```
 1                   IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3    UNITED STATES OF AMERICA,         )   Docket No. 19 CR 864-4
                                        )
 4                    Plaintiff,        )   Chicago, Illinois
                                        )   December 9, 2019
 5               v.                     )   10:05 a.m.
                                        )
 6    ASHIK DESAI,                      )
                                        )
 7                    Defendant.        )

 8                TRANSCRIPT OF PROCEEDINGS - Arraignment/Plea
                  BEFORE THE HONORABLE THOMAS M. DURKIN
 9
      APPEARANCES:
10
      For the Government:    MR. MATTHEW F. MADDEN
11                           Assistant United States Attorney
                             Honorable John R. Lausch Jr.
12                           United States Attorney
                             219 S. Dearborn Street
13                           5th Floor
                             Chicago, IL 60604
14
                             MR. KYLE C. HANKEY
15                           Assistant United States Attorney
                             United States Department of Justice
16                           Criminal Division, Fraud Section
                             1400 New York Avenue NW
17                           Washington, DC 20530

18    For the Defendant:     MR. MICHAEL D. MONICO
                             MS. JACQUELINE S. JACOBSON
19                           Monico & Spevack
                             20 S. Clark Street
20                           Suite 700
                             Chicago, IL 60603
21
      Also Present:          MR. ASHIK DESAI
22                           MS. JUDITH LESCH, Pretrial Services

23    Court Reporter:        LAURA R. RENKE, CSR, RDR, CRR
                             Official Court Reporter
24                           219 S. Dearborn Street, Room 1432
                             Chicago, IL 60604
25                           312.435.6053
                             laura_renke@ilnd.uscourts.gov
```

1    (In open court; defendant present.)

2        THE CLERK:  19 CR 864, United States of America v.

3    Ashik Desai.

4        MR. MADDEN:  Good morning, your Honor.  Matthew Madden

5    and Kyle Hankey on behalf of the United States.

6        THE COURT:  Good morning.

7        MR. MONICO:  Good morning, your Honor.  Michael Monico

8    and Jacqueline Jacobson on behalf of Mr. Ashik Desai, who is

9    present.

10        THE COURT:  Okay.

11        MS. LESCH:  Good morning, your Honor.  Judith Lesch on

12    behalf of pretrial services.

13        THE COURT:  All right.  Good morning.

14        We are here for an initial appearance and I believe a

15    change of plea.

16        MR. MONICO:  Yes, your Honor.

17        THE COURT:  Okay.  For the record, I should put --

18    I've known Mr. Monico since he and I were in the

19    U.S. Attorney's Office together for a brief time back in 1980.

20    And then I've had cases against him, trials against him.  And

21    then he has spoken in my law school classes at DePaul and John

22    Marshall several times.  We're friends, but not such that I

23    feel the need to recuse myself.  But I put it on the record as

24    a matter of disclosure.  And if you feel differently,

25    Mr. Madden, you're free to file a motion to recuse.

1      MR. MADDEN:  Thank you, your Honor.  We see no issue

2  with it.

3      THE COURT:  Okay.  All right.

4      Well, then I think the first step would be to go

5  through the change of plea, and then we'll deal with bond

6  issues.

7      Certainly the pretrial services officer can have a

8  seat.

9      MS. LESCH:  Thank you, your Honor.

10      MR. MADDEN:  Should we do the arraignment first?

11      THE COURT:  I think we need -- actually, I misspoke.

12  We should arraign first, and then we'll do the change of plea.

13      All right.  Mr. Monico, have you received a copy of

14  the indictment in this case?

15      MR. MONICO:  Yes, your Honor.  We acknowledge receipt

16  of the indictment and waive reading of it.

17      THE COURT:  All right.

18      MR. MONICO:  And we will enter a plea of guilty to it

19  today, your Honor.

20      THE COURT:  All right.  What is the maximum penalty?

21      MR. MADDEN:  Your Honor, there's a -- he's charged

22  with wire fraud.  The maximum penalty is 20 years'

23  imprisonment.  The maximum term of supervised release is three

24  years.  The maximum potential fine is $250,000.  And there's a

25  $100 special assessment.

1          THE COURT:  All right.  So in light of the maximum

2   penalties, the -- there's been a waiver of the indictment --

3   waiver of the reading of the indictment, and there's going to

4   be an entry of a plea of guilty today.

5          Does that satisfy things for an arraignment?

6          MR. MADDEN:  Yes.

7          THE COURT:  All right.  Then let's please swear in the

8   defendant.  He should switch places with you, Mr. Monico, so he

9   can stand in front of the microphone.

10          THE CLERK:  Raise your right hand, please.

11     (Defendant duly sworn.)

12          THE DEFENDANT:  I do.

13          THE COURT:  All right, sir.  Do you understand you're

14   now under oath, and if you answer any of my questions falsely,

15   your answers may later be used against you in another

16   prosecution for perjury or making a false statement?

17          THE DEFENDANT:  Yes, your Honor.

18          THE COURT:  All right.  I understand you decided to

19   offer a plea of guilty.  Before I make a decision whether or

20   not to accept your plea of guilty, I must determine you're

21   competent to plead guilty at this time, you've had the

22   assistance of counsel, you understand your trial rights, you

23   understand the nature of the charges against you, and your plea

24   is voluntary and that there's a factual basis for your plea.

25          You've been placed under oath, and I'm going to ask

1    you some questions, and I'll give you advice about your rights.

2    At any time during these proceedings, you can consult with your

3    lawyer.  If you don't understand a question or a statement, get

4    my attention.  I'll interrupt the proceeding and allow you to

5    talk to your lawyers.

6              Do you understand what I've told you?

7              THE DEFENDANT:  Yes, your Honor.

8              THE COURT:  All right.  What's your name?

9              THE DEFENDANT:  Ashik Desai, your Honor.

10             THE COURT:  And how old are you?

11             THE DEFENDANT:  26 years old.

12             THE COURT:  Where do you live?

13             THE DEFENDANT:  Philadelphia, Pennsylvania.

14             THE COURT:  What's your marital status?

15             THE DEFENDANT:  I'm unmarried.

16             THE COURT:  What's the highest level you achieved in

17   school?

18             THE DEFENDANT:  I'm currently a student pursuing my

19   master's in business administration.

20             THE COURT:  All right.  Can you speak, read, write,

21   and understand English?

