| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

```
 3   UNITED STATES OF AMERICA,        )  Docket Nos. 19 CR 864-1,
                                      )              -2, -3
 4              Plaintiff,            )
                                      )  Chicago, Illinois
 5        v.                          )  February 20, 2020
                                      )  9:21 a.m.
 6   RISHI SHAH, SHRADHA AGARWAL,     )
     and BRAD PURDY,                  )
 7                                    )
                Defendants.           )
 8
 9                TRANSCRIPT OF PROCEEDINGS - Status
                 BEFORE THE HONORABLE THOMAS M. DURKIN
10

11   APPEARANCES:

12
     For the Government:  MR. MATTHEW F. MADDEN
13                        MR. SAURISH APPLEBY-BHATTACHARJEE
                          Assistant United States Attorneys
14                        Honorable John R. Lausch Jr.
                          United States Attorney
15                        219 S. Dearborn Street
                          5th Floor
16                        Chicago, IL 60604

17
                          MR. WILLIAM E. JOHNSTON
18                        MR. KYLE C. HANKEY
                          United States Department of Justice
19                        Criminal Division, Fraud Section
                          1400 New York Avenue NW
20                        Washington, DC 20530

21
     For Defendant        MR. JONATHAN C. BUNGE
22   Shah:                MS. MARGARET HAAS
                          Quinn Emanuel Urquhart & Sullivan LLP
23                        191 N. Wacker Drive
                          Suite 2700
24                        Chicago, IL 60606

25
```

1    APPEARANCES (Cont'd.):

2

3    For Defendant            MS. CHRISTINA M. EGAN
     Agarwal:                 MR. VINU G. JOSEPH
                              McGuireWoods LLP
4                             77 W. Wacker Drive
                              Suite 4100
5                             Chicago, IL 60601

6

7    For Defendant            MR. THEODORE T. POULOS
     Purdy:                   MS. EMILY C.R. VERMYLEN
                              Cotsirilos Tighe Streicker
8                               Poulos & Campbell Ltd.
                              33 N. Dearborn Street
9                             Suite 600
                              Chicago, IL 60602

10

11   Also Present:            MR. RISHI SHAH
                              MS. SHRADHA AGARWAL
12

13   Court Reporter:          LAURA R. RENKE, CSR, RDR, CRR
                              Official Court Reporter
14                            219 S. Dearborn Street, Room 1432
                              Chicago, IL 60604
15                            312.435.6053
                              laura_renke@ilnd.uscourts.gov
16

17

18

19

20

21

22

23

24

25

1       (In open court; defendants Agarwal and Shah present.)

2            THE CLERK:  19 CR 864, United States of America v.

3       Rishi Shah, Shradha Agarwal, Brad Purdy, and Ashik Desai.

4            MR. MADDEN:  Good morning, your Honor.  Matthew

5       Madden, Saurish Appleby-Bhattacharjee, William Johnston, and

6       Kyle Hankey on behalf of the United States.

7            THE COURT:  All right.  Good morning.

8            MS. EGAN:  Good morning, your Honor.  Christina Egan

9       and Vinu Joseph on behalf of Shradha Agarwal, who is present in

10      court.

11           THE COURT:  All right.  Good morning.

12           DEFENDANT AGARWAL:  Good morning, your Honor.

13           MR. BUNGE:  Good morning, your Honor.  Jon Bunge and

14      Margaret Haas on behalf of Rishi Shah, who is also present in

15      court.

16           THE COURT:  All right.  Good morning.

17           MR. POULOS:  Good morning, your Honor.  Ted Poulos and

18      Emily Vermylen on behalf of Brad Purdy.

19           THE COURT:  All right.  Is Mr. Purdy here, or no?

20           MR. POULOS:  He's not here.  He resides out of state.

21      I didn't understand that he was required to be here today.

22           THE COURT:  I didn't require.  But has he ever -- he's

23      never appeared in front of me.

24           MR. POULOS:  Not in front of you, your Honor.

25           THE COURT:  All right.  That's fine.

1          And I know -- Ms. Egan, your client, does she reside

2   in Chicago?

