IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )       Docket No. 19 CR 864
                  Plaintiff,        )
                                    )       Chicago, Illinois
        v.                          )       November 16, 2022
                                    )       4:01 p.m.
RISHI SHAH, SHRADHA AGARWAL,        )
BRAD PURDY,                         )
                                    )
                  Defendants.       )

TRANSCRIPT OF TELEPHONIC PROCEEDINGS - Status Hearing
BEFORE THE HONORABLE THOMAS M. DURKIN

APPEARANCES:

For the Government:     MR. MATTHEW F. MADDEN
                        Assistant U.S. Attorney
                        219 South Dearborn Street, 5th Floor
                        Chicago, Illinois  60604

                        MR. WILLIAM E. JOHNSTON
                        MR. KYLE C. HANKEY
                        U.S. Department of Justice
                        Criminal Division, Fraud Section
                        1400 New York Avenue NW
                        Washington, D.C.  20530

ELIA E. CARRIÓN
Official Court Reporter
United States District Court
219 South Dearborn Street, Room 1432,
Chicago, Illinois 60604
(312) 408-7782
Elia_Carrion@ilnd.uscourts.gov

APPEARANCES (Continued:)

For Defendant
Shah:                    MR. JOHN C. HUESTON
                         Hueston Hennigan LLP
                         620 Newport Center Drive, Suite 1300
                         Newport Beach, California  92660

                         MS. VICKI CHOU
                         MR. SPENCER SCHMIDER
                         Hueston Hennigan LLP
                         523 West 6th Street, Suite 400
                         Los Angeles, California  90014

For Defendant
Agarwal:                 MS. KOREN L. BELL
                         MR. A. ALEXANDER LOWDER
                         Larson LLP
                         555 South Flower Street, Suite 4400
                         Los Angeles, California  90071

For Defendant
Purdy:                   MR. THEODORE T. POULOS
                         Cotsirilos, Tighe, Streicker, Poulos &
                         Campbell, Ltd.
                         33 North Dearborn Street, Suite 600
                         Chicago, Illinois  60602

1    (Proceedings heard telephonically:)

2            THE COURT:  Emily, please call the case.

3            THE CLERK:  This is Case No. 19 CR 864, United States

4    v. Shah.

5            Could I please have the attorneys present on behalf

6    of the United States state their name.

7            MR. MADDEN:  Yes.  Good afternoon.  Matthew Madden,

8    William Johnston, and Kyle Hankey on behalf of the

9    United States.

10           THE CLERK:  And on behalf of Rishi Shah.

11           MR. HUESTON:  Good afternoon, Your Honor.

12   John Hueston, Vicki Chou, and Spencer Schmider on behalf of

13   Rishi Shah.

14           THE CLERK:  And on behalf of Shradha Agarwal.

15           MS. BELL:  Good afternoon, Your Honor.  Koren Bell

16   and Alex Lowder on behalf of Shradha Agarwal.  She's also

17   present.

18           THE CLERK:  And on behalf of Brad Purdy.

19           MR. POULOS:  Good afternoon, Your Honor.  Ted Poulos

20   on behalf of Mr. Purdy.  And Mr. Purdy is on the line as well.

21           THE COURT:  All right.  Well, thank you all; thank

22   the parties for being on.  I wanted to go through a few

23   things.

24           The letters to the prospective jurors are going to go

25   out around December 12th, and in that letter I'm going to tell

1   the jurors how long I expect the trial to last.  Your last

2   status report told me it would last 14 weeks.  We start

3   January 23rd.  If we take into account Fridays off, which I

4   hope is what you took into account on your estimate, if not,

5   it'll lengthen that 14 weeks.  And we have Presidents' Day off

6   February 20th.  We're going to be going for quite some time.

7           First, did your estimates assume four-day weeks?

8   First, the government.

9           MR. MADDEN:  Yes, Your Honor.

10          THE COURT:  Okay.  And on the defense -- maybe one

11  person can speak -- the four-week defense estimate, is that

12  assuming a four-day week?

13          MR. POULOS:  It's Ted Poulos.

14          Yes, we did, Your Honor.

15          THE COURT:  Okay.  Good.

16          I noted that all parties want to see the juror

17  responses.  We're going to send out about 500 notices

18  December 12th.  I'm going to tell the jurors it's 14 weeks,

19  unless you tell me today you expect it to be shorter or

20  longer.

21          This is a question that is fraught, but I'll ask it

22  anyway:  Are all three defendants going to trial?

23          MR. HUESTON:  Your Honor, it's John Hueston on behalf

24  of Rishi Shah.  We are planning to go to trial.

25          THE COURT:  Okay.

1      MS. BELL:  Your Honor, Koren Bell.  Thank you,

2  Your Honor.  Yes, we are planning to go to trial.

3      MR. POULOS:  And Ted Poulos for Brad Purdy.  Yes,

4  Your Honor, we are planning and preparing to go to trial.

5      Judge, if I may interject right here at this moment

6  when we're talking about juror questionnaires going.

7  Your Honor, the counsel for all -- for all three defendants

8  have conferred about this, we've given it a lot of thought,

9  we've discussed it with each of our clients, and I notified

10  the government of this the other day.  Your Honor, all three

11  defendants would prefer to waive their right to a jury trial

12  and proceed with a bench trial for a number of different

13  reasons -- reasons, the least of which is, Judge, you know,

14  concerns about a winter COVID wave and how that might impact

15  or cause or risk mistrials and the like.

16      And so I could put that on the record, Your Honor,

17  of course, written waivers of a jury trial.  We would supply

18  those should the Court indicate that Your Honor would conduct

19  a bench trial and the government consent to it as well.

20      THE COURT:  Well, Mr. Madden, had you known of this

21  until Mr. Poulos just said this, and if you have, have you

22  talked it over with your cocounsel and with your supervisors?

23      MR. MADDEN:  So we -- Your Honor, we did.  Mr. Poulos

24  let us know, I think, two days ago.  We have discussed it

25  internally, and we respectfully wish to proceed with the jury

1  trial.

2  THE COURT: Okay. Well, then we have to have a jury

3  trial because all three interested parties -- the defendants,

4  the government, and I -- all have to agree to it. I'm not

5  going to tell you what I'm thinking because I don't have to.

6  If the government doesn't want to do a bench, then there will

7  be a jury trial.

8  So back to the process. We have three defendants

9  going. Is 14 weeks still a fair estimate to put in for the

10  jury?

11  MR. MADDEN: Your Honor, for the government's -- from

12  our perspective, we think -- we still think our case in chief

13  will last approximately ten weeks. It is difficult for us to

14  gauge the length of crosses, but we expect lengthy

15  cross-examinations, and given that, we think that ten weeks is

16  our best estimate.

17  THE COURT: Mr. Hueston, or anyone else that can

18  speak on behalf of defense, is four weeks, collectively --

19  rather than poll each one of you, but maybe someone from the

20  defense can speak to this -- is four weeks a good estimate?

21  I -- candidly, in a case like this, it wouldn't shock

22  me -- not that it's required, but it wouldn't shock me that a

23  defendant or all three testify. Nobody's -- you know, unlike

24  many of the cases in federal court where people have reasons,

25  because of their prior life and history, for not wanting to

1  get up in front of a jury.  We have three successful,

2  articulate defendants.  It wouldn't shock me if all three

3  testified.

