<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )   Docket No. 19 CR 864
 4                   Plaintiff,       )
                                      )   Chicago, Illinois
 5        v.                          )   December 16, 2022
                                      )   10:05 a.m.
 6   RISHI SHAH, SHRADHA AGARWAL,     )
     BRAD PURDY,                      )
 7                                    )
                     Defendants.      )
 8

 9        TRANSCRIPT OF PROCEEDINGS - Final Pretrial Conference
              BEFORE THE HONORABLE THOMAS M. DURKIN
10

11   APPEARANCES:

12
     For the Government:     MR. MATTHEW F. MADDEN
13                           MR. SAURISH APPLEBY-BHATTACHARJEE
                             Assistant U.S. Attorney
14                           219 South Dearborn Street, 5th Floor
                             Chicago, Illinois  60604
15

16                           MR. WILLIAM E. JOHNSTON
                             MR. KYLE C. HANKEY
17                           U.S. Department of Justice
                             Criminal Division, Fraud Section
18                           Washington, D.C.  20530

19

20

21

22                        ELIA E. CARRIÓN
                        Official Court Reporter
23                    United States District Court
                 219 South Dearborn Street, Room 1432,
24                      Chicago, Illinois 60604
                           (312) 408-7782
25                  Elia_Carrion@ilnd.uscourts.gov
</pre>

APPEARANCES (Continued:)

```
For Defendant
Shah:                   MR. JOHN C. HUESTON
                        Hueston Hennigan LLP
                        620 Newport Center Drive, Suite 1300
                        Newport Beach, California  92660

                        MS. VICKI CHOU
                        MR. MICHAEL H. TODISCO
                        MS. KAREN DING
                        Hueston Hennigan LLP
                        523 West 6th Street, Suite 400
                        Los Angeles, California  90014


For Defendant
Agarwal:                MS. KOREN L. BELL
                        MR. A. ALEXANDER LOWDER
                        Larson LLP
                        555 South Flower Street, Suite 4400
                        Los Angeles, California  90071

                        MR. PATRICK W. BLEGEN
                        MS. KELSEY KILLION
                        Blegen & Garvey
                        53 West Jackson Boulevard, Suite 1437
                        Chicago, Illinois  60604


For Defendant
Purdy:                  MR. THEODORE T. POULOS
                        MR. ERIC PRUITT
                        MR. JOHN PAVLETIC
                        Cotsirilos, Tighe, Streicker, Poulos &
                        Campbell, Ltd.
                        33 North Dearborn Street, Suite 600
                        Chicago, Illinois  60602
```

1          (Proceedings heard in open court.)

2                THE COURT:  Let's call the case.

3                THE CLERK:  This is Case No. 19 CR 864, United States

4    v. Shah, Agarwal, and Purdy.

5                Could I please have the attorneys present on behalf

6    of the United States state their name.

7                MR. MADDEN:  Good morning, Your Honor.

8    Matthew Madden, William Johnston, Saurish

9    Appleby-Bhattacharjee, and Kyle Hankey on behalf of the

10   United States.

11               THE COURT:  Good morning.

12               THE CLERK:  And on behalf of Rishi Shah.

13               MS. CHOU:  Good morning, Your Honor.  Great to see

14   everyone in person.  Vicki Chou, John Hueston, Mike Todisco,

15   and Karen Ding on behalf of Rishi Shah.  And Mr. Shah is

16   present.

17               THE COURT:  All right.  Good morning.

18               THE CLERK:  On behalf of Shradha Agarwal, please.

19               MS. BELL:  Good morning, everyone.  I'm --

20               COURT REPORTER:  You can speak directly into the mic,

21   please.

22               THE COURT:  Yeah, you can all remain seated.  That's

23   fine, because my court reporter can only hear you if you're

24   speaking into a mic.

25               MS. BELL:  Ah, okay.

1    THE COURT:  You'll get used to it.

2    MS. BELL:  Okay.  Thanks very much.

3    Okay.  Good morning, everyone.  Koren Bell,

4    Alex Lowder, Pat Blegen on behalf of Shradha Agarwal, who is

5    also present.

6    THE COURT:  All right.  Good morning.

7    MR. BLEGEN:  I'm sorry, Judge, and also

8    Kelsey Killion on behalf of Ms. Agarwal as well.

9    THE COURT:  Okay.

10    THE CLERK:  And on behalf of Brad Purdy, please.

11    MR. POULOS:  Good morning.  Ted Poulos, Eric Pruitt,

12    John Pavletic on behalf of Brad Purdy, who's present.

13    THE COURT:  Okay.  Good morning, everyone.  Good to

14    see some of you in person that I've only heard by voice up to

15    now.

16    We're here for a final pretrial conference.  We have

17    a trial date of January 24th.  We moved it from the 23rd

18    because I have a trial the week before that may kick over to

19    the 23rd, so we'll start our jury selection on the 24th.

20    We sent out 500 jury notices; we've gotten 24 back.

21    Four people have said they could sit for 14 weeks; 20 have

22    said they cannot.  I haven't seen the responses.  I'll see if

23    their reasons for not sitting are acceptable.  My hope is that

24    we get -- as we get more returns, we get more yeses so I don't

25    have to dip into the noes and force them to possibly sit on a

1  case or challenge their reasons for not wanting to sit.

2  It's much easier when people come in who say they

3  actually can sit for a trial this length.  If it turns out we

4  end up with a lower number than we will need, because given

5  the challenges I gave each side -- 14 for the government,

6  22 for defendant -- we need a minimum of 54 jurors who have

7  not been challenged for cause to allow for full exercise of

8  challenges by the defendants and the government.

9  If it turns out we're -- we don't have that number,

10  we may have to reduce the number of challenges you have.  The

11  challenges that are there are -- you have a right to a

12  particular number under the rules.  Any additional challenges

13  are at my discretion, and I'll certainly consider lowering

14  those challenges, not below what you're allowed under the

15  rules, but lowering them so that we don't have to delay the

16  case to allow for more notices to go out and more people to be

17  selected -- to be called in.

18  I hope we don't come to that.  I'm going to keep you

19  advised as we go forward on the number of returns we get, the

20  number of yeses, and it's still my hope we get 100 to 120

21  people that say they can sit for a trial this length and that

22  we can safely get 54 noncause-challenged jurors for you to

23  consider for purposes of selection, but that's the current

24  state of affairs on that.

25  Okay.  Typically, at a final pretrial conference what

1  I do is I go through a group of practices I have off the
2  record so my court reporter doesn't take it down, because it's
3  really procedural.  At the end of that discussion, if there's
4  anything you want to put on the record, we'll do it.  But
5  unless there's an objection to go off the record now and just
6  tell you how I conduct a trial.  If there's reasons you think
7  a different practice makes sense, we can talk about it.
8              Anybody object to that?
9              MS. CHOU:  No objection, Your Honor.
10             MR. BLEGEN:  No objection.
11             THE COURT:  Okay, great.  We're off the record.
12         (Off-the-record discussion.)
13             THE COURT:  Let's go on the record.
14             We had a number of discussions -- a number of topics
15 covered, mainly about procedural aspects of the conduct of the
16 trial.
17             Is there anything we've talked about off the record
18 that anyone wants to put on the record now to lodge an
19 objection to or otherwise seek clarification?  First, the
20 government.
21             MR. MADDEN:  No, Your Honor.
22             THE COURT:  Defense?
23             MS. CHOU:  No, Your Honor.
24             MR. BLEGEN:  No, Your Honor.
25             MR. POULOS:  No, Your Honor.

1  THE COURT:  Okay.  As soon as I said we're on, let's
2  go off again.

3       (Off-the-record discussion.)

4       THE COURT:  We can go on the record.

5       Okay.  I've looked over the Santiago proffer made by
6  the government, looked at the defense responses to it, and
7  finally, the government's reply.  I am going to admit the
8  statements made in the evidentiary proffer by the government.
9  I'm going to give you a more detailed ruling why, either
10  orally or in writing, at sometime before the trial or sometime
11  during a -- you know, at the end of the day, in the middle of
12  jury selection or something, at some point before you do your
13  openings, but I'm going to admit them.

14       They've met the burden by a preponderance to allow
15  their admission, but I will give you a much more detailed
16  reasoning for it noting that many of these statements are
17  admissions.  They're not -- there's a separate basis for
18  admissibility anyway, but I'll give you a ruling.  But so you
19  all know what to expect at trial and what to cover in your
20  openings, if necessary.

21       All right.  Let's go through the -- well, it's 11:20.
22  Let's take a ten-minute break.  And we'll come back, I expect
23  we'll go till about 12:30 and we'll keep going as long as we
24  need to.

25       Let's go off the record.

1    (Off-the-record discussion.)

2    (A recess was had from 11:22 a.m. to 11:37 a.m.)

3    THE COURT:  Okay.  There's a number of motions in

4    limine that were filed by both the government and defense.

5    I've reviewed the motions and the responses.  I did not ask

6    for replies, nor were ones given, but we'll start first with

7    the government's.

8    Okay.  And I'll say this about motions in limine in

9    general:  All motions in limine rulings are subject to

10   reconsideration based on arguments and evidence presented at

11   trial.  It doesn't mean you can just reargue because you don't

12   like the ruling.  These rulings have some force, but if there

13   is a reason where something has happened during the trial to

14   make rearguing them appropriate, I'll hear it.  So keep that

15   in mind as I go through these rulings.

16   The first one is the government's motion to preclude

17   evidence or argument regarding specific lawful conduct.

18   Defendants' response is that evidence of nonfraudulent

19   delivery, defendants' family, friends, health challenges, and

20   charities admissible to negate element of fraudulent intent.

21   These first four motions -- really, there's four

22   motions the government brings under this broad umbrella, are

23   what the government contends are potential areas where the

24   defendants will encourage the jury to decide the case on an

25   improper basis, also known as jury nullification.  The

1   defendants, of course, represent they'll do no such thing, so

2   that seemed little to decide, but each side has their own view

3   on what would be argument or evidence that would be posited

4   for jury nullification.

5   I'd like the government to explain -- the most

6   important of these is why I should allow evidence of

7   successful nonfraudulent campaigns as evidence that the

8   defendants will suggest -- they'll use it to suggest they

9   don't know of -- they didn't know of the fraudulent campaigns.

10  I think my law clerk may have emailed -- this is the

11  one where -- among all the others I'd like -- probably could

12  benefit from oral argument.  But are you prepared to address

13  that?

14  MR. HANKEY:  Yes, Your Honor.

15  THE COURT:  Okay.  Who's going to do it?

16  MR. HANKEY:  Kyle Hankey.

17  THE COURT:  Okay.  Go ahead.

18  MR. HANKEY:  Your Honor, so, first of all, when we

19  drafted this particular motion, we flagged three areas where,

20  you know, we could divine from activities so far pretrial that

21  the defense may venture into, but we don't have specifics

22  around which campaigns the defense might want to present as

23  lawful campaigns, but we anticipate that they might.

24  THE COURT:  Well, let's go first and find out.

25  Do you anticipate offering evidence of lawful

1  campaigns?  I got that from your response as something you

2  intend to do, but let's check right now.  Do you intend to do

3  it?

4  MS. CHOU:  Yes, we do, Your Honor, and we also intend

5  to present evidence on some of the campaigns that the

6  government has alleged are fraudulent to dispute that

7  characterization.

8  THE COURT:  No doubt.  I'm sure you're -- you're

9  going to challenge what they say is fraudulent, but if the

10  government isn't offering it as evidence of a fraudulent

11  campaign and you have other campaigns that you believe were

12  lawful, it is your intent to offer those somehow either

13  through cross or in your case?

14  MS. CHOU:  Yes, Your Honor.

15  THE COURT:  Okay.  Go ahead, then, Mr. Hankey.

16  MR. HANKEY:  So, Your Honor, it's hard to see from

17  the defendants' response how those campaigns would be admitted

18  for any legitimate either character purpose or for 404(b)

19  purpose.  Defense claims that they wouldn't be proffered as

20  character evidence, but really is evidence relevant to whether

21  or not there's a scheme or intent to defraud.  But,

22  Your Honor, it -- simply -- lawful campaigns simply aren't

23  relevant for those purposes.  We flagged about 200 or so

24  campaigns that we believe are fraudulent.

25  THE COURT:  How many campaigns are there total?

1   What's the universe of them?

2          MR. HANKEY:  You know, I would say probably well over

3   400 campaigns total.

4          THE COURT:  So you're alleging about a quarter of

5   them are fraudulent?

6          MR. HANKEY:  Yes, Your Honor, at least.

7          THE COURT:  Okay.  And what's the time period we're

8   talking about?  I can pull the indictment, but you know it by

9   heart.  Go ahead.

10          MR. HANKEY:  They span 2011 through 2017.

11          THE COURT:  That's the time period of the scheme

12   you've alleged?

13          MR. HANKEY:  Yes, Your Honor.

14          THE COURT:  Okay.  So you're going to present

15   evidence, currently at least, of 100 fraudulent campaigns and

16   you believe there's 400 total campaigns that the company was

17   involved in?

18          MR. HANKEY:  Yeah.  I mean, our list of fraudulent

19   campaigns is probably closer to 200, Your Honor.

20          THE COURT:  Okay.

21          MR. HANKEY:  So probably closer to half of the total

22   number of campaigns.

23          THE COURT:  Okay.

24          MR. HANKEY:  And -- and so it's hard for us to

25   understand how, you know, campaigns 200 through, let's say,

1  400, the nonproblematic campaigns could in any way shed light
2  on the defendants' intent or lack of intent.  It -- it's kind
3  of like saying if you have a bank robbery case and, therefore,
4  banks -- the defendant passed three banks on the way to rob
5  the fourth bank, that somehow the fact that he passed those
6  three banks is relevant in proving that he lacked intent to --
7  or, you know, to -- to rob the fourth bank.

8        THE COURT:  Well, I've heard that example -- that
9  exact example before in other cases.  What I understand the
10 defense to be is there were fraudulent campaigns; we just
11 didn't know about it.  Now, you don't have to commit to a
12 defense right now, and your clients don't have to testify to
13 that, they don't have to testify at all, but is that in
14 general the defense in this case?  You seem to be pointing the
15 finger at Desai.  Am I pronouncing it correctly?

