```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )   Docket No. 19 CR 864-1
 4                   Plaintiff,       )
                                      )   Chicago, Illinois
 5              v.                    )   June 16, 2023
                                      )   9:04 a.m.
 6   RISHI SHAH,                      )
                                      )
 7                   Defendant.       )

 8
          TRANSCRIPT OF PROCEEDINGS - Forfeiture Hearing
 9          BEFORE THE HONORABLE THOMAS M. DURKIN

10

11   APPEARANCES:

12   For the Government:    MR. MATTHEW F. MADDEN
                            MR. SAURISH APPLEBY-BHATTACHARJEE
13                          MR. TONY CHMURA
                            Assistant U.S. Attorneys
14                          219 South Dearborn Street, 5th Floor
                            Chicago, Illinois  60604
15

16   For Defendant         MR. RICHARD E. FINNERAN
     Rishi Shah:           MS. HANNAH WISSLER
17                          Bryan Cave Leighton Paisner LLP
                            One Metropolitan Square
18                          211 North Broadway, Suite 3600
                            St. Louis, Missouri  63102
19

20

21

22   Court Reporter:       ELIA E. CARRIÓN, CSR, RPR, CRR, CRC
                            Official Court Reporter
23                          United States District Court
                            219 South Dearborn Street, Room 1432
24                          Chicago, Illinois 60604
                            312.408.7782
25                          Elia_Carrion@ilnd.uscourts.gov
```

1     (Proceedings heard in open court.)

2          THE COURT:  Okay, please call the case.

3          THE CLERK:  This is Case No. 19 CR 864, United States

4   v. Rishi Shah.

5          May I please ask that the attorneys present on behalf

6   of the United States state their names.

7          MR. MADDEN:  Good morning.  Matthew Madden,

8   Saurish Appleby-Bhattacharjee, and Tony Chmura on behalf of

9   the United States.

10         THE CLERK:  And on behalf of Mr. Shah?

11         MR. FINNERAN:  Good morning, Your Honor.

12  Richard Finneran and Hannah Wissler on behalf of Defendant

13  Rishi Shah.

14         THE COURT:  What's your colleague's name?  Sorry.

15         MR. FINNERAN:  Hannah Wissler.  She won't be

16  speaking.  She's just here to assist me.

17         THE COURT:  Very good.  All right.  Welcome, both of

18  you.

19         Okay.  And the defendant, Mr. Shah, is present?

20         MR. FINNERAN:  Yes, Your Honor.

21         THE COURT:  Okay.  Hang on one second.  We're going

22  to get the -- are we good?

23         COURT REPORTER:  Please speak into the microphone.

24  Otherwise, I can't hear you.

25         MR. FINNERAN:  I will.  Thank you.

1          THE COURT:  Yeah.  Off the record.

2       (Off-the-record discussion.)

3          THE COURT:  Back on the record.

4          All right.  We're here.  We'll -- Mr. Madden, why

5     don't you describe what the government's motion is.

6          MR. MADDEN:  Sure, Your Honor.  I was going to do

7     it -- the government has filed a motion for an entry of

8     preliminary order of forfeiture, and the defense is objecting

9     to the motion.  I'm prepared to do an opening statement.  If

10    you'd like me to do it now, I can.  Or I can...

11         THE COURT:  That's fine.

12         For the record, Ms. Agarwal and Mr. Purdy have

13    reached agreement on their motion for entry of preliminary

14    order of forfeitures.  I've entered those orders because

15    they're unopposed.  They've been docketed.

16         So we're here on Mr. Shah's motion -- or on

17    Mr. Shah's opposition to your motion.

18         All right.  You can make an opening statement.

19         MR. MADDEN:  Thank you.

20         Your Honor, the purpose of forfeiture is to take away

21    a defendant's ill-gotten gains.  This is separate and apart

22    from restitution.  Restitution is victim-focused, focused on

23    making the victims whole.  This part of the proceeding is

24    about taking away the ill-gotten gains of the defendant.

25         And in this case, the ill-gotten gains came from two

1    places:  One was the April 2016 loan from which the

2    Defendant Shah and Agarwal got their first dividend, and then

3    the second place was the 2017 capital raise when the

4    defendants obtained that $225 million dividend.

5         Shah was convicted on nearly all counts at trial.  He

6    was convicted on 19 out of 22 counts.  As far as forfeitures

7    goes, he was convicted on all of the counts that mattered.

8    The only not guilties were a couple of wire fraud executions.

9    That was Count 20 -- 20 and 21.  It was an email execution.

10   The troublemaking F'ers execution was one.  The other one was

11   the Bryan Morgan whistleblower email, which was No. 20 -- I'm

12   sorry -- that was 21.  And then one mail fraud execution,

13   which was Count 23; that was the March 2017 payment on the

14   Merck Belsomra campaign.

15        But for forfeiture purposes, the important counts

16   really were we had charged three executions of the -- of the

17   investor -- of the investors' wires -- were wire fraud

18   executions.  One was Goldman Sachs, one was Leerink, and one

19   was CapitalG.  He was convicted on all of those counts.  And

20   then the --

21             THE COURT:  What are the loans from again?

22             MR. MADDEN:  The loans were from -- so the ones I

23   just mentioned, those were the investor funds that were

24   from those -- a variety of companies.  The loan was from

25   JPMorgan.  It was a bank consortium, but JPMorgan was -- was

1    the lead.

2          THE COURT:  And then the capital raised was raised

3    through Leerink?

4          MR. MADDEN:  There were numerous investors.  It was

5    a -- you know, there were 10-, maybe 20-plus investors.  And

6    I've got the list that I'll show you.

7          THE COURT:  Okay.

8          MR. MADDEN:  But basically, it's Google, CapitalG,

9    and Leerink were three of them.  Those were the ones that

10   testified at trial.

11         THE COURT:  Right.

12         MR. MADDEN:  And he was -- so he was convicted on all

13   of the counts that related to the dividends.  He was convicted

14   on all those counts.

15         THE COURT:  Let me ask defense.  Are you contesting

16   the issue of these funds being forfeitable as opposed to is it

17   tracing?  Are you arguing that the not guilties relate to some

18   of the funds they're trying to forfeit?

19         MR. FINNERAN:  No, Your Honor, we're not contesting

20   that any of the acquitted counts are an issue for the

21   forfeiture.

22         Our arguments are limited to -- on the assumption

23   that the funds that Mr. Madden is talking about are themselves

24   criminal proceeds, whether the government has successfully

25   traced to the assets it seeks to forfeit those funds, that's

1    what we're focused on the hearing today.  We'll be making

2    other arguments in our briefing, but it's -- that

3    particular --

4            THE COURT:  Okay.

5            MR. FINNERAN:  -- point of is the bank loan or the

6    investor funds, are those criminal proceeds?  What are

7    [unintelligible] proceeding where I anticipate that will be

8    contested in later proceedings, we're not at liberty to argue

9    that point.

10           THE COURT:  Fair enough.  Okay.  I just wanted to

11   know where we're going.  And I'll give you a chance to make an

12   opening statement yourself.

13           Go ahead.

14           MR. MADDEN:  Your Honor, basically under the law, the

15   dividends are -- well, we've got the jury verdict that shows

16   that the dividends were fraud proceeds.  And the government,

17   under the law, is entitled to forfeit those ill-gotten gains,

18   those proceeds.

19           So I think the place to start, Your Honor, is the

20   Federal Rules of Criminal Procedure.  It's laid out in

21   Rule 32.2(b)(1)(A), and these are -- these are quotes.

22           If the government seeks forfeiture -- this is not all

23   of it, but I just pulled out some of the most relevant

24   portions for today.

25           "If the government seeks forfeiture of specific

1   property" -- which we are seeking -- "the Court must determine

2   whether the government has established the requisite nexus

3   between the property and the offense."

4          Another part -- and we are also seeking a personal

5   money judgment today, so:  "If the government seeks a personal

6   money judgment, the Court must determine the amount the

7   defendant will be ordered to pay.

8          And I'm going to go through this in more detail, but

9   the personal money judgment is the total amount of ill-gotten

10  gains.  And then the property that we're taking would be

11  applied towards that personal money judgment.

12         We bear the burden of proof.  There's dozens and

13  dozens of cases that hold that because forfeiture is part of

14  sentencing, it's a lower standard of proof.  It's a

15  preponderance standard for all -- all the -- everything we

16  need to prove here.

17         We have to -- this is again from 32.2 -- we have to

18  establish a nexus between the property we're seeking to be

19  forfeited and the offense.  It's a pretty low standard.  The

20  properties sought to be forfeited must bear more than an

21  incidental or fortuitous connection to criminal activity.

22         This is a recent case, citing a recent case from

23  Judge Kendall, Your Honor, that went to a forfeiture

24  proceeding last year, *Delgiudice*.  And if it's helpful, we

25  can -- if it's helpful, we can email you a copy of these

1   PowerPoint slides after this, because there's a number of case

2   law cites in there.

3           THE COURT:  That's fine, as long as the defense has

4   them.

5           MR. FINNERAN:  No objection, and we will do the same.

6           THE COURT:  Okay.

7           MR. MADDEN:  And we'll email a copy to the defense as

8   well, Your Honor.

9           So if this is a mandatory forfeiture, mandatory part

10  of the defendant's sentence, this is again part of -- the

11  quote here is -- comes from 32.2.  The gist is Rules of

12  Evidence don't apply, do not apply.  Just like they don't at

13  any part of sentencing, the standard is reliability.

14          You can rely on evidence from the trial.  And you can

15  also rely on evidence submitted by either the government or

16  the defense posttrial in these proceedings to make --

17          THE COURT:  By the way, I think I recognize -- is

18  that your agent?  Is that the agent?

19          MR. MADDEN:  Correct.

20          THE COURT:  Any objection to the witness staying in

21  the courtroom for this?

22          MR. FINNERAN:  No, Your Honor.  We've already

23  discussed that.  We have no objection.

24          THE COURT:  Great.

25          MR. FINNERAN:  And they have no objection to our

1    forensic expert either, as I understand it.

2            THE COURT:  Great.  I thought I recognized her back

3    there.

4            MR. MADDEN:  Yes, correct.

5            THE COURT:  All right.  Go ahead.

6            MR. MADDEN:  So anyways, the short of it is it's just

7    like any finding you would make at sentencing.  The Rules of

8    Evidence don't apply.  It's just reliability is the standard.

9            So we -- as you'll recall, there were two forfeiture

10   allegations in the indictment.  The first one -- the only

11   reason there's two is because there's different provisions for

12   mail and wire fraud and bank fraud.  And we charged both.  The

13   first one relates to the wire fraud counts, which included the

14   capital raise funds.  And then the -- so the dividends

15   associated with that.

16           These were the three counts at issue:  Count 22,

17   Goldman invested $100 million, and we charged -- but they sent

18   it in two wires.  We charged one of the wires as Count 22.

19   Shah was convicted on that count.

20           We also charged CapitalG, which is part of the

21   Google.  They -- they invested 50 million.  And they -- this

22   was the wire on that.  He was convicted of that count.

23   Leerink, you might remember Todd Cozzens was one of our last

24   witnesses, the guy who was a -- I think, was he an Olympic

25   sailor?

1      THE COURT:  Yes.

2      MR. MADDEN:  Yes.

3      THE COURT:  Yachtsman.

4      MR. MADDEN:  Yachtsman.

5      And anyways, they had invested 15 million in April

6  of 2017.  He was convicted on that count as well.  So those

7  are the three counts that are most important for forfeiture on

8  the -- on the capital raise dividend.

9      The second allegation, this is the bank loan.  There

10  were two bank loans, and they got the significant dividend

11  from the April 2016 one, which is Count 9, which is right

12  here.  Here's JPMorgan.  This was the credit agreement,

13  Government Exhibit 573.  And both Shah and Agarwal got a

14  dividend from -- from this one as well.

15      So the components of the forfeiture judgment are

16  we're seeking the personal money judgment.  I'm going to go

17  through the math and how -- in terms of how we calculated

18  that.

19      The second part is the specific assets traceable,

20  that were directly traceable to the fraud.  And that's

21  what's -- that's -- so Ms. Poelking is a -- she's a forensic

22  accountant.  You may recall she testified at the trial.  She's

23  not a special agent, but she -- she's an -- she's an

24  accountant with the FBI, and she's going to walk through how

25  she traced -- before trial, she -- we did a significant

1    financial investigation.  She traced the monies into -- most

2    of them were invested in early stage companies by Shah and

3    Agarwal.

4           So first, for the personal money judgment,

5    Your Honor, the calculation of judgment should be

6    reasonable -- a reasonable estimate but does not need to be

7    precise.  There's that case *Bogdanov* from the Seventh Circuit

8    that says a reasonable estimate suffices, similar to how we

9    talk about loss.  We just have to come -- we just have to

10   arrive at a reasonable estimate based on the evidence.  In

11   here, we believe that 55 million is the correct amount of the

12   forfeiture judgment.

13          So this is -- this, Your Honor, is Government

14   Exhibit 1081.  This lists all of -- all of the investors

15   that -- you were asking who invested.  This is a list of all

16   the investors.  You'll see CapitalG, maybe about six or seven

17   down, had invested 50 million.  And you see -- so the first

18   two you see, it actually says Global Private Opportunities.

19   And there's a 52 million and change and 47.  That's actually

20   Goldman.  So Goldman Sachs is -- I think Global Private

21   Opportunities is a Goldman entity.  So they invested

22   100 million.

23          And you can go down.  Emerson Collective was another

24   big investor.  That's -- Steve Jobs's wife is, I think, a

25   principal of that business.  That was a $50 million

1    investment.

2         Then you see Leerink about halfway down.  Actually,

3    it's -- Leerink's about halfway down.  That was 15 million.

4    That was Mr. Cozzens.  And the rest are all listed there.

5         And the reason we have this here is it came out to

6    487 million.  You'll recall that 225 million of that went to

7    Shah and Agarwal as a dividend.

8         And then this is the tracing that Ms. Poelking will

9    go through.  It's a pretty straightforward tracing.

10        The one thing that happened here is -- and after the

11   *Wall Street Journal* came out, after the *Wall Street Journal*

12   article about Outcome came out, the investors sued Shah and

13   Agarwal.  And there was litigation in both New York and

14   Delaware.  That was ultimately settled, and the upshot of the

15   settlement in terms of like Shah and Agarwal and what they got

16   to keep was they kept $31 million.  So this is Docket 75-2.

17   This is -- this is a file -- a prior filing by Shah and

18   Agarwal in this case.

19        Approximately 31 million was -- remained in Gravitas,

20   which was the entity owned by Shah and Agarwal where they had

21   the dividend.  So initially, it was 225 that went to Gravitas.

22   After the settlement, they only had 31.  So we're not seeking

23   all 225 on that part, we're only seeking 31.

24        Shah owns -- Shah has an 80 percent interest,

25   ownership interest in the company and in Gravitas, and Agarwal

1   has 20.  So there's an 80/20 split.  So to look at -- with

2   31 million remaining in that, you know, in Gravitas from that

3   first dividend, if you multiply that by 80 percent, it comes

4   out to 24.8 million.  So that was -- of the 31 that remained,

5   that's what was -- that was what Shah was entitled -- that was

6   his money.

7           This is the -- this is just the trial exhibit,

8   Your Honor, of the dividend from that bank loan.  This is the

9   second part of it, $30.2 million, and it shows that this went

10  to Rishi Shah -- at the bottom.  That was his portion of the

11  dividend.  This is testimony of Ms. Poelking from trial

12  talking about the -- testifying about that dividend from the

13  April 2016 loan from JPMorgan.

14          So if you add those two numbers up on the right-hand

15  side, Your Honor, you've got 24.8 from the initial -- from the

16  capital raise in 2017.  That was Shah's.  30.2 million from

17  the April 2016 dividend.  That's where we get the 55 million.

18          So that's what the personal money judgment against

19  Shah should be.  That's what we're asking to be in the

20  forfeiture order.

21          And we did the same analysis for Agarwal, and she did

22  not object.  And we did the same thing, we just added the two

23  components of Agarwal's dividends, which would have been

24  20 percent times 31 million for that first part.  And then the

25  second component was how much she received from the April 2016

1    bank loan.

2         For Agarwal, I don't have the precise number in front

3    of me.  But it was like either 13 or 14 million total for her

4    personal money judgment.

5         So the second part of -- the second component of the

6    forfeiture judgment after the personal money judgment is the

7    specific assets that are directly traceable to the fraud.  And

8    this is what Ms. Poelking is going to testify about.  She's

9    going to go through this exhibit and describe exactly how she

10   traced these monies.  This was a trial exhibit which -- it's a

11   long list, and there's three pages to it here.  But this is

12   first how she traced the dividend -- the monies from the

13   $225 million dividend to Gravitas from that capital raise.

14        And they were mostly invested in funds that invested

15   in early stage companies.  That's what we obtained the

16   protective order for.  That's -- those were the assets that we

17   listed in the forfeiture allegation.  Then we obtained the

18   protective order to restrain those assets, basically just keep

19   the status quo so that they would be available for potential

20   forfeiture.

21        Then this is the same -- this is the second page of

22   that exhibit, which she'll describe how she traced these

23   monies from the April 2016 dividend.  And then there's a few

24   more that we put on.  I think this is actually page 1 of the

25   exhibit, which she'll describe how she traced, for example,

1    monies that Shah used to purchase the house on 924 North

2    Clark.

3           THE COURT:  Weren't some of the monies used for --

4    sent to law firms?  I know in the Agarwal forfeiture --

5    preliminary order of forfeiture I just signed, there was some

6    $3 million or so, I believe, or --

7           MR. MADDEN:  Yeah.

8           THE COURT:  -- imprecise in the amount, but it went

9    to a law firm.  Are there similar monies for Mr. Shah?

10           MR. MADDEN:  Yes.  I think Ms. Poelking is going to

11    testify about it.  But they had -- if I recall correctly, some

12    of them at least were -- were sold from an investment that

13    Gravitas made.  And then those monies were transferred to

14    their attorneys.

15           And my recollection is it happened like the week of

16    the indictment.  I can't remember if it happened the days

17    before or the days after that they had retained new counsel

18    around that time.  It was Quinn Emanuel.  And I think Shah

19    sent -- I can't -- I don't remember the exact amount.  He sent

20    a significant amount of money to Quinn Emanuel around that

21    time.  And then Quinn Emanuel ended up returning the money --

22    or sent the money.  It's in escrow -- it's in escrow with the

23    government right now.

24           THE COURT:  All right.

25           MR. MADDEN:  So in terms of there's -- there's a --

1   we filed our motion.  Even though it was opposed, we filed our

2   motion and we split it up into a couple different components.

3          Exhibit A listed the monies that are directly

4   traceable.  And by that, we mean Ms. Poelking was able to

5   trace them to fraud proceeds.  And so just -- for example,

6   just take the first one as an example:  $60,000 in capital

7   contributions to a certain investment fund, Investment Fund A,

8   held in the name of JumpStart Ventures.

9          JumpStart is a company -- JumpStart and Gravitas are

10  controlled by Shah and Agarwal.  And so they invested in a

11  whole bunch of different funds.  Some of the money we traced

12  as fraud proceeds.  They had -- there were -- in some of those

13  funds, there were monies that were not traced, that were not

14  traceable.  But it's still their funds.

15         So what we're seeking to do, Your Honor, is the

16  portions that are directly forfeitable are listed in

17  Exhibit A, like 60,000, 15,000, 475,000 towards the bottom.

18  Those are directly forfeitable to the government.  And then

19  the balance of that -- and so I guess -- let me just step

20  back.

21         There will -- we expect there to be a delta between

22  what's directly forfeitable and the 55 million personal money

23  judgment.  So the -- it's a little bit hard to value the --

24  all of these things because some of them are -- many of them

25  are investments in early stage companies.  And some of them

1   have appreciated, and some of them appreciated significantly.

2   But we -- it still appears that there will be a delta between

3   55 million and the amount that we will be able to obtain if

4   directly forfeitable.  That balance, we are entitled to take

5   as substitute assets.

6          We can take substitute assets from a defendant to

7   satisfy a personal money judgment.  And so in this case, one

8   portion that we're seeking to take as part of the forfeiture

9   will be the directly forfeitable part.  We listed those in

10  Exhibit A.  The second part that we're seeking to take is

11  parts -- it can be -- it can be anything that is the -- that

12  is defendant's property to satisfy the money judgment and --

13  but we refer to that as substitute assets.

14         And there's a standard for that that you've seen many

15  times, but I've got it in here.  It's basically if they've

16  been -- if the proceeds had been diminished in value,

17  transferred to another jurisdiction, essentially, if we can't

18  get them another way.

19         THE COURT:  What do you do with assets that -- if I

20  find that a personal money judgment should be entered and I

21  find that the -- the directly traceable funds are not liquid

22  funds, what do you do with some of these investments in these

23  start-ups?  Do you sell them?  Do you hold them?  What do you

24  do with them and how do you -- if you sell them, is there a

25  market for them?

1          MR. MADDEN:  So that comes later and, you know,

2     the -- our forfeiture people and the marshal service get

3     involved in that, whether it's real property or investments.

4     And it is -- this case is more complicated than most.

5          Since the time we indicted -- I don't know the exact

6     number, but I could figure it out -- somewhere maybe 5-ish of

7     these funds did -- the funds were sold or closed or Shah and

8     Agarwal's investment was -- was bought out.  And those -- and

9     those occasions, the monies were put in an escrow.  This is

10    pursuant to the protective order.  The funds would -- their

11    attorneys usually would contact us, and they would contact a

12    representative of, you know, Gravitas, either Shah and Agarwal

13    or their counsel, and say -- let them know this happened.

14          Those funds were transferred into escrow accounts.

15    So they were transferred either into an escrow account held by

16    the government, while working with the FBI and the marshal

17    service have an escrow account, or -- or the fund has an

18    escrow account that they're holding it.  And so we, the

19    government, already has -- it might be 15 million plus in an

20    escrow account from those -- from some of those transactions.

21          You're right that there's a bunch of other -- there

22    are a bunch of other assets being held, and we'll have to deal

23    with that later.  I'm not sure exactly if they would be sold

24    immediately.  But, you know, we've been in touch with counsel

25    for many of these -- many or all of these -- or at least

1　either counsel or a representative of these funds, and we'll

2　have to work that out.  So I'm not sure exactly how it will

3　work.

4　　　　THE COURT:  Because if you're saying your burden, I

5　can't even get to substitute assets until I know the amount of

6　the traceable funds, correct?

7　　　　MR. MADDEN:  Well, there's -- there's -- there's

8　that, but I guess there's actually a third component even.

9　Because there's -- the third thing is restitution.  So,

10　of course, we don't have restitution yet.  But I'll show you

11　here is we plan to file a motion for prejudgment garnishment.

12　And here's why:  The restitution number in this case is going

13　to be very significant.  You might remember the testimony from

14　Mr. Eberts from Goldman or Leerink or Todd Cozzens from

15　Leerink and Laela Sturdy from Google.  They basically lost

16　everything.  There might be -- some of them might have a

17　small -- you know, it's either everything or nearly everything

18　was lost.  The total amount of the investments was

19　487 million.

20　　　　So the -- that's -- and there's three classes of

21　victims.  There's the investors who -- so that amount of loss

22　is probably going to be -- it's going to be over 400 million.

23　First we have to -- we're going to calculate the exact amount.

24　The second component is going to be loss from the lenders.

25　The lenders also lost in the millions.  Then the third

1    component is potential loss with -- with the clients, the

2    pharmaceutical -- mostly pharmaceutical companies.

3            So we'll add up those three numbers.  The number is

4    going to be very high.  We know it's going to be more than

5    400 million.

6            So to the extent that there's, you know, the directly

7    forfeitable assets and then the substitute assets, some of

8    them have appreciated significantly.  So let's say there is

9    the -- the value of those two is more than 55 million, we're

10   going to be seeking to garnish any monies above those so that

11   they can held and applied to restitution.

12           So we'll file that motion in the next week or so.  I

13   think we actually did that in another case in front of you

14   pretty recently.  So that's what we intend to do because no

15   matter what -- how much these funds are worth, there's no way

16   that they will come close to satisfying the amount of

17   restitution.  The amount of restitution is going to be over

18   400 million.  Even if these have appreciated significantly,

19   it's not going to be more than 100 million.

20           So anyways, that -- that -- I'll just go back just

21   for a minute.  So in terms of the substitute assets,

22   Your Honor, this is the standard that's in front of you.  This

23   is from his -- this is from our -- from our motion.  You know,

24   to satisfy a personal money judgment entered against Shah or

25   any defendant, if -- if monies can't be -- if the proceeds

1   can't be located, if they were transferred to a third party,

2   if they're beyond the jurisdiction of the Court or have been

3   diminished in value or commingled with other property that

4   can't be divided without difficulty, then they are -- we are

5   entitled to -- to go after them as substitute assets.

6   And so the various components that we're seeking here

7   are in order for the directly traceable assets, then

8   substitute assets, which we've identified in Exhibit C here of

9   our -- of our motion.  And the way we framed this, Your Honor,

10  is -- so, for example, if like No. 2 there is -- we identified

11  $60,000 of that investment as directly forfeitable.  We're

12  seeking the rest of the capital contributions which we did not

13  trace directly as a substitute asset.

14  And then I guess the other thing that I'll mention is

15  we're also entitled to -- on the directly traceable funds,

16  those are -- the way the law works is title vests in the

17  government at the time of the offense when something is

18  forfeitable.  So any appreciation that Shah or Agarwal got on

19  those funds, that -- that goes to the government as well.

20  So there's the -- you know, there's the -- there's

21  the directly traceable assets themselves and then the

22  appreciation.  The parts that are not directly forfeitable

23  we're seeking as substitute assets.  And then the third

24  component -- will come a little bit later -- is in terms of

25  the excess.  We'll be seeking that -- our -- someone from our

1    Financial Litigation Unit, we've -- they file these motions

2    with some regularity.  We'll be seeking to -- to garnish those

3    just to hold them pending the anticipated restitution order.

4           So that's all I have, Your Honor, unless you have

5    further questions.

6           THE COURT:  Is it your intent to take forfeited funds

7    and use it for restitution payments?

8           MR. MADDEN:  Yes, Your Honor.  And so the way that

9    works is -- I mean, the trial team's intent is to recommend to

10   main justice that anything that we obtain from -- from

11   Ms. Agarwal or really any of the defendants, Shah or -- or

12   Purdy, be applied against restitution.  And then that would --

13   that would lower the restitution amount and then return to the

14   victims.  That decision is ultimately made by main justice.

15   We don't have any reason to think that that's not what will

16   happen, but that's what we intend to recommend.

17          THE COURT:  Okay.  All right.  Thank you.

18          MR. MADDEN:  Thank you.

19          THE COURT:  All right.  I'll hear from defendant.

20          And, Mr. Madden, if you could even email that

21   PowerPoint slide to Sydney now, I wouldn't mind a copy that I

22   can refer to during these proceedings.

23          MR. MADDEN:  Yes, Your Honor.

24          MR. FINNERAN:  Your Honor, before I begin, can I just

25   address first of all a couple of preliminary matters and also

1    some of the questions you asked Mr. Madden?

2              THE COURT:  All right.

3              MR. FINNERAN:  So first of all, my phone is turned

4    off at this point so I don't know whether my assistant

5    successfully got my entry on file or not.  She was having some

6    trouble with it this morning.  If it's not, I have a paper

7    copy of my entry of appearance I'm happy to hand the Court.

8              THE COURT:  I'll recognize your appearance.

9              MR. FINNERAN:  Okay.  Fair enough.  Thank you, Judge.

10             Secondly, you asked me earlier about the question of

11   are we contesting any of these funds are -- are -- the

12   original April 2016 loan and the investor funds, that they are

13   not proceeds.  As I said, we're not for the purposes of this

14   hearing going to contest that.

15             I know that earlier in the case before I -- I've only

16   been involved for a couple of weeks.  Earlier in the case,

17   there was litigation at the very outset about whether that

18   $30 million dividend was something that was traceable or not.

19   Your Honor ruled on that and determined that it's -- it --

20   that there had not been a sufficient showing made that it was

21   not traceable.

22             So we're going to take those assumptions for today,

23   but I don't want my comments to be viewed as having waived any

24   objection we might have on appeal to those issues.

25             THE COURT:  All right.

1    MR. FINNERAN:  And, finally, I spoke with the

2    government yesterday.  My understanding is that they are

3    willing to let us just admit all our exhibits en masse at the

4    beginning to sort of save time.  So I can either do that now

5    or I can do that at the beginning of my witness's examination.

6         I've got paper copies of our -- the ones that we're

7    using on direct.  For the cross of Ms. Poelking, they're

8    mostly big spreadsheets so I've got electronic versions of

9    those.  How would you like to handle that?

10        THE COURT:  Let's just do it when your witness is on.

11   We'll admit them en masse at that time.

12        MR. FINNERAN:  All right.  I do want to also, just on

13   the record, compliment the government's -- as I mentioned,

14   I've only been in this case for two weeks, and they've been

15   very generous in giving me their time to help me get up to

16   speed and sharing documents with me.

17        So you asked a couple of questions that I think I may

18   be able to shed some --

19        COURT REPORTER:  Slow down, please.

20        MR. FINNERAN:  Oh, sorry.

21        You asked a couple of questions I may be able to shed

22   some light on.

23        So you asked what the government is likely to do in

24   terms of liquidating these funds.  So in my experience, I

25   practiced at the U.S. Attorney's Office in St. Louis for seven

1    years and I dealt with that issue quite frequently.  My

2    expectation is that the government will either put those on

3    the open market and try to sell them or they'll have some sort

4    of auction where those assets would be sold.

5           That's really outside of the scope of this hearing,

6    and I believe outside the scope of the Court's authority

7    really to direct that.  Once the government takes title to

8    those assets, then it can do with it what it wants.  But

9    typically, the government doesn't hold on to investments.  It

10   sells them pretty promptly and tries to get the cash.

11          THE COURT:  Well, the reason I asked is that -- and

12   maybe it is beyond what I'm going to have to deal with.  But

13   if I make a finding as to the personal money judgment, how

14   it's satisfied, I suppose, is really up to the forfeiture unit

15   of the U.S. Attorney's Office and the defendant.  But it

16   occurred to me many of these are not easily valued --

17          MR. FINNERAN:  Right.

18          THE COURT:  -- assets, and that's why I wanted to

19   know.

20          MR. FINNERAN:  And I guess the point is, Your Honor,

21   once this order -- if this Court were to order the forfeiture

22   of those assets, the government will sell them for what it

23   wants to sell them for and we won't have any opportunity as

24   the defendant to claim they're selling it for too low of a

25   value or something like that.  If you rule against us, it's

1    the government's property and they can sell it at a loss if
2    they want to.

3              THE COURT:  Well, I think it affects the amount of
4    the personal -- or the substitute assets --

5              MR. FINNERAN:  Yes, it does.

6              THE COURT:  -- which is why I -- really what drove my
7    question.

8              MR. FINNERAN:  Okay.  And we will address that today,
9    later, Your Honor.

10             THE COURT:  Okay.

11             MR. FINNERAN:  You also asked about whether these
12   funds will be applied to restitution.  And Mr. Madden
13   indicated his -- it is his intention to request that the
14   Department of Justice applies them to restitution.  That's a
15   process called "restoration."

16             The Department of Justice has discretion to decide
17   whether it will do that.  And one of the factors it considers
18   is whether the defendant has other assets available to pay
19   restitution.  As we're going to talk about, we believe there's
20   a nonzero chance that these assets will fulfill whatever
21   restitution obligation the government is likely to get.

22             And so as a consequence of that, if this Court orders
23   forfeiture of these assets and then they are greater than
24   necessary to cover the -- the forfeiture judgment, the
25   government may decide to keep both.  It doesn't have to apply

1   everything to restitution.  So I just want to make the Court's
2   aware.  And if -- we'll probably in our posthearing briefing
3   cite the Court to the regulations the department uses to
4   decide questions like that.
5           THE COURT:  Okay.
6           MR. FINNERAN:  Okay.  With that, I will begin my
7   opening statement, may it please the Court.
8           My name is Richard Finneran.  I said that probably
9   when -- yep, when I stood up.  And I am representing Mr. Shah
10  with respect to this forfeiture hearing.
11          Your Honor, can you see the presentation I have on
12  the screen?
13          THE COURT:  Yeah.  I've got a screen right here.
14          MR. FINNERAN:  Okay, wonderful.
15          So first I want to talk about what this hearing is
16  not about.  Mr. Madden spent probably the first many minutes
17  of his presentation talking about the evidence in the trial
18  and establishing that these investor funds and this dividend
19  are connected to the crime.
20          At this stage of the proceeding, though, we would
21  contest Mr. Shah's guilt, still on appeal and so forth, we do
22  not have the liberty to challenge that at this point in the
23  proceedings.
24          So we're assuming for purposes of this hearing
25  that -- that all the funds that came from those two sources

1   are criminal proceeds.  We are not here today able to contest

2   that finding.  So the Court can assume in all the testimony it

3   hears that these are criminal proceeds at the moment.  They

4   were lent at the moment the investors paid them.  So we're not

5   here to argue about that today.

6          What we are here to argue about is whether the

7   government has met its burden of showing the property that it

8   has restrained in this case is subject to criminal forfeiture

9   as criminally derived property.  And to do that, the

10  government must persuade the Court that the property it seeks

11  to forfeit was derived from one of those two sources.  So

12  that's really the factual question you're considering today.

