1  IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF ILLINOIS
2  EASTERN DIVISION

3  UNITED STATES OF AMERICA,          )
                                      )   Docket No. 19 CR 864-1
4           Plaintiff,                )
                                      )   Chicago, Illinois
5           v.                        )   August 1, 2023
                                      )   11:02 a.m.
6  RISHI SHAH,                        )
                                      )
7           Defendant.                )

8

           TRANSCRIPT OF PROCEEDINGS - Oral Argument
9          BEFORE THE HONORABLE THOMAS M. DURKIN

10
   APPEARANCES:
11
   For the Government:    MR. MATTHEW F. MADDEN
12                        MR. SAURISH APPLEBY-BHATTACHARJEE
                          Assistant U.S. Attorneys
13                        219 South Dearborn Street, 5th Floor
                          Chicago, Illinois 60604
14

15
   For Defendant          MR. RICHARD E. FINNERAN
16 Rishi Shah:            Bryan Cave Leighton Paisner LLP
                          One Metropolitan Square
17                        211 North Broadway, Suite 3600
                          St. Louis, Missouri 63102
18

19

20

21

22 Court Reporter:        ELIA E. CARRIÓN, CSR, RPR, CRR, CRC
                          Official Court Reporter
23                        United States District Court
                          219 South Dearborn Street, Room 1432
24                        Chicago, Illinois 60604
                          312.408.7782
25                        Elia_Carrion@ilnd.uscourts.gov

1    (Proceedings heard in open court.)

2         THE COURT:  Let's call the case, please.

3         THE CLERK:  This is Case No. 19 CR 864, United States

4    v. Rishi Shah.

5         May I please ask that the attorneys present on behalf

6    of the United States state their names.

7         MR. MADDEN:  Good morning, Your Honor.

8    Matthew Madden and Saurish Appleby-Bhattacharjee on behalf of

9    the United States.

10        THE CLERK:  And on behalf of Rishi Shah, please.

11        MR. FINNERAN:  Good morning, Your Honor.

12   Richard Finneran on behalf of Rishi Shah.

13        THE COURT:  All right.  I believe you asked for the

14   oral argument in this case.  Is that correct, the parties?

15        MR. FINNERAN:  We agreed to an oral argument in this

16   case, yes, Your Honor.

17        THE COURT:  Okay.  I've read the briefs.  There are

18   two motions.  One is the government's motion for prejudgment

19   garnishment, which is fully briefed; one is Shah's motion --

20   Defendant Shah's motion to amend the protective order, both of

21   which really deal with the issue of the 4.9 million that the

22   government agrees -- I believe you conceded should not have

23   been restrained before the trial.

24        Is that correct, Mr. Madden?

25        MR. MADDEN:  I agree that it's not -- it was not --

1    there were commingled assets.  The vast majority of the funds

2    were -- were proceeds and that that portion, that of which our

3    estimate was 4.9 million, that those were -- are not

4    traceable.

5            THE COURT:  Okay.  Okay.  And not being traceable,

6    should they have been restrained in the original order I

7    entered on April 8, 2020?

8            MR. MADDEN:  It's -- it's unclear to me, Your Honor.

9    The -- the issue we had is -- this was -- it was an unusual

10   situation where Shah, you know, consistent with his affidavit,

11   his assets were illiquid and he invested in a number of funds

12   that invested in early-stage companies.  And so given those

13   circumstances in consultation with the money -- the MLARS

14   section of DOJ, that's what -- that's what we did.  And so,

15   yeah, some portion of it was not traceable.

16           I mean, there were assets amongst those where

17   100 percent was traceable.  There were other assets where not

18   100 percent was traceable, and that's where you get that

19   approximately 20 percent.  So that -- that's the situation.

20           If we went to MLARS tomorrow with the new case, they

21   might advise us to do the same thing.  I'm not entirely sure

22   what DOJ would advise us to do.

23           THE COURT:  Okay.  Well, isn't what the -- your

24   motion, Mr. Finneran, and your motion, Mr. Madden, on behalf

25   of the government, really what to do with that 4.9 million?

1         MR. MADDEN:  Yes.

2         THE COURT:  Do you agree?

3         MR. FINNERAN:  I agree, Your Honor, we have to decide

4 what to do with the 4.9 million.  We don't agree that

5 4.9 million is the correct number of what's not traceable

6 today, but we agree that 4.9 million is what is at issue today

7 in terms of what we've moved to amend the protective order to

8 release.

9         THE COURT:  All right.  Well, how do you want to

10 proceed?  Happy to hear -- I'll obviously hear argument from

11 both of you, but who wants to go first?

12         MR. MADDEN:  I'll defer, Your Honor.

13         MR. FINNERAN:  I'm happy to go first, Your Honor.

14         THE COURT:  Go ahead.

15         MR. FINNERAN:  Do you mind if I come to the podium

16 or --

17         THE COURT:  No, not at all.  Go ahead.  It's

18 refreshing.  As long as you're in front of a microphone,

19 that's the key.

20         MR. FINNERAN:  And we don't have a -- they don't let

21 us sit at the table in St. Louis, so I'm not used to speaking

22 to the judge from the table.

23         THE COURT:  Okay.

24         MR. FINNERAN:  Well, thank you, Your Honor, again for

25 the opportunity to speak with you and to address this issue.

1   We were last here six weeks ago for the forfeiture hearing,

2   and as you know at that time, I made an oral motion which we

3   followed up with our motion to amend.  As we've just heard,

4   the government now admits that there's about $5 million worth

5   of assets that it cannot trace to the crimes of conviction,

6   but which are nonetheless restrained by this Court's

7   protective order as of today.

8        Again, we believe the number is larger, but here

9   we're talking about -- you know, we've given you a proposed

10  order that basically would take those monies out of the

11  restraining order reserving all rights that we'll have later

12  to argue about the ultimate forfeitability of property once we

13  get to that stage.

14       As you said, there are two motions, and really those

15  two motions reflect two different ways that the government

16  could potentially, if it persuades you, nonetheless, hold on

17  to that about $5 million that it concedes is not traceable to

18  the crimes of conviction.  And so those are first, if it

19  persuades you that you are authorized to restrain substitute

20  property at this case -- at this stage of the case, despite

21  there not being either a preliminary order of forfeiture

22  against Mr. Shah nor a judgment against Mr. Shah.

23       And the second is if it convinces you that under

24  either the All Writs Act or the federal debt collection

25  procedures act, you have the authority to restrain those

1  assets in anticipation of a restitution order.

2       So I'm happy to take those whichever order the Court

3  likes, but I was going to start with the substitute assets

4  unless you'd rather I start with the garnishment.

5       THE COURT:  Well, I think there's agreement or it's

6  pretty clear in the law that substitute assets cannot be used

7  preconviction.

8       MR. FINNERAN:  Correct.

9       THE COURT:  They shouldn't be frozen, which I think

10  is why the government is grudgingly conceding possibly they

11  shouldn't have been restrained.

12       MR. FINNERAN:  Correct.

13       THE COURT:  I'm not attributing any bad faith to it.

14  I just think that your client has a complicated financial

15  picture.  And I reread the order.  You know, the money went to

16  Gravitas and that was then used to -- in a settlement with the

17  company.  They allowed him to have some of those monies.

18       MR. FINNERAN:  Uh-huh.

19       THE COURT:  Rereading the order, it's pretty

20  straightforward, that was money that should -- having come

21  from Gravitas which received the lion's share -- or a good

22  portion of the loan which was I believe proceeds of the fraud.

23  I heard test -- you weren't here, but I am sure you've

24  reviewed the transcript.  I heard testimony from investors

25  that said they wouldn't have given this money to Mr. Shah and

1  his company but for the false statements made.  It's pretty

2  straightforward.  So -- but postconviction is a different

3  issue.

4          MR. FINNERAN:  Uh-huh.

5          THE COURT:  It strikes me as odd that when there is

6  going to be inevitably a restitution order in this case, that

7  what -- even with setoffs is going to be enormous.  Even with

8  the setoffs for monies those victims may have received by way

9  of settlement is going to be enormous.

10         And the preliminary order of forfeiture, which hasn't

11 been entered yet, but there's no reason we can't proceed --

12 you know, we deferred it for this, this proceeding, but I'm

13 wondering whether that ought to go first and determine what

14 the actual amount is that is forfeitable.

15         You contest the figures of the government and say

16 they're -- they're grossly in excess.  The government defers

17 on that, and I've heard evidence, and I'm not sure there's

18 more evidence I need to hear or I need to decide it based on

19 the completed briefing.  But we're not in the preconviction

20 stage, we're in the postconviction stage, and it strikes me as

21 odd that the money that you're seeking to have released, I'm

22 not sure it's yours, to quote the *Marshall* case, which I'd

23 like you to address.  I'm not sure you can use money that's

24 not yours to pay for an attorney or pay for however Mr. Shah

25 wants to pay his expenses; other expenses, his living

1    expenses.

2         Mr. Shah has a right to an attorney, but

3    postconviction, I'm not sure he can use that money to fund an

4    attorney of his choice when an attorney will be appointed for

5    him if he can't afford one.  There's my dilemma and you can

6    address it.

7         MR. FINNERAN:  Okay.  Thank you, Your Honor.  And I

8    understand the dilemma we're in sort of a twilight here

9    between two ends of the case law.  One, as you've

10   acknowledged, which says that preconviction you can't

11   restrain, another set that says postjudgment you can restrain.

12   There are some cases that I think say postconviction, but

13   they're all arising in the postjudgment context, so I have

14   not -- in the context of forfeiture, I know we've got

15   garnishment cases to talk about, but I think that we're kind

16   of in unchartered territory to some degree.

17        THE COURT:  Is it different though?  I mean, I know

18   it's --

19        MR. FINNERAN:  Uh-huh.

20        THE COURT:  -- casewise you can distinguish it that

21   way.

22        MR. FINNERAN:  Uh-huh.

23        THE COURT:  But isn't the logic of keeping money

24   available for victims and for forfeiture more applicable

25   postconviction, whether it's postconviction or postjudgment,

1  the difference is at postjudgment time you have certainty as

2  to what the amount is.

3       MR. FINNERAN:  Uh-huh.

4       THE COURT:  A preliminary order of forfeiture would

5  allow for that certainty, at least preliminarily of what the

6  forfeiture should be.

7       MR. FINNERAN:  Right.

8       THE COURT:  I -- I think that's -- we may be in a

9  twilight zone, but we're in a twilight zone that's a lot

10  closer to postjudgment than preconviction.

11       MR. FINNERAN:  Let me try to tell you why I think

12  that's not right, but I understand your perspective.

13       THE COURT:  Sure.

14       MR. FINNERAN:  So let me start with reductio ad

15  absurdum that I think will help explain why that really can't

16  be right.  So if it was the case that a moment that the

17  defendant is convicted, then the government has the ability

18  not to seize only the property obtained from the crime but

19  also the property that is not connected to the crime, that he

20  has clean property, then everybody who gets retained to be

21  sentencing counsel in the case, appellate counsel in the case,

22  all their retainers would be in jeopardy.

23       And the right to counsel does not terminate at the

24  point of conviction.  It terminates at the point of -- well,

25  judgment in the district court and then at the point of an

1    appeal where a defendant also has a right to counsel there.

2    So --

3            THE COURT:  Well, the right -- distinguish right to

4    counsel with counsel of choice.  Appointed counsel is always

5    available --

6            MR. FINNERAN:  True.

7            THE COURT:  -- for any nondiscretionary appeal.  And

8    appointed counsel is available to Mr. Shah.  It may not be

9    what he prefers.  But is it his money to spend, which I think

10   was the point of *Marshall*?

11           MR. FINNERAN:  I understand, Your Honor.  So -- so I

12   would say, first of all, if we're talking about money that is

13   not his money to spend because of the fact that it was

14   obtained from an illegal source, then I think the

15   Supreme Court's decisions in *Monsanto* and *Caplin* and *Drysdale*

16   tell us, no, he can't spend that money for that purpose.

17           THE COURT:  Agreed.

18           MR. FINNERAN:  Here, we're in the *Luis* category of

19   cases.  We're in the situation where the government now

20   acknowledges this is untainted property, property that

21   Mr. Shah does have a constitutional right to retain his

22   counsel of choice.  And the mere fact that he might be able to

23   also have appointed counsel retained for him, well, of course,

24   that's true of every defendant who's denied his counsel of

25   choice, but still the Constitution is interpreted by the

1  Supreme Court in *Luis* entitles a defendant to his counsel of

2  choice.

