```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )   Docket No. 19 CR 864
 4                  Plaintiff,        )
                                      )   Chicago, Illinois
 5        v.                          )   January 30, 2023
                                      )   8:16 a.m.
 6                                    )
     RISHI SHAH, SHRADHA AGARWAL,     )
 7   BRAD PURDY,                      )
                                      )
 8                  Defendants.       )
```

```
 9          TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 1A
10        BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
```

```
11
     APPEARANCES:
12

13   For the Government:    MR. MATTHEW F. MADDEN
                            MR. SAURISH APPLEBY-BHATTACHARJEE
14                          Assistant U.S. Attorneys
                            219 South Dearborn Street, 5th Floor
15                          Chicago, Illinois  60604

16
                            MR. WILLIAM E. JOHNSTON
17                          MR. KYLE C. HANKEY
                            U.S. Department of Justice
18                          Criminal Division, Fraud Section
                            Washington, D.C.  20530
19

20

21

22                    ELIA E. CARRIÓN
                    Official Court Reporter
23               United States District Court
            219 South Dearborn Street, Room 1432,
24                  Chicago, Illinois 60604
                       (312) 408-7782
25             Elia_Carrion@ilnd.uscourts.gov
```

1    APPEARANCES (Continued:)

2

3    For Defendant
     Shah:                        MR. JOHN C. HUESTON
                                  Hueston Hennigan LLP
4                                 620 Newport Center Drive, Suite 1300
                                  Newport Beach, California  92660
5
                                  MS. VICKI CHOU
6                                 MR. MICHAEL H. TODISCO
                                  MS. KAREN DING
7                                 Hueston Hennigan LLP
                                  523 West 6th Street, Suite 400
8                                 Los Angeles, California  90014

9
     For Defendant
10   Agarwal:                     MS. KOREN L. BELL
                                  MR. A. ALEXANDER LOWDER
11                                MR. STEPHEN G. LARSON
                                  Larson LLP
12                                555 South Flower Street, Suite 4400
                                  Los Angeles, California  90071
13
                                  MR. PATRICK W. BLEGEN
14                                MS. KELSEY H. KILLION
                                  Blegen & Garvey
15                                53 West Jackson Boulevard, Suite 1437
                                  Chicago, Illinois  60604
16

17   For Defendant
     Purdy:                       MR. THEODORE T. POULOS
18                                MR. ERIC PRUITT
                                  MR. JOHN PAVLETIC
19                                Cotsirilos, Tighe, Streicker, Poulos &
                                  Campbell, Ltd.
20                                33 North Dearborn Street, Suite 600
                                  Chicago, Illinois  60602
21

22

23

24

25

1       (Proceedings heard in open court.)

2       THE COURT:  This is the United States v. Shah,

3   Agarwal, and Purdy, 19 CR 864.

4       For the record, let's have everyone identify

5   themselves, starting first with the government.

6       MR. MADDEN:  Good morning, Your Honor.

7   Matthew Madden, William Johnston, Kyle Hankey, and Saurish

8   Appleby-Bhattacharjee on behalf of the United States.

9       THE COURT:  All right.  For Defendant Shah?

10      MR. HUESTON:  Good morning, Your Honor.

11  John Hueston, Michael Todisco, Vicki Chou, and Karen Ding on

12  behalf of Defendant Rishi Shah.

13      THE COURT:  And for Defendant Agarwal?

14      MS. BELL:  Good morning, Your Honor.  Koren Bell,

15  Alex Lowder, Pat Blegen, and Kelsey Killion on behalf of

16  Ms. Agarwal.

17      THE COURT:  And for Defendant Purdy?

18      MR. POULOS:  Good morning.  Ted Poulos and

19  L.J. Pavletic on behalf of Defendant Purdy, who's present.

20      THE COURT:  Okay.  Defendants don't need to be

21  present for this.  We're going to talk a little bit about

22  the -- some of the objections to the demonstratives the

23  parties intend to use during the openings.

24      Two things I wanted to raise.  First, is we --

25  because we have two additional jurors, we need to make sure we

1    swear those jurors in.  I can do it outside the presence of

2    the others or in a general group.  My suggestion is when they

3    all come in, we swear them again and not separate out the two

4    and just simply swear in the group of 19.

5         Okay.  Openings, we're going to get done today.  I

6    saw the list of exhibits you intend to use.  The government

7    gave a conservative estimate timewise, what they thought their

8    opening would be.  I'm going to suggest the three defense

9    counsel giving openings talk at a break or talk before we

10   start.  They're finishing today.

11        And if, Mr. Poulos, you're probably at the tail end

12   of this, but if it's 5 o'clock, you're done.  I hope it

13   doesn't come to that.  I hope we can finish well in advance.

14   I don't want to cut off a word of your opening, but if you're

15   worried, given the timing of how things are going, talk to

16   your fellow counsel and try and get some -- be reasonable

17   among yourselves.

18        MR. HUESTON:  Your Honor, we have no concern.  We

19   really do believe we're going to finish in advance, well in

20   advance of 5 o'clock.

21        THE COURT:  Well, at 9:00 p.m. or 9:30 p.m. last

22   night when I was looking at all the exhibits everyone's using

23   and all the arguments you're having about admissibility of

24   them, which hopefully you've resolved, because I saw a hopeful

25   email from Mr. Madden this morning, I was concerned that we

1   were going to be spending more than a day on openings.

2       You have a witness in the wings in case we get to

3   that position, right?

4       MR. MADDEN:  We do.  And there's -- there's nearly

5   zero issues with the exhibits that we intend to use with him.

6   I think there's just one that's remaining that I think is

7   minor.

8       THE COURT:  Okay.  All right.  Good.

9       And then as to the one juror who we spoke about who

10  originally had some travel issues, I intend to talk to her, if

11  we want to talk to her separately, after the openings.

12  Because I think anyone who hears these openings, hopefully

13  anyone who hears the openings as a juror is going to feel

14  invested in sitting on this jury.  Hopefully that's the

15  reaction of the juror after they hear all your openings.  I

16  expect it will be.

17      Okay.  Where do we stand on -- Mr. Madden, in light

18  of your last email 15, 20 minutes ago, as to what's still to

19  be resolved?

20      MR. MADDEN:  Your Honor, we're withdrawing our

21  objection to the vast majority of the government exhibits that

22  the defense wants to use.  It sounds like they're using them

23  for -- they're offering them for issues other than the truth.

24      THE COURT:  Okay.

25      MR. MADDEN:  There's a handful for Agarwal.  We're

1    still objecting to one email -- one government exhibit, which

2    is No. 28.  And then for Shah, there's four that we're still

3    objecting to, which are 143, 662, 687, and 793.

4              THE COURT:  All right.  And none on Purdy, correct?

5              MR. MADDEN:  None on Purdy.

6              THE COURT:  And is there any defense objections to

7    what the government is putting in their opening?

8              MR. POULOS:  No, Your Honor.

9              MS. BELL:  No -- go ahead.

10             MR. LOWDER:  Your Honor, it's not an objection that

11   needs to be ruled on.  It was just preserving the Santiago

12   issue to that one exhibit, so we don't need to have argument.

13             THE COURT:  Okay.  And Santiago issues are preserved

14   throughout this trial without additional objection.

15             MR. LOWDER:  Thank you, Your Honor.

16             THE COURT:  Okay.  Can you put those up on a screen?

17             MR. MADDEN:  Pardon me?

18             THE COURT:  Either put them up on the screen or a

19   hard copy.  We're talking about --

20             MR. HUESTON:  Your Honor, maybe if I can --

21             THE COURT:  -- five exhibits.

22             MR. HUESTON:  -- clarify.  I mean, this is the first

23   we're hearing this.  We appreciate the government, you know,

24   dropping off 50 objections.

25             THE COURT:  So do I.

1    MR. HUESTON:  But they fail to mention any of the
2  defense exhibits.  The defense exhibits are being brought in
3  for the same purpose as the government exhibits, not for the
4  truth of the matter asserted; a fact on listeners' state of
5  mind.

6    And let me assure the Court, I've done a lot of
7  trials.  What I have contemplated here is gonna be within the
8  time estimate I promised the Court.

9    THE COURT:  Well, let me give you some broad thoughts
10  I have on evidentiary rulings.  Any document that's on Desai
11  is going to come in one way or the other, either substantively
12  or for impeachment purposes.  Because I'm assuming nothing the
13  defense is going to show Desai is there to bolster his
14  credibility.  And so that's a proper use of an exhibit.

15    Maybe there's a limiting instruction cause it's not
16  being brought in for the truth, but to show an inconsistency
17  or impeachment.  That's a limiting instruction I give on the
18  spot if an appropriate objection or request for such an
19  instruction was made.

20    So as far as Desai's concerned, I think if he's --
21  his name's on an email, it's fair game in an opening because
22  it's going to come in on cross.  I don't think the defense is
23  going to offer a Desai email for anything other than to
24  impeach him or to set up an impeachment.

25    Secondly, I -- absent an argument otherwise, I think

1    just about every email within this company prior to the

2    *Wall Street Journal* article or an SEC notice of investigation

3    or a U.S. attorney notice of investigation is a business

4    record.  They're all made in the ordinary course of business.

5    That's what these emails are, as far as I can see.

6          Now, if there is notice of a *Wall Street Journal*

7    investigation, notice of a SEC investigation or a

8    U.S. attorney investigation, and there are self-serving

9    statements that start showing up because people believe

10   defendants believe, well, I want to set up my defense.

11         If there's something -- and I'll use the most obvious

12   and probably improbable example -- but if Shah and Agarwal

13   say, you know, I've always thought Desai was pulling one over

14   on us and that is after notice of an investigation, that's a

15   self-serving statement that I'd have to examine even more

16   closely because that is -- there'd be an argument that the

17   defendants are just setting up a way to get in some hearsay or

18   setting up their defense, having notice of an investigation.

19         And it's not unusual for an admission to be properly

20   admitted by the government, but the defense can't get it in

21   because it's hearsay.  There's no -- that's a basic

22   Evidence 101, absent another use for that, that document,

23   another proper use under the Rules of Evidence.

24         So I'm -- those are broad thoughts I wanted to give

25   you as to I think the business record nature of just about

1 every email that's being offered until we get to the point

2 where there is a clear line, where the -- it's not being --

3 it's not in the ordinary course of business, and it's probably

4 a setup of a potential defense.

5 　　　　　MR. HUESTON:  Your Honor, in light of that guidance,

6 I would suggest -- I think to save time, I would imagine the

7 government might want to revisit its objections.  Don't mean

8 to speak over them and --

9 　　　　　THE COURT:  Well, there is only four of them, so...

10 　　　　　But I just wanted to tell you how I view evidence in

11 this case.  Absent -- and not having heard one word of opening

12 and not really examined the exhibits you've all tried to

13 offer.

14 　　　　　MR. HUESTON:  And I will also say that there's

15 nothing that you described preliminarily out of bounds that is

16 in this list.  There's nothing after, there's nothing like

17 that.

18 　　　　　THE COURT:  Okay.

19 　　　　　MR. POULOS:  Your Honor, I'm happy to hear that,

20 Your Honor.  We've -- I've had the same view all along.  And

21 it -- it will greatly streamline the presentation of evidence

22 in this case so that we're not --

23 　　　　　THE COURT:  Well, I haven't heard from the

24 government.  They may tell me where I'm mistaken on a lot of

25 this, but I -- and it doesn't have to be between the

1    defendants and each other.  It could be between third parties,

2    whether it's people within the company or emails with JPMorgan

3    or, you know, AbbVie or some other third party.  If it's a

4    routine -- or something that is routinely generated, even if

5    the facts are unusual or the circumstance is unusual, it

6    doesn't mean it's not made in the ordinary course of business.

7              And -- but go ahead, Mr. Madden.  You're ready to

8    jump out of your chair.

9              MR. MADDEN:  I guess we don't view every email sent

10   at Outcome prior to the, you know, *Wall Street Journal* article

11   investigation or other investigations as -- as a business

12   record.  And if that were true, you know, our Santiago proffer

13   was kind of pointless, because, you know, we did that -- if we

14   believed that all the records were business records, there

15   wasn't -- the vast majority of what we were seeking to admit

16   with our Santiago proffer was emails.

17             And so we view them as coconspirator statements, and

18   that's why most of them are admissible, in addition to other

19   alternative bases like admissions.

20             THE COURT:  Well, I think your Santiago proffer did

21   have value because it allows for the admission of emails that

22   would other be -- otherwise be against one defendant to be

23   attributable to others.  So if -- that, to me, was the crucial

24   part of any ruling I made on the Santiago proffer.

25             MR. MADDEN:  But if they're business records,

1    wouldn't the same be true?

2            THE COURT:  Well, there might be a basis to --

3    you know, there's a question of whether a document is

4    admissible for hearsay purposes and a question of whether they

5    are also attributable to other defendants.

6            And maybe you're -- I see your point.  Maybe if

7    they're independently admissible as an exception to hearsay,

8    they're admissible to everyone.  I'm not sure the -- I'm not

9    sure the answer to that.

10            MR. MADDEN:  Okay.

11            THE COURT:  I know that the answer is when, given the

12    ruling I made, that they're admissible to everyone.  And maybe

13    there's exceptions to this broad statement I've made, and I'm

14    not foreclosing that, but I'm giving you my initial

15    impression.

16            MR. MADDEN:  And we appreciate that.  And we'll think

17    it -- we think that there should be some limits, but I think

18    we'd prefer to talk about it internally a little bit, looking

19    at the defense exhibits.

20            THE COURT:  Sure.

21            MR. MADDEN:  So I guess what I would suggest is there

22    are some objections to the PowerPoint.  We don't have issues

23    with Agarwal or Purdy's PowerPoints.  We still have some

24    remaining issues for the Shah PowerPoint.

25            What I would suggest is maybe we can just resolve

1   those.  And then if the government could have a few minutes,

2   given your comments on the hearsay rule, to just discuss

3   internally our remaining objections?

4           THE COURT:  Sure.  And don't take my statements

5   farther than I made them, which is I'll certainly give you a

6   chance to push back on any particular exhibit.  But broadly

7   speaking, I stand by what I said.

8           MR. MADDEN:  Understood.

9           THE COURT:  But if you've got exceptions, there are

10  reasons that something you can point out is really not made in

11  the ordinary course of business, they're all maintained,

12  they're all kept in the ordinary course of business.

13          This is really a question of whether they were made

14  in the ordinary course of business.  And if that's something

15  that you're going to push back on in some way, then I'll be

16  happy to hear it.

17          Okay.  I'll give you whatever time you need to take

18  care of that.

19          MR. MADDEN:  Thank you.

20          Did you want to go over the Shah PowerPoint now or --

21          THE COURT:  Oh, I thought -- is that -- I thought

22  that's something --

23          MR. MADDEN:  It's -- it's separate.  It's more --

24          THE COURT:  All right.  I've got them here.

25  Go ahead.

1           MR. MADDEN:  So the first issue was they paraphrased
2   comments that they expect Mr. Kazi to say.  Essentially, that
3   Kazi believes that Shah believes a couple of things.
4           THE COURT:  Yeah.
5           MR. MADDEN:  That's hearsay for -- it's being offered
6   for the truth of Shah's belief.  Otherwise --
7           THE COURT:  Is Kazi going to testify?
8           MR. MADDEN:  He is.
9           THE COURT:  All right.  Is he going to -- what is the
10  good faith basis the defense believes that they're going to
11  get this statement out of him on cross?
12          MR. HUESTON:  Literally said these --
13          COURT REPORTER:  Can you speak into the mic, please?
14          MR. HUESTON:  Sorry.
15          First proposal was doing the quotes of what he said
16  in the grand jury.
17          COURT REPORTER:  And slow down.
18          MR. HUESTON:  He literally said this under oath,
19  Your Honor.
20          So what we did so as not to -- and the government
21  objected to the quotes.  We said, fine, we'll paraphrase what
22  we expect he will say.  So that's the good faith basis.
23          THE COURT:  Well, that -- no, it's a separate issue,
24  though.
25          MR. HUESTON:  Okay.

1          THE COURT:  I think the issue is opinion testimony

2     by -- and tell me if I'm wrong from the government's point of

3     view, but I view the flaw of this, if there is one, opinion

4     testimony of what Shah believed.

5          I'm going to wait until the door is shut because...

6          Opinion testimony of what Shah believed.

7          And off the record.

8        (Off-the-record discussion.)

9          THE COURT:  Back on the record.

10         Is that where your argument is?

11         MR. MADDEN:  Yes, Your Honor.

12         MR. HUESTON:  Let me respond to that.

13         THE COURT:  Go ahead.

14         MR. HUESTON:  So Mr. Kazi is going to take the stand.

15    He's going to say, I had a meeting with Mr. Shah, and I have

16    four issues I raised.  And one of them was, you know, I can't

17    believe that you think this company is gonna really generate,

18    you know, over a billion dollars in revenue.

19         And in -- under oath before this deposition, he said,

20    you know, he really did believe.  It's within his lay

21    perception.  My conversations, he really did believe in the

22    company.  He really did believe it was going to generate over

23    a billion in revenues.  Directly relevant.

24         THE COURT:  Well, I'm going to let it in for opening.

25    You're going to have to lay a 701 foundation to allow it to

1  come in as substantive testimony.  But this seems within the

2  bandwidth of something that a witness with proper foundation

3  can get that statement in under 701.

4          All right.  Next one.

5          MR. MADDEN:  Your Honor, the only other one that

6  we're going to stand on, we're -- is the -- they have a slide

7  with a large shredder and Ashik Desai's picture next to it.

8  That's argumentative.  That was Slide 21 in the deck that was

9  sent to us.

10          THE COURT:  I thought they were going to --

11          Go ahead.

12          MR. MADDEN:  It sounds like, or appears to us, that

13  they're maintaining their position, but they offered a

14  separate -- they also offered an alternative, which is a

15  picture of Desai with a telephone, which we do not object to.

16          MR. HUESTON:  That's fine.  We'll work with that,

17  Your Honor.  That's fine.

18          THE COURT:  Yeah.  Shredder's out.  That's

19  argumentative.

20          MR. MADDEN:  Okay.

21          THE COURT:  All right.  Anything else on the --

22          MR. MADDEN:  That's it on the slides.

23          THE COURT:  Okay.  And how about the exhibits

24  themselves?

25          MR. MADDEN:  Could we have a couple of minutes to

1     discuss, based on your comments, Your Honor?

2            THE COURT:  Sure.

3            And then anyone who's seated on this side of the

4     courtroom, that's going to be completely reserved for jurors.

5     So please sit on the other side.  Thank you.

6            (Pause in the proceedings.)

7            MR. MADDEN:  Your Honor, we're ready if you're ready.

8            THE COURT:  Okay.  Please proceed.

9            MR. MADDEN:  Your Honor, with respect to the defense

10     exhibits, in order to streamline things and go forward with

11     openings today, we're okay going -- going forward with them.

12     However, we -- we do know there are some self-serving

13     statements by defendants in a number of the defense exhibits

14     that we believe are hearsay.

15            The defense is telling us that they're going to use

16     them for -- not for their truth, and we'll take them at their

17     word, but we want to maintain our ability to object to these

18     exhibits or any other defense exhibits as they come up at

19     trial.

20            THE COURT:  Absolutely.  And I'll -- I wanted to say

21     this, too:  If either side refers to exhibits in their opening

22     statement and they don't come in, it's not going to be a

23     comment on the defendants' failure to testify if they don't

24     testify.  For the government to say, they showed you this

25     exhibit in opening statement and they never offered it.  It

1  doesn't switch the burden of proof.

2      But you are affirmatively, as officers of the court,

3  telling this jury this is an exhibit they're going to see.

4  And you do that at your own risk.  That happens in every case.

5  But given the number of objections that occurred --

6      Mr. Donahue, can you shut the -- or can the last

7  person then shut the door, please?  Thanks.

8      Given the objections I saw, do it at your own risk.

9  And I don't -- if this were a shorter trial, I'd go through

10 all 50 or 60 exhibits, if forced to.  But I doubt the jury's

11 going to remember what was referred to in opening, but

12 certainly impressions are made after an opening, and that's

13 important.  And so I recognize the government's objections

14 being important.

15      But I -- but -- and I appreciate your backing off on

16 these objections for the -- and these being used for

17 nonhearsay purposes.  But if you don't use it and it's

18 referred to extensively in opening and the government wants to

19 refer to the fact that they promised you this and they didn't

20 offer it, that will not be a basis for an objection that's a

21 comment on the defendants' failure to testify or a shifting of

22 the burden of proof.  Because you're affirmatively saying this

23 is going to be used, in my mind, by putting it up in opening.

24      Does everyone agree to that?

25      First, Defendant Shah?

1           MR. HUESTON:  Yes, Your Honor.

2           THE COURT:  Defendant Agarwal?

3           MR. LOWDER:  Yes, Your Honor.

4           THE COURT:  Defendant Purdy?

5           MR. POULOS:  Yes, Your Honor.

6           THE COURT:  All right.  Okay.  You should have

7   received --

8           I don't know.  Sydney, did you give them copies yet?

9           MS. BLACK:  Not yet.

10          THE COURT:  All right.  We're going to give you

11  copies of the preliminary instructions.  One last chance to

12  look at them and see if there's anything you have an objection

13  to.

14          MR. LOWDER:  Your Honor, if -- this is Mr. Lowder.

15          THE COURT:  Yes.

16          MR. LOWDER:  Quick question.  Is the government also

17  withdrawing the objection to the government exhibit that was

18  part of our opening?  I just wasn't clear on that and just

19  wanted to make sure I didn't miss it.

20          MR. MADDEN:  I'm sorry; I missed that question.

21          THE COURT:  Mr. Lowder wanted to know if you were

22  going to be objecting to the Agarwal -- withdrawing your

23  objection to the Agarwal exhibit you had said a moment ago you

24  were objecting to.

25          MR. LOWDER:  And that was Government Exhibit 28, I

1    think is what you had indicated.

2            MR. MADDEN:  Yeah, it's the same.  We'll take the

3    same position on that, Your Honor.

4            THE COURT:  Okay.  Fair enough.  Okay, very good.

5            Then I'm going to come back in about ten minutes, and

6    you can tell me if you have any objections.  Or just let

7    Sydney know right away if you have an objection to anything on

8    the preliminary instructions.

9            They pretty -- they should accurately have reflected

10   the decisions that were made last week and also some of the

11   back-and-forth emails on some of the language.

12           So let me know if there's an objection to that, and

13   I'll come back in about ten minutes.

14           (A recess was had from 8:39 a.m. to 8:53 a.m.)

15           THE COURT:  All right.  A couple of points I want to

16   make.  One, is there any objection to the preliminary jury

17   instructions that Sydney handed out?

18           First, from the government?

19           MR. MADDEN:  No, Your Honor.

20           THE COURT:  Oh, hang on.  We're still hooking up.

21       (Pause in the proceedings.)

22           THE COURT:  Mr. Hueston?

23           MR. HUESTON:  No, Your Honor.

24           MR. LOWDER:  No, Your Honor.

25           MR. POULOS:  No, Your Honor.

1          THE COURT:  All right.  And that was in response to

2     the question that is now on the record, does anyone have an

3     objection to the preliminary jury instructions.

4          Okay.  And one more comment on the business record

5     exception to the hearsay rule regarding --

6          MR. LOWDER:  I'm sorry to interrupt, Your Honor.

7          Do you want the door closed for this or do you care?

8          THE COURT:  Yeah, let's close it for a second.

9          And so everyone knows, the rule is going to be when

10    the jury's in the courtroom, everyone needs to wear a mask

11    unless you are an attorney speaking or me speaking.

12    Otherwise, I'm going to wear a mask.

13         So that's the general rule.  And if there's anyone in

14    the audience who doesn't have a mask, we can provide you one

15    or make sure you bring one next time -- well, we'll provide

16    you one, and always have one when you come in.

17         Okay.  On the hearsay issue about the emails, I gave

18    you my general impressions.  I'm certainly willing to hear an

19    argument about why any particular email -- most of the emails

20    the government's going to offer are admissions by one of the

21    defendants.  They're on it or they authored it.

22         (Pause in the proceedings.)

23         THE COURT:  They're on it or authored it.  As to

24    emails the defense wishes to offer, if they're being offered

25    for the truth of the matter asserted, you're going to have to

1    satisfy the business record foundation for it.  In general,

2    what I viewed as -- a quick skim of some of these is they all

3    appear to be -- satisfy the requirements of a business record

4    made at or near the time of the events depicted, made in the

5    ordinary course of business, kept in the ordinary course of

6    business.

7         But the rule also allows for arguments why a

8    particular exhibit doesn't meet those requirements.  I

9    think -- I think 803(6) also states:  The opponent does not

10   show that some source of the information or the method of

11   circumstances of preparation indicate a lack of

12   trustworthiness.

13        So that if the defense is going to offer an email,

14   make sure it fits within the four corners of the five

15   requirements of 803(6).  But it's generally been my belief and

16   experience that routine emails within a company are business

17   records.  They satisfy the business record exception to the

18   hearsay rule.  And you should all keep that in mind.

19        None of this matters for the opening statements.

20   But, Mr. Madden, your comment about why did you prepare a

21   Santiago proffer, it's because if you hadn't, you'd be

22   offering a number of statements that, on their face at least,

23   wouldn't be attributable to other defendants.

24        And I think if you didn't offer a Santiago proffer,

25   you'd be the first time prosecutor I've ever seen who hasn't.

1    And you didn't want to be there, so...

2          But I -- I wanted to tell you my general impression

3    and make sure the parties know they're still going to have to

4    satisfy the rule specifically.

5          Okay.  Anything else we need to address before we

6    bring the jury in?

7          MR. LOWDER:  Your Honor, if we may have a moment just

8    to double-check our tech before we --

9          THE COURT:  Sure, we can go off the record.

10         Anything else on the record anyone else needs to

11   discuss?

12         MR. LOWDER:  Not for Ms. Agarwal, Your Honor.

13         THE COURT:  No.  Okay.  Off the record.

14      (Pause in the proceedings.)

15         COURT SECURITY OFFICER:  All rise.

16      (Jury in at 9:08 a.m.)

17         THE COURT:  Okay.  Please be seated.

18         Good morning, ladies and gentlemen.  Thank you for

19   all being timely and coming in.  We're going to begin with

20   opening statements in a moment.

21         The first thing I'm going to do is ask my courtroom

22   deputy to please swear you in as jurors once again.

23         So if you could all stand, please, and Emily will

24   swear you in.

25      (Jurors sworn.)

1  JURORS:  I do.

2  THE COURT:  All right.  Please be seated.

3  The seating arrangement is changeable, however you

4  are comfortable sitting.  I don't want more than eight in the

5  jury box, so at least there's one seat between you.  And then

6  there's one seat down here at the bottom, to the left of the

7  jury box, and a number of other seats out there for you.

8  If it turns out that you're uncomfortable in a

9  position, you want to get closer or you're fine back there,

10  talk to your fellow jurors about changing seats.  There's no

11  order in any way.  And whatever you can work out among

12  yourselves is fine by me.  I just want you to be separated for

13  your own safety and to have you comfortable.

14  You should be able to see witnesses because we have

15  an iPad up on the witness stand so the image of the witness

16  will be projected on that so that those of you in the back

17  will have an even clearer view of the witness.  And all

18  exhibits will be projected up on the screen also, screens that

19  the individuals in the box here have in front of them.

20  All right.  The first step is I'm going to read you

21  preliminary jury instructions, and then we'll begin with

22  openings.

23  You all have a copy of them.  You can maintain this

24  copy throughout the trial.  At the end of the trial, I'm going

25  to collect them from you and I'm going to give you final jury

1  instructions.  Those final instructions will guide your
2  deliberations.

3        These are predictions.  In many ways, they will be
4  identical to many of the instructions you'll get at the end,
5  but they're just predictions of what they will likely be.  But
6  it's important you at least know and have some idea of the
7  kind of issues you're going to have to decide in this case
8  when you finally go back to deliberate.

9        You can take notes on these if you wish.  And again,
10  when -- at the end of the case before you go back and
11  deliberate, I'm going to collect these from you and give you
12  final jury instructions, many of which may read close to what
13  you have now.

14        So with that, we'll begin with Preliminary
15  Instruction No. 1.

16        Ladies and gentlemen, you're now the jury in this
17  case.  I'd like to take a few minutes to describe your duties
18  as jurors and give you instructions concerning the case.

19        As the judge in this case, one of my duties is to
20  decide all questions of law and procedure.  In these
21  preliminary instructions, during the trial, and at the end of
22  the trial, I will instruct you on the rules of law you must
23  follow in making your decision.  The instructions that I give
24  you at the end of the trial will be more detailed than the
25  instructions I'm giving you now.  Each of you will have a copy

1    of the instructions that I give you at the end of the case.

2            You have two duties as jurors.  Your first duty is to
3    decide the facts from the evidence that you see and hear in
4    court.  Your second duty is to take the law as I give it to
5    you, apply it to the facts, and decide if the government has
6    proved the defendants guilty beyond a reasonable doubt.

7            You must perform these duties fairly and impartially.
8    Do not let sympathy, prejudice, fear, or public opinion
9    influence you.  In addition, do not let any person's race,
10   color, religion, age, national ancestry, or gender influence
11   you.

12           You should not take anything I say or do during the
13   trial as indicating what I think of the evidence or what I
14   think your verdict should be.

15           The charges against the defendants are in a document
16   called an indictment.  You will have a copy of the indictment
17   during your deliberations.

18           The indictment in this case charges that Defendants
19   Rishi Shah, Shradha Agarwal, and Brad Purdy committed the
20   crimes of mail fraud, wire fraud, and bank fraud; that
21   Defendant Rishi Shah committed the crime of money laundering;
22   and that Defendant Brad Purdy committed the crime of making a
23   false statement to a bank.  The defendants have pleaded not
24   guilty to the charges.

25           The indictment is simply the formal way of telling

1   the defendants what crimes they're accused of committing.  It

2   is not evidence that the defendants are guilty.  It does not

3   even raise a suspicion of guilt.

4           Each defendant is presumed innocent of each and every

5   one of the charges.  This presumption continues throughout the

6   case.  It is not overcome unless from all the evidence in the

7   case you're convinced beyond a reasonable doubt that the

8   particular defendant you're considering is guilty as charged.

9           The government has the burden of proving each

10  defendant's guilt beyond a reasonable doubt.  This burden of

11  proof stays with the government throughout the case.

12          A defendant is never required to prove his or her

13  innocence.  He or she is not required to produce any evidence

14  at all.

15          You may consider only the evidence that you see and

16  hear in court.  You may not consider anything you may see or

17  hear outside the court, including anything from the newspaper,

18  television, radio, the Internet, or any other source.

19          The evidence includes only what the witnesses say

20  when they're testifying under oath, the exhibits that I allow

21  into evidence, and any facts to which the parties stipulate.

22  A stipulation is an agreement that certain facts are true or

23  that a witness would have given certain testimony.

24          Nothing else is evidence.  Any statements or

25  arguments that the lawyers make are not evidence.  If what a

1  lawyer says is different from the evidence as you see or hear

2  it, the evidence is what counts.  The lawyers' questions and

3  objections, likewise, are not evidence.

4  A lawyer has a duty to object if he or she thinks a

5  question or evidence is improper.  When an objection is made,

6  I'll be required to rule on the objection.  If I sustain an

7  objection to a question a lawyer asks, you must not speculate

8  on what the answer might have been.  If I strike testimony or

9  an exhibit from the record or tell you to disregard something,

10  you must not consider it.

11  Pay close attention to the evidence as it's being

12  presented.  During your deliberations, you will have any

13  exhibits that I allow into evidence, but you will not have a

14  transcript of the testimony.  You will have to make your

15  decision based on what you recall of the evidence.

16  You may have heard the terms "direct evidence" and

17  "circumstantial evidence."  Direct evidence is evidence that

18  directly proves a fact.  Circumstantial evidence is evidence

19  that indirectly proves a fact.

20  For example, direct evidence that it was raining

21  outside is testimony by a witness that it was raining.

22  Indirect evidence that it was raining outside is the

23  observation of someone entering a room carrying a wet

24  umbrella.

25  You're to consider both direct and circumstantial

1  evidence.  The law does not say that one is better than the
2  other.  It's up to you to decide how much weight to give to
3  any evidence, whether direct or circumstantial.

4         Give the evidence whatever weight you believe it
5  deserves.  Use your common sense in weighing the evidence and
6  consider the evidence in light of your own everyday
7  experience.

8         People sometimes look at one fact and conclude from
9  it another fact exists.  This is called an "inference."  You
10  are allowed to make reasonable inferences, so long as they're
11  based on the evidence.

12         Part of your job as jurors will be to decide how
13  believable each witness was and how much weight to give each
14  witness's testimony.  I'll give you additional instructions
15  about this at the end of the trial.

16         Do not make any decisions simply by counting the
17  number of witnesses who testified about a certain point.

18         What is important is how truthful and accurate the
19  witnesses were and how much weight you think their testimony
20  deserves.

21         You will be permitted to take notes during the trial.
22  If you take notes, you may use them during deliberations to
23  help you remember what happened during the trial.  You should
24  use your notes only as aids to your memory.  The notes are not
25  evidence.  All of you should rely on your independent

1  recollection of the evidence, and you should not be unduly

2  influenced by the notes of other jurors.  Notes are not

3  entitled to any more weight than the memory or impressions of

4  a juror.

5  I should tell you, in cases I've had with a lot of

6  documents, when you get all these exhibits back to you in the

7  jury room at the end of the case, sometimes it's helpful

8  during the trial if there's a document you want to take a

9  special look at when you deliberate to write the exhibit

10  number down, whether it be a government or defense exhibit.

11  You're free to do that or take any kind of notes you

12  want.  But sometimes, it's helpful to actually note an exhibit

13  number so you're not poring through a large number of exhibits

14  to find the one you wanted to take a special look at.

15  Okay.  Counts I, II, IV, XI, XXIII, and XXV charge

16  each of defendants, Rishi Shah, Shradha Agarwal, and

17  Brad Purdy, with mail fraud.  In addition, Defendant Shah is

18  charged with wire fraud in Counts V, XIV through XXII, XXIV,

19  and XXVI.

20  Defendant Agarwal is charged with wire fraud in

21  Counts XIV through XVIII, XX, XXII, XXIV, and XXVI.

22  And Defendant Purdy is charged with wire fraud in

23  Counts III, VII, XXI, XXII, XXIV, and XXVI.

24  In order for you to find Defendants Rishi Shah,

25  Shradha Agarwal, and Brad Purdy guilty of any of these

1  charges, the government must prove each of the following
2  elements beyond a reasonable doubt as to the charge you're
3  considering.

4       One, that the defendant you are considering knowingly
5  devised or participated in a scheme to defraud as described in
6  Count I.

7       Two, that the defendant you're considering did so
8  with the intent to defraud.

9       And three, the scheme to defraud involved a
10  materially false or fraudulent pretense, representation, or
11  promise.

12       And four, that for the purpose of carrying out the
13  scheme or attempting to do so, the defendant you're
14  considering used or caused the use of the United States mails,
15  or caused interstate wire communications to take place in the
16  manner charged in the particular count.

17       If you find from your consideration of all the
18  evidence that the government has proved each of these elements
19  beyond a reasonable doubt as to the defendant and charge
20  you're considering, then you should find the defendant guilty
21  of that charge.

22       If, on the other hand, you find from your
23  consideration of all the evidence that the government has
24  failed to prove any one of these elements beyond a reasonable
25  doubt as to the defendant and charge you are considering, then

1   you should find that defendant not guilty of that charge.

2          Count VIII of the indictment charges Defendant

3   Brad Purdy with making a false statement to a financial

4   institution.  In order for you to find the defendant guilty of

5   this charge, the government must prove each of the following

6   elements beyond a reasonable doubt:

7          One, the defendant made a false statement to

8   JPMorgan Chase Bank, orally or in writing;

9          And two, at the time the defendant made the

10  statement, he knew it was false;

11         And three, the defendant made the statement with the

12  intent to influence the action of JPMorgan Chase Bank

13  concerning a loan;

14         And four, the accounts of JPMorgan Chase were insured

15  by the Federal Deposit Insurance Corporation.

16         If you find from your consideration of all the

17  evidence that the government has proved each of these elements

18  beyond a reasonable doubt, then you should find the defendant

19  guilty.  If, on the other hand, you find from your

20  consideration of all the evidence that the government has

21  failed to prove any one of these elements beyond a reasonable

22  doubt, then you should find the defendant not guilty.

