1       IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3    UNITED STATES OF AMERICA,            )
                                          )   Docket No. 19 CR 864
4                    Plaintiff,           )
                                          )   Chicago, Illinois
5        v.                               )   January 31, 2023
                                          )   8:32 a.m.
6                                         )
     RISHI SHAH, SHRADHA AGARWAL,         )
7    BRAD PURDY,                          )
                                          )
8                    Defendants.          )

9           TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 2A
10        BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury

11   APPEARANCES:
12

13   For the Government:     MR. MATTHEW F. MADDEN
                             MR. SAURISH APPLEBY-BHATTACHARJEE
14                           Assistant U.S. Attorneys
                             219 South Dearborn Street, 5th Floor
15                           Chicago, Illinois  60604

16
                             MR. WILLIAM E. JOHNSTON
17                           MR. KYLE C. HANKEY
                             U.S. Department of Justice
18                           Criminal Division, Fraud Section
                             Washington, D.C.  20530
19

20

21

22                     ELIA E. CARRIÓN
                     Official Court Reporter
23                 United States District Court
             219 South Dearborn Street, Room 1432,
24                   Chicago, Illinois 60604
                        (312) 408-7782
25               Elia_Carrion@ilnd.uscourts.gov

1   APPEARANCES (Continued:)

2
    For Defendant
3   Shah:                          MR. JOHN C. HUESTON
                                    Hueston Hennigan LLP
4                                   620 Newport Center Drive, Suite 1300
                                    Newport Beach, California  92660
5
                                    MS. VICKI CHOU
6                                   MR. MICHAEL H. TODISCO
                                    MS. KAREN DING
7                                   Hueston Hennigan LLP
                                    523 West 6th Street, Suite 400
8                                   Los Angeles, California  90014

9
    For Defendant
10  Agarwal:                       MS. KOREN L. BELL
                                    MR. A. ALEXANDER LOWDER
11                                  MR. STEPHEN G. LARSON
                                    Larson LLP
12                                  555 South Flower Street, Suite 4400
                                    Los Angeles, California  90071
13
                                    MR. PATRICK W. BLEGEN
14                                  MS. KELSEY H. KILLION
                                    Blegen & Garvey
15                                  53 West Jackson Boulevard, Suite 1437
                                    Chicago, Illinois  60604
16
17  For Defendant
    Purdy:                         MR. THEODORE T. POULOS
18                                  MR. ERIC PRUITT
                                    MR. JOHN PAVLETIC
19                                  Cotsirilos, Tighe, Streicker, Poulos &
                                    Campbell, Ltd.
20                                  33 North Dearborn Street, Suite 600
                                    Chicago, Illinois  60602
21

22

23

24

25

1           (Proceedings held in open court.)

2           THE CLERK:  This is case No. 19 CR 864, United States

3   v. Shah, Agarwal, and Purdy.

4           THE COURT:  All right.  Good morning.  I wanted to go

5   over a couple of things, if you could please shut the door in

6   the back.  I'd like to go over a couple of things before we

7   have to take a break at 8:45 for other cases I have to hear.

8           It looks like some of the parties are here, at least

9   every party is represented.  Some the parties are here, some

10  are not.

11          Any objection proceeding in the absence of your

12  clients for Defendants Shah and Agarwal?

13          MS. CHOU:  No, Your Honor.

14          MS. BELL:  No, Your Honor.

15          THE COURT:  No?  Okay.

16          The first thing is I believe there was going to be an

17  acknowledgment on the record by the defendants that

18  identification will not be an issue so that the government can

19  proceed with their examination of witnesses without having to

20  go through the ritual of having each witness identify a

21  defendant and having the defendants stand up.

22          Is that true on behalf of the Defendant Shah?

23          MS. CHOU:  Yes, Your Honor.

24          THE COURT:  Defendant Agarwal?

25          MS. BELL:  Yes, Your Honor.

1    THE COURT:  And Defendant Purdy?

2    MR. POULOS:  Yes.

3    THE COURT:  Any additional information or

4    acknowledgment you want on behalf of the defendants from the

5    government?

6    MR. MADDEN:  No, Your Honor.

7    THE COURT:  Okay.  That is the agreement.

8    All right.  There were exhibits admitted yesterday,

9    perhaps over -- I thought without objection, and it may very

10   well have been over objection, at least to one or two, but I

11   think there was some confusion on that.

12   MS. CHOU:  We've worked it out, Your Honor.

13   THE COURT:  All right.  They're without objection,

14   then, correct?

15   MS. CHOU:  Correct.

16   THE COURT:  Okay.  And I'd ask you to still follow

17   the protocol I suggested at the very beginning, which is at

18   the end of every day, someone from each team get together and

19   make you're all in agreement on the exhibits that were

20   admitted.

21   If there's a disagreement, bring it to my attention.

22   Absent that, you're going to be keeping a running list; I will

23   not be.  I'm not going to keep track of 1,000 exhibits, but

24   you'll keep a running list of the ones that are actually

25   admitted.  So when we get to providing them to the jury, then

1  we won't have disagreements and be hunting through a

2  transcript looking to see whether it was admitted or not.

3          Are you following that procedure?

4          MR. MADDEN:  We did it last night, Your Honor.  A

5  member of our team emailed the -- a copy or a list of the

6  admitted exhibits to the defense, and I think we're -- the

7  defense agrees.

8          THE COURT:  Great.

9          MR. MADDEN:  We'll do it every night.

10         THE COURT:  Okay.  Very good.

11         My courtroom deputy had a request from one of the

12 jurors that the attorneys identify themselves every day, for

13 at least a few days, so they can recognize you and understand

14 who represents who.  I don't think there's any confusion about

15 who represents the parties, given the attorneys that did the

16 opening statements, but there's a lot of people in the

17 courtroom who didn't speak yesterday, and I think they wanted

18 to get some more introductions around.

19         So we'll do it at the start of today.  And I think

20 every time someone gets up, it's good if they identify

21 themselves and say who they represent.  And we'll do the same

22 tomorrow morning.

23         Okay.  Any other suggestions on that?

24         MR. MADDEN:  On a separate issue, Your Honor, we just

25 ask that the Court remind the jurors about which elevator bank

1   to take, just so we're all on separate elevator banks.

2           THE COURT:  Sure.  Okay.

3           Ms. Bell, did you want to say something?

4           MS. BELL:  Yes.  Thank you, Your Honor.

5           Just with respect to the objections, in order to have

6   a clean record preserving the Santiago issue, which we

7   understand has been overruled and yet still needs to be

8   specifically asserted as to particular documents we believe it

9   applies to, I think is where we ended up.  Because if not, I

10  think with the quantity of evidence, it would be confusing.

11          I'm just wondering about the memo streamlined

12  procedure.  Perhaps we continue to file something with the

13  Court like we did the other day, where we listed the specific

14  objections so that the Court in bulk can simply say per the

15  Court's prior ruling, those are all overruled.  Or something

16  to that effect.

17          But we understand we're not seeking to press that

18  argument at this point, but we do want a clean record that we

19  have that ongoing issue and that it's not just as to the

20  hearsay exception component, but also to 401, 403 on the

21  grounds of essentially undue prejudice, given, you know,

22  our -- our theory here that this is not a single overarching

23  theme.

24          So I just wanted to discuss what's the best way to

25  proceed so that it's least disruptive, would be with respect

1    to that.

2              THE COURT:  Well, what's the government's response?

3              MR. MADDEN:  It seems like they're reraising their

4    standing objection that the Court has already denied.  I guess

5    I don't see -- on the 403, I don't see how a single

6    overarching scheme is a 403 argument.  We understood that as a

7    more substantive argument, rather than like a standing

8    403 objection.

9              MS. BELL:  I can address that, Your Honor.  And we're

10   not reraising it.  This was kind of the idea behind the

11   standing objection.  It was just an easy shorthand way we

12   could say we believe this objection applies; we want to

13   preserve it as to this document.  We understand it's been

14   overruled.  We're not seeking to -- we don't even need to

15   raise it in court.

16             We just want a clean record that we're raising that

17   particular set of objections as to a particular document.  And

18   the 403 issue, just to be clear, is if there's no single

19   overarching scheme, then this, you know, inflammatory evidence

20   as to Desai and what he and his underlings did would not be

21   admissible as to our client.

22             So in our view, it's all part and parcel of the

23   challenge we have raised and intend to reassert at the end of

24   the government's case-in-chief as to the premise of an

25   overarching scheme.

1    THE COURT:  Well, I think these need to be argued

2  outside the presence of the jury.  If you have a series of

3  documents you intend to introduce today, I don't know if...

4    I'll wait until Mr. Madden's done.

5    Mr. Madden, are you going to be offering a series of

6  exhibits today that you're going to offer for admission into

7  the -- admission into evidence before we start with the jury

8  this morning?

9    MR. MADDEN:  The only other witness we're going to --

10  not for Kazi.  For Kazi, we're fine.  The only other witness

11  that I think we'll get to today is Jason Ketchum.

12    And there's been back and forth between the parties,

13  and I think we're close to an agreement, but I'm not sure.  I

14  think there are still some outstanding exhibits.  I'm not sure

15  if the defense is still going to object to them or not.

16    THE COURT:  How much longer is your direct?

17    MR. MADDEN:  About an hour, Your Honor.  Maybe about

18  an hour.

19    THE COURT:  All right.  How long is the cross?

20    MS. CHOU:  I think ours is about two hours.

21    THE COURT:  Oh, all right.  Well, we're not going to

22  be getting to -- and I don't know what anybody else's is, but

23  it's something more than to the two hours that Defendant Shah

24  is going to cross, so I -- I think when we are outside the

25  presence of the jury, when the government seeks to offer

1  exhibits and there is no objection or the objection is --
2  whatever your objection is, we do it at the time of the
3  admission on the assumption we're going to get all these
4  exhibits admitted before the witness hits the stand -- or
5  resolved before the witness hits the stand now.

6  Now, that can't anticipate exhibits you're going to
7  use on cross.  You may be seeking to offer them at that time.
8  My suggestion is you offer them on cross, rather than waiting
9  to offer up a wheelbarrow full of them during your case.

10  Is there any objection to defense offering exhibits
11  through a witness if the authentication or foundation's been
12  laid?

13  MR. MADDEN:  No, Your Honor.

14  THE COURT:  All right.  So do it at that time.

15  MS. CHOU:  Yes, Your Honor.

16  THE COURT:  And that's how I've always seen it,
17  anyway, but I just want to make sure you follow that protocol.

18  I think these standing objections can be made at the
19  time the government offers them.  It -- outside the presence
20  of the jury.  If there is an additional objection that wasn't
21  made earlier, you're not waiving it as long as you bring it up
22  in a timely fashion, same day; in other words, if there's
23  something you forgot.

24  But it's really not going to -- it's a pro forma
25  objection to preserve the record, but not to keep the document

1  from coming in.  Make your objection in your record later that
2  day at a break.  I will not view that as a waiver.

3       And I think that's the easiest way to streamline
4  this.  As you might have guessed, my single solid -- well, one
5  of my goals is to minimize the time the jury has to sit back
6  there and not be out here between 9:00 and 5:00.

7       MS. BELL:  Yes, Your Honor.

8       THE COURT:  I want to make it two 15-minute breaks
9  and an hour for lunch.  And other than that, I really want
10  them out here and have you examining witnesses.

11       MS. BELL:  Yes, Your Honor.  We'll make sure that's
12  not disruptive at all.  We'll take care of it in a very
13  streamlined fashion.

14       THE COURT:  Yeah.  And I think the protocol I
15  described will allow that.

16       MS. BELL:  Yes, Your Honor.

17       THE COURT:  But we'll work it out.

18       MS. BELL:  Yes, Your Honor.  We can simply, I think,
19  just list for the record the following exhibit numbers, you
20  know, for the set.  The government can list its set.  We can
21  list our set and say we -- you know, that's per the standing
22  objection.  And Your Honor can swiftly dispose of that.

23       THE COURT:  Well, and if it's an objection other than
24  the separate conspiracy --

25       MS. BELL:  Correct.

1    THE COURT:  You know, if it's a standing objection

2    that the allegations in the Santiago proffer that the

3    government set forth was multiple conspiracies and they're not

4    going to be able to tie it up, that's part of your standing

5    objections you put in writing.

6        If there's something else, this particular document

7    is not relevant, this particular document is -- its relevance

8    is outweighed by its prejudicial impact, state that at our

9    break.

10    MS. BELL:  Understood, Your Honor.

11    THE COURT:  That's not a standing objection.  That's

12    something different.

13    MS. BELL:  Yes, understood.

14    MR. BLEGEN:  Judge, one thing.  I don't know if you

15    recall.

16        If we inadvertently ran into a juror this morning,

17    that's why the government raised the elevator issue.

18    THE COURT:  Yeah.

19    MR. POULOS:  Ms. Hipp and I got on -- we were on the

20    elevators we were supposed to take.  The juror got on, and

21    then Mr. Johnston on on the 13th floor.  Hipp and I didn't

22    even realize it was a juror until she had already walked down

23    the hall, and Mr. Johnston said, oh, that was a juror, so...

24    THE COURT:  Did either of you say anything in the

25    elevator?

1          MR. BLEGEN:  No.  But I think I did let her get on
2     the elevator before me.

3          THE COURT:  Okay.  I'll remind them about the
4     elevator issue.  As long as nobody spoke, these things happen
5     occasionally.  And we don't have juror badges like some
6     courthouses.

7          MR. BLEGEN:  And we did not discuss the case at all
8     on the elevator.

9          THE COURT:  Great, okay.  No harm.

10          I'll remind them, though, of that protocol we're
11     using.

12          Mr. Poulos.

13          MR. POULOS:  Going back just to the standing
14     objection-type issues.  Just logistically, it would be very
15     helpful if we could ask the government when they send over
16     their list of exhibits that they're going to be introducing,
17     if they could in one column of the Excel sheet that they're
18     using just put 801(d)(2)(E) or 801 or any shorthand signal for
19     these are the ones we're offering under 801(d)(2)(E), it would
20     really expedite the process for us to be able to say these are
21     the ones we object to.

22          THE COURT:  I'm not going to -- the government's
23     doing more than they have to, which is fine.  I'm glad they
24     are.

25          MR. POULOS:  Yeah.

1       THE COURT:  I simply am not going to involve myself

2   in what sounds like a very practical suggestion you have.

3   It's up to you and the government.  I'm not going to

4   micromanage something I can't compel.

5       MR. POULOS:  I understand.

6       THE COURT:  But your suggestion is a good one.  The

7   government can take it or leave it, and that's -- they have

8   their own challenges to put together a case like this.  And if

9   that's a huge time drain, you know, they'll tell you.

10      MR. POULOS:  Yeah.  But I -- it's a far larger time

11  drain for us to try to have to go through those, read them,

12  determine -- to guess -- guess which ones these are.

13      THE COURT:  Okay.

14      MR. POULOS:  And so that's why I raised it, but I'll

15  speak to Mr. Madden and his team.

16      THE COURT:  Yeah, I think that's the best route to

17  go.  Okay.

18          I have to call some other cases.  Go about your work,

19  but please try to be a little quiet.

20          (Pause in the proceedings.)

21          (Jury in at 9:04 a.m.)THE COURT:  Please be seated.

22          Good morning, ladies and gentlemen.  A couple quick

23          reminders.  Please use the elevators closest to the

24          courtroom.  And I'll instruct the parties and attorneys

25          to use the elevators at the far end.

1        Figure out where that is on the first floor.  I've
2    been here ten years, and I'm still confused which bank
3    goes to which side.  But once you identify where the
4    proper side of the building is when you're downstairs,
5    always use that.  Then we won't have the occasional
6    bump-ins with attorneys and parties and it'll just
7    minimize those kinds of contact.
8        Secondly, the stipulation read yesterday and other
9    stipulations that are going to be read throughout the
10   trial, they're all going to be put in written form.
11   These are all written stipulations.  So all those
12   acronyms about the Bates numbers, Bates stamps, where
13   documents came from, it's not a memory test and you
14   don't have to learn shorthand to get all those down when
15   it's being read.  You'll get a copy of that when you
16   deliberate, so don't feel it necessary to -- it's
17   probably better to listen than write stuff down quickly
18   on that.
19       Because you'll actually get a binder of these
20   stipulations.  You won't get testimony.  That -- you
21   won't get transcripts, but you will get such a binder of
22   the stipulations and, of course, the exhibits, you'll
23   get.
24       And then finally, I think I'm going to ask the
25   attorneys right now to once again identify themselves

1         for the record and who they represent.  There's a lot of

2         people over here.  It's important for you to recognize

3         them as they come up.  Certainly the three attorneys

4         that are argued yesterday, you remember; but there's a

5         lot of other attorneys that are going to have roles in

6         this case.

7         So I'd ask each side to identify the people at their

8         table.  You can take your mask off when you do it.

9         MR. MADDEN:  Thank you, Your Honor.

10         Good morning again, everyone.  Matthew Madden on

11 behalf of the United States.  I'm joined by Annamelda Paul

12 from the Department of Justice, she's a law clerk;

13 Marlon Cromwell, who is a paralegal with DOJ; Mark Stakem,

14 whose a special agent with the FBI; William Johnston, who is

15 another prosecutor with DOJ; Saurish Appleby-Bhattacharjee,

16 another DOJ prosecutor; and Kyle Hankey, who gave the opening

17 statement, another DOJ prosecutor.

18         THE COURT:  All right.  Thank you.

19         On behalf of Defendant Shah?

20         MR. HUESTON:  Good morning, everybody.  Nice to see

21 you again.  My name is John Hueston, and I am representing

22 Mr. Rishi Shah, along with Karen Ding and Vicki Chou.

23         THE COURT:  Thank you.

24         On behalf of Ms. Agarwal.

25         MS. BELL:  Good morning, everyone.  I'm Kori Bell.

Kazi - direct by Madden

261

```
 1  And I'm joined by colleague Alex Lowder, who gave the opening
 2  statement, as well as Pat Blegen and Kelsey Killion.  And we
 3  are privileged to represent our client, Shradha Agarwal right
 4  here.
 5          THE COURT:  Thank you.
 6          And on behalf of Mr. Purdy.
 7          MR. POULOS:  Good morning again.  Ted Poulos.  This
 8  is Brad Purdy, of course; and my colleagues Eric Pruitt and
 9  L.J. Pavletic.
10          THE COURT:  All right.  Thank you.
11          All right.  The witness is on the stand.
12          Sir, you're still under oath.  You can take your mask
13  off.
14          You may proceed.
15          MR. MADDEN:  Thank you, Your Honor.
16          I just want to test that my microphone it's working.
17  Yes, good.
18      SAMEER KAZI, GOVERNMENT WITNESS, PREVIOUSLY SWORN
19                  DIRECT EXAMINATION [resumed]
20  BY MR. MADDEN:
21  Q.  Mr. Kazi, I believe that when we left off yesterday, you
22  had just started to talk about your brief employment at
23  Outcome, correct?
24  A.  Yes.
25  Q.  And you said that you worked there a little bit longer
```

Kazi - direct by Madden

1   than two weeks?

2   A.  Correct.

3   Q.  And then you also described the background of what the

4   business was, correct?

5   A.  Correct.

6   Q.  How many offices did Outcome have that you're aware of?

7   A.  I was aware of a Chicago office and a New York office.

8   Q.  Which Outcome Health office were you going to be based out

9   of?

10  A.  I would have been based out of the New York office.

11  Q.  During your time at Outcome, which I believe you said was

12  a little bit more than two weeks, were you actually in the

13  New York office?

14  A.  I was.

15  Q.  Could you explain to the jury when you were in the

16  New York versus Chicago?

17  A.  During my first week, I spent four or five days there.

18  And then in the last three days of my employment, I spent a

19  couple of days there as well.

20  Q.  Okay.  In New York?

21  A.  Correct.

22  Q.  And then the remaining time, were you in Chicago?

23  A.  That is correct.

24  Q.  Your offer letter that we went over yesterday reflected

25  that you were going to report to the CEO, Rishi Shah.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 18 of 310 PageID #:12817
Kazi - direct by Madden
263

1          Did you, in fact, report to Mr. Shah?

2     A.  I did.

3     Q.  During the time that you were at Outcome, approximately

4     how many in-person meetings did you have with Shah?

5     A.  Three.

6     Q.  We'll go over the details of those meetings in a few

7     minutes, but first, I want to ask you some more background

8     questions about your employment at Outcome.

9          Did anyone report to you?

10    A.  I had two direct reports.

11    Q.  Who were they?

12    A.  Liane Pierce and Adam Prowker.

13          MR. MADDEN:  May we please publish Government

14    Exhibit 1116?

15    BY MR. MADDEN:

16    BY MR. MADDEN:

17    Q.  Do you recognize the individual in that photo?

18    A.  I do.

19    Q.  Who is that?

20    A.  That is Adam Prowker.

21    Q.  What was Prowker's role at Outcome Health?

22    A.  He was responsible for data science and postcampaign

23    analysis.

24    Q.  What does that mean?

25    A.  He assessed the performance of the advertising campaigns

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 19 of 310 PageID #:12818
Kazi - direct by Madden
264

1    that were run by Outcome Health.

2            MR. MADDEN:  Can we please now publish Government

3    Exhibit 1115?

4    BY MR. MADDEN:

5    Q.  Do you recognize the individual who's depicted in that

6    photo?

7    A.  I do.

8    Q.  Who is it?

9    A.  That is Liane Pierce.

10   Q.  What was Pierce's role at Outcome Health?

11   A.  She was responsible for managing clients and for the

12   rollout of the ad campaigns.

13   Q.  After you started at Outcome Health, how did you

14   communicate with Outcome Health executives and employees?

15   A.  Email, text message, voice app called "Voxer."

16   Q.  What's Voxer?

17   A.  Voxer is an application you download to your phone that

18   allows you to send short voice messages back and forth.

19   Q.  When you were at Outcome, how often did you use Voxer to

20   send messages?

21   A.  Infrequently.

22   Q.  You said that you met with Shah approximately three times

23   in person during the 17 days that you were at Outcome,

24   correct?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 20 of 310 PageID #:12819
Kazi - direct by Madden
265

1  Q.  Were those all in-person meetings?

2  A.  They were.

3          MR. MADDEN:  Could you please now publish Government

4  Exhibit 1118?

5          And could you blow it up just a little bit, please?

6  BY MR. MADDEN:

7  Q.  Mr. Kazi, do you see the calendar on the screen in front

8  of you?

9  A.  I do.

10  Q.  Does that calendar accurately reflect the dates of your

11  employment at Outcome and then also the dates of several

12  meetings that you had while you were there?

13  A.  It does.

14  Q.  Turning first to your dates of employment, using the touch

15  screen, could you circle the -- your first day and your last

16  day there?

17  A.  [Witness complies.]

18  Q.  What was your first day?

19  A.  It was January 9, 2017.

20  Q.  What was your last day?

21  A.  January 25, 2017.

22          MR. MADDEN:  And could someone undo those circles, if

23  you don't mind?  Thank you.

24  BY MR. MADDEN:

25  Q.  Thank you.

Kazi - direct by Madden

266

1    Turning to your first week, I think you testified

2  that you were in New York for the majority of that week,

3  correct?

4  A.  Correct.

5  Q.  Were you in Chicago at any point that week?

6  A.  I was in Chicago on that Friday.

7  Q.  Did you meet with Shah that day?

8  A.  I did.

9  Q.  As reflected in the calendar?

10    Where did you and Shah meet?

11  A.  At his office, at the Outcome offices.

12  Q.  Was that the first in-person meeting you had with Shah

13  after you started the company?

14  A.  I believe so.

15  Q.  What do you recall about that meeting with Shah?

16  A.  It was an opportunity for me to provide some information

17  to him about my experience in the first week and for him to

18  share with me sort of the -- what he shared with me was the

19  opportunity at the business in terms of possible revenue,

20  et cetera.

21  Q.  Could you tell us a little bit more about what Mr. Shah

22  said about the opportunity for revenue at the business?

23  A.  Sure.  His -- he indicated to me that there was enough

24  inventory of tablets and wallboards and televisions at

25  physicians' offices to have -- to -- to get Outcome to a

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 22 of 310 PageID #:12821
Kazi - direct by Madden
267

1   billion dollars in revenue just with the existing inventory
2   alone.
3   Q.  Did that surprise you?
4   A.  It did surprise me.
5   Q.  Why?
6   A.  I was starting to hear some indication that we had clients
7   where we did not have enough inventory to fulfill what
8   contractual commitments were made to them.
9   Q.  Even in your first week, you were starting to hear that?
10  A.  I was.
11  Q.  What -- how much revenue, approximately, did Outcome have
12  at that time, annually?
13  A.  Around $200 million.
14  Q.  So the increase to over a billion would be significant?
15  A.  It would be very significant.
16  Q.  Do you recall anything else about that discussion about
17  revenue at the meeting?
18  A.  Nothing other than the fact that it was both surprising
19  and exciting to me if indeed there was that much latent
20  revenue to be had in the business.  I wanted to go pursue that
21  as quickly as possible.
22  Q.  Did Shah give you any direction along those lines?
23  A.  I don't recall him giving me any direction.  I remember
24  thinking to myself that there were a number of things I needed
25  to dig into to try to figure out how to go unlock that

Kazi - direct by Madden

268

1   revenue.

2   Q.  Is there anything else about that meeting on the first

3   Friday you worked at Outcome with Shah that stands out to you?

4   A.  Nothing else that I would add.

5          MR. MADDEN:  Could we go back to the calendar,

6   please?

7   BY MR. MADDEN:

8   Q.  Drawing your attention to the calendar, when was your next

9   in-person meeting with Shah, approximately?

10  A.  Thursday, the 19th.

11  Q.  That was your second week at Outcome?

12  A.  That is correct.

13  Q.  Where was that meeting?

14  A.  That was also at Mr. Shah's office in the Outcome offices,

15  Chicago.

16  Q.  Do you recall if anyone else was present besides you and

17  Shah?

18  A.  I don't recall.

19  Q.  If there was any -- a third person present, who was it?

20  A.  It would have been Mr. Shah's chief of staff.

21  Q.  What do you recall, if anything, about that second meeting

22  with Shah?

23  A.  It was not -- at this point -- at this, after all these

24  years, it's not very memorable to me exactly what we talked

25  about in that meeting.

Kazi - direct by Madden

269

1   Q.  Understood.

2          Did you meet with either Agarwal or Desai during the

3   several weeks you worked at the company?

4   A.  I did, with both of them.

5   Q.  Starting first with Agarwal, did you have any in-person

6   meetings with her?

7   A.  I did have an in-person meeting with her.

8   Q.  Do you recall when it was, approximately?

9   A.  It was sometime in the second week.  It may have even been

10  on that 19th.

11  Q.  Was it in person?

12  A.  It was.

13  Q.  Who else was present, if anyone, besides the two of you?

14  A.  Her chief of staff may have been present.

15  Q.  What do you recall about that meeting with Agarwal?

16  A.  My goal in that meeting was just to bring to light my

17  understanding about inventory at the business and how as a

18  business we did not have a real good grasp of how much we had,

19  how it was deployed, et cetera.

20         And knowing that it was so critical to the way that

21  it was being represented to potential customers and customers,

22  I wanted to get an understanding from her whether she

23  understood the enormity of the problem and whether there was a

24  mandate to try to fix it.

25  Q.  When you say the "enormity of the problem," what are you

Kazi - direct by Madden

1    talking about?

2    A.  The entire revenue base of the company's based on the

3    availability and deployment of inventory for ad campaigns.

4    And without a good understanding of how much there was and

5    where it was deployed and how much was available, it would be

6    very difficult to make commitment to prospective customers

7    and/or unlock the billion dollars in revenue that was

8    potentially available to us.

9    Q.  How did Agarwal respond?

10   A.  Her response was that there were a number of people

11   working on it.  She did not seem to indicate that it was as

12   big of a problem as I believed it to be.  And that --

13   certainly, she did indicate that we should get after it and

14   try to get our arms around inventory at the company.

15   Q.  Did you offer to do anything with respect to the

16   inventory?

17   A.  I -- I offered to help spearhead an initiative to tackle

18   understanding how much and where the inventory was.

19   Q.  Did Agarwal respond to that suggestion?

20   A.  Not that I can remember.

21   Q.  Okay.  Is there anything else about that meeting with

22   Agarwal that stood out to you?

23   A.  No.

24   Q.  You said you also met with Desai during your time at

25   Outcome?

Kazi - direct by Madden

271

1   A.  I did.

2   Q.  Approximately how many times did you meet in person with

3   Desai?

4   A.  We may have met twice.

5   Q.  What do you recall -- I guess first, were they one-on-one

6   meetings?

7   A.  Those two were one-on-one meetings.

8   Q.  Do you recall where you met with Mr. Desai?

9   A.  Once in New York and once in Chicago.

10  Q.  What stands out to you about the meeting in New York, if

11  anything?

12  A.  The meeting in New York was an introductory meeting during

13  my first week to get an understanding about his role, the work

14  that he was doing with clients to acquire customers, how the

15  sales team was run, sales operations, et cetera.

16  Q.  What was Desai's role?

17  A.  He was responsible for acquiring customers, pharmaceutical

18  customers who wanted to display ads on devices.

19  Q.  You said in addition to the meeting in New York, you met

20  with him in Chicago?

21  A.  I did.

22  Q.  Where did you meet with him in Chicago?

23  A.  We met at a restaurant at or close to the Outcome offices.

24  Q.  Just the two of you?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 27 of 310 PageID #:12826
Kazi - direct by Madden
272

1   Q.  What, if anything, do you recall about that second meeting

2   with Desai?

3   A.  It was slightly more operational.  We were digging into

4   the billion -- the latent billion dollars that Rishi had

5   talked about, the inventory gaps.  We talked about some

6   personnel issues, where he was having some friction with

7   Adam Prowker, in particular.

8   Q.  What was the friction between the two of them, if you

9   recall?

10  A.  The -- there was a gap in the way that each of them

11  approached the business of inventory deployment and reporting

12  against that inventory.  And there was also -- it appeared

13  that there was a bit of a personality clash between the two of

14  them as well.

15  Q.  What was your impression of Desai based on your meetings

16  with him and the time that you worked at Outcome?

17  A.  I felt he was a very bright young man who was thrust into

18  a position that he was unfit for.

19  Q.  Why do you say he was thrust into a position that he was

20  unfit for?

21  A.  The nature of the clients that Outcome was signing up, the

22  scope of the contract negotiations, how one manages a sales

23  team, create sales forecasts, sets up predictability of

24  revenue, et cetera, requires some level of expertise and

25  experience.  And he was too early in his career to have had

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 28 of 310 PageID #:12827
Kazi - direct by Madden
273

1   that experience.

2   Q.  Did you have any meetings with Brad Purdy during your time

3   at Outcome?

4   A.  If I did, they were in passing.  Because at the Chicago

5   office, we were in some proximity to each other.

6           MR. MADDEN:  Could we now please publish Government

7   Exhibit 1113?

8   BY MR. MADDEN:

9   Q.  Mr. Kazi, do you see the photos depicted in front of you?

10  A.  I do.

11  Q.  Could you walk us through what's reflected on the screen?

12  A.  From the top left is a photo of Rishi Shah, the CEO and

13  cofounder of Outcome Health.  The top right is a photo of

14  Shradha Agarwal, who's the president and cofounder of the

15  company.  Bottom left, Brad Purdy, COO, chief operating

16  officer, and chief financial officer.  And the bottom right,

17  Ashik Desai, the executive vice president of business growth.

18  Q.  Mr. Kazi, do you know the approximate ages of those four

19  individuals when you were working with them in January 2017?

20          Just ballpark?

21  A.  Under 30.

22  Q.  Were any of them -- do you know who the youngest was among

23  them?

24  A.  It was Ashik.

25  Q.  Based on your conversations with and meetings that we just

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 29 of 310 PageID #:12828
Kazi - direct by Madden
274

1    discussed and other interactions with this group, did you form

2    an impression about who came up with Outcome's sales ideas?

3    A.   My impression was always that Rishi and Shradha -- and

4    Rishi, in particular, was the thought leader behind how sales

5    were done at Outcome.

6    Q.   How did you form that impression?

7    A.   I observed just Rishi's passion around what was happening

8    in the pharmaceutical business, group meetings where we were

9    discussing sales-related matters, things of that nature.

10   Q.   Was Shah a hands-on, detail-oriented leader?

11   A.   In my opinion, he was.

12   Q.   You mentioned Agarwal as someone else who was behind

13   Outcome's sales ideas.

14          Could you explain why you said that?

15   A.   I assumed that based on her longevity at the company, the

16   fact that she was a cofounder, there had to have been some

17   interactions with Rishi and Shradha around how sales were done

18   at Outcome.

19   Q.   Who was Desai's boss?

20   A.   It was Rishi Shah.

21   Q.   Do you know who owned Outcome?

22   A.   Outcome was -- at the time I was at the company, the

23   company was closely held and majority owned by Rishi Shah and

24   Shradha Agarwal.

25   Q.   What does closely held mean?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 30 of 310 PageID #:12829
Kazi - direct by Madden
275

1    A.  It is a privately held business where the majority of the
2    stock of the company is held by a few people.
3    Q.  And those few people in this case were Shah and Agarwal?
4    A.  Correct.
5    Q.  During the time that you were there, did you see yourself
6    as a part of Outcome's executive team?
7    A.  It was certainly intimated to me that I was part of the
8    executive team.
9    Q.  Did you see yourself as part of it, based on your
10   experience there?
11   A.  I did not.
12   Q.  Why not?
13   A.  It's typical that an executive team would have regular
14   meetings, that there would be some group discussions about the
15   operations of the business, everyone would have a chance to
16   share with others on the executive team.  And none of that
17   happened during my time at the company -- for me.
18   Q.  Who were the members of the Outcome's executive team
19   during the time that you were there?
20   A.  It was the four individuals that we saw on the screen.
21   There was the chief people officer by the name of
22   Madan Nagaldinne.
23          There was a marketing leader, and I cannot remember
24   his name.
25   Q.  Okay.  And if there was an inner circle of executives at

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 31 of 310 PageID #:12830
Kazi - direct by Madden
276

1   Outcome Health, who was part of it?

2   A.  It was the four individuals on the screen.

3   Q.  Okay.  That's Shah, Agarwal, Purdy, and Desai?

4   A.  Correct.

5   Q.  You testified that you supervised both Liane Pierce and

6   Adam Prowker, correct?

7   A.  I did.

8   Q.  Did you have any in-person meetings with them?

9   A.  I did.

10  Q.  Did you have -- did you ever meet with the two of them at

11  the same time?

12  A.  I did.

13          MR. MADDEN:  Can we go back to the calendar, please,

14  which is 1118?

15          THE COURT:  I think it's at your end.

16      (Counsel conferring.)

17          MR. MADDEN:  I'll use the ELMO, Your Honor.  Let me

18  see if I can do it this time.

19          THE COURT:  All right.

20          All right.  Well, maybe it's my problem.  All right.

21          Emily, if you're listening, come on in.

22          Here we go.

23          MR. MADDEN:  Thanks.

24          THE COURT:  It's up.

25  BY MR. MADDEN:

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 32 of 310 PageID #:12831
Kazi - direct by Madden
277

1   Q.  Mr. Kazi, can you see the January 2017 calendar again?

2   A.  Yes.

3   Q.  When was the meeting that you had with Prowker and Pierce?

4   A.  January 20, 2017.

5   Q.  Where did you and Prowker and Pierce meet?

6   A.  Met at the Outcome Chicago offices.

7   Q.  Was it in person?

8   A.  It was.

9   Q.  What was the purpose of your meeting with Prowker and

10  Pierce?

11  A.  After a couple of weeks of just learning a bit more about

12  the business, I wanted to do a deeper dive-in with each of

13  them about their parts of the business.

14  Q.  Was anyone else present besides the three of you?

15  A.  No.

16  Q.  Did the meeting go as you expected?

17  A.  It did not.

18  Q.  Why not?

19  A.  What each of them quickly revealed to me in the

20  conversation were several inconsistencies at Outcome Health;

21  one around inventory, another one around contractual commits,

22  a third around how return on investment was being reported

23  back to customers.

24  Q.  You mentioned three issues, and let's start first with the

25  return on investment, or ROI.

1          Can you explain what Prowker and Pierce -- what
2    concerns they raised to you about ROI?
3    A.  Yes.  In contracts that Outcome Health was signing with
4    their customers, they were committing to a dollar return on
5    investment.  So for every dollar spent by the pharmaceutical
6    company, what they could expect back in dollars returned.
7    Typically, $2 for every dollar invested; $3 for every dollar
8    invested, et cetera.

9          These were contractual commits.  And when an
10   advertising campaign was run, those campaigns were assessed by
11   a third-party company named IMS Health.  IMS would prepare a
12   presentation, and one of the components of the presentation
13   would be what they believed the return on investment to be.

14         What Adam and Liane shared with me was that, in many
15   cases, there was a discrepancy between what IMS Health was
16   reporting for the ROI and then what the actual ROI being
17   reported back to customers was.
18   Q.  And when you say "discrepancy," what do you mean?
19   A.   IMS reported a very low ROI, and something higher than
20   that was being presented to customers.
21   Q.  Did they identify any person that they believed was
22   involved in manipulating the numbers on the IMS reports that
23   were reported to clients?
24   A.   They shared with me that Ashik Desai was responsible for
25   doing that.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 34 of 310 PageID #:12833
Kazi - direct by Madden
279

1  Q.  In addition to the manipulation of the IMS ROI performance
2  reports, I think you mentioned that they raised concerns about
3  inventory, correct?
4  A.  They did.
5  Q.  What were the concerns about inventory that they raised?
6  A.  One concern was that -- so again, in contracts, there were
7  specific inventory numbers, sometimes by month being
8  contracted for -- to customers.
9        Those inventory levels were reported back to
10 customers on a monthly basis as part of an affidavit that was
11 notarized.  There was a discrepancy in actual device inventory
12 that ads were being run on versus what was being reported to
13 customers.
14 Q.  When you say there was a discrepancy between the actual
15 numbers and what was -- from the contract and what was being
16 reported to customers, can you explain that?
17 A.  There were fewer devices that were actually being used to
18 show ads versus what was being reported to customers.
19 Q.  Okay.  And according to Prowker and Pierce, was this
20 discrepancy or gap in delivery being disclosed to clients?
21 A.  In some cases, it was disclosed to clients.
22 Q.  In other cases, was it -- was it disclosed in all cases,
23 to your knowledge?
24 A.  I don't believe that it was disclosed in all cases.
25 Q.  Was there any -- in terms of inventory, was there any

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 35 of 310 PageID #:12834
Kazi - direct by Madden
280

1    discussion of how inventory was sold to clients, concerns

2    raised about that?

3    A.  We were -- I was told that our contracts had inventory

4    levels being contracted for where the company was unsure

5    whether that inventory was actually available to be deployed

6    for those clients.

7    Q.  And then the -- so there were concerns about whether or

8    not inventory was there.

9          And then given that these affidavits were sent --

10   sent out, what did that mean about whether or not it was

11   actually being delivered?

12   A.  The inventory was not available.

13   Q.  So were the monthly affidavits being sent out, were they

14   false?

15   A.  They were false.

16   Q.  What did the affidavits reflect?

17   A.  They reflected, as best as I can remember, by -- in some

18   cases, device type, how many devices were available.

19          MR. HUESTON:  Your Honor -- excuse me.

20          I object, Your Honor.  Could we have some foundation

21   for the basis of his knowledge of this testimony?  Is this

22   what he --

23          MR. MADDEN:  I mean, I'm going to show him an

24   affidavit later.

25   BY MR. MADDEN:

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 36 of 310 PageID #:12835
Kazi - direct by Madden
281

1  Q.  Did you -- did they show you any documents during this
2  meeting?
3  A.  They did.
4  Q.  And after this meeting, were you sent additional documents
5  about these issues?
6  A.  I was.
7  Q.  Based on the fact that you were sent and shown these
8  documents, could you describe what was in the -- what the
9  affidavits represented?
10 A.  Yes.  The affidavits had an indication of device type
11 and -- and inventory deployed against a particular drug or ad
12 campaign for a particular month.
13 Q.  When you say inventory deployed, what do you mean by that?
14 A.  The number of devices that ad campaigns were run.
15 Q.  Okay.  Did you all discuss why there was under-delivery on
16 the Outcome campaigns?
17 A.  We did discuss that.
18 Q.  Do you remember anything about that?  Anything in
19 particular?
20 A.  I don't.
21 Q.  What was your initial reaction to all of these issues that
22 Prowker and Pierce raised with you?
23 A.  You know, the -- the trifecta of those things was quite
24 shocking to me when they brought -- you know, when I
25 understood the full picture of what they were saying to me.

1  Q.  Were you concerned about it?

2  A.  I was more than concerned about it, yes.

3  Q.  Could you expand on that?

4  A.  My -- my gut reaction to learning about the scope of what

5  was happening was that in the event that these things -- these

6  matters came to light to clients, two things:  One, that

7  there's a possibility that a -- that revenue could be called

8  back by clients, therefore, impacting the business.  But even

9  more importantly than that, my sense was that this was at

10 least to some degree fraudulent.

11 Q.  Did you use the word "fraud" in your discussions with

12 them?

13 A.  I believe I did.

14 Q.  You first mentioned that you were concerned that revenue

15 could be called back.

16        Could you explain why that was a concern?

17 A.  Clients, when it came to -- it's possible that when it

18 came to light to clients that they were being underserved by

19 the service provider, that they would demand to have contracts

20 canceled and/or ask for monies paid to be paid back to them.

21 Q.  Okay.  Was there any concern about what the clients would

22 do going forward if that was disclosed to them?

23 A.  It's possible that they would have chosen not to do

24 business with Outcome Health again.

25 Q.  What was Prowker and Pierce's demeanor like when they

1  discussed these issues with you?

2  A.  They were both -- they were both shaken up and -- and

3  concerned about what was happening at the business.

4  Q.  How did you respond to all of this?

5  A.  My initial reaction was to ask them whether they were

6  playing a prank on me based on my newness at the company.

7  They were both somber-faced and said no.  And then asked me --

8  they both asked me what I was going to do.  I said to them

9  that I was going to bring up these matters with Rishi Shah.

10  Q.  How did they respond to that?

11  A.  They asked me what I thought would happen as part of that

12  conversation.  I said to them, Well, it was either I would get

13  a mandate from the CEO to aggressively fix these issues at the

14  company or not.  And if that wasn't the case, then it's highly

15  likely that I wouldn't be in my position anymore.

16  Q.  What did you -- how did the meeting end?

17  A.  With just that indication.  And that I asked them for some

18  follow-up information, some documentation.  Some of the

19  material that they had shared with me, I asked them to send it

20  to me so that I could review it prior to any meeting with

21  Rishi Shah.

22  Q.  Did Prowker and Pierce send you materials related to the

23  issues and concerns that they raised with you?

24  A.  They did.

25  Q.  Why did you ask Prowker and Pierce to pull together data

Kazi - direct by Madden

284

1   illustrating the issues?

2   A.  I thought it was very reasonable that in a meeting with

3   the CEO, that Rishi would ask me how I knew what I knew, and

4   that we would dig in and review each of those documents so I

5   could get a better understanding of what was going on from the

6   CEO.

7   Q.  You had been a CEO yourself previously, correct?

8   A.  That is correct.

9   Q.  And that was what you expected would happen?

10  A.  That's what I would have done.

11          MR. MADDEN:  I'd now like to display Government

12  Exhibit 794.

13          THE COURT:  See if it works now.

14          MR. MADDEN:  You know, I'd actually -- this will be

15  difficult to display on the ELMO.

16          THE COURT:  Try it here.

17          MR. HUESTON:  It's working.

18          MR. MADDEN:  It's working?  Okay.

19          THE COURT:  Okay.

20          MR. MADDEN:  Thank you.

21          Could you blow up the email, please, the top part?

22  BY MR. MADDEN:

23  Q.  Mr. Kazi, can you see the email that's in front of you?

24  A.  I can.

25  Q.  Who sent you this email?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 40 of 310 PageID #:12839
Kazi - direct by Madden
285

1    A.  Liane Pierce.

2    Q.  What was the date of the email?

3    A.  It's January 25, 2017.

4    Q.  What was the time?

5    A.  1:50 a.m.

6    Q.  Was this January 25th email sent before or after that

7    meeting that you just described with Prowker and Pierce?

8    A.  It was after.

9    Q.  What was your understanding of the purpose of this email?

10   A.  It's to provide me the information that I requested in

11   that meeting.

12   Q.  And was this in advance of your meeting with Shah?

13   A.  It was in advance of my meeting with Shah, yes.

14   Q.  Did you, in fact, meet with Shah?

15   A.  I did.

16   Q.  What was the date of the meeting with Shah?

17   A.  It was January 25, 2017.

18   Q.  Okay.  So a number of hours after this 1:50 a.m. email?

19   A.  Yes.

20   Q.  Did Pierce include a link in this document?

21   A.  She did.

22   Q.  First, could you just read the first -- the first

23   paragraph of this?

24   A.  Yes.

25        "Hi, SK.  I added in the NPS deals from last year and

1    the ones for 2017 that I know exist.  For performance, I

2    denoted the known underperformance across all three NPS deals.

3    However, I will need to get with Adam and his team tomorrow to

4    complete this with the actual results."

5    Q.  Okay.  At this point, I'd like to show you the Google

6    document that was linked in the middle there, which is

7    Government Exhibit 794A.

8            MR. MADDEN:  And for the record, this is -- there's a

9    number of tabs here.  This is the tab that's named "Overview."

10   BY MR. MADDEN:

11   Q.  Mr. Kazi, do you recall seeing this spreadsheet or some

12   version of it after your meeting with Pierce and Prowker?

13   A.  I do.

14   Q.  I want to go over this in some detail, but on this first

15   tab, could you describe for the jury just generally what it

16   reflects?

17   A.  Sure.  The columns represent drug types, so different --

18   different pharmaceuticals, a link --

19   Q.  You can use the touch screen, too, if you don't mind, to

20   show like what you're talking about there.

21   A.  Okay.  So this, for example, is a particular drug.  These

22   are all of the different devices as part of the contract.

23   There are the campaign start and end dates, or contract start

24   and end dates.  I don't know exactly when.

25            For each of the device types for that particular

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 42 of 310 PageID #:12841
Kazi - direct by Madden
287

1  drug, there's what was contracted for for those particular

2  devices and then what the actual numbers were against those

3  devices.

4          Column G shows what the contracted return on

5  investment was.  And then Column H represents what the

6  third-party firm reported as the performance.

7          MR. MADDEN:  Could you go back to the left, please.

8  BY MR. MADDEN:

9  Q.  And just for the record, you circled, in Column A,

10 NovoLog.

11         That was one of the drugs or brands reflected?

12 A.  Yes.

13 Q.  In Column B was the contracts, some of the contracts that

14 you circled?

15 A.  With device types.

16 Q.  And could you explain the device types that's reflected?

17 A.  Sure.  ERT represents the examination room tablet.  WR is

18 the waiting room device; a television, I believe.  WB is a

19 wallboard, a touchscreen wallboard.  And then the last one is

20 a Wi-Fi product that was implemented at physicians' offices.

21 Q.  And then moving to the right, what do Columns C and D

22 reflect?

23         Not for that campaign necessarily, just in general.

24 A.  Potentially the contract start and end dates for those

25 devices.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 43 of 310 PageID #:12842
Kazi - direct by Madden
288

1  Q.  Understood.

2        On the Column E is -- is -- contracted delivery is

3  reflected, correct?

4  A.  Of each of those device types, yes.

5  Q.  And what's your understanding of what that number

6  represents there?

7  A.  The number of devices that were committed to the customer.

8  Q.  Column F reflects actual delivery.

9        What's your understanding of that column?

10 A.  The actual number of devices delivered during that period.

11 Q.  Okay.  And there's a number of columns -- in Column F,

12 there's a number of -- there's a number of lines that are

13 shaded red.

14        What's your understanding of -- of those?

15 A.  It appears that those indicate where there was

16 under-delivery of devices that were contracted for.

17 Q.  And just at a high level --

18        MR. MADDEN:  Could you go down a little bit in the

19 spreadsheet?  Just all the way to -- just slowly go to the

20 bottom, please.

21 BY MR. MADDEN:

22 Q.  Approximately how many were -- how many of those columns

23 were highlighted in red?

24 A.  Oh, maybe two-thirds of them.

25 Q.  Okay.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 44 of 310 PageID #:12843
Kazi - direct by Madden
289

1    MR. MADDEN:  Could you go back up to the top, please?

2  BY MR. MADDEN:

3  Q.  Could you -- Mr. Kazi, there's an undo button -- or maybe

4  the judge could do it for the -- it might be in the right-hand

5  corner of your screen.  Thank you.

6          I want to just go over a few of these just to give

7  the jury some examples.

8          Let's start with Pradaxa at line 2.

9          MR. MADDEN:  And maybe we can make that -- focus on

10  that on the screen, if possible, both including the Column 1

11  and 2, please, if there's a way to do that.

12  BY MR. MADDEN:

13  Q.  First, what are the start and end date of that Pradaxa

14  campaign?

15  A.  The Pradaxa campaign, start date, 2/1/2016; end date,

16  6/30/2016.

17  Q.  What was the contracted delivery for that campaign?

18  A.  4,486 devices.

19  Q.  What was the actual delivery, according to the

20  spreadsheet?

21  A.  2,074.

22  Q.  Does the spreadsheet reflect under-delivery on that

23  campaign?

24  A.  It does.

25  Q.  What was the approximate under-delivery?

Kazi - direct by Madden

290

1   A.  2,000 devices, approximately.

2   Q.  Is that in the range of 50 percent?

3   A.  Yes.

4   Q.  And what was the -- was there an ROI or return on

5   investment guarantee on this campaign?

6   A.  There was.

7   Q.  What was it?

8   A.  3:1.

9       MR. MADDEN:  Now, could we go to the right on this,

10  please, just to see the whole...

11  BY MR. MADDEN:

12  Q.  And what do Columns H and I reflect?

13  A.  Column H represents the reported performance of that

14  campaign by the third-party firm IMS Health, and Column I

15  represents the internal calculation of the campaign

16  performance.

17  Q.  Is there a difference between H and I?

18  A.  There is.

19  Q.  What's the difference, and what's your understanding of

20  that difference?

21  A.  This data shows that IMS reported a .504 performance, so

22  less than 1.  And the internal calculation showed a .8

23  performance.

24  Q.  And does that, in fact, say what -- what does CMH stand

25  for?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 46 of 310 PageID #:12845
Kazi - direct by Madden
291

1   A.  ContextMedia Health, I believe.

2   Q.  And -- and it says "client reported."

3        Is that -- what's your understanding of that?

4   A.  Oh, it -- I don't -- it's -- essentially, it's the client

5   doing the calculation and providing that back.

6   Q.  Okay.  Or I guess another possibility, that's what the

7   clients told --

8   A.  Or the client --

9        COURT REPORTER:  You're talking over each other.  I

10  didn't get the question.

11       MR. MADDEN:  Sorry.

12  BY MR. MADDEN:

13  Q.  Could it also be that that was what Outcome told the

14  client the ROI was?

15       MS. BELL:  Objection, Your Honor.  Leading.

16       THE COURT:  Sustained.

17  BY MR. MADDEN:

18  Q.  We can move on from that one.

19       I'd like to now turn to line 5.  If you could move to

20  the left, Jardiance.  Yep, thank you.

21       Could you walk through the Jardiance exam room tablet

22  campaign for the year 2006 in terms of the contracted delivery

23  and the actual delivery?

24  A.  The Jardiance exam room tablet contract dates from

25  1/1/2016 to 12/31/2016, the client contracted for

Kazi - direct by Madden

292

1  6,645 devices, and 5,311 were delivered.

2  Q.  Was there a ROI guarantee on that campaign as well?

3  A.  There was.  It was 3:1.

4  Q.  Okay.  I'm not going to go over all the campaigns in red,

5  but I want to show you a few more examples.

6            Could we look at Praluent, which I think is lines 10

7  through 12, please?

8            I'm going to draw your attention to the exam room

9  tablet campaign for Praluent for the year 2016.

10            Could you walk through the contracted delivery number

11  and the actual delivery number?

12  A.  Row 11 shows that the contracted delivery was 11,187.  And

13  the actual devices delivered were 4,922.

14  Q.  Was there under-delivery in that campaign?

15  A.  There was.

16  Q.  What was it, approximately?

17  A.  A little over 50 percent.

18  Q.  I'm going to turn your attention to Repatha at lines 18

19  and 19, please.

20            Starting first with the exam room tablet campaign,

21  can you go over the contracted delivery number and the actual

22  delivery number?

23  A.  Contracted, 4,740; and actual, 2,934.

24  Q.  Was there an under-delivery in that campaign?

25  A.  There was.

1    Q.  What was the approximate amount?

2    A.  30 percent.

3    Q.  And just going down to the WB, the wallboard campaign for

4    Repatha during that same time period, could you go over those

5    numbers?

6    A.  It was contracted for 4,630; actual delivery, 1,503.

7    Q.  What was the under-delivery on that campaign?

8    A.  60 percent.

9    Q.  And drawing your attention now to lines 20 to 23, which is

10   Simponi Aria, could you go over the delivery on the exam room

11   tablet for that campaign?

12   A.  Row 21, contracted for 630; delivered, 174.

13   Q.  What was the under-delivery on that campaign?

14   A.  I don't know.  70 percent?  You know, it's a lot of math.

15   Q.  Yeah.  So I don't mean -- approximately.  I don't mean it

16   to be a math test.

17         What about the wallboard campaign for Simponi Aria

18   during 2016?

19   A.  630 contracted for, 142 delivered.

20   Q.  A greater than 50 percent under-delivery again?

21   A.  Yes.

22   Q.  I'm going to show you Xeljanz, which is below there --

23   thank you -- 24 to 26.

24         Could you go over -- do you know what kind of drug

25   Xeljanz is?

1   A.  I don't.

2   Q.  Okay.  No worries.

3          Could you go over the numbers on Xeljanz for the

4   waiting room screens?

5   A.  The waiting room screens, Row 24, 399 contracted for,

6   123 delivered.

7   Q.  What was the under-delivery on that one?

8   A.  Over 60 percent.

9   Q.  And then the exam room tablets for Xeljanz, was there

10  under-delivery on that as well?

11  A.  There was.

12  Q.  What was it, approximately?

13  A.  40 percent.

14  Q.  And then was there under-delivery on the wallboard

15  campaign for Xeljanz as well?

16  A.  There was.  9 --

17  Q.  What was that?

18  A.  15 percent.

19  Q.  Finally, I'd like to turn your attention to Column J.

20         MR. MADDEN:  Let's see.  Yeah, could we go to the

21  notes column at Column J?  Yeah, it's lines 13 and 14, please.

22  BY MR. MADDEN:

23  Q.  Could you read 13?

24  A.  It says:  "This program also experienced a campaign ops

25  error that made it dark from March through April."

Kazi - direct by Madden

295

1   Q.  And just for the record, I think 13 was Invokana, a drug
2   called Invokana.
3           Do you have an understanding of what a campaign going
4   dark for a time period means?
5   A.  I can only assume that there was no reporting --
6           MR. HUESTON:  Objection.  Calls for speculation.
7           THE COURT:  Rephrase your question.  If he is making
8   an assumption, that's a proper objection, but if he's got a
9   basis for this knowledge, he should state it.
10  BY MR. MADDEN:
11  Q.  Do you have an understanding about what going dark during
12  a time period for an advertising campaign means?
13  A.  Reporting information was not collected.
14  Q.  Reporting information.
15          And what does that mean, exactly?
16  A.  The performance of the campaign was not reported
17  accurately.
18  Q.  Okay.  And could you read line 14, please, which is that
19  same drug?
20  A.  Full delivery report here shows inconsistent delivery
21  across months, despite affidavit reporting to clients
22  suggesting otherwise.
23  Q.  I draw attention now to line 24.
24          MR. MADDEN:  If you could highlight that line,
25  please.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 51 of 310 PageID #:12850
Kazi - direct by Madden
296

1  BY MR. MADDEN:

2  Q.  Column J.  Could you read that?

3  A.  "2015 results show serious difference between IMS data and

4  what was presented to client."

5  Q.  What's your understanding of that?

6  A.  That the ROI result that IMS reported back to

7  Outcome Health and what was presented to the client was

8  different.

9  Q.  Was that one of the concerns that Pierce and Prowker had

10  raised with you?

11  A.  Yes.

12  Q.  And finally, could we look at line 39, please, 39 and 40.

13        What does line 39 reflect?

14  A.  It states:  "Need anticipated shortfall.  This is an

15  example of oversold oncology inventory."

16  Q.  What's your understanding of oversold oncology inventory?

17  A.  More devices were contracted for than were available to be

18  deployed for oncology drug clients.

19  Q.  And could you read the line 40 as well, please?

20  A.  "This is an example of oversold oncology inventory where

21  we didn't shut down the contract because of renewing a 2016

22  contract that also experienced a shortfall."

23  Q.  I'd like to know --

24        MR. MADDEN:  Could you hit the IMS data granular tab,

25  please?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 52 of 310 PageID #:12851
Kazi - direct by Madden
297

1  BY MR. MADDEN:

2  Q.  Mr. Kazi, at a high level, could you walk through the --

3  what the columns represent?

4  A.  Column A represents the drug brand.  Column B represents

5  whether there was an inconsistency between IMS's report and

6  what was presented to the client.  In Column C, I don't know

7  what NPI means.

8  Q.  Okay.

9  A.  Or what office counts means in D.

10       E represents the ROI result that IMS delivered to

11  Outcome Health, and then Column F is the ROI reported to

12  clients.

13  Q.  There are two -- on this list, there are two that are

14  highlighted yellow.

15       What's highlighted in yellow?

16  A.  Row 7 is Repatha, and Row 9 is Xeljanz.

17  Q.  What's your understanding of why those were highlighted?

18  A.  That in the case of Repatha, the IMS ROI was very low or

19  negligible.  And I --

20  Q.  It's a little bit technical, but could you read the client

21  ROI side of Repatha, line 7?

22  A.  Yes.  It states:  "Client deck from February shows a

23  90.1 percent prescription lift and an inflated Y axis of 0-900

24  compared to 0 to 160 for IMS.

25  Q.  You said that NRx lift means prescription lift.

Kazi - direct by Madden

298

1          Could you explain what -- that concept?

2   A.  The number of the increase in prescriptions from a

3   previous baseline.

4   Q.  And is that increase based on the Outcome advertising in

5   the office?

6   A.  Yes.

7   Q.  Is that what IMS was measuring?

8   A.  Yes.

9   Q.  And then what does line 9 reflect about Xeljanz in terms

10  of the status?

11  A.  It states negative results as being presented by IMS.

12  Q.  Okay.  And then at line -- what does Column B reflect for

13  Xeljanz?

14  A.  Column?

15  Q.  Column B.

16  A.  Oh, it states different results.

17          MR. MADDEN:  I'm going to now -- I'd like to now

18  publish Government Exhibit 795, please.

19          Could you blow up that first -- the email portion of

20  this, please?

21  BY MR. MADDEN:

22  Q.  Who sent you this email, Mr. Kazi?

23  A.  It was Adam Prowker.

24  Q.  Who else was copied on it?

25  A.  I was copied on it.  It was sent to Liane Pierce.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 54 of 310 PageID #:12853
Kazi - direct by Madden
299

1  Q.  What was the time and date of the email?

2  A.  January 25, 2017, at 6:24 a.m.

3  Q.  When was this sent in relation to your meeting with Shah?

4  A.  A few hours before my meeting with Mr. Shah.

5  Q.  What was your understanding of the purpose of this email?

6  A.  It was providing me additional data around performance of

7  a particular drug and some information that IMS Health did.

8  Q.  Did Prowker attach any documents to this email?

9  A.  He did.

10  Q.  What was attached?

11  A.  It's a document called "IMS_ContextMedia Health_promo

12  return_ Neulasta_Jan 26_results_June 2016.

13  Q.  Okay.  Do you have -- you don't need to read the other

14  one.

15        We're going to go over the documents themselves, but

16  do you have an understanding of what these two documents were?

17  A.  It's a presentation that IMS had prepared about --

18  Q.  Okay.  Okay.

19        MR. MADDEN:  Could we go to the email itself, please?

20        And could you highlight the first paragraph?

21        THE COURT:  And when the witness reads part of an

22  email, there's a tendency to read more quickly than normal

23  testimony.  There's smoke coming from my court reporter's

24  fingers, so please slow down when you read something.

25        THE WITNESS:  Yes.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 55 of 310 PageID #:12854
Kazi - direct by Madden
300

1        THE COURT:  Thank you.

2        THE WITNESS:  Thanks.

3    BY MR. MADDEN:

4    Q.  Could you please slowly read this paragraph?

5    A.  Yes.

6        "I am also gathering examples of inconsistencies

7    between IMS results and those shared with the client.  Copied

8    an example below.  Look specifically at Slides 15 and 17 from

9    the original IMS deck (bigger of the two files) and then

10   Slides 8 and 9 on the deck shared with the client.  The client

11   deck was neither produced nor shared by Marketing Sciences

12   (only Bryan and Claire were here in June/July).  My

13   understanding is this type of practice was pervasive in 2015."

14   Q.  Who worked at Marketing Sciences?

15   A.  Adam Prowker did.

16   Q.  Okay.  And there's a reference to two different sizes of

17   decks.

18       What was -- what was Prowker saying about the

19   different sizes of the PowerPoint decks?

20   A.  The IMS deck was bigger of the two decks provided.

21   Q.  And what was the second deck, the smaller one?

22   A.  That shared -- the deck shared with the client.

23   Q.  I'd like to know -- go over the documents that were

24   attached to this email, starting with the larger one first.

25       MR. MADDEN:  If you could call up page 4 of this,

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 56 of 310 PageID #:12855
Kazi - direct by Madden
301

1    please.  And could you highlight the -- so make page 4 larger,

2    please.  Thank you.

3    BY MR. MADDEN:

4    Q.  Mr. Kazi, could you read the title in dark blue of this

5    document?

6    A.  "ContextMedia Health Neulasta Infusion Center Tablets,

7    Promotional Evaluation."

8    Q.  What is this larger document?

9    A.  It's an evaluation of the campaigns that ContextMedia

10   Health or Outcome Health ran on behalf of the Neulasta

11   infusion center product.

12   Q.  So is Neulasta a drug?

13   A.  It is.

14   Q.  Is IMS Health, is that name reflected on here somewhere?

15   A.  It is.

16   Q.  Could you circle it, please?

17   A.  [Witness complies.]

18   Q.  Thank you.

19        And does this relate to a certain time period or

20   length of time?

21   A.  It's a four-month period in which tablets were tested.

22   Q.  All right.  Are these the ROI reports or IMS ROI reports

23   that Prowker and Pierce had raised concerns about?

24   A.  I believe so.

25        MR. MADDEN:  Could you please now call up page 10 of

1    this document?

2    BY MR. MADDEN:

3    Q.  And drawing your attention to the bottom portion of this

4    where there's that small chart, can you -- what does this

5    reflect about the time period of this -- of the -- this -- the

6    study on this Outcome ad campaign?

7    A.  That the -- there's both a pretest time period and a --

8    and a period during which the test was run.  The pretest was

9    from July through December of 2015, and the test was run from

10   Jan through April 2016.

11   Q.  So the test -- posttest period on the far right was

12   January to April 2016?

13   A.  Correct.

14   Q.  I'd now like to go to page 26 of this document.

15          What's -- what is reflected on this document,

16   Mr. Kazi, on page 26?

17          I can ask you a more specific question.

18   A.  That would be great.

19   Q.  Turning your attention to the -- the light blue portion

20   underneath where it says Neulasta New to Brand, during the

21   four months, could you read that portion?

22   A.  Yes.

23          "During the four months test/posttest period, exposed

24   to promotion HCPs prescribed 20.6 fewer Neulasta New to Brand

25   Administrations compared to nonexposed control HCPs.  This

Kazi - direct by Madden

303

1    change in prescribing behavior is statistically significant."
2    Q.  Do you know what HCP stand for?
3    A.  I do not recall.
4    Q.  Okay.  Does healthcare providers --
5            MR. HUESTON:  Objection, Your Honor.
6            MS. BELL:  Objection, Your Honor.
7            THE COURT:  That's a pretty inconsequential lead, so
8    overruled.
9            You can -- there's a question pending.  Go ahead.
10   The objection as overruled.  You can lead for this common
11   acronym.
12           MR. MADDEN:  Okay.
13   BY MR. MADDEN:
14   Q.  Does HCP stand for healthcare providers?
15   A.  I believe it does.
16   Q.  Okay.  And what does this -- what does this information
17   reflect, big picture, about whether or not according to IMS
18   this was a successful ad campaign for -- for Outcome?
19   A.  This information would indicate that it was not a
20   successful ad campaign because after the ad campaign was run,
21   fewer prescriptions for Neulasta were -- fewer new -- new
22   prescriptions for Neulasta were prescribed.
23   Q.  More than 20 percent fewer were prescribed during the time
24   that Outcome was running the ads?
25   A.  Yes.

1  Q.  And we won't go over the whole graph, but is there a

2  graphic representation of -- of this as well, in addition to

3  the written portion?

4  A.  There's a shaded column with two different lines, the

5  control group versus the -- those exposed to ads.  And it

6  shows that the ad data point is lower than the ones not

7  exposed.

8  Q.  At a high level, could you go over what a control group is

9  versus the exposed to the promotion means?

10  A.  Not exposed to the ad versus exposed to the ad.

11  Q.  Okay.  So exposed to the ad, is that where the ad

12  campaigns -- Outcome's ads were running?

13  A.  Correct.

14  Q.  And then the other, a second group of doctors where the ad

15  was not running, that's where they were -- that's what was

16  compared to?

17  A.  Yes.

18  Q.  And -- okay.

19        MR. MADDEN:  Now let's -- I want to now move to the

20  shorter document, which is the second document attached to

21  this email.

22        Could you please call up page 46?

23  BY MR. MADDEN:

24  Q.  Does the first page of this document, the shorter

25  document, is it the same or very similar to the first page of

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 60 of 310 PageID #:12859
Kazi - direct by Madden
305

1    the larger IMS document?

2    A.  Very similar.

3          MR. MADDEN:  Could you now pull up page 49, please?

4    BY MR. MADDEN:

5    Q.  Is the -- are the testing periods, including the

6    test/posttest four-month period, the same?

7    A.  They are.

8    Q.  And I didn't ask you this in the first page, but is this

9    also Neulasta, the same drug, the same time period?

10   A.  Yes.

11         MR. MADDEN:  Could we now go to page 54 of this

12   document?

13   BY MR. MADDEN:

14   Q.  And again, just to reiterate, what's your understanding

15   of -- this is the shorter, smaller deck.

16         What was this deck?  Or who was it presented to?

17   A.  This was presented to the client.

18         MR. MADDEN:  Could you now please call out that light

19   blue portion?

20   BY MR. MADDEN:

21   Q.  Could you read that, please?

22   A.  "During the four months' test/posttest period, exposed to

23   promotion HCPs prescribed 20 percent more Neulasta

24   administrations compared to nonexposed control HCPs.  This

25   change in prescribing behavior is statistically significant."

Kazi - direct by Madden

1    Q.  And then for the graph below, does the graph below

2    similarly -- is it consistent with the -- the language that

3    there was a successful 20 percent increase?

4    A.  The graph does indicate that, yes.

5    Q.  Could we now compare -- so this is page 54 on the shorter

6    document.

7            Could you compare this to -- side by side with

8    26 from the larger document?

9            MR. MADDEN:  And, Ms. Paul, could you highlight the

10   20.6 fewer portion of the -- I guess maybe just, yeah, call

11   out both portions, top portions.

12   BY MR. MADDEN:

13   Q.  And, Mr. Kazi, could you circle the material -- any

14   differences that you see between -- on these two from the text

15   here, between these two reports?

16   A.  [Witness complies.]

17   Q.  Could you explain what the difference is?

18   A.  The one on the top showed that healthcare professionals

19   prescribed 20 percent more of the drug.  And the one on the

20   bottom shows that healthcare professionals prescribed

21   20.6 percent fewer prescriptions.

22   Q.  And which one was presented to the client, according to

23   Prowker and Pierce?

24   A.  The 20 percent more.

25   Q.  And which one came from -- was -- was the actual IMS's,

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 62 of 310 PageID #:12861
Kazi - direct by Madden
307

1    the result of IMS's study?

2    A.   That 20.6 percent fewer prescriptions.

3    Q.   And -- and Prowker sent this to you before your meeting

4    with Shah?

5    A.   He did.

6    Q.   In addition to these documents that we've just gone over,

7    were you sent another spreadsheet that related to revenue at

8    the company?

9    A.   I believe I was.

10   Q.   What do you recall about that document?

11   A.   It was a document that had a list of customers, their

12   contract term revenue associated with that client, and whether

13   or not there was an inventory and/or an ROI discrepancy for

14   that customer.

15   Q.   At a high level, what -- what did that spreadsheet

16   reflect?

17   A.   That there were a material number of clients that had some

18   sort of a discrepancy.

19   Q.   Discrepancy in what sense?

20   A.   ROI being misrepresented or fewer or less inventory than

21   was contracted for.

22   Q.   The delivery issues on that second portion?

23   A.   Yes.

24   Q.   You testified that you did, in fact, meet with Mr. Shah,

25   correct?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 63 of 310 PageID #:12862
Kazi - direct by Madden
308

1   A.  I did.

2          MR. MADDEN:  Could we have the calendar now, which is

3   Government Exhibit 1117?  Or actually, this is fine.

4   BY MR. MADDEN:

5   Q.  Mr. Kazi, what does this reflect?

6   A.  It's a meeting invitation for January 25th at 9:00 a.m.

7   Central Time for me to meet with Rishi Shah.

8   Q.  Where did you and Mr. Shah meet that day?

9   A.  We met at his home in New York.

10  Q.  What time of day did you meet with him?

11  A.  It was 9:00 a.m. Central Time.

12  Q.  Was anyone else present for the meeting?

13  A.  Not that I was aware of.

14  Q.  Before you met with Shah, did you tell him the issues that

15  you wanted to discuss with him?

16  A.  I did not.

17  Q.  Did you mention -- other than Prowker and Pierce, did you

18  mention the issues that you wanted to raise with Shah to

19  anyone else?

20  A.  Yes.

21  Q.  Who did you tell about it?

22  A.  I spoke to the Outcome Health chief people officer,

23  Madan Nagaldinne, about that.

24          MR. MADDEN:  Could we now display Government

25  Exhibit 1114?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 64 of 310 PageID #:12863
Kazi - direct by Madden
309

1   BY MR. MADDEN:

2   Q. Do you recognize the individual depicted there, Mr. Kazi?

3   A. This is Mr. Nagaldinne, the chief people officer.

4   Q. What does it mean to be the chief of people officer at

5   Outcome?

6   A. The head of HR.

7   Q. This is the person that you mentioned the issues about

8   which you were going to speak with Shah?

9   A. [No audible response.]

10         MR. MADDEN: If you could take this down, please.

11   BY MR. MADDEN:

12   Q. Approximately how long did your meeting with Shah take?

13   A. 15 or 20 minutes.

14   Q. Going into the meeting, what was your plan?

15   A. My plan was to bring up the three or four topics that Adam

16   and Liane had brought up with me and then to get into a

17   discussion with Rishi about how to handle these topics.

18   Q. Did the meeting start the way you expected?

19   A. It did not.

20   Q. Can you explain?

21   A. Yes. After some initial pleasantry, Rishi shared with me

22   that he believed that there might have been a -- that might --

23   that there was a cultural misfit between me and the company

24   and that he had received several reports of people stating

25   that I was a, quote, bull in a china shop and being

1   disrespectful and poking my nose into parts of the business.

2   Q.  Were you surprised by that feedback?

3   A.  I was surprised by the feedback, yes.

4   Q.  Given what you had planned to discuss with him that day,

5   how did that negative feedback strike you?

6   A.  It struck me as people providing -- folks that I had

7   spoken with about different matters at the company providing

8   feedback to Rishi and that maybe this was a foil to some of

9   the things that I was going to share with him.

10  Q.  What happened after Shah told you that he'd received that

11  negative feedback about you?

12  A.  I indicated that there are several topics I wanted to

13  speak with him about.  And I quickly rattled off -- well, I

14  spoke about four topics, with him pausing at the end of each

15  one to get some feedback from him.

16  Q.  What were the topics that you raised with him?

17  A.  One was ROI and contracting ROI versus actual performance

18  and how it was being reported to clients.

19          One was the inventory shortfall.

20          One was the misrepresentation of inventory on

21  affidavits.

22          And lastly, the -- the -- this latent billion-dollar

23  revenue versus inventory and sales targets of the company.

24  Q.  Were those first three issues, anyways, the issues that

25  Prowker and Pierce had raised with you?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 66 of 310 PageID #:12865
Kazi - direct by Madden
311

1  A.  They were.

2  Q.  And what was -- what was more specifically the ROI issue

3  that you raised?

4  A.  That we were contracting for ROI and that -- excuse me --

5  and that the third-party reported ROI was much less than what

6  we had been contracted for, but also, to exacerbate that, that

7  the company was misrepresenting IMS Health's results and

8  inflating them.

9  Q.  Did Shah express surprise when you said that the company

10  was misrepresenting those IMS results to clients?

11  A.  On the contrary, he knew that that had happened in the

12  past.

13  Q.  Did he ask you who was changing the numbers?

14  A.  I can't recall if he did.

15  Q.  With respect to the -- to the inventory issue, could you

16  explain what you expressed to Shah about that?

17  A.  That there were several instances that I had been made

18  aware of where there was a -- that there were contractual

19  commitments for inventory and that, in reality, much less

20  inventory was available to certain clients.

21  Q.  Was that the under-delivery, some of the data that we were

22  looking at before?

23  A.  Yes.

24  Q.  How did Shah respond to that issue?

25  A.  He was aware of it, in that he shared that there had been

Kazi - direct by Madden

312

1  conversations with some clients and some make-goods have --
2  had happened.
3          THE WITNESS:  Excuse me.
4  BY MR. MADDEN:
5  Q.  What's a make-good?
6  A.  It's where there's an agreement with a client about
7  certain concessions a service provider might make or monies
8  paid back to them.
9  Q.  You also mentioned that there were misrepresentations
10 being made in affidavits to clients in that meeting with Shah?
11 A.  Correct.
12 Q.  How did he respond to that concern?
13 A.  He was aware of it.
14 Q.  Did Shah respond with alarm at any of these issues?
15 A.  He did not.  On the contrary, he -- it just seemed
16 business as usual in that these were matters that needed
17 attention, but not alarm for -- on his side.
18 Q.  You also mentioned a fourth issue, referring back to that
19 billion-plus in revenue conversation I think that you and Shah
20 had.
21         Could you explain to the jury what you said about
22 that?
23 A.  Just that without having a good grasp of what inventory
24 was available for prospects and for customers, that the way we
25 were setting quotas for sales teams and setting up sales

Kazi - direct by Madden

313

1  forecasts may be inflated and not accurate.

2  Q.  How did Shah respond to that?

3  A.  I cannot remember.

4  Q.  Okay.  Based on Shah's statements to you during the

5  meeting, was Shah aware that Outcome was selling inventory it

6  did not have?

7  A.  He was.

8  Q.  Based on Shah's statements during the meeting, was he

9  aware that Outcome was sending false affidavits to clients?

10  A.  He was.

11  Q.  And based on the statements he made during that meeting,

12  was Shah aware that Outcome was manipulating the IMS ROI

13  reports that was presenting to clients?

14  A.  He was.

15  Q.  At any time during the meeting, did Shah indicate that he

16  was not aware of those issues?

17  A.  Not that I can remember.

18  Q.  Did you bring anything with you to the meeting?

19  A.  I had my work bag and laptop and work phone with me.

20  Q.  Why did you bring your laptop?

21  A.  My intention was that in the event that Mr. Shah wanted to

22  go deeper on any of those matters or asked me for a source of

23  information or how I understood what I did, I would be -- I

24  would just show him the information that was sent to me.

25  Q.  Did Shah ever ask you how you knew about all these issues?

1   A.  Not that I can remember.

2   Q.  Did Shah ask you to see any data or backup that you had

3   reflecting those issues?

4   A.  He did not.

5   Q.  Did Shah ask you any questions about the manipulation of

6   the ROI reports?

7   A.  Not in any detail, that I can remember.

8   Q.  Did Shah dig in with you on manipulation of the ROI

9   reports?

10  A.  Not that I can remember.

11  Q.  Did Shah direct you to take any action with respect to the

12  manipulation of the ROI reports?

13  A.  He did not.

14  Q.  How many questions did Shah ask you about the false

15  affidavits that Outcome was sending to clients?

16  A.  None.

17  Q.  Did Shah dig in on the issue of the false affidavits with

18  clients?

19  A.  He did not with me.

20  Q.  Did Shah give you any direction on what you could do about

21  false affidavits being sent to clients?

22  A.  He did not.

23  Q.  Did Shah ask you any questions about Outcome overselling

24  inventory?

25  A.  Not that I can remember.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 70 of 310 PageID #:12869
Kazi - direct by Madden
315

1  Q.  Did Shah dig in on the issue of Outcome overselling
2  inventory?
3  A.  He did not.
4  Q.  Did Shah show any interest at all in discussing the issues
5  you raised?
6  A.  He did not.
7  Q.  What did you think about Shah's reaction to you raising
8  all these issues with him?
9  A.  I thought that this was a person who knew what was
10 happening at their company and -- yes.
11 Q.  What -- what about you personally and your future at the
12 company?  How did you start thinking about that?
13 A.  Well, my -- my intention was clear that I wanted to
14 separate from the company because of what had happened in that
15 meeting.
16 Q.  Walking into the meeting, were you intending to leave the
17 company?
18 A.  I thought to myself that if my CEO didn't engage with me
19 as deeply as I thought these matters deserved, that I would --
20 I would leave the company.
21 Q.  And based on his reaction, what did you decide to do?
22 A.  I decided that I would leave, and then the subsequent
23 conversation led to that happening.
24 Q.  The conversation that we're talking about here?
25 A.  Correct.

1  Q.  What did you say -- so let me ask you this:

2       After you raised all those issues with Shah, what

3  happened next in the conversation?

4  A.  He pivoted back to this idea that I was not a cultural fit

5  and asked what should be done about that.  My response was

6  that we were -- he was intimating that perhaps I should

7  separate.  And I said, we -- I -- very definitively that we

8  should separate.

9  Q.  And what did you do?

10 A.  I took out all of the company property that I had

11 available in my bag, placed it on a table, had a few more

12 niceties, and left the apartment.

13 Q.  How did Shah respond when you said, we should separate?

14 A.  In a manner, it seemed that he didn't assume it would be

15 as easy, that I would suggest that we should separate.

16 Q.  You were willing to walk away from the potential for a

17 $30 million equity?

18 A.  Yes.

19 Q.  Why?

20 A.  It's not the way that I live my life.

21 Q.  What do you mean by that?

22 A.  I -- there's no way I could be involved in a -- in a

23 situation with a company where I believed there was fraud

24 happening and the CEO didn't see it as a major red flag and

25 something that needed to be addressed with immediacy and

Kazi - direct by Madden

317

1    urgency.

2    Q.  At any time during the meeting, did you say to Shah that

3    the issues that you were raising were normal?

4    A.  Not that I can recall.

5    Q.  Did you think that the issues you raised were normal?

6    A.  I did not.

7    Q.  After your meeting with Shah that day when you turned in

8    your company property and left, did Shah reach out to you

9    later in the day?

10   A.  He did.

11   Q.  How so?

12   A.  He sent me an email.

13   Q.  Can you describe the tone of the email?

14   A.  It's very cordial.  It was an email proposing a potential

15   advisorship for me with the company.

16   Q.  In the email, did Shah address any of the issues that you

17   had raised with him about the company's business practices?

18   A.  He did not.

19   Q.  You said he offered you something about being an advisor

20   at the company?

21   A.  He did.

22   Q.  How did you respond?

23   A.  My response in an email back to him just stated that I'd

24   be open to considering it if he or Shradha felt that there was

25   real value in me in an advisorship role.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 73 of 310 PageID #:12872
Kazi - direct by Madden
318

1  Q.  Were you actually interested in being an advisor to

2  Outcome after what you learned?

3  A.  I was not.

4  Q.  Other than that one email exchange, was there any more

5  discussion of you serving as an advisor at Outcome?

6  A.  No.

7  Q.  Were you ever an advisor to Outcome?

8  A.  I was not.

9  Q.  I'd like to cover one last topic with you.

10        While you were working at Outcome, did you have any

11 discussions with Shah about Outcome raising money from lenders

12 or investors?

13 A.  The only conversation I can recall is -- is knowing that

14 Outcome Health had raised capital and a private deck markets

15 to do an acquisition prior to me joining the company.  And

16 then, secondarily, that there was no reason for the company to

17 raise outside capital because of how profitable it was and how

18 quickly it was growing.

19 Q.  Let me break that down a little bit.

20        You mentioned that Outcome had raised money in the

21 private debt market to acquire a competitor.

22        Could you explain what you meant by that?

23 A.  Lenders that lend companies money to do acquisitions and

24 then that debt is syndicated into the public markets.

25 Q.  And so were you -- was -- had Outcome raised -- had

1   Outcome obtained money from lenders in order to buy its
2   competitor before you started at the company?
3   A.  Yes.
4   Q.  And then there was a second part where you mentioned
5   raising additional capital from investors.
6            Could you -- was that based -- was that a
7   conversation you had with Shah?
8   A.  It was a discussion that we had had, yes.
9   Q.  And what did Shah say about that?
10  A.  Just that the company was growing at such a rapid clip and
11  that the company was profitable, that there was no reason for
12  the company to raise capital from the outside.
13  Q.  Do you know whether, in fact, Outcome raised capital from
14  outside investors shortly after you left the company?
15  A.  I became aware of it through the public media.
16  Q.  Do you know if Shah was already in negotiations with
17  investors at the time you met with him to raise all those
18  concerns about Outcome's business practices?
19  A.  I wasn't aware of any of that.
20  Q.  Do you know approximately how much money Outcome raised
21  from investors shortly after you left the company?
22  A.  I believe it was somewhere in the neighborhood of 4- or
23  $500 million.
24            MR. MADDEN:  May I have a moment, Your Honor?
25            THE COURT:  Yes.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 75 of 310 PageID #:12874
Kazi - cross by Hueston
320

1          MR. MADDEN:  No further questions.

2          THE COURT:  All right.  Cross-examination.

3          We'll go to about a quarter to 11 --

4          MR. HUESTON:  Okay.

5          THE COURT:  -- before we take the morning break.

6                    CROSS-EXAMINATION

7    BY MR. HUESTON:

8    Q.  Good morning, Mr. Kazi.  My name is John Hueston.

9          We haven't met before, have we?

10   A.  We haven't.

11   Q.  All right.  Well, let me kind of pick up where Mr. Madden

12   left off.

13          So when you were there, I think it was 17 days,

14   right?

15   A.  Yes.

16   Q.  Okay.  You never observed someone committing fraud at the

17   company, right?

18   A.  Correct.

19   Q.  Okay.  And you never personally observed anything other

20   than with respect to potential fraud -- other than what

21   Ms. Pierce and Mr. Prowker gave and told you, right?

22   A.  Correct.

23   Q.  Okay.  And we'll get into more of that later.

24          And you have no specific recollection of either

25   Ms. Pierce or Mr. Prowker saying the word "fraud" to you,

1    right?

2    A.  Correct.

3    Q.  And when you spoke to Mr. Shah, you never said to

4    Mr. Shah, Mr. Desai is committing fraud, right?

5    A.  Not that I can remember.

6    Q.  And, in fact, you're not sure you used the word fraud at

7    all with Mr. Shah in that meeting on the 25th, correct?

8    A.  I'm not sure.

9    Q.  And, Mr. Kazi, no one ever said to you during your time

10   there, Rishi Shah is committing fraud at the company, right?

11   A.  Correct.

12   Q.  And no one said to you that Rishi Shah knows there's fraud

13   at the company, right, sir?

14   A.  I don't know that to be true.

15   Q.  Okay.  Let's -- you remember you gave sworn testimony

16   about four months ago, in September?

17   A.  Yes.

18            MR. HUESTON:  Okay.  Let's put up the clip, please,

19   page 242, line 4 to line 12.

20            We'll post that, please, and I'll --

21            THE COURT:  That's PC1 or 2?

22            MR. MADDEN:  I'm going to object, Your Honor.

23            THE COURT:  Well, we'll get it back in a minute.  I

24   want to make sure we --

25            Before you play anything, sorry, let's deal with the

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 77 of 310 PageID #:12876
Kazi - cross by Hueston
322

1    objection.  I want to make sure I've got the right connection.

2          Is it defense PC1 or 2, if you know?  I've switched

3    the defense --

4          MR. MADDEN:  I'm objecting to --

5          THE COURT:  All right.  I'll take it off for the

6    jury.

7        (Indiscernible crosstalk.)

8          MR. HUESTON:  And, Your Honor --

9          THE COURT:  Okay.  Let's go to sidebar.

10         And, ladies and gentlemen, any of these sidebars,

11   feel free to stand up and stretch.

12       (Proceedings heard at sidebar on the record.)

13         THE COURT:  Okay.  Go ahead.

14         MR. MADDEN:  Your Honor, he needs to establish that's

15   a prior inconsistent statement first before he shows it.

16         THE COURT:  Well, I assume it's inconsistent or he

17   wouldn't show it.

18         What's the basis of the inconsistency?

19         MR. HUESTON:  Well, he said, I don't remember that to

20   be true.  And right here, he says -- it's clear, Your Honor.

21   Look at lines 10 through 12.  Unfortunately, it's not up

22   anymore where he says:  Yeah, I never said that to Rishi Shah.

23         It's establishes the very point I was trying to

24   establish.

25         THE COURT:  All right.

1          MR. MADDEN:  It's -- it's different.  The first

2  question was:  Did you say that to Rishi Shah?  And Kazi

3  agreed that he didn't.

4          The next question was:  No one said to you that

5  Rishi Shah knows about the fraud?  And he said, I'm not sure.

6  So it's a different question.

7          MR. HUESTON:  Well --

8          THE COURT:  Why don't you set it up again?  I think

9  if he -- there may have been a couple of double negatives in

10  the question, and he may have misunderstood it.

11          Just set it up again.  And I'll allow it if you

12  represent there's something in the SEC dep that's inconsistent

13  with that.

14          MR. HUESTON:  Thank you.

15          THE COURT:  All right.

16     (Sidebar ended.)

17  BY MR. HUESTON:

18  Q.  Okay.  Mr. Kazi, let's try this again.

19          No one said to you that Rishi Shah knows there's

20  fraud at the company, right?

21  A.  I don't remember one way or the other.

22  Q.  Okay.  Let's go to the deposition, page 242, lines 10

23  through 12.

24          MR. HUESTON:  And is it up?

25          THE COURT:  It is.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 79 of 310 PageID #:12878
Kazi - cross by Hueston
324

1          MR. HUESTON:  Okay.

2     BY MR. HUESTON:

3     Q.  And --

4          "QUESTION:  The former.  Does Rishi know there's

5     fraud at the company?

6          "ANSWER:  No one said that to me."

7          That was your testimony, right, sir?

8     A.  Yes.

9          MR. HUESTON:  Okay.  We can put that aside.

10    BY MR. HUESTON:

11    Q.  Now, I want to back up.  Let's go back to the beginning.

12         Mr. Kazi, I want to start -- we'll reorient to the --

13    right before you joined Outcome Health.  I just want to talk a

14    little bit about your experiences.

15         Other than your work at Outcome Health, you had no

16    experience working in healthcare up to that time, right?

17    A.  Correct.

18    Q.  Okay.  And you had no prior experience with pharmaceutical

19    companies as customers or clients, right?

20    A.  Correct.

21    Q.  And -- or any experience with point-of-care advertising

22    where screens are placed in physicians' offices and companies

23    advertise them, right?

24    A.  Correct.

25    Q.  And you came to Outcome Health through an executive

1    recruiting firm, right?

2    A.  Yes.

3    Q.  Rishi Shah wasn't some sort of friend of yours and asked

4    you to come in.  It was you came in through a recruiting firm,

5    right?

6    A.  Yes.

7    Q.  And you, in fact, hadn't even heard of Outcome Health

8    before the recruiter told you about it, right?

9    A.  Correct.

10   Q.  Okay.  And given your background, you recognized that you

11   would have a steep learning curve in life sciences and

12   Outcome, right?

13   A.  Yes.

14   Q.  Mr. Kazi, I think you spent a little time in your

15   testimony saying you didn't see yourself as part of the

16   executive team.  Do you remember that testimony?

17   A.  I do.

18   Q.  And I think you, in fact, mentioned -- there was a mention

19   of inner circle and you felt that Mr. Shah, Ms. Agarwal,

20   Mr. Desai, and Mr. Purdy were the inner circle at

21   Outcome Health.  Is that right?

22   A.  Yes.

23   Q.  Okay.  But Mr. Shah did bring you on as a senior executive

24   at the company, right?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 81 of 310 PageID #:12880
Kazi - cross by Hueston
326

1  Q.  Okay.  And even though you were a total outsider, you came

2  through an executive recruiting firm, right?

3  A.  Yes.

4  Q.  Okay.  And prior to Outcome, you had a long prestigious

5  set of positions as senior executive at a number of companies.

6  Mr. Madden established that, right?

7  A.  Yes.

8  Q.  All right.  Including being an executive vice president

9  and general manager of a company that was acquired by

10  Salesforce, right?

11  A.  Correct.

12  Q.  And an interim CEO at a software company called Simply

13  Measured, right?

14  A.  Yes.

15  Q.  And when you came to Outcome, again, you were hired in a

16  very senior position, right?

17  A.  Yes.

18  Q.  In fact, you were the COO, the chief operating officer, of

19  the life sciences part of the business, right?

20  A.  Correct.

21  Q.  And that's the part of the business that generated all the

22  revenue of the business, right?

23  A.  Correct.

24  Q.  So again for perspective, once a deal was signed with a

25  pharmaceutical company, the management of the inventory,

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 82 of 310 PageID #:12881
Kazi - cross by Hueston
327

1    getting the ads displayed, living up to the ROI associated

2    with what was in the contract, all of the reporting, auditing,

3    et cetera, that was all your responsibility, right?

4    A.  Correct.

5    Q.  In other words, everything postsale was your

6    responsibility, right?

7    A.  That is correct.

8    Q.  Okay.  Now, Mr. Kazi, you'll concede that everybody has

9    their own management style, right?

10   A.  Yes.

11   Q.  And you tend to --

12        THE COURT:  If you can keep your voice up or move the

13   mic a little closer, whatever's easier.

14        Thank you.

15   BY MR. HUESTON:

16   Q.  And you liked -- your style was having some more control,

17   right?

18   A.  I'm not sure what you mean by that.

19   Q.  Well, you liked to be able to influence the success of a

20   business, right?

21   A.  Yes.

22   Q.  All right.  And you left Salesforce because you felt the

23   bureaucracy of the company was not to your liking, right?

24   A.  Sure.

25   Q.  And you've also described yourself as pretty

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 83 of 310 PageID #:12882
Kazi - cross by Hueston
328

1   detail-oriented, right?

2   A.  Yes.

3   Q.  And you didn't try to hide any of that when you were

4   interviewing at Outcome, right?

5   A.  I did not.

6   Q.  Okay.  And, in fact, you mentioned during your interview

7   with Mr. Shah when the government, you know, had you circle

8   the room in the house you met with that --

9         By the way, did you think there was anything

10  nefarious or wrong happening in that room that was -- the

11  government had you circle?

12  A.  No.

13  Q.  No.  You just met in the living room, right?

14  A.  Yes.

15  Q.  All right.  And during that interview with Mr. Shah, you

16  discussed your expectations for your role, right?

17  A.  I did.

18  Q.  In fact, you mentioned here that you asked Mr. Shah, the

19  CEO of the company, how government -- how governance would be

20  ensured at Outcome Health if Shah was a bad actor, right?

21  A.  I did.

22  Q.  And you understand, that would -- that's not the typical

23  question that an interviewee would ask a CEO, right?

24  A.  I don't know that to be true.

25  Q.  At a job interview?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 84 of 310 PageID #:12883
Kazi - cross by Hueston
329

1  A.  Sure.

2  Q.  Okay.  And, sir, Mr. Shah didn't say, I can't believe

3  you're asking me that question, right?

4  A.  He did not say that.

5  Q.  He didn't say, are you kidding me?  Get out of this house.

6  A.  He did not say that to me.

7  Q.  And to be clear, you had no reason at that point to think

8  that fraud or anything bad was happening at Outcome Health,

9  right?

10  A.  None whatsoever.

11  Q.  You also discussed compensation during your interview with

12  Mr. Shah, right?

13  A.  We did.

14  Q.  And Mr. Shah -- details were reviewed by Mr. Madden -- he

15  was willing to pay a substantial amount of money to get you to

16  come to Outcome Health, right?

17  A.  Yes.

18  Q.  He wasn't nickel and diming you there?

19  A.  Not at all.

20  Q.  Okay.  He wanted you to come over, right?

21  A.  He did.

22  Q.  Yeah.

23        Now, you understand that Mr. Shah was willing to

24  extend such a generous offer because the company was in a mode

25  where they wanted to hire experienced executives to help run

1   and scale the business, right?

2   A.  Yes.

3   Q.  And you weren't the only experienced executive they were

4   bringing on, right?

5   A.  Yes.

6   Q.  So, for instance, Vivek Kundra, he was brought in as COO

7   of the other side of the business, the side that placed

8   screens in doctors' offices, right?

9   A.  Correct.

10  Q.  So you were coming in, you know, outside of what you

11  described as the inner circle on one side, and then we had

12  Vivek Kundra being invited in outside of the inner circle on

13  the other side, right?

14  A.  I don't know about the second part of your statement.

15  Q.  Okay.  But you did understand he was brought in as COO of

16  the other side of the business, right?  The side that placed

17  screens in doctors' offices?

18  A.  Yes.

19          MR. HUESTON:  All right.  And let's -- just so the

20  jury has pictures being popped up here, let's go to

21  Demonstrative B, please, Slide 1.

22  BY MR. HUESTON:

23  Q.  And can you identify who's pictured here, sir?

24  A.  This is Vivek Kundra.

25  Q.  Who we've just been talking about, right?

Kazi - cross by Hueston

1    A.   Correct.

2         MR. HUESTON:   Okay.  And then we would move this

3    slide into evidence at this time, Your Honor.

4         THE COURT:   Any objection?

5         MR. MADDEN:   No, Your Honor.

6         THE COURT:   All right.  It's admitted into evidence.

7         What's the number on this?

8         MR. HUESTON:   It -- for now, we'll call it Demo B,

9    Slide 1.  We'll have to assign a number later.  This is

10   something we're going to have to anticipate.

11        THE COURT:   All right.  And I think we're going to

12   take our break right now.

13        So it's 10:37.  A 15-minute break.  And, ladies and

14   gentlemen, there's one seat available in the jury box.  So if

15   any of you want to switch, you're free to do so.  I know some

16   of you have moved out.  Wherever you're most comfortable and

17   feel you can view things the best.

18        All right.  Please don't discuss the case among

19   yourselves or with anyone else.  We'll see you in 15 minutes.

20        COURT SECURITY OFFICER:   All rise.

21      (Jury out at 10:37 a.m.)

22        THE COURT:   All right.  Please be seated.

23        Sir, you're on cross-examination.  So please don't

24   discuss your testimony with anyone.

25        You're free to take -- go off the witness stand.

Kazi - cross by Hueston

332

1    We're going to resume at 10:52 sharp.  We did this break a
2    little early because the CSO said one of the jurors needed a
3    restroom break, so we took it a little earlier.
4            A couple things.  Now that it's -- we can go off the
5    record.
6            (Off-the-record discussion.)
7            (Jury in at 10:54 a.m.)
8            THE COURT:  All right.  Please be seated.
9            Sir, you can take your mask off.
10            And, Mr. Hueston, you may continue.
11            MR. HUESTON:  Thank you, Your Honor.
12   BY MR. HUESTON:
13   Q.  Good morning, again, Mr. Kazi.
14   A.  Hello.
15   Q.  Now, we are just speaking about Vivek Kundra, which you've
16   identified as the COO of the other side of the business,
17   right?
18   A.  Yes.
19   Q.  All right.  And you were aware that Mr. Kundra was the
20   former chief information officer of the United States under
21   President Barack Obama, right?
22   A.  I'm aware of that.
23   Q.  And you were asked about Madan Nagaldinne, right?
24   A.  Yes.
25   Q.  Chief people officer, right?

1  A.  Correct.

2  Q.  And you were aware that he had been an executive at

3  Facebook before coming to Outcome, right?

4  A.  Yes.

5  Q.  And you talked a lot about your two direct reports.  We'll

6  get into more of that later.  But just for now, Liane Pierce

7  and Adam Prowker, they were pretty experienced people brought

8  on my Outcome to take over these issues that raised concerns,

9  right?

10  A.  Sorry.  Is your question were they experienced?  Or were

11  they here to address the matters?

12  Q.  Well, in your -- four months ago in your deposition, you

13  understood that Liane Pierce and Adam Prowker were two pretty

14  experienced individuals, right?

15  A.  They've -- yes.

16  Q.  Okay.  And also understood that both of those people had

17  been reporting to Ashik Desai, right?

18  A.  Correct.

19  Q.  And now you were being hired to take over from Mr. Desai

20  overseeing Prowker and Pierce's teams, right?

21  A.  Yes.

22  Q.  And in general, you were basically asked by Mr. Shah to

23  take over a whole bunch of duties that used to be

24  Ashik Desai's duties, right?

25  A.  All of the duties not related to sales.

Kazi - cross by Hueston

334

1    Q.  Okay.  Let's go to your deposition, page 202, lines 14 to
2    17.
3            MR. HUESTON:  You can put that up, please.
4    BY MR. HUESTON:
5    Q.  And here, the testimony -- the --
6            "QUESTION:  The duties that you assumed, you
7    basically took a whole bunch of duties that used to be
8    Ashik Desai's duties, right?"
9            MR. MADDEN:  Objection, Your Honor.
10   BY MR. HUESTON:
11   Q.  "ANSWER:  Correct."
12           MR. MADDEN:  It's not inconsistent.
13           MR. HUESTON:  It's unqualified.
14           THE COURT:  All right.  Well, we're not going to
15   argue about that.
16           Ladies and gentlemen, depositions are things
17   sometimes taken -- they are often done in a lawyer's office --
18   where one party gets to ask questions of a witness that may
19   later appear in court.  And that's what happened here.
20           Occasionally, there'll be instances where a witness
21   testifies to something and an attorney thinks what was said in
22   the deposition is inconsistent.  Not for me to decide.  It's
23   ultimately for you to decide whether there's an inconsistency,
24   and if there is, what weight to attach to the statement in
25   court or the statement outside of court and used to judge the

1  credibility of any witness where such a perceived
2  inconsistency is suggested by an attorney.
3       That's simply what's going on here.  And these
4  depositions don't take place in court.  As I said, they're in
5  a lawyer's office.  There's a court reporter similar to Elia
6  in the room, and the lawyers ask the questions back and forth.
7  Ultimately, you decide whether or not these are inconsistent
8  or not.
9       I'll overrule the objection.  Proceed.
10      MR. HUESTON:  Okay.
11 BY MR. HUESTON:
12 Q.  This was your testimony under oath, right, sir?
13 A.  Correct.
14 Q.  Okay.  And in other words, Mr. Shah was bringing you, an
15 outsider and an experienced executive, bringing you to come in
16 and take over duties held by Ashik Desai, right?
17 A.  Correct.
18 Q.  Someone you understand is an alleged coconspirator here in
19 this case, right?
20 A.  Yes.
21 Q.  Okay.  And Mr. Desai is also someone you believed had been
22 running the entire organization that both sold the inventory
23 to pharmaceutical clients and managed the people who delivered
24 against those contracts, right?
25 A.  Correct.

1   Q.  And by the way, when you came into Outcome, Mr. Shah

2   didn't put any restrictions on you saying don't tell -- talk

3   to certain people or don't look into this or that, right?

4   A.  He did not.

5   Q.  All right.  No permission needed to talk to anybody,

6   right?

7   A.  Yes.

8   Q.  Okay.  Yes, meaning no permission was required?

9   A.  Correct.

10  Q.  Just making sure we have a clean record.  Thank you.

11        Now, you mentioned that the -- the reason you felt in

12  your 17 days that you may not have been part of the inner

13  circle is because you don't remember being a part of any

14  executive team meetings during that 17 days, right?

15  A.  Yes.

16  Q.  All right.  And it's possible, you would concede, that you

17  were the only executive that didn't meet in some format with

18  the rest of the team, right?

19  A.  It's possible.

20  Q.  Okay.  So, for instance, are you aware that there was an

21  executive team meeting scheduled for January 12, 2017; but it

22  was canceled because several individuals were traveling?  Were

23  you aware of that?

24  A.  I was not.

25        MR. HUESTON:  Okay.  Let's pull up -- CX10046, which

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 92 of 310 PageID #:12891
Kazi - cross by Hueston
337

1    is an email from Mr. Surakanti on January 11, 2017, to a

2    Listserv exec at ContextMedia, Inc.com, which we'd move into

3    evidence at this time.

4             THE COURT:  Any objection?

5             MR. MADDEN:  No objection.

6             THE COURT:  All right.  It's admitted without

7    objection.

8         (Said exhibit admitted in evidence.)

9    BY MR. HUESTON:

10   Q.  And you see, sir, the subject:  Tomorrow's exec team

11   meeting.  With an attachment.

12            Do you see that?

13   A.  I do.

14   Q.  And if we look below it, Mr. Surakanti writes that, quote:

15   "Given several members of our team will be traveling

16   overnight, it is best we take a different approach with

17   tomorrow's exec team meeting."  Right?

18   A.  That's what it states.

19   Q.  Okay.  And he goes on to say:  Rather than meeting in

20   person tomorrow morning, I will start a Vox chain tonight to

21   cover the planned agenda.  Do you see that?

22   A.  I do.

23   Q.  All right.  And then he says:  The agenda's below, and we

24   would ask each of the owners -- each owner to share a brief

25   message with the group.

Kazi - cross by Hueston

338

1          Do you see that that?

2     A.  I do.

3     Q.  And let's look at the agenda below.  You see that Madan is

4     listed there at point 3, correct?

5     A.  Yes.

6     Q.  All right.  And that's Madan Nagaldinne, right?

7     A.  Correct.

8     Q.  The chief people officer, yes?

9     A.  Yes.

10    Q.  And you're not aware of the government accusing

11    Mr. Nagaldinne of participating in fraud, right?

12    A.  I'm not aware of that.

13    Q.  Okay.  And we see that Vivek is listed here as part of the

14    executive team meeting.  Do you see that?

15    A.  I do.

16    Q.  And you recognize that that's Vivek Kundra, the former

17    chief information officer under Barack Obama, right?

18    A.  Yes.

19    Q.  Okay.  And he was the COO on the physician side of the

20    company.  So he's included in the meeting, and he's giving

21    reports, right?

22    A.  Yes.

23    Q.  You're not aware of the government --

24              MR. MADDEN:  Objection, Your Honor.

25    BY MR. HUESTON:

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 94 of 310 PageID #:12893
Kazi - cross by Hueston
339

1    Q.  -- accusing Mr. Kundra --

2              MR. HUESTON:  Can I finish my answer -- question?

3              THE COURT:  Well, the court reporter is putting her

4    hands up because she can't hear both.

5              MR. HUESTON:  Okay.

6              THE COURT:  Is the objection to the question that he

7    began or the previous one?

8              MR. MADDEN:  Both.

9              THE COURT:  All right.  Finish your question so I

10   know what the objection is going to be.

11             MR. HUESTON:  Okay.

12   BY MR. HUESTON:

13   Q.  And you're not aware of the government accusing Mr. Kundra

14   of participating in fraud, right, sir?

15             THE COURT:  All right.  Hang on before you answer.

16             The objection?  Or do you need to go to sidebar?

17             MR. MADDEN:  I guess we can go to sidebar,

18   Your Honor.

19             THE COURT:  All right.

20          (Proceedings heard at sidebar on the record.)

21             THE COURT:  Go ahead.

22             MR. MADDEN:  Your Honor, it's not appropriate to ask

23   witnesses whether they know who has been charged by the

24   government or not in these cases.

25             THE COURT:  Agreed.  That doesn't go to his state of

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 95 of 310 PageID #:12894
Kazi - cross by Hueston
340

1   mind or the knowledge he has firsthand from his events at

2   Outcome.

3            Objection sustained.

4          (Sidebar ended.)

5            THE COURT:  All right.  Objection sustained.

6            Please proceed.

7   BY MR. HUESTON:

8   Q.  And Jayanth Surakanti is on the agenda, right?

9   A.  Yes.

10  Q.  Okay.  And what was his position?  Do you remember?

11  A.  I believe he was Rishi Shah's chief of staff.

12  Q.  Okay.  And so let's look at the last topic listed here.

13  It says:  2017 goal setting, progress/challenges.  Right?

14  A.  Yes.

15  Q.  And that's assigned to all, right?

16  A.  Yes.

17  Q.  So fair to say now that you've seen this executive meeting

18  notice of cross-functional executives beyond Mr. Shah,

19  Mr. Desai, and Mr. Purdy and Ms. Agarwal, there were others

20  included here other than those four, right?

21  A.  Yes.

22  Q.  All right.  And are you aware that there was another

23  executive team meeting on January 18th?

24  A.  I was not.

25            MR. HUESTON:  Okay.  Let's pull up CX10047.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 96 of 310 PageID #:12895
Kazi - cross by Hueston
341

1        MR. MADDEN:  Your Honor, I'm going to object to them

2    showing documents that are not in evidence before they --

3    unless they show them to me first.

4        MR. HUESTON:  Well, I'm putting it up to first get

5    admitted, and then I'm going to.

6        MR. MADDEN:  Well, I need to see it before the jury

7    sees it.

8        THE COURT:  All right.  I'll turn off the jury

9    monitor.  The witness can see it.  The government can see it.

10        Take a look.  And if there's no objection, I'll turn

11    on the monitor for the jury.

12        MR. MADDEN:  No objection, Your Honor.

13        THE COURT:  All right.

14        MR. HUESTON:  May I publish?

15        THE COURT:  You may.  I just turned it on right now.

16        So is there any objection to -- well, Defense

17    Exhibit 10047 is admitted without objection.

18        Go ahead.

19        MR. HUESTON:  Thank you.

20        (Said exhibit admitted in evidence.)

21    BY MR. HUESTON:

22    Q.  And this is an email dated January 18, subject:  1/18

23    executive team agenda.  Correct?

24    A.  Yes.

25    Q.  And you see here that Mr. Surakanti is emailing on that

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 97 of 310 PageID #:12896
Kazi - cross by Hueston
342

1    date the executive team agenda to the same executive team

2    Listserv as the last email, right?

3    A.  Correct.

4    Q.  All right.  And in fact, sir, are you aware that there was

5    an executive team meeting on the same day as your final

6    meeting with Mr. Shah?

7    A.  I was not.

8           MR. HUESTON:  Well, let's pull up without showing it

9    to the jury for identification purposes so government counsel

10   can see it, CX10048, which is another Surakanti email.

11          We'd ask to move it in at this time.

12          MR. MADDEN:  No objection.

13          THE COURT:  All right.  10048, defense exhibit, is

14   admitted without objection.  It's published to the jury.

15          MR. HUESTON:  Thank you, Your Honor.

16       (Said exhibit admitted in evidence.)

17   BY MR. HUESTON:

18   Q.  And the subject here is a January 25th executive team

19   meeting, right?

20   A.  Yes.

21   Q.  And Mr. Surakanti says:  "Please see attached agenda for

22   tomorrow's executive team meeting," right?

23   A.  Yes.

24   Q.  And if we scroll to the next page, we can see the agenda

25   for the meeting, right?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 98 of 310 PageID #:12897
Kazi - cross by Hueston
343

1    A.  Yes.

2    Q.  All right.  Now, Mr. Kazi, even though you didn't take

3    part in the -- in an executive team meeting during your

4    17 days there, you were invited to a senior management retreat

5    during your time there.  Do you remember that?

6    A.  I do not.

7    Q.  Okay.  Let me see if I can help you with that.

8         MR. HUESTON:  Let's go to CX10049 for identification

9    only, please.

10        And we'd move this into evidence at this time.

11        THE COURT:  Any objection?

12        MR. MADDEN:  No, Your Honor.

13        THE COURT:  It's admitted without objection.

14        MR. HUESTON:  Okay.  Let's publish, please.

15      (Said exhibit admitted in evidence.)

16   BY MR. HUESTON:

17   Q.  And directing your attention to this, this is an

18   invitation to a senior management retreat taking place --

19   scheduled to take place April 7th to 10th, right, sir?

20   A.  Yes.

21   Q.  Okay.  And if we look below required attendees, down

22   below, and let's scroll down a little bit, please.  Okay.

23        You can see that you're one of the required

24   attendees.  Is that right?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 99 of 310 PageID #:12898
Kazi - cross by Hueston
344

1  Q.  Okay.  But you left the company before the retreat took
2  place, right, sir?
3  A.  Yes.
4  Q.  All right.
5         MR. HUESTON:  Okay.  We can put that down.
6  BY MR. HUESTON:
7  Q.  And let me just ask you, sir:  There's nothing inherently
8  wrong or bad about being in an inner circle at a company,
9  right, sir?
10        It's something -- the term "inner circle" doesn't --
11  isn't something that's evil or bad, right?
12  A.  It isn't.
13  Q.  Right.  Companies -- top executives at any company could
14  be described at the highest level as part of an inner circle,
15  right?
16  A.  Yes.
17  Q.  And, sir, you were CEO at Cheetah Digital, right, from
18  about June of 2017 to about February of 2022?
19  A.  Yes.
20  Q.  And you're familiar with Glassdoor, the review website
21  where employees can post complaints or issues?  You've heard
22  of that?
23  A.  I am.
24  Q.  And, in fact, it's kind of like Yelp, except people
25  provide reviews of the companies they work for, right?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 100 of 310 PageID #:12899
Kazi - cross by Hueston
345

```
 1    A.  Yes.
 2    Q.  All right.  And I'd like to take a look at one of the
 3    reviews while you were there.
 4              MR. HUESTON:  And we can put this --
 5              MR. MADDEN:  Objection to relevance.
 6              THE COURT:  Let's go to sidebar.
 7         (Proceedings heard at sidebar on the record.)
 8              THE COURT:  I assume this is a derogatory review?
 9              MR. MADDEN:  Pardon me?
10              THE COURT:  I'm asking defense counsel.
11              MR. HUESTON:  Yeah.  The review is an accusation that
12    he was part of an inner circle.  And this is just going to
13    establish -- I'm sure he's going to say I saw this or I didn't
14    see it; and, yeah, there's nothing wrong with being in an
15    inner circle.
16              THE COURT:  He's already said that.  So what
17    relevance does this have if he's already admitted there's
18    nothing wrong with an inner circle?
19              MR. HUESTON:  Well, this is certain force to his
20    testimony on direct, Your Honor.  I think I have to do a
21    little more to establish that there's nothing wrong with being
22    in an inner circle and even he's been part of an inner circle.
23    And there have been issues raised, and it's not a concern.  I
24    think it's important to put that to rest.
25              MR. MADDEN:  Your Honor --
```

1          THE COURT:  Go ahead.

2          MR. MADDEN:  It's not relevant.  I haven't seen the

3  document, but to talk about -- that is just not relevant to

4  his credibility.

5          THE COURT:  We're not going off into his management

6  reviews at other companies.  There's nothing he said relating

7  to how he ran other companies as a comparison to this company.

8          MR. HUESTON:  Well --

9          THE COURT:  I take that back.  I think there were

10 some comparisons.  But I don't know why a negative review of

11 another -- from an unknown employee, presumably these are all

12 anonymous, from an unknown employee in another company would

13 be relevant to this issue.

14         He's already admitted there's nothing wrong with an

15 inner circle.  If you want to explore it and he eventually

16 says there is something wrong with an inner circle, then I'll

17 take a look at the document outside the presence the jury and

18 possibly allow it.  But right now, it's not contradictory, and

19 this is a classic case of going off on a side road.

20         MR. HUESTON:  Okay.  Let me complete my record.

21         THE COURT:  Go ahead.

22         MR. HUESTON:  I do believe he made a series of

23 observations in his exam where government counsel drew from

24 him inferences of really what Rishi Shah could have, should

25 have been doing and what was happening, all drawn from the

1    very beginning of their exam building up all that prior
2    experience.  So I do believe it's appropriate to put that
3    perspective before the jury.
4              THE COURT:  Response, briefly.
5              MR. MADDEN:  It's -- it's not relevant, Your Honor.
6    It's a total tangent.  And to talk about some anonymous review
7    from a company that Kazi used to work at has just nothing to
8    do with this case or his credibility.
9              We'd also ask for a clarifying instruction or an
10   objection has been sustained for the jury to disregard the
11   question and not speculate what the answer may have been.
12             MR. HUESTON:  Well, I don't think that's necessary.
13             THE COURT:  It's not necessary in the middle of an
14   examination.  Remind me at some point during the day where it
15   wouldn't rub off on the questioner.
16             MR. HUESTON:  Maybe after one of their objections
17   is --
18             THE COURT:  Yeah, I'll do it at the end of the --
19   sometime during the day where it's not going to be something
20   that would inure to the detriment of either side.
21             MR. HUESTON:  Yeah.  One last thing here.  I've just
22   been reminded that the government asked him a question about
23   what he would have done as a CEO during the exam.  And this is
24   partly why all this really is relevant.  They put him up
25   here --

1           THE COURT:  Put it up on the screen.  Let me look at

2     it.

3           MR. MADDEN:  Objection on the basis of hearsay as

4     well, Your Honor.

5           THE COURT:  Well, it's cross-examination.  It doesn't

6     change the hearsay rules, but --

7           Yeah, we're going to have to get into the entire

8     structure on Cheetah to have this have any relevance.  It's

9     the classic -- I called it a side road.  Mr. Madden called it

10    a tangent.

11          Objection sustained.

12          MR. HUESTON:  Okay.

13       (Sidebar ended.)

14    BY MR. HUESTON:

15    Q.  Let's move on.

16          At the time you joined Outcome Health, it was still a

17    start-up, right, sir?

18    A.  I don't know that to be true.

19    Q.  Okay.  You -- I think you testified you considered it to

20    be a tween in the corporate life cycle, right?

21    A.  Sure.

22    Q.  All right.  And it's fair to say that more mature

23    companies have more processes and other structure in place,

24    right?

25    A.  They do.

1  Q.  And Outcome Health, in particular, was growing quickly,

2  wasn't it?

3  A.  It's unclear to me how quickly they were growing.

4  Q.  Okay.  Well, prior to when you joined, you thought the

5  company was growing in the 40 to 50 percent range, right?

6  A.  I think that's what was shared with me.

7  Q.  Okay.  And in fact, once you got to Outcome, you were

8  shown information that suggested it had being growing much

9  faster than that, right?

10  A.  I don't recall that.

11  Q.  Okay.  Let's go to CX10050.1, which is a transcript of a

12  Voxer from Mr. Shah to you dated January 14, 2017.

13          MR. HUESTON:  But before it's put up, we'd move this

14  into evidence at this time.

15          THE COURT:  Any objection?

16          MR. MADDEN:  Hearsay, Your Honor.

17          THE COURT:  All right.  Let's go to sidebar again.

18      (Proceedings heard at sidebar on the record.)

19          THE COURT:  Response?  Response?

20          MR. HUESTON:  Yes.  Well, number one, these are

21  business records.  These Voxers were accounts required by the

22  business, and these were used in the course of business to

23  bring messages back and forth.  So that's basis number one.

24          Basis number two is this is relevant to Mr. Shah's

25  state of mind and the backdrop and what he was aware of.  So

1    at the very least, you know, this is going to be something

2    he's going to say, yes, I remember this, I was being told this

3    or not.

4            It's not for the truth -- the underlying truth of the

5    matter asserted; but I believe a Vox, the Voxers come in like

6    a business record, just like emails.

7            THE COURT:  Well, one, I didn't make the conclusion

8    yesterday that only emails come in as business records.  This

9    is not being offered by the government.  It's offered by the

10   defense, so it's not an admission.

11           MR. HUESTON:  Right.

12           THE COURT:  And if it's being offered to show the

13   state of mind as to -- well, I didn't see it long enough to

14   read it, but if it's being offered for a nonhearsay purpose, I

15   need to explain that to the jury.

16           MR. HUESTON:  Yes.

17           THE COURT:  Is there an objection to the nonhearsay

18   purpose to show the state of mind of the defendant at this

19   time in his communications?

20           This is between Shah and this witness, correct?

21           MR. HUESTON:  Correct.

22           MR. MADDEN:  Yes, Your Honor.  I'd like to see it.

23   It was only just briefly displayed on the screen, so I wasn't

24   able to read it fully.

25           THE COURT:  And from now on, when a witness is on

1    cross, they -- the government can't talk to him.  There is no

2    strategic detriment to you to show these exhibits to the

3    government at a break and see if there's objection.

4         I understand when a person's on direct, you want to

5    keep your cross secret.  But once they're on the stand, they

6    can't talk to them.  And you've really got to show these

7    exhibits because we can't proceed like this for the next --

8         MR. HUESTON:  I didn't anticipate --

9         THE COURT:  -- two-and-a-half months.

10        MR. HUESTON:  -- these kinds of objections.

11        THE COURT:  Well, I think it's -- I could've.  So I

12   think now we know.  And I think that we're going to have to

13   deal with this at lunchtime.

14        But put it up on screen, please.  I'll make sure the

15   jury doesn't see it.

16        MR. HUESTON:  Yeah.

17        THE COURT:  Nor the witness.

18        MR. HUESTON:  And the key parts here, Your Honor, I'm

19   going to highlight is Mr. Shah's --

20        THE COURT:  Say it next to the mic.

21        MR. HUESTON:  Sorry.

22        -- Mr. Shah's state of mind and position, then, that

23   this is historical backdrop.  It's multisided network, and he

24   describes bottlenecks are constraints with respect to

25   inventory.  And the bottleneck reference and the issue of what

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 107 of 310 PageID #:12906
Kazi - cross by Hueston
352

1    he thought at the time about the growth that was happening in

2    this period, that's --

3            THE COURT:  What's the timing?  When does this take

4    place?

5            MR. HUESTON:  This is January 14th.

6            THE COURT:  So it's before the --

7            MR. HUESTON:  Before --

8            THE COURT:  -- meeting in New York?

9            MR. HUESTON:  Yes.

10           THE COURT:  All right.  Response?

11           MR. MADDEN:  I think, Your Honor, the state the mind

12   is only relevant for forward-looking statements, not

13   backward-looking statements.

14           THE COURT:  You've got to look at -- speak into the

15   mic.

16           MR. MADDEN:  Your Honor, state of mind is only for

17   forward-looking statements, not backward-looking statements.

18           THE COURT:  No.  This is -- I'm going to allow this

19   in for the state of mind of the defendant.  We have extensive

20   testimony from this witness about what he thought Shah

21   thought, what was Shah's attitude, why didn't he -- did he

22   react to this, did he react to that.

23           The objection is overruled.  And I'll instruct the

24   jury that this is not being offered for the truth of these

25   assertions but for the state of mind of Mr. Shah when he made

Kazi - cross by Hueston

353

1    these -- left this Voxer for the witness.

2            Objection overruled.

3        (Sidebar ended.)

4            THE COURT:  All right.  The exhibit is admitted.

5    What's the number on it again?

6            MR. HUESTON:  CX10050.1.

7            THE COURT:  All right.  It's admitted.

8            Any objection to it were noted at sidebar.

9        (Said exhibit admitted in evidence.)

10           THE COURT:  Ladies and gentlemen, this isn't being

11   offered for the -- you'll get this instruction a lot during

12   the trial.  This document isn't being offered for the truth of

13   the various things that Mr. Shah said, but to reflect his

14   state of mind on that date.  People say things, and they may

15   not be true.  It's not offered substantively for whether these

16   facts are true, but they are a reflection and being offered

17   for the piece of evidence -- the specific purpose of trying to

18   establish what the state of mind of Mr. Shah was on that date.

19   So that's the basis of the admission.

20           You may proceed.

21           MR. HUESTON:  All right.  Thank you, Your Honor.

22       (Off-the-record discussion.)

23   BY MR. HUESTON:

24   Q.  Let's take a look at a portion of this.  This is -- again,

25   this is a transcript of a Voxer.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 109 of 310 PageID #:12908
Kazi - cross by Hueston
354

1    That's a voicemail, right?  We're getting familiar
2  with the term.
3  A.  Yes.
4  Q.  All right.  From Mr. Shah to you, and it's dated
5  January 14, 2017.
6    Now, in this, Mr. Shah describes giving you a
7  historical backdrop.  We'll highlight those words.  You see
8  that?
9  A.  Yes.
10 Q.  All right.  And he says:  "As a multisided network, our
11 bottleneck or constraint has changed over the course of time."
12 Right?
13 A.  Yes.
14 Q.  And I think you were describing this, in part, on the
15 government's exam.  You understand what a multisided network
16 is, right?
17 A.  I do.
18 Q.  On one side of the network is the physician offices where
19 ads are shown, right?
20 A.  Yes.
21 Q.  And the other side the network is the pharmaceutical
22 companies who buy the ads, right?
23 A.  Yes.
24 Q.  And there's a reference to bottleneck.  Bottleneck refers
25 to the fact that one side or the other is lagging behind,

Kazi - cross by Hueston

355

1  right?

2  A.  Ostensibly, yes.

3  Q.  Okay.  And so then Mr. Shah says:  The reason why all of a

4  sudden commercial became the bottleneck is that, "Not only did

5  you more than double the size of the footprint in '15, you

6  then doubled the size the footprint again in '16."

7        And you understood you meaning the company, right,

8  not you personally?

9  A.  Yes.

10  Q.  All right.  And footprint meant the numbers of doctors'

11  offices.  That's how you interpreted that, right?

12  A.  Or devices.

13  Q.  Okay.  Or devices.  Fair enough.

14        And then he says:  "That alone would have maybe

15  caused 4-, 500 percent growth over that period of time in the

16  inventory."  Right?

17  A.  Theoretically.

18  Q.  Yeah.

19        And that's the view he expressed to you at that time,

20  right?

21  A.  Yes.

22  Q.  And you would agree, 4- or 500 percent growth, that's a

23  lot more than 40 to 50 percent, right?

24  A.  Of the amount of inventory or doctors' offices,

25  theoretically, yes.

Kazi - cross by Hueston

1  Q.  Okay.  And on top of that, Mr. Shah says:  You -- meaning

2  Outcome -- launched several new products at the end of '15.

3  Right?

4  A.  Yes.

5  Q.  And then in December, we bought AccentHealth, which

6  greatly provided a bunch more inventory.  Do you see that?

7  A.  Yes.

8  Q.  And then he says:  That's why you all of a sudden have

9  this nearly 5 to 10 percent growth in inventory.  Do you see

10  that?

11  A.  I do.

12  Q.  And, sir, we can put this down.

13        It was your view that -- and you've testified under

14  oath on this -- Mr. Shah genuinely believed in the future

15  growth and success of the company, right, sir?

16  A.  I did.

17  Q.  Okay.  Now, after you started at Outcome Health, you did

18  discover some operational problems, right?

19  A.  I did.

20  Q.  And it wasn't surprising to you that Outcome had some

21  operational challenges, right?

22  A.  It was surprising to me the scope of the challenges that

23  were presented to me.

24        MR. HUESTON:  Okay.  Let's go to GX720.  And we'd ask

25  to move this in at this time.  It's an email from Mr. Shah and

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 112 of 310 PageID #:12911
Kazi - cross by Hueston
357

1    the Government's Exhibit 720.

2            MR. MADDEN:  No objection.

3            THE COURT:  It's admitted without objection.

4        (Said exhibit admitted in evidence.)

5    BY MR. HUESTON:

6    Q.  And posted, here it is.  And it's an email from yourself

7    to Mr. Shah, January 11, 2017.  Do you see that?

8    A.  I do.

9    Q.  And that was two days after you started, right?

10   A.  Yes.

11   Q.  And here, you say that you feel a bit overwhelmed from all

12   the new -- let's go down below.  And you say you feel a bit

13   overwhelmed from all the intros, info, and training, right?

14   A.  That's correct.

15   Q.  And you also say:  Feel like I have a lot of domain stuff

16   to learn, but the operational challenges that I am seeing are

17   not surprising.  Right?

18   A.  I did state that.

19   Q.  Okay.  And by the way, domain stuff, that means

20   terminology, nature of contracts, how the advertising bid and

21   inventory is managed, right?

22   A.  How that -- how the Outcome Health business specifically

23   runs.

24   Q.  Okay.  In short, how the business worked, right?

25   A.  Yes.

Kazi - cross by Hueston

358

1   Q.  All right.  In fact, a big part of the reason you were

2   hired was to help Outcome's challenges, right?

3   A.  I wasn't made aware of any challenges as part of the

4   interview or hiring process.

5   Q.  Okay.  Well, let's -- but you were -- certainly once you

6   were there, people were saying we've got challenges and we'd

7   like you to try to address them, right?

8   A.  Those became -- the nature of the challenges became

9   apparent to me at the end of my second week at the company.

10  Q.  All right.  Well, let's see if you actually were aware of

11  that earlier.

12          MR. HUESTON:  Let's go to CX8501, which is an email

13  chain between you and Mr. Shah.  We'll just show this to

14  attorneys only at this point.

15          We move this into evidence at this time.

16          MR. MADDEN:  I'm sorry.  Could you show me the email

17  again?  I can't see it.

18          MR. HUESTON:  Sure.

19          MR. MADDEN:  No objection.

20          THE COURT:  All right.  It's admitted without

21  objection.

22      (Said exhibit admitted in evidence.)

23  BY MR. HUESTON:

24  Q.  Okay.  And this is dated November 30, 2016, right, when

25  you were still interviewing for the job?

1    A.  Correct.

2    Q.  And going down to Mr. Shah's email to you, he says:  "I

3    shared our conversation with a few people here, and we all

4    couldn't be more excited about the opportunity to work

5    together and have your leadership on one of our toughest

6    challenges and biggest opportunities."  Right?

7    A.  Yes.

8    Q.  And he also says the role, "Is also very timely/urgent on

9    our end, given how critical those areas are to future growth

10   of the business."  Right?

11   A.  He does state that.

12   Q.  And those areas would be the ones that you would be

13   working on, right?  That's how you understood that?

14   A.  Yes.

15   Q.  And you recognize you weren't the only person who was

16   being brought in to try to improve the organization, right?

17   A.  I didn't understand that as part of the context of this

18   email.

19   Q.  Not in part of this email, but you understood that people

20   at the company were working on issues at the business, right?

21   A.  At the time that this email was sent, there wasn't any

22   clarity about what the challenges or opportunities were at the

23   business.

24   Q.  Right.  But he was highlighting to you that you would be

25   invited to bring your leadership to one of their toughest

Kazi - cross by Hueston

360

1   challenges, right?

2   A.  Yes.

3   Q.  All right.  You can put that down.

4           Now --

5           THE COURT:  And Mr. Kazi's cell phone was on that

6   last number.  Maybe he's got a new number now; but in the

7   future, just make sure you redact --

8           MR. HUESTON:  Will do.

9           THE COURT:  -- things like that.

10          MR. HUESTON:  Didn't see it.

11          THE COURT:  I'm sure it was inadvertent.

12          MR. HUESTON:  It was.

13          THE COURT:  Go ahead.

14          MR. HUESTON:  We will take care of that.  Thank you.

15  BY MR. HUESTON:

16  Q.  So let's talk briefly about the -- we're going to come

17  back to it in more detail -- the meeting with Mr. Shah on

18  January 25th.  Okay?

19  A.  Okay.

20  Q.  Now, I'm not sure it came out clearly here at trial, but,

21  sir, you --

22          MR. MADDEN:  Objection to the narrative, Your Honor.

23          MR. HUESTON:  Well, it's a transition.

24          THE COURT:  Overruled.

25  BY MR. HUESTON:

1    Q.  Sir, you originally told the government it was actually

2    Mr. Shah who set up the meeting with you on January 25, 2017.

3    Remember that?

4    A.  I don't remember who set up the meeting.

5    Q.  Okay.  Let's go to -- and I'm going to use this at first

6    to refresh recollection.  Let's go to DX5652, which is the

7    FBI 302.  And we'll put it before you.

8            And this is, sir, a memo of interview by the FBI of

9    an interview with you.  You can see that there.  And I'm going

10   to go to page 6 and highlight --

11           MR. MADDEN:  I'm going to object.

12           MR. HUESTON:  -- words.

13           THE COURT:  To refreshing his memory?

14           MR. MADDEN:  No.  But to the identification of a

15   document in those terms.

16           MR. HUESTON:  Well --

17           THE COURT:  Well --

18           MR. MADDEN:  He doesn't need to explain what it is.

19           THE COURT:  Just you're showing him a document and

20   asking him to refresh his memory.

21           Ladies and gentlemen, one of the things that happens

22   in trials is if a witness is unclear or doesn't recall

23   something, a lawyer is entitled to show that witness something

24   that might refresh his memory, his or her memory.  And that's

25   all that's going on right now.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 117 of 310 PageID #:12916
Kazi - cross by Hueston
362

1          The document itself is irrelevant for purposes of

2    evidence.  You don't see it.  It's just the witness, and he or

3    she will read it and see if that refreshes their memory.  Then

4    they're allowed to testify from a refreshed memory to what

5    they recall something to be when they talk to you.

6          So let's move on from what the document is and let

7    the witness examine the page.

8          MR. HUESTON:  Great.

9    BY MR. HUESTON:

10   Q.  Let's go to page 6, and we'll highlight the statement.

11         And the statement is:  Shah set up a meeting with

12   Kazi on January 25, 2017.  Does that refresh your recollection

13   that that's what you stated at that time?

14   A.  It appears that's what I stated.

15   Q.  Okay.

16         MR. MADDEN:  Your Honor, it's not appropriate for the

17   defense attorney to read it.  The witness can read it himself

18   and indicate whether or not it refreshes his recollection.

19         THE COURT:  Technically true.  And we'll follow that

20   protocol going forward.

21         But I think -- is your memory refreshed, sir?

22         THE WITNESS:  It isn't.

23         THE COURT:  All right.  Well, then it's --

24         MR. HUESTON:  Then we're going to take the next step.

25         THE COURT:  Go ahead.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 118 of 310 PageID #:12917
Kazi - cross by Hueston
363

1          MR. HUESTON:  Your Honor, at this time, I would like
2    to introduce this 302 report as a memorandum from an FBI agent
3    of that interview on that date and read that statement into
4    the record.  And I'm assuming the government is going to
5    stipulate that this is, in fact --
6          THE COURT:  Any objection to this being read in since
7    the memory -- the witness's memory was not refreshed?
8          MR. MADDEN:  Yes, Your Honor.
9          THE COURT:  All right.  There is an objection?
10         MR. MADDEN:  Yes.
11         THE COURT:  All right.  Let's go to sidebar.
12         And, ladies and gentlemen, these sidebars -- before
13    we get --
14         Let's turn it off for a minute.
15         Before we had this technology, we'd literally have to
16    go over to the side.  All the attorneys and everybody would go
17    over to the side.  It was endless.  This is much quicker.  And
18    again, feel free to stand up, stretch.  If you want to talk to
19    each other about anything other than the case, if you can hear
20    each other over this noise, feel free to do so.
21         All right.  Let's go to sidebar.
22       (Proceedings heard at sidebar on the record.)
23         THE COURT:  Go ahead.
24         MR. MADDEN:  Your Honor, FBI 302 under Seventh
25    Circuit case law is clear.  It is not a witness's prior

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 119 of 310 PageID #:12918
Kazi - cross by Hueston
364

1      statement.  It is the statement of the agent who prepared it.

2                THE COURT:  Right.

3                MR. MADDEN:  So it's not appropriate for him to read

4      into the record an FBI agent's statement.

5                THE COURT:  Yeah.  The witness doesn't recall it.  So

6      the appropriate thing to do is to put it in in your case.

7                I have noted earlier that I think the introduction of

8      impeachment in the defense case months after the impeachment

9      is meaningless to a jury.  So I'll allow that to be introduced

10     if it's by way of stipulation.  Otherwise, I'm going to let

11     him call an FBI agent after this witness testified to prove up

12     that relatively insignificant fact for this case.

13               MR. MADDEN:  That's fine.  But the other issue is is

14     not remembering is different than having an inconsistency.

15               THE COURT:  Well, it's not inconsistent.  He's

16     refreshing his memory.  Well, did he originally say he doesn't

17     know who set it up?

18               MR. HUESTON:  No, he didn't say that.

19               THE COURT:  What did he say?

20               MR. HUESTON:  Specifically, he said that Shah set up

21     the meeting.

22               THE COURT:  All right.

23               MR. MADDEN:  And here today, he said I'm not sure who

24     set up the meeting.  So it's not inconsistent.

25               THE COURT:  Well, it's -- it's a fact -- if he said

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 120 of 310 PageID #:12919
Kazi - cross by Hueston
365

1    it before, he doesn't remember it now.  Defense is entitled to
2    impeach him with the fact that he said it before and that's
3    allowed.
4            If he can't do it through this witness, then you
5    either stip or I'll let him call in an FBI agent right after
6    this witness to state the unremarkable fact that it was set up
7    by Shah, apparently.
8            MR. MADDEN:  Understood, Your Honor.
9            THE COURT:  All right.
10           MR. MADDEN:  So we'll do it later.  I doubt this is
11   going to be the only issue he's going to use for the 302.
12           MR. HUESTON:  It is actually the only issue.  So he's
13   actually not going to allow me to state that -- that fact?
14           THE COURT:  Apparently, he is, but after the witness
15   is off the stand.  Otherwise, you can wait till April.
16           MR. HUESTON:  No, that's not right.  And you
17   recognize why it's not right.
18           THE COURT:  Well, I know it's not right; but it's the
19   proper procedure under the rules.  And I'm making an exception
20   to the rules.
21           MR. HUESTON:  Yes.
22           THE COURT:  And it'll be done -- if they aren't
23   agreeing to do it right now, then you can do it right after
24   the witness is off of the stand.
25           We're going to talk about this at lunchtime because

1　this is intolerable.  We're going to have to move past this.

2　This is the first witness, and we've had about seven breaks so

3　far.

4　　　　Are you going to agree to stipulate to this right

5　now, that at least the witness said on a prior occasion -- or

6　just let the witness read it.

7　　　　MR. MADDEN:  For this statement, yes.  But just I

8　don't want to set a precedent that we're going to agree to

9　this.

10　　　　THE COURT:  You won't be, but let's get past this.

11　And just ask for a quick stipulation, Mr. Hueston.  Will the

12　government agree that on a previous occasion he said this and

13　the government can so stipulate, and we move on.

14　　　　MR. HUESTON:  Yep.

15　　　　THE COURT:  All right.

16　　　(Sidebar ended.)

17　　　　THE COURT:  All right.  Proceed.

18　　　　MR. HUESTON:  All right.  So let's put this statement

19　up here and --

20　　　　THE COURT:  This is not for the jury, just for the

21　witness.

22　　　　MR. HUESTON:  Right.

23　　　　And is the government prepared to stipulate that this

24　is a statement as recorded by the FBI in the memorandum?

25　　　　MR. MADDEN:  Yes.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 122 of 310 PageID #:12921
Kazi - cross by Hueston
367

1          MR. HUESTON:  All right.  And at this time,

2  Your Honor, I would ask permission to read this statement.

3          THE COURT:  Just read it.  We're not going to put it

4  up on the screen.  Just read it.

5          MR. HUESTON:  Okay.  Shah set up a meeting with Kazi

6  on January 25, 2017.

7          THE COURT:  So stipulated?

8          MR. MADDEN:  Yes, Your Honor.

9          THE COURT:  All right.  Very good.  Move on.

10  BY MR. HUESTON:

11  Q.  Now, I want to ask about when you -- you've given --

12  you've had several meetings with the government, right?

13  A.  Yes.

14  Q.  And one of them was appearing before the grand jury,

15  right?

16  A.  Yes.

17  Q.  And the government drafted your statement for the

18  grand jury, right?

19  A.  Yes.

20  Q.  It was basically a script?

21  A.  I don't know what that means.

22  Q.  Okay.  Well Mr. Madden read your statement to the

23  grand jury, right?  Do you remember that?

24  A.  I don't remember that.

25  Q.  You don't remember him starting -- he actually literally

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 123 of 310 PageID #:12922
Kazi - cross by Hueston
368

1   said:  My name is Sameer Kazi.  Do you remember him doing that

2   for the grand jury?

3           MR. MADDEN:  Objection.  It's been asked and

4   answered.

5           THE COURT:  Overruled.

6           There's a question pending.  Go ahead.

7   A.  I don't remember how the grand jury process went down.

8   BY MR. HUESTON:

9   Q.  Okay.  Let me just briefly show this to you to see if it

10  refreshes your recollection.

11          MR. HUESTON:  So let's go to DX5545, which is the

12  transcript, page 6, lines 9 to 10.  And I think we're going to

13  have to --

14          THE COURT:  Yeah.  It's now on the witness's screen,

15  but not the jury's.

16          MR. HUESTON:  Right.  And I think we're going to have

17  to go above it and go to the prior page to get the context.

18  Okay.

19  BY MR. HUESTON:

20  Q.  And you can see at the bottom of that page 5, it's by

21  Mr. Madden.  Do you see that?

22  A.  Yes.

23  Q.  Okay.  And then if we go back to the next page, it's

24  Mr. Madden continuing there.  And he's actually reading your

25  statement, including starting with my name is Sameer Kazi,

Kazi - cross by Hueston

369

1  right?

2  A.  Yes.

3  Q.  Okay.  All right.  Great.

4         Now, in that --

5         THE COURT:  Do you want this still open for the

6  witness?

7         MR. HUESTON:  No.  No need to keep that open at that

8  time.

9  BY MR. HUESTON:

10 Q.  And, in fact, at the grand jury in that script, Mr. Madden

11 said you set up the meeting with Mr. Shah.  Do you remember

12 that?

13 A.  I don't remember that; but if that's the statement in the

14 grand jury statement, then yes.

15 Q.  Okay.  And that statement with the grand jury, that came

16 after that earlier meeting with the FBI, right, sir?

17 A.  Yes.

18 Q.  Okay.  So the truth is what you originally said, right,

19 that Mr. Shah had reached out to you to talk about other

20 subjects, right, sir?

21 A.  I actually don't remember how the meeting got scheduled.

22 Q.  Okay.  Let me see if I can help with that.

23        MR. HUESTON:  Let's go to DX --

24        MR. MADDEN:  Object to the narrative by Mr. Hueston,

25 Your Honor.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 125 of 310 PageID #:12924
Kazi - cross by Hueston
370

1          THE COURT:  All right.  Just try and ask questions.

2          MR. HUESTON:  Sure.  Let's go to DX6230.1, and this

3     is a transcript of a Voxer from Mr. Shah to Kazi.  We move

4     this into evidence.

5          THE COURT:  Any objection?  Take a moment to look at

6     it if...

7          MR. MADDEN:  No objection, with the same limiting

8     instruction, Your Honor.

9          THE COURT:  It'll be admitted.  Again, this is not

10    for the truth of the matters contained in this but just to

11    show the state of mind of Mr. Shah when this voicemail was

12    created.

13          So it's admitted over the objection stated earlier.

14    Now it's displayed before the jury.

15          (Said exhibit admitted in evidence.)

16          MR. HUESTON:  Okay, great.

17    BY MR. HUESTON:

18    Q.  And you see the date here is January 23rd?  That's two

19    days before the meeting on the 25th, right?

20    A.  Yes.

21    Q.  And Mr. Shah says:  "Hey, Sameer.  This is Rishi.  I hope

22    all is well.  Hope you had a great weekend."

23          COURT REPORTER:  Slow down.

24          MR. HUESTON:  I'm sorry.  I was reading pretty quick

25    there.

1  BY MR. HUESTON:

2  Q.  "Excited to catch up with you this week.  I reflected a

3  bunch on our conversation late last week and wanted to know if

4  you did as well and wanted to make sure I get your thoughts."

5          And then he continues and says:  "But I'm developing

6  increasing conviction that centralizing sales operations and

7  business systems under one leader, and that being you, is the

8  right step."

9          Do you see that?

10  A.  I do.

11  Q.  Okay.  And then he says that he wants to check in on how

12  you're feeling about the topic and make sure we're in sync.

13          Do you see that?

14  A.  I do.

15  Q.  Okay.  And then just to finish the record here, the next

16  day he asks his assistant, Mr. Chou, to set up a time to meet

17  with you.

18          THE COURT:  I think you misspoke.

19          MR. HUESTON:  I'm sorry.

20  BY MR. HUESTON:

21  Q.  And we can put this one aside.

22          And do you recall, in fact, that he tells you in a

23  subsequent Voxer that he actually had asked his assistant,

24  David, to find a time to meet with you tomorrow morning?

25  A.  I don't recall that.

1  Q.  Okay.  Let's just go to that quickly.

2          MR. HUESTON:  That will be a Voxer transcript

3  DX6234.1, which we'd ask to move in for same purpose as stated

4  earlier by Your Honor.

5          THE COURT:  All right.  We'll put it up on the screen

6  just for the government and the witness.

7          MR. MADDEN:  Okay.  No objection.

8          THE COURT:  All right.  Do you want the same standing

9  objection or no objection at all?

10          MR. MADDEN:  The same standing objection.

11          THE COURT:  All right.  Same thing, ladies and

12  gentlemen, not offered for its truth but just to show the

13  state of mind of Mr. Shah at the time this was created.

14          It's admitted.

15      (Said exhibit admitted in evidence.)

16          MR. HUESTON:  Okay.

17  BY MR. HUESTON:

18  Q.  And Mr. Shah says to you:  "Hey, Sameer.  I just asked

19  David to find us a time to meet tomorrow morning" --

20          MR. HUESTON:  I'm speeding up again.  I apologize.

21  BY MR. HUESTON:

22  Q.  "I just asked David to find us a time to meet tomorrow

23  morning before the off-site, so you'll be hearing from him

24  soon."

25          You see that?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 128 of 310 PageID #:12927
Kazi - cross by Hueston
373

1  A.  I do.

2  Q.  And so looking at this, Mr. Shah set up the meeting with

3  you because he had some topics he wanted to talk to you about,

4  right?

5  A.  Yes.

6  Q.  Okay.  Now, we can put that down.

7          So you've testified before that your motivation for

8  this meeting on the 25th with Mr. Shah was to fix things at

9  the company, right?

10 A.  It was to bring to light that these things were occurring

11 and to have a discussion with Mr. Shah.

12 Q.  Okay.  That's fair.

13         And even though you had planned to discuss certain

14 issues with Mr. Shah, you did not tell Mr. Shah in advance of

15 the meeting that you planned to raise those issues with him,

16 right?

17 A.  That's correct.

18 Q.  And you didn't email the materials you had from Ms. Pierce

19 and Mr. Prowker to Rishi saying, Rishi, this is what I need to

20 talk to you about, right?

21 A.  Correct.

22 Q.  In fact, you didn't send anything to Mr. Shah in advance

23 of the meeting, right?

24 A.  That is correct.

25 Q.  Including any of the data that you received and shared

1    with the government during your direct exam, right?

2    A.  I didn't share the data with the government.

3    Q.  Right.  You didn't share any of the data that you had

4    received from Liane Pierce or Adam Prowker with Mr. Shah.  You

5    didn't send any of that in advance of the meeting, right?

6    A.  Correct.

7    Q.  Okay.  So fair to say Mr. Shah had no chance to digest

8    ahead of the meeting the materials that you had received,

9    right?

10   A.  Correct.

11   Q.  Okay.  Now, at trial, you testified that you anticipated

12   at the meeting that you would, quote, dig in and review

13   documents so I could get a better understanding of what was

14   going on.

15          That's what you said you anticipated you would do at

16   this meeting with Mr. Shah.  Is that what you just testified

17   to?

18   A.  I believe so.

19   Q.  Okay.  But, sir, actually, as you testified previously

20   under oath, you were never anticipating a deep dive into the

21   data with Mr. Shah at that meeting, right?

22   A.  That's not true.

23   Q.  Okay.  Let's go to your deposition, page 145, line 22.

24          MR. MADDEN:  Your Honor, I'd ask to see it first so I

25   can confirm that's --

Kazi - cross by Hueston

375

1      MR. HUESTON:  That's what we're going to do right
2   now.  We're going to --
3      (Indiscernible crosstalk.)
4      MR. HUESTON:  Yeah.  We're going to show it without
5   showing it to the jury.  It'll be deposition page 145,
6   line 22, to 146, line 4; and in particular, lines 25 through
7   2.
8      MR. MADDEN:  No objection.
9      THE COURT:  All right.  Go ahead.
10      MR. HUESTON:  Thank you.  Let's post it, please.
11   BY MR. HUESTON:
12   Q.  And starting at line 22:
13      "QUESTION:  Okay.  But doesn't seem like you had time
14   to really dig into them in depth.  Is that fair?
15      "ANSWER:  Yeah.  Because I didn't anticipate the
16   nature of the meeting with Rishi would be a deep dive into the
17   data.  This was a, hey, here are some things that are
18   happening we would need to figure some stuff out."
19      That's your testimony, right, sir?
20   A.  Yes.
21   Q.  Okay.  Thank you.  We can put that down.
22      Now, you made a brief reference to this, but just to
23   clarify, in advance of this meeting with Mr. Shah, you did
24   talk with Mr. Nagaldinne, right?
25   A.  I did.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 131 of 310 PageID #:12930
Kazi - cross by Hueston
376

1  Q.  And after you left that meeting with Mr. Nagaldinne, you

2  said:  "I'm asking myself why should I do this?  What's in it

3  for me to do this?"

4      Do you remember that?  Is that some of the -- the

5  words that you remember, roughly along the lines of what you

6  remember saying in part to Mr. Nagaldinne during that meeting?

7  A.  I don't remember that specifically.

8  Q.  Okay.  Let me see if I can refresh your recollection with

9  GX760B, which is a transcript of a Voxer.  And I'm just going

10 to show you three lines and ask you whether that refreshes

11 your recollection.  So we'll highlight the lines.  I won't

12 read them, and you'll just answer whether they refresh your

13 recollection or not.

14     THE COURT:  Go ahead.  And ask your next question.

15     MR. HUESTON:  Sure.  Sorry.

16 BY MR. HUESTON:

17 Q.  Does that refresh your recollection?

18 A.  No.  This appears to be something that Madan shared with

19 someone else.

20 Q.  Okay.  Let's -- do you recall telling Mr. Nagaldinne that

21 you were -- that you had -- it was a humongous operational

22 problem and working on it might not be worth your time?  Do

23 you recall saying something along those lines?

24 A.  I don't recall saying that.

25 Q.  Okay.  Let me go to -- let me see if I can refresh your

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 132 of 310 PageID #:12931
Kazi - cross by Hueston
377

1    recollection.  Let's go to page 2 of this, lines 30 to 32.

2    And read that and let me know if this refreshes your

3    recollection.

4    A.  I understand that it's stated here, but it doesn't help me

5    remember that it was something that I had specifically said.

6    Q.  Okay.  Let me ask if you recall saying:  I'm asking

7    myself -- something along the lines of:  I'm asking myself why

8    I should do this.  It might not be worth my time.

9            Do you remember saying something along those lines?

10   A.  I do not.

11   Q.  Okay.  Well, let's put this aside, then.  Let's go to the

12   meeting itself.

13           You recall -- I think you began -- you testified on

14   direct that Mr. Shah did lead off the conversation, right?

15   A.  Yes.

16   Q.  And you'd agree that would make sense since Mr. Shah

17   set up the meeting, right?

18   A.  Okay.

19   Q.  Okay?  And Mr. Shah, you recall, told you there was a

20   cultural fit issue he wanted to talk to you about, right?

21   A.  He did.

22   Q.  And he told you he had received negative feedback about

23   you, right?

24   A.  Yes.

25   Q.  And that he told you that you were being perceived as a

Kazi - cross by Hueston

378

1 | bull in a china shop, right?

2 | A.  Yes.

3 | Q.  Now, you would agree, sir, that a new senior executive who

4 | might be described as acting like a bull in a china shop, that

5 | might be concerning to a CEO, right?

6 | A.  If an executive were doing that, that might be concerning

7 | to a CEO.

8 | Q.  Okay.  But I just want to make clear, 'cause when I --

9 | when you testified on direct, you weren't trying to suggest

10 | that this was a trivial concern of Mr. Shah's, were you?

11 | A.  If my CEO believed that -- or if a CEO believed that an

12 | executive was not a cultural fit or a, quote, bull in a china

13 | shop, then that's not a trivial concern.

14 | Q.  Okay.  And in your meetings with the government, the

15 | government would show you some documents from time to time,

16 | right?

17 | A.  Yes.

18 | Q.  They chose what documents to show you, right?

19 | A.  Yes.

20 | Q.  Okay.  Did the government tell you that ten days earlier

21 | than this meeting on January 15th -- actually five days --

22 |         MR. MADDEN:  Objection, Your Honor.

23 |         THE COURT:  He's got to finish it.

24 |         MR. HUESTON:  Yeah.

25 | BY MR. HUESTON:

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 134 of 310 PageID #:12933
Kazi - cross by Hueston
379

1    Q.  -- five days before you met with Prowker and Pierce, that

2    Mr. Shah had received reports that you were potentially a bull

3    in a china shop?

4              MR. MADDEN:  Objection.  Same objection, Your Honor.

5              THE COURT:  Overruled.

6    A.  I was not aware.

7    BY MR. HUESTON:

8    Q.  Well, let's take a look, then.

9              MR. HUESTON:  Let's go to DX10051 which is a Voxer

10   text.  And we'll just put it up first without -- put it just

11   for -- okay.  That's --

12             Yeah.  And we have a clearer version that we're going

13   to do by way of a demonstrative.  We'll show this before it's

14   showed to the jury, Cross Demonstrative C.

15             MR. MADDEN:  I don't see the content.

16             THE COURT:  Let's go to sidebar.

17         (Proceedings heard at sidebar on the record.)

18             THE COURT:  All right.  This is apparently something

19   he's unaware of, correct?

20             MR. HUESTON:  Right, Your Honor.  But I think --

21   again, let me step back a second.  He's been put on as a first

22   introductory witness with a broad description of suspected

23   fraud and questions about Mr. Shah's pretext and whatever.  So

24   I want to make sure the jury sees that -- he's unaware, but

25   this is going to come in as a business record.  And it --

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 135 of 310 PageID #:12934
Kazi - cross by Hueston
380

1           THE COURT:  Well, it might, it might not.

2           MR. HUESTON:  Okay.  Well, all right.

3           State of mind to Shah and the reports that he was

4    getting that he was a bull in a china shop ten days earlier

5    shows it's not a pretext.  It's relevant to this trial, and

6    it's important to put his testimony about this all-important

7    meeting in context.

8           THE COURT:  During the trial, possibly sometime, but

9    not through this witness.

10          If this is not something the government showed him --

11   which I'm not sure it's a proper question anyway, but

12   apparently they didn't -- if it's not something he was aware

13   of, then you're just putting in evidence that -- he's a vessel

14   for evidence that should come in through another witness.

15          MR. HUESTON:  But if I may respond?

16          THE COURT:  You may.

17          MR. HUESTON:  The government has prepared this

18   witness by selectively showing him certain documents which has

19   allowed him to testify refreshed on certain things.  And they

20   have chosen to show and not show certain things.

21          I think it's important for the jury to have the full

22   context here.  It's going to be -- I believe, if we look at

23   this, there's not going to be an objection to admissibility.

24   And it should come in to put it in context, and then we move

25   on.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 136 of 310 PageID #:12935
Kazi - cross by Hueston
381

1          THE COURT:  Wrong witness.

2          MR. MADDEN:  We do object on hearsay, relevance, and

3    facts not in evidence.

4          THE COURT:  Objection sustained.

5          If it's going to come in, it's going to come through

6    a witness that has firsthand knowledge of this communication.

7    He's already said he doesn't know.

8          And so the objection's sustained.

9          MR. HUESTON:  Okay.

10        (Sidebar ended.)

11   BY MR. HUESTON:

12   Q.  Okay.  We can move on, Mr. Kazi.  But you would agree

13   if --

14        THE COURT:  Please take the exhibit down.

15        MR. HUESTON:  Yeah.

16   BY MR. HUESTON:

17   Q.  Mr. Kazi, you would agree if, in fact, the CEO had been

18   receiving complaints over time, ten days earlier, bull in a

19   china shop, that's something that he would be -- he should be

20   concerned about or think about, right?

21   A.  Yes.

22   Q.  All right.  Great.

23        Mr. Kazi, we discussed earlier the lack of prior

24   experience with the industry Outcome Health operated in, so I

25   want to refocus in that area.

Kazi - cross by Hueston

382

1          We saw through an earlier exhibit, I showed you three

2    days in you expressed feeling overwhelmed with all the new

3    topics.  Do you remember that?

4    A.  Yes.

5    Q.  Okay.  And by the time of your meeting with Mr. Shah you

6    had been at Outcome Health for about two weeks, right?

7    A.  Yes.

8    Q.  So fair to say at that time there was still a lot of about

9    Outcome Health's business that you didn't know, right?

10   A.  Yes.

11   Q.  You had never interacted with a client, right?

12   A.  I don't believe so.

13   Q.  And you were never part of a sales meeting with a client,

14   right?

15   A.  I don't think so.

16   Q.  And you had never seen an actual contract between

17   Outcome Health and one of its pharmaceutical clients?

18   A.  I had seen a contract.

19   Q.  Do you remember how many contracts you had seen?

20   A.  I do not.

21   Q.  Okay.  And you would agree -- well, did you know or have

22   an understanding that some contracts specifically provided for

23   Outcome's delivery to grow over time?

24   A.  I don't recall that.

25   Q.  Okay.  Let's show you GX --

Kazi - cross by Hueston

1      MR. HUESTON:  Put up for identification GX1763.  And
2  it is a contract -- we'd ask to move this in at this time.
3      THE COURT:  Is there any objection?
4      MR. MADDEN:  No, Your Honor.
5      THE COURT:  All right.  It's admitted.
6      (Said exhibit admitted in evidence.)
7      MR. HUESTON:  Okay.
8  BY MR. HUESTON:
9  Q.  And looking here at the top, the title here is "Campaign
10 is 2016 CMH Infusion Center Opdivo Solid," right?
11 A.  Yes.
12 Q.  Okay.  And if we look at the bottom of the first page
13 under additional contract terms or supplemental provisions,
14 the media for each month is broken out.
15      Do you see that, October?
16 A.  I see the October one, yes.
17 Q.  Okay.  So October starts at 550 infusion room tablets,
18 right?
19 A.  Yes.
20 Q.  And then if we go to November, it goes up to 600 infusion
21 room tablets, right?
22 A.  I don't --
23 Q.  Let's go -- we'll show it to you.  Sorry.
24 A.  Yes.  Correct.
25 Q.  Okay.  And then if we go to December, it goes up to --

1    there's November.  Sorry.

2           And then here's December.  It's going up to

3    650 infusion room tablets, right?

4    A.  Yes.

5    Q.  So as we went through October, November, December, the

6    number of tablets goes up every month, right?

7    A.  Yes.

8    Q.  All right.  And if we go to the third page, you see that

9    this is signed -- let's go to the third page -- by

10   Ashik Desai, right?

11   A.  Yes.

12   Q.  All right.  And there's been a discussion about

13   make-goods.  Do you remember that?

14   A.  Yes.

15   Q.  All right.  And are you aware that Outcome's contracts

16   also included provisions for make-goods?

17   A.  I was not.  I don't recall that.

18   Q.  Okay.  Well, let me see if I can show you a contract to

19   help you with that.

20          MR. HUESTON:  GX1500, just put this up for

21   identification first and ask to move it in at this time.

22          THE COURT:  Any objection?

23          MR. MADDEN:  No, Your Honor.

24          THE COURT:  It's admitted without objection.

25          MR. HUESTON:  Okay.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 140 of 310 PageID #:12939
Kazi - cross by Hueston
385

1        (Said exhibit admitted in evidence.)

2    BY MR. HUESTON:

3    Q.  And this states it's for a project called "2016 Brintellix

4    New Patient Start Program."

5        Do you see that?

6    A.  Yes.

7    Q.  And the contract states:  "The company shall include the

8    Takeda advertisement on one or more sponsored devices of at

9    least 5,075 target healthcare facilities."

10       Do you see that?

11   A.  I don't see that.

12   Q.  Let me pull the language up.

13   A.  Okay.

14   Q.  I'm talking ahead of the call-out.

15   A.  I see it.

16   Q.  It's like it's under the first bullet there, under

17   Takeda's participation?  Nope, that's not it.

18       There.  You see it now?

19   A.  I do.

20   Q.  Okay.  And it further states:  "The company services shall

21   result in at least 4,415 new to brand prescriptions."

22       Do you see that?

23       Let's get it up there.  There we are.

24       Do you see that?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 141 of 310 PageID #:12940
Kazi - cross by Hueston
386

1    Q.  Okay.  Now, let's go to page 2, and there's a section
2    called "Compensation Adjustments."
3            Do you see that?
4    A.  I do.
5    Q.  And under that, there's something called "Provider
6    Guarantee."
7            Do you see that?
8    A.  Yes.
9    Q.  All right.  And it states:  "If company fails to meet its
10   provider guarantee during the program term, Takeda and the
11   company shall determine the form of compensation, either a
12   credit of the pro rata portion of the fees paid by Takeda
13   pursuant to this PWO for Takeda to apply toward charges for
14   any future services with the company or a refund to Takeda."
15           Do you see that?
16   A.  I do.
17   Q.  And then at the bottom of this, there's actually an
18   example provided of what would happen to provide a make-good.
19           Do you see that?
20   A.  I do.
21   Q.  All right.  And so they say:  "For example, if there's a
22   shortfall of 75, the creditor refund due to Takeda would be
23   $14,779."  Right?
24   A.  Yes.
25   Q.  So here's an example of a make-good expressly in one of

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 142 of 310 PageID #:12941
Kazi - cross by Hueston
387

1   the Outcome Health's contracts, right?

2   A.  Yes.

3   Q.  Okay.

4           MR. HUESTON:  Okay.  We can put that aside.

5   BY MR. HUESTON:

6   Q.  And, sir, you also had no prior experience with studies on

7   the efficacy of advertising for pharmaceutical companies prior

8   to arriving at Outcome Health, right?

9   A.  Correct.

10  Q.  And in your two weeks at the company, you had only been

11  given a high-level explanation of the process by which IMS

12  reports were received and then communicated to the clients,

13  right?

14  A.  Yes.

15  Q.  All right.  And you had not seen any ROI studies besides

16  the ones Mr. Prowker and Ms. Pierce sent you, right?

17  A.  I believe so.

18  Q.  Okay.  You believe that's correct, right?

19  A.  Yes.

20  Q.  Okay.  And sitting here today, did you know which

21  contracts had ROI guarantees and which did not?

22  A.  Not sitting here today.

23  Q.  Okay.  Now, let's talk about -- we're going to focus in on

24  the information that you did gather.

25          So to be clear, the information that informed the

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 143 of 310 PageID #:12942
Kazi - cross by Hueston
388

1  concerns that you discussed in the meeting with Rishi Shah, it

2  all came from Liane Pierce and Adam Prowker, right?

3  A.  Yes.

4  Q.  Okay.  And, in fact, you did not interact with

5  Outcome Health clients, right, sir?

6  A.  Not in the time that I was there.

7  Q.  Okay.  And Mr. Prowker and Ms. Pierce, they're the ones

8  who told you that Outcome had customers who had contracted for

9  a certain amount of advertising inventory and Outcome had

10 consistently under-delivered against those targets, right?

11 A.  They shared with me data that showed that.

12 Q.  Okay.  And we'll get to the data.

13         And Ms. Pierce and Mr. Prowker, they were also the

14 ones who told you about the misrepresentations of ROI to

15 customers, right?

16 A.  Yes.

17 Q.  And they talked to you about the affidavits, right?

18 A.  Yes.

19 Q.  And I think, as we established earlier, you don't recall

20 Mr. Prowker or Ms. Pierce using the word "fraud" in their

21 discussions with you, right?

22 A.  I don't believe that they did.

23 Q.  And that meeting you had with them on January 20, 2017,

24 that was the first time you met with Prowker and Pierce,

25 right?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 144 of 310 PageID #:12943
Kazi - cross by Hueston
389

1    A.   The three of us together.

2    Q.   Okay.

3    A.   Not on a -- we had met previously one on one.

4    Q.   All right.  And it was during that meeting with the three

5    of you together that they first told you about the issues you

6    later raised with Rishi Shah, right?

7    A.   They had intimated -- they had hinted around it

8    previously, but in that meeting, they laid it out with data.

9    Q.   And just in terms of timing, that was just five days

10   before you had that meeting with Mr. Shah, right, on the 25th?

11   A.   Yes.

12   Q.   And, again, just to set the time frame between that

13   January 20th meeting with Pierce and Prowker and the

14   January 25th meeting with Mr. Shah, you didn't speak with

15   anyone else to try to get more information about the issues

16   that Prowker and Pierce had raised, right?

17   A.   Not that I can remember.

18   Q.   Okay.  So you didn't go to Vivek Kundra, for instance?

19   A.   I did not.

20   Q.   And, sir, Mr. Kundra, didn't you think that Mr. Kundra,

21   the person responsible for the side of the business that was

22   signing up doctors' offices, didn't you think that he would

23   have relevant knowledge about Outcome's inventory?

24   A.   It's possible that he did.

25   Q.   Okay.  And you told the government in one of your

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 145 of 310 PageID #:12944
Kazi - cross by Hueston
390

1   interviews that the affidavits were actually prepared by the

2   accounting director of finance.

3          Do you remember saying that?

4   A.  I don't remember saying that.

5   Q.  Okay.  And the -- well, let me see.

6          Do you remember the accounting director of finance

7   was John Bosshart?

8   A.  I believe that's correct.

9   Q.  And you didn't speak to Mr. Bosshart about the affidavit

10  issues, did you?

11  A.  Well, I did --

12         MR. MADDEN:  Object.  He's already said he didn't --

13  didn't speak to anyone.

14         THE COURT:  Overruled.

15  BY MR. HUESTON:

16  Q.  You may answer.

17  A.  I did not speak to Mr. Bosshart.

18  Q.  Okay.  And you didn't attempt to gather any data yourself

19  outside of what Mr. Prowker and Ms. Pierce gave you, right?

20  A.  Correct.

21  Q.  Even though you had been given a list of people by

22  Adam Nixon that was supposed to potentially help you get

23  information on content delivery and inventory management,

24  right?

25  A.  I don't remember that.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 146 of 310 PageID #:12945
Kazi - cross by Hueston
391

 1  Q.  Okay.  Let's go to DX4427 for identification.

 2          MR. HUESTON:  And we'll just put it up for attorneys'

 3  eyes only and ask to move this in at this time.

 4          MR. MADDEN:  No objection.

 5          THE COURT:  It's admitted without objection.

 6      (Said exhibit admitted in evidence.)

 7          MR. HUESTON:  Okay.  Let's post it, please.

 8  BY MR. HUESTON:

 9  Q.  And you'll see, sir, this is an email from Adam Nixon on

10  January 18 to yourself; subject, people update.

11          Do you see that?

12  A.  I do.

13  Q.  And he writes below:  "Quick update from yesterday as it

14  relates to content delivery/inventory management."

15          You see that?

16  A.  I do.

17  Q.  And then down below that, he lists people and their roles,

18  right?

19  A.  Yes.

20  Q.  All right.  And, for instance, the first person he lists

21  is Shashin.  And it states:  "Building reporting functionality

22  for actuals and he is the best source for reporting based on

23  current environment."  Right?

24  A.  It does state that.

25  Q.  And do you know who Shashin is?

Kazi - cross by Hueston

392

1    A.  I do not.

2    Q.  So you didn't go to him for any data, right?

3    A.  I did not go to that person.

4    Q.  Or any of the other individuals listed here as recommended

5    by Mr. Nixon, right?

6    A.  That's correct.

7    Q.  Okay.

8            MR. HUESTON:  We can put that down.

9    BY MR. HUESTON:

10   Q.  So let's go now to Mr. Prowker and Ms. Pierce.

11           And you stated you asked them to pull together data

12   that they had illustrating issues, right?

13   A.  Yes.

14   Q.  Okay.  And they did send you some information, right?

15   A.  They did.

16   Q.  But you have no understanding of where they got the

17   numbers they sent you, right?

18   A.  I do not.

19   Q.  And, Mr. Kazi, you do consider yourself to be pretty

20   detail-oriented, right?

21   A.  Yes.

22   Q.  And you never asked them where they got that data, right?

23   A.  I don't recall asking them that.

24   Q.  You were relying on Ms. Pierce and Mr. Prowker, right?

25   A.  I was.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 148 of 310 PageID #:12947
Kazi - cross by Hueston
393

1    Q.   Okay.  Let's talk about what they sent you.

2              On direct -- let's go to --

3              On direct, we saw GX750.  That's the January 23,

4    2017, email that Ms. Pierce sent you.  Do you remember that?

5    It's already admitted.

6    A.   Yes.

7    Q.   Okay.  And this is the email, you know, the government

8    walked you through where Ms. Pierce sends some support

9    materials, right?

10             MR. MADDEN:  Just objection -- just for the record,

11   we did not go through this on direct.

12             THE COURT:  All right.  But it's admitted, correct?

13             MR. APPLEBY-BHATTACHARJEE:  No, it's not.

14             THE COURT:  It's not admitted?  Well, then let's --

15             MR. HUESTON:  Let's -- okay.

16             THE COURT:  It's shocking that we wouldn't know which

17   exhibits are admitted with so many -- I'm being facetious.

18             All right.  Do you have any objection to it from the

19   government?

20             MR. MADDEN:  No, Your Honor.

21             THE COURT:  All right.  It's admitted without

22   objection.

23             You may display it to the jury.

24        (Said exhibit admitted in evidence.)

25   BY MR. HUESTON:

Kazi - cross by Hueston

394

1  Q.  Okay.  And so here is a January 23, 2017, email that she
2  sent you.  And it says:  "Support items for SK.zip."  Right?
3  A.  Yes.
4  Q.  Okay.  And if we go to the second page, you can see an
5  affidavit, right?
6        You see that?
7  A.  Yes.
8  Q.  And this is one of the affidavits she was claiming was
9  false, right?
10  A.  Perhaps.
11  Q.  Okay.  You just don't remember?
12  A.  I don't.
13  Q.  All right.  But these are her support materials, and she
14  chose this one, right?
15  A.  Yes.
16  Q.  And who signed it?
17  A.  Ashik Desai.
18  Q.  Okay.  Let's go to the third page.
19        And she attaches another affidavit of performance,
20  right?
21  A.  Yes.
22  Q.  And who signs this one?
23  A.  Mr. Desai.
24  Q.  Okay.  Now, you do recall --
25        MR. HUESTON:  We can put this down.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 150 of 310 PageID #:12949
Kazi - cross by Hueston
395

1    BY MR. HUESTON:

2    Q.  -- that Mr. Prowker and Ms. Pierce specifically accused

3    Ashik Desai of changing numbers, right?

4    A.  They did.

5    Q.  And the numbers they accused him of changing were known as

6    ROI numbers, right?

7    A.  Yes.

8    Q.  And ROI stands for what?

9    A.  Return on investment.

10   Q.  Yet, sir, you don't recall ever confronting Mr. Desai

11   about the information you received from Mr. Prowker and

12   Ms. Pierce, do you?

13   A.  I do not.

14   Q.  The person who you were told was intentionally changing

15   ROI numbers, you don't recall confronting him?

16   A.  Correct.

17   Q.  Let's go back to the information Ms. Pierce sent you on

18   January 23, 2017.  So we'll go back to 750.  Let's go to the

19   fourth page of that document.

20         MR. HUESTON:  So let's put that back up, please,

21   fourth page of this document.

22   BY MR. HUESTON:

23   Q.  And you see this is titled at the top "Entresto."

24         Do you see that?

25   A.  I do.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 151 of 310 PageID #:12950
Kazi - cross by Hueston
396

1  Q.  And if we go to the first table down below -- okay, that's

2  the synopsis, thank you -- and there's a table down below,

3  right?

4  A.  Yes.

5  Q.  Now, this says actuals and then contracted, right?

6  A.  Uh-huh.

7  Q.  And --

8          THE COURT:  You have to answer verbally.

9          THE WITNESS:  Yes.

10         THE COURT:  Okay.

11  BY MR. HUESTON:

12  Q.  All right.  And they missed the actuals in a lot of these,

13  right?

14  A.  It appears that they missed --

15  Q.  The contracted.  I misspoke.

16         They missed the target of contracted in a lot of

17  these, right?

18  A.  Correct.

19  Q.  But there's a third column called make-good, right?

20  A.  Yes.

21  Q.  And looking at this column, sir, and this attachment that

22  was sent to you, you would agree that the make-good numbers

23  are the difference each time of what was contracted and what

24  was actually delivered, right?

25  A.  It appears so.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 152 of 310 PageID #:12951
Kazi - cross by Hueston
397

1  Q.  Reflecting that the company was making good on misses,
2  right?
3  A.  That's not what this reflects, necessarily.
4  Q.  Okay.  Well, that's the list of make-goods that is set
5  forth here as the difference between actuals and contracted,
6  right?
7  A.  It's merely the difference.  It doesn't stipulate that
8  this -- these were made good.
9  Q.  That it actually happened --
10  A.  Yes.
11  Q.  -- that's what you're saying?  Right.
12         But at least the face of the contract indicates
13  that's the column of what would be made good, right?
14         Those numbers reflect the differences, right?
15  A.  Yes.
16  Q.  All right.  Now, at the time you were having a meeting --
17  now we've walked you through this.
18         At the time you were having the meeting with
19  Mr. Prowker and Ms. Pierce, you actually didn't have an
20  understanding of what make-goods referred to, right?
21  A.  I don't know that to be true.
22  Q.  Okay.  Let's go to your deposition, page 98, line 7 to 12.
23         MR. HUESTON:  We'll just show this internally first.
24  98, line 7 to 12.
25         May I proceed?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 153 of 310 PageID #:12952
Kazi - cross by Hueston
398

1    THE COURT:  Well, the first question is:  Does this

2    refresh his memory as to --

3    MR. HUESTON:  Well, actually, it's just impeachment,

4    Your Honor.  He said --

5    THE COURT:  All right.

6    MR. HUESTON:  That -- understand.

7    THE COURT:  You're correct.

8    All right.  Any objection to having this displayed?

9    MR. MADDEN:  As long as the whole thing is read, we

10   do not object.

11   MR. HUESTON:  That's what I intended to do.

12   THE COURT:  Okay.  Proceed.

13   BY MR. HUESTON:

14   Q.  Okay.

15   "QUESTION:  Do you have an understanding -- did you

16   at the time understand what make-good referred to?

17   "ANSWER:  No.  I mean, it's clearly -- it's clearly

18   just the delta between those two, yeah."

19   That's what you said under oath, right, sir?

20   A.  Right, what I said was --

21   Q.  That's all right.  You don't need to comment.  That's all

22   I want to --

23   MR. MADDEN:  Object to him interrupting the witness,

24   Your Honor.

25   MR. HUESTON:  Well, I asked --

Kazi - cross by Hueston

399

1          THE COURT:  Have you completed your answer?

2          THE WITNESS:  I have not.

3          THE COURT:  Finish your answer.

4    A.  What this stipulates is that in the context of that

5    spreadsheet, I don't understand what that column make-good

6    specifically refers to.

7    BY MR. HUESTON:

8    Q.  Okay.

9          MR. HUESTON:  We can put this down.  And let's go

10   back to the exhibit on page 1 that we were on, 750.  Scrolling

11   back up to page 1, if we can put it back up.

12   BY MR. HUESTON:

13   Q.  And Ms. Pierce writes to you.  It's a short email.

14         Here are four different examples.  In the second

15   sentence, she writes:  "I can speak to the details on these as

16   needed.  Please let me know what further information is

17   needed."

18         That's what she wrote, right?

19   A.  Yes.

20   Q.  But you don't recall talking to her about those documents

21   after she sent them to you, right?

22   A.  Correct.

23   Q.  In fact, you didn't look at the specific details of the

24   document she sent you there, right?

25   A.  I don't remember if I did or didn't.

Kazi - cross by Hueston

1    Q.  Okay.  And, sir, sitting here today, you do know now that

2    a make-good typically refers to where you financially

3    compensate a customer for something that's a gap, right?

4    A.  I know it now, and I knew it then.

5    Q.  Okay.  And make-goods can take different forms, right?

6    A.  Yes.

7    Q.  They can be an extension of a contract, returning money,

8    or providing free ad campaigns in the future, right?

9         Those would be examples, correct?

10   A.  Correct, yes.

11   Q.  And you would agree that make-goods are good business

12   tools when legitimate mistakes are made, right?

13   A.  They're a business tool that's used, yes.

14   Q.  Okay.  Great.

15        MR. HUESTON:  We can put that down.

16        THE COURT:  Ladies and gentlemen, I want to remind

17   you, attorneys on both sides are making objections at various

18   spots.  They're not attempting to do anything other than

19   follow my rules, which is that if they have a question about a

20   piece of evidence, they should make the objection.

21        You shouldn't hold it against them; shouldn't count

22   objection sustained or overruled.  None of that matters.  And

23   they're following my rules, so don't hold it against an

24   attorney on either side if they seem to be making a lot of

25   objections at various times.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 156 of 310 PageID #:12955
Kazi - cross by Hueston
401

1                   It's going to happen throughout the trial, and that

2       is something they're required to do under the rules I have.

3                   Proceed.

4                   MR. HUESTON:  Okay.  Thank you, Your Honor.

5       BY MR. HUESTON:

6       Q.  And by the way, Mr. Prowker and Ms. Pierce sent you more

7       information a couple days later, right?

8       A.  They did.

9       Q.  Okay.  Let's start with Ms. Pierce.  And we're going to

10      show you DX4495.

11                  MR. HUESTON:  And we'll show this for attorney

12      identification only at this point.

13                  MR. MADDEN:  No objection.

14                  THE COURT:  All right.  It's admitted without

15      objection.

16          (Said exhibit admitted in evidence.)

17                  MR. HUESTON:  Okay.  Let's publish.

18      BY MR. HUESTON:

19      Q.  And you can see at the top, this is an email from

20      Liane Pierce to you and Mr. Prowker dated January 25th, right?

21      A.  Yes.

22      Q.  And that's the same day as your meeting with Mr. Shah,

23      correct?

24      A.  Correct.

25      Q.  And, in fact, sir, you were almost positive that you

1    didn't look at these attachments, right?

2        That's your testimony of four months ago under oath?

3    A.  Yes.

4    Q.  Okay.

5    A.  In -- in detail.

6    Q.  Let's go to your deposition, page 106, 23 to 107, line 5.

7        MR. HUESTON:  And I'd ask permission to read this in

8    at this time.

9        THE COURT:  Any objection?

10        MR. MADDEN:  No, Your Honor.

11        MR. HUESTON:  Okay.

12   BY MR. HUESTON:

13   Q.  And here, the reference is then:  "Did you understand what

14   all this meant back when you were looking at it?  This was

15   January 25th.  She sent it to you after" --

16        THE COURT:  Slow down.

17        MR. HUESTON:  My apologies.

18   BY MR. HUESTON:

19   Q.  "And did you understand what all of this meant back when

20   you were looking at it?  This was January 25th.  She sent it

21   to you after midnight."

22        And your answer was, broadly:  "I'm almost positive I

23   didn't look at these decks."

24        MR. MADDEN:  Your Honor --

25   BY MR. HUESTON:

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 158 of 310 PageID #:12957
Kazi - cross by Hueston
403

1    Q.   QUESTION: --

2              MR. HUESTON:  May I finish, please?

3              MR. MADDEN:  Yes.

4    BY MR. HUESTON:

5    Q.   "That you did not look at them"?

6              "ANSWER:  I did not."

7              MR. MADDEN:  Your Honor, I'd object under the rule of

8    completeness for the whole question to be read so the witness

9    can see the entire question, not just that -- that short

10   portion.

11             THE COURT:  All right.  Go ahead.

12             MR. HUESTON:  Happy to show the earlier part.

13   BY MR. HUESTON:

14   Q.   So there it is.

15             So just figuring out what that can possibly refer,

16   yeah, okay.  And same thing on the Xeljanz sheet.  No Xs

17   there.  That's the earlier part of that.

18             Do you see that?

19   A.   I do.

20   Q.   But on the next page, you stated:  "I'm almost positive I

21   didn't look at these decks."

22             "QUESTION:  That you did not look at them?

23             "ANSWER:  I did not."

24             That was your testimony, right?

25   A.   Yes.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 159 of 310 PageID #:12958
Kazi - cross by Hueston
404

1    Q.  Okay.

2            MR. HUESTON:  We can put that down.

3    BY MR. HUESTON:

4    Q.  And let's go to Mr. Prowker's email sent on January 25,

5    2017, which this is one the government did show.  My mistaken

6    citation earlier.

7            MR. HUESTON:  GX795, so that's already admitted and

8    we can put that up.

9    BY MR. HUESTON:

10   Q.  All right.  You see that there?

11   A.  I do.

12   Q.  And you were shown this earlier.  And he says he's sending

13   you an example of inconsistencies between IMS results and

14   those shared with the client, right?

15   A.  Yes.

16   Q.  And to be clear, he says "inconsistencies."  He doesn't

17   use the word "manipulation," for instance, right?

18   A.  Yes.

19   Q.  And he is referring to the two attachments he's sending,

20   correct?

21   A.  Correct.

22   Q.  And he says that one of the decks is the, "Original IMS

23   deck and the other is the deck shared with the client."

24   Right?

25   A.  Yes.

1    Q.  And when you were asked about this email under oath in

2    September, you couldn't recall looking at the attachments in

3    detail, right, sir?

4    A.  Yes.

5    Q.  Okay.  And the government did have you review the

6    attachments at trial today to this email.  You remember that?

7    A.  Yes.

8    Q.  Okay.  But again, four months ago, you said:  "I'm not

9    sure I looked at these in detail at all."  Right?

10   A.  These specific decks, yes.

11   Q.  All right.  I'm going to put that down.

12          Now, after receiving that email, you didn't speak

13   with Mr. Prowker, right?

14   A.  Correct.

15   Q.  And you didn't ask him any follow-up questions?

16   A.  Correct.

17   Q.  And, in fact, before the meeting with Mr. Shah, you didn't

18   review any of the emails Ms. Pierce and Mr. Prowker had

19   sent -- had sent you in-depth, right?

20   A.  Yes.

21   Q.  And you could not say what specific data was altered or

22   manipulated, right?

23   A.  Correct, not off the top of my head.

24   Q.  Right.  And you would agree it does matters -- it does

25   matter what changes were made to a particular report, right?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 161 of 310 PageID #:12960
Kazi - cross by Hueston
406

1   A.  Sorry.  I don't understand the context of the question.

2   Q.  Well, depending on what changes might be made, it's not

3   necessarily a big deal, right?  It depends on what the changes

4   are.

5           MR. MADDEN:  Objection to form.

6           THE COURT:  If the witness understands, he can

7   answer.

8   A.  Could you repeat the question, please?

9   BY MR. HUESTON:

10  Q.  Yeah.  Let me ask the question asked of you in deposition.

11          If someone says to you, changes are made to the

12  report before it goes out to the client, that's not

13  necessarily a big deal, right?

14  A.  It depends on the changes.

15  Q.  Right.  And because you didn't look at the -- the attached

16  studies, you didn't see what those changes actually were, did

17  you?

18  A.  I did not.

19  Q.  Okay.  Now, let's talk more about the January 25, 2017,

20  meeting with Mr. Shah.

21          THE COURT:  You've got about 15 minutes until we

22  break for lunch.

23          MR. HUESTON:  Okay.  And that's what I'm measuring,

24  Your Honor.

25          THE COURT:  Sure.

1    MR. HUESTON:  Thank you.  We'll launch into this.
2  BY MR. HUESTON:
3  Q.  Now, you testified on direct that after Mr. Shah talked to
4  you about the negative feedback he received about you, you
5  told Mr. Shah you wanted to go over some topics with him,
6  right?
7  A.  Yes.
8  Q.  Okay.  And by the way, before getting into those topics,
9  you didn't tell Mr. Shah in the meeting -- you didn't caveat
10  your comments by saying, look, I've only been here a couple of
11  weeks, I may not have a full understanding.
12    You didn't say anything like that in the meeting,
13  right?
14  A.  No.  It was -- I assumed it was understood.
15  Q.  Okay.  Now, on direct, you said you recalled four topics,
16  right?
17  A.  Yes.
18  Q.  All right.  When you were asked about this meeting four
19  months ago in September, you remembered three, maybe four
20  topics, right?
21  A.  Okay.
22  Q.  Okay.  Let's go through them.
23    The first topic that you recalled and described was
24  there's an inventory gap, right?
25  A.  Yes.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 163 of 310 PageID #:12962
Kazi - cross by Hueston
408

1    Q.  Okay.  And when you raised that issue, Mr. Shah didn't

2    seem upset at you for raising that issue, right?

3    A.  He was not.

4    Q.  And he didn't get hostile when you brought it up, right?

5    A.  Not at all.

6    Q.  He didn't say, how dare you accuse us of that, out of my

7    house?

8    A.  No.

9    Q.  No.  He was cordial, wasn't he?

10   A.  Yeah.  I wasn't accusing him of anything.

11   Q.  Okay.  And in fact, he acknowledged the inventory gaps,

12   didn't he?

13   A.  He did.

14   Q.  And according to your testimony under oath in September,

15   the gist of what he said was, quote:  We're aware of it, we're

16   working through to fixing it.  That's what you recalled,

17   right?

18   A.  Yes.

19   Q.  So number one, we're aware of it, right?  Yes?

20   A.  Yes.

21   Q.  And number two, we're working through fixing it, right?

22   A.  Yes.

23          MR. HUESTON:  Let's do a Cross Demo A, Slide 1,

24   please.  As a demonstrative only.

25          THE COURT:  Have you shown it to the government?

1        MR. MADDEN:  No.

2        THE COURT:  Any objection to it?

3        MR. MADDEN:  Where are the -- Your Honor, I don't

4   know where the quotes are from.

5        MR. HUESTON:  The quotes are just what he said.  So

6   it's just a --

7            (Counsel conferring.)

8        THE COURT:  He probably anticipated what was going to

9   be said.

10       MR. HUESTON:  It was under-oath testimony.

11       MR. MADDEN:  No objection.

12       THE COURT:  All right.  You can display it to the

13  jury.

14       MR. HUESTON:  Okay.  Let's display this, just to keep

15  everybody oriented.

16  BY MR. HUESTON:

17  Q.  It's Topic 1.  When you raised the issue of inventory

18  gaps, you recalled Mr. Shah answering, we're aware of it,

19  right?

20  A.  Yes.

21  Q.  And we're working through fixing it, right?

22  A.  Yes.

23  Q.  Okay.  Now, you testified earlier that Mr. Shah didn't

24  respond with alarm, right, at the issues you raised?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 165 of 310 PageID #:12964
Kazi - cross by Hueston
410

1  Q.  But, Mr. Kazi, you would agree that if he knew about it

2  and was already working on fixing it, that might be a basis

3  why he's not reacting with alarm.

4         You'd concede that, right?

5  A.  Yes.

6  Q.  Okay.  And you also testified that Mr. Shah -- I think you

7  said that he never said we needed to fix the issues.  Did

8  you -- did you say something like that?

9  A.  I don't recall.

10  Q.  All right.  In any event, we've established what you

11  recall he said on Topic 1.

12         And let me -- let me ask you this:  You would agree

13  that the existence of a delta in and of itself doesn't

14  necessarily indicate fraud, right?

15  A.  Correct.

16  Q.  Okay.  Let's go to Topic 2, the affidavits.

17         The next topic was misrepresentations on affidavits

18  to customers, right?

19  A.  Sure.

20  Q.  Okay.  But I showed you a couple of examples today, but

21  when you testified before the grand jury, you didn't even

22  know --

23         MR. MADDEN:  Objection to the -- objection, hearsay

24  to the setup, Your Honor.

25         MR. HUESTON:  I didn't even finish my question.  Let

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 166 of 310 PageID #:12965
Kazi - cross by Hueston
411

1  me try a new question.

2          THE COURT:  All right.

3  BY MR. HUESTON:

4  Q.  Earlier when you've testified before the grand jury,

5  you --

6          MR. MADDEN:  Objection.

7          MR. HUESTON:  I'm going to finish my question.

8  BY MR. HUESTON:

9  Q.  -- you couldn't remember who was signing the affidavits,

10  right?

11          MR. MADDEN:  Can we have a sidebar, Your Honor?

12          THE COURT:  All right.

13      (Proceedings heard at sidebar on the record.)

14          THE COURT:  All right.  Go ahead.

15          MR. MADDEN:  The grand jury statements and the prior

16  deposition testimony are hearsay.  It's not appropriate for

17  him to immediately refer to his prior testimony like that.  He

18  needs to ask him a question without saying where it is.  If he

19  then gets an inconsistent answer, then he can go to it.  But

20  it's not appropriate to say --

21          THE COURT:  All right.  Response?

22          MR. HUESTON:  Yeah, of course I can say -- to help

23  frame it.  The truthful -- what, when, and where it happened

24  as a prior statement, how is that out of bounds?

25          THE COURT:  Is there something prejudicial about the

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 167 of 310 PageID #:12966
Kazi - cross by Hueston
412

1  fact that he testified in the grand jury; he gave a deposition
2  to the SEC?  They both come out.
3          MR. HUESTON:  And I have not said SEC.
4          THE COURT:  No, it was on the top of the transcript.
5          MR. HUESTON:  Okay.
6          THE COURT:  We'll deal with that at lunchtime.
7          But the -- I think there's some significance to a
8  person testifying under oath in the grand jury.  And if he's
9  got a good faith basis to ask a question based on the
10 transcript, he can orientate the witness to when he said it.
11 I don't see the prejudice in this.
12         It's -- it's not hearsay if it's used for impeachment
13 purposes.  It's just simply to -- for the -- allowed to show
14 the inconsistencies before -- between what he said under oath
15 here and what he said in the grand jury, which I assume -- I
16 haven't gotten there yet, nobody has, but I assume that's what
17 you're leading up to.
18         MR. HUESTON:  Right.
19         THE COURT:  Okay.  So the objection's overruled.
20         And let's talk about this in ten minutes, but I see
21 no reason to stop the cross on this point.
22      (Sidebar ended.)
23         THE COURT:  Objection overruled.
24         Proceed.
25 BY MR. HUESTON:

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 168 of 310 PageID #:12967
Kazi - cross by Hueston
413

1  Q.  Mr. Kazi, I had to reorient myself for a second.

2        Four months -- when you testified before the

3  grand jury, you actually couldn't recall who was signing off

4  on the monthly affidavits, right?

5  A.  If that's what the grand jury statement says.

6  Q.  Okay.  Now, here at trial, you testified when you were

7  asked by the government about these affidavits, when they

8  asked you what you recalled about what Mr. Shah's response

9  was, you said only that he knew of the issue, right?

10 A.  Yes.

11 Q.  Okay.  But four months ago under oath, sir, you recalled

12 that Mr. Shah said that the issue related to an operational

13 problem with communication between the finance department and

14 Mr. Desai, right?

15 A.  If that's what the deposition statement says.

16 Q.  Okay.  And that the problem had since been fixed, right?

17 A.  Okay.

18        MR. HUESTON:  And let's put those up as Cross

19 Demonstrative A, Slide 3.

20        THE COURT:  Again, any objection?  As long as it's

21 consistent with what was just said.

22        MR. HUESTON:  That's right.

23        THE COURT:  Well, I'm asking the government if

24 there's any objection.

25        MR. MADDEN:  No, Your Honor.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 169 of 310 PageID #:12968
Kazi - cross by Hueston
414

1           THE COURT:  All right.  Go ahead.

2    BY MR. HUESTON:

3    Q.  So here, affidavits to -- Mr. Shah told you, when you

4    raised the affidavits issue, it related to an operational

5    problem, correct?

6    A.  Yes.

7    Q.  And it had since been fixed, right?

8    A.  Yes.

9    Q.  Okay.  And you also recalled that he said we're making it

10   so that it doesn't happen again.

11          You recalled him saying that, right?

12   A.  If that's what's in the deposition record.

13   Q.  Would you like to see it to confirm that recollection?

14   A.  Yes.

15   Q.  All right.  Let's look at it.  Deposition -- and I'll just

16   show it to you quietly at first -- deposition 149, lines 2 to

17   10; and in particular, lines 7 to 10 -- 8 to 10.

18   A.  Okay.

19   Q.  Okay.  So you agree, you remember -- you recalled him

20   saying, I don't think it's happening anymore, right?

21   A.  Yes.

22   Q.  Okay.  So let's now go back to the Cross Demo Slide 4.

23   Let's complete the recollection of Mr. Shah's responses to you

24   under affidavits.

25          "Related to an operational problem, had since been

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 170 of 310 PageID #:12969
Kazi - cross by Hueston
415

1  fixed and we're making it so it doesn't happen again," right?

2  A.  Yes.

3  Q.  And by the way, the government, after you said the shorter

4  answer, didn't ask you if you recalled these other things.

5  They didn't ask you that on direct, did they?

6  A.  They did not.

7  Q.  Okay.  And the last point, I want to make sure this is in

8  the record, you also have previously recalled that Mr. Shah

9  has said, I don't think it's happening anymore, right?

10        That's what I just showed you as part of the --

11  A.  Correct.

12  Q.  Okay.  So let's -- just to make that clear, let's go to

13  Cross Demo Slide 5 to make sure we have our whole record here.

14        You see that?

15  A.  I see it.

16  Q.  So you recalled in answer to the issue of affidavits, he

17  said, it's related to an operational problem, it had since

18  been fixed, we're making it so it doesn't happen again, and I

19  don't think it's happening anymore.

20        That's what you recalled, right?

21  A.  Him saying, yes.

22  Q.  Okay.  So again, stepping back a bit, you would concede

23  that the -- it would make some sense that he wasn't surprised

24  since he'd already told you he knew about the issue and was

25  taking steps to address it?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 171 of 310 PageID #:12970
Kazi - cross by Hueston
416

1      That's possible in terms of why he wasn't surprised,
2  right, sir?
3           MR. MADDEN:  Objection.  Calls for speculation.
4           THE COURT:  Sustained.
5  BY MR. HUESTON:
6  Q.  Okay.  Sir, did you perceive this as a basis for why he
7  might not be surprised?
8           MR. MADDEN:  Same objection.
9           THE COURT:  Same ruling.
10          MR. HUESTON:  Okay.
11 BY MR. HUESTON:
12 Q.  You would agree there would be no need for Mr. Shah to
13 tell you to fix a problem that had already been fixed?  You'd
14 agree with that premise?
15          MR. MADDEN:  Same objection.
16          THE COURT:  Overruled.
17 A.  I wouldn't agree with that.
18 BY MR. HUESTON:
19 Q.  Well, if he believed the problem had already been fixed,
20 it would make sense he wouldn't ask you to fix it, right?
21 You'd agree with that?
22 A.  If he had believed that, but there were people on staff
23 that didn't believe that.
24 Q.  Well, you didn't tell him at the meeting, you're mistaken,
25 it actually hasn't been fixed.  You didn't -- you don't recall

1    telling him that, right?

2    A.  I did not say that to him.

3    Q.  Okay.  Nor did you say, hold up, Mr. Shah, I've got

4    documents to show that you're mistaken.  You didn't say that,

5    did you?

6    A.  I did not.

7    Q.  Okay.

8    A.  There was not that opportunity in the dialogue.

9    Q.  Well, you didn't interject or say that at any time in that

10   15-minute meeting, did you?

11   A.  I did not.

12   Q.  Okay.  And let's go to --

13           THE COURT:  Well, if we're going to go to another

14   topic, it's time for a lunch break.

15           MR. HUESTON:  Yes, good time to break.

16           THE COURT:  All right.  Ladies and gentlemen, one

17   hour.  Please don't discuss the case among yourselves or with

18   anyone else.  Keep an open mind.

19           And if for some reason you're not done eating in an

20   hour, I'm not going to cause indigestion.  You just tell the

21   court security officer, and we'll be ready when you are.

22   Thank you very much.

23           COURT SECURITY OFFICER:  All rise.

24       (Jury out at 12:28 p.m.)

25           THE COURT:  All right.  Please be seated.

1      Sir, you can leave the stand.  Please don't discuss

2  your testimony with anyone; you're on cross-examination.

3      Okay.  A couple things we need to discuss.  Let's go

4  off the record for a minute.  Couple of these are minor on my

5  punch list here.

6      (Off-the-record discussion.)

7      THE COURT:  I didn't hear an objection, but I would

8  have sustained it.  What the government asks or does not ask a

9  witness on direct examination is not a proper question, in my

10  mind.

11      I mean, every judge has their own rules, but it's --

12  you can argue that if you want in your -- you have interim

13  statements.  You can even argue.  It's not going to wait

14  two-and-a-half months before you argue it.

15      But if that were the line of cross that was

16  permissible, you could go on endlessly.  And I know it's

17  particular -- there's a particular point you were trying to

18  make, but you don't make it through a witness, you make it

19  through argument.  Because this witness is not the vessel for

20  your arguments -- or any witness is not the vessel for your

21  arguments.  They're here to answer questions about things they

22  saw, perceived, or can explain.

23      That's how I rule -- that's how I view it, so be

24  careful.  Because if you get an objection, I'll sustain it on

25  that point.  What the government didn't ask is perfectly fine

1  argument, but not a -- this witness -- the jury knows what
2  they didn't ask, and you can point it out during your
3  argument.

4      MR. HUESTON:  That's fine, Your Honor.  Thank you.
5      THE COURT:  Okay.  I ruled against you where you
6  wanted to put something in that this witness was unfamiliar
7  with, the -- I think it was the bull in the china shop
8  comments between other witnesses which he already said he was
9  unaware of other people talking about him being a bull in a
10  china shop.  Again, this witness is not the vessel to put in
11  documents that he is not privy to and he's unfamiliar with.

12      And it's the same kind of thing, and it's my -- that
13  was the reason for my ruling.  I didn't take the time to
14  explain it in greater detail when we were in the midst of
15  going back and forth, but that's how I view rule -- that's how
16  I view things like that.

17      And it applies to both sides.  Put it in through a
18  proper witness if you want, someone who saw it, someone who
19  heard it.  Or if need be, you know, you can ask -- well, I
20  don't want to do it at sidebar, but -- we'll be here forever.

21      But if it wasn't shown to a witness to prep them
22  because it wasn't on their -- it wasn't something they were
23  copied on, you just can't use it through that witness.

24      Business records, I'm still going to wait for -- we
25  haven't had to confront the ugly issue of all these different

1  emails coming in.  I'm letting things in for the state of mind
2  of the defendant, I believe properly for that purpose.  But if
3  we're going to dig deeper into this business record issue that
4  I raised yesterday, I'll be happy to take briefs or argument
5  from the parties at a time when you're not trying to eat
6  lunch.

7         Refreshing memory, correct, the 302 does not come in.
8  But I stated at our final pretrial conference, I view the
9  ability to impeach -- to prove up an impeachment that takes
10 place three months later as a meaningless gesture.  It's of no
11 use to the jury.  My only job in this case is to make -- make
12 things useful to the jury.

13        So keep that in mind.  If you can't reach a
14 stipulation you can just read, then I'll let them call an FBI
15 agent out of order who can prove up the impeachment if it's
16 appropriate, if there's a foundation properly laid for it.

17        So I mentioned this at the final pretrial conference,
18 I believe.  And it's the only way to go on long trials.  And
19 maybe it's different than what other judges do, but that's
20 what I do.

21        Anything else we need to talk about any of these
22 subjects?  I'll let you go, otherwise.

23             MR. MADDEN:  Not at this time, Your Honor.

24             MR. HUESTON:  No, Your Honor.

25             MS. BELL:  No, Your Honor.

1          MR. POULOS:  Judge, real quickly on impeachment.
2          THE COURT:  Yeah.
3          MR. POULOS:  I don't expect I'm going to have to
4   impeach this witness with his 302.  But just on procedure,
5   I've -- I lately have seen judges require or things -- do
6   differently.
7          So, for example, Mr. Kazi, just as an example:
8   Mr. Kazi, you testified on direct that you set up that meeting
9   with Mr. Shah.  Now, if I was crossing on that issue, I could
10  just reiterate that and say, isn't it a fact that Mr. Shah set
11  up that meeting?  No, I don't remember that.  Well, didn't you
12  tell the FBI that Mr. Shah set up the meeting when you were
13  interviewed?  And you'll set up to the interview:  Didn't you
14  tell the government when you were interviewed on X, Y, Z date?
15  Period.  I don't remember that.
16         Now, at that stage, Your Honor, it's my understanding
17  I may seek to refresh his recollection, but I'm not required
18  to.  And that an "I don't remember saying that" is the
19  equivalent of a no, from which then you could prove up the
20  impeachment.
21         THE COURT:  Don't remember is not quite a no.  It's a
22  time to refresh his recollection.  You can refresh it with a
23  302.  You can refresh it with a rock.  You can refresh a
24  witness's recollection with anything.  And then -- and I used
25  the rock example because Judge John Powers Crowley used that

1    when he taught me evidence in law school.

2           But then if he still doesn't recall it, that's when

3    you can then offer that, if it's truly inconsistent, through a

4    third party such as an agent.

5           MR. POULOS:  So we should attempt to see if it

6    refreshes his recollection.

7           THE COURT:  You have to do that.

8           MR. POULOS:  Okay.

9           THE COURT:  Although I think there wasn't so much

10   about Mr. Purdy so far, so I hope you're not going to be

11   testing the rules of evidence on this witness.

12          MR. POULOS:  I don't expect I'm going to.  I did send

13   the government, I don't know, somewhere just shy of 20 emails

14   that I intend to review with him.

15          THE COURT:  All right.

16          MR. POULOS:  And I notified the government what those

17   are.

18          And with Professor Cary [phonetic] at Loyola, it was

19   a bowl of soup -- or a bowl of spaghetti.  I'm sorry, a bowl

20   of spaghetti.

21          THE COURT:  Yeah, rock, a bowl of soup.

22          All right.  Anything else?

23          All right.  We'll see you at 1:30.

24      (Pause in the proceedings.)

25          THE COURT:  All right.  Let's have someone from the

1   government and then Mr. Ketchum and his attorney appear before
2   me.
3           All right.  Please state your name, sir.
4           MR. KETCHUM:  Jason Ketchum.
5           THE COURT:  All right.  And represented by?
6           MR. STETLER:  Chris Stetler, Your Honor.
7           THE COURT:  All right.  And for the government?
8           MR. HANKEY:  Kyle Hankey.
9           THE COURT:  Okay.  You can come on up, Mr. Hankey,
10  right by the mic, too.
11          All right.  I have before me a petition for an order
12  granting immunity pursuant to Section 6002 of Title 18 to
13  compel a witness to testify.
14          Mr. Ketchum has previously indicated a willingness to
15  testify at trial without immunity, but his counsel has
16  indicated that Mr. Ketchum, following advice of counsel, is
17  likely to invoke his Fifth Amendment right to -- not to
18  incriminate himself if called to testify.
19          The government has obtained the authorization from
20  the Deputy Attorney General to seek immunity for Mr. Ketchum.
21  I've reviewed the petition; I've reviewed the letter from the
22  Attorney General.
23          Have you seen both of those, Mr. Stetler?
24          MR. STETLER:  I have not seen the letter, Your Honor.
25          THE COURT:  All right.  Do you want to see it?

1          MR. STETLER:  I apologize, Your Honor.  I have not

2    seen the application.  I've just seen the proposed order.

3          THE COURT:  Do you want to see the letter?

4          MR. STETLER:  No.

5          THE COURT:  All right.  And then I have a draft order

6    granting Mr. Ketchum immunity.  Have you seen that?

7          MR. STETLER:  Yes, Your Honor.

8          THE COURT:  Is there any objection by the defendant

9    to the form of the petition or the proposed order?

10          MR. STETLER:  We would propose, Your Honor, that you

11    right now order him to testify.  I know there's some language

12    in paragraph 2 of the order, if you could just make the order

13    now as opposed to during testimony.

14          THE COURT:  All right.  Well, I'm going to -- is

15    there any objection to that by the government?

16          MR. HANKEY:  No, Your Honor.

17          THE COURT:  Okay.  I find that the petition and the

18    letter from the Attorney General are in order -- the Deputy

19    Attorney General.  And I am going to order --

20          Mr. Ketchum, what this means is if you're called to

21    testify --

22          And you're under subpoena.  Is that correct,

23    Mr. Stetler?

24          MR. STETLER:  Yes, Your Honor.

25          THE COURT:  You're under subpoena.  You're required

1    to testify in this trial.  And you have -- no longer will have

2    a right, once I sign this order, to exercise your Fifth

3    Amendment privilege.  You'll be required to answer every

4    question put to you by the government and by the defense.

5         Should you refuse to testify and answer that, I can

6    hold you in contempt and possibly have you jailed until you do

7    answer.  I don't anticipate that being an issue, but that's

8    the consequence of not answering questions when you're placed

9    under immunity, which you are right now.

10        And I'm going to enter this order.  My courtroom

11   deputy will affix my signature, my electronic signature to

12   this, and we'll enter this on the docket.

13        Do you have any questions, Mr. Ketchum?

14        MR. KETCHUM:  I don't, Your Honor.

15        THE COURT:  Mr. Stetler?

16        MR. STETLER:  No, Your Honor.

17        THE COURT:  And from the government?

18        MR. HANKEY:  No, Your Honor.

19        THE COURT:  All right.  This petition is granted.

20   Thank you.

21        MR. STETLER:  Thank you.

22        (A recess was had from 12:43 p.m. to 1:30 p.m.)

23

24

25

426

```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3    UNITED STATES OF AMERICA,           )
                                          )    Docket No. 19 CR 864
 4                        Plaintiff,      )
                                          )    Chicago, Illinois
 5         v.                             )    January 31, 2023
                                          )    1:30 p.m.
 6                                        )
      RISHI SHAH, SHRADHA AGARWAL,        )
 7    BRAD PURDY,                         )
                                          )
 8                        Defendants.     )

 9
                 TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 2B
10            BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury

11
      APPEARANCES:
12

13    For the Government:     MR. MATTHEW F. MADDEN
                              MR. SAURISH APPLEBY-BHATTACHARJEE
14                            Assistant U.S. Attorneys
                              219 South Dearborn Street, 5th Floor
15                            Chicago, Illinois  60604

16
                              MR. WILLIAM E. JOHNSTON
17                            MR. KYLE C. HANKEY
                              U.S. Department of Justice
18                            Criminal Division, Fraud Section
                              Washington, D.C.  20530
19

20

21

22                          ELIA E. CARRIÓN
                          Official Court Reporter
23                     United States District Court
                  219 South Dearborn Street, Room 1432,
24                      Chicago, Illinois 60604
                            (312) 408-7782
25                  Elia_Carrion@ilnd.uscourts.gov
```

```
 1    APPEARANCES (Continued:)

 2
      For Defendant
 3    Shah:                      MR. JOHN C. HUESTON
                                 Hueston Hennigan LLP
 4                               620 Newport Center Drive, Suite 1300
                                 Newport Beach, California  92660
 5
                                 MS. VICKI CHOU
 6                               MR. MICHAEL H. TODISCO
                                 MS. KAREN DING
 7                               Hueston Hennigan LLP
                                 523 West 6th Street, Suite 400
 8                               Los Angeles, California  90014

 9
      For Defendant
10    Agarwal:                   MS. KOREN L. BELL
                                 MR. A. ALEXANDER LOWDER
11                               Larson LLP
                                 555 South Flower Street, Suite 4400
12                               Los Angeles, California  90071

13                               MR. PATRICK W. BLEGEN
                                 MS. KELSEY H. KILLION
14                               Blegen & Garvey
                                 53 West Jackson Boulevard, Suite 1437
15                               Chicago, Illinois  60604

16
      For Defendant
17    Purdy:                     MR. THEODORE T. POULOS
                                 MR. ERIC PRUITT
18                               MR. JOHN PAVLETIC
                                 Cotsirilos, Tighe, Streicker, Poulos &
19                               Campbell, Ltd.
                                 33 North Dearborn Street, Suite 600
20                               Chicago, Illinois  60602

21

22

23

24

25
```

1    (Proceedings heard in open court; jury out:)

2    THE COURT:  All right.  Ready to proceed, Mr. Madden?

3    MR. MADDEN:  Yes, Your Honor.

4    THE COURT:  Okay.  Let's bring in the jury.

5    MR. HUESTON:  So I provided a copy of our remaining

6    exhibits to the government, Your Honor, so hopefully this will

7    move faster.

8    THE COURT:  Well, are there -- have you had a chance

9    to look it over to see --

10    MR. HUESTON:  No, he's looking them over now.

11    THE COURT:  All right.  If you reach a point,

12    Mr. Madden, where you want to go to sidebar just to say --

13    MR. HUESTON:  Just to signal you're okay --

14    THE COURT:  This is off the record.

15    (Discussion held off the record.)

16    COURT SECURITY OFFICER:  All rise.

17    (Jury enters courtroom.)

18    THE COURT:  All right.  Please be seated.

19    Sir, you can take your mask off.  The witness is

20    still under oath, and you may continue with your

21    cross-examination.

22    MR. HUESTON:  Thank you, Your Honor.

23    SAMEER KAZI, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

24                CROSS-EXAMINATION (RESUMED)

25    BY MR. HUESTON:

1  Q.  Good afternoon, Mr. Kazi.

2  A.  Good afternoon.

3  Q.  Okay.  I'm going to move to the third topic.  The third

4  topic that you have recalled discussing was something you

5  described as a disconnect between Mr. Shah's perception of

6  inventory and revenue versus your view of reality, right?

7  A.  I don't remember saying those exact words.

8          MR. HUESTON:  Let's go to your deposition, page 149,

9  lines 18 to 25.  Show it to counsel first.  And if okay, I'd

10 like to present it.

11         MR. MADDEN:  No objection.

12         THE COURT:  All right.

13 BY MR. HUESTON:

14 Q.  All right.  And there it is:

15         "Question:  Okay.  Next, so inventory gaps,

16 affidavits?

17         "Answer:  I think the third topic was likely this

18 disconnect between his perception of inventory and revenue

19 possibility versus what the reality was."  And you added:  "I

20 can't remember what he said or what the fourth topic necessary

21 if there was one."

22         That was your testimony, right?

23 A.  Yes.

24         MR. HUESTON:  Okay.  We can put that down.

25 BY MR. HUESTON:

1   Q.  And what you're referring to is the fact that Mr. Shah had

2   previously told you that Outcome Health had, he believed,

3   enough inventory to drive 1.7 billion in revenue, right?

4   A.  Yes.

5   Q.  Okay.  And you told him in your view, it was not feasible

6   to drive that kind of revenue based on current inventory,

7   right?

8   A.  Yes.

9   Q.  And that was your opinion, sir, right?

10  A.  Correct.

11  Q.  All right.  Your opinion after 17 days of employment,

12  right?

13  A.  Yes.

14  Q.  And as you stated before, all the information you learned,

15  everything you learned that raised the concerns that you went

16  into the meeting with Rishi Shah about, all your information

17  came from Liane Pierce and Adam Prowker, right?

18  A.  That, and just observing operations at the business.

19  Q.  Okay.  But you feel Mr. Shah really believed the company

20  was going to reach a billion dollars in revenue, right?

21  A.  Yes.

22          MR. HUESTON:  All right.  Let's put up Cross

23  Demonstrative Demo A, now Slide 6.

24          And under -- and may I publish, counsel?

25          THE COURT:  It's published, but any objection to

1  this?  I'll take it off.

2          MR. MADDEN:  No.

3          THE COURT:  Okay.  Go ahead.

4  BY MR. HUESTON:

5  Q.  All right.  So under the $1 billion revenue possibility,

6  you've testified Shah really believed the company was going to

7  reach 1 billion plus in revenue, right, sir?

8  A.  Yes.

9  Q.  Okay.  In fact, you think he believed it was far more than

10 that, right?

11 A.  It's possible.

12         MR. HUESTON:  Let's go to your deposition at page 41,

13 lines 17 to 22.  If we can put that up.  First just counsel

14 only.

15         MR. MADDEN:  It's -- I'm sorry, I can't read it.

16         MR. HUESTON:  Yeah.

17         MR. MADDEN:  Thank you.

18         It's not inconsistent, Your Honor.

19         MR. HUESTON:  Oh.

20         THE COURT:  Well, again, ladies and gentlemen, some

21 of these, it's in the eyes of the beholder.  There may be --

22 and that's up to you to decide whether some of these things

23 that were said in a deposition were inconsistent with what was

24 said in court, so you can display this.

25         MR. HUESTON:  Thank you.

1   BY MR. HUESTON:

2   Q.  "Question:" --

3           MR. HUESTON:  Let's put it up.

4   BY MR. HUESTON:

5   Q.  -- "Do you believe he really believed the company was

6   going to reach a billion in revenue?

7           "Answer:  I do believe that, but I don't think that

8   was -- I think he believed it was far more than that."

9           That was your testimony, right?

10  A.  Yes.

11  Q.  And by the way, that was his internal goal, right?

12  A.  I believe so.

13  Q.  You would agree that there's nothing fraudulent about

14  Mr. Shah believing his company could reach a billion dollars

15  in revenue, right?

16  A.  Yes.

17  Q.  You agree with my statement?

18  A.  Yes.

19          MR. HUESTON:  All right.  We can put that down.

20  BY MR. HUESTON:

21  Q.  And by the way, the meeting on January 25th, that wasn't

22  the first time that you spoke with Mr. Shah about the goal of

23  trying to get to a billion or more of revenue, right?

24  A.  Correct.

25  Q.  Okay.  In fact, just to make sure we're clear on that,

1  Mr. Shah had repeatedly expressed interest in discussing that

2  topic with you prior to January 25th, right?

3  A.  He had discussed that topic with me prior.

4         MR. HUESTON:  Okay.  And let's take a look at an

5  example of that.  For identification, I have a Voxer of

6  January 14th, 2017, that was sent by Mr. Kazi to Mr. Shah.

7         THE COURT:  Any objection to this one?

8         MR. MADDEN:  I don't know if I've seen it.

9         THE COURT:  Okay.  We'll put it up.

10        MR. HUESTON:  Yeah, and we would look at the

11  transcript.  It's 10055.1.

12        MR. MADDEN:  No objection.

13        THE COURT:  All right.  It's admitted without

14  objection.

15      (Said exhibit admitted in evidence.)

16  BY MR. HUESTON:

17  Q.  Okay.  So it's up there on the screen, and I want to

18  highlight some of what you said here in the Voxer.

19        You say, in part:  "I wanted to just bring up one

20  topic in this, in the conversation with Rishi yesterday which

21  was this idea that, for 2017, that, um, a billion dollars of

22  revenue is both possible and indicative that we are behind."

23        Do you see that?

24  A.  I do.

25  Q.  And you later say, "I was surprised to hear that," right?

1    A.  Yes.

2    Q.  And you also say, "There are likely a number of things

3    that are preventing us from doing that," right?

4    A.  Yes.

5    Q.  So you suggested it's important to identify "the three,

6    four, five things that are preventing us to getting to a

7    billion," right?

8    A.  Yes.

9    Q.  And then you raise the possibility of talking about it at

10   the next cabinet meeting, right?

11         You say:  "Maybe it's a topic we should be thinking

12   about for the next cabinet meeting if you agree."  Right?

13   A.  Yes.

14   Q.  And in response, do you recall Mr. Shah telling you that

15   this had, in fact, been a subject of significant conversation

16   among himself and others?

17   A.  I don't recall that.

18         MR. HUESTON:  Okay.  Let's -- if we can, I would like

19   to, for identification, identify CX 10056.1, which is a

20   transcript of a Voxer of Mr. Shah's response.

21         MR. MADDEN:  We are okay with it as long as it's for

22   the effect on the listener.

23         THE COURT:  All right.  Ladies and gentlemen, this is

24   being admitted, you'll see it in a minute, not for the truth

25   of what's in the -- in the email or the voicemail rather, but

1  just for the effect on the listener, the listener being this
2  witness.

3       Documents are admitted sometimes for limited
4  purposes.  Sometimes they're admitted with no conditions.
5  Some are with certain conditions.  This is one of them.  So
6  this is just -- nothing about what's in this is being offered
7  for its truth, but just for the effect on this listener when
8  he heard this voicemail.

9       Is that the instruction you're looking for,
10  Mr. Madden?

11       MR. MADDEN:  Yes, Your Honor.  Thank you.

12       THE COURT:  All right.  It's admitted for that
13  purpose, 105 -- 10056.1.

14      (Said exhibit admitted in evidence.)

15  BY MR. HUESTON:

16  Q.  Okay.  And he starts by saying, "But, uh, great topic
17  suggestion on the top five, you know, this is the subject of
18  significant conversation in a very targeted and pointed way
19  over the last six months.  There's a number of answers and a
20  number of steps being taken to mobilize on it, but it's the
21  subject of at least two or three conversations a week between
22  Ashik, Brad and myself, along with some others."

23       And then he suggests the first step would be for you
24  to spend some time with Ashik on it, right?

25  A.  Yes.

1  Q.  Okay.  And so the five things he's talking about here,

2  these are the five things that are preventing us from getting

3  to a billion, right?  That's referring to your earlier -- you

4  see that as a response to your five issues that you were

5  raising, right?

6  A.  Yes.

7  Q.  Okay.  And then he says, "It's been the subject of

8  significant conversation in a very pointed way.  There's a

9  number of answers and a number of steps being taken to

10  mobilize on it, and it's the subject of at least two, three

11  conversations a week between Ashik, Brad and myself, along

12  with others," right?

13  A.  Yes.

14  Q.  Okay.  So he's telling you that he and others have already

15  been discussing obstacles to getting to 1 billion in revenue,

16  right?

17  A.  Yes.

18  Q.  And then he suggests that you first spend time with

19  Mr. Desai on this, and then we can talk about it as a group,

20  right?

21  A.  Yes.

22  Q.  Okay.  And then he also adds:  It's probably not right to

23  bring up with the exec group yet because "we're so deep on

24  those five things already."  Right?

25  A.  Just that it should be at a high level.

1    Q.  Yeah, okay.

2           And then he says:  "Let's bring it up in the right

3    format and go deep."  Right?

4    A.  Yes.

5    Q.  And what is your understanding of the term "go deep" mean?

6    A.  Analyze the tactics necessary to unlock a billion dollars

7    in revenue.

8    Q.  Okay.  And he closes this by saying he is "eager to work

9    with you on that," right?

10   A.  Yes.

11   Q.  All right.  So Mr. Shah is telling you he was already

12   aware of the obstacles getting to 1 billion, right?

13   A.  Yes.

14   Q.  Okay.  And that he was already discussing them with some

15   members of the executive team, right?

16   A.  Yes.

17   Q.  And he invited you to become part of that discussion once

18   you had a chance to dig in.  Fair?

19   A.  Fair.

20   Q.  Okay.  And, in fact, to go deep with him on it at the

21   right point in time, right?

22   A.  That's what he said.

23          MR. HUESTON:  Okay.  We can put that down.

24   BY MR. HUESTON:

25   Q.  And then, sir, later do you recall, and I know this is

1   years ago, but around January 19th, do you recall speaking

2   again with him about something called blueprint to a billion.

3   Do you remember that topic?

4   A.  That was a phrase that I brought up.

5   Q.  I'm sorry, I heard a cough.  I couldn't hear you.

6   A.  That was a phrase that I had brought up.

7   Q.  Okay.  So let's go into that a little bit.  You had

8   brought up with Mr. Shah?

9   A.  I had, in a -- not in a one-to-one conversation but after

10  wrote this idea of a blueprint to a billion.

11          MR. HUESTON:  Okay.  Let's -- let's dive into that a

12  little bit.  Let's go to GX 742, which I'd ask to be admitted

13  at this time.

14          MR. MADDEN:  No objection.

15          THE COURT:  It's admitted without objection.

16      (Said exhibit admitted in evidence.)

17          MR. HUESTON:  Let's put it up.

18  BY MR. HUESTON:

19  Q.  And this is, in fact, if you look at it, you'll recognize

20  this as the agenda, proposed agenda for your one-on-one with

21  Mr. Shah, right?

22  A.  Yes.

23  Q.  And if we go down lower, one of the topics down below --

24  oh -- there it is.  Here are the topics.  First topic,

25  blueprint to a billion, right?

```
 1  A.  Yes.
 2  Q.  And there are several bullets there underneath, right?
 3  A.  Yes.
 4  Q.  All right.  And the second one, I just want to draw your
 5  attention to, that includes data, reporting, inventory, list,
 6  pricing, revenue, status, sales ops, right?
 7  A.  Yes.
 8  Q.  And there's a bullet for operational excellence, right?
 9  A.  Yes.
10  Q.  And so these were some of the issues that you intended to
11  address to possibly set the blueprint to getting to a billion,
12  right?
13  A.  These were the topics I put together to have a discussion.
14  Q.  Great.  And that was all before the meeting on
15  January 25th, right?
16  A.  Correct.
17          MR. HUESTON:  All right.  We can put that aside.
18  BY MR. HUESTON:
19  Q.  I want to talk a little bit about inventory gap.  That was
20  mentioned on direct.
21          Sir, you have acknowledged -- well, let me just ask
22  you this:  Mr. Prowker and Ms. Pierce told you that everyone
23  at Outcome Health knew about the inventory gap which happened
24  on some contracts in 2015 and 2017, right?
25  A.  Yes.  I mean, maybe they were exaggerating by using the
```

1  word everyone, but, yes.

2  Q.  Okay.  My point here is that during your time at Outcome,

3  you don't recall people being sensitive about talking about

4  deltas or gaps, right?

5  A.  I don't recall that happening.

6  Q.  You don't recall people were being sensitive talking about

7  that, right?

8  A.  Correct.

9  Q.  Okay.  And you were also included on emails about deltas,

10  right, sir?

11  A.  Relative to specific clients, yes.

12        MR. HUESTON:  Okay.  Well, let's look at an example.

13  Let's go to DX 4450, marked right now just for identification.

14        MR. MADDEN:  No objection.

15        THE COURT:  It's admitted without objection.

16     (Said exhibit admitted in evidence.)

17        MR. HUESTON:  Okay.  Let's put it up, please.

18  BY MR. HUESTON:

19  Q.  And this is, in fact, an email from Mr. Desai to Liane

20  Pierce and Kristen Carlisle cc'ing you, right?

21  A.  Yes.

22  Q.  And what's the subject?

23  A.  It says, "inventory deltas."

24  Q.  Okay.  And let's go below, and then down below Mr. Desai

25  says:  "Hi, LP and Kristen.  Based on current sold programs,

1  do we have a sense of general deltas on inventory that we have
2  by network?"
3         Do you see that?
4  A.  I do.
5  Q.  And you understood general deltas to mean the delta of
6  contracted versus what was being delivered, right?
7  A.  Yes.
8         MR. HUESTON:  Okay.  And so we can put that down.
9  We're going to look now at Mr. Carlisle's response where
10 you're copied, and this would be GX 749 marked for
11 identification.
12        THE COURT:  You can put it up on the screens.
13        MR. MADDEN:  No objection.
14        THE COURT:  All right.  It's admitted without
15 objection.
16    (Said exhibit admitted in evidence.)
17 BY MR. HUESTON:
18 Q.  Okay.  And you see here, here's an email from Kristen
19 Carlisle to yourself and others responding here.  You see the
20 subject, inventory deltas, right?
21 A.  Yes.
22 Q.  Okay.  And so Ms. Carlisle says, "I am working on a
23 device-level report, but in the meantime, here's a report on
24 office-level targets for all live sponsorships by therapeutic
25 category."  Right, sir?

1    A.   It does state that.

2    Q.   Okay.  And then she goes on to note that, "I'm basing this

3    off reserved right now.  The infrastructure for deployed and

4    actuals reporting is in place, but our trial partnership with

5    Treasure Data has lapsed, so access required for this level of

6    reporting is not available in the short-term.  Shashin worked

7    to extend it and get a refresh of data, which I hope to have

8    in by EOW."  That's end of week, right?

9    A.   Yes.

10   Q.   Okay.  And then just to help interpret some of the

11   technolese there, deployed and actuals, that means what's

12   actually playing on the devices, right?

13   A.   Yes.

14   Q.   Okay.  And she's explaining why there isn't data on the

15   deployed and actuals in the short-term, right?

16   A.   Yes.

17   Q.   Okay.  But, she notes, the infrastructure for deployed and

18   actuals reporting is in place, right?

19   A.   Yes.

20   Q.   So you would agree this reflects people working on getting

21   systems in place to reflect the right data, right?

22   A.   Not necessarily.

23   Q.   Okay.  Working on systems to improve the reporting of

24   these data points, right?

25   A.   Not necessarily.

1  Q.  All right.  And you received other emails about Outcome's

2  efforts to improve their inventory system.  Do you remember

3  that?

4  A.  Not specifically.

5          MR. HUESTON:  Okay.  Well, let me see if we can get

6  help on that.  DX 4403 marked for identification.

7          MR. MADDEN:  No objection.

8          THE COURT:  It's admitted without objection.

9      (Said exhibit admitted in evidence.)

10  BY MR. HUESTON:

11  Q.  Okay.  And you can see this is an email from Adam Nixon to

12  you on January 16th, right?

13  A.  Yes.

14  Q.  And the header there is overriding work streams, do you

15  see that?

16  A.  I do.

17  Q.  Great.  And you would read overriding work streams to mean

18  work in progress along these certain areas, right?

19  A.  Yes.

20  Q.  Okay.  And you see the first bullet says:  "Build content

21  delivery and inventory system."  Right?

22  A.  I see that.

23  Q.  And the second bullet says:  "Finalize operational/system

24  process and systems," right?

25  A.  Yes.

1   Q.  And just two days before your meeting with Mr. Shah,

2   Mr. Shah told you he wanted to centralize sales operations and

3   business systems under you, right?

4   A.  He did write that, yes.

5   Q.  Okay.  And, sir, he wanted to give that responsibility to

6   you, not to Mr. Desai, right?

7   A.  That's what he stated.

8   Q.  Okay.  Or to you and not anyone else in that inner circle.

9   To you.

10  A.  Yes.

11          MR. HUESTON:  Okay.  We can put that down.

12  BY MR. HUESTON:

13  Q.  Now, I want to drill in a little more about Mr. Prowker

14  and Ms. Pierce.  Let's start with Mr. Prowker first.

15          You understood that Mr. Prowker had only been hired

16  in the fall of 2016.  Do you remember that roughly?

17  A.  I think so.

18  Q.  And that -- and that would be around four months in

19  advance of your meeting with him, right?  Pretty recently

20  before you met with him?

21  A.  Yes.

22  Q.  Okay.  And you were aware that others in the company had

23  concerns about Mr. Prowker's performance, right?

24  A.  I can't recall.

25          MR. HUESTON:  Let's go to DX 5384.1, which we've

1    marked for identification.

2           MR. MADDEN:  Same objection as the prior one, Your
3    Honor.

4           THE COURT:  This is for state of mind or effect on
5    the listener?

6           MR. HUESTON:  It's for both, Your Honor.

7           THE COURT:  Well, I'm asking the government's
8    objection.

9           MR. MADDEN:  I guess both.

10          THE COURT:  And so you're not objecting to it being
11   admitted for purposes of showing the state of mind of the
12   defendant and the effect on the listener, meaning this
13   witness?

14          MR. MADDEN:  Yes.

15          THE COURT:  Okay.  And a lot of this may sound like
16   legalese, but, of course, we're in a courtroom, so it should.

17          What this means is the content itself isn't
18   necessarily true, but it is admitted to show the effect on
19   this listener, whether it was true or not, what he did in
20   response to this, and it also shows the state of mind of
21   Mr. Shah.

22          Maybe these facts are true, maybe they're not, but
23   this reflected or can be offered as some evidence of what he
24   was thinking at the time.

25          So those are these legalese terms we're throwing

1   around, but that's what they mean.

2          So with that, it's admitted for those purposes, and

3   it's displayed to the jury.

4       (Said exhibit admitted in evidence.)

5   BY MR. HUESTON:

6   Q.  Okay.  And so here it is, and let me try to focus on a

7   couple of portions of this.

8          First, this is January 20th, you can see that, 2017,

9   right?

10  A.  Yes.

11  Q.  And it's sent from Mr. Shah to yourself and Ashik Desai,

12  right?

13  A.  Yes.

14  Q.  And he mentions that he happened to run into Mr. Prowker

15  inadvertently after the town hall, right?

16  A.  Yes.

17  Q.  And, by the way, you understood there were weekly town

18  hall meetings for the whole company; do you remember that?

19  A.  I remember attending one town hall meeting.

20  Q.  Okay.  And Mr. Shah says it was -- it was a "good

21  conversation.  He actually had a couple of great insights on

22  data and on some of the opportunity."  Right?

23  A.  Yes.

24  Q.  Then he also says:  "In my conversation it also became

25  clear he did not understand growth strategy, its role or

1  purpose."  Right?

2  A.  Yes.

3  Q.  And he said he's concerned about this and that it would be

4  very valuable and important to sit down with Adam and make

5  sure he understands growth strategy, right?

6  A.  Yes.

7  Q.  And as Mr. Prowker's manager, he wanted you to be part of

8  that as well, right?

9  A.  Yes.

10  Q.  He wrote:  "And given, Sameer, that you manage Adam, it

11  would be good for you to sit in on this and for you to

12  understand this as well."  Right?

13  A.  Yes.

14  Q.  Okay.  And one reason Mr. Shah says it's important to

15  "make sure that Adam gets it" is "because if Adam doesn't get

16  it, there's no way his team is going to get it," right?

17  A.  Yes.

18          MR. HUESTON:  All right.  We can put that down.

19  BY MR. HUESTON:

20  Q.  And you referenced this, I think you used the word

21  friction, but you recall there was friction between Mr. Desai

22  and Mr. Prowker, right?

23  A.  Yes.

24  Q.  And you also have recalled that there was a gray area in

25  which the list-match process responsibility fell, which was

1  part of the basis for the friction between Mr. Desai and

2  Mr. Prowker.

3  A.  Yes.

4  Q.  All right.  And you were also aware that Mr. Desai and

5  Mr. Prowker had contention about a number of topics, right?

6  A.  Yes.

7  Q.  For instance, Mr. Prowker challenged Mr. Desai and was not

8  supportive of his sales targets, right?

9  A.  Yes.

10  Q.  And, by the way, you have described Mr. Prowker as

11  socially awkward, right?

12  A.  Yes.

13  Q.  And you recall describing him as agitated when you first

14  met him, right?

15  A.  Yes.

16  Q.  And, in fact, at one point, you were even considering

17  replacing Mr. Prowker, right?

18  A.  Yes.

19        MR. HUESTON:  Okay.  Let's go to DX 5381.1.  We

20  looked at this earlier, I believe.

21        THE COURT:  Is it in evidence?

22        MR. HUESTON:  I believe it's in evidence.  I'll pause

23  for a moment.

24        MR. MADDEN:  I don't think it is.

25        THE COURT:  All right.

1    MR. HUESTON:  All right.  I'm mistaken.  I'm glad I
2    paused.  Why don't we just put this up internally, and I'll
3    ask.
4    THE COURT:  It is.
5    MR. MADDEN:  It's in evidence, Your Honor?
6    THE COURT:  Well, that's my question.
7    MR. HUESTON:  I don't think it is, so I'm asking for
8    your review at this time.
9    MR. MADDEN:  Can we have a brief sidebar, Your Honor?
10   THE COURT:  Go ahead, we'll do it.
11      (Proceedings heard at sidebar:)
12   THE COURT:  Go ahead.
13   MR. MADDEN:  Your Honor, Mr. Hueston does not seem to
14   be using these documents for the effect on the listener's
15   state of mind.  He's just reading in the statements, so he
16   seems to be using them for their truth rather than for a
17   non-hearsay purpose.
18   THE COURT:  Response?
19   MR. HUESTON:  My response is that the Court has given
20   an appropriate limiting instruction, and what Mr. Shaw has
21   said and I read reflects his state of mind, and this has been
22   back and forth with Mr. Kazi who's acknowledged that, in fact,
23   it's having this effect, and it's exactly for the purposes set
24   forth.
25   THE COURT:  Well, yeah, whether it's read in, it's

1    subject to a limiting instruction.  He can't read it in a way
2    or a manner that is any -- it's read in as plain English, and
3    then it has an application to the jury, an admissible basis in
4    front of the jury, which is what I've given a limiting
5    instruction on.

6         So I have explained to the jury two or three times
7    now what effect on the listener means, what effect -- what the
8    state of mind of the defendant means.  I don't know what else
9    I can do, but those are acceptable ways to allow a document to
10   come in.

11        We can discuss later whether these are documents that
12   go back to the jury, which is a separate issue.  They may.
13   They may not.

14        MR. MADDEN:  Understood, Your Honor.

15        THE COURT:  But for purposes of the examination, I
16   think they're acceptable to put in front of the jury.  They've
17   all been admitted subject to objections, and that may -- or
18   limits, and that may affect their ability to go back to the
19   jury.

20        MR. MADDEN:  Understood.

21        THE COURT:  Okay.  So is there an objection to this
22   document for the limited purpose of, I assume, the state of
23   mind of defendant?

24        MR. MADDEN:  We'll maintain the objection, Your
25   Honor.

1    THE COURT:  All right.  But it will be admitted to
2  show the state of mind of the defendant.  It's a statement he
3  made in the middle of this relatively short interchange with
4  the witness, and it shows what was on the mind of Mr. Shah
5  when he was dealing with the witness.  No indication at this
6  point that these are emails or voicemails created with the
7  threat of investigation or some other purpose to just
8  memorialize a defense.  By all accounts, it shows what he was
9  thinking at the time.

10    If you have a different interpretation that would
11  cause its inadmissibility, you can raise it, and you can
12  certainly examine on cross.

13    MR. MADDEN:  Thank you, Your Honor.

14    THE COURT:  All right.  Be admitted for those
15  purposes.

16    (Proceedings heard in open court:)

17    THE COURT:  All right.  This document is admitted to
18  show the state of mind of the defendant at that time when this
19  voicemail was left.

20    (Said exhibit admitted in evidence.)

21  BY MR. HUESTON:

22  Q.  Okay.  So directing your attention to this, Mr. Kazi,
23  we're looking at this Voxer from Mr. Shah, and he states, I'm
24  just going to pull out the one line there, this is a reference
25  to you that you had already concluded Prowker shouldn't be in

1  the role he's in, and that -- that corresponds to your own
2  recollection, right?
3  A.  That's what's stated here in this transcript, and, yes, I
4  had my doubts about Adam Prowker in his role.
5       MR. HUESTON:  Okay.  And we can put that down.
6  BY MR. HUESTON:
7  Q.  And, in fact, you had been considering replacements for
8  Mr. Prowker, right?
9  A.  I had looked into it.
10 Q.  Okay.  Great.  We can move on from that topic.
11      Now, in total, I think you testified the meeting you
12 had with Mr. Shah on January 25th was about 15 minutes long,
13 right?
14 A.  I believe so.
15 Q.  Okay.  And then after the meeting, you did not send the
16 materials that you had from Ms. Pierce or Mr. Prowker to
17 Mr. Shah, correct?
18 A.  Correct, because I didn't have any company equipment with
19 me.
20 Q.  Okay.  Well, just asking whether you sent it or not.
21 A.  After the meeting?
22 Q.  Right.
23 A.  I didn't because I didn't have any equipment with me.
24 Q.  Okay.  You brought your laptop to the meeting, right?
25 A.  And I left it there.

1  Q.  I know.  But while you were at the meeting, you didn't

2  say, you know, I have some documents I'm going to just --

3  before I shut this down and turn it in, I'm going to send them

4  to you.

5      You didn't make that offer, right?

6  A.  I didn't.

7  Q.  And after the meeting, you didn't raise these issues with

8  anyone else, right?

9  A.  I did not.

10 Q.  And you also didn't forward any of the information that

11 you received to anyone else, right, sir?

12 A.  There was no way for me to do that.

13 Q.  Okay.  Well, you didn't speak with any of Outcome's

14 lawyers, right?

15 A.  I did not.

16 Q.  And you didn't report the issues to any clients, right?

17 A.  Correct.

18 Q.  Or in those next coming months to any governmental agency,

19 right?

20 A.  Correct.

21 Q.  Okay.  Now, you were asked on direct briefly about the way

22 the meeting closed out, so I want to direct you to that now.

23      MR. HUESTON:  Let's bring up Government Exhibit GX

24 793 marked for identification.

25      MR. MADDEN:  No objection, Your Honor.

1        THE COURT:  It's admitted without objection.

2        (Said exhibit admitted in evidence.)

3        MR. HUESTON:  Okay.  Let's put it up, please.

4   BY MR. HUESTON:

5   Q.  And this is an email exchange that you had with Mr. Shah

6   following the end of that meeting, right?

7   A.  Yes.

8   Q.  All right.  And Mr. Shah starts the email to you, thanking

9   you for your candor, right?

10  A.  Yes.

11  Q.  All right.  And he says, "While disappointing in some ways

12  for the both of us, I'm confident this is the right decision,

13  but I hope -- but I hope you keep -- keep you as an advisor

14  and a friend of our family and firm."  Right?

15  A.  Yes.

16  Q.  All right.  And then he asks if you would be willing to

17  serve in an advisory capacity of some kind, "to directly

18  advise and help me and Shradha on some of the areas you see

19  the capacity for improvement on."  That's what he wrote,

20  right?

21  A.  Yes.

22  Q.  He says he would love to get the help, and he believes you

23  have a lot to offer from that vantage point, right?

24  A.  Yes.

25  Q.  And so, again, he's not angry with you for raising

1 concerns, right?

2 A. Correct.

3 Q. He wasn't angry with you at all during that meeting,

4 right?

5 A. He was not.

6 Q. He was cordial, correct?

7 A. Yes.

8 Q. And he's writing an email here afterwards that he still

9 would like your feedback and help; that's what he's writing in

10 the email, right?

11 A. An offer for -- to serve in an advisory capacity, yes.

12 Q. Okay. And you don't reply and say no thank you, I

13 appreciate the offer, but no thanks. That's not how you

14 responded, right?

15 A. Correct.

16 Q. You respond: "Rishi, thank you. I echo your opening

17 thoughts," right?

18 A. Yes.

19 Q. And then you write another sentence. You say: "I would

20 be open to an advisorship only if it made sense to you and

21 Shradha and if you both felt that I could add value."

22         You added that sentence, right?

23 A. Yes.

24         MR. HUESTON: We can put that down.

25 BY MR. HUESTON:

1  Q.  Now, you also reached out to Mr. Desai asking to keep in

2  touch, didn't you?

3  A.  I believe I did.

4        MR. HUESTON:  And let's go to your email on that.

5  That would be CX 10057 marked for identification.

6        THE COURT:  Any objection?

7        MR. MADDEN:  No, Your Honor.

8        THE COURT:  It's admitted without objection.

9      (Said exhibit admitted in evidence.)

10  BY MR. HUESTON:

11  Q.  And this is from your personal email address, right, on

12  January 26th, 2017?

13  A.  It is, yeah.

14  Q.  And you write:  "Albeit short, I really enjoyed our time

15  working together and wish we could have known each other

16  better."  That's what you wrote to him, right?

17  A.  Yes.

18  Q.  And you wrote:  "I wish you the very best.  Thanks for

19  everything.  Let's stay in touch."  Right?

20  A.  Yes.

21  Q.  Now, I've redacted it below your signature block.  I'm

22  happy to show it to you without the presence of the jury, but

23  do you recall you put your personal cell phone number below

24  your signature?

25  A.  That's part of my signature block.

1  Q.  Okay.  And "thanks for everything.  Let's stay in touch."
2  Right?
3  A.  Yes.
4  Q.  You thought well of him at the time, right?
5  A.  A polite thing to say in a professional context.
6  Q.  You reached out to him, correct?
7  A.  Correct.
8  Q.  Okay.  And now this is the guy that, according to you,
9  Mr. Prowker and Ms. Pierce accused of changing ROI numbers,
10 right?
11 A.  Yes.
12 Q.  And was responsible for all the conduct that they talked
13 about, right?
14 A.  Yes.
15 Q.  Okay.  And so after hearing what you heard from
16 Mr. Prowker and Ms. Pierce and after the meeting with
17 Mr. Desai, you didn't come out of those meetings thinking
18 Mr. Desai was a fraudster, did you?
19 A.  I came out of the -- I came out of the company relieved to
20 not be at the company anymore.
21 Q.  Let me try the question again.
22 A.  Sure.
23 Q.  When you wrote this email, you wrote it to him because at
24 that time, you didn't think he was a fraudster, right?
25 A.  I wrote it to him as a gesture of professional courtesy.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 213 of 310 PageID #:13012
Kazi - cross by Poulos
458

1   Q.  Did you think -- had you concluded by that time this guy's

2   a fraudster?

3          MR. MADDEN:  Objection, asked and answered.

4          MR. HUESTON:  I've not gotten an answer.

5          THE COURT:  Overruled.

6   BY THE WITNESS:

7   A.  I believe that he was making some mistakes in the

8   business.

9   BY MR. HUESTON:

10  Q.  Mistakes in the business, and this is the email you wrote,

11  right?

12  A.  Yes.

13         MR. HUESTON:  Okay.  That's all the questions I have

14  right now.  Pass the witness.

15         THE COURT:  All right.  Additional cross-examination.

16         MR. POULOS:  Yes, Your Honor.

17         I'll need just a second, Your Honor.

18      (Counsel conferring.)

19                      CROSS-EXAMINATION

20  BY MR. POULOS:

21  Q.  Good afternoon, sir.

22  A.  Good afternoon.

23  Q.  My name is Ted Poulos.  I'm an attorney for Brad Purdy.

24         During the time that you were at Outcome Health, is

25  it correct to say that you hardly interacted with Brad Purdy

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 214 of 310 PageID #:13013
Kazi - cross by Poulos
459

1    at all?

2    A.  That's correct.

3    Q.  Yeah.  And after you got that information from Pierce and

4    Prowker and met with Rishi Shah, did you -- you never shared

5    any of that information with Brad Purdy, correct?

6    A.  Correct.

7    Q.  Okay.  Or anyone else in the company, correct?

8    A.  Correct.

9         MR. POULOS:  Okay.  I have a few emails just to kind

10   of go through a few of the events during that time that you

11   were at Outcome Health, okay?  And I'd like to start with, and

12   I guess we're just going to show it to the witness and not the

13   jury for now --

14        THE COURT:  Well, it depends.  If the government's

15   objecting to some of these, or do you want to take them one at

16   a time?

17        MR. POULOS:  I don't think they're objecting.

18        THE COURT:  Hang on.

19        MR. MADDEN:  Not to the emails.

20        THE COURT:  All right.  What numbers are those?

21        MR. MADDEN:  No objection to those.

22        MR. POULOS:  4376.

23        THE COURT:  Go ahead.

24        MR. POULOS:  4386.

25        THE COURT:  Okay.

1              MR. POULOS:  Government Exhibit 728.

2              That 4386 was a defense exhibit, Judge.

3              Government Exhibit 728, Defense Exhibit 4404, and I

4    have a demonstrative that goes with that.  That's 4404.1.

5              MR. MADDEN:  What's that?

6              MR. POULOS:  Defense Exhibit 4410, Defense

7    Exhibit 4409, and then items that are in evidence, Government

8    Exhibit -- well, I don't need to cover those.

9              THE COURT:  All right.  Is there any objection to any

10   of those exhibits?

11             MR. MADDEN:  No.

12             THE COURT:  They're all admitted without objection.

13   Proceed.

14        (Said exhibits admitted in evidence.)

15             MR. POULOS:  Then I have a couple more, Your Honor.

16   Government Exhibit 739, and there is an exhibit to the last

17   one that perhaps we could maybe address at the break.

18             THE COURT:  All right.  Any objection to Government

19   Exhibit 739?

20             MR. MADDEN:  No.

21             THE COURT:  It's admitted without objection.

22             All right.  Proceed.

23        (Said exhibit admitted in evidence.)

24             MR. POULOS:  Let's start with Defense Exhibit 4376 --

25             THE COURT:  When you're turned away, the court

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 216 of 310 PageID #:13015
Kazi - cross by Poulos
461

1    reporter can't hear you.  So either put a portable mic on or
2    stay tethered.  They can hear you back there.
3             MR. POULOS:  4376, and if we can just blow up the
4    to/from/subject line section first.
5    BY MR. POULOS:
6    Q.  Mr. Kazi, this is an email, do you see, from Liane Pierce
7    dated Sunday, January 8th, 2017, correct?
8    A.  Yes.
9    Q.  That was the day before you started, correct?
10   A.  Correct.
11   Q.  And she sent this to an email that says
12   leaders@contextmedia, and then she blind copied you on it.  Do
13   you see that?
14   A.  I do.
15   Q.  And the subject line is a weekly recap commercial
16   solutions operations-client success and Marketing Sciences,
17   correct?
18   A.  Yes.
19   Q.  Okay.  Now, Mr. Kazi, by the time you left, did you come
20   to understand that there was this email of leaders at
21   ContextMedia that included, of course, the top executives, but
22   a number of managers as well?
23   A.  If I had, I've forgotten about it.
24   Q.  Okay.  And commercial solutions, operations, that's what
25   you were hired to be the COO of, is that fair?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 217 of 310 PageID #:13016
Kazi - cross by Poulos
462

1   A.  It's --

2   Q.  Or part of it?

3   A.  -- got several different names but at least the client

4   success and Marketing Science is part of it.

5   Q.  Okay.  And client success was Liane Pierce, right?

6   A.  Correct.

7   Q.  It was her job to make sure that they succeeded with the

8   clients, that is, delivered on the contracts, correct?

9   A.  Correct.

10  Q.  And Marketing Science was Adam Prowker, right?

11  A.  Yes.

12  Q.  Let's throw out another name.  Bryan Morgan, do you

13  remember Bryan Morgan as somebody who worked with Adam Prowker

14  and was in Marketing Sciences by any chance?

15  A.  I don't recall.

16  Q.  Okay.  But you did know by the time that you started that

17  this Marketing Science unit that was led by Adam Prowker, they

18  had taken over the responsibility for preparing and analyzing

19  ROI data, correct?

20  A.  They played a role in it certainly.

21  Q.  Okay.  Well, did you understand that that was their role,

22  they were in charge of preparing the ROI studies for that

23  period of time?

24  A.  Along with a third-party firm.

25  Q.  Okay.  Right, that's what I mean.  They got the data from

1    IMS.

2    A.  Yes.

3    Q.  Prowker's team analyzed the data and then prepared the ROI

4    reports that were submitted to clients, correct?

5    A.  Yes.

6    Q.  Okay.  And prior to that time, it was Desai.  Did you come

7    to learn that?

8    A.  And even after Marketing Science took over, Ashik played a

9    role there.

10         MR. POULOS:  Okay.  So let's turn to the weekly

11   recap.  I want to review certain -- a large portion of this

12   weekly recap from them.

13         So if we could just go to the first, cover the first

14   third of the email.  Perhaps that will be enough for everybody

15   to see.

16         By the way, if you wouldn't mind going all the way

17   down to the bottom or just showing -- that's okay, you don't

18   need to blow it up.

19   BY MR. POULOS:

20   Q.  Do you see at the bottom left-hand corner it's signed from

21   AP, Adam Prowker, and LP, Liane Pierce.  Do you see that?

22   A.  Yes.

23         MR. POULOS:  Okay.  Now if we could go back to that

24   top third.

25   BY MR. POULOS:

1  Q.  They write:  "Hi all, as we kick off the new year, we want

2  to provide highlights regarding the latest from commercial

3  solutions operations, as well as the key initiatives for the

4  new year."  Correct?

5  A.  Yes.

6  Q.  "As always, let us know if you have any comments or

7  feedback on anything included," correct?

8  A.  Yes.

9  Q.  Okay.  Now, then there's a heading called wins and

10  highlights, correct?

11  A.  Yes.

12  Q.  Let me read that first win bullet point.  They say that

13  campaign operations and inventory operations deployed 188

14  campaigns across 78 opportunities/contracts over 14 business

15  days to start 2017.

16          Do you see that?

17  A.  I do.

18  Q.  And then she wrote -- they wrote:  "Exceptional teamwork

19  across the board resulted in an error rate of less than

20  3 percent."  Correct?

21  A.  Yes.

22  Q.  "Team will now be focused on gap closing."  Correct?

23  A.  Yes.

24  Q.  "Further QA," correct?

25  A.  Yes.

Kazi - cross by Poulos

465

1  Q.  "And utilization of AH network."  Did I read that
2  correctly?
3  A.  Yes.
4  Q.  Okay.  When this email was sent out saying that they are
5  going to focus on gap closing, you knew that was the gap
6  between what was being -- the number of ads that were being
7  played versus what the contract amount was, right?  I mean,
8  did you come to understand that?
9  A.  I came to understand that.
10  Q.  Okay.  QA, of course, means quality assurance?
11  A.  Yes.
12  Q.  And the utilization of the AH network.  Mr. Kazi, you knew
13  before you started that Outcome Health had just closed on the
14  acquisition of its main competitor, AccentHealth, correct?
15  A.  Yes.
16  Q.  And then let's read the Marketing Science wins and
17  highlights section.
18        "The Marketing Science team has been focused on
19  stability and growth as we roll into 2017.  Among the projects
20  we are currently in-flight with, the team has been scoping the
21  top 100 lifestyle brands' reach within the CMH/AH networks to
22  help guide the sales focus, building client-facing assets
23  around performance programs, and impact case studies and
24  developing an in-house solution to inventory management and
25  list matching to better serve operational efficiency and

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 221 of 310 PageID #:13020
Kazi - cross by Poulos
466

1  excellence."

2         Do you see that?

3  A.  I do.

4  Q.  Mr. Kazi, you did know, as you were starting out at

5  Outcome Health, that they were in the process of continuing to

6  grow and improve their systems, right?

7  A.  I mean, that's what's stated here.

8  Q.  Okay.  When -- that last clause about developing an

9  in-house solution to inventory management and list matching,

10  do you -- did you know what list matching was?

11  A.  I didn't when I read this email on my first day.

12  Q.  Did you come to learn who was responsible for the

13  list-match process at this time; it was the Marketing Science

14  unit?

15  A.  It was done between Marketing Sciences and Ashik Desai.

16  Q.  Okay.  Now, how do you know that, sir?

17  A.  Because I learned that during my time at the company.

18  Q.  Okay.  So this was Prowker's team working with Desai and

19  his team?

20  A.  It was Prowker's team working on it and in some cases

21  Ashik coming in over the top.

22         MR. POULOS:  Okay.  Now, let's go to the challenges

23  section.

24         If you could just blow up the first paragraph under

25  challenges.

1  BY MR. POULOS:

2  Q.  This part reads:  "Since our contracts are booked against

3  devices but we don't have a system in place that allows us to

4  book our inventory against devices, there is a substantial lag

5  to understanding where gaps exist between contracted and

6  deployed inventory," correct?

7  A.  Yes.

8  Q.  And then it says:  "We are hopeful that the actuals

9  reporting will help solve this.  If not, we will need to look

10  into a system or reporting structure that will give us no less

11  than a 48-hour log."

12        Did I read that correctly?

13  A.  You did.

14  Q.  Adam Nixon, I think he's been referenced here a little bit

15  in some of the material that maybe Mr. Hueston showed you.

16        Do you remember Adam Nixon being the accounting

17  manager?

18  A.  I do.

19  Q.  Okay.  And do you remember meeting with him and

20  interacting with him and him explaining to you that he, that

21  he in the accounting department was working with Liane Pierce

22  and her team to continue to build and develop better processes

23  for tracking contracts and performances?

24  A.  I remember meeting with him.  I don't recall the nature of

25  the conversation.

1    MR. POULOS:  Okay.  We could move on from this

2  exhibit.

3  BY MR. POULOS:

4  Q.  If we could now go to Exhibit 4386.  This is an email from

5  Adam Nixon to you.  It's dated January 11th.  Do you see that?

6  A.  I do.

7    MR. POULOS:  And if we could just blow up the first

8  portion of that email.  Perfect.

9  BY MR. POULOS:

10  Q.  Adam Nixon wrote, "I'm excited to have you here.  Your

11  role, as I understand it from Madan's email and conversations

12  with Brad, aligning the period from sales to finance

13  (Marketing Science and sales ops to fulfillment) is going to

14  be HUGE."  All caps on the huge, correct?

15  A.  Yes.

16  Q.  "I've been playing it on the side, trying to keep everyone

17  honest/aligned."  Correct?

18  A.  Yes.

19  Q.  All right.  And this part about, you know, he understands

20  from conversations with Madan and conversations with Brad that

21  you're coming on to oversee that process described there,

22  correct?

23  A.  Yes.

24  Q.  And that's the same process that Mr. Hueston showed you

25  about Rishi Shah having hired you for that purpose, correct?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 224 of 310 PageID #:13023
Kazi - cross by Poulos
469

1  A.  Sure.

2  Q.  Okay.  And then he ended this email saying, "Very much

3  looking forward to diving in.  There's all sorts of backstory

4  to provide you on how we got here, current process, where to

5  go for information, et cetera," correct?

6  A.  Yes.

7  Q.  Now, you did -- you have a recollection of meeting with

8  Adam Nixon?

9  A.  I do.

10  Q.  But you don't recall any of the substance of those

11  meetings?

12  A.  I do not.

13        MR. POULOS:  Okay.  If we could go to Government

14  Exhibit 728.

15        And if you could blow up the to/froms and the first

16  paragraph there.

17  BY MR. POULOS:

18  Q.  This is an email from Brad Purdy to Eric West and others.

19  You're cc'd on it.  Do you see your name there, Mr. Kazi?

20  A.  I do.

21  Q.  Okay.  And it says, "New York AH/CMH decisions."  Do you

22  see that?

23  A.  I do.

24  Q.  Why don't you just read that first -- that one-paragraph

25  email that Brad wrote, just go ahead and read it to yourself.

1    Tell me when you're done.

2    A.  Done.

3    Q.  Do you remember conversations with Liane Pierce and Adam

4    Prowker where decisions were being made about now the

5    integration of AccentHealth's operations with the new company

6    now having been acquired by Outcome?

7    A.  I do remember we had conversations like that.

8    Q.  Okay.  And decisions had to be made about what kind of

9    structure's to be put in place, correct?

10   A.  Yeah.

11   Q.  And who to keep, which employees to keep, which ones to

12   integrate into the new system, right?

13   A.  Yes.

14   Q.  Mr. Kazi, my question to you is do you -- do you recall

15   that Brad Purdy was kind of at the very top kind of

16   responsible for the integration of AccentHealth?

17   A.  I remember him playing a very important role in that,

18   yeah.

19          MR. POULOS:  Okay.  If we could go to Defense

20   Exhibit 4404.

21   BY MR. POULOS:

22   Q.  This is an email between you and Adam Nixon again.  Do you

23   see that?  This is January 16th.

24   A.  I do see it.

25          MR. POULOS:  Okay.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 226 of 310 PageID #:13025
Kazi - cross by Poulos
471

1          Okay.  If we could -- can I -- did I learn from
2    Mr. Hueston that I could touch this and mark it, Judge, or --
3          THE COURT:  I think the touch screen works there,
4    sure.
5          MR. POULOS:  Okay.  Is that on everyone's screen?
6          If that part could be blown up, please, basically two
7    parts of the email chain.  Down -- right there.
8    BY MR. POULOS:
9    Q.  So in the bottom portion of this section of the email,
10   Adam Nixon sent you an email saying, "Rough number of assets
11   at member (does not speak to signal strength)."  Did I say
12   that?
13   A.  Yes.
14   Q.  And then the -- then he, a minute later, from 4:15 to
15   4:16, sent you data about -- you understood that was the
16   inventory at Outcome Health at that time, correct?
17   A.  I believe so.
18   Q.  Do you recall that the reference to -- so this is
19   reporting, do you see, 57,786 tablets at this time?
20   A.  Yes.
21   Q.  And it says TV screen, 20,885, correct?
22   A.  It does.
23   Q.  And then waiting room screens, 22,933, correct?
24   A.  Yes.
25   Q.  And then wallboards is 33,732, right?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 227 of 310 PageID #:13026
Kazi - cross by Poulos
472

1    A.  Yes.

2    Q.  Do you remember -- take a shot at this.  Do you remember

3    the TV screens there, that number of 20,885 for TV screens was

4    the number of screens acquired from AccentHealth?

5    A.  I don't remember that.

6              MR. POULOS:  Okay.  I have a demonstrative exhibit,

7    I've just taken those numbers and just done a little math.  So

8    if we could turn to 4404.1.

9              This math has been double checked, Your Honor.

10   BY MR. POULOS:

11   Q.  Just as to those four items that I identified, do you see

12   that that totals 135,336 devices?

13   A.  Yes.

14             MR. POULOS:  Okay.  Let's move to Defense

15   Exhibit 4410.

16             The highlighting on this exhibit is mine, just for

17   the record, Your Honor.

18   BY MR. POULOS:

19   Q.  I don't want to review the whole thing, but do you recall

20   Adam Prowker sending you emails like this, depicting the

21   debates, disagreements that he was having?

22   A.  I remember him sending me this email.

23   Q.  Okay.  Looking just at the -- starting at the bottom.  I

24   hope that's legible for everybody, we don't need to blow it

25   up.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 228 of 310 PageID #:13027
Kazi - cross by Poulos
473

 1          THE COURT:  It's pretty small.

 2          MR. POULOS:  Oh.

 3   BY MR. POULOS:

 4   Q.  So this is the lower chain.  These are emails between

 5   Prowker and Desai.  Do you see that?

 6   A.  Yes.

 7          MR. POULOS:  Okay.  Now, if we could move up to the

 8   next email.

 9   BY MR. POULOS:

10   Q.  This is from Adam Prowker to you, January 17th.  And he

11   wrote:  "FYI, wanted you to have visibility into some of my

12   'angst' and challenges with the current operating rhythm, but

13   also thought it would be helpful to share my initial thinking

14   about Marketing Sciences moving forward."

15          Did I read that correctly?

16   A.  You did.

17          MR. POULOS:  Okay.  Let's move up to the next email.

18   BY MR. POULOS:

19   Q.  Now, you responded to him:  "You and I should connect re:

20   your 'angst' as you put it.  Every interaction that you/Ashik

21   have pushed to me involves something off kilter.  I'd like to

22   understand better.  We need to find a way to challenge this

23   unhealthy dynamic" --

24   A.  Change.

25   Q.  Yes, thank you.  "We need to find a way to change this

1  unhealthy dynamic for both scale and productivity reasons."

2  Correct?

3  A.  Yes.

4  Q.  "What time do you get in on Friday?" is what you said.

5  A.  Yes.

6  Q.  When you say for both scale and productivity, I think we

7  understand productivity.  What do you mean by scale?

8  A.  For the company to grow and accelerate, we can't have

9  operational issues between leaders and other executives.

10         MR. POULOS:  Okay.  And then let's just go to his

11  response to your email, moving up the chain -- no, I'm

12  sorry -- right here.

13  BY MR. POULOS:

14  Q.  He responded:  "Agreed.  In a bad place and would love to

15  get out of it.  Need help.  This is me asking for help."

16  Correct?

17  A.  Yes.

18  Q.  Now, he mentioned the meeting that you had on Friday, and,

19  of course, that was the meeting that you've -- we've heard a

20  lot about.

21         Did you discuss that with him, with him and Liane

22  Pierce, this angst and these issues at that time or not?

23  A.  Not during the meeting that Liane, Adam and I had.

24         MR. POULOS:  Okay.  If we could go to an exhibit that

25  we've looked at, I just have a couple questions, Government

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 230 of 310 PageID #:13029
Kazi - cross by Poulos
475

1    Exhibit 795, please.

2          So if we could blow up the first paragraph.

3    BY MR. POULOS:

4    Q.  Just for the record, this is one of a number of emails

5    that Prowker and Pierce sent to you after meeting with you to

6    discuss their concerns, correct?

7    A.  Okay.

8    Q.  I want to focus on that last sentence.  This is where they

9    sent you information about altered ROI reports, right?

10   A.  Yes.

11   Q.  And what Adam Prowker wrote to you in that last sentence

12   is:  "The client deck was neither produced nor shared by

13   Marketing Sciences (only Bryan and Claire were here in

14   June/July); my understanding is this type of practice was

15   pervasive in 2015."  Correct?

16   A.  That's what it states.

17   Q.  Okay.  Did -- he's highlighting that this was pervasive in

18   2015, correct?

19   A.  He is.

20   Q.  Did Prowker express to you any concerns about the ROI

21   reports that his team in Marketing Science had generated?

22   A.  I don't recall him stating that one way or the other.

23   Q.  And, again, do you recall whether -- Bryan Morgan doesn't

24   ring a bell to you right now at all?

25   A.  Not to me.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 231 of 310 PageID #:13030
Kazi - cross by Poulos
476

1    Q.  Claire Stegman, S-T-E-G-M-A-N, does that name mean

2    anything to you?

3    A.  It does not.

4         MR. POULOS:  Okay.  Let's move on to Exhibit -- I

5    think it's a spreadsheet -- 794-A.

6         Okay.  Could we make that spreadsheet larger on the

7    screen?

8         Okay.  Well, we'll work with this.

9         If we focus on column G first, and, Laura, if you

10   could just slowly scroll down.

11   BY MR. POULOS:

12   Q.  Do you see that almost every campaign -- let me back up

13   here just to set the scene.  I'm sorry.

14        This is one of the spreadsheets that Prowker or

15   Pierce sent you, correct?

16   A.  Yes.

17   Q.  To highlight under-delivery and some of the issues that

18   they were concerned with, right?

19   A.  Correct.

20   Q.  And you do see under actual delivery, the items in pink,

21   correct, where there is some under-delivery being reported

22   there, right?

23   A.  Yes.

24   Q.  Okay.  Now, in column G, it identifies whether or not

25   there's an ROI guarantee associated with the contract, right?

Kazi - cross by Poulos

477

1  A.  Yes.

2  Q.  And now we could kind of scroll down, and do you see, sir,

3  that almost every one of the contracts that they're

4  identifying here has an ROI guarantee until you get to the --

5  near the bottom?

6  A.  Yes.

7  Q.  And the -- almost all, not all, are 3-to-1 guarantees,

8  correct?

9  A.  Correct.

10  Q.  And then of all these contracts --

11      MR. POULOS:  If we could go to the bottom of the list

12  there, please.

13  BY MR. POULOS:

14  Q.  Almost all of these contracts, you see the bottom two

15  lines are one campaign.  That's Tecentriq, correct?

16  A.  Yes.

17  Q.  With no ROI guarantee, and the other one is Keytruda;

18  again, no ROI guarantee referenced in this document, correct?

19  A.  Yes.

20      MR. POULOS:  Laura, if we could scroll up to -- if

21  you could -- well, I don't know.  Well, let me just stay right

22  there.

23  BY MR. POULOS:

24  Q.  I want to direct your attention to this box, line 13, 14,

25  15, 16.  That's data about the brand name Invokana, correct?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 233 of 310 PageID #:13032
Kazi - cross by Poulos
478

1  A.  Yes.

2  Q.  And we've established I think earlier that there's the

3  contract delivery and then there's the actual delivery, right?

4  A.  Yes.

5  Q.  For ERT, that's the exam room tablets, right?

6  A.  Yes.

7  Q.  Do you see that the contract was for 1,177 tablets, right?

8  A.  Yes.

9  Q.  But this document is reporting that they were playing

10  those ads on 3,721 devices, right?

11  A.  That's what it states.

12  Q.  And then for the wallboards, the contract was 344 devices,

13  but they were playing it on 1,101, correct?

14  A.  Yes.

15  Q.  Did Liane Pierce ever explain to you the weighted average

16  approach that the company was employing?

17  A.  No, not that I recall.

18  Q.  I'm sorry?

19  A.  Not that I recall.

20  Q.  Okay.  Column E, where it is reporting contract delivery,

21  did she explain or do you know whether or not that is contract

22  delivery that was in place in December or in January or any

23  particular time?  Do you know the time period covered here?

24  A.  I can only assume --

25  Q.  Well, I don't want you to assume.  I'm asking if you know.

1  Do you know, sir?

2  A.  Can you repeat your question?

3  Q.  Did she explain or do you know what time period the

4  delivery data is covering?

5  A.  I -- no.

6          MR. POULOS:  Okay.  And if we could scroll over to

7  get to column I, please.

8  BY MR. POULOS:

9  Q.  Under this heading of CMH client-reported performance, and

10 if you just scroll down slowly, there's a lot of N/A.  And do

11 you know if that is referring to just not available?

12 A.  That's what N/A would imply.

13         MR. POULOS:  Okay.  Now I'd like to focus on some of

14 the notes under column J.

15         Can you scroll over -- yeah, thank you.  We're going

16 to need to move over a little further.

17         And what I'd like to do here is -- I'd like to go

18 to -- there we are.  If you could scroll down further now.

19 Further down.  Here we go.

20 BY MR. POULOS:

21 Q.  For this campaign, I want to start on this line here,

22 line 27.  It says:  "Full delivery and make good report found

23 below.  Required as part of a make good with client," correct?

24 A.  Yes.

25 Q.  Okay.  So this was referencing that there was going to be

Kazi - cross by Poulos

480

1   a make good, correct?

2   A.  It does reference that.

3       MR. POULOS:  Okay.  And then if we go to line 37, so

4   here, Laura, I'm going to ask if you could scroll all the way

5   over to the right first so we see what campaign this is on,

6   line 37.

7   BY MR. POULOS:

8   Q.  This is on Xeljanz.  Do you see that?

9   A.  I do.

10  Q.  Okay.  Now, if we could get back to the note.

11      Liane Pierce wrote:  "Here is example of 2017 RA gaps

12  due to historical relationships with client, we alerted the

13  team of the issue, and we have no option.  We alerted the team

14  to the issue, and we have no option other than dayparting or

15  trying to find help from AH to fill these inventory gaps."

16  Correct?

17  A.  Yes.

18  Q.  Now, Mr. Kazi, did you read this and study these when you

19  received them, or not?

20  A.  I don't believe I did.

21  Q.  Okay.  Do you have any recollection of her discussing with

22  you what they were doing in connection with utilizing

23  AccentHealth inventory to fill gaps?

24  A.  At a very high level.

25  Q.  Okay.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 236 of 310 PageID #:13035
Kazi - cross by Poulos
481

1           MR. POULOS:  Okay.  If we could now go to Government

2    Exhibit 750, please.

3    BY MR. POULOS:

4    Q.  So this has been reviewed with you.  Again, this is an

5    email Liane Pierce sent you after the meeting you had with her

6    and Prowker, correct?

7    A.  Yes.

8    Q.  Subject, Friday's discussion.  Do you see that?

9    A.  I do.

10   Q.  And then let's just recap again what she wrote.

11          She said she was providing you four different

12   examples with support materials to emphasize some of the

13   issues we have discussed.  Correct?

14   A.  Yes.

15          MR. POULOS:  Okay.  If we could skip to page 3,

16   please, of this document.

17   BY MR. POULOS:

18   Q.  This is one of the affidavits that she presented to you,

19   right?

20   A.  Yes.

21   Q.  And do you see that this was on the Rexulti campaign.  Do

22   you see that?

23   A.  I do.

24   Q.  The Rexulti campaign for 2016, correct?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 237 of 310 PageID #:13036
Kazi - cross by Poulos
482

1   Q.  Mr. Kazi, when Liane Pierce explained to you that there

2   were issues with the affidavits, did she explain to you that

3   they had just recently discovered that problem with affidavits

4   as a result of an under-delivery on Rexulti?  Do you remember

5   that at all?

6   A.  I don't.

7           MR. POULOS:  If we could go to the bottom, to page 4,

8   the bottom of page 4, and then I think what we're going to

9   highlight continues on page 5.

10  BY MR. POULOS:

11  Q.  So do you see Item 2 down there below?  It's Rexulti, do

12  you see that?

13  A.  I do.

14  Q.  And here's what she wrote:  "Synopsis.  We contracted for

15  420 waiting room TVs in February, and either inventory or

16  personnel limitations caused us to be well short of that until

17  the program audit performed in July."

18          Do you see that?

19  A.  I do.

20          MR. POULOS:  And if we could continue to the next

21  page.

22  BY MR. POULOS:

23  Q.  And then she explained:  "Actual delivery below.  Our

24  affidavits from finance and the reports to clients did not

25  showcase this shortfall.  Note:  October was a campaign ops

Kazi - cross by Poulos

483

1   error that the client and sales team -- the client and sales

2   team was made aware of on 10/28."  Correct?

3   A.  Yes.

4   Q.  Do you have any recollection of discussions with her about

5   the Rexulti campaign?

6   A.  I do not.

7          MR. POULOS:  Okay.  If we could now go to page 6.

8          If we could blow up the paragraph No. 4 under the

9   heading of Deloitte & Touche audit.

10   BY MR. POULOS:

11   Q.  Do you see that, sir?

12   A.  I do.

13   Q.  I'm going to read this into the record.

14          "On an annual basis, we are required to produce

15   reports for them to showcase that we fulfilled against our

16   contract.  For Gilenya, this is the report that was produced

17   for D&T.  Note the difference between actual, what was

18   provided to the client, and what D&T received."

19          Did I read that part correctly so far?

20   A.  Yes.

21   Q.  Did you understand from Liane Pierce that false

22   information had been reported to Deloitte & Touche, that

23   that's what she was saying here?

24   A.  By reading that, it makes it clear.

25   Q.  Then she goes on to say:  "They," Deloitte, "understand

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 239 of 310 PageID #:13038
Kazi - cross by Poulos
484

1  that our rev rec" -- let me repeat that.  "They understand our

2  rev rec to be based on the eventual delivery of the device

3  count; i.e., we must deliver by end of contract but aren't

4  required to hit the contract device contracts -- to hit the

5  contract device contracts every month."  Correct?

6  A.  That's what she wrote regarding revenue recognition.

7  Q.  Okay.  Did she discuss that with you?

8  A.  I don't remember.

9       MR. POULOS:  Okay.  If we can take that down, please.

10  BY MR. POULOS:

11  Q.  Did you speak with Liane Pierce after meeting with

12  Mr. Shah?

13  A.  Have we spoken since?  Since that meeting?

14  Q.  Yeah -- yes, have you?

15  A.  Yes.

16  Q.  How many times?

17  A.  I can't recall.

18  Q.  I mean, was it a handful or --

19  A.  Fewer than four or five times.

20  Q.  Did you talk to her before -- in the immediate aftermath

21  of your departure from the firm?

22  A.  If I did, it was about what my status was at the company.

23  Q.  Meaning you were leaving?

24  A.  Correct.

25  Q.  Did you have any conversations with Liane Pierce about

Kazi - cross by Poulos

485

 1  whether or not she should report this information to Deloitte?
 2  Did you --
 3  A.  Oh, no, I did not.
 4  Q.  Did she say anything to you about whether she should or
 5  shouldn't report this to Deloitte?
 6          MR. MADDEN:  Objection.  Hearsay.
 7          THE COURT:  Well, first, the question is -- that's a
 8  yes or no.  Then we'll see where we go from there.
 9  BY THE WITNESS:
10  A.  Could you repeat, please?
11  BY MR. POULOS:
12  Q.  Did she say anything to you about whether or not she
13  should report this information that she was providing to you
14  to Deloitte?
15  A.  Not that I recall.
16          THE COURT:  Move on.
17          MR. POULOS:  Nothing further, Your Honor.
18          THE COURT:  All right.  Any additional cross?
19          MS. BELL:  Yes, Your Honor.
20          THE COURT:  All right.
21          You know, we're about ready for the afternoon break.
22  We're going to take it right now, and you can start your cross
23  after we're back.
24          15 minutes, ladies and gentlemen.  Please don't
25  discuss the case among yourselves or with anyone else.

1      COURT SECURITY OFFICER:  All rise.

2        (Jury exits courtroom.)

3      THE COURT:  Okay, sir, you can leave the stand.

4   You're still on cross, so please don't discuss your testimony

5   with anyone.

6      All right.  How long -- we can go off the record.

7        (Discussion held off the record.)

8      THE COURT:  See you in 15 minutes.

9      MR. HANKEY:  We can clear up some exhibit-related

10  items before the next witness comes on.  I think we've got

11  agreement with the defense.

12     THE COURT:  Are there some exhibits you're going to

13  offer there's no objection to?

14     MR. HANKEY:  That's correct.

15     THE COURT:  Why don't you read them off if you've got

16  those numbers.

17     MR. HANKEY:  We can make a reference to what has been

18  filed recently by docket.  It's a long list of exhibits.

19     THE COURT:  Okay.

20     MR. HANKEY:  Do that on the record that way?

21     THE COURT:  Well, we don't have to go through --

22  let's go off the record.

23        (Discussion held off the record.)

24

25

ROUGH DRAFT - CHAMBERS USE ONLY - DO NOT CITE

487

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Kazi - cross by Bell

488

1          (Proceedings heard in open court.  Jury out.)
2              THE COURT:  Ready to proceed?
3              MS. BELL:  Yes, Judge.
4              THE COURT:  Off the record.
5          (Discussion had off the record.)
6          (Jury in at 3:01 p.m.)
7              THE COURT:  All right.  Please be seated.
8              Sir, you can take off your mask.  You're still under
9      oath.
10             And, Ms. Bell, you may proceed with
11     cross-examination.
12             MS. BELL:  Thank you.
13      SAMEER KAZI, DEFENDANT AGARWAL'S WITNESS, PREVIOUSLY SWORN,
14                       CROSS-EXAMINATION
15     BY MS. BELL:
16     Q.  Good afternoon, Mr. Kazi.
17     A.  Good afternoon.
18     Q.  I represent Shradha Agarwal, together with my colleagues
19     over there.
20     A.  Yes.
21     Q.  So when you took the job at Outcome, you had no shortage
22     of other professional opportunities; right?
23     A.  Yes.
24     Q.  In fact, there were two other opportunities that you were
25     considering?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 244 of 310 PageID #:13043
Kazi - cross by Bell
489

1    A.  Correct.

2    Q.  And you were a highly-sought-after professional at that

3    point in time; right?

4    A.  Yes.

5    Q.  Maybe you could tell us just very briefly what those other

6    opportunities were.

7    A.  Well, one of them was an opportunity to start an

8    investment fund with a partner from a private equity firm.

9    And another one was a direct investment and possible operating

10   role we were considering for a buyout.

11   Q.  And at the time, you were in an interim CEO position;

12   right?

13   A.  I was transitioning -- I transitioned out at the end of

14   October, I believe.

15   Q.  Okay.  And it was only interim because you had asked for

16   it to be interim, but they would have liked you to be CEO;

17   right?

18   A.  Yes.

19   Q.  And, in fact, when you left Outcome, that was also the

20   role you stepped into, CEO; right?

21   A.  I stepped into a CEO role, yes.

22   Q.  But back in 2016, you chose to accept the position at

23   Outcome because you were inspired by this vision and their

24   mission; right?

25   A.  Also the fact that it was a Chicago-based company, and I

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 245 of 310 PageID #:13044
Kazi - cross by Bell
490

1    have a soft spot for the growth of technology in Chicago.

2    Q.  And the tech mission of the company was to activate the

3    best possible health outcome for every person, not just across

4    the country, but actually across the world, right, eventually?

5    A.  Yes.

6    Q.  Now, we talked a lot about the growth of the company and

7    the fact that you were hired to help scale the company; right?

8    A.  Yes.

9    Q.  And in particular the kind of -- the employee-based growth

10   that was ongoing at the time; right?

11   A.  I'm sorry, I don't follow that.

12   Q.  In other words, that part of the growth was there was a

13   lot of hiring going on.

14   A.  During the time that I was hired, there were many, many

15   people coming into the company.

16   Q.  And in particular, let's look at Exhibit 8643.  I think

17   you were asked about how many employees.  And, in fact, the

18   company hired its 500th employee, and that coincided with your

19   first week on the job.  Do you remember that?

20              THE COURT:  Any objection to the exhibit?

21              MR. MADDEN:  No.

22              THE COURT:  Admitted without objection.

23              MS. BELL:  Thank you, your Honor.

24        (Exhibit admitted into evidence.)

25   BY MS. BELL:

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 246 of 310 PageID #:13045
Kazi - cross by Bell
491

1  Q.  So let's take a look at this.  Do you see this, it was an

2  e-mail sent on January 16, 2017, sent to everyone?

3  A.  Okay.

4  Q.  Do you see that?  So you would have received that; right?

5  A.  Sure.

6  Q.  And it's entitled, 500 Medians?

7  A.  Yes.

8  Q.  And if we can actually go to the e-mail, it says:  500

9  Medians.  This week is an exciting one filled with many

10  milestones.  First, internally we begin the transition from

11  ContextMedia Health to Outcome Health.

12       Do you recall that branding transition?

13  A.  I do.

14  Q.  Okay.  And Outcome Health tracking, again, the mission of

15  the company, to bring the best possible health outcomes to

16  clients.  Right?

17  A.  Yes.

18  Q.  When and where they need it most, in the physicians'

19  offices.

20  A.  Correct.

21  Q.  Then the e-mail goes on to say:  It is also another type

22  of celebration, on-boarding our 500th and last class of

23  Medians.

24       Medians, meaning, those who were there at the time

25  the company was ContextMedia?

Kazi - cross by Bell

492

1    A.  Yes.
2    Q.  Okay.  We can take that down.  And let's take a look at
3    8500.
4            And I would move that in, your Honor.  I don't
5    believe there is an objection either to that one?
6            THE COURT:  Any objection?
7            MR. MADDEN:  No, your Honor.
8            THE COURT:  It's admitted without objection.
9       (Exhibit admitted into evidence.)
10   BY MS. BELL:
11   Q.  All right.  And this is another e-mail sent here, if we go
12   up on January 15th, again, sent to everyone.
13           Announcement:  Newest ContextMedians.
14           And then if we look down at the list, we see
15   yourself, you're there, second-from-the-bottom, there in New
16   York.  Then we also see a number of other people here.
17           Do you see Parag Vaish, SVP of Product Growth?
18   A.  Yes.
19   Q.  And that's San Francisco Bay area.  Do you see that?
20   A.  I do.
21   Q.  And I think you had mentioned that you were familiar with
22   or you knew that there were two offices.  It was Chicago,
23   right, that was the headquarters?
24   A.  Yes.
25   Q.  New York, where the sales operations were run; right?

Kazi - cross by Bell

493

1   A.  Yes.

2   Q.  And then in addition, there were plans to open a San

3   Francisco office; right?

4   A.  I vaguely remember that.

5   Q.  Okay.  And, in fact, Mr. Vaish was hired to build a

6   substantial engineering team in San Francisco; right?

7   A.  I can't recall.

8   Q.  He started together with you in your same class; right?

9   A.  Yeah.  We didn't interact very much.

10  Q.  Okay.  But there is an orientation process and then a

11  whole on-boarding process; right?

12  A.  Yeah.  I can't remember it, but, yes, there was.

13  Q.  Understandably.  It's been a while.  But let's see if this

14  jogs your memory.

15          He was actually tasked -- one of his priorities was

16  to build the campaign operation's infrastructure with Liane

17  Pierce and Adam Prowker.  Do you remember that?

18  A.  I do not.

19  Q.  Okay.  And then here we've also got, for example, Trecia

20  Curtis, who was hired at the same time as you as a senior

21  campaign operation specialist.  Do you recall her?

22  A.  I do not.

23  Q.  Okay.  All right.  We can move on from that.

24          All right, sir.  So with -- in terms of Ms. Agarwal,

25  your interactions with her were likewise very brief; right?

1    A.  They were.

2    Q.  Okay.  So there were basically a total of two meetings

3    with Ms. Agarwal, an interview prior to your getting the job

4    offer, and then a second meeting during your time at the

5    company.  Right?

6    A.  As best as I can recall, yes.

7    Q.  Okay.  So in terms of the interview process, do you recall

8    that you talked about the fact that your family is from

9    Hyderabad and that Ms. Agarwal is also from India?

10   A.  My wife's family is from Hyderabad.

11   Q.  Okay.

12   A.  But I don't recall that conversation.

13   Q.  Okay.  All right.  And do you recall talking about your

14   backgrounds, your respective backgrounds a bit?

15   A.  I don't recall, but it wouldn't be out of character to do

16   that.

17   Q.  Okay.  Do you recall that Ms. Agarwal told you that she

18   came to the United States to study broadcast journalism at

19   Northwestern?

20           MR. MADDEN:  Objection, your Honor.  Relevance.

21           THE COURT:  Well, let's go to sidebar.

22        (Proceedings heard at sidebar.)

23           THE COURT:  What is the -- well, first, what's the

24   relevance?  But if the witness doesn't recall --

25        (Technical difficulties.)

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 250 of 310 PageID #:13049
Kazi - cross by Bell
495

1           THE COURT: Okay.  What is the relevance?  And then if

2     the witness doesn't recall specific conversations about

3     background, what is the point of putting it all into a

4     question for him to say I don't recall --

5           MS. BELL:  Sorry, your Honor, is the Court speaking?

6     We can't --

7           THE COURT:  You can't hear me?

8           MR. MADDEN:  We can.

9           THE COURT:  Government can.  Try one of the -- is it

10    unplugged?  Can you hear me?  All right.  Let's try one of

11    those.  Okay.  Can you hear me now?  Just get to a mic.

12          All right.  The question is, one, what is the

13    relevance; and, two, if the witness doesn't recall having

14    conversations about this other than maybe we would have talked

15    about it, this doesn't seem anything more than an effort to

16    get in the background of the defendant in a question for the

17    witness to say, I don't remember.

18          MS. BELL:  Very well, your Honor.  The witness did

19    say, and he certainly -- the prior statements reflect that

20    there was a discussion about background as to Mr. Purdy --

21    well, I won't go on.  But I do have a basis for asking the

22    questions, but I can move on.

23          THE COURT:  Well, if the basis is your client telling

24    you that --

25          MS. CHOU:  Your Honor, none of the headphones on our

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 251 of 310 PageID #:13050
Kazi - cross by Bell
496

1    table are working.

2              THE COURT:  Okay.  Then I'm going to ask Sydney to

3    check with Emily to see if they can help on that.

4              But the objection is sustained.

5              MS. BELL:  Very well, your Honor.

6         (End of sidebar proceedings.)

7              THE COURT:  The objection was sustained.  Go ahead.

8    BY MS. BELL:

9    Q.  Okay, sir.  Now, did you discuss -- or do you recall

10   discussing, in the course of your interviews, the impetus, the

11   motivation for founding the company?

12   A.  I do remember talking about the founding story.

13   Q.  Okay.  And do you recall that the founding story was that

14   Ms. Agarwal had a passion for healthcare that was personal in

15   nature based on her family members?

16   A.  Vaguely.

17   Q.  Okay.  And do you recall in particular that Ms. Agarwal

18   had family members in India who had suffered from --

19             MR. MADDEN:  Objection, your Honor.

20             THE COURT:  Beyond the "vaguely," do you remember any

21   of the details about her personal history that caused

22   Ms. Agarwal to become involved in starting this company?

23             THE WITNESS:  I do not.

24             THE COURT:  All right.  Move on.

25   BY MS. BELL:

1   Q.  Do you remember, sir, that the takeaway from this was the
2   need to provide patients with healthcare information at a time
3   when they could make informed decisions about their care at
4   the doctor's office?
5   A.  Hard to separate that from the conversation and the
6   mission of the company.
7   Q.  Okay.  But did you understand, based on your conversation
8   with Ms. Agarwal in the course of that interview process, that
9   this was a -- there was a personal motivation for the concept
10  behind the company?
11  A.  I don't recollect that.
12  Q.  Okay.  Now, turning to Ms. Agarwal's roles, I believe
13  yesterday you testified that her role at the time you joined
14  was specifically overseeing content production for the
15  information that the company presented in physicians'
16  offices --
17  A.  I remember that.
18  Q.  -- on the devices.  Okay.  And I think we talked about in
19  the -- or you've talked about in the course of the prior
20  examinations that there were three products that the company
21  had at the time you joined?  There were the screens; right?
22  A.  Yes.
23  Q.  The screens in the waiting room?
24  A.  Yes.
25  Q.  And then there were the tablets that actually allowed

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 253 of 310 PageID #:13052
Kazi - cross by Bell
498

1    patients back in the exam rooms to pick up a tablet; right?
2    A.  Yes.
3    Q.  And interact with the tablet?
4    A.  Correct.
5    Q.  And then there were these wallboards which were also
6    interactive; right?  You could touch them and different
7    content would come up?
8    A.  Yes.
9    Q.  Okay.  So I'd like to just play a little demonstrative,
10   it's very short for the jury, to showcase these products.
11          And this would be 8646, your Honor.  And there is no
12   objection to this, move it in.
13          THE COURT:  All right.  This is admitted without
14   objection.
15       (Exhibit admitted into evidence.)
16          THE COURT:  Is there sound on this, or no?
17          MS. BELL:  There is.  I think it's some music.  We
18   can put the music on.
19          THE COURT:  Oh, if it's just music.
20       (Video played in open court.)
21   BY MS. BELL:
22   Q.  Okay.  So going back to Ms. Agarwal's role, your
23   understanding was that she was actually in charge of that
24   content that would come up on the screen overseeing the
25   development of that content?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 254 of 310 PageID #:13053
Kazi - cross by Bell
499

1  A.  Yes.

2  Q.  Okay.  And that would include, for example, identifying

3  needs for the content; right?

4  A.  Sure.

5  Q.  And also creating the content and editing the content?

6  A.  Yes.

7  Q.  Okay.  And do you recall that that wallboard product at

8  the end where the doctor was actually interfacing with the

9  screen, that was a new product that had come out in 2016?

10 A.  Vaguely.

11 Q.  And it was exciting because it also was doctor-facing as

12 well as patient-facing?

13 A.  Yes.

14 Q.  So there was a lot of new work to be done to develop the

15 content for the doctors in terms of the anatomical modeling to

16 be able to show patients exactly, you know, what was going on.

17 A.  Okay.

18 Q.  That's a question.

19 A.  Oh.

20 Q.  Do you recall that?

21 A.  I don't recall that specifically.

22 Q.  Okay.  Now, in your direct today, in terms of Ms.

23 Agarwal's additional roles, you testified that you had assumed

24 that Ms. Agarwal, in addition to Mr. Shah, came up with

25 Outcome sales ideas, and that you made that assumption due to

Kazi - cross by Bell

500

1    her title as co-founder.

2    A.  Yes.

3    Q.  Do you remember that?

4    A.  I do.

5    Q.  And I just want to be absolutely clear.  You don't have

6    any personal knowledge that Ms. Agarwal was involved in sales

7    ideas; right?

8    A.  That is correct.

9    Q.  Or any other sales function; right?

10   A.  Correct.

11   Q.  Okay.  And, in fact, you previously told the government or

12   discussed the government -- well, let me ask you this:

13          Do you recall that Ms. Agarwal was also involved in

14   additional roles at the time you joined?

15   A.  I don't recall.

16   Q.  Okay.  And in -- let me ask you specifically, do you

17   recall that Ms. Agarwal was also in charge of marketing,

18   products and engineering?

19   A.  I don't.

20   Q.  Okay.  Why don't we take a look at -- let me see if I can

21   refresh your recollection with this.  This would be

22   Exhibit 5652.

23          THE COURT:  Are you seeking its admission?

24          MS. BELL:  No, we'll go ahead and just put this up on

25   the screen.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 256 of 310 PageID #:13055
Kazi - cross by Bell
501

1         This is the second page, Laura.  If we could put that

2    up just for the witness.

3    BY MS. BELL:

4    Q.  So, Mr. Kazi, you do remember being interviewed by the

5    government back in December of 2017?

6    A.  I remember that I had an interview with the government,

7    yes.

8    Q.  Okay.  And let's see if this refreshes your recollection

9    about what you told the government regarding Ms. Agarwal's

10   roles.  And, let's see, if you could just direct your

11   attention to the third paragraph, very last sentence at the

12   bottom.

13        Do you see that, sir?

14   A.  I do.

15   Q.  Does that refresh your recollection about what you told

16   the government?

17   A.  I'm sure that's what I understood at the time.

18   Q.  Okay.  And so, in fact, sitting here today, now, do you

19   have a recollection that Ms. Agarwal was, in fact, involved or

20   that you told the government that Ms. Agarwal was involved in

21   marketing products and engineering?

22   A.  No.

23        MS. BELL:  Do we have a stipulation?

24        MR. MADDEN:  Yes.

25        MS. BELL:  Okay.

Kazi - cross by Bell

502

1       THE COURT:  All right.  Why don't you just state what

2   it is.

3       MS. BELL:  Okay.

4   BY MS. BELL:

5   Q.  So you did tell the government that Ms. Agarwal was in

6   charge of marketing, products and engineering?

7   A.  Apparently.

8   Q.  And --

9       THE COURT:  Hang on.

10      MR. MADDEN:  We stipulate to that.  The witness says

11  he doesn't recall, but we stipulate.

12      THE COURT:  Yeah.  In an interview in December of

13  2017, he said that to the government, in an interview.

14      So stipulated?

15      MR. MADDEN:  So stipulated.

16      THE COURT:  Very good.  Move on.

17      MS. BELL:  Thank you.

18  BY MS. BELL:

19  Q.  In addition, you told the government that Mr. Desai was in

20  charge of pharmaceutical sales; right?

21  A.  Yes.

22  Q.  And let's just flush out a little more marketing products

23  and engineering.  So marketing, at the time you joined, one of

24  the big things was this re-branding, do you remember that,

25  where ContextMedia was being re-branded as Outcome?

1    A.  I do remember that.

2    Q.  Okay.  So there was a lot of work involved in that; right?

3    A.  Yes.

4    Q.  Okay.  And do you recall, does that refresh your memory

5    about Ms. Agarwal's role in connection with marketing, that

6    she had a major role in that re-branding?

7    A.  It does not.

8    Q.  Okay.  Now, product and engineering, that was both the

9    hardware and the software; right?  So it would have been --

10   kind of overseeing that area would be both the screens but

11   also the software programs necessary to generate all of that

12   content that we saw on the screens in the video; right?

13   A.  Yes.

14   Q.  Okay.  And do you recall, does that -- do you recall

15   Ms. Agarwal's role in that context, in the context of the

16   software and the hardware?

17   A.  I don't recall it sitting here right now.

18   Q.  Okay.  What about Ms. Agarwal's role in hiring and

19   development?  That that was a major -- she was assisting you,

20   for example, in the recruitment of an executive assistant

21   and -- do you recall that?

22   A.  I do not.

23   Q.  Okay.  It was a long time ago, so.  Just trying to see if

24   this jogs your memory.

25           And finally, with the office build-outs, that was

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 259 of 310 PageID #:13058
Kazi - cross by Bell
504

1   another major component of her work.  Do you remember that?

2   A.  I do not.

3   Q.  Okay.  And in the context specifically of New York and New

4   York with the merger that we saw -- or not the merger, but the

5   acquisition of AccentHealth, does that jog your memory at all

6   about --

7           MR. MADDEN:  I'm going to object, your Honor.  He

8   said he doesn't recall these roles, so I don't know why we're

9   going over all the details.

10          THE COURT:  Yeah, I think you've exhausted his memory

11  on this.

12          Do you remember anything about these roles beyond

13  what you've already talked about?

14          THE WITNESS:  I do not.

15          THE COURT:  All right.  New topic, then, please.

16          MS. BELL:  Understood, your Honor.

17  BY MS. BELL:

18  Q.  Could we just go back very briefly to an exhibit that's

19  already in evidence.  That's 10046.

20          Okay.  Sir, and you may recall being asked about this

21  previously today, but if you look down at the very bottom --

22  so this is about the executive team meeting.  And then if you

23  see that there were certain topics assigned to Shradha.  The

24  first bullet, we talked about that, the new brand.  And then

25  the second from the bottom, communications, re West Coast

Kazi - cross by Bell

505

1  expansion.  Do you recall that in connection with Mr. Vaish,

2  who we already spoke about, that there was -- we talked about

3  the plans to open the San Francisco office?

4  A.  I vaguely remember there was a plan to open up a San

5  Francisco office.

6  Q.  Okay.  And do you recall Ms. Agarwal's involvement in

7  that?

8  A.  I do not.

9  Q.  Okay.  So moving on from the interview, you met with

10  Ms. Agarwal on January 19th.  Do you recall that?

11  A.  Yes.

12  Q.  And if we could just pull up the calendar.  That's

13  Exhibit 1118.

14       Okay.  And so January 19th, that's a Thursday; right?

15  A.  Yes.

16  Q.  And that was the day before your meeting with Mr. Prowker

17  and Ms. Pierce; right?

18  A.  Correct.

19  Q.  Okay.  And you testified previously that there were

20  basically kind of two topics that you remember discussing

21  during that meeting.  And one was trying to gain an

22  understanding of what Ms. Agarwal's understanding was about

23  the state of the inventory; right?

24  A.  Yes.

25  Q.  And the second was just trying to kind of discuss the

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 261 of 310 PageID #:13060
Kazi - cross by Bell
506

1   related need to have a system in place so that there could be

2   realtime information about the data.

3   A.  Yes.

4   Q.  Do you remember that?  Okay.

5          And what your takeaway from that discussion was that

6   Ms. Agarwal did not understand the state of the inventory;

7   correct?

8   A.  Correct.

9   Q.  And she believed that Ashik Desai knew the available

10  inventory information for the company; right?

11  A.  That's correct.

12  Q.  And at the time, that made sense to you, given

13  Ms. Agarwal's role and her focus, which was on these other

14  areas we've discussed; right?

15  A.  Yes.

16  Q.  And you were concerned, however, that contrary to the

17  understanding that Ms. Agarwal had expressed to you, that --

18  that Mr. Desai, in fact, did not have the real inventory data

19  information?

20  A.  He did not.

21  Q.  And you did also, with regards to the systems, your

22  impression was that Ms. Agarwal believed that there was

23  movement towards trying to improve the systems for

24  understanding data in realtime.  And we've talked a lot about

25  that today.

Kazi - cross by Bell

507

```
 1   A.  Yes.
 2   Q.  And that her impression was that the responsibility for
 3   that was spread across various different groups at the
 4   company; right?
 5   A.  Yes.
 6   Q.  And you also came away with the impression that she did
 7   acknowledge that there was room to improve, they were working
 8   on it; right?
 9   A.  Yes.
10   Q.  And she specifically identified some of the efforts that
11   she thought were in progress; right?
12   A.  Yes.
13   Q.  Okay.  So, for example, she talked to you about the fact
14   that Vishal Patel, he was the director of finance; right?
15   A.  Yes.
16   Q.  Was working on an inventory project at the time?
17   A.  I can't recall exactly, but that makes sense that she may
18   say something like that.
19   Q.  Okay.  But you remember generally her identifying, at
20   least from her perspective, from her vantage point, some of
21   the initiatives she thought were in process; right?
22   A.  Yes.
23   Q.  Okay.  But from your perspective, with your background and
24   experience, you didn't feel that that was sufficient; right?
25   A.  Yeah, I actually don't believe that any of those
```

Kazi - cross by Bell

508

1  initiatives were really in play.

2  Q.  Okay.  Well, you don't -- going back to your conversation

3  with her, right, you didn't tell her:  I don't think any of

4  those initiatives were in play.  Right?

5  A.  I believe I mentioned to her that we needed a centralized

6  mode of getting to the bottom of the answers around inventory.

7  Q.  And she absolutely agreed with you that getting accurate

8  data on the company's inventory was important; right?

9  A.  She did.

10  Q.  Critical; right?

11  A.  Yes.

12  Q.  And she absolutely shared that goal to make sure that the

13  data available was accurate but also comprehensive; right?

14  A.  Yes.

15  Q.  Okay.  And, in fact, that was part of your role and why

16  you were there; right?

17  A.  It was unclear that it was my role, specifically because

18  of how far-reaching -- how many fingers were in the inventory

19  pot at the time.

20  Q.  Okay.  And she acknowledged that there were lots of people

21  working on this problem, right --

22  A.  She did.

23  Q.  -- trying to tackle it from different angles?  Okay.

24        And you said that you -- actually, on direct you

25  mentioned that you had actually proposed that maybe you could

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 264 of 310 PageID #:13063
Kazi - cross by Bell
509

1    have a role in spearheading the work on this; right?

2    A.  Yes.

3    Q.  And she certainly didn't say she thought that was a bad

4    idea; right?

5    A.  She did not.

6    Q.  Okay.  So -- but you knew that that was something you

7    would have to discuss with Mr. Shah because you were his

8    direct report, right -- or he was your direct report?

9    A.  Correct.

10   Q.  Okay.  All right.  So you discussed a bit about --

11   actually, let's go to Exhibit 747, if we could.  And this is

12   something -- this is a Voxer which you were played in your

13   meeting with the government on January 23rd, 2017.  And you

14   also heard this, or at least saw a transcript of it at the

15   time of your deposition.

16          So I think we can just actually put up the transcript

17   for this, Laura.

18          THE COURT:  Any objection to this?

19          MR. MADDEN:  No, your Honor.

20          THE COURT:  It's admitted without objection.

21      (Exhibit admitted into evidence.)

22          MS. BELL:  It's 747B.

23          MS. DOMINIAK:  I don't have 747B.

24          MS. BELL:  This is Government Exhibit 747, Voxer, and

25   there should be a transcript B.

Kazi - cross by Bell

510

1          THE COURT:  It's up.

2    BY MS. BELL:

3    Q.  Okay.  Excellent.  All right.

4          So just to orient us all, so this is -- was a Voxer

5    from Ms. Agarwal to Mr. Shah on January 23, 2017.  And if we

6    can just scroll down, let me see the exact line, to line 14

7    and all the way through 21, please.

8          Okay, sir.  So just to kind of set the stage, this is

9    a Voxer, and you may recall it, that Ms. Agarwal sent to

10   Mr. Shah following a weekly meeting with Madan Nagaldinne, who

11   we've talked about, after you had discussed preliminarily some

12   of your concerns with Mr. Nagaldinne.  Okay?

13         Do you recall hearing this Voxer when you met with

14   the government on January 23rd?  I'm sorry, on --

15   A.  I do.

16   Q.  Okay.  January --

17         MR. MADDEN:  I'm going to object under rule of

18   completeness, your Honor, to show the earlier lines that

19   precede this.

20         MS. BELL:  We can certainly play the whole Voxer, but

21   my question relates to that particular section.  So if you

22   prefer, we can go ahead and play the whole --

23         THE COURT:  Yeah, you have no objection to the whole

24   thing?

25         MR. MADDEN:  No, your Honor.

Kazi - cross by Bell

511

1      THE COURT:  I can't judge whether or not -- is there

2   a part of this, or do you want the whole thing?

3      MR. MADDEN:  It's probably easier to play the whole

4   thing.  It's only a couple minutes, I think.

5      THE COURT:  Is there a recording of it?

6      MS. BELL:  There is.  And just to orient everyone,

7   the jury heard this in opening from Mr. Lowder, so we can go

8   ahead and play this.

9      THE COURT:  Okay.  All right.

10      (Video played in open court.)

11   BY MS. BELL:

12   Q.  Okay.  So you never spoke with Ms. Agarwal directly, you

13   never told her about your conversation with Mr. Prowker and

14   Ms. Pierce; correct?

15   A.  Correct.

16   Q.  And as we looked at the calendar, in fact, when you met

17   with Ms. Agarwal, you hadn't even met with them yet, it was

18   the day before; right?

19   A.  Correct.

20   Q.  And after you met with Ms. Agarwal on January 19th, you

21   had no other further substantive conversations with her;

22   right?

23   A.  Correct.

24   Q.  Okay.  So this is kind of like a game of telephone, right,

25   where she's not getting the information directly from you,

Kazi - cross by Bell

512

1    she's getting it through someone else; right?

2    A.  Yes.

3    Q.  And, in fact, you don't recall communicating the belief

4    that the company was running an unethical business; right?

5    A.  To whom?

6    Q.  You don't remember communicating that to Mr. Nagaldinne

7    when you spoke to him; right?

8    A.  That's right.  I don't remember that.

9    Q.  Okay.  And, in fact, you pulled him aside when you crossed

10   paths in the hallway to have this conversation; right?

11   A.  We had a sit-down, yes.

12   Q.  Okay.  But it was in the hallway where you crossed paths

13   and you pulled him -- pulled him aside; right?

14   A.  Into a room, yeah.

15   Q.  It was kind of impromptu.

16   A.  Yes.

17   Q.  Okay.  So now if we could put the transcript back up,

18   747B.  And if we could go back to that middle section, lines

19   14 through 21.  Okay.  And do you see that where Ms. Agarwal

20   tells Mr. Shah:

21           It might be something that we really need to take a

22   strong stance on and give Sameer the mandate, and maybe even

23   saying in two weeks you have got to clean this up and show us

24   fully transparent inventory, which is why you are here, and

25   making sure, you know, we have the sales OP function and

Kazi - cross by Bell

513

1   everything operating in a check and balance, which, again, is

2   why we are making all of these moves.

3          Do you see that?

4   A.  I do.

5   Q.  Okay.  And do you recall discussing that mandate with

6   Ms. Agarwal in your meeting?

7   A.  I don't recall.

8   Q.  Okay.  But that's certainly consistent with your

9   understanding of your position and why you were hired; right?

10  A.  No, it's not.

11  Q.  All right.  So you don't remember discussing that at all

12  with her?

13  A.  I don't.  And I wasn't hired to clean up a bunch of

14  inconsistencies in the business.

15  Q.  But you were hired to address operational problems; right?

16  We've talked about that.

17  A.  I was hired to run operations, not to necessarily address

18  a slate of operational issues that were pre-existing at the

19  company.

20  Q.  You were generally hired to deal with everything after

21  sales; right?

22  A.  Correct.

23  Q.  You were at the top of that --

24  A.  Yes.

25  Q.  -- division?  And under that division, you had lots of

1  people helping you like Liane Pierce and Adam Prowker; right?

2  A.  Correct.

3  Q.  Okay.  We can take that down.

4          So we went through several different examples of all

5  of the various different meetings and efforts there were to

6  align information and coordinate amongst teams.  Okay?  So,

7  for example, Mr. Poulos showed you some exhibits regarding the

8  Commercial Solutions team.  Do you recall that -- the

9  Commercial Solutions cabinet meeting, for example?

10  A.  I recall him showing me a document with that on it.

11  Q.  Okay.  Let's go to another example of one of these

12  documents.  But let me back up a second.

13          During your first week, you had a whole structured

14  set of coordinated meetings and on-boarding; right?

15  A.  Yes.

16  Q.  And they scheduled for you a whole host of meetings with

17  different functional leaders; right?

18  A.  Yes.

19  Q.  And you also received weekly reports from various teams;

20  right?

21  A.  I recalled receiving one of those reports.

22  Q.  Okay.  So why don't we take a look at 8640.

23          THE COURT:  Any objection?

24          MR. MADDEN:  No, your Honor.

25          THE COURT:  It's admitted without objection.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 270 of 310 PageID #:13069
Kazi - cross by Bell
515

1    (Exhibit admitted into evidence.)

2    BY MS. BELL:

3    Q.  Okay.  So is this an example of the one of these e-mails

4    that you recall getting?  We can look at the top line here.

5    January 16th, sent to the leaders.

6    A.  I don't recall receiving this e-mail.

7    Q.  Okay.  But you would have gotten it as one of the leaders;

8    right?

9    A.  Assuming that I was part of that e-mail --

10    Q.  Okay.

11    A.  -- group.

12    Q.  And let's look down to the data warehouse setup, data

13    management and analytics, and specifically data warehouse

14    setup.  And you see there:

15         We're confirming the device actuals reporting is

16    providing the needed data for monthly billing.  We're focused

17    on the transition this week but have the plan together for

18    switching back to the actual data warehouse project we

19    postponed for the device actuals reporting needs.  We'll be

20    determining if and when we'll have available resources beyond

21    the maintenance work while we rebuild the data management

22    team.

23         So this was just another example of a whole host of

24    different e-mails that you were getting in an effort to kind

25    of coordinate and align communication amongst the various

Kazi - cross by Bell

516

1  groups that were working on these problems; right?

2  A.  I don't recall getting this e-mail.

3  Q.  Okay.  Let's actually scroll down to communication, which

4  is a little further on this e-mail.  The next page, I believe.

5  Okay.

6        MR. MADDEN:  I'm going to object, your Honor.  This

7  witness doesn't recall receiving this e-mail.

8        THE COURT:  It's in evidence.  I suppose it's proper

9  to ask questions about it if -- but --

10        MS. BELL:  Understood, your Honor.

11        THE COURT:  If he has never seen it before, all he's

12  going to be doing is reading something that's already in

13  evidence.

14        MS. BELL:  Understood.

15  BY MS. BELL:

16  Q.  Do you see there it says:

17        We'll be setting a monthly leadership review meeting

18  for the road project -- product road map and we'll be inviting

19  you to the biweekly sprint review and demo sessions to give

20  those interested a visual look into what's being accomplished

21  in each two-week sprint and how each project is progressing.

22  A.  I see it.

23  Q.  Okay.  And do you remember the monthly leadership review

24  meeting?

25  A.  I do not.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 272 of 310 PageID #:13071
Kazi - cross by Bell
517

1   Q.  Okay.  You do remember a Town Hall meeting; right?  That
2   was -- you mentioned that in your prior testimony?
3   A.  Yes.
4   Q.  Okay.  And that was on January 19th, the same day you met
5   with Ms. Agarwal.  Do you remember that?
6   A.  I actually don't remember when it was, but, okay.
7   Q.  Okay.  And you were actually introduced.  You introduced
8   yourself and spoke about your role and your vision a bit;
9   right?
10  A.  Yes.
11  Q.  Okay.  And the Town Hall was a weekly, all-employee
12  meeting, where leadership shared updates; right?
13  A.  I believe so.
14  Q.  Okay.  And the updates would include things like the
15  product improvements, such as the wallboards we talked about,
16  growth goals, and new hires; right?
17  A.  Ostensibly.
18  Q.  Well, do you remember that from your experience?  I know
19  you were --
20  A.  I attended one -- one meeting.
21  Q.  Okay.  One.  One meeting.  And do you recall that there
22  was also a forum for -- a question-and-answer forum from
23  employees?
24  A.  I don't recall that.
25  Q.  Sir, just to close this out -- and thank you for your time

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 273 of 310 PageID #:13072
Kazi - redirect by Madden
518

1    and your efforts to remember -- you did not at any point learn

2    that Ms. Agarwal was involved in efforts to give false

3    inventory estimates to customers; right?

4    A.  Correct.

5    Q.  You didn't at any point learn that she was involved in any

6    efforts to change IMS, ROI numbers; right?

7    A.  Correct.

8    Q.  You didn't learn that there was anything unethical that

9    Ms. Agarwal was personally involved in as it relates to the

10   operations of the business at all; right?

11   A.  Correct.

12   Q.  And, in fact, you have no concerns about any unethical

13   conduct involving Ms. Agarwal of any kind; right?

14   A.  I do not.

15           MS. BELL:  Nothing further, your Honor.

16           THE COURT:  All right.  Redirect examination.

17           MR. MADDEN:  Thank you, your Honor.

18                     REDIRECT EXAMINATION

19   BY MR. MADDEN:

20   Q.  Hello again, Mr. Kazi.

21   A.  Hello.

22   Q.  You were asked a number of questions during

23   cross-examination about operational challenges at Outcome

24   Health based on at least one exhibit that was shown to you.

25           Do you recall that line of questioning?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 274 of 310 PageID #:13073
Kazi - redirect by Madden
519

1   A.  I do.

2   Q.  Are lies to clients operational challenges?

3   A.  Pardon me?

4   Q.  Are lies to clients operational challenges?

5   A.  Yes.

6   Q.  What about manipulating ROI reports?

7   A.  Absolutely.

8   Q.  Are sending false affidavits to clients operational

9   problems?

10  A.  Much more than just an operational problem.

11  Q.  Could we pull up Government Exhibit 747.

12          And, your Honor, at this time, I don't think it's in

13  evidence, but the government will move it into evidence.

14  That's the Voxer that was just played by Ms. Agarwal's

15  attorney.

16          THE COURT:  I thought it was in evidence.

17          It was offered; correct?

18          MS. BELL:  Yes, your Honor.

19          MR. MADDEN:  I may have missed that.  Okay.

20          THE COURT:  It's in evidence.  You can just play it.

21  Hang on, let me just switch over to the --

22          MR. MADDEN:  The transcript, please.  Could you blow

23  up the top half of this, approximately.

24  BY MR. MADDEN:

25  Q.  What was the date of this Voxer, Mr. Kazi?

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 275 of 310 PageID #:13074
Kazi - redirect by Madden
520

1   A.  January 23, 2017.

2   Q.  Where does this fall in relation to the meeting that you

3   had with Prowker and Pierce and then your subsequent meeting

4   with Shah?

5   A.  It was in between the two.

6   Q.  There is a reference to, on line 2 to Madan, M-a-d-a-n.

7   Who is that?

8   A.  He's the Chief People Officer.  Was.

9   Q.  You mentioned him during your direct examination; correct?

10  A.  I did.

11  Q.  What did you -- why did you mention him?

12  A.  I forgotten the reference to what I made earlier, but.

13  Q.  Was he the person that you mentioned what you were going

14  to talk to Shah about?

15  A.  He --

16  Q.  After your meeting with Prowker and Pierce?

17  A.  I did, yes.

18  Q.  And what does this suggest about whether or not Shah was

19  informed of what you wanted to raise with him?

20  A.  He was informed.

21  Q.  And according to this, at line 5 to 6, it says:  You were

22  visibly shaken up and said that the company was operating

23  unethical business.  Correct?

24  A.  That's what it states.

25  Q.  Was Outcome operating an unethical business?

Kazi - redirect by Madden

521

 1          MS. BELL:  Objection, your Honor.  Asked and
 2   answered.
 3          THE COURT:  Overruled.
 4   BY THE WITNESS:
 5   A.  There were aspects of the business that were not ethically
 6   correct.
 7   BY MR. MADDEN:
 8   Q.  And this -- directing your attention to lines 7 to -- 7 to
 9   8, there is a reference to Ashik changing numbers.  Is that
10   consistent with what Prowker and Pierce had told you?
11   A.  Yes.
12   Q.  And could you go to the middle of part of this, maybe
13   lines 10 to 25, or so, including below here.
14          And after the reference to Ashik changing numbers,
15   I'm going to direct your attention to lines 11 to 13, where
16   Madan says:  This is not the first time that you and I have
17   heard that feedback and that David Jundt told everybody the
18   reason he quit was because he saw Ashik doing this at the Eli
19   meeting -- Eli Lilly meeting.
20          When you talked to Shah on January 25th and raised
21   the fact that the ROI reports were being manipulated, did he
22   say, this is not the first time I've heard about this?
23   A.  I don't recall him saying that exactly.
24   Q.  Did he indicate whether or not he knew -- knew it already,
25   though?

Kazi - redirect by Madden

522

1  A.  He knew about it.

2  Q.  If we could go to the last -- the next page, please.

3  Second page of this document.  And could you just blow up that

4  text there.

5        There is a reference to Liane and Adam on line 29.

6  Who are they?

7  A.  They're my direct reports when I was at Outcome Health.

8  Q.  Is that Liane Pierce and Adam Prowker?

9  A.  Yes.

10 Q.  Who were -- were they the ones who you met with and they

11 raised these issues with you?

12 A.  They did.

13 Q.  You can take this down, please.

14        Mr. Shah's attorney asked you a number of questions

15 suggesting that you had a steep learning curve when you

16 arrived at Outcome.  Do you remember those questions?

17 A.  I remember him saying that.

18 Q.  You had worked at other companies, though, before you

19 started there; correct?

20 A.  Just a few.

21 Q.  Approximately how much work experience did you have before

22 you arrived at Outcome, just in terms of years, approximately?

23 A.  20 years.

24 Q.  Had you been a senior executive at a number of companies,

25 including a CEO, before you arrived at Outcome?

Kazi - redirect by Madden

523

1  A.  Yes.

2  Q.  Were you familiar with contracting with clients?

3  A.  Very much so.

4  Q.  Were you familiar with delivering on contracts?

5  A.  Absolutely.

6  Q.  Were you familiar with billing clients for things that

7  were actually delivered?

8  A.  Yes.

9  Q.  In your experience, is it normal to bill clients for

10  something that's not delivered?

11  A.  It depends on the context of the contract.

12  Q.  If -- is it -- is it normal to bill clients for something

13  that is never delivered?

14  A.  It is --

15        MR. POULOS:  Your Honor, I'm going to object to this

16  type of testimony.

17        THE COURT:  Overruled.

18  BY THE WITNESS:

19  A.  Do you mind repeating?

20  BY MR. MADDEN:

21  Q.  I'll ask you another question.

22        You said that you're familiar with billing clients

23  for things that are actually delivered; correct?

24  A.  Yes.

25  Q.  Is it -- is it normal to bill clients -- is it normal to

Kazi - redirect by Madden

524

1  overbill clients?

2  A.  It is not.

3  Q.  Was there any steep learning curve that you had at Outcome

4  to know that?

5  A.  No.

6  Q.  Is it normal to lie to clients?

7  A.  It is not.

8  Q.  Is it normal to manipulate data that's delivered directly

9  to clients?

10  A.  Absolutely is not.

11  Q.  Did you have any steep learning curve with those

12  principles when you arrived at Outcome?

13  A.  I did not.

14  Q.  Did you know that before you became the COO of Outcome?

15  A.  I did.

16  Q.  When you met with Shah on January 25th, did he respond to

17  you in a way that you'd expect a CEO to respond to those types

18  of concerns?

19  A.  Absolutely not.

20  Q.  Why not?

21  A.  Why did he not?

22  Q.  In what way?  In what way?

23  A.  Oh.  When faced with this sort of information, whether one

24  knows about it or not --

25           MR. HUESTON:  Objection.  I'm going to object.  This

1  is either expert testimony or speculation about what Mr. Shah
2  said.
3        THE COURT:  I don't think he was asking why Mr. Shah
4  didn't say anything.  I understood the question to be
5  clarified as saying why he was -- what he had expected.  And I
6  think that's proper in the context of the cross-examination.
7        Go ahead and answer.
8  BY THE WITNESS:
9  A.  When faced with the types of issues that I brought up with
10 Mr. Shah in that meeting, my expectation would have been the
11 CEO would have very clearly stated how severe and serious
12 these issues were, how detrimental they could be to the
13 business, and how urgently we needed to go and address and
14 remediate these issues.  And then whether it was to me or
15 someone else in the company, or even to themselves, give a
16 very clear mandate that they needed to be fixed.
17 Q.  Did Shah do any of that?
18 A.  He did not.
19 Q.  Shah's attorney also asked you questions about whether or
20 not you e-mailed those -- those support items that Prowker and
21 Pierce had sent to you, whether or not you e-mailed those to
22 Rishi Shah.  Do you remember that?
23 A.  Yes.
24 Q.  If Shah had asked you for the supporting data that you had
25 on the computer, would you have e-mailed it to him?

1  A.  Gladly.

2  Q.  Would you have turned -- opened your laptop and shown it

3  to him at that meeting?

4  A.  Absolutely.

5  Q.  Was that one of the reasons you brought your laptop with

6  you?

7  A.  Yes.

8  Q.  Was that why you asked Prowker and Pierce to provide you

9  with the support?

10  A.  Exactly, yes.

11  Q.  Mr. Shah's lawyer also asked you, after you left, did

12  you -- after you left Shah's apartment, did you e-mail him the

13  data.  Do you remember those questions?

14  A.  I do.

15  Q.  Was it possible for you to e-mail -- access an Outcome

16  Health e-mail account after you left?

17  A.  It was not.

18  Q.  In whose possession did you leave your laptop?

19  A.  With Mr. Shah.

20  Q.  There were also questions asked to you, suggesting that

21  Shah said those issues that you raised, those had been

22  addressed and fixed.  Do you remember those questions?

23  A.  I do.

24  Q.  When Pierce and Prowker spoke to you, what was your

25  understanding about whether those issues had been fixed?

1   A.  They had not been fixed.

2   Q.  What was your understanding about whether they were

3   current, ongoing issues?

4   A.  They were current, ongoing issues.

5   Q.  Did they also discuss whether in addition to being current

6   and ongoing, they were also historical issues?

7   A.  That is correct, they were.

8   Q.  Were Prowker and Pierce, given their roles at the company,

9   in a position to know if those were current issues?

10  A.  Yes.

11  Q.  In light of the information you had from Prowker and

12  Pierce, did you believe Shah when he said the issues had all

13  been fixed?

14  A.  No.

15  Q.  You were asked a number of questions about why you didn't

16  go to -- whether and why you didn't go to other employees

17  after you got that information from Prowker and Pierce.

18          Do you remember those questions?

19  A.  Yes.

20  Q.  Rather than taking those detours, who did you go to?

21  A.  I went directly to Rishi Shah.

22  Q.  Was he your boss?

23  A.  He was.

24  Q.  Was he the CEO?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 283 of 310 PageID #:13082
Kazi - redirect by Madden
528

1  Q.  Was he the founder of the company?

2  A.  Yes.

3  Q.  You were also asked questions about -- saying that you

4  didn't repeat what you learned at the company in the coming

5  months to any government agency.  Do you remember that

6  question?

7  A.  Yes.

8  Q.  At the -- you left the company in January of 2017;

9  correct?

10 A.  Correct.

11 Q.  When the -- at a certain point, were you approached by a

12 government agency, specifically the FBI?

13 A.  I was.

14 Q.  And when you were approached, did you volunteer to speak

15 to the FBI and DOJ?

16 A.  I did.

17 Q.  And did you share with them largely the same information

18 that you've shared today?

19 A.  I did.

20 Q.  About your meetings with Prowker and Pierce and your

21 meeting with Shah?

22 A.  Yes.

23 Q.  Did you also -- were you also asked to be deposed in front

24 of the -- deposed in a civil case?

25 A.  I was.

1    Q.  And did you share the same information?

2    A.  I did.

3    Q.  Were you also asked to testify in front of the grand jury?

4              MR. POULOS:  Objection, your Honor.  May I be heard

5    at sidebar?

6              THE COURT:  Yeah, I know the headphones are not

7    working at the Shah table.  If you want to come over to this

8    table, there's a microphone there, and you can use the

9    headphone over here.  Rather than interrupt things and get it

10   fixed, I thought you could use that.

11             (Proceedings heard at sidebar.)

12             THE COURT:  Can you hear me on this?  Okay.  And then

13   if you need to use a mic, just turn that around.  I think

14   that's a live mic.

15             Okay.  Mr. Poulos, your objection.

16             MR. POULOS:  Judge, there hasn't been a claim of

17   recent fabrication.  So he's getting into --

18             THE COURT:  Speak into the mic a little closer.  Go

19   ahead.

20             MR. POULOS:  There is no claim of recent fabrication,

21   your Honor.  So the -- the government should not be permitted

22   to say:  Did you tell the FBI everything you said today?  Did

23   you say the same thing in a deposition?

24             THE COURT:  All right.  What is the response?

25             MR. MADDEN:  I think there has been a claim of recent

1    fabrication based on Shah's cross-examination.  The other

2    issue is, he was also asked:  You didn't repeat this

3    information about your concerns in the coming months to any

4    government agency?  The reality is, he did.  He shared these

5    exact same concerns with the FBI and the US Attorney's office.

6              THE COURT:  Is that a quote from the actual answer --

7    question and answer during his cross-examination?

8              MR. MADDEN:  It's -- my paraphrased notes were,

9    Mr. Hueston said:  You didn't repeat in the coming months

10   those, you know, concerns to a government agency.

11             THE COURT:  Okay.  Response?

12             Actually, we can't hear the mic.  You may have to go

13   to one of the mics at the other table.  I'm sorry, this is

14   awkward.  Use one of theirs.

15             MS. DING:  Can you hear me now?

16             THE COURT: Yes, I can.

17             MS. DING:  We didn't check the transcript, but I

18   believe the question was:  You didn't go to a government

19   agent.  Not that you did not repeat it, so.

20             THE COURT:  Say that a little closer to the mic.

21             MS. DING:  The distinction is between whether he went

22   to a government agency of his own accord versus was approached

23   by one, which the government has introduced that he was

24   approached by an agency.  But Mr. Hueston only got into the

25   matter whether he went on his own to a government agency.

1    THE COURT:  All right.  Last word.

2    MR. MADDEN:  That's not a material difference.  They

3    can -- they can make that point, I guess, on recross, if they

4    want.

5    THE COURT:  Yeah, I think going versus being asked,

6    you can always refuse to answer.  And he apparently

7    volunteered this without any immunity; is that correct?

8    MR. MADDEN:  Correct, your Honor.

9    THE COURT:  Okay.  Objection overruled.

10        (End of sidebar proceedings.)

11   BY MR. MADDEN:

12   Q.  Mr. Kazi I believe my last question was:  Did you, in

13   addition to going -- sharing this information to the FBI, did

14   you also testify about this in the grand jury?

15   A.  I did.

16        THE COURT:  Well, to be clear, the government asked

17   him to go to the grand jury --

18        MR. MADDEN:  Right.  Correct.

19        THE COURT:  -- is that correct?

20        People don't walk into the grand jury.

21        MR. MADDEN:  Correct.

22        THE COURT:  Maybe you ought to clarify that.

23        MR. MADDEN:  Sure.

24   BY MR. MADDEN:

25   Q.  Were -- after you were interviewed by the FBI did the

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 287 of 310 PageID #:13086
Kazi - redirect by Madden
532

1  government ask you to testify about this in the grand jury?

2  A.  Yes.

3  Q.  And was that testimony largely consistent with what you've

4  talked about today?

5  A.  Yes.

6         MR. MADDEN:  May I have a moment, your Honor?

7         THE COURT:  Yes.

8         MR. MADDEN:  Could you call up 747, please.  Just one

9  question.

10         THE COURT:  Is this in evidence?

11         MR. MADDEN:  Yes.

12         THE COURT:  This is that voicemail.  Go ahead.

13         MR. MADDEN:  Same Voxer.

14         THE COURT:  All right.

15  BY MR. MADDEN:

16  Q.  Mr. Kazi, directing your attention to lines 30 to 31 where

17  it says:  If Liane and Adam in your first week are coming to

18  you and sharing this, it's not good leadership on their part,

19  and we may need to clean up in a lot of different parts of the

20  org.

21         Based on your interactions with Prowker and Pierce,

22  did they need to be cleaned -- cleaned up out of the

23  organization?

24  A.  Not at all.

25  Q.  You testified on cross-examination that you were relieved

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 288 of 310 PageID #:13087
Kazi - recross by Hueston
533

1  to no longer be there, to no longer be at Outcome.  Do you
2  remember that?
3  A.  I do.
4  Q.  Why were you relieved to no longer be there?
5  A.  I didn't agree with the way they were running their
6  business.  And of the things that I learned that were
7  happening at the business, that was not something that I
8  wanted my name associated with.
9           MR. MADDEN:  No further questions, your Honor.
10          THE COURT:  All right.  Recross, subject to --
11  limited to the areas that were on redirect.
12          MR. HUESTON:  Yes, your Honor.
13          THE COURT:  All right.
14                       RECROSS EXAMINATION
15  BY MR. HUESTON:
16  Q.  Mr. Kazi, you were asked some questions about a recounting
17  from Ms. Agarwal of a conversation of Madan Nagaldinne on
18  January 23rd; right?
19  A.  Yes.
20  Q.  I want to complete that sequence because, from there,
21  government counsel asked you questions about what was in
22  Mr. Shah's mind.
23          So I want to turn to Government Exhibit 760B, which
24  is, in fact, a Voxer sent from Mr. Nagaldinne and sent on from
25  Shrada Agarwal.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 289 of 310 PageID #:13088
Kazi - recross by Hueston
534

1        MR. MADDEN:  I'm going to object as beyond the scope,

2    you Honor.  This is new -- another Voxer.

3        MR. HUESTON:  Your Honor, this connects directly to

4    this same sequence that she was talking about.  I want to

5    complete the record here, that it went --

6        THE COURT:  Overruled.  Go ahead.

7        MR. HUESTON:  Yeah, okay.  Let's put this up, please.

8        MR. MADDEN:  It's not in evidence, John.

9        MR. HUESTON:  Okay.  We move it into evidence.

10        MR. MADDEN:  No objection.

11        THE COURT:  All right.  It's admitted into evidence

12    without objection.

13        (Exhibit admitted into evidence.)

14    BY MR. HUESTON:

15    Q.  All right.  And you can see this is January 24th; right?

16    A.  Yes.

17    Q.  Okay.  And I'm just going to -- this is going to really be

18    a step to where this -- where Mr. Shah goes with this next.

19    But I will point out, if we go to page 2 of this document,

20    down at line 32, he states:  And I -- Madan -- told him after

21    recounting the issues you had set forth, I said, hey, Sameer,

22    you've got to think about this, you know, across the board.  I

23    don't think it is that bad.

24        Do you see those words?

25    A.  I do.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 290 of 310 PageID #:13089
Kazi - recross by Hueston
535

1    Q.  You did say:  Oh, no, it's terrible.

2          But those were his words; right?  Correct?

3    A.  Yes.

4    Q.  Okay.  And down further, lines 39 to 40 -- actually,

5    starting at line 38, he's talking about Liane goes and marks

6    X-X-X to a bunch of contracts which Liane believes is in

7    trouble.

8          And he then states:  I don't even know what trouble

9    means to her.

10          Right?  He states that?

11   A.  Yes.

12   Q.  And then later, on page 3 of 3, I just want to point out

13   line 60 to 62, after recounting issues alleged with the ROI,

14   he writes:

15          Knowing Ashik, this is not what he would say, so I

16   really don't know what Sameer is trying to -- why he is so

17   fearful.

18          Do you see those words?

19   A.  I do.

20          THE COURT:  Can you go back to the first page?  This

21   is a voicemail from who and left for who?  Just so I've got

22   it.

23          MR. HUESTON:  Madan Nagaldinne.

24          THE COURT:  To?

25          MR. HUESTON:  And it was originally sent to Shradha

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 291 of 310 PageID #:13090
Kazi - recross by Hueston
536

1　Agarwal, and then she forwards that to Rishi Shah, you can see

2　that at the top.  And then right below it, your Honor, you can

3　see -- this is my next thing -- that he forward -- Rishi Shah

4　then sends this right on to Ashik Desai.

5　　　　　　THE COURT:  Thank you.

6　BY MR. HUESTON:

7　Q.  Okay.  Now I want to go to Mr. Desai's response, which is

8　about 20 minutes later.  And this is Government Exhibit 762B.

9　　　　　　MR. MADDEN:  Objection as beyond the scope, your

10　Honor.

11　　　　　　MR. HUESTON:  This is the direct answer to the very

12　same --

13　　　　　　THE COURT:  Well --

14　　　　　　MR. MADDEN:  There are dozens of communications about

15　this.

16　　　　　　MR. HUESTON:  No.  This is the direct --

17　　　　　　THE COURT:  Well, we don't need to argue.

18　　　　　　If this relates to the last voicemail --

19　　　　　　MR. HUESTON:  Yes.

20　　　　　　THE COURT:  -- this is a proper subject.  This

21　witness was only at the company a couple weeks.  I think these

22　e-mails are proper subject and were raised on redirect in --

23　at least in form, if not substance, so proceed.

24　　　　　　MR. HUESTON:  Thank you.  Let's put it up.

25　BY MR. HUESTON:

1  Q.  And at the top, Ashik Desai writes:

2           Thanks, Rishi, for sharing this Vox.  I'm sure we'll

3  talk about it more tonight, but my preliminary thoughts, I

4  obviously have no idea what's in that document and what it's

5  relating to -- and then he goes on on line 4 to say:

6           I think there's five points here that are critical as

7  I listen to everything.

8           Do you see that?

9  A.  Yes.

10  Q.  Okay.  And down -- he says:

11           So, first, as it relates to the affidavits, there's

12  no doubt that there's a disparate issue here where the finance

13  organization and sales force is what's outputting the

14  affidavits, um, but the delivery system isn't actually what's

15  communicating to that document.

16           Do you see that?

17  A.  I do.

18  Q.  And later he says:

19           And this is a major fix we're investing in, not only

20  from a systems perspective but a process perspective moving

21  forward into '17.

22           Do you see that?

23  A.  I do.

24  Q.  Okay.  And he says that, going forward, the affidavits

25  will be based on -- produced -- based on what's in the

Kazi - recross by Hueston

538

1  delivery system; correct?

2  A.  That's what it states.

3  Q.  And that's the same thing that Mr. Shah related to you in

4  the meeting, right, sir, in essence?

5          Let's go to cross-demonstrative A, slide 5 as a

6  reminder.  Let's put it up.

7          THE COURT:  Well, can you answer the question without

8  a reminder, or do you need to be reminded?

9          THE WITNESS:  That's not what he said exactly.

10         MR. HUESTON:  Okay.

11 BY MR. HUESTON:

12 Q.  All right.  Let's put that down.

13         And then he also explains that, quote:  Where we've

14 had guarantees and where we've had to measure and where

15 there's a make-good, we've absolutely gone ahead and provided

16 those.

17         Do you see that?  At lines 20 to 21.  Let's just

18 highlight that.

19 A.  Yes.

20 Q.  Okay.  And by the way, he also explains why Ms. Pierce

21 might not have known about the make-goods; right?  He says,

22 quote:

23         CSMs in the end are not the ones that are actually

24 working through make-goods discussions.  It's the sales team

25 and working directly with the client on these.

1          Do you see that language?

2    A.  I see it.

3    Q.  And CSMs are client success managers; correct?

4    A.  Yes.

5    Q.  And Ms. Pierce was the head of client success; right?

6    A.  Yes.

7    Q.  All right.  So Ms. Pierce may not have known about

8    make-goods because her team was not actually the one actually

9    working through make-goods discussions.  It's the sales team;

10   right?

11   A.  That's what it states here.

12   Q.  Okay.  And, finally, he also says:

13          There's no doubt there's deltas on programs -- that's

14   at lines 48 -- let's go to 48, 48 through 50.

15          There's no doubt that there's deltas on programs.

16          Do you see that?  But he says:

17          How we -- he later says, starting at line 50:

18          How we've dealt with these in 2016, is with the

19   utmost integrity and in the spirit of long-term partnership

20   with our partners where -- where we've had to make good, we

21   absolutely will.

22          Right, sir?

23   A.  That's what it states.

24   Q.  And I've quoted a few things in this lengthy response to

25   Mr. Shah, which he sent to Mr. Desai for answers before he had

1    the meeting with you; right, sir?

2    A.  Yes.

3           MR. HUESTON:  No further questions.

4           THE COURT:  All right.  Anything else?

5           MS. BELL:  Nothing further, your Honor.

6           MR. POULOS:  Nothing further, your Honor.

7           THE COURT:  Any re-redirect?

8           MR. MADDEN:  No. No, your Honor.

9           THE COURT:  Okay, good.

10          Sir, you're excused.  Thank you.

11          THE WITNESS:  Thank you.

12          THE COURT:  All right.  Please call your next

13   witness.

14          MR. HUESTON:  Your Honor, I would like at this time

15   to do a brief interim statement.

16          THE COURT:  You can do a brief interim statement.

17          Ladies and gentlemen, I mentioned before that parties

18   were allowed to make brief interim statements, ten minutes for

19   the government, 15 minutes for the defense.

20          Government, you should get your stopwatch out because

21   I ask each side to keep track of the other's time.  I warn you

22   all, if you go over your time, I'll cut you off mid-sentence.

23   So you have it.

24          The witness should not come in during the interim

25   statements.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 296 of 310 PageID #:13095
interim statement - by Hueston
541

1           You may proceed.

2           MR. HUESTON:  Okay.  Thank you.  Your Honor.

3           INTERIM STATEMENT ON BEHALF OF DEFENDANT SHAH

4           MR. HUESTON:  Ladies and gentlemen, that was the

5    first witness, and I want to review with you key issues and

6    reasons to doubt.

7           Point Number 1.  They tried to establish that the

8    three defendants and Mr. Desai were in some sort of inner

9    circle, trying to pursue the conspiracy.  And you heard

10   Mr. Kazi say and concede that there's nothing wrong with

11   having an inner circle.  That's what top executives normally

12   are.

13          Next slide.

14          And, in fact, as I explored with him, there were --

15   Vivek Kundra and Madan Nagaldinne were members of the

16   executive team, something that he admitted once he saw some of

17   the meeting agendas that hadn't been shown to him before.

18          And then, question:  By the way, when you came into

19   Outcome, Mr. Shah didn't put any restrictions on you saying

20   don't talk to certain people, don't look into this or that;

21   right?

22          Answer:  He did not.

23          Ladies and gentlemen, what was happening here?

24   Measure the actions of Mr. Shah.  What he was doing was

25   inviting a powerful outsider, a very smart guy, to come in and

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 297 of 310 PageID #:13096
interim statement - by Hueston
542

1  be a part of this operation at the highest level.  If he was

2  worried about a fraud or in cahoots about a fraud, he never

3  would have done so.

4          Let's go to the next slide.

5          Okay.  And, in other words, Mr. Shah was bringing you

6  to come in and take over duties held by Ashik Desai; correct?

7  Someone you understand is an alleged co-conspirator here in

8  this case?

9          Yes.

10         Pause and think about what he admitted there.  If

11 Mr. Desai, by way of the government's theory, is the sort of

12 Mini-Me of Rishi Shah, the henchman doing all sorts of evils

13 to be hidden from everybody, well, why has he brought in

14 Mr. Kazi, said, we'll pay you $30 million, and, by the way,

15 we're moving Mr. Desai out of the way and you're in charge?

16 The answer is, he was focused on trying to make that company

17 better, build the company's operations.  That's why.  There

18 was no suspicion at that time that Mr. Desai was in on

19 anything.

20         Next.

21         And yet, sir, you don't ever recall confronting

22 Mr. Desai about information you received from Mr. Prowker and

23 Ms. Pierce?

24         I do not.

25         That's key, folks.  I wish -- we wish he had because

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 298 of 310 PageID #:13097
interim statement - by Hueston
543

1    then he could have said, look, I've got something to tell you.
2    I've confronted Mr. Desai.  It's out here.  He never
3    confronted Desai.
4              Let's go to the next slide.
5              And when you spoke to Mr. Shah, you never said to
6    Mr. Shah, by the way, Mr. Desai is committing fraud?
7              He didn't.
8              Next slide.
9              In fact, when I showed him this e-mail, right here,
10   he reached out saying he liked him, which is not what you do
11   with somebody you think is a fraudster in the middle of
12   changing all the numbers in the company.
13             Next slide.  Sorry, back one.
14             Do you think -- had you concluded at this time this
15   guy's a fraudster?
16             He just -- he couldn't even tell you that, ladies and
17   gentlemen.
18             I believe he was making some mistakes in the
19   business.
20             Even here today he couldn't say he was a fraudster.
21             And so what does that tell you?  It shows you that he
22   knowingly -- Mr. Shah, and the top executives brought in this
23   powerful executive, wanted him to focus on operational issues,
24   and he did not -- when he claimed he saw issues with Desai,
25   didn't confront Desai, didn't bring it up with Shah so that

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 299 of 310 PageID #:13098
interim statement - by Hueston
544

1    Shah could do something about it.

2             Next slide.

3             Three topics.  He was really here to relate what he

4    remembered in that meeting on January 25th.

5             It should be notable, ladies and gentlemen, that the

6    government, when they got his initial answer that, oh,

7    Mr. Shah just seemed to know the issues, and then they tried

8    to move on, it was on my cross-examination that I brought out

9    his recollection from earlier sworn testimony that the

10   government chose not to show you that, Oh, we're aware of it,

11   but more than that, we're working through fixing it.

12            That's exactly what a responsible CEO does.  What

13   more could you ask Mr. Shah to do?  Especially when Mr. Kazi

14   is not saying, wait a minute, we've got a fraud here.

15            Next slide.

16            What about the other issue?  Affidavits.

17            Related.  He said:  I think it's related to an

18   operational issue.

19            I just showed you the Voxer -- the response from

20   Mr. Desai claiming it was just that.  He went to Mr. Desai.

21   What's going on here?  Got an answer, and then went to this

22   meeting.  It wasn't news to him.  That's why he wasn't

23   surprised and presented that to Mr. Kazi.  Mr. Kazi didn't

24   say, no, you're wrong, it's a fraud; or, wait, I have

25   documents to show you you're wrong.  Chose not to do that.

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 300 of 310 PageID #:13099
interim statement - by Hueston
545

1    And, in fact, he recalled Mr. Shah said: It's since

2  been fixed. We're making it so it doesn't happen again. And:

3  I don't think it's happening anymore.

4    Again, what else should this CEO do than those

5  reasonable steps?

6    Next.

7    And then the idea that a billion dollars of revenue

8  could be possible. And he admitted, Mr. Shah really did

9  believe that. And when I pressed him on his own view, he

10  said: Yeah, my view -- Mr. Kazi -- my view is just an opinion

11  after 17 days of employment. It's not a fact that's wrong or

12  crooked. It was a difference of opinion. Nothing there that

13  should be surprising, especially after he admitted that he and

14  Mr. Shah had been talking about blueprint-to-a-billion and all

15  sorts of other ideas to get to the billion-dollar mark.

16  That's not "Crazy Town." That was something they were all

17  working on.

18    Next slide.

19    That's it about him. I'm going to give you a little

20  preview whose coming up next.

21    Jason Ketchum. He is a salesperson. You heard a lot

22  about him in opening statement as somebody who is involved at

23  some level in fraud and asserted by the government to be

24  committing fraud with Ashik Desai. Remember that he is coming

25  in with what's called an immunity agreement, which is a

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 301 of 310 PageID #:13100
interim statement - by Hueston
546

1      get-out-of-jail-free card, and you'll need to consider that.

2              Next slide.

3              What I want you to keep in mind when you're listening

4      to this testimony, the evidence will show that he is not

5      client-facing.  He doesn't know what was told to clients.

6      That's important.

7              Number 2.  Pay close attention to what he was saying

8      to Mr. Shah then in the documents and in Voxers that they show

9      him versus what he is saying in the courtroom now with his

10     get-out-of-jail-free card.

11             And three.  Wait for it.  Wait for the full

12     context -- it will probably have to come when I get up for

13     cross-examination -- when they go into these campaigns and

14     have him say, look, like I did in opening statement, this

15     number is not right.  Give me an opportunity to show in cross

16     that it was, in context, no fraud at all.

17             Thank you for your attention.

18             THE COURT:  All right.  Ready to call your next

19     witness.

20             MR. POULOS:  Your Honor, I have an interim statement

21     as well.

22             THE COURT:  Counts on your clock, your collective

23     clock.

24             MR. POULOS:  Yes, of course, your Honor.

25             THE COURT:  And the government is keeping track of

1  the time; correct?

2  MR. MADDEN:  We are.

3  THE COURT:  Thank you.

4  INTERIM STATEMENT ON BEHALF OF DEFENDANT PURDY

5  MR. POULOS:  Ladies and gentlemen, I'll be very

6  brief.  What I did on cross-examination there, is, you saw

7  that most of those contracts and that spreadsheet, where she's

8  reporting under-delivery, almost all of them were three-to-one

9  ROI guarantees.  Okay?  And remember what I said about what

10  Deloitte & Touche had determined, that, so long as you

11  satisfied the ROI, you satisfied the contract for

12  revenue-recognition purposes.  That's why I highlighted that.

13  The other point about Deloitte is, I'm hoping you'll

14  make -- Government Exhibit 750, page 6, that comment that

15  Liane Pierce made about Deloitte and the audit.  Okay?  That

16  Deloitte also took the position, you don't have to satisfy a

17  contract on a month-by-month basis.  That was -- that comment,

18  that was in there as well.

19  I highlighted the Rexulti affidavit because the

20  evidence in this case will show that, in very late 2016, Liane

21  Pierce, Outcome, the company itself, doing the right thing,

22  disclosed an under-delivery.  And that created a big question.

23  Well, wait a minute, we've got these affidavits that said you

24  had been fulfilling it.  That is when everybody realized and

25  learned that the system that Demas had put in place long ago

1  of just sending out these affidavits and billing for every

2  month.

3          So when you hear evidence about fixing the affidavit

4  process, that's what they're referring to.  They had just

5  discovered that there was this problem that had just been

6  built into the system, and they were fixing it.  You've seen

7  it in some of these Voxers, and the like, and you'll see

8  plenty more evidence of that.

9          That's all I got.

10          THE COURT:  All right.

11          MR. BLEGEN:  Judge, briefly on behalf of Ms. Agarwal.

12          THE COURT: Sure.

13       INTERIM STATEMENT ON BEHALF OF DEFENDANT AGARWAL

14          MR. BLEGEN:  Hi, folks.  You're going to hear from

15  Jason Ketchum next, you just heard.  Remember back in opening

16  statements you heard about an e-mail from Ms. Agarwal that has

17  the phrase, accurate versus made-up.  The reason I'm flagging

18  that for you is, Jason Ketchum's not on that e-mail, but he

19  has information relevant to that e-mail which may be a little

20  bit hard to understand when we get to cross-examination.  So

21  just keep your ears up for the accurate-versus-made-up thing,

22  and we'll discuss it on cross with Mr. Ketchum.  Thank you.

23          THE COURT:  All right.  Is the government going to do

24  an interim statement?

25          MR. APPLEBY-BHATTACHARJEE:  We do have an interim

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 304 of 310 PageID #:13103
interim statement - by Appleby-Bhattacharjee
549

1    statement.

2           THE COURT:  Okay.  We're not going to get to

3    Mr. Ketchum today because we're going to break in about five

4    minutes, but you go ahead and -- you're free to make that

5    statement right now.

6           MR. APPLEBY-BHATTACHARJEE:  Thank you.

7           THE COURT:  And the defense can keep track of this

8    time.  This part doesn't count.  It's only when he starts

9    talking.

10          MR. APPLEBY-BHATTACHARJEE:  Thank you.

11          INTERIM STATEMENT ON BEHALF OF THE GOVERNMENT

12          MR. APPLEBY-BHATTACHARJEE:  Members of the jury,

13   yesterday we told you that we would start near the end of the

14   story of Outcome's fraud.  And that's what you heard from

15   Sameer Kazi, an executive with extensive experience who was

16   wooed by Outcome, and specifically by Rishi Shah.

17          Outcome promised him the world.  A high six-figure

18   salary.  Equity to the tune of $30 million.

19          THE COURT:  Stand near the mic, please.

20          MR. APPLEBY-BHATTACHARJEE:  The opportunity to help

21   grow Outcome into a billion-dollar company, just like Rishi

22   Shah always wanted.  Yet, all of that came crashing down in

23   just two weeks between when Mr. Kazi started at Outcome on

24   January 9, 2017, and his last day on January 25th.

25          You heard about what Mr. Kazi learned on January 20th

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 305 of 310 PageID #:13104
interim statement - by Appleby-Bhattacharjee
550

1   from Liane Pierce and Adam Prowker.  That Outcome was selling

2   inventory that it didn't have.  That Outcome was submitting

3   false affidavits to clients.  And that Outcome was falsifying

4   ROI reports.  And Mr. Kazi told you his first impression when

5   he heard these things.  He thought that Pierce and Prowker

6   were playing a prank on him.  But they weren't.  These were

7   serious issues, ones that Mr. Kazi decided he'd have to act on

8   immediately.

9          And you heard what he did.  He didn't take a detour,

10  as he said on redirect examination.  He went straight to the

11  top.  On January 25th, he met with defendant Shah and laid out

12  what he had learned:  That Outcome was selling inventory that

13  it didn't have.  That Outcome was falsifying affidavits that

14  went to clients.  That Outcome was manipulating ROI data.  And

15  was defendant Shah surprised by any of this?  No.  Did he "dig

16  in," as Mr. Hueston said was typical of Shah's approach?  No.

17  Mr. Kazi had the same doctored ROI reports on his laptop that

18  Mr. Hueston showed you in opening, claiming that that was

19  evidence of the real fraud.

20         He told you he was ready to dig in, to discuss these

21  issues and these reports with Mr. Shah, but Shah had zero

22  interest because Shah knew all about it.  He dismissed Kazi's

23  concerns and went on the attack.  He called Kazi a bull in a

24  china shop, and he showed him the door.

25         You'll learn about what happened after Mr. Kazi left

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 306 of 310 PageID #:13105
interim statement - by Appleby-Bhattacharjee
551

1  Outcome.  How, in October of 2017, the Wall Street Journal
2  published an article about Outcome raising the same issues
3  that Mr. Kazi tried to address with Shah.  The same day that
4  the article was published, Outcome had a company-wide Town
5  Hall.  Shah led that meeting, and Agarwal was by his side,
6  taking questions from employees at the company who were
7  rightfully concerned about what was being reported in the
8  press about their company.

9        And one employee asked defendant Shah flat out:  When
10  did you first know about this?  When did you first learn that
11  ROI results were being manipulated?  And as you'll learn, Shah
12  lied to the entire company.  He said:  We learned about this
13  specific concern about a few weeks ago.

14        Members of the jury, you already know that that's not
15  true.  From Ms. Bell's cross-examination, you know that was a
16  lie.  Because in a January 2017 recording that you already
17  heard at Government's Exhibit 747, Agarwal told Shah:  This is
18  not the first time you and I have heard that Ashik is changing
19  numbers.

20        The government's first witness, Sameer Kazi, told
21  Shah the same thing face-to-face.  Again, in January 2017.
22  And did Shah blink?  No.  Did he direct Mr. Kazi, his brand
23  new Chief Operating Officer, to fix these issues?  No.  He
24  swept the issues under the rug, and he pushed Mr. Kazi out,
25  just as you'll see Defendants Shah, Agarwal and Purdy did with

Case: 1:19-cr-00864 Document #: 583 Filed: 11/29/23 Page 307 of 310 PageID #:13106
interim statement - by Appleby-Bhattacharjee
552

1    others at Outcome who came to them with the truth that
2    Outcome's business model was rotten to its core.
3         The defendants all agree that there was a frauded
4    outcome, but they want you to believe that it only started
5    when Ashik Desai joined the company.  That's just not true.
6         Mr. Poulos said in opening that what was happening in
7    2012 and 2013, has nothing to do with what was happening in
8    2015, 2016, 2017.  Well, you'll see that's not true.  And
9    you'll see just how far back this fraud goes.  It didn't start
10   in January of 2017, when Sameer Kazi arrived on the job.  Or
11   in 2016, or in 2015.
12        And our next witness, Jason Ketchum, takes us back to
13   the beginning of the story, all the way back in 2011, when the
14   fraud started, when Outcome was a small company, led as it
15   always was by Shah and Agarwal at the top.  Years, years
16   before Ashik Desai ever joined the company by when the fraud
17   that the defendants had put in place was already in full
18   swing.
19        Ketchum was there when Shah and Agarwal created
20   Outcome's fraudulent business practices, selling inventory
21   that Outcome didn't have, submitting false affidavits to
22   clients, and manipulating ROI results to make clients believe
23   that their advertising campaigns were far more successful than
24   they actually were.
25        Sameer Kazi didn't discover something that no one

1  else knew about, least of all the defendants.  The Wall Street

2  Journal didn't uncover a fraud that no one knew about, least

3  of all the defendants.

4       This was how things worked at Outcome from the very

5  beginning because that's how defendants Shah, Agarwal, and

6  later Purdy, decided to grow their business.  Through lies.

7  Through deceit.  Through fraud.  That was the Outcome way of

8  doing business.  It always was.

9       THE COURT:  All right.  Ladies and gentlemen, we'll

10  break for tonight.  Please don't discuss the case among

11  yourselves or with anyone else.  Keep an open mind.  There's

12  more evidence to hear.

13       Recall, too, that the interim statements by both

14  sides are just as opening statements and closing arguments,

15  they're not evidence.  They're arguments of lawyers properly

16  made as to what they think the evidence was and what it will

17  be.  But they, themselves, are not evidence.  The only

18  evidence is what you hear from the witness stand and the

19  exhibits that are admitted in evidence.

20       Thank you all, and see you tomorrow morning.

21       COURT SECURITY OFFICER:  All rise.

22       (Jury out at 4:24 p.m.)

23       THE COURT:  Okay.  Anything pressing that has to take

24  place now as opposed to tomorrow morning?

25       MR. MADDEN:  No, your Honor.

1          MR. HUESTON:  No your Honor.

2          MR. POULOS:  No, Judge.

3          MR. LOWDER:  No, your Honor.

4          THE COURT:  Thank you.  Let's make it 8:30 again

5    tomorrow morning, in case -- we can bring up issues.  You can

6    talk through the exhibits you're going to go through with

7    Mr. Ketchum.  Hopefully you'll reach agreement on all of them.

8    If you can't, maybe we can resolve them tomorrow morning.

9          MS. CHOU:  We have.  We're --

10         THE COURT:  Perfect.  Okay.  All right.  See you

11   tomorrow morning.

12         One thing I'd like you to think about is whether we

13   want an explanation to the jury of what a grand jury is.  Not

14   as an indicting body, but an investigating body.

15         MR. MADDEN:  Sure.

16         THE COURT:  It's probably unfamiliar to the jurors.

17   And it might be -- if you can come up with a neutral

18   statement --

19         MR. MADDEN:  Sure.

20         THE COURT:  -- that doesn't talk about the indictment

21   but about what they -- why people appear in front of it, I'm

22   happy to read that to them or take any other suggestions.

23   Something to think about.  See you tomorrow.

24         MR. MADDEN:  Thank you.

25         (Trial adjourned at 4:26 p.m.)

1          *   *   *   *   *

2          C E R T I F I C A T E

3          We certify that the foregoing is a correct

4  transcript from the record of proceedings in the

5  above-entitled matter.

6  /s/ Elia E. Carrión          1st day of February, 2023

7  _____         _____
   Elia E. Carrión                       Date
   Official Court Reporter

8

9  /s/ Kathleen M. Fennell      1st day of February, 2023

10 _____         _____
   Kathleen M. Fennell                   Date
   Official Court Reporter

11

12 /s/ Sandra M. Tennis         1st day of February, 2023

13 _____         _____
   Sandra M. Tennis                      Date
   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25