555

```
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3      UNITED STATES OF AMERICA,          )
                                           )   Docket No. 19 CR 864
 4                      Plaintiff,         )
                                           )   Chicago, Illinois
 5           v.                            )   February 1, 2023
                                           )   9:02 a.m.
 6      RISHI SHAH, SHRADHA AGARWAL,       )
        BRAD PURDY,                        )
 7                                         )
                        Defendants.        )
 8

 9            TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 3A
            BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11      APPEARANCES:

12
        For the Government:    MR. MATTHEW F. MADDEN
13                             MR. SAURISH APPLEBY-BHATTACHARJEE
                               Assistant U.S. Attorneys
14                             219 South Dearborn Street, 5th Floor
                               Chicago, Illinois  60604
15

16                             MR. WILLIAM E. JOHNSTON
                               MR. KYLE C. HANKEY
17                             U.S. Department of Justice
                               Criminal Division, Fraud Section
18                             Washington, D.C.  20530

19

20

21

22                          ELIA E. CARRIÓN
                           Official Court Reporter
23                       United States District Court
                     219 South Dearborn Street, Room 1432,
24                         Chicago, Illinois 60604
                              (312) 408-7782
25                     Elia_Carrion@ilnd.uscourts.gov
```

556

1    APPEARANCES (Continued:)

2

3    For Defendant
     Shah:                    MR. JOHN C. HUESTON
                              Hueston Hennigan LLP
4                             620 Newport Center Drive, Suite 1300
                              Newport Beach, California  92660
5
                              MS. VICKI CHOU
6                             MR. MICHAEL H. TODISCO
                              MS. KAREN DING
7                             Hueston Hennigan LLP
                              523 West 6th Street, Suite 400
8                             Los Angeles, California  90014

9

10   For Defendant
     Agarwal:                 MS. KOREN L. BELL
                              MR. A. ALEXANDER LOWDER
11                            MR. STEPHEN G. LARSON
                              Larson LLP
12                            555 South Flower Street, Suite 4400
                              Los Angeles, California  90071
13
                              MR. PATRICK W. BLEGEN
14                            MS. KELSEY H. KILLION
                              Blegen & Garvey
15                            53 West Jackson Boulevard, Suite 1437
                              Chicago, Illinois  60604
16

17   For Defendant
     Purdy:                   MR. THEODORE T. POULOS
18                            MR. ERIC PRUITT
                              MR. JOHN PAVLETIC
19                            Cotsirilos, Tighe, Streicker, Poulos &
                              Campbell, Ltd.
20                            33 North Dearborn Street, Suite 600
                              Chicago, Illinois  60602
21

22

23

24

25

1           THE COURT:  Okay.  There was a limiting instruction

2  proposed by the attorneys for Mr. Purdy, and I -- I'm going to

3  give it as revised.  It's going to read as follows and I'll

4  give this at the beginning of today's testimony.

5           "The parties have stipulated that Brad Purdy did not

6  join Outcome Health until July 2012, therefore you may not

7  consider evidence relating to the events occurring prior to

8  July 2012 and the case against Brad Purdy.  Each defendant's

9  entitled to have his or her case decided just on the evidence

10  which applies to him or her."

11           That'll be read to the jury before the next witness.

12           There was a Document 359-1, which was -- well,

13  359 and 359-1, which was docketed as a joint submission

14  regarding admissibility of exhibits for the week of

15  January 30, 2023.  There's a number of exhibits listed in

16  359-1.  I appreciate the hard work that went into it by the

17  parties.

18           It includes an exhibit number, a description of the

19  exhibit, the Shah, Agarwal, and Purdy objections, and then the

20  government response.  The majorities are being offered by the

21  government as being statements admissible as coconspirator

22  statements.  Those exhibits will be admitted without the need

23  for the parties to further object.

24           Unless they have a specific objection that the

25  document is not in furtherance of the conspiracy or some other

1  objection they wanted to raise as to the admissibility on that
2  grounds.

3      If there are documents being offered by the
4  government for the nonhearsay purpose of effect on the
5  listener or some other type of either exception to the hearsay
6  rule or for the nonhearsay purpose, the government should so
7  state when they offer the exhibit.  And if there is the need
8  for a limiting instruction relating to that, the defense
9  should state that.

10      You don't need to go at sidebar for that, unless
11  there's further objection.  And I'll give the limiting
12  instruction if it's being offered for a limited purpose.  You
13  do need to state your objections beyond those of a
14  coconspirator, the -- the ones that have already been raised
15  as coconspirator statements so the proper record can be made
16  later.

17      There was issues related -- Mr. Blegen raised issues
18  about the business record aspect of some of these documents.
19  I told the government they would need to lay a business record
20  foundation, not for each document but in general for the types
21  of documents you seek to raise, bring in as business records.

22      Mr. Blegen raised the issue that there may be
23  reliability issues relating to some of them.  I told him that
24  I would conditionally admit these documents if a proper
25  foundation was laid.

1           If through cross-examination or examination of other
2   witnesses, the reliability of these documents comes into
3   question so that the -- the underlying business record
4   foundation is no longer appropriate, I'll entertain a motion
5   to strike those exhibits at that time.

6           But then the only way, I think, to proceed if the
7   government makes a proffer, which they already have, and I'll
8   ask you to do it again, Mr. Hankey, the proffer you made off
9   the record about the -- these records -- or I think it was
10  Mr. Johnston did it -- but, Mr. Johnston, you can put on the
11  record, while we're waiting for a juror, the underlying
12  proffer as to the business record obligations and foundation
13  that these records would have.

14          We have all our jurors.  Why don't you do it quickly.
15  We can assemble the jurors.

16          MR. HUESTON:  And, Your Honor, I have just a very --
17          COURT REPORTER:  Mic.

18          MR. HUESTON:  Sorry.

19          I just have a very brief responsive statement to make
20  within our allocable minutes before the witness is called.

21          THE COURT:  Okay.  And everyone's been keeping track
22  of each other's times, correct?

23          MR. MADDEN:  Yes.

24          MR. HUESTON:  Yes.

25          THE COURT:  All right.  Off the record.

1          (Off-the-record discussion.)

2          MR. JOHNSTON:  Yes, Your Honor.  The government

3    expects the evidence to show --

4          THE COURT:  Hang on one second.  We're going to hook

5    up again.  Go ahead.

6          MR. JOHNSTON:  The government expects the evidence to

7    show that Outcome Health had a number of delivery systems and

8    systems that tracked inventory and where the campaigns were

9    playing.  These systems were kept and maintained in the

10   ordinary course of Outcome Health business.

11         We believe witnesses will testify that the systems

12   were updated regularly by people with knowledge at the time

13   they had the relevant information and that these systems and

14   databases were relied on by employees and executives at the

15   company, including the defendants, to make all important

16   business decisions.

17         Finally, we expect witnesses to say that they

18   frequently as part of their ordinary business duties copied

19   and transcribed data and printouts and outputs from these

20   systems into emails and transmitted them to other employees

21   and executives at Outcome Health to carry on the business of

22   the company.

23         THE COURT:  All right.  I'll view that as evidentiary

24   proffer.  It may not all be through this witness.  It may be

25   later witnesses, but that proffer is sufficient for me to at

1    least feel comfortable going forward once you start laying

2    business record foundations for the admissibility of these

3    records.

4         If as Mr. Blegen suggested there are reliability

5    issues that are brought out on cross-examination and if

6    they're sufficiently severe, I'll entertain motions to strike

7    these exhibits.

8         Okay.  The jury should be coming in.

9         MR. HANKEY:  Your Honor, I just wanted a brief --

10        THE COURT:  Yeah.  Into the mic.

11        MR. HANKEY:  So, Your Honor, yesterday, we -- the

12   parties generally admitted three exhibits by their initial

13   exhibit number but did not admit -- move in to admit the

14   attachments, which have sub-letters.  So we just would like to

15   move those into evidence.  We provided these to the defense.

16        THE COURT:  Why don't you state the numbers on the

17   record.

18        MR. HANKEY:  747A, 750A, 750B, 750C -- excuse me --

19   that's E, not C, 749A.

20        THE COURT:  Any objection?

21        MS. CHOU:  No, Your Honor.

22        MS. BELL:  No, Your Honor.

23        MR. POULOS:  No, Your Honor.

24        THE COURT:  Off the record.

25        (Off-the-record discussion.)

1      COURT SECURITY OFFICER:  All rise.

2      (Jury in at 9:11 a.m.)

3      THE COURT:  All right.  Please be seated.

4      Good morning, ladies and gentlemen.  The good news is

5  it should be warmer when you leave today than when you walked

6  in.

7      So I believe the defense wishes to make another

8  interim statement.

9      Is that correct, Mr. Hueston?

10     MR. HUESTON:  Yes, Your Honor.  Brief response.

11     THE COURT:  You may proceed.

12     MR. HUESTON:  Thank you.  Ladies and gentlemen, just

13  a brief response.  Didn't have a chance to get up yesterday.

14  I want to make sure we are all focused on the real issue in

15  this case.  And that is intent to defraud.  And what does that

16  mean?  It means what was in the mind of Mr. Shah and the other

17  defendants at that time?

18     And so with that in mind, let's look at what the

19  story of the first witness was.  Let's start with what doesn't

20  matter.  The government spent about 30 minutes going through

21  different documents that Mr. Kazi said he remembered in part

22  or went through at a high level.  He admitted he showed none

23  that to Mr. Shah or the other defendants.  Those don't count.

24     And also, what had Mr. Kazi been told by the others

25  that he didn't share with Mr. Shah?  If he didn't share it

1  with Mr. Shah, it doesn't count; it's not in Mr. Shah's head
2  or the other defendants.

3      And, finally, whether Mr. Kazi was right or wrong.
4  That doesn't matter, either, because at the end of the day, it
5  turns out he was on to some things.  But what matters is at
6  the time, what were the defendants thinking.

7      And so next slide.

8      Let's go over what the evidence shows at that time.
9  So from Mr. Shah's perspective, as Mr. Kazi's walking into the
10 meeting, he knows that Mr. Kazi has no relevant background in
11 point-of-care advertising, zero pharmaceutical experience.

12     He's been there for 17 days, and he's been getting
13 complaint after complaint that he is a bull in a china shop,
14 and there are issues, which Mr. Kazi admitted are not
15 frivolous.  He as a CEO would think them serious too.

16     Next slide.

17     And so what did the evidence show was in Mr. Shah's
18 mind?  The government's spent a lot of time on Shradha
19 Agarwal's Voxer, which came early on Monday -- right? -- that
20 Kazi may have concerns.  Shah acts.  He's the one who reaches
21 out.  Sets up a meeting.  He doesn't try to hide from it.

22     Then he gets an email, a Voxer from Madan Nagaldinne,
23 who had been there far longer than Mr. Kazi.  And he says, "I
24 don't know why Sameer is so fearful.  I don't think that's
25 bad."

1    What does Shah do?  He doesn't sit back and go,
2    "Sounds like there's no problem."  He goes ahead and schedules
3    the meeting.  He acts to meet with Mr. Kazi.  But he goes
4    beyond that.  He takes that additional step.  And you'll see
5    it during the trial.  He goes to the source.  He goes and does
6    something that Mr. Kazi does not.

7    He confronts Desai.  He presents all the accusations
8    to Desai.  And Desai responds authoritatively, explains
9    everything is under control.  It's operational.  It's serious,
10   but it's fixed or getting fixed.  He gets the answers that
11   Mr. Kazi doesn't.

12   And so what happens when he meets with Mr. Kazi?  Of
13   course, he's not surprised, because he's done his homework,
14   and he's been provided answers.  And he doesn't just sit there
15   with his arms folded.  He explains why he's not surprised.  He
16   tells Mr. Kazi, "Understood.  Important issues being fixed or
17   in the process of being fixed."

18   And importantly, undisputed, Mr. Kazi never says
19   anything to change what Mr. Shah is thinking.  Doesn't say,
20   "Well, you know, I don't think that's right."  Doesn't say,
21   "You know, I've got some documents.  You ought to look at it.
22   You might have a misimpression."  Does none of that at all.

23   And so what's the government left with?  They want
24   you to be Monday morning quarterbacks.  Woulda, coulda,
25   shoulda.  Well, maybe Mr. Shah could've asked some questions.

1   Ask yourself, "What should he have done with this in mind at
2   this point?"

3          "Well, Mr. Kazi, I see you didn't bring any
4   documents, and you haven't offered any.  Do you have any
5   documents?"  Or, "Mr. Kazi, you're showing yourself the door."

6          Remember it's Mr. Kazi who suggested he wanted to
7   leave, not Mr. Shah.  "Oh, excuse me.  Mr. Kazi, you haven't
8   said anything after my explanations.  Are you sure you don't
9   want to say something else?"  Woulda, coulda, shoulda.

10          Imagine anybody's life being judged in hindsight.
11  That's not the right standard.  You judge what's in their mind
12  at that time.  And the evidence clearly shows good faith,
13  nothing even close to an intent to defraud.

14          And as for town halls and other things, we're going
15  to get to those things later in this case.  But as to the
16  first witness with the government, it shows that Mr. Shah and
17  the other defendants acting in absolute good faith.  No
18  criminal intent whatsoever.

19          Thank you.

20          THE COURT:  Any additional interim statements before
21  we proceed with the next witnesses?

22          From defense.

23          MS. BELL:  No, Your Honor.

24          MR. POULOS:  Not at this -- not at this time,
25  Your Honor.

1          THE COURT:  Anything else from the government?

2          MR. APPLEBY-BHATTACHARJEE:  Yes, Your Honor.  And

3   could we switch over to the government's laptop?

4          THE COURT:  Yes.

5          MR. APPLEBY-BHATTACHARJEE:  I'm testing the mic.  Can

6   you hear me?

7          Good morning, members of the jury.  Every time you

8   hear defense counsel say, "No one told my client that fraud

9   was happening at Outcome," every time you hear defense counsel

10  ask, "What was in the mind of my client," I want you to

11  remember the following words.

12         (Video played.)

13         MR. APPLEBY-BHATTACHARJEE:  Rishi Shah said those

14  words with Shradha Agarwal sitting next to him and Brad Purdy

15  in the audience.  Shah admitted to the whole world that

16  selling something you don't have is fraud.  He didn't say this

17  in 2017 or 2016 or 2015.

18         Those words came out of Rishi Shah's mouth in

19  November 2012.  Before Ashik Desai joined Outcome.  Before

20  Sameer Kazi or Vivek Kundra or Madan Nagaldinne or so many

21  other names that you heard.  Selling something you don't have

22  is fraud.

23         That's what Mr. Kazi learned Outcome was doing.  So

24  he left the company, unwilling to participate in what

25  Rishi Shah himself described as fraud.  A fraud that you'll

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 13 of 269 PageID #:13122
Ketchum - direct by Hankey
567

1   learn from our next witness, Jason Ketchum, was always the

2   Outcome way -- selling inventory that Outcome didn't have.

3   Sending false affidavits and manipulating ROI reports to cover

4   it up.

5           Shah was right, all the way back in November 2012.

6   That's fraud.  Plain and simple.

7           THE COURT:  All right.  Call your next witness.

8           MR. HANKEY:  The government calls Jason Ketchum.

9           THE COURT:  All right.  Please raise your right hand.

10       (The witness is sworn.)

11          THE WITNESS:  I do.

12          THE COURT:  Have a seat.  You can take off your mask.

13          THE WITNESS:  Yes, Your Honor.

14          THE COURT:  Move the mic over so you can speak into

15  it clearly.

16          THE WITNESS:  Yes, Your Honor.

17          THE COURT:  Proceed.

18          JASON KETCHUM, GOVERNMENT WITNESS, DULY SWORN

19                    DIRECT EXAMINATION

20  BY MR. HANKEY:

21  Q.  Good morning.  Can you please state and spell your name

22  for the record?

23  A.  Jason Ketchum, J-A-S-O-N, K-E-T-C-H-U-M.

24  Q.  Mr. Ketchum, if you'd like, you can move that binder to a

25  place where it's more comfortable or you can leave it there.

1   A.  Okay.

2   Q.  Mr. Ketchum, where are you from originally?

3   A.  Orland Park, Illinois.

4   Q.  And where did you get your education?

5   A.  I went to Augustana College in Rock Island, Illinois.

6            MR. HANKEY:  And I'll ask you, Mr. Ketchum, just to

7   slow down a little bit for the court reporter.

8            THE WITNESS:  Sure.

9            MR. HANKEY:  Thank you.

10  BY MR. HANKEY:

11  Q.  Mr. Ketchum, where do you currently live?

12  A.  In Chicago, Illinois.

13  Q.  What field of work are you in?

14  A.  Mostly technology.

15  Q.  Mr. Ketchum, have you ever worked at a company named

16  Outcome Health?

17  A.  I did.

18  Q.  When did you work there?

19  A.  From 2011 to 2018.

20  Q.  When you started there, was it called ContextMedia?

21  A.  It was.

22  Q.  And later it changed its name to Outcome Health?

23  A.  It did.

24  Q.  Can I use the name "Outcome" to refer to the company

25  throughout your time there?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 15 of 269 PageID #:13124
Ketchum - direct by Hankey
569

1    A.   Sure.

2    Q.   Who ran Outcome Health when you started there in 2011?

3    A.   Rishi Shah, Shradha Agarwal, and Jim Demas.

4    Q.   Did Brad Purdy work at Outcome when you started in 2011?

5    A.   He did not.

6    Q.   Approximately when did Mr. Purdy start at the company?

7    A.   A little bit later.  I want to say in 2012.

8          THE COURT:  All right.  And at that point, let me --

9    at this point, rather, let me make a quick reading of a

10   stipulation.

11         "The parties have stipulated that Brad Purdy did not

12   join Outcome Health until July 2012, therefore, you may not

13   consider evidence relating to events occurring prior to

14   July 2012 in the case against Brad Purdy.  Each defendant is

15   entitled to have his or her case decided just on the evidence

16   which applies to him or her."

17         You may proceed.

18         MR. HANKEY:  Thank you, Your Honor.

19   BY MR. HANKEY:

20   Q.   Mr. Ketchum, what kind of company was Outcome Health?

21   A.   Outcome Health was a healthcare technology company.

22   Q.   And just from a very high level, what was the business

23   model of Outcome Health?

24   A.   Sure.

25         THE WITNESS:  Your Honor, the jury's right here?

Ketchum - direct by Hankey

570

1    THE COURT:  Pardon me?

2    THE WITNESS:  The jury is right there?

3    THE COURT:  The jury is right there --

4    THE WITNESS:  Okay.  Sorry.

5    THE COURT:  -- right there, and all the way up in the

6  back or all the way across.

7    THE WITNESS:  Okay.  Thank you, Your Honor.

8    THE COURT:  All right.

9  BY THE WITNESS:

10  A.  Outcome Health placed devices -- so TVs when I first

11  started there, and later tablets or iPads like you would use

12  and large touch screen devices in the doctors' offices across

13  the U.S.

14        So a TV in the waiting room, in exam room, there

15  would be a tablet that can be used, a large, digital touch

16  screen that can be used by doctor or a nurse to -- to chat

17  with the patient.

18        And in an infusion room, speed -- so think if someone

19  is getting chemotherapy for cancer treatment, there would be a

20  tablet there to deliver information to those patients, the

21  caregivers that -- that were there with those patients, and

22  then the deliverers of care.  So nurses or -- or doctors would

23  use those devices to assist the care of the patient.

24        THE COURT:  And just the jurors in the back, if you

25  have trouble seeing -- if you want to look at the monitor,

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 17 of 269 PageID #:13126
Ketchum - direct by Hankey
571

1    fine.  If you want to see the witness directly, you want to

2    move your cushion over, feel free to do that.  Whatever you're

3    comfortable doing.

4              Okay.  Thank you.

5    BY MR. HANKEY:

6    Q.  Now, from a high level, Mr. Ketchum, how was Outcome able

7    to place those devices into doctors' offices?

8    A.  Sure.  So there was a sales team called member outreach

9    that would reach out mostly via phone or email and also at

10   in-person conferences to convince staff at doctors' offices

11   and doctors' offices -- and the doctors at the doctors'

12   offices to have those devices installed in their healthcare

13   practices.

14             And then advertising was sold on those devices.

15   Primarily, pharmaceutical companies would advertise their

16   drugs on those devices, but it was sponsorship for advertising

17   dollars that -- that funded the installation of those devices

18   and paid for -- paid for the company to run.

19   Q.  Did Outcome pay the doctors' offices to install the

20   devices into their office?

21   A.  No.  It was a free service.  It wasn't -- doctors' offices

22   were not paid.  Occasionally, a gift card might be sent out or

23   lunch might be purchased for the doctor's office as sort of a

24   thank you or to help encourage them to sign up.

25   Q.  And, of course, the doctors weren't paying Outcome to have

1    the devices installed in their offices.

2         Is that right?

3    A.   Correct.   It was -- it was considered a free service.

4         MR. HANKEY:   Ms. Paul, can we please display

5    Demonstrative Exhibit 1126.

6    BY MR. HANKEY:

7    Q.   Mr. Ketchum, have you ever heard Outcome described as a

8    two-sided market?

9    A.   I have.

10   Q.   And what did that mean to you?

11   A.   Sure.   So if you look at the picture, you see membership

12   and sponsorship, and each one of those represents one side of

13   the two-sided market.   So like I briefly mentioned,

14   Outcome Health had a team called member outreach that would

15   spend their time working with doctors' offices to get those

16   devices sold.

17        And then there was a membership services team that

18   was responsible for getting those sold offices installed.   And

19   so that was primarily what made it membership, at least in the

20   earlier days.   There were more teams later on, and maybe we'll

21   touch on that later.   But that was primarily membership.

22        And then sponsorship was a team that worked with the

23   pharmaceutical companies and advertising agencies and media

24   agencies to sell advertising on those devices.   So the one

25   side was membership, which is the doctors' offices and the

1   devices, which is, sort of, what the -- the purpose of the

2   company was.

3          And then there was funded through sponsorship, which

4   was the other side of the market.

5   Q.  Where did you first hear this two-sided market term used?

6   A.  Rishi Shah used to -- used to talk about it.

7   Q.  And did you ever hear Ms. Agarwal use it?

8   A.  Sure, yes.

9   Q.  And Mr. Purdy?

10  A.  Yes.

11  Q.  How big was Outcome when you first started there in late

12  2011?

13  A.  I want to say it was less than 20 people.

14  Q.  And approximately how large was the company when you left

15  there in 2018?

16  A.  After some downsizing, I'm not too sure.  I believe it was

17  upwards of 600 people at one point in time.

18  Q.  Now, back in 2012 and 2013, what was your primary role at

19  Outcome?

20  A.  I was a member services executive, and I was the team lead

21  of the member services team.

22          So if you recall, that was the team that received the

23  sign-up form for membership outreach after the sale was made

24  and worked with the doctors' offices and the staff to have

25  those devices installed and then worked with the staff at

1    those offices to make sure the right type of content was on

2    the -- those devices.  So the TVs and later the tablets and

3    wallboards.

4            And making sure those offices were generally happy.

5    So it's, kind of, like an account management-type of role is

6    probably the right way to think about it.

7            MR. HANKEY:  Ms. Paul, can we please play

8    Demonstrative Exhibit 1127.

9    BY MR. HANKEY:

10   Q.  Mr. Ketchum, have you ever heard of Outcome Health's

11   business being described as being like a three-legged stool?

12   A.  I have.

13   Q.  And what were the three legs of that three-legged stool?

14   A.  Member outreach, member services, and sponsorship sales.

15   Q.  And each one of those represent one of the primary

16   departments of Outcome Health while you were there?

17   A.  Yes.

18   Q.  And you just described to the jury what member services

19   did, correct?

20   A.  Correct.

21   Q.  Can you explain what member outreach was?

22   A.  Sure.  Member outreach was the sales team that worked with

23   the doctors' offices to get them to agree to sign up for the

24   service to be installed.

25   Q.  And then from a very high level, what was sponsorship

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 21 of 269 PageID #:13130
Ketchum - direct by Hankey
575

1  sales?

2  A.  That was the team responsible for working with life

3  sciences companies, so pharmaceutical companies and media

4  agencies to sell advertising on those devices.

5  Q.  Did you -- while you were in the member services

6  department in 2012 and 2013, did you also assist with some

7  sponsorship sales activities?

8  A.  I did.

9       MR. HANKEY:  Ms. Paul, can we please display

10  Demonstrative Exhibit 1128.

11  BY MR. HANKEY:

12  Q.  I'm showing you a demonstrative exhibit with the title at

13  the top, "Stages of Sponsorship."

14       Looking at the content of this slide, does this

15  accurately show some of the key activities of sponsorship

16  sales?

17  A.  Yes.

18  Q.  Sponsorship sales, again, that sold advertising space on

19  Outcome's screens to pharma companies?

20  A.  Correct.

21  Q.  Can you walk us through each one of these activities from

22  a high level, please, Mr. Ketchum?

23  A.  Sure.

24       THE WITNESS:  Is it possible to get some water?

25  I'm sorry.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 22 of 269 PageID #:13131
Ketchum - direct by Hankey
576

1          MR. HANKEY:  We can work on that for you.

2          THE WITNESS:  Thank you, Mr. Hankey.  I apologize.

3  BY THE WITNESS:

4  A.  Sure.  A list match -- so a media agency or the

5  pharmaceutical company would send a list, usually an Excel

6  file, of doctors.  So just a list of doctors that that

7  particular brand or -- or agency's interested in targeting

8  for -- for their own reasons.

9  BY MR. HANKEY:

10  Q.  Do you see -- do you see here an item for contract?

11  A.  I do.

12  Q.  What does that represent?

13  A.  A contract is -- is the agreement of what -- what the

14  delivery is going to look like.  So how many offices is going

15  to be purchased, how many doctors are going to be targeted as

16  a part of that, and what the value of that contract is.

17          MR. HANKEY:  May I approach, Your Honor?

18          THE COURT:  Go ahead.

19          THE WITNESS:  I'm sorry.  I thought there was going

20  to be water.  I apologize.

21          THE COURT:  Don't use water in the water pitchers.

22  It may have been here since the time of Everett McKinley

23  Dirksen, so...

24  BY MR. HANKEY:

25  Q.  Mr. Ketchum, does a contract typically follow a list

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 23 of 269 PageID #:13132
Ketchum - direct by Hankey
577

1  match?

2  A.  It does.  It did for the most part.

3  Q.  You see here the words "go live."

4        What -- what does that mean?

5  A.  That's the date that the contract was scheduled to go live

6  on the devices across those doctors' offices that were

7  purchased.

8  Q.  And, again, that follows the signing of the contract

9  typically?

10  A.  Typically, yeah.

11  Q.  You see the words "invoice and proof of performance"?

12  A.  I do.

13  Q.  What generally would happen between go live and the end of

14  the contract as it relates to those types of activities?

15  A.  Monthly -- typically monthly, an invoice would be sent to

16  the client for -- so Outcome Health would send an invoice to

17  the client saying, "Hey, this is -- this is what the -- you

18  need to pay us for that given period of time," along with a

19  brief of performance.

20        So that was a document that said we fulfilled the

21  contract for this month.  So here's the -- here's the invoice

22  for -- for what we delivered.

23  Q.  Did every contract or every client require proof of

24  performance?

25  A.  For the most part, yes.  There might have been outliers.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 24 of 269 PageID #:13133
Ketchum - direct by Hankey
578

1    But from what I saw, for the most part, yes.

2    Q.  And then finally, we see "ROI studies" on here.  We'll

3    speak more about them later.

4            But just from a high level, what were ROI studies?

5    A.  Sure.  So ROI study -- "ROI" means return on investment.

6    So very simply, somebody -- so a client gives Outcome Health

7    money to run an advertising campaign, and they want to know

8    how much value they got back for what they spent.

9            So we -- if a company spent a dollar, did they make

10   more than a dollar or less than a dollar back on what they

11   spent for that particular campaign.

12   Q.  Now, of these different activities, which, if any of them,

13   did you have some role in at some point in time during that

14   2012 and 2013 time period?

15   A.  Just about all of them.

16   Q.  Who did you primarily work with --

17           THE COURT:  Can we flip back to the witness, or were

18   you going to use this?

19           MR. HANKEY:  Thank you, Your Honor.

20   BY MR. HANKEY:

21   Q.  Okay.  Mr. Ketchum, who did you primarily work with when

22   helping with these sponsorship sales activities?

23   A.  Primarily, Rishi Shah, Shradha Agarwal, Jim Demas, when I

24   first started, and later a little bit with Brad Purdy.

25   Q.  Did Outcome Health have salespeople dedicated to the sales

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 25 of 269 PageID #:13134
Ketchum - direct by Hankey
579

1    process?

2    A.  They did.

3    Q.  Did you work with them from time to time as well?

4    A.  Yes.

5    Q.  Now, did there come a point in time in your career at

6    Outcome when you eventually stopped doing list matches and

7    proofs of performance and other activities to support

8    sponsorship?

9    A.  Yes.

10   Q.  Roughly when was that?

11   A.  Sometime, I believe, in 2013 into 2014.

12   Q.  Who took over when you stopped performing those functions?

13   A.  Mostly Ashik Desai.

14   Q.  Now, Mr. Ketchum, when you were at Outcome, did you ever

15   lie to its pharmaceutical clients?

16   A.  Yes.

17   Q.  And when you -- when you were there, did you ever conceal

18   important information from the clients?

19   A.  Yes.

20   Q.  Did you ever deceive those pharma clients?

21   A.  Yes.

22   Q.  Can you explain to the jury what you did to lie to conceal

23   from and deceive Outcome's clients?

24   A.  Yes.  So list matches included projections.  So it would

25   include -- so when the list was sent -- I'm sorry.

Ketchum - direct by Hankey

1         When a list was sent from a potential client to

2    Outcome Health, it was matched up.  That list of doctors was

3    matched up against the list of doctors in Outcome Health's

4    database.  And the list matches oftentimes included

5    projections.

6         So doctors that were not yet installed.  And in some

7    instances, were not even close to saying yes to being

8    installed.  And they were presented to the client as though

9    they were already installed or would soon be installed.

10        And then so they were sold and -- and Outcome Health

11   received revenue for those -- for those doctors' offices that

12   were not installed.  And then later, during proofs of

13   performance, it was made to look like that number of offices

14   that was contracted for was indeed hit and that there was

15   no -- no shortfall on delivery.

16        So that was concealed from the clients.

17   Q.  Do you see anyone in the courtroom today that participated

18   in these activities with you?

19   A.  I do.

20   Q.  Who was that?

21   A.  Shradha Agarwal, Rishi Shah, and Brad Purdy.

22   Q.  What was Ms. Agarwal's role at Outcome?

23   A.  Mrs. Agarwal had a few roles over the years when I first

24   started.  I believe her title may have been chief marketing

25   officer.  I believe she held the title of chief strategy

1    officer at some point in time and was president at

2    Outcome Health at a later point in time.

3    Q.  Can you explain to the jury what Shradha Agarwal did to

4    participate in this lying to Outcome's clients?

5    A.  Sure.  Ms. Agarwal directed the -- the strategy behind

6    list matches.  So what projections should like and what should

7    be communicated to the client.  Directed the concealment of

8    the end of the delivery via a proof of performance or

9    affidavits.

10          And then also in changing some of the return on

11   investment studies that were, I believe, presented to the --

12   to the client later.

13   Q.  What was Mr. Shah's role at Outcome?

14   A.  He was the chief executive officer.

15   Q.  Can you tell us what Rishi Shah did to participate in

16   lying to clients?

17   A.  Similar to Ms. Agarwal, he -- or Mrs. Agarwal, he directed

18   the projections on list matches, the concealment via proof of

19   performance or affidavits, and altering return on investment

20   studies.

21   Q.  And what was Mr. Purdy's role at Outcome?

22   A.  Brad wasn't, at least in my time there, quite as involved

23   in the list matches.  Although, he did help -- sorry --

24   although, he did help build some of the models around lists

25   and targeting.

1    So that's really more what our member outreach team

2  is calling on.  But he was involved later on with some of the

3  proof of performance -- sorry.  I apologize -- return on

4  investment studies.  Not proof of performance.  Return on

5  investments analysis and some of the alterations that were

6  made there.

7  Q.  And in performing those things, did you observe Mr. Purdy

8  doing any of that in a deceptive manner?

9  A.  I believe so, yes.

10  Q.  Now, Mr. Ketchum, during the investigation of this case,

11  did you receive a letter of immunity from the government?

12  A.  I did.

13  Q.  And are you testifying today pursuant to an order of

14  immunity from the court?

15  A.  Yes.

16  Q.  What do you understand that this immunity means for you?

17  A.  That my job is to tell the truth.

18  Q.  And what -- what else does it mean for you under your

19  understanding?

20  A.  That if I tell the truth, I won't get into any trouble.

21  Q.  Now, Mr. Ketchum, I want to focus your attention to the

22  very beginning of your time at Outcome.  And even we'll start

23  before then.

24    Can you please tell the jury about your professional

25  career before you started at Outcome?

1   A.  Sure.  Graduated from college.  I worked at Enterprise

2   Holdings for a period of time.  Then worked with a recruiter

3   and worked at a now defunct company called Dex.  And then

4   worked with another recruiter to find ContextMedia in 2011.

5   Q.  What was -- what did that recruiter tell you about Outcome

6   when you first spoke to them?

7   A.  Sure.  That it was run by young, incredibly brilliant

8   people who were trying to find a way to do well while doing

9   good.  That they were involved not only in the healthcare

10  space and helping sick patients to get better but also heavily

11  involved in the community philanthropically.

12  Q.  And did you interview at Outcome?

13  A.  I did.

14  Q.  Did Rishi Shah interview you?

15  A.  He did.

16  Q.  What did Mr. Shah tell you about Outcome Health?

17  A.  That it was a very well-respected company, in the -- in

18  the healthcare and healthcare technology space.  That they

19  were growing really fast.  That people really liked the way

20  that they operated.  That folks felt they were generally smart

21  and ahead of the curve, especially compared to potential

22  competitors in the space.

23          And that they were somewhat of a family when it comes

24  to -- to business.  And that they were a scrappy -- a scrappy

25  start-up that worked really, really hard.

1    Q.  And did Shradha Agarwal interview you?

2    A.  She did.

3    Q.  What did she tell you about Outcome?

4    A.  Very similar.  That it was a very family environment.

5    That they were trying to solve some really big problems and

6    needed folks to help them grow and -- and make a real impact

7    in people's lives.  Mostly, the lives of sick patients.

8    Q.  And this was back in 2011?

9    A.  Yes.

10   Q.  And you testified earlier that Brad Purdy wasn't at the

11   company at that point in time?

12   A.  Correct.

13   Q.  Was Ashik Desai there then when you started?

14   A.  He was not.

15   Q.  Now, you accepted an offer at Outcome after the

16   interviews?

17   A.  I did.

18   Q.  What attracted you to the company?

19   A.  A number of things.  The role of member services was --

20   was pretty cool to me at the time, because you were working

21   with doctors' offices.  And at the time, I had a number of

22   sick family members.  My dad who has now since passed -- he

23   passed in 2019 -- suffered from cancer for almost 20 years.

24          You know, he even sometimes joked that people would

25   say, "What do you have," he would say, "I suffer from chronic

Ketchum - direct by Hankey

585

1    cancer."  Just 'cause he just always seemed to have it.  It

2    was pretty rough.  And so did my sister.

3         And so working with a -- the opportunity to work with

4    a company that was impacting those patients was -- was really

5    appealing to me.  And then the role of working directly with

6    the doctors and learning that space was really exciting.

7         And the opportunity to work with people who were

8    smart and well-respected as Rishi and Shradha was really,

9    really appealing.  The family environment was true.

10   Outcome Health was very much like a family.

11        THE COURT:  Slow down, please, so my court reporter

12   can keep up with you.

13        THE WITNESS:  Sorry, Your Honor.

14   BY MR. HANKEY:

15   Q.  Now, how many employees did you testify that Outcome had

16   in 2011?  You said --

17   A.  Somewhere around 20.  Maybe -- maybe a little less.

18   Q.  And where were Outcome's offices at the time?

19   A.  Lake and Michigan, 205 North Michigan.

20   Q.  And later, they moved to different sets of offices?

21   A.  Yeah.  In Chicago, it was 330 North Wabash.

22   Q.  So at this time back in 2011 to 2013, what was your first

23   title and job at the company?

24   A.  Member services executive.

25   Q.  And Rishi Shah was the CEO at the time?

1  A.  Yes.

2  Q.  How involved was Mr. Shah in the day-to-day operations of

3  the company back in that time period?

4  A.  Very.  Rishi was very dialed in on what was happening at

5  the company.

6  Q.  And can you expand on that a little bit by describing

7  specifically what Mr. Shah was dialed in on?

8  A.  Yeah, sure.  Rishi was -- was very involved in things

9  related to studies.  I remember very shortly after I first

10  started there, Rishi asked -- pulled me in and asked me to

11  work on an Excel project related to a sponsorship client,

12  which was outside of my normal duties as a member services

13  executive.

14        But he was -- he was very dialed in.  He always

15  wanted to know what was going on with members.  When something

16  bad would happen with -- with doctors' offices, someone was

17  unhappy, you know, Rishi would always want to know about it

18  and would want to talk about how to deal with it.

19        And I think it's -- it's, sort of, important to know

20  for context, I think, for the jury that, you know, when you're

21  talking about a doctor's office, big or small, whether it's in

22  a city or somewhere somewhat rural or even somewhere that's,

23  you know, more -- more rural than rural, you know, some of

24  these offices are in the middle of nowhere, you hear some

25  pretty crazy stories of what can go on there.

1    We're also relying on third-party technicians.  So

2  people who don't work for Outcome Health or, at that time,

3  ContextMedia to go in and install these devices and fix these

4  devices.

5    So there are people who you don't necessarily get to

6  meet or talk to that are going to these doctors' offices where

7  there's sick patients and, you know, trying to do something.

8  So think about some of the craziest things that you can think

9  of somebody maybe doing when they went into that doctor's

10  office that was inappropriate, and it probably happened.

11    And so, you know, we had to deal with some of the

12  repercussions if a technician maybe showed up drunk or -- or

13  even not wearing pants at one point in time.

