823

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )   Docket No. 19 CR 864
4                 Plaintiff,         )
                                     )   Chicago, Illinois
5        v.                          )   February 2, 2023
                                     )   9:06 a.m.
6   RISHI SHAH, SHRADHA AGARWAL,     )
    BRAD PURDY,                      )
7                                    )
                  Defendants.        )
8

9        TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 4A
     BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11  APPEARANCES:

12
    For the Government:   MR. MATTHEW F. MADDEN
13                        MR. SAURISH APPLEBY-BHATTACHARJEE
                          Assistant U.S. Attorneys
14                        219 South Dearborn Street, 5th Floor
                          Chicago, Illinois  60604
15

16                        MR. WILLIAM E. JOHNSTON
                          MR. KYLE C. HANKEY
17                        U.S. Department of Justice
                          Criminal Division, Fraud Section
18                        Washington, D.C.  20530

19

20

21
                      ELIA E. CARRIÓN
22                 Official Court Reporter
                United States District Court
23        219 South Dearborn Street, Room 1432,
                  Chicago, Illinois 60604
24                    (312) 408-7782
              Elia_Carrion@ilnd.uscourts.gov
25

824

```
 1   APPEARANCES (Continued:)

 2
     For Defendant
 3   Shah:                   MR. JOHN C. HUESTON
                             Hueston Hennigan LLP
 4                           620 Newport Center Drive, Suite 1300
                             Newport Beach, California  92660
 5
                             MS. VICKI CHOU
 6                           MR. MICHAEL H. TODISCO
                             MS. KAREN DING
 7                           Hueston Hennigan LLP
                             523 West 6th Street, Suite 400
 8                           Los Angeles, California  90014

 9
     For Defendant
10   Agarwal:                MS. KOREN L. BELL
                             MR. A. ALEXANDER LOWDER
11                           MR. STEPHEN G. LARSON
                             Larson LLP
12                           555 South Flower Street, Suite 4400
                             Los Angeles, California  90071
13
                             MR. PATRICK W. BLEGEN
14                           MS. KELSEY H. KILLION
                             Blegen & Garvey
15                           53 West Jackson Boulevard, Suite 1437
                             Chicago, Illinois  60604
16
17   For Defendant
     Purdy:                  MR. THEODORE T. POULOS
18                           MR. ERIC PRUITT
                             MR. JOHN PAVLETIC
19                           Cotsirilos, Tighe, Streicker, Poulos &
                             Campbell, Ltd.
20                           33 North Dearborn Street, Suite 600
                             Chicago, Illinois  60602
21

22

23

24

25
```

1      (Proceedings held in open court.)

2      (Jury in at 9:06 a.m.)

3          THE COURT:  All right.  Good morning, ladies and

4   gentlemen.  We're continuing the direct examination of the

5   witness.

6          I -- the court security officer probably told you,

7   I'm relaxing the rule on anything other than water in the

8   courtroom.  If you want to bring coffee in or soda, this is

9   too long a trial for you to, you know, not do that.  Just be

10  careful because, believe it or not, there'll be other juries

11  hearing cases in this case in the future so I want to try and

12  keep the floor relatively clean.  And accidents happen, so

13  that's not a big deal.  But try and be careful if you bring

14  anything other than water, but you're free to do so.

15         With that, you may continue your direct examination.

16         Sir, you're still under oath.  Please proceed.

17         MR. HANKEY:  Thank you, Your Honor.

18         Could we please pull up Government's Exhibit 122,

19  which is in evidence.

20     JASON KETCHUM, GOVERNMENT WITNESS, PREVIOUSLY SWORN

21              DIRECT EXAMINATION [resumed]

22  BY MR. HANKEY:

23  Q.  Mr. Ketchum, do you see that on your screen?

24  A.  Yes.

25  Q.  Is this an email that we looked at, at the very end of

1    your testimony yesterday?

2    A.  Yes.

3    Q.  I want to focus you back in on Mr. Crandall's email at

4    2:32 p.m.

5            And we looked at the first part of this yesterday.

6    I'm going to focus in on the last part.

7            But if you would, just so we get back on the same

8    page, just read the email that Mr. Crandall sent at 2:32 p.m.

9    A.  "Guys, this is going to happen.  I just spoke to Jennifer

10   about another possible client, Conagra, and she shared the

11   news that this is 99 percent approved, and they expect to give

12   paperwork to start by 2/1, which is Friday, hence the

13   heads-up.

14           "Are we ready to expand to 155 screens starting

15   Friday if we get the word?  She also expects to have approval

16   on the 110 ramp-up screens too.  But at least we have till

17   April 1st to deliver the first 50.  All great work by Bob."

18   Q.  Okay.  What campaign is Mr. Crandall talking about here?

19   A.  This is Humira.

20   Q.  Can you remind us who Matt Crandall is?

21   A.  Matt Crandall is a salesperson on the sponsorship sales

22   team for Outcome Health.

23   Q.  Was there eventually a ramp-up of additional screens

24   beyond the original 480 that were contracted for?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 5 of 274 PageID #:13383
Ketchum - direct by Hankey
827

 1   Q.  Can you describe at a high level how that worked?

 2   A.  Can you restate your question.  I don't understand.

 3   Q.  Yeah.  This ramp-up of screens, can you just describe to

 4   the jury what that means?

 5   A.  Selling -- selling additional rheumatology office.  So the

 6   member outreach team, which is the sales team at

 7   Outcome Health that was responsible for working with doctors'

 8   offices and healthcare systems to sell specifically

 9   rheumatology practices and bring them into the fold, into the

10   network.

11          MR. HANKEY:  I'd like to pull up Government's

12   Exhibit 129.  The email is offered under (d)(2)(E).  The

13   attached contract with a business record.

14          THE COURT:  All right.  That'll be admitted.

15          (Said exhibit admitted in evidence.)

16   BY MR. HANKEY:

17   Q.  What are we looking at here, Mr. Ketchum?

18   A.  It's an email from Jim Demas to Shradha Agarwal.

19   Q.  Who's Jim Demas again?

20   A.  Jim Demas was the chief financial officer for contact --

21   Outcome Health.  Sorry.

22   Q.  And what, if any, role did he have with respect to

23   contracting for Outcome?

24   A.  He is the chief financial officer.  He handled quite a bit

25   or maybe even the majority of the contracting.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 6 of 274 PageID #:13384
Ketchum - direct by Hankey
828

1    Q.  Now, let's look at the attachment to Mr. Demas's email.

2         What are we looking at here, Mr. Ketchum?

3    A.  That is a contract from Target Health to Outcome Health

4    for Humira.

5    Q.  Let's go to page 4, please.

6         Now, Mr. Ketchum, looking at page 4, does this appear

7    to be a contract with a ramp-up that Mr. Crandall described in

8    his last email?

9    A.  It does.

10        MR. HANKEY:  Okay.  Can we please zoom in on the row

11   of boxes with the 10 on the left-hand side of them.

12   BY MR. HANKEY:

13   Q.  Mr. Ketchum, what does this Row 10 in the contract

14   represent?

15   A.  It represents a number of offices that need to be -- that

16   are contracted to display the Humira advertisement over a

17   period of time.

18   Q.  And what's the period of time in this row?

19   A.  From February 1, 2013, to December 31, 2013.

20   Q.  Are you able to read the portion of this row that

21   describes what's being delivered in that time frame?

22   A.  Yes.

23   Q.  Can you read it for us, please?

24   A.  "Digital screens located in 155 rheumatologists' waiting

25   rooms (additional 155 offices to current 325 office campaign)

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 7 of 274 PageID #:13385
Ketchum - direct by Hankey
829

1   60-second spot, two times per hour."

2   Q.  So what does this say about the number of offices that

3   Humira expected from Outcome in this February-to-December

4   time frame?

5   A.  That they expected to have 155 in addition to the 325.

6           MR. HANKEY:  Okay.  And let's -- let's zoom back out.

7   And let's look at Row 6, please.  Zoom that in.

8   BY MR. HANKEY:

9   Q.  Now, what are we looking at here, in Row 6 of this

10  contract?

11  A.  That is a line showing what was to be delivered for Humira

12  on the Outcome Health network over a period of time from

13  April -- sorry -- April 1, 2013, until April 30, 2013.

14  Q.  And does it have a similar description of what's being

15  delivered in the middle of it?

16  A.  Yes.

17  Q.  Okay.  And if you look at that, what's the number of

18  offices that the contract says will be delivered in that April

19  time frame?

20  A.  "50 rheumatologists waiting rooms (additional 50 offices

21  to current 480 office campaign) 60-second spot, two times per

22  hour."

23          MR. HANKEY:  Now, let's -- Ms. Paul, can we zoom back

24  out to just this page and then blow up all the boxes of this

25  page -- rows, rather.  Thank you.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 8 of 274 PageID #:13386
Ketchum - direct by Hankey
830

1  BY MR. HANKEY:

2  Q.  Do you see a series of these rows that we've been focusing

3  in on?

4  A.  Yes.

5  Q.  What do these various rows in this contract represent for

6  the ultimate delivery under the contract?

7  A.  Each row represents a period of time that Outcome Health

8  was supposed to play the Humira advertisement on the

9  Outcome Health devices.  And each box describes the number of

10  offices that -- or number of waiting rooms that should display

11  that advertisement.

12  Q.  And in terms of numbers of offices over time, what appears

13  to be happening month by month under the contract?

14  A.  It appears to be going up.

15        MR. HANKEY:  Ms. Paul, can we please display

16  Demonstrative 1134B.

17  BY MR. HANKEY:

18  Q.  Mr. Ketchum, does this demonstrative -- can you describe

19  to the jury what this demonstrative depicts?

20  A.  This demonstrative appears to represent in chronological

21  order what the previous contract represented, the previous

22  contract, the lines that we were looking at were not in

23  chronological order.

24  Q.  And does this focus in on a portion of the total period of

25  time covered by the contract?

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 9 of 274 PageID #:13387
Ketchum - direct by Hankey
831

1    A.  Yes.  Just January through June 2013.

2           MR. HANKEY:  Now let's pull up Demonstrative

3    Exhibit 1134G, please.

4    BY MR. HANKEY:

5    Q.  What are we looking at here, Mr. Ketchum?

6    A.  This is the chart that was just put up.  But this includes

7    the number of actual installations that Outcome Health had at

8    various points in time throughout the contract.

9    Q.  Mr. Ketchum, did Outcome give the Humira client what they

10   purchased under their contract during this

11   February-through-June time period?

12   A.  No.

13   Q.  How do you know that?

14   A.  And you can see that represented by the red X's that there

15   was a -- there was a shortfall.

16          MR. HANKEY:  Now let's look at Demonstrative

17   Exhibit 1134A, please.

18   BY MR. HANKEY:

19   Q.  What are we looking at here, Mr. Ketchum?

20   A.  This appears to be a chart representing the delivery that

21   was contracted for, for Humira.

22   Q.  And focusing in on the month of June.

23          Do you see that?

24   A.  Yes.

25   Q.  How far short was Outcome's delivery for the month of

1    June 2013?

2    A.   Over 100.

3          MR. HANKEY:   Now I'd like to display Government's

4    Exhibit 138, which we're offering under (d)(2)(E).

5          THE COURT:   All right.   It's admitted.

6          (Said exhibit admitted in evidence.)

7    BY MR. HANKEY:

8    Q.   Mr. Ketchum, is this an email you sent to Mr. Demas on

9    February 8, 2013?

10   A.   Yes.

11   Q.   And can you read the subject of the email?

12   A.   "AndroGel and Walmart POP."

13   Q.   What is a POP or a POP?

14   A.   Proof of performance.

15   Q.   Is -- now, can you -- can you just read the text of the

16   email that you write to Mr. Demas.

17   A.   "JD, once we hear back from Rishi and Bob on filling the

18   office gap and on impressions, I'll get the Humira POP to

19   you."

20   Q.   Did Humira also require a POP?

21   A.   Yes.

22   Q.   And what did you -- what were you telling Mr. Demas here

23   about the Humira POP?

24   A.   That there was a shortfall.

25   Q.   Shortfall in what?

1  A.  In what Outcome Health had delivered versus what was
2  contracted.
3  Q.  What do you mean by "filling the office gap"?
4  A.  I was waiting to hear back on instruction of what to share
5  with the client because of the shortfall.
6  Q.  What did that have to do with preparing the Humira POP?
7  A.  If Humira received what was actually delivered, they would
8  have seen that there was a shortfall.
9        MR. HANKEY:  Let's look at Government's Exhibit 136,
10  which we're offering under (d)(2)(E).
11        THE COURT:  It's admitted.
12      (Said exhibit admitted in evidence.)
13  BY MR. HANKEY:
14  Q.  I want to start at your email, Mr. Ketchum, sent at
15  9:34 a.m., the bottom of the page.
16        Is this sent at -- on February 8, 2013?
17  A.  Yes.
18  Q.  So just right around the same time period when you sent
19  the last email?
20  A.  Yes.
21  Q.  Can you -- to whom were you writing your email?
22  A.  To Rishi.
23  Q.  And can you read what you wrote to Mr. Shah?
24  A.  "Rishi, Jim and I just wanted to double-check with you
25  about the Humira POP.  We are contracted for 480 sites.

1  Currently, we have 419.  What do you recommend we send them

2  for addresses to fill the gap?  Should we include CM PCP

3  offices or should we send them offices from outreach?"

4  Q.  Mr. Ketchum, you wrote, "We are contracted for 480 sites.

5  Currently, we have 419."

6          Why is that something that you wanted to tell

7  Mr. Shah in this email?

8  A.  To alert Rishi of the under-delivery.

9  Q.  Who is the end user of this proof of performance you're

10  talking about preparing?

11  A.  The agency, the media agency representing the client.

12  Q.  What was your understanding of the purpose of a proof of

13  performance going to Humira?

14  A.  To serve as proof that the contract was delivered.

15  Q.  And based on what we just looked at and what we see here,

16  was the contract being delivered as planned?

17  A.  No.

18  Q.  And as promised?

19  A.  Nope.

20  Q.  Mr. Ketchum, you asked Mr. Shah, "What do you recommend we

21  send them for addresses to fill in the gap?"

22          What did you mean there when you wrote, "fill in the

23  gap"?

24  A.  I was asking Rishi what we should do to send the clients,

25  so they're not alerted there's a shortfall.

Ketchum - direct by Hankey

835

1    Q.  So then what did you propose potentially doing in your

2    email to Mr. Shah?

3    A.  Including ContextMedia primary care offices or potentially

4    offices from outreach.

5    Q.  Is primary care where you write PCP?

6    A.  Yes.

7    Q.  Same thing?

8    A.  Yes.

9    Q.  And this -- did Humira purchase PCP offices?

10   A.  No.

11   Q.  How do you know that?

12   A.  The contracts stipulated rheumatology offices.

13   Q.  What would it mean to send client offices from outreach?

14   A.  They would be offices that are not installed.

15   Q.  And how do you know that?

16   A.  'Cause they're still being sold by the member outreach

17   team.

18   Q.  Would they have even officially signed up for a screen at

19   that point if they were still in outreach?

20   A.  No.

21   Q.  Why were you proposing to include either PCP offices that

22   the client didn't buy or outreach offices that didn't have a

23   screen?

24   A.  Both were options that were instructed to -- to me but in

25   prior engagements, prior times.

Ketchum - direct by Hankey

1   Q.  Can you explain what you mean by that?

2   A.  Yeah.  In prior shortfalls, when trying to figure out what

3   to do to communicate to clients so they wouldn't be alerted of

4   a shortfall, there were times where we were instructed to

5   include primary care offices or offices from outreach to close

6   the gap.

7   Q.  Who instructed you to do that?

8   A.  Either Rishi or Shradha or even Jim Demas at times.

9   Q.  And at what time period are we talking about where they

10  would have instructed you to do that?

11  A.  2012 and 2013.

12  Q.  Why were you in your email asking Mr. Shah what he would

13  recommend doing?

14  A.  'Cause I was looking for instruction from Rishi.

15  Q.  Okay.  Let's look at Mr. Shah's response to your email.

16          Can you read what he wrote, please, Mr. Ketchum?

17  A.  "Thanks, Jay.  There isn't a great answer available here.

18  I know we've added a number of new room sites lately, so I

19  would encourage us to use the MS pipeline and get any new

20  rooms MO has cleared into the MS database.  After that, I

21  think using CM group PCP sites is the best option."

22  Q.  Mr. Shah wrote, "There isn't a great answer here."

23          But did he ultimately give you a recommendation on

24  what to do?

25  A.  Yes.

Ketchum - direct by Hankey

837

1  Q.  Did he tell you to come clean with Humira and tell them
2  that Outcome only had 419 offices installed at that point?
3  A.  Nope.
4  Q.  Did he tell you to include -- only include the 419 offices
5  that Outcome did have on the proof of performance?
6  A.  Nope.
7  Q.  Can you explain what Mr. Shah did recommend that you do?
8  A.  To capture any potential sales that had come through from
9  member outreach to member services, and then after that, to
10  include primary care sites.
11 Q.  So those new rheumatologists' offices recently cleared
12 into MS, into the MS database.
13         Would they have been installed, at this point in
14 time, being covered by the POP?
15 A.  No.
16 Q.  So would including those in the POP be a lie to the
17 client?
18 A.  Yes.
19 Q.  And using PCP sites, would those include offices where
20 there was a rheumatologist?
21 A.  No.
22 Q.  What did the contract with Humira require that Outcome
23 provide to Humira?
24 A.  Offices with rheumatologists.
25 Q.  What had Humira previously told Outcome about whether it

Ketchum - direct by Hankey

838

1  would accept PCPs?

2  A.  It had instructed that they would not accept them.

3  Q.  Was Outcome currently playing the Humira ad in PCP sites,

4  to your knowledge?

5  A.  I'm not sure.

6  Q.  Now, let's look at your response to Mr. Shah.

7      Can you read what you wrote in response to Mr. Shah?

8  A.  "RS.  Perfect.  Thank you."

9  Q.  So did you agree to do what Shah said in his email?

10 A.  Yes.

11 Q.  And, ultimately, what were you agreeing to do?

12 A.  Send incorrect information to the client.

13 Q.  By "incorrect," do you mean telling a lie to the client?

14 A.  Yes.

15 Q.  How did lying to clients make you feel at this time,

16 Mr. Ketchum?

17 A.  I can't remember how this particular instance made me

18 feel.  But as I testified yesterday, I generally would feel

19 bad about it.  But, you know, when I would bring it up to --

20 to my supervisors, I would be made to feel like what we were

21 doing was -- was perfectly acceptable.

22 Q.  And by "bringing it up to your supervisors," specifically,

23 who were you referring to?

24 A.  Rishi and/or Shradha.

25 Q.  Mr. Ketchum, why didn't you refuse to lie to the customer

Ketchum - direct by Hankey

839

1   in this case?

2   A.  I believed at the time that it was okay to do it.

3   Q.  And how did you come to that belief?

4   A.  From a discussion with Rishi and/or Shradha.

5           MR. HANKEY:  Let's look at Exhibit 149.

6           And we could just blow up the top, please.

7           THE COURT:  This is in evidence?

8           MR. HANKEY:  (d)(2)(E), Your Honor.

9           THE COURT:  It's admitted.

10         (Said exhibit admitted in evidence.)

11  BY MR. HANKEY:

12  Q.  Now, Mr. Ketchum, what do we see here in this email?

13  A.  An email from me to the pharma client with the POP

14  attached.

15  Q.  I'm sorry.  What was that last part?

16  A.  With the proof of performance attached.

17  Q.  Is that attached in a CSV file?

18  A.  It is.

19         MR. HANKEY:  Okay.  Your Honor, we would open up the

20  CSV file, which we're offering as a -- as an attachment to a

21  coconspirator statement, but also it's a verbal act, effect on

22  the listener.

23         THE COURT:  All right.  Probably is a business record

24  too.

25         This is prepared at the -- by Outcome, correct?

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 18 of 274 PageID #:13396
Ketchum - direct by Hankey
840

 1          MR. HANKEY:  Yes.  Although, it's not accurate,

 2     Your Honor.

 3          THE COURT:  All right.

 4          MR. BLEGEN:  Could we have a brief sidebar?

 5          THE COURT:  All right.

 6        (Proceedings heard at sidebar on the record.)

 7          MR. BLEGEN:  Okay.  If the government could use just

 8     801(d)(2) or something other than "coconspirator statement" as

 9     the shorthand for the admissibility.

10          MR. HANKEY:  Yes, Your Honor.

11          THE COURT:  Good idea.  Just I think you're using

12     (d)(2)(E).  Keep calling it that.

13          And isn't this a business record?  Even if the

14     information on it is not accurate, that's the whole point of

15     this trial.  It's something prepared in the ordinary course of

16     business.  It's prepared to be relied upon by the client.

17          So is there a reason that can't -- it doesn't come in

18     as a business record?

19          MR. HANKEY:  You're right, Your Honor.  My apologies.

20          THE COURT:  I'm listening for opposing views by the

21     defense if they disagree.

22          MR. BLEGEN:  I do not disagree.

23          THE COURT:  All right.  It's a business record.  It's

24     admitted.

25          And that is what number, Mr. Johnston?

1          MR. HANKEY:  149A.

2          THE COURT:  All right.  That's admitted.  Okay.

3          (Said exhibit admitted in evidence.)

4          THE COURT:  All right.  Back on the record.

5          (Sidebar ended.)

6          THE COURT:  And was the screen moved?  Was there some

7    problem seeing it?  Are you okay now?

8          A JUROR:  I just couldn't see it quite well.  Yeah --

9          THE COURT:  Okay.

10          A JUROR:  -- it's much better.

11          THE COURT:  Yeah.  And please do -- at any point if

12   you can't hear something or can't see something to your

13   satisfaction, just get our attention.  We'll make -- we'll

14   make do.  What we can't do is get individual screens to each

15   of you out there, unfortunately.

16          But as long as you can see it on that screen

17   sufficiently, then we're good.

18          You may proceed.

19          MR. HANKEY:  Thank you.

20          Let's pull up 149A, please.

21   BY MR. HANKEY:

22   Q.  Mr. Ketchum, is this the attachment that you included in

23   your email that we just saw at Exhibit 149?

24   A.  Yes.

25          MR. HANKEY:  Now I'd like to just scroll down this --

1    THE COURT:  And since this is so small, why don't you

2    just highlight part of it?  You scrolled down okay.  But

3    highlight part of it so jurors in the last row of the -- of

4    the gallery out there are able to see it, because it's a

5    pretty fine print.

6    MR. HANKEY:  Will do, Your Honor.

7    THE COURT:  All right.

8    MR. HANKEY:  Let's scroll down.  I'd like to get to

9    the bottom of this spreadsheet so that we can see how many

10   rows are on it, please.

11   BY MR. HANKEY:

12   Q.  And as you're looking at this, Mr. Ketchum, do you see --

13   there we go.  All right.

14   So at the very bottom, Mr. Ketchum, are you able to

15   tell how many rows there are in this spreadsheet?

16   A.  It looks as though there's 480 rows.

17   Q.  Okay.  We see an entry on 481.

18   But can you explain why you're saying 408?

19   A.  I believe the first row is a header row, so it is not a

20   part of the count.

21   MR. HANKEY:  Now, in looking at -- let's -- if we

22   could, Ms. Paul, could we zoom in on the text here.  Just on

23   any given row, if that's possible, or blow up the Excel file.

24   And if not, that's fine.

25   BY MR. HANKEY:

1   Q.  We've highlighted Row 469.

2         What does that row represent, Mr. Ketchum?

3   A.  That row represents an office address.

4   Q.  And what is that -- do you see in that row that there's a

5   representation about "Humira rheum"?

6   A.  Yes.

7   Q.  What does that mean?

8   A.  That the office was playing the Humira rheumatology

9   advertisement.

10   Q.  Now, do you see anything in this row that specifies that

11   the office might be a PCP or from member services?

12   A.  No.

13   Q.  And as we scroll through it, did you see anything else in

14   this spreadsheet that informed the client of either thing?

15   A.  No.

16   Q.  How many rheumatologists' offices did you tell Mr. Shah

17   Outcome actually had at this point in time?

18   A.  I believe 419 or so.

19   Q.  And how many are being represented in this proof of

20   performance that you're sending to the client?

21   A.  480.

22   Q.  Was that a lie?

23   A.  Yes.

24   Q.  Why is that?

25   A.  Because there was not 480 rheumatology offices installed,

 1  let alone receiving the advertisement.

 2          MR. HANKEY:  Now let's -- let's pull up Exhibit 148,

 3  which we're offering under (d)(2)(E).

 4          THE COURT:  It's admitted.

 5      (Said exhibit admitted in evidence.)

 6          MR. HANKEY:  Let's blow up the top part of this

 7  email, please, Ms. Paul.

 8  BY MR. HANKEY:

 9  Q.  Mr. Ketchum, do you see an email from you to Tiffany Yuh

10  on February 12, 2013?

11  A.  Yes.

12  Q.  Where does she work?

13  A.  She works at Target Health.

14  Q.  And, again, what was Target Health?

15  A.  An agency representing the pharmaceutical client.

16  Q.  And in this case, do they represent Humira?

17  A.  Yes.

18  Q.  What's the subject of this email?

19  A.  "February Proof of Performance."

20  Q.  And just generally speaking, what -- what are you sending

21  to Target Health in this email?

22  A.  An invoice, a proof of performance, and an affidavit for

23  Humira, AndroGel, and Bayer --

24          COURT REPORTER:  I'm sorry; repeat that.  An

25  invoice...

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 23 of 274 PageID #:13401
Ketchum - direct by Hankey
845

1  THE WITNESS:  An invoice, proof of performance, and
2  an affidavit for Humira, AndroGel, and Bayer.
3  MR. HANKEY:  Bayer.
4  I'd like to turn to page 8 of this exhibit.  Could we
5  blow up the text of this, please.  Thank you.
6  BY MR. HANKEY:
7  Q.  What are we looking at here, Mr. Ketchum?
8  A.  Affidavit.
9  Q.  Was this one of the attachments that you sent to Target
10  Health?
11  A.  Yes.
12  Q.  Can you explain -- well, let's -- let's focus in on the
13  middle of this affidavit, Mr. Ketchum.
14  What's the period of activity that's being covered by
15  this affidavit?
16  A.  February 1, 2013, through February 28, 2013.
17  Q.  And what does it say immediately below that date range?
18  A.  "Number of offices and locations delivered, 480."
19  Q.  What does "period of activity" mean?
20  A.  The month in which the advertisement was supposed to run.
21  Q.  And in this month of February, were 480 offices actually
22  delivered?
23  A.  Nope.
24  Q.  Whose signature is at the bottom of this affidavit?
25  A.  Mine.

Ketchum - direct by Hankey

846

1   Q.  What date did you sign it?

2   A.  February 11, 2013.

3   Q.  Is this affidavit a truthful document, Mr. Ketchum?

4   A.  No.

5   Q.  What, if anything, in this affidavit was a lie to the

6   client?

7   A.  The number of offices that was delivered.

8   Q.  Yet you signed it anyway?

9   A.  Yes.

10          MR. HANKEY:  Now let's go to page 7.  And if we

11  could, just blow up the top half of this, please, Ms. Paul.

12  The -- if we could go down just a bit more to cover the text.

13  And there we go.  Thank you.

14  BY MR. HANKEY:

15  Q.  What are we looking at here, Mr. Ketchum?

16  A.  An invoice from Outcome Health to Target Health.

17  Q.  And what campaign does this invoice relate to?

18  A.  Humira.

19  Q.  Was this, again, one of the attachments that you sent to

20  Target Health?

21  A.  Yes, I believe so.

22  Q.  And what is the amount due on this invoice?

23  A.  $26,970.

24  Q.  And what was the client paying for?

25  A.  For delivery of, in this instance, 155 screens.  Waiting

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 25 of 274 PageID #:13403
Ketchum - direct by Hankey
847

1  rooms, offices.

2  Q.  Do you see also below that an additional number of screens

3  or text about other screens?

4  A.  Yes.  Screens are additional to the 325 screens per the

5  original contract.

6          MR. HANKEY:  And let's look at 1134C.  It's a

7  demonstrative.

8  BY MR. HANKEY:

9  Q.  Mr. Ketchum, did the client -- did the Humira client get

10  what they were invoiced for in this invoice?

11  A.  Nope.

12  Q.  Why is that?

13  A.  'Cause they got 419, and they were invoiced for 480.

14  Q.  How did Outcome end up in this situation where they were

15  invoicing a client for offices that weren't delivered?

16  A.  Because they were promised offices that were not yet

17  installed.

18  Q.  And how were they promised those?

19  A.  I don't understand the question.

20  Q.  How did that happen?  How -- how did they come to be

21  promised those offices?

22          What led up to that?

23  A.  Oh.  Conversations between Shradha and Rishi and the

24  salesperson.

25  Q.  Now, in -- in the invoice that we just reviewed --

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 26 of 274 PageID #:13404
Ketchum - direct by Hankey
848

1      MR. HANKEY:  If we could go back to that, please,

2   Ms. Paul.  That was 148, page 7.  Thank you.

3   BY MR. HANKEY:

4   Q.  In this invoice, did the client -- did Outcome lie to the

5   client in this invoice?

6   A.  Yes.

7   Q.  What were they lying about?

8   A.  The number that was delivered, the number of offices that

9   were delivered.

10  Q.  Mr. Ketchum, why did you sign a false affidavit and send

11  it to the Humira client?

12  A.  I was instructed to.

13  Q.  Who instructed you to do it?

14  A.  In that instance, I believe it was Jim Demas or

15  Rishi Shah.

16  Q.  Why did you send the Humira client an invoice that lied

17  about what's being delivered?

18  A.  I was instructed to.

19  Q.  Who instructed you to do it?

20  A.  In this instance, I believe Jim Demas or Rishi Shah.

21      MR. HANKEY:  If you would, just remember to please

22  slow down, Mr. Ketchum.  Thank you.

23      I'd like to pull up Exhibit 175, which is being

24  offered under (d)(2)(E).

25      THE COURT:  It's admitted.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 27 of 274 PageID #:13405
Ketchum - direct by Hankey
849

1          (Said exhibit admitted in evidence.)

2     BY MR. HANKEY:

3     Q.  Let's start at the email sent at 11:19 a.m. on

4     February 27th.  Mr. Crandall to Ms. Bautista.

5          And who's copied on Mr. Crandall's email here to

6     Ms. Bautista?

7     A.  Shradha Agarwal.

8     Q.  And can you remind the jury who you said Ms. Bautista was?

9     A.  An employee at Target Health.

10    Q.  Can you read what Mr. Crandall wrote?

11    A.  "Hi, Yesenia.  Here you go.  Attached please find the list

12    of all -- of all of the locations, prescribers for our Humira

13    campaign."

14    Q.  Who's --

15         MR. HANKEY:  Well, let's go to the next email,

16    please, at 2:14 p.m.  Ms. Bautista's response.  There we go.

17    BY MR. HANKEY:

18    Q.  What did Ms. Bautista write later that same day?

19    A.  "Hi, Matthew.  I took a look through the list and there

20    appears a good amount of locations that are nonrheumatology,

21    such as pediatrics, cardiology, family practice, oncology.

22    Maybe these were inputted by mistake."

23    Q.  And we looked at the Humira contract earlier.

24         What specialty of doctor did it specifically require

25    Outcome to provide?

Ketchum - direct by Hankey

850

1    A.  Rheumatology.

2    Q.  Let's look at Ms. Agarwal's email at 11:18 a.m.

3            What is she doing next?  She -- she appeared to be

4    forwarding the email.

5    A.  Uh-huh.

6    Q.  And what happens next?

7    A.  Rishi Shah replied.

8    Q.  And what did he write?

9    A.  "Why would there be nonRHN offices on this?"

10   Q.  Let's go to your response, please.

11           What did you write in response?

12   A.  "The request I got was for a list of all prescribers at

13   Humira offices.  Was this incorrect?"

14           MR. HANKEY:  And then let's go to the email at the

15   very top.

16   BY MR. HANKEY:

17   Q.  Can you read -- who's sending this email?

18   A.  Shradha Agarwal.

19   Q.  And to whom?

20   A.  To myself, copying Rishi Shah.

21   Q.  Okay.  And what does she ask?

22   A.  "Can you forward to us the original request from Target

23   Health?"

24           MR. HANKEY:  Let's look at Exhibit 180, which is

25   being offered under (d)(2)(E).

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 29 of 274 PageID #:13407
Ketchum - direct by Hankey
851

1    THE COURT:  It's admitted.

2    (Said exhibit admitted in evidence.)

3    MR. HANKEY:  Let's start at the February 27th email

4  from Ms. Agarwal to Jim Demas at 12:09.  That's it.

5  BY MR. HANKEY:

6  Q.  Can you read what Ms. Agarwal wrote here?

7  A.  "Hi, guys.  There's some confusion on whether or not we've

8  previously shared prescriber names with Target Health.  Could

9  you guys add some background on the rheum list we sent today?"

10  Q.  Then does Mr. Demas respond at 1:40?

11  A.  Yes.

12  Q.  What does he write?

13  A.  "Hey, SA.  Clinic list provided with POP reports only

14  contain address, city, state, and zip.  To my knowledge, we've

15  always told Target that company policy and confidentiality

16  agreements prohibit us from sharing prescriber names."

17  Q.  And then let's look at what Ms. Agarwal writes next.

18    What does she write?

19  A.  "Okay.  Thank you.  This was an oversight on some of our

20  parts, including mine.  In the rush of meeting their quick

21  deadline, none of us paused and realized what we were

22  delivering."

23  Q.  Then does Mr. Shah weigh in, in the conversation?

24  A.  It appears so.

25    MR. HANKEY:  Let's focus on that, please.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 30 of 274 PageID #:13408
Ketchum - direct by Hankey
852

1   BY MR. HANKEY:

2   Q.  What does he write?

3   A.  "I agree.  We do not and should not share physician names

4   with Target Health."

5   Q.  What happens next?

6   A.  I reply.

7   Q.  What did you write?

8   A.  "SA, so are we just going to send them office addresses

9   this morning and not rheum plus internal medicine

10  prescribers?"

11  Q.  What does Ms. Agarwal write in response?

12  A.  "Unfortunately, in this case -- in this case, we have --

13  we have to, given we already did.  Fortunately, they've lost

14  this account and this is temporary."

15  Q.  Mr. Ketchum, why was this a concern to have sent the

16  Humira client a list that specified doctors names in it?

17  A.  Because it would -- it would make it clear to the client

18  that they were receiving offices that were not rheumatology

19  practices.

20          MR. HANKEY:  I'd like to pull up Exhibit 179, which

21  is offered under (d)(2)(E).

22          THE COURT:  It's admitted.

23      (Said exhibit admitted in evidence.)

24          MR. HANKEY:  Let's start with Ms. Agarwal's email on

25  February 28 at 11:38 a.m.

1  BY MR. HANKEY:

2  Q.  Is this on the same topic, Mr. Ketchum?

3  A.  Yes.

4  Q.  Is this the next day after the series of emails we just

5  reviewed?

6  A.  Yes.

7  Q.  Can you please read what Ms. Agarwal wrote here at 11:38?

8  A.  Yes.  "Hi, guys.  Thinking about this on a fresh day.  I'm

9  not sure we should continue to entertain their request of

10  prescriber names.  What we should do is say that was an

11  internal document of all prescribers at Humira sites that you,

12  MC, shared in error, and should be deleted.

13       "We should attach a new document that has 480 unique

14  addresses (325, plus 155) and the specialty column of mostly

15  rheums, plus a few IMs.  I think they need this just for

16  client reporting purposes.  And given Jim has already

17  maintained the same stance with the client as well, we

18  shouldn't set precedent with Target Health by giving them

19  prescriber names and ME numbers this one time."

20  Q.  Let's look at the next email in this string.  Mr. Crandall

21  replies.

22       What does he write?

23  A.  "Agree.  Let me get back to office and send.  Mea culpa."

24  Q.  Who's copied on this email?

25  A.  Shradha Agarwal -- it's sent to Shradha Agarwal copying

Ketchum - direct by Hankey

854

1    Bob Mons and Rishi Shah.

2            MR. HANKEY:  Let's go to the next email.

3    BY MR. HANKEY:

4    Q.  What does Ms. Agarwal write here?

5    A.  "All right.  New plan.  Please see below, and we need one

6    more list."

7    Q.  Okay.  And then do you respond?

8    A.  Yes.

9    Q.  What do you write?

10   A.  "SA, attached is an Excel version and a PDF in case you

11   want to send them that."

12           MR. HANKEY:  Your Honor, the government offers the

13   attachment under (d)(2)(E), business record, and as a

14   nonhearsay purpose verbal act.

15           THE COURT:  It's admitted.

16           MR. HANKEY:  179A.

17       (Said exhibit admitted in evidence.)

18           MR. HANKEY:  Let's pull up 179A.  Thank you.

19   BY MR. HANKEY:

20   Q.  Is this the attachment to the email that we just looked at

21   you having sent?

22   A.  Yes.

23   Q.  Can you describe to the jury what you had put together

24   here in this attachment?

25   A.  A list of doctors' offices.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 33 of 274 PageID #:13411
Ketchum - direct by Hankey
855

1  Q.  Did you attempt to follow Ms. Agarwal's instruction?

2  A.  Yes.

3  Q.  Do you see a Column E for specialty?

4  A.  Yes.

5           MR. HANKEY:  I'd like to scroll down and look at

6  what's in that column.  Let's stop there.

7  BY MR. HANKEY:

8  Q.  Do you see that in Column E until Row 426, all of the

9  locations had "rheumatology" in the column?

10  A.  Yes.

11  Q.  And then what happens next starting at that row?

12  A.  It begins to show internal medicine physicians.

13  Q.  Is that consistent with Ms. Agarwal's email?

14  A.  Yes.

15  Q.  What is an internal medicine office?

16  A.  It's a doctor's office.  But in this instance, not

17  necessarily a rheumatology practice.

18  Q.  So in this -- is this an example of Outcome revealing

19  potentially to a client that they're not running in all the

20  offices contracted for?

21  A.  Yes.

22  Q.  Did that happen sometimes?

23  A.  Yes.

24  Q.  Now, in this case, did the client already understand there

25  might be an issue with the delivery?

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 34 of 274 PageID #:13412
Ketchum - direct by Hankey
856

1    A.  Yes.

2    Q.  How do you know that?

3    A.  Because they had already commented on a prior list of

4    physicians and had highlighted that there was some pediatrics

5    and internal medicine doctors on it.

