1096

1              IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3    UNITED STATES OF AMERICA,    )
                         )   Docket No. 19 CR 864
4               Plaintiff,   )
                         )   Chicago, Illinois
5      v.                 )   February 6, 2023
                         )   8:39 a.m.
6    RISHI SHAH, SHRADHA AGARWAL, )
  BRAD PURDY,            )
7                          )
           Defendants.   )
8

9          TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 5A
     BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11   APPEARANCES:

12
  For the Government:    MR. MATTHEW F. MADDEN
13                      MR. SAURISH APPLEBY-BHATTACHARJEE
                   Assistant U.S. Attorneys
14                      219 South Dearborn Street, 5th Floor
                   Chicago, Illinois  60604
15

16                      MR. WILLIAM E. JOHNSTON
                   MR. KYLE C. HANKEY
17                      U.S. Department of Justice
                   Criminal Division, Fraud Section
18                      Washington, D.C.  20530

19

20

21

22                   ELIA E. CARRIÓN
               Official Court Reporter
23             United States District Court
       219 South Dearborn Street, Room 1432,
24              Chicago, Illinois 60604
              (312) 408-7782
25          Elia_Carrion@ilnd.uscourts.gov

1　APPEARANCES (Continued:)

2

3　For Defendant
　　Shah:　　　　　　　　MR. JOHN C. HUESTON
　　　　　　　　　　　　Hueston Hennigan LLP
4　　　　　　　　　　　　620 Newport Center Drive, Suite 1300
　　　　　　　　　　　　Newport Beach, California  92660
5
　　　　　　　　　　　　MS. VICKI CHOU
6　　　　　　　　　　　　MR. MICHAEL H. TODISCO
　　　　　　　　　　　　MS. KAREN DING
7　　　　　　　　　　　　Hueston Hennigan LLP
　　　　　　　　　　　　523 West 6th Street, Suite 400
8　　　　　　　　　　　　Los Angeles, California  90014

9

10　For Defendant
　　Agarwal:　　　　　　MS. KOREN L. BELL
　　　　　　　　　　　　MR. A. ALEXANDER LOWDER
11　　　　　　　　　　　MR. STEPHEN G. LARSON
　　　　　　　　　　　　Larson LLP
12　　　　　　　　　　　555 South Flower Street, Suite 4400
　　　　　　　　　　　　Los Angeles, California  90071
13
　　　　　　　　　　　　MR. PATRICK W. BLEGEN
14　　　　　　　　　　　MS. KELSEY H. KILLION
　　　　　　　　　　　　Blegen & Garvey
15　　　　　　　　　　　53 West Jackson Boulevard, Suite 1437
　　　　　　　　　　　　Chicago, Illinois  60604
16

17　For Defendant
　　Purdy:　　　　　　　MR. THEODORE T. POULOS
18　　　　　　　　　　　MR. ERIC PRUITT
　　　　　　　　　　　　MR. JOHN PAVLETIC
19　　　　　　　　　　　Cotsirilos, Tighe, Streicker, Poulos &
　　　　　　　　　　　　Campbell, Ltd.
20　　　　　　　　　　　33 North Dearborn Street, Suite 600
　　　　　　　　　　　　Chicago, Illinois  60602
21

22

23

24

25

1    THE COURT:  Okay.  One of our jurors, Juror No. 1,
2  has indicated in a voicemail to Emily that he is ill, but
3  possibly he could come in, but he wouldn't be here until about
4  11:15.  The parties have agreed that if he is well enough to
5  come in, rather than lose him this early in the case, he would
6  sit in the overflow courtroom to prevent whatever he has from
7  spreading to someone else, where he could observe documents
8  and the arguments.
9    We're checking with him to see if, in fact, he's well
10  enough to come in.
11    The government agrees to that procedure if he is well
12  enough to come in?  We wouldn't start until about 11:15 when
13  he came in.
14    MR. MADDEN:  Yes, Your Honor, as long as the defense
15  all waive the right to challenge him participating remotely.
16    THE COURT:  Right.  Let's hear first from defense
17  counsel.
18    Defendant Shah?
19    MR. HUESTON:  We agree, Your Honor.
20    THE COURT:  And Mr. Shah, I need to hear from him.
21    MR. SHAH:  I agree, Your Honor.
22    THE COURT:  Okay.  For Ms. Agarwal?
23    MS. BELL:  We agree, Judge.
24    THE COURT:  And herself?
25    MS. AGARWAL:  Yes, Your Honor.

1          THE COURT:  Okay.

2          MR. POULOS:  Team Purdy agrees as well.

3          MR. PURDY:  We agree.

4          THE COURT:  Okay.  All right.  All defendants

5   individually have agreed through counsel and, by themselves,

6   they've agreed.  And we'll see what we can find out from our

7   juror.

8          In the meantime, I received a list of documents from

9   the government which includes --

10          And are these expected to be used for your next

11  witness?

12          MR. APPLEBY-BHATTACHARJEE:  After Mr. Ketchum, yes,

13  some of these documents are going to be used with the next

14  three witnesses.

15          THE COURT:  Okay.  There's a large number of

16  exhibits, government exhibits, under 801(d)(2)(E) for

17  admissibility which, other than the standing objection which

18  is noted for all of them, they'll all be admitted.

19          (Said exhibits admitted in evidence.)

20          THE COURT:  There's other exhibits called undisputed,

21  and I take it --

22          Is there any basis for objection to those?  Or it's

23  undisputed they come in?

24          MR. APPLEBY-BHATTACHARJEE:  We -- we had identified

25  the proffered use for those exhibits.  They are alternatively

1 offered for nonhearsay purposes. A number of them are
2 business records. And based on the government's proffered
3 use, there were no objections by the defense group to all the
4 exhibits listed there.

5 The only two exhibits -- there's one (d)(2)(E)
6 exhibit that is disputed, and one other exhibit that is
7 disputed which we're prepared to argue if the Court wishes to
8 take further argument.

9 THE COURT: Well, the (d)(2)(E) exhibit objection I
10 believe was the -- let's go off the record.

11 (Off-the-record discussion.)

12 THE COURT: Back on the record.

13 Everyone agreed that Emily can call the juror to see
14 how he is doing and whether he would agree to come in to sit
15 in the overflow courtroom.

16 Okay. As to the two exhibits that were not agreed
17 to, subject to the overall objection, the standing objection,
18 one was a document from RJ Palmer. It's Government
19 Exhibit 1093. And the objection as stated in the emails was
20 it predates the -- the date when the defense agrees that
21 the -- or believes that the conspiracy existed or that the
22 joint venture existed.

23 This is a document dated February of -- February 7,
24 2014, I believe. Is that correct?

25 MR. APPLEBY-BHATTACHARJEE: Your Honor, the date is

1 on the face of the invoice.

2 THE COURT: Right.

3 MS. CHOU: Your Honor, could I --

4 THE COURT: Go ahead.

5 MS. CHOU: So this falls into -- this is related to

6 our standing objection and related to our trial brief. But

7 because it was not categorized as a coconspirator statement,

8 it wasn't captured in our standing objections because it is a

9 separate business record. And so that's the reason why we

10 lodged an objection. There isn't anything more than that to

11 address.

12 THE COURT: All right. Well, it's a business record.

13 On the face of it, it appears to be a business record. I

14 thought the objection was that it's early in the scheme, the

15 alleged scheme --

16 (Indiscernible crosstalk.)

17 THE COURT: -- and you've lodged a standing objection

18 to the -- your contention that the -- that scheme -- it's

19 really two schemes in this case. I've overruled that in an

20 oral ruling I gave at the final pretrial conference.

21 And for the reasons given at the final pretrial

22 conference, I find this to be within the overall scheme

23 charged by the government, which started no earlier -- or at

24 least as early as 2011, I believe. And this document falls

25 well within that, so it'll be admitted over your objection.

1    MS. CHOU:  Thank you, Your Honor.

2    THE COURT:  The other document was Defense

3    Exhibit 3456, which the -- is a -- looks like an email or some

4    type of a communication between David Ma and Brad Purdy.

5    I'm not -- what's the nature of the communication?

6    It looks like an email on the top, but it's more

7    conversational in the body of it.

8    MR. JOHNSTON:  It's a chat.  It's a record of a chat

9    on Outcome's computer systems.

10    THE COURT:  Okay.

11    MR. POULOS:  Your Honor?

12    THE COURT:  Yeah?

13    MR. POULOS:  The nature of that objection is this:

14    Prior to the pretrial conference, Judge, you looked me in the

15    eye and said, if you intend to --

16    THE COURT:  Boy, that's a stark statement.  Go ahead.

17    MR. POULOS:  But, Judge, we were -- we were talking,

18    Your Honor, about, you know, what do we need to disclose?  And

19    you did say you don't have to disclose stuff for

20    cross-examination.

21    But it's one of these situations where, you know, it

22    was likely I would want that document in the defense

23    case-in-chief.  I didn't know if they were going to call

24    David Ma, you know, all that stuff.

25    So, Judge, I disclosed a lot of defense exhibits,

1 and -- and this wasn't on -- this -- this document was -- was

2 not on the government's exhibit list. And there was no

3 indication they were going to use the defense exhibit until

4 over the weekend. And so I objected to that, and I asked

5 the -- I told them it's a cross exhibit.

6 And I asked them not to discuss it with David Ma if

7 they hadn't done so at that point. And so it's a situation

8 of, you know, no good deed goes unpunished, Judge.

9 So I do object to them using that, using that

10 document. I object to them discussing it with David Ma in

11 advance of his testimony as well.

12 And -- and now further, Judge, I think I got a set of

13 exhibits from the government last night where they've now

14 taken this defense exhibit and marked it as a government

15 exhibit.

16 THE COURT: Response?

17 MR. JOHNSTON: Your Honor, the government can use any

18 document it wants provided in discovery. This document was

19 provided by the government.

20 If the Court cares to know, I actually independently

21 found it and then started cross-referencing -- well, noticed

22 that our paralegals had tagged it as a defense exhibit. And

23 rather than just redesignate -- have the same document

24 designated twice, we can -- I decided to just use the -- the

25 one that's been tagged with the defense exhibit. But there's

1    no -- there's no dibs in federal trials, right?

2              THE COURT:  Well, yeah, I'm -- there's no reason they

3    can't use it.  It was something that the government produced,

4    I assume, in discovery.  Correct?

5              MR. JOHNSTON:  We did.

6              THE COURT:  Yeah.  And the fact that you wanted to

7    use it in defense, I'm -- Ma is testifying, correct?

8              MR. JOHNSTON:  He is, Your Honor.

9              THE COURT:  All right.  Well, it's going to come in

10   one way or the other, and the government can use it.  So the

11   objection is overruled.

12             Okay.  There are a number of defense exhibits that

13   were going to be used on cross.

14             Let's go off the record.

15        (Off-the-record discussion.)

16             THE COURT:  Let's go on the record.

17             Emily spoke to the juror.  He said he's not up to a

18   one-hour train ride.  We would lose an entire day, if not

19   more, because there's no telling when he's going to be better.

20             So unless someone gives me an objection, a reason not

21   to excuse him, I will excuse him.

22             Anything from the government?

23             MR. APPLEBY-BHATTACHARJEE:  We don't object,

24   Your Honor.

25             THE COURT:  Okay.  Defense, do you need to talk for a

1    minute?  I'll let you talk if you want.

2         (Pause in the proceedings.)

3         MR. BLEGEN:  Defense as a group objects to him being

4    excused.  One, he is Juror No. 1.  Two, if we lose a juror

5    every week, we're going to run out of jurors.  And -- and,

6    you know, there might be some alternative way.  We could see

7    if the other jurors could come in on Friday, for example, this

8    week.

9         There might be another way to make up the time rather

10   than losing Juror 1, who from my point of view has been one of

11   the more attentive jurors during the trial and -- and,

12   you know, we think he's a good juror for the defense.

13        I don't know if that's a good reason from your point

14   of view, but we didn't leave him on the jury as -- by

15   accident.

16        THE COURT:  Nor did the government.

17        MR. BLEGEN:  Right.

18        THE COURT:  I am not prepared to lose a day of trial.

19   We've got 18 people sitting back there expecting to go today.

20   We have 18 people who have patterned their lives around Friday

21   off.  I have a number of matters Friday, not -- I'd move my --

22   if I could do it, I'd move everything on Friday and I'd do it

23   at 8:30 every morning this week to make up for the lost Friday

24   time.

25        But more importantly, we have 18 jurors who have --

1 | are waiting back there to start in about five minutes.  I just
2 | don't see -- and there's no telling when he's going to be
3 | better.  We could lose a day today, and he could be sick
4 | tomorrow.  The stomach flu that's running around now is --
5 | lasts a couple of days from what I've, unfortunately, heard
6 | about.

7 | So if I thought this was a personal emergency that
8 | was a one-day-for-sure problem, I might be more sympathetic to
9 | your position, Mr. Blegen.  But we can't tell whether he's
10 | even going to be ready to come in tomorrow.

11 | Short of you agreeing to let him participate by
12 | phone, which I understand, given the nature of the cross, is
13 | document-heavy, all documents he would get back in the jury
14 | room, but absent your agreeing to let him participate by
15 | phone, I'm going to excuse him.

16 | Anything else?  Or do you want to retalk that over
17 | too?

18 | MR. BLEGEN:  It sounds like we do not want to talk
19 | about that further, Judge.

20 | THE COURT:  All right.

21 | MR. BLEGEN:  Thank you.

22 | THE COURT:  All right.  Then over objection, I'll
23 | excuse that juror.

24 | Anything else anyone wants to put on the record on
25 | that issue?

1     Okay.  I'm going to have Emily contact him to excuse

2  him, thank him for his service, but -- I'd do it myself, but I

3  think we have some work to do before we bring in the jury.

4     Okay.  So Juror No. 1 will be excused.  Juror No. 13

5  will slide into the spot of serving on this jury.

6     And before she calls, I want to make sure, nobody's

7  inclined to let him participate by phone, correct?  I fully

8  understand why you wouldn't want to, but I want to make sure

9  that is the position of all the defendants.

10     MR. BLEGEN:  Correct, Your Honor.

11     THE COURT:  Okay.  All I need to hear is from one.

12     MS. BELL:  Your Honor, just one question.  I'm

13  assuming there's no easy way to get him some sort of device

14  between now and, say, you know, within a couple of hours where

15  he could view the exhibits remotely?

16     THE COURT:  I don't think so.

17     MS. BELL:  Okay.

18     THE COURT:  Not that I'm aware of.  The -- well,

19  let's -- let's double-check with our tech group and make sure

20  there's no way to do this.

21     As I said, we haven't done remote trials in this

22  district.  I know the Western District of Washington has and

23  maybe some places in California have.  We simply haven't.

24     Off the record.

25     (Off-the-record discussion.)

1    THE COURT:  Back on the record.

2    There were, I believe, eight exhibits that the

3  defense wished to use.  Exhibit 108 is a document that's a

4  duplicate of -- Defense Exhibit 108 is a duplicate of

5  Government 112, I believe.

6    Is that correct?

7    MR. HANKEY:  Yes, Your Honor.

8    THE COURT:  Defense can use whatever exhibit they

9  want that's with their number on it.

10    So 108's admitted.

11    (Said exhibit admitted in evidence.)

12    THE COURT:  The Desai plea agreement, 5255, why are

13  you going to use that with Ketchum?

14    MR. HUESTON:  Your Honor, I don't intend to -- well,

15  first of all, it will be coming into this trial, but I don't

16  intend to walk him through all the provisions of that.

17    In fact, I may not use it at all.  I think it's

18  important when we're describing -- to back up a little bit,

19  Mr. Ketchum has been presented pretty much as just kind of

20  strolling into the courtroom and wanting to tell the truth.

21  And there's been this letter signed that gives him immunity.

22  There's not much more than that in the record.

23    So I do think this is very important for someone who

24  gets a deal, that's meaningful to begin showing the jury the

25  meaningfulness of that deal.  And he's been described as the

1 pre-Ashik Desai by the government. And so, you know, I think

2 he's aware that he is -- he faces that kind of exposure, but

3 he fights and, you're aware, Mr. Desai's facing up to

4 20 years, and here's his plea, and this is what he was doing.

5 And then I move out of it. That's about the extent

6 of it, Your Honor. I think that's fair play.

7 THE COURT: Response?

8 MR. HANKEY: Well, Your Honor, I mean, as far as we

9 know -- first of all, he's never seen the Ashik Desai plea

10 agreement. You know, the government's charging decisions here

11 are not appropriate.

12 It's certainly appropriate to cross-examine

13 Mr. Ketchum on his immunity, but the decision to charge Desai

14 and not Mr. Ketchum is not an appropriate line of cross. So

15 we just don't see the intersection between the Desai plea

16 agreement and Mr. Ketchum's testimony and his immunity.

17 THE COURT: Well -- Mr. Ketchum's not in here,

18 correct? I don't see him in here.

19 All right. I'm assuming you're going to --

20 Let's go off the record.

21 (Off-the-record discussion.)

22 THE COURT: Back on the record.

23 I assume you're going to cross Ketchum and ask what

24 he thought his exposure was criminally; how much time he could

25 do in jail.

1    MR. HUESTON:  Right.

2    THE COURT:  All right.  And he'll answer that one way

3 or the other.  If he says he doesn't know, you can ask him if

4 he knew what Desai was facing.  If he says, I have no idea,

5 then I'm not sure showing him the Desai plea agreement is

6 relevant.

7    If -- if he -- you can certainly ask, Any reason you

8 think you'd have a different exposure than Desai?  And if

9 he -- I'm just struggling with the relevance of Desai's plea

10 agreement itself.

11    MR. HUESTON:  Well, Your Honor, following that very

12 type of cross -- and that is the kind of cross I'm going to

13 do -- I think it's important if he says, Well, I don't know,

14 it's -- this is partly why Your Honor has appropriately let

15 some documents in that a particular witness wasn't on to

16 provide, you know, the narrative context.

17    The impeachment, the context now that the jury needs

18 to start processing, I -- I really need to put Ketchum in

19 context.

20    THE COURT:  Well, how about this?  I have no problem

21 with you saying, Did you know Desai was facing 20 years for

22 his conduct?

23    MR. HUESTON:  Okay.

24    THE COURT:  You don't have to show him the plea

25 agreement.

1          MR. HUESTON:  Right.

2          THE COURT:  That's going to come in through Desai.

3          MR. HUESTON:  Yep.

4          THE COURT:  But you can ask him if he knew that.

5     He'll either say yes or no.

6          MR. HUESTON:  Okay.

7          THE COURT:  But you've made your point, and a point

8     that'll be reinforced later with --

9          MR. HUESTON:  That's fine.

10         THE COURT:  -- Desai.

11         MR. HUESTON:  And I'll live with.

12         THE COURT:  Okay.

13         MR. BLEGEN:  Judge, can I chime in on a closely

14    related topic?

15         THE COURT:  Yeah.

16         MR. BLEGEN:  I saw some emails back and forth about

17    the government objecting to Mr. Ketchum's immunity letter

18    coming in as evidence, which I -- I'm not sure what position

19    Mr. Shah ultimately took.  But my position is that's the

20    agreement between him and the government, and that should come

21    in.  It's much like a plea agreement.

22         THE COURT:  Are you objecting to the immunity letter

23    coming in?

24         MR. HANKEY:  No, Your Honor.  We can withdraw that.

25         THE COURT:  Okay.  The Dan Collins website, I'm sure

1    he'd love to have it put forth to the world.

2              MR. HUESTON:  No, Your Honor, I said right here,

3    we're not offering that exhibit.

4              THE COURT:  Okay.

5              MR. HUESTON:  We're not offering it.

6              THE COURT:  Good.  Okay.

7              MR. HANKEY:  On that point, though, Your Honor, our

8    understanding is that the defense plans to ask Mr. Ketchum

9    about his representation and his choice of counsel, which we

10   think is --

11             THE COURT:  In the what?

12             MR. HANKEY:  His representation in the investigation

13   and his choice of counsel, which we think isn't an appropriate

14   line of questioning.  Our understanding is that they've marked

15   this, Mr. Collins' bio, to refresh his memory about the fact

16   that Mr. Collins is a white color criminal defense attorney.

17             THE COURT:  This is unremarkable.  He's got an

18   immunity agreement from the government.  Of course he's going

19   to hire a white collar criminal defense lawyer.

20             And the defense just said they're not going to use

21   it.  If you intend to use it to refresh his memory in any way,

22   then go to sidebar before you use it.  But it seems as if the

23   defense has represented they're not going to use it.

24             So if they want to refresh his memory with it, it

25   still doesn't go in front of the jury.  It would be used to

 1   refresh his memory.  The fact that a person seeks out white
 2   collar criminal defense help, gets an immunity letter from the
 3   government, that's all relevant to his bias and what he
 4   perceived to be his exposure.  So -- but they're going to use
 5   it to refresh memory, if anything.
 6              It's not going to be offered, correct?
 7              MR. HUESTON:  Correct.
 8              THE COURT:  Okay.  There's an email chain discussion
 9   with Ketchum regarding truthfulness of Velazquez forwarding
10   email chain discussion with Ketchum regarding truthfulness and
11   emails to Purdy.
12              And there is an objection by the government in using
13   this?  This is Defense Exhibit 10119.
14              MR. HANKEY:  Yes, Your Honor.  Our objection is that
15   this is extrinsic evidence of Ketchum's lack of truthfulness
16   and should be excluded under 608(b).
17              THE COURT:  Well, he's on it, correct?
18              MR. HUESTON:  Yes.
19              THE COURT:  And I see that it's Ketchum to Velazquez
20   to start with, with a -- on a chain where even Ketchum itself
21   says:  "I need to be clear in my emails to be sure there isn't
22   any lack of communication or trust there."
23              I don't understand why this -- since Ketchum is on
24   it, this wouldn't be relevant to use for a party -- for a
25   defendant to challenge his credibility.

1    MR. HANKEY:  So, Your Honor, this -- the matter that
2    he's discussing here with Ms. Velazquez, who's his boss,
3    doesn't have any relevance to the underlying facts at trial.
4         THE COURT:  What's it about?
5    MR. HANKEY:  It relates to, as I understand it -- and
6    I, of course, haven't talked to Mr. Ketchum about this -- but
7    it relates to whether or not certain clinics had been
8    scheduled for the receipt of some advertising.
9         And it looks like, yet, Ms. Velazquez is saying that
10   he dropped the ball and didn't do his job and then he tried to
11   accuse a coworker of dropping the ball instead.  This -- it
12   doesn't really relate to anything that we covered with him on
13   direct.  Its only relevance is really in establishing that he
14   minimized what he did or, you know, lied about what Mr. Kemp
15   didn't do.
16        And so for that reason, it's just -- it's only
17   relevant to his truthfulness.  It's extrinsic evidence of
18   that.  It should be excluded under 608(b).  We wouldn't
19   oppose, you know, them asking questions on cross about it.
20   You know, but other than that, this string shouldn't come into
21   evidence.
22        THE COURT:  All right.  Final last word?
23        MR. HUESTON:  I'm sorry, last word to me?
24        THE COURT:  Yes.
25        MR. HUESTON:  Your Honor, this couldn't be more

1  relevant.  Ketchum testified at trial, "I'm here to tell the

2  truth."  They have portrayed him during this very time period

3  as being a trusted insider, entrusted, you know, with the

4  darkest secrets.  And this is a direct exchange with

5  Mr. Ketchum with his supervisor about how he's not

6  trustworthy.

7           And we're not going to get into the specific

8  underlying incident.  It's the whole point that his supervisor

9  is telling him, I find you not truthful and this isn't the

10  first time.  It's a general opinion of untruthfulness that

11  absolutely comes in.

12           And, remember, it goes to Mr. Purdy and his state of

13  mind.  He's one of the ones who has been charged here, as, you

14  know, sitting there and trusting a guy like this with the

15  darkest secrets.  It couldn't be more impactful.

16           THE COURT:  Defense Exhibit 10119 will be admitted.

17           (Said exhibit admitted in evidence.)

18           THE COURT:  I think under 608(b), it's allowed to be

19  cross-examined about.  If he doesn't remember it, since it's

20  his own document, I'm going to allow it in.

21           10120 is an email from Ketchum to Agarwal in

22  September 2017:  "Am I getting fired?"

23           What's the objection to this?

24           MR. HANKEY:  Well, Your Honor, this -- frankly, we're

25  not sure the relevance at all to this.  I mean, it's just --

1   whether or not he's being fired in 2017 has nothing to do with
2   his testimony about the conduct of the defendants' focus on
3   2012 and 2013.
4           THE COURT:  Well, but he's testified that he was
5   involved -- I thought he testified he was involved in criminal
6   activity as long as he was at that company.  Not as frequently
7   toward the end, but he was still involved in it.
8           Am I mistaken on what he said?
9           MR. HANKEY:  He testified that he -- he continued to
10  observe the types of activities that occurred in 2012 and
11  2013, and that he did encourage the defendants -- you know,
12  when there were allegations raised, he kind of encouraged them
13  by minimizing the allegations that were raised about the fraud
14  that was continuing at the -- at the company.
15          THE COURT:  Yeah.  10120 is admitted.  It goes to his
16  bias; it goes to his credibility.  And what he gave -- why he
17  thought he was being fired in 2017, we'll just have to see
18  what he says.
19          I suspect you're not even sure, because you haven't
20  had a chance to talk to him, on what the relevance of these
21  emails are.  But I'll hear a contemporaneous objection if it
22  turns out he's -- what -- what he says about these has no
23  relevance.  I can always hear an objection at that point, and
24  strike the testimony if it clearly has nothing to do with any
25  issues in this case.

1      MR. HANKEY:  Your Honor, if I may?

2      THE COURT:  Yes.

3      MR. HANKEY:  So we -- again, we're -- we don't know

4  for sure because we haven't talked to him about these

5  exhibits.  But we think that, because of the timing, this text

6  may relate to the two other exhibits that are at issue,

7  10121 and 10122.

8      And, you know, in sum, what appears to be happening

9  here is that these exhibits relate to whether or not

10  Mr. Ketchum is liked within the company, whether he's, you

11  know, an employee that his coworkers like to work with.

12  You know, I'm referring to a Voxer exchange between Mr. Shah

13  and Ms. De Voto, who was in the --

14      THE COURT:  Yeah.  Let me say this about that.

15      There's a difference between emails Ketchum is on and

16  emails between two people, Shah and De Voto, that Ketchum was

17  not on where they talked about Ketchum.  I have serious doubts

18  as to the admissibility of these two Voxers.

19      I'll certainly let defense argue about it.  But,

20  you know, the state of mind objection, which is the basis of

21  this coming in, or a present sense impression, this all

22  depends on if -- the state of mind exception under 803(3)

23  allows for this admissibility.  There's no hearsay.

24      Anybody that writes an email, that is their state of

25  mind when they write it.  If that were the -- if that were the

1 rule, you write something and it's admissible because it
2 reflects your state of mind, there would be no hearsay
3 exception.

4 A defense offering a -- in effect, a statement by
5 Mr. Shah in a defense case is hearsay. If you were to offer
6 it, the government, it's not hearsay, it's an admission.

7 But a defense offering it, at least my impression --
8 and I'll hear argument otherwise -- is that the state of mind
9 exception typically deals with intent, plan, and motive. And
10 Shah's state of mind on whether he thought Ketchum is an
11 honest guy, at least through hearsay, seems like a reach to
12 me.

13 This is different than a direct communication between
14 Ketchum and Agarwal or a -- which is the am-I-being-fired
15 email. It's different than the -- Velazquez forwarding an
16 email chain with Ketchum regarding truthfulness. Again,
17 Ketchum's on those.

18 But an email that's unrelated to Ketchum himself,
19 other than talking about him, I'm not sure state of mind is an
20 adequate basis to put those in on behalf of Shah, at least
21 from the defense side. The government can do it.

22 I'll hear argument from the defense, and then we're
23 going to -- I don't know if we know any more about the ability
24 to --

25 (Pause in the proceedings.)

1          THE COURT:  Let's see -- okay.

2          Let's hear from defense on these last two, which are

3    10121 and 10121.1 and then 10122 and 10122.1 and then 10123.

4    It's three -- it's basically five exhibit numbers, all

5    relating to two sets of Voxer interchanges.

6          MR. HUESTON:  Yeah.

7          THE COURT:  Go ahead.

8          MR. HUESTON:  Your Honor, just on the 10121, that is

9    a Voxer that actually he literally says:  "I just got off the

10   phone.  I just finished a conversation with Ketchum," and

11   he -- and it's a conversation that he had with Ketchum.

12         So there are two points here.  One, if necessary, I'm

13   going to say, "Well, Mr. Ketchum, does this refresh your

14   recollection?  You had this conversation.  Is this what Shah

15   said to you?"  He can say, "No."  I don't think anybody is

16   going to object that I can do that.

17         But secondly, Your Honor --

18         THE COURT:  Sure.  As long as it's not shown to the

19   jury.

20         MR. HUESTON:  Right.

21         And then secondly, Your Honor, this is relevant state

22   of mind of Mr. Shah.  He's been presented, Mr. Ketchum, as

23   somebody who has been trusted throughout by these guys,

24   you know, held close in the circle.

25         And here, contemporaneously in the time of the

1    alleged conspiracy, here's Mr. Shah saying, you know, I've

2    just talked to this guy, I don't trust him.  That is a

3    powerful counterpunch and impeachment.  That's the general

4    thing.

5         We can even just, you know, forget state of mind for

6    a moment.  That's just impeachment of this whole concept that

7    he was, you know, held close in the huddle.  And it makes, you

8    know, absolutely no sense if that theory is true that, you

9    know, they're internally at the time saying, you know, I don't

10   trust this guy.  You know, what are we going to do with him?

11        It completely destroys that narrative.  It's a very

12   powerful impeachment.

13        THE COURT:  You can ask him about it.  You can ask to

14   refresh his memory with an email Ketchum had with -- or I'm

15   sorry -- that Shah had with De Voto.  But its separate

16   admissibility is what I just spoke to, and I don't see it

17   being admitted at this point.

18        You can renew your request if -- at the appropriate

19   time if Ketchum denies having such a conversation with Shah.

20        MR. HUESTON:  Okay.  Thank you, Your Honor.

21        THE COURT:  All right.  Anything else on exhibits?  I

22   think that covers them all.

23        MR. APPLEBY-BHATTACHARJEE:  Before the jury comes in,

24   can I just preadmit the exhibits on the record?

25        THE COURT:  Yeah.  What I'm going to suggest we do is

1  on all of the exhibits that I've either ruled on today or --
2  on the government's side or you've -- they're being admitted
3  undisputed, subject to the standing objection on coventurer
4  statements, I'm going to simply ask you to docket it.

5        And I've already admitted them, and I'll formally --
6  remind me later, I'll formally admit them based on the docket
7  number.  But when you use them now, you no longer have to
8  separately seek admission.  Just go up to the witness and say,
9  "I'm going to show you Government Exhibit 25.  What does this
10  show?"  We're going to save a little time that way, and the
11  objections are preserved.

12        What I don't know -- there are separate objections
13  for the other noncoventurer documents, which are -- you say
14  they're undisputed, but there are objections?

15        MR. APPLEBY-BHATTACHARJEE:  So there's a subset of
16  coventurer statements where the admissibility as a coventurer
17  statement is not disputed other than the standing objection.

18        THE COURT:  Right.

19        MR. APPLEBY-BHATTACHARJEE:  There's an alternative
20  basis offered for those documents where they're either being
21  offered alternatively as business records or for their falsity
22  rather than their truth.

23        There's a limited subset of those where defense
24  counsel disputes that the documents constitute business
25  records.  I don't think that's something we need to resolve

1    this morning.  But it is something, for the sake of the

2    record, moving forward, that we would like to have resolved at

3    some point this week.

4              THE COURT:  All right.  Well, the docket -- what you

5    put on the docket may have to reflect the objections to the

6    non-801(d)(2)(E) documents.  And the docket -- what you put on

7    the docket will memorialize those objections.

8              MR. APPLEBY-BHATTACHARJEE:  Yes, Your Honor.  We will

9    do that and also incorporate the Court's rulings.  I think

10   again, today, there are only two documents that were objected

11   to that the Court has resolved the objection.

12             THE COURT:  Right.

13             MR. APPLEBY-BHATTACHARJEE:  We -- we will, in

14   addition to listing out the exhibits that have been admitted

15   today, we will flag in the docket entry those specific

16   documents for which there are pending objections on alternate

17   bases that we'll say will be ruled upon at another time.

18             THE COURT:  Okay.

19             MS. CHOU:  And, Your Honor, there is just one quick

20   thing I'd like to put on the record.

21             THE COURT:  Sure.

22             MS. CHOU:  While we've addressed this with the

23   government, and I understand that this will be remedied going

24   forward -- sorry -- but there were -- there was at least one

25   document that was added to last week's list that involves

1  Mr. Ketchum that probably should have been put in before his
2  direct closed.

3          And I did notice a document -- a newly disclosed -- a
4  document on the newly disclosed exhibit list that also
5  would -- would have been a Ketchum document.

6          So we just ask that going forward, the government
7  move all documents into evidence related to a witness before
8  that witness gets off the stand on direct, because otherwise,
9  it makes cross too much of a moving target.

10          THE COURT:  Sure.  Well, was it admitted during his
11  direct examination?

12          MS. CHOU:  It was not.  That's the issue, is that it
13  was not admitted and they are now seeking to admit it as part
14  of their list for this week.

15          THE COURT:  Well, presumably on redirect they're
16  going to use it.  But you need to put in --

17          So it's clear, all these documents being admitted are
18  not going to the jury unless they're used with a witness.
19  You're not going to dump in 100 documents that -- and I know
20  no one's going to do this, but we are not going to just dump
21  in a set of documents that the witness is not examined about.

22          They're either examined in one way or the other or
23  they're not going to be given to the jury, because that's not
24  how you --

25          MS. CHOU:  That addresses our concern, then,

1  Your Honor, as long as documents aren't going to the jury that
2  haven't been addressed.
3        THE COURT:  Yeah.  No, if the government wants them
4  to go back to the jury, use it on redirect if you have to.
5        MR. APPLEBY-BHATTACHARJEE:  Well, one thing I'll
6  note, Your Honor, is that to date, we have shown certain
7  summaries as demonstratives.  We may be seeking the
8  substantive admission of those demonstratives later as summary
9  charts.
10       There are also going to be summary charts that are
11  admitted later in evidence.  And some of the underlying
12  documents on this list are the data points that are reflected
13  in the summary charts.
14       THE COURT:  Well, if they are stipulated to as
15  documents that are admitted and the parties stipulate they can
16  go to the jury, that's fine.  But I -- I'm back where I
17  started:  If they aren't used with a witness, unless there's
18  an agreement, they're not going back to the jury.
19       And if it's a document that you need to finish a
20  summary chart you're going to seek the admission of, put it on
21  redirect or recall Ketchum.
22       MR. APPLEBY-BHATTACHARJEE:  Yes, Your Honor.
23       And I will note that I think that this concern that
24  Ms. Chou has raised is going to be mixed moving forward.  We
25  had -- all the documents on the list that we discussed this

 1  morning were disclosed, in addition to the documents that were
 2  moved into evidence live during Mr. Ketchum's testimony.
 3          Our intent was always to flag for preadmission the
 4  documents we intended to use, in this instance, with the
 5  government's first five witnesses.  And moving forward, I
 6  think we -- we will be following the same protocol of
 7  identifying documents and the basis on which we seek their
 8  admission before witnesses take the stand.
 9          So I'm hoping that this is an academic concern moving
10  forward.
11          THE COURT:  Okay.
12          MR. POULOS:  Your Honor, I -- I -- excuse me.
13          THE COURT:  Let's go off the record for a minute.
14      (Off-the-record discussion.)
15          THE COURT:  Let's go on the record.
16          Go ahead.
17          MR. HANKEY:  So last night, we received a
18  supplemental list from the defense as to some additional
19  exhibits that they added in good faith to their list.
20          And one of those was Exhibit 195, which we didn't --
21  we did not object to the defense admitting for its effect on
22  the listener, which we believe would -- it certainly includes
23  Mr. Purdy; it included the senior management team.
24          It's an email that included the senior management
25  team email address, which, you know, we believe include the

1 | other defendants as well.

2 | In the email, Mr. Demas says at the very top of the

3 | email -- this is an April 7, 2013, email:  "Hey, Brad.

4 | Pradaxa was sold on a weighted average of 1,819 screens

5 | (numbers stated in the contract)."

6 | We would object to this email being admitted for the

7 | truth.  We'd ask for a limiting instruction when it's

8 | admitted.  Our understanding is that the defense would like it

9 | to be admitted for the truth.  And, you know, if the Court is

10 | entertaining that, we'd like to be heard on the reasons why we

11 | don't think that's appropriate.

12 | THE COURT:  Are you offering it for its truth?

13 | MR. TODISCO:  Yes, Your Honor.  It's our position

14 | that --

15 | THE COURT:  Well, before I -- what I'd like you to do

16 | is give me a copy of it.  And we'll deal with it -- I'll look

17 | it over and we'll deal with it at our first break.

18 | It's not coming up before the first break, I assume.

19 | MR. TODISCO:  It will not, correct.

20 | THE COURT:  Okay.  Great.  Let me take a look at it.

21 | Yeah, sure.  Thank you.

22 | Okay.  Why don't we go to chambers, then.

23 | (Pause in the proceedings.)

24 | THE COURT:  All right.  Government 195 is going to be

25 | offered by the defense.

1    Is that -- by Defendant Shah, do you intend to offer
2    it?
3    MR. HUESTON: Yes, Your Honor.
4    THE COURT: Okay. And defense wishes to offer it as
5    substantive evidence, and you're objecting to its being
6    offered for the truth.
7    Why?
8    MR. HANKEY: Your Honor, because it's -- it's
9    hearsay. And the assertion is -- is false. And it's clearly
10   false.
11   We can show through another exhibit, Exhibit 263,
12   that Mr. Shah, at least, understood some months later that it
13   was not a weighted average campaign. And then, you know,
14   we've seen the contract doesn't provide for weighted average
15   deliveries.
16   So while it's relevant to the intent of the
17   defendants, the assertion itself shouldn't come in for the
18   truth because of its lack of reliability.
19   THE COURT: Well, why isn't -- what is the lack of
20   reliability? It's a 2013 email from Demas to Purdy talking
21   about Pradaxa's being sold on a weighted average. That may or
22   may not be true, but isn't that the subject of additional
23   evidence as opposed to --
24   What's the reason this isn't, in effect, a business
25   record anyway?

1          MR. HANKEY:  Because it's a -- it's a straight

2   comment in a string of emails, Your Honor.  It's not something

3   that's being, you know, generated pursuant to a regular

4   process of the company.  And again, even if it were -- if it

5   did meet the elements of the business record section, it does

6   lack reliability.

7          And it -- we can kind of cover that if you like as

8   well, Your Honor.  But these assertions about weighted average

9   campaigns, weighted average was an excuse, effectively, that

10  these defendants and their coventurers would make any time

11  that they realized that the -- their clients were about to see

12  that they were under-delivering, and they would kind of go

13  back to this weighted average understanding.

14         THE COURT:  But this is between Demas and Purdy,

15  correct?

16         MR. HANKEY:  It is.  I don't have it in front of me,

17  Your Honor.

18         THE COURT:  Yeah, I'm sorry; you gave it to me.

19         MR. HANKEY:  Yeah.

20         THE COURT:  But it's between -- the top part, which I

21  think is the part you're concerned about, is between Demas and

22  Purdy, who are presumably two insiders.  Isn't Demas -- was

23  Demas one of the salespeople that you were trying to keep

24  things away from?  I didn't think so.

25         MR. HANKEY:  No, he wasn't.

1    THE COURT:  All right.  So it's two insiders, a

2  defendant and Demas, who presumably has no reason to be hiding

3  the truthfulness of the weighted average assertion from

4  salespeople.  I don't see where this is unreliable.

5    I mean, it may be false.  That's what you have to

6  prove if that's the -- your theory of the case.  But I don't

7  think this document is -- well, I -- I'll reverse it.  I think

8  this is a business record.  These are routine communications

9  between insiders at the company about what the contract with

10  Pradaxa was.

11    So I believe it has a -- it's made at or near the

12  time of the events.  It -- you know, I think it's admissible

13  as a business record.  And Ketchum, he's CC'd.  You can ask --

14  the defense can ask Ketchum about this on cross.  He's a CC on

15  this thing.

16    MR. HANKEY:  Our concern, Your Honor, is that if this

17  is a business record, then -- I mean, it just opens the

18  floodgates on both sides, really, for the admissibility of

19  just random email exchanges about the contracts and -- and

20  events that we're discussing at trial.

21    And it -- it really doesn't bear the type of

22  systematic use of company records and -- and the like.

23  There's no indicia here that Mr. Demas went and looked at the

24  contract.  Of course if he had, it wouldn't have shown that it

25  was a weighted average contract.

1        THE COURT:  It was or was not?

2        MR. HANKEY:  The contract was not a weighted average

3    contract.

4        THE COURT:  Right.  Okay.

5        MR. TODISCO:  And I can respond to that, Your Honor.

6        THE COURT:  Go ahead.

7        MR. TODISCO:  This is not just a straight comment

8    about a contract.  Mr. Demas was the CFO of Outcome at the

9    time.  And, in fact, Mr. Ketchum testified last week that

10   Mr. Demas was responsible for contracting at Outcome.

11       So this is squarely within the responsibilities of

12   this high level employee who is speaking about areas within

13   his direct knowledge and something that he would have been

14   personally involved in.  Moreover, Mr. Ketchum described these

15   MS weekly reports that he sent out being part of his job

16   responsibilities and something that he sent to senior

17   management.

18       So the whole record is directly within what these

19   employees did on a day-to-day basis.  And this would in no way

20   open the door for, you know, just some off-the-cuff comment

21   coming in.  You know, "I think this, I think that."  This is

22   the person responsible for this area at Outcome explaining

23   what he understood the contract to be and sending it not only

24   to Mr. Purdy, but to the entire senior management team.

25       And, of course, just a final point, whether or not

1  this is truthful or the truth is a separate question about
2  whether the jury can consider it for the truth.  And that's
3  all we're asking for.
4           MR. HANKEY:  Your Honor, Mr. Demas --
5           THE COURT:  Go ahead.
6           MR. HANKEY:  -- they -- they could call Mr. Demas to
7  testify to lay the necessary foundation if he can do it.
8           If I may, too, just add a finer point on my comments
9  about the lack of reliability for these types of statements.
10  I'll refer the parties and the Court to exhibit -- Government
11  Exhibit 263, which I can provide the Court a copy of.
12           But in it, Ms. Agarwal -- this is August 6, 2013 --
13  writes:  "Reminder, the biggest issue here is that the list
14  they have of 1,819 matches isn't the true list.  Not even
15  one-third of it was installed at the time."  She's referring
16  to Pradaxa, the client, and the list that they have.
17           And then Mr. Shah responds to Ms. Agarwal and copies
18  Mr. Desai:  "Yep, this is a big deal, so we'll have to refresh
19  it somehow and make sure they have the right list.  If they
20  insist on doing a study internally, we'll have to send it to
21  them with dates of initial operation and just go to a" -- in
22  quotes -- '"weighted average understanding.'"
23           "We'll try to move away from that, but that's the
24  only contingency plan I can think of.  Let me know if you guys
25  see other options."

1    And, Your Honor, I mean, it's our view that the
2    defendants used these self-exculpatory comments about weighted
3    average campaigns throughout the course of the conspiracy to
4    kind of marshal -- circle the wagons around what their common
5    narrative is going to be if they're caught in doing what
6    they're doing, so --

7    THE COURT:  If those exhibits -- have you offered
8    those, the one you just referred to?

9    MR. HANKEY:  Not yet, Your Honor, because it -- you
10   know, it doesn't include Mr. Ketchum on it.

11   THE COURT:  But you will be?

12   MR. HANKEY:  Yes.

13   THE COURT:  As admissions by the defendant?

14   MR. HANKEY:  Yes.

15   THE COURT:  All right.  But those -- is there an
16   indication that Demas, who is the author of this, is saying
17   that it's a weighted average because he's trying to somehow
18   circle the wagons and set up a defense for any trial that may
19   occur years later?

20   MR. HANKEY:  Well, I mean, Your Honor, he's just
21   wrong.  I mean, and that's -- you know, it's --

22   THE COURT:  Well, that's -- that's fine.

23   And the -- and part of an admission of a business
24   record, why it's admitted is because the regularity of the
25   communication enhances the reliability of the truthfulness --

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 38 of 293 PageID #:13690

1  for truthfulness of the document.

2          That's why a business record exists.  They're routine
3  practices and, therefore, there's no real reason to doubt the
4  veracity of the document itself.

5          When is this going to come up?

6          MR. TODISCO:  After lunch, presumably.

7          THE COURT:  Okay.  Let me give it some more thought.
8  I understand the government's position; I understand yours.

9          And this goes back to an issue we raised at the
10  beginning of trial about are emails business records or not.
11  And I think I -- at that time, I think it's -- I told you I
12  thought it was situational, depending on the timing, depending
13  on who the people were on the email, depending on what the
14  content of the email was.

15          The mere fact they're wrong, frankly, I'm not sure,
16  you know, that that is the sole determining factor.

17          MR. HANKEY:  Our view, Your Honor, is really just
18  to -- the fact they're wrong underscores the -- our position
19  that this -- these kinds of statements are really -- they're
20  just self-exculpatory, circling the wagons types of statements
21  they're making in emails, not for the purpose of getting
22  everyone on the same page and, you know, informing the company
23  of what the business records of the company show, but really
24  for that other purpose.

25          If it was -- if it was that Mr. Demas was

1  communicating with the records that the company showed, the
2  contract doesn't show that it's a weighted average contract.
3  And so it's -- that supports our view that that's the intent
4  behind making this statement and other statements like it.

5          MR. TODISCO:  And, Your Honor, if I may respond.

6          There's no email that I'm aware of or that the
7  government has produced to show that Mr. Demas somehow ten
8  years ago was laying a record to show that this was actually a
9  weighted average campaign when he knew that it wasn't.

10          So absent something like that, showing that this is a
11  smoke screen, I mean, we are four years before issues come to
12  light.  The presumption is that this is something within
13  Mr. Demas', the CFO's, responsibility.  As Mr. Ketchum
14  testified, Mr. Demas was responsible for contracting.  And he
15  is describing the contract that he wrote and that he entered
16  into.

17          THE COURT:  Okay.  All right.  Well, I'll consider
18  your arguments and let you know about its admissibility for
19  the truth as opposed to for state of mind at lunchtime or
20  before it's used in the afternoon.

21          Okay.  Off the record.

22          (Off-the-record discussion.)

23
24
25

1    THE COURT:  Back on the record.

2    We'll bring in the jury.

3    And let's have your witness come in, please.

4    (Jury in.)

5    THE COURT:  Please be seated, ladies and gentlemen.

6    Thank you for being so patient.  I believe we have it

7    set up where the juror who was ill but able to still

8    participate is both listening to the witness examination and

9    in a position to see the witness and also see exhibits when

10   they're displayed.

11   Also, I ask that you not sit at that seat right over

12   there because Louie would then be blocked, and it's important

13   he see the courtroom in his position as court security

14   officer.

15   So, we'll go back to normal when our juror is better.

16   Hopefully by tomorrow.  And thank you all for being patient.

17   Okay.  You may continue.

18   Sir, you're still under oath.  Do you understand

19   that?

20   THE WITNESS:  Yes, your Honor.

21   THE COURT:  All right.

22   You may continue cross-examination.

23   And we've had a method where the juror can

24   communicate with Emily and my law clerk if there's any

25   technical problems at his end.  If we don't hear from

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 41 of 293 PageID #:13693
Ketchum - cross by Hueston
1136

1  Mr. Santiago, Mr. Santiago, we're going to assume you hear

2  everything.  Same rules apply at home as they do here.  No

3  outside communication.  Please obviously pay attention to the

4  testimony and the exhibits, and we'll go from there.

5           Proceed.

6           MR. HUESTON:  Thank you, your Honor.

7       JASON KETCHUM, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

8           CROSS-EXAMINATION ON BEHALF OF DEFENDANT SHAH

9  BY MR. HUESTON:

10 Q.  Mr. Ketchum, you might recall we left off with the idea

11 that context matters.  And you agreed with that, right?

12 A.  Yes.

13 Q.  And it's been a long weekend, so let's just reorient

14 quickly to where we were.  Let's go to Government Exhibit 284.

15          MR. HUESTON:  Put that back up, please.

16 BY MR. HUESTON:

17 Q.  And here it is.  And you'll remember that we covered this,

18 that, standing alone here spoke to RS on the Pradaxa list.

19 Next sentence:  In the end, we are open to being honest if

20 it's caught.  But given the lack of communication between

21 research and brand teams, I think this will be highly

22 unlikely.

23          We covered that, right?

24 A.  Correct.

25 Q.  Sounds bad in isolation, you'd admit, right?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 42 of 293 PageID #:13694
Ketchum - cross by Hueston
1137

1  A.  Yes.

2  Q.  Okay.

3       Let's look at context.  We started and we only had a

4  few minutes.  We went back beforehand to August 6th, 2013, to

5  see what Mr. Shah was actually saying.  So, let's go back to

6  that Exhibit 263.

7       And here, up at the top, he's saying to Ms. Agarwal

8  and Desai in response to this issue -- look at the embedded

9  part first:  The biggest issue here is they have a list of

10 1819 matches that isn't the true list.

11       He responds:  Yup, this is a big deal.  So, we'll

12 have to refresh it somehow and make sure they have the right

13 list.

14       That's what he says, right?

15 A.  Yes.

16 Q.  Okay.  And let's see what happens after that.

17       Let's go to DX 7532.  And here, it's now a couple

18 days later, August 8th, right?

19 A.  Yes.

20 Q.  All right.

21       And if we go to the embedded e-mail, here's Mr. Desai

22 talking to Rishi Shah and Bob Mons, right?

23 A.  I just see the e-mail from Ashik to Shradha.

24 Q.  That's at the top.  Yeah.  Let's --

25 A.  Oh, I see.  Okay.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 43 of 293 PageID #:13695
Ketchum - cross by Hueston
1138

1    Q.  Yeah, our bad.  We showed you -- there's the embedded.  It
2    goes from Desai to Shah and Mons, right?
3    A.  Yes.
4    Q.  And before I get into the language of this, Pradaxa, that
5    was sold by BI, right?  That was the company?
6    A.  Yes.
7    Q.  Okay.  So, let's see what Mr. Desai is doing after
8    Mr. Shah said, let's disclose this.
9            Hey Rishi, just got off the call with Greg at BI.
10           Right?  Do you see that?
11   A.  Yes.
12   Q.  And, then, down in the next paragraph:  Their research
13   lead Brett has required a list of physicians with starting
14   dates of the CM campaign --
15           That's ContextMedia, right?
16   A.  Yes.
17   Q.  -- as they will do a time alignment, so we are good from
18   that end.
19           Do you see that?
20   A.  Yes.
21   Q.  Okay.
22           And, by the way --
23           MR. HUESTON:  We can put this document down.
24   BY MR. HUESTON:
25   Q.  You understand generally this term "time alignment."  That

Ketchum - cross by Hueston

1139

1    means offices installed over time, right?

2    A.  That's correct.

3    Q.  So, not all at once, right?

4    A.  Correct.

5    Q.  Okay.

6         Let's go on and see what happens after that.  Let's

7    go to Government Exhibit 275.  We'll put that up.  Same day.

8    And Mr. Shah is writing back to Mr. Desai with you on it and

9    Shradha Agarwal, right?

10   A.  Correct.

11   Q.  And he writes:  Hey, Ashik, Jay.

12        Do you see that at the top?

13   A.  I do.

14   Q.  Then down in the last paragraph:  From speaking to Ashik

15   this a.m., it sounds like we'll be okay giving them a list of

16   physicians with dates of the program start and they'll do time

17   alignment on their end.

18        That's what he says, right?

19   A.  Correct.

20   Q.  All right.

21        And, then, let's go now forward in time to just a

22   couple days before that first e-mail.  Now we go to Defense

23   Exhibit 7562.  And let's see what Mr. Desai is telling

24   Mr. Shah here.

25        Subject Re: BI meeting.  Do you see that?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 45 of 293 PageID #:13697
Ketchum - cross by Hueston
1140

 1   A.  I do.

 2   Q.  BI, maker of Pradaxa, right?

 3   A.  Correct.

 4   Q.  All right.

 5          Hey, Rishi --

 6          MR. HUESTON:  Let's go into it.

 7          Now let's go to the third paragraph.

 8   BY MR. HUESTON:

 9   Q.  To date, I told Bob I will have the prescriber list ready

10   and he can mention it to Greg again next week --

11          Do you see that?

12   A.  I do.

13   Q.  -- at which point I will send the file that afternoon.

14          Right?

15   A.  I see that.

16   Q.  That's what he tells Mr. Shah, right?

17   A.  Correct.

18   Q.  Mr. Shah is on that e-mail, correct?

19   A.  Yes.

20   Q.  Okay.

21          So, that -- let's go back now to the e-mail where we

22   started, 284.  Let's take a look at this e-mail.  This is the

23   e-mail where we started without context, right?  Do you see

24   it?

25   A.  I do.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 46 of 293 PageID #:13698
Ketchum - cross by Hueston
1141

1  Q.  Notice at the top, this is from Mr. Desai to you, correct?

2  A.  Yes.

3  Q.  Do you see Mr. Shah on this e-mail?

4  A.  I do not.

5  Q.  Right.  It's not sent to him, is it?

6  A.  Does not appear so.

7  Q.  And there's not any evidence this was forwarded to Mr.

8  Shah, right?

9  A.  Doesn't look that way.

10  Q.  Right.

11       And you're not here to tell the jury that Mr. Desai

12  is a truth teller; are you, sir?

13  A.  No.

14  Q.  You understand that he's an admitted liar and fraudster,

15  right?

16  A.  Yes.

17  Q.  And, in fact, you're aware that Mr. Desai has even said

18  that he hid his fraud from Mr. Shah.  Are you aware of that?

19  A.  I'm not.

20  Q.  Okay.  We can put this aside.

21       Now, in your exam over the course of two days with

22  Mr. Hankey, you admitted to telling a lot of lies; is that

23  fair?

24  A.  Yes.

25  Q.  Okay.

1    But you didn't talk about all the lies that you told
2  while at Outcome Health, right?
3  A.  I can't speak to that.
4  Q.  Okay.
5    And, in fact, sir, you've had trouble telling the
6  truth your whole life, right?
7  A.  I don't -- I don't believe so.
8  Q.  Okay.
9    Well, let's start with Outcome Health.  Ten years
10  ago, sir, your direct supervisor -- this is 2012, 2013 -- she
11  had to plead with you to just please be honest.  Do you
12  remember that?
13  A.  I don't.
14  Q.  Okay.
15    MR. HUESTON:  Let's go to CX 10119.
16  BY MR. HUESTON:
17  Q.  By the way, Silvia Velazquez, she was your supervisor in
18  2013 or so, right?  Do you remember --
19  A.  Yes.
20  Q.  -- that?  Okay.
21    And, so, let's put this up.  And we're going to start
22  at the embedded e-mail there.  It's from you, Jason Ketchum,
23  August 7th, 2013, to Silvia Velazquez.  Do you see that?
24  A.  I do.
25  Q.  You start by saying, I appreciate the feedback, right?

 1  A.  I do.

 2  Q.  Well, let's look at what she was telling you.

 3         MR. HANKEY:  Object to the narrative.

 4         THE COURT:  Just ask questions.

 5         MR. HUESTON:  Yeah.

 6  BY MR. HUESTON:

 7  Q.  Let's go down to the bottom of two e-mails at Page 3 going

 8  into Page 4.  And we can see that Ms. Velazquez is relaying a

 9  request from a client about when her, quote, customization is

10  going to go live.

11         Do you see that?

12  A.  I do.

13  Q.  Okay.

14         And Ms. Velazquez notes that the client had sent the

15  customizations to you and was chasing an answer from multiple

16  people at Outcome Health.  Do you see that?

17  A.  I do.

18  Q.  All right.

19         And, then, we go to the middle of Page 3.  Middle of

20  Page 3 you claim, quote, they were already done.  TK --

21         That's Travis Kemp, by the way, right?

22  A.  Correct.

23  Q.  -- TK scheduled them.  They should show on their screen

24  tomorrow.  I was working on them this week.

25         Do you see that language?

1  A.  I do.

2  Q.  But now following up the next two e-mails above, let's go

3  to Page 2 when Ms. Vasquez e-mails Mr. Kemp to confirm he'd

4  already scheduled the videos.

5          MR. HUESTON:  Let's pull that up.

6  BY MR. HUESTON:

7  Q.  He says that he just received one of the videos earlier

8  that day and that for the others, you had not yet entered the

9  media changes.

10         Do you see that?

11  A.  I do.

12  Q.  Okay.

13         And, then, we go up one more e-mail.  And even though

14  you had started the e-mail chain by claiming the videos were

15  already done earlier in the week, you now change your story to

16  say they're done now, right, sir?

17  A.  Yes, it appears that.

18  Q.  Okay.

19  A.  Yes.

20  Q.  And now let's go to the top of Page 2, Ms. Velazquez's

21  response.  And she writes:  Okay.  This morning, the way you

22  phrased the e-mail made it seem like you did them prior and

23  were just waiting for slacker Travis to upload them.

24         Do you see that language?

25  A.  I do.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 50 of 293 PageID #:13702
Ketchum - cross by Hueston
1145

1  Q.  Whereas what I think really happened is that you forgot

2  about them and did them after I sent you the e-mail at 8:45

3  a.m.

4        Do you see that?

5  A.  I do.

6  Q.  And you would admit she's saying that you lied and tried

7  to blame Mr. Kemp for your own mistake, right, sir?

8  A.  That's what it looks like.

9  Q.  Okay.

10        And, then, she goes on and says:  We all make

11  mistakes and it's okay if you forgot, as long as you tell me

12  so I could have helped you and we could have gotten them done

13  together.  Or heck, I could have just done them myself,

14  honestly.

15        And, then, she says:  Please just be honest with me.

16        That's what she says, right?

17  A.  Correct.

18  Q.  And she goes on and says:  I would appreciate it and we

19  would have a better working relationship this way.  I hope you

20  take this as constructive criticism.

21        So, you see, your supervisor is telling you, sir,

22  that she's concerned and needs to help you accept

23  responsibility for your own actions, right?

24  A.  Correct.

25  Q.  All right.

1    And, then, if we go up one paragraph, she goes on and

2    she says:  I'm not sure if you were aware of this, but the way

3    you phrase e-mails sometimes makes it seem like you are hiding

4    something by not fully telling the truth.

5    See that?

6    A.  I do.

7    Q.  So, your boss feels the need to tell you it's important

8    not to hide things, right?

9    A.  Yes.

10   Q.  And to tell the whole truth, correct, sir?

11   A.  Uh-huh, yes.

12   Q.  And she continues:  This isn't the first time you do this,

13   so I feel like it's my responsibility to tell you as a friend

14   and colleague, especially since I've heard similar comments

15   from other people and I don't want anyone thinking negatively

16   of you.

17   Did I read that correctly?

18   A.  Yes, sir.

19   Q.  So, it wasn't the first time; was it, Mr. Ketchum?

20   A.  I can't speak to that.

21   Q.  You were being told that.  That's what she said, right?

22   A.  I was being told that, yes.

23   Q.  Okay.

24   MR. HUESTON:  So, we can put that down.

25   BY MR. HUESTON:

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 52 of 293 PageID #:13704
Ketchum - cross by Hueston
1147

1   Q.  Now, you're aware, sir, that the government has alleged

2   that you worked closely with Mr. Shah and Agarwal to further a

3   fraud scheme, right?  You understand that?

4   A.  Yes.

5   Q.  And during the government's opening, sir, the jury was

6   told that you had gained their trust and that you were only --

7           MR. HANKEY:  Objection, your Honor.

8   BY MR. HUESTON:

9   Q.  -- one of four or five people --

10          MR. HANKEY:  Objection.

11  BY MR. HUESTON:

12  Q.  -- entrusted with dark secrets behind the success of the

13  company --

14          THE COURT:  Sustained.

15  BY MR. HUESTON:

16  Q.  -- at the time of the fraud.

17          THE COURT:  Sustained.

18          MR. HUESTON:  Okay.

19  BY MR. HUESTON:

20  Q.  Are you aware -- well, sir, do you believe that you're one

21  of only four or five people entrusted with dark secrets behind

22  the success of the company?

23          MR. HANKEY:  Object to form.

24          THE COURT:  He can answer, if he can.

25  BY THE WITNESS:

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 53 of 293 PageID #:13705
Ketchum - cross by Hueston
1148

 1   A.  I can't speak to that.
 2   BY MR. HUESTON:
 3   Q.  Well, do you think you were in a trusted circle of four or
 4   five people at Outcome Health that were entrusted with dark
 5   secrets?
 6   A.  I --
 7   Q.  Does that sound right?
 8   A.  I have -- I have no idea.  I really can't speak to that.
 9   Q.  Well, you don't feel that fits you or that might fit you?
10   A.  I don't feel that fits me.
11   Q.  Okay.  Thank you.
12          And let's see, frankly, if you were entrusted by --
13          MR. HANKEY:  Objection.  Narrative.
14          THE COURT:  Please just ask questions.
15          MR. HUESTON:  Let's go to CX 10120.  Let's put that
16   up.
17   BY MR. HUESTON:
18   Q.  This is a text from you to Ms. Agarwal on September 8th --
19   28th, 2017.  Do you see that?
20   A.  Yes.
21   Q.  And you ask, am I getting fired?  Do you see that?
22   A.  I do.
23   Q.  And let's go to Pages 2 to 3.  If we look at the next
24   three texts all from you, you say:  Rishi just added a
25   one-to-one to my calendar for the end of the day today.

1    Do you see that?

2  A.  Yes.

3  Q.  And what does one-to-one mean?

4  A.  One-on-one conversation.

5  Q.  Okay.

6      And, then --

7      MR. HUESTON:  Next text.

8  BY MR. HUESTON:

9  Q.  Then you wrote:  I'd rather it came from you, right?

10 A.  Yes.

11     MR. HUESTON:  And, then, next text.

12 BY MR. HUESTON:

13 Q.  I'm freaking out quite a bit, right?

14 A.  Yes.

15 Q.  And let's see Ms. Agarwal's response.  Quote, Page 4, she

16 writes:  Jason, I'm in New York City today.  No.  We do need

17 to have a candid conversation about where you want your career

18 to grow and whether that opportunity is still here or one of

19 our portfolio companies or elsewhere.

20     That's what she writes, right?

21 A.  Yes.

22 Q.  And you recall what was communicated at that candid

23 conversation with leadership?  Do you remember what was said?

24 A.  I don't.

25 Q.  Okay.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 55 of 293 PageID #:13707
Ketchum - cross by Hueston
1150

1           Well, let me see if I can refresh your recollection.

2           MR. HANKEY:  Your Honor, we'd object to hearsay.

3           THE COURT:  Well, first is to see if he can refresh

4    his recollection.

5    BY MR. HUESTON:

6    Q.  So, let me show you -- and we'll just put this up for

7    attorney and your eyes only --

8           THE COURT:  And this is obscured from the remote

9    juror, too; is that correct?

10          MS. DOMINIAK:  Yes, your Honor.

11          THE COURT:  If you've got a hard copy, you may just

12   want to show it to him.

13          MR. HUESTON:  Yes.  Let me see if I can grab a clean

14   hard copy.

15          With permission, may I approach?

16          THE COURT:  Go ahead.

17       (Document tendered.)

18   BY MR. HUESTON:

19   Q.  And, Mr. Ketchum, I put in front of you a document and

20   I've underlined the language I'd like to review to see if it

21   refreshes your recollection that that was a point of

22   discussion with you.

23   A.  I don't recall that.

24   Q.  Okay.  You can give me that back.

25   A.  You said just read the underlined copy?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 56 of 293 PageID #:13708
Ketchum - cross by Hueston
1151

1    Q.  Yeah.

2          By the way, Mr. Ketchum, I don't think this was

3    mentioned on direct, but in 2018, you actually deleted all

4    your Voxers, right?

5    A.  Oh, I don't recall that.

6    Q.  Okay.  We'll get back to that.

7          MR. HANKEY:  Object to the narrative, your Honor.

8          THE COURT:  I think just asking questions is fine.

9    None of these narratives are all that prejudicial.  But

10   nonetheless, the proper form is to ask questions.  Don't need

11   introductory comments before a new paragraph starts.

12   BY MR. HUESTON:

13   Q.  Now, on direct -- well, let's go to GX 1124.  And this is

14   a February 23rd, 2017, e-mail from you to Ms. Agarwal, forward

15   feedback.

16          Do you see that?

17   A.  Yes.

18   Q.  And you're forwarding a message you sent to Mr. Shah,

19   right?

20   A.  Yes.

21   Q.  All right.

22          And let's go to Page 2.  And I want to go to

23   "Employee Voice and Career Satisfaction" section.  Do you see

24   that?

25   A.  Yes.

1  Q.  And your recommendation includes that, quote:  We aren't a

2  multi-thousand-person business yet, and part of our secret

3  sauce has always been our ability to make employees feel

4  comfortable in sharing their thoughts.  I've even been on the

5  negative end of that when I had employees raising concerns

6  about my leadership, but it was and is the best thing for the

7  business and I'm glad it happened.

8          Do you see that?

9  A.  Yes.

10  Q.  So, this is you writing this, right?

11  A.  Yes.

12  Q.  So, even from your own perspective, sir, you did

13  understand that you had been moved from a prior role due to

14  people raising concerns about you, right?

15  A.  Yes.

16  Q.  Okay.

17          Now, earlier we saw the text of Ms. Agarwal where you

18  asked if you were getting fired, right?

19  A.  Yes.

20  Q.  She wasn't the first person you messaged while at Outcome

21  Health asking if you were getting fired, right, sir?

22  A.  Probably not.

23  Q.  And with all the complaints about you, you'd admit maybe

24  you were getting a little paranoid about getting fired; is

25  that fair?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 58 of 293 PageID #:13710
Ketchum - cross by Hueston
1153

1    MR. HANKEY:  Objection.  Relevance.

2    THE COURT:  Overruled.

3  BY THE WITNESS:

4  A.  I can't speak to that.

5  BY MR. HUESTON:

6  Q.  Okay.  Let's go to CX 10123.  And you see this is an

7  e-mail from Travis Kemp to Mr. Shah and Ms. Agarwal, subject

8  Jason, right?

9  A.  Yes.

10  Q.  Do you see that?

11    And we can see below that Mr. Kemp pasted a chat with

12  you into the e-mail.  Do you see that?

13  A.  Yes.

14  Q.  And the top two -- it's a little fuzzy.  Let's see if we

15  can read it.  The top two messages from you say:  So, did you

16  figure out any good info in the meeting yesterday?  Am I

17  getting sacked?

18    Do you see that?

19  A.  I do.

20  Q.  Again, just assumed you had done something worthy of

21  getting fired, right?

22  A.  No.  Not necessarily.

23  Q.  You just thought you'd ask?

24    THE COURT REPORTER:  I'm sorry?

25    THE WITNESS:  I said no, not necessarily.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 59 of 293 PageID #:13711
Ketchum - cross by Hueston
1154

1    BY MR. HUESTON:

2    Q.  Not necessarily.

3            You just --

4            THE COURT:  Try and keep the mic close.  I know when

5    you look at the screen --

6            THE WITNESS:  Sorry, your Honor.

7            THE COURT:  -- your head is away from the mic.  So,

8    try and move them where you can do both.

9            THE WITNESS:  Sorry.

10           THE COURT:  Go ahead.

11   BY MR. HUESTON:

12   Q.  So, you just asked, am I getting sacked?

13   A.  I don't remember the context of the conversation, but --

14   Q.  Okay.

15           But you don't doubt that's you asking, am I getting

16   sacked, right?

17   A.  That's me.

18   Q.  And this is a separate time from the one I showed you

19   earlier, right?

20   A.  Yes.

21   Q.  And, then, let's see what Mr. Kemp writes above.

22           Rishi, Shradha, Jason has been all over me asking why

23   Matt and I were held back yesterday and he wasn't invited.

24   Might be a good idea to address sooner than later.  I can tell

25   he is not all mentally there right now.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 60 of 293 PageID #:13712
Ketchum - cross by Hueston
1155

1           Did I read that correctly?

2    A.  Looks that way, yes.

3    Q.  Now let's go to CX 10124.  And this is an e-mail from

4    Mr. Shah to Mr. Kemp and Jim Demas, subject JK.  That's your

5    initials, right?

6    A.  Yes.

7    Q.  And it's about you, but you're not on this e-mail chain,

8    right?

9    A.  Correct.

10   Q.  And this is 2012, right, for date orientation?

11   A.  Correct.

12   Q.  And this is, from what you describe, the supposed height

13   of your fraud with Mr. Shah, right?

14   A.  I -- I suppose.

15   Q.  Okay.

16          Right.  When you claim that you were Mr. Shah's

17   confidante and co-conspirator, right?

18          THE WITNESS:  There's a weird echo.

19          THE COURT:  Yeah, there's an echo.  I don't know if

20   we can --

21       (Brief pause.)

22          THE COURT:  All right.  Good time to stand up and

23   stretch.

24          I think the plan is, ladies and gentlemen, we're

25   going to go straight through to lunch.  If you need to take a

Ketchum - cross by Hueston

1156

 1    break for the restroom, though, just raise your hand, we'll

 2    take a short break.  Otherwise, we'll try and go straight

 3    through to lunchtime, 12:15, 12:30, depending on when there's

 4    a natural time to break.

 5           Mr. Ketchum, why don't you say something, see if we

 6    hear that echo again.

 7           THE WITNESS:  Hello.

 8           THE COURT:  Also, anything from mine?

 9           How about --

10           MR. HUESTON:  Yes.  Testing, testing.

11           THE WITNESS:  There's still a little bit of feedback.

12           THE COURT:  There's still a little bit, but it's not

13    too disruptive.  We'll have somebody work on it.  But in the

14    meantime, let's see if we can keep going.  And if it erupts

15    again, we'll stop.

16           You may continue.

17           MR. HUESTON:  All right.

18    BY MR. HUESTON:

19    Q.  And let's go to the bottom of Page 2 to Mr. Shah's

20    original e-mail.

21           MR. HUESTON:  Put that up.  There we go.

22    BY MR. HUESTON:

23    Q.  And Mr. Shah wrote:  I talked to Jason this evening and

24    he's ready for the full assault tomorrow.  TK --

25           That's Travis Kemp, right?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 62 of 293 PageID #:13714
Ketchum - cross by Hueston
1157

1    A.   Yes.

2    Q.   -- I'd urge you to be comprehensive, specific and fully

3    transparent.  You should be aggressive and make it clear what

4    mistakes it is Jason keeps on making so he has a chance to

5    demonstrate he can fix this.

6          Do you see that?

7    A.   I do.

8    Q.   You would agree, sir, that the e-mail reflects you're not

9    a confidante; you're a problematic employee that Mr. Shah had

10   to trust others to step in and address, right?

11         MR. HANKEY:  Objection.  Could we go to sidebar, your

12   Honor?

13         THE COURT:  Sure.

14      (Proceedings had at sidebar:)

15         THE COURT:  I'm assuming the remote juror cannot hear

16   us at sidebar.

17         If you happen to hear me, Mr. Santiago, please e-mail

18   Emily and Sydney immediately.  But we're going to assume you

19   can't hear us.

20         So, go ahead.

21         MR. HANKEY:  Thank you, your Honor.

22         Your Honor, this is an e-mail that Mr. Ketchum is not

23   on.

24         THE COURT:  I know.

25         MR. HANKEY:  There shouldn't be questions about it.

1    And, honestly, your Honor, I thought this setup was

2  such that if a witness is going to be asked about -- or if a

3  document the witness is not on is going to be published, the

4  witness is going to read it into the record.  That was the

5  order of operation that we used.  Here, this is much different

6  with Mr. Hueston reading the e-mail and then asking questions

7  about it.

8    MR. HUESTON:  Well, first of all, it's my exam.  And

9  I've never had a rule where I couldn't read what I want read

10  into the record.  So, that's how I want to proceed with my

11  exam, and it will make it flow more smoothly.  So, that's

12  Point Number One.

13    THE COURT:  Go ahead.  What's Point Number Two?

14    MR. HUESTON:  I'm not sure what the other objection

15  is here.  I should -- I think it's, gee, I can't ask him a

16  question about this.  I can ask him and I can say, okay,

17  setting aside this document, you would agree -- this is

18  cross-examination about a concept of impeachment, and I

19  absolutely should be able to ask that.

20    THE COURT:  Well, the topic.

21    And the document is in evidence, correct?

22    MR. HUESTON:  Yes.

23    THE COURT:  There was no objection from the

24  government?

25    MR. HUESTON:  Correct.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 64 of 293 PageID #:13716
Ketchum - cross by Hueston
1159

1          MR. HANKEY:  Correct.

2          THE COURT:  Well, it's in evidence.

3          But if you're asking him questions about what people

4    meant in an e-mail he's not on, I'll sustain the objection.

5    But there's no problem displaying it since it's in evidence,

6    and no problem saying what other people said and seeing if he

7    agrees with it --

8          MR. HUESTON:  That's right.

9          THE COURT:  -- as long as it's in evidence.

10         Now, I think that is still consistent -- I'll hear

11   argument at lunchtime with the ruling I made on the document

12   you had the witness simply read.  But using a document that's

13   in evidence to orientate a witness to a subject or a

14   conversation, seeing if he agrees or disagrees with it, since

15   the document is in evidence, I don't see a problem with that.

16         Again, I'll hear -- if you believe this is

17   inconsistent with the ruling I made when you put your document

18   in, I'll hear argument on that at lunchtime.

19         MR. HUESTON:  Yeah.  And one other difference with

20   this document, it's about him.  So, he should be able to talk

21   about whether he agrees or this is right, and that's what I've

22   asked him.

23         THE COURT:  All right.  Objection overruled.  As long

24   as the exhibit is in evidence.

25         (Proceedings had in open court:)

Ketchum - cross by Hueston

1160

1    THE COURT:  All right.  Proceed.

2    BY MR. HUESTON:

3    Q.  Okay, Mr. Ketchum, let me ask the question, again.  So,

4    you'd agree you're not a confidante here; you're a problematic

5    employee that Mr. Shah had to trust others to step in and

6    address, right?  That's what this shows?

7    A.  I disagree with the sentiment.  Employees oftentimes get

8    coaching from supervisors.

9    Q.  And is it your testimony, sir, that employees were often

10   asking at Outcome Health whether they were going to get fired?

11   A.  I have no idea what other --

12   Q.  Okay.

13   A.  -- people were doing.

14   Q.  All right.

15       So, let's go to Mr. Kemp's response here.  Mr. Kemp

16   writes:  Sounds good.

17       Do you see that?

18   A.  Yes.

19   Q.  And, then, down below, Mr. Kemp writes:  Sounds good,

20   Rishi.  Guns a blazing.

21       Right?  See that?

22   A.  Yes.

23   Q.  I spoke to Matt a little last night, and I know that he

24   has some opinion, as well, that he would like to share with

25   you, as well.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 66 of 293 PageID #:13718
Ketchum - cross by Hueston
1161

1    You know Matt Garms, right?

2    A.  Yes.

3    Q.  And, sir, guns blazing, you understand here Mr. Shah was

4    okay with Mr. Kemp going guns blazing.  That's what this

5    indicates, right?

6         MR. HANKEY:  Objection, your Honor.  Asking to

7    interpret.

8         THE COURT:  Sustained.

9         MR. HUESTON:  Okay.

10   BY MR. HUESTON:

11   Q.  Two e-mails up, let's go there, Mr. Kemp writes:  Correct,

12   yeah, I didn't get into it with him --

13        That's Garms, right?

14   A.  Yes.

15   Q.  -- too deeply.  But I know he has made comments in the

16   past that would be valuable data points.

17        Right?

18   A.  Yes.

19   Q.  And, sir, let's go to another e-mail, CX 8570.  This is a

20   July 12th e-mail from Mr. Demas to Mr. Shah and Ms. Agarwal,

21   subject Jason.

22        Do you see that?

23   A.  Yes.

24   Q.  And let's look at what Mr. Demas writes here:  TK, Joe and

25   Roberto all expressed frustration with Jason.  Apparently, his

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 67 of 293 PageID #:13719
Ketchum - cross by Hueston
1162

1    lack of attention to detail and poor documentation have

2    resulted in repeated errors.

3           Do you see that?

4    A.  Yes.

5    Q.  Travis also told me that Jason often takes the easy path

6    when it comes to troubleshooting, i.e., quick to schedule work

7    orders.  Travis has had several talks with Jason and has

8    spoken with Silvia, but now feels the need to escalate the

9    issue to SMT.

10          Right?

11   A.  Yes.

12   Q.  Okay.

13          And, sir, you know SMT means, what?

14   A.  Senior management team.

15          MR. HANKEY:  Objection.

16   BY MR. HUESTON:

17   Q.  Apart from the --

18          THE COURT:  Well --

19   BY MR. HUESTON:

20   Q.  -- document, you know what SMT --

21          THE COURT:  Overruled.

22          MR. HUESTON:  Yes.

23   BY MR. HUESTON:

24   Q.  Go ahead, you can answer.  What does that mean?

25   A.  Senior management team.

Ketchum - cross by Hueston

1163

1  Q.  Okay.

2          And we talked about Travis Kemp.  You know Joe Nace

3  (phonetic)?

4  A.  Yes.

5  Q.  And Roberto Meza?

6  A.  Yes.

7  Q.  Who were they?

8  A.  Employees at Outcome Health.

9  Q.  Okay.

10         So, let's go to DX 3057.  And this is an e-mail from

11  Ms. Agarwal to the senior management team, SMT.  Do you see

12  that?

13  A.  Yes.

14  Q.  Why don't you read the subject line.

15  A.  Another example of unreliable, inaccurate data from JK.

16  Q.  Okay.

17         And this is 2013, right?  March of 2013?

18  A.  Yes.

19  Q.  This is still the period where you're involved -- you're

20  at the height of your involvement in the fraud, by your

21  testimony, right?  Fair statement?

22  A.  Based on the e-mails that I was shown during my testimony,

23  yes.

24  Q.  Okay.

25         And, by the way, senior management team, SMT, just

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 69 of 293 PageID #:13721
Ketchum - cross by Hueston
1164

1    apart from this document, you're not part of that listserv,
2    right?
3    A.  No.
4    Q.  You're not part of the senior management team?
5    A.  No.
6    Q.  Okay.
7             And, now, to the leaders, the senior management team,
8    Ms. Agarwal cuts and pastes a chat -- let's look at that --
9    where you'd be provided information about the match on Qsymia.
10   Do you see that?
11   A.  Yes.
12   Q.  Okay.
13            Now, you would agree by looking at this that Ms.
14   Agarwal in this instance, she's not conspiring to cook up data
15   with you; she's actually pissed that you can't even get her
16   reliable numbers, right, sir?
17            MR. HANKEY:  Objection, your Honor.
18   BY MR. HUESTON:
19   Q.  You're on the e-mail, right, sir?
20            MR. HANKEY:  Asking to interpret.
21            THE COURT:  I understand.
22            But is Mr. Ketchum on this?
23            MR. HUESTON:  Not on the e-mail.  I misspoke.
24            THE COURT:  All right.
25            But the body of this, is this a conversation with Mr.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 70 of 293 PageID #:13722
Ketchum - cross by Hueston
1165

1    Ketchum and --

2            MR. HUESTON:  Yes.

3            THE COURT:  -- Ms. Agarwal?

4            MR. HUESTON:  Yes, it is.

5            THE COURT:  All right.

6            He can speak to what's on these.

7            Off the record.

8        (Discussion held off the record.)

9            THE COURT:  Back on the record.

10           Go ahead.

11   BY MR. HUESTON:

12   Q.  You would agree in this text message with you, she's

13   pissed you can't even get her reliable numbers, right, sir?

14   A.  I can't speak to if she's mad.

15   Q.  Okay.

16           She's reporting concerns to a group of people, right?

17   It's entitled, another example of unreliable, inaccurate data

18   from you, right?  That's what the e-mail indicates?

19   A.  That's what the subject says, yes.

20   Q.  Okay.

21           Let's go to CX 10125.  And this is a February 26th,

22   2012, e-mail from Ms. Velazquez.  That's your supervisor,

23   right?

24   A.  Yes.

25   Q.  To Mr. Shah, Ms. Agarwal, Mr. Demas, Mr. Garms, Mr. Kemp,

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 71 of 293 PageID #:13723
Ketchum - cross by Hueston
1166

1  and others, right?

2  A.  Yes.

3  Q.  And she says:  Hello, team.  February 26th, 2012, right?

4  Let's look at where she says, hello, team.

5       Do you see that?

6  A.  Yes.

7  Q.  And looking above -- you're not part of what she's calling

8  team there, right?

9  A.  Correct.

10 Q.  And Ms. Velazquez includes personnel notes.  So, let's go

11 to that, the Jason entry.

12      And the Jason entry says, quote:  I'm working with

13 Jason right now to get better at thoroughly logging member

14 calls.  From a NetOps standpoint MIAs, I know it's something

15 that Travis has noticed, as well, and we are both pointing it

16 out to him when we catch it so that he can continue to

17 improve.  At this point, it's similar to Chris's situation.  I

18 feel he gets too excited sometimes that he forgets the

19 importance and impact of details.

20      Do you see that?

21 A.  Yes.

22 Q.  Okay.  Let's go to CX 10126.  And 10126, you can see this

23 is another e-mail on the senior management team listserv,

24 right, April 28th, 2012?

25 A.  Yes.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 72 of 293 PageID #:13724
Ketchum - cross by Hueston
1167

1    Q.  And midway down the page, there's a header note noting

2    highlights of quarterly performance review meetings.

3           Do you see that?

4    A.  Yes.

5    Q.  And this quarterly performance review meetings, you would

6    agree this is being circulated -- if you look at the top,

7    you're not part of that group that's privy to that right?

8    A.  Correct.

9    Q.  Okay.  And let's see your review at the bottom.

10          In Jason's review, I stressed the need for him to

11   slow down and focus on the details.  In addition, I informed

12   him that he will be pulled from anything that I find is a

13   distraction if he cannot get the basic tasks down because --

14   if he cannot get the basic tasks down because he can't get

15   himself to focus.

16          Do you see that?

17   A.  Yes.

18   Q.  Jason did a horrible job last quarter of staying on top of

19   his installation and account management cases that were tough.

20   If an office did not respond to his happy-go-lucky attitude,

21   he would push it off his priority and task list.

22          Did I read that correctly?

23   A.  Yes.

24   Q.  Okay.

25          You would agree, sir, the description of you there,

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 73 of 293 PageID #:13725
Ketchum - cross by Hueston
1168

1    setting aside this document, that's not a description of

2    someone that would want to be included in some kind of

3    hundred-million-dollar fraud scheme, right, sir?

4              MR. HANKEY:  Objection.

5              THE COURT:  Sustained.

6    BY MR. HUESTON:

7    Q.  Let's go to another document, CX 10127.  Now we're at

8    April 25th, 2013.  And this is an e-mail between Mr. Purdy and

9    Mr. Shah.  Do you see that?

10   A.  Yes.

11   Q.  And, by the way, unlike the other e-mails, there are

12   just Mr. Purdy and Mr. Shah on this, right?  No one else?

13   A.  Correct.

14   Q.  And let's go down to the first page.  Mr. Shah writes:

15   Any early signs on Jason?

16             MR. HUESTON:  Let's see if we can pull that out.

17   There we are.

18   BY MR. HUESTON:

19   Q.  As you point out, I think he can be good at times on

20   personnel-related issues, and he seems to really thrive in and

21   enjoy those mentoring situations.  However, his inability to

22   subsequently confront the problem directly hampered him there.

23             Do you see that?

24   A.  Yes.

25   Q.  Good sometimes but unable to confront real problems; is

Ketchum - cross by Hueston

1169

1    that right?

2           MR. HANKEY:  Objection.

3           THE COURT:  Sustained.

4    BY MR. HUESTON:

5    Q.  Mr. Purdy responds --

6           MR. HUESTON:  Let's go to his response.

7    BY MR. HUESTON:

8    Q.  -- Jason is definitely an interesting case.  As you

9    surmised, he is pretty good in mentoring situation and

10   resolving team conflicts early.  He has lost a bit of

11   credibility with Julie because of his errors but was able to

12   work through the situation well.

13          Do you see that?

14   A.  Yes.

15   Q.  And this is a reference to lost bit of credibility with

16   Julie.  You see the name Julie?

17   A.  Yes.

18   Q.  And you know that's Julie Gorbery?

19   A.  Who?

20   Q.  Gorbery.  Julie Gorbery.  Not ringing a bell?

21   A.  No, sir.

22   Q.  Okay.

23          Let's move to, then that said, he definitely has dug

24   a bad hole with TK and MG in particular.  There have been

25   quite a few cases that popped up from Elena Clinics he took

1    over in particular.  We have discussed these and I had three
2    very stern conversations about all these issues.  I didn't go
3    as far as calling him a liar, but TK and MG firmly believe he
4    makes things up, under-executes, and tries to frame things to
5    look good.  I think the truth is somewhat in the middle, to be
6    honest.
7         Do you see that?
8    A.  Yes.
9    Q.  All right.
10        And let's -- and Mr. Purdy then responds saying
11   you're an interesting case, right?  Do you see that?
12        MR. HUESTON:  See if we can pull that out.
13   BY MR. HUESTON:
14   Q.  Jason is definitely -- it's the first embedded e-mail.
15   And Mr. Purdy responds calling you an interesting case, right?
16   A.  Yes.
17   Q.  And he mentions stern conversations, right, with you?
18   A.  Yes.
19   Q.  And making things up, under-executes and tries to frame
20   things to look good.
21        Do you see that?
22   A.  I see that.
23   Q.  And, then, let's look at Mr. Shah's answer above:  I think
24   you/me/JH should talk about this soon/today.  JD caught up
25   with TK/MG, and it seems they are extremely wary of JK and his

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 76 of 293 PageID #:13728
Ketchum - cross by Hueston
1171

1  actions.  Would be good to walk through what we think is the

2  best way forward.

3           Do you see that?

4  A.  Yes.

5  Q.  And, sir, you're aware at this time, document aside, that

6  people had concerns about your work at this time, right?

7  A.  I see that in the e-mails.

8  Q.  Okay.

9           In fact, people were wary of you, right?

10           MR. HANKEY:  Objection to the characterization.

11           MR. HUESTON:  Document aside.

12           THE COURT:  Again, if he's aware that that was the

13  perception of people, he can so state.  If he's not, he should

14  say he doesn't recall it or that's not true.

15  BY THE WITNESS:

16  A.  I don't recall other than reading this e-mail.

17  BY MR. HUESTON:

18  Q.  Okay.

19           Let's go to DX 3054.  It's a February 28th, 2013,

20  e-mail from Mr. Demas --

21           By the way, that was the CFO at the time, right?

22  A.  Yes.

23  Q.  -- to Ms. Agarwal and Mr. Shah now about a request from

24  Walgreens.  Do you see that?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 77 of 293 PageID #:13729
Ketchum - cross by Hueston
1172

1  Q.  Now, let's go midway down the page.  And Ms. Agarwal

2  summarizing a request from Walgreens for a count of physician

3  offices, quote-unquote, within ten miles of their store

4  locations.

5        Do you see that?

6  A.  Sorry, it kind of zoomed in and out very quickly.

7        I see that.

8  Q.  All right.

9        And if you look down further, you can see you used

10  actually 15 miles for your search radius, right?

11  A.  Yes, it looks that way.

12  Q.  Okay.

13        And, then, you can see below --

14        MR. HUESTON:  Let's go back up.

15  BY MR. HUESTON:

16  Q.  -- you didn't respond, right?  You didn't respond to this

17  when Ms. Agarwal brought it up.

18        My bad.  I made a mistake.  I'll rerun it at ten

19  miles like the client asked, right?

20  A.  Looks that way.

21  Q.  Okay.

22        THE COURT:  Go off the record for one minute.

23      (Discussion held off the record.)

24        THE COURT:  Back on the record.

25        MR. HUESTON:  Thank you.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 78 of 293 PageID #:13730
Ketchum - cross by Hueston
1173

1   BY MR. HUESTON:

2   Q.  And, so, just going back to this, you said 15, but the way

3   they are clustered so closely, the numbers don't change.

4   That's what you said, right?

5   A.  Looks that way, yes.

6   Q.  So, you weren't taking responsibility there in that e-mail

7   for making a mistake, right?

8   A.  I can't speak to that.

9   Q.  Okay.

10          Let's see what Ms. Agarwal says.  She forwards this

11  to Mr. Shah and Mr. Demas.  Do you see that?

12  A.  Yes.

13  Q.  And she writes, quote:  I'm looking forward to AD taking

14  over.

15          Right?

16  A.  Yes.

17  Q.  And you understand that's a reference to Ashik Desai?

18  A.  Yes.

19  Q.  And, sir, she explains, quote:  In the midst of the mess

20  yesterday and today with TH, not having reliable data should

21  be the least of our worries, and then the attitude of

22  justifying it is not good.

23          Do you see that?

24  A.  I do.

25  Q.  And, then, she writes:  I was on a call with Eric of

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 79 of 293 PageID #:13731
Ketchum - cross by Hueston
1174

1 Androderm and had to rerun a lot of their follow-up questions

2 on my own because JK wasn't accurate.  He said most docs who

3 matched Androderm in low deciles were very high decile -- very

4 high-market deciles.  Truth was it was 50/50.

5         Do you see that?

6 A.  I do.

7 Q.  And you understand she was complaining about you to a

8 client, right?

9         MR. HANKEY:  Objection.

10         THE COURT:  Sustained.

11 BY MR. HUESTON:

12 Q.  Separate from this document --

13         MR. HANKEY:  Your Honor, can we go to sidebar,

14 please?

15         THE COURT:  Sure.

16    (Proceedings had at sidebar:)

17         THE COURT:  Go ahead.

18         MR. HANKEY:  Your Honor, that's the third or fourth

19 objection like that that we've -- that's been sustained and,

20 honestly, with the questioning, that the testimony is

21 essentially getting out there through the question.

22         THE COURT:  Well, he's reading documents where people

23 are talking behind his back about bad performance by him.

24 That's fine.  Documents are in evidence.  He can publish them

25 any way he wants.  Publish them through this witness is fine.

1  The objectionable part is saying -- is referring to that as,

2  so people were saying X or Y.

3        MR. HANKEY:  That's our objection, your Honor.

4        THE COURT:  Yeah.

5        No, I mean, your point is being made, Mr. Hueston,

6  but I think getting into the substance of the e-mail when

7  they've been objecting, I've sustained the objections.  So --

8        MR. HUESTON:  I am trying -- I am listening, and I've

9  tried to say, now separate from this document, and I put out

10  the proposition.  That's fair game.

11        THE COURT:  Yes, but if you -- I think the way to do

12  it is, did you know any of this?  I'm not going to tell you

13  how to ask a question, of course.

14        MR. HUESTON:  All right.

15        THE COURT:  But I think the non-objectionable part

16  is, did you know anything about people talking about your

17  performance?

18        MR. HUESTON:  Sure.  Okay.

19        THE COURT:  Let's try and keep it to that and move it

20  along.  Your point has been made.  People objected to his

21  performance and --

22        MR. HUESTON:  Yep.

23        THE COURT:  -- apparently weren't telling him or at

24  least he doesn't remember it.

25        MR. HUESTON:  Almost done with the module.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 81 of 293 PageID #:13733
Ketchum - cross by Hueston
1176

1      THE COURT:  All right.

2         (Proceedings had in open court:)

3      THE COURT:  Remember to keep your mics far away from

4   the -- or your headphones away from the mics.

5         Okay.  Proceed.

6   BY MR. HUESTON:

7   Q.  So, I'm just going to ask you, Mr. Ketchum, were you aware

8   that Ms. Agarwal and people at the top levels of the company

9   were even complaining to clients about your issues?

10  A.  No.

11  Q.  Not aware of that.  Okay.

12         And let's go to the top e-mail, Mr. Demas' response.

13  And he writes:  Agreed.  Working closer with JK, I've come to

14  the conclusion he is a pleaser, my own term.

15         Do you see that?

16  A.  Yes.

17  Q.  He's more focused on gaining favor with people than he is

18  on the accuracy or solutions.

19         Do you see that?

20  A.  I do.

21  Q.  I'm finding he's reluctant to be the bad guy.

22         Right, sir?

23  A.  I see that.

24  Q.  Okay.  So, we can put that aside.

25         So, we've just looked at e-mails involving a number

Ketchum - cross by Hueston

1177

1    of former Outcome Health employees, right?

2    A.  Yes.

3    Q.  Included your former supervisor Silvia Velazquez?

4    A.  Yes.

5    Q.  Yes?

6             Matt Garms?

7    A.  Yes.

8    Q.  Roberto Meza?

9    A.  Yes.

10   Q.  Travis Kemp?

11   A.  Yes.

12   Q.  Joe Nace?

13   A.  Yes.

14   Q.  Julie last name unknown?

15   A.  Yes.

16   Q.  All right.

17            Jayanth Surakanti was on some of these, right?

18   A.  Yes.

19   Q.  And, sir, you'll recall -- you were on some of these

20   e-mail chains -- these people were making efforts to try to

21   improve your work, to keep you honest, to get you more

22   accurate, right?

23   A.  Yes.

24            MR. HANKEY:  Asked and answered, your Honor.

25            THE COURT:  Overruled.  He answered the question.

Ketchum - cross by Hueston

1178

1    BY MR. HUESTON:

2    Q.  And you answered "Yes," right?

3    A.  Yes.

4    Q.  Thank you.  Let's put that one -- we're done with that

5    module.

6            Now, Mr. Ketchum, I just want to table set a little

7    bit here.  We've never met before, right?

8    A.  Correct.

9    Q.  The defense lawyers have not had a chance to speak with

10   you before today, right?

11   A.  Correct.

12   Q.  But you would agree the government, including most of the

13   attorneys sitting here today, they've met with you in one form

14   or the other at least 15 or so times, right?

15   A.  I don't recall the number, but yes.

16   Q.  Okay.  Sounds about right?

17   A.  Probably, yeah.

18   Q.  And after those meetings, sir, you're aware that about one

19   week ago on Monday night after trial ended for the day, the

20   government filed a motion asking the Court to enter an order

21   granting you formal statutory immunity.  You're aware of that,

22   right?

23   A.  Yes.

24   Q.  All right.

25           And that was right before you started testimony,

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 84 of 293 PageID #:13736
Ketchum - cross by Hueston
1179

1  right?

2  A.  Yes.

3  Q.  Okay.

4          Now, prior to that request for formal immunity, you

5  actually already had an immunity deal, right?

6  A.  Yes.

7  Q.  Yeah.  You and the government signed an immunity letter

8  agreement in June of 2019, right?

9  A.  Yes.  I believe that was the timing.

10 Q.  Okay.  And that's GX 1026.

11         MR. HUESTON:  And let's just put that up to Page 2.

12 BY MR. HUESTON:

13 Q.  That's the cover page of that immunity letter, right?

14 A.  Yes.

15 Q.  And that's your signature there at the bottom, right?

16 A.  Yes.

17 Q.  And you understood, sir, under that prior letter

18 agreement, if you showed up and gave complete, accurate,

19 truthful testimony, then none of the information you'd give to

20 the government could be used against you, right?

21 A.  Yes.

22 Q.  Now, despite having that in place, from the formal

23 statutory immunity that went in last Monday, in that

24 application your counsel informed the government that you

25 still plan to invoke the Fifth Amendment right to not

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 85 of 293 PageID #:13737
Ketchum - cross by Hueston
1180

1   incriminate yourself if you were called to testify, right?

2   A.  Yes, I believe so.

3   Q.  Let's just take a look to make sure we're on the same

4   page.  CX 10116.  And we'll just go to Paragraph 1 of this.

5   And it states:  The United States has subpoenaed Jason Ketchum

6   to testify at the trial in this matter.  Although Mr. Ketchum

7   has previously indicated a willingness to testify at trial

8   without immunity, his counsel has indicated that Mr. Ketchum,

9   following advice of counsel, is likely to invoke his Fifth

10  Amendment right not to incriminate himself if called to

11  testify.

12          Right?

13  A.  Yes.

14  Q.  Okay.

15          So, it was too risky for you to go forward and

16  testify without this formal court order of immunity.  That was

17  your understanding, right?

18  A.  I was just following advice of counsel.

19  Q.  Okay.

20          And with this statutory immunity, you do understand

21  that now nothing you say can be used against you, not only by

22  the U.S. Attorney's Office here in Chicago, but all federal

23  prosecutors in states across the country.  You know that,

24  right?

25  A.  I believe that -- yes, I believe so.

1  Q.  Right.

2          That's the ultimate get out of jail free card?

3          MR. HANKEY:  Objection.

4  BY MR. HUESTON:

5  Q.  You agree, right, sir?

6          THE COURT:  Sustained.

7  BY MR. HUESTON:

8  Q.  And before you even testified, sir, you knew that a broad

9  grant of immunity was going to be important to you because

10  you've admitted, right, at this trial to participating in

11  crimes, right?

12  A.  Yes.

13  Q.  And, by the way, sir, let's put this immunity agreement in

14  perspective.  Sir, you understood that your crimes potentially

15  could call for charges with upwards of 20 years of

16  imprisonment, right, sir?  You understood that?

17  A.  Actually, I -- I don't.  I didn't.

18  Q.  Okay.

19          You were not required to plead guilty to a crime,

20  right, sir?

21  A.  Correct.

22  Q.  Okay.

23          And you are aware that Mr. Desai pled guilty to a

24  crime, right?

25  A.  Yes.

 1   Q.  Okay.

 2           And, sir, you were not -- in your immunity agreement,

 3   just so we're clear here, you're not pleading guilty to

 4   something that calls for a ten-year potential term of

 5   imprisonment, right?

 6           MR. HANKEY:  Objection.  Asked and answered.

 7           THE COURT:  Overruled.

 8   BY MR. HUESTON:

 9   Q.  Right, sir?

10   A.  I'm sorry, what was the question?

11   Q.  You're not asked to plead to something calling for a

12   ten-year period of imprisonment, right?

13   A.  Correct.

14   Q.  Not even a five-year period of imprisonment, right?

15   A.  Correct.

16   Q.  Or even one year, right?

17   A.  Correct.

18   Q.  Mr. Desai, you understand, did not get an immunity

19   agreement, right, sir?

20   A.  I -- I don't know what Mr. Desai got.

21   Q.  Okay.

22           You understand -- I think in your testimony you said

23   you taught Mr. Desai certain things about fraud, right?

24   A.  No, I didn't say that.

25   Q.  Oh, okay.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 88 of 293 PageID #:13740
Ketchum - cross by Hueston
1183

1        Were you involved -- just so I can understand, did

2   you try to tutor Mr. Desai on how to commit fraud in any way

3   at Outcome Health?

4   A.  No.

5   Q.  All right.

6        So, then fair to say -- I just like to use this

7   analogy -- from what you know, it's apples and oranges between

8   you and Mr. Desai; is that fair?

9   A.  I can't speak to that.

10  Q.  Okay.

11       But if I represent to you that Mr. Desai might be

12  facing 20 years of imprisonment, that's certainly apples and

13  oranges versus --

14             MR. HANKEY:  Objection.

15  BY MR. HUESTON:

16  Q.  -- what you potentially face --

17             THE COURT:  Sustained.

18  BY MR. HUESTON:

19  Q.  -- right, sir?

20             THE COURT:  Sustained.

21  BY MR. HUESTON:

22  Q.  You face zero time if you are adjudged by the government

23  to give truthful testimony, right?

24  A.  Yes.

25             THE WITNESS:  Sorry, there's a lot of feedback.

1 Sorry, your Honor.

2          THE COURT:  We're working on it.

3          Anyone have their headphones near their microphones?

4 If you do, just move them away.

5          Did you hear the question and give an answer to it?

6          THE WITNESS:  I actually don't -- I don't remember if

7 I did or not.  Maybe repeat the question.  Sorry.

8          THE COURT:  It said, "You face zero time if you're

9 adjudged by the government to give truthful testimony," and he

10 answered, "Yes."

11          MR. HUESTON:  Yes.  Okay.

12          THE COURT:  All right.  Go ahead.

13 BY MR. HUESTON:

14 Q.  You'd agree, sir, there's a world of difference between

15 having to plead guilty to a crime and actually not having to

16 plead guilty at all?  You would agree with me there, right?

17 A.  Yes, sir.

18 Q.  And that was important to you that you didn't have to

19 plead guilty to a crime, right?

20 A.  I believe so, yes.

21 Q.  In fact, if the government judges your testimony to be

22 truthful, you'd still have your job as chief innovator at a

23 tech incubator, right?

24          MR. HANKEY:  Objection.

25          THE COURT:  Overruled.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 90 of 293 PageID #:13742
Ketchum - cross by Hueston
1185

1  BY THE WITNESS:

2  A.  Yes.

3  BY MR. HUESTON:

4  Q.  Yeah, because that's the job you have now, right?

5  A.  Not an incubator, but yes.

6  Q.  You get to keep your job, right?  You won't have to be

7  separated from your family, wife or child, right?

8  A.  Correct.

9  Q.  Or embarrass your family potentially by having to plead

10  guilty to a federal crime, right?  You're spared that?

11  A.  Correct.

12  Q.  Let's now move to the 15 or so sessions you had with the

13  government before this trial.

14       Now, you recall that you first appeared for an

15  in-person interview at the U.S. Attorney's Office around

16  August of 2018.  Do you remember that?

17  A.  Yes.

18  Q.  Okay.

19       And at that initial meeting, do you recall --

20  actually, let's go to Demo Slide 1 and put this up.

21       MR. HANKEY:  Your Honor, I don't know that we've seen

22  this yet.  If not, we'd like to see it first before it's

23  displayed.

24       THE COURT:  Do you have a hard copy you can show the

25  government?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 91 of 293 PageID #:13743
Ketchum - cross by Hueston
1186

1      MR. HUESTON:  Yeah.

2           Let's put this down, please.

3           THE COURT:  Let's take it off the screen, please.

4      Defense counsel -- thank you.

5           MR. HUESTON:  Sorry.  Thought we -- thought I

6      disclosed it.

7          (Brief pause.)

8           MR. HANKEY:  May we have a sidebar, your Honor?

9           THE COURT:  All right.

10         (Proceedings had at sidebar:)

11          THE COURT:  Go ahead.

12          MR. HANKEY:  Does the Court have a copy of these

13     slides?

14          THE COURT:  I don't.

15          MR. HANKEY:  Okay.  Well --

16          THE COURT:  Are these just slides indicating who is

17     at meetings?

18          MR. HUESTON:  Exactly.  And, then, later -- let me

19     finish.  So, yes, that's all I'm going to establish.  If he

20     doesn't remember, I'll show him the 302 to refresh his

21     recollection.  I'm sure he's going to say, yep, that's who was

22     there.

23          THE COURT:  Right.

24          MR. HUESTON:  And the date.  That's it.

25          Now, later I do -- and if he doesn't remember, I

1    won't show the slide.

2            But he makes statements in some of these sessions,

3    and if he doesn't remember, I'm going to refresh his

4    recollection.  I'm guessing he's going to say, yep, I believe

5    this is what I said.  I'm going to put some of those into

6    slides later on those dates.

7            THE COURT:  What's the objection?

8            MR. HANKEY:  So, first of all, as to the attendees,

9    his attorneys listed on the slides, we don't understand why

10   that's relevant.

11           THE COURT:  Because he was there.  I mean --

12           MR. HUESTON:  Correct.

13           THE COURT:  -- I think any session with the

14   government in prep, it's unprivileged.  He's not a client.

15   You don't have a client really in any sense when you prep

16   witnesses.  And anybody who's attending a prep session, from

17   the witness to the attorneys to the defense lawyer, is fair

18   game to point out.  Now, most people do it orally, but it's

19   effective -- probably more effective -- to do it in this

20   manner.  There's nothing objectionable about that.

21           MR. HANKEY:  The bigger issue, your Honor, is that

22   the slides contain summaries of representations that were made

23   by him during the meeting.  That's hearsay.  He hasn't -- no

24   foundation for prior inconsistent statement has been made yet.

25           THE COURT:  Response?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 93 of 293 PageID #:13745
Ketchum - cross by Hueston
1188

1      MR. HUESTON:  Well, I'm not putting that slide up

2   first.

3      THE COURT:  Right.

4      MR. HUESTON:  Those are later slides.

5      THE COURT:  You're simply going to ask him, did you

6   say this at that session?

7      MR. HUESTON:  Yeah.

8      THE COURT:  If he acknowledges it, you can put it on

9   the demonstrative screen.  If he denies it, then you try and

10  refresh his recollection with anything you want, including the

11  302.  If he still denies it and says, I don't remember saying

12  it, at that point you'll be allowed to put in that, presumably

13  by way of stipulation or by calling the FBI agent out of order

14  right after this witness is off the stand, to perfect the

15  impeachment.

16      That's the procedure that should be followed.  So,

17  we'll take it a step at a time.  But these initial ones about

18  who's at the meeting are perfectly permissible.

19      MR. HANKEY:  Yes, your Honor.

20      THE COURT:  Objection overruled.

21    (Proceedings had in open court:)

22      THE COURT:  All right.  Please proceed.

23      MR. HUESTON:  Okay.

24      So, let's go put up Demonstrative No. 1.

25  BY MR. HUESTON:

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 94 of 293 PageID #:13746
Ketchum - cross by Hueston
1189

1  Q.  And I realize this is a ways ago, and happy to show you a

2  report of interview to refresh your recollection.  But does

3  this sound right to you at that first meeting, there was FBI

4  Special Agent Mark Stakem and government attorneys Mr. Hankey,

5  Mr. Johnston and Mr. Adam -- Mr. Madden?

6  A.  Yes.

7  Q.  Okay.  Very good.

8       So, at this initial meeting, Mr. Ketchum, you recall

9  being shown and asked about a number of documents relating to

10  your time at Outcome Health, right?

11  A.  Yes.

12  Q.  Okay.

13       And you didn't have a lawyer at that first meeting,

14  right?

15  A.  No.

16  Q.  And the information you provided at this initial meeting,

17  you would agree it was pretty different from what you'd say

18  later to the government; is that fair?

19  A.  Can't speak to that.

20  Q.  Okay.

21       Well, you understand, sir, that one of the issues you

22  were asked about on direct is whether Mr. Shah and Ms. Agarwal

23  disclosed to clients that sales figures included projections.

24  Remember that?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 95 of 293 PageID #:13747
Ketchum - cross by Hueston
1190

1    Q.  And -- but when you first appeared for an interview, Mr.

2    Ketchum, you told the government and the FBI agent that it was

3    your understanding that Mr. Shah, Ms. Agarwal did communicate

4    separate growth in installation numbers.

5           Do you remember that?

6    A.  I do.

7    Q.  Okay.

8           So, let's go to Demonstrative Slide No. 2.  And

9    that's what I just stated and you said "Yes" to, right?  That

10   you said that you believe that Shah and Agarwal communicated

11   to pharmas that Outcome Health was providing the pharmas two

12   numbers, one installed, one growth, right?

13   A.  Yes.

14   Q.  All right.

15          Now, let's -- let me ask you, sir, something happened

16   in that first meeting where you showed up voluntarily without

17   an attorney that made you feel uncomfortable, right?

18   A.  Yes.

19   Q.  You didn't leave the meeting feeling the same way as when

20   you entered it, right?  Is that fair?

21   A.  I can't really speak to that, but --

22   Q.  Okay.

23          You left the meeting feeling uncomfortable?

24   A.  Yes.

25   Q.  So, after that meeting, you went out and hired a white

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 96 of 293 PageID #:13748
Ketchum - cross by Hueston
1191

1    collar criminal defense attorney, right?

2    A.  No.  That wasn't the --

3    Q.  All right.

4    A.  -- order of operation.

5    Q.  You hired Daniel Collins?

6    A.  I did.

7    Q.  Okay.

8         He's a lawyer?

9    A.  Yes.

10   Q.  All right.

11        And, then, with your lawyer, right, you then next met

12   with the government in December 2018, right?  Actually, you

13   were there with two attorneys at the time.  Do you remember

14   that?  Dan Collins and Christina Chapin?

15   A.  Yes, I recall.

16   Q.  Sounds about right?

17   A.  Yes.

18   Q.  And let's put up Demo 3 on the second meeting.  And you

19   recall that's around December 13th, 2018, right?

20   A.  Yes.

21   Q.  And you recall, again, FBI agent Special Agent Mark

22   Stakem, right?

23   A.  Yes.

24   Q.  And, again, the government attorneys, Mr. Hankey,

25   Mr. Johnston, Mr. Madden, and Dan Collins, your counsel,

Ketchum - cross by Hueston

1192

1    right?

2    A.  Yes.

3    Q.  All right.

4           MR. HUESTON:  We can put that down.

5    BY MR. HUESTON:

6    Q.  At this time, before you showed up for that second meeting

7    in December 2018, you had gotten an agreement that the

8    government would generally not be able to use your statements

9    at that meeting against you, right?

10   A.  Yes.

11   Q.  That's called a proffer.  You understand that, right?

12   A.  I don't know what it was called, but that was what I

13   understood.

14   Q.  Okay.

15          Yeah, let's forget the term.  But you understood

16   that, basically, the rules are tell us everything you know and

17   we won't use it against you, right?

18   A.  Yes.

19   Q.  Okay.

20          And we'll consider a deal, right?

21   A.  I don't know about the last part, but --

22   Q.  All right.  All right.

23          And you did understand at that time, by that time,

24   that the government was conducting a criminal investigation,

25   right?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 98 of 293 PageID #:13750
Ketchum - cross by Hueston
1193

1  A.  Yes.

2  Q.  And you would admit at that time as you were thinking

3  about all this, you thought about, you know, boy, if I get

4  indicted, that would really impact my career, my family.  You

5  thought about that, right?

6  A.  Sure, yes.

7  Q.  Now, at that -- starting at that proffer session, sir,

8  with knowledge that there's a criminal investigation, you

9  recall that your story that you were telling the government

10  began to change.  Do you remember that?

11  A.  I recall being shown e-mails and talking through the

12  e-mails that were being shown to me.

13  Q.  That caused you to change your testimony and story?

14  A.  No.  There was just more e-mails that were shown.  And

15  when I was explaining what the e-mails were showing, it

16  became -- I was just telling the truth of what was being shown

17  in the e-mails.

18  Q.  Okay.  Well, let's go through these sessions.

19          So, I'm going to ask you first about ROI slide decks.

20  Return on investment in slide decks.  Do you remember

21  testifying that on direct?

22  A.  Yes.

23  Q.  And do you recall, sir, that when you were first asked

24  about those criteria and the edits Mr. Shah made to the ROI

25  slide decks, you said that Mr. Shah made changes based on

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 99 of 293 PageID #:13751
Ketchum - cross by Hueston
1194

1  logic he believed was more correct, and that he told you his

2  rationale at the time.

3          Do you remember that?

4  A.  Yes.

5          MR. HANKEY:  Objection as to date.

6          THE COURT:  Yeah, why don't we make it specific to a

7  time.

8          MR. HUESTON:  Okay.

9          THE COURT:  If there is a specificity you can put in

10  the question.

11          MR. HUESTON:  Sure.

12  BY MR. HUESTON:

13  Q.  That was actually at your second meeting.  So, the answer

14  to that was "Yes," right?

15  A.  Yes.

16  Q.  And you recall that was at your second meeting there at

17  the proffer, right?

18  A.  I don't recall the meeting, but I do recall saying that.

19  Q.  Okay.

20  A.  Something to that effect.

21  Q.  Well, let's see if we -- just to make sure that we are

22  certain here, let's go to 5655 just for identification

23  purposes.  And --

24          MR. HANKEY:  Your Honor, this should be to the

25  witness --

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 100 of 293 PageID #:13752
Ketchum - cross by Hueston
1195

1  THE COURT:  Yes.

2  MR. HANKEY:  -- right?

3  THE COURT:  Take it off the screen for the jurors.

4  MR. HUESTON:  For identification meant just for the

5  witness.  Apologies.

6  THE COURT:  Can you show it just to the witness or do

7  I need to switch it here?

8  MS. DOMINIAK:  Your Honor, I can play through remote

9  witness, but I need you to blank the screen for jurors.

10  THE COURT:  All right.  I'll do that.

11  MS. DOMINIAK:  Thank you.

12  THE COURT:  You can show it to the witness.

13  MR. HUESTON:  Sure.

14  THE COURT:  And you're blanking it to the remote

15  juror, correct?

16  MS. DOMINIAK:  I am, your Honor.

17  THE COURT:  All right.  Thank you.

18  BY MR. HUESTON:

19  Q.  Okay.  And, sir, you see down on the bottom there,

20  investigation on 12-13-2018, right?

21  A.  Yes.

22  Q.  Okay.

23  And just to reorient, you remembered that as the time

24  of your second meeting, this proffer meeting, right?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 101 of 293 PageID #:13753
Ketchum - cross by Hueston
1196

1   Q.  Okay.

2           And, then, why don't we flip quickly to a reference

3   to Tabs 51, 52, 53, 54, 55, which is on Page 13.

4           MR. HUESTON:  One more.

5   BY MR. HUESTON:

6   Q.  And just take a look at that and read it and just tell me

7   if this refreshes your recollection, yeah, this is when you

8   said what we just covered.

9   A.  Can I have a moment to read it?

10  Q.  Yeah.  Yeah.  That's the idea.

11  A.  Okay.  Sorry.

12          THE COURT:  While he's reading it, ladies and

13  gentlemen, what's going on here is the witness is -- Mr.

14  Hueston is seeing if he can refresh the witness' recollection

15  showing him a document that otherwise is inadmissible in

16  evidence.  But this is to see if his memory is refreshed; and,

17  if it is, he can testify from a refreshed memory.

18          If this seems confusing, blame the British.  This is

19  all based on British law that started many centuries ago.  But

20  these are the rules of evidence and we need to follow the

21  rules.  So, that's what's going on right now.

22      (Brief pause.)

23  BY MR. HUESTON:

24  Q.  Okay.  So, question, does this refresh your recollection

25  that what you said you discussed, it's right here, right?

1    A.  Yes.

2    Q.  Okay.  Great.

3              So, that's at that second meeting, the proffer?

4    A.  Yes.

5    Q.  Great.  Great.

6              THE COURT:  All right.  You can take the --

7              MR. HUESTON:  We can take that down now.

8              THE COURT:  -- exhibit off now.  Put the screen back

9    up for the jury.

10             MR. HUESTON:  Very good.

11             THE COURT:  And make sure the remote juror has a full

12   screen now, too, please.

13   BY MR. HUESTON:

14   Q.  And, again, just to set the table, this is the second

15   meeting.  Now, you know, you're there with a proffer, right?

16   A.  Yes.

17   Q.  And that -- this is the time where you're supposed to be

18   totally honest and telling the complete truth, right?

19   A.  Yes.

20   Q.  And when you were explicitly asked about these ROI

21   filters -- you just looked at your testimony there, your

22   summary -- not a peep about any wrongdoing from Mr. Shah or

23   Ms. Agarwal on that, right?

24   A.  Not in the segment -- the segment that you showed me, no.

25   Q.  Okay.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 103 of 293 PageID #:13755
Ketchum - cross by Hueston
1198

1           So, let's now go to the next meeting.  You met with

2   the government a third time around May of 2019.  Does that

3   sound about right?

4   A.  I can't speak to the timeline, but if that's the date on

5   the note, then --

6   Q.  Okay.  For purposes of moving this along, let me represent

7   that that's right.

8   A.  Okay.

9   Q.  Let's put up Demo 6, and let me see if this helps you

10  orient here on the third meeting.

11          And, so, the third meeting on May 2nd, 2019, again,

12  same people attending with yourself, right?

13  A.  Yes.

14  Q.  Mr. Stakem, government attorneys, and your attorney

15  Mr. Collins, right?

16  A.  Yes.

17          THE COURT:  If this gets to be too much, we'll have

18  the tech person come up.  I think he's on his way anyway to

19  see if we can fix this.  But otherwise, we're going to try and

20  --

21          MR. HUESTON:  Okay.  Right.

22          THE COURT:  -- power through to the lunch break if we

23  can.

24          MR. HUESTON:  Yeah.

25          THE COURT:  It's getting worse.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 104 of 293 PageID #:13756
Ketchum - cross by Hueston
1199

 1  BY MR. HUESTON:

 2  Q.  Sir, at this meeting, you were, again, asked about return

 3  on investment, and at this time, you said you didn't think it

 4  had anything to do with device shortfalls when you were at

 5  Outcome Health.  Do you remember that testimony?

 6  A.  I don't.

 7  Q.  Let me see if I can refresh your recollection.

 8          MR. HANKEY:  Objection to the reference to it being

 9  testimony.

10          THE COURT:  Well, let's see if his memory is

11  refreshed.  He can affirm the predicate of the question.

12          MR. HUESTON:  Yes.

13          So, let's go to -- and this is just for the witness

14  and attorneys -- 5656.

15  BY MR. HUESTON:

16  Q.  And we're going to go to Page 9.  And I'm going to

17  highlight a sentence, and I'll ask you to read it and see if

18  that refreshes your recollection that you said this at this

19  time.

20          MR. HUESTON:  Let's highlight it.  Let's underscore

21  the last sentence.

22  BY MR. HUESTON:

23  Q.  Does that refresh your recollection that that's one of the

24  statements you made in that interview with the government?

25  A.  I -- I don't recall making that statement, but I do see it

1    here.

2    Q.   Okay.

3            MR. HUESTON:  At this time, we'd ask for a government

4    stipulation to simply read this in as a summary recorded by

5    Special Agent Mark Stakem.

6            THE COURT:  Any objection to that?

7            MR. HANKEY:  Could we go to sidebar, your Honor?

8            THE COURT:  All right.

9         (Proceedings had at sidebar:)

10           THE COURT:  All right.  Go ahead.

11           MR. HANKEY:  Your Honor, we would agree to stipulate

12   after the testimony, but we're not going to do it during the

13   testimony.

14           THE COURT:  I'll give you the same leeway on defense.

15   It's completely ineffective and, I think, not helpful to the

16   jury, which is my only concern -- not that it's helpful to the

17   defense or the government; it's not helpful to the jury -- to

18   hear impeachment even at the end of what may be an all-day

19   cross-examination.  You want to stipulate to it now, fine.  I

20   can't force you to stipulate.  But I may -- I don't want to be

21   in a position where I interrupt his testimony and we call

22   Mr. Stakem --

23           Is he in the courtroom?

24           MR. HANKEY:  He's present, yes, your Honor.

25           THE COURT:  Present.

Ketchum - cross by Hueston

1201

1     -- have him come up right now and read his 302.

2          That's the alternative.  And I'll interrupt this

3    right now.

4          So, please stipulate because -- and I'll give you the

5    same opportunity when it's on the defense side.  But we're

6    fighting about a fact that's not in dispute.  This is what the

7    -- he said to the agent, unless the agent is the first agent

8    in my experience to disavow something said in a 302.

9          I know this may seem unconventional, but this is the

10   rule I told you, at least in general -- maybe not interrupting

11   the testimony, but I didn't anticipate testimony this long.

12   And I'm concerned the jury will not understand impeachment

13   that occurs after a witness is off the stand when he may be

14   another day or day-and-a-half before he's off.

15         MR. HANKEY:  Your Honor, may I take a moment to

16   consult?

17         THE COURT:  Go ahead.  Please do.

18       (Brief pause.)

19         MR. HANKEY:  Okay, your Honor.  We'll agree to it,

20   although we'll just note that we do believe this is a change

21   to the process in the middle.

22         THE COURT:  Well, in general, I think it's the same

23   process, but it -- and perhaps I am changing it on the fly

24   here, but I'm recognizing that the -- doing this at the end of

25   a witness' testimony is simply not nearly as helpful to the

1   jury as doing it in the middle.  And a simple stipulation that

2   this is what he said -- he's not denying it.  All he's saying

3   is he doesn't remember it.

4            And if you stipulate to it, that's going forward,

5   this is not a -- well, I'll let you evaluate the impeachment

6   value, et cetera.  But he's just saying he doesn't remember

7   it.  And for an agent to come in and say he does remember it

8   or this is what he said is a simple thing that could be done

9   and should be done and is allowed to be done.  Because the law

10  is that if a person doesn't recall it, that's as if he's

11  saying -- that's a denial and you can perfect impeachment

12  through such a process.

13           I'm just -- I believe under -- I believe it's -- I'll

14  give you the Federal Rule of Evidence cite that I can control

15  the order of the presentation of evidence for the convenience

16  of the jurors.  In fact, I am going to get the rule cite.  I

17  believe it is 60- -- I apologize here.  If anyone can find the

18  one that deals with the order of cross-examination, I'll be in

19  your debt.

20           MR. HANKEY:  611, your Honor.

21           THE COURT:  Thank you.

22           Under 611, I can control the mode of direct and

23  cross-examinations to avoid wasting time and make procedures

24  for determining the truth effective.  And under that rule, I'm

25  asking you to stipulate to this.  Otherwise, because I can't

1   force a stipulation, I'll do what I said:  We'll interrupt Mr.

2   Ketchum's testimony; we'll call the agent; he will say what

3   was said in that interview, which I hope you don't want to do.

4   But that's the alternative.

5         MR. HANKEY:  We'll agree to it reluctantly, your

6   Honor.

7         THE COURT:  Over objection.  That's fine.  I

8   understand.  But that's the basis for my ruling.

9         Okay.  How do you want to proceed?  Do you want to

10   just, Mr. --

11         MR. HUESTON:  I will simply ask if the government is

12   prepared to stipulate that the following was recorded by

13   special agent statement, quote, and that's it.

14         THE COURT:  Yeah, all right.

15         And that's how we'll do it unless you have another

16   procedure for that, that part of it.

17         MR. HANKEY:  We can do that for now.  If we have

18   something else to offer at lunch, we'll let you know.

19         THE COURT:  Sure.  A different way of stating it, but

20   the same effect is going to happen?

21         MR. HANKEY:  Yes.

22         THE COURT:  Okay.  Thank you.

23      (Proceedings had in open court:)

24         THE COURT:  All right.  Proceed.

25         MR. HUESTON:  Is the government prepared to stipulate

1    that Special Agent Stakem wrote down and recorded in this

2    interview with Mr. Ketchum:  "Around this time, Ketchum didn't

3    think OH failing to deliver on ROI had to do with device

4    shortfalls"?

5            MR. HANKEY:  Your Honor, we'd ask that we stipulate

6    to the whole paragraph, for rule of completeness.

7            THE COURT:  Go ahead.  Read in the whole paragraph.

8            MR. HUESTON:  Sure.

9            THE COURT:  And the idea of recording -- there's not

10   tape recordings.  These are sit-down interviews where the

11   agents take notes.  And this is his record of the meeting when

12   he has his notes typed up.

13           And, yeah, go ahead with the full paragraph, please.

14           MR. HUESTON:  Ketchum shared specifics of the

15   Glassdoor post with an OH interviewer or the OH candidate

16   after the candidate raised issues of possible fraud at OH.

17   Ketchum didn't remember the OH interviewer's name or the OH

18   candidate.  Around this time, Ketchum didn't think OH failing

19   to deliver on ROI had to do with device shortfalls.

20           MR. HANKEY:  The government so stipulates.

21           THE COURT:  All right.  Proceed.

22           MR. HUESTON:  So, let's go to Demo 7, please.

23           THE COURT:  Take that off.  Okay.

24           MR. HUESTON:  Yeah.  And let's just go to

25   Demonstrative 7 with the quote.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 110 of 293 PageID #:13762
Ketchum - cross by Hueston
1205

1  BY MR. HUESTON:

2  Q.  And that's what -- Ketchum didn't think OH failing to

3  deliver on ROI had to do with device shortfalls?  That's what

4  I just read, right, sir?

5  A.  Yes.

6  Q.  Okay.

7        Now, again in the May 2019 meeting, you were

8  accompanied, as we covered, right, with your attorney, right?

9  A.  Yes.

10  Q.  And, then, after that third meeting in May of 2019, your

11  attorney indicated to the government that you had information

12  about your time at Outcome Health that tended to incriminate

13  you.  Do you remember roughly that happening?

14  A.  Yes.

15  Q.  Okay.

16        And it's at that time you ended up getting your first

17  immunity agreement that we talked about earlier?  Around that

18  time, the letter immunity agreement?

19  A.  Okay.

20  Q.  All right.

21        And, sir, we touched on this earlier, but I just want

22  to make sure it's clear.  One of the important terms -- let's

23  go to GX 1026, which is that letter immunity deal.  One of the

24  important terms is that -- if we get to this, at Pages 1 to

25  2 -- if the government determines you have not fully complied

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 111 of 293 PageID #:13763
Ketchum - cross by Hueston
1206

1   with the agreement, then the statements you made can be used

2   as evidence in criminal prosecution against you, right?

3   A.  Yes.

4   Q.  You understood that?

5   A.  Yes.

6   Q.  So, you understood that you don't get a say in that

7   determination, the government determines that, right?

8   A.  Yes.

9   Q.  The Judge doesn't determine that.  It's the government,

10  right?

11  A.  Yes.

12  Q.  Government, and government alone, right?

13  A.  It's my understanding.

14  Q.  And you understand that if you change your story, sir, you

15  risk losing your deal and you may be subject to prosecution,

16  right?

17  A.  I was just reading through e-mails, sir.

18  Q.  Just in terms of what -- you know, your possible exposure,

19  if you, in fact, change your story, make a false statement,

20  you could be prosecuted for making a false statement, right?

21  A.  Yes.

22  Q.  All right.

23          Now, after receiving this immunity deal on around

24  July 2019 -- 23rd, 2019, you met for a fourth time with the

25  government, right?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 112 of 293 PageID #:13764
Ketchum - cross by Hueston
1207

1  A.  Yes.

2  Q.  And, so, let's just put up Demo 8.  And you recall the

3  fourth meeting July 23rd, 2019, there was an agent -- FBI

4  agent there, Christopher Santangelo and basically the same

5  attorneys from the government and your attorney, right?

6  A.  Yes.

7  Q.  Okay.

8        And by that time you had your letter immunity

9  agreement, right?

10  A.  Yes.

11  Q.  All right.

12        Now, two days later, you met for a fifth time to

13  testify as a witness for the government before the grand jury,

14  right?

15  A.  Yes.

16  Q.  All right.

17        And let's go to Demo 9.  And at that grand jury,

18  there was the FBI agent there and Mr. Hankey, Mr. Johnston,

19  Mr. Madden, right?

20  A.  Yes.

21  Q.  And you had your immunity deal at that time, right?

22  A.  Yes.

23  Q.  Now --

24        MR. HUESTON:  We can put that down.

25  BY MR. HUESTON:

1  Q.  You remember when you appeared before the grand jury, you

2  read the text of a written statement that the government wrote

3  for you, right?

4  A.  It was written together, but yes.

5  Q.  Okay.

6         And, sir, in that text that was written, you would

7  agree that what you said was drifting more and more away from

8  what you said in the earlier sessions with the government,

9  right?

10 A.  I'm not sure I agree to that.

11 Q.  Okay.

12        Let's go to one example.  Earlier we discussed how

13 when you were first asked about applying filters to get a

14 return on investment, you said that Mr. Shah was making

15 changes based on logic he thought was more correct, right?

16 Remember --

17 A.  Sure.

18 Q.  Okay.

19        And as we covered, you don't recall saying a peep in

20 those earlier sessions about wrongdoing on the ROI by Mr. Shah

21 through those early sessions, right?

22 A.  Not from what you've shown me today, no.

23 Q.  Okay.

24        But, sir, before the grand jury, you read the script

25 that said you actually believe that Mr. Shah's criteria had

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 114 of 293 PageID #:13766
Ketchum - cross by Hueston
1209

1   the effect of raising return on investment, right?

2   A.  Yes, that's true.

3   Q.  And a brand-new theory showing up for you in a script

4   written by the government, right?

5           MR. HANKEY:  Objection.  Characterization.

6           THE COURT:  Sustained.

7   BY MR. HUESTON:

8   Q.  First time that you had been mentioning this up through

9   those recorded interviews, right, sir?

10   A.  I can't speak to that, but --

11   Q.  Okay.

12           Well, let's go to another example.  You said in your

13   third interview -- we covered this just earlier -- that there

14   was no connection between device shortfalls and ROI, right?

15   A.  I believe it said I believed at the time there was none.

16   Q.  Okay.

17           But then just before the grand jury, then for the

18   first time you said there was a connection, right?

19   A.  I'd have to see what was said specifically at the grand

20   jury.

21   Q.  Yeah, I'm going to show you that.  But let me see if I

22   can -- if you'll remember this.

23           Do you recall saying you knew that ROI studies left

24   out offices without devices, quote, to make the client believe

25   they got what they paid for?  Do you remember saying that?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 115 of 293 PageID #:13767
Ketchum - cross by Hueston
1210

1    Sound about right?

2    A.  Yes.

3    Q.  Okay.

4         So, let's go to Demo 12.  And, sir, on the left --

5    this is what we covered in your fifth meeting, which was with

6    the grand jury -- those are the people that were present.  At

7    that time, you had your immunity agreement, right?

8    A.  Yes.

9    Q.  And there's the statement that was written by the

10   government, right?

11   A.  Yes.

12   Q.  And, then, you stated:  I also knew -- statement written,

13   I think you said, by the government and you had some input on

14   that, right?

15   A.  Yes.

16   Q.  Okay.

17        And, then, at the bottom, as we covered, I also knew

18   that the purpose of creating the list for IMS in this manner

19   was to make clients believe that they were getting what they

20   paid for, right?

21   A.  Yes.

22   Q.  That's what you said.

23        But in contrast, in the third meeting that we just

24   covered, as we just read in from the agent's notes of

25   interview, that you didn't think OH failing to deliver on ROI

1    had to do with device shortfalls, right?

2    A.  That is what it said --

3    Q.  Okay.

4    A.  -- from the note in the third meeting, yes.

5         THE COURT REPORTER:  I'm sorry, sir, I didn't hear

6    that.

7         THE WITNESS:  Sorry.  That is what the note from the

8    third meeting said.

9    BY MR. HUESTON:

10   Q.  We can put that aside.

11        Now, again, as we covered in your first interview

12   when you came in, you told the FBI you believe that Mr. Shah

13   and Ms. Agarwal disclosed projections to clients.  Remember?

14   A.  Yes, I recall that at the time.

15   Q.  Okay.

16        And after you got your immunity deal, you told the

17   grand jury that clients were led to believe that all screens

18   in a list match were installed as of the date of the list

19   match and that projections were not disclosed, right, sir?

20   A.  I think there's some context that's being left out of the

21   communication.

22   Q.  Well, I'm just asking you do you recall saying that before

23   the grand jury?

24   A.  Yes.

25   Q.  Okay.  That's all I wanted.

1          So, let's go to Demo 13 and look side by side between

2    those two things.

3          So, again, now after you got your immunity deal

4    before the grand jury, you stated:  They wanted clients to

5    believe that Outcome had a higher number of doctors' offices

6    and devices installed as of the date of the list match than

7    Outcome really had.

8          In your first meeting, almost a year before that, you

9    said, as we had reviewed:  Ketchum believed Shah and Agarwal

10   communicates to pharmas that Outcome Health was providing the

11   pharmas two numbers, one installed, one growth.

12         Right, sir?

13   A.  Shown a lot of e-mails between those two --

14   Q.  Okay.

15   A.  -- time periods.

16   Q.  Just covering what we've -- I'm just summarizing what

17   we've just covered, right?

18   A.  Yes.

19   Q.  Okay.

20         MR. HUESTON:  We can put that down.

21   BY MR. HUESTON:

22   Q.  Now, you continued to meet with the government even after

23   that grand jury testimony, right?

24   A.  Yes.

25         THE COURT:  Can I talk to the attorneys at sidebar

1       for a moment.

2              (Proceedings had at sidebar:)

3              THE COURT:  There's been many references now to grand

4       jury.  I think jurors need to know this is not a second trial.

5       If you're willing to let me at least say the grand jury is a

6       body the government uses, a group of people where the

7       government has witnesses come in to testify, either read --

8       well, testify; I'll leave at that -- but it's not a separate

9       trial, there was no earlier trial in this case.

10             I won't talk about their indictment function, just

11      that they are a group of people that hears testimony under

12      oath.

13             Any objection to that by the government?

14             MR. HANKEY:  None from the government.

15             THE COURT:  Defense?

16             MR. HUESTON:  No.

17             MS. BELL:  No objection, your Honor.

18             MR. POULOS:  No, your Honor.

19             THE COURT:  Okay.  Very good.

20          (Proceedings had in open court:)

21             THE COURT:  Ladies and gentlemen, you've heard a lot

22      about grand jury.  I can assure you there was no earlier trial

23      before a jury.  A grand jury is simply a group of people,

24      group of citizens like yourselves brought in to allow the

25      government to do investigations where people come in and

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 119 of 293 PageID #:13771
Ketchum - cross by Hueston
1214

1    testify under oath.  That's all it is.  That's the mechanism.

2    And it's not as if there was another earlier trial in this

3    case.  So, if you're unfamiliar with the term "grand jury," I

4    wanted to give you that definition.

5         Please proceed.

6         MR. HUESTON:  Thank you.

7    BY MR. HUESTON:

8    Q.  Okay.  Let's see if we can move through the other meetings

9    quickly here.  Let's go to Demo 14.

10        You remember you kept meeting with the government

11   afterwards, right?

12   A.  Yes.

13   Q.  All right.

14        So, let's put up Demo 14.  You recall this is roughly

15   September, September 28th, 2022.  Again, basically the same

16   people there, FBI agent Special Agent Mark Stakem, DOJ

17   attorneys Mr. Hankey, Mr. Johnston, Mr. Madden, and your

18   counsel is there, right?

19   A.  Yes.

20   Q.  And you still had your immunity deal at that time, right?

21   A.  Yes.

22        MR. HUESTON:  So, we can put that down.

23   BY MR. HUESTON:

24   Q.  There was then a seventh meeting on November 15th, 2022.

25   So, we're getting pretty -- just a couple of months ago or so,

1    right?

2    A.  Yes.

3    Q.  Let's pull that up.  That's Demo 15.  And let's just

4    quickly review.  That's November 15th, 2022.  And does this

5    roughly accord with your memory?  This was with FBI agent

6    Special Agent Santangelo, DOJ attorneys Mr. Hankey, Mr.

7    Madden, and you had your counsel there, too, with your grant

8    of immunity, right?

9    A.  Yes.

10   Q.  Okay.

11           And, then, let's go to Demo 16.  There was yet

12   another meeting you had with the government around December

13   2nd, 2022.  It was less than a couple months ago.  Or December

14   1st, I guess.  Do you see that?

15   A.  Yes.

16   Q.  And, again, Special Agent Santangelo, DOJ attorneys

17   Mr. Hankey, Mr. Madden, and you had counsel there, as well,

18   right?

19   A.  Yes.

20   Q.  Still under your immunity deal, right?

21   A.  Yes.

22   Q.  And, then, Demo 17, a tenth time, couple days before New

23   Year's Eve.  Do you remember having to trek downtown on the

24   eve of New Year's Eve?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 121 of 293 PageID #:13773
Ketchum - cross by Hueston
1216

1    Q.  Yeah.

2           MR. HUESTON:  And let's pull that up.  That's going

3    to be Demo 17.

4    BY MR. HUESTON:

5    Q.  Okay.  And this says December 2, but I think it should say

6    December 30th.  You remember that, right?  Oh, there we are.

7    There's the tenth meeting.

8           Do you see that?

9    A.  Yes.

10   Q.  And does that appear to be right?  FBI Special Agent

11   Stakem, basically the same folks from DOJ and your counsel?

12   We added Mr. Appleby-Bhattacharjee here, right?

13   A.  Yes.

14   Q.  And, then, let's go to the next demonstrative, the

15   eleventh meeting.  This is on January 19th, right?

16          THE COURT:  It says January 9th.

17          MR. HUESTON:  I'm sorry, it does.  It should say

18   January 19th.  There we go.

19   BY MR. HUESTON:

20   Q.  And you recall that's just less than two weeks ago, right?

21   A.  Yes.

22   Q.  And this time there's a different agent there, Special

23   Agent Johnsrud, right?

24   A.  Yes.

25   Q.  And it looks like the same set of DOJ attorneys as last

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 122 of 293 PageID #:13774
Ketchum - cross by Hueston
1217

1    time, as well as your attorney, right?

2    A.  Yes.

3    Q.  Okay.

4         And we'll quickly flip through the others.  There was

5    a thirteenth time after that, right, sir?  I think it was the

6    20th, a day later?

7    A.  Yes.

8    Q.  And, again, same folks there, once again, from the

9    government, the FBI, and your counsel, right?  Another session

10   you had with the government, right?

11   A.  Yes.

12   Q.  Okay.

13        And, then, the thirteenth meeting, this is on January

14   27th.  That's -- I think it's about Friday.  I'm losing track

15   of the dates, but I think that's two Fridays ago, right?

16   A.  I'm not sure about the day of the week, but yes.

17   Q.  Okay.

18        And, again, an FBI agent, couple of the DOJ

19   attorneys, and your counsel, right?

20   A.  Yes.

21   Q.  Then there was another meeting -- fifteenth one, right --

22   on January 29th.  That was on a Sunday.  Do you remember

23   having to come in on a Sunday?

24   A.  I don't actually, but if it's -- the date's the date,

25   then --

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 123 of 293 PageID #:13775
Ketchum - cross by Hueston
1218

1    Q.  Okay.  It sounds about right, though, right?

2    A.  Yes.

3    Q.  So, by the end of this process --

4            MR. HUESTON:  We can take this down.

5    BY MR. HUESTON:

6    Q.  It took a lot of time to go through all those meetings?

7    A.  Yes.

8    Q.  By the end of this process, 15 times you trekked in

9    downtown to look at documents with the FBI, right?

10   A.  Yes.

11   Q.  And, sir, during that testimony, you said you looked at

12   documents and you responded; is that right?

13   A.  Yes.

14   Q.  Yeah.

15           And you saw the characterization that Outcome Health

16   had of you -- or Mr. Demas -- that you were viewed to be a

17   pleaser.  Do you remember that?

18   A.  I saw that.

19   Q.  And do you view yourself to be a pleaser?

20   A.  I'm not sure.

21   Q.  You weren't trying to be a pleaser with the government

22   through all those sessions; is that your testimony?

23   A.  The government basically just walked through e-mails with

24   me.

25   Q.  Okay.

1    Let's go through -- we're going to go through each of

2    the specific campaigns you testified about, but I do want to

3    start with one quick example.  And this was -- this is about

4    weighted average growth for Novo Nordisk.  Do you remember

5    being asked about that by the government in one of those

6    recent prep sessions a little over a week ago?

7    A.  Yes.

8    Q.  Okay.

9    And the government showed you then -- let's talk

10   about what they showed you in these sessions to prepare you

11   for your testimony.  They showed you what's now marked as

12   Government Exhibit 142, which I'll pull up now.  There it is.

13   And asked in that session about Mr. Shah's comment that when

14   the Novo match was negotiated with the client, Mr. Shah had

15   been using weighted-average numbers.

16   Do you remember being asked about that?

17   A.  Yes.

18   Q.  Okay.

19   And what you did, you assumed that Mr. Shah was

20   lying, right?

21   A.  I can't speak to that.

22   Q.  Do you recall telling the FBI in that meeting -- well, let

23   me see if I can put this up to refresh your recollection.

24   MR. HUESTON:  We'll go, to refresh recollection, DX

25   5731 at Page 2, just for the witness and attorneys only,

1    please.

2    BY MR. HUESTON:

3    Q.  And I'll have you look at that language and ask if this

4    refreshes your recollection and the words captured.

5         (Brief pause.)

6    BY THE WITNESS:

7    A.  Okay.

8    BY MR. HUESTON:

9    Q.  Okay.  Does that refresh your recollection?  Sound about

10   right?

11   A.  Yes.

12   Q.  Okay.

13        MR. HUESTON:  So, I'm going to go ahead and now

14   publish this, your Honor, and --

15        MR. HANKEY:  Wait.

16        THE COURT:  No --

17        MR. HANKEY:  Your Honor, objection.

18        THE COURT:  No.  He can testify to his refreshed

19   recollection.

20        MR. HUESTON:  Okay.

21   BY MR. HUESTON:

22   Q.  So --

23        THE COURT:  You're not going to publish this

24   document.

25        MR. HUESTON:  Okay.  That's fine.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 126 of 293 PageID #:13778
Ketchum - cross by Hueston
1221

1    BY MR. HUESTON:

2    Q.  And so --

3           THE COURT:  You can take the document off the screen,

4    please.

5           MR. HUESTON:  Yeah.

6    BY MR. HUESTON:

7    Q.  And, sir, now what do you remember saying about that?

8    A.  That just because it was -- something was stated in an

9    e-mail that a campaign was a weighted average.  If it wasn't

10   communicated to the client where it wasn't indicated in the

11   contract that it was a weighted average, then you wouldn't

12   know if it was or wasn't a weighted average, but that Rishi

13   Shah was my boss, so did what he said.

14   BY MR. HUESTON:

15   Q.  Right.

16          And that it refreshed your recollection in that you

17   don't remember Mr. Shah speaking with Novo about this being a

18   weighted-average campaign, right?

19   A.  Correct.

20   Q.  Okay.

21          Now, sir, that's what you remember by looking at that

22   document and that document alone, right?

23   A.  Yes.

24   Q.  And I'm not sure who was pulling documents for you at that

25   meeting, but let's go to --

1    MR. HANKEY:  Objection to the narrative.

2    BY MR. HUESTON:

3    Q.  -- GX 143.

4         THE COURT:  Please ask questions.

5         MR. HUESTON:  Okay.

6         THE COURT:  The narrative is stricken.

7         MR. HUESTON:  All right.

8    BY MR. HUESTON:

9    Q.  Let's go to GX 143 and pull that up.

10        And, sir, you don't recall being shown this document

11   in that session, right, sir?

12   A.  Can I take a quick moment to review?

13   Q.  Sure.

14        MR. HANKEY:  Your Honor, could we have a sidebar,

15   please?

16        THE COURT:  All right.

17      (Proceedings had at sidebar:)

18        THE COURT:  Go ahead.

19        MR. HANKEY:  I'm not really sure where this is going.

20   This document wasn't -- doesn't have Mr. Ketchum on it.

21        THE COURT:  Was this introduced in your case?

22        MR. HANKEY:  I can't see it anywhere, but it didn't

23   look like it was.

24        THE COURT:  Does defense know?

25        MR. HUESTON:  I don't think so.  It's a marked

1    government exhibit and this is --

2              THE COURT:  Is this in evidence, is the question.

3              MR. HUESTON:  Yes, it is.

4              THE COURT:  You offered it in the defense case?

5              MR. HUESTON:  Right.

6              THE COURT:  All right.

7              He's not on it.  So, you can ask him to read it.  And

8    if there's questions prompted from that, you can.

9              MR. HUESTON:  That's fine.  That's fine.

10             THE COURT:  That's the procedure we did earlier.

11             MR. HUESTON:  That's right.

12             MR. HANKEY:  Right, but the question he was asking is

13   whether he was shown the document during the meeting --

14             THE COURT:  Oh, yeah.

15             MR. HANKEY:  -- with the government.

16             MR. HUESTON:  Your Honor, can I answer?

17             THE COURT:  Go ahead.

18             MR. HUESTON:  I can -- I have to be able to answer

19   that because what he's basically testifying is, and he's

20   trying to convey to the jury, that his testimony naturally

21   evolved from documents shown to him in those sessions with the

22   FBI.  It's important for me to say, well, here's one you

23   didn't get shown and it shows something different.  It

24   properly suggests to the jury context matters.  That's a very

25   important point for us.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 129 of 293 PageID #:13781
Ketchum - cross by Hueston
1224

1      MR. HANKEY:  Your Honor, may I respond?

2      THE COURT:  Yes.

3      MR. HANKEY:  I'm not even sure how this is -- any of

4  this is inconsistent with the witness' prior testimony.  It

5  just -- I'm not sure how we ended up going down this rabbit

6  hole to begin with.

7      THE COURT:  Well, is the -- I don't have it in front

8  of me.  Is it inconsistent with testimony he gave, this

9  exhibit?

10      MR. HUESTON:  Yeah.  It's inconsistent with what he

11  just summarized.  He told the FBI that, I don't think Mr. Shah

12  told the client.  And this e-mail is next in sequence,

13  literally the next exhibit listed on their list, that shows he

14  did tell the client.  So, I'm going to just read that in, and

15  then I'm done with this module.

16      MR. HANKEY:  It's a document that he's never seen

17  before that is inconsistent with what he told the government

18  before in a meeting outside of court.

19      THE COURT:  Right.

20      MR. HANKEY:  None of that is inconsistent with his

21  testimony in trial.  So --

22      THE COURT:  Well -- but no.  If he said something

23  inconsistent in a previous meeting with the government, that's

24  fair game.  How he got here, it's not necessarily -- every one

25  of his prior statements, if they switch in subtle or not

1    subtle ways, is proper area for cross-examination.  It's a

2    prior inconsistent statement.

3            MR. HANKEY:  I agree with that, your Honor, but this

4    e-mail doesn't have -- it's not Mr. Ketchum's e-mail, and he's

5    not on it.  So, it's not a prior inconsistent statement of Mr.

6    Ketchum.

7            THE COURT:  All right.  It's a subtle difference.

8            You are just going to ask him to read it and then ask

9    if he told the government something earlier different than

10   what he said in court or earlier than what he said in a prior

11   session, and then you said you're done with this, correct?

12           MR. HUESTON:  I believe I'm just about done, yes.  I

13   don't think I have any other documents on it, yes.

14           THE COURT:  All right.

15           MR. BLEGEN:  Judge, I'm sorry, can I interject for a

16   moment?  This is Pat Blegen.

17           THE COURT:  You just won, so I don't know if you want

18   to interject.

19           MR. BLEGEN:  Well, I guess this being only the last

20   question on this topic.  The reason is I have this, of course,

21   in my --

22           THE COURT:  Sure.

23           MR. BLEGEN:  -- cross-examination, as well.

24           So, the issue is Mr. Ketchum said that if it was a

25   weighted-average contract, it would be in the contract in his

1  testimony.  What Mr. Hueston is doing now -- and I'll -- may

2  or may not do, depending on how he finishes it -- is that

3  that's not the case because there were external discussions

4  about weighted average, which this e-mail proves.

5          And it is one of the goose-and-gander things that we

6  agreed to previously where even if he's not on an e-mail, he

7  can be shown the e-mail and then, I believe, could correctly,

8  properly be asked, does this now change your view that

9  weighted average had to be written in the contract for it to

10 be understood by the parties.

11         That's the point, I think, that's being made here;

12 and, if it isn't, that's the point I will make on cross if you

13 let me.

14         THE COURT:  We'll talk in 15 minutes at lunchtime

15 about that in greater detail.  The limited questions that

16 Mr. Hueston said he's going to ask on this we'll proceed with.

17 And, then, if there's going to be additional questions like

18 that, Mr. Blegen, we'll talk about that during the lunch break

19 so we're not keeping the jury waiting.

20         Go ahead and finish this document.

21     (Proceedings had in open court:)

22         THE COURT:  All right.

23 BY MR. HUESTON:

24 Q.  Okay.  Let's proceed with Exhibit 143.  You can see that,

25 sir?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 132 of 293 PageID #:13784
Ketchum - cross by Hueston
1227

1  A.  Yes.

2  Q.  Okay.

3       Now, let's look at what is being said here.  If we

4  look down below, Mr. Shah is reminding the Novo client that

5  this is a weighted-average campaign.  Do you see that?

6  A.  Yes.

7  Q.  And you don't recall seeing this in that prep session when

8  you gave that earlier testimony, right?

9  A.  I don't recall seeing this, no.

10  Q.  Instead, sir, by seeing the earlier document but not this,

11  you were left with the misimpression that Mr. Shah had lied

12  when all you needed to do is see that Mr. Shah had been saying

13  what he was saying right here in this document, right?

14  A.  So, the -- I do have a little bit of clarification.  I'm a

15  little confused on something.  The Novo campaign that was from

16  my testimony, I don't recall if it's related to this 2013

17  campaign or an earlier one.

18  Q.  Okay.  Fair enough.

19       But you do recognize that this is a communication --

20  Paul Stevenson is the client rep, right?

21  A.  Yes.

22  Q.  At Novodisk, right?

23  A.  Yes.

24  Q.  And written there below from Mr. Shah is, quote:  You are

25  correct, but our weighted average is 1800 for the 2013 Novo

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 133 of 293 PageID #:13785
Ketchum - cross by Hueston
1228

1    program, disclosed expressly by Mr. Shah, correct?

2    A.  Yes, I see that.

3    Q.  And you would agree, sir, again, context matters, right?

4    A.  Yes.

5    Q.  All right.  You can put that aside.

6         Let's talk a little more about those ROI reports.

7    Return on investment, right?

8    A.  Yes.

9    Q.  Okay.

10        And, now, just again to set the stage here, Outcome

11   generally used a third-party company called IMS to conduct the

12   ROI or return on investment analysis, right?

13   A.  Yes.

14   Q.  And I think you testified that one of your

15   responsibilities at Outcome was to assemble the list of

16   physicians to send to IMS, right?

17   A.  Yes.

18   Q.  And, again, to reorient on some of the topics covered last

19   week, the list of physicians that you'd send to IMS were those

20   that were exposed to Outcome ads.  That list was called the

21   test group?

22   A.  Yes.

23   Q.  Okay.

24        And you explained that IMS compares the test group to

25   a group of control doctors, right?

1  A.  Yes.

2  Q.  Okay.

3       And the control doctors are physicians that IMS comes

4  up with that did not receive the Outcome programming, right?

5  A.  Yes.

6  Q.  That's the idea, right?

7  A.  Yes.

8  Q.  To figure out if an ad -- playing an ad has an effect.

9  Well, let's test doctors who are seeing the ad and whether

10 they're prescribing more versus doctors who are not seeing it,

11 right?

12 A.  Yes, that's right.

13 Q.  Okay.

14      That's the general idea?

15 A.  Yes.

16 Q.  And, again, for clarification, I think you explained that

17 when IMS measures the difference in prescriptions written by

18 the test group of doctors on the one hand and the control

19 group on the other, right, that's how they measure the

20 difference?

21 A.  Yes.

22 Q.  Now, also for context, you've admitted you're not a data

23 guy, right?

24 A.  No.

25 Q.  Bachelor of Arts degree in business administration and

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 135 of 293 PageID #:13787
Ketchum - cross by Hueston
1230

 1   economics, right?

 2   A.  Minor in economics, but --

 3   Q.  A minor.  Okay.

 4   A.  Just want to be --

 5   Q.  Gotcha.

 6       You don't have a degree in statistics, right?

 7   A.  No.  No.

 8       Sorry.  I think I'm far from the mic.  Sorry.

 9   Q.  Yeah.

10       You don't have a degree in mathematical analysis,

11   right?

12   A.  No.

13   Q.  Or a degree in epidemiology, right?

14   A.  No.

15   Q.  And you've never conducted a longitudinal cohort study,

16   right?

17   A.  No.

18   Q.  Now -- but you've testified that the filters or the

19   criteria that Outcome applied to the test groups amounted to

20   cherry-picking.  Is that a fair summary of what you testified

21   to?

22   A.  Yes.

23   Q.  And I believe you testified that those criteria

24   constituted cherry-picking because they made it more likely

25   the ROI study would have a positive result, right?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 136 of 293 PageID #:13788
Ketchum - cross by Hueston
1231

1  A.  Yes.  And we saw some e-mails to that effect, too.

2  Q.  Well, let me ask you about that.  We didn't see an e-mail

3  with the term "cherry-picking" in it, did we?

4  A.  No, we did not.

5  Q.  And, in fact, you can't recall one e-mail ever where

6  anybody was saying, let's do cherry-picking, or used the term

7  "cherry-picking," right?

8  A.  No.

9  Q.  And during your direct exam, you'll recall you didn't

10  testify about a single document where Ms. Agarwal or Mr. Shah

11  actually told you to cherry-pick the offices that were top

12  performers based on having lots of sales, right?

13  A.  Not the phrase cherry-picking but the effect of it --

14  Q.  Okay.  We'll --

15  A.  -- yes.

16  Q.  -- get into that.

17        So, you've never actually run the numbers, sir, to

18  see how these different filters would have impacted IMS's

19  calculations, have you?

20  A.  No.

21  Q.  And, by the way, at trial you testified that Mr. Shah

22  taught you how to apply those filters, right?

23  A.  Yes.

24  Q.  But, in fact, isn't it true you also learned how to apply

25  these filters, you've thought, very possibly from your boss

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 137 of 293 PageID #:13789
Ketchum - cross by Hueston
1232

1  Silvia Vasquez, for instance, right?

2  A.  I don't recall that.

3  Q.  You don't recall stating that possibly Travis Kemp and

4  Silvia Velazquez --

5  A.  I understand.  I understand.  Sorry.  I was a little

6  confused on your line of questioning.

7         Yes.

8  Q.  Yes.

9         And, sir, let's start now with the example -- one

10  example -- of the criteria that you claimed on direct was

11  deceptive.  I think you testified that Outcome sometimes

12  removed from the test group doctors who may not have received

13  the full campaign, right?

14  A.  Yes.

15  Q.  Okay.

16         And I just want to pause here and ask you, if the

17  goal is to know whether Outcome's ads are working, then you

18  would agree you need to study doctors who actually saw the

19  ads, right?  That's a common sense idea that you'd agree with,

20  right?

21  A.  It would depend on the approach.  So, we'd have to see the

22  statement of work and the communication between Outcome Health

23  and the client to understand that context.

24  Q.  Well, you knew that clients understood that these IMS

25  studies were only measuring physicians currently utilizing

1    Outcome's advertising, right?

2    A.  Yes.

3    Q.  And let's go to CX 10061.  And --

4         MR. HUESTON:  That's not right.  Let's go to -- it

5    should be a September 27th, 2012, e-mail.  Sorry.  Take that

6    down.

7         Okay.  Here we are.  106 -- 10061.

8    BY MR. HUESTON:

9    Q.  This is a September 27th, 2012, e-mail from Mr. Mons to

10   you, Mr. Shah and Ms. Agarwal.  Do you see that?

11   A.  Yes.

12   Q.  And the subject is preparation for October 1st

13   teleconference with Vivus Qsymia, right?

14   A.  Yes.

15   Q.  And if we look at the agenda items, you can see one of the

16   agenda items is to -- we'll highlight this year -- achieve

17   consensus on ROI metrics and protocol, right?

18        Let's -- specifically, let's go to the language, my

19   hope for this call is to have Mike and Ellen say to Jean-Luc

20   they have met with us regarding ROI metrics and all agreed on

21   measurement protocol.

22        Do you see that?

23   A.  Yes.

24   Q.  And what we can see is Mr. Mons on this e-mail, if we look

25   at the e-mail, he's attaching a draft deck, right?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 139 of 293 PageID #:13791
Ketchum - cross by Hueston
1234

1    MR. HUESTON:  Let's go to the top.

2    BY MR. HUESTON:

3    Q.  Do you see the draft deck?

4    A.  Yes.

5    Q.  And it's a draft deck that if you look at the first line,

6    Hi, guys, we have a call with Vivus on Monday.  I need your

7    help.  Like we did with Francie at Amgen last month, we have a

8    similar mission with a different drug.

9         Do you see that?

10   A.  Yes.

11   Q.  You understand he's attaching a deck that was based on a

12   presentation used with Amgen, right?

13   A.  It appears that way, yes.

14   Q.  Yeah.

15        And if we go to Page 11 of this deck, let's see --

16   let's take a look at what's being shown on the client side.

17   There's a slide on IMS Health Study and Benchmark.

18        Do you see that?

19   A.  Yes.

20   Q.  And let's go to the second bullet.  IMS used a test group

21   of physicians currently utilizing ContextMedia in-office

22   digital programming.

23        Do you see that language?

24   A.  Yes.

25   Q.  So, again, sir, the point of the IMS study as it's

Ketchum - cross by Hueston

1235

1    presented here was to see if Outcome's ads were working,
2    right?
3    A.  I believe there's context missing here.
4    Q.  Well, I'm just asking you about that.
5         This indicates that, in fact, IMS is using a test
6    group of physicians currently utilizing ContextMedia in-office
7    digital programming, right?
8    A.  The bullet before it indicates that there's more to it,
9    though.
10   Q.  Well, let's just answer this question first.  That's what
11   it says, right?
12   A.  Yeah, that's what it says.
13   Q.  Okay.
14        Then there's another bullet above that, right?
15   A.  Yes.
16   Q.  And that one says:  ContextMedia Health Partners with IMS
17   Health to measure the effectiveness of its condition-specific,
18   point-of-care marketing prescribing behavior.
19        I read that correctly, right?
20   A.  Yes.
21   Q.  Okay.
22        And, sir, this is a deck that was used, you just
23   said, for Amgen, right?
24   A.  I don't know if it actually was used for Amgen, but it
25   indicated like it may --

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 141 of 293 PageID #:13793
Ketchum - cross by Hueston
1236

1   Q.  Okay.

2   A.  -- have been, yes.

3   Q.  Okay.

4           Let's look at another example.  Let's go to CX 10166.

5   10166.

6       (Brief pause.)

7           MR. HUESTON:  That one appears to be missing, your

8   Honor.  So, maybe this is a good time to break for lunch.

9           THE COURT:  That's fine.  It's likely in the cloud.

10      (Laughter.)

11          MR. HUESTON:  Right.

12          THE COURT:  We will take an hour break for lunch.

13          Mr. Santiago, you can mute your screen and also take

14  a break the same time as the jury.  We'll be back in an hour.

15  Please don't discuss the case with yourselves or anyone else.

16  And keep an open mind.  There's more evidence to hear.

17          Thank you.

18      (Jury out.)

19          THE COURT:  Sir, you're on cross-examination.  Please

20  don't discuss your testimony with anyone.  Come back in one

21  hour, please.

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Okay.  I hope our juror --

24          Mr. Santiago, please make sure you mute your screen.

25          Anything we need to discuss at this time?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 142 of 293 PageID #:13794
Ketchum - cross by Hueston
1237

1         MR. HUESTON:  No, your Honor.

2         MR. BLEGEN:  Judge, did you want to discuss the issue

3  you said we'd hold till lunch now or -- I mean, it won't come

4  up with me till, you know, tomorrow, but --

5         THE COURT:  Let's wait on it then, because possibly

6  our juror will be back and we won't have to worry about feeds

7  and things like that.  Okay.

8         Mr. Madden?

9         MR. MADDEN:  Your Honor, we don't have to do it now.

10 The next witness is going to testify remotely.  The defendants

11 have agreed to it.  We've got their waiver.  So, either now

12 or, you know, at the end of the day or tomorrow morning if we

13 could just go over the waiver.

14        THE COURT:  Let's do that either later today or first

15 thing tomorrow morning.

16        MR. MADDEN:  Sounds good.

17        THE COURT:  Anything else?

18     (No response.)

19        THE COURT:  All right.  See you in an hour.  Thank

20 you.

21     (Recess taken at 12:20 o'clock p.m., until 1:20 o'clock

22 p.m., of the same afternoon.)

23

24

25

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3  UNITED STATES OF AMERICA,      )
                            )   Docket No. 19 CR 864
4              Plaintiff,  )
                            )   Chicago, Illinois
5     v.                   )   February 6, 2023
                            )   1:29 p.m.
6
  RISHI SHAH, SHRADHA AGARWAL,   )
7  BRAD PURDY,              )
                            )
8             Defendants.  )

9

        TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 5B
10     BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury

11
  APPEARANCES:
12

13  For the Government:    MR. MATTHEW F. MADDEN
                        MR. SAURISH APPLEBY-BHATTACHARJEE
14                   Assistant U.S. Attorneys
                        219 South Dearborn Street, 5th Floor
15                   Chicago, Illinois  60604

16
                        MR. WILLIAM E. JOHNSTON
17                   MR. KYLE C. HANKEY
                        U.S. Department of Justice
18                   Criminal Division, Fraud Section
                        Washington, D.C.  20530
19

20

21

22                    ELIA E. CARRIÓN
                  Official Court Reporter
23            United States District Court
         219 South Dearborn Street, Room 1432,
24            Chicago, Illinois 60604
                (312) 408-7782
25         Elia_Carrion@ilnd.uscourts.gov

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 144 of 293 PageID #:13796
Ketchum - cross by Hueston
1239

1  APPEARANCES (Continued:)

2

3  For Defendant
   Shah:                    MR. JOHN C. HUESTON
                            Hueston Hennigan LLP
4                           620 Newport Center Drive, Suite 1300
                            Newport Beach, California  92660

5
                            MS. VICKI CHOU
6                           MR. MICHAEL H. TODISCO
                            MS. KAREN DING
7                           Hueston Hennigan LLP
                            523 West 6th Street, Suite 400
8                           Los Angeles, California  90014

9
   For Defendant
10 Agarwal:                 MS. KOREN L. BELL
                            MR. A. ALEXANDER LOWDER
11                          Larson LLP
                            555 South Flower Street, Suite 4400
12                          Los Angeles, California  90071

13                          MR. PATRICK W. BLEGEN
                            MS. KELSEY H. KILLION
14                          Blegen & Garvey
                            53 West Jackson Boulevard, Suite 1437
15                          Chicago, Illinois  60604

16
   For Defendant
17 Purdy:                   MR. THEODORE T. POULOS
                            MR. ERIC PRUITT
18                          MR. JOHN PAVLETIC
                            Cotsirilos, Tighe, Streicker, Poulos &
19                          Campbell, Ltd.
                            33 North Dearborn Street, Suite 600
20                          Chicago, Illinois  60602

21

22

23

24

25

1    (Proceedings heard in open court; jury out:)

2    THE COURT:  All right.  Let's go on the record.

3    I want to confirm again the intention of the parties.

4    I noted earlier, much of it was off the record so I want to

5    put it on the record, one of the jurors was ill, couldn't come

6    in, but was in a position where he could follow the trial,

7    both the witness testimony and exhibits, and have it displayed

8    on his computer at home.

9    There's nothing wrong with that as long as the

10   parties all agreed.  I want to get on the record again the

11   consent of all parties to this procedure.  We've spoken to the

12   juror at lunch time.  He was hearing everything fine, seeing

13   all the exhibits that were up there, saw the witness, so

14   there's no problem with that.

15   He is not hearing this right now.  His audio is off.

16   So I want to consent -- make sure this is consented to by the

17   parties.

18   Government agrees to this procedure?

19   MR. HANKEY:  We do for today, Your Honor.

20   THE COURT:  Okay.  And I'll note, too, the juror had

21   said he's feeling better and he expects to be in tomorrow.

22   Okay, defense?

23   MR. HUESTON:  Yes, Your Honor.

24   THE COURT:  Can I hear from your client?

25   DEFENDANT SHAH:  Yes, Your Honor.

1    THE COURT:  All right.  From Ms. Agarwal?

2    MR. BLEGEN:  Yes, with the same understanding that

3    even if it comes up in the future, we may have a different

4    position with a different juror or something else.

5    THE COURT:  Well, it worked today.  And I want to

6    hear from your client that she agrees.

7    DEFENDANT AGARWAL:  Yes, Your Honor.

8    THE COURT:  Okay.

9    MR. POULOS:  Yes, Your Honor.

10   DEFENDANT PURDY:  Yes, Your Honor.

11   THE COURT:  Okay.  And then at some point this

12   morning, there was like a 60-second period where someone else

13   popped up on WebEx, it was -- was it Lynn Meier? -- Lynn

14   Meier, who I think is one of the witnesses who is going to

15   testify remotely.

16   She may have -- is it a man or a woman?

17   MR. HANKEY:  A woman.

18   THE COURT:  She may have simply been, you know,

19   checking out the WebEx connection, but she may have

20   inadvertently gotten into this dialogue.  It was only for

21   about 60 seconds sometime this morning.  It showed up on the

22   screen.  Someone noticed it.

23   I don't know that Ms. Meier heard anything of any

24   consequence that would relate to her testimony.  I'm putting

25   it on the record.  If the parties want to inquire about that

1   of her separately, they can do it.  But these things happen,

2   and it was certainly inadvertent and brief.  But if that's

3   going to create an issue, you all know about it and you can

4   inquire of Ms. Meier about it when we're not in court.

5           Okay.  Anything else the parties need to --

6           MR. HANKEY:  No, Your Honor.

7           THE COURT:  On the ContextMedia document, the -- I'm

8   sorry, let me find the right exhibit.  I don't have the number

9   right here.  The one that you were asking about having come in

10  for the offered for its truth as opposed to just effect on the

11  listener.

12          MR. HANKEY:  Yes.

13          THE COURT:  Is that coming up today?

14          MR. TODISCO:  It may, Your Honor.

15          THE COURT:  All right.  I'm not letting it in for its

16  truth.  I reviewed that again.  It's -- these offhand email

17  conversations don't bear the indicia of reliability that's

18  necessary as a business record.

19          It can come in for the effect on the listener, which

20  I think the government had no objection to, correct?

21          MR. HANKEY:  Correct.

22          THE COURT:  But it's not coming in for the truth.  It

23  really doesn't have to do with the truth or accuracy of the

24  representation.  It's just not a routine communication, and

25  for that reason, I'm not admitting it as a business record.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 148 of 293 PageID #:13800
Ketchum - cross by Hueston
1243

1    It can be offered.  You can ask for a limiting instruction

2    when it comes in, and I'll give the appropriate limiting

3    instruction, but it's not being admitted for its truth.

4              All right.  Let's bring in the jury.

5              Can Emily hook him in again?  Thanks.

6              COURT SECURITY OFFICER:  All rise.

7          (Jury enters courtroom.)

8              THE COURT:  All right.  Please be seated.

9              You may continue your cross-examination.

10             MR. HUESTON:  Thank you, Your Honor.

11        JASON KETCHUM, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

12                   CROSS-EXAMINATION (RESUMED)

13   BY MR. HUESTON:

14   Q.  Mr. Ketchum, I want to just briefly return to something

15   that you said you might not recall, so let me tee that up.

16             I think you said you don't recall that you deleted

17   your Voxer communications relating to Outcome Health?

18   A.  Correct, yeah, I don't recall that.

19   Q.  Okay.  So I want to see if I can refresh your recollection

20   with an FBI memorandum of interview.  So I'm going to put one

21   sentence up, not to be shown to the jury, and I'll have you

22   read that.

23             This is from your first session on August 9th, 2018.

24   And read that sentence and let me know if that refreshes your

25   recollection.

1    THE COURT:  It's not there yet.

2    There we go.

3  BY THE WITNESS:

4  A.  I still don't really recall.  I see it there, but I don't

5  recall.

6    MR. HUESTON:  At this time, we'd ask the government's

7  stipulation that we read that single sentence into the record

8  at this time as a statement recorded by Special Agent Stakem

9  on August 9th, 2018.

10    THE COURT:  All right.  Is the government willing to

11  do that?

12    MR. HANKEY:  Yes.

13    THE COURT:  Subject to the same objections you made

14  in the past.

15    MR. HANKEY:  Yes.

16    THE COURT:  All right.  Go ahead.

17    MR. HUESTON:  "Ketchum deleted any Voxer

18  communications relating to Outcome Health, OH, when he left OH

19  in February 2018."

20    We may put that down.

21    THE COURT:  All right.  And that's simply a

22  stipulation as to what the agent believes the witness said.

23  It's not a recording.  It's what the agent took down in his

24  notes about what the witness said.

25    Stipulated by the government?

1    MR. HANKEY:  So stipulated, Your Honor.

2    THE COURT:  All right.

3    MR. HUESTON:  Thank you.

4  BY MR. HUESTON:

5  Q.  All right.  Mr. Ketchum, let's go back to ROI, return on

6  investment.  We've been talking about the idea of filters.  So

7  I want to go to another example here.  I think we got it teed

8  up so we can get it up on the screen this time.

9    MR. HUESTON:  Let's go to CX 10166.

10  BY MR. HUESTON:

11  Q.  Okay.  And there it is.  And now, this is a document, it

12  says from Mr. Mons to Shradha Agarwal, cc: Rishi Shah.  And

13  the subject is AZ Crestor ROI research process, 2012.

14    Do you see that?

15  A.  I do.

16  Q.  And you're not on the email, but, again, you recognize

17  that as Crestor, and you testified about Crestor, right?

18  A.  Yes.

19  Q.  Okay.  Let's go to page 4 of this document, and you see

20  the beginning of this PowerPoint says research discussion with

21  Crestor, right?

22  A.  Yes.

23  Q.  And the date is January 15th, 2013, right?

24  A.  Yes.

25  Q.  And if we go to page 5, and at the top, it says,

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 151 of 293 PageID #:13803
Ketchum - cross by Hueston
1246

1  "Process," right?  Do you see that?

2  A.  I do.

3  Q.  And then it lists bullets of process below.  Do you see

4  that?

5  A.  I do.

6  Q.  And the very first one says:  "IMS Health receives a list

7  of physicians whose patients are exposed to the promotion in

8  our offices."  Right?

9  A.  Yes.

10        MR. HUESTON:  Okay.  And we can put that aside.

11  BY MR. HUESTON:

12  Q.  Separate from this document, you understood Crestor was a

13  big client for Outcome Health, right?

14  A.  Yes.

15  Q.  All right.  And you recall that Outcome's own clients

16  acknowledged that the most important thing about ROI studies

17  was to learn as much as possible about how advertising

18  affected different types of offices.  You remember that,

19  right?

20  A.  I'm not -- I'm not entirely sure what I'm trying to --

21  what I'm supposed to recall here.

22        MR. HUESTON:  All right.  Let's go to CX 10062.

23  BY MR. HUESTON:

24  Q.  And this is a March 4, 2013 email from Bob Mons to

25  Mr. Shah and Ms. Agarwal, subject:  Feedback from Earl re:

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 152 of 293 PageID #:13804
Ketchum - cross by Hueston
1247

1  Crestor, and Michelle's issue, high priority.  You're not

2  copied on this email, right?

3  A.  Correct.

4  Q.  But you know that Mr. Black is at Zenith Media.  That's

5  the client -- Crestor client rep, right?

6  A.  I believe so, yes.

7  Q.  Okay.  And in the email below on the second half of the

8  page, Mr. Black writes:  "The most important thing is to learn

9  as much as possible about how the advertising affected

10 different types of offices."

11       That's what he wrote, right?

12 A.  Yes, I see that.

13 Q.  All right.  Now let's go do Government Exhibit 8, which

14 was already presented.  Let's look at some of the other

15 filters.

16       So this is a January 27, 2012 email from Mr. Shah to

17 Matt Coppola, you and Travis Kemp.  You looked at that last

18 week.  Do you remember that?

19 A.  Yes.

20 Q.  I realize there are a lot of documents.

21 A.  I do.

22 Q.  Okay.  And Mr. Shah looked for a complete list of filters

23 for Novo research.  Do you remember that?

24 A.  Yes.

25 Q.  So, first, sir, you'll agree that Mr. Shah is asking

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 153 of 293 PageID #:13805
Ketchum - cross by Hueston
1248

1  Mr. Coppola for the list of filters that are applied, right?
2  A.  Yes.
3  Q.  And you've described Mr. Coppola as a warehouse manager;
4  right?
5  A.  Yes, I believe so.
6  Q.  Okay.  You would agree that these filters used at Outcome
7  Health, it wasn't something secret inside Outcome Health.
8  Here's the warehouse manager talking about it, right?
9  A.  Correct.
10  Q.  And some of the filters Mr. Shah describes includes
11  removing DVD offices, removing offices with compliance issues,
12  and removing offices without full-time physicians.  Right?
13  A.  Yes.
14  Q.  And we're going to get back to some of these in a moment.
15  I want to focus on what's not included in this list.
16          You'd agree there's no filter for only offices that
17  had high sales, right?  That's not listed as a filter?
18  A.  Correct.
19  Q.  And you talked a bit last week about physician decile
20  rankings.  Do you remember that?
21  A.  I do.
22  Q.  And you'd agree that decile is a ranking for physicians on
23  how much of a particular drug that they write, right?
24  A.  Yes.
25  Q.  Okay.  And nowhere here in this list of filters is he

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 154 of 293 PageID #:13806
Ketchum - cross by Hueston
1249

1    saying filter for just the highest decile prescribers and

2    remove the doctors we know don't write a lot of them, right?

3    You don't see that?

4    A.  I don't.

5    Q.  And, in fact, you recall that Outcome's studies actually

6    controlled for decile between the test group and the control

7    group, to make sure it was apples and apples, right?

8    A.  Yes.

9            MR. HUESTON:  All right.  And let's just, you know,

10   pull up a document to show that, CX 10059.

11   BY MR. HUESTON:

12   Q.  First at page 1 that says:  Research discussion with Novo.

13   Do you see that?

14   A.  I do.

15           MR. HUESTON:  And let's go to page 3 to see what was

16   discussed with Novo.

17           And if we highlight here the one that says decile,

18   third bullet down.

19   BY MR. HUESTON:

20   Q.  IMS then builds a control group of physicians nearly

21   identical to the test group except for this promotion, they

22   control for a number of factors including, and there's a list

23   there, and you can see the word -- we'll highlight it --

24   decile.  Do you see that?

25   A.  I do.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 155 of 293 PageID #:13807
Ketchum - cross by Hueston
1250

1    MR. HUESTON:  All right.  So we can put that down.
2  BY MR. HUESTON:
3  Q.  So let's go through some of these filters here.  We'll
4  start with full-time physicians, okay?
5  A.  Oh, yes.  Sorry.
6  Q.  All right.  And, again, you've said you're not a data guy,
7  but you do know that there were legitimate analytical reasons
8  why Outcome needed to exclude part-time doctors from the test
9  list to get accurate results, to get apples to apples, right?
10  A.  I'm not entirely sure I understand the -- how that relates
11  to part-time.
12  Q.  Okay.  Well, let's see if we can explore that.  Let's --
13  let's try to bring it down to a more basic level.
14    You do understand that to conduct an accurate study,
15  you need the test group of the Outcome-exposed physicians to
16  be nearly identical, right, to the control group in every way
17  other than the fact that they saw Outcome advertisements,
18  right?
19  A.  Yes.
20  Q.  They have to be the same in every way?
21  A.  Ideally, yes.
22  Q.  Okay.  And so there needs, to put this in lay terms, there
23  needs to be a match for every physician in the test group to
24  the corresponding physician in the control group except one
25  saw the ads and one did not, right, to make it apples to

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 156 of 293 PageID #:13808
Ketchum - cross by Hueston
1251

1    apples?

2    A.  Yes.

3    Q.  Okay.  And if there's something that was -- that Outcome

4    included in the test group that couldn't be replicated in the

5    control group, that's when you not -- you no longer have

6    apples to apples, right?  That's when you could have results

7    thrown off, right?

8    A.  Yes.

9    Q.  All right.  So let's, with that in mind, let's go to GX

10   286.

11          And here we have an August 28, 2013 email from

12   Mr. Desai to you, and the subject is part-time physicians for

13   Novo study.  Do you see that?

14   A.  I do.

15   Q.  And he's forwarding an email to you from Jeremy Mittler at

16   Crossix.

17          MR. HUESTON:  Let's just show that.

18   BY MR. HUESTON:

19   Q.  Do you see that there?

20   A.  Yes.

21   Q.  And you recognize Crossix as another company that is kind

22   of similar to IMS.  They conduct ROI studies.

23   A.  Yes.

24   Q.  Yes.  And in the bottom email, Mr. Desai asks Crossix:

25   "Quick question on prescriber list.  In the past we have

1  pulled part-time physicians from the test group as they tend

2  to skew results.  Does Crossix have the ability to identify

3  part-time physicians?  Or should just send a list with

4  full-time in our network?"  Do you see that?

5  A.  I do.

6  Q.  Okay.  So you'd agree with me the question here is if

7  there are part-time physicians in the test group, are you

8  going to be able to find a match in the control group, right?

9  It's got to be apples to apples.

10  A.  Yes.

11  Q.  And let's look at Crossix's response.

12        Then they write back, Jeremy Mittler at Crossix, he

13  says:  "We do not have a way to explicitly identify part-time

14  physicians.  We would need to make assumptions based on the

15  number of patients we see for each physician.  I would

16  recommend pulling these from the file."  Right?

17  A.  Yes.  I see that.

18  Q.  Pulling the part-time physicians out?

19  A.  Yes.

20  Q.  Filtering out the part-time physicians?

21  A.  I see that, yes.

22  Q.  Okay.  And that's Crossix.  They're an expert third-party

23  entity like IMS, right?

24  A.  Yes.

25  Q.  That's not Mr. Shah telling them to do it.

1    A.  No.

2    Q.  All right.  And, sir, without -- I realize no academic

3    training in this area, you testified at trial it was improper

4    cherry-picking to remove offices that had part-time

5    physicians, right?  That was your impression?

6    A.  That was my impression, yes.

7    Q.  Okay.  But here you're being told by a subject matter

8    expert at Crossix that they had approved of this filter for

9    full-time doctors as a recommended practice, right?

10   A.  Yes.

11   Q.  Okay.  And --

12        MR. HUESTON:  Okay, we can put that aside.

13   BY MR. HUESTON:

14   Q.  And not only this, sir, you're aware that Mr. Shah

15   actually disclosed this very practice to Outcome clients,

16   aren't you?

17   A.  I was not.

18   Q.  Okay.  Let's look at CX 10063.  And this is a July 11,

19   2012 email from Mr. Shah to David Colin at J3.  Do you see

20   that?  You're on this email, too, on the cc: line.

21   A.  Yeah, I see that.

22   Q.  Okay.  J3, you recognize that.  That's the agency for

23   Johnson & Johnson, right?

24   A.  Yes.

25   Q.  And you can see below, let's look at what Mr. Colin asked,

1 from Johnson & Johnson: "Hey, Jeana and Rishi. As the brand

2 is trying hard fighting to get funds for 2013, they are trying

3 to perform an ROI in offices with TV versus without. Right

4 now to be candid, they are not seeing the lifts they hoped and

5 believe a big cause is that the control group that they are

6 using contains offices that at one point were in the network."

7 Do you see that?

8 A. Yes, I do.

9 Q. Okay. So you'd agree this relates to what we have been

10 just talking about, that if the control group and the test

11 group are not nearly identical in every way other than

12 exposure to the promotion, you might have an inaccurate study,

13 right?

14 A. This -- can I ask a clarifying question? Am I allowed to

15 ask clarifying question?

16 Q. Well, just try to answer my question. You would agree to

17 that proposition, sir?

18 A. Is this related to the part-time physicians, full-time

19 physicians, or is this a different --

20 Q. We'll get -- it does -- this does go into part-time

21 physicians.

22 A. Okay.

23 Q. Okay?

24 A. Okay.

25 Q. All right. So you would agree again that if the control

 1  group and test group are not nearly identical in every way

 2  other than exposure to promotion, then you'll have an

 3  inaccurate study, right?  We've agreed to that earlier.

 4  A.  Yes.

 5  Q.  Okay.  So Mr. Shah responds here, quote -- let's go to it:

 6  "Hi David, a quick question:  Are they limiting the test group

 7  being measured to physicians practicing full-time in RHN

 8  locations?  The reason I ask is if PT" -- you understood that

 9  to be part-time, right?

10  A.  Yes.

11  Q.  "If part-time physicians are being included in the test

12  group, it will dilute the impact since only a segment of the

13  patients they see have access to the promotion."  Right?

14  A.  Yes.

15  Q.  And so Mr. Shah, you understood him to be explaining why

16  it leads to a more accurate result in this instance in

17  filtering out part-time physicians, right?

18  A.  Yes.

19  Q.  Okay.  And by the way, I think you've admitted in your

20  direct exam, you actually didn't have a whole lot of insight

21  into who the most important customers were during the 2011 to

22  2013 time period; but I think you did identify J & J's Simponi

23  brand as one of two of the big customers that you have been

24  able to remember, right?

25  A.  I don't recall that during my direct testimony.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 161 of 293 PageID #:13813
Ketchum - cross by Hueston
1256

1    Q.  Okay.

2    A.  Possible --

3    Q.  But that's --

4         THE COURT:  One at a time.

5         MR. HUESTON:  Sorry.

6    BY MR. HUESTON:

7    Q.  Does that sound familiar?  It was one of the big clients

8    that you can remember?

9    A.  I recall Simponi being a client.  I don't recall the size

10   of it.

11   Q.  Okay.  And this is an email to the J & J client about

12   Simponi, right?

13   A.  Yes.

14   Q.  All right.  Now, let's move on to another filter that you

15   did talk about in your direct.  You testified that it was

16   cherry-picking to use a filter to remove offices where

17   competitor systems were also installed, right?

18   A.  Yes.

19   Q.  Okay.  And, sir, the reason that one might remove those

20   offices is that if an office already had a competitor system

21   installed that had impacted the doctors' prescribing, then it

22   might be hard to tell if Outcome's system also had an effect,

23   right?

24   A.  Depends on the context.

25   Q.  Could be a conflating factor?

1 A. It could be.

2 Q. So to give kind of an easy example, let's say I want to

3 assess the effect of caffeine on a person after they drink a

4 cup of coffee, okay? You got that?

5 A. Yes, I believe so.

6 Q. All right. So if someone drinks an energy drink with a

7 lot of caffeine before they drink a cup of coffee, that might

8 throw things off, right?

9 A. Yes, sure.

10 Q. Hard to measure the impact that the energy drink provided,

11 for instance, because maybe coffee had done the same thing

12 already, right?

13 A. Yes.

14 Q. Okay. Now, sir, this supposed cherry-picking here, are

15 you aware that this was not only fully disclosed to IMS but

16 also disclosed directly to Outcome clients. Were you aware of

17 that?

18 A. I was -- in this context, I was not.

19 Q. Okay. Let's go to GX 10197, and this is a February 14,

20 2013 email from Lynne Sperling at IMS to Mr. Shah, you, and

21 Ms. Agarwal. Subject: Crestor control list. Do you see

22 that?

23 A. Yes.

24 Q. And we can see below Mr. Shah writes: "Hi, Lynne. We

25 asked our Crestor client for a list of all physicians that

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 163 of 293 PageID #:13815
Ketchum - cross by Hueston
1258

1  were exposed to in-office activity."

2          And she replied with the following:  "We are able to

3  do this but we first -- but first we need IMS as a

4  sub-vendor."  Right?  Do you see that?"

5  A.  Yes.

6  Q.  So Mr. Shah here, he's actually got the list of physicians

7  exposed to other competitors' programs directly from the

8  client.  Do you see that?

9  A.  Yes.

10  Q.  All right.  And he is sharing this process with IMS.

11  That's what he's saying here, right?

12  A.  Can I just have a quick moment to read it?

13  Q.  Yep.

14  A.  Thank you.

15          Okay.  I read it.

16  Q.  Yeah, and he's saying we've got to get IMS as a sub-vendor

17  to be a part of this, right?

18  A.  Yes.

19  Q.  It's being shared with IMS, right?

20  A.  Yes.

21  Q.  Now, before we move on to the next allegation, let's pull

22  back up 10063, and this is Mr. Shah's email to the J & J

23  client about Simponi, right?  You remember this email?

24  A.  Yes.

25  Q.  Okay.  And in the bottom paragraph, he writes:  "Just

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 164 of 293 PageID #:13816
Ketchum - cross by Hueston
1259

1 thought we would offer this in case it's one of the issues

2 that may be muddying things."  Do you see that?

3 A.  I do.

4 Q.  "There's also a lot of nuance to the control selection

5 process."  Do you see that?

6 A.  I do.

7 Q.  And, sir, you don't dispute that there is, in fact, a lot

8 of nuance to the process of defining the proper test and

9 control lists, right?

10 A.  No.

11 Q.  You don't dispute that?

12 A.  I don't.

13 Q.  Okay.  And, sir, let's move on to another subtopic here.

14       You testified last week about an instance related to

15 the Crestor study where Mr. Shah edited the PowerPoint

16 presentation.  Do you remember that?

17 A.  Yes.

18 Q.  Okay.  But you acknowledge, sir, that Mr. Shah actually

19 did frequently find errors and mistakes in IMS's work, right?

20 A.  I believe that had happened in the past, yes.

21       MR. HUESTON:  So let's take a look at some of those

22 examples.  Let's go to GX 15.  That was already admitted.  You

23 looked at it last week.  Let's put it up.

24 BY MR. HUESTON:

25 Q.  Okay.  First paragraph, do you see that Mr. Shah states

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 165 of 293 PageID #:13817
Ketchum - cross by Hueston
1260

1  here:  "Please note that the IMS email below is incorrect on

2  the test period."  Do you see that in, like, the third line

3  there?

4  A.  Yes, I do.

5  Q.  Okay.  "It assumes the Levemir program ran across the

6  entire year."  Right?

7  A.  Yes.

8  Q.  That's an example of him spotting an error, right?

9  A.  Yes.

10  Q.  Needs to be corrected, right?

11  A.  Yes.

12        MR. HUESTON:  Okay.  Let's go to CX 10065.

13        There we go.

14  BY MR. HUESTON:

15  Q.  And this is a February 12, 2013 email from Mr. Shah to

16  you, subject:  Crestor II.  Do you see that?

17  A.  Yes, I do.

18  Q.  And if we look below, Mr. Shah writes about IMS:  "Thanks,

19  Jay.  She did provide an ETA when we sent list?  I was on

20  calendar yesterday.  The meeting is next Thursday which got me

21  a little nervous since we don't have the study yet and in the

22  past, IMS has made some mistakes we've needed a few days to

23  fix."

24        That's what he wrote, right?

25  A.  Yes.

1  Q.  To you?

2  A.  Yes.

3  Q.  On multiple occasions, you witnessed IMS's mistakes

4  firsthand, right?

5  A.  Yes.

6          MR. HUESTON:  Let's go to another example.  CX 8284.

7  BY MR. HUESTON:

8  Q.  And this is an email from you to Mr. Desai, Mr. Shah and

9  Ms. Agarwal, subject:  Forward Levemir analysis update.  Do

10  you see that?

11  A.  Yes.

12  Q.  And you write, at the top:  "Ashik, attached is the

13  original Levemir study from IMS.  Let me know if you have any

14  questions.  This isn't the first deck they sent us.  Rishi and

15  I caught an error in the original, so this is the most

16  accurate deck."  Right?

17  A.  Yes.

18  Q.  You and Mr. Shah made a fix to the IMS deck to make it

19  more accurate, didn't you, sir?

20  A.  It appears so, yes.

21  Q.  Right.  And so based on the error that you and Mr. Shah

22  caught, the deck became more accurate, right?

23  A.  That's what it looks like, yes.

24  Q.  And by the way, some of these errors are not little --

25  it's not like a missed period.  Some of these errors are

Ketchum - cross by Hueston

1262

1  pretty serious, right?

2  A.  I'd have to see the context, but possibly.

3       MR. HUESTON:  Let's go to CX 10066.  Here we go.

4  BY MR. HUESTON:

5  Q.  This is an email from you to Mr. Shah, copying

6  Ms. Agarwal.  Subject:  Crestor NBRx reanalysis, sent on

7  March 14, 2013.  Do you see that?

8  A.  Yes.

9  Q.  And Mr. Shah notes to you:  "FYI, talked Lynne about this

10  on the phone, and she sent a note to the programmers in China.

11  Looks like they just made a mistake somewhere."

12       Do you see that?

13  A.  Yes.

14  Q.  And, sir, you recall that this issue came to light because

15  Mr. Shah spotted a problem in the data that you had sent him,

16  right?

17  A.  Yes.

18  Q.  And then you responded:  "This is what I figured.  Scary.

19  They are supposed to be the experts."

20       Do you see that?

21  A.  Yes.

22  Q.  That was a scary mistake that you found, right?

23  A.  Yes.

24  Q.  IMS was supposed to be the experts, but Mr. Shah was

25  catching their mistakes, right?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 168 of 293 PageID #:13820
Ketchum - cross by Hueston
1263

1   A.  In this instance, yes.

2   Q.  Okay.  And, sir, not only were IMS's errors -- we can put

3   that down -- concerning to you, but you yourself actually

4   expressed a need to doublecheck IMS's work, right?

5   A.  Yes.

6   Q.  And let's look at that.

7       10068, a February 7, 2012 email from you to Mr. Shah.

8   Subject:  Followup.

9       Here it is.

10      And you wrote:  "Rishi, sounds like we should be

11  pretty darn good to go here.  If they get me that test list,

12  like it sounds like they might, we can be even more sure.  My

13  only concern goes back to what you mentioned before, which is

14  mistakes on their end.  I'd love to doublecheck their work."

15      That's what you wrote, right?

16  A.  Yes.

17  Q.  You were concerned enough about their mistakes you wanted

18  to doublecheck it, right?

19  A.  Yes.

20  Q.  And, sir --

21      MR. HUESTON:  We can put that down.

22  BY MR. HUESTON:

23  Q.  -- as we covered earlier, the first time you spoke to the

24  government about this issue, you told them that the changes

25  Mr. Shah made to the IMS decks were based on logic that

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 169 of 293 PageID #:13821
Ketchum - cross by Hueston
1264

1   Mr. Shah believed was more accurate.  Remember I reviewed that
2   with you?
3   A.  You did.
4           MR. HUESTON:  Okay.  We can put that aside.
5   BY MR. HUESTON:
6   Q.  Let's talk more about Crestor.  One of the allegations
7   relating to Crestor is that there was a shortfall in installed
8   locations as of the go-live date in the campaigns and that
9   Outcome supposedly did not tell AstraZeneca about the
10  shortfall, right?
11  A.  Yes.
12  Q.  Are you remembering that?
13  A.  Yes.
14  Q.  All right.  And I think you also testified that in the
15  Crestor campaign, you said the proper unit of measurement for
16  that campaign was offices, not screens, right?
17  A.  I'd have to doublecheck the emails related specifically to
18  that campaign.  We talked about a lot of campaigns.
19  Q.  I know.  You did go across a lot of that.
20          Well, let's look at whether the Crestor campaign was
21  based on offices versus screens.  And to do that, again,
22  because there was a lot of testimony about it --
23          MR. HANKEY:  Objection, narrative.
24          MR. HUESTON:  It's a transition.
25          THE COURT:  It's still a narrative.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 170 of 293 PageID #:13822
Ketchum - cross by Hueston
1265

1    MR. HUESTON:  Okay.

2    THE COURT:  Just ask a question.

3  BY MR. HUESTON:

4  Q.  You'll agree with me there were two separate Crestor

5  contracts, right?  The 420 sites starting about July 1, 2012,

6  and then one for the additional 188 sites starting on

7  October 1st, right?

8  A.  Yes, that sounds right.

9  Q.  Okay.  Let's go to the first contract period.  Let's start

10  with that.

11    And let's go to CX 7160.  And this is an email from

12  yourself to Mr. Shah, subject:  Crestor match.  And then down

13  below where you write to Mr. Shah, going to direct your

14  attention to the middle of the second line, you write:  "My

15  understanding is we are looking at 419 screens."  Correct?

16  A.  I see that.

17  Q.  You used the word screens, right?

18  A.  I did.

19  Q.  Okay.  And let's put that down and move on to CX 8596.

20    Okay.  And you recognize this as an October 2nd,

21  2020 -- I'm sorry -- 2012 email from you to Mr. Mons and

22  Ms. Agarwal, right?

23  A.  Yes.

24  Q.  Okay.  And Mr. Mons down below, he asks for key numbers

25  and dates, including for the July 12th go-live date.  Do you

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 171 of 293 PageID #:13823
Ketchum - cross by Hueston
1266

1  see that?

2  A.  Give me just a moment?

3  Q.  Sure.

4        See the first -- the second kind of indent, key

5  numbers and dates, and the first one is July 2012 --

6  A.  Yes.

7  Q.  -- CM match for go live?

8  A.  Yes, sir.

9  Q.  Okay.  Great.

10        And in response, let's look at your response, you

11  write:  "Hi guys, at launch we had 419 screens live."

12        You used the word screens, right?

13  A.  I did.

14  Q.  Okay.  And let's now go to -- this is towards the

15  beginning, right, of this time period, right, October 2012?

16  A.  Yes, I believe so.

17        MR. HUESTON:  Okay.  Let's go further in time now.

18  Let's go to CX -- okay.  One moment here.

19        Let's go to CX 8596.

20  BY MR. HUESTON:

21  Q.  Okay.  And here at the top, you said:  Hi guys, at launch

22  we had 419 screens live.  For October, we are at 585," right,

23  "installed or in process."  Do you see that?

24  A.  Yes.

25  Q.  And that's all after you say 419 screens live, for

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 172 of 293 PageID #:13824
Ketchum - cross by Hueston
1267

1    October, we're at 485, you're still talking in terms of

2    screens, right?

3    A.  Seems so, yeah.

4    Q.  And we know from your testimony last week, October was the

5    jump from the 420-screen contract to the 608-screen second

6    contract.  Remember that?

7    A.  I believe so, yes.

8    Q.  Okay.  But right here at the start of October, you're

9    reporting you're well above 420 screens.  You're at 585,

10   right?

11   A.  Screen count, yes --

12   Q.  Yes.

13   A.  -- looks like.  Installed or in process.

14   Q.  Sure.

15         So if Outcome is measuring in screens, it's

16   over-delivering at this point, right?

17   A.  You know, again, we covered a lot of testimony.  Is it

18   possible to pull up the numbers that were contracted for that

19   time period just so I can --

20   Q.  I will get to that.

21   A.  Okay.

22   Q.  But just go with me for a moment.

23   A.  Sure.

24   Q.  If the unit of measurement is screens, by your report

25   here, it's going above 420, right?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 173 of 293 PageID #:13825
Ketchum - cross by Hueston
1268

1    A.  Yes.  Yeah, yeah.

2    Q.  Okay.  So now let's go to Government Exhibit 43.  That's

3    already been admitted and reviewed.

4            Let's go down to your comment at the bottom of the

5    page.  On August 8th, you said:  "We have 459 Crestor screens

6    right now.  Considering we started out with 401 at the outset,

7    we have clearly done pretty well.  Since July 1, we have added

8    58 screens.  Above and beyond the contract, we are currently

9    plus 40 screens."

10           Those are words that you wrote, right, sir?

11   A.  Looks like that, yes.

12   Q.  And you are talking about the contract requirement in that

13   email, aren't you?

14   A.  It appears so, yes.

15   Q.  And you're measuring -- in this email here, you're

16   measuring the contract requirement in terms of screens, right,

17   sir?

18   A.  Yes, that looks to be accurate.

19   Q.  And not only that, you're explicitly making the connection

20   that Outcome is over-delivering on the contract.  That's what

21   you're saying here, right?

22   A.  That's -- that's what this email says, yes.

23   Q.  It's your email, right?

24   A.  Yes, yeah.

25   Q.  Your words at the time, right?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 174 of 293 PageID #:13826
Ketchum - cross by Hueston
1269

1    A.  Yes.

2    Q.  Before you got an immunity deal, right?

3    A.  Correct.

4            MR. HUESTON:  Okay.  We can take that one down.

5    BY MR. HUESTON:

6    Q.  So let's take a look at the contract now.  Let's go to GX

7    36, and, sir, here's the contract, and I'm happy to let you

8    look through the other pages.

9            Do you see anything here on this page in terms of

10   references to offices?

11   A.  I do not.

12   Q.  There's no reference here at all, right?

13   A.  No.

14   Q.  And I believe you testified that the contract should say

15   offices, right?

16   A.  Yeah.  It would typically indicate one way or the other.

17   Q.  Okay.  This isn't showing it.

18   A.  That's correct.

19   Q.  Okay.  Let's go on to the second contract period here.

20           The next contract, sir, I think you said you had an

21   understanding that Outcome had contractual obligations to

22   deliver offices under that contract, the second contract, by

23   October 1st, 2012.  Do you remember that?

24   A.  I believe that was correct, yes.

25   Q.  Okay.  So now let's go to GX 50, and this is an October 3,

Ketchum - cross by Hueston

1270

1  2012 email chain between you, Mr. Shah, and Ms. Agarwal,
2  right?
3  A.  Yes.
4  Q.  Okay.  And while discussing a potential campaign for
5  aspirin, Ms. Agarwal writes:  "JK ran the numbers for our
6  Crestor meeting today, and we had just under 600 matches sites
7  including pipeline."
8        Do you see that?
9  A.  I do.
10 Q.  Okay.  And, sir, it's your understanding that Outcome was
11 obligated to have a total of 608 sites for Quarter 4, 2013,
12 right?
13 A.  Yes, I believe that's the way the math works out.
14 Q.  Okay.  And I think you testified last week you thought
15 that this email showed that Outcome missed its projection
16 deadline of October 1st, right?
17 A.  Yes, I believe so.
18 Q.  Okay.  But, sir, do you know that the extension contract
19 was not even in place on October 1st?  Do you know that?
20 A.  No.
21 Q.  Okay.  Sir, are you aware that on September 20, 2012, two
22 weeks before this email we're looking at, Zenith Media had
23 told Mr. Mons that the Quarter 4 deal was dead because Crestor
24 wasn't going to get any incremental dollars for Quarter 4.
25 Are you aware of that?

1  A.  I was unaware of that.

2  Q.  Okay.  And so you were not aware of that when you told the

3  government --

4           MR. HANKEY:  Objection, Your Honor.

5           THE COURT:  Pardon me?

6           MR. HANKEY:  The witness has already testified he

7  isn't aware of these things he's being asked about.

8           THE COURT:  Well, let's -- complete the question.

9           MR. HUESTON:  I'm just going to move on.

10           THE COURT:  All right.

11  BY MR. HUESTON:

12  Q.  Let's go to CX 7142, and this is a September 20th email

13  from Mr. Mons to Matthew Ubriaco at Zenith, copying

14  Ms. Agarwal.  Subject:  AZ Crestor and Symbicort, ContextMedia

15  Q4 incremental dollars for additional sites.  Do you see that?

16  A.  I do.

17  Q.  Let's go to the bottom of page 1, and this is Mr. Mons

18  asking Mr. Ubriaco for a status on the Q4 incremental

19  proposal, right?

20  A.  Yes.

21  Q.  And let's look at Mr. Ubriaco's response.  He writes:

22  "Hey, Bob, I think they're both dead.  From what I'm hearing,

23  we won't be getting Q4 incremental dollars."

24           Do you see that?

25  A.  I do.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 177 of 293 PageID #:13829
Ketchum - cross by Hueston
1272

1  Q.  And you're not copied on this email, right?

2  A.  I'm not.

3  Q.  Okay.  Let's now go to CX 7121.  And this is a

4  September 26, if we look at the top, first email from Mr. Mons

5  to Mr. Ubriaco and others regarding the Crestor Quarter 4

6  campaign, right?

7  A.  Yes, it looks that way.

8  Q.  Okay.  And Mr. Ubriaco writes to Mr. Mons:  "Hey, Bob, it

9  appears Crestor may again get Q4 incremental dollars.

10  However, that would only be for November and December."  Do

11  you see that?

12  A.  Yes.

13  Q.  Okay.  And, sir, just, you know, to make sure the

14  perspective is clear, this is the first time you're seeing

15  this, right?

16  A.  Yes.

17  Q.  So when you testified earlier about what you were drawing

18  from other emails, you didn't have this for context, right?

19  A.  I did not.

20  Q.  Okay.  So, actually, sir, sitting here now, you'd admit

21  you don't know what dates were covered by the contract when it

22  was eventually finalized, right?

23  A.  Based on this email, it looks as though the contract did

24  not -- was not live for October for the additional sites.

25  Q.  Okay.  And that's different than what you were assuming

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 178 of 293 PageID #:13830
Ketchum - cross by Hueston
1273

1    earlier, right?

2    A.  Yes.

3    Q.  Okay.  So let's go to Government Exhibit 49.  And this is

4    the insertion order you looked at last week for the

5    incremental campaign.

6            So if we go to the top of page 1, you see that this

7    is for Crestor, right?

8    A.  Yes.

9    Q.  And at the bottom of the page lists the dates of

10   October 15, 2012 through December 16, 2012, right?

11   A.  Yes.

12   Q.  Okay.  And, sir, let's go to page 2.  This is the second

13   contract now.

14           Now this says the order is -- there is a reference

15   here.  Let's go pull out order number, date, and now here in

16   the second contract, we do see -- now we see units/offices,

17   right?

18   A.  Yes.

19   Q.  So you'd agree units/offices, that's units or offices,

20   right?

21   A.  Yes.

22   Q.  And, sir, no one pointed this out to you before you were

23   testifying about this second contract, right?

24   A.  No.

25           MR. HUESTON:  Okay.  Let's put that down.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 179 of 293 PageID #:13831
Ketchum - cross by Hueston
1274

1    Let's go now to GX 39 page 3.  That's already admitted.

2            And Mr. Demas here, this was something that was shown

3    to you.  When Mr. Demas asks you for a count of how many

4    offices are matched up, let's just see if we can find that

5    language.

6            I think it should be on page 3.

7    BY MR. HUESTON:

8    Q.  Okay.  Let's go to your July 25, 2012, 8:33, Mr. Demas,

9    down below.  Below that, you write:  Hi, guys, preliminary

10   number looks to be 441 screens."  Right?

11   A.  Hold on, I'm trying -- oh, I see it.  Okay, yes.

12   Q.  We'll pull that out.  You're using the word screens here,

13   right?

14   A.  Yes.

15   Q.  And above, if we go higher, you continue to use the word

16   screens, right?

17   A.  Um --

18   Q.  Let's go higher.  There we are again.

19   A.  Yes.

20   Q.  Yeah.

21           So, sir, with this in mind, the contract said units

22   or screens, and you were continually using the word screens in

23   your discussions at the time --

24           MR. HANKEY:  Objection, Your Honor.  That

25   mischaracterizes the evidence and what's in the contract.  It

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 180 of 293 PageID #:13832
Ketchum - cross by Hueston
1275

1  said units/offices.

2          MR. HUESTON:  Well, I'm citing what he said as --

3          THE COURT:  Why don't you rephrase.

4          MR. HUESTON:  Okay.

5  BY MR. HUESTON:

6  Q.  Let's go -- with your recent testimony in mind, let's go

7  to Government Exhibit 68.

8          And here's the -- this one you did review last week.

9  It's November 12, 2012, from you to Ms. Agarwal.  Subject:

10 High priority list of Crestor sites we are running on.  Do you

11 see that?

12 A.  Yes.

13 Q.  Now, let's go to page 3.  And Mr. Mons asks:  "Can you

14 push me an Excel with the list of 608 sites we currently

15 running Crestor spots."  Do you see that?

16 A.  Yes.

17 Q.  Okay.  And after an exchange with Ms. Agarwal, you answer

18 up top --

19         MR. HUESTON:  Let's go to your answer up top at

20 page 2, and -- oops, that's not -- there it is.  It's the

21 higher one, at top.

22 BY MR. HUESTON:

23 Q.  You write:  "We actually have 589 locations and 671

24 screens," right?

25 A.  Yes.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 181 of 293 PageID #:13833
Ketchum - cross by Hueston
1276

1  Q.  Okay.  So, again, if the correct unit of measurement is

2  screens as your own emails are reflecting here, then less than

3  a month into the campaign, Outcome is again over-delivering on

4  the 608-unit promise, right?

5  A.  It appears so.

6  Q.  Okay.  So now let's go to Exhibit 10173.

7          And so this was -- we're now overlaying what the

8  government walked you through when they used -- you remember

9  the red Xs were the offices that they plotted out, right?

10 A.  Yes.

11 Q.  And they showed that to you to illustrate the point that

12 you guys weren't quite hitting the mark, right?

13 A.  Yes.

14 Q.  What I've just gone through, sir, were screens that we've

15 just reviewed at different points of time.  Do you see the

16 blue Xs?

17 A.  I do.

18 Q.  And if the proper unit is screens, you would agree the

19 blue Xs are showing performance above what was contracted for,

20 right?

21 A.  Yes.

22          MR. HUESTON:  Okay.  Let's put that down.

23 BY MR. HUESTON:

24 Q.  Okay.  Let's now move to your claim that Outcome didn't

25 disclose the use of projections.  Again, we have the two

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 182 of 293 PageID #:13834
Ketchum - cross by Hueston
1277

 1  contracts, so we're going to divide them up here.

 2         Let's go first to Government Exhibit 1109, and this

 3  is an April 6, 2012 email, so you'd agree to get the timing in

 4  frame, April is a few months before July, right?

 5  A.  Yes.

 6  Q.  Before the July 1 contract for 420 screens, right?

 7  A.  Yes.

 8         MR. HUESTON:  Okay.  And let's go straight to page 2,

 9  the middle email.  Oh, there we are.

10  BY MR. HUESTON:

11  Q.  And there is an email from Robert Goode at Zenith Media,

12  and we've already covered, I think you've said -- you've

13  identified Zenith Media is, in fact, the agent representing

14  Crestor, right?

15  A.  Yes.

16  Q.  Okay.  And you reviewed on direct Mr. Goode's statement

17  that:  "The client has expressed interest in running in the

18  496 offices that are guaranteed from your list match that you

19  provided to our planning team," right?  You remember reviewing

20  that.

21  A.  Yes.

22  Q.  And then but was "very hesitant about committing to the

23  full proposal you sent over since those offices are still in

24  question."

25         Do you remember looking at that language?

Ketchum - cross by Hueston

1278

1  A.  Yes.

2  Q.  Okay.  And looking at that language, you testified that

3  the client wanted to purchase only what was currently

4  installed.  Do you remember that?

5  A.  Yes, I believe so.

6  Q.  Okay.  And the person whose email that we're looking at

7  here, sir, that's Robert Goode, right?

8  A.  Yes.

9  Q.  And you're not on this email, right?

10 A.  No.

11 Q.  And, sir, if I represented to you in all your emails that

12 Mr. Goode never sent you a single email, you'd have no reason

13 to doubt that, right?

14 A.  No, I wouldn't.

15 Q.  Okay.  So you're interpreting this intent off what was

16 forwarded to you, right?

17 A.  Yes.

18 Q.  Okay.  Now, from these emails, I think you testified that

19 you were able to conclude throughout the communications with

20 the client about the Crestor campaign, you said you saw

21 nothing from Mr. Shah showing that he wanted to be transparent

22 and honest with the client about what was included in the list

23 match, right?

24 A.  Correct.

25 Q.  Okay.  So I want to demarcate here, this is April 6, 2012,

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 184 of 293 PageID #:13836
Ketchum - cross by Hueston
1279

1  right?

2  A.  Yes.

3  Q.  And the parties are still negotiating, right?  Nothing's

4  been agreed to yet, right, sir?

5  A.  Correct.

6  Q.  Okay.  And we know that there are more negotiations to

7  come because you testified that the parties ultimately agreed

8  to a contract with 420 sites, right?

9  A.  Yes.

10 Q.  But here you're talking about still a number of 496,

11 right?

12 A.  Yes.

13 Q.  Negotiations are coming.  There was no contract for 496,

14 right?

15 A.  I believe -- yeah, I believe that's correct, yes.

16 Q.  Okay.  All right.

17         So let's get some greater context here.  Let's go --

18         MR. HANKEY:  Object to the narrative.

19         MR. HUESTON:  Let's --

20         THE COURT:  Please ask questions.

21         MR. HUESTON:  Yeah.

22         Let's go to DX 5655.

23         THE COURT:  Take this down.

24         MR. HUESTON:  Oop, sorry.  Take this down.  Sorry

25 about that.  That is a mistake.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 185 of 293 PageID #:13837
Ketchum - cross by Hueston
1280

1  BY MR. HUESTON:

2  Q.  Sir, you will -- you'll admit you weren't the primary

3  point of contact for Crestor Pharma, right?

4  A.  No, I was not.

5  Q.  Okay.  So your understanding that the Crestor Pharma

6  didn't want to buy projections, that's based on information

7  you happened to receive whenever someone decided to copy you

8  or forward some information, right?

9  A.  That's correct.

10  Q.  In fact, you'll admit you didn't talk to pharmas during

11  the 2012-2013 timeframe, right?

12  A.  No.

13  Q.  You didn't, right?

14  A.  I did not.

15  Q.  Good.

16         And, in fact, in the exhibit we just showed you, you

17  got looped in only when Mr. Mons decided to forward you his

18  emails with the client, right?

19  A.  Yes.

20  Q.  All right.  So let's go back -- let's go to GX 1109 at 2.

21         Okay.  And we're at page 2 of this document.  And

22  further below there's a larger group in the email that

23  includes Mr. Mons and Mr. Shah.  Do you see that --

24  A.  Yes.

25  Q.  -- and others?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 186 of 293 PageID #:13838
Ketchum - cross by Hueston
1281

1  A.  Yes.

2  Q.  And you're not cc'd on this email, right?

3  A.  No, I'm not.

4  Q.  He -- you would agree that Mr. Mons appears to be

5  forwarding you a broader chain once it might be relevant to

6  your more narrow role, right?

7  A.  Yes.

8  Q.  Okay.  And you'd also agree that Mr. -- you didn't cc:

9  Mr. Mons on every email you were sending while at Outcome

10  Health, right?

11  A.  No.

12  Q.  And you would also admit that in a business organization,

13  sir, not every email is going to be relevant to everyone else,

14  right?

15  A.  That's correct.

16  Q.  So just because someone's left off doesn't mean there's a

17  nefarious or evil reason for that, right?

18  A.  That's true.

19  Q.  Okay.  Now, in addition to not being on many of these

20  emails and you said not talking directly to any pharma in 2012

21  and 2013, I believe you testified last week that your work on

22  the sales side of Outcome was about 1 percent of your work

23  during this period, right?

24  A.  It was small, yes.

25  Q.  I think you said 1 percent.  Do you remember that?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 187 of 293 PageID #:13839
Ketchum - cross by Hueston
1282

1   A.  That sounds about right, yeah.

2   Q.  Yeah.  99 percent was you working in doctors' offices.

3   A.  Yeah, yes.

4   Q.  Okay.  And that 1 percent includes the sales part, right?

5   So doctors' offices, that's 99 percent?

6   A.  Yes.  When you say sales, you mean the sponsorship sales?

7   Q.  Yes.

8   A.  Yes.

9   Q.  So there's just -- you would admit, there's just a lot on

10  the sales side that you just weren't participating in at that

11  time, right?

12  A.  Yes.

13  Q.  Okay.  A lot of emails you didn't see?

14  A.  Yes.

15  Q.  A lot of meetings you didn't attend on that, right?

16  A.  Yes.

17  Q.  Okay.  Let's go to an email you were on, DX 6221.  And

18  this is a February 17, 2012 email from Mr. Shah to Mr. Mons,

19  Ms. Agarwal, and yourself, subject:  Crestor list match.  Do

20  you see that?

21  A.  Yes.

22  Q.  And you can see from below that Mr. Mons is forwarding a

23  request for a Crestor list match from Zachary Santucci at

24  Zenith Media, right?

25  A.  Yes.

1  Q.  And, again, Zenith Media, that's Crestor's advertising

2  agency, right?

3  A.  Yes.

4  Q.  And Mr. Shah responds, "The match won't take us too long,

5  but since we don't have a cardio network, I imagine we won't

6  match to many Crestor targets.  Maybe the story we can tell is

7  we've studied the list and we're confident we could penetrate

8  X number, 500 or a thousand, of the highest decile offices,

9  within Y time period, six months or a year, plus we already

10  have Z number, less than a hundred, in our network through

11  other vertical properties."  Do you see that?

12  A.  Yes, I do.

13  Q.  Okay.  So what he's saying here is we can tell them two

14  things, right?  One, that we've looked at the list and we

15  could get to a certain type of number over a period of time,

16  right?

17  A.  Yes.

18  Q.  We can tell them that, and then he says, plus, right, we

19  can tell them we already have a small number already, right?

20  A.  Yes.

21  Q.  Okay.  And so you would agree, Mr. Shah is saying disclose

22  to the client that this campaign would be based at least in

23  part on projected growth, right?

24  A.  Yes.

25  Q.  Okay.  And now last week, sir, you testified you'd seen

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 189 of 293 PageID #:13841
Ketchum - cross by Hueston
1284

1    nothing showing that Mr. Shah wanted to be clear or honest.

2    The first email right here, he's telling the pharma rep that

3    there would be growth, right?

4    A.   In this email, he's telling Bob, Shradha and myself, but

5    it seems to indicate that he wants that communicated to the

6    client, yes.

7    Q.   Thank you.  Let's move to GX 1110.

8            This is now March 15, 2012, and it's an email from

9    Mr. Shah to you.  Subject:  List match Crestor.  Do you see

10   that?

11   A.   Yes.

12   Q.   And Mr. Shah starts by noting that this is the list of

13   doctors from Crestor they'd like you to run a match on, right?

14   A.   Yes.

15   Q.   And now let's go down to the section that says objectives.

16   Do you see that?

17   A.   I do, yes.

18   Q.   So let's blow that out.  And at No. 2, he writes:

19   "Segment their list so we can go back with a proposal to build

20   a Heart Health Network around a set of highest volume

21   cardiologists," right, sir?

22   A.   Yes.

23   Q.   The words "proposal to build," you understood that to mean

24   projected growth, right?

25   A.   Yes.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 190 of 293 PageID #:13842
Ketchum - cross by Hueston
1285

1    Q.  Okay.  Let's now go to CX 7096.

2           This is four days later, right?  Now we're at

3    March 19th?

4    A.  Yes.

5    Q.  Okay.  You send -- the subject is summary of the Crestor

6    match.  Do you see that?

7    A.  Yes.

8    Q.  Okay.  And you're sending Crestor list-match results to

9    Mr. Mons, and you copy Mr. Shah here, right?

10   A.  Yes, looks that way.

11   Q.  Okay.  And what you write then is:  "Attached is a summary

12   of the match that was completed with a breakdown by decile,"

13   right?

14   A.  Yes.

15   Q.  Okay.  And then you write:  "For the office match, it is

16   important to take into account the number of unique addresses

17   versus the total number of address matches.  The address match

18   total means that there are multiple prescribers at each

19   address location."  Right?

20   A.  Yes.

21   Q.  All right.  And then continuing below, you write:  "The

22   office match may seem disproportionately high because of the

23   duplicates."  Right?

24   A.  Yes.

25   Q.  And you say:  "And reality is roughly 10 percent based on

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 191 of 293 PageID #:13843
Ketchum - cross by Hueston
1286

1  unique addresses," right?

2  A.  Yes.

3  Q.  And so since there are multiple prescribers per facility,

4  you want to look at the total office match.  That's what

5  you're writing here, right?

6  A.  Yes.

7  Q.  In fact, that's your quote in the last line there, right?

8  A.  Yes, that's correct.

9  Q.  Okay.  So let's turn to the attachment here because there

10  was an attachment to your email, and you summarize the results

11  in a spreadsheet table.

12      MR. HUESTON:  Let's get it up.

13      Okay.  Here we are.

14  BY MR. HUESTON:

15  Q.  Do you see this spreadsheet?

16  A.  Yes, I do.

17  Q.  Okay.  And you summarized this in the table as having

18  527 -- if you look at down starting at line 14 there, you

19  summarize below 527 address matches, right?

20  A.  Yes.

21  Q.  And 136 unique address matches, right?

22  A.  Yes.

23  Q.  Okay.  Now, you talked last week about how the final

24  contract you believe did not include low decile subscribers,

25  right?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 192 of 293 PageID #:13844
Ketchum - cross by Hueston
1287

1    A.  I believe that's true, yes.

2    Q.  Okay.  But at this stage in the negotiations, that concept

3    from what we're seeing here hadn't been introduced, right?

4    You're looking at all decile prescribers here --

5    A.  Yes.

6    Q.  -- if we can roll up?

7            Okay.  Good.

8            And before we move on, let's go to the cover email.

9            You noted in the cover email to Mr. Mons that -- you

10   told Mr. Mons that the right number to look at is 527 total

11   matches, right?

12           MR. HUESTON:  Let's get that up.  We'll have to find

13   the right language.

14   BY THE WITNESS:

15   A.  I did -- I saw something to that effect.

16   BY MR. HUESTON:

17   Q.  Yeah, we just have to get the right -- it is important to

18   take into account the number of unique addresses versus total

19   number of addresses, and I've managed to just completely block

20   it out.

21           Ah, I've cleared it.

22           Okay.  You were telling him to look at the total

23   offices, right, not the unique offices?

24   A.  Yes.

25   Q.  And the total from that attached spreadsheet is 527,

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 193 of 293 PageID #:13845
Ketchum - cross by Hueston
1288

1    right?

2    A.  Yes, I believe that's -- yes.

3              MR. HUESTON:  Okay.  We can take that down.

4              Let's go to CX 10072.

5    BY MR. HUESTON:

6    Q.  Okay.  And this is -- moving forward in time here, this is

7    another email chain between you, Mr. Mons and Mr. Shah.  It's

8    now April 6, right?

9    A.  Yes.

10   Q.  And now this is the revised Crestor HHN 202 cost template,

11   right?

12   A.  Yes.

13   Q.  Okay.  Let's go to page 3.

14             And there's a recap here.  Mr. Mons is summarizing,

15   he says:  "Hi, Earl, pardon" -- sorry.  Let's go to the top of

16   that email where it says:  "Hi, Earl, pardon the lengthy

17   email.  I want to recap my discussion with Reese from Monday."

18             Do you see that?

19   A.  Yes.

20   Q.  And do you understand he's summarizing his discussions

21   with the client about the proposal, right?

22   A.  Yes.

23   Q.  Okay.  And, again, you weren't on this original email,

24   right?

25   A.  I was not.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 194 of 293 PageID #:13846
Ketchum - cross by Hueston
1289

1  Q.  Okay.  And he proposed a match based on growth up to a

2  thousand sites that will be operational by July 1st.  That's

3  what he says here, right?

4  A.  Can I just have a quick moment to read it?

5  Q.  Sure.

6  A.  Thank you.

7        Okay.  Sorry, what was your question?

8  Q.  Sure.  He is here proposing a match based on -- this is,

9  you know, an April email projected growth of up to a thousand

10  sites operational by July 1st, right?

11  A.  Yes.

12  Q.  Okay.  And then below that, he notes that the initial 496

13  sites matched against a network built with cardio/diabetes

14  profile.  Do you see that?

15  A.  Yes.

16  Q.  Okay.  So you'd agree this is a proposal for growing to a

17  thousand sites by July 1st, but there's this subset of 496

18  sites already installed, right?

19  A.  It does look that way, yes.

20  Q.  And that's kind of matching what Mr. Shah laid out

21  earlier, right?  Let's think about something growing from A to

22  B and then said, but we'll have this smaller number of already

23  installed, right?

24  A.  Yes.

25  Q.  Okay.  And, sir, again, in your early interview with the

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 195 of 293 PageID #:13847
Ketchum - cross by Hueston
1290

 1  FBI, you said, as we covered, that this was the proper way to

 2  do sales, right?  To disclose what the initial match was and

 3  to separately make clear what the projected growth was.  That

 4  would be the right process, right?

 5  A.  Yes.

 6  Q.  Okay.  And, in fact, those 496 sites represented as the

 7  initial match is actually lower than the 527 matched locations

 8  you said was the correct number to look at in that earlier

 9  email, right?

10  A.  Yes.

11  Q.  Okay.

12          MR. HUESTON:  Okay.  We can put that -- we can put

13  that down.

14          Let's go now to 10072.  Yeah, go to the second page.

15  BY MR. HUESTON:

16  Q.  And this is the April 6th email, where Mr. Goode says:

17  "The client doesn't want the whole proposal, only the

18  guaranteed sites."  Do you see that?

19  A.  Yes.

20  Q.  Okay.  So now in context, sir, what was left out --

21          MR. HANKEY:  Objection.

22          MR. HUESTON:  Okay.  Well, let's -- let me just --

23  I'll rephrase the question.

24  BY MR. HUESTON:

25  Q.  What we've just gone through, you'd agree, shows that

Ketchum - cross by Hueston

1  Outcome was clearly dividing a proposal, right, into existing

2  offices on the one hand, the 596 or what you said was the 528,

3  and another proposal for growth to a thousand by July 1st,

4  right?

5  A.  Yes.

6  Q.  Okay.  And there's no contract right now at this time.

7  It's April 6th, right?  We've covered that.

8  A.  Yes.

9  Q.  So this what you were shown and testified to earlier, this

10 is the pre-April 6th context to what we just went through,

11 right?

12 A.  Yes.

13 Q.  Okay.  And in even just the next message up here, sir, I

14 want to point out that Mr. Mons forwards this communication

15 internally and asks about ways to "go back to them to consider

16 buying what I have matched against the top 5 deciles by -- and

17 installed by July so we can increase the size of the deal."

18 Right?

19 A.  Yes.

20 Q.  So, again, sir, Mr. Mons is telling you and Mr. Shah that

21 he will go back to the client to negotiate a deal for a

22 particular set of prescribers that will be installed by July,

23 right?

24 A.  Yes, looks that way.

25 Q.  All right.  And so he's saying -- he's a salesman.  He's

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 197 of 293 PageID #:13849
Ketchum - cross by Hueston
1292

1   going to make another attempt at selling projected growth to
2   the client, right?
3   A.  Yes.
4   Q.  Okay.  Let's go to page 1.  And now Mr. Shah responds:
5   "We should internally look at this as two deals."  Right?  Do
6   you see that?
7   A.  Yes.
8   Q.  "Existing network and expansion."  And he writes that "If
9   we are only going to sell them our existing network, here are
10  a couple of observations that could add value to the contract:
11         "1, I'm sure with the growth of the past several
12  weeks, we now have over 500 screens that match against their
13  list."  Right?
14  A.  Yes.
15  Q.  And, again, Mr. Shah here is discussing delivery in terms
16  of screens, right?
17  A.  Yes.
18  Q.  All right.  And by the way, you don't remember anyone
19  correcting him on these email chains saying it's not screens,
20  Mr. Shah.  Remember, it's offices.  Nothing like that, right?
21  A.  Not that I recall.
22  Q.  Right.  And you were using the word screens as we've
23  showed, right?
24  A.  Yes.
25  Q.  And we've even showed a contract with no mention of

Ketchum - cross by Hueston

1    offices, right?

2    A.  Yes.

3    Q.  And one that said offices or units, right?

4    A.  Yes.

5    Q.  Okay.  And let's go to page 2, and he writes:  If -- "If

6    we included all of our sign-ups to be installed in the next

7    month, the list may actually be closer to 550 or even 600.  We

8    had 75 sales last month and about that number the month

9    before, many of which are in the process of installation, and

10   thus I don't believe were included in the initial match."

11   Right?

12   A.  Yes.

13   Q.  And let's look at your response to this, front page.

14   There you are.

15           In your response, you don't correct Mr. Shah and say,

16   look, there's an error in your understanding about Outcome's

17   network growth, right?

18   A.  I do not.

19   Q.  You just say:  "Absolutely.  I'll have it ready Monday

20   morning."  Right?

21   A.  Yes.

22   Q.  And then after that email, as Mr. Mons indicated he would,

23   let's go back, Outcome went back to the client.  You can put

24   the email aside.

25           You remember that Outcome went back to the client to

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 199 of 293 PageID #:13851
Ketchum - cross by Hueston
1294

1 negotiate a campaign set to begin with devices that were
2 projected to be installed by July 1?
3 A. Yes.
4        MR. HUESTON:  So let's go to CX 7113.
5        THE COURT:  And please slow down when you're reading.
6        MR. HUESTON:  Thank you, Your Honor.  That is a
7 tendency.
8 BY MR. HUESTON:
9 Q.  Here we are at 7113, and this is an email from Mr. Shah to
10 Mr. Mons, copying you and others.  Subject:  Crestor revised
11 costs template.  Do you see that?
12 A.  I do.
13 Q.  And Mr. Shah writes:  "Hi, Bob, we just had a thorough
14 discussion about where we stand right now on Crestor matched
15 offices, where we'll be by July 1 and also our by 12/31 -- our
16 growth by 12/31."  Do you see that?
17 A.  Yes.
18 Q.  And he writes:  "The conclusion is we'll have 604 Crestor
19 matched offices by July 1, and 448 offices of them will be in
20 categories 1 and 2."
21        Do you see that?
22 A.  Yes.
23 Q.  And, in fact, sir, you can see below, Mr. Mons had himself
24 initiated his discussion with his own ramp schedules, right?
25 Do you see the reference to ramp?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 200 of 293 PageID #:13852
Ketchum - cross by Hueston
1295

1  A.  Can I just have a quick moment just to review?

2  Q.  Sure.  It's in the line 1 there and 2.

3  A.  Okay.  Yes, I see it.

4  Q.  Okay.  By the way, ramp, that's ramp up, that's

5  anticipated growth, right?

6  A.  Yes.

7  Q.  Okay.  So he's expressly referencing ramp or growth right

8  here, right?

9  A.  Yes.

10  Q.  And you are aware, sir, that these ramp schedules, they

11  were repeatedly communicated to clients to ensure there was no

12  ambiguity.  Are you aware of that?

13  A.  No.

14  Q.  Okay.  But you did attend some meetings where ramp

15  schedules were discussed.  Do you remember that?

16  A.  Yes, I believe so.

17  Q.  Okay.  Let's go to CX 7115.  And the top email is from

18  Mr. Mons to Mr. Shah and Ms. Agarwal, Crestor status.  This is

19  April of 2012, right?

20  A.  Yes.

21  Q.  And you're not included on this.

22  A.  No.

23  Q.  But you can see below.  Let's look.  Mr. Mons is

24  forwarding communications.  Let's look below.

25        Mr. Mons is forwarding a communication from a Tim

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 201 of 293 PageID #:13853
Ketchum - cross by Hueston
1296

1    Rafferty at Zenith Media, right?

2    A.  Yes.

3    Q.  And you've already told us that Zenith Media is the client

4    rep for Crestor, right?

5    A.  Yes.

6    Q.  Okay.  So top -- let's go to top of page 2.

7           And there's an email from Mr. Mons that says, and

8    this is to Zenith Media folks, right?

9    A.  Yes.

10   Q.  "Thank you for spending time with Rishi, Jason" -- that's

11   you, right?

12   A.  Yes, it is.

13   Q.  -- "and myself to get on the same page.  I'm sorry we

14   couldn't turn it around faster, but we needed to delve into

15   our member services installation pipeline to be certain there

16   is no ambiguity in our ramp forecast."

17          That's what he said, right?

18   A.  Yes.

19          MR. HUESTON:  And we can put that down.

20   BY MR. HUESTON:

21   Q.  You weren't on that email, so I'll just ask.  You are

22   aware, or maybe you weren't aware, that, in fact, Mr. Mons and

23   Mr. Shah continued to have conversations with the client to

24   ensure there was no confusion.

25          Are you aware of that one way or the other?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 202 of 293 PageID #:13854
Ketchum - cross by Hueston
1297

1 | A.  No, I was not.

2 | Q.  Okay.  Let's go to CX 7116.  And this is a June 1st email

3 | from Mr. Mons to Mr. Shah, and June 1st, that's, like, four

4 | months into the negotiations, right?

5 | A.  Yeah, that sounds about right.

6 | Q.  Okay.  And the subject Crestor buy, right?

7 | A.  Yes.

8 |         MR. HUESTON:  Let's go to page 2 -- that doesn't look

9 | very good.  There we go.  There's -- it should be Mr. Mons'

10 | note to the client.

11 |         Yes.  There we go.

12 | BY MR. HUESTON:

13 | Q.  There's something -- there's a note here to a Zak, right?

14 | Do you see that at the top?

15 | A.  Yes.

16 | Q.  "Zak, there was some confusion in the process that can

17 | be -- that can easily be explained and resolved.  I knew our

18 | ramp schedule may be a source of confusion.  For this reason,

19 | I showed the ramp by month, category and cost, and structured

20 | it so that you would pay only for what we delivered."

21 |         Do you see that?

22 | A.  Yes.

23 |         MR. HUESTON:  Okay.  And we can put that down.

24 | BY MR. HUESTON:

25 | Q.  And, sir, following these lengthy negotiations in early

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 203 of 293 PageID #:13855
Ketchum - cross by Hueston
1298

1  June, you recall that Crestor Pharma and Outcome did enter a

2  contract for the third quarter of 2012, right?

3  A.  Yes.

4  Q.  Third quarter is July, August, September, right?

5  A.  Yes.

6  Q.  All right.  And as you went over I think last week, the

7  first Quarter 3 contract was for 419 sites, right?

8  A.  Yes.

9  Q.  And you knew that that Q3 contract had a go-live date of

10  July 1st, right?

11  A.  Yes.

12  Q.  Okay.  And go live in a contract was the date when pharmas

13  expected a certain number of offices to be installed, right?

14  A.  For the advertisement to start playing, yes.

15  Q.  Okay.  That's right.

16       And, in fact, sir, a go-live date is also -- you have

17  said that a go-live date is when pharmas expected a certain

18  number of offices to be installed pursuant to their contracts,

19  right?

20  A.  A certain number of locations for the advertisement to be

21  playing in by that date, yes.

22  Q.  Okay.  Good.

23       MR. HUESTON:  Let's go to GX 1067.  Let's look at

24  this email on June 5, 2012, and we'll go down to page 2 where

25  you email Mr. Shah.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 204 of 293 PageID #:13856
Ketchum - cross by Hueston
1299

1  BY MR. HUESTON:

2  Q.  And you say:  "Rishi, hope you are on the mend.  I am

3  rerunning everything and making sure we have DHN IDs lined up

4  for the go-live date."  Right?

5  A.  Yes.

6  Q.  And, sir, just pausing here for a moment, because this is

7  a campaign with a go-live date of July 1, you'd agree that not

8  every single device needed to be installed when you're writing

9  this email as of June 5th, 2012, right?

10  A.  Correct.

11  Q.  Okay.  Because this is almost a month before the contract

12  was set to start, right?

13  A.  Yes.

14      MR. HUESTON:  So we can put that down.

15  BY MR. HUESTON:

16  Q.  So you would agree, sir, just to clarify any confusion, as

17  of June 6th, which is weeks before July 1 go-live date,

18  there's no shortfall to report, right?  Because your contract

19  starts July 1st, right?

20  A.  That's correct.

21  Q.  All right.  So, sir, let me make sure I have followed the

22  testimony correctly here.

23      So I think we've covered Outcome and Crestor had a

24  month's long negotiation discussing ramped growth and a

25  go-live date of July 1st.  Fair?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 205 of 293 PageID #:13857
Ketchum - cross by Hueston
1300

1    MR. HANKEY:  Objection, Your Honor, asked and
2    answered, and this is pure narrative.
3    THE COURT:  Yeah, sustained.  Just ask more questions
4    on new subjects.
5    MR. HUESTON:  Okay.
6    BY MR. HUESTON:
7    Q.  And so we've covered that the date to look for then was
8    the July 1 go-live date, right?
9    A.  Yes.
10   Q.  All right.  Now let's go to the fourth quarter of 2012,
11   and that was the contract for 188 sites.  Do you remember?
12   A.  That sounds right, yes.
13   Q.  Okay.  And, again, fourth quarter, I always think of a
14   football game, but in a calendar it's October, November,
15   December, right?
16   A.  Yes.
17   Q.  And for this campaign, you also testified, I believe, that
18   there was an understanding that Outcome would be using numbers
19   based on only what was currently available in the network,
20   right?  You remember testifying to that?
21   A.  That sounds right.
22   Q.  And so let's go to GX 42.
23   And this is an August 8, 2012 email from Mr. Shah to
24   you, Ms. Agarwal, and a Ms. Lynn Jones, subject:  AZ/Crestor
25   additional Quarter 4 money priority, right?

Ketchum - cross by Hueston

1301

1    A.  Yes.

2    Q.  Let's go to page 3, and at page 3, we can see that

3    Mr. Mons is receiving a message from Matthew Ubriaco at

4    Zenith, right?

5    A.  Yes.

6    Q.  And, again, you're not the one directly communicating with

7    the client or the client rep, right?

8    A.  I am not.

9    Q.  And Mr. Ubriaco writes to Mr. Mons:  "I'm back on AZ now.

10   We may have some incremental dollars coming for Quarter 4.

11   Has ContextMedia acquired any additional offices from the

12   AZ/Crestor list match that was previously executed?  If so,

13   please provide aggressive costs to run four spots per hour in

14   Quarter 4, estimated impressions for both age 18-plus, age

15   50-plus and an office location list," right?

16   A.  Yes.

17   Q.  And right above that, pull out, Mr. Mons emails you and

18   Mr. Shah, and he says:  "J," that's you, right?

19   A.  Yes.

20   Q.  "Can you pull together all incremental Crestor sites

21   beyond the initial match we did for Q3."  Do you see that?

22   A.  Yes.

23   Q.  And then he says:  "I can show everything installed and in

24   pipe for October go live."  Right?

25   A.  Yes.

1  Q.  So to be clear, sir, it's Mr. Mons, the person who's been

2  communicating with the client rep for months, who's suggesting

3  showing projected numbers here, right?

4  A.  Yes.

5  Q.  And he doesn't say that he just wants to show projections

6  or maybe that Outcome should show projections.  He says I can

7  show everything installed and in pipe for October go live.

8  That's his words, right?

9  A.  Yes.

10  Q.  And, again, Mr. Mons had many conversations with the

11  client that you were not privy to, right?

12  A.  Yes.

13  Q.  And let's look at Mr. Shah's response to you:  "Jay, you

14  may have my authority to project robustly for Quarter 4.  Now

15  that we have been calling on the Crestor list for over a

16  month, I expect many of the new sales generated in August and

17  early September to be from the Crestor list."

18         So I want to pause in the latter part of what he's

19  saying there, Mr. Ketchum.  So by Mr. Shah telling you that

20  the call team has been focused on Crestor, you'd agree that

21  Mr. Shah is providing you with a good reason why he believes

22  that Outcome can project robustly, right?

23         MR. HANKEY:  Foundation.

24  BY MR. HUESTON:

25  Q.  That's how you interpreted it, right?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 208 of 293 PageID #:13860
Ketchum - cross by Hueston
1303

1    THE COURT:  If he knows.

2    BY THE WITNESS:

3    A.  Yes.

4    BY MR. HUESTON:

5    Q.  So then he continues:  "Even the client says aggressive

6    costs, ha, so let's go deep and throw it up there."

7         And so Mr. Shah is conveying to you that the

8    instruction to project robustly is responsive to the request

9    from the client below.  It's following the request from below,

10   right, sir?

11   A.  Yes.

12   Q.  And let's go to your response on page 1.

13        When you respond to him, sir, you don't say:  "Hey, I

14   think you're misreading the client's request," right?

15   A.  No.

16   Q.  And you didn't say:  "Look, I think aggressive costs, that

17   has some meaning other than what you seem to be looking into

18   it, Mr. Shah."  You don't say that, right?

19   A.  No.

20   Q.  And by the way, in terms of putting the time straight,

21   these emails are being sent at the beginning of August about

22   what sites will be available October 1st in the future, right?

23   A.  Yes.

24   Q.  Okay.  And you would agree that there will always be some

25   uncertainty in the forecasting about what might be available

1  two months out, right?

2  A.  Yes.

3  Q.  All right.

4      THE COURT:  We're going to break about 3:00 for the

5  afternoon break, so you've got about 10 more minutes unless

6  you're entering a new subject.

7      MR. HUESTON:  No, no, this is good.  Thank you, Your

8  Honor.  That's just what I needed.

9  BY MR. HUESTON:

10 Q.  All right.  Let's now go here to page 1 here.  You say you

11 have full confidence, sir, at the top here, after replying to

12 Mr. Shah, you say you have full confidence that Outcome would

13 have this number installed or nearing installed by October 1,

14 right?

15 A.  Yes.

16 Q.  "Sales goal is well over 200 between now and then, and

17 they will blow the goal out of the water."  Those are your

18 words, right?

19 A.  Yes.

20 Q.  And then you describe the projection.  You say:  "This is

21 a great projection."  Right?

22 A.  Yes.

23     MR. HUESTON:  Okay.  You can put that down.

24 BY MR. HUESTON:

25 Q.  And by the way, you testified last week that you did

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 210 of 293 PageID #:13862
Ketchum - cross by Hueston
1305

1  believe that Outcome would hit that number and deliver for the

2  client.  It was your good-faith belief, right?

3  A.  I believe so, yes.

4  Q.  And Outcome Health was making good-faith efforts, as we've

5  shown here, to get to a correct projected number for Crestor,

6  right?  That's what those emails reflect.

7  A.  Seems so, yes.

8  Q.  And it was your job to run the projections, right?

9  A.  As instructed, yes.

10       MR. HUESTON:  Okay.  And let's go to the final email

11  in that exchange.  I did ask to put it down, but the final

12  email in that exchange, if we put it back up.  I think that's

13  GX 42.  Yeah.

14  BY MR. HUESTON:

15  Q.  And right at the top, right, Mr. Shah says:  "Please speak

16  to Bob and give him the incremental number."  Right?

17  A.  Yes.

18  Q.  And as I think we've covered, incremental, that signifies

19  that there's projected growth.  That's what increment means,

20  right?

21  A.  Depends on the context.  In this instance, I believe

22  that's the case, yes.

23  Q.  Okay.  And Mr. Shah is actually telling you to communicate

24  this information about the incremental to Mr. Mons, right?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 211 of 293 PageID #:13863
Ketchum - cross by Hueston
1306

1    MR. HUESTON:  All right.  Let's now go to GX 45.

2    BY MR. HUESTON:

3    Q.  And this is an August 8th, 2012 email from you to

4    Mr. Mons, copying the entire sponsorship team, right?

5    A.  Yes.

6    Q.  Subject:  Crestor incremental for October, right?

7    A.  Yes.

8    Q.  And you wrote:  "Attached is the incremental growth for

9    Crestor.  The screen growth is 194.  That is an additional 194

10   screens on top of their original buy, live by October."

11   Right?

12   A.  Yes.

13   Q.  You see that?

14   A.  Yes.

15   Q.  And you wrote "live by October," not already installed,

16   right?

17   A.  Yes.

18   Q.  Okay.  And you knew, we've just covered, that Mr. Mons

19   started this email chain by asking you for a projection,

20   right?

21   A.  Yes.

22   Q.  Okay.  And since you said this was a great projection of

23   what would be installed by October 1st, and since Mr. Mons is

24   explicitly asking you for projection, there's nothing wrong

25   here, right, sir?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 212 of 293 PageID #:13864
Ketchum - cross by Hueston
1307

1  A.  It looks as though I was -- yeah, fulfilling the request

2  as it was requested.

3  Q.  Yeah, as best you could, right?

4       Okay.  And Mr. Mons, were you aware Mr. Mons

5  continued to meet with the client to discuss the campaign and

6  provide information about Outcome's network even after sending

7  this email?

8  A.  No.

9  Q.  You were not aware of that?

10 A.  No.

11 Q.  Let's go to CX 8596.  We move forward in time to

12 October 2, 2012, and it's an email from you to Mr. Mons, copy

13 Ms. Agarwal, subject:  AZ meeting Wednesday.  Do you see that?

14 A.  Yes.

15 Q.  And separate from this, you know AZ is AstraZeneca, right?

16 A.  Yes.

17 Q.  And you know AstraZeneca is the manufacturer of Crestor?

18 A.  Yes.

19 Q.  Okay.  And we look below.  Mr. Mons asks for key numbers

20 and dates to prep for the Crestor meeting and then lists them

21 out.  Do you see that?  Key numbers and dates?

22 A.  Yes.

23 Q.  Okay.  And the purpose of the meeting he tells you is to

24 discuss 2012-2013 and to give some color on our progress

25 against their match.  Do you see that?

1    A.  I do.

2    Q.  And looking at the topics, the topics include:

3    November '12, November 2012 forecasted match installed, right?

4    A.  Yes.

5    Q.  And go down below.  What does that say, No. 4?

6    A.  December 2012 forecast.

7    Q.  Forecast, right?

8    A.  Yes.

9    Q.  Sir, Mr. Mons is literally telling you he's going to give

10   the client color on progress into November and December

11   forecasts, right?

12   A.  Yes.

13   Q.  Okay.  And, again, forecasts, not already installed

14   offices, right?

15   A.  Correct.

16        MR. HUESTON:  All right.  Your Honor, I am moving

17   into a different subtopic at this point.

18        THE COURT:  All right.  Ladies and gentlemen, it's

19   about 2:54.  We'll break for 15 minutes.  Please don't discuss

20   the case among yourselves or with anyone else.  Mr. Santiago,

21   you can also take a break.

22        COURT SECURITY OFFICER:  All rise.

23     (Jury exits courtroom.)

24        THE COURT:  All right, sir, you can leave the stand

25   for 15 minutes.  Please don't discuss your testimony with

```
 1    anyone.
 2              THE WITNESS:  Yes, Your Honor.
 3              THE COURT:  All right.  Is it off?
 4              THE LAW CLERK:  She's cutting it now.
 5              THE COURT:  Okay.  You can have a seat.
 6              Okay.  We're just in the courtroom.  Anything we need
 7    to address?  First the government?
 8              MR. HANKEY:  Yes, Your Honor.  We can -- are we on
 9    the record?
10              THE COURT:  Yes.
11              MR. HANKEY:  We can continue objecting every time
12    that there's a narrative statement or Mr. Hueston is, you
13    know, testifying essentially through his questioning, but, you
14    know, the Court has told Mr. Hueston not to do that
15    repeatedly, yet it continues, and --
16              THE COURT:  Yeah, I mean, there's a fine line between
17    testifying or an extensive summary and just bringing a jury's
18    attention to a particular subject matter, and that's a
19    situational objection.
20              Mr. Hueston, it's your habit.  Try not to do it.
21    You've -- when I've sustained the objection, you move right
22    into the question.  I don't think the effectiveness of
23    pointing the jury to where you're going has been diminished in
24    any way.
25              MR. HUESTON:  Yeah, I think the only thing that I --
```

1    it's hard for me to get out of a habit of, and I think it's
2    proper in the evidence, is to headline and say, now, let's
3    move now, we've covered this period of time.  Let's now move
4    to 2013.
5            THE COURT:  If that's all you did, I'd be fine.
6            MR. HUESTON:  Okay.
7            THE COURT:  But what you're saying now we've just
8    covered that you've done X, Y, Z.
9            MR. HUESTON:  Okay.  I'll stop that.  I did.  Look,
10   in some courtrooms, that's fine.  I hear you, and I'm not
11   doing that anymore, but I will do some topic transitions.
12   That's fair game.
13           THE COURT:  As long as it's limited to that.  And
14   some courtrooms don't give you a chance for interim
15   statements, and you've got them here.
16           MR. HUESTON:  True.  Thank you, Your Honor.
17           THE COURT:  Use your time for interim statements to
18   make those comments.
19           Anything else from defense?
20           MR. HUESTON:  No, Your Honor, thank you.
21           MR. BLEGEN:  No, Your Honor.
22           MS. BELL:  No, Your Honor.
23           MR. POULOS:  No, Your Honor.
24           THE COURT:  Okay.  See you in 15 minutes.
25       (Brief recess; change of reporters.)

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 216 of 293 PageID #:13868
Ketchum - cross by Hueston
1311

1

2          (Jury enters.)

3               THE COURT:  All right.  Please be seated.

4               You may continue your cross-examination.

5               MR. HUESTON:  Thank you, Your Honor.

6    BY MR. HUESTON:

7    Q.  Mr. Ketchum, I want to talk about one more thing on the

8    Crestor campaign that has to do with the ROI calculation.

9               And I think you testified on direct that it's your

10   understanding that IMS studied a sample of about 126

11   physicians to measure the efficacy of the program.  Does that

12   sound right?

13   A.  That sounds right.

14   Q.  Okay.  And I think you expressed that it was your view

15   that to get a true representation of ROI on Crestor's 608 site

16   program, all 608 sites should have been measured, right?

17   A.  Yes.

18   Q.  Okay.  So no sampling, IMS needed to study all 608?

19   A.  Yes.

20   Q.  You're not a data guy, a stats guy?

21   A.  No.

22   Q.  Right.  Okay.  Well, let's explore that.

23               Sir, you would admit that you were not capable of

24   running an IMS analysis on your own without the help of

25   experts, right?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 217 of 293 PageID #:13869
Ketchum - cross by Hueston
1312

1 A.  No -- yes, I would agree with that.  No, I am not.

2 Q.  Okay.  And so you're not aware, sir, that it would not

3 have been possible to run an IMS study that measures every

4 single office in a campaign?  Are you aware of that?

5 A.  No.

6 Q.  Okay.  Back in 2013, dealing with this in realtime, you

7 knew that IMS typically had reliable data on only about

8 30 percent of physicians.  Do you remember that?

9 A.  I do not.

10 Q.  Okay.  Let's go to CX 10081.

11          And at the bottom of this e-mail, this is dated

12 September 5, 2012.

13          Do you see that?

14 A.  I do.

15 Q.  And what I want to do is get to -- okay.  "I wonder when

16 IMS will provide us how many of the 757 physician locations

17 that IMS have claims data for measurement."

18          Do you see that?

19 A.  I do.

20 Q.  That was the question, right?

21 A.  Yes.

22 Q.  And let's look at how you answered it.  Above, Bob Mons

23 first:  "My recollection is they typically get approximately

24 30 percent reliable reporting on claims data.  Can you confirm

25 or get a specific answer on the 757 we matched so I can

 1   respond to?"

 2          You see that?

 3   A.  Yes.

 4   Q.  And then at the top, what did you write here?

 5   A.  Would you like me to read it?

 6   Q.  Sure.

 7   A.  "Correct, Bob, the hit rate is typically 30 percent."

 8   Q.  30 percent of the total, right?

 9   A.  Yes.

10   Q.  In terms of getting reliable data, right?

11   A.  Yes.

12   Q.  Okay.  You didn't remember that in testimony last week,

13   right?

14   A.  No.

15   Q.  Okay.  So you would agree then, let's take that

16   30 percent.  IMS -- send IMS a list of 600 physicians in a

17   campaign, take about 30 percent, you and I both didn't major

18   in math, but that's maybe 180 would come out at 30 percent,

19   right?

20   A.  Sure.

21   Q.  Sounds about right --

22   A.  Yeah.

23   Q.  -- in terms of what you would expect based on reliable

24   numbers that you could look at from IMS, right?

25   A.  Sure, yes.

Ketchum - cross by Hueston

1314

1  Q.  Okay.  So with that in mind, this e-mail, refreshing your
2  recollection, you would agree, sir, that the suggestion that
3  all 608 sites should have been in the IMS study, that just
4  doesn't comport with what you guys were thinking of and
5  understood at the time, right?
6  A.  That's correct.
7  Q.  All right.  Let's go to GX 167.  And this is a
8  February 22, 2013, e-mail from you to Mr. Shah, Mr. Purdy,
9  subject:  Crestor deck.
10       You see that?
11  A.  Yes.
12  Q.  Let's go to page 9.  And this is the slide that you did
13  talk about last week, right?
14  A.  Yes.
15  Q.  And you said -- I think -- something along the words of
16  Mr. Shah deleted this and he shouldn't have, right?
17  A.  I don't recall.
18  Q.  Okay.
19  A.  I recall that it was removed, yes.
20  Q.  Okay.  Good enough.
21       And because the other information in this graphic
22  from the lower two bars, you see this has three bars in it?
23  A.  Yes.
24  Q.  That appears on other slides.  You saw that, right?
25  A.  Yes.

1 Q.  So Mr. Shah, by dropping this slide, is only deleting the

2 top fact, that 126 physicians participated in the digital

3 interoffice programming for Crestor, right?

4 A.  Yes.

5 Q.  Okay.  And I think as you testified last week, I think you

6 said that Mr. Shah didn't want the client to see the very top

7 row, revealing that the list that Outcome sent to IMS to study

8 only had 126 patients on it, right?

9 A.  Yes.

10 Q.  And if that were true, it would have shown some

11 cherry-picking, right?

12 A.  Yes.

13 Q.  Okay.  Now, though you were testifying to this 126

14 doctors, I don't think we saw in your direct exam the actual

15 list, right, the overall list of what was sent to IMS, right?

16 A.  I don't believe so.

17 Q.  And let's go to CX 10082.

18         MS. DOMINIAK:  Can you repeat that?

19         MR. HUESTON:  Let's look at that list.

20 BY MR. HUESTON:

21 Q.  And, in fact, this is January 29, 2013, Crestor physician

22 set, right?

23 A.  Yes.

24 Q.  It's from you, right?

25 A.  Yes.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 221 of 293 PageID #:13873
Ketchum - cross by Hueston
1316

1  Q.  You remember being shown this by the government at any
2  time?
3  A.  No.
4  Q.  Okay.  And the attachment says Crestor prescriber for IMS
5  study, right?  And this is the attachment.  You said -- well,
6  let's cover this first.  "Lynn, here is the set of physicians.
7  Please let me know if you need anything else."
8         Right?
9  A.  Yes.
10  Q.  You were sending it on, right?
11  A.  Yep.  Yes.
12  Q.  Let's see how many you sent.  Let's go to the attachment,
13  the Excel sheet.  And there's a list here of doctors and
14  addresses, right?
15  A.  Yes.
16  Q.  And next to everyone on the list -- this is kind of Excel
17  101 -- as you go down, it gives you the number of people,
18  right, so I don't have to -- you and I don't have to count
19  them all up?
20  A.  Correct.
21  Q.  All right.  So if we go get to the bottom of this, let's
22  go, let's go, we're already over a hundred, we're over 200,
23  500.  What do we got?
24  A.  It looks like 594.
25  Q.  500 -- it goes all the way -- you're right, 595 entries;

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 222 of 293 PageID #:13874
Ketchum - cross by Hueston
1317

1  but one of them is not a doctor, so 594 doctors, right, or

2  offices?

3  A.  Yeah, because I think there's a header, header row.

4  Q.  There's a header there.  So 594, right?

5  A.  Yes.

6  Q.  And now we talked about this 30 -- you've been refreshed

7  on 30 percent, this is usually about all they can pull from an

8  overall list of data provided to them, right?

9  A.  Yes.

10 Q.  So now seeing all this, let's try to reconstruct.  So you

11 sent a list of 584 to IMS, right?

12 A.  Yes.

13 Q.  And then, sir, does the math sound right:  IMS ended up

14 finding 126 of them in the IMS prescriber database.  Does that

15 sound about right?

16 A.  I'm not a mathematician, but yeah, I believe so.

17 Q.  Let's go to -- in fact, let's go to GX 169 to check that.

18 169, now, that's an e-mail from Mr. Shah, to Mons, Purdy, and

19 yourself.  And there's an attachment here.  Let's go to --

20 this is the Crestor promotion evaluation, and we go to 169 at

21 page 8.  Control group selection is the sub -- it may not be

22 page 8.  One moment.  Here we go.  I misspoke.  It's page 9.

23 You see it says control group selection?

24 A.  Yes.

25 Q.  And it says 100 -- oh, there we are.  "126 potential test

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 223 of 293 PageID #:13875
Ketchum - cross by Hueston
1318

 1    physicians were matched to the IMS health prescriber universe

 2    to identify potential control physicians based on the

 3    following criteria."

 4         Right?

 5    A.  Yes.

 6    Q.  Okay.  And then IMS, sir, apparently made a mistake by

 7    putting the same number in for the potential test group,

 8    right?  They described this amount that came out as the whole

 9    potential test group, right?

10    A.  Can you pull the prior slide up just one more time?

11    Q.  Sure.

12    A.  Sorry.  I believe so, but I just want to double-check.

13         MR. HANKEY:  Your Honor, I'm going to object on

14    foundation here.

15         MR. HUESTON:  This is what he testified about last

16    week.

17         THE COURT:  Was this exhibit put up in front of him

18    last week?

19         MR. HUESTON:  No, it wasn't, but this is an e-mail

20    attachment to his own e-mail.

21         THE COURT:  Could I see the original e-mail, the

22    first page?

23         MR. HUESTON:  From Jason Ketchum.

24         THE COURT:  All right.  Objection overruled.

25    BY MR. HUESTON:

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 224 of 293 PageID #:13876
Ketchum - cross by Hueston
1319

1    Q.  Okay.  So this is the prior slide, right?

2    A.  Yes.

3    Q.  So you would agree, sir, look at that first entry, when it

4    says 126 physicians participated in the digital in-office

5    programming for Crestor, well, that was inaccurate because we

6    showed 594 were participating, right?

7    A.  Yes.

8    Q.  You just hadn't seen that spreadsheet that you've had,

9    right?

10   A.  Yes.

11   Q.  And so this was a mistake in the slide.  In fact, the 126

12   is what IMS then kicked back, right?

13   A.  Yes.

14   Q.  All right.  We can put that down and move on.

15            Let's go on another topic.  Another area of your

16   testimony for orientation is you testified about different

17   stages of the process by which Outcome sold advertising space

18   to clients, right?

19   A.  Yes.

20   Q.  All right.  Let's go to GX 1128.  And I think, again, you

21   recognize this, right?

22   A.  Yes.

23   Q.  And you testified that this slide shows the key activities

24   of sponsorship sales, right?

25   A.  Some of them.  It's not an exhaustive or, hyperspecific,

Ketchum - cross by Hueston

1    but yeah, generally.

2    Q.  Okay.  That's fair.  And the first stage you list there is

3    list match, right?

4    A.  Yes.

5    Q.  And just to reorient us, the list match is the process

6    where Outcome would take a list of doctors provided by the

7    client that the client was interested in and match it for a

8    proposed Outcome campaign, right?

9    A.  Yes.

10   Q.  Okay.  And we saw that sometimes Outcome just sent back to

11   the client a number of physicians matched, right?

12   A.  Yes.

13   Q.  Other times Outcome would send a list of physicians back,

14   typically in Excel, right?

15   A.  Yes.

16   Q.  And you testified last week you believe you may have

17   deceived clients when you performed the list matches, right?

18   A.  Yes.

19   Q.  And the reason that you thought the list matches you

20   performed were possibly not truthful is because they sometimes

21   included projections, or didn't include projections, right?

22   A.  Yes.

23   Q.  Okay.  I think you said the match included projections,

24   that that's what made them misleading, right?

25   A.  Yes.

1 Q.  All right.  Now, to be clear, you're not saying that there

2 would be anything deceptive about including projections if

3 Outcome told the clients the list match included projections,

4 right?

5 A.  Correct.

6 Q.  Okay.  And, in fact, the first time you spoke to the

7 government, you said you did believe that Mr. Shah,

8 Ms. Agarwal did communicate to pharmas that there were growth

9 projections, right?

10 A.  Yes.

11 Q.  All right.  And we reviewed this briefly before, but you

12 said you thought they separately communicated two separate

13 numbers to the client, one number of what was already

14 installed and then another of what was projected for growth,

15 right?

16 A.  Yes.

17 Q.  All right.  And we've already covered that 99 percent of

18 your time was in doctor's office, the rest of the 1 percent is

19 giving you some limited insight here, right?  You didn't talk

20 to the pharma companies yourselves?

21 A.  Correct.

22 Q.  Now, even before the list match occurred, you would agree

23 you know that there were conversations between Outcome

24 salespeople and the prospective client, right?

25 A.  Yeah, sure.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 227 of 293 PageID #:13879
Ketchum - cross by Hueston
1322

1    Q.  And typically you're not privy to that unless somebody

2    happens to forward you an e-mail, right?

3    A.  Correct.

4    Q.  Okay.  So let's look at some of the communications that

5    happened before that list match process.

6           So let's go to DX 6206.  And this is a July 20, 2012,

7    e-mail from Outcome salesman Bob Mons to Carol Lansen at

8    MEC Global.

9           Do you see that?

10   A.  Yes.

11   Q.  You recognize MEC Global.  That's an ad agency, right?

12   A.  I believe so, yes.

13   Q.  And the subject line is Amgen/Enbrel, 2013 ContextMedia

14   program terms and cost, next steps, right?

15   A.  Yes.

16   Q.  And there's a copy to Mr. Shah, Ms. Lynn Jones,

17   Ms. Agarwal, to Amgen employees and yourself, right?

18   A.  Yes.

19   Q.  And let's look at what Mr. Mons was writing here:  "Hi,

20   Carol, thanks for making time to visit with Rishi and myself?"

21           Right?

22   A.  Yes.

23   Q.  And you weren't in that meeting with Amgen, right?

24   A.  No, I don't believe so.

25   Q.  You do know that Amgen is a huge pharma company, right?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 228 of 293 PageID #:13880
Ketchum - cross by Hueston
1323

1    A.  Yes.

2    Q.  Yeah.  And Mr. Mons continues:  "Attached is the deck we

3    reviewed today along with the 2013 program terms and cost.  As

4    discussed, we will initiate our dermatology network build in

5    the fall and average 1200 sites or more in 2013."

6         Do you see that?

7    A.  Yes.

8    Q.  And that's an e-mail sent in July 2012, right, sir?

9    A.  Yes.

10   Q.  And you would agree Mr. Mons here, he's explicitly

11   disclosing that Outcome will build its network starting in the

12   future, right, in the fall?

13   A.  Yes.

14   Q.  And would grow it so that it would average 1200 sites in

15   2013, right?

16   A.  Yes.

17   Q.  Okay.  So let's go to page 12 of the PDF.

18        MR. HUESTON:  And I think we got to go two more

19   pages.  Through 2013.  I may have the wrong -- one moment.

20   There we go.  Okay.

21   BY MR. HUESTON:

22   Q.  And this says at the second bullet here:  "Through 2013,

23   we are expecting to build out our dermatology health network

24   from 300 sites, fourth quarter 2012, to over 1200 sites across

25   the U.S."

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 229 of 293 PageID #:13881
Ketchum - cross by Hueston
1324

1  　　　Right?

2  A.  Yes.

3  Q.  That's talking about building and projections, right?

4  A.  Yes.

5  Q.  And right below, Outcome notes that this is the network

6  that will be in place by 2012, right?

7  A.  Can you repeat your question?  I'm so -- I'm sorry.

8  Q.  Sure.  The second bullet says through 2013.  They're

9  projecting forward into 2013, right?

10  A.  Yes.

11  Q.  I know this is a long time ago, but I think we started,

12  this is a July 2012 e-mail, right?

13  A.  Yes.

14  Q.  They're projecting into the future, right?

15  A.  Yes.

16  Q.  All right.  Okay.  So we can -- so, sir, you would agree,

17  this is a time, by the way, 2012, 2013, the company is much

18  smaller, right?

19  A.  Yes.

20  Q.  This is a time where Mr. Shah was actually in the room

21  with clients.  This isn't 500 employees years later, right?

22  A.  Correct.

23  Q.  So you would agree here it is early on, 2012, back when

24  Mr. Shah was in the room with the clients, Outcome is

25  explicitly disclosing how many sites it is currently in and

1     what it projects to be in the future, right?

2     A.  Yes.

3     Q.  Okay.

4              MR. HUESTON:  We can take that down.

5     BY MR. HUESTON:

6     Q.  We've talked about this a bit, but another way that

7     Outcome included projected growth in campaigns was with the

8     use of a weighted average, right?  You've talked about that a

9     bit.  Yes?

10    A.  Yes.  Sorry.

11    Q.  You have to say "yes" for the record.

12    A.  No, no, sorry.  I wasn't sure if you were done with your

13    question.  Yes.

14    Q.  Okay.  Fair enough.  And you explained last week that

15    weighted average meant that the campaign started with a lower

16    number of devices and grew over the course of the campaign to

17    get to a higher number, right?

18    A.  Yes.

19    Q.  That's the idea, to try to get to a weighted average

20    projection, right?

21    A.  Yes.

22    Q.  Okay.  And typically the weighted average would hopefully

23    be the middle of that projection?

24    A.  Theoretically, yes.

25    Q.  Yeah.  Now, I think you testified that from what you saw,

1    documents you saw, that Outcome didn't always inform

2    salespeople or clients that Outcome wanted to use weighted

3    average type understandings?

4    A.  Correct.

5    Q.  Okay.  Let's go to CX 10106.  We just saw one, by the way.

6    The last exhibit I showed you talked about an average.  It a

7    was weighted average reference, right?

8    A.  Yes.

9    Q.  That was to Amgen, a huge client, right?

10   A.  Yes.

11   Q.  Okay.  Let's go to this one.  This is January 24, 2012, so

12   we're in early days still, small company, right?

13   A.  Yes.

14   Q.  From Jeana Loewe to Mr. Mons, copying Mr. Shah and

15   Ms. Agarwal, right?

16   A.  Yes.

17   Q.  Okay.  Now, you're not on this e-mail, right?

18   A.  Correct.

19   Q.  Okay.  And we'll just look below.  Mr. Mons, let's go down

20   below to Mr. Mons' e-mail.  And he asks:  "Hi, Jeana, I know

21   you have a keen eye for detail and quality.  I was hoping you

22   could review the attached DHN/RHN presentations."

23        Do you see that?

24   A.  Yes.

25   Q.  "And give me some help."

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 232 of 293 PageID #:13884
Ketchum - cross by Hueston
1327

1        Right?

2   A.  Yes.

3   Q.  And from the e-mail he's sending the RHN deck back, right?

4   Or she's sending it back above.  Sorry.

5   A.  Yes, that appears to be the case.

6   Q.  Okay.  Great.  So let's go to page 2 of the exhibit.  It

7   says, "ContextMedia's rheumatoid health network overview for,"

8   and then there's a blank, "sponsor logo here," right?

9   A.  Yes.

10  Q.  And stepping away from this document, it's an example of a

11  template, right?

12  A.  Yes.

13  Q.  A template would be we make a structure for a

14  presentation, and, you know, if we're going to use it multiple

15  times, then we can put in a different -- you know, a different

16  company, use it over and over again, right?

17  A.  Yes.

18  Q.  Okay.  It looks like this is a template, right?

19  A.  It does.

20  Q.  Okay.  And let's go to page 9 to see Mr. Mons' template

21  for these sponsor presentations.  And the slide says, "RHN

22  sponsorship program opportunity" at the top, right?

23  A.  Yes.

24  Q.  And let's look at what it says for network overview.  It

25  says, "2012 monthly weighted average reach."

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 233 of 293 PageID #:13885
Ketchum - cross by Hueston
1328

1    Right?

2  A.  Yes.

3  Q.  So this template for the entire year is disclosing that

4  the campaign will grow over the course of the year, right?

5  A.  Yes.

6  Q.  And, sir, in presentations like this, a presentation to

7  the client, that would typically be at the beginning they're

8  being shown here's what we're going to do for you, right?

9  A.  Yes.

10  Q.  They're being shown at the beginning, we're going to be

11  using weighted average, right?

12    A JUROR:  Your Honor?

13    THE COURT:  Yes.

14    A JUROR:  I need to step out.

15    THE COURT:  You need to get some water?  Sure.  Or

16  step out?  Go ahead.

17    We'll take a brief recess.  Everyone can stand up and

18  stretch if you'd like.

19    (Off the record.)

20    THE COURT:  Okay.  Please have a seat.

21    And you may continue.

22    MR. HUESTON:  Thank you, Your Honor.

23  BY MR. HUESTON:

24  Q.  Okay.  Let's go to CX 10107.  Let's go to another example.

25  This is an October 11, 2012, e-mail from Ms. Agarwal to

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 234 of 293 PageID #:13886
Ketchum - cross by Hueston
1329

1  Mr. Shah, subject:  Niaspan and the Heart Health Network,

2  right?

3  A.  Yes.

4  Q.  Okay.  And forwarded below is an e-mail from Mr. Crandall

5  to Jennifer at Target Health.

6          Do you see that?

7  A.  Yes, I do.

8  Q.  Okay.  And you understand that Target Health is a media

9  company, right?

10  A.  Agency, yes.

11  Q.  Agency, right, a buyer on behalf of pharmas?

12  A.  Yes.

13  Q.  Thank you.

14          And you understand that it also, it's a buyer on

15  behalf of -- they have multiple clients, right?

16  A.  Yes.

17  Q.  Multiple pharmaceutical clients?

18  A.  Yes.

19  Q.  And then below that is an e-mail from Mr. Svec to Leah

20  Sallen and Emily Morris at Mindshare copying Mr. Crandall.

21          Do you see that?

22  A.  Yes, I do.

23  Q.  Just separate from this e-mail, you know that Mindshare,

24  that's another media company, right?

25  A.  Agency, yes.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 235 of 293 PageID #:13887
Ketchum - cross by Hueston
1330

1  Q.  Agency that represents pharma companies?

2  A.  Yes.

3  Q.  Okay.  And the note says, "Hello, Leah, Emily, thanks for

4  your time and input today.  You are already aware of our

5  diabetes health, but as we discussed, we have expanded rapidly

6  to create a Heart Health Network which we recommend for

7  Niaspan in 2013."

8       Do you see that?

9  A.  Yes.

10  Q.  Words rapid expansion are used there, right?

11  A.  Yes.

12  Q.  Second paragraph says, "Attached please find a brief

13  summary of our Heart Health Network opportunity with a

14  weighted average of 1600 screens for 2013."

15       Do you see that?

16  A.  Yes.

17  Q.  So the words used here, weighted average, right?

18  A.  Yes.

19  Q.  And by the way, this is a time period even before you were

20  brought into the process, sir, right, October 2012?

21  A.  I can't speak to that, but I believe so.

22  Q.  Okay.  And let's look at the top.  Mr. Shah says at the

23  top --

24       MR. HUESTON:  Oh, before we get to her, Mr. Shah's,

25  there he is.  The second one in there, Wednesday October 10th,

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 236 of 293 PageID #:13888
Ketchum - cross by Hueston
1331

1    there it is.
2    BY MR. HUESTON:
3    Q.  And he says, "Good e-mail, Matthew."
4           Right?
5    A.  Yes.
6    Q.  And Ms. Agarwal says above that, "By the way, I'm pretty
7    sure Matthew ghostwrote the original e-mail to MS, very clear,
8    concise and confident."
9           Do you see that?
10   A.  I do.
11   Q.  Okay.  Let's go to CX 10108.  This is an August 25, 2013,
12   e-mail from Mr. Shah to Ms. Agarwal, subject:  Recent
13   proposals, right?
14   A.  Yes.
15   Q.  And let's just go to the bottom of this e-mail.  And at
16   the bottom, Ms. Agarwal asks Mr. Svec for the Onglyza
17   proposal.
18          Do you see that?
19   A.  I do.
20   Q.  And separate from this, you understand that Onglyza is a
21   diabetes brand from AstraZeneca?
22   A.  Yes.
23   Q.  And Mr. Svec responds:  "Here it is, but I only have it on
24   Adobe.  We put it together on Rishi's computer in his hotel.
25   If you need it in PowerPoint, Rishi should have it."

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 237 of 293 PageID #:13889
Ketchum - cross by Hueston
1332

1          Do you see that?

2    A.  I do.

3    Q.  And then above, Mr. Shah sends the deck to Ms. Agarwal

4    which he says is from July, right?

5    A.  Yes.

6    Q.  Okay.  And then if we go to page 4, we see three proposals

7    outlined, right, program options:  option 1, option 2, option

8    3.  Do you see those?

9    A.  I do.

10   Q.  And each proposal is marked as a quote-unquote, weighted

11   average proposal, right?  Weighted average, weighted average,

12   weighted average?

13   A.  Yes.

14   Q.  Okay.  Option 3 which ends in June instead of December is

15   only for 900 screens instead of a thousand, right?

16   A.  Yes.

17   Q.  Okay.  Like the ones that run through December?

18   A.  Yes.

19   Q.  Okay.  And we can put that down.

20         And, sir, separately, you did observe that clients

21   were often well aware of the use of projections in Outcome

22   campaigns.  You saw that, right?

23   A.  I saw some e-mails about that, yes.

24   Q.  Okay.  Let's go to CX 10104 and look at an example from

25   October 2012.  And this is an e-mail chain between you,

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 238 of 293 PageID #:13890
Ketchum - cross by Hueston
1333

1  Ms. Agarwal, and Mr. Shah dated October 8, 2012.  And it's

2  regarding Simponi 2012 live screens rollup.

3         Do you see that?

4  A.  Yes.

5  Q.  Okay.  And, again, Simponi, that's a rheumatoid arthritis

6  medication manufactured by Johnson & Johnson?

7  A.  Yes.

8  Q.  Okay.  And at the bottom of page 1, there's a beginning of

9  an e-mail from a Kelly Hart at UMJ3, or JJJ.  And you

10 understood that to be Johnson & Johnson's advertising agency,

11 right?

12 A.  Yes.

13 Q.  And at the top of page 2, if you go to what Ms. Hart is

14 writing:  "Attached you will find the rollup of screens/full

15 year forecast on a monthly basis.  For January through

16 September, this should include the total screens that were

17 approved/live.  For all months moving forward, it should be

18 the counts that you forecast that will be approved/live by the

19 end of that month."

20         Do you see that?

21 A.  I do.

22 Q.  And so the client here is acknowledging that the campaign

23 involved forecasts, right?

24 A.  Yes.

25 Q.  And that those forecasts, they, in fact, can change

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 239 of 293 PageID #:13891
Ketchum - cross by Hueston
1334

1  throughout the term of a contract, right?

2  A.  Yes.

3  Q.  And Ms. Agarwal then forwards this to you and says:

4  "Projections for October through December remain the same for

5  these purposes - 450."

6          Right?

7  A.  Yes.

8  Q.  And then she continues:  "RS, unless there's a reason for

9  us to show actual growth that will happen independent of their

10  contract?  My hesitation is that they'll come back and tell us

11  not to grow if they can't fund."

12          Do you see that?

13  A.  I do.

14  Q.  So you understood her concern wasn't that Outcome wasn't

15  going to go grow enough to meet projections.  Her concern was

16  that Outcome might actually grow too much, beyond what they

17  could afford, right?

18  A.  Yes.

19  Q.  All right.  Let's go to GX 64.  And this is November

20  of 2012, November 9, 2012, between you, Mr. Shah, and

21  Ms. Agarwal, subject:  Symlin pipeline results.

22          Do you see that?

23  A.  Yes.

24  Q.  And Symlin is a diabetes medication manufactured by

25  AstraZeneca?

1  A.  Yes.

2  Q.  And turning to page 3 of this, you write:  "RS and SA -

3  the attached file has the match with Symlin's pivot tables and

4  ours."

5        Do you see that?

6  A.  Yes.

7  Q.  And then below, you wrote:  "Next steps are to project out

8  utilizing the overlay lists like Rishi instructed, but I need

9  to know the target number of offices we are looking to be in

10  so I can pull the correct number of prescribers and

11  corresponding offices."

12        Right?

13  A.  Yes.

14  Q.  You needed to know the target number, right?

15  A.  Yes.

16  Q.  And bottom of page 1, you go to bottom of page 1 after

17  some back and forth between you and Mr. Shah, Mr. Shah

18  summarizes what you'd come up with, writing:  "Here are the

19  final stats on the current match."

20        Right?

21  A.  Yes.

22  Q.  Okay.  And the match is broken down into two categories,

23  right?

24  A.  Yes.

25  Q.  Current match, then current, and projected match, right?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 241 of 293 PageID #:13893
Ketchum - cross by Hueston
1336

1 A.  Is there -- does that go into the next page -- no.

2 Q.  Yeah, there it is.  Let me give you the full context.

3 A.  Thank you.

4 Q.  All right.  So we got current match, right?

5 A.  Yes.

6 Q.  And then current plus projected, right?

7 A.  Yes.

8 Q.  And that here, this document, this is also perfectly

9 consistent with your recollection in that first meeting with

10 the FBI that Mr. Shah and Ms. Agarwal reported two numbers to

11 pharma, one with current installs and one including growth,

12 right?

13 A.  Yes.

14 Q.  Okay.

15      MR. HUESTON:  We can take that down.  Let's go to DX

16 6217.

17 BY MR. HUESTON:

18 Q.  And this is a November 19, 2012, e-mail between

19 Ms. Agarwal and Steve Svec, right?

20 A.  Yes.  I'm sorry.

21 Q.  Sorry.  I'm sorry.  Symlin cross-reference list.

22      Do you see that?

23 A.  Yes.

24 Q.  Okay.  And what's being forwarded here, if you look below,

25 it's a conversation between Outcome salesman Steve Svec and

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 242 of 293 PageID #:13894
Ketchum - cross by Hueston
1337

1  representatives at the Scout advertising agency.

2           Do you see that?

3  A.  Yes.

4  Q.  And if we go to the bottom of page 4, top of page 5,

5  Mr. Svec writes:  "Jane and Raffi, we have completed your list

6  match, and we are currently matching 695 physicians in 463

7  locations."

8           Do you see that?

9  A.  Yes.

10 Q.  And, sir, let's compare the current match results

11 disclosed to the client here with what Mr. Shah confirmed with

12 you in GX 64; okay?

13 A.  Yes.

14 Q.  And let's put them up side by side.  Okay.  So we can see

15 on the right -- there we are.  And do those numbers match?

16 A.  Yes.

17 Q.  They're exactly the same, right?

18 A.  Yes.

19 Q.  Okay.

20          MR. HUESTON:  And then let's go back to DX 6217.

21 Let's continue here.

22 BY MR. HUESTON:

23 Q.  Mr. Svec writes:  "With our current pipeline, we project

24 reaching 1475, 1,475 of these physicians in 1100 locations

25 over the course of 2013?"

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 243 of 293 PageID #:13895
Ketchum - cross by Hueston
1338

1         Do you see that?

2    A.  Yes.

3    Q.  "My impression is that you're looking more short-term with

4    this, but I want you to know that we will be growing

5    through 2013 and beyond if you have the opportunity to give it

6    a long-term look!"

7         Right?

8    A.  Yes.

9    Q.  He is, again, expressly disclosing this is a projection,

10   right?

11   A.  Yes.

12   Q.  And the projection of 1,475 physicians in 1,110 locations

13   that is passed along to the client, again, that's the exact

14   proposed match that you and Mr. Shah discussed internally on

15   that other exhibit, right, GX 64?

16   A.  Yes.

17   Q.  Okay.  So here back when Mr. Shah and Ms. Agarwal were

18   closely involved, right, early days of the company, I've shown

19   you examples here where Outcome is explicitly disclosing the

20   projected pipeline and that it will be growing through the

21   contract term, right?

22   A.  Yes.

23   Q.  Okay.  Let's go to CX 10105.  And now we're on a

24   February 11, 2013, e-mail between you, Mr. Shah, Ms. Agarwal,

25   subject:  Novo match.

1    Do you see that?

2  A.  I do.

3  Q.  Okay.  Let's go to page 2 in the middle.  And you can see

4  that you wrote that the list match was for Novo's Victoza and

5  insulin medications, right?

6  A.  Yes.

7  Q.  All right.  And at the bottom of page 1, you wrote:  "RS

8  and SA (with your fake out of office) what are you guys

9  thinking as far as projection goes?  Should we send them the

10  true match with MS and the latter stages of outreach?  To

11  Rishi's point, we are on pace."

12    Do you see that?

13  A.  Yes.

14  Q.  And up above, let's see what Mr. Shah says.  And Mr. Shah

15  says, "Can you tell me what the match looks like if we use the

16  later stages of outreach (stuff where we think there's a good

17  likelihood it will come in.)"

18    Do you see that?

19  A.  Yes.

20  Q.  "I think the best option may be to give them this limited

21  set of matches and let them know this is a match on the

22  diabetes network for which Novo has contracted a weighted

23  average of 1800 screens."

24    Do you see that?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 245 of 293 PageID #:13897
Ketchum - cross by Hueston
1340

1  Q.  Okay.  So to try to unpack that, Mr. Shah, you would

2  agree, isn't asking for an unrealistic projection; he's asking

3  for offices that only have a good likelihood of coming in,

4  right?

5  A.  Yes.

6  Q.  And he's saying the best option is to disclose that match

7  involves a weighted average, right?

8  A.  Yes.

9  Q.  So Mr. Shah asks for a reasonable projection, then said

10  the best course of action is to tell the client that the match

11  involves growth, right?

12  A.  Yes.

13  Q.  Okay.  We can put that down.

14          Let's go to CX 10158.  February 6, 2012, e-mail chain

15  from Mr. Shah to you, Mr. Svec, Ms. Agarwal, subject:  Revised

16  PowerPoints.

17          Do you see that?

18  A.  Yes.

19  Q.  And let's go to the bottom e-mail on the first page,

20  Mr. Svec asks:  "Guys, here's an urgent request from AZ" --

21  that's AstraZeneca, right?

22  A.  Yes.

23  Q.  -- "regarding the list match.  Any chance of getting these

24  numbers to me ASAP?"

25          Do you see that?

1   A.  Yes.

2   Q.  And then Mr. Shah replies above:  "Steve, one of the

3   slides lists a percentage figure for the offices that matched.

4   In order to calculate the number of offices by decile, you

5   should apply the percentage against our weighted average of

6   1200 offices."

7           Right?

8   A.  Yes.

9   Q.  So Mr. Shah receives a question about a list match and

10  again explains to the salespeople that the match is based on a

11  weighted average.

12          Do you see that?

13  A.  Yes.

14  Q.  So you're seeing this is giving additional context, sir,

15  on this issue that you testified last week, right?

16  A.  Yes.

17  Q.  And you're seeing, sir, that there's a lot of

18  communications that you weren't shown before, right?

19  A.  Yes.

20  Q.  That show that there were conversations between Outcome

21  and the client about disclosures of projections, right?

22  A.  Yes.

23  Q.  All right.  So you were shown a few e-mails last week

24  involving list matches that included projections, and you were

25  asked, well, did Mr. Shah give you explicit instructions to

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 247 of 293 PageID #:13899
Ketchum - cross by Hueston
1342

 1  disclose that number, that the number included projections.
 2  Do you remember those questions?
 3  A.  Yes.
 4  Q.  But what we never saw, sir, was Mr. Shah telling you not
 5  to tell a client that the list match included projections,
 6  right?
 7  A.  Correct.
 8  Q.  Not a single instance of that, right?
 9  A.  No, we did not see that.
10  Q.  Okay.  Let's move on to another topic.  Let's talk about
11  the different types of contracts.  You testified a little bit
12  about different types of contracts at Outcome Health that you
13  were familiar with, right?
14  A.  Yes.
15  Q.  Okay.  Let me put up a couple of demonstratives that the
16  government showed to orient us here.
17          MR. HUESTON:  So let's put up GX 1133L, side by side
18  with GX 1133J.
19  BY MR. HUESTON:
20  Q.  Okay.  And the one on the right was showing delivery
21  against, if there was a requirement that all offices be
22  installed as of a go-live date, right?
23  A.  Yes.
24  Q.  Okay.  And I think while -- you testified that while
25  weighted average might be a little closer, Outcome failed to

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 248 of 293 PageID #:13900
Ketchum - cross by Hueston
1343

1  deliver under either scenario, either weighted average or

2  ultimate outcome, right?

3  A.  Yes.

4  Q.  We'll talk about that in more detail in a minute.  But

5  just so -- and weighted average is on the left, right?

6  A.  Yes.

7  Q.  Okay.  I just said left-right, but these are two different

8  types of contracts that were talked about, right?

9  A.  Yes.

10        MR. HUESTON:  So we can take those down.

11  BY MR. HUESTON:

12  Q.  But, in fact, those weren't the only two contract types

13  that Outcome had, right?

14  A.  No.

15  Q.  Sometimes clients just bought access to the whole Outcome

16  network and not a specific set of offices, right?

17  A.  Yes.

18  Q.  And sometimes a campaign instead had what was referred to

19  as a build goal.  Do you remember that?

20  A.  Yes.

21  Q.  And in a build goal, the only number that matters to the

22  client is the final number, right?

23  A.  It depends on the client, but I believe that's -- yes.

24  Q.  But generally that's right, you're building to a goal,

25  right?

1   A.  Yes.

2   Q.  Okay.

3        MR. HUESTON:  And to illustrate the build goal idea,

4   let's go to DX 10182.  And I'll just put this up as a

5   demonstrative.

6   BY MR. HUESTON:

7   Q.  And so let's just take the Pradaxa example, right?  You've

8   talked a lot about the -- you know, 18 -- 1,819 office goal.

9   Remember?

10  A.  Yes.

11  Q.  And so to run out a scenario here where you just surpass

12  that goal in the last month, if that's what a contract was to

13  get there as a build goal in the last month, it might look

14  like something like that, right?

15  A.  Yes.

16  Q.  So you could go under, under, under, under, under, but if

17  you get over the line in the last month, you build to that

18  goal, you're good, right?

19  A.  Yes, to the build goal, yes.

20  Q.  Okay.

21        MR. HUESTON:  And we can take that down.

22  BY MR. HUESTON:

23  Q.  And there are -- were other ways you understood, sir, that

24  you might not hit delivery numbers but still not violate the

25  contract, right?

1    A.  Yes.

2    Q.  So, for example, Outcome could miss a delivery but provide

3    a make good, right?

4    A.  Yes.

5    Q.  And the make good might take the form of a credit issued

6    to a client, right?

7    A.  Yes.

8            MR. HUESTON:  So let's go, again, to show this

9    visually, let's go to the next slide of an example of a make

10   good.  We'll go to slide 2.

11   BY MR. HUESTON:

12   Q.  So let's say, for instance, this is a contract that's

13   going in April, May, June, and July, and they're hitting

14   the -- the X's are below the line.

15           Do you see that?

16   A.  Yes.

17   Q.  And it looks like they're not going to hit the line at

18   all.

19           Do you see that?

20   A.  Yes.

21   Q.  And one way they could provide a make good would be to

22   provide an extension of the campaign, run it more at no cost

23   for a few months, right?

24   A.  Yes.

25   Q.  And by doing that, that would satisfy the contract, right?

1    A.  Yes.

2    Q.  Okay.

3    A.  It could.

4    Q.  It could.  And just to be clear, in fairness to you, I

5    mean, at Outcome, I think you've testified you didn't have

6    insight as to when or how make goods were provided?

7    A.  That's correct.

8    Q.  Not really part of what you did?

9    A.  Correct.

10   Q.  Okay.  But from your own experience in sales --

11           MR. HUESTON:  We can take that down.

12   BY MR. HUESTON:

13   Q.  -- in 2016, there were two main programs you recall being

14   involved with that had shortfalls, Eisai's weight loss drug,

15   and the diabetes drug Contour.  Does that ring a bell?

16   A.  Yes.

17   Q.  And, sir, in both instances, are you aware that, you know,

18   Outcome approved refunds or make goods to the brands for

19   hundreds of thousands of dollars?

20   A.  Yes.

21   Q.  Okay.  And, in fact, I think you told the FBI in those

22   sessions you believe that issuing those make goods, that was

23   the right thing to do, right?

24   A.  Yes.

25   Q.  So from your limited time in sales, sir, it's fair to say

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 252 of 293 PageID #:13904
Ketchum - cross by Hueston
1347

 1   you have first-hand experiences that under-delivery on a

 2   campaign doesn't mean necessarily you violated the contract,

 3   right?

 4   A.  Correct.

 5   Q.  Let alone committed fraud, right?

 6   A.  Correct.

 7   Q.  Okay.  You just have to do a make good, right?

 8   A.  Yes.

 9   Q.  Okay.  And there were even more ways that you're aware of

10   that missing numbers didn't mean there was any contract

11   violation; is that right?

12   A.  Yes, correct.

13   Q.  So, for example, there were instances where clients signed

14   a letter acknowledging that at the end of the campaign,

15   regardless of any obligations that might have existed in the

16   contract, they considered the agreement to be complete, right?

17   A.  I was unaware of that.

18   Q.  Okay.  Let's go to GX 1386.

19           MR. HANKEY:  Your Honor, I don't believe this is in

20   evidence.

21           THE COURT:  Let's take it off the screen.

22           All right.  Let's go to sidebar.

23       (Sidebar.)

24           THE COURT:  All right.  What's the objection?

25           MR. HANKEY:  Your Honor, I don't think this is --

1    THE COURT:  Was this tendered as a defense exhibit

2  over the weekend?

3    MR. HUESTON:  Not over the weekend, but this is one

4  of the ones -- let me back up a bit.

5    This was disclosed earlier today.  And this is a

6  module -- or last night?  It was last night.  As we prepared

7  this module late -- and I will say, Your Honor, that the

8  government, and we haven't complained, has sent e-mails and

9  stuff, you know, during their exams.  He will find it in his

10  e-mails.  So it wasn't in the initial tranche.  Oh, actually I

11  have a note that the government did agree to this list, so

12  actually the record reflects you agree.

13    THE COURT:  To this exhibit?

14    MR. HUESTON:  Yes.

15    THE COURT:  Or set of exhibits you're going to use in

16  this area?

17    MR. TODISCO:  Yes.

18    THE COURT:  Do you want to confirm that, Mr. Hankey?

19    MR. HANKEY:  If you don't mind.

20    THE COURT:  Sure.  Go ahead.

21    MR. HANKEY:  What's the exhibit number again?

22    MR. TODISCO:  1836.

23    THE COURT:  You need to speak into the mic.

24    MR. TODISCO:  And we sent it at 10:19 last night.

25  Then you responded this morning with the one objection on the

1   business records issue that Judge Durkin resolved this
2   morning.

3       MR. HANKEY:  Okay.  I don't need to check then.  I
4   must have been mistaken, Your Honor.  However, I think the
5   testimony for Mr. Ketchum is that he did not recall this.

6       THE COURT:  He doesn't recall the type of contract
7   that allowed for basically the customer saying well, if you
8   don't give us everything we want, no big deal, which I think
9   is what the import of this is.  He said he didn't recall
10  anything like that.  So you're about to ask him about what he
11  didn't recall?

12      MR. HUESTON:  Well, I'm just going to -- this
13  document they've agreed it's admissible.  It's a business
14  record.  I'm just going to point out the provision that says
15  just that and move on.  That's all.

16      THE COURT:  All right.  Well, that's consistent with
17  the -- what's been going on all day today and in part what
18  happened with the -- well, any additional objection?

19      MR. HANKEY:  No, not to that, Your Honor.

20      THE COURT:  Okay.  All right.  So the -- the document
21  apparently is admissible or admitted.  We'll deal with that at
22  4:30 about what's in, what's out.  But this questioning is
23  proper.  Go ahead.

24      MR. HUESTON:  Thank you.

25      (End of sidebar.)

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 255 of 293 PageID #:13907
Ketchum - cross by Hueston
1350

1           THE COURT:  All right.  You may proceed.

2           MR. HUESTON:  Okay.  So let's go ahead and put the

3    document up, GX 1836.

4    BY MR. HUESTON:

5    Q.  And you could see this is a document here, Outcome Health

6    to Heather Econ, Spark Communications, re:  completion of

7    agreements.  And so let's go down further in the paragraph,

8    and I'm going to highlight the language.

9           THE COURT:  Who is this from?  Can you show the last

10   page --

11          MR. HUESTON:  Sure.

12          THE COURT:  -- so we know who wrote it?

13          MR. HUESTON:  Sure.  Yes.  Brok Vandersteen on behalf

14   of ContextMedia, and this is acknowledged and agreed by

15   Spark Communications, as an agent for and on behalf of

16   Novo Nordisk Pharmaceuticals.

17          Okay.  So let's go to the first page.  Okay.  And

18   there's some initial language here, and then following --

19   let's go to the following quote, please, following discussions

20   and mutual agreement.  There it is.

21   BY MR. HUESTON:

22   Q.  "The parties have now determined that the agreements are

23   complete?"

24          Right?  Do you see that language, sir?

25   A.  Yes.

Ketchum - cross by Hueston

1351

1   Q.  Okay.  We can put that one aside.

2          And so we've gone through a number of examples of

3   different types of contracts that various clients had, right?

4   A.  Yes.

5   Q.  Okay.  There are differences in the campaigns, right?

6   A.  Yes.

7   Q.  Let's go to GX 1130 which is something that you looked at

8   on direct exam, and I think you testified about this as a

9   sample contract, right?

10  A.  Yes.

11  Q.  And you recall that this is a January 30, 2013, contract

12  for Humira, correct?

13  A.  I believe so, yes.

14  Q.  And if you look at the column titled quantity paid, "QTY

15  paid"?

16  A.  Yes.

17  Q.  And we kind of blow that out, I think the numbers are very

18  small.  There are different -- the contract calls for a

19  different quantity each month as you go down, right?  That's

20  65, and there are different quantities below that.

21          MR. HUESTON:  Let's pop it back out.

22  BY MR. HUESTON:

23  Q.  You see there's 65, and I could even see it from here,

24  110, 95, 80, right?

25  A.  Yes.

1  Q.  Okay.  So even in this model contract, Mr. Ketchum, when

2  Outcome's CFO sent it over to you, even he said it was a

3  little confusing.  Do you remember that?

4  A.  I don't.

5        MR. HUESTON:  Let's go to the beginning of the

6  e-mail, GX 191 at 1.

7  BY MR. HUESTON:

8  Q.  "Jay, this contract is a little confusing?"

9        Do you see that?

10 A.  Yes.

11 Q.  And now you've previously identified this Humira contract

12 where we've been talking about here as an incremental

13 contract, right?

14 A.  Yes.

15 Q.  Okay.  And I think you've said that special rules apply to

16 a contract designated incremental, including that an

17 incremental contract typically would be an exception to what

18 you said is the rule, that everything needed to be actually

19 installed as of the precise dates in the contract, right?

20 A.  I don't recall if that's exactly what I said, but I think

21 the gist of it.

22 Q.  All right.  Okay.  That's fair.  But this model contract,

23 what you call the model contract, that actually shows there

24 are exceptions to the rule about how contracts are interpreted

25 and executed, right?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 258 of 293 PageID #:13910
Ketchum - cross by Hueston
1353

1    A.  Yes.

2    Q.  Okay.  So let's go back to GX 1133J.  This is the original

3    slide that the government showed you demonstrating the Pradaxa

4    campaign.  That's what we're going to be talking about now,

5    was behind in August, okay?

6    A.  Yes.

7    Q.  Now, we've just reviewed and you've just stated that

8    because there's under-delivery at a point in time that doesn't

9    necessarily mean that Outcome is yet violating contractual

10   provision, right?

11   A.  It's possible, yes.

12   Q.  Okay.  You first have to dig into the details, right, and

13   figure out, well, is this a campaign with a strict go-live

14   date or not; that's an important detail, right?

15   A.  Yes.

16   Q.  Or you have to figure out does it have a build goal,

17   right?

18   A.  Yes.

19   Q.  Or is it an incremental campaign, right?

20   A.  Yes.

21   Q.  Or a weighted average contract, right?

22   A.  Yes.

23   Q.  You might also want to know, gosh, if something is

24   happening here with performance, does it have anything to do

25   with the client, is the client responsible for some issue in

1    performance; that's a factor, right?

2    A.  Sure, yes.

3    Q.  Okay.  And you'd want to know before you concluded there

4    was a violation whether there was a make good, right?

5    A.  Yes.

6    Q.  And you'd also want to know, like in the contract I just

7    showed you, whether even if there is a miss that the client

8    said at the end of the day we're going to view this as

9    completed, you would want to know that too, right?

10   A.  Yes.

11   Q.  And so, sir, you would agree that these delivery charts

12   that you testified about last week, that's like the beginning

13   of the story.  There were a lot of other details that matter,

14   right?

15   A.  Yes.

16   Q.  All right.  So let's now get into Pradaxa.  That's a heart

17   health medicine, right?  That's what Pradaxa was?

18   A.  Yes.

19   Q.  And that's manufactured by a pharma company called

20   Boehringer Ingelheim, right?  BI it's often referred to?

21   A.  Yes.

22   Q.  So let's briefly put back up GX 1133J and G 1133L and put

23   them side by side.  Okay.  There's 1133J on the left, 1133L on

24   the right.

25          So 1133J, the one on the left there, that's what you

 1    described as Outcome's delivery on the Pradaxa campaign as you

 2    understood through what was shown to you last week as

 3    Outcome's contractual obligations, right?

 4    A.  Yes.

 5    Q.  Okay.  And then it was your understanding that Outcome had

 6    an obligation I think you said to deliver 1,009 screens right

 7    from the onset of the campaign, right?

 8    A.  That sounds correct, yes.

 9    Q.  Okay.  And then on the right side, that's what you

10    describe what delivery would look like if Pradaxa had been a

11    weighted average campaign, right?

12    A.  Yes.

13    Q.  Okay.  And, again, the difference is if this is a weighted

14    average campaign, then Outcome -- it's okay if Outcome is

15    missing early as long as it makes up later, right?

16    A.  Yes.

17    Q.  And you explained that to satisfy the weighted average

18    contract, you do just need to make that up at some point

19    during the contract, right?

20    A.  Yes.

21    Q.  All right.  Now, the chart -- let's see.  If you look at

22    1133J now, let's just look at that alone.  I notice here the

23    X's that you went through with Mr. Hankey, that stops there in

24    August, right?

25    A.  Yes.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 261 of 293 PageID #:13913
Ketchum - cross by Hueston
1356

1  Q.  And I think you testified that you believe it would have

2  been unlikely, at least based on the trajectory of those X's,

3  that Outcome was going to actually grow in those later months

4  of the year, right?

5  A.  Correct.

6  Q.  Okay.  And by the way, those X's were all charted in terms

7  of offices, not screens, correct?

8  A.  I believe so, yes.

9  Q.  Okay.  But either way, you do agree that without knowing

10  the total delivery for the full year, you can't actually

11  conclude if the weighted average number was even met, right?

12  You really need to know the other end of the equation, right?

13  A.  Yes.

14  Q.  Okay.  But I think you testified you just hadn't been

15  shown anything to suggest that Pradaxa was, in fact, a

16  weighted average contract, right?

17  A.  Correct.

18  Q.  All right.  So let's go to GX 88.  You were shown this

19  exhibit last week.  And this is where Ms. Agarwal says, and

20  we'll pull it out:  "We have to race to 1,819 screens there by

21  midyear and believe only have a third of those already."

22          Do you remember that?

23  A.  Yes.

24  Q.  And Mr. Shah is copied on this e-mail, right?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 262 of 293 PageID #:13914
Ketchum - cross by Hueston
1357

 1   Q.  And in her e-mail, Ms. Agarwal is describing Outcome's

 2   obligations in terms of screens, right?

 3   A.  Yes.

 4   Q.  And I think you testified, sir, this e-mail indicated that

 5   Ms. Agarwal is under the belief there's a weighted average for

 6   the contract, right?

 7   A.  Yes.

 8   Q.  And just to be clear, for the record, you're not saying

 9   Ms. Agarwal didn't genuinely believe, right, at this time that

10   this was a weighted average or wasn't a weighted average

11   campaign; it's just that based on your review of the contract,

12   she was mistaken, right?

13              MR. HANKEY:  Foundation, Your Honor.  Speculation.

14              THE COURT:  Sustained.

15              MR. HUESTON:  Okay.

16   BY MR. HUESTON:

17   Q.  You have no basis to say this wasn't a genuine belief,

18   right?

19              MR. HANKEY:  Objection.  Same objection.

20              THE COURT:  Yeah, you're asking him -- it is

21   speculation.  The objection is sustained.

22              MR. HUESTON:  Well, let me try one more thing.

23   BY MR. HUESTON:

24   Q.  Did you have conversations with her at the time about

25   this, the race to 1819 screens?

Ketchum - cross by Hueston

1358

1    A.  Not that I really recall.

2    Q.  Okay.  Then I'll move on.

3         And, again, you understand a mistake is not

4    necessarily fraud, right?

5    A.  Correct.

6         MR. HANKEY:  Objection.  Mischaracter- --

7    argumentative.

8         MR. HUESTON:  Well --

9         THE COURT:  Well --

10        MR. HANKEY:  Legal conclusion.

11        MR. HUESTON:  This is --

12        THE COURT:  Hang on.  It's this witness's perception.

13   He already testified to things he believed occurred that were

14   fraudulent so he can properly inquire about things that might

15   not be.  So objection overruled.

16        MR. HUESTON:  Okay.  So we can put this down.

17   BY MR. HUESTON:

18   Q.  And you testified last week that Outcome's CFO Jim Demas,

19   that he handled quite a bit and maybe even a majority of

20   Outcome's contracting, right?

21   A.  Yes.

22   Q.  So that means he, to your understanding, would take what

23   the parties agreed to and try to put it in a contract.  That's

24   one of his roles, right?

25   A.  I can't speak too confidently to that.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 264 of 293 PageID #:13916
Ketchum - cross by Hueston
1359

1   Q.  Okay.  But he was mostly involved in the contracting,
2   right?
3   A.  Yes.
4   Q.  All right.  So let's go to GX 195.  And this is an e-mail
5   from Mr. Demas to Mr. Purdy and the senior management team
6   responding to one of your MS weekly reports; is that right?
7   A.  Yes.
8           MR. HUESTON:  And at this time we'd ask that this be
9   admitted as a hearsay exception for effect on the listener.
10          THE COURT:  Ladies and gentlemen, this is going to be
11  admitted for that purpose.  It's not admitted for the truth.
12  In other words, the factual statement here is not being
13  admitted as something you can take as truthful or as proof of
14  the -- what's represented in the e-mail, but it is admitted
15  for the limited purpose of the effect on the listener, the
16  people who were party to this e-mail.
17          MR. HUESTON:  Okay.  And let's go to the bottom of
18  page 2.
19  BY MR. HUESTON:
20  Q.  And we see here that this is the report where you note
21  that there were 800 Pradaxa screens, right?
22  A.  Yes.
23  Q.  So you're using the word "screens," right?
24  A.  Yes.
25  Q.  All right.  And by the way, sir, you mentioned that you

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 265 of 293 PageID #:13917
Ketchum - cross by Hueston
1360

1    were rerunning the match to get any new additions.  You see

2    that?

3    A.  Yes.

4    Q.  And you would agree, sir, at the time you would only be

5    doing that if at that time you were also under the impression

6    that this was a campaign that included growth, right?

7    A.  I can't really speak to that.

8    Q.  Okay.  At the time, sir, you're rerunning a match to get

9    new additions scheduled.  That's talking in terms of growth,

10   scheduled additions?

11   A.  That's not necessarily growth pertaining to a contract.

12   That's just growth of the network in general, I believe.

13   Q.  Okay.

14          MR. HUESTON:  And let's go to page 1.

15   BY MR. HUESTON:

16   Q.  Mr. Purdy asks:  "SA/RS, I thought we started the year

17   with more Pradaxa screens than that."

18          And, again, he's talking in terms of screens, right?"

19   A.  Yes.

20   Q.  And then he continues:  "What were the numbers you

21   remember?  What is the go-live commitment?"

22          Do you see that?

23   A.  I do.

24   Q.  And as you discussed last week, there's only a strict

25   go-live commitment if the contract is not weighted average,

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 266 of 293 PageID #:13918
Ketchum - cross by Hueston
1361

 1  right?

 2  A.  Correct.

 3  Q.  Okay.  Weighted average is the exception where you can

 4  start under the contracted-for number, right?

 5  A.  Yes.

 6  Q.  And then Mr. Demas, again, is who you described as the one

 7  most responsible for contracting, right?

 8  A.  Yes.

 9  Q.  He replies and says, "Pradaxa was sold on a weighted

10  average of 1,819 screens."

11          Right?

12  A.  Yes.

13  Q.  And this e-mail is sent to the senior management team

14  ListServ?

15  A.  Yes.

16  Q.  And that senior management team ListServ, that includes

17  Mr. Shah, right?

18  A.  Yes.

19  Q.  And Ms. Agarwal, right?

20  A.  Yes.

21  Q.  So you agree Mr. Shah is receiving this information from

22  Mr. Demas as well, right?

23  A.  Yes.

24  Q.  And so when you testified last week, you weren't shown

25  this last week, were you?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 267 of 293 PageID #:13919
Ketchum - cross by Hueston
1362

 1   A.  No.

 2   Q.  So when you testified last week that you didn't see

 3   anything indicating that Pradaxa was a weighted average

 4   contract, you hadn't seen this e-mail, right?

 5   A.  That's correct.

 6   Q.  And you weren't part of the Pradaxa contracting process,

 7   were you?

 8   A.  No.

 9   Q.  It would have been helpful to have this as part of context

10   for you?

11        MR. HANKEY:  Objection, Your Honor.  He wasn't on

12   this e-mail.

13   BY MR. HUESTON:

14   Q.  Would you have --

15        MR. HUESTON:  It's a separate question.

16        MR. HANKEY:  Objection to the narrative.

17        THE COURT:  All right.  Re-ask your question.

18        MR. HUESTON:  Sure.

19   BY MR. HUESTON:

20   Q.  Do you agree that seeing this e-mail would have provided

21   you with some helpful context to your testimony?

22   A.  Yes.

23   Q.  Okay.  And by the way, Mr. Demas also describes the

24   delivery obligations in terms of screens.  He uses the word

25   "screens," right?

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 268 of 293 PageID #:13920
Ketchum - cross by Hueston
1363

1   A.  Yes.

2   Q.  All right.  Let's go to GX 247, already admitted, and look

3   at one more example.  This is an e-mail you looked at last

4   week between you and Mr. Shah.  And you will recall that

5   Mr. Shah asked you down at the bottom of page 1 for

6   information about the Pradaxa campaign, including terms of the

7   their buy.

8           Do you see that?

9   A.  Yes.

10  Q.  Okay.  And you had noted that, "Shradha indicated they

11  purchased a weighted average."

12          Do you see that?

13  A.  Yes.

14  Q.  So Mr. Shah is asking you about terms of the buy because

15  presumably he doesn't know, right?  Is that how you interpret

16  that?

17  A.  Yes.

18  Q.  Okay.  And the information that Mr. Shah is given is that

19  this is a weighted average campaign.  That's what this

20  appears, right?

21  A.  Yes.

22  Q.  And you're not saying that Mr. Shah should have

23  disbelieved this information you were providing, right?  You

24  have no basis to disbelieve what you're saying here, right?

25  A.  Correct.  Sorry.  I was a little confused in the way you

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 269 of 293 PageID #:13921
Ketchum - cross by Hueston
1364

1    were asking your question.

2    Q.  Thank you.  I clarified.

3          And, again, you testified that Mr. Demas prepared the

4    invoices for Outcome, right?

5    A.  Yes.

6    Q.  And so let's go to GX 1095.  And I think on direct exam

7    you did identify this as an invoice from Outcome for the

8    Pradaxa campaign, right?

9    A.  Yes.

10   Q.  All right.  And the invoice is billing for "Pradaxa

11   advertising content on 1,819 ContextMedia health screens

12   during the month of April."

13         See that?

14   A.  I do.

15   Q.  Okay.  Again, mentioning screens, right?

16   A.  Yes.

17   Q.  And if we flip through to pages 2, 3, and 4, it's flipping

18   as you go.  It's pretty much the same.  It's 1,819 screens

19   each time that's mentioned, right?

20   A.  Yes.

21   Q.  And regardless, I think you testified on direct you

22   thought it should be offices, right?

23   A.  Yes, I believe so.

24   Q.  Okay.  But regardless of whether you think it should have

25   been in offices, we've shown now person after person

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 270 of 293 PageID #:13922
Ketchum - cross by Hueston
1365

1    referencing this in screens, right?

2    A.  Yes.

3    Q.  And now I'm showing you every invoice says screens, right?

4    A.  Yes.

5    Q.  And you would agree in this invoice Outcome is telling the

6    client it's based on screens?

7    A.  Yes.

8    Q.  Okay.  And, sir, you're not a Certified Public Accountant,

9    right?

10   A.  No.

11   Q.  Never been a CFO of a company, right?

12   A.  No.

13   Q.  Okay.  And you've seen others with reference to the words

14   weighted average campaign, right, including from Mr. Demas?

15   A.  Yes.

16   Q.  And that was told by Mr. Demas to Mr. Shah and

17   Ms. Agarwal, right?

18   A.  Yes.

19   Q.  So Mr. Demas, these are his invoices, right?

20   A.  Yes.

21   Q.  It's fair to say with the knowledge that Outcome is

22   currently below 1819 screens, Mr. Demas is reporting a

23   weighted average number on the invoice, right?

24          MR. HANKEY:  Objection.  Speculation.  Foundation as

25   to knowledge.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 271 of 293 PageID #:13923
Ketchum - cross by Hueston
1366

1     THE COURT:  Sustained.

2     MR. HUESTON:  Okay.

3  BY MR. HUESTON:

4  Q.  You saw earlier he was talking about this as a weighted

5  campaign, right?

6  A.  Yeah, in the e-mail, yes.

7  Q.  Okay.  And he's putting out these invoices, right?

8  A.  Yes.

9  Q.  And the weighted campaign was for 1,819 screens?

10  A.  Yes.

11  Q.  And each invoice says 1,819 screens from Mr. Demas, right?

12  A.  Yes.

13  Q.  Across time, right?

14  A.  Yes.

15  Q.  And if it were a weighted campaign, that would be

16  appropriate because you're getting billed for the weighted

17  number across time, right?

18  A.  Yes.

19  Q.  Okay.  You can put that down.

20     MR. HUESTON:  If I can just have one minute,

21  Your Honor.

22     THE COURT:  All right.

23     MR. HUESTON:  Maybe do a stretch break just --

24     THE COURT:  Sure.

25     MR. HUESTON:  Thanks.

Case: 1:19-cr-00864 Document #: 586 Filed: 11/29/23 Page 272 of 293 PageID #:13924
Ketchum - cross by Hueston
1367

1    THE COURT:  We've got about five minutes left anyway.

2    MR. HUESTON:  Okay.  All right.  Actually, if I

3  could -- I promise I'm going to reduce what I have, if maybe

4  we can cut five minutes early.

5    THE COURT:  In other words, if we break now --

6    MR. HUESTON:  Yeah.

7    THE COURT:  -- you'll take less time tomorrow?

8    MR. HUESTON:  I will.  I promise.

9    THE COURT:  Those are the magic words, ladies and

10  gentlemen, that every lawyer uses toward the end of a day.

11    MR. HUESTON:  Yeah.

12    THE COURT:  So I'll give you -- I'll grant that

13  request.

14    Ladies and gentlemen, I do want to talk to you about

15  one thing.  We conducted today's proceeding with the consent

16  of the parties with one of the jurors being unable to be here

17  because of illness.  Happily he believes he will be back

18  tomorrow.  He's feeling better, and I expect he'll be back

19  tomorrow.

20    Being in the courtroom, as you can tell, is an

21  essential part of any jury trial, of course, and I made a very

22  limited exception to that today.  It's the exception, not the

23  rule.  In fact, I doubt I will allow it again.  We need you

24  all here.  And I want to compliment you on doing so, for all

25  of you to come every day in a timely way.  You've had to wait

1 | for us.  We've never had to wait for you, and I appreciate
2 | that very much.

3 | I don't want to discharge anyone or delay the trial
4 | if a juror can't be here, so please continue your good
5 | attendance, your timeliness.  I don't expect we will follow
6 | this procedure again in the future.  So I would like to again
7 | compliment you on your efforts, and we'll take Mr. Hueston up
8 | on his comment that he's going to reduce what he has to do by
9 | working on it overnight.

10 | With that, we'll let you go for tonight.  Please
11 | don't discuss the case among yourselves or with anyone else.
12 | We'll see you tomorrow morning at 9:00, and we'll start
13 | promptly then.  Thank you all.

14 | COURT SECURITY OFFICER:  All rise.

15 | (Jury exits.)

16 | THE COURT:  Okay.  Please be seated.

17 | Sir, you are released.  You can come back tomorrow
18 | morning at 9:00.  Please don't discuss your testimony with
19 | anyone as you are on cross-examination.

20 | THE WITNESS:  Yes, Your Honor.

21 | THE COURT:  Thank you.

22 | We'll make sure our remote juror is no longer
23 | connected.

24 | LAW CLERK:  She removed the juror from Webex.

25 | THE COURT:  Okay.  He's no longer on.

1  Okay.  A couple of things I want to raise on the

2  record.

3  One of the problems, concerns I have, is that we were

4  not able to observe that juror, and that's -- part of a trial

5  isn't just them looking at you, it's you looking at them.

6  I want to confirm on the record with each defendant

7  that they're waiving their ability to have observed that juror

8  today.  If they want a moment to talk to their counsel, they

9  can because if you're not going to waive it, I'm going to

10  discharge the juror and he will not come back tomorrow.  So

11  I'll give you all -- we'll go off the record for a minute, let

12  each of you talk to your client because I'm going to ask each

13  client if they had a full conversation with their lawyers

14  about this situation.  And this is the reason I'm likely not

15  to do this again.

16  (Off the record.)

17  MR. HUESTON:  Your Honor, I can begin.  We discussed

18  this already at another time, and my client is prepared on the

19  record to make that waiver.

20  THE COURT:  All right.  Mr. Shah, you understand that

21  you had a right to have the absent juror in the courtroom.  We

22  could have either discharged him where he wouldn't have heard

23  testimony today, or delayed the trial for a day for him to

24  come back tomorrow.  The decision was made by the parties to

25  allow this to proceed in the matter it did, but one thing you

1  didn't get to do is watch that juror, his reaction to

2  evidence, make sure he was being attentive, which I'm sure he

3  was, but you have that ability with the screen and such that

4  we could have watched him, but it is not the preferred way of

5  proceeding with a trial.  Have you had a chance to discuss

6  this with your lawyers and are you waiving any objection you

7  have to the procedure we conducted today?

8             DEFENDANT SHAH:  I have, and I do, Your Honor.

9             THE COURT:  All right.  As to Ms. Agarwal, have you

10  had a chance to talk this over with your lawyers, and do you

11  agree to the procedure we followed today which I have just

12  outlined?

13             DEFENDANT AGARWAL:  Yes, Your Honor.

14             THE COURT:  Okay.  And Mr. Purdy?

15             DEFENDANT PURDY:  Yes, Your Honor, I approve.

16             THE COURT:  Okay.  All right.  Well, then I think is

17  there any additional colloquy that the government wants me to

18  conduct with the defendants on this waiver?

19             MR. HANKEY:  No, Your Honor.

20             THE COURT:  Okay.  I should note that in the Ninth

21  Circuit, the case of *U.S. v. Edward Knight*, which is at 56

22  F.4th 1231, a Ninth Circuit case, 2023, this exact problem

23  came up.  The Court allowed a juror who was absent to hear

24  testimony, who was ill to continue to hear testimony as long

25  as he could see the witness, see the documents, hear the

1  lawyers, and the Court confirmed that he could, and the

2  defendant gave a waiver similar to the one I just obtained

3  from the defendants, and the Ninth Circuit upheld that

4  procedure as proper.  But going forward, I'm not sure I'm

5  going to do it.  In fact, I doubt it.  I think it's not the

6  best practice.  And it was acceptable today because the

7  parties have agreed to it and consented to it, but I think we

8  have 19 prospective jurors for a reason.  And going forward,

9  absent something extraordinary, I will likely either recess

10  the trial to allow a juror to come in the next day if they're

11  ill or discharge the juror and proceed with the remaining

12  jurors.  We'll address that when it comes up, but that's the

13  way I'm going to go forward.

14          Anything else anyone wants to talk about on that

15  subject?

16          MR. POULOS:  Your Honor, may I just have a moment to

17  confer with counsel?

18          THE COURT:  Sure.

19      (Counsel conferring.)

20          MR. POULOS:  Your Honor, could the Court tomorrow

21  morning conduct a colloquy with this juror just to confirm

22  that he was able to hear all the testimony, the entire

23  proceeding, that he watched the entire proceeding, that

24  throughout that he was able to see all the exhibits?

25          THE COURT:  I have no problem with that.

1        Any objection by the government?

2        MR. HANKEY:  No objection.

3        THE COURT:  Okay.  I don't want to do that in the

4    courtroom.  And if you're satisfied I conduct that colloquy

5    outside the presence of the other jurors in the hallway with

6    him with my law clerk as a witness, I think that --

7        MR. POULOS:  That would be fine, Judge.

8        THE COURT:  If you're fine with that procedure, I'd

9    rather do it that way.  It doesn't need to be on the record.

10   I'll report to you what I learned on the record, but there's

11   no need to single out this juror who --

12       MR. POULOS:  Correct.

13       THE COURT:  -- as you all know when we spoke to him

14   on the phone was very happy that he was being given the

15   opportunity to participate this way, those of you that went

16   back to chambers.  So this was not a reluctant juror who

17   didn't want to serve.  He wanted to serve and was very unhappy

18   that he couldn't because of the illness which happily I think

19   he's over.

20       MR. POULOS:  That was my assessment as well,

21   Your Honor, on the call, that he wanted to serve and was happy

22   that the Court accommodated this today.

23       THE COURT:  Okay.  Very good.  That's all we need to

24   say on this subject unless anyone else wants to raise

25   anything?

1      Okay.  What else do you want talk about now?  I think

2   the -- by the way, my courtroom deputy told him if he took any

3   notes today to bring them down to court.  We'll give him a

4   stapler or a paper clip so he can attach them to his notepad

5   and to -- and they'll then remain locked up in the jury room

6   every night just like all the other jurors' notes.

7      Okay.  There was some back and forth about the

8   procedure on admitted documents.  Ms. Chou sent an e-mail

9   about a change in the procedure where I had noted that I don't

10  think it's appropriate to have documents that are although

11  admitted in evidence were never referred to by the parties go

12  back to the jury.  If you disagree with that, I'll hear your

13  argument, but my thought would be that we conditionally admit

14  all the exhibits that you've agreed should come in and then

15  decide those that go back to the jury later of -- would be

16  those that actually were presented to the jury in one form or

17  another.

18      If you think that the jury can see -- have further

19  review of documents you never referred to during the case,

20  that's unusual.  I'm not sure I would allow it.  But I would

21  hear argument on why you think it should happen.

22      MR. HANKEY:  Your Honor, that, what you just

23  described, is generally fine with us.  Is it okay if we look

24  at the -- a written procedure rule and then let you know --

25      THE COURT:  Sure.

1    MR. HANKEY:  -- either this evening or in the morning
2    if we have any comments?
3    THE COURT:  Yeah.  What I'd like to have happen, as
4    you know because of the volume of exhibits, is a document
5    similar to the one prepared by the government which notes the
6    various exhibits that are admitted, admitted over objection,
7    or admitted without objection, docketed, and then I would
8    simply say docket entry 15 reflects the state of the exhibits,
9    and they're all admitted per that, what is in effect an agreed
10   statement of admission.  But I need to -- I need you to
11   propose a proposal that works for all of you so that I'm not
12   having you do unnecessary work.  I thought today went very
13   smoothly compared to other days because we weren't going
14   through that ritual of seeking admission of exhibits that had
15   a standing objection or no objection.
16        And so to the extent we can memorialize that, we have
17   to.  There has to be a record of what's in and what's -- and
18   there has to be a preservation of objections beyond the
19   standing objection.  But to the extent you could find a way to
20   memorialize that, then I think that's going to be the way we
21   have to go forward.  And I thought you were getting close to
22   that.
23        MS. CHOU:  Yes, I think Your Honor's suggestion makes
24   sense.  Conditionally admitted sounds like good language for
25   that, and so we can continue with the filing.  And then just

1  in terms of what's actually admitted for purposes of the jury,

2  we'll exchange those lists at the end of each day as we've

3  been doing for what's been mentioned.  That would be -- those

4  will be the exhibits admitted into the record.

5           THE COURT:  If you disagree about the idea of the

6  jury getting exhibits that are admitted in evidence that the

7  parties ended up not using for whatever reason on cross or

8  direct, the choice was not to use it because of situations

9  involving witness answers, if you think those exhibits still

10 ought to go to the jury, I need to know why and what authority

11 there is for that.

12          MR. HUESTON:  My position is completely consistent

13 with what you've set forth.

14          THE COURT:  All right.  Because otherwise what's the

15 point?

16          MR. HUESTON:  We agree.

17          MR. HANKEY:  I agree, Your Honor.

18          THE COURT:  I can't just do a document dump on the

19 jury when there's never been an examination about it.

20          MR. HUESTON:  Agreed.

21          MR. POULOS:  Judge, I think the way that we've been

22 handling the process and the way it's evolved is a really good

23 one.

24          My only request, Judge, is that the government --

25 that they be admitted on a witness-by-witness basis as opposed

1  to admission now of witnesses that are coming, you know --

2       THE COURT:  I think that you asked for that earlier,

3  and I heard argument on it and I said that's not necessary.

4  So it was without prejudice, but it's denied again.

5       MR. POULOS:  Okay.

6       THE COURT:  They're giving you the exhibits for a

7  week.  And I'm confident you all know with some level of

8  certainty which exhibits are coming in with which witness, not

9  always, but I'm pretty sure this is not a mystery to you.

10      MR. POULOS:  Your Honor, the reason for that is

11 simply that we get a list of exhibits with a very short

12 turnaround time while we're also preparing cross-examinations

13 and the like and that when you sit down and focus on a witness

14 four witnesses down the road, you -- they see and discover

15 other issues.  So may we at least, Your Honor, if there -- as

16 Ms. Chou used the word conditionally admit, I'm fine with

17 that, but I would like the right to raise any additional

18 challenges before it is shown to any particular witness.

19      THE COURT:  Well, that's fine.

20      MR. POULOS:  I don't want to waive the issue.

21      THE COURT:  No, but if there's an objection that is

22 not part of all the things you've agreed to on those charts

23 that you're providing on Sunday night or Sunday afternoon,

24 you're free to raise that in court.  I'm not cutting anybody

25 off.

1    Let me say one other thing, too, about the course of
2    the trial.  We promised the jury 14 weeks.  I don't know if
3    our first week of jury selection counts as one of them and
4    we're already in our third week or we're in our second week.

5    I'm not going to cut off the defense or government
6    from presenting their cases.  That's simply not appropriate,
7    and you're allowed to do cross-examinations and present your
8    case without limitation.  That's your absolute right.

9    But my right to conduct the trial includes putting
10   time limits on closings.  I don't want to.  I've never done
11   it, but I will.  If this jury doesn't get the case in the time
12   we've promised them, we are being unfair to the jury.  And so
13   I'm telling this way in advance so that no one is surprised
14   later if I end up putting time limits on closings to allow for
15   them to deliberate.  And you don't want them, if they pattern
16   their life around 14 weeks, running into 15 weeks and then
17   having to deliberate into their 16th week.  That's not going
18   to be good for either side.  You want a jury that has the
19   ability to deliberate within the time period you predicted
20   this case would last.  Now, I know we didn't talk about
21   deliberations, but they ought to be getting this on the 14th
22   week, whether we're in our third week or second week right
23   now.  And if I think we're not going to -- it's not going to
24   happen, I will put time limits on closings so they can get it
25   in a reasonable time.

1        Okay.  Anything else from the government?

2        MR. HANKEY:  Yes, Your Honor.  We want to be heard on

3   a couple of things.

4        So one is the questions by Mr. Hueston about whether

5   the government showed a certain document or asked certain

6   questions on direct.

7        This is a case with many, many documents.  I mean,

8   our database has over a million records in it.  We spent two

9   hours on direct with this witness.  We fronted many issues --

10  sorry, two hours.  Two days.

11       THE COURT:  Yeah.

12       MR. HANKEY:  We wish it was two hours.  And we

13  fronted many issues.  Of course, we, you know, focused on

14  documents that Mr. Ketchum was on, things that he was aware

15  of.  If we tried to front every single thing that, you know,

16  we thought could come up on cross, the testimony would have

17  doubled in length, at least.

18       So we -- for a variety of reasons, we didn't do that,

19  and then we didn't confront things especially that he wasn't

20  on.

21       So the questions about whether things were shown on

22  direct or not suggests that there's some improper reason for

23  not covering all of this in direct, and we -- you know,

24  Your Honor, the questions just aren't appropriate.

25       THE COURT:  Okay.

1     Response?

2          MR. HUESTON:  Yeah.  Thank you.

3          So No. 1, there were a number of questions by

4     Mr. Hankey, some of which I quoted:  Did you see anything that

5     indicated Mr. Shah ever tried to honestly disclose X, went

6     beyond the documents, basically put stuff out there and said

7     this is an example of these guys committing fraud, right.  And

8     had some very quick summary testimony which, Your Honor, we've

9     objected to several times, like foundation and it's like,

10    well, you said we can go at it in cross, and we are now going

11    at it in cross.

12         I think what's been revealed with this witness, the

13    government doesn't like it, but it's the truth, is it's clear

14    to me, I've spent a lot of time on Mr. Ketchum.  He seems like

15    a pretty nice guy.  He was shown some documents.  And it's my

16    view and it's my defense that he was led to believe after

17    giving some pretty exculpatory positions that with what he saw

18    over time, okay, this is I guess -- you know, this is what I'm

19    seeing.  And what I'm illustrating is that when context

20    matters, that's our defense theme.  And when you look at other

21    things, and I'm reminding the jury, it isn't any kind of dig

22    on the government.  It's just a reminder with the witness

23    like -- and he's acknowledged, like, oh, yeah, now that I see

24    this, thank you, it's helpful.  And he's coming out in a

25    different way.  That is very appropriate, and it's been I

1  think critical testimony that is providing the truth.

2          THE COURT:  Okay.  No piling on, anything else?

3  Okay.

4          Mr. Blegen, anything else?

5          MR. BLEGEN:  I mean, they also asked this witness

6  various -- several times over objection, well, what did you

7  conclude or what did you believe someone else meant based on

8  these things.  And, for example, if they left out and never

9  showed him part of the same e-mail chain that would have

10  affected his understanding, how do we do it without saying to

11  him, and you haven't seen this before?  Otherwise we're

12  calling him a liar for something he's not lying about.  He

13  just didn't see it before.  I don't think it can be done any

14  other way.

15          THE COURT:  Yeah, unfortunately I can't think of

16  another way it can be done either.  There's a vast number of

17  documents you could show him.  I don't want you to show him a

18  thousand documents just so the defense can't get to say you

19  didn't see this document before.

20          And I think the phrasing by the defense can be

21  different.  It doesn't have to be the government didn't show

22  you this document on direct examination.  Because if that

23  happens, I'll just say, the government doesn't have to show

24  every document in existence just to avoid that question.  But

25  you're certainly allowed to ask, can I show you another

1　document different than the one you were -- that puts context

2　into an exhibit the government -- to an exhibit the government

3　showed you.  I don't know any other way to do it other than

4　I -- but the criticism of the government, I'll give a curative

5　instruction if that happens because it's not -- it's not

6　appropriate.  It's -- the universe is too large to require the

7　government to show a witness every question to avoid that type

8　of quasi-government misconduct suggestion.

9　　　　　But you're certainly free to point out documents that

10　are different, have a different -- in some ways contradictory

11　to some of the documents the government showed.  I'm not going

12　to prevent you from doing that.  That's the defense, and

13　that's appropriate.

14　　　　　But if you suggest the government somehow did this in

15　a sly or deceiving way, I'll give you a curative instruction.

16　You're on notice, don't do it that way.  It's easy enough.

17　It's just words.  But if you do that, I'll give a curative

18　instruction that you won't like.

19　　　　　MR. HUESTON:  Let me just make sure I understand.  So

20　I get that.  I want to just make sure that I'm toeing the

21　right line here.

22　　　　　With the context here, Your Honor, this isn't just

23　kind of throwing something out there.  Mr. Ketchum has

24　repeatedly stated in testimony, and it was powerful, he

25　admitted that, yeah, I did change my testimony when I -- after

1  I saw certain e-mails.

2  And so I can remove the word "government."  But I
3  think it's important at times to say, you know, this is new to
4  you, right?  This is a document you haven't seen before.  We
5  didn't see this on your direct.  You don't remember ever
6  seeing this, before I get to my next question.  And I think
7  that's fair because then he looks at it, and he goes, yeah,
8  and then he answers it.  And then --

9  THE COURT:  All except the part you didn't see it on
10  direct.  It's a new document.  You haven't seen this before.
11  Don't mention direct.  Don't mention the government didn't see
12  fit to show it to you.  And I know that's a slight variation,
13  but I think the government's objection on the score of them
14  having to show him hundreds of documents to prevent that type
15  of question which implies government deceptiveness or
16  government misconduct is a good objection.  But you can
17  certainly say, I'm going to show you a document you haven't
18  seen before, or have you seen this document before.

19  MR. HUESTON:  Right.  Do you remember seeing this
20  before?  Have you seen this before?

21  THE COURT:  That's fine.

22  MR. HUESTON:  Fine.

23  THE COURT:  And, Mr. Hankey, that may not be as far
24  as you want it to go, but that's as far as I'm going to let it
25  go.  And I think it at least removes the sting, I think the

1 unfair sting that the government is somehow hiding documents
2 from the jury.
3        MR. HANKEY:  It does, Your Honor.
4        THE COURT:  All right.
5        Okay.  Anything else?
6        MR. HANKEY:  Yeah, just one other just brief issue.
7        There was I think only one, but there was one defense
8 demonstrative that had defense -- additional defense pieces to
9 it on top of the demonstrative that we offered last week.  It
10 included our exhibit sticker on it.
11        THE COURT:  Right.
12        MR. HANKEY:  We would just ask that if the defense is
13 going to do that that they remove our exhibit sticker from it.
14        THE COURT:  Sure.  I'm sure they'll do that.  This is
15 the one of the chart that had the projected --
16        MR. HUESTON:  Sure.  I mean --
17        THE COURT:  -- screens, and you can just put a
18 different exhibit sticker on it.
19        MR. HUESTON:  We will.  But it would go up first -- I
20 think it was like a build.  So we had to establish first you
21 saw this, this was the government's thing, and then we showed
22 what we built on top.  Then I think we have to put a new
23 sticker on it --
24        THE COURT:  Right.
25        MR. HUESTON:  -- to show this is something different,

1    and we will do that.

2         THE COURT:  Okay.  Yeah.  You're not prevented from

3    using the government demonstrative.  They used it so you can

4    use it to make a point and compare it to a demonstrative you

5    prepared which is what you're doing, and that's entirely

6    appropriate.

7         Anything else from the government?

8         MR. HANKEY:  No, Your Honor.

9         THE COURT:  Okay.

10        Defendant Shah?

11        MR. HUESTON:  No, Your Honor.

12        THE COURT:  Defendant Agarwal?

13        MR. BLEGEN:  No.

14        MS. BELL:  No, Your Honor.

15        MR. POULOS:  No, Your Honor.

16        THE COURT:  Okay.

17        Mr. Hueston, how much longer do you think you have?

18   How many modules do you have and then how many --

19        MR. HUESTON:  You know, I will say, I've gone through

20   most of my stuff.  Of course most is 51 percent.  We started

21   at 10:30 today, Your Honor.

22        THE COURT:  I know.

23        MR. HUESTON:  I actually think I would have been

24   pretty, you know, kind of rounding the bend there if we had

25   started at 9:00.  So I'm going to go back tonight and see what

1   else I can cut.  But, you know, I'm always cautious, a couple

2   of hours, three.  You know, the Humira campaign is a big

3   campaign.  I've got to get through that.  That's the biggest

4   chunk.

5           THE COURT:  All right.

6           MR. HUESTON:  But, you know, that's about it.

7           MR. HANKEY:  Your Honor, it would be useful for us to

8   know when, roughly speaking, understanding that there's a lot

9   in flex, but roughly when we may be back on redirect.  We'll

10  of course disclose our redirect exhibits.

11          THE COURT:  Well, my next question was Mr. Blegen,

12  you're doing the cross.

13          MR. BLEGEN:  Yes.

14          THE COURT:  You've been piping up on objections so I

15  assume you're doing the cross.

16          MR. BLEGEN:  Yes.

17          THE COURT:  How long do you think you'll be?

18          MR. BLEGEN:  Multiple hours.

19          THE COURT:  Okay.

20          MR. BLEGEN:  I'm notoriously bad at gauging how long

21  I will be, but it's usually longer than I think.

22          THE COURT:  Okay.

23          MR. BLEGEN:  So multiple hours.

24          THE COURT:  Keeping in mind -- and, of course, you're

25  not going to repeat anything prior counsel did unless it's

1  unintentional.

2  MR. BLEGEN:  I'm not intending to repeat anything

3  prior counsel did, but I still have to wait and see what's

4  coming.

5  THE COURT:  Sure.

6  And, Mr. Poulos, are you doing the cross?

7  MR. POULOS:  Mr. Pruitt is.

8  THE COURT:  Mr. Pruitt.

9  MR. PRUITT:  I am, Your Honor.  Thankfully

10  dramatically shorter I think for us.

11  THE COURT:  Okay.

12  MR. PRUITT:  Maybe 30, 35 minutes, I think.

13  THE COURT:  Great.  Well, you may get to redirect

14  tomorrow, so you know.  And if it carries over into the night

15  then you'll finish your redirect Wednesday morning.

16  MR. HUESTON:  Yeah.  And we're happy -- I'm always

17  happy to provide a good faith update at any time, and I think,

18  you know, Mr. Hankey was kind enough to do that himself.

19  THE COURT:  Sure.

20  MR. HUESTON:  And we'll continue to do that.

21  THE COURT:  Okay.  And my rule is, this is not

22  unusual, but I'm going to try and strict -- try and keep to

23  the rule, I'm not sure I did with the first witness, but keep

24  to the rule that redirect cover matters on cross, not raise

25  new matters, and recross and then the continuous drip of

1 re-redirect and re-recross be limited to the questions and

2 answers that preceded it. And I think in an effort to move

3 the case along and follow the rules, I may be -- you should

4 know that will likely be an objection that will be sustained

5 if it's something I hadn't heard of that's new that doesn't

6 really have any relation to the earlier cross or direct.

7 Secondly, too, you should know on redirect, and I

8 think you know this, redirect doesn't mean you can lead. It's

9 still direct examination. But you can lead to get to a topic

10 with substantive testimony. The rules relating to an adverse

11 witness don't come off the table on redirect because it's

12 still direct examination essentially.

13 MR. HANKEY: Yes.

14 THE COURT: And I think you followed that on the last

15 witness, but that should be followed throughout the trial.

16 MR. HANKEY: Yes.

17 THE COURT: Okay. Anything else?

18 See you all tomorrow morning. I have a criminal

19 matter at 8:45. Absent a need to address exhibits coming up

20 tomorrow, why don't you come here at 8:45, be a little quiet

21 when you come in because I'll have a matter on the phone. But

22 if problems arise overnight, watch the e-mails. We may ask

23 you to come in at 8:30. Otherwise, 8:45.

24 Thank you.

25 MR. HUESTON: Thank you.

1388

1          MR. HANKEY:  Thank you, Your Honor.

2        (Trial adjourned until 8:45 a.m., 2/7/23.)

3

4                        CERTIFICATE

5       I certify that the foregoing is a correct transcript from

6  the record of proceedings in the above-entitled matter.

7  */s/ Elia E. Carrión*        *7th day of February, 2023*

8  *Elia E. Carrión*               *Date*
   *Official Court Reporter*

9

10  */s/ Joseph Rickhoff*        *7th day of February, 2023*

11  *Joseph Rickhoff*               *Date*

12

13  */s/ Kathleen M. Fennell*    *7th day of February, 2023*

   *Kathleen M. Fennell*         *Date*

14

15  */s/ Kelly M. Fitzgerald*    *7th day of February, 2023*

16  *Kelly M. Fitzgerald*           *Date*

17

18

19

20

21

22

23

24

25