1389

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2               EASTERN DIVISION

3    UNITED STATES OF AMERICA,        )
                                      )   Docket No. 19 CR 864
4                    Plaintiff,       )
                                      )   Chicago, Illinois
5        v.                           )   February 7, 2023
                                      )   8:58 a.m.
6    RISHI SHAH, SHRADHA AGARWAL,     )
     BRAD PURDY,                      )
7                                     )
                     Defendants.      )
8

9        TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 6A
        BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11   APPEARANCES:

12
     For the Government:    MR. MATTHEW F. MADDEN
13                          MR. SAURISH APPLEBY-BHATTACHARJEE
                            Assistant U.S. Attorneys
14                          219 South Dearborn Street, 5th Floor
                            Chicago, Illinois  60604
15

16                          MR. WILLIAM E. JOHNSTON
                            MR. KYLE C. HANKEY
17                          U.S. Department of Justice
                            Criminal Division, Fraud Section
18                          Washington, D.C.  20530

19

20

21

22                  ELIA E. CARRIÓN
                   Official Court Reporter
23             United States District Court
           219 South Dearborn Street, Room 1432,
24              Chicago, Illinois 60604
                    (312) 408-7782
25           Elia_Carrion@ilnd.uscourts.gov

```
 1   APPEARANCES (Continued:)

 2
     For Defendant
 3   Shah:                        MR. JOHN C. HUESTON
                                  Hueston Hennigan LLP
 4                                620 Newport Center Drive, Suite 1300
                                  Newport Beach, California  92660
 5
                                  MS. VICKI CHOU
 6                                MR. MICHAEL H. TODISCO
                                  MS. KAREN DING
 7                                Hueston Hennigan LLP
                                  523 West 6th Street, Suite 400
 8                                Los Angeles, California  90014

 9
     For Defendant
10   Agarwal:                     MS. KOREN L. BELL
                                  MR. A. ALEXANDER LOWDER
11                                MR. STEPHEN G. LARSON
                                  Larson LLP
12                                555 South Flower Street, Suite 4400
                                  Los Angeles, California  90071
13
                                  MR. PATRICK W. BLEGEN
14                                MS. KELSEY H. KILLION
                                  Blegen & Garvey
15                                53 West Jackson Boulevard, Suite 1437
                                  Chicago, Illinois  60604
16
17   For Defendant
     Purdy:                       MR. THEODORE T. POULOS
18                                MR. ERIC PRUITT
                                  MR. JOHN PAVLETIC
19                                Cotsirilos, Tighe, Streicker, Poulos &
                                  Campbell, Ltd.
20                                33 North Dearborn Street, Suite 600
                                  Chicago, Illinois  60602
21

22

23

24

25
```

1    (Proceedings held in open court; outside the presence of

2    the jury.)

3    THE COURT:  All right.  I spoke to Mr. Santiago in

4    the hallway with my law clerk as a witness, and Emily was

5    there.  And Mr. Santiago indicated he could see and hear

6    everything that occurred in court yesterday.  He said he was

7    attentive, he paid as much attention to it as if he were in

8    the courtroom.  He didn't take any breaks when we weren't

9    breaking.

10   And I was satisfied based on his answers that he

11   fully participated as a juror yesterday remotely.  As I said,

12   I doubt we're going to do this again, but the defense

13   requested I have that colloquy with him, and I'm satisfied

14   that he fully participated as a juror remotely yesterday.

15   Any additional questions on that or objections to the

16   procedure?

17   First, the government?

18   MR. HANKEY:  No, Your Honor.

19   THE COURT:  Defense?

20   MR. HUESTON:  No, Your Honor.

21   MS. BELL:  No, Your Honor.

22   MR. POULOS:  No, Your Honor.

23   THE COURT:  Okay.  Are we ready to proceed?

24   MR. HUESTON:  Yes, Your Honor.

25   MR. HANKEY:  May I confer with Mr. Hueston?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 4 of 311 PageID #:13949
Ketchum - cross by Hueston
1392

1    THE COURT:  Yeah, we have a minute or two while the

2    jury lines up.

3        (Counsel conferring.)

4        MR. HUESTON:  Okay.  We're ready.

5        THE COURT:  Okay.  We've texted the court security

6    officer -- Emily is, and we'll get going.

7        (Pause in the proceedings.)

8        (Jury in at 9:04 a.m.)

9        THE COURT:  All right.  Please be seated.

10        Good morning, ladies and gentlemen.  Welcome back.

11        Mr. Ketchum, you're still under oath.  Do you

12    understand?

13        THE WITNESS:  Yes, Your Honor.

14        THE COURT:  Okay.  Mr. Hueston, you may continue your

15    cross-examination.

16        MR. HUESTON:  Yes, Your Honor.  I guess we're waiting

17    for...

18        (Counsel conferring.)

19        JASON KETCHUM, GOVERNMENT WITNESS, PREVIOUSLY SWORN

20                CROSS-EXAMINATION [resumed]

21    BY MR. HUESTON:

22    Q.  Good morning, Mr. Ketchum.

23    A.  Good morning.

24    Q.  Okay.  We left off yesterday talking about the

25    2013 Pradaxa campaign.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 5 of 311 PageID #:13950
Ketchum - cross by Hueston
1393

1    Do you remember that?

2    A.  Yes.

3    Q.  Okay.  And just to reorient us --

4         MR. HUESTON:  Let's pull up GX1133L.

5    BY MR. HUESTON:

6    Q.  And we've seen this, right?

7         We looked at it, and you walked through this last

8    week, right?

9    A.  Yes.

10   Q.  Okay.  And you see that this is a version of the chart

11   based on a weighted average --

12   A.  Yes.

13   Q.  -- campaign?

14        Okay.  And you'll recall, again to orient, that we

15   reviewed emails yesterday like the one from CFO Demas to the

16   senior management team Listserv that, in fact, described to

17   them that Pradaxa was a weighted average campaign.

18        Remember that?

19   A.  Yes.

20   Q.  All right.  So let's reorient on how this chart was put

21   together.

22        MR. HUESTON:  Let's go to GX194.

23   BY MR. HUESTON:

24   Q.  And let's go to the bottom of this page.

25        And this is an email that you were on there, right,

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 6 of 311 PageID #:13951
Ketchum - cross by Hueston
1394

1    from you?

2    A.  Yes.

3    Q.  Okay.  And at the bottom, it says -- you listed here

4    708 offices and 800 screens, right?

5    A.  Yes.

6    Q.  And you remember yesterday we reviewed a bunch of

7    documents where people were talking about this in terms of

8    screens, right?

9    A.  Yes.

10   Q.  Including on invoices, right?

11   A.  Yes.

12          MR. HUESTON:  Okay.  So let's go back to GX1133.

13   BY MR. HUESTON:

14   Q.  And this was plotted out in terms of offices, right?

15   A.  Yes.

16   Q.  Not screens.

17          MR. HUESTON:  So now I want to go to DX10227.

18   BY MR. HUESTON:

19   Q.  And -- oops not quite there yet.

20          And what I want to do here is now plot this out in

21   terms of screens.

22          So we went over the first one, GX194.  You see that?

23   A.  Yes.

24   Q.  And I've put a green X representing 800 screens, right?

25   A.  Yes.

1  Q.  Okay.  And, sir, you can see I've pulled out other

2  exhibits, GX205, 221, 247, which you reviewed last week.  And

3  those have references to screens in the numbers presented

4  there.

5         Does that look about right to you?

6  A.  Yes.

7  Q.  Okay.  And, sir, looking at this chart, in terms of

8  screens, Outcome is still not quite on pace.  But if you're

9  looking at it in terms of screens, it's closer than the

10 trajectory based on offices, right?

11 A.  Yes.

12 Q.  Okay.  And, sir, you do realize -- or do you remember

13 there were significant hurdles in this campaign caused by the

14 client?

15        Do you remember that?

16 A.  I do.

17 Q.  Okay.  You did testify last week that the campaign, to

18 your recollection, was anticipated to begin in January 2013,

19 right?

20 A.  Yes.

21 Q.  And the documents that you looked at last week showed the

22 client failing to get Outcome the advertising material on time

23 for a January start.

24        You remember that?

25 A.  Yes.

 1   Q.  Okay.  And, in fact, due to this client delay, the

 2   campaign didn't end up starting until April, right?

 3   A.  Yes.

 4   Q.  All right.  And by the way, the delivery chart --

 5         MR. HUESTON:  Let's go to GX1134.

 6         There we go.  Okay.

 7   BY MR. HUESTON:

 8   Q.  Well, do you remember -- putting this aside, the technical

 9   difficulty aside -- do you remember there was a delivery chart

10   that tracked through about August; it ended in August?

11   A.  Yes.

12         MR. HUESTON:  Okay.  That's all I needed to get.

13   BY MR. HUESTON:

14   Q.  Sir, were you aware, in fact, that the campaign actually

15   was paused on July 16, 2013, while Outcome waited for the

16   client to change advertising for the campaign?

17   A.  Yes.

18         MR. HUESTON:  Okay.  And, in fact, let's go to

19   DX10184.

20   BY MR. HUESTON:

21   Q.  All right.  And let's go down to where it says

22   "BI Pradaxa."

23         And it says here:  "Went live April 1.  Then dark

24   July 16 until September 1.  Creative change."

25         You see that?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 9 of 311 PageID #:13954
Ketchum - cross by Hueston
1397

1    A.  Yes.

2    Q.  And you recall that was a time while -- that was the

3    time period where Outcome was waiting for the client to

4    change, right?  Change advertising?

5    A.  Yes, appears that way.

6    Q.  And the client was aware that the campaign remained dark

7    through at least September 10, 2013, due to their own delays

8    on providing new ads to Outcome.

9         Were you aware of that?

10   A.  No.

11        MR. HUESTON:  Okay.  Let's go to DX10185, at 4.

12   BY MR. HUESTON:

13   Q.  And if we look at program period, it states here:

14   "Campaign went dark across physician office waiting rooms from

15   July 19, 2013, through September 10, 2013, due to creative

16   delays."

17        Remember that -- or you see that, rather?

18   A.  I see that.

19   Q.  Okay.  Now, you went through invoices for these months

20   last week, right?

21   A.  Yes.

22   Q.  And you're aware from that that the client wanted to

23   continue to pay Outcome, despite the fact that there was this

24   dark period caused by the delay, right?

25   A.  I believe so.

Ketchum - cross by Hueston

1   Q.  You see that?

2   A.  Yes.

3   Q.  Okay.  And given your role at Outcome at the time, you

4   weren't aware of this dark period, right?

5          That wasn't something you'd be aware of at the time?

6   A.  No.

7   Q.  No, you weren't aware?  Just making sure.

8   A.  Oh, yeah, correct.

9   Q.  Okay.  So let's add these facts now to the demonstrative,

10  DX10228.

11         And here, sir, we've added the early delay and the

12  dark period now reflected on the chart, right?

13  A.  Yes.

14  Q.  Okay.  And you agree that adding these facts makes the

15  picture look a little more complicated, right?

16  A.  It does.

17  Q.  All right.  So looking at this chart, sir, is it fair to

18  say the campaign didn't go as planned by anyone?  Is that

19  fair?

20  A.  Correct.

21  Q.  All right.  Now, as you alluded to last week, there is a

22  mechanism in these campaigns to make up when a campaign

23  doesn't go as planned, right?

24         It's called a make-good?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 11 of 311 PageID #:13956
Ketchum - cross by Hueston
1399

1 Q. And I think you testified in this case, you didn't know

2 either way if there was a make-good or not, right?

3 A. Correct.

4 Q. All right. And in fact, the only two campaigns you recall

5 working on when you were in sales when there were delivery

6 problems, you recalled that there were make-goods provided,

7 right?

8 A. Yes.

9 Q. And you're aware, sir, that from the very beginning in

10 this campaign -- or maybe you weren't -- there was a potential

11 make-good discussed as part of this campaign?

12 Were you not aware?

13 A. I was not aware.

14 Q. Okay.

15 MR. HUESTON: Let's go to DX10186.

16 BY MR. HUESTON:

17 Q. And this is an email chain between Mr. Mons, Mr. Shah, and

18 client reps at RJ Palmer.

19 Do you see that?

20 A. I do.

21 Q. All right. And going to the bottom of page 3, we're going

22 to go to the start of a December 6th email from Mr. Mons.

23 You see that?

24 A. Yes.

25 Q. And then if we go to page 4, middle of the paragraph,

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 12 of 311 PageID #:13957
Ketchum - cross by Hueston
1400

1　Mr. Mons writes -- and I'll highlight this:  "In addition --

2　in addition, the responses to your additional questions from

3　12/15 are included below."

4　　　　　You see that?

5　A.  Yes.

6　Q.  And then let's go to Question 2 from the client.

7　　　　　"Question 2 from the client:  In your proposal, you

8　are guaranteeing a 3:1 ROI.  What will the outcome be in terms

9　of pricing and make-goods should you not be able to deliver on

10　this?"

11　　　　　Do you see that?

12　A.  Yes.

13　Q.  And there's an answer provided, right?

14　A.  Yes.

15　Q.  "Run it at no charge until we hit 3:1."

16　　　　　Do you see that?

17　A.  I do.

18　Q.  All right.  And you're aware, sir, that given -- putting

19　this document aside -- given client-caused delays and dark

20　periods and anticipated shortfall, Outcome -- or maybe you

21　weren't aware -- Outcome began planning to make a make-good

22　here?

23　　　　　Were you aware of that or not?

24　A.  I was not.

25　　　　　MR. HUESTON:  All right.  Let's go to DX10187.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 13 of 311 PageID #:13958
Ketchum - cross by Hueston
1401

1    BY MR. HUESTON:

2    Q.  And we'll go to --

3              MR. HUESTON:  For the record, it's an email from

4    Mr. Mons to Geetha Gopal.  And subject:  "ContextMedia

5    follow-up."

6    BY MR. HUESTON:

7    Q.  You see that?

8    A.  Yes.

9    Q.  And we're going to go into the email here from Mr. Mons.

10             And he writes -- and Mindshare World, you knew that

11   as a client rep, right?

12   A.  Yes.

13   Q.  Okay.  And he writes:  "Hi, Geetha.  I know we discussed

14   the cure for an ROI deficiency when we met yesterday.  I

15   wanted to put in a note so there is no confusion.  I have CC'd

16   Tom -- Lyndon and Tom at RJP so it is not overlooked with the

17   2014 insertion order."

18             Do you see that?

19   A.  Yes.

20   Q.  And so you weren't aware, 'cause you weren't on this email

21   chain, that Mr. Mons is communicating to the client about a

22   make-good, right?

23   A.  Yes.

24   Q.  Okay.  And then he writes:  "Because of the delayed start

25   this year and the suspension due to this creative change, we

1    will not have data on the 2013 sponsorship until

2    February of 2014.  However, as we discussed, the 2014

3    sponsorship commitment will need to be finalized in early

4    October 2013.

5         "To address any shortfall in our 3:1 ROI guarantee

6    for 2013, we will allow the 2014 contract to be suspended

7    after June 2014 so we can run any necessary make-good spots

8    beginning in July 2014."

9         Do you see that?

10   A.  I do.

11   Q.  Okay.

12        MR. HUESTON:  We can put that aside.

13   BY MR. HUESTON:

14   Q.  And, sir, you agree up through this point, there's no

15   secret to the client or at Outcome that this campaign's having

16   problems, right?

17   A.  Correct.

18   Q.  Okay.  It didn't meet either side's expectations.  Fair

19   statement?

20   A.  Yeah.

21   Q.  All right.

22   A.  Yes, fair statement.

23        MR. HUESTON:  And let's go now to DX6211.

24   BY MR. HUESTON:

25   Q.  And you're not on this email, but this is a September 20,

1  2013, email from Mr. Mons to the Pradaxa client, copying

2  Mr. Desai.  And the subject is "Pradaxa 2013 proposal and

3  2012 comparison analysis."

4           You see that?

5  A.  Yes.

6  Q.  And let's go to page 4.

7           And you can see that there's list-match results here,

8  right?

9  A.  Yes.

10  Q.  Okay.  And I think as we saw you say earlier, apart from

11  this document, it wasn't uncommon to rerun a list match at

12  various times during the year, right?

13  A.  Correct.

14  Q.  Okay.  In fact, again, separate from this document, I

15  believe you said that you might be rerunning a match every

16  week for Pradaxa, right?

17  A.  Yes.

18  Q.  Okay.  So in fact, here, sir, look at -- so there's a

19  list match here, you see.

20           And it's going to the client, right?

21  A.  Yes, appears that way.

22  Q.  And it's different from the numbers -- different from and

23  lower than the 1,819 site match that was discussed earlier,

24  right?

25  A.  Can I just have a quick moment to review the document?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 16 of 311 PageID #:13961
Ketchum - cross by Hueston
1404

1    Q.  Sure.

2    A.  Thank you.

3           Yes, it appears that way.

4    Q.  Okay.  The total's only 915, right?

5    A.  Yes.

6    Q.  Okay.  And regardless of what the correct match is, this

7    deck discloses that there were only 753 sites live as of that

8    day, with only 850 planned by July --

9           MR. HANKEY:  Your Honor, objection.  The witness is

10   not on this email and cannot interpret that.

11          MR. HUESTON:  Okay.  Well, let me just go to page 5,

12   and I'll just ask what it says.

13          Withdraw the question.

14          THE COURT:  All right.

15   BY MR. HUESTON:

16   Q.  So going to page 5, it says:  "List-match results for

17   2013."  Right?

18   A.  Yes.

19   Q.  Okay.  And there's a header saying "Discussion," right?

20   A.  Yes.

21   Q.  And Bullet 2 says:  "753 sites live today."  Right?

22   A.  Yes.

23   Q.  And then it says:  "850 live by January 1, 2014."  Right?

24   A.  Yes.

25   Q.  All right.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 17 of 311 PageID #:13962
Ketchum - cross by Hueston
1405

1    MR. HUESTON:  Okay.  We can put that aside.
2  BY MR. HUESTON:
3  Q.  And then, sir, are you aware or are you not aware that
4  based on this set of continued discussions with the client, it
5  was determined that given Pradaxa's own errors, there was not
6  a trigger for a make-good?
7        Are you aware of that or not?
8  A.  I was not.
9  Q.  Okay.
10    MR. HUESTON:  Let's go to DX10188.
11  BY MR. HUESTON:
12  Q.  And this is a February 26, 2014, email from
13  Daniel Schwartz at Outcome to Mr. Desai and Mr. Mons.
14  Subject:  "High-priority time-sensitive Pradaxa July to
15  December proposal."
16        You see that?
17  A.  I do.
18  Q.  And in the email in the middle of the page from Mr. Mons,
19  he writes in the second paragraph:  "Please remember they
20  cannot trigger a make-good on our ROI guarantee for
21  2013 without at least six months of measured data.
22        "So we are cool for not on 2013 ROI as AD finessed a
23  four-month read per Brett.  So for now, the 2013 guarantee
24  does not appear to be an issue and has not come up since our
25  research discussion on February 18?"

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 18 of 311 PageID #:13963
Ketchum - cross by Hueston
1406

1    You see that?

2  A.  I do.

3        MR. HUESTON:  We can take that down.

4  BY MR. HUESTON:

5  Q.  And, sir, you've agreed, apart from these documents, that

6  doing make-goods and discussing those with clients, that's the

7  good thing to do, the right thing to do, right?

8  A.  Yes.

9  Q.  And you understand that the prospect of an ROI shortfall

10  and lower expected delivery were disclosed to the client here,

11  right?

12  A.  Yes.

13  Q.  And it's not your testimony, sir, that Mr. Shah,

14  Ms. Agarwal, or Mr. Purdy are responsible for even a client's

15  own errors, right?

16  A.  That's correct.

17  Q.  Okay.

18        MR. HUESTON:  We can move on.

19  BY MR. HUESTON:

20  Q.  Let's talk -- let's talk now about Humira.  That was a

21  topic of some testimony last week.

22        You remember that?

23  A.  Yes.

24  Q.  And again to orient, Humira is a pharmaceutical brand for

25  rheumatology diseases, right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 19 of 311 PageID #:13964
Ketchum - cross by Hueston
1407

1   A.  Yes.

2   Q.  And before we talk about the details of that campaign, I

3   just want to ask you some questions about the rheumatology

4   category.

5           Sir, you recall in Outcome's early years, Outcome had

6   a separate rheumatology network, right?

7   A.  Yes.

8   Q.  And when Outcome was selling rheumatology campaigns like

9   Humira during that period, it had initially assumed that it

10  was going to have quick growth in that area, right?

11  A.  Yes.

12  Q.  And at that time, you witnessed real growth at Outcome,

13  right?

14  A.  Absolutely.

15  Q.  So, for example, sir, from 2011 to 2015, you recall that

16  Outcome experienced roughly over 200 percent year-over-year

17  growth in some areas, right?

18  A.  Yes.

19  Q.  Now, last week you testified, I believe, that rheumatology

20  specialty -- it turned out to be difficult to grow, right?

21  A.  It did.

22  Q.  Despite those initial expectations it was going to take

23  off?

24  A.  Yes.

25  Q.  All right.  Now, one of the challenges that you folks

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 20 of 311 PageID #:13965
Ketchum - cross by Hueston
1408

1   learned with this, with rheumatology, was that those offices

2   had been inundated with phone calls from competitors, right?

3   A.  Yes.

4   Q.  And now, despite the specific challenges associated with

5   rheumatology, by 2012, Outcome had some initial success,

6   creating at that point what was the largest point-of-care

7   rheumatology growing network among its competitors, right?

8   A.  Yes.

9   Q.  All right.

10       MR. HUESTON:  So let's go to CX10085.

11  BY MR. HUESTON:

12  Q.  All right.  And we can see at the top, this is an email

13  from you to Mr. Shah.  And it's dated July 10, 2012, right?

14  A.  Yes.

15  Q.  All right.  And let's go to what Mr. Shah writes in the

16  email below:  "The next year" -- and we'll highlight this --

17  "the next year will tell if my feeling is accurate, but I

18  haven't felt more energized by, impressed with, or proud of

19  our sponsorships since the early days of ContextMedia when

20  some of our first big sales were inked."

21       You see that?

22  A.  Yes.

23  Q.  And if we scroll to pages 2 and 3, okay, you can see here

24  that Mr. Shah is describing what it is that's making him proud

25  and impressed within the organization, right?

1    It's kind of a summary?

2   A.  Yes.

3   Q.  All right.  And back then, Mr. Ketchum, you reached out to

4   Mr. Shah with a private response, right?

5   A.  Yes.

6   Q.  Let's go to that, on page 1.  Right at the top.

7        And can you read what you wrote there?

8   A.  "Wow, got a little foggy-eyed.  That was awesome.  CM is

9   awesome.  Strong to quite strong.  Will need to get retired

10  for strong to superhuman.  Have a good flight."

11  Q.  All right.  And let's look three paragraphs down from

12  this.  Mr. Shah wrote:  "In less than two years, we built a

13  rheumatology network from scratch that is larger than the two

14  next biggest competitors combined."

15       You see that?

16  A.  Yes.

17  BY MR. HUESTON:

18  Q.  And then he continues:  "Simultaneously, we doubled the

19  size of our diabetes network.  And we did so by both beating

20  our competitors, more than a quarter of our growth is from

21  switches, but also by growing the market.  For the first time

22  ever, many leading universities and medical centers have POC

23  education because of our innovative efforts."

24       You see that?

25  A.  Yes.

Ketchum - cross by Hueston

1   Q.  So you'd agree by July 2012, Outcome is seeing growth
2   across the network, right?
3   A.  Yes.
4   Q.  Okay.  And we can put this down.
5          And you remember that around July 2012 -- I realize
6   this is a long time ago -- that's roughly when discussions
7   began with the client about the 2013 Humira campaign.
8          Does that sound about right?
9   A.  It does.
10  Q.  All right.  So to set the stage for the 2013 Humira
11  campaign, given the success that Outcome had seen in its other
12  networks and the initial success with rheumatology up to 2012,
13  you would agree that Outcome had a good faith reason at that
14  point to believe in its rheumatology campaigns, right?
15  A.  Yes.
16  Q.  So let's start with -- let's now get into the campaign.
17  And let's start, like we've done with the others, with whether
18  the campaign was measured in screens or offices.  Okay?
19  A.  Yes.
20  Q.  So you stated, I think last week, that your recollection
21  at the time was that it was a contract that called for
22  offices, right?
23  A.  I believe so, yes.
24  Q.  All right.  And again, at that point in your career, you
25  actually weren't involved in selling pharma contracts, right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 23 of 311 PageID #:13968
Ketchum - cross by Hueston
1411

 1    A.  Correct.

 2    Q.  And you weren't in the room, then, when the contract was

 3    negotiated?

 4    A.  No.

 5    Q.  All right.  You do understand to satisfy the initial

 6    contract, Outcome only needed to be on screens located in

 7    325 waiting rooms and not 325 separate offices?

 8            Did you understand that?

 9    A.  I'm not entirely sure.  I'd have to look at the agreement.

10    Q.  Okay.  Let's -- let's do that.

11            MR. HUESTON:  Let's go to GX1076.

12    BY MR. HUESTON:

13    Q.  We'll just put it up there, and I'll ask you -- this is an

14    email that attaches -- you see the attachment, Humira

15    contract?

16    A.  Yes.

17    Q.  Okay.  And let's go to the contract.

18            And just let me pause here.  Is this the first time

19    that you're seeing this?

20    A.  I believe so, yes.

21    Q.  Okay.  So let's go to where it says --

22            MR. HUESTON:  Now let's blow out that bucket below.

23    Yeah.

24    BY MR. HUESTON:

25    Q.  "Comm, market, media format, address/description."

Ketchum - cross by Hueston

1412

1      You see that?

2    A.  Yes.

3    Q.  And look under address/description, and it says:  "Digital

4    screens located in 325 rheumatologists' waiting rooms."

5           Right, sir?

6    A.  Yes.

7    Q.  Okay.  And you haven't seen this before.  So now, you see

8    this is actually for screens located in 325 waiting rooms,

9    right?

10   A.  Yes.

11   Q.  All right.  And let's go to page 7 -- I'm sorry.

12          MR. HUESTON:  Let's go to GX148 to look at the

13   invoices.

14   BY MR. HUESTON:

15   Q.  Okay.  And this is you -- we -- I think you went over this

16   last week.

17          This is you were attaching some invoices sent on the

18   Humira campaign, right?

19   A.  Yes.

20   Q.  All right.  Let's go to page 3.  And here, it says:

21   "Advertising content" -- we'll blow it up -- "on

22   325 ContextMedia Health screens."

23   A.  Yes.

24   Q.  During February, right?

25   A.  Yes.

1    Q.  Okay.  And then let's go to page 7 of this document.

2         And taking a look at this, it -- this is for an

3    incremental contract, right, sir?

4    A.  It appears that way, yes.

5    Q.  The invoice is for Humira rheumatology content on

6    155 ContextMedia screens during February 2013, right?

7    A.  Yes.

8    Q.  And, in fact, right below that, it says:  "Screens are

9    additional to 325 screens per contract."  Right?

10   A.  Yes.

11   Q.  Screens, screens, and also additional.  That's

12   incremental, right?

13   A.  Yes.

14   Q.  All right.  And we can put that down.

15        And are you aware, sir, that the Outcome employees

16   who were speaking to the crest -- to the Humira client to

17   negotiate the campaign, were you aware that they were

18   referring to campaign and screens?

19   A.  No.

20        MR. HUESTON:  Let's go to GX91.

21   BY MR. HUESTON:

22   Q.  And this is a January 3, 2013, email chain between you,

23   Ms. Agarwal, Mr. Shah, and Matthew Crandall.

24        You see that?

25   A.  Yes.

1  Q.  And the subject is:  "Rheum network, number of screens."
2  Right?
3  A.  Yes.
4  Q.  All right.  Let's look at the bottom email.
5          Mr. Crandall writes to you:  "Hi, Jason.  I have a
6  call with an RA marketing client tomorrow.  We have
7  325 screens sold for Humira all year."
8          You see that?
9  A.  Yes.
10  Q.  So just for starters, Mr. Crandall is describing the
11  commitment to Humira in terms of screens, right?
12  A.  Yes.
13  Q.  Not offices.
14          And you would agree it's salespeople like
15  Mr. Crandall, and not yourself, that had those calls and
16  meetings, right, with clients?
17  A.  Yes.
18  Q.  Okay.  And by the way, he also notes:  "We are
19  projecting -- let's look at that -- we are projecting
20  819 weighted average for the year."
21          You see that?
22  A.  Yes.
23  Q.  Okay.  And Mr. Crandall's one of the three salesmen I
24  think I recall you talking about last week, right?
25  A.  That's correct.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 27 of 311 PageID #:13972
Ketchum - cross by Hueston
1415

1   Q.  All right.  'Cause it was still a pretty small company at
2   this point.
3   A.  Yes.
4   Q.  Now, so what I've just shown you is Mr. Crandall is an
5   example of a salesman, one of the three, that seems to be
6   fully aware that Outcome's selling here on projections and
7   using a weighted average approach, right?
8   A.  Yes.
9           MR. HUESTON:  All right.  So let's go to CX8508.
10       (Counsel conferring.)
11          MR. HUESTON:  Oh, I'm being told we may have lost
12  screens.
13          THE WITNESS:  Mine's dark, too.
14          THE COURT:  Still nothing?
15       (Counsel conferring.)
16          THE COURT:  Emily, if you can come in and see if you
17  can fix this.
18       (Pause in the proceedings.)
19          MR. HUESTON:  May I proceed, Your Honor?
20          THE COURT:  You may.
21  BY MR. HUESTON:
22  Q.  All right.  Okay, Mr. Ketchum, we're back on line.
23          So I put up before you CX8508.  Do you see that?
24  A.  I do.
25  Q.  All right.  And this is now a January 29, 2013,

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 28 of 311 PageID #:13973
Ketchum - cross by Hueston
1416

1  email chain between Mr. Crandall, you, Mr. Shah, Ms. Agarwal,

2  and others, right?

3  A.  Yes.

4  Q.  And the subject is:  "Humira schedule of additional RA

5  screens in 2013."  Right?

6  A.  Yes.

7  Q.  And let's go to the bottom of page 1.  And Mr. Crandall

8  writes:  "Guys, this is going to happen.  I spoke to

9  Jennifer."

10         You see that?

11  A.  Yes.

12  Q.  And you know that Jennifer was one of the Humira agents,

13  Jennifer Greufe?

14  A.  Yes.

15  Q.  Okay.  And then he writes:  "Are we ready to expand to

16  plus 155 screens starting this Friday if we get the word?"

17         You see that?

18  A.  I do.

19  Q.  All right.  So Mr. Crandall is saying right after he got

20  off the phone with the client, 155 screens, right?

21  A.  Yes.

22  Q.  Okay.  All right.

23         MR. HUESTON:  And we can put that down.

24         Let's go to CX10175.

25

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 29 of 311 PageID #:13974
Ketchum - cross by Hueston
1417

1  BY MR. HUESTON:

2  Q.  And this is an email from Mr. Mons to Mr. Shah and

3  Ms. Agarwal.  You're not on this.  Its subject:  "Humira ramp

4  forecast," dated January 23, 2013.  Right?

5  A.  Yes.

6  Q.  Okay.  So we'll just look at what Mr. Shah writes here.

7         "Hey, Bob.  Please find attached an internal RHN

8  deployment plan for the incremental campaign that SA and I

9  just did."

10         You see that?

11  A.  Yes.

12  Q.  Okay.  And then he continues:  "We have 52 deployments

13  that are in second or third waiting rooms of existing RHN

14  members."  Right?

15  A.  Yes.

16  Q.  "We're using to get a boost by April, then adding 15 per

17  month through December to get a weighted average of 110,

18  beginning with 50 and ending with 170."

19         Right?

20  A.  Yes.

21  Q.  Okay.  So setting this document aside, sir, you've heard

22  employees talk about screens as deployments sometimes, right?

23  A.  Yes.

24  Q.  Okay.  And RHN members, you've heard that being described

25  as -- a member would be like an office, right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 30 of 311 PageID #:13975
Ketchum - cross by Hueston
1418

1    A.  Correct.

2    Q.  Okay.  So going back to the document for a moment, at the

3    bottom of the email, Mr. Shah -- we'll highlight this -- says

4    that he leave it up to Mr. Mons.

5            "I'll leave that up to you as to how you want to

6    communicate to TH."

7            You see that?

8    A.  Yes.

9    Q.  "Unless SA has thought on it."  Right?

10   A.  Yes.

11   Q.  And separate from this, you know TH is Target Health

12   there, client rep at Humira?

13   A.  Correct.

14   Q.  All right.  And, sir, just to be clear, you haven't seen

15   this before today, right?

16   A.  I don't believe so, no.

17   Q.  And you haven't seen any documents at all indicating

18   Mr. Shah did not believe the contract was measured in screens,

19   right?

20           MR. HANKEY:  Objection.  Foundation.  Speculation.

21           THE COURT:  Well, it's just simply what he has seen.

22   BY MR. HUESTON:

23   Q.  Right?

24           THE COURT:  Overruled.

25   A.  I don't believe so.

Ketchum - cross by Hueston

1419

1    BY MR. HUESTON:

2    Q.  Okay.  Thank you.

3           MR. HUESTON:  Now we can put that down.

4    BY MR. HUESTON:

5    Q.  Let's move to another topic.

6           The -- I think we covered the Humira campaign in

7    2013 was supposed to start January 2013, right?

8    A.  Yes.

9    Q.  And do you recall the client was actually more than a week

10   late sending the Humira advertising content for Outcome to

11   display?

12   A.  I don't recall.

13   Q.  Okay.  Let's look at -- let me see if I can refresh your

14   recollection.

15   A.  Sure.

16          MR. HUESTON:  So just for the witness, Your Honor and

17   attorneys, if we can rig this, I'd like to put up CX10087.

18          THE COURT:  Go ahead.

19   BY MR. HUESTON:

20   Q.  And then -- yeah, I'm just going to have you read what's

21   highlighted there and ask if it refreshes your recollection on

22   that.

23   A.  Okay.  Yes.

24   Q.  So it does refresh your recollection?  Okay.

25          So you recall the campaign fell behind here, through

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 32 of 311 PageID #:13977
Ketchum - cross by Hueston
1420

 1   no fault of Outcome, right?

 2   A.  Yes.

 3   Q.  All right.

 4          MR. HUESTON:  We can put that down.

 5   BY MR. HUESTON:

 6   Q.  And you know under the contract, it was the Humira

 7   advertising agency's responsibility to timely provide

 8   advertising content to Outcome, right?

 9   A.  Yes.

10   Q.  Okay.  And do you recall, sir, that Outcome actually

11   provided a make-good of about 60 extra offices to make up for

12   the lost Humira impressions anyway?

13   A.  No, I was not.

14   Q.  Let's look at a January --

15          MR. HUESTON:  CX10088 at page 1.

16   BY MR. HUESTON:

17   Q.  All right.  And this is an email from you, at the top,

18   right?

19   A.  Yes.

20   Q.  All right.  And down below in the embedded email,

21   Ms. Agarwal writes:  "Nothing new on Bayer aspirin."  And it

22   goes on.

23          "And Humira has 325 for full year, but additional

24   60 for mid-Jan to mid-March."

25          Do you see that?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 33 of 311 PageID #:13978
Ketchum - cross by Hueston
1421

1    A.  I do.

2    Q.  And that indicates there's going to be a make-good here,

3    an extra 60 being added for that period, right?

4    A.  It's not clear if it's a make-good, but it does show an

5    extra 60.

6    Q.  Okay.  Operational issue occurred.  Outcome provided a

7    fix, right?

8    A.  Looks that way, yes.

9    Q.  Great.

10            MR. HUESTON:  We can put that down.

11   BY MR. HUESTON:

12   Q.  Now, last week -- again to orient here -- I think you

13   testified about a few issues related to the Humira campaign

14   that you recalled at that time, including under-delivery, what

15   you remembered as inaccurate invoices, and a couple of

16   affidavits you signed that you said were false.

17            Do you remember that?

18   A.  Yes.

19   Q.  Okay.  So let's go through this.

20            First, you said that you didn't believe that Outcome

21   actually had the 155 additional screens promised to Humira,

22   right?

23   A.  Yes.

24   Q.  All right.  So let's address that first.

25            MR. HUESTON:  Let's go to CX10089.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 34 of 311 PageID #:13979
Ketchum - cross by Hueston
1422

1    BY MR. HUESTON:

2    Q.  And the start to the top from Mr. Demas, right, to

3    yourself and Ms. Agarwal, right?

4    A.  Yes.

5    Q.  And the topic is Humira extension, right?

6    A.  Yes.

7    Q.  And let's look down to Ms. Agarwal's email.  And she says:

8    "Humira wants to expand their program with us.  And looking at

9    Quickbase numbers, I quoted them an additional 155 screens, as

10   they want to make it happen this quarter."

11          You see that?

12   A.  I do.

13   Q.  And, again, she's using the term "screens," right?

14   A.  Yes.

15   Q.  And you know that Quickbase was a system that showed what

16   devices were installed in what offices, right?

17   A.  Yes.

18   Q.  All right.  So she's saying:  "After looking at our

19   inventory in Quickbase, I'm quoting 155 screens."  Right?

20   A.  Yes.

21   Q.  All right.  And, you know, you didn't respond to her here

22   and say, Well, actually, I'm looking at Quickbase and it

23   doesn't show that level of inventory, right?

24   A.  Correct.

25   Q.  And you would agree, Mr. Ketchum, that -- I think you had

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 35 of 311 PageID #:13980
Ketchum - cross by Hueston
1423

1    described at one point Quickbase was a tough program.  It's a,

2    in your words, beast of a program to master, right?

3    A.  Sure.  Yes.

4    Q.  All right.  Easy to make a mistake with it, right?

5    A.  Yes.

6    Q.  Okay.  And you've testified also, I think, that

7    Ms. Agarwal was incorrect here, right?

8    A.  I believe so, yes.

9    Q.  But again, you didn't correct her here, right?

10   A.  It does not appear that way, no.

11   Q.  All right.

12          MR. HUESTON:  Let's go to GX110.

13   BY MR. HUESTON:

14   Q.  And this is another January 22, 2013, email between you,

15   Mr. Mons, Ms. Agarwal, Mr. Shah, and Mr. Crandall.

16          And the subject line is:  "Feasibility of an

17   incremental 161 offices for Humira from July to

18   December 2013."  Right?

19   A.  Yes.

20   Q.  And Mr. Mons is forwarding correspondence he had with

21   Jennifer Greufe and Yesenia Bautista at Target Health, right?

22   A.  Yes.

23   Q.  And again, you know, that's the ad agency working on

24   behalf of Humira, right?

25   A.  Yes.

1  Q.  And down below, Mr. Mons mentions that he, quote:  "Spoke

2  to Jen a few minutes ago, and she was confident that the

3  client would approve another 155 sites, bringing Humira to

4  480 screens."

5         You see that?

6  A.  Yes.

7  Q.  Again, it was Mr. Mons hot off of the phone with the

8  client, right?

9  A.  Yes.

10  Q.  All right.  Let's go down to the bottom of page 6.  And

11  Mr. -- Ms. Bautista, she writes:  "For Humira RA, we are

12  contracted for 325 offices full year.  Is this the max rheum

13  network?"

14         Do you see that?

15  A.  I do.

16  Q.  So here, Ms. Bautista's talking about offices,

17  325 offices, right?

18  A.  Correct.

19  Q.  So let's see what happens in this chain back and forth.

20         Top of page 3, Mr. Mons writes -- and this is:

21  "Hello, Jen."  Right?

22  A.  Yes.

23  Q.  "We are excited to have the opportunity to grow the

24  program, the Humira program.  When you get confirmation, we

25  will add 155 screens on February 1, bringing the total to

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 37 of 311 PageID #:13982
Ketchum - cross by Hueston
1425

1    480."

2          Do you see that?

3    A.  I do.

4    Q.  And so in this chain, you can see Mr. Mons and

5    Ms. Bautista, they're switching back and forth between screens

6    and offices, right?

7    A.  Yes.

8    Q.  They seem to be using the term interchangeably, right?

9    A.  Yes.

10   Q.  At the very minimum, there appears to be some confusion.

11         You'd give us that, right?

12   A.  Yes.

13   Q.  Okay.  Now, when you're forwarding this chain -- again,

14   let's back up here.

15         You don't say in this chain anywhere, Bob, hey,

16   you know, you're talking about adding 155 screens, but

17   actually, our commitment is for unique offices, even if those

18   offices have multiple waiting rooms and screens?

19         You didn't say that in this chain, right?

20   A.  No.

21   Q.  Instead, at the top, let's see how you signed off.

22         You wrote:  "Nice job, B."  Right?

23   A.  Yes.

24   Q.  Okay.  And now let's go back to Mr. Mons' response on

25   page 3 where he writes:  "We are happy to work with Humira

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 38 of 311 PageID #:13983
Ketchum - cross by Hueston
1426

1    from July to December on incremental screens installed."

2            You see that?

3    A.  I do.

4    Q.  "Historically, most of our growth has come in the first

5    half of the year.  I cannot say exactly what our incremental

6    growth will be from July to December, but we will work

7    aggressively to build a larger program for Humira."

8            You see that?

9    A.  I do.

10   Q.  And so you would agree that he's telling the client, hey,

11   we're doing our best to project accurately.  We'll work as

12   hard as we can, but no one can predict precisely the future,

13   right?

14   A.  Yes.

15   Q.  And so let's look at Ms. Greufe's response, which copies

16   Ms. Bautista and Mr. Shah.  And she writes:  "Hi Bob and

17   team."

18           MR. HUESTON:  Pull that out.

19   BY MR. HUESTON:

20   Q.  "Hi, Bob and team.  Thank you for your quick response.  It

21   is a shame that it wouldn't be possible to begin incremental

22   activity earlier in the year.  However, if the earliest we

23   could add offices to the program is July, we would look to add

24   161 offices from July to September."

25           Right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 39 of 311 PageID #:13984
Ketchum - cross by Hueston
1427

1   A.  Yes.

2   Q.  And so you would agree the client's response is saying, I

3   wish we could buy more and buy it sooner, right?

4   A.  Yes.

5   Q.  Okay.  She doesn't say, Hold on, you're telling me that

6   incremental growth numbers of future screens aren't always

7   exactly precise, right?

8   A.  She's not.

9   Q.  And last week, you were asked if there had been, quote,

10  "Any emails we looked at so far involving a client like

11  Ms. Bautista, or any others representing Humira, indicated

12  that they would have accepted this type of shortfall early on

13  and making it up later?"

14          You remember getting asked that question?

15  A.  I do.

16  Q.  And I think you were -- I tried to count up what you were

17  shown at that time.  I recall you were shown about three

18  emails for that testimony.

19          Does that sound about right?

20  A.  Yeah, I think so.

21  Q.  Okay.  And this is the first time you're seeing this email

22  where Mr. Mons is explaining that Outcome, quote, "Cannot say

23  exactly what our incremental growth will be," right?

24  A.  Yes.

25          MR. HUESTON:  All right.  Let's go now to CX8508.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 40 of 311 PageID #:13985
Ketchum - cross by Hueston
1428

1   BY MR. HUESTON:

2   Q.  And I know we're looking at a lot of emails, but I'll just

3   tell you this is an email we were just looking at earlier --

4   A.  Sure.

5   Q.  -- a few minutes ago, where Mr. Crandall, after speaking

6   to the client said, "155 screen extensions look likely to

7   happen and had asked if Outcome was ready to put the extension

8   into action."

9           You remember that?

10  A.  Yes.

11  Q.  All right.  And let's just pull that language out.

12          "Are we ready to expand 155 screens starting Friday

13  if we get the word?"  Right?

14  A.  Yes.

15  Q.  And Ms. Agarwal responds:  "Excellent.  If it's the same

16  creative, we should be fine on our end."  Right?

17  A.  Yes.

18  Q.  All right.  Now, last week, you testified with what you'd

19  seen then, that you didn't think this was a correct answer

20  because you thought there weren't, from your recollection,

21  155 sites available, right?

22  A.  Correct.

23  Q.  Yeah.

24          And you know that Ms. Agarwal is saying this on this

25  chain with Mr. Kemp and Mr. Postel.  Do you see that?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 41 of 311 PageID #:13986
Ketchum - cross by Hueston
1429

1    A.  Yes.

2    Q.  And you know that Mr. Kemp and Mr. Postel, they're the

3    folks who are actually going to be responsible for taking the

4    creative and pushing it out onto the system.

5         That was their role, right?

6    A.  Yes.

7    Q.  All right.  So -- so you would agree if Ms. Agarwal got it

8    wrong, there weren't 155 sites, then these guys wouldn't have

9    been able to push out a creative on July 1.

10        Fair statement?

11   A.  Yes.

12   Q.  Okay.  So let's look at what happened.

13        MR. HUESTON:  Let's go to DX3052.

14   BY MR. HUESTON:

15   Q.  And this is an email from Travis Kemp, right?

16   A.  Yes.

17   Q.  And, again, he's one of the two who's actually going to be

18   responsible for taking that creative and getting it into the

19   system, right?

20   A.  Yes.

21   Q.  All right.  And this is sent on February 1, 2013.

22   Subject:  "Weekly net tops report."

23        You see that?

24   A.  Yes.

25   Q.  And it's going to team leads.  And you were part of that

Ketchum - cross by Hueston

1430

1    Listserv, right?

2    A.  Yes.

3    Q.  You were a team lead.  Okay.

4         And by the way, there's also that SMT Listserv, that

5    senior management team.

6    A.  Yes.

7    Q.  And Mr. Shah and Ms. Agarwal were on that, right?

8    A.  Yes.

9    Q.  All right.  So again to reorient us, February 1, 2013,

10   that's the day the Humira extension was set to go live, right?

11   A.  Yes.

12   Q.  All right.  And now Mr. Kemp writes -- let's look at what

13   he writes in the fifth bullet down.

14        The Humira addition, 155 sites, was pushed out today,

15   as well as Kay's natural extension."

16        You see that?

17   A.  I do.

18   Q.  And, sir, you're not saying that Mr. Kemp is lying in this

19   email, right?

20   A.  No.

21   Q.  You just didn't remember this email, right?

22   A.  No -- correct.

23   Q.  No, you didn't remember, correct?

24   A.  Correct, yes.

25   Q.  Okay.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 43 of 311 PageID #:13988
Ketchum - cross by Hueston
1431

1    MR. HUESTON:  Let's put that aside.

2    Now, let's go to GX122.

3    BY MR. HUESTON:

4    Q.  And we'll go to a January 29, 2013, email chain from

5    Ms. Agarwal to a number of Outcome employees, including

6    yourself.  Subject, "Humira schedule of additional RA screens

7    in 2013."

8    You see that?

9    A.  Yes.

10   Q.  And let's go to page 2.

11   And we see it's January 23, 2013.  On that day,

12   Mr. Mons sends an email to Yesenia.  And that's

13   Yesenia Bautista, right?

14   A.  Yes.

15   Q.  The rep for Humira?

16   A.  Yes.

17   Q.  And one of the things Mr. Mons sends to Ms. Bautista is,

18   quote, "Excel file with current installed, plus avails for

19   February 1."  Right?

20   A.  Yes.

21   Q.  And he says it has multiple tabs.  Right?

22   A.  Yes.

23   Q.  The first tab with the current 325 Humira RA sites, right?

24   A.  Yes.

25   Q.  And the second tab with the available RA inventory, right?

1    A.  Yes.

2    Q.  All right.  Now, I believe you've already testified that

3    the file showing the 155 additional sites available on this

4    day, the January 23rd, to the client for a February 1 start

5    date may have been inaccurate because the sites were projected

6    but not installed, right?

7    A.  Yes.

8    Q.  That was your recollection at the time?

9    A.  It was.

10         MR. HUESTON:  So let's go to GX108.

11   BY MR. HUESTON:

12   Q.  And this is an email from you to Mr. Shah and Ms. Agarwal.

13   Subject, CM inventory for Humira.  Sent on January 23rd -- 22,

14   2013, right?

15   A.  Yes.

16   Q.  So this is one day before Mr. Mons sent you what he

17   described was available inventory, right?

18   A.  Yes.

19   Q.  All right.  So there's an attachment titled "CM Sites for

20   Humira 1_22_13," right?

21   A.  Yes.

22   Q.  And if we scroll through -- this is from you -- if we

23   scroll through the attachment, we see you're listing out

24   actual addresses and locations, right?

25   A.  Yes.

1   Q.  Let's just scroll through.

2         Okay.  And let's look at what you wrote about this

3   attachment to Ms. Agarwal and Mr. Shah.

4         And you said:  Attached is a spreadsheet with two

5   tabs.  Tab 1 includes the 325 sites that Humira is currently

6   live on.  Tab 2 includes 155 additional rheum sites that are

7   currently available."  Right?

8   A.  Yes.

9   Q.  So you wrote "currently available," right, sir?

10  A.  I did.

11  Q.  Okay.  And, sir, that's the information your bosses were

12  getting, right, from you that they're currently available,

13  right?

14  A.  Yes.

15  Q.  You weren't trying to lie to them, were you?

16  A.  No.

17  Q.  Okay.  So let's -- let's put that down.

18        Yesterday, we looked at maybe a dozen or more

19  emails -- well, let me put that -- let me put that aside.

20        MR. HUESTON:  Let me withdraw that question.

21  BY MR. HUESTON:

22  Q.  Let's look at a few more emails on this idea of the

23  155 screens being available.

24        MR. HUESTON:  Let's go to DX30 -- 3052.

25  BY MR. HUESTON:

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 46 of 311 PageID #:13991
Ketchum - cross by Hueston
1434

1    Q.  And we looked at this earlier just for orientation.  And

2    3 -- DX3052 at 1:  The Humira addition 155 sites was pushed

3    out today."

4            You see that?

5    A.  I do.

6    Q.  That's consistent with you saying they're currently

7    available, right?

8    A.  Yes.

9    Q.  Okay.  And given that these 155 sites appear to have been

10   actually activated, it appears they're currently available,

11   right?

12   A.  It does.

13   Q.  All right.

14           MR. HUESTON:  We can put that down.

15   BY MR. HUESTON:

16   Q.  Let's go to the topic of affidavits.

17           I think you said that you sent an affidavit that you

18   believed was false to a client about Humira, right?

19   A.  Yes.

20   Q.  All right.  And you believed that these affidavits

21   represented what had played for Humira in a prior month,

22   right?

23   A.  I don't recall that, but...

24   Q.  Okay.

25   A.  I don't recall that.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 47 of 311 PageID #:13992
Ketchum - cross by Hueston
1435

1  Q.  That's all right.

2       Let's -- let's back off a little bit and talk

3  about -- 'cause you were there in the early days, a little bit

4  about the history of the affidavit process.

5  A.  Sure.

6  Q.  Because it didn't start like that at Outcome, right?

7  A.  No.

8  Q.  In the sense of there was a different affidavit gathering

9  process at first.  You remember?

10  A.  Yes.

11  Q.  What was that?

12  A.  It was for -- specifically, originally for DVD sites.

13  Sites that didn't have a television with a computer that was

14  attached to the Internet would be sent to DVD, and the site

15  would send in an affidavit indicating that they did play the

16  DVD.

17  Q.  Yeah.  So let me see if I can say it in a different way

18  and see if you can agree with me.

19       Outcome actually went out early on and -- and

20  gathered affidavits from the physicians saying the ads were

21  being played in the physicians' offices, and they were

22  manually faxed in.

23       You remember that?

24  A.  I do.

25  Q.  Okay.  And that manual -- this is in the early days.  That

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 48 of 311 PageID #:13993
Ketchum - cross by Hueston
1436

1 | manual system required a lot of time and effort to deal with
2 | all those faxes, right?
3 | A.  It did.
4 | Q.  Okay in the early days of the company.  But the company
5 | grew, right?
6 | A.  Yes.
7 | Q.  All right.  And by the way, that manual fax it in right
8 | from the doctors, that was something that -- you know,
9 | Mr. Shah, that was his system he came up with, right?
10 | A.  I'm not sure he came up with that, but I believe it was
11 | Rishi, yes.
12 | Q.  Okay.  And then around the end of 2013 as the company's
13 | getting bigger, this manual fax affidavit system, it is phased
14 | out, right?
15 | A.  Yes.
16 | Q.  All right.  So with that context in mind, let's go back to
17 | the specific Humira affidavit in question that you reviewed.
18 |          MR. HUESTON:  So let's go to CX10029.
19 | BY MR. HUESTON:
20 | Q.  And, sir, just, you know, there's the date at the top.
21 | You know, this is a January 17, 2013, email from Mr. Demas to
22 | Ryan Postel, Mr. Kemp, and yourself.  Subject:  "Information
23 | for POP" -- that's proof of performance -- "affidavit," right?
24 | A.  Yes.
25 | Q.  And Mr. -- let's look at what Mr. Demas says.  He

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 49 of 311 PageID #:13994
Ketchum - cross by Hueston
1437

1    explains, quote, "Our sponsorship contracts with Target Health
2    require us to provide certain proof of performance
3    documentation on a monthly basis.  Included with this info is
4    an affidavit of performance that contains various" --
5              THE COURT:  Please slow down a little.
6              MR. HUESTON:  I'm sorry, Your Honor, let me slow
7    down.
8    BY MR. HUESTON:
9    Q.   "Included with this information -- info is an affidavit of
10   performance that contains various information about the
11   creative spot that was run during the month."
12             Do you see that?
13   A.   I do.
14   Q.   Okay.  And let's go to page 3.  And here, we see the form
15   for the Humira affidavit that would lay out the number of
16   offices/locations delivered in the period of play, among other
17   things, right?
18   A.   Yes.
19   Q.   All right.  So again, unlike the affidavits from Outcome's
20   early years that were signed by doctors that were saying what
21   it played in those doctors' offices, this was a new system,
22   right, where the affidavit was to be signed by Outcome,
23   representing what they believed had played, right?
24   A.   Yes.
25   Q.   Okay.  And this February 2013 affidavit process, this was

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 50 of 311 PageID #:13995
Ketchum - cross by Hueston
1438

1  actually your very first time doing this after taking over the

2  process from CFO Demas, right?

3  A.  Yes, I believe so.

4  Q.  And, in fact --

5       MR. HUESTON:  Yeah, let's go to GX148 at 1, just so

6  that's clear.

7  BY MR. HUESTON:

8  Q.  And so here it is February 12, 2013, you're writing at the

9  top, right?

10  A.  Yes.

11  Q.  And you write there:  "Tiffany, please find the attached

12  clinic list, invoices, and affidavits.  I will be taking this

13  over from Jim moving forward."  Right?

14  A.  Yes.

15  Q.  Okay.  And as part of your very first time doing this, you

16  had some questions about how to fill this out.

17       Remember that?

18  A.  Yes.

19       MR. HUESTON:  So let's go to GX136.

20  BY MR. HUESTON:

21  Q.  And here's an email from you to Mr. Shah and Mr. Demas.

22       You see that, February 8th?

23  A.  Yes.

24  Q.  "Quick question about Humira POP."  Right?

25  A.  Yes.

1  Q.  And in the bottom email, you write:  Rishi, Jim and I just

2  wanted to double-check with you about the Humira POP.  We are

3  contracted for 480 sites.  Currently we have 419.  What do you

4  recommend we send them for addresses to fill in the gap?

5  Should we include CM PCP offices or should we send them

6  offices from outreach?"

7          You see that?

8  A.  I do.

9  Q.  Okay.  And so you agree you're bringing up the idea of

10  using primary care offices or offices from outreach in this

11  email chain, right?

12  A.  Yes.

13  Q.  And I think you testified last week that maybe the reason

14  you were doing that was because on prior engagements with this

15  process you had been instructed to do that, right?

16  A.  I believe that was the case, yes.

17  Q.  But, sir, as we just went over now with these other emails

18  that you're seeing, this is the first month you took over this

19  process from Mr. Demas, right?

20  A.  I'd have to see prior emails, but this email does seem to

21  indicate that.

22  Q.  Okay.  And you would agree, sir, that if in fact from what

23  the email indicates, this is the first time you're handling

24  these proof of performance affidavits, you couldn't have been

25  instructed prior with proof of performance to falsify them,

1    right?  This would have been the first time?

2    A.  Can't really speak to that, but it does appear that way.

3    Q.  Okay.  So let's go now to the topic of Mr. Shah's

4    suggestion that it's okay to use sites from the MS database

5    and the MS pipeline.  Let's go to that topic.

6            And I think you testified that, you know, at least

7    what you were seeing last week --

8    A.  My screen went dark.  Was it supposed to?

9    Q.  No.

10           THE COURT:  Here we are.

11           MR. HUESTON:  Ah, there we are.  We're back.

12   Thank you for the heads-up on that.

13           THE WITNESS:  Sure.

14   BY MR. HUESTON:

15   Q.  And I think you were describing last week, based on what

16   you were seeing, that by putting sites in from MS database and

17   pipeline, it may have been misleading because you thought at

18   the time it wasn't installed, right?

19   A.  Yes.

20   Q.  All right.  So let's look at that issue.

21           MR. HUESTON:  Let's go to DX10177.

22   BY MR. HUESTON:

23   Q.  And this is an email from you to Mr. Shah.  This is

24   October 21, 2015.  Subject line:  "IHS TouchPoint with

25   updates."  Right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 53 of 311 PageID #:13998
Ketchum - cross by Hueston
1441

1    A.  Yes.

2    Q.  And in the second paragraph, you write, quote:  Attached

3    is the current sales and onboarding pipeline for IHS."

4         You see that?

5    A.  Yes.

6    Q.  And you attached a file titled "IHS Pipelines."

7         You see that?

8    A.  Yes.

9    Q.  So let's look at the Excel attachment here, DX10177, that

10   you attached.

11        MR. HUESTON:  We'll take a moment to pop into that.

12        THE COURT:  Is the exhibit sticker on this one

13   located somewhere else?  I don't see a defense exhibit sticker

14   on this.

15        MR. HUESTON:  Your Honor, yeah, we'll fix that, but

16   we've labeled it DX10177 for the record.  You're right, I

17   don't see it on that front page.

18        THE COURT:  All right.

19        MR. HUESTON:  But this has been disclosed, fully

20   disclosed.

21   BY MR. HUESTON:

22   Q.  Okay.  So let's go now -- we're on the Excel attachment

23   that you sent.  Do you see that?

24   A.  Yes.

25   Q.  Okay.

1    A.  Yes.  Sorry.

2    Q.  Okay.  And if we go to the -- if we look at the attachment

3    here, there's actually a sale -- it's called sales pipeline,

4    right?

5    A.  Yes.

6    Q.  Okay.  And if we go to Column H, there's actually a column

7    here for "number of installed," right?

8    A.  Yes.

9    Q.  And so this pipeline is showing when some of these have

10   actually already been installed, right?

11   A.  Yes.

12   Q.  Okay.  And so you can see some numbers there as we roll

13   down, right?

14   A.  Yes.

15   Q.  Okay.  And I've summed it up in Excel, and it comes up to

16   be about 246.

17          I realize you and I are both not math geniuses, but

18   that seem about right?  Look about right to you?

19   A.  Yes.

20   Q.  Okay.

21          MR. HANKEY:  Your Honor, we're going to object.  The

22   date on this email is years after the email that appears to be

23   the subject matter of what we're discussing.  We just don't

24   see the relevance.

25          MR. HUESTON:  Well, I'm going to tie -- the

 1   relevance, I'm tying it in here.

 2   BY MR. HUESTON:

 3   Q.  So --

 4               THE COURT:  Well, hang on.  Let's go to sidebar.

 5               MR. HUESTON:  Yeah.

 6           (Proceedings heard at sidebar on the record.)

 7               THE COURT:  All right.  Unfortunately, the exhibit's

 8   not up when we go to sidebar.  But what was the date of the

 9   original email on that?

10               MR. HUESTON:  The original -- well, I --

11               THE COURT:  The email that attaches the Excel

12   spreadsheet.

13               MR. HUESTON:  2015.

14               THE COURT:  Okay.  And what's the objection?

15               MR. HANKEY:  The objection, Your Honor, is that the

16   subject of the cross relates to an October 2013 email.  We

17   just don't -- we don't see the relevance of going over a

18   2015 spreadsheet to the --

19               THE COURT:  All right.  Response?

20               MR. HUESTON:  Yeah, it's directly relevant.  They've

21   had him testify that when something's in the pipeline, it

22   means it's not installed.  This is an email during the course

23   of the alleged scheme, and it shows -- there's documentation

24   where they acknowledge and they actually track installations

25   in the pipeline.  It's definitely relevant.

1     THE COURT:  Yeah, I think redirect, you'll have to

2  clear it up if you think this is an example that is not

3  apropos to the scheme itself.  But it's within the scheme

4  period, and I've already allowed evidence of lawful conduct

5  during the scheme to come in to show knowledge of the

6  defendants -- or to -- to rebut claims that the defendants

7  acted with fraudulent intent.

8     So the objection's overruled.

9    (Sidebar ended.)

10     THE COURT:  Objection overruled.

11     You may proceed.

12     MR. HUESTON:  Thank you.

13  BY MR. HUESTON:

14  Q.  Okay.  So then we can see here that there are offices in

15  the pipeline that are installed, right?

16  A.  Yes.

17  Q.  Okay.  And, in fact, there were offices in the pipeline

18  that were available for immediate scheduling, right?

19  A.  Appears so, yes.

20     MR. HUESTON:  Let's go to CX10096.

21  BY MR. HUESTON:

22  Q.  And this is a Wednesday, June 27th email, 2012, from you

23  to Mr. Svec, copying Mr. Shah and Ms. Agarwal.

24     Do you see that?

25  A.  Yes.

1  Q.  And let's go to the bottom of page 2.  And there's a note

2  from the client, quote, "We noticed that there are a couple of

3  locations on the list that don't seem relevant to our target

4  audience.  Can you tell us more about these locations?  Could

5  exclude them from the buy if they only treat children?"

6        You see that?

7  A.  Yes.

8  Q.  And if we go to the top email, you respond:  "Hi, Steve."

9        MR. HUESTON:  Let's pull that out.  There we go.

10  BY MR. HUESTON:

11  Q.  "Hi, Steve.  There were a total of nine pediatric offices,

12  including the two that were already sent over.  We are able to

13  replace them with nearby offices that are in the pipeline.

14  Our outreach team has been dominating, so there will be no

15  change in office count."

16        Right, sir?

17  A.  Yes.

18  Q.  And you attached two Excel files to this, right?

19  A.  Yes.

20  Q.  It looks like?

21  A.  It does.

22  Q.  And the date of this is June 27th, right?

23  A.  It is.

24  Q.  An email?

25        And attached here is a Xiaflex June 25th go live,

1  right?

2  A.  Yes.

3  Q.  And a Xiaflex June 18th go live, right?

4  A.  Yes.

5  Q.  So the date of this email, again, June 27th, right?

6  A.  Yes.

7  Q.  So that's after the go-live dates of what you're

8  attaching, right?

9  A.  Yes.

10  Q.  And so these offices, they're listed as still in the

11  pipeline even after their go-live date, right?

12  A.  Yes.

13  Q.  And then you say:  "Once Mike B. is back, I will have the

14  ad swapped."  Right?

15  A.  Yes.

16  Q.  They're ready to go.  You're ready to swap them in, right,

17  sir?

18  A.  Yes, sir.

19  Q.  So the offices that we've been -- you're describing here

20  as in the pipeline, they had gone live and were available to

21  have the ad swapped in, right?

22  A.  Yes.

23        MR. HUESTON:  Let's now go back to GX136.

24  BY MR. HUESTON:

25  Q.  So when Mr. Shah here was telling you to look to the

1  MS pipeline, as we just saw, there were offices in the
2  pipeline already installed and ready for ads, right?
3  A.  It appears so, yes.
4  Q.  And then Mr. Shah said, well, if there weren't pipeline
5  offices, use PCPs, right?
6  A.  Yes.
7  Q.  And that's primary care physician offices?
8  A.  It is.
9  Q.  Okay.  And you're aware that Outcome did have at least
10  60 or more primary care physicians available who were
11  playing -- or could've played this content in February 2013,
12  right?
13  A.  Yes.
14  Q.  Okay.  Let's go back to GX136 -- well, we are still
15  here -- at page 1.
16        And at the top, of course, you respond:  "Perfect.
17  Thank you."  Right?
18  A.  I do.
19  Q.  All right.
20        MR. HUESTON:  Okay.  We can put that down.
21  BY MR. HUESTON:
22  Q.  Let's look at the affidavit itself now.
23        So we go to February 12, 2013.  It's an email from
24  you to Tiffany Yuh.  Subject, February POP.  You see that?
25  A.  Yes.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 60 of 311 PageID #:14005
Ketchum - cross by Hueston
1448

1  Q.  And you wrote:  "Tiffany, please find the attached clinic
2  lists, invoices, and affidavits for Humira, AndroGel, and
3  Bayer."
4          You see that?
5  A.  Yes.
6  Q.  All right.  Let's start at page 3.  And we saw this
7  earlier.  The invoices for this campaign references screen
8  count, right?
9  A.  Yes.
10  Q.  And if we go to page 8, now we see the affidavit of
11  performance for Humira, right?
12  A.  Yes.
13  Q.  And I notice here, it says offices/locations, right?
14  A.  Yes.
15  Q.  And we've talked about your understanding of that slash.
16  That's offices or locations, right?
17  A.  Yes.
18  Q.  And you'd agree with me that what's specified in the
19  contract, we reviewed that earlier, is the screens located in
20  325 waiting rooms.
21          Remember reviewing that?
22  A.  I do.
23  Q.  Each waiting room is a location in that contract, right?
24  A.  Yes.
25  Q.  Okay.  And we see your signature down at the bottom of

Ketchum - cross by Hueston

1449

1  this, right, sir?

2  A.  Yes.

3  Q.  And you signed this affidavit, right?

4  A.  Yes.

5  Q.  And by the way, you didn't tell Mr. Shah before you put

6  your name on this that you felt this was deceptive, right?

7  A.  I don't recall.

8  Q.  You never said or recall telling anyone before you signed

9  this affidavit, "I think this is deceptive," right?

10  A.  I don't recall on this particular affidavit, no.

11  Q.  Okay.  So let's keep digging into this.

12          I think you testified that you thought this affidavit

13  was meant to serve as proof of what was delivered, right?

14  A.  Yes.

15  Q.  Okay.  And let's look at that.  You signed this affidavit

16  on February 11, 2013, right?

17  A.  Yes.

18  Q.  That's the first third of the month, right?

19  A.  It is.

20  Q.  If you look up, the period of performance that this

21  affidavit is supposed to cover is February 1 through

22  February 28th, right?

23  A.  Yes.

24  Q.  So this affidavit is somehow covering things that are

25  scheduled to play after you're signing this, right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 62 of 311 PageID #:14007
Ketchum - cross by Hueston
1450

1    A.  Yes.

2    Q.  In the future?

3    A.  Correct.

4    Q.  And you weren't trying to deceive anybody by putting

5    February 28th at the bottom of that, right?

6    A.  No.

7    Q.  Okay.  So whatever this affidavit is meant to be saying,

8    it can't possibly be intended to be a statement of what had

9    already played, right?

10   A.  Correct.

11   Q.  Okay.  So let's talk now about the filling the gap

12   discussion.

13           MR. HUESTON:  Go back to GX136 again, at 1.

14   BY MR. HUESTON:

15   Q.  And so with reference to Mr. Shah talking about the

16   pipeline offices or PCP offices that were -- let's just say

17   they weren't -- let's just assume for a moment they weren't

18   playing, we've shown that these things were pushed out, this

19   was February 11th in that affidavit, right?

20   A.  Yes.

21   Q.  It's certainly possible that those locations could have

22   been added after February 11th, right?

23   A.  Yes.

24   Q.  'Cause we already saw examples of stuff in the pipeline

25   live and ready to go, right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 63 of 311 PageID #:14008
Ketchum - cross by Hueston
1451

1  A.  Yes.

2  Q.  Okay.  And, again, you know, you signed February 11th.

3  Most of the month was left until the 28th, right?

4  A.  Yes.

5  Q.  All right.

6        MR. HUESTON:  So let's now go to GX148.

7  BY MR. HUESTON:

8  Q.  And this is an email from you to others, February 12,

9  2013, right?

10 A.  Yes.

11 Q.  And there's an attachment there, Humira Clinic List,

12 right?

13 A.  Yes.

14 Q.  And let's go to page 43, which is the last attachment.

15        And, again, we start seeing a list of offices with

16 street address locations, right?

17 A.  Yes.

18 Q.  So I want to just kind of scroll through with you.  We'll

19 go page by page.  It's a lot of pages, right?

20 A.  It is.

21 Q.  It's about 15 pages?  Does that sound about right?

22 A.  Sure, yes.

23 Q.  Okay.  Now, on direct, I believe you testified that just

24 because you included offices on the list, that didn't

25 necessarily mean that an ad was playing in the office, right?

Ketchum - cross by Hueston

1452

1   A.  Potentially, yes.

2   Q.  And you testified that you were also not sure if the PCP

3   sites you included in the affidavit were playing the Humira

4   ad.

5       You just don't know one way or the other, right?

6   A.  Correct.

7   Q.  And you testified you may even have double-checked, but

8   you don't know, right?

9   A.  That's correct.

10  Q.  That's a long time ago, right?

11  A.  Yes.

12  Q.  Okay.  So, sir, here's the 15 pages of 480 offices.  Which

13  of these were made up?

14  A.  I don't know.

15  Q.  Okay.  You're saying it's impossible to know today if any

16  of these were made up, right, sir?

17  A.  That's correct.

18  Q.  Okay.

19      MR. HUESTON:  We can put that down.

20  BY MR. HUESTON:

21  Q.  Let's talk a little bit about -- a little bit more about

22  your recollection about the affidavit process.

23      And again, that was a long time ago, right?

24  A.  Yes.

25  Q.  And you've had some different recollections about who may

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 65 of 311 PageID #:14010
Ketchum - cross by Hueston
1453

1    have given you some instruction on that affidavit over time,

2    right?

3    A.   There were multiple affidavits, and there was a lot of

4    direction from -- from my supervisors at the time.

5    Q.   Okay.   In November of 2022, two months ago, you recall

6    telling the government that it was either Mr. Desai or

7    Mr. Shah that instructed you to sign the February 2013 Humira

8    affidavit?

9            Does that sound right?

10           MR. HANKEY:  Objection.

11           MR. HUESTON:  It's directly relevant.  I --

12           THE COURT:  What's the objection?  Briefly, just the

13   grounds.

14           MR. HANKEY:  May I have a moment to confer with

15   counsel?

16           THE COURT:  Sure.  Go ahead.

17       (Counsel conferring.)

18           MR. HANKEY:  Okay.

19           THE COURT:  Objection withdrawn?

20           MR. HANKEY:  Withdrawn, Your Honor.

21           THE COURT:  All right.  Go ahead.

22           MR. HUESTON:  Okay.

23           THE COURT:  If only you could do this all the time.

24           MR. HUESTON:  Yeah.

25   BY MR. HUESTON:

1   Q.  Okay.  So you remember, sir, a couple months ago, you

2   recalled that you signed the February 2013 Humira affidavit at

3   the direction of either Mr. Desai or Mr. Shah?

4          Remember that?

5   A.  I don't recall that.

6   Q.  Okay.  Let me see if I can refresh your recollection.

7   A.  Sure.

8   Q.  And what we'll do is we'll put this up just on the screen

9   for you and the attorneys.

10         MR. HUESTON:  And I've shown this to the attorney.

11  BY MR. HUESTON:

12  Q.  And this is from an FBI 302 report?

13  A.  Sure.

14  Q.  And I'm going to highlight the sentence and ask if that

15  refreshes your recollection.

16         MR. HUESTON:  Highlight the last line, 37.

17  A.  I see that, but I don't recall the -- I still don't recall

18  that, saying that.

19  BY MR. HUESTON:

20  Q.  Okay.

21         MR. HUESTON:  So at this time, we'd ask, with the

22  government stipulation, that we read in this recorded -- this

23  statement as recorded by the special agent from that interview

24  of November 15, 2022.

25         THE COURT:  All right.  Well, it wasn't a recording.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 67 of 311 PageID #:14012
Ketchum - cross by Hueston
1455

1    It was just notes --

2            MR. HUESTON:  Just -- yes.

3            THE COURT:  -- simply notes of what he recalls this

4    witness saying.

5            Government agree?

6            MR. HANKEY:  One moment, Your Honor.

7            THE COURT:  All right.

8        (Pause in the proceedings.)

9            MR. HANKEY:  We so stipulate, Your Honor.

10           THE COURT:  All right.  Go ahead and read it in.

11           MR. HUESTON:  Okay.

12   BY MR. HUESTON:

13   Q.  "Ketchum remembered that he signed the document at the

14   direction of either Desai or Shah."

15           Did I read that correctly?

16   A.  Yes.

17   Q.  All right.  Let's put that up on --

18           MR. HUESTON:  We're going to call this Humira Demo 1,

19   and it's just the statement and the date.  Let's put it up.

20   BY MR. HUESTON:

21   Q.  And that's -- these are the words I just read to you,

22   right?

23   A.  Yes.

24   Q.  All right.  And again, let's talk -- last week, I believe

25   you -- sorry.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 68 of 311 PageID #:14013
Ketchum - cross by Hueston
1456

1    December 30th, sir, you had a different recollection.

2  Do you remember coming in and talking about this again?

3  A.  Not specifically.

4  Q.  Do you recall on December 30th saying that you most likely

5  signed this affidavit at the request of Jim Demas, not

6  Ashik Desai or Rishi Shah, as you stated in your November 15,

7  2022, interview?

8    Does that sound familiar?

9  A.  It doesn't.

10  Q.  Okay.  I'd like to --

11  A.  It's possible, though.

12  Q.  Let's once again try to refresh your recollection.

13  A.  Sure.

14    MR. HANKEY:  Your Honor, objection to misstating the

15  record.

16    MR. HUESTON:  Well --

17    THE COURT:  Well, the questions of lawyers are not

18  evidence.  If the question is something you don't recall from

19  the evidence, then you should disregard it.  The -- the

20  critical part is not the question, but the answer of the

21  witness.  That is the evidence you consider.

22    We're just simply trying to refresh the witness's

23  recollection at this point.  Is that correct?

24    MR. HUESTON:  Yes, Your Honor.

25    THE COURT:  All right.  The screen is blank for the

1    jury, and you can put it up for the witness to see if his

2    recollection is refreshed.

3              MR. HUESTON:  Okay.  Let's go to -- okay.

4    BY MR. HUESTON:

5    Q.  This is the 1/4/2023 of the 12/30/2022 meeting.  And, sir,

6    just read this line here.  And I'll ask you if this refreshes

7    your recollection.

8    A.  It does not.

9              MR. HUESTON:  Okay.  And once again, I'd ask for the

10   government's stipulation to read in the statement from the FBI

11   special agent's report of the interview dated January 4, 2023,

12   of a meeting on December 30, 2022.

13             THE COURT:  All right.  Any objection other than

14   previously stated objections?

15             MR. HANKEY:  No objection.

16             THE COURT:  All right.  Go ahead and read it in.

17             MR. HUESTON:  All right.

18             "Ketchum most likely signed this affidavit at the

19   request of Jim Demas, not Ashik Desai or Rishi Shah as he

20   stated in his November 15, 2022, interview."

21   BY MR. HUESTON:

22   Q.  Did I read that correctly, sir?

23   A.  Yes.

24             MR. HUESTON:  Okay.  Let's go to Humira Demo 2.

25   BY MR. HUESTON:

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 70 of 311 PageID #:14015
Ketchum - cross by Hueston
1458

1    Q.  And that's the December 30th meeting that I just read

2    from.  And the words here, "Ketchum most likely signed this

3    affidavit at the request of Jim Demas, not Ashik Desai or

4    Rishi Shah."

5          That's what I just read, right?

6    A.  It is.

7    Q.  And, again, Mr. Demas, he was the CFO, right?

8    A.  Yes.

9    Q.  And you understood him to be an experienced accountant?

10   A.  Yes.

11   Q.  And you told him of the gap, right?

12   A.  Yes, I believe so.

13   Q.  Yeah.  So on December 30th, this is -- appears to be

14   the -- you're recalling the instruction he gave you, right?

15   A.  Possibly, yes.

16   Q.  Okay.  Now, last week you testified -- let's see if you

17   remember -- that either Mr. Demas or Mr. Shah instructed you,

18   right?

19   A.  Yes, I recall that.

20   Q.  All right.

21         MR. HUESTON:  So let's put that as Demonstrative 3.

22   Let's add that.

23   BY MR. HUESTON:

24   Q.  Okay.  So, sir, to recap, on November 15th, I think that's

25   about two months ago -- December, January -- 2 1/2 months ago,

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 71 of 311 PageID #:14016
Ketchum - cross by Hueston
1459

1  you remember that you signed the document at the direction of

2  either Mr. Desai or Shah?

3          That's what those notes indicate, right?

4  A.  It is.

5  Q.  And you came in on the eve of New Year's Eve, a little

6  over a month ago, and you said, from the notes:  "Ketchum most

7  likely signed this affidavit at the request of Jim Demas, not

8  Ashik Desai or Rishi Shah."  Right?

9  A.  It says that, yes.

10  Q.  And now at trial, your recollection was, Well, actually, I

11  think it's Jim Demas or -- and Rishi Shah, right?

12  A.  I believe that was "or."

13  Q.  Or, you're right.  Thank you.

14          Or Rishi Shah, right?

15  A.  Yes.

16  Q.  Sir, this is a long time ago, right?

17  A.  Yes.

18  Q.  It's hard to remember crisply what exactly happened when,

19  right?

20  A.  Yes.

21  Q.  And this iteration here of what you were trying your best

22  to recollect, right, over time --

23  A.  Yes.

24  Q.  -- shows changing recollections, right?

25  A.  It does.

 1  Q.  All right.

 2         MR. HUESTON:  We can put that down.

 3  BY MR. HUESTON:

 4  Q.  Okay.  Let's go on to another subtopic.  One other thing

 5  you talked about is you observed that if we put

 6  nonspecialists' offices that are more like generalists'

 7  offices, those would be -- I think your words were -- very

 8  unlikely to prescribe a rheumatology drug, right?  Something

 9  like that.

10         Do you remember saying that?

11  A.  That -- that -- that sounds -- yes, sounds accurate, yeah.

12  Q.  All right.  And I don't know if you're aware or not, so

13  let me just ask you:

14         In fact, were you aware that the nonspecialists'

15  offices that Outcome included in the Humira campaign were

16  actually included because the physicians were declaring they

17  treated rheumatology and asked specifically for rheumatology

18  content?

19  A.  Not aware.

20  Q.  Okay.  So let's go into that a bit.

21         MR. HUESTON:  Let's go to Government Exhibit 183.

22  BY MR. HUESTON:

23  Q.  And let's go down to the bottom of page 1.  And

24  Mr. Crandall says there:  "I can convey this to TH."

25         That's Target Health, right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 73 of 311 PageID #:14018
Ketchum - cross by Hueston
1461

1    A.  Yes.

2    Q.  And note that she also asks:  "If AbbVie" -- that's the

3    client, right?

4    A.  It is.

5    Q.  -- "If AbbVie does not accept these offices, they want new

6    RA offices to replace them."  Right?

7    A.  Yes.

8    Q.  "If it comes to this, we'll have to reduce our contract."

9    Right?

10   A.  Yes.

11   Q.  Okay.  And let's look at page 1.

12           At page 1, you were asked on direct if Mr. Shah said

13   at this time to reduce the billing for Humira.

14           You remember getting that question?

15   A.  I do.

16   Q.  All right.  And I believe you were shown just the first

17   page of this email during your direct.  There are six pages to

18   this, right?

19           Do you see that, page 1 of 7 at the bottom?

20   A.  I do see that, yes.

21   Q.  All right.  Let's dive into what's behind this.  Let's go

22   to page 4.

23           And there's another response from Ms. Bautista here

24   where she says, quote:  "The list includes 53 internal

25   medicine offices.  Can these be scrubbed off?  Our contracted

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 74 of 311 PageID #:14019
Ketchum - cross by Hueston
1462

1    buy is for rheum offices only."

2              You see that?

3    A.  Yes.

4    Q.  And now let's see how Mr. Crandall responds.  We go to the

5    bottom of page 3.

6              And he explains to Ms. Bautista, quote:

7    "Technically, these offices are marked as IM" -- internal

8    medicine, right?

9    A.  Yes.

10   Q.  -- "but they have opted into our Rheumatoid Health

11   Network, as they see RA patients and wanted rheumatology

12   programming."  Right?

13   A.  Yes.

14   Q.  So let's look at Ms. Bautista's reply to that information.

15             She says:  "We'll need to let AbbVie team know."

16   Right?

17             AbbVie is the manufacturer of Humira, right?

18   A.  Yes.

19   Q.  And then she continues:  "If AbbVie accepts these offices

20   as relevant, then we can count them."  Right?

21   A.  Yes.

22   Q.  All right.  So let's just pause for a moment right here.

23             So in this same email that you reviewed last week,

24   this email shows the client is actually telling everyone here

25   that the offices could be relevant and could be properly

1  counted.  They just need to check in with AbbVie, right?

2  A.  Yes.

3  Q.  All right.  And then she continues:  "If not, then the

4  offices will need to be taken out and replaced with rheum

5  offices per our contract."  Right?

6  A.  Yes.

7  Q.  So there's nothing here where the client's saying the

8  contract needs to be reduced, right?

9  A.  No.

10  Q.  She just says it might need to show reduced if AbbVie

11  concludes that these are not the right offices for them,

12  right?

13  A.  Yes.

14  Q.  All right.  And let's go to the middle of page 2.

15         And here, Mr. Crandall asks for the criteria that

16  Outcome used for including internal medicine doctors in the

17  Humira campaign, right?

18  A.  Yes.

19  Q.  And if we go to the top of page 2, Mr. Shah replies:  "We

20  do not have prescription data to share here.  The office was

21  included in the RHN" -- that's rheumatology network, right?

22  A.  Yes.

23  Q.  -- "the rheumatology network because they declared that

24  they treat RA" -- that's rheumatology, right?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 76 of 311 PageID #:14021
Ketchum - cross by Hueston
1464

1  Q.  -- "at signup and asked for rheumatology content."

2        You see that?

3  A.  Yes.

4  Q.  All right.  Now let's go back to page 1.  And with that

5  context, we can see Mr. Crandall responds, right?

6  A.  I do.

7  Q.  He says:  "Yes, this helps.  I can convey this to

8  Target Health."  Right?

9  A.  Yes.

10 Q.  And you understand him to be saying, I'm going to tell the

11 client, right?

12 A.  Yes.

13 Q.  All right.  And he continues:  "Note that she also asks

14 that if AbbVie does not accept these offices, they want new RA

15 offices to replace those.  If it comes to this, we'll have to

16 reduce our contract by that number of offices."  Right?

17 A.  Yes.

18 Q.  And just, you know, going up to the top, Mr. Shah's

19 response.  And you would agree here, he's not saying, Hey,

20 listen, don't tell the client the truth if there's any chance

21 we need to reduce the contract and cost us money.

22        He doesn't say anything like that, right?

23 A.  No.

24 Q.  In fact, he responds:  "Terrific.  Let me know how it goes

25 on this match."  Right?

1465

1    A.  Yes.

2    Q.  All right.

3              MR. HUESTON:  Okay.  We can put that document down.

4              What's your -- where do you --

5              THE COURT:  All right.  This is about time for the

6    break, ladies and gentlemen.

7              Are you at a point --

8              MR. HUESTON:  This is a convenient breaking point.

9              THE COURT:  All right.  We'll break for 15 minutes.

10   Please don't discuss the case among yourselves or with anyone

11   else.  Keep an open mind as there's more evidence to hear.

12             COURT SECURITY OFFICER:  All rise.

13        (Jury out at 10:27 a.m.)

14             THE COURT:  All right.  Sir, please don't discuss

15   your testimony with anyone as you're on cross-examination.  Be

16   back in 15 minutes, please.

17             THE WITNESS:  Yes, sir.

18             THE COURT:  Anything we need to discuss?

19             First, the government?

20             MR. HANKEY:  Your Honor, there were a few exhibits

21   that team Shah sent over this morning and asked us to look at

22   before the break.  We looked at them.  We had objections to

23   about five of them.

24             And I understand you may be using the --

25        (Counsel conferring.)

1          MR. TODISCO:  And, Your Honor, I have copies here.
2   If we could give them to you with the objections now and then
3   perhaps address them when we come back from the --
4          THE COURT:  Yeah.  Give me a few minutes to read them
5   over, and then we'll talk about them in about ten minutes.
6          MR. HUESTON:  Okay.  I'll give you a good faith
7   estimate of where I am.
8          THE COURT:  Mic, please.
9          MR. HUESTON:  I'm sorry.
10         Yeah, I should be done before lunch.  And hopefully,
11  even, you know, faster.  So it's --it's moving along.
12         THE COURT:  Okay.  All right.
13         Yeah, if you have a copy of them, I'll take them.
14         And does it note the objections of the government at
15  this point, or is it still premature to --
16         MR. TODISCO:  I can scribble them in, and Mr. Hankey
17  can confirm.
18         MR. HANKEY:  Thank you.
19         THE COURT:  All right.  Please do that.
20         MR. HANKEY:  I'll rely on Mr. Todisco to get them
21  right.
22         THE COURT:  Anything else we need to put on the
23  record?
24         MR. POULOS:  No, Your Honor.
25         MR. BLEGEN:  No, Your Honor.

1467

1    MR. LOWDER:  No, Your Honor.

2    THE COURT:  All right.  Thanks.

3    (A recess was had from 10:29 a.m. to 10:43 a.m.)

1       (Proceeding heard in open court. Jury out.)

2           THE COURT:  All right.  Have you met and conferred

3    with the defense on these exhibits?

4           MR. HANKEY:  Only on a couple of them, your Honor.

5    We haven't had time otherwise.

6           THE COURT:  Are they still all at issue?

7           MR. HUESTON:  Well, I hope not.  I mean, look, let me

8    just try to summarize this.  I think most of these are

9    Mr. Ketchum -- literally Ketchum is on all of these and --

10   here -- here's the idea here, I mean -- Oh, I'm sorry,

11   Mr. Ketchum is here.

12          THE COURT:  Mr. Ketchum, if you could wait out in the

13   hall, please.

14          THE WITNESS:  Yes, your Honor.

15       (Witness exited the courtroom.)

16          THE COURT:  Okay.

17          MR. HUESTON:  Your Honor, by the way, three of these

18   we had conversations about and came into opening because we

19   talked about the relevance.  Very particularly here, and it's

20   very pointedly apparent, you know, Mr. Ketchum on direct

21   testified that at times, you know, he felt terribly, badly.

22   And there's been, you know, some mixed testimony about what he

23   felt while he was there at the company.  And this is

24   appropriate.  This is Mr. Ketchum writing these documents

25   about how he feels about the company at the time.

1     I'm not going to spend a lot of time on these, but

2  I'm just going to kind of clip through those to show his views

3  over time about -- and he's telling this to Shah, and others.

4     THE COURT:  Response?

5     MR. HANKEY:  Your Honor, I don't think you have a

6  full list of the documents they sent us this morning.  And the

7  reason I mention that is there are a number of e-mails on the

8  list that do support what I believe Mr. Shah is suggesting,

9  e-mails that talk about how Mr. Ketchum is happy to work at

10  Outcome, and things.  It's a good company.  We did not object

11  to all of those.  There are some that just don't seem to be as

12  on point and, in any event, would be cumulative of the other

13  ones we didn't object to.  And those are the ones that we

14  provided to you.

15     And we have a separate objection as to 10222 and 875.

16     THE COURT:  What's the 875 objection?

17     MR. HANKEY:  The 875 is another iteration of an

18  e-mail string that has previously been admitted.  I can't

19  recall the exhibit number, but you may remember seeing the

20  e-mail on the bottom.  The previous exhibit forwarded -- Jason

21  forwarded that e-mail to Shradha Agarwal after he sent it to

22  Rishi Shah.  This exhibit, 875, has Rishi Shah's commentary on

23  what Mr. Ketchum wrote.  We object to that commentary as

24  hearsay, and the bottom is cumulative.

25     MR. HUESTON:  And, your Honor, the non-hearsay

1 purpose, while we're on that 875, is that it's an act.  He's

2 forwarding this.  He's not trying to hide it or -- he's

3 forwarding this.  This is a list of criticisms, and he is

4 forwarding this to Agarwal, and others.

5          THE COURT:  Well, it's not simply forwarding it,

6 though.  He has additional comments.

7          MR. HUESTON:  He does.  And that reflects a state of

8 mind.  I mean, there are two different bases here.  That's --

9 I think both points are relevant.

10          THE COURT:  What's the relevance of his state of mind

11 to this overall e-mail of Ketchum?  The state of mind

12 objection seems to me is being used in many ways simply to get

13 around hearsay and swallowing a hearsay rule.  Statements of a

14 defendant typically are not -- can't be offered by defendant.

15 If they want to get their statement in, they testify.  They

16 typically are not offered unless there is a specific hearsay

17 exception that doesn't swallow the rule.  And if there is

18 statements that come in to show state of mind, then it's going

19 to have to be targeted relevant to a state of mind that is to

20 negate the state of mind the government is alleging.  I'm

21 finding the state-of-mind objection to be possibly misused.

22 Unless I'm misunderstanding the point.

23          MR. HUESTON:  Okay.  Well, not intending to misuse --

24          THE COURT:  No, I understand that.  What I meant is

25 I'm misunderstanding it.

1    MR. HUESTON:  I think there have been allegations
2    that -- and then part of the government's case theory is that
3    Mr. Shah was running around trying to stamp out people who
4    were, over time, who were raising issues, or sticking his head
5    in the sand.  And him going:  Hey, here are criticisms,
6    everybody.  Look.  You know, that -- that definitely -- and
7    this is, you know, during the time period.  That definitely
8    counters that notion.  It's relevant.  It's not sort of a
9    generalized, he's just saying something.

10    THE COURT:  All right.  Well, are you alleging that
11    he was trying to stamp out criticism and fire or eliminate or
12    marginalize people that had criticism of the conduct of the
13    company?

14    MR. HANKEY:  We are, your Honor.  But I'll note, if I
15    may respond to that, he's not just blasting this out to a
16    broad group of people.  He sends it to Ms. Agarwal, Mr. Purdy
17    Mr. Desai, and then to his chief of staff, Madan Nagaldinne.
18    And you'll see other exhibits that the government offers with
19    Mr. Nagaldinne on them, and I believe with Mr. Surakanti on
20    them.  So it's really not going to add much, you know, to the
21    evidence to show that he sent this e-mail to this select group
22    of people.

23    MR. HUESTON:  Okay.  Well, that's the government's
24    opinion.  We're on two sides of the aisle here.

25    THE COURT:  Yeah, no, I -- I'll let this in.  But

1 we're getting into the world of cumulative. It's -- what is

2 it, 875? It's listed as government exhibit 875, which I

3 thought you entered this first part; is that correct? Is the

4 bottom portion of this already in evidence?

5 　　　　　MR. HANKEY: It came in through the defense, yes.

6 　　　　　THE COURT: All right. Yeah, the 875 objection,

7 overruled.

8 　　　　　MR. HANKEY: May we ask for a limiting instruction as

9 to the top part?

10 　　　　　THE COURT: Sure. Just to show?

11 　　　　　MR. HANKEY: Show that he sent it, to forward it --

12 　　　　　THE COURT: Well, it's more than that. If it was to

13 show that he sent it, I'd have him redact the portion that has

14 the comment. It's more than that. It has statements he makes

15 about the comments of Mr. Ketchum.

16 　　　　　MR. HUESTON: Right. That's the state of mind.

17 　　　　　MR. HANKEY: Those statements aren't -- yeah, there's

18 a bunch of self-exculpatory information here that's not

19 relevant to proving the point that Mr. Hueston is raising.

20 　　　　　Mr. Hueston is saying that he forwarded it to these

21 people, and that's evidence that Mr. Shah didn't have anything

22 to hide. His statements don't add to that fact.

23 　　　　　MR. HUESTON: That's the government's opinion. And

24 they can counter that in their case.

25 　　　　　THE COURT: Well, it explains why he sent it. If he

1    merely forwarded it, so be it.  But he is actually explaining,
2    acknowledging that this is what Ketchum said and actually
3    saying they're thoughtful, candid comments and ideas.  I don't
4    know where that is --
5            MR. HANKEY:  It's the lots of misunderstandings that
6    he is stating here.  And that's -- in order for the state of
7    mind exception to apply, there has to have been more time --
8            THE COURT:  Yeah, if you want to redact that.  If he
9    wants to talk about misunderstandings, he can get up on the
10   stand and testify to it.  But his statement, affirmative
11   statement, there are misunderstandings, is hearsay.  If you
12   want to redact that portion --
13           MR. HUESTON:  Sure.  Redact that portion.
14           THE COURT:  All right.  "Lots of misunderstandings as
15   we see from departures leading to speculation and
16   telephone..."
17           MR. HUESTON:  Yeah, we'll redact that.
18           THE COURT:  Take that out.
19           MR. HUESTON:  Sure.
20           THE COURT:  And with that objection -- with that
21   redaction, objection overruled.
22           The other one you have an objection to is 10222?
23           MR. HANKEY:  Yes, your Honor.
24           THE COURT:  What's the objection here?
25           MR. HANKEY:  Relevance.  It appears to relate to the

1  resolution of a lawsuit in 2012.  And we just don't -- we
2  don't understand how it's relevant to anything in this case.
3         THE COURT:  All right.  I don't know about the
4  lawsuit, so go ahead.
5         MR. HUESTON:  Yeah.  No, what I'm going to be
6  pointing out is what Mr. Ketchum's writing below.  We're not
7  talking about a lawsuit.  "A quick moment, strike a chord."
8  And he's saying positive things here about his experience.
9  That's what I'm going to be bringing out.  "Inspirational."
10 "Starting this morning, it was brought to our attention we
11 needed members --"
12         THE COURT:  Slow down.
13         MR. HUESTON:  Sure.  In that second paragraph.
14         I'm just -- you know, that's -- I'm focusing on his
15 positive comments, not going to be talking about lawsuits.
16         MR. HANKEY:  Again, your Honor, we're going to not
17 object to a number of exhibits that show positive comments.
18 There is already some exhibits like that into evidence.  So,
19 if anything, if there is -- this is relevant, it's cumulative.
20         There's also some, you know, confusing information in
21 here about legal matters, and the like.  I'm referring to
22 Mr. Ketchum's original e-mail.  And then, like, certainly, you
23 know, even if the bottom e-mail were admissible, the top
24 e-mail should be redacted as hearsay.  And it's just
25 completely irrelevant.

1        MR. HUESTON:  Your Honor, again, I'm not -- I'm happy

2   to redact Mr. Shah's portion above.  I don't care about that.

3   But when I hear cumulative, I mean, I get a chance to

4   structure my case.  I think I've been moving the pace, and

5   this is relevant stuff and --

6        THE COURT:  Well, if you want to put in what

7   Mr. Ketchum said to show that Mr. Ketchum was in 2012 happy

8   with his situation at the company, which is I assume the point

9   of this.

10       MR. HUESTON:  Yes.

11       THE COURT:  Then redact the part about Mr. Shah

12   because that's hearsay.

13       MR. HUESTON:  That's fine.

14       THE COURT:  Okay.  All right.  With that redaction,

15   objection overruled.

16       All right.  Ready to go?

17       MR. HUESTON:  Yes.

18       MR. HANKEY:  Yes.

19       THE COURT:  Okay.  Let's bring in the jury.  Thank

20   you.

21       (Jury in at 10:53 a.m.)

22       THE COURT:  All right.  Mr. Ketchum, you can retake

23   the stand once the jurors pass.

24       Please be seated, ladies and gentlemen.  Sorry for

25   the delay.  We were trying to work out some agreements on

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 88 of 311 PageID #:14033
Ketchum - cross by Hueston
1476

1  exhibits that may shorten the time we go to sidebars.  So
2  apologize if we took longer than normal, but it's all for a
3  good cause.  You may proceed.
4           MR. HUESTON:  Thank you, your Honor.
5                CROSS-EXAMINATION (Resumed.)
6  BY MR. HUESTON:
7  Q.  Good morning again, Mr. Ketchum.
8  A.  Good morning.
9  Q.  All right.  Let's go to GX-176.  And this is an e-mail
10  from February 27, 2013, between you, Ms. Agarwal, and
11  Mr. Crandall.  Subject:  Humira RA locations list.
12          Do you see that?
13  A.  Yes.
14  Q.  And I believe you're seeing this for the first time;
15  right?
16  A.  I believe so, yes.
17  Q.  Okay.  And let's go look at what happens here.
18  Mr. Crandall forwards the e-mail to Ms. Agarwal and you and
19  says, quote, "the short answer --" let's pull that out.
20          "The short answer for TH --"
21          You understood that as Target Health; right?
22  A.  Yes.
23  Q.  "Is that these are all high RHM."  Rheumatology; right?
24  A.  Yes.
25  Q.  "The short answer for Target Health is that these are all

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 89 of 311 PageID #:14034
Ketchum - cross by Hueston
1477

1  high rheumatology prescribers, but I need to discuss with you

2  please."  Right?

3  A.  That's what it says, yes.

4  Q.  Okay.  So you didn't see this before you testified that,

5  you know, family practitioners might actually not -- that are

6  listed might not be likely to prescribe the drug; right?

7  A.  No.

8  Q.  And we saw earlier that Ms. Bautista was planning to ask

9  Abbvie whether they accepted the offices as relevant and

10  wanted to count them in the campaign; right?

11  A.  I did.

12  Q.  And do you recall, in fact, that Abbvie, because you

13  worked on those subsequent affidavits, they didn't ask to

14  remove those high-prescribing rheumatology offices even though

15  they were technically primary care.  Are you aware of that?

16  A.  I was not.

17  Q.  Okay.  Let's go -- first, just to put this in

18  perspective -- well, let's go to exhibit 193.  This is now

19  April 5, 2013.  And here Ms. Agarwal -- it's an e-mail from

20  Agarwal to Mr. Shah.  And she says:

21          "We keep running into this issue what to do.  They

22  realized they were PCPs last time but didn't ask to remove

23  yet."  Right?

24  A.  Yes.

25  Q.  That's April 5th; right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 90 of 311 PageID #:14035
Ketchum - cross by Hueston
1478

1    A.  Yes.

2    Q.  And if compare in time, we go back to 183 at 3, March 7,

3    2013, at page three.  And here:

4           "Technically these offices are marked as IMs but they

5    have opted into our rheumatoid health network as they see

6    RA --" rheumatology -- "patients and wanted rheumatology

7    program.  Let me know if this suffices."  Right?  "Otherwise

8    we can scrub this off."  Correct?

9    A.  Yes.

10   Q.  And I showed you the e-mail a month later where that

11   hadn't happened; right?

12   A.  Yes.

13   Q.  So, sir, you'd agree with me possibly Ms. Bautista didn't

14   go back to --

15           MR. HANKEY:  Objection.

16           MR. HUESTON:  I didn't finish my question.

17           MR. HANKEY:  Your Honor, speculation.

18           THE COURT:  Well, I think the word "possibly" tipped

19   off the objection, so rephrase.

20           MR. HUESTON:  All right.  I'll rephrase.

21   BY MR. HUESTON:

22   Q.  You would agree by the e-mails we're seeing here that it

23   appears that Abbvie had deemed the offices relevant and

24   acceptable through this time?

25           MR. HANKEY:  Foundation.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 91 of 311 PageID #:14036
Ketchum - cross by Hueston
1479

1    THE COURT:  If he knows.

2  BY MR. HUESTON:

3  Q.  From what you've seen.

4  A.  From what I've seen, it does look that way.

5    THE COURT:  Well, no, it's -- you're not--

6    THE WITNESS:  I apologize, your Honor.

7    THE COURT:  Many of these e-mails you haven't seen

8  before and you're simply being asked to read them.

9    THE WITNESS:  Yes.

10    THE COURT:  And the question is what your knowledge

11  is based on what you recall, not on things you saw in court.

12    THE WITNESS:  Yes, your Honor.

13  BY THE WITNESS:

14  A.  I can't speak to that.

15  BY MR. HUESTON:

16  Q.  Okay.  Now, let's go to exhibit 159-A.  This is the data

17  that accompanied the proof of performance you sent out to the

18  client.  Let's pull this up.  Okay.  Just for orientation,

19  there's the e-mail.

20    And there would be the update report that would be

21  sent; right?

22  A.  Yes.

23  Q.  Okay.  And if we go to one -- I'm sorry, that's 159.  I

24  think it's 149.  We'll just -- let's go past this.  We'll come

25  back later, if we can.  Let's go to the discussion about

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 92 of 311 PageID #:14037
Ketchum - cross by Hueston
1480

1    whether Outcome under-delivered in the Humira campaign.

2            As we went over earlier, the first contract called

3    for 325 sites for the full year; right?

4    A.  Yes.

5    Q.  And you don't dispute that Outcome scheduled and delivered

6    those 325 sites once it received the advertising content from

7    the client; right?

8    A.  No.

9    Q.  So the first contract was satisfied; right?

10   A.  Yes, I believe so.

11   Q.  And the second contract, the extension, that called for

12   the additional -- we've been seeing 155 screens, right,

13   beginning in February, 2013?

14   A.  Yes.

15   Q.  And as we went over earlier, Mr. Kemp reported that those

16   155 locations for February, they went live on January 31st.

17           Do you remember seeing that?

18   A.  Yes, I remember seeing that.

19   Q.  Okay.  And by your own count that you circulated in weekly

20   reports, you agree that Humira was consistently playing on

21   over 480 screens; right?

22   A.  Yes.

23   Q.  So let's pull up GX-194 as an example.  And this is dated

24   April 7, 2013.  Do you see that?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 93 of 311 PageID #:14038
Ketchum - cross by Hueston
1481

1  Q.  And let's go to page 2.  And here you're reporting that
2  Humira was on 502 screens; right?
3  A.  Yes.
4  Q.  And that's more than 480; right?
5  A.  Yes.
6  Q.  That's over-delivery, not under-delivery; right?
7  A.  It appears so, yes.
8  Q.  Okay.  So let's go to CX-10180.  And let's pull up the
9  chart that you originally went over in your direct.
10        And you remember, this is the one that you went
11  through on direct with Mr. Hankey; right?
12  A.  Yes.
13  Q.  And so now we'll go to CX-10180 at two.  And we're going
14  to add the data points now that we've covered, including
15  Mr. Kemp saying, "the 155 sites went live on February 1st."
16        Do you see that?
17  A.  Yes.
18  Q.  And what we just covered, your representation, there were
19  502 screens in early April.  Do you see that?
20  A.  I do.
21  Q.  So it's starting to look a little bit different; right?
22  A.  It does.
23  Q.  And beyond those 480 screens, that just leaves the third
24  contract, right, which is represented on a slide there that
25  you covered in direct which shows those little step-ups;

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 94 of 311 PageID #:14039
Ketchum - cross by Hueston
1482

1    right?

2    A.  Yes.

3    Q.  And as we covered earlier, sir, that was the contract for

4    Outcome's predicted incremental growth; right?

5    A.  Yes.

6    Q.  As it would grow over those months; right?

7    A.  Yes.

8    Q.  And you remember we covered an e-mail that you saw for the

9    first time where Mr. Mons said, "when projecting the future

10   incremental growth, Outcome couldn't perfectly predict the

11   future."  Right?

12   A.  Yes.

13   Q.  Okay.  So now let's go back to our demonstrative.

14            MR. HANKEY:  Your Honor, objection.  Could we have a

15   sidebar?

16            THE COURT:  All right.

17            MR. HANKEY:  Thank you.

18        (Proceedings heard at sidebar.)

19            THE COURT:  Go ahead.

20            MR. HANKEY:  Your Honor, so we have seen these

21   before.  We saw them this morning right before we started.

22   And we looked at them briefly, and we're okay with them then,

23   but we've now noticed that the X that we were just discussing

24   showed the 500 screens is placed on the chart closer to 600

25   rather than 500 on the chart.  It's a misleading

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 95 of 311 PageID #:14040
Ketchum - cross by Hueston
1483

1   demonstrative.

2           THE COURT:  Well, that's redirect.  You've got the

3   chart.  If the defense put the number in wrong, I think they

4   will either correct it right now or pay for it on redirect.

5           MR. HUESTON:  That's right.

6           THE COURT:  But that's the -- I don't find this so

7   misleading that you can't correct it on cross.

8           MR. HUESTON:  There was certainly no intention to do

9   that.

10          THE COURT:  Well, maybe you can clean it up now.

11          MR. HUESTON:  Yeah.

12          THE COURT:  Okay.

13          MR. HUESTON:  Yes, we will.

14          MR. HANKEY:  Okay.

15          THE COURT:  Thank you.

16      (End of sidebar proceedings.)

17  BY MR. HUESTON:

18  Q.  Okay.  So going back here -- look, by the way, the X seems

19  to be higher than the -- it should be.  It's poked a little

20  high.  It was supposed to be where about 500 is; right?

21  A.  Yes.

22  Q.  Yeah.  And that's still higher than the 480 which was what

23  was the objective, as you described it; right?

24  A.  I believe so, yes.

25  Q.  Okay.  Over-performance; right?

1  A.  Yes, it appears that way.  Yes.

2  Q.  Okay.  So let's now go to page 3 of our demonstrative now.

3  We just covered how Mr. Mons said that when he was predicting

4  future incremental growth he said that Outcome to the client

5  couldn't be perfectly predictive of the future; right?

6  A.  Yes.

7  Q.  So let's add that data point in.  That covers that period

8  when he was talking about that projected incremental growth;

9  right, sir?

10  A.  It appears so, yes.

11  Q.  Okay.  And, sir, I think you testified about how that

12  extension period there covered in green, at least your

13  recollection at the time was, that it was not a

14  weighted-average agreement; right?

15  A.  Yes.

16  Q.  And the question of whether it was weighted average or not

17  is important because you testified, I think, that

18  weighted-average campaigns, in your recollection, were an

19  exception to the general rule about whether it was okay to

20  grow into a contract over time; right?

21  A.  Yes.

22  Q.  Okay.  And I think you said that if a campaign was

23  actually one of the exceptions to what you're remembering as

24  your general rule, then you would expect the exception to be

25  pretty clearly discussed; right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 97 of 311 PageID #:14042
Ketchum - cross by Hueston
1485

1    A.  Yes.

2    Q.  Okay.  And I believe you were asked on direct if there

3    were any e-mails that you saw between the client's agents,

4    like Ms. Bautista, indicating that one or more of these

5    exceptions applied; right?

6    A.  Yes.

7    Q.  Okay.  Let's go to CX-10099.

8            And this is an e-mail from Mr. Mons to you.  Subject:

9    Humira schedule of additional RA screens in 2013.  Sent

10   January 23, 2013.  Do you see that?

11   A.  Yes.

12   Q.  And you haven't seen this e-mail before; have you?

13   A.  I don't believe so.

14   Q.  And he's forwarding you an e-mail to the Humira client,

15   Yesenia Bautista at Target Health.  Do you see that?

16   A.  I do.

17   Q.  And down below, as to the third commitment, Mr. Mons

18   explains in the third bullet, "110 RA screens."

19            Do you see that?

20   A.  Yes.

21   Q.  "Weighted average."  Those are the words he used; right?

22   A.  It is.

23   Q.  "From April to December will be added beginning

24   April 1st."  Right?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 98 of 311 PageID #:14043
Ketchum - cross by Hueston
1486

 1   Q.  And Mr. Shah and Mr. Mons are on this e-mail during the

 2   negotiations, but you were not part of the negotiations;

 3   right?

 4   A.  Correct.

 5   Q.  You agree right here, Mr. Mons is describing 110 screen

 6   extension as being based on a weighted average.  Right, sir?

 7   A.  Yes.

 8   Q.  Okay.  And let's look at one more communication that you

 9   weren't included on.  Let's go to CX-10175.  And this is an

10   e-mail from Mr. Mons to Mr. Shah, cc'ing Shradha Agarwal.

11           And we looked at this earlier.  Mr. Shah was laying

12   out a deployment plan for a weighted average of 110; right?

13   A.  Yes.

14   Q.  Okay.  And we look at the last paragraph.  He says to

15   Mr. Mons, quote:

16           "You may not need to give them this monthly

17   breakdown - maybe just the weighted average of 110 and then

18   quarterly numbers."

19           Do you see that?

20   A.  I do.

21   Q.  There are the words "weighted average" again; right?

22   A.  Yes.

23   Q.  And an indication -- well, Mr. Mons communicated with the

24   client; right, sir?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 99 of 311 PageID #:14044
Ketchum - cross by Hueston
1487

 1  Q.  All right.  We can put that down.

 2          Let's go to one last item here on Humira.  And,

 3  again, to orient, let's look at this GX-1134.  This was a

 4  delivery chart that was constructed with on your direct exam.

 5  Let's pull that up.  GX-1134.

 6          Okay.  Here we are.  Do you remember seeing this,

 7  sir?

 8  A.  Yes.

 9  Q.  Okay.  And the Humira campaign here was actually scheduled

10  to go from January through December; right?

11  A.  I believe so, yes.

12  Q.  But this chart ends in June; right?

13  A.  Yes.

14  Q.  Okay.  So I don't think there was testimony earlier about

15  what happens afterwards, so let's try to look at what happens

16  here.  GX-197.  Let's go to that.

17          And here is an April 9, 2013, e-mail from you to

18  Ms. Tiffany Yuh at Target Health.  Subject:  April documents.

19          Do you see that?

20  A.  Yes.

21  Q.  And the e-mail that you're sending has several

22  attachments, including the April affidavit for Humira; right?

23  A.  Yes.

24  Q.  And if we go to page 150 of this exhibit, we'll see --

25  the -- there is an affidavit for Humira.  Do you see that?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 100 of 311 PageID #:14045
Ketchum - cross by Hueston
1488

1  A.  Yes.

2  Q.  And this affidavit, this has your signature; right?

3  A.  Yes.

4  Q.  All right.  And, again, once again, we have this funny

5  thing here where you're signing this.  It looks like you're

6  signing it April 5th; right?

7  A.  Yes.

8  Q.  And it's supposed to cover stuff that's going to happen at

9  the end of the month; right?

10  A.  Yes.

11  Q.  So, again, not clear.  You're signing something April 5th,

12  but it appears to be what you're guessing or believing is

13  going to happen by the end of the month; right?

14  A.  Yes.

15  Q.  So let's pull up GX-198.  And you recall at the bottom of

16  page 1 we saw that Mr. Crandall -- let's go to the bottom of

17  page 1 -- was confirming with Ms. Bautista that Humira was

18  electing to pause the campaign.

19        Do you remember us going over that?

20  A.  I do.

21  Q.  And I think you testified -- you've already testified the

22  campaign appeared to restart when Humira sent new advertising

23  to Outcome around May 10th; right?

24  A.  Yes.

25  Q.  Okay.  So let's go now to 10180, page 4.  We're going to

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 101 of 311 PageID #:14046
Ketchum - cross by Hueston
1489

1    add to the demonstrative.  So let's now plot the fact that the

2    campaign was paused from April 9th to May 5th.

3            Okay.  Do you see that?

4    A.  I do.

5    Q.  All right.  That's roughly the period.  It's just a

6    demonstrative that you're remembering there was a pause in the

7    campaign; right?

8    A.  Yes.

9    Q.  And we've just gone over whether this campaign includes a

10   weighted average understanding; right?

11   A.  Yes.

12   Q.  And you'd agree if there was a weighted-average component,

13   some under-delivery would be okay, as long as it's made up at

14   some later time; right?

15   A.  Yes.

16   Q.  And so if there is a weighted-average component here,

17   it's -- with what we're seeing through June, it's impossible

18   to know whether the weighted average was actually hit based on

19   the data we have here; right, sir?

20   A.  Yes.

21   Q.  Okay.  We can put that down.

22           All right.  I want to turn to a different topic.

23   Let's go to Exhibit 10219.  And this is a May 18, 2012, e-mail

24   from Mr. Mons to Mr. Shah.  Subject:  DLife contact info.

25           Do you see that?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 102 of 311 PageID #:14047
Ketchum - cross by Hueston
1490

1    A.  Yes.

2    Q.  And there is a note that is being sent to a Jean Luke.

3    Medication, Qnexa.  Right?

4    A.  Yes.

5    Q.  And just separate from this document, you recall that

6    Qnexa is a weight-loss medication that would eventually be

7    renamed Qsymia before it was launched?

8    A.  Yes, I believe so.

9    Q.  And you remember the manufacturer of Qsymia is VIVUS or

10   VIVUS?

11   A.  Yes.

12   Q.  In that first paragraph, Mr. Mons writes:

13           "ContextMedia is a Chicago-based company that

14   operates the largest and fastest growing condition-specific

15   point-of-care health media network in the nation."

16           Do you see that?

17   A.  Yes.

18   Q.  And this, again, was a May 2012 e-mail; right?

19   A.  Yes.

20   Q.  And in the next sentence, he writes:

21           "In 2013, we will reach approximately 8,000

22   prescribers."

23           Right?

24   A.  Yes.

25   Q.  And this is May, and he's talking 2013, months later;

1  right?

2  A.  Yes.

3  Q.  So let's now go to DX-10220.  And this is an e-mail

4  between Steve Svec -- I'm sorry, did I pronounce his name

5  right?

6  A.  Svec, yes.

7  Q.  All right.  He was an Outcome salesman; right?

8  A.  He was.

9  Q.  And Mr. Shah.  Subject:  Endo percentage.  Dated

10  September 27, 2011.  Right?

11  A.  Yes.

12  Q.  On page 2 he writes:

13        "I'm working on a proposal for next year and the

14  client only wants Endos not PC."  Right?  "What is our current

15  percentage of Endos in DHN, and Rishi, can I apply that to

16  next year's weighted average?"

17        See those words?

18  A.  Yes.

19  Q.  And separate again from this document, you know that

20  AndroGel is a medicine manufactured by Abbott; right?

21        Sorry, was that a yes?

22  A.  Yes, it was.

23  Q.  Okay.  And going to the middle of page 1, Mr. Shah's

24  e-mail at 8:52 PM, Mr. Shah writes, quote:

25        "Steve, I'd base it on a weighted average of 900

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 104 of 311 PageID #:14049
Ketchum - cross by Hueston
1492

1   screens."  Do you see that?

2   A.  Yes.

3   Q.  And then Mr. Svec says, quote:

4           "I think we should trim that down to 850 to be safe."

5   And he says because he didn't want to, quote:

6           "Blow them -- " that's the client " -- away."  Right?

7   A.  Yes.

8   Q.  And what does Mr. Shah say up above?  He says, "fine with

9   850."  Right?

10  A.  He does.

11  Q.  All right.  Now, sir, before you had seen all these

12  documents today and what I showed you yesterday, I think you

13  testified last week that there were only some clients who knew

14  about projected growth; right?

15  A.  That was my understanding, yes.

16  Q.  Okay.  And you testified, you know, that it may have just

17  been an exception; right?

18  A.  I did.

19  Q.  But we've now reviewed that growth was disclosed to

20  AstraZeneca.  Do you remember that?

21  A.  Yes.

22          MR. HANKEY:  Objection.  Asked and answered.

23          THE COURT:  Sustained.  The review you can use during

24  your interim statement or closings.

25          MR. HUESTON:  Okay.  Okay.

1    BY MR. HUESTON:

2    Q.  We've reviewed a number of clients; right?

3    A.  Yes.

4    Q.  They were all big clients; right?

5    A.  Yes.

6    Q.  All right.  And I won't review them all, but can you name

7    any other big clients during 2012, that we haven't covered in

8    what I've reviewed to you -- with you over the last two days?

9    A.  Not that I can recall.

10   Q.  All right.  And, sir, then you'd agree, here's the 2012

11   period, whatever happened after you were replaced by Mr. Desai

12   and Mr. Shah transitioned to a higher-level role, when

13   Mr. Shah was running the show, it appears that every single

14   client that --

15            MR. HANKEY:  Object to the form.

16   BY MR. HUESTON:

17   Q.  -- you've identified was informed of Outcome's growth

18   projections; right?

19            MR. HANKEY:  Speculation.  Argumentative.

20            THE COURT:  What Mr. Shah was aware of, unless he had

21   a direct conversation with you, is sustained.

22   BY MR. HUESTON:

23   Q.  Okay.  Sir, what we've reviewed, you would agree, it's

24   showing disclosures of growth; right?

25            MR. HANKEY:  Objection.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 106 of 311 PageID #:14051
Ketchum - cross by Hueston
1494

1    THE COURT:  Overruled.

2  BY THE WITNESS:

3  A.  Yes.

4    MR. HUESTON:  Just one moment.  Apparently they're

5  trying to re-load an exhibit I lost.

6    THE COURT:  All right.

7    MR. HUESTON:  Okay.  We're ready to go.

8  BY MR. HUESTON:

9  Q.  Okay, Mr. Ketchum.  We're rounding the bend here.  Almost

10  done.  Last topic.

11    Last week you testified about your understanding of

12  your work at Outcome, right, how you felt about it at the

13  time; right?

14  A.  Yes.

15  Q.  I think I believe I heard you say that when you were at

16  Outcome, you really believed in the mission and the work that

17  the company was doing; right?

18  A.  I absolutely did, yes.

19  Q.  And you even explained how it wasn't until years later in

20  hindsight that you connected your work with any notion of

21  wrongdoing; right?

22  A.  Yes, I recall that.

23    MR. HANKEY:  Misstates the evidence, your Honor.

24    MR. HUESTON:  He just said yes.

25    THE COURT:  Well, again, the question is not the

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 107 of 311 PageID #:14052
Ketchum - cross by Hueston
1495

1    evidence, the answer of the witness is.  If there's an

2    objection that some testimony is misstated, that's for you to

3    decide, the jury, not for the lawyers.

4         Objection overruled.

5         Wait for your next question.

6         Go ahead.

7    BY MR. HUESTON:

8    Q.  Okay.  And you said, sir, that -- let me ask you:

9         Do you recall, you said you "had a hard time

10   connecting your work at Outcome with the concept of

11   wrongdoing, but that gradually changes.  You re-reviewed

12   e-mails during meetings with the government."

13        Do you remember saying that?

14   A.  Yes.

15   Q.  All right.  And, sir, you testified that the e-mails -- I

16   think you've testified that the e-mails that you and I have

17   reviewed, that's helped put some context on these earlier

18   e-mails; right?

19   A.  Yes.

20   Q.  And in many instances, the e-mails that we reviewed

21   together were e-mails you had been copied on; right?

22   A.  Yes.

23   Q.  Or you wrote yourself, right --

24   A.  Yes.

25   Q.  -- ten years ago, but you had forgotten them; right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 108 of 311 PageID #:14053
Ketchum - cross by Hueston
1496

1    A.  Yes.

2    Q.  Okay.  And that's understandable; right?  Can't be

3    expected to remember everything that's happened ten years ago.

4    Is that right?

5            MR. HANKEY:  Asked and answered.

6            THE COURT:  Overruled.  But it is a second time, so

7    no more after that.  You can answer the question.

8            MR. HUESTON:  Yeah, sure.

9    BY MR. HUESTON:

10   Q.  Certainly reasonable that you can forget some things ten

11   years ago; right?

12   A.  Yes.

13   Q.  Okay.  I want to briefly take a look at your understanding

14   of Outcome as expressed while you were there.  So let's go to

15   DX-5599.  And you will see this is an e-mail from you dated

16   March 20, 2012, from you to Mr. Shah, Ms. Agarwal, and others.

17   Subject:  Summary of visits/audits.

18           Do you see that?

19   A.  Yes.

20   Q.  You wrote:  "Hello, everyone.  Below is a brief summary of

21   my visits to Indiana and Wisconsin."

22           Right?

23   A.  Yes.

24   Q.  And I want to go to the last bullet, where you write,

25   quote:  "Two of the DHN clinics in particular share our core

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 109 of 311 PageID #:14054
Ketchum - cross by Hueston
1497

1  values, and we had a really good discussion surrounding them.

2  One of our DHN sites in Indiana was so crowded people were

3  shoulder-to-shoulder sitting and standing (and one in a

4  wheelchair.)  But everyone was engaged in our programming.

5  They were laughing together and took notes, even though there

6  was limited space to move their arms.  It was an interesting

7  situation from my perspective because I saw patients who

8  should have been uncomfortable (they probably were) but the

9  DHN seemed to not only educate but bring them together and

10  keep the atmosphere relaxed in the waiting room."

11         Those are your words; right?

12  A.  Yes, I recall that.

13  Q.  When you testified last week about real caring for the

14  company, it's because you saw the impact it had on patients;

15  right?  That's an example?

16  A.  It sure is.

17  Q.  Let's go to DX-10222.  And this is an e-mail from Mr. Shah

18  to you on October 2nd, 2012, copying everyone, it says; right?

19  There's an everyone list serve at the top?

20  A.  Yes.

21  Q.  Okay.  That's for everybody in the entire company?

22  A.  Yes.

23  Q.  And there's no text below, but Mr. Shah is forwarding this

24  thing on to everybody that you're sending him; right?

25  A.  Yes, it appears that way.

1  Q.  And let's go into the e-mail you wrote.  And I just want

2  to highlight a couple things.  You wrote, quote:  "I wanted to

3  take a quick moment to share a story that I think will strike

4  a chord with everyone.  As you are all aware, we are

5  navigating a legal matter and preparing a response.  As part

6  of our response, we have reached out to a few members who have

7  switched out from HAN."

8         And then in the second paragraph, you write, quote:

9  "The part where this really becomes inspirational started this

10  morning when it was brought to our attention that we needed

11  members -- "

12         And by members, those are doctors; right?

13  A.  Yes.

14  Q.  "To sign new, more formal documents, and going even

15  further, to sign them under oath."

16         Right?

17  A.  Yes.

18  Q.  And then below you said that after a member office had

19  gone out of their way to get this done themselves, they had

20  written to you, quote:  "Not necessary, friends take care of

21  friends."

22         Right?

23  A.  Yes.

24  Q.  And then right below that, you wrote, quote:  "It doesn't

25  even matter what member office this is or which MSE happens to

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 111 of 311 PageID #:14056
Ketchum - cross by Hueston
1499

1  be the point person for the office because no matter who it

2  is, the response would have been very similar."

3         Right, sir?

4  A.  Yes.

5  Q.  Okay.  So in the last exhibit we looked at, you were

6  describing how Outcome's products help patients; right?

7  A.  Yes.

8  Q.  And in this exhibit, we're looking at how doctors' offices

9  were really enthusiastic about Outcome; right?

10  A.  Yes.

11  Q.  Let's go to DX-6201.  And this is a July 28, 2012, e-mail

12  from you to Mr. Shah, copying the sponsorship team.  Subject:

13  Best media kit ever.

14         Do you see that?

15  A.  I do.

16  Q.  Okay.  And we see the embedded e-mail halfway down the

17  page.  It's from a Gina Buttafoco at Direct Advantage; right?

18  A.  Yes.

19  Q.  And you recognize -- Direct Advantage was an advertising

20  agency; right?

21  A.  Yes.

22  Q.  And in the first paragraph she writes that Outcome had

23  sent her a media kit loaded on an iPad; right?

24  A.  Yes.

25  Q.  And then if we go two paragraphs down, she wrote, quote:

1    "I've been in this business probably longer than either of you

2    have been alive, and I've never received a media kit that I

3    wanted to tear into more.  Saying thank you, no matter how

4    many o's, you put in the word so before much is soooooo

5    inadequate, but it's all I've got.  So thank you, much."  Do

6    you see that?

7    A.  I do.

8    Q.  Then up above, Mr. Shah forwards the message; right?

9    A.  He does.

10   Q.  Okay.  And he says:  "Sometimes it pays to be

11   unconventional.  A very emotive note from the founder of

12   Direct Advantage responsible for allocating about 100 million

13   of Novo's ad spend last year."

14            Do you see that?

15   A.  I do.

16   Q.  Let's go to your reply.  What do you say in reply?

17   A.  I say that is "aaaaaawesome."

18   Q.  And you really "aaaaaawesome;" right?

19   A.  Yes, I was mimicking the -- mirroring the -- not

20   mimicking, that's incorrect.  I was mirroring the amount of

21   letters in the "so."

22   Q.  Because you agreed with that sentiment?

23   A.  Yes.

24   Q.  Okay.  So we looked at patients, doctors.  This is now

25   another stakeholder, advertising agencies; right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 113 of 311 PageID #:14058
Ketchum - cross by Hueston
1501

1  A.  Yes.

2  Q.  Enthusiastic about Outcome; right?

3  A.  Yes.

4  Q.  And you agree that Outcome grew under Mr. Shah's

5  leadership because it did things differently; right?

6  A.  It did, yes.

7  Q.  It had great and innovative ideas and executed on them;

8  right?

9  A.  I agree with that, yes.

10  Q.  Okay.  We can take that one down.

11          Now, I think you testified that at certain point at

12  your time at Outcome Health you transitioned to working with

13  hospital systems; right?

14  A.  Yes.

15  Q.  So let's go to DX-6203.  And this is an e-mail from you to

16  everyone; right?

17  A.  Yes.

18  Q.  And the subject line is:  The outcomes of great service.

19          Right?

20  A.  Yes.

21  Q.  And one e-mail down, we see that Ms. Peggy Hasenauer at

22  University of Chicago had written:  "Please have anyone

23  interested in learning about our wonderful experience with

24  your company to call me on my cell or send an e-mail to this

25  address."

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 114 of 311 PageID #:14059
Ketchum - cross by Hueston
1502

1      Do you see that?

2   A.  I do.

3   Q.  And up above, you wrote:  "Team, please see the below

4   e-mail from our contact at the University of Chicago.  We have

5   had several CMer's --" that's people, ContextMedia; right?

6   A.  Yes.

7   Q.  "Work closely with Peggy over the years and each has done

8   an amazing job of building rapport and ultimately delivering

9   on our mission.  A special shout out to Tony N., and Julie J.,

10  who have really driven this relationship.  I could send a note

11  like this multiple times per day based on all of the

12  incredible feedback that we get, but I'd rather have everyone

13  working to add more members and working to serve more members

14  versus reading more e-mails."

15      Right?

16  A.  Yes.

17  Q.  Okay.  So we've now seen patients, doctors, media

18  companies and now hospitals; right?

19  A.  Yes.

20  Q.  And, again, when you were explaining last week about when

21  you worked at Outcome, this is the kind of stuff that you were

22  seeing back then that was making you feel proud of it; right?

23  A.  Yes.

24  Q.  And so you not only believed in the company, but you

25  believed that Mr. Shah and Ms. Agarwal were great leaders;

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 115 of 311 PageID #:14060
Ketchum - cross by Hueston
1503

1  right?

2  A.  Yes.

3  Q.  Let's go to DX-6204.  And here's an August 1st, 2013,

4  e-mail from you to Ms. Agarwal and Mr. Shah.  Subject:  ITA

5  spotlight.  And that's referring to Illinois Technology

6  Association; right?

7  A.  Yes.

8  Q.  And you see below you're quoting from the Illinois

9  Technology Association spotlight article; right?

10  A.  Yes, I am.

11  Q.  And the quote was, quote:  "The founders have so much

12  passion about their work.  Sometimes even business-related

13  events become part of their playtime.  That's what happens

14  when you love the people you work with, you love what you do,

15  and you enjoy every element of it, while in the office or out

16  of it."

17        Do you see that?

18  A.  I do.

19  Q.  And you forwarded this; didn't you?

20  A.  I did.

21  Q.  And you wrote down below:

22        "So true!" Exclamation points.  Right?

23  A.  Uh-huh.

24        THE COURT:  You have to use words.

25        THE WITNESS:  Yes.  Oh, sorry, your Honor.  Yes.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 116 of 311 PageID #:14061
Ketchum - cross by Hueston
1504

1  BY MR. HUESTON:

2  Q.  You believed that; right, sir?

3  A.  I did.

4  Q.  Let's go to DX-10223.  And here is an August 18, 2012,

5  e-mail from you to Mr. Shah.  Subject:  Hello.

6       Do you see that?

7  A.  Yes.

8  Q.  And you see below Mr. Shah had sent you an article; right?

9  A.  Yes.

10 Q.  And you write here, quote:  "I still have a feeling

11 someone will approach you in a couple years about writing a

12 book about building a successful company from scratch and the

13 culture necessary to do it."

14      Right?

15 A.  Yes.

16 Q.  And, again, you genuinely believed that; right, sir?

17 A.  Yes.

18 Q.  And you wrote, quote:  "Just imagine the size we will be

19 by then."

20      And you thought that Outcome would keep growing and

21 keep succeeding; right, sir?

22 A.  I did.

23 Q.  Let's go to DX-10225.  And we now move to 2014.  This is

24 an e-mail from you to Mr. Shah.  Subject:  Thank you.

25      Right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 117 of 311 PageID #:14062
Ketchum - cross by Hueston
1505

1  A.  Yes.

2  Q.  And you wrote:  "RS - I just wanted to drop you a quick

3  note to thank you for including me on your one-on-one walks.

4  It was nice to catch up with you, and I look forward to

5  continue sharing ideas, struggles, and general conversation."

6        Right?

7  A.  Yes.

8  Q.  So you talked about sharing ideas and struggles with

9  Mr. Shah; right?

10  A.  Yes.

11  Q.  And you'd agree that things weren't always perfect at

12  Outcome; right?

13  A.  Of course not.

14  Q.  And by these things, these one-on-ones, you saw that

15  Mr. Shah was open to hearing about problems like this and

16  working to fix them; right?

17  A.  Yes.

18  Q.  And that's what a good leader does; doesn't he?  Right,

19  sir?

20  A.  Yes.

21  Q.  Takes time to hear from employees, listen to struggles,

22  and work on solutions.  Fair?

23  A.  Yes.

24  Q.  Let's go to DX-10224.  And this is an October 11, 2012,

25  e-mail from you to Mr. Shah.  Subject:  Thank you.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 118 of 311 PageID #:14063
Ketchum - cross by Hueston
1506

1         Right?

2    A.   Yes.

3    Q.   And let's go to the second paragraph.  You talk about

4    receiving what you describe as the, quote:  "Incredible honor

5    of the PMA."

6         Do you remember that?

7    A.   I do.

8    Q.   That was the Purple Man Award; right?

9    A.   It was.

10   Q.   Sir, yesterday we reviewed e-mails where there were

11   concerns raised about reliability at times, but people did at

12   the company recognize your commitment and passion; right?

13   A.   Yes.

14   Q.   And the Purple Man Award was recognizing that; right?

15   A.   Yes.

16   Q.   So up above you write, quote:  "Rishi, as you could

17   probably tell, I was pretty overcome with emotion today and

18   was pretty much at a loss for words.  As I reflect back on the

19   day and last year, I just get filled with such joy and

20   excitement.  Joy because I get to work with such great people

21   and have made such great friends, and excitement because we

22   have so much more to do."

23        Right?

24   A.   Yes.

25   Q.   "I just want to say thank you, thank you for the

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 119 of 311 PageID #:14064
Ketchum - cross by Hueston
1507

1  incredible honor of the PMA.  Thank you for such a generous

2  gift.  Thank you for leading such a great company.  Thank you

3  for being so great to work for, and thank you for being a

4  great friend."

5        Right?

6  A.  Yes.

7  Q.  Okay.  And that was 2012; right?

8  A.  Yes.

9  Q.  We can take that down.

10       Now, last week, sir, I think there was testimony

11 about how you might have mentioned -- or the word Ponzi scheme

12 might have come up with Mr. Shah.  Do you remember that?

13 A.  Yes.  Sent an e-mail to that effect.

14 Q.  Okay.  And when you use that phrase, you were saying to

15 Mr. Shah, obviously Outcome is not a Ponzi scheme; right?

16 A.  Yes.

17 Q.  Okay.  And let's go to GX-875.  And this is a

18 February 22nd, 2017, e-mail chain; right?

19 A.  Yes.

20 Q.  And here there is an embedded e-mail from you to Mr. Shah.

21 Subject:  Feedback.

22       Do you see that?

23 A.  I do.

24 Q.  And you wrote:  "Hey, RS."  That's Mr. Shah; right?

25 A.  It is.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 120 of 311 PageID #:14065
Ketchum - cross by Hueston
1508

1  Q.  "You told me to keep the feedback coming."

2         Right?

3  A.  Yes.

4  Q.  You wanted your feedback; right?

5  A.  Yes.

6  Q.  Even when it was some tough feedback?

7  A.  Yes.

8  Q.  "You told me to keep the feedback coming early, and I

9  wanted to let you know about some things I hope we can get in

10  front of.  I'm going to be pretty blunt here.  One, because we

11  have a long history of working together.  And two, because

12  we've been good friends for years, and I know you want to hear

13  it.  This is our company and our family, and I am seeing and

14  hearings some things I want to make sure we look at."

15         Do you see that?

16  A.  Yes.

17  Q.  And you're noting that Mr. Shah had asked for feedback;

18  right?

19  A.  Yes.

20  Q.  And let's look at a few of the areas that you raised for

21  discussion.  Let's go to "Staff Departures."  And here you

22  wrote:  "In CS, the departure of several --" quote-unquote.

23  You put kind of air quotes there -- "'senior folks'"?

24  A.  Yes.

25  Q.  "Has people asking questions and some people are making up

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 121 of 311 PageID #:14066
Ketchum - cross by Hueston
1509

1  their own stories;" right?

2  A.  Yes.

3  Q.  And when you put "senior" in kind of air quotes, that

4  indicates some skepticism by you that they're truly senior?

5  A.  No, no.  That's not skepticism.  That's folks who held

6  senior titles.

7  Q.  Okay.  That's good.  And then you continue:  "I heard

8  someone in New York use the phrase --" quote -- "'this place

9  is a Ponzi scheme,' and now people are reading on Glassdoor

10 that Collin W left because he was afraid of losing his

11 license."

12         And then you say, "clearly not the reason for his

13 taking a new role."  Right?

14 A.  Yes, correct.

15 Q.  And then you say:  "We've made strides here about

16 communicating the go-forward strategies, but anything we can

17 do to just flat out squash that type of talk and

18 misinformation would be really helpful."

19         Do you see that?

20 A.  Yes.

21 Q.  And so, sir, you understood that this information about

22 why people left, you understood that to be misinformation

23 based on people, as you were writing, making up their own

24 stories; right?

25 A.  Yes.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 122 of 311 PageID #:14067
Ketchum - cross by Hueston
1510

1  Q.  And you knew for a fact that some rumor on Glassdoor about

2  Outcome's lawyer leaving for fear of losing his license, you

3  said it was just not true; right?

4  A.  Yes.

5  Q.  And you continue in the next sentence, quote:  "Our

6  leaders there are mostly new and may not know how to squash

7  this sort of behavior."

8          Right?

9  A.  Yes.

10 Q.  And the next paragraph down, you wrote:  "For example,

11 last week a candidate asked the interviewer (it wasn't me, I

12 don't interview people anymore) if the stories about fraud

13 were true.  I was available to jump in and do a deep dive on

14 CS and share personal examples of where program results

15 weren't positive, but by being transparent, we were able to

16 build trust with trust, a go-forward plan with a client."

17         Right?

18 A.  Yes.

19 Q.  "Connecting the dots was helpful for the candidate, but we

20 need everyone to understand these types of stories and how we

21 rely on transparency and partnership, so we can just squash

22 this type of talk because it's just ridiculous."

23         That's what you wrote; right?

24 A.  Yes.

25 Q.  And by the way, what you said earlier there, about sharing

 1   personal examples where the program results weren't positive

 2   but by being transparent were able to build a trust -- trust

 3   going forward, that describes some of the examples we've gone

 4   over; right?

 5   A.  Yes.

 6   Q.  Okay.  And you saw firsthand, sir, as you wrote right

 7   here, that when there were issues on campaigns or failures to

 8   meet guarantees, you describe that you and others were very

 9   transparent with the client and had presented a go-forward

10   plan; right?

11   A.  Yes.

12   Q.  And so you'd agree, sir, that under-delivery, that's just

13   the beginning of the story; right?

14   A.  Yes.

15   Q.  And if you're transparent and provide a go-forward plan,

16   then you've been doing -- you do right by the client; right?

17   A.  Yes.

18   Q.  Okay.  So at this point in time, in February 2017, you had

19   been at the company for about over six years at that point;

20   right?

21   A.  Yes.

22   Q.  And you had seen the company grow from 15 people, or so,

23   to 600 or over; right?

24   A.  Yes.

25   Q.  And for maybe $5 million in revenue to 100 million, or

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 124 of 311 PageID #:14069
Ketchum - cross by Hueston
1512

1   more.  Right?

2   A.  I don't recall the revenue, but it was a significant

3   increase.

4   Q.  And maybe a thousand devices in the beginning to over

5   100,000 devices.  Does that sound about right?

6   A.  Yes.  Possibly, yes.

7   Q.  And during this time, sir, you held roles in nearly every

8   single area of the company over time; right?

9   A.  Several, yes.

10  Q.  And you had worked closely with Mr. Shah; right?

11  A.  Yes.

12  Q.  And at least some of those years you were side-by-side in

13  the trenches with him as you both built this business,

14  particularly early on; right?

15  A.  Yes.

16  Q.  And after those six years, sir, as you wrote here at the

17  time, you believe that any suggestion of fraud was, in your

18  words, "actually ridiculous."  Right?

19  A.  Yes.

20  Q.  And let's look quickly -- let's go up to the top.  And up

21  at the top Mr. Shah writes -- he forwards what you wrote;

22  right?

23  A.  Yes, it appears so.

24  Q.  And he wrote:  "Some really thoughtful, candid comments

25  and ideas from JK."

Ketchum - cross by Hueston

1513

1        That's you below; right?

2  A.  Yes.

3  Q.  Because you had also outlined some issues and solutions;

4  right?

5  A.  Yes.

6  Q.  And by the way, he's forwarding this to Shradha Agarwal,

7  Jayanth Surakanti, Brad Purdy, Ashik Desai, but also Madan

8  Nagaldinne; right?

9  A.  Yes.

10  Q.  Came in from Facebook; right?

11  A.  I don't recall where it came from.  I believe he worked

12  there, yes.

13  Q.  And how about Vivek Kundra?

14  A.  Yes.

15  Q.  Where did Vivek Kundra come from?

16  A.  I believe sales force.

17  Q.  And you remember that Vivek Kundra also served as an

18  official in the Obama Administration?

19  A.  Yes.

20  Q.  And, sir, you said earlier Mr. Shah was the sort of leader

21  who liked feedback and wanted solutions; right?

22  A.  Yes.

23  Q.  So this was February 2017; right?

24  A.  Yes.

25  Q.  Okay.  So let's move forward in time.  We're going to go

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 126 of 311 PageID #:14071
Ketchum - cross by Hueston
1514

 1   to DX-10226.  And this is a July 2017, text from you to

 2   Ms. Agarwal.

 3         Do you see that?

 4   A.  Yes.

 5   Q.  And you wrote:  "Hey, SA - this is a little awkward to

 6   say, and you may have already been keyed into it, but Rolfe

 7   Winkler from the WSJ --" that's the Wall Street Journal?

 8   A.  Yes.

 9   Q.  "Seems to have some grudge against us.  Apparently he has

10   been reaching out to former Outcome Health folks and is asking

11   some questions.  It seems like he is angling to put together a

12   negative article."

13         Right?

14   A.  Yes.

15   Q.  Okay.  And if we go to page 9 of this exhibit, after some

16   back-and-forth texts with Ms. Agarwal, you write:  "Some

17   people will always try to tear things down.  People think this

18   place exists like we won the lottery.  They don't realize we

19   cracked the uncrackable doctors' offices because we worked a

20   gazillion hours a week and leaned on everyone in creative

21   ways.  It's so annoying."

22         Right?

23   A.  Yes.

24   Q.  And we've seen some communications reflecting that over

25   the past couple days; right, sir?

Ketchum - cross by Hueston

1515

1    A.  Yes.

2    Q.  Outcome became a great company in part because Ms.

3    Agarwal, Mr. Shah, you and others, were creative, cracked the

4    uncrackable issues, and worked a gazillion hours a week;

5    right?

6    A.  Yes.

7    Q.  And you testified, sir, I think, that you no longer work

8    at Outcome Health -- there was a company that acquired Outcome

9    Health; right?

10   A.  Yes.

11   Q.  And after Ms. Shah and Ms. Agarwal stepped down from

12   day-to-day management of that company in January 2018, in

13   February 2018, you were eventually laid off --

14   A.  Yes.

15   Q.  -- as the company downsized?

16   A.  Yes.

17   Q.  Okay.  And, sir, at least last week you testified you had

18   come to believe at some point you had engaged in some

19   wrongdoing at Outcome; right?

20   A.  Yes.

21   Q.  Now, you and I have just gone through examples and saw

22   that, in a number of instances, your understanding at the time

23   is that you had, in fact, given testimony without the full

24   context of some of what I've shown you here today, yesterday;

25   right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 128 of 311 PageID #:14073
Ketchum - cross by Blegen
1516

1    A.  Yes.

2    Q.  And some of the time you thought there was wrongdoing, it

3    turned out that you just didn't know or remember an important

4    fact; right?

5              MR. HANKEY:  Objection to the recap.

6              THE COURT:  Sustained.

7              MR. HANKEY:  We've gone over this.

8    BY MR. HUESTON:

9    Q.  Okay.  And, sir, you never had an intent to defraud anyone

10   while you were at Outcome; right, sir?

11   A.  No.

12   Q.  You never had an intent?

13   A.  No.

14   Q.  Correct?  Meaning, correct, never an intent?

15   A.  Never an intent.

16   Q.  All right.  Thank you.

17             Pass the witness.

18             THE COURT:  All right.  Additional cross-examination?

19             MR. BLEGEN:  Yes, Judge.

20             THE COURT:  Maybe stretch for a minute while the

21   lawyers reposition.

22             Okay.  Please have a seat.

23                        CROSS-EXAMINATION

24   BY MR. BLEGEN:

25   Q.  Good morning, Mr. Ketchum.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 129 of 311 PageID #:14074
Ketchum - cross by Blegen
1517

1   A.  Good morning.

2   Q.  My name is Pat Blegen.  I am one of the attorneys for

3   Shradha Agarwal.

4   A.  It's actually a little bit hard to hear you.

5           THE COURT:  Move the mic up a little further maybe on

6   your lapel or up on the --

7           MR. BLEGEN:  Is that better?

8           THE WITNESS:  I think so, yeah.

9           MR. BLEGEN:  How's that?

10          THE COURT:  Worse.

11          THE WITNESS:  It's kind of hard to tell until you get

12  going a little bit.

13          MR. BLEGEN:  How about now, Mr. Ketchum?  Okay?  All

14  right.

15          THE COURT:  If any members of the jury have trouble,

16  just raise your hand.

17          Go ahead.

18  BY MR. BLEGEN:

19  Q.  So early on when you're being cross-examined by

20  Mr. Hueston, he was talking to you about your immunity

21  agreement with the government.  Do you remember that?

22  A.  Yes.

23  Q.  And he was going through the fact that your immunity

24  letter says that it's the government's full discretion to

25  decide whether you've complied with the agreement by telling

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 130 of 311 PageID #:14075
Ketchum - cross by Blegen
1518

1   the truth; right?

2   A.  Yes.

3   Q.  Okay.  And then he said something like, and if you change

4   your story, they could yank your immunity and prosecute you;

5   right?

6   A.  I was just instructed to tell the truth.

7   Q.  Okay.  But your response to that question was:  Sir, I was

8   just reading through e-mails.

9        Do you remember that?

10  A.  Yes, I believe so.

11  Q.  All right.  And that's essentially what happened when you

12  were meeting with the government; correct?

13  A.  Yes.

14  Q.  They gave you -- I mean, you reviewed with them a mountain

15  of e-mails over your -- what is it -- 15 meetings with them?

16  A.  Yes.

17  Q.  All right.  But you know, and you knew at the time, that

18  there are a mountain of e-mails that you couldn't possibly

19  review with them; right?

20  A.  I suppose so.

21  Q.  You would have needed 150 meetings, or something; correct?

22  A.  Yes.

23  Q.  I mean, this company was filled with young tech people;

24  right?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 131 of 311 PageID #:14076
Ketchum - cross by Blegen
1519

1  Q.  And so there were e-mails flying back and forth hundreds
2  of times a day; right?
3  A.  Yes.
4  Q.  Okay.  But you understand now, do you not, that if you see
5  an e-mail, which you either hadn't seen before or you forgot
6  about it, it is okay to change your position about what
7  happened; right?
8  A.  Based on the information that I see, yeah, I'll just tell
9  the truth based on what I see from the e-mails, yes.
10  Q.  Okay.  And that's some of what you did today with
11  Mr. Hueston; correct?
12  A.  Yes.
13  Q.  Yesterday and today; correct?
14  A.  Yes.
15  Q.  You've seen e-mails, and you've said:  Well, hang on a
16  second, now I think differently about something.  Right?
17  A.  Yes.
18  Q.  Because part of what you were asked to do on direct
19  testimony was to tell us your understanding of what other
20  people were saying; right?
21  A.  Yes.
22  Q.  Or what other people meant; correct?
23  A.  Yes.
24  Q.  All right.  But that understanding can change depending on
25  e-mails that you hadn't seen or didn't remember; right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 132 of 311 PageID #:14077
Ketchum - cross by Blegen
1520

1  A.  Yes.

2  Q.  But e-mails weren't the only kind of communications that

3  were going on at Outcome Health, of course; right?

4  A.  No.

5  Q.  No, meaning I'm right.  Correct?

6  A.  No, meaning you're right.  Yes.

7  Q.  The salespeople were on the phone with clients all the

8  time; correct?

9  A.  Yes.

10  Q.  And so there were levels of understanding that they

11  reached with clients that were not even on e-mails; right?

12  A.  Yes.

13  Q.  Okay.  And, you know, you've talked to us about what your

14  understanding of what some of the contracts were; correct?

15  A.  Yes.

16  Q.  Like, for example, I think it was for the Novo contract

17  you said:  Well, my understanding is there's -- it's not a

18  weighted-average contract because the words weighted average

19  are not in there; right?

20  A.  Yes, I believe that's correct.

21  Q.  But now you've seen e-mails where the client clearly

22  indicated it was a weighted-average contract; right?

23  A.  Yes.

24  Q.  And that changes your whole perception about that whole

25  Novo issue; right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 133 of 311 PageID #:14078
Ketchum - cross by Blegen
1521

1  A.  It does.

2      MR. HANKEY:  Your Honor, may we get a sidebar,

3  please?

4      THE COURT:  Okay.

5      (Proceedings heard at sidebar.)

6      THE COURT:  Okay.  Proceed.

7      MR. HANKEY:  Your Honor, we thought at first that

8  this is just a setup for, you know, new questions of this

9  witness.  But this appears to be more of like a closing

10 argument or interim statement, just a recap of things that

11 were said earlier.  It made sense for a few, but now we're 10,

12 12 questions deep.

13     THE COURT:  New lawyer, new defendant.  He can ask

14 anything he wants that's not cumulative of himself.  If he

15 covers areas already covered by Mr. Hueston, you ought to

16 phrase it as something different.  And the more time we take

17 on cross, the less time you're all going to have on closings.

18     Okay.  Objection overruled.

19     (End of sidebar proceedings.)

20     MR. BLEGEN:  I can continue, Judge?

21     THE COURT:  You may.

22 BY MR. BLEGEN:

23 Q.  And so you've had now a completely new perception of the

24 Novo issue based on something you saw in court; right?

25 A.  Yes.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 134 of 311 PageID #:14079
Ketchum - cross by Blegen
1522

1  Q.  Okay.  And you've realized that it is okay to do that, to

2  change your position based on new information you're seeing,

3  as long as you're being truthful; right?

4  A.  Yes.

5  Q.  Okay.  So we now know that there were e-mails that set,

6  sort of, understandings of what was going on, right, some of

7  which you may not have seen?

8  A.  Um, yes.

9  Q.  We know that there were phone calls between the pharmas

10  and the clients -- excuse me, between the salespeople and the

11  pharmas; correct?

12  A.  Yes.

13  Q.  And there may also have been discussions, by telephone or

14  in person, about the contracts between the people negotiating

15  the contracts; right?

16  A.  Yes.

17  Q.  And you weren't one of those people?

18  A.  I was not.

19  Q.  Okay.  You also told us on direct, you gave us what your

20  understanding of what a client wanted or, excuse me,

21  understood or expected.  Do you remember that?

22  A.  Yes.

23  Q.  How old were you at the time when you started at Outcome

24  Health?

25  A.  Sometime in my 20s.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 135 of 311 PageID #:14080
Ketchum - cross by Blegen
1523

1  Q.  Okay.  And Mr. Shah and Ms. Agarwal were in their 20s as
2  well at the time?
3  A.  Yes.
4  Q.  And you had not worked for a pharma company; right?
5  A.  No.
6  Q.  And you knew that Ms. Agarwal had not worked for a pharma
7  company; right?
8  A.  Correct.
9  Q.  But Outcome Health did have employees who used to work for
10 pharma companies; right?
11 A.  Yes.
12 Q.  Jim Demas, for example; correct?
13 A.  He did.
14 Q.  Jim Demas was like a -- wasn't he an accountant for pharma
15 companies?
16 A.  I believe so, yes.
17 Q.  Wasn't he a CFO for a pharma company, too?
18 A.  I'm not too sure.  I know he had a high-level position.  I
19 can't recall the pharmaceutical company, but I know he had a
20 high-ranking position there.
21 Q.  Okay.  High-ranking position in a pharmaceutical company;
22 right?
23 A.  Yes.
24 Q.  And he was also experienced; right?
25 A.  Very much so.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 136 of 311 PageID #:14081
Ketchum - cross by Blegen
1524

1    Q.  How old was he?

2    A.  I actually don't know.  Much older than us.

3    Q.  So he was not a fresh tech kid; right?

4    A.  No.

5    Q.  All right.  Who do you think would have a better

6    understanding of what a pharma company expected or

7    understood --

8            MR. HANKEY:  Objection.

9    BY MR. BLEGEN:

10   Q.  -- you or Mr. Demas?

11           MR. HANKEY:  Objection.  Calls for speculation.

12           THE COURT:  Sustained.

13   BY MR. BLEGEN:

14   Q.  Did you hear him talking from time to time about what --

15   his work at pharmas?

16   A.  A bit.

17   Q.  Okay.  He was the one who dealt with the contracts?

18   A.  Yes.

19   Q.  He was the one who said at one point, in a statement that

20   wasn't offered for its truth, this contract is a

21   weighted-average contract; right?

22   A.  I recall that.

23   Q.  He also was heavily involved in the proof of performances;

24   correct?

25   A.  Yes.

1  Q.  Whether make-goods would need to be given; right?

2  A.  Yes.

3  Q.  So Outcome didn't shy away from having people work for

4  them who knew what pharmas wanted; right?

5  A.  I don't believe so.

6  Q.  Mr. Demas ultimately left Outcome Health; right?

7  A.  Yes.

8  Q.  But the reason he left was because of a relationship with

9  another employee.  Am I right about that?

10 A.  I'm not entirely sure of the reason he left.

11 Q.  Okay.  You never heard about why he left?

12 A.  I heard of some activities, but I don't actually know the

13 ultimate reason why he left, at least not that I recall the

14 specifics.

15 Q.  Did you hear about those activities, the ones that I just

16 mentioned?  Not to embarrass anyone.

17 A.  Which activities?

18         MR. HANKEY:  Objection, hearsay.

19         THE COURT:  Sustained.

20 BY MR. BLEGEN:

21 Q.  You told us that your work related to list-matches was

22 like one percent of the things that you did at Outcome Health;

23 right?

24 A.  Very small percent, yes.

25 Q.  But you still worked pretty hard on those list-matches;

1  right?

2  A.  Yes, of course.

3  Q.  And including, like, all hours of the night?

4  A.  Yes, of course.

5  Q.  And early in the morning; right?

6  A.  I stated I believed in the mission, yes.

7  Q.  Okay.  Well, but what you didn't do was just make up

8  numbers; right?

9  A.  No.

10  Q.  Never?

11  A.  No.

12  Q.  And no -- well, since I represent Ms. Agarwal, she never

13  told you to make up a number; right?

14  A.  No, not that I recall.

15  Q.  You, Ms. Agarwal, whoever else was working at

16  list-matches, could have gotten a lot more sleep if you had

17  just said, hey, let's just pick a number and give that to the

18  client; right?

19  A.  Can you restate your question?  I'm sorry, I'm a little

20  confused by your question.  I'm sorry.

21  Q.  When you did list-matches --

22  A.  Yes.

23  Q.  -- you did an actual analysis?

24  A.  Yes.

25  Q.  You had to view spreadsheets; right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 139 of 311 PageID #:14084
Ketchum - cross by Blegen
1527

1   A.  Yes.

2   Q.  You had to match one spreadsheet against another; right?

3   A.  Yes.

4   Q.  You had to know the current actually installed base;

5   right?

6   A.  Yes.

7   Q.  You then had to know what was in the MS pipeline; right?

8   A.  Yes.

9   Q.  And the MS pipeline, just so we're all clear, is things

10  that were just about to be installed; right?

11  A.  In theory, yes.

12  Q.  Okay.  Well, you knew that some of them were, like,

13  literally on the verge of being installed; right?

14  A.  Yes.

15  Q.  You could tell me today we have 150 installed right now at

16  almost noon, and by 12:30 there could be more installed;

17  right?

18  A.  Yes.

19  Q.  All you were waiting for was to get a message from the

20  installer that it's installed; right?

21  A.  More or less, yes.

22  Q.  Okay.  Well, I mean, that's how it worked.  You guys would

23  find out that an installation was completed; right?

24  A.  Yes, it -- more or -- yes.  Yes.  More or less, yes.

25  Sorry, I'm thinking about the -- it was a bit complex, but,

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 140 of 311 PageID #:14085
Ketchum - cross by Blegen
1528

1    yes.  In short, yes.

2    Q.  All right.  So the MS pipeline was not some, you know,

3    created, made-up number.  It was what was going to happen in

4    the very near future; correct?

5    A.  For the most part, yes.

6    Q.  All right.  Let's go back to the making up of numbers.

7            You had to compare one spreadsheet versus another;

8    right?

9    A.  Yes.

10   Q.  You sometimes had to figure out what this decile number

11   was; correct?

12   A.  Yes.

13   Q.  And see how many you matched with that; right?

14   A.  Yes.

15   Q.  You had to know what the approximate rate of installations

16   were; right?

17   A.  Yes.

18   Q.  And take that into account?

19   A.  Yes.

20   Q.  You had to know how many sales the member outreach people

21   had been making over the past few months in order to gauge

22   what your rate of installation -- or, excuse me, your rate of

23   sales were; correct?

24   A.  Yes.

25   Q.  All right.  And all of that took a lot of time; correct?

1   A.  Yes.

2   Q.  And energy; correct?

3   A.  Yes.

4   Q.  Now, you told us on direct, the government asked you some

5   question like, well, did you think that the pharmas were

6   actually sending people out there to look in the offices and

7   see whether their ads were running.  Right?

8   A.  I think I recall something like that, yes.

9   Q.  And you said something like, well, not very often.  Right?

10  A.  That sounds correct.

11  Q.  Okay.  So you could have just came up with -- come up with

12  a number and saved yourself a lot of time and energy; right?

13  I don't mean you, I mean Outcome Health could have done that;

14  right?

15  A.  I suppose so.

16  Q.  Right.  You could have just -- if the client said we have

17  on our list-match 75,000 doctors, you could have said, well,

18  we have 35,000 as a match; right?

19  A.  I suppose so.

20  Q.  Right.  But you guys never did that; did you?

21  A.  No.

22  Q.  You actually used a real analysis based on real numbers to

23  give a projection or a number to the client; right?

24  A.  Yes.

25  Q.  Let me show you a few of these.  If you could put up

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 142 of 311 PageID #:14087
Ketchum - cross by Blegen
1530

1    government exhibit 43, Laura.

2            This is an exhibit that you saw before regarding

3    Crestor; right?

4    A.  Yes.

5    Q.  But this is an example of, in here, you're calculating

6    actual percentages; correct?

7    A.  Yes.

8    Q.  Do you see that at the top?

9    A.  I do.

10   Q.  Right now about 48 percent of our sales have been Crestor.

11   But the reason for my 75 screens per month is taking the

12   acceleration into account; right?

13   A.  Yes.

14   Q.  That wasn't just some made up -- acceleration wasn't a

15   fiction, that was a real thing; right?

16   A.  Yes.

17   Q.  And you had to do math -- I know you're not a math

18   professor, or anything.  You had to do math and use

19   spreadsheets to figure these things out; correct?

20   A.  Yes.

21   Q.  To try to project -- to try to give a real number based on

22   something real; right?

23   A.  Yes.

24   Q.  Let me show you GX-44.  Just highlight the top, if you

25   would, Laura.  Thank you.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 143 of 311 PageID #:14088
Ketchum - cross by Blegen
1531

1        Again, you're doing actual work here.  "I went into

2   the next two stages of MO to pull addresses.  I pulled 194

3   locations and I have full confidence that we will have this

4   number installed or nearly installed by October 1st."

5        Do you see that?

6   A.  I do.

7   Q.  Again, you doing actual work to come up with a real

8   number; right?

9   A.  Yes.

10  Q.  Can you put up government exhibit 42.

11        I believe you've seen this one before as well?

12  A.  Yes.

13  Q.  Again, in here you tell Mr. Shah what you have done.

14  Meaning, here's the time-consuming, complicated steps I went

15  through.  And Mr. Shah is fine with this:  Please go ahead and

16  give him the incremental number he can sell to Crestor.

17  Right?

18  A.  Yes.

19  Q.  Put up defense exhibit 8570 -- I'm sorry, it's 8510.  I

20  think.

21        Here's you, again, calculating numbers, coming up

22  with percentages and talking about what is matched based on

23  reality in Outcome Health's system; right?

24  A.  Yes.

25  Q.  Meaning, these -- these -- the list of these doctors were

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 144 of 311 PageID #:14089
Ketchum - cross by Blegen
1532

1  not just pulled out of thin air, they were literally somewhere

2  in Outcome Health that they could match to; right?

3  A.  Yes.

4  Q.  They were either in the MS pipeline, or the MO pipeline;

5  right?

6  A.  Yes.

7  Q.  And MS pipeline was used if the campaign was going to

8  start sooner.  But if the campaign was going to start maybe

9  sometime later, you'd go into the MO pipeline; right?

10  A.  Yes.

11  Q.  But you didn't just say, "I have Dr. Joe Smith" if he

12  wasn't anywhere in your pipeline; right?

13  A.  No.

14  Q.  Can you put up defense exhibit 7647.

15       And here you're answering some questions on Prolia

16  for Ms. Agarwal.  And this is one of the examples where you

17  then had to go into the even more complicated analysis of

18  working with deciles; right?

19  A.  Looks that way, yes.

20  Q.  And am I right about that, that deciles made it more

21  complicated?

22  A.  Yes.

23  Q.  All right.  And so, but even then, you weren't just making

24  stuff up, these were legit numbers that the company had;

25  right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 145 of 311 PageID #:14090
Ketchum - cross by Blegen
1533

1  A.  Yes.

2  Q.  Put up defense exhibit 8134.  And if you could highlight

3  the top, Laura.  Thank you.

4        And here you're indicating that you had rerun some

5  numbers to come up with an exact percentage.  Do you see that?

6  A.  Yes.

7  Q.  60 percent, but you make sure to tell them it's

8  59.53 percent, to be exact?

9  A.  Yes.

10  Q.  And what kind of additions you're having over the past two

11  months; correct?

12  A.  Yes.

13  Q.  Sometimes the percentage of match or the match wasn't

14  great; right?

15  A.  Correct.

16  Q.  And you told people that; correct?

17  A.  Yes.

18  Q.  Including the clients.

19        Can you put up, Laura, DX-8509.  This one, maybe

20  highlight the middle where it starts with, "we have 4491

21  matched."

22        Here you're saying that you have matched the

23  6.1 percent of the entire Pradaxa list; right?

24  A.  Yes.

25  Q.  That's not very high; is it?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 146 of 311 PageID #:14091
Ketchum - cross by Blegen
1534

1    A.  No.

2    Q.  Nobody told you, well, gee, just change 6.1 percent to

3    61 percent?

4    A.  No.

5    Q.  Right?  Just say, move the decimal point.  We'll make lots

6    more money.

7            Nobody ever said that to you --

8    A.  No.

9    Q.  -- or anything like it; right?

10   A.  No.

11   Q.  Let me see DX-8514.  This, Mr. Ketchum, is an e-mail

12   between you and Ms. Agarwal about Takeda gout drug.  Is that

13   what that is?

14   A.  Yes.

15   Q.  Am I saying the name right?

16   A.  Takeda gout, yes.

17   Q.  Takeda gout.  And gout is just the illness; right?

18   A.  Yes.

19   Q.  Okay.  So here in the middle you ask Ms. Agarwal:  "SA -

20   what kind of projections do we want here?  Installed plus MS

21   pipe only or should we expand out a bit?"

22            Do you see that?

23   A.  Yes.

24   Q.  And her response is:  "We're not growing rheum much, so

25   I'd say current plus MS pipeline and any others Matt Garms

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 147 of 311 PageID #:14092
Ketchum - cross by Blegen
1535

1  thinks we're about to close."

2        Correct?

3  A.  Yes.

4  Q.  That means -- so MS pipelines means the ones that are,

5  like, in one of the stages of being installed; right?

6  A.  Yes.

7  Q.  And about to close from Matt Garms means, hey, use the

8  offices that we know are about to sign up with us; right?

9  A.  Yes, it appears so.

10 Q.  And -- well, I mean, first of all, that is what it says?

11 A.  That's what it says, yes.

12 Q.  And isn't that what you understand it to mean, too?

13 A.  Yes.

14 Q.  "About to close" means deals were about to get done;

15 right?

16 A.  Yes.

17 Q.  And then those offices will be part of Outcome Health's

18 network; correct?

19 A.  Yes.

20 Q.  All right.  Ms. Agarwal didn't tell you, well, you know,

21 go -- you know, go pull off some doctors' names off the

22 internet and tell them we have those, too; right?

23 A.  No.

24 Q.  She's telling you to find out what's the reality of what's

25 going to happen soon; correct?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 148 of 311 PageID #:14093
Ketchum - cross by Blegen
1536

1   A.  Yes.

2   Q.  And even conceding, "we're not growing rheum much."

3   Right?

4   A.  Correct.

5   Q.  Why don't you take a look at defendants' exhibit -- or

6   let's take a look at defendants' exhibit 8613.

7           This is an e-mail between you and Ms. Agarwal about a

8   drug called Zetia; is that right?

9   A.  I actually am not too sure how to say that.

10  Q.  Okay.  I'm going to say Zetia.

11          You asked Ms. Agarwal how far out do we want to

12  project for Zetia; right?

13  A.  Yes.

14  Q.  And her response is, MS pipeline.  Correct?

15  A.  Yes.

16  Q.  Meaning, the offices that are just about to be installed?

17  A.  Yes.

18  Q.  Okay.  She doesn't say, gee, project out as far as we

19  possibly can, make up some numbers so we can get a lot of

20  money from a pharma company; right?

21  A.  No, she doesn't.

22  Q.  We're going to get to this one a little later, too, but

23  put up, please, defense exhibit 7455 and highlight the

24  bottom -- or pull out the bottom part, please.

25          First of all, have you noticed yet, Mr. Ketchum, that

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 149 of 311 PageID #:14094
Ketchum - cross by Blegen
1537

1  this e-mail is related to Linzess?

2  A.  I see that, yes.

3  Q.  Because it's in bold there in the middle; right?

4  A.  Yes.

5  Q.  Bob Mons is asking here for you to check out and see if we

6  have any gastroenterologists in our network; right?

7  A.  Yes.

8  Q.  And that's because that's the kind of drug that Linzess is

9  related to; right?

10  A.  Yes.

11  Q.  And Ms. Agarwal's response is not, hey, let's tell him we

12  have a thousand.  Right?

13  A.  Correct.

14  Q.  It's:  "Jay, do we have anything here?  If not, no

15  worries."

16  A.  Correct.

17  Q.  She is not telling you to inflate anything; right?

18  A.  She is not.

19  Q.  And she is not telling you that it's a problem if we don't

20  have anything here; correct?

21  A.  Correct.

22  Q.  One of the things that you did as part of the 99 percent

23  of your other work was similar to what Mr. Mons was just

24  asking here about:  Hey, do we have any gastroenterologists in

25  our network.  Meaning, communicate with the doctors' offices

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 150 of 311 PageID #:14095
Ketchum - cross by Blegen
1538

1  to see what kind of things they did; right?

2  A.  Yes.

3  Q.  Okay.  And that was a very important part of Outcome

4  Health's business model; right?

5  A.  Yes.

6  Q.  All right.  You guys would -- stayed in close

7  communications with the doctors' offices as best you could;

8  right?

9  A.  Yes.

10  Q.  Wanted to make sure the screens were running; right?

11  A.  Yes.

12  Q.  Wanted to make sure they were happy with everything;

13  correct?

14  A.  Yes.

15  Q.  If they had any complaints about whatever, the screens

16  falling off the wall, or it's too bright, or too loud,

17  whatever, you guys could help them fix it; right?

18  A.  Yes.

19  Q.  But another thing you guys did was you would survey the

20  doctors' offices from time to time to find out what kind of

21  patients they were seeing; correct?

22  A.  Yes.

23  Q.  And so to help you guys when a new, you know, drug came

24  out, maybe we have something that would be appropriate for

25  that pharma; right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 151 of 311 PageID #:14096
Ketchum - cross by Blegen
1539

1   A.  Yes.

2   Q.  Okay.  So this is an issue that you're not going to be

3   very familiar with because you haven't seen it, but you, in

4   fact, helped with a survey back in 2012, regarding how many of

5   the doctors in your guys -- in Outcome Health's network saw or

6   dealt with patients who had depression.

7           Do you remember that?

8   A.  I don't.

9   Q.  Okay.  Well, then, I'll show it to you.

10          Can we put up defense exhibit 8699.  And I'll just

11  give you a second to look at the first page, if you want,

12  or --

13  A.  Yeah, could I?  Thank you.

14  Q.  Yes.

15  A.  Okay.

16  Q.  All right.  From the first page of this e-mail, what is

17  going on is that you're sending along to Ms. Agarwal the

18  results of a survey that had gotten sent out to doctors in

19  Outcome Health's network; right?

20  A.  Yes.

21  Q.  And one -- and so it's -- you cover a bunch of areas;

22  right?

23  A.  Yes.

24  Q.  One of those areas is depression?

25  A.  Yes, I see that.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 152 of 311 PageID #:14097
Ketchum - cross by Blegen
1540

1  Q.  And the result you got at least from this part of the

2  survey, or this survey, was 29.23 percent; right?

3  A.  Yes.

4  Q.  All right.  Flip into the next page, Laura, if you would.

5      But other times, when you -- take a look at that for

6  a second, if you want to figure out what we're talking about.

7  A.  Thank you.  Okay.

8  Q.  Other times the survey results were in ranges; right?

9  A.  Yes.

10  Q.  Do you remember that, generally?

11  A.  Generally, yes.  Yes.

12  Q.  Okay.  Sounds like you remember it not even generally.

13  You remember this; right?

14  A.  This is coming back to me, yes.

15  Q.  Okay.  And so you would get results from doctors' offices

16  as to a range of their patients that suffered from or reported

17  suffering from various things, one of which was depression in

18  this instance; correct?

19  A.  Yes.

20  Q.  And so when somebody at Outcome Health talked to a pharma

21  and they said, hey, we'd like to target a depression drug with

22  you guys, you could find out what percentage of your doctors

23  dealt with that issue; right?

24  A.  Theoretically, yes.

25  Q.  Okay.  And if somebody picked a number between 31 and

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 153 of 311 PageID #:14098
Ketchum - cross by Blegen
1541

1    60 percent, that would be in the range; right?

2    A.  In this instance, yes.

3    Q.  Okay.  Or if somebody was comfortable going with 29 point

4    percent or almost 30 percent, that would be okay, too; right?

5    A.  From what I saw in the prior e-mail, that would have been

6    accurate, yes.

7    Q.  And, yet again, you guys didn't make up these survey

8    results, this is legitimate work that you did; right?

9    A.  Yes.

10   Q.  And these are legitimate answers from real doctors; right?

11   A.  Yes.

12   Q.  So those numbers, those percentages, are not made up; are

13   they?

14   A.  Correct.

15   Q.  So if somebody were to, like, show an e-mail that said,

16   hey, we're contrasting real versus --

17          MR. HANKEY:  Objection, your Honor.

18          MR. BLEGEN:  I'll withdraw it, Judge.

19          THE COURT:  All right.

20          MR. BLEGEN:  I forgot we have interim statements.

21          THE COURT:  Okay.

22   BY MR. BLEGEN:

23   Q.  But that's -- a small part of your work was --

24          You can take that one down, Laura.

25          A small part of your work was these surveys; right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 154 of 311 PageID #:14099
Ketchum - cross by Blegen
1542

1    A.  Yes.

2    Q.  But it was real work that you really did; correct?

3    A.  Yes.

4    Q.  Okay.  I mentioned the drug Linzess a few minutes ago;

5    right?

6    A.  Yes.

7    Q.  And Linzess is one of the areas that you have testified

8    about mostly on direct from the government.  Do you remember

9    that?

10   A.  Yes.

11   Q.  And Linzess is the issue where the government showed you

12   an e-mail -- and we'll put it up on the screen.  Government

13   exhibit 207.  You can highlight the top part.

14           You recall that this is the issue where there is an

15   e-mail chain about matching the doctors' list and giving the

16   list.  And Ms. Agarwal writes:  "Based on projection" with a

17   couple of dots after it; right?

18   A.  Yes.

19   Q.  And Mr. Mons is not on that e-mail, the one that says

20   "Based on projection"?

21   A.  Correct.

22   Q.  Do you recall that?

23   A.  I do.

24   Q.  And you testified, essentially, that this was an example

25   of Ms. Agarwal trying to hide that information from Mr. Mons?

1   A.  That was my belief, yes.

2   Q.  Okay.  I'm going to go through the Linzess thing in a

3   couple of steps, but what you just said, that based on

4   projection, without him on the e-mail, is hiding it from

5   Mr. Mons, only makes sense if Mr. Mons doesn't already know

6   it's a projection; right?

7   A.  Yes, I believe that's -- I believe so.

8   Q.  Okay.  Because you -- I think you said something about

9   this yesterday.  You didn't think that every single person had

10  to be copied on every single e-mail about every single topic

11  at Outcome Health; did you?

12  A.  No.

13  Q.  No.  That's silliness; right?

14  A.  Yes.

15  Q.  Okay.  So let's start with Linzess.  First put up defense

16  exhibit 8593.

17          And this is not an e-mail that you're on, but why

18  don't you just take a look at --

19          Don't blow it up yet, just let him read it for a

20  second, Laura, if you don't mind.

21          Can you read it in that small size?

22  A.  I can, yes.

23  Q.  Okay.  And then I'll blow it up in a second.  That's

24  perfect.

25  A.  Okay.  Thank you.  Okay.

1  Q.  Okay.  I don't need to read the whole thing.  What's going

2  on here is Mr. Mons is trying to get Ms. Agarwal to assign him

3  to this account; right?

4  A.  Yes.

5  Q.  So he can sell it and presumably --

6          MR. HANKEY:  Objection.  This witness is not on this

7  e-mail.

8          THE COURT:  Correct.  He can read it.  Asking for his

9  interpretation isn't proper, so.

10          MR. BLEGEN:  You said improper?

11          THE COURT:  He can read it, if you want.  But asking

12  for his interpretation of an e-mail he's not on isn't a proper

13  question.

14  BY MR. BLEGEN:

15  Q.  Without any interpretation, do you know from this e-mail

16  that the Linzess issue began in December of 2012?

17          MR. HANKEY:  Objection.  Same objection, your Honor.

18          THE COURT:  No, that's a separate question.  He's

19  asking him a direct question about when the Linzess issue

20  began.  If he recalls.

21  BY MR. BLEGEN:

22  Q.  Can you tell from this e-mail that it began around

23  December 12th of 2012?

24  A.  Yes.

25  Q.  All right.  Now, completely aside from this e-mail,

1    salespeople at Outcome Health wanted to get accounts; right?

2    A.  Yes.

3    Q.  So that they could sell to those accounts; right?

4    A.  Yes.

5    Q.  And presumably make money; right?

6    A.  Yes.

7    Q.  Okay.  Laura, could you put up -- so put up exhibit --

8    defense exhibit 8635.  And go to the second page.

9           I know that you obviously aren't the person who signs

10   off on this contract, but did you know that Linzess did not

11   become an agreement -- a contract until March of 2015?

12   A.  No.

13   Q.  Okay.  Can you tell that now from looking at this

14   document?

15          MR. HANKEY:  Objection.  He's not on this document.

16   No personal knowledge of this.

17          THE COURT:  I'll allow this question.  It's just a

18   date.  Go ahead.

19   BY THE WITNESS:

20   A.  I wouldn't know if there was an agreement prior to this,

21   but I can see that there's an agreement signed here.

22   BY MR. BLEGEN:

23   Q.  Okay.  So you know at least there's one in 2015, but maybe

24   there were ones before that?

25   A.  Yes.  I wouldn't know.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 158 of 311 PageID #:14103
Ketchum - cross by Blegen
1546

1    Q.  All right.  You would not know.  All right.

2            Let me put up defense exhibit 7455 again.

3            This, sir, is the e-mail we looked at a few minutes

4    ago where -- that you are on.

5    A.  Yes.

6    Q.  Where Ms. Agarwal responds -- excuse me, Ms. Agarwal says

7    to you:  "Jay, do we have anything here?  If not, no worries."

8            Right?

9    A.  Correct.

10   Q.  And you understand that to mean, it's okay if we don't

11   have anything; right?

12   A.  Yes.

13   Q.  Put up defense exhibit 6209.

14           I understand that you're not on this agreement.  Do

15   you see that?

16   A.  Correct.

17   Q.  Can you read what Mr. Mons says following, "attached is an

18   overview"?

19   A.  Just the top e-mail?  Okay, yes.  "Attached is an

20   overview - slide 3 will answer your question on our expansion

21   schedule.  We are the fastest growing POC marketer."

22   Q.  That's enough.  You don't need to read anymore.

23           You can see from this, you don't need to interpret

24   it, that there is a communication from Mr. Mons to the client

25   about expansion schedule; right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 159 of 311 PageID #:14104
Ketchum - cross by Blegen
1547

1   A.  Yes.

2   Q.  Now, Laura, would you put up government exhibit 209.  If

3   you could expand the bottom page -- bottom part of the page.

4        This is you communicating to Ms. Agarwal what the

5   actual installed numbers are.  Am I right about that?

6   A.  Can I have a quick moment to just review?

7   Q.  Yes.

8   A.  Thank you.

9        Can I -- are there e-mails prior to this that I can

10  review, just so I can have more context?  It looks like it's

11  page 1 of 3.

12  Q.  You can go back -- well, I'm going to get to some other

13  e-mails.

14  A.  Okay.  Oh, got it.  Okay.

15       MR. HANKEY:  Your Honor, if the witness can't recall,

16  then he can't answer the question.

17       THE COURT:  Well, we aren't there yet.  If you -- if

18  you need to see the entire document because that's in

19  evidence, you can go back.  It doesn't seem like there is much

20  on the other pages, but go ahead and look at them if you want.

21       THE WITNESS:  Not necessary, your Honor.

22       THE COURT:  All right.

23       MR. BLEGEN:  Let me re-ask the question in a

24  different way --

25       THE COURT:  Go ahead.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 160 of 311 PageID #:14105
Ketchum - cross by Blegen
1548

1    MR. BLEGEN:  -- and then see if this solves the issue
2  you're having.
3  BY MR. BLEGEN:
4  Q.  The number of 1150 prescribers and 965 waiting rooms is
5  communicated to Ms. Agarwal; correct?
6  A.  Yes.
7  Q.  Is it your view of this e-mail that those numbers are not
8  at least here being communicated to Mr. Mons as well?
9    You might have to take a look at the e-mail to figure
10  that out.
11  A.  Yeah, I'm sorry.  I was absorbing your question.
12    Yes, it appears so.
13  Q.  It is or is not communicated to Mr. Mons?
14  A.  It appears as though it is because I include the note:
15  "Bob, here's a short note."
16  Q.  So already if the number ends up being higher than 1150,
17  both -- Mr. Mons is going to know that it's a projection;
18  right?
19    MR. HANKEY:  Speculation.
20    THE COURT:  Sustained.
21  BY MR. BLEGEN:
22  Q.  All right.  Let's take a look at government exhibit 208.
23  Start in the middle, if you would, Laura.
24    Ms. Agarwal asks:  "What would the match look like if
25  we did project as a weighted average for H2?"

Ketchum - cross by Blegen

1549

1           Do you see that?

2    A.  Yes.

3    Q.  And H2 means the second half of the year; correct?

4    A.  Yes.

5    Q.  Which starts when?

6    A.  It would start June or July.

7    Q.  Well, which?

8    A.  July.  Sorry.

9    Q.  That's all right.  And this is being discussed in May,

10   right, early May?

11   A.  Yes.

12   Q.  So it's a couple of months out; right?

13   A.  Yes.

14   Q.  And then she says that "1K match of 95K prescribers looks

15   weak."  Right?

16   A.  Yes.

17   Q.  Your response is up at the top; correct?

18   A.  Yes.

19   Q.  And you say, "assuming a monthly goal of 150 sales."

20           And that's not an unrealistic goal; right?

21   A.  No.

22   Q.  You guys had hit 150 sales or more in a month before;

23   right?

24   A.  I believe so, yes.

25   Q.  Right at that time; correct?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 162 of 311 PageID #:14107
Ketchum - cross by Blegen
1550

1   A.  Yes.

2   Q.  "90.4 percent being a hit against Linzess, holy cow, we

3   would add 678 prescribers, bringing the total at the end of

4   September to 1828 in 1643 waiting rooms."  Right?

5   A.  Yes.

6   Q.  Okay.  What did you mean when you said "holy cow"?

7   A.  That the high match rate -- it was a high match rate.  It

8   was impressive.

9   Q.  That's good for you guys; right?

10  A.  Yes.

11  Q.  And that was true; right?

12  A.  Yes.

13  Q.  You didn't make up that match rate?

14  A.  Nope.

15  Q.  But I guess we're still up in the air about whether

16  Mr. Mons knows it's based on projection, or not; right?

17  A.  I believe so, yes.

18  Q.  Okay.  Let's go to defense exhibit 7436.  And if we could

19  go to the last page -- I'm sorry, second-to-the-last page.

20  And highlight the middle part.

21        Here we know that Mr. Mons got the numbers, 1150

22  prescribers, 965 waiting rooms, because he responds and says,

23  "Jay, is there a spreadsheet that should be included showing

24  the matches?"

25  A.  Yes.

1   Q.  All right.  So we know he got the 1150 number; right?

2   A.  Yes.

3   Q.  Let's turn to the front page and highlight what Mr. Mons

4   says.  He says:  "SA - I was thinking we should just show

5   physician matches/not waiting rooms.  I also think we'll have

6   to disclose what docs we matched as we may not be the only POC

7   (waiting room TV program) they are considering, and they will

8   want to make sure there are no names on our list that appear

9   on competitor's."

10          Do you see that?

11  A.  I do.

12  Q.  So now you know that Mr. Mons knows a projection is being

13  used; right?

14          MR. HANKEY:  Objection, speculation.

15          THE COURT:  He can -- this is an e-mail they're both

16  on.  I believe he's listed at the front of this.  So he can

17  talk about what he understands the recipient of an e-mail to

18  read.  Go ahead.

19          MR. HANKEY:  My other objection, your Honor, is rule

20  of completeness as to the last two sentences of that e-mail.

21          THE COURT:  Well, this is in evidence; correct?

22          MR. HANKEY:  Yes.

23          MR. BLEGEN:  It's on the screen.

24          THE COURT:  Well, it's on the screen, but each side

25  can read any part of an e-mail they want as long as the

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 164 of 311 PageID #:14109
Ketchum - cross by Blegen
1552

1  exhibit is in evidence.  Otherwise, we're going to be here a

2  long time.

3          Go ahead.

4  BY MR. BLEGEN:

5  Q.  All right.  Do you see the part at the bottom where he

6  says, "I haven't seen the list as I could not open."  Right?

7  A.  Yes.

8  Q.  But he's still got the 1150 numbers; right?

9  A.  Yes.

10  Q.  And he is still saying, "they will want to make sure there

11  are no names on our list that appear on competitor's"?

12  A.  Yes.

13  Q.  So he knows that that shows an understanding that this is

14  going to be a projection; right?

15  A.  Yes, it does.

16  Q.  Because there is no way for a competitor's -- excuse me.

17  There is no way for a competitor's list to have an office on

18  it that's already installed for Outcome Health; right?

19  A.  Correct.

20  Q.  Okay.  So we do know with certainty that Mr. Mons knew

21  that this was a projection; right?

22  A.  I believe so, yes.

23  Q.  Okay.  And so the based-on-projections e-mail that doesn't

24  have Bob Mons' office -- excuse me, Bob Mons on it as a cc,

25  it's not trying to hide anything from anybody; is it?

1    A.  It does not appear so.

2    Q.  Right.  And that's something that you're now concluding,

3    based on having seen an e-mail that you just didn't get a

4    chance to look at before; right?

5    A.  Yes.

6    Q.  And you weren't on; right?

7    A.  Correct.

8    Q.  And that's -- so the truth of that situation is Ms.

9    Agarwal was not trying to deceive anybody by taking Bob Mons

10   off the list; was she?

11           MR. HANKEY:  Objection, speculation.

12           THE COURT:  Well, he was asked about that same

13   subject on direct, so he can respond to this question.

14   BY THE WITNESS:

15   A.  Based on this e-mail, no, it does not appear so.

16           THE COURT:  All right.  We're -- are you entering

17   another area?

18           MR. BLEGEN:  Yes.

19           THE COURT:  All right.  We'll take our lunch break

20   right now.  Ladies and gentlemen, please don't discuss the

21   case among yourselves or with anyone else.  Keep an open mind.

22   We will see you in about an hour.

23           COURT SECURITY OFFICER:  All rise.

24       (Jury out at 12:28 p.m.)

25           THE COURT:  All right, sir.  Please come back in an

1   hour.  Don't discuss your testimony with anyone, as you are on

2   cross-examination.

3          THE WITNESS:  Yes, your Honor.

4          THE COURT:  Thank you.

5          Okay.  You can have a seat.  A couple of quick

6   points.  You're going to do a waiver regarding the remote

7   testimony?

8          MR. APPLEBY-BHATTACHARJEE:  Yes, your Honor.  And I

9   have the signed waiver here, but I think given that it

10  implicates a constitutional right, we should also put it

11  orally on the record.

12         THE COURT:  I agree.  Do you expect to get to that

13  today?

14         MR. APPLEBY-BHATTACHARJEE:  Not today but this week.

15         THE COURT:  Why don't we do it at 4:30.  Everyone --

16  no one is waiting for lunch at 4:30.  But we should do it

17  today.

18         MR. APPLEBY-BHATTACHARJEE:  Understood.

19         THE COURT:  Okay.  There's double negatives going on.

20  This is a trial point.  It's just a matter of everyone speaks.

21  But, for instance, "he didn't do that" and -- "he didn't do

22  that" or "she didn't do that" and "is that correct?"  And then

23  the person says, no -- responding to the first part of the

24  question -- he didn't do that.  It's confusing sometimes.  It

25  will be confusing on the record.  So just make sure you, on

1    cross -- I probably gave a bad example, so probably confused

2    it more.  But just make sure on cross you get the answer you

3    want because this witness is answering no as if -- without

4    listening to the whole part of it, which is:  Is that correct?

5    Where he should be saying, yes.  So just do that.  I noticed

6    that with the witness a little bit in Mr. Hueston's testimony,

7    a little bit now with Mr. Blegen's.  And just something to

8    keep in mind.  It's more witness-specific, but it's there, and

9    it will be confusing on the record.

10            Is Mons going to be called as a witness?  Is it

11   unknown?  Or what do you think?

12            MR. JOHNSTON:  Not by the government, your Honor.

13            THE COURT:  Okay.  And, yeah, I see some raised

14   eyebrows sometimes when I don't allow questions about

15   documents the witness is on.  This is the procedure you all

16   agreed to.  Documents admitted, put in front of a witness,

17   doing nothing more than reading them and not interpreting

18   them.

19            Go ahead.  Mr. Blegen, you looked at me like I had

20   changed the Federal Rules of Evidence somehow in the middle of

21   your cross-examination.  But I wanted to clarify.  My

22   understanding of the agreement, the government started this --

23            MR. BLEGEN:  Right.

24            THE COURT:  -- by putting a document up to have a

25   witness read it.  I asked the government, I'll let you do this

1  as long as the defense can do the same thing.  The defense
2  has, at least through this witness, done a lot more of it.  I
3  expect the government will do more.  And I think that's an
4  expeditious way to get documents in front of a jury when we
5  don't want to be calling 150 witnesses in this case.  Maybe we
6  will anyway, but it's certainly going to cut down on the
7  number of witnesses that need to be called.  And that's how I
8  viewed your agreement, and that's the rule I've been
9  following.

10  Mr. Hueston said, taking this document aside, what do
11  you remember?  And that's fine.  But asking a person who is
12  not on an e-mail to interpret the e-mail, other than providing
13  definitions for acronyms, I haven't been allowing.

14  MR. BLEGEN:  Then I must have misunderstood, Judge.
15  So I thought this came up twice.  It came up the first time I
16  was objecting to foundation about an e-mail that I think it
17  was Mr. Ketchum wasn't on.

18  THE COURT:  Right.

19  MR. BLEGEN:  And the government, and I think then
20  Mr. Hueston -- and the government then asked him questions
21  about that e-mail.  It wasn't just reading it in.  This wasn't
22  the thing that came at the end.  And Mr. Hueston said:  Judge,
23  I think we're fine with this as a group.  If it's
24  goose-versus-gander rule, meaning, we can ask questions about
25  those separately, I objected to an e-mail that pre-dated this

1  guy, Mr. Ketchum, being at Outcome Health.

2          THE COURT:  Right.

3          MR. BLEGEN:  And that one, he was allowed to just be

4  essentially a reader witness.  So if I raised my eyebrow, it

5  was because I thought that on the first group, meaning

6  witness -- e-mails that are within the time that he was there,

7  he can comment on those.  It's the other -- the ones that he

8  is just reading in because they don't want to call an agent,

9  that he can't.

10         THE COURT:  I don't understand that to have happened.

11 I thought he was somewhere on an e-mail chain.  He was on a cc

12 or a bcc, or part of a company-wide distribution.  And that's

13 where I allowed questions because, whether he remembers it or

14 not, he at least got it in his inbox at some point when he was

15 there.

16         I don't recall -- and the government can correct me.

17 I don't recall allowing you to ask questions about an e-mail

18 where this witness was not on it at any point.

19         MR. HANKEY:  I don't think that specifically came up.

20 There was, I believe, one e-mail where I forgot the rule for a

21 couple of questions, as has happened, you know, since then.

22         THE COURT:  Sure.

23         MR. HANKEY:  But our practice has been to strictly

24 just have the witness read the e-mail.  In fact, we had been

25 trying not to read it ourselves.  We thought, you know, we

1  would -- it would be best to have the witness read it.  But I
2  understand that's not how we're going to proceed.

3        THE COURT:  Well, these are documents in evidence.
4  And having them read by the witness on the stand, publishing
5  them that way, seems like an expeditious way to do it rather
6  than, as I said, calling someone to -- someone else to read
7  them.  Might as well do it with the witness on the stand.  And
8  I thought defense used that so far and is still using that so
9  far to put statements in context in an appropriate way.

10        If I'm misunderstanding the rule or you have a
11  different agreement on this, you can talk about it over lunch
12  and tell me.  But that's how I've interpreted it.  If that's
13  going to change the nature of your cross-examination, you can
14  raise it with me when we come back.

15        MR. BLEGEN:  I'll look at the transcript.  Maybe I'm
16  misremembering how it happened.  But that's what I thought the
17  goose-and-gander rule was for.  But I'll look up that term in
18  the transcript and see if I can figure out --

19        THE COURT:  It's 33 F.3d 241.

20        On interim statements, it occurs to me now,
21  everyone's going to be jumping up to do them after this
22  witness.  And it can't be whoever jumps up first, like in a
23  commodity exchange, sold or bought gets it first.  If the
24  government doesn't choose to do one or isn't going to do one,
25  unless the defense does one, then I'll let the defense go

1    first.  But if you all want to do one, the party whose case it

2    is goes first.  So if the government says, we want to do an

3    interim statement, defense says they want to do one, I'll let

4    the government go first, if it's an equal draw.  If the

5    government says we're not sure and defense goes first, then

6    the government can respond, if they want to.  I haven't had

7    this come up before, and that seems like the only fair way to

8    do it.  If multiple people want to do, I'll let the party

9    whose case it is at the time go first.  If multiple people

10   don't want to do it, or you change your mind, then the other

11   party can do it first.

12            Okay.  All right.  I'm keeping you from lunch.  So

13   let's come back in an hour.

14            (Recess from 12:35 p.m. to 1:30 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1560

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2    EASTERN DIVISION

3    UNITED STATES OF AMERICA,        )
                                      )  Docket No. 19 CR 864
4                   Plaintiff,        )
                                      )  Chicago, Illinois
5         v.                          )  February 7, 2023
                                      )  1:29 p.m.
6    RISHI SHAH, SHRADHA AGARWAL,     )
     BRAD PURDY,                      )
7                                     )
                    Defendants.       )
8

9         TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 6B
       BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11   APPEARANCES:

12
     For the Government:    MR. MATTHEW F. MADDEN
13                          MR. SAURISH APPLEBY-BHATTACHARJEE
                            Assistant U.S. Attorneys
14                          219 South Dearborn Street, 5th Floor
                            Chicago, Illinois  60604
15

16                          MR. WILLIAM E. JOHNSTON
                            MR. KYLE C. HANKEY
17                          U.S. Department of Justice
                            Criminal Division, Fraud Section
18                          Washington, D.C.  20530

19

20

21

22                    ELIA E. CARRIÓN
                    Official Court Reporter
23               United States District Court
              219 South Dearborn Street, Room 1432,
24                  Chicago, Illinois 60604
                        (312) 408-7782
25              Elia_Carrion@ilnd.uscourts.gov

1561

1    APPEARANCES (Continued:)

2

       For Defendant
3      Shah:                    MR. JOHN C. HUESTON
                                Hueston Hennigan LLP
4                               620 Newport Center Drive, Suite 1300
                                Newport Beach, California  92660
5
                                MS. VICKI CHOU
6                               MR. MICHAEL H. TODISCO
                                MS. KAREN DING
7                               Hueston Hennigan LLP
                                523 West 6th Street, Suite 400
8                               Los Angeles, California  90014

9
       For Defendant
10     Agarwal:           MS. KOREN L. BELL
                                MR. A. ALEXANDER LOWDER
11                              MR. STEPHEN G. LARSON
                                Larson LLP
12                              555 South Flower Street, Suite 4400
                                Los Angeles, California  90071
13
                                MR. PATRICK W. BLEGEN
14                              MS. KELSEY H. KILLION
                                Blegen & Garvey
15                              53 West Jackson Boulevard, Suite 1437
                                Chicago, Illinois  60604
16

17     For Defendant
       Purdy:                   MR. THEODORE T. POULOS
18                              MR. ERIC PRUITT
                                MR. JOHN PAVLETIC
19                              Cotsirilos, Tighe, Streicker, Poulos &
                                Campbell, Ltd.
20                              33 North Dearborn Street, Suite 600
                                Chicago, Illinois  60602
21

22

23

24

25

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 174 of 311 PageID #:14119
Ketchum - direct by Blegen
1562

1    (Proceedings heard in open court, jury out:)

2        THE COURT:  You ready to proceed?

3        MR. BLEGEN:  Yes.

4        THE COURT:  Okay.  Is your client here?

5        MR. HUESTON:  Yes, let me grab him.  Yes.

6        THE COURT:  All right.  The witness, he can retake

7    the stand.

8        MR. HANKEY:  He's going to be in shortly.  I spoke to

9    his counsel.  He had to use the restroom.  He's coming

10   directly here.

11        THE COURT:  Oh, all right.

12      (Jury enters.)

13        THE COURT:  All right.  Please be seated.

14        Mr. Blegen, you may continue your cross-examination.

15        MR. BLEGEN:  Thank you, Judge.

16   JASON KETCHUM, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

17               CROSS-EXAMINATION (RESUMED)

18   BY MR. BLEGEN:

19   Q.  Good afternoon, Mr. Ketchum.

20   A.  Good afternoon.

21   Q.  Before the break, I had asked you some questions about

22   whether you recall the reason for Mr. Demas leaving

23   Outcome Health.  Do you remember that?

24   A.  Yes.

25        MR. BLEGEN:  All right.  Could we put up Defense

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 175 of 311 PageID #:14120
Ketchum - direct by Blegen
1563

1  Exhibit 3357.

2  BY MR. BLEGEN:

3  Q.  Sir, do you see at least on the top that that was an

4  e-mail that you received?

5  A.  Yes.

6  Q.  All right.

7       MR. BLEGEN:  Can you go to the second page, Laura,

8  and highlight the part below where "leadership" starts.

9  BY MR. BLEGEN:

10  Q.  Sir, do you see where Ms. Agarwal states, "Leadership, we

11  presented the opportunity this morning to Jim and Christy to

12  resign and part ways with ContextMedia while supporting this

13  sudden event through a severance package."

14  A.  Yes.

15  Q.  Do you see where it says, "Needless to say, it's a very

16  difficult time for the accounting team and the company, and we

17  need to enter our best efforts to stand by our own team

18  members through this unfortunate situation as they come to

19  terms with it"?

20  A.  Yes.

21  Q.  And do you see where it says, "Katie is reaching out today

22  to the direct team impacted by this change in work flow to

23  update them and have them assist in their transition.  We are

24  in the midst of an audit, and Brad is taking the lead during

25  this time.  Any finance and accounting related questions,

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 176 of 311 PageID #:14121
Ketchum - direct by Blegen
1564

1    please rely on him."

2            Do you see that?

3    A.  Yes.

4    Q.  Okay.  Do you now recall that it was a personal issue that

5    caused Jim and Christy to leave Outcome Health?

6    A.  Yes.

7    Q.  Okay.  I'll leave it at that.  Thank you.

8            I was asking you a little bit before the break about

9    this idea that when you were at Outcome Health you didn't just

10   make up numbers.  Remember that, those questions?

11   A.  I do, yes.

12           MR. BLEGEN:  Can we put up Government Exhibit 1127.

13   BY MR. BLEGEN:

14   Q.  So as you recall, sir, this was an exhibit the government

15   discussed with you about the sort of three-legged stool model

16   of Outcome Health, right?

17   A.  Yes.

18   Q.  And I think you said something along the lines of all of

19   these legs need to be in balance or the stool will get wobbly

20   or fall over, something, right?

21   A.  Yes.

22   Q.  All right.  So sponsorship sales is, of course, the sales

23   arm of -- or leg of the stool that is trying to sell ads to

24   pharma companies, right?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 177 of 311 PageID #:14122
Ketchum - direct by Blegen
1565

1  Q.  Member outreach is the group of -- I guess they're also
2  salespeople, but they're not really selling anything.  They're
3  trying to convince doctors to let you guys put your screens in
4  their offices, right?
5  A.  Yes.
6  Q.  Okay.  And member services is -- that was you and other
7  people who dealt with the doctors' offices to make sure
8  everything was fine, right?
9  A.  Yes.
10 Q.  Okay.  So if the numbers that sponsorship sales was using
11 was just sort of created out of thin air and was a gigantic
12 number, and that number didn't get communicated to the rest of
13 the leadership of Outcome Health, then the stool would fall
14 over, right?
15 A.  Yes.
16 Q.  Because what Outcome Health did was try to align the
17 member outreach with what had been sold, right?
18 A.  Yes.
19 Q.  So, for example, if you tell a pharma company in, you
20 know, nine months from now we will have 11 -- a thousand
21 screens in, you know, some office that targets gout, let's
22 say, right, then what Outcome Health would do was, one, they
23 would direct the member outreach people to contact doctors in
24 that category, right?
25 A.  Yes.

Ketchum - direct by Blegen

1566

1   Q.  And they would also hire more people to do that, right?

2   A.  Yes.

3   Q.  And you and Ms. Agarwal had lots of interactions regarding

4   hiring people, correct?

5   A.  Yes.

6   Q.  Interviewing -- you said "yes" like in a sort of

7   exasperated way, right?

8   A.  Yes.

9   Q.  So that was a huge task of both you and Ms. Agarwal that

10  you were involved in, correct?

11  A.  Yes.

12  Q.  And you guys did like extensive interviews of people,

13  right?

14  A.  Yes.

15  Q.  It wasn't just hey, come in, what's your name, what's your

16  experience, you got the job, right?

17  A.  Correct.

18  Q.  You guys did role playing, right?

19  A.  Yes.

20  Q.  You had a bunch of questions to ask people, right?

21  A.  Yes.

22  Q.  Okay.  And part of that hiring was to get people to work

23  in member outreach, right?

24  A.  Yes.

25  Q.  To fulfill the numbers that sponsorship sales had given to

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 179 of 311 PageID #:14124
Ketchum - direct by Blegen
1567

1    clients, right?

2    A.  Yes.

3    Q.  Okay.  But if there's a disconnect in the middle, meaning

4    the information from sponsorship sales is just being made up

5    with no connection to how much -- and not told to people, then

6    nobody knows to hire more people, right?

7    A.  Correct.

8    Q.  Now, that didn't happen when you were there, right?

9    A.  Not that I recall.

10   Q.  The information was shared as to what numbers are we using

11   with pharmas, correct?

12   A.  Yes.

13   Q.  Okay.  I want to talk to you about a drug called Multaq.

14   All right.  And you remember being -- the government asking

15   you about it?

16   A.  Yes.

17   Q.  Any recollection of what Multaq is or does?

18   A.  Not off the top of my head, no.

19   Q.  Okay.  That's fine.

20           MR. BLEGEN:  Can you put up Government Exhibit 134.

21   Highlight the top for now.  Thank you.

22   BY MR. BLEGEN:

23   Q.  So the government showed you this exhibit in which

24   Ms. Agarwal says to MC, that's Matt Crandall, right?

25   A.  It is.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 180 of 311 PageID #:14125
Ketchum - direct by Blegen
1568

1  Q.  "I did IM you that same day after talking with JK on
2  confusion regarding future growth numbers."
3      Right?
4  A.  Yes.
5  Q.  And she says, "121 offices, 134 screens, 263 prescribers
6  equals current."
7      Do you see that?
8  A.  Yes.
9  Q.  And that's current installed, right?
10 A.  It appears so, yes.
11 Q.  Okay.  And then under that, Ms. Agarwal says, "I'd create
12 the proposal for 150 waiting rooms for the year and keep it
13 simple (no weighted average/monthly growth, et al.)."
14     Do you see that?
15 A.  I do.
16 Q.  And I think you told us on direct that that -- that you
17 understood or interpreted that to mean that Ms. Agarwal was
18 trying to keep the fact of weighted average, that this number,
19 150, include weighted average or growth or something from the
20 client, right?
21 A.  Yes, I recall saying that.
22 Q.  Okay.  You would agree with me, would you not, that that
23 only makes sense if Ms. Agarwal hadn't already told
24 Matt Crandall to give the live numbers to the client, right?
25 A.  Yes.

Ketchum - direct by Blegen

1569

1  Q.  Okay.  All right.  Let's talk about Multaq for a minute.

2          MR. BLEGEN:  Laura, would you put up Government

3  Exhibit 79 -- excuse me -- Defense Exhibit 7914.

4  BY MR. BLEGEN:

5  Q.  And if you want to look at that for --

6          MR. BLEGEN:  Go ahead and blow it up to the bottom of

7  the text.

8  BY MR. BLEGEN:

9  Q.  Have you had a chance to review it?

10 A.  Hold on.  I'm a little confused.  Is the me -- oh, the me

11 is Matthew Crandall.  Okay.  Sorry.  I was a little confused

12 on the parties.  One more moment.  Sorry.

13 Q.  Yeah.  You're the Jason.

14 A.  I got that part.  I was just trying to figure out who the

15 other one was.

16          Okay.  I got it.

17 Q.  Okay.  So I'm not going to read it out loud since it's in

18 evidence, but in summary, you and Mr. Crandall are discussing

19 how many offices would be available for Multaq, right?

20 A.  Yes.

21 Q.  And he gets confused in part, right?

22 A.  Yes.

23 Q.  And ultimately you tell him, you know, you're talking

24 about you say there aren't 188 offices, there are 136 offices,

25 correct?

Ketchum - direct by Blegen

1570

 1  A.  Yes.

 2  Q.  And he then switches the screens, right?

 3  A.  Yes.

 4  Q.  You say there is a small projection in there, right?

 5  A.  Yes.

 6  Q.  Okay.  And what's the small projection in, the number of

 7  screens?

 8  A.  I believe in the number of, yeah, offices and then

 9  screens, yes.  I believe so.

10  Q.  All right.  Well, just as an aside, there can never be

11  more offices than screens, right?

12  A.  That's correct.

13  Q.  But there can be more screens than offices?

14  A.  Yes.

15  Q.  Okay.  And that's for circumstances where a big doctor's

16  office has more than one waiting room, right?

17  A.  Yes.

18  Q.  And sometimes then you would have to use two screens to

19  have one in each waiting room, right?

20  A.  Yes, or a particularly large waiting room, yes.

21  Q.  Meaning you could put two screens in a really big room so

22  that everyone in there could see it, right?

23  A.  Yes.

24  Q.  All right.  And that is an advantage to the client, right?

25  A.  Sure.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 183 of 311 PageID #:14128
Ketchum - direct by Blegen
1571

1  Q.  Because therefore more eyeballs are watching the screens,

2  right?

3  A.  Yes.

4  Q.  Which is what they want?

5  A.  Correct.

6  Q.  They want people to see their ads, correct?

7  A.  Of course.

8  Q.  Okay.  So the more screens, the better for the clients,

9  right?

10  A.  Yes.

11  Q.  All right.  So anyway, towards the end, Mr. Crandall gets

12  confused, right, and says, still confused, meaning how many

13  offices now, and he says 90, you say 121 offices, 263

14  prescribers, right?

15  A.  Yes.

16  Q.  And that's essentially -- that's currently installed,

17  right?

18  A.  It appears that's the case, yes.

19  Q.  All right.  When you said 136 offices, that was with a

20  small amount of projection, right?

21  A.  Yes, it appears that's the case.

22  Q.  Now, despite Ms. Agarwal's suggestion that Mr. Crandall

23  use 150 as the office number to propose, he doesn't use 150,

24  does he, or do you recall?

25  A.  I don't recall.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 184 of 311 PageID #:14129
Ketchum - direct by Blegen
1572

 1   Q.  All right.
 2          MR. BLEGEN:  Can we put up Defense Exhibit 7920.
 3   BY MR. BLEGEN:
 4   Q.  Do you see in the middle -- and that's an e-mail that
 5   you're on, correct?
 6   A.  Yes.
 7   Q.  February 13, 2013 --
 8   A.  Yes.
 9   Q.  -- the top one?
10          In the middle you see Ms. Agarwal's e-mail suggesting
11   150, right?
12   A.  Yes.
13   Q.  Okay.  At the top, you see what Mr. Crandall actually
14   proposed, right?
15   A.  I do.
16   Q.  He presented 125 waiting rooms?
17   A.  Yes.
18   Q.  Do you know whether there are any discussions between
19   Ms. Agarwal and Mr. Crandall intervening?
20   A.  I don't.
21   Q.  They could and did often talk on the phone or in person,
22   right?
23   A.  Sure, yes.
24   Q.  Okay.  So it's very possible that they had a discussion
25   about this?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 185 of 311 PageID #:14130
Ketchum - direct by Blegen
1573

1       MR. HANKEY:  Objection.  Speculation.

2       THE COURT:  Sustained.

3       MR. BLEGEN:  Ah.

4   BY MR. BLEGEN:

5   Q.  In any event, what Ms. Agarwal suggests in an e-mail about

6   150 was not a mandate to Mr. Crandall, obviously, right?

7   A.  It does not appear to be the case.

8   Q.  Because he went with a different number, right?

9   A.  Yes.

10      MR. BLEGEN:  Can we see Defense Exhibit 8615?

11  Highlight the top part here.

12  BY MR. BLEGEN:

13  Q.  And so in addition to Ms. Agarwal and Mr. Crandall having

14  the ability to talk to each other, Mr. Crandall also talks to

15  the client, correct?

16  A.  It appears that's the case, yes.

17  Q.  But so you see where he says, "I'll talk to the client,"

18  right?

19  A.  Yes.

20  Q.  All right.  But so you know that salespeople, as we said

21  earlier, they often talk to the clients, right?

22  A.  Yes.

23  Q.  They didn't just e-mail them, right?

24  A.  No.

25  Q.  These are sales guys.  They want to create relationships

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 186 of 311 PageID #:14131
Ketchum - direct by Blegen
1574

1 with clients and chat them up to ask about their families,

2 those kinds of things, right?

3 A. Yes.

4 Q. And you heard that kind of talk when you were sitting

5 there. I think you said it was like sort of an area with

6 cubicles, right?

7 A. Yes.

8 Q. You could hear them talking like that, right?

9 A. Not so much sponsorship, but all the other sales teams,

10 yes.

11 Q. Okay. Now, your testimony on direct was something along

12 the lines of Ms. Agarwal was trying to get Mr. Crandall to

13 hide the fact that a projection was being used or to not

14 reveal it to the client, right?

15 A. It seemed that was the case.

16 Q. Okay. And it seemed that way based on the e-mails that

17 you saw, right?

18 A. Yes.

19 Q. All right. But you already agreed with me that if

20 Ms. Agarwal had already said, well, just send them the live

21 numbers, that doesn't make sense, does it?

22 A. I suppose not.

23 Q. All right.

24          MR. BLEGEN: Can we see Defense Exhibit 7843. If you

25 would blow up the top part.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 187 of 311 PageID #:14132
Ketchum - direct by Blegen
1575

1  BY MR. BLEGEN:

2  Q.  This is an e-mail from Ms. Agarwal to Mr. Crandall on

3  February 1, 2013, correct?

4  A.  Yes.

5  Q.  That's five days before she suggests 150 waiting rooms?

6  A.  I believe that's correct, yes.  Yep.

7  Q.  Okay.  And do you see the part where she says, "Matthew,

8  here's the breakdown:  121 offices, 134 screens, 263

9  prescribers, currently live."

10  A.  Yes.

11  Q.  And those are accurate numbers, right?

12  A.  I believe so.

13  Q.  And then she says, "What Jay was saying is that of the

14  6700 doctors we're currently calling, only 188 are Multaq

15  matches.  Makes sense.  Multaq is looking for cardios, and

16  we're calling PCPs."

17          Do you see that?

18  A.  I do.

19  Q.  Also truthful information, right?

20  A.  Yes, seems so.

21  Q.  Okay.  Here's the good part:  "For your proposal to them,

22  I'd keep things simple and use the above numbers as live

23  numbers."

24          Do you see that?

25  A.  I do.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 188 of 311 PageID #:14133
Ketchum - direct by Blegen
1576

1  Q.  "If there's interest, we can find a way to start adding

2  more cardios, but we will need a longer term commitment, eight

3  to 12 months."

4        Right?

5  A.  Yes.

6  Q.  So it is nonsense that Ms. Agarwal was trying to hide --

7            MR. HANKEY:  Objection.

8            THE COURT:  Finish the question.

9            MR. HANKEY:  Argumentative.

10           THE COURT:  Go ahead.  You can finish your question

11  and then I'll rule on the objection.

12           MR. BLEGEN:  I forgot what --

13           THE COURT:  Unless you want to rephrase it.

14           MR. BLEGEN:  I'll try.  I forgot what I was going to

15  say.

16           THE COURT:  You used the word "nonsense" and that was

17  the objectionable part.

18           MR. BLEGEN:  You say it is objectionable?

19           THE COURT:  Yeah.

20  BY MR. BLEGEN:

21  Q.  It is not true -- let me do it this way.  You testified

22  your understanding of what Ms. Agarwal was trying to do was to

23  hide something, right?

24  A.  Based on what I saw, yes.

25  Q.  Okay.  But based on what you see now that would not be

1  your understanding, would it?

2  A.  It seems that would be the case, yes.

3  Q.  It seems I would be correct?

4  A.  It appears that way, yes.

5  Q.  That she was not trying to hide something because she had

6  already communicated -- told Crandall to send them the live

7  numbers, right?

8  A.  Yes, that's what this e-mail is saying.

9  Q.  And so that's another instance where, I'm not complaining,

10 you have seen additional documents, and your testimony about

11 what you understood to be happening has changed, right?

12 A.  Yes, I suppose so.

13 Q.  Well, I -- so "I suppose so" is a very polite way of

14 saying things; but we're in court, so the answer is yes,

15 right?

16 A.  Yes.

17 Q.  Okay.

18         MR. BLEGEN:  Could you put up Government Exhibit 140.

19 I don't -- is everybody else's screens on?  Oh, maybe that

20 one's not supposed to be on.

21         THE COURT:  The screen in front of the jury box is

22 what the jurors are seeing.

23 BY MR. BLEGEN:

24 Q.  Sir --

25         MR. BLEGEN:  Could you blow up the top part?  Oh, I'm

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 190 of 311 PageID #:14135
Ketchum - direct by Blegen
1578

1  sorry.  Take that down.  Blow up the part that starts with

2  "I'm not sure in this particular case."

3  BY MR. BLEGEN:

4  Q.  So I believe the government showed you this exhibit.

5  You're not on it.  Oh, actually you are on it.  The government

6  showed you this exhibit and asked you questions about

7  whether -- what Ms. Agarwal said about salespeople getting

8  confused was true or that you had perceived that.  Do you

9  remember that?

10  A.  Yes.

11  Q.  Okay.

12          MR. BLEGEN:  You can take that down.

13  BY MR. BLEGEN:

14  Q.  And you said, no, I observed them, and I did not observe

15  them to get confused?

16  A.  That's correct.

17  Q.  Okay.  So taking us back to about five minutes ago, we do

18  know that the salespeople, at least one of them so far,

19  sometimes got confused about the numbers?

20  A.  That did happen in that example, yes.

21  Q.  Yeah.  And that was Mr. Svec, right?

22  A.  Yes.

23  Q.  And he literally said, "I'm confused"?

24  A.  I believe that was Mr. Crandall.

25  Q.  Oh, I'm sorry.  It was Crandall.  And he literally said,

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 191 of 311 PageID #:14136
Ketchum - direct by Blegen
1579

1  though, "I'm confused"?

2  A.  Yes, he did.

3  Q.  And the confusion related directly to what the government

4  was asking you about which was how to present things to a

5  client, right?

6  A.  That's true.

7  Q.  Because that's what he was trying to figure out, correct?

8  A.  Yes.

9          MR. BLEGEN:  Could we put that one back up just for a

10  second, Government Exhibit -- excuse me -- Defense

11  Exhibit 7914.

12          THE WITNESS:  My screen went dark.

13          MR. BLEGEN:  So did mine.

14          THE COURT:  Okay.

15          MR. BLEGEN:  I may have bumped this screen over here

16  with my finger or folder.

17          THE WITNESS:  It's back.

18          MR. BLEGEN:  There we go.

19  BY MR. BLEGEN:

20  Q.  So we saw this a few minutes ago, sir.  That is the

21  example of Mr. Crandall in this instance getting confused

22  about the numbers, right?

23  A.  Yes.

24  Q.  Okay.

25          MR. BLEGEN:  You can take that one down.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 192 of 311 PageID #:14137
Ketchum - direct by Blegen
1580

1  BY MR. BLEGEN:

2  Q.  And these guys weren't dummies, right, the salespeople?

3  A.  No.

4  Q.  But some of these numbers were complicated, right?

5  A.  Yes.

6  Q.  And some of the ways that things had to get presented to

7  the clients were complicated, right?

8  A.  Sure, yes.

9  Q.  And the language was important, right?

10  A.  Yes.

11  Q.  Because something could get twisted or spun around or the

12  numbers could be wrong, correct?

13  A.  Yes.

14  Q.  Okay.

15          MR. BLEGEN:  Let's put up Defense Exhibit 8757.  And

16  I think blow it up from the bottom, if you would, on that

17  first page.

18  BY MR. BLEGEN:

19  Q.  And if you want a second to -- or more than a second to

20  take a look at it, please do, and then I'll ask you some

21  questions.

22  A.  Thank you.

23  Q.  And if you want us to not have it blown up, we can do that

24  too.

25  A.  Actually, could you zoom out a bit?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 193 of 311 PageID #:14138
Ketchum - direct by Blegen
1581

1    Q.  Yeah.

2    A.  Thank you.

3         Okay.

4    Q.  So although he does not use the literal phrase "I'm

5    confused," Mr. Svec is having trouble understanding the math

6    that's going back and forth here, is he not?

7    A.  Yes, that's true.

8    Q.  All right.

9         MR. BLEGEN:  Can we blow up the part at the bottom

10   where he says, "Hey, Jason, not sure I understand this?"

11   BY MR. BLEGEN:

12   Q.  He's having trouble with the math.  He's having trouble

13   with the spreadsheets and the various columns, right?

14   A.  Yes.

15   Q.  Okay.  And as you said, this stuff can get complicated,

16   right?

17   A.  Yes.

18   Q.  Okay.

19         MR. BLEGEN:  Go up to the next paragraph that starts

20   with "Steve, the way we read their request."

21   BY MR. BLEGEN:

22   Q.  That's Ms. Agarwal trying to explain what -- how she or

23   she and someone else read the request from the client, right?

24   A.  Yes.

25   Q.  All right.  Above that, Steve says that he read it a

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 194 of 311 PageID #:14139
Ketchum - direct by Blegen
1582

1    different way, and -- or what you guys -- read what you guys

2    are saying a different way, correct?

3    A.  It appears, yes, that's the case.

4    Q.  And in the top, Ms. Agarwal explains it, and Mr. Svec

5    eventually says, "Okay, makes sense."

6    A.  Yes.

7    Q.  All right.  So that's another -- an instance of one of the

8    other salesman, Mr. Svec, getting confused, having trouble

9    understanding the numbers regarding what's going to be

10   presented to a client, right?

11   A.  Yes.

12   Q.  Let me show you Defense Exhibit 7841 which you are not on.

13   And I'll have you read --

14          MR. BLEGEN:  Pull out the bottom where Mr. Mons's

15   e-mail -- right to there, yes.

16   BY MR. BLEGEN:

17   Q.  Can you just read for us what Mr. Mons writes under ideas

18   for 9/12 Amgen Prolia presentation?

19   A.  The bullet points?

20   Q.  Yes.

21   A.  "Ideas for 9/12 Amgen Prolia presentation.  Cover slide,

22   SA will lead presentation - run off five loaded iPads, mighty

23   meeting."

24          "Slide 2, current match, 957, forecast match by

25   February 2013 go live - JK/SA fill in."

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 195 of 311 PageID #:14140
Ketchum - direct by Blegen
1583

1      "12-month weighted average equals 1600 sites."

2      "Insert ramp forecast, SA/JK, build the way we build

3   our ROI slide in template deck."

4   Q.  Thank you.

5      MR. BLEGEN:  Could we go up to the top of the e-mail

6   and highlight the part that starts with "Hi, Bob."

7   BY MR. BLEGEN:

8   Q.  Can you read the first two lines of that?

9   A.  "Thanks for the outline.  Are you building the initial

10  draft for the deck or would you like me to?  I also think you

11  meant current match is 757 and wanted to clarify, not every

12  CMH office has brochure holder."

13  Q.  That's fine.  And that's an e-mail from Ms. Agarwal to

14  Mr. Mons, correct?

15  A.  Yes.

16  Q.  On September 8, 2012, correct?

17  A.  Yes.

18  Q.  And she -- the number that she gives, 757 as the current

19  match, is lower than the number of current match Mr. Mons

20  asserted, right?

21  A.  Yes.

22  Q.  Am I reading that correctly?

23  A.  That's the case.

24  Q.  And does she also indicate that not every CMH office has

25  brochure holder?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 196 of 311 PageID #:14141
Ketchum - direct by Blegen
1584

1    A.  Yes.

2    Q.  And Ms. Agarwal was right about that, correct?

3    A.  The brochure holder?

4    Q.  Yes.

5    A.  Yes.

6    Q.  Let me show you Defense Exhibit 8700.

7           MR. BLEGEN:  And I would just blow up the second --

8    the bottom section under, on February 4, 2013.

9    BY MR. BLEGEN:

10   Q.  And did you have a chance to see that this is an e-mail

11   chain that you're on?

12   A.  Yes.

13   Q.  Okay.  And it's from February 4th of 2013?

14   A.  Yes.

15   Q.  All right.  And so here Mr. Mons is sending an e-mail that

16   ultimately gets forwarded to you that says, "Research

17   associate at Vivus, they are very pleased with our willingness

18   to survey some of the CMH practice managers in the Qsymia

19   match group.  AV has not done this before and is looking for

20   some guidance from us specifically."

21          Do you see that?

22   A.  Yes.

23          MR. BLEGEN:  Now, if you could blow up the top part.

24   BY MR. BLEGEN:

25   Q.  In response, Mr. Shah says in part, "The screening would

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 197 of 311 PageID #:14142
Ketchum - direct by Blegen
1585

1  depend on their survey objectives since it's of practice

2  managers and not viewers.  I don't imagine any real screening

3  questions, but based on what they want to know, we may add

4  this."

5        Do you see that?

6  A.  Yes.

7  Q.  And is Mr. Shah correcting Mr. Mons there?

8  A.  It appears to be the case, yes.

9  Q.  Okay.  Regarding some confusion that Mr. Mons has?

10 A.  Yes.

11       MR. BLEGEN:  You can take that one down.

12       Can we put up Defense Exhibit 8649.  Just leave it up

13 for a second so the witness could see it.

14 BY MR. BLEGEN:

15 Q.  Do you see that this is an e-mail chain that you are on

16 again?

17 A.  Yes.

18 Q.  From February 13th of 2013?

19 A.  Yes.

20 Q.  All right.

21       MR. BLEGEN:  Can we blow up the bottom part,

22 Mr. Mons's e-mail.

23 BY MR. BLEGEN:

24 Q.  You see where Mr. Mons says, "Hello, Anusha"?  You see

25 that?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 198 of 311 PageID #:14143
Ketchum - direct by Blegen
1586

1   A.  Yes.

2   Q.  And is Anusha a representative of a client?

3   A.  Yes.

4   Q.  She works in an agency?

5   A.  It looks like she works directly for the brand actually.

6   Q.  For the pharma?  Okay.

7   A.  Yes.

8   Q.  "We are planning a patient intercept survey of a

9   representative sample of CMH offices."

10          Do you see that?

11  A.  Yes.

12  Q.  "It is scheduled for late March, and we can include up to

13  three questions for Qsymia at no charge to Vivus."

14          Do you see that?

15  A.  Yes.

16  Q.  And that e-mail was sent on February 13th of 2013, right?

17  A.  Yes.

18  Q.  All right.

19          MR. BLEGEN:  Can we go to the middle of the page and

20  highlight Mr. Ketchum's response.

21  BY MR. BLEGEN:

22  Q.  That e-mail from Mr. Mons was of interest to you because

23  if you guys were doing a patient intercept survey, you would

24  have had to do something, right?

25  A.  Yes.

Ketchum - direct by Blegen
1587

1  Q.  And you would have to do something related to an Arbitron

2  study, right?

3  A.  Yes.

4  Q.  Okay.  But Mr. Mons is wrong, right?

5  A.  It appears that's the case, yes.

6  Q.  It was not going to be a patient intercept survey, was it?

7  A.  It does not appear, no.  No.

8  Q.  Okay.

9  A.  It's not.

10 Q.  What kind of survey was it going to be?

11 A.  Just a survey that an employee was going to perform.

12 Q.  Survey of whom?

13 A.  The office, the office staff.

14 Q.  I see.

15         MR. BLEGEN:  Can we highlight the very first e-mail

16 at the top?

17 BY MR. BLEGEN:

18 Q.  And this is Mr. Shah informing you that Mr. Mons is wrong,

19 right?

20 A.  Yes.

21 Q.  And he says, "Nope, this is the survey Sylvia is doing.

22 Bob's just adding Bob language."

23         Right?

24 A.  Yes.

25 Q.  And is that just sort of a funny way of saying Bob has

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 200 of 311 PageID #:14145
Ketchum - direct by Blegen
1588

1   something messed up here?

2   A.  Yes.

3   Q.  All right.  And notably, though, Mr. Mons is not on that

4   e-mail, right?

5   A.  He's not.

6   Q.  Okay.  So he got taken off when his confusion about

7   something was being discussed?

8   A.  Yes.

9   Q.  Among the more senior people in the firm?

10  A.  Yes.

11  Q.  Okay.

12          MR. BLEGEN:  You can take that down one.  Thank you.

13          Can you put up Government Exhibit 277.

14  BY MR. BLEGEN:

15  Q.  Do you want a second to take a look at this one?  It is,

16  again, an e-mail chain that you're on.

17  A.  Yes.  Is it -- is there more?  Are there more pages to it?

18  It looks like there --

19  Q.  There is a --

20  A.  It's just a bunch of -- okay.

21  Q.  There's a proposal attached to it which we can look at if

22  you want, but the point -- I'll tell you what the point is --

23  A.  I see.

24  Q.  -- and you could tell me if you want to see more.

25  A.  Okay.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 201 of 311 PageID #:14146
Ketchum - direct by Blegen
1589

1  Q.  By the way, so salespeople could send out their own

2  proposals, right?

3  A.  Yes, I believe so.

4  Q.  Well, Mons sends this one to a client, right?

5  A.  Yes.

6  Q.  To Lyndon Chin?

7  A.  Yes.

8  Q.  All right.

9        MR. BLEGEN:  So can you highlight the bottom part, or

10  pull out the bottom part.

11  BY MR. BLEGEN:

12  Q.  Read to me what Mr. Mons sends to Lyndon.

13  A.  "Lyndon, per our chat today, we ran deciles 4 through 10

14  against 2013 target list and matched 3,449 physician

15  practices, 2,668 waiting rooms.  See option B in attached

16  proposal."

17  Q.  That's enough.  The rest is just chatting between him and

18  the client, right?

19  A.  Yes.

20  Q.  Okay.  Can you see what Mr. Mons got confused here?

21  A.  I don't follow your question.

22  Q.  Okay.  So maybe I don't understand.  It's not possible to

23  have more physician practices than waiting rooms for a match,

24  is it?

25  A.  No.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 202 of 311 PageID #:14147
Ketchum - direct by Blegen
1590

 1   Q.  Okay.  So, I mean, you guys sold -- so a physician's
 2   practice could have multiple physicians, right?
 3   A.  Yes.
 4   Q.  And it could have multiple waiting rooms?
 5   A.  Yes.
 6   Q.  But you guys didn't target any physician practices that
 7   did not have a waiting room, right?
 8   A.  No.
 9   Q.  Because then you wouldn't have anywhere to put the screen,
10   right?
11   A.  Correct.
12   Q.  So it is impossible to have more physician practices than
13   waiting rooms, right?
14   A.  Correct.
15   Q.  Okay.  And so that's another instance of Mr. Mons getting
16   confused about something, right?
17   A.  Yes, it appears so.
18   Q.  And if you go up to the top, you'll see that Mr. Mons
19   repeated that same confusion to you, Mr. Shah, and Mr. Desai.
20          Do you see that?
21   A.  Yes, I do.
22   Q.  Okay.
23          MR. BLEGEN:  You can take that one down.
24   BY MR. BLEGEN:
25   Q.  I just want to briefly talk to you about this because

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 203 of 311 PageID #:14148
Ketchum - direct by Blegen
1591

1  Mr. Hueston went over it with you, but you've seen multiple

2  e-mails now where the salesperson clearly knows about the

3  concept of projection, right?

4  A.  We've seen them, yes.

5  Q.  Multiple ones, right?

6  A.  Yes.

7  Q.  And clearly knows about the concept of weighted average,

8  right?

9  A.  Yes.

10  Q.  Okay.  So that was not something that was hidden or

11  disguised from the salespeople, was it?

12  A.  From what I've seen at this point, no.

13  Q.  Okay.  And that's a change since the other day when you

14  were on direct, right?

15  A.  I believe on direct I said it was generally accepted to

16  not share that information, but we have seen multiple

17  instances where it was shared.

18  Q.  Okay.  You recall that you were asked some questions from

19  the government about a drug called Xarelto?  Do you remember

20  that?

21  A.  Yes.

22  Q.  Any recollection of what kind of drug Xarelto is?

23  A.  Heart health.

24  Q.  Heart health.  All right.  And this is the -- you guys

25  call these campaigns, right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 204 of 311 PageID #:14149
Ketchum - direct by Blegen
1592

1  A.  Yes.

2  Q.  So this -- the Xarelto campaign is the one where you told

3  the jury that you thought that Ms. Agarwal was doing something

4  sneaky regarding exclusivity, right?

5  A.  It appeared to be the case, yes.

6  Q.  And that she also appeared to be selling something or

7  presenting something as live, current, when it wasn't, right?

8  A.  Yes.

9  Q.  You, in fact, said on direct, well, we didn't have 3200

10  screens at that time.  Remember that?

11  A.  Correct.

12  Q.  But the reality is, as you found out later in the direct

13  testimony, is that Xarelto wasn't even going to start until

14  the next year, right?

15  A.  Correct.

16  Q.  So your testimony that this statement was not true because

17  we didn't have 3200 screens was wrong, right?

18          MR. HANKEY:  Objection.  Vague.

19          THE COURT:  Well, if the witness can answer.  If he

20  needs clarification, he can ask for it.

21          THE WITNESS:  Yeah, I'm a little confused on the

22  question.

23  BY MR. BLEGEN:

24  Q.  Okay.  So you said to the jury you saw -- here, I'll put

25  it up for you.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 205 of 311 PageID #:14150
Ketchum - cross by Blegen
1593

1    A.  Okay.

2    Q.  If I could find the right exhibit.

3        MR. BLEGEN:  Put up Government Exhibit 235.  And

4    highlight the -- under "we can go two routes with this."

5    BY MR. BLEGEN:

6    Q.  We'll talk about the first point a little later, but the

7    second point, Ms. Agarwal says, "One of the ways we could go

8    with this is say we have 3200 but only 2200 are available to

9    them.  Now, if Pradaxa renews for 1800 and wants to do a new

10    list match (anticipating growth during this year) we are way

11    overstretched."

12        Do you see that?

13    A.  Yes.

14    Q.  The part I'm talking about is you said to the jury when

15    the government said to you is, was we have 3200 a truthful

16    statement, you said no, it was not a truthful statement.  And

17    they said why, and you said because we didn't have 3200,

18    right?

19    A.  I believe that was true at the time, yes.

20    Q.  Okay.

21        MR. BLEGEN:  You can pull it out now, or unexpand it.

22    BY MR. BLEGEN:

23    Q.  That e-mail was written on June 21, 2013, right?

24    A.  Yes.

25    Q.  And the campaign wasn't going to start until 2014, right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 206 of 311 PageID #:14151
Ketchum - cross by Blegen
1594

1   A.  Yes.

2   Q.  Okay.  So you know that Ms. Agarwal wasn't talking about

3   what we have currently installed right now.  She's saying what

4   we can tell them we will be at January 1st of 2014, right?

5   A.  That appears to be the case now, yes.

6   Q.  Okay.  And you know that now because you now know that

7   this campaign wasn't even going to start until 2014, right?

8   A.  Correct.

9         MR. BLEGEN:  Okay.  You can take that one down.

10  BY MR. BLEGEN:

11  Q.  The other thing you said, though, was that there was a

12  problem with exclusivity because -- who is their competitor,

13  Pradaxa?

14  A.  Yes.

15  Q.  Because Pradaxa had a bunch of screens at Outcome Health

16  already, right?

17  A.  Yes.

18  Q.  And you said, well, that, you know, you couldn't sell into

19  that one because Pradaxa had them already, right?

20  A.  Yes.

21  Q.  When was the Pradaxa contract going to end?

22  A.  I don't recall.

23  Q.  Would it help your analysis to know when it was going to

24  end?

25  A.  It would.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 207 of 311 PageID #:14152
Ketchum - cross by Blegen
1595

1  Q.  Let me see if I can pull that one out for you.  Ah.

2         MR. BLEGEN:  Government Exhibit 247, please.  And I

3  think it would be helpful to look at -- just let him look at

4  the front page for a second and then I'll flip to the second

5  page.

6         MS. DOMINIAK:  Can you repeat the number, please?

7         MR. BLEGEN:  247, Government Exhibit 247.

8  BY MR. BLEGEN:

9  Q.  Do you see that?

10  A.  Yes.

11  Q.  And so you can tell at the bottom of the -- so this is,

12  again, an e-mail that you're on, right?

13  A.  Yes.

14  Q.  July 9th of 2013?

15  A.  Yes.

16  Q.  And you end up answering some questions for Mr. Shah,

17  right?

18  A.  Yes.

19         MR. BLEGEN:  Can you flip -- flip to the second page

20  and highlight the top half.

21  BY MR. BLEGEN:

22  Q.  One of the questions you ask is when is the term of --

23  what is the term of the Pradaxa program, right?

24  A.  Yes.

25  Q.  And the term is December 31st of 2013 is the end, right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 208 of 311 PageID #:14153
Ketchum - cross by Blegen
1596

1   A.  Yes, that's correct.

2   Q.  So now knowing that, there's no problem with exclusivity

3   here, is there?

4   A.  If it's a 2014 campaign and this campaign is in 2013, then

5   no, there's no problem.

6   Q.  Well, do you know that it's -- do you know -- excuse me.

7        You do know that the Xarelto was a 2014 campaign,

8   right?

9   A.  Now I do, yes.

10  Q.  Okay.  You're not disputing that, right.

11  A.  No.  Based on the information I've seen the last couple of

12  days, yes, it appears the Xarelto began -- was designed to

13  begin in 2014.

14  Q.  Right.  And there's no problem whatsoever with

15  Outcome Health negotiating with another drug company in case

16  the first one decides not to re-up the next year, right?

17  A.  No.

18  Q.  Okay.  So, again, you said something on direct that there

19  was something, whatever, nefarious about this exclusivity

20  issue, but there was nothing nefarious about it, right?

21  A.  Based on the information I saw, it appeared as though,

22  yes.

23  Q.  I'm not blaming you.  Remember, at the beginning there's a

24  mountain of e-mails, right?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 209 of 311 PageID #:14154
Ketchum - cross by Blegen
1597

1  Q.  Okay.  But you now know seeing one of them, an additional

2  one, that there was nothing nefarious about that at all, was

3  there?

4  A.  It appears that's the case, correct.

5  Q.  It was simple business of trying to make sure we have a

6  customer if -- customer 2 if customer 1 decides not to re-up,

7  right?

8  A.  That's what it appears to be, yes.

9  Q.  And Ms. Agarwal disclosed that to the salesperson who was

10  involved, or maybe you don't know that.  Hang on.  I'm sorry.

11         MR. BLEGEN:  Put up Defense Exhibit 7775.  This is --

12  don't blow anything up yet so he has a chance to look at it.

13  BY MR. BLEGEN:

14  Q.  But this is a communications between Ms. Agarwal and

15  Mr. Svec that you are on, right?

16  A.  Yes.

17  Q.  And if you want to see any more -- it's an e-mail chain

18  that goes on for a while.  If you want to see any more of it,

19  let me know.

20  A.  Okay.

21  Q.  Okay.  You see --

22         MR. BLEGEN:  If you could blow up the middle part.

23  BY MR. BLEGEN:

24  Q.  You see what Ms. Agarwal tells Steve Svec to share with

25  the client, right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 210 of 311 PageID #:14155
Ketchum - cross by Blegen
1598

1   A.  Yes.

2   Q.  "I'd share with the client that we are showing 100 percent

3   of the match as available as we don't have any 2014 contracts

4   yet."

5        See that part?

6   A.  Yes.

7   Q.  And that's her telling Svec, you know, we don't -- they're

8   available as we don't have any yet?

9   A.  Yes.

10  Q.  But she adds -- I'm sorry.  You said yes?

11  A.  Yes.

12  Q.  "However, another brand has ROFR."

13        What is that?

14  A.  Right of first refusal.

15  Q.  And would that other brand be Pradaxa?

16  A.  I believe so, yes.

17  Q.  "On half of the network."

18        Do you see that?

19  A.  Yes.

20  Q.  "Also, we will start the year with around 2200-ish but are

21  projecting a weighted average of 3200-ish if Xarelto wants to

22  commit to growth with us given the J&J history of doing so

23  with Simponi."

24        Do you see that?

25  A.  I do.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 211 of 311 PageID #:14156
Ketchum - cross by Blegen
1599

1   Q.  Not a single deceptive thought in that e-mail, is there?

2           MR. HANKEY:  Objection.  Speculation.

3           THE COURT:  Sustained.  He can talk about the words

4   but not the thoughts.

5           MR. BLEGEN:  Okay.

6   BY MR. BLEGEN:

7   Q.  The words are that we will start with the year, meaning

8   start 2014, with around 220-ish, right?

9   A.  2,200-ish, yes.

10  Q.  I'm sorry.  What did I say?

11  A.  200-ish.

12  Q.  Oh.  2,200ish, right?

13  A.  Yes.

14  Q.  And "ish" is shorthand for approximately, right?

15  A.  Yes.

16  Q.  Okay.  But are projecting a weighted average of 320-ish.

17  Do you see that?

18  A.  3,200-ish.

19  Q.  Jeez.  You're right.  3,200ish, right?

20  A.  Yes.

21  Q.  And that's, again, an approximation, right?

22  A.  Yes.

23  Q.  Okay.  3200-ish was not a made-up number, right?

24  A.  I don't believe so, no.

25  Q.  You guys -- there was some thought that went into how we

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 212 of 311 PageID #:14157
Ketchum - cross by Blegen
1600

1    could get to that number by the next year, right?

2              MR. HANKEY:  Foundation, Your Honor.

3              THE COURT:  If he knows.

4              He's on this e-mail chain, correct?

5              MR. BLEGEN:  He is.

6              THE COURT:  All right.

7              Go ahead.  If you know.

8    BY THE WITNESS:

9    A.  I don't recall the logic behind the 3200 so I don't -- I

10   can't really speak to that in this instance.

11   BY MR. BLEGEN:

12   Q.  Okay.  But you told us earlier that there was always logic

13   behind the numbers that you and Ms. Agarwal used, right?

14   A.  Yes.  I just don't know what the logic on this one was.

15   Q.  Fair enough.  And she told Mr. Svec, or recommended that

16   Mr. Svec disclose the ROFR, right?

17   A.  Yes.

18   Q.  Meaning you won't be able to get all of it if Pradaxa does

19   re-up?

20   A.  That's correct.

21   Q.  Again, that's an instance of projection and weighted

22   average and growth not being hidden from the salesperson,

23   right?

24   A.  That's correct.

25   Q.  Or the client, right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 213 of 311 PageID #:14158
Ketchum - cross by Blegen
1601

1  A.  I'm not sure of the communication to the client, but it

2  appears as though the directive is to communicate it to the

3  client.

4  Q.  Well, we certainly know that Ms. Agarwal suggested that he

5  share that information with the client, right?

6  A.  That's correct.

7  Q.  Because that's exactly what she says, "I'd share with the

8  client"?

9  A.  Yes.

10  Q.  Okay.  Let's take a look at Government Exhibit 235.

11          MR. BLEGEN:  Can you highlight the 1 and 2 in the

12  middle of the page?

13  BY MR. BLEGEN:

14  Q.  Now, you see where Ms. Agarwal says, "Now, if Pradaxa

15  renews for 1800 and wants to do a new list match (anticipating

16  growth during this year) we are way overstretched."

17          Do you see that?

18  A.  Yes.

19  Q.  Okay.  That's her expressing a concern about being

20  overstretched, right?

21  A.  Yes.

22  Q.  That's how you understood that, right?

23  A.  Yes.

24  Q.  If you're just making up numbers to steal from pharmas,

25  who cares, right?

1  A.  Yes.

2  Q.  Yeah.  She could have just double-booked them, right?

3  A.  Yes.

4  Q.  Now, you, as part of this e-mail --

5        MR. BLEGEN:  If we could blow up sort of the whole

6  middle part starting on -- after Friday.

7  BY MR. BLEGEN:

8  Q.  You told us I think on direct that there was maybe

9  something unusual about 100 percent of the network being

10  available.  You remember that?

11  A.  Yes.

12  Q.  Now, I don't know for certain so just please tell me.  Was

13  that related to because you thought for a while that Xarelto

14  was going to run in 2013, the same year Pradaxa was up?

15  A.  Can I just have a moment to re-read this?

16  Q.  Of course.  Do you want us to unzoom out?

17  A.  Could you?

18  Q.  Yes.

19  A.  I'm -- I'm sorry.

20  Q.  Go ahead.

21  A.  I believe what I found unusual in this instance was

22  that -- I'm sorry, there's things flinging around -- that

23  100 percent of the network would appear as available to the

24  client.

25  Q.  And the reason for that is because you didn't think that

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 215 of 311 PageID #:14160
Ketchum - cross by Blegen
1603

1  Xarelto would match with 100 percent of the network; is that

2  right?

3  A.  Correct.

4  Q.  Okay.  But Ms. Agarwal gave you an explanation for that,

5  didn't she?

6  A.  Yes.

7  Q.  She said that -- do you see under, "Let's back up a

8  minute, Xarelto gave us a list of AFib deciles and

9  2200-something matched with a projection, leading us to

10  year-end."

11         Do you see that?

12  A.  Yes.

13  Q.  And then she says, "We are selling 3,216 as a weighted

14  average of HHN size next year."

15         Right?

16  A.  Yes.

17  Q.  And we saw a minute ago that she already told Mr. Svec to

18  tell them about weighted average, tell the client, right?

19  A.  Yes.

20  Q.  Okay.  And then she says, "Given it's AFib, all our

21  physicians should be on this list even if low decile, wrote

22  more cholesterol or whatever."

23         Right?

24  A.  Yes.

25  Q.  This was a different kind of match than you normally would

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 216 of 311 PageID #:14161
Ketchum - cross by Blegen
1604

1    get from clients, right?

2    A.  It seems so.

3    Q.  It was a nonspecific match related to AFib, right?

4    A.  Yes, it appears that's the case.

5    Q.  And that's Ms. Agarwal telling you that, right?

6    A.  Yes.

7            MR. BLEGEN:  Can we pull up DX 8760 and go to page 2.

8    BY MR. BLEGEN:

9    Q.  You're not on this e-mail?

10   A.  Correct.

11   Q.  Would you -- you know who Bruce Lee is, right?

12   A.  Appears to be an e-mail from J3.

13   Q.  All right.  And you know -- and Steve Svec is a

14   salesperson, right?

15   A.  Yes.

16   Q.  Can you read the e-mail from Mr. Lee to Steve that starts

17   with "Steve"?

18   A.  Yes.

19           "Steve, since we first started discussing Xarelto, we

20   have solidified plans for full year 2013.  While there are

21   currently no dollars, we are always looking for new and better

22   opportunities.  I will say that the physician list we provided

23   represented all high prescribers of anticoagulants not

24   specific to Xarelto.  Therefore, I'm not sure why our match

25   rate should be any lower than competitors unless there is a

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 217 of 311 PageID #:14162
Ketchum - cross by Blegen
1605

1    different criteria.

2           "Overall, there are two barriers we would have to

3    overcome before our talks can become serious.  First is the

4    match rate/volume of offices, and second is pricing because

5    there is a fairly sizable gap.

6           "As always, thanks for your continued efforts."

7    Q.  Okay.  And you see in there that Mr. Lee was indicating

8    that this was a -- that this list was not specific to Xarelto.

9    You see that?

10   A.  Yes.

11   Q.  And so when Ms. Agarwal says that the match should be

12   100 percent because this is not a list specific to Xarelto,

13   it's an AFib list, she's right, isn't she?

14   A.  Yes.

15   Q.  And you just didn't know about this other communication

16   between Mr. Lee and Mr. Svec, right?

17   A.  That's correct.

18   Q.  So even then, even in real time you didn't know about it,

19   so you raised a question, right?

20   A.  Yes.

21   Q.  Ms. Agarwal didn't tell you to shut up and don't ask me

22   questions, I'm trying to make money here, did she?

23   A.  No.

24   Q.  She explained it to you, right?

25   A.  Yes.

1   Q.  And now you know she was correct?

2   A.  Yes.

3           THE COURT:  Go to sidebar briefly.

4       (Sidebar.)

5           THE COURT:  Okay.  I'm assuming all these exhibits

6   both used by Mr. Hueston and now by Mr. Blegen are not

7   objected to by the government.  I'm not soliciting objections.

8   I'm just assuming these are ones that have been agreed to

9   already are admissible.  There are some that I know Mr. -- we

10  essentially reserved because there had been objections by the

11  government and I wanted to see how -- whether they were used

12  and how they were used.  But for the vast majority of these

13  which have been coming in throughout the defense cross, I'm

14  assuming the government had no objection; is that correct,

15  Mr. Hankey?

16          MR. HANKEY:  Yes, Your Honor.

17          THE COURT:  Okay.  Very good.  I just want to make

18  sure that we're proceeding on the same understanding.

19          MR. HANKEY:  And there are some exhibits that we

20  haven't reviewed yet.  I shared with Mr. Blegen which ones we

21  have reviewed.  So if one of these pops up we'll --

22          THE COURT:  Yeah, just speak up and say you have an

23  objection and we'll talk about it at sidebar.  But I'm pleased

24  we're going through this so seamlessly, but I want to make

25  sure it's based on everyone being on the same page.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 219 of 311 PageID #:14164
Ketchum - cross by Blegen
1607

 1      Okay.  We can go back.

 2        (End of sidebar.)

 3        MR. BLEGEN:  Let's put up Defense Exhibit 8757 and

 4   highlight the top quarter of the page.

 5   BY MR. BLEGEN:

 6   Q.  Unless, sir, you want to read the whole e-mail.

 7   A.  That would be helpful, just in case, yeah.

 8   Q.  Okay.

 9        MR. BLEGEN:  Leave it as is.

10        THE WITNESS:  Thank you.

11        Okay.

12        MR. BLEGEN:  Okay.  Zoom in on the top quarter.

13   BY MR. BLEGEN:

14   Q.  Do you see the line where Ms. Agarwal says, "We won't have

15   the total 3200 on January 1st, and I'm hesitant to overcommit

16   ourselves"?

17   A.  Yes.

18   Q.  All right.  And you understand that to be Ms. Agarwal

19   being careful about what they commit to a client, right?

20   A.  Yes, it appears that's the case.

21   Q.  So you've been adding like "it appears to be the case" at

22   the end.

23   A.  Oh, yes.

24   Q.  I don't -- I can ask you some more questions about it, but

25   the answer was yes, that's what -- that's how you understand

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 220 of 311 PageID #:14165
Ketchum - cross by Blegen
1608

1   it, right?

2   A.  Yes.

3   Q.  Okay.  And that's her being careful to make sure that

4   Outcome Health -- your understanding is that's her being

5   careful to make sure Outcome Health can hit the numbers its

6   giving to the clients, right?

7   A.  Yes.

8   Q.  And she's already said give it to them as a weighted

9   average, right?

10  A.  Yes.

11          MR. BLEGEN:  Could I have a second, Judge?

12          THE COURT:  Sure.

13      (Counsel conferring.)

14  BY MR. BLEGEN:

15  Q.  Do you remember some testimony from your direct about this

16  splattering or scattering of names on a list?

17  A.  Yes.

18  Q.  Okay.  And correct me if I'm wrong, but in general, that

19  was in relation to the Humira campaign, right?

20  A.  Yes.

21  Q.  Where Target Health had raised some objection to PCPs or

22  IMs being on the list of doctors who received their ads,

23  right?

24  A.  That's correct.

25  Q.  And as I think you heard or learned through Mr. Hueston's

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 221 of 311 PageID #:14166
Ketchum - cross by Blegen
1609

1  cross-examination, that was something that Target Health said
2  they wanted to check with the client about, right?
3  A.  Yes.
4  Q.  And didn't ever provide an answer as to whether it was
5  okay to use those or not.  You remember that?
6  A.  Yes.
7  Q.  Okay.  And so let me show you Government Exhibit 179.
8  This is the list of rheumatologists and IMs that you were
9  going to send to Humira, correct?
10  A.  Yes.
11  Q.  Okay.  And just so make sure that I'm understanding
12  correctly, there was no separate rheumatoid health network and
13  a separate -- what does IM stand for, internal medicine?
14  A.  Yes, internal medicine.
15  Q.  Internal medicine network, right?
16  A.  No.
17  Q.  It was all one network, right?
18  A.  No.  No.  There were -- there were -- there was
19  ContextMedia Health and then there was networks within
20  ContextMedia Health.
21  Q.  Okay.
22  A.  So, yeah.
23  Q.  All right.  And was the point that you were trying to make
24  yesterday or the questions you were trying to answer yesterday
25  was that by asking you to splatter the names that Ms. Agarwal

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 222 of 311 PageID #:14167
Ketchum - cross by Blegen
1610

1  was trying to hide them from the client?

2  A.  It appeared that was the case, yes.

3  Q.  Okay.  Well, first of all, the client already knew that

4  there were IMs on the list from that other list you had sent

5  them, right?

6  A.  Yes.

7  Q.  Okay.  So it wouldn't be very important to hide something

8  that they already knew about, right?

9  A.  Correct.

10  Q.  And secondly, the list that you said, 179 --

11          MR. BLEGEN:  Can you scroll through the first couple

12  of pages?  Actually I think there's maybe a 179A which is a

13  spreadsheet?

14  BY MR. BLEGEN:

15  Q.  Most of the times you guys sent spreadsheets to clients,

16  right?

17  A.  It depends on the --

18  Q.  Okay.  You sometimes sent spreadsheets, right?

19  A.  Sometimes, yes.

20  Q.  Do you remember whether this was a spreadsheet or not?

21  A.  I can't recall if it was a spreadsheet or a PDF that was

22  made from a spreadsheet.

23          MR. BLEGEN:  Yeah, it's 179A.  You know what, let me

24  do it this way.  On Exhibit 179, could you go to page --

25          THE COURT:  I think you've got it up there now.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 223 of 311 PageID #:14168
Ketchum - cross by Blegen
1611

1    MR. BLEGEN:  I got it.  I'm sorry.  If you have 179A,

2  we'll stick with that.

3  BY MR. BLEGEN:

4  Q.  Okay.  So this is the list that you sent to them, right?

5  A.  Yes.

6  Q.  And so it's the specialty column, column E that we're

7  talking about here, right?

8  A.  Yes.

9  Q.  All right.

10    MR. BLEGEN:  So, Laura, would you scroll down to

11  the -- towards -- just keep scrolling to the end.

12  By MR. BLEGEN:

13  Q.  So, first of all, on this list here, the first many, many,

14  many, many are rheumatology, right?

15  A.  Yes.

16    MR. BLEGEN:  Okay.  Stop there.

17  BY MR. BLEGEN:

18  Q.  And it's not until you're several pages in, 400 some

19  doctors down, 425 or so doctors down that an internal medicine

20  name pops up, right?

21  A.  That's correct.

22  Q.  So the list that you had had the internal medicine names

23  buried at the end of the list, right?

24  A.  Yes.

25  Q.  Right?  So you would have had to go all the way till

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 224 of 311 PageID #:14169
Ketchum - cross by Blegen
1612

1  almost the end to get to where internal medicine guys start,
2  correct?
3  A.  Yes.
4  Q.  Okay.  Now, Ms. Agarwal asks you to splatter it, right?
5  A.  Yes.
6        MR. BLEGEN:  Can we go to Government Exhibit 178 and
7  go to page 4.  Go to page 3 for a second just so we can see
8  that that's the end of the e-mail.
9  BY MR. BLEGEN:
10 Q.  You see that as being the end of the e-mail, and then the
11 next is the list?
12 A.  Yes.
13 Q.  Okay.  Well, as scattered, internal medicine doctors come
14 up on the first page of the list, right?
15 A.  Yes.
16 Q.  Okay.  Are you still telling us that you think there was
17 some intent to hide the fact that there were internal medicine
18 doctors on the list by moving them from the end to the first
19 page?
20 A.  With some of the e-mails that I saw where it was disclosed
21 to the client that those non rheumatology doctors were
22 approved, it doesn't seem as though this is hiding anything.
23 Q.  And also it's on the first page of the list, right?
24 A.  Yes.
25 Q.  Right?  You know, the -- you agree with me that if you're

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 225 of 311 PageID #:14170
Ketchum - cross by Blegen
1613

1    trying to hide something you don't generally put it on the
2    first page, do you?
3    A.  Yes, that's true.
4    Q.  And if you really had an intent to hide something, you
5    could just take the specialty column right out of there,
6    right?
7    A.  I can't speak to that in this instance, but theoretically.
8    Q.  Well, I mean, it was an Excel spreadsheet, right?
9    A.  Yes.
10   Q.  Do you know how to delete columns on an Excel spreadsheet?
11   A.  Yes.
12   Q.  So if Ms. Agarwal had told you to do that, you could have?
13   A.  Yes.
14   Q.  And if she had told you to change the name under specialty
15   to make them all say rheumatology, you could have done that
16   too, right?
17   A.  Yes.
18   Q.  But she didn't ask you to do any of -- either of those
19   things, did she?
20   A.  No.
21          MR. BLEGEN:  You could take that down.  Sorry.
22   BY MR. BLEGEN:
23   Q.  Staying on the topic of Humira and Ms. Agarwal, the
24   government showed you Government Exhibit 193.
25          MR. BLEGEN:  If you could put that up, please.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 226 of 311 PageID #:14171
Ketchum - cross by Blegen
1614

1  BY MR. BLEGEN:

2  Q.  You remember that exhibit, sir?

3  A.  Yes.

4  Q.  And this is one where they showed you the bottom part that

5  you were on where you ask Ms. Agarwal a question regarding the

6  Humira POP for target.  And you say, "We need to add an

7  additional 50 sites for POP that are rheum.  Should I look to

8  add PCP?"

9          Do you see that?

10  A.  Yes.

11  Q.  What you're talking about there is add them to the proof

12  of performance list, right?

13  A.  Yes.

14  Q.  You're not talking about adding them to have the

15  advertisements played, right?

16  A.  Correct.

17  Q.  You already know the advertising was played there, right?

18  A.  Hard to tell from this.

19  Q.  From that, but you could tell, to save time, from

20  something that Mr. Hueston showed you this afternoon, right?

21  A.  Oh, yes.  Yes.  That's true.  Yes.

22  Q.  Remember?

23  A.  Yes.

24  Q.  He showed you the one that said from Travis Kemp saying

25  hey -- I think it's DX 3052.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 227 of 311 PageID #:14172
Ketchum - cross by Blegen
1615

1  MR. BLEGEN:  You could put that up briefly.

2  THE WITNESS:  I recall that, the 155 sites, yes,

3  go-live.

4  BY MR. BLEGEN:

5  Q.  So the government asked you some questions about that

6  regarding well, hey, did you even know whether the ad was

7  playing on there, right?

8  A.  Correct.

9  Q.  At the time you didn't --

10  A.  I did not.

11  Q.  -- but you do now know that it was, right?

12  A.  Yes.

13  Q.  So there wasn't some trick being played on, you know,

14  Target Health or the folks at Humira that hey, we're not even

15  playing the ads on your screen, was there?

16  A.  No.

17  Q.  It was being played, right?

18  A.  Yes.

19  Q.  The only issue was are they going to accept the PCPs or

20  not, right?

21  A.  Yes.

22  Q.  Okay.  And so the government showed you the top of this

23  e-mail where Ms. Agarwal says, "We keep running into this

24  issue, what to do?  They realized they were PCPs last time but

25  didn't ask to remove yet."

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 228 of 311 PageID #:14173
Ketchum - cross by Blegen
1616

1      Right?

2  A.  Yes.

3  Q.  Okay.  You know now that AbbVie was in the process of

4  considering whether to accept the PCPs as rheumatologists,

5  right?

6  A.  Yes.

7  Q.  Okay.  And Mr. Hueston went through with you the fact that

8  those POP affidavits are forward looking, correct?

9  A.  Yes.

10  Q.  Let me show you Defendant's Exhibit 8710 which you are on,

11  I believe, which is an e-mail chain from March 11th to

12  March 13th of 2013.

13      Do you see that?

14  A.  Yes.

15  Q.  And on this e-mail chain are you, Mr. Kemp, Mr. Postel, to

16  two of the guys who are -- work in the area of getting the

17  videos on the screens, right?

18  A.  Yes.

19  Q.  And you're getting forwarded a message between

20  Mr. Crandall and Ms. Bautista, right?

21  A.  Yes.

22      Can I have a moment to read this?

23  Q.  Yeah, of course.

24  A.  Okay.

25  Q.  Okay.  This e-mail chain is in March of 2013, right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 229 of 311 PageID #:14174
Ketchum - cross by Blegen
1617

 1    A.  Yes.

 2    Q.  And Ms. Agarwal's e-mail where she says, "We keep running

 3    into this issue, what to do," is from April 5th of 2013.

 4           MR. BLEGEN:  Can you put Government Exhibit 193 up

 5    next to 8710?

 6    BY MR. BLEGEN:

 7    Q.  All right.  You see where in April Ms. Agarwal says, "We

 8    keep running into this issue, what to do?  They realized

 9    that PCPs -- they were PCPs last time but didn't ask to remove

10    yet."

11           Do you see that?

12    A.  Yes.

13           MR. BLEGEN:  Okay.  You can take that blowup down.

14    BY MR. BLEGEN:

15    Q.  Now, look and see what Mr. Crandall asks in his sentence

16    that starts with "also" of Ms. Bautista?  You see where he

17    says, "Also, any feedback from the Humira client regarding our

18    office list by specialty"?

19    A.  Yes, I see that.

20    Q.  You understand that he's asking about this very same topic

21    which is are you -- is -- are the -- what is it, AbbVie?

22    A.  AbbVie, yes.

23    Q.  Are the AbbVie people willing to accept the PCPs, right?

24    A.  Yes.

25           MR. BLEGEN:  And can you pop up to Ms. Bautista's

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 230 of 311 PageID #:14175
Ketchum - cross by Blegen
1618

1  response?

2  BY MR. BLEGEN:

3  Q.  She doesn't answer, does she?

4  A.  No.

5  Q.  Okay.  So if there's an issue of what to do, the question

6  is because they haven't gotten the answer yet, right?

7  A.  Hard to tell with the right context, but -- it's just hard

8  to tell without having more context in that what the "what to

9  do" portion is.

10  Q.  Okay.  But they had not gotten -- as far as this time is

11  concerned, they certainly haven't gotten the answer yet as to

12  whether the PCPs were accepted?

13  A.  That's correct.

14  Q.  You told us in your direct testimony, and just correct me

15  if I'm wrong, that -- did you think that there was some

16  efforts to keep Outcome Health's revenue away from people like

17  you who worked for Outcome?

18  A.  There was a period of time where some financial

19  information was redacted, yes.

20  Q.  On what?

21  A.  Some of the -- in the executive team meetings, there was

22  information where just overall revenue was redacted.

23  Q.  Okay.  And at the time did you think there was something

24  suspicious about that?

25  A.  At the time I was annoyed by it, but I didn't necessarily

1    think at the time suspicious, no.

2    Q.  Okay.

3    A.  Not that I recall.

4    Q.  Were you annoyed because you thought they were trying to

5    hide revenue so everybody wouldn't ask for a raise?  Is that

6    why you were annoyed?

7    A.  More because it was trying to get a sense for budgets

8    department by department.

9    Q.  I see.  Okay.  You recall, do you not, that Ms. Agarwal

10   sent out year-end reviews which included Outcome Health's

11   revenue?

12   A.  Yes.

13   Q.  Okay.

14          MR. BLEGEN:  So, for example, could we put up DX --

15   Defense Exhibit 3623.  That's the wrong exhibit I think,

16   but -- 3623.  And I'll -- just highlight the top part, the

17   first bullet under -- first of all, highlight the top.

18   BY MR. BLEGEN:

19   Q.  You got this because you're one of the "everyone" at

20   ContextMedia, Inc., right?

21   A.  Yes.

22   Q.  And this was from January 3rd of 2016?

23   A.  Yes.

24   Q.  2015 - year in review?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 232 of 311 PageID #:14177
Ketchum - cross by Blegen
1620

1       MR. BLEGEN:  Just highlight the first bullet, if you

2   would.

3   BY MR. BLEGEN:

4   Q.  That -- and that was prepared by -- it comes from

5   Ms. Agarwal, right?

6   A.  Yes.

7   Q.  Okay.  And it has the end of year revenue, right?

8   A.  It does.

9   Q.  Okay.

10      MR. BLEGEN:  You can take that down.

11  BY MR. BLEGEN:

12  Q.  Much like you, Mr. Ketchum, you knew from interacting with

13  Ms. Agarwal that list matches and numbers to give to clients

14  was not the only thing she was working on, right?

15  A.  That's correct.

16  Q.  She worked on dozens of other issues, correct?

17  A.  Yes.

18  Q.  She was heading up Outcome Health's building buildout of a

19  new office space, was she not?

20  A.  That's correct.

21  Q.  Okay.  And you knew that took up a substantial amount of

22  her time, right?

23  A.  Yes.

24  Q.  You knew that she played a substantial role in

25  interviewing and hiring of people, right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 233 of 311 PageID #:14178
Ketchum - cross by Blegen
1621

1   A.  Yes.

2   Q.  And you guys gave -- had endless e-mails back and forth

3   about is this candidate a good one, a bad one, should we hire

4   this person, should we not, right?

5   A.  Yes.

6   Q.  There was lots and lots of discussion back and forth about

7   that, correct?

8   A.  Correct.

9   Q.  Ms. Agarwal was a very big proponent of Salesforce, right?

10  A.  The software?

11  Q.  Yes.

12  A.  Yes.

13  Q.  Meaning she was constantly trying to get the salespeople

14  to keep the information up to date and accurate on Salesforce,

15  right?

16  A.  Yes.

17  Q.  And that was an information sharing system among all the

18  people who were doing sales, right?

19  A.  Yes, it's a CRM.

20  Q.  I'm sorry.  It's a what?

21  A.  It's called a CRM.

22  Q.  Oh.  What does CRM stand for?

23  A.  Client or customer relationship management tool.  It's a

24  software that -- yes.

25  Q.  And in there, the salespeople were to keep their notes of

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 234 of 311 PageID #:14179
Ketchum - cross by Blegen
1622

1  their interactions with the clients, right?

2  A.  Yes.

3  Q.  Including if they said something over the phone or

4  whatnot, right?

5  A.  Yes.

6  Q.  You looked a little sideways there.  Did the salespeople

7  not always keep up to date on Salesforce?

8  A.  Salespeople in general -- sorry for any side eye.

9  Salespeople in general are notoriously bad at updating.  If

10  you're in sales, it's a constant source of frustration to make

11  sure salespeople keep it updated.

12  Q.  And Ms. Agarwal was constantly on the salespeople to keep

13  it up to date, was she not?

14  A.  I would imagine, yes.

15            THE COURT:  You need a break?

16            THE WITNESS:  Yeah.  Sorry.

17            THE COURT:  Okay.  Yeah.  We're about time for our

18  afternoon break anyway, so we'll take a 15-minute break,

19  ladies and gentlemen.  Please don't discuss the case amongst

20  yourselves or with anyone else.

21            COURT SECURITY OFFICER:  All rise.

22       (Jury exits.)

23            THE COURT:  Sir, you're excused.  15 minutes.  Please

24  don't discuss the case with anyone as you're on

25  cross-examination.

1    THE WITNESS:  Yes, Your Honor.

2    THE COURT:  Okay.  Anything -- you can all have a

3  seat.  Anything we need to discuss during this break?

4    MR. HUESTON:  No, Your Honor.

5    MR. HANKEY:  Nothing from the government, Your Honor.

6    THE COURT:  Okay.

7    MR. POULOS:  No, Your Honor.

8    THE COURT:  All right.  Off the record.

9  (Recess had.)

10  (Change of court reporters.)

1  COURT SECURITY OFFICER:  All rise.

2  (Jury enters courtroom.)

3  THE COURT:  All right.  Please be seated.

4  When you come in and Louie shuts the door, I'm always

5  afraid he's going to shut the door and there's someone who's

6  just trailing and we hear knocking.  So, I hope you're

7  counting.

8  COURT SECURITY OFFICER:  Yes, sir.

9  (Laughter.)

10  THE COURT:  All right.  You may continue your

11  cross-examination, Mr. Blegen.

12  BY MR. BLEGEN:

13  Q.  Mr. Ketchum, before we went to the break, we were talking

14  about Salesforce and Ms. Agarwal's efforts to try to make sure

15  salespeople updated the information in Salesforce.  Do you

16  remember that?

17  A.  Yes.

18  Q.  And you said it's a really hard thing to get salespeople

19  to put their notes in and keep track of what they're doing.

20  A.  It can be, yes.

21  Q.  Okay.  Ms. Agarwal was also involved in efforts to share

22  information throughout the company, was she not?

23  A.  Correct.

24  Q.  And she espoused the sharing of information, correct?

25  A.  Yes.

1 Q.  She espoused communication between different branches,

2 different stools -- legs of the stool, right?

3 A.  Yes.

4 Q.  She espoused communication essentially among everyone,

5 right?

6 A.  Yes.

7 Q.  And she was very open and encouraged people, if they had a

8 problem with something that was going on at Outcome Health, to

9 talk about it, correct?

10 A.  Yes.

11 Q.  All right.  One of the ways that information was shared at

12 Outcome Health is that recent sales were communicated to the

13 entire company, were they not?

14 A.  Yes.

15        MR. BLEGEN:  Okay.  Can we pull up Defense

16 Exhibit 8543.

17        Just leave that as is for a moment so he has a chance

18 to look at it.

19        THE WITNESS:  I read it.

20 BY MR. BLEGEN:

21 Q.  And you're on this email because you're on the everyone

22 list, right?

23 A.  Yes.

24 Q.  And this is an August 27, 2012 email from Mr. Garms.

25        MR. BLEGEN:  Can you blow up the middle part, please?

1   BY MR. BLEGEN:

2   Q.  That's Mr. Garms updating the entire company on how the

3   sales are doing on the membership outreach side, correct?

4   A.  Yes.

5   Q.  Meaning this is how many offices we've gotten to sign up

6   to take our screens over the past, whatever, month, right?

7   A.  That's day, but yes.

8   Q.  I'm sorry?

9   A.  Oh, there is a monthly update, yes.  Yes, there is a

10  monthly update.

11  Q.  You see that on there, right?

12  A.  I do, yes.

13  Q.  All right.  And another way --

14          MR. BLEGEN:  You can take that down.

15  BY MR. BLEGEN:

16  Q.  -- that salespeople, for example, would know what has been

17  installed is that there were monthly updates from Jeana Loewe,

18  indicating what the installations were, right?

19  A.  Yes.

20          MR. BLEGEN:  Can we pull up Defendants' Exhibit 8711.

21  BY MR. BLEGEN:

22  Q.  I'll just give you a moment to look at it if you'd like.

23  A.  Okay.

24  Q.  And, again, you're on this email because you're an

25  everyone, right?

1  A.  Yes.

2  Q.  December 20, 2011, correct?

3  A.  Yes.

4  Q.  And Ms. Loewe is updating everyone on what the current

5  installation status is, right?

6  A.  Yes.

7  Q.  So if the word projection is not specifically used in an

8  email with a salesperson, they might still know it's a

9  projection if they just look at what the current installation

10 number is, right?

11 A.  Yes.

12 Q.  All they would have to do is say, well, we are installed X

13 and we're selling X plus whatever, right?

14 A.  Yes.

15 Q.  Okay.  So there was a way for salespeople to know what was

16 actually installed, right?

17 A.  Yes.

18 Q.  And that was one of the kinds of open communications that

19 Ms. Agarwal espoused.

20 A.  Yes.

21 Q.  Sometimes you sent out the information on what the current

22 installation was, right?

23 A.  Yes.

24        MR. BLEGEN:  All right.  Let's take a look at Defense

25 Exhibit 8752.

```
 1   BY MR. BLEGEN:
 2   Q.  Do you see that email?
 3   A.  Yes.
 4   Q.  Shouldn't take you long, but I'll give you a second to
 5   look at it.
 6   A.  It was easy for me to scan it.
 7   Q.  Okay.  And so this is you informing everyone at the
 8   company on January 18th of 2013 what the installation goal and
 9   installed playing content is, right?
10   A.  Yes.
11   Q.  And installed not playing content?
12   A.  Yes.
13   Q.  And various other things, correct?
14   A.  Yes.
15   Q.  And that went to everyone in the company?
16   A.  Yes.
17            MR. BLEGEN:  You can take that one down.
18   BY MR. BLEGEN:
19   Q.  And, in fact, when Ms. Agarwal was involved with the sales
20   team, she had the excellent idea of putting all the
21   information on Google Drive so everyone could access it.  Do
22   you remember that?
23   A.  I do.
24            MR. BLEGEN:  Let's see Defense Exhibit 8580.
25   BY MR. BLEGEN:
```

1  Q.  Do you see your email to everyone?

2  A.  Yes.

3  Q.  And after the first sentences, do you say:  "Shradha had

4  the excellent idea of getting everything out onto Google Drive

5  so everyone can easily access information."

6          Do you see that?

7  A.  I do.

8  Q.  And among the kinds of folders you were looking to create

9  were data clients send us, right?

10 A.  Yes.

11 Q.  Internal data?

12 A.  Yes.

13 Q.  That would be data related to the size of the network,

14 right?

15 A.  Yes.

16 Q.  Matched data, right?

17 A.  Yes.

18 Q.  Presentation decks and ROI decks.

19 A.  Yes.

20 Q.  Do you see all that?

21 A.  I do.

22 Q.  And anyone who was on that list there, including Mr. Mons

23 and Mr. Svec, could have accessed that information on Google

24 Drive, right?

25 A.  Yes, I believe so.

1  Q.  So if a salesperson had a bit of curiosity as to whether

2  they were selling a projection or the actual installed number,

3  they could look on Google Drive and see, right?

4  A.  Theoretically, yes.

5  Q.  Well, it was available to see if they had wanted to do

6  that, right?

7  A.  Yes.

8        MR. BLEGEN:  Let's put up Defense Exhibit 8541.

9  BY MR. BLEGEN:

10 Q.  And that's another example of Ms. Loewe, Jeana Loewe,

11 providing the current installed numbers and other information

12 to everyone in September of 2012, right?

13 A.  Yes.

14 Q.  And while we're talking about the things that Ms. Agarwal

15 was working on, that was one of them, right?

16 A.  Yes.

17 Q.  Information sharing among everyone at Outcome Health.

18 A.  Yes.

19 Q.  Ms. Agarwal also worked on the programming -- is that what

20 you guys called it -- programming that got played on the

21 screens.  What did you call the stuff on the screens?

22 A.  Content.

23 Q.  Content.

24 A.  Yes.

25 Q.  She worked on the content that would get played on the

1  screens, right?

2  A.  Yes.

3  Q.  So the way that Outcome Health worked is there were ads

4  that were on the screens, right?

5  A.  Yes.

6  Q.  But there was also educational content, correct?

7  A.  Correct.

8  Q.  I mean, this was good content, right?  You know that.

9  This was like medically approved and reviewed by people,

10  correct?

11  A.  The purpose of the company for the most part was -- the

12  purpose of the company was to educate, so, yes, the content

13  was -- was the most important part.

14  Q.  And you guys took that seriously, right?

15  A.  Yes.

16  Q.  And Ms. Agarwal was involved in it all of the time, was

17  she not?

18  A.  Um --

19  Q.  Well, let me strike that.  Obviously no one is doing

20  everything all of the time.

21      Ms. Agarwal was heavily involved in the content and

22  approving of it and reviewing it before it got put on the

23  screens, right?

24  A.  Ms. Agarwal had a passion for education, and, yes.

25      Mrs. Agarwal, sorry.

1 Q.  That's okay.

2         What about the programming library?  Do you remember

3 what the programming library was?

4 A.  Yes.

5 Q.  What was it?

6 A.  It's where you could go and view and see what content

7 ContextMedia Outcome Health had available.

8 Q.  And Ms. Agarwal was working on that as well, was she not?

9 A.  Yes.

10 Q.  Outcome Health had an E newsletter, correct?

11 A.  It did.

12 Q.  And Ms. Agarwal -- what did the E newsletter do, just

13 briefly?

14 A.  There was an internal sort of newsletter that was created,

15 but then there was also one that went out to doctors' offices.

16 Q.  And Ms. Agarwal worked on that project as well, did she

17 not?

18 A.  Yes.

19 Q.  How about the company's own website?  Ms. Agarwal was

20 heavily involved in working on that, too, was she not?

21 A.  Yes.

22 Q.  And another thing that Ms. Agarwal was involved in was she

23 was trying to get Outcome Health to get on those award lists

24 for, like, best places to work or whatever they're called,

25 right?

1   A.  Yes.

2   Q.  It's like a best and brightest or best place to work in

3   Chicago, correct?

4   A.  Yes, there were several, yes.

5   Q.  And she was involved in that, right?

6   A.  Yes.

7   Q.  But the reason that Outcome Health wanted to be on those

8   kinds of lists was so that they could attract good employees,

9   right?

10  A.  That's right.

11  Q.  It wasn't just like beating their chests.  There's a

12  purpose for being on those things, correct?

13  A.  Yes, it took time to fill those out.  There was a purpose,

14  yes.

15  Q.  Yes.  And the purpose is to attract quality employees,

16  right?

17  A.  Yes.

18  Q.  There were times when a doctor's office wanted to

19  de-install the screens, correct?

20  A.  Yes, of course.

21  Q.  Ms. Agarwal was involved in that, too, was she not?

22  A.  Yes.

23  Q.  Outcome Health had a member -- a member letter, correct?

24  A.  Yes.

25  Q.  How often did those get sent out?

1  A.  I don't actually recall.

2  Q.  Okay.  You do recall, though, that Ms. Agarwal was

3  involved in that as well, right?

4  A.  Yes.

5  Q.  What was the smart playlist?

6  A.  I might be speaking out of turn here a little bit, so it's

7  a -- I might not get it exactly right.

8          MR. HANKEY:  Objection.

9  BY THE WITNESS:

10  A.  It's been a while.

11  BY MR. BLEGEN:

12  Q.  If you don't know what it is, you can just tell me you

13  don't know what it is and then we'll both agree that we don't

14  know what it is, and I'll move on to another folder, okay?

15  A.  Okay.

16  Q.  Fair enough.

17          Ms. Agarwal was even involved with the holiday cards

18  that Outcome Health sent out, right?

19  A.  Yes.

20  Q.  Meaning she was deeply involved in who's getting the cards

21  and how many were going out, all of those things, correct?

22  A.  Correct.

23  Q.  Ms. Agarwal's involvement in the sales, though, and the

24  list matches that you've been testifying to for the last

25  couple of days only lasted for about a year; is that right?

 1  A.  It's hard for me to put a total timetable on it.

 2  Q.  Okay.  Well, let's take a look at some exhibits and see if

 3  that helps you.

 4  A.  Sure.

 5          MR. BLEGEN:  Can we see Defendants' Exhibit 100 --

 6  10085.

 7          MS. BELL:  Correct.

 8          MR. BLEGEN:  Seems high.  Page 2.  Can you -- yes.

 9          MR. HANKEY:  Your Honor, may we go to sidebar?

10          THE COURT:  Sure.

11          MR. HANKEY:  Can we take this --

12          MR. BLEGEN:  Take that down.

13          MR. HANKEY:  Take it down.

14      (Proceedings heard at sidebar:)

15          THE COURT:  Okay.

16          MR. HANKEY:  I may be able to shortcut this just by

17  speaking to Mr. Blegen and looking at a copy of this.  I just

18  want to make sure this isn't one of the ones --

19          THE COURT:  Go ahead.  Yeah, why don't you talk.

20      (Counsel conferring.)

21      (Proceedings heard in open court:)

22          THE COURT:  Still need to go to sidebar, or are you

23  okay?

24          MR. HANKEY:  No.  We're fine, Your Honor.  We can

25  proceed.

1    THE COURT:  Okay.

2    MR. BLEGEN:  Let's put 10085 back up again.  Actually

3  go to the first page, if you would.

4  BY MR. BLEGEN:

5  Q.  Do you see the date of this email, Mr. Ketchum?

6  A.  Yes.

7  Q.  July 10, 2012?

8  A.  Yes.

9  Q.  Okay.

10    MR. BLEGEN:  Zoom out of that, please.

11  BY MR. BLEGEN:

12  Q.  And do you see it's Mr. Shah addressing people, but you

13  received it on that date?

14  A.  I did, yes.

15  Q.  Okay.

16    MR. BLEGEN:  Go to the second page, please.  And

17  highlight the part that starts with "Shradha."

18  BY MR. BLEGEN:

19  Q.  Just take a look at that briefly.

20    Do you see where it says:  "Shradha starting this

21  month will be spending a majority of her time, 90 percent

22  plus, on sponsorships" --

23  A.  Yes.

24  Q.  -- "through the end of 2013"?

25  A.  Yes.

1    Q.  Okay.  And so do you now recall that Shradha started
2    working with sales in --
3            MR. BLEGEN:  Go back to the first page.
4    BY MR. BLEGEN:
5    Q.  -- either June or July of 2013?  July of 2000 -- excuse
6    me -- July of 2012.  Do you see that?
7    A.  Yes.
8    Q.  And that's Mr. Shah indicating that that's when
9    Ms. Agarwal is going to start being involved in that?
10   A.  Yes.
11           MR. BLEGEN:  Okay.  Now can we put up Defense
12   Exhibit 3063.
13           And highlight the middle part, please.
14           I'm sorry, lower down than that.
15   BY MR. BLEGEN:
16   Q.  This is an email from Ms. Agarwal on July 23rd of 2013.
17   Do you see that?
18   A.  Yes.
19   Q.  To various people, correct?
20   A.  Correct.
21   Q.  Indicating, essentially saying:  "Hey, SS team," that's
22   the sales team, correct?
23   A.  It is.
24   Q.  "We've chatted about this over the past few weeks, but RS
25   will now be your first point of contact on everything SS

1  related as we transition back to what we each do best, RS on
2  sales and me on product."
3        Do you see that?
4  A.  I do.
5  Q.  "Please keep me copied on all communications for the next
6  few weeks as we transition.  And, of course, if you get -- if
7  you need to get ahold of me, you can, but try RS first."
8        Do you see that?
9  A.  Yes.
10  Q.  Okay.  So do you now recall that Ms. Shradha was involved
11  in sales and this list-match process for a little bit over a
12  year from July of 2012 to a little later in July of 2013?
13  A.  Yes.
14  Q.  Okay.  And does that comport with your memory as to when
15  she was involved in that?
16  A.  It's harder to remember the hard dates, but the email does
17  relatively line up, so it makes sense.
18  Q.  Okay.
19        (Counsel conferring.)
20  BY MR. BLEGEN:
21  Q.  Was it around 2013 that Outcome Health's growth sort of
22  exploded?
23  A.  Yeah.  I recall Outcome Health hitting a growth inflection
24  point around that timeframe, yes.
25  Q.  Okay.  And as the years between 2013 and 2015 and 2016,

1    the growth expanded even exponentially, did it not?

2    A.  Yes.

3    Q.  All right.  So if we were to look at like a growth chart

4    of 2012 or 2013, there wouldn't be very many people on it,

5    would there?

6    A.  Correct.

7    Q.  How many people were in the company in that timeframe?

8    A.  Oh, geez.  I wouldn't recall.  Not that many.

9    Q.  In the 20s?

10   A.  Probably.

11          MR. BLEGEN:  Okay.  Can we pull up Defense

12   Exhibit 5023.

13          See if you can expand just the first quarter of it.

14          One second, Judge.

15       (Counsel conferring.)

16          MR. BLEGEN:  To save my eyes, I had to ask what year

17   this is because I cannot see.

18          This is, I believe, the 2017 growth -- excuse me --

19   org chart for Outcome Health.

20          Can you expand just maybe the far left side, please?

21          I don't think we're going to be able to zoom in

22   enough for you to be able to see the faces or the names.

23          THE COURT:  Was this created for trial, or is this a

24   document from Outcome Health?

25          MR. BLEGEN:  I believe it's from Outcome Health, but

1 I'll have to confirm with co-counsel.

2 MR. LOWDER: I believe it was produced by Outcome

3 Health. You can see the Bates on the lower right, Your Honor.

4 THE COURT: You're right. There's a Bates number.

5 Thank you.

6 Yeah, I can't read it, and I'm right next to a

7 screen. The jury can't read it.

8 MR. BLEGEN: So let's take it down.

9 THE COURT: Okay.

10 BY MR. BLEGEN:

11 Q. It's really big, right?

12 A. Yes.

13 Q. 2017? There are multiple, multiple people on that org

14 chart in 2017, correct?

15 A. Yes.

16 Q. And you know that between 2013 and 2017, Outcome Health

17 hired a lot of management-type people, correct?

18 A. Yes.

19 Q. And they hired people who had worked in big tech areas,

20 correct?

21 A. Yes.

22 Q. They hired Madan Nagaldinne, for example, right?

23 A. Yes.

24 Q. Who used to work for Facebook?

25 A. Yes, he worked at Facebook. I don't recall what he worked

 1  for immediately, but yes.

 2  Q.  And they hired Vivek Kundra who we've heard some about,

 3  right?

 4  A.  Yes.

 5  Q.  And they were -- there was an effort to expand Outcome

 6  Health's management team because they had grown so big, right?

 7  A.  Yes.

 8  Q.  I mean, it literally exploded in growth, did it not?

 9  A.  It did.

10  Q.  And some of that growth caused operational issues for

11  Outcome Health, didn't it?

12  A.  It did.

13  Q.  In the days when you and Ms. Agarwal were involved in the

14  sales, the installations were a lot smoother and easier,

15  correct?

16  A.  I'm not entirely sure what you mean by smoother or easier.

17  Sorry.

18  Q.  Well, you didn't have as many of them, for one, right?

19  A.  That's true, yes.

20  Q.  Okay.  And you didn't have to hire as many subcontracted

21  tech people to actually install the screens and stuff.

22  A.  Yes, that's true.

23  Q.  Okay.  As Outcome Health grew bigger, one of the

24  operational problems became getting all of the installations

25  lined up with all of the outsourced installation tech guys who

1  became involved, correct?

2  A.  Yes.

3  Q.  And that caused a delay between -- in some instances

4  between what Outcome Health sold and what it was able to

5  install, right?

6  A.  Yes.

7  Q.  Okay.  But that happened more so in later years as Outcome

8  Health got much bigger, did it not?

9  A.  Yes, that's true.

10  Q.  Let me show you Government Exhibit 203.

11       Are you with me?

12  A.  Yes.

13  Q.  Okay.  This is the exhibit where a new agency had come in

14  for Humira, the new agency being Spark, correct?

15  A.  Yes.

16  Q.  And Ms. Agarwal writes an email saying:  This gives us a

17  real opportunity to," and then she lists the things that she

18  thinks it gives an opportunity to do, right?

19  A.  Yes.

20  Q.  "Sell waiting rooms/screens versus unique addresses that

21  TH bought.  We let Spark know they have 510 as of today!

22  Build goal is now an EOY" -- end of year -- "versus weighted

23  average."  Do you see that?

24  A.  I do.

25  Q.  And you testified on direct that you thought that this was

1   some sort of effort to renegotiate the contract?

2   A.  It appeared so.

3   Q.  Okay.  Well, so first of all, if Spark wanted to

4   renegotiate the contract, they were perfectly capable -- they

5   can do that if they want, right?

6   A.  Yes.

7   Q.  Okay.  You didn't think this as being something deceptive,

8   did you?

9   A.  At the time, it appeared as though it might be, yes.

10  Q.  Okay.  But that's because at the time, you didn't realize

11  that there was this discrepancy between offices and screens,

12  right?

13  A.  That's correct.

14  Q.  But now you know that there was this issue of did they

15  really buy offices or did they buy screens, right?

16  A.  Correct.

17  Q.  Because you now know that there are documents, like the

18  invoices, that say screens, right?

19  A.  Yes.

20  Q.  And then there's a bunch of emails from the salespeople

21  saying that this was screens, correct?

22  A.  Yes.

23  Q.  So if Ms. Agarwal is trying to convince Spark, hey, this

24  is really a screens deal here, sorry for the confusion, that's

25  not being deceptive, is it?

1  A.  No.

2  Q.  Okay.  And also if she were trying to be deceptive, she

3  wouldn't say we have 510 as of today, right?

4  A.  I'm not sure I can speak to that.

5  Q.  Okay.  Well, 510 is below what you said the contracted

6  amount was.

7  A.  That's true.

8  Q.  Let's take a look at Government Exhibit 1134e.

9        Do you see that up there?

10  A.  Yes.

11  Q.  According to this chart, this government's demonstrative

12  chart, how many were they supposed to have based on the

13  contract/for offices on April 13th of -- whatever year this

14  is -- 2013?

15  A.  530.

16  Q.  And how many did Ms. Agarwal -- how many did Ms. Agarwal

17  say we have?

18  A.  510.

19  Q.  Okay.  So she just disclosed an under-delivery?

20  A.  Seemingly.

21  Q.  If Spark thinks that it really should be offices or

22  screens, she's still exposing an under-delivery, right?

23        MR. HANKEY:  Objection, foundation.

24        THE COURT:  Overruled.

25        Go ahead.

1    MR. BLEGEN:  That means you can answer.

2  BY THE WITNESS:

3  A.  Oh.  Yes.

4  BY MR. BLEGEN:

5  Q.  Okay.

6  A.  Sorry.

7  Q.  I guess I'll repeat the question.

8          She's exposing to Spark, the new agency, that there's

9  an under-delivery from your point of view, correct?

10  A.  Yes.

11  Q.  We talked earlier about the Xarelto issue where

12  Ms. Agarwal told the salesperson, hey, keep in mind the other

13  company, the other drug, Pradaxa, has a right of first

14  refusal, right?

15  A.  Yes.

16  Q.  A right of first refusal was something that was valuable

17  to a pharma company, right?

18  A.  Yes.

19  Q.  Because sometimes the company was as interested in their

20  own ads playing on screens as they were in keeping other ads

21  from playing on the screens, right?

22  A.  Yes.

23  Q.  It was sort of like a box-out philosophy, where they're

24  like this is good for us, even if we have a right of first

25  refusal, even if we're not intending to use those screens, we

1  want to keep another company, a competitor, out of them.

2  Correct?

3  A.  Yes.

4  Q.  And that's sometimes what happened with rights of first

5  refusal, correct?

6  A.  Yes.  I recall that.

7  Q.  There was some discussion in your direct testimony the

8  other day about scrubbing data.  Do you remember that?

9  A.  Can I get some clarification on scrubbing data?

10  Q.  Well, that's what I was going ask you.  Do you know what

11  scrubbing data is?

12  A.  Not in the context at the moment, no.

13  Q.  Okay.  So someone saying scrub the data, is that

14  necessarily nefarious?

15  A.  Not necessarily, no.

16  Q.  Okay.  So let's take a look at Government -- excuse me --

17  Defense Exhibit 8769.

18        Do you see at the top where you say, this is

19  March 13, 2013:  "Hi SA.  We should have Zetia's list this

20  week.  They were rescrubbing the list prior to sending."

21        Do you see that?

22  A.  I do.

23  Q.  That's the client scrubbing or in this instance

24  rescrubbing their list prior to sending, right?

25  A.  Correct.

1647

1    Q.  Okay.  Nothing nefarious about using scrubbing, right?
2    A.  No.
3            MR. BLEGEN:  Let's take a look at Defendants'
4    Exhibit 8728.
5            Maybe blow up the middle portion.
6    BY MR. BLEGEN:
7    Q.  Have you had a chance to look at that?
8    A.  Yes.
9    Q.  And here Lynne Sperling from IMS is using scrubbing,
10   correct?
11   A.  Correct.
12   Q.  She says:  "Hello Jason.  We continue to work through the
13   analysis which is quite complicated, given the scrubbing
14   required of the old versus new participants and merging the
15   old NBRx dataset with the updated NBRx dataset."
16           Do you see that?
17   A.  Yes.
18   Q.  Okay.  And there's nothing nefarious in that context of
19   using scrubbing, is there?
20   A.  No.
21   Q.  I mean, if you don't know this, just tell me you don't
22   know this, but as someone who works with data, have you heard
23   data scrubbing or scrubbing data frequently?
24   A.  Yes.
25   Q.  What does it mean in general?

1  A.  Cleaning, cleaning the data, making it more -- it could

2  mean a few different things.  Making it more organized, making

3  sure it's more accurate.  It just depends on the context.

4  Q.  So as you sit here now, Mr. Ketchum, do you still think

5  that generally salespeople were not aware that projections

6  were being used?

7  A.  Based on the emails that I've seen today, there were

8  several examples where salespeople were very well aware that

9  there were projections being used, yes.

10  Q.  Okay.  But as you sit here now --

11  A.  Yes.

12          THE COURT:  Well, let him -- I don't think he was

13  done with his question.

14          THE WITNESS:  Sorry, Your Honor.

15          MR. BLEGEN:  I wasn't finished.  Let me go back in

16  time a little bit.

17  BY MR. BLEGEN:

18  Q.  On direct you said words to the effect of "I think

19  generally the salespeople did not know that projections were

20  being used."

21  A.  Yes.

22  Q.  As you sit here now, having seen more documents, do you

23  still think that's the case?

24  A.  No.

25          MR. BLEGEN:  You just saved an entire folder, so --

1    Judge, I think we were able to get a better -- more

2    viewable copy of the org chart which I would like to show him

3    briefly.  Is there a number for it?

4    MR. LOWDER:  It's the same exhibit number, just a

5    color copy, Your Honor.

6    THE COURT:  Yeah, I thought I saw it earlier

7    displayed, and it was a clearer view.  So I'm not surprised

8    you have it there.

9    So go ahead.

10   BY MR. BLEGEN:

11   Q.  All right, Mr. Ketchum, this is Defense Exhibit 5023.

12   Where would you be on this chart?  Do you have a sense so we

13   can blow it up to where you're at?

14   A.  2017 I believe I would have been on the sales side for

15   sponsorship, so I wouldn't be where we're seeing now.

16   THE COURT:  Your screen is a touch screen, so if you

17   want to circle wherever you are if you've got it, go ahead.

18   THE WITNESS:  Oh, I was unaware.  Thank you, Your

19   Honor.

20   Can I move it?  No, I can't move it.  Sorry.

21   THE COURT:  Luckily, I can erase it.

22   THE WITNESS:  Thank you, Your Honor.

23   THE COURT:  All right.

24   THE WITNESS:  Can you go that way, scroll to the

25   left?

1     Okay, can you stop?  Sorry, it's making me a little
2  dizzy.
3     I don't even know where I'm at on the chart.  I think
4  we went past me.  There's a lot of people.
5     MR. BLEGEN:  Judge, I'm not sure this is something
6  that can be done on a computer, so we're going to just take it
7  down.
8     THE COURT:  Okay.
9  BY MR. BLEGEN:
10 Q.  Mr. Ketchum, Mr. Hueston went through some communications
11 that you had sent during your tenure, indicating that you were
12 proud of the work that you had done at Outcome Health.  Do you
13 remember that?
14 A.  Yes.
15 Q.  Indicating that you liked the people that worked there,
16 liked the work that you did, thought they were doing the right
17 thing.  Remember?
18 A.  Yes.
19 Q.  Okay.  And there was some mention about a *Wall Street*
20 *Journal* article or reporter asking questions for the *Wall*
21 *Street Journal* intending to write a negative article about
22 Outcome Health.  Remember that?
23 A.  Yes.
24 Q.  A negative article about Outcome Health did come out
25 eventually, correct?

1 A.  It did.

2 Q.  And it was in October of 2017, right?

3 A.  Sounds correct, yes.

4 Q.  Even after that article came out, you were still proud of

5 the work you had done at Outcome Health, correct?

6 A.  Yes.

7 Q.  And you were still proud of the work you had done in

8 sales, correct?

9 A.  Yes.

10 Q.  And you asked Ms. Agarwal to -- essentially you told her

11 let's stop messing around here.  There are people who

12 understand how we built this business and who were

13 instrumental in building it who are asking to be put back in

14 the game.

15 A.  Yes.

16 Q.  Do you remember that?  And you were talking about

17 yourself, right?

18 A.  And others.

19 Q.  You said:  "I've been trying to know my place, but I feel

20 like I need to start speaking up."

21 A.  Yes.

22 Q.  Do you remember that?

23       And that was you trying to get back into a -- the

24 role that you had had at Outcome Health previously, correct?

25 A.  Not necessarily a specific role, just more engaged with

1  being more mission oriented.

2  Q.  But you specifically talked about how we built this

3  business, right?

4  A.  Yes.

5  Q.  You didn't build it based on lies, did you?

6  A.  Based on the mission being the focus.

7  Q.  All right.  You didn't base it on pulling numbers out of

8  thin air and saying that's the number we can meet, right?

9  A.  No.  As I stated in my prior testimony, one of the things

10  that I appreciated most about the organization was the tie, my

11  personal tie I had to disease states, and that mission I felt

12  several people were not -- were not focused on.

13  Q.  Outcome Health was a growth company, was it not?

14  A.  It was.

15  Q.  And as far as you knew, everyone was aware of that, right?

16  A.  Yes.

17  Q.  People at Outcome and the clients, correct?

18  A.  Yes.

19  Q.  And it was not a secret that Outcome Health's business

20  model was to sell, then build, correct?

21  A.  No.

22  Q.  It was not a secret within Outcome Health, was it?

23  A.  No.

24  Q.  And it was not a secret to the clients, was it?

25  A.  No.

1  Q.  Okay.  So I have to ask you about something that you

2  testified to on direct related to this sell, then build

3  philosophy, okay?

4  A.  Yes.

5  Q.  And let me see if I can take you back to it.

6       You testified that Ms. Agarwal had sent you an email

7  discussing the sell, then build philosophy, and what you said

8  was, it was -- it came up in the context of someone being

9  interviewed for a job, right?

10  A.  Yes.

11  Q.  And that Ms. Agarwal's email was a question asking whether

12  the person knew and could handle that Outcome Health sold,

13  then build.  Do you remember that?

14  A.  Yes.

15  Q.  Where did you get the "could handle" part?

16  A.  I may have been misremembering that -- the specific

17  wording of the email.  It was more the gist of that particular

18  email.

19  Q.  Well, let's take a look at the specific email, okay?

20  A.  Sure.

21  Q.  GX 495.  And I'll let you take a look at the first page.

22  A.  Yes, this is -- this is the email.

23  Q.  Yeah.  And this is an email that you saw in one of your

24  prep sessions with the government, right?

25  A.  Yes.

1  Q.  Okay.  A recent prep session, correct?

2  A.  Yes.

3  Q.  Okay.

4          Okay?

5  A.  Yes.

6  Q.  Let me ask you some questions about this email first.

7  A.  Yes.

8  Q.  So first of all, this was an email discussing a guy who

9  might get hired at Outcome Health, right?

10  A.  Yes.

11  Q.  A guy named Adam Prowker, right?

12  A.  Yes.

13  Q.  He ultimately did get hired, but he wasn't hired yet,

14  correct?

15  A.  Correct.

16  Q.  And he was a person who knew people in the pharma

17  business, right?

18  A.  Yes.

19  Q.  Okay.  He knows what the marketers are looking for as well

20  as data analytics teams -- as well as data analytics teams are

21  driving towards.  Do you see that?

22  A.  Yes.

23  Q.  And that's Ms. Agarwal on this chain that you're on

24  discussing this Adam Prowker guy, right?

25  A.  Yes.

 1  Q.  And this is, of course, an example of how really in-depth

 2  you guys went for hiring, correct?

 3  A.  Yes.

 4  Q.  Emails back and forth about this.

 5  A.  Yes.

 6  Q.  The question Ms. Agarwal asks at the bottom of her part of

 7  the chain, a little farther down, the very last bullet point

 8  above "on Monday."

 9        Do you see that?

10  A.  Yes.

11  Q.  What does that say?

12  A.  "Does he understand we generally sell, then build, not

13  vice-versa?"

14  Q.  Okay.  Well, if Outcome Health's business model of sell,

15  then build, was a secret in a black box, Ms. Agarwal just

16  said, hey, does Prowker know about it, right?

17  A.  Yes.

18  Q.  It wasn't a secret in a black box, was it?

19  A.  No.

20  Q.  Okay.  And she just announced to a person or said it

21  should be announced to a person who could announce to the

22  whole world, hey, everybody, Outcome Health sells, then builds

23  out their network, right?

24  A.  Yes.

25  Q.  Okay.  But so here's what I'm curious about.

1  　　　　　This says:  "Does he understand we generally sell,
2  then build, not vice-versa?"
3  A.  Yes.
4  Q.  Where is "can he handle" part?
5  A.  I misremembered.  I was just trying to recall the gist of
6  the email.
7  Q.  But do you understand the difference?
8  A.  Yes.
9  Q.  The "can he handle" suggests there's something wrong or
10  nefarious that he has to be able to handle, right?
11  A.  Yes, I suppose that's correct, yes.
12  Q.  Okay.  So there is no suggestion in here about that, is
13  it?
14  A.  No.
15  Q.  It's, in fact, just the opposite of being nefarious.  It
16  is saying does this person who doesn't even work here yet
17  understand this is how we do things?
18  A.  Yes.  I believe my testimony was being taken a little out
19  of context in this instance though.
20  Q.  Well, am I taking it out of context?
21  A.  I think so.
22  Q.  Okay.  Well, maybe I got upset over nothing.  We'll find
23  out.
24  　　　　　You didn't mean to suggest that there was anything
25  nefarious about her question?

1  A.  No.  I believe the -- what I was asked was can you recall

2  or do you know that Outcome Health continued to sell on

3  projections.  And I said, yes, I know that's the case.  I can

4  recall an email, and this was the email I was recalling, where

5  it was mentioned that there was a candidate and did the

6  candidate know that Outcome Health generally sells, then

7  builds.  So that was the context of the question.

8  Q.  Okay.  But so sell, then builds necessarily involves

9  projection, right?

10  A.  Yes.

11  Q.  Okay.  And what you're telling us now -- correct me if I'm

12  wrong -- is that Ms. Agarwal was not -- did not express a

13  concern in her question about whether this guy could handle

14  what we do, right?

15  A.  No.

16  Q.  Meaning I'm correct?

17  A.  Yes, you're correct.

18  Q.  Ms. Agarwal was not suggesting we should find out if he

19  can "handle" -- I'm using air quotes for the record -- what we

20  do here.

21  A.  That's correct.

22  Q.  And so what this email actually demonstrates is that

23  Ms. Agarwal had no problem with a candidate knowing their

24  business philosophy of projections, correct?

25          MR. HANKEY:  Speculation.

1    MR. BLEGEN:  Well, I could rephrase it, Judge.

2    THE COURT:  Rephrase.

3    BY MR. BLEGEN:

4    Q.  Your understanding of this question from Ms. Agarwal is

5    that she wants to make sure that this person who doesn't even

6    work there yet understands that Outcome Health sells on

7    projections.

8    A.  Yes.

9    Q.  Correct?

10   A.  Yes.

11   Q.  I am correct?

12   A.  You are correct.

13   MR. BLEGEN:  If I could just have one moment, Judge.

14   THE COURT:  All right.

15   (Counsel conferring.)

16   MR. BLEGEN:  I'm told that the org chart is now

17   visible.

18   THE COURT:  Go ahead.

19   MR. BLEGEN:  Not quite as dramatic is the last thing,

20   but we'll look at the org chart for a minute.

21   BY MR. BLEGEN:

22   Q.  Can you find yourself on there, sir?

23   A.  Oh, geez, I'll try.

24   Not yet.  Oh, sorry.

25   No.

1    THE COURT:  If you know where he is, why don't you
2    put it there.
3        MR. BLEGEN:  I don't know where he is, Judge.
4        Thank you for your testimony, Mr. Ketchum.  I'm not
5    going to make you look at the chart anymore.
6    BY THE WITNESS:
7    A.  There's a lot of people.
8    BY MR. BLEGEN:
9    Q.  Yeah, a whole lot, right?
10   A.  Yes.
11   Q.  Oh, here we go.  And every single one of them knew that
12   Outcome Health sells, then builds, right?
13       MR. HANKEY:  Objection.  Speculation.
14       THE COURT:  Sustained.
15       MR. BLEGEN:  Thank you.
16       THE COURT:  All right.  Any further
17   cross-examination?
18       MR. PRUITT:  Yes, Your Honor.
19       THE COURT:  All right.
20       MR. BLEGEN:  Can I just have a moment to get my stuff
21   out of here?
22       THE COURT:  Sure.  We'll stand up for a moment and
23   stretch while the attorneys switch.  Or not.  No one has to
24   stand.
25       (Pause.)

1        THE COURT:  Okay.  Ready to proceed?

2        MR. PRUITT:  Your Honor, just one preliminary matter.

3        THE COURT:  Yeah.

4        MR. PRUITT:  I had just recently tendered to the

5   government two additional documents that we intend to use with

6   Mr. Ketchum.  They're DX 3091 and DX 3126.  They're org

7   charts.

8        I believe they're going to be admitted without

9   objection so long as we lay a foundation as to the approximate

10  date of the records.

11       MR. HANKEY:  That's correct, Your Honor.

12       THE COURT:  Okay.  Very good.  Lay your foundation.

13  Seek their admission, and I'll rule on it.

14       You can take your mask off.

15       MR. PRUITT:  Thank you, Your Honor.

16       THE COURT:  And why don't you introduce yourself to

17  the jury, since they haven't heard from you before.

18       MR. PRUITT:  I was going to do that.

19       THE COURT:  Good.

20       MR. PRUITT:  Good afternoon, everyone.  My name is

21  Eric Pruitt.  I'm one of the attorneys for Brad Purdy over

22  here.

23                    CROSS-EXAMINATION

24  BY MR. PRUITT:

25  Q.  Good afternoon, Mr. Ketchum.

1  A.  Good afternoon.

2  Q.  Last but not least for me today.

3       Mr. Ketchum, during your direct, Mr. Hankey focused

4  on your time in member services during 2011 to 2013, correct?

5  A.  Yes.

6  Q.  And when you started at Outcome, main leadership of the

7  company consisted of Rishi Shah, Shradha Agarwal, and Jim

8  Demas, correct?

9  A.  Yes.

10  Q.  Now, the parties have stipulated that Brad Purdy didn't

11  start at Outcome until July 2012, and that's consistent with

12  your recollection, correct?

13  A.  Yes.

14  Q.  Now, you testified during your direct about some of Brad's

15  roles and responsibilities during the time period we're

16  talking about, 2012 and 2013, and I just want to ask you a few

17  more questions about that.

18       THE COURT:  And if you're not going to wear the

19  portable mic, make sure the mic there is turned towards you a

20  little more so we can all hear you.

21       MR. PRUITT:  Is that better for the court reporter?

22       THE COURT:  Very good.

23  BY MR. PRUITT:

24  Q.  You recall, don't you, Mr. Ketchum, that one of the things

25  Brad focused on in 2012 and 2013 was handling the logistics of

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 274 of 311 PageID #:14219
Ketchum - cross by Pruitt
1662

1  installing all these devices the jury's been hearing about in
2  the doctors' offices, correct?
3  A.  Yes.
4  Q.  And that in and of itself was a fairly time-consuming part
5  of his job.  Would that be fair to say?
6  A.  Yes.
7  Q.  And a lot of his work in 2012 and 2013 was also focused on
8  purchasing and acquiring these devices that ended up getting
9  installed in the doctors' offices; is that right?
10  A.  Yes.
11  Q.  And I think you just were talking to Mr. Blegen about
12  educational content a little bit, and I believe I heard you
13  say that educational content was the most important part of
14  the company; it's kind of what the company was all about,
15  right?
16  A.  Yes.
17  Q.  And it's correct, isn't it, that Brad was involved in
18  obtaining this educational content for the devices; is that
19  right?
20  A.  Not solely, but yes.
21  Q.  Right.  And one of those, I believe, was getting
22  educational content from the Mayo Clinic; is that right?
23  A.  Yes, I recall that.
24  Q.  And were you involved in that project as well?
25  A.  It rings a bell, but I can't speak too much about it.  I

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 275 of 311 PageID #:14220
Ketchum - cross by Pruitt
1663

1  recall some work with the Mayo Clinic though, yes.

2  Q.  Okay.  And another one was Susan G. Komen, the cancer

3  foundation, correct?

4  A.  Yes.

5  Q.  And the American Heart Association, that's another one

6  that Brad worked on, right?

7  A.  Yes, I believe so.

8  Q.  And it's fair to say, right, that a big part of Brad's job

9  during that time period is kind of working on special

10  projects, kind of unique, one-off projects?

11  A.  Yes.

12  Q.  And you recall that Brad made several trips to China in

13  connection with obtaining devices that Outcome needed.

14  A.  That was, I believe, a different time period, but yes.

15  Q.  Okay.  And he also was involved in connection with that

16  setting up the whole supply chain in China for these devices.

17  Do you recall that?

18  A.  I do.  Again, different time period, but yes.

19  Q.  Okay.  A little bit later in time?

20  A.  Yes.

21  Q.  Okay.  And thanks for clarifying that.

22      And Brad went on to lead the project to develop and

23  implement Outcome's exam room tablets, right, these tablets

24  that got developed?

25  A.  Yes.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 276 of 311 PageID #:14221
Ketchum - cross by Pruitt
1664

1   Q.  And those were different from the original screens they
2   had in the waiting rooms, right?
3   A.  Yes.
4   Q.  And that process involved getting feedback from some of
5   the members, these doctors' offices and stuff, because to my
6   understanding, there was customization that had to be done to
7   get the tablets and the screens kind of the way they wanted
8   them.
9   A.  Yes.  It was a complicated process.
10  Q.  Okay.  And you were involved in that process as well?
11  A.  Yes.
12  Q.  And that involved interaction, going back and forth with
13  the members, getting feedback and trying to incorporate that
14  into the designs?
15  A.  Yes.  It was a very different type of experience.
16  Q.  Okay.  And that's something Brad was heading up?
17  A.  Yes.
18  Q.  And Brad also worked with engineers to develop software
19  for these new tablets, right?
20  A.  Yes.
21  Q.  Again, that's a little later in time, right?
22  A.  Yes.
23  Q.  Okay.  Now, all this stuff that we just discussed, this
24  was all on the membership side of the business, correct?
25  A.  Yes.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 277 of 311 PageID #:14222
Ketchum - cross by Pruitt
1665

1   Q.  All right.  Brad was never in charge of sponsorship sales

2   at Outcome.

3   A.  Not that I recall, no.

4   Q.  Brad did not sell ads to pharmaceutical clients, correct?

5   A.  Not that I recall, no.

6   Q.  And Brad did not negotiate contracts with pharmaceutical

7   clients, correct?

8   A.  Not that I recall, no.

9           MR. PRUITT:  Your Honor, at this time, we'd like to

10  publish DX 3091.

11          THE COURT:  This is one of the admitted ones or is

12  this one of the ones --

13          MR. PRUITT:  One of the ones that we just put in, and

14  apologies to Laura.  She may need a second to find that.

15          THE COURT:  All right.  Is there going to be an

16  objection to this?

17          MR. HANKEY:  No objection.

18          THE COURT:  I think in light of his testimony, no

19  objection?

20          MR. HANKEY:  That's right.

21          THE COURT:  All right.  It's admitted.

22      (Said exhibit admitted in evidence.)

23          MR. PRUITT:  And, Your Honor, just to be clear, we're

24  going to lay a little foundation with him as to time.

25          THE COURT:  All right.  But it's easier to display it

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 278 of 311 PageID #:14223
Ketchum - cross by Pruitt
1666

1  when you do that than not, so you're free to display it.

2       MR. PRUITT:  Thank you, Your Honor.

3  BY MR. PRUITT:

4  Q.  All right, Mr. Ketchum, do you see DX 3091 in front of you

5  right now?

6  A.  Yes.

7  Q.  And I believe that -- well, here, let's look at this for a

8  second.

9       From looking at this and seeing the relative position

10  of the people here on the chart, do you have an understanding

11  as to the approximate time that this org chart reflects?

12  A.  Give me just a quick moment.

13  Q.  No, of course, take your time to take it in.

14  A.  I believe this would be 2013 or 2014.

15  Q.  Okay.  So as I recall your testimony on direct, Ashik

16  Desai joined the company as a full-time employee late 2013; is

17  that right?

18  A.  August 2013, yes.

19  Q.  August 2013.

20       And we see that Jim Demas and Kristie Peters are

21  still at the company, so we know it's before February of 2015,

22  right?

23  A.  Correct.

24  Q.  Okay.  And so I just want to focus a little bit on this

25  and walk through this a little bit.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 279 of 311 PageID #:14224
Ketchum - cross by Pruitt
1667

1    So at the far right of the screens that everyone's

2    looking at, we have member outreach, right?

3    A.  Yes.

4    Q.  All right.  And so that's Matt Garms and his team at that

5    time?

6    A.  Yes.

7    Q.  These are the folks who are reaching out to the doctors'

8    offices and trying to get them to sign up and become members,

9    correct?

10   A.  Correct.

11   Q.  All right.  And then another name we've heard and I think

12   seen on a few of the emails if we go over to the next column

13   is Travis Kemp?

14   A.  Yes.

15   Q.  Okay.  And can you just explain, because I don't know

16   exactly how much they've heard about this, what exactly did

17   Travis Kemp do if you can summarize that?

18   A.  Yes, I can.  At this point in time?

19   Q.  Yes, in that point in time.

20   A.  So at this point in time, Travis Kemp -- can you actually

21   zoom out?  Sorry, because the org will make sense as I'm

22   talking through it.

23   So Travis oversaw how content was put on the screen,

24   so NetOps.  And when I say content put on the screen, I don't

25   mean he was responsible for the creation of the content or

1  what type of content, just the actual operations of content

2  needs to go on a screen.  So if that makes sense.

3          So network operations was the team of call them

4  engineers, they probably weren't really engineers, but they

5  would work with the technicians that you've heard about who

6  were out in the field at doctors' offices installing the

7  equipment and making sure that the equipment was functioning

8  properly.  So that was -- so Travis oversaw that.

9          He also oversaw what was called the onboarding team

10  so as the team started to break up a bit, although this

11  re-org'd shortly after this, onboarding was responsible for

12  the portion of the member services team.  If you recall my

13  prior testimony, there was member services, then member

14  services started to split out into multiple teams because

15  member services for a period of time was responsible for the

16  installation of the equipment, making sure the equipment was

17  functioning.  So if it lost Internet connection, making sure

18  it was functioning.  And then also customized content and then

19  keeping the doctors happy so what you might think about as

20  more of a traditional account management type of role.

21          So onboarding was one of the specific roles of the

22  project management portion of getting the systems installed

23  once they were sold.  Network health took over the

24  responsibility of making sure those devices were connected.

25  And then logistics is sending out equipment.  So it's like

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 281 of 311 PageID #:14226
Ketchum - cross by Pruitt
1669

1   think of it more like a warehouse type of job, of

2   organization.  That's the simplest way to put it.

3           Sorry.  That was kind of short story long.

4   Q.  No, that's okay.  I think it's important for everyone

5   because we hear a lot of these names to understand the context

6   and who does what.

7           You know, one of the things we heard about during

8   your direct and I think also during some of the crosses was

9   devices going MIA.  Do you remember that testimony?

10  A.  Yes.

11  Q.  And I believe you said that that's -- would involve when

12  devices lost network connectivity or things like that?

13  A.  Yes.

14  Q.  And so is that what the people under Travis would deal

15  with?  Is that their responsibility?

16  A.  For this period of time it looks like that, yes.

17  Q.  Okay.  And so coming over next, we have Jim Demas, the

18  CFO, and the people under him.

19          And a few questions for you about Mr. Demas.

20          Mr. Ketchum, you testified about invoices, about

21  affidavits, and about proofs of performance that were sent to

22  clients, correct?

23  A.  Yes.

24  Q.  And the affidavits and the proofs of performance,

25  technically those are two separate kinds of documents, right?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 282 of 311 PageID #:14227
Ketchum - cross by Pruitt
1670

1    A.  Yes.

2    Q.  But they're similar in that they're showing the client

3    this is what we're invoicing you for, correct?

4    A.  Yes.

5    Q.  Okay.  And you were shown a number of these documents

6    during Mr. Hankey's questioning of you.

7    A.  Yes.

8    Q.  So if I heard your testimony correctly, Mr. Demas and the

9    accounting department, these were the people who were

10   responsible for preparing those invoices, correct?

11   A.  Yes.

12   Q.  So it falls under this part of the org chart?

13   A.  Yes.

14   Q.  Jim Demas in the accounting department also had the

15   primary responsibility for preparing those affidavits and

16   proofs of performance, correct?

17   A.  Yes.

18   Q.  Okay.  And you ended up working on those things

19   occasionally, right?

20   A.  Yes.

21   Q.  But Mr. Demas was your main point of contact on issues

22   relating to invoices and proofs of performance, correct?

23   A.  Generally.

24   Q.  And affidavits as well?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 283 of 311 PageID #:14228
Ketchum - cross by Pruitt
1671

 1  Q.  Okay.  And, Mr. Ketchum, you are not an accountant,
 2  correct?
 3  A.  No.
 4  Q.  And you understood that Mr. Demas was a CPA?
 5  A.  Yes.
 6  Q.  That he was an experienced CPA?
 7  A.  Yes.
 8  Q.  And as I believe you already covered, he worked for pharma
 9  companies in the past, or at least one?
10  A.  Yes.
11  Q.  Okay.  And Kristie Peters is listed here as a direct
12  report of Jim Demas, correct?
13  A.  Yes.
14  Q.  Was that your understanding as well, that she reported
15  directly to Mr. Demas?
16  A.  Yes.
17  Q.  Sorry.  That was a bad question.
18          And was Ms. Peters also involved in the preparation
19  of the affidavits and the proofs of performance?
20  A.  I can't speak to that.
21  Q.  Okay.  Going over -- we'll move past over to Shradha.  At
22  this point in time, you're in member services, correct?
23  A.  Yes.
24  Q.  Okay.  And that's -- can you remind me, Ryan Postel, we've
25  heard testimony about him.  He's listed as media here.  At

1    that point in time, what was Ryan Postel's job exactly?

2    A.  I believe his title at the time was media producer.

3    Q.  What did that involve, I'm sorry?

4    A.  He would help create content.

5    Q.  Like the educational content?

6    A.  Yes.

7    Q.  Like the stuff for the Mayo Clinic and Susan G. Komen or

8    other stuff?

9    A.  Other stuff.

10   Q.  I'm sorry.  I don't know actually.  What other kind of

11   stuff?

12   A.  I apologize.

13   Q.  No need to apologize.

14   A.  I don't know the exhaustive list of his job duties, but

15   one of the job duties as media producer was to create custom

16   videos.  So different from member services who would create

17   custom videos which were more -- it's hard to describe them.

18   Think of them more like an animated slide show.

19        Very -- they're professionally done but not by

20   someone who's a professional videographer.  That's maybe a

21   little difficult to understand now because a lot of people are

22   good at it.  Back then they weren't.

23        Ryan would actually film.  He was a fantastic

24   videographer and photographer.  He would actually film

25   personal stories and segments that could go onto the screens

1    educational content-wise.

2    Q.  And then to the left of this, we next have at this point

3    in time, Ashik Desai as the executive vice president.  That's

4    what EVP is, correct?

5    A.  Yes.

6    Q.  Of business growth and analytics, correct?

7    A.  Yes.

8    Q.  And then under that, we see sponsorships.  These are the

9    salespeople, correct?

10   A.  Correct.

11   Q.  Steve Svec, Bob Mons, and Matt Crandall, all these names

12   that are becoming familiar to us, correct?

13   A.  Yes.

14   Q.  So Ashik Desai did not to start as the head of business

15   growth and analytics, did he?  If you remember?

16   A.  I don't actually recall.  It was pretty shortly after he

17   started.

18   Q.  Okay.  So he got elevated to that position fairly shortly

19   after he started?

20   A.  Yes.

21   Q.  And these are the people interacting with the pharma

22   clients, correct?

23   A.  Yes.

24   Q.  Okay.  And then finally at the far left, while I'm curious

25   about Katie De Voto, I don't know that we need to know about

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 286 of 311 PageID #:14231
Ketchum - cross by Pruitt
1674

1    why you had a talent manager.

2           But Brad is listed as chief operating officer on this

3    chart, correct?

4    A.  Yes.

5    Q.  And that was your understanding of his title at that point

6    in time?

7    A.  Yes.

8    Q.  The only person I see reporting up to Brad on this org

9    chart for this point in time is Chirag Patel, and I don't know

10   that we've heard that name.  Who is Chirag Patel?

11   A.  He was a software developer.  He was the head of software

12   development for Outcome Health for a period of time.

13   Q.  So, for example, when we were talking about these new

14   tablets that Outcome designed to put in the exam rooms,

15   software had to be developed to run on those; is that right?

16   A.  Yes.

17   Q.  And is that something Brad worked with Chirag Patel on?

18   A.  I believe so, yes.

19   Q.  Okay.  And does this accurately reflect your understanding

20   of how the company was structured at that time?

21   A.  Yes.

22   Q.  Okay.  And as we can see from this, Brad Purdy is not over

23   member services, correct?

24   A.  Correct.

25   Q.  He's not over anything other than Chirag Patel, as far as

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 287 of 311 PageID #:14232
Ketchum - cross by Pruitt
1675

1    his direct reports?

2    A.  At this point in time, yes.

3           MR. PRUITT:  You can take that down, Laura.

4           Laura, can you pull up 3126?

5           And if we could just make that a little bigger but

6    maybe still see the whole thing.

7    BY MR. PRUITT:

8    Q.  Okay.  I'm not going to make you go over everything again,

9    but from looking at this, I see that Jim Demas and Kristie

10   Peters are still here.  So we know this is before February of

11   2015, correct?

12   A.  Yes.

13   Q.  It looks like a few changes have been made though.  From

14   looking at this, and take your time, can you tell

15   approximately when this org chart, what time period this would

16   reflect?

17   A.  Later than the one you showed me prior, but I can't put a

18   specific time period on it.

19   Q.  Okay.  But prior to February 2015?

20   A.  Yes, given the people who were still there.

21   Q.  After -- I'm sorry.  I didn't mean to talk over the

22   witness.

23           After 2013?

24   A.  Yes.

25   Q.  Okay.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 288 of 311 PageID #:14233
Ketchum - cross by Pruitt
1676

1  THE COURT:  And you're moving for admission of both

2  charts, correct?

3  MR. PRUITT:  I am, Your Honor.  Thank you.

4  THE COURT:  Any objection to both?

5  MR. HANKEY:  No objection.

6  THE COURT:  All right.  Those numbers?

7  MR. PRUITT:  Those numbers are 3091, DX 3091, and DX

8  3126.

9  THE COURT:  All right.  They're both admitted without

10  objection.

11  (Said exhibits admitted in evidence.)

12  BY MR. PRUITT:

13  Q.  There have been a few changes since the last one we looked

14  at, but the main thing I wanted to foc on, the company has

15  certainly grown at this point in time, correct?

16  A.  Yes.

17  Q.  More people in member outreach?

18  A.  Yes.

19  Q.  You're in member services now, but we see an asterisk next

20  to your name.  Do you know why there's an asterisk next to

21  your name?

22  A.  I think at that point I was a team lead.

23  Q.  Ah, okay.

24  And we see more people in sponsorship, I think.  It's

25  gotten a little bit bigger here?

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 289 of 311 PageID #:14234
Ketchum - cross by Pruitt
1677

1    A.  Yes.

2    Q.  And then off to the left, we have Brad still -- still

3    chief operating officer, and that's consistent with your

4    understanding at that point in time?

5    A.  Yes.

6    Q.  Under Chirag Patel, director of software development, I

7    think two people have been added since the last org chart we

8    looked at, Steve Parrish, who's senior software engineer?

9    A.  Yes.

10   Q.  And then Jonathan Pauli, who's system administrative,

11   Linux engineer?

12   A.  Yes.

13   Q.  Looking at this as a layperson, Mr. Ketchum, what I'm

14   seeing here is people involved with software development and

15   kind of computer systems issues are the people who report up

16   directly to Brad?

17   A.  Yes.  Jon Pauli would be known as what's called a dev ops

18   engineer.

19           THE COURT:  Why don't you spell that.

20           THE WITNESS:  D-E-V, O-P-S engineer.  Sorry, Your

21   Honor.

22   BY MR. PRUITT:

23   Q.  Is that consistent with your understanding of Brad's

24   primary area of responsibility at that point in time?

25   A.  Yes.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 290 of 311 PageID #:14235
Ketchum - cross by Pruitt
1678

1   Q.  Okay.  Not sales?

2   A.  No.

3   Q.  Not dealing with pharma clients?

4   A.  No.

5   Q.  Okay.  And, again, the issue and one of the core issues

6   we've been hearing about over the last couple of days, this

7   issue of contractual terms, contractual obligations to

8   clients, invoicing, those responsibilities are housed

9   primarily under Jim Demas and his part of the shop, correct?

10  A.  Yes.

11  Q.  So, Mr. Ketchum, you testified quite a bit now over the

12  past couple days about list matches, right?

13  A.  Yes.

14  Q.  Brad Purdy did not teach you how to do list matches,

15  correct?

16  A.  No.

17  Q.  And to the extent a list match included projections or

18  devices that Outcome did not have in its inventory yet, that's

19  not something Brad Purdy ever instructed you to do, correct?

20  A.  Not that I recall.

21  Q.  You also testified about this issue of not discussing with

22  Outcome salespeople that list matches were based on

23  projections.  Do you remember that?

24  A.  Yes.

25  Q.  Brad Purdy never directed you to keep information from

1    salespeople, did he?

2    A.  No, not that I recall.

3    Q.  And Brad Purdy never directed you or asked you to keep

4    information from clients, did he?

5    A.  No, not that I recall.

6    Q.  Mr. Ketchum, you testified you had conversations with

7    people at Outcome where you expressed concerns about the

8    truthfulness of the list-match information being provided to

9    customers.  Do you remember that?

10   A.  Yes.

11   Q.  Brad Purdy was not one of those people you discussed that

12   with, was he?

13   A.  No, not that I recall.

14   Q.  And, Mr. Ketchum, your testimony was that Ashik Desai

15   later took over doing list matches from you at some point in

16   2013; is that right?

17   A.  Yes.

18        MR. PRUITT:  Okay.  Your Honor, could we display DX

19   9007 to the jury?  No objection from the government, I

20   believe.

21        THE COURT:  Go ahead.

22        MS. DOMINIAK:  9007?

23        MR. PRUITT:  DX 9007, correct.

24        And if we could just highlight the top of this for a

25   moment first so he can kind of orient himself.

Case: 1:19-cr-00864 Document #: 587 Filed: 11/29/23 Page 292 of 311 PageID #:14237
Ketchum - cross by Pruitt
1680

 1  BY MR. PRUITT:

 2  Q.  See here, Mr. Ketchum, this is an email that you sent,

 3  correct?

 4  A.  Yes.

 5  Q.  Sunday, August 4, 2013, correct?

 6  A.  Yes.

 7  Q.  And this is MS weekly report, correct?

 8  A.  Yes.

 9  Q.  Member services?

10  A.  Member services, yes.

11       MR. PRUITT:  Okay.  And then Laura, if you could go

12  down to the third paragraph down that starts "I worked."

13  BY MR. PRUITT:

14  Q.  And could you read that for us, Mr. Ketchum?

15  A.  "I worked with Ashik going over list matches and he seems

16  to be getting a good grasp.  I'll continue working with him to

17  make sure he's up to speed quickly on list matches and other

18  activities."

19  Q.  Okay.  And so, Mr. Ketchum, does this accurately reflect

20  at this point in time you were in charge of training or taking

21  the lead on training Ashik Desai on how to do list match?

22  A.  From the technical standpoint of Excel and database, yes.

23  Q.  Okay.  And so when you say that, I don't know if the jury

24  got an explanation of what that means.

25       When you say the technical aspect, what does that

1    mean?

2    A.   Sure.  So how far to project or anything like that is

3    situational, as you saw in several emails.  So when I'm

4    talking about this, it's really more -- so there's a

5    Quickbase, which you've heard a number of times.  So how to go

6    into Quickbase, search for doctors of a specific specialty

7    or -- so an endocrinologist, rheumatologist, or just pulling

8    all doctors.

9           And then if it's for projection purposes, how member

10   outreach database looks, so what stages of member outreach and

11   how to export that into an Excel file.  And then Ashik didn't

12   have much of a -- much experience using Excel, so things like

13   how to do -- how to match list to list, he wouldn't have known

14   how to do because there's some -- there's what's called a

15   function.  So there's some functions that help you -- there's

16   some -- I'm trying to think of the simple way to describe

17   this.

18          There are some -- there's some functionality built

19   into Microsoft Excel that helps you do things, and one of

20   those -- one of the things that's built into Excel is to help

21   quite literally match different lists in Excel, so different

22   spreadsheets based on criteria.  And Mr. Desai didn't have

23   experience with Excel, so he didn't know how to use those

24   types of functions.

25          And then additionally didn't know how to do things

1    like pivot -- I'll describe what a pivot table is, too.

2    Didn't know how to do things like a pivot table.

3           So a pivot table is where you can get various pieces

4    of information and then have Excel put it into a chart where

5    you can -- you can get a good sense for what the overall data

6    that you're looking at represents I think is the simplest way

7    to explain that.

8    Q.  Okay.  That answered my question.  Thank you.

9           Mr. Ketchum, in doing that, the process of -- is it

10   your testimony that the process of including projections or

11   working other kinds of information into those matches is not

12   something you taught Mr. Desai?

13   A.  The projections would be something that's different case

14   by case and would usually come from either Rishi or Shradha as

15   you saw from the emails as far as how far to project out.

16   Q.  Yes, but I guess my question more goes to like the

17   technical aspects of how to incorporate that into the Excel

18   spreadsheets that you're producing, isn't that something you

19   would have had to have taught him as well?

20   A.  Oh, yes.  Sorry.  I misunderstood your question.

21   Q.  Okay.

22   A.  Yes, you would need to know how to pull out the stages

23   from member outreach.  So you saw in prior testimony various

24   member outreach stages from pitched and info sent, ongoing

25   dialogue, verbal sign-up, and then some various stages for

1    member services.

2         So you would need to know how to pull those stages

3    from the database so at that time from Quickbase.

4    Q.  And just so we're really clear, because I want to make

5    sure -- this is kind of an important point, I want to make

6    sure we're clear with this, Mr. Ketchum --

7    A.  Sure.

8    Q.  -- so there are aspects of the inclusion of the

9    projections, as we're calling that broadly, that you did teach

10   Mr. Desai because he had to understand how do I bring these

11   things from the member services pipeline or these other things

12   into these Excel spreadsheets?

13   A.  Yes.

14   Q.  So that part of it you did teach him?

15   A.  Yes.

16        MR. PRUITT:  Okay.  Judge, I think we're getting a

17   little close.

18        THE COURT:  We are.  We are.  Ladies and gentlemen,

19   that concludes today's session.

20        Please don't discuss the case among yourselves or

21   with anyone else.

22        Get a good night's rest.  Keep an open mind.  There's

23   more evidence to hear, of course, and we'll see you all

24   tomorrow morning.  Thank you.

25        COURT SECURITY OFFICER:  All rise.

1           (Jury exits courtroom.)

2           THE COURT:  All right, sir, you can leave the stand.

3    Be back tomorrow morning at 9:00.  Please don't discuss the

4    case with anyone, as you are still on cross-examination.

5           THE WITNESS:  Yes, Your Honor.

6           THE COURT:  All right.  Mr. Pruitt, you need to keep

7    your voice up or get closer to the mic or wear a portable mic.

8           MR. PRUITT:  I'll put the portable mic on.

9           THE COURT:  That's fine.  I think that will help the

10   court reporter because she, just like all the others, is

11   listening with her headphones.

12          MR. PRUITT:  I missed that during the transition.  I

13   will, Your Honor.

14          THE COURT:  That's fine.

15          The screen goes dark occasionally, and I think

16   something's going on over at that end when it happens.  I

17   could be wrong, and maybe you want to check.  You don't have

18   to go on the record, but it seems as if it's -- occasionally

19   it goes dark and then it comes back on.  I don't know if

20   that's at your end or if it's something we need to fix at our

21   end, but --

22          MS. DOMINIAK:  Yes.

23          THE COURT:  You don't have to cover what she says

24   because it's too hard.

25          Go ahead.  Tell me though.  We'll go off the record.

1      (Discussion held off the record.)

2            THE COURT:  We can go back on the record.

3            I believe we had a waiver on the use or the several

4  witnesses testifying by video, live video, but testimony by

5  video.  Is that correct?

6            MR. MADDEN:  Correct, Your Honor.

7            THE COURT:  Okay.  And you want to hand that up?

8            MR. MADDEN:  Yes.

9         (Tendered.)

10            THE COURT:  Thank you.

11            Okay.  This is titled Defendants' Waiver of Right to

12  Cross-Examine Specified Government Witnesses in Person, and it

13  is signed by Mr. Shah, Ms. Agarwal and Mr. Purdy, and by

14  attorneys for them, and it relates to witnesses Lynn Meier, a

15  Starcom representative, and Tameka Teal, a Compas

16  representative.  And I'll ask each of the defendants, starting

17  with defendant Shah, Mr. Shah, did you read this document over

18  and sign it?

19            DEFENDANT SHAH:  Yes, I did, Your Honor.

20            THE COURT:  And did you have sufficient time to talk

21  to your attorneys and understand that you have a right to

22  require these witnesses to come to court so they can be face

23  to face with your attorneys and cross-examined in this

24  courtroom; do you understand that?

25            DEFENDANT SHAH:  Yes, I do, Your Honor.

1    THE COURT:  All right.  Are you waiving your right to
2  have that take place in the courtroom and instead agreeing to
3  have it being done over a video, where they'll be live and
4  your attorney can ask questions, but they won't be in the
5  courtroom; do you understand that?
6    DEFENDANT SHAH:  I do, Your Honor.
7    THE COURT:  And you're agreeing to do that?
8    DEFENDANT SHAH:  Yes, Your Honor.
9    THE COURT:  All right.  I won't go through the same
10  colloquy with each of you, but the same questions apply.
11  Ms. Agarwal, are you comfortable -- are you agreeing to that?
12    DEFENDANT AGARWAL:  Yes, Your Honor.
13    THE COURT:  Mr. Purdy, are you agreeing to that?
14    DEFENDANT PURDY:  Yes, Your Honor.
15    THE COURT:  All right.  Mr. Madden, are there any
16  other questions I should ask on the subject?
17    MR. MADDEN:  No, Your Honor.
18    THE COURT:  Okay.  Then that waiver, I'll give it
19  back to you.  You can enter it on the docket whenever you are
20  comfortable doing so.
21    (Tendered.)
22    THE COURT:  Okay.  I still -- we can go off the
23  record now.
24    (Discussion held off the record.)
25    THE COURT:  Okay.  Let's go back on the record.

1    Mr. Madden, looks like you wanted something to say.

2    MR. MADDEN:  I just wanted to mention that we filed a

3    very brief, straightforward motion to admit Jason Ketchum's

4    prior grand jury statement as a prior consistent statement.

5    THE COURT:  Yes.

6    MR. MADDEN:  To state the obvious, his credibility

7    has been attacked, and he testified consistent with his direct

8    testimony in the grand jury about three-and-a-half years ago.

9    So we're seeking under -- we're seeking to admit that as

10   non-hearsay during his redirect.

11   Obviously, he'll be subject to cross on it.  We think

12   it's very clear the predicate has been established.

13   MS. CHOU:  Your Honor, we'd like some time to take a

14   look at that because it's been a while since I looked into

15   this issue.  I can't remember if there's a rule about the

16   prior consistent statement needing to be made prior to the

17   circumstances that would cause there to be a motive to lie, in

18   which case this would not qualify.  So if we could just have

19   some time to look into it and respond.

20   MR. MADDEN:  Can I briefly respond to that, Your

21   Honor?

22   THE COURT:  Yes.

23   MR. MADDEN:  So I can short circuit it.

24   The rule was amended in 2014, so prior to 2014, it

25   was more difficult to get in a prior consistent.  In 2014, it

1   was broadened.  I mean, it was broadened so much that once
2   the -- you know, it comes in even to rehabilitate the
3   declarant's credibility as a witness when attacked on another
4   ground.  So that last part was put in.
5           It used to be, I think *Tone* was the Supreme Court
6   case on this on the prior 2014 version.  We had to establish
7   that timing that Ms. Chou mentioned used to be more important
8   because we had to establish that it was to rebut an express or
9   implied charge that the declarant recently fabricated it, but
10  then the additional language came in in 2014.
11          THE COURT:  Yeah, you're talking about
12  801(d)(1)(B)(ii).
13          MR. MADDEN:  Correct.
14          THE COURT:  To rehabilitate the declarant's
15  credibility as a witness when attacked on another ground.
16          MR. MADDEN:  Correct.
17          THE COURT:  He's been attacked on another ground.
18  I'm not -- I'll give you a chance to read their memo.  It came
19  in at 2:00 this afternoon, I was trying to read it, 2:00 or
20  3:00.  You'll have a chance to read it.  If you want to
21  respond, you can do it in writing or orally tomorrow morning.
22  We'll reconvene at 8:30.
23          I think I have an 8:45 matter.  We'll reconvene at
24  8:30 for anyone who wants to argue about this, and I'll deal
25  with the -- their motion to admit at that time.

1    Mr. Madden has correctly stated the rule, so I'll
2    give you a chance to respond though.
3            MS. CHOU:  Okay.  Thank you, Your Honor.
4            THE COURT:  Okay.  Anything else from the government
5    first?
6            MR. MADDEN:  No, Your Honor.
7            MR. HANKEY:  One housekeeping matter, Your Honor, on
8    exhibits.
9            THE COURT:  Yeah.
10           MR. HANKEY:  On exhibits?
11           THE COURT:  Yeah.  In front of the mic, please.
12           MR. HANKEY:  This can be done off the record.
13           THE COURT:  All right.  Let's go off the record.
14        (Discussion held off the record.)
15           MR. JOHNSTON:  Actually, two issues related to David
16    Ma.
17           THE COURT:  Go ahead.  Yes.
18           MR. JOHNSTON:  The first issue is we believe that the
19    defense cross-examination of David Ma is going to run right
20    smack into their motion in limine, which the Court granted,
21    which was the prohibition on mentioning the SEC proceeding.
22           David Ma has filed a whistleblower complaint with the
23    SEC.  In his deposition, he was questioned about this.  Unless
24    the defense is prepared to represent that they're not going to
25    question Mr. Ma on his whistleblower status, then we believe

1 that we have the right to front it, and they can't pretend
2 that, say we don't want to get into this and then decide on
3 cross that they changed their mind.

4     THE COURT: Is the whistleblower, did he blow his
5 whistle to the SEC?

6     MR. JOHNSTON: Well, he did. He did.

7     THE COURT: Okay. I just wanted to know. A lot of
8 places --

9     MR. JOHNSTON: This issue, the issue, Your Honor, is
10 that the defense is likely to use this to suggest he has a
11 financial motive in the outcome of this case because a guilty
12 verdict in this case could affect the SEC case, and then the
13 resolution of the SEC case could result in a potential
14 monetary award to Mr. Ma.

15     Obviously, you know, we, in our response to their
16 motion, said we were fine not bringing this up, but flagged it
17 for the Court at the time we responded to their motion in
18 limine that we didn't see how their motion could stand in
19 light of what we expect to be a cross-examination.

20     And so we think this needs to be raised with the
21 Court because we do not think it's fair for them to have filed
22 this motion and then decide at cross that they've changed
23 their mind and now they want to get into it and bring it up.

24     THE COURT: Well, do you intend -- who's doing the
25 cross of Mr. Ma?

1    MR. LOWDER:  I am for Ms. Agarwal.

2    THE COURT:  All right.  And for Mr. Shah?

3    Mr. Poulos and Mr. Shah?

4    You're still working on it.

5    MR. HUESTON:  We're working on it yet.

6    THE COURT:  Okay.  Well, do you intend to bring it

7    up?  First for Defendant Shah?

8    MS. CHOU:  We're not sure, but even if we do, we do

9    not think that his motive to lie or his motive to say certain

10   things as a result of his financial incentive from being a

11   whistleblower necessarily means that the SEC proceedings

12   should come in.

13   THE COURT:  How can't it?  Because the outcome of

14   this case may affect the outcome of the SEC case, which may

15   affect -- the SEC has to win their case presumably for the --

16   and get some kind of award for the whistleblower to receive

17   funds, I think.  I don't know the -- his contract or his deal.

18   MR. LOWDER:  I don't think that --

19   THE COURT:  Go ahead, Mr. Lowder.

20   MR. LOWDER:  The point is his motivations for filing

21   it don't necessarily mean the SEC took it up and is pursuing a

22   case in order for us to show his motive or his bias in terms

23   of making the pitch to the SEC and also reporting to the *Wall*

24   *Street Journal*.

25   So the financial motive for him exists whether or not

1    the SEC takes up the case.  It just goes to his justification

2    or his reason for pursuing it in the first instance, which was

3    alluded to in opening statements, that he went to the *Wall*

4    *Street Journal* and is one of the people that blew the whistle.

5    And so I think we should be able to attack his motive for

6    doing that, at least for pursuing it, whether or not there's

7    an existing financial motivation for him now because there's a

8    pending SEC matter.

9         THE COURT:  I -- excuse me.  I'll have to reread the

10   motion in limine.  My understanding was you didn't want the

11   SEC action to come into evidence.

12         MR. LOWDER:  I think that's right.  But the point is

13   just because he filed a whistleblower complaint does not mean

14   that the SEC actually took it up because of his complaint.  We

15   don't know why the SEC initiated that action.  We don't have

16   visibility into that.  All we know is that he pursued it.

17         THE COURT:  One at a time.

18         Go ahead, Mr. Poulos, your turn now.

19         MR. POULOS:  Sorry, Judge.

20         The timeline is this:  That he contacts the reporter

21   for the *Wall Street Journal*, and he will admit that he was

22   contacting a number of former employees, trying to elicit them

23   in the cause.  The article gets published, and shortly

24   thereafter, he and his lawyer go to -- you know, file a

25   whistleblower complaint.  And in doing that shortly after the

1    article came out, he specifically noted the whistleblower

2    status and putting him in a position for a reward.

3         And as Mr. Lowder says if I get into that, Judge, or

4    if we get into it, that's as far as I want to go, that at the

5    time that he filed -- that he filed that in close proximity to

6    the article that he caused to be published, he had that

7    financial motive.

8         I don't think it's necessary.  I wasn't intending, as

9    Mr. Johnston suggested, that I was going to claim that the

10   outcome of this case has any impact on any SEC case.  Just

11   that at the time that the article -- around the time the

12   article was published and shortly thereafter, he sought that

13   whistleblower status and asserting a claim to any potential

14   monetary award.  We don't need to get beyond that.

15        THE COURT:  Who did he file the whistleblower

16   complaint with?

17        MR. POULOS:  The SEC.

18        THE COURT:  All right.  Response?

19        MR. JOHNSTON:  And, Your Honor, we believe that if

20   this is brought out, we can explore with him on either direct

21   or redirect that he has no -- there's no direct financial

22   motive for him.  At least he'll claim he doesn't have it

23   because he says he did this for other reasons.

24        But we do believe that the jury is entitled to learn

25   what may or may not actually result in the reward for him.  So

1  they would need to understand that there's no connection or at
2  least there's no direct connection between this case and any
3  financial award so they're not sitting here thinking, oh, if
4  he testifies the way the government wants him to testify --
5            THE COURT:  He'll make some money.
6            MR. JOHNSTON:  -- he's going to make some money.
7            THE COURT:  Well, does the defense intend to go
8  anywhere close to that, Mr. Poulos?
9            MR. POULOS:  To that part no, Your Honor.  Just the
10  motivation of around the time of the article.
11            THE COURT:  Whatever that may have been.
12            MR. POULOS:  Yeah.
13            THE COURT:  But that nothing about his testimony
14  is -- affects his ability to recover.
15            MR. POULOS:  I do not plan to go there, no.
16            MR. LOWDER:  Do not intend to cover that at all.
17            THE COURT:  Mr. Hueston, Ms. Chou?
18            MS. CHOU:  No.
19            THE COURT:  No?  Does that satisfy?
20            MR. JOHNSTON:  I mean, it does, and that's what we
21  can -- I mean, we're still entitled to obviously front that
22  fact, but we can -- we'll front the fact that there's an SEC
23  proceeding, just the fact that he filed a whistleblower -- a
24  whistleblower claim.
25            THE COURT:  Yeah, you can.

1    MR. JOHNSTON:  That's the point.

2    THE COURT:  And you can even ask a leading question

3 if you want and say you have no financial motive in this case

4 in any way.  I'll let you ask a leading question because

5 that's the truth.

6    MR. LOWDER:  Your Honor, I think that's the

7 prejudicial thing that we were talking about.

8    THE COURT:  What?

9    MR. LOWDER:  The SEC proceeding is not what we're

10 intending to elicit from Mr. Ma.  It's about him filing the

11 complaint.  Not what actions followed.  Just his motivation,

12 his bias.

13    THE COURT:  He has a motivation to make money by

14 filing a whistleblower complaint.  That's fair game.  But the

15 part that's, I believe, off limits in this case, unless you

16 want to blow up the whole situation and talk about every

17 aspect of the filing in the SEC case, is that he has no

18 financial motive attached to his testimony in this case.  His

19 whistleblower complaint has no effect -- or the outcome of

20 this case has no effect on his testimony.

21    Now -- or on his -- the outcome has no effect on his

22 testimony.  If you'll all agree to that, then we shortcut

23 this.  I think what the government wants to prevent is someone

24 getting up and suggesting that if he says what the government

25 wants, he's going to make some money, as Mr. Johnston just

1    said.

2              It's more nuanced than that, and if you raise that,

3    I'm going to let the government get into the nuance, which

4    will raise the SEC, will raise the results of an SEC case,

5    whether the SEC deems fit to award him whistleblower money

6    based on the SEC case, and that's -- nobody wants to do that.

7    We've got enough issues in this case without raising all that.

8              MR. JOHNSTON:  The other issue then, even if what

9    they intend to raise, there's nothing that's per se

10   objectionable, of course, but if they get into the motives and

11   the circumstances for why he did file a whistleblower

12   complaint, that could raise a -- at least the appearance of a

13   possible conflict that we think the Court should at the very

14   least inquire into.  We don't need to be a part of it, the

15   government --

16             THE COURT:  What's --

17             MR. JOHNSTON:  So the facts are that after the *Wall

18   Street Journal* article was published, he -- Mr. Ma had some

19   concerns about his own exposure.  He was a student at Stanford

20   business school at the time.  One of his acquaintances was a

21   student at Stanford Law School at the time, and that student

22   is now a member of the defense team, Karen Ding.

23             And when he expressed his concerns to her, Ms. Ding

24   recommended that he contact or that he get in touch with a

25   lawyer that she knew from her childhood in Davis, California.

1    That is now Mr. Ma's current lawyer, Michael Hirst,

2    who represented him to -- and helped him file his

3    whistleblower complaint.  Not saying there's a conflict, but

4    down the road, someone could say, hey, Team Shah didn't go

5    after, you know, Mr. Ma as hard as they should have because of

6    the, you know, past relationship and the circumstances of

7    Mr. Ma getting his lawyer, and we wouldn't want any

8    suggestion --

9    THE COURT:  Well, let me -- before we go any further.

10   Your client knows this.

11   MS. CHOU:  Yes, of course.

12   THE COURT:  He probably knew it before it was said

13   here.  I'm certain he knew it before.  Prepare a waiver form

14   of some kind, indicating that he has -- aware that a current

15   member of the trial team, which -- and she was a law student

16   at the time, correct?

17   MS. CHOU:  We've handled this, Your Honor,

18   internally, as you would have expected before she joined the

19   team.

20   THE COURT:  Yeah.

21   MS. CHOU:  And there is an agreement among the

22   parties that this fact is not relevant.

23   THE COURT:  Right.

24   MS. CHOU:  So we don't anticipate that this will come

25   up.

1     THE COURT:  If you're worried about a waiver though
2  in the event there's a conviction that a basis of that is
3  somehow that the Hueston team didn't aggressively
4  cross-examine, which I don't think anyone can reasonably say
5  that --
6     MR. JOHNSTON:  I don't expect that.
7     THE COURT:  -- who's been in this courtroom the last
8  two days, but prepare a waiver form that --
9     MS. CHOU:  Sure, Your Honor.
10     THE COURT:  -- indicates your client's aware of it.
11     Okay.  Anything else we need to put on the record?
12     MR. JOHNSTON:  No, Your Honor, not from the
13  government.
14     THE COURT:  Okay.  Kathy you're free.
15     (Discussion held off the record.)
16     (Court adjourned, to reconvene at 8:30 a.m. on 2/8/23.)
17
18
19
20
21
22
23
24
25

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Elia E. Carrión                    8th day of February, 2023
_____        _____
Elia E. Carrión                                Date
Official Court Reporter


/s/ Sandra M. Tennis                  8th day of February, 2023
_____        _____
Sandra M. Tennis                              Date
Official Court Reporter


/s/ Kelly M. Fitzgerald                8th day of February, 2023
_____        _____
Kelly M. Fitzgerald                          Date
Official Court Reporter

/s/ Kathleen M. Fennel                8th day of February, 2023
_____        _____
Kathleen M. Fennel                          Date
Official Court Reporter