22             THE DEFENDANT:  Yes, your Honor.

23             THE COURT:  And that's your primary language?

24             THE DEFENDANT:  Yes, your Honor.

25             THE COURT:  What kind of work have you done in the

1    last few years?

2             THE DEFENDANT:  Prior to starting school, I worked at

3    Outcome Health, a company here in Chicago.

4             THE COURT:  All right.  Did you work in between

5    Outcome Health and school, or is that your last job?

6             THE DEFENDANT:  I had an internship for three or four

7    months with another health care company here in Chicago.  But

8    it was not a full-time job, your Honor.

9             THE COURT:  All right.  And you're going to school

10   full time now?

11            THE DEFENDANT:  Yes, your Honor.

12            THE COURT:  All right.  Are you in good physical

13   health?

14            THE DEFENDANT:  Yes, your Honor.

15            THE COURT:  Have you taken any drugs or alcoholic

16   beverages within the last 24 hours?

17            THE DEFENDANT:  No, your Honor.

18            THE COURT:  Have you ever been under the care of a

19   doctor for a mental condition?

20            THE DEFENDANT:  No, your Honor.

21            THE COURT:  Does either the government or defense have

22   any doubt as to defendant's competence to plead guilty at this

23   time?

24            MR. MONICO:  No, your Honor.

25            MR. MADDEN:  No, your Honor.

1          THE COURT:  All right.  I find the defendant is

2   competent to offer a plea of guilty.

3          Tell me the name of the attorneys that are

4   representing you in this case.

5          THE DEFENDANT:  Michael Monico and Jackie Jacobson,

6   your Honor.

7          THE COURT:  Have you received a copy of the indictment

8   that's pending against you in this case?

9          THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  Have you had enough time to talk to your

11   attorneys to discuss the case?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  Have you told them everything there is to

14   tell them about the case from your perspective?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  Have they done everything you wanted them

17   to do?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  Have they done anything you didn't want

20   them to do?

21          THE DEFENDANT:  No, your Honor.

22          THE COURT:  Are you satisfied with Ms. Jacobson and

23   Mr. Mon -- and Mr. Monico's representation of you?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  Now, I know you've decided not to have a

1    trial and to plead guilty, but I want to explain to you your

2    trial rights that you're giving up by pleading guilty.  Under

3    the Constitution and laws of the United States, you're entitled

4    to a trial by jury on the charges against you.

5            Do you understand that?

6            THE DEFENDANT:  Yes, your Honor.

7            THE COURT:  You have a right to plead not guilty and

8    to persist in a not-guilty plea.

9            Do you understand that?

10           THE DEFENDANT:  Yes, your Honor.

11           THE COURT:  If you plead not guilty and you have a

12   trial, you'd have a right to a public and speedy trial, and

13   you'd have a right to be in the courtroom at all phases of the

14   trial and to present and object to evidence.

15           Do you understand that?

16           THE DEFENDANT:  Yes, your Honor.

17           THE COURT:  You'd have a right to be represented by

18   counsel of choice at trial or to be appointed counsel if you

19   can't afford one; and your counsel would have a right to make

20   arguments on your behalf, present evidence, object to evidence,

21   and cross-examine witnesses.

22           Do you understand these rights?

23           THE DEFENDANT:  Yes, your Honor.

24           THE COURT:  You'd have a right to see and hear all the

25   witnesses called to testify against you and use the subpoena

1    power of the Court to obtain the attendance of witnesses.  A

2    subpoena is simply a document which requires any person to come

3    to court that you and your attorneys want to come to court to

4    testify in your defense.

5          Do you understand that?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  At trial you wouldn't have to prove you're

8    innocent, and, indeed, you'd be presumed to be innocent.  The

9    government would be required to prove you guilty by competent

10    evidence beyond a reasonable doubt.

11          Do you understand these rights?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  At trial you'd have a right to testify if

14    you chose to do so.  You'd also have a right not to testify.

15    No inference or suggestion of guilt could be drawn from the

16    fact you didn't testify.

17          Do you understand that?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  If the trial is a jury trial, the jury

20    would be composed of 12 laypersons selected at random.  You and

21    your attorney would have an opportunity to exclude jurors for

22    cause if bias or disqualification is shown and also to exclude

23    a specific number of jurors without cause.

24          Do you understand that?

25          THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  A jury would have to agree unanimously

2  before you could be found guilty.

3          Do you understand that?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  Should also be advised a trial can either

6  be a jury trial or a trial by a judge without a jury, which is

7  called a bench trial.  I'd be the judge in a bench trial.  You

8  can have a bench trial if you, the government, and I all agree

9  to that procedure.

10         Do you understand that?

11         THE DEFENDANT:  Yes, sir.  Yes, your Honor.

12         THE COURT:  At trial, a judge or jury would be guided

13  by the same rule which requires that guilt be determined beyond

14  a reasonable doubt.

15         Do you understand that?

16         THE DEFENDANT:  Yes, your Honor.

17         THE COURT:  If at trial you're found guilty, you'd

18  have a right to appeal.  Some possible bases for an appeal of a

19  trial verdict include insufficient evidence, pretrial or trial

20  errors by the judge, and violations of your rights by the

21  prosecution during pretrial or trial stages.

22         Do you understand that?

23         THE DEFENDANT:  Yes, your Honor.

24         THE COURT:  Have you discussed your trial rights with

25  your attorneys?

1    THE DEFENDANT:  Yes, your Honor.

2    THE COURT:  If you plead guilty and I accept your

3    plea, there will not be a trial.  And I'll enter a finding of

4    guilty today and sentence you in the future on the basis of

5    your plea after I consider all factors in your case, including

6    a presentence investigation report.

7    Do you understand that?

8    THE DEFENDANT:  Yes, your Honor.

9    THE COURT:  Is there a written plea agreement?

10    MR. MADDEN:  Yes, your Honor.

11    THE COURT:  All right.  I'll ask this of counsel.

12    Have any other agreements been made or promises that are not in

13    writing?

14    MR. MONICO:  No, your Honor.

15    THE COURT:  And from the government?

16    MR. MADDEN:  No, your Honor.

17    (Document tendered to the Court.)

18    THE COURT:  All right.  The courtroom deputy is going

19    to show you a copy of this plea agreement.  There's signatures

20    above the names of the attorneys for the government and above

21    your attorneys' names.  I'm going to ask you, is that your

22    signature?

23    THE DEFENDANT:  Yes, your Honor.

24    THE COURT:  Did you read this document before you

25    signed it?