3          MS. EGAN:  She does not, your Honor.  She resides in

4   Texas.

5          THE COURT:  All right.  And, Mr. Bunge, how about your

6   client?

7          MR. BUNGE:  Puerto Rico, your Honor.

8          THE COURT:  Okay.  Well, thank you for being here, but

9   I'll waive your presence at further proceedings.  If I need you

10  here, I'll tell -- and I'll --

11         Mr. Purdy appeared for his initial appearance,

12  correct?

13         MR. POULOS:  Definitely, yes.

14         THE COURT:  All right.  Then I'll waive his appearance

15  in the future.  Thank you for all being here on this time, but

16  there won't be a need to do it in the future absent me

17  otherwise ordering it.

18         All right.  A couple disclosures.

19         Mr. Poulos, I think this is the first time you've been

20  in front of me on this case.  Correct?

21         MR. POULOS:  That's right, your Honor.

22         THE COURT:  All right.  The government should know I

23  know Mr. Poulos from days we were in the U.S. Attorney's Office

24  together, just as I know Mr. Bunge and Ms. Egan from --

25  Mr. Bunge from days in the U.S. Attorney's Office, Ms. Egan

1  from time at Mayer Brown when we worked at Mayer Brown

2  together.  So we're all friendly.  Not close personal friends

3  in the sense that I've either visited their house or they've

4  visited mine, which is my rule on how close people are to me.

5  So if it gives you pause, you can seek to recuse me,

6  but it is -- that's my disclosure.

7  MR. MADDEN:  Thank you, your Honor.  We don't see it

8  as an issue.

9  THE COURT:  Okay.  I did ask for you to provide me the

10  names of the -- *in camera* of the various entities listed in the

11  indictment -- there's a number of them -- because I wanted to

12  make sure none of them were former clients of mine.

13  The only two that are -- are listed that I'm even

14  familiar with -- I'm, of course, familiar with the names of a

15  lot of these institutions, but they were never significant

16  clients when I worked at Mayer Brown.

17  I did a lot of work for JPMorgan Chase.  Not on this

18  case, not any way related to this.  So I was one of probably

19  thousands of attorneys that have worked for JPMorgan Chase,

20  been retained by them at one time or another.  It was an

21  engagement of the law firm Mayer Brown, not of me, and -- but I

22  did work on matters for JPMorgan.  And I've been gone from

23  Mayer Brown over seven years.

24  AbbVie, which is one of the split-offs of Abbott

25  Labs -- there's Abbott Labs and AbbVie.  I did a lot of work

1  for Abbott, mainly in litigation areas, over the years.  The

2  last work I did for them was probably ten years ago.  I'm sure

3  there are people up there that still work there in the legal

4  department that I know.  It was a, you know, client I did

5  litigation for.

6         Again, I -- nothing related to this case, as far as I

7  know.  But I make this disclosure to all sides so in case

8  you -- that is a problem for anyone, you can file a motion

9  relating to it, and I'm happy to consider it as you present it.

10  But I don't view that -- I'm making these disclosures simply as

11  matters of disclosure, not to indicate that I think I have a

12  conflict.

13         Okay.  The -- then another issue I wanted to raise

14  before I get into the protective order issue is it appears

15  there's two defendants that were -- pled guilty before Judge

16  Tharp related to this case.

17         MR. MADDEN:  That's accurate.

18         THE COURT:  Okay.  I don't particularly care about

19  having more defendants in this case, but I -- and are they

20  cooperating?

21         MR. MADDEN:  They are.

22         THE COURT:  There's plea agreements that state that?

23         MR. MADDEN:  Yes.

24         THE COURT:  All right.  So I'm not disclosing secrets,

25  but I suspected that was the case.

1          I don't know why the government indicts people in

2     the -- what is an overall single case in front of different

3     judges.  That's your decision, not mine.

4          It may be more efficient to have the sentencings of

5     those defendants transferred to me -- they've pled guilty, so

6     they're going to be sentenced -- in the sense that it's likely

7     they're -- one of the factors in your -- your recommendation to

8     the sentencing judge as to the appropriate sentence is the

9     level of their cooperation, which is best judged often by the

10    judge who hears their testimony if there's a trial in this

11    case.