4              Is that baked in to your four-week estimate?

5              MR. HUESTON:  Your Honor, it's John Hueston on behalf

6  of Mr. Shah, and it's -- it's -- as I hope you can imagine,

7  it's way too early for us to bake in whether our clients will

8  actually testify --

9              THE COURT:  Of course.

10             MR. HUESTON:  -- but that -- yeah.  And, look, I,

11 frankly, think 14 weeks sounds way too long to me for this

12 trial, but I can't do anything about the government's

13 estimate.  I used to be on the government side; it may be that

14 long.  If it is, I think -- I'm -- I think two to four weeks

15 on the defense side, but I'd say four to be conservative.  My

16 other colleagues might differ on that, but certainly 14 weeks.

17 I can't imagine, you know, collectively, going over 14 weeks.

18             THE COURT:  Well, I think that's what we have to warn

19 the jurors, because if we tell them ten weeks and we go 14,

20 we're going to have a lot of upset jurors and --

21             MR. HUESTON:  Yeah.

22             THE COURT:  -- possibly some saying they can't serve

23 anymore, and that's a huge waste --

24             MR. HUESTON:  Right.

25             THE COURT:  -- and we turn to our alternates.

1          Does anyone on the defense disagree?  If you do,

2    speak up, but I'll assume you all are good with what

3    Mr. Hueston said, otherwise, I'll -- unless you speak up and

4    have a different view.

5          Okay.  We'll put 14 weeks in the juror questionnaire.

6    And it's not even a questionnaire.  This is really just a

7    notice that you're being called for jury.  We give them a

8    couple of opt-outs.  So over 70 years old where they can --

9    under our local rule, they can opt out of jury service.  If

10   there's something about COVID that would make it impossible to

11   serve; they may be immunocompromised or care for an

12   immunocompromised relative.  And that's about it.

13         We don't put much else in there about -- well, we say

14   is there some reason you can't do it otherwise, and then we'll

15   get responses.  This is not the bias-type questionnaire where

16   they would express bias for or against the government or for

17   or against defendants.  But we ask them about anything else

18   that would make it impossible to serve.  I also include

19   language that talks about why it's so important they serve.

20         We'll get, based on my prior experience, and I may be

21   repeating myself from our last status, but we'll get a lot of

22   COVID-related responses; we'll also get a lot of people who

23   are small business owners that can't afford to be away from

24   work for 14 weeks; students.  We often get students, and they

25   say I can't miss 14 weeks of class, even if they may not show

1  up for those classes even if they weren't on jury service, but
2  they'll say they can't sit for 14 weeks; a variety of
3  different excuses.

4          You all asked to see those.  We'll provide those to
5  you.  But the ruling is the one I make.  This is not -- I
6  don't need your input, nor am I going to ask for it, but I
7  will, in fact, let you have access to those.  But ideally, we
8  have, you know, 100 to 120 or 130 people that say they can sit
9  for a trial that length.  And that'll give us enough people,
10 then, when they come in to fill out the questionnaires that we
11 can have a sufficient number of jurors that you can exercise
12 all your challenges and we -- you can still seat a full jury
13 of 12, plus 6 alternates, which is what we'll have.

14         Mr. Poulos, I think you expressed the view last time
15 that you wanted to try and get, you know, hopefully,
16 entrepreneurs or people who had some business experience.
17 Given my experience with the trial I just got off yesterday, I
18 think -- which was a shorter trial than this one, I fear what
19 you're going to end up with is a lot of jurors who are
20 retirees and possibly small business owners before they
21 retired; a lot of federal employees and other employees of
22 companies that will pay their salaries while they're on jury
23 service, and a lot of unemployed people.

24         And I wish it weren't so, but the longer the trial
25 gets, the more selective -- or not more selective -- but the

1   more restrictive the people who can possibly serve on it

2   becomes.  So keep that in mind, which is why I really wanted

3   to nail down this estimated time because I think once you get

4   past two or three weeks, you're pretty much eliminating almost

5   anyone who would be happy to serve otherwise, but because of

6   the economics of it, they simply can't.

7            I think we're long past the 2- to 3-week trial, so

8   maybe whether it's 10 or 14 isn't going to make much

9   difference, other than somebody with a long-standing

10  nonrefundable vacation, but I guess I've got an answer to my

11  question and that's what we'll put in the letter.  I'll show

12  you a copy -- I'll make sure a copy of the letter is sent to

13  you so you all have it or it's provided to you so you know

14  what's going out, and I'll let you know what the returns are

15  as they come in.

16           Anything else on the jury process at this point?  I

17  think -- and remind me -- unfortunately, I just got off this

18  long trial, you're going to have to remind me.  We had a

19  status earlier and I thought I had reserved on the issue of

20  how many challenges each side gets.

21           Is that correct?

22           MR. MADDEN:  Your Honor, it's Mr. Madden.

23           I think we're in agreement.  The only -- in terms of

24  the number of challenges, the only outstanding issue was I

25  think the defense had asked for each side to get a couple of

1 extras for alternates, although you explained your jury
2 selection process, we're basically -- we exercise our strikes
3 all at the same time. And I think you expressed the view that
4 that request really just amounted to each side getting,
5 you know, extra strikes because you didn't -- because of the
6 fact that we exercise them all at the same time. So I think
7 you hadn't ruled on that one issue but, otherwise, we're
8 largely in agreement.

9 THE COURT: Okay. Yeah, and you're right,
10 Mr. Madden, it's not a question of you pick your 12 and then
11 let's go to alternates. It's really the first 18 that are
12 selected after all the challenges are made are the jury. The
13 first 12 of them are the jury; the next six are the
14 alternates. So it's just a question of whether beyond the
15 12 and 20, which I think is where you're at, if my notes are
16 correct, whether I give additional challenges that account for
17 the fact that we have six alternates.

18 What I'll likely do is just give each side a couple
19 more. Obviously, more to the defense than the government, but
20 I'll give each side additional strikes which will accommodate
21 the fact that we're picking 18 jurors. And I'll -- as we get
22 closer to trial, I'll give you something on that.

23 Okay. There is a motion to permit access by the
24 government -- permit access to certain evidence or preclude
25 its use at trial. The government had filed a motion seeking

1   access to, apparently, millions of records beyond the scope of
2   their search warrants or to preclude defendants' use of any of
3   those records at trial.

4          The government's motion is granted in part and denied
5   in part.  Turning first to the documents that Dr. Muth
6   reviewed.  Rule 16 doesn't require the recitation or
7   disclosure of every document that an expert has access to, but
8   it does require defendants to provide a summary of the bases
9   and reasons for an expert's opinion.  Given defendants'
10  disclosures, any distinction between Dr. Muth reviewing a
11  document in the course of formulating an opinion or relying on
12  it is, I think, really a semantic difference, not a
13  substantive one.

14         In other words, I don't think defendants can satisfy
15  its obligations to summarize the bases and reasons for
16  Dr. Muth's opinion by citing documents the government has
17  never seen.  So defendant is therefore ordered to immediately
18  produce -- immediately, meaning in the next few days or
19  whenever is reasonably practical -- produce the documents
20  outside the scope of the search warrant that were specifically
21  cited in its expert disclosures as being reviewed by Dr. Muth.

22         That was an extremely limited subset of the large
23  number of documents that were seized pursuant to the search
24  warrant, not looked at pursuant to the search warrant, but
25  seized pursuant to it.

1    On the other hand, the defendants have no obligation

2   to disclose any of the other documents if and until they

3   decide to use them at trial because they weren't obtained for

4   use -- they were outside the scope of the search warrant.