16        MS. CHOU:  Yes, Your Honor, that's correct --
17        THE COURT:  Yeah.

18        MS. CHOU:  -- that is going to be a significant
19 portion of the defense.  And if you look at the government's
20 campaign list, the vast majority of the campaigns are 2015 to
21 2016 when none of our clients were directly involved in
22 negotiating the contracts, signing the contracts.  You know,
23 most of the contracts was being committed by other people.
24 And so it is a key part of our defense, what they knew about
25 what other people were doing, and if they understood the

1   campaigns to largely be legitimate or even that there were

2   many campaigns that were legitimate.  Of course that goes to

3   their intent.

4           THE COURT:  All right.  Well, propensity evidence is

5   not admissible.  You know, just because you committed a crime,

6   you can't put in that you didn't commit a crime.  On the other

7   hand, intent is a critical issue in this case, necessarily is.

8   It's a specific intent crime.  It's not willful, which you put

9   in one of your instructions, it's not knowingly.  It's not a

10  healthcare fraud case.  But knowing intent, knowing you

11  intended to -- you acted knowingly is an absolute critical

12  part of what the government is required to prove and a

13  critical part of what the defense can respond to.

14          So how does this not go to their intent when -- if --

15  if they had their hands on every one of the campaigns an equal

16  amount for the entire period of time -- in other words, their

17  roles were undifferentiated, the time period for the roles

18  being undifferentiated was the same, it was these three

19  defendants were the only operators of the company, your

20  argument would have more strength, but how -- why don't you

21  respond to both what the defense has said and what I'm saying

22  about this.

23          MR. HANKEY:  Your Honor, I think the key thing to

24  bear in mind is that we haven't alleged that this company was

25  a fraud *in toto,* right?  So I don't think it'll be a dispute

1   on our end that there were some campaigns that didn't include
2   the type of fraudulent activity alleged in the indictment.

3           So the fact that there were some campaigns that
4   didn't involve that fraudulent activity doesn't really bear
5   upon whether or not the defendants intended the fraud that
6   occurred with respect to the 200 or so campaigns that we've
7   put on the list.  And if there is relevance to that point,
8   it's really of marginal benefit, given that the focus of the
9   indictment is really on the campaigns that we've listed.  And
10  any -- you know, any evidence to that -- to attempt to bring
11  in those additional campaigns would be a waste of time, it
12  would be confusing to the jury, and its benefit would be
13  outweighed by the undue prejudice to the government.

14          THE COURT:  Well, how are you prejudiced?  If I
15  instruct them that evidence of lawful conduct is not there to
16  show propensity of defendants to act lawfully, which I'd give
17  such an instruction if asked, other than the argument about
18  time -- and I'm going to ask the defense about the time this
19  would take.

20          But other than the argument about time, how are you
21  really prejudiced?  The jury's -- it's a simple proposition
22  for the jury to know, we think these are fraudulent ones and
23  we don't contest these other ones are not.  Then you get into
24  the weeds, on the defense side, of whether or not each
25  individual defendant had knowledge of just lawful

1  transactions, for instance.

2  Now, you're going to prove they didn't.  Based on the

3  Santiago proffer, you're going to attempt to prove you didn't.

4  I don't know if you're going to prove it or not, but you're

5  going to attempt to show through emails and voice mails and

6  witness testimony that they had contact with the illegal

7  campaigns.  But the defense -- a defendant may get up and say,

8  I wasn't involved in those; I was only involved in lawful

9  ones.

10  And a jury would necessarily believe when half of the

11  campaigns you allege are fraudulent that the whole company is

12  crooked.  I mean, it's not an unusual leap for a jury to think

13  that.  And if that's not true, one way to prove it's not true

14  for the defense that they were acting without intent to

15  defraud is that the number of the transactions that took place

16  were lawful.  And I -- I think it's -- well, that's what I'm

17  thinking, but I'll hear from the defense on how long you think

18  it would be to put in this evidence.

19  And I'm -- is it Ms. Chou, Ms. Choi?

20  MS. CHOU:  Chou, Chou, just C-H-O.

21  THE COURT:  That's been most helpful.  I've been

22  mispronouncing your name from the start so I apologize.

23  Go ahead.

24  MS. CHOU:  Your Honor, we are not anticipating

25  putting on evidence of 200 lawful campaigns, but most of it is

1  going to come out in cross.  We are still developing our

2  defense case.  We expect there to be some, but it is not going

3  to be the equivalent of the government's case in chief.

4        THE COURT:  That's what I had anticipated.  You're

5  not going to put on a summary witness who is going to get on

6  and say, here are the 200 -- I didn't see that among your

7  experts, here are the 200 that were lawfully done, unless I

8  misread expert reports.  I don't think anybody's talking about

9  that, are they?

10        MS. CHOU:  No.  We have not included that in any of

11  our expert disclosures.

12        THE COURT:  Yeah, you've got a guy on blitzscaling --

13  a term I'd never heard before -- you've got somebody who's

14  going to talk about Deloitte, and then you've got somebody

15  who's going to talk about the startup world.

16        Have I broadly defined your three experts?

17        MS. CHOU:  That's about right, Your Honor.

18        THE COURT:  I know it's not exactly, but as long as

19  it's about right.  Okay.

20        I believe this evidence, if offered, is relevant to

21  negate the fraudulent intent and not to show propensity.  I'll

22  give an instruction, if necessary, to show that it's not that

23  it can't be used for that purpose by the jury.  Whether it's

24  an in -- an instruction while the evidence is coming in or

25  it's an instruction at the end of the case.

1    A lot of the proffered testimony, candidly, that

2 comes through your Santiago proffer, the witnesses use

3 imprecise words.  And it's not their fault; it's just how they

4 talk.   Most of the transactions were crooked; many of the

5 transactions were crooked; many were illegal.  Defendants need

6 to be allowed to drill down as to what they mean by most and

7 many.  That's not a -- you know, maybe the question won't be

8 asked that way on direct.  I hope not, but if it is, then

9 they're fully entitled to ask on cross to define many or,

10 you know, give you examples of those that are not.

11    So I'm going to deny the government's motion, at

12 least as to that aspect.  And I'll revisit it if it turns out

13 that the evidence is being introduced for the improper purpose

14 of showing propensity to act lawfully.

15         MR. HANKEY:  Your Honor --

16         THE COURT:  If it's coming in for intent, that's

17 fine.

18         Go ahead, Mr. Hankey.

19         MR. HANKEY:  May I ask just one point of

20 clarification?

21         THE COURT:  Yeah.

22         MR. HANKEY:  So would that be limited to campaigns

23 and activities by the defendants where it's clear the

24 defendants were at least aware of what's happening on those

25 campaigns, they're either actually involved on those

1    campaigns, or they've -- there's some evidence, some

2    foundation that the defendants were aware to what's -- of

3    what's happening on these lawful campaigns.

4              THE COURT:  No, I'm not going to micromanage it that

5    way.  I don't think that's appropriate.  You've got an easy

6    redirect if this comes out on cross saying any evidence that

7    Defendant 1, 2, or 3 was even involved in that.  It's a layup

8    on redirect if they want to raise it that way, but I'm not

9    going to restrict it that way.

10             Go ahead, talk to your colleague, and...

11             (Counsel conferring.)

12             MR. HANKEY:  Your Honor, in that motion, there were

13   also two other categories.

14             THE COURT:  Yeah.

15             MR. HANKEY:  Thank you.

16             THE COURT:  One is the -- what inspired the

17   defendants to form and grow the company.  If the defendants

18   testify, one or more testify, they're all allowed to give a

19   little bit of background.  It's not unusual to give their

20   background, educational, and really, why they may have formed

21   a company.  That is not I think so unnecessarily prejudicial

22   and irrelevant, but it's not coming in in opening unless

23   you're promising you're going to call your clients as

24   witnesses in the defense case, because the only person that

25   could give that information in a nonhearsay way are the

1  defendants themselves.

2  So if I hear it in opening, I hope I hear right after

3  that, "And you'll hear my client tell you that."  I doubt

4  you're going to say that in opening, but that's the rule.

5  I -- you shouldn't say something in opening, of course, that

6  you don't expect to call -- a witness to support, and I don't

7  see how the motive and how the reasoning of why Mr. Shah or

8  Ms. Agarwal or Mr. Purdy got involved in this company is going

9  to come out through anyone other than them in a nonhearsay

10  way.

11  So if they testify to it, I think a little background

12  is appropriate, and that background may include why they

13  started the company.  It's fine.

14  There is something also about charitable uses of the

15  money.  Just as the defense doesn't want the government to put

16  in extravagant or lavish lifestyle purchases for monies that

17  two of the three defendants received, I don't think that's

18  relevant.  So, too, it's irrelevant the charitable monies paid

19  by the defendants.

20  If someone stole money -- and I'm not -- you know,

21  I'm just using this as a shorthand, but if someone took money

22  improperly, it really doesn't matter they use it for a good

23  purpose; it doesn't.  And similarly, if they took money

24  improperly, it's unnecessarily prejudicial to show they used

25  it to buy a luxury item.  It's the same rule for both.

1        Now, if you want to push back on that, I didn't start
2    argument on this so give me your best argument if you think
3    I've got that wrong, but my view is it's two sides of the same
4    coin.  And just as the government wants to keep your clients'
5    charitable contributions out, so, too, you want to keep the
6    government from talking about buying a car or a jet or a house
7    or whatever the item is.  I didn't get the details, but
8    whatever they spent it on.

9        MS. CHOU:  Your Honor, as for Mr. Shah, we don't --
10   so just setting the table, we don't anticipate this to be a
11   lengthy discussion and we also don't anticipate to be
12   introducing it as unmoored from anything else.  It's not like,
13   you know, Mr. Shah has made contributions in all these
14   different areas, but we could see it being relevant to the
15   background, to the capital raise, what they were planning to
16   do, why -- why they even sought to do the capital raise at
17   that time, why they sought to do the distribution.

18       You know, all of that is -- is background for this
19   specific side of events and relative to his motive, especially
20   to rebut the government's contention that they were out to
21   defraud investors because they were trying to take all this
22   money for themselves when, in fact, they didn't end up taking
23   the money for themselves.  They didn't transfer any of it into
24   their personal banks.  You know, they had intended to use it
25   for various different -- other areas besides personal

1  spending.

2  THE COURT:  Well, does it matter?  It really doesn't
3  matter.  If false statements are made to people to cause them
4  to part with money, whether it be a pharma company, an
5  investment house, a -- any of the other private investors,
6  public investors, it really doesn't matter where the money
7  goes.

8  If you can -- I'm skeptical.  If you come up with an
9  argument why it negates intent to defraud, I'll hear your
10  argument.  And that's probably much deeper into the trial, but
11  I don't think the purposes of the money, how it's being used,
12  you can use it for an altruistic purpose or a -- or to use it
13  to, you know, finance a drug empire.  Not -- I'm using this
14  hyperbole.  It's not in this case, of course.  It doesn't
15  matter what you're using it for.  If you obtained it through
16  false statements, through a fraud, and you had a fraudulent
17  intent to do it, it doesn't matter what you're using it for, I
18  think.

19  Now, if somehow the reasons they wanted the money
20  are -- you can make a compelling argument that it negates
21  intent, I'll hear your argument, but I am skeptical at this
22  point and neither thing should be mentioned in opening, and if
23  you're going to offer it during trial, you have to give me
24  better reasons than I've heard today, both from the government
25  on offering luxury lifestyle or payments, use of the money,

1  and use the money or intent to use the money for charitable
2  purposes.

3          MS. BELL:  Your Honor, may I just add one thing --
4          THE COURT:  Sure, Ms. Bell.  Go ahead.
5          MS. BELL:  -- for the Court to consider in this
6  respect?

7          I think it will leave the jury with the misleading
8  impression.  I mean, I expect the government to get up in
9  opening and say, you know, and this $225 million went straight
10 to pockets, and that certainly leaves, without telling the
11 story, and I think that's what Ms. Chou was referring to, is
12 simply rounding that out, where did it go.  I mean, you know,
13 this is -- with documentary evidence, you can show it went
14 here and sat there --

15         THE COURT:  Where did it go?  Where did it go?

16         MS. BELL:  Actually, I'll let Ms. Chou -- there was a
17 structured arrangement, but you can...

18         MS. CHOU:  Yeah, it was all held in a holding
19 company.  And so part of this is not even a story of where the
20 money actually went.  This is just as background where they
21 had contemplated this money to go and so there isn't going to
22 be -- there wouldn't be any detailed evidence about some
23 dollars went here, some dollars went there, you know, these
24 are the different charities.  It is all sort of just
25 background, what their intent was at the time when they were

1   formulating their plans.

2          THE COURT:  But I'm still back to whatever it was
3   going to be used for, it didn't matter if there were false
4   statements made to obtain it.  And I know that may be a
5   difficult part of the case for the defense because they were
6   large amounts of money and they went to, presumably, at least
7   from what I read, part of it went to the defendants.  How they
8   were -- or it went -- you have to be accurate where it went.
9   It went to a trust account or some type of secure account and
10  not into a personal bank account.  You can't inaccurately
11  describe it.

12         Where did it go, from the government's perspective?
13         MR. MADDEN:  It went to a holding company for tax
14  purposes, at least -- I guess there was more than one -- there
15  was more than one dividend, at least the one from the capital
16  raise went to a holding company for tax purposes.

17         MS. CHOU:  Your Honor, that's not -- it wasn't a
18  holding company, but it sat under the Outcome Health -- under
19  the corporate holding company and so there were various
20  reasons for that, not just tax, and that's part of the
21  explanation for the structure.

22         THE COURT:  Okay.

23         MR. MADDEN:  And the company was owned by Rishi Shah
24  and Shradha Agarwal.  It's for their benefit.  So it was -- it
25  was ultimately their money and they certainly -- I mean,

1   there's plenty of evidence that it was their money.