13         Now, as you heard from Mr. Madden, as the government

14  now apparently admits, that is not true for a large amount of

15  what the government has restrained.  So I'm just going to take

16  one example to compare this for you.

17         The government's motion, as Mr. Madden just explained

18  to you -- this is Item (e) -- seeks $475,000 in funds that

19  were transferred to Investment Company B.  Now, Investment

20  Company B is Guild Capital.  So you may want to keep track of

21  that because we're going to talk about that quite a bit today.

22         But the government now is admitting that it can only

23  trace $475,000 from those two incidents to Guild Capital.

24  We're going to show actually that they may not even be able to

25  trace that, but that's not what the government has restrained

1    in this case.

2            The government's motion, which it -- oh, it should

3    not say the government's motion on the right side.  It should

4    say forfeiture allegation and protective order on the

5    right side.  The government has alleged that all right, title,

6    and interest in those investments is subject to forfeiture

7    including, but not limited to, the $475,000.

8            And based upon that representation it made to the

9    grand jury, this Court issued a protective order freezing not

10    just $475,000 at Guild Capital, but all of the funds that were

11    in Guild Capital in the name of Gravitas Holdings or

12    JumpStart Ventures II, LLC.

13            And the government's own spreadsheets, which were

14    produced to my colleagues on the defense side in advance of

15    Ms. Poelking's testimony at trial, demonstrate that the

16    government knew that there were more funds in those -- in many

17    of these investments than it could trace to those assets.

18            THE COURT:  On the top of the screen, there's a small

19    arrow at the top right.

20            MR. FINNERAN:  Yes, sir.

21            THE COURT:  Why don't you hit that so I can see the

22    entirety.

23            MR. FINNERAN:  Okay.  Did I do it?

24            THE COURT:  Yes.  Thank you.

25            MR. FINNERAN:  Okay.  So just to take Guild Capital,

1    which I mentioned a moment ago, this is an early chart where

2    the government is indicating it could only trace 75,000.  Now

3    it claims to trace 475,000.  But the government still

4    recognized even -- this is back in 2020, I believe -- that

5    there was $4.6 million of assets in Guild Capital which it

6    could not trace and, nonetheless, restrained.

7            Today, it asks you to forfeit that property as

8    substitute property.  But as Your Honor noted in his order on

9    the motion to release funds for Mr. Shah's defense, the Court

10   and the government do not have the power to restrain

11   nontraceable assets prior to a defendant's judgment.

12           And so in this situation, we're going to demonstrate

13   that this was -- this was the first issue that I raised with

14   Mr. Madden when I first met him on Monday, is that the

15   government's restraints were broader than permitted.  And

16   the -- the order that we've been asked to sign sought all

17   right, title, and interest.  It appears now the government

18   concedes that and is now only asking this Court to find that

19   the traceable assets are forfeitable as directly traceable

20   property and then to, nonetheless, forfeit the rest as

21   substitute property.

22           So I intend to explain to the Court why that tracing

23   doesn't work and then also why we don't think substitute

24   property can be forfeited in this case.

25           THE COURT:  Why?  Are you getting there?

1        MR. FINNERAN:  I'll get there, yes, Your Honor.

2        THE COURT:  Okay.  Go ahead.

3        MR. FINNERAN:  So the total here is $4 million.  And

4   you can see here just with these companies alone, the

5   government restrained approximately $13 million.

6        Just last night, we received an update from Guild

7   Capital as to what the total amount of the investments at

8   Guild Capital is today.  You can see here that they are

9   showing this is the amount invested and the estimated

10  unrealized value.  You can see that there was actually more

11  than 9 million that was invested into Guild Capital entities

12  that are described in this chart, and the government again

13  only traced $475,000 to attempt to restrain that 9 million.

14       Likewise, we can look now at the value of the cash.

15  Mr. Madden mentioned this, several investments were sold.

16  These amounts are in the thousands.  So the bottom numbers

17  there are actually 1.2 million and 10.5 million.  These funds

18  also have been restrained on the basis of only $475,000 the

19  government could trace to any Guild Capital transaction.

20       Now, this is what we were just about to -- you asked

21  about a moment ago, Your Honor.  When I was an AUSA, I

22  sometimes called this the "heads-I-win, tails-you-lose

23  problem," which is that even when the government cannot show

24  that an asset is traceable, it then usually seeks to forfeit

25  that property as substitute property, other property of the

1    defendant.

2          Again, one of our critical points is that the

3    government shouldn't be in a position to have restrained any

4    of these assets in the first place since it now asserts that

5    most of the money restrained is not traceable property.  And

6    then it also seeks, as you heard from Mr. Madden, to obtain a

7    money judgment in the amount of $55 million.

8          So I'm happy to go into them now if it would help the

9    Court.  But given the limited time we have this morning, our

10   arguments about why this should not be forfeited as substitute

11   property are really mostly legal arguments in nature, not

12   factual arguments.  But one of the interesting parts about the

13   world of forfeiture is -- I'm sure as Your Honor knows --

14   there's relatively little controlling circuit case law on a

15   lot of these issues.

16         And so there will be some issues of first impression

17   for Your Honor to consider about whether money judgment is

18   available in this case and also whether these assets can be

19   forfeited as substitute assets, again primarily legal

20   arguments.

21         Given the schedule that I know my opponents have

22   today, we intend not to really dive into those arguments

23   today, but I'm happy to answer any questions Your Honor has at

24   any point.

25         So moving next then, I'll give you a quick overview

1  of some of the governing case law we do have.  There's not too

2  much.

3       THE COURT:  By the way, you're going quick.  Elia is

4  going to have trouble keeping up with you.

5       MR. FINNERAN:  Understood.  And I apologize,

6  Your Honor.  I will try to slow down.

7       THE COURT:  Take your time.  We have enough time

8  today to get this done.

9       MR. FINNERAN:  Okay.  So I'm going to just give a

10  quick review of three Seventh Circuit cases that lay out some

11  of the law that you must apply in this case.

12       So the first of those is actually a civil forfeiture

13  case from 1992, the United States against $448,000.  You know,

14  the curiosity of it being an in rem proceeding so the

15  defendant has an amount of money.  As the Court said in that

16  case, bank accounts do not commit crimes, people do.  And

17  therefore, the presence of one illegal dollar in an account

18  does not taint the rest.  Again, the government now appears to

19  concede this point and is not seeking to forfeit assets that

20  it knows it cannot trace.  But this is one aspect of the law

21  for you to apply.

22       Another case from 2009, United States against Hodge,

23  tells you that the forfeiture statutes cover only income and

24  assets that were obtained from unlawful deeds, not from other

25  lawful activity.  And so when there are both lawful and

1  unlawful aspects to a business, only the income attributable

2  to the unlawful activities is forfeitable.

3      The biggest project, probably most important case,

4  because it will provide you with your standard of review of

5  the facts in this case, is United States against Genova, a

6  2003 case.  As Mr. Madden acknowledged, restitution is loss

7  based and forfeiture is gain based.  And while in most cases

8  the government does seek to restore forfeited assets to

9  victims through restitution, it is not required to.  And

10  moreover, there's no judicial review available of this

11  decision not to do so.

12      So as *Genova* tells us, that in order for forfeiture

13  to occur, there must be some proceeds, which means profits net

14  of the costs of the criminal business.  Now here, since the

15  government has connected its forfeiture to the bank loan and

16  the investor money, there's nothing to net out here.  But

17  that's important to note that if the government were, instead

18  of trying to trace this funding to ContextMedia or Outcome

19  Health or something like that, it would have had to go through

20  the very laborious task of trying to distinguish clean

21  deposits from dirty deposits and then deduct the costs

22  associated.

23      The government has not endeavored to do that.  It has

24  made no argument that that is the case.  And so we're really

25  only focusing on that bank loan and the investor money.

1    This is also an important point, that in a criminal
2  forfeiture case, value added independently by the accused does
3  not -- is not subject to forfeiture.  So this *Genova* case is a
4  case where I think a corrupt public official had basically
5  added something to his house.  And the house had been bought
6  with clean proceeds.  The extension or whatever it was he
7  added to the house, the government alleged had been built
8  with -- with fraudulent proceeds or criminal proceeds.  And
9  the Court said, well, if you can show that that's what
10  happened, then you can have the -- the value of the extension.
11  But you can only have from the house the value that can be
12  shown to be traceable to that criminal activity.  If the
13  defendant independently adds value, then that is not
14  traceable.
15    This also goes to an issue that we intend to raise
16  with Your Honor, again, a legal issue.  But just to have it
17  flagged for you, Mr. Madden indicated that he believes that
18  any appreciation in these investments is also subject to
19  forfeiture because of what he -- what's called the "relation
20  back doctrine," which is a doctrine that says that when
21  forfeiture occurs, the government's ownership interest relates
22  back to the time of the crime.
23    That is true, but it is only true once this Court
24  orders judicial condemnation of those forfeitable assets.  It
25  relates back, but only to what the government can trace.  So

1    we will make the argument to you that appreciation should not

2    be considered as part of what the government can directly

3    forfeit.  We'll get to whether it can forfeit that same

4    appreciation as a substitute asset.

5        But here's the real important slide.  And that is

6    that once we have contended with some evidentiary support, as

7    we very much will do so today, that at least some of the value

8    in the given asset came from lawful, nonforfeitable sources,

9    then the prosecutor must demonstrate how much is forfeitable.

10   In other words, it's the government's burden to demonstrate

11   that these -- these items are subject to criminal forfeiture.

12       And the Court says here:  Just as the house as a

13   whole contains nonforfeitable value, so the improvements made

14   during the defendant's -- I'm going to mess that word up --

15   mayor -- mayoralty may contain nonforfeitable value.  The

16   district judge must try to determine which is which.

17       And so that's what we're here to do today, is try to

18   split the other property of the defendant from the allegedly

19   criminal proceeds and have Your Honor determine which is

20   which.

21       One question to consider on that point is what the

22   burden of proof is.  So I believe it is established by Seventh

23   Circuit case law that you are to use a preponderance of the

24   evidence standard in making that determination.  So it must be

25   more likely than not that -- that the property is traceable to

1    a crime for you to order forfeiture of that property.

2         We intend to demonstrate that the government has not

3    met that preponderance standard in many of the cases here.

4    And we also intend to preserve the issue for appeal that the

5    government should have to meet the beyond a reasonable doubt

6    standard in order to forfeit property.  I don't think you're

7    at liberty to agree with us on that, but I may try to make an

8    argument that you are.

9         More likely, you'll be applying the preponderance

10   standard today.  And as you'll see, we believe that there are

11   many cases here where the government cannot meet that

12   more-likely-than-not standard.

13        So that's our review of the case law.  I'm happy to

14   answer any questions you have.  But otherwise, I'll get to the

15   meat of what we're talking about today.

16        So I believe during Ms. Poelking's testimony on

17   behalf of the government, you will see this chart.  And this

18   is really what the whole case is about as far as this hearing

19   goes.

20        This chart starts on the far left side with the

21   investor money and in the top right corner with the JPMorgan

22   Chase Bank loan.  As Mr. Madden explained to you, the

23   government has convinced the jury effectively that those

24   assets are traceable to the crime.  And therefore, if the

25   government were going to the accounts that Exhibit A reflects

1   or to JPMorgan Chase and trying to seize and forfeit that

2   money, there would be no question and I would not be here for

3   a hearing for you in front -- in front of you for a hearing

4   today.

5       But instead, what the government is seeking to do is

6   to trace that money through a long and complex series of

7   transactions -- excuse me -- and forfeit items that are --

8   that were purchased out of other accounts on this chart.

9       So you'll see on the far right, Rishi Shah,

10  Chase 9002.  That is one of the accounts the government claims

11  forfeitable assets were purchased out of.  You will see

12  Rishi Shah, BOA 955.  That is one of the accounts from which

13  the government contends forfeitable proceeds were transferred.

14  You will see Rishi Shah Pershing accounts below that.  That is

15  another of the accounts from which the government contends

16  forfeitable assets were purchased.  And you will see below the

17  trust Pershing accounts, the last of the accounts from which

18  the government contends that forfeited assets were purchased.

19      The testimony that we will present today both through

20  cross-examination and Ms. Poelking and through our own

21  forensic accountant and expert Ron Braver will show you that

22  there are issues with literally every single one of these

23  accounts and the government's tracing.  So not the origin of

24  the funds, that's not in contention here today, but the way

25  those funds are connected to the assets the government now

1    seeks to forfeit.

2           So we will demonstrate during the hearing today

3    numerous flaws in the government's tracing analysis.  I'm not

4    going to go through them all because you're going to hear the

5    evidence in just a few moments, but just to give you two

6    examples.  As we just heard from Mr. Madden, the biggest asset

7    or one of the most important assets the government traces to

8    is the $30 million deposit into Mr. Shah's JPMorgan Chase

9    account.

10          The government's analysis assumes that all 30 million

11   of those dollars are traceable to the fraud.  Yet, the

12   government's own tracing analysis of the source of those funds

13   suggests that only $27 million was actually traceable to the

14   fraud.  So we will go through this spreadsheet in more detail

15   with Ms. Poelking and with Mr. Braver.

16          But let me just try to orient you to this format

17   because you're going to see a lot of documents like this

18   today.  In the far right column, you see a number that is

19   an -- excuse me -- the far left column, you see a number.

20   That is an ID number.  It's just a tracking for the number of

21   the transactions in the account.  So this was the 2,580th

22   transfer into the account.

23          The next line is the date of the transfer.  The next

24   column is the person who received the transfer.  The next line

25   reflects the debit from this account.  This is the

1    government's own spreadsheet.

2           In this last column is where the government analyzed

3    using a method we'll discuss called "first in, first out" how

4    much of that $30 million was traceable to the criminal

5    proceeds in this case.  And if you add up all the numbers

6    above the last line, it totals about $3 million.

7           And the government's spreadsheet suggests that only

8    $27 million is actually traceable to the crime.  Yet, as I

9    will show you today, when the government proceeded from this

10   account to trace to the next account and the next account and

11   the next account, it assumed that all $30 million were subject

12   to forfeiture and traceable.  As a result of that, the

13   government is still today here seeking the forfeiture of

14   assets to which it cannot trace dirty money.  Just to show you

15   the delta between those two.

16          In several cases, it's also the case that the

17   government's spreadsheets show that alternative tracing

18   methods demonstrate that the proceed was -- the proceeds were

19   actually derived from clean funds and not from dirty funds.

20   And just to make it clear, this -- these spreadsheets I'm

21   talking about, which we'll go through in detail, were only

22   produced -- if I understand correctly, and Mr. Madden can

23   correct me, of course -- but were only produced as part of

24   Ms. Poelking's Jencks production on March 19th of this year.

25   And so prior to that time, we did not have access to the

1    spreadsheets we'll be going over today.

2            This is a significant problem that there's other

3    methods that the government even acknowledges would

4    demonstrate and make these assets not traceable.  And that is

5    because, as we explained to you a moment ago, the government

6    bears the burden of proof on forfeiture.  So if there's one --

7    one tracing method that says that an asset is traceable and

8    another that says it isn't and there's no reason to disqualify

9    either approach as being better than the other, then the tie

10   goes to the defendant because the government bears the burden

11   of showing, at least by a preponderance of the evidence, that

12   the asset is traceable to forfeiture.

13           So we'll just take one example of that.  Again, we'll

14   see many more today.  But we'd like you to consider the

15   tracing of one of the supposedly fraudulent transfers made to

16   purchase Mr. Shah's home.  So the government purports to trace

17   almost $5.6 million through a first in, first out approach.

18   And we'll explain that to you in far more detail.  But

19   basically, a first in, first out approach assumes that when a

20   withdrawal is made from the account, that withdrawal was

21   connected to the oldest dollar in the account, the dollar that

22   arrived in that account first.

23           So if there's $100 in an account that came from two

24   different deposits, one for 75 and one for 25, and there's a

25   withdrawal for 25, the government will assume that that first

1    $75 transaction was the source of that transfer and not the

2    later deposited $25.  So we'll go -- it's probably a little

3    confusing to say it verbally, but when we get into it, I think

4    it will make a lot more sense.

5           Under that approach, as I said, the government

6    purports to trace in 5.5, 5.6 or so million dollars.  But the

7    government's own spreadsheet reflects that if you take a

8    different approach and use what's called the last in, the

9    first out tracing method whereby you assume that any

10   withdrawal is funded by the most recent deposit, then in fact

11   none of the money used to purchase this house was traceable.

12          THE COURT:  The money is fungible.  Is there any case

13   law on which approach, whether it's LIFO or FIFO, to use?

14          MR. FINNERAN:  There are district court cases,

15   Your Honor, where the Court has recognized that FIFO is an

16   acceptable method of tracing.  We have not located any Seventh

17   Circuit case where they have either blessed or not blessed one

18   of these tracing methods.

19          But I believe it is well-established that the

20   government must find a method of tracing that actually works.

21   And our contention is at a preponderance of the evidence stage

22   when we're asked to say which is true, is it this tracing or

23   that tracing, if the government cannot present you with a

24   persuasive reason that you should prefer their tracing method

25   to another method they apparently applied but chose to reject,

 1    then the -- again, the tie should go to the defendant.

 2             THE COURT:  What difference does it make, though, if

 3    the money is fungible?

 4             MR. FINNERAN:  It makes a big difference, Your Honor,

 5    because the fact that there are -- that some of these assets

 6    here can be demonstrated under alternative tracing methods to

 7    have been purchased with other clean funds means that in that

 8    account there was other money that was not connected to the

 9    crime.

10             And so when Mr. Shah buys this house, we have to ask

11    the question:  Did he buy it with the clean money or the dirty

12    money?  And that's what tracing is all about.

13             THE COURT:  If the money has no -- fair enough.  I

14    think I understand the argument.

15             But the money loses its -- if it's mixed with --

16    dirty money is mixed with clean money, it doesn't necessarily

17    change its stripes as money.

18             MR. FINNERAN:  Uh-huh, sure.

19             THE COURT:  And I think that may be what we're going

20    to argue about.

21             MR. FINNERAN:  We will have that argument,

22    Your Honor.  I will resist going into it too far right now

23    except to say this:  That if the government wanted to do that,

24    wanted to say that the money was commingled and, therefore, we

25    shouldn't bother to split it up, we can just treat it all as

1    dirty, that's a money-laundering theory.

2           And the government, when they do money laundering,

3    does have the ability to forfeit both dirty and clean money

4    that had been commingled in an account.  But in this

5    particular case, the government is not asking you to apply any

6    money-laundering theory, nor did it convict Mr. Shah of any

7    1956 money-laundering count.  Instead, it simply is asking you

8    to find by a preponderance of the evidence that the money,

9    for example, that Mr. Shah used to purchase his house is

10   criminal proceeds.

11          And the statutes themselves use the word "traceable"

12   to demonstrate the government must show not merely that these

13   deposits went from one account to another account to another

14   account and it's basically all tainted.  Instead, the

15   government must show which is which.  And that's what the

16   Seventh Circuit has said in the case law that I provided to

17   you.

18          One drop into an ocean does not make the entire ocean

19   subject to forfeiture.  One drop of money into an account does

20   not make the entire account subject to forfeiture.  That is

21   the Seventh Circuit law, and it's well consistent with the

22   language of the statute.

23          So I will be very forcefully arguing to you that you

24   cannot simply say because dirty money came in and we can't

25   tell which is which, the defendant loses.  Instead, the

1    Court -- the Seventh Circuit has told you you must consider
2    which is which.
3         Thank you.
4         So let me just take, then, one moment before I close
5    to tell you why we believe this hearing matters in the long
6    run.  As Your Honor knows, it is not common to have hearings
7    like this.  In my seven years as a federal prosecutor, I had
8    two hearings like this where defendant contested the
9    forfeiture.  It is a rare thing.
10        But that is because in many cases the defendant has
11   no real defenses to forfeiture.  The government has
12   successfully traced and, as a result of that, there's nothing
13   to argue about.  And I get many, many calls from many, many
14   people on issues like this.  And most of those cases I turn
15   down because there is nothing to argue about.
16        We're here today because there is quite a lot that
17   went wrong here and that we need to argue about.  So we will
18   present at the -- in our briefing substantial arguments
19   against the imposition of the money judgment and the
20   forfeiture of nontraceable property in this case as substitute
21   property.
22        So again, I don't want to waste our time this morning
23   going into detail with those arguments, but it should not be
24   assumed as you sit here that it's all going to be covered by
25   the money judgment anyway.  We're going to make significant

1   arguments to you for why it shouldn't be covered by the money

2   judgment.

3         We also anticipate that there will be significant

4   issues raised as to whether any restitution is still owed to

5   the victims in this case. So Mr. Madden I think made some

6   reference to this, that he believes it'll be at least

7   $400 million. There's losses to the bank, as well as to the

8   lenders. Our position is the bank has been fully made whole,

9   that loan has been fully paid.

10        And as it comes to the investors, the investors did

11   not only get cash, they got ownership and control of a very

12   significant asset, the company. And so we'll be arguing to

13   you at that stage -- and we're not going to have that argument

14   today -- that that satisfies the restitution obligation

15   because that property was returned to the supposed victims in

16   the case.

17        THE COURT: Well, we'll deal with it another time.

18   But that's a -- I heard these witnesses testify they lost it

19   all. Now, maybe they got some stock --

20        MR. FINNERAN: Uh-huh.

21        THE COURT: -- in Outcome, but whether the value of

22   that equated with -- is in any way equal to the amount they

23   invested is, I guess, a question I'll have to hear.

24        MR. FINNERAN: That is a question you'll have to

25   hear, so I'm not at this point handling that yet. But my

1  understanding from my cocounsel on this case is that there

2  will be testimony and evidence to hopefully persuade you the

3  value of that was at least something that has to be taken into

4  consideration, whether it completely eliminates the

5  restitution order or significantly reduces it.

6        Still, I don't want the Court to go through this

7  hearing with the assumption that it's all going to be paid to

8  restitution anyway.  There will be arguments to the contrary

9  that you'll entertain at a later time.

10        THE COURT:  Okay.

11        MR. FINNERAN:  And then finally, Mr. Madden said he

12  doesn't believe that the assets that are restrained are

13  sufficient to cover even the $55 million money judgment the

14  government asks for today.  The evidence that we received last

15  night from Guild Capital suggests there's potentially

16  $20 million worth of the assets there.  And the assets the

17  government otherwise seeks to trace, by my math, add up to

18  more than $40 million.

19        So I do believe there's a serious possibility that

20  given the appreciation and the increase in value that some of

21  these assets have seen, that there would be excess money on

22  top of that $55 million judgment, even if the Court were to

23  impose it.

24        So again, I just simply ask the Court to not assume

25  that because -- even if it believes it must enter a

1   $55 million money judgment, that that means that every one of

2   these assets will be forfeited as substitute property.

3           So that's probably part of the main reason.  But the

4   biggest issue for you to think about is this:  And that is

5   that the government has no authority prior to judgment to

6   continue to restrain property that is not traceable to a

7   criminal offense.

8           Mr. Madden represented today -- and I never heard

9   this before, so for the first time -- that they are going to

10  ask you to enter a prejudgment garnishment order against these

11  assets.  I haven't had the chance to research that, but I've

12  never seen it in my practice.  And the case law is fairly

13  clear that a defendant does have a right to keep any assets

14  that are not traceable for the purposes of, among other

15  things, of paying his counsel and having his right to counsel

16  satisfied.

17          And so there's actually a potential constitutional

18  issue that will have to be considered in this case if the

19  Court concludes, as I think the government is now largely

20  conceding, that Mr. Shah does not in fact -- excuse me -- most

21  of these assets that were restrained are not actually

22  traceable to the crime.  Then we will argue to you both as a

23  statutory matter and as a constitutional matter it will be

24  impermissible for the Court to continue to restrain those

25  funds which are not traceable and, thereby, prevent Mr. Shah

1    from using them to continue his defense in this case.

2            So those are the arguments we intend to make to you

3    today and in subsequent briefing.  Unless the Court has any

4    questions, we're prepared to proceed with evidence.

5            THE COURT:  All right.  Thank you.

6            MR. FINNERAN:  Thank you.

7            THE COURT:  All right.  Government may call its first

8    witness.

9            MR. APPLEBY-BHATTACHARJEE:  Thank you, Your Honor.

10   We call forensic accountant Megan Poelking.

11           THE COURT:  Please raise your right hand.

12     (The witness is sworn.)

13           THE WITNESS:  Yes, Your Honor.

14           THE COURT:  Have a seat, please.

15           And if you'll excuse me, I have externs who normally

16   sit in the jury box.  If -- you're free to come up here and

17   sit in it if you want.  Stay back there if you'd like.

18           But I give them the opportunity to observe

19   proceedings, closer than they normally would.  And there's no

20   prejudice to either side by doing that, so they're free to sit

21   up here if they'd like.  And you're all more accustomed to

22   asking questions in front of a jury anyway, so this will

23   simulate that.

24           Thank you.

25           And, Mr. Finneran, if you would also email your

Poelking - direct by Appleby-Bhattacharjee

50

1    slides to my law clerk Sydney, we'll make a copy and I'll --

2    unless you have an extra copy.

3           MR. FINNERAN:  I'm not sure that we have the capacity

4    to send an email right now because we're not hooked into the

5    Wi-Fi.

6           THE COURT:  Okay.

7           MR. FINNERAN:  But we'll be happy to provide one

8    after.

9           THE COURT:  That'll be great.  Thank you.

10          MR. APPLEBY-BHATTACHARJEE:  May I proceed,

11   Your Honor?

12          THE COURT:  You may.

13        MEGAN POELKING, GOVERNMENT'S WITNESS, DULY SWORN

14                     DIRECT EXAMINATION

15   BY MR. APPLEBY-BHATTACHARJEE:

16   Q.  Good morning, Ms. Poelking.

17   A.  Good morning.

18   Q.  I'd like to start by briefly recapping your background and

19   work history, which you already covered at trial.

20          Are you still employed at the FBI?

21   A.  I am.

22   Q.  In what capacity?

23   A.  I'm a forensic accountant.

24   Q.  And approximately how long have you worked for the FBI as

25   a forensic accountant?

Poelking - direct by Appleby-Bhattacharjee

51

1   A.   Almost -- well, seven years.

2   Q.   Are you still a CPA?

3   A.   Yes.

4   Q.   And are you current on your certification requirements to

5   maintain your status as a CPA?

6   A.   I am.

7   Q.   Were you asked to analyze the disposition of certain

8   proceeds received by Outcome Health and related entities in

9   this investigation?

10  A.   Yes.

11  Q.   Did you review financial records and other documents in

12  conducting that analysis?

13  A.   I did.

14  Q.   Did that include bank records?

15  A.   Yes.

16  Q.   And records obtained from Outcome Health?

17  A.   Yes.

18  Q.   How about records obtained from private equity firms?

19  A.   Yes.

20  Q.   Did you prepare summary charts based on your review of

21  those records?

22  A.   I did.

23  Q.   Were the relevant records in each summary chart you

24  prepared distilled from hundreds of pages of bank records and

25  other documents that you and other investigative agents

Poelking - direct by Appleby-Bhattacharjee

52

1   obtained in the course of the investigation?

2   A.   They were.

3   Q.   And does each summary chart you prepared fairly and

4   accurately summarize the relevant transactions to the best of

5   your knowledge?

6   A.   Yes.

7   Q.   I'm going to draw your attention now to Government's

8   Exhibit 1029.  Can you see that on your screen?

9   A.   I can.

10  Q.   Do you recognize this exhibit?

11  A.   I do.

12  Q.   Is this one of the summary charts you prepared?

13  A.   Yes.

14  Q.   And does it have three pages?

15  A.   Yes.

16  Q.   We'll walk through this chart in some detail shortly,

17  but --

18           THE COURT:  Is there going to be any objection to any

19  of the charts the government is using?

20           MR. FINNERAN:  No, Your Honor, there's not.

21           THE COURT:  Okay.  And I understand the government's

22  going to have no objection to your charts either.

23           MR. APPLEBY-BHATTACHARJEE:  That's correct,

24  Your Honor.

25           THE COURT:  Okay, very good.  I'll assume they're

Poelking - direct by Appleby-Bhattacharjee

53

1   all -- we can assume they're all admitted for purposes of this

2   hearing without going through the formalities of laying

3   foundations, et cetera.

4           MR. APPLEBY-BHATTACHARJEE:  Thank you, Your Honor.

5           THE COURT:  Okay.

6   BY MR. APPLEBY-BHATTACHARJEE:

7   Q.  Before we dive into the specifics of Exhibit 1029, as a

8   refresher, did Outcome Health obtain a bank loan in or around

9   April 2016?

10  A.  Yes.

11  Q.  Did certain executives at Outcome receive dividend

12  payments from that loan?

13  A.  They did.

14  Q.  Which executives?

15  A.  Rishi Shah and Shradha Agarwal.

16  Q.  Did Outcome Health also obtain a bank loan in or around

17  December of 2016?

18  A.  Yes.

19  Q.  Did an executive at Outcome receive a portion of the

20  proceeds of that loan, according to your analysis of the

21  financial records?

22  A.  Yes.

23  Q.  Which executive?

24  A.  Rishi Shah.

25  Q.  Did Outcome Health raise money from outside investors in

Poelking - direct by Appleby-Bhattacharjee

54

1    or around 2017?

2    A.   Yes.

3    Q.   Was a portion of that investor money paid as a dividend to

4    an entity controlled by Shah and Agarwal?

5    A.   Yes.

6    Q.   What was the name of that entity?

7    A.   Gravitas Holdings.

8    Q.   Do your summary charts in Exhibit 1029 account for certain

9    transactions that were made using the proceeds of the bank

10   loan and capital raise dividends you just described?

11   A.   Yes.

12   Q.   So let's start with page 2 of Exhibit 1029.

13        Are the assets listed on this page of the exhibit all

14   attributable to a common funding source?

15   A.   They are.

16   Q.   And what source is that?

17   A.   The capital raise in 2017.

18   Q.   I want to walk through the columns on this page.  First,

19   there's the leftmost column titled "Forfeiture Allegation

20   Reference."  Do you see that?

21   A.   I do.

22   Q.   What does that mean?

23   A.   So in the indictment, there were two forfeiture

24   allegations, and each allegation had subparagraphs with

25   letters.  So it's just referring to either Forfeiture

Poelking - direct by Appleby-Bhattacharjee

1    Allegation 1 or 2 and then the various paragraphs which

2    correspond to the assets.

3    Q.   The next column to the right of that is titled "Source of

4    Funds."  Do you see that?

5    A.   I do.

6    Q.   And what does that signify?

7    A.   That's the bank account where the funds were deposited and

8    then where the assets were purchased from.

9    Q.   The column to the right of that is "Funds Transferred To."

10   What does that signify?

11   A.   So those were the various assets that were purchased -- or

12   the funds where the money went to.  So...

13   Q.   To the right of that is a column titled "Asset" with

14   various asset descriptions below that.  Can you describe where

15   that information came from?

16   A.   Yes.  Through the course of the investigation, we were

17   able to determine the specific asset that was purchased from

18   each of those entities that we saw in the previous column.

19   Q.   And the language of all right, title, and interest, is

20   that similar to the language appearing in the indictment?

21   A.   It is.

22   Q.   And here, there are several named entities.  Were those

23   anonymized in the indictment but now unanonymized in your

24   charts?

25   A.   Yes.

Poelking - direct by Appleby-Bhattacharjee

56

1   Q.  We'll come back to the penultimate column titled "Amount

2   Traceable to Criminal Proceeds."  But first, the rightmost

3   column titled "Date Sent," what does that signify?

4   A.  So that was the date of the transaction in the bank

5   records.

6   Q.  Do all three pages of Exhibit 1029 have similar column

7   headings as you've just covered?

8   A.  They do.

9   Q.  And do those columns generally have the same meaning as

10  you've described?

11  A.  Yes.

12  Q.  So looking now at page 2 of Exhibit 1029, I'm going to

13  focus on the Source of Funds column.

14          In this instance, did all of the transactions on

15  page 2 of Exhibit 1029 originate from the same bank account?

16  A.  They did.

17  Q.  And which bank account was that?

18  A.  The Gravitas Holdings account at Pershing ending in 6290.

19  Q.  I'm going to draw your attention now to Government's

20  Exhibit 1081.

21          MR. APPLEBY-BHATTACHARJEE:  And I'll note,

22  Your Honor, that this was a trial exhibit as well.

23  BY MR. APPLEBY-BHATTACHARJEE:

24  Q.  Is this a summary chart you prepared, Ms. Poelking?

25  A.  Yes.

Poelking - direct by Appleby-Bhattacharjee

57

1   Q.   Can you please walk us through what this chart shows?

2   A.   So this is a summary of the 2017 capital raise.  It has

3   the dates of all of the transactions coming into the account,

4   the investor, where the funds originated from, the amount of

5   the investment, and the account that the funds were deposited

6   into, which would total the 487 million.

7            THE COURT:  Going back to your earlier chart, did

8   Gravitas have any funds in it before the -- the loan money

9   went in?

10           THE WITNESS:  No.

11           THE COURT:  Okay.  So that -- it was solely funded by

12  the loans?

13           THE WITNESS:  Yes.

14           THE COURT:  Okay.  Go ahead.

15           MR. APPLEBY-BHATTACHARJEE:  Or the capital raise

16  dividend in this instance, Your Honor.