3         So I -- I start with that reductio really just to

4  explain why the logic -- I understand the Court's thinking

5  about the logic, but by -- by that same token, if we accept

6  the proposition the government wants you to -- to accept

7  today, which is that it not only can restrain property

8  postconviction, but it can restrain property under the FDCPA

9  anytime that it has an anticipation of a restitution order.

10  And that's going to have a very significant impact on counsel

11  of choice and is going to raise significant Sixth Amendment

12  concerns.

13         So I mean, looking at the plain language of the

14  statute in a second to try to --

15         COURT REPORTER:  Slow down.

16         MR. FINNERAN:  -- excuse me.

17         -- explain to you why I don't think that that

18  construction is correct.  But just in terms of logic and

19  common sense, that's how I think about why it makes sense to

20  draw the line at judgment and not a conviction is because,

21  among other things, the defendant does have a right to counsel

22  of choice throughout these proceedings, not merely prior to

23  this conviction.

24         THE COURT:  Well, *Jones* I think talks about whether

25  the *Luis* decision does not necessarily apply if the defendant

1  miss -- misstating it, but the *Luis* decision is not

2  necessarily determinative if the defendant has sufficient

3  alternative assets available.

4  I don't know what Mr. Shah has.  He's spending money.

5  He's spending it on you.  Well spent.  He's spending it on --

6  up until two days ago when I granted the motion to withdraw

7  from the Hennigan firm, he was spending it on trial counsel.

8  MR. FINNERAN:  Uh-huh.

9  THE COURT:  He's still spending it on Mr. Glozman.

10  He's spending it on -- I'm not sure who else.  So he certainly

11  has -- I have -- I'm not aware of whether he has insufficient

12  to sufficient assets available to him to continue to pay you,

13  have you represent him at sentencing, or whoever he intends to

14  have represent him at sentencing, and without prejudging the

15  posttrial motions, but if they're denied, who's going to

16  represent him on appeal?

17  I don't -- there's nothing indicating he's penniless.

18  And, if anything, the government's attachments to their

19  motions -- qualified by your explanations -- but still

20  indicate a person who enjoys significant wealth.

21  Where is he -- where is the Sixth Amendment concern

22  at this point if he has sufficient alternative assets

23  available to him?

24  MR. FINNERAN:  So I -- I'm not prepared to concede

25  today that he does have sufficient alternative assets without

1    getting deep into it.  I'm doing this case on a substantial

2    discount based upon my discussions with Mr. Shah.  I -- some

3    of the information the government put into its motion

4    obviously we had the time to investigate and respond to and I

5    think debunk a number of them.  The rest of them I haven't --

6    I didn't have a chance to figure everything out.

7         But let me sort of set one piece of that -- that

8    record straight because I think it is important for what comes

9    next even -- as well as what comes now.

10        So the biggest thing the government points to there

11   in terms of new assets that Mr. Shah has access to that he

12   could use to retain his counsel of choice is this $6 million

13   rough -- I think it's roughly $6 million distribution that

14   came out of one of the unrestrained JumpStart Ventures a few

15   months before the trial.  And so the fact that that money was

16   given to him at that point, as I understand that a lot of that

17   has been spent already, but that doesn't really affect whether

18   the order in the first place, you know, was restraining more

19   property than it should have or whether he needed those funds

20   to retain counsel of choice.

21        Getting away from the facts for a moment, though, I

22   think I may read *Jones* a little bit differently.  As I read

23   *Jones*, what the court is dealing with in the *Jones* case is a

24   plain error issue and it's deciding whether or not the

25   defendant should have raised the issue earlier and said that

1   *Luis* didn't change the framework for his ability to raise the

2   issue earlier.  I don't read it as actually saying that

3   there's a requirement the defendant demonstrate a need for

4   property before he can challenge the order, and I think in

5   your order of years ago before I was involved in the case, you

6   even in there raised questions about what the actual rule

7   should be.

8           I think, though, obviously, regardless of what the

9   Seventh Circuit has said, we have to look at what the

10  Supreme Court said in *Luis*.  I know we have a split opinion

11  there.  You know, Justice Thomas and four other Justices, and

12  lawyers hate having to figure those things out and figure out

13  which rule is the controlling rule, but I think we've

14  explained fairly persuasively in our posttrial briefing, which

15  I know not -- not what we're talking about today, that

16  Justice Thomas's opinion is the controlling rule and his rule

17  does not say that the defendant has to show that he doesn't

18  have other assets that he could have used to pay an attorney.

19  Rather, he is able to take clean funds, that is his

20  constitutional right to use any clean funds that are available

21  to him to pay for his counsel of choice.

22          THE COURT:  Posttrial?

23          MR. FINNERAN:  Well, that's not the -- the setting of

24  *Luis,* of course, is a setting where it's post -- postjudgment

25  that the issue is raised.  And the challenge was to a pretrial

1   restraint of the property.  So we're not in the -- the

2   twilight zone that we were talking about earlier.  But what

3   Justice Thomas does say is that that right continues through

4   the -- it does not -- the defendant's right to use that

5   property continues until trial and judgment.  So the words of

6   Justice Thomas tell us that conviction is not the point of

7   demarcation; it is the judgment in the case.

8           THE COURT:  Well, again, *Marshall* does a pretty good

9   job -- I think it's not binding, but it's persuasive

10  authority -- it does a pretty good job of discerning the

11  *Caplin* case and the *Luis* case in talking about the gap that

12  you're addressing right now and how they believe it applies.

13  And the takeaway from that case is you can't spend money you

14  don't own.  Does the government own this money postconviction?

15  Own it in the sense that I can just say, Let it go.  That,

16  victims, sorry, you have no right to this money.  Government,

17  sorry, you have no right to forfeit this money --

18          MR. FINNERAN:  Uh-huh.

19          THE COURT:  -- despite the conviction and because of

20  a Sixth Amendment concern.

21          The Sixth Amendment concern in my mind still has to

22  go to whether or not he has sufficient funds to support

23  a vigorous -- the -- support the defense of his choice --

24          MR. FINNERAN:  Uh-huh.

25          THE COURT:  -- going forward between now and the

1   appeal, including the appeal.

2         There's kind of my dilemma.  If this were -- if he

3   was penniless, maybe it's a -- that's something to consider.

4   If he was, you know, mega wealthy, that would be something to

5   consider.  I don't know where he's at --

6         MR. FINNERAN:  Uh-huh.

7         THE COURT:  -- and maybe I have no right to know

8   that.  But pre -- pretrial it's a different issue.  But

9   posttrial, there's -- there are rights now that attend to what

10  I believe to be are going to be significant forfeiture and

11  restitution orders that vastly exceed the frozen assets that

12  are tainted.

13        I think inevitably there's going to be a -- I could

14  be wrong.  You're going to brief this and argue otherwise, but

15  I think there's at least a reasonable likelihood there's going

16  to be significant substitute assets that are going to be

17  forfeited and that there are going to be -- there's going to

18  be a restitution order that exceeds the wealth of Mr. Shah.

19  If it does not exceed his wealth, he doesn't need this money

20  to fund an attorney.  He's got way more funds than any

21  reasonable person would need to fund an attorney, no matter

22  how expensive the attorney may be.  So that's -- I'm giving

23  you the --

24        MR. FINNERAN:  These are --

25        THE COURT:  -- back and forth.

1          MR. FINNERAN:  No, I appreciate it.  And this is --

2     I'm glad for the dialogue, the opportunity for the dialogue.

3     So, first of all, there's a lot -- a lot of little points

4     there.  Let me try and get the last one first.

5          The government's not just asking you to restrain up

6     to $55 million.  Its garnishment order -- its garnishment

7     motion says, because we presented argument, at least, that the

8     amount of restrained property may exceed even the $55 million

9     it seeks in terms of total possible substitute assets, that

10    you should continue the restraint of all of it.  So you said

11    if Mr. Shah was so wealthy that he had more than $55 million,

12    which I fairly -- and I can -- believe I can confidently tell

13    you that is not true, or at least it's not true based upon

14    what he told me when I was working out my arrangement with

15    him -- even if -- they want you to restrain more than

16    $55 million, to continue the restraint of all of this

17    property.

18         And so without -- as you said, if the government's

19    right about restitution, which I hope to have the opportunity

20    to argue --

21         THE COURT:  Slow down.

22         MR. FINNERAN:  -- why it's wrong.  If it's right

23    about restitution, then the example you just gave, even if he

24    were fabulously wealthy and had $400 million, the government

25    wants you to restrain all of that, and that would, as I -- I

1  believe I've articulated before, don't need to rehash, does

2  impact upon his counsel of choice and his ability to use his

3  money to pay for the counsel of his choice.

4          And I don't discern a limit in either of the

5  opinions, frankly, in *Luis* as to whether the defendant can

6  hire one lawyer or an army of lawyers or the best lawyer in

7  the world who has the highest rate in the world.  Counsel of

8  choice, as I read the *Luis* opinion, allows the defendant to

9  choose who will represent him throughout the case with money

10 that is untainted, as the government now concedes this money

11 is.

12         THE COURT:  No, with money that is untainted

13 postconviction.

14         MR. FINNERAN:  Yeah.

15         THE COURT:  That's the difference.  It may not be his

16 money at this point.

17         MR. FINNERAN:  And that's -- I wanted to get to that

18 point.  And thank you for reminding me of that.  So the -- the

19 earliest point I think at which we could say that untainted

20 property is not the defendant's property is at the point where

21 this Court enters a preliminary order of forfeiture against

22 the defendant's interest in that property.

23         Even then, I would say that that is not -- because it

24 is preliminary in nature and not a final order, that is not

25 the time at which the government gets title to the property.

1  And it's fairly well-established under forfeiture law,

2  judicial condemnation of a contingent forfeitable interest in

3  property does not occur until the final judgment in the case.

4         So while the government may have a hope and a belief

5  that it will be able to forfeit this property as substitute

6  property, although my next note is why I don't think they can

7  do that, that is not a current interest in this property.

8  That means that is the government's property.  The government

9  points to this relation back doctrine which says that the

10  government's interest vests to a previous time once the

11  forfeiture is entered.  But the courts are clear that doctrine

12  does not apply to substitute assets.  It only applies to

13  directly traceable property.

14         So -- and, you know, I -- I practiced forfeiture for

15  seven years when I was in the government, I've -- I've -- I

16  try and handle these cases so long as I can when there's an

17  issue to argue about, which often there isn't, but I -- I

18  don't believe the government could plausibly contend that they

19  own this property today.

20         THE COURT:  Fair enough.  And that goes to the -- I'm

21  just using the language that the *Marshall* decision --

22         MR. FINNERAN:  Yeah, no, I understand.

23         THE COURT:  -- but is there no remedy -- the

24  government points to the All Writs Act as a basis to at least

25  prevent the dissipation of assets that may very well have to

1    be used to satisfy a restitution of forfeiture order.

2           MR. FINNERAN:  Uh-huh.

3           THE COURT:  If -- if -- if there's no remedy, then

4    the money just goes out the door and is gone.  Now, you

5    balance that, of course, with the Sixth Amendment concern.

6    But let's assume those Sixth Amendment concerns which -- would

7    you agree the All Writs Act allows for the freezing of assets

8    until a final order -- final order of forfeiture is determined

9    or a final restitution order is determined once we hear from

10   victims and hear setoff arguments that you're going to make?

11          MR. FINNERAN:  No.  And for a simple reason, and

12   that's what the Court has said in -- I wrote the names down --

13   the *Shoop* case, the *Penn Bureau* case -- *Penn Bureau of Prisons*

14   case, and the *Syngenta* case, which is that if -- if there is a

15   statute that governs the issue that the party seeking the writ

16   is -- is seeking to avail themselves of effectively, the

17   All Writs Act does not allow the Court to get around that.

18   We're not --

19          THE COURT:  What statute would that be?

20          MR. FINNERAN:  I think there's two statutes that

21   directly cover this issue.  One, of course, is the forfeiture

22   statute, Section 853; and the other is the federal debt

23   collection procedures act.