23         Counts IX and XIII of the indictment charge each of

24  the defendants, Shah, Agarwal, and Purdy, with bank fraud.  In

25  order for you to find Defendants Rishi Shah, Shradha Agarwal,

1    and Brad Purdy guilty of any of these charges, the government
2    must prove each of the following elements beyond a reasonable
3    doubt as to the charge you're considering:

4            One, there was a scheme to defraud a bank as charged
5    in the indictment;

6            Two, the defendant you are considering knowingly
7    carried out or attempted to carry out the scheme;

8            And three, the defendant you are considering acted
9    with the intent to defraud the bank;

10           And four, the scheme involved a materially false or
11   fraudulent pretense, representation, or promise;

12           And five, at the time of the charged offense, the
13   deposits to the bank were insured by the Federal Deposit
14   Insurance Corporation.

15           If you find from your consideration of all the
16   evidence that the government has proved each of these elements
17   beyond a reasonable doubt as to the defendant and the charge
18   you are considering, then you should find that defendant
19   guilty of that charge.

20           If, on the other hand, you find from your
21   consideration of all the evidence that the government has
22   failed to prove any one of these elements beyond a reasonable
23   doubt as to the defendant and the charge you are considering,
24   then you should find that defendant not guilty of that charge.

25           A scheme is a plan or a course of action formed with

1  the intent to accomplish some purpose.

2       A "scheme to defraud" is a scheme that is intended to
3  deceive or cheat another and to obtain money or property or
4  cause the actual or potential loss of money or property to
5  another by means of materially false or fraudulent pretenses,
6  representations, or promises.

7       A person acts with intent to defraud if he or she
8  acts knowingly with the intent to deceive or cheat the alleged
9  victim in order to cause a gain of money or property to the
10  defendant or another or the actual or potential loss of money
11  or property to another.

12       A person acts knowingly if he or she realizes what he
13  or she is doing and is aware of the nature of his or her
14  conduct and does not act through ignorance, mistake, or
15  accident.  In deciding whether Rishi Shah, Shradha Agarwal,
16  and Brad Purdy acted knowingly, you may consider all the
17  evidence, including what Mr. Shah, Ms. Agarwal, and Mr. Purdy
18  did or said.

19       A false or fraudulent pretense, representation,
20  promise, or omission is material if it is capable of
21  influencing the decision of the person to whom it was
22  addressed.  It is not necessary that the false or fraudulent
23  pretense, representation, promise, or concealment actually
24  have that influence or be relied on by the alleged victim, as
25  long as it is capable of doing so.

1          Counts X and XII of the indictment charge

2   Defendant Rishi Shah with money laundering.  In order for you

3   to find the defendant guilty of these charges, the government

4   must prove each of the following elements beyond a reasonable

5   doubt:

6          One, the defendant engaged or attempted to engage in

7   a monetary transaction;

8          And two, that defendant knew the transaction involved

9   criminally-derived property;

10          And three, the property had a value greater than

11  $10,000;

12          And four, the property is derived from bank fraud;

13          And five, the transaction occurred in the

14  United States.

15          If you find from your consideration of all the

16  evidence that the government has proved each of these elements

17  beyond a reasonable doubt as to the charge you are

18  considering, then you should find the defendant guilty of that

19  charge.

20          If, on the other hand, you find from your

21  consideration of all the evidence that the government has

22  failed to prove any one of these elements beyond a reasonable

23  doubt as to the charge you are considering, then you should

24  find the defendant not guilty of that charge.

25          A defendant's presence at the scene of a crime and

1  knowledge that a crime is being committed is not sufficient by
2  itself to establish the defendant's guilt.

3       If a defendant performed acts that advanced the crime
4  but had no knowledge that the crime was being committed or was
5  about to be committed, those acts are not sufficient by
6  themselves to establish the defendant's guilt.

7       A defendant's association with persons involved in a
8  criminal scheme is not sufficient by itself to prove his or
9  her membership in the criminal scheme.

10      The defendants have been accused of more than one
11 crime.  The number of charges is not evidence of guilt and
12 should not influence your decision.  You must consider each
13 charge and the evidence concerning each charge separately.
14 Your decision on one charge, whether it is guilty or not
15 guilty, should not influence your decision on any other
16 charge.

17      Even though the defendants are being tried together,
18 you must consider each defendant and the evidence concerning
19 that defendant separately.  Your decision concerning one
20 defendant, whether it is guilty or not guilty, should not
21 influence your decision concerning any other defendant.

22      You will hear testimony from witnesses who were
23 promised benefits in return for their cooperation with the
24 government and/or who have pled guilty to being or -- to being
25 or stated that they were involved in some of the crimes the

1    defendants are charged with committing.

2              You may not consider a witness's guilty plea as

3    evidence against Rishi Shah, Shradha Agarwal, or Brad Purdy.

4              You may give these witnesses' testimony whatever

5    weight you believe is appropriate, keeping in mind you must

6    consider their testimony with caution and great care.

7              Before we begin the trial, I want to discuss several

8    rules of conduct you must follow as jurors.

9              First, you should keep an open mind throughout the

10   trial.  Do not make up your mind about what your verdict

11   should be until after the trial is over, you have received my

12   final instructions on the law, and you and your fellow jurors

13   have discussed the evidence.

14             Second, your verdict in this case must be based

15   exclusively on the law as I give it to you and the evidence

16   that is presented in court during the trial.  For this reason,

17   and to ensure fairness to both sides in this case, you must

18   obey the following rules.  These rules apply both when you're

19   here in court and when you're not in court.  They apply until

20   after you've returned your verdict in the case.

21             One, you must not discuss the case, the issues in the

22   case, or anyone who is involved in the case among yourselves

23   until you go to the jury room to deliberate after the trial is

24   completed.

25             Two, you must not communicate with anyone else about

1    this case, the issues in the case, or anyone who's involved in
2    the case until after you've returned your verdict.

3           Three, when you're not in the courtroom, you must not
4    allow anyone to communicate with you or give you any
5    information about the case, the issues in the case, or about
6    anyone who is involved in the case.  If someone tries to
7    communicate with you about the case, the issues in the case,
8    or someone who is involved in the case or if you overhear or
9    learn any information about the case, the issues in the case,
10   or someone involved in the case when you're not in the
11   courtroom, you must report this to me promptly.

12          You may tell your family and your employer that
13   you're serving on the jury so that you can explain that you
14   have to be in court.  However, you must not communicate with
15   them about the case, the issues in the case, or anyone who is
16   involved in the case until after you've returned your verdict.

17          Five, all the information you'll need to decide the
18   case will be presented here in court.  You may not look up,
19   obtain, or consider information from any outside source.

20          There's two reasons for these rules.  First, it would
21   not be fair to the parties in the case for you to consider
22   outside information or communicate information about the case
23   to others.  Second, outside information may be incorrect or
24   misleading.

25          When I say you may not obtain or consider any

1    information from outside sources and may not communicate with

2    anyone about the case, the issues in the case, or those

3    involved in the case, I am referring to any and all means by

4    which people communicate or obtain information.

5           This includes, for example, face-to-face

6    conversations; looking things up; doing research; reading,

7    watching, or listening to reports in the news media; or any

8    communication using any electronic device or media such as a

9    telephone, cell phone, smartphone, iPhone, Android,

10   BlackBerry, or a similar device, a computer, the Internet,

11   text messaging, chat rooms, blogs, social networking sites

12   like Facebook, YouTube, Twitter, Instagram, Snapchat, or

13   LinkedIn, or any other form of communication at all.

14          If you hear, see, or receive any information about

15   the case by these or other means, you must report that to me

16   immediately.  And by reporting it to me, you can give a note

17   or tell my courtroom deputy or the court security officer, and

18   he or she will communicate it to me and we'll take it from

19   there.

20          We're now ready to begin the trial.  The trial will

21   proceed in the following manner:  First, each party's

22   attorneys may give an opening statement.  An opening statement

23   is not evidence.  Rather, it is a summary of what each party's

24   attorneys expect the evidence will show.

25          After the opening statements, you will hear the

1  evidence.  After the evidence has been presented, the
2  attorneys will make closing arguments, and I'll instruct you
3  on the law that applies in the case.  After that, you will go
4  to the jury room to deliberate on your verdict.
5          With that, is the government ready to give its
6  opening statement?
7          MR. HANKEY:  Yes, Your Honor.
8          THE COURT:  You may proceed.
9      (Pause in the proceedings.)
10         THE COURT:  You can say good morning twice.
11         MR. HANKEY:  Good morning.
12         THE COURT:  All right.
13     OPENING STATEMENT ON BEHALF OF THE GOVERNMENT
14         MR. HANKEY:  Ladies and gentlemen, this trial is
15  about ambition, greed, and fraud.  At its core, this trial is
16  about lies to get money and it's about what it took to hide
17  those lies.  It's about Rishi Shah, Shradha Agarwal, and
18  Brad Purdy stealing money from the clients of the company that
19  they ran.  And it's about the lies that they told to banks and
20  investors to get hundreds of millions of dollars in funding.
21         At this trial, you're going to learn that the
22  defendants caused their company, Outcome Health, to commit
23  fraud in four main ways:
24         First, they sold advertising inventory that they
25  didn't have to their clients.  Second, they billed clients for

1  advertising that they didn't deliver.  Third, they lied to

2  banks and investors to get hundreds of millions of dollars.

3  And fourth, they lied to keep the clients, banks, and

4  investors from finding out what they did.

5         And through their fraud, Shah and Agarwal personally

6  got approximately $262 million between the two of them.  That

7  is why we are here today.

8         This trial is about lies told by ambitious young

9  entrepreneurs to take their company to commanding heights,

10  lies to grow Outcome Health into a company worth billions of

11  dollars, and lies to satisfy the defendants' ambition and

12  greed.

13         During this trial you're going to see that the

14  defendants ran a Chicago-based company that was admired for

15  its rapid growth and success, Outcome Health.  Rishi Shah was

16  its founder and the CEO, Shradha Agarwal was another founder

17  and its president, and Brad Purdy was the chief operating

18  officer and the chief financial officer.

19         On the outside, Outcome Health looked like an amazing

20  success.  But you'll see that beneath the surface, Outcome's

21  outward success was built on a scheme to defraud Outcome's

22  clients, a scheme built up through lies told by the defendants

23  over years.

24         Now, Outcome Health was in the advertising business,

25  and its clients were mostly pharmaceutical companies.  Outcome

1   gave TV screens and tablet screens to doctors' offices around
2   the country for free.  Outcome played educational content on
3   those screens, which is how they convinced doctors to put
4   screens in their offices.

5   Outcome also played advertising on those screens.
6   Most of this advertising was for pharmaceuticals, medicines
7   that treated conditions that the doctors in those offices
8   might also treat.  So, for example, Outcome could place a
9   screen in the waiting room of a heart doctor and then play an
10  ad for a heart medicine like Pradaxa in the waiting room.
11  That was valuable to the company that made Pradaxa, and so
12  that was how Outcome made money.

13  Outcome would sell advertising time on all of those
14  screens around the country.  Pharma companies would pay
15  Outcome to play their drugs' ads in a certain number of
16  offices in that network.  The thing is, it wasn't easy for the
17  pharma companies to check to see if their ads were actually
18  playing in all the right offices, which led to why we're here
19  today.

20  In this trial, you're going to see that the
21  defendants caused Outcome to sell advertising inventory that
22  they didn't have to their clients.  You'll see that Outcome
23  would tell its clients that it would play their ads in more
24  offices than Outcome actually had.

25  Shah and Agarwal, to start, and then Purdy caused

1   Outcome to inflate office counts that it gave to clients so

2   that the company could get bigger contracts.  Next, they would

3   bill those clients full freight for all of those offices,

4   regardless of whether the ad actually played there.

5         That was how they lied to clients to sell advertising

6   inventory that Outcome didn't have and how they billed their

7   clients for advertising that they didn't get.  It didn't

8   happen on every single campaign with every single client, but

9   it happened a lot and for years, to the tune of tens of

10  millions of dollars in fraudulent proceeds for Outcome.

11        You'll see that they did this so that they could grow

12  their company big enough to eventually raise hundreds of

13  millions of dollars from banks and investors.  And they

14  eventually did go to those banks and investors and lied to

15  them to get money.

16        One of the main ways that they did this was by lying

17  to the audit firm that the banks and investors relied upon to

18  check Outcome's financials.  Each of them, Shah, Agarwal, and

19  Purdy, took steps to hide the fraud from Outcome's independent

20  auditors to get those auditors to give their company's

21  financials a seal of approval.

22        And you'll see that this mattered to the banks and

23  investors when they decided to give those hundreds of millions

24  of dollars to Outcome.  And then, Shah and Agarwal, combined,

25  personally received $260 million from the investment deal and

1   one of those loans.

2          Now, to keep the fraud against clients, banks, and

3   investors going, they lied and concealed their fraud in a

4   number of ways.  For one thing, they silenced employees in the

5   company who were concerned about the fraud and raised those

6   concerns internally.

7          You see, certain Outcome employees exposed to the

8   inner workings of the fraud were very worried about what they

9   saw.  And those employees raised concerns so that Shah,

10  Agarwal, and Purdy heard them.  The evidence will show that

11  the defendants belittled, accused, or cast these people out,

12  called them toxic, said that they were bad for the culture of

13  the company.

14         That's what this trial is about.  You'll hear about

15  lies told to clients to get contracts, lies to bill clients

16  for advertising inventory not delivered, lies to auditors,

17  banks, and investors to get hundreds of millions of dollars.

18  And you'll see how the defendants lied and also silenced

19  concerned employees to cover up their actions.

20         This was their scheme to defraud, their scheme to

21  reach their ambition, and scheme to satisfy their greed.  And

22  for this scheme, Rishi Shah, Shradha Agarwal, and Brad Purdy

23  have been charged with mail fraud, wire fraud, and bank fraud.

24         Mail fraud and wire fraud are about lies to get money

25  using the mail and interstate communications, like email.

1    Bank fraud is about lies told to banks to get money.

2            Additionally, Brad Purdy has been charged with making

3    a false statement to a bank; and Shah has been charged with

4    money laundering for using the proceeds of this fraud to rent

5    a luxury home in Chicago and to charter a private jet.

6            So today, I'm going to tell you how the defendants'

7    scheme worked.  First, I'll start with some background about

8    how this scheme started.  Then I'll walk you through what the

9    defendants did to commit fraud.  And finally, before I sit

10   down, I'll give an overview of the types of evidence that

11   you'll see at this trial.

12           So first, let's start with some background on Outcome

13   and how the fraud began.  Rishi Shah founded Outcome Health

14   around 2006, shortly before he left his studies at

15   Northwestern University.  You're going to hear that Shah's

16   ambition was to create a company that would place screens in

17   doctors' offices around the country to educate patients about

18   their healthcare decisions.

19           And the vision was grand.  Shaw hoped Outcome would

20   become a massive company worth billions and billions of

21   dollars.  And you'll see that Shah's ambitions were broad and

22   far-reaching.

23           Early on, Shah partnered with his friend from

24   Northwestern, Shradha Agarwal.  You'll see that she also

25   shared Shah's ambitions for Outcome Health.  For much of its

1  existence, the company was actually called ContextMedia, but

2  it changed its name and was better known as Outcome Health.

3  So you'll hear it called Outcome Health throughout this trial.

4          Shah and Agarwal wanted to build a national network

5  of waiting room screens that would play educational content in

6  doctors' offices.  The company, again, would make money

7  selling advertising on those screens, and the company often

8  called that inventory.

9          And they would use the money from selling ad

10  inventory to grow their network even larger.  By 2012, they

11  were successfully convincing pharma companies to pay millions

12  of dollars to get ads directly in front of patients in

13  doctors' offices.

14          You will learn that these ad sales were critical to

15  achieving Shah and Agarwal's ambition of turning Outcome into

16  a multibillion dollar tech company.  The more ads that they

17  could run, the faster Shah and Agarwal could grow their

18  company.

19          But there was a catch.  Somehow, they had to buy all

20  of those TV screens for doctors' offices.  Somehow, they had

21  to pay technicians to install those screens all around the

22  country.  And somehow, they had to pay Outcome employees to

23  work tirelessly to convince doctors to put a screen in the

24  office.

25          So how would they pay for all this if they needed

1   screens to make money in the first place?  This was a dilemma.
2   Explaining it himself, Shah would say Outcome was in a
3   "two-sided market."  On the one hand, Outcome needed to build
4   the number of screens in offices so that they could sell
5   advertising to pharma companies.

6          But on the second side, Outcome needed to convince
7   pharma clients to play ads so that they could get money that
8   they needed to get more offices.  This was the dilemma of the
9   two-sided market, and it was the classic "chicken and the egg"
10  situation.  And it also stood in the way of their ambitious
11  plans.

12         Well, you're going to see that Shah and Agarwal found
13  a shortcut to get around the chicken and the egg of the
14  two-sided market.  They lied, and they oversold advertising
15  inventory to their clients.  You see, when pharma clients
16  asked Outcome about how many offices they had available to run
17  their ads, Outcome often told the clients that Outcome had
18  more offices than it really had.  Most of the time, the pharma
19  clients didn't know this.  And you'll see that they definitely
20  would've wanted to know.

21         Shah, Agarwal, and eventually Purdy told each other
22  that they were just projecting what they'd have in the future
23  once an ad campaign started running.  But many clients didn't
24  want projections, they wanted to know what Outcome had right
25  then and there.  And to those clients, the defendants lied.

1       They committed fraud at the outset by telling clients

2   that they had more offices available than was really true.

3   You'll see that they did it because their lies about their

4   company's network size helped them get bigger contracts.  And

5   bigger contracts meant that they could make more money and

6   grow faster.

7       But all this lying about office numbers to clients

8   led to an even bigger problem.  You see, a lot of the

9   defendants', quote, projections missed the mark, oftentimes by

10  a lot.  I'll give you a hypothetical example.

11      Let's say that Outcome was negotiating a pharma

12  client contract and told the client that Outcome had

13  1,000 offices, but they really had 600 when the client signed

14  the contract.  So in this scenario, there were 400 promised

15  offices missing from Outcome's network.  And then they never

16  got those 400 missing offices installed by the time the

17  contract started.

18      So in this example, they had a contract that promised

19  1,000 offices, but they'd give their client only 600 when the

20  contract started.  You will see that when situations like this

21  actually arose, Agarwal, Shah, and Purdy did not want the

22  clients to know that they weren't delivering as promised.

23      Instead, they kept billing the clients the full

24  amount month after month, and then the defendants directed

25  their employees to lie to their clients to cover up the

1  shortfall and keep the money flowing.  That was how they got

2  the money that they needed to grow their company into what

3  they wanted it to be.

4  You see, this whole dilemma, this chicken and the egg

5  situation, it's not something that you have to take the

6  government's word for.  You can listen to Rishi Shah himself

7  on video.

8  We're about to play you a video of a 2012 speech that

9  Rishi Shah gave about this two-sided market while sitting

10  right next to Shradha Agarwal.  And the evidence will show

11  that Defendant Brad Purdy was sitting in the audience.

12  THE COURT:  If any of the jurors have a screen that

13  does not show something, if any of these screens don't show

14  something when one side or the other is putting an exhibit up,

15  just raise your hand and we'll make sure we get that screen

16  fixed.

17  Proceed.  Sorry.  If you want start over, go ahead.

18  MR. HANKEY:  Thank you, Your Honor.

19  (Video played.)

20  MR. HANKEY:  You'll see that Shah made those

21  statements in November 2012.  In that very same month, Shah

22  and Agarwal lied to a client about how many offices that they

23  had available to run ads.  And just weeks later, Outcome

24  billed a different client for offices that the client didn't

25  get.

1    In the video, Shah said that he had to run his

2   company like a military operation or else it was fraud.  Well,

3   ladies and gentlemen, Rishi Shah was right about that; it was

4   fraud.  And that's what happened.

5    Shah, Agarwal, and Purdy didn't come close to running

6   Outcome like a military operation.  And Rishi Shah,

7   Shradha Agarwal, and Brad Purdy and others pushed ahead

8   anyway.  They lied to clients to get big contracts, lied to

9   collect the clients' money, and lied to cover it all up.

10    One other thing about that video:  You heard Shah say

11   that it was like Outcome used smoke bombs when they negotiated

12   contracts with clients.  You'll also hear that Shradha Agarwal

13   used that same term "smoke bomb."  The evidence will show that

14   the defendants' methods of hiding their fraud were like smoke

15   bombs.

16    What were those methods?  Well, you'll see how it

17   worked when you hear the defendants' own voices on tape.  And

18   you'll see their emails and text messages with each other.

19   First, you'll hear straight-up lies to hide the fraud, lies to

20   customers, lies to employees, lies to lenders, and lies to

21   investors.  Lies to cover up their scheme.

22    Second, you'll see the defendants silencing employees

23   who raised concerns.  They did this in different ways.  They

24   used false accusations to attack their character, and some,

25   they belittled.

1          Third, you'll hear them using misdirection,

2   minimizing the past reality of the fraud by focusing on

3   something else.  And fourth, you'll hear them talking around

4   the fraud.  You'll see them ignoring it and being

5   nonresponsive to the concerns that were raised to them.  They

6   used any one or more of these tactics to suit the situation in

7   front of them, to throw smoke bombs, to hide the fraud that

8   grew their company.

9          So now I will walk you through the details of how all

10  this worked.  Remember, I said the defendants committed their

11  fraud in four main ways.

12         First, they sold ad inventory, doctors' offices that

13  they didn't have, to their clients.  Second, they billed those

14  clients for offices and advertising that they didn't get.

15  Third, they lied to banks and investors to get hundreds of

16  millions of dollars.  And fourth, they lied and took other

17  steps to keep the clients, banks, and investors from finding

18  out what they did.

19         So who were the main participants?  By 2011,

20  Shradha Agarwal and Rishi Shah started defrauding their

21  clients by selling them ad inventory that Outcome didn't have.

22  In 2012 and 2013, Agarwal and Shah personally directed an

23  employee named Jason Ketchum to overstate the number of

24  offices that they promised to clients so that they could get

25  bigger contracts.  And they directed Jason Ketchum to hide

1    this fraud from clients so the clients would continue to pay

2    bills for offices that they didn't get.

3         In 2012, Brad Purdy joined Outcome.  And you'll see

4    that soon after, he jumped right into the scheme.  Then around

5    August 2013, Shah and Agarwal hired a brand-new Northwestern

6    graduate named Ashik Desai, and they put him right to work on

7    defrauding Outcome's clients.

8         This was Desai's first time professional experience

9    after college, and they got him started on this right away.

10   With encouragement and direction from Purdy, Agarwal, and

11   Shah, you'll see that Desai continued to defraud Outcome's

12   clients from 2013 through 2017.

13        So how exactly did the defendants defraud their

14   clients?  We'll start with the lies to sell advertising

15   inventory that Outcome didn't have.  That began with Outcome

16   finding a client interested in playing ads on Outcome's

17   network.

18        The client would usually start by sending Outcome a

19   list of doctors that the client wanted to target with

20   advertising.  The client wanted Outcome to do what was called

21   a "list match."  What the clients thought Outcome was doing

22   was then comparing the client's list to Outcome's list of

23   offices where Outcome actually had screens installed.  The

24   clients expected to find out how many client-targeted offices

25   had Outcome screens in them.

1    Here, you see a simple diagram that shows the basics

2   of how this worked.  The overlap between the client's list of

3   offices it wanted to target and then Outcome's list of offices

4   was supposed to show which target offices actually had Outcome

5   screens installed.  The overlap between the two lists was

6   called the "list match."

7    Outcome would send the list match with specific

8   offices flagged back to clients.  Clients were usually led to

9   believe that the list they got back only flagged offices where

10  Outcome actually had screens installed.  But that was often a

11  lie.  Instead, in 2012 and 2013 when Outcome did list matches

12  for clients, Shah and Agarwal personally told their employees

13  to project by including on the list match offices that Outcome

14  did not have.

15    You will hear from clients that they didn't want

16  projections and list matches.  They wanted a list of offices

17  where Outcome actually had screens.  Earlier, I mentioned

18  Jason Ketchum.  Ketchum worked closely with Shaw and Agarwal

19  in 2012 and also in 2013.  While doing so, he prepared

20  fraudulent list matches that falsely showed that Outcome had

21  more matching inventory than it really had.

22    You'll see email after email after email after email

23  in which Shah and Agarwal directed Ketchum to lie to clients

24  about the amount of ad inventory that Outcome could give them

25  to give clients fraudulent list match results.  And then,

1    you'll see emails in which Agarwal and Shaw directed Ketchum

2    to hide the fact that they gave clients false list matches.

3            They even instructed Ketchum and others to hide a lot

4    of what they were doing from Outcome's own salespeople.  Shah

5    and Agarwal would tell Ketchum that they didn't want the

6    salespeople to, quote, lose confidence selling to clients by

7    knowing about fraudulent list matches.

8            You'll see that Shah and Agarwal tried to keep the

9    truth about the inventory that Outcome actually had in a black

10   box.  Salespeople didn't know, so their clients wouldn't know.

11   This is how Shah and Agarwal lied to clients to sell ad

12   inventory that Outcome didn't have, fraudulent list matches

13   that lied about the inventory that Outcome had available to

14   sell to its clients; also, that Outcome could get bigger

15   contracts.

16           So after Shah and Agarwal got contracts through

17   fraudulent list matches, the company would lie in its billings

18   to the clients.  Remember, this is the second way in which the

19   defendants lied in their scheme to defraud.  You see, after

20   the campaign started, they couldn't deliver all of the offices

21   that they had promised to the client in their contract.

22           Shah and Agarwal often didn't come clean with the

23   clients about that under-delivery.  Instead, they would have

24   Ketchum do all kinds of things to lie and cover up the

25   shortfall.  And then they continued to bill those clients in

1    full for the contracted number of offices.

2           Yes, you'll see that they stole money from their

3    clients by billing them for offices that the clients didn't

4    receive.  To hide the under-deliveries, Shah and Agarwal had

5    Ketchum send clients false affidavits showing full delivery.

6    These were signed documents that certified that Outcome was

7    delivering all of the offices that the client bought.

8           Ketchum would send these, even when Outcome clearly

9    did not deliver as promised.  He would also sell false lists

10   of -- send false lists of offices that lied about where the

11   campaign was playing.

12          And there was another important way that Shah,

13   Agarwal, and Ketchum hid this under-delivery from clients.

14   You'll see that Shah and Agarwal had Ketchum cherry-pick data

15   that was used to study how well the advertising did.  You see,

16   Outcome told clients that they would have a third party

17   analyze the specific offices where the ad played.

18          This analysis was supposed to tell Outcome and the

19   client how much the campaign caused doctors to write more

20   prescriptions.  These were called ROI studies.  ROI stood for

21   return on investment.  Clients wanted to know how much money

22   their contract with Outcome earned them.  And then they

23   compared that to how much they spent for the ads to see the

24   return on their investment.

25          So, for example, if the advertising earned the client

1   $3 million but the contract only cost $1 million, that would

2   be a 3:1 return on their investment.  These studies were

3   supposed to tell the clients what the ROI was.

4          Well, you're going to see that Shah and Agarwal told

5   Ketchum in 2012 and '13 to cherry-pick the data that the third

6   party would study for the ROI.  What they told Ketchum to do

7   and what Ketchum in fact did was pick the best offices for the

8   study.

9          He left out any offices where the ad had technical

10  difficulties playing.  And he definitely left out all the

11  offices where Outcome didn't have any screens at all, even

12  though the client was still paying for those screens.  Of

13  course, if Ketchum had included the offices where the ad never

14  played, there wasn't much chance that the study would show

15  good results, so Shah and Agarwal had them excluded from the

16  study.

17         And the studies of those cherry-picked offices, as

18  designed, showed very good results.  But when Shah gave the

19  results to clients, he presented them as if they were

20  representative of the whole campaign and how it performed, as

21  if the client actually got what they paid for when they really

22  didn't.

23         As I mentioned, you will see email after email after

24  email that will show you how each step of the scheme worked

25  during the time when Ketchum was being directed by Shah and

1    Agarwal.  These emails will show that Shah and Agarwal
2    personally directed Ketchum to do these things to defraud
3    Outcome's clients to get around the dilemma of the two-sided
4    market and grow their company.  And they got Ketchum to do
5    these things for them in 2012 and 2013.
6           So what happened next?  In August 2013, the scheme
7    included a new and key participant.  You'll see that Shah and
8    Agarwal hired someone brand-new to take over Ketchum's role in
9    the fraud.  This new employee was Ashik Desai.
10          In 2012, Ashik Desai was an undergraduate student at
11   Northwestern.  Shah and Agarwal got to know Desai when he
12   interned at Outcome, and they decided to hire him when he
13   graduated.  And he began working full-time at Outcome in
14   August 2013.
15          This was Desai's first professional experience after
16   college.  And they actually made Desai a senior executive at
17   Outcome.  Soon after they started, they put him in charge of
18   their sales to clients.  He was 20 years old, and he reported
19   directly to the CEO of the company, Rishi Shah.
20          You'll see that Desai was the perfect fit for the
21   defendants' scheme.  You'll learn that the 20-year-old Desai
22   admired Shah.  He emulated him.  People even called
23   Ashik Desai "mini Rishi."  That was how hard Desai worked to
24   be just like his mentor, Rishi Shah.
25          And so the defendants trusted him with the dark

1   secrets behind the success of their company.  He was their

2   protégé.  They entrusted him with false list matches; they

3   entrusted him with lying to clients to hide the

4   under-delivery.  Most everything that Shah and Agarwal had

5   Ketchum doing in the scheme, they handed off to Desai in the

6   second half of 2013.

7        We expect Desai to testify that he learned it all

8   from Shah, Agarwal, Purdy, and Ketchum in 2013 and 2014.  They

9   found a willing student in Desai, eager to please his new

10  teachers.  And it wasn't long after he started that they began

11  teaching him how to commit the fraud.

12       Here's an example of Shradha Agarwal sending Desai an

13  email on August 8 explaining how to conceal the fraud.  This

14  was mere days after Desai started at Outcome.  Agarwal

15  responds to an email that Desai wrote.

16       She instructs him by saying:  "Guys, anytime that

17  we're having a back-and-forth discussion on what data to use,

18  let's take the SS" -- that's sponsorship sales -- "person off

19  the chain.  I've noticed their confidence level in our data

20  changed dramatically when presenting to clients if they

21  believe it's accurate versus made up."

22       I'll repeat, she said:  "Their confidence level in

23  our data changed dramatically when presenting to clients if

24  they believe it's accurate versus made up."

25       So Agarwal instructed him to leave them off these

1 emails.  And who's copied on her email?  Rishi Shah.  This is
2 one week after Ashik Desai started at the company, and
3 Shradha Agarwal is teaching him how to keep salespeople in the
4 dark so that they can lie to clients.

5 You'll also see that, consistent with their trust of
6 Desai, Shah and Agarwal let him handle the fraud on his own,
7 much more than they did with Ketchum.  And you'll see that
8 they continued through the years to encourage Desai to defraud
9 Outcome's clients.  And they pushed him to expand the fraud by
10 demanding ever bigger contracts from clients.

11 Desai continued the fraudulent list matches, the
12 false affidavits, false list of offices, the cherry-picked ROI
13 studies.  And other things that Ketchum did in 2012 and 2013,
14 Desai continued into 2014 and beyond.  And the evidence will
15 show that Shah, Agarwal, and Purdy encouraged Desai to keep
16 doing these things over the years.

17 For one thing, Desai tracked the under-deliveries to
18 the clients.  And he shared that under-delivery tracking with
19 Shah, Agarwal, and Purdy.  And you'll see that they discussed
20 those under-deliveries.  The gap between the ad inventory that
21 they actually had and what they needed for their contracts,
22 they began calling that "delta," or the "deltas."

23 Delta meant the difference between the contracted
24 number of devices and the number that Outcome actually had.
25 Desai and his team tracked those deltas in reports that he

1   shared and discussed in meetings with Shah, Agarwal, and
2   Purdy.  And Desai also continued to lie to clients and cover
3   up these deltas.

4           And you'll see that he did that because that was what
5   he was instructed and -- and encouraged to do by Shah,
6   Agarwal, and Purdy.  It's what Shah and Agarwal did with
7   Ketchum in 2012 and 2013, and it's what they trained Desai to
8   do in 2013 and beyond.

9           Now, both Ketchum and Desai will testify at this
10  trial, as will others who were involved in the fraud, like a
11  former analyst at Outcome named David Ma.  Ma and Ketchum had
12  both been given immunity, which means that if they tell the
13  truth, what they say cannot be used against them.

14          Desai has pled guilty to wire fraud for what he did
15  at Outcome.  And we expect Desai to testify that he hopes to
16  receive leniency from the government for testifying at trial.

17          Listen to these witnesses.  Listen to what they have
18  to say and watch for how their testimony is supported, that
19  is, corroborated by emails, documents, recordings, and other
20  testimony in the case.

21          One thing that you're going to see is that the
22  under-delivery, those deltas, they got to be so large that the
23  ROI cherry-picking that Shah, Agarwal, and Ketchum did in 2012
24  and 2013 wasn't able to hide the delivery shortfalls in later
25  years.

1    So Desai began directly changing numbers in the ROI

2    studies before they went to the clients.  And he did this on

3    his own, without running it by Shah, Agarwal, or Purdy.  In

4    fact, we expect that Desai will tell you that he told a lie to

5    Purdy when someone found out that Desai had changed the

6    numbers on one of the ROI studies.

7    We expect Desai to testify about this and about other

8    things that he said to the defendants.  And Desai will explain

9    in detail how things really worked at Outcome.  You'll hear

10   about the way Shah, Agarwal, and Purdy had Desai and others

11   run the operations of the company.

12   You'll see that Shah, Agarwal, and Purdy not only

13   knew about the delivery shortfalls, or the deltas, that

14   continued under Desai's supervision, for years they continued

15   to encourage Desai to defraud Outcome's clients.  The way of

16   doing business that they started in 2011 and continued with

17   Ketchum, continued with Desai after that.

18   And you'll see that it wasn't just Shah and Agarwal

19   who encouraged Desai to continue their scheme to defraud.

20   Though Brad Purdy did not start at the company until the

21   second half of 2012, you'll see that he, too, was involved in

22   defrauding Outcome's clients.  I'll give you one example.

23   Around late 2013, Outcome introduced a new product to

24   doctors and clients.  It was a computer tablet, like an iPad,

25   that was installed in the exam rooms of doctors' offices.  So

1    after someone waited in the exam room and saw an Outcome

2    waiting room screen on the wall, they would also have one of

3    those tablets in their exam room.

4         The idea was that the patients could pick up the

5    tablet and interact with it while they waited for their doctor

6    to come into the room.  Just like the waiting room screens,

7    Outcome put educational content and advertising on those

8    tablets.  And Outcome -- Outcome's pharma clients paid Outcome

9    to play ads on the tablets.

10        One thing that Outcome told pharma clients about

11   these tablets is that the company could track when patients

12   picked them up and used them.  Outcome convinced clients that

13   this would show the clients how often people actually saw the

14   ads on the tablets.

15        They called the data from this tracking "tablet

16   metrics."  Well, the thing is that Purdy and Desai devised a

17   method for inflating the tablet metrics before they went to

18   clients.  You see, the tablet metrics that originally came in,

19   they were not good, so they inflated the numbers to make them

20   look better.

21        You'll hear that Purdy is one of the employees who

22   originally came up with the idea to inflate the tablet

23   metrics.  And you'll see that he was well aware of what was

24   going on.

25        Here's one email you're going to see at trial.

1    First, the Outcome analyst that I mentioned earlier named

2    David Ma emails Purdy and Desai, attaching some sample tablet

3    metrics used with sponsorship sales.

4         He tells Ashik Desai, or AD:  "I mentioned to BP" --

5    that's Brad Purdy -- "that these are inflated.  I wanted to

6    make sure you're comfortable using numbers at these magnitudes

7    for potential use in presentations with systems.  Assuming no

8    concerns, but wanted to confirm."

9         You'll learn what Brad Purdy did and didn't do when

10   he got this email from -- from David Ma.  What didn't he do?

11   He didn't tell Ma not to use inflated numbers.  He didn't

12   express shock or concern at what he was reading.  He asked for

13   the information in a presentation format.

14        And David Ma did what he asked and sent him a

15   presentation for their client, GlaxoSmithKline.  You'll learn

16   that Brad Purdy, the CFO, was behind this inflating of numbers

17   going to clients.

18        Also, since at least 2013, Purdy was part of

19   Outcome's senior executive team along with Shah, Agarwal, and

20   Desai.  Remember that Desai and others started tracking the

21   amount of ad inventory that clients weren't paying for that --

22   but that they actually didn't get.  Sometimes, these reports

23   that tracked this under-delivery, they were called "delta

24   reports."