14    So those are things that came through.  Sorry.

15  Q.  And now, Mr. Ketchum, Ms. Agarwal's role in 2012 and '13,

16  what was that?

17  A.  Shradha was heavily involved in marketing early on and the

18  brands.  And then slightly later on, became much more involved

19  in sponsorship.  Rishi and Shradha sometimes, sort of,

20  alternated who was more focused on membership and who was more

21  focused on the sponsorship side, or the two-sided market.

22    So, you know, sometimes Rishi would be more running

23  membership, and Shradha would be more running sponsorship, and

24  then sometimes they would swap.

25  Q.  Can you give the jury a sense of Outcome's physical office

1   space at that time in the '12 and '13 time period?

2          Where your office was versus Ms. Agarwal, Mr. Shah's

3   office, and then after you joined, Mr. Purdy's office?

4   A.  Sure.  I was small.  I didn't have an office.  I just kind

5   of sat with the member services team in some cubicles.  But it

6   was a smaller office.  I don't know the square footage.  But

7   there was, I guess, kind of -- there was sort of a wall here,

8   and that -- there would be offices on the wall.  And then,

9   sort of, right where the jury box kind of starts is where the

10  member services -- some cubes for member services and some

11  desks.

12         And then right over here is where member outreach,

13  sort of, sat.  So it was pretty tight, and you can, sort of,

14  hear what people were staying.  And Rishi and Shradha's

15  offices were, sort of, on the wings.  There was a conference

16  room on this wing and then the room end was -- at the office

17  was usually Rishi's or Shradha's.

18         And then the corner office was used by them too.

19  Q.  And throughout the course of those years, 2012, 2013, did

20  you have a lot of email correspondence with Mr. Shah and

21  Ms. Agarwal about various things?

22  A.  Yes, absolutely.

23  Q.  And outside of that email correspondence, did you also

24  have personal interactions with them in the office?

25  A.  Yeah, absolutely.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 35 of 269 PageID #:13144
Ketchum - direct by Hankey
589

1    Q.  Related to various business issues of the company?

2    A.  Yeah, absolutely.

3    Q.  How frequently would you interact with them, you know,

4    just face to face?

5    A.  Multiple -- face to face, if they were in the office,

6    multiple times per day.  They were very engaged with -- with

7    the staff.

8    Q.  Now, let's talk a little bit more about Outcome Health as

9    a company.

10   A.  Sure.

11   Q.  You earlier described Outcome as like a three-legged

12   stool.

13           MR. HANKEY:  So if we could please put that

14   demonstrative back up please, Ms. Paul.  That's 1127.

15   BY MR. HANKEY:

16   Q.  Mr. Ketchum, can you explain to the jury how Outcome was

17   like a three-legged stool other than having three, kind of,

18   core business components within it?

19   A.  Sure.  Sorry.  I use my hands a lot.  I apologize for

20   that.

21           So like a stool that you would sit on in your home or

22   somewhere else, everyone knows what a wobbly stool feels like

23   and how annoying that can be.  Outcome Health was somewhat

24   similar.  So your -- have member outreach, which is trying to

25   get doctors' offices to say yes.

1    You had member services, who was trying to install

2 and maintain those offices.  And then you have sponsorship

3 sales who's trying to sell advertising on to that network.

4    And so there -- that sponsorship sales is essentially

5 funding and paying for those devices to go into those doctors'

6 offices.  And like a stool, if any one of those teams starts

7 to do too much too fast or not enough, the stool can get

8 really wobbly, and the business model breaks down.

9    So if member outreach is selling far more offices

10 than what sponsorship could sell on to, then there's no --

11 there's not enough revenue to pay for that, and Outcome Health

12 can't be -- can't be profitable.

13    If member services can't install those devices or if

14 they can't keep those customers -- those doctors' offices

15 happy and there's complaints, so then there's a lot of offices

16 that are canceling the service, all of a sudden, it's like a

17 boat with a hole in it, and it's just filling with water, and

18 you're -- you're kind of trying to bail the water out before

19 the boat sinks.

20    So then that also won't -- won't lead to a business

21 that works.  And on sponsorship, if you were either not

22 selling enough advertising to go on to it, to those devices,

23 the member outreach member services can't be -- can't function

24 properly.

25    And, similarly, if too many sponsorship contracts are

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 37 of 269 PageID #:13146
Ketchum - direct by Hankey
591

1   sold and there's not enough devices to go on to, then you

2   aren't going to be able to fulfill those contracts.  So if any

3   one of those three legs of the stool doesn't do what it's

4   supposed to do properly, then that stool becomes lopsided and

5   eventually can fall over.

6   Q.  Mr. Ketchum, did you come up with this concept of thinking

7   about Outcome?

8   A.  No.

9   Q.  Did someone else in Outcome come up with it?

10   A.  Yes.

11   Q.  To your knowledge, who was that?

12   A.  I believe it was Rishi, but I heard Rishi would talk about

13   it.  Shradha would talk about it.  Jim Demas would talk about

14   it.  It was pretty well talked about.

15   Q.  Now, we've talked a little bit about member outreach.

16        Can you describe how member outreach knew which

17   doctors to contact in order to talk to them about potentially

18   installing a device in their office?

19   A.  Sure.  There was -- there's a database that the member

20   outreach team would use.  When I first started there, they

21   used a database called Quickbase, and that would -- that would

22   have a list of leads for those salespeople to -- to call on.

23   Q.  And who in Outcome would actually contact the doctors'

24   offices to try to convince them to install a device, and how

25   would they do it?

1  A.  The salespeople who are part of the member outreach team

2  would be the ones picking up the phone -- primarily the phone,

3  sometimes email, to contact the doctors' offices.  So usually

4  just calling and saying, "Hey, do you have a second to chat

5  about patient education in your practice?"

6        The other -- the other method that was pretty common

7  was to go to medical conferences to talk to doctors there.

8  Q.  Would the member outreach employee make a record of their

9  contact with the doctors' offices?

10  A.  They would.  They would put a record in the -- in the

11  Quickbase, the database, yeah.

12  Q.  And what was the ultimate goal or what was member outreach

13  trying to attain at the end of your process?

14  A.  A sign-up form.  So they would want to hear from the

15  doctors' offices that the doctor does want to have the device

16  installed, and the doctor's office would fill out a pretty

17  basic sign-up form just indicating that they wanted the

18  service.

19  Q.  Where were the various stages of member outreach tracked?

20  A.  The stages were also tracked in Quickbase.

21        MR. HANKEY:  Now, Ms. Paul, if we could please pull

22  up Demonstrative Exhibit 1129.

23  BY MR. HANKEY:

24  Q.  Mr. Ketchum, does this demonstrative describe or -- or

25  identify some of the stages of member outreach?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 39 of 269 PageID #:13148
Ketchum - direct by Hankey
593

1  A.  Yes.

2  Q.  Starting with the first one, call list/target offices.

3       Can you explain what that is?

4  A.  Sure.  So the call list and the target offices are just

5  the -- the total list of offices that would -- Outcome Health

6  would be interested in, in having installed in their network.

7  So that could vary over time, and it probably warrants a

8  lengthy discussion that I don't think is -- unless Mr. Hankey

9  wants me to talk about.

10      It's just a list of the doctors that Outcome Health

11 wants to have installed.

12 Q.  And then we see, "pitched and info sent."

13      What does that describe?

14 A.  That means the salespeople from the member outreach

15 chatted with the office, spoke to them about the benefits

16 of -- of Outcome Health's system, and then sent information

17 along postconversation.  So it was a sales pitch.

18 Q.  Was "ongoing dialogue" next?

19 A.  Yes.

20 Q.  What was that?

21 A.  Back and forth.  So it could be salespeople saying, "Hey,

22 what did you like about what we talked about?  What concerns

23 do you have?"  Just "ongoing dialogue" means exactly that;

24 there's ongoing conversations.

25 Q.  And then there's "verbal commitment"?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 40 of 269 PageID #:13149
Ketchum - direct by Hankey
594

1    A.  Yep.

2    Q.  What was "verbal commitment"?

3    A.  "Verbal commitment" means that office.  So it could be the

4    doctor or office manager or someone else who works there says,

5    "Hey, we want" -- sorry -- "we would like the devices

6    installed."

7    Q.  And each of these stages would be recorded in Quickbase?

8    A.  Yes.

9    Q.  Who would do the recording of these stages in Quickbase?

10   A.  The salesperson would do it as they were working through

11   the sales process.

12   Q.  And, then, finally, we see an entry for "sign-up form

13   executed and received."

14           Is that the sign-up form that you were just

15   describing to the jury?

16   A.  Yes.

17   Q.  Where the doctor is officially telling Outcome it will

18   accept a device in their office?

19   A.  Correct.

20   Q.  Now, we looked at the three main divisions of Outcome's

21   business.

22           What happened after member outreach achieved its goal

23   and got the sign-up form from an office?

24   A.  Sure.  The sign-up form would go to member services.  When

25   I first started, member services was a little bit of a

1  catchall team, which happens quite a bit at smaller companies,

2  especially tech start-ups.

3       So the member services team would reach out to the

4  office, confirm that the office did want the Outcome Health

5  system installed in their practice.  And then there was some

6  coordination around getting the technology there, you know,

7  what day would you want to have everything installed.  A

8  technician has to come out and install it.

9       Internet would have to be available in some way,

10  shape, or form.  So Internet, line, a cable may have to be run

11  or have to figure out a Wi-Fi-type solution.  You have to make

12  sure there's a power outlet and the TV can be installed in.

13       And then you have a conversation around custom

14  content.  So a lot of offices would have custom videos made

15  welcoming patients to the practice.  You know, "Hey, I'm

16  Dr. Smith.  Welcome to my practice," kind of stuff.

17       So member services was responsible for that and

18  getting the device installed.  And so that -- that's what

19  happened when the sign-up form went through.

20  Q.  And in that 2012/2013 time period, you were a member

21  services executive?

22       That was your title?

23  A.  Uh-huh.

24  Q.  And those were the types of activities --

25       THE COURT:  You have to say "yes" or "no."

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 42 of 269 PageID #:13151
Ketchum - direct by Hankey
596

1          THE WITNESS:  Oh, sorry.

2    BY THE WITNESS:

3    A.  Yes.

4    BY MR. HANKEY:

5    Q.  And those were the types of activities that you performed

6    as a member services executive?

7    A.  Yes.

8    Q.  Who was your supervisor in member services at that time?

9    A.  When I first started there, it was Sylvia Velazquez.  Now

10   Sylvia Belcher.

11   Q.  And in that --

12          COURT REPORTER:  Can you spell that?

13          THE WITNESS:  B-E-L -- Velazquez?

14          COURT REPORTER:  No.

15          THE WITNESS:  Belcher, B-E-L-C-H-E-R.

16   BY MR. HANKEY:

17   Q.  What kind of devices was Outcome installing in 2012 and

18   2013?

19   A.  Primarily, TVs.  So a TV that would typically get mounted

20   on the wall.  And there's a computer that gets mounted behind

21   the TV that's connected to the TV that would run the content.

22   Q.  And in your testimony just now, I think you were

23   describing, in a way, various stages of member services,

24   correct?

25   A.  Yeah, yes.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 43 of 269 PageID #:13152
Ketchum - direct by Hankey
597

1  Q.  Were those stages tracked as well?

2  A.  They were.

3  Q.  And where were they tracked?

4  A.  Also in Quickbase at that time.  Later Salesforce.  But at

5  that time period, Quickbase.

6          MR. HANKEY:  Please try to remember to slow down,

7  Mr. Ketchum.

8          THE WITNESS:  Sorry.

9          MR. HANKEY:  Thank you.

10  BY MR. HANKEY:

11  Q.  And who would record those entries of the member services

12  stages in Quickbase?

13  A.  The member services executive who was responsible for that

14  particular practice.

15  Q.  Now, could you go into the database and to Quickbase and

16  find out where any particular office in the database was in

17  either a member outreach stage or member services stage?

18  A.  Yes.

19  Q.  And could you pull a list of all the offices that were in

20  any particular stage at any given time?

21  A.  Yes.

22  Q.  Did you pull those lists as your -- kind of your ordinary

23  functions at Outcome at 2012 and 2013?

24  A.  Yes.

25  Q.  Okay.  And did you do that as part of your job duties

1    working at Outcome?

2    A.  Yes.  'Cause with member services, especially, you'd want

3    to track and have a chat with each member of the team.

4    You know, why are offices in particular stages, can we help

5    offices get installed faster.  What are some processes that

6    you can change.

7            It was something that was discussed pretty regularly.

8    Q.  Now, Mr. Ketchum, if someone walked into one of the

9    doctors' offices that was actually installed into

10   Outcome Health's network, what would they see on the waiting

11   room screen -- excuse me -- the screen in the waiting room of

12   the doctor's office?

13   A.  I'm not sure I understand your question.

14   Q.  So if someone's waiting in the waiting room where there's

15   a waiting room screen installed, what kind of content would

16   they see on the screen?

17   A.  Sure.  It would depend on the type of practice.  So the

18   content was practice-specific, generally.  So if you were in a

19   endocrinologist's office -- so a doctor who treats a lot of

20   patients for diabetes, you know, Type 2 diabetes might be an

21   example of that -- you would see content that would help a

22   patient that has Type 2 diabetes.  So it could be recipes,

23   diet tips, conversations, and stories about patients who have

24   gone through treatment for Type 2 diabetes.  Because it can be

25   scary.

1        And so just trying to help patients understand and

2    not be as scared before they go talk to their doctor.  And

3    there would be advertisements on there, as well, that would be

4    typically therapies that are relevant to that particular

5    practice, so the patient can talk to the doctor about them.

6    Q.  And the name of that group at Outcome that sold the

7    advertising space on those devices was sponsorship sales?

8    A.  Yes.

9        MR. HANKEY:  Could we please pull up demonstrative

10   1128 again, please.

11   BY MR. HANKEY:

12   Q.  And, again, you testified earlier about list match.

13       That was generally the first step in the process

14   of -- of sponsorship sales?

15   A.  Yes.

16       MR. HANKEY:  And we can take that down, Ms. Paul.

17   BY MR. HANKEY:

18   Q.  Now, focusing on list match, was this one of the areas

19   where you said earlier you were involved in deceiving

20   Outcome's clients?

21   A.  Yes.

22   Q.  How was a list match supposed to work at Outcome?

23   A.  Sure.  A client, potential client would send a list of

24   doctors --

25       MR. HUESTON:  Wait a minute.  Ask for some foundation

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 46 of 269 PageID #:13155
Ketchum - direct by Hankey
600

1    about his knowledge on this topic.

2              THE COURT:  Sure.

3              Go ahead and lay a foundation so the jury knows the

4    basis of what he's testifying about.

5    BY MR. HANKEY:

6    Q.  Mr. Ketchum, were you involved in list matches?

7    A.  Yes.

8    Q.  Were you involved in list matches that you believed were

9    done legitimately and not intended to deceive clients?

10   A.  Yes.

11   Q.  And were -- you testified earlier that you were also

12   involved in some list matches that were intended to deceive

13   clients?

14   A.  Yes.

15   Q.  Okay.  Are you able to explain how a list match was

16   supposed to work if it were done without deceiving clients?

17   A.  Yes.

18              THE COURT:  Proceed.

19   BY MR. HANKEY:

20   Q.  Mr. Ketchum, can you explain how a list match was supposed

21   to work if it was done in a way that was not deceptive?

22   A.  Sure.  A list of doctors would be sent to Outcome Health,

23   typically via Excel.  Outcome Health would pull a list of its

24   physicians from its database, and you match one file of

25   doctors to the other file of doctors, and you see where

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 47 of 269 PageID #:13156
Ketchum - direct by Hankey
601

1    there's -- where there's a match.

2            MR. HANKEY:  Now, if we could just display briefly,

3    Ms. Paul, Demonstrative Exhibit 1084.

4    BY MR. HANKEY:

5    Q.  Mr. Ketchum, does this chart show a rough picture of how a

6    list match worked?

7    A.  Yes.

8    Q.  Can you just explain what we see here?

9    A.  Sure.  This pretty much just illustrates what I just

10   mentioned, which is a list of doctors that the potential

11   client which is interested in, which would be the circle in

12   green.  And the circle in blue is the list of doctors that

13   Outcome Health has in its network or universe, and then the

14   overlap would be the list match.

15           MR. HANKEY:  We can take that down.  Thank you.

16   BY MR. HANKEY:

17   Q.  Now, Mr. Ketchum, did you observe interactions between

18   Outcome and the clients during the list match phase?

19   A.  Yes.

20   Q.  How would you see those interactions?

21           In what form?

22   A.  Usually email.

23   Q.  And can you expand a little bit more on what types of

24   emails you would see in which you would observe those

25   interactions?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 48 of 269 PageID #:13157
Ketchum - direct by Hankey
602

1    A.  Sure.  Oftentimes, the salesperson from sponsorship sales

2    would forward a request, sometimes to me or to Shradha or to

3    Rishi for a list match to be performed.

4              Is that -- do you want me to...

5    Q.  Based on that awareness of that process, did you come to

6    gain an understanding of the pharmaceutical clients'

7    expectations of what a list match involved?

8    A.  Yes.

9    Q.  What did most clients -- what did you understand most

10   clients to expect a list match to involve?

11             MR. BLEGEN:  Pardon me.  Objection to foundation and

12   potentially hearsay.

13             THE COURT:  Let's go to sidebar.

14        (Proceedings heard at sidebar on the record.)

15             THE COURT:  All right.  First, is the Shah table

16   working?

17             MR. HUESTON:  Yes, Your Honor.

18             THE COURT:  Okay.  Go ahead, Mr. Blegen.

19             Into the mic.  A little closer.

20             MR. BLEGEN:  I think the question lacks foundation as

21   to where he got this understanding of what clients expected.

22             THE COURT:  I'm still having trouble hearing you.

23   Can you just speak up.  Nobody can hear you.

24             MR. BLEGEN:  The question lacks foundation as to his

25   understanding of what clients expected, and, potentially, it's

 1    based on hearsay if he heard it from clients.

 2              THE COURT:  All right.  Well, response.

 3              MR. HANKEY:  Your Honor, we laid the foundation

 4    already.  He testified that he saw email correspondence

 5    between clients and the salespeople.

 6              THE COURT:  All right.  Well, he -- he's in a perfect

 7    position having dealt with clients to explain what clients

 8    expected.  It's got to be based on their statements to him,

 9    not on some aspirational belief of what they expected.

10              He's got -- you've got to establish that his belief

11    in what clients expected is based on conversations or emails

12    with those clients.

13              In effect to the -- and also to the extent that it's

14    hearsay, this is all based on -- I'm going to allow it in for

15    its effect on the listener.  The whole point is what he

16    believed the client wanted and what he did in response to

17    that.

18              So for -- to the extent there's a hearsay objection,

19    if there is one, that's overruled, because it's going to be

20    allowed on the effect of the listener.  If there's a -- I

21    assume we're going to hear from clients, anyway, going

22    forward.

23              They're going to say what they actually wanted and

24    what they were expecting, correct?

25              MR. HANKEY:  That's correct.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 50 of 269 PageID #:13159
Ketchum - direct by Hankey
604

1    THE COURT:  All right.  So I'll let it in for that

2    nonhearsay purpose.  And if the defense wants an instruction

3    to that effect at the appropriate time, just ask for it.  We

4    don't need to go to sidebar.  And I'll give that appropriate

5    instruction.

6    MR. HANKEY:  And just to clarify briefly, Your Honor.

7    Some of these -- many of these emails are between the

8    salesperson and the client that Mr. Ketchum's copied on --

9    THE COURT:  Right --

10   MR. HANKEY:  -- those emails with.

11   THE COURT:  -- I assumed that.

12   MR. HANKEY:  Okay.  Thank you.

13   THE COURT:  So thank you.  Objection's overruled.

14   MR. BLEGEN:  Your Honor, can I just make one final

15   comment?

16   THE COURT:  Yes, sir.

17   MR. BLEGEN:  Maybe I missed it, but it did not sound

18   to me as though they were limiting the testimony here to his

19   understanding, meaning the witness's understanding of what

20   clients expected of it.  It sounded like what did clients

21   expect.  Maybe I --

22   THE COURT:  Yeah, clarify that.

23   MR. HANKEY:  Yes, Your Honor.

24   THE COURT:  Make that clear, because it's what's in

25   his mind.  Not on the client's mind.  We hear that from the

1    clients themselves when they testify.

2                MR. POULOS:  Your Honor?

3                THE COURT:  Yes.

4                MR. POULOS:  Your Honor, it's Ted Poulos.

5                Just for the record, Mr. Ketchum's understanding of

6    what clients expected is not relevant to the case in my view.

7                And the other point is if his understanding of the

8    expectations of what clients want is based on emails, the

9    government should just introduce those emails as the best

10   evidence of that.  And I think it's generally just

11   inappropriate for him to be talking about the state of mind of

12   third parties, especially given the fact that he was on the

13   member service side, not interacting with clients at all.

14               THE COURT:  All right.  Well, you've laid a

15   foundation for why he has this knowledge.  Further clarify

16   that it's his belief and testimony as to what he believed

17   clients wants -- wanted based on interactions either with the

18   clients or review of emails that he or other people had with

19   those clients.

20               That's acceptable, and I think relevant.

21               So the objection's overruled.

22               MR. HUESTON:  Your Honor, just for the record, I want

23   to join the objection that the state of mind of Mr. Ketchum is

24   not a grounds for a hearsay exception.  Thank you.

25               MR. HANKEY:  May we make a record here as well?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 52 of 269 PageID #:13161
Ketchum - direct by Hankey
606

1                    THE COURT:  Go ahead.

2                    MR. HANKEY:  Your Honor, Mr. Ketchum's state of mind

3      is at issue in this case, the existence of a scheme, and his

4      participation in the scheme.  And his participation in the

5      scheme with defendants is very much at issue.

6                    It's been raised on multiple occasions in connection

7      with various aspects of pretrial litigation, including in

8      connection with the Santiago proffer and their standing

9      objection.

10                   So we also expect that defense will challenge his

11     knowing participation in the scheme.

12                   So for those reasons, it's relevant testimony.

13                   THE COURT:  And I so find.

14                   MR. HANKEY:  Thank you.

15                 (Sidebar ended.)

16                   THE COURT:  All right.  Proceed.

17                   Objection overruled.

18                   MR. HANKEY:  Thank you, Your Honor.

19     BY MR. HANKEY:

20     Q.  So, Mr. Ketchum, I want to focus on your understanding of

21     what clients expected from a list match.

22                   So can you testify what -- based on your observations

23     of interactions with -- between Outcome and the clients what

24     you understood the clients to expect a list match to involve?

25     A.  Sure.  I was on emails where I saw clients make fairly

1  specific requests.  Most of those requests were indicated very

2  clearly that clients were interested in having offices that

3  were already installed.

4         There were other stipulations that came along as

5  well.  They may want not just specific doctors, but they may

6  say, "We just want all rheumatologists."  So not necessarily a

7  list match, but "We want every rheumatologist very

8  specifically and only rheumatologists."

9         But ones that are installed for the most part.  Very,

10  very rarely was growth expected from the emails that I saw

11  from clients.

12  Q.  But there were occasions, Mr. Ketchum, where based on

13  those interactions, you did observe that some clients expected

14  some, as you put it, growth in the contract?

15  A.  Yes, some did.

16  Q.  And those were exceptions to the understanding that you

17  described generally, correct?

18  A.  That's correct.

19  Q.  Can you -- I'd like you to explain a bit more, if you

20  would, those exceptions.

21         And can you -- can you describe exactly what types of

22  contract structures you observed clients and salespeople

23  talking about that would be that exception to the rule?

24  A.  Sure.  I saw -- I did see some emails that would come --

25  come through where clients would say, "Hey, you know, we're

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 54 of 269 PageID #:13163
Ketchum - direct by Hankey
608

1    currently installed, but we'd like to see -- we'd like to

2    grow.  We have initial budget.  We'd like to understand how

3    many more screens we can have."

4         And then even forward-looking, "How many offices do

5    you think you might have in the future?"

6         But that was -- that was not -- that was nowhere near

7    as often as offices -- or as clients saying, "Hey," very

8    specifically, "who do you have based on the list match?"

9    Q.  Now, those exceptions occurred.

10        What, if anything, would you expect to see in the

11   contracting process as a result of those discussions if that

12   became part of the deal?

13   A.  That they would be noted in the --

14        MR. BLEGEN:  Objection to foundation and relevance.

15        THE COURT:  Overruled.

16        MR. HANKEY:  You may answer.

17        THE WITNESS:  Can you repeat the question?

18   I'm sorry.

19        MR. HANKEY:  Yes.

20   BY MR. HANKEY:

21   Q.  In talking about these exceptions to the general rule

22   about clients' expectations on list matches, what, if

23   anything, would you expect to see play out in the contracting

24   process if growth was part of the deal?

25   A.  I would expect it to be pretty clearly discussed from the

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 55 of 269 PageID #:13164
Ketchum - direct by Hankey
609

1  client or the -- or the agency representing the client that

2  growth was -- was a part of it.  I would also expect to see

3  that in the contract.

4         THE COURT:  And so it's clear, this witness is

5  testifying to what he understands is the client's

6  expectations.  He doesn't know what's in clients' minds.  He

7  can't testify to that.

8         But he can testify to what he believed was in their

9  minds, based on his either conversations or review of emails

10  or other information he gleaned from working there.

11        Proceed.

12        MR. HANKEY:  Thank you, Your Honor.

13  BY MR. HANKEY:

14  Q.  Mr. Ketchum, have you ever heard of the term "weighted

15  average"?

16  A.  Yes.

17  Q.  Was that one of these exceptions that you've been

18  describing?

19  A.  Could be, yes.

20  Q.  Can you describe what that term "weighted average"

21  meant -- what your understanding of that term was in

22  connection with client contracts?

23  A.  Sure.  So to -- to try to just make it as simple as

24  possible for -- for everybody.  You have a period of time, so

25  let's say January 1st and December 31st.  So one year.  And

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 56 of 269 PageID #:13165
Ketchum - direct by Hankey
610

1    there is a certain number that exists.  In Outcome Health's

2    instance, there are a certain number of doctors' offices that

3    exists as an installed -- that are installed on January 1st.

4           And on December 31st, there's a certain number of

5    offices that are installed at that date too.  And hopefully

6    some growth of those offices over that time.  And the weighted

7    average is just the average of those two.  So the weighted

8    average would be the average of -- of those two over the

9    period of time, basically.

10          MR. HANKEY:  Ms. Paul, can we please pull up

11   Demonstrative Exhibit 1136.

12          I've got a hard copy, Your Honor.

13          THE COURT:  If -- let me know if you want to use that

14   or if you're going to pull it up off of here.  It looks

15   like -- I think you said 1136.

16          MR. HANKEY:  I said 1136, and that was my mistake.

17   It's 1135.

18          THE COURT:  All right.  Proceed.

19   BY MR. HANKEY:

20   Q.  Mr. Ketchum, do you see 1135 displayed in front of you?

21   A.  I do.

22   Q.  Now, we see three boxes with numbers in them.

23          The numbers on the left-hand side of the

24   demonstrative, are those numbers, numbers you recognize from

25   any particular campaign?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 57 of 269 PageID #:13166
Ketchum - direct by Hankey
611

1   A.  Yeah.  This looks like Pradaxa's campaign.

2   Q.  Now, was the Pradaxa campaign you're referring to, to your

3   understanding, was it actually a weighted average campaign?

4   A.  No, I don't believe it was.

5   Q.  But using these numbers as an example, can you describe

6   what we see here in demonstrative -- Demonstrative

7   Exhibit 1135?

8   A.  Yes.  If you look on the bottom left, you see 708.  That's

9   the number of offices that Outcome Health had installed at the

10   start of the contract for Pradaxa.  The contracted number that

11   Outcome Health agreed to deliver for Pradaxa was 1,819

12   offices.

13         If it were a weighted average, Outcome Health

14   would've needed to end the -- the year essentially at just shy

15   of 3,000 offices -- so it looks like 2,930 offices in this

16   instance -- to meet a weighted average of 1,819 offices.

17         So that's how many more offices would need to be sold

18   above the contracted amount to reach what would be a weighted

19   average.

20         So to -- to, kind of, say in a -- in a slightly

21   different way, everything that's in red on the left-hand side

22   where there's less that are installed than what's being

23   contracted, all of that would need to be made up in the green

24   in order for that contract to be considered met, provided it

25   was indeed a weighted average.  If that makes sense.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 58 of 269 PageID #:13167
Ketchum - direct by Hankey
612

1  Q.  Now, the visual depiction in this demonstrative, does it

2  assume -- looking at the red line, does it assume a constant

3  rate of growth across that whole April to December

4  time period?

5  A.  In this instance, yes, it does.

6  Q.  Okay.  So that doesn't necessarily have to happen, a

7  constant rate of growth, in order for a weighted average to

8  play out?

9  A.  No.

10  Q.  This is what it would look like if that were the case?

11  A.  Yes.

12  Q.  In any event, constant rate of growth or not, do you have

13  to make up for the under-delivery that occurs at some points

14  with equal, later over-delivery?

15  A.  Yes.

16        MR. HANKEY:  We can take that down, Ms. Paul.

17  BY MR. HANKEY:

18  Q.  Mr. Ketchum, based on your observations of the contracting

19  process at Outcome, how often do you recall seeing Outcome

20  actually contracting for weighted average campaigns in

21  2012 and 2013?

22  A.  I'm not sure I can actually recall any true weighted

23  average campaigns that I saw via -- either that came through

24  via email or that were contracted.

25  Q.  Now, when you were typically -- excuse me -- when you were

1  involved in deceiving clients about list match, what was it

2  that was usually misrepresented in the list matches?

3  A.  The number of offices that were actually installed at that

4  moment in time or the number of offices that would be

5  installed on the go-live date.

6  Q.  Did you observe interaction between Outcome salespeople

7  and potential clients in the sales process, specifically as it

8  relates to list matches?

9  A.  Yes.

10  Q.  Did -- during those observations of the sales process, did

11  you come to understand why clients -- did you have an

12  understanding of why clients would want Outcome to actually

13  have in its network the offices returned in the list match?

14        Just yes or no.

15  A.  Yes.

16  Q.  Okay.  And how did you come to understand why clients

17  would actually want Outcome to have in its network those

18  offices during a list match, if you can understand that?

19  A.  Sure.  I saw it -- I saw it laid out pretty clearly in the

20  emails what the request was.

21  Q.  And so what was your understanding of why clients would

22  want Outcome to actually have offices in its network when

23  they're returned on list match results?

24  A.  Because a client or a potential client doesn't want to pay

25  for something they're not getting.  So if they're paying for

1    it, they want to -- they want to get what they're paying for.

2    Q.  What did Outcome hope would happen next after sending list

3    match results to a pharma client?

4    A.  That it would go into contracting.

5            MR. HANKEY:  Now, Ms. Paul, can we please pull up

6    demonstrative Exhibit 1130.

7    BY MR. HANKEY:

8    Q.  What do we see here on the screen, Mr. Ketchum?

9    A.  It looks like a sample contract.

10   Q.  Okay.  So can you explain what kind of information we

11   would typically see in an Outcome Health contract with the

12   pharma client?

13   A.  Sure.

14           THE COURT:  Can you blow this up a little.

15   Thank you.  Even more, if possible.  It's very hard to read

16   the small print.

17   BY THE WITNESS:

18   A.  So where the small print is, where it says "address" or

19   "description," that is the area that would talk about the

20   number of offices that are a part of that -- that agreement

21   during that time period.

22           You see where it says "start date" and "end date"?

23   That's the time period in which those offices are supposed to

24   run the advertising campaign.  And then the -- the total cost

25   for that time period is also -- appears to be highlighted in

 1    that yellow box.
 2    BY MR. HANKEY:
 3    Q.  Now, if a -- if a client also -- did you ever hear of
 4    clients writing an ROI guarantee into some contracts?
 5    A.  Yes.
 6    Q.  And if there was an ROI guarantee, would that be spelled
 7    out in the contract itself?
 8    A.  I believe so, yes.
 9    Q.  And how about IMS studies?
10          Did contracts ever specify whether ROI studies would
11    be performed by a particular third party?
12    A.  Yes.  Oftentimes, IMS announced these were a part of the
13    agreed-upon contract.
14          THE COURT:  And, ladies and gentlemen, you've seen
15    PowerPoints, and the parties have put up during the opening
16    interim statements, you've seen demonstrative exhibits.  These
17    are things that don't go back to you when you deliberate.
18    These are for purposes of demonstrating or enhancing an
19    argument one side or the other makes.
20          What you'll get back in the jury room are the actual
21    exhibits themselves, the documents themselves.  The
22    demonstrative may -- may be used for purposes of explanation,
23    but the exhibits you'll get in the jury room are those that
24    are admitted in evidence that are the real -- the real
25    contracts or the real exhibits or the real emails.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 62 of 269 PageID #:13171
Ketchum - direct by Hankey
616

1          So keep that in mind as these are flashed before you.

2          Proceed.

3     BY MR. HANKEY:

4     Q.  Now, Mr. Ketchum, when you were involved in deceiving

5     clients in the list-match process, did you have an

6     understanding of what the goal was of deceiving clients in the

7     list-match process?

8     A.  Yes.

9     Q.  What was that?

10    A.  To capture as much of the client's budget as possible.

11    Q.  What does that mean, "to capture as much of the client's

12    budget as possible"?

13    A.  Sure.  So when it comes to business -- this is pretty true

14    for most businesses -- when you have a budget as a team or an

15    organization, if you spend less in a given year than what your

16    budget specifies you have, you oftentimes won't get the same

17    level of budget the next budgeting period.

18         So if someone says you have $100 to perform your

19    function and you only need $75 to perform your function, the

20    next period, you're probably only going to get $75.  So a lot

21    of clients and agencies -- I represent them -- try to use

22    their -- their whole budget when they can, so then they have

23    access to that budget the next year.

24         And Outcome Health oftentimes tried to capture as

25    much of that budget as they could, which included including

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 63 of 269 PageID #:13172
Ketchum - direct by Hankey
617

1   projections in -- in the list-match period and during the

2   contracting period.

3   Q.  How did you come to understand and know that that was the

4   goal of deceiving clients in connection with list matches?

5   A.  Yeah, I had conversations with Rishi Shah and

6   Shradha Agarwal about it.

7   Q.  Did you and Rishi Shah and Shradha Agarwal accomplish the

8   goal of getting -- capturing more budget?

9   A.  Yes.

10  Q.  Would that ever lead to other issues or problems for

11  Outcome?

12  A.  Absolutely.

13  Q.  And what were those?

14  A.  Well, once more -- once more doctors' offices than -- once

15  more doctors' offices are promised to a potential client than

16  what's installed, once the go-live date happens, there's not

17  enough offices that are -- are going to meet the contract.  So

18  you're starting off that agreement with an under-delivery,

19  shortfall.

20          And then, you know, you have to send to the client on

21  a regular basis, you know, the -- a proof of performance

22  saying, "Hey, we -- you know, Outcome Health has fulfilled the

23  agreement."

24          And then pay Outcome Health for fulfilling that

25  agreement.  And if there's a continuing shortfall, you have to

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 64 of 269 PageID #:13173
Ketchum - direct by Hankey
618

1    keep figuring out, you know, what are you going to say to the

2    client, what should the client be told.

3    Q.  Now, just a couple of follow-up questions on list match.

4         Was -- in connection with this -- the deceptive list

5    matches, was Outcome selling something that it didn't have to

6    clients?

7    A.  In the sense that it was selling -- it was making promises

8    to clients that doctors were installed when they weren't, yes.

9         MR. HANKEY:  Your Honor, I'm happy to continue.

10   We're at a natural breaking point if we want to take the break

11   or happy to keep going.

12        THE COURT:  All right.  Well, it's a little early,

13   but we'll take our break right now.  15 minutes.

14        Please don't discuss the case among yourselves or

15   with anyone else.  We'll see you -- and keep an open mind as

16   there's more evidence to hear.  We'll see you in 15 minutes.

17        COURT SECURITY OFFICER:  All rise.

18      (Jury out at 10:24 a.m.)

19        THE COURT:  All right.  Sir, you can leave the stand.

20   Be back in 15 minutes.

21        Anything we need to put on the record right now?

22        MR. HANKEY:  No, Your Honor.

23        MR. HUESTON:  No, Your Honor.

24        MR. POULOS:  No, Your Honor.

25        MR. BLEGEN:  No, Your Honor.

619

1          THE COURT:  All right.  Thank you.  See you in

2   15 minutes.

3          (A recess was had from 10:25 a.m. to 10:36 a.m.)

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 66 of 269 PageID #:13175
Ketchum - direct by Hankey
620

1    (Change of reporter; jury out.)

2           THE COURT:  All right.  Please be seated.

3           Let's bring in the jury.

4    (Jury in.)

5           THE COURT SECURITY OFFICER:  All rise.

6           THE COURT:  All right.  Please be seated.

7           Ladies and gentlemen, sorry about the delay.  We had

8    a technical issue we were trying to resolve.

9           Secondly, you'll notice there is a different view of

10   the witness.  We're going to try this because I think it will

11   make the sound match the -- the witness's speech so that we

12   won't have the delay that you may have noticed on the earlier

13   camera views.  So hopefully this works a little better.

14          And you may proceed.

15          MR. HANKEY:  Thank you, Your Honor.

16   BY MR. HANKEY:

17   Q.  Mr. Ketchum, did Outcome Health do a list match for the

18   pharma brand LINZESS?

19   A.  Yes.

20   Q.  In document 13?

21   A.  Yes.

22   Q.  Was LINZESS a type of medicine?

23   A.  Yes.

24   Q.  What did it treat, if you know?

25   A.  I believe irritable bowel.

1  Q.  I'm sorry, what was that?

2  A.  Irritable bowel, if I recall.

3          THE COURT:  Move the mic a little closer.

4          THE WITNESS:  Sorry, Your Honor.

5          MR. HANKEY:  I'd like to display just for the witness

6  and the Court Government Exhibit 210.

7          MR. BLEGEN:  It was showing to the jury, Your Honor.

8          THE COURT:  Oh, okay.  Sorry.  I thought they had the

9  jury monitor off.