6              MR. HANKEY:  I'd like to show Government's

7    Exhibit 178 under (d)(2)(E).

8              THE COURT:  It's admitted.

9         (Said exhibit admitted in evidence.)

10   BY MR. HANKEY:

11   Q.  Now, let's focus in on Ms. Agarwal's email at 150.

12             Is this a continuation of the email string that we

13   just saw?

14   A.  Yes.

15   Q.  Now, can you read her response to your email, please?

16   A.  "One more request.  I'm not at a computer yet.  Can you

17   sort by zip or another criteria so internal medicine gets

18   splattered.  Just make sure first few are not internal

19   medicines."

20   Q.  When she's referring to internal medicine in her email,

21   what's she referring to?

22   A.  Internal medicine doctors.

23   Q.  And is that - is she referring to the items on the list we

24   just reviewed?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 35 of 274 PageID #:13413
Ketchum - direct by Hankey
857

1  Q.  What does "splattered" mean?

2  A.  Spread out throughout the document.

3  Q.  Let's look at your response at 2:00 p.m.

4        What did you write?

5  A.  "Done and done.  They are scattered now.  The first ten

6  are rheum and then IMs are scattered the rest of the way."

7  Q.  And to whom did you write your email?

8  A.  To Shradha Agarwal.  And I copied Jim Demas.

9  Q.  Now, Mr. Ketchum, what did you understand the objective to

10  be here in splattering or scattering the IMs?

11  A.  To make it less obvious to the client that there were

12  internal medicine physicians included.

13  Q.  And had you attached a list to your email?

14  A.  Yes.

15        MR. HANKEY:  Your Honor, we'd like to show 178 as a

16  (d)(2)(E) statement, business record, and verbal act.

17        THE COURT:  It's admitted.

18      (Said exhibit admitted in evidence.)

19  BY MR. HANKEY:

20  Q.  Mr. Ketchum, looking at 178A, is this the attachment to

21  your email?

22  A.  Yes.

23  Q.  Now, let's -- just looking at the first 29 rows here.

24        Does it appear that you followed the direction you

25  had been given?

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 36 of 274 PageID #:13414
Ketchum - direct by Hankey
858

1  A.  Yes.

2  Q.  Can you explain why it looks to be that way?

3  A.  Because you'll see a grouping of rheumatology practices,

4  and then you'll see internal medicine physicians are, sort of,

5  spread out throughout the rest of the document.

6  Q.  Now, Mr. Ketchum, just because you included these internal

7  medicine offices in this list, does that necessarily mean that

8  the Humira ad was playing in those offices?

9  A.  No, not necessarily.

10          MR. HANKEY:  Let's look at Exhibit 183, which we're

11  offering under (d)(2)(E).

12          THE COURT:  It's admitted.

13      (Said exhibit admitted in evidence.)

14          MR. HANKEY:  I'd like to focus on the March 6, 2013,

15  email from Mr. Crandall at 5:07 p.m.

16  BY MR. HANKEY:

17  Q.  Can you read the first paragraph of Mr. Crandall's email?

18  A.  "Hello.  Yes, this helps.  And I can convey this to Target

19  Health.  Note that she also asks that if AbbVie does not

20  accept these offices, they want new RA offices to replace

21  those.  If it comes to this, we'll have to reduce our contract

22  by that number of offices."

23  Q.  Now, what was AbbVie?  What was -- who were they?

24  A.  That's the pharmaceutical client.

25          MR. HANKEY:  We can zoom back out.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 37 of 274 PageID #:13415
Ketchum - direct by Hankey
859

1  BY MR. HANKEY:

2  Q.  And, Mr. Ketchum, if you need a minute to look at this

3  string, you certainly should.

4          But what is Mr. Crandall writing about here?

5  A.  I'll take a moment to read the document.

6  Q.  Yes.  If it's easier for you, we can give it to you in

7  hard copy.  Okay?

8  A.  No, this is fine.

9          MR. HANKEY:  Can you -- can you go down a little bit,

10 Ms. Paul, to earlier emails in the string.  Okay.

11         THE WITNESS:  Can you actually zoom out.  It's --

12 it's hard to read.  That's better.  Okay.

13 BY MR. HANKEY:

14 Q.  Does this refresh your recollection of what Mr. Crandall

15 was writing about?

16 A.  Yes.

17 Q.  Okay.  And what -- what was happening here?

18 A.  The primary care or the internal medicine offices were

19 called into question by Target Health, and it was communicated

20 to Target Health that the internal medicine doctors themselves

21 indicated that they treat rheumatology patients.

22         So the employees at Target Health said that they

23 would submit those physicians to the pharmaceutical client to

24 see if they would be acceptable for the advertising to run in

25 their offices.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 38 of 274 PageID #:13416
Ketchum - direct by Hankey
860

1        MR. HANKEY:  Ms. Paul, could we go back to

2   Mr. Crandall's email.

3   BY MR. HANKEY:

4   Q.  What was Mr. Crandall saying will need to happen if the

5   Humira client does not accept the internal medicine offices?

6   A.  That the contract would have to be reduced.

7   Q.  What does that mean?

8   A.  That the contract would decrease, would go down, be worth

9   less.

10  Q.  In -- in dollars?

11  A.  Yes.

12  Q.  Okay.  Can you read the next part of Mr. Crandall's email

13  starting with, "Also we agreed"?

14  A.  "Also, we agreed to add new growth RA offices starting in

15  April.  Do we have a count of new offices signed up?"

16  Q.  What was Mr. Crandall referring to when he said that

17  Outcome agreed to, quote, "add new RA offices starting in

18  April"?

19  A.  I actually believe that the agreement was that Target

20  Health would -- would want to understand what growth was.

21        MR. HANKEY:  Let's -- let's look back at Exhibit 1 --

22  129, and to the attachment, please.  Let's zoom in.  Row 6.

23  BY MR. HANKEY:

24  Q.  Now, do you recall looking at this contract earlier,

25  Mr. Ketchum?

1  A.  Yes.

2  Q.  And what -- again, what does the contract provide for

3  in -- throughout the course of 2013?

4  A.  480 offices playing the advertisement in Outcome Health

5  rheumatology offices.

6  Q.  And then month by month, what was contracted for under the

7  contract?

8  A.  Growth.

9        MR. HANKEY:  Okay.  Let's go back to the previous

10  exhibit.  And we can go back to Mr. Crandall's email.

11  BY MR. HANKEY:

12  Q.  So he wrote, "We agreed to add new growth.  RA offices

13  starting in April.  Do we have a count of new offices signed

14  up?"

15        MR. HANKEY:  Let's go to Demonstrative 1134B, please.

16  BY MR. HANKEY:

17  Q.  And what does depict, again, Mr. Ketchum?

18  A.  The -- what should have been delivered for Humira.

19  Q.  And Crandall's asking if there's a new count of -- count

20  of new offices signed up?

21  A.  Yes.

22  Q.  Was that relevant to the discussion about placing internal

23  medicine doctors on a Humira list?

24  A.  No.

25        MR. HANKEY:  Now let's look at the -- go back to

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 40 of 274 PageID #:13418
Ketchum - direct by Hankey
862

1    Mr. Crandall's email, or to the previous exhibit.  And I want

2    to focus us in on Mr. Shah's response.  That's 183.

3            MR. APPLEBY-BHATTACHARJEE:  Your Honor, I believe we

4    lost the screen.

5            THE COURT:  I see screens.  What do you mean you lost

6    it?

7            MR. APPLEBY-BHATTACHARJEE:  I mean we lost --

8            THE COURT:  I know.  I'm being facetious.  Sorry;

9    gotta have a little humor sometimes.

10           All right.  Anything at your end?

11           MR. HANKEY:  Not yet, Your Honor.

12       (Pause in the proceedings.)

13           THE COURT:  Okay.  We can go off the record.

14       (Off-the-record discussion.)

15           THE COURT:  Okay.  We can go back on the record.

16           And you may proceed.

17           183 is already in, correct?

18           MR. HANKEY:  Yes.

19           THE COURT:  Yes.  All right.  Very good.

20   BY MR. HANKEY:

21   Q.  Just before we get too far, I do have a follow-up question

22   on the Humira -- the list that was sent to Humira with the --

23   the rheumatologist and the IMs that were splattered.

24           Do you recall that?

25   A.  Yes.

1  Q.  So when you sent that list over to the client -- or when

2  that list was sent to the client, did you ensure -- did you

3  check to ensure whether those internal medicine offices were

4  actually playing the ad?

5  A.  No.

6  Q.  Did you observe Ms. Shah -- or Mr. Shah or Ms. Agarwal

7  direct anyone to check to ensure that the ad was being played

8  in those offices?

9  A.  Not that I recall.

10        MR. HANKEY:  Okay.  So back on 183.  Let's look at

11  Mr. Shah's response to Mr. Crandall's email.

12  BY MR. HANKEY:

13  Q.  Can you read what Mr. Shah wrote?

14  A.  "Hi, Matthew.  Terrific, let me know how it goes on this

15  match.  For the growth, I believe we sold a weighted average

16  with growth trajectory.  Are you aware of this?  We are

17  focusing on rheumatology and do expect to add growth this

18  month and moving forward.  Rishi."

19  Q.  What does "weighted average with growth trajectory" mean

20  to you?

21  A.  "Weighted average," as I testified yesterday, is a -- the

22  average of -- between two time periods.  "Growth trajectory,"

23  it means the weighted average, I believe, should be going up.

24  Q.  Did Mr. Shah answer Mr. Crandall's question about account

25  of new rheumatologist offices for the April growth?

Ketchum - direct by Hankey

864

1  A.  No, no.

2        MR. HANKEY:  Let's look at Mr. Crandall's response to

3  Mr. Shah's email.

4  BY MR. HANKEY:

5  Q.  Can you read the first sentence of his response?

6  A.  "Hi.  Yes, I'm aware of our growth projection, which

7  Target Health bought as specific monthly goals, rather than a

8  single-weighted average for April through December."

9  Q.  Let's stop there.

10        MR. HANKEY:  Let's go back to 1134B.

11  BY MR. HANKEY:

12  Q.  Now, we're looking at the contract delivery chart.

13        Is this consistent with what Mr. Crandall is

14  describing?

15  A.  It is.

16  Q.  In what way?

17  A.  It's specific targeted growth goals.

18  Q.  How is that different from weighted average delivery?

19  A.  With the weighted average delivery, you would have the --

20  the goal would be the weighted average.  The ramp-up or the

21  steps of growth are not as relevant in that instance.  What

22  matters is the -- the weighted average number.

23        Specific growth targets that are agreed to, those

24  are -- those need to be met by a specified date.

25  Q.  And what's in place to obligate Outcome to meet those

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 43 of 274 PageID #:13421
Ketchum - direct by Hankey
865

1    targets by specified date?

2    A.  Contract.

3    Q.  Who is correct about whether this was a weighted average

4    contract or a contract with specific growth targets over

5    months?

6    A.  Matthew Crandall was.

7        MR. HANKEY:  Now let's look at exhibit -- go back to

8    183, please.  I'd like to show Mr. Shah's response to

9    Mr. Crandall's email.

10   BY MR. HANKEY:

11   Q.  Can you read the first sentence of Mr. Shah's reply to

12   Mr. Crandall?

13   A.  "Ah, got it, Matthew.  I think we will be soft on April

14   specifically, but will make up for it through over-performance

15   on the latter months."

16   Q.  What does that mean, to be "soft on April," specifically?

17   A.  To miss the number.

18   Q.  To miss what number, Mr. Ketchum?

19   A.  To miss the agreed upon growth target, the number that the

20   contract stipulates.

21       MR. HANKEY:  Okay.  Now let's look at

22   Demonstrative 1134E, please.

23   BY MR. HANKEY:

24   Q.  And what are we looking at here in 1134E?

25   A.  That is -- this chart represents the contracted amount

Ketchum - direct by Hankey

1    between Outcome Health and Humira.  And the red X's represent

2    the actual installations during each period in time.

3    Q.  Now, was Mr. Shah right that Outcome was soft on

4    delivering the contracted number of offices in April?

5    A.  Yes.

6    Q.  Approximately how far short was Outcome in delivering on

7    its April requirement?

8    A.  Approximately 100.

9         MR. HANKEY:  Now let's go back to 183, please,

10   Mr. Shah's email.

11   BY MR. HANKEY:

12   Q.  Now, just focusing still on the first sentence of the

13   email where he says, "I think we will be soft on April

14   specifically, but will make up for it through over-performance

15   on the latter months."

16        Did the contract permit this kind of making up for

17   under-delivery later on?

18   A.  No.

19   Q.  And what did Mr. Crandall's email to Mr. Shah say about

20   doing that?

21   A.  That the targets needed to be hitted and that it was not a

22   weighted average.

23   Q.  And what did Mr. Shah say at the beginning of this

24   sentence in response to Mr. Crandall's email?

25   A.  That the April target would be missed but that

1  Outcome Health would make up for it through over-performance

2  in the latter months.

3  Q.  Did he acknowledge that he read and understood

4  Mr. Crandall's email?

5  A.  Yes.

6  Q.  How did he do that?

7  A.  He says, "Ah, got it, Matthew."

8  Q.  Now, had there been any other emails we looked at so far

9  involving the client like Ms. Bautista or any others

10  representing Humira indicating that they would have accepted

11  this type of shortfall early on and making it up later?

12  A.  No.

13      MR. HANKEY:  Let's go back to 183, please, and focus

14  back on Mr. Shah's email.

15  BY MR. HANKEY:

16  Q.  Can you read the next paragraph of what Mr. Shah wrote?

17  A.  "RHN has been tough to reaccelerate because the rheum

18  market has been saturated by competitors who are fax spamming

19  offices.  So as soon as we say, "waiting room TV," the offices

20  are often hanging up."

21  Q.  Can you read the next paragraph of this email?

22  A.  "However, we're fighting through it and will soon start

23  adding 20 plus per month.  I do think we'll hit the weighted

24  average number over the term of the program, but maybe under

25  in the beginning and over-projections in final part of the

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 46 of 274 PageID #:13424
Ketchum - direct by Hankey
868

 1    program."
 2    Q.  Now, when you were at Outcome, did you observe challenges
 3    in selling offices to the rheumatologists' doctors' offices
 4    around the country?
 5    A.  Yes.
 6    Q.  And is that what Mr. Shah's writing about here?
 7    A.  Yes.
 8    Q.  And just to be clear, what is "RHN"?
 9         What does that mean?
10    A.  That stands for the Rheumatology Health Network.
11    Q.  Did you have an understanding of why it was becoming
12    difficult to sell screens into rheumatologists' doctors'
13    offices?
14    A.  Yes.
15    Q.  Why was that?
16    A.  There was a few reasons.  One is the one that Mr. Shah
17    highlighted.  But the reason that was a challenge was
18    rheumatology doctors were seen as particularly valuable to
19    have in a point-of-care company.
20         So Outcome Health would find it very valuable or
21    competitors of Outcome Health would find rheumatology
22    practices to be lucrative, to be really profitable to have.
23    So a lot of competitors along with Outcome Health were
24    frequently contacting those offices, and so those offices
25    would get annoyed at the constant communications, and it made

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 47 of 274 PageID #:13425
Ketchum - direct by Hankey
869

1    selling into them challenging.

2    Q.  Now, Mr. Ketchum --

3           MR. HANKEY:  Let's go back to 183, please.

4    BY MR. HANKEY:

5    Q.  And focusing now on Mr. Shah's last sentence of his email.

6           Do you see where he wrote, "I do think we'll hit the

7    weighted average number over the term of the program, but

8    maybe under in the beginning and over-projections in the final

9    part of the program."

10          Do you see that?

11   A.  Yes.

12   Q.  Did -- did the Humira contract allow for under-delivery

13   below any of the specific numbers in the contract?

14   A.  No.

15   Q.  What was happening if Outcome was under-delivering to

16   Humira but billing Humira in full?

17   A.  They would be billing for something that was not

18   fulfilled.

19   Q.  Is there anything in Mr. Shah's emails here that says that

20   Outcome should reduce its billing to Humira if the company

21   doesn't meet its contracted office counts?

22   A.  No.

23          MR. HANKEY:  Now, if we go back to Mr. Crandall's

24   email below.  Let's see.  The -- that's it.

25   BY MR. HANKEY:

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 48 of 274 PageID #:13426
Ketchum - direct by Hankey
870

1   Q.  Did -- Mr. Crandall wrote that, "If AbbVie does not accept

2   these offices, they may want new RA offices to replace this.

3   If it comes to this, we'll have to reduce our contract by that

4   number of offices."

5           What did Mr. Crandall suggest doing?

6   A.  Reducing the contract.

7   Q.  And how would that affect the invoicing?

8   A.  Invoicing would've been reduced.

9   Q.  And why might the contract need to be reduced, according

10  to Mr. Crandall?

11  A.  Because less offices would be being delivered.

12  Q.  Now, sticking on the subject of invoicing, let's shift to

13  the Crestor campaign that we talked about earlier before we

14  continue with this Humira story.

15          MR. HANKEY:  I'd like to pull up government's

16  exhibit -- or Demonstrative 1132C.

17  BY MR. HANKEY:

18  Q.  We went over the Crestor program yesterday in detail,

19  correct?

20  A.  Yes.

21  Q.  Now, looking at this Crestor delivery chart, did Outcome

22  deliver to the Crestor client the number of offices that the

23  client purchased under its contracts?

24  A.  No.

25          MR. HANKEY:  Ms. Paul, could we display side by side

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 49 of 274 PageID #:13427
Ketchum - direct by Hankey
871

1    Government's Exhibit 52, which the government is offering as a

2    business record's invoice.

3            THE COURT:  It's admitted.

4        (Said exhibit admitted in evidence.)

5            MR. HANKEY:  And 49, which is -- I believe it's in

6    evidence.  If not, it's being offered as -- it's a contract

7    being offered as a business record.

8            THE COURT:  It's also admitted.

9        (Said exhibit admitted in evidence.)

10            MR. HANKEY:  On 52, could we please highlight -- blow

11    up on page 1 the middle of the exhibit starting at the amount

12    due box above.  There.  Thank you.

13    BY MR. HANKEY:

14    Q.  What is Government's Exhibit 52, Mr. Ketchum?

15    A.  An invoice for Crestor.

16    Q.  And then if we look at the contract on the right,

17    Exhibit 49, what is that a contract for?

18    A.  Crestor.

19            MR. HANKEY:  Could we make that box a little bit

20    smaller, Ms. Paul.  And then I'd like you to blow up --

21    thank you.  And then right -- that was perfect up at the top.

22    Thank you.

23            And then if you could, Ms. Paul on 49, could you blow

24    up the middle portion beginning at "posting date" and going

25    down through "cost."  Display that.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 50 of 274 PageID #:13428
Ketchum - direct by Hankey
872

1    BY MR. HANKEY:

2    Q.  Okay.  So what was the cost of the additional 188 offices

3    that Crestor purchased in this contract?

4    A.  $66,522.

5    Q.  What amount did Outcome invoice the -- Crestor for on

6    October 15, 2013?

7    A.  It looks like $66,522.

8            MR. HANKEY:  Let's look at Demonstrative 1132B.

9    BY MR. HANKEY:

10   Q.  What are we looking at here, Mr. Ketchum?

11   A.  A chart representing what was supposed to be delivered per

12   the contract for Crestor.

13   Q.  Does it also show the actual installations over time?

14   A.  It does.

15   Q.  How far short was Outcome in delivering on the

16   188 additional offices at the end of October 2013?

17   A.  Over 100.

18   Q.  And when was that invoice submitted that we just looked

19   at?

20   A.  In October.

21           MR. HANKEY:  Let's look at Demonstrative 1132C,

22   please.

23   BY MR. HANKEY:

24   Q.  Mr. Ketchum, how would you describe Outcome's success in

25   delivering on the 188 offices through the entire contract?

Ketchum - direct by Hankey

873

1   A.  It was unsuccessful.

2   Q.  What did you, Shah, and Agarwal do to get those 18 --

3   188 additional offices into the contract for Crestor?

4   A.  I used projections.

5   Q.  Projections in what?

6   A.  Can you clarify your question.

7   Q.  You used projections how?

8   A.  Oh, projections for what Outcome Health thought they might

9   have.

10  Q.  And where do those projections go into?

11  A.  The -- the proposal and eventually the contract.

12  Q.  And were those projections a lie to the client?

13  A.  Yes.

14  Q.  Why -- why they a lie?

15  A.  Because they were offices that Outcome Health wound up not

16  having.

17  Q.  What was the purpose of those lies?

18  A.  To increase the contract value.

19  Q.  And, ultimately, what did Outcome get as a result of those

20  lies?

21  A.  Additional revenue.

22          MR. HANKEY:  Now, let's look at Demonstrative 1132C

23  and put that side by side with Government Exhibit 59, which

24  are invoices being offered as business records.

25          THE COURT:  They're admitted.

 1          (Said exhibit admitted in evidence.)

 2              MR. HANKEY:  59.

 3   BY MR. HANKEY:

 4   Q.  Mr. Ketchum, is this an email from Sean Alexander to

 5   Ms. Kwon at Zenith Media?

 6   A.  Yes.

 7   Q.  December 2012?

 8   A.  Yes.

 9   Q.  What is he attaching on this email?

10   A.  A series of invoices.

11              MR. HANKEY:  And let's look at -- Ms. Paul, if we

12   could go -- on 59, into the invoices, please.

13   BY MR. HANKEY:

14   Q.  Do you see page 4 of this exhibit, an invoice from Outcome

15   to Zenith Media for Crestor?

16   A.  Yes.

17   Q.  How much is being billed?

18   A.  65,100.

19   Q.  Let's go to -- and then I'm sorry.

20              And then what's -- what does it say that it's billing

21   for?

22   A.  For September.

23   Q.  And does it say it's billing for delivery under a

24   contract?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 53 of 274 PageID #:13431
Ketchum - direct by Hankey
875

1  Q.  Is there any mention in this invoice of any reduction due
2  to any under-delivery?
3  A.  Nope.
4        MR. HANKEY:  Okay.  Let's go to the next invoice, if
5  there is another one.  Oh, thank you.
6  BY MR. HANKEY:
7  Q.  And what's the -- what's the date of this invoice we're
8  looking at, Mr. Ketchum?
9  A.  October 1, 2012.
10  Q.  Okay.  And, again, the same amount?  65,100?
11  A.  Yes.
12  Q.  And any mention of any reduction for under-delivery?
13  A.  Nope.
14        MR. HANKEY:  Okay.  This was submitted -- and let's
15  go to the next one, please.
16  BY MR. HANKEY:
17  Q.  What's the amount under this one?
18  A.  66,522.
19        MR. HANKEY:  Okay.  And if we can go to the middle,
20  please, Ms. Paul.  If we can zoom back out.
21  BY MR. HANKEY:
22  Q.  This is for -- we looked at this earlier.
23        This is for delivery across the 188 additional
24  screens, right?
25  A.  Yes.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 54 of 274 PageID #:13432
Ketchum - direct by Hankey
876

1  Q.  Okay.  So that's why there's a different amount being
2  invoiced?
3  A.  Yes.
4         MR. HANKEY:  Let's look at the next invoice, please.
5  BY MR. HANKEY:
6  Q.  Same amount here is what we'd seen in the earlier
7  invoices, 65,100?
8  A.  Yes.
9  Q.  For what month?
10  A.  For -- the date was November 1st.
11  Q.  Looking at the chart on the left, 1132C, can you see the
12  state of delivery under the contract around November of that
13  year?
14  A.  Yes.
15  Q.  Can you describe what it depicts?
16  A.  A shortfall.
17  Q.  By approximately how much?
18  A.  Looks like a little over 100.
19  Q.  Any mention in this invoice of a make-good or reduction
20  due to any under-delivery on the contract?
21  A.  No.
22  Q.  Okay.  Let's -- let's just talk about these invoices
23  generally, Mr. Ketchum.
24         Did Outcome lie to the client in these invoices?
25  A.  Yes.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 55 of 274 PageID #:13433
Ketchum - direct by Hankey
877

1  Q.  In what way?

2  A.  The invoices were for the full amount of the contract for

3  what was supposed to be delivered.  And the full amount that

4  was supposed to be delivered was not delivered.

5  Q.  Who caused this to happen, Mr. Ketchum?

6  A.  Outcome Health did.

7  Q.  And specifically who in Outcome Health caused it to

8  happen?

9  A.  Rishi Shah, Shradha Agarwal.

10  Q.  What about you?

11  A.  Yes.

12  Q.  What did the client get as a result of those lies?

13  A.  They were billed additional revenue, additional money.

14  Q.  Where did all these lies in -- on the Crestor campaign

15  leave the Crestor client at the end of the day?

16  A.  They did not get what they paid for.

17          MR. HANKEY:  Okay.  I want to turn back to Humira.

18  Same campaign we were talking about in 2013.  Let's look at

19  Exhibit 192, which we're offering under (d)(2)(E).

20          THE COURT:  It's admitted.

21       (Said exhibit admitted in evidence.)

22          MR. HANKEY:  Can you blow up the top, please.

23  BY MR. HANKEY:

24  Q.  Mr. Ketchum, you're writing an email on April 5, 2013.

25          To whom are you writing it?

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 56 of 274 PageID #:13434
Ketchum - direct by Hankey
878

1    A.  Shradha Agarwal.

2    Q.  What's the subject?

3    A.  "Humira Proof of Performance."

4    Q.  Can you read what you wrote.

5    A.  "SA, I have a quick question regarding Humira proof of

6    performance for Target.  We need to add an additional 50 sites

7    for proof of performance that are rheum.  Should I look to add

8    PCP?"

9    Q.  Why are you asking this question?

10    A.  I'm looking for direction.

11    Q.  You write, "Should I look to add PCP."

12         What does that mean?

13    A.  Add primary care physicians.

14    Q.  But you knew that the client only wanted rheumatologists

15    and not PCPs, correct?

16    A.  Yes.

17         MR. HANKEY:  Let's look at 193 offered under

18    (d)(2)(E).

19         THE COURT:  It's admitted.

20      (Said exhibit admitted in evidence.)

21  BY MR. HANKEY:

22    Q.  Is this just a forward of the email we just looked at,

23    Mr. Ketchum?

24    A.  Yes.

25    Q.  Are you on it?

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 57 of 274 PageID #:13435
Ketchum - direct by Hankey
879

1  A.  No.

2  Q.  Okay.  What date was it forwarded?

3  A.  It was forwarded on April 5, 2013.

4  Q.  From Shradha Agarwal to whom?

5  A.  Rishi Shah.

6  Q.  Just want you to read it.  I don't want you to describe

7  what's being written.

8         But could you please read what Ms. Agarwal wrote to

9  Mr. Shah?

10  A.  "We keep running into this issue.  What to do?  They

11  realized they were PCPs last time but didn't ask to remove

12  yet."

13  Q.  Now, in your original email, when you say, "We need to add

14  an additional 50 sites for POP that are rheum," after you do

15  so, would you ensure that the Humira ad would actually be

16  playing on those 50 PCP sites?

17  A.  I don't recall, but likely not.

18  Q.  Why do you say, "likely not"?

19  A.  'Cause I don't -- I don't believe that was generally a

20  standard practice to double-check that.

21  Q.  What was the purpose of adding an additional 50 sites for

22  POP?

23  A.  To show the client that the delivery was fulfilled, the

24  contract delivery was fulfilled.

25  Q.  Showed to whom?

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 58 of 274 PageID #:13436
Ketchum - direct by Hankey
880

 1   A.  To the client.

 2          MR. HANKEY:  Let's look at 194, which we're offering

 3   under (d)(2)(E).

 4          THE COURT:  It's admitted.

 5       (Said exhibit admitted in evidence.)

 6   BY MR. HANKEY:

 7   Q.  Mr. Ketchum, let's --

 8          MR. HANKEY:  If we could, let's just blow up the very

 9   top of "from, sent, to, subject."

10   BY MR. HANKEY:

11   Q.  Can you describe what -- what we're looking at here in

12   Government's Exhibit 194?

13   A.  An email sent from myself to the senior management team

14   and the team leads from --

15   Q.  And what -- specifically, what type of email was it?

16   A.  A weekly report.

17   Q.  What is an MS weekly report?

18   A.  It's a weekly update for what happened in the member

19   services team.

20   Q.  Now, you're sending to senior management team.

21          Can you describe what that was?

22   A.  At that time, senior management team was Jim Demas,

23   Rishi Shah, Shradha Agarwal.  And I believe by that point in

24   time, Brad Purdy was also a member of that team.

25   Q.  When you wrote into Outlook, you know, to send an SMT at

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 59 of 274 PageID #:13437
Ketchum - direct by Hankey
881

1    ContextMedia, Inc., was that like a mailbox that would deliver

2    that email to those people you just listed?

3    A.  Yes.

4            MR. HANKEY:  Let's zoom back out, please, Ms. Paul.

5    BY MR. HANKEY:

6    Q.  What's the purpose of these MS weekly reports?

7    A.  To keep senior management and team leads, sort of, in the

8    loop on what was going on, team by team in this instance with

9    the member services team.

10   Q.  Now, again, member services was the part of the company

11   that would take the offices once there was a sign-up form from

12   outreach, and then start installing or trying to install

13   Outcome devices into those offices?

14   A.  Yes.

15   Q.  So is this reporting on various activities going on in

16   that part of the business?

17   A.  Yes.

18   Q.  Now, do you see at the bottom of your email a portion

19   where it begins, "Below are the unique screen counts for

20   Humira, Pradaxa, and for our whole network"?

21           MR. HANKEY:  Could we blow that up just starting it

22   below and then through the rest of the email, please,

23   Ms. Paul.

24   BY MR. HANKEY:

25   Q.  Do you see that there, Mr. Ketchum?

1   A.  Yes.

2   Q.  Okay.  Could you please read what it says for Humira --

3           MR. HANKEY:  I'm sorry.  We'll have to go to the next

4   page for Humira.  There we go.

5   BY MR. HANKEY:

6   Q.  Do you see a location and screen count for Humira on this

7   weekly report?

8   A.  Yes.

9   Q.  What does it say?

10  A.  432 locations, 502 screens.

11          MR. HANKEY:  Let's go back to demonstrative -- or go

12  to Demonstrative 1134E.

13  BY MR. HANKEY:

14  Q.  Do you see the 432 on the chart?

15  A.  Yes.

16  Q.  And how many offices did Outcome promise Humira in the

17  contract as of April 1?

18  A.  I believe 530.

19  Q.  Now, let's go to -- by "approximately," how far was the

20  company under-delivering at that point?

21  A.  Approximately 100 offices.

22          MR. HANKEY:  Now let's go back to 194.

23  BY MR. HANKEY:

24  Q.  Now, was Ms. Agarwal and Mr. Shah aware that Humira was

25  not playing in the number of offices required under the

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 61 of 274 PageID #:13439
Ketchum - direct by Hankey
883

1  contract?

2  A.  Yes.

3  Q.  And how?

4  A.  Well, I'd ask them how to satisfy the proof of

5  performance, and I listed out the screen counts or the -- and

6  the office counts in the weekly emails.

7  Q.  Did they ever tell you to let the client know about the

8  under-delivery to Humira?

9  A.  No.

10  Q.  Do you ever recall Mr. Shah or Mrs. Agarwal telling

11  anyone else at Outcome to tell Humira about the

12  under-delivery?

13  A.  No.

14      MR. HANKEY:  Let's look at Exhibit 197, which we're

15  offering under (d)(2)(E).

16      THE COURT:  It's admitted.

17    (Said exhibit admitted in evidence.)

18      MR. HANKEY:  Can we blow up the top, please.

19  BY MR. HANKEY:

20  Q.  Mr. Ketchum, what are you doing in this email?

21  A.  Sending the proof of performance, invoices, and affidavits

22  to Target Health.

23  Q.  Now, this is similar to a previous email we looked at,

24  correct?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 62 of 274 PageID #:13440
Ketchum - direct by Hankey
884

1          MR. HANKEY:  Let's look at page 149 of this exhibit.

2    BY MR. HANKEY:

3    Q.  We looked at some invoices earlier, correct, including

4    some for Crestor?

5    A.  Uh-huh, yes.

6          MR. HANKEY:  Let's zoom in on the middle part,

7    please.

8    BY MR. HANKEY:

9    Q.  And what does this represent, Mr. Ketchum?

10   A.  Humira's contracted purchase.

11   Q.  And what amount's being billed to the client, looking on

12   the right?

13   A.  A total of 35,670.

14   Q.  Can you read the first bullet under "Activity," please?

15   A.  "Humira rheumatology advertising content on 155

16   ContextMedia Health screens during April 2013.  60-second

17   spot, two times per hour.  Per order number."  And it lists

18   out a contract.

19   Q.  Is Outcome billing the client for full delivery of the

20   155 and 50 additional offices?

21   A.  Yes.

22   Q.  Is there anything in here about a make-good or reduction

23   or anything of that nature?

24   A.  No.

25   Q.  Now, do you see on this invoice -- where does this invoice

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 63 of 274 PageID #:13441
Ketchum - direct by Hankey
885

1   come from?

2          Is it from Outcome?

3   A.  Yes.

4   Q.  Who would generate the invoice?

5   A.  Jim Demas.

6   Q.  And on this invoice, does it say 155 screens or offices?

7   A.  It says, "screens."

8   Q.  And we looked at the contract earlier.

9          What did the contract stipulate?

10  A.  Waiting rooms, I believe.

11  Q.  Did it also say, "additional offices"?

12  A.  It did.

13  Q.  And how much money --

14         MR. HANKEY:  Well, strike that.

15         Let's look at page 150 of this exhibit.  Can we blow

16  up the text, please.

17  BY MR. HANKEY:

18  Q.  What is this affidavit of performance telling the Humira

19  client?

20  A.  That they received 530 offices or locations.

21  Q.  And who signed it?

22  A.  I did.

23         MR. HANKEY:  And if we could, please, side by side

24  with 1134E.

25  BY MR. HANKEY:

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 64 of 274 PageID #:13442
Ketchum - direct by Hankey
886

1    Q.  How many were being delivered in April?

2    A.  432.

3    Q.  So how -- by how much had you inflated the number of

4    offices being delivered in the affidavit of performance?

5    A.  About 100.

6    Q.  Why did you send an affidavit of performance in April with

7    an inflated number of offices?

8    A.  I was instructed to.

9    Q.  By whom?

10   A.  In this instance, Jim Demas and Rishi Shah.

11              MR. HANKEY:  Let's look at Exhibit 205, please.

12              This is being offered under (d)(2)(E).

13              THE COURT:  It's admitted.

14         (Said exhibit admitted in evidence.)

15              MR. HANKEY:  Your Honor, this may be a good time for

16   a break, actually.

17              THE COURT:  All right.  It's about 10:30.  We'll take

18   our morning break before you start this exhibit.

19              Please don't discuss the case among yourselves or

20   with anyone else, and keep an open mind.  We'll see you in

21   15 minutes.

22              COURT SECURITY OFFICER:  All rise.

23         (Jury out at 10:28 a.m.)

24              THE COURT:  Sir, you can leave the stand.  Be back in

25   15 minutes.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 65 of 274 PageID #:13443
Ketchum - direct by Hankey
887

1          Anything we need to discuss?

2               MR. HANKEY:  Nothing from the government.

3               MR. HUESTON:  No, Your Honor.

4               MS. BELL:  No, Your Honor.

5               MR. POULOS:  No, Your Honor.

6          (A recess was had from 10:29 a.m. to 10:51 a.m.)

7               COURT SECURITY OFFICER:  All rise.

8          (Jury in at 10:51 a.m.)

9               THE COURT:  All right.  Please be seated.

10              You may continue your direct examination.

11              MR. HANKEY:  Thank you, Your Honor.

12   BY MR. HANKEY:

13   Q.  Mr. Ketchum, I'd like to just revisit one thing that we

14   were talking about towards the end of this last period related

15   to the April Humira POP.

16              MR. HANKEY:  Could we pull up 192, which is already

17   in evidence.

18   BY MR. HANKEY:

19   Q.  And, again, what is a -- what is a POP or proof of

20   performance?

21   A.  It's a list of offices that are sent to a client or the

22   agency representing the client.

23   Q.  Okay.  And is it similar to the affidavit?

24   A.  It's similar in that it is a record that a contract has

25   been fulfilled.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 66 of 274 PageID #:13444
Ketchum - direct by Hankey
888

1    Q.  And are they both sent in the same frequency?

2    A.  Generally, monthly.

3    Q.  And when you send in POPs, do they typically align with

4    the numbers in the affidavits?

5    A.  Yes, typically.

6    Q.  Now, in this case, you're talking about the Humira POP

7    with whom?

8    A.  Shradha Agarwal.

9            MR. HANKEY:  And then let's go to 197, which is in

10   evidence.  Page 150, please.

11   BY MR. HANKEY:

12   Q.  And do you remember we looked at this Humira affidavit of

13   performance, correct?

14   A.  Yes.

15   Q.  Okay.  And just to, kind of, clarify here.

16           Who would have been directing you -- do you have a

17   specific recollection as to this affidavit and this POP, who

18   was directing you to submit it with inflated numbers?

19           Or is your recollection based on, kind of, your --

20   your general practice of submitting things?

21   A.  For the proof of performance, it was direction from

22   Shradha Agarwal, as you saw in the prior email.  For this

23   affidavit, it's just general from prior conversations.  It was

24   general practice to talk with Jim Demas, Rishi Shah, and

25   Shradha Agarwal before sending those.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 67 of 274 PageID #:13445
Ketchum - direct by Hankey
889

1    MR. HANKEY:  Okay.  Now, let's look at Exhibit 221.

2    This is being offered under (d)(2)(E), Your Honor.

3    THE COURT:  It's admitted.

4        (Said exhibit admitted in evidence.)

5    MR. HANKEY:  And can we please blow up just the top

6    portion.  Down to "agrees."  Actually, let's go back -- I'm

7    sorry.  Let's -- instead, let's blow up the bottom two-thirds

8    of the email.

9    BY MR. HANKEY:

10   Q.  Is this another MS weekly report, Mr. Ketchum?

11   A.  Yes.

12   Q.  And what -- when were you sending it?

13   A.  It looks like it was sent Sunday, June 2nd.

14   Q.  Who would you have sent this weekly report to?

15   A.  Senior management and team leads.

16       MR. HANKEY:  Now let's go -- if we could pop back

17   out, please, and go to -- at the very bottom where it begins,

18   "below are the unique."

19   BY MR. HANKEY:

20   Q.  Mr. Ketchum, similar to the last one of these weekly

21   reports that we reviewed, does this provide unique screen and

22   office counts for the rheumatoid health network?