1           THE DEFENDANT:  Yes, your Honor.

2           THE COURT:  Did you discuss this plea agreement with

3      your attorneys?

4           THE DEFENDANT:  Yes, your Honor.

5           THE COURT:  Did anyone pressure you to sign this plea

6      agreement?

7           THE DEFENDANT:  No, your Honor.

8           THE COURT:  Did you sign this plea agreement

9      voluntarily?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  Under the plea agreement, you're pleading

12     guilty to Count VI of the superseding indictment.

13          Do you understand that?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  I'm now going to explain to you what the

16     consequences are when you plead guilty.

17          If I accept your plea of guilty, you'll be judged

18     guilty of a felony; and that adjudication of guilt may deprive

19     you of valuable civil rights such as the right to vote, the

20     right to hold public office, the right to serve on a jury, and

21     the right to possess firearms.

22          Do you understand that?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  And are you a United States citizen?

25          THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  Were you born in the United States or

2     naturalized?

3          THE DEFENDANT:  Born in the United States, your Honor.

4          THE COURT:  All right.  Now, this indictment and plea

5     agreement are matters of public record and may be disclosed to

6     any party.

7          Do you understand that?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  Will the government's attorney please

10    state what the maximum penalties are in this case.

11         MR. MADDEN:  Yes, your Honor.

12         If the defendant's convicted, there's a maximum term

13    of imprisonment of 20 years, a maximum term of supervised

14    release of three years, a maximum fine of $250,000, and a

15    special assessment of $100.

16         THE COURT:  And is there restitution that's mandatory?

17         MR. MADDEN:  There is mandatory restitution.  We're

18    going to determine that amount at the time of sentencing, your

19    Honor.

20         THE COURT:  What is the approximate amount overall in

21    the case?

22         MR. MADDEN:  It is -- it's between 250,000 --

23    $250 million and $550 million, your Honor.

24         THE COURT:  All right.

25         Sir, do you understand what the maximum penalties are

1   in this case?

2           THE DEFENDANT:  Yes, your Honor.

3           THE COURT:  And there's a mention of supervised

4   release.  That's something that follows any jail sentence if

5   one is imposed.  And there are conditions of supervised

6   release, and if you violate those conditions, you can go back

7   to jail if you're originally sentenced to jail.

8           Do you understand that?

9           THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  That effectively raises the maximum

11  because it adds more jail time to a potential sentence.

12          Do you understand that?

13          THE DEFENDANT:  Yes, your Honor.

14          THE COURT:  What's the government's preliminary

15  calculation of the offense level of the defendant and the

16  criminal history category and the resulting guideline range?

17          MR. MADDEN:  Your Honor, his criminal history category

18  is I.  He has no criminal history.

19          The offense level calculations are set out on pages 13

20  and 14 of the plea.  His base offense level is 7 under

21  2B1.1(a), your Honor.

22          After that, 28 levels are added because the loss

23  exceeded 250 million but did not exceed 550 million.

24          Two levels are added because the -- after that because

25  the offense involved ten or more victims.

1         An additional two levels are added because the offense

2    involved sophisticated means.

3         Three levels are added after that because the

4    defendant was a manager and supervisor of criminal activity

5    that involved five or more participants.

6         Three levels are subtracted because of the defendant's

7    acceptance of responsibility.

8         And if you do that math, it comes out to an offense

9    level of 39.

10        With a criminal history category of I, that results in

11   an anticipated advisory sentence -- guideline sentencing range

12   of 262 to 327 months.  However, because the statutory maximum

13   is 240 months on wire fraud, that becomes under the guidelines

14   the anticipated guideline range of 240 months.

15        THE COURT:  Does defense agree with these preliminary

16   calculations?

17        MR. MONICO:  Yes, your Honor.

18        THE COURT:  All right.  Sir, have you and your

19   attorneys -- have you talked to your attorneys about how the

20   Sentencing Commission guidelines might apply to your case?

21        THE DEFENDANT:  Yes, your Honor.

22        THE COURT:  I'm not going to be able to determine the

23   guideline range for your case until after the presentence

24   report has been completed and you and the government have had

25   an opportunity to challenge the facts and calculations reported

1    by the probation officer.

2           Do you understand that?

3           THE DEFENDANT:  Yes, your Honor.

4           THE COURT:  You also understand that after your

5    initial advisory guideline range has been determined, I have

6    the authority to depart, or vary, upward or downward from that

7    range, although I really -- I can't go beyond the statutory

8    maximum, but I can depart and vary below that amount.  And I

9    have to examine other statutory sentencing factors that may

10   result in the imposition of a sentence that's either greater --

11   well, that's lesser than the advisory guidelines sentence.  It

12   can't be any greater because it is the statutory maximum.

13          Do you understand that?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  You also understand parole has been

16   abolished, and if you're sentenced to a period of imprisonment,

17   you're going to do the majority of time in jail.  You get good

18   time credit if you follow the rules of the jail, but,

19   otherwise, any sentence of imprisonment, you'll do the majority

20   of time in prison.

21          Do you understand that?

22          THE DEFENDANT:  Yes, your Honor.

23          THE COURT:  And, sir, if the sentence is more severe

24   than you expected, you'll still be bound by your plea of guilty

25   and you have no right to withdraw it.

1          Do you understand that?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  Now, there are other agreements in this

4   plea agreement.  Is that correct?

5          MR. MADDEN:  Yes, your Honor.

6          THE COURT:  Why don't you outline them, Mr. Madden.

7          MR. MADDEN:  Your Honor, this is a cooperation

8   agreement between the defense and -- and the government, and

9   that is set forth on pages 16 and 17 of the agreement.  The

10  defendant has been cooperating with the government, and he's

11  agreed to fully and continue fully and truthfully cooperating

12  with the government in any matter that he's called upon to

13  testify by the government.  That includes pretrial preparation.

14  It also includes truthful testimony at any trial that he's

15  called upon to testify.

16          He also has agreed to postpone his sentence until the

17  case is resolved against his codefendants.  At the time of his

18  sentencing, the government will make known to you the extent of

19  the defendant's cooperation.  And if we have determined that

20  he's continued to cooperate and provide truthful and full

21  cooperation as required by the agreement, we will move the

22  Court under Guideline 5K1.1 to depart downward from the low end

23  of the applicable guideline range.