12         You'd have to raise that with the attorneys for those

13    defendants, but I don't think Judge Tharp would object to

14    having two less people on his docket, and I won't object to

15    having two more.  But I leave that to you, but I wanted to

16    raise it because it seemed peculiar.  There may be reasons,

17    which you don't have to put on the record, why you did it the

18    way you did, but just an observation because I've seen that in

19    other cases.

20         MR. MADDEN:  Yeah.  And you raised this, I think, at

21    the last time we were here, or maybe two times ago.  They

22    probably will not testify at this trial.  I mean, there's at

23    least a possibility that they will, but if trial were starting

24    tomorrow, they would not be testifying.

25         THE COURT:  Okay.

1          MR. MADDEN:  It really just depends maybe on the

2     defenses and things like that.  But I think it's unlikely that

3     they'll testify, so I think it's maybe a little different

4     situation than the average case where you'd expect them to

5     testify in a related case.

6          THE COURT:  That's fine.  I'm -- it's just an

7     observation, and I'm happy not to have two additional

8     sentencings.  But I just wanted to raise it.

9          MR. MADDEN:  Thank you.

10          THE COURT:  Okay.

11          MR. POULOS:  Your Honor, I should add that if the

12     government doesn't call either of those two, I think there's

13     also a decent chance that we would call at least one or both to

14     testify at the trial.  Again, possibility.  I think there's at

15     least some -- a realistic likelihood of that scenario.

16          THE COURT:  All right.  Well, I throw it out there

17     saying I don't think Judge Tharp cares about -- "cares" is too

18     strong a word.  But I think he would not object if the

19     sentencings were transferred to me, nor would I.

20          But we're going to leave it alone unless I get a

21     motion presumably from their attorneys, which would have to

22     be -- I'd have to hear from the government on whether they

23     object to it before I'd do anything like that.

24          Okay.  All right.  The motion for protective order,

25     which I've received a lot of briefing on, including a

1    spreadsheet that the government submitted this morning -- have

2    the defendants seen that?

3          MR. BUNGE:  Yes, your Honor.

4          MS. EGAN:  Yes, your Honor.

5          THE COURT:  Okay.  All right.  So it's -- you all have

6    it.

7          In essence, defendants Shah and Agarwal want to use

8    10.3 million in assets in accounts at their law firms, Quinn

9    Emanuel and McGuireWoods, to pay what they estimate to be in

10   the end a total of 14 to $15 million to defend this case.

11         How long do you think this case will last trialwise?

12         MR. MADDEN:  Rough estimate, your Honor -- it really

13   is going to depend a lot on how many defendants go to trial and

14   the length of cross-examinations.  But --

15         THE COURT:  Assume all three go to trial.  That's what

16   we have right now.

17         MR. MADDEN:  I'd say approximately two months, maybe a

18   little bit more.

19         THE COURT:  Okay.  And the parties have agreed that

20   there's 4.5 million in the retainer account of Quinn Emanuel

21   that is not subject to any protect -- any protective order

22   freeze that I entered earlier.  Is that correct?

23         MR. MADDEN:  That's correct.

24         MR. BUNGE:  I should say, your Honor, it's closer to

25   4 million now.

1          THE COURT:  4 million?

2          MR. BUNGE:  Yeah.

3          THE COURT:  Okay.  That number is not going to go up;

4     it's going to go down.

5          MR. BUNGE:  That's right.

6          THE COURT:  All right.  Okay.

7          And even though Quinn Emanuel is representing

8     Mr. Shah, does Ms. Agarwal have any right to have any of her

9     attorneys paid out of that now $4 million?  I don't know if

10    there's agreements between those two defendants as to this

11    money.

12         MR. BUNGE:  We don't.  We don't have any agreement on

13    that issue.