5   Those documents were, by definition, not evidence of the crime

6   being investigated.  If defendants are going to use documents

7   from those millions of other documents seized pursuant to the

8   search warrant that the government hasn't seen, they need to

9   disclose them pursuant to the order already entered, by

10  January 6.

11    If they know it earlier, they should disclose it

12  earlier, but they're not obligated to do so until January 6.

13  Given the length of this trial, the government's going to

14  still have several months to look at these documents before

15  they're going to be introduced by the defendants, so I don't

16  view that as being a huge -- a matter of huge prejudice to the

17  government.

18    If defendants decide during trial they are going to

19  use more documents than they disclosed at January 6 -- on

20  January, I suppose that's possible, but they're going to have

21  to show cause why they didn't disclose it on January 6.  But

22  the vast majority of those documents that are in defendants'

23  possession and not in the government's possession will remain

24  so, other than those that were referenced in Dr. Muth's

25  disclosure.

1    Any questions on that ruling?  First, from the
2  government.
3    MR. JOHNSTON:  Yes, Your Honor.  This is Mr. Johnston
4  speaking.
5    THE COURT:  Yes, sir.
6    MR. JOHNSTON:  Just to clarify something about the
7  documents that Dr. Muth referenced.  So these -- all of these
8  documents that the defendants have were produced by the
9  government, but the way we've maintained them is we've had
10  them basically segregated from the prosecution team on sort of
11  a sort of filtered side of our database that we don't have
12  access to --
13    THE COURT:  Mr. Johnston, let me interrupt.
14    MR. JOHNSTON:  Yes.
15    THE COURT:  You're absolutely right, these are
16  documents you have; you just haven't been able to look at
17  them.
18    MR. JOHNSTON:  Yeah.
19    THE COURT:  Is that where you're going?
20    MR. JOHNSTON:  Yeah.
21    THE COURT:  You're right.  I apologize.
22    MR. JOHNSTON:  The defendants don't actually need to
23  produce them to us.  Just the Court needs to give us authority
24  for those documents and then the -- the limited range that are
25  designated in Dr. Muth's report can be transferred to us to

1  our -- from one side of the database to the other one that we
2  can then look at.

3        THE COURT:  Yeah, that's fine.  And you're --
4  thank you for reminding me of that; that's absolutely right.
5  They don't have to produce them to you; you just have to have
6  the ability to look at them.  And if it's easier to get them
7  from the defense, so be it.  I don't know if the Bates stamp
8  numbers are such --

9        MR. JOHNSTON:  They are.  They were produced out of
10  our own system so it's pretty easy for us to have our -- the
11  support staff transfer those to our side of the database.

12        THE COURT:  Fair enough.

13        Any objection to that process by the defense?

14        MR. SCHMIDER:  Yes, Your Honor.  This is
15  Spencer Schmider on behalf of Rishi Shah.

16        I just want to make a couple points with respect to
17  the documents referenced in the Muth disclosure.  I think,
18  first of all -- and I understand Your Honor's tentative
19  ruling, but there's -- there's no authority for the idea that
20  just because he's reviewed the documents that that means those
21  need to be disclosed.

22        But beyond that fact, I think it's important to note
23  that the language is -- is very clear in these disclosures
24  that Dr. Muth has been given access to, has reviewed, and
25  continues to review thousands of documents from Bates ranges

1  such as. So the disclosures do not say that he has refused --

2  reviewed all 454,000 pages of those documents, which, yes, it

3  is a -- a smaller subset of the millions of pages of documents

4  which the government initially requested, but it's still a

5  large number of documents. And although he has reviewed

6  documents from that subset, it is not the case that he

7  reviewed all of those documents. And so at a minimum, we

8  would ask that we be given the opportunity to locate, if there

9  are specific documents he reviewed, those documents.

10  And I'd also just like to note that defendants have

11  segregated since the government raised this issue, and I'd

12  like to note that they raised it 7 1/2 months after this

13  disclosure; they never asked for any clarification about

14  whether he -- he was relying on particular documents from --

15  within those Bates ranges. But I would just say that under

16  these circumstances, we've segregated the documents as soon as

17  we learned about the government's position, so there's no

18  practical sense in which Dr. Muth is going to be using these

19  moving forward in his opinions.

20  THE COURT: Well, the difficulty on this is you can't

21  get into the mind of Dr. Muth and know what impacts his

22  opinion. If he's reviewing documents -- most experts review

23  documents that both sides have access to. It may be books; it

24  may be treaties; it may be a set of discovery. And both sides

25  have access to it. The problem here is if he's looking at

1  documents the government doesn't have access to.  And the
2  statement that he's not relying upon it is not something that
3  can be tested in a traditional way where you -- the other side
4  knows what he's looking at; the government simply doesn't
5  know.  And I don't view it as unfair to the defendants if an
6  expert is looking at a batch of documents and says, I don't
7  need to rely upon any of these.  He still looked at them.
8  That's the problem.  If he looked at them, I don't know what
9  impact it had on him.  It may have had no impact, so be it.
10  It may have had a subliminal impact.  Who would possibly know
11  that?  That's not going to be tested in court.
12  But it's -- I think it's fair for a person who's
13  going to testify as an expert, if I allow him to testify, to
14  allow the government to look at what he looked at.  So this
15  wasn't a tentative ruling; this is a final ruling.  And it may
16  be a ruling that carries with it, if there are more documents
17  he looks at from the database that is unknown to the
18  government going forward, those will have to be disclosed --
19  not disclosed, but they'll have to be noted to the government
20  so the government can then gain access to it.
21  Any other questions by anyone on this subject?
22  Okay.  Thank you.  We will go on from there.
23  The government provided me sometime ago with the
24  codes identifying, you know, Victim A and Investor B,
25  et cetera.  I simply can't find it.  I apologize.  Can you --

1  I'm sure you gave it -- I assume you gave that to the defense

2  long ago, but can you provide another copy to me?

3       MR. MADDEN:  We do -- we did do that, Your Honor, and

4  there is -- you know what, there's an updated one for the

5  Santiago proffer 'cause there may have been a few additional

6  anonymized names in there so we will -- we emailed that to the

7  defense the day after we filed it, but we will email a copy of

8  that, with a copy to the defense, to Ms. Wall.

9       THE COURT:  Okay.  Very good.

10      A thing to consider if we are going to go with the

11 jury trial, which obviously we are at this point, one thing

12 I'd like you to think about -- I just got off this long trial

13 and we had two things I suggested to the parties.  They agreed

14 on one and not on the other, and we'll deal with this at the

15 final pretrial conference, but it's something to think about

16 in the meantime.  I -- in civil cases, I allow jurors to ask

17 questions.  And stop me if I've talked about this.  I don't

18 have my transcript from the last status with me right now, and

19 if we talked about juror questions, stop me right now.

20      Anyone?

21      Apparently not.  Okay.  I let jurors ask questions in

22 civil cases, and I -- if the parties agree, I let them ask

23 questions in criminal cases.  I won't force this issue if one

24 party, government or defense, or a single defendant and not

25 all defendants, object to it.  I'm not going to put this

1  process in place without a unanimous agreement by everyone,
2  but it's -- they're all done in writing; it's only after a
3  witness has been fully questioned.  On this last criminal
4  trial I allowed it because the parties all agreed to it, and
5  we didn't have many questions, but the questions that were
6  asked by the jurors were good ones.