2           THE COURT:  Well, the only way they're going to be

3   able to introduce evidence about what their intent to use the

4   money for was and why that would negate intent to get the

5   money illegally is if they testify, and so it's going to be

6   difficult for you to get into this in opening statement

7   without a promise of the defendants testifying.

8           And if you're going to promise they're going to

9   testify, which I'd be shocked, but if you promise they're

10  going to testify, then you still need to front this with me on

11  what you're going to say about this because I'm not convinced

12  that the ultimate use of the money by either -- from either

13  perspective is relevant to the jury.

14          You know, you don't have to answer today about

15  whether your client's going to -- whether you're going to

16  promise your client's going to testify, but it can't come in

17  from other witnesses.

18          MS. BELL:  And, Your Honor, I'm sorry --

19          THE COURT:  Because you're arguing it's their intent

20  that makes this relevant, and their intent is something to

21  what they can testify.

22          Go ahead, Ms. Bell.

23          MS. BELL:  And, Your Honor, I think our concern is

24  slightly different, which is that we still believe that this

25  is just certainly part of the story and that it will leave the

1    jury with the misleading impression to just kind of end with

2    and, you know, the 225 million went straight to them, right?

3    That's actually not what happened factually, and I think that

4    with very kind of discrete record-based testimony, which I

5    think the parties will be in agreement about exactly where it

6    went.

7    And certainly, I understand the Court's position that

8    if we want to elaborate on then what they intended to do with

9    that, that that might be through testimony only, but in terms

10   of rounding out the story of what happened with the 25 --

11   $225 million, where did it go, and, you know, where did it

12   stay, that seems like something that with record-based proof

13   could simply close the loop and avoid the misleading

14   impression that in fact the money went straight to their

15   pockets and perhaps it was spent, right, because I think that

16   would be -- that will be where jurors' minds go or there will

17   at least be the question of, oh, well, you've got it in your

18   pocket, that must mean, you know, that's what -- you must have

19   expended it.

20   THE COURT:   What do the records show it went to after

21   it went to the holding company?

22   MR. JOHNSTON:   Your Honor, they were sued pretty

23   immediately.  Well, it was -- it went to a holding company;

24   they started making investments.  Most of it was -- they --

25   was then tied up in a lawsuit by the investors at the end of

1  2017 and then they had to return the bulk of it to -- in a
2  settlement with the debt investors and their equity investors
3  and put a bunch back into the company.

4          MS. CHOU:  And the remainder was seized by the
5  government and so they -- they never got a cent for
6  themselves.

7          THE COURT:  Yeah, I don't think we're getting into
8  that, unless you all think that -- all unanimously agree
9  that's a relevant fact, but it's -- it is what it is.  It's
10 how much money was obtained, it goes to the intent of the
11 defendants if they got it for a purpose -- whether it be a --
12 whatever the reason they got it, they got it, as I
13 understand -- or the holding company got the money.

14         I'm -- you know, I'll let you -- this gets into the
15 minutiae of the financial transaction, which was not something
16 that was covered in the briefs with any great detail, but my
17 ruling stands.  If you want to supplement something you filed
18 already, speak to the government about what they're going to
19 say in opening about this.

20         Who's going to be your witness in all of this, the
21 summary agent witness or the accountant?

22         MR. JOHNSTON:  Well, actually, Your Honor, this is
23 not a case where the personal benefit to the defendants was
24 hidden from the lenders and investors.  So actually this --
25 the personal benefit and the dividend payments and the gain to

1   them was actually disclosed to the investors and the lenders.

2   The -- the defendants told them, we're going to take out this

3   loan and pay ourselves "X" amount of dollars.  They told the

4   investors we're going to raise $500 million and pay ourselves

5   225 million of that, and then we'll just have an accountant at

6   the end of the case say, and then the wire -- we confirmed a

7   wire transfer of 225 million to this particular account.

8           THE COURT:  You've got witnesses, investors, and --

9   who said that the defendants said we're going to take this

10  money out and pay it to ourselves?

11          MR. JOHNSTON:  Well, not only that.  It's in the

12  investment documents that they gave to the investors.

13          THE COURT:  Okay.

14          MR. JOHNSTON:  There are going to be exhibits that

15  say this money is going to the defendants.

16          THE COURT:  All right.  Well, I'll let you finish

17  talking to yourselves.  Go ahead.  I mean, I'd rather you talk

18  and -- you can't do two things at once.  If you need to talk

19  to your colleague, go ahead.

20          MS. CHOU:  Your Honor, our discussion is that this is

21  part of what is misleading and our concerns about how the

22  government is going to be introducing this because the

23  distribution was made to Gravitas.  That's what's part of the

24  documents.  It wasn't to Rishi and Shradha.

25          MR. JOHNSTON:  And, Your Honor, that's what

1 defendants represented to investors that the money was going

2 to them and then the same amount went into an entity called

3 Gravitas for which there's evidence that they were the sole

4 owners of.

5 THE COURT: Well, you get to -- well, you get to put

6 it in. That's what the investors were told, and it's a --

7 if -- I can't change the facts. That's what -- if that's what

8 the investors were told, so be it. I don't -- you know, the

9 underlying purpose for what they were going to do with the

10 money once they got it is not coming in, unless they testify

11 and you proffer as to what they would say the reason was, and

12 I agree that somehow that proffered testimony would be

13 relevant to their intent on whether they intended to defraud

14 the investors.

15 MR. MADDEN: Your Honor, if I just add one thing?

16 THE COURT: Yeah.

17 MR. MADDEN: And I understand this is -- was not

18 covered by the defense motion, but I just want to make a note

19 of it for Your Honor. We included two Section 1957 money

20 laundering --

21 THE COURT: Those come in.

22 MR. MADDEN: -- statute --

23 THE COURT: There's no way that proof of those two --

24 two counts does not necessarily bring in what the money was

25 used for. That's part of the transaction.

1    MR. MADDEN:  Thank you, Your Honor.

2    THE COURT:  You can't prove it up without putting

3    that in and it is what it is.  There's no way around that.  I

4    don't even think the defense is objecting to that.

5    MR. MADDEN:  They --

6    THE COURT:  My recollection was they agreed that

7    necessarily would come in.

8    MR. MADDEN:  That's our understanding, too,

9    Your Honor.

10    THE COURT:  Okay.  All right.  There's a motion to

11    preclude evidence or argument regarding implied government

12    misconduct.  Defendants do not intend to argue government

13    misconduct and agreed to raise that with the government or the

14    Court before they do if the circumstances change.  So that

15    motion's denied because the defendants have already said

16    they're not going to do it.

17    There's a motion to preclude cross -- or argument

18    regarding investigative steps not taken.  Defendants say they

19    do not intend to question regarding investigative decisions

20    unconnected to other evidence or a specific defense.  This is

21    really more appropriately dealt with through relevance and

22    403 objections to specific evidence.

23    Defendants say they are not going to raise questions

24    about the government's investigation that are not conducted to

25    the -- connected to the evidence.  This comes up occasionally

1  and sometimes it's proper to ask if they did something, but an
2  argument that the prosecution, in essence, you know, putting
3  the government on trial over a shoddy investigation, that's
4  not proper; that's jury nullification.

5      I'll hear -- if there's particular questions asked
6  that get into this realm, the government can object.  I'll
7  rule on it at the time.

8      All right.  There's a motion to preclude evidence and
9  argument regarding possible penalties or its impact on
10 conviction.  Defendants agree they will not argue about
11 specific penalties to defendants, but they want to cross about
12 the plea agreements.  Of course you can.  The jury finds out
13 what they're facing through the cross as a practical matter.
14 Any thinking juror knows what the penalties are when they hear
15 the -- see the plea agreements for the defendants that have
16 pled.  And I don't know if the two that -- was it Han and --
17     MR. MADDEN:  Choi.

18     THE COURT:  -- Choi, I don't know if they're going to
19 testify.  You indicated they weren't, but the defense said you
20 probably were going to call him.

21     Mr. Poulos, you said that.

22     MR. POULOS:  There's a very decent chance of that,
23 yes.

24     THE COURT:  Okay.  And I'm sure their plea agreements
25 will come up there and the maximum penalties and the

1 guidelines calculations for the advisory guidelines, and I'm
2 sure they're going to come out in Desai. That is proper
3 cross. You're absolutely entitled to go into that. You can't
4 argue, of course, which you won't, that, look what Desai's
5 facing, so is my client. The jury will figure it out, but you
6 can't argue it.

7 Okay. There's a motion to exclude discussion of
8 discovery matters in the presence of the jury. Again, the
9 defense agrees they won't do it, so I'm going to deny the
10 motion because defense says they're not going to do it.

11 When I deny these motions, it doesn't mean that it's
12 an improper motion. It just means there's no need for the
13 motion; it's denied as moot. I have a representation from the
14 defense they're not going to do it.

15 All right. There's a motion to preclude a missing
16 witness argument. I'll allow both sides to address this with
17 respect to specific nontestifying witnesses. We're going to
18 have, what, 100 witnesses in this case? From the government?

19 MR. MADDEN: No. Less than that, Your Honor.
20 Depending on stipulations, somewhere between, say, 35 and 50,
21 hopefully --

22 THE COURT: Oh.

23 MR. MADDEN: -- at the lower end of that.

24 THE COURT: It's still quite a few. We'll see who's
25 missing at the end of this case. We'll see if it's something

1   the defense wants to argue the government could've called

2   someone.  It's a fraught area for you because if you had the

3   equal ability to bring that witness in, that opens the door to

4   rebuttal argument by the government that you could've done it,

5   too.  That's fraught because of the obvious point that the

6   defendants don't have to prove a thing, but if you open the

7   door, the government often will get to argue that you could

8   have called the witness, too.  This is really too general at

9   this point to rule on until we know who the missing witness

10  is, if any.  So it's denied without prejudice.

11          There's an argument -- there's a motion to preclude

12  evidence and argument regarding defendants' good faith belief

13  that victims would not be harmed.  Defendants argue that it's

14  relevant to whether there was an intent to defraud.

15          I'm going to deny the government's motion -- whether

16  the government believes their statements were true is highly

17  probative of a lack of intent to defraud.  Conversely,

18  disallowing such evidence regarding the defendants' knowledge

19  of the falsity of the statements would unreasonably hinder in

20  good faith defense as contemplated in the Seventh Circuit

21  pattern and jury instructions.

22          The good faith instruction which 6.10 says:  If a

23  defendant acted in good faith, then he or she lacked the

24  intent to defraud.  A defendant acted in good faith if at the

25  time he or she honestly believed the truthfulness that the

1  government has charged as being false.  There's a lot of

2  parens in the pattern instruction, but I've put them in

3  quickly.  And also it reads:  A defendant does not have to

4  prove his good faith.  Rather, the government must prove

5  beyond a reasonable doubt the defendant acted with an intent

6  to defraud.  A defendant's honest and genuine belief that he

7  or she will be able to perform what he promised is not a

8  defense to fraud if the defendant also knowingly made false

9  and fraudulent representations.

10  Now, I won't go through all the committee comment on

11  6.10, but if a defendant believes they could have delivered on

12  all this, that's certainly probative evidence of whether they

13  had an intent to defraud.  If a defendant testifies, you can

14  cross them that that belief was unreasonable, that that belief

15  is inconsistent with representations they made to their

16  colleagues in emails, inconsistent with testimony of

17  government witnesses.

18  One question I had, though, you know, we have this

19  contention on these -- on the ability to fulfill the

20  requirements of some of these contracts where defendants said

21  we have so many screens, we're going to play so many ads,

22  we're going to get a return on investment of "X" amount, and

23  what I thought was kind of unusual -- maybe it's not in this

24  industry -- an unusual way of justifying it, saying, well, we

25  don't have those screens now, but by the end of the campaign,

1   we'll have them and more.  And if you average it out over the
2   year of the campaign, we would have what we promised in our
3   contract.
4          Did the -- did the customers know this?
5          MR. JOHNSTON:  No, Your Honor.  The evidence will
6   show at trial that virtually none of the customers knew that
7   the defendants internally used this rationalization when
8   delivering on the contracts.
9          MS. CHOU:  Your Honor --
10         THE COURT:  Well, let me push back, and I'll hear
11  from you in a sec.
12         Your word "virtually none" is provocative.
13         MR. JOHNSTON:  Some of the clients would say they've
14  heard of the term but did not agree to the specific contact --
15  contracts being delivered on that basis.  And then a couple
16  would say, yes, this specific -- specific contract could be
17  seen as a weighted average, but the idea is that we've
18  actually explicitly spelled out month by month what is -- what
19  was the growth rate or the delivery.
20         But no witness, we believe, at trial, no single
21  victim witness will say that the defendants' company could
22  unilaterally decide to deliver the contracts on a weighted
23  average.  If they were going to do that type of delivery, it
24  would have to be spelled out in the contract and it would have
25  to be explicitly said what the delivery would be month by

1  month over the course of the -- of the campaign if it were

2  going to in fact grow.

3       THE COURT:  Was there such a contract with any of the

4  witnesses you're going to call?

5       MR. JOHNSTON:  There were a couple growth campaigns.

6  So a couple of the witnesses come in will come in and testify

7  about the contract and it will show the month by month

8  delivery in the contract, and they'll say, that's what we

9  expected, not the defendants deciding the way that they could

10  do it themselves.

11       THE COURT:  All right.  Well, that's evidence -- I'm

12  not hear to argue the evidence.

13       Ms. Chou, you won this motion.  Do you want to say

14  anything?

15       MS. CHOU:  No, Your Honor.  Thank you.

16       THE COURT:  Okay.  Yeah, you can put in that evidence

17  if they -- whether it's through their testimony or -- I don't

18  know how else they'll do it, but if there's a way or an

19  argument you want to make that they acted -- they believed

20  that victims would not be harmed, I'm going to allow you to do

21  it.

22       MS. CHOU:  Thank you, Your Honor.

23       THE COURT:  Okay.  And disagreements of what the

24  government just said, you're not agreeing to it by not

25  responding.  I don't think it's helpful at this point to

1  respond to it because it doesn't go to anything we have to
2  decide today.