17           THE COURT:  Well, that's coming.  But at the time

18  the -- the loans came first, right?

19           MR. APPLEBY-BHATTACHARJEE:  The loans came first, and

20  those dividends were actually deposited into separate

21  accounts, which I will get to.

22           THE COURT:  All right.

23           MR. APPLEBY-BHATTACHARJEE:  I'm starting with the

24  capital raise dividend.

25           THE COURT:  Okay.

Poelking - direct by Appleby-Bhattacharjee

58

1    THE WITNESS:  So yes.  To clarify, the balance was

2    zero.  The first deposit was the 225 million from the

3    dividend -- or from the capital raise.

4    THE COURT:  Okay.

5    BY MR. APPLEBY-BHATTACHARJEE:

6    Q.  And so as to the capital raise investor money, were all of

7    those investments initially deposited into the same account?

8    A.  Yes.

9    Q.  And was that an Outcome, Inc., account at JPMorgan Chase

10   ending in 9393?

11   A.  Yes.

12   Q.  And you mentioned the total amount that Outcome Health

13   raised as part of the 2017 capital raise was approximately

14   $487 million.  Is that right?

15   A.  That's correct.

16   Q.  Drawing your attention to the date column, you can see

17   that there are dates of investment money being sent to

18   Outcome Health between approximately March 1st and July 14th

19   of 2017.  Is that right?

20   A.  Yes.

21   Q.  So focusing your attention on the entries below May 3,

22   2017, after May 3rd of 2017, were there only four investments

23   remaining to total that $487 million amount?

24   A.  Yes.

25   Q.  And if I could just ask you to do some rough math.  As --

Poelking - direct by Appleby-Bhattacharjee

59

1   as of May 3, 2017, what was the remaining balance of

2   investments that was still to come into Outcome Health's

3   account through July of 2017?

4   A.   So this was a little over $40 million remaining.

5   Q.   Turning next to Government's Exhibit 1082.

6          MR. APPLEBY-BHATTACHARJEE:  And I'll note,

7   Your Honor, this was another trial exhibit.

8   BY MR. APPLEBY-BHATTACHARJEE:

9   Q.   Ms. Poelking, is this another summary chart you prepared?

10  A.   It is.

11  Q.   So I'll zoom in to the middle of the page to make it

12  easier to read, but could you walk us through what this

13  exhibit shows?

14  A.   Yes.  So starting on the left, we have the 2017 capital

15  raise investors which we just went through.  That 487 million

16  was deposited into the Outcome, Inc., account held at JPMorgan

17  Chase ending in 9393.

18          Over a similar time frame, 487 million was deposited

19  into the Outcome Holdings, LLC, account held at Chase ending

20  in 9765.  On May 19, 2017, Outcome Holdings sent 225 million

21  to the Gravitas Holdings, LLC, account held at Chase ending in

22  9898.  Gravitas Holdings at Chase sent 225 million to the

23  Gravitas Holdings account held at Pershing Advisor Solutions

24  ending in 6290.

25          THE COURT:  And my question earlier -- maybe I was

Poelking - direct by Appleby-Bhattacharjee

1    unclear on it:  Did the Gravitas Holdings, LLC, account at

2    Chase 9898 have any money in it before the 225 million was

3    sent there?

4              THE WITNESS:  No.

5              THE COURT:  And did the Gravitas Holdings at Pershing

6    have any money in it before the $225 million was sent to it?

7              THE WITNESS:  No.

8              THE COURT:  Okay.  Go ahead.

9    BY MR. APPLEBY-BHATTACHARJEE:

10   Q.  So we talked about the multiple-month period over which

11   the $487 million sum was deposited by investors originally

12   into Outcome's JPMorgan Chase account and then into the

13   Outcome Holdings, LLC, account.

14             As of May 19, 2017, did the Outcome Holdings, LLC,

15   Chase account ending in 9765 have at least $225 million in

16   funds traceable to the capital raise investors?

17   A.  Yes.

18   Q.  And that $225 million was ultimately deposited into the

19   Gravitas Holdings, LLC, Pershing account ending in 6290.  Is

20   that right?

21   A.  That's correct.

22   Q.  And based on your review of the underlying documentation,

23   who, if anyone, was the authorized officer listed on the

24   Gravitas Pershing account?

25   A.  Rishi Shah.

Poelking - direct by Appleby-Bhattacharjee

61

1          THE COURT:  Following up on the questions, did the

2     Outcome, Inc., Chase Account, 9393 have money in it before the

3     487 million got into it, if you know?

4          THE WITNESS:  I would have to double-check, but...

5          THE COURT:  Okay.  Same with the Outcome Holdings,

6     LLC, account, did that have monies in it before the

7     487 million got into it?

8          THE WITNESS:  Again, I don't recall it did, but I'll

9     double-check for you.

10         THE COURT:  All right.

11         Go ahead.

12         MR. APPLEBY-BHATTACHARJEE:  And to the extent the

13    Court wishes, we can supplement the record with a declaration

14    from Ms. Poelking with any open questions, of course

15    consulting with defense counsel before we do that.

16         THE COURT:  Sure.

17    BY MR. APPLEBY-BHATTACHARJEE:

18    Q.  So turning back to page 2 of Exhibit 1029.  So is that

19    Gravitas Pershing account ending in 6290 what's listed in

20    every entry under the source of funds column on this page of

21    the exhibit?

22    A.  Yes.

23    Q.  So now I'd like to turn your attention to the "Amounts

24    Traceable to Criminal Proceeds" column.

25         Do you see that?

Poelking - direct by Appleby-Bhattacharjee

62

1   A.   I do.

2   Q.   Can you explain what that columns means in the context of

3   your overall analysis?

4   A.   Yes.  So using the FIFO method that was discussed earlier

5   and the 225 that got -- 225 million that was deposited into

6   the Pershing account held in the name of Gravitas Holdings, I

7   was able to trace these specific amounts to that initial

8   deposit.

9   Q.   So you just referenced the FIFO method.  Is that also

10  known as the first in, first out accounting methodology?

11  A.   It is.

12  Q.   Can you explain at a high level what FIFO entails?

13  A.   It just pretty much means funds are spent from the account

14  in the order they were received, so the first funds would be

15  spent first.

16  Q.   So I just want to provide maybe some illustrative examples

17  with round numbers.  Let's suppose that $100 of clean money

18  are in an account and $100 of, quote/unquote, dirty money are

19  deposited into the account after, and then the transaction is

20  performed for the purchase of $100.  Under FIFO, would that

21  $100 transaction be traceable to criminal proceeds?

22  A.   No.

23  Q.   Let's suppose that $100 in dirty funds are deposited into

24  an account first, followed by $100 of clean funds, and then a

25  $100 transaction is made, under FIFO, would that transaction

Poelking - direct by Appleby-Bhattacharjee

63

1    be traceable to criminal proceeds?

2    A.   It would.

3    Q.   Now, is FIFO a commonly used accounting methodology?

4    A.   It is.

5    Q.   During your tenure as an FBI forensic accountant, how

6    often have you used the FIFO methodology to trace alleged

7    criminal proceeds involved in transactions?

8    A.   The FIFO method is the only one I've used.

9    Q.   Are you familiar with last in, first out accounting

10   methodology?

11   A.   I am.

12   Q.   Is that sometimes known as LIFO?

13   A.   Yes.

14   Q.   And so using the same round numbers, let's assume an

15   account has $100 in clean funds, and then $100 in dirty funds

16   are deposited into the account, a $100 transaction is made.

17   Under LIFO, is that traceable to criminal proceeds?

18   A.   Yes.

19   Q.   The converse:  $100 in dirty funds in the account, $100 in

20   clean funds deposited later, a $100 transaction.  Is that

21   traceable to criminal proceeds using LIFO?

22   A.   No.

23           THE COURT:  Is the FIFO -- is your use of FIFO tied

24   in any way to GAAP or GAAS?  Or is it just the practice as a

25   forensic accountant you've utilized?

Poelking - direct by Appleby-Bhattacharjee

1    THE WITNESS:  Yeah.  I mean, they're both accepted

2  ways to account for money.  But in -- when I first started at

3  the FBI, that's what we used.  So that's what I use.

4    THE COURT:  Okay.  But there's no preferred or

5  required method under -- it probably wouldn't be GAAS, but

6  under GAAP?

7    THE WITNESS:  Not that I'm aware of, no.

8    THE COURT:  Okay.

9  BY MR. APPLEBY-BHATTACHARJEE:

10  Q.  And so you touched upon this earlier in response to

11  Judge Durkin's questioning, but what was the balance of the

12  Gravitas Pershing account ending in 6290 before the

13  $225 million dividend was deposited into it on or about

14  May 19, 2017?

15  A.  Zero dollars.

16  Q.  So using either FIFO or LIFO for the assets listed on this

17  page, would you arrive at the same result?

18  A.  I would.

19  Q.  And can you please explain?

20  A.  Based on my review of the account, the 225 was deposited.

21  There were interest earned on the 225.  So no matter which way

22  you look at the deposits, like it would have all been related

23  to the fraudulent proceeds.

24  Q.  And were all of the transactions listed on page 2 of

25  Exhibit 1029 traceable to the $225 million capital raise

Poelking - direct by Appleby-Bhattacharjee

65

1    dividend?

2    A.  Yes.

3          THE COURT:  If there was more money in the original

4    transfer from the investors to the first Chase account, it

5    would make a difference whether you use LIFO or FIFO, wouldn't

6    it, if there was money in the account?

7          THE WITNESS:  If there had been money in the account,

8    yes.

9          THE COURT:  Okay.  Same with the second transfer to

10   the Chase account?

11         I interrupted you.  Go ahead and finish your answer.

12         THE WITNESS:  No.  I -- yes.  If the account didn't

13   start with zero and there had been other deposits throughout

14   the life of the account, then perhaps it would have changed.

15   So...

16         THE COURT:  Based on which accounting method you

17   used.

18         THE WITNESS:  That's correct.

19         THE COURT:  Okay.  All right.  Go ahead.

20   BY MR. APPLEBY-BHATTACHARJEE:

21   Q.  So moving now to page 3 of Exhibit 1029, are the assets

22   listed on this page attributable to a common funding source?

23   A.  Yes.

24   Q.  What source?

25   A.  The loans obtained in 2016.

Poelking - direct by Appleby-Bhattacharjee

66

1  Q.  And on this page under the Source of Funds column, there

2  are references to bank accounts associated with both

3  Rishi Shah and Shradha Agarwal.  Is that right?

4  A.  Yes.

5  Q.  So I want to draw your attention just to the account or

6  the entries associated with Rishi Shah.  Are all of those

7  entries associated with the Chase bank account ending in 9002?

8  A.  They are.

9  Q.  And as for the transactions on this page of Exhibit 1029

10 related to Rishi Shah, do all of the transactions relate to a

11 common source of funds?

12 A.  Yes.

13 Q.  What is that source?

14 A.  The $30 million dividend obtained from the April 2016

15 loan.

16 Q.  Turning to Government's Exhibit 1078, this is another

17 trial exhibit.  And is this a summary chart you prepared?

18 A.  Yes.

19 Q.  So I want to focus on the first three transactions.  Left

20 to right, can you walk us through what this exhibit shows?

21 A.  Yes.  So this shows that on April 8, 2016, JPMorgan Chase

22 sent $89 million to ContextMedia for the $110 million loan.

23 ContextMedia on the same day sent a $30.2 million wire to

24 Rishi Shah with the memo dividend distribution, and those

25 funds were deposited into the Chase account ending in 9002.

Poelking - direct by Appleby-Bhattacharjee

67

1  Q.  Drawing your attention now to Government's Exhibit 571,
2  another trial exhibit, is this an email dated April 8, 2016?
3  A.  It is.
4  Q.  And is it from John Bosshart to Rishi Shah, copying others
5  at Outcome Health?
6  A.  Yes.
7  Q.  And does this email include a wire transaction for
8  approximately $30.2 million into Rishi Shah's bank account at
9  Chase ending in 9002?
10 A.  Yes.
11 Q.  And what, if any, context or explanation is given for the
12 reason for that transfer?
13 A.  It says it's a wire confirmation for the dividend
14 distribution to Rishi.
15 Q.  So back to page 3 of Exhibit 1029, now that we've
16 explained the Source of Funds column for the transactions
17 involving Mr. Shah's account, can you walk us through what the
18 rest of the -- this page of the exhibit shows as to the assets
19 associated specifically with Mr. Shah?
20 A.  Yes.  So similar to the other page we saw like this, we
21 have the forfeiture allegation reference, the bank account
22 where the funds originated from, the companies where the funds
23 were transferred to, the specific assets we were able to
24 identify at those companies, the amount that was traceable to
25 the criminal proceeds, and then the date that the transaction

Poelking - direct by Appleby-Bhattacharjee

68

1   occurred in the bank records.

2   Q.   And what was the balance of Shah's Chase Bank account

3   ending in 9002 before the $30.2 million dividend was deposited

4   into it on or about April 8, 2016?

5   A.   Zero dollars.

6   Q.   Did you treat the entire $30.2 million balance deposited

7   into the account as criminal proceeds?

8   A.   I did.

9   Q.   Why did you do that?

10  A.   Based on the email that we just read, the dividend was

11  based on the loan that was received by the company.

12  Q.   And so with the assumption that you made based on your

13  review of that email, that all $30.2 million were criminal

14  proceeds, under -- using either FIFO or LIFO for the assets

15  listed on this page, would you arrive at the same result?

16  A.   I would.

17  Q.   And were all of the transactions associated with Shah on

18  page 3 of Exhibit 1029 traceable to the April 2016 bank loan

19  dividend that was deposited into his Chase Bank account ending

20  in 9002?

21  A.   Yes.

22  Q.   So moving finally to page 1 of Exhibit 1029, were all of

23  the transactions on this page attributable to one person?

24  A.   They were.

25  Q.   And who was that person?

Poelking - direct by Appleby-Bhattacharjee

69

1  A.  Rishi Shah.

2  Q.  Did you trace the funds involved in these transactions to

3  three common sources?

4  A.  I did.

5  Q.  What sources were those?

6  A.  The two loans that were obtained in 2016 and the capital

7  raise in 2017.

8  Q.  So drawing your attention to the Source of Funds column,

9  are there two different bank accounts listed in this column?

10 A.  There are.

11 Q.  A Pershing account ending in 5573?

12 A.  Yes.

13 Q.  And what, if any, connection did Rishi Shah have to that

14 account?

15 A.  He was the signer on the account.

16 Q.  Is there also a Pershing account ending in 7793 listed in

17 this column?

18 A.  Yes.

19 Q.  And what, if any, connection did Shah have to that

20 account?

21 A.  He set up the Baroda Trust, so he was listed on some of

22 those documents.

23 Q.  And based on your review of bank records, did Mr. Shah

24 himself effectuate certain wire transfers of funds that you

25 traced as criminal proceeds to the Baroda Trust account?

Poelking - direct by Appleby-Bhattacharjee

70

1   A.   It was either him or the trustee of the trust who would

2   have been acting at his direction.

3   Q.   So turning to Exhibit 1031, is this another summary chart

4   you prepared?

5   A.   Yes.

6   Q.   Does this summary chart account for three different

7   criminal sources of funds?

8   A.   It does.

9   Q.   Can you walk us through what those are?

10  A.   The 2017 capital raise and then two loans obtained in

11  2016.

12  Q.   So I'm highlighting starting from the left of the page the

13  straight lines going through the middle.  Are these

14  transactions starting with the investors and ending at the

15  ContextMedia Health, LLC, account at Chase reflective of the

16  capital raise funds?

17  A.   They are.

18  Q.   And then at the top, there's a reference to JPMorgan

19  Chase, with two arrows below that.  Do those relate to the two

20  separate loans that Outcome Health obtained from JPMorgan

21  Chase in 2016?

22  A.   They do.

23  Q.   All right.  So can you walk us through the transactions

24  ending at the Rishi Shah Pershing accounts and the Baroda

25  Trust Pershing accounts at the bottom of the page broken out

Poelking - direct by Appleby-Bhattacharjee

71

 1   by the three different criminal sources that you attributed to

 2   those funds?

 3   A.   Yes.   I guess if we start in the middle of the page, the

 4   ContextMedia Health accounts at Chase received both the

 5   2017 capital raise funds and funds from the December 2016 bank

 6   loan.   From there, 13.8 million of that was traceable to those

 7   sources.   That was sent to Gravitas Hardware.   And

 8   $4.3 million of those funds were traceable to the sources of

 9   fund -- the 2017 capital raise and the bank loan in

10   December 2016, those funds were transferred to Rishi Shah's

11   account at Bank of America ending 0955.

12   Q.   And your summary chart designates that transfer from

13   Gravitas Hardware to Rishi Shah is comprising approximately

14   $4.3 million in criminal proceeds.   Is that right?

15   A.   That's correct.

16   Q.   And is that a determination you made using the FIFO

17   methodology?

18   A.   Yes.

19   Q.   All right.   Can you walk us --

20        THE COURT:   But there were other funds in Gravitas

21   Hardware when the 13.8 million went into it?

22        THE WITNESS:   I believe so, yes.

23        THE COURT:   All right.

24   BY MR. APPLEBY-BHATTACHARJEE:

25   Q.   And then if you can walk us through the transactions

Poelking - direct by Appleby-Bhattacharjee

72

1   related to the April 2016 bank loan and the flow of funds from

2   that loan into Rishi Shah's Bank of America account.

3   A.   Yes.  So Chase sent the 89 million to the ContextMedia

4   account held at CIBC ending in 7426.  They sent the

5   $30.2 million dividend to Rishi Shah's account at Chase ending

6   in 9002.  From that, I was able to trace $3.1 million in

7   criminal proceeds to the Rishi Shah Bank of America account

8   ending 0955.

9   Q.   Just drawing your attention to the December 23, 2016,

10  JPMorgan Chase Bank loan, was that initial bank loan amount

11  deposited into ContextMedia Health, LLC's account?

12  A.   It was.

13  Q.   And then did you trace $4 million of those loan proceeds

14  as being deposited the same day from ContextMedia Health's

15  account into Rishi Shah's personal bank account at Chase

16  ending in 9002?

17  A.   That's correct.  On the same day that ContextMedia

18  received the 216 million, 4 million was sent to Rishi Shah's

19  account.

20  Q.   Okay.  And at the bottom of the page -- or at the bottom

21  of the excerpt I've highlighted here, you note approximately

22  $3.1 million in criminal proceeds transferred from Shah's

23  Chase bank account ending in 9002 to Shah's Bank of America

24  account ending in 0955.  Is that right?

25  A.   That's correct.

Poelking - direct by Appleby-Bhattacharjee

73

1    Q.   And when you say "criminal proceeds," what are the two

2    sources involved in that transaction?

3    A.   The two bank loans obtained in 2016.

4    Q.   And again, is that a determination you made applying the

5    FIFO methodology?

6    A.   Yes.

7    Q.   Now, turning to the last three transactions depicted on

8    the chart, can you just walk us through the flow of funds from

9    the Bank of America ending in 0955 to the next two series of

10   accounts and describe the source of the criminal proceeds you

11   traced?

12   A.   So Rishi Shah's Bank of America account ending 0955 sent

13   7.4 million in criminal proceeds to the Rishi Shah Pershing

14   accounts on April 20, 2017.  The source of those funds would

15   be all three that we discussed, the 2017 capital raise and the

16   two loans in 2016.

17        The Rishi Shah Pershing accounts sent 5.75 million in

18   criminal proceeds to the Baroda Trust Pershing accounts on

19   June 18, 2018.  And again, the source would be all three of

20   those that we discussed.

21   Q.   And in tracing those proceeds, again, did you use the FIFO

22   methodology throughout?

23   A.   I did.

24        THE COURT:  All right.  And so in summary, the -- if

25   there are funds in these accounts when the fraudulent

1    proceeds, the dirty money, goes in, if the account was -- if

2    there were funds in it, the FIFO method would account for how

3    you determined there were fraudulent proceeds as they were

4    transferred out, correct?

5            THE WITNESS:  Correct.

6            THE COURT:  And if they were -- if the fund was

7    empty, it really doesn't matter whether you use FIFO or LIFO,

8    the account was empty no matter which method you used because

9    it was just they were the only funds there to take out?

10           THE WITNESS:  They were the only funds initially

11   deposited, yes.  There could --

12           THE COURT:  Yes, that's what I meant.  I'm sorry.

13   But that -- then if money -- if an account had zero in it,

14   3 million in dirty money goes in, 3 million goes out, you

15   didn't need to utilize any accounting method because that was

16   directly traceable?

17           THE WITNESS:  Correct.

18           THE COURT:  Okay.

19   BY MR. APPLEBY-BHATTACHARJEE:

20   Q.   So now turning back to page 1 of Exhibit 1029, now that

21   we've explained the Source of Funds column, can you walk us

22   through what the rest of this page shows?

23   A.   Right.  So similar to the other two that we saw, we have

24   the forfeiture allegation reference, the bank account where

25   the funds originated, the companies where the funds were

Poelking - cross by Finneran

1   transferred to, the specific assets we were able to identify,

2   the amount traceable to those criminal proceeds, and then the

3   date that the transaction occurred in the bank records.

4   Q.   And were all of the transactions listed on page 1 of

5   Exhibit 1029 traceable to the proceeds from the April 2016

6   loan, the December 2016 loan, and the 2017 capital raise using

7   the FIFO methodology?

8   A.   Yes.

9            MR. APPLEBY-BHATTACHARJEE:  May I have a moment,

10  Your Honor?

11           THE COURT:  Yes.

12           MR. APPLEBY-BHATTACHARJEE:  Nothing further,

13  Your Honor.  I pass the witness.

14           THE COURT:  All right.  Cross-examination.

15           Off the record.

16     (Off-the-record discussion.)

17           THE COURT:  All right.  A ten-minute break while you

18  set up.

19           And the witness is on cross-examination, so please

20  don't discuss your testimony with the government.  Okay?

21     (A recess was had from 10:38 a.m. to 10:49 a.m.)

22           THE COURT:  Okay.  You may proceed.

23           MR. FINNERAN:  Thank you, Your Honor.

24           Ladies and gentlemen of the extern jury, thank you.

25                         CROSS-EXAMINATION

1    BY MR. FINNERAN:

2    Q.  Ms. Poelking, nice to -- we met in the hallway, but I

3    would like to introduce myself to you once again.  My name is

4    Richard Finneran.  I represent Rishi Shah.  I'll be conducting

5    your cross-examination.

6    A.  Okay.

7    Q.  First, have you testified in court before?

8    A.  I have.

9    Q.  Okay.  I just want to set a few ground rules for the

10   beginning of our discussion.

11        So first of all, as I'm sure you expect, we're going

12   to be diving into your analysis and I'm going to point out

13   what I consider are flaws in your analysis.  But I hope you

14   won't take any of my questions as questioning your integrity

15   or your honesty.  That's not my intention, and I'm fully aware

16   of the consequences if that were to be the case.  So please

17   don't interpret my critiques of your analysis as an indictment

18   on your integrity.

19   A.  Okay.

20   Q.  Is that fair?

21   A.  Uh-huh.

22   Q.  Secondly, as I have mentioned for all my questions, we're

23   going to presume that both the April 2016 loan proceeds and

24   the investor proceeds were criminal proceeds.  So while that's

25   a matter that we contested at trial and which may be contested

Poelking - cross by Finneran

77

1    on appeal, for the purposes of this hearing, we're going to

2    make that assumption.  Is that understood?

3    A.   Okay.

4    Q.   So when I use the word dirty money, can we agree that's a

5    reference to the fraudulent proceeds from one of those two

6    sources?

7    A.   Yes.

8    Q.   And when I use the term clean money or clean funds, can we

9    agree that's a reference to sources other than those two

10   sources?

11   A.   Yes.

12   Q.   Okay.  Secondly, just one more premise I'd like to set

13   down with you before we dive in.

14          We talked earlier about the idea of money being

15   fungible and the idea that once money is put into an account,

16   it can be challenging to trace that money.  Do you recall that

17   discussion?

18   A.   I do.

19   Q.   Can we agree that based on your experience, the mere fact

20   that money that is dirty money has been deposited into an

21   account is not enough to make the entire amount of that

22   account criminal proceeds in the absence of some

23   money-laundering theory?

24   A.   Yes, sure.

25   Q.   In other words, you do have to trace?

Poelking - cross by Finneran

78

1    A.  I would -- yes, I would say you have to trace it.

2    Q.  Right.  Okay.

3            So before we get into this case, I'd like to ask you

4    a little bit about your background and training.  So I heard

5    from the direct examination you are a CPA?

6    A.  I am.

7    Q.  Can you tell where you got your education?

8    A.  I went to the University of Georgia.

9    Q.  And do you have -- that was for undergraduate?

10   A.  Undergrad and then I also did the master's of accounting

11   there.

12   Q.  Okay.  That's what I was looking for.

13   A.  Uh-huh.

14   Q.  And as far as your CPA, how long have you been a CPA?

15   A.  Since 2011 I believe, so a while.

16   Q.  Okay.  And in order to get a CPA, am I correct you have to

17   take certain tests?

18   A.  Yes.

19   Q.  And what are the topics you have to take tests on in order

20   to get that certification?

21   A.  Auditing, tax, business law, things like that.

22   Q.  Okay.  Is any of those related to the kind of tracing that

23   we're talking about today?

24   A.  Yes.

25   Q.  Where would that fall in in your understanding of the

Poelking - cross by Finneran

79

1   different disciplines of accounting?

2   A.   Well, we use it in audit a lot, I presume.  So...

3   Q.   Okay.  So since then joining the government, am I correct

4   that you've received additional training relating to your role

5   as an investigative analyst or -- I think you said, was it,

6   forensic accountant for the FBI?

7   A.   That's correct.

8   Q.   Have you specifically received training relating to the

9   tracing of criminal proceeds?

10  A.   Yes.

11  Q.   And have you also in your, I'm sure, many years of

12  experience had, effectively, on-the-job training and

13  experience to learn how to do that successfully?

14  A.   Yes.

15  Q.   Okay.  Do you agree with me that when you're investigating

16  a criminal case, it is usually the best approach to make

17  conservative assumptions in an analysis?

18  A.   I would agree with that, yes.

19  Q.   And is part of the reason for that that in any criminal

20  case, it's the government that bears the burden of proof?  Is

21  that right?

22  A.   Yes.

23  Q.   And as a consequence of that, you are working for the

24  government, you need to present evidence that is capable of

25  carrying that burden?

1   A.  Correct.

2   Q.  So am I correct you're also trained, therefore, to give

3   the -- effectively, the benefit of the doubt to the defendant

4   when there's a question about whether or not a particular item

5   is subject to forfeiture or traceable to criminal proceeds?

6   A.  Yes.

7   Q.  Okay.  I'd like to start, then -- oh, sorry.  One more

8   preliminary matter.

9         Are you aware that the Court ordered the government

10   to provide -- or I guess I shouldn't say ordered.  It was

11   reflected in a minute entry that the Court required the

12   government to provide its tracing analysis to the defense for

13   this hearing on or before May 19, 2023?

14         MR. APPLEBY-BHATTACHARJEE:  Objection as to

15   foundation.

16         MR. FINNERAN:  I asked her if she's aware.

17         THE COURT:  Overruled.

18   By THE WITNESS:

19   A.  Yeah, I'm not sure when they were supposed to turn it

20   over.

21   BY MR. FINNERAN:

22   Q.  Okay.  Are you aware that at some point there was a

23   request or an order -- again, I don't want to call it an

24   order -- an indication the government had to turn over

25   evidence to the defense by a certain date prior to this

Poelking - cross by Finneran

81

1  hearing?

2  A.  Yeah.  I would assume that they would have to turn it over

3  before today.

4  Q.  And did you help the government prepare the production

5  that was then provided to the defense later on?

6          I guess you don't know if it was provided.  Is that

7  fair?

8  A.  Right, yeah.  I don't know what you were provided.

9  Q.  Okay.  Let's start here then:  Do you recall putting

10  together various tracing spreadsheets that are numbered

11  Government Exhibit 1029 through, I think, 1032?

12  A.  I believe so, yes.

13  Q.  And did you also prepare a folder called "supporting

14  documentation" that would have been provided to us with those

15  spreadsheets?  Do you recall making that folder?

16  A.  I believe so, yes.

17  Q.  Okay.  All right.  So I'd like to start, then, by showing

18  you what the government showed you.

19          MR. FINNERAN:  And it's not -- you can't see it on

20  the screen, can you, Your Honor?

21          THE COURT:  Not yet.  I see something that says

22  WorkPlace Lite.

23          MR. FINNERAN:  Okay.  We've got a dual monitor --

24  here we go.  Dual monitor situation.  Okay.  Now hopefully,

25  you can see it?

1          THE COURT:  I can.

2          MR. FINNERAN:  Okay.  I'm going to try to zoom in a

3   little bit.

4   BY MR. FINNERAN:

5   Q.   Okay.  Ms. Poelking, do you recognize -- I'm sorry, I've

6   hid the exhibit number.  See if I can zoom out a little bit.

7          Do you recognize this document, Ms. Poelking?

8   A.   I do.

9   Q.   Is this Government Exhibit 1029?

10  A.   It is.

11  Q.   You discussed this on direct examination, correct?

12  A.   Yes.

13  Q.   This document reflects basically a summary of your

14  conclusions in your tracing analysis.  Is that fair to say?

15  A.   Yes.

16  Q.   Okay.  So we're just going to take one page as an example.

17  Obviously, we're going to dive in a lot more, but I do have a

18  question about this exhibit.

19         So here, there's a column that says "Amount Traceable

20  to Criminal Proceeds," second from the right.  Do you see that

21  column?

22  A.   Yes.

23  Q.   So just taking one example, it says there that $15,000 is

24  traceable to a company called Eight Partners VC Fund I, LP.

25  Is that correct?

Poelking - cross by Finneran

1    A.   Yes.

2    Q.   The asset that is listed, though, in the asset column says

3    all right, title, and interest in Eight Partners VC Fund, LP.

4    Is that correct?

5    A.   Yes.

6    Q.   Is it your understanding that $15,000 is the total amount

7    that represents all right, title, and interest in Eight

8    Partners Fund -- Eight Partners VC Fund I, LLP?

9    A.   So it is my understanding that it would be the $15,000

10   that was traceable to the criminal proceeds on April 24, 2018.

11   So all right, title, interest in the $15,000 sent on that

12   date.

13   Q.   In the $15,000.  Is that right?

14   A.   Correct.

15   Q.   So is it your view that the remaining amount of money, if

16   there is a remaining amount of money -- and we'll look at

17   examples -- but assume with me for the moment that there were

18   other investments made into Eight Partners VC Fund I, LLP,

19   other than those $15,000, okay?  Can we join with that

20   assumption for just a moment?

21   A.   I would like -- I would like to see the other two pages of

22   this because there were some funds that were attributable to

23   different aspects of the fraud.  So I don't want to say

24   specifically for Eight Partners.  But yes, there could have

25   been other -- right.

Poelking - cross by Finneran

84

1   Q.  I'm not asking you to testify there were others from

2   Eight Partners because I haven't shown you anything and you

3   may not have a recollection.

4   A.  Okay.

5   Q.  What I'm asking you is if we assume for the moment that

6   there were other contributions and deposits to Eight Partners

7   VC Fund other than the $15,000, would you agree that nothing

8   in your analysis would suggest that those other funds are

9   traceable to criminal proceeds?

10   A.  If I did not trace them on the other two pages, then

11   correct.

12   Q.  Okay.  Oh, I understand what you're saying now.  Okay.

13   There were some other inputs into Eight Venture Funds that

14   might be traceable?

15   A.  Correct.

16   Q.  I guess I picked a bad example, potentially.

17         But what I'm trying to establish is just the

18   principle that the mere fact that the $15,000 or other amounts

19   are traceable doesn't mean that everything at Eight ventures

20   is subject to forfeiture as directly traceable property.  Is

21   that correct?

22   A.  Based on these charts, yes, correct.

23         THE COURT:  And you're not seeking it from the

24   government's perspective, correct?

25         MR. APPLEBY-BHATTACHARJEE:  That's correct,

1  Your Honor.  That's what the distinction between Exhibit A and

2  Exhibit C is meant to capture.

3          THE COURT:  Okay.

4          MR. FINNERAN:  Correct.

5  BY MR. FINNERAN:

6  Q.  And I was about to ask:  Are you aware that the government

7  as of today is not seeking to forfeit any amount as directly

8  traceable proceeds that is not on your chart as traceable to

9  these various investments?

10  A.  Yeah.  I haven't seen the updated document.  But yes,

11  that's what I was told.

12  Q.  Okay.  Are you aware, however, that -- well, actually, you

13  testified in the grand jury in this case, didn't you?

14  A.  Yes.

15  Q.  Are you aware that the forfeiture allegation in this case

16  suggested that all right, title, and interest in each of these

17  assets was traceable to the crime?

18  A.  Again, I would say it was all right, title, and interest

19  on the day that that transaction was sent over was traceable

20  and forfeitable.

21  Q.  Okay.  I'll show you a different document, then, for a

22  moment.

23          THE COURT:  If this is about the indictment alleging

24  that all right, title, and interest in Eight Partners LLC fund

25  is forfeitable, the government has abandoned -- if that's an

Poelking - cross by Finneran

1   either overstatement in the indictment or just an underproof

2   at trial, they've abandoned that theory.