24          Now, the government says this is a circular argument

25   because, well, if it doesn't -- if it's not covered by one of

those two things, in other words, if it's not allowed to do it under one of those two things, then the All Writs Act acts as a backstop. That's exactly what the Supreme Court said is not true in each of those three cases. What the court said is that if the subject matter is covered by a statute, then the All Writs Act is not a get-out-of-jail-free card. And if it weren't, then the All Writs Act would be an absolute plenary authority for courts to issue any order they wished on any topic they wished so long as they were not allowed to do so by another statute.

I -- I, frankly, think this argument is among the weaker arguments because of how clear the Supreme Court's rulings on these issues have been. I acknowledge the Second Circuit's opinion in -- I don't have the name in front of me, but that Second Circuit case that they rely upon goes the other way. It predates at least one of those cases, *Shoop*, where the court I think was the most explicit about this. But, frankly, I don't know how the Second Circuit got there without reading either of those two cases or citing them in its opinion. And I encourage the Court to not, in my view, commit the same error that the Second Circuit did in reaching that decision.

So you told me that All Writs Act, which was sort of down my outline, and if I can go back up --

THE COURT: Sorry about that.

1    COURT REPORTER:  I can't understand you.  You have to

2  slow down.

3    MR. FINNERAN:  I'm sorry.

4    You took me to the All Writs Act, which was a little

5  bit down my outline, but I'm -- I'm happy to take it in

6  whatever order you like, but if I could go back to substitute

7  assets first.

8    So we've made arguments obviously in writing as to

9  why we don't think the property the government here is focused

10  on even would be subject to forfeiture as a substitute asset.

11  There's two ways for us to get there.  And I encourage the

12  Court to consider the easiest way first, and that is the fact

13  the government hasn't made any showings in order to obtain the

14  forfeiture of substitute assets.

15    It's not merely the fact the government gets to say,

16  well, this is clean property and we want a money judgment and

17  so we get to forfeit other property as substitute assets.

18  Section 853(p) sets out conditions the government must satisfy

19  before the forfeiture of substitute property is permitted.

20    And if you'd like, Judge, I've actually got on my

21  screen -- I could put it on the screen for you if that's

22  faster.

23    THE COURT:  Sure.  Well, that's...

24    MR. FINNERAN:  I pulled up all the statutes in

25  anticipation of possibly needing any of this, so...

1      (Pause in the proceedings.)

2          MR. FINNERAN:  I can pull up the provision I'm

3    talking about for you.

4          THE COURT:  Okay.

5          MR. FINNERAN:  Okay.  So what I've placed on your

6    screen just now is section -- Subsection P of 853.  And so as

7    you can see here, there are numerous requirements the

8    government must satisfy before it can forfeit an item of

9    property.  So let me take them sort of -- there's three, as I

10   read it.

11         So first, it has to show that one of the conditions

12   in A through E is met.  It's got to show that for some reason,

13   basically, it can't get the property that was traceable.  And

14   in the event that it's going to do it in the first way, it has

15   to show it exercised due diligence to try to locate that

16   property and could not locate it.

17         But probably most importantly, all of those five

18   statements are preceded by the phrase:  As the result of any

19   act or omission of the defendant.  And so it's not -- and this

20   was dealt with by the Supreme Court in a case, it's not that

21   any act by any person or any defendant is enough to make an

22   item of clean property forfeiture -- subject to forfeiture as

23   substitute property.  The government has to show that Mr. Shah

24   did something to cause one of these five conditions to occur.

25   I didn't hear any evidence at the forfeiture hearing of any of

1   that.

2          Moreover, in the last paragraph here, it says that:

3   It must be the property of the defendant.  And here, these are

4   actually not generally properties of the defendant.  They are

5   properties of other entities, which are separate legal

6   entities that are not, you know, charged as defendant's in

7   this case or anything of the sort.

8          THE COURT:  Well, I'm confused.  If -- is it his

9   money or not?

10         MR. FINNERAN:  It is the money of jump -- well, it's

11  different things.  But it's the property of Jumpstart or

12  Gravitas.  I believe in some cases it is his property, but in

13  any event, it is clean, untainted property that Mr. Shah can

14  use to promote his defense, and that is sufficient for it to

15  qualify as exempted from restraint under the Sixth Amendment.

16  And obviously, we're arguing about when, but that's the

17  difference there.

18         THE COURT:  Well, you're arguing it's his money.

19         MR. FINNERAN:  I'm arguing that he has -- he has the

20  ability to use this property for his defense.  It is not his

21  money right now because it is owned by Gravitas -- well, it's

22  not, first of all, money in most cases.  It's stock or

23  interest in property that Gravitas Holdings owns.

24         THE COURT:  Who owns Gravitas?

25         MR. FINNERAN:  I believe it is 80 percent owned by

1 Mr. Shah and 20 percent owned by Ms. Agarwal. But, you know,

2 I don't believe that the language of this provision empowers

3 the Court to just ignore the existence of corporate forums,

4 for example, in deciding whether or not a particular item is

5 property of the defendant. And we -- we articulated that in

6 one of our brief -- items of briefing with a little more

7 explanation.

8            THE COURT: All right.

9            MR. FINNERAN: So because the government hasn't done

10 any of these things at this stage, the easiest way for the

11 Court to dispose of the substitute asset argument would not be

12 to make some broad holding about when can you or can you not

13 restrain substitute property. Simply say, I don't have to

14 reach that question because the government did it at the

15 forfeiture hearing, didn't do any of the things it needed to

16 forfeit substitute property.

17            But if the Court does decide to reach that

18 question -- I'm going to flip to another tab. And the

19 provision that would govern its decision would be Rule 32.2 of

20 the Federal Rules of Criminal Procedure. And the important

21 thing to recognize here is that the -- this rule uses the

22 words "substitute property" and "specific property" as

23 different categories. The substitute property referring to

24 untraceable property; specific property referring to property

25 that is traceable or involved in money laundering, whatever

1  the case might be, under the relevant statute.

2  As the Court can see, what the preliminary order

3  provision says is that the Court can direct the forfeiture of

4  specific property and direct the forfeiture of a substitute

5  property if the government has met the statutory criteria.

6  When the Court then looks down to Subsection 3 at the

7  bottom of the screen, you can see there the rule specifically

8  sets out what can be seized.  And it says:  The entry of

9  preliminary order of forfeiture authorizes the Attorney

10  General to seize the specific property subject to forfeiture.

11  So this rule, in my view, very clearly and

12  explicitly, distinguishes the substitute from the specific

13  property and only empowers the government to seize the

14  specific at the time of the entry of a preliminary order of

15  forfeiture.

16  If you go down further in the rule to the final

17  subsection of Subsection E, this allows the government to

18  amend an existing order to include substitute property.  And

19  so I think a very fair construction of the rule, and the one

20  that I operated under when I was an AUSA, was that until I had

21  a final order of forfeiture, I did not have the ability to go

22  and seize the substitute property unless in a guilty plea

23  situation the defendant had agreed that the preliminary order

24  of forfeiture would become final as to the defendant prior to

25  sentencing.

1           THE COURT:  Seize or freeze?

2           MR. FINNERAN:  So this -- the freezing -- so we're

3    talking about restraint pre -- pretrial restraint.  That's

4    covered by --

5           THE COURT:  I'm familiar with that portion.

6           MR. FINNERAN:  Yeah, so that's a different statute.

7    So -- so this -- this provision here only governs -- when we

8    get to 32.2, we're talking about preliminary order of

9    forfeiture forward is basically what it covers.  So I guess

10   my -- I hear what you're saying, I guess, is that there's

11   nothing here that says the government can't freeze.  It just

12   says it can't seize it, but there's also nothing in here that

13   says it can freeze it.  It says that it can only seize the

14   specific property even once a preliminary order of forfeiture

15   has been entered.

16          THE COURT:  It just seems illogical to seize property

17   that the government hasn't frozen.  It seems illogical to

18   prevent the government from freezing property they intend to

19   later seize, because once the intent to seize is known by a

20   defendant, that's easy to transfer it to a -- to the Caymans

21   or to another entity or another person.

22          By the way, before you answer that.  You had inquired

23   of my courtroom deputy whether your client -- it was necessary

24   for your client to be here.

25          MR. FINNERAN:  Oh.

1    THE COURT:  I said it was not unless he wanted to be.

2  Do you waive your client's presence for today?

3    MR. FINNERAN:  Yes, Your Honor.  I apologize for not

4  doing that at the beginning.  I do waive Mr. Shah's appearance

5  today.

6    THE COURT:  All right.  And I find it's not necessary

7  for him to be here for this argument.  I'm not going to make

8  rulings today, nor do I -- is it necessary he even be here for

9  rulings.  He is free to be here for any proceeding we have.

10    Also, are you representing Ms. Agarwal in this

11  matter?

12    MR. FINNERAN:  No, Your Honor.

13    THE COURT:  Okay.  Note for the record they have not

14  appeared.  And beyond that, I'll say nothing.

15    Okay.  I interrupted you.  Go ahead.

16    MR. FINNERAN:  Well, you asked me a question right

17  before you interrupted me and we'll -- and that --

18    THE COURT:  Seizing versus freezing.

19    MR. FINNERAN:  Versus freezing.  So I'm not sure I

20  totally followed the Court's question, so please correct me if

21  I misunderstand it.  But if the government were permitted to

22  not -- basically, what I think I understand you to be asking

23  is, if we all know the government is going to seize the

24  property, should not the Court have the authority to freeze

25  the property in advance of that to prevent its dissipation?

1        THE COURT:  Yes.

2        MR. FINNERAN:  And my answer to that is, whatever we

3   might think should be the case, there's no authority for that.

4   The rule itself does not permit the freezing of substitute

5   property.  As Your Honor's prior orders have recognized in the

6   pretrial context, substitute property cannot be frozen.  As

7   *Luis* recognizes, to do so violates the Sixth Amendment.  So

8   whatever we might think about the wisdom of such an approach,

9   Congress has not adopted such an approach and the

10  Constitution, in our view, would prohibit it.

11       THE COURT:  Fair point.  Now, how about cases

12  postconviction prejudgment?  Anything out there that prevents

13  the government from freezing assets that will later be used --

14  at least the intent of the government is to use them to

15  satisfy a final order of forfeiture where they'll seize the

16  money?

17       MR. FINNERAN:  So, as I discussed before, I -- I --

18  we're in the twilight when you're asking me the question about

19  forfeiture.  In the context of the FDCPA and the restraint of

20  property for restitution, there is case law out there, but

21  I -- I'm happy to discuss it and explain why I don't think it

22  permits the government to do what it seeks to do here.

23       THE COURT:  It's in your brief, so I'm -- you don't

24  have to argue it, but --

25       MR. FINNERAN:  Okay.  Well, I'll just quickly bullet

1   point a couple of things I want to emphasize.

2           THE COURT:  Not quickly.

3           MR. FINNERAN:  I will slowly emphasize a few things

4   that the -- I want to emphasize from our briefing on the

5   garnishment motion.

6           So again, there's two ways for the Court to resolve

7   this, in my view correctly, and the easier way would be simply

8   to say -- in here I think it's very straightforward, the

9   government has not satisfied the statutory criteria under the

10  FDCPA to get a garnishment order.  Most plainly -- and I can

11  pull it up -- the government's application has to do a long

12  list of things that are listed in Section 3101.  And the

13  government did nearly none of them in this case.

14          First of all, it has to afford Mr. Shah the

15  opportunity for notice and a hearing on any garnishment issue.

16  And that's, you know, not been -- he's not even been --

17  submit -- sent to the notice, let alone provided the

18  opportunity for a hearing.

19          But probably most problematically, the government is

20  also required under the statute to specify the amount of the

21  debt that it seeks to collect.  And here, the government

22  admits that it cannot specify the amount of the debt.

23  Instead, it says that it can estimate that the amount of the

24  debt will exceed $400 million.  And in our opposition, we

25  pointed out that that argument is inconsistent with prior

1   statements the government has made relating to the full making

2   whole of prior investors, it's inconsistent with the facts

3   about lenders having been repaid, and it's inconsistent with

4   the government's own filings in this case relating to

5   $190 million of funds, not -- not property, but funds that

6   were returned either to the investors or to Outcome Health as

7   part of the settlement in the case.