25        During 2014, 2015, and 2016, Purdy, Shah, Agarwal,

1  and Desai saw and discussed the reporting on Outcome's deltas.

2  Purdy, Shah, and Agarwal knew that Outcome was not delivering

3  to clients what the company had promised them to deliver.

4  And Purdy oversaw the department that continued to

5  bill the clients in full, even when Purdy knew that the

6  clients were not getting the offices that they had paid for,

7  even though he was well aware that those contracts had

8  significant deltas.

9  Now, remember the fourth way that the defendants lied

10  to complete their scheme.  These were the smoke-bomb tactics

11  that Shah, Agarwal, and Purdy used to cover up their fraud.

12  And you're going to learn that these lies to hide the fraud

13  encouraged Desai to avoid talking about the truth, even in his

14  conversations with Shah, Agarwal, and Purdy.

15  You see, people who confronted the truth, who spoke

16  openly about the fraud at Outcome, they were called "toxic."

17  Some were fired or pushed out of the company.

18  On the other hand, people who lied, people who

19  diminished the past reality of the fraud, people who avoided

20  the truth and instead focused on the future or elsewhere, they

21  were rewarded.  Those were the people who didn't make Shah,

22  Agarwal, and Purdy confront the dirty secret of Outcome's

23  success.

24  As for Brad Purdy, his role in the scheme really came

25  to a head in 2016.  You see, Purdy was the chief operating

1   officer of the company starting in early 2013.  But by 2015,
2   he also became the chief financial officer, or CFO.  As the
3   chief financial officer, Purdy was in charge of the company's
4   financial accounting.

5          You see, like many companies, Outcome tracked how
6   well that they were doing in their advertising sales and
7   recorded their revenue and profit in financial statements.
8   Those financial statements would become important when Outcome
9   went to the banks and investors to get funding for the
10  company.

11         This is when the third type of lies began, lies to
12  defraud banks and investors to give Outcome and Shah and
13  Agarwal hundreds of millions of dollars.  These were the lies
14  that they used to finally achieve their ultimate ambition.

15         In early 2016, Outcome had its financials audited by
16  a major outside accounting firmed named Deloitte.  This was a
17  process where the outside accounting firm, Deloitte, would
18  take the financials prepared by Outcome and check them to make
19  sure that they followed the rules of accounting.

20         The plan for the audit that happened in early 2016
21  was to get the company ready for raising some serious money
22  for the first time in Outcome's history.  They first decided
23  to go to banks to get their funding.  And then later, they
24  found investors to pay them cash for a stake in the company.
25         To get that cash funding, the company needed to give

1  its financials to the banks and investors and they needed

2  those financials to be audited by an outside audit firm.  Like

3  I said, the outside firm, Deloitte, would review management's

4  financial calculations and check to see if they were done the

5  right way.

6         But the problem was -- that you'll see -- is that the

7  fraud on pharma clients continued in full swing in 2016 and it

8  had grown in size.  As a result, Outcome recorded millions in

9  revenue and profit that it didn't actually earn, millions in

10  profit that should not have been on those financials that it

11  gave to the banks and the investors.

12         And to do that, they had to hide the fraud from the

13  audit firm, Deloitte.  They had to or else Deloitte would

14  never sign off on the financials and Shah and Agarwal could

15  not get the cash funding that they wanted.

16         You'll see that Outcome ultimately got $110 million

17  from banks in April of 2016.  One of the main purposes of that

18  loan was to pay Agarwal, personally, $7 million directly into

19  her bank account.  And Shah, he personally took $30 million.

20         Next, Outcome got $375 million from lenders in

21  December 2016 so that the company could buy a competing

22  company and grow even bigger.  And then, Outcome got

23  $487 million from investors in May of 2017.  Shah and Agarwal,

24  combined, got over $225 million of the investors' money from

25  that transaction.

1    You're going to hear testimony from one of the

2  lenders and a couple of the investors and see that they would

3  never have given Outcome, Shah, and Agarwal all of that money

4  if the investors knew that they were defrauding Outcome's

5  clients.

6    The other thing that you'll see is that in 2016 when

7  the defendants were trying to get all that bank and investor

8  money, it was actually becoming harder for Shah, Agarwal,

9  Purdy, and Desai to keep the fraud hidden.  A big reason for

10  this is because their company was growing and they had to hire

11  new people to help them run it.

12    First, Desai had to hire a number of people to help

13  him run his part of the company.  These people were hired in

14  2014 and 2015 as analysts to do the fraudulent list matches.

15  And these analysts also did a lot of the work to cover up the

16  company's under-delivery, to hide those deltas.  Desai was in

17  charge of the analysts from 2014 through 2017.  And you'll

18  hear from at least one of them at trial, David Ma.

19    Another thing that happened in 2016, in 2017 was that

20  Outcome started hiring a lot of people with very impressive

21  résumés to be managers at Outcome.

22    These employees came from big tech companies like

23  Salesforce and Facebook.  They had years of experience working

24  in the tech industry.  You'll see that this helped Outcome to

25  reassure the lenders and investors that Outcome was a company

1    they should invest in.  However, a few of these new employees,

2    both the junior analysts and the deeply experienced

3    executives, became very concerned about what they saw when

4    they got to the company.

5         These concerned employees told Outcome's management

6    about what they saw.  And all three defendants heard about

7    these concerns.  Some of these concerns -- concerned employees

8    even confronted Shah personally with their concerns.

9         What did Shah, Agarwal, Purdy, and Desai do?  The

10   evidence will show that they did what they had been doing for

11   years, they threw smoke bombs to hide the fraud.  Like I said,

12   this was the fourth type of lies told to further their scheme.

13   These were the lies to cover up what they had done.

14        And you'll see what they did.  They marginalized or

15   pushed these concerned employees out of the company.  And then

16   they lied about why the employees left.  Like I said, Shah and

17   Agarwal called employees who didn't ignore the fraud toxic.

18   They didn't fit, quote, the culture of the company.  And

19   of course, neither Shah, Agarwal, or Purdy were honest with

20   the clients, auditor, lenders, or investors about all these

21   concerns they'd heard about.

22        And you'll hear that things would have been a lot

23   different if the defendants had only been honest.  In fact, a

24   large portion of these employee concerns surfaced in early

25   2017 just as the company was finishing that deal to get

1    $487 million from investors, but the defendants hid their
2    scheme from the investors.

3         Eventually, the fraud came to an end.  In this case,
4    it didn't end until it was finally exposed to the public in
5    late 2017.  You see, David Ma, one of those analysts who had
6    worked for Desai, he went to a major national newspaper, the
7    *Wall Street Journal*, and told them all about the fraud.  This
8    is how this all came crashing down.

9         And you're going to learn what Shah, Agarwal, and
10   Purdy did and didn't do after it all came to light.  You'll
11   see that they didn't own up to the fraud.  They threw one last
12   smoke bomb.  You'll see that Shah and Agarwal strained to
13   convince Outcome's investors, employees, and others that they
14   had no idea that there was any fraud in their company.

15        They wrote emails to clients and investors.  They
16   held meetings and made phone calls.  You'll see that
17   Rishi Shah stood up in front of all of his employees and lied
18   to them.

19        One last push to avoid accountability for what he and
20   Agarwal had set out to do in 2011, 2012, and 2013 and what
21   they had Desai do for them in '14, '15, '16, and '17.  One
22   last time, they tried to use smoke bombs to cover up their
23   fraud.

24        Now, before I sit down, let's talk briefly about the
25   types of evidence that you'll see at trial.

1    You're going to hear from live witnesses, read
2  numerous emails, and see the defendants' own text messages
3  with each other.  And you'll get to hear audio recordings with
4  the defendants speaking to each other, talking about how to
5  conceal the fraud at Outcome.  Many of these recordings are
6  called Voxers, a type of messaging service that the defendants
7  used that's kind of like voicemail.

8    You'll hear from the victims, employees of the
9  defrauded pharma clients.  You'll see testimony by employees
10  of the investors and from one of the banks, and you'll hear
11  from multiple employees who were directly involved in the
12  fraud.

13    You're also going to hear from some of the concerned
14  employees who reported what they saw happening.  In fact,
15  we're going to start this trial near the end.  You're going to
16  hear from a man named Sameer Kazi.  Sameer Kazi was hired by
17  Shah and Agarwal in 2017 to run the operations of the company
18  as it prepared for that big investor deal that they eventually
19  got in May 2017.

20    Kazi started in early 2017, and you're going to learn
21  that it took him two weeks to realize what was happening at
22  the company.  It took him two weeks to recognize the fraud.
23  Remember that throughout this trial when you hear suggestions
24  that the defendants were too busy or distracted to know what
25  was going on at their company.  It took Kazi two weeks to see

1   the fraud.

2          And when he reported it directly to Shah, what
3   happened?  They showed him the door.  Kazi was out of the
4   company two weeks after he started.  He's the first witness
5   you'll hear from at this trial.  And Mr. Kazi was just one of
6   the concerned employees who came forward to report what they
7   saw.

8          Shah, Agarwal, and Purdy in the face of those
9   concerns empowered and encouraged Desai to continue the fraud.
10  To protect, insulate, and empower Desai -- indeed, to protect
11  and insulate themselves, Shah, Agarwal, and Purdy shunned the
12  employees who refused to diminish the past and refused to
13  ignore the truth.

14         This trial is about Shah, Agarwal, and Purdy
15  committing fraud with Ketchum, Desai, and others for ambition
16  and greed.  For years, they tricked Outcome's clients into
17  believing that they had ad inventory that they didn't actually
18  have.  For years, they under-delivered to clients, but billed
19  them in full to grow their company to a point where they could
20  raise hundreds of millions of dollars from lenders and
21  investors.

22         And for years, they used smoke bombs to cover up what
23  they were doing.  Through the years, the people on the front
24  line of this fraud may have changed, but the fraud remained
25  the same.  And Rishi Shah, Shradha Agarwal, and Brad Purdy

1   were behind the scenes making it happen.

2           Ladies and gentlemen, over the course of this trial,

3   you are going to hear from many witnesses, see many emails,

4   text messages.  And you're going to hear many recorded

5   messages.  You're going to see the evidence of the defendants'

6   fraud and how they committed it and how they covered it up,

7   all for ambition and greed.

8           And at end of this time, at the end of this trial,

9   we're going to come back before you one last time and ask you

10  to find the defendants guilty beyond a reasonable doubt on all

11  charges.

12          Thank you.

13          THE COURT:  All right.  Thank you, Mr. Hankey.

14          Ladies and gentlemen, we'll take our morning break

15  right now.  Please don't discuss the case among yourselves or

16  with anyone else.  Keep an open mind.  You have more opening

17  statements to hear and then evidence to hear, obviously.

18          So you can leave your materials on your chairs if

19  you'd like.  No need to bring them back.  You'll have to do

20  that at the end of the day.  And again, feel free to switch

21  seats if you're more comfortable sitting somewhere else.

22          See you in 15 minutes.

23          COURT SECURITY OFFICER:  All rise.

24      (Jury out at 10:27 a.m.)

25          THE COURT:  All right.  Please be seated.

1          Anything we need to discuss on the record?  First,
2  the government.
3          MR. MADDEN:  No, Your Honor.
4          THE COURT:  Any defendants?
5          MR. HUESTON:  No, Your Honor.
6          MR. POULOS:  No, Your Honor.
7          THE COURT:  Okay.  15 minutes.  And then go ahead and
8  do your testing so you're ready to begin.
9          MR. HUESTON:  Will do, Your Honor.
10        (A recess was had from 10:28 a.m. to 10:48 a.m.)
11          COURT SECURITY OFFICER:  All rise.
12        (Jury in at 10:48 a.m.)
13          THE COURT:  Okay.  Please be seated.
14          There's a wire that crosses your paths.  Please be
15  careful.  We don't want an accident.  I'd have to be a witness
16  in a lawsuit.  I don't want to do that.  So just be careful
17  crossing over the wire.
18          All right.  Is defense ready to begin opening?
19          MR. HUESTON:  Yes, Your Honor.
20          THE COURT:  You may proceed.
21          OPENING STATEMENT ON BEHALF OF DEFENDANT SHAH
22          MR. HUESTON:  Good morning, ladies and gentlemen.
23          The true centerpiece of this case is an admitted
24  fraudster and liar named Ashik Desai, someone who has admitted
25  he hid his fraud from Rishi Shah.  Let me repeat that again,

1    'cause you didn't hear it from the government.  Someone who

2    has admitted he hid his fraud from Rishi Shah.

3         So how does the government connect Rishi Shah to a

4    fraud that Mr. Desai's going to admit he hid from him?  Well,

5    you heard an opening statement.  They have some sort of

6    football handoff theory that Jason Ketchum is an original

7    fraudster and he did a handoff to Mr. Desai.  And Mr. Shah was

8    somehow tutoring these folks all across the way, passing down

9    his knowledge, I guess, to Mr. Desai at his knee.

10        The problem with that, ladies and gentlemen, there's

11   not one piece of evidence to show that, to support that.  Not

12   one.  In the couple of emails you saw and the snippet from a

13   public TV conference is an example of how the government is

14   gonna show you things out of context.

15        And we're going to take the time, we're going to ask

16   you for the patience to allow us to show you the full context.

17   And when we show you the full context, you will conclude that

18   Mr. Shah never committed fraud, ever.

19        In contrast to Mr. Shah, Ashik Desai committed a

20   brazen fraud not connected to any action or direction of

21   Mr. Shah.  In fact -- and I'm going to start here in

22   opening -- you're going to see example after example of

23   Mr. Desai acting the opposite of Mr. Shah.

24        He didn't follow any lead of Mr. Shah's.  He went in

25   a completely different illegal direction.  And he knew it, and

1    that's why he hid his fraud from Mr. Shah.

2          The true story in this case is about a fraud

3    committed by Ashik Desai, a fraud which crushed the dream of

4    Rishi Shah to build, yes, what he hoped would be a great

5    company.  Ambition they say, as if that's some sort of

6    evidence of fraud.  It's called the American dream.

7          And you'll hear that Mr. Shah, he left college before

8    he was 20 years old and he poured everything he had into this

9    company and, over the course of ten years, built this company

10   up from nothing.

11         The stakes in this case, ladies and gentlemen,

12   couldn't be higher.  Mr. Shah's liberty is at stake.  And so

13   I'm going to start with five critical facts, five critical

14   facts which give reason for doubt, reason to pause before

15   judging something that can affect Mr. Shah's life.

16         Let's start.  The five critical facts fall under

17   these categories here, PAUSE.  And I'm going to talk about the

18   first one now, pioneers.

19         You know, by listening to the government's opening,

20   you might've gotten the impression, gosh, Outcome Health

21   sounds like a house of cards.  It's just a big fraud that was

22   waiting to fall.  Well, you're going to see that that's simply

23   not true.  Outcome Health was a new and different idea that

24   took fire, caught fire across the country.  People were

25   excited about it; people knew it was a growing company.  That

1    wasn't hidden.

2            These pharma companies wanted to buy into the growth;

3    they wanted to ride the wave.  And you'll see the evidence.

4    Let's start with some examples.  I'm going to start walking

5    you through the hard evidence.  I'm not going to just talk at

6    you.

7            So here's an example, Mr. Ketchum.  Can't wait to see

8    him.  He'll be the second witness at trial.  By the way, this

9    is an example of what Mr. Ketchum said then at the time to

10   Mr. Shah versus what he will say now with a deal from the

11   government that gets him a get-out-of-jail-free card.

12           What did he say at the time?  "One of our DHN sites,

13   I saw patients who should have been uncomfortable, but DHN

14   seemed to not only educate, it brought them together, kept the

15   atmosphere relaxed.  He was excited about the product."

16           And, again, here's a client -- a client rep coming

17   back to Rishi Shah and others:  "I've been in this business

18   probably longer than either of you have been alive.  I've

19   never received a media kit that I wanted to tear into more."

20           There was excitement about this idea and concept, but

21   this wasn't just an idea on paper; it was a business that

22   worked.  Here is a document that you will see in evidence.

23   And you'll see starting in 2013 that it says devices.  That

24   means the number of tablets and waiting rooms that are being

25   put up around the country.  They started small.  The business

1   started small, under 1,000 in 2013.

2           Look at the rate of growth in their successful
3   placements.  This business was real.  It was exciting.  They
4   had it up to almost 100,000 devices growing at double, year
5   after year.  Real numbers; real company.

6           Others from around the community acknowledged what a
7   great idea this was.  Here's Peggy Hasenauer from the
8   University of Chicago Medicine:  "Please have anyone
9   interested in learning about our wonderful experience with
10  your company call me."

11          And another one, the Illinois Technology Association:
12  "The founders have so much passion about their work."

13          By the way, folks, you're going to hear that over and
14  over at trial.  Government witness after government witness
15  will concede these folks really believed in what they were
16  building.  They had a passion about it.  And that's what
17  happens when you love the people you work with, love what you
18  do, and enjoy every element of it.  That's not their
19  statements.  These are people in the outside observing it
20  real time.

21          Even at the height of Mr. Desai's fraud in
22  2015/2016 -- this is the government's expert; he'll take the
23  stand later -- even he will say that there was $100 million of
24  real revenue that year at the height of Mr. Desai's fraud;
25  real revenue.

1         And you'll hear that there are these advertising

2    campaigns.  There are hundreds that the government doesn't

3    even attempt to finger as improper.

4         Outcome was a great company, and it was started by

5    Mr. Rishi Shah.

6         If you could stand up, please, for just a moment.

7         And as I mentioned, Mr. Shah, he was very young when

8    he tried this.  Dropped out of college before he was 20 years

9    old.  And as you'll see -- and we're going to give you example

10   after example -- he worked to build a company that got very,

11   very large over the course of just 11 years.  You'll see he

12   started with just a handful of employees, and the company grew

13   very fast.

14        The government seemed to pooh-pooh.  Oh, you know,

15   operational issues.  Operational issues, for anybody who works

16   at a company, are real.  This thing grew from 16 employees to

17   over 500 by 2017.  That was all-consuming for Mr. Shah, who

18   worked, as you will see, in good faith to spot, fix, and act

19   every time he saw an issue; every time.

20        In fact, Mr. Kazi, he'll be the first witness.

21   You know what he's going to say today or tomorrow?  He's going

22   to say this.  He had a conversation with Mr. Shah.  We'll get

23   into it.  He presented Mr. Shah with some information.  And

24   he'll tell you, hey, there's no doubt Mr. Shah really believed

25   in the company.  It wasn't any kind of false thing.  He

1  believed in it and really believed that it was going to be

2  worth a billion -- it was going to generate a billion dollars

3  of revenue at all.

4        In fact, you heard a lot of money being thrown around

5  here, this capital raise, 250 million or so.  Let me make sure

6  I clear up an understanding.  That was a capital raise done in

7  2017.  And Mr. Shah didn't spend a dollar of it.  It went into

8  a holding company.  He didn't spend a dollar of it.  He didn't

9  take the money and run.

10        And by the way, everybody was getting paid a lot at

11  this company.  Here are three examples:  Mr. Kazi, yes, he was

12  there two weeks, and we'll talk about that.  He was offered

13  $600,000 annual salary and annual bonus.  And look at this:

14  $30 million floor.  Meaning, minimum amount of money in equity

15  he was going to get out of this company, 30 million.  And he

16  wasn't the only one.  You're going to see other high-level

17  people that Mr. Shah brought into the company.

18        And by the way, folks, I want you to begin processing

19  this.  If you're running a fraud in your company, you're going

20  to invite outsiders in to come take a peek?  Does that make

21  sense to you?  He brought in Nandini Ramani, a 20 -- almost

22  $20 million floor in equity.  And then Getty Atienza had a

23  growth strategy, also from the outside, $20 million floor in

24  equity.  Everybody was excited about coming here and working.

25  It was a successful business.

1    So the company was real.  It was a pioneering

2    concept.  It's a real business model which, by the way, you're

3    going to hear is still here today, now bought by another

4    company.  Still here.  No house of cards.  Fact number one.

5    Number two, I counted the minutes until I heard the

6    government mention Mr. Desai's name.  They're burying him.  It

7    was 24 minutes in before you heard mentioned, and then

8    35 minutes into the hour opening before they started talking

9    about Mr. Desai.  That's intentional.  They want you to think

10   that Mr. Desai's just some little pawn.  That's not what the

11   evidence is going to show.

12   Here, this is what he's going to be forced to say on

13   the stand:  I did not tell Rishi Shah or others that I

14   falsified the ROI reports -- which I submit to you we'll show

15   is the most important thing to the investors -- and lied to

16   Mr. Shah and others when asked if he was changing reports.

17   Ask yourself this:  If he's in the huddle, in the

18   fraud, why is he pushing away and hiding stuff from his

19   coconspirator?  It makes no sense.  Reason to doubt.

20   He wanted to hide ROI manipulation from Mr. Shah, and

21   he said he was embarrassed.

22   (Audio played.)

23   MR. HUESTON:  What you just heard there is the voice

24   of Ashik Desai.  What he was doing there, you're going to see

25   the pattern.  The government said, oh, Mr. Shah didn't want to

1   hear about bad things.  He'd just flush people out, it was

2   just in the huddle, in a fraud.  Not true.

3           He asked Mr. Desai, who was the wunderkind.  He

4   seemed to be this brilliant genius who was getting things

5   done.  He earned his way into the company.  He started at

6   $90,000 a year, not a bad salary for someone about 20.  Within

7   three years, he was being paid $500,000 a year.  And he was

8   still on the ascent.

9           And so what happened, you'll see it, when Mr. Shah

10  gets issues and problems, he doesn't go, oh, that's our fraud,

11  I'm going to shut up and hide it.  He goes to Mr. Desai and

12  asks.  And you just heard, and there it is, Mr. Desai

13  authoritatively saying, oh, we have this, we have that, but

14  don't worry, we've been operating with the utmost integrity, a

15  spirit of long-term partnership.  And there's a key term there

16  at the end that the government didn't mention to you.

17          And where we have to, we make good; we make good.

18  You know what that is?  This is critical.  You'll hear that in

19  this growing company, there were times where they estimated

20  they would put in a certain amount of screens and they didn't

21  do it.  And they told the clients about it and said, you know

22  what?  For that difference, we're giving you a make-good;

23  we're going to compensate you for it.  And there's Mr. Desai

24  saying, Don't worry, Rishi, we're doing the make-good.

25          Now, you'll hear he was lying about it, but that's

1    what he told Mr. Shah; was in Mr. Shah's mind.  Mr. Shah

2    thought everything was fine.  But that's because Mr. Desai was

3    lulling him into thinking things were fine.  He was lying.

4         And by the way, Mr. Shah wasn't the only one who

5    thought Mr. Desai was a wunderkind and someone who was

6    reliable and someone who was authentic.  Here is a review

7    prepared for Goldman Sachs, who came in.  And they assessed

8    Mr. Desai, and here it is in the report:  "Effective salesman.

9    He convincingly tells the Outcome story, exudes authenticity.

10   This is somebody, it doesn't matter that he was young.  He was

11   a little boy genius that was impressing everybody.  High EQ

12   and IQ, emotional intelligence and raw intelligence.

13        This is from Crain's Chicago Business.  He not only

14   was a star in the company, he was a star in Chicago.  He was

15   rising up.  He was the toast of the town.  Here he is

16   celebrated as one of the top 20 executives in Chicago in their

17   20s.  That's heady stuff, ladies and gentlemen.

18        But that wasn't all.  He got other national awards.

19   I'm going to show you this clip.

20        (Video played.)

21        MR. HUESTON:  It's kind of hard to pick it up.  What

22   was said there was he's achieved more in his 20s than most

23   people have achieved in a lifetime.  Imagine being told that

24   as you're walking on the stage of this national management

25   presentation.  And then the announcer said:  "He has doubled

1  the revenue of Outcome Health over time."

2  Folks, that's heady stuff.  Guy coming in, he's

3  telling Rishi Shah all is well.  He's being credited with

4  bringing this company up.  He's the toast of the town.  And

5  you know what?  He makes a fatal error.  He lies and covers it

6  up for himself.  It's for him, not for Shah or for the

7  company.  This reputation, this sort of toast of the town, all

8  of this he knew would unravel if he revealed, you know what,

9  it's all based on my lies.

10  There's another reason why this fraud went on so

11  long.  Mr. Desai didn't know how to get out of it.  Here's

12  David Ma.  He worked underneath Mr. Desai.  He's in on it.  So

13  glad we're going to see him at trial.  Here he is texting at

14  the time:  "Oh, boy, we set ourselves down a bad path of

15  showing metrics like this in the first place."

16  Before that:  "Our inflation of ads 12 times per

17  patient is absurd.  The fraud" -- he's saying, "We're now at

18  the point of doing absurd things here.  And we went down this

19  path.  It snowballed because we did something wrong to begin

20  with."  Desai didn't know how to stop it, and Ma's calling him

21  on it.

22  What else happened here?  You know what Desai did?

23  He insulated himself.  He became the keeper of information.

24  It was hard to know without getting to Desai.  And that's not

25  just me saying it, that's Goldman Sachs doing a diligence

1    review.

2          What did they assess on Mr. Desai?  Historically, a

3    lot of the information about business forecasting is in

4    Ashik's head.  And historically, he would say deals that are

5    done, that he could talk about the pipeline, and that he ran

6    every deal.

7          And again, ladies and gentlemen, you may question,

8    gosh, is that a bad business judgment?  Maybe he shouldn't

9    have been given that kind of responsibility.  Isn't that an

10   error in the way the company was run?  You can say yes to all

11   those things.  What you need to consider is:  But is that

12   fraud?

13         Ashik Desai at the center.  And we'll get into more

14   examples of how he's off on his own and reassuring Mr. Shah,

15   allowing this fraud to go on.  That's fact number two.

16         Fact number three, under-delivery.  Ladies and

17   gentlemen, under-delivery is not fraud.  Let's talk about it.

18         They were beginning to suggest in opening that

19   Mr. Shah, before Mr. Desai showed up, where Mr. Ketchum was

20   hiding the fact that at times they were not able to meet the

21   targets they were setting.  Not true.  Here's Mr. Shah talking

22   to a client here and making sure he understood an important

23   concept the government also didn't bother telling you.

24         Because everybody knew that Outcome Health was a

25   growing company, they'd start negotiating in a contract, like

1  here in January for -- for maybe the next January.  And they

2  would estimate, okay, well, by next January, because I showed

3  you that chart where things are going up, growth will be up

4  here.  So we think we're going to get to this target number of

5  offices.

6         And the clients loved it.  They wanted to buy into

7  that.  And so here's an example of Mr. Shah being totally

8  candid.  He said, Hey, our weighted average is 1,800.

9         Let me quickly explain what that means.  Let's say we

10  have 1,600 screens today, but by the end of 2023, I think

11  we're going to get to 2,000 screens.  Then the weighted

12  average is 1,800.  It's an idea that this is an estimate and

13  we're going to take what we think is the middle.  We may have

14  less now; we hope to have more later and come out around the

15  point where we think we're going to hit the target.

16         And he's explaining it.  And he gives more details of

17  exactly what is in the database.  This is early on when

18  Mr. Shah was there with just 11, 12 employees.  How does he

19  conduct himself?  With the ultimate, utmost transparency.

20  "Perfect," the client says.  He's good with that.

21         Here's another example.  Bob Mons, he's one of the

22  salespeople.  This is also early on, first 16 or so employees.

23  What is he doing?  Rishi Shah is carbon-copied.  Total

24  transparency, that this is a growth idea.  Hey, Humira, we're

25  going to work with you on a basis of incremental screens

1  installed.  They're not hiding the growth.  They're putting it

2  out there.  I cannot say exactly what the growth will be.

3  They're not putting out a number and hiding it.  They're

4  saying, this is the state of things.  And the clients loved

5  it.  They kept signing up.

6            Then you heard from the government, delta, as if

7  that's some sort of secret bad word, delta.  What is delta?

8  Delta is the difference between the target number they put out

9  there and how they're doing towards that target.

10           Here's an example of the delta on a number of

11  campaigns circulated to an entire executive team, far more

12  than these three people here.  If it's a fraud, they're all

13  talking openly about it.  But of course it's no fraud.

14  They're measuring how they're doing against their targets.

15           And if you look at those numbers, some of them are on

16  the plus.  They're delta high.  They're over-delivering.

17  We're ahead of our target.  And some are minus.  Okay, those

18  are the ones we need to focus on, folks.  Snap to it.  That's

19  what a company does.  How are we going to close that gap and

20  get to that target number when we promised?  Let's work on

21  that.  Let's improve our operations.

22           That's what you're going to see evidence of at this

23  trial.  They openly talk about it because that's good

24  business, to work on your issues and problems.  That is not

25  fraud.

1        And you'll hear it, not just from me, but from the

2    witnesses in this case.  Blake Chandlee, Outcome executive

3    vice president of commercial development, he'll tell you he

4    didn't think it was an ethical issue that there was

5    under-delivery.  And given all the make-goods, if they miss,

6    they pay the difference?  That's a business decision.  That's

7    not fraud.  And it was open.

8        Madan Nagaldinne, he will say -- he came from

9    Facebook.  And you'll see testimony that in his experience,

10    with his background and experience -- he was brought into the

11    company as one of those high-level execs -- you always cut

12    slack when the platform -- the business is growing users.

13    Because media buyers understand that there are going to be

14    inconsistencies in delivery.  It's understood in the

15    marketplace.

16        Here's an example of what the clients were signing.

17    Advertising agreement:  "If the actual deliverables fall

18    short, below the guaranteed levels, we're going to make it up

19    to you.  It's a make-good."  That's honest, good business.

20    That's not fraud.

21        Bob Mons, he will tell you make-goods have been a

22    common theme out there in advertising media for 50 years.  It

23    wasn't made up here in Outcome Health.  Well-known and

24    understood, if you under-deliver, you make good.  Outcome was

25    just doing it the same way.

1       And Mr. Desai, he will have to say, too, when there's

2  a make-good -- he told this to Mr. Shah.  Later on, once

3  Mr. Desai is in things and the business is getting big, there

4  are concerns, are we actually doing the make-goods here?  And

5  Mr. Shah's like, I hope so.  He goes to Mr. Desai, hey, are we

6  doing the right thing here?  And here's what Desai says:  Oh,

7  we've absolutely gone ahead and provided those.

8       Shah took action.  Fact number four, more reason for

9  doubt.

10       From what you heard from the government, you'd gather

11  that Mr. Shah, he was either huddled with two other people

12  about this fraud or kicking people out or -- or -- or trying

13  to hush things up when people brought up issues and mistakes.

14  That's not what the facts are going to show here, folks.

15       You're going to see a pattern of Mr. Shah, while

16  managing all these operational issues as the company goes from

17  16 employees to 500, focusing on and wanting to run a good

18  business.  Here he is here, early on, telling Mr. Mons to be

19  careful with his projections, not bloat your -- your

20  projections; be careful.  Be careful on projecting the

21  9 million patients.  And then what does Mons say?  Okay, boss,

22  I'll dial down the numbers.

23       That's evidence of a CEO trying to do the right

24  thing, not a CEO trying to build something up that's bogus

25  because he has ambition.

1          Blake Chandlee will also say thanks to Rishi's

2    guidance and input, it helped get things done.  We became

3    better.  We figured out how to close problems in the company.

4    The intention was always to build good systems, and they

5    didn't have them at first when they were a scrappy start-up.

6          Here's Mr. Shah later.  You'll see this in one of

7    these Voxers when he's responding to people.  When issues are

8    beginning to arise, he's like -- he thinks from Mr. Desai that

9    everything should be fine, let's just tell everybody about it,

10   let's be transparent, folks.  You'll see him say it then,

11   before there was any government investigation.  We should

12   publish all our contracts now.  Publish our methodology.

13   Let's be transparent about the difficult types and solutions

14   and programs we sell.  Got nothing to hide.

15         And again, you'll see him over and over again not

16   hiding or not wanting to know the truth.  When he sees a

17   problem, he wants to jump in; he wants to dig in and

18   understand.  Right here.

19         You'll hear that one of the people that brought a

20   complaint up is named Adam Prowker.  I believe he'll testify

21   at this trial.  And what does he do with Mr. Prowker?  He

22   goes, I want to be involved in that.  I want Adam to be

23   involved in that.  I want to dig in and understand this

24   myself.

25         And you know what he says?  He wanted to -- he was

1   hearing some stuff from Mr. Desai that was different from

2   Mr. Prowker.  So what did he do?  Same thing an honest person

3   would do.  I'm going to put you both in a room; we can hear

4   you both out and figure out what's going on.

5            Ask yourself, ladies and gentlemen, does somebody

6   committing fraud with Mr. Desai say, I'm putting you on the

7   hot spot with the other guy, mano a mano?  No.  That's the

8   action of somebody digging in, trying to find the truth.  And

9   what you'll hear is Mr. Desai's brilliant and he always has

10  his facts and he convinced Mr. Shah that he was right and not

11  Prowker.

12           PAUSE.  E, excitement about growth.  The government

13  seemed to suggest that growth was some sort of hidden secret

14  here, that clients had no idea that they were projecting and

15  they were growing their ability to do these screens.  Not

16  true.

17           This is a deck that was sent out to clients.  These

18  are parts of presentations.  They highlighted -- I think this

19  is like the first or second page of the deck -- high growth,

20  in all caps.  130 high decile practices monthly.  The clients

21  liked hearing that.

22           Here's another chart from that deck; showed the

23  facts.  It was growing year after year after year.  The

24  clients loved that.  They wanted to get and ride the wave of

25  the ad company that was getting into more and more doctors'

1    offices.

2          And here's on Outcome salesperson who will tell you

3    growth wasn't hidden.  It was a key selling point for

4    Outcome Health.  Clients valued it.  And he and others spoke

5    openly with clients about it.  There's no hidden secret.

6          And here's feedback that Ashik Desai is sending in to

7    the senior management team, including Rishi Shah, saying:

8    "Hey, the brands love this.  They like the fact.  And they're

9    wanting us to forecast growth.  They want to see it, and so we

10   will.  Because multiple brands want to buy your growth."

11         So the government says these four were in some sort

12   of conspiracy.  But, folks, as I've already begun showing you,

13   we're going to get into some details now, apples and oranges

14   between Rishi Shah and Desai.  He wasn't some tutor, mentee,

15   mini-me, following him and doing what he did.

16         And I'll show you examples of this.  Here's

17   Mr. Desai.  You want to see real fraud?  I'm going to show you

18   some examples right now.

19         Here's an original return on investment, ROI, slide

20   that Mr. Desai had.  You know what he did to it?  He switched

21   the lines.  He made one go lower and one go higher.  He just

22   simply fudged the numbers.  And then, instead of what it

23   should've said, that the HCPs -- that they had 20 percent

24   fewer, since he switched the lines, he was now able to say

25   20 percent more.

1        Folks, that is Exhibit A in fraud.  That's

2   outrageous, brazen fraud.  There's nothing like that from

3   Mr. Shah.  There's plenty of that with Mr. Desai.

4        And here, David Ma, who's one of his underlings,

5   talking to Mr. Desai.  Outright acknowledgment that they are

6   engaged in not just fraud, but outrageous fraud.  "These click

7   metrics make me nervous.  The clicks are closer to 120 for the

8   entire month.  What we are showing Simponi, 22,000 clicks, is

9   185,000, the real number."  That text never goes to Mr. Shah.

10  That stays in the huddle of Mr. Desai with his fraud.

11       Apples.  How does Mr. Shah's conduct compare?  I've

12  already given you some examples.  Again, he started with

13  16 employees.  Those early days, he was more on the scene and

14  was, as I gave you some examples, talking about transparency,

15  weighted average and others.

16       But later, take a look at this org chart.  By 2017 --

17  and it takes a while to scroll through it -- it's a big

18  company with 500 employees.  Take a look at that, ladies and

19  gentlemen.  There is no way a CEO knows what every one of

20  those people is doing every day.  He has to rely on people to

21  provide reports; he has to rely on his lieutenants to be

22  honest with him.  It's a different scenario while he's

23  managing all the different operational challenges.

24       What all else is happening there?  Mr. Shah, as this

25  company is building, he believes in it.  He brings in these

1   really smart people from incredible backgrounds.

2   Vivek Kundra, he served in the Obama administration, brings

3   him in.  You heard about Sameer Kazi, brings him in.