10          Go ahead.

11          MR. HANKEY:  The government is offering this

12  Exhibit 210 for a nonhearsay purpose, Your Honor.

13          THE COURT:  And that purpose is what?

14          MR. HANKEY:  It's a verbal act, and the top part of

15  the e-mail is not hearsay.

16          THE COURT:  Okay.

17          Any objection for those purposes?  Any objection by

18  defense, given those -- the limited use of these documents?

19          MR. HUESTON:  No, Your Honor.

20          MR. BLEGEN:  No, Your Honor.

21          MR. PRUITT:  No, Your Honor.

22          THE COURT:  All right.  It's admitted subject to

23  those qualifications.

24          It is now displayed to the jury.

25          MR. HANKEY:  Thank you, Your Honor.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 68 of 269 PageID #:13177
Ketchum - direct by Hankey
622

1   BY MR. HANKEY:

2   Q.  Mr. Ketchum, do you see an e-mail in front of you at the

3   bottom between Mr. Mons and Mark Rosetti?

4   A.  Yes.

5   Q.  Who was Mark Rosetti?

6   A.  He worked for, I believe, Ironwood Pharmaceuticals.

7   Q.  And who was Bob Mons?

8   A.  He was a salesperson at Outcome Health who worked on the

9   sponsorship sales team.

10          MR. HANKEY:  Now, Ms. Paul, could we please zoom in

11  on the -- Mr. Rosetti to Mons e-mail at 1:02 p.m.

12          Yeah, it's actually on the next page at the very top.

13  BY MR. HANKEY:

14  Q.  Mr. Ketchum, can you describe what's happening in this

15  e-mail.

16  A.  Mark -- Mr. Rosetti is sending Bob Mons an e-mail

17  requesting a list match to be conducted.

18          MR. HANKEY:  Now, Ms. Paul, could we please zoom in

19  on the 4:49 p.m. e-mail.

20  BY MR. HANKEY:

21  Q.  Can you read what Mr. Mons told Mr. Rosetti in response to

22  his e-mail.

23  A.  Yes.

24          "Hey, Mark.  I hope your week is going well.  We

25  performed a match against the target list you provided for

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 69 of 269 PageID #:13178
Ketchum - direct by Hankey
623

1  LINZESS.  We matched 1828 HCPs and1643 unique waiting rooms.

2  Let me know how you want to proceed?  Thanks, Mark."

3  Q.  Mr. Ketchum, did Mr. Mons' e-mail provide truthful

4  list-match results to the client here?

5  A.  No.

6  Q.  Why not?

7  A.  The match included projections.

8  Q.  Okay.  I want to focus your attention to some e-mails

9  earlier in time than these.

10       MR. HANKEY:  And I'll start with Government's

11  Exhibit 202, which the government is offering under (d)(2)(E).

12       THE COURT:  All right.  It will be admitted subject

13  to the objections previously lodged.

14       (Government's Exhibit No. 202 was received in evidence.)

15       MR. HANKEY:  Let me focus on the 6:24 p.m. e-mail,

16  please.

17       There it is.

18  BY MR. HANKEY:

19  Q.  Mr. Ketchum, can you please read Mr. Mons' e-mail at

20  6:24 p.m.

21  A.  "Michelle/Mark, thanks for making time to meet with

22  Shradha, Matthew, and myself today.  Per our discussion,

23  attached is the deck we reviewed along with the links below to

24  Black Box creative samples running on network and IBS content

25  samples also currently running on our PCP network.  Thanks for

1    getting the CDA out.  We'll turn it Monday so we can initiate

2    the match next week.  Please let me know if there is

3    additional information we can provide.  Enjoy your weekend."

4    Q.  When he's referring to "the match," what is Mr. Mons

5    referring to?

6    A.  The match for LINZESS.

7    Q.  What's the date on this e-mail, Mr. Ketchum?

8    A.  April 12th, 2013.

9    Q.  Is this roughly three weeks prior to the last exhibit we

10   just looked at?

11   A.  I believe so, yes.

12        MR. HANKEY:  Now, Ms. Paul, can we please focus on

13   the Ruggiero e-mail at 10:37 p.m.

14   BY MR. HANKEY:

15   Q.  Mr. Ketchum, is this the next e-mail in the string?

16   A.  Yes, it appears so.

17   Q.  Can you please read what Ms. Ruggiero wrote.

18   A.  "Hi, Bob.  Thanks for sending the samples and the deck we

19   reviewed today.  In order to do a physician match with our

20   target list, could you let me know what we will need to send

21   you?  Would we need names, city, state, ZIP?  Anything else?"

22   Q.  And who is Michelle Ruggiero?

23   A.  Michelle worked for an agency representing the client,

24   representing LINZESS.

25   Q.  And what did --

1          MR. HANKEY:  If we could zoom out, please, Ms. Paul.

2  BY MR. HANKEY:

3  Q.  What did Mr. Mons do when he received Michelle Ruggiero's

4  e-mail?

5  A.  I believe he sent the request onward.

6          MR. HANKEY:  Can we please zoom in on the 6:44 p.m.

7  e-mail, Ms. Paul.

8  BY MR. HANKEY:

9  Q.  Can you please read what Mr. Mons wrote.

10  A.  "Hey Big.  See Michelle's e-mail highlighted in this

11  string.  She asked what we need to run the match for their

12  LINZESS docs against our installed base.  Can you list exactly

13  what you want or feel free to respond directly to Michelle and

14  copy Mark Rossetti (highlighted) myself, Matthew, and SA.

15  Michelle is not an analyst, so please list what you need to

16  run the match and kindly explain the process and timing.

17  Thanks."

18  Q.  Who is the "SA" here?

19  A.  Shradha Agrawal.

20  Q.  And who is Big?

21  A.  I believe me.

22  Q.  And what does he say at the very end?

23  A.  "Thanks, Jay."

24  Q.  Who is Jay?

25  A.  Me.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 72 of 269 PageID #:13181
Ketchum - direct by Hankey
626

1    Q.   Okay.  Mr. Ketchum, what was your understanding of what

2    Mr. Mons is trying to accomplish here by forwarding this

3    e-mail to you?

4    A.   He is trying to make sure that a list match could be

5    properly executed.

6    Q.   Now, Mr. Mons wrote:  "She asked what we need to run the

7    match for their LINZESS docs against our installed base."

8            Do you see that?

9    A.   I do.

10   Q.   What does the phrase "against our installed base" mean?

11   A.   It means against offices that are currently installed in

12   the Outcome Health network.

13   Q.   Did Ms. Agrawal appear to receive Mr. Mons' e-mail?

14           MR. HANKEY:  And we could back out a little bit,

15   Ms. Paul, and focus in on the top e-mail, please.

16   BY THE WITNESS:

17   A.   Yes.

18   BY MR. HANKEY:

19   Q.   What did she do -- what did Ms. Agrawal do after she

20   received a copy of this e-mail?

21   A.   She copied Ashik Desai on the e-mail chain.

22   Q.   Now, at this point in time, April of 2013, what was Ashik

23   Desai doing at this time?

24   A.   He was in college, I believe.

25           MR. HANKEY:  And, Ms. Paul, can we please turn to

1  Government Exhibit 209, which the government is offering under

2  (d)(2)(E).

3          THE COURT:  All right.  It will be admitted over the

4  same standing objection.

5          (Government's Exhibit No. 209 was received in evidence.)

6          MR. HANKEY:  And can we please zoom in on the e-mail

7  at 12:36 p.m.

8  BY MR. HANKEY:

9  Q.  Mr. Ketchum, could you please read the first three lines

10  of this e-mail.

11  A.  Yes.

12          "Shradha, here is the match information for LINZESS,

13  1,150 prescribers, 965 waiting rooms."

14  Q.  What are you telling Shradha Agrawal here?

15  A.  What the results from the list match were.

16          MR. HANKEY:  Now, could we zoom in on the e-mail at

17  2:25 p.m., please.

18  BY MR. HANKEY:

19  Q.  Did Ms. Agrawal respond?

20  A.  Yes.

21  Q.  What did she ask?

22  A.  "Jay, how many physicians are on their list?  Do they have

23  decile data?"

24  Q.  What is decile data?

25  A.  Decile is a ranking system of sorts for physicians based

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 74 of 269 PageID #:13183
Ketchum - direct by Hankey
628

1  on how much of a particular drug or a category of drugs that a

2  doctor prescribes.

3  Q.  And Ms. Agrawal is referring to their list here.  What

4  list is she referring to?

5  A.  The physician list that LINZESS sent to be matched

6  against.

7         MR. HANKEY:  Could we please zoom in on the e-mail

8  from Jason Ketchum at 2:26 p.m., please.

9  BY MR. HANKEY:

10  Q.  And what did you tell Ms. Agrawal in response?

11  A.  "95,000, and unfortunately no segmentation information."

12  Q.  Okay.  And, again, what does that 95,000 represent?

13  A.  The total number of physicians that were on the list that

14  LINZESS sent to Outcome Health to match against.

15         MR. HANKEY:  And now, could we zoom in on the next

16  e-mail, please.

17  BY MR. HANKEY:

18  Q.  Can you read Ms. Agrawal's response.

19  A.  Yes.

20         "What would the match look like if we did project as

21  a weighted average for H2?  1K match of 95K prescribers looks

22  weak."

23  Q.  Ms. Agrawal wrote "1K match of 95K prescribers looks

24  weak."

25         Why might a 1K match of 95K prescribers look weak?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 75 of 269 PageID #:13184
Ketchum - direct by Hankey
629

1   A.  The total percent of the doctors in our network that

2   matched to their total list could be perceived as relatively

3   low.

4   Q.  And what does the 1K match represent?

5   A.  The installed -- the installed -- the physicians that are

6   installed in the Outcome Health network.

7   Q.  Does that refer back to the number that you provided

8   earlier?

9   A.  Yes.

10  Q.  Did Ms. Agrawal use the phrase "project as a weighted

11  average"?

12  A.  Yes.

13  Q.  What does that mean?

14  A.  To change -- to take a look at the list match and see what

15  the list match might look like if -- instead of looking at the

16  match as a current installed base, if it was a projection

17  based on what Outcome Health might have for the second half of

18  the year.

19  Q.  Is that consistent with what the client appeared to you to

20  expect in the list match?

21  A.  It's not.

22  Q.  And why not?

23  A.  Because the -- it -- the request was for installed and the

24  word "installed" was used.

25  Q.  And we saw that term "installed base" --

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 76 of 269 PageID #:13185
Ketchum - direct by Hankey
630

1  A.  Hm-mm.

2  Q.  -- in --

3  A.  That's correct.

4  Q.  -- Mr. Mons' e-mail?

5  A.  Yes.

6  Q.  Is that what you're referring to?

7  A.  Yes.

8  Q.  Now, is Mr. Mons -- we're looking at Government's

9  Exhibit 209.

10        Is Mr. Mons copied on Ms. Agrawal's e-mail in

11  Government's Exhibit 209?

12  A.  No.

13  Q.  Bob Mons was the Outcome salesperson, correct?

14  A.  Yes.

15  Q.  Did Ms. Agrawal usually copy Outcome salespeople on

16  e-mails talking about projections in list match?

17  A.  Typically, no.

18  Q.  Did you ever gain an understanding of why not?

19  A.  Yes.

20  Q.  How did you learn why Ms. Agrawal typically did not copy

21  Outcome's salespeople on e-mails about projections?

22  A.  From conversations with Shradha Agrawal.

23  Q.  And what was your understanding of why Agrawal usually did

24  not copy Outcome salespeople on these types of e-mails?

25  A.  My understanding was, it was -- Ms. Agrawal wanted

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 77 of 269 PageID #:13186
Ketchum - direct by Hankey
631

1  salespeople to feel confident in the numbers that they were

2  selling to clients, and so wouldn't want that -- wouldn't want

3  to have that confidence shaken if that salesperson were to

4  understand that there were projections or if there were

5  shortfalls.

6  Q.  You used that term "confidence."  Is that your term?

7  A.  No, that was a term that was used by Shradha during

8  conversation.

9  Q.  And what did you understand that confidence to mean?

10  A.  With salespeople -- a confident salesperson -- I'm trying

11  to -- I want to answer this in a succinctly way -- in a

12  succinct way.

13          Salespeople want to be confident typically when

14  they're trying to sell something.  It doesn't matter what

15  they're trying to sell.

16          If you lack confidence in what you're selling and you

17  lack conviction of what you're selling, that can oftentimes be

18  perceived by the -- whoever you're trying to sell to.

19          So in this instance, you -- Shradha wanted the

20  salesperson, Bob, to be confident when he's talking to the

21  client so the client would be more likely to buy.

22  Q.  And in this -- in those circumstances, what might cause a

23  salesperson like Mr. Mons to lose that confidence?

24  A.  If you're selling something that, you know, you don't have

25  or if you're selling something that you're concerned you may

1    not be able to achieve, then you're -- you might lose

2    confidence when you're talking to that client and selling them

3    something that you don't believe you can fulfill.

4    Q.  And is that what you understood Ms. Agrawal to be talking

5    about?

6    A.  I believe so, yes.

7              MR. HANKEY:  Now, Ms. Paul, could we please pull up

8    Government's Exhibit 208, which we're offering under

9    (d)(2)(E).

10             THE COURT:  It's admitted subject to the same

11   objection.

12        (Government's Exhibit No. 208 was received in evidence.)

13   BY MR. HANKEY:

14   Q.  Mr. Ketchum, is this a continuation of the e-mail string

15   that we just reviewed?

16   A.  Yes, it is.

17   Q.  I'd like to focus on the e-mail at 2:41 p.m., which is at

18   the top.

19             What did you tell Ms. Agrawal in your response to her

20   e-mail?

21   A.  I replied with what -- what a projection could look like.

22   Q.  And what -- and can you please read what you told her?

23   A.  Yes.

24             "SA, assuming a monthly goal of 150 sales,

25   90.4 percent being a hit against LINZESS (holy cow) we would

1  add 678 prescribers, bringing the total at the end of

2  September to 1828 and 1643 waiting rooms?

3  Q.  Do you see Ashik Desai copied on your e-mail?

4  A.  I do.

5  Q.  Can you explain what you were doing with the monthly goal

6  of 150 sales here?

7  A.  Yes.  So that is in reference to member outreach's goal.

8  Again, member outreach is the sales team responsible for

9  bringing doctor's offices into the Outcome Health network to

10  then hand over to member services.

11       So assuming there is some assumptions built into the

12  projection, assuming member outreach achieves their goal of

13  150 sales per month against a target list -- and that target

14  list would include LINZESS-preferred physicians or physicians

15  that LINZESS requested -- 90.4 percent of those sales, then,

16  statistically should be against that LINZESS list.  That gives

17  you the -- a projection of about 678 prescribers would be

18  added during that time period.

19  Q.  Now, you gave a number for September.

20       Do you see that?

21  A.  I do.

22  Q.  What was that number?

23  A.  1,828 prescribers and 1,643 waiting rooms.

24  Q.  And what did that represent in the context of what you're

25  doing here?

1   A.   That would -- that would represent the number of offices

2   that Outcome Health in the future theoretically should have

3   installed by that time period.

4   Q.   The total number?

5   A.   That matched against the list.

6   Q.   Ms. Agrawal had assumed a campaign for the second half of

7   the year; is that right?

8   A.   I believe so, yes.

9   Q.   So why project, as it appears you've done here, to

10  September and not December?

11  A.   I believe that was the time frame that was requested in

12  the -- from the client.

13  Q.   Now, if Outcome were to truly deliver a weighted average

14  of 1828 screens, what would have to happen in the second half

15  of the year, and particularly in October through

16  December 2013?

17  A.   Is your question assuming the weighted average number

18  would be 1,828?

19  Q.   That's right.

20  A.   Far more than 1,828 would need to be sold.

21       If the jury remembers my prior testimony when I

22  talked about weighted average, you'd need to have more sold at

23  the end to account for the short number at the beginning.

24       So if the weighted average is 1,828, by the end of

25  the year, you'd have to have far more than 1,828 to achieve

1    that average.

2    Q.  And earlier we looked at your results of the list match

3    against the installed base, correct?

4    A.  Correct.

5    Q.  Do you recall roughly what the results of installed

6    devices were?

7    A.  I don't, but it's -- it was less than that.

8           MR. HANKEY:  Okay.  Let's just take a look at

9    Exhibit 209.  And zoom in on the 12:36 p.m. e-mail.

10   BY MR. HANKEY:

11   Q.  Does that refresh your memory, Mr. Ketchum?

12   A.  It does.

13   Q.  And what -- what was the number of installed waiting rooms

14   at the time that you conducted the list match against the

15   installed base?

16   A.  965.

17          MR. HANKEY:  Let's take a look at Exhibit 210,

18   please.

19          THE COURT:  Is this in evidence?

20          MR. HANKEY:  This is one we've reviewed, Your Honor.

21   It is.

22          THE COURT:  It's already admitted?

23          MR. HANKEY:  Admitted for a nonhearsay purpose.

24          THE COURT:  All right.  And, again, if there is an

25   instruction needed, defense should ask for one.

1           Proceed.

2   BY MR. HANKEY:

3   Q.  Now, Mr. Ketchum, we looked at this e-mail earlier.

4           Do you recall it?

5   A.  I do.

6   Q.  What number did Mr. Mons give to Mr. Rosetti for the

7   results of the list match?

8   A.  1,828.

9   Q.  Earlier you testified that this e-mail to the client was

10  not truthful, correct?

11  A.  Correct.

12  Q.  Why was this e-mail in Exhibit 210 untruthful?

13  A.  Because it included that projected number and not the true

14  number of what was installed.

15          MR. HANKEY:  Let's take a look in the same exhibit,

16  Ms. Paul, at the Rosetti e-mail at 4:55 p.m.

17  BY MR. HANKEY:

18  Q.  And, Mr. Ketchum, Mr. Rosetti is writing:  "That's great,

19  Bob.  We'll need a file back (ideally Excel) that tells us

20  specifically what offices you've matched to.  You can simply

21  highlight the offices in the target list file that match."

22          Do you see that?

23  A.  I do.

24  Q.  What was the client asking for in that e-mail?

25  A.  The client was asking to see which physicians specifically

Ketchum - direct by Hankey

637

 1  were matched to and to have a record of that.
 2  Q.  Mr. Ketchum, would a client -- based on your understanding
 3  of how the contracting process worked, would a client ask for
 4  a specific list if they thought that they were receiving a
 5  projection?
 6          MR. BLEGEN:  Judge, objection.  Foundation.
 7          THE COURT:  Sustained.
 8          MR. BLEGEN:  Lack of --
 9          THE COURT:  Sustained.
10  BY MR. HANKEY:
11  Q.  Now --
12          MR. HANKEY:  I'll try to lay the foundation,
13  Your Honor.
14          THE COURT:  All right.
15  BY MR. HANKEY:
16  Q.  So you testified earlier that you saw interactions with
17  clients and salespeople, correct?
18  A.  Yes.
19  Q.  About list matches?
20  A.  Yes.
21  Q.  And through that process, did you gain an understanding of
22  how the list-match process worked?
23  A.  Yes.
24  Q.  You were -- in fact, you were involved in the list-match
25  process?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 84 of 269 PageID #:13193
Ketchum - direct by Hankey
638

1    A.  Yes.

2    Q.  And did you see e-mails like the -- one of the ones we've

3    seen where the client would specify what they're expecting out

4    of the list-match process?

5    A.  Yes.

6            MR. HANKEY:  May I proceed, Your Honor?

7            THE COURT:  Yeah, the differentiation is, again, this

8    witness can't know what's specifically in a customer's mind.

9    He can only know what he -- what he believes is in a

10   customer's mind based on e-mails or other interactions.  So

11   you need to phrase your question precisely in that way.

12           MR. HANKEY:  Okay.

13           MR. BLEGEN:  Judge, just for the record, I also have

14   a relevance objection that what his belief about what the

15   customer wanted is not relevant.

16           THE COURT:  And that, I've overruled.  Thank you.

17           Go ahead.

18           MR. HANKEY:  Thank you.

19   BY MR. HANKEY:

20   Q.  Now, Mr. Ketchum, your belief, your understanding of what

21   the client expected, would a client ask for a specific list of

22   physicians, as LINZESS -- yeah, LINZESS has here, if the

23   client thought that they were receiving a projection or a

24   weighted average?

25           MR. BLEGEN:  Judge --

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 85 of 269 PageID #:13194
Ketchum - direct by Hankey
639

1  BY MR. HANKEY:

2  Q.  What was your understanding of whether a client would do
3  that?

4          THE COURT:  Go ahead.

5          MR. BLEGEN:  The beginning parts of the question is
6  leading.  And it also calls for speculation.

7          MR. HUESTON:  This is almost like summary testimony,
8  expert testimony instead of something derived from a document
9  or something before him.

10         THE COURT:  All right.  Make it specific to this
11  particular -- when you get two or three objections, there must
12  be something wrong with the question.

13         So when you -- ask it again, ask it specific to this
14  particular e-mail, not in general, and base it again on what
15  he understood the customer would have been expecting.  The
16  jury understands only the customer can talk about that.

17         Go ahead.

18         MR. HANKEY:  I have another way to get at this.

19         THE COURT:  You have another way?  That's fine.

20         MR. HANKEY:  So, Your Honor, does --

21  BY MR. HANKEY:

22  Q.  Excuse me, Mr. Ketchum --

23         THE COURT:  Yeah, I'm not the witness.

24      (Laughter.)

25  BY MR. HANKEY:

1  Q.  Mr. Ketchum, now, what is a client -- what is physically

2  going back to the client when they get list-match results?

3  A.  I don't understand the question.

4          In general or specific to this --

5  Q.  Yeah, let's just start generally.

6          When a client asks for a list match, what are the

7  different things that could be communicated back to the client

8  after a list match is performed?  How is that done?

9  A.  There is a few different things that could be -- that

10  could be done.  It could just be a number, here's the number

11  that were matched.  Some clients may ask for the number, but

12  decile information.  So not only what was matched, but the

13  decile -- pardon me -- the decile rankings of the doctors or

14  the offices that were matched.

15          And sometimes there were requests to have the

16  specific doctors that were matched to be sent to the client,

17  which is -- which is -- this is an instance like that.

18  Q.  Okay.  Now, if specific offices are going back to the

19  client -- and in this case, the client was expecting installed

20  base offices, correct?

21          MR. BLEGEN:  Objection.  That's leading and what he

22  had tried to ask before.

23          MR. HANKEY:  Well, we've -- he's already testified as

24  to the meaning of installed base.

25          THE COURT:  Yeah, and the leading is overruled.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 87 of 269 PageID #:13196
Ketchum - direct by Hankey
641

 1    And -- yeah, overruled.

 2            Go ahead.  You've laid a foundation.

 3    BY MR. HANKEY:

 4    Q.  Okay.  Would you like me to ask again?

 5    A.  Please.

 6    Q.  In this instance, you testified that the client expected

 7    list-match results with installed base offices in it, correct?

 8    A.  Yes.

 9    Q.  And we earlier looked at an e-mail where you performed a

10    projection, correct?

11    A.  Yes.

12    Q.  Now, when the list-match results are going back to the

13    client, how would projected -- is it possible for the company

14    to project offices in a list match going back to the client?

15    A.  Not accurately.

16    Q.  Can you explain why?

17    A.  Sure.

18            So, for example, if you're sending -- if Outcome

19    Health is sending a list of offices or highlighting a list of

20    offices -- of doctors that are matched to a list and a

21    projection is included, there's really no accurate way that

22    Outcome Health would know the specific doctors that are being

23    added during that time period.  You would have a good

24    understanding of the types of doctors because they're coming

25    from a particular list.

1           So -- and I earlier testified that on the projection

2    based on 150 sales per month, 90 percent plus from a

3    particular list.  So you can have an understanding of the

4    makeup of the physicians, but it's really difficult to

5    understand the specific physicians that are going to agree

6    during that time period and then accurately reflect that in a

7    file that would go to a client.

8    Q.  Now, based on, again, what you saw in those interactions

9    between the client and the salespeople, did you have an

10   understanding of whether clients expected accurate list-match

11   results of Outcome's installed base?

12   A.  Yes.

13   Q.  And what was that understanding?

14   A.  That they would -- they would want the information they

15   receive from Outcome Health to be accurate.

16           MR. HANKEY:  Now, if we could go back to Exhibit 210,

17   please, which is in evidence.

18           Can we focus in on e-mail -- the e-mail at 4:06 p.m.,

19   please.

20   BY MR. HANKEY:

21   Q.  Is this the next e-mail after Mr. Rosetti's e-mail that we

22   just looked at?

23   A.  Yes, it appears so.

24   Q.  Okay.  What did Mr. Mons do with that e-mail?

25   A.  He forwarded it to Shradha, myself, and Ashik Desai.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 89 of 269 PageID #:13198
Ketchum - direct by Hankey
643

1  Q.  Did this client's request for a list create an issue for

2  Outcome under these circumstances?

3  A.  Yes.

4  Q.  What was that?

5  A.  It was unclear how to fulfill the requests from the client

6  because the list-match results that were shared with the

7  client included a projection, but at this point, the client is

8  looking for a very specific set of physicians that were

9  represented as installed but that are not yet installed.

10         MR. HANKEY:  Let's please pull up Exhibit 207.  This

11  is being offered under (d)(2)(E).

12         THE COURT:  It will be admitted subject to the

13  objection earlier lodged.

14      (Government's Exhibit No. 207 was received in evidence.)

15         MR. HANKEY:  Please zoom in on the e-mail at

16  4:10 p.m.

17  BY MR. HANKEY:

18  Q.  Is this a continuation of the last e-mail that we just

19  saw?

20  A.  Yes.

21  Q.  What did Ms. Agrawal do with Mr. Mons' e-mail after she

22  received it?

23  A.  She forwarded it to myself and Ashik Desai.

24  Q.  What did she write?

25  A.  "Based on projection . . ."

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 90 of 269 PageID #:13199
Ketchum - direct by Hankey
644

1  Q.  What did that mean to you?

2  A.  That she wanted -- that Shradha wanted the request from

3  the client to be fulfilled based on the projection that was

4  shared with the client and not the actual installed base.

5  Q.  Did she copy Mr. Mons on her response?

6  A.  No.

7           MR. HANKEY:  Let's please pull up Exhibit 212.  This

8  is being offered under (d)(2)(E).

9           THE COURT:  It is admitted subject to that previous

10  objection.

11       (Government's Exhibit No. 212 was received in evidence.)

12           MR. HANKEY:  And let's focus on the bottom e-mail at

13  4:17 p.m.

14           THE WITNESS:  Would you like me to read it?

15           MR. HANKEY:  Yeah, and actually, just one moment so

16  we could see the context.

17           Could we please pop back out, Ms. Paul, and just

18  scroll down to the next page so we see --

19  BY MR. HANKEY:

20  Q.  Do you see on this Exhibit 210 Ms. Agrawal's e-mail based

21  on projection at the bottom?

22           Do you see that, Mr. Ketchum?

23  A.  I do.

24  Q.  Okay.  So that's just -- that's the e-mail we just looked

25  at, right?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 91 of 269 PageID #:13200
Ketchum - direct by Hankey
645

1   A.  Yes.

2           MR. HANKEY:  Okay.  So can we please look at the next

3   e-mail in the string.

4   BY MR. HANKEY:

5   Q.  Do you respond to Ms. Agrawal?

6   A.  Yes.

7   Q.  What do you write?

8   A.  "Well, 90 percent of them are easy.  We can do our best to

9   scrub for competitor systems, *et cetera*."

10  Q.  You wrote "scrub for competitor systems."

11          What does that mean?

12  A.  Offices that have a competitor system, a competitor to

13  Outcome Health, so another company's TVs or devices installed

14  in a doctor's office that we know about that is marked in our

15  system but that does not yet have an Outcome Health system

16  installed.

17  Q.  Why was it necessary to do that?

18  A.  If an office was represented to the client as being in the

19  Outcome Health network but they actually had a competitor

20  system, it would be very clear to the client that Outcome

21  Health was probably not installed there.

22          MR. HANKEY:  Okay.  Let's look at the next e-mail,

23  please, Ms. Paul.

24  BY MR. HANKEY:

25  Q.  Can you read Shradha Agrawal's response.

1    A.  Sure.

2             "Tomorrow morning feasible?"

3    Q.  And let's look at the next one.

4             Can you read what you wrote, Mr. Ketchum.

5    A.  Yes.

6             "SA, to confirm, we are filling in the projection

7    with matched leads from outreach that we are scrubbing to the

8    best of our ability of competitor systems.  Should we only

9    send first name, last name, city, state, instead of full

10   address?"

11   Q.  What did you mean when you asked "to confirm, we are

12   filling in the projection"?

13   A.  I wanted to confirm with Ms. Agrawal what she wanted to

14   have done to fulfill the client request.

15   Q.  Why were you confirming that with Ms. Agrawal?

16   A.  That's not a decision I would have made.

17   Q.  Do you see where you wrote that you would fill in the

18   projection with "matched leads from Outcome" -- "outreach,"

19   rather?

20   A.  Yes.

21   Q.  What were you using when you used leads from outreach?

22   A.  Physicians and physician practices that were in the member

23   outreach portion of the database.  So they are offices that

24   are not yet installed.

25   Q.  Now, let's look at Exhibit -- staying in the same exhibit,

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 93 of 269 PageID #:13202
Ketchum - direct by Hankey
647

1    rather, can you read Ms. Agrawal's response to your e-mail.

2    A.   "Right, we should just highlight their rows for our

3    matches."

4    Q.   What did you understand Ms. Agrawal to be saying here?

5    A.   That she wanted to include the offices that are from the

6    member outreach side of the database.

7    Q.   And did Ms. Agrawal tell you to inform Mr. Mons that your

8    list-match results contained a projection?

9    A.   No.

10   Q.   Did she tell you to inform Mons or the client that Outcome

11   wanted a weighted average-type contract?

12   A.   No.

13   Q.   If this were the actual -- actually the situation where

14   Outcome and the client both understood this to be a weighted

15   average contract, would filling in matched offices make sense

16   to you under the circumstance?

17   A.   No.

18   Q.   Why not?

19   A.   Because you still wouldn't know which physicians you would

20   have installed during that time period.

21        MR. HANKEY:  Let's look at Exhibit 214, which the

22   government is offering under (d)(2)(E).

23        THE COURT:  It's admitted for that purpose.

24        If there's additional objections that relate to the

25   particular admissibility of this or any other document that's

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 94 of 269 PageID #:13203
Ketchum - direct by Hankey
648

1    admitted under that rule, you should state.

2            Proceed.

3            It's admitted.

4        (Government's Exhibit No. 214 was received in evidence.)

5    BY MR. HANKEY:

6    Q.  Now, is this an e-mail that you sent to Ms. Agrawal about

7    two hours later?

8    A.  Yes.

9    Q.  What were you sending to her?

10   A.  The requested file for LINZESS.

11   Q.  Why did you send the spreadsheet to Ms. Agrawal and not

12   Mr. Mons?

13   A.  Because that's what I was instructed to do.

14           MR. HANKEY:  Let's look at Exhibit 213.

15   BY MR. HANKEY:

16   Q.  While she's pulling that up, did you notice anyone copied

17   on that e-mail?

18   A.  Yes.

19   Q.  Who was?

20   A.  Ashik Desai.

21           MR. HANKEY:  213 is offered under (d)(2)(E).

22           THE COURT:  It's admitted for the same reason.

23       (Government's Exhibit No. 213 was received in evidence.)

24   BY MR. HANKEY:

25   Q.  Now --

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 95 of 269 PageID #:13204
Ketchum - direct by Hankey
649

1          MR. HANKEY:  213, please.  Thank you.

2          Can you please zoom in on the top part in the text

3     but not the signature line, please, so we can read all of

4     that.

5     BY MR. HANKEY:

6     Q.  Now, Mr. Ketchum, this is May 9th still.

7          To who are you sending this e-mail?

8     A.  To Mr. Rosetti.

9     Q.  And, again, who was he?

10    A.  He worked at the client.

11    Q.  Could you please read the first paragraph.

12    A.  "Mark, hope all is well with you.  I wanted to introduce

13    myself."

14          THE COURT:  Slow down if you're reading.

15          THE WITNESS:  Yes, Your Honor.

16    BY THE WITNESS:

17    A.  "My name is Jason Ketchum, and I am the analyst at

18    ContextMedia working with Bob Mons.  I performed the match for

19    LINZESS and wanted to send you the Excel file as requested and

20    thought you might appreciate a little bit of color on some of

21    the data I found.  Overall, we matched to 1,829 prescribers

22    and 1,644 unique waiting rooms.  The attached file shows the

23    matched prescribers in Column 1."

24    BY MR. HANKEY:

25    Q.  What did you believe to be telling the client in this

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 96 of 269 PageID #:13205
Ketchum - direct by Hankey
650

1  e-mail, representing to the client in this e-mail?

2  A.  Representing that we had 1,828 prescribers as being

3  currently installed.

4  Q.  Was that an honest representation of the list-match

5  results?

6  A.  No.

7  Q.  Again, why not?

8  A.  Because Outcome Health did not have 1,829 match

9  prescribers to the LINZESS list.

10  Q.  Did the list that you attached to Mr. Rosetti contain

11  matched leads from outreach?

12  A.  Yes.

13  Q.  And why was that a problem?

14  A.  Because those were not installed.

15  Q.  Why did you misrepresent the number of installed offices

16  to the client in this list match?

17  A.  I was told to.

18  Q.  Who told you to do it?

19  A.  In this instance, Shradha Agrawal.

20  Q.  Is this the only time that you lied to a client?

21  A.  No.

22  Q.  Was this the only time that Ms. Agrawal told you to lie to

23  a client?

24  A.  No.

25  Q.  Were there times when Mr. Shah directed you to lie to a

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 97 of 269 PageID #:13206
Ketchum - direct by Hankey
651

1  client?

2  A.  Yes.

3  Q.  How did it make you feel, Mr. Ketchum, when you lied to

4  clients like this?

5  A.  Bad.

6  Q.  And why is that?

7  A.  Because I felt as though it was a misrepresentation.

8  Q.  But you did this repeatedly and you didn't leave the

9  company?

10  A.  No.

11  Q.  And why not?  Why did you continue to do it without

12  leaving Outcome?

13  A.  Sure.  So I think it's important to sort of understand

14  that this was a very small part of what I did on a daily

15  basis.  I spent most of my time -- you know, 99 percent of my

16  time working with doctor's offices, so doctors, nurses, office

17  staff that are there and the content that goes on the devices

18  that was beneficial to patients.

19        So these types of requests were more the exception

20  than the norm.  So I actually didn't spend a ton of time on

21  them.  But when I did and when it made me feel uncomfortable,

22  I'd bring it up.  And I brought it up a couple times, like,

23  "Hey, Shradha or Rishi, is this, you know, something we should

24  be doing?"

25        And I was generally after talking to Rishi and

1  Shradha made to feel as though -- you know, a couple of
2  things.  One, made to feel a little bit foolish like I
3  couldn't see that this was the right thing to do, which is I
4  guess kind of hard to describe the feeling of feeling that.
5  But just sort of -- you know, I would walk in, express some
6  concern, and by the time I walked out, I would -- to myself I
7  was thinking, man, I was a real -- kind of a real idiot for
8  thinking that I was -- that this was something we shouldn't be
9  doing and then was just sort of turned to focus on -- on what
10  my -- my actual full-time job was that I was being compensated
11  for.
12          And I frankly really believed in the mission of the
13  company.  You know, the company was doing really good things
14  for patients.  The technology was real.  It really was helping
15  patients all over the U.S. and doctors all over the U.S.  So,
16  you know, I was really -- I mean really, really passionate
17  about the mission of the business.  And so when, you know,
18  some of these, you know, from my perspective, kind of one-off
19  type of requests would come through and maybe if I felt
20  uncomfortable about them or brought them up, I was generally
21  made to feel better about them by the end of that
22  conversation.
23  Q.  What kinds of things would Ms. Agrawal or Mr. Shah say to
24  you to get you comfortable with lying to clients?
25  A.  Sure.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 99 of 269 PageID #:13208
Ketchum - direct by Hankey
653

1          MR. BLEGEN:  Can I ask for some foundation as to

2    specifically who said what, if he can recall?

3          THE COURT:  Yes.

4          MR. HANKEY:  We can do that.

5          THE COURT:  When, where, who else was present.

6          MR. BLEGEN:  Yes, that, too.

7    BY MR. HANKEY:

8    Q.  And, Mr. Ketchum, let's talk about Ms. Agrawal first.

9          You describe conversations that you had with

10   Ms. Agrawal about concerns, correct?

11   A.  Sure.  Yes.

12   Q.  Okay.  Where did those occur?

13   A.  In the office generally.

14   Q.  And when would they take place?

15   A.  Randomly during some of the requests when I would feel a

16   little bit uncomfortable about them.

17   Q.  Okay.  And let's just start with years.  You know, what

18   years of your time at Outcome would you have those types of

19   conversations with Ms. Agrawal?

20   A.  Generally around 2012 or 2013.

21   Q.  And did -- in later years, what happened to kind of your

22   involvement in these types of activities?

23   A.  I didn't work on sponsorship, list-match requests in this

24   capacity after 2013.  And I was really kind of focused

25   elsewhere on other parts of the business, so I just didn't

1  really think about them too much.

2  Q.  So that affected the frequency with which you brought

3  concerns to Ms. Agrawal?

4  A.  Absolutely, yeah.

5  Q.  Now, when you brought concerns to Ms. Agrawal, who, if

6  anyone, was present when you talked to them or about them?

7  A.  Generally, just Rishi or Shradha, because like I mentioned

8  before, usually one or the other was kind of focused on

9  sponsorship at that time.  And the office was such that you

10 could just kind of pop your head in to whoever's office you

11 were trying to chat with.  So you'd kind of just pop in, have

12 a quick chat, and then go back to your -- go back to your

13 work.

14 Q.  And, again, focusing on your conversations with

15 Ms. Agrawal about your concerns about list matches --

16 A.  Sure.

17 Q.  -- sometimes were those one on one with her?

18 A.  Yeah.

19 Q.  And sometimes was Mr. Shah also present?

20 A.  I believe so, yeah.

21 Q.  Okay.  So when those conversations occurred with

22 Ms. Agrawal, what kinds of things would Ms. Agrawal say that

23 would, you know, convince you to continue with your work at

24 Outcome despite the concerns as you raised to her?

25 A.  Yeah, so with Ms. Agrawal, it was generally, you know,

1    "Hey, don't be pessimistic.  Outcome Health doesn't miss

2    numbers.  We hit the numbers we say we're going to hit," and

3    then really focusing on the mission of the business and all

4    the good that was being done by the -- by the company.