23   A.  Yes.

24   Q.  Okay.  Previously we saw a specific count for Humira,

25   correct?

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 68 of 274 PageID #:13446
Ketchum - direct by Hankey
890

1  A.  Yes.

2  Q.  Now it's for RHN?

3  A.  Yes.

4  Q.  That's the rheumatoid health network?

5  A.  Yes.

6  Q.  Can you explain the difference between the two?

7  A.  The Rheumatoid Health Network would be any Outcome Health

8  office that had a rheumatologist that was practicing in it.

9  And then the Humira contract would be an office that was

10  playing the -- the Humira advertisement.

11  Q.  So comparing the two, are they pretty similar if we're

12  talking about counts?

13  A.  They would be.

14  Q.  What did you tell the recipients of this email was the

15  number of locations and screens playing in the rheumatoid

16  health network?

17  A.  439 locations and 510 screens.

18        MR. HANKEY:  Let's pull up 1134G, please.

19  BY MR. HANKEY:

20  Q.  What does this reflect?

21        What does this show the contracted number was about

22  June of 2013?

23  A.  560.

24  Q.  Again, who would have received your email with the actual

25  counts of offices installed in the Rheumatoid Health Network

1    as of the beginning of June?

2    A.  Senior management team and team leads.

3    Q.  Who was in the -- who was on that senior management team

4    email?

5    A.  At that time, I believe it was Rishi Shah,

6    Shradha Agarwal, Jim Demas, and Brad Purdy.

7    Q.  Did Ashik Desai work at the company at this point in time?

8    A.  No.  I don't believe he'd started at that point yet.

9    Q.  Approximately when did he start?

10   A.  I believe August 2013.

11   Q.  So all of this -- up until this point, we talked about

12   Crestor, Humira, and some other campaigns.

13           I believe on one set, we at least saw Mr. Desai

14   copied, but was he working at Outcome through any of this

15   we've been talking about up to this point?

16   A.  Not full-time.  Potentially as an intern, but not

17   full-time.

18           MR. HANKEY:  Let's go back to 1134G, please.

19           Could we pull that up side by side with 1135.

20   BY MR. HANKEY:

21   Q.  Mr. Ketchum, do you remember seeing 1135 yesterday?

22   A.  Yes.

23   Q.  Can you explain again what, just high level, it depicts?

24   A.  The -- the chart on the right depicts a weighted average,

25   a potential weighted average campaign.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 70 of 274 PageID #:13448
Ketchum - direct by Hankey
892

1  Q.  And under "weighted average delivery," what does that type

2  of weighted average delivery require if Outcome Health starts

3  a contract with under-delivery?

4  A.  It would have to have a fairly significant over-delivery

5  to meet the contracted weighted average.

6  Q.  Does the amount of over-delivery depend on the amount of

7  under-delivery?

8  A.  Yes.

9  Q.  Now, was -- the Humira 2013 campaign we're talking about,

10  to your knowledge, was it a weighted average delivery

11  campaign?

12  A.  No.

13  Q.  What did the contract say about weighted average?

14      Anything?

15  A.  Nothing.

16  Q.  What did it indicate as to whether it was weighted average

17  or not?

18  A.  It just specified specific growth goals.

19  Q.  Now, looking at 1134G, how would you describe Outcome's

20  growth in screens compared to the contract delivery levels

21  throughout this time period that this is focused on,

22  January -- the first -- essentially, the first six months of

23  the year?

24  A.  The growth was fairly flat.

25  Q.  And where was it in comparison to what was required under

1    the contract?

2    A.   It was under-delivery each month.

3    Q.   Now, just speaking hypothetically, if Humira were a

4    weighted average contract, was Outcome growing fast enough to

5    deliver a weighted average of what the contract required?

6    A.   No.

7    Q.   And why do you say that?

8    A.   Because Outcome would have had to over-deliver and have

9    far more than, let's say, even 530, which was the contracted

10   amount for April.  It would have had to deliver significantly

11   more than 530 in order to meet that as a weighted average.

12            And Outcome didn't have much growth at all, let alone

13   a significant growth to allow that to -- to happen.

14   Q.   And I think you just described Outcome's growth in the

15   Humira offices is relatively flat --

16   A.   Yes.

17   Q.   -- is that correct?

18   A.   Yes.

19   Q.   Okay.  And so what would have to happen to the growth

20   trajectory in, let's say, July, in order for Outcome to

21   successfully deliver Humira under weighted average if that --

22   if that were, in fact, the way that contract worked?

23   A.   The growth would have to increase by a substantial amount.

24   Q.   And what did you say earlier about what was happening with

25   the ability to install screens in rheumatologists' offices

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 72 of 274 PageID #:13450
Ketchum - direct by Hankey
894

1    around this time?

2    A.  It was a challenge.

3    Q.  Why was that a challenge?

4    A.  A few reasons.  But a primary one was that due to the

5    value of a rheumatology practice in that space where

6    Outcome Health was competing, there were a lot of competitors

7    that were calling in to that office consistently which made

8    those -- the office staff and the doctors less open -- made

9    those doctors and the staff less open to talking to

10   Outcome Health's salespeople from the member outreach team.

11   Q.  Now, Mr. Ketchum, were you involved in every single

12   campaign sale that Outcome sold in 2012 and 2013?

13   A.  I'm not sure.

14   Q.  You don't know one way or another?

15   A.  No.

16   Q.  Were you familiar with all of Outcome's contracts during

17   that time period?

18   A.  No.

19   Q.  Is it possible that there could have been some campaigns

20   that were weighted average campaigns and you just didn't know

21   about them?

22   A.  Yes.

23        MR. HANKEY:  I'd like to pull up Exhibit 3017.  This

24   is a business record.  It's a contract.

25        THE COURT:  It'll be admitted.

Ketchum - direct by Hankey

895

1           (Said exhibit admitted in evidence.)

2           MR. HANKEY:  Okay.  Let's just zoom in on the header

3    and the top paragraph, please.

4    BY MR. HANKEY:

5    Q.  And above the writing, just the titles here, can you just

6    read what this Exhibit 30 -- 3017 is?

7    A.  "The statement of work."

8    Q.  And does it specify the name of a client that this relates

9    to?

10   A.  Yes.  Novo -- Novo Nordisk.

11   Q.  What is Novo Nordisk?

12   A.  It's a diabetes drug.

13   Q.  Is there a date on this contract?

14   A.  Looks like May 3, 2011.

15   Q.  I'm using the term "contract."

16           Is a statement of work like a contract?

17   A.  Similar.

18   Q.  Now, were you at Outcome in May of 2011?

19   A.  No.

20           MR. HANKEY:  Let's look at page 2 of this statement

21   of work.  And, Ms. Paul, if you could expand the Section 3

22   deliverables through the first paragraph.  Thank you.

23   BY MR. HANKEY:

24   Q.  Do you see a header here, "Section 3:  Deliverables"?

25   A.  Yes.

1   Q.  Can you please read the first sentence after that header?

2   A.  "Supplier agrees to place Novo Nordisk advertising content

3   on a weighted average of 1,000 video screens beginning

4   March 1, 2011, through December 31, 2011."

5           MR. HANKEY:  We can take that exhibit down.

6           Let's pull up Exhibit 3010.  It's another contract

7   being offered as a business record.

8           THE COURT:  It's admitted.

9       (Said exhibit admitted in evidence.)

10          MR. HANKEY:  Can you please expand the title of the

11  document down through the first paragraph.

12  BY MR. HANKEY:

13  Q.  Mr. Ketchum, could you read the title of this document?

14  A.  "ContextMedia, Inc., Advertising Agreement."

15  Q.  And can you read the first paragraph of 3010?

16  A.  "This advertising agreement is entered into as of

17  February 1, 2011 (the effective date) between UMJ3 agency, a

18  New York corporation, with its principal place of business at

19  28 West 23rd Street, New York, New York (sponsor) and

20  ContextMedia, Inc. in Illinois" --

21  Q.  You can stop there, Mr. Ketchum.

22          MR. HANKEY:  And then if we can pop out, please.  Can

23  you expand just Section 1, please, Ms. Paul.

24  BY MR. HANKEY:

25  Q.  Can you read what Section 1 states?

1   A.  "Program Overview."

2   Q.  Yes.

3   A.  "ContextMedia shall place advertising content for McNeal

4   PPC, Inc.'s Listerine on the Diabetes Health Network, a

5   physician waiting room TV network located within endocrinology

6   and diabetes specialty practices."

7           MR. HANKEY:  Now let's go to Section 2, please, and

8   blow up that section.

9   BY MR. HANKEY:

10  Q.  Mr. Ketchum, can you read the first sentence?

11  A.  "ContextMedia agrees to place Listerine advertising

12  content on a weighted average of 1,000 Diabetes Health Network

13  screens beginning March 1, 2011, through December 31, 2011."

14  Q.  Mr. Ketchum, were you involved in this campaign?

15  A.  No.

16          MR. HANKEY:  We can take that down.

17  BY MR. HANKEY:

18  Q.  Mr. Ketchum, is it possible there could be more campaigns

19  where weighted average was written into the contract?

20  A.  Yes.

21  Q.  Now, we looked at contracts for Humira, correct?

22  A.  Yes.

23  Q.  And Crestor?

24  A.  Yes.

25  Q.  Did either of those specify weighted average like we just

 1   saw in these two contracts we looked at?

 2   A.  No.

 3   Q.  If weighted average delivery is the plan, is that

 4   something that you thought clients would want to know?

 5   A.  I believe they would want to know, yes.

 6   Q.  Let's --

 7          MR. HANKEY:  One moment, Your Honor.

 8   BY MR. HANKEY:

 9   Q.  Let's shift gears, Mr. Ketchum.

10          MR. HANKEY:  I'd like to offer Exhibit 134, which is

11   being offered under (d)(2)(E).

12          THE COURT:  It's admitted.

13       (Said exhibit admitted in evidence.)

14   BY MR. HANKEY:

15   Q.  Have you ever heard of a drug brand called Multaq?

16   A.  Yes.

17          MR. HANKEY:  And if we could, let's zoom in on -- on

18   this Exhibit 134 on an email sent by Matt Crandall at

19   11:24 a.m.

20   BY MR. HANKEY:

21   Q.  Can you read Mr. Crandall's email?

22   A.  "Hi, Shradha.  I think you wanted to discuss these numbers

23   with Jason before I talk to the client again and don't know if

24   you had a moment yet to connect with Jason.  Are we okay

25   offering 125 list match offices now and plus cardiology

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 77 of 274 PageID #:13455
Ketchum - direct by Hankey
899

1    growth?  Would you say plus five cards per month or about

2    20 weighted average for 2Q through 4Q?"

3    Q.  So, Mr. Ketchum, let's focus in on this email from

4    Mr. Crandall.

5          What -- what do you understand Mr. Crandall to be

6    asking Ms. Agarwal here in his email?

7    A.  If Ms. Agarwal is okay offering a proposal to a potential

8    client for list match that includes potential growth.

9    Q.  Let's look at Ms. Agarwal's response to Mr. Crandall.

10         Does she copy you?

11    A.  Yes.

12    Q.  Can you read what she wrote to Mr. Crandall?

13    A.  "Hi, MC.  I did IM you that same day after talking with JK

14    on confusion regarding future growth numbers.  121 offices,

15    134 screens, 263 prescribers equals current.  I'd create the

16    proposal for 150 waiting rooms for the year and keep it simple

17    (no weighted average/monthly growth at all)."

18    Q.  So what -- what did Mr. Crandall ask Ms. Agarwal should be

19    done with the proposal?

20    A.  If the proposal should include a list match plus growth

21    opportunity.

22    Q.  In the proposal itself?

23    A.  Yes.

24    Q.  And what is Ms. Agarwal telling Mr. Crandall to do

25    instead?

1    A.  To just give a number.

2    Q.  What does "keep it simple" mean?

3    A.  To not include growth.

4           MR. BLEGEN:  Objection.  It's his understanding

5    that's relevant.

6           THE COURT:  Rephrase the question.

7           MR. HANKEY:  Yes, Your Honor.

8    BY MR. HANKEY:

9    Q.  Mr. Ketchum, what was your understanding of what "keep it

10   simple" meant in this context?

11   A.  To not include growth numbers.

12   Q.  And -- and what does she write after "keep it simple"?

13   A.  "No weighted average/monthly growth at all."

14   Q.  Did you understand her to want Mr. Crandall to communicate

15   that these offices would be delivered on a weighted average

16   basis?

17   A.  No.

18   Q.  Or that there was any growth in the proposal?

19   A.  No.

20          MR. HANKEY:  Let's shift gears again, Mr. Ketchum,

21   and go to Exhibit 302, which is being offered as a (d)(2)(E)

22   statement.

23          THE COURT:  It'll be admitted.

24      (Said exhibit admitted in evidence.)

25          MR. HANKEY:  Excuse me.  Wrong exhibit.

Ketchum - direct by Hankey

901

1       1105 is also (d)(2)(E).

2           THE COURT:  It'll be admitted.

3       (Said exhibit admitted in evidence.)

4           MR. HANKEY:  Okay.  I'd like to start with a

5   February 5, 2013, email from Ms. Sperling at 346, please.

6   BY MR. HANKEY:

7   Q.  Do you see the subject line of Ms. Sperling's email is

8   "ContextMedia AndroGel Update"?

9   A.  Yes.

10  Q.  What was AndroGel?

11  A.  A pharmaceutical product.

12  Q.  And, again, who is Ms. Sperling?

13  A.  She worked at IMS Health.

14  Q.  What was her role there vis-à-vis Outcome Health?

15  A.  She interfaced with Outcome Health for contracting and for

16  delivery of IMS research studies.

17  Q.  Can you read the first two sentences of her email?

18  A.  "Attached please find the statement of work for the update

19  to the AndroGel analysis.  Once I have signature, I can

20  go ahead and request the data."

21  Q.  When she's referring to an AndroGel analysis here, what's

22  she talking about?

23  A.  A -- likely an ROI standard for AndroGel performed by IMS.

24  Q.  Did Mr. Shah respond?

25          MR. HANKEY:  Pop out, please.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 80 of 274 PageID #:13458
Ketchum - direct by Hankey
902

1  BY MR. HANKEY:

2  Q.  You see a response from Mr. Shah?

3  A.  Yes, yes.

4  Q.  Okay.  Well, by "response," you mean he forwarded the

5  email --

6  A.  To me.

7  Q.  -- correct?

8          And can you read what Mr. Shah wrote to you in his

9  email on February 5th?

10  A.  "Jason, AndroGel is the one we've been having issues with

11  on the return.  Before Lynne pulled the new read based on

12  test/control, please make sure to very tightly scrub the test

13  group for all things that could depress returns and have them

14  removed from the test group.  Examples might be MIAs,

15  deinstalls, nonendos, part-time physicians.  I think if we can

16  really tightly control the test physicians, that might help

17  us."

18  Q.  Now, Mr. Shah sent his email to you.

19          Did he copy Ms. Sperling on it?

20  A.  No.

21  Q.  What do you understand Mr. Shah when he says that

22  "Androgen is one -- is the one we've been having issues with

23  on the return"?

24  A.  That it's a program that hasn't been giving good ROI

25  returns.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 81 of 274 PageID #:13459
Ketchum - direct by Hankey
903

1    Q.  What was he referring to when he referred to the "test

2    group" here?

3    A.  The "test group" means the list of offices that

4    Outcome Health had in its network.

5    Q.  What was he telling you to do with the test group?

6    A.  To cherry-pick offices.

7    Q.  And did he give you any instruction on how to do it?

8    A.  He did.

9    Q.  And what would that have been?

10   A.  Remove offices that had MIA cases, deinstallation cases,

11   offices that didn't have practicing endocrinologists, and

12   offices that might have part-time physicians practicing.

13   Q.  And did you -- do you see where he wrote, "I think if we

14   can really tightly control the test physicians, that might

15   help us"?

16           Do you see that?

17   A.  I do, yep.

18   Q.  What did you understand him to mean, like, how -- help you

19   in what way?

20   A.  Help Outcome Health have a better return on investment

21   from the study.

22   Q.  Now, if there were offices where the ad never ran because

23   there wasn't a screen there, would you include those

24   physicians in the test group if you were filtering like this?

25   A.  No.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 82 of 274 PageID #:13460
Ketchum - direct by Hankey
904

1  Q.  Why not?

2  A.  Because the advertisement wouldn't have played in that

3  example.

4  Q.  Why was that significant when you're trying to filter the

5  test group?

6  A.  When you're filtering a test group to optimize for an ROI,

7  you want to make sure that the offices that are being studied

8  or the physicians in those offices that are being studied are

9  as optimal as possible.

10       So their TV worked the entire time, the advertising

11  played properly.  They're the right types of physicians that

12  might have a better propensity to write a particular

13  prescription in the first place and that they are full-time

14  practicing providers.

15       MR. HANKEY:  Let's look at Exhibit 135, which we're

16  offering as a (d)(2)(E) exhibit.

17       THE COURT:  It'll be admitted.

18     (Said exhibit admitted in evidence.)

19       MR. HANKEY:  Sorry.  Just 135.

20  BY MR. HANKEY:

21  Q.  Now, do you see here in 135 that you responded to the last

22  email that we just read?

23  A.  Yes.

24       MR. HANKEY:  Would you please expand that, Ms. Paul.

25  That's it.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 83 of 274 PageID #:13461
Ketchum - direct by Hankey
905

 1  BY MR. HANKEY:

 2  Q.  What did you say?

 3  A.  "RS, that is the plan.  We will be thorough to put

 4  ourselves in the best position possible."

 5  Q.  Best position possible in what way?

 6  A.  Best position possible to have a positive result from the

 7  IMS study.

 8  Q.  Okay.  And then do you see at the top that Mr. Shah

 9  responded to your email?

10  A.  I do.

11          MR. HANKEY:  Will you expand that, please.

12  BY MR. HANKEY:

13  Q.  Can you read what he wrote to you?

14  A.  "Thanks, Jason.  Let me know if questions -- if any

15  questions pop up.  And please make sure to get this list to

16  Lynne by close of business Thursday if possible so she doesn't

17  accidentally start the process on the new read.  Thanks, RS."

18  Q.  Okay.  Shifting gears again.

19          Did you ever work on a campaign for the pharma brand

20  Pradaxa in 2013?

21  A.  Yes.

22  Q.  What was Pradaxa?

23  A.  Pradaxa's a heart health drug.

24  Q.  And what company made Pradaxa?

25  A.  I believe BI.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 84 of 274 PageID #:13462
Ketchum - direct by Hankey
906

1  Q.  What does BI stand for?

2  A.  Boehringer Ingelheim.

3  Q.  Did BI use an agency to buy advertising space from

4  Outcome?

5  A.  Yes, they did.

6  Q.  Do you recall what it was?

7  A.  Not off the top of my head.

8  Q.  We'll see some emails in a minute.

9      Were you involved in a list match for the 2013

10  Pradaxa campaign?

11  A.  Yes.

12  Q.  Was that list match an honest and truthful list match

13  presented to the client?

14  A.  No.

15  Q.  Why not?

16  A.  I included projections.

17  Q.  Did Outcome deliver the number of devices that it promised

18  in its contract with Pradaxa?

19  A.  No.

20  Q.  Was Outcome honest and truthful with the Pradaxa client

21  about Outcome's under-delivery on the contract?

22  A.  No.

23      MR. HANKEY:  Okay.  Let's start by pulling up

24  Exhibit 1065, which is a (d)(2)(E) exhibit.

25      THE COURT:  It's admitted.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 85 of 274 PageID #:13463
Ketchum - direct by Hankey
907

1          (Said exhibit admitted in evidence.)

2     BY MR. HANKEY:

3     Q.  I'd like to start at an email from Lyndon Chin at

4     10:27 a.m.

5          Do you see that on your screen, Mr. Ketchum?

6     A.  Yes.

7     Q.  Sent on November 12, 2012, correct?

8     A.  Yes.

9     Q.  And who's he sending his email to?

10    A.  Bob Mons.

11    Q.  Who's he copying?

12    A.  Thomas Coyle.

13    Q.  Where did Mr. Chin and Mr. Coyle work?

14    A.  RJ Palmer.

15    Q.  And what was RJ Palmer?

16    A.  That was the agency representing the client.

17    Q.  What did Mr. Chin send to Mons in this email that we're

18    looking at here?

19    A.  A request for a list match to be performed.

20         MR. HANKEY:  Let's look at the next email in this

21    string.

22    BY MR. HANKEY:

23    Q.  What did Mr. Mons do with Mr. Chin's email?

24    A.  He forwarded it to me.

25    Q.  And what did he ask for?

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 86 of 274 PageID #:13464
Ketchum - direct by Hankey
908

1   A.  For me to perform a list match.

2   Q.  Now, in Mr. Chin's email asking you for the list match, is

3   there anything in it that suggested that Pradaxa expected a

4   weighted average delivery number?

5   A.  No.

6   Q.  Anything in Mr. Mons's email to that effect?

7   A.  No.

8         MR. HANKEY:  Let's look at the response or the next

9   email in the string, please.

10   BY MR. HANKEY:

11   Q.  Who's sending this email?

12   A.  Shradha Agarwal.

13   Q.  Who is she sending it to?

14   A.  Myself and Rishi Shah.

15   Q.  Is Bob Mons copied on her response?

16   A.  Nope.

17   Q.  Can you read what Ms. Agarwal wrote?

18   A.  "Easy part of this list is that it is very clear that

19   decile ten is their highest.  The challenging part is of the

20   73,000 names on this list, they're not all physicians.  A lot

21   of CDs, RNs, et cetera.  So we'll need to do the widest match

22   criteria we can with every name in our database."

23   Q.  She's referring to a list.

24         What list is she referring to?

25   A.  The list that the agency sent on behalf of the client.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 87 of 274 PageID #:13465
Ketchum - direct by Hankey
909

1    Q.  She's referring to deciles here.

2            Can you remind us what a decile is in the list match

3    context?

4    A.  A decile is a ranking for physicians for how much of a

5    particular type of drug or category of drugs have a tendency

6    to prescribe.

7    Q.  Now, in this, Ms. Agarwal wrote, "We'll need to do the

8    widest match criteria we can with every name in our DB."

9            What did DB stand for?

10   A.  Database.

11   Q.  What database would that have been?

12   A.  At that time, it was Quickbase.

13   Q.  What did you understand that to be telling you to do?

14   A.  To perform a wide list match.

15   Q.  Would that only include offices where screens were

16   installed?

17   A.  No.

18   Q.  How do you know that?

19   A.  Because it says every name in our database.

20           MR. HANKEY:  Let's look at Exhibit 67, which is

21   offered under (d)(2)(E).

22           THE COURT:  It's admitted.

23       (Said exhibit admitted in evidence.)

24   BY MR. HANKEY:

25   Q.  Mr. Ketchum, is this a continuation of the string we were

Ketchum - direct by Hankey

910

1  just reviewing?

2  A.  Yes.

3  Q.  Let's start at the email that you sent in response to

4  Ms. Agarwal's email at 11:20 a.m.

5  A.  "That is pretty easy.  Do we want MS and outreach to

6  project MS only or MS and an overlay combo to project?"

7  Q.  Okay.  Let's break this down a little bit.

8        You're asking Ms. Agarwal a question?

9  A.  Yes.

10 Q.  High level, kind of, what are you trying to understand

11 from Ms. Agarwal?

12 A.  Ms. Agarwal said manage against -- or match against every

13 name in the database, and I'm sort of looking for direction as

14 far as how expansive she wanted that match to -- to be.

15 Q.  Okay.  So one option you offer is MS and outreach to

16 project, correct?

17 A.  Yes.

18 Q.  What would that include?

19 A.  Offices that are installed, offices that member services

20 is working on installing, and offices that member outreach is

21 working on selling.

22 Q.  Then you see you offer MS only?

23 A.  Yes.

24 Q.  Would that just be the offices where outreach had

25 convinced the doctor to sign, that member services is trying

Ketchum - direct by Hankey

911

1  to install a device?

2  A.  Yeah.

3  Q.  And would it include installed devices?

4  A.  Yes.

5  Q.  And then the last option.  "MS and -- and overlay combo to

6  project."

7          Do you see that?

8  A.  Yes.

9  Q.  What would that include in the list-match results?

10 A.  There was a new target list that was being worked on.  And

11 so the -- the combo -- the overlay combo was a series of lists

12 that were matched together that were going to become a lead.

13 They were going to be inputted in the database for member

14 outreach to use as a -- as a lead list.

15 Q.  Now, let's talk about the target list.  We've seen, I

16 believe, in some emails that sometimes clients called their

17 list for a list match a target list --

18 A.  Yes.

19 Q.  -- correct?

20          You're not talking about that kind of target list?

21 A.  No.

22 Q.  Can you explain what list you're talking about?

23 A.  Yeah.  I'm -- I'm talking about a list that member

24 outreach would start calling on to have those offices become

25 customers of Outcome Health.

1  Q.  Okay.  And so explain why you're referring to that as an

2  overlay.

3          I hear "overly," but did you mean "overlay"?

4  A.  I did.

5  Q.  Okay.  Why is that an overlay?

6  A.  Because it was a number of lists.  So a series of separate

7  lists that were, sort of, laid on top of each other to see

8  what doctors were on each of those lists.  And where you had

9  multiple doctors or the same doctor on multiple lists, that

10 would then make that doctor or somebody that Outcome Health

11 would want to target.

12         Similarly, if the doctor was particularly highly

13 ranked on deciles, which, again, is a ranking for the

14 propensity of a doctor to -- to write a prescription of a

15 particular drug or category, then that would also go into a

16 squaring mechanism.

17         And that was an overlay list.  So just a series of

18 lists that were, kind of, laid on top of each other, and then

19 a list was created from that.

20 Q.  For the member outreach folks to target certain offices to

21 try to convince them to join the Outcome network of screens?

22 A.  Yes.

23         MR. HANKEY:  Let's look at Ms. Agarwal's response to

24 your email.

25 BY MR. HANKEY:

Ketchum - direct by Hankey

913

1  Q.  She wrote it the same day?

2  A.  Yes.

3  Q.  And who did she copy on her response?

4  A.  To me and copied to Rishi Shah.

5  Q.  Can you read her response?

6  A.  "Full MS, plus MO pipeline plus project from overlay combo

7  of the list.  We'll soon start to call.  That is more

8  diabetes-focused."

9  Q.  Okay.  So which -- just in layman's terms, which option

10  did she pick?

11          What was she directing you to do?

12  A.  Kind of a combination.  So member services, member

13  outreach pipeline, plus the overlay list that we had just

14  discussed.

15  Q.  Now, in the option she selected, did -- would that

16  include -- including offices in the list-match results where

17  Outcome hadn't even called the doctor up to see if they're

18  interested in joining the network?

19  A.  That's correct.

20  Q.  Could it include offices where a competitor of Outcome's

21  already had screens installed?

22  A.  It could.

23  Q.  Would that present a challenge in terms of onboarding that

24  office for use in the Pradaxa network?

25  A.  Yes.

1    Q.  In what way?

2    A.  Competitor offices took longer to install.

3    Q.  What did it involve if there was a competitor already in

4    that office?

5        What would that involve to ultimately get a screen

6    installed in that office?

7    A.  The competitor would have to come and take down their

8    system for Outcome Health to put in their -- their system.

9        MR. HANKEY:  Now, let's go back to -- blow out to

10   Exhibit 67.  Just one moment.

11   BY MR. HANKEY:

12   Q.  So if we're talking about projecting from an overlay

13   combo -- right? -- was there a chance that the offices that

14   would be included in that projection would tell Outcome's

15   member outreach salesperson that they had no interest

16   whatsoever in having a screen installed in their office?

17   A.  Yes.

18   Q.  And was there a chance that those --

19       MR. HANKEY:  Strike that.

20   BY MR. HANKEY:

21   Q.  Did -- yesterday we talked about a conversion rate?

22       Do you recall that?

23   A.  Yes.

24   Q.  What was the conversion rate?

25   A.  In general terms, it's the -- it's the percentage of a

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 93 of 274 PageID #:13471
Ketchum - direct by Hankey
915

 1  number -- it's the percentage of a lead list or percentage of

 2  leads that converts to, in this instance, a customer.

 3  Q.  Was that something that Outcome Health tracked?

 4  A.  I believe so, yes.

 5  Q.  And did you see the conversion rate from time to time?

 6  A.  I -- I believe I did, but I don't really recall.

 7  Q.  Did you ever hear Mr. Shah or Ms. Agarwal in 2012 or 2013

 8  talking about the conversion rate?

 9  A.  Not in specific numbers.

10  Q.  Okay.  Now, with respect to this list match on Pradaxa,

11  did you end up following Ms. Agarwal's direction to include

12  doctors from the call list in the list match that targeted

13  list of offices?

14  A.  Yes.

15        MR. HANKEY:  Let's look at Exhibit 71, which is being

16  offered under (d)(2)(E).

17        THE COURT:  It's admitted.

18     (Said exhibit admitted in evidence.)

19  BY MR. HANKEY:

20  Q.  And I'd like to start by -- well, if you would,

21  Mr. Ketchum, jut review this email to yourself and look up

22  when -- when you're done.

23  A.  Okay.

24  Q.  Now, from a high level, what are you writing about in this

25  email that we're looking at?

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 94 of 274 PageID #:13472
Ketchum - direct by Hankey
916

1  A.  Sending a summary of the list match that was requested for

2  me to perform.

3          MR. HANKEY:  Okay.  Can -- can we blow up the top

4  part all the way down to the 2251 prescribers line.

5  BY MR. HANKEY:

6  Q.  Who were you sending your email to?

7  A.  Shradha Agarwal and Rishi Shah.

8  Q.  Did you arrive at two different sets of numbers?

9  A.  Yes.

10  Q.  Do you see where you write, "Here is where we stand with

11  current MS pipeline, name and address match"?

12  A.  Yes.

13  Q.  What were the number of offices that resulted from the

14  match using the current MS pipeline?

15  A.  761 offices.

16  Q.  Now, would all of those offices been actually installed at

17  that time?

18  A.  No.

19          MR. HANKEY:  Now let's go down to -- before we do

20  that, actually, I think it helps to -- if we could blow up the

21  text of Mr. Ketchum's email above.  Why don't we just review

22  that so that we have the full context here.

23  BY MR. HANKEY:

24  Q.  Mr. Ketchum, could you read what you wrote to Ms. Agarwal

25  and Mr. Shah?

1   A.   "Hi, guys.  Here is the breakdown for Pradaxa (sending in

2   email format since I'm guessing you'll be reviewing on your

3   phones.)  I have looked at this two ways.  What we currently

4   have utilizing the MS pipeline and an address match to pick up

5   any prescribers we might be missing out on.  The full match we

6   discussed utilizing MS, member services, outreach, and overlay

7   lists we've been using for the past couple of matches."

8   Q.   Now, did either of these two ways of looking at the match

9   comply with the direction that you got from Ms. Agarwal?

10  A.   Yes.

11  Q.   Which one?

12  A.   No. 2.

13  Q.   Okay.  And the one that we just looked at, the

14  761 offices, was that one or two?

15  A.   That was one.

16         MR. HANKEY:  Okay.  Now, let's -- let's pop back out,

17  and let's go look at the results of No. 2, which would be

18  further below.  We are DC.  If we could blow up, "Here's where

19  we stand."  Thank you.

20  BY MR. HANKEY:

21  Q.   Can you read what you wrote there, Mr. Ketchum?

22  A.   "4,419 prescribers in 2,555 offices."

23  Q.   Now, is this the result of running the match according to

24  the directions you got from Ms. Agarwal?

25  A.   Yes.

Ketchum - direct by Hankey

1   Q.  And so what -- how many offices resulted from running

2   it -- the match that way?

3   A.  2,555.

4   Q.  And approximately how many more offices resulted from this

5   match compared to running it just against installed and MS?

6   A.  Approximately 1,800.

7   Q.  Again, this -- these results, these would have included

8   offices that potentially had never been called on before?

9   A.  Yes.

10          MR. HANKEY:  Now, looking at the desk -- can we pop

11  out just a bit, and expand from "here's where we stand" down

12  through the decile breakdown.

13  BY MR. HANKEY:

14  Q.  Just high level, can you describe what this decile

15  breakdown is?

16  A.  Yes.  Based on the list that was matched, it's a breakdown

17  of where those doctors that were matched on the installed

18  member outreach and the overlay list, where those doctors fall

19  on the decile rankings.

20  Q.  How many offices did Pradaxa end up buying from Outcome?

21  A.  I believe 1,819.

22  Q.  Did that represent a subset of this 2,555?

23  A.  I believe so.

24          MR. HANKEY:  Your Honor, I'd offer Exhibit 84, the

25  email and the attached contracts being offered as business

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 97 of 274 PageID #:13475
Ketchum - direct by Hankey
919

1    records also as -- for effect on the listener.

2            THE COURT:  It's admitted.

3        (Said exhibit admitted in evidence.)

4            MR. HANKEY:  Let's blow up this -- Mr. Coyle's email,

5    so the first email in the string here where it says, "Hi,

6    Bob."  And then let's go through "please review."  That's

7    good.

8    BY MR. HANKEY:

9    Q.  Tom Coyle.

10            Who is he?

11   A.  He worked for RJ Reynold, I believe.

12   Q.  RJ Palmer?

13   A.  Sorry.  Yeah, RJ Palmer.  I apologize.

14   Q.  Can you read what he writes in the first sentence of his

15   email?

16   A.  "Attached you will find all of the 2013 insertion orders

17   we are sending for Pradaxa to run with ContextMedia in the

18   1,819 target offices, 1,919 Pradaxa-matched physician offices.

19            "As discussed in the email below, since we are not

20   expecting MLR to approve the Pradaxa spot until February

21   earliest, the February and March insertion orders reflect a

22   higher frequency of spot plays per hour to cover the January

23   activity that will not be running in (from two times to three

24   times per hour).  The reminder of the campaign, April through

25   December, we will be running at two times frequency per hour."

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 98 of 274 PageID #:13476
Ketchum - direct by Hankey
920

1  Q.  Okay.  Thank you.

2          And in the first sentence, is he just saying that

3  he's forwarding the insertion orders for this Pradaxa

4  campaign?

5  A.  Yes.

6  Q.  And then what's he explaining just high level through the

7  rest of it?

8  A.  The frequency at which the advertising spots are going to

9  play and that there's going to be some change in the frequency

10  to account for one of the months that the advertisement is not

11  going to play in.

12          MR. HANKEY:  Okay.  Let's pop out and go to the

13  response to this email, please.

14  BY MR. HANKEY:

15  Q.  And do you see what Mr. Mons does with the email after he

16  receives it?

17  A.  Yes.

18  Q.  What does he do?

19  A.  He forwards it to Jim Demas and copied Shradha Agarwal.

20          MR. HANKEY:  Let's go to the insertion order of --

21  first one.

22  BY MR. HANKEY:

23  Q.  Now, do you see -- is this a Pradaxa insertion order, one

24  of them copied or attached to the email?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 99 of 274 PageID #:13477
Ketchum - direct by Hankey
921

1          MR. HANKEY:  Could we blow up everything from

2   "additional comments" and all the way down to the end, please,

3   Ms. Paul.

4   BY MR. HANKEY:

5   Q.  What does this contract say that Pradaxa is purchasing?

6   A.  1,819 target offices.

7   Q.  What does "target offices" mean?

8   A.  Offices that were matched on a -- on a list match.

9   Q.  Do you see above that, let's say about five or six lines

10  down from the top, "to be displayed in"?

11  A.  Uh-huh.  Yes.

12  Q.  Can you read what that says?

13  A.  "To be displayed in 1,018 -- 1,819 target offices,

14  3,200 Pradaxa-matched doctors."

15  Q.  What does that mean to be displayed for

16  3,200 Pradaxa-matched docs?

17  A.  That the belief was that 3,200 doctors worked at -- target

18  and matched doctors worked in those 1,819 offices.

19  Q.  "Target and matched."  Does that mean they were on the

20  clients' target list for the list match?

21  A.  Yes.

22  Q.  Why is there a difference between the number of offices

23  here and the number of doctors?

24  A.  'Cause there's generally more than one doctor that works

25  at a practice.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 100 of 274 PageID #:13478
Ketchum - direct by Hankey
922

1    Q.  That can happen?

2    A.  Oh, absolutely.

3    Q.  But not always?

4    A.  Not always.

5         MR. HANKEY:  Let's look at Exhibit 85, which is being

6    offered under (d)(2)(E).

7         THE COURT:  It's admitted.

8        (Said exhibit admitted in evidence.)

9    BY MR. HANKEY:

10   Q.  Let's start with the email that you sent at 2:23 p.m.,

11   which is at the top.

12        Okay.  Is this an email string that relates to

13   multiple pharma campaigns?

14   A.  Yes.

15   Q.  I want to focus your attention to the top email, and --

16   and are you responding to requests from Ms. Agarwal?

17        THE WITNESS:  Can you blow that out?  I'm not

18   entirely sure.

19        MR. HANKEY:  Let's blow -- let's go back out.  Can we

20   pop back out, please, Ms. Paul?

21   BY MR. HANKEY:

22   Q.  Do you see at the bottom --

23        MR. HANKEY:  Why don't we just look at her email.  We

24   could expand that.

25   BY MR. HANKEY:

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 101 of 274 PageID #:13479
Ketchum - direct by Hankey
923

1    Q.  What does Ms. Agarwal write to you at 2:30 p.m.?

2    A.  "Sometime today or tomorrow should be fine.  We need this

3    for January, so assuming true contracted sites.  1,000 for

4    AndroGel endo-focused and 749 for Qsymia list match of PCP

5    focus.  Thanks for your help during your vacation."

6    Q.  What did "true contracted sites" mean to you?

7    A.  Sites that are on the list match.

8    Q.  And here you're talking -- she's asking you about two

9    other campaigns besides Pradaxa, correct?

10   A.  Yes.

11          MR. HANKEY:  Okay.  Well, let's -- let's now go to

12   the top email.

13   BY MR. HANKEY:

14   Q.  Did you respond to her request?

15   A.  I did.

16   Q.  Did you write anything in her request about the Pradaxa

17   count of offices and screens?

18   A.  Yes.

19   Q.  Can you read what that says?

20   A.  "For Pradaxa, we are up to 2,276 prescribers and

21   776 offices with 848 screens."

22   Q.  Okay.  And now, we saw Pradaxa contract, correct?

23   A.  (No audible response.)

24   Q.  Was the campaign supposed to start yet?

25          Was it starting in December?

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 102 of 274 PageID #:13480
Ketchum - direct by Hankey
924

1  A.  No.

2  Q.  It started a bit later in January, correct?

3  A.  Correct.

4  Q.  But how many number -- how many offices did Outcome

5  promise to Pradaxa beginning at the start date in 2013?