24          And we'll recommend a specific sentence that includes

25  a term of imprisonment in the custody of the Bureau of Prisons,

1    and that recommendation will not be greater than ten years'

2    imprisonment.  The defendant is free to recommend any sentence,

3    but, of course, the ultimate decision to depart from the

4    guideline range rests with the Court.

5              THE COURT:  And when you say depart from the low end

6    of the applicable guideline range, it's really departing from

7    what is the -- the guideline range of 240 months.

8              MR. MADDEN:  Correct.

9              THE COURT:  All right.  Does defense agree with

10   this -- what is necessarily a summary of the plea agreement?

11             MR. MONICO:  Yes, your Honor.

12             THE COURT:  All right.  And is there a waiver of

13   appeal in this case?

14             MR. MADDEN:  Yes, your Honor.  There is a waiver of

15   his right to appeal both the conviction and sentence, and that

16   is on page 22 of the agreement.

17             THE COURT:  All right, sir.  And do you understand by

18   pleading guilty, if the government makes the departure motion

19   that they've indicated they will make if you fully and

20   truthfully cooperate, that you waive any errors that occur

21   today, waive any errors that may occur at your sentencing, and

22   the only thing you don't waive is if you believe you're --

23   received ineffective assistance of counsel or you're

24   incompetent to plead guilty or be sentenced -- so competency

25   issues -- and then if there's a change in law relating to the

1    guidelines that favor you; but other than those three limited

2    circumstances, you have no right to appeal?

3         Do you understand that?

4         THE DEFENDANT:  Yes, your Honor.

5         THE COURT:  All right.  Have I correctly stated what

6    the agreement is as to the waiver of appeal?

7         MR. MADDEN:  Yes, your Honor.

8         THE COURT:  All right.  Defense agrees?

9         MR. MONICO:  Yes, your Honor.

10        THE COURT:  All right.

11        All right, sir.  Has anyone forced you in any way to

12   plead guilty?

13        THE DEFENDANT:  No, your Honor.

14        THE COURT:  Has anyone threatened you in any way to

15   cause you to plead guilty?

16        THE DEFENDANT:  No, your Honor.

17        THE COURT:  You've acknowledged you signed this plea

18   agreement, correct?

19        THE DEFENDANT:  Yes, your Honor.

20        THE COURT:  Other than the plea agreement, have any

21   promises been made to you to cause you to plead guilty?

22        THE DEFENDANT:  No, your Honor.

23        THE COURT:  Is your decision to plead guilty entirely

24   voluntary?

25        THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  Have any promises been made to you about

2     what your sentence will be?

3          THE DEFENDANT:  No, your Honor.

4          THE COURT:  The final decision as to what your

5     sentence will be rests with me, and I may sentence you to a

6     longer period of incarceration or a shorter period of

7     incarceration than you expect.

8          Do you understand that?

9          THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  Now, I have to be convinced you're guilty

11     beyond a reasonable doubt before I'll accept your plea of

12     guilty, so listen carefully to what the government attorney

13     says the evidence will show.  I'm going to ask you at the end

14     of what he says on whether or not you agree with what he said,

15     whether you disagree with any parts of it, and whether you wish

16     to add to it.

17          Then I'm going to ask you to tell me in your own words

18     what you did.  It's not meant to be nearly as lengthy as what I

19     expect the government is going to say, and it is not meant to

20     be a statement in mitigation.  It is simply a -- I need to hear

21     from you words other than "yes" and "no" so I know that you are

22     acknowledging guilt and that you've done things that are, in

23     fact, crimes.

24          So the first step, though, is to have the government

25     outline what the evidence would be if this case went to trial

1    on Count VI of the superseding indictment.

2              MR. MADDEN:  Thank you, your Honor.

3              If this case went to trial, the government would prove

4    the following facts beyond a reasonable doubt:

5              Beginning no later than 2013 and continuing until at

6    least 2017, at Chicago, in this district, and elsewhere, Ashik

7    Desai, the defendant here, along with Rishi Shah, Shradha

8    Agarwal, and Brad Purdy, and with others known and unknown,

9    knowingly devised, intended to devise, and participated in a

10   scheme to defraud Outcome Health's clients, investors, and to

11   obtain -- and investors and to obtain money and property by

12   means of materially false and fraudulent pretenses,

13   representations, and promises.

14             THE COURT:  Hang on one second.  Are you going to be

15   essentially reading from the plea agreement?

16             MR. MADDEN:  Yes.

17             THE COURT:  Why don't I give this to my courtroom

18   deputy so she can hold it next to my court reporter.

19             MR. MADDEN:  Page 2 at the bottom.

20             THE COURT:  And if anyone wants to -- this is going to

21   be lengthy.  If anyone wants to have a seat while this is being

22   read, feel free to sit down.

23             MR. MADDEN:  I've got an extra copy if that would be

24   helpful.

25             THE COURT:  I'll take an extra, yeah.

1          THE CLERK:  Let's do this.

2          THE COURT:  And if anyone wants to have a seat, you're

3    free to have a seat because this is going to take a while.

4          Okay.  Proceed.

5          MR. MADDEN:  Thank you.

6          Outcome, a Delaware corporation with headquarters

7    located in Chicago, Illinois, provided point-of-care

8    advertising services to pharmaceutical, or "pharma," companies.

9    Outcome's business model was to place television screens,

10   tablets, and wall boards that displayed educational content

11   into doctors' offices and then sell advertising space on those

12   devices to pharma companies.

13         Rishi Shah and Individual A founded Outcome in 2006.

14   Desai started as a summer intern at Outcome during the summer

15   of 2012 when he was a college student.  Desai later accepted a

16   job offer from Outcome and started at Outcome in approximately

17   July 2013 as vice president of business growth and analytics.

18   During his employment at Outcome, Desai reported to Shah, the

19   cofounder and chief executive officer of Outcome.

20         List match and deltas:  One of Desai's

21   responsibilities after he started in 2013 was to conduct list

22   matches to support the process of contracting with pharma

23   clients.  Specifically, when negotiating a new contract with

24   Outcome, pharma clients typically gave Outcome's salespeople a

25   list of doctors' offices in which they wanted their ads to

1    play.  Part of Desai's job was to take these lists and match

2    them against the offices in Outcome's network.  This process

3    was called a "list match."  Brad Purdy, Outcome's chief

4    operating officer and later its chief financial officer, and

5    Individual A performed list matches before Desai joined

6    Outcome.

7         I want to make one change.  "Individual A" should be

8    "Individual B" because that's different than the person that

9    cofounded Outcome.  It's another -- it's a former employee of

10   Outcome Health.

11        THE COURT:  All right.  I'm going to change it on the

12   original plea agreement.  And then when you're done with your

13   factual recitation, I'm going to ask the government attorney,

14   defense attorney, and the defendant to initial it.