14         THE COURT:  Okay.  All right.

15         Well, the government argues defendants can't challenge

16    the protective order without a showing of bona fide need.  Do

17    you agree that if there is a bona fide need, Mr. Madden, it

18    doesn't matter whether the money is so-called tainted money or

19    not?

20         MR. MADDEN:  No, it does.  If there is a bona fide

21    need, it does matter.  If it's tainted, then they -- then it's

22    forfeitable money and they don't get it.

23         THE COURT:  Bona fide need or not?

24         MR. MADDEN:  Yeah.

25         THE COURT:  Okay.  What's the defendants' view on

1  that?

2  MR. BUNGE:  Well, we think --

3  THE COURT:  Do you agree?

4  MR. BUNGE:  No, your Honor.  We argue that under the

5  law that it -- we can use the money as long as it's not

6  traceable to the criminal proceeds.

7  THE COURT:  I understand that.  But assuming it's

8  traceable, does the bona fide need analysis even take place?

9  MR. BUNGE:  I don't believe so, your Honor --

10  THE COURT:  Okay.

11  MR. BUNGE:  -- under the law.

12  THE COURT:  All right.

13  Do you agree, Ms. Egan?

14  MS. EGAN:  We agree.

15  THE COURT:  Okay.  All right.

16  So the bigger issue then is whether this is traceable

17  or not.  There's a heavily contested issue whether there's a

18  bona fide need.  I have affidavits from two of the defendants

19  saying they're not impoverished, but they can't pay this kind

20  of money.  I have a variety of charts from the government

21  indicating the assets are pretty significant.

22  MR. MADDEN:  Yeah.  I mean, I guess if you look -- so

23  the lead -- the lead Seventh Circuit case is *Moya-Gomez*.  And

24  if you look at *Moya-Gomez*, there's two parts to it.  It's an

25  if-then proposition.  If the defendants establish a bona fide

1   need for the restrained assets -- that's the first part.  If

2   they establish that, then we get to the second part, which is

3   whether or not they're traceable and forfeitable.

4         From what I've -- from the affidavit, your Honor, that

5   we have in this case, especially from Mr. Shah, it's totally

6   inadequate and, from what I can tell, does not disclose

7   unrestrained assets.

8         When we -- when the government saw your order, what I

9   expected to get from -- that we'd get from the defendants is

10  account statements, investment account statements, bank

11  balances, a spreadsheet listing all of the unrestrained assets.

12        Instead we got, you know, a -- two paragraphs in

13  this -- in the supplement about his assets.  And his assets are

14  probably in excess of $50 million.  And we got two paragraphs

15  in a very brief, bare-bones affidavit that basically says most

16  of his assets are in these, in Gravitas or -- Gravitas or

17  JumpStart, and they're illiquid.  They don't list what the

18  assets are, don't list how much went into them.  There's no

19  specificity.

20        So I think that -- I do think it's worth -- I mean,

21  both of those issues, for them to get the money, they need to

22  prevail on both of those issues.  But at least the way the case

23  law is set out, you don't even get to issue number two if they

24  don't get past issue number one.

25        THE COURT:  Issue number one being bona fide need.

1          MR. MADDEN:  Correct.

2          THE COURT:  All right.  Well, in fairness to them --

3    and I'm not going to make arguments for them, but this has been

4    on a fairly accelerated -- these are complex financial -- it's

5    not a simple, you know, savings account at the local savings

6    and loan.  There's a lot of different assets tied up in a lot

7    of different entities and a lot of different places.

8          So I'm not surprised the -- the request -- which was

9    not something that they could have anticipated necessarily --

10   was -- was such that they could have prepared an extensive

11   listing of all assets in the time I gave them.  So I'm not

12   ascribing any bad motive to the omission of information.

13   Possibly it's more a matter of not having enough time.

14         But I can't look at all of this without recognizing

15   there's a significant dispute between the government and

16   defense as to whether bona fide need exists.

17         I also don't understand -- and this is where I ask

18   that question.  If Mr. Shah has $4 million available to pay for

19   a defense and Ms. Agarwal has some personal assets and there's

20   a dispute between the government and them what she has that's

21   available, why isn't any of that 4 million available to her to

22   pay -- although it's in the Quinn Emanuel account, why isn't

23   some of it available to pay for her expenses for McGuireWoods?