7  They're done in writing.  I review them at sidebar
8  with everyone to make sure that there's no objection to the
9  question.  I then let the party that's got the witness on the
10  stand ask the question.  I allow, you know, prefatory
11  questions to put the question in context; I allow
12  cross-examination on the new question.  And it's a great way
13  to know what a jury is thinking, it's a great way to know if
14  you think on either the government or defense side you've got
15  an issue nailed and it turns at least one juror doesn't think
16  so.  You're not looking to see if they're frowning and smiling
17  at you throughout the trial; you know where their head's at a
18  little bit.  And you can adjust your prosecution or defense a
19  little bit, at least based on what questions the jurors are
20  asking.

21  And from my perspective, I don't think it gives an
22  advantage to either side.  I think it is just helpful to the
23  jury.  And that's my singular goal, beyond making sure,
24  you know, the parties get a fair trial, but I think I want the
25  jurors to be as educated as they can, and if they think

1   there's something missing that they don't get and they get to
2   put that question in writing, it gives both sides a chance to
3   educate that juror and, obviously, the other jurors and anyone
4   in the courtroom on that point.

5           So give it some thought.  If there's an interest in
6   that, we'll talk about it at the final pretrial conference.
7   I'm going to have my law clerk email you the instruction I
8   routinely include in the preliminary instructions that
9   describes juror questions, if you all agree to it.  But maybe
10  once you see the instruction I give the jurors, maybe you'll
11  feel more comfortable doing that, but I don't know if you've
12  had that process in -- you might have had it in civil cases;
13  I'm not sure you had it in any criminal cases, but I'm
14  throwing it out there.

15          And my law clerk, by the way, her name is
16  Sydney Black, she will be sending you an email, but she can be
17  your point of contact going forward on issues that don't deal
18  simply with scheduling where you'll talk to Emily, my
19  courtroom deputy.  But if there's some substantive legal
20  issues that come up, feel free to email her, copying everyone,
21  and we will respond.

22          I don't want to stand on protocol as long as everyone
23  has notice.  If there are some questions about an issue that
24  we can resolve quickly and not wait for our next status call,
25  just send that email to Sydney and she'll introduce herself by

1  email to all of you.

2  Okay.  The second issue that I want you to think
3  about, if you can, that I would raise at the final pretrial
4  conference, but no point waiting until then, is the issue of
5  interim statements.  Again, in civil cases I do this
6  routinely.  I allow the parties 10, 15 minutes a week divided
7  up any way they want where they can give an interim statement
8  and they don't give notice to the other side.  They just say,
9  Judge, I'd like to make an interim statement.

10  It can't interrupt a witness.  It's got to be after a
11  witness has testified.  And you can use that 10 or 15 minutes
12  any way you want.  Use it in increments of 1 minute,
13  5 minutes, 7 minutes, whatever you want.  Unused time at the
14  end of one week doesn't carry over to the following week.
15  Each side keeps the time of the other side so nobody's going
16  to go even a second over without someone jumping up and
17  saying, Judge, they're done.

18  I used to police this where there wouldn't be
19  arguments in it, but that turned out to be unworkable.  So as
20  long as it's not something you say that would be unacceptable
21  in a closing argument, you can say it in the interim
22  statement.  It's a great opportunity, I think, especially in
23  long cases to -- on the government's side to tell a jury where
24  they're at.  You know, we have -- we've proven X, we're about
25  to prove Y.  From the defense point of view, it's a great

1  opportunity, in my mind, to not let the wait of a ten-week --
2  ten weeks of witnesses by the government accumulate and have
3  the jury, despite our best efforts, start thinking about
4  conclusions and for you to get up and give statements saying
5  not so fast, you know, that cross showed X or we're going to
6  put on witnesses that will show Y, or however you want to use
7  it.

8  Give it some thought.  I think they are hugely
9  helpful to juries in lengthy trials, and this will be a
10 lengthy trial, of course.  So give it some thought.  I won't
11 do interim statements either unless everyone agrees.  If
12 someone disagrees on jury questions and interim statements, I
13 don't need to know who it is.  I don't want to put the --
14 given the fact I'm in favor of these, I don't want anyone to
15 think that by opposing it they're going to be irritating me.
16 You won't.

17 I just need to know there is a unanimous agreement to
18 it or there's not.  And I don't need to know who is in favor
19 of it.  Maybe all three are opposed to it, all three
20 defendants and the government, all four parties, or maybe just
21 one person is opposed to it, but I don't want anyone pointing
22 a finger.  I just need to know unanimously.  You can talk
23 about it and then get back to me at the final pretrial
24 conference.

25 Okay.  Two defendants, Choi and Han, are -- pled

1  guilty before Judge Tharp in 19 CR 865.  Per the Santiago

2  proffer, they're testifying in this case.  I talked to

3  Judge Tharp.  I don't know why -- and I don't need to know

4  why -- they were charged separately in informations as opposed

5  to in this indictment.  The government has their reasons, and

6  it's none of my business, but I would expect -- and maybe you

7  can tell me this, Mr. Madden, I assume they have cooperation

8  plea agreements.

9        MR. MADDEN:  They do, Your Honor, but just to --

10  yeah, so they are under subpoena and we did talk about this

11  once or twice over the past couple of years.  I -- I doubt

12  that they will testify but, you know, there's -- there's the

13  possibility that we call them as witnesses, so we -- so we did

14  subpoena them.

15        THE COURT:  Well, where I was going on this is simply

16  whether it makes sense to transfer, by agreement with

17  Judge Tharp, the -- their cases to me.  I thought they would

18  be testifying.  You're telling me that they might not, and

19  maybe they will.  But even if they don't testify, they're

20  going to have to be sentenced, and my evaluation of where they

21  stood in things if, you know, Desai, Choi, and Han are the

22  only defendants I have to sentence, I will still have the

23  benefit of a trial to understand their role and their -- what

24  they did.

25        I'd like you -- I don't know that the defendants in

1  this case have any dog in this fight.  If you have an

2  objection to that process, let me know, of just transferring

3  it.  It just seemed more efficient, rather than have

4  Judge Tharp trying to learn about a case that would involve a

5  lot of work by him just to learn the underlying facts of the

6  case when he has no involvement otherwise.  When I will have

7  the benefit of a lengthy trial, it would seem that it would

8  make more sense for me to conduct their sentencing and just

9  simply transfer it to me.

10  Now, that has to involve -- I'd obviously have to

11  know what the attorneys for -- it's -- is it pronounced Choi?

12  Is that one defendant?

13  MR. MADDEN:  It's Choi, yes, Your Honor.  Your Honor,

14  the government has no objection.  That does -- you know, that

15  does make some sense, and we have no objection.

16  Choi is represented by Bill Ziegelmueller; and Han is

17  represented by Leigh Roadman.

18  THE COURT:  Okay.  Well, do any of the defendants

19  here in this case have any objection to that?

20  Okay.  I'll assume silence means no objection.  If

21  you do have an objection, state it.

22  Okay.  Then I'd ask you, Mr. Madden, to contact those

23  attorneys, Mr. Ziegelmueller and Mr. Roadman, and see if they

24  have an objection.  Copy them on an email to my courtroom

25  deputy stating you've spoken to them and they either have an

1  objection or don't.  If they do, we won't do -- well, if they

2  do, I'm not sure that necessarily carries the day.  I'll think

3  about it, but it's easier if they have no objection, we'll

4  just do an administrative transfer within the courts and then

5  their sentencing will be put off indefinitely until this trial

6  is over.  But it just seems unfair to Judge Tharp to have him

7  learn about a -- learn all the things I will necessarily learn

8  by listening to the evidence.  Okay.