3  Okay.  The next motion is to admit whistleblower
4  communications for the nonhearsay purpose of proving mens rea,
5  notice and context.  The defense says the evidence is not
6  probative of specific fraudulent acts.  These are
7  out-of-context excerpts showing -- that are prejudicial that
8  the whistleblower term itself is prejudicial.  There's not any
9  reference -- necessarily a reference to fraud in the
10 statements of -- that they're trying to get in, and I should
11 not admit this in a blanket fashion without foundation or
12 context.

13 Well, that's a truism.  I'm not going to admit
14 anything without foundation or context.  If you believe the
15 government's offering any exhibit that doesn't have proper
16 foundation, you should object.  If you believe that there's an
17 excerpt of what the government is putting in that is out of
18 context, you should ask me to have the remainder of it put in,
19 provided it puts the excerpt in proper context.  It doesn't
20 allow for wholesale inclusion of a multipage document if most
21 of it doesn't put the excerpt the government wants to put in
22 in context, but that's -- you know what I'm talking about.  So
23 that part is certainly a proper objection by the defense.

24 My understanding is there are people who are -- went
25 to the defendants -- Defendant Shah, in particular -- and

1 said, I have problems here. I think there was one guy who
2 worked at the company for a week or two and then he met with
3 Mr. Shah in New York. That's one aspect, and you have people
4 who are -- gave written comments in exit interviews.

5 Is that the two categories of people in general, or
6 am I conflating something?

7 MR. JOHNSTON: Yes, either personal -- personal
8 conversations with one or more of the defendants, written
9 communications, either in exit interviews that were then sort
10 of filled out and forwarded to the defendants or in emails or
11 letters that were sent and forwarded to the defendants.

12 THE COURT: Okay. So the foundation will have to be
13 that -- excuse me -- one of the defendants either saw this --
14 I think Mr. Purdy's involved in some of these, too -- they
15 were either forwarded to a defendant, shown to them, or in the
16 case of people complaining about conduct at the company,
17 whether we call them whistleblowers or not, they had to have
18 been in communication with the defendants.

19 And is that the foundation you're going to lay for
20 all these?

21 MR. JOHNSTON: Yes, Your Honor.

22 THE COURT: Okay. Do you intend to call all these
23 people that gave exit interviews and then had conversations
24 with the defendants?

25 MR. JOHNSTON: No, Your Honor. Some of these people

1  didn't actually have direct conversations.  They had it with

2  someone else and then their -- what they wrote down got

3  forwarded to the defendants so they would -- if they testified

4  wouldn't speak to a direct conversation with the -- with the

5  defendants.

6  THE COURT:  All right.  And how are you going to lay

7  the foundation for the ones where they didn't speak?  It's

8  just a -- well, how -- how are you going to lay the foundation

9  for it, first, before we get to the hearsay issue?

10  MR. JOHNSTON:  So a couple different ways.

11  COURT REPORTER:  Can you move the mic closer to you?

12  MR. JOHNSTON:  The people who actually spoke to the

13  defendants will come and testify or there'll be someone who

14  was present at the conversation and testify as to what the

15  third party told one of the defendants.

16  THE COURT:  Okay.

17  MR. JOHNSTON:  So that's Category 1.  Category 2,

18  with respect to letters or emails or questionnaires that were

19  filled out, we will have evidence that they were forwarded to

20  the defendants and that evidence will come in an email that

21  was found in their inbox.  Now, they can obviously argue I

22  didn't read that, but that goes to weight, not admissibility.

23  THE COURT:  Okay.  All right.  And the exit interview

24  people, are they on your list at all or you're simply not

25  calling them?

1     MR. JOHNSTON:  The only -- only one person is on
2  the -- of the exit interview people is currently on our
3  witness list.
4     THE COURT:  Do any of them call themselves
5  whistleblowers?  I mean, that seems like a term that would be
6  used in an argument, but I'm not sure any witness calls
7  themselves a whistleblower.  Do any of them --
8     MR. JOHNSTON:  Some -- some of the witnesses who will
9  testify do see themselves as whistleblowers.
10     MS. CHOU:  But not the -- but not the ones who filled
11  out exit interviews, to the Court's core question.
12     MR. JOHNSTON:  Candidly, I'm not sure anybody's
13  explicitly put that question to them.
14     THE COURT:  Well, the defense objects.  There's a lot
15  of objections, but the defense objects first to the term
16  whistleblower.  It would be an odd person that calls
17  themselves a whistleblower.  Maybe their lawyer will, maybe
18  the government will in an argument, but I don't know that a
19  witness should identify themselves as a whistleblower.
20     You don't know the answer of whether they even would
21  if they were asked that?
22     MR. JOHNSTON:  Well, some people I know do actually
23  see themselves in that role.
24     THE COURT:  All right.  Well, I'm not going to
25  prohibit the use of the word whistleblower in an argument,

1  whether it be opening or closing.  I don't think witnesses

2  should call themselves whistleblowers.  I don't think -- that

3  doesn't go toward any aspect of their testimony.  They can

4  say, I saw illegal activity and I reported it to a defendant.

5  They can say, I saw illegal activity and I put it down in an

6  exit interview.  But the whistleblower characterization is

7  more of an adjective than a noun, and I don't think they

8  should be calling themselves that, and it doesn't add anything

9  to their testimony.

10       The strength of their testimony, presumably, is on

11  what they saw, heard, or did, not on a characterization that

12  they may have picked up from watching a, you know, movie or

13  having a lawyer represent them and attempt to get the --

14  you know, some kind of credit as a whistleblower.  So I'm not

15  going to let them call themselves whistleblowers.  I'm not

16  going to prohibit its use in argument because that's a -- it's

17  not a horrible term that is so prejudicial that it can't be

18  used.  You can use it in the common sense meaning of it,

19  although I haven't heard defense argument.

20       I apologize, Ms. Chou, are you going to take the lead

21  on most of the arguments or is someone else going to do this?

22       Ms. Bell?

23       MS. CHOU:  A lot of them but not all of them.

24       THE COURT:  All right.  That's my preliminary ruling.

25  Push back if you'd like.

1    MR. POULOS:  If I may jump in here.

2    THE COURT:  It's Mr. Poulos.

3    MR. POULOS:  Your Honor, the -- I would ask that the

4    Court because it is argumentative.  Now, in closing argument,

5    that's argument, of course, and we could see how that evidence

6    comes in, what all these witnesses say, how they hold up on

7    cross on various issues.  But I would ask, Your Honor, that

8    they not be permitted to use that term.  I think it's

9    prejudicial; it's argumentative in opening statement.

10   THE COURT:  Do you intend to use -- who's doing the

11   opening?

12   MR. HANKEY:  Kyle Hankey, Your Honor.

13   THE COURT:  Mr. Hankey, are you going to use it in

14   opening?  You've got it all written out and practiced by now,

15   right?

16   MR. HANKEY:  We won't -- we won't use it in

17   opening --

18   THE COURT:  Okay.  Fair enough.

19   MR. HANKEY:  -- the term whistleblower.

20   MR. JOHNSTON:  Yes, we definitely will.

21   THE COURT:  Oh, you will?

22   MR. JOHNSTON:  It's in the indictment, Your Honor.

23   THE COURT:  Where?

24   MR. JOHNSTON:  It's alleged on paragraph 17, 31(a)

25   that's -- as one of the modes of -- manner and means of the

1  scheme is marginalizing and ignoring whistleblowers; bottom of
2  the page 17.

3        MS. CHOU:  Your Honor, just because it's in the
4  indictment doesn't make it appropriate for opening, and here's
5  where the -- the minutiae of it -- the details do become
6  relevant, because who are they -- how -- are they going to
7  describe ten whistleblowers?  Are they going to describe two
8  whistleblowers?  Ten is very prejudicial and not accurate.

9        MR. JOHNSTON:  Well, Your Honor, of course the
10 defense can push back on any of our characterizations, but we
11 are allowed in an indictment to fairly characterize the
12 evidence that is going -- that forms the core of the
13 government's case.  It is a fairly colloquial term that an
14 average jury would understand to mean somebody reports
15 wrongdoing to a superior, which is the exact definition in the
16 defendants' motion.  So using that shorthand, rather than the
17 literal definition of you're going to hear from people who
18 support -- who witnessed wrongdoing to a superior and then
19 you -- and reported it to a superior and then you're going to
20 always have to repeat that phrase, that clunky phrase, I think
21 is unnecessary and unreasonable cabining of the government's
22 characterization of the evidence.

23       MS. CHOU:  Your Honor, point taken, but, you know,
24 even in this discussion, the government's unwilling to say,
25 are they calling the people writing exit interviews

1  whistleblowers or not.  A person -- to me, an exit interview

2  is not a whistleblower.  No one could understand that as such.

3  THE COURT:  Here's what we'll do.  Don't use the

4  phrase in opening.  You don't need it.  It's not that clunky

5  to say, people complained during their exit interviews and

6  said they saw misconduct.  People went right to the defendants

7  and complained and said they saw misconduct.  That is not so

8  clunky.  It doesn't detract from the strength of your opening.

9  It's in the indictment, but the jury doesn't get the

10  indictment up front.  They don't get it until the end.  And if

11  it turns out that no whistleblower testifies or there's parts

12  of this indictment that just weren't proven up but are

13  prejudicial, then it gets redacted.  You're going to call

14  these people inevitably.  It'll be fairer after I hear their

15  testimony to characterize them as whistleblowers in your

16  closing if you want, but it's not going to make your openings

17  so clunky it's improper.  Just don't use the phrase in

18  opening.

19  MR. JOHNSTON:  Your Honor, it would be helpful to

20  know if -- what you view the definition of a whistleblower is

21  because --

22  THE COURT:  That's the problem.

23  MR. JOHNSTON:  -- that obviously is going to --

24  THE COURT:  Yeah.

25  MR. JOHNSTON:  -- we're going to approach our direct

1  examinations to -- with an eye towards eliciting the facts
2  that we can then use to fairly characterize them as
3  whistleblowers, which is exactly kind of what is fronted by
4  this motion.

5       THE COURT:  Well, that's the problem.  Is a
6  whistleblower someone who without any motive, other than an
7  altruistic one, come forward to complain about misconduct?  Is
8  the whistleblower somebody who goes to try and collect a
9  bounty of some kind in exchange for providing information?  Is
10 a whistleblower someone who goes to the government to try and
11 cut a deal and tells the government what they know about
12 something?  Who knows.  There's a lot of definitions of it,
13 which is part of what I read is the problem from the -- from
14 the briefing.  And that's why not saying it in opening is
15 fine.

16      You can bring out the circumstances of -- unless --
17 unless they consider themselves and use the word whistleblower
18 at the time they spoke to a defendant, not later when either
19 their lawyer or they themselves have decided what they are,
20 when -- don't bring it out.  Lay your foundation for what --
21 what they saw, did, and heard, and -- and you'll likely -- I
22 don't see any reason not to characterize it in the common
23 sense phrase a whistleblower once I hear what they have to say
24 how they came forward.

25      I saw enough from the exit interviews where -- I'm

1  not sure that's a whistleblower.  It's an exit interview.

2  Some people consider whistleblowers someone who goes to the

3  government to complain about problems, not go to a -- not go

4  to a defendant; they go to an outside agency.

5       I don't know where all these people went, and I think

6  it's a fluid phrase, given the definition.  So we're going to

7  hold off on that, its use in opening and probably will be used

8  in closing based on what I hear, and a proper foundation to be

9  able to use it in closing is just what they saw, heard, were

10 exposed to, and did in response to what they saw, heard, and

11 were exposed to.

12      MR. JOHNSTON:  Understood, Your Honor, but I'll just

13 note for the record that the defendants used the word

14 whistleblower at least on one occasion -- well, with respect

15 to one of the persons, and then there's also going to be like

16 actual letters where --

17      THE COURT:  Sure.

18      MR. JOHNSTON:  -- the lawyer uses that word, so it's

19 going to come up.

20      THE COURT:  Well, the lawyer part we'll get to in the

21 fullness of the trial and see how relevant a -- if you intend

22 to offer a lawyer letter --

23      MR. JOHNSTON:  Well, yeah, lawyer letter that was

24 sent to the defendants --

25      THE COURT:  Yeah.

1    MR. JOHNSTON: -- and they commented on and read.

2    THE COURT: Yeah, that may very well come in and the

3  use of the word whistleblower will be in the context of that

4  letter where it may be defined who the person is and what they

5  had to say.

6    If a witness calls themselves a -- or if a defendant

7  refers to somebody as a whistleblower, that's an admission; it

8  comes in. You can argue about what they meant by that word,

9  but, of course, it comes in if it's an admission. But

10  argument -- statement -- opening statement, don't use it. And

11  unless the witness -- you know, the context you're talking

12  about with the letter to the defendant or defendant referring

13  to a witness as a whistleblower, of course that comes in.

14    Did the -- I don't see -- if all these exit

15  interviews and other comments of these exit interview comments

16  were exposed -- the defendants were exposed to them, the

17  government's offering them for the nonhearsay purpose of

18  notice, that seems like a proper purpose. I'd give an

19  instruction that it's not to be considered for the truth.

20    The problem with that -- and I'll hear defense

21  argument on it -- the problem with even using that in opening,

22  though, is what do I do, interrupt your opening and say, by

23  the way, you can't consider that for the truth of what's in

24  it. You can only consider it for purposes of notice.

25    Do you intend to use this in opening?

1    MR. JOHNSTON:  Well, Your Honor, I mean, to the
2  extent you -- we would characterize it as you will hear
3  evidence that the defendants were informed that the people
4  working under Desai were concerned about committing fraud,
5  so -- so that's -- that would be -- you know, I'm not going
6  to -- we're not quoting Mr. Hankey's --
7    THE COURT:  Yeah.
8    MR. JOHNSTON:  -- opening, but it would be in that --
9  in that realm, basically characterizing that the jury will
10  hear evidence that the defendants were informed repeatedly
11  that fraud was going on at the company.
12    THE COURT:  All right.  Let's hear from defense.
13    MR. POULOS:  Judge, with respect to the -- let me
14  make one observation right now, Judge.  You know, the
15  government repeatedly from the start of this case until just
16  now constantly says the defendants got this.  And it's just
17  not true.  These -- these exit interviews, as far as I recall,
18  are a Brad Purdy issue, at least the two that I -- that we
19  addressed, Your Honor.  The other defendants didn't receive
20  this.
21    And so I would ask that -- that the -- that the Court
22  direct the prosecutors not to use defendants received certain
23  things, unless they know that all three received it, that --
24  that -- that they need to individualize the evidence here.
25    As to the two exit interviews, Your Honor, that --

1  that we've addressed in our response, it's really a 403 issue.