3          So it doesn't matter in my mind.  It's a difference

4   at this point that is not something that's being contested.

5          MR. FINNERAN:  Your Honor, I understand that point of

6   view.  As the Court is aware, the Court issued a protective

7   order in this case that was based upon the grand jury's

8   finding that all right, title, and interest was traceable.

9          THE COURT:  Sure.  And it's just like every other

10  indictment.  Sometimes they don't prove up everything that

11  is -- that the grand jury returns.

12         But what's the sanction or remedy if more is being

13  held when all they're seeking now is what the actual

14  contributions to that fund with dirty money was?

15         MR. FINNERAN:  Yes, Your Honor.  I'm happy to answer

16  that.  So there's two issues there.  So the first is I'm

17  hoping to establish a record that at the time that the

18  government obtained the indictment up until the time that it

19  produced this evidence, it had an awareness that not all the

20  funds were traceable.  I think that's an important point to

21  preserve on the record for appeal.

22         But secondly, if the Court determines -- as I think

23  you're acknowledging -- that these things are not traceable,

24  then we intend to seek to ask the Court to release those from

25  the protective order that are not traceable.  And being able

Poelking - cross by Finneran

 1    to establish now that the order -- through this witness is

 2    that the order restrains nontraceable property would be a

 3    valuable thing for me to make a record on.

 4         THE COURT:  Can I restrain funds that would be used

 5    for restitution?

 6         MR. FINNERAN:  Our position is no, Your Honor.

 7    There's no authority that we're aware of.  Mr. Madden made

 8    reference to something called a motion for --

 9         I think you said preliminary garnishment?

10         MR. MADDEN:  Garnishment.

11         MR. FINNERAN:  Prejudgment --

12         MR. MADDEN:  Prejudgment.

13         MR. FINNERAN:  -- garnishment?  I'm not familiar with

14    that mechanism, but the restitution statute itself, to my

15    awareness, does not authorize the government or the Court to

16    restrain nontraceable property.  Moreover, the Supreme Court

17    has held, at least against the United States, that if those

18    funds are intended to be used to fund a criminal defense --

19         THE COURT:  Right.

20         MR. FINNERAN:  -- et cetera, the defendant has a

21    constitutional right to know.

22         THE COURT:  Okay.  All right.  I'm familiar with

23    that.  Go ahead.

24         MR. FINNERAN:  And I promise I'm not going to belabor

25    this point.  I just want to try and get the one point out.

Poelking - cross by Finneran

88

1          THE COURT:  Go ahead.

2     BY MR. FINNERAN:

3     Q.   So my question was:  Are you aware that the indictment in

4     this case suggested that there -- that all right, title, and

5     interest in each of the assets the government sought to

6     forfeit was traceable to criminal proceeds?

7     A.   Right.  And again, I'll just say I was under the

8     impression that it meant all right, title, and interest of

9     those funds that were sent on that date to the fund.

10    Q.   Okay.  So that's why I'm going to now show you an exhibit

11    that we've marked.

12         MR. FINNERAN:  And, Your Honor, this might be a good

13    time -- this is one of the exhibits I was planning to use with

14    my expert.  If we can just introduce those in one fell swoop,

15    they're Exhibit Shah Forfeiture 9001 through 9025.

16         THE COURT:  They're all admitted without objection.

17      (Said exhibits admitted in evidence.)

18    BY MR. FINNERAN:

19    Q.   This is an excerpt from -- actually, down here it says the

20    government motion for preliminary forfeiture.  That's a

21    mistake.  It is actually an excerpt from the language of the

22    indictment.

23         Do you recognize this statement or statements similar

24    to it?

25    A.   I do, yeah.

Poelking - cross by Finneran

1    Q.   So just to read it, does it say:   All right, title, and

2    interest in the investments by Company B held in the name of

3    Gravitas Holdings and JumpStart Ventures?   Is that what it

4    says?

5    A.   That's what the beginning of the statement says, yes.

6    Q.   And then it says:   Including, but not limited to, $475,000

7    in capital contributions.   Is that what it says?

8    A.   That were submitted between those dates, yes.

9    Q.   Right.   So is your understanding of the words including,

10   but not limited to, that the indictment alleged and the

11   government eventually restrained more money from Investment

12   Company B than just the $475,000 that you traced?

13            MR. APPLEBY-BHATTACHARJEE:   Objection to the extent

14   it calls for interpreting the indictment.

15            MR. FINNERAN:   I'm asking for her understanding,

16   Your Honor.

17            THE COURT:   That's an interpretation.

18            Overruled.

19   BY MR. FINNERAN:

20   Q.   Could you answer the question, please?

21   A.   Right.   So my understanding is that the 475 that was

22   contributed between those two dates is what was subject to the

23   protective order.

24   Q.   Okay.   And in fact, I think we'll corroborate that.   I'm

25   going to show you a document --

Poelking - cross by Finneran

90

1           Okay.  Do you recognize this document?

2    A.  I do.

3           MR. FINNERAN:  And I will ask this document be marked

4    as Shah Forfeiture 9026, and we'll provide a copy.

5    BY MR. FINNERAN:

6    Q.  Is this an email between you and Mr. Madden on August 13,

7    2020?

8    A.  Yes.

9    Q.  I'd like you to focus on the paragraph that begins:  Our

10   subjects and their companies.

11   A.  Yes.

12   Q.  Do I read the following sentence correctly there?

13          Our subjects and their companies made investments in

14   Guild and I2A with traceable funds, but there were also

15   investments in these entities that dated back to 2015 and

16   2013, respectively.  Is that correct?

17   A.  Yes.

18   Q.  And I'll show you one more.

19          Is this also an email between you and Mr. Madden?

20   A.  It is.

21          THE COURT:  What number is this, sir?  Is this part

22   of the same string?

23          MR. FINNERAN:  It's not part of the same string.  We

24   will designate this Shah Forfeiture 9027.

25          THE COURT:  All right.  26 and 27 are admitted.

Poelking - cross by Finneran

91

1    (Said exhibits admitted in evidence.)

2  BY MR. FINNERAN:

3  Q.  Is this an email between you and Mr. Madden from

4  February 18, 2020?

5  A.  Yes.

6  Q.  And there are other people on the chain, but we don't have

7  to focus on that.

8       You can see there where it says:  One item is in

9  yellow -- 7wire -- as we were only able to trace 280K to the

10  fraud.  The remainder is not protected.

11       Is that a correct reading of that sentence?

12  A.  Yes.

13  Q.  So was it your understanding at the time that this email

14  was sent that, in fact, only $280,000 had been restrained by

15  the protective order?

16  A.  For that instance, yes.

17  Q.  Okay.  So you were not aware -- let's put it this way:  If

18  other funds from that entity were restrained by the

19  restraining order, the protective order, you were not aware of

20  that.  Is that fair?

21  A.  I don't believe so, no.

22  Q.  And you don't --

23  A.  I don't believe I was aware of that, no.

24  Q.  Okay.  Good enough.

25       Okay.  So now I'd like to walk you through a little

Poelking - cross by Finneran

1    bit about just setting some ground rules on tracing methods.

2           So we've already talked about FIFO.  Does that stand

3    for first in, first out?

4    A.  It does.

5    Q.  And I think you said it one way, but I'll say it the way I

6    think about it.  Tell me if I'm wrong.  Using FIFO, you as an

7    analyst would assume that any withdrawal from an account was

8    funded with the oldest dollar that was in the account, meaning

9    the one that was deposited furtherest back in time.  Is that

10   correct?

11   A.  Correct, yeah.

12   Q.  Okay.  You're also familiar with an accounting method

13   called LIFO?

14   A.  I am.

15   Q.  And does that stand for last in, first out?

16   A.  Yes.

17   Q.  And does that -- as an analyst, would you using that

18   methodology assume that the most recent dollar deposited into

19   the account funds every subsequent withdrawal?

20   A.  Correct.

21   Q.  Okay.  Are you also familiar with a method called the

22   pro rata method?

23   A.  I have heard of it, yes, uh-huh.

24   Q.  And what is the pro rata method?

25   A.  Yeah, just it divides it up evenly between all the

Poelking - cross by Finneran

1    deposits in the account, the clean and the dirty money.

2    Q.   Okay.  So to take an example, if we got $100 that comes

3    into an account and you characterize half of it as being from

4    the fraud and half of it not, or there's one $50 deposit that

5    we will call clean and one $50 deposit called dirty, and then

6    there's a $50 withdrawal, we would assume under the pro rata

7    method that $25 was traceable to the clean money and $25 to

8    the dirty money.

9    A.   Sure.

10   Q.   Is it also true under that method that as additional funds

11   are added to the account, that proportion has to be adjusted

12   based upon whether the deposits were clean or dirty in order

13   to apply that method?

14   A.   Correct, yeah.

15   Q.   Okay.  So I think you testified on direct examination that

16   at least LIFO and FIFO are well-accepted tracing methods under

17   GAAP.  Is pro rata also such a method?

18   A.   I believe so, yes.

19   Q.   Are there any other methods that you're aware of?

20   A.   The lower -- lowest intermediate balance method.

21   Q.   And that's -- that -- because I don't think you used it in

22   this case, but that's similar to FIFO, right?  It's assuming

23   that whatever's remaining in an account is -- is traceable

24   money?

25   A.   Correct.

Poelking - cross by Finneran

94

1  Q.  Okay.  How do you decide which method to use?

2  A.  Again, when I started here, we just always used the FIFO

3  method.  So that's what I go with.

4  Q.  Well, when you say you started here, what are you

5  referring to?

6  A.  So when I arrived at the Chicago field office, that's just

7  the method that the other forensic accountants were using, so

8  that's what I used.

9  Q.  Okay.  Is there any reason you're aware of for why the

10  Chicago field office uses the FIFO method?

11  A.  I'm not aware of a specific reason, no.

12  Q.  Is there a reason to consider that method a more valid

13  tracing approach than any of the other methods we've

14  discussed?

15  A.  It would depend on court cases, I would assume.  But no, I

16  don't believe so.

17  Q.  Well, I'm not asking for court cases as you're, I assume,

18  not an attorney.

19  A.  No.

20  Q.  I'm just asking from your expertise in accounting, is

21  there any reason that an accountant chooses to prefer FIFO

22  over other methods in doing a tracing analysis?

23  A.  For these purposes, no, I don't think so.

24  Q.  No.

25        We talked earlier about giving the defendant the

Poelking - cross by Finneran

1   benefit of the doubt.  Remember that?

2   A.  I do, uh-huh.

3   Q.  So do you agree with me that if one method shows that an

4   asset is traceable and another method shows that it's not,

5   that the way to give the benefit of the doubt would be to

6   employ the tracing method that does not show the asset is

7   traceable to fraud?

8   A.  Not necessarily.  I would just assume that you would have

9   to apply the same tracing methodology across the board for the

10  particular subject.  So I mean, if we're going to pick FIFO

11  for some assets, LIFO for others, that wouldn't really make

12  sense.

13  Q.  Okay.  So your testimony on that point at least, which

14  we'll cover that, too, is that in a single tracing analysis,

15  one should use a consistent method?

16  A.  I believe so, yeah.

17  Q.  And I don't want to misstate your testimony, but are you

18  saying that in a particular case, one should use a consistent

19  method so that if there's one account and a second account,

20  that you should use the same method in both accounts even if

21  they go to different assets?  Is that what you're saying?

22  A.  Correct, yes.  You should use FIFO -- well, you should

23  pick one method and stick with it, yes.

24  Q.  Okay.  But again, my question, just to make sure I'm

25  understanding your testimony, if you do both methods and you

Poelking - cross by Finneran

1    see that FIFO shows it's traceable, LIFO shows it's not

2    traceable, would it not be consistent with giving the

3    defendant the benefit of the doubt to use the LIFO method and

4    not the FIFO method?

5    A.   I suppose you could do that.  But again, I just have

6    always used the FIFO method, so that's what I went with.

7    Q.   Okay.  And I'm not asking you whether you think that's

8    right or not to use the FIFO method.  I'm just asking you

9    about whether or not it's consistent with giving the defendant

10   the benefit of the doubt.  So what's your testimony on that?

11   A.   I suppose, yes, you could run both scenarios and see which

12   one gives the defendant -- yeah.

13   Q.   Okay.  All right.  So why don't we take a look at some of

14   your spreadsheets.

15            MR. FINNERAN:  Then I will warn the Court we're about

16   to dive into the actual spreadsheets of your analysis.  So

17   this -- we'll do our best to keep this clear for the record.

18   BY MR. FINNERAN:

19   Q.   Am I correct that you did a FIFO analysis of each of the

20   accounts that appears -- and I'll show it to you if you don't

21   recall which exhibit I'm talking about -- but on Exhibit 1031,

22   which I've just put on the screen, this government exhibit?

23   A.   That's correct.

24   Q.   Okay.  And is it also the case that you generated an

25   analysis using the LIFO method?

Poelking - cross by Finneran

97

1   A.  It was part of the same spreadsheet, yes.

2   Q.  And was it also the case that you generated an analysis

3   using the pro rata method?

4   A.  Yes.

5   Q.  Okay.  So let me just show you one example so we can

6   orient ourselves.  I guess we'll start -- why don't we start

7   with 9002.

8          All right.  I'll zoom in a moment, but hopefully you

9   can tell from the header at the top that this is a document

10  indicated with a Bates number.  And then it says Rishi Shah

11  Chase 9002.

12         Do you recognize this as being the spreadsheet you

13  prepared, analyzing that account?

14  A.  So all I can see is the tracing.

15  Q.  Oh, I'm sorry.  The two screens are messing me up.  I've

16  got to figure out how to fix that.  I think it's because I

17  tried to show the presentation earlier.  I'm sorry.

18         Now, can you agree with me that the top of this

19  document is titled "Rishi Shah Chase 9002"?

20  A.  Correct, yes.

21  Q.  And does this reflect your tracing analysis of that

22  account?

23  A.  It does.

24         MR. FINNERAN:  Your Honor, we'd ask to move this into

25  evidence as Shah Forfeiture Exhibit 928 -- excuse me -- 9028.

Poelking - cross by Finneran

1    THE COURT:  All right.  9028 is admitted without -- I

2  assume these are all without objection, correct?

3    MR. APPLEBY-BHATTACHARJEE:  Yes, Your Honor.

4    THE COURT:  All right.  It's admitted without

5  objection.

6    (Said exhibit admitted in evidence.)

7  BY MR. FINNERAN:

8  Q.  So just looking at this document -- and for some reason it

9  opened in the middle of the document, so I'm going to try to

10  scroll up to -- oh, what have I done?  It's flipping around.

11    I've added three charts to your spreadsheet by

12  accident.  Give me one moment.  I'll try to fix this.

13    All right.  So ignoring that part, are there multiple

14  tabs at the bottom of this document, one of which is named

15  "FIFO"?

16  A.  Yes.

17  Q.  And is another named LIFO?

18  A.  Yes.

19  Q.  And is another named pro rata?

20  A.  Yes.

21  Q.  And just for the sake of the record, the tabs named

22  Chart 1 through 5, I just accidentally messed up in Excel.

23    They were not part of the original document.  Is that

24  right?

25  A.  Correct.

Poelking - cross by Finneran

99

1    Q.   Okay.  So what appears -- so there's also a tab called

2    data, or data, and that's the tab we're on.  Is it fair to say

3    that document -- that tab simply reflects the raw data from

4    bank records for this account?

5    A.   Yes.

6    Q.   And then is it fair to say the FIFO tab reflects your

7    analysis under first in, first out?

8    A.   Correct.

9    Q.   And same for LIFO and pro rata, those reflect your

10   analysis of this account under that method.  Is that right?

11   A.   Correct.  But again, I focused just on the FIFO tab.

12   So...

13   Q.   Well, when you say "focused," what do you mean?

14   A.   That was the tab I used for my tracing and to pull out

15   these assets that were on those original three pages.

16   Q.   Okay.

17            THE COURT:  So I'm clear, you -- you prepared this

18   chart, correct?

19            THE WITNESS:  Yeah.

20            THE COURT:  So you did it using LIFO, FIFO, and

21   pro rata?

22            THE WITNESS:  Correct.

23            THE COURT:  All right.  Why did you -- if LIFO's the

24   practice that you followed, why did you prepare it using FIFO

25   and pro rata also?

1        THE WITNESS:  It's just a spreadsheet that can

2    automatically run.  So those three just pop up anyways, but

3    the FIFO tab is the tab that I used for this case.

4        THE COURT:  Oh, I see.  The -- you can use any of

5    these accounting methods, and it automatically populates

6    the Excel sheet?

7        THE WITNESS:  Yeah.  And these weren't final

8    documents either.  These were just documents that I had

9    emailed to the AUSAs during the course of the investigation.

10        THE COURT:  Okay.  All right.

11        Proceed.

12    BY MR. FINNERAN:

13    Q.  Maybe to help clear that up, is this -- this area, the

14    first page of a document, called dash -- or excuse me -- a tab

15    called "dashboard"?

16    A.  Yeah.

17    Q.  Do you see that?

18    A.  Yes.

19    Q.  Is this what you were referring to the judge a moment

20    ago --

21    A.  Yes.

22    Q.  -- in terms of...

23        So talk through it for us and how this works.  How do

24    these spreadsheets get generated?

25    A.  So on the data chart, that would originally be just a

Case: 1:19-cr-00864 Document #: 480 Filed: 07/05/23 Page 101 of 230 PageID #:5603
Poelking - cross by Finneran
101

1    blank spreadsheet.  I would fill it in with all of the

2    transactions from the bank records.

3           Come back over here to the data tab.  If you scroll

4    down a little bit, there's an execute button.  And then that

5    automatically fills in the FIFO and LIFO and pro rata tabs

6    based on what I categorize as the fraudulent transfers.

7    Q.  Right.  So -- and I -- for the record, I did scroll down.

8           You mentioned something at the end that I think is

9    important for the Court to understand.  In splitting up the

10   fraudulent from the nonfraudulent proceeds, this -- I don't

11   know what you'd call, program?  What should we call it?

12   A.  Sure, program.

13   Q.  Okay.  This program relies upon your inputs as to what

14   deposit should be considered fraudulent and what should be

15   considered clean.  Is that fair?

16   A.  Yes.

17   Q.  Okay.  So now let's just look for a moment at the FIFO

18   analysis.

19          So just to again orient everyone here to these charts

20   because they -- they're not always intuitive.  Let me try to

21   zoom out.  Where's my zoom?

22          Why don't we just walk across and I'll -- if there's

23   no objection, I'll just let you walk us through each column

24   and tell us from left to right what does each column reflect.

25   A.  Right.  So the first column is just the transaction

Poelking - cross by Finneran

1    reference number.  The second column would be the account that

2    the funds originated from.  Column C is the date, which is the

3    date of the transaction.  The description is just the

4    description of the transaction per the bank records.  The

5    deposit amount is the deposit amount, and the withdrawal

6    amount, the running balance in the account.

7           And then I just -- the entity column is me trying to

8    clean up the descriptions to make everything more streamlined.

9    Column J is where I would mark a transaction as fraudulent or

10   not.  And then the calculation is the macro that runs in the

11   background to pull out the fraudulent assets.

12   Q.  Okay, great.  And I've maybe picked a bad example.  Let me

13   go to a different one so we can show -- illustrate the

14   difference for the Court.

15          I'm now going to put up -- I think this would be an

16   example.  Okay.  I've just put a new document on the screen.

17   Do you -- and I'm sorry -- I don't know why they're opening

18   up.  It's probably where you last saved it, I'm guessing.

19   It's starting in the middle of the document, but I'll try to

20   get up to the top.

21          Do you recognize this document as a tracing analysis

22   performed for a Baroda Trust Pershing account?

23   A.  I do.

24          MR. FINNERAN:  And, Your Honor, we'll move this in as

25   90 -- I think I'm on 29.

Poelking - cross by Finneran

1    THE COURT:  All right.  Admitted without objection.

2    (Said exhibit admitted in evidence.)

3    BY MR. FINNERAN:

4    Q.  Okay.  So I really want mainly the Court to understand how

5    this calculation column works, because that's really critical

6    for our ongoing discussion.

7         So you'll see that in cell K11, which I've

8    highlighted with my cursor, that there are amounts that are

9    basically being traced to prior deposits.  Is that correct?

10   A.  That's correct.

11   Q.  And then if we look down two cells from there, the word

12   "fraudulent" appears in two of those entries.  Is that right?

13   A.  Correct.

14   Q.  So can you explain to the Court what it means when we see

15   some that say fraudulent and some that don't say fraudulent?

16   A.  So there were funds transferred into this account from

17   Rishi Shah's Pershing account ending in 5573 that I was not

18   able to trace to the fraud, so those don't have the X in the

19   column.  So the program --

20   Q.  Sorry.  Let me slow you down one little bit, just so both

21   the court reporter and the judge can follow.

22        That -- you're referring now to the cells I've just

23   highlighted that have the X in the fraud column?  Is that

24   right?

25   A.  Right.  So those are funds that I was able to trace to the

Case: 1:19-cr-00864 Document #: 480 Filed: 07/05/23 Page 104 of 230 PageID #:5606
Poelking - cross by Finneran
104

1    three instances of fraud that we were discussing in this case.

2    The funds prior to that -- so there's a balance of 3.3 million

3    in the account prior to that that I was not able to trace

4    using the FIFO method.  So those would be considered our clean

5    funds.

6    Q.  And it's also the case, am I correct, that a deposit of

7    $891,000 appears after that that you also designate as a

8    clean -- I highlight this -- a clean deposit?  Is that right?

9    A.  Correct.  So total, that was like an over $6 million

10   deposit.  I broke it out between clean and dirty based on the

11   tracing.

12   Q.  Right.  So now let's return to the calculation column.

13            So can you explain what it means when it says --

14   we'll just take the second line -- withdrawal of roughly

15   $27,000 derived from Deposit ID No. 2?

16   A.  Right.  So the way that this calculation is working, it's

17   saying that that withdrawal, the 27,000, originated from the

18   very first deposit here from Rishi Shah's Pershing account

19   5573, that 38,000.

20   Q.  I'm sorry.  It says Deposit ID 2.  So wouldn't that be the

21   second -- oh, I see.  Because one is the beginning balance?

22   A.  Correct.

23   Q.  Is that right?

24   A.  Yes.

25   Q.  Okay.  So the way that we understand ID 2, we go over to

Poelking - cross by Finneran

1    this right column and then exam ID 2 to determine what it's

2    tracing it to?

3    A.   Yes.

4    Q.   Okay.  So then we go down to the one that appears -- has

5    the words fraudulent appearing.  Why don't we just take the

6    example of the second and third lines.  Can you explain how

7    that tracing is working to ID 3 and ID 4?

8    A.   Correct.  So by the time we get to the -- well, so we're

9    trying to use up the beginning balance.  So using up the 3.398

10   balance prior to the first $155,000 fraudulent deposit, so

11   this entire withdrawal of 7.2 million, this calculation is

12   showing that of the roughly 3.9 million is derived from the

13   fraudulent funds, but the previous 3.3 million was clean.

14   Q.   Right.  So I'm going to restate it.  Tell me if I've got

15   it right.

16        So for those two -- first two withdrawals, 10,000 and

17   3.3 million, we would look back up to ID 2 and ID 3 and see

18   those are not marked as fraudulent.  And since we're using a

19   first in, first out method, this program assumes that those

20   are then clean funds.  But when those funds have now been

21   exhausted and the only next -- the next source of the deposit

22   is Deposit ID 4, then the program says, okay, $155,000 are

23   traceable to that ID 4 and then the remaining 3.7 million are

24   traceable to ID 5.  Is that correct?

25   A.   That's correct.

Poelking - cross by Finneran

1        And I also just want to repoint out that these were

2  draft documents sent.  So I don't -- I can't be sure that

3  these are the final documents, but yes.

4  Q.  Are there more recent versions of these documents?

5  A.  I can't be sure.  I don't know if there are or not, but --

6  Q.  Okay.

7  A.  Yeah.

8  Q.  Well, I will represent to you that at least I was not able

9  to discover later versions of these documents --

10  A.  Okay.

11  Q.  -- in what we were provided.  But if there are later

12  versions, I'll work with Mr. Madden to make sure we have

13  copies of them.

14  A.  Okay.

15  Q.  And, obviously, I'm not saying it wasn't produced.  I've

16  gone through as much as I can in a short time.  I may not have

17  located it.

18  A.  Okay.

19  Q.  Okay.  So that's how it works for FIFO.  Let me go to the

20  LIFO tab now and just contrast what we just discussed with

21  that.

22        And so looking at those same transactions, it shows

23  here that this entire deposit -- excuse me -- this entire

24  withdrawal of $27,000 is indicated as being traceable to the

25  clean funds, correct?

Poelking - cross by Finneran

1   A.  Correct.

2   Q.  And then the next tab, it's saying that approximately

3   5 million is traceable to the fraudulent deposit under LIFO.

4   Is that correct?

5   A.  Correct.

6   Q.  And just to contrast that once again, that's a different

7   amount, in fact, in this case a higher amount than what was

8   traced to that -- to that amount under FIFO.  Is that right?

9   A.  Correct.

10  Q.  Okay.  And the difference -- the reason for the difference

11  is the difference in these ID numbers -- is that right? --

12  that under the LIFO tab, it's starting with the most recent

13  deposit, not the oldest deposit, and tracing it in reverse

14  order, from 9 to 8 to 7 to 6 as opposed to from 1 to 2 to 3 to

15  4?

16  A.  Yes.

17  Q.  Okay.  Finally -- and we'll be very brief on this because

18  I don't think that you relied upon this either, but this is

19  the pro rata tab.  Is that correct?

20  A.  That's correct.

21  Q.  And so here, we don't have that sort of tracing to

22  particular deposits.  Instead, in the calculation column,

23  there's just a number.  Can you tell me what that number

24  reflects?

25  A.  So honestly, I didn't even look at this tab really.  I

Poelking - cross by Finneran

1    just focused on the FIFO tab.  So...

2    Q.  Okay.  That's -- thank you for your honesty.  That

3    surprises me, but I appreciate it.

4         Are you aware of how those numbers are calculated,

5    even if you didn't look at it?

6    A.  Yeah.  I mean, I didn't go back -- I double-checked the

7    FIFO tab, but I have not double-checked this tab.  So I don't

8    want to say how it's calculated.

9    Q.  Okay.  Fair enough.  I will then -- with my witness, I

10   will establish how that's calculated.

11   A.  Okay.

12   Q.  Thank you for letting me know that.

13        Okay.  Let me just catch up in my notes here.

14        Okay.  So I'm going to go back now to the prior

15   exhibit, which I believe we called 9028.  And here, this is a

16   deposit into a context -- excuse me -- a deposit into

17   Rishi Shah 9002 from a ContextMedia Health account.  Is that

18   correct?

19   A.  That's correct.

20   Q.  I'm looking at the first -- excuse me -- the second line,

21   ID No. 2.

22        And that reflects a $30 million deposit?

23   A.  Yes.

24   Q.  Is that the $30 million dividend we've been discussing

25   throughout the morning?

Poelking - cross by Finneran

1   A.   It is.

2   Q.   Okay.  And you've marked X in the fraud column.  Is that

3   correct?

4   A.   Yes.

5   Q.   And what does that mean?

6   A.   That means that entire 30.2 million is attributable to the

7   dividends that Rishi received based on the April 2016 loan.

8   Q.   Okay.  And that's under a FIFO method?  Is that right?

9   A.   Yes.

10  Q.   We're on the FIFO tab, right?

11  A.   Uh-huh.

12  Q.   And actually also under the LIFO approach, because there

13  were -- as the Judge has pointed out, there were no other

14  deposits in this account, then that also would show that a

15  large amount of money was traceable to that as well.  Is that

16  correct?

17  A.   Correct.

18  Q.   Okay.  So this is a ContextMedia Health account that was

19  the source of this deposit.  Do you recall which account that

20  was?

21       I can show you.  I was just asking if you remember.

22  A.   I mean, no.

23  Q.   It's not a quiz.  Here we go.  We'll go back to 1031.  Can

24  you tell from this chart what the source of that $30.2 million

25  deposit was?

Poelking - cross by Finneran

1   A.  Right.  It was the account ending in 7426.

2   Q.  And did you analyze that account in the same manner we've

3   just discussed?

4   A.  Yes.

5   Q.  Okay.  I'm going to show you that now.

6          MR. FINNERAN:  Oops, I opened the wrong one.

7   BY MR. FINNERAN:

8   Q.  Not 6463, but the next one's coming.  Okay.

9          So again, just looking at the production number, is

10  this your analysis of CIBC 7426?

11  A.  It is.

12         MR. FINNERAN:  Your Honor, we move this as 9030.

13         THE COURT:  All right.  It's admitted without

14  objection.

15    (Said exhibit admitted in evidence.)

16  BY MR. FINNERAN:

17  Q.  So now what I'm going to do is scroll down in this

18  document.  Where's the mouse?  I've lost the mouse.  There it

19  is.  Okay.

20         Scroll down in this document to the date of this

21  transaction, which from the chart was 4/8/2016.  I'll try to

22  go faster.

23         Okay.  So first of all, is this here on line 2580 the

24  withdrawal from this account?

25  A.  It is.

Poelking - cross by Finneran

1  Q.  And it's that same amount, $30 million?

2  A.  Correct.

3  Q.  And this is Transaction No. 2580, Correct?

4  A.  Yes.

5  Q.  Does that reflect that there were 2,579 transactions

6  before this fraudulent withdrawal?

7  A.  From the production I received, yes, there was that many

8  transactions.

9  Q.  And the balance in the account at the time of this

10  withdrawal was $92 million -- is that correct? -- if you look

11  up on line 2579?

12  A.  Well, there are a lot of transactions on April 8.  So if

13  you go up to the line that starts with April 7 --

14  Q.  Understood.

15  A.  -- perhaps we could see what the balance actually -- so

16  keep going up a little -- it was roughly $3 million.

17  Q.  Roughly, yeah.  I'm sorry.  You're very correct to point

18  that out.  Let me go up to the beginning of the date.  So we

19  can see here at the end of the prior day, the balance was

20  $3.92 million?

21  A.  Correct.

22  Q.  Okay.  And that means there was another source of funding

23  that you did not trace to the fraud that could've funded that

24  $30 million transfer.  Is that correct?

25  A.  There was only 3 million in the account, so they would not

1   have been able to make the $30 million wire.

2   Q.   Right.  But under a FIFO approach, as your own analysis

3   shows, that $3 million is not traceable to the fraud, if you

4   look on line 2581.

5   A.   Yeah, ContextMedia did have $3 million in the account

6   prior to that transfer.

7   Q.   Right.  And I think you said earlier that it's important

8   to use a consistent method of tracing --

9            COURT REPORTER:  Can you slow down?

10           MR. FINNERAN:  I'm sorry?

11           COURT REPORTER:  Slow down.

12           MR. FINNERAN:  Yes.

13  BY MR. FINNERAN:

14  Q.   I think you said earlier that it's important to use a

15  consistent method of tracing throughout one analysis.

16  A.   Correct.

17  Q.   And under your own FIFO tab, this shows that 3 million of

18  that 30 million was not traceable to the fraud, correct?

19  A.   There was a balance of 3 million in the account prior to

20  that transfer.

21  Q.   Well, that really wasn't my question.  This is your

22  analysis, right?

23  A.   Yes.

24  Q.   And it shows from this FIFO analysis that $3 million-plus

25  were not traceable to that fraudulent deposit, correct?

Poelking - cross by Finneran

1  A.  In the ContextMedia account, yes.

2  Q.  Okay.

3  A.  There's $3 million.

4  Q.  Now, if you employ a LIFO approach, to go down to 2580 --

5  scrolling slowly, I apologize.

6        If you apply a LIFO approach -- I'm just going to --

7  well, here I get to extend this column so we can see what's in

8  it.

9        I now just flipped to the LIFO page, the same

10  spreadsheet.  Under a LIFO approach, this would entirely be

11  traceable to fraud, wouldn't it?

12  A.  The $30.2 million is traceable to the fraud, yes.

13  Q.  I'm sorry.  When I said it, I meant the 32 million.

14  A.  Uh-huh.

15  Q.  So again, the FIFO and the LIFO approach produced

16  different results, right?

17  A.  Yes.

18  Q.  On how much is traceable?

19  A.  Yes.

20  Q.  And you selected, I thought you testified, the FIFO

21  approach.

22  A.  We've established that the $30.2 million dividend is

23  traceable to the fraud.

24  Q.  Yeah.  But that's not really my question.

25        My question is:  Under a FIFO analysis, is -- is the

Poelking - cross by Finneran

1   $3 million traceable to the fraud or not?

2   A.   From the ContextMedia account, yeah, it's traceable.  Like

3   when it hits Rishi's account, Rishi's account had $0 in it

4   prior to receiving the $30.2 million fraudulent dividend.

5   Q.   I'm sorry for miscommunicating.

6          So I'm talking about what was in the ContextMedia

7   account before that transfer.  You agree with me there was

8   more than $3 million in that account?

9   A.   Yes.

10  Q.   Before that -- before the $30 million dividend arrived?

11  A.   Yes, there's 3 million.  Yes.

12  Q.   Right.  And you also agree with me that employing a first

13  in, first out method, then that $3 million that was in the

14  account should be considered part of the source of the funding

15  for the $30 million transfer to Mr. Shah's account?