8           Now, I know there's going to be some dispute at

9   sentencing as to what the other value that the investors got

10  in that settlement was and whether that's sufficient to offset

11  the restitution order or not.  But the fact the government in

12  its reply did not give any response to our arguments about why

13  it has failed to give Mr. Shah the credit that I believe it

14  should be undisputed, he has to get for at least the cash that

15  the supposed victims received back, is, frankly, perplexing to

16  me.

17          So, again, if the Court simply looks at the statute

18  and says, if the government wishes to avail itself of the

19  FDCPA, the statute has rules and it hasn't followed them, then

20  the Court doesn't have to get into the thornier questions as

21  to whether or not it can oppose a prejudgment remedy under the

22  FDCPA in anticipation of a restitution order.

23          THE COURT:  Do you have an estimate of what's owed

24  under restitution?

25          MR. FINNERAN:  I don't, Your Honor.  And nor do I

1   have the burden to have such an estimate at this stage.  I --

2   I -- we did put numbers in our brief I think that would

3   demonstrate what the credits at minimum must be, but I expect

4   that there will be a substantial argument made at sentencing,

5   by myself or others, that the investors in this case didn't

6   just get cash, they got control of Outcome Health, and then

7   the -- that entity later engaged in a merger and the announced

8   value of that merger was in the billions of dollars.

9         And so the notion that the investors at the end of

10   the day are out of pocket here is challenging to square with

11   that, at the very least.  It's something that will I think

12   have to be very seriously litigated at the sentencing stage,

13   and I -- I think the easiest way, again, for the Court to deal

14   with that would be to say, it's the government's burden at

15   this stage.  The government hasn't put that forward.  I'm not

16   prejudging what I'll say about restitution at the end of the

17   case, but I'm not prejudging it against Mr. Shah either and

18   assuming that the government is going to be able to make a

19   showing that -- to me, it's really hard to understand how

20   it -- it'll answer the question, I'm sure of it, how it's

21   going to explain those credits aren't justified in a case like

22   this.

23         If the Court, however, decides it wants to dive into

24   the FDCPA and reach this very controversial question as to

25   whether or not you can do a prejudgment restraint of property

1    in anticipation of restitution, I -- I -- first of all, I

2    think that it is challenging to square with the language of

3    the statute.  The statute allows you to use the FDCPA to

4    collect either a debt to United States or a judgment.  And the

5    restitution statute says you can use the FDCPA to collect an

6    order of restitution.

7            Now, in cases that the government has cited where the

8    victim is the United States and there is a debt already owing

9    to the United States, we concede in a case like that the

10   government can prior to judgment obtain a prejudgment

11   garnishment.  But in a case like this where the United States

12   is not a victim today and therefore is not owed a debt today,

13   it only will be owed a debt once it is a judgment creditor.

14           And the government cites the *Stacy* case, which came

15   out in June from the Seventh Circuit, as though it's helpful

16   to them, but this is a case where there was a restitution

17   order in place and the court said that because there was an

18   order in place, now the United States was a judgment creditor

19   of the defendant's and could use the offset procedures.

20           There is no case in the Seventh Circuit or in any

21   district court, as far as I can tell, where absent a debt owed

22   to the United States, the court permitted prejudgment

23   restraint of property for restitution.  And --

24           THE COURT:  On that argument, then, isn't the FDCPA

25   an available remedy to the government making the All Writs Act

1  at least a potential avenue to restrain the release of the

2  monies?

3          MR. FINNERAN:  No, Your Honor, for the reason I

4  explained earlier which is that it covers the same subject

5  matter --

6          THE COURT:  Okay.

7          MR. FINNERAN:  -- the fact --

8          THE COURT:  Right, I understand that.

9          MR. FINNERAN:  -- that you can't get what you want

10 out of the All Writs Act -- excuse me -- the FDCPA does not

11 mean the All Writs Act is there as a backstop.  And that is

12 square holding of *Shoop*, *Penn Bureau*, and *Syngenta* in other

13 contexts.

14          But let me just really take a moment to -- because

15 you asked about the logic of some of these positions.  The

16 government's position on this I think is really staggering,

17 because what it is saying is that anytime it has anticipation

18 of a restitution order, then it can get a garnishment order.

19 There is nothing in the logic of this position to suggest that

20 conviction has anything to do with it.

21          And so under the government's logic, which says that,

22 oh, no, there will be a restitution order some day and so

23 therefore we can get a restraint today, I'm not sure what

24 would prevent the government under that construction of the

25 statute from using the FDCPA to restrain property

1  preindictment, which as we know from *Luis* and from the Seventh

2  Circuit's precedent would violate the Sixth Amendment and

3  would be excessive relative to what Congress has expressed

4  they authorized under the forfeiture laws.

5  THE COURT:  Well, that's what prevents it from being

6  done preindictment.  We're in a different world.  And I'm

7  still back to the same question we started with, is -- which

8  is postconviction --

9  MR. FINNERAN:  Uh-huh.

10  THE COURT:  -- if the government has presented

11  evidence, at least they did during the trial of victims losing

12  large -- hundreds of millions of dollars, I even heard the

13  setoffs, and I've heard your arguments about why some of the

14  setoffs may have greater value than what on its face would

15  seem to indicate there's still a lot of money owed.

16  MR. FINNERAN:  Uh-huh.

17  THE COURT:  I -- to say that they could freeze --

18  that they're allowed to freeze money, or request freezing by

19  me of that money, I don't think leads to the conclusion that

20  they could do it preindictment.  I mean, if you want to

21  extrapolate and say look at what this will cause and upset the

22  world, it's not going to happen preindictment.

23  We're talking about a postconviction environment

24  where significant evidence was heard at trial, which I

25  heard --

1           MR. FINNERAN:  Uh-huh.

2           THE COURT:  -- even though it was a jury trial, I

3   heard the same evidence, of large -- hundreds of millions of

4   dollars lost by investors, hundreds of millions of dollars

5   lost by banks, tens of millions of dollars, if not more, lost

6   by pharmaceutical clients that didn't get what they bargained

7   for.

8           So it's -- it's not a -- I don't think you can

9   extrapolate that if -- if it gets frozen here, look what they

10  could do -- under these circumstances, under the FDCPA, look

11  what could happen preindictment.  I don't think that's a

12  logical corollary.

13          MR. FINNERAN:  So yes, Your Honor I understand that

14  obviously the Sixth Amendment would impose limitations in a

15  preindictment context.  I'm talking about the construction of

16  the statute itself.  So the construction of the statute that

17  the government is offering you would allow that.

18          Now, you may say there are other things that would

19  prevent that from happening, but they're trying to parse the

20  words of the statute in a different way than we are, and that

21  is the logical extension of their construction.  It would

22  allow the government to restrain that property in that

23  setting.

24          I think what that demonstrates is that interpreting

25  the statute in that way would raise a significant

1  constitutional question and see if the Court doesn't reach a

2  Sixth Amendment issue, it should, based upon constitutional

3  avoidance, select the construction of the statute, which we

4  think is clear.  But to the extent there is an ambiguity, the

5  one that avoids those thorny constitutional questions.

6  　　　　　To address what you said a moment ago, Your Honor,

7  about these investor losses.  So I don't think -- and I

8  encourage you if you're willing to, to ask the government for

9  its position on these things, the government can really

10  contend that either customers or lenders are out of pocket

11  today.  It's -- I understand there was testimony at the

12  hearing that they, you know, suffered losses, et cetera.  But

13  there's a DOJ press release that we attached to one of our

14  filings where they trumpeted the fact that they had gotten all

15  the money back for the investors and even kept $4.5 million in

16  reserve in case they missed somebody.

17  　　　　　THE COURT:  Well, so, Mr. Madden, put it on your list

18  of things to address when it's your turn, which is coming up

19  close --

20  　　　　　MR. FINNERAN:  Yes, I know.

21  　　　　　THE COURT:  -- because I gave the parties an hour and

22  a half, and I've asked you a lot of questions, but I'll

23  probably do the same with Mr. Madden --

24  　　　　　MR. FINNERAN:  Yes.

25  　　　　　THE COURT:  -- and we're about 45 minutes.

1    MR. FINNERAN:  Thank you, Your Honor.  I'm basically

2  done.  I just want to hit the points you just hit.

3    On the lenders, again, a question I hope Mr. Madden

4  will address is that my understanding is that they have been

5  paid out as part of refinancing from the very investor deal.

6  And the investors, I think that's where the big fight's going

7  to be at sentencing, is over, okay, we know they got cash

8  back, we know they got interest in the company, what was that

9  interest worth.

10    My only submission today is that we don't have the

11  answers to those questions yet.  The government's asking you

12  to presume those -- the answers to those questions and deny

13  Mr. Shah access to untainted property based upon that

14  assumption.

15    It has a burden of proof, if it's going to do that,

16  that it has not met.  It has burdens under the FDCPA and under

17  the forfeiture statute to meet before it can forfeit

18  substitute property or restrain property for restitution that

19  it has not complied with.

20    And for those reasons, Your Honor, we ask the Court

21  to amend its protective order.

22    THE COURT:  All right.  Thank you.

23    Mr. Madden.

24    MR. MADDEN:  Your Honor, the defense is not dealing

25  with the present.  They are arguing this as if this were two

1   years ago and not taking into consideration the fact that we

2   had a three-month trial earlier this year when the defendant

3   was convicted on almost every count.  That fact changes the

4   analysis significantly, because postconviction, the government

5   and the many victims of the defendant's crimes have a much

6   stronger interest and right to those proceeds -- to those

7   funds than they would preconviction.

8           The defendant has called this unchartered territory.

9   In fact, there are numerous cases that we cited and they have

10  not distinguished where courts have done exactly what we're

11  asking.  They have -- they have restrained postconviction

12  presentencing, which is usually just a short period of time,

13  assets pending the expected restitution judgment.  It's not

14  just the Second Circuit.  He's right.  Yes, this is the law in

15  the Second Circuit.

16          It's the eighth -- that Second Circuit case is

17  *Catoggio*, C-A-T-O-G-G-I-O.  It's the Eighth Circuit.  The

18  Eighth Circuit collected cases and said, we agree, the

19  sentencing court has jurisdiction to enforce restitution order

20  and use the All Writs Act to prevent the restitution debtor

21  from frustrating the collection of the restitution debt.

22          The Southern District of New York, the District of

23  Nevada, the District of Ohio, the *Marshall* case from the

24  Fourth Circuit, all of these cases support what the government

25  is asking the Court to do here.  The --

1          THE COURT:  What's the vehicle?  Is it the forfeiture

2     statute?  Is it the FDCPA?  Is it the All Writs Act?

3          MR. MADDEN:  I think it can be done under all of

4     those vehicles.  Let me -- let me just -- I'll start with --

5     you know, one way to do this is to issue a writ of -- of

6     garnishment as to all of the restrained funds under the

7     All Writs Act pending the anticipated restitution order.

8     That -- that's the simple way to do it for all of the funds.

9          THE COURT:  And what's the standard for anticipated

10    restitution order?  You just heard Mr. Finneran say your

11    numbers -- your estimate of 400 million doesn't take into

12    account setoffs, and the value the investors received when

13    they got stock to Outcome as part of any settlement.

14         MR. MADDEN:  I think it would be the same standard

15    we'd apply at sentencing, of course.  When it comes to loss,

16    it just needs to be a reasonable estimate of loss.  The same

17    types -- it needs to be reliable evidence.  Just -- you know,

18    just as if you're making a finding at sentencing.

19         And I can explain what we are doing.  We are, of

20    course, doing factual investigation, doing everything we can,

21    reaching out the victims to figure what the losses are.  And,

22    yes, there are pharma losses, there's pharma restitution.

23         So let me -- I can -- I can address that to let you

24    know what we are doing and what we would propose.

25         THE COURT:  And, by the way, the parties all agree,

1  it is a preponderance standard at this point.  It's the

2  sentencing issue forfeiture.

3         Do the parties agree it's a preponderance standard?

4         MR. MADDEN:  Yes.

5         THE COURT:  First, the government.

6         MR. MADDEN:  Yes.

7         THE COURT:  Defense?

8         MR. FINNERAN:  Your Honor, I believe that you are

9  bound by circuit case law to -- to apply a preponderance

10  standard, but I don't want to concede that we won't argue at

11  some stage that -- that it should be a higher standard.