4   Madan Nagaldinne from Facebook, brings him in at a high level.

5   Michelle Patel, Groupon, again at a high level.

6   Nandini Ramani from Twitter, at high level.  And Blake

7   Chandlee from Facebook.  Outsiders brought in at a high level.

8           Ladies and gentlemen, ask yourself if he's got this

9   great fraud going, cooking the books, why are you bringing in

10  all these outsiders?  The answer is:  The evidence will show

11  he's bringing them in because he wants to legitimately build

12  this company.  And if there are problems, he's okay with that,

13  he wants to hear about them.  He wants to address them and fix

14  them.  And there are problems, and you'll hear about them at

15  trial.  And they did their best to deal with them with the

16  input from people like these.

17          So this is just a simple little graphic to show you

18  what I was doing with my hands earlier.  As this company was

19  growing, look at March of 2011 when they had very few of these

20  devices.  A year later, they had more than doubled their

21  growth.  So they would often negotiate a contract early in the

22  spring and try to figure out where they were going to be eight

23  months from now.

24          And by the way, they weren't doing dopey guesswork.

25  As I showed you, they were experiencing real growth, doubling,

1    doubling, doubling.  So they had every good faith reason to

2    think they were going to keep moving up and they could achieve

3    those targets, but that was not always easy.

4         Doctors closed down offices; doctors don't use their

5    screens anymore; campaigns sometimes don't work out as they're

6    intended.  So there are issues, and that needs to be

7    addressed.

8         So Bob Mons will tell you, hey, when you're growing

9    year over year, we do have to factor in the growth.  Doing

10   that with widgets in any company, you'd have to do the same

11   thing.

12        So here's another example:  Rishi, apples.  Early in

13   2012, I just showed you the brazen fraud of Mr. Desai.

14   Compare here.  What is he telling Jason Ketchum, the second

15   witness at trial?  Hey, Jason, the lists match.  Of course,

16   our network will be a lot bigger next year, but we have to do

17   the match now.  It's challenging to do it.  It's tough to

18   project who will be in that network in the future.  So while

19   the actual network a year from now may be composed

20   of different physicians, the match should be approximately the

21   same.  So he's trying to give guidance and trying to be fair

22   with Mr. Ketchum and candidly proposing where the growth

23   should be.  That's what the evidence is going to show you.

24        Here's another example of what was happening under

25   Rishi fraud when -- Rishi Shah when he was there in the early

1  years, to Jane Norcross:  "We are currently matching" --

2  transparency in what they're doing.  "We are currently

3  matching 695 physicians in 463 locations."  But look at the

4  underlying words.  They're being told there's a pipeline, that

5  they're projecting numbers, and that they will be growing.

6  This wasn't hidden from clients.  It was shown to them.

7       And Bob Mons will say that Mr. Shah's practice,

8  building and growing, Mr. Shah clearly laid that out with

9  clients.  Everything Mr. Shah believed, everything was

10  disclosed.

11       In fact, the government talked about deltas as if

12  that's some sort of bad thing.  Well, all the pictures you see

13  over at the top, you'd have to think all these people were

14  involved in fraud, because it was openly talked about.  This

15  wasn't a fraud.  It was how to close a delta to be a good,

16  growing business.

17       In fact, they got so excited at one executive retreat

18  about how they were going to get rid of deltas or *minimize*

19  them, they wanted to put it in writing and sign it and put it

20  on the wall.  If that's a fraud, folks, you don't try to put

21  it in writing and hang it on your wall.  It's because they

22  were running a business and tackling challenges.  Apples and

23  oranges.

24       I'm going to give you some other quick examples.

25  What you're going to see Mr. Shah doing versus what you're

1   going to see Mr. Desai doing.

2           On the left, Mr. Shah, he is telling his clients in

3   presentations going to clients:  "Through 2013, we are

4   expecting to build out our dermatology health network from

5   300 to over 1,200 sites."  Fully disclosed.

6           Now, on the right, an example of what Mr. Desai was

7   doing.  He wasn't telling people the facts.  He was secretly

8   hiding it.  And here he is telling one of his underlings:

9   Don't share this with the client.  Mr. Shah, share it;

10  Mr. Desai, don't share it.

11          Another example.  On the left, Mr. Shah.  "Eric" --

12  he's telling one of the folks, employees -- "make sure you're

13  on the same page here and believe it's realistic."  He's

14  telling them, don't give something pie in the sky.  Be

15  realistic.  And let's attack any holes in our assumptions in

16  the growth model.  That's what a good CEO does.

17          Compare Desai on the right.  He's telling -- this is

18  with David Ma, the underling:  "I can deflate more than

19  10 percent if we want to be closer to reality or I can inflate

20  ten times that."  And then later, Mr. Desai:  "Well, maybe

21  seven to eight times inflation."  They're openly talking about

22  internally they're inflating numbers.  Complete opposite of

23  Mr. Shah, who's telling his people when he was close in

24  earlier in those years, be realistic, be clear.

25          Another example.  On the left, Mr. Shah about ROI

1    studies.  He's telling Jason Ketchum:  "It's important to get

2    those ROI studies right.  Not inflate them.  Get them right."

3         And Mr. Ketchum is going to have to admit, Shah's

4    revisions to ROI analyses were based on logic that Shah

5    believed was more correct.  He made revisions because he

6    believed he was putting out more accurate representative

7    numbers to the clients.

8         Now, let's compare that to Desai.  Desai wasn't

9    trying to be accurate.  He was erasing, fudging, and just

10   inserting other numbers.  Apples and oranges.

11        (Audio played.)

12        MR. HUESTON:  What you just heard is the voice of

13   Rishi Shah.  And what is he doing?  He is hearing that Adam,

14   Adam Prowker, has a problem.  Now, the government just said,

15   oh, you know, this -- they just tried to stamp, minimize, and

16   shoot them out the door.  This is real time.  Mr. Shah, you

17   heard his own words saying, I want to hear him out.  I want to

18   try to get to the bottom of this.  That's what he would do.

19        Compare Desai.  When he saw an issue internally with

20   his underlings, hey, that guy's a problem.  Can we pull him

21   off all this digging into the 2016 program?  He doesn't make

22   me comfortable.  He doesn't want him digging in.  Shah wants

23   to meet with Prowker, get to the bottom of it; Desai, pull

24   that guy off, let's avoid things.

25        Another apples and orange.  Rishi Shah on the left:

1   "Bob, this is why I'm so confident on our growth."  And he

2   lays out data, 17,000 prospects, so I think we can get to X or

3   Y.  He provides reasoning for where he is projecting.  He

4   wasn't always right, but he gave good faith reasoning.

5          On the right, compare Mr. Desai:  "We have to get

6   tablet engagement up next year."  And then Ma:  "I don't think

7   we'll ever reach what we are saying here."  They knew it was

8   just bogus; it was based on nothing.  Shah, reasoning from

9   facts; Desai, making stuff up.

10          Shah, another example on the left:  "We've taken many

11  actions to elevate the standards of reporting and transparency

12  in our industry.  And we've adopted the most rigorous platform

13  campaign and standards."

14          This is what Mr. Shah was putting out there as these

15  complaints were coming out.  He was saying, guys, what do we

16  have to -- what do we have to do here?  Do we have issues?

17  Let's fix them.  And he was told, we have fixes.  And he said,

18  let's tell the world about them.

19          Compare that with Mr. Desai.  You know what Mr. Desai

20  did?  You see that disappearing iPhone?  When people were

21  beginning to make accusations, he got on his iPhone and he

22  deleted all his texts.  Transparency from Mr. Shah on the

23  left; Desai, frantically deleting his texts.

24          Desai wanted to hide the falsified IMS reports.  And

25  he will admit to you that in contrast to what he was doing in

1    fraud, whenever he talked to Rishi Shah and Shradha, they

2    didn't want to say, hey, what's going on with the fraud?  He

3    says, whenever I talked to them, it would be about operational

4    challenges, not fraud.  Desai himself is going to be forced to

5    admit that what he was doing was separate and he was hiding it

6    from Mr. Shah.

7         Folks, you're going to see in this case there are

8    going to be a lot of documents.  But I want you to put it in

9    context.  We call this the full context.  Here's a mock-up of

10   one day of emails, hundreds of emails that Mr. Shah receives.

11        And then I want you to just think about seven years

12   of emails.  Seven years of emails.  Can you imagine having

13   your emails and text messages for seven or eight years all out

14   there for people to pick through?  And in the end, you're

15   going to see that the government has picked out a handful out

16   of all those over seven years, little excerpts, little clips.

17   And they say, see these seven?  It's a fraud.

18        Well, we're going to show you, ladies and gentlemen,

19   your common sense tells you that's not fair because it doesn't

20   give you the full context.  We're going to give you full

21   context.

22        Let me give you an example of how context matters.

23   So this is just a hypothetical.  Take a look at this.  Let's

24   say your spouse is saying, just tell her I'm sick.  I don't

25   want to see them.  And the other spouse replies, okay.  I

really don't think she'll have any reason to question that.

Now, if you look at that, you go, gosh, sounds like they're cooking up a lie, right? But look at in context. Three days earlier, that same spouse says: I think I'm coming down with something. Hopefully, I'll be feeling better in time for dinner Saturday or Sunday. Yeah, you don't want to get anyone sick. I know, but I'd feel bad because if we had to cancel, we had to cancel last time. And I just don't want her to think I'm making up an excuse.

Okay. So you're getting more context here. And now the final context. It was about the spouse's mom. She goes: Are you feeling better? And then she answers: I think so. Haven't been resting up. Haven't wanted to see anyone and risk spreading this bug. That's good of you. Rest up.

When I showed you that first part out of context, you thought, they're cooking up a lie. Now I showed you the whole context, you realize that was no lie. They just didn't want the mom to feel bad.

That's an example of what we're going to have to do in this case. We're going to have to take time. And I'm going to ask your patience on cross-examination of these witnesses, like Mr. Ketchum, who has said one thing when he was with Mr. Shah, but then when he was given a get-out-of-jail-free card, he's saying something else.

Have patience. Let me work up the full context.

I'll give you one example of how we're going to try to do this.

I suspect the government is going to put this on at trial and go, hah, look at this, this is fraud. It's an email from Ms. Agarwal that says: "Reminder. The biggest issue here is the list they have of 1,819 matches isn't the true list. Oh, my goodness, that looks like a smoking gun. It must be fraud."

Well, we're going to show you the context. We're going to show you, you go back ten months earlier, what was the client being told? Rishi to Bob Mons, the salesman: "Hey, Bob, this is good. I added one more feature into the negotiations into the contract. Our inventory availability is dynamic." In other words, it changes. We don't have a set number of screens. It's changes. He's making sure the client knows that the numbers change.

Nine months earlier -- this is about Pradaxa. Bob Mons says, again: "Per your request, our list match, it's set forth below. But warning, it's dynamic." It changes. That's not being hidden. It's being told.

And then Ms. Agarwal says: "Hey, if they ask, we have no problem sending them the actual list with matches." Oh, now, that gives you a little context, doesn't it? In terms of were they trying to hide something when you saw that other email?

1        Okay.  More context.  Eight months earlier, same

2   client.  This is with the client on it, Geetha Gopal, from

3   Bob Mons with Rishi Shah.  "We've been the fastest growing

4   marketer for the past five years.  We're adding approximately

5   150 practices monthly."  He's projecting, making clear these

6   are projections.

7        Five months earlier, they put the contract in.  Look

8   at the term, 18 -- 1,819 target offices.  What does target

9   tell you and the other business?  That they're trying to get

10  there, not that they already have it.

11       Folks, you will see these documents and you will

12  realize that the snippets that you will show will show no

13  fraud at all.

14       And then five months earlier, more.  This is going to

15  the senior management team from Jim Demas.  They were sold a

16  weighted average of 1,819, a guess that it was going to be in

17  the middle of something in growth.  A concept the government

18  didn't bother telling you about.  And then after Ms. Agarwal

19  says they don't have the current true list, what does

20  Rishi Shah say, three hours later?

21       "Okay, yeah, this is a big deal.  Let's make sure

22  they have the right information.  So we'll have to refresh it

23  somehow.  Give them the -- give them the updated numbers and

24  make sure they have the right list."

25       Is that a fraudster pumping numbers or is that

1    something making sure they got the right data?  It's the
2    latter.
3              And then you'll see later, they figure out a way to
4    give them the right list.  They give them the data to do so.
5    And still later than that, in September, they show them, we're
6    way off, folks.  They disclose it.  We're at 753.  We're not
7    going to make that 1,800 number.  They tell Pradaxa.  And you
8    know what Pradaxa does?  They say, okay, thanks for letting us
9    know.  And they sign up next year.
10             That's an example of the context that I'm going to be
11   working and our teams are going to be working to show you, to
12   illustrate no fraud at all.  It'll take time.  It'll take
13   patience.  We will show that to you.
14             Questions asked, solutions reached.  And I'm rounding
15   the bend here, folks.  I appreciate your patience, but this is
16   important.  Because the government's going to have a lot of
17   time to talk to you, and we're going to -- it'll be some time
18   until we get to a defense case.
19             But when they say that when questions were raised,
20   people were stomped out, that's not the full story.  They're
21   leaving out key facts.  I'm going to give you a sample.
22             Let's go here.  One of the people you're going to
23   hear about who complained is Sean Bogdany in October of -- and
24   November of 2016.  And, folks, you're going to draw on some of
25   your own common experience.  Not everybody who raises a

1    complaint in a company, the evidence will show, have their

2    facts straight.  The company needs to investigate to figure

3    out if they're right.  And that's what they did here with

4    Mr. Bogdany.  Mr. Shah -- this is Collin Williams, a company

5    attorney, got a demand letter from Mr. Bogdany, as you can see

6    here, vaguely alleging fraud.  There's some kind of ongoing

7    fraud.  So what does Mr. Shah and the company do?  Do they go,

8    pay him off, don't look into it?  No.  They ask questions.

9    They dug in.

10            This is Jeff Kabat, the boss of Mr. Bogdany.  You

11   know what he says?  He says Bogdany is full of it.  I

12   explained that I was open kimono.  I showed everything about

13   projected growth in our meeting with our client.  I didn't

14   hide growth.  I showed it.  I have a dozen or so discussions

15   and emails with members of the client team over a period of

16   weeks, to which he has not privy.

17            He's saying I have all this evidence that I was

18   telling the client about growth.  Bogdany didn't know about

19   it.  This is what Rishi Shah and others are hearing.  And

20   more, Shah and Outcome Health, they hired big law firms to

21   look into this stuff.  Here's Greenberg Traurig, a big firm,

22   who concluded when they looked into it that Mr. Bogdany

23   appears to be fabricating information in order to get a

24   substantial settlement payment.

25            And they say often, future inventory is projected

1    into sales with full knowledge of the customers.  That's what

2    this law firm concluded and circulated.  Customers are aware.

3    They understand that it's not just the market's existing

4    inventory, but also the future inventory that's coming.

5           And then Mr. Desai -- this is important because Shah

6    doesn't just bring in these other people to look.  He asked

7    Desai because at this point, he doesn't think Desai is

8    committing a fraud.  He goes:  Ashik, is this true?  And he

9    gets -- he gets assurances from Desai.  Desai forwards what

10   Jeff Kabat wrote.  He's letting Rishi Shah know that Bogdany

11   is awful.  He says:  Look at this.  Kabat says about Bogdany

12   that he's becoming a leper within the company, that he is

13   going out of his way to create issues where none exist.

14   That's not Mr. Shah saying that.  That's people he's trusting

15   saying that.

16          And so Mr. Shah thinks this is not an issue.  Problem

17   resolved.  Who's the final word on that?  You're going to see

18   this pattern.  Ashik Desai.

19          Another example.  We'll quickly through -- move

20   through these.  I call these the Christmas Voxers.  People

21   were beginning to raise issues that were eventually shown to

22   be conducted with Desai's fraud.  And you'll see that Mr. Shah

23   begins asking questions, but unfortunately, Desai convinces

24   him each and every time it's not true.

25          So here, hey, guys -- through this Voxer he's putting

1    out there.  He says, "Hey, Brad is sharing some concerns with
2    me, folks.  I think what Brad is sharing is if you look at our
3    contracts, we can't deliver them as it stands.  Ashik, since
4    you know these contracts best, it would be great for you to
5    develop a recommendation whether you see the problem as
6    urgently as Brad."
7         Ask yourself:  If these guys are huddled into fraud,
8    why is he asking a question like this?  Instead, what you're
9    seeing real time is Shah going, is this true?  Ashik, you're
10   the guy who knows.  Give me answers.
11        Here's what Desai says:  Let me go ahead and give you
12   some background.  Now, watch what he says here.  Shah then
13   asks -- he then says:  "Hey, Ashik, as a point of
14   information" -- these are questions he's asking Desai -- "what
15   do these affidavits report on?"  Give me information here.
16   It's hard to comment on the options without knowing what the
17   affidavit is exactly.
18        In that message, you'll see Mr. Shah doesn't know.
19   So he's turning to Desai.  And what does Desai say in
20   response?  He is the guy who has the knowledge.  He's -- look
21   at him, he's the instructor.  So historically, our affidavit
22   process is X, Y, and Z.  He tells him that.  And we're working
23   to change the practice.  Assuring him he's on it, he's on the
24   scene, and the operational challenge is being met.
25        And, ladies and gentlemen, something else the

1   government didn't tell you, the person signing those

2   affidavits which turned out to be false, Ashik Desai.  He was

3   covering up and hiding from Mr. Shah his own fraud.

4           Under-delivery.  You just heard that under-delivery

5   is a fraud and Shah knew about it and was hiding it.  Not

6   true.  He asked questions about it.  Asked questions of Desai.

7   I'm hearing about this.  And what does Desai say?  "The

8   process called into question what happens with campaigns that

9   are behind relative to contractual obligations.  It's probably

10  really two or three categories.  The more common one is where

11  you may be behind on just a few campaigns in January.  But by

12  June, don't worry about it -- about it.  Based on our growth

13  projections and how we're pacing, we're gonna be far in excess

14  of it."

15          Don't worry about it.  I'm analyzing the facts, a

16  couple of exceptions, we're not going to have an issue.  Lulls

17  and assures Mr. Shah and covers up his fraud.

18          And Shah says similar things.  He's like, wait, let's

19  be transparent now.  We have these weighted programs.  Can't

20  we just make sure we're telling the clients this?  He can't

21  understand what's going on because he doesn't know about

22  Desai's concealment and fraud.  What you see, apples and

23  oranges, is Shah saying be transparent, tell folks the growth

24  and weighted averages.

25          And Desai lulls him again and says, oh, okay.  Sure.

Case: 1:19-cr-00864 Document #: 582 Filed: 11/29/23 Page 107 of 245 PageID #:12661
opening - defendant Shah
107

1   We're being transparent.  Don't worry about it.  No need to

2   ask any more questions.  Lulls him again into thinking no

3   problem.  Every time Mr. Shah digs in, Mr. Desai responds and

4   assures him, no problem at all.

5          How about those deltas?  No problem on that either

6   when Desai is asked.  How we've dealt with this in 2016 --

7   this is the height of the fraud that's coming out in this

8   trial -- is with the utmost integrity and in the spirit of

9   long-term partnership.  And where we've had to make good, we

10  absolutely will.

11         That sounds like someone who's an honest broker.  But

12  what the evidence will show is he lied to Mr. Shah's face, and

13  he stopped Mr. Shah from getting to the bottom of it.  That's

14  the Christmas Voxers.

15         Really quickly, Sameer Kazi, you'll hear him either

16  later today or tomorrow.  He does come in, and he raises -- in

17  his 17 days, he raises three issues:  ROI guarantees; an issue

18  about revenue, saying 50 percent of the revenue could be

19  recalled; and affidavits, there's something going on with the

20  affidavits.

21         Does Mr. Shah go, huh, who cares?  No.  He asks and

22  digs in.  And he goes to the person he thinks has all the

23  answers and, again, he's lied to on each point.  He forwards

24  the concerns to Mr. Desai, who says, thanks for this; we're

25  going to talk about it more tonight.

opening - defendant Shah

1        And then he gives him lies on all three things.

2   "ROI, hey, where we've had to measure and where there's a

3   make-good, we've gone ahead and provided those.  We don't have

4   an issue with ROIs."

5        How about revenue?  And he quotes Mr. Kazi,

6   "50 percent of all revenue is at risk?"  He assures Mr. Shah,

7   "That's not true.  This is a very buttoned up effort.  I'm on

8   it.  It's something we have to be held to a very high level of

9   scrutiny because Deloitte & Touche is here."  He's telling

10   Mr. Shah, I'm on this; that number's wrong; we have to have

11   everything on the straight and narrow because we've got

12   auditors here.  No concern.

13        And number three, how about the affidavits?  Shah's

14   asking.  Again, a lie from Mr. Desai.  When we spoke about

15   affidavits, it's just systems challenges.  Nobody's changing

16   anything.  We've had a systems issue and we've made

17   corrections manually.  Problem solved.  Another lie by Desai,

18   lulling Mr. Shah into thinking no problems.

19        And Desai further says:  "I've talked to Sameer.

20   He's engaged.  It's just operational problems."  And you'll

21   hear Mr. Shah also after being told by Ashik Desai that there

22   were real -- no real, real problems here saying he's had good

23   conversations with Mr. Kazi as well.  Let's skip that

24   recording that time.

25        And in the end, he's not mad at Mr. Kazi for bringing

1    this up.  He thanks him for his candor.  He says:  "I hope to

2    keep you as an advisor and friend."  And Mr. Kazi says:  I

3    echo your thoughts.  I'd be open to an advisorship."  That's

4    the actions of a man who was interested in trying to figure

5    out things, not someone panicked, hiding, and kicking people

6    out.

7              One last example.  I showed you some of this already.

8    Adam Prowker, what happens when he raises concerns?  You'll

9    hear about him.  He talks to Adam Prowker.  He said, I -- he

10   had a couple of great insights, folks, says Rishi Shah.  In my

11   conversation, though, it came clear he didn't understand

12   growth strategy.  Mr. Prowker's not totally on the ball.

13             Now, you'll see this document.  Adam Prowker does put

14   together IMS manipulation data in an email to Liane Pierce and

15   Sameer Kazi.  You know what you're going to learn in this

16   case?  No one forwarded this to Rishi Shah.  Prowker didn't,

17   Sameer Kazi didn't, Liane Pierce didn't.  It never got to

18   Shah.  It's important to know what folks understand.

19             And once again, what is Mr. Shah doing?  It's typical

20   of him.  I want to get involved.  He's not hiding from this.

21   Oh, my God, they're onto the fraud.  He wants to get in it and

22   figure out what's at the bottom of it.  I want to hear him

23   out.  I need to do that for myself to assess credibility.

24   We're going to get to the bottom of this.

25             Would he want to get to the bottom of his own fraud?

1   No.

2          And what does Desai do?  Same thing he always does.

3   He's pushing Shah to think this is not a problem.  I've got

4   the facts, Prowker's wrong and he's toxic.  You heard the

5   government say our guys are saying toxic.  It's Desai feeding

6   that, infecting the view of these people bringing up concerns,

7   delaying the uncovering of his own fraud.

8          And Shah listens to that, finishes, and concludes

9   that Prowker doesn't have the facts straight.  And Desai

10  continues to assure him that that's correct, we should just

11  get him out of here.  Look at his last line he's telling

12  Mr. Shah:  "He doesn't know what he's talking about.

13  Terminate him for cause."

14         And so Prowker's resolved after Mr. Shah asked

15  questions and after he was deceived as to what was going on.

16         Now, this isn't all that Mr. Shah was doing.  He was

17  working to build this company.  I'm going to begin finishing

18  here where I started.  Here are example after example of the

19  different methodologies and systems he put in place, not just

20  people, but systems improvements so they could minimize delta,

21  so they could get those affidavits out there with correct

22  numbers, so that they could address all those problems.

23         All those things, you'll hear at this trial, created

24  an improved company.  They were on the trajectory to the

25  fixes, but what they didn't know was that Desai was deceiving

1    them and concealing a fraud.

2         And, folks, what the government wants you to think,

3    in summary again, is that these three people were in some kind

4    of black box and were hiding growth, hiding deltas, hiding

5    make-goods, hiding these things.  But as I've begun showing

6    you and you will see in the evidence at trial, if that's

7    fraud, then all the original people that worked with them in

8    those early years who talked openly about growth, projections,

9    sales will increase, make-goods, they'd all have to be in on

10   it, too.

11        And that's not all.  How about in the later years?

12   That row of people I just added there, they're all part of the

13   new executive leadership team.  You're going to hear they went

14   on retreats and talked openly about it.  You're going to ask

15   yourself, is that what fraudsters do, share their fraud with

16   other people?  Spit-ball it and put it in PowerPoint

17   presentations?  No.  They're trying to address the operational

18   issues.

19        And then this:  In 2017 when Deloitte & Touche came,

20   every person in charge of the department was asked to answer

21   and provide a certification.  And you'll see that 20 different

22   people in charge of 20 different departments said, I am not

23   aware of any instances of fraud involving management,

24   employees, or outside parties conducting business with

25   Outcome Health.

1        And our folks got that.  And it was a further

2   assurance nothing was going on.  What they didn't know is that

3   there was a cancer inside, a cancer growing with Ashik Desai.

4   That's what was hidden from them.  With messages and

5   certifications like that and addressing the operational

6   issues, they thought they were doing the right thing in

7   growing the company.

8        Folks, the story you will hear about Rishi Shah at

9   trial is the story of a young entrepreneur with a dream to try

10  to build a great company.  And government witness after

11  government witness will tell you that he really did believe in

12  this.  This was not some sort of, like, I'm hoping to just

13  make a quick cash grab.  He really believed.  He was

14  optimistic.

15       And the evidence will show that his one fatal flaw

16  was putting great trust and responsibility on the one

17  executive who would betray him, Ashik Desai.  Ashik Desai, who

18  came up with a brazen fraud, not connected with anything that

19  Rishi Shah was doing.  And worse, when Rishi Shah came

20  digging, looking for answers as complaints and issues came in,

21  lied to Rishi Shah, stopping him from getting to the bottom of

22  things until everything collapsed.

23       The question that you will have to ask yourself:

24  Would a mastermind -- a so-called mastermind of fraud hire new

25  top executives to come in and look under the hood to see the

1    fraud?  Would a mastermind of fraud meet with these people who

2    have issues and try to get to the bottom of his own fraud?

3    Does that make any sense to you?  Would a mastermind of fraud

4    bring in auditors and others to investigate his own fraud?

5           Folks, you're here for a reason.  There are only

6    12 -- 16 judges or lawyers there.  It's you, ladies and

7    gentlemen.  You're here to bring your common sense, not to

8    leave it at the door.  And you apply your common sense to

9    determine if there's reason to doubt.

10          And in this opening, I've suggested many reasons --

11   you just need one -- many reasons to doubt.  Did Mr. Shah

12   commit errors of judgment?  Yes.  Did Mr. Shah make mistakes?

13   Did Mr. Shah trust people he shouldn't have?  Yes, he did.

14   And he's going to live with that.  But what he didn't do, the

15   evidence will show, is commit fraud.

16          Now, every week, the judge gives us a few minutes to

17   talk to you about the state of the evidence.  And Ms. Chou and

18   I will have the privilege of talking for a few minutes each

19   week.  And we're going to remind you each week of additional

20   reasons to doubt.

21          And at the end of this trial, we'll have a chance to

22   address you one more time.  And at that time, I ask you to

23   return the only verdict supportable by the evidence, and that

24   is not guilty on all counts.

25          Thank you for your patience.

1      THE COURT:  All right.  Thank you, Mr. Hueston.

2      Ladies and gentlemen, we'll take a lunch break a

3  little earlier than normal.  I don't want to have to interrupt

4  the next opening statement for you to take lunch.

5      It's going to be an hour.  If you need more time,

6  just tell the court security officer.  A lot of you may be

7  unfamiliar with The Loop.  There's a cafeteria on the second

8  floor.  We've given you -- or can if you don't have it -- a

9  bit of a diagram of the area that offers up names of different

10  food establishments around.  I'm not certifying the quality of

11  any food, but they're all just relatively fast-food places if

12  you want to go out and bring something back.  You, of course,

13  can bring your lunch.  But we're not forcing you to eat in an

14  hour if it turns out you need more time.  Just tell the court

15  security officer.  We'll be ready when you are.

16      We're going to break today at 5 o'clock, but I'd like

17  you all to discuss whether or not that works for all of you.

18  I want to go to at least 4:30.  Hopefully, we can go to 5:00

19  nearly every day.  But if for some reason you need to break at

20  4:30 or 4:45 on a particular day, or even today, because

21  it's -- that's the only way to allow you to catch your last

22  express train home, we'll honor that and break at 4:30 or 4:45

23  or 5 o'clock.

24      Tomorrow we have to break at 4:20.  There's a

25  conflict that will require us to break at 4:20.  But the

1    presumptive time will be 9:00 to 5:00.

2          So please don't discuss the case among yourselves or

3    with anyone else.  Keep an open mind.  And we'll see you at

4    about 1 o'clock unless you need more time.

5          And talk to the court security officer about what

6    kind of liquids you can bring back, if any.  We're going to

7    start bringing pop up at the break in the afternoon that you

8    can store and have available for you tomorrow.  I'm not sure

9    there's anything like that back right now, but talk to Louie

10   about the -- what the rules are in bringing liquids back.  You

11   can certainly bring food back.

12         Thank you all.  See you in an hour.

13         COURT SECURITY OFFICER:  All rise.

14      (Jury out at 11:56 a.m.)

15         THE COURT:  All right.  Please be seated.

16         Anything we need to discuss?  First, the government.

17         MR. MADDEN:  No, Your Honor.

18         THE COURT:  Defense?

19         MR. HUESTON:  No, Your Honor.

20         MR. POULOS:  No, Your Honor.

21         MR. LOWDER:  No, Your Honor.

22         THE COURT:  Okay.  Who's doing the opening for

23   Ms. Agarwal?  Mr. Lowder?

24         MR. LOWDER:  I am.

25         THE COURT:  Okay.  I'll ask this of all defense.

1          Do you need that screen that's in front?  I'm
2   concerned about the wire that crosses.  If that's --
3          MR. HUESTON:  No, we're going to remove that.  That
4   was part of the jockeying we did or failed to do.  We'll get
5   that fixed.
6          THE COURT:  Yeah, I'm just concerned we'll have a
7   trip.
8          MR. HUESTON:  We'll remove it.
9          THE COURT:  Okay.  How long do you expect to be,
10  Mr. Lowder?
11         MR. LOWDER:  Still in the neighborhood of 45 minutes.
12         THE COURT:  Okay.  And, Mr. Poulos?
13         MR. POULOS:  An hour to an hour 15.
14         THE COURT:  Okay.  So you should have your witness
15  prepared.  We will go to whatever time the jury says they can
16  go today.
17         MR. MADDEN:  He'll be here.
18         THE COURT:  Okay.  And again, for your planning
19  purposes, 4:20 we have to break tomorrow.  But otherwise,
20  we'll be going to 5 o'clock or the time the jury tells us.
21         Okay.  And now, do we need to resolve anything
22  regarding the -- you said there's one exhibit that is the
23  subject of some dispute?
24         MR. MADDEN:  The only exhibit, I think Agarwal's
25  attorneys objected to a calendar that we created for the first

1   witness.  It's a demonstrative, though.  I think they objected

2   on hearsay grounds.  We're not seeking to admit it.  We're

3   just using it as an aid to the jury.

4         The reality is that both Shah and Agarwal used

5   chronologies in their opening which are not objectionable.

6         THE COURT:  Yeah.

7         MR. MADDEN:  And so really, the calendar's no

8   different.

9         THE COURT:  Sounds like it to me, but talk to them

10  over the break.  If there's still a dispute, then show me a

11  copy and I'll rule on it before it's offered with the witness.

12        MR. MADDEN:  Sounds good.  Thank you.

13        THE COURT:  All right.  Thank you.

14      (A recess was had from 11:58 a.m. to 12:59 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )   Docket No. 19 CR 864
4                   Plaintiff,       )
                                     )   Chicago, Illinois
5       v.                           )   January 30, 2023
                                     )   12:59 p.m.
6                                    )
    RISHI SHAH, SHRADHA AGARWAL,     )
7   BRAD PURDY,                      )
                                     )
8                   Defendants.      )

9
            TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 1B
10      BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury

11
    APPEARANCES:
12

13  For the Government:   MR. MATTHEW F. MADDEN
                          MR. SAURISH APPLEBY-BHATTACHARJEE
14                        Assistant U.S. Attorneys
                          219 South Dearborn Street, 5th Floor
15                        Chicago, Illinois  60604

16
                          MR. WILLIAM E. JOHNSTON
17                        MR. KYLE C. HANKEY
                          U.S. Department of Justice
18                        Criminal Division, Fraud Section
                          Washington, D.C.  20530
19

20

21

22                    ELIA E. CARRIÓN
                    Official Court Reporter
23               United States District Court
              219 South Dearborn Street, Room 1432,
24                 Chicago, Illinois 60604
                      (312) 408-7782
25             Elia_Carrion@ilnd.uscourts.gov

```
 1   APPEARANCES (Continued:)

 2
     For Defendant
 3   Shah:                      MR. JOHN C. HUESTON
                                Hueston Hennigan LLP
 4                              620 Newport Center Drive, Suite 1300
                                Newport Beach, California  92660
 5
                                MS. VICKI CHOU
 6                              MR. MICHAEL H. TODISCO
                                MS. KAREN DING
 7                              Hueston Hennigan LLP
                                523 West 6th Street, Suite 400
 8                              Los Angeles, California  90014

 9
     For Defendant
10   Agarwal:                   MS. KOREN L. BELL
                                MR. A. ALEXANDER LOWDER
11                              Larson LLP
                                555 South Flower Street, Suite 4400
12                              Los Angeles, California  90071

13                              MR. PATRICK W. BLEGEN
                                MS. KELSEY H. KILLION
14                              Blegen & Garvey
                                53 West Jackson Boulevard, Suite 1437
15                              Chicago, Illinois  60604

16
     For Defendant
17   Purdy:                     MR. THEODORE T. POULOS
                                MR. ERIC PRUITT
18                              MR. JOHN PAVLETIC
                                Cotsirilos, Tighe, Streicker, Poulos &
19                              Campbell, Ltd.
                                33 North Dearborn Street, Suite 600
20                              Chicago, Illinois  60602

21

22

23

24

25
```

1          (Proceedings heard in open court, jury in:)

2          THE COURT:  All right.  Please be seated.

3          Ladies and gentlemen, a couple quick comments.  One

4     is you'll see lawyers or even parties coming in and out at

5     times during trial.  That's necessary sometimes for them to

6     work on something like arranging for witnesses or other

7     matters that -- for work on this case that has to take place

8     in the hallway or outside the courtroom.

9          No disrespect is meant by that.  It just is a fact of

10    a long trial where some work has to be done outside and people

11    will be coming in and out, but that shouldn't be viewed by you

12    as anything other than that.

13         Secondly, there's a reference to something called

14    interim statements.  That's something I allow in lengthy

15    trials, and that is to allow each side 10 minutes for the

16    government, 15 for the defense, an opportunity after a witness

17    has testified or several witnesses testified to make what they

18    call an interim statement to be broken up in increments of a

19    minute or all 10 minutes or all 15 minutes.  Generally, it's a

20    short statement talking about what you may have just heard or

21    what you can expect.

22         I find it's helpful in lengthy trials for you to get

23    some perspective from the lawyers.  10 minutes for the

24    government, 15 by the defense, and if they don't use their

25    time in a week, it doesn't carry over to the following week.

1    So you may hear occasionally a request by a side to

2    say can I make an interim statement, and that's the purpose of

3    it.  Those statements are just like opening statements.

4    They're not evidence, just like closing arguments are not

5    evidence, but they are meant to be helpful to you for a party

6    to point out what they think has been shown so far or what you

7    can expect in the future.

8        With that, Mr. Lowder, you may begin.

9        OPENING STATEMENT ON BEHALF OF DEFENDANT AGARWAL

10       MR. LOWDER:  Thank you, Your Honor.

11       Good afternoon, ladies and gentlemen.  I have the

12   distinct honor of representing my client, Ms. Shradha Agarwal,

13   here in this case.

14       One of the most important things that you guys --

15   that I want you all to take into account during the course of

16   this trial is the concept of perspective.  Now, as you begin

17   to hear evidence in this case, you will notice that the

18   government's charges against my client may seem peculiar.

19       The government has alleged that my client was a

20   knowing participant in a scheme to defraud pharmaceutical

21   clients, lenders, and investors of Outcome Health.  The

22   charged scheme at the heart of the government's case requires

23   you to view the evidence from a very specific perspective.

24       The evidence that we expect you to hear in this case

25   has to line up just so to fit into the construct that the

1   government offered to you in his opening argument.