5           You know, it's -- there was a lot that was said.  I

6    sort of in my head say it was kind of like a word salad a

7    little bit, but, you know, essentially it was just -- what was

8    said was enough to make me feel really positive again about

9    the company.

10   Q.  What does word salad mean?

11   A.  Just, you know, a various -- a various number of phrases

12   that I think just affirmed my -- my belief in the mission and

13   made me feel as though some of the things I was uncomfortable

14   about, I shouldn't feel uncomfortable about.

15   Q.  And you referred to comments by her saying that Outcome

16   always hit its numbers.

17          Did -- is that correct?

18   A.  I did say that, yes.

19   Q.  You did say that.

20          In your experience, in -- let's at least focus on

21   2012 and 2013, did Outcome always hit its delivery numbers?

22   A.  No.

23   Q.  We've talked about Ms. Agrawal.  Now let's focus on

24   Mr. Shah.

25          Did you have conversations with Mr. Shah about your

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 102 of 269 PageID #:13211
Ketchum - direct by Hankey
656

 1  concerns separate from those that you referred to earlier when

 2  you'd bring them to Ms. Agrawal?

 3  A.  Yes.

 4  Q.  And did you bring similar concerns to Mr. Shah when you

 5  discussed those?

 6  A.  I did.

 7  Q.  What -- just generally speaking, what were those concerns

 8  that you would --

 9          MR. HUESTON:  Objection.  Vague as to time and place.

10          THE COURT:  Lay a foundation.

11  BY MR. HANKEY:

12  Q.  In -- starting with years, in what years would you bring

13  those concerns to Mr. Shah's attention?

14  A.  2012 and 2013.

15  Q.  And at what location were you when you would have those

16  conversations with Mr. Shah?

17  A.  In the office.

18  Q.  And generally speaking, what concerns would you bring to

19  Mr. Shah's attention when you had those conversations with

20  him?

21          MR. HUESTON:  Objection.  Again, vague, "generally

22  speaking."

23          THE COURT:  It should be particular to the extent the

24  witness recalls, but also who else was present.

25          MR. HANKEY:  I'm sorry?

1    THE COURT:  Also who else was present for the

2  conversation, and then with the specificity he can recall.

3  BY MR. HANKEY:

4  Q.  Focusing on these Rishi Shah conversations about concerns,

5  who else would be present when you brought concerns to him?

6  A.  Typically Rishi or Rishi and Shradha.

7  Q.  Now, can you describe what concerns you brought to

8  Mr. Shah as -- specifically as best as you can understand

9  them -- or recall them.

10  A.  Sure, that some of the numbers were -- were beyond what

11  Outcome Health at the time was selling or was installing and,

12  you know, some of the comments that were -- some of the

13  information that was being shared with clients was -- was

14  represented as being truthful, but it wasn't truthful.

15    MR. HUESTON:  Objection.  Foundation and vague as to

16  time.

17    THE COURT:  He's -- objection overruled.  That's

18  subject to cross-examination.

19    Proceed.

20  BY MR. HANKEY:

21  Q.  You can continue.

22    You were describing the concerns that you brought to

23  Mr. Shah's attention --

24  A.  Yeah.

25  Q.  -- in 2012 and 2013.

Ketchum - direct by Hankey

658

1  A.  Just that some of the numbers and some of what I was being

2  asked to communicate to clients wasn't truthful.

3  Q.  And specifically in what context did those -- that

4  untruthful information unfold in those concerns that you

5  brought to Mr. Shah?

6  A.  I'm not sure I understand your question.

7  Q.  Can you -- can you expand a little bit more on -- any

8  other details that you recall about the concerns that you

9  brought specifically to Mr. Shah's attention?

10  A.  Oh, it was mostly just, "Hey, I'm" -- you know, "Hey,

11  Rishi.  I'm concerned that, hey, some of the numbers that

12  we're sharing with clients are pretty big projections, and I

13  don't know if they're going to get hit.  And some of the

14  e-mails that I'm being asked to send, we don't have these

15  things yet."

16  Q.  What would Mr. Shah say in response to concerns like that?

17  A.  Similar to Ms. Agrawal.  You know, "Hey, don't be

18  pessimistic.  Outcome Health is going to hit this."

19        With Mr. Shah it was a little different.  Sometimes I

20  walked out of there feeling like I was a real idiot, but still

21  the same -- the same end result.  I wound up feeling very

22  positive after talking to them that, you know, what I was

23  doing was -- was okay.

24  Q.  You said that it was a little different with Mr. Shah.

25  Can you explain what you mean by that.

1  A.  Yeah, Mr. Shah had a way -- and I don't know if it was

2  intentional or unintentional, but a way to sometimes make

3  people feel a little bit like they were -- they were not as

4  smart as him.  And so, you know, you'd kind of go in.  I'd

5  feel a little bit -- I'd feel like an idiot, and then, you

6  know, somewhat -- sort of a -- the way I described it is, you

7  would kind of get torn down and then built back up.  So I'd

8  get torn down, feeling like a little bit of an idiot, and

9  then, you know, Rishi would kind of build me back up to the

10  point where you almost feel like a super hero, like we're

11  doing -- we're really doing the right things for -- for

12  patients across the country.

13  Q.  And would that occur when you raised issues with Mr. Shah

14  about list matches?

15  A.  Yeah.

16  Q.  And what kinds of things would Mr. Shah say to you when

17  you raised those concerns in 2012 and 2013 to build you back

18  up?

19  A.  Yeah, similar to what I just mentioned, you know, "Hey,

20  we're -- we're really doing amazing things for patients and,

21  you know, we're saving people's lives."  And there was always

22  really positive stories that were shared across the company

23  about people who were impacted and, you know, all the positive

24  work that was being done.  And, you know, focusing on this

25  type of thing is -- we were being really pessimistic about it,

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 106 of 269 PageID #:13215
Ketchum - direct by Hankey
660

1  and, you know, you're not -- you're not seeing things the way

2  that you should, essentially.

3  Q.  Mr. Ketchum, did that have an effect on your decision to

4  continue working at Outcome despite these things that you've

5  described doing?

6  A.  Yes, it made me feel confident enough in what was being

7  done, that what I was doing was okay and that the mission of

8  the company was really important.  The work was really

9  positive, and it made me feel that way enough to stay there

10  and continue working.

11  Q.  After those conversations that we've just talked about

12  with Mr. Shah and Ms. Agrawal, did you continue to lie to

13  clients?

14  A.  Yes.

15  Q.  Mr. Ketchum, you stayed at Outcome until 2018?

16  A.  Yes.

17  Q.  And you testified earlier that you eventually stopped

18  doing list matches for clients?

19  A.  Correct.

20  Q.  When, again, was that?

21  A.  Sometime in 2013 or 2014.

22  Q.  Now, during the rest of your time at Outcome after you

23  stopped doing list matches for clients, did you observe things

24  that indicated that some of the practices that you've

25  described continued?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 107 of 269 PageID #:13216
Ketchum - direct by Hankey
661

1  A.  Yes.

2  Q.  Can you explain?

3  A.  Yeah, there were concerns raised by some employees that

4  Outcome Health was a Ponzi scheme or a house of cards or that

5  we -- that Outcome Health was lying to clients and

6  misrepresenting studies to clients.

7  Q.  Now, you referred to other employees raising concerns,

8  correct?

9  A.  Correct.

10  Q.  Approximately when did that occur?

11  A.  In 2016, 2017, certainly in that time period.

12  Q.  Did you communicate with Mr. Shah and Ms. Agrawal about

13  those concerns that you were hearing?

14  A.  Yes.

15  Q.  What did you tell them?

16  A.  I --

17        MR. HUESTON:  Objection.  Vague.  Time.

18        THE COURT:  Sustained.

19        MR. HUESTON:  Place.

20  BY MR. HANKEY:

21  Q.  So when -- when were these concerns raised again?

22  A.  2016 and 2017, certainly, and possibly even 2015.

23  Q.  Okay.  So just focusing on 2017 for now.  Did you

24  communicate with Mr. Shah about those concerns in 2017?

25        MR. HUESTON:  Objection.  Vague as to "concerns."

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 108 of 269 PageID #:13217
Ketchum - direct by Hankey
662

1    THE COURT:  Well, we'll have to get to the detail

2 once we establish there was a conversation.

3    So proceed.  Lay a foundation.  If you don't, then we

4 don't get to a conversation.

5 BY MR. HANKEY:

6 Q.  Did you communicate with Mr. Shah about employee concerns

7 in 2017?

8 A.  Yes.

9 Q.  Before we get to what you communicated to Mr. Shah, can

10 you describe what those concerns were that you were hearing

11 from other employees at Outcome and where you were hearing

12 those from?

13 A.  Sure.

14    For example, I had heard that one of the in-house

15 attorneys for -- Outcome Health counsel quit because he was

16 afraid he was going to lose his law license.  Employees had

17 said that they had heard that Outcome Health was a Ponzi

18 scheme.  It was communicated that multiple high-level people

19 were leaving because Outcome Health was delivering false

20 information, things to that effect.

21 Q.  Those specific concerns, did you communicate any of them

22 to Mr. Shah?

23 A.  Yes.

24 Q.  Which ones did you communicate to Mr. Shah in 2017?

25 A.  I believe all of them.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 109 of 269 PageID #:13218
Ketchum - direct by Hankey
663

1  Q.  Okay.  And how about Ms. Agrawal; sticking with those

2  concerns that you just listed, which, if any, of those

3  concerns did you communicate to Ms. Agrawal?

4  A.  I believe all of them.

5  Q.  Now, in doing that, did you offer any support to Mr. Shah

6  or Ms. Agrawal in connection with those concerns?

7  A.  Yes.

8  Q.  Can you explain what you offered?

9  A.  Yeah, I wrote an e-mail.

10  Q.  And just describe, you know, what you said to Mr. Shah and

11  Ms. Agrawal about these employee concerns that you were

12  hearing?

13  A.  That we had heard them and that Outcome Health needed --

14          MR. BLEGEN:  Judge, could we be heard at sidebar?

15          THE COURT:  All right.

16      (Proceedings heard at sidebar on the record.)

17          THE COURT:  Okay.  Go ahead.

18          MR. BLEGEN:  Judge, I guess my objection is

19  cumulative.  They're going to have a witness describe an

20  e-mail that they're putting in -- are they not putting in

21  evidence; is that the understanding?

22          THE COURT:  I don't know.  Mr. Johnston -- or

23  Mr. Hankey.  I'm sorry.

24          MR. HANKEY:  The e-mail he is referring to I believe

25  is an e-mail sent in early 2017 that we do not seek to admit.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 110 of 269 PageID #:13219
Ketchum - direct by Hankey
664

1    I understand the defendants have an objection to it.  It's

2    hearsay, it contains hearsay, so we're just proceeding with

3    this.

4              And I'll just -- one --

5              THE COURT:  All right.  Let's cover that first.

6              So, Mr. Blegen, apparently they're not going to offer

7    it, so there is nothing cumulative about an e-mail consistent

8    with the testimony he just gave, unless you're going to offer

9    it or unless you attack his credibility and he needs -- and

10   the government seeks to do it in redirect.

11             Go ahead.

12             You were going to --

13             MR. HANKEY:  I think that if the objection is

14   overruled, I'll just --

15             THE COURT:  Well, the objection was cumulative, I

16   thought.

17             Mr. Blegen, was that it?

18             MR. BLEGEN:  It was, but that was because I thought

19   the e-mail was coming in as evidence.  I guess now it's not.

20             If the recent e-mail is not coming in is that it's

21   hearsay, then the statements made to him are all hearsay as

22   well.

23             THE COURT:  I didn't hear an objection when he said

24   that.  I thought I would.  I didn't hear an objection.

25             MR. BLEGEN:  Because I thought the e-mail was coming

1    in, but -- so then I do have an objection to hearsay.

2         THE COURT:  All right.  Well, what's the response of

3    the government?

4         MR. HANKEY:  Your Honor, it's not being -- it's not

5    being offered for the truth.  It's being offered for the

6    effect on the listener, Mr. Ketchum.

7         THE COURT:  The effect on -- I assume it's more

8    important -- it's not the effect on Ketchum; it's the effect

9    on his relating it to the defendants and the effect on them?

10        MR. HANKEY:  I was just going to say that as well.

11        THE COURT:  Okay.

12        MR. HANKEY:  The reason it's relevant to Mr. Ketchum

13   is because we understand that the defendants will be

14   challenging his credibility.  In fact, they've already

15   challenged his credibility.

16        One thing that they'll -- we anticipate him offering

17   during cross -- or trying to pursue in cross is the reason for

18   why Mr. Ketchum stayed at the company so long when he had been

19   committing the fraudulent conduct that he had been committing.

20        THE COURT:  All right.  Last word.

21        MR. BLEGEN:  I still think it's hearsay, Judge,

22   but --

23        THE COURT:  Well, it's -- I'm going to instruct the

24   jury it's being offered not because of the truth of a Ponzi

25   scheme or somebody being afraid of losing his law license or

1    anything; it's just something that was related to the

2    defendants and it's being offered for evidence of the state of

3    mind of the defendants.

4         This is similar to some of the evidence submitted

5    yesterday, statements that somehow -- of other people that was

6    put before them and would be evidence to show what their state

7    of mind is or -- period.  That's the basis for its admission.

8         It is hearsay what Ketchum heard from unname,

9    unknown -- unnamed and unknown people with various allegations

10   of a Ponzi scheme and other incidents or other beliefs on how

11   the company is being run.  So that's hearsay.  But it's -- but

12   if it was related to the defendants, it's admissible for the

13   limited purpose of showing the state of mind of the

14   defendants.

15        Anything else?

16        MR. POULOS:  Your Honor, may I have a moment to

17   confer with counsel?

18        THE COURT:  Go ahead.

19      (Counsel conferring.)

20        THE COURT:  All right.  Ready to proceed?  Or is

21   there anything else anyone needs to say?

22        I'm sorry, you didn't have your headphones on.

23        Anything else to say, or can we proceed?

24        MR. HUESTON:  Nothing further.

25        MR. POULOS:  Nothing further.

1      MR. HANKEY:  Nothing further from me, Your Honor.

2      THE COURT:  All right.

3    (End of sidebar.)

4      THE COURT:  All right.  Ladies and gentlemen, there

5  was an objection relating to some of the statements that

6  Mr. Ketchum heard that he related to the defendants.  Whatever

7  Mr. Ketchum may have heard from various people about a Ponzi

8  scheme or somebody thinking they were going to lose their law

9  license, that's hearsay.  It's not being offered for the truth

10  of whatever these people said.  But if he related it to the

11  defendants, it simply goes to the state of mind of the

12  defendants, what they heard and how they acted when they heard

13  it.

14      Proceed.

15      MR. HANKEY:  Thank you, Your Honor.

16  BY MR. HANKEY:

17  Q.  Now, in communicating those specific concerns to Mr. Shah

18  and Ms. Agrawal in 2017, did you try to offer your support to

19  Mr. Shah and Ms. Agrawal in connection with those concerns?

20  A.  Yes.

21  Q.  And can you describe what you offered, what you did in

22  that regard?

23  A.  Yeah, I sent an e-mail and said, you know, Outcome Health,

24  we need to get ahead of this stuff and really figure out a

25  communication plan to -- to make sure that, you know, any

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 114 of 269 PageID #:13223
Ketchum - direct by Hankey
668

1  mistruths that were circulating or rumors that were

2  circulating amongst the staff needed to be addressed.

3  Q.  And what did you tell them about the allegations and

4  whether you believe them?  Or at least what did you indicate

5  to them about whether you believed these allegations?

6  A.  I indicated that I did not believe them.

7  Q.  Why did you do that?  Why did you indicate that you didn't

8  believe them?

9  A.  At the time I don't believe I did.

10  Q.  Okay.  And was there a time when you tried to convince

11  someone that there was not fraud at Outcome?

12  A.  Yes.

13  Q.  And can you explain.

14  A.  It was a candidate.  A candidate had asked in an

15  interview, "I heard there's fraud at Outcome Health.  Is there

16  fraud at Outcome Health?"

17  Q.  And what did you do in response to that?

18  A.  I explained to them a customer situation that I -- that I

19  participated in and explained that in that particular

20  instance, there was an underdelivery and that it was directly

21  addressed with the client.

22  Q.  Do you recall, roughly speaking, when that was?

23  A.  I believe it was in 2017.

24  Q.  How long -- how much time had passed in 2017 since you had

25  stopped doing list matches for sponsorship sales?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 115 of 269 PageID #:13224
Ketchum - direct by Hankey
669

1    A.   About four years.

2    Q.   But you testified that you did still see some practices

3    continue -- practices that you had previously been concerned

4    about continue?

5    A.   Yes.

6    Q.   And what were those again?

7    A.   Projections, still conversations around how member

8    outreach needed to hit specific specialty network targets to

9    meet contracts that were sold.

10   Q.   So why did you stay at Outcome through 2018 when you saw

11   indications that some of that was continuing?

12   A.   Yeah, there's a couple -- a couple pieces to that, I

13   think.

14          So, you know, one, as I had mentioned, when concerns

15   were -- when I brought up concerns to Rishi and Shradha, I was

16   made to feel fine by the time I walked out of meeting with

17   them.

18          And then, you know, allegations of fraud, I never

19   connected the seriousness of some of the concerns that I had

20   earlier with -- with that being fraud, outright fraud.  It

21   just -- it's difficult I think sometimes to look back at

22   something you've done and things that you've participated in

23   and things that you've worked on and say, you know, I did

24   something wrong there, something bad there, I was a part of

25   it, and then I was okay with it.

1        And in that time, you know, in that moment,

2   2012/2013, I was, again, made to feel like it's fine.  And I

3   moved on and really focused on the mission, which I believed

4   in strongly.

5        And then when I heard allegations of like what was

6   going on and specifically heard the term "fraud," it makes you

7   kind of question, like, if -- if I was -- if I was wrong about

8   that stuff earlier, then that -- you know, that -- that's a

9   difficult position to be in.

10        So I think, you know, internally I tried to -- tried

11   to rationalize some of that behavior because, again, at that

12   time I felt like it was -- I felt like it was wrong, but then,

13   again, I was made to feel like it was okay after my initial

14   feelings of it being wrong.

15   Q.  You felt like what was wrong, Mr. Ketchum?

16   A.  Lying to clients.

17   Q.  In what time period are you referring?

18   A.  I'm talking about 2012 and 2013 in that context.

19   Q.  Well, why -- you were describing it being difficult to

20   confront that.  Can you explain what you mean.

21   A.  Yes.  So, you know, later -- -- in the later years of

22   Outcome Health when allegations of fraud started to come out,

23   I -- I guess I had a hard time connecting, you know, the

24   weight of the term "fraud" with the activities I participated

25   in earlier at Outcome Health, which, you know, in hindsight,

1    that was the case, seemingly.

2           And so, you know, when you -- when you try to

3    rationalize past behavior, you're like, no, I didn't -- I

4    couldn't have committed or participated in fraud in those

5    earlier days.  There's -- there's no way.  You know, I felt

6    kind of bad about it a little bit, but, you know, I brought it

7    up and was kind of made to feel okay about it and, you know,

8    at least enough to sort of move on with what my job was.

9           And, you know, it's hard to kind of feel like maybe

10   you're -- you're a part of -- you're like the bad guy.  And in

11   that instance, I think I was having a hard time realizing or

12   rationalizing with my own self that, you know, some of the

13   things I did were wrong and I shouldn't have felt okay about

14   those things as some of these larger allegations were coming.

15   And I just -- I had a hard time connecting those dots at that

16   time.

17   Q.  You say -- you say you engaged in rationalizing.

18          What do you mean by that?

19   A.  Trying to make my -- I think trying to make myself feel

20   like my earlier behavior was okay.

21   Q.  Why was it hard to connect the dots, as you say?

22   A.  Yeah, in the moment, it's -- you know, you hear

23   allegations of fraud, of what's going on at Outcome Health.

24   And I think back to some of the things I did earlier at

25   Outcome Health.  And it's like, you know, was that -- was that

 1    fraud that I was helping to commit at that time?  Because at

 2    the time, you know, there's a -- in my head there was a

 3    difference between, you know, bringing up a concern and

 4    saying, hey, are we maybe not being as truthful with customers

 5    as we should be and fraud, which -- which sort of has a big

 6    weight to it -- and I had a hard time -- I had a hard time

 7    coming to terms with that.

 8    Q.  Earlier you testified that in 2012 and 2013, the purpose

 9    of the use of projections in list matches was to get larger

10    contracts -- or a larger budget, correct?

11    A.  Mm-hmm.  Yes.

12    Q.  Do you recall that?

13    A.  Yes.

14    Q.  What was the end result of getting more budget from the

15    client as a result of that?

16    A.  Getting more dollars from the client.

17    Q.  So what did you understand the purpose of lying in list

18    matches to ultimately be for Outcome?

19    A.  To help grow Outcome Health.

20    Q.  Did you understand that at the time?

21    A.  Yes.

22    Q.  In 2012?

23    A.  Yes.

24    Q.  In 2013?

25    A.  Yes.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 119 of 269 PageID #:13228
Ketchum - direct by Hankey
673

1  Q.  Now, have you ever -- do you recall Outcome ever work --

2  working on a list match for the Botox client?

3  A.  Yes.

4  Q.  Were you involved in that list match?

5  A.  Yes.

6      MR. HANKEY:  Let's pull up Government's Exhibit 1104,

7  which is being offered under (d)(2)(E).

8      THE COURT:  It's admitted subject to that objection.

9      (Government's Exhibit No. 1104 was received in

10     evidence.)

11     MR. HANKEY:  Let's zoom in on the bottom e-mail

12  there, please, Ms. Paul.

13  BY MR. HANKEY:

14  Q.  Do you see an e-mail from Alla Knirel at Target Health to

15  Bob Mons copying Rishi Shah?

16  A.  Yes.

17  Q.  What is the date of the e-mail?

18  A.  October 18th, 2012.

19  Q.  Who is Ms. Knirel?

20  A.  She is an employee at Target Health.

21  Q.  And, again, Mr. Mons is one of Outcome's salespeople?

22  A.  Yes.

23  Q.  What was Ms. Knirel asking for in this e-mail?

24  A.  For a list match to be conducted.

25  Q.  What did she want sent back to her from Outcome?

1    A.  A very specific file with criteria.

2    Q.  Okay.  Can you read the last sentence in her e-mail.

3    A.  Yes.

4         "There is a column on both lists called 'Matched.'

5    Please put a '1' in that column next to the physician that is

6    a match."

7    Q.  Now, let's look at the next e-mail in this string.

8         What did Mr. Mons do with Ms. Knirel's e-mail?

9    A.  Forwarded it to myself and copied Rishi and Shradha.

10   Q.  Can you read what he wrote.

11   A.  "Hi J.  See Alla's note below and attached.  Please let me

12   know how long to turn it so I can relay on my end.  Thanks."

13   Q.  Turn what?

14   A.  Turn the list match.  Execute the list match.

15   Q.  Who is copied?

16   A.  Rishi and Shradha.

17   Q.  Now, let's look at the next e-mail in this string.

18        Did Rishi Shah write an e-mail after Mr. Mons asked

19   for the list match?

20   A.  Yes.

21   Q.  Who did Mr. Shah copy on his e-mail?

22   A.  Myself and Shradha Agrawal.

23   Q.  Did he include Mr. Mons?

24   A.  No.

25   Q.  Can you read the first two sentences of Rishi Shah's

Ketchum - direct by Hankey

675

1  e-mail.

2  A.  Yes.

3       "This list match is for a buy that would take place

4  next year.  Of course, our network will be a lot bigger next

5  year, but we have to do the match now.  This is challenging as

6  it's tough to project what will be in our network in the

7  future, but let's try to cut the gap as long as" --

8       THE COURT:  Slow down, please.

9       THE WITNESS:  Sorry, Your Honor.

10  BY THE WITNESS:

11  A.  -- "let's try to cut the gap as much as possible by

12  including the entire MS database plus layering in the top one

13  or two stages of the MO pipeline."

14  BY MR. HANKEY:

15  Q.  Mr. Shah wrote "let's cut the gap."

16       What did that mean to you?

17  A.  To me when I heard that, that meant tried to -- the gap

18  represents the distance between that moment in time and when

19  the contract would go live, so that's the gap, and the number

20  of offices that would be installed in that time period.

21       So cut the gap, I believe it to mean include offices

22  that would get installed during that time period.

23  Q.  Can you read -- can you read the next sentence in

24  Mr. Shah's e-mail?

25  A.  "While the actual network a year from now may be composed

1    of different physicians, the match should be approximately the

2    same as our MO database final stage accounts are unlikely to

3    be disproportionately higher or lower matches to chronic

4    migraine than those physicians we actually ended up adding in

5    the next several months."

6    Q.  What did you understand Mr. Shah to be saying here?

7    A.  That the doctors that are included on the match are likely

8    not going to be the exact same doctors that will actually get

9    installed because it's impossible to know which ones are

10   actually going to say yes and get installed.

11   Q.  In connection with this list match, what had the client

12   asked for Outcome to send back to her?

13   A.  A match of physicians that were currently installed.

14   Q.  I'm sorry, can you repeat that?

15   A.  A match with physicians that are currently installed.

16   Q.  And why did you understand that to be the case?

17   A.  That's what was requested in the amount.

18   Q.  And what did she physically wanted returned back to her

19   after the match was performed?

20   A.  A file that indicated which physicians matched.

21   Q.  Now, do you see any direction about Mr. Shah in this

22   e-mail to let the client know that you would be including in

23   the list-match results offices that might not ultimately be

24   installed?

25   A.  No.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 123 of 269 PageID #:13232
Ketchum - direct by Hankey
677

1   Q.  Is there anything indicating that the client should or

2   would know that the list you would be sending back to the

3   client included offices not in the network?

4   A.  No.

5   Q.  Is there anything in Ms. Knirel's e-mail that suggested

6   she expected a list match that included offices not in the

7   network?

8   A.  No.

9   Q.  Now, you testified that Mr. Mons was not copied on

10  Mr. Shah's e-mail?

11  A.  Correct.

12  Q.  Did you have conversations with Mr. Shah, yes or no, about

13  including salespeople on e-mails about projections?

14  A.  Yes.

15  Q.  And in what time frame would you have had those

16  conversations?

17  A.  While I was performing list matches.  2012, 2013.

18  Q.  Where would you have those conversations?

19  A.  In the office.

20  Q.  Who, if anyone else, would participate in those

21  conversations?

22  A.  Rishi or Shradha generally.

23  Q.  When it's with Rishi, who else would participate?

24  A.  Sometimes Shradha.

25  Q.  Would she always be there?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 124 of 269 PageID #:13233
Ketchum - direct by Hankey
678

1  A.  No.

2  Q.  Sometimes one on one?

3  A.  Yeah.

4  Q.  Okay.  And what did Mr. Shah in those 2012 and 2013

5  conversations tell you about whether or not he wanted

6  salespeople copied on e-mails about using projections and list

7  matches?

8  A.  The same as Ms. Agrawal, that -- wanted salespeople to be

9  confident and have full confidence in what they were selling.

10  Q.  Now, in the e-mail that we were just on, Government's

11  Exhibit 1104 --

12          MR. HANKEY:  If we could zoom back in on Mr. Shah's

13  e-mail at the top, please.

14  BY MR. HANKEY:

15  Q.  Now, do you see in the middle of the e-mail where he says

16  "The match should be approx" -- or "approximately the same as

17  our MO database final stage accounts"?

18  A.  Yes.

19  Q.  What does "MO" stand for?

20  A.  Member outreach.

21          MR. HANKEY:  Can we show the Demonstrative 1129,

22  please.

23  BY MR. HANKEY:

24  Q.  By including offices from the top one or two stages of

25  member outreach, what would be included in the list, in the

1   list-match results?

2   A.  Verbal commitment and ongoing dialogue.

3   Q.  With respect to verbal commitment, what would be happening

4   vis-à-vis Outcome in those offices that were in verbal

5   commitment at that point in time?

6   A.  For a verbal commit office, a doctor's office or a staff

7   member who works at the doctor's office, it would indicate to

8   the salesperson at Outcome Health that they wanted to have the

9   Outcome Health system installed, but at that point in time,

10  they had not yet sent in a signup form.

11  Q.  And then you testified that the other stage included in

12  the first one or two stages, if it were two stages, would be

13  ongoing dialogue, correct?

14  A.  Yes.

15  Q.  What would be happening vis-à-vis Outcome and doctor's

16  offices that were in the ongoing dialogue stage?

17  A.  Back-and-forth communications from the salesperson to the

18  office, the doctor's office, about, you know, what's a reason

19  that, you know, you're not saying yes to Outcome Health, what

20  are some things that we can do to maybe get you to say yes,

21  what are some things that you're not understanding, just

22  general back-and-forth of the salesperson trying to convince

23  the office to have the system installed.

24  Q.  So to be clear, this is before an office even indicates a

25  verbal commitment to actually move forward with the

1   installation?

2   A.  Yes.

3   Q.  And was Mr. Shah suggesting that offices in this stage

4   could -- could be included in the Botox list-match results?

5   A.  Yes.

6           MR. HANKEY:  Let's look at Government's Exhibit 58.

7   Just for -- if we could take that down, please.  I just want

8   to display it to the Court before we display it to the jury.

9           And this one we would offer on (d)(2)(E) as well,

10  Your Honor.

11          THE COURT:  All right, it's admitted subjected to the

12  earlier objection.

13          It will be displayed to the jury.

14          MR. HANKEY:  Thank you.

15      (Government's Exhibit No. 58 was received in evidence.)

16          MR. HANKEY:  Now, let's focus in on the e-mail at

17  10:48 a.m., please.

18          This will be on October 23rd.

19  BY MR. HANKEY:

20  Q.  Now, is this an e-mail, Mr. Ketchum, that you wrote on

21  October 23rd, 2012?

22  A.  Yes.

23  Q.  Can you read your e-mail.

24  A.  "Hi, guys.  We only matched to 19 prescribers for Allergan

25  Botox.  Allergan sent us two lists.  One list had 5,019

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 127 of 269 PageID #:13236
Ketchum - direct by Hankey
681

1    targets and the other had 420 targets.  I didn't copy Bob on

2    this because I don't want him to go into a panic.  I figured

3    we could sort out a game plan here."

4    Q.  Can you explain what you had done at this point?

5    A.  I don't understand the question.

6    Q.  Yeah, so what is this -- what are you saying here that

7    you've done?

8    A.  Oh, I'm asking Rishi and Shradha that -- I performed the

9    match.  The match wasn't very good.  Before I told Bob that

10   the match wasn't very good, I wanted them to know.

11             MR. HANKEY:  Now, looking at the same e-mail string,

12   can we focus in on the Shradha Agrawal e-mail at 4:54 p.m.,

13   please.

14   BY MR. HANKEY:

15   Q.  Can you read Ms. Agrawal's response to your e-mail?

16   A.  "Jay, thank you.  Will let you know if we need any more

17   information.  This is including MO pipeline, correct?"

18   Q.  "MO" stood for member outreach?

19   A.  Yes.

20   Q.  What does "MO pipeline" mean?

21   A.  The member outreach pipeline, so the list of offices that

22   the sales team is calling on and then working through the

23   sales process through the various stages with the last stage

24   being the member who signed up.

25   Q.  Now, let's look at the next e-mail, please.

1          Can you read what you wrote next.

2    A.   "Hi, Shradha and Rishi.  This was just on the MS and MS

3    pipeline.  I just ran it against outreach, and we were able to

4    beef up the match a little bit matching to 75 prescribers

5    total (74 on one list and one on the other list).  This

6    equates to 75 unique addresses.  We will probably need to use

7    a multiplier to get screen count.  They wanted to have the

8    file e-mailed back over to them.  They had very explicit

9    directions.  I am attaching the file so you can look at it.

10   They want to see this by the end of the day tomorrow.  And the

11   matches are noted by a one in the match column.  This was

12   directly from their instructions.  Again, they were very

13   specific."

14   Q.   Now, you wrote in your e-mail "this was just on the MS and

15   MS pipeline."

16          Can you explain what that meant.

17   A.   Yes.  So matching to MS, which is the installed base, and

18   the MS pipeline are the list of offices that have said that

19   they want the system, and member services is working on

20   installing them.

21   Q.   And then can you explain after you used MS and MS

22   pipeline, what you did next.

23   A.   Let them know that when I matched against outreach, that

24   there were more matches.

25   Q.   And, again, outreach is earlier in the membership sales

1    process than MS?

2    A.  Yes.  Once member services gets it, a signup form has at

3    least been received.  Some confirmation still needs to be

4    done, but it's been received.  And if it's an outreach, it has

5    not yet been sold.

6    Q.  Did you see where you write "We will probably need to use

7    a multiplier to get screen count"?

8    A.  Yes.

9    Q.  Why would it be necessary to use a multiplier to get the

10   screen count?

11   A.  If you're using projections, you wouldn't know -- you

12   wouldn't have an accurate representation of screens that are

13   installed because they're not installed yet, so you have to

14   use a multiplier to try to figure out how many screens might

15   be included in the number of physician offices that you're

16   representing to the client.

17   Q.  And why did you need to know the number of screens in

18   performing a list-match result?

19   A.  Because it would be communicated to the -- to the client,

20   you know, X number of physicians with X number of waiting

21   rooms and X number of screens, generally.

22          MR. HANKEY:  Let's look at, in the same e-mail

23   string, an e-mail at 11:35 a.m.

24   BY MR. HANKEY:

25   Q.  Did Mr. Shah respond to your e-mail?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 130 of 269 PageID #:13239
Ketchum - direct by Hankey
684

1    A.  Yes.

2    Q.  What did he write in response?

3    A.  "Got it.  Thanks, Jason.  I think this is good to send to

4    Bob."

5    Q.  And let's look at the next e-mail in the string.

6            What did you write next?

7    A.  "It should be, but I always want to run anything through

8    you two before sending to Bob so you know what he's looking

9    at."

10   Q.  When you wrote "running anything through you two," who did

11   you mean?

12   A.  Rishi and Shradha.

13   Q.  Why did you write that you always wanted to run anything

14   through Rishi Shah and Shradha Agrawal before sending it to

15   Bob?

16   A.  Because they were the ones who made the call on the

17   decision on what would get sent to clients or, generally, the

18   salespeople.

19           MR. HANKEY:  Okay.  Now let's look at the very last

20   e-mail in this string.

21   BY MR. HANKEY:

22   Q.  What did Mr. Shah write in response to your e-mail?

23   A.  "Thanks Jay.  That's good protocol as there are a lot of

24   moving pieces.

25           "SA, are you okay with Jay passing this on at the 75

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 131 of 269 PageID #:13240
Ketchum - direct by Hankey
685

1   level?"

2   Q.  Who is copied on this e-mail?

3   A.  Shradha Agrawal.

4   Q.  So shifting gears, let's talk about sponsorship sales.

5         MR. HANKEY:  If we could pull up Exhibit 1127 for

6   demonstrative purposes, please.

7   BY MR. HANKEY:

8   Q.  Mr. Ketchum, this is the three-legged stool demonstrative.

9         Do you see that?

10  A.  Yes.

11  Q.  Can you -- so which aspect of the organization handled

12  sales to the client -- to the pharma clients again?

13  A.  Sponsorship sales.

14        MR. HANKEY:  And we could take that demonstrative

15  down.

16  BY MR. HANKEY:

17  Q.  Mr. Ketchum, how often did you hear that a client would

18  visit an office to verify that a screen was there and their ad

19  was playing in -- let's just focus on the 2012 and 2013 time

20  period?

21  A.  Not very often.

22  Q.  Is there -- were there processes in place for clients to

23  understand whether they were getting what they paid for under

24  the contract?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 132 of 269 PageID #:13241
Ketchum - direct by Hankey
686

1  Q.  And what were those processes?

2  A.  Proof of performance and an affidavit.

3  Q.  What is a proof of performance?

4  A.  So a list of offices that are sent to the client.  Those

5  offices represent -- are supposed to represent where their

6  advertising is played.

7  Q.  And what is an affidavit?

8  A.  It's a document that shows information about the contract

9  and says that the contractor in that time period was

10  fulfilled.

11          MR. HANKEY:  I'd like to show Government's

12  Exhibit 148, Page 8.

13          THE COURT:  Is this in evidence?

14          MR. HANKEY:  It's on the list, Your Honor, and

15  it's -- we're offering it.  It's a -- excuse me, let's just --

16  if we could just pull it up without showing it to the jury

17  first.

18          And could we go to the top of this exhibit, please.

19          I'm sorry, Ms. Paul.  I wasn't clear.

20          Could we go to Page 1, please.

21          Thank you.

22          So, Your Honor, this is being offered as a verbal

23  act, a nonhearsay purpose.

24          THE COURT:  All right.  Is there any objection

25  subject to that basis of admission?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 133 of 269 PageID #:13242
Ketchum - direct by Hankey
687

 1          MR. HANKEY:  And, Your Honor, just -- I'm sorry -- to

 2    clarify, this would also fit as a co-conspirator statement,

 3    (d)(2)(E).

 4          THE COURT:  All right.

 5          MR. HUESTON:  No objection.

 6          THE COURT:  Anyone else?

 7          MR. BLEGEN:  No objection, Your Honor.

 8          MR. PRUITT:  No.

 9          THE COURT:  All right.  It's admitted without

10    objection.

11          MR. HANKEY:  Thank you.

12        (Government's Exhibit No. 148 was received in evidence.)

13          MR. HANKEY:  Can we please go to Page 8 of this

14    exhibit.

15    BY MR. HANKEY:

16    Q.  So you testified that an affidavit was one way that a

17    client would seek confirmation it was getting what it paid

18    for?

19    A.  Yes.

20    Q.  Is this an example of an affidavit that was provided to a

21    client?

22    A.  Yes.

23    Q.  Now, what -- what are the kind of essential

24    representations in the affidavit?  If you wouldn't mind just

25    kind of walking through what is being represented in this

1    affidavit.