6  A.  1,819.

7  Q.  And according to your email to Ms. Agarwal, how many

8  offices did Outcome have as of December 27th?

9  A.  776.

10  Q.  Now, above that, the two lines down, you see at the very

11  top, "Hi, guys.  Okay.  A lot to break down.  These all

12  include MS pipeline as well."

13          Do you see that?

14  A.  Yes.

15  Q.  So would the 776 include MS pipeline offices?

16  A.  Yes.

17  Q.  So what does that mean as far as whether all 776 offices

18  were actually installed at the -- at this point in time?

19  A.  Some of them are in the process of being installed.

20  They're not actually installed at that moment in time.

21          MR. HANKEY:  Let's look at Exhibit 8 -- 88.  So just

22  88.  It's being offered under (d)(2)(E).

23          THE COURT:  It's admitted.

24      (Said exhibit admitted in evidence.)

25  BY MR. HANKEY:

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 103 of 274 PageID #:13481
Ketchum - direct by Hankey
925

1  Q.  I'm going to focus you on the first email of this string

2  sent by Brok Vandersteen.

3          What do we see in this first email sent January 2 by

4  Mr. Vandersteen?

5  A.  Sales recap.

6  Q.  To whom is it sent?

7  A.  To everyone at the company.

8  Q.  Can you read what he wrote until you get to "CMH update"?

9  A.  "Happy New Year.  Medians.  With everyone back in the

10 office and with no time to waste, there were four sales today.

11 Deven, Chris, Nate, and I each had one.  2013 is going to be a

12 good year."

13 Q.  And then what does he provide below that?

14 A.  A series of updates.

15 Q.  On what?

16 A.  Sales.

17 Q.  Sales?

18 A.  Member outreach sales.

19         MR. HANKEY:  Okay.  Now, let's look at the next email

20 in this string.

21 BY MR. HANKEY:

22 Q.  You see that Ms. Agarwal forwarded Mr. Vandersteen's

23 email, January 2nd to Brad Purdy, Rishi Shah, and you?

24 A.  Yes.

25 Q.  Can you read what she wrote?

1    A.   "Guys, when does MO, member outreach, get the new list

2    with Pradaxa cross-tabulation?  We have to raise to

3    1,819 screens there by mid-year and believe we only have a

4    third of those already."

5    Q.   Now, what is -- what does a list with Pradaxa

6    cross-tabulation mean?

7    A.   The -- the lead list that member outreach would call on.

8    Q.   What is Ms. Agarwal -- what did it mean to you when she

9    said, "We have to raise to 1,819 screens there by mid-year"?

10   A.   That particular sentence seems to indicate that

11   Ms. Agarwal is under the belief there's a weighted average for

12   the contract.

13   Q.   What does she say after that?

14   A.   "And believe only have a third of those already."

15   Q.   What did the contract require?

16   A.   1,819.

17   Q.   1,819 matched offices?

18   A.   Yes.

19   Q.   Did you see anything in the contract that indicated that

20   it was a weighted average contract like we saw in the other

21   contracts earlier?

22   A.   No.

23   Q.   To your understanding, was this a weighted average

24   contract?

25   A.   No.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 105 of 274 PageID #:13483
Ketchum - direct by Hankey
927

1   Q.  And earlier in Exhibit 84 --

2           MR. HANKEY:  Can we blow up Exhibit 84, please, or

3   bring that back up.

4   BY MR. HANKEY:

5   Q.  We just looked at this.

6           This is the exhibit where Mr. Mons was forwarding the

7   Pradaxa contracts?

8   A.  Yes.

9   Q.  And who's copied?

10  A.  Shradha Agarwal.

11          MR. HANKEY:  Let's go to Exhibit 99.

12          Offered under (d)(2)(E).

13          THE COURT:  It's admitted.

14      (Said exhibit admitted in evidence.)

15          MR. HANKEY:  Let's look at the Shradha Agarwal email

16  sent at 10:56 a.m., please.  Well, start at the -- there we

17  are.  Okay.  I didn't see that.  Thank you.

18  BY MR. HANKEY:

19  Q.  What does Ms. Agarwal write at 10:56?

20  A.  "Hey, guys.  Update on Xarelto's rerun."

21  Q.  What was Xarelto?

22  A.  A heart health drug.

23  Q.  Was it a competitor of Pradaxa?

24  A.  I believe so.

25  Q.  Now, when she referred to a rerun for Xarelto, what was

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 106 of 274 PageID #:13484
Ketchum - direct by Hankey
928

1    she talking about?

2    A.  List match.

3           MR. HANKEY:  Let's go up to the next email in this

4    string, please.

5    BY MR. HANKEY:

6    Q.  Do you see that you responded to Ms. Agarwal?

7    A.  Yes.

8    Q.  At 11:07?

9    A.  Yes.

10   Q.  Can you just take a moment to read this email to yourself,

11   and then explain to the jury what you're talking about here.

12   A.  I'm ready.

13   Q.  Okay.  Can you explain what you're communicating in this

14   email?

15   A.  Yes.  That I was waiting on some information in order to

16   complete a new list match.  And that there -- and then I was

17   highlighting some similarities and differences between the

18   Xarelto and Pradaxa list match is -- and highlighting why

19   there were some -- why there were some differences between

20   them.

21   Q.  And in this case, were you explaining how the Pradaxa list

22   match was done?

23   A.  Yes.

24   Q.  What -- what were the similarities between the Xarelto

25   match and the Pradaxa match?

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 107 of 274 PageID #:13485
Ketchum - direct by Hankey
929

1  A.  That they both included installed plus member services
2  pipeline.
3  Q.  What's the difference?
4  A.  That the Xarelto list used the member outreach pipeline.
5  And for Pradaxa, they used -- the list match used the overlay
6  list, so a new target list for member outreach.
7          MR. HANKEY:  Let's look at the next email in the
8  string.  You know what?  I'm sorry.  I forgot one piece.  If
9  we can go back to that email, please; 1107.
10  BY MR. HANKEY:
11  Q.  Do you see where you wrote, "For Pradaxa" -- this is about
12  halfway through your email -- "For Pradaxa we used installed
13  plus MS, plus the overlay that Rishi and you and I came up
14  with that night."
15  A.  Uh-huh.
16          THE COURT:  You have to use words.
17          THE WITNESS:  Sorry, Your Honor.
18  BY THE WITNESS:
19  A.  Yes.
20  BY MR. HANKEY:
21  Q.  What are you explaining there?
22  A.  Where the overlay list came from.
23          MR. HANKEY:  Okay.  Let's pop back out, and go to the
24  next email in the string, please.
25  BY MR. HANKEY:

1    Q.  Did you reply to the last email?

2    A.  Yes.

3    Q.  And to whom did you send your email?

4    A.  To Shradha Agarwal.

5    Q.  Who's copied?

6    A.  Brad Purdy.

7    Q.  Can you please read your email?

8    A.  "SA, Brad and I walked through the logic here.  Pretty

9    straightforward.  But we want to clarify a couple of things.

10   One, are we assuming 150 new sites per month from now through

11   June?

12          "Two, for the deliverable, do you want the decile

13   breakout and office counts in total (figuring Pradaxa has

14   purchased a large percent of the match and are mutually

15   exclusive, or do you want us to give them what will be

16   available?

17          "The match is all set.  We are ready to add to the

18   counts for projecting purposes but want to make sure we hit

19   everything correctly)."

20   Q.  Which list match are you talking about here, Xarelto or

21   Pradaxa?

22   A.  In this instance, I believe Xarelto.

23   Q.  Were you planning to use projections for this Xarelto list

24   match?

25   A.  I didn't.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 109 of 274 PageID #:13487
Ketchum - direct by Hankey
931

1  Q.  Do you see where you wrote, "SA, Brad and I walked through

2  the logic here.  Pretty straightforward"?

3  A.  Yes.

4  Q.  What did that mean?

5  A.  That Brad and I discussed how to perform the list match.

6  Q.  Do you see where you asked Ms. Agarwal if she wanted the

7  deliverable to include office counts in total or, quote, "what

8  will be available"?

9  A.  Yes.

10 Q.  Why were you asking that?

11 A.  Because Pradaxa had purchased -- had still had a very

12 large purchase that was -- Outcome Health was under-delivering

13 on, so I wasn't entirely sure what Xarelto was -- what to

14 present to Xarelto 'cause I wasn't sure what they could buy.

15 Q.  Was it an issue that there was already a Pradaxa contract

16 in place and that -- and there was under-delivery against that

17 contract?

18 A.  Yes.

19 Q.  Can you explain why that was an issue here?

20 A.  Yes.  So offices that -- so pharmaceutical companies that

21 have competing drugs typically would not want their drug

22 advertised on the screen where a competitor's drug would also

23 be advertised.  They -- they would want to have mutual

24 exclusivity.

25          So they're the only type of that drug that's on the

1  screen generally.  So if Pradaxa was in one -- was supposed to

2  be in 1,819 offices, those offices could not also have Xarelto

3  be playing in them.  And so, you know, the question becomes,

4  what -- what do you even tell Xarelto they can buy, because

5  they can't go on the Pradaxa screens, and there's not even

6  enough offices for what Pradaxa was supposed to have.

7  Q.  Would that dynamic, just hypothetically speaking, assuming

8  this is a weighted average contract on Pradaxa, would that

9  still be an issue if Pradaxa was a weighted average contract?

10  A.  Yes.

11  Q.  Why is that?

12  A.  For the weighted average, you'd have to have more than

13  1,819 at some point in time before the end of the campaign

14  just to hit that weighted average of 1,819.  Weighted average

15  doesn't mean at some point you have to hit it.  It means you

16  have to go past it a fairly significant amount in order to hit

17  that number as a weighted average.

18       So since you would have to theoretically sell

19  significantly more than that 1,819 number to even achieve the

20  weighted average, it's unclear what Xarelto would be able to

21  purchase.

22       MR. HANKEY:  I'd like to offer Exhibit 98 under

23  (d)(2)(E).

24       THE COURT:  It's admitted.

25     (Said exhibit admitted in evidence.)

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 111 of 274 PageID #:13489
Ketchum - direct by Hankey
933

1    MR. HANKEY:  Can you pull it up, please.

2    BY MR. HANKEY:

3    Q.  Mr. Ketchum, is this a continuation of the previous string

4    we looked at?

5    A.  Yes.

6    MR. HANKEY:  Okay.  Let's pull up Ms. Agarwal's

7    response at 12:34 p.m.

8    BY MR. HANKEY:

9    Q.  She's responding to your email?

10   A.  Yes.

11   Q.  What does she write?

12   A.  "I'm still curious why only 55 percent overlap.  Yes,

13   let's give them two numbers, full match network as on 7/1 and

14   available match -- matches network."

15   Q.  What did you understand her to be telling you to do here?

16   A.  To give Xarelto the number of offices that matched.

17   Q.  Let's look at your reply.

18   Who's copied on your reply?

19   A.  Brad Purdy.

20   Q.  And you replied back to Ms. Agarwal?

21   A.  Yes.

22   Q.  Can you read the first sentence of your response to

23   Ms. Agarwal?

24   A.  "SA, Pradaxa bought 1,819 matched offices with

25   3,200 matched prescribers going live at the end of this month.

1    Are you sure there will even be availability for start of
2    Q3 for Xarelto?  Are you thinking Pradaxa will get all of the
3    CMH to start this month and then give them the growth until we
4    have them hit 1,819?  Then figure Xarelto can have what is
5    above and beyond that?"
6    Q.  What concern were you raising here in response to
7    Ms. Agarwal's email?
8    A.  I didn't know what we could present to Xarelto because
9    Pradaxa had a fairly significant contract that wasn't met.
10   Q.  What are you suggesting when you asked, "Are you thinking
11   Pradaxa will get all of CMH to start this month then give them
12   the growth until we have them 1,819."
13   A.  I don't understand the question.
14   Q.  And so when you write -- where you write that, "Are you
15   thinking Pradaxa will get all of the CMH to start," can you
16   explain what you mean there when you're explaining that or
17   asking that question?
18   A.  Sure, yeah.  Since there was already a -- there weren't
19   enough offices to meet the Pradaxa agreement.  So I'm asking,
20   you know, is Pradaxa just going to get every office that gets
21   in -- that gets added to the network, and then once the
22   contracted number is achieved, 1,819, then additional office
23   beyond that could go to Xarelto.  And I was looking for
24   clarification on that.
25   Q.  Now, just hypothetically speaking, if Pradaxa were being

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 113 of 274 PageID #:13491
Ketchum - direct by Hankey
935

1    delivered on a weighted average, would taking this approach

2    have met -- allowed Pradaxa to meet the weighted average?

3    A.  No.

4    Q.  Why not?

5    A.  Because anything beyond -- if everything beyond 1,819 went

6    to Xarelto, then there wouldn't have been enough offices for

7    Pradaxa to overshoot 1,819 in order to meet that weighted

8    average number.

9         MR. HANKEY:  Now the government offers Exhibit 101

10   under (d)(2)(E).

11        THE COURT:  It'll be admitted.

12      (Said exhibit admitted in evidence.)

13        MR. HANKEY:  Can we blow up the email and the text

14   there, please.

15   BY MR. HANKEY:

16   Q.  Is this an email you sent on January 15, 2013?

17   A.  Yes.

18   Q.  Does it relate to Pradaxa?

19   A.  Yes.

20   Q.  To whom did you send it?

21   A.  To Shradha and -- Agarwal and Brad Purdy.

22   Q.  What's the subject of your email?

23   A.  "Pradaxa Current Office Counts."

24   Q.  Can you read what you wrote?

25   A.  "Hi, guys.  Right now, we have 806 Pradaxa targets

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 114 of 274 PageID #:13492
Ketchum - direct by Hankey
936

1  installed or in member services pipeline.  This is 45 more

2  offices than when we first matched on November 14th.  That is

3  30 -- and is 30 more than when we ran this on December 27th.

4  Obviously, about 90 percent -- 95 percent of the offices we

5  add moving forward will be Pradaxa targets."

6  Q.  Now, when you write, "806 Pradaxa targets installed or in

7  MS pipeline," what are Pradaxa targets?

8  A.  Those are offices that meet the criteria for being a

9  match.  So they're offices that meet the -- satisfy the

10 contract.

11 Q.  Would 806 only include offices that are installed, or

12 would it include some offices that weren't even installed yet?

13 A.  Some offices that weren't even installed yet.

14      MR. HANKEY:  Now, could we highlight the sentence

15 that says, "This is 45 more offices than we first matched on

16 November 14"?

17 BY MR. HANKEY:

18 Q.  How many Pradaxa offices had been added in the last two

19 months, according to your email?

20 A.  45.

21 Q.  And given that the 806 includes MS pipe, is it possible

22 that some of those 45 offices weren't even installed?

23 A.  That's correct.

24      MR. HANKEY:  We'd like to offer Exhibit 139 under

25 (d)(2)(E).

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 115 of 274 PageID #:13493
Ketchum - direct by Hankey
937

1      THE COURT:  It's admitted.

2         (Said exhibit admitted in evidence.)

3  BY MR. HANKEY:

4  Q.  Now, I want to focus you on a Bob Mons's email sent

5  February 7th at 6:11 p.m., please.

6  A.  You'd like me to read it?

7  Q.  First of all, so whom is Mr. Mons sending his email?

8  A.  Bob Mons sent it to Lyndon Chin, Thomas Coyle, and

9  Pete Regan.

10 Q.  Are they're at RJ Palmer?

11 A.  Yes.

12 Q.  And that's the media agency that represented the Pradaxa

13 brand on this campaign?

14 A.  Yes.

15 Q.  Can you read the first sentence of Mr. Mons's email?

16 A.  "Lyndon, great seeing you guys today.  Thanks for making

17 time.  Per Pete's request, attached is an overview for WHIT.

18 We are rock solid in the DPP4 category.  About 70 percent new

19 scripts written in BRx in DPP4s come from our member

20 practices."

21 Q.  We can stop there.  And I want to bump down to the first

22 bullet below.

23      Because this relates to a couple of different

24 campaigns, correct?

25 A.  Yes.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 116 of 274 PageID #:13494
Ketchum - direct by Hankey
938

1  Q.  Let's start -- sorry.  The bullet -- let's focus on the

2  bullet for Pradaxa below.

3         Can you read what that says?

4  A.  "Pradaxa.  I will have Jason run a new match so you can

5  get the benefit of sites added that are in your sweet -- I

6  will have Jason run a new match so you can get the benefit of

7  sites added that are in your sweet spot.  Thanks for update on

8  MLR status.  Please continue to keep us posted."

9         MR. HANKEY:  And, Ms. Paul, can we drag this down so

10 that Mr. Ketchum can see the top of this?  Let's keep the --

11 keep it up, but just drag it down so we can see the top of the

12 email, the exhibit.

13 BY MR. HANKEY:

14 Q.  Do you see -- do you see that you received a copy of this

15 email?

16 A.  Yes.

17 Q.  Okay.  So what did -- when Mr. Mons --

18         MR. HANKEY:  If we could blow up that Pradaxa bullet

19 again, please, Ms. Paul.  Thank you.

20 BY MR. HANKEY:

21 Q.  So when Mr. Mons wrote this, what did you understand him

22 to be suggesting that you would do for him?

23 A.  That I would run a list match that would pick up any new

24 sites that Outcome Health added that would match to do

25 Pradaxa's target list.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 117 of 274 PageID #:13495
Ketchum - direct by Hankey
939

1  Q.  Okay.  Let's look at what happens next after Mr. Mons

2  sends his email.

3         So does it appear that Mr. Shah somehow received a

4  copy of Mr. Mons's email?

5  A.  Yes.

6  Q.  And what did he do with it?

7  A.  He forwarded it to Shradha and myself.

8  Q.  This is February 10, 2013, correct?

9  A.  Yes.

10  Q.  What did -- now, did Mr. Shah copy Mr. Mons on this email?

11  A.  No.

12  Q.  Can you read the first paragraph of Mr. Shah's email to

13  you and Ms. Agarwal?

14  A.  "Hey, guys.  For Pradaxa, we already factored in our

15  growth in the initial match, but when Bob learned over lunch

16  last Thursday that Pradaxa is likely going to start in March,

17  he suggested rerunning the match to see if we picked up

18  any more physicians.  This doesn't make sense since we already

19  aggressively factored in for gains in new practices."

20  Q.  I want to focus you in on the last sentence there.  "This

21  doesn't make sense since we already aggressively factored in

22  for gains in new practices."

23         What did you understand Mr. Shah to be saying there?

24  A.  That running a new list match doesn't make any sense.

25  Q.  And why would that not make any sense?

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 118 of 274 PageID #:13496
Ketchum - direct by Hankey
940

1  A.  Because the original number included projections for

2  growth, and so there's no point in running a -- a new list.

3  Q.  Did you agree with Mr. Shah there?

4  A.  Absolutely.

5  Q.  And why is that?

6  A.  Because there -- there wouldn't be a point in running a

7  list match when you had already projected for growth.

8  Q.  Can you read the next paragraph of Mr. Shah's email?

9  A.  "SA, does Bob know our match was projected?  Didn't want

10 to copy him on this so he doesn't get confused, but not sure

11 how we should follow up on that point.  He references having

12 asked Jason to rerun below."

13 Q.  Okay.  Now, when Mr. Shah wrote that he didn't want to

14 copy Mons so that he, quote, "doesn't get confused," what did

15 you understand that to mean?

16 A.  That he didn't want Bob to know the -- to understand the

17 conversation that was happening saying the original sale was

18 based on a projection.

19 Q.  Now, yesterday, we talked about conversations that you had

20 with Mr. Shah and Ms. Agarwal in 2012 and 2013 about this,

21 correct?

22 A.  Yes.

23 Q.  And just to recap.

24       In that time period, what was their general direction

25 to you as to copying salespeople on emails about projections

Ketchum - direct by Hankey

941

1   and list match?

2   A.  That salespeople would be more confident if they were

3   generally just given a number.  Not a rule, but generally.

4   Q.  Now, when -- when you were at Outcome Health in 2012 and

5   2013, did you interact with the salespeople?

6   A.  For sponsorship sales?

7   Q.  Yeah, sponsorship sales.

8   A.  Yes.

9   Q.  And did you interact with Bob Mons?

10  A.  Yes.

11  Q.  Did you talk to him about various aspects of his job?

12  A.  Yes.

13  Q.  Including list matches?

14  A.  Yeah, yes.

15  Q.  And how to pitch new campaigns to clients?

16  A.  More Bob educating me on it, but yes.

17  Q.  Okay.  But you saw -- in observing that, did you perceive

18  that he was competent in his job or that he, you know,

19  sometimes got confused in how to present campaigns to clients?

20  A.  I felt Bob to be competent.

21  Q.  And how about other salespeople who were at Outcome at

22  that time?

23          Let's just start with what -- who were the other

24  salespeople who were there?

25  A.  Matthew Crandall.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 120 of 274 PageID #:13498
Ketchum - direct by Hankey
942

1  Q.  Matthew Crandall.  Okay.

2  A.  Steven Svec.

3  Q.  Did you observe Mr. Crandall, Mr. Svec interacting with

4  clients about the results of list matches?

5  A.  Yes.

6  Q.  Making pitches to clients?

7  A.  Not necessarily pitches to clients but hearing about them

8  afterwards, yes.

9  Q.  Okay.  In any of those discussions or observations, did

10  you observe either Mr. Crandall or Mr. Svec getting confused

11  about how to present results of list matches to clients?

12  A.  No.

13        MR. HANKEY:  Let's go back to Exhibit 139.

14        THE COURT:  Before we go to the next exhibit, let's

15  go off the record.

16      (Off-the-record discussion.)

17        THE COURT:  All right.  We're back on the record.

18        You may proceed.

19        MR. HANKEY:  Thank you, Your Honor.

20  BY MR. HANKEY:

21  Q.  So we're back at Exhibit 139.

22        Do you see that in front of you, Mr. Ketchum?

23  A.  Yes.

24  Q.  And Rishi Shah sent an email to Ms. Agarwal and you on

25  February 10, 2013?

1  A.  Yes.

2  Q.  Can you read the last sentence of Mr. Shah's email to the

3  two of you?

4  A.  "We could maybe add a few or just say it wasn't too many,

5  and we may be better off rerunning and reporting later in the

6  year."

7  Q.  Now, did Mr. Shah write anything about explaining to Mons

8  that Outcome did not have the 1,819 offices that had been

9  promised to the client?

10  A.  No.

11  Q.  Not in this email?

12  A.  No.

13  Q.  And eventually, does Mr. Mons come to learn that there was

14  a projection in this list match?

15  A.  I believe so, yes.

16  Q.  Now, would that -- telling Mr. Mons that there had been a

17  projection, would that have helped Mr. Mons understand why it

18  didn't make sense to run a new list match for Pradaxa?

19  A.  It would have.

20      MR. HANKEY:  Let's look at Exhibit 140, which we're

21  offering under (d)(2)(E).

22      THE COURT:  It's admitted.

23      (Said exhibit admitted in evidence.)

24  BY MR. HANKEY:

25  Q.  Okay.  Do we see that this is a continuation of the email

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 122 of 274 PageID #:13500
Ketchum - direct by Hankey
944

1    string we were just reviewing?

2    A.  Yes.

3         MR. HANKEY:  Can you focus, Ms. Paul, on the

4    Shradha Agarwal response to Mr. Shah at 4:44 a.m.

5    BY MR. HANKEY:

6    Q.  Can you read what Ms. Agarwal wrote in response to

7    Mr. Shah?

8    A.  "I'm not sure in this particular case, but generally the

9    team doesn't know it's a projection because they get confused

10   about how to represent it, even though they need not say it

11   any differently."

12   Q.  Let's stop there.

13        When Ms. Agarwal's referring to the team, what do you

14   understand her to be saying there?

15   A.  The sponsorship sales team.

16   Q.  And do you see where Ms. Agarwal wrote that the team

17   doesn't know about projection, because they, quote, "get

18   confused about how to represent it"?

19   A.  Yes.

20   Q.  Is she referring to the salespeople getting confused?

21   A.  Yes.

22   Q.  In their presentations to whom?

23   A.  To clients.

24        MR. HANKEY:  Now, let's go to the next -- actually,

25   stay on that.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 123 of 274 PageID #:13501
Ketchum - direct by Hankey
945

1  BY MR. HANKEY:

2  Q.  If you could read the rest of her email, please,

3  Mr. Ketchum?

4  A.  "I agree with you in just adding a few names and some

5  actual matched prescribers/sites that we've since installed

6  that may not have been on our original projection list."

7  Q.  Now, what did you understand Ms. Agarwal to be saying

8  there when she is writing that?

9  A.  That includes some additional doctors to make it look like

10 there's been some growth.

11 Q.  Is this the only time that you'd heard Ms. Agarwal or

12 Mr. Shah say that salespeople generally weren't told about

13 projecting and list matches?

14 A.  No, not the first time.

15 Q.  Now, did -- did this and other directions to you on this

16 topic have an impact on how you communicated about projections

17 and list matches with salespeople?

18 A.  Yes.

19 Q.  Can you explain how?

20 A.  Yeah.  I -- I didn't discuss projections much with

21 salespeople due to what I was told by Rishi and Shradha.

22 Q.  But you, I believe, had testified that there were

23 occasions where salespeople were made aware either on the

24 front end or at some point that projections were occurring?

25 A.  Yes.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 124 of 274 PageID #:13502
Ketchum - direct by Hankey
946

1    MR. HANKEY:  Let's look at the same email, and just

2    Mr. Shah's response at 8:01 p.m., please.

3    BY MR. HANKEY:

4    Q.  Can you read what Mr. Shah wrote in response?

5    A.  "Sounds good.  Action item.  JK.  Submit, please,

6    projection but add it -- add to it any newly signed-up offices

7    now installed or in MS pipeline that weren't already installed

8    or projected."

9    Q.  All right.  And then let's look at the next email.

10    What did you write back?

11    A.  "Sounds good."

12    MR. HANKEY:  I'd like to offer Exhibit 194 under

13    (d)(2)(E).

14    THE COURT:  It'll be admitted.

15    (Said exhibit admitted in evidence.)

16    BY MR. HANKEY:

17    Q.  Mr. Ketchum, what are we looking at here in 194?

18    A.  Member services weekly activity report.

19    Q.  Is this one that you sent by email?

20    A.  Yes.

21    Q.  April 7, 2013?

22    A.  Yes.

23    Q.  And to whom did you send it?

24    A.  To senior management and team leads.

25    Q.  Okay.  And at this point, April 2013, who would have been

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 125 of 274 PageID #:13503
Ketchum - direct by Hankey
947

1  on that senior management team email box?

2  A.  Jim Demas, Rishi Shah, Shradha Agarwal, and Brad Purdy.

3  Q.  What was the purpose of these --

4        MR. HANKEY:  Well, strike that.

5  BY MR. HANKEY:

6  Q.  Do you see at the bottom of this weekly activity report --

7  or weekly report a count for Pradaxa offices in the network?

8  A.  Yes.

9  Q.  Can you read what that says?

10  A.  "Pradaxa:  708 locations, 800 screens, I am rerunning a

11  match tomorrow to get any new additions scheduled.  This" --

12  Q.  Now -- go ahead.

13  A.  -- "this will be a weekly exercise."

14  Q.  Now, in a previous email, I believe we saw that there were

15  some anticipated delays in starting the campaign.

16        Do you recall that?

17  A.  I do, yes.

18  Q.  Around when did the contract -- or when did the campaign

19  start playing ads in offices?

20  A.  I believe February.

21  Q.  And then ultimately may there have been some additional

22  delay to April?

23  A.  I believe there was.

24  Q.  Okay.  Now, I'd like to turn your attention to

25  Demonstrative 1133A, please.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 126 of 274 PageID #:13504
Ketchum - direct by Hankey
948

1       What are we looking at here, Mr. Ketchum?

2   A.  It's a chart depicting time periods.  So month by month in

3   the rows, and then the columns indicate the contracted amount

4   and then the actual installations that Outcome had --

5   Outcome Health had towards the -- that contracted amount.

6   Q.  What was the contracted amount for the period of April to

7   December 2013?

8   A.  1,819.

9   Q.  And how many were installed as of April?

10  A.  708.

11  Q.  So about how far short of the contracted amount was

12  Outcome in April 2013?

13  A.  About 1,100.

14      MR. HANKEY:  I'd like to offer Exhibit 205 under

15  (d)(2)(E).

16      THE COURT:  It's admitted.

17      (Said exhibit admitted in evidence.)

18  BY MR. HANKEY:

19  Q.  Now, is this another weekly report, Mr. Ketchum?

20  A.  Yes.

21  Q.  The last one we saw was early April, correct?

22  A.  Yes.

23  Q.  What's the date on this one?

24  A.  May 5, 2013.

25      MR. HANKEY:  And if we could, Ms. Paul, could we pull

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 127 of 274 PageID #:13505
Ketchum - direct by Hankey
949

1    up the bottom of this page where it provides screen counts.

2    BY MR. HANKEY:

3    Q.  Again, are you providing screen counts for the Pradaxa

4    campaign in this weekly report?

5    A.  Yes.

6    Q.  Now, did -- did these weekly reports go out weekly, or do

7    they go out monthly?  We're looking at them here monthly.

8         But do they actually go out, roughly, weekly?

9    A.  Yes, weekly.

10   Q.  Now, what is the count of Pradaxa offices and screens as

11   of May 5, 2013?

12   A.  775 offices and 881 screens.

13        MR. HANKEY:  So let's look at Demonstrative 1133D,

14   delta.

15   BY MR. HANKEY:

16   Q.  What are we looking at here, Mr. Ketchum?

17   A.  It's a -- it's a graph indicating the contracted amount

18   for Pradaxa, along with Outcome Health's performance towards

19   that contract.

20        MR. HANKEY:  Okay.  And if we could go to 1133C,

21   please.

22   BY MR. HANKEY:

23   Q.  And is this a table that charts out contracted amounts

24   versus actual installations?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 128 of 274 PageID #:13506
Ketchum - direct by Hankey
950

1  Q.  Similar to the one we just looked at, correct?

2  A.  Yes.

3  Q.  Looking at the April and May installations, approximately

4  how many screens had been added in that roughly one-month

5  period between the April -- early April weekly report and the

6  early May weekly report?

7  A.  Just shy of 70.

8          MR. HANKEY:  Let's go back to Exhibit 205, which is

9  in evidence.

10  BY MR. HANKEY:

11  Q.  You see here, Mr. Ketchum, that anyone responded to your

12  email?

13  A.  Yes.

14  Q.  Okay.

15          MR. HANKEY:  Can we blow that up, please, Ms. Paul.

16  BY MR. HANKEY:

17  Q.  Who responded?

18  A.  Rishi Shah.

19  Q.  Can you read what he wrote?

20  A.  "Thanks, Jay.  I thought both of your last two reports

21  were terrific."

22          MR. HANKEY:  Let's look at Exhibit 221, which we

23  offer under (d)(2)(E).

24          THE COURT:  It's admitted.

25      (Said exhibit admitted in evidence.)

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 129 of 274 PageID #:13507
Ketchum - direct by Hankey
951

1  BY MR. HANKEY:

2  Q.  Is this another weekly report, Mr. Ketchum?

3  A.  Yes.

4  Q.  And what date did you send this?

5  A.  June 3, 2013.

6         MR. HANKEY:  Ms. Paul, can we go down to the number

7  of -- actually, let me back up.

8         Sorry, Mr. Ketchum.  We weren't showing you the date

9  of your original email.

10        So, Ms. Paul, could we blow up on Sunday, June 2nd.

11  BY MR. HANKEY:

12  Q.  When did you originally send your weekly report?

13  A.  June 2, 2013.

14  Q.  Earlier, we were looking -- we were showing you, kind of,

15  the header of the email that was the next day or what appeared

16  to be the next day?

17  A.  Yes.

18  Q.  Okay.  Now, let's look at the bottom of this email where

19  you have the screen counts.

20        And can you tell us what the number of offices and

21  screens were for Pradaxa as of June 3, 2013?

22  A.  Pradaxa.  832 offices, 943 screens.

23  Q.  Now, this is about a month after the last one we just

24  reviewed, correct?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 130 of 274 PageID #:13508
Ketchum - direct by Hankey
952

1          MR. HANKEY:  Let's pull up Demonstrative 1133F,

2    please.

3    BY MR. HANKEY:

4    Q.  And, again, is this a -- appear to be a plotting of the

5    installations over time?

6    A.  Yes.

7          MR. HANKEY:  Could we go to 1133E, please.

8    BY MR. HANKEY:

9    Q.  Looking at this installation chart, approximately how many

10   screens had been added between the early May weekly report and

11   the early June weekly report?

12         Just an approximate amount.

13   A.  Around 50.

14         MR. HANKEY:  Now, could we go back to Exhibit 221,

15   please.

16   BY MR. HANKEY:

17   Q.  Did Mr. Purdy respond to your weekly report?

18   A.  Yes.

19   Q.  And is he -- is he writing about something that you put

20   in -- that you had put in the body of your report?

21   A.  Yes.

22   Q.  Does this indicate that he read your email?

23   A.  Yes.

24         MR. HANKEY:  Let's go to Exhibit 235, which we're

25   offering under (d)(2)(E).

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 131 of 274 PageID #:13509
Ketchum - direct by Hankey
953

1        THE COURT:  It's admitted.

2        (Said exhibit admitted in evidence.)

3        MR. HANKEY:  Let's start with the very first email in

4   this string, please.  I'm thinking we may have to go down a

5   bit, Ms. Paul, to another -- you know what?  I can shortcut

6   this a little bit.  So why don't we -- why don't we go back to

7   the top, Ms. Paul.  Thank you.

8   BY MR. HANKEY:

9   Q.  And is this -- Mr. Ketchum, just looking at the top of

10  this email, does this appear to be an email string related to

11  the Xarelto list match?

12  A.  Yes.

13  Q.  And we looked at another set of emails on that Xarelto

14  list match earlier, correct?

15  A.  Yes.

16  Q.  Okay.  Xarelto is another heart drug?

17  A.  Yes.

18  Q.  Like Pradaxa was?

19  A.  Yes.

20  Q.  Now, if you would, I'd like you to take a look at this.

21  This is a lengthy email string, so if it would help you to

22  have the binder, we can provide you with a paper copy.  But

23  I'd like you to read through it and then answer a couple of

24  high level questions about it.

25  A.  Sure.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 132 of 274 PageID #:13510
Ketchum - direct by Hankey
954

1          MR. HANKEY:  Would you like a paper copy?

2          THE WITNESS:  No, I think the screen will be fine.

3          MR. HANKEY:  Let's start towards the bottom,

4     Ms. Paul.

5          THE WITNESS:  Oh, is it -- do you want me to read all

6     11 pages?

7          MR. HANKEY:  Just so -- yeah.  So you can understand

8     the --

9          THE WITNESS:  Paper copy, please.  Sorry.

10         MR. HANKEY:  May I approach, Your Honor?

11         THE COURT:  You may.

12         MR. HANKEY:  Your Honor, this will shortcut us having

13    to go each step -- through each email and move it along

14    faster.

15         THE COURT:  That's fine.

16         MR. HANKEY:  Thank you.

17         THE COURT:  Let's go off the record.

18       (Off-the-record discussion.)

19         THE COURT:  Back on the record.

20         Go ahead.

21         MR. HANKEY:  Thank you.

22    BY MR. HANKEY:

23    Q.  Okay.  You've had an opportunity to look at that,

24    Mr. Ketchum?

25    A.  Yes, I have.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 133 of 274 PageID #:13511
Ketchum - direct by Hankey
955

1   Q.  So just from a high level, can you describe to the jury

2   what this Xarelto client was asking for in this exhibit?

3   A.  The Xarelto client is communicating with Outcome Health's

4   sales team on the sponsorship side to try to figure out what

5   they might be able to purchase for a potential upcoming

6   campaign.

7   Q.  Did you and Ms. Agarwal discuss this request?

8   A.  We did.

9   Q.  Was there an issue responding to the request?

10  A.  There was.

11  Q.  Can you just describe from a high level what that was?

12  A.  Yeah.  It was -- it's difficult to figure out what to

13  respond back to the client with.  One, because there was a

14  projection.  And, two, because Pradaxa -- the Pradaxa

15  contracts still hadn't been met, and those offices were still

16  under contract.

17  Q.  Okay.  Let's -- I do want to focus on a couple of emails

18  in this string.

19          So if we could pull that 235 up and look at your

20  email at the bottom of the page here at 10:05 a.m.

21          Can you read what you wrote to Ms. Agarwal?

22  A.  Yes.  "If that's the case, then we need -- then we need to

23  be higher than the matched office count.  It will look way too

24  weird if the entire network is a match.  Maybe we use 5,000 or

25  5,500."

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 134 of 274 PageID #:13512
Ketchum - direct by Hankey
956

1  Q.  Can you explain what you're asking Ms. Agarwal about here

2  and pointing out to her?

3  A.  Yes.  That if we -- if Outcome Health -- if we just said,

4  "Our whole network matches to your list," that's just an add

5  thing, and it's -- it's essentially impossible.  So I'm just

6  trying to figure out working with Ms. Agarwal what the right

7  thing to present to the client would be.

8          MR. HANKEY:  Can you -- can we go to Ms. Agarwal's

9  response, please; 10:14.

10  BY MR. HANKEY:

11  Q.  Can you read the first part of her response going through

12  the first three bullets?

13  A.  "Let's back up for a minute.  Xarelto gave us a list of

14  A-fib deciles, and 2,200-something matched with a projection

15  leading us to year-end.  We are selling 3,216 as weighted

16  average of HHN size next year.

17          "Given it's A-fib, all our physician offices should

18  be on this list, even if low decile.  Wrote more cholesterol

19  or whatever."

20  Q.  Okay.  Now, in the first bullet, Ms. Agarwal wrote,

21  "2,200-something matched with a projection leading us to

22  year-end."

23          What's she referring to there?

24  A.  That the list match included a projection.

25  Q.  For Xarelto?

1  A.  Yes.

2  Q.  Can you read the middle part of Ms. Agarwal's -- reading

3  the middle part of Ms. Agarwal's email, why don't we do that.

4  Starting at, "So we can go two routes with this," going

5  through those first two bullet points, please.