15        MR. MADDEN:  Thank you, your Honor.

16        THE COURT:  It's on page 3.

17        Go ahead.

18        MR. MADDEN:  Brad Purdy and Individual B performed

19   list matches before Desai joined Outcome.  After Desai joined

20   Outcome, he performed list matches until approximately sometime

21   in 2014, when Analyst A started at Outcome, and then Analyst A

22   took over that responsibility under Desai's supervision.

23        Desai learned Outcome's list match methodology by

24   observing Purdy and Individual B -- that should be changed

25   too --

1    THE COURT: All right.

2    MR. MADDEN: -- perform list matches and by watching

3 the internal and external communications of Shah, Outcome's

4 president Shradha Agarwal, Purdy, and others regarding list

5 matches and related issues. Desai then passed on what he

6 learned to Analyst A. The methodology involved inflating the

7 match by representing to clients that Outcome had in its

8 network a higher number of doctors' offices on the clients'

9 lists than Outcome actually had.

10    The result of the list match process was that Outcome

11 was selling inventory it did not have. This created a number

12 of problems, including under-delivering on campaigns while

13 still billing the clients as if Outcome had delivered in full.

14 Outcome delivered in several ways: (1) --

15    THE COURT: I believe you meant "under-delivered."

16    MR. MADDEN: I'm sorry.

17    Outcome under-delivered in several ways: (1) Outcome

18 did not run the ads on the contracted number of screens; and

19 (2) even when Outcome was running ads on the contracted number

20 of screens or even above the contracted number, Outcome

21 oftentimes was not running the ads in the correct offices, that

22 is, the offices "matched" during the list match process.

23    Internally, Outcome referred to the difference between

24 the contracted number of screens and the actual number of

25 screens where Outcome was running the campaigns as the "delta"

or the "gap." Despite these deltas or gaps, and despite also
running ads in off-target offices, Outcome billed the clients
at the contracted number of screens as if it had been
delivering in full on the contracts.

From at least approximately 2014 forward, Desai and
others at Outcome began to track the deltas or gaps in the ad
campaigns. Sometimes this was done informally in e-mails, and
other times it was done in spreadsheets. Desai, Shah, Purdy,
Agarwal, and others discussed the campaign deltas at leadership
retreats.

Tablets: When Desai first started working at Outcome,
Outcome was selling advertising space on TVs that it placed in
waiting rooms. In approximately late 2013 or early 2014,
Outcome introduced another product: tablets. Tablets were
interactive iPad-like products that were placed in exam
rooms. Outcome had numerous problems with the tablets,
including particularly large deltas, but continued to bill
clients as if Outcome had delivered in full on its contracts.

Desai and others at Outcome, including Analyst A, sent
some of the pharma clients regular reports regarding the
patients' engagement with the Outcome tablets, including the
number of clicks by patients. Desai and Analyst A inflated
these numbers in order to conceal the deltas. Purdy was aware
that the tablet metrics were inflated. One way that Desai
inflated the tablet metrics was, using the data Outcome had for

1    tablet metrics, to take the top 5 percent of the results and

2    then extrapolate these numbers for all of the Outcome tablets

3    in the campaign.  By doing this, Outcome was ignoring

4    95 percent of the results that showed lower patient engagement

5    with tablets.  On occasions when Desai and Analyst A inflated

6    the tablet metric numbers but did not use the 5 percent

7    inflation method, they just made up the numbers as they saw

8    fit.

9         Desai and Analyst A inflated the numbers heavily;

10   sometimes the inflated number reported to the clients was more

11   than 100 times the actual patient engagement numbers Outcome

12   had.  During approximately 2014, Desai told Agarwal about how

13   Outcome was inflating the tablet metrics that Outcome sent to

14   clients.  Agarwal did not say anything in response when Desai

15   told her about the inflated metrics.  Desai and Analyst A

16   continued to inflate tablet metrics after Desai had this

17   conversation with Agarwal.

18        Concealing the deltas from accounting and the outside

19   auditor:  Outcome hired an accounting firm, which I will refer

20   to as Auditor A, to audit its financial statements for the year

21   2015.  As part of the 2015 audit, Auditor A tested whether

22   Outcome delivered on its contracts by requesting data about

23   some of Outcome's 2015 campaigns.  Outcome understood -- excuse

24   me -- Desai understood that the data request was a potential

25   problem because, in fact, Outcome had under-delivered on

1    numerous campaigns in 2015, and Auditor A and the internal

2    Outcome accounting team were not aware of the under-deliveries.

3    Desai understood that if Outcome disclosed the under-deliveries

4    to the internal accounting team and Auditor A, it would bring

5    scrutiny and questions.  Desai was worried that if Outcome

6    disclosed the under-deliveries to accounting and Auditor A,

7    Outcome's clients would find out, which had the potential to

8    cost Outcome millions of dollars as clients may have stopped

9    working with Outcome.

10         During his time at Outcome, Desai learned that revenue

11   can only be recognized when there is delivery.  Because Outcome

12   had under-delivered on a number of campaigns but billed the

13   clients as if Outcome had delivered on the campaigns in full,

14   disclosure of the deltas to accounting and Auditor A would have

15   impacted the prior year's revenue.  Likewise, if Outcome

16   disclosed the deltas to clients, clients would demand refunds

17   or make-goods, and Outcome would have to lower its prior year's

18   revenue.

19         Desai asked Purdy for guidance on this issue.  Desai

20   and Purdy discussed how large of a delta Outcome could show to

21   the Outcome accountants and Auditor A.  Desai and Purdy decided

22   that Outcome could only show deltas of less than 10 percent and

23   that for ad campaigns on Auditor A's list that had deltas of

24   greater than 10 percent, Outcome would create a false list of

25   offices by including offices where the devices had not been

1    installed or were currently uninstalled.  The purpose of adding

2    these uninstalled devices or offices to the list was to conceal

3    the deltas from accounting and Auditor A.  After these

4    discussions with Purdy for campaigns that had deltas of more

5    than 10 percent, Desai told an analyst to add numerous device

6    IDs of tablets or TVs to the lists for the auditors when in

7    fact ads did not run on those devices.