24         MS. EGAN:  So, Judge, I think the question the Court

25   asked was whether there are any agreements with respect to that

1  4 million.  And as it stands right now, there are not.  The

2  parties have endeavored to work together.  And as we've

3  postured to the Court, you know, should there be the funds that

4  we're asking for, we would work efficiently together to -- to,

5  you know, use those funds as efficiently as possible and, you

6  know, tender, you know, bills to the Court, anything that the

7  Court might require in that.

8          So I think we're in this limbo period right now where

9  as we've stated in our -- and in our filings, there was

10  2.5 million that was transferred to McGuireWoods that we are

11  holding in an account and not touching, along with the

12  remainder that's also subject to the protective order that we

13  are not touching.

14          But we just haven't reached any -- any agreements as

15  of this time with respect to that remaining 4 million.  I don't

16  know if Mr. Bunge wants to add anything to that.

17          MR. BUNGE:  That's --

18          THE COURT:  All right.

19          MR. BUNGE:  -- right, your Honor.  I didn't mean to

20  imply that we weren't going to try to work this out.  We just

21  haven't come to an agreement with respect to the 4 million.

22          THE COURT:  Because there's 4 million the government's

23  not -- hasn't frozen.  It's available to pay for --

24          MR. BUNGE:  That's right.

25          THE COURT:  -- attorneys' fees.

1      MR. BUNGE:  That's right.

2      THE COURT:  And I didn't know whether that is

3 something that has been reserved for Mr. Shah or whether it's

4 jointly available to both firms to pay expenses for -- for this

5 case.  And that was my question.

6      There's no answer to that at this point?

7      MS. EGAN:  I would say that's correct.  There are

8 no -- no agreements, and we -- we simply haven't discussed that

9 at this point, Judge.

10      THE COURT:  Is there any legal prohibition?  In other

11 words, is there any allocation of this that occurred when the

12 monies were first sent out that prevents them from being used

13 for both defendants?

14      MR. BUNGE:  I don't believe so, your Honor.

15      THE COURT:  Okay.  All right.

16      And is there any other monies available from all the

17 monies advanced earlier to the different law firms -- Winston &

18 Strawn, some of the other firms that received money?  Are there

19 any funds that have not been expended that are not something

20 that the government would be seeking -- that they're not

21 subject of a freeze order that could be used for the defense of

22 these two defendants?

23      MR. BUNGE:  There's not, your Honor.  That's how this

24 whole issue arose.  We had additional money besides the 4 that

25 we were -- some of which we'd sent over to McGuireWoods.

1    Just to make sure that we were transparent with the

2    government, we told them about this money.  And then they took

3    the position that that -- that money was subject to the

4    protective order as well.  So there's no other money that the

5    government has agreed we can use besides the 4 million.

6         THE COURT:  All right.  Is that correct, Mr. Madden?

7         MR. MADDEN:  Yes.

8         THE COURT:  All right.

9         MR. MADDEN:  Other than all their other assets, of

10   course.

11        THE COURT:  Right, which is the subject of --

12        MR. MADDEN:  Yeah.

13        THE COURT:  -- significant dispute.

14        MR. BUNGE:  Could -- I'm sorry.  I didn't mean to

15   interrupt.

16        THE COURT:  Go ahead.

17        MR. BUNGE:  Just -- I just wanted to respond to a

18   couple things, your Honor.  One is you had asked whether it's

19   necessary to show that the assets are traceable to the

20   criminal -- alleged criminal proceeds, whether that's a

21   fundamental question that needs to be answered in order for

22   the -- for the funds to be seized.

23        Bona fide need in the Seventh Circuit -- it's actually

24   an open issue as to whether bona fide need needs to be

25   established if the government can't show that the funds are

1  traceable to criminal proceeds.  And there's a district court

2  case in Washington that says otherwise.