9         MR. POULOS:  Your Honor, it's -- Your Honor, it's

10 Ted Poulos.

11         THE COURT:  Yes.

12         MR. POULOS:  While we're on the subject of Choi and

13 Han, I think the last time this issue was raised, I said that

14 there was a decent chance that if the government doesn't call

15 one or both of them that -- that the defense may call one or

16 both of them because they really are essential to so many of

17 the events that I think are at issue here.

18         And so I'm just fronting the idea that I think

19 they -- it would be likely if they would testify if called by

20 some party, and I'm just putting on the front burner now

21 this -- this issue that I've run into from time to time where

22 witnesses had the cooperation plea agreement and they will

23 testify if the government calls them, but might be inclined to

24 assert the Fifth Amendment if the defense calls them.  So I'm

25 just alerting the Court today that it's something we should be

1  ready for down the road.

2  THE COURT: Well, so be it. You know, you can --

3  you know Mr. Ziegelmueller or Mr. Roadman better than I do.

4  You can talk to them, too, about this.

5  MR. POULOS: Yeah.

6  THE COURT: I don't know if -- can a person take the

7  Fifth when called by the defense? You think they would

8  take -- there's a possibility they'd take the Fifth if called

9  by the government?

10  MR. POULOS: No, they're required to testify for the

11  government.

12  THE COURT: That's what I thought. Maybe I misheard

13  you, but you think they would do it if called by the defense?

14  MR. POULOS: Well, it's just a concern, Your Honor.

15  I'm just saying it's a possibility that we'll be, you know,

16  addressing that -- that -- the propriety of that happening so.

17  THE COURT: Well, it's an interesting issue, but I

18  don't know where they'd have a right to assert a

19  Fifth Amendment privilege if they've already admitted to

20  conduct. I mean, as long as it's not -- the testimony will

21  likely be -- it's not just coextensive with the factual basis.

22  It would probably be greater, but it would be the unusual

23  circumstance where a person would take the Fifth in front of

24  the sentencing judge on conduct that is the subject of their

25  criminal information plea.

1          I guess we'll -- I've seen every -- I thought I've

2   seen everything, but that would be a new one.  So be it.  But

3   all in all, it still reinforces in my mind that the efficiency

4   of having their sentencings -- having their cases transferred

5   to me, which you can speak to Mr. Madden and, obviously,

6   attorneys for Choi and Han if you've got a reason to talk to

7   them about this, but I'll wait to hear from Mr. Madden on the

8   views of attorneys for those two defendants.

9          Okay.  Anything else -- I want to get to *Daubert*

10  motions, but is there anything else that I've not addressed

11  that you would like me to address today?  I know I have a

12  number of -- oh, Mr. -- I'll raise this before I get an answer

13  to that question.

14         You didn't think you were going to raise any 404(b)

15  evidence, Mr. Madden.  Is that -- have you cemented your

16  position on that?

17         MR. MADDEN:  I'd say 99 percent sure that we're not

18  going to.  I don't -- yeah, so I really doubt it at this

19  point.

20         THE COURT:  Okay.  Well, you've got until

21  November 25th to cross over to that 1 percent that you're

22  holding back so you've got a little time.  Your notice is due

23  November 25th so I guess we'll know an answer for sure on that

24  date.  Okay.

25         MR. POULOS:  Judge --

1          MS. CHOU:  Your Honor, sorry to --

2          THE COURT:  Yes.

3          MS. CHOU:  This is Vicki Chou.  Sorry to jump in.

4          I think there was a little bit of ambiguity about the

5     Court's order on the documents.  The Bates range cited in the

6     disclosure letters, those documents were not all reviewed by

7     Dr. Muth, and I believe we have tracked the documents that

8     Dr. Muth actually reviewed, and so I presume the Court's order

9     is pertaining only as to the documents Dr. Muth actually

10    reviewed, which we can --

11         THE COURT:  Yes.

12         MS. CHOU:  -- segregate and provide to the

13    government.

14         THE COURT:  That is absolutely right --

15         MS. CHOU:  Okay.  Thank you, Your Honor.

16         THE COURT:  -- but critically, it's not limited to

17    what he relied upon; it's what he reviewed.  And if it's --

18         MS. CHOU:  Understood, understood.

19         THE COURT:  -- if that's different than a, you know,

20    disclosure was inaccurate or the government thought something

21    was reviewed but not -- whatever that range is, the -- that's

22    a factual issue -- a factual matter that there are documents

23    he reviewed, you kept track of it, that's what the government

24    should be told they can look at and that's --

25         MS. CHOU:  Yes, Your Honor.  Thank you.

1          THE COURT:   Okay.  Great.

2              And someone else wanted to raise something?

3          MR. POULOS:   Yes, Judge, it's -- Judge, it's

4    Ted Poulos again.

5          THE COURT:   Yeah.

6          MR. POULOS:   Speaking -- speaking of November 25th,

7    Judge, that's the Friday after Thanksgiving.   I conferred with

8    the government on this issue, just the scheduling matter.  Our

9    response is due to the government's motions in limine and

10   there were many and some of them are quite substantive are due

11   on Tuesday -- next Tuesday, the 22nd.   And we're going to meet

12   that deadline, but the three -- but the Friday after

13   Thanksgiving, Your Honor, our Santiago proffer -- our

14   responses to the Santiago proffer are due and --

15         THE COURT:   Sure.

16         MR. POULOS:   -- the government doesn't have an

17   objection to this request, Your Honor; we would like an extra

18   seven days to December 2nd to submit our responses to the

19   Santiago proffer.

20         THE COURT:   Sure.  No objection by the government?

21         MR. MADDEN:   Correct, Your Honor.

22         THE COURT:   Okay.  Yeah, you've got it.  So

23   December -- what day was it you wanted, December --

24         MR. POULOS:   Friday, December 2nd.

25         THE COURT:   December 2nd.  Okay, that's fine.  And --

1        MR. POULOS:  Thank you.

2        THE COURT:  -- Mr. Madden, you can -- you can also

3   take the extra time to decide if you're going to file any

4   404(b) evidence.

5        MR. MADDEN:  Sounds good.

6        THE COURT:  I don't think that's going to prejudice

7   the defendants too much, if at all.  Okay.  And you can all

8   make that date -- I know the motions in limine are pretty

9   substantial.  You can all make the November 22nd date?  I'm

10  not fishing for you to ask for more time, but you're

11  comfortable you can make that date?

12       MR. POULOS:  On the defense side, I think we are

13  comfortable, yes.

14       THE COURT:  Okay.  That's fine.  And we have -- I did

15  not ask for replies, so that's fine.  Okay.  And we've got

16  other dates, December 2nd.  And December 9th, witness lists

17  and exhibit lists; December 12th for the government.  Our

18  final pretrial conference is December 16th.  I just want to

19  make sure I've allowed myself enough time to look over your

20  motions in limine which I think on the schedule you have

21  proposed is -- that'll work.

22       Okay.  The *Daubert* motions.  I must tell you,

23  you know, Rule 702 is -- requires that expert testimony be

24  relevant.  I'm having a lot of difficulty understanding in

25  some ways the relevance of some or many of the opinions of all

1  three defendants.  It could be me.  It could be I need to -- I

2  read the Santiago proffer, I've read the indictment, and I may

3  need just to -- maybe I'll learn more as I read the motions in

4  limine and the responses, but many of these seem untethered to

5  the actual Outcome Health situation.

6          There's really three limitations on an expert.

7  There's statement of mind limitations.  You know, they can't

8  testify to a defendant's state of mind.  Relevant limitations:

9  You know, the relevance, it has to be tied somehow to the

10  company or possibly to what the defendants knew.  And then,

11  finally, reliability limitations.