2  The first one, some analyst -- now, this was at a point,

3  Your Honor, when the company had about 450 employees maybe, a

4  lot of employees.  A number of employees left.  And there was

5  one exit interview -- one of the -- an early exit interview

6  when somebody said why they were leaving, or what -- what

7  would be an important component to their replacement, "someone

8  for whom integrity is not a number one concern, they should be

9  willing to operate in shades of ethical gray."  It's just way

10 too vague, Your Honor.  And --

11         THE COURT:  I disagree.  That's not vague.  I'm

12 interrupting you, but on that point, I don't think that's

13 vague.  Anybody rational person, a leader in a company, a

14 manager in a company reading that, that ought to ring -- I

15 would think, it rings a lot of alarm bells.  If you didn't see

16 it, so be it.  If the person doing the exit interview was a

17 disgruntled employee who got fired for incompetence and had an

18 axe to grind, so be it.  If this was one of 400 exit

19 interviews, so be it, but I'm not agreeing that that's vague.

20         MR. POULOS:  Okay.  I'll say nothing further,

21 Your Honor.  I -- I --

22         THE COURT:  Okay.

23         MR. POULOS:  When you have a company -- respectfully,

24 Judge, when you have a company that big and that has so many

25 different operations, you know, somebody operating in a gray

1  area ethically, it could mean a million different things.

2  THE COURT:  And that's a great closing argument, or

3  opening statement after the government gets up.  And it may be

4  a very compelling one, and you can explain that when the

5  witnesses -- when the evidence comes in, you can question the

6  witness about, this is one of out of how many, and maybe

7  there's problems relating to the -- or reasons for the witness

8  putting that kind of -- or the exit interviewee putting that

9  kind of information in there.

10  But I'm going to allow it in, not for the truth since

11  you're not calling the witnesses, but for notice to whoever

12  received it, in this case it was apparently Mr. Purdy.  I'll

13  allow it in for that purpose.

14  If the government doesn't properly characterize in

15  their opening that it's not being offered for the truth but

16  just to put Mr. Purdy on notice, if you go over the line and

17  characterize it as truthful, I will interrupt your opening

18  after a sidebar that Mr. Poulos will call for and he'll ask

19  for an instruction on the nonhearsay purpose for it and I will

20  tell the jury that.

21  And I give instructions in court in common sense

22  ways.  I don't just mindlessly say, this is offered for the --

23  not offered for the truth, but just to show notice.  That's

24  kind of a meaningless statement for a group of lay jurors.  I

25  tell them what it means, and I explain it in more detail as to

1  what purpose they can consider it for.  So the instruction

2  will be that, but I give explanations so that a jury is not

3  given these when in many ways they're ignored instructions.

4      So keep your -- Mr. Hankey, keep your discussion of

5  this within the bounds of what I just talked about, but I'm

6  allowing it in for notice.  And if you think there's -- some

7  of these are out of context, Mr. Poulos, talk to the

8  government when they offer it.  They don't have to put the

9  whole context in in their opening, but if they offer a portion

10 of the exit interview and it's one of multiple pages, it would

11 be put the parts -- the offensive parts from your perspective

12 in context, talk to the government.  If they don't agree,

13 bring it to me, and I'll look at the whole document and see

14 what part comes in.

15      MR. POULOS:  Thank you, Judge.

16      THE COURT:  Okay.  All right.  Anything else on this

17 subject?  Okay.

18      MS. BELL:  Yes, Your Honor.

19      THE COURT:  Oh, go ahead.

20      MS. BELL:  I'm sorry.

21      (Counsel conferring.)

22      MS. BELL:  Your Honor, with respect to the

23 instruction that you will be giving, would the Court consider

24 some additional language along the lines of a limiting

25 instruction.  So this is -- as -- as Mr. Poulos mentioned,

1 this is one of a number of different categories of evidence
2 which we expect will go to, you know, one of our clients and
3 not another, and we think given the length of the trial and
4 the complexity of the evidence, it's appropriate to have a
5 reminder, a limiting instruction reminder, about how evidence
6 can be considered as it pertains to the other -- you know, the
7 other -- others of our clients --

8          THE COURT:  Sure.

9          MS. BELL:  -- when only one is at issue.  Okay.  Very
10 well.

11          THE COURT:  No, that's fair.  That's fair.  Propose
12 it at an appropriate time.  Much evidence comes in because a
13 general scheme is alleged, comes in as to all defendants, but
14 it's not a conspiracy that's alleged.  It's not automatic that
15 evidence as to one comes in as to all.  I'll hear argument
16 about that at some point but, certainly, some evidence may
17 just relate, may just relate to one particular defendant.  I'd
18 have to hear why it doesn't apply to all.  But if you ask for
19 an instruction, Ms. Bell, at the appropriate time, I'm happy
20 to give it at any time --

21          MS. BELL:  Thank you, Your Honor.

22          THE COURT:  -- lengthy trial or not.

23          Okay.  Next motion in limine is to preclude
24 impermissible use of prior deposition testimony.  The defense
25 points out this is -- basically amounts to a request that the

1  Federal Rules of Evidence be enforced.  I'm going to deny the
2  motion for that reason.  The parties should be able to follow
3  the Federal Rules of Evidence without ruling on a motion in
4  limine.

5         Again, denial doesn't mean anything other than we
6  don't need a ruling on -- we don't need an affirmative ruling
7  on this for you all to follow the rules.

8         Preclude use of -- another one is preclude use of
9  witness interview memos during cross.  Government should raise
10 specific -- defendants' response is, if the government
11 believes that 302s -- is it 302s?  Or what is the
12 investigative agency on this?

13        MR. HANKEY:  It's FBI and FDIC, OIGs, many of the
14 memoranda are 302s, but there are a few that -- we can just
15 call them all 302s.

16        THE COURT:  Probably safer.  But -- so if -- if
17 there's -- defense says if there's specific objections to the
18 way a cross is being conducted, they could do it at trial, and
19 that it's common practice to read from interview reports
20 during cross.  Well, you all know that 302s are not prior
21 statements of the witnesses, unless they adopted them, so they
22 shouldn't be used as actual impeachments, but you can --
23 you're permitted to call the FBI agents and use the 302s --
24 you can use the 302s to refresh their recollection.

25        If a witness doesn't remember talking to the FBI, you

1  can refresh their memory with a rock.  You can show them a
2  302, you can show them a rock, you can show them anything you
3  want.  If that refreshes their memory, they testify from their
4  refreshed memory.  If that still doesn't refresh their memory,
5  you attempt to lay a foundation with past recollection
6  recorded.

7       You may not be able to with a 302, but, if not, then
8  you may be able to impeach by use of the 302 by calling the
9  FBI agent.  We talked about that earlier.  Or getting a stip
10  as to what the FBI agent said.

11       I think there was a request by the government that
12  you not be allowed to hold the 302 and approach a witness
13  saying, didn't you tell the FBI so and so?  Of course you can
14  do that, as long as you accurately read what's there.  I've
15  seen lawyers -- well, I've heard of this, where they go up
16  with a piece of paper, you know, that's got, you know, a lunch
17  menu on it, and they say, Didn't you the tell FBI the
18  following?  And of course, there's no such thing.

19       So do it in good faith.  You know, have the -- if
20  you're going to hold the document up and read from it,
21  of course, it's going to be the document that contains the
22  statement you want the witness to agree to or not agree to.
23  But I'm not going to micromanage how competent lawyers on both
24  sides cross-examine a witness in that way.  Just follow the
25  Federal Rules of Evidence.

1          And, again, if there are objections that the manner
2   of the cross is misleading to the jury, I'll hear the
3   objection.  And if it's misleading to the jury, I'll likely
4   sustain it.  You can hold a piece of paper up and use it in
5   cross.  You're probably going to use it to hand to the witness
6   anyway to refresh their recollection or put it on your
7   computer and have me just make the computer of the witness be
8   visible.

9          Okay.  Another one is to preclude self-exculpatory
10  hearsay by the government.  Defense response is
11  self-exculpatory statements are not categorically inadmissible
12  due to hearsay exceptions and the rule of completeness.

13         So the government asked me to exclude the defendants'
14  own self-exculpatory hearsay statements.  In doing so, they
15  presume there's no nonhearsay purpose without dealing with
16  specific statements.

17         This is hard for me to deal with in the abstract.  If
18  the defendants intend to rely on such a statement in opening,
19  front it with me.  If there's some statement that you think is
20  contained in an exhibit the government intends to use but it's
21  not the statement itself that the government's offering, front
22  it with me so I can see whether or not the exhibit that
23  contains what they want to put in -- they, the government --
24  make sure that the defendants' statement is something that
25  either is -- should be part of the government exhibit that's

1   being offered in fairness under the rule of completeness or

2   there's a nonhearsay basis for its admission.

3           The briefs on both sides were excellent, by the way,

4   in discussing the exceptions to hearsay and rule of

5   completeness.  And so when you raise this with me, you ought

6   to refer to your briefs because you both did an excellent job

7   briefing all the different ways an exculpatory statement can

8   come in on a nonhearsay basis or under a rule of completeness.

9   And the government pointed out why this is often a method the

10  defense used to slide in a defense statement when it's

11  improper to offer it because it's not by a party opponent.

12          So you both had your shots.  They both were well

13  done.  I need a statement in front of me to rule on this

14  intelligently, and I don't have one right now.  So if you're

15  going to use it in opening, though, front it with me so we can

16  discuss it.

17          Okay.  Government motion in limine to preclude

18  victim-blaming evidence or argument.

19          Does the government take the position that Deloitte

20  is a victim?

21          MR. HANKEY:  No, Your Honor.

22          THE COURT:  Okay.  All right.  The defense says

23  Deloitte is not a victim.  The government

24  mischaracterizes Mr. Lys's testimony -- is it Lys, L-Y-S, Lys?

25          MR. APPLEBY-BHATTACHARJEE:  Lys.

1    THE COURT:  Lys's testimony and --

2    MS. CHOU:  Your Honor, sorry; I couldn't -- we

3  can't -- did you say yes or no to you consider Deloitte a

4  victim?

5    THE COURT:  I'm sorry?

6    MS. CHOU:  I couldn't tell if the government said yes

7  or no to whether they consider Deloitte a victim.

8    MR. APPLEBY-BHATTACHARJEE:  So we do not allege

9  Deloitte as a victim that was defrauded out of money or

10  property, but the allegations in the indictment do say that

11  one of the means by which the scheme was accomplished was by

12  withholding material information from Deloitte that was used

13  to obtain audited financial statements that then furthered

14  other aspects of the fraud such as the lender and investor

15  fraud.

16    THE COURT:  Yeah, if -- they don't have to be a

17  victim.  If misrepresentations were made in the rep letter

18  that companies typically provide to accounting firms and those

19  are tied to the defendants, either directly or they had

20  knowledge that the reps made to Deloitte, it doesn't matter

21  whether Deloitte's called a victim or not.  They are -- that

22  is proof of a scheme to defraud, in my opinion, and is

23  admissible.  And characterizing them as a victim or not

24  doesn't change that fact, but I did want to find out what you

25  viewed them as, which is why I asked.

1    I think -- and then the defense response to the

2    motion by the government preclude victim-blaming is -- as I

3    said, Deloitte's not a victim, the government mischaracterizes

4    Mr. Lys's testimony and the availability of a curative

5    instruction.

6    I don't know whether Lys's going to be allowed to

7    testify.  I reserved on that.  I want to hear more of the case

8    to decide whether or not I think his opinions are relevant.  I

9    don't have a real strong basis to find that he's incompetent

10   to offer opinions.  He's certainly experienced in accounting

11   matters and testified a number of times.  It's more a question

12   of whether his opinions are relevant, but we'll get to that

13   during the trial, and so I reserved on it.

14   I can't rule preemptively on victim-blaming evidence

15   that comes out in cross in the abstract.  I'm going to have to

16   hear what the questions are when you get there.  If -- if the

17   defendants relied upon Deloitte in some way and that negates

18   their intent, I'm not sure -- well, I expect defendants will

19   say they relied upon Deloitte.  That becomes nuanced if false

20   statements were made to Deloitte to have them render opinions

21   that they did, and if the defendants were responsible in some

22   way for those false statements to see how the evidence comes

23   out.

24   I can't rule on a victim-blaming objection at this

25   point.  In the abstract, you're not supposed to blame victims

1  in cases.  Going back to the bank robbery analogy we had, you
2  can't argue the bank allowed themselves to be robbed because
3  they had a bad security system.  That's victim-blaming.  If
4  Deloitte improperly approved this averaging or smoothing of
5  the -- what'd you call it earlier?

6            MR. APPLEBY-BHATTACHARJEE:  The weighted average.

7            THE COURT:  -- the weighted average.

8            If they approved that as a proper method of revenue
9  recognition and that's -- turns out it's improper, I'll just
10 have to hear about that as we get to it.  I don't know if
11 that's where the government's going on this.

12           What is the Deloitte evidence?

13           MR. APPLEBY-BHATTACHARJEE:  Well, the Deloitte
14 evidence will center around the type of records that were
15 given to and then withheld from Deloitte and the records that
16 they were ultimately relying upon in order to make inclusions
17 regarding inventory, delivery, and the like.

18           THE COURT:  And are you -- is the evidence going to
19 show any of these defendants were responsible for providing
20 incomplete or inaccurate information to Deloitte?

21           MR. APPLEBY-BHATTACHARJEE:  Yes.  Either that the
22 defendants or -- or people working at the direction of
23 defendants were tendering information to Deloitte.