16  A.   Sure.

17  Q.   Okay.  Under a LIFO approach, it wouldn't be.

18  A.   Okay.

19  Q.   Well, I'm asking.  Do you agree?

20  A.   Yes.  Yes.

21  Q.   Okay.  Now, when we then turn back, I believe this was

22  9028, to your spreadsheet here where you traced from, Mr. --

23  from that ContextMedia account to Mr. Shah's account, you

24  clicked the X in the fraud column, correct?

25  A.   Yes.

Poelking - cross by Finneran

1    Q.   That assumes, then, that all the 30 million was traceable

2    to the fraud, doesn't it?

3    A.   Yes.

4    Q.   And so therefore, everything that follows from this rests

5    upon that assumption?

6    A.   Correct.

7    Q.   Okay.  Were there other occasions where, in fact, you did

8    try to split up the fraudulent from the nonfraudulent portion

9    of a single deposit when doing your analysis?

10   A.   Yes.

11   Q.   Okay.  Let me catch up in my notes.

12          So now I'm going to show you -- I believe this is our

13   first time looking at it, so we'll call this 9031.

14          THE COURT:  It's admitted without objection.

15     (Said exhibit admitted in evidence.)

16          MR. FINNERAN:  I'm sorry; it's taking a moment to

17   open.  These are large spreadsheets.

18   BY MR. FINNERAN:

19   Q.   Again, looking at the top of this document, is this your

20   tracing analysis for Mr. Shah's Pershing tracing account?

21   A.   Yes.

22   Q.   And again, this is 9031.  So if we look at the first two

23   lines here, I think you testified earlier that this account

24   was empty before the money was transferred, right, there was

25   no balance?

Poelking - cross by Finneran

1    A.   Correct.

2    Q.   Okay.  So now we see here that you have then designated a

3    portion -- excuse me -- designated on line 2 about

4    $7.4 million as being dirty and about $16.7 million as being

5    clean.  Is that correct?

6    A.   Yes.

7    Q.   That's your notation, not from the bank, right?

8    A.   Yes.

9    Q.   Okay.  And I should note I just observed that your version

10   of this document appears to have some hidden columns.  So let

11   me --

12            I'm sorry, just -- well, I'll just say there's some

13   hidden columns.  So I'm going to unhide those real quick for

14   the completeness of the record.  Actually, I guess I have to

15   edit.  Do I have to edit to do that?  I don't.  Okay.

16            So is it fair to say that the reason that you

17   designated a portion of these funds as dirty and a portion of

18   the funds as clean is that your prior tracing analysis had

19   established that you could under a FIFO method get -- trace

20   some dirty proceeds to that deposit, but not the entirety of

21   that deposit?

22   A.   Correct.

23   Q.   So even though these appear on two different lines, they

24   are, in fact, one deposit, right?

25   A.   Yes.

Poelking - cross by Finneran

1  Q.  There was one single deposit of roughly $16 million into

2  this account?

3  A.  Yes.

4  Q.  And then it's your analysis that has attempted to separate

5  the dirty from the clean?

6  A.  Yes.

7  Q.  Isn't that a pro rata analysis?

8  A.  I'm not sure.  I just -- I didn't want to call the entire

9  deposit a dirty deposit if it wasn't.  So...

10  Q.  I -- I understand.  But when you're splitting up a portion

11  of a single deposit or withdrawal and trying to determine that

12  part of it is clean and part of it is dirty, isn't that the

13  pro rata method we discussed about beforehand?

14  A.  I couldn't say.  I don't know.

15  Q.  Are you not familiar with the pro rata method?

16  A.  I'm not as familiar with it as the FIFO method, no.

17  Q.  Okay.  But you're familiar enough to know it's an

18  established form of accounting, but you're just not familiar

19  with how it works?

20  A.  Correct.

21  Q.  Okay.  We don't have to cover that any longer.

22       Why don't we just look for a moment, though, at the

23  top of this spreadsheet at the LIFO method.  And so again, am

24  I correct here that you have designated lines 2 and 3 as being

25  the division of this one deposit between dirty and clean

Poelking - cross by Finneran

1  funds?

2  A.  Yes.

3  Q.  And if I scroll over -- I'm sorry; it's zoomed in very

4  far -- but I scrolled over here.

5       Does this show that under this analysis, this

6  withdrawal on line 4 to Eight VC funds of $15,000, which we

7  discussed earlier, is not traceable to the fraud but instead

8  to the clean money?

9  A.  On the LIFO tab, yes, you're correct.

10  Q.  Right.  On the FIFO tab, though, it is traceable to the

11  dirty money.  Is that right?

12       Sorry.  I've got to scroll over so you can confirm

13  that.  I don't know what's going on with my mouse.  There you

14  go.

15  A.  Yes.

16  Q.  Okay.  So it was your decision to split the clean from the

17  dirty, right, based on your analysis?

18  A.  Uh-huh.

19  Q.  Why did you decide to put the dirty money listed first and

20  the clean money second?

21  A.  That's just how I put it in there.  I didn't really have a

22  method for doing that.

23  Q.  Okay.  We agree it's one deposit, right?

24  A.  Yes.

25  Q.  And you've made the decision of which one's which?

Poelking - cross by Finneran

1  A.  Yes.

2  Q.  If you put the clean line first instead of the dirty line,

3  under FIFO what would happen to this deposit?

4  A.  Then it would not have been categorized as the fraudulent

5  deposit.

6  Q.  Right.  So even under a FIFO method, if we split this

7  deposit in two and we assume the clean money and not the dirty

8  money was the first source of funding --

9         MR. FINNERAN:  Thank you.

10        COURT REPORTER:  Please slow down.

11        MR. FINNERAN:  Yes.

12 BY MR. FINNERAN:

13 Q.  So even under a FIFO method, not a LIFO method, your

14 method, a FIFO method, if we split this deposit in two and we

15 assume the clean money is the first deposit when it's really

16 one deposit and the dirty is the second, then this money

17 wouldn't be traceable under that method either.

18 A.  Correct.  I mean, it's all the same deposit.  But yes, if

19 you reordered it how I did, then you're correct.

20 Q.  Are you aware of any accounting principle that would

21 instruct you to order them in the way that you did?

22 A.  No, I'm not aware of one.

23 Q.  Would you agree with me that ordering them in the way you

24 did is not consistent with giving the benefit of the doubt to

25 the defendant in your analysis?

Poelking - cross by Finneran

1   A.  I guess in this particular case.

2   Q.  Okay.

3   A.  But...

4   Q.  So I'm going to return now to the Baroda Trust document.

5      (Counsel conferring.)

6          MR. APPLEBY-BHATTACHARJEE:  It's 9029.

7          MR. FINNERAN:  9029.  Thank you so much.

8   BY MR. FINNERAN:

9   Q.  So I'm returning to the Baroda Trust 9029 that we looked

10  at earlier.  Do you still recognize this?

11  A.  I do.

12  Q.  And, again, does this present the same issue on lines

13  5 and 6 that you segregated what is supposedly a -- oh, excuse

14  me; I'm on pro rata.  Let me go back to FIFO.

15          So orient ourselves.  I'm on lines 4 and -- excuse

16  me -- 5 and 6 on this chart.  Is that correct?

17  A.  Correct.

18  Q.  And this is where we see again your division of dirty and

19  clean.  Is that right?

20  A.  Yes.

21  Q.  So under the FIFO method, once again, let me ask you:

22  When we look at that $7 million withdrawal that occurs on

23  line 12, if you had put the clean money before the dirty

24  money, would the result change in this case?

25  A.  So in this case, the 891,000 would be before the

Poelking - cross by Finneran

1  5.5 million?

2  Q.  Yeah.  I'm asking you to assume that you invert the order

3  of lines 5 and 6 so that you would put the -- the clean money

4  in first and assume under FIFO that the withdrawals came from

5  the clean money, would that change the result?

6  A.  Yes, it would have changed it.

7  Q.  Okay.  And looking on the LIFO tab, just to complete the

8  loop on this, likewise under a LIFO approach if we were to

9  assume that the withdrawals came from the last deposit and not

10  the first, then a significant portion here of that withdrawal

11  again would have been funded by nonfraudulent proceeds -- is

12  that correct? -- under this approach, under the LIFO approach?

13          Sorry.  Looking at line 12, there would be about

14  $2 million, $2.1 million that would not be traceable under a

15  LIFO approach.  Is that correct?

16  A.  I would have to go back and do the calculation, but...

17  Q.  I'm sorry.  I'm just asking you to describe the document.

18  I'm looking in this -- this box here, line 12.  Do you follow

19  where my cursor is?

20  A.  Yes.

21  Q.  Okay.  And so according to that box, about 2.1 -- roughly

22  $2.2 million would not be traceable to what you had

23  characterized as the dirty deposits under a LIFO method?

24  A.  Correct.

25  Q.  Okay.  And again, let me just ask it generally for all the

Poelking - cross by Finneran

1  accounts:  Is it the case that -- you did this in several

2  accounts, where you split up dirty and clean.  Is there any

3  reason in one of the accounts where the decision was made to

4  put the clean first and the dirty second or just take one

5  consistent approach throughout?

6  A.  No.  I would have taken a consistent approach.

7  Q.  Okay.

8  A.  Uh-huh.

9  Q.  And just one question while we're on the topic of the

10  Baroda Trust.  I think you said earlier that your

11  understanding is that Mr. Shah would have had control of this

12  account.  Is that correct?

13  A.  So he established the trust, but I know there was a

14  trustee.

15  Q.  Are you aware this is an irrevocable trust?

16  A.  I have the document.  I'd have to go double-check, but...

17  Q.  Okay.  If it was an irrevocable trust, would that

18  not limit Mr. Shah's ability to direct the conduct of that

19  trust?

20  A.  I'm not aware of the legal implications of that.

21  Q.  I think you said on direct examination -- you may have

22  been speaking casually, but I think you said that that would

23  have been done at his direction by the trustee.

24      Do you have any evidence to support the notion that

25  Mr. Shah directed the trustee to make any transfers into or

Poelking - cross by Finneran

1   out of this trust?

2   A.  Based on the documents I have, I do not know.

3   Q.  Okay.

4        MR. FINNERAN:  Okay.  One moment.  I just need to

5   check one thing here.

6   BY MR. FINNERAN:

7   Q.  Okay.  Let's take a moment here to talk about the Pershing

8   accounts.

9   A.  Okay.

10   Q.  So this one here is called Baroda Trust Pershing.  We

11   looked at one earlier that's called Rishi Shah Pershing.  Am I

12   correct that in each of those cases, there was not just one

13   account that was being reviewed?

14   A.  Correct.

15   Q.  So looking now on the far left column, we can see that

16   some of these deposits come from Pershing 7793, some come from

17   Pershing 8007.  Is that correct?

18   A.  Correct.

19   Q.  You have for purposes of your analysis collapsed those

20   accounts together.  Is that correct?

21   A.  Yes.

22   Q.  Why would you do that?

23   A.  There's various transfers between all the accounts, but

24   they are all collectively the Baroda Trust accounts.

25   Q.  Sure.  But even if two accounts transfer money between

Poelking - cross by Finneran

1    each other, in order to trace those funds, don't you have to

2    analyze them separately?

3    A.   I mean, I can break this out on to two different

4    spreadsheets and trace it back and forth, yes.

5    Q.   Have you done that?

6    A.   Not in this case, no.

7    Q.   Okay.  So failing to do that creates the risk that you

8    might ignore transfers that didn't just come between the

9    accounts, but from other accounts.  Is that fair to say?

10   A.   No.  This would have only eliminated the inner Pershing

11   transfers.

12   Q.   Why do you say that?

13   A.   Because that's what I did back when I created the

14   spreadsheet.

15   Q.   I guess I'm not -- maybe you have to explain what you mean

16   by inner Pershing transfers.  I don't understand you.

17   A.   So if the Baroda Trust account ending 7793 transferred

18   money into the Baroda Trust Pershing account ending 8007 and,

19   vice versa, if they transferred back and forth, then I call

20   those like interbank transfers, and I would eliminate those

21   for purposes of this spreadsheet.

22   Q.   When you say "eliminate," you mean disregard in terms of

23   analysis?  You're not deleting the --

24   A.   No.  They --

25   Q.   -- lines out of the --

Poelking - cross by Finneran

1    A.  I mean, they would --

2              THE COURT:  One at a time, please.

3              MR. FINNERAN:  Yeah.

4    BY MR. FINNERAN:

5    Q.  So sorry.

6              My question was:  When you say "eliminate," you just

7    mean disregard for purposes of analysis.  You're not modifying

8    the bank records to delete entries.  Is that correct?

9    A.  No.  I'm just saying they net to zero, so it -- for

10   purposes of this spreadsheet, they're not on here.

11   Q.  Okay.  So when you say "they net to zero," just as

12   accounting talk, what do you mean?

13   A.  That if a transfer is $100 debiting out of one account,

14   it's crediting the other account, it's a net zero.  It adds to

15   zero.

16   Q.  But you didn't do -- make any effort to trace that $100

17   from one account to the next account.  You, instead, combined

18   those analyses together in order to treat them all as one

19   account for purposes of tracing?

20   A.  For this example, yes.

21   Q.  Okay.  And I think you also testified earlier that you did

22   that in some cases because you believe the only source of

23   money in was a fraudulent deposit -- is that correct? -- for

24   Gravitas, I think you testified earlier?

25   A.  Yes.

Poelking - cross by Finneran

1    Q.   That then would also mean that you'd be treating any

2    interest, dividends, distributions, other gains or

3    appreciation on those investments, you'd be treating those as

4    fraudulent as well, wouldn't you?

5    A.   Well, if we're going to take the 225 million example, if

6    that accumulated interest, that interest would be attributable

7    to that 225.

8    Q.   When you say "attributable," you mean traceable?

9    A.   Right, yes.

10   Q.   Okay.  Just to tell you, we're going to disagree with that

11   conclusion legally, but that was your rationale -- is that

12   correct? -- that if it's -- if it's basically coming from

13   interest, dividends, distributions, then you consider that to

14   be also traceable money, and that's been calculated and added

15   into your analysis?

16   A.   Yes.

17   Q.   Okay.  All right.  So is it fair to say that in each of

18   the examples that I've shown you, there was a tracing analysis

19   available to you that is an accepted analysis under standard

20   accounting principles that would have led you to the

21   conclusion that some of the assets in this case were not, in

22   fact, traceable to the fraud?

23   A.   Yes.  There were assets in here that I was not able to

24   trace to the fraud.

25   Q.   I'm sorry.  That's -- my question was not clear.

Poelking - cross by Finneran

1    A.   Okay.

2    Q.   There are a number of assets that you did trace to the

3    fraud, correct?

4    A.   Yes.

5    Q.   Am I correct that at least in some cases that I've shown

6    you this morning -- and I'm not going to do this for two more

7    hours -- some cases I've shown you this morning, there were

8    other methodologies that could have been utilized that would

9    have demonstrated the assets were, in fact, not traceable to

10   the fraud?

11   A.   Correct.  But perhaps there were other assets that I did

12   not attribute to the fraud that then would be captured under a

13   different method.

14   Q.   Sure.  But you haven't done that analysis, have you?

15   A.   No.

16   Q.   And when you say other assets that could be traceable to

17   the fraud, do you have something in mind?

18   A.   No.  Not off the top of my head, no.

19   Q.   Okay.

20   A.   Sorry.

21   Q.   But you would agree with me, then, that under a LIFO

22   approach, sometimes we would have a different result?

23   A.   Yes.

24   Q.   And you would agree with me also that under a FIFO

25   approach, if you simply ordered the deposit, a single deposit,

Poelking - cross by Finneran

1   as being clean first instead of dirty first, or vice versa,

2   that could also affect the result in some cases?

3   A.   Sure, yes.

4   Q.   Do you also agree with me, then, that that analysis is not

5   consistent with giving the defendant the benefit of the doubt?

6   Using a FIFO method I mean.

7   A.   I mean, I just applied that consistently throughout the

8   case.  So...

9   Q.   And that consistent thing you did throughout the case, do

10  you agree with me that it would -- did not -- it's not

11  consistent with giving the defendant the benefit of the doubt?

12  A.   I would have to run the LIFO analysis to see what assets

13  would have popped out of that to know which way would have

14  been more favorable for the defendant, I suppose.

15  Q.   In the examples --

16          THE COURT:  If giving a defendant the benefit of

17  doubt means a lower number, so be it.  But I'm not sure

18  there's a legal concept involved with giving a defendant the

19  benefit of the doubt.  You apply accounting techniques one way

20  or the other, correctly or incorrectly.

21          MR. FINNERAN:  Uh-huh.

22          THE COURT:  I -- certainly applying them consistently

23  is something that's important, but I'm not sure there's any

24  concept in the law about giving the benefit of the doubt to

25  the defendant such as the presumption of innocence.  This is

Poelking - cross by Finneran

 1   strictly accounting.

 2          So I'm -- you keep using that phrase, but I'm not

 3   sure that's tethered to any legal concept.  Consistency for

 4   accounting purposes is.

 5          MR. FINNERAN:  Uh-huh.

 6          THE COURT:  But in a tracing analysis, I'm not sure

 7   the benefit of the doubt -- if the numbers were the reverse,

 8   you wouldn't be giving the benefit of the doubt.  But if it

 9   was proper accountingwise, it doesn't matter.  So I'm --

10          MR. FINNERAN:  I --

11          THE COURT:  Go ahead and proceed.  You can address

12   this in closings or in your briefs, but I'm not --

13          MR. FINNERAN:  Not persuaded yet.

14          THE COURT:  Well, it's not even a matter of

15   persuasion.  I'm not sure it applies in an accounting

16   analysis.

17          MR. FINNERAN:  May I respond, Your Honor, or would

18   you like me to proceed?

19          THE COURT:  Briefly.

20          MR. FINNERAN:  Very briefly.  So first of all, the

21   witness has testified that her training did train her to give

22   the defendant the benefit of the doubt.  So partly this is

23   just impeachment of whether or not the -- that that was done.

24          THE COURT:  Okay.

25          MR. FINNERAN:  But secondly, as I'm about to

Poelking - cross by Finneran

1    inquire -- well, can I just inquire, and then we'll go back to

2    this?

3            THE COURT:  Yes.

4    BY MR. FINNERAN:

5    Q.  So this may take a second.  But are you aware that, at the

6    very least in a hearing such as this, the government must

7    prove beyond -- excuse me -- by a preponderance of the

8    evidence that a particular asset is derived from fraud in

9    order for them to find that it is traceable and, therefore,

10   subject to forfeiture as directly traceable property?

11           I know, of course, there's substitute property.  I'm

12   not asking about that.  Just in terms of demonstrating that

13   something is traceable, are you aware that that must be

14   demonstrated by the government by a preponderance of the

15   evidence?

16           MR. APPLEBY-BHATTACHARJEE:  Objection.  Relevance.

17           THE COURT:  Well, she sat through the opening.  But

18   she can answer.

19   BY MR. FINNERAN:

20   Q.  Okay.  Please answer.

21   A.  Yeah.  I was going to say in Mr. Madden's opening, he did

22   say that.

23   Q.  Okay.  And -- and -- but you're -- okay.

24           Were you aware of it before that?

25   A.  Vague -- yes.

Poelking - cross by Finneran

1    Q.  Okay.  So your training has told you that in order for you

2    to be successful in your efforts to trace assets, you must

3    meet at least that standard.

4    A.  Yes.

5    Q.  Is that fair to say?

6    A.  Yes.

7    Q.  I won't get into whether or not that's the right standard.

8    Let's assume that's the right standard.

9           Would you agree with me that if there are two

10   different methodologies, both accepted accounting

11   methodologies, one of which would indicate that property is

12   subject to forfeiture and one which would indicate that it's

13   not, would you agree with me that it's not more likely than

14   not that that asset is subject to forfeiture?

15          MR. APPLEBY-BHATTACHARJEE:  Objection.

16          THE COURT:  Sustained.

17   BY MR. FINNERAN:

18   Q.  Okay.  One moment.

19          THE COURT:  I determine that, not her.

20          MR. FINNERAN:  I'm sorry?

21          THE COURT:  I determine that, not her.

22          MR. FINNERAN:  Fair enough.

23          THE COURT:  That's the basis of my ruling.  If

24   there's --

25          MR. FINNERAN:  No, I understand.

Poelking - cross by Finneran

1          THE COURT:  Okay.  Fair enough.

2          MR. FINNERAN:  I'm trying to ask in a way that avoids

3   a legal standard since this is not a legal expert.  So give me

4   a moment.

5          THE COURT:  I'm not sure you get that through a

6   witness.  You get that through argument.

7          MR. FINNERAN:  Yeah, I'm thinking.  I'm -- I don't

8   think I have it right now, but I will try.  But I may just

9   move on.

10         THE COURT:  Okay.

11         MR. FINNERAN:  Okay.  Although I do intend to argue

12  that.

13  BY MR. FINNERAN:

14  Q.  All right.  Ms. Poelking, am I correct that you testified

15  in the grand jury in this case?

16  A.  Yes.

17  Q.  And am I correct that your purpose in so testifying was to

18  establish probable cause to believe that these assets that are

19  listed in the indictment were subject to forfeiture?

20  A.  Yes.

21  Q.  And you may or may not be aware of this, but are you aware

22  that including such assets specifically and obtaining a

23  grand jury finding on those assets allows a court to then

24  issue a protective order or a restraining order to prevent the

25  defendant from using those funds in a pretrial setting?

Poelking - cross by Finneran

1     MR. APPLEBY-BHATTACHARJEE:  Objection.  Relevance.

2     THE COURT:  Overruled.

3 BY MR. FINNERAN:

4 Q.  Okay.

5     THE COURT:  Go ahead.  You can answer if you know.

6 BY MR. FINNERAN:

7 Q.  If you know.

8 A.  Yeah.  I mean, I just know what happened in this case,

9 that that is what happened.  But not necessarily before I went

10 in the grand jury, no, I didn't.

11 Q.  Okay.  And you're aware that the protective -- as you just

12 said, a protective order was issued in this case?

13 A.  Yes.

14 Q.  Are you aware that that was based upon deference to the

15 grand jury's determination of probable cause, that -- if

16 you're not aware, that's fine.  I'm just --

17 A.  Yeah, I don't -- I don't know.

18 Q.  I'd now like to show you the government's exhibits again.

19 This is Exhibit 1029.  So let me show you -- we'll focus on

20 the one that -- or we'll focus on the last page, which I

21 think -- whoops.  What happened?

22     Okay.  We looked at this a little bit earlier, but

23 now I'm showing you the third page.  Do you recognize this as

24 the third page of Grand Jury Exhibit 1029?

25 A.  Yes.

Case: 1:19-cr-00864 Document #: 480 Filed: 07/05/23 Page 134 of 230 PageID #:5636
Poelking - cross by Finneran
134

1   Q.  Okay.  Are you aware that the government lacks the power

2   under the law to restrain assets pretrial if they are not

3   traceable to a fraud --

4           MR. APPLEBY-BHATTACHARJEE:  Objection.

5   BY MR. FINNERAN:

6   Q.  -- or a crime?

7           THE COURT:  Sustained.

8           Again, that's an argument you can make.

9           MR. FINNERAN:  I understand.

10          THE COURT:  Not this witness.  Not your witness

11  either.

12          MR. FINNERAN:  No, I know.

13  BY MR. FINNERAN:

14  Q.  So do you agree with me that -- let's start here.

15          Do you agree with me that the only amounts that you

16  traced to the fraud are amounts that are listed in this column

17  "amount traceable to criminal proceeds" on Grand Jury

18  Exhibit -- I've lost the number -- 1029?

19  A.  Correct.

20  Q.  And is it also fair to say, then, that if funds were

21  restrained in excess of that amount, that was not based upon

22  your tracing analysis?  Is that fair to say?

23  A.  So these were the funds that I was able to trace.

24  Q.  Yeah.  In other words -- I think maybe you've answered it.

25          But if there were other funds restrained, you did not

Poelking - cross by Finneran

1    do some additional tracing analysis that we're not seeing

2    reflected here that might have permitted the restraint of

3    those funds.  Is that correct?

4    A.   Yeah.  This is the tracing that I did.

5    Q.   Okay.  I think I may have an objection, but I'm going to

6    ask the question anyway.

7              Are you aware that a defendant --

8              THE COURT:  Not a good way to start a question.

9              MR. FINNERAN:  Well, you know, I have to say it or

10   else I won't have it on appeal.

11             THE COURT:  Fair enough.

12             MR. FINNERAN:  So, Your Honor -- excuse me.

13   BY MR. FINNERAN:

14   Q.   Ms. Poelking, are you aware that Mr. Shah has a right

15   under the Sixth Amendment of the Constitution to counsel of

16   choice?

17             MR. APPLEBY-BHATTACHARJEE:  Objection.

18             THE COURT:  Sustained.

19             MR. FINNERAN:  Okay.

20   BY MR. FINNERAN:

21   Q.   Were you aware at any point prior to today's hearing that

22   funds that were not traced by you into many of these assets

23   had been restrained by the Court in this case?

24   A.   I don't believe so, no.

25   Q.   Okay.  Were you -- well, I guess I can ask you the

Poelking - cross by Finneran

1  question here.  Let me -- maybe you don't recognize it, and I

2  will just skip it with you.

3          This is Exhibit Shah Forfeiture 9022 -- oh,

4  excuse me; I'm sorry.  This is Exhibit Shah Forfeitures 9023.

5          Do you see this document?

6  A.  I do.

7  Q.  Okay.  And is this a document you prepared?  It's an

8  excerpt from that document?

9  A.  Yeah.  I mean, it looks like a draft version of something,

10  but yes.

11  Q.  Yeah.  And so let's just talk about what these columns

12  reflect.  What does each column reflect?

13  A.  The asset that we were able to identify being purchased

14  with the funds.  The value of funds sent from bank accounts is

15  exactly what I saw coming from the bank accounts.  And then

16  current value I believe would have been based on subpoena

17  returns that we received.

18  Q.  And I'll represent to you this was the attachment to the

19  email we looked at earlier where you said that that 7wire

20  amount was highlighted in yellow because not all of it was

21  traceable.  Do you recall that email?

22  A.  Yes.

23  Q.  Okay.  And so is it fair to say that your analysis would

24  permit the restraint of all the money in the green column, as

25  well as the yellow amount, but only $280,000 of it?

Poelking - cross by Finneran

137

1    A.   So the amount in that middle column that's highlighted

2    green --

3    Q.   Uh-huh.

4    A.   -- was the value when the funds were transferred, but I

5    believe that the current value column is what that investment

6    was worth at the time that we received the returns.

7    Q.   Now, when you say "that investment," do you mean -- so

8    let's take Eight Partners as an example.  When you say that

9    $30,000 was the value sent and that $280,000 was the current

10   value, is it your testimony that your understanding was that

11   all of that 283 was traceable to the 30,000 in some way?

12   A.   I would have to go back and look at the spreadsheet

13   because I honestly can't remember if the 283 was the 30,000,

14   whether that appreciated to or if there was multiple

15   transactions that would have fed into that 283.  I can't say.

16   Q.   Okay.  Fair enough.

17            Isn't it true, based upon your review of the subpoena

18   returns that we just discussed, that each of these entities

19   received capital contributions or investments that are in

20   excess of the amount on the value column?

21   A.   I don't know that each of them received additional funds

22   that were not traceable, no.

23   Q.   Are you aware that at least some entities did receive

24   additional funds that were not traceable among the entities

25   that were restrained in this case?

Poelking - cross by Finneran

1    A.   Yes.

2    Q.   All right.  Now I'm going to show you what's Exhibit Shah

3    Forfeiture 9024.  And you may not have seen this, so let me

4    ask you that question first.

5         Are you aware that yesterday, Guild Capital produced

6    a chart to myself and to my counsel on the other side

7    reflecting the capital contributions and value of the

8    investments in Guild Capital?

9    A.   I know you mentioned that in your opening.  But prior to

10   that, no, I didn't know.  I did not.

11   Q.   You were not aware of it before that?

12   A.   No.

13   Q.   Okay.  Well, this is in evidence.  Let me just ask you a

14   couple of questions about what it means to you.

15        You can see here that this -- and I'll -- just for

16   the record, I'll say the title at the top is mine.  So Guild

17   Capital account values as of December 2022, that's my header.

18   But everything below that is information produced by Guild

19   Capital.  Do you understand?

20   A.   Okay.  Yeah.

21   Q.   Okay.  So if we look at the header, it says:  Invested

22   capital and estimated unrealized value in investments.

23        Did I read that correctly?

24   A.   Yes.

25   Q.   So then looking at the amount column, would you understand

1    that to be a reflection of the amount invested into each of

2    the assets listed in the liability column?

3    A.  I wouldn't be able to say since I didn't create this

4    chart.

5    Q.  Okay.  Fair enough.

6              Are you aware of what Guild Capital is?

7    A.  It's been a while since I looked at the subpoena

8    productions, so --

9    Q.  Okay.

10   A.  -- no.

11   Q.  So is it fair, though, in -- in -- in most of the other

12   situations in this case, there was a capital contribution or

13   investment made into a particular entity and then that entity

14   is what the government sought to forfeit?  Is that correct?

15   Excuse me.  The interest in that entity is what the government

16   sought to forfeit?

17   A.  So if we saw $50,000 going to Guild Capital, then we

18   sought to forfeit that $50,000 interest.

19   Q.  Okay.  Is it your understanding that Guild Capital is --

20   is the entity into which that investment was made?

21   A.  That was where the funds were transferred from the bank

22   accounts.

23   Q.  Right.  But as this chart reflects -- and I know you

24   haven't seen it before, that's your testimony -- and as Shah

25   Exhibit 9025 indicates, Guild Capital took that money and then

Poelking - cross by Finneran

1  invested it into a particular entity.  Isn't that right?

2  A.  I couldn't say.

3  Q.  You don't recall that from your review of the subpoena

4  returns from Guild Capital?

5  A.  I would have to go back and review them.  But yes, I'm

6  sure they -- they might have used it to invest in these other

7  companies.

8  Q.  Right.  And so to complete a tracing analysis of any money

9  that went to Guild Capital, wouldn't you have to trace to the

10  actual investment that was made with the money and not just to

11  the person who received the money in order to make the

12  investment?

13          THE COURT:  Well, doesn't the trace start with where

14  the proceeds were illegally obtained?

15          MR. FINNERAN:  Yes, sir.

16          THE COURT:  And is it your position, then, that

17  you've got to follow that money to the very end and it can't

18  be traced at least to a -- from the -- where it started

19  illegally --

20          MR. FINNERAN:  Uh-huh.

21          THE COURT:  -- goes to an entity, and then that

22  entity sends it to somebody else --

23          MR. FINNERAN:  Uh-huh.

24          THE COURT:  -- is it -- is it your position it's

25  improper for the government to take it from that first entity

Poelking - cross by Finneran

1    if it's there?

2              MR. FINNERAN:  I -- that's -- actually, the

3    government could do that.  I'm not saying the government is

4    doing that in this case.

5              Here's what I'm trying to say, maybe that'll help

6    clarify the question for the witness as well.

7              THE COURT:  Okay.

8              MR. FINNERAN:  So multiple different amounts of money

9    were sent to Guild Capital.  Not all of those are traceable to

10   the fraud by the witness's own testimony.  Guild Capital is

11   not an investment.  It's a company that makes investments into

12   other companies.  So my position is that if Ms. Poelking had

13   actually traced the money to a particular investment that was

14   made, then that would be fine.  But what has happened is she

15   simply stopped at Guild Capital and didn't follow the money to

16   any of those particular entities when there were other

17   investments that were made, many as we saw in the prior email,

18   in 2015 and 2013 prior to the fraud, that were made in

19   specific entities and yet the government has sought to

20   restrain all of these entities under the protective order.

21             And still today, in its new order, is asking to

22   forfeit $475,000 from Guild Capital entities without any

23   specification as to which entities those funds eventually were

24   transferred to.

25             THE COURT:  Okay.

Poelking - cross by Finneran

142

1   BY MR. FINNERAN:

2   Q.   That probably gives away part of my questioning, but do

3   you understand what I just said?  Is it your understanding

4   that you did not -- once you got to Guild Capital, did you do

5   any tracing after that to trace any particular fraudulent

6   transfer to any particular entity into which Guild Capital

7   made investments -- excuse me -- into which, yes, Guild

8   Capital then made investments?

9   A.   So I would have to go back and look at the production.

10  But I don't know that we had a way to know -- say the 475 went

11  to Guild Capital, I don't know that I could tell how it was

12  broken out from there.

13  Q.   Okay.  But you were aware that there had been other

14  investments made through Guild Capital that were not traceable

15  to the fraud, weren't you?

16  A.   Correct.

17        MR. FINNERAN:  I've got one more question,

18  Your Honor, that I just want to establish the record here.

19  BY MR. FINNERAN:

20  Q.   Are you aware of the settlement that Mr. Shah reached with

21  the investors in this case?

22  A.   No.

23  Q.   You have no awareness of that?

24  A.   I don't believe so.

25  Q.   Okay.  Fair enough.

Poelking - redirect by Appleby-Bhattacharjee

1        MR. FINNERAN:  If I can confer with my cocounsel?

2        THE COURT:  Sure.

3   (Counsel conferring.)

4        MR. FINNERAN:  Your Honor, I have no further

5  questions for the witness at this time and I tender her for

6  redirect.