12         THE COURT:  Okay.  All right.  Proceed.

13         MR. MADDEN:  So just on -- on the, you know,

14  restitution and loss figures, you know, we are conducting some

15  analysis, investigation to -- to -- to figure out what the

16  correct estimate of loss is here and what the amount of

17  restitution is.

18         There were three classes of victims in this case.

19  The investors who invested 48 -- $487.5 million; second, the

20  pharma victims who were defrauded for years and years out of

21  millions -- tens of millions of dollars; and the lenders who

22  invested, I think it was $475 million -- $475 million was

23  loaned to Outcome in two loans.

24         Starting with the investors.  It's true there was a

25  settlement.  So it is -- and we -- I don't know why

1  Mr. Finneran just said this, but we did agree that it should

2  be reduced by that $31 million as a part of that settlement.

3  And that's set forth in some of our filings.  You need to

4  reduce that $487.5 million number by 31 because they got that

5  in the settlement.  So that brings it down to -- let's see.

6          THE COURT:  These are investors you're talking?

7          MR. MADDEN:  The investors, to 456.5 million.

8          The next question is -- and this is a little more

9  complicated question.  As a part of the settlement,

10  159 million went back to the company.  So -- now, there was

11  significant restructuring of the company at that point.  And

12  the defense is claiming, well, that 159 million, that should

13  be -- that should further reduce the restitution amount.

14          I'm not sure if that's right, and we're trying to

15  figure out exactly what happened in that restructuring; who

16  maintained control of the company, such that, you know, would

17  that be appropriate to reduce the restitution amount.

18          So -- but let's just say -- we're not conceding that,

19  but let's just say that that's true, if you add up 159

20  plus 31 million, that's 190 million.  So let's just say that's

21  true, so we start with the 487.5, reduce it by 190 million,

22  that comes out to just under 300 million in restitution.  It's

23  297.5.  So we're still at 300 million, approximately.

24          The other -- and the other benefit that the -- or the

25  other asset that the -- the investor victims got out of

1  settlement was an interest in Outcome which eventually became

2  an interest in PatientPoint.  PatientPoint was one of their

3  competitors that acquired them.

4      We have reached out to the victims.  Goldman was --

5  Goldman was the lead investor.  As you know, there were other

6  significant investors like Google, CapitalG, Leerink,

7  et cetera.  We're going to get information on this and we'll

8  turn it over to the defense.  Our understanding is that

9  interest is not worth very much at all.  And we've -- we're

10 seeking a valuation on that.

11     But you had testimony, you know, under oath testimony

12 at trial by, for example, Laela Sturdy at -- of CapitalG;

13 Leerink -- Todd Cozzens from Leerink.  You may recall

14 Laela Sturdy's testimony was that it was I think worth

15 virtually -- their 50 million was worth virtually nothing.

16     Todd Cozzens testified that Leerink said it was

17 something like ten cents on the dollar.  So he testified that

18 they had a 90 percent loss.

19     Google testified that they had almost 100 percent

20 loss, and they had that -- they are the entities that have

21 that interest in PatientPoint, so they -- they do not view

22 that as a significant value.

23     THE COURT:  Did they -- when they said it was a total

24 loss, I don't recall with specificity, and you're going to

25 have to pull the transcript up, whether they meant the

1    investment, you know, the total loss but for their interest in

2    the successor to Outcome, or total loss in the sense of they

3    just didn't get that money back?

4         MR. MADDEN:  They weren't totally specific about it

5    and, you know, and we'll reach out to all of -- we'll reach

6    out to everyone, including -- including CapitalG and Leerink

7    and ask us -- ask for documentation of -- of, you know, of how

8    they've -- how they value it.  And so we're putting all of

9    that together.

10        But based on -- based on our interviews of -- based

11   on the testimony we had in court, based on our interviews of

12   the victims in the past and our understanding is that the

13   interest in PatientPoint is not of significant value.  And so

14   what that means is we're still at that -- let's say it's

15   reduced somewhat, but like right now we're at -- and just

16   assuming that we're subtracting that 159 that went back to the

17   company, which I'm not sure is appropriate, but we're still at

18   about $300 million in restitution just on -- just on the

19   investor side.

20        So -- and so -- and so we're investigating that.  I

21   expect in 30 days or so, or 45, we should have that -- we

22   should have a good idea of -- of the information from the

23   investors, which we'll turn over to the defense, and we will

24   have a reasonable estimate of what the loss is on the investor

25   side.

1       Next is the pharma side.  We had our -- our

2  witness -- our expert witness at trial in forensic accounting

3  was Michael Petron.  He gave all of the benefits of the doubt

4  that he could to the defense in his analysis and came up with

5  how much revenue was overstated which was another way of

6  saying how much they had overbilled their clients.

7       And -- and of note, that only took into account when

8  services weren't rendered.  It didn't take into account the

9  many times when there was off-target delivery, because you'll

10  recall, they were delivering even on -- you know, where --

11  when they did deliver, they were often delivering in the wrong

12  offices that was inconsistent with what they were supposed to

13  do.

14       Under his analysis, so what we're doing there is,

15  that was only for 2015 and 2016.  We're comparing his analysis

16  of how much they overbilled clients to what Outcome actually

17  paid in restitution for those specific clients.  And, you

18  know, so for example, if -- let's just say if -- if his

19  analysis showed that Pfizer was overbilled by $5 million in

20  those years and Outcome already paid Pfizer 5 million or more,

21  then it's a wash.

22       However, there are numerous pharma victims under

23  Petron and his team's analysis who were overbilled who Outcome

24  did pay any restitution to.  So what that means is, from the

25  way it looks to us is there is going to be millions of dollars

1  of restitution owed based on the pharma victims.  The fact

2  that we issued a press release did not mean that -- I mean, I

3  can take a look at that press release, but we did not say the

4  defendants don't owe any restitution because of our -- the --

5  the NPA that we entered into with the company.

6       The third class of victims is the lenders.  We still

7  need to get more information from the lenders.  Our

8  understanding is yes, there is millions of dollars of loss for

9  the lenders as well.

10       THE COURT:  Did they get anything back, the lenders?

11       MR. MADDEN:  Yes, they did.  I can't remember the

12  terms, Your Honor.  It's been a while since I looked at it,

13  but, yes, they were part of that settlement.  I think they had

14  a better position than the investors did as a part of that

15  settlement, but I -- I'd have to go back and look at the

16  settlement agreement.

17       THE COURT:  But if they got some of it back, it was

18  part of the 190 million.

19       MR. MADDEN:  Yes.

20       THE COURT:  That was the overall settlement.  There

21  was not a separate set of settlements with JPMC or the other

22  lenders?

23       MR. MADDEN:  No, no, there -- I don't think so.  And

24  I think -- I think some of -- some of the early loan, I

25  believe, was repaid, or I'm not sure -- I can't remember right

1  now, but -- so some of that would not be loss anyways.

2      So I'm not prepared to get into the details --

3      THE COURT:  Right.

4      MR. MADDEN:  -- on the lender side, but I do think

5  that that's going to add to the ledger.  And so -- so anyways,

6  any way you look at it, its hundreds and hundreds of millions

7  of dollars in restitution.  We fully expect it to be more than

8  300 million, maybe more than 400 million in restitution.

9      On the other hand, we're also trying to ascertain

10 what is the value of the -- of what has been restrained.  You

11 know, has it increased in value?  And there is one example

12 that the defense keeps pointing out that of course he had one

13 investment that went really well.  That's the one that they're

14 touting.  Well, there are other investments, and of course not

15 all of them have done that well.

16     THE COURT:  What is the value as of today, roughly

17 speaking, of what's been restrained?

18     MR. MADDEN:  I don't know exactly, but I -- we expect

19 it to be in the range of, I would say, 40 million to 80 or --

20 80 million, something in that range.

21     THE COURT:  That's less than the amount you believe

22 will be ordered for restitution.

23     MR. MADDEN:  By hundreds of millions.  We -- I

24 think -- we think that restitution is going to be 300 -- so

25 the loss figure is, you know, for the guidelines is

1   250 million to 550 million.  We believe that loss is going to

2   be in that category of 250 to 550.  I expect it's probably --

3   and, again, this is all subject to change based on information

4   that we get from victims -- but we think the restitution

5   figure's probably going to be in the range of 300 to somewhere

6   over 400 million, somewhere in that range for restitution,

7   which means that what we're talking about here, even if his

8   investments have done really well -- and, by the way, they're

9   not just --

10          THE COURT:  Slow down, please.

11          MR. MADDEN:  Sorry.

12          They're not just his investments.  They're also

13  Shradha Agarwal's investments.  They -- she owns 20 percent of

14  basically everything that we're talking about.  So it's not

15  just going to go to his -- his forfeiture, you know, his FMJ

16  because she -- it will be 20 percent of it would be applied

17  towards her forfeiture money judgment.

18          So the short of it is -- and -- so on the other -- on

19  the other side of it, there's the victims that we're talking

20  to, and then there's the funds, you know, where -- where

21  Mr. Shah and Agarwal invested their money.  And we're in

22  communications with them asking for, for example, the most

23  recent quarterly statement so we can see what the -- you know,

24  a reasonable estimate of current valuation.

25          So as we -- we're gonna get those in, we're gonna add

1 those to our spreadsheet, the one that we had that had like

2 the 18 -- that listed all of the funds and showed what was

3 restrained as proceeds and what -- what the excess was, and

4 we'll add another column that has our recent information about

5 the current valuation.

6 We expect that current valuation to be somewhere in

7 that range that -- that I mentioned. And again, that's a big

8 range because we just haven't heard back from everybody. But

9 I think it's -- there's no way it's going to be more than

10 100 million. We expect it to be less than 100 million.

11 THE COURT: So it's your position you're not

12 currently restraining monies greater than what you anticipate

13 to be the restitution amount?

14 MR. MADDEN: No, it's just a fraction.

15 THE COURT: And restitution, you can double-count for

16 forfeiture is the way I read the law --

17 MR. MADDEN: Correct.

18 THE COURT: -- that you can forfeit profit -- monies

19 that are -- have a tainted source. The four point -- or the

20 5 million did not, but you can -- you can certainly forfeit,

21 absent a restitution order, monies with a tainted source

22 without giving a credit to the restitution amount. Is that --

23 I -- that's what I've read. I wanted to know if that's the

24 position of the government. And I'll hear from defense too.

25 MR. MADDEN: It's true that -- so restitution

1  forfeiture are separate --

2       THE COURT:  Right.

3       MR. MADDEN:  -- parts of a criminal sentence.

4       And, you know, the -- there's different -- there's

5  different rationale for them.  Forfeiture is to take away the

6  ill-gotten gains from the defendant, whereas restitution is

7  victim-focused.  It's focused on the victims' losses and

8  making the victims whole.

9       And so we -- we could, if we deemed it appropriate in

10  this case, seek the full amount of restitution -- let's just

11  say it's 300 million.  300 million in restitution plus

12  55 million in forfeiture and not apply that.  And there's --

13  that's consistent with the law.

14       What we -- I think we explained previously what we

15  intend to do is ask DOJ to apply that 50 -- whatever we take

16  in terms of forfeiture, because our goal is to get the -- the

17  funds back to the victims, and that would further reduce

18  restitution.

19       THE COURT:  No, and that's typically what I've seen

20  in other cases.  The government's not looking to put the money

21  in the U.S. Treasury.  They're looking to get the money back

22  to give it to victims.

23       But do you agree that they are at least two separate

24  remedies?

25       MR. FINNERAN:  Yes, Your Honor.

1          THE COURT:  Okay.  Go ahead.

2          MR. MADDEN:  Thank you.

3          So -- so that's -- you know, so we'll -- I think both

4    on our -- our, you know, outreach to the funds and to the

5    victims, which includes those three classes of victims, we

6    expect to be getting more information in the next 30 days and

7    we'll -- you know, we will turn things over to the defense

8    and -- and ultimately we're looking to come up with a

9    spreadsheet that will be able to give Your Honor more clarity

10   about, you know, to your question about what's the -- what's

11   the estimated value of what has been restrained and what --

12   and then, on the other hand, what is -- what is the amount of

13   loss in restitution.