2        Now, I have an example. It's a simple device that I

3   think will help demonstrate some of the problems with the

4   government's case against Ms. Agarwal.

5        Now, some of you may be familiar with this object and

6   when you look at it, it actually -- it's quite remarkable.

7   When you look at it from the perfect angle, it looks complete,

8   like a complete triangle. But the reality of this object is

9   quite different. As soon as you shift your perspective, you

10   see the change. You see the split. You see that you're not,

11   in fact, looking at a triangle. This is what you're looking

12   at.

13        And ladies and gentlemen, this is what the evidence

14   will show in this case, that the government's perspective on

15   the evidence just doesn't fit. It isn't correct.

16        Now, when we started the morning today, Judge Durkin

17   read to you a set of preliminary instructions. I'm not going

18   to go over them all, but I have a few that I think will really

19   highlight for you the problems with the government's case and

20   how I want you to consider the evidence as it comes in.

21        The first and the most important is the burdens of

22   proofs and the presumption of innocence.

23        Now, I'm going to read it to you because I think it's

24   that important. Each defendant is presumed innocent of each

25   and every one of the charges. This presumption continues

1    throughout the case.  It is not overcome unless, from all the
2    evidence in the case, you are convinced beyond a reasonable
3    doubt that the particular defendant you are considering is
4    guilty as charged.

5           The government has the burden of proving each
6    defendant's guilt beyond a reasonable doubt.  This burden of
7    proof stays with the government through the case.

8           I want to hang for a second on "beyond a reasonable
9    doubt."  That is the highest burden of proof that we have in
10   our legal system.  And what does that mean, presumption of
11   innocence, government has to prove beyond a reasonable doubt?
12   What that means is Ms. Agarwal sits here in this courtroom an
13   innocent woman.  It is one of the fundamental tenets of our
14   legal system and our system of justice.

15          Now, the Court has instructed you about the
16   presumption of innocence, and we expect the Court to repeat
17   that instruction before you begin deliberations at the
18   conclusion of the case.

19          Now, we expect the evidence to reflect that
20   Ms. Agarwal has devoted her entire professional life to
21   building and growing Outcome Health.  Outcome Health, as
22   you've already heard, built a network of screens and devices
23   to deliver educational content to patients and doctors.

24          Outcome Health also sold advertising space on its
25   network of devices to generate revenue.  This is not in

1    dispute.  What you've heard and what's important to remember

2    is that Outcome Health was a real business, providing a

3    legitimate benefit to doctors, patients and to its

4    pharmaceutical clients.  The evidence will bear that out and,

5    again, it's not in dispute.

6            As you can imagine, Ms. Agarwal during her 10 years

7    at ContextMedia Health -- Outcome Health, excuse me, made

8    mistakes.  There are decisions that, with the benefit of

9    hindsight, I suspect she would do differently.  That's no

10   surprise.  She's human just like the rest of us.

11           This case, however, is not a civil case about

12   regulatory compliance, mistakes or decisions that, with the

13   benefit of hindsight, someone should -- could have or should

14   have done differently.

15           In this criminal case, the government has to prove

16   beyond a reasonable doubt that Ms. Agarwal operated with

17   criminal intent at the time she performed her duties as an

18   executive of Outcome Health.

19           Now, another instruction I want to bring your

20   attention to, and I think it really bears repeating based on

21   some of the comments we heard this morning from the

22   government, is that each defendant in this case deserves

23   separate consideration.  In the government's opening remarks,

24   there were lots of comments lumping all three of the

25   defendants in this case together.

1    But the judge is instructing you, and you can see it

2  on your screen, I won't read it again, that each defendant

3  deserves separate consideration.  You need to evaluate the

4  evidence and how that bears on each defendant's guilt or lack

5  thereof separately.

6    Another instruction that I think bears keeping in

7  mind as I walk through my remarks is the intent to defraud.

8  The government -- the Judge instructed you on that.  I'm going

9  to revisit that again, and I'm going to read it to you:  A

10  person acts with intent to defraud if he or she acts knowingly

11  with the intent to deceive or cheat the alleged victim in

12  order to cause a gain of money or property to the defendant or

13  another, or the actual or potential loss of money or property

14  of another.

15    I want to highlight that instruction because it's

16  part of the framework.  When I talk about perspective and

17  you're evaluating the evidence that comes in this case, I want

18  you to keep that instruction in mind as you're thinking about

19  what was in Ms. Agarwal's mind; what was her intent when she

20  was writing these communications, when she was receiving

21  information in the course of her duties at Outcome Health.

22    Another instruction I want to highlight for you is

23  the scheme to defraud.  It's the heart of the government's

24  case.  The government has charged my client, along with

25  Mr. Purdy and Mr. Shah, as participating in a scheme to

1    defraud.  And, again, the instruction is important because
2    it's not casual, it's not mere association, which we'll get
3    to, it is a plan or course of action designed to achieve a
4    specific purpose.

5         In its opening remarks, the government highlighted a
6    number of purposes that it claims our clients were trying to
7    do.  What I want you to look at, again, the communications,
8    the evidence, the testimony of the witnesses, does that bear
9    that out?  Does it fit that framework that the government
10   offered up in its opening remarks?

11        And I submit to you that when you do listen to that
12   evidence and you consider it, it won't.

13        The last instruction that I want to re-raise with you
14   is mere association, and this is important, given the context
15   with which these allegations come up.

16        All of the defendants here were executives at the
17   same company.  They were working together.  Different areas,
18   but working together to grow, build a business, and make it
19   successful.  But what's important here is that -- well, let me
20   pause there.

21        And they were in a business with an admitted
22   fraudster, and that's Ashik Desai, who you've heard a lot
23   about already.  And their mere association with Mr. Desai is
24   not enough to find them guilty of any of the crimes alleged by
25   the government.  And I want you to keep that in mind as well

1   because I think that as you see some of these communications

2   that I'm going to talk about a little bit more, think about

3   what they actually represent.  Mr. Hueston addressed it, and

4   I'm going to touch on it again.

5           So when you put all these instructions together

6   combined with the other instructions that you'll likely

7   receive at the end of the case, I reiterate it's the

8   government's burden to prove to you that Ms. Agarwal knowingly

9   participated in a scheme to defraud Outcome Health's

10  pharmaceutical customers, lenders, and investors.

11          Now, the only way, and I've got to stress this, the

12  only way that Ms. Agarwal's status as an innocent woman

13  changes is if the government proves every element of the

14  charged offenses beyond a reasonable doubt.

15          And as I mentioned, it's not merely enough to show

16  that Ms. Agarwal was a co-founder or senior executive at

17  Outcome Health, and with these instructions in mind, I ask you

18  to pay close attention to the evidence the government presents

19  to you during this trial, but I also ask you to pay equal

20  attention to the evidence that the government doesn't present

21  to you during this trial.

22          Now, in light of the anticipated length of this

23  trial, I'm not going to overwhelm you at this moment with

24  every detail we expect you to hear.  With my opening remarks,

25  I want to focus on our concerns regarding the scheme alleged

1   by the government and offer a frame of reference for the

2   evidence that we expect you all to hear.

3           Now, in his opening statements, Mr. Hankey indicated

4   the scheme alleged by the government began in 2011 and ran

5   through at least 2017.  I've got a demonstrative here to kind

6   of show you that.

7           Now, one of the things that I want to touch on before

8   I get into the construction of the scheme that's been alleged

9   is a category of evidence that's been discussed already, and

10  that is the electronic communications.  We have concerns about

11  the evidence the government will offer up to try and prove

12  that the alleged scheme existed and that my client was a

13  knowing participant.

14          Now as you've seen, we believe that the government

15  will offer a number of electronic communications as proof of

16  this alleged scheme.  The concern in this trial is that we

17  expect that you'll only see snippets in a sea of business

18  communications that existed over the timeframe that the

19  government has laid out.

20          Now, you've heard about the founding of this company.

21  College kids started this company in 2006 right when

22  electronic communications like email, text message were well

23  on their way to becoming ubiquitous.

24          Now, during her time at Outcome Health, my client

25  often received over a hundred if not more email and other

1   electronic communications in a single day.

2          Now, as these communications come up, ask yourself if

3   context seems to be missing.  Pay attention to who's part of

4   the communications.  Pay attention to who's not part of the

5   communications.  Pay attention to the content of the

6   communications.  What's there, what's not there.  Do they fit

7   the framework that the government has offered up to you in its

8   opening remarks?

9          Now, when you try to resolve these questions,

10  remember that sitting here today, we all have the benefit of

11  hindsight and are also looking at these communications through

12  a very specific perspective that has been offered up by the

13  government.  Perspective though is critical, and the most

14  important perspective when it comes to my client is hers and

15  the intent that she had, the perspective that she had in real

16  time as she was addressing these issues as they came up.

17         Now, a great example of this issue is one of the

18  communications that Mr. Hankey showed in his opening remarks.

19  It was an August 8, 2013 email from my client discussing

20  patient solutions for depression, and if you want to mark it

21  down, it's Exhibit No. GX 274.

22         And in that communication, Mr. Hankey focused on real

23  versus made-up and take the salesperson off the chain.  I'm

24  going to submit to you, and I think the evidence is going to

25  show, that he left out critical context for that

1    communication.

2            First, this case is about an alleged scheme to

3    defraud or falsify data for some pharmaceutical campaigns in

4    advertising.  The email that he showed you isn't even about a

5    pharmaceutical campaign.  It's about a survey that was done,

6    and you'll hear evidence about that.

7            The second part about that communication is when you

8    look at this round in context, other communication which I

9    expect you to hear in this case, you'll see that the

10   evidence -- the data that was being discussed wasn't made up.

11   It was real, it was tangible, and Ms. Agarwal openly discussed

12   that data with her colleagues.

13           This is a prime example of what I would ask you to

14   keep an eye out for as you consider the communications

15   presented to you by the government in this case.

16           Now, at the beginning of the case, you heard that the

17   defendants were charged with a number of counts, and broadly

18   for my client they fit into three categories:  Mail fraud,

19   wire fraud, and bank fraud.  And I've broken these out into

20   four categories to kind of help you visualize them and keep

21   them in your mind as the evidence comes in.

22           Now, there's a mailing alone or a wire attached to

23   each of the counts in the indictment against my client.

24           In connection with the mail and wire fraud counts --

25   charges, one of the elements that you need to consider and the

1    government has to prove beyond a reasonable doubt is that

2    Ms. Agarwal used or caused the use of the United States mails

3    or caused interstate wire communications to take place in the

4    manner charged in that particular count.

5        In other words, the government must prove to you

6    beyond a reasonable doubt that each charged mailing or wire

7    was made for the purpose of carrying out the overarching

8    scheme the government has charged.  I'm going to discuss that

9    in a minute.

10       As to the two lender charges against my client, the

11   government addressed those in its opening remarks.  One was a

12   loan.  No money was paid out.  And the second was a loan that

13   the company used to acquire another business to grow its

14   inventory, and you'll hear evidence about that in the trial.

15   And I want you to think about that second loan transaction and

16   think is that consistent with a scheme to defraud, or is that

17   a business trying to expand its footprint and deliver more

18   services to its clients?

19       Now, as I mentioned, the charged transactions fall

20   into four groups, and you see them here.  The first is the

21   pharma accounts.  There's six of them that are alleged against

22   my client.

23       The next group are the two counts from the lenders

24   that I just discussed.

25       And then you have three counts against the investors

1   and the investments that Mr. Hankey addressed, and then you've

2   got these six communications, which I'll address more closely

3   in a moment.  And when you break them up this way, interesting

4   patterns emerge.

5           First focusing on the pharma accounts, you'll see

6   here that these six counts are all grouped in an interesting

7   timeframe.  These charged transactions are all after Mr. Desai

8   joined the company and took over sponsorship sales operations

9   at Outcome Health.  I want you to pay attention to that.

10  Another detail, and I'll talk to you about it in a moment, is

11  that during this timeframe, Ms. Agarwal did not have any

12  oversight, ownership, or participation in Outcome Health sales

13  process, yet she's charged here.

14          We move on to the lender counts, you'll hear

15  evidence, and I'll talk to you about it in some more detail,

16  that Ms. Agarwal did not have ownership or oversight over the

17  finance or accounting functions for Outcome Health as she's

18  charged here.

19          Likewise, with the investors.  She was not

20  responsible for putting together the presentations, deciding

21  on what inventory or what information to provide to the

22  investors.  She's still charged.

23          And, lastly, the communications.  These may be the

24  most peculiar.  And as you look at this, you'll see that five

25  of the six of these counts are all clustered around a tight

Case: 1:19-cr-00864 Document #: 582 Filed: 11/29/23 Page 133 of 245 PageID #:12687
opening - defendant Agarwal
133

1  three-day window, and those five that are clustered on January

2  23rd, 24th and 25th all relate to a single issue, and these

3  are all internal communications. You're actually going to

4  hear one of them before I sit down today, and I want you to

5  think about that. And when you hear the communications, ask

6  yourself if they're consistent with someone who's trying to

7  further a scheme to defraud.

8       Now, I get the opportunity and I want to take this

9  time to give you some information, some context about my

10  client and her -- how she operated at this company. Now,

11  you've heard some evidence about the challenges this company

12  faced as a start-up, and you'll hear more evidence that that

13  process was hard. And Ms. Agarwal and her colleagues worked

14  incredibly hard to build this business up.

15      Ms. Agarwal, as you heard, was one of the first

16  full-time employees for Outcome Health. We will anticipate

17  that you'll hear evidence that her employment with Outcome

18  Health started during her last year of college, and she jumped

19  into this business head first, fresh out of college.

20      And the evidence and witness testimony will show her

21  considerable contributions to this business. However, the

22  evidence we expect to be introduced at this trial will not

23  capture the full picture of Ms. Agarwal's roles and

24  responsibilities of this company, and I will try to provide

25  some context now.

1    The evidence will show that when Ms. Agarwal joined

2  the company, her title was director of marketing and media.

3  Ms. Agarwal held that title for two years.

4    Next in line we'll hear that in 2010, Ms. Agarwal's

5  title changed to chief marketing officer.  Another title she

6  would hold for two years.  In 2012, Ms. Agarwal was officially

7  named a co-founder of the business.  You'll hear that.  You'll

8  hear that that was not her title.  That was not how she was

9  recognized until this point.

10    At the same time, Ms. Agarwal gained the title of

11  chief strategy officer for the business, a title she would

12  hold for 12 -- for two years until becoming president in 2014

13  and the title she would hold throughout the course of the

14  events in this case.

15    Now, even with these title changes, we expect the

16  evidence to show that except for a one-year period from

17  July 2012 to 2013, Ms. Agarwal's areas of ownership for the

18  business did not change.  Now, obviously as you've heard, the

19  company grew, and it grew quite dramatically from 2013 to

20  2017.  The evidence will show that growth changed the

21  day-to-day activities Ms. Agarwal was personally involved in.

22    However, that growth you'll see from the evidence did

23  not change the area of the business where Ms. Agarwal's

24  attention was directed.  So what was her focus?

25    Here.  During her tenure at Outcome Health, these

1   were the areas of business that she was focused:  Marketing,

2   human resources, company culture, recruiting and hiring,

3   content, product, office buildouts.  I want to highlight a

4   couple of these for you.

5           Content.  You heard from the government, you also

6   heard from Mr. Hueston that the educational content that the

7   company provided was a critical part of its mission, and

8   you'll hear that that was a part of the business that was

9   central to Ms. Agarwal.

10          The other is product.  And these are tech companies,

11  this is new to me, but you'll hear that in a tech company,

12  product is also -- it's not just the screens and the devices.

13  It's also the software features that they deploy, and she

14  oversaw engineers.  It's that side of the house that she

15  worked on.

16          Now, I mentioned to you that finance and accounting

17  aren't on this list.  It's not areas of business that she was

18  ever in charge of.

19          Now, you'll hear that in this burgeoning business,

20  Ms. Agarwal, along with her colleagues, worked extremely long

21  hours, and she was dedicated to making the company successful.

22          Now, we also expect you to hear from ContextMedia

23  employees, customers, and investors, and we expect those

24  individuals to reference and talk to you about Ms. Agarwal's

25  mission-driven focus for this business, that the benefits that

1    the business delivered to patients and doctors was important

2    to her, more important than the revenue.

3            We also expect the evidence to show her focus on the

4    people side of the business.  I expect you to hear that every

5    employee who testifies in this case was personally interviewed

6    by Ms. Agarwal before they joined the business.  You may hear

7    that she actually participated in the onboarding and hiring

8    process for every employee throughout her tenure at Outcome

9    Health.

10           And when those employees talk about that process,

11   they'll talk to you about what her focus was during that

12   interview, what qualities she wanted, the culture that she was

13   trying to impart on that business, and what values were

14   important to her.

15           Now, when you hear from the former employees that

16   will testify in this case, I also expect you to hear them say

17   that she wasn't much involved in the commercial side of the

18   business.  Some of them may even tell you they don't know what

19   she did when they talked about people that worked on that side

20   of the house.

21           Now, you've heard that Outcome Health was a growing

22   business, start-up, and Ms. Agarwal, like the rest of her

23   colleagues, were learning on the fly.  She was fresh out of

24   school, her colleagues were fresh out of school, and they made

25   mistakes.  It's not a crime.  It's just the reality of anyone

1    who's trying to start a business.  It's difficult.

2         Now, in that environment, I expect you to hear that

3    Ms. Agarwal was focused on problem-solving, that her focus was

4    trying to get better and improve and move the business

5    forward; that she did not focus on complaining.  She didn't

6    ignore problems.  She met them head on, wanted to find a

7    solution, and deploy the resources necessary to fix it, and

8    you'll hear that during this trial.

9         Now, in that environment, decisions, choices that in

10    hindsight seem obvious were anything but in real time.  I

11    remind you I want you to consider what her perspective was in

12    real time as she's facing these challenges, as she's receiving

13    information about what the company is doing and should be

14    doing.

15         Now, one of the critical issues in this case is

16    intent.  We talked about it.  And at the end of the case,

17    you'll be asked to determine whether Ms. Agarwal operated with

18    the intent to defraud.  It's one of the elements of the

19    charges against her.  Ask if she had the intent to defraud

20    Outcome Health's customers, if she had the intent to defraud

21    Outcome Health lenders, if she had the intent to defraud

22    Outcome Health's investors.

23         Now, when you make that determination, I want you to

24    make it not with the benefit of hindsight as we sit here today

25    or the selective presentation of emails plucked out of

1   hundreds of thousands of emails that these folks sent over the

2   course of the years, but based on what you believe her

3   perspective was at the time that she was carrying out her

4   duties.

5      Now, in his opening statement, Mr. Hankey referred to

6   some of the time that Ms. Agarwal spent working with Outcome

7   Health's sales department and the department that dealt with

8   pharmaceutical sales called sponsorship sales, and you're

9   going to learn that Ms. Agarwal was pulled into that

10  department in July of 2012.

11     You'll see here in the first line:  Starting this

12  month, Shradha will be spending the majority of her time on

13  sponsorships through the end of 2013, and this was an email

14  that was sent to everyone at ContextMedia at the time, which

15  is probably about less than 20 people.  Prior to that, that

16  wasn't her area of responsibility.

17     But what you'll learn is one of the reasons that she

18  was pulled into this role was that she was in New York to open

19  up the New York office, but prior to that time, Outcome Health

20  was only in Chicago and she was there and she was filling a

21  need, which is common in burgeoning business.  People get

22  pulled outside of their other roles to help the business meet

23  its goals.

24     Now, when Ms. Agarwal jumped into sponsorship sales

25  in 2012, Outcome Health already had two experienced

opening - defendant Agarwal

1   salespeople.  The first, Steve Svec, joined in April of 2010

2   and the second salesperson, Bob Mons, joined in January 2012.

3   And we expect you to hear from both gentlemen during the

4   course of this trial.

5          Now, the evidence will show you that when Mr. Svec

6   joined, the company had less than 15 full-time employees, and

7   Mr. Svec joined the company with close to 20 years of

8   experience working in sales and marketing in the medical

9   field.

10         Now, Bob Mons, when he joined the company in

11  October 2012, he had spent six years at NBC as a director of

12  network sales with a focus of driving sales for client

13  pharmaceutical companies, and he spent another four years in

14  sales roles before joining ContextMedia in 2012.

15         Now, another name that you've heard about is Jason

16  Ketchum.  When Ms. Agarwal joined the sponsorship sales org or

17  jumped in to help, Jason Ketchum was already at the company.

18  He was working in membership services, but he was supporting

19  the sponsorship sales team.

20         Then you'll learn that Matthew Crandall, another

21  experienced salesperson, joined the company in October 2012

22  shortly after Ms. Agarwal jumped in to help.

23         Mr. Crandall is another person who came into the

24  business with almost 25 years of sales experience and at least

25  16 years of sales experience in the medical industry.

1            And lastly, a gentleman that you've heard a lot about

2    is Mr. Desai, Ashik Desai.  He joined Outcome -- Outcome

3    Health towards the middle of 2013, as Ms. Agarwal was rotating

4    off.  I want you to keep that in mind.

5            Now, one of the things about hiring experienced

6    salespeople and one of the operating functions for this

7    company of Outcome Health that you'll learn is that the

8    salespeople didn't have scripts, right?  They weren't told

9    what to tell their customers.

10           Now, in his opening statement, Mr. Hankey suggested

11   that Outcome Health's practice, business model of using

12   projections and forecasts was some kind of dark secret.  It's

13   just not so.

14           Here's an email from October 2011 from Mr. Svec,

15   first Outcome Health salesperson, discussing the term of

16   weighted average, and he writes:  Our weighted average of 1200

17   screens in 2012 should give us more than enough offices.

18           Here, in black and white.  An Outcome Health

19   salesperson was aware of the concept of weighted average and

20   communicated to the client.  I'll show you another example.

21           This is an email from Bob Mons in August of 2012,

22   copying Mr. Ketchum and Mr. Shah.  In it, he says:  J -- this

23   is to Mr. Ketchum -- can you pull together all incremental

24   Crestor sites.  I can show everything installed and in pipe

25   for October go live.

1          Now, ladies and gentlemen, as you hear evidence in

2     this case, I think you're going to hear that pipe, that

3     reference there, is their pipeline.  These are offices they

4     expect to come online, growth.  The concept that the

5     salespeople were familiar with.

6          Got one more example for you.   Again, Bob Mons,

7     April, 22nd, 2013, discussing Lyndon Chin, who is an agency

8     rep, says:  Hey, Lyndon, 400 will be a weighted average by

9     year end.

10          Again, growth.  Out of the mouth of an Outcome Health

11     salesperson to a customer.  No dark secret.  It was the

12     business model.  Salespeople were aware of it.

13          Now, Ms. Agarwal's time in sponsored sales was

14     relatively short lived, given her tenure at the company.

15     You'll see that in July 23rd, 2013, almost exactly a year

16     later, she rolls out, and she's no longer in the sponsorship

17     sales role, and she writes:  We've chatted about this over the

18     past few weeks, but RS will now be your first point of contact

19     as we transition back to what we each do best.

20          There it is.  In and out.

21          Now, the evidence in this case will show you that

22     once Ms. Agarwal stopped supporting the sponsorship sales

23     group, she ceased oversight over that part of the business.

24     She wasn't personally involved.

25          Now, you may see communications where she received

1    information about the performance of that area of the business

2    and others.  She's the president of the company.  She wouldn't

3    be doing her job if she didn't receive some information.  So I

4    want you to think about those communications when you see

5    those FYIs that are delivered to her and presented to you by

6    the government.

7           Is that evidence of somebody who is president of a

8    company receiving information in the course of business, or is

9    it something different?  I believe it's the former.

10           Now, you also learned that other than this brief

11    period in sponsorship sales, Ms. Agarwal had little oversight

12    over the commercial aspects of the business that were tainted

13    by the actions of Mr. Desai.  Now, even with that deception,

14    make no mistake, Outcome Health was a real business,

15    delivering real results to real patients, doctors, and

16    sponsors.

17           Now, as you've heard, certain employees have admitted

18    to knowingly and intentionally participating in a plan or

19    course of action to falsify information, and we'll talk about

20    them.

21           You heard two of them, Ashik Desai and David Ma, but

22    I'm going to give you two more names that you'll hear about

23    during the course of this trial.  You may not hear from them,

24    but you'll see their names.  The names are Kathryn Choi and

25    Oliver Han.  They are two of Mr. Desai's direct reports who

1   you'll see communications from where they deliberately and

2   knowingly falsified critical data for the company and kept it

3   within their own circle.  They were insiders in Mr. Desai's

4   conduct.

5          Now, as you've heard, Mr. Desai has admitted that he

6   kept a lot of his activities secret from Ms. Agarwal, Mr. Shah

7   and Mr. Purdy.

8          Now, one of the details that hasn't come up yet but I

9   want to raise with you as you think about how this company

10  operated is that Ms. Agarwal worked primarily from the Chicago

11  office, the main office for the business, but the sponsorship

12  sales office was in New York.  And so you can see here her

13  tenure, 2008 to 2017, primarily in Chicago.  That brief period

14  we talked about July 2012 to 2013 in New York.

15         Now, again, Ms. Agarwal's roles and responsibilities

16  post-2013.  Same list that I showed you before, just a

17  mark-out, no sales.  And that would continue until 2017.

18         Now, one of the things that's critically important

19  for you to consider as you listen to the evidence is that this

20  company was growing and trying to improve, and one of the

21  things that we expect you to hear as you listen to the

22  evidence and you see the communications, is that the company

23  invested in systems and processes.  Those investments are

24  wholly inconsistent with individuals who are trying to

25  perpetuate a fraud.

1           And those investments are important.  I want to talk

2       about them.  One is experienced executives, and you saw some

3       of the names, you heard them, you saw their pictures earlier

4       this morning.

5           You also had data science professionals.  Why would

6       you let them poke under your hood if you're trying to

7       perpetuate a fraud?  You'll learn that Ms. Agarwal was a

8       proponent of bringing these people into the business.  Same

9       with analysts in order to improve their ability to process and

10      have data accuracy.  You don't hire these folks if you're

11      trying to perpetuate a fraud.

12          Likewise, software engineers.  You'll learn that she

13      was behind bringing in software engineers into the business to

14      try and improve their systems, streamline it and give people

15      more access, not less, more access to the data on inventory

16      and performance.

17          I want to talk about the systems.  Inventory

18      management, critical function.  She was a proponent of

19      improving their systems around inventory management.  Same

20      thing with advertising delivery is another system that you

21      will learn that Ms. Agarwal pushed to improve that would have

22      exposed the conduct of Mr. Desai and, in fact, you'll learn

23      did.

24          The last that I'll talk about now is network health.

25      It's another process to show that devices were running in the

1   field and that they had access to them so they'd have
2   confidence that their representations to their customers were
3   accurate.

4           Now, you've heard their names before, but I think it
5   bears repeating.  When we talk about the experienced
6   executives, we're talking about Blake Chandlee came from
7   Facebook; Vivek Kundra came from Salesforce; Getty Atienza,
8   Bridgewater; and Madan Nagaldine, who worked at Amazon and
9   Facebook.  If you're trying to perpetuate a fraud, you don't
10  bring these people into your house and give them the mandate
11  to improve your business.

12          And that you'll hear from these folks that there were
13  no efforts by my client or anyone to limit what they did in
14  carrying out their job functions based on the charges they
15  were given when they were hired.

16          Some of the other folks that you'll hear about that
17  are part of this process are Brian Morgan, Adam Prowker and
18  Liane Pierce, some of the names you've already heard.  These
19  are some of the people that you will have heard started to
20  discover what Mr. Desai was doing and started to report on it.

21          Other folks that you may hear from are Bridget
22  O'Donnell, Ryan O'Donnell, Kristen Carlisle, Sahir Raoof, and
23  Nikhil Maitra, analysts who also reported on Mr. Desai's
24  misdeeds.

25          And what I expect you to see is that in late 2016,

1   rolling into 2017, these investments in people and process

2   started to bear fruit, and we'll talk about that in more

3   detail.

4           And the fruit of that was not only improved process

5   but also uncovering the fraud by Mr. Desai, Mr. Han, Ms. Choi

6   and Mr. Ma.

7           I want to talk to you briefly about the sponsorship

8   sales under Ashik Desai.

9           Again, Mr. Desai and sponsorship sales, primarily

10  from the New York office, and you've already heard a lot about

11  Mr. Desai, so I'm not going to go into great detail.

12          One of the things that the Court talked about in its

13  preliminary instructions was that there's certain witnesses

14  whose testimony you should consider with great care, and

15  you're going to hear from Mr. Desai during this case.  He is

16  one of those witnesses.

17          Now, Mr. Desai you already heard excluded Ms. Agarwal

18  from his efforts to falsify information.  He's admitted under

19  oath that he didn't share with Ms. Agarwal that he was

20  manipulating ROI information and providing other false

21  assurances in an attempt to deceive lenders, clients, and

22  investors of Outcome Health.

23          Now, a caution.  Mr. Desai has pled guilty for his

24  conduct.  You've heard that.  You'll hear him say it when he

25  testifies.  You'll also hear that he's agreed to cooperate

1   with the government.  He sat for countless interviews with the

2   government and has agreed to testify in this trial, all with

3   the hope of shaving time off a years-long sentence, off a

4   decades-long prison sentence that he faces for his actions.

5          Now, as I mentioned, Mr. Desai did not act alone.

6   These are his insiders, and you'll see communications

7   involving these people.  And when you see their

8   communications, I'm going to show you a few examples.  I want

9   you to compare those to the communications that you see with

10  my client.

11         The first is Oliver Han who's a sponsorship sales

12  analyst.  There's Kathryn Choi, she's a senior sponsorship

13  sales analyst, and there's David Ma, product analytics

14  manager.  I expect you to hear testimony from Mr. Ma during

15  the course of this case.

16         All three of these individuals reported to Mr. Desai.

17  Let's focus on Mr. Ma, and I'll show you a few examples of his

18  communications with Mr. Desai.

19         So this is May 28th, 2015, Mr. Ma writes, and I think

20  you've seen another message on the screen, he writes:  So we

21  can inflate impressions on our end in order to pump up total

22  clicks.

23         Brazen.  Ashik Desai, David Ma, the only members of

24  that chain.

25         Next example, June 30, 2014 in a text message, Ashik

1     Desai says:  Yeah I'd skew it up a bit as you know, so inflate
2     at your discretion as this is very arbitrary.
3            Mr. Ma responds:  What number would you be
4     comfortable with?
5            These are the communications of fraudsters.
6            I'll give you another example.
7            This is August 13th, 2014 communication between David
8     Ma to Ashik Desai.  And you see David ends his communication
9     to Ashik, says, I can inflate Victoza a bit more so they are
10    closer.
11           Again, openly discussing inflating and fabricating
12    key data for Outcome Health.
13           Now, you'll note Ms. Agarwal is nowhere to be found
14    on these communications, and I submit to you you're not going
15    to see any communications of this kind between David Ma and
16    Ashik Desai that involve Ms. Agarwal, nor will you see any
17    with Mr. Han or Ms. Choi.  Likewise, I don't expect you to
18    hear evidence or see any evidence of communications from
19    Ms. Agarwal to Mr. Desai, Mr. Han, Ms. Choi or Mr. Ma
20    directing them to inflate or withhold data.  It's just not
21    there.
22           Now, of this group of trusted insiders, one of them
23    will likely come and claim that Ms. Agarwal was aware of
24    wrongdoing.  And, again, Mr. Ma, you've heard this.  He's a
25    witness whose testimony you should listen to with great

1  caution.  He hasn't pled guilty, but he received immunity from

2  the government for his testimony.  Again, he's met with the

3  government, and he's testifying in this case under that

4  protection.

5      Now, an interesting thing about Mr. Ma that you'll

6  learn, that he left Outcome Health in 2015 and received

7  immunity from the government.  The government promised not to

8  prosecute him if he agreed to provide information.

9      Now, in his opening remarks, the government mentioned

10 these delta reports as a representation of under-delivery of

11 contracts.  You're going to get a chance to see some of these

12 results that were sent -- some of these reports, excuse me,

13 that were sent to my client.

14     I want you to look at those documents for yourself.

15 Pay attention to them.  Don't pay attention to the

16 characterization offered by Mr. Ma.  Look at the face of the

17 reports.

18     These so-called delta reports weren't reports on

19 contract shortfalls.  They were on categories in their growth

20 model.  Again, the projections that Mr. Hueston mentioned,

21 where they're trying to say we're trying to get to X, what do

22 we need to do to get there to grow our network?  Those are the

23 reports.  They don't mention contracts.

24     Now, another comment that's related to Mr. Ma that

25 came up in opening is smoke bomb.  Mr. Hankey didn't attribute

1    it to him, but Mr. Ma is the one who's going to say

2    Ms. Agarwal used the term.

3         If Mr. Ma re-asserts that allegation here in court, I

4    want you to listen carefully to him.  Listen for context.

5    Listen for the lack thereof.  Listen if he has any other

6    statement accompanying that or details or foundation that

7    suggest that that allegation is reliable.  I submit to you, it

8    won't be there.

9         I also want you to keep in mind what Mr. Ma has

10   participated in.  You've seen examples.  One's up on the

11   screen now.

12        Now, one detail I think we should know and we expect

13   you should hear about Mr. Ma is that he didn't raise any

14   concerns about his conduct or Mr. Desai's or anyone else's

15   while he was an employee at Outcome Health.  He didn't report

16   to HR.  He didn't report to legal.  He didn't report to

17   Ms. Agarwal.

18        What you're going to learn is that long after Mr. Ma

19   left the company, when there were benefits that he thought he

20   could get from the government, that's when he decided to come

21   forward.  He didn't come forward until the summer or fall of

22   2017.

23        And I submit to you that when he came forward, he was

24   not the one who broke the story; that the cracks in

25   Mr. Desai's scheme were already forming and apparent to the

1   outside world, and he tried to get ahead of it.

2   Now, because Mr. Desai and Mr. Ma were promised

3   benefits from the government, consider their testimony with

4   care.  You can give their testimony any weight that you choose

5   or no weight at all.

6   We talked about this, and I won't belabor it, it's

7   critical to the allegations against my client, the allegation

8   that he participated in a scheme to defraud with Mr. Desai

9   when Mr. Desai has admitted under oath that he kept his

10  actions a secret from Ms. Agarwal.  He didn't treat her like

11  an insider like he treated Ms. Choi, Mr. Han or Mr. Ma.

12  Now, not only did he keep his actions secret, just

13  like the communications you saw with Mr. Shah, he provided my

14  client with assurances that he was addressing the problems as

15  they came up, and this is just an example.

16  Here he's talking about new inventory and how to fill

17  it into the delta, so the gaps, to grow the inventory.  We're

18  distributing the MSE installs each month across these six

19  networks.  There it is.  Putting inventory to work, addressing

20  the problem.

21  Here's another communication.  This is Mr. Desai

22  writing, said:  Hi, team.  We have a solution here.  Lee and I

23  spoke.  You'll learn that the Lee in this message is a

24  gentleman that reported to Ms. Agarwal, not alleged to be a

25  co-schemer, and he was the head of engineering at the time.

1    Lee and I spoke today, and Walter will be getting it

2    done shortly.  We won't be automating scheduling yet, but will

3    be automating the data and analytics around what site and

4    device should get what when installed.

5    Remember I talked to you about systems and processes

6    to try and improve them?  Here it is.  He's responding to a

7    problem to Ms. Agarwal telling her that the investments that

8    the company was making, he was using them, trying to improve

9    them and moving forward.  He didn't say he was committing

10   fraud.  He didn't talk to her like some kind of insider that

11   we were caught.  Trying to address a problem.

12   And I want to play you a Voxer, and I'm going to play

13   you two seconds of it so you can hear his voice, hear him

14   identifying a problem, talking to my client, Ms. Agarwal, and

15   offering up solutions.

16   (Tape played in open court.)

17   MR. LOWDER:  Now, listen to that communication.  He

18   mentioned two names, Ryan Morgan, an analyst that he's working

19   with.  Talking about he was one of the analysts, one of the

20   data professionals that was brought in to help make the

21   company better.

22   Liane Pierce was hired specifically to improve

23   advertising and content of the company, and he's openly

24   talking with Ms. Agarwal about working with her to address a

25   problem.

1      You also heard him mention an audit.  If he was in a

2   fraud with Ms. Agarwal, would she want him to perform an

3   audit?  No.

4      I'm going to give you another segment of this same

5   communication.

6          (Tape played in open court.)

7          MR. LOWDER:  Again, hope you feel good about the

8   fixes and the solutions.  QA, QC.  Addressing problems.