2    A.  Sure.

3           So the vendor information -- in this instance, it's

4    -- it says ContextMedia.  That was before the name change to

5    Outcome Health -- the program name -- so this was for HUMIRA's

6    rheumatoid arthritis -- who the client was, and then the

7    brand, what type of content was played -- so it's the name of

8    the advertisement, the creative that was sent -- the contract

9    that it's associated with, the invoice numbers from Outcome

10   Health that it's represented -- that are represented there,

11   the period in which the affidavit represents or the period of

12   the contract time period in which the affidavit represents,

13   the number of offices that were delivered, and then

14   information about the spots.

15          So in this instance, there was two different

16   advertising spots playing 60 seconds -- that were 60 seconds

17   long and playing two times an hour.

18   Q.  Now, do you see a signature on this affidavit?

19   A.  I do.

20   Q.  Whose signature is on this one?

21   A.  It's mine.

22   Q.  Now, were you ever involved in providing affidavits that

23   you knew were false and misleading to clients?

24   A.  Yes.

25   Q.  Were you ever involved in providing proofs of performance

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 135 of 269 PageID #:13244
Ketchum - direct by Hankey
689

1  lists of offices to clients that you knew were false and
2  misleading?
3  A.  Yes.
4  Q.  Earlier we referred to ROI studies.
5       Do you recall that?
6  A.  Yes.
7  Q.  What does "ROI" stand for?
8  A.  Return on investment.
9  Q.  And what was an ROI study?
10 A.  A study performed by a third party, so another company,
11 that would analyze the -- a list of doctors that receive
12 programming to measure the effectiveness of that programming.
13 Q.  Now, in your interactions with -- let's start with
14 Mr. Shah.  Did -- in your conversations with him in 2012 and
15 2013, did he ever communicate to you what the purpose of an
16 ROI study was?
17 A.  Yes.
18 Q.  And what did he communicate to you?
19 A.  To share with the client the results of their advertising
20 campaign.
21 Q.  And specifically, what types of results?
22 A.  The financial results.  So the ROI study measures the
23 number of prescriptions that a particular doctor writes.  So
24 if Outcome Health has advertisements of a drug on its screen
25 in a doctor's office, in theory, that doctor should then write

1  more prescriptions for a particular drug.  And the ROI study

2  would measure how many more prescriptions that office wrote

3  compared to similar offices with doctors who historically have

4  written similar levels of a particular drug in similar types

5  of markets treating similar types of people with similar types

6  of illnesses, and you measure the difference between the two.

7        So did a doctor receiving programming write more

8  prescriptions than a doctor who didn't receive programming?

9  So the doctor who received programming would be the test

10  doctor and the doctor who did not receive programming would be

11  the control doctor, and you measure the difference in

12  prescriptions written, and then you look at that -- the

13  revenue generated with that compared to how much was spent on

14  the advertising campaign and that gives you -- that gives a

15  client the return on their investment.

16  Q.  Who typically conducted these ROI studies?

17  A.  Usually a company called IMS.

18  Q.  Were you ever involved in providing deceptive ROI studies

19  to Outcome's clients?

20  A.  Yes.

21  Q.  And just from a very high level, can you describe what you

22  did in connection with providing deceptive ROI studies to

23  Outcome's clients?

24  A.  Yes.

25        The lists that were studied were cherry-picked.  So

1    doctors who for a variety of reasons may not have received the
2    full campaign would be removed from the test pool for
3    analysis.
4    Q.  In your first year working at Outcome, did you help
5    sponsorship sales on a campaign for the brand CRESTOR?
6    A.  Yes.
7    Q.  What year was that?
8    A.  I believe 2012.
9    Q.  What does CRESTOR treat?
10   A.  It's a heart drug.
11   Q.  And what company made CRESTOR?
12   A.  CRESTOR is, I believe, AstraZeneca.
13   Q.  And did they ultimately buy advertising from Outcome?
14   A.  Yes.
15   Q.  And did they use a -- what's called a media agency?
16   A.  Yes.
17   Q.  What is a media agency?
18   A.  A media agency is a company that works on behalf of a
19   client, so a pharmaceutical company in this context, to do a
20   few different things.  They could help them with creative, so
21   what content should look like, or they can help them with
22   media buys, so handle the purchasing of media for those
23   clients.  So handling the purchasing, the contracting, and the
24   subsequent analysis that might come along with those
25   contracts.  There's other things, too, but that's kind of the

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 138 of 269 PageID #:13247
Ketchum - direct by Hankey
692

1   gist of it.

2   Q.  Now, in helping sponsorship sales on this CRESTOR campaign

3   in 2012, did you do anything that was deceptive while working

4   on this campaign?

5   A.  Yes.

6   Q.  Can you explain just at a high level what you did.

7   A.  Yes.

8           There was projections that were included in the

9   CRESTOR campaign.  Those projections, since they were included

10  in the contracting process, the client couldn't be alerted

11  that there was ultimately a shortfall because the amount that

12  they purchased wasn't installed.

13          And so proofs of performance and affidavits had to be

14  modified to make it look like they were in fact getting the

15  contracted value, and the return on investment was -- was

16  cherry-picked to try to make it appear as though it was more

17  beneficial to them than it was.

18          MR. HANKEY:  I'd like to display Government's

19  Exhibit 36.

20          This is not in evidence, Your Honor, but it's -- it's

21  a contract, so it's being offered for the truth but as a

22  business record of Outcome Health.

23          THE COURT:  All right.  Any objection?

24          MR. HUESTON:  No objection.

25          MR. BLEGEN:  No objection.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 139 of 269 PageID #:13248
Ketchum - direct by Hankey
693

1           THE COURT:  All right.  It's admitted without

2    objection.

3           (Government's Exhibit No. 36 was received in evidence.)

4    BY MR. HANKEY:

5    Q.  What are we looking at here, Mr. Ketchum, in Government's

6    Exhibit 36?

7    A.  An insertion order for CRESTOR from Zenith Media.

8    Q.  Now I'd like to walk through this.

9           But, first of all, what is an insertion order?

10   A.  Effectively a contract.

11   Q.  Now, this may actually -- this may be easier if you look

12   in the binder that you have in front of you and pull up this

13   exhibit in your binder because I'm going to ask you to look

14   through the exhibit.  We'll go to pages on the screen along

15   the way.

16          The numbers should be on the tabs on the side.  So

17   this is Exhibit 36.

18   A.  Okay.

19   Q.  Can you take a moment and look at the insertion orders for

20   July, August, and September and tell us whether they contain a

21   number of offices on them.

22          And then I'll have you look at October, November, and

23   December and do the same.

24          Have you been able to review the July, August, and

25   September?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 140 of 269 PageID #:13249
Ketchum - direct by Hankey
694

1    A.  Yes, sir.

2    Q.  Do you see any contract numbers on those three?

3    A.  I see an order number.

4    Q.  But do you see any number of offices contracted on those

5    three?

6    A.  I do not.

7    Q.  Okay.  And then looking at October, November, and December

8    and calling your attention to the top left-hand corner --

9           MR. HANKEY:  We can show Page 11, Ms. Paul.

10   BY MR. HANKEY:

11   Q.  And if you look at Page 11 in the top left-hand corner,

12   Mr. Ketchum, do you see a number of offices there?

13          And we've highlighted it on the screen, too.

14   A.  Yeah, 420.

15   Q.  Okay.  How do you know that -- well, can you -- can you

16   explain just what your understanding of the meaning of this

17   is, to have a number of offices in the contract?

18   A.  That's the number of offices that the content should be

19   playing in.

20          MR. HANKEY:  Now, let's look at Government's

21   Exhibit 49.

22          This, Your Honor, is another contract offered as a

23   business record.

24          THE COURT:  All right.  Any objection?

25          MR. HUESTON:  No objection.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 141 of 269 PageID #:13250
Ketchum - direct by Hankey
695

1          MR. PRUITT:  No objection.

2          MR. BLEGEN:  No.

3          THE COURT:  Admitted without objection.

4      (Government's Exhibit No. 49 was received in evidence.)

5          MR. HANKEY:  And if we could go to Page 2, please.

6          And if we could blow up the top left-hand corner of

7   the screen.

8          Thank you.

9   BY MR. HANKEY:

10  Q.  Now, Mr. Ketchum, is this another Crestor insertion order?

11  A.  It is.

12  Q.  And does it contain a number of offices required under the

13  insertion order?

14  A.  Yes.

15  Q.  What number?

16  A.  188.

17  Q.  And what time span does this cover?

18  A.  It covers the -- I'm sorry.  It's dated --

19          MR. HANKEY:  Yeah, if we could pop back out,

20  Ms. Paul, that might help a little bit.

21          And let's go to the first page.

22          And at the bottom there, the bottom five rows,

23  please.

24  BY THE WITNESS:

25  A.  It's for October 15th, 2012, through December 16th, 2012.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 142 of 269 PageID #:13251
Ketchum - direct by Hankey
696

1  BY MR. HANKEY:

2  Q.  Okay.  Thank you.

3          Now, have you reviewed e-mails in connection with

4  this contract?

5  A.  Yes.

6  Q.  Do you have an understanding of what the first set of IOs,

7  or contracts, required in terms of delivery amounts between

8  July and the end of the year for 2012?

9  A.  Yes.

10 Q.  What was that?

11 A.  To deliver, I believe it was, 420 and then the additional

12 insertion order here for installed offices in that time

13 period.

14 Q.  Now, let's take a --

15         MR. HANKEY:  If we could pull up Demonstrative

16 Exhibit 1132a.

17 BY MR. HANKEY:

18 Q.  Mr. Ketchum, what do we see on Demonstrative

19 Exhibit 1132a?  What's represented here?

20 A.  The contracted amount.

21 Q.  Over what time period?

22 A.  The time period of the contract, so July 2012 through

23 December 2012.

24 Q.  So can you explain what's happening to the contracted

25 amount over that time period?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 143 of 269 PageID #:13252
Ketchum - direct by Hankey
697

1    A.   The contracted amount is increasing.

2    Q.   From where to where?

3    A.   From 420 to 608.

4    Q.   Did Outcome deliver the number of offices to CRESTOR

5    required by Outcome's contract with the CRESTOR client?

6    A.   No.

7    Q.   And how did you -- how did you come to know that, that

8    Outcome did not deliver that number of offices?

9    A.   Because we did not have that number of offices installed

10    and it was communicated.

11         MR. HANKEY:   Let's pull up Government's Exhibit 124.

12         This is being offered under (d)(2)(E) and as a

13    business record, Your Honor.

14         THE COURT:   Any objection?

15         MR. HUESTON:   No objection, Your Honor.

16         MR. PRUITT:   No, Your Honor.

17         MR. BLEGEN:   No.

18         THE COURT:   All right.   It's admitted without

19    objection.

20       (Government's Exhibit No. 124 was received in evidence.)

21         THE COURT:   Proceed.

22    BY MR. HANKEY:

23    Q.   Can you explain what Government's Exhibit 124 is to the

24    jury.

25    A.   It's an office count for offices that are installed over a

1    period of time related to CRESTOR.

2    Q.  And when did you perform this office count?

3    A.  January 30th, 2013.

4    Q.  And in relation to the CRESTOR contract, when was that

5    occurring?

6    A.  After the contract.

7    Q.  Who did you send this to?

8    A.  To Rishi and to Shradha.

9            MR. HANKEY:  Now, if we could display --

10   BY MR. HANKEY:

11   Q.  Well, before we go off that, do you see in the middle of

12   the page, the portion that provides your office count?

13   A.  Yes.

14   Q.  Can you just read the sentence that begins that office

15   count?

16   A.  "How many offices did we start with in July?  August?

17   September?  October?  November?  And December?"

18   Q.  Okay.  And then what do you provide following that

19   sentence?

20   A.  The office counts for what was installed.

21   Q.  Are those cumulative office counts or something else?

22   A.  Something else.

23   Q.  Okay.  Can you describe what that represents?

24   A.  It's the number of offices that were installed in that

25   time period.  So in the month of September, 62 were installed

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 145 of 269 PageID #:13254
Ketchum - direct by Hankey
699

1    and in the month of July, five were installed.

2    Q.  When you say "installed," is that the total amount

3    installed in that time period or added in that time period,

4    just to clarify?

5    A.  I'm not sure I understand what you're asking.

6    Q.  Yeah, so just focusing on September, right, and the number

7    is 62, does that represent the total amount of screens playing

8    a CRESTOR ad --

9    A.  No.

10   Q.  -- or something else?

11   A.  That's the amount that were installed that month that are

12   in addition that will be playing the CRESTOR ad.

13   Q.  In addition to what had been in place the previous month?

14   A.  Correct.

15        MR. HANKEY:  Now, let's look at the --

16   Demonstrative 1132b.

17   BY MR. HANKEY:

18   Q.  Mr. Ketchum, does this chart look familiar?

19   A.  Yes.

20   Q.  And are you familiar with the amounts in the third column,

21   "Actual Installations"?

22   A.  Yes.

23   Q.  Have you had an opportunity to review your -- the last

24   e-mail we looked at and this chart?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 146 of 269 PageID #:13255
Ketchum - direct by Hankey
700

1   Q.  Okay.  Do these accurately represent, to the best of your

2   knowledge, the numbers?

3   A.  Yes.

4   Q.  Now, can you just describe to the jury what we're seeing

5   here in this chart.

6   A.  On the left -- the column all the way on the left is the

7   date.  The month represented the end of the month.  The

8   contracted amount is the middle column.  And so in July, the

9   contracted number of offices were 420.  Starting in October,

10  the contracted amount was 608.  That 608 comes from the 420 of

11  the original contract plus the additional 188 that were an

12  additional buy.  And then the column on the far right is the

13  number of actual installed offices.

14          MR. HANKEY:  Let's take a look at Demonstrative

15  Exhibit 1132c, please.

16  BY MR. HANKEY:

17  Q.  What are we looking at here, Mr. Ketchum?

18  A.  It's a chart that shows two things:  the contracted amount

19  and the change of that contracted amount from the original to

20  what it wound up being.  And then the red Xs show the actual

21  installations month by month.

22  Q.  How many offices was Outcome supposed to provide to

23  CRESTOR starting in July of 2012?

24  A.  420.

25  Q.  And how many offices did Outcome actually have by the end

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 147 of 269 PageID #:13256
Ketchum - direct by Hankey
701

1  of August 2012, according to your calculation?

2  A.  337.

3  Q.  Is that -- I'm sorry, is that -- at the end of August, is

4  that perhaps 378?

5  A.  Oh, I apologize.  Yes, end of August, 378.  Yes.  Sorry.

6  Q.  Yet Outcome was supposed to show CRESTOR's ads in 420

7  offices by the beginning of the contract?

8  A.  That's correct.

9  Q.  And that was July 2012?

10  A.  Correct.

11  Q.  Was this underdelivery on the campaign -- the CRESTOR

12  campaign a surprise to you?

13  A.  No.

14  Q.  Why not?

15  A.  Because it started as an underdelivery and the additional

16  buy was beyond what the sales team, the member outreach sales

17  team was selling.  So it started as an underdelivery and just

18  remained an underdelivery.

19        MR. HANKEY:  Your Honor, this would be a good time to

20  break.

21        THE COURT:  All right.  Ladies and gentlemen, we'll

22  take our lunch break.  One hour.

23        Please don't discuss the case among yourselves or

24  with anyone else and keep an open mind as there is more

25  evidence to hear.

1          THE COURT SECURITY OFFICER:  All rise.

2      (Jury out.)

3          THE COURT:  All right, sir.  You can leave the stand.

4   Be back in one hour, please.

5          THE WITNESS:  Thank you.

6          THE COURT:  Anything we need to discuss?

7          MR. HANKEY:  Nothing further from the government,

8   Your Honor.

9          MR. HUESTON:  No, Your Honor.

10          MR. BLEGEN:  No, Your Honor.

11          MR. PRUITT:  No, Your Honor.

12          THE COURT:  See you in an hour.

13      (Lunch recess taken at 12:30 p.m. until 1:28 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2    EASTERN DIVISION

3    UNITED STATES OF AMERICA,          )
                                        )    Docket No. 19 CR 864
4                    Plaintiff,         )
                                        )    Chicago, Illinois
5         v.                            )    February 1, 2023
                                        )    1:28 p.m.
6    RISHI SHAH, SHRADHA AGARWAL,       )
     BRAD PURDY,                        )
7                                       )
                     Defendants.        )
8

9         TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 3B
       BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11   APPEARANCES:

12   For the Government:        MR. MATTHEW F. MADDEN
                             MR. SAURISH APPLEBY-BHATTACHARJEE
13                           Assistant U.S. Attorneys
                             219 South Dearborn Street, 5th Floor
14                           Chicago, Illinois  60604

15
                             MR. WILLIAM E. JOHNSTON
16                           MR. KYLE C. HANKEY
                             U.S. Department of Justice
17                           Criminal Division, Fraud Section
                             Washington, D.C.  20530
18

19

20

21                        SANDRA M. TENNIS
                          KATHLEEN FENNELL
22                      Official Court Reporters
                      United States District Court
23             219 South Dearborn Street, Room 2260,
                        Chicago, Illinois 60604
24                        (312) 408-7782
                  Sandra_Tennis@ilnd.uscourts.gov
25

1    APPEARANCES (Continued:)

2

3    For Defendant
     Shah:                          MR. JOHN C. HUESTON
                                    Hueston Hennigan LLP
4                                   620 Newport Center Drive, Suite 1300
                                    Newport Beach, California  92660
5
                                    MS. VICKI CHOU
6                                   MR. MICHAEL H. TODISCO
                                    MS. KAREN DING
7                                   Hueston Hennigan LLP
                                    523 West 6th Street, Suite 400
8                                   Los Angeles, California  90014

9

10   For Defendant
     Agarwal:                       MS. KOREN L. BELL
                                    MR. A. ALEXANDER LOWDER
11                                  MR. STEPHEN G. LARSON
                                    Larson LLP
12                                  555 South Flower Street, Suite 4400
                                    Los Angeles, California  90071
13
                                    MR. PATRICK W. BLEGEN
14                                  MS. KELSEY H. KILLION
                                    Blegen & Garvey
15                                  53 West Jackson Boulevard, Suite 1437
                                    Chicago, Illinois  60604
16

17   For Defendant
     Purdy:                         MR. THEODORE T. POULOS
18                                  MR. ERIC PRUITT
                                    MR. JOHN PAVLETIC
19                                  Cotsirilos, Tighe, Streicker, Poulos &
                                    Campbell, Ltd.
20                                  33 North Dearborn Street, Suite 600
                                    Chicago, Illinois  60602
21

22

23

24

25

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 151 of 269 PageID #:13260
Ketchum - direct by Hankey
705

1          (Proceedings heard in open court.  Jury out.)

2               THE COURT:  Ready to proceed?  Have the witness

3     retake the stand.

4               How much longer is your direct?

5               MR. HANKEY:  At least through the rest of today.

6               THE COURT:  Okay.

7          (Jury in at 1:29 p.m.)

8               THE COURT:  All right.  Please be seated.  You may

9     continue with your direct examination.

10              MR. HANKEY:  Thank you, your Honor.

11        JASON KETCHUM, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

12                   DIRECT EXAMINATION (Resumed.)

13    BY MR. HANKEY:

14    Q.  Mr. Ketchum, I'd like to draw your attention to

15    Government's Exhibit 1067, which the government is offering

16    under (d)(2)(E).

17              THE COURT:  It's admitted, subject to earlier

18    objections.

19    BY MR. HANKEY:

20    Q.  Now, let's start at the top of the e-mail.  Look at the

21    header at the very top.  Is this an e-mail string that

22    involves you, Mr. Shah, and Ms. Agarwal?

23    A.  Yes.

24    Q.  June 5th, 2012; right?

25    A.  Correct.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 152 of 269 PageID #:13261
Ketchum - direct by Hankey
706

1    Q.  What's the subject line of this e-mail?

2    A.  Crestor match info for your meeting.

3    Q.  Okay.

4          Ms. Paul, can we please go down to the e-mail that

5    was sent at 10:20 a.m.?  There it is.  If you can blow that

6    up, please.

7          Mr. Ketchum, could you please -- is this an e-mail

8    that you sent that we're looking at?

9    A.  Yes.

10   Q.  Can you please read your e-mail?

11   A.  "Rishi, hope you are on the mend.  I am rerunning

12   everything and making sure that we have DH IDs lined up for

13   the go-live date, but I have a question regarding the

14   contract.  My understanding is we are looking at 419 screens;

15   correct?  Of those, are they all supposed to be by High

16   Crestor or decile 1-5?  We have 529 screens matched to their

17   list.  Of those, the numbers are still roughly what they were

18   six weeks ago with 376 screens making up High Crestor and top

19   5 deciles.  I just want to keep an eye out on the High Crestor

20   and top 5 decile count."

21   Q.  Looking at this e-mail, Mr. Ketchum, at this point in

22   time, in June of 2012, what was the number of screens that you

23   were trying to meet?

24   A.  It was over 600, I believe.  Oh, I'm sorry, this time I

25   believe it was 420.  Sorry.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 153 of 269 PageID #:13262
Ketchum - direct by Hankey
707

1  Q.  Do you see in your e-mail where you say, "my understanding
2  is we are looking at 419 screens"?
3  A.  Yes.
4  Q.  Is that the number at that point in time you were looking
5  at meeting?
6  A.  Yes.
7  Q.  But when the contract was signed, what did -- what was the
8  required number of offices in the contract?
9  A.  420.
10  Q.  You referenced two categories of matches here.  Do you see
11  that?
12  A.  Yes.
13  Q.  What were those categories?
14  A.  High Crestor or decile 1-5.
15  Q.  Can you explain what that meant?
16  A.  Deciles, like I mentioned in earlier testimony, is a
17  ranking system, of sorts, for physicians based on how much of
18  a particular drug they write.  And High Crestor is a subset of
19  that.  So it's physicians who are writing a high -- a high
20  number of Crestor drugs -- of Crestor, the -- the drug
21  Crestor.
22  Q.  How many screens -- looking at your e-mail, how many
23  screens combined were in those categories?
24  A.  529 screens matched to their list.
25  Q.  And then you write:

1       "Of those, the numbers are still roughly what they

2   were six weeks ago, with 376 screens making up the High

3   Crestor and top 5 deciles."

4   A.  Yes.

5   Q.  So which -- of the total 529, how many were in the High

6   Crestor and top 5 decile?

7   A.  376.

8   Q.  Now, here, Mr. Ketchum, you're referring to number of

9   screens; correct?

10  A.  Yes.

11  Q.  There's sometimes -- speaking generally and focusing on

12  the 2012-2013 time period, were there sometimes more than one

13  screen installed in any given doctor's office?

14  A.  Yes.

15  Q.  Can you explain how that could come about?

16  A.  Yes.  So there is a couple of ways that could -- that

17  could come about.  You could have a doctor's office that has

18  more than one waiting room.  So you could have one doctor's

19  office with two waiting rooms, or more, and a TV screen in

20  each of those waiting rooms.

21      You could also have a waiting room that has sort of

22  different waiting areas.  So, you know, for example, this room

23  is one room, but there's different areas where people can sit.

24  And so you might have a TV associated with each of the areas

25  someone might sit.

Ketchum - direct by Hankey

709

1          Or it could be a particularly big space.  So still

2    sort of one waiting area and one sort of seating area, but

3    it's a bigger space.  Maybe it's long.  And so you might have

4    multiple screens to make sure people can see those screens

5    wherever they're sitting.

6    Q.  So at this point in time, if there were 376 screens in

7    those two categories, would you expect there to be more or

8    less offices than 376?

9    A.  I would expect there to be less offices than screens.

10   Q.  When we looked at the Crestor contract earlier, did it

11   count by offices or screens?

12   A.  I believe by offices.

13   Q.  Now, let's take a look at the 10-29 e-mail here.  Did

14   Mr. Shah respond to your e-mail?

15   A.  Yes.

16   Q.  Can you read what he wrote?

17   A.  "Thanks, Jason.  Yes, the idea is they want to buy only

18   those two categories, but given the late contract delivery,

19   we'll be okay growing into it."

20   Q.  Now, Mr. Shah wrote, "the idea is that they want to buy

21   only those two categories."  What two categories is he

22   referring to?

23   A.  High Crestor or deciles 1-5.

24   Q.  Did Outcome have enough screens to meet that 419 number

25   that you used -- that you were discussing at that time?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 156 of 269 PageID #:13265
Ketchum - direct by Hankey
710

1  A.  Screens?  Was your question screens?

2  Q.  We'll start with screens.

3  A.  No.

4  Q.  Did Outcome have enough offices to meet that 419 number?

5  A.  No.

6  Q.  Now, let's look at the response that you wrote at

7  10:30 a.m.  Yeah, the next e-mail.

8        Mr. Ketchum, can you read what you wrote?

9  A.  "Okay.  That makes me feel a lot better."

10  Q.  Now, did you tell the Crestor client that Outcome did not

11  have the 420 offices required by the contract?

12  A.  No.

13  Q.  Are you aware of Shah or Agarwal telling the Crestor

14  client that?

15  A.  No.

16  Q.  Could you please pull up 1132-C for demonstrative

17  purposes, please.

18        We looked at this chart earlier, right, Mr. Ketchum?

19  A.  Yes.

20  Q.  Is that correct?

21  A.  Yes.

22  Q.  When did Outcome finally get to 420 offices?

23  A.  It looks like sometime in October.

24  Q.  And we looked at the second Crestor contract earlier.  Do

25  you recall that?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 157 of 269 PageID #:13266
Ketchum - direct by Hankey
711

1  A.  Yes.

2  Q.  Did Outcome sell additional offices to Crestor after it

3  sold the initial 420?

4  A.  Yes.

5  Q.  How many was that?

6  A.  188.

7  Q.  And how did Outcome do in delivering under that additional

8  number of offices added to the program?

9  A.  It did not meet the contracted requirement.

10  Q.  And where do we see that depicted in this chart that we're

11  looking at?

12  A.  The red Xs, as they move up, starting in November, you can

13  see the 493, the 538, and the 601 versus what was contracted

14  with 608.

15  Q.  I'd like to focus you in on the time period leading up to

16  the second contract.  If we could pull up Exhibit 39.

17        This is being offered under (d)(2)(E).

18        THE COURT:  It's admitted subject to the previous

19  objection.

20      (Exhibit admitted into evidence.)

21  BY MR. HANKEY:

22  Q.  Now, Mr. Ketchum, I'll draw your attention to a July 16th

23  e-mail from Mr. Mons to Mr. Doucet at 8:34 p.m.

24        On July 16th, 8:34 p.m.  Thank you.  No, that is

25  12:21 PM.  So we're looking for, again, July 16, 2012,

Ketchum - direct by Hankey

712

1  Ms. Paul.  The writing is very small.  You'll need to go up a

2  little bit.  We could start at the first e-mail that begins on

3  that date, and then we can go from there.  Thank you.

4        Now, do you see on -- pulled out on your screen,

5  Mr. Ketchum, an e-mail from Mr. Mons to Michael Doucet?

6  A.  Yes.

7  Q.  Okay.  And who was Michael Doucet?

8  A.  Michael Doucet worked at a media agency representing the

9  brand.

10       THE REPORTER:  Worked at where?

11       THE WITNESS:  A media agency representing the brand.

12  Sorry.

13  BY MR. HANKEY:

14  Q.  Is that Zenith Media?

15  A.  Yes.

16  Q.  Now, do you see in Mr. Mons' e-mail where he's referring

17  to when "he'll hold the space in Q4"?

18  A.  Yes.

19  Q.  What does Q4 stand for?

20  A.  Fourth quarter.

21  Q.  And Mr. Mons wrote that Kalin and Leslie asked him to

22  provide a line of site in the, quote, committed installed base

23  for Q4.  Do you see that?

24  A.  Yes.

25  Q.  What is line of site mean?

Ketchum - direct by Hankey

713

1   A.  Line of site means offices that you can reasonably predict

2   are going to be installed.  You can sort of see them on the

3   path to installation.

4   Q.  And in this case, by when?

5   A.  By Q4.

6   Q.  And when he uses the term "committed installed base," what

7   does that mean?

8   A.  Offices that are going to be installed by Q4.

9   Q.  Now, skipping ahead a couple of e-mails, Ms. Paul, could

10  we please pull up the Ms. Agarwal e-mail at 6:48 PM on

11  July 24th.

12          Okay.  Do you see here that Ms. Agarwal's writing in

13  this chain, "Woo hoo, what's the amount?"

14  A.  Yes.

15  Q.  Can you explain to the jury what Ms. Agarwal is asking

16  about here?

17  A.  The amount of the additional purchase.

18  Q.  Now let's take a look at the next e-mail.  I believe it's

19  the next e-mail in the stream.  Mr. Demas at 9:12 p.m.

20          Who is Mr. Demas, Mr. Ketchum?

21  A.  Jim Demas was the Chief Financial Officer of the company.

22  Q.  Can you read what he wrote in his response to Ms. Agarwal?

23  A.  "193K for three months.  I talked to Bob about additional

24  offices.   Insertion orders are 420.  He said he believes

25  Zenith would buy all additional offices that matched the high

1    prescriber lists, the first two categories.  They would

2    execute a separate insertion order for the additional offices.

3          "JK, tomorrow can you let us know how many are

4    currently matched?  Please include all active clinic stages."

5    Q.  Now, what is Mr. Demas asking you to do here in the last

6    two sentence -- or two sentences of what you just read?

7    A.  To run a fresh list-match against the client's physician

8    list.

9    Q.  Let's look at your response to that e-mail.

10         One up, Ms. Paul.  The next one up.  Yes, thank you.

11         What did you write?

12   A.  "Jim, I sure will.  I will have it for you first thing."

13   Q.  And then what's in the next e-mail?  Who sends the next

14   e-mail?

15   A.  Rishi Shah.

16   Q.  What does he write?

17   A.  "Make sure we include all the pipeline stuff to so we gain

18   an ability to project a bit too.  Thanks, Jay."

19   Q.  What does -- what did "include all the pipeline stuff"

20   mean to you?

21   A.  In this context, it could mean member services pipeline.

22   It could also mean member outreach pipeline.

23   Q.  Let's look at your response to that e-mail.  9:38 p.m.

24   What did you write?

25   A.  "I can project from outreach as well.  We can include any

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 161 of 269 PageID #:13270
Ketchum - direct by Hankey
715

1    verbals, if you like."

2    Q.  What does "verbals" refer to?

3    A.  Verbal commitments from doctors' offices that are working

4    with a member outreach team.

5    Q.  Is that before or after they've officially signed up for

6    the contract?

7    A.  It's before.

8    Q.  Excuse me, the office has officially signed up for the

9    screen in their office.

10   A.  It's before.

11   Q.  Now, let's look at the same exhibit now, the Rishi Shah

12   e-mail at 1:28 a.m.  Is this the next e-mail on the string?

13   A.  Yes.

14   Q.  What did Mr. Shah write?

15   A.  "Yes, you read my mind or projected from my e-mail, ha."

16   Q.  Now let's look at what Mr. Demas wrote.  What did he write

17   in response?

18   A.  "Oh, yes, pipeline stuff.  Good call.  If I'm going to

19   contribute on sponsorship side, I really need to start

20   thinking more aggressively, say like a salesperson."

21   Q.  Now we can zoom back out.

22           Mr. Ketchum, did you end up doing a list-match?

23   A.  Yes.

24   Q.  How did you go about doing it?

25   A.  Can you clarify your question?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 162 of 269 PageID #:13271
Ketchum - direct by Hankey
716

 1  Q.  What did you -- what did you need from the client in order
 2  to perform a list-match?
 3  A.  A list of their physician offices, or a list of their
 4  physicians.
 5  Q.  And what specifically was the client looking for a match
 6  against?
 7  A.  Committed installed base.
 8  Q.  And were there any categories of doctors' offices that
 9  they were looking to run their ads in?
10  A.  High Crestor and decile 1-5.
11  Q.  Let's look at Mr. Ketchum's e-mail on July 25th at
12  8:22 a.m.  Yes, bottom of page 2.  Thank you.
13          Now, Mr. Ketchum, after you performed the list-match,
14  did you report back?
15  A.  Yes.
16  Q.  What did you report?
17  A.  "Hi guys, preliminary --" do you want me to read it?
18  Sorry.
19  Q.  Yes, please.
20  A.  Sure.  "Hi guys, preliminary number looks to be 441
21  screens, which is 40 more than we had at the start of July.
22  That includes MS pipeline, outreach verbals, and installed
23  base.  I want to be exhaustive with MS" -- member services --
24  "to make sure there are no sheets that came in overnight,
25  et cetera.  I don't think the number will move, but I would

 1  rather be safe and double check."

 2  Q.  Were all of these offices that you'd include in the

 3  results installed in Outcome's network?

 4  A.  No.

 5  Q.  How do you know?

 6  A.  Because it included MS pipeline and outreach verbals.

 7  Q.  How about -- strike that.

 8       So let's look at Ms. Agarwal's response to your

 9  e-mail at 9:18.  Oh, I'm sorry.  Yeah, it's not -- not in

10  direct response.  Before we go there, why don't we just look

11  at Mr. Demas and Mr. Ketchum's e-mails first, just so we can

12  keep following the chain.  If we could -- yeah, if we could

13  look at them both, that would be great, Ms. Paul.  The two --

14  I'm sorry, the two at the very bottom of the screen that we're

15  looking at.  Thank you.

16       So here, Mr. Ketchum, are you essentially telling a

17  joke?

18  A.  Yes.

19  Q.  Okay.  Now, then, let's look at the response to

20  Mr. Demas's e-mail.

21  A.  "JK, too much coffee this morning."

22  Q.  Okay.  And then we can go back out, Ms. Paul, and then go

23  to the next e-mail in the string, or the next two e-mails.

24  Yeah, that's good.  Just so we have the context.

25       Now, what did you write in response to Mr. Demas's

Ketchum - direct by Hankey

1   e-mail?

2   A.  "Just poured my first cup and haven't even taken a sip."

3   Q.  And what did Ms. Agarwal write?

4   A.  "Ha, ha, ha.  JK, can you also tell us how many additional

5   screens were added in exactly what time period?  I want to be

6   able to project to October 1st screen count.  Thank you."

7   Q.  Let's look at your reply.  Are you able to read that on

8   the screen, Mr. Ketchum?

9   A.  I am, yes.

10  Q.  Can you read that, please, for the jury?

11  A.  "Backing out the verbals, we just need to remove eight

12  screens, so we have added 33 screens, MS pipeline and -- it

13  went away.

14  Q.  I think it just went dark.

15  A.  Okay.

16  Q.  We had to reset it.

17  A.  Sorry.  "Backing out the verbals, we just need to remove

18  eight screens, so we have added 33 screens, MS pipeline and

19  installed since July 1st."

20  Q.  And then what happened next in the conversation?

21  A.  Rishi replied.

22  Q.  Do you see a reply by Ms. Agarwal?

23  A.  Oh, Ms. Agarwal replied.  I apologize.

24  Q.  What did she write?

25  A.  "So about ten screens per month.  Given the first week of

1    July was a holiday week, I had estimated we'd have 100

2    additional screens from now until October 1st, so I think that

3    makes sense."

4    Q.  And then what did she write on top of her own e-mail?

5    A.  "Per week, sorry."

6    Q.  What's she doing there?

7    A.  Changing her -- her comment of "sales per month" to "sales

8    per week."

9    Q.  She just made a mistake?

10   A.  Yep.

11   Q.  Okay.  And then let's go to the next e-mail on the string,

12   please.  Do you see that Mr. Shah weighed in?

13   A.  Yes.

14   Q.  Can you read his e-mail, please?

15   A.  "520 sounds about right, then 100 more.  Although I will

16   say that it may even -- it may even up being closer to 575 or

17   600.  My rationale is the MO team had a slow start on this

18   list.  A lot of their sales continues to be from their old

19   pipeline.  In August and September, I'd assume our sales goal

20   will be at least 90 each month.  And I'd assume the vast

21   majority will be Crestor matching.  We'll get at least 120

22   from that, and then we will also have another 30 from

23   pre-August."

24   Q.  Please stop there.

25           So just in the last few e-mails, can you explain to

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 166 of 269 PageID #:13275
Ketchum - direct by Hankey
720

1  the jury what you are doing in this back-and-forth that we've

2  just been reading?

3  A.  Yes.  Trying to think through how many offices will wind

4  up being added that match to the target list for projection

5  purposes.

6  Q.  And how are you going about doing that?

7  A.  Talking through productivity of the member outreach team

8  and the productivity -- against the particular list that they

9  had been calling against.

10 Q.  Were you doing a good-faith effort here to try to get to a

11 number, projected number?

12 A.  Yes.

13 Q.  But what did the -- what did we see earlier that the

14 client expected out of the list-match?

15 A.  An actual number of installed, not a projection.

16 Q.  Now let's read the last line in Mr. Shah's e-mail here.

17 Do you see where it begins, "now I understand"?

18 A.  Yes.

19 Q.  Can you please read that?

20 A.  "Now I understand not all of them may be technically

21 installed by 10-1, but they will be in our install pipeline

22 and in place for the -- certainly the majority of Q4."

23 Q.  Now, this all related to a list-match for a contract to

24 start October 1st; correct?

25 A.  Yes.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 167 of 269 PageID #:13276
Ketchum - direct by Hankey
721

1   Q.  Or around then?

2   A.  Yes.

3   Q.  Have you seen anything so far to indicate that the Crestor

4   client would have accepted under-delivery at any point in

5   their campaign?

6   A.  No.

7   Q.  Had you seen anything to indicate that the Crestor client

8   would accept a dispatch based on projection?

9   A.  No.

10  Q.  Did you see e-mails during the initial negotiations with

11  Crestor that showed what they wanted?

12  A.  Yes.

13  Q.  And what specifically are you thinking of?

14  A.  When it's "against your committed installed."

15          THE REPORTER:  I'm sorry, would you repeat that,

16  please?

17          THE WITNESS:  Where the e-mail said "against your

18  committed installed."

19  BY MR. HANKEY:

20  Q.  Now, let's look at Government's Exhibit 1110, which the

21  government is offering under (d)(2)(E).

22          THE COURT:  All right.  I'll admit it, subject to

23  that objection.

24      (Exhibit admitted into evidence.)