6  A.  "So we can go two routes with this.  We say what we showed

7  as matched and available is 100 percent of our network.  So

8  our network is about 2,200.  We do receive a renewal from

9  Pradaxa, we have room to grow additionally.

10          "Say we have 3,200, but only 2,200 are available to

11  them.  Now, if Pradaxa renews for 1,800 and wants to do a new

12  list match anticipating growth during this year, we are way

13  overstretched."

14  Q.  So what is the -- what's the issue here?

15          Why is this a challenge to respond to Xarelto's

16  question about the availability?

17  A.  It -- it was desirable to try to tell Xarelto that there

18  was something that they could purchase, but it was difficult

19  to figure out what that could be.

20  Q.  Why was that difficult to figure out what to tell

21  Pradaxa -- Xarelto that they could purchase?

22  A.  Because there was already an under-delivery on Pradaxa.

23  Q.  Why did that make it difficult?

24  A.  There wasn't offices to sell to Xarelto.

25  Q.  Offices available with screens installed in the network?

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 136 of 274 PageID #:13514
Ketchum - direct by Hankey
958

1  A.  Correct.

2  Q.  Now, looking at Option 1 of Ms. Agarwal's email where she

3  says, "We say what we showed as matched and available is

4  100 percent of our network, so our network is about 2,200.  If

5  we do receive a renewal from Pradaxa, we have room to grow

6  additionally."

7        But it had been truthful to tell Xarelto that they

8  matched to 100 percent of the network?

9  A.  No.

10  Q.  Why not?

11  A.  Because they didn't match to 100 percent of the network.

12  Q.  And then how about telling that -- Xarelto that 2,200 is,

13  quote, "matched and available"?

14        You see that?

15  A.  Yes.

16  Q.  "2,200 is available," rather.

17        Would that have been an accurate representation?

18  A.  No.

19  Q.  Would it have been truthful to tell the client that

20  Outcome had 3,200 offices total?

21  A.  That I'm not -- sorry.

22  Q.  Yeah.  So looking at Option 2, where she says, "say we

23  have 3,200"?

24  A.  I don't believe Outcome Health had 3,200 offices at that

25  time.

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 137 of 274 PageID #:13515
Ketchum - direct by Hankey
959

1        MR. HANKEY:  Let's go to -- go back to Exhibit 221,

2   please.  And if we could go down to the very bottom where the

3   screen counts are located.

4   BY MR. HANKEY:

5   Q.  You see where it says, "total CMH"?

6   A.  Yes.

7   Q.  Okay.  What does that say?

8   A.  2,149 members, 2,433 screens.

9   Q.  What does that mean?

10  A.  There was no -- far less than 3,200.

11  Q.  30 -- when you're referring to 3,200, 3,200 what?

12  A.  Offices.

13  Q.  Okay.  And 2,149 members.

14        Would that have been offices?

15  A.  That would have been offices.

16        MR. HANKEY:  Let's look at --

17        THE COURT:  I think we're near lunch hour.  If you're

18  going to start a new exhibit, we'll take a break.  If you want

19  to finish off on what you've already entered, we'll do that.

20        MR. HANKEY:  This is a good spot to stop.

21        MR. BLEGEN:  Judge, before we break, under

22  the doctrine of completeness, I --

23        COURT REPORTER:  Speak into the mic, please.

24        MR. BLEGEN:  I'm sorry.  I would request --

25        THE COURT:  You can take your mask off too when

1   you're doing that.

2           MR. BLEGEN:  We can go to sidebar to do the --

3           THE COURT:  Sure.  Okay.

4       (Proceedings heard at sidebar on the record.)

5           THE COURT:  Go ahead.

6           MR. BLEGEN:  Judge, so they've been putting up these

7   exhibits and talking about current installed and what you have

8   now.

9           Under the doctrine of completeness, they should be

10  required to put up, again, Exhibit 235, which indicates that

11  they're talking about something that happened in 2014.  I just

12  think that it's left a big misrepresentation in front of the

13  jury about when the Xarelto people were interested in numbers

14  and what the numbers would be.

15          THE COURT:  Well, is there part of an exhibit that

16  has been displayed that -- I mean, a number of these exhibits

17  are multipage, and only parts of them are displayed.

18          MR. BLEGEN:  Understood.

19          THE COURT:  That would seem to be an area you can

20  cross-examine on, rather than requiring the government to put

21  up more pages of an exhibit already in evidence.

22          MR. BLEGEN:  But -- I could, Judge, but the purpose

23  of completeness is that it be done at the time, so that

24  doesn't leave a misrepresentation or a misunderstanding --

25  excuse me -- until, whenever, Monday or Tuesday of next week.

1    So all I would ask is that they put up Exhibit 235,

2 which is also in evidence, and indicate what the top of the

3 email says, which is subject, "Xarelto in Office 2014."

4    THE COURT:  Okay.  Any objection to that by the

5 government?

6    MR. HANKEY:  Your Honor, we do object, because the

7 rule of completeness doesn't require that now.

8    THE COURT:  All right.  We're not going to -- we'll

9 decide -- I'm not going to do it right now.  We'll talk about

10 this when the jury's released.

11   (Sidebar ended.)

12    THE COURT:  Okay.  Ladies and gentlemen, we'll take

13 our lunch break right now.  Please don't discuss the case

14 among yourselves or with anyone else, and keep an open mind as

15 there's more evidence to hear.

16    COURT SECURITY OFFICER:  All rise.

17   (Jury out at 12:31 p.m.)

18    THE COURT:  All right.  Please be seated.

19    Do you want this done in the presence of the witness

20 or not or do you care?

21    MR. BLEGEN:  I don't care.  He can go to lunch.

22    THE COURT:  All right.  Be back in an hour, sir.

23    All right.  Why don't you put that exhibit up.  What

24 was it again?

25    MR. HANKEY:  235.

```
 1              THE COURT:  Mr. Blegen, what number was it?
 2              MR. BLEGEN:  It's 235.
 3              THE COURT:  Okay.  Yeah, let's put it up on the
 4   screen.
 5              Okay.  What part was displayed and then what part is
 6   it that was not visible to the jury that you do want
 7   displayed?
 8              Let's start first with the government.  What -- this
 9   is a single page or looks like 11 pages?
10              MR. HANKEY:  11-page email string, Your Honor.
11              THE COURT:  All right.  What part did you display and
12   talk about with the witness?
13              MR. HANKEY:  Well, we had displayed this entire first
14   page and then we focused in on -- and I'm not finished with
15   this exhibit, by the way, Your Honor.
16              THE COURT:  Okay.
17              MR. HANKEY:  We had focused in on the bottom two
18   emails and hadn't looked at the top one yet.
19              THE COURT:  All right.  And what part of it,
20   Mr. Blegen, did you believe the jury ought to see or hear
21   about under the rule of completeness?
22              MR. BLEGEN:  The very top part where it says,
23   "Xarelto in office 2014-ContextMedia."
24              THE COURT:  The jury can see that.
25              MR. HANKEY:  Yeah.
```

1          THE COURT:  I don't think the rule of completeness
2   requires the government to highlight parts of a document that
3   you like.  That's what you do on cross.  The nature of this
4   case, because of its length, because of the length of this
5   witness and every other witness makes that difficult
6   sometimes, but that's the nature of the case.

7          If you want to make the directs shorter or the
8   crosses shorter, but you don't have -- the government puts a
9   document in, the whole thing is fair game.  But they don't
10  have to highlight parts of it that advantage you no more than
11  you have to advantage -- if you got up, and put in part of
12  this document, talked about it.

13         And I'd say in the middle of your examination, "Well,
14  make sure you talk about the bottom part too."

15         That's not fair to either side.  So the -- I'm --
16  I'm -- I'm happy to hear more argument on this, but that's how
17  I read it.

18         MR. BLEGEN:  All right.  Well, that -- I think the
19  government did that in one of -- in Ms. Bell's examination
20  where she wanted to put in part of a statement and they said,
21  "Well, you should put the whole statement in.

22         The issue is these are --
23         COURT REPORTER:  Slow down.
24         THE COURT:  Slow down.  Slow down, please.
25         MR. BLEGEN:  I'm sorry.

1    I think that did happen previously.  And the issue
2    here is it's not -- the concern is the subsequent exhibits,
3    which are statements which are attributing to Ms. Agarwal, but
4    without the jury understanding, because they don't have the
5    complete record of the statements involved that what's being
6    talked about here is a proposal for 2014.

7    That's -- that's the confusion that I think is
8    being -- I'm not saying they're doing it on purpose.  They may
9    have put this up for all I know.  I don't remember whether the
10    214 got on there, but -- excuse me -- 2014 got on there.

11    But what I'm asking for under completeness is that
12    when they're introducing statements about this topic and then
13    putting in other documents related to current inventory,
14    what's becoming obscured is that what's being discussed in
15    the -- in the full context of the statement is something that
16    wouldn't start until 2014.

17    THE COURT:  Yeah, I understand the rule of
18    completeness to be something where if a document, a partial
19    document or a partial conversation is admitted and other parts
20    of it are necessary to put that part in context, admitted, and
21    then something not admitted needs to be admitted to put that
22    part which is admitted into context, that's what the rule of
23    completeness contemplates.

24    This is an admitted document.  They are highlighting
25    parts of it.  If they highlighted every page of every

1  document, we'd be -- it wouldn't be 14 weeks; it would be
2  14 months for this trial.
3  So I think this is standard cross-examination.  I
4  heard a little bit of it with the last witness.  "The
5  government didn't ask you about this, did they," on this
6  document, which is, you know, I anticipate you'll be saying
7  that on your cross if you're doing the cross on this.
8  But that's -- in my mind, this is not a rule of
9  completeness issue.  This is just a cross-examination issue to
10  highlight other parts of an already admitted exhibit.  If they
11  had just brought in and admitted the bottom two or three
12  paragraphs, I'd -- I'd feel differently about your objection.
13  MR. BLEGEN:  And I might feel differently, too, if I
14  were going to cross-examine this guy this week --
15  MR. HANKEY:  Can I just --
16  (Indiscernible crosstalk.)
17  THE COURT:  Let him finish.
18  MR. BLEGEN:  -- the confusion is that it might be --
19  Let him finish.  Okay.  Go ahead, Mr. Johnston -- or
20  Mr. Hankey.
21  MR. HANKEY:  So first of all, we just object on
22  grounds of what the rule of evidence requires.
23  THE COURT:  You won that one.
24  Go ahead.
25  MR. HANKEY:  There's certainly -- there's certainly

1   nothing to hide here.  2014 is on the exhibit.  It's not the

2   intent of the government to hide that ball.

3           We may well, and probably will, highlight that top

4   part of the exhibit.  We would -- yeah, Your Honor, when --

5   when defense did point on cross with the previous witness that

6   the government hadn't covered something in its direct, we

7   objected.  You sustained the objection.

8           THE COURT:  Well, everything's situational.

9           MR. HANKEY:  Understood.

10          THE COURT:  That's just rhetorical flourish that

11  lawyers say.  "They didn't ask you this, so I will."

12          Sometimes it's objectionable; sometimes it's not.

13  You now have a preview of what Mr. Blegen's going to ask, so

14  you may want to blunt it in your direct, but however you want

15  to proceed.  But that's -- the rule of completeness is

16  different than what you're objecting to.  I think you're

17  objecting to what in effect is the problem with the length of

18  time the witness is on the stand.

19          Anything else on the record?

20          MR. BLEGEN:  No.

21          MR. HANKEY:  No.

22          THE COURT:  All right.  Off the record.

23      (Off-the-record discussion.)

24      (A recess was had from 12:37 p.m. to 1:30 p.m.)

25

1               IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3  UNITED STATES OF AMERICA,     )
                         )  Docket No. 19 CR 864
4           Plaintiff,     )
                         )  Chicago, Illinois
5    v.                   )  February 2, 2023
                         )  1:30 p.m.
6  RISHI SHAH, SHRADHA AGARWAL, )
  BRAD PURDY,             )
7                       )
          Defendants.    )
8

9        TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 4B
       BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11  APPEARANCES:

12  For the Government:   MR. MATTHEW F. MADDEN
                      MR. SAURISH APPLEBY-BHATTACHARJEE
13                  Assistant U.S. Attorneys
                  219 South Dearborn Street, 5th Floor
14                  Chicago, Illinois  60604

15

16                  MR. WILLIAM E. JOHNSTON
                  MR. KYLE C. HANKEY
17                  U.S. Department of Justice
                  Criminal Division, Fraud Section
18                  Washington, D.C.  20530

19

20

21

22                SANDRA M. TENNIS
                KATHLEEN FENNELL
23           Official Court Reporters
           United States District Court
24      219 South Dearborn Street, Room 2260,
           Chicago, Illinois 60604
25            (312) 408-7782
         Sandra_Tennis@ilnd.uscourts.gov

```
 1    APPEARANCES (Continued:)

 2
      For Defendant
 3    Shah:                      MR. JOHN C. HUESTON
                                 Hueston Hennigan LLP
 4                               620 Newport Center Drive, Suite 1300
                                 Newport Beach, California  92660
 5
                                 MS. VICKI CHOU
 6                               MR. MICHAEL H. TODISCO
                                 MS. KAREN DING
 7                               Hueston Hennigan LLP
                                 523 West 6th Street, Suite 400
 8                               Los Angeles, California  90014

 9
      For Defendant
10    Agarwal:                   MS. KOREN L. BELL
                                 MR. A. ALEXANDER LOWDER
11                               MR. STEPHEN G. LARSON
                                 Larson LLP
12                               555 South Flower Street, Suite 4400
                                 Los Angeles, California  90071
13
                                 MR. PATRICK W. BLEGEN
14                               MS. KELSEY H. KILLION
                                 Blegen & Garvey
15                               53 West Jackson Boulevard, Suite 1437
                                 Chicago, Illinois  60604
16
17    For Defendant
      Purdy:                     MR. THEODORE T. POULOS
18                               MR. ERIC PRUITT
                                 MR. JOHN PAVLETIC
19                               Cotsirilos, Tighe, Streicker, Poulos &
                                 Campbell, Ltd.
20                               33 North Dearborn Street, Suite 600
                                 Chicago, Illinois  60602
21

22

23

24

25
```

1    (Proceedings heard in open court. Jury out.)

2         THE COURT:  All right.  Are we ready to go?

3         MR. HUESTON:  Yes.

4         MR. HANKEY:  Yes.

5         THE COURT:  Let's bring in the jury.

6    (Jury in at 1:31 p.m.)

7         THE COURT:  All right.  Please be seated.  Welcome

8    back.  We will continue the direct examination of the witness.

9         You may proceed.

10        MR. HANKEY:  Thank you, your Honor.

11    JASON KETCHUM, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

12              DIRECT EXAMINATION (Resumed.)

13   BY MR. HANKEY:

14   Q.  I'm going to go back to Exhibit 235, which is in evidence,

15   pick up where we left off.

16        Mr. Ketchum, before we took our break, we were

17   talking about a Xarelto list-match; correct?

18   A.  Yes.

19   Q.  And what was that list-match for?  Was it for a 2013

20   campaign, for a 2014 campaign?

21   A.  I believe it was for a 2014 campaign.

22   Q.  If you look at the top of the e-mail, does that help you

23   answer your question?

24   A.  It does.  Yeah, it says "Xarelto In-Office 2014."

25   Q.  Okay.  Now, looking out from June 21, 2013 to 2014, how

1   much time was there between this point in time and when 2014

2   would start?

3   A.   Approximately six months.

4   Q.   Okay.  How, if at all, would that affect kind of the

5   dynamic that you described here, the challenges that were

6   apparent in this e-mail string that you described earlier?

7   A.   I'm not sure I understand the question.

8   Q.   So let's just kind of recap.  What was it that you and

9   Ms. Agarwal were trying to work through in this e-mail string

10  that we reviewed earlier?

11  A.   So, some of the -- one of the big concerns was that there

12  was an under-delivery for Pradaxa already.  So the question

13  is, how can -- what can Xarelto even buy if the contract

14  hasn't even been met for Pradaxa.  And if you want to try to

15  communicate to a potential client that there is going to be

16  something to buy, what is it that can be communicated.

17  Q.   Okay.  Now, the fact that this campaign is going to start

18  in six months, does that affect the analysis here?

19  A.   It does.

20  Q.   And can you describe how it does?

21  A.   Because you're trying to figure out how much inventory or

22  how much you might have, you know, come -- come January of the

23  following year.

24  Q.   Now, let's look at the top e-mail in this string.  You see

25  you're sending an e-mail to Ms. Agarwal in response to the

1    last e-mail that we reviewed?

2    A.  Yes.

3    Q.  Okay.  And same day, June 21st?

4    A.  Yes.

5    Q.  Can you read what you wrote?

6    A.  "SA - Okay, that does make sense.  Based on the e-mail

7    that was sent to us, we may not even need to update the

8    template, rather just give Steve the right language to

9    communicate to the client.  Which one do you think is the

10   better option?"

11   Q.  Now, popping back out, looking at Ms. Agarwal's e-mail, do

12   you see anything in this e-mail that suggests that Outcome

13   should tell Xeralto that your list-match involved a

14   projection?

15   A.  No.

16   Q.  Let's look at Exhibit 244.

17           This is being offered under (d)(2)(E), your Honor.

18           THE COURT:  It will be admitted.

19        (Exhibit admitted into evidence.)

20   BY MR. HANKEY:

21   Q.  Do you see an e-mail from Mr. Shah at 8:57 a.m.?

22   A.  Yes.

23   Q.  Let's expand that.

24           Can you read the first sentence of Mr. Shah's e-mail

25   to you?

1    A.  "Hi Jay, in advance of our Pradaxa research prep meeting

2    tomorrow, can you pull for me all of the pertinent details of

3    the campaign?  Specifically, I'd like to know:"

4    Q.  And, let's see.  Then what does he ask you to provide

5    after that?

6    A.  "Terms of their --"

7            "1) Terms of their buy including the number of

8    offices, screens, healthcare providers if stipulated in those

9    levels along with the cost, (total and by office or screen.)

10           "2) The time term of the program.

11           "3) How large our network was when the program

12   started by offices, screens, and healthcare providers and the

13   breakout of these healthcare providers by decile match, etc."

14   Q.  Okay.  Then let's look at your response to Mr. Shah's

15   e-mail.  What do you write in response?

16   A.  "Sounds good.  I will have this ready."

17   Q.  Okay.  Let's go to Exhibit 247, please.  This is being

18   offered under (d)(2)(E).

19           THE COURT:  It will be admitted.

20         (Exhibit admitted into evidence.)

21   BY MR. HANKEY:

22   Q.  Mr. Ketchum, do you see at the top you're responding to

23   Mr. Shah's questions that we just reviewed?

24   A.  Yes.

25   Q.  And, let's see, actually, let's go down to the e-mail at

1  the very bottom, Ms. Paul, at 1:27 p.m. We can -- yes. And

2  then all the way down to the bottom, if you would, to the next

3  page as well. There, yes. It kind of overlaps. Perfect,

4  thank you.

5      Okay. Does this reflect your answers to Mr. Shah's

6  questions?

7  A. Yes.

8  Q. Okay. Did you embed your responses in the e-mail that

9  Mr. Shah wrote?

10 A. Yes.

11 Q. Now, it's a little hard to tell where his e-mail stops and

12 yours begins; is that correct?

13 A. That's correct.

14 Q. Okay. But if you look at Item Number 1, are you able to

15 recall where his question stopped. Can you read his question,

16 I guess?

17 A. Yes. Question one is:

18      "Terms of their buy including the number of offices,

19 screens, and healthcare providers if stipulated in those

20 levels along with the cost (total and by office and screen.)"

21      That's a question.

22 Q. And then what is your response?

23 A. My response is:

24      "1,819 target offices, 3,200 Pradaxa matched doctors.

25 (Shradha indicated they purchased a weighted average.)"

1  Q.  Then let's go to the third -- or the second and third
2  bullet and blow those up, please, and the offices/screen
3  count.
4          Do you see that you bring up the time term of the
5  program?
6  A.  Yes.
7  Q.  And you respond to that?
8  A.  Yes.
9  Q.  Let's just focus in -- we can blow it up from Number 2 and
10 3, down to offices and screens, and that's it.  Just the --
11 there we go, that's better.
12          So do you see the time term of the program,
13 Mr. Ketchum?
14 A.  I do.
15 Q.  And what did you provide to Mr. Shah?
16 A.  The time term was 4/1/2013 through 12/31/2013.
17 Q.  What was the third question that he asked you?
18 A.  "How large our network was when the program started by
19 offices, screens, and healthcare providers and the breakout of
20 these healthcare providers by decile match, etc."
21 Q.  Did you give him an office count and a screen count for
22 when the programs started?
23 A.  Yes.
24 Q.  What was that?
25 A.  760 offices and 862 screens.

1  Q.  Okay.  Now, let's go back to number one.

2           And you see where when you provide the number of

3  target offices, you write:  "Shradha indicated they purchased

4  a weighted average."  Do you see that?

5  A.  Yes.

6  Q.  What did that mean?

7  A.  It meant that I wanted to tell Rishi that Shradha had told

8  me that the client had purchased a weighted average.

9  Q.  Now, is there anything that you've seen in the e-mails

10  we've reviewed, the contracts, that supported Ms. Agarwal's

11  indication that Pradaxa purchased a weighted average campaign?

12  A.  No.

13  Q.  Was there a reason why you specifically wrote that Shradha

14  indicated they purchased a weighted average?

15  A.  Because Shradha indicated it, and she was one of the heads

16  of the company.

17  Q.  Let's look at -- did Mr. Shah respond to your e-mail --

18  A.  Yes.

19  Q.  -- after that?  What did he write?

20  A.  "Thanks, Jason.  Can you indicate which decile is the

21  highest for this?  Also, did we have any other physician

22  segmentation info or was it primarily decile?"

23  Q.  Okay.  And then what, if any, response did you give to

24  that e-mail?

25  A.  I responded:  "Ten is the highest decile.  The decile info

1    was market level, not Pradaxa specific, the additionally

2    included specialty.  Tier level information and CVM, which

3    meant, build, gain, observe, defend or maintain.  We currently

4    have 1,993 matched HCPs and 1,019 offices, 1,173 screens

5    installed (plus MS pipeline.)"

6    Q.  Now let's go to Exhibit 253, which we're offering under

7    (d)(2)(E).

8              THE COURT:  It's admitted.

9          (Exhibit admitted into evidence.)

10   BY MR. HANKEY:

11   Q.  Now, do you see that this is an e-mail string involving

12   you, Ms. Agarwal, Mr. Purdy and Mr. Shah?

13   A.  Yes.

14   Q.  Okay.  What's the subject line of the e-mail string?

15   A.  "Breakdown of lists."

16   Q.  Okay.  Let's go down to the two e-mails at the bottom of

17   the string.  I can't recall if they're -- yeah, starting with

18   that e-mail, right there, at 5:23 p.m.

19              Can you read that e-mail, please?

20   A.  "Hi guys, here's the info on the lists.  Please let me

21   know if you think of anything else to peak at, I can easily

22   get anything we need in advance of us talking.  Two tabs.  Tab

23   1 has the info on the lists.  Tab 2 has decile info.  I

24   included where our prescribers are coming from based on our

25   current target list."

1  Q.  Okay.  And then can you go up to the next e-mail, please.

2  This would be the one that starts:  "Hi, Jason."

3  A.  Would you like me to read it?

4  Q.  Yes.  So we can't -- just to point out, we can't tell from

5  this, right, whose sending this because there's not that,

6  like, header information; is that correct?

7  A.  That's correct.

8  Q.  Okay.  I would like -- like you to read it, and then we'll

9  move to the next e-mail.

10  A.  "Hi, Jason.  I'd also like to see the total members added

11  in past seven months (since Jan. 1) and which lists they match

12  on with identifying those that match on several.

13      "Alternatively, is it safe to assume they all match

14  to at least BMS/AZ plus Pradaxa because of the star/lightning

15  call list and then could be matching Qsymia, Nesina, Insulet

16  selectively?  But in that case, why would only 351 of 652 be

17  top 5 deciles on Onglyza list and only 431 are Pradaxa top 5?

18  Where would the other several hundred be picked up from by the

19  MOEs?  We've only added a handful of RHN this year.

20      "The Onglyza bottom 5 may match some Nesina top 5,

21  but even so, only explains a few more.  My guess is we've

22  added about 800 to 900 members the past seven months?  I'd

23  like to understand comprehensively who these other members

24  are."

25  Q.  So here the writer of this e-mail is asking about a number

1  of campaigns; correct?

2  A.  Correct.

3  Q.  What is requested in the very first sentence of the

4  e-mail?

5  A.  To see which total numbers have been added in the past

6  seven months and which lists those members matched from.

7  Q.  Okay.  Now let's look at your response to that e-mail.

8       Now, can you read what you write in the first line of

9  the e-mail?

10  A.  "SA - since 1/1/2013, we have added 659 physical sites

11  (installed plus MS pipeline.)"

12  Q.  What are you telling Ms. Agarwal here?

13  A.  The amount that have been added between January 1st, 2013,

14  and July 24, 2013.

15  Q.  And when you're referring to 659 physical sites, can you

16  tell what you're referring to there?

17  A.  Office locations.

18  Q.  Okay.  Now, is that for a specific campaign, or for

19  something else?

20  A.  I believe that's total, but it's a little bit unclear in

21  this e-mail.

22  Q.  If you go back to the previous e-mail.

23  A.  Total members.

24  Q.  Why do you say that?

25  A.  Because it says:  "I'd like to see total members added."

1  Q.  Let's go back to the top.  And when you say you've added

2  659 physical sites, installed MS pipe, would that -- what

3  would that mean for it to include MS pipe, the 659?

4  A.  That includes offices that are in the process of being

5  installed but that are not yet installed.

6  Q.  Now, can you read the next three lines of this e-mail,

7  please?

8  A.  "They are mostly coming from our overlay list,

9  star/lightning, which is Pradaxa plus AZ/BMS or Insulet or

10  Symlin or Takeda."

11  Q.  What do you mean there, Mr. Ketchum?

12  A.  So member outreach had a call list that they were calling

13  to try to add doctors' offices to the Outcome Health Network.

14  And those call lists are made up of lists.  And so what I'm

15  highlighting here is where the offices that have been added

16  during that period of time, what lists they came from.

17  Q.  And what do you say next in the next line of the e-mail?

18  A.  "431 come from Pradaxa plus something else on the overlay

19  list."

20  Q.  So what does that mean in the context of what you just

21  described?

22  A.  That of the 659 sites, 431 of them come from -- qualified

23  for the Pradaxa contract.

24  Q.  And what does it mean to qualify for the Pradaxa contract?

25  A.  They have a Pradaxa-matched physician that has been added

1    to the network.

2    Q.  That would mean matched to the list that Pradaxa gave for

3    the list-match?

4    A.  That's correct.

5    Q.  Let's pull up demonstrative 1133-G, please.

6            What are we looking at here, Mr. Ketchum, in 1133-G?

7    A.  It's a chart that is showing the Pradaxa installations

8    compared to the contracted amount over a period of time.

9    Q.  And what was the contracted amount over that time?

10   A.  1,819.

11   Q.  And so far, between April and July, has Outcome achieved

12   the 1,819 offices?

13   A.  Nope.

14   Q.  How far short were they in July?

15   A.  800.

16   Q.  Let's look at 1133-H as a demonstrative, please.

17           And Mr. Ketchum, can you describe to the jury what

18   we're looking at here?

19   A.  It's a graph that shows the contracted amount compared

20   with the actual installations.  The blue line represents the

21   contracted amount and the red Xs represent the actual

22   installations over time in the Outcome Health Network.

23   Q.  Let's go to Exhibit 257 which we're offering under

24   (d)(2)(E).

25           THE COURT:  It's admitted.

1        (Exhibit admitted into evidence.)

2   BY MR. HANKEY:

3   Q.  Okay.  And this is -- this is still on Pradaxa, a slightly

4   different topic.  So it's actually -- before we get to this,

5   I'd like to circle back to 235 because there's a question I

6   forgot to ask you, Mr. Ketchum.  This is the e-mail that we

7   were looking at regarding the Xeralta list-match.  Do you

8   remember that?

9   A.  Yes.

10  Q.  And in the middle e-mail, if we can pull up "so we can go

11  two routes with --" yeah, "two routes with this."  And then

12  one and two.

13         This is Ms. Agarwal's e-mail; right?

14  A.  Yes.

15  Q.  Do you see where she writes:  "Now if Pradaxa renews for

16  1,800 and wants to do a new list-match (anticipating growth

17  during this year) we are way overstretched."

18         Do you see that?

19  A.  Yes.

20  Q.  Do you have an understanding of what that means?

21  A.  I do.

22  Q.  And can you explain that, please?

23  A.  If Pradaxa -- yes.  The note says if Pradaxa wants to

24  renew for the contracted amount that they had purchased for

25  the prior year for the next year, and they want to do a new

1   list-match, that Outcome Health is going to be -- it's going
2   to be very difficult to achieve that because they already not
3   achieved the prior contract.
4   Q.  Why -- what does it mean "anticipating growth during this
5   year"?  What does that refer to?
6   A.  The projection that Pradaxa received included growth, but
7   they didn't know it included growth.  So Pradaxa is expecting
8   the Outcome Health Network to grow during the course of that
9   year.  But if they find that there was no growth, that would
10  look odd.
11  Q.  How would -- can you explain some more.  How would Pradaxa
12  in this context expect there to be growth during this year?
13  A.  Sure.  So at the start of the year, Pradaxa was told that
14  there was 1,819 offices that matched their list that their
15  advertisement could run on.  If going into the next year they
16  ask how many offices are available that are matched to the
17  list and the number doesn't change, they're going to ask,
18  didn't you -- didn't you grow at all this year?  We thought
19  Outcome Health was a growing company.
20  Q.  Okay.  Now, we can go to Exhibit 257 offered under
21  (d)(2)(E).
22          THE COURT:  It's admitted.
23        (Exhibit admitted into evidence.)
24  BY MR. HANKEY:
25  Q.  All right.  Let's start with July 30, 2013, e-mail from

1    Ms. Agarwal at 9:24 a.m.

2         Do you see an e-mail from July 30, 2013, from

3    Ms. Agarwal to Ashik?

4    A.  Yes.

5    Q.  Who is Ashik?

6    A.  Ashik Desai was about to be an employee at Outcome Health.

7    Q.  Can you read the first paragraph of her e-mail?

8    A.  "Hey, Ashik.  I'm designating you internal project manager

9    on the following research projects, all of which are due ASAP,

10   but I've listed in order of importance.  Jason is coordinating

11   externally, Jim does contracting, and Rishi is the internal

12   point person for any questions on them."

13   Q.  She refers to a series of research projects.  What

14   research projects -- what do you understand her to mean by

15   research projects?

16   A.  ROI studies.

17   Q.  And then does she list six specific studies after that?

18   A.  Yes.

19   Q.  Now, who did Ms. Agarwal tell Mr. Desai to go to if he had

20   any questions about doing ROI studies?

21   A.  Rishi.

22   Q.  Is that where she writes:  "Rishi is the internal point

23   person for any Qs on them"?

24   A.  Yes.

25   Q.  And let's go to your e-mail at 9:52 a.m.

1              Can you read what you wrote in response to

2      Ms. Agarwal's e-mail?

3      A.  Yes.  "SA - we still need to have the Pradaxa methodology

4      call, on the previously scheduled one, Pradaxa was a no-show."

5      Q.  What was that Pradaxa methodology call that you're

6      referring to?

7      A.  It was a call that was supposed to take place between

8      Outcome Health and the Pradaxa team to talk through and agree

9      on the methodology for a return on investment study.

10     Q.  Let's look at Ms. Agarwal's response.  What does she

11     write?

12     A.  "Jay, we don't actually need another 13-person methodology

13     call, given we did that in January already.  Bob needs to

14     schedule a one-on-one between Greg, the research lead at BI

15     and RS."  Rishi Shah.

16     Q.  And then let's look at the next e-mail in the string.

17             And this is an e-mail from you to Ms. Agarwal,

18     copying Ashik Desai and Rishi Shah?

19     A.  Yes.

20     Q.  Can you read what she wrote?

21     A.  "Exactly, so we can go in strong so they rely on only us

22     and don't worry about doing an internal measurement."

23     Q.  What is an internal measurement?

24     A.  That they would do their own return-on-investment

25     analysis.

1    Q.  By "they," who are you referring to?

2    A.  The client.  BI.

3    Q.  As opposed to?

4    A.  IMS or one of our -- one of the partners that Outcome

5    Health worked with.

6    Q.  How would the client go about doing their own internal

7    measurement?

8    A.  I would imagine they would use the test and control list

9    similar to IMS or one of the other companies that would do ROI

10   studies.

11         MR. BLEGEN:  Objection.  Did he say I imagine?  I

12   think he's speculating.

13         MR. HANKEY:  Next questions will be more concrete,

14   your Honor.

15         THE COURT:  All right.  Well, let's strike the last

16   answer and ask a question where he can testify from certainty,

17   or near certainty, rather than "I imagine."

18         MR. HANKEY:  Yes.

19         THE COURT:  May have just been the phrase he used,

20   but we'll strike the answer, and you can re-ask it.

21         MR. HANKEY:  Yes.

22   BY MR. HANKEY:

23   Q.  Mr. Ketchum, did you observe situations where clients ran

24   internal measurement studies --

25   A.  Yes.

1  Q.  -- themselves?

2  A.  Yes.

3  Q.  And in -- how did you -- in 2012 and 2013, how did you

4  observe those clients doing those internal measurements?  How

5  did you become aware that they would do them?

6  A.  I saw the e-mail exchanges.

7  Q.  And in those e-mail exchanges, did you get -- gain any

8  knowledge of generally how the clients would go about

9  performing those internal studies?

10  A.  Yes.  Similar to how IMS would do it, with a

11  test-and-control group.

12  Q.  And -- well, then, let's look at your e-mail here,

13  Mr. Ketchum.  You wrote:  "So we can go in strong so they rely

14  on only us and don't worry about doing an internal

15  measurement."

16        When you say "they" rely, who are you referring to

17  with "they"?

18  A.  The client.

19  Q.  Is this what you understood the objective to be in having

20  this one-on-one with the internal person at Pradaxa about the

21  study?

22  A.  I did.

23  Q.  Was that your objective alone?

24  A.  No.

25  Q.  Did you believe it was the group's objective?

1  A.  Yes.

2  Q.  Why would that benefit Outcome for Pradaxa not to do their

3  own internal measurement and instead allow Outcome to hire IMS

4  or someone else do it?

5  A.  If Pradaxa did their own analysis, a few things might pop

6  up.  One, the cherry-picking filtering system that we

7  previously discussed likely would not be used.  And, two, they

8  would have to measure all of the physicians that were included

9  in those projections, including physicians who did not receive

10  the advertisement.

11        MR. HANKEY:  Your Honor, the next exhibit would be

12  admitted for effect on the listener.  It's Exhibit 71 --

13  excuse me, Exhibit 264.

14        THE COURT:  All right.  Not for the truth of the

15  information contained in it; correct?

16        MR. HANKEY:  Correct.

17        THE COURT:  All right.

18        Ladies and gentlemen, this -- is there any objection?

19        MR. BLEGEN:  Can they put it up on the screen?

20        THE COURT:  Sure, we'll put it up just for the

21  attorneys.  Hang on.

22        MR. HANKEY:  This is 264.

23        MR. HUESTON:  No objection.

24        THE COURT:  All right.  It's admitted for that

25  purpose.

1           Ladies and gentlemen, its not for the truth of what's
2    on the document but the effect on the listener who presumably
3    is the witness.  Correct?  Or on the --
4           MR. HANKEY:  The defendants.
5           THE COURT:  Effect on the defendants.
6           MR. HANKEY:  Yes.
7           THE COURT:  All right.  For that purpose, it's
8    admitted, and I'll display it to the jury.
9        (Exhibited admitted into evidence.)
10   BY MR. HANKEY:
11   Q.  Okay.  Let's focus on the first e-mail in this string, the
12   one from Greg Lane at 1:36 p.m.  And let's blow it up all the
13   way down to below Mr. Lane's signature there.
14          We'll blow it up some more in a minute, but can you
15   see Greg Lane's signature and his title?
16   A.  Yes.
17   Q.  What was his title?
18   A.  Associate Director, Business Analytics.
19   Q.  And where did he work?
20   A.  He worked at Boehringer-Ingelheim.
21   Q.  And what relation did Boehringer-Ingelheim have to this
22   Pradaxa campaign?
23   A.  It was the manufacturer of -- it was the pharmaceutical
24   company that owned Pradaxa.
25   Q.  Okay.  Let's go back to the doc, but then just blow up

1  this e-mail starting with the header and going through the
2  first paragraph of the e-mail, please.
3          Can you read Mr. Lane's e-mail?
4  A.  "Hi Bob, thanks for your patience.  May I suggest that
5  just you and I talk on Thursday, 8/8 at 10:00 a.m.  We at BI
6  have internalized the ROI process, and I would like to explain
7  the specifics and reasoning directly to you.  Paula is aligned
8  on this decision."
9  Q.  And BI is -- again, that's short for Boehringer-Ingelheim?
10 A.  Yes.
11 Q.  What did it mean for BI to internalize the ROI process?
12 A.  That they believe they understand how they want to perform
13 the return-on-investment analysis.
14 Q.  Now, let's pop back out, and then I'll let you finish
15 reading his e-mail.  If you can expand the rest of Mr. Lane's
16 e-mail, please.
17         Can you read that please, Mr. Ketchum?
18 A.  "If this timing is good, I will set up a conference call.
19         "Above said, I am highly enthused about an in-office
20 point-of-care programs such as ContextMedia's and hope we can
21 work together to ensure proper ROI measurement of the Pradaxa
22 program now underway."
23 Q.  Now, is this internalization of the ROI process within BI
24 a potential problem for Outcome?
25 A.  Yes.

1  Q.  The same set of problems you just described?

2  A.  Yes.

3          MR. HANKEY:  Your Honor, the government -- well,

4  let's actually -- let's look -- I'm sorry, let's go back to

5  that.  Let's look at the top e-mail, just so we can see it.

6  BY MR. HANKEY:

7  Q.  And do you see that Mr. Mons forwards the e-mail?

8  A.  Yes.

9  Q.  To whom did he forward it to?

10  A.  To Shradha Agarwal and Rishi Shah.

11  Q.  Did he copy anyone?

12  A.  Yes.  Ashik Desai and myself.

13  Q.  Okay.  The next exhibit, your Honor, we're offering for

14  effect on the listener as well.  277.

15          THE COURT:  All right.  Display it just to the

16  attorneys.