8          For the 2016 audit, which occurred in early 2017,

9    Desai told analysts to do the same thing.

10         ROI reports:  Outcome agreed to have third-party

11   companies, including one that will be referred to as

12   Measurement Company A, measure the performance of Outcome's

13   advertising campaigns, and then Outcome provided that

14   information to some of its clients.

15         The performance reports reflected some key numbers,

16   including: (1) the number of offices or doctors where Outcome

17   ads ran; (2) the increase or decrease in prescriptions in those

18   offices as compared to the similar offices where the ads did

19   not run, which was referred to as the "lift" or "prescription

20   lift"; and (3) incremental revenue gained by the client based

21   on the performance of Outcome's ad campaigns, which was used to

22   calculate the ROI.

23         When Measurement Company A completed the reports, a

24   Measurement Company A employee typically sent them to Desai

25   and/or another Outcome employee.  Because Outcome had so many

significant deltas on its ad campaigns, the results in the
reports were often poor.  Consequently, Desai altered the key
numbers in the reports before the information was sent to
clients.  Desai did this in order to continue the concealment
of under-deliveries from the clients and to make it appear that
Outcome had delivered in full on its ad campaigns and that the
ad campaigns performed well.

After getting the reports from Measurement Company A,
Desai often altered, among other things, the number of offices
or doctors from the number reflected in the report -- often
lower than the contracted number due to the deltas -- to the
contracted number of offices or doctors to conceal the deltas
and make it appear that Outcome delivered on the contract, and
Desai inflated the prescription lift to make it appear that
Outcome's ads were successful, and he changed the incremental
revenue number to make it appear that the ad campaign drove a
significant increase in revenue for the client that met or
exceeded any contractual ROI guarantee.

After changing the key numbers and shortening the
number of slides, Desai sent the altered PowerPoint slides to
the client or sent them to another Outcome employee who he knew
would send them to the client.  Desai also sometimes presented
the PowerPoint slides to clients.

False affidavits:  Many clients required Outcome to
provide some proof -- such as affidavits -- that Outcome

1    actually ran their ads on the number of screens as agreed in

2    the contracts.  Outcome regularly sent false monthly affidavits

3    to clients.  They were false because Outcome had deltas on many

4    ad campaigns, but in the affidavits, Outcome represented that

5    the ads had run on the contracted number of screens, which

6    concealed the deltas from the clients.  The affidavits were

7    typically sent to the client together with the monthly invoice

8    for that particular campaign, billing the client for the number

9    of screens set out in the contract.  Starting in approximately

10   2014, Desai began signing many false affidavits.  Later, others

11   just affixed Desai's electronic signature to the affidavits.

12   Before Desai first started signing affidavits in 2014, Desai

13   saw prior affidavits Outcome had sent to clients and noticed

14   that the affidavits reflected the contracted number of screens,

15   even when he knew Outcome had not delivered on the contracted

16   numbers.

17          In late 2016, Desai discussed the false affidavits in

18   a lengthy voice message he left for Shah and Purdy.  During

19   that call, Desai mentioned, among other things, the --

20   quote/unquote -- "massive inventory gaps" that Outcome had on

21   ad campaigns.  Desai cautioned against calling attention to

22   those massive inventory gaps, noting it would cause revenue

23   risk and account relationship issues.

24          Capital raise:  During 2016 and 2017, Shah and Purdy

25   met with numerous investors to raise capital for Outcome.

1    Desai knew about Shah and Purdy's efforts to raise capital

2    because, at Shah and/or Purdy's direction, Desai talked to --

3    talked with some of the potential investors about Outcome's

4    business and answered their questions about the business.

5    Desai knew that the potential investors had been provided with

6    Outcome's financial information.  Since Desai knew about

7    Outcome's deltas and because he knew that the deltas had been

8    concealed from the clients and Auditor A, Desai knew that some

9    of the financial information provided to investors, including

10   revenue, was inflated.

11        Before they invested, the investors were provided

12   access to a data room that contained, among other things,

13   Outcome's financial statements and more than 20 Measurement

14   Company A performance reports.  As indicated above, financial

15   information in the financial statements, including Outcome's

16   revenue, was false, as were key numbers in many of the

17   performance reports in the data room.  Such information was

18   material to the investors.  Between approximately March and

19   July 2017, Outcome raised approximately $487.5 million from

20   investors.  The $487.5 million capital raise resulted in a

21   distribution of 225 million to Shah and Agarwal.

22        Departure from Outcome Health:  During approximately

23   July or August 2017, Desai learned that a reporter was reaching

24   out to numerous former and current Outcome employees and asking

25   questions about Outcome's business practices.  Before the

1    article was published, Outcome placed Desai on leave.  Desai
2    later resigned.
3         Amount of loss:  The amount of loss to pharma clients
4    and investors due to the fraud that was reasonably foreseeable
5    to Desai was more than $250 million but less than $550 million.
6         Wire execution:  On or about February 26, 2016, at
7    Chicago, in the Northern District of Illinois, and elsewhere,
8    defendant Ashik Desai, for the purpose of executing the scheme,
9    knowingly transmitted and caused to be transmitted by means of
10   wire communication in interstate commerce certain writings,
11   signs, and signals, namely, an e-mail message from Ashik Desai
12   to Brad Purdy, which was routed through Google's computer
13   services -- servers located outside the state of Illinois,
14   asking for Purdy's guidance on how to conceal the deltas on
15   advertising campaigns from Auditor A.
16        THE COURT:  All right, sir.  Have you heard the
17   statement of the government?
18        THE DEFENDANT:  Yes, your Honor.
19        THE COURT:  Is the statement correct?
20        THE DEFENDANT:  Yes, your Honor.
21        THE COURT:  Do you disagree with any part of the
22   statement?
23        THE DEFENDANT:  No, your Honor.
24        THE COURT:  Do you wish to add to any part of the
25   statement?

1    THE DEFENDANT:  No, your Honor.

2    THE COURT:  Now, you've already signed the plea

3 agreement in which you've admitted to these facts, correct?

4    THE DEFENDANT:  Yes, your Honor.

5    THE COURT:  And the government's attorney has

6 summarized those facts.

7    As I mentioned earlier, I ask defendants who plead

8 guilty in front of me to give me a brief statement of what they

9 did.  I don't know if you've had a chance to talk to your

10 lawyers about this.  I would advise you to do so if you

11 haven't, and I'll give you the opportunity if you need that

12 time.