3  The other thing, your Honor, is the government

4  yesterday -- I don't know if you want me to go through this

5  now, but the government --

6  THE COURT:  I've got a jury waiting, so --

7  MR. BUNGE:  I know.  I'm sorry.

8  THE COURT:  And I --

9  MR. BUNGE:  Well, but they listed --

10  THE COURT:  Yeah.

11  MR. BUNGE:  -- various items that they said we didn't

12  disclose in the documents, and I'm prepared either in writing

13  or right now to go through those with you and explain why those

14  are not assets available to Mr. Shah.

15  THE COURT:  I think it's best you do that in writing.

16  MR. BUNGE:  All right.

17  THE COURT:  I'm not -- I -- I had hoped to give you a

18  decision today.  I can't, both because of the -- you know, the

19  flurry of documents that came in late, which indicate to me

20  there may be some dispute.  I had hoped -- I -- I recognize

21  the -- the protocol is first establish bona fide need, then go

22  to see if the money is tainted.

23  On the other hand, if I make a finding on taint, I

24  don't know there's a need to -- if I find the money is tainted,

25  there is no issue on bona fide need.  If I find the money is

1   not tainted, then we presumably go backwards and do bona fide

2   need.  I -- I'm not sure there's a -- I'm not sure the

3   procedure I want to follow because there's significant issues

4   on bona fide need.

5       I -- I will credit the defendants' argument.  Whether

6   14 or 15 million is needed to defend this case I don't know,

7   but I fully expect more than 4 million is given the rates the

8   firms charge, the amount of discovery -- and, Mr. Poulos,

9   you're probably dying over there hearing all this.

10  (Laughter.)

11      THE COURT:  Just kidding.

12      But -- but, you know, given the rates you charge and

13  given the amount of discovery that I expect is involved in a

14  case like this -- and if it's a two-month trial, that's -- just

15  the trial time is going to be significant.  The expenses

16  relating to that is going to be significant.

17      So I -- I had hoped to give you a ruling today, and

18  I'm not going to.  I'm going to -- if you want to submit

19  something, Mr. Bunge -- I don't want to encourage more paper,

20  but this is an important issue.  May deal with continuity of

21  counsel.  May have to get new lawyers if the two lawyer -- two

22  firms that have filed limited appearances are going to

23  withdraw.

24      So I'll let you file something if you'd like to

25  respond to the last government's brief.  That will be the end

1  of it, though.

2          MR. BUNGE:  All right.

3          THE COURT:  There has to be an end to this.

4          Ms. Egan, you can do the same.

5          MS. EGAN:  Thank you, Judge.

6          THE COURT:  How much time do you want?

7          MR. BUNGE:  Would a week be all right, your Honor?

8          THE COURT:  That's fine.  I'm --

9          MS. EGAN:  That's fine, Judge.  Thank you.

10         THE COURT:  So a week from today.

11         And then I -- whether I give you an oral ruling or

12  written ruling, I'm not sure yet.  I won't require defendants

13  to come in.  They all live out of town, so I'm not going to

14  require them to come in for the next appearance.  The lawyers

15  are all local.  A couple are from D.C., I think, but they can

16  participate by phone if they want, as can any out-of-town

17  counsel for defendants.  At least appear by phone.

18         If there's going to be argument, I want the attorneys

19  who are going to argue in the courtroom.  It's just too hard to

20  do it over the phone otherwise.

21         All right.  Then let's continue this matter.  It's

22  going to have to be on a Friday, sadly, because I'm going to be

23  in Rockford.

24         How is the 20th of March?  I don't want to delay this

25  too much.  We've got pending criminal charge.  This case needs

1    to move forward.

2         Have you prepared discovery and turned it over to

3    defense yet?

4         MR. MADDEN:  On a rolling basis.  We've produced the

5    vast majority of it, but we're still producing discovery.

6         THE COURT:  Okay.  All right.

7         MR. MADDEN:  Your Honor, I'm out of town on the 20th.

8    If we can do it either the 13th or the 27th, those Fridays.

9         MR. POULOS:  I'm out of town from March 11th through

10   the 20th.  As to this issue, we're not -- you know, our

11   attendance participation isn't necessary.  Ms. Vermylen could

12   probably cover it.