12          I -- I guess I'll ask this question first, and each

13  defendant can answer:  Do you intend to speak about these

14  experts' opinions, these opinion testimony witnesses, in your

15  opening statements?  Well, maybe that's unfair.  Let me tell

16  you why I'm asking.  That's probably a better reason.  It's

17  not a trick question.

18          It's very difficult for me to rule on the abstract as

19  to the relevance, not getting even into reliability, but the

20  relevance of these witnesses until I have a better feel for

21  what the government's case is.  It may not be these witnesses

22  are relevant until I -- the government puts in evidence

23  relating to what they believe the defendants knew and why they

24  knew it.  It may be it doesn't become relevant until a

25  defendant testifies, which, of course, they have no obligation

1    to do.  But if a defendant testifies and puts his state of

2    mind saying they relied upon something and that reliance is

3    called into question as to its reasonableness, it may be the

4    expert has something to add to that equation.

5         But if these are going to be witnesses that you

6    intend to rely upon and argue and present to the jury in your

7    opening statements, the government would have to deal with

8    this issue a lot sooner.  And it may require *Daubert* hearings,

9    or at the very least some arguments about the relevance of

10   their testimony.

11        So I'm back to the same question, and maybe you can't

12   answer it right now because you're -- you've got so many other

13   things to do you haven't started thinking about what exactly

14   you're going to say in your opening.  Sometimes defense

15   lawyers have a minimalist approach to their openings,

16   sometimes they -- they go on at length about what they're

17   going to say and what they do say in their opening.

18        But if you're going to talk about any of these three

19   experts in your opening, then we're going to have to address

20   their relevance and reliability and possibly -- very possibly

21   have a *Daubert* hearing on all three before that happens.

22        So if you're prepared to tell me right now what your

23   position is on that, that's fine.  If not, I'd like you to

24   give it some thought and we'll have to address it fairly soon

25   because I expect if we're going to have a *Daubert* hearing

1  before this trial, you're going to have to get the schedules

2  of three very -- what are likely very busy witnesses, such

3  that they come to Chicago.  I think one -- well, at least one

4  is in Chicago.

5          Is it -- how do you pronounce it?  Is it Lys, L-Y-S?

6          MR. POULOS:  Lys.

7          THE COURT:  And he's in Chicago, right?

8          MR. POULOS:  Yes, in the Chicago area.

9          THE COURT:  And Muth, Muth, I'm pronouncing correctly

10  because I think I've said it earlier.  You can correct me.

11  He's in Chicago also?

12          MS. CHOU:  Yes, Your Honor, he is.

13          THE COURT:  And Yeh is out in California?  Am I

14  pronouncing it correctly?

15          MS. CHOU:  Yes, Your Honor.

16          THE COURT:  He's in California, I thought I read.  Is

17  that correct?

18          MS. CHOU:  Yes, I believe so.

19          THE COURT:  Yeah, getting these people in or even,

20  you know, from across town, given their schedules, and getting

21  all of you in from California and the Chicago attorneys is an

22  undertaking and I don't want to do that if it's a matter I can

23  resolve during trial.

24          Now, this may be central to your defense and you

25  can't approach this case without knowing whether they're

1  testifying or not, and I understand that.  But if you're not
2  going to mention it in an opening, I will likely have a better
3  ability to rule on the objections of the government as we get
4  into the trial.

5       Is anyone prepared to speak to this today?
6  Otherwise, I'll give you a date to tell me what you want to
7  do.  First, for -- Mr. Hueston or Ms. Chou, do you want to
8  speak to this?

9       MS. CHOU:  Your Honor, I think we need more time to
10  consider.

11       THE COURT:  Yeah, I'm not surprised.  So that's fine.
12  But I hope you understand where I'm coming from on this.  I --
13  I have -- I think the objections raised by the government
14  are -- are significant.  I have -- I know you've refined the
15  disclosures to eliminate any ambiguity about their not
16  testifying about the state of mind of the defendants which,
17  of course, they cannot do, but I still have questions about
18  their relevance.

19       This is not an accounting malpractice case,
20  of course.  And the government's point about you can't victim
21  blame and say if Deloitte had done a better -- done a better
22  job, then the alleged fraud wouldn't have occurred.  That of
23  course is not -- that's not what the defense says they're
24  saying, but the government thinks they are, I -- I --
25  Dr. Yeh -- is it Dr. Yeh?  I think it is.

1    MS. CHOU:  I think he's just Chris Yeh, but it's
2    Professor Muth.

3    THE COURT:  All right.  Mr. Yeh, all right.  Mr. Yeh.
4    Who came up with this phrase of --

5    MS. CHOU:  Blitzscaling.

6    THE COURT:  -- blitzscaling?  I looked it up in
7    Webster's.  It seems like it's a phrase that is -- who came up
8    with it?  Mr. Yeh?

9    MS. CHOU:  I think he and his -- his coauthor did.

10    THE COURT:  Yeah.  I mean, I'm puzzled and not quite
11    sure where the idea that if you want to take advantage of a
12    market opportunity where you move quickly into an area that is
13    unoccupied by other competitors and you want to take advantage
14    of the -- of the market and that opportunity so you move
15    quickly on a variety of things, so be it.  That doesn't change
16    the normal equation of false statements can't be made.

17    Whether you go with a catchy name like blitzscaling,
18    meaning you just move more quickly and you do a variety of
19    things that, you know, some businesses do and some businesses
20    don't, it doesn't change the basic requirement that you be
21    truthful in [inaudible] interested third parties.

22    Now, I'm oversimplifying, of course, and I would
23    certainly entertain -- not right now -- but entertain at some
24    point the -- some oral argument on why these opinions of all
25    three of them are relevant, but I -- I'm having a little

1   difficulty understanding what difference any of that makes to
2   a basic -- what is I think seems like a straightforward case.
3   The government claims it's straightforward, and the defense
4   says it's fairly straightforward, too, that Choi, Han, and
5   Desai committed a massive fraud that they hid from the three
6   defendants.

7           I don't know that talking about the scope of -- and
8   the -- what start-ups do and what they look like is all that
9   relevant.  What's important is what Outcome looked like;
10  Outcome looked like.  And talking about how some companies
11  move very quickly to take advantage of market opportunities,
12  so it be.  Some companies do, some companies don't.  You're
13  not in the auto industry.  You're in a unique area that the
14  defendants took advantage of in the good sense of getting into
15  a market area that was not filled with competitors.  So be it.

16          And if they had to move quickly on that, that's fine.
17  It doesn't change the basic facts at all.  You can't do it in
18  a way that's improper, whether you're a big company, a small
19  company, moving slow or moving quickly.  So I just don't
20  understand -- and I'm previewing all this in case you're going
21  to argue this in front of me -- I don't understand how that's
22  relevant.

23          And as Dr. Muth on -- or Mr. -- I guess it's
24  Dr. Muth -- on revenue recognition, you know, maybe that's an
25  issue if the revenue recognition policies that Deloitte

1   followed were improper and the defendants relied upon them.

2   Just pointing out they were improper or somehow there's a --

3   you know, they didn't do it according to GAAP or GAAS -- well,

4   no -- GAAP for the revenue recognition, and GAAS, I guess, as

5   to whether they followed proper auditing procedures, I --

6   again, it's not an accounting malpractice case.  And unless

7   this gets tethered to something that relates to a defense,

8   it's just criticism of -- in Muth -- in Lys's case --

9   criticism of Deloitte that -- you know, so be it, but

10  Deloitte's not on trial.

11        So I'm sorry to ramble a little on this.  I've

12  finished reading these and I haven't organized it, but I want

13  to tell you, I have some significant doubts about this that

14  may be allayed at a *Daubert* hearing, it may be allayed if we

15  have oral argument and you can explain the relevance of it

16  without us having to drag in the witnesses, and it may be

17  allayed deeper into the trial if you don't need a ruling on

18  this to give your opening statements.