24           THE COURT:  And we're getting to Mr. Poulos's
25 objection when you say "defendants."  Are there particular --

1   is it just Mr. Purdy, is it the other two defendants, is it --

2              MR. APPLEBY-BHATTACHARJEE:  Certainly Mr. Purdy.

3   With respect to the other defendants, I -- I --

4              MR. JOHNSTON:  There are -- there are specific false

5   statements that we are alleging that both Defendants Shah and

6   Agarwal made to the Deloitte auditors.  With respect to

7   weighted average question, we will be arguing -- or presenting

8   evidence that they were misled as to client approval about

9   weighted average delivery and that in general weighted average

10  delivery was a rationalization and a cover that the defendants

11  devised very early on in their company to cover up shortfalls.

12             So even though the specific representations to the

13  client -- to Deloitte, about, hey, clients allowed weighted

14  average delivery, those were most of the times made by

15  Ashik Desai, but Ashik Desai will say, yeah, this was the

16  cover story that we basically used any time we were caught

17  with underdelivery and, you know, I learned this from Shah and

18  Agarwal.

19             MR. APPLEBY-BHATTACHARJEE:  And the Court also

20  touched upon the management representation letters.  Those

21  were executed by all three defendants, and I expect that

22  witnesses from Deloitte will also testify about annual fraud

23  inquiry meetings that they had individually with each of the

24  defendants and representations made during those.

25             THE COURT:  All right.  Well, any further comment by

1  defendants?  You don't have to agree with the government's

2  characterizations.  I'm sure you have a different view of the

3  evidence, but any comments about this motion to preclude

4  victim-blaming?

5          MR. POULOS:  No, Your Honor.

6          THE COURT:  Okay.  You can -- we'll see how it goes

7  if I'll allow cross of Deloitte about whether they properly

8  followed GAAP and GAAS on their -- as they performed their

9  audits and -- but, again, this is one of those that in the

10  abstract I can't rule definitively.  In general, you can't

11  blame a victim in a fraud case.  Everyone knows that.  There's

12  an instruction that provides that.  This is a lot more

13  nuanced.  And if there were mistakes made by Deloitte that

14  were relied upon to negate intent by the defendants, that

15  would seem to be a proper area to point out that Deloitte said

16  it was okay, I thought it was okay because they told me it

17  was, and, therefore, I didn't have an intent to defraud.

18  Seems like a classic example of how you would argue the

19  relevance of this to a defendant's intent.

20          MR. APPLEBY-BHATTACHARJEE:  And on -- on the point of

21  reliance, Your Honor, and I know that this was extensively

22  addressed in the *Daubert* briefing, but we have posed an

23  objection to the expert opining about what was -- what would

24  have constituted reasonable reliance under Rule 704.

25          THE COURT:  Right.  I recall that, and we'll get to

1  that under *Daubert*.  It gets close to an expert commenting on
2  the actual intent of a defendant which, of course, is
3  improper, but okay.

4          I'm not sure I helped you much on this.  I said I'd
5  defer ruling, but I think you have some broad ideas of how I
6  would rule as you get into this.

7          Final is, preclude argument defining reasonable
8  doubt.  Defendants reserve the right to request an
9  instruction.  You can reserve it.  You can prevent that
10 instruction, but we're going to use the Seventh Circuit
11 instruction on reasonable doubt.  And don't deviate from that
12 in your openings.

13         If you want to argue this at an instruction
14 conference later, I'll hear it, you can preserve it for --
15 anticipating I'll deny it, you can preserve it for appeal if
16 there's a conviction, but don't try and argue about what
17 reasonable doubt is in the openings at the least.  You
18 probably shouldn't do it in closings either, but certainly,
19 don't do it in openings.

20         Okay.  Defense motions in limine shouldn't take as
21 long.  Does anyone need a break?  I would prefer -- well,
22 let's go off the record.

23         (Off-the-record discussion.)

24         THE COURT:  Let's take a 15-minute break.

25         (A recess was had from 12:50 p.m. to 1:11 p.m.)

<pre>
 1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3
    UNITED STATES OF AMERICA,       )
 4                                  )    Docket No. 19 CR 864
                    Plaintiff,      )
 5                                  )    Chicago, Illinois
         v.                         )    December 16, 2022
 6                                  )    1:11 p.m.
    RISHI SHAH, SHRADHA AGARWAL,    )
 7  BRAD PURDY,                     )
                                    )
 8                  Defendants.     )

 9
            TRANSCRIPT OF PROCEEDINGS - Final Pretrial Conference
10              BEFORE THE HONORABLE THOMAS M. DURKIN

11
    APPEARANCES:
12

13  For the Government:     MR. MATTHEW F. MADDEN
                            MR. SAURISH APPLEBY-BHATTACHARJEE
14                          Assistant U.S. Attorney
                            219 South Dearborn Street, 5th Floor
15                          Chicago, Illinois  60604

16
                            MR. WILLIAM E. JOHNSTON
17                          MR. KYLE C. HANKEY
                            U.S. Department of Justice
18                          Criminal Division, Fraud Section
                            Washington, D.C.  20530
19

20

21

22            KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                        Official Court Reporter
23                  United States District Court
                  219 South Dearborn Street, Suite 1426
24                    Chicago, Illinois  60604
                    Telephone:  (312) 435-5569
25              Kathleen_Fennell@ilnd.uscourts.gov
</pre>

1    APPEARANCES (Continued:)

2
     For Defendant
3    Shah:                    MR. JOHN C. HUESTON
                              Hueston Hennigan LLP
4                             620 Newport Center Drive, Suite 1300
                              Newport Beach, California  92660
5
                              MS. VICKI CHOU
6                             MR. MICHAEL H. TODISCO
                              MS. KAREN DING
7                             Hueston Hennigan LLP
                              523 West 6th Street, Suite 400
8                             Los Angeles, California  90014

9
     For Defendant
10   Agarwal:                 MS. KOREN L. BELL
                              MR. A. ALEXANDER LOWDER
11                            Larson LLP
                              555 South Flower Street, Suite 4400
12                            Los Angeles, California  90071

13                            MR. PATRICK W. BLEGEN
                              MS. KELSEY KILLION
14                            Blegen & Garvey
                              53 West Jackson Boulevard, Suite 1437
15                            Chicago, Illinois  60604

16
     For Defendant
17   Purdy:                   MR. THEODORE T. POULOS
                              MR. ERIC PRUITT
18                            MR. JOHN PAVLETIC
                              Cotsirilos, Tighe, Streicker, Poulos &
19                            Campbell, Ltd.
                              33 North Dearborn Street, Suite 600
20                            Chicago, Illinois  60602

21

22

23

24

25

1    (Proceedings heard in open court:)

2         THE COURT:  All right.  Please be seated.

3         A couple things I want to raise off the record.

4    (Discussion held off the record.)

5         THE COURT:  Let's go on the record.

6         All right.  Let's go through the defendants' motions

7    in limine.

8         The first is to exclude speculative and lay opinion

9    testimony regarding defendants' state of mind.  The

10   government's response is there's no blanket prohibition

11   against lay witness opinion on state of mind or ultimate

12   issues.

13        It would be unreasonably broad to preclude any

14   testimony about a defendant's state of mind.  Witnesses can

15   testify based on their perceptions pursuant to Rule 701, as

16   long as it's rationally based and satisfies the rules --

17   satisfies the requirements of that rule and requirements of

18   Rule 403.

19        Lay opinions about mental state are not per se

20   inadmissible, and using interview memos where questions were

21   asked about state of mind, which is where the defense

22   objections came, you saw a lot of interview memos where

23   witnesses speculated or gave opinions about state of mind,

24   that's not a good proxy for what they may be asked in court.

25   It's a start, but the government should know you can't ask a

1  witness what somebody was thinking.

2  And if you get into that area, front it with me.
3  We'll do a voir dire, or you can tell me what you expect the
4  witness to say, and I'll rule on its admissibility at that
5  time.

6  You always can object to speculative testimony on the
7  defense side, of course.  And as I said, it's an easy sidebar.
8  If I do allow it in because I think it satisfies 701, you can
9  cross, of course, on the weakness of that testimony.

10  So it's basically a deny and defer.  Denying the
11  motion because it's -- I can't per se stop any testimony about
12  a defendant's state of mind, but I'm deferring it if you
13  intend to offer it.

14  The next motion in limine is to preclude
15  undifferentiated references to the defendants as a group.  The
16  government's response is defendants acting as a group is part
17  and parcel of the alleged scheme.  Defendants can cross on
18  these points.

19  I'm going to deny the motion.  This seems unwieldy
20  and inconsistent with the case as charged.  The government's
21  seeking to prove just that, the defendants acted as a group.
22  You can call into question individual defendants' involvement
23  or knowledge on cross, and if a witness refers to an
24  undifferentiated mass of defendants, you can make an
25  objection, and I will allow the government to rephrase the

1  question.  So if it's something where an individual should be
2  identified in -- necessarily as part of an answer, they'll
3  have to do so.

4         I'll also give an instruction, as Ms. Bell asked, at
5  the appropriate time when this comes up to inform the jury
6  that the defendants, although charged and being tried
7  together, their guilt or innocence is decided on an individual
8  basis.  I'll give the pattern instruction that relates to
9  individual consideration for each defendant, and I'll give it
10  more than once, if necessary.

11         And I think the fear of wasting the Court's time to
12  object to lumping is probably overblown because the government
13  has represented through the nod of the head of one of the
14  prosecutors that they're going to ask careful questions that
15  are not unfairly lumping defendants together.

16         So I think occasionally it's proper.  Usually it's
17  not, and I'll hear objections when it comes in if the question
18  improperly lumps people together.

19         Next motion is to exclude evidence of customer,
20  investor and lender losses.  The government's response is
21  losses are relevant to intent and materiality and are not
22  prejudicial or speculative.

23         I'm going to deny the motion by defendants.  Evidence
24  of loss in fraud cases is routinely admitted even if it's not
25  an element of the crime.  Defendants have said fraud occurred,

1  but they had no intent to defraud and Desai is the main

2  culprit.

3          Evidence of loss and the amount of loss goes to

4  whether the defendants knew of the fraud, let alone

5  participation in it.

6          There's no doubt if the loss were in the thousands of

7  dollars in a multi-million-dollar company, the defendants

8  would offer it to show lack of intent or knowledge of the

9  fraud.

10          Conversely, if the losses are much larger, as they

11  were here, the government should be allowed to show it to

12  offer -- offer it to show evidence of intent.

13          Also, I don't think there's anything speculative

14  about a finance professional quantifying his or her company's

15  loss under Rule 701.  If the testimony is overly speculative,

16  an appropriate objection can be made, but I don't think

17  someone saying they lost their entire investment, as long as

18  it's rationally based on something they can be cross-examined

19  on, is overly speculative.

20          You've got 302s, grand jury testimony or OIG

21  interviews of these folks.  If you think there's something

22  that they're going to say that isn't supported by their

23  ability to talk about it under 701, raise it with the

24  government.  See if it's actually going to be questioned

25  about, because, once again, what's in these 302s is not

1  necessarily the same proxy of what's going to be asked in
2  court.  But ask the government if they're going to testify
3  about it.  If you think it's unfairly -- it's not something
4  they can support, I'll hear about it before they testify to
5  it.

6  But the collateral effects of the losses if -- I
7  don't think Goldman is going to come in and talk about this
8  breaking their bank -- but the collateral effects of losses,
9  like personal effects of losing money, damage to a company
10  that made the investment, that's out-of-bounds.  That's
11  improper and shouldn't be brought out.

12  The jury doesn't need to hear someone made an
13  investment, their company had to lay off people or they
14  lost -- lost something beyond just the monetary loss.  The
15  collateral consequences, that's out-of-bounds and should not
16  be referred to by witnesses.

17  Next one is preclude characterization as
18  whistleblowers.  I dealt with this already.  I've already
19  ruled that the government cannot use that term in opening.  If
20  it's used by defendants themselves or in a letter to the
21  defendants that is admitted in evidence, so be it.  It will be
22  used there.  And if the evidence supports the use of the term
23  in closing, I'll allow it then.

24  So that motion is granted with the qualifications
25  I've already put on the record.

1    Next is to exclude evidence of defendants' wealth,

2  assets, spending or movement of money beyond those charged in

3  Counts 10 and 11.  The government's response is wealth and

4  spending is probative of intent and is not prejudicial.

5    Certainly as to the money laundering charge, the

6  movement of the money, where it went is obviously relevant,

7  and even if it's prejudicial, it's relevant.  And its

8  relevance outweighs any prejudicial impact.

9    I think I've ruled on this, in essence.  Salaries and

10 distributions are properly introduced to show motive and

11 intent.  Defendants said they had no intent to defraud.  Desai

12 was the master mind.

13    Evidence of the money the defendants received would

14 tend to show they were at least in it together as the

15 defendants, especially the two owners of the company.  They

16 had the most to gain from the fraud.

17    The spending, as I said before, by defendants on

18 luxury items is irrelevant, as is spending on charitable

19 causes.  They're both out unless you give me a good reason to

20 allow it in.

21    There's a motion to exclude evidence or arguments of

22 defendants' personal lives.  The government's response is

23 apparently some time ago before the events in this case, there

24 was a romantic relationship or dating relationship between two

25 of the defendants, and the government says they'll only offer

1    that fact as a -- to help establish a close, trusting
2    relationship during the scheme period.

3            I'm going to grant the motion to exclude.  The
4    romantic relationship ended before the alleged scheme, and the
5    government can speak to the closeness of Shah and Agarwal
6    without referring to any romantic relationship.

7            However, if the basis of a witness's observations
8    that they were close and trusting is the fact that that
9    witness knew of the prior relationship and the witness is
10   going to say so, you need to front that before the witness
11   says it with me, and I'll consider whether or not its
12   prejudicial impact outweighs its probative value.

13           But otherwise, no, it doesn't come in.  But if a
14   defendant then on cross challenges the basis for a witness's
15   belief there is a close and trusting relationship between the
16   defendants, you may open the door to that fact.  So be careful
17   on your cross, but it's out otherwise.