7        THE COURT:  All right.

8        Redirect examination.

9        MR. APPLEBY-BHATTACHARJEE:  Thank you, Your Honor.

10          REDIRECT EXAMINATION

11  BY MR. APPLEBY-BHATTACHARJEE:

12  Q.  Hi, again, Ms. Poelking.  You were asked a number of

13  questions on cross-examination about performing an analysis

14  for the benefit of the doubt of the defendant.

15        Do you recall that line of questioning?

16  A.  I do, yeah.

17  Q.  Is it consistent with your practice to use FIFO for some

18  assets and LIFO for other assets?

19  A.  No.

20  Q.  Do you use the same methodology across all assets?

21  A.  I do.

22  Q.  Why do you do that?

23  A.  To keep it consistent.  It wouldn't make sense to switch

24  the methods on different assets.

25  Q.  And sitting here today, without speculating, can you tell

Poelking - redirect by Appleby-Bhattacharjee

1    if you went from FIFO for specific assets to LIFO or, vice

2    versa, whether the amount of forfeitable assets you would have

3    traced could have been greater?

4    A.   It could have been, yes.  I would have rerun the analysis.

5    Q.   And again, without speculating, can you tell if you had

6    used a different accounting methodology asset by asset whether

7    the total assets that you traced would have been lesser in

8    total value than what you have testified to in court today?

9    A.   Right, it's hard to say.  It could've gone either way.

10   Q.   You were asked some questions about assets restrained

11   based on your tracing.  Do you recall that?

12   A.   Yes.

13   Q.   Do you know on an asset-by-asset basis how many of those

14   assets were liquid at the time they were restrained?

15   A.   No.

16   Q.   Now, on the topic of the $30.2 million deposit into Shah's

17   bank account ending in 9002, we saw one of your work papers at

18   Shah Forfeiture Exhibit 9028 that focused just on that

19   account.  Do you recall that?

20   A.   Yes.

21   Q.   And that account started with a zero balance.  Is that

22   right?

23   A.   Correct.

24   Q.   And on or about April 8, 2016, there was an approximately

25   $30.2 million deposit.  Is that right?

1    A.   Yes.

2    Q.   And in that work paper, Exhibit 9028, you categorize the

3    entire amount as proceeds of fraud.  Is that right?

4    A.   Yes.

5    Q.   And why did you do that?

6    A.   Because we had established that the 30.2 dividend was a

7    result of the April 2016 bank loan received.

8    Q.   And in making that conclusion, did you rely, among other

9    things, on records like the email in Exhibit 571 with the --

10   the memo regarding the dividend distribution to Mr. Shah?

11   A.   Yes.

12             MR. APPLEBY-BHATTACHARJEE:  May I have a moment?

13             THE COURT:  Yes.

14      (Counsel conferring.)

15             MR. APPLEBY-BHATTACHARJEE:  Nothing further.

16             THE COURT:  Any additional questions?

17             MR. FINNERAN:  Yes, Your Honor.  I have a short

18   recross.

19             THE COURT:  Go ahead.

20                       RECROSS-EXAMINATION

21   BY MR. FINNERAN:

22   Q.   Ms. Poelking --

23   A.   Hi.

24   Q.   -- on redirect just now, you just testified you used a

25   consistent method throughout your analysis.  Is that correct?

Poelking - recross by Finneran

1    A.   Yes.

2    Q.   Didn't we see an example during your cross-examination of

3    where you didn't do that with respect to the $30 million

4    dividend?

5    A.   The 30 million has been established as part of the

6    April 2016 loan.

7    Q.   Well, I understand that.  But you did a FIFO analysis of

8    that deposit in this case, did you not?

9    A.   If you start with the ContextMedia account using the FIFO

10   method, yes, 27 million would be attributable to the fraud.

11   But from the Rishi Shah bank account that received the funds

12   that started with the zero dollar balance, the $30 million we

13   have established is part of the fraud.

14   Q.   Well, the judge will decide whether you established or

15   not.

16   A.   Okay.

17   Q.   But you have said that under your own analysis, under a

18   FIFO, that only 27 million would be.  Is that right?

19   A.   The ContextMedia account did have 3 million in it prior to

20   making that transfer.

21   Q.   And to answer my question, that means that under a FIFO

22   analysis, only 27 million would be traceable.

23   A.   Sure, yes.

24   Q.   Okay.  I'm going to now show you again Government

25   Exhibit 1031.

Case: 1:19-cr-00864 Document #: 480 Filed: 07/05/23 Page 147 of 230 PageID #:5649
Poelking - recross by Finneran
147

1        You recognize this, of course?

2    A.  Yes.

3    Q.  So the government has not sought to forfeit $27 million

4    from Chase 9002, has it?

5    A.  No.  We identified specific assets, correct.

6    Q.  Correct.  In other words, when we go down this chart from

7    9002 to the bottom of the chart, all of that depends on the

8    assumption that $30 million is traceable to the crime, right?

9    A.  Yes.

10   Q.  And that is only true if you use a LIFO approach.  Isn't

11   that right?

12   A.  Starting with the Rishi Shah Chase 9002 account, using

13   FIFO or LIFO, the $30.2 million would be attributable to the

14   fraud.

15   Q.  I thought we just established that under FIFO on the

16   spreadsheet that we looked at together -- I can bring it up if

17   I have to -- you could only trace 27 million to the fraud

18   because 3 million was in the account prior to that deposit.

19   A.  If we start with the ContextMedia account, there was

20   3 million in the account.  But if we start with the Rishi Shah

21   account, the $30.2 million was attributable to the dividend.

22   Q.  Okay.  I'm sorry.  I guess we have to go back to look at

23   this.

24          So here's 9002.  You marked the 30 million debited as

25   all being fraud on your LIFO tab and showing this on your FIFO

Poelking - recross by Finneran

1    tab, correct?

2    A.   Correct.  And if I had a chart that started just with the

3    Rishi Shah account, then the 30 million would be all

4    attributable to the fraud.

5    Q.   But the only reason to believe that the 30 million is

6    traceable -- well, let me not ask that question.

7              MR. FINNERAN:  Withdrawn.

8    BY MR. FINNERAN:

9    Q.   We looked at this spreadsheet -- sorry -- where we

10   established that under a FIFO method -- oh, sorry; I shouldn't

11   have gone away -- I'm highlighting the cell on the screen.

12             Do you recognize this to be the exhibit we introduced

13   earlier reflecting the 7426 account?

14             MR. APPLEBY-BHATTACHARJEE:  Counsel, I think you need

15   to drag that over.

16             MR. FINNERAN:  Oh, you're right.  It's on the wrong

17   screen.  Sorry.  Thank you very much.

18   BY MR. FINNERAN:

19   Q.   Okay.  And the zoom is now messed up, so let me zoom out.

20             Okay.  So again looking at line 2581, this is on your

21   FIFO tab in the account reflecting 7426, doesn't this show

22   that under a FIFO approach only 27 million is traceable?

23   A.   In the ContextMedia account, using the FIFO method, yes,

24   the 27.

25   Q.   And under a LIFO method, the entire amount would be

Poelking - recross by Finneran

1   traceable, correct?

2          I've got that on the screen here.  It shows the

3   30 million would be traceable under a LIFO method.

4   A.  Based on this spreadsheet, yes.

5   Q.  Right.  And so you testified earlier it would be important

6   to use a consistent method throughout one tracing analysis.

7          Did you use the LIFO method to trace the money from

8   9012 to 955 to the Pershing accounts and then to Baroda Trust?

9   Or did you use a FIFO method?

10  A.  The FIFO method.

11  Q.  Well, so that's inconsistent with the method you used to

12  determine the 30 million was traceable, which is a LIFO

13  method, right?

14  A.  The 30 million was the dividend that he received based on

15  the April 2016 loan, so that is attributable to the fraud.

16  Q.  Under the LIFO method?

17  A.  Under the FIFO method in that Rishi Shah Chase 9002

18  account.

19  Q.  Under the FIFO method you're saying, then?

20  A.  If you pull up the Chase 9002 account, it has a $0 balance

21  prior to the $30.2 million.

22  Q.  In the Rishi Shah account, correct?

23  A.  Yes.

24  Q.  Right.  But in the ContextMedia account which you just

25  looked at, that $30 million transfer, under a FIFO approach,

Poelking - recross by Finneran

1   only $27 million of that can be attributed to the fraud

2   because there were $3 million of funds in the ContextMedia

3   account before that transfer, right?

4          Maybe this might help.  I know you have an email that

5   shows that this money came into the account and it was

6   considered a dividend, right?

7   A.  Yes.

8   Q.  You're aware of that email?

9   A.  Yes.

10  Q.  To then assume that the next transfer out of the account

11  constituted that $30 million, that is using a LIFO approach,

12  right?  It is assuming that the most recent deposit is the one

13  that left the account, right?

14  A.  But would you agree that in the Rishi Shah Chase account,

15  the very first deposit is that $30.2 million?

16  Q.  Yes.  And under a LIFO approach, as your chart shows us,

17  you can consider that all to be fraudulent proceeds.  Under a

18  FIFO approach, you cannot.

19         So my question to you is:  Do you agree that the only

20  way to determine or -- or submit to this Court that the

21  entirety of that 30 million deposit that goes into one account

22  and goes into the next one all came from the fraud and not the

23  $3 million that was sitting in the account before, you have to

24  assume a LIFO approach, that the most recent deposit is what

25  then left the account as we -- was used to fund the next

Poelking - recross by Finneran

1  transaction?

2  A.  He could not have received the $30 million without that

3  loan as there was only 3 million in the account.

4  Q.  I'm not sure you answered my question.  Could you answer

5  my question?

6  A.  Can you repeat it?

7  Q.  I'll try.

8       So that would be true under a LIFO method, correct?

9  If we assume that the money that just came into the account is

10  the money that just left the account, then all $30 million

11  would be considered fraud for the next transaction you

12  analyze, right?

13  A.  Yes.

14  Q.  Okay.  Under a FIFO method, though, that would not be the

15  case.  You would have to assume, instead, the older money in

16  the account, the $3 million balance, partly funded that

17  $30 million transfer, correct?

18  A.  Sure, yes.

19  Q.  So then when you consistently use the same approach in the

20  future accounts, should you not have used the LIFO approach

21  and not the FIFO to continue your tracing?

22  A.  I used the FIFO method throughout.

23  Q.  What should you have done?  What is the appropriate way to

24  do it?

25  A.  I just chose one method, and I stuck with it, the FIFO

Case: 1:19-cr-00864 Document #: 480 Filed: 07/05/23 Page 152 of 230 PageID #:5654
Poelking - recross by Finneran
152

1    method.

2    Q.  I think we've got the point.  I'll just ask one more

3    question.

4           You cannot, using the FIFO method, trace all

5    $30 million of that deposit to the fraud.  You can only trace,

6    as this exhibit demonstrates on line 2581, $27 million.  Isn't

7    that right?

8           MR. APPLEBY-BHATTACHARJEE:  Asked and answered.

9           MR. FINNERAN:  If you're satisfied, Your Honor,

10   I'll --

11          THE COURT:  I've -- yeah, I'm the fact finder.  I'm

12   satisfied.

13          MR. FINNERAN:  Okay.

14          THE COURT:  Remember recross is limited to redirect.

15          MR. FINNERAN:  I think I stood on one point the whole

16   time, but I'm done, Your Honor.  That's it.

17          THE COURT:  All right.  Any additional questions?

18          MR. APPLEBY-BHATTACHARJEE:  No, Your Honor.

19          THE COURT:  All right.  Ms. Poelking, you're excused.

20   Thank you.

21     (Witness excused.)

22          THE COURT:  Okay.  Any additional witnesses by the

23   government?

24          MR. MADDEN:  No, Your Honor.

25          THE COURT:  All right.  Defense has a witness,

Poelking - recross by Finneran

1    correct?

2         MR. FINNERAN:  Yes, Your Honor.

3         THE COURT:  All right.  Why don't we get through his

4    direct.  We'll take a shorter lunch break than normal, but I'm

5    not going to -- we'll see.  How long do you expect your direct

6    to be?  Just sit down and speak into the mic.

7         MR. FINNERAN:  Your Honor, I think if we could take a

8    short break, I might be able to cut some things out of my

9    direct because we covered them with Ms. Poelking.

10        THE COURT:  That's fine.

11        MR. FINNERAN:  She answered in a way I credit her for

12   being forthcoming about it, so I may -- I may try to cut some

13   of that out and see if we can speed it up, so if we could take

14   a short break.

15        THE COURT:  All right.  Off the record.

16     (Off-the-record discussion.)

17     (A recess was had from 12:13 p.m. to 12:36 p.m.)

18        THE COURT:  Call your next witness -- or your first

19   witness.

20        MR. FINNERAN:  Yes, Your Honor.  The defense calls

21   Ron Braver to the stand.

22        THE COURT:  All right.  Come on up here, sir.

23        Please raise your right hand.

24     (The witness is sworn.)

25        THE WITNESS:  So help me God.

Braver - direct by Finneran

154

1          THE COURT:  All right.

2          You may proceed.

3          MR. FINNERAN:  Thank you, Your Honor.

4      RONALD H. BRAVER, DEFENDANT'S WITNESS, DULY SWORN

5                    DIRECT EXAMINATION

6    BY MR. FINNERAN:

7    Q.   Mr. Braver, first I noticed that you walked up with

8    something to the stand.  Is that just a paper copy of the

9    exhibits we're going over?

10   A.   Yes.  Yeah.

11   Q.   Mr. Braver, would you please state your name and

12   occupation for the record, please.

13   A.   My name is Ron Braver.  I'm a forensic accountant.  I'm a

14   partner in a firm called HKA Global, Inc.

15   Q.   And can you tell us a little bit about your educational

16   background, please.

17   A.   Sure.  I have BS in -- a bachelor of science in accounting

18   and a master's in taxation.

19   Q.   Where is your bachelor's from?

20   A.   Northeast Missouri State.  It's Truman State now.

21   Q.   And where is your master's from?

22   A.   DePaul University.

23   Q.   Are you a certified public accountant?

24   A.   I am.

25   Q.   And how long have you held that distinction, roughly?

Braver - direct by Finneran

1   A.   Since 1985.  I've been licensed since 2010.

2   Q.   Are you a certified fraud examiner?

3   A.   I am.

4   Q.   How long have you held that distinction, roughly?

5   A.   Around 2009.

6   Q.   Are you a licensed private detective?

7   A.   I am.  Illinois --

8   Q.   How long --

9   A.   -- Illinois licensed private detective.

10  Q.   How long have you held that distinction?

11  A.   Around 2010, 2011.

12  Q.   Are you a member of any professional organizations?

13  A.   Yes.  I'm a member of the American Institute of Certified

14  Public Accountants and Association of Certified Fraud

15  Examiners.

16  Q.   In the course of your career, have you received

17  specialized training in the area of asset tracing?

18  A.   I have.

19  Q.   And when and how did you receive that training?

20  A.   I started my career with the IRS as a revenue agent in

21  1984.  In September of 1985, I became a special agent and

22  began -- had six months of training or five to six months of

23  training in Glynco, Georgia.  I worked as a special agent

24  through 2007 and became a supervisory special agent until I

25  retired in 2010 from the IRS.

Braver - direct by Finneran

1   Q.  And in the course of that service, did you receive

2   training in asset tracing?

3   A.  I did.  I had a number of investigations; I had a number

4   of training; we had annual training.  And I was also an

5   on-the-job instructor where I instructed newer agents on --

6   on -- on the subject of asset tracing.

7   Q.  How long, all told, were you employed by the

8   U.S. Government?

9   A.  25 years.

10  Q.  And what titles did you hold over the course of that time?

11  A.  Revenue agent, special agent, and supervisory special

12  agent.

13  Q.  As part of your experience as -- now I'm not talking about

14  your training, but your actual experience -- did you conduct

15  asset tracing investigations in criminal and civil

16  investigations?

17  A.  Yes.  I started my career in the drug task force for the

18  first five years.  Then to -- at failed banks and savings and

19  loans, failure of various banks.  And then I was involved in

20  Operation Silver Shovel, which was the -- well, political

21  corruption.  And I had an organized crime case after that and

22  then significant financial crimes, where I ended my career.

23  Q.  In the course of your experience, did you have occasion to

24  perform tracing analyses in each of those different

25  departments or specialties you worked in?

Braver - direct by Finneran

1    A.   Yes.  I swore out a number of affidavits for seizure

2    warrants and complaints for -- for the seizure and forfeiture

3    of assets.

4    Q.   Did you also have experience testifying in court on behalf

5    of the government?

6    A.   I have.

7    Q.   And just tell us a little bit about that.

8    A.   In a number of trials and also in an asset forfeiture case

9    as well.

10   Q.   In the course of your investigations of financial tracing

11   for the government, were there some situations or maybe many

12   situations where you were able to successfully trace assets

13   and thereby obtain their forfeiture?

14   A.   Yes.

15   Q.   Were there other cases where, based upon your analysis,

16   you were not able to connect particular assets to a crime and

17   thereby not obtain their forfeiture?

18   A.   Yes.

19   Q.   So when did you leave the government?

20   A.   I left in 2010, September 2010.

21   Q.   So you've spent roughly 13 years in private practice.  Is

22   that fair?

23   A.   Correct.

24   Q.   In that time, what kind of work have you done?

25   A.   Forensic accounting investigations, first with

Braver - direct by Finneran

1  Grant Thornton, an international accounting firm, then I had

2  my own firm for ten years, then I recently joined HKA about a

3  year and a half ago.

4  Q.  In that capacity in your private sector work, have you

5  testified in court?

6  A.  I have, a number of times.

7  Q.  And have that -- has that included forensic tracing or

8  accounting analysis?

9  A.  Yes.

10  Q.  What specific areas of expertise would you say you have

11  that are relevant to the issues in today's case?

12  A.  Tracing assets, forfeiture experience, you know,

13  performing various analysis on bank accounts and, you know,

14  following the money.  Always following the money.

15  Q.  Is it correct that you have been retained by my law firm

16  in this case?

17  A.  Yes.

18  Q.  And how recently did that occur?

19  A.  A little over a week ago.

20  Q.  Okay.  So fair to say that you've had to do a lot of work

21  in the last week to get up to speed in the case?

22  A.  Yes.

23  Q.  And this probably goes without saying, Mr. Braver, but

24  though you've been retained by Mr. Shah, has the fact that

25  Mr. Shah is your -- excuse me -- by me, and Mr. Shah is my

Braver - direct by Finneran

1  client, is the fact -- is that fact something that will color

2  your testimony today in terms of your analysis of these

3  accounts?

4  A.  No.  Trying to follow the money and -- and to give

5  truthful testimony.

6  Q.  Thank you.

7         So let's talk a little about, then, what you reviewed

8  in the course of the last week to prepare yourself for today.

9  Did you review the superseding indictment in this case?

10  A.  I did.

11  Q.  Did you review the protective order in this case?

12  A.  I did.

13  Q.  I'm not sure if you got the final one.  Did you review

14  draft versions of the motion for preliminary order of

15  forfeiture in this case?

16  A.  Just the drafts.

17  Q.  Not the -- not the final?

18  A.  Not the final.

19  Q.  What about the draft agreed preliminary order of

20  forfeiture?

21  A.  I don't believe so.

22  Q.  Okay.  We didn't get that.

23         Did you review the grand jury transcript for the

24  witness we heard from earlier, Megan Poelking?

25  A.  I did.

Braver - direct by Finneran

1    Q.  Did you review a forfeiture production that the government

2    provided on May 19, 2023?

3    A.  I did.

4    Q.  Did you also review a series of tracing documents that

5    appear to have been prepared by Ms. Poelking?

6    A.  I did.

7    Q.  And is it your understanding that those documents were

8    contained in a Jencks production that was provided by the

9    government?

10   A.  That's my understanding.

11   Q.  Is it also your understanding that that production

12   occurred on or about March 19, 2023?

13   A.  My understanding, it was before trial.

14   Q.  Okay.  Before trial?

15   A.  Right.

16   Q.  Do you know if it was -- maybe you don't know.

17          Was it immediately before trial or in the midst of

18   trial?  Or do you have any recollection?

19   A.  I don't -- I remember somebody mentioning it today in

20   court, in March of --

21   Q.  I'm sure we can establish that in some other way, so no

22   worries.

23          Did you also review some relevant case law that had

24   been provided to you by myself and my associate?

25   A.  Yes.

Braver - direct by Finneran

1   Q.   Can you describe what that case was?

2   A.   *U.S. v. Conrad Black*, et al.

3   Q.   And what was your familiarity with that case?

4   A.   I was a special agent for the IRS on that case.

5   Q.   And did you review a decision by then-district court Judge

6   Amy St. Eve in that case?

7   A.   I did.

8   Q.   And do you recall in that case that Judge St. Eve found

9   that certain assets were not traceable to a criminal -- a

10  crime because the government had not presented sufficient

11  evidence to establish it?

12  A.   Correct.

13  Q.   Okay.  So we're going to go through in some detail your

14  analysis.  But to help orient the Court, I'd like to first go

15  over what I believe your conclusions are in this case.  And if

16  I misstate something, please correct me.

17          So first of all, did you reach conclusions in this

18  case?

19  A.   I did.

20  Q.   Okay.  Is it one of your conclusions that the government

21  has provided insufficient evidence for at least --

22          MR. MADDEN:  Objection.  Leading.

23          THE COURT:  Overruled.  I mean, these are --

24          MR. FINNERAN:  Preliminary.

25          THE COURT:  They're preliminary.  And it would be

Braver - direct by Finneran

1    leading if you're getting into why he reached these

2    conclusions, but you can lead him on the conclusions.

3         MR. FINNERAN:  I'm asking if they're a conclusion or

4    not.  So again, if I misspeak, please tell me.

5    BY MR. FINNERAN:

6    Q.  Is one of your conclusions that the government has not

7    provided sufficient evidence to link many of the items in this

8    case to the alleged fraudulent funds?

9    A.  I'm missing a number of source documents and a number of

10   source spreadsheets that did not enable me to trace the funds.

11   Q.  Okay.  Did you also in your analysis identify inaccuracies

12   in Ms. Poelking's computations?

13   A.  Yes.

14   Q.  And we'll get into the details later, so I'm really just

15   asking if these are your conclusions or not.

16        Did you also reach a conclusion about whether the

17   government had adopted a tracing method that was most

18   favorable to the defendant or most favorable to the

19   government?

20   A.  I did.

21   Q.  What was your conclusion on that point?

22   A.  That they always found for the -- for the defendant -- or

23   for the government.  They always -- that the methodology they

24   used was for the benefit of the government, it seemed.

25   Q.  And did you also in the course of your investigation

Braver - direct by Finneran

1   determine that they did that despite having conducted

2   alternative tracing analyses that were not as favorable?

3   A.   Correct, yeah.  I -- in each of the spreadsheets that I

4   reviewed, there were alternative methodologies.

5   Q.   Did you also form any conclusions about challenges with

6   the way that the government split single deposits into clean

7   and dirty funds?

8   A.   I did.

9   Q.   What was the issue you identified there?

10  A.   Sometime -- well, they always used dirty funds first and

11  the clean funds second when they were using the FIFO method.

12  Q.   And we'll get into it, but why is that consequential?

13  A.   Because the -- the fund -- the fraudulent proceeds would

14  then be traced to a -- to an asset purchase when they may not

15  have been.

16  Q.   Okay.  Let's go ahead then and get into your expert

17  testimony.

18          So first of all, are you familiar with a principle

19  that's sometimes called "benefit of the doubt"?

20  A.   Yes, I am.

21  Q.   Can you describe to the Court both how you know of that

22  principle and what that principle is?

23  A.   The benefit of the doubt is -- it's the conservative

24  approach.  If there's two different approaches or two

25  different -- if there's an issue on a case and it's -- and it

Braver - direct by Finneran

1   is -- or a transaction occurs in a case and it's for -- and it

2   would lead to the benefit of the defendant, you would use the

3   more beneficial transaction or the -- the outcome of that

4   beneficial transaction and not the one that would be harmful

5   to that -- to the defendant.

6   Q.   Where did you come to learn of this principle?

7   A.   We learned that in training when I first started and

8   throughout my career.  It's been 38 years, and we've always

9   used that principle, beneficial -- you always give the benefit

10  of the doubt to the -- because we have the burden of proof --

11  when I was a government agent, we had the benefit -- the

12  burden of proof, and we accepted that burden of proof.

13  Q.   Okay.

14          MR. FINNERAN:  Your Honor, I'm just going to ask the

15  question.  I had some questions here about how FIFO and LIFO

16  work.  I gathered from your questions that you seem to

17  understand that.  Can I skip that?

18          THE COURT:  I do.

19          MR. FINNERAN:  I'm going to skip that, then.

20  BY MR. FINNERAN:

21  Q.   I would like, however, Mr. Braver, to ask you a couple of

22  questions about the pro rata approach.

23  A.   Okay.

24  Q.   So can you explain to the Court what the pro rata approach

25  is?

Case: 1:19-cr-00864 Document #: 480 Filed: 07/05/23 Page 165 of 230 PageID #:5667
Braver - direct by Finneran
165

1  A.  It's -- you look at the amount of the fraudulent funds and

2  the amount of the nonfraudulent funds and -- and you -- you

3  determine a ratio of -- of what was fraudulent and what was

4  not fraudulent.  And that ratio would change every time either

5  fraudulent funds come in or nonfraudulent funds come in.

6  Q.  And once that ratio is determined, how is that presumption

7  then applied to any withdrawals from the account?

8  A.  It's applied in the ratio that's -- that was available

9  before that transaction.

10  Q.  Just to help us understand that, could you give us an

11  example with $100 and -- and -- I don't know.  Can you give us

12  an example using round numbers, please?

13  A.  Sure.  $100 and $60 was nonfraudulent, and 40 was

14  fraudulent.  $50 was taken out.  You know, six -- it's four --

15  6/10 of that would be -- you know, $40 would be -- would be

16  nonfraudulent.  Or I'm sorry.  $30 would --

17         THE COURT:  I understand what it is.

18         THE WITNESS:  $30 would be fraudulent.

19  BY MR. FINNERAN:

20  Q.  I'm sorry.  One important point, though, I do want to

21  make, Mr. Braver.  You testified earlier that the ratio has to

22  be adjusted as money comes into and out -- into and out of an

23  account --

24  A.  Yes.

25  Q.  -- is that correct?

Braver - direct by Finneran

1  A.  Right.

2  Q.  Have you reviewed the pro rata tracing analysis in this

3  case?

4  A.  Yes.

5  Q.  Was that aspect of the pro rata analysis properly applied

6  on any of the spreadsheets you looked at?

7  A.  No.

8  Q.  What happened instead?

9  A.  It seemed like they used the -- the pro rata at the end of

10 the transactions that appear on the spreadsheet.

11 Q.  So is it your testimony that the -- at least the pro rata

12 tab of each of these spreadsheets is not a reliable indication

13 of the pro rata approach applied to these accounts?

14 A.  Correct.

15 Q.  So how does a forensic accountant such as yourself, in

16 both your career now and as a special agent, how does a person

17 decide which of these methods to use, LIFO, FIFO, pro rata?  I

18 think we heard earlier about lowest intermediate balance.

19 What should go into the determination of which approach to use

20 in a particular case?

21 A.  You would evaluate all three and determine which one is

22 the most beneficial to the defendant.

23 Q.  What is the purpose in a case like this of doing tracing?

24 What is -- what is attempted to be established by tracing?

25 A.  You have to determine -- if you're seizing an asset, you

Braver - direct by Finneran

1   have to -- you can only seize an asset in this -- in this case

2   if it's traceable to fraudulent funds.

3   Q.   In your training and experience in the government, was --

4   were you instructed to -- if you were going to seize an asset,

5   were you instructed to determine whether or not the government

6   could meet its burden of proof with respect to that asset?

7   A.   We would make recommendations, but that -- that decision

8   was made by the -- the -- or the U.S. Attorney's Office.

9   Q.   Fair enough.

10          So I have a couple questions for you just about the

11  government's production, which you believe that production was

12  made on May the 19th, to your recollection?

13  A.   Yes.

14  Q.   And did you review that production?

15  A.   I did.

16  Q.   Did that production contain any of the tracing

17  spreadsheets we're going to discuss today?

18  A.   No.

19  Q.   Did it -- what was -- what was -- well, let me start here.

20          Were there some Excel spreadsheets in that

21  production?

22  A.   I don't believe so.

23  Q.   Okay.  But I believe there was.  You may not recall it.

24  A.   Okay.

25  Q.   Did the production mostly consist of simply bank records?

Braver - direct by Finneran

1    A.   Right, yes.

2    Q.   Okay.  However, did I provide you, in anticipation of your

3    testimony, with a number of tracing analyses that had been

4    performed by Ms. Poelking?

5    A.   Yes, you did.

6    Q.   And what did that allow you to do?  Once you received

7    those spreadsheets, what kind of work did you do from there?

8    A.   We -- I reviewed those and recomputed to see if she did it

9    correctly.

10   Q.   Okay.  I'm going to put on the monitor --

11          MR. FINNERAN:  Your Honor, these have all been

12   admitted already.

13   BY MR. FINNERAN:

14   Q.   -- what has been marked as Exhibit Shah Forfeiture 9001.

15          Do you recognize this document, Mr. Braver?

16   A.   Yes.

17   Q.   Can you see it all right?

18   A.   I do.

19   Q.   Okay.  And as reflected in the bottom right corner, is

20   this adapted from Government Exhibit 1030?

21   A.   Yes.

22   Q.   Okay.  And as you examined this document, were there any

23   things that stood out to you immediately in terms of what the

24   government's tracing analysis showed and didn't show?  What's

25   the first thing that you noticed?

Braver - direct by Finneran

1    A.   So it shows that the money comes in from investors between

2    3/1 -- March 1st and July 17th of 2017, $487,500,000 going

3    into a company called Outcome, Inc.  But she didn't identify

4    the accounts or the -- the bank accounts associated with

5    Outcome, Inc., providing those schedules for us to trace that

6    money.

7    Q.   Is that also true of Outcome Holdings, LLC?

8    A.   Yes.

9    Q.   Is it important as a forensic analyst to not simply trace

10   money to a company's bank accounts but, instead, to trace it

11   to a particular account?

12   A.   Yes, yes.  And also, if you're rendering an opinion, the

13   AICPA requires you to identify your -- your basis for that

14   opinion.

15   Q.   Okay.  I also want to point out the bottom of this chart

16   where there's an entry for Gravitas Holdings, LLC, Pershing.

17   Do you now know what that entry refers to?

18   A.   Yes.

19   Q.   There's no account number, but did you determine what the

20   reference is there?

21   A.   Correct.

22   Q.   What did you determine that to be?

23   A.   The Pershing accounts, I believe there's several accounts

24   relating to Gravitas Holdings.

25   Q.   And you said "accounts."  Did you review spreadsheets to

Braver - direct by Finneran

1   see whether those accounts had been separately analyzed or

2   else had been collapsed for purposes of analysis?

3   A.   We'd have to refresh my memory.  I believe I -- I looked

4   at a number of Gravitas Holdings spreadsheets, so...

5   Q.   Well, are you aware there was at least one spreadsheet

6   where the government had collapsed multiple Gravitas

7   accounts -- Holdings accounts for purposes of analysis?

8   A.   Yes.  Yes.

9   Q.   And can you explain to the Court why that presents a

10  problem from a tracing perspective?

11  A.   You just -- you have to trace the money going in and

12  there -- and if there's other deposits, other ins and outs, it

13  makes it difficult to determine -- or not just difficult, but

14  it -- you can't -- you can't determine where the ins and outs

15  came from.

16  Q.   So is this a similar point to what we said a moment ago,

17  that you don't trace company to company, but account to

18  account?

19  A.   Correct.

20  Q.   I've zoomed in now on what is Exhibit Shah Forfeiture

21  9003.  And I'll highlight these dates for you.

22          Did you make any observations about the importance of

23  the highlighted dates on the screen?

24  A.   The dates are March 1st through July, and they're --

25  they're arranged before the May 19, 2017, transaction.

Braver - direct by Finneran

1   Q.  So this chart reflects -- if I'm understanding your

2   testimony correctly, this chart reflects deposits over a

3   period from March until July of 487 million.  Is that correct?

4   A.  Correct.

5   Q.  But then it reflects a transfer at an earlier date than

6   the end of that date range.  Is that right?

7   A.  Correct.

8   Q.  So based on this chart alone, can you determine whether or

9   what portion of that money, the 487, is actually traceable to

10  the 225 later down the chart?

11  A.  We were not provided those charts, so we could not.

12  Q.  Okay.  Moving next to Exhibit Shah Forfeiture 9004, do you

13  recognize this document?

14  A.  I do.

15  Q.  Is this another of the government's tracing charts?

16  A.  It is.

17  Q.  So I'm going to point again just the beginning of this

18  chart.  Does that reflect the same issue we saw in the

19  previous chart with respect to the dates?

20  A.  Yes.

21  Q.  Okay.  I'm now going to zoom in on the top right of the

22  chart.  This is Exhibit Shaw Forfeiture 9005.  And I probably

23  should mention -- am I correct, this document is sourced from

24  Government Exhibit 1031?

25  A.  Yes.

Braver - direct by Finneran

1    Q.   Okay.  So let me ask you first about this ContextMedia

2    Health, LLC, account.  Just looking at these charts, did you

3    observe any issues with the way the government had

4    characterized this spot on the chart?