14         One other caveat that we haven't really talked about,

15   it also just makes the whole defense position perplexing here

16   is, these -- the -- the assets are illiquid.  You know, the

17   defendant has -- Shah's on record accurately stating that

18   everything's illiquid.  But now he's coming into court and is

19   claiming, well, I need access to these illiquid funds so that

20   I can fund my defense, which is just strange on its face

21   because it was convenient -- when it was convenient to call

22   them illiquid he did, but now it's convenient to ignore the

23   fact that they're illiquid.

24         THE COURT:  Well, illiquid assets can become liquid

25   when you sell them.  What's the -- if I find that the

1  5 million should be returned to him, can't an equivalent

2  amount of illiquid assets be sold to generate a $5 million

3  cash amount?

4  　　　　MR. MADDEN:  It would probably depend on which --

5  what -- which fund you're talking about.  Because what I was

6  going to say is what the funds are telling us and which we're

7  not surprised by is, you know, let's say the estimated current

8  value from a, you know, quarterly statement might be

9  6 million, but that's an estimate and it's based on -- and

10  it's -- they'll say it's illiquid, meaning that -- and it's

11  based on, for example, an expectation of a liquidity event in

12  6 to 12 months.  But, of course, who knows if that's going to

13  happen and who knows if -- even if it were returned, which I

14  don't think you should do anyways, if they could find a buyer

15  for it.

16  　　　　THE COURT:  Is there any straight cash in the frozen

17  monies?

18  　　　　MR. MADDEN:  Some -- yes, because, you know, we

19  actually -- so there were some liquidity events and some

20  distributions over the past -- the last -- over the past three

21  years.

22  　　　　THE COURT:  Which you've retained?

23  　　　　MR. MADDEN:  Which we've retained.  And actually,

24  though -- and I have to -- we'll see -- I think that -- I

25  think that some of the distributions did go to Mr. Shah, or at

1   least go to Gravitas, including on some other restrained

2   assets.  I'm still putting that together.  I don't think it

3   was supposed to happen, but that also further undermines their

4   argument if that's true because, of course, he's -- if he's

5   been getting access to some of these distributions, whereas

6   some of the distributions I know were sent to an escrow

7   account, but based on at least what some of these funds are

8   telling, it may be that some of the distributions, including

9   millions of dollars, did go to Mr. Shah over the past three

10  years.

11          THE COURT:  So much for a court order.  I assume

12  these funds had the court order.

13          MR. MADDEN:  They do, they do.  And so I -- and I'm

14  not 100 percent sure about that.  I just need to -- they do

15  have the court order, but I'd need to confirm whether or not

16  these distributions that are listed in fact went to Mr. Shah.

17          THE COURT:  Well, if they did, doesn't that diminish

18  the argument that the 5 million was improperly restrained

19  pre -- prejudgment?

20          MR. MADDEN:  It does.  It at least would show that

21  he's had access to these funds for attorneys' fees.

22          THE COURT:  Well, access and use.

23          MR. MADDEN:  Use.

24          THE COURT:  If the -- if the frozen funds were X and

25  he wants 5 million back from it, but he actually obtained some

1    figure, 5 million or less back from it, that -- that ought to

2    be a setoff to the 5 million that you have argued -- that

3    you've admitted was untainted when it was originally

4    restrained.

5         MR. MADDEN:  So -- so anyways, there is -- there is

6    some factual investigation that we're doing.  It's ongoing and

7    we expect, again, in the next month or so that we should have

8    a better idea of what -- what has been restrained exactly,

9    what the current value is, and then also what the -- what the

10   government's position will be on both loss and restitution.

11        THE COURT:  I know you have more to cover, but do you

12   know what the assets are of Mr. Shah?  I can't believe that I

13   have to -- that I can't at least consider whether the

14   defendant has sufficient alternative assets to hire competent

15   counsel.  You put in all kinds of attachments to your motion

16   about some pretty, you know, extensive spending.

17        Defense has, you know, gone back on that and said

18   it's not quite as extravagant as you've alleged and they have

19   noted they have additional investigation to do on that, but if

20   you could find these expenses that he's done, I'm wondering if

21   the government has some estimate as to the funds he has

22   available to him both back when this preliminary order of

23   forfeiture was -- not preliminary order of -- when the

24   original freeze order was entered, because there was reference

25   at that time the government saying he has access to other

1    money and what you think he has now.

2         MR. MADDEN:  So we -- obviously, we have some records

3    and we -- we submitted some of them in connection with our

4    filings here.  We -- we don't know exactly how much money he

5    has, because we don't have all the records.  As of, you know,

6    right around the time of indictment, we had done a thorough

7    financial investigation of him and we had a good idea of what

8    he had.  Of course, an indictment happens and we're not

9    getting those records.

10        And so time has gone by and we have received some

11   records, but it's not like during the course of postindictment

12   we were getting all of his bank records.  We do have some.  So

13   that's -- and that's where we, like -- and what we did see --

14   Mr. Finneran made a reference to $6 million right before

15   trial.  Actually, it was more than $9 million.

16        One of his investments that was not restrained, he

17   received -- it was in excess of a $9 million payment in

18   September of 2022, so shortly before trial.  That went into

19   one of his accounts.  And in that account he had more than

20   $11 million at that time.  So when he had access --

21        THE COURT:  11 million before the 9 million got put

22   in or --

23        MR. MADDEN:  No.

24        THE COURT:  -- 11 million --

25        MR. MADDEN:  After, after.

1          THE COURT:  And that's an unrestrained account?

2          MR. MADDEN:  Unrestrained account.

3          THE COURT:  Okay.

4          MR. MADDEN:  So just -- if you just consider that,

5     and, then, remember, he had formed -- at the time of the first

6     litigation on this protective order which was 2020, everyone

7     agreed that he had approximately $4 million that he got to

8     keep on attorneys' fees that the government wasn't going

9     after.  You just add up those numbers, that's $13 million by

10    itself.

11         And Shah and Agarwal, remember back then, said in

12    2020, they only needed -- I say only -- but they needed 14 to

13    15 million between the two of them.  And they never said, you

14    know, Shah needs 10, she needs 4; or Shah needs 7 and she

15    needs 8, or whatever it is.  But either way, we're already

16    talking about $13 million that he could've used on attorneys'

17    fees.

18         And we do see in the records, million-dollar payment

19    to Hueston Hennigan, million-dollar payment to lawyers,

20    substantial payment to the vendor who did all the PowerPoints

21    at trial, but we don't have all the records going from 2019,

22    2020, 2021.  We would not be surprised if he did spend in

23    excess of $10 million on attorneys' fees already, you know.

24    But he's not offering up those records.

25         We could -- we could issue subpoenas.  I don't know

1  if it's worth it to go into that type of investigation at this

2  point when we've already seen records showing that what I just

3  mentioned, he had more than $13 million just from those two --

4  those two transactions.  And then he got more than $6 million

5  from another transaction from Guild Capital.  That was in

6  2021.

7          Now, they say that was Baroda Trust -- and we'll talk

8  about this with our Financial Litigation Unit -- but that

9  trust is -- it's his family's trust.  And it's -- I believe

10 the beneficiaries are maybe his parents and his child.  And,

11 you know, we -- we saw significant transfer of money into his

12 own account from Baroda Trust.  So anyways, that is -- we'll

13 see how we're going to handle Baroda Trust, but that may have

14 also been funds that he could've had access to for attorneys'

15 fees.

16         Anyway, so the short of it is, is just taking a step

17 back from it, he's probably one of the wealthiest individuals

18 that has been charged in this district in the past ten years.

19 If he's not the wealthiest, he's up there.  He has access to

20 $20 million plus, at least 14 million plus, probably more like

21 20 plus for attorneys' fees over the course of time.

22         And he's living like it, right?  That's -- he's --

23 he's living a life of luxury:  He's gambling, he's going on

24 yachts, he's traveling by private jet.  And yet, he's in court

25 claiming that he didn't have sufficient funds for attorneys.

1  Just it doesn't add up, of course, when you see that type of

2  lifestyle. Those are his choices. If he wants to spend his

3  money on traveling by private jet and going to Alinea, and,

4  you know, taking limos to court, which -- which he does, he

5  can do that. But then to come into court and claim that he

6  doesn't have enough money for attorneys' fees when he's got

7  this all-star line-up of close to 20 attorneys that's been

8  representing him to the tune of millions of millions of

9  dollars, it just -- it -- it -- he clearly had sufficient

10  funds to hire outstanding attorneys in this case.

11       And where we're at now is he has been convicted. The

12  victims are out hundreds of millions of dollars. It's -- the

13  law allows appropriately courts to restrain money at this

14  point. And that's -- that's all we're asking for is to

15  restrain money for a short period of time until the

16  sentencing, which now is in two months. And in advance of

17  that, we request that you issue the preliminary order of

18  forfeiture and also rule in our favor on the motion for

19  garnishment.

20       THE COURT: Can the FDCPA -- isn't it limited, as

21  Mr. Finneran said, to an existing order of restitution?

22       MR. MADDEN: I don't -- I don't think so. I'll have

23  to -- I hadn't -- I'll have to look at that *Stacy* case, and

24  I'll talk to our Financial Litigation Unit AUSAs. I know that

25  we -- it's been used in this district numerous times, even in

1  the Wicked Town case, for example, which you presided over.

2  It was used recently for a -- for an anticipated restitution

3  debt.  So I believe -- I believe there is case law authority

4  to use it for an anticipated restitution debt rather than just

5  a, you know, post -- post-judgment debt.  But I can -- we can

6  follow up on that.

7       THE COURT:  Is there a reason to -- a lot of this --

8  not all of it, but some of it relates to the uncertainty as to

9  what the forfeiture amount will be, at least on the vehicle of

10 using the substitute assets as a basis to hold money that is

11 not specifically tainted.  But doesn't that -- we need to

12 have, at some point obviously, a preliminary order of

13 forfeiture.  I know I held off on briefing, at your request,

14 the parties' request, to brief these first.  But logically,

15 shouldn't the preliminary order of forfeiture go first?

16      MR. MADDEN:  I -- I agree.  I agree that it should.

17 I don't know -- we've briefed so much at this point.  We

18 can -- we can brief that further, but like -- what might --

19 one thing that would be helpful, of course, is for us to -- I

20 think as a practical matter, we need to get you information on

21 the value of what's been restrained.  Because the reality is,

22 as I think the parties -- I don't think there's much dispute

23 about the $55 million money judgment figure, because that

24 comes cleanly from what Shah got from the dividends.

25      And we should in the next 30 days or so have enough

1  information from the funds to be able to say it's

2  approximately $50 million or whatever it is. And then I think

3  from there, you'd be in a position to -- to rule on the

4  preliminary order of forfeiture.

5  THE COURT: Mr. Finneran, what do you think about

6  that, whether we should -- before I rule on these particular

7  motions determine -- follow through with our hearing and enter

8  after argument a preliminary order of forfeiture?

9  MR. FINNERAN: So I object to that approach --

10  THE COURT: Come on up. Probably easier both have

11  you standing up here. There's -- both mics work.

12  MR. FINNERAN: Great.

13  I'd object to that approach for a number of reasons.

14  So, first, Mr. Bhattacharjee, correct me if I'm wrong, but my

15  recollection is the government was the one who proposed to me

16  that we do these first because of its briefing schedule and

17  posttrial motions and everything that we not --

18  THE COURT: And I --

19  MR. FINNERAN: -- overlap it.

20  THE COURT: -- whoever proposed it --

21  MR. FINNERAN: Fair enough.

22  THE COURT: -- as we're now deeper into it --

23  MR. FINNERAN: Yes.

24  THE COURT: -- I'm wondering whether that simplifies

25  some of the issues. Because if one of your arguments is that

1  the government is vastly overstating the amount of restitution

2  owed, the forfeiture that they may be seeking, and if a

3  preliminary order of forfeiture will at least give some

4  certainty as to what the amount is and then the issue of

5  whether it's proper to allow further restraint of assets,

6  which may be less than what that preliminary order of

7  forfeiture is, or whether the other vehicles the government's

8  attempting to use to freeze the assets that you want for --

9  your client wants to presumably pay attorneys' fees, is

10 appropriate, but we need a number.

11         MR. FINNERAN:  Right.  The reason I don't think that

12 is right is because the government today acknowledges that up

13 until conviction, at the very least it seems, Mr. Shah was

14 subject to an illegal restraint.  It is now asking you to

15 continue that illegal restraint.  So it needs to have a basis

16 to do that in the law.