9      Now, we'll learn that these assurances were false,

10  but these are the communications that Mr. Desai had with

11  Ms. Agarwal, not the same type that he had with Mr. Ma.

12     Now, the last communication you'll see here is

13  another assurance, and I won't belabor it, but, again,

14  problems come up, and Mr. Desai assures Ms. Agarwal it's being

15  addressed.

16     I want to focus here.  He's talking about David

17  Jundt, who you'll learn had raised concerns about Desai's

18  efforts to manipulate ROI reports.  And he said, you know, a

19  few months ago, since then, we've had team meetings led by

20  Adam, Adam Prowker, someone else hired to improve their

21  operations, on methodology for ROI process with marking

22  scientists and build confidence around program measurement

23  today and in the future.  SVPs even did one-on-ones with their

24  sales folks to make sure everyone felt comfortable and

25  confident.

1    Not making the circle smaller.  He's suggesting
2    Ms. Agarwal was making it bigger.  If she believed she was in
3    a fraud scheme with him, why would they need to have this
4    communication?
5         Now, another critical thing is that Desai admitted
6    that he destroyed evidence when news broke about his actions,
7    and this act of destruction deserves your attention.
8         You'll learn that Mr. Desai and his subordinates
9    frequently used text messages to talk about their efforts to
10   falsify and fabricate data, so his efforts to destroy that
11   evidence or hide his wrongdoing should grab your attention.
12   And I showed you one example of text messages between
13   Mr. Desai and Mr. Ma.
14        Now, in contrast, you'll see in this case hundreds of
15   communications involving my client.  I talked to you about the
16   fact that electronic communications were ubiquitous.  You're
17   going to have emails, text messages, Voxers, chats, all
18   preserved that are available in this case.  She didn't delete
19   a single one, even when the stuff hit the fan.
20        Now, as I wrap up here, I want to talk to you about
21   the turn when things kind of fell apart or you can say when
22   the investments that my client and Mr. Shah and Mr. Purdy
23   pushed for started to bear fruit and gave them evidence and
24   exposed what Mr. Desai was doing.
25        Now, you're going to hear about increasing concerns

1   from employees and others about Mr. Desai's actions, and as

2   you're presented with the complaints regarding Mr. Desai's

3   behavior, consider what complaints actually made their way to

4   Ms. Agarwal.  Think about how the complaints were presented to

5   her and think about her response.

6           Now, as you think about her response on the charges

7   here, think about her responses and do they reflect the state

8   of mind of someone who believed they were in a years-long

9   fraud scheme to defraud that included Mr. Desai?  A years-long

10  scheme that included Outcome Health's pharmaceutical

11  customers, that targeted its lenders, targeted its investors.

12  Think about if those communications that you hear from

13  Ms. Agarwal and her response to the complaints consistent with

14  these charges.

15          Now, before I sit down, I want to play a recording

16  for you.  I promised I would at the beginning.  The recording

17  I want to play for you is one of the communications the

18  government has charged in this series.  It's actually the

19  January 23, 2017 communication the government alleges is in

20  furtherance of the scheme to defraud.  It's a recording of my

21  client, and I want you to listen to it.

22          (Tape played in open court.)

23          MR. LOWDER:  Think about that, that last statement.

24  Give Sameer -- you've heard about Sameer Kazi -- the mandate

25  to show us fully transparent inventory.  He's an outsider.

1    Transparency.  Is that consistent with furthering a scheme to
2    defraud?  I suggest it is not.

3           Now, that communication is just one of five on that
4    same topic, and you heard from my client, you heard her state
5    of mind, her response to the concerns that were raised by
6    Mr. Kazi.  And as you hear that evidence and the other
7    communications surrounding that event, I want you to really
8    think hard about whether or not that's consistent in
9    furtherance of a scheme to defraud, or is it consistent with
10   an executive who is responding to a crisis and trying to find
11   the best way forward.  I suggest to you it's the latter.

12          Now, my client's response won't be the only one that
13   you'll hear.  There are other executives at the company who
14   are also responding to this event.  I want you to listen to
15   them, listen to their voices, listen to their communications,
16   read their communications, and see how they respond and
17   compare it.

18          Now, at the beginning, I mentioned mistakes, that
19   Ms. Agarwal likely made them.  I also mentioned decisions that
20   someone may make differently with the benefit of hindsight.
21   With the benefit of hindsight, you all may believe that
22   Ms. Agarwal made mistakes or that she failed as a manager.
23   This case, again, is not concerned with whether Ms. Agarwal
24   made a mistakes as a manager.

25          The government must prove that Ms. Agarwal, acting

1    with the intent to defraud, was a knowing participant in the

2    scheme alleged in the indictment.  That she failed to discover

3    a fraud committed by a trusted colleague is not fraud.  If at

4    the end of the day you're left with reasonable doubt about

5    whether Ms. Agarwal acted in good faith to do her job, even

6    when she got it wrong, that is a complete defense to the

7    charges, and you must find her not guilty.

8           Now, once you step away from the perspective the

9    government proposes, you don't see this.  You see this.

10          Now, at the end of this trial, my colleagues and I

11   will ask you to find my client, Ms. Agarwal, not guilty of all

12   charges.

13          Thank you for your time and attention.

14          THE COURT:  All right.  Thank you, Mr. Lowder.

15          Mr. Poulos, do you want a short break to set up, or

16   are you ready to start?

17          MR. POULOS:  I need to move the podium, but other

18   than that.

19          THE COURT:  Oh, that doesn't take long, so go ahead.

20   We're a little early for our afternoon break.

21          You can all stand up and stretch, ladies and

22   gentlemen, if you want, while Mr. Poulos gets ready.

23          MR. POULOS:  Judge, can we have a five-minute break?

24          THE COURT:  All right.  Let's take a five-minute

25   break.  Don't discuss the case among yourselves or with anyone

1    else.  This will give a chance to change the electronics so we

2    don't have any interruptions.  So we'll see you.  This won't

3    be the full afternoon break, but it will be a short one.

4         COURT SECURITY OFFICER:  All rise.

5       (Jury exits courtroom.)

6         THE COURT:  We'll take about five minutes.  Anything

7    we need to discuss?

8         MR. MADDEN:  No, Your Honor.

9         THE COURT:  Okay.  We'll take the afternoon break

10   after Mr. Poulos, and then be prepared to put on your first

11   witness after that.

12        MR. APPLEBY-BHATTACHARJEE:  Yes, Your Honor.

13        THE COURT:  And we won't break after Mr. Poulos.

14   We'll go right into the witness -- or, no, I guess not.  We'll

15   take our break.  Depends on the time, but we'll take it then

16   and go from there.  Thank you.

17      (Brief recess.)

18        COURT SECURITY OFFICER:  All rise.

19      (Jury enters courtroom.)

20        THE COURT:  All right.  Please be seated.

21        All right.  Mr. Poulos, you may proceed.

22       OPENING STATEMENT ON BEHALF OF DEFENDANT PURDY

23        MR. POULOS:  May it please the Court.

24        Ladies and gentlemen, Brad Purdy is not guilty of

25   these charges.  He didn't knowingly and intentionally

1  participate in any scheme to defraud.  He didn't intend to

2  defraud any client, advertising client, of Outcome Health.  He

3  didn't intend to defraud any lender.  He did not intend to

4  defraud any investor.

5          He is not guilty of the charges the government

6  brought here, and I'm confident that at the end of the case,

7  that's exactly what you will conclude as well.

8          This is a -- a good-news-and-bad-news situation

9  because the bad news for you is you have to hear from another

10  lawyer this afternoon and it's after lunch.  The good news is

11  I'm the last one you'll hear from, okay?  But I know it's

12  after lunch, and I hope you'll bear with me.

13          I do want you to know that I've kind of struggled

14  with putting this opening statement together for Brad.  It's

15  been something of a challenge because I know I'm going fourth,

16  and I'm trying to figure out -- I've been trying to figure out

17  how to balance, you know, what's the right amount of

18  information that we could present to you, that I can present

19  to you now after you've been presented a lot of information.

20          So, you know, how much information is too much, and

21  how much information do I think you really need to get here so

22  that you have a good foundation on which to understand and

23  assess the evidence as it's coming in to you because it comes

24  in piecemeal one exhibit, one witness at a time.

25          It really is a challenge because this is a

1   complicated case.  14 weeks.  It's going to be a ton of

2   exhibits, a ton of emails.  Some of these emails, long chains

3   of emails.  Dozens of witnesses.  The evidence in this case is

4   going to cover literally hundreds and hundreds of events

5   occurring over a several-year period at a complicated business

6   that was growing by leaps and bounds.

7           Mr. Hueston showed you that chart of inventory.

8   Outcome Health was rocketing in its business, in this

9   industry, especially in 2015 and 2016.

10          Some of the issues that are at play here are complex

11  issues.  They are.  You know, issues relating to audits and

12  accounting principles.  You know, I think you're going to hear

13  terms like GAAP compliant revenue recognition.  You're going

14  to get the pleasure of learning about that as I've had to.

15          Another reason the case is complicated, I think, and

16  as lawyers, you know, what we want to do is just present you,

17  do our best to present to you here's what actually happened,

18  okay?  And to present that to you in the context of a trial

19  where these fine folks are presenting one side of the story,

20  and I'm presenting part of a story, Mr. Hueston's presenting a

21  story, Ms. Agarwal's lawyers are presenting another part of

22  the story.  It's the adversary system.

23          So there are all these events and this complicated

24  business that grew by leaps and bounds.  And the point I'm

25  trying to get to is these issues and events that you're going

1    to hear about were occurring on an ever-changing and evolving

2    playing field.  They're going to present some evidence

3    tomorrow probably, about list match, how is a list match done

4    in 2012, when there were 20 employees there.  And then they're

5    going to argue to you that the way it was done in 2012 was

6    done the exact same way when there were 500 people at this

7    company.

8         So it's complicated because it was evolving, and it's

9    complicated because we're going to try to show you the context

10   that Mr. Hueston did talk about of trying to keep in mind

11   where we are in the timeline of events, where are we in the

12   history of the company?  Who was in charge of what and when

13   and how did that evolve and change?

14        This company, as Mr. Hueston put on that screen, went

15   from about I think it was 8,000 screens thereabout, it was

16   less than 10,000 screens on December 31st of 2014, okay?  Less

17   than 10,000.  I think it was 8,000.

18        Two years later on December 31st of 2016, there were

19   about 100,000 screens.  In the span of 24 months, Outcome

20   Health installed ten times more screens than they had.  That's

21   a big deal.  This company became the big deal.

22        And, you know, despite the charges here, what these

23   kids did is remarkable.  Now, I use the term "kids."  I mean

24   no disrespect to Mr. Shah or Ms. Agarwal or my client Brad

25   Purdy; but when you're representing clients who are as old as

1    your own kids, it's easy to get there, okay, and maybe to

2    understand the challenges that these young kids had as they

3    were growing this great company and dealing with who, some ma

4    and pa down the street?  They were dealing with Goldman Sachs,

5    Google, the Pritzker Foundation Group, Pfizer.  You know, they

6    were dealing with the masters of the universe.  That's what

7    they were doing as young, young, relatively inexperienced

8    entrepreneurs.

9           Keep this in mind as you hear this evidence about

10   2012 and 2013 with 20 employees and Jason Ketchum doing

11   whatever the heck he was doing.  What was happening at Outcome

12   Health in 2012 and 2013 has nothing to do with what was

13   happening at Outcome Health in December of '16, in January of

14   '17, when they were dealing with audits, and these huge

15   investment firms were salivating over themselves to invest in

16   this company, get a chunk of this amazing company because, as

17   Mr. Hueston said, those hundred thousand screens were real.

18          And you know what?  On January 1st of 2017, that --

19   those hundred thousand screens, they went to 120, 120,000

20   screens in one day because they acquired the main competitor

21   in this industry.  120,000 screens now.

22          So in that kind of context with this kind of

23   tremendous and amazing growth and this kind of company, 25

24   employees.  Mr. Hueston said 500.  I think there's some

25   indication that by early 2017, it was 600 employees.  Imagine

1  cobbling together that organization.  This guy gets hired.  We

2  got this new division.  We've got this going on.  Why?

3  Because of that explosive, amazing growth.  New departments,

4  new VPs, new managers, everybody coming -- all sorts of new

5  technology.  All sorts of data systems were constantly being

6  employed.  Why?  Because they were trying to get their arms

7  around this beast.  It was bursting at the seams, trying to

8  organize the data, put better systems in place.

9         That's what was happening.  So I'm going to go on

10  here for a little bit, but I hope that by the time I sit down,

11  I will have struck the right balance here, okay, and I hope

12  that you all will appreciate a few more details.

13         What I'm going to do is kind of touch on some of the

14  big-picture items here, okay?  And then I'm going to tell you

15  a little bit about Brad and his role in the company, and then

16  I'm going to talk to you on some of the really key issues and

17  events through the prism of the growth of this company, okay?

18  I hope you'll bear with me.

19         So big picture and bottom line, of course, is this:

20  The evidence will not support a finding that Brad Purdy is

21  guilty of any one of these charges beyond a reasonable doubt.

22  That, of course, is the biggest picture of them all.  He

23  didn't knowingly and intentionally participate in any scheme,

24  and he didn't intend to defraud anything -- anyone.  He didn't

25  do any of those things.  You will see ample evidence of Brad

1  Purdy acting in good faith throughout his tenure at Outcome
2  Health.

3         What does that mean?  What do I mean by good faith?
4  He didn't lie.  Brad Purdy did not lie to a single client at
5  Outcome Health.  In fact, you know, I have respect for
6  Mr. Hankey, but he painted with, you know, a pretty broad
7  brush this morning.  How many times did he say the defendants
8  did this, the defendants did this.  He said the defendants
9  lied to the pharmaceutical clients.

10        Brad Purdy, ladies and gentlemen, the evidence is
11 going to show didn't deal with the pharmaceutical clients.  He
12 wasn't in sales.  He didn't make any representations about
13 contract delivery and their devices.  He didn't.

14        He didn't lie to any investors or any bank.  He did
15 not.  Now, information when he becomes CFO, information that
16 went to the investors and banks, was not on the total up and
17 up because of what Ashik Desai did, but Brad Purdy didn't know
18 that Desai had cooked up those books.  Brad Purdy didn't know.

19        Mr. Hankey told you, he didn't know how he had cooked
20 up the ROI reports.  He lied to Brad Purdy about that.  So,
21 look, we're not here telling you -- we're all admitting here,
22 we're all acknowledged, there's no dispute among the parties a
23 fraud was committed.  It was Ashik Desai's fraud.

24        Let me give you one example of Brad's good faith,
25 evidence of his good faith.  I'm going to come to this again,

Case: 1:19-cr-00864 Document #: 582 Filed: 11/29/23 Page 165 of 245 PageID #:12719
opening - defendant Purdy
165

1    but feel free to make the note that it was March of 2015.
2    That is when Brad Purdy became the CFO of Outcome Health.  He
3    was 25 years old.  A few months away from his 26th birthday,
4    he became the CFO.

5          He has no accounting -- he's not an accountant.  He's
6    not a CPA.  He had no accounting experience.  But Brad's
7    smart, he's industrious, and he was learning on the fly and in
8    this rapidly growing company, okay, where the government
9    claims that Brad Purdy was part of some scheme to cheat the
10   pharmaceutical industry, well, guess what Brad Purdy did.
11   Guess what Brad Purdy did when he became the CFO.

12         He hired top talent, outsiders, experienced
13   professionals to come in, brand new people, and manage the
14   accounting department.

15         He brought in a number of different professionals.
16   And what did he have these professionals do in a case where
17   the allegation is that he was part of a scheme to cheat these
18   clients and under-deliver on contract performance?  What did
19   he do?  Here's what you're going to learn.

20         These new professionals that came in, because they
21   were getting better and better, the new professionals that
22   come into the accounting department, they began implementing
23   systems to specifically track the contractual requirements of
24   Outcome Health.

25         They also began to make sure the accounting

1  department was interacting with the sales guys, the Desai

2  group, the Ashik Desai group, to make sure, as best they

3  could, that they're properly accounting for contract

4  performance in their financial records.  That's good faith.

5  That shows good faith.

6        Those kind of systems were entirely lacking under the

7  prior CFO.  So big improvements were made, and things

8  continuously improved.  I mentioned good faith a number of

9  times because, Mr. Lowder said it, too, good faith is a

10 complete defense to all the charges in this case because good

11 faith, people operating in good faith, that's the opposite,

12 opposite, of an intent to defraud.

13        See, they don't allow me to work the remote at the

14 house, but I think I can do this.

15        We focused on this a little bit.  This is critical,

16 okay?  This is really at the heart of the case.  You're going

17 to get a bunch of instructions.  They are all important, they

18 really are, but for me and Brad Purdy, this is the critical

19 one, the definition of intent to defraud.

20        A person acts with intent to defraud if he or she

21 knowingly and with the intent to deceive or cheat the alleged

22 victim in order to gain -- in order to cause a gain of money

23 or property to the defendant or someone else or another or the

24 actual or potential loss of money or property to another.

25        The key words there are "knowingly" and "intent,"

1    intent to defraud.

2           So that's what the case is about.  When we talk about

3    intent and knowing, we're talking about state of mind.  We

4    really are talking about what is in somebody's head.  What was

5    he thinking?  What did he know?  What did he know?

6           More importantly in my view as part of this case is

7    really going to boil down to what did Brad Purdy not know?

8    What had he been told, what had he been told, and what had

9    been kept from him.  So the question, the evidence as to those

10   questions reveal his state of mind and his knowledge and

11   intent, and I believe they will show a total lack of knowledge

12   on critical facts and a lack of an intent to defraud.

13          So big picture again, this is the key question that

14   you'll have to decide.  The question you will be asked to

15   decide for Brad Purdy is whether the government has proven

16   beyond a reasonable doubt that Brad Purdy specifically

17   intended to defraud Outcome's clients, the lenders, and

18   investors, okay?  Big picture, basic claim.  Can they prove

19   beyond a reasonable doubt that Brad Purdy had that kind of

20   intent to cheat and deceive?

21          As we sat through that jury selection process, you

22   heard His Honor, Judge Durkin, mention it a bunch, right?

23   Beyond a reasonable doubt.  Are you okay with that?  Do you

24   accept, do you agree with the presumption of innocence and the

25   requirement of proof beyond a reasonable doubt, that that is

1    their burden?  And, of course, you've all passed that test,

2    and, of course, we appreciate that.  And you've taken an oath

3    to follow that law and hold the government to that requirement

4    because, ladies and gentlemen, it is, of course, the linchpin,

5    the very foundation of the American system of criminal

6    justice.  It is sacred in the law.

7        It's the highest burden of proof in the law because,

8    as Mr. Hueston's told you, liberty is at stake here.  And at

9    the end of the trial, I'm confident you will find reasonable

10   doubts, all sorts of reasonable doubts.  Reasonable doubts

11   will pervade this case because Brad Purdy, the evidence will

12   show, acted in good faith based on the information that he had

13   at the time, based on often limited information.

14       You'll learn here that certain information that would

15   have exposed the fraudulent conduct was kept from Brad Purdy

16   and intentionally so.  The intentional concealment of that

17   type of information will be more reasonable doubt.

18       So it is important, and I ask you to throughout this

19   trial try to keep straight involving three defendants, what

20   was everyone involved in?  What was Brad Purdy actually

21   involved in, and what was he not involved in?

22       You're going to see that as part of some of the most

23   critical parts of the government's case, Brad Purdy wasn't

24   involved.  He wasn't involved in a number of what I believe

25   are going to be important critical meetings, key discussions.

1  He's not on some of the most significant emails.  So he

2  definitely did not have all the facts, but he did his best to

3  keep up.

4         But it was in this context of this constantly

5  evolving monster of a company that's bursting at the seams,

6  trying to get your arms around it, that Brad didn't realize,

7  didn't know, quite frankly, didn't even suspect what Ashik

8  Desai and his co-schemers, these other kids that worked for

9  Ashik, what they were doing.

10        The evidence is going to show this, and it really

11 does relate to these individuals.  David Ma, he's going to be

12 a witness in this case.  David Ma, Kathryn Choi, and Oliver

13 Han.  Ma was the first of these young analysts, but the

14 evidence is going to show this, Ashik Desai corrupted.  He

15 corrupted a number of young, very bright and eager data

16 analysts.  Ma was the first.  And then Ma trained and taught

17 with Ashik Desai and brought Kathryn Choi and Oliver Han into

18 the fraudulent conduct.

19        Together they concealed information.  They produced

20 false and fraudulent data, but you will see emails throughout

21 this case of that group in various combinations, Desai, Ma,

22 Choi, Han blatantly, blatantly talking about how they are

23 simply going to lie, what lies they are going to tell.  What

24 lies, most importantly for me and Brad Purdy, what lies

25 they're going to tell to Brad and the accounting team in the

1    middle of Deloitte's audits.

2          They're talking about it.  You're going to see it.

3    We're going to introduce those.  Brad is not on any of those

4    emails.  He's just -- he isn't.  That's how you know it was

5    intentionally concealed.  He never saw those emails because he

6    wasn't a member of that scheme.

7          And it's not just that things were concealed from

8    him.  He was affirmatively lied to, okay?  Brad was lied to

9    repeatedly.  Brad and his team of accountants, especially in

10   connection with the audit, you know, Deloitte would say, hey,

11   accounting team, because that's who they dealt with, we need

12   these data, we need delivery reports, we need ROI reports, we

13   need this information so that we can conduct our audit and

14   make sure your financial records and your revenue recognition

15   is legit.

16         And the accountant -- this wasn't really Brad, the

17   accountants, I'll get to them in a minute, they would send

18   these emails to Ashik Desai and his team and say where are we

19   here?  Give us the information and the data.  And then you'll

20   see these people cooking up and discussing what lies they're

21   going to tell.

22         If Brad was a knowing and intentional member of that

23   scheme, why are they lying to Brad as well?  Why are they

24   keeping critical information from them?

25         Good faith?  Brad, you will see, often asks the right

1  questions, often asks for the right information, and he didn't

2  get it, and, of course, he didn't know it at the time.

3        But it turns out that what happened to this company,

4  you know, where things really fell through the cracks and

5  maybe you could even say fell off a cliff, it wasn't just

6  Ashik Desai and the fraud that he was committing.  It was

7  other people.  There were other managers who failed to do what

8  I think all of us would expect they would have done, should

9  have done.  New managers, okay?  New people that had been

10 brought in.  Liane Pierce, you haven't already written that

11 name down, please I suggest you do so.  Liane Pierce is going

12 to be pretty critical to this case because Liane Pierce was

13 hired in 2016 to do this in a case involving intentional

14 fraudulent under-delivery of contracts.

15        She was hired and given the job, the title position

16 of something they called client success.  It is your job,

17 Ms. Pierce, and you'll see she had experience in the industry,

18 in the ad industry.  It is your job, Ms. Pierce, to track all

19 the contractual obligations and make sure that they are being

20 fulfilled.  Liane Pierce, you make sure that the contracts are

21 being fulfilled.

22        Now, I'm not telling you she walked into the job and

23 on day one like had her arms around it.  I told you.  This was

24 a complicated beast.  But she worked on it, and I think she

25 did so -- I think the evidence is going to show she did that

1   in good faith.

2          And then she was hired at the exact same time roughly

3   that they hired yet another accounting manager, an experienced

4   guy, and these two were assigned together.  Adam Nixon is his

5   name, okay?  Adam Nixon and Liane Pierce, accounting and

6   contract delivery, you guys talk to each other, figure out the

7   systems for tracking this.

8          And I'm going to try to introduce some evidence to

9   you and documents showing that it was a frustrating thing.

10  One arm didn't know what they were doing.  You know why?

11  Because they needed to improve their systems.  Sales reps are

12  out there, selling, entering contracts, putting data into this

13  software thing you're going to hear about called Salesforce,

14  and you know what they're putting in?  There wasn't enough,

15  what do you call it, regimentation?  They were putting in

16  data, and they see the data, and there wasn't a consistent

17  methodology.  So Liane Pierce was working on it in good faith,

18  and I think, you know, did a pretty good job with that.

19         Now, I bring up Liane Pierce right now when I say

20  managers that didn't do their job.  She was trying to do that

21  job, but this ties into something else that Mr. Hankey said

22  this morning.  He said that Sameer Kazi, who was hired to be

23  the COO of the entire arm of the business that handles

24  contracts and delivery and that, okay, the area that was the

25  most critical part, really what we're really going to be

1   talking about in this case.

2          Sameer Kazi comes in in January, and he was gone, I

3   don't know, about three weeks, right?  I think you heard

4   Mr. Hankey said that Kazi strolls into Outcome Health and

5   discovered the fraud just in a matter of a couple weeks.  Like

6   he walked into the break room, opened the fridge, and the

7   fraud jumped out at him.

8          That's not true at all.  Sameer Kazi did not discover

9   the fraud.  He learned of the fraud.  He was told of the

10  fraud.  By who?  By Liane Pierce and Adam Prowker.  They had

11  seen certain issues and problems.

12         Pierce, I think, discovered that Desai and his

13  analysts were lying to the auditors, cooking up the records,

14  okay?  And Kazi comes in, he's an outsider, and they meet with

15  him, and they raise all these concerns.

16         Pierce in January of 2017 in the middle of the big

17  audit that Deloitte is doing, that these banks and these

18  investors who came up with 5 -- you know, $487 million to buy

19  a piece of this company, the big audit that Deloitte's doing

20  right in January of '17, that's when Pierce tells Kazi about

21  what's going on.

22         And Pierce and Prowker send an email to Kazi with

23  specific information and examples.  Hey, here's what's in this

24  contract, yet here's what the report was to Deloitte.  Here's

25  what the report was to Deloitte.

1          Prowker sends another email because Prowker had taken

2    over ROI.  I'm going to talk about this a little bit.  But

3    Prowker had also presented to Kazi some data saying we know

4    that at least on these two contracts, Desai, or somebody,

5    cooked up the ROI reports.  There wasn't a 3-to-1 return or

6    whatever it was.  He lied.  Here's fraudulent ROI reports, and

7    they give them to Mr. Kazi.

8          And you're going to hear about a conversation that

9    Mr. Kazi had with Mr. Shah, okay, and Mr. Hueston correctly

10   noted and pointed out that seems like at the end of that

11   meeting, things were friendly.  Hey, maybe we can consult

12   together again.

13         I don't know what happened there really between

14   Pierce and Kazi.  I know the emails that he got.  But

15   Mr. Hueston is exactly right.  Kazi didn't press one button,

16   okay?  You guys all -- we all know this in this day and age,

17   one button forwards that thing to Brad, it would forward it to

18   the accountants, it would forward it to Deloitte, and he

19   didn't do that.  So, listen, he was only there for three

20   weeks, okay?

21         But ladies and gentlemen, here's what you're going to

22   learn here:  Liane Pierce and Adam Prowker, especially Liane

23   Pierce, they were on all sorts of emails leading up to that,

24   and after that with the accountant saying Liane, Adam, we need

25   this information for Deloitte for the big audit, and they had

1   information that Desai had lied and they only give it to Kazi.

2   They didn't give it to the head accounting manager, the

3   controller of the company, where all's they had to do was

4   press one button.

5          So that's what I'm talking about.  And, you know,

6   I've kind of gotten away from my notes here, but that's what

7   I'm talking about when I say that Ashik and these three young

8   analysts were lying about a lot of things and creating all

9   sorts of false data and reports, but other managers just

10  didn't do their job.

11         It would have revealed the fraud.  It would have

12  ended it.  The investors wouldn't have invested, or maybe they

13  would have said, okay, let's look at that.  Oh, the expert

14  says it's still a hundred-million-dollar company, not a

15  hundred 30 million for 2016.  Who knows what would have

16  happened?

17         But Liane Pierce was in direct communication with the

18  auditors and then didn't do the simplest thing, to disclose it

19  to Brad, the CFO, or anybody else.

20         So that's why I say, you know, if the managers had

21  just done I would say that's part of doing their job, when

22  you're head of client success.  What's more, a few weeks after

23  writing an email to Kazi saying that they're lying to

24  Deloitte, she signed one of these sub certifications for the

25  accountant saying I'm not aware of any fraud.

Case: 1:19-cr-00864 Document #: 582 Filed: 11/29/23 Page 176 of 245 PageID #:12730
opening - defendant Purdy
176

1          Did Brad rely on that?  Pierce never told him this

2   stuff.  The head of client success and inventory certifies no

3   fraud.

4          Did Brad rely on that?  Did other people rely on

5   that?  Of course.  That's the system.

6          People didn't do their job, Desai lied, and now we

7   have this fine young man sitting in this courtroom full of

8   fear and worry, when all's he did was try to do his job and do

9   it right and in good faith.

10         Now, I'm not sitting here telling you 25-year-old,

11  26-year-old Brad Purdy was -- you know, made no mistakes.  He

12  tried his best, and you're going to see that during this

13  trial.

14         Who else did Brad Purdy rely on?  He relied on

15  Deloitte itself.  He relied on Deloitte itself.  And I'm going

16  to get into this a little bit.  You'll hear about some of the

17  mistakes that Deloitte made and that the accounting

18  professionals made.

19         And ladies and gentlemen, he relied on, guess what,

20  lawyers.  He relied on the in-house counsel at Outcome Health

21  who also worked with, Mr. Hueston put it up on the screen,

22  Greenberg Traurig, one of the most prestigious law firms in

23  this city, maybe even the country.

24         That's who Collin Williams worked with because that's

25  where he came from.  He had colleagues over there.  So how did

1    Brad rely on lawyers?

2            Mr. Hueston did touch on it, and you've heard about,

3    oh, people were starting to make allegations and this and

4    that.  I think you'll come to see that a lot of the things

5    that the government were referring about is stuff that I think

6    a top executive would consider to be, you know, somewhat

7    gossipy, okay, especially involving Desai and these analysts

8    who, by the way, were in New York.  There was the New York

9    office.  They weren't here in Chicago where Brad worked.

10           So let me just tell you about this.

11           Hey, I think I got a slide on this, the lawyers and

12   Sean Bogdany's allegations.

13           Sean Bogdany worked in sales out of New York.  He had

14   a big account, Bristol Myers Squibb.  Pretty big.  And

15   Bogdany, kind of out of the blue, hired -- you know, has a

16   lawyer of his write a formal letter to Collin Williams.

17           Collin Williams was the in-house lawyer at Outcome

18   Health.  He worked at Greenberg Traurig, this prestigious law

19   firm.  He writes a letter to the corporate counsel, making

20   formal specific allegations of fraudulent conduct.

21           Now, I think the way it turns out is the allegations

22   of fraudulent conduct, knowing what we know now, you know, it

23   alleged basically what the government's alleging here in many

24   ways.  But Collin Williams, an experienced lawyer, you know.

25   He wasn't right out of law school.  He was well into his 40s,

1     and he brings in a great lawyer from Greenberg Traurig.  They

2     tell Brad, Brad's in writing, he's on emails where they tell

3     Brad they're going to investigate the allegations, and they

4     did.

5               And so when you're investigating these kind of

6     allegations, who do you talk to?  You know who the lawyers

7     talk to?  They talked to Jeff Kabat.  Mr. Hueston touched on

8     him.  He was the immediate supervisor, a VP, a senior VP in

9     sales.

10              They talked to Ashik Desai because he was in charge

11    of sales.  And who else did they talk to?  They talked to

12    Liane Pierce.  And after that, after those discussions and

13    that investigation, Mr. Hueston put some of it, so I'm not

14    going to belabor the point, but Brad received those because

15    the CFO, the general -- the in-house corporate counsel

16    reported to Brad.  Brad's on these documents.  He saw the

17    drafting that was going on.

18              And these lawyers, after doing that investigation,

19    unequivocally, unequivocally told Brad Purdy that these

20    allegations are bogus.  They're false.  In fact, they are

21    defamatory.  They used the term extortion.  This guy's just

22    trying to extort the company by coming up with these bogus

23    allegations.

24              And they also told him that the lawyers had

25    discovered that Sean Bogdany had done the exact same thing at

Case: 1:19-cr-00864 Document #: 582 Filed: 11/29/23 Page 179 of 245 PageID #:12733
opening - defendant Purdy
179

1   his prior employer with the exact same lawyer.  So believe me,

2   you get that kind of in-writing, affirmative,

3   no-doubt-about-it -- oh, and by the way, the letter after

4   talking to Kabat and after talking to Pierce and after talking

5   to Desai himself, the letter also told Brad that about these

6   growth contracts.  We sell on projection and we try to satisfy

7   them on a weighted average approach and we grow into them, and

8   the lawyers in writing said after their investigation, they

9   had determined that that is done with the full knowledge of

10  the clients.  That's what the lawyers said, okay?

11         Brad relied on the lower-level analysts.  He relied

12  on other new managers.  He relied on Deloitte.  He relied on

13  the accountants.  He relied on lawyers.  Did I already say

14  them?  He relied on Ashik Desai.

15         And Ashik Desai, you know, let down everybody

16  obviously.  He didn't do right.  Well, the clients didn't --

17  some clients didn't get accurate information because of Desai.

18  Neither did Brad.  The lenders didn't get accurate information

19  because of Desai.  Neither did Brad.

20         The biggest mistake Brad ever made, of course, was

21  believing that Ashik Desai, this golden child, this precocious

22  genius, I mean, he graduates Northwestern University at the

23  age of 20, starts at this company, was going to go to med

24  school.  He was a star.  And I don't think anybody saw Ashik,

25  at least Brad didn't, don't think these people did, this

1  award-winning guy, a super star in the business, a star in the

2  Chicago community.  The biggest mistake Brad ever made was

3  thinking that that kid was a person of integrity.  He wasn't.

4  He told lie after lie after lie, and that's why Brad's in this

5  courtroom.

6          I'm going to tell you one more thing.  Ashik Desai's

7  lies continue to this very day.  You're going to hear some

8  lies from Ashik Desai on that witness stand.  I'm going to do

9  my best to expose them.

10          When Judge Durkin reads that instruction:  Caution

11 and great care.  That's a unique instruction.  That's not for

12 every witness.  For witnesses like Desai, who is looking at, I

13 don't know how many years, 20, 30, for what he did here, and

14 he cut a deal, of course.  And so when you're at that level,

15 the only kind of deal you're going to get is if you implicate

16 the other members of the senior executive team, okay?  They're

17 not going to give him a bunch of time off of his deal or

18 recommend a bunch of time off his deal for implicating some

19 low-level analysts, okay?  It's always got to go up.

20          So as the judge said, be sure to judge Ashik Desai

21 with caution and great care.  See to what extent some of the

22 things he says here are not corroborated.  Mr. Hankey told

23 you, oh, and you'll see, it's corroborated.  Nuh-uh, not on

24 some of the most critical conversations.  In fact, far from

25 being corroborative, the what I call the objective

1  contemporaneous data, okay, in evidence, that's the stuff that
2  was created in real time that doesn't have a motive to lie or
3  a foggy memory.

4        The objective, contemporaneous data that I hope to
5  introduce to you is going to prove, not corroborate, prove
6  that he's not truthful with you.

7        I'm going to pause here, ladies and gentlemen.
8  Again, introduce myself.  My name is Ted Poulos, and these are
9  my colleagues, Eric Pruitt and L.J. Pavletic.  They're my
10  partners.  And this -- take your mask off, Brad -- we have the
11  privilege and awesome responsibility of representing this fine
12  young man, Brad Purdy.

13        And I say awesome responsibility because it is an
14  awesome responsibility that weighs on any lawyer worth his
15  salt to represent a man that is wrongly accused by his
16  government.

17        Now, I'm going to take a step back here and tell you
18  a little bit about Brad.  He's now 33 years old.  He was born
19  in June of 1989.  June of 1989.  His parents divorced when he
20  was very young, and he was raised by his single mom Connie.
21  He was raised, he and his sister were raised by a single mom
22  Connie in a small town about an hour, maybe a little more,
23  north of New York City, okay?

24        He finished high school in 2007, and then he came
25  here to attend Northwestern University.  He graduated four

1    years later, did his mom a favor, not the five-year plan.  He

2    graduated in the spring of 2012.

3          Now, Brad is smart and talented.  He earned two

4    degrees in that four-year period.  They were a bachelor's

5    degree in economics and a bachelor's degree in political

6    science, okay?  Not accounting.  He has no MBA.

7          After he graduated in the spring of 2011, Brad

8    returned to New York, and he worked for a big investment firm.

9    He was on, you know, a trading desk, his first job.  He stayed

10   there just for one year because he came back to Chicago to

11   take a position with Outcome Health.  He started there in July

12   of 2012, okay?  July of 2012 is when Brad started.