25          MR. HANKEY:  Actually, your Honor, can we -- Oh,

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 168 of 269 PageID #:13277
Ketchum - direct by Hankey
722

1   yeah, this is.  You got that right.  I'm sorry.  So this is

2   being offered under (d)(2)(E).

3            THE COURT:  All right.  It's admitted subject to the

4   earlier objections.

5            MR. HANKEY:  Thank you.

6   BY MR. HANKEY:

7   Q.  Now, focusing on page 1 of this e-mail, Mr. Ketchum, do we

8   see an e-mail from Zakary Santucci?

9   A.  Yes.

10  Q.  And he's with Zenith Media?

11  A.  Yes.

12  Q.  Again, what was Zenith Media?

13  A.  It was that media agency that represented the

14  pharmaceutical client.

15  Q.  And he is writing here to Mr. Bob Mons?

16  A.  Yes.

17  Q.  Can you read what Mr. Santucci wrote?

18  A.  "Bob, as requested, we have attached the offices for

19  list-match.  Do you know when we can expect this?"

20  Q.  Okay.  Let's look at the next e-mail on the string,

21  please.

22  A.  "Please advise on how long we need so I can relay to Zak

23  on the match?  The build is separate discussion.  Thanks, B."

24  Q.  That's Mr. Mons?

25  A.  Yes.

Ketchum - direct by Hankey

723

1    Q.  He's forwarding Santucci's e-mail?

2    A.  Yes.

3    Q.  To whom did he forward it?

4    A.  Jim Demas, Rishi Shah, and Shradha Agarwal.

5    Q.  Do you see where he wrote, "the build is a separate

6    discussion"?

7    A.  Yes.

8    Q.  When he uses that term, "build," what build is he

9    referring to?

10   A.  I believe he's referring to growth opportunity.

11   Q.  What would "separate discussion" be?

12   A.  So if it's -- if growth is included, that would be

13   separate from the conversation for what's currently installed.

14   Q.  Now, let's look at Exhibit 1109.

15          If we could just display it for the Court and the

16   parties, please, again.

17          This is being offered under (d)(2)(E), your Honor.

18          THE COURT:  All right.  It's admitted, subject to

19   earlier objection.

20          MR. HANKEY:  May we display it?

21          THE COURT:  It's up now.

22          MR. HANKEY:  Thank you.

23   BY MR. HANKEY:

24   Q.  Now, do you see an e-mail from -- I think we have to go

25   down a page, at least, Ms. Paul.  There we are.  Can you

1    please blow up the e-mail at the bottom?  Thank you.

2            Do you see an April 6, 2012, e-mail from Robert

3    Goode?

4    A.  Yes.

5    Q.  Is he with Zenith Media as well?

6    A.  Yes.

7    Q.  Okay.  Can you please read the first two sentences of

8    Mr. Goode's e-mail to Mr. Mons?

9    A.  "Hi, Bob.  The client has expressed interest in running in

10   the 496 offices that are guaranteed from your list-match that

11   you provided to our planning team.  They are very hesitant

12   about committing to the full proposal you sent over since

13   those offices are still currently in question.

14           "Could you please provide a pricing option based off

15   of the 496 list-matched offices that we can provide to the

16   client today?"

17   Q.  Now, if we could zoom back out, please, Ms. Paul.

18           Did you and Mr. Shah end up receiving a copy of this?

19           Scroll up a little bit, Ms. Paul.

20           Did you end up receiving a copy of this e-mail?

21   A.  Yes.

22   Q.  And Mr. Shah as well?

23   A.  Yes.

24   Q.  Now, these two e-mails, the e-mail that we just looked at,

25   was sent back in the spring of 2012; correct?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 171 of 269 PageID #:13280
Ketchum - direct by Hankey
725

1    A.  Yes.

2    Q.  That was prior to the set of e-mails we just reviewed

3    about the list-match; correct?

4    A.  Yes.

5    Q.  And based on what we see, what had -- let me -- actually,

6    before I get there, I just want to look at one other thing.

7           So if we could look at Mr. Shah's e-mail at

8    11:50 a.m.  Let's just blow up the first half of it first.

9           And I won't ask you to read all of this, but can you

10   just read it quickly yourself and explain what Mr. Shah is

11   talking about here in response to Mr. Goode's e-mail?

12   A.  Yes.

13          Would you like me to explain?

14   Q.  Well, let's look at the rest of it before you start.

15   A.  Okay.

16   Q.  Do you see that Mr. Shah's writing here about both a -- if

17   we could pop back out -- an expansion network and then an

18   existing network?

19   A.  Yes.

20   Q.  Can you explain the differences between what Mr. Shah's

21   writing about there?

22   A.  Yes.  So Mr. Shah is stating that this should be looked at

23   as two separate deals with the client, potential client.

24          Deal one is selling the existing network.  That does

25   include some growth, but growth that's going to happen in the

1    near term.

2        And the deal two, is an expansion network which

3    includes future growth on the network that matched against

4    their list.  And then Rishi offers some suggestions for how to

5    make the potential client comfortable with the risk that comes

6    along with contracting for growth.

7    Q.  Now, when we looked at Government's Exhibit 39, that was

8    July 25, 2012; correct?

9    A.  Yes.

10   Q.  And so it was July of 2012, when that additional 188

11   offices was being negotiated?

12   A.  Yes.

13   Q.  And when were these e-mails sent?

14   A.  In April of 2012.

15   Q.  Okay.  So based on the e-mails we've reviewed so far to

16   you, did Crestor -- how did Crestor appear to respond to this

17   notion that they could buy an existing network and expansion

18   network?

19   A.  Crestor appears to have hesitations around purchasing

20   growth but is interested in purchasing what is currently

21   installed.

22   Q.  Now, let's go back to Exhibit 39.  And let's go back to

23   9-27.  So your response to the --

24       If we could blow up, Ms. Paul, on the first page,

25   both the e-mail that we just reviewed -- yes, starting there,

1    and then all the way down to the e-mail we reviewed with

2    Mr. Shah.  That's it.  Thank you.

3           So at the bottom in this pop-out, Mr. Ketchum, we see

4    Mr. Shah's e-mail, correct, that we reviewed earlier?

5    A.  Yes.

6    Q.  And then what did you respond to that e-mail?

7    A.  Would you like me to read it?

8    Q.  Yes, please.

9    A.  "I would definitely think the sales will accelerate.  We

10   have our 25-day baseline right now.  We can check in every

11   couple of weeks to see exactly what the acceleration rate will

12   be.  This could give us a pretty accurate forecast, but I

13   definitely agree with Rishi on acceleration.  And I won't give

14   another car fact even though typing acceleration makes me --

15          THE COURT:  You need to slow down.

16          THE WITNESS:   Sorry.

17          "And I won't give another car fact even though typing

18   acceleration makes me want to."

19   BY MR. HANKEY:

20   Q.  That last part refers back to the joke that you told

21   earlier?

22   A.  Yes.

23   Q.  Okay.  Now, let's look at Mr. Shah's response to your

24   e-mail.  Can you read his response, please?

25   A.  "Ha, ha.  My sense is if we'll have picked up 150 at

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 174 of 269 PageID #:13283
Ketchum - direct by Hankey
728

1    minimum, and it might be more, should we tell Bob this so he

2    can start to get budget to cover at least that amount?

3           "I worry once allocations and buys are finished for

4    other networks they may not be able to find incremental

5    dollars."

6    Q.  Now, again, we're talking about a contract that's supposed

7    to begin when?

8    A.  In July.

9    Q.  Was it Q4?

10    A.  Yeah, I'm sorry, Q4.

11    Q.  What month would that begin?

12    A.  October.

13    Q.  And did Outcome have these 150 offices that Mr. Shah is

14    referring to in its network?

15    A.  No.

16    Q.  What did he ask you to do?

17    A.  Can you clarify your question?

18    Q.  What was he asking you to do with the 150 offices?

19    A.  To include them in a projection.

20    Q.  And what is -- do you see where Mr. Shah's writing,

21    "should we tell Bob this so he can start to get budget to

22    cover at least that amount."

23    A.  Yes.

24    Q.  What does that mean, to get -- what did that mean to you,

25    "to get budget to cover at least that amount"?

Ketchum - direct by Hankey

729

1   A.  To have Bob communicate to the client the size of the
2   network so they can allocate the budget for that future
3   growth.
4   Q.  Now, let's look at Government's Exhibit 41, please, which
5   is being offered under (d)(2)(E).
6           THE COURT:  All right.  It's admitted subject to
7   earlier objection.
8        (Exhibit admitted into evidence.)
9   BY MR. HANKEY:
10  Q.  And I'd like to focus in on Mr. Ubriaco's e-mail at the
11  bottom at 5:28 PM.  Who is Matt Ubriaco?
12  A.  Matt Ubriaco is an employee at Zenith Media.
13  Q.  And when is he sending this e-mail we're looking at?
14  A.  August 7, 2012.
15  Q.  Can you read what Mr. Ubriaco writes to Bob Mons in his
16  e-mail?
17  A.  "Hi, Bob, hope all is well.  I'm back on AZ now.  We may
18  have some incremental dollars coming our way for Q4.  Has
19  ContextMedia acquired any additional offices from the AZ
20  Crestor list-match that was previously executed?  If so,
21  please provide aggressive costs to run four, 60-second spots
22  per hour in Q4.  Estimated impressions for both A18 plus and
23  A50 plus and an office location list.  We need this info by
24  COB tomorrow 8-8, please.  I apologize for the quick
25  turnaround.  Thanks, Matt.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 176 of 269 PageID #:13285
Ketchum - direct by Hankey
730

1  Q.  Now, what does Mr. Mons do with Mr. Ubriaco's e-mail?

2  A.  Forwards it.

3  Q.  If we could pop out, please.  Who does he forward it to?

4  A.  Me and Rishi.

5  Q.  And what does he write in his e-mail?

6  A.  "Jay, can you pull together all incremental Crestor sites

7  beyond the initial match we did for Q3.  I can show everything

8  installed and in pipe for October go-live.  I need this as

9  soon as you can get it.  Read Matt's note below.  Thanks,

10 Jay."

11 Q.  So Mr. Mons writes to you and Mr. Shah, "I can show

12 everything installed and in pipe for October go-live."

13        Do you see that?

14 A.  Yes.

15 Q.  Now, does that suggest to you that, in this case, Mr. Mons

16 is expecting some projection?

17 A.  Yes.

18 Q.  And in the last e-mail, Mr. Shah told you to communicate

19 something to Mr. Mons.  Is it possible that in that case he

20 was okay with some projection?

21        MR. HUESTON:  Objection.  This is leading the

22 witness.  He can ask how he interpreted the language.

23        MR. HANKEY:  I'll withdraw, your Honor.

24        THE COURT:  All right.  Rephrase.

25 BY MR. HANKEY:

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 177 of 269 PageID #:13286
Ketchum - direct by Hankey
731

1    Q.  Now, Mr. Ketchum, earlier you talked about what Mr. Shah
2    communicated to you about whether or not he wanted salespeople
3    to know about projections.  Do you recall that?
4    A.  Yes.
5    Q.  Was that a hard-and-fast rule that applied every time?
6    A.  No, it was a generality.
7    Q.  Were there times when the salespeople knew there were
8    projections in list-matches to clients?
9    A.  Yes.
10   Q.  How would you describe the frequency of that, compared to
11   times when they weren't aware of projections, or at least
12   weren't told about projections?
13          MR. HUESTON:  Objection, foundation.
14          THE COURT:  Well, let's first establish that that
15   occurred, and then you can lay the foundation before you get
16   into the detail of the conversation.
17   BY MR. HANKEY:
18   Q.  So were there -- were there times when salespeople were
19   told or became aware of projections in list-matches?
20   A.  Yes.
21   Q.  Okay.  And you were also -- you also observed times when
22   they were not told about projections; correct?
23   A.  Yes.
24   Q.  Could you give the jury a sense of the relative frequency
25   of one over the other?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 178 of 269 PageID #:13287
Ketchum - direct by Hankey
732

1    MR. HUESTON:  Still going to object.  Vague as to
2    time.
3        THE COURT:  Well, establish the years, and then the
4    question is perfectly fine.
5        MR. HANKEY:  Thank you.
6    BY MR. HANKEY:
7    Q.  We're focusing on 2012, or in 2013.  So just the relative
8    frequency of salespeople knowing about projections and being
9    told about them versus not being told about them.
10   A.  In my experience interacting, it was more frequent to not
11   tell them.  But it did happen on more than -- more than one
12   occasion.  It happened on a few occasions where salespeople
13   did know about projections.
14   Q.  Now, in this e-mail -- so we had just looked at -- if we
15   could --
16       Ms. Paul, could we go out and copy both this one and
17   Mr. Mons's e-mail.  Thank you.
18       Okay.  So Mr. Mons had e-mailed you and Mr. Shah and
19   said "I can show everything installed and in pipe for October
20   go-live."  Correct?
21   A.  Yes.
22   Q.  What happens next after Mr. Mons sent that e-mail?
23   A.  Rishi sends an e-mail to me and Shradha and Terry Lynne
24   Jones.
25   Q.  Okay.  Now, can you please read Mr. Shah's e-mail?

1    A.   "Jay, you have my authority to project robustly for Q4.

2    Now that we have been calling on the Crestor list for over a

3    month, I expect many of the new sales generated in August and

4    early September to be from the Crestor list.  And even the

5    client says 'aggressive costs,' ha, so let's go deep and throw

6    it up there."

7    Q.   And did Mr. Shah copy Mr. Mons on this e-mail where he

8    said "let's go deep and throw it up there"?

9    A.   No.

10   Q.   Mr. Shah writes -- he tells you to project robustly.  Do

11   you see that?

12   A.   Yes.

13   Q.   Project robustly in doing what?

14   A.   Projecting the number of offices that are going to be

15   installed that match the Crestor list.

16   Q.   Now, I'd like to turn your attention to Government's

17   Exhibit 40, which is being offered under (d)(2)(E).

18             THE COURT:  It's admitted, subject to earlier

19   objection.

20       (Exhibit admitted into evidence.)

21   BY MR. HANKEY:

22   Q.   Is this a continuation of the same e-mail string,

23   Mr. Ketchum?

24   A.   Yes.

25   Q.   Do you see at the top your response to Mr. Shah?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 180 of 269 PageID #:13289
Ketchum - direct by Hankey
734

1  A.  Yes.

2  Q.  What did you write?

3  A.  "RS, sounds good to me."

4  Q.  Okay.  Now, let's look at Exhibit 44, which is also being

5  offered under (d)(2)(E).

6        THE COURT:  It's admitted over earlier objection.

7        (Exhibit admitted into evidence.)

8  BY MR. HANKEY:

9  Q.  Now I'd like to focus you on your 8:48 a.m. e-mail.  It's

10  at the bottom of page 1.

11        Okay.  Now, is this, again, another e-mail continuing

12  on the same topic?

13  A.  Yes.

14  Q.  What did you write to Mr. Shah here?

15  A.  "Rishi, they did ask for office locations.  We can

16  obviously include all pipeline including outreach pipeline for

17  locations.  But what would you recommend we send them to cover

18  the office location request for what we need to project above

19  and beyond the offices we can send locations for?"

20  Q.  When you wrote, "they did ask for office locations," what

21  are you referring to?

22  A.  The agency asked for office locations.

23  Q.  Is that an issue under these circumstances?

24  A.  Yes.

25  Q.  And what is that?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 181 of 269 PageID #:13290
Ketchum - direct by Hankey
735

1  A.  Because it included a projection, it's unclear which

2  offices you should include because it was a projection.

3  Q.  And what do you suggest be done in light of the fact that

4  the client has asked for office locations?

5  A.  I said "we can obviously include all pipeline including

6  outreach pipeline for locations."  So that was the suggestion.

7  Q.  And what are you asking for guidance on in your e-mail?

8  A.  I'm just asking Rishi what I should do.

9  Q.  Let's look at Exhibit 43, which is being offered under

10  (d)(2)(E).

11          THE COURT:  Admitted, subject to earlier objection.

12      (Exhibit admitted into evidence.)

13  BY MR. HANKEY:

14  Q.  Okay.  Now, let's focus on Mr. Ketchum's e-mail at 8:57

15  a.m.

16          Mr. Ketchum, is this just a continuation of the same

17  conversation we've been looking at?

18  A.  Yes.

19  Q.  Okay.  Just a few minutes later, right after the last

20  e-mail we've looked at?

21  A.  Yes.

22  Q.  Can you read what you wrote?

23  A.  "All right, guys.  We have 459 Crestor screens right now.

24  Considering we started out with 401 at the outset, we have

25  clearly done pretty well.  Since July 1st, we have added 58

1    screens.  Above and beyond the contract, we're currently at
2    plus 40 screens.  We are adding screens at a rate of about 45
3    per month, looking at July and accounting for the holiday
4    week, and looking at the start of this month.  It is a strong
5    bet we will add 50 screens this month and 50 screens in
6    September, putting our incremental growth for Crestor for an
7    October 1st go-live at plus 140 screens.  Taking into account
8    that our sales team will increase momentum, I would like to
9    bump the growth of Crestor's qualified screens to 75 per month
10   for August and September, putting us at plus 190 screens for
11   October go-live."
12   Q.  Now, Outcome is growing and adding offices that would
13   eventually match Crestor's list; correct?
14   A.  Yes.
15   Q.  Okay.  Well, let's look at Exhibit 45, which is also being
16   offered under (d)(2)(E).
17           THE COURT:  All right.  That will be admitted.
18           And rather than say, over earlier objection, I know
19   there's a standing objection.  And unless there is a separate
20   objection than the one lodged earlier, I'm just going to say
21   admitted.  But you -- feel free to object to otherwise if
22   there is a different basis for objection.  All right.  It's
23   admitted.
24       (Exhibit admitted into evidence.)
25           MR. HANKEY:  Thank you.  This is 45.  Okay.  Maybe

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 183 of 269 PageID #:13292
Ketchum - direct by Hankey
737

1  44, Ms. Paul.  This one is also being offered under (d)(2)(E),

2  your Honor.

3       THE COURT:  It's admitted.

4    (Exhibit admitted into evidence.)

5  BY MR. HANKEY:

6  Q.  Now, do you see that Mr. Shah responded at 9:26 --

7  A.  Yes.

8  Q.  -- a.m.?  Can you please read his response?

9  A.  "Maybe the way around that is to go deeper into the MO CRM

10  and include one to two more stages?  That way we'll have more

11  locations with addresses.

12       "Not all will go, but new sales from August plus

13  early September will cover the gap even it's reasonable."

14  Q.  Now, you had flagged that the client wanted an office

15  location list; correct?

16  A.  Yes.

17  Q.  Okay.  But there was a projection; correct?

18  A.  Yes.

19  Q.  So what is Mr. Shah suggesting that you do here?

20  A.  Send locations for offices that are in the member outreach

21  database.

22  Q.  Now, Shah wrote:  "Not all will go but new sales from

23  August plus early September will cover the gap, even it's

24  reasonable."  Do you see that?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 184 of 269 PageID #:13293
Ketchum - direct by Hankey
738

1  Q.  What did that mean to you?

2  A.  That not all of the sales -- that not all of the offices

3  that are included in that list are going to sign up.

4  Q.  What does that mean for the list-match, then, for the list

5  that's being sent back to the client?

6  A.  It means it's going to be inaccurate.

7  Q.  Why would it be inaccurate?

8  A.  Because it's including offices that are not yet installed.

9  And while the offices that are going to be installed should

10  theoretically match to the target list, they would be

11  different offices, or a good number of them would be different

12  offices.

13  Q.  Now, let's look at demonstrative 1086.

14          And Mr. Ketchum, looking at 1086, just high level,

15  what are we looking at here?

16  A.  It says "stages of inventory," but in reality it's the

17  installation pipeline for a doctor's office.  From member

18  outreach communicating with them, starting with "pitch and

19  info sent" to getting a sign-up form, going to member

20  services, and then eventually being installed.

21  Q.  Okay.  So, again, if Mr. Shah is directing you to include

22  offices that were in member outreach, that would include

23  offices where a doctor wasn't signed up yet?

24  A.  Correct.

25  Q.  As you included offices that were earlier and earlier in

1    this pipeline, what, if any, effect would that have on the
2    accuracy of the list-match results sent back to the client?
3    A.   The earlier in the member outreach sales pipeline, the
4    more inaccurate the list would be.
5    Q.   Why is that?
6    A.   So with a verbal-committed office, you at least have heard
7    from the office that they are interested in the system, and
8    the odds of getting a sign-up form are very good.
9            As you move further away from that stage, you have
10   offices that are less and less likely to ultimately say yes.
11   So an ongoing dialogue -- the conversion -- I'm not sure what
12   the conversion rate was, but the conversion rate would be --
13   conversion rate from ongoing dialogue to sign-up, in that
14   stage, would be less than the conversion rate from verbal
15   commitment to sign-up.  And that conversion rate gets lower
16   and lower as you move further and further away from -- from a
17   stage standpoint from the sign-up form.
18   Q.   You use that term conversion rate.  Can you explain, first
19   of all, what that was in the context of Outcome?
20   A.   A conversion rate is the percent or the number of, in this
21   context, offices that sign up compared to the list of offices
22   that you're calling on.  So if -- if you had ten offices in
23   verbal commitment and ultimately nine of those offices send in
24   the sign up form in a given period of time, you'd have a
25   90 percent conversion rate in that stage because 90 percent of

1    those offices sent in that sign-up form.

2              That number, that percent, starts to decrease the

3    further away you get as you get in the earlier sales stages.

4    Q.  And looking at this chart, when you say "further away you

5    get," moving in which direction on the chart that we're

6    looking at, 1086?

7    A.  Moving to the left.  So if you start at sign-up, form

8    executed, and received, and you move to the left, verbal

9    commit is less likely than just having the sign-up form.  And

10   then ongoing dialogue is less likely than verbal commit.  And

11   pitch and info sent is less than --

12             THE REPORTER:  Pitch and info sent is?

13   BY THE WITNESS:

14   A.  Pitch and info sent is less likely to convert than ongoing

15   dialogue and verbal commit.

16             THE REPORTER:  Can you slow down, please.

17             THE WITNESS:  Sorry.  Sure.

18             THE COURT:  And, sir, you'll note, this is two

19   separate court reporters.  So it's not just the court

20   reporter, it's you.  Slow down.

21             THE WITNESS:  I understand, your Honor.  I'm sorry.

22             THE COURT:  Because when you speak more quickly, the

23   words slur a little bit, too.  So slow down and concentrate,

24   if you can, especially when you read something.  There is a

25   tendency of people to read something quicker than you normally

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 187 of 269 PageID #:13296
Ketchum - direct by Hankey
741

1    speak.  So we want to make sure we have an accurate record.
2    Thank you.
3              THE WITNESS:  Yes, your Honor.
4    BY MR. HANKEY:
5    Q.  Let's look at Government's Exhibit 45, please.  This is
6    being offered under (d)(2)(E).
7              THE COURT:  It's admitted.
8         (Exhibit admitted into evidence.)
9    BY MR. HANKEY:
10   Q.  I'm sorry, for some reason I have this number wrong.  44
11   again.  Back to where we were.
12             Now, let's look at the e-mail at the very top.  This
13   is already in evidence.
14             And did -- Mr. Ketchum, did you try to do what
15   Mr. Shah suggested in the last e-mail we looked at?
16   A.  Yes.
17   Q.  And did you report back?
18   A.  Yes.
19   Q.  Who received your report back?
20   A.  Rishi Shah, Shradha Agarwal, and Terry Lynne Jones.
21   Q.  Who is Terry Lynne Jones?
22   A.  Terry Lynne Jones worked on the sponsorship sales team for
23   a period of time.
24   Q.  What was her role?
25   A.  I don't recall her title, but I believe Terry was more or

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 188 of 269 PageID #:13297
Ketchum - direct by Hankey
742

1  less in charge of the sponsorship sales team.

2  Q.  Can you read what you wrote, please?

3  A.  Yes.

4  Q.  Slowly.

5  A.  Yes.

6          Okay.  I went into the next two stages of MO to pull

7  addresses.  I am including company name and address.  I pulled

8  194 locations, and I have full confidence that we will have

9  this number installed or nearing install by October 1st.

10         "Sales' goal is well over 200 between now and then,

11 and they will blow the goal out of the water.  The majority of

12 their sales will come from this list, so this is a great

13 projection.

14         "I have attached the file for review.  Let me know if

15 anyone would like to see any changes made to the file before I

16 forward it to Bob."

17 Q.  Now, what file were you attaching to the e-mail?

18 A.  The list of offices.

19 Q.  Mr. Ketchum, did you believe that Outcome would actually

20 have this number installed or nearing install by the start of

21 the campaign?

22 A.  Yes.

23 Q.  But was including offices without the screen installed

24 consistent with what you observed the client's expectations to

25 be?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 189 of 269 PageID #:13298
Ketchum - direct by Hankey
743

 1   A.  No.

 2   Q.  What did those earlier client e-mails that we reviewed

 3   reflect about their expectations?

 4   A.  That they wanted only offices that were installed or

 5   committed installed.

 6   Q.  Is there anything on this Crestor campaign that we've seen

 7   so far that indicated to you that Mr. Shah wanted to be

 8   transparent and honest with a client about what was included

 9   in the list-match?

10   A.  No.

11   Q.  Let's look at Exhibit 42.

12          This is being offered under (d)(2)(E).

13          THE COURT:  It's admitted.

14       (Exhibit admitted into evidence.)

15   BY MR. HANKEY:

16   Q.  And let's start with Mr. Shah's e-mail at 121.  Thank you.

17          Is this Mr. Shah responding to your e-mail,

18   Mr. Ketchum?

19   A.  Yes.

20   Q.  It's sent the same day?

21   A.  Yes.

22   Q.  Can you read what Mr. Shah wrote?

23   A.  "I'm okay with this.  Please speak to Bob and give him the

24   incremental number he can sell to Crestor Q4."

25   Q.  Looking at this e-mail conversation, what was the

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 190 of 269 PageID #:13299
Ketchum - direct by Hankey
744

1   incremental number that Mr. Shah told you to give to Mons?

2   A.  The larger -- the 200 number.

3   Q.  Do you see here, is it possible -- you say "I pulled 194

4   locations"?

5   A.  Yes.

6   Q.  Would that be the number?

7   A.  Yes.

8   Q.  Do you -- now, do you see any direction by Mr. Shah here

9   to tell Mons that the number included offices without a screen

10  installed?

11  A.  No.

12  Q.  Now, let's look at Exhibit 124.

13          Just on our screens, please.  Thank you.

14          The government is offering this under (d)(2)(E), your

15  Honor.

16          THE COURT:  All right.  It's admitted.

17      (Exhibit admitted into evidence.)

18  BY MR. HANKEY:

19  Q.  And Mr. Ketchum, I actually believe we looked at this

20  e-mail earlier.  Do you recall that?

21  A.  Yes.

22  Q.  And can you just describe succinctly what it is?

23  A.  Yes.  This is an e-mail that is laying out just a summary

24  of installs for -- relating to the Crestor campaign.  So

25  installs per month and number of each CP.  So number of

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 191 of 269 PageID #:13300
Ketchum - direct by Hankey
745

1    doctors in those offices, et cetera.

2    Q.  Okay.  And let's pull up demonstrative 1132-C, please.

3           So at the end of August, how many offices did Outcome

4    have, according to your calculations?

5    A.  342.

6    Q.  And, actually, let's go -- if we could pull up 1132-B,

7    please.

8           And do you see the date column where it says "end of

9    month"?

10   A.  Yes.

11   Q.  Okay.  Now, looking at that, is it easier to tell the

12   number of installations at the end of August?

13   A.  Yes.

14   Q.  And what's that number?

15   A.  378.

16   Q.  And in August, you're about to tell the client that

17   Outcome could deliver almost 200 more on top of the 420

18   already contracted; is that correct?

19   A.  Yes.

20   Q.  So how many would that be, 200 on top of 420?

21   A.  620.

22   Q.  Let's look at Exhibit 45, please.

23           This is being offered under -- this is a

24   co-conspirator -- (d)(2)(E), and also a non-verbal act --

25   verbal act.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 192 of 269 PageID #:13301
Ketchum - direct by Hankey
746

1    THE COURT:  It's admitted.

2        (Exhibit admitted into evidence.)

3    BY MR. HANKEY:

4    Q.  This is 45.

5        Now, what's the date of this e-mail, Mr. Ketchum?

6    A.  August 8, 2012.

7    Q.  Is that the same date of the series of e-mails that we've

8    been looking at recently?

9    A.  Yes.

10   Q.  Okay.  And, again, this is 132, so it's in that afternoon

11   of August 8th?

12   A.  Yes.

13   Q.  It's from you to Mr. Mons.  What are you sending Mr. Mons

14   here?

15   A.  The additions -- the incremental additions for Crestor.

16   Q.  Now, recalling the e-mails that we've just been looking

17   at, did it appear that Mr. Mons had been copied on the

18   back-and-forth between you and Mr. Shah about the projections

19   and the list-match?

20   A.  No.

21   Q.  What did you write to Mr. Mons here?  Can you read it,

22   please?

23   A.  "B, attached is the incremental growth for Crestor.  The

24   screen growth is 194.  That is an additional 194 screens on

25   top of their original buy.  Live by October.  The office

 1   locations are attached."

 2   Q.  And what is -- can you describe to the jury what is on the

 3   list that you would have attached to this?

 4   A.  A list of offices that were included on projection but

 5   that are -- being position is being currently installed or

 6   available for playing the advertisement.

 7   Q.  Now, let's look at the Excel file that's attached.

 8          This is Exhibit 45A, which the government is also

 9   offering as part of this exhibit we've just been looking at.

10          THE COURT:  It's admitted.

11       (Exhibit admitted into evidence.)

12   BY MR. HANKEY:

13   Q.  Mr. Ketchum, do you see we're looking at the very top of

14   the Excel file right now?

15   A.  Yes.

16   Q.  Okay.

17          And, Ms. Paul, could you slowly scroll down the list

18   until we get to the bottom.  You can go a little faster.  You

19   can actually drag the bar down.  There we go.

20          What are we looking at here, Mr. Ketchum?

21   A.  Location list of offices.

22   Q.  Is this a list that the client had requested?

23   A.  Yes.

24   Q.  Okay.  How many offices appear to be on this list?

25   A.  188.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 194 of 269 PageID #:13303
Ketchum - direct by Hankey
748

1  Q.  Did Outcome and Crestor eventually enter into a contract

2  for these additional sites?

3  A.  Yes.

4  Q.  Let's take a look back at 49, which is in evidence.  And

5  if we could go to page 2, please.

6          What are we looking at here, Mr. Ketchum?

7  A.  An insertion order.

8  Q.  And what -- again, an insertion order is a contract?

9  A.  More or less, yes.

10  Q.  Who is this between?

11  A.  Zenith Media and Outcome Health.

12  Q.  Let's zoom in the upper left.  How many offices are

13  required by this contract?

14  A.  188.

15  Q.  And let's go to page 1 and go to the middle text and look

16  at the posting date, down to the cost.  Thank you.

17          What was the duration of this contract, Mr. Ketchum?

18  A.  The duration of the contract was -- well, the sale date

19  was October 15th through December 31st.

20  Q.  And then what was the cost of these 188 offices for that

21  time period?

22  A.  $66,522.

23  Q.  Now, if we could, please, go back to 1132-B, please.

24          How many offices was Outcome supposed to give Crestor

25  before October?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 195 of 269 PageID #:13304
Ketchum - direct by Hankey
749

1   A.  420.

2   Q.  And then what did that number go up to in October?

3   A.  608.

4   Q.  So that's the 420 plus the 188 sites?

5   A.  Yes.

6   Q.  That we saw on the Excel sheet?

7   A.  Yes.

8   Q.  And then how many offices were actually delivered by the

9   end of October?

10  A.  493.

11  Q.  And let's go to 1132-C.

12          We see that depicted here with the red X?

13  A.  Yes.

14  Q.  And just approximately how many offices was Outcome

15  under-delivering by at that time?

16  A.  Over 100.

17  Q.  Let's look at Exhibit 68.  Which -- can we just pull that

18  up for our view -- actually, this is under (d)(2)(E).

19          THE COURT:  All right.  It's admitted.

20       (Exhibit admitted into evidence.)

21  BY MR. HANKEY:

22  Q.  Now, let's pull up Mr. Mons' e-mail at 11:41 a.m.  And may

23  be even further down.  There it is at the very bottom.  Thank

24  you, Ms. Paul.

25          Now, this is November 12, 2012; correct?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 196 of 269 PageID #:13305
Ketchum - direct by Hankey
750

1  A.  Yes.

2  Q.  So we're jumping ahead a few months?

3  A.  Yes.

4  Q.  Okay.  Now, what is Mr. Mons asking here in his e-mail?

5  A.  For a file with a list of sites that's running the Crestor

6  spot.

7  Q.  Is he writing to you?

8  A.  Yes.

9  Q.  Who wanted the list of offices that he is asking for?

10  A.  The agency buyer, Zenith.

11  Q.  Okay.  And let's pop out, please, Ms. Paul.

12        And can you look at the next e-mail and show us who

13  he has copied on the next e-mail?  Who is copied, along with

14  you, by Mr. Mons?

15  A.  Shradha and Rishi.

16  Q.  Now, let's look at Ms. Agarwal's e-mail on the same day

17  but at 11:25.  What does she write?

18  A.  "Hey, where in QB is this marked?  I may be able to pull

19  this list quicker as I'm on the laptop."

20  Q.  What is QB?

21  A.  Stands for Quickbase.

22  Q.  Is that the database we talked about earlier where the

23  stages of member outreach and member services were tracked?

24  A.  Yes.

25  Q.  For each office?

1  A.  Yes.

2  Q.  Now, let's look at your response to Ms. Agarwal.  Can you

3  please read it?

4  A.  Yes.

5        "I'm on the laptop, too.  I have it pulled already.

6  What info do you want to send over, just street, address,

7  state and zip, or do you want to include suite number as well?

8  Should I include the screen count as well and the primary

9  name?  When we send clinic locations to target, Jim only sends

10  them street, city, state, and zip and excludes primary name

11  and suite.  I think we need to include screen count in this."

12  Q.  And what did Ms. Agarwal ask in return in the next e-mail?

13  A.  "Do we have 608 locations or 608 screens, and if latter,

14  how many locations?"

15  Q.  What's the difference here that Ms. Agarwal is asking

16  about?

17  A.  Ms. Agarwal is asking about if the 608 number relates to

18  the number of offices or the number of screens that are in

19  offices.

20  Q.  Okay.

21        And if we could go down, Ms. Paul, back to Mr. Mons'

22  original e-mails at the bottom.

23        What did -- 608, what did Mr. Mons ask for?

24  A.  Sites.

25  Q.  What does sites mean?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 198 of 269 PageID #:13307
Ketchum - direct by Hankey
752

1  A.  Offices.

2  Q.  Let's look at Government's Exhibit 74, please.  And this

3  is being offered under (d)(2)(E).

4        THE COURT:  It's admitted.

5      (Exhibit admitted into evidence.)

6  BY MR. HANKEY:

7  Q.  And I'd like to go down to a November 16th e-mail sent by

8  Su Kyung, 12:41.

9        I think it was at the -- just a little bit up.

10  Further up.  I'm sorry, Ms. Paul, let's go down.  A little bit

11  further.  There we go.  Thank you.

12        Now, do you see an e-mail from Su Kyung on

13  November 16, 2012?

14  A.  Yes.

15  Q.  And who is Su Kyung?

16  A.  Su worked at Zenith Media.

17  Q.  And she's writing to Mr. Mons and Matt Ubriaco?

18  A.  Yes.

19  Q.  What was Ms. Kyung saying that she needed here?  You can

20  take a minute to read it and just explain what she's saying

21  that she needed?

22  A.  Ms. Kyung is saying that they need a unique physician

23  identifier to ensure cross-match.

24  Q.  So Outcome had apparently already sent her an office list?

25  A.  Yes.

1    Q.  Okay.  And she needed a unique physician identifier.  What
2    does that mean?
3    A.  Something that can establish the doctor as being that
4    doctor.  So, you know, like, if you work at a company, you
5    might have an employee number.  If you're -- have a Social
6    Security number if you're in the US that identifies who you
7    are, there are similarly identifying numbers for physicians
8    that are assigned to a physician.
9    Q.  And is that information that Outcome always had?
10   A.  No.
11   Q.  Were there -- did the likelihood of having that
12   information depend on where an office was in the pipeline that
13   we looked at earlier?
14   A.  Actually, at this point in time, I don't really think
15   Outcome Health tracked it in general.  But if they did get it,
16   it would usually be at any stage that they could load the
17   list.  Ideally you would have the identifier even in the
18   member outreach database.
19   Q.  Okay.  Where would you get the identifier if you had it?
20   A.  You could purchase the identifier from a list, or
21   sometimes it would come on list-matches or lists that would
22   come from clients.  So you could get an identifying number of
23   a physician when you put it in your target list.
24   Q.  Now, I'd like to look at Mr. Mons' e-mail which comes next
25   at 12:49.

Ketchum - direct by Hankey

754

1    And what is -- what is Mr. Mons writing in his

2  e-mail?

3  A.  "Hey, J, see e-mail below and let me know when you can

4  turn it.  Thanks."

5  Q.  And then let's look at the next e-mail in the

6  conversation.

7    Did Ms. Agarwal send it?

8  A.  Yes.

9  Q.  Can you read what she wrote?

10  A.  "Hey, I'm not at my computer, but the list of 608 I sent

11  them was using the list of 600 plus you sent me, removing

12  duplicates due to DHN plus RHN ID, which I think brought me to

13  614, and them removing certain rows that had the exact same

14  address down to the suite number.

15    "Given our sales this week, we may even want to pull

16  a fresh list to try and give them as many unique addresses as

17  we can and then add matched physicians at the same addresses.

18    "Does that make sense?"

19  Q.  Let's look at the next e-mail.  Do you see a response by

20  Mr. Shah?

21  A.  Yes.

22  Q.  And what did he write?

23  A.  "Hey, SA.  This does make sense, and we'll want to make

24  sure to add every physician we can.

25    "Two questions.

1        "Should we also include unmatched physicians

2  practicing at these sites?  I think yes, but on a separate tab

3  but not sure?