17          MR. HUESTON:  No objection.

18          THE COURT:  All right.  And I'll assume that one of

19  you speaks for all of you, unless I hear otherwise.

20          All right.  It's admitted not for the truth of what's

21  contained in the document but for the effect on the people

22  that saw it.

23  BY MR. HANKEY:

24  Q.  Okay.  Let's start at the bottom of this page, the e-mail

25  from Bob Mons at 5:23.  Is this e-mail on July 11th to Lyndon

1   Chin and Thomas Coyle?

2   A.  Yes.

3   Q.  Again, they're at RJ Palmer, which is the media agency

4   that represents Pradaxa?

5   A.  Yes.

6   Q.  Can you read Mr. Mons' e-mail?

7   A.  "Lyndon - per our chat today, we ran deciles 4 through 10

8   against 2013 target list and matched 3,449 physician

9   practices, 2,668 waiting rooms.  See option B in attached

10  proposal."

11          "It was great seeing you and Tom today.  Red Eye is

12  one of my favorites!  Thanks for making time!  Please let me

13  know if there is anything else you guys need?"

14  Q.  Okay.  So that e-mail relates to a new list-match that was

15  being done for the Pradaxa brand?

16  A.  Yes.

17  Q.  This wouldn't relate to this 2013 campaign we've been

18  talking about; correct?

19  A.  No.

20  Q.  Or it wouldn't be for the current 2013 campaign we're

21  talking about; correct?

22  A.  That's correct.

23  Q.  Now, let's look at the next e-mail in this string.  We

24  could just blow it up through "Jason suggested to start."

25          Now, what does Mr. Mons do with the e-mail that he

1  sent to RJ Palmer?

2  A.  He sent it along to myself, Rishi and Ashik.

3  Q.  And then can you read what he writes to you in forwarding

4  it to you?

5  A.  "Latest Pradaxa proposal options for 2014.  We ran deciles

6  4 through 10 against 2013 target list, matched 3,449 physician

7  practices, 2,668 waiting rooms.  See option B in attached

8  proposal.

9        "Question from RJP today, need to respond ASAP.

10  Breakout of the doctors in the Pradaxa list that ContextMedia

11  covered in the 2013 POC plan, 3,200 physicians.  Could you

12  give us a breakout of cardiologists versus PCPs?  Jason

13  suggested I check with SA, she's at a wedding out of touch,

14  before I sent anything."

15  Q.  Now, when he refers to a question from RJP, that's

16  RJ Palmer; correct?

17  A.  Correct.

18  Q.  Lyndon Chin and Tom Coyle?

19  A.  Yes.

20  Q.  Okay.  And they ask for "a breakout of the doctors in the

21  Pradaxa list that ContextMedia covered in the 2013 POC plan,

22  the 3,200 physicians.  Could you give us a breakout of cards

23  versus PCP."

24        So when he's referring to the 2013 POC plan, what's

25  he referring to there?

1  A.  The program they ran in 2013.

2  Q.  And when he's asking for a breakout of cards versus PCPs,

3  what's that referring to?

4  A.  Physicians or cardiologists who are primary care

5  providers.

6  Q.  Now, Mr. Ketchum, did this request from the Pradaxa client

7  pose a problem for Outcome?

8  A.  Yes.

9  Q.  What was the problem?

10  A.  There was an under-delivery, so there's essentially no way

11  that a list of physicians that were installed could accurately

12  be sent to the client.

13  Q.  Let's look at -- why don't we just finish reviewing this

14  e-mail so we can see what else was written in it.  Let's blow

15  up the rest.

16          Can you read the rest of the e-mail from Mr. Mons?

17  A.  "My understanding is about six percent of our Pradaxa

18  sites are cardiologists, but if there are multiple HCPs per

19  location, perhaps we can show a higher number by stating it

20  this way:

21          Cardiology practice HCPs =

22          Primary care practice HCPs =

23          Internal medicine practice HCPs =

24          "We've never told them a specific number of

25  cardiologists.  Our criteria for cardio network are practices

1  that index high for prescriptions that are for

2  cardiology-related scripts, such as statins, thinners and

3  a-fib drugs."

4  Q.  Now, is Mr. Mons suggesting, instead of sending a list

5  back, just sending a -- maybe numbers of doctors that fit

6  these various categories?

7  A.  Yes.

8  Q.  Even then, is there a problem with doing that under the

9  circumstances of what was happening?

10  A.  Yes.

11  Q.  Why would that be difficult?

12  A.  The numbers would be inaccurate because, again, there was

13  a shortfall.

14  Q.  And just to expand on that, why would the fact that

15  there's a shortfall create inaccurate numbers?

16  A.  Because you would have to include those projections which

17  aren't actually offices that are installed or physicians that

18  are installed.

19  Q.  Okay.  Let's look at Exhibit 276, which we're offering

20  under (d)(2)(E).

21           THE COURT:  It's admitted.

22        (Exhibit admitted into evidence.)

23  BY MR. HANKEY:

24  Q.  Does it appear that Mr. Shah responded to Mr. Mons'

25  e-mail?

1  A.  Yes.

2  Q.  Let's just expand that Rishi Shah e-mail at the very top,

3  the entire thing.

4          Can you read the first paragraph of Mr. Shah's

5  response?

6  A.  "Hi, guys.  My sense is it's best to jump simply to --"

7          I believe it's "just simply reply."

8          "-- with a percent of the physicians that are

9  cardios.  This percent will be very low.  It sounds like six

10  percent.  I'll check with Ashik and/or Jay and have them pull

11  a final number so we can reply to the agency.

12          "The number they're referencing was against a

13  projection we ran based on growth, so I don't want to get into

14  a back-and-forth on numbers there, as I think it will be

15  simpler to just reply with a percent on cardios.  We can note

16  that it may substantially increase in 2014 as we grow a

17  dedicated cardio network, but for now we focused on PCPs that

18  are that high writers of cardovascular drugs as a proxy for

19  building a targeted heart health network."

20  Q.  Okay.  And, now, whose copied on Mr. Shah's e-mail here?

21  A.  It's sent to Bob Mons, and copied is myself, Ashik Desai

22  and Shradha Agarwal.

23  Q.  Looking at the first sentence of the second paragraph, you

24  see where Mr. Shah wrote:  "The number they're referencing was

25  against a projection"?

1  A.  Yes.

2  Q.  What did that mean to you?

3  A.  That Rishi is highlighting to the group that the number

4  Pradaxa is asking to have broken out was originally based on a

5  projection.

6  Q.  Now, Mr. Ketchum, was this one of the times when Shah was

7  open with Mr. Mons about having used a projection in a

8  list-match?

9  A.  Yes.

10 Q.  And to your knowledge, was Mr. Mons aware of the

11 projection up until this point?

12 A.  To my knowledge, no.

13 Q.  What is different about this situation as compared to when

14 you, Agarwal, and Shah were preparing a list-match to provide

15 to Mr. Mons?

16 A.  In this instance, Mr. Mons is aware that there's a

17 projection.  Previously he was unaware there was a projection.

18 Q.  Now, in this e-mail, and take a moment to look at it just

19 to be accurate, but do you see anything in this e-mail in

20 which Mr. Shah is telling Mr. Mons to inform the client of the

21 fact that there was a projection?

22 A.  I'll take a moment.

23        It does not appear that way.

24 Q.  Do you see where Mr. Shah writes:  "The number they're

25 referencing was against a projection we ran based on growth,

1  so I don't want to get into a back-and-forth on numbers there,
2  as I think it will be simpler to just reply with a percent of
3  cardios"?
4  A.  Yes.
5  Q.  Let's look at Exhibit 275, which we're offering under
6  (d)(2)(E).
7          THE COURT:  It's admitted.
8        (Exhibit admitted into evidence.)
9  BY MR. HANKEY:
10 Q.  Now, is 275 another iteration of -- or another response to
11 the same Bob Mons e-mail that kind of kicked these last couple
12 e-mails off?
13 A.  Yes.
14 Q.  Can we zoom in on this additional response by Mr. Shah to
15 Mr. Mons' e-mail.
16          It's August 8th, so it's the same day as the last one
17 we looked at, Mr. Ketchum?
18 A.  Yes.
19 Q.  Whose copied on this e-mail?
20 A.  Ashik -- oh, Shradha Agarwal is copied on it.  It's sent
21 to Ashik Desai and myself.
22 Q.  Is Mr. Mons copied on this one?
23 A.  Nope.
24 Q.  Can you read the first paragraph of Mr. Shah's e-mail?
25 A.  "Hey, Ashik and Jay - What percent of our Pradaxa-matched

1    physicians are cardios versus PCPs?  I think we should find
2    that and just run have one of you send that to Bob."
3    Q.  Can you continue reading the next paragraph.
4    A.  "Also, can you explain to me where the 3,200 number
5    they're referencing is coming from?  Is that the number of
6    physicians that we projected matching to the Pradaxa list last
7    year?  It looks too big to be the case.  I suspect it's the
8    total number of HCPs in offices with matched physicians?  But
9    if I can get an update with exactly what was sold to them in
10   terms of offices, matched HCPs and total HCPs, that would be
11   helpful, along with a number of offices, matched HCPs and
12   total HCPs that we currently have.
13          "From speaking to Ashik this a.m., it sounds like
14   we'll be okay giving them a list of physicians with dates of
15   the program start and they'll do time alignment on their end."
16   Q.  Now, in that last sentence that you just read that begins
17   "from speaking to Ashik this a.m.," what was Mr. Shah talking
18   about there?
19   A.  That Rishi and Ashik had a conversation that morning.
20   Q.  Okay.  So further up in the e-mail, he's talking about
21   providing the percentage of cardios versus PCPs, or at least
22   responding to that question?
23   A.  Yes.
24   Q.  But the last paragraph appears to be related to a
25   different -- a different topic on the Pradaxa campaign?

1  A.  Yes.

2  Q.  He writes:  "We'll be okay giving them a list of

3  physicians."

4           Who does he appear to be referring to there?

5  A.  The client.

6  Q.  Why would the client need a list of physicians?

7  A.  To perform an ROI study.

8  Q.  Could providing a list of physicians with dates of the

9  program start be a problem for Outcome?

10  A.  Yes.

11  Q.  And why is that?

12  A.  Because there was under-delivery.  So it would be

13  difficult to send an accurate list of physicians without

14  alerting the client that there was an under-delivery.

15  Q.  And by "accurate," do you mean truthful?

16  A.  Yes.

17  Q.  Why did Shah need to send a list of physicians with the

18  program start on it, though?

19  A.  Because to effectively measure a program, you have to know

20  when that doctor first started to receive the programming.

21  Q.  And why is that?

22  A.  Because that's -- that's when the measurement can actually

23  start.

24  Q.  And if the measurement started before the doctor was

25  receiving the program, what might happen to the study?

1   A.  It wouldn't perform as well.

2   Q.  The results wouldn't come out as well as they otherwise

3   would?

4   A.  Correct.

5   Q.  Now, before we move off this, I just want to compare this

6   e-mail.  So if we leave this 275 up but pull up the last one

7   we looked at, 276.  And 275 is the one we just reviewed,

8   that's on the left.  Mr. Mons is not copied on it.  How much

9   longer -- how much time had elapsed between the e-mail that

10  Mr. Mons was copied on by Mr. Shah and the one that we just

11  reviewed?

12  A.  About four minutes.

13  Q.  Now, let's look at Exhibit 284, which we're offering under

14  (d)(2)(E).

15          THE COURT:  It's admitted.

16      (Exhibit admitted into evidence.)

17  BY MR. HANKEY:

18  Q.  I want to focus on -- why don't we start at the bottom of

19  this e-mail string.  So start with the very first e-mail in

20  the string.

21          Whose sending the e-mail?

22  A.  Ashik Desai.

23  Q.  Had Mr. Desai started at the company by this time?

24  A.  Yes.

25  Q.  And roughly how long had he been there?

1   A.   Almost a month.

2   Q.   Can you read what Mr. Desai wrote to you?

3   A.   "Hey Jay, working through this SOW for the Pradaxa study.

4   Any thoughts on how we should segment this study?

5          "1st segment:  Run analysis test period from April

6   through June (as ad spot went black on July 15) and then one

7   from April through August.

8          "2nd segment:  Decile?  Let me know if you want to

9   chat on this."

10  Q.   Now, he's referring to a statement of -- or SOW for the

11  Pradaxa work study.  What does SOW stand for?

12  A.   Statement of work.

13  Q.   Now, let's look at the next e-mail in the string.  Do you

14  reply?

15  A.   I do.

16  Q.   What do you write back?

17  A.   I say:  "Hey, bud, let me think about this for a bit.

18  I'll get back to you shortly."

19  Q.   Okay.  And then what does Mr. Desai write in response?

20  A.   "Cool!  Thanks, Jay.  Once we get these defined we can go

21  ahead and start the analysis."

22  Q.   Let's stop there.  So what's Mr. Desai talking about in

23  that first sentence?

24  A.   The Pradaxa study.

25  Q.   Who would be conducting that Pradaxa study that he is

1  talking about there?

2  A.  I believe that would be BI.

3  Q.  Okay.  He referred to an SOW.  Would there be an SOW in

4  place if BI were doing the study?

5  A.  Potentially, yes.

6  Q.  Potentially?  Okay.  Well, let's go to the next paragraph.

7  And start reading at "Spoke to RS."

8  A.  "Spoke to RS on the Pradaxa list.  He had a good idea on

9  how to do it.  We can walk through it on Thursday, but I do

10  think it will help us to cover our bases.  In the end we are

11  open to being honest if it's caught, but given the lack of

12  communication between research and brand teams, I think this

13  will be highly unlikely."

14  Q.  Now, the last e-mail that we looked at at Government's

15  Exhibit 275, that was sent on August 8th; correct?

16  A.  Yes.

17  Q.  And that related to, at least in part, to the internalized

18  Pradaxa study at BI?

19  A.  Yes.

20  Q.  How long had elapsed to this exhibit from the last one we

21  looked at?

22  A.  Just a few weeks.

23  Q.  How long had Mr. -- well, you testified earlier that

24  Mr. Desai had been an employee of Outcome at this point for

25  nearly a month?

1  A.  Yes.

2  Q.  Now, when Mr. Desai wrote "In the end we are open to being

3  honest if it's caught," what would you understand that to

4  mean?

5  A.  That Outcome Health would tell the client there was a

6  shortfall.

7  Q.  They would tell the client under what circumstances?

8  A.  If the client catches it.

9  Q.  Catches?

10  A.  That there's a shortfall.

11  Q.  And by shortfall, what are you referring to?

12  A.  That the contract was not met.

13  Q.  How could that shortfall be caught under these

14  circumstances?

15  A.  Because the list that would be sent to Pradaxa for

16  analysis would not include the projections.

17  Q.  Is that -- we looked at that earlier e-mail where it said

18  that it would provide time alignment?

19  A.  Correct.

20  Q.  Now, can you read after "open to being honest if it's

21  caught," can you continue reading the rest of that sentence?

22  A.  "But given the lack of communication between research and

23  brand teams, I think this will be highly unlikely."

24  Q.  What did you understand that to mean?

25  A.  That Ashik did not think that the client would see that

1  there was a shortfall.

2  Q.  Now, Mr. Desai says that "we are open to being honest."

3  What did you understand that to mean?

4  A.  That Outcome Health would tell the client there was a

5  shortfall, if necessary.

6  Q.  And what is the opposite of being honest?

7  A.  Not being truthful.  Lying.

8  Q.  And when he is referring to "we are open," who is he

9  referring to?  Who did you understand that to mean?

10  A.  Outcome Health.

11  Q.  When he talks about a research team and a brand team,

12  what's the brand team?

13  A.  The brand team is the team that actually works either for

14  the client or for the agency but working on -- working on the

15  brand itself.  So those who are actually working on Pradaxa.

16  Q.  And when you say -- use the term "working on," can you

17  kind of be a little bit more specific, the types of job duties

18  they would have vis-à-vis this campaign?

19  A.  Yeah, they would be responsible -- so the Pradaxa brand

20  team in this context would be the team that -- whose

21  responsibility it is to make sure that Pradaxa is successful

22  in its media spent in this context.

23  Q.  And then he refers to a research team.  What would you

24  understand the research team to be?

25  A.  The team that does analysis for not just the brand but

1   for -- for all of the pharmaceutical brands of that company.

2   Q.  Now, when Desai refers to a lack of communication between

3   those teams, what is Desai suggesting might end up playing

4   out?

5   A.  That because the two teams, the research team and the

6   brand team at the particular client, don't communicate very

7   well, that they may not communicate that they see a shortfall.

8   So if the research team has a list and they -- they may not

9   realize that the list is smaller than what it should be.

10  Q.  Was Desai saying that he thought that Outcome would be

11  caught?

12  A.  No.  He thought it was unlikely.

13  Q.  If Outcome wasn't caught, do you see anything in this

14  e-mail saying that Shah and Desai would be open and honest

15  with the Pradaxa client if Outcome wasn't caught?

16  A.  No.

17  Q.  Let's look at Exhibit 302, which is being offered under

18  (d)(2)(E).

19          THE COURT:  It will be admitted.

20          (Exhibit admitted into evidence.)

21  BY MR. HANKEY:

22  Q.  I want to focus you in on the top e-mail on --

23          MR. HUESTON:  Your Honor, on the last e-mail, I know

24  this is a little late.  I just want to make sure it's clear

25  that that is coming in not for the truth of the matter

1    asserted but as a hearsay statement.

2          THE COURT:  Well, was that -- what was the --

3          MR. HANKEY:  Can we put it back up on the screen for

4    the --

5          THE COURT:  Yeah.

6          MR. HANKEY:  Your Honor, given the --

7          THE COURT:  Yeah, given the parties, I'm going to

8    admit it substantively as a statement under (d)(2), overruling

9    your objection.

10         Proceed.

11   BY MR. HANKEY:

12   Q.  Now, we're looking at Exhibit 302.  Do you see that on the

13   screen, Mr. Ketchum?

14   A.  Yes.

15   Q.  And can we zoom in on the top two e-mails, please,

16   Ms. Paul.

17         What do you -- this -- actually, I'm sorry, why don't

18   I give you a little more context, Mr. Ketchum.

19         So we should start -- let's start at the bottom of

20   this.  Let's go to the second page.  Let's start with the

21   e-mail from Mr. Purdy.

22         Can you read what he wrote?

23   A.  "Did you see my message last night?  What is the

24   difference between the approximately 1K Pradaxa offices you

25   told me in IM we had versus the 1,450 Heart Health Network

1   offices in the MS report?"

2   Q.  And what did you reply with?

3   A.  "Offices requesting cardio content are added to the Heart

4   Health Network, or if they have a cardiologist on staff.  But

5   that doesn't necessarily mean they are on the Pradaxa target

6   list."

7   Q.  And then let's go to the next e-mail.

8          What did Mr. Purdy write back?

9   A.  "Can you send me the number of offices for the past six

10  months here?"

11  Q.  And then the next one, what did you reply?

12  A.  "602 Heart Health Network screens including installed and

13  MS pipeline have been created (so input on the member side)

14  since 3/1."

15         "138 don't appear to have a Pradaxa qualified

16  prescriber.  This would appear to be due to 1) the office

17  qualified as part of a healthcare system.  2) the office was

18  on an expanded list where they were top decile on the list,

19  but not on Pradaxa.  3) there is a rheumatologist on staff.

20  4) Endocrinologist on staff.  5) Special approval from Rishi."

21  Q.  Okay.  And then let's go to the next e-mail.  What did

22  Mr. Purdy write back?

23  A.  "Sorry, I meant the total number of Pradaxa offices at

24  each end-of-month period."

25  Q.  And then what did you reply with?

1    A.   "BWP - These are the screen counts."

2    Q.   Then, finally, what did Mr. Purdy write back to you?

3    A.   "Sorry for the back-and-forth here.  I want total

4    installed Pradaxa screens at the end of each month."

5    Q.   Okay.  So it looks like there was a little bit of

6    miscommunication between you and Mr. Purdy here?

7    A.   It seems that way.

8    Q.   Did that happen from time to time?

9    A.   Of course.

10   Q.   Okay.  Let's look at the screen counts that you provided

11   to Mr. Purdy.

12        Based on this information, did it appear as though

13   Outcome had reached its 1,819 contracted amount of screens for

14   Pradaxa by September 2013?

15   A.   No.

16   Q.   I'm going to show you -- let's go to Exhibit 331.  Hold up

17   on pulling it up.

18        We're offering 331 as a business record and also for

19   effect on the listener, your Honor.

20        THE COURT:  It will be admitted.

21     (Exhibit admitted into evidence.)

22   BY MR. HANKEY:

23   Q.   Now, looking at 331, are you on this e-mail, Mr. Ketchum?

24   A.   No.

25   Q.   Okay.  So without describing what's being said, I'd like

1   you to read the first e-mail, please.

2   A.  "Can you confirm how many sites currently have Pradaxa

3   running?"

4   Q.  That was sent by whom?

5   A.  Brad Purdy.

6   Q.  On what date?

7   A.  October 7, 2013.

8   Q.  Then what is the reply?  Who replies to his e-mail?

9   A.  Travis Kemp.

10  Q.  On the same date?

11  A.  It looks like it, yes.

12  Q.  What did he write?

13  A.  "964 is the list I have."

14  Q.  And then the next e-mail?

15  A.  "Thanks, TK."

16  Q.  Who wrote that?

17  A.  Brad Purdy.

18  Q.  To whom?

19  A.  Travis Kemp.

20  Q.  All right.  And then, Mr. Ketchum, what was, again, the

21  number of offices that Outcome was obligated to give to

22  Pradaxa under its contract in October of 2013?

23  A.  1,819.

24  Q.  And that contract required that number of offices to be

25  provided each month?

1    A.   Yes.

2    Q.   Let's look at demonstrative 1133-I, please.

3         What do we see here on 1133-I, Mr. Ketchum?

4    A.   That's the chart that's detailing the Pradaxa

5    installations by month with the contracted amount and the

6    actual installations.

7    Q.   So between the months of April and August 2013, had

8    Outcome achieved 1,819 Pradaxa offices in any of those months?

9    A.   No.

10   Q.   Now, if we go to 1133-J, what do we see depicted there in

11   that demonstrative?

12   A.   It's the contracted amount for Pradaxa.  And the red Xs

13   represent the actual installations delivered by Outcome

14   Health.

15   Q.   Now, looking at -- we saw an e-mail earlier, right, where

16   there was a suggestion by Ms. Agarwal through you to Mr. Shah

17   that the Pradaxa contract was a weighted average delivery

18   contract.  Do you recall seeing that?

19   A.   I do.

20   Q.   Let's pull up the demonstrative exhibit GX1133-K.

21        Now, does this demonstrative look similar to another

22   one that we've been looking at from time to time?

23   A.   It does.

24   Q.   Can you explain what we see here, starting with the blue

25   boxes and the arrows.  What are those pointing out?

1  A.  So the overall chart represents what a weighted average

2  campaign -- successful weighted average campaign would look

3  like for Pradaxa if it were a weighted average.  The 708

4  number that you see in the blue box on the bottom left

5  represents the number that Outcome Health started with for

6  Pradaxa installations.

7  Q.  On what date or what month?

8  A.  April, 2013.  The 1,819 that you see in the blue box on

9  the left-hand side above the 708 represents the number that

10  was contracted for.  The blue box in the upper right, 2930,

11  represents the ending value.  And what that means is, the red

12  that you see on the bottom left, if you recall in my testimony

13  yesterday when we talked about this a bit, the red in the

14  bottom left represents how short the Outcome Health Network

15  was for the 1,819.  So if it was a weighted average, that

16  shortfall would have to be made up on the other side, which is

17  represented by the green.  So almost -- approximately, it

18  looks like, 2,930, or so, offices would have to be installed

19  by the end of the year to achieve a weighted average of 1,819.

20  Q.  Now, Mr. Ketchum, you didn't create this chart; correct?

21  A.  Nope.

22  Q.  But you understand this chart to display a -- just an

23  assumption that there's going to be constant growth from that

24  708 value in April through the end of the campaign; is that

25  correct?

1  A.  Yes, the -- the dotted line -- it does show or assume
2  constant growth.
3  Q.  And that doesn't necessarily have to be the case?
4  A.  Absolutely not.
5  Q.  Growth cost faster than that?
6  A.  Yeah, growth can sort of skip a -- you know, be higher in
7  some months and lower in other months.
8  Q.  And so that 2,930 value, that's an approximate value, but
9  assuming that there's, you know, kind of constant growth
10 across the campaign?
11 A.  Yes.
12 Q.  But does that change the fact that if you have a weighted
13 average contract and you have under-delivery, you still have
14 to make up for the over-delivery at some point during the
15 contract?
16 A.  That's correct.
17 Q.  Is that what the red and the green depict here?
18 A.  Correct.
19 Q.  Now let's look at demonstrative exhibit GX1133-L.
20      What are we looking at here, Mr. Ketchum?
21 A.  This is a chart that shows the same weighted average
22 concept from the prior chart.  But this chart includes the
23 actual installations month by month that Outcome Health
24 delivered.
25 Q.  And where do we see -- can you describe on the chart where

1  the actual installations are falling in comparison to where

2  they would need to fall if there was constant growth in the

3  first half of the campaign?

4  A.  The red Xs would be going -- would be going up and to the

5  right.

6  Q.  Okay.  Well, where -- just looking historically from April

7  through August, how was Outcome doing in achieving

8  weighted-average delivery across the campaign, if -- if that

9  were the way this campaign could be delivered?

10  A.  Thus far unsuccessful because it was no where near even

11  achieving the 1,819 number, let alone surpassing it.

12  Q.  What would have to happen starting in August if the

13  company wanted to have any chance of delivering this contract

14  on a weighted average basis?

15  A.  It would have to sell -- sell and install almost 2,000

16  offices from September through the end of the year.

17  Q.  And at this point in time, roughly how many offices total

18  did the company have?

19  A.  A little over 2,000, I believe.

20  Q.  Across all of its networks?

21  A.  Yes.

22  Q.  And how long had the company been in existence?

23  A.  Since 2006, if I recall.

24  Q.  Now, Mr. Ketchum, was there -- to your knowledge, was

25  there any process in place on the Pradaxa campaign to account

1  for or evaluate whether this contract was achieving a weighted
2  average level of delivery?
3  A.  I'm not sure I understand the question.
4  Q.  Yeah.  So if you have -- if you have a -- let's just kind
5  of talk about a hypothetical weighted average.
6          THE COURT:  Do you need this exhibit up?  Otherwise,
7  I'm going to switch to the witness.
8          MR. HANKEY:  Can you leave it up just one more
9  minute?
10         THE COURT:  I'll leave it up as long as you want if
11  you're going to ask questions about it.  Go ahead.
12         MR. HANKEY:  Okay.
13  BY MR. HANKEY:
14  Q.  So if you have a weighted average delivery contract, how
15  would a company know where it is along the way in achieving
16  its weighted-average delivery?
17  A.  To my knowledge, there was nothing like that.
18  Q.  There was nothing at Outcome to account for that over
19  time?
20  A.  Not that I was aware of.
21  Q.  On the Pradaxa campaign?
22  A.  Correct.  Not that I was aware of.
23  Q.  And were you aware of that happening anywhere else in the
24  company?
25  A.  No.

1  Q.  Are you saying that it never happened, or you just weren't

2  aware of it happening?

3  A.  Just wasn't aware of it happening.

4  Q.  You had never been asked to account for that on any of the

5  campaigns?

6  A.  No.

7  Q.  Let's look at Exhibit 1095, which we're offering --

8  invoices we're offering as business records.

9          THE COURT:  They're admitted.

10         (Exhibit admitted into evidence.)

11  BY MR. HANKEY:

12  Q.  Looking at page 1 of 21, Mr. Ketchum, what do we see here?

13  A.  An invoice from Outcome Health to RJ Palmer --

14  Q.  What's the date --

15  A.  -- related to Pradaxa.

16  Q.  Can we blow up the first half of the document, please.

17          What's the date of this invoice?

18  A.  April 1st, 2013.

19  Q.  It went to RJ Palmer?

20  A.  Yes.

21  Q.  And can you read what it says in the activity box?

22  A.  "Pradaxa advertising content on 1,819 ContextMedia health

23  screens during the month of April 2013."

24  Q.  Let's stop there.  Was that true or was that a lie?

25  A.  It was a lie.

1  Q.  Why was it a lie?

2  A.  There was not 1,819 offices that received the programming.

3  Q.  What -- can you continue reading the rest of the activity

4  box, please?

5  A.  "75 second spots, two times per hour, 480 spots per

6  office.  Per order number and it lists out the order number."

7  Q.  How much was billed to RJ Palmer?

8  A.  $219,371.40.

9  Q.  Do you see anything in this invoice indicating a credit

10  or, you know, a make-good, or anything of that nature, in

11  connection with the under-delivery that we know Outcome

12  experienced on this campaign in April?

13  A.  No.

14  Q.  Let's look at the next invoice.  Now, do you see this is

15  an invoice for May?

16  A.  I do.

17  Q.  And same or similar amount being invoiced?

18  A.  Same.  Similar, yeah.

19  Q.  Let's look at the next invoice.  Is this an invoice for

20  June?

21  A.  Yes.

22  Q.  Same or similar amount being invoiced?

23  A.  Yes.

24  Q.  Let's look at the next one.  Is this for July, 2013?

25  A.  Yes.

1    Q.  Same or similar amount?

2    A.  Yes.

3    Q.  Let's go to the next one.

4            Is this for August?

5    A.  Yes.

6    Q.  Same or similar amount?

7    A.  Yes.

8    Q.  Let's go to the next one.

9            November.  Same or similar amount being billed?

10   A.  That's for September.

11   Q.  Sorry.  Thank you.  September.

12   A.  Same.  Yes, similar.

13   Q.  Okay.  Let's look at the next one, please.

14           Is this the invoice for October?

15   A.  Yes.

16   Q.  Same question on the amount?

17   A.  Same or similar, yes.

18   Q.  And do we see the November invoice?

19   A.  Yes.

20   Q.  And, again, is this the same or similar amount?

21   A.  Yes.

22   Q.  And the next one.  Do we see a December 2013 invoice?

23   A.  Yes.

24   Q.  Same or similar amount being invoiced?

25   A.  Yes.

1    Q.  When was the end of the 2013 campaign we've been talking
2    about?
3    A.  12/31, 2013.
4    Q.  Okay.  I'd like to shift gears.  And I wanted to go back
5    to Humira and pick up where we left off.  And we'll start by
6    pulling up Exhibit 198, which is offered as a (d)(2)(E)
7    exhibit.
8              THE COURT:  It's admitted.
9           (Exhibit admitted into evidence.)
10   BY MR. HANKEY:
11   Q.  And let's pull up the e-mail from Matthew Crandall on
12   April 9, 2013, at 11:23.
13             To whom is Mr. Crandall sending his e-mail?
14   A.  To Yesenia Bautista from Target Health.
15   Q.  Can you read what he's writing?
16   A.  "Hello, Yesenia, I just want to send a brief note to
17   confirm our conversation.  As of last night, per your request
18   we have paused the Humira campaign with CMH.  We look forward
19   to receiving new (unbranded) creative ASAP to restart the
20   campaign."
21   Q.  Let's stop there.  So he wrote "as of last night per your
22   request we have paused the Humira campaign."
23             What does that mean, to pause the campaign?
24   A.  That they wanted the advertisement to be taken off the
25   screen.

1   Q.  And Mr. Crandall refers to receiving new unbranded

2   creative.  What does "creative" refer to?

3   A.  It's the advertisement.

4   Q.  And he writes "ASAP to restart the campaign."  What would

5   that indicate?

6   A.  That once the Outcome Health receives the new

7   advertisement, that they would restart the campaign.

8   Q.  Okay.  Can you continue reading Mr. Crandall's e-mail?

9   A.  "This also confirms that you are not canceling your

10  exclusive RA presence in the contracted offices and we will

11  continue to bill as scheduled.

12          "Please keep us posted with updates.  We look forward

13  to restarting with you ASAP.

14          "Thanks, Matthew."

15  Q.  So when Mr. Crandall writes "this also confirms that you

16  are not canceling your exclusive RA presence in the contracted

17  offices," what does "exclusive RA presence" mean?

18  A.  It means that another rheumatology drug won't play in the

19  office that Humira was playing in.

20  Q.  Now, let's go back out and then look at Mr. Crandall's

21  next e-mail in the string.

22          What does Mr. Crandall write in this e-mail, and to

23  whom is he writing?

24  A.  He writes it to, I believe looks like --

25          Can you scroll out?  Sorry, can you zoom out?  I just

1    want to make sure.

2         It looks like he's sending it to Jim Demas.

3    Q.  And what does he write to Mr. Demas?

4    A.  "Hi, Jim, I think you're up to speed on the pausing of

5    Humira.  Target Health asked that we note this on the end of

6    the month affidavit to them and agreed that we will bill in

7    full each month."

8    Q.  And what did -- what was your understanding of the meaning

9    of "bill in full each month"?

10   A.  That Humira was going to continue paying for the offices,

11   even though the advertisement wasn't playing in them.

12   Q.  Did Mr. Demas respond?

13   A.  Yes.

14   Q.  And what did he write?

15   A.  "Thanks, Matthew.

16        "Do we know if they're exercising the out clause

17   "provided written notice of termination"?

18        "Copying JK since he's assisting with POP."

19   Q.  What's an out clause?

20   A.  A clause allowing a customer to cancel.

21   Q.  And then he says he's copying JK.  Is that you?

22   A.  Yes.

23   Q.  And assisting with P-O-P.  What does that mean?

24   A.  Assisting with proof of performance.

25   Q.  We saw Humira proofs of performance earlier?

1  A.  Yes.

2  Q.  In fact, we looked at one for -- that you issued in early

3  April, maybe just this day or the day before; correct?

4  A.  Yes.

5  Q.  Do you see that Ms. Agarwal weighs in?

6  A.  Yes.

7  Q.  What does she write?

8  A.  "They are not (on Humira.)"

9  Q.  What do you understand that she's referring to there?

10  A.  Replying to Jim Demas' question of if Humira is exercising

11  the out clause.

12  Q.  Now, I would like to go to Exhibit 1138, which is we're

13  offering not for the truth -- well, we are -- excuse me.

14  We're offering it as a business record and also as a verbal

15  act, contains requests and questions.

16          THE COURT:  It will be admitted.

17      (Exhibit admitted into evidence.)

18  BY MR. HANKEY:

19  Q.  Okay.  Let's start with the very first e-mail in the

20  string.

21          Do you see an e-mail from Mr. Crandall to Yesenia

22  Bautista?

23  A.  Yes.

24  Q.  May 6th?

25  A.  Yes.

1  Q.  So just almost a month later?

2  A.  Yes.

3  Q.  And what is the subject line of his e-mail?

4  A.  "New Abbvie unbranded RA spots.  What happens after

5  May 10th?"

6  Q.  Can you read Mr. Crandall's e-mail?

7  A.  "Hi, Yesenia.  Do you have any time to jump on a call

8  later today?  I met with one of the Humira brand managers in

9  Chicago area on Friday and want to touch base with you and

10  also learn if you heard anything about the May 10th date for

11  the Humira creative.

12          "Also, do you know if the AndroGel literature

13  scheduled to ship to us this week was sent yet or what day we

14  should expect to receive it."

15  Q.  Now, when Mr. Crandall is asking about the May 10th date

16  for the Humira creative?

17  A.  Yeah.

18  Q.  Actually, never mind.  I'm not going to ask you about

19  that.  But if we can go to the next e-mail up on the string.

20          Okay.  And what does Ms. Yesenia write in response?

21  A.  "Hi, Matthew.  Sorry, was a bit busy today.  Perhaps we

22  can connect tomorrow afternoon.  In regards to the RA spot,

23  can you let me know who the creative came from.  Is there a

24  contact name?  The creative agency is not familiar with this

25  note.

1    "Will get back to you in regards to the AndroGel
2  brochures."
3  Q.  Okay.  And we'll take a moment to fix our trial director.
4  Okay.  Let's go to the next e-mail.  Can we expand that,
5  please?
6        Okay.  Can you read just the "hi Ryan" through "the
7  best, Angela" part of this?
8  A.  Sure.  "Hi, Ryan.  Please find a link to download the
9  DA15s cake and bike for a 5-1 use.  Please note the spots have
10  been reformatted per your requested specs attached.  Please
11  confirm receipt.  Best, Angela."
12  Q.  Okay.  And then let's go to Mr. Crandall's e-mail, the
13  next e-mail.  Whose he writing to there?
14  A.  To Yesenia and copying Jennifer Griefe.
15  Q.  Can you read his e-mail?
16  A.  "Hi, Yesenia.  Tomorrow is good, especially early
17  afternoon, like noon through 2:00.  Can we talk at 1:00?
18        "Here's the e-mail that came with the RA spots from
19  Angela Peters at PKT including the note available until May
20  10, 2013."
21  Q.  Okay.  And let's go to the next e-mail.
22  A.  "Noon works.  Please call my line below.  Please disregard
23  the note about May 10.  We will be running the unbranded 15s
24  until approximately mid July."
25  Q.  And then, finally, what's the last e-mail in the string?

1    A.  "Sounds good.  I'll call you then.  Thanks for clarifying

2    that Humira unbranded spot will continue."

3    Q.  So Mr. Ketchum, we saw that in -- we can take this down.

4         We saw that in early April what happened to the

5    Humira campaign that had been running on the network?

6    A.  It stopped running on the network.

7    Q.  And then by May, what appeared -- what -- what happened

8    with the campaign?

9    A.  It started running back on the network with new creative

10   -- with a new advertisement.

11   Q.  Now, let's look at --

12        THE COURT:  Well, before you get to another exhibit,

13   we will take our afternoon break.

14        MR. HANKEY:  Perfect.

15        THE COURT:  About 15 minutes, ladies and gentlemen.

16   Please don't discuss the case among yourselves or with anyone

17   else.

18        COURT SECURITY OFFICER:  All rise.

19      (Jury out at 2:50 p.m.)

20        THE COURT:  All right, sir, you can leave the stand.

21   15 minutes, please.

22        Anything anyone needs to put on the record?

23        MR. HANKEY:  No, your Honor.

24        MR. HUESTON:  No.

25        THE COURT:  Okay.  Off the record.

1          (Recess at 2:50 p.m.)