13    Otherwise, I'm going to ask you to tell me in your own

14 words what you did, understanding this is not meant to be a

15 statement in mitigation.  There will be time for that at

16 sentencing.  And it's just something I can -- make me

17 comfortable with the fact that you are not just saying "yes"

18 and "no" to everything and you actually understand what you're

19 pleading guilty to.

20    Are you prepared to make a statement?

21    THE DEFENDANT:  Yes, your Honor.

22    THE COURT:  All right.  Proceed.

23    THE DEFENDANT:  Your Honor, I agree with Mr. Madden's

24 factual summary.

25    When I worked at Outcome Health, there were practices

1    going on there that were wrong, and I participated in those

2    practices that wound up defrauding Outcome's customers.  Those

3    practices included selling inventory that was not there,

4    falsely inflating data, and concealing deltas from Outcome's

5    customers, other people at Outcome, and auditors.

6         I personally hid the deltas by changing key numbers in

7    the ROI reports that were being sent to Outcome's customers.

8    Among other things, this led to inflated revenue for the

9    company and overbilling of Outcome's customers.

10        THE COURT:  All right.  All right.  Thank you.

11        I -- there were two typos in the plea agreement that

12   I'm going to ask the parties to initial.  I have tabs on the

13   first two.

14        Before I get to that, I have a couple further

15   admonitions.  On the agreements relating to sentencing, you

16   understand, sir, if the government doesn't make a motion for

17   departure based on your cooperation, then the government's free

18   to recommend any sentence up to the statutory maximum.

19        Do you understand that?

20        THE DEFENDANT:  Yes, your Honor.

21        THE COURT:  And also there's an agreement on

22   restitution, which the parties agreed that any restitution

23   obligation of the defendant as to Outcome clients is offset by

24   payments made by Outcome to clients, including $65,468,489 in

25   payments and in-kind services that Outcome has made or is

1    committed to make to Outcome's clients.

2              Do you understand that?

3              THE DEFENDANT:  Yes, your Honor.

4              THE COURT:  So the very large restitution number

5    stated by the government is going to be offset by payments that

6    Outcome has actually made or promised to make.

7              MR. MADDEN:  Correct, your Honor.

8              THE COURT:  All right.  Do you understand that, sir?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  All right.  I'm going to give back the

11   original then and ask that the two changes in the plea

12   agreement's factual basis be initialed by the government, the

13   defense, and the defendant.

14        (Counsel conferring.)

15             THE CLERK:  Thank you.

16        (Document tendered to the Court.)

17             THE COURT:  All right, sir.  You've made these

18   changes, initialed them, and agree with them.  Is that correct?

19             THE DEFENDANT:  Yes, your Honor.

20             THE COURT:  Okay.  All right.

21             All right.  Do you need a chance to talk to your

22   client about something, or are we set?

23             MR. MONICO:  Well, Judge, we want to make a point.

24             Jackie?

25             MS. JACOBSON:  Oh.  Just with respect to the

1    restitution, we just wanted to add that in addition to the

2    offset that the full amount of the restitution may be

3    apportioned for liability among the defendants to reflect the

4    level of contribution to the victims' loss and the economic

5    circumstances of each defendant.

6              THE COURT:  Absolutely.  And that is the agreement.

7              Do you understand that, sir?

8              THE DEFENDANT:  Yes, your Honor.

9              THE COURT:  All right.  So there's no double counting.

10   There's one restitution amount because there's one loss

11   ultimately.  And there will be arguments by your counsel and by

12   the government and consideration by me as to all responsible

13   defendants, should they be convicted, as to what the

14   appropriate amount of restitution is as to each defendant.

15             Do you understand that?

16             THE DEFENDANT:  Yes, your Honor.

17             THE COURT:  All right.  Thank you, Ms. Jacobson.

18             MS. JACOBSON:  You're welcome.

19             THE COURT:  All right.  Does either the government or

20   defense know of any reason why the defendant should not plead

21   guilty?

22             MR. MONICO:  No, your Honor.

23             MR. MADDEN:  No, your Honor.

24             THE COURT:  Sir, do you have any questions of me

25   before I ask you what your plea of -- plea is?

1       THE DEFENDANT:  No, your Honor.

2       THE COURT:  All right, sir.  So what is your plea to

3  Count VI of the superseding indictment: guilty or not guilty?

4       THE DEFENDANT:  Guilty, your Honor.

5       THE COURT:  Since you acknowledge you're in fact

6  guilty as charged in Count VI of the superseding indictment,

7  you've had the assistance of counsel, you know of your right to

8  trial, what the maximum possible punishment is, and you're

9  freely and voluntarily pleading guilty, I'll accept your plea

10  of guilty and enter a finding of guilty on your plea as to

11  Count VI of the superseding indictment.

12       Because there's a cooperation clause in the plea

13  agreement, I'm going to defer setting of any date for a

14  presentence report to be prepared.  That will be deferred until

15  after the -- presumably if there's a trial, it will be after

16  Mr. Desai testifies in that trial.  So we won't have another

17  date in that regard.

18       That raises the question of bond.  Is the government

19  seeking detention?

20       MR. MADDEN:  No, your Honor.  We've reached an

21  agreement with Mr. Desai.

22       THE COURT:  All right.  And what is the agreement?

23       MR. MADDEN:  Your Honor, the agreement is for an

24  unsecured bond in the amount of $4,500.  He does not need to

25  report to pretrial services; but that he is required to

1    surrender any passport to pretrial services; obtain no other

2    passport; his travel is restricted to the continental United

3    States; and then to refrain from possessing a firearm,

4    destructive device, or other dangerous weapon.

5              THE COURT:  All right.  Did you bring your passport

6    with you?

7              THE DEFENDANT:  Yes, your Honor.

8              THE COURT:  Mr. Monico has it.  All right.  He'll turn

9    it over to pretrial services.

10             MR. MONICO:  Yes, your Honor.  I'm doing so right now.

11        (Document tendered to Ms. Lesch.)

12             THE COURT:  And do you own a firearm?

13             THE DEFENDANT:  No, your Honor.

14             THE COURT:  All right.  Don't -- don't buy one.

15             And you can't travel internationally without a

16   passport.  Don't seek another passport.

17             Do you understand that?

18             THE DEFENDANT:  Yes, your Honor.

19             THE COURT:  Can't apply for another one.

20             All right.  I'm going to go through the conditions of

21   bond with you.

22             THE CLERK:  Thanks, Matt.

23        (Document tendered to the clerk.)