13        THE COURT:  Yeah, you're not going to be required to

14   be here, Mr. Poulos, unless you have a dog in this fight, and I

15   don't think you do.  So okay.

16        MS. EGAN:  Judge, I will be out of town on the 13th.

17        THE COURT:  Let's tentatively set it for the 20th.

18        You're out of town, Mr. Madden?

19        MR. MADDEN:  I am, yeah.

20        THE COURT:  Can your colleague appear?

21        MR. MADDEN:  Yes, yes.

22        THE COURT:  All right.  If I'm going to require oral

23   argument or ask some substantive questions, either I'll ask you

24   to appear by phone or we'll set it for another date.

25        MR. MADDEN:  Okay.

1      THE COURT:  It's possible this case in Rockford may

2  settle so that my Fridays aren't the only day I'm in Chicago in

3  March.  If that happens, my courtroom deputy will work with you

4  to arrive at an alternative date and try and get -- get you a

5  ruling on this.

6      I may give a written ruling, which would obviate the

7  need to even appear for anything other than a status relating

8  to telling me how discovery is moving along.  Or if I decide

9  not to unfreeze these funds or make them available, I'll

10  need -- give you time to decide with your clients whether or

11  not you're going to continue as counsel or they're going to

12  seek alternative counsel.

13      So tentatively March 20th.  And, Mr. Madden, if I'm

14  going to need you to do any arguing on this, at that time we'll

15  move it to a date you can be available.

16      MR. BUNGE:  Your Honor, I have a trial March 20th, but

17  I'll ask my partner to come and cover this.

18      THE COURT:  Okay.  Yeah, this date may be bad for

19  everybody, but --

20      MR. BUNGE:  Right.

21      THE COURT:  -- I'll know soon if this case in Rockford

22  settles.  And I have a vast number of dates that are available

23  if that happens.  If not, we'll have to work on something.

24      Okay.  Anything else from the government right now?

25      MR. MADDEN:  Yes.  An unrelated issue, your Honor.

1  When the defendants first appeared in front of the magistrate

2  judge, they were released on order of conditions of release.

3  And there's an appearance bond form.  We actually had them sign

4  the wrong form.  So I sent them the correct one and asked them

5  to sign.  If we could just have them sign it and then submit it

6  to the Court for your signature, that would be great.

7             THE COURT:  Sure.  Okay.  I'll do that right now.

8             MR. MADDEN:  Thank you.

9             THE COURT:  And --

10       (Counsel conferring.)

11             MS. EGAN:  Judge, with respect to Ms. Agarwal, her

12  husband is going to need to sign this as well.  He is not in

13  court.  So we will have that done and then provide it to

14  Mr. Madden.

15             THE COURT:  Okay.

16       All right.  Anything else from the government?

17             MR. MADDEN:  No, your Honor.

18             THE COURT:  Is there an excludable time order entered

19  in this case?

20             MR. MADDEN:  There was until today.  So we are moving

21  to exclude time in the interest of justice and given the

22  complexity of the case until the next status.

23             THE COURT:  All right.  Any objection?

24             MR. BUNGE:  No.

25             MS. EGAN:  No objection.

1          MS. VERMYLEN:  No objection.

2          THE COURT:  Mr. Poulos?  No objection.  All right.

3          Very good.  I'll enter it through that date for the

4   reasons stated by the government.

5          Anything else from defense counsel?

6          MS. EGAN:  No, your Honor.

7          MR. BUNGE:  No, your Honor.  Thank you.

8          MR. POULOS:  No, your Honor.

9          THE COURT:  All right.  Thank you all.

10          MULTIPLE COUNSEL:  Thank you.

11      (Concluded at 9:44 a.m.)

12                  C E R T I F I C A T E

13      I certify that the foregoing is a correct transcript of the

14   record of proceedings in the above-entitled matter.

15

16   */s/ LAURA R. RENKE*                         *February 21, 2020*
     LAURA R. RENKE, CSR, RDR, CRR
17   Official Court Reporter

18

19

20

21

22

23

24

25