19        So probably a lot for you to think about, and I'll

20  give you that time to do so, but I think if there's an intent

21  to refer to these experts in your opening and an intent to

22  know the answer to whether they'll be allowed to testify, and

23  if they are allowed, what they'll testify to, and you need to

24  know that going in to trial, then we're going to have either

25  at a minimum some argument on the issue of the relevance, and

1   it's very possible we need them to come in and testify so I
2   can understand how they reach their conclusions -- reliability
3   of their conclusions.

4           Okay.  So any questions on that?  First, from the
5   government.

6           MR. MADDEN:  No, Your Honor.

7           THE COURT:  All right.  And how about the defendants,
8   any questions on that one?  And if you have a suggestion of
9   the time you need to tell me what your position is on their
10  use in opening statements, I'd appreciate it.  That you can
11  tell me today, how much time you need to make that decision.

12          So Mr. Hueston or Ms. Chou.

13          MS. CHOU:  Can we get until after Thanksgiving, maybe
14  until the 2nd, December?

15          THE COURT:  That's fine.  This is a big issue, and
16  the 2nd of December is fine, as far as I'm concerned,
17  understanding that as we get closer to trial, it's going to
18  jam your -- I'll give you the time.  I've got another couple
19  of trials in between you -- in between today and your trial,
20  but I'll find the time, and it's a matter, frankly, of making
21  sure you're not jamming your witnesses if it turns out
22  something where they have to testify to, especially the
23  out-of-town witness.

24          Okay.  But December 2nd's fine, as far as I'm
25  concerned.

1      How about Ms. Bell?

2      MS. BELL:  Thank you, Your Honor.  We will confer and

3  work together to get you an answer by then.

4      THE COURT:  Okay.  And finally, Mr. Poulos.

5      MR. POULOS:  December 2nd is fine, Judge, although

6  I'll observe today that I have never once promised anything

7  about a defense case in my opening statement.

8      THE COURT:  Well, that's the -- yeah, that's what I

9  thought and -- but these are people you've retained, paid for,

10  and, you know, if it's a big part of your case, you may -- I

11  just don't know --

12      MR. POULOS:  Yeah.

13      THE COURT:  -- Mr. Poulos.

14      MR. POULOS:  And, Judge, the other observation I'll

15  make, we don't need to get into it now, I don't think so,

16  we'll let you know by December 2nd, but -- but the Deloitte

17  issue, Dr. Lys's testimony about Deloitte and what they knew

18  and understood and the incorrect data determinations they

19  made, I think it is going to be -- it will become apparent

20  that it's -- that it is pretty relevant and it's also tied to

21  some of the issues that the government expert's going to be

22  testifying about as well, so I'm pretty comfortable with that,

23  but we could address that down the road, I suspect, but we'll

24  let you know for sure December 2nd.

25      THE COURT:  You couldn't -- you couldn't help

1  yourself, Mr. Poulos.  You still had to argue it, didn't you?

2      MR. POULOS:  Sorry.

3      THE COURT:  That's fine.  No, December 2nd's fine.

4  It doesn't have to be a filing on the record.  It's simply an

5  email to Sydney letting her know your position on this,

6  copying the government.  I'm sure you'll meet and confer and

7  talk about this ahead of time, but why don't we do it that way

8  and then we'll go from there.

9      And don't take -- my comments about where I thought

10  there were problems with these issues, don't take them as

11  definitive or exhaustive.  I had a lot of notes next to all

12  the briefs both sides filed and also next to the opinions, the

13  disclosures, and I didn't try and summarize them here.  I just

14  gave you a couple highlights, but by no means should you

15  consider those to be my only concerns, nor should you view

16  them as a definitive statement of what I am concerned about,

17  but there's enough there where I'm going to want to know more

18  about things before I give you a ruling on -- on their

19  admissibility, or even a *Daubert* hearing.  So there you have

20  it.

21      Mr. Madden, if you change your mind on a bench, let

22  us know before December 12th because that's when the letters

23  go out.

24      MR. MADDEN:  Will do, Your Honor.  Respectfully, we

25  have discussed it and given it consideration, so I don't

1  expect that we'll change our position.

2  THE COURT:  No, and there's no reason you should.  If

3  that's your call, then keep -- keep it, and we'll have a jury

4  trial, which is from my perspective fine.  I love jury trials,

5  so I'm happy to do it, and we'll proceed from there.

6  Okay.  I think that's all I had on my list of things.

7  Does anyone else have any questions or things they want to

8  raise at this time?

9  First, the government.

10  MR. JOHNSTON:  Your Honor, this is Mr. Johnston.

11  Sorry to return to the issue of the search warrant

12  materials.  When Ms. Chou came out and asked for clarification

13  from the Court about exactly which materials the government

14  would have authority to access, she indicated that they had

15  been tracking the exact documents that Mr. -- or that Dr. Muth

16  had reviewed, and so is the Court's position -- the Court's

17  ruling that we only -- that what they disclosed in their

18  letter is not what we get access to?  Because that was how the

19  government understood the Court's ruling, what they said in

20  their letter that -- that Dr. Muth had been given access to is

21  what the government could also access.

22  THE COURT:  Well, by given access, I assume it's not

23  just here's the keys, take a look at -- you know, and

24  therefore if he has keys, he has access to a million

25  documents.  I assume the defense has tracked -- and I think

1  Ms. Chou has indicated -- they've tracked what he has looked

2  at, not what he's relying upon for his opinions, but what he

3  has looked at in his review from which he's probably plucked

4  some documents that he intends to rely upon.

5      Is that correct, Ms. Chou?

6      MS. CHOU:  Yes, Your Honor.  And if that turned out

7  not to be the case, or if they aren't able to identify that

8  with specificity, then we'll let the government and the Court

9  know, but my understanding is that he's been coding the

10  documents as he's been reviewing them.

11      THE COURT:  Okay.  Yeah, Mr. Johnston, that's what I

12  understood.

13      Do you disagree or is there some problem with that --

14  that protocol?

15      MR. JOHNSTON:  I mean, that is -- that is fine,

16  Your Honor.  It just, I guess, brings into question the entire

17  disclosure of Dr. Muth, because one of the things we had

18  complained about is they basically just said, here's a couple

19  million documents that Dr. Muth was provided access to.  So

20  now they have the ability to tell us which ones he's reviewed,

21  then we ask that they tell us all the ones they reviewed, not

22  just the ones from that specific range, because otherwise it's

23  sort of a -- a document dump-type disclosure that sort of

24  tells us nothing, because it just said, here's a couple

25  million documents he's been given access to, but it -- now it

1  appears that they actually know -- you know, have a record of
2  exactly which ones he's reviewing.

3  So we're going to be limited to only reviewing the
4  exact documents that he has put his eyes on, and we also ask
5  to be informed of the other documents that he is reviewing,
6  not just the ones from the -- the search warrant materials.

7  THE COURT:  Well, we're talking --

8  MS. CHOU:  Your Honor?

9  THE COURT:  Yeah, go ahead, Ms. Chou.  Go ahead.

10  MS. CHOU:  Yeah, I think that's a different issue, as
11  we -- I think we -- we briefed.  There's no authority that
12  requires defendants to identify what documents the expert has
13  reviewed.  We just included that as the -- disclosure as part
14  of the hope -- the conversation with the government in hopes
15  of warding off the motion.