18           Last motion to exclude is to exclude evidence of --
19   motion in limine, rather, is to exclude evidence of the fact
20   of the SEC investigation and lawsuit.  The government's
21   response is the defendants are likely to open the door and
22   impeaching based on SEC deps and suggesting bias by Analyst A
23   who is an SEC, I'll use this phrase, whistleblower.

24           The government may also call a witness to testify
25   about Purdy's desire to include a term in the settlement

1 | agreement that would prevent the employee from going to the
2 | SEC.

3 |     I'm going to deny the motion.  The government stated
4 | that if they believe the defense opens the door, they will
5 | raise the issue before the Court before eliciting testimony
6 | referring to the SEC investigation or case.

7 |     I'm denying it in the sense that the government has
8 | said they're not going to open it.  I suppose one way to say
9 | is I'm granting it.  No reference to the SEC investigation
10 | unless the defense opens the door.

11 |     If the government calls the proposed witness,
12 | apparently the attorney for Outcome employee Sean Bogdany, we
13 | can revisit the issue of mentioning the SEC if it's still
14 | something that's not already come out.

15 |     MR. HUESTON:  Your Honor?

16 |     THE COURT:  Go ahead.

17 |     MR. HUESTON:  So in terms of, say, impeachment with a
18 | transcript, I think we can probably reach a stipulation with
19 | the government that in a prior proceeding without invoking the
20 | word SEC.

21 |     THE COURT:  You can.

22 |     MR. HUESTON:  We will -- so obviously we're going to
23 | use these transcripts.  We're not going to throw out the word
24 | SEC, and we'd ask the government not do the same based on the
25 | rationale the Court has just outlined.

1       THE COURT:  Right.  No, you can refer to it as a
2  prior statement you made under oath.
3       MR. HUESTON:  Right.
4       THE COURT:  Whether at some point you think the jury
5  may be thinking there had been a prior trial, you can see if
6  there's a stipulation, it might be a prior statement under
7  oath but was not involved in a trial.
8       MR. HUESTON:  Right.
9       THE COURT:  Something to make it clear because if I'm
10  a juror, I'm thinking, oh, this is the second trial involving
11  this, or there must have been another trial.
12       So you may want to find a way to wordsmith that to
13  take that impression away from the jury, but you don't have
14  to -- you can cross without referring to the SEC.  And whether
15  we get to the SEC on this Analyst A issue is -- will come up
16  when that witness testifies.
17       Anything else on any of the defense motions in
18  limine?  Any of the rulings I made on any issue today?  First
19  from the government?
20       MR. MADDEN:  No, Your Honor.
21       THE COURT:  Defense?
22       MS. CHOU:  No, Your Honor.  Thank you.
23       THE COURT:  Ms. Bell?
24       MS. BELL:  Your Honor, does the Court intend to
25  address Santiago further or was that --

1           THE COURT:  That was to tell you what's going to

2   happen, but I'm going to give you either an oral ruling or

3   written ruling sometime before trial.  I'll give you my

4   rationale.

5           MS. BELL:  Thank you, Your Honor.

6           THE COURT:  But I thought it was important for you to

7   know what my ruling would be so you could plan accordingly.

8           MS. BELL:  Thank you, Your Honor.  So I may have a

9   comment after the Court addresses that.

10          THE COURT:  I wouldn't be surprised.

11          That's fine, but for purposes of your planning, the

12  government has adequately laid a proper preponderance proffer

13  that would support the admission of co-conspirator statements.

14          MR. POULOS:  Your Honor, on the Santiago issue, and I

15  think it's -- you know, we'll await your written ruling or

16  further discussion on that issue.

17          One thing with respect to Mr. Purdy, Your Honor, is I

18  think there is a legitimate question as to exactly at what

19  point is he a member -- you know, has government produced

20  evidence that he's a member of the conspiracy?

21          I think that there are a number of communications

22  involving other parties, Ms. Agarwal, Mr. Shah, for example,

23  that may take place even before Mr. Purdy becomes an employee.

24          And so at what point, I think the government should

25  point to this date and statements that are admitted prior to

1 that date, you know, I think Mr. Purdy would be entitled to a

2 limiting instruction to the jury on that point, so --

3         THE COURT: All right. Any objection from the

4 government on that?

5         MR. MADDEN: Your Honor, we'd like to -- they can

6 proffer a limiting instruction and we'll take a look at it,

7 and we can let them know if we've got an objection or not.

8         THE COURT: All right. Yeah, again, it's not a

9 conspiracy case, as was pointed out by the government

10 repeatedly in their Santiago proffer and in their reply, so

11 the traditional laws of conspiracy where you're accountable

12 for the conduct of co-conspirators even if you haven't -- even

13 if you join the conspiracy later doesn't necessarily apply.

14         MR. POULOS: Right.

15         THE COURT: It was a joint venture, at least for

16 Santiago purposes, for evidentiary purposes, and there is a

17 fundamental issue of fairness of why should I be on the hook

18 for statements made before I even joined the company.

19         So propose an instruction. Run it by the government.

20 See if there's a reason -- an agreement you can reach.

21         Is -- Ms. Agarwal and Mr. Shah were in this for the

22 entirety of the charged scheme, correct?

23         MR. MADDEN: They both worked there long before 2011,

24 which is when we allege the scheme started, so yes.

25         THE COURT: And they worked there at the very end --

1  to the end of the scheme, correct?

2  MR. MADDEN:  Yes.

3  THE COURT:  And Mr. Purdy joined when?

4  MR. MADDEN:  2012.

5  MR. POULOS:  July of 2012, Your Honor.

6  THE COURT:  July of 2012.  Okay.  So --

7  MR. POULOS:  Well, that's when he joined the company.

8  THE COURT:  Well --

9  MR. POULOS:  Right.

10  THE COURT:  -- but that's an easy dividing line.

11  MR. POULOS:  Right.

12  THE COURT:  Not necessarily the one that you're going

13  to be suggesting, but --

14  MR. POULOS:  Right.

15  THE COURT:  -- certainly conduct and statements that

16  occurred before he joined, you have a pretty good point.

17  MR. POULOS:  Okay.

18  THE COURT:  The arguments about how quickly he -- the

19  government believes he joined the scheme is a different issue.

20  That may be the matter that you have disagreement on and is

21  not something I have to resolve.  That's something the jury

22  can resolve.

23  But certainly from 2011.  Do you have a date in 2011,

24  or is it just the year?

25  MR. MADDEN:  The year 2011.

1    THE COURT: Yeah, from 2011 to July 2012, propose an
2   instruction to the government and see what they say, or
3   government you propose one -- I guess it's really Mr. Poulos's
4   obligation to propose one. He's the one that wants it, so,
5   okay.
6    MR. MADDEN: He tries to get us to do their work,
7   though, sometimes, Your Honor.
8    THE COURT: I know.
9     (Laughter.)
10    THE COURT: Okay. Anything else then that we need to
11   deal with today?
12    MS. CHOU: Your Honor, just as a housekeeping
13   matter --
14    THE COURT: Yes.
15    MS. CHOU: -- I think in our stipulation we had
16   indicated that we reserved the right to file additional MILs
17   based on the exhibit list or the witness list.
18    I don't have anything in mind at this point, but they
19   did -- the government produced their exhibit list on
20   December 12th, which is what we had indicated our date was
21   based off of.
22    We didn't get the full set of endorsements, exhibits
23   until last night and so we would just ask for leave to have a
24   slightly later date.
25    THE COURT: Sure. What -- remind me of what the

1    timing was.

2         MS. CHOU:  I think we had indicated December 30th, so
3    we would just ask for an additional week.

4         MR. MADDEN:  So can I respond to that, Your Honor?
5         THE COURT:  Yes.

6         MR. MADDEN:  So we provided -- what we were required
7    to do was provide the exhibit list to the defense by whatever
8    that date was, I think the 12th.  We did that.  They have
9    all -- and it was -- it's very detailed.  It contains, for
10   example, for emails, the to and from, who sent it, the subject
11   line, the Bates number, the starting Bates number, the end
12   Bates number, the date of it, and the Bates number.  So they
13   could easily -- and they have all that evidence already
14   because we turned it over in discovery.

15        We then agreed to give them electronic copies of
16   everything on a document production system, which we provided
17   to them yesterday.  So they -- I mean, they already had these
18   items.  To make it more convenient to them, we provided it to
19   them on Thursday.

20        So if I understand their request, they're asking to
21   move back the date that they give us their list.

22        MS. CHOU:  No, no, no.  We're asking about any MILs
23   that pertain to exhibit lists --

24        MR. MADDEN:  I'm sorry.

25        MS. CHOU:  -- exhibits or witness lists that we

1 didn't -- wouldn't otherwise be covered by what we've already
2 filed.

3       THE COURT: You mean motions in limine?

4       MS. CHOU: Yes.

5       THE COURT: Okay.

6       Yeah, if there's something that came out in the
7 exhibit list or the witness list that you believe necessitates
8 an additional motion in limine, go ahead.

9       MS. CHOU: Thank you.

10       THE COURT: And you want until when to do that?

11       MS. CHOU: I think it's January --

12       MR. POULOS: Your Honor, as far as want until when,
13 Judge, I think it's going to take us all of next week to get
14 through the thousand exhibits. A lot of these, you know,
15 these Voxer -- there are a hundred Voxer transcripts alone. A
16 lot of emails are multi-page, multi-chain materials.

17       So, just -- I think you proposed right at the
18 beginning, Your Honor, that we'll get a list of exhibits from
19 the government that they intend to use the following day, and
20 obviously we'll be raising issues as they come.

21       To the extent we see something very significant
22 that's, again, an obvious issue or a serious problem, we'll
23 try to alert the Court and brief that issue as expeditiously
24 as we can. But I think for my money, it just seems impossible
25 for us to commit that we can file motions in limine in

1  connection with a thousand government exhibits at any

2  particular point.

3          THE COURT:  Well, here's the triage on this because I

4  don't want to get a raft of motions in limine.  You now know

5  the government's -- the universe of the government's

6  witnesses.  You now know the universe of the government's

7  exhibits.  You're going to go through those and raise your

8  hands and say I can't believe they're bringing this witness in

9  or I can't believe they're offering this exhibit.

10         Your first step ought to be call them and say are

11 they really doing it?  People over-designate exhibits, they

12 over-designate witnesses.  And if they really are going to use

13 it and they really are going to call the witness, then the

14 next step is are you really going to mention it in opening?

15         If they say they're not, you can raise it with me

16 later in a timely way, but it's not something that I'm going

17 to have to rule on in the ether, which is what I've been doing

18 on most of these.

19         I've learned more about the case just talking to you

20 today than I did by reading all the briefs, and it's important

21 that I have the context to make an intelligent decision.

22         So if you go on that kind of a triage, I'm not going

23 to put a deadline on your motions in limine.  You're really

24 just making motions to object to an exhibit or a witness, and

25 if the government is going to put that exhibit in their

1   opening, refer to it or in their first witness or if they're

2   going to refer to the witness in their opening, then we ought

3   to be talking about it before trial, and if not, we can talk

4   about it during trial.

5          And it's just going to -- you're going to have to

6   meet and confer on this first and then raise with me the

7   problems you see coming on the horizon that need to be

8   addressed immediately.

9          I think it's the only rational way to do it because I

10  think many of the things you think, when reading it, are

11  problems may end up not being problems when you talk to the

12  government, or they say if we're going to do that, we're going

13  to do it four weeks into it, and then in four weeks you decide

14  not to do it.

15         So that's how I think we ought to do it.  I'm not

16  going to put a hard deadline on when you object to anything

17  along those lines, other than you can't raise an objection to

18  something they're going to do in their opening the morning of

19  their opening.

20         If you haven't met and conferred and brought it to me

21  before that, then it's too late.

22         Okay.  Anything else we need to discuss on any issue?

23         MR. BHATTACHARJEE:  Your Honor, I know that the Court

24  is deferring ruling on the disputed instructions.  We have

25  spoken with the defense about submitting joint proposed

1   preliminary instructions.

2          The one material issue that we should resolve just on
3   the record before submitting those is we intend to submit
4   hopefully joint proposed preliminary instruction on the
5   elements of the charged offenses, and there is a disagreement
6   about the willfulness element in the bank, wire and mail fraud
7   cases.

8          So if the Court could resolve that objection on the
9   record, and then we'll submit proposed instructions that
10  conform with that.

11         THE COURT:  My understanding is willful comes in on
12  healthcare fraud, and it's not included as an element of mail,
13  bank or wire fraud.  The instructions, Seventh Circuit Pattern
14  Instructions, don't include it.  The statute doesn't include
15  it.

16         I don't understand why it should be added as an extra
17  element, which is what it is, when it's added.  It's language
18  that is inapplicable per the statute and per the pattern
19  instruction.  That was the government's response when you
20  suggested it in your instructions.

21         Now, I suppose if you want to file a reply to the
22  government's response, I'll hear it, but I'm -- absent
23  something I'm missing, which is possible, certainly possible,
24  it doesn't belong there.

25         MS. BELL:  And, Your Honor, we will preserve our

1  objection and submit on the papers, so we appreciate the
2  Court's ruling.

3  THE COURT:  Okay.  The ruling is it's not in.  You've
4  preserved your objection --

5  MS. BELL:  Understood.  We'll just preserve the
6  objection, which is it was meant to really be preserved, and I
7  think it's adequately briefed, and we don't need to burden the
8  Court with further argument on that.

9  THE COURT:  So preserved, your objection.

10  And remember, these are preliminary jury
11  instructions.  We're going to have an instruction conference
12  at the end of the case where you'll again renew your
13  objection.

14  You'll want a willful language added, and I'll likely
15  deny it, and you'll have a clean record then from the
16  instructions given to the jury for final instructions.

17  MS. BELL:  Understood, Your Honor.

18  THE COURT:  Okay.  Anything else?

19  MR. BHATTACHARJEE:  Nothing from the government.
20  Thank you.

21  THE COURT:  All right.  Anything else from defense?

22  MR. BLEGEN:  Judge, one of the questions I had about
23  preliminary instructions, and I don't have it in front of me,
24  does the government -- are they seeking the ostrich
25  instruction in the preliminary --

1       THE COURT:  They're not going to get it in

2   preliminary instructions.