5    A.   The ContextMedia?

6    Q.   Yeah, the one that's highlighted.

7    A.   Oh, that one.  Oh, yeah, there's two accounts -- they

8    collapsed two accounts into one.

9    Q.   So does that present the same issue as we discussed a

10   moment ago?

11   A.   Yes.

12   Q.   I'll now point you down the chart to the part where the

13   government traced from here.  And I'm going to point out the

14   bottom of the chart where it says "Baroda Trust Pershing

15   accounts."

16        Do you see -- is there anything that you have to

17   share with the Court about this, this entry?

18   A.   Yes.  There's a number of accounts relating to Pershing,

19   and we didn't have sufficient information to see the different

20   transactions within those accounts.

21   Q.   Just based on this document, you're saying?

22   A.   Correct.

23   Q.   Okay.  Let me ask the same question then about the

24   Rishi Shah Pershing accounts entry that I've just highlighted.

25   Does that present the same issue we just discussed of the

Braver - direct by Finneran

1    accounts being collapsed on this chart?

2    A.  Yes.

3    Q.  I won't belabor the point.

4         Let's go back up the chart.  This is Exhibit Shah

5    Forfeiture 9007.  Does this chart reflect a transfer of

6    $30.2 million on April the 8th, 2016?

7    A.  It does.

8    Q.  And did you conduct an analysis of the government's

9    tracing of that transfer?

10   A.  I did.

11   Q.  All right.  Let's go to Exhibit Shah Forfeiture 9008.

12        Did you review Ms. Poelking's FIFO analysis of that

13   $30.2 million deposit?

14   A.  I did.

15   Q.  Is this an excerpt from that analysis?

16   A.  It is.

17   Q.  All right.  I'd like to start by highlighting the amount

18   of the withdrawal and then the amount at the bottom of the

19   chart.

20        Can you explain to the Court -- very briefly, because

21   we've heard testimony on this -- what the importance of those

22   two numbers is?

23   A.  The account had over $3 million in it prior to fraudulent

24   funds coming in.  And then when this 30 million came out, the

25   first 3 million came out first and then the last 27,086,000

Braver - direct by Finneran

1  came out second.

2  Q.  And that analysis you just described, is that consistent

3  with a first in, first out tracing method?

4  A.  Yes.

5  Q.  If -- if somebody were to then from that account -- so

6  assume that all $30 million was traceable -- and purport to

7  use the FIFO method going forward, would that be appropriate

8  or inappropriate?

9  A.  Can you repeat that?

10 Q.  Yeah.  I'm sorry; I think I ran through it.

11         So assume for the moment that a person doing an

12 analysis and trying to use FIFO throughout the analysis were

13 to assume that the entire $30 million was traceable under that

14 analysis, would that be accurate or inaccurate?

15 A.  It would be -- it would be inaccurate.  The -- the

16 27 million -- or the $30 million transferred to the Rishi Shah

17 account should show 3 million in non -- nonfraudulent funds

18 and 27 million in fraudulent funds.

19 Q.  Okay.  So then as you review that account, this

20 $30 million transfer, did you review CIBC 7426 as reflected on

21 Exhibit Shah Forfeiture 9009?

22 A.  Yes.

23 Q.  And what did you determine upon your review?

24 A.  That should be 27 million point -- 27.1 million.

25 Q.  And is that under a FIFO analysis?

Braver - direct by Finneran

1    A.   That's under the FIFO.

2    Q.   And does that have any effect on the accounts that are

3    analyzed after -- along this chain of -- of following the

4    money, as you said -- does that change in the chart have any

5    effect on what follows?

6    A.   It can.

7    Q.   So let's go ahead and look down here.  Whoops, excuse me.

8         On this Baroda Trust Pershing account, is that one of

9    the accounts that was in your analysis affected by that error

10   in analysis?

11   A.   Yes.

12   Q.   Okay.  I'm actually going to have to stop the presentation

13   for one second because I notice I've got an animation problem.

14   This one thing is going to look weird, so let me fix it real

15   quick.

16        Okay.  Mr. Braver, I'm now showing you what has been

17   marked as Exhibit Shah Forfeiture -- oh, sorry; we just looked

18   at this one -- was marked as Exhibit Shah Forfeiture 9013.

19   And does this reflect portions of Ms. Poelking's analysis of

20   Pershing 6290?

21   A.   It does.

22   Q.   And what does the first line here -- or the first three

23   entries here, what does that indicate in terms of her

24   analysis?

25   A.   Indicates that she applied the dirty funds before the

Braver - direct by Finneran

1   clean funds.

2   Q.  Well, sir, let's just focus first on which method.  And

3   here, I'll do the next thing so we can --

4   A.  Oh, I'm sorry.

5   Q.  Which -- what was the difference between these two

6   portions of the chart?  Let's start there.

7   A.  She used the first in, first out on the top portion and

8   last in, first out on the bottom portion.

9   Q.  Okay.  And so does that, as these deposit numbers

10  reflect -- and we went over this previously, so I won't

11  belabor the point -- but does that reflect that under the last

12  in, first out analysis, this $15,000 would not be traceable or

13  it was traceable under the first in, first out analysis?

14  A.  Correct.

15  Q.  Okay.  I now -- I'm going to go to the point you're about

16  to raise, which is about this division between dirty and

17  clean.  And can you explain why that presents an issue?

18  A.  It becomes an issue because if you're using the first in,

19  first out, it -- it matters which one you apply first.  If you

20  apply the clean funds first, the 15,000 would not be

21  fraudulent withdrawal.

22  Q.  And am I correct that lines 2 and 3, although they're

23  split up as two deposits, are actually a pro rata split of a

24  single deposit?

25  A.  Yes.  It's one deposit of 16,700,000 and change.

Braver - direct by Finneran

1    Q.  So I think you maybe just explained this, but -- oh, and

2    this is what the columns are.  It was animated out of order.

3    If those two entries would be flipped and No. 2 were to be put

4    in the place of No. 3 and vice versa, even under a FIFO

5    approach, how would that affect whether or not the $15,000 was

6    traceable to the fraud?

7    A.  It wouldn't -- it would not be traceable to fraud.

8    Q.  Is that because under a FIFO method, you would assume that

9    that $9 million that's listed as clean was the source of that

10   $15,000 withdrawal?

11   A.  Correct.

12   Q.  And maybe that's a good thing to point out.  When we're

13   talking about tracing methods, what we're effectively talking

14   about are different assumptions that an analyst makes in

15   trying to analyze an account, right?

16   A.  Yes.

17   Q.  So under FIFO, one assumes that the oldest deposit is the

18   source of the withdrawal.  And under LIFO, they assume the

19   newest one is the source of the withdrawal.

20   A.  Correct.

21   Q.  Those are both just assumptions, though, correct?

22   A.  They're assumptions you make based on the first in, first

23   out or last in, first out.

24   Q.  Right.

25           I'm going to move now to Shah Exhibit 9014.  And I'd

Braver - direct by Finneran

1   now like to ask you about the other side of this chart which

2   sources funds from this ContextMedia Health, LLC, account.  Do

3   you see the highlighted portion?

4   A.   I do.

5   Q.   And what does that reflect, according to the chart?

6   A.   That there's 13.8 million coming out of the ContextMedia

7   Health account, Chase 6463 and 6471 --

8   Q.   Okay.

9   A.   -- and going into Gravitas Hardware.

10  Q.   And did you analyze both the Gravitas Hardware account and

11  the ContextMedia Health account 6463?

12  A.   Yes.

13  Q.   Were you able to determine that, while the accounts are

14  collapsed here, that $13.8 million actually came from 6463?

15  A.   Yes.

16  Q.   All right.  Did you then review Ms. Poelking's analysis of

17  6463?

18  A.   I did.

19  Q.   This is Shah Exhibit 9015.  Does this reflect a portion of

20  Ms. Poelking's Gravitas Hardware analysis?

21  A.   Correct.

22  Q.   And can you look here at the highlight?  What does that

23  reflect?

24  A.   It reflects that the first 340,000 was a fraudulent

25  deposit and the -- or fraudulent -- or came from a fraudulent

Braver - direct by Finneran

1   deposit.  The rest, everything else except for the

2   3.9 million -- 3.9 and the 3.4 million came from a fraudulent

3   deposit.

4   Q.   And did you review to see what this supposedly fraudulent

5   deposit was, this ID 1548 I've just highlighted on the screen

6   there?  I mean, that's -- the amount from that 340.  Did you

7   analyze what that went back to?

8   A.   It went back to the Chase 6463 account.

9   Q.   Oh, I don't think that's -- I'm showing you another

10  portion of the document.  Does this refresh your recollection

11  as to what --

12  A.   Oh.

13  Q.   -- ID 1548 went back to?

14  A.   It went to the Outcome Holdings account.  I'm sorry.

15  Q.   Yeah.  So a different account at Chase with 9765.  Is that

16  correct?

17  A.   Correct.

18  Q.   What about the $3 million withdrawal that goes back to

19  ID 1649?  What about that one?

20  A.   It came from an account called "Investment Fund."

21  Q.   And, again, this is all based on a first in, first out

22  method?

23  A.   Yes.

24  Q.   Were you able to review either this Investment Fund

25  document or Chase 9765 to determine whether the assumption

Braver - direct by Finneran

1   that these were fraudulent deposits could be validated?

2   A.   We were -- I was not provided the information to make that

3   analysis.

4   Q.   And based on your review, was any of that information

5   contained in the government's forfeiture production?

6   A.   It was not.

7   Q.   I'm now turning to Shah Forfeiture 9016.  And based upon

8   what we just discussed, were you able to say that you could

9   not validate the assumption that $4.3 million in criminal

10  proceeds left that account?

11  A.   Correct, I was not able to verify it.

12  Q.   Going down the chart, let's talk about these accounts.

13       We already talked about how the right side of the

14  chart has that $27 million issue.  On the left side of the

15  chart, you lacked sufficient data to be able to analyze this.

16  Does that have a sort of cascading effect down the chart?

17  A.   Yes.

18  Q.   Can you explain what that means?

19  A.   Well, as we showed you prior, I believe the 7.4 million

20  that -- that was designated as dirty funds would not be

21  designated as dirty funds --

22  Q.   And would the same --

23  A.   -- or the fraudulent funds.

24  Q.   And would the same be true of the 5.75 below that?

25  A.   Correct.

Braver - direct by Finneran

1   Q.   I'm now going to show you what is Outcome -- excuse me --

2   Shah Forfeiture 9002, which I showed you earlier.

3           And we talked earlier about how this Gravitas

4   Holdings account at Pershing was a collapsed account.  Is that

5   correct?

6   A.   Correct.

7   Q.   Did, however, that basically reflect that there were

8   interest, dividends, and other appreciation on these

9   investments in those accounts?

10  A.   Yeah.  I believe there was a number of transactions in

11  that account.

12  Q.   And did you do any analysis to determine whether or not

13  those funds were connected to all the dirty money the

14  government claims they were connected to?

15  A.   I did.

16  Q.   And what did you conclude?

17  A.   That -- that --

18  Q.   I don't need an exact number, but did you make a

19  conclusion about whether all of the dividends were so

20  traceable or if only some were?

21  A.   Can you repeat that?

22  Q.   Yeah.

23          So you analyzed Gravitas Holdings --

24  A.   Right.

25  Q.   -- Pershing accounts.  And am I correct you identified

Braver - direct by Finneran

1  nontraceable deposits into those accounts?

2  A.  Yes.

3  Q.  And so based upon that, is it your view that at least some

4  of the interest and dividends in those accounts are not

5  traceable to the fraud?

6  A.  Correct.

7  Q.  Thank you.

8       I'm back to Shah Forfeiture 9001, a very similar

9  document.  We talked earlier about how you did not have the

10  records to analyze these accounts.  Does that mean that you

11  were unable to determine whether or not the rest of this down

12  the chart is, in fact, traceable to the fraud?

13  A.  Correct.

14  Q.  In anything that you received from us, did you see any

15  tracing analysis of any Outcome, Inc., account?

16  A.  I did not.

17  Q.  Did you see any tracing analysis of any Outcome Holdings

18  account?

19  A.  I did not.

20  Q.  I'm now showing Shah Forfeiture Exhibit 9003.

21       And once more, you identified this issue with the

22  dates.  Was there anything that we provided you that enabled

23  you to analyze what actual portion of that 487 million was

24  deposited prior to 5/19/2017?

25  A.  The government put up a schedule today.  But other than

Braver - direct by Finneran

1    that, I've never -- and I -- and they haven't provided any

2    supporting records relating to, but that was the first time I

3    saw that document.

4    Q.   So you hadn't seen that schedule until today?

5    A.   Correct.

6    Q.   All right.  I'm now taking you to a slide that's going to

7    help us understand some of your conclusions.  This is Shah

8    Forfeiture Exhibit 9018.

9         Can you describe what this generally is?  And then

10   we'll go column by column.

11   A.   So this is the -- the first -- it's just a schedule of

12   determining -- tracing the funds for the various assets that

13   were sold -- seized --

14   Q.   Okay.

15   A.   -- or forfeited --

16   Q.   And -- and do you --

17   A.   -- or issued a protective order.  I'm sorry.

18   Q.   Yeah.  Just to be clear, they then seized or restrained --

19   A.   Correct.

20   Q.   -- at this stage.

21   A.   They issued a protective order.

22   Q.   Looking at the columns, am I correct that the first one,

23   two, three, four, five -- six columns are all part of what we

24   saw before as a government exhibit, Government Exhibit 1029?

25   A.   Yes.

Braver - direct by Finneran

1   Q.  And there are then three columns that are headed "HKA"

2   column.  So why don't you tell us what each of those columns

3   reflects.

4   A.  We -- we performed an analysis of -- of the -- of the

5   transactions in each of these items.  And in using the various

6   FIFO method, using dirty funds, using clean funds, and -- and

7   LIFO traceable, and -- and -- and we came up with the amounts.

8   Q.  Okay.  So there's two entries that both say 1B.  You see

9   on the far left?  So actually, this -- this reflects -- am I

10  correct? -- four -- excuse me -- four different assets that

11  the government seeks to forfeit in this case?  Is that right?

12  A.  Yes.

13  Q.  Based upon -- we'll start with the government's analysis.

14  If we use a FIFO analysis and assume that a split deposit

15  is -- it starts with spending the dirty money, were you able

16  to validate that under that approach, indeed, $6.6 million

17  would be traceable to the crime?

18  A.  Correct.

19  Q.  But what does the next column, traceable using clean funds

20  first, reflect?

21  A.  If we use the clean funds first, there would be no money

22  traceable to -- to those assets that were issued in the

23  protective order.

24  Q.  And, again, when we talk about clean and dirty here, we're

25  talking about the government's division of a single deposit?

Braver - direct by Finneran

1    A.   Yes.

2    Q.   Are you aware of any accounting principle that would

3    suggest when using a FIFO method that you should start by

4    using a portion of one deposit as opposed to another portion

5    in doing that analysis?

6    A.   No.

7    Q.   And what about the last column?  If the government had --

8    in fact, let's start here:  Did the government do any LIFO

9    analysis of this -- of these accounts?

10   A.   Yes.

11   Q.   And if that analysis had been the method it used to seek

12   forfeiture in this case, how much would have been traceable of

13   these assets?

14   A.   None.

15   Q.   So is it your testimony that based either under a FIFO

16   method, assuming that the clean assets that were a portion of

17   a single deposit were credited first, or under a LIFO method,

18   the assets the government seeks to forfeit on this chart would

19   contain no forfeitable interest whatsoever?

20   A.   Correct.

21   Q.   I'm now going to another document adopted from

22   grand jury -- excuse me, not grand jury -- Government

23   Exhibit 1029.  Can you tell us which account these different

24   items relate to from the second column?

25   A.   These all relate to Rishi Shah's JPMorgan account ending

Braver - direct by Finneran

1    in 9002.

2    Q.   Okay.  So once again, is this the account where we're

3    talking about there being a $30 million deposit and the

4    government assuming that that entire deposit was dirty in its

5    analysis?

6    A.   Yes.

7    Q.   Let's just start with that deposit.  In your opinion, is

8    it appropriate to -- well, let me start this.

9          Are you familiar with how dividends are paid as a

10   matter of accounting?

11   A.   I am.

12   Q.   How are dividends paid?

13   A.   Paid from current and accumulated earnings and profits

14   after a board of directors agrees to -- to pay a dividend.

15   Q.   And what does that -- can you say that in more plain

16   English for us?

17   A.   The board of directors would -- would -- would meet and

18   determine based on the accumulated and current earnings and

19   profits if they could fund a dividend.  And if they agreed to

20   issue a dividend, it's paid out of accumulated and current

21   earnings and profits.  Earnings and profits are the profits of

22   the company revenue less expenses, and there's adjustments

23   that you make.

24         And I don't want to get in the technical area of

25   earnings and profits, but there's adjustments you make to that

Braver - direct by Finneran

1    as well.

2    Q.   Okay.  So based upon that, is it fair to say that in

3    ordinary practice, if there were loan funds in an account and

4    earnings and profits in an account and a dividend was paid,

5    what assumption would an accountant make as to what was the

6    source of those -- that dividend?

7    A.   It would be the amount in the account, not -- not the -- a

8    loan doesn't -- has nothing to do with issuing a dividend.

9    Q.   And would that also be true if the funds were traced not

10   to a loan but to paid-in capital by an investor?

11   A.   Or money that's in the account already, yes.

12   Q.   Right.

13        Okay.  So then looking back to this chart, on the

14   assumption that the government is using the FIFO method and

15   giving credit for the dirty funds first, just looking down --

16   well, actually, let's start with the clean.

17        So here, the government, am I correct, for assets 2D

18   and 2P used an analysis where it assumed effectively that the

19   first $27 million, at least, was traceable property?

20   A.   Correct.

21   Q.   One --

22   A.   But I don't -- just to clarify that.  I don't believe it

23   is.  If you remember, the $3 million was used -- was -- came

24   out first --

25   Q.   Right.

Braver - direct by Finneran

1    A.   -- was in there.  So in this case, it would have been

2    first.

3    Q.   Right.  And that's what I'm about to ask you.

4    A.   Yeah.

5    Q.   So you see this last column I've just highlighted here?

6    A.   Yeah.

7    Q.   When you're using the FIFO method, so using the

8    government's own method, if the assumption were made that the

9    clean funds were the first funds to leave, then how would that

10   affect the traceability of assets 2D, 2P, 2Q, and 2B in the

11   first four -- three lines of this chart?

12   A.   They would only be able to have a protective order on

13   $34,500.

14   Q.   Sir, I'm just asking about the first -- the first four

15   lines.  So --

16   A.   Oh, the first four.  Sorry.

17   Q.   I'm sorry; the first three lines.  The three I've

18   highlighted.

19   A.   First, there would be no money forfeitable --

20   Q.   So in other words, under -- I'm sorry.  I didn't mean to

21   interrupt.  Finish your answer.

22   A.   There would be no money under the protective order for

23   those three items.

24   Q.   And so if we make the assumption now that the funds are

25   clean instead of dirty, is it correct to say that no part of

Braver - direct by Finneran

1   those assets would be subject to criminal forfeiture or as

2   directly traceable property?

3   A.  Correct.

4   Q.  So then going down the chart to the next three lines, does

5   this reflect that -- excuse me -- the next two lines, does

6   this reflect now using the government's own analysis whether

7   or not those funds can actually be traced?

8          Or maybe that's a bad way to say it.

9          Using the dirty funds first approach --

10  A.  Okay.

11  Q.  -- and assuming that 27 million and not 30 million were

12  traceable, how would that affect the traceability of the

13  Volition Capital Fund II and Eight Partners VC Fund I, LLP?

14  A.  Those funds would not be forfeitable -- or not be subject

15  to a protective order.

16  Q.  And you're saying a clean funds first approach, how much

17  of those investments would be forfeitable?  To the right.

18  A.  Both -- 34,500.

19  Q.  Right.

20         So regardless of which assumption the government

21  makes, is it fair to say that at least some of the assets on

22  this chart are not subject to forfeiture?

23  A.  Correct.

24  Q.  I'll now show you the last line, which is 7wire Venture's

25  fund for $280,000.  Do you see that line?  The very bottom?

Braver - direct by Finneran

1  A.  Yes.

2  Q.  And what did your analysis conclude about the traceability

3  under -- of that asset using either the assumption that

4  $27 million of dirty fund was spent first or the $3 million of

5  clean fund -- funds was spent first?

6  A.  The 280,000 would not forfeitable.

7  Q.  So asset 2A would simply not be subject to forfeiture as

8  directly traceable property.  Is that correct?

9  A.  Correct.

10  Q.  So as a result of that, is it your understanding that

11  there are tracing issues with all of the items reflected on

12  Shah Forfeiture 90 -- it's wrong in the exhibits -- 9020?

13  A.  Yes.

14  Q.  I'm now showing you Shah Forfeiture Exhibit 9019.  And

15  this is simply a copy, basically, of page 2 of Grand Jury

16  Exhibit 1029.  Is that right?

17  A.  Yes.

18  Q.  And what was the source of funds, according to Column 2,

19  for all of the assets reflected on this chart?

20  A.  Gravitas Holdings Pershing 6250 -- 6290.  I'm sorry.

21  Q.  Okay.  And we talked about this earlier, but is that one

22  of the Gravitas Holdings collapsed accounts that we were

23  talking about?

24  A.  I believe so, yes.

25  Q.  And is that also an account that was funded by the two

Braver - direct by Finneran

1    different Outcome Holdings entities that we talked about

2    earlier?

3    A.   Yes.

4    Q.   Again, did you have the records you needed to be able to

5    determine any tracing with respect to those Outcome entities?

6    A.   I was not.

7    Q.   So as a result of that, which of these assets can you say

8    the government has successfully traced to forfeiture?  Are

9    there any?

10   A.   None.

11   Q.   I'm now showing you Shah Forfeiture 9022.  Do you

12   recognize this to be some of the language from the

13   government's -- it's wrong on the slide, I'll fix it -- from

14   the government's superseding indictment?

15   A.   Yes.

16   Q.   Is this part of the forfeiture allegation in that case?

17   A.   It is.

18   Q.   And do you see here -- oops.  Excuse me.

19        What does it reflect about the amount of money that

20   the government sought to forfeit?  Or I guess I should -- let

21   me start that over.

22        What does this reflect about the amount of money --

23   the specific amount of money the government sought forfeiture

24   of from an Investment Company B?

25   A.   I believe they're -- they're trying to get right, title,

Braver - direct by Finneran

1   and interest in the investments in that, not limited to

2   475,000 in capital contributions.

3   Q.  So why do you reach that conclusion?  What language in

4   here suggests to you that what the government sought to

5   forfeit and restrain was more than just $475,000?

6   A.  It says all rights, title, and interest in investments,

7   plural, made with Investment Company B.

8   Q.  Doesn't that also say including, but not limited to?

9   A.  Including, but not limited to.

10  Q.  And are you aware that Investment Company B is the way

11  that the indictment refers to a company called Guild Capital?

12  A.  Yes.

13  Q.  So I'm going to go to this chart.

14      Do you recognize this as being a document that you

15  reviewed in the course of your analysis?

16  A.  Yes.

17  Q.  And do you understand this to be an attachment to an email

18  that Ms. Poelking sent to the prosecutors in this case?

19  A.  I don't recall that, but I do remember seeing this

20  document.

21  Q.  Okay.  Thank you.

22      Does this reflect for each of these entities a

23  significant difference between the amount of money that the

24  government says was sent from the bank accounts and the value

25  of those investments?

Braver - direct by Finneran

1    A.   Yes.

2    Q.   What is the total difference in value according to this

3    chart, just roughly?

4    A.   Just under 10 million.

5    Q.   So is it fair to say that whenever this chart was created,

6    it reflected that there was 10 million more dollars in these

7    entities than the government had traced in?

8    A.   Yes.

9    Q.   I'm going to focus your attention on the Guild Capital

10   line.  That's in the middle of the chart.  It says $75,000.

11   Do you see that?

12   A.   I do.

13   Q.   What amount does it say next to current value?

14   A.   4,681,000.

15        COURT REPORTER:  Can you repeat that?

16        MR. FINNERAN:  I'm sorry; We can repeat.  How far

17   back do we need to go?  Okay.  Thank you.

18   BY MR. FINNERAN:

19   Q.   Suffice it to say there's a very big difference between

20   75,000 and 4.6 million?

21   A.   Yes.

22   Q.   So if, as we saw in the previous slide, the government

23   restrained not just 75- or $475,000 but, instead, all right,

24   title, and interest at Guild Capital, would it be fair to say

25   the government restrained a large amount of nontraceable

Braver - direct by Finneran

1   assets?

2   A.   If this chart is accurate, yes.

3   Q.   Okay.  Are you aware that yesterday we received from --

4   some information from Guild Capital about the amounts that

5   were actually paid in to Guild Capital?

6   A.   Yes.

7   Q.   And let me just try and clarify this difference.

8         For most of the entities we've talked about, am I

9   correct that these were capital contributions or investments

10  directly into an entity in which Gravitas Holdings or

11  JumpStart then held an interest in that entity?

12  A.   Yes.

13  Q.   Am I also correct that that's not true of Guild Capital

14  because Guild Capital actually takes the money and then

15  invests it in an entity?

16  A.   Yes.

17  Q.   Okay.  Is that reflected here on Shah Forfeiture 9024, a

18  portion of the records we received yesterday from Guild

19  Capital?

20         And I should note that the government also received

21  this document.  So -- I'm sorry.  I lost my question there.

22         Does this column that says "Liability" indicate

23  particular entities into which investments were made by

24  Gravitas Holdings, JumpStart Ventures, and JumpStart Ventures

25  II, LLC?

Braver - direct by Finneran

1   A.   Yes.

2   Q.   What does the heading at the top say next to the No. 1?

3   A.   Invested capital and estimated unrealized value of

4   investments.

5   Q.   So does this chart basically suggest what the current

6   value might be of each of these assets that the money was

7   invested into?

8   A.   Yes.

9   Q.   Did you see any tracing analysis in the course of your

10  review, whether conducted by the government or otherwise, that

11  would have traced the money that went to Guild Capital not

12  merely to Guild Capital itself, but to any one of those

13  entities listed on the left?

14  A.   No.

15  Q.   It says here that the total value is 11 million.  That's

16  more than the 4 million we saw before.

17         Do you believe, based on your review, that the

18  government can trace any more than the $475,000 that it listed

19  on its exhibit to any of these entities?

20  A.   I don't know what records the government has, so I can't

21  comment on that.

22  Q.   I'm asking based upon the records you've seen, have you

23  seen anything suggesting the government has performed that

24  tracing analysis?

25  A.   No, I have not.

Braver - direct by Finneran

1   Q.  Oh, excuse me.  I forgot to put the title on there.

2           Is it correct that these amounts are estimated values

3   as of December of 2022?  At the top.

4   A.  Yes.

5   Q.  So now I'll show you this final slide, 9025.

6           Is this -- well, tell me what it says next to No. 2,

7   at the top.

8   A.  Home Chef Series A.  No. 2, JumpStart Ventures.

9   Q.  Sorry.  Sorry.  At the very top, I meant the No. 2 --

10    (Indiscernible crosstalk.)

11  A.  Value of cash held related to past investment realization

12  events.

13  Q.  So does this reflect an amount of cash that Guild Capital

14  indicates it is holding based upon stocks or businesses that

15  had been sold and exited?

16  A.  Yes.  It looks like recognized money.

17  Q.  All right.  So help with the math a little bit.  In the

18  last two columns, it says:  Dollar sign apostrophe 000S.  What

19  does that reflect?

20  A.  So the 200 -- it depends on which -- if you're looking at

21  line 1, 250 would be 250,000, and then 220 would be $220,000.

22  Q.  What about the bottom of the chart?

23  A.  1,200,000 and 10,594,000.

24  Q.  So does this reflect that investments at Guild Capital

25  yielded $10 million plus from the exit from the things listed

Braver - direct by Finneran

1    in Portfolio Company?  Sorry; that's the first column,

2    Portfolio Company.

3    A.   The -- the last column says "Net Unrealized Value," and

4    the top says "Realization Events."  So...

5    Q.   Do you understand --

6    A.   Yeah.

7    Q.   I don't know if you recall from seeing the original

8    document, but do you understand what the term net unrealized

9    value signifies with relation to --

10   A.   Right.

11   Q.   -- carried interest?

12   A.   Approximate value, right.

13   Q.   Does the net part relate to carried interest in any way?

14   A.   Right, yes.

15   Q.   And explain to the Court, just briefly, what that means.

16   A.   Net of expenses of -- paid to the management company.

17   Most of these kind of companies pay 2 percent management fee

18   and 20 percent of the profit.

19   Q.   So in other words, this amount here is not money that

20   would be owed to the management company.  This is the money

21   that would be owed to either JumpStart Ventures I or II or

22   Gravitas Holdings, the investment -- the entity that made the

23   investment?

24   A.   Correct.

25   Q.   So does this reflect, then, that there -- from the sale of

Braver - cross by Appleby-Bhattacharjee

1    these companies, there was some $10 million that currently is

2    held -- owed, effectively, to one of those three entities by

3    Guild Capital?

4    A.   Correct.

5    Q.   And again, did you see any records whereby the government

6    traced the money not just to Guild Capital, but into one of

7    these particular entities?

8    A.   I have not.

9    Q.   And does this chart also indicate, based on the invested

10   amount, the $1.2 million, that, in fact, a lot more than the

11   $475,000 the government purports to trace went into at least

12   some of these companies?

13   A.   It appears that way, yes.

14   Q.   Okay.

15        MR. FINNERAN:  Your Honor, I have no further

16   questions at this time.

17        THE COURT:  All right.

18        Cross-examination.

19        MR. APPLEBY-BHATTACHARJEE:  May I proceed?

20        THE COURT:  You may.

21                    CROSS-EXAMINATION

22   BY MR. APPLEBY-BHATTACHARJEE:

23   Q.   Good afternoon, Mr. Braver.

24   A.   Good afternoon.

25   Q.   FIFO is a generally accepted accounting methodology.  Is

Braver - cross by Appleby-Bhattacharjee

1  that right?

2  A.  Yes.

3  Q.  And is it fair to say you used FIFO during your tenure as

4  a government agent?

5  A.  Yes.

6  Q.  The purpose of accounting methodologies like FIFO is to

7  trace specific assets when funds used to purchase them are

8  commingled in accounts with clean and dirty funds.  Is that

9  fair?

10  A.  It's one of the methodologies you evaluate, yes.

11  Q.  And when funds are commingled, you can use FIFO to trace

12  which funds were used to purchase an asset.  Is that right?

13  A.  Yes.

14  Q.  You could also use LIFO?

15  A.  Yes.

16  Q.  Or the pro rata approach?

17  A.  You should use all three in evaluating, yes.

18  Q.  And FIFO and LIFO can sometimes reach different results.

19  Isn't that right?

20  A.  Absolutely.

21  Q.  But they can sometimes reach the same results, correct?

22  A.  Yes.

23  Q.  For example, if an account starts with a zero balance and

24  the only deposit into it is dirty funds, under FIFO or LIFO

25  you'd reach the same conclusion?

Braver - cross by Appleby-Bhattacharjee

1    A.   Correct.

2    Q.   I want to ask you about your understanding of Mr. Shah's

3    JPMorgan Chase Bank account ending in 9002.

4             Now, that account started with a zero balance,

5    correct?

6    A.   Yes.

7    Q.   And it received a $30.2 million deposit on or about

8    April 8, 2016?

9    A.   Correct.

10   Q.   And that was the first deposit into the account, correct?

11   A.   Yes.

12   Q.   Now, are you aware that that deposit was a dividend paid

13   to Mr. Shah as part of an April 2016 bank loan?

14   A.   It wouldn't be part of the bank loan.  The bank loan

15   funded that, so the bank loan would be deposited into the --

16   wherever the loan was deposited.  And then a dividend is

17   issued by the company and the board of directors.

18   Q.   So that's your understanding, correct?

19   A.   Well, that's how corporations operate.

20   Q.   Have you reviewed the underlying loan agreement?

21   A.   I have not.

22   Q.   So you're not familiar with its terms?

23   A.   I was not provided that.

24   Q.   But was it withheld from you?

25   A.   Nobody provided it to me.

Braver - cross by Appleby-Bhattacharjee

1    Q.  Did defense counsel say that he could not access it if you

2    asked for it?

3    A.  I -- no, he did not.

4    Q.  And are you aware that the loan agreement itself was one

5    of the trial exhibits in this case?

6    A.  I was -- well, I'd assume it would be, yes.

7    Q.  But you didn't review all of the trial exhibits in this

8    case, correct?

9    A.  I only reviewed what they provided me.

10   Q.  So I'm going to draw your attention to Government's

11   Exhibit 573, which is the loan agreement related to the

12   April 2016 loan.

13          And I take it from our exchanges so far, you've never

14   seen this document, correct?

15   A.  I have not.

16   Q.  All right.  I'm going to turn your attention to

17   Section 5.08 of this agreement appearing at page 74.

18          And I know that the text is small, so I'm going to

19   highlight it here.  Section 5.08, can you just read the title

20   appearing next to that section?

21   A.  Use of Proceeds.

22          Oh, you want me to read the whole thing?

23   Q.  No.  I'm going to highlight some of this language, and

24   I'll ask you to read into the record through where I stop

25   highlighting.