17         As I've explained today, I don't believe that either

18 of those bases it cited are sufficient.

19         THE COURT:  Well --

20         MR. FINNERAN:  So the default --

21         THE COURT:  They've admitted illegal restraint up

22 until the time of conviction.

23         MR. FINNERAN:  Correct.

24         THE COURT:  I think you have.  And whether you want

25 to call it illegal or improper or money that was not

1   tainted -- you don't have to buy into the words of illegal.

2   No one on the government likes to say that -- but the money --

3   if you knew then what you know now, you wouldn't have

4   restrained that money.  Is that correct?

5           MR. MADDEN:  I -- I still don't know what the right

6   way -- I mean, because what we might've done is restrained and

7   we could've tried to sell everything, which probably would not

8   have been a good thing for Mr. Shah either, because there

9   would have been significant losses on those assets at that

10  time.  So I'm not sure how we would have handled it, but it is

11  true --

12          THE COURT:  Right.

13          MR. MADDEN:  -- that, you know, that excess of

14  20 -- you know, 19 percent, or whatever it was, is not

15  traceable.

16          THE COURT:  Okay.  Yeah, maybe that's the correct way

17  of putting it.  5 million was not traceable.

18          MR. FINNERAN:  Right.  So -- and again, we think it's

19  much more than 5 million that wasn't traceable, but

20  let's stick with that number for a moment.

21          THE COURT:  Slow down, please.

22          MR. FINNERAN:  Yep.

23          Again, the restraint was, from our perspective -- I'm

24  not asking them to concede it -- but illegal at least until

25  the point of conviction.  For the government to then continue

1  that restraint, because what it's asking to do now is

2  basically through sentencing when everything will, you know,

3  it'll be over because there will be a judgment and there'll be

4  an amount and everything else.

5       In this twilight, as I have called it, there must be

6  some authority that permits the government to restrain the

7  property.  Now, if the government's right and the FDCPA or the

8  All Writs Act or the statute permitted it, then I

9  wouldn't have an argument to make.  But we try to explain why

10  that's not the case.

11       And to allow this restraint to continue when, in our

12  view, none of those are lawful methods for this restraint to

13  continue to a point where it will become a moot point means

14  that if the Court ultimately finds that despite Mr. Madden's

15  predictions today there is not the amount of restitution that

16  the government expects, there will not be a way to unring that

17  bell.

18       Mr. Shah will have had to go to sentencing with the

19  lawyers that he's able to afford today and go through his

20  appeal with the lawyers that he's able to afford today, as

21  supposed to those that he might afford if he had access to the

22  money that's been illegally restrained.

23       They keep talking about 20 lawyers.  There's two

24  people left standing:  me and Mr. Glozman.  Everybody else,

25  insofar as I'm aware -- and I do have an associate in

1    St. Louis, so make it three -- but we are -- I'm working on a

2    discount.  I don't know Mr. Glozman's arrangement.  Mr. Shah

3    wants to hire and retain and continue to have other lawyers at

4    his disposal.  That my understanding is he does not have

5    the -- the wherewithal to be able to afford today and --

6              THE COURT:  How do we know that?

7              MR. FINNERAN:  I -- I don't know.  I -- I -- I am

8    based on -- basing it on my own understanding.  But it's the

9    government's burden on all of this.  I mean, this is -- part

10   of what's confusing to me as I'm sitting there listening is

11   Mr. Madden says in 30 days we should know, et cetera.  The

12   government investigated this case for three years.  We had a

13   forfeiture hearing set for months.  We held the forfeiture

14   hearing.  We extended the government's time to respond to --

15   we extended the government's time to respond to our

16   garnishment opposition.

17        I -- I'm perplexed as to how the government can stand

18   there and say we don't know yet, but we believe we will.  It

19   has the burden on each of these statutes to establish its

20   basis for restraint.

21             THE COURT:  It hasn't been that long.  I mean, we're

22   going to -- absent a request that I'd consider very carefully

23   to continue the sentencing, we're going to go ahead with the

24   sentencing as scheduled, provided -- I'll rule on posttrial

25   motions.  If I don't grant them, we'll proceed with the

1  sentencing as scheduled and we'll have a forfeiture hearing.

2        Now, whether that forfeiture hearing occurs -- I

3  don't know if there's anything that restricts my ability to

4  sentence Mr. Shah, at least on the nonforfeiture portion of a

5  sentence.  And then if there is need for continued hearings to

6  continue those and conduct those while the parties are

7  disputing the amounts of money that may be owed.

8        MR. FINNERAN:  There is, Your Honor.  The -- in order

9  for the -- a forfeiture -- a preliminary forfeiture order, in

10  order to become filed with the defendant must be incorporated

11  into the Court's judgment.  And so --

12        THE COURT:  I understand, but I can -- I don't have

13  to enter judgment on the date of sentencing.  And I enter

14  judgment when the judgment and commitment order is entered --

15        MR. FINNERAN:  Uh-huh.

16        THE COURT:  -- that would be entered when forfeiture

17  has been completed.

18        My question was simply -- and I'm deferring to your

19  expertise on this -- is there anything that prevents me from

20  sentencing Mr. Shah which doesn't go to the issue of

21  restitution or my -- my determination of the 3553(a) factors

22  is not going to be based on the precise amount of any

23  forfeiture or any restitution orders.  It's going to be based

24  on 3553(a) factors.

25        I don't think there's anything that prevents me from

1  sentencing him, not entering a judgment and commitment order

2  until I've concluded what the appropriate amounts are for

3  restitution and forfeiture.  Unless you're telling me the

4  rules prevent that process from going forward.

5       I say that only because you're right, normally, this

6  is all worked out.  It's rare it's contested, frankly, which

7  is why --

8       MR. FINNERAN:  Right.

9       THE COURT:  -- this is an interesting process.  But

10  when -- but when it is contested, even if it's often worked

11  out or hearings and findings are made before the sentencing

12  itself --

13       MR. FINNERAN:  Uh-huh.

14       THE COURT:  -- I'm not sure that's required.  I can't

15  enter a judgment and commitment order until all the aspects of

16  sentencing are completed, but the critical part of sentencing,

17  of course, the determination of whether and how much jail time

18  is imposed --

19       MR. FINNERAN:  Oh --

20       THE COURT:  -- can be, I think, undertaken before a

21  final -- final order of forfeiture is entered.

22       MR. FINNERAN:  I'm -- I'm sorry.  I'm making sure I'm

23  following you correctly.  So the -- the thought would be that

24  you determine the sentence but you do not impose sentence

25  against Mr. Shah as -- while these issues are litigated?

1         THE COURT:  Well, I determine it, I impose it, but I

2 don't enter the judgment on it or anything else relating to

3 it --

4         MR. FINNERAN:  Uh-huh.

5         THE COURT:  -- until all aspects of the sentencing

6 have been completed, which includes the forfeiture hearing.

7         MR. FINNERAN:  Okay.

8         THE COURT:  I'm not sure there's anything that

9 requires that all -- I raise this --

10         MR. FINNERAN:  Yeah.

11         THE COURT:  Let me start over.

12         I'm raising this because you're talking about the

13 fact that the government has been delaying.  And it's unfair

14 to -- when the government has asked for more time on certain

15 things.  Well, if they need more time and your client's not in

16 custody, I'm prepared to give them that time.

17         MR. FINNERAN:  I see.

18         THE COURT:  And if I were to sentence Mr. Shah -- and

19 I'm not prejudging what the sentence would be -- but I

20 wouldn't enter the final judgment and commitment order if I

21 gave him a period of incarceration -- and I'm not commenting

22 either way -- but if I did, I wouldn't set a surrender date

23 until this aspect of the case was completed, which would

24 complete the entirety of the sentencing process.  That's all

25 I'm saying.

1        MR. FINNERAN:  I've never encountered such a

2   situation before so I'll have to research whether there are

3   any impediments there.  I guess with respect to this

4   particular issue what I would say is that, you know, today,

5   Mr. Shah does not have access to this money.  He would like to

6   use it to retain counsel for sentencing and for other

7   procedures that are going forward in this case.

8        And so if you take any further steps in this case

9   while permitting what we believe is an illegal restraint to

10  continue, then we're going to have a hard time unringing that

11  bell if the Court ultimately determines that in fact the

12  government has overstated the restitution amount or the

13  government has not met its burden with respect to substitute

14  assets or any of these other issues.

15       So in my mind, the order of operations needs to be

16  that the assets are -- should be released because of the

17  restraint having been previously illegal.  The government

18  should have to come forward to meet a burden to demonstrate

19  that it has some basis to continue the restraint, because it's

20  conceded that $5 million should not have been restrained in

21  the first place.

22       I've argued today, well, I don't believe it's

23  identified such a basis.  If the Court disagrees and thinks

24  that one of these bases is sufficient, then I've lost my

25  argument today.  But if the Court agrees with all of that and

1  does not allow Mr. Shah immediate access to these funds, that

2  is going to continue to impact his representation going

3  forward in the case, and in our view, violate the statutes and

4  the constitution.

5      THE COURT:  How do I know he doesn't have money to do

6  it?  How does he know -- how do I know he doesn't have another

7  5 million out there to continue his representation absent

8  giving him $5 million which the government has made a

9  pretty -- in my mind, pretty compelling case is ultimately

10  going to have to be forfeited or used for restitution?

11      MR. FINNERAN:  Well, first I ask you to reserve

12  judgment on those points --

13      THE COURT:  I will.

14      MR. FINNERAN:  -- no matter how compelling -- I know

15  you will -- no matter how compelling the government's case may

16  seem.

17      And I -- I guess I would say two things:  First of

18  all, again, I don't -- I don't know as I'm sitting here today

19  what Mr. Shah's assets are, but I would have thought the

20  burden to make that showing to you, if it was critical to your

21  decision, was the government's to make.  And if that was going

22  to be part of a garnishment proceeding, that there'd be a

23  hearing on that issue.  None of that has taken place.  The

24  government has -- in my mind has had the opportunity to brief

25  this issue fully, hasn't requested that sort of --

1       THE COURT:  The only way they can find out what money

2  he has, given the complexity of Mr. Shah's financial

3  situation, would be a way they -- they're not allowed to do,

4  which would be ask him questions.

5       MR. FINNERAN:  Uh-huh.

6       THE COURT:  Something you can do, but certainly

7  something the government can't compel.

8       MR. FINNERAN:  Right.

9       THE COURT:  And I don't have an affidavit from him

10  about what his assets are that he could use to pay for

11  counsel, what counsel he is choosing to -- that he wants to

12  use in his wildest dreams, the most ex -- as you put it, the

13  most expensive lawyer in the world, the greatest lawyer in the

14  world.  I don't know what that lawyer would cost and why that

15  lawyer is necessary to provide him with adequate defense,

16  which so far he's had more than adequate defense.  He's had

17  outstanding counsel by reputation preindictment, because I

18  don't know what happened there, by my observation

19  postindictment, during the trial, and during these

20  proceedings.  So I don't have anything from him.  The

21  government can't compel it, and --

22       MR. FINNERAN:  And he has no burden.

23       THE COURT:  Well, he -- pre -- preconviction maybe,

24  but postconviction you're asking me to release money that I

25  believe there is at least a good faith basis to believe they

1   would be used to pay victims.  And if he needs that money for

2   attorneys, I need to know -- I believe I need -- I believe it

3   shifts to him on why he needs to show he needs more money than

4   he has to hire counsel that he would have to identify.

5          MR. FINNERAN:  And, Your Honor, I -- I -- well, two

6   things.  First of all, I will state our position, which is we

7   don't believe he has that burden.  We believe that regardless

8   of whether or not he has other funds, that the government's

9   restraint of untainted property that he could use to pay his

10  lawyers under Justice Thomas's opinion in *Luis* clearly

11  violates the Sixth Amendment.

12         THE COURT:  And he could use to pay his lawyers or he

13  could use to gamble --

14         MR. FINNERAN:  He could.

15         THE COURT:  -- or -- and -- and that's the

16  distinguishing part.

17         MR. FINNERAN:  I haven't authorized Mr. Shah to say

18  that if the Court insists upon it, then we will take whatever

19  steps the Court deems necessary to ensure that whatever funds

20  are released by Mr. Shah -- by the Court are directed towards

21  his legal representation in this case, although we don't

22  believe the law compels him to put it to that use.  We're

23  prepared to take whatever steps the Court would -- would deem

24  appropriate to ensure itself of that if it has concerns.