13         Of course, he started -- he came in as an employee,

14   okay?  He's always been an employee.  He had no equity stake

15   in the company.  He wasn't a founder.  The company was six

16   years old, roughly six years old by the time that he joined.

17   And he didn't receive a dime of that investor money or any

18   money from any of these bank loans or anything like that.  He

19   drew a salary.

20         So he had just turned 23 years old when he joined

21   Outcome Health, and he went through a few different titles.

22   When he first was hired, Mr. Shah hired him to be director of

23   new ventures and alliances.  That was basically looking out

24   for new business opportunities for the company that really had

25   nothing to do with the operations of the business.  But soon

1   enough, he got pulled into various operational roles, and

2   around late 2013 or early '14, he was given the, okay,

3   impressive title of COO, chief operating officer, but -- and

4   this is a big but, okay, big but -- Brad never functioned as a

5   traditional COO that some of you may think of, just in terms

6   of your own experience of what is a COO, because he never had

7   full operational control of the business.  He didn't.  He

8   really was on one side of the business.

9        Mr. Hankey did talk about, well, at least played a

10  tape referring to this two-sided market, two-sided business.

11  Outcome was a two-sided business.  A two-sided business.  You

12  know, I think I can explain this relatively quickly.

13       There's the membership side and the sponsorship sales

14  side, okay?  Membership.  Sponsorship.  Membership, that's the

15  side of the business that is getting these screens installed

16  in doctors' offices, okay?

17       Sales side is sponsorship sales.  They're the side

18  going out, trying to get pharmaceutical companies to buy ads,

19  okay?

20       So the membership side.  You'll see things like MOE

21  and MSC.  Those are various titles for people in the

22  membership side of the business.  The first step is go to

23  doctors' offices, convince them that, hey, getting these

24  screens installed in here and playing this educational content

25  is good for everybody.  Doctors didn't receive a dime for

1    that, but they would sign up.

2          As I said -- well, the second step was, of course,

3    you had to acquire these screens and devices, over a hundred

4    thousand of them by 2017.

5          The third step is to get them installed, have the

6    technicians do it.

7          And the fourth step really in that process is getting

8    educational content to play on the screens.

9          Until March of 2015 when Brad became the CFO, that's

10   the side of the business that Brad worked on.  That's where

11   his primary duties and responsibilities were.  So he spent a

12   lot of time dealing with, you know, these really nonprofit

13   media companies, the nonprofits like, you know, the American

14   Heart Association, the Susan G. Komen Foundation, you know,

15   the American Diabetes Association.  They generated all this

16   free content or the content at least to put up on the screens

17   to educate patients in doctors' offices.

18         So he spent a lot of time doing that.  He spent a lot

19   of time ordering and scheduling the delivery of thousands and

20   thousands and thousands of devices, you know, the waiting room

21   screens and eventually the tablets and then focusing on the

22   logistics and all that stuff, okay?

23         That's the side of the business that Brad was on.  So

24   I believe that a big, big part of the government's case here

25   is the government trying to hold Brad Purdy criminally

1   responsible for things that occurred in the area of the

2   company that he had nothing to do with.  Well, look, I

3   shouldn't say nothing to do with, but he's not the guy who ran

4   it.  Occasionally, he got called in, you know, some discussion

5   or whatever.  But that wasn't his side of the business.

6         And quite frankly here, I really see the government's

7   case against Brad Purdy as not saying, not really alleging

8   that Brad Purdy did anything to actually cause the fraud to

9   happen.  It really boils down to this, and that's why I've

10  been talking about his state of mind, knowledge, what had he

11  been told, what had he not been told, because their case

12  really is:  Brad, you should have figured it out.  You should

13  have known.

14        Who cares that Liane Pierce didn't disclose things to

15  you.  Who cares that Prowker didn't disclose things to you.

16  Who cares that lawyers assured you that everything was great,

17  and those allegations are true.  Who cares about all that?

18  You, Brad Purdy, at the age of 25, 26, 27, you should have

19  figured it out, and because you were the CFO dealing with the

20  banks and the investors, you should have disclosed it and

21  reported it to them.

22        So here's what we get to instead.  Brad was on the

23  membership side primarily, overwhelmingly, okay?  Not the

24  sales side before he became CFO.  And then in addition to all

25  of that, Brad would occasionally get, you know, assigned

1    special projects by Rishi Shah.

2              One of the big products that Brad was assigned to was

3    developing, implementing, installing, creating and developing

4    these interactive tablets, okay, that are going to get

5    installed.  Prior to 2013, really 2014 is when they launched

6    them, the main device were these waiting room screens.  You

7    know, it's a TV basically mounted to a wall in a waiting room.

8    But then they went with these tablets, and by 2016, the

9    tablets were the No. 1 product and device because they were in

10   the exam rooms.  And so you get, guess what, one device in a

11   waiting room in an office.  Most exam rooms, most offices

12   average at least three exam rooms, so you get three exam room

13   tablets installed.  So Brad, look, spent a ton of time dealing

14   with that.

15             And what you're going to learn is that it's a new

16   product, it was complicated, that there were all sorts of

17   technological problems in getting it up and running and

18   working right, okay?  And you're going to see, I'm going to

19   show you emails, where they were talking about the problems

20   with these tablet metrics.  You know, the metrics that they

21   were getting on patient, you're going to see this, the

22   engineers, not Brad, the engineers are saying, hey, we just

23   had this huge drop in our metrics.  What's going on with our

24   software and technology?

25             It took them months to figure out.  But what the

1  engineers ended up doing is saying they came up with
2  something, keep an eye out for this term, they came up with
3  something called compensation.  The engineers said we think we
4  figured out the right compensation formula to apply here
5  because we know, we conclude that the numbers that are
6  actually being reported to the data are inaccurately low.
7       They're not accurate.  They're low.  We know it.  And
8  these engineers, okay, scientists, people who have the
9  technical know-how came up with a compensation formula that
10  said so we get this kind of data, we work through it, we
11  should be reporting X, not Y.
12       And those numbers that the engineers had authorized
13  to report using this formula, they were, guess what, I guess
14  you can call it inflated, but they were not fraudulently
15  inflated, okay?
16       So Mr. Hueston talked about it, too.  Context here,
17  context.  Not ContextMedia, context generally, is the whole
18  ballgame here.  It's all about context.  You know, you get one
19  email that says, hey, David Ma, hey, I told Brad these are
20  inflated.
21       What does that really mean in the context of what
22  Brad knew and understood that they were increasing and
23  reporting higher numbers, okay?
24       So, March 15 is an important time.  Brad becomes the
25  CEO of this business.  He agreed to take on that role.  And we

1  acknowledge, there's no doubt about it.  We acknowledge when

2  you become the CFO, you are taking on some important

3  responsibilities.  That's absolutely true.

4       And as I said before, the government's going to be

5  introducing some emails here and there that Brad's on in 2012

6  or 2013 when he's brand new to the company, but Mr. Hankey did

7  say really things come home for Brad, the main issues for Brad

8  are late '16 and early '17 because that's when they're

9  handling the debt refinancing thing to acquire the competing

10  company and also dealing with, you know, the investors and the

11  like, and he is the CEO.  And oh, by the way, that's when the

12  audit occurred, okay, for 2016.  The big loans occurred.  The

13  dealings with these big sophisticated institutional investors

14  occurred.

15       The prior CFO, and as I was touching on a little bit

16  earlier, about trying to keep track of when things are

17  happening in the timeline.  The prior CFO was a guy named Jim

18  Demas.  I probably should have made a slide for him.

19       Did I?  I think so.  I did.

20       Jim Demas.  He was the prior CFO.  Now, he had been

21  at the company for years before Brad got there, and he was a

22  CPA, a Certified Public Accountant.  And he was experienced,

23  not a kid recently out of college like Brad.  He had been in

24  charge of the accounting department before Brad when he was

25  the CFO.  And Demas and the people that worked with Demas,

1   they were in charge of billing the pharmaceutical companies

2   for contract delivery and performance, okay?

3        So until Brad becomes CFO, March of '15, he has no

4   responsibility for affidavits and invoices or tracking devices

5   or any of that, okay? He didn't. Demas did. Brad wasn't in

6   the accounting department. He wasn't the CFO.

7        He left in about March of 2015. I want to tell you

8   this. He didn't leave because of any of the conduct involved

9   in this case. He wasn't, oh, my God, we're committing fraud,

10  I'm out of here. That's not what happened here.

11       Demas left because he had a relationship with a woman

12  who was in the accounting department and a direct report, and

13  he was asked to resign. They asked him to resign, and the

14  woman also resigned.

15       That woman, by the way, worked with Demas and was

16  primarily responsible for the billing to the pharmaceutical

17  industry. So when Brad becomes CFO, the two most senior

18  people in the accounting department have just left and

19  resigned.

20       And that's when Mr. Shah asked Brad just a few years

21  out of college to step into the CFO role, and Brad agreed to

22  do so. Again, he was 25 at the time, less than four years out

23  of college, now serving as the CFO of a company that that year

24  in 2015 reported $60 million in revenue.

25       Now, I've noted Brad's age and youth a couple of

1  times, and I don't want you to misunderstand me at all, okay?

2  He was an adult, of course.  He knew right from wrong, of

3  course.  The reason I mention his age and youth is because it

4  really signals and I'd say screams inexperience, inexperience

5  in the real world, inexperience in the business world, yet

6  here he is, the CFO of a 60 million soon to be $130 million

7  company dealing with the Goldman Sachs and the Google Capitals

8  of the world.

9       So imagine that.  Try to imagine being in your mid

10  20s and being there.  Heavy stuff for sure.

11       He is bright and talented, but he was very

12  inexperienced.  Look, was he in over his head?  Was he out

13  over his skis?  Should he have said, gee, Rishi, that's quite

14  an honor, but I'm not ready for that yet?  You know, maybe so.

15  But here he was, he's now the CFO with no accounting

16  experience.

17       So the first thing Brad did, he was smart enough to

18  know he's never run a finance department, accounting thing.

19  He's no CPA, no accounting education, no accounting

20  experience.  The first thing Brad did as CFO is he hired that

21  fellow right there, John Bosshart, to be the controller of

22  Outcome Health.

23       John Bosshart then ran the entire accounting

24  department.  He reported to Brad, Brad was the CFO, and they

25  interacted together, but Bosshart was in charge of all the

1    accounting aspects of the company.  And, you know, he had the

2    perfect amount of experience.

3           He was 45 years old.  He had been the chief

4    accounting officer at Groupon.  That's where he came from.  He

5    had been there for four years.  For five years -- five years

6    before that, he had been the chief accounting officer at

7    Orbitz, you know, that online travel website company.  And

8    working with Brad, Brad working with Bosshart, they made a

9    number of improvements to the accounting department.

10          They continued to hire more and more people.  I've

11   touched on it, about making sure that the accounting

12   department was interacting with the sales department and

13   tracking inventory and handling the billing.  They handled all

14   the billing, okay?

15          So let me move on to just under-delivery.  At no time

16   before or after he was CFO did Brad know, believe, think or

17   even suspect that Ashik Desai and others were lying to the

18   pharmaceutical clients about delivery on their contracts,

19   okay?  And it gets in just very briefly, Mr. Hueston touched

20   on it, and that's because this weighted average approach, this

21   weighted average concept, I put it on the screen, it is a very

22   important concept to this case, okay?  Mr. Hueston touched on

23   it.  He explained some of it.

24          I just want to highlight what the weighted average

25   approach means.  That because they're rocketing up, they're

1   negotiating a contract in August that's going to kick in in
2   January.  Well, how many devices are you going to have?  I
3   don't know.  We're installing -- I think they installed way
4   more than a thousand tablets every month in 2015.  Almost
5   every month, okay?  They were installing way more than 2,000
6   tablets every month in 2016.

7           So they're negotiating these contracts.  There's this
8   concept of weighted average approach.  Brad didn't deal with
9   sales.  He didn't handle weighted average approach.  He didn't
10  talk about it with any clients because that wasn't his job.
11  But from almost early on in the company, Brad understood that
12  we dealt with weighted average, that that's what the clients
13  knew.  In fact, again, the lawyers said so in response to the
14  Bogdany allegation.  It's with the full knowledge of the
15  client.

16          And so what it means is you signed the contract, let
17  me just say set for 750.  750 devices.  At the beginning of
18  the contract, you might only have 600 devices, but you're
19  installing, installing, installing, adding more ads to more
20  and more screens because, again, a couple thousand are being
21  installed, for example, in 2016, so that you reach a point
22  where you're playing to 750, but then you're playing 800 or
23  850.

24          And what the accountants are looking for, what, in
25  fact, Deloitte was looking for, okay, on a weighted average

1    approach, did you average 750?  And that's what Brad

2    understood kind of early on in the company, and you'll see

3    plenty of stuff about weighted average.

4          And I mentioned Deloitte because, ladies and

5    gentlemen, the accountants knew about weighted average.  Demas

6    knew about it.  He told Brad about it.  Bosshart learned about

7    it right away and, guess what, Bosshart told Deloitte about it

8    pretty much right away.

9          So the accountants and the auditors blessed this

10    weighted average approach, and there was this whole thing that

11    because the contract was for 750, they billed for 750 every

12    month.

13          So some simple numbers.  If you had a $1.2 million

14    contract for 750 a month, they billed 100,000 a month to get

15    to 1.2 million over that, and on the average approach, okay,

16    750.

17          So the billing and the invoices that went out said

18    750 even when it was 600.  Deloitte and the accountants knew

19    that.  No one raised this as this is some big fraud.  They

20    didn't express any concern.  If they had, the young CFO of the

21    company would have done something about it.  Everybody would

22    have done something about it.

23          Again, he relied on these skilled professionals who

24    didn't raise any concern or alarm about it.  That's what Brad

25    knew and understood.  And the weighted average approach, I

1    think it's really important here as well because the

2    government's always like, oh, deltas.  There were these

3    deltas.  Gee, you saw that there were deltas.  You got delta

4    reports.  People talked about deltas in contract delivery.

5          The weighted average approach, 750, they were only at

6    600 or whatever you might be, it assumes that there are

7    deltas.  And by the way, it's not like there were deltas in

8    all the contracts, okay?  They had plenty of inventory.  They

9    fulfilled on contract after contract after contract.  There

10    were some that they didn't, okay?

11          And Brad understood.  Brad expected that Ashik Desai,

12    if you're not satisfying a contract, you bill them

13    1.2 million, guess what, if you fell a little short, give them

14    a make good.  Run the ad for another two months at the right

15    amount for free.  That's what a make good was.  Or give them a

16    refund.  That's what Brad understood would happen.  And, in

17    fact, that is what happened.  There were make goods on the

18    books of the company pretty regularly.

19          So it wasn't like, oh, my God, there's a fraud going

20    on there.

21          I want to talk about ROI, okay?  It's really, really

22    important here.  Just like weighted average, ROI, return on

23    investment.  Again, people have talked about it today.

24          My fancy slides.  A lot of the contracts were, for

25    example, again, I'm just going to give it to you one more

1   time.  Forgive me for repeating something that you've heard,
2   but it's so important to understand.
3          Some of the contracts, in fact, I think in '16, the
4   vast majority of contracts had these ROI guarantees in them.
5   It said, hey, Pfizer, hey, Bristol Myers Squibb, hey whatever,
6   we guarantee you this:  For every dollar you spend with us,
7   you're going to realize $3 worth of prescriptions.  We
8   guarantee it.  And if we don't make it, we could either refund
9   some money or continue to run the program for free as a make
10  good until we achieve that level of return.
11         3-to-1 ROI guarantees.  How do they do that?  IMS.
12  You're going to hear a lot about IMS.  IMS is a company,
13  they're not the only one, but IMS was the main one that
14  Outcome dealt with.  There are these data mining companies in
15  this country, in the world, I think, that actually get
16  information from, like, Walgreens or CVS or whoever, all over.
17  They track.  They know every prescription that practically
18  every doctor in this country writes.
19         And so that's how -- so they would get the data from
20  IMS, big, detailed reports.  Ashik would get them.  And then
21  he would analyze the data and then come up with a PowerPoint
22  presentation and say, yep, we've satisfied the ROI, okay?
23         So that's what that was about.  And from 2014 and '15
24  and into 2016, Desai is the guy who prepared the ROI reports
25  and, guess what, yeah, he lied about them sometimes, not all

1   the time, but he lied about them seemingly when he needed to.

2          So it's really important for three reasons, okay, ROI

3   and what Ashik Desai did on ROI reports.  It's really

4   important for three reasons.  The first reason is this:  The

5   accountants and Deloitte, the auditors, they determined, it

6   was their view that so long as you satisfied the ROI, you're

7   good.  It doesn't matter if you under-delivered on the

8   contract because I guess their view was, that's what the

9   clients bought.  They bought an ROI guarantee.  Did you spend

10  this amount of money?  Did you get this amount of return?

11  You're good.  It doesn't matter what the delivery was.  The

12  contract is satisfied.

13         So, again, another reason why maybe hearing about a

14  delta, not that big of a concern, are we satisfying the ROI?

15  And that's what Ashik did with everybody here, assured

16  everybody that the ROI is terrific because when he lied, when

17  he lied about the ROI reports and cooked these things up, it

18  wasn't that -- just that we satisfied the ROI, it was that we

19  wildly exceeded it in some cases.  That was Ashik.  He was

20  just making it up.

21         It's also very significant for a second reason, okay?

22  And it is this massive fraud on investors and lenders.  It

23  goes right to the heart of this.  As part of their -- you

24  think Goldman Sachs and Google Capital do some due diligence

25  in connection with making that?  Of course, they do, as does

1   JPMorgan Chase when they're going to loan out $375 million.

2          And they knew that ROI was the critical component in

3   this company, and they said, hey, give us some historical ROI

4   studies.  And Ashik Desai sent over I think it was about 28

5   when it came to the $487 million investment.  He sent them

6   over, Bosshart got them, put them in a data room for investors

7   to get into, and they could look at them, download them, copy

8   them, whatever, 28.

9          It looks like -- it looks like maybe half of them

10  were bogus, false, artificially inflated.

11         So the investors, Goldman, Google, others, JPMorgan,

12  they analyzed that data, and they determined that on those 28

13  ROI studies that Desai had prepared and sent over, the average

14  return was 5 to 1, 5 to 1, and the investors loved it.  Boy,

15  did they love it, 5 to 1.

16         You know, you're going to hear about a lot of these

17  brand name prescription drugs that, you know, we've seen it in

18  some of the juror questionnaires, you know, all these

19  pharmaceutical ads on the TV.  You're going to, by the end of

20  this trial, appreciate them or recognize them in a slightly

21  different way, but here's the point:  They did this study,

22  this full due diligence analysis, and the return on investment

23  of 5 to 1 is way better, way better investment, way better

24  return than all those ads we see night after night after night

25  on TV.  A way better return.  And way, way better than, like,

1    a print media in a magazine or whatever.

2           So they see this is the best return on investment in

3    the pharmaceutical ad industry, and guess what?  At that point

4    in time, the pharmaceutical industry was spending only about

5    somewhere around like I think it was like 2 percent, I mean,

6    some tiny fraction of their ad budget went to this direct

7    point-of-care advertising at Outcome.

8           So when Goldman and Google and everybody else sees,

9    and the people at the company saw it, too, what Ashik was

10   doing, we're the best, this is the best possible return.  So

11   that -- that kind of 5-to-1 return that Ashik created in those

12   reports was the reason, I posit to you it was the reason those

13   big companies came up with 487 million and wanted a chunk of

14   that because when you're getting a 5-to-1 return that blows

15   away any competition and they're only spending some tiny

16   fraction in this kind of the area, that's the future.  That's

17   the future.

18          That's why when they made the investment on a company

19   that reported $130 million in revenue, they valued the company

20   at $5 billion.  And the point is Ashik Desai admitted as he

21   must, okay, that he did that on his own.  The ROI fraud that

22   occurred here is Ashik Desai's fraud and his alone.  He admits

23   it.  And that is the big fraud here.  That's the reason these

24   big companies invested all of that money.  It is critically

25   important.

1           The third reason is, of course, that he kept it from

2    them.  And not just kept it from them, okay?  No, he kept it

3    from Mr. Shah and Ms. Agarwal and Brad Purdy.  When that is

4    the massive fraud here, when that is the main driving force,

5    5-to-1 ROI guarantee versus, okay, some expert is going to

6    come in here and say, well, really when I look at the data and

7    actual delivery and make all the assumptions, they really

8    should have only reported $100 million, not 130 million.  You

9    know that's still a great company, $100 million.

10          They did it with the 5 to 1, $5 billion valuation

11   blowing the competition away.

12          I believe that's what the evidence is going to show

13   in this case.  And he kept it from them, and he didn't just

14   keep it from them, okay?  It's also maybe the best evidence of

15   a ton of evidence of Brad Purdy's bad -- good faith, good

16   faith, the best evidence of his good faith.

17          IMS, the company, this happened in about May of 2016.

18   It involved the drug I believe, pretty sure, Trajenta.  This

19   drug Trajenta, okay?  They had an ROI contract, and Trajenta,

20   or maybe the ad agency, but the client, they got an ROI report

21   from Desai, and you know what they did?  They said, hey, hey,

22   IMS, can you send us over the raw data in connection with this

23   ROI report?  And IMS did.  And they saw the discrepancy.

24          You're going to see the email.  I'm going to show it

25   to you.  Might be a government exhibit.  You're going to see

1   it.  The main contact at IMS, I think her name is Lynne

2   Sperling, sends an email to Desai because Desai is the one who

3   dealt with them, and says, hey, Ashik, we just got contacted,

4   and they said they got -- you know, we just gave the data for

5   it, they showed us the ROI report.  Guess what?  It doesn't

6   jibe?  What happened?  Your ROI report is way better.  It's

7   wrong.

8          What do you think Ashik decided?  One guess, okay?

9   He lied.  He lied in writing.  He came up with an honest

10  mistake, an honest mistake.  Oh, you know, one of the data

11  people in our division kind of knew, you know, made the

12  mistake of thinking you're supposed to check this and that and

13  all these technical terms, and then, you know, made the

14  mistake of assuming this and that.  Sorry.  You know, we got

15  it right.  We'll address it with him.  Won't happen again.

16  IMS said okay.

17         Brad heard about this, and he went to Ashik Desai and

18  said what the -- and Ashik Desai assures Brad, gave him the

19  same explanation of an honest mistake.  Brad believed it.  IMS

20  believed it.  The company believed it.  The client believed

21  it.  The client ended up getting a make good to make up for,

22  okay, honest mistake, mistakes happen, and, yeah, mistakes

23  happen, but that is good faith.  Brad didn't ignore it.  He

24  didn't bury it.  He didn't try to conceal anything.  That's

25  good faith, ladies and gentlemen.

1    Deloitte, as I said, did two audits while Brad was

2    CFO.  Brad becomes CFO in May -- March of 2015.  Bosshart gets

3    hired, you know, a month later.  Deloitte's in there in late

4    '15, early '16, doing their audits.  They do another one in

5    late '16, early '17, okay, while Brad is CFO.  And everybody

6    relied on Desai and his team to provide the data on delivery

7    and ROI reports because, guess what, he's the guy who had it.

8    They had to rely on him, okay?

9    So, again, I told you there will be a number of

10   emails where Desai and these analysts that worked with him

11   were clearly blatantly discussing how they were going to lie

12   and they kept that secret.  That was what they did.

13   I talked to you about context a little bit, but I --

14   and I'm just about done here, I promise -- context and

15   hindsight.  Almost every event and every email that's going to

16   be introduced here by the government, the real question is,

17   okay, what's the context there?

18   And as Mr. Hueston said all of us on behalf of our

19   individual clients are going to try to give you the full and

20   complete context to those exhibits because the government's

21   presentation of evidence, I believe, is going to be based on

22   an extremely selective presentation of the emails, like

23   blinders on.  They're going to introduce slivers of this and

24   that and bits and pieces of information, and we will do our

25   best to introduce the context.  And I'm apologizing right now

1    because sometimes in order to establish the context, I'm going

2    to have to show a witness a bunch -- a number of emails, just,

3    here's what really happened, and I think you'll find that

4    context enlightening.

5         Last thing about context.  Ladies and gentlemen, the

6    government's going to pick out an email here and an email

7    there like, oh, inflated metrics, okay?  They're going to pick

8    emails out like that, selective, narrow, and the like.  I want

9    you to know this.  During the time that Brad was at Outcome

10   Health, he received hundred -- hundreds of thousands of

11   emails.  And I believe it's going to ramp up like this.

12   Listen, there are, I think -- we're still doing the analysis

13   because it's such a big data set, but it looks like he sent or

14   received somewhere between 500,000 emails, maybe as much as

15   700,000, but don't hold me to that, we are still doing that

16   analysis.  But we will present it to you because it's context

17   and quite significant.

18        Even at 500 or so, I mean, the average email he got

19   every single day was 150, and that's if you just do the math

20   at 365.  If you exclude Saturday, Sunday, and holidays, it's

21   way more than that during the business week when those things

22   were done.

23        I also know this, that there are going to be critical

24   days here where he received something like, and it did go up,

25   500 emails in one day, maybe 700 emails in one day.  300

1    emails in one day.  The day of this thing, oh, I told them

2    it's inflated, the one they showed you, I think -- don't hold

3    me to it, we're checking -- there were a few hundred emails

4    that he received that day, and they're going to line up all

5    these emails and present them to you skipping months and

6    months and weeks and days and say and present it to you as if,

7    as if that's the way Brad Purdy experienced it, okay?

8         They're going to show an email about Pradaxa.  Brad

9    was told this in March of 2013 about Pradaxa and another one

10   in October of 2013, like he's supposed to connect those two

11   dots when he's getting thousands of emails in between.

12        But can you imagine that kind of life, leading --

13   getting hundreds, hundreds, of emails a day at times?

14        So important context.  I trust you've all heard the

15   metaphor, the evidence in this case is perfect for this

16   metaphor because it will show this, ladies and gentlemen,

17   especially in 2016 and 2017:  Brad Purdy was drinking from a

18   fire hose every day, and I'm going to mix my metaphors here

19   and butcher them, forgive me for this, but I think a better

20   metaphor is he was drinking from a fire hose every day

21   16 hours a day while he was running 100-yard dash after the

22   other.

23        That was Brad's life.  In 2016, do you know what he

24   was doing as CFO?  He was heading up a $375 million

25   acquisition with JPMorgan in New York.  Just try to imagine

1   the responsibility and level of detail to that.  At the same

2   time, he was heading up the $215 million acquisition of

3   Accenthealth.

4         Right after that, right at the beginning of 2017

5   another thing on Brad's pretty plate is he was the guy

6   assigned to integrate these two companies.  Imagine that,

7   integrating two big large companies, and that was Brad's

8   responsibility, too.  In the middle of all that, he's dealing

9   with audits.

10         Now, Bosshart and Nixon, the accountants, they were

11   dealing directly with it, but there's issues coming to Brad on

12   this and that.  And this email coming in and this email coming

13   in and this email coming in, and they're going to point to an

14   email here or there, like, ah-ha, an email that Brad doesn't

15   even respond to.  Many of the emails he's cc'd on.

16         I don't know what your life is like, but, you know, I

17   have -- we all get, like, cc'd on emails at work and this and

18   that, and I'm, like, why are you filling my box up with this

19   stuff that I don't need to deal with?

20         You're going to see a lot of that, that's going on,

21   but that is important context as well, okay?

22         And the government's going to take an email or two,

23   and this is what lawyers do, okay?  Not blaming them for it.

24   It's just the reality.  We'll deal with it.

25         They're going to take an email or two, and they are

1   going to apply this hyper focus on one word or one sentence

2   and present it and argue it and interpret it as if Brad Purdy

3   sat there and read it and studied it and pondered it.

4   That's -- that's what I think a large part of the government

5   case is going to be about.

6           I've probably gone a little longer than I expected,

7   but this is the last one and the last subject.  Other lawyers

8   have talked about this, but it is so vitally important, the

9   separate consideration.  Even though the defendants are being

10  tried together, you must consider each defendant and the

11  evidence concerning that defendant separately.  Your decision

12  concerning one defendant, whether guilty or not, should not

13  influence your decision concerning the other defendant.

14          I end here because  -- it's also where Judge Durkin

15  started -- that's really important in a case like this, and

16  especially in a complex case.  Eric, L.J. and I, we only

17  represent Brad Purdy.  Our obligations, our duties, are to

18  Brad Purdy, and that's what we're going to do here.

19          Just like Mr. Shah and Ms. Agarwal's duties go to

20  their clients.  That's the way it's supposed to be.  That's

21  the way it should be.  We're Brad Purdy's lawyers, okay?

22          Now, I think you will see times over the course of

23  trial that we're all dealing with common issues, but we're

24  looking out for Brad.

25          You have to give him separate consideration, and what

1    that really means is even though this is one trial and you are

2    one jury, there are really three separate trials going on

3    here.  You're one jury dealing with three trials in one of the

4    most complex cases I've ever been involved in.

5         I'm going to ask you this, ladies and gentlemen,

6    because I think it's going to be a difficult -- it's going to

7    be a challenge and a difficult task.  Judge Durkin talked

8    about it as well.  You know, use your notes.  Please use your

9    notes and mark down stuff.  Try to keep the evidence separate.

10        Try, if you could, please, as evidence comes in make

11   a note was Brad Purdy involved in that one?  Is he on this

12   one?  Who is?  Who isn't?  We'll do our best when we come back

13   after the trial in our closing argument to, you know, discuss

14   all that, what he's on, what he's not on, but I hope you can

15   do that and keep it straight.

16        Because when this case is all over, you're going to

17   see a big, big failure on the government's case as to Brad

18   Purdy, and I do believe the evidence and justice will demand,

19   militate, compel you to find Brad Purdy not guilty of all

20   these charges.

21        I really do thank you for your patience.

22        THE COURT:  All right, thank you, sir.  Ladies and

23   gentlemen, we're going to take a 15-minute break right now.

24   It's a little later than normal, but I know you're asking to

25   leave at 4:30 every day going forward.  We will do that.

1   We'll take a 15-minute break, start with the first witness and
2   be done at 4:30 today.
3           Please don't discuss the case among yourselves or
4   with anyone else, and keep an open mind.
5           COURT SECURITY OFFICER:  All rise.
6       (Jury exits courtroom.)
7           THE COURT:  All right.  You can have a seat.
8           As you heard, the jury's going to leave at 4:30 every
9   day, so plan your days accordingly.  We will deal with as many
10  issues as we can at 4:30 to smooth out the next day.
11          Tomorrow morning I have some matters at 8:45.  I do
12  it by phone from the courtroom.  You're free to come in and
13  out.  Just try and be quiet so it doesn't interfere with my
14  ability to hear what other attorneys say over the phone on
15  other cases.
16          The door -- we're going to make sure these doors are
17  closed.  If they're not, point it out to me because the jurors
18  are using some of the restrooms in Judge Pacold's jury room
19  down the hall.
20          So they're not only going to be over in this hallway,
21  they're going to be back and forth behind this, the hallway
22  behind the courtroom.  So if, by chance, one of these doors is
23  open, let me know that so a juror doesn't hear conversations
24  we're having outside of their presence.
25          Anything else we need to discuss right now?

1      MR. MADDEN:  No, Your Honor.

2      MR. HUESTON:  Your Honor, just one thing, should have

3 raised it I think at least -- well, now is the time for the

4 first witness.  Witness sequestration order.

5      I assume, but I want to put on the record that no

6 witness is going to -- that's going to be called is going to

7 be listening to or reading transcripts of anything in the

8 trial prior to their testimony, and I just want to get an

9 agreement to that.

10      THE COURT:  Agreed by the government?

11      MR. JOHNSTON:  Your Honor, we would make an exception

12 for our agent and our expert.

13      MR. HUESTON:  That's fine.

14      THE COURT:  Yeah, and the same goes for defense

15 witnesses.

16      MR. HUESTON:  Right.

17      THE COURT:  Other than the defendants, of course.

18      MR. HUESTON:  Yes.

19      THE COURT:  Okay.

20      All right.  That's agreed.  Agreed to by the

21 government, agreed to by defense?

22      MR. HUESTON:  Yes.

23      MR. POULOS:  Yes.

24      THE COURT:  Okay.  Anything else?

25      MR. LOWDER:  Yeah, just one scheduling question, I

1  know it's early in the week.  Do you anticipate bringing us in
2  on Friday this week?
3          THE COURT:  If there's reason to.
4          MR. LOWDER:  Okay.
5          THE COURT:  Let's see how the week develops.  I'm not
6  going to be coming in at 7:00 in the morning Monday morning to
7  resolve things we could have done Friday, so keep that in
8  mind.
9          I don't mind if out-of-town lawyers return home
10 Thursday night and participate by phone on Friday.  I
11 encourage you to do that.  I don't want you to have to stay
12 here just for something we can do over the phone, but we'll
13 work Friday if the circumstances require it.
14         MR. LOWDER:  Not a problem.  Thank you, Your Honor,
15 appreciate it.
16         THE COURT:  Okay.  Very good.  See you in 12 minutes.
17     (Recess taken from 3:41 to 3:53 p.m.)
18
19
20
21
22
23
24
25

1        (In open court outside the presence of the jury; defendants

2     present.)

3            THE COURT:  All right.  Let's bring in the jury.

4            MR. LOWDER:  Your Honor, one quick question on the one

5     juror.

6            THE COURT:  Here's what I'm going to do on that.

7     We're going to ask her for the information that she needs to

8     give us, and if we get any pushback or discussions, then we'll

9     talk to her then.

10            MR. LOWDER:  Sounds good.

11            THE COURT:  I don't see any reason to separately

12     question her.

13            MR. LOWDER:  Just wanted to remind you.

14            THE COURT:  Sure.  Understood.  Thank you.

15            All right.  Let's bring in the jury.

16            Is your witness in the courtroom?

17            MR. MADDEN:  I'm going to read one stipulation, your

18     Honor, and then move to admit the exhibits and then have them

19     come in, if that's all right.

20            COURT SECURITY OFFICER:  All rise.

21            THE COURT:  Just have them nearby.

22        (Jury in at 3:54 p.m.)

23            THE COURT:  All right.  Please be seated.

24            All right.  The government may present its case.

25            MR. MADDEN:  Your Honor, at this time the government

1        is going to read a stipulation.

2                 THE COURT:  All right.  Ladies and gentlemen, a

3        stipulation is an agreement between the parties as to certain

4        exhibits or certain testimony.

5                 You may proceed.

6                 MR. MADDEN:  Thank you, your Honor.

7                 COURT REPORTER:  Can we have Mr. Madden turn his

8        microphone on, please.

9                 THE COURT:  Oh.  Turn on your mic, please.

10                MR. MADDEN:  It is on.  Can you hear me?

11                COURT REPORTER:  Just a moment.  We're resetting.

12                THE CLERK:  It should be on now.

13                THE COURT:  Try it now.

14                MR. MADDEN:  Test.

15                THE COURT:  Okay.  Proceed.

16                MR. MADDEN:  All exhibits with a Bates number

17       referenced in the left-hand column below are authentic records

18       of the corresponding company listed in the right-hand column.

19                Bates number from the left-hand column:

20                OH DOJ-SHAH, DOJ-PURDY are records of Outcome Health

21       and its predecessor company ContextMedia.

22                Bates number beginning with BI is a record of the

23       company Boehringer Ingelheim.

24                Bates number BOA is a record of the company Bank of

25       America.

1          CIBC is a record of the company Canadian Imperial Bank

2     of Commerce and its predecessor The Private Bank.

3          Bates number DAN is a record of the company Dentsu

4     Aegis Network.  That's D-E-N-T-S-U.  Second word is A-E-G-I-S.

5          Bates number DT is a record of Deloitte & Touche.

6          Bates record GB -- GCB is a record of Gold Coast Bank.

7          Bates record -- Bates number GOOG, G-O-O-G, is a

8     record of Google.

9          Bates number GS is a record of Goldman Sachs.

10         Bates number JP or JPM is a record of JPMorgan Chase.

11         Bates number LTP is a record of the company Leerink

12    Transformation Partners.

13         Bates number PER is a record of Pershing, LLC.

14         Bates number PFE is a record of Pfizer.

15         Bates number PGVC is a record of Pritzker Group

16    Venture Capital.

17         So stipulated as to Shah?

18         MS. CHOU:  Yes.  Yes, your Honor.

19         MR. MADDEN:  So stipulated as to Agarwal?

20         MS. BELL:  Yes, your Honor.

21         MR. MADDEN:  So stipulated as to Purdy?

22         MR. POULOS:  Yes.

23         THE COURT:  All right.  Ladies and gentlemen, Bates

24    numbers are just stamps on a document when they're produced.