4        "We don't have a unique identifier for all of them.

5  We can share what we -- especially since many of these are

6  projected from their list, we'll have an identifier from their

7  list, I assume, have but will have some missing."

8  Q.  And where Mr. Shah writes "especially since many of these

9  are projected from their list, we'll have an identifier from

10  their list, I assume."  What did you understand that to mean?

11  A.  That offices that are -- or doctors that are included from

12  their list are going to naturally have an identifying number

13  because their list had an identifying number associated with

14  the doctors.

15  Q.  Let's look at what you wrote in response to Mr. Shah.

16        Can you read what you wrote?

17  A.  Yes.

18        "Hi, guys.  I can import all identifiers from their

19  list so our prescribers have them.  We shouldn't run into an

20  issue with this.  Su is expecting this sometime before the end

21  of the day on Monday."

22  Q.  And then what comes next?

23        And we don't have blow up the next one, but what does

24  Mr. Shah write in response?

25  A.  He says, "Thanks, Jay.  Just make sure --"

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 202 of 269 PageID #:13311
Ketchum - direct by Hankey
756

1    THE COURT:  It's very small.  I think you need to

2  blow it up before it's read.

3    MR. HANKEY:  Okay.  Thank you, Judge.

4    THE COURT:  Because it's hard for me and then I

5  assume for the jurors to read it unless it's blown up.

6  BY MR. HANKEY:

7  Q.  What does Mr. Shah respond with?

8  A.  "Thanks, Jay.  Let's just make sure we get all the

9  physicians we can on this."

10  Q.  And then what do you write?

11  A.  "Hi, guys.  Regarding Rishi's comment about having the

12  additional prescribers on a separate tab, I think we should

13  put all prescribers in their offices in one tab.  We destroyed

14  their list, so we wouldn't be able to specifically target

15  their prescribers, technically, right?  I think it makes more

16  sense to include all prescribers that they have with any

17  identifiers we can and send that over.  They are going to do a

18  computerized match any ways, so it won't matter much if

19  prescribers are on one or multiple tabs.  What do you think?"

20  Q.  And then Mr. Shah responds to your e-mail.  Let's take a

21  look at that.

22    Oh, I'm sorry, Ms. Agarwal responds.

23    What does she write?

24  A.  "Jay, good points but when they bought the extension to

25  608 sites, it was based on a list-match.  So up until the 608

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 203 of 269 PageID #:13312
Ketchum - direct by Hankey
757

1   we would know (according to them) which prescribers matched,

2   but beyond that, we wouldn't.  So let's give them the matched

3   prescribers in one tab and all others in another if that is

4   what RS suggested."

5   Q.  So Ms. Agarwal writes:  "So up until the 608, we would

6   know (according to them) which prescribers matched, but beyond

7   that we wouldn't."

8          Mr. Ketchum, can you explain just what's going on in

9   the back-and-forth between Ms. Agarwal, you, and Mr. Shah here

10  about the client's request?

11  A.  Trying to figure out how to fulfill their request.

12  Q.  Was there a challenge here?

13  A.  Yes.

14  Q.  What was the challenge?

15  A.  What was presented to them was a projection.  What was

16  presented to the client was a projection, so there is really

17  no clear way to send an accurate list of what prescribers are

18  from that projection and have those be the ones that were

19  accurately installed.

20  Q.  Now, let's look at Exhibit 124.  This is in evidence.

21  And, you know what, we'll move on from this.

22          So let's look at Exhibit 92.  And this is being

23  offered under (d)(2)(E), your Honor.

24          THE COURT:  It's admitted.

25      (Exhibit admitted into evidence.)

Ketchum - direct by Hankey

758

 1  BY MR. HANKEY:

 2  Q.  And, Ms. Paul, can you just blow up all the texts in this,

 3  please, so we can read it more easily.  Thank you.

 4          Mr. Ketchum, what do we see here in this exhibit?

 5  A.  Shradha Agarwal is assigning me a project.

 6  Q.  And what is she using to assign you a project?

 7  A.  Software called Asana.

 8  Q.  What is Asana?  How is it used at Outcome?

 9  A.  Asana is project management tool that is used by lots of

10  people and companies.  And Outcome Health used it for a period

11  of time.

12          THE COURT:  Why don't you spell that.

13          THE WITNESS:  A-s-a-n-a.

14  BY MR. HANKEY:

15  Q.  Now, is there a title to this assignment that Ms. Agarwal

16  is giving to you?

17  A.  Yes.

18  Q.  What is it?

19  A.  "Crestor ROI study, mid Feb expected, priority number

20  two."

21  Q.  ROI, again, that was return on investment?

22  A.  Yes.

23  Q.  You testified earlier that these ROI studies were provided

24  to clients?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 205 of 269 PageID #:13314
Ketchum - direct by Hankey
759

1    Q.  At just very high level, what were they -- what did

2    Mr. Shah tell you they were providing to clients?

3    A.  A measure of the effectiveness of the campaign.

4    Q.  And you testified earlier that IMS performed these studies

5    many times?

6    A.  Many times, yes.  Not exclusively, but in my experience,

7    more -- more often than others.

8    Q.  Can you explain what IMS was?

9    A.  IMS was a third-party company that had access to physician

10   information and physician prescriber information, so -- or

11   prescribing information, I should say, so they could look and

12   see what doctors were prescribing, how much over a period of

13   time.  And had the capabilities to perform an analysis on that

14   sort of thing.

15   Q.  What did IMS need from Outcome in order to start its

16   study?

17   A.  A list of physicians to study.

18   Q.  Here in Ms. Agarwal's assignment to you, what is she

19   asking you for?

20   A.  To pull together a list of physicians that ran the Crestor

21   programming.

22   Q.  And why was she asking you to do that?

23   A.  Because it would need to be used to send IMS for study

24   purposes.

25   Q.  Now, what specifically is she telling you to do in order

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 206 of 269 PageID #:13315
Ketchum - direct by Hankey
760

1   to pull this list for IMS?

2   A.  "Pull a list of Crestor physicians, scrub for MIAs and

3   other issues with date of initial operation, date of ad going

4   live."

5           THE COURT:  Let's go off the record for a minute.

6           (Discussion had off the record.)

7   BY MR. HANKEY:

8   Q.  Mr. Ketchum, can you explain what it meant to you to scrub

9   a list of physicians for MIAs and other issues?

10  A.  Yes.  An MIA is when the computer that's behind the TV, so

11  the -- effectively what runs the programming inside of the

12  television in a doctor's office, if it loses internet

13  connectivity, then you don't -- you wouldn't know what could

14  or could not be playing on that TV.  So if a device loses

15  internet connection, it could go blank, it could just be a

16  black screen.  It could still be playing content, but you

17  can't update or change that content.  You just really don't

18  know what could be going on with that screen.

19          And so scrubbing for MIAs means looking at the

20  offices that ran Crestor, looking to see how many times an MIA

21  occurred at that office, and how long that occurred for, and

22  then removing those from consideration for study.

23  Q.  Now, earlier you testified that one of the deceptive

24  things that you did was to cherry-pick data; correct?

25  A.  Yes.

1  Q.  Is this part of that process, the cherry-picking data
2  process?
3  A.  Yes.
4  Q.  Why did you call it cherry-picking?
5  A.  It's just sort of a slang term that I would use for it,
6  but in this instance, it relates to choosing the best offices
7  for studies.  So you're removing offices that wouldn't be
8  ideal to give Outcome Health the best opportunity to have a
9  positive result for the study that's being conduct.
10  Q.  Did you have an understanding of what the end objective
11  was of doing this cherry-picking?
12  A.  Yes.  To have an optimized list to send IMS for analysis.
13  Q.  And what was the hope that would come out of that IMS
14  study as a result of cherry-picking the offices?
15  A.  The ROI would be as high as possible.
16  Q.  Now, is this something, this process of scrubbing a list
17  for IMS, is this something that you were familiar with already
18  by the time Ms. Agarwal had asked you to do it in connection
19  with this campaign?
20  A.  Yes.
21  Q.  Had you done it before?
22  A.  Yes.
23  Q.  Who initially taught you how to do this cherry-picking?
24  A.  Rishi Shah.
25  Q.  Now, let's look at Government's Exhibit 150.  This is

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 208 of 269 PageID #:13317
Ketchum - direct by Hankey
762

1    being offered under (d)(2)(E).

2            THE COURT:  It's admitted.

3            And then when you're done with this exhibit, we'll

4    take our afternoon break.

5            MR. HANKEY:  Yes, your Honor.

6            THE COURT:  Go ahead.

7        (Exhibit admitted into evidence.)

8    BY MR. HANKEY:

9    Q.  And I'd like to focus on Mr. Ketchum's e-mail at

10   10:08 a.m., please.

11           To whom are you sending this e-mail, Mr. Ketchum?

12   A.  Sending an e-mail to Lynn Sperling who worked at IMS.

13   Q.  Now, do you see at the very top, you actually -- you're

14   writing:  "RS, reply from Lynn, looks like we will have it in

15   a couple of days."

16   A.  Yep, yes.

17   Q.  Let's pop back out, Ms. Paul, so we could just --

18           So now that you could see the whole page, does it

19   look like you're sending this e-mail to Ms. Sperling or to

20   someone else?

21   A.  No, I'm forwarding an e-mail from Ms. Sperling to Rishi

22   Shah.

23   Q.  Thank you.  Okay.

24           Now, can you read this e-mail to yourself and then

25   explain to the jury what you're telling Mr. Shah?

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 209 of 269 PageID #:13318
Ketchum - direct by Hankey
763

1        Okay.  Actually, we need to look at the bottom

2    e-mail, Ms. Paul, I'm sorry.  There we go.

3        What are you forwarding to him?  An e-mail from

4    Ms. Sperling.  What's she asking for?

5    A.  Sorry, with the moving of the --

6    Q.  Take your time.

7    A.  I need just to read it.

8        Okay.  Ms. Sperling sent me an e-mail stating that

9    the control group outperformed the test group in the month of

10   July and so they're going to have to exclude that from the

11   test and the post-test period.  So I was informing Mr. Shah of

12   that.

13   Q.  Now, if the control group outperforms a test group in an

14   IMS study, is that a good or a bad thing?

15   A.  It's a bad thing.

16   Q.  Why is it a bad thing?

17   A.  That means doctors who did not receive advertising on a

18   specific drug wrote more of that particular drug than a doctor

19   who did receive advertising of that drug.

20   Q.  Now, Ms. Paul, can we go back to the main document and

21   then just pull out Mr. Shah's response by itself?  In the

22   middle.  I'm sorry.  There we go.  Thank you.

23       What did Mr. Shah write?

24   A.  "Thanks, Jay.  Bizarre.  We already excluded all offices

25   not installed or playing by July, right?"

Case: 1:19-cr-00864 Document #: 584 Filed: 11/29/23 Page 210 of 269 PageID #:13319
Ketchum - direct by Hankey
764

1   Q.  Excluded from what?

2   A.  Excluded from the list that was sent to IMS for analysis.

3   Q.  Is Mr. Shah here referencing something that you would

4   typically do in your filtering of the study before it went to

5   IMS?

6   A.  Yes.

7   Q.  What is -- specifically is he asking about?

8   A.  He's asking that offices were -- were removed that were

9   not installed or were not playing the advertisement in July.

10  Q.  Now, we had looked at a chart, right, that depicted the

11  installations versus contracted amount in July.

12          Where -- just roughly speaking, how was Outcome doing

13  in delivering under its contract --

14  A.  Under-deliver.

15  Q.  -- in July?

16  A.  It was under delivery.

17  Q.  Now let's look at your response.

18          One e-mail up, Ms. Paul.

19          What did you write?

20  A.  "Yes, we did.  I thought it was bizarre as well."

21  Q.  And then what did Mr. Shah write?

22  A.  "At least we have both NRx and NBRx coming.  So that

23  should give us more to work with."

24  Q.  What does that mean, having "both NRx and NBRx coming"?

25  A.  Different -- different types of measurement for

1    prescribing habits for physicians.

2            MR. HANKEY:  Your Honor, we can take a break here.

3            THE COURT:  All right, ladies and gentlemen, we'll

4    take a 15-minute break.  Please don't discuss the case among

5    yourselves or with anyone else.  And keep an open mind, there

6    is more evidence to hear.

7            COURT SECURITY OFFICER:  All rise.

8        (Jury out at 2:52 p.m.)

9            THE COURT:  All right, sir, you can leave the stand.

10   Be back in 15 minutes.  Anything we need to discuss?

11           MR. HANKEY:  Nothing from the government.

12           MR. HUESTON:  No, your Honor.

13           THE COURT:  All right.  Thank you.  See you in 15.

14

15

16

17

18

19

20

21

22

23

24

25

1          COURT SECURITY OFFICER:  All rise.

2      (Jury enters courtroom.)

3          THE COURT:  Please be seated.  We'll hold on one

4   minute while one juror comes in in a second.

5          Oh, here we go, very good.

6          We've got everybody?  Welcome back.

7          All right.  One quick comment.  I know it's cold and

8   dry in here.  You may have noticed.  If at any point you're

9   not feeling well or anything, please make sure when you're

10  home, take a home test, home COVID test, just to make sure

11  we're all being careful.  If for any reason -- people with

12  coughs and colds, they're exacerbated every time they're in

13  this courtroom, I can tell you that.  And it's not my

14  courtroom, it's the whole building.

15         But be safe, and if for some reason you're feeling

16  ill, take a home COVID test to make sure it's not just the

17  effects of the courtroom or some type of seasonal cold.

18         All right.  With that, you may continue your direct

19  examination.

20         MR. HANKEY:  Thank you, Your Honor.

21         Ms. Paul, can we please pull up Government's 150

22  again.  This is in evidence.  Just to bring us back to where

23  we were, can you zoom Mr. Shah's 9:12 a.m. email again.  The

24  one in the middle.  There we go.

25  BY MR. HANKEY:

1  Q.  Okay.  So, Mr. Ketchum, to reorient us, Mr. Shah had

2  asked:  We already excluded all offices not installed or

3  playing by July.  Is that right?

4  A.  Correct, yes.

5  Q.  Okay.  And your testimony was that this is part of the

6  scrubbing that -- process for Crestor that you testified about

7  earlier?

8  A.  Yes.

9  Q.  And I'd like to show you Demonstrative Exhibit 1136.

10          Now, do you see on the left side of this

11  demonstrative exhibit a number of doctors that are colored red

12  and blue?

13  A.  Yes.

14  Q.  So talking about a hypothetical -- or let's talk about

15  generally how this scrubbing or cherry-picking worked.

16          If the blue doctors on the left were the doctors

17  where this -- the advertising was playing as hoped for and

18  expected and the red doctors were not playing in the

19  advertising or had MIAs or any other issue, what would you do

20  next to cherry-pick for the ROI studies?

21  A.  Also included would be -- it depends on the study

22  actually.

23  Q.  Okay.  What were -- what were the most common filters that

24  you used to do that cherry-picking?

25  A.  MIA would be one.  It would have to be a broadband office,

1    not a DVD office, so an office connected to the Internet, not

2    just playing a DVD.

3          Sometimes it would be an office that includes a

4    particular specialist that's practicing there, so whether

5    that's a rheumatologist or an endocrinologist, and a few

6    others, but those are the primary ones.

7    Q.  So if the blue offices, we're looking at blue doctors here

8    on this demonstrative represent the doctors where everything

9    is running appropriately, what happens next in your filtering

10   process?

11   A.  Those doctors that had the advertisement properly played

12   and those doctors that were deemed appropriate would be sent

13   to IMS for analysis.

14   Q.  Would that represent the middle group of doctors in this

15   chart?

16   A.  Yes, I believe so.

17   Q.  Okay.  At the end of the process, how were the results of

18   the ROI study that IMS got back using the cherry-picked

19   doctors, how would they be presented to clients?

20   A.  They would be presented as though -- oftentimes as though

21   they were representative of the entire analysis.  So the fact

22   that there were less doctors being studied would oftentimes be

23   concealed in some manner from the client.

24   Q.  Okay.

25          MR. HANKEY:  And now, let's look at Exhibit 166, and

1  let's pull this up for the Court, please.

2  　　　　Thank you.

3  　　　　This is being offered under (d)(2)(E), Your Honor.

4  　　　　THE COURT:  It's admitted.

5  　　(Said exhibit admitted in evidence.)

6  BY MR. HANKEY:

7  Q.  Mr. Ketchum, do you see an email on February 21st from

8  Lynne Sperling?

9  A.  Yes.

10  　　　　MR. HANKEY:  We'll blow that up.

11  BY MR. HANKEY:

12  Q.  And can you read Ms. Sperling's email that she wrote?

13  A.  "Hello, Jason and Rishi.  Good news.  I just received the

14  preliminary results for the Crestor NBRx analysis, and the

15  results look great.  NBRx lift is plus 28.4 percent with a

16  99.78 percent confidence level.  Market share increase is a

17  net positive 2.3 percent with a 99.99 percent confidence

18  level.  Physician penetration net increase is 13.51 percent

19  with a 99.96 percent confidence level.  I will have the report

20  for you later today."

21  Q.  Generally speaking, did you agree this is good news?

22  A.  It's good news.

23  Q.  Why is it good news?

24  A.  Because it's a positive ROI study.

25  Q.  Let's take a look at your email after you got this from

1    Ms. Sperling.

2          Who do you write it do?

3    A.  Rishi.

4    Q.  What do you write?

5    A.  "Yes, yes, yes.  I knew it."

6    Q.  Why did you write that?

7    A.  I was excited at the results.

8    Q.  Mr. Ketchum, what was the significance of a good or bad

9    ROI study for Crestor in this campaign?

10   A.  It would or could impact future purchase behavior.

11         MR. HANKEY:  Now, let's look at Government's

12   Exhibit 1111, which we're offering under (d)(2)(E).

13         THE COURT:  It's admitted.

14   BY MR. HANKEY:

15   Q.  Now, Mr. Ketchum, is this an email that you send to

16   Mr. Purdy the next day?

17   A.  Yes.

18   Q.  What's the subject line of your email?

19   A.  Promo -- sorry, subject line is Crestor deck.

20   Q.  And what did you attach to your email to Mr. Purdy?

21   A.  A copy of the Crestor -- the IMS study.

22   Q.  Can you read what you wrote to Mr. Purdy?

23   A.  "BP, I think I covered all of the changes.  Let me know if

24   I missed anything or if anything needs to be modified."

25   Q.  Now, just if you would summarize what you had been doing

1  with the Crestor deck or presentation before you sent it to
2  Mr. Purdy?
3  A.  Making some changes as they were requested by I believe
4  Rishi Shah.
5       MR. HANKEY:  Now, can we please show Exhibit 167 only
6  for the Court and the parties, please.
7       And, Your Honor, we're offering this as a (d)(2)(E)
8  statement.
9       THE COURT:  Be admitted.
10      MR. HANKEY:  May we publish?
11      THE COURT:  Yes.
12      (Said exhibit admitted in evidence.)
13  BY MR. HANKEY:
14  Q.  Now, Mr. Ketchum, what is the date of this email that
15  we're looking at here?
16  A.  February 22nd, 2013.
17  Q.  Okay.  And to whom are you sending the email?
18  A.  To Rishi Shah and Brad Purdy.
19  Q.  And can you read your email, please.
20  A.  "RS - Brad asked that I forward this deck to you.  Let me
21  know if you have any questions."
22  Q.  And, again, what's the attachment that's attached to this
23  email?
24  A.  The deck that IMS created for the Crestor study.
25  Q.  Do you see the file name includes the word final at the

1    end?

2    A.  Yes.

3    Q.  What does that suggest to you?

4    A.  That it's the final version of the deck.

5         MR. HANKEY:  Now, Ms. Paul, can we please turn to the

6    deck, page 1 of 29.

7         Yeah, we can just start -- there we go.  Thank you.

8    BY MR. HANKEY:

9    Q.  This is 2 of 30 of the exhibit.  Can you describe what

10   this top page is that we're looking at, Mr. Ketchum?

11   A.  The top page is the cover page for the deck, and then the

12   next page that you can also see on the screen just lays out

13   what the agenda is.

14        MR. HANKEY:  Okay.  And now, Ms. Paul, can we go to I

15   believe it's going to be page 6 of the exhibit.

16   BY MR. HANKEY:

17   Q.  And what's the title of this slide?

18   A.  Research methodology.

19   Q.  Can you read the middle bullet that starts with paired

20   comparison analysis?

21   A.  Paired -- sorry.  "Paired comparison analysis to measure

22   changes in Crestor new-to-brand prescription-writing behavior

23   of a test group relative to a similar group of control

24   physicians."

25   Q.  Can you describe in your own words what that means?

1    A.   Sure.

2          So what it's saying essentially is something I

3    mentioned a little bit earlier, which is you have a group of

4    physicians that received the advertising, and that's the test

5    group.  And IMS looked at various characteristics of the

6    physicians that are in that test group and tried to find

7    similar types of doctors or physicians that had similar

8    prescribing behavior so they could measure those control

9    physicians and those test physicians against each other.

10          So one of those -- so two similar doctors and then a

11   whole bunch of pairs of similar doctors.  One of those doctors

12   in that pair received the advertising, and the -- I'm sorry --

13   and the other physician did not receive the advertising.  And

14   then you want to see what the difference between those two is

15   essentially.

16   Q.   In their prescription-writing behavior?

17   A.   Yes.

18   Q.   Now, what is -- how did IMS know which doctors to include

19   in that test group, the doctors who received the advertising?

20   A.   Outcome Health sent those physicians to IMS indicating

21   they were the test physicians.

22   Q.   So that was the group you were applying the cherry-picking

23   to?

24   A.   Yes.

25          MR. HANKEY:  Let's look at I believe it's going to be

1    page 9.

2            There we go.

3    BY MR. HANKEY:

4    Q.  And can you read the title of this page 9 of the exhibit,

5    please.

6    A.  Test group.

7    Q.  Mr. Ketchum, can you explain what this particular slide in

8    the IMS deck is showing?

9    A.  Yes.  It's laying out the way the test group was set up in

10   the deck.  So it's saying that 126 physicians participated in

11   the digital in-office programming for Crestor.  That was the

12   list of physicians that IMS was able to -- that received from

13   Outcome Health.

14           126 of those 126 physicians qualified as a potential

15   test physician, meaning they successfully matched to the

16   physician database that IMS had, so they had information about

17   that doctor, that group of doctors.

18           And of that 126, there were able to find a matched

19   control to 111 of those doctors.

20   Q.  Now, if we look at the very top, Mr. Ketchum, this slide

21   says that there were only 126 physicians who participated in

22   the digital in-office programming for Crestor; is that

23   correct?

24   A.  Correct.

25   Q.  But what number of offices was Outcome required to provide

1  to Crestor under its contract from July 2012 through October
2  of 2012?
3  A.  I believe 420.
4  Q.  And then from October 2012 to December 2012, how many
5  offices was Outcome supposed to be providing to Crestor?
6  A.  608.
7  Q.  Now, let's look at the next slide.  Can you -- this is
8  page 10 of the exhibit.
9          Can you please read the title of this slide.
10  A.  Control group selection.
11  Q.  And does this slide also reference 126 number?
12  A.  Yes.
13  Q.  Can you read the first bullet of this slide?
14  A.  "126 potential test physicians were matched to the IMS
15  health prescriber universe to identify potential control
16  physicians based on the following criteria."
17          MR. HANKEY:  Now, Ms. Paul, is there any way that we
18  could line up this slide with the last slide that we just
19  looked at, so the control group slide and the test group
20  slide.
21  BY MR. HANKEY:
22  Q.  So, Mr. Ketchum, looking at the control group slide and
23  that representation about the 126 potential test physicians
24  matched, is that essentially a repeat of the middle line on
25  the test group slide?

1    A.   Yes.

2    Q.   Okay.  Now, how is that different from the top bar of the

3    test group slide?  Can you contrast the two, the meaning

4    between the two?

5    A.   I'm not sure I understand the question.

6    Q.   Yeah, so comparing the -- just looking at the test group

7    slide.

8    A.   Uh-huh.

9    Q.   Comparing the darkest bar at the top to the middle bar,

10   what's the difference between the 126 physicians in the top

11   and then in the middle bar?  What's happened between those two

12   steps?

13   A.   The top -- the darkest bar, the top bar that says 126

14   physicians, is the list of physicians that was sent to IMS.

15          The second one that also says 126 physicians is the

16   list of physicians that IMS was able to identify that they had

17   information on.  So the difference is IMS indicating they had

18   information on those physicians.

19   Q.   And, again, asking about the test group slide on page 9 of

20   the exhibit, both the top bar and the middle bar in this slide

21   were in the slide presentation that you worked on with Brad,

22   correct?

23   A.   Yes.

24   Q.   The one that -- this was referred to as the final?

25   A.   Yes.

1  Q.  In the file name?

2  A.  Yes.

3          MR. HANKEY:  Now, let's look -- go back to the first

4  page of this exhibit, Ms. Paul, please.

5  BY MR. HANKEY:

6  Q.  And to whom were you sending this slide deck again?

7  A.  To Rishi.

8          MR. HANKEY:  I'd like to show you Government's

9  Exhibit 168, which we're offering under (d)(2)(E).

10          THE COURT:  It will be admitted.

11        (Said exhibit admitted in evidence.)

12  BY MR. HANKEY:

13  Q.  Let's start with the very first email in the string from

14  Bob Mons at 3:34, please.

15          Mr. Ketchum, can you read Mr. Mons' email?

16  A.  "RS - anything to share yet on draft Crestor analytics

17  presentation?"

18  Q.  What's an analytics presentation?

19  A.  Essentially the deck.

20  Q.  What we were just looking at?

21  A.  Yes.

22  Q.  Let's look at Mr. Shah's response at 4:41 a.m.

23          What did Mr. Shah write to Mr. Mons in response?

24  A.  "Hi Bob.  Yep, check this out.  Fantastic returns.  I need

25  to plug in their exact cost numbers but the cost per new

1 Crestor patient, NBRx, looks to be less than $70, which is
2 incredible.  The new patient value is generally 2,000 plus for
3 pharma, so you can imagine the ROI.  These are some of the
4 stronger returns we've had, and I suspect it's because Crestor
5 is such a highly written product in a very highly written
6 category, statins, so a 28.4 percent lift will produce massive
7 results."
8 Q.  I'd like to page through this exhibit.  Let's look at
9 the -- what does Mr. Shah attach to his email?
10 A.  A copy of the deck.
11 Q.  Okay.  Now, let's look through the deck that's attached to
12 Government's Exhibit 168, and as we slowly page through this,
13 I'd like you to look for the slide, the test group slide, that
14 we had just looked at in the final that you sent to Mr. Shah.
15        MR. HANKEY:  Okay.  Now I'd like to go back to
16 slide -- it might be page 9, Ms. Paul.  Go back up.  And let's
17 page down.  There we are.
18 BY MR. HANKEY:
19 Q.  This is -- we're looking at page 10 of the exhibit.  Do
20 you see the control group selection slide in this deck?
21 A.  Yes.
22 Q.  Okay.  But -- and we looked at this in your -- this same
23 slide was in the deck that you sent to Mr. Shah, correct?
24 A.  Yes.
25 Q.  Did you see anywhere in the deck that Mr. Shah sent to

1  Mons the test group slide that we looked at in the last
2  exhibit?
3  A.  No.
4  Q.  What -- what information is missing from this deck that
5  was in that previous deck that you sent to Mr. Shah?
6  A.  Information about the test group.
7  Q.  And specifically what information about the test group is
8  not being included in this report?
9  A.  The total size of the test group that was sent to IMS.
10 Q.  What was that number?
11 A.  126.
12 Q.  Is that the top bar in that test group slide that we
13 looked at?
14 A.  Yes.
15        MR. HANKEY:  I'd like to go to Exhibit 169.  This is
16 being offered under (d)(2)(E).
17        THE COURT:  It's admitted.
18     (Said exhibit admitted in evidence.)
19        MR. HANKEY:  Can we blow up the top part, please.
20 BY MR. HANKEY:
21 Q.  And can you tell the jury what we're looking at here in
22 Exhibit 169?
23 A.  An email that Rishi Shah sent to Bob Mons.
24 Q.  And can you read the text of Mr. Shah's email to Mr. Mons?
25 A.  "Hi Bob.  Please find attached the PowerPoint and PDF

1　files for presentation tomorrow morning.  Thanks again for

2　your patience."

3　Q.  Who's copied on the email?

4　A.  Shradha Agarwal, Brad Purdy, and myself.

5　Q.  And what did you understand Mr. Shah to be referring to

6　when he's referring to the presentation tomorrow morning?

7　A.  Presentation that they were going to have with the client.

8　Q.  Who is they?  To your knowledge, who is the "they" that

9　Mr. Shah is referring to?

10　A.  I believe Rishi -- certainly Rishi and Bob and

11　potentially --

12　Q.  I don't want you to speculate other than that.

13　A.  Yeah.  Rishi and Bob.

14　　　　MR. HANKEY:  Now, let's look at this deck that's

15　attached to this exhibit.  And, again, I'd like to look for

16　the slide that we saw in the final that you sent to Mr. Shah

17　titled test group, and we can scroll through it.

18　　　　Let's slow down just a little bit, Ms. Paul.

19　　　　Thank you.

20　BY MR. HANKEY:

21　Q.  Now, and the rest of the -- it looks like we're starting

22　over again, right?  There were two files attached to your

23　email?

24　A.  Yes.

25　Q.  Have we reviewed the contents of the deck that has been

1  sent to Mr. Mons for the presentation?

2  A.  Yes.

3  Q.  Did you see a slide in it that revealed the number of

4  physicians that were provided by you to IMS for the test

5  group?

6  A.  No.

7  Q.  Now, Mr. Ketchum, you testified that Mr. Shah taught you

8  how to do the cherry-picking of offices for the ROI study

9  list?

10  A.  Yes.

11        MR. HANKEY:  I want to show you Exhibit No. 8, which

12  is being offered under (d)(2)(E).

13        THE COURT:  It's admitted.

14     (Said exhibit admitted in evidence.)

15        MR. HANKEY:  Can we zoom in on this email, please,

16  Ms. Paul.

17        Thank you.

18  BY MR. HANKEY:

19  Q.  What's the -- what's the date of this email, Mr. Ketchum?

20  A.  January 27, 2012.

21  Q.  Who's sending it?

22  A.  Rishi Shah.

23  Q.  And to whom is he sending it?

24  A.  Matt Coppola.

25  Q.  Who's copied?

1  A.  Myself and Travis Kemp.

2  Q.  What's the subject line?

3  A.  Novo research list.

4  Q.  What is Novo?

5  A.  A drug.

6  Q.  And January 27, 2012, how long after you started at the

7  company would this have been?

8  A.  Just a couple of months.

9  Q.  Now, can you read the first three lines of Mr. Shah's

10  email?

11  A.  "Hey, Matt, I need to submit a list of our prescribers to

12  IMS for the 2011 research.  It's been some time since we

13  pulled such a list.  Can you send me a complete list of

14  filters we've used in the past?  I'm noting a few below that I

15  recall but wanted a full list from you since you've always

16  applied the filters."

17  Q.  Let's stop there.

18        So does Mr. Shah go on to include a list of filters?

19  A.  Yes.

20  Q.  And what were filters?

21  A.  Can you clarify your question?

22  Q.  What -- when Mr. Shah is referring to filters here, what's

23  he referring to generally?

24  A.  Things that are used to remove offices for -- from the

25  test pool for various reasons.

1    Q.  What's the first filter listed in Mr. Shah's email?

2    A.  Remove DVD offices.

3    Q.  Can you explain what that meant?

4    A.  Some of the offices, when Outcome Health first started,

5    DVD players were sent to the doctors' offices because

6    broadband wasn't as widespread as it became and as widespread

7    as WiFi is now.  So offices were sent DVD players and a DVD

8    was mailed to them every month to play.

9         So you can't really control whether or not an office

10   is hitting "play" on the DVD, so it's a little bit unknown if

11   the contents is being played.

12   Q.  What was Mr. Shah's next filter?

13   A.  Remove offices with compliance issues noted through MIA

14   cases, Broadsign or Landscape or member services notes.

15   Q.  What did that mean?

16   A.  Any offices that had a number of MIA cases, MIA meaning

17   they weren't connected to the Internet.  Broadsign and

18   Landscape were software platforms that were used to control

19   the devices in various ways, either turn the TV on or off or

20   control content, and member services was the team that worked

21   with the doctors' offices, so any notes the team may put in

22   the system.

23        So through a combination of issues that may come up

24   through either -- any of those, the office may be removed.

25   Q.  How could including those offices with those issues in it,

1  in the test group, impact an ROI study?

2  A.  If an office didn't have the content playing for a

3  significant period of time over a period of time because of MS

4  cases, that could -- that could hurt the results of an ROI

5  study because that doctor and the patients of those doctors

6  would not have received the content.

7  Q.  Can you read the next filter that Mr. Shah listed in his

8  email?

9  A.  Remove offices not receiving creative for doctors' choice

10  or any other reason.

11  Q.  What did that mean?

12  A.  Physicians in the network had the option to remove any

13  advertisement that they weren't comfortable playing in their

14  office.

15  Q.  And when he refers to any other reason, what could that

16  be?

17  A.  It could be that we knew there was an inadequate setup for

18  TVs, the TV could have been muted, there were some instances

19  where the TV would play content, but we knew that volume was

20  an issue or the TV was muted, so it might be removed for that

21  reason.

22          Or there were also times where there may not

23  necessarily be a number of MIA cases, but we were aware that

24  there were competitor systems that were also installed in the

25  same location as one of our systems or in a similar location.

1  So same office, maybe different waiting rooms, or, you know,

2  an office may be undergoing some sort of construction or some

3  refurbishing, so the TV may have been taken down for a period

4  of time.

5     Or if there's some instances where maybe the office

6  was unhappy and so the member services team was trying to work

7  to make them happy.  So they may remove the office from that

8  criteria list to go to IMS because we knew they weren't happy,

9  so we weren't really sure if they were being compliant or not.

10  Q.  How could including offices that didn't receive the

11  creative affect an ROI study?

12  A.  If you're knowingly measuring an office that you're fairly

13  confident wasn't playing the content during the duration,

14  you're measuring that office as though it was receiving the

15  content, and so it's going to have poorer results than an

16  office that would receive the content the entire time

17  theoretically.

18  Q.  What's the next filter in Mr. Shah's list?

19  A.  Remove offices without a full-time practicing

20  endocrinologist or PCP, internal medicine, or family

21  practicing physician.

22  Q.  And how would -- how might including those types of

23  offices affect an ROI study?

24  A.  If an office doesn't have a full-time practitioner, in

25  this instance an endocrinologist or a primary care, internal

1  medicine or family, they may not either see patients the
2  entire time they're open, they may not have consistent opening
3  hours, they just may not practice that often, or you have
4  rotating physicians who were just part-time physicians at
5  those locations, which is going to interfere with the ability
6  for the in-office programming to have an impact on the
7  prescribing behavior in theory.
8  Q.  Now, can you read the next paragraph of Mr. Shah's email
9  slowly, please.
10  A.  "We should have the 2009 and 2010 Novo lists that we can
11  consult.  Can you send me the list we used last year?  Once we
12  settle on the filters (likely same as last year) we'll need to
13  provide this to IMS.  We'll also need to include date of
14  initial operation for any prescribers or offices that were new
15  to the network last year so the pretest period can be set to
16  the 6 months prior to them having DHN.
17          "This is a top priority, so please send along as soon
18  as you have a chance.  Today would be great if you're able to
19  get it -- get to it.  If not, Monday is fine.
20          "Thanks, Matt."
21  Q.  Now, in your early months at Outcome when you first began
22  learning about this filtering process, did you get the
23  impression that it had been done in the past before it was
24  explained to you?
25  A.  Yes.

1   Q.  How did you get that impression?

2   A.  Even just from this email, it pretty clearly states that

3   the filtering system was used in the past, specifically for

4   Novo even.

5           MR. HANKEY:  Now, let's look at Exhibit 15, please,

6   which the government is offering under (d)(2)(E).

7           THE COURT:  It's admitted.

8        (Said exhibit admitted in evidence.)

9           MR. HANKEY:  And, Ms. Paul, if we could please zoom

10  in from the very top through Mr. Ketchum's first paragraph.

11          Thank you.

12  BY MR. HANKEY:

13  Q.  Now this is an email from Mr. Shah to you on February 3rd,

14  2012?

15  A.  Yes.

16  Q.  And can you please read the first paragraph of Mr. Shah's

17  email?

18  A.  "Hey Jason, I want to catch you up on where we stand on

19  the Levemir ROI study and ask for your help in the next steps.

20  The objective of this study is to measure the efficacy of

21  Levemir's advertising program on our network from June 1st of

22  2011 through December 31st.  Please know that the IMS email

23  below is incorrect on the test period.  It assumes the Levemir

24  program ran across the entire year."

25          MR. HANKEY:  Now, Ms. Paul, can we please zoom in on

 1   the next paragraph.

 2   BY MR. HANKEY:

 3   Q.  Can you please read that, Mr. Ketchum.

 4   A.  "It's critical we get each of these perfect, and some of

 5   these next steps may require significant human review

 6   especially on the compliance and MIA filter from member

 7   services and/or Net Ops.  Please review the below and let me

 8   know when you think you can get this to IMS by.  They're ready

 9   to start the analysis as soon as they have the data from us so

10   the earlier the better, but I want to make sure we take out --

11   we take our time to filter as well as we can."

12   Q.  And now let's look at the next paragraph including No. 1

13   in the bullets below it.

14   A.  "I'm going to cover the three next steps below:

15          "1.  Review of the previous test file and removal of

16   unqualified physicians.

17          "Attached you will find a list of DHN prescribers

18   (names in column H and I) that was previously submitted to IMS

19   and used for both 2009 and 2010 analysis.

20          "This list was previously filtered to remove

21   suboptimal offices based on factors that are listed below.

22          "I need you to review this list and remove any

23   offices based on the same criteria, specifically if they are

24   no longer a part of our network (deinstallation or doctor

25   move) or if they had MIA issues and the screen was off from

1  6/1/2011 to 12/31/2011."