1  THE COURT:  Okay.  Let's have the witness retake the
2  stand, please.
3      Mr. Madden, can we get the -- here we go.
4      All right.  If the direct finishes, do you need a
5  break before you start, or can you launch right in?
6      MR. HUESTON:  Ready to launch right in.
7      THE COURT:  I assume so.
8      Okay.  Are they on their way?
9      MR. MADDEN:  Yes.  They're in the hallway.  About
10  30 seconds.
11     THE COURT:  Okay.  We can stay off the record.
12    (Discussion held off the record.)
13     COURT SECURITY OFFICER:  All rise.
14    (Jury enters courtroom.)
15     THE COURT:  All right.  Please be seated.
16     All right.  You may continue.
17     MR. HANKEY:  Thank you, Your Honor.
18     Okay.  I'd like to display Demonstrative 1134 B,
19  please.
20 BY MR. HANKEY:
21 Q.  And, Mr. Ketchum, just a reminder, this is the chart that
22 shows the Humira contracted amount over time, correct?
23 A.  Yes.
24     MR. HANKEY:  Okay.  And then let's look at the
25  overlay, 1134 G, please.

1 | BY MR. HANKEY:

2 | Q.  And this is the one with the red Xs on it, correct?

3 | A.  Yes.

4 | Q.  Okay.  And you see the red X for April and May?

5 | A.  Yes.

6 | Q.  Okay.  That red X for April, the 432 amount, what did that

7 | represent again?

8 | A.  The offices that were actually delivered by Outcome Health

9 | for the Humira campaign.

10 | Q.  Okay.  Now, at this point in time, according to the emails

11 | we read, at some point as of at least April 9th, there was a

12 | pause to the campaign, correct?

13 | A.  Yes.

14 | Q.  Okay.  So when you say actually delivered, you mean the ad

15 | was on the screens or delivered in some other way?

16 | A.  For April, the screens were held so the inventory was

17 | reserved, but the advertisement didn't play in that month.

18 | Q.  And then was that the case until the ad started running

19 | again?

20 | A.  Correct.

21 | Q.  So depending on when that ad actually went up on the

22 | screen, that 442 number may represent either held screens or

23 | screens running the ad?

24 | A.  That's correct.

25 | Q.  And just to refresh, what was happening with the billing

1  during that April and May time period?

2  A.  Billing continued.

3  Q.  Now, do you recall we earlier looked at an early

4  April 2013 Humira affidavit?

5  A.  Yes.

6  Q.  And proof -- or an email exchange with Ms. Agarwal about a

7  proof of performance?

8  A.  Yes.

9  Q.  Now, after the campaign was paused, were you asked to

10  prepare a revised April proof of performance?

11  A.  Yes.

12  Q.  Can you just generally describe what was revised?

13  A.  Yeah, it was supposed to be -- it was revised to reflect

14  that the advertisement was not playing in those -- in those

15  screens or in those offices.

16      MR. HANKEY:  The government offers Exhibit 201 under

17  (d)(2)(E).

18      THE COURT:  It's admitted.

19    (Said exhibit admitted in evidence.)

20      MR. HANKEY:  Now, let's go to the very bottom.  First

21  email from Mr. Crandall April 16 at 3:33 p.m., and blow that

22  up, please.

23  BY MR. HANKEY:

24  Q.  Who is Mr. Crandall emailing?

25  A.  Matthew Crandall is emailing Shradha Agarwal and copying

1  Steve Svec.

2  Q.  What's the subject of his email?

3  A.  RHN growth.

4  Q.  Can you read what Mr. Crandall wrote?

5  A.  "Hi, Shradha.  Steve and I are having an intro call with

6  new AbbVie agency on Thursday and walking through current

7  programs and commitments.  If we get into the growth offices

8  or RHN Humira, how should we address?  We are contracted for

9  plus 50 starting 4/1 and another plus 15 every month

10  thereafter."

11  Q.  Now, Mr. Crandall's referring to new -- a new AbbVie

12  agency.  What does that refer to?

13  A.  A different agency was taking over the Humira business.

14  Q.  AbbVie was the company that made Humira?

15  A.  Yes.

16  Q.  Let's look at the next email in this string.

17        What does Ms. Agarwal write in response?

18  A.  "Jay, where are we today installed and in the MS pipe" --

19  pipeline.

20        MR. HANKEY:  And let's go to the next email.

21  BY MR. HANKEY:

22  Q.  What do you respond with?

23  A.  "510 screens in 436 offices."

24  Q.  What happens next?

25  A.  Shradha asks me:  "Is it installed or inclusive of

1  pipeline?"

2        MR. HANKEY:  Then let's expand the top email, please.

3  BY MR. HANKEY:

4  Q.  What did you write back?

5  A.  "That includes the MS pipe."

6  Q.  Who's copied on your email?

7  A.  It's to Shradha and copies Brad Purdy, Rishi Shah and

8  Ashik Desai.

9        MR. HANKEY:  Now let's -- I'd like to offer

10  Exhibit 203 under (d)(2)(E), Your Honor.

11        THE COURT:  It's admitted.

12  BY MR. HANKEY:

13  Q.  Now, Mr. Ketchum, the last exhibit we looked at, a series

14  of emails sent on April 16th, correct?

15  A.  Correct.

16  Q.  What's the date on this email?

17  A.  April 18th.

18  Q.  Okay.  And let's -- who's sending this email?

19  A.  Shradha Agarwal.

20  Q.  To whom?

21  A.  Jim Demas, Rishi Shah, Matthew Crandall.

22  Q.  Who's copied?

23  A.  Myself, Ashik Desai and Steve Svec.

24  Q.  Let's take a look at Ms. Agarwal's email.

25        Can you read what she wrote?

1  A.   "Hey guys, Matthew and Steve had a call with the new

2  agency for AbbVie today and as we had guessed, there's a lot

3  of confusion and not a very smooth transition in terms of what

4  has been bought.  At this point, all they have is monthly

5  dollars spent with each vendor.  This gives us a real

6  opportunity to:

7          "Sell waiting rooms and screens versus unique

8  addresses that Target Health bought.  We let Spark know they

9  have 510 as of today.

10         "Build goal is now an end of year versus weighted

11 average.  We do need to give them history of spend broken out

12 by month and media bought.

13         "MC, could you work with JD to put this together for

14 Spark for Humira and Steve for AndroGel.

15         "Thanks."

16 Q.  And do you see there that Ms. Agarwal wrote:  "We let

17 Spark know they have 510 as of today"?

18 A.  Yes.

19 Q.  What do you understand her to be referring to there?

20 A.  That they -- that Shradha told Spark that Humira has 510

21 waiting rooms or screens today.

22 Q.  And who is Spark?

23 A.  Spark was the new media agency representing Humira.

24 Q.  And what had she read and write about, where she wrote,

25 "at this point all they have is monthly dollars spent with

1  each vendor."  What did you understand her to be pointing out
2  there?
3  A.  That Spark didn't know the terms of the contract.
4  Q.  And then she writes in the first bullet:  "Sell waiting
5  rooms screens slash" -- excuse me -- "waiting rooms/screens
6  versus unique addresses that TH bought."
7        What's TH?
8  A.  Target Health.
9  Q.  And what do you understand that to mean?
10 A.  To -- she tried to change the agreement with the agency to
11 waiting rooms and screens versus what was agreed with Target
12 Health, which was addresses.
13 Q.  And what is the second bullet -- what do you understand
14 the second bullet to be saying?
15 A.  That the number is now an end-of-year number versus a
16 weighted-average number.
17        MR. HANKEY:  Let's look at -- I'd like to admit 204
18 under (d)(2)(E), Your Honor.
19        THE COURT:  It's admitted.
20      (Said exhibit admitted in evidence.)
21 BY MR. HANKEY:
22 Q.  Do you see that Mr. Shah responded to Ms. Agarwal's email?
23 A.  Yes.
24 Q.  What did he write?
25 A.  A smiley face and it says "nice."

1             MR. HANKEY:  The government would move to admit

2  Government's Exhibit 1137 as (d)(2)(E).

3             THE COURT:  It's admitted.

4      (Said exhibit admitted in evidence.)

5             MR. HANKEY:  Okay.  Let's start at the bottom just to

6  see where this exchange begins.  One more page up.

7             There we go.

8  BY MR. HANKEY:

9  Q.  Is this -- does this email string begin with the same

10  Shradha Agarwal email we've just been looking at?

11  A.  Yes.

12  Q.  Okay.  Let's look at the next email in response to that.

13             Who sends the response that we see here?

14  A.  Matthew Crandall.

15  Q.  Can you read what he writes?

16  A.  "Shradha, I was already working on this.  Please see

17  attached.  Do you think this will work?  Note that the IO

18  breaks out monthly growth and spend very specifically, rather

19  than a weighted average.  I did not hear Spark say weighted

20  average was what they want.  They want to know their dollar

21  committed by month.  Do you think this will suffice?"

22  Q.  Now, Mr. Crandall refers to IO.  What's an IO again?

23  A.  Insertion order.

24  Q.  Is that like a contract?

25  A.  Yes, more or less.

1   Q.  Did we review the Humira IO earlier?

2   A.  Yes, we did.

3   Q.  Now, Mr. Crandall's contrasting monthly growth versus

4   weighted average.  Is that a fair representation of what he's

5   doing here?

6   A.  Yes.

7   Q.  What did --

8           MR. HANKEY:  Let's go -- let's go to the next email.

9   BY MR. HANKEY:

10  Q.  And can you read that email, please?

11  A.  "Hi, MC.  I think this is a good start, but for Humira, we

12  have to match what we have billed for past months.  I'm not

13  sure that was 510.  Can you work with JD to match the

14  numbers?"

15          MR. HANKEY:  Then let's go to the next email.

16  BY MR. HANKEY:

17  Q.  Can you read that one, please?

18  A.  "Hi, Jim.  Here is the summary I am preparing for Spark.

19  Can we talk tomorrow to discuss how this lines up with our

20  year to date and future billing.

21          "SA - I reread your email and think we are in

22  agreement that they are buying specific growth per year,

23  getting us to 634.  Contacted number" -- I think it's

24  "contracted number, not 635, by year end.  I revised the

25  spreadsheet to reflect this.  You agree?"

1  MR. HANKEY:  Then let's go to the top email.

2  BY MR. HANKEY:

3  Q.  Can you read what -- who sends that email?

4  A.  Jim Demas.

5  Q.  And to whom is he sending it?

6  A.  Matthew Crandall and copying Shradha Agarwal and Steve

7  Svec.

8  Q.  And what does he write?

9  A.  "Hi Matthew.  Let's talk in the morning."

10  Q.  Now, earlier we looked at --

11  MR. HANKEY:  If we could, let's just go ahead and

12  pull up Exhibit 201, which is already in evidence.

13  BY MR. HANKEY:

14  Q.  And is this the email where you sent just a couple days

15  prior the 510 screens to Ms. Agarwal?

16  A.  Yes.

17  Q.  And then you clarified that that includes MS pipe?

18  A.  Yes.

19  Q.  What does that mean again to include MS pipe?

20  A.  It includes offices that are not yet installed but are in

21  the process of installing.

22  Q.  So offices where the ad wasn't running and couldn't run at

23  that point in time, correct?

24  A.  Yes, correct.

25  Q.  And then let's look at Demonstrative Exhibit 1134 E.

1    And for the month of April, what's the contracted
2  number of offices for that month?
3  A.  For April, it was contracted for it looks like 530.
4  Q.  Okay.  Shift gears now.
5    Now, Mr. Ketchum, you testified early yesterday that
6  there came a time when you stopped doing list matches and
7  working on ROI studies, POPs and the like for sponsorship
8  sales, do you recall that?
9  A.  Yes, that's correct.
10  Q.  And around when did that occur?
11  A.  It was approximately when Ashik Desai started in 2013.
12  That's when I started to do less and less.
13  Q.  And he started in roughly August 2013?
14  A.  Yes.
15  Q.  You said you started to do less and less.  Can you expand
16  on what you mean by that?
17  A.  It wasn't a hard cut-off.  I would still get asked
18  questions from time to time, but over time, I stopped being
19  involved completely.
20  Q.  Who would ask you questions?
21  A.  It could be, I believe, Rishi, Shradha at times, Ashik at
22  times.
23  Q.  And when Rishi and Shradha asked you questions, let's just
24  focus on August 2013 through the end of the year.  When they
25  asked you questions, what do you mean they asked you

1  questions?  What kind of questions?

2  A.  It could be related to, you know, what do the install

3  numbers look like, you know, pulling numbers periodically,

4  helping Ashik with Excel, that type of stuff.

5         Ashik was still pretty new, and so understanding how

6  to use Excel or how to use the database, Quickbase at the

7  time, was new to him.

8  Q.  Where had Mr. Desai been prior to starting at Outcome?

9  Had he been working somewhere else?

10  A.  He was in college.

11  Q.  Do you know where he was in college?

12  A.  Northwestern University.

13  Q.  Now, you also referred to Mr. Desai asking you some

14  questions as you kind of transitioned off that role.

15  A.  Yes.

16  Q.  What kinds of questions would Mr. Desai ask you?

17  A.  Questions on how to -- how to do a list match as far as

18  how to use Excel, where to pull information from in the

19  database to get, you know, Outcome's list of physicians, that

20  sort of thing.

21  Q.  Why -- why would he need Outcome's list of physicians?

22  A.  To perform a list match, you would need to understand how

23  to get access to the information, the data.

24  Q.  So is it your understanding that in that kind of August

25  and following months that he was starting to do list matches

1   at the company?

2   A.  Yes.

3   Q.  And when you were helping him learn how to pull data for

4   those list matches, what specifically were you showing him?

5   A.  Where to go in Quickbase to pull information.  You know,

6   there was a member services database.  There was another side

7   of the database which was member outreach, so how to get

8   access to those, how to export that information into Excel,

9   and then how to use Excel.

10  Q.  So Quickbase was the database where both member services

11  and member outreach tracked the progress of offices through

12  outreach and services?

13  A.  That's correct.

14  Q.  So I think you were just referring to Outcome having a

15  side of that database -- or outreach, rather, having a side of

16  that database and services having a side of it?

17  A.  At that time, yes.

18  Q.  You showed Mr. Desai how to access data from both sides of

19  that?

20  A.  Yes.

21  Q.  Why would he need to be able to access member services and

22  member outreach?

23  A.  Member services to pull lists of currently installed

24  offices, and member outreach for any projections that are

25  requested to include in projections that are -- that are

1   requested.

2   Q.  Projections for what purposes?

3   A.  For list-match purposes.

4          MR. HANKEY:  Let's look at Exhibit 165.  The

5   government's offering this under (d)(2)(E).

6          THE COURT:  It will be admitted.

7       (Said exhibit admitted in evidence.)

8   BY MR. HANKEY:

9   Q.  Now, let's start at Ms. Agarwal's email at 8:53 p.m.,

10  which is at the very bottom.

11         Now, this is February 18, 2013, correct?

12  A.  Yes.

13  Q.  So several months prior to when Mr. Desai starts,

14  officially starts at the company, correct?

15  A.  Yes.

16  Q.  What was he doing -- what was his relationship with

17  Outcome prior to August 2013?

18  A.  At various times, he was an intern at the company.

19  Q.  Would he sometimes work in the office?

20  A.  Yes.

21  Q.  Now, can you please read Ms. Agarwal's email that we see

22  here?

23  A.  "Hey guys, have we yet figured a way to utilize some on

24  Ashik's time for sponsorship projects?  The two areas the team

25  most needs help on a day-to-day basis is:  List matches for

1   prescribers, demographic info on patients.  I wonder if we can

2   have Ashik come in for a day and observe how we do these and

3   take over from there on?"

4   Q.  Now, when Ms. Agarwal refers to SS, you said sponsorship,

5   that's the sponsorship sales part of the business?

6   A.  Yes.

7   Q.  Let's go to the next email in this string.  And do you see

8   that Mr. Demas responds?

9   A.  Yes.

10  Q.  What does he write?

11  A.  "Hey SA, I'll reach out to Ashik.  Can you provide a

12  couple dates that you might want him to come in.  Thanks."

13  Q.  Let's look at the next email.  Is that by Mr. Shah on

14  February 19th?

15  A.  Yes.

16  Q.  Can you read it, please?

17  A.  "That's exactly right on the projects.  We should actually

18  coordinate this for when Jason and potentially Brad are here

19  so Ashik can be walked through how our list matches are done.

20  Maybe just JK, since Brad and I will be gone for a while."

21  Q.  Now, when Mr. Shah is referring to Brad in this email,

22  which Brad is he referring to?

23  A.  Brad Purdy.

24  Q.  And when Mr. Shah refers to Ashik being walked through how

25  our list matches are done, what do you understand that to

1  mean?

2  A.  How to perform a list match.  So take the two lists and

3  compare them in Excel.

4  Q.  And then he writes:  "Maybe just JK since Brad and I will

5  be gone for a while"?

6  A.  Yes.

7  Q.  What appears to be happening there?

8  A.  It looks as though Brad and Rishi were going to be out of

9  the office for a period of time.

10  Q.  Let's look at the next email in the string.  Who sends

11  this?

12  A.  Shradha Agarwal.

13  Q.  Can you read what she wrote?

14  A.  "I'll be in Chi for the week 8 through the 14th of March."

15  Q.  And then let's look at the final email in the string.

16          Who writes this last email?

17  A.  I do.

18  Q.  Who's -- to whom are you sending it?

19  A.  To Shradha, copying Jim Demas, Rishi Shah and Shradha

20  Agarwal.

21  Q.  And what's the subject line of the email string?

22  A.  Ashik's time.

23  Q.  Can you read what you wrote?

24  A.  "Ashik should pick things up quickly.  I believe I have

25  walked him through things before."

1   Q.  Now, Mr. Ketchum, when you were teaching Mr. Desai how to

2   pull data from the database, member outreach, member services,

3   did you also give him guidance on how to -- how aggressively

4   to project in list matches?

5   A.  No.  I don't believe so.

6   Q.  What -- so was your -- for list matches, was your guidance

7   mostly confined to just working the database and working on

8   through Excel?

9   A.  Yes.

10  Q.  Who was it who taught you how to project for list-match

11  purposes?

12  A.  As we've seen in prior emails, projections were usually

13  requested directly from Rishi and/or Shradha.  That was on a

14  case-by-case basis, depending on the client.

15          MR. HANKEY:  The government would offer Exhibit 215

16  under (d)(2)(E).

17          THE COURT:  Be admitted.

18      (Said exhibit admitted in evidence.)

19  BY MR. HANKEY:

20  Q.  Let's start with the bottom email, please.

21          Laura Standefer's email?

22  A.  Uh-huh.

23  Q.  Okay.  It's a lengthy email.  Let's blow it up.  I won't

24  ask you to read the whole thing, but I'll ask you, is it an

25  email about a potential campaign or actual campaign for a gout

1  drug?

2  A.  It is.

3  Q.  Takeda gout?

4  A.  Yes.

5  Q.  Okay.  Why don't we just read the first paragraph.

6  A.  "Good morning, Bob, I hope this email finds you well.

7  Your follow-up was very timely as I have a request from the

8  Takeda gout franchise team for your point-of-care POS

9  landscape evaluation recommendation.  The request is a quick

10  turnaround, and client would like the initial presentation

11  early the week of May 20th.  Yikes."

12  Q.  Okay.  Now let's look at the next email, please.

13         What does Mr. Mons do after he receives that email?

14  A.  He sends an email to Ashik.

15  Q.  What does he write?

16  A.  "Hey Ashik, hope your Tuesday is going well.  I need a

17  quick turn this match so I can build a proposal and be it to

18  the client on 5/16.  Sorry for the short notice, but I only

19  got the request today.  Target list attached."

20  Q.  And when is he sending this email?

21  A.  May 14, 2013.

22  Q.  Now, let's look at the top email in the string.  Does

23  Mr. Desai respond?

24  A.  Yes.

25  Q.  To Mr. Mons?

1  A.  Yes.

2  Q.  Who does he copy?

3  A.  Shradha and me.

4  Q.  Can you please read Mr. Desai's response?

5  A.  "Hey B and Jay, spoke to each of you separately about this

6  match, but just to make sure we are all on the same page, Jay

7  will be taking the lead on this one.  After speaking to SA, I

8  still think it makes sense -- I think it still makes sense to

9  have Jason lead the charge on these matches until I am fully

10  up to speed on how they are conducted.  I don't want to

11  sacrifice the quality or timeliness of our match during the

12  transition process.  Thanks, Jay, for your help with this

13  match."

14  Q.  So what do you understand Mr. Desai to be recommending

15  here in his email?

16  A.  That I perform this match.

17  Q.  And what does it appear is the reason for why Mr. Desai is

18  recommending that?

19  A.  Because he's worried about sacrificing quality as he's

20  learning how to do them.

21  Q.  And at the end of his email, he refers to a transition

22  process.  Do you see that?

23  A.  Yes.

24  Q.  What did you understand him to be referring to there?

25  A.  He still needed to start at Outcome Health.  He hadn't

1   started yet.  So this was a couple of months, a few months

2   before he even started at the company.

3        MR. HANKEY:  The government would offer Exhibit 258

4   as a (d)(2)(E) exhibit.

5        THE COURT:  It's admitted.

6      (Said exhibit admitted in evidence.)

7   BY MR. HANKEY:

8   Q.  We looked at a version of this earlier in another string,

9   didn't we, Mr. Ketchum?

10  A.  Yes.

11  Q.  I don't want to ask you to read it again, but is this an

12  email from Ms. Agarwal to Mr. Desai, Mr. Shah, and you?

13  A.  Yes.

14  Q.  Okay.  And just describe again, just so we can place this

15  in a timeline, what was Ms. Agarwal delegating to Mr. Desai

16  here?

17  A.  Research studies.

18  Q.  Those ROI performance studies?

19  A.  Yes.

20  Q.  And, again, to whom was Mr. Desai to go if he had any

21  questions on how to perform the studies?

22  A.  Rishi Shah.

23  Q.  Did Mr. Desai ultimately take on the work of performing

24  these studies?

25  A.  Yes, I believe so.

1  Q.  And -- well, strike that.

2         MR. HANKEY:  Why don't -- I'll offer Exhibit 259 as a

3  (d)(2)(E) exhibit, Your Honor.

4         THE COURT:  It's admitted.

5      (Said exhibit admitted in evidence.)

6         MR. HANKEY:  Okay.  Let's zoom in on the very first

7  email in this string.

8  BY MR. HANKEY:

9  Q.  Do you see the very first email in this string is one from

10 you on August 1st, 2013?

11 A.  Yes.

12 Q.  And you write:  "Team SS."  What would that refer to?

13 A.  Sponsorship sales.

14 Q.  Can you read what you wrote?

15 A.  "I am going on vacation on August 13th, and I will be back

16 on August 26th.  While Ashik will be up to speed at that

17 point, I still think it would be a good idea to get your hands

18 on any upcoming list matches or any type of analysis projects

19 as early as possible so Ashik and I can work through them

20 together.  Please ping me for anything you might even -- you

21 even might think you need so Ashik and I can make sure --

22         THE COURT:  You need to slow down.

23         Off the record.

24      (Discussion held the record.)

25         THE COURT:  Back on the record.

1   BY MR. HANKEY:

2   Q.  Can you also move the mic a little bit closer to the

3   screen?  Is that possible?

4   A.  I think that's as close as it's going to get.  Is this

5   better for the jury?

6   Q.  Thank you.

7           Why don't we start back at "I still think it would be

8   a good idea" but just please read slowly.

9   A.  "I still think it would be a good idea to get your hands

10  on any upcoming list matches or any type of analysis projects

11  as early as possible so Ashik and I can work through them

12  together.  Please ping me for anything you might -- you even

13  think you might need so Ashik and I make sure nobody is left

14  hanging on anything while I'm gone.  I am going to bring my

15  laptop with me and will have international service, so text me

16  if anything pops up and I will be able to help."

17  Q.  So you were planning to go on vacation?

18  A.  Yes.

19  Q.  You wrote:  "I still think it would be a good idea to get

20  your hands on any upcoming list matches or any type of

21  analysis projects."

22  A.  Yes.

23  Q.  What would that -- list matches is apparent on its face,

24  but beyond list matches, what other types of analysis projects

25  might that involve?

1  A.  It can be decile breakouts, requests for, you know, as we

2  saw through some emails prior, you know, what is the decile

3  ranking of particular physicians or breakout of specialties,

4  stuff like that.

5  Q.  And why were you recommending to the sponsorship sales

6  team that they identify those upcoming matches and other

7  analysis projects?

8  A.  Because I believe August 1st was Ashik's first day, and he

9  still was pretty uncomfortable with Excel and the database.

10 So if a request came in, I wasn't sure if Ashik would be

11 comfortable going into Quickbase and exporting the data and

12 then using that data in Excel.

13 Q.  Let's look at the next email in the string.

14         Can you slowly read Mr. Shah's response?

15 A.  "Thanks, Jay.  I think it will be good for you to review

16 in detail how you do physician matches with Ashik before this

17 so you don't get bugged at all on the trip."

18 Q.  What did you understand physician matches to mean here?

19 A.  List matches.

20         MR. HANKEY:  Can we go to the next email, please.

21 BY MR. HANKEY:

22 Q.  And what do you write back to Mr. Shah?

23 A.  "RS:  Thanks for looking out.  Ashik and I are doing

24 exactly that.  We will do several dry runs over the next

25 10 days to make sure he is very comfortable with everything,

1    but sometimes questions still pop up.  I do want everyone to

2    feel free to text me for anything as well though.  While I

3    probably won't be checking my email often, if I get a text,

4    I'll know to reach out."

5    Q.  You referred to dry runs.  Dry runs of what?

6    A.  Using -- exporting data from Quickbase and then exporting

7    them into Excel and then performing a list match.

8    Q.  Okay.  Let's pop out, does Mr. Shah acknowledge your

9    email?

10   A.  Yes.

11   Q.  What does he write?

12   A.  "Thanks Jay."

13       MR. HANKEY:  The government would offer Exhibit 262

14   as a (d)(2)(E) exhibit.

15       THE COURT:  It's admitted.

16     (Said exhibit admitted in evidence.)

17   BY MR. HANKEY:

18   Q.  Now, let's start at the very first email on August 5th.

19       Mr. Ketchum, are you -- can you please read the email

20   that you're writing on August 5, 2013?

21   A.  "Ashik, this has been scrubbed for normal filters but does

22   include part-time prescribers.  Take a look, let me know if

23   there are any questions."

24   Q.  And then let's go to Mr. Desai's response.

25   A.  "Got it.  Thanks for putting this together, Jay.  I added

1  this to the list of items I need to learn how to do from you.

2  With regards to dates the campaign ran for each physician, how

3  do we gather that?"

4          MR. HANKEY:  Okay.  And Ms. Paul, could we just go

5  ahead and blow up -- we can blow up both emails together with

6  the header.  Thank you.

7  BY MR. HANKEY:

8  Q.  Okay.  So -- and what's the subject line of this email

9  exchange between you and Mr. Desai?

10 A.  "Novo prescribers, Crossix."

11 Q.  And what dates are you guys sending these emails?

12 A.  August 5th and August 6th.

13 Q.  What is Crossix?

14 A.  It's a third-party company similar to IMS that performed

15 research studies.

16 Q.  ROI analysis studies for campaigns?

17 A.  Correct.

18 Q.  Now, when you wrote to Ashik that something had been

19 scrubbed for normal filters, what does that refer to?

20 A.  That's the filtering system that we've seen in prior

21 emails.

22 Q.  And when you say it does include PT prescribers, what does

23 that mean?

24 A.  Part-time prescribers.

25 Q.  And in this context, what did part-time prescribers mean?

1 A.  A -- someone who can write a prescription, so a doctor, a

2 nurse practitioner or other, but who is not working at an

3 office full-time.

4 Q.  Where would you have gotten the normal filters that you

5 used in this case?

6 A.  I'm not sure what you mean.

7 Q.  So when you refer to normal filters, where would you have

8 received which filters to run?

9 A.  Oh, those were shown to me by Rishi.

10 Q.  Now, in Mr. Desai's response to your email, he wrote:  "I

11 added this to the list of items I need to learn how to do from

12 you."

13        What do you understand that to mean?

14 A.  That Ashik wanted to know how filtering typically worked.

15        MR. HANKEY:  Okay.  We can take that down.

16 BY MR. HANKEY:

17 Q.  So 2012, 2013, can you remind the jury of what your

18 primary role at the company was during that time period?

19 A.  Yes.  I worked in member services, so for reference when

20 you saw those member services weekly activity emails, that was

21 the team that I -- I worked on.  That was the team that I was

22 a part of.

23 Q.  So all of these sponsorship sales activities we've been

24 reviewing, that wasn't part of your primary responsibility at

25 the company during that time?

1  A.  No, it was not.

2  Q.  Now, sometime after August 2013, did your role at Outcome

3  begin to change?

4  A.  It did.

5  Q.  Can you explain how it changed and --

6  A.  Sorry, I didn't mean to cut you off.

7  Q.  Can you explain how it changed and when?

8  A.  Sure.

9      I became a team lead of member services.  Eventually

10  as the teams grew, the member services team broke out into a

11  few different teams.  If you remember me describing member

12  services early on, it did a lot of different functions from

13  project managing the installation of the TVs to account

14  management type of role, troubleshooting, creating content

15  that would go on the screens that was custom for the doctors'

16  offices.

17      So those teams began to or those individual roles

18  turned into their own teams eventually, and I managed those --

19  that group of teams.

20  Q.  Around what time period did you do that?

21  A.  I believe that change occurred sometime in 2014, if I'm

22  not mistaken.

23  Q.  Okay.  And for how long did you manage those teams?

24  A.  Hmm, over a year, I believe.

25  Q.  What happened next?

1  A.  I moved over to managing our integrated health system

2  team, which was a team that was responsible for figuring out

3  how to work with large healthcare systems and sell Outcome

4  Health's devices into those large healthcare systems.  And I

5  worked on that team for a little over a year, I believe.

6  Q.  And roughly when did you transition into that integrated

7  health systems role?

8  A.  I believe that was sometime in 2015.

9  Q.  And so then you worked on that for a year or more into

10  2016?

11  A.  Yes.

12  Q.  Then what -- what was your role after that?

13  A.  I actually worked on the sponsorship team, managing a few

14  accounts.

15  Q.  And roughly when did you start that?

16  A.  I believe that was either 2016 or 2017.

17  Q.  Which accounts did you work on?

18  A.  Bayer and UCB and SI.

19  Q.  Did you have any other roles after that?

20  A.  I did.  There was a period of time where there was quite a

21  bit of turbulence at Outcome Health, and I wound up working on

22  the people team for a while.

23  Q.  What's the people team at Outcome?

24  A.  HR type of organization, working on hiring people and that

25  sort of thing.

1  Q.  How big did you say Outcome was when you started in late
2  2011?
3  A.  Around 20 people.
4  Q.  And then, roughly speaking, how big was it when you left?
5  A.  I believe over 600.
6        Well, there were some layoffs, so at a peak, it was
7  over 600.  I don't recall the size it was when I was laid off.
8  Q.  So during this 2014, say, through 2015 time period, in any
9  of these roles, did you continue to attend meetings with
10  Shradha Agarwal, Rishi Shah, Brad Purdy?
11  A.  Yes.
12  Q.  And in any particular kind of time period in that 2014
13  through '17 time period where you continued to do that, or was
14  it throughout?
15  A.  Throughout.
16  Q.  What kind of meetings would you attend with Rishi Shah,
17  Shradha Agarwal, Brad Purdy in that time period?
18  A.  So there were leadership meetings; there were executive
19  meetings, leadership retreats, executive retreats.
20        The team meetings and the executive meetings were on
21  a fairly regular cadence.  The retreats were not -- not as
22  regular.
23  Q.  Okay.  So you referred to team meetings, and you also
24  referred to leadership meetings.  Is that the same thing or
25  different?

1 A. Leadership team meetings and then executive team meetings,
2 yes.
3 Q. What's a leadership team meeting?
4 A. That would be a meeting of groups of various leaders from
5 different teams and organizations in the company.
6 Q. And what cadence did or how often did those leadership
7 team meetings occur?
8 A. Ideally, they were weekly, but several times per month.
9 Q. And who from the senior executive leadership of Outcome
10 would attend those leadership team meetings?
11 A. The leadership team meetings didn't always have Rishi,
12 Shradha or Brad in them. It was just occasional.
13        The executive team meetings always had Rishi, Shradha
14 and Brad Purdy in them and others.
15 Q. Let's talk about those executive team meetings. In that
16 2014 through 2017 time period, what part of that time period
17 did you attend executive team meetings?
18 A. I believe through 2016. I don't -- if I recall correctly.
19 Q. How often would those executive team meetings occur?
20 A. At least monthly.
21 Q. Would Rishi Shah attend those?
22 A. Yes.
23 Q. Shradha Agarwal?
24 A. Yes.
25 Q. Brad Purdy?

1  A.  Yes.

2  Q.  Ashik Desai?

3  A.  Yes.

4  Q.  What kind of topics would be covered at executive team

5  meetings?

6  A.  Hiring counts, growth numbers.

7        So when I say hiring counts, I mean employees, staff.

8  Growth numbers on the membership network, so the actual

9  doctors' offices broken out oftentimes by specialty during

10  that time period.

11        Some sponsorship information as far as -- some

12  revenue, although at times revenue information was redacted

13  from reports.  That type of thing.

14  Q.  Okay.  Let's break that down a little bit.

15        So growth numbers on the membership network.  What do

16  you mean by that?

17  A.  Sure.  How member outreach or integrated health systems or

18  member services, which eventually turned into member

19  experience, how they were doing from a sales standpoint, so

20  how many offices were being added during a period of time in

21  relation to what the goals were, what the models looked like.

22  So were the sales in line, ahead or behind of what the growth

23  models looked like.  And then various reports highlighting

24  the -- where things were in line or were missing.

25  Q.  And during that time period, did you have any roles that

1 had a direct interface into that growth of membership of

2 doctors' offices?

3 A.  Yes.

4 Q.  What roles would that have been?

5 A.  When I was overseeing member services and member

6 experience, there were offices -- so there were new devices,

7 new products that were being sold.  So member experience and

8 the account managers were selling those, so they were tracking

9 those numbers.

10         Installation rates, so how quickly installations were

11 happening was included there, too, as part of the growth.  And

12 with integrated health systems, we were tracking forecasting,

13 so these were larger health system deals, so you wouldn't just

14 close, you know, one or two or three or four offices.  It

15 could be hundreds or even a thousand or more, so trying to

16 keep an eye on what that sales forecast looked like to see how

17 close those deals were or were not from closing.  They were

18 somewhat complicated sales.

19 Q.  Now, you also referred to discussions about sponsorship

20 sales --

21 A.  Yes.

22 Q.  -- information in executive meetings?

23 A.  Yes.

24 Q.  What kinds of -- let me back up.

25         Sponsorship sales, again, that's the sales to the

1  pharma clients, right?

2  A.  Yes.

3  Q.  What kinds of information would be discussed in executive

4  team meetings concerning sponsorship sales?

5  A.  Where the company was missing as far as contracts, so

6  where there were shortfalls.  At the time, they were referred

7  to as deltas, so there were delta reports that talked about a

8  couple things.  One, they could just be missing on the growth

9  target, but it also could be related to specific contracts.

10 Q.  So did the contractual requirements for campaigns or

11 categories of drugs come up in these executive meetings?

12 A.  From time to time, yes.

13 Q.  Now, was there some relationship between the growth on the

14 membership side and the contractual requirements discussed in

15 those meetings?

16 A.  Yes.

17 Q.  Can you explain what that means?

18 A.  Yes.

19       So membership, member outreach and member services

20 and integrated health systems, they, because there are

21 specialties of doctors' offices across the U.S., those

22 doctors' offices would be targeted by specific teams on member

23 outreach or penetration of new products by member services or

24 what specialties might get included in a sale of a larger

25 health system.

1 And so those sales would need to be included in not
2 only what had been closed but what was forecasted to close and
3 approximately when.

4 And then that -- but the specialties were sold
5 oftentimes based on contracts that either needed to be met or
6 that there was an opportunity to -- to get.  So the -- I think
7 the better way to phrase that is revenue opportunities on
8 sponsorship sales oftentimes directed the activity of the
9 sales team on the membership side in relation to what types of
10 doctors' offices were being targeted.

11 Q.  Let's break that down a little bit.

12 So when you say revenue opportunities on the
13 sponsorship sales side, what are you referring to?

14 A.  Potential contracts.

15 Q.  And when you speak of that in the context of driving what
16 membership sales is doing, member outreach is doing, how would
17 those two things relate?

18 A.  So -- it could be a little complicated, so I'm going to
19 try to -- I'm going to try to explain it somewhat simply.

20 But if there are -- so there at any point in time
21 could be a lot of potential advertising campaigns that can be
22 sold on the sponsorship side.  There were more and more
23 salespeople that were added, so in the emails we reviewed, we
24 mostly saw two, three, or maybe four salespeople on the
25 sponsorship side.  But that grew tremendously over time as the

1 head count, you know, approached 600 or so people over time.

2 And so there was lots of potential activity.

3 And so there could be a lot of activity in a

4 particular category, whether that was a lot of potential in

5 rheumatology or maybe there was a lot of potential in a

6 neurological drug or a heart health drug over time, or I-CARE,

7 iHealth, so there was -- as those opportunities and the amount

8 of opportunities, as you started to see grow in particular

9 categories, when I say categories, I mean the diseases that

10 people have across the country that, you know, afflictions

11 that folks are dealing with, you would see those

12 opportunities, and that would drive what type of behavior, so

13 the types of offices that the member outreach team is calling

14 on.  Although by that point, they weren't called member

15 outreach anymore, but that same type of team.

16 Q.  So member outreach was making decisions about where to

17 target their energy in relation to where sponsorship sales was

18 looking to kind of grow the sponsorship side of the business?

19 A.  Yes.

20 Q.  Now, you referred to the term delta.

21 A.  Uh-huh, yes.

22 Q.  You referred to that as something being discussed in these

23 executive meetings?

24 A.  Yes.

25 Q.  Can you explain what that term meant in the context of

1   those meetings?

2   A.  Delta basically just means change or difference.  So it's

3   the difference between either what was supposed to have been

4   sold from just a goal standpoint versus what was actually sold

5   or what was achieved.

6         It could also mean what was sold from a contractual

7   standpoint versus what the current state of the network looks

8   like.

9   Q.  So sold from a contractual standpoint, can you explain

10  what that means, like what is that?

11  A.  Yeah, commitments that need to be met.  So, you know,

12  similar to Humira, you saw specific commitments that needed to

13  be achieved for the Humira campaign.

14        So specific achievements, there would be targets for

15  these clients over time, and so those -- any difference there

16  would be considered a delta.