24             THE COURT:  All right.

25             All right, sir.  The conditions of release are you not

1    violate any federal, state, or local law while on release.

2           You must cooperate in the collection of a DNA sample

3    if the collection is authorized by 42 U.S.C. § 14135a.

4           You must immediately advise the Court, defense

5    counsel, and the U.S. Attorney in writing before any change in

6    address or telephone number.

7           And you must appear in court as required.

8           And when sentenced, you must surrender to any

9    institution you're designated at if you receive an

10   incarceration sentence.

11          I'm not going to require another date for you to

12   appear at this point.  That would be -- there's no date set for

13   any trial in this case.  Haven't even had the defendants before

14   me yet, the other -- the codefendants.  So that date will be

15   set in the future.  But when a date is set for you to appear

16   for -- either for trial or for sentencing, you need to appear.

17          Do you understand that?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  All right.  And by signing this, the other

20   conditions are surrendering your passport to pretrial services,

21   which was just done; obtain no passport; abide by the

22   restrictions of remaining in the continental United States; and

23   refraining from possessing a firearm, destructive device, or

24   other dangerous weapon.

25          The bond will be in the amount of $4,500.  And it will

1    be a recognizance bond, and it will be forfeited in the event

2    of a failure to appear as required or surrender, any sentence

3    imposed.

4         I'm going to explain to you now the penalties and

5    sanctions for violating any conditions of release that may

6    result -- it may result in the immediate issuance of a warrant

7    for your arrest, a revocation of your release, an order of

8    detention, a forfeiture of any bond, and prosecution for

9    contempt of court that could result in imprisonment, a fine, or

10   both.

11        While on release, if you commit a federal felony

12   offense, the punishment is an additional prison term of not

13   more than ten years; and for a federal misdemeanor offense, the

14   punishment is an additional prison term of not more than one

15   year.  The sentence will be consecutive, that is, in addition

16   to, any other sentence you receive.

17        It's a crime punishable by up to ten years in prison,

18   and a $250,000 fine, or both, to obstruct a criminal

19   investigation; tamper with a witness, victim, or informant;

20   retaliate or attempt to retaliate against a witness, victim, or

21   informant; or intimidate or attempt to intimidate a witness,

22   victim, juror, informant, or officer of the court.

23        The penalties for tampering, retaliation, or

24   intimidation are significantly more serious if they involve a

25   killing or an attempted killing.

1    If after release you knowingly fail to appear as the

2  conditions of release require, or to surrender to serve a

3  sentence, you may be prosecuted for failing to appear or

4  surrender, and additional punishment may be imposed.

5    If you're convicted of an offense punishable by death,

6  life imprisonment, or imprisonment for a term of 15 years or

7  more, you'll be fined not more than $250,000 or imprisoned for

8  not more than 10 years, or both.

9    An offense punishable by imprisonment for a term of

10  five years or more, but less than 15 years, you'll be fined not

11  more than $250,000 or imprisoned for not more than five years,

12  or both.

13    Any other felony, you'll be fined not more than

14  $250,000 or imprisoned not more than two years, or both.

15    And a misdemeanor, you'll be fined not more than

16  $100,000 or imprisoned not more than one year, or both.

17    A term of imprisonment imposed for failure to appear

18  or surrender will be consecutive to any other sentence you

19  receive.  In addition, a failure to appear or surrender may

20  result in the forfeiture of any bond posted.

21    Sir, are you aware of all these conditions?

22    THE DEFENDANT:  Yes, your Honor.

23    THE COURT:  All right.

24    All right.  And I believe you'll still have to be

25  processed through the Marshals Service.  I've signed the

1    conditions, and I'll also sign the bond.

2          All right.  Beyond the defendant being processed

3    through the Marshals Service, anything else we ought to discuss

4    today?

5          MR. MADDEN:  No, your Honor.

6          MR. MONICO:  No, your Honor.

7          THE COURT:  Okay.  And anything else from pretrial

8    services?

9          MS. LESCH:  No, your Honor.

10          THE COURT:  All right.  And, Mr. Madden, I noted that

11   two individuals appearing to be associated with this crime were

12   charged by way of I think an information.

13          MR. MADDEN:  Yes.

14          THE COURT:  That was assigned to Judge Tharp.

15          MR. MADDEN:  Correct.

16          THE COURT:  What is the process -- it would seem if --

17   are those people -- given the fact it's an information, are

18   they cooperating?

19          MR. MADDEN:  Yes.

20          THE COURT:  Presumably they're going to be testifying

21   in any trial that occurs here.

22          MR. MADDEN:  Probably not.

23          THE COURT:  Oh, all right.

24          MR. MADDEN:  I think it's -- you know, it is possible.

25   I think Mr. -- it's -- I'm certain that Mr. Desai would testify

1    if this -- if these three defendants -- other defendants go to

2    trial.  It's much less likely that the other two would testify.

3              THE COURT:  All right.  Because I've noted a

4    practice -- I just had a case this morning where a key

5    cooperator was charged in a separate indictment from the

6    defendant -- defendant who is going to trial.  I'm going to

7    have to evaluate that cooperator's testimony in order to

8    determine -- well, I'm going to have to evaluate the --

9              MR. MADDEN:  Sure.

10             THE COURT:  -- cooperator's testimony for me then to

11   call the judge who is doing the sentencing and say, "The

12   cooperator was a good witness," "a bad witness," "a cooperative

13   witness," or "an uncooperative witness."  And it seems

14   inefficient and not helpful to anybody to have that kind of

15   separation.

16             If the individuals before Judge Tharp are not likely

17   to testify here, it's not an issue here.

18             MR. MADDEN:  Okay.

19             THE COURT:  So but that's why I raise it.

20             MR. MADDEN:  Yes, I understand.

21             THE COURT:  Okay.  All right.

22             Anything else by anybody?

23             MR. MADDEN:  No, your Honor.

24             MS. LESCH:  No, your Honor.

25             THE COURT:  All right.

1      MR. MONICO:  No, your Honor.

2      THE COURT:  Thank you all.

3      MR. MADDEN:  Thank you.

4      MS. LESCH:  Thank you.

5      (Concluded at 10:51 a.m.)

6                    C E R T I F I C A T E

7      I certify that the foregoing is a correct transcript of the

8 record of proceedings in the above-entitled matter.

9

10 */s/ LAURA R. RENKE*                    *December 12, 2019*
   LAURA R. RENKE, CSR, RDR, CRR
11 Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25