16  And then the Point B as to the materials in these
17  subsets, we are willing -- and it's probably easier for us to
18  identify and produce those from the tagged universe, as
19  opposed to having to do some back and forth exchange of lists.

20  THE COURT:  Yeah, however that works out
21  logistically, whatever's easier for the parties, I'm sure
22  you've all cooperated up to now.  I'm sure you will continue
23  to do it here.  I -- Mr. Johnston, on the one hand you didn't
24  want a document dump; you were looking for all these documents
25  in your motion, so I limited it to the documents that he has

1  looked at. And my key point is not just relied upon for an
2  opinion, but he's looked at, for the reasons I gave earlier.
3  Those are the documents the defense -- I'm assuming, Ms. Chou,
4  you've represented that he has kept track of what he's looked
5  at. Is that correct?
6          MS. CHOU: Yes, that's my best understanding --
7          THE COURT: Okay.
8          MS. CHOU: -- where -- yeah.
9          THE COURT: I'm sure you'll have a discussion with
10  him after this to make sure that's the case. And if it's not,
11  you know, let the government know. If we have to reconvene a
12  call, we will, but if he's been keeping track by Bates range
13  of a -- you know, in the previous world, he might say I looked
14  at those two boxes out of a hundred. That would be the two
15  the government can get access to then. Same thing now with
16  just Bates ranges for that.
17          And if it turns out that he hasn't been as precise
18  about what he's looked at, we'll have to address the issue
19  otherwise. But that's -- Mr. Johnston, that's what he's --
20  that's what my order is, my oral order today, for them to
21  make -- let you know what those are. I thought they did. If
22  it turns out it's a larger subset or a smaller subset and he
23  didn't actually look at those, then you don't get them. If
24  they are documents that he's relying upon for his opinion,
25  of course you're going to get that. That's part of the

1 Rule 16 disclosure issues.

2 MR. JOHNSTON: Okay. Thank you for the

3 clarification, Your Honor.

4 THE COURT: Ms. Chou, any other clarification you

5 need on this?

6 MS. CHOU: No, Your Honor. Thank you.

7 THE COURT: Okay. Anything else from the government?

8 Okay. And how about for -- Mr. Hueston or Ms. Chou,

9 on behalf of your client, anything else?

10 MR. HUESTON: Nothing else on behalf of Rishi Shah.

11 Thank you, Your Honor.

12 THE COURT: And, Ms. Bell, for Ms. Agarwal?

13 MS. BELL: Nothing further. Thank you, Your Honor.

14 THE COURT: And, Mr. Poulos, anything else?

15 MR. POULOS: Nothing -- nothing further. Thank you,

16 Judge.

17 THE COURT: Okay. Well, I look forward to what you

18 tell me about this issue, and then we should probably, as

19 always, have another status in this case just to keep track of

20 things. I would suggest probably the 8th or the 9th.

21 Emily, are you still on the line?

22 THE CLERK: Yes, Judge, I'm still on the line.

23 THE COURT: Can we do a call on the 8th or the 9th?

24 THE CLERK: We can do the 9th.

25 THE COURT: Okay. And let's make it midday or later

1  for everyone on the West Coast.

2  THE CLERK:  We can do noon.

3  THE COURT:  Okay.  Fine.  Does that work for

4  everyone?  I'll assume yes, unless I hear no.

5  MR. MADDEN:  Your Honor --

6  MS. CHOU:  Your Honor, we have --

7  THE COURT:  Go ahead.

8  MR. MADDEN:  Could we do it a little bit later in the

9  day possibly?

10  THE COURT:  Yeah.

11  MR. MADDEN:  I might be traveling that day.

12  THE COURT:  Oh, fine.  What are you suggesting,

13  Mr. Madden?

14  MR. MADDEN:  Say, 3:00 p.m. or later.

15  THE COURT:  How about -- we did a 4 o'clock call

16  today.  How does that work for everyone, 4 o'clock on

17  December 9th?  And if it doesn't work, we'll just switch the

18  day.  That's not -- there's nothing magic about this.

19  MR. MADDEN:  It works for the government.

20  THE COURT:  Okay.  And how about -- I'll assume it

21  works for everyone on the defense, unless you tell me it

22  doesn't.  Okay.

23  MS. CHOU:  That works for us.  This is Vicki Chou.

24  And this would be in addition to the final pretrial

25  conference we have set on the 16th?

1    THE COURT:  That's correct.  This is just a --

2    MS. CHOU:  Okay.

3    THE COURT:  -- regular update to kind of discuss

4    issues.  I may ask you to come on earlier for a call if when I

5    learn about on December 2nd convinces me that we need to start

6    setting dates for a *Daubert* hearing or set a date for an oral

7    argument on relevance relating to these opinions, or it's

8    something we wrap into the final pretrial conference on the

9    16th, which -- where we have pretty much the full day.

10    By the way, there's one other point I'd like to make

11    that I -- so you know going forward.  I found on lengthy

12    trials that the process of perfecting impeachment when a

13    defendant cross-examines a government witness and they point

14    out a prior inconsistent statement or some type of

15    inconsistent statement, that waiting until the defense case,

16    which may be nine, ten weeks later, nine weeks, maybe, later

17    to perfect that impeachment usually done by way of a

18    stipulation that if called to testify, FBI agent so-and-so or

19    IRS agent so-and-so would say the witness said the sky was

20    green when on direct they said it was blue.  I find that to be

21    very unhelpful to a jury.  It's almost incomprehensible and it

22    doesn't make any sense to me.

23    So I will generally allow the perfection of

24    impeachment to interrupt the government's case to put that in

25    right after the -- you know, if the defense cross-examines a

1   witness and they deny they said something to the other -- to

2   the agents that's inconsistent with their actual direct

3   testimony and you were going to get that in in your case, I

4   will typically allow that in during the government's case,

5   often by stipulation, hopefully, so we're not interrupting the

6   witnesses.  But that kind of impeachment is meaningless to

7   happen ten weeks later.

8        So the government should know that's my practice.

9   The trial I just completed, I did that, and I think it's only

10  fair to defendants because there's just no way to understand

11  the import of that type of impeachment when it -- that type of

12  evidence when it comes on much later than when the witness

13  testifies.

14       And, again, I'm not trying to help the government or

15  defense.  I think it's unfair to the jury.  And that's my

16  concern.  So keep that in mind, too.  I will tell you at the

17  final pretrial conference, but I thought I'd tell you up front

18  now and if there's any constitutional or statute or case law

19  that says that's wrong, you can be prepared to tell me, but I

20  think that's within my discretion and that's how I've been

21  calling it in the past.

22       Okay, everyone, we'll talk to you soon, and have a

23  good holiday.

24            MR. MADDEN:  Thank you, Your Honor.  You, too.

25            MR. POULOS:  Thank you, Your Honor.

1      MS. CHOU:  Thank you, Your Honor.

2      MR. HUESTON:  Thank you, Your Honor.

3      MS. BELL:  Thank you.

4      (Proceedings concluded at 5:04 p.m.)

5                    CERTIFICATE

6      I certify that the foregoing is a correct transcript from

7  the record of proceedings in the above-entitled matter.

8  */s/ Elia E. Carrión*              *7th day of December, 2022*

9  *Elia E. Carrión*                          *Date*
   *Official Court Reporter*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25