3       MR. BLEGEN:  Oh, okay.

4       THE COURT:  No.  I don't think they're seeking it,

5   but they're not going to get it.  That's reserved for a very

6   special type of situation at the end of the case, and we

7   wouldn't know that for 10 weeks, 14 -- 18 weeks now.  So, no,

8   no ostrich instruction in the preliminaries.

9       Anything else?

10      MS. BELL:  Your Honor, two other things.

11      One, we do anticipate, once we've received Your

12  Honor's ruling, formal ruling on Santiago, likely proposing a

13  standing objection to statements that, you know, we believe

14  are not, you know, properly admissible pursuant to the

15  co-conspirator exception rule, and that way I think that will

16  expedite things so we can simply refer to that in the course

17  of trial rather than reiterating all of the objections.

18      THE COURT:  Yeah.  I think there will be a number of

19  statements that come in of the co-conspirator statement.  A

20  number of the attachment statements, attachment to their

21  original Santiago proffer, just about every one of those

22  statements was an admission by a party-opponent beyond, you

23  know, being a co-conspirator statement.

24      There were a few between Desai and Han and Desai and

25  Choi that didn't involve defendants, but everything else

1  involved one or more defendants, at least of your chart.

2          MS. BELL:  Yes, and our position on that would be

3  it's not necessarily -- it would be, for example, Mr. Purdy's

4  statement --

5          THE COURT:  Yeah.

6          MS. BELL:  -- is an admission as to him but not

7  necessarily as to our clients unless the government has the

8  preponderance of proof that they're all in a conspiracy, but

9  obviously we've --

10          THE COURT:  Right, or a joint venture.

11          MS. BELL:  -- I'm sorry, or a scheme, a joint

12  venture, exactly.

13          Obviously, we've made that argument.  We understand

14  the Court will be overruling that argument, but that would be

15  our concern as to those.

16          And so in order to preserve such objections, we will

17  formulate some type of submission to the Court that we can

18  refer to that will expedite things so we're not all popping up

19  with these various objections through the trial, given the

20  Court's ruling at the outset on that.

21          THE COURT:  Right.

22          Well, that's a good practice, and I'll look forward

23  to anything you can propose on that to expedite a standing

24  objection.

25          That may not cure the separate admissibility of a

1  statement, separate basis for admissibility.  We'll have to

2  deal with that as it comes through.  But I'll give you the

3  ruling and try to address the admissibility of the statements

4  as to all defendants if given the -- given the finding that

5  the government's met its burden of proof under their Santiago

6  proffer for admissibility of co-conspirator statements.

7              Go ahead.  I'm sorry.

8              MS. BELL:  I'm sorry.  Will the Court also be

9  addressing, I think we had a further request in terms of a

10  remedy insofar as we did not know, it was not clear to us

11  whether there were going to be additional co-schemers that the

12  government will allege were part of the scheme, and they kind

13  of gave us a list and then said and others.  So we would just,

14  you know, renew our request or -- in that respect in

15  connection with the Court's ruling on this.

16              THE COURT:  Well, certainly a Santiago proffer is not

17  required to contain every statement that they intend to offer

18  as a co-conspirator statement, and you can always object to a

19  statement that may not have been in the proffer that you think

20  is not something in furtherance of a scheme.

21              Do you intend to offer any statements of anyone who

22  has not been identified as a co-schemer?

23              MR. MADDEN:  Not under that rule, no.

24              THE COURT:  Okay.  There's your answer -- well, maybe

25  that's an answer that doesn't answer your question, but is

1  there more you want from the government?

2  MR. MADDEN:  I guess what I mean to say is so we've

3  identified, I think, nine individuals as co-venturers in that

4  statement.  We don't intend to rely on the co-venturer

5  exception to -- in support of admissibility of statements by

6  people other than that group of nine.

7  THE COURT:  Okay.  Well, the problem comes in, I

8  suppose, since no conspiracy has been charged is do admissions

9  that are not part of a co-conspirator statement -- this goes

10  to Mr. Poulos's statement, in part.  Co-conspirator statements

11  are admissible against other members of the scheme.  I'm using

12  co-conspirator in the sense that's what the Federal Rules of

13  Evidence calls it.

14  There's a separate basis for admissibility as to a

15  number of the statements.  If you rely upon that separate

16  basis, is it appropriate to instruct the jury that that's

17  admissible only as to the person who made the statement?

18  MR. BHATTACHARJEE:  On that point, Your Honor,

19  party-opponent admission is one of the alternative bases, but

20  other bases that we've identified include, for example, that a

21  statement is offered for its falsity but not its truth.

22  THE COURT:  Same thing though.  Whatever the

23  exception is, whether it doesn't fulfill the definition of

24  hearsay because it's a party-opponent statement or it's

25  brought in as an exception to the hearsay rule under 803 or

1    804, does that statement, is that attributable to the non --

2    nonspeaker just as co-conspirator statements are?

3            MR. BHATTACHARJEE:  I think, Your Honor, that that's

4    going to have to be answered on a case-by-case basis.

5            THE COURT:  Well, I'd appreciate you all thinking

6    about that because I can see chaos ensuing, and I don't think

7    it's helpful to the jury for them to say you can consider that

8    statement just against Defendant Shah, but you consider that

9    statement against Defendant Shah, Defendant Agarwal and

10   Defendant Purdy.  And that's not helpful to the jury.  It may

11   be legally correct, but I -- I'm happy to take guidance from

12   all of you on how to solve that dilemma because we're going to

13   confront both of those.

14           MR. BHATTACHARJEE:  And, Your Honor, I appreciate the

15   concern.

16           I will say that concern would really impact the

17   limited group of statements involving potential co-venturers

18   who are not identified in the group of nine in the

19   government's Santiago proffer.  I would fairly venture that

20   that will be a vast minority of the exhibits, and so --

21           THE COURT:  Well, I thought you weren't going to

22   offer anything more than the nine by way of co-venture

23   statements.

24           MR. BHATTACHARJEE:  By way of co-venture.  So

25   anything involving other analysts, for example, I think can be

1  addressed on an analyst-by-analyst basis.

2  THE COURT: Well, if it's statements by other
3  analysts that relate to a defendant, then they come in as an
4  admission are only -- I would think are only admissible as
5  to -- that statement is only admissible as to the defendant
6  who made the statement, because if it's co-venturers, then we
7  get into the co-conspirator exception that allows those
8  statements to be attributable to all the defendants.

9  I'm speaking out loud here, which is always a bad
10  idea, but I view this as a fairly important thing to nail
11  down, and I'd ask you all to think about it and find a way
12  that we can properly instruct the jury as to the difference as
13  long as you agree on the difference and the instruction that
14  would be given.

15  I think you've raised a good point though, and I
16  think it's -- happily, we're not doing opening statements
17  tomorrow, but I think you all need to think about this.  If
18  there's a solution, great.

19  Mr. Madden, you want to say something?

20  MR. MADDEN:  We will think about it, Your Honor, and
21  there may be some instances where a limiting instruction is
22  appropriate.

23  For the statements that are coming in under the
24  Santiago proffer, I don't think a limiting instruction is
25  necessary because for the reasons given your ruling, but, you

1    know, just for example, a lot of times something was said,
2    Executive A talked to Shah, and then Shah shares that with
3    Purdy, for example.

4             And so many times, you know, someone, a whistleblower
5    statement is told to one defendant and then shared with
6    another, and so I think it really depends on which statement
7    we're talking about.

8             So we can think that through, but --

9             THE COURT:  If you can divide it into broad
10   categories, you don't have to give me the 2,000 statements you
11   intend to offer or whatever it's going to be, pieces of
12   evidence, but broad categories and see if there can be
13   agreement on instructions for particular broad categories that
14   make sense and are not just words to a jury that they ignore.

15            We assume -- the law, of course, assumes jurors
16   follow instructions, but I think we have to recognize that,
17   you know, in a lengthy trial, those instructions need to be
18   reinforced and spoken in common English in many cases, and I
19   think categorizing them in an easily understood way, if you
20   can reach agreement, may be the way to solve that problem.

21            So you know the statements.  I don't know.  I know
22   what's in your -- what's in your Santiago proffer, but I don't
23   know the universe of statements.

24            Okay.  Anything else?

25            MS. BELL:  And, Your Honor, I'm sorry --

1          THE COURT:  Go ahead, Ms. Bell.

2          MS. BELL:  I don't mean to belabor this, it just

3   wasn't clear to me whether -- is the government's position

4   that there are additional unidentified co-venturers, just that

5   they're not going to rely on the exception?  Because I think

6   that was a separate aspect of our request, that we would just

7   like to know who do they identify as a co-venturer.

8          THE COURT:  I thought they had nine, and there may be

9   other witnesses that talk about admissions, not as statements

10  in furtherance of the venture, but as admissions.

11         Am I mischaracterizing your statement?

12         MR. MADDEN:  You're not.  We're not relying on the --

13  we're only relying on the co-venturer exception for statements

14  of those nine witnesses.

15         THE COURT:  Okay.  Does that help, Ms. Bell, what you

16  were looking for?

17         MS. BELL:  Yes.  Thank you, Your Honor.

18         THE COURT:  All right.

19         Mr. Poulos?

20         MR. POULOS:  Your Honor, with respect to the Santiago

21  proffer, and this relates, this question of, okay, when did

22  Brad Purdy supposedly become a co-venturer?  When did he join

23  this scheme to defraud, and, again, it goes to, you know, the

24  broad brush of the government saying defendants did this, the

25  defendants did that.

1            And, Judge, we -- this was somewhat unusual for me,

2    but we -- we went into great detail of what the objective

3    contemporaneous documentation shows in connection with Desai's

4    claim of a telephone conversation with Mr. Purdy, and in

5    making the Santiago determination, the Court makes a

6    Rule 104 -- is it? -- determination as to that on the

7    preponderance of the evidence.

8            And as we pointed out, Your Honor, we feel that the

9    preponderance of evidence is in favor of Mr. Purdy on that

10   issue, that that conversation, in fact, never occurred.  And

11   if the preponderance is in our favor on that issue, Your

12   Honor, we suggest and propose that the Court cannot rely on

13   that evidence as evidence of Mr. Purdy's participation in this

14   co-venturer scheme.

15           THE COURT:  Is that a motion to reconsider?

16           MR. POULOS:  On that, yes, Your Honor, it is.  I --

17           THE COURT:  I read -- I read your brief carefully,

18   and I -- it was more detailed than I've seen in most Santiago

19   proffers, you supported it; but I think on a preponderance

20   standard, the government met its burden.  I disagree -- it is

21   not my role to judge credibility in a -- well, I'll speak

22   carefully.

23           It's a low standard for the government,

24   preponderance, and I believe they met it.  So I'll give you

25   more reasons, if necessary, when I give you the ruling; but

1   you should assume the statements the government has proffered

2   as to Mr. Purdy will be admitted as co-conspirator statements

3   that were contained in their motion.

4           MR. POULOS:  Okay.  Thank you, Judge.

5           THE COURT:  Okay.  Sure.

6           Anything else?

7           MS. BELL:  Just one final housekeeping matter --

8           THE COURT:  Yes.

9           MS. BELL:  -- regarding the temperature.

10          THE COURT:  Yeah.

11          MS. BELL:  Is there anything -- I'm personally cold,

12  I think a few of us are, and I'm not sure what Your Honor's

13  preference is, which obviously we defer to; but we were just

14  wondering if this is the normal temperature and if it's

15  possible to raise, or what the Court's practice is as to that

16  when you have people from California.

17          THE COURT:  Off the record.

18      (Discussion off the record.)

19          THE COURT:  All right.  Anything else?

20          All right.  We'll be in touch obviously, and I'll

21  keep you relatively -- I'll start giving you the scan of the

22  noes, reasons why people say they can't do it.  I promised you

23  you'll get to see that.

24          I'll start doing that as they get collected, and I'll

25  give you a, if not real-time, a pretty contemporaneous view of

1   how many jurors we're getting.

2        If we -- I hope we get enough jurors. I mean, I
3   can't predict it. I hope we do. We can't not try this case.
4   And if we're really getting low, I'm going to ask the jury
5   department to send out by special mail more notices. I've
6   done that in another case, but then we run into time crunches,
7   so --

8        MR. HUESTON: Yeah, and, Your Honor, I would just say
9   we'd prefer that than we lose challenges, so -- and I know
10   you're sensitive to that.

11        THE COURT: No. A 14-week trial is hard to schedule.
12   These defendants deserve to have this case tried. They've
13   been waiting for a while, and they absolutely deserve to get
14   this resolved. Their lives are on hold until this is
15   resolved. I'm sensitive to that.

16        So I can't give you 14 other weeks any other time.
17   I'd have to move -- well, we've got it. Let's keep it.

18        And if it means fewer challenges on a proportional
19   basis, we may end up doing that to make sure we get a group of
20   18. That's much more preferable than to just blowing it all
21   up and saying we can't do it and we'll have to try another
22   time.

23        MR. POULOS: Judge, do we have another status set?
24   Does it make sense to set a status just to check in, or
25   perhaps the Court could just issue a date?

1       THE COURT:  Yeah.  Not between Christmas and

2   New Year's unless you want to.

3       MR. POULOS:  No.

4       THE COURT:  I'm back -- I'm here the 3rd, 4th and

5   5th.  Why don't we -- Emily will send you an email suggesting

6   a date on the 3rd, 4th or 5th --

7       MR. POULOS:  That's fine.

8       THE COURT:  -- to give you a -- or 6th to just check

9   in and tell you where things stand.

10      Okay.  Nice to meet all of you, and we'll see you

11  soon.

12      Thank you all.  Have a good holiday.

13      (Which were all the proceedings heard.)

14                  C E R T I F I C A T E

15      We certify that the foregoing is a correct

16  transcript from the record of proceedings in the

17  above-entitled matter.

18

    /s/ Elia E. Carrión

19  _____

20

21  /s/ Kathleen M. Fennell          December 19, 2022

    _____  _____

22          Official Court Reporters              Date
            United States District Court
23          Northern District of Illinois
                  Eastern Division

24

25