Braver - cross by Appleby-Bhattacharjee

1    A.   The proceeds -- you want me to do it out loud?

2    Q.   Yes, please.

3    A.   The proceeds of the loans and the --

4           THE COURT:  That's not necessary.  I can read it.

5           MR. APPLEBY-BHATTACHARJEE:  Okay.  Okay.

6           THE WITNESS:  Okay.  Yeah, thank you.

7           THE COURT:  And it's an exhibit I'm familiar with

8    from the trial.

9    BY MR. APPLEBY-BHATTACHARJEE:

10   Q.   Well, if you can read along with me, it starts that the

11   proceeds of the loans and letters of credit will be used only

12   to finance.  And then it goes on, correct?

13   A.   Correct.

14   Q.   And one of the specific items that is listed as being

15   financed by the proceeds of the loan is the effective date

16   distribution.  Do you see that?

17   A.   I see where it says to finance the effective date

18   distribution.

19   Q.   Now, is it fair to say you don't know what the effective

20   date distribution is because you haven't seen this contract

21   before?

22   A.   I'm sure it's defined in -- in the contract somewhere.

23   Q.   Do you have any independent understanding of what that

24   term means?

25   A.   I don't want to assume, but I have an idea of what it

Braver - cross by Appleby-Bhattacharjee

1    means.

2    Q.   I'm going to turn to the definition of that term which

3    appears at page 15 of the contract.

4              MR. FINNERAN:   Your Honor, I'm going to object.   The

5    witness has already testified he hasn't seen this document.

6    I'm not clear what the relevance of this testimony would be to

7    get from him.   As you've said, we can all read the document.

8              THE COURT:   What is the relevance?

9              MR. APPLEBY-BHATTACHARJEE:   Well, Your Honor, the

10   witness testified that a loan has nothing to do with issuing a

11   dividend, which I'm illustrating --

12             THE COURT:   Overruled.   Overruled.

13             Go ahead.

14   BY MR. APPLEBY-BHATTACHARJEE:

15   Q.   All right.   Now, I'm going to draw your attention to the

16   definition of effective date distribution.   Do you see that?

17   A.   Yes, I do.

18   Q.   And it says:   A one-time distribution made on or about the

19   effective date to the direct or indirect holders of the equity

20   interest of holdings in an amount up to $50 million.

21             Now, without reviewing this contract, you don't have

22   any independent understanding of who the borrower is, what

23   holdings refers to, or who the direct or indirect holders of

24   the equity interest are, correct?

25   A.   Correct.

Braver - cross by Appleby-Bhattacharjee

1 Q.  Based on the contract language and the two provisions

2 we've just reviewed, you'd agree that there is a nexus between

3 the effective date distribution and the funds provided as part

4 of this loan, correct?

5 A.  Yes.

6 Q.  And your analysis regarding the circumstances of the

7 dividend payment to Mr. Shah into the JPMorgan Chase account

8 ending in 9002 did not in any way rely upon the terms of this

9 agreement, correct?

10 A.  Well, again, money is fungible.  And they could make a

11 distribution up to 50 million, correct?  So the money goes

12 into that account, and then they -- and then the board of

13 directors issues a distribution or a dividend.

14        And that dividend could use part nonfraud funds and

15 part fraud funds.  So I don't -- I understand there's a

16 connection with the loan, but the money is separate --

17 or the -- the loan is separate.  The loan -- they borrowed the

18 money.  They're agreeing that they can make this distribution.

19 It looks like they followed the loan agreement.

20        So -- and the board of directors would issue the

21 dividend.  It's just how that money is paid out would matter

22 as to what was in there first if you're using the FIFO method.

23 Q.  You're testifying as to your general understanding of how

24 dividends are paid, correct?

25 A.  Correct.

Braver - cross by Appleby-Bhattacharjee

1  Q.  Not -- and your testimony today about how dividends are

2  paid based on your general understanding did not derive from

3  your review of the terms of this contract.  Is that fair?

4  A.  Well, you're showing me the contract.  And it says that

5  they could issue a dividend up to 50 million.  It doesn't say

6  specifically take the money that we're giving you and issue a

7  $30.2 million distribution to -- so that's what I'm saying, is

8  money's fungible.  And if you're using a consistent method of

9  FIFO, you would consider that, in my opinion as an expert.

10  Q.  But again, you agree even based on your cursory review of

11  this contract that there is certainly a nexus between the

12  effective date distribution and the underlying loan agreement

13  and the funds provided?

14  A.  Yes.  And it looks like it was a disclosed distribution,

15  right.

16  Q.  Now, I want to talk about the Gravitas Holdings account at

17  Pershing ending in 6290.  That account also started with a

18  zero balance, correct?

19  A.  Yes, I believe -- is that the -- where the 285 million

20  went into?

21  Q.  The 225.

22  A.  225 -- I'm sorry.  Yes.

23  Q.  So that account started with a zero balance, correct?

24  A.  Yes.

25  Q.  And then it received a $225 million dividend deposit,

Braver - cross by Appleby-Bhattacharjee

1    correct?

2    A.   Correct.

3    Q.   And that was the first deposit into that account, correct?

4    A.   From my recollection, yes.

5    Q.   Now, you were shown a number of tracing charts during your

6    direct examination related to that deposit.  Do you recall

7    that?

8    A.   The -- define tracing charts.

9    Q.   So tracing charts that had been disclosed by the

10   government before this hearing that were given to you for your

11   review, as well as ones that you made modifications to based

12   on your own analysis.

13          Do you recall walking through those charts with

14   defense counsel?

15   A.   Yes.  You're talking about Exhibit 1031?

16   Q.   Correct.

17   A.   Okay.  Yes, Government Exhibit 1031.

18   Q.   Government Exhibit 1031.

19   A.   I just want to be clear because there's some other charts

20   that I saw today.

21   Q.   Yes.  And so on that point, you saw Government

22   Exhibit 1031 during your direct examination, correct?

23   A.   Yes.

24   Q.   And you saw Government Exhibit 1030.  Is that right?

25   A.   I did, yes.

Braver - cross by Appleby-Bhattacharjee

1  Q.  And you made certain annotations or adjustments to this

2  based on your own analysis as well, as we saw in the defense

3  forfeiture exhibits?

4  A.  Explain that.  You know, what --

5  Q.  Well, there were --

6    (Indiscernible crosstalk.)

7  BY MR. APPLEBY-BHATTACHARJEE:

8  Q.  -- there were versions of this chart with certain

9  transactions highlighted, et cetera.  Do you recall that?

10  A.  Yes, I do.

11  Q.  And you had commented that this chart you believed didn't

12  pass muster because it didn't identify specific bank accounts.

13  A.  More -- more about the source documents.  I didn't have

14  the source documents.  I didn't have the tracings of the

15  Outcome, Inc., the Outcome Holdings.  That's what I was

16  missing.  I didn't know what else was in those accounts before

17  the money went to Gravitas.

18  Q.  Is it fair to say that in preparing for your testimony

19  today you did not review the chart that's on the screen right

20  now, Government's Exhibit 1082?

21  A.  I did not get this chart.

22  Q.  Okay.  And you did not review Government's Exhibit 1081

23  before preparing for your testimony today?

24  A.  I did not get this chart.  And again, both of these charts

25  do not show the tracing.  It's showing summaries.

Braver - cross by Appleby-Bhattacharjee

1  Q.  Did you request the underlying bank records?

2  A.  I did not.

3  Q.  Did you know that the underlying bank records were marked

4  as a trial exhibit, Government's Exhibit 1291?

5  A.  As a trial exhibit?  I -- I was not provided that as -- as

6  my testimony today.

7  Q.  So your analysis was not based on any of the information

8  in Government's Exhibit 1082 and 1081, which I just showed

9  you.  Is that right?

10  A.  Correct.

11  Q.  As well as the underlying bank records, correct?

12  A.  Correct.

13  Q.  Okay.  You were shown Government's Exhibit 1029, as well

14  as certain annotations that you made to this exhibit based on

15  your own analysis.  Do you recall that?

16  A.  Yes.

17  Q.  I'm going to focus just on the original version of

18  Government's Exhibit 1029.  Here, we're looking at page 1.

19        And you had testified about how using LIFO instead of

20  FIFO would change the results on page 1 of Exhibit 1029.  Do

21  you recall that?

22  A.  Yes.

23  Q.  Now, would you agree that using LIFO instead of FIFO, you

24  would get the same results as appear on page 2 of

25  Exhibit 1029?

Braver - cross by Appleby-Bhattacharjee

1  A.  Same results as what?

2  Q.  That these same amounts traceable to criminal proceeds

3  would result if you use LIFO as opposed to FIFO?

4  A.  So this -- this document, I was never -- I never received

5  any of this.

6        Oh, okay.  Yeah.  So I never received the

7  documents -- any of the documents where the money came from

8  that was put into Gravitas Holdings Pershing 290.  Oh, well,

9  actually, this is -- that was the source of Gravitas Holdings

10  per -- yeah, I --

11        So what was your question again?  I'm sorry.

12  Q.  So applying LIFO as opposed to FIFO, all the entries here

13  under amounts traceable to criminal proceeds would be the

14  same, correct?

15  A.  Could I see the Gravitas Holdings Pershing 290

16  spreadsheet?

17  Q.  Sure.  So I'm under the LIFO tab, and essentially every

18  transaction appearing below the initial deposit of 225 million

19  is deemed fraudulent, correct?

20  A.  Correct.

21  Q.  So applying --

22  A.  That's assuming that the 225 million coming in, we had

23  source information for that.  Then I would agree with you.

24  Okay.

25  Q.  And you'd agree that using LIFO, you get the same results

Braver - cross by Appleby-Bhattacharjee

1  on page 3 of Exhibit 1029 relating to all the transactions

2  from Rishi Shah's account ending in 9002?

3  A.  Rishi Shah's account is the $30.2 million.  So that's --

4  using LIFO, the $30.2 million -- could I see 1020 -- 1031 one

5  more time?  I have it here.

6  Q.  Here you go.  Here's 1031.

7  A.  Okay.  Using LIFO, you're right, the 30.2 would be --

8  would be fraudulent proceeds.

9  Q.  So then based on your testimony, while using LIFO may

10  change the results on page 1 of Exhibit 1029 to the

11  defendant's benefit, it doesn't change the results on pages 2

12  or 3, correct?

13  A.  Like I said, you would do an analysis using all three and

14  then determine what is the most beneficial to the individual.

15  But I -- I -- I'd have to -- I -- I believe we did this, and I

16  just can't remember by memory of what this -- of what was the

17  most beneficial of the three.

18  Q.  Fair enough.

19        You testified about how flipping clean and dirty

20  funds from the same deposit could impact the results under

21  FIFO and LIFO.  Do you recall that?

22  A.  I do.

23  Q.  I'm going to draw your attention to what I'll designate as

24  Government's Exhibit 2001.  This is a tracing chart associated

25  with Rishi Shah's Bank of account -- America account ending in

Braver - cross by Appleby-Bhattacharjee

1    0955.

2              THE COURT:  Are you offering this?

3              MR. APPLEBY-BHATTACHARJEE:  Yes, I'm offering it.

4              THE COURT:  Any objections?

5              MR. FINNERAN:  No.

6              THE COURT:  Admitted without objection.

7       (Said exhibit admitted in evidence.)

8    BY MR. APPLEBY-BHATTACHARJEE:

9    Q.   Do you recall seeing this as among the work papers you

10   received while preparing for your testimony today?

11   A.   I did.

12   Q.   And here, you'll note that the -- there is a deposit

13   totaling approximately $12.4 million dated 11/6/2017 that is

14   broken into a clean and a dirty piece.  Do you see that?

15   A.   I do.

16   Q.   And in this instance, the clean amount, which is

17   approximately 9.1 million, is listed first, correct?

18   A.   Correct.

19   Q.   And the dirty amount is listed second, correct?

20   A.   Correct.

21   Q.   Now, under FIFO, that works to the defendant's benefit,

22   correct?

23   A.   Yes.

24   Q.   So earlier you testified that the government's assumptions

25   always work to the defendant's detriment.  Do you recall that

Braver - redirect by Finneran

1    testimony?

2    A.  I do.

3    Q.  And in this instance at least, that's not an accurate

4    statement, correct?

5    A.  I'd have to evaluate it.  But yes, it doesn't appear to be

6    for this transaction.

7         MR. APPLEBY-BHATTACHARJEE:  May I confer with my

8    colleague for a moment, Your Honor?

9         THE COURT:  Yes.

10     (Counsel conferring.)

11        MR. APPLEBY-BHATTACHARJEE:  No further questions.

12   Thank you, Your Honor.

13        THE COURT:  Any redirect?

14        MR. FINNERAN:  Yes, Your Honor.

15                      REDIRECT EXAMINATION

16   BY MR. FINNERAN:

17   Q.  Mr. Braver, I'd like to ask you a few questions about what

18   the government just discussed with you.  I'm going to put up

19   on the screen my version, same -- same document, of 905 --

20   excuse me -- 0955, which the government just introduced in

21   evidence.

22        Does this obviously look familiar to you?

23   A.  Yes.

24   Q.  And here, it was pointed out that the transactions are

25   listed clean and then dirty, as opposed to dirty and then

Braver - redirect by Finneran

1   clean.

2   A.   Correct?

3   Q.   And I think the question was asked whether this would

4   necessarily benefit the defendant.  Wouldn't that depend on

5   which assets in this account you attempted to trace out of

6   this account?

7   A.   Yes.

8   Q.   So in other words, if the fund -- you're using a FIFO

9   method and the things you're trying to trace out happened

10  relatively close in time to this deposit, then that would

11  benefit the defendant, right?

12  A.   Yes.

13  Q.   But if they were later in time, it would actually work to

14  the defendant's detriment.  Isn't that right?

15  A.   Possibly.

16  Q.   Okay.  I'm going to show you the Gravitas Holdings

17  accounts at Pershing.  The government showed you this exhibit

18  as well.  I'm not sure if I have the exhibit number.

19     (Counsel conferring.)

20          MR. FINNERAN:  We'll clean that up in a second,

21  Your Honor.

22          MR. APPLEBY-BHATTACHARJEE:  I'm not sure we marked

23  that one, but we -- can we treat it by agreement as

24  Government's Exhibit 2002?

25          MR. FINNERAN:  Yes, Your Honor.

Braver - redirect by Finneran

1    (Counsel conferring.)

2         MR. FINNERAN:  Okay.

3         THE COURT:  All right.  Government 2002, we'll just

4    call that this -- or call this that and --

5         MR. FINNERAN:  Yes.

6         THE COURT:  -- it will be admitted without objection.

7         MR. FINNERAN:  Thank you.

8    (Said exhibit admitted in evidence.)

9    BY MR. FINNERAN:

10   Q.  So this was shown to you on cross-examination as well,

11   wasn't it?

12   A.  Yes.

13   Q.  And there we see on line 2 the $225,000 deposit?

14   A.  Correct.

15   Q.  Now, I think you testified earlier this is actually

16   depicted as one account, but this is actually a collapse

17   analysis of multiple accounts.  Is that right?

18   A.  Correct.

19   Q.  So first of all, I think you said this on your cross, but

20   just to establish it, whether or not any of those assets are

21   traceable depends upon the assumption that all of that

22   $225 million is traceable to the fraud, correct?

23   A.  Correct.

24   Q.  And the accounts in which -- from which that account --

25   from which that deposit was made, the two Outcome Health

Braver - redirect by Finneran

1   Holdings accounts, am I correct that you have not seen any

2   tracing analysis that the government prepared for either of

3   those accounts?

4   A.   Correct.

5   Q.   I'm now going to -- if I can do this on the fly, I'm going

6   to just apply a filter here to show which of these

7   transactions come out of the 6290 account and which come out

8   of another account.

9        So you see here -- are there many, many Gravitas

10  Holdings accounts that are not related to 6290?

11  A.   Yes.

12  Q.   I'm now going to filter to just to 6290.  And do you see

13  here that there are both deposits and withdrawals that since

14  the money came into 6290 would be traceable to that $225,000

15  deposit, whether it's fraudulent or not?

16  A.   Correct.

17  Q.   I'm now going to do the opposite, and I'm going to filter

18  out 6290.  Does this show that there are many, many deposits

19  and withdrawals, as well, that are not connected to that

20  transfer because they are not in 6290?

21  A.   Correct.

22  Q.   Now, in fairness to the government, if we look at the

23  descriptions here, do they generally all read something like

24  dividends, interest, and other income, net change in

25  portfolio, dividends, fees, et cetera?

1  A.  Yes.

2  Q.  And I'll scroll down so you can confirm that.

3        Is your answer still yes?

4  A.  Yes.

5  Q.  Okay.  So on the assumption that all the -- all these

6  dividends are traceable to that deposit, then perhaps the

7  government would be correct.  But have you seen any analysis

8  to demonstrate that all these are traceable to that deposit?

9  A.  No.

10  Q.  I'm going to now -- we're just working backwards to the

11  government's examination, so I'm going to show grand jury -- I

12  keep saying grand jury -- Government Exhibit 1081.

13        MR. FINNERAN:  Sorry.  Is it visible to everybody?  I

14  can't tell on my screen.  Can you see this?

15        MR. APPLEBY-BHATTACHARJEE:  We could see it.

16        THE COURT:  Top half.

17        MR. FINNERAN:  Okay.  Yeah, it looks cut off.  Let me

18  try to zoom out.

19  BY MR. FINNERAN:

20  Q.  So you testified on cross-examination that this is a

21  document you had not seen until today?

22  A.  Correct.

23  Q.  Am I correct you reviewed the 5/19 forfeiture production

24  the government provided?

25  A.  Yes.

Braver - redirect by Finneran

1  Q.  And was it your understanding that production contained

2  the documents the government intended to rely upon for this

3  hearing?

4  A.  Yes.

5  Q.  And did you find this document anywhere in those

6  documents?

7  A.  I did not.

8  Q.  The government asked you whether there were tracing

9  documents.  Would you call this a tracing document?

10 A.  No.

11 Q.  Does this do anything to indicate even the bank account

12 into which any of these amounts were deposited?

13 A.  It does say that --

14 Q.  I'll zoom in.  Sorry.  One moment.

15 A.  -- it was deposited into an Outcome, Inc., JPMorgan Chase

16 account at 9393.

17 Q.  Have you seen any tracing analysis of that account?

18 A.  I have not.

19 Q.  If there were other deposits and withdrawals from that

20 account, would that affect which and how -- which of these

21 amounts and how much of them would be traceable to the fraud?

22 A.  It could, yes.

23 Q.  Have you seen any analysis of that?

24 A.  I have not.

25 Q.  I'm going to show you Government Exhibit 1082.

Braver - redirect by Finneran

1       Was this document shown to you also at your

2  cross-examination?

3  A.  Yes.

4  Q.  Had you seen this document before today?

5  A.  I did not.

6  Q.  Did you review the forfeiture production the government

7  provided on May 19th?

8  A.  I did.

9  Q.  Was this document contained in that production?

10  A.  It was not.

11  Q.  Was it your understanding that the government would

12  produce any tracing analysis that it attempted to use today in

13  that production?

14  A.  That was my understanding.

15  Q.  Is this a tracing analysis?

16  A.  No.

17  Q.  What -- what -- why is it not a tracing analysis?

18  A.  It doesn't show the ins and outs in the accounts.

19  There's -- there's several sources in certain accounts -- oh,

20  no.  The source is the government exhibit.  I'm sorry.

21  Q.  So all this tells you is that money came into an account

22  and left an account.  Is that right?

23  A.  Yes.

24  Q.  Does it not tell you anything about whether there were

25  other withdrawals not depicted on the chart?

Braver - redirect by Finneran

1    A.   Correct.

2    Q.   Does it tell anything about whether there were other

3    deposits not depicted on the chart?

4    A.   It does not.

5    Q.   Would a forensic analyst need that information in order to

6    conduct a tracing analysis?

7    A.   Yes.

8    Q.   Is your failure to have that information the reason that

9    you would not be able to -- that you were not able to prepare

10   today to examine those -- those accounts?

11   A.   Yes, correct.

12   Q.   All right.  One final line of questioning that came out of

13   the cross-examination.

14        So -- or actually two lines of questioning.

15        You talked about the loan agreement.  Is that

16   correct?

17   A.   Yes.

18   Q.   And you had not seen that document before today?

19   A.   I had not.

20   Q.   Again, to your understanding, was that in the government's

21   forfeiture production?

22   A.   No.

23   Q.   Okay.  And that loan agreement -- does anything about the

24   loan agreement affect how one traces the money that goes into

25   the account?

Braver - redirect by Finneran

1   A.   No.

2   Q.   What determines how you trace the money?

3   A.   Using one of the method -- methods available --

4   Q.   That's based upon, in part, whether there were other funds

5   in the account at the time that $30 million was received?

6   A.   Correct.

7   Q.   I'm going to show you Government Exhibit 1031, if I can

8   find it.

9        Can you see 1031 on your screen?

10  A.   I can, yes.

11  Q.   That deposit was made into Rishi Shah Chase 9002.  Is that

12  your understanding from the far right side of the chart?

13  A.   Yes.

14  Q.   Does the government then use that deposit as the basis, in

15  part, to trace criminal proceeds into 0955 and then into the

16  Pershing and Baroda Trust accounts?

17  A.   Based on this chart, yes.

18  Q.   And when we're looking at forfeitable property supposedly

19  paid out of those accounts, does the government's use of that

20  30 million as opposed to the 27 million you testified would

21  have been appropriate affect the tracing in those accounts?

22  A.   It does.

23  Q.   Does it also affect the tracing out of 9002 in terms of

24  whether or not a particular asset can be traced when other

25  deposits were made into 9002?

Braver - redirect by Finneran

1   A.  Yes.

2   Q.  I'm going to bring you back to an exhibit we discussed on

3   direct examination, 9020.  Does this reflect your analysis of

4   that Rishi Shah 9002 account?

5   A.  Yes.

6   Q.  And does this show that even under a FIFO approach, once

7   that correct assumption is made, that a large portion of the

8   proceeds in this account are not traceable?

9   A.  Correct.

10  Q.  Under an assumption that the dirty funds were first, is

11  your conclusion that only 1.5 million is traceable as opposed

12  to the 1.9 million the government seeks to forfeit today?

13  A.  Yes.

14  Q.  And under a clean funds first approach, is it your

15  testimony and conclusion that only 34,000 would be traceable

16  to the crime?

17  A.  Yes.  And in this case, I believe the clean funds first

18  approach would be the appropriate approach.

19  Q.  And why do you have that belief?

20  A.  Because the 3 million was in the account before the

21  proceeds from the loan came in.

22  Q.  So you're not trying to say that the $30 million dividend

23  didn't come from the bank, are you?

24  A.  No.

25  Q.  You're trying to identify when the money then leaves the

Braver - redirect by Finneran

1   account, what portion of it is traceable to that dividend.  Is

2   that correct?

3   A.   Correct.

4   Q.   Okay.  Finally, you said that FIFO is a generally accepted

5   method of tracing.  Is that correct?

6   A.   Yes.

7   Q.   Is it the only acceptable method of tracing?

8   A.   No.

9   Q.   What are some other acceptable methods of tracing?

10  A.   LIFO and pro rata.  There's another one as well that --

11  Q.   Not relevant here.

12  A.   Yeah.

13  Q.   And in your experience when multiple tracing methods lead

14  to different conclusions and you're doing an analysis in a

15  criminal case, which method is the appropriate one to use?

16          MR. APPLEBY-BHATTACHARJEE:  Asked and answered.

17          THE COURT:  Sustained.

18          MR. FINNERAN:  Okay.

19  BY MR. FINNERAN:

20  Q.   Is there any reason to prefer one analysis over another,

21  in general, among FIFO, LIFO, and pro rata?

22  A.   Benefit of the doubt to the -- to the defendant.

23          MR. FINNERAN:  Okay.  That's all I have, Your Honor.

24          THE COURT:  Any additional questions?

25          MR. APPLEBY-BHATTACHARJEE:  No.  Thank you,

1    Your Honor.

2              THE COURT:  All right.  Sir, you're excused.

3    Thank you.

4       (Witness excused.)

5              THE COURT:  Any additional witnesses by defense?

6              MR. FINNERAN:  No, Your Honor.

7              THE COURT:  All right.  Any rebuttal witnesses by the

8    government?

9              MR. APPLEBY-BHATTACHARJEE:  No, Your Honor.

10             THE COURT:  All right.  This is a criminal case, so

11   you're entitled to closing arguments.  I'm not sure we need to

12   do them today.  I think the parties would prefer to do some

13   briefing on this.  Is that correct?

14             MR. APPLEBY-BHATTACHARJEE:  Yes, Your Honor.  I would

15   propose a course of action that I hope defense counsel finds

16   agreeable.

17             It looks like there's several legal issues separate

18   and apart from the factual issues raised today that the Court

19   may have the -- may benefit from briefing about.  So if we

20   could set a briefing deadline at the Court's convenience for

21   briefs by the parties?

22             The government filed its initial motion -- perhaps

23   that could be served as the initial motion.  Defendant can

24   have a response deadline, and then we could file a reply.  And

25   then the equivalent of closings arguments, to the -- to the

1   extent the Court thinks they are necessary, we could have at

2   the hearing on the motion.

3          THE COURT:  Well, this is part of a criminal case.

4   So it's not a matter of whether I feel it's necessary.  It's

5   whether the parties feel it's necessary.

6          So I'm happy to have you count your initial

7   preliminary motion for forfeiture or your -- serve as your

8   opening brief.  I'll let the defense file a response to it,

9   and you can file a reply.

10         Consult with each other.  Email my courtroom deputy

11  by Tuesday and tell her what your proposed schedule is.

12         There was a whiff, or at least a suggestion somehow,

13  that everything you were supposed to get you didn't get.  Now,

14  if that's the case, you know, this has been set for quite some

15  time.  We have a sentencing set I believe in November.

16         And if you are -- provided I don't grant any

17  posttrial motions, which is -- haven't been filed yet, but

18  if -- if your claim is they didn't prove what they needed to

19  prove and there were more documents needed to prove it, that's

20  one thing.  That goes to the burden of proof.

21         MR. FINNERAN:  Yes.

22         THE COURT:  If your claim is they were sitting on

23  documents you didn't get, then I need to hear that, and we may

24  need to conduct additional hearings on this based on that.

25         Is it the former or latter?

1          MR. FINNERAN:  Can I make a record on that, because

2     it's a little of both.

3          THE COURT:  Go ahead.

4          MR. FINNERAN:  Okay.  So, Your Honor, we received a

5     forfeiture production on 5/19.  And I understand that -- the

6     government obviously produced voluminous records in advance of

7     that.  My understanding from the Court's order was that those

8     were the documents the government intended to rely upon at the

9     hearing and those are the documents, in part, that were

10     provided to Mr. Braver.

11          We then through our own review of the documents that

12     the government had previously provided, identified the tracing

13     spreadsheets that we've been discussing at length today.

14          I can't sit here and say that every single document

15     that -- you know, I -- I don't doubt that the government did

16     attempt to produce everything.  I'm not trying to make some

17     accusation.  However, I did not find anywhere in the documents

18     that I reviewed among Ms. Poelking's Jencks production any

19     tracing analysis of any of the Outcome Holdings accounts.

20          So --

21          THE COURT:  I don't know what tracing analysis -- I

22     don't mean to be simple on this, but I don't know that there's

23     an established way of showing a tracing analysis.  Maybe

24     there's a formal way that Mr. Braver used it when he was with

25     the IRS.  Maybe there's a way he did it in other cases --

1            MR. FINNERAN:  Uh-huh.

2            THE COURT:  -- but -- and I don't see anything in the

3    Federal Rules of Criminal Procedure that give guidance as to

4    the correct way to conduct a tracing analysis.  I just take

5    the evidences as it comes in and decide whether the burden has

6    been met by a preponderance by the government.

7            MR. FINNERAN:  No, I understand, Your Honor.

8            THE COURT:  All right.

9            MR. FINNERAN:  All I'm saying is this, is that

10   because the Jencks production did not include any tracing for

11   Outcome Health, I presume none exists.  If there was a tracing

12   for Outcome Health or Outcome Holdings that we have not

13   received, then that may be an issue.

14           But I'm happy to take the government's representation

15   that no such tracing chart like the ones we saw today exists,

16   and I don't think in that case we need to conduct a hearing on

17   the question.

18           THE COURT:  All right.

19           Response?

20           MR. APPLEBY-BHATTACHARJEE:  Yes, Your Honor.  And I

21   acknowledge that counsel is relatively new to the case, and I

22   don't begrudge him for not knowing the history of productions

23   that have been made, including the extensive trial record and

24   over 1,500 trial exhibits.

25           When we set the forfeiture hearing and set this

1   deadline for the disclosure of tracing charts, I think we had

2   been fairly clear that we would be relying on the same charts

3   that were presented to the grand jury and appended to the

4   grand jury transcripts which had been produced to defense

5   counsel for all defendants, now years ago.

6          And what we had commented is that those charts, which

7   were really demonstratives that would aid the testimony of

8   Ms. Poelking, would be updated if necessary and by the

9   May 19th date, that any updated versions that were separate

10  and apart from trial exhibits that were used, including during

11  Ms. Poelking's trial testimony, we would disclose.  That was

12  the focus of that disclosure.

13         The Jencks production was made during trial before

14  Ms. Poelking took the stand in a posture where we did not know

15  whether we would be having a forfeiture hearing before the

16  jury.  And so all of the underlying substantive type records

17  were produced at that time.

18         I believe I can fairly represent that nothing that

19  was presented through the witness in terms of documentation,

20  et cetera, relied on by both parties has been withheld by the

21  government.  I did make certain inquiries on cross-examination

22  of the defense witness regarding records that I think are --

23  they are -- it's fair to assume are available to the defense

24  group, although I acknowledge that they weren't part of the

25  May 19 production simply because they are part of the trial

1  record.

2         And I think we noted when the Court originally set

3  this forfeiture hearing that we would reserve our right to

4  rely upon trial evidence and testimony as necessary to prove

5  up our burden.

6         MR. FINNERAN:  Your Honor, if I may, I think that

7  actually resolves almost everything.  Because I did review

8  Ms. Poelking's grand jury transcript and the supporting

9  exhibits.  I did locate and review the entirety of the

10  Poelking Jencks production that was made during trial and

11  then, obviously, the May 19 production.

12         In none of those productions was there a tracing

13  analysis of the Outcome Holdings account or the Outcome

14  Incorporated account.  So if counsel is representing to the

15  Court that all such documents have been turned over, then I

16  think it's safe to assume that no such tracing analysis exists

17  or was conducted.  And we don't think we need to inquire into

18  the matter further.

19         THE COURT:  Response?

20         MR. APPLEBY-BHATTACHARJEE:  I will take that.

21         THE COURT:  All right.

22         MR. APPLEBY-BHATTACHARJEE:  I don't --

23         THE COURT:  Okay.

24         MR. APPLEBY-BHATTACHARJEE:  -- anticipate anything

25  further is forthcoming with respect to tracing going higher up

1    in the chain of the transaction.

2           THE COURT:  Well --

3           MR. FINNERAN:  And of course, Your Honor, if after

4    this hearing I confer with the government and we determine

5    that something was inadvertently withheld, we will work with

6    the government on that issue.

7           THE COURT:  Either to reach a resolution of what it

8    is or reconvene a hearing.  But Tuesday, give my courtroom

9    deputy an agreed briefing schedule.  Let me know whether or

10   not either side wants a closing argument.

11          If you can't make that determination by Tuesday,

12   certainly let us know sometime before the briefing is

13   completed and I'll schedule another oral argument.

14          MR. FINNERAN:  Your Honor, I have one other matter

15   before you --

16          THE COURT:  Go ahead.

17          MR. FINNERAN:  I'm confident Your Honor is not

18   prepared to rule on this today, but I would like to make an

19   oral motion, given the fact that the government did not

20   present evidence and appears to have conceded that most of the

21   assets in this case were not traceable.  I would like to make

22   an oral motion that the protective order be amended to release

23   from the protective order any asset that the government failed

24   to produce evidence of tracing for today.  And I will be

25   filing a written motion to that effect.

1    THE COURT:  All right.  Well, I'm not going to rule

2  on your oral motion.

3    MR. FINNERAN:  Of course.

4    THE COURT:  File your oral motion.  And if there is

5  such a written motion, then you should get an agreed briefing

6  schedule on that, too.

7    MR. APPLEBY-BHATTACHARJEE:  I think what we'll do is

8  we'll confer with counsel and on Tuesday submit just a global

9  briefing schedule for your response and initial motion and

10  then our reply and response.

11    MR. FINNERAN:  That is acceptable to the defense.

12    THE COURT:  Okay.  Very good.

13    All right.  Then, we will look forward to getting the

14  briefs and whether you want closing arguments on the case.

15    Thank you all.

16    MR. APPLEBY-BHATTACHARJEE:  Yes.  Thank you,

17  Your Honor.

18    MR. FINNERAN:  Thank you, Your Honor.

19    (Proceedings concluded at 2:06 p.m.)

20                        CERTIFICATE

21    I certify that the foregoing is a correct transcript from

22  the record of proceedings in the above-entitled matter.

23  */s/ Elia E. Carrión*        *5th day of July, 2023*

24  _____              _____
   *Elia E. Carrión*                      *Date*
   *Official Court Reporter*

25