25         But again, the government bears the burden, from my

1  perspective, of showing this Court some statutory basis, not a

2  good faith belief, that it is going to be able to get it

3  someday, but instead, under either the FDCPA or the forfeiture

4  statutes, it has a burden of proof and it simply hasn't met

5  it.

6  THE COURT:  Well, Mr. Madden, you're in dangerous

7  ground, I must tell you, on this because there'll be an appeal

8  in this case, and one of the issues on appeal is whether the

9  defendant was somehow -- his Sixth Amendment right to counsel

10  of choice was -- was in any way hindered.  I don't believe it

11  has been.  I believe he's gotten -- I won't restate, but I

12  believe he's received the services of extremely competent

13  counsel.

14  But I would encourage you and the defense, if -- it

15  may not be Mr. Shah's burden overall, but if he's claiming

16  he's using it for defense and for a particular attorney, I

17  don't know what that attorney costs and I don't know what he

18  has.  It might be best that the two of you speak about this

19  and see if there's any compromise.  Right now, the positions

20  are the government doesn't want to let it go; defense wants it

21  all.  Maybe there's a basis -- if -- with more information

22  from the defense can be done privately, it doesn't have to be

23  put in the docket -- a filed docketed entry, and more

24  discussion by the government on whether or not any compromise

25  or concession can be reached.

1      If not, I'll rule one way or the other, but we're

2  creating an appellate issue either way no matter how I rule,

3  and -- well, at least if I rule one way, I'm creating an

4  appellate issue.  And I think it's worth -- the case law is a

5  little unclear.  I've cited some of the cases, but there's no

6  case on all fours in this twilight zone of postconviction

7  prejudgment that deals with monies that were not tainted

8  pre -- preindictment -- or pre -- preverdict, so...

9      MR. MADDEN:  Could I respond to a couple of points,

10  Your Honor?  I know you've got to go.

11      THE COURT:  Yeah.

12      MR. MADDEN:  Just on one point on the timing of

13  forfeiture.  It is true that the defense and the government

14  talked about it and agreed to do it this way.  It has occurred

15  to me, though, that it probably is preferable to enter the

16  order -- the preliminary order of forfeiture first, and it may

17  be strategic if the defense would prefer to go this way,

18  because once you enter the preliminary order of forfeiture

19  under both Rule 32.2 and then under 21 U.S.C. 853(g), it's

20  very clear that that can include substitute assets.

21      And so if -- you know, because 21 U.S.C. 853(g),

22  that's triggered once, and so I think the language is upon

23  entry of an order of forfeiture.  And if you look at 32.2 --

24  this is the Federal Rules of Criminal Procedure -- A -- I'm

25  sorry -- (b)(2)(A), if the court finds that property is

1  subject to forfeiture, et cetera, et cetera, then it refers to

2  including substitute -- substitute property.  So I think

3  that's another reason to consider the preliminary order of

4  forfeiture first or -- or at the same time.

5       THE COURT:  Yeah, that's fine.  That's typically

6  what's done.  I'm happy to do it that way.  I just was hearing

7  discussions about a lot of work the government still has to do

8  and the defense saying we've given them all kinds of time, and

9  I'm -- absent moving the sentencing date, I'm not sure that it

10  all can be done.

11       MR. MADDEN:  I guess -- you never know.  I think

12  we're very confident that we can get it done in advance of

13  sentencing, Your Honor.  I mean, and like to the point of we

14  haven't -- to the defense claim that, oh, why haven't we

15  gotten this done, well, the valuation as of last year wasn't

16  really going to help us very much, you know.  And so it wasn't

17  something that made sense to do, you know, during the middle

18  of trial.  It makes sense to do it as close to, like, current

19  valuation as possible which is why we're doing it --

20       THE COURT:  All right.

21       MR. MADDEN:  -- that way.

22       And then in terms of Mr. Shah, you know, we submitted

23  the government's version of the offense.  Probation's going to

24  be reaching out to him to be interviewed.  And a part of that

25  interview, of course, is going to include, you know,

1    discussion of his current assets, and so we'll see what he

2    says to probation --

3          THE COURT:  Which he's not required to respond to.

4    Well, I've never seen a defendant not do it --

5          MR. MADDEN:  Yeah.

6          THE COURT:  -- but I don't know that a defendant is

7    required to do that.  I -- I -- maybe you can advise me on

8    this because I've never seen a defendant refuse to do it.

9          MR. MADDEN:  But --

10         THE COURT:  If he's going to do that anyway,

11   Mr. Finneran, maybe there's a --

12         MR. FINNERAN:  I have not discussed it with him,

13   Your Honor, so I don't know.

14         THE COURT:  Okay.  Well, if it's coming anyway, maybe

15   that's the kind of thing that if you give to the government

16   ahead of time in some summary form in an off-the-record

17   discussion, and you also provide them with information about

18   who he wants to hire and what the arrangement would be,

19   there's no real strategic issue here.  It's not a -- well, I

20   don't view any great secret in that or -- or disadvantage to

21   the defendant telling the government.  You've already listed

22   an attorney, a well-known attorney, as someone he wants to

23   hire.

24         MR. FINNERAN:  Uh-huh.

25         THE COURT:  I have no idea what that attorney's

1   retainer is and what his hourly rates are and what his

2   estimate is, but if you gave all that to the government, I'm

3   going back to what I suggested a moment ago, I won't do it

4   again, about at least speaking to the government about that.

5         Mr. Madden, you were going to raise a couple of

6   points when I said all that.

7         MR. MADDEN:  That's all right.  So the only other

8   thing I was going to say is we, of course, are cognizant of a

9   potential appeal.  We've looped in our appellate section.  We

10  feel that we have a strong record and that we have the much

11  stronger position here than the defense, and that we also have

12  made a strong record that Shah has had access to in excess of

13  $20 million and he has been spending money on -- extraordinary

14  amounts of money on luxury items.  Obviously, he could have

15  spent that on attorneys.  He also spent millions of dollars on

16  outstanding attorneys.  And so we've -- we believe that we

17  will prevail on appeal if you rule in our favor, Your Honor.

18        THE COURT:  Well, if --

19        MR. FINNERAN:  I disagree.

20        THE COURT:  I know.

21        If there's any interest in what I've just said about

22  that, contact my law clerk Sydney with -- one way or the

23  other --

24    (Indiscernible crosstalk.)

25        MR. FINNERAN:  Sorry; go ahead.

1    THE COURT:  -- with an email by a week from today

2  indicating you're discussing some compromise on the motion to

3  modify the protective order or to engage in prejudgment --

4  modify the protective order, which really is the only thing

5  that is -- that that discussion would impact.

6    If there's no agreement, all I need is an email to my

7  law clerk saying there's no agreement.  I don't need to know

8  who the disagreeable party was or what the nature of the

9  disagreement is; just no agreement.  That's all I need to

10  know.

11    MR. FINNERAN:  Your Honor, could I have one more

12  thing to answer a question you asked Mr. Madden?

13    THE COURT:  Go ahead.

14    MR. FINNERAN:  So you asked if funds were liquid.  So

15  I believe if you look at No. 1 at the government's own motion

16  for a preliminary order of forfeiture, there are three assets

17  that were liquidated as Mr. Madden indicated liquidity events

18  occurred.  And the government currently is in possession of

19  $1.1 million of liquid funds over and above what it claims it

20  can trace into those funds.

21    In addition, Investment Company B, which we've made

22  repeated reference to, because there the government had only

23  traced in some half a million dollars and restrained assets

24  valued at $20 million today by that entity.  $10 million of

25  those are now liquid because of liquidity events.  So I

1    believe that there are at least $11 million of restrained

2    liquid funds currently covered by the protective order.  I

3    just wanted to address that question.

4          THE COURT:  All right.  And they're fungible.  I

5    don't think there's -- now, if there's a tracing of monies and

6    about 5 million was untainted, the fact -- I don't think that

7    5 million, if it's in a non -- an -- nonliquid asset is

8    important, as long as the bulk has some liquid assets.

9          Do you agree with that?

10         MR. MADDEN:  I'm sorry; I didn't -- I didn't follow

11   that.

12         THE COURT:  Yeah, no, maybe I -- I --

13         MR. FINNERAN:  I'd say, Your Honor, I disagree with

14   that.  The government's burden is to trace asset by asset.

15   And so if there is one investment that goes up, another one

16   that goes down, you know, the government can't sort of make up

17   the difference by forfeiting the other one if the other one

18   isn't traceable.

19         THE COURT:  So you're saying if I order these monies

20   returned and it's in an illiquid asset, it has to be

21   liquidated, even at a loss to your client, if necessary, a

22   loss to the fund -- that's not really your client -- it's a

23   loss to the fund --

24         MR. FINNERAN:  Uh-huh.

25         THE COURT:  -- to provide the cash value of the

1   $5 million.

2        MR. FINNERAN:  Your Honor, what our amended order

3   would ask you to do is to amend the order so that only the

4   traceable property would be subject to restraint.  That would

5   produce I believe about $11 million of liquid funds.  And then

6   with respect to the illiquid funds, then, you know, to the

7   extent that they equal the amount that's restrained, they'd be

8   restrained.  And then Mr. Shah or the government, we have to

9   talk about what happens on a -- on a liquidation event.

10        THE COURT:  So are you saying that the trace -- the

11   non -- what you're saying is that the funds that were

12   originally restrained that should not have been restrained now

13   has a value of some $11 million?

14        MR. FINNERAN:  In excess of that, Your Honor.  But

15   the -- the government's conceded 5 million.  The -- I think

16   what they haven't talked about much is Guild Capital.  So

17   Guild Capital we presented evidence up -- I said the name.  I

18   meant to say Investment Company B -- in its -- in our

19   forfeiture hearing, we discussed at some length.  That is an

20   entity the government -- don't hold me to it -- I believe

21   could trace something around half a million dollars to.  But

22   each of those -- Guild Capital is not an entity that

23   Mr. Shah's company is invested in.  It's an entity that money

24   was transferred to and then that company made investments.

25        The records that we demonstrated at the forfeiture

1    hearing show that the value of the liquid and illiquid

2    investments totals about $20 million, 10 of which is already

3    liquid.  So I don't know how the government thinks that it can

4    say that any of that 10 million -- any of that 20 million,

5    other than the 500 or so it can trace in, is traceable.

6    That's something I think we're going to have to litigate at a

7    forfeiture hearing.

8              What I believe our motion is limited to today is the

9    funds the government concedes are traceable -- or excuse me --

10   are not traceable, which my understanding from their Exhibit K

11   is roughly $5 million.

12             THE COURT:  In a liquid or nonliquid asset?

13             MR. FINNERAN:  I -- correct me if I'm wrong,

14   Mr. Madden, but I believe that's just a sum of the difference

15   between the amount they can trace in to the fund and the

16   amount that was -- was restrained by the Court.  So that --

17   that chart doesn't really answer that particular question.

18             But again, let's just take Investment Company B as an

19   example.  I believe there's in excess of $5 million in that --

20   in that fund that is not traceable to the crimes of conviction

21   that Mr. Madden could possibly make available if we reach an

22   agreement, and there's at least $1.1 million that's in the

23   government's possession today because they got seizure

24   warrants for the money.  That's under their POF motion in

25   excess of what they claim to trace.

1          THE COURT:  All right.  Anything else?

2          MR. MADDEN:  No, Your Honor.

3          THE COURT:  Okay.

4          MR. FINNERAN:  No, Your Honor.

5          THE COURT:  Well, thank you all.  An email a week

6    from today if there's any -- in the unlikely event you reach

7    agreement, let's put it that way.

8          MR. FINNERAN:  Your Honor, thank you for the time you

9    gave us this morning.  I really appreciate the length of time.

10          THE COURT:  Thank you all.

11          MR. MADDEN:  Thank you.

12          THE COURT:  Okay.

13     (Proceedings concluded at 12:42 p.m.)

14                          CERTIFICATE

15     I certify that the foregoing is a correct transcript from

16    the record of proceedings in the above-entitled matter.

17    */s/ Elia E. Carrión*          *11th day of August, 2023*

18    *Elia E. Carrión*                        *Date*
      *Official Court Reporter*

19

20

21

22

23

24

25