25    When the government does an investigation, they gather

1    documents from a variety of sources.  So everyone knows what

2    the documents are and how many there are, there are numbers put

3    on them by the party that's producing them.

4         Bates comes from a guy in the 1800s who actually

5    invented a machine where if you stamp it, the number advances

6    each time you stamp it.  It's more advanced now, obviously.

7         But those are all abbreviations you'll see on

8    documents that are going to be admitted in evidence that were

9    not on those documents when they were actually in the custody

10   of the bank or the other entity.  These are done and put on the

11   record on these documents for purposes of production in this

12   litigation.

13        You may proceed and call your next witness.

14        MR. MADDEN:  Thank you, your Honor.  I'm going to

15   first move to admit a number of exhibits, if that's okay.

16        THE COURT:  If there's an agreement on it, why don't

17   we do that outside the presence of the jury.

18        Is there an agreement on these exhibits?

19        MR. MADDEN:  None of them objected to as far as --

20   based on our prior communications.

21        THE COURT:  All right.  Well, let's do it this first

22   time, and then we're going to do this outside the presence of

23   the jury after today.  Go ahead and read them.

24        MR. MADDEN:  Government Exhibits 1051, 1123, 1116,

25   1115, 1113, 1114, 1117, 794, 795, 793.

```
 1              THE COURT:  All right.  Any objection to admission of
 2     those exhibits?
 3              MR. HUESTON:  No, your Honor.
 4              MR. POULOS:  No, your Honor.
 5              MS. BELL:  No, your Honor.
 6              COURT REPORTER:  I'm sorry.  Can we -- can you
 7     identify who is speaking as you respond.
 8              MR. HUESTON:  John Hueston on behalf of Rishi Shah.
 9              No.
10              MS. BELL:  Koren Bell on behalf of Shradha Agarwal.
11              No.
12              MR. POULOS:  Ted Poulos on behalf of Mr. Purdy.
13              No.
14              THE COURT:  All right.  They're all admitted without
15     objection.
16          (Government Exhibits 793, 794, 795, 1051, 1113, 1114, 1115,
17          1116, 1117, and 1123 admitted in evidence.)
18              THE COURT:  Proceed.
19              MR. MADDEN:  Thank you, your Honor.
20              Your Honor, the government calls Sameer Kazi.
21              THE COURT:  All right.
22              Sir, right up here.  You can take your mask off.
23              Please raise your right hand.
24          (Witness duly sworn and takes the stand.)
25              THE WITNESS:  I do.
```

Kazi - Direct by Madden

1    THE COURT:  Have a seat, please.

2           You can move the mic closer, if need be, and you can

3    move the chair up if you'd like.

4           You may proceed.

5           MR. MADDEN:  Thank you, your Honor.

6           SAMEER KAZI, GOVERNMENT WITNESS, SWORN

7                   DIRECT EXAMINATION

8    BY MR. MADDEN:

9    Q.  Good afternoon, Mr. Kazi.

10   A.  Good afternoon.

11   Q.  Can you please state your name and spell your name for the

12   record.

13   A.  Sameer Kazi, S-A-M-E-E-R, K-A-Z-I.

14   Q.  What do you do for a living, Mr. Kazi?

15   A.  I work in software technology.

16   Q.  What company do you work at?

17   A.  I work at a company called ActiveCampaign.

18   Q.  How long have -- what's your role at ActiveCampaign?

19   A.  I'm the president.

20   Q.  How long have you been the president there?

21   A.  Since June.

22   Q.  What did you do before you joined ActiveCampaign?

23   A.  I was at a company called Cheetah Digital.

24   Q.  What kind of company is Cheetah Digital?

25   A.  Marketing software technology.

1  Q.  What was your role at Cheetah Digital?

2  A.  CEO.

3  Q.  How long were you the CEO of Cheetah?

4  A.  Five years.

5  Q.  Directing your attention to January of 2017, were you

6  employed at that time?

7  A.  I was --

8  Q.  January of 2017.

9  A.  I was employed.

10  Q.  What were you doing?

11  A.  I was chief operating officer at Outcome Health.

12  Q.  I'm going to ask you to go into greater detail about your

13  employment at Outcome Health, of course.  But first I want to

14  talk a little bit more about your background before you worked

15  at Outcome Health.

16         Can you please describe to the jury any post-high

17  school education that you have.

18  A.  I have an undergraduate degree from the University of

19  Arizona in mechanical engineering.  I have an MBA from

20  Northwestern.

21  Q.  I'd like to now turn to your employment history after

22  college.

23         What was your first job after college?

24  A.  I was a sales engineer at Johnson Controls.

25  Q.  How long did you work at Johnson Controls, Mr. Kazi?

 1    A.   Shy of a year.

 2    Q.   What did you do after you left Johnson Controls?

 3    A.   I moved to Milwaukee to become a solutions engineer at a

 4    company called Norstan.

 5    Q.   How long did you work at that company in Milwaukee?

 6    A.   About a year and a half.

 7    Q.   What did you do next?

 8    A.   I moved to Chicago and did a startup in the West Loop

 9    called NextWave Technology.

10    Q.   What kind of company was that?

11    A.   It is a technology consulting company.

12    Q.   What was your role there?

13    A.   I was CEO.

14    Q.   How long were you CEO of NextWave?

15    A.   Two years.

16    Q.   What was your next step in your career?

17    A.   I was at a company based in Downers Grove -- I'm sorry --

18    based in Chicago called The Customer Group.

19    Q.   What kind of company was that?

20    A.   It was a CRM consulting company.

21    Q.   What does that mean?

22    A.   Customer relationship marketing software consulting.

23    Q.   What was your role at The Customer Group?

24    A.   I was a consultant and the chief technology officer.

25    Q.   How long did you stay there?

Kazi - Direct by Madden

1    A.  Year and a half.

2    Q.  What did you do after you left The Customer Group?

3    A.  I was at a company in Downers Grove called Sentinel

4    Technologies.

5    Q.  What kind of company is Sentinel?

6    A.  It's a technology reseller and systems integrator.

7    Q.  What was your role at Sentinel Technologies?

8    A.  I was a vice president of business development.

9    Q.  How long did you work there?

10   A.  Four and a half years.

11   Q.  After you left Sentinel, what was your next job?

12   A.  I was at a company called ExactTarget based out of

13   Indianapolis, Indiana.

14   Q.  What kind of company is ExactTarget?

15   A.  Marketing technology.

16   Q.  What was your role there?

17   A.  Several roles.  Started off as the vice president of

18   professional services.  And my last role there was the general

19   manager for all of our Europe, Middle East, and Africa

20   operations.

21   Q.  How long did you work at ExactTarget?

22   A.  Six years.

23   Q.  What did you do after you left ExactTarget?

24   A.  Took a little bit of time off and then was the interim CEO

25   at a company based out of Seattle called Simply Measured.

Kazi - Direct by Madden

1    Q.  How long were you the interim CEO of Simply Measured?

2    A.  For a year.  And after that, I was the chairperson for a

3    year.

4    Q.  What kind of company was Simply Measured?

5    A.  It was a social media analytics software business.

6    Q.  After you left your role as interim CEO of Simply Measured,

7    what did you do next?

8    A.  I joined Outcome Health.

9    Q.  And that was in -- when?

10   A.  January of 2017.

11   Q.  So approximately how many years -- we went through your

12   employment history quickly there, obviously.

13          How many years of post-college work did you have

14   before you joined Outcome?  Approximately.

15   A.  20.  Is that -- 20.

16   Q.  How did you -- turn your attention now to Outcome.

17          How did you first learn about a potential job

18   opportunity there?

19   A.  Spring of 2016, I was contacted by a recruiter at a company

20   called Daversa Partners.

21   Q.  Were you already familiar with Outcome at that time?

22   A.  I was not.

23   Q.  What was Outcome called at that time, if you recall?

24   A.  It was called ContextMedia.

25   Q.  Did the name change to Outcome at a certain point?

Kazi - Direct by Madden

1    A.   It changed formally when I joined the company.

2    Q.   If it's okay with you, for the sake of simplicity, I'm

3    going to try to call it Outcome or Outcome Health today even if

4    it was ContextMedia at certain points.

5    A.   Okay.

6    Q.   What did you learn about the potential opportunity at

7    Outcome from the recruiter at Daversa?

8    A.   I learned that this was a very exciting Chicago-based

9    company at the intersection of health care and technology

10   growing very rapidly and a group of people that I should know.

11   Q.   What was the first step in your interview process or

12   recruiting process at Outcome?

13   A.   It was an informational interview that I had with Rishi

14   Shah, the CEO, at the Outcome Health offices.

15   Q.   Did you know Rishi Shah before you met him at that time?

16   A.   I did not.

17   Q.   You said it was at Outcome's offices.

18   A.   Yes.

19   Q.   Where are Outcome's offices?

20   A.   At the time, they were in the old IBM Building across from

21   the Trump Tower.  I don't know the exact address.

22   Q.   Downtown Chicago?

23   A.   Yes.

24   Q.   Was anyone else present for your meeting with Rishi Shah

25   that day?

Kazi - Direct by Madden

1    A.   I believe that Rishi's chief of staff was present.

2    Q.   Do you recall what his name is?

3    A.   I think his name -- his first name is Jayanth.

4    Q.   Is that J-A-Y-A-N-T-H?

5    A.   I believe so.

6    Q.   Besides Mr. Shah and Jayanth, was anyone else there?

7    A.   Not that I can recall.

8    Q.   What do you recall about that first meeting with Shah at

9    Outcome's offices in Chicago?

10   A.   It was primarily informational.  Learned a lot about the

11   company, the path to creating the company, the work the company

12   was involved in, and some discussion about my background.

13   Q.   Does anything else stand out to you about that initial

14   meeting with Shah?

15   A.   No.

16   Q.   How did that first meeting with Shah end?

17   A.   It ended very cordially without any commitments on either

18   party's side.

19   Q.   What happened in terms of next steps?

20   A.   There was a several-month period where there was no

21   contact.  And then the recruiter reached back out again,

22   ostensibly because there was a need at the company and they

23   wanted to test to see if I was interested.

24   Q.   What was the time frame of this, approximately?

25   A.   Must have been late summer.

Kazi - Direct by Madden

1    Q.   2016?

2    A.   Yes.

3    Q.   Did you meet with Shah again?

4    A.   I did.  We met again at the Outcome Health offices.

5    Q.   Was anyone else present besides you and Shah?

6    A.   I don't remember exactly, but I'm sure that -- I think that

7    the chief of staff may have been present.

8    Q.   So either it was just the two of you -- you and Shah -- or

9    possibly his chief of staff Jayanth was there as well?

10   A.   Correct, yes.

11   Q.   Besides you and Shah and possibly his chief of staff, was

12   anyone else present?

13   A.   Not that I can recall.

14   Q.   Does anything in particular stand out to you about that

15   second meeting with Shah?

16   A.   Nothing other than the fact that we went deeper into the

17   way the company operated, the opportunity in the market, the

18   vision that Rishi had about where the company was going.

19   Q.   How did the second meeting with Shah end?

20   A.   With slightly more interest tried to pursue on both

21   parties' part, but without any commitments.

22   Q.   What was the next step in your interview process?

23   A.   The next step was a round of more formal interviews at the

24   company.

25   Q.   And --

Kazi - Direct by Madden

1         THE COURT:  And, Mr. Madden, before --

2         Ladies and gentlemen, I know there's a delay and some

3  choppiness in the video feed, especially for the folks in the

4  back who are looking at it.  We're trying to get that fixed.

5  It resembles one of those movies where they dub in a different

6  language.  Everything is a few seconds behind.

7         So we'll try and get that fixed overnight, but please

8  bear with us.  And you can still see the witness very clearly

9  on the monitor, I'm sure.

10        Proceed.  Sorry to interrupt.

11        MR. MADDEN:  Thank you.

12  BY MR. MADDEN:

13  Q.  You said the next step was that you did more formal

14  interviews at Outcome?

15  A.  Correct.

16  Q.  Was that at the Chicago offices again?

17  A.  It was.

18  Q.  Who did you interview with?

19  A.  I interviewed with -- with Rishi, with Brad Purdy, with

20  Shradha and Ashik Desai.

21  Q.  Were they one-on-one meetings, or was it a group interview?

22  A.  They were one-on-one meetings.

23  Q.  Starting with Shah, what stands out to you about the

24  interview you did with Shah at the Outcome office?

25  A.  It was a very cordial conversation about how the day was

1    going to go, who I was going to speak with, and just the tone

2    of the conversation to be had.

3    Q.  What do you recall about your interview with Agarwal?

4    A.  I don't remember anything specific.  I'm sure there was

5    some back-and-forth about my background and the nature of her

6    role at the company.

7    Q.  What was her role at that time?

8    A.  Her role at the time was specifically overseeing content

9    production for the information that they presented at

10   physicians' offices on devices.

11   Q.  And what was Shah's role?

12   A.  It was CEO.

13   Q.  What do you remember -- you said you interviewed with Ashik

14   Desai as well?

15   A.  I did.

16   Q.  What do you remember about your interview with Desai?

17   A.  It was primarily a conversation about a different part of

18   the business.  The part of the business that Ashik oversaw

19   related to contracts with pharma companies and how that process

20   happened.

21   Q.  Do you recall anything else of note about that interview

22   with Desai?

23   A.  No.

24   Q.  I think you said you interviewed with Purdy as well.

25   A.  I did.

Kazi - Direct by Madden

1    Q.   What do you recall about that interview?

2    A.   It was a very cordial conversation about each of our

3    backgrounds and some common experiences that the both of us

4    have had when we were younger.

5    Q.   What happened after that round of interviews at the Outcome

6    offices?

7    A.   There was an invitation for a subsequent meeting with Rishi

8    to continue the conversation.

9    Q.   Approximately when did that next meeting take place?

10   A.   I can't remember exactly.  Must have been late fall of

11   2016.

12   Q.   Where did the meeting take place?

13   A.   It took place at Rishi's home in Chicago.

14   Q.   Why did you meet at Shah's home?

15   A.   Ostensibly to cater to his travel schedule.

16            MR. MADDEN:  At this time I'd like to call up

17   Government Exhibit 1051, which has already been admitted into

18   evidence.

19            I might go to hard copy.  There's a technical

20   difficulty, your Honor.

21            THE COURT:  Sure.  Turn on the ELMO.

22            No.  We'll get this worked out.

23            Okay.  Go ahead if you've got it there.

24            THE CLERK:  I've got it, yeah.

25            THE COURT:  All right.  And is that up?  You need to

1    pull the camera up.  There you go.

2         I told the lawyers if they break it, they buy it.  And

3    first day -- things will go smoother tomorrow, but this is the

4    first day to get all these exhibits up on the screen.  So

5    please be patient with everyone.

6         All right.  You may proceed.

7         MR. MADDEN:  Thank you.

8    BY MR. MADDEN:

9    Q.  Mr. Kazi, are you familiar with the house that's depicted

10   in Government Exhibit 1051?

11   A.  This was the home that I met Rishi in.

12   Q.  Where is this home located?

13   A.  It is in Chicago.

14   Q.  Do you recall what street it's on or what neighborhood?

15   A.  It's on Clark Street just north of the Loop.

16   Q.  And there's -- the screen in front of you is a touchscreen.

17   It looks like there's a number on the right-hand side of the

18   exterior door.  Could you circle that on the touchscreen.

19   A.  Certainly (indicating).

20   Q.  What number is reflected there?

21   A.  924.

22   Q.  You said this is the house where you met with Shah for that

23   next interview?

24   A.  That's correct.

25   Q.  Was anyone else present for the meeting with Shah at his

Kazi - Direct by Madden

1    house?

2    A.  Not that I saw.

3    Q.  I want to turn over the back to the second page of the

4    exhibit.

5            What's reflected in this second page of the exhibit?

6    A.  This is the entryway to the home, with the front door right

7    in front.

8    Q.  And looking at the screen, if you could see the area of the

9    house where you met with Shah, could you circle that as well,

10   please.

11   A.  Certainly (indicating).

12   Q.  What did you and Shah discuss that day at his house?

13   A.  We talked more about the need in the business, different

14   opportunities that -- where I might be able to make an impact.

15   We talked more specifically about any compensation expectations

16   I might have and what governance in the business might look

17   like, et cetera.

18   Q.  I'd like to break that down a little bit.  It sounds like

19   you talked about your role, your expectations for compensation,

20   and then issues related to governance.  Is that right?

21   A.  Correct.

22   Q.  What do you recall about the discussion that the two of you

23   had about your potential role at Outcome?

24   A.  It wasn't anything specific or an offer made, but there was

25   discussions about different parts of the business -- the device

1    side, the content side, and the pharma side -- and different

2    places where there were needs where I could make an impact.

3    Q.  What about comp?  You said that you talked about your

4    expectations for compensation.

5    A.  We did, yep.  I laid out what I thought my -- my

6    expectations would be for long-term incentives to be at the

7    company.

8    Q.  How did Shah react to your expectations for compensation?

9    A.  Without any surprise.

10   Q.  You also mentioned governance.  Could you explain to the

11   jury any discussion you had with Shah about governance at

12   Outcome Health.

13   A.  Sure.  One of the questions I posed was what was in place

14   at the business in the event that Shah himself were a bad actor

15   or were found to be a bad actor.  What was the governance

16   structure like at the business was the question that I asked.

17   Q.  What did you mean by the term "bad actor"?

18   A.  Someone that is doing something not in service of the

19   business itself or something potentially illegal.

20   Q.  Why did you ask Shah that question?

21   A.  Most public companies have a board in place or some sort of

22   governance in place to provide oversight for management.  Many

23   private companies that are investor-backed have boards in place

24   to provide oversight for management.

25            In a closely held private business like Context --

1  like Outcome Health was at the time, it wasn't clear to me

2  whether there was such a governance structure in place or not,

3  and I was trying to get to the bottom of it.

4  Q.  Did the house that Shah was living in have anything to do

5  with your question?

6          MR. HUESTON:  Objection.  Relevance.

7          THE COURT:  Overruled.

8          You can answer.

9          THE WITNESS:  Perhaps not directly.  But it was a very

10  nice house.

11          THE COURT:  Well, if it didn't have any impact on your

12  discussion, then the objection is sustained.

13          If it did have some impact on what your thoughts were,

14  then you can testify to it.

15          THE WITNESS:  It did not.

16          THE COURT:  All right.  Proceed.

17  BY MR. MADDEN:

18  Q.  So you said -- you've mentioned the term "governance."

19  Could you explain to the jury what you mean by the term

20  "governance."

21  A.  Sure.  Typically a group of individuals, committee of some

22  sort that oversees the actions of management, including the CEO

23  and the way they run the company, capital allocation, how money

24  is spent, and how the business is run more generally.

25  Q.  So it was about oversight of the executives, including

Kazi - Direct by Madden

1  Shah?

2  A.  That is correct.

3  Q.  Mr. Kazi, can you please take a look around the courtroom

4  and let the jury know if you see Rishi Shah, the CEO of Outcome

5  Health you met with that day, to whom you posed the "bad actor"

6  question.

7  A.  I see him in the courtroom.

8  Q.  Could you indicate where he's sitting and an item of

9  clothing that he's wearing.

10  A.  He's sitting on the right-hand side of the courtroom

11  wearing a gray blazer.

12          MR. MADDEN:  Your Honor, may the record reflect that

13  the witness has identified the defendant Rishi Shah.

14          THE COURT:  It will.

15  BY MR. MADDEN:

16  Q.  And also can you look around the courtroom and let us know

17  if you see Shradha Agarwal, who you interviewed with that day.

18  A.  I do.

19  Q.  Can you indicate where she's sitting and an item of

20  clothing that she's wearing.

21  A.  Far right and a green top.

22          MR. MADDEN:  May the record reflect that the witness

23  has identified the defendant Shradha Agarwal.

24          THE COURT:  It will.

25  BY MR. MADDEN:

1  Q.  And could you also look around the courtroom and let us

2  know if you see Brad Purdy.

3  A.  I do.

4       MR. POULOS:  We stipulate to the identification, your

5  Honor.  Identity is not an issue in this case.

6       MR. MADDEN:  Thank you.

7       THE COURT:  All right.  The record will reflect the

8  identification by the witness of Mr. Purdy.

9  BY MR. MADDEN:

10 Q.  Mr. Kazi, during the meeting with Mr. Shah that day at his

11 house, did he give you a job offer?

12 A.  He did not give me a job offer at that time.

13 Q.  Did you ultimately get a job offer from Shah?

14 A.  I did.

15 Q.  Was it verbal or written?

16 A.  It was initially a verbal offer, followed up by a written

17 offer.

18 Q.  What role were you offered?

19 A.  I was offered the role of chief operating officer of the

20 life sciences group in the business.

21      MR. MADDEN:  I'm now going to go back to the ELMO, if

22 that's okay.

23      THE COURT:  All right.

24      MR. MADDEN:  For the record, this is Government

25 Exhibit 1123.

Kazi - Direct by Madden

1  BY MR. MADDEN:

2  Q.  Mr. Kazi, I'm just showing you the top half of the

3  document.  But are you familiar with it?

4  A.  I am.

5  Q.  What is this document?

6  A.  This is the written job offer that Outcome Health gave to

7  me.

8  Q.  What was the date of the job offer letter?

9  A.  It is December 22nd, 2016.

10  Q.  According to this, what was the position that you were

11  offered?

12  A.  Chief operating officer, life sciences group.

13  Q.  Who were you going to report to?

14  A.  Rishi Shah, founder and CEO.

15  Q.  What does that mean, to report to someone?

16  A.  They are responsible for guiding you, for giving you

17  priorities, and essentially denoting what you do at the

18  company.

19  Q.  So he was your -- he was going to be your boss?

20  A.  Yes.

21  Q.  And the text is a little bit garbled, but what was your

22  start date?

23  A.  It is -- it was January 9th, 2017.

24  Q.  Can you -- and could you go over your compensation,

25  starting first with the base salary and bonus that's reflected

1    in this offer letter.

2    A.   A base salary of $600,000 per year and an annual bonus of

3    up to $150,000.

4    Q.   I want to draw your attention now to the "Restricted

5    Incentive Award" paragraph.

6        Could you read at least up through the portion about

7    the cliff increments and those percentages starting at the top.

8    A.   Yes.   "Restricted Incentive Award.   You will also receive

9    $750,000 in Restricted Incentive Awards within 30 days of end

10   of quarter for the quarter in which you start employment at

11   ContextMedia.   This grant will have day one initial value, and

12   you will be able to track its performance regularly based on

13   company-released financials.   The RIA grant will have a minimum

14   value of $30 million if it becomes fully vested" -- in paren --

15   "(the 'RIA Guarantee').   The RIA vests upon the satisfaction of

16   both a time-based and liquidity event-based requirement.   The

17   time-based requirement of the grant will be satisfied in annual

18   cliff increments of 10 percent, 10 percent, 20 percent,

19   20 percent, and 40 percent, subject to your continued

20   employment with the Company."

21   Q.   Thank you.

22       First, can you explain what a restricted incentive

23   award is.

24   A.   RIA, or restricted incentive award, is a -- is a long-term

25   incentive plan award that is meant to have some subset of

1    employees stick around at the company for a long period of time

2    in the hopes of making some money at some point in the future.

3    Q.  Was this the equity portion of your compensation?

4    A.  This was the phantom equity portion of my compensation.

5    Q.  What does "phantom equity" mean?

6    A.  So equity is actual stock in a company.  Phantom equity is

7    a promise of a stock award or a promise of a payout.

8    Q.  Okay.  And it appears that there are a couple of

9    requirements for you to -- to get this equity compensation.

10   Could you explain the two requirements.

11   A.  Sure.  So any sort of a long-term incentive award in many

12   cases has what's called a vesting schedule.  So there's a

13   period of time with which certain portions of that award become

14   available to the employee, and in this case in annual

15   increments.  So at the end of every year, 10 percent,

16   10 percent, 20 percent, 20 percent, and then 40 percent would

17   become available, to make a total of 100 percent over a

18   five-year period.

19   Q.  So that's -- is that the time-based requirement for your

20   equity compensation?

21   A.  That is correct.

22   Q.  And there was a second portion in addition to the

23   time-based requirement, correct?

24   A.  It is the liquidity event-based requirement.  And that just

25   implies that there's an event that occurs at some point in the

Kazi - Direct by Madden

1   future that creates liquidity or cash at the company.  The

2   employees are only able to collect the cash that's due to them

3   in the event that there's some sort of a liquidity event, like

4   an initial public offering or a sale of the company or a

5   partial sale of the company.

6   Q.  You mentioned an initial public offering or a sale of the

7   company.  I don't know if you read all the way down to it, but

8   it appears that the initial public offering does appear later

9   in this, little bit below from where you read, correct?  Can

10  you circle that.

11  A.  Yes (indicating).

12  Q.  What is an initial public offering of a company?

13  A.  It's -- it is a process with which stock in the company is

14  offered to the public markets to be bought and sold.

15  Q.  In other words, a private company can become a public

16  company through an initial public offering?

17  A.  That is correct.

18  Q.  Is the term "IPO" sometimes used for initial public

19  offering?

20  A.  It is.

21  Q.  Did you discuss the possibility of an IPO with Shah at any

22  point?

23  A.  There was a point in time where we talked very loosely

24  about an IPO and the fact that, you know, it wasn't -- it

25  wasn't a thing that was necessarily on anybody's mind at the

Kazi - Direct by Madden

1  time.

2  Q.  Okay.  And so the second portion, the liquidity-based

3  event, you described that as either being potentially an IPO

4  or, for example, a sale of the company.

5  A.  Correct.

6  Q.  And what was the value of your equity compensation if

7  those -- in the event that those requirements were met?

8  A.  What was -- what's stipulated here was that there would be

9  a minimum value of 30 million paid to me in the event of a

10  liquidity event and at the end of the vesting period.

11  Q.  Could you explain what it means that it was a minimum value

12  of 30 million.

13  A.  That if, for whatever reason, my RIA grant was worth less

14  than 30 million at -- in the event of a sale or an IPO that I

15  would be made whole up to the 30 million.

16  Q.  And if it was worth more than that, you would get the

17  upside?

18  A.  Correct.

19  Q.  I'm going to show you the second page of Government

20  Exhibit 1123.

21       There's an undo button, I think -- thank you.  Someone

22  did that for you.

23       Who signs the letter?

24  A.  It is signed by Brad Purdy, the company chief operating

25  officer.

Kazi - Direct by Madden

1   Q.   Did -- does your signature appear on the letter?

2   A.   It does.

3   Q.   Did you ultimately accept this offer?

4   A.   I did.

5   Q.   And when did you, in fact, start at Outcome Health?

6   A.   I started January 9th, 2017.

7   Q.   How long did you work at Outcome?

8   A.   I worked there for two weeks and three days.

9   Q.   At a high level, can you describe Outcome Health's business

10  model.

11  A.   Sure.  The company negotiates with physicians and

12  physicians' offices to place equipment in their offices,

13  equipment like tablets and wall boards and televisions.

14       They then show proprietary educational content on

15  those devices.  And with certain frequency, they show relevant

16  pharmaceutical drug ads on those devices.  And they have a

17  group at the business, the life sciences group, that's

18  responsible for negotiating advertising contracts with

19  pharmaceutical companies.

20  Q.   Okay.  Let me stop you there.

21       You said that the company puts three types of

22  screens -- or at that time was putting three types of

23  screens -- TVs, tablets, and wall boards -- into doctors'

24  offices?

25  A.   Correct.

Kazi - Direct by Madden

1  Q.  Was Outcome charging the doctors' offices for those

2  screens?

3  A.  They were giving them away for free.

4  Q.  How did Outcome make money?

5  A.  They charged the pharmaceutical companies to run ads.

6  Q.  What were some of the expenses that Outcome had?

7  A.  I would say the biggest category of expenses, all of the

8  staff at the company and then, secondarily, the capital

9  purchases of all of the equipment that they placed into

10  physicians' offices.

11  Q.  Do you know -- I know you weren't there for very long.  But

12  do you know approximately how many employees Outcome had at

13  that time?

14  A.  I cannot recall.

15  Q.  Okay.

16       THE COURT:  And when you get to a convenient spot,

17  we're near 4:30.  Finish up the line of questioning.  But if --

18  go ahead and do that.

19       MR. MADDEN:  Now would be -- I mean, we could -- I'm

20  kind of on the same topic for the next 10 or 15 minutes.

21       THE COURT:  Okay.  Then we'll break for the evening.

22       Ladies and gentlemen, we'll break until 9:00 tomorrow

23  morning.  You need to take all your materials back with you.

24  Please lock them in the jury room.  I know you're spread out in

25  the hallway, but these should be locked -- or put in the jury

1    room, which we'll lock.

2            Please don't discuss the case among yourselves or with

3    anyone else.  Keep an open mind.  Stay away from any news media

4    or anything else that may touch on this case.

5            And we will see you tomorrow morning.  Thank you all.

6            COURT SECURITY OFFICER:  All rise.

7        (Jury out at 4:29 p.m.)

8            THE COURT:  Okay.  If you can close that back door,

9    please.  Is this door closed?  Yeah, I think it is.

10           All right.  Have a seat, please.

11           MR. MADDEN:  Can Mr. Kazi be excused, your Honor?

12           THE COURT:  Sir, you can be excused.  You're still on

13   direct examination.  You can speak to the government if you

14   choose to do so.  If they want to talk to you, there's no

15   prohibition against it.

16           So you're excused.  Please be back by 9:00 tomorrow

17   morning.

18           THE WITNESS:  Yes.

19           THE COURT:  Thank you.

20           All right.  Is there anything anyone wants to put on

21   the record?  I have a couple technical issues to talk through

22   how we can smooth out some things, but none of that needs to be

23   on the record.

24           Anything from the government you need on the record?

25       (Counsel conferring.)

1          MR. MADDEN:  I don't know if this -- I don't know this

2   needs to be on the record, but just we've got the exhibits for

3   tomorrow, Ketchum being the other witness.

4          THE COURT:  Yeah.  Are they all in a position where

5   they're unopposed?

6          MR. MADDEN:  We -- I don't think so.  So I think we'd

7   have to discuss that with the defense.

8          THE COURT:  Okay.

9          Then we will have to do that tomorrow morning.  But

10   I'd like to do that outside the presence of the jury.

11          MR. MADDEN:  Of course.

12          THE COURT:  Anything else from the government that you

13   want to put on the record?

14          MR. MADDEN:  No, your Honor.

15          THE COURT:  How about from defense?

16          MR. HUESTON:  Well, just a request for the government.

17   We can expedite the process if you identify which of the

18   Ketchum exhibits, and then we'll work in good faith to try to

19   overcome any objections.

20          MR. MADDEN:  We'll do that.

21          THE COURT:  Okay.  Anything else from defense?

22          MR. POULOS:  Not on the record, your Honor.  Not on

23   the record.

24          THE COURT:  Anything for defendant Agarwal?

25          MS. BELL:  Your Honor, I don't believe so.  I think

1    Ms. Chou is going to raise something related to the exhibits.

2              THE COURT:  Go ahead.

3              MS. CHOU:  Your Honor, I think this might have just

4    been, you know, first-day confusion, but we had lodged

5    objections to two of these exhibits.  They were hearsay

6    objections, which I think your Honor has indicated that -- that

7    these documents all likely are considered business records and

8    will come in anyway.  But I don't think that was actually --

9              THE COURT:  Well, if they were not opposed -- or if

10   they were opposed and they were admitted -- they haven't been

11   shown to the jury yet, correct?

12             MR. MADDEN:  Correct.

13             THE COURT:  All right.  Then let's deal with each one

14   of them.  Or do you want to discuss it?

15             MR. MADDEN:  I'm not sure which ones they were.

16             MS. CHOU:  794, and then 795 was not on your list of

17   disclosed exhibits.  You had written down 875, so I'm not sure

18   if that was --

19             THE COURT:  We can go off the record for a minute.

20        (Off-the-record discussion.)

21             THE COURT:  Anything else we need to put on the

22   record?  Anything else anyone wants to raise?

23             Hearing nothing, I assume not.

24             Okay.  Let me tell you about business records.

25             If a record is made as part of the regular practice of

1   the business and the author was under some business duty to

2   generate the e-mail in this case, then it would be a business

3   record.

4          The reliability on it doesn't attach just because a

5   person who is engaged in a business activity writes it.  Just

6   because someone in a business writes it, that doesn't go to the

7   reliability of it.

8          It's essential that the statement be of the type that

9   persons engaged in the activity record that information

10  routinely.

11         Now, it may very well be that the back-and-forth

12  between employees of the company is a routine practice that

13  they engage in.

14         If there's some objection based on issues of

15  reliability as to that recording of a -- that's reflected in

16  e-mail, certainly there can be pushback on whether or not it's

17  a business record.

18         I've found a couple district court cases that state,

19  in essence, every e-mail between people in a company is not a

20  business record because they're with a company.

21         On the other hand, I haven't seen -- at least my

22  limited view of the e-mails as has been described in your

23  *Santiago* proffer -- seen any e-mails that are outside the

24  bandwidth of what would be routine communication between

25  employees about either metrics or communications with customers

1      or communications with lenders or communications among

2      themselves about those same communications.

3              That to me would constitute, I believe, a business

4      record absent you pointing out something about the document

5      that's not.

6              Now, if you're going to offer it as a business record,

7      it's the obligation of the party that's not offering it, or

8      opposing its admission, to come to me and tell me why you don't

9      think it's reliable.

10              Similarly, if the defense offers it as a business

11     record, which is the more problematic issue because if the

12     government offers it and one of the three defendants is on it,

13     it's an admission anyway.

14              But if the defense offers it, even if one of their

15     clients is on that, it only comes in if it comes in as a

16     business record or some other exception to the hearsay rule.

17              And you're going to -- and then you, the government,

18     will have to be opposing those e-mails on a reliability issue

19     or on some other -- one of the prongs of the business record.

20              That's my understanding of the business record rule.

21     I'm happy to hear pushback from anybody if I got it wrong in

22     law school and -- or if there's cases that point out that what

23     I've just said is incorrect.  And I'll expect you to provide it

24     to me if you think that formula that I'm postulating is

25     incorrect.

1      But that's how I see it.  And point out to me either

2  now or at some point during trial -- not during witness

3  testimony on jury time -- where that analysis is incorrect.

4      So --

5      MR. MADDEN:  Understood.

6      THE COURT:  -- you're not offering anything,

7  Mr. Madden?

8      MR. MADDEN:  No, not right now.  I prefer to consult

9  with my colleagues and think about it a little bit.

10      THE COURT:  That and consult with "Evidence by

11  MacArthur" down there if you want.  You can do that.

12      And similarly, on the defense side, I'd expect you to

13  point out to me where you think, if the government is offering

14  it, there are issues of reliability that would be part of the

15  equation of whether it could be offered as a business record.

16      But when I made the statement this morning, it was a

17  broad statement saying everything seems within the bandwidth of

18  what these people do on a daily basis for their work.  It's not

19  necessarily the end of the analysis, but that was my initial

20  thought when I spoke this morning and caused alarm by both

21  sides that all rules of evidence are off.

22      They're not.  The rules of evidence still exist in

23  this trial and in the courtroom.  And you'll have to satisfy

24  the -- absent agreement, you'll have to satisfy the

25  prerequisites of the business record exception to the hearsay

1    rule if you're going to offer something.

2            MR. HUESTON:  Thank you, your Honor.  I'm just going

3    to say I didn't see you abandoning the rules of evidence.  But

4    appreciate it.

5            THE COURT:  All right.

6            Okay.  Anything else you want to put on the record?

7            MR. MADDEN:  No, your Honor.

8            MR. HUESTON:  No, your Honor.

9            THE COURT:  Okay.  Laura, off the record.  You're free

10   to go.  Thank you.

11       (Off-the-record discussion.)

12           (Concluded at 4:38 p.m.)

13                    C E R T I F I C A T E

14      We, ELIA E. CARRIÓN, KATHLEEN M. FENNELL, and LAURA R.

15   RENKE, certify that the foregoing is a correct transcript of

16   the record of proceedings in the above-entitled matter.

17

18   */s/ ELIA E. CARRIÓN*                    *January 31, 2023*
     ELIA E. CARRIÓN, CSR, RPR, CRR
19   Official Court Reporter

20
     */s/ KATHLEEN M. FENNELL*               *January 31, 2023*
21   KATHLEEN M. FENNELL, CSR, RMR, FCRR
     Official Court Reporter
22

23   */s/ LAURA R. RENKE*                    *January 31, 2023*
     LAURA R. RENKE, CSR, RDR, CRR
24   Official Court Reporter

25