2  Q.  Mr. Ketchum, in the middle bullet, do you see where

3  Mr. Shah said the list was previously filtered to remove

4  "suboptimal offices"?

5  A.  Yes.

6  Q.  What were suboptimal offices?

7  A.  Those could be offices that had MIA compliance issues,

8  offices that don't have a full-time practicing physician, a

9  lot of the filtering rules that we previously covered.

10 Q.  And as you referred to factors that are listed below?

11 A.  Yes.

12     MR. HANKEY:  Ms. Paul, can we go to the bottom of the

13 email on page 1 and starting with filters, yes, through thanks

14 Rishi.

15     Thank you.

16 BY MR. HANKEY:

17 Q.  Is this what Mr. Shah is referring to?

18 A.  Yes.

19 Q.  Are these similar to the ones we just reviewed in the last

20 exhibit?

21 A.  Yes.

22 Q.  What did Mr. Shah want you to do in sending you this

23 email?  What did you understand Mr. Shah wanted you to do when

24 he sent you this email?

25 A.  To make sure that the list of physicians that was going to

1  be sent to study was -- was optimized.

2  Q.  What do you mean by optimized?

3  A.  That any of the filters that needed to be applied would be

4  applied to the physicians that were there to make sure that

5  there were no physicians that -- being studied that may have

6  had a compliance issue or other potential issue.

7  Q.  Now, earlier you referred to being taught how to run these

8  filters on IMS test groups, correct?

9  A.  Uh-huh, yes.

10  Q.  Is this an example of you being taught how to do it?

11  A.  Yes.

12       MR. HANKEY:  Now, before we move on from Crestor, I'd

13  like to go back to Exhibit 1109.  This is already in evidence.

14       And bear with me just one moment.

15       Let's blow up the expansion network part of this

16  email.

17  BY MR. HANKEY:

18  Q.  Do you recall this email, reviewing this email earlier,

19  Mr. Ketchum?

20  A.  Yes.

21  Q.  And do you see at the top a date for a reply that you

22  sent?

23  A.  April 6th.

24  Q.  Okay.  Now, in this email, can you please read what

25  Mr. Shah's writing under Item No. 1, just starting with "I

1 would encourage"?

2 A.  "I would encourage you to talk to the client and agency to

3 understand how they're looking at risk.  Reinforcing that we

4 will only invoice those offices that are actually installed

5 may help quell this concern."

6           MR. HANKEY:  Let's stop there.

7           Ms. Paul, can you drag that down so we can see who

8 Mr. Shah is writing this to, or zoom out?

9 BY MR. HANKEY:

10 Q.  Do you recall who he's writing this email to, Mr. Ketchum?

11 A.  He's sending it to Bob, Bob Mons.

12 Q.  Bob Mons, okay.

13           Now, when Mr. Shah is encouraging Mr. Mons to talk to

14 the client and the agency to understand how they're looking at

15 risk, reinforce that we will only invoice those offices that

16 were actually installed, is that an accurate statement based

17 on your experience at Outcome about how Outcome handled

18 invoicing on all of its contracts?

19 A.  No.

20 Q.  Why is that?

21 A.  Because shortfalls were typically concealed from clients.

22 Q.  Now, did Outcome always have shortfalls on every contract?

23 A.  No.

24 Q.  Okay.  So there were some contracts where Outcome would

25 actually deliver as planned?

1   A.  Yes.

2   Q.  And in that case, there were no issues with the invoices?

3   A.  Correct.

4   Q.  But where would this statement not be an accurate

5   representation to Mr. Mons?

6   A.  If there was a shortfall and it was represented to the

7   client as though there was not a shortfall.  Then the client

8   would be invoiced for the full amount, and the shortfall would

9   not be taken into account.

10          MR. HANKEY:  Okay.  Let's turn to Exhibit 77, please,

11   which is being offered under (d)(2)(E).

12          THE COURT:  It's admitted.

13      (Said exhibit admitted in evidence.)

14   BY MR. HANKEY:

15   Q.  Mr. Ketchum, were there other times when you're involved

16   in list matches that projected inventory from member outreach

17   like you did with Crestor?

18   A.  Yes.

19   Q.  Were you involved with a list match involving the pharma

20   brand Insulet in 2012?

21   A.  Yes.

22   Q.  Looking at Government's Exhibit 77, I'd like to focus your

23   attention first on an email that you sent on November 30th at

24   12:08 p.m.

25          MR. HANKEY:  Should be on the next page, Ms. Paul.

1  There we are at the bottom.

2  BY MR. HANKEY:

3  Q.  Mr. Ketchum, who are you writing your email to here?

4  A.  To Shradha Agarwal.

5  Q.  And can you please read your email?

6  A.  "Hi Shradha.  For Insulet we are looking at 966

7  prescribers in 501 locations with 559 screens.

8          "Numbers might seem low, but they sent us a list with

9  only 7,427 prescribers on it, and several were noted as

10  deceased, and 3,666 offices.  Meaning we matched to 13 percent

11  of their prescriber list and we have 13.7 percent of total

12  amount of targeted offices.  Let me know if you have any

13  questions."

14  Q.  When you write list here, what are you referring to?

15  A.  The list of physicians that the Insulet client sent to be

16  matched to.

17  Q.  Let's look at Ms. Agarwal's response to your email at

18  4:23.  What did she write?

19  A.  "How about we go into the verbal commit stage too.  The

20  program will likely start later than January."

21  Q.  And what part of the membership outline would verbal

22  commit be in again?

23  A.  Can you -- I don't quite understand your question.

24  Q.  Where in the membership sales pipeline would verbal commit

25  be?

1  A.  In the member outreach portion just before sign-up.

2  Q.  Now, let's look at your response to Ms. Agarwal's email at

3  6:05.  What did you write?

4  A.  "Adding in the verbal gave us an additional 7 names in 5

5  offices."

6  Q.  And let's look at Ms. Agarwal's email in response to you.

7  What did she ask?

8  A.  "Hmm, and did you also run with ongoing dialogue out of

9  your own curiosity?"

10 Q.  What did "run with ongoing dialogue" mean to you?

11 A.  Shradha was wondering if I also matched to see what

12 percent or how many doctors from the ongoing dialogue stage

13 matched to Insulet's list.

14 Q.  Now, again, where in the member stages of membership sales

15 did ongoing dialogue fall?

16 A.  It was in the member outreach stage, and it was the

17 earlier stage than verbal commit.

18 Q.  And what was -- what type of activity was happening if an

19 office was in the ongoing dialogue stage?

20 A.  Back and forth between the salesperson and the doctor's

21 office.

22 Q.  Had there been any kind of commitment by the doctor's

23 office to actually install a device in that office at that

24 time?

25 A.  No.

1  Q.  Is it possible that an office in the ongoing dialogue
2  stage would ultimately decide not to install an Outcome
3  screen?
4  A.  Yes.
5  Q.  How is that possible?
6  A.  Because they haven't even sent a sign-up form in.  It's an
7  earlier part of one of the sales stages.
8  Q.  Is it possible that an office in the ongoing dialogue
9  stage has a competitor's screen already installed in it?
10  A.  Yes.
11  Q.  And what, if any, challenges could that cause Outcome if
12  an office has a competitor's screen in it and Outcome is
13  trying to convince that office to install an Outcome screen?
14  A.  The competitor's screen would have to be removed first,
15  and that could take some time.
16  Q.  When you're talking about some time, can you give a
17  ballpark of what was typically experienced?
18  A.  It could take a few months.
19  Q.  Now, let's look at your response at 6:24.  Did you do what
20  Ms. Agarwal asked for?
21  A.  I did.
22  Q.  What did you write?
23  A.  "With ongoing dialogue, we pick up 197 prescribers in 121
24  offices."
25  Q.  Let's look at Ms. Agarwal's response to your email.  What

1  did she write?

2  A.  "Great.  Let's use that number."

3  Q.  And then what did you write after that?

4  A.  "Sounds great to me.  Have a great weekend."

5  Q.  Would the list match you were working on there include

6  offices not in Outcome's network?

7  A.  Yes.

8  Q.  Based on your experience working in the part of the

9  company that installed screens in offices, what was the

10  likelihood that all of the offices identified in the network

11  would be in the network by the time the campaign started?

12  A.  Can you clarify your question?  I'm not sure when you say

13  identified.

14  Q.  What was the likelihood that all of the offices that's

15  being identified in the list match would actually be installed

16  in the network by the time the campaign --

17          MR. HUESTON:  I'm going to object, vague as to time

18  period.

19          MR. BLEGEN:  And speculation.

20          MR. HANKEY:  I'll lay a foundation

21          THE COURT:  Rephrase and lay a foundation for that.

22          MR. HANKEY:  Yes, Your Honor.

23  BY MR. HANKEY:

24  Q.  Focusing on 2012, did you have an understanding based on

25  your work in membership services of the conversion rate as you

1    described earlier of offices from member outreach to actually
2    installed in the network?
3    A.  Some, yes.
4    Q.  How did you gain that understanding?
5    A.  Because I worked with the physician practices and
6    communicated with the sales team.
7    Q.  And when you refer to the sales team, who are you
8    referring to?
9    A.  The member outreach team.
10   Q.  Did you need to do that in order to do your job functions
11   properly?
12   A.  No, but it was a small company, and we talked.
13   Q.  Okay.  And did you -- through those conversations, did you
14   actually gain an understanding of how well the company was
15   converting offices from talking to them about installing a
16   device into a device that was actually installed in the
17   office?
18   A.  I wouldn't be able to speak--
19          MR. BLEGEN:  Objection.
20          MR. HUESTON:  Objection.  Based on that foundation,
21   calls for speculation with that broad question.
22          MR. HANKEY:  I was just asking yes or no there, Your
23   Honor.
24          THE COURT:  Let's start with that.
25   BY MR. HANKEY:

1   Q.  Yes or no to that question, please.

2   A.  Yes.

3   Q.  You gained an understanding of -- yes or no -- to the rate

4   of conversion between member outreach and actually installed?

5   A.  Not the specific rate.

6          MR. HANKEY:  Okay.  Well, I'll move on from there,

7   Your Honor.

8          THE COURT:  All right.

9          MR. HANKEY:  Let's look at Exhibit 1076, please.  And

10  this is -- Your Honor, this is being offered, it's a contract

11  being offered as a business record of the company.

12         THE COURT:  All right.  It will be admitted.  And,

13  again, if there's an objection, make it contemporaneously.

14      (Said exhibit admitted in evidence.)

15         MR. BLEGEN:  I didn't hear the exhibit number.  I'm

16  sorry.

17         MR. HANKEY:  1076.

18         MR. BLEGEN:  Thank you.

19         THE COURT:  All right.  Proceed.

20         MR. HANKEY:  Now, if we could go to page 2 of this

21  exhibit, and, Ms. Paul, if you could blow that up, please.

22  BY MR. HANKEY:

23  Q.  What are we looking at here, Mr. Ketchum?

24  A.  This is a contract between Target Health and Outcome

25  Health for Humira.

1    Q.  What is Humira?

2    A.  It's a rheumatology drug.

3    Q.  What's the date in the upper right-hand corner of this

4    contract?

5    A.  Looks like November 20th, 2012.

6    Q.  And do you see a signature on the bottom left?

7    A.  I do.

8    Q.  Is that the same date on the signature?

9    A.  Yes.

10   Q.  What kind of medicine was Humira?

11   A.  Treated patients with various rheumatic conditions.  It

12   had a number of indications.

13   Q.  Was the Humira client another client that you deceived

14   during the 2013 campaign?

15   A.  Yes.

16   Q.  How did -- what did you do to deceive the Humira client in

17   that 2013 campaign?

18   A.  There were proofs of performance and affidavits that were

19   submitted that were inaccurate and presented as such.

20   Q.  Now, let's go to page 2 of the contract.

21        MR. HANKEY:  And actually, yeah, let's -- I'm sorry,

22   Ms. Paul, let's zoom in right in the middle.

23        There we go.

24   BY MR. HANKEY:

25   Q.  Now, looking at this contract, Mr. Ketchum, can you -- can

1   you tell the jury how many offices Outcome promised Humira to
2   provide under this contract?
3   A.  325 rheumatologists' waiting rooms.
4   Q.  And for what time period did the contract require Outcome
5   to provide those waiting rooms?
6   A.  January 1st, 2013 through December 31st, 2013.
7   Q.  January 1st, 2013 through December 31st, 2013?
8   A.  Yes.
9   Q.  How much was Humira paying per month under this contract?
10  A.  I believe $56,550.
11          MR. HANKEY:  I'd like to display, just for the Court
12  to start, please, Exhibit 110.
13          Your Honor, we're offering this as a (d)(2)(E)
14  exhibit.
15          THE COURT:  It's admitted.
16      (Said exhibit admitted in evidence.)
17          MR. HANKEY:  Ms. Paul, can we please focus on
18  Ms. Bautista's email at 12:51 p.m. on January 22nd.
19          There we are.
20  BY MR. HANKEY:
21  Q.  Mr. Ketchum, who is Yesenia Bautista?
22  A.  An employee at Target Health.
23  Q.  And what was Target Health?
24  A.  A media agency representing the client.
25  Q.  A media agency?

1    A.  Yes.

2    Q.  Was -- and again -- well, let me ask you this:  What is

3    Ms. Bautista asking here in her email to Bob?

4    A.  She's asking about the -- some of the specifics of the

5    contract for Humira.  She's asking about the number that's

6    contracted and wondering if that's the full amount of the

7    rheumatology network that Outcome Health had.

8    Q.  And she's writing to Bob Mons here?

9    A.  Yes.

10   Q.  Let's look at Mr. Mons' response to her email.

11        What does he write in response?

12   A.  "Yesenia, we have additional sites available.  How much

13   are you looking for, budget, projected start date and same

14   creative?"

15   Q.  And let's look at Ms. Bautista's response.  What did she

16   write back?

17   A.  "Hi, Bob.  How about you tell me what you have in

18   inventory as of today?  Yes, same creative.  We want to be in

19   all rheum offices.  Please no PCPs.  We could possibly start

20   very soon.  Appreciate your quick response."

21   Q.  Now, where Ms. Bautista writes, "We want to be in all

22   rheum offices.  No PCPs."  What is a PCP?

23   A.  Primary care practitioner.

24   Q.  And what is a rheum?

25   A.  A rheumatologist.

1  Q.  Now, what is the difference -- what is your understanding
2  of the difference between a rheumatologist and a PCP, primary
3  care physician, from the perspective of Outcome's list of
4  physicians?
5  A.  A rheumatologist is someone whose specialty is treating
6  patients with a rheumatic condition, so that could be
7  rheumatoid arthritis, ankylosing spondylitis, gout, or some
8  others.  There's a number of conditions.
9       A primary care practitioner is, you know, the doctor
10  you might see just for your general -- your general health,
11  your general care.
12  Q.  Was this the only time that you saw a pharma client
13  express a preference for doctors of one specialty over
14  another?
15  A.  No.
16  Q.  Did -- you testified earlier that you saw correspondence
17  from clients like this about what they would like to purchase
18  from Outcome, correct?
19  A.  Yes.
20  Q.  And in that correspondence, did pharma clients sometimes
21  make it known why they would favor one specialty over another?
22  Yes or no?
23  A.  Yes.
24  Q.  And what would they express in doing so?
25  A.  They would be quite direct in what they wanted.

1  Q.  And why -- what was your understanding based on that

2  correspondence that you reviewed, thinking 2012 and 2013, of

3  why clients would favor one specialty over another?

4  A.  Depending on the type of drug that it is, it may only be

5  prescribed by a specialist.  So if it's a rheumatology drug,

6  then they would only want to be in front of rheumatologists

7  because if you put that drug in front of a family

8  practitioner, that family practitioner is much more -- is very

9  unlikely to prescribe that drug, and so you wouldn't want to

10  waste your dollars.

11  Q.  Again, what kind of drug is Humira?

12  A.  A rheumatology drug.

13  Q.  So what kind of doctors would be most likely to prescribe

14  a rheumatology drug?

15  A.  A rheumatologist.

16  Q.  Was it surprising to you that Ms. Bautista would be saying

17  that they wanted to be in all rheumatologists' offices and not

18  in PCP offices?

19  A.  No.

20  Q.  Why not?

21  A.  Because it's a rheumatology drug.

22  Q.  Let's look at Mr. Mons' response to Ms. Bautista's email.

23      Can you read what he wrote?

24  A.  "Yesenia, we have 155 additional rheumatology practices

25  available to go live today.  Please advise."

1  Q.  What did Mr. Mons put underneath the words "available to

2  go live today"?

3  A.  It's underlined.

4  Q.  Let's look at Ms. -- the next email in this string,

5  Ms. Bautista's response.  What did she write?

6  A.  "That's great, Bob.  Can you send us the full list of 325

7  offices where we are running and separately the list of 155

8  locations where we can add in activity?  Via Excel, please."

9  Q.  Can you look at the next email in the string, please.

10  What did Mr. Mons write?

11  A.  I sure will.  Give me a few minutes.

12      MR. HANKEY:  Let's look at Exhibit 107.  This is

13  being offered under (d)(2)(E).

14      THE COURT:  Be admitted.

15    (Said exhibit admitted in evidence.)

16  BY MR. HANKEY:

17  Q.  And I'd like to focus you on Ms. Agarwal's email at

18  1:13 p.m.

19      What does Ms. Agarwal write in this email?

20  A.  She's detailing out the ask from Humira.

21  Q.  Let's take this one piece at a time.  So please read the

22  first sentence of Ms. Agarwal's email.

23  A.  "Humira wants to expand their program with us, and after

24  looking at Quickbase numbers, I quoted them an additional 155

25  screens, as they want to make it happen this quarter."

1  Q.  What does Ms. Agarwal say in the second sentence of her
2  email?
3  A.  "They'd like to see an Excel spreadsheet of the 325 sites
4  they've currently purchased, and now the additional 155 sites
5  they could purchase."
6  Q.  So they wanted a list of the additional 155 that had just
7  been quoted to them?
8  A.  Yes.
9  Q.  And also the 325 that they'd purchased in the contract we
10 reviewed earlier?
11 A.  Yes.
12 Q.  What does the next sentence say in her email?
13 A.  "They emphasized a couple times that no PCP, only rheum."
14 Q.  What did that mean?
15 A.  That the client only wants rheumatologists, no primary
16 care providers.
17 Q.  What does Ms. Agarwal ask you to do at the end of her
18 email?
19 A.  To pull both of those lists.
20 Q.  Now, let's look at your response to Ms. Agarwal's email.
21 Who's copied on your response?
22 A.  Shradha and Jim Demas.
23 Q.  Okay.  Now, what do you write in the first sentence of
24 your email?
25 A.  "SA - lost you on chat there.  Not sure if you are mobile

1  so lost the connection.  A few questions I have to make sure

2  we do this right."

3  Q.  Can you read the next sentence?

4  A.  "Right now Humira is in 325 sites.  Those sites have a

5  total of 363 screens."

6  Q.  And let's look at the next one.

7  A.  "If Humira wants offices with rheums, then we have a total

8  of 387 sites that have a rheum with a total of 440 screens."

9  Q.  One moment.

10         And what does she say -- or what do you say next,

11  Mr. Ketchum?

12  A.  "Our total RHN network including MS pipeline has 417 with

13  478 screens."

14  Q.  So based on your counts in this email, Mr. Ketchum, how

15  many rheumatologist offices did Outcome have available as of

16  that day?

17  A.  387 sites it looks like.

18  Q.  How many offices did Ms. Bautista ask about in her email?

19  A.  An additional 155.

20  Q.  On top of?

21  A.  325.

22  Q.  So how many total rheumatologist offices did Outcome need

23  to show to the client in order to get the new contract?

24  A.  Whatever 325 plus 155 is.

25  Q.  Is that about 480?

1   A.  Yeah, give or take.

2   Q.  How many rheumatologists -- again, you said that Outcome

3   only had 387 rheumatologist offices?

4   A.  Yes.

5   Q.  How many screens were in those offices?

6   A.  440.

7   Q.  How could there be 440 screens in 387 offices?

8   A.  It could be offices that have multiple waiting rooms.  It

9   could be a larger waiting room that needs multiple screens.

10  It could be one waiting room with multiple seating areas

11  inside that waiting room.

12          MR. HANKEY:  Okay.  Now, let's go back to

13  Ms. Agarwal's previous email that we just looked at down below

14  and zoom that, please.

15  BY MR. HANKEY:

16  Q.  Now, is Ms. Agarwal -- read her email to yourself again.

17          Is she referring to screens, sites -- excuse me --

18  screens, offices, or both in her email?

19  A.  Both, actually.

20  Q.  And did Outcome have enough rheumatologist screens, if

21  we're talking about screens, to supply the additional 155 that

22  Agarwal told Mons to sell?

23  A.  I don't believe so, no.

24  Q.  And why is that?

25  A.  Because I believe there was 440 screens, but the amount

1  total would have been closer to 480.

2  Q.  Can you read the -- let's go back to your email, please,

3  at the top.

4         Can you read the last sentence of your email to

5  Ms. Agarwal?

6  A.  "I just want to make sure what we send out doesn't raise

7  eyebrows."

8  Q.  What were you referring to there?

9  A.  That whatever gets communicated and sent out to the client

10  doesn't have them ask questions about what they're seeing.

11  Q.  Why would that be a problem?

12  A.  Because it would raise questions of, you know, does

13  Outcome Health have this -- these screens installed or not.

14  Q.  Would that have been a problem if Outcome was being honest

15  with the client about how many screens were being installed?

16  A.  No, it wouldn't have.

17         MR. HANKEY:  Bear with me one moment.

18         Let's look at Exhibit 112, please.

19         Actually, Ms. Paul, can you please pull up 109 but

20  just for the Court and the parties.

21         Okay.  Your Honor, we're offering 109 as -- for the

22  non-hearsay purpose of it's a verbal act.

23         THE COURT:  All right.  Any objection?

24         MR. BLEGEN:  Judge, I --

25         MR. HUESTON:  No objection.

1         MR. BLEGEN:  I think there's a hearsay objection to

2  the initial part of the email.

3         MR. HANKEY:  We're not offering for the truth, Your

4  Honor.

5         THE COURT:  All right.  Given the fact it's not being

6  offered for the truth of the information in the document, but

7  just the -- I assume the effect on the listener, is that the

8  purpose or just the --

9         MR. HANKEY:  It's a verbal act.

10        THE COURT:  All right.  Given that representation, is

11  there any objection?

12        MR. BLEGEN:  I don't see how the first bullet point

13  is a verbal act, but --

14        THE COURT:  Do you intend to put in the first bullet

15  point?

16        MR. HANKEY:  Well, just as context on this email.  We

17  don't need to offer it for the truth.

18        THE COURT:  Why don't you -- are you offering both

19  emails or just the top one?

20        MR. HANKEY:  Both --

21        THE COURT:  Or just --

22        MR. HANKEY:  We'd also rely on the rule of

23  completeness, Your Honor, to include it.

24        MR. BLEGEN:  Judge, the rule of completeness is for

25  the opponent of the statement, not the offeror of it.

1    THE COURT:  All right.  Have you got another exhibit

2  to go and we can talk about this at 4:30?

3    MR. HANKEY:  Yes, Your Honor.

4    THE COURT:  Let's do that.

5    MR. HANKEY:  Let's look at Exhibit 112, please.  And

6  if we can zoom in on --

7    THE COURT:  Is this admitted?

8    MR. HANKEY:  Oh, this is -- if not, we're offering

9  this under (d)(2)(E), Your Honor.

10    THE COURT:  All right.  It's admitted.

11    (Said exhibit admitted in evidence.)

12    MR. HANKEY:  Your Honor, I'm sorry, could we have a

13  sidebar --

14    THE COURT:  All right.

15    MR. HANKEY:  -- to discuss this?  Thank you.

16    (Proceedings heard at sidebar:)

17    THE COURT:  Okay.  Go ahead.

18    MR. HANKEY:  Okay.  Your Honor, I'd like to talk

19  again about --

20    THE COURT:  You have to speak into the mic.  Can't

21  hear you.

22    MR. HANKEY:  Exhibit 109, I believe.

23    THE COURT:  I'm still not hearing you.

24    MR. HANKEY:  Can you hear me now?

25    THE COURT:  Yes.

1          MR. HANKEY:  Okay.  Thank you.

2          So the last exhibit we were just looking at to which

3    there was an objection under hearsay, we're not offering any

4    of it for the truth.  It's relevant to showing what's being

5    represented to the client, and information in the email is

6    deceptive.  So it's solely being offered as an act of

7    providing deceptive information to a client.

8          That one particular bullet that's being, you know,

9    addressed in the objection, we're not offering that for the

10   truth.  That's just part of the context of the email.  It's

11   part of the representation to the client.  We're offering it

12   regardless of the truth solely just for rule of completeness

13   and for context.

14         THE COURT:  All right.  Response.

15         MR. HUESTON:  Yes, Your Honor.

16         Mr. Ketchum is not on this email chain, but I'm

17   prepared to allow this to go forward under the rule of what's

18   good for the goose is good for the gander, because tomorrow

19   I'm going to be showing some Mr. Ketchum some emails he's not

20   on for the rule of completeness of the campaigns.

21         So I'm okay with that, as long as the government

22   knows what we're doing in response.

23         THE COURT:  All right.  Well, do you have unanimity

24   among the defense on that?

25         MR. HUESTON:  Yes.

1    MR. PRUITT:  Yes, Your Honor.

2    THE COURT:  Mr. Blegen?

3    MR. BLEGEN:  Yes.

4    THE COURT:  Okay.  The government understands the

5    condition by which the defense is letting it in.  They intend

6    to cross-examine this witness with emails he's not on.  His

7    knowledge of those emails, maybe he can read them, but he may

8    say I don't know what's being said there because he's not on

9    them.

10    Are you willing to do that though?

11    MR. HANKEY:  We're willing to allow them to ask him

12    to read the email, which is all we're doing here.  We're just

13    asking him to read this email.

14    THE COURT:  Yeah, speak up.

15    Understood, and they're going to do the same tomorrow

16    with other emails.

17    MR. HUESTON:  That's right.

18    MR. HANKEY:  Yes, Your Honor.

19    THE COURT:  Any objection to that process?  Because

20    if that's acceptable to the government, I'll let this exhibit

21    in.

22    MR. HANKEY:  No objection to that process.

23    THE COURT:  Okay.  Very good.

24    MR. HUESTON:  Thank you.

25    (Proceedings heard in open court:)

1    THE COURT:  Okay.  You can go back to the previously

2  objected-to exhibit, and that exhibit will be admitted per our

3  discussion at sidebar.

4    MR. HANKEY:  Thank you.

5    (Said exhibit admitted in evidence.)

6    MR. HANKEY:  Could we please pull up Exhibit 109.

7    Now, Ms. Paul, can we zoom in on the bottom email

8  from Mr. Mons at 3:17 p.m.

9  BY MR. HANKEY:

10  Q.  Mr. Ketchum, are you copied on this email?

11  A.  No.

12  Q.  Now, can you read the first three lines of Mr. Mons' email

13  to Ms. Bautista?

14  A.  "Yesenia, I know that Jen met with Rishi earlier today.  I

15  just want to confirm/clarify a few things.  Humira is running

16  on 325 RA screens currently.  We can add 155 RA screens

17  immediately, bringing Humira's total to 480 screens."

18  Q.  Can you read where it starts "please advise on the

19  following"?

20  A.  "What date do you want us to add the 155 screens for

21  Humira?  They are available today.  Will it be 155 or 110?

22  Does Humira want to commit to our incremental growth from July

23  through December, number of screens TBD?  Let me know if

24  there's anything that requires further clarification.  I will

25  forward the Excel in a separate email shortly."

1    Q.   Now, let's look at the response to this email.

2         Mr. Ketchum, who is responding to Mr. Mons' email?

3    A.   Jennifer Greufe.

4    Q.   And where does she work?

5    A.   Target Health.

6    Q.   Who's copied?

7    A.   It's sent to Bob Mons, and Matthew Crandall and Rishi Shah

8    are copied on it, along with Yesenia Bautista.

9    Q.   Can you read the first bullet of Ms. Greufe's email.

10   A.   "The goal is to add 155 incremental offices to our

11   currently contracted order of 325 RA offices beginning

12   February 1st."

13   Q.   Do you see anything in her email referring to number of

14   screens being purchased?

15   A.   No.

16        MR. HANKEY:  Let's turn to Exhibit 112.

17        If we could blow up the top, please, Ms. Paul.

18        THE COURT:  I think this was just admitted a moment

19   ago, correct?

20        MR. HANKEY:  It was, Your Honor.

21        THE COURT:  All right.  Proceed.

22   BY MR. HANKEY:

23   Q.   This is an email that you sent a bit later that afternoon,

24   correct?

25   A.   Yes.

1  Q.  What are you doing in this email?

2  A.  Sending a spreadsheet to Shradha Agarwal and Rishi Shah.

3  Q.  Now, can you read your email -- the text of the email that

4  you sent to Ms. Agarwal and Mr. Shah?

5  A.  "SA and RS:  Attached is a spreadsheet with 2 tabs.  Tab 1

6  includes the 325 sites that Humira is currently live on.

7  Tab 2 includes 155 additional rheum sites that are currently

8  available.  Please let me know if you have any questions."

9        MR. HANKEY:  Now, I'd like to pull up, side by side

10  if we could, Ms. Paul, Exhibit 107, which is already in

11  evidence, and 112 side by side.

12  BY MR. HANKEY:

13  Q.  Do you see both Exhibits 107 and 112 in front of you?

14  A.  Yes.

15  Q.  107 we reviewed earlier, correct?

16  A.  Yes.

17  Q.  It's an email from you to Shradha and copying Jen?

18  A.  Yes.

19        MR. HANKEY:  Okay.  Can we blow up -- yes, please,

20  Ms. Paul -- that there that you're blowing up, 112, and then

21  the text of Mr. Ketchum's email at the top of 107.

22  BY MR. HANKEY:

23  Q.  Now, Mr. Ketchum, in your email in 107, how many offices

24  did you say Outcome had a rheumatologist in?

25  A.  387.

1  Q.  And would that have been enough for Outcome to provide the
2  155 additional rheums as currently available as you had said
3  in your email to Ms. Agarwal and Mr. Shah in Exhibit 112?
4  A.  No.
5  Q.  Who is copied on the email where you sent the 387 sites
6  number?
7  A.  Jim Demas.
8  Q.  And to whom did you send it directly?
9  A.  Shradha Agarwal.
10       MR. HANKEY:  Now, let's take down Exhibit 107 and
11  leave up 112.  Can you read the -- on the 112 side, if we
12  could blow that up, please, Ms. Paul.
13  BY MR. HANKEY:
14  Q.  Now, again, this is the email you sent to Ms. Agarwal and
15  Mr. Shah.  What is the attachment name in the email that she
16  sent to them?
17  A.  CM sites for Humira, 1-22-2013.
18  Q.  Were all of the offices attached to this exhibit currently
19  available as you said in your email at 112?
20  A.  No.
21  Q.  And how do you know that?
22  A.  Because it includes more offices than were available, so
23  it could not have included offices that were actually --
24  actually installed.
25       MR. HANKEY:  Can we please pull up 1112 for the Court

1    and the parties, please.

2              Your Honor, we're offering this for the non-hearsay

3    purpose of Mr. Ketchum providing this information to Mr. Mons,

4    not for the truth of the information that's being --

5              THE COURT:  Any objection?

6              MR. HUESTON:  No objection.

7              MR. BLEGEN:  No.

8              MR. PRUITT:  No objection, Your Honor.

9              THE COURT:  All right.  It will be admitted for that

10   purpose.

11        (Said exhibit admitted in evidence.)

12   BY MR. HANKEY:

13   Q.  Now, Mr. Ketchum, is this an email that you sent to

14   Mr. Mons the next morning after the email we just reviewed?

15   A.  Yes.

16   Q.  Can you explain what you're sending to Mr. Mons in this

17   email?

18   A.  Yes.  I'm sending Bob Mons the spreadsheet that was

19   communicated back and forth between Rishi, Shradha and myself.

20   Q.  Can you read the attachment name?

21   A.  CM sites for Humira 1-22-2013.

22   Q.  Now, we saw earlier that Ms. Bautista at Target Health had

23   asked the day before for a list of the 325 offices where

24   Outcome was running --

25   A.  Yes.

1  Q.  -- do you recall that?

2  A.  Yes.

3  Q.  And then a list of the additional 155 offices being

4  offered.  Do you recall that?

5  A.  Yes.

6      MR. HANKEY:  Let's look at Exhibit 122, just for the

7  Court and the parties, please.

8      And we're admitting this under (d)(2)(E), Your Honor.

9      THE COURT:  It will be admitted.

10     (Said exhibit admitted in evidence.)

11     MR. HANKEY:  Now, I'd like to focus on Mr. Mons'

12 email to Ms. Bautista at 11:37 a.m., which would be down --

13 there we are, on the second page.  Can we go -- yeah, that's

14 good.  Perfect.

15 BY MR. HANKEY:

16 Q.  Now, is this a continuation of a string that we were

17 reading earlier?

18 A.  Yes.

19 Q.  And can you please read Mr. Mons' email through the first

20 two bullets?

21 A.  "Hi, Yesenia, per your requests, Excel file with currently

22 installed plus avails for Feb 1st.  The attached has 3 tabs.

23 The first tab lists the current 325 Humira RA sites.  The

24 second tab is available RA inventory, 155.

25     "155 screens, February 1st through December 31st,

1  go-live ready, awaiting your approval."

2  Q.  How did Mr. Mons characterize the list of 155 sites that

3  he sent over?

4  A.  As go-live ready.

5  Q.  Was that true?

6  A.  No.

7  Q.  Why not?

8  A.  Because they were not go-live ready.

9  Q.  Now, let's look at in the same string Mr. Crandall's email

10 to Ms. Agarwal at 2:32 p.m.

11          Who is Matthew Crandall, Mr. Ketchum?

12 A.  Salesperson on the sponsorship sales team.

13 Q.  And what was -- what campaign is Mr. Crandall writing

14 about here?

15 A.  The Humira campaign.

16 Q.  And can you read the first three sentences of

17 Mr. Crandall's email?

18 A.  "Guys, this is going to happen.  I just spoke to Jennifer

19 about another possible client, ConAgra, and she shared the

20 news that this is 99 percent approved, and they expect to give

21 us paperwork to start by 2/1, which is Friday, hence, the

22 heads up.

23          "Are we ready to expand to 155 screens starting

24 Friday if we get the word?"

25 Q.  Now, let's look at the response to Mr. Crandall's email.

1          Who responded to his email?

2    A.  Shradha Agarwal did.

3    Q.  And were you copied?

4    A.  Yes, I was.

5    Q.  Mr. Shah copied?

6    A.  Yes, he was.

7    Q.  What did she write in response?

8    A.  "Excellent.  If it's the same creative, we should be fine

9    at our end."

10   Q.  When she wrote "we would be fine on our end" in response

11   to Mr. Crandall's email, was that an honest answer to his

12   question?

13   A.  No.

14   Q.  Why not?

15   A.  Because Outcome Health would not be ready to install or to

16   play the advertising spot on those offices by that time.

17          MR. HANKEY:  All right.  Your Honor, this is a good

18   stopping point for us.

19          THE COURT:  All right.  Ladies and gentlemen, we'll

20   break for today.  Please don't discuss the case among

21   yourselves or with anyone else.  Keep an open mind.  We'll see

22   you tomorrow morning at 9:00.  Thank you very much.

23          COURT SECURITY OFFICER:  All rise.

24      (Jury exits courtroom.)

25          THE COURT:  All right, sir, you can leave the stand.

1   You're still on direct examination, so you can speak to the

2   prosecutors if you choose to do so and certainly to your

3   attorney.

4          Back tomorrow morning at 9:00.

5          THE WITNESS:  Thank you, Your Honor.

6          THE COURT:  All right.  I think going forward, we're

7   going to send you an email tonight about a protocol we're

8   going to suggest going forward for exhibits starting next

9   week.  We'll send you something tonight on that, and you can

10  talk about that tomorrow morning or during a break.

11         Also, if you're offering it as a document that's part

12  of the co-conspirator exception, you don't need to put it up

13  on the screen for the parties and me.  They have the exhibit

14  numbers presumably.  You just simply have to say I'm offering

15  this under, you know, 801(d)(2) or whatever shorthand you're

16  using.

17         I'm going to admit it absent hearing a specific

18  objection on something other than that admissibility standard,

19  you know, its relevance, not in furtherance, whatever it is.

20  But I'm simply going to admit it.  You won't have waived that

21  objection if, after I say admitted, you say, Judge, can we

22  talk for a minute.  But you are waiving it if you wait later.

23  But you can raise it right then.

24         Many of these appear to be noncontroversial in the

25  sense that there's no controversy as to their admissibility,

1  but rather than going through this fiction of putting it up
2  just for the lawyers and me and then saying what the basis of
3  admissibility is when I'm going to admit it, just state the
4  basis.  I will admit it, and speak up promptly if you have a
5  separate objection than the one that's been lodged generally.
6            Okay.  Anything else from the government?
7            MR. HANKEY:  Nothing, Your Honor.
8            THE COURT:  How much longer do you have on this
9  witness on direct?
10            MR. HANKEY:  At least until lunch, but it could well
11  be all day tomorrow.
12            THE COURT:  Okay.  And anything else from defense?
13            MR. HUESTON:  No, Your Honor.
14            MR. LOWDER:  No, Your Honor.
15            MR. POULOS:  No, Your Honor.
16            THE COURT:  Okay.  Thank you all.
17         (Court adjourned, to reconvene at 8:45 a.m. on 2/2/23.)
18
19
20
21
22
23
24
25

1                            CERTIFICATE

2          I certify that the foregoing is a correct transcript from

3     the record of proceedings in the above-entitled matter.

4     /s/ Elia E. Carrión              2nd day of February, 2023

5     Elia E. Carrión                          Date
      Official Court Reporter

6

7     /s/ Amy Spee                     2nd day of February, 2023

8     Amy Spee                                 Date
      Official Court Reporter

9

10    /s/ Sandra M. Tennis             2nd day of February, 2023

11    Sandra M. Tennis                         Date
      Official Court Reporter

12

13    /s/ Kathleen M. Fennell          2nd day of February, 2023

14    Kathleen M. Fennell                      Date
      Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25