17  Q.  Difference between the contracted amount and what?

18  A.  What was actually available, what was being delivered.

19  Q.  Were there deltas sometimes discussed where the campaign

20  was actually underway?

21  A.  Yes.

22  Q.  So in some cases, contracts had a contracted amount that

23  was higher than what Outcome could actually deliver during

24  that contract?

25  A.  Yes.

1  Q.  Now, you also described another kind of way in which delta
2  was discussed.

3  A.  Yes.

4  Q.  Can you explain what that is?

5  A.  Yes.

6         So there's just -- in just about any -- in almost any
7  company, there's a goal.  You have something that, as an
8  employee, you're trying to do or as a team you're trying to
9  achieve.  In general with sales, there's a sales target or
10 sales goal or quota that is supposed to be achieved.

11        And companies, the majority of companies everywhere
12 who have a sales team typically set up some sort of longer
13 term goal, whether that's, like, a five-year plan or ten-year
14 plan or one-year goal that is looking to be achieved, and then
15 that's broken down by quarter and by month and by week and by
16 day, and that drives activity.

17        So your goal for a salesperson might be a hundred
18 sales of some sort, and then there's certain activities that
19 you know need to be done.  So whether it's a certain number of
20 phone calls that need to be made or emails or touch points or
21 meetings.  And so you would have small goals that roll up into
22 these larger goals that should then ultimately lead to those
23 sales.

24        So small activities lead to sales, and then those
25 sales grow over time to meet your monthly goal, your quarterly

1 | goal, the annual goal. And then the individual goals also
2 | roll into the team goals, if that makes sense.
3 | Q. Mr. Ketchum -- I'm sorry, I didn't mean to cut you off.
4 | A. Just five more seconds.
5 | Q. Sure.
6 | A. And then where those sales goals for Outcome Health were
7 | set, where they were not being achieved would be the delta.
8 | So the delta report on the sales goal for the Outcome Health
9 | sales team on the member outreach side, the delta would
10 | highlight the goal of the team versus where the team was
11 | performing.
12 | Q. Now, the first delta we're talking about -- either way
13 | these deltas are related, is that fair to say?
14 | A. Yes.
15 | Q. Okay. So when we talk about the delta between the
16 | contracted number of offices and the number of offices that
17 | Outcome Health had, how frequently was that discussed in these
18 | executive meetings?
19 | A. Frequently.
20 | Q. And besides Mr. Shah, Ms. Agarwal, Mr. Desai, you, who
21 | else would attend those meetings?
22 | A. Everyone else on that team.
23 | Q. On what team?
24 | A. The executive team. So do you want me to list out all the
25 | names?

1  Q.  How many people are we talking about?

2  A.  It changed a little bit over time, but give me a quick

3  moment.

4  Q.  Just a rough count.

5  A.  Ten-ish.

6  Q.  Okay.  Now did -- at that time in 2014 through 2017, did

7  you have insight into what was being billed to those clients

8  that had deltas?

9  A.  No, not necessarily.

10  Q.  Well, you say not necessarily.  What do you mean?

11  A.  That typically wasn't included in the reports.

12  Q.  Did you have insight into whether make goods or, you know,

13  any kind of media credits or anything was being provided on

14  those contracts?

15  A.  Media credits and make goods were discussed as -- that

16  they were being done, but I wouldn't -- I didn't know whether

17  or not they actually were.

18  Q.  And -- and in those executive meetings?

19  A.  Yes.

20  Q.  And in what context?

21  A.  It would be discussed, you know, in conversation, hey,

22  there's a make good that, you know, Outcome Health or we have

23  to do for a particular brand, and the campaign's going to run

24  longer as part of that make good, or, you know, they're going

25  to get credits.

1    MR. BLEGEN:  Excuse me, Judge.  Can I interrupt and
2    ask for a little foundation as to who's saying what?
3    THE COURT:  Yes.  Please do, and while you're --
4    before you formulate that question, we'll take a 30-second
5    stretch break.  We've got half an hour left for the week, so
6    good time to stretch out for a second if you choose to do so.
7    No requirement.
8    (Pause.)
9    THE COURT:  Okay.  Everyone please have a seat.
10   The objection was to lay more foundation for these
11   general discussions, so please do.
12   MR. HANKEY:  Yes, Your Honor.
13   BY MR. HANKEY:
14   Q.  So in these executive meetings that we've been talking
15   about make goods, I want to ask you a couple of questions on
16   that.
17   So when those discussions came up, who was presenting
18   information about make goods just by name?
19   A.  Typically Ashik Desai.
20   Q.  Okay.  And in what time period are we talking about?
21   A.  2014 through 2016.
22   Q.  And when he brought those up, was it in relation to
23   specific campaigns?
24   A.  Typically, yes, brands.
25   Q.  And -- but you didn't have insight, I believe you

1    testified, into whether those were actually made, correct?

2    A.  No.  I didn't know.

3    Q.  Who in executive management would have had insight into

4    that?

5            MR. BLEGEN:  Judge, objection.  Calls for

6    speculation.

7            MR. HANKEY:  Can I lay a foundation?

8            THE COURT:  Lay a foundation, please.  Should have

9    actual knowledge or something approaching a pattern, where he

10   can testify with particularity.  So try and lay more of a

11   foundation.

12   BY MR. HANKEY:

13   Q.  Mr. Ketchum, when you were at Outcome in that '14 through

14   '17 time period, did you observe the level of access that

15   Rishi Shah had to information and data within the company?

16   A.  Yes.

17   Q.  And how would you describe the level of access that he had

18   to information and data in the company?

19   A.  Rishi Shah would have had access to any data that he

20   wanted.

21   Q.  How do you know that?

22   A.  He was the CEO of the company, so the CRM at that point

23   had moved to Salesforce.com.

24   Q.  What's CRM?

25   A.  The database.  So it moved from Quickbase to Salesforce.

1 And so Rishi would have had, as CEO, would have had no

2 revisions to his access to data.

3 Q.  How about Ms. Agarwal?

4       MR. HUESTON:  Objection.  I'm going to object.

5 There's no foundation for that observation.

6       THE COURT:  Are you -- well, I'm not going to ask

7 questions.  You can lay more foundation as to his knowledge of

8 who had access to the Salesforce data, Salesforce data system.

9       MR. HANKEY:  Salesforce system.

10       MR. BLEGEN:  Judge, I thought the original question

11 was who had the knowledge, not the access.

12       THE COURT:  Well, let's let -- let's let him ask the

13 questions.

14       Go ahead.

15 BY MR. HANKEY:

16 Q.  So, Mr. Ketchum, did you -- did you ever observe times

17 when Mr. Shah would ask for data from Salesforce or possess

18 data from Salesforce?

19 A.  Yes.

20       MR. HUESTON:  Objection, vague.

21       THE COURT:  Overruled.

22 BY MR. HANKEY:

23 Q.  Did that inform your understanding of the level of access

24 that he had to the Salesforce data?

25 A.  No, not necessarily.

1  Q.   In observing his access or, rather, in observing the

2  Salesforce data that he had, did you perceive that he had

3  difficulty getting that data?

4          MR. HUESTON:  Objection --

5  BY THE WITNESS:

6  A.   I can't speak to that.

7          MR. HUESTON:  -- vague.

8          THE COURT:  Overruled.

9          MR. HUESTON:  Withdrawn.

10         THE COURT:  Witness can't answer it.

11 BY MR. HANKEY:

12 Q.   And when Mr. Shah made requests for data from Salesforce,

13 did you ever perceive any difficulties by him getting the data

14 he asked for?

15         MR. HUESTON:  Objection.  No foundation --

16         THE COURT:  First, did you ever observe Mr. Shah

17 accessing that data?  That's the question I think -- well, you

18 ask it.

19 BY MR. HANKEY:

20 Q.   Did you ever observe Mr. Shah asking for Salesforce data?

21 A.   Yes.

22 Q.   And then the next question is did you ever observe him

23 have any challenges getting the information he'd asked for

24 from Salesforce?

25 A.   No.

1  Q.  Now, same questions as to Ms. Agarwal.  Did you ever
2  observe her asking for information from Salesforce?
3  A.  Yes.
4  Q.  And did you ever observe her having difficulty getting
5  what she asked for from Salesforce?
6  A.  No.
7  Q.  And the same question as to Mr. Purdy.  Did you ever
8  observe him asking for information from Salesforce?
9  A.  No -- oh, I apologize.
10          Yes, yes, I observed.
11  Q.  You did observe him asking for it?
12  A.  Yes.  I apologize.
13  Q.  And did you ever perceive any challenges by him getting
14  any access to data from Salesforce?
15  A.  No.
16  Q.  Is Salesforce the location where the make-good information
17  would be saved?
18  A.  Yes.
19  Q.  Did you ever access Salesforce to look at whether make
20  goods were being made?
21  A.  No, not that I recall.
22  Q.  Why not?
23  A.  It just wasn't a part of my day-to-day role during that
24  time period.
25  Q.  Now, these deltas that we've been talking about, how would

1  the information about the deltas between the contracted amount
2  and the amount that's being delivered, how would that be
3  presented at the executive meetings?
4  A.  There's a delta report.
5  Q.  And what -- can you just describe generally what a delta
6  report was?
7  A.  A report showing that where there were -- a report showing
8  how the company was doing towards goal, simplest way to
9  describe that.
10  Q.  And you also referred to revenue information being shared
11  in those meetings; is that correct?
12  A.  Yes, some was.
13  Q.  When you referred to revenue information, can you be a
14  little more specific?
15  A.  There was some information as far as contracts,
16  opportunities, and some dollar values that were associated
17  with those revenue opportunities related to particular brands
18  or categories.
19         Oftentimes overall company revenue, though, was not
20  shared with the broader executive team.
21  Q.  Now, you also mentioned executive retreats, correct?
22  A.  Yes.
23  Q.  What were executive retreats?
24  A.  Times where the executive team would travel somewhere to
25  have deeper discussions about various topics with the company.

1   Q.  And did you attend those executive retreats?

2   A.  For a period of time, yes.

3   Q.  Where were those executive retreats that you attended?

4   A.  Usually out of town somewhere.  You know, could be up in

5   Lake Geneva, Wisconsin, or somewhere like that.

6   Q.  What was the purpose of an executive retreat?

7   A.  One, to spend some time together.  Everyone was, you know,

8   managing their own teams or departments, and that was

9   challenging.  And so getting some time to spend some time

10  together was -- was viewed as important.  And then also to

11  work through and solve problems that the company was facing.

12  Q.  When you attended executive retreats, who else attended

13  them?

14  A.  Whoever else was considered as part of the executive team

15  at the time.

16  Q.  So that would include Mr. Shah, Ms. Agarwal, Mr. Purdy,

17  Mr. Desai?

18  A.  Yes, and others.

19  Q.  And others who attended those executive meetings?

20  A.  Yes.

21  Q.  Was every meeting in the executive retreats that you

22  attended always open to every person attending the retreat?

23  A.  I'm not sure I understand the question.

24  Q.  Yeah, so why don't we -- why don't we talk a little bit

25  more about what happened at the retreats.

1    So just focusing on the business that was done on the

2    retreats, what kinds of things would occur on the executive

3    retreats?

4    A.  Breakouts on particular topics.  It could be plans related

5    to sales teams, so the member outreach sales team.  Ways to

6    achieve hiring goals.

7    It could be conversations around member services or

8    member experience and challenges that the team was facing and

9    how to deal with some of those.

10   HR or hiring challenges that were being faced.

11   Sponsorship-related challenges that were being faced,

12   and oftentimes there were some small, like, group-type

13   sessions like breakout-type sessions.

14   Q.  What is small group or breakout discussion?

15   A.  Small groups of the members of the team would sort of

16   break out into smaller groups and have discussions to work

17   through some of those problems.

18   Q.  Were deltas discussed at executive retreats?

19   A.  Yes.

20   Q.  The type of delta where there's a contracted level on a

21   campaign and delivery on the campaign is less than the

22   contracted amount?

23   A.  Oftentimes at the executive retreats, the

24   sponsorship-related information was shared amongst a smaller

25   group but not necessarily the broader group of the executive

1  team.  So in some instances, I wasn't involved in those

2  conversations.

3  Q.  And who was involved in those smaller group discussions of

4  sponsorship sales-related information?

5  A.  Typically Rishi Shah, Shradha Agarwal, Brad Purdy, Ashik

6  Desai, and at certain points in time, Iman Jalali.

7  Q.  Who is Iman Jalali?

8  A.  Chief of staff of -- I believe Shradha's chief of staff.

9  Q.  And when you're referring to sponsorship sales

10  information, what are you referring to there?

11  A.  In that context, I'm speaking more to revenue and revenue

12  related to contracts and overall revenue as well.

13  Q.  How about deltas, is that something that -- was that

14  discussed in that smaller group meeting?  Was it --

15          MR. PRUITT:  Objection, Your Honor.  Foundation.  He

16  said he wasn't at those meetings.

17          MR. HANKEY:  Fair enough, Your Honor.  I'll withdraw

18  that.

19          THE COURT:  All right.

20  BY MR. HANKEY:

21  Q.  Were the deltas discussed in the meetings that you

22  attended at the retreats?

23  A.  In -- in some contexts, yes.  Not in some of the deeper

24  dives.  That occurred in the breakouts.

25  Q.  Now, during the time period of 2014 through 2017, did you

1  perceive -- well, were you privy to information that told you

2  one way or another that the company was still selling

3  sponsorship based on projections?

4  A.  Yes.

5  Q.  What information led you to that understanding?

6  A.  There were emails that I was a part of when hiring people

7  that specifically discussed -- I can recall an email that

8  Shradha actually sent, where the candidate in question --

9       MR. BLEGEN:  Judge, can we get some foundation as to

10  date and time or just maybe see the email?

11       THE COURT:  Yeah, start over.  Ask for -- lay some

12  foundation if he's going to be relating things he learned at a

13  meeting.  You need to know who was there, what the meeting

14  was, when it occurred.

15       MR. HANKEY:  Okay.

16  BY MR. HANKEY:

17  Q.  Let's start in 2014, so after you've transitioned the role

18  to Mr. Desai, the sponsorship sales, analytics roles to

19  Mr. Desai.

20       In 2014, did you -- did you receive emails or attend

21  any meetings where projections were discussed?

22  A.  Yes.

23       MR. BLEGEN:  Judge, objection to foundation.

24  That's --

25       THE COURT:  Well, no, this is preliminary, and then

1 | he can get to the detail, but he's got to start somewhere, and
2 | that's an appropriate way to start.
3 |       Go ahead.
4 | BY MR. HANKEY:
5 | Q.  And in -- in the emails that you received, did any of
6 | them -- were any of them sent by any of the defendants at this
7 | trial?
8 | A.  Not that I can recall.  The specific email I'm talking
9 | about, I can recall the candidate in question.
10 | Q.  Before you go into that, do you recall the sender of that
11 | email?
12 | A.  I do.  It was Shradha Agarwal.
13 | Q.  Okay.  And roughly when was that email sent?
14 | A.  I think it was 2016, but I can't recall the date but I can
15 | recall the parties involved in the email.
16 | Q.  It's after the time that you stopped doing list matches
17 | and the like?
18 | A.  Yes.
19 |       MR. HANKEY:  Your Honor, may I proceed?
20 |       THE COURT:  Yes.
21 | BY MR. HANKEY:
22 | Q.  So what do you recall learning about projections in the
23 | email that you're referring to from Ms. Agarwal?
24 | A.  In this particular email, there was a candidate who was in
25 | consideration for joining Outcome Health, and Ms. Agarwal

1  posed a question to the group of whether or not the candidate

2  knew and could handle the fact that Outcome Health was selling

3  to build at the time.  So, you know, can this candidate handle

4  the fact that we are selling something that's going to be

5  built versus something that already exists.

6          So that email indicates to me that selling to build

7  is selling on projections.

8          MR. HANKEY:  May I have one moment, Your Honor?

9          THE COURT:  All right.

10      (Counsel conferring.)

11         MR. HANKEY:  The government would offer Government's

12  Exhibit 2 as a (d)(2)(E) statement.

13         THE COURT:  All right.  It's admitted.

14      (Said exhibit admitted in evidence.)

15         MR. HANKEY:  Okay.  Let's start at the next page, the

16  very -- and the next page.

17         Okay.  This is the beginning of the email.  So why

18  don't we blow up the header and the first paragraph of the

19  email.

20         MR. BLEGEN:  Judge, could we have a sidebar briefly?

21         THE COURT:  Sure.

22      (Proceedings heard at sidebar:)

23         THE COURT:  Go ahead.

24         MR. BLEGEN:  Can we put the email back up just on the

25  screen for the --

THE COURT: Sure. Well, you know what, unfortunately because when it's on a sidebar, I can't get the document on the screen because the sidebar notice overrules that.

MR. BLEGEN: So don't hold me to the date then. I think this predates his getting to Outcome Health. I think it probably is admissible as a co-conspirator statement, but I don't see what the possible relevance is --

THE COURT: Slow down a little.

Go ahead.

MR. BLEGEN: I think it probably is admissible as a (d)(2)(E) statement, but it's before he's at Outcome Health, and I don't see any basis, the relevance of asking him questions about a conversation between Ms. Agarwal and Mr. Shah that predates his employment at Outcome Health.

I don't know what he could interpret, what he could understand anyone to mean. It has nothing to do with him.

THE COURT: Okay. Mr. Hankey.

MR. HANKEY: That's not going to happen, Your Honor. All we're going to do is read in the email through Mr. Ketchum. It's obviously relevant on its face. It's just an email exchange between Mr. Shah and Ms. Agarwal. So someone's going to have to read it in. It relates to the testimony that Mr. Ketchum gave both in content and in time. There's no other witness we're calling that, you know, can relate -- that has related or will relate events that occurred

1    going back to 2012, so we'd like to read it in through him.

2         THE COURT:  So you're essentially publishing it

3    through this witness, not asking the witness any substantive

4    questions, but having him read it into the record so the jury

5    can read it?

6         MR. HANKEY:  That's correct.

7         THE COURT:  All right.  Is there still an objection,

8    Mr. Blegen?

9         MR. BLEGEN:  Yes.  The prejudice is it gives the

10   appearance to the jury that it has something to do with this

11   witness.  This is a fact witness, not an agent who typically

12   gets called to read in emails or documents and those kind of

13   things.  It has nothing to do with him.

14        THE COURT:  All right.  Can you put an agent on to

15   publish it?

16        MR. HANKEY:  We could, Your Honor, but this -- this

17   could be presented with no witness, and it's really our

18   choice, Your Honor, when to present it.  And, frankly, we

19   think it would help the jury to understand this email in the

20   context of the timeline that's been discussed during his

21   testimony.  To call an agent after him is just going to take

22   it out of the timeframe.

23        THE COURT:  Well, I think there is -- as long as it's

24   explained up front that this email predates his -- in fact,

25   you can even state that to the jury.  This email predates his

1   employment at the company.  It's simply being read in while
2   he's on the stand --
3          MR. HANKEY:  Yes, Your Honor.
4          THE COURT:  -- to make it clear, which I think will
5   ameliorate any prejudice that it somehow is -- he's sponsoring
6   it in some way or he has relevant information about it in some
7   way.
8          So I think that's an acceptable way to do it.  This
9   is not a matter of rules of evidence.  It's a matter of trial
10  procedure on how to publish something, so --
11         MR. POULOS:  Your Honor?
12         THE COURT:  Go ahead.
13         MR. POULOS:  It also predates Mr. Purdy's time at the
14  company.  Would the Court consider that limiting instruction
15  one more time?
16         THE COURT:  Sure.
17         MR. POULOS:  Thank you.
18         THE COURT:  I can make that construction again.
19         MR. POULOS:  Thank you.
20         THE COURT:  All right.  We have about nine minutes to
21  go before the week is over.  We'll go with this, and you have
22  more testimony, I assume, or do you not?
23         MR. HANKEY:  This is it, Your Honor.
24         THE COURT:  This is it.  Okay.
25         MR. HANKEY:  You want me to explain the publishing?

1    THE COURT:  I think you should.  I don't -- you can

2    explain that this is -- predates his employment and is simply

3    being introduced while he's on the stand, and all you're

4    asking him to do is read it.

5         MR. HANKEY:  Okay.

6         THE COURT:  All right.  Objection is overruled.

7         (Proceedings heard in open court:)

8         THE COURT:  Did one juror have to leave or no?  Okay.

9         Go ahead, sir.

10        MR. HANKEY:  So ladies and gentlemen of the jury,

11   we're showing you Government's Exhibit 2, and this email

12   string here, Government's Exhibit 2, predates Mr. Ketchum's

13   employment at the company, though we're going to have

14   Mr. Ketchum -- we're publishing it to you so you can look at

15   it, and we're going to have Mr. Ketchum read it into the

16   record.

17        THE COURT:  But he can't be questioned about it

18   substantively because he just wasn't there.  And in addition,

19   this predates Mr. Purdy's employment at the company, so it's

20   not something that should be considered against Mr. Purdy, as

21   I instructed you earlier on some of these early pieces of

22   evidence.

23        Proceed.

24        MR. HANKEY:  Thank you.

25   BY MR. HANKEY:

1  Q.  Mr. Ketchum, do you see the first email in the string,
2  Steve Svec to Jennifer Suski?
3  A.  Yes.
4  Q.  Can you please read that email?
5  A.  "Jennifer, my name is Steve Svec.  I am the Diabetes
6  Health Network's account director" -- sorry, can the jury hear
7  me?  I apologize.
8         "My name is Steve Svec.  I am the Diabetes Health
9  Network's account director for Cycloset.  To give you some
10  background, the Diabetes Health Network is an educational
11  network broadcast via broadband in the waiting rooms of
12  endocrinologists who treat a high volume of diabetes patients.
13  In fact, we are currently in the waiting room of one-third of
14  all endocrinologists in the U.S.  I have attached a recent Med
15  Ad News article about our company for your review.  It's a
16  good introduction."
17         MR. HANKEY:  Okay.  Now, let's blow up the next part
18  of this email.
19  BY MR. HANKEY:
20  Q.  Can you continue reading, please?
21  A.  The DHN, Diabetes Health Network, is a really efficient
22  and effective way to reach the exact patients you want to
23  reach at the best possible moment to reach them, as they
24  prepare to speak with their physician about their condition.
25  Our programs drive sales by sparking conversation between

1  patients and their physicians, and we can track this sales

2  lift through IMS studies, comparing our offices to a control

3  group.  In fact, we will guarantee an ROI of 2-to-1 for our

4  long-term programs, and we usually do much better than that.

5          "The Diabetes Health Network is perfectly positioned

6  to drive sales by bringing your message to the right audience

7  at the perfect time and location.  Might you have some time

8  for a more detailed conversation?

9          "Please let me know if you are open to an in-person

10  meeting or a conference call.  I assure you it will be time

11  well spent.  Thanks, Jennifer.  I hope to speak with you soon.

12          "Best regards, Steve Svec."

13          MR. HANKEY:  Okay.  Let's please blow up the next

14  email in this string.

15  BY MR. HANKEY:

16  Q.  Can you read the "from" date and "to" information?

17  A.  From Steve Svec to Rishi Shah, February 16, 2011.

18  Q.  Can you read the email?

19  A.  "Rishi.  Here is the email I sent off for Cycloset

20  yesterday morning.  Jennifer looped in Jennifer Socks, and we

21  have a conference call with Jessica next Thursday."

22  Q.  Let's look at the next email.

23          Can you start by reading the "to," "from" and "date"

24  information?

25  A.  "From Rishi Shah to Shradha Agarwal and Jim Demas sent

1　Wednesday, February 16, 2011.

2　Q.　What did Mr. Shah write?

3　A.　"I really like Steve's email below.  He's using it as a

4　standard intro."

5　Q.　Let's look at the next email.  Does this reflect who wrote

6　this email?

7　A.　Yes.

8　Q.　On what date?

9　A.　February 25, 2011.

10　Q.　Who wrote it?

11　A.　Shradha Agarwal.

12　Q.　Can you read what she wrote?

13　A.　"When did our number go from one-fourth to one-third?

14　What's the backing on this?"

15　Q.　Let's look at the next email.  Who wrote this email?

16　A.　Rishi Shah.

17　Q.　To whom?

18　A.　Shradha Agarwal.

19　Q.　On what date?

20　A.　Friday, February 25, 2011.

21　Q.　Can you read what he wrote?

22　A.　"Weighted average this year equals 1000."

23　　　　MR. HANKEY:  Let's go to the next email.

24　BY MR. HANKEY:

25　Q.　Who wrote this email?

1   A.  Shradha Agarwal.

2   Q.  On what date?

3   A.  February 25, 2011.

4   Q.  What did she write?

5   A.  "Isn't it inaccurate to say we're already in?"

6          MR. HANKEY:  Can we look at the next email?

7   BY MR. HANKEY:

8   Q.  Who wrote this email?

9   A.  Rishi Shah.

10  Q.  To whom?

11  A.  Shradha Agarwal.

12  Q.  On what date?

13  A.  February 25, 2011.

14  Q.  Can you read what Mr. Shah wrote?

15  A.  "As a standalone term is" --

16  Q.  Start that over again, please.

17  A.  Yes.

18          "As a standalone, the term is inaccurate.  In this

19  context, he's selling that we're in one-third over the term of

20  when we're selling you.  You can suggest better language, but

21  I'm fine with it.  We only sell 1K anyway, not current

22  number."

23          MR. HANKEY:  Let's go to the next email.  Sorry, the

24  next one is --

25  BY MR. HANKEY:

1  Q.  Who wrote the next email?

2  A.  Shradha Agarwal.

3  Q.  On what date?

4  A.  February 25, 2011.

5  Q.  What did she write?

6  A.  "We are currently in the waiting rooms of one-third of all

7  endocrinologists in the U.S.  Seems inaccurate to me and heard

8  you say it a lot at DSE, too."

9        MR. HANKEY:  Let's look at the last email.

10  BY MR. HANKEY:

11  Q.  Who wrote it?

12  A.  Rishi Shah.

13  Q.  To whom did he write it?

14  A.  Shradha Agarwal.

15  Q.  On what date?

16  A.  February 25, 2011.

17  Q.  What did he write?

18  A.  "Let's just get to 1K quickly."

19        MR. HANKEY:  We tender the witness, Your Honor.

20        THE COURT:  All right.  We're at 4:28.  You've got

21  30 seconds, or do you want to start Monday morning?

22        MR. HUESTON:  I'd like to start.

23        THE COURT:  Go ahead.

24        MR. HUESTON:  Okay.

25        THE COURT:  Very briefly because I'll cut you off

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 264 of 274 PageID #:13642
Ketchum - cross by Hueston
1086

1  when it's 4:30.

2                    CROSS-EXAMINATION

3  BY MR. HUESTON:

4  Q.  Mr. Ketchum, you'd agree that one email often doesn't tell

5  the whole story about an issue, right?

6  A.  Yes.

7  Q.  That's right.  Context matters, right?

8  A.  Yes.

9          MR. HUESTON:  Okay.  Let's pull up Government

10  Exhibit 284 quickly, which was up earlier already admitted,

11  pop it up here.

12  BY MR. HUESTON:

13  Q.  And this is the one, while it's coming up, where it's

14  Mr. Desai writing to you with Mr. Shah not on it.  Here it is.

15  "Spoke to RS on the Pradaxa list."  And then that line:  "In

16  the end, we're open to being honest if it's caught."

17          Do you remember that?

18  A.  Yes.

19  Q.  Sure sounds bad sitting there all by itself, right?

20  A.  Yes.

21  Q.  Okay.  One thing the government didn't show you is what

22  Mr. Shah was saying and doing himself in the lead-up to this,

23  right?

24  A.  Correct.

25  Q.  Context matters, right, sir?

Case: 1:19-cr-00864 Document #: 585 Filed: 11/29/23 Page 265 of 274 PageID #:13643
Ketchum - cross by Hueston
1087

1    A.  Yes.

2            MR. HUESTON:  Let's start on that.  Let's go to

3    Government Exhibit 263, marked for identification, look to

4    push it in -- put it in at this time.

5            THE COURT:  Any objection?

6            MR. HANKEY:  No objection.

7            THE COURT:  It's admitted.

8        (Said exhibit received in evidence.)

9            MR. HUESTON:  Let's put it up, please.

10   BY MR. HUESTON:

11   Q.  And this is the same -- here we are.  It's earlier that

12   month, and here you can see there's a reference to the Pradaxa

13   campaign, and Mr. Shah is saying to Mr. Desai and Shradha

14   Agarwal:  "Yeah, this is a big deal, so we'll have to refresh

15   it somehow, the 18, 19 matches referenced below, and make sure

16   they have the right list."

17           Do you see that?

18   A.  I do.

19   Q.  Okay.  And you haven't seen this before, have you, sir?

20   A.  No.

21   Q.  Okay.  Let's quickly jump to the next document in order.

22   Let's see what Mr. Shah does two days later.

23           THE COURT:  That's the last one.

24           MR. HUESTON:  All right.  We'll pick it up on Monday.

25   Thank you, Your Honor.

1    THE COURT:  All right.  Ladies and gentlemen.  During

2   the trial, I may have asked a question myself.  I think I did

3   today.  I may have asked one earlier, and I'll probably

4   throughout the trial.

5    Don't assume that because I asked a question I hold

6   any opinion about -- on the matter I asked about or on what

7   the outcome of the case should be.

8    You have a long weekend.  Please don't discuss the

9   case among yourselves or anything else.  Think about anything

10  other than this case.  Come back healthy and rested Monday

11  morning.

12    You've been a great jury.  You've been attentive,

13  you've been timely, and we'll pick this up Monday morning, and

14  have a good weekend.  Thank you.

15    COURT SECURITY OFFICER:  All rise.

16   (Jury exits courtroom.)

17    THE COURT:  Thanks.  You can have a seat, sir.

18    Sir, you're now on cross-examination, which means you

19  cannot discuss your testimony with the government, and so

20  please abide by that and be back here tomorrow -- Monday

21  morning at 9:00, all right?

22    THE WITNESS:  Yes, Your Honor.

23    THE COURT:  Thank you.

24    MR. HUESTON:  Your Honor, may I ask for a point of

25  clarification --

1    THE COURT:  Yes.

2    MR. HUESTON: -- because I don't know the local custom

3    here, but I assume, but I just want to make sure it's

4    formalized, that that also means that, and I assume they

5    wouldn't, but that the government is not going to be talking

6    to his counsel and allowing preparation for cross, that that

7    is broadly prohibited.

8    THE COURT:  Yeah.  I'm assuming the government will

9    agree to that.

10   MR. HANKEY:  Yeah.

11   THE COURT:  I'm not even sure they would even think

12   to do that.

13   MR. HUESTON:  I figured.  I just wanted to make sure.

14   THE COURT:  That would be a work around the

15   prohibition, and they're not going to do that.

16   Does the government agree?

17   MR. HANKEY:  We do, Your Honor.

18   THE COURT:  All right.  I think they have other

19   things to do over the weekend than do that.

20   Okay.  So there you have it on the record.

21   Sir, you can leave the stand.

22   THE WITNESS:  Thank you, Your Honor.

23   THE COURT:  Anything else anyone wants to put on the

24   record; first the government?

25   MR. HANKEY:  Your Honor, I assume we'll be getting

1 | the cross exhibits over the weekend?

2 | THE COURT: Yeah, I assume so. The witness has been

3 | tendered. As many as you believe you're going to use, get

4 | them to the government by Sunday morning just like the

5 | government's going to get you what exhibits they're going to

6 | use or get a list to me Sunday morning.

7 | The government needs to, unless you have a different

8 | proposal than the one we suggested to you, the government's

9 | going to send out their list of exhibits they're going to use

10 | this coming week, and now that you have a witness who has been

11 | tendered, you ought to be doing the same to the government.

12 | Mr. Stetler is not going to be working to communicate

13 | through the government in any way, and there's no reason you

14 | can't send them so that if there are objections, we talk about

15 | them Monday morning, not every time you try and introduce a

16 | record, an exhibit, during the cross of the witness.

17 | Okay. Anything else from the government?

18 | MR. HANKEY: No, Your Honor.

19 | THE COURT: Anything else from defense?

20 | MR. HUESTON: Just -- I'm just reflecting.

21 | So I'm going to do my best to disclose what I think

22 | I'm going to use in cross --

23 | THE COURT: Right.

24 | MR. HUESTON: -- on Monday. I don't know, you know,

25 | there are things I may not want to do, and I certainly, I

1  don't know if we're going to a Tuesday, but I will in good
2  faith by Sunday give everything I would use on a Monday.  But
3  these are shifting, you know, issues, and, so, I mean, I'm
4  processing this.  I've never had to give cross exhibits in
5  advance.  I understand we don't want any slowdown, so I'm
6  going to get out what I feel in good faith I'm going to cover
7  on Monday.

8          THE COURT:  That's fine.  Do your best.  The more
9  we -- you disclose, the more we get from the government no
10  objection, you just can put them right in, we get it on the
11  record and --

12          MR. HUESTON:  I'm all for that.

13          THE COURT:  -- it will make your cross more seamless.
14  We aren't going to be having it interrupted.

15          MR. HUESTON:  Yes.

16          THE COURT:  Mr. Blegen, you raised earlier that
17  things change.  Sometimes the answer involves the need to use
18  a different exhibit than you planned or additional exhibits
19  than you planned.  I get that, and you're not going to be
20  penalized for that; but you all ought to have some idea of
21  what they're going to use, and to the extent you do, turn it
22  over or at least give the exhibit numbers.

23          MR. BLEGEN:  Judge, on that topic, sort of related to
24  the last issue.

25          THE COURT:  Yeah.

1    MR. BLEGEN:  So now that he has seen and read this

2  exhibit that he read in as a reader witness, we're free to

3  cross-examine him about it, I assume.

4    MR. HANKEY:  No, Your Honor.

5    THE COURT:  Well, he published it.

6    MR. BLEGEN:  But --

7    THE COURT:  If the whole point of it -- he didn't

8  comment on it.  He didn't say a word about it.  In fact, even

9  if he hadn't finished reading it, I would say he's essentially

10 been tendered.  He is the vessel it was presented to the jury

11 to read to them.

12   MR. BLEGEN:  I understand.

13   THE COURT:  What were you going to ask about it?

14   MR. BLEGEN:  Well, I may ask -- so here's my big

15 concern with this whole issue, and maybe I didn't explain it

16 as well as I should have.

17   He is a fact percipient witness.

18   THE COURT:  Right.

19   MR. BLEGEN:  To add to his knowledge something that

20 he didn't have previously may make him perceive things

21 differently.  And that was -- that's my concern.

22   So at a minimum, we should be able to cross-examine

23 him about it now that he has seen it and read it if we so

24 choose.  I mean, I don't know if I will or not.  I was not

25 expecting to see an exhibit that predated him come in through

1    him.

2            THE COURT:  All right.  Let's see where it goes.  You

3    may -- you're going second, I assume, on cross?

4            MR. BLEGEN:  I believe so, yes.

5            THE COURT:  So let's see how the other cross goes.

6    You may have no need to do that.  You may decide not to.  You

7    may decide to put on your own witness who's -- well, there's

8    other people in that email chain other than the defendants.

9            You may put your own witness on to talk about what

10   the content is, at least I think the beginning was other

11   people.

12           MR. BLEGEN:  Steve Svec was in the beginning of the

13   email.

14           THE COURT:  Yeah, so I'm not going to rule in

15   advance, so the government objects to you doing that.  But you

16   make a point that he may have learned something by reading it

17   that he didn't -- he wasn't aware of before, so we'll see when

18   you get to it.  I'll hear your argument when we get to that

19   point.

20           Anything else then from any other defense counsel?

21           MR. POULOS:  No, Your Honor.

22           THE COURT:  All right.

23           MR. HANKEY:  May I ask one point of clarification on

24   the exhibits?

25           THE COURT:  Yes.

1    MR. HANKEY:  So what I heard Mr. Shah's counsel say

2  is that for exhibits that he plans to use on Monday, he'll

3  provide us over the weekend.  I have no idea how long he

4  intends his cross to last.  I assume he doesn't have exhibits

5  that he plans to use on Tuesday and that he's, you know, not

6  planning to share those with us until later?

7    THE COURT:  As many as you think you're going to use

8  disclose to him on Sunday.  If -- he may not get to all those

9  exhibits on Monday.

10    But if you know you have them and you're going to use

11  them, disclose the exhibit numbers to the defense so they can

12  say no objection.  If most of them are just more emails --

13    MR. HUESTON:  Yeah, Your Honor --

14    THE COURT:  -- in this endless chain, then I expect

15  no objection, and we can just go right through.

16    MR. HUESTON:  Yeah, I hear that.

17    Look, I -- the government, I don't blame them.  I'm

18  in their shoes, I'm trying to get as many as my cross exhibits

19  as I can, and it's not because they want to look and say no

20  objection.  They want to see everything I'm going to possibly

21  go in and consider and start thinking about where they're

22  going to go on redirect.

23    I don't want to help them in that.  So what I want to

24  do is help the Court.  I want to make sure what I'm using

25  they've already been able to review and it's seamless.

1     But if I had theoretically two days of cross, I don't
2  think it's right for me to give over all that stuff well in
3  advance.  I just don't think it's appropriate, and I think it
4  compromises a lot of the objectives of cross and it does give
5  away stuff that I think hurts me strategically in a way that's
6  atypical in a trial like this.

7     THE COURT:  Do you want me to tell the government to
8  turn over exhibits as they use them for every witness going
9  forward?

10     MR. HUESTON:  No, I think a day -- it's 24 hours in
11  advance --

12     THE COURT:  Stop.  Let me finish.  Let me finish.

13     You want me to tell the government every time they
14  put a witness up, the first time you're going to know the
15  exhibits they're going to use is when they introduce them in
16  front of the jury?

17     That's -- that's -- you're asking for -- let's go off
18  the record for a minute.

19     (Discussion held off the record.)

20     (Court adjourned, to reconvene at 8:30 a.m. on 2/6/23.)

21

22

23

24

25

1                          CERTIFICATE

2          I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.

4    */s/ Elia E. Carrión*              *3rd day of February, 2023*

5    *Elia E. Carrión*                           *Date*
     *Official Court Reporter*

6

7    */s/ Sandra M. Tennis*             *3rd day of February, 2023*

8    *Sandra M. Tennis*                          *Date*
     *Official Court Reporter*

9

10   */s/ Kathleen M. Fennell*          *3rd day of February, 2023*

11   *Kathleen M. Fennell*                       *Date*
     *Official Court Reporter*

12

13

14

15

16

17

18

19

20

21

22

23

24

25