1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

3   UNITED STATES OF AMERICA,          )
                                       )   Docket No. 19 CR 864
4                  Plaintiff,          )
                                       )   Chicago, Illinois
5        v.                            )   February 8, 2023
                                       )   8:38 a.m.
6   RISHI SHAH, SHRADHA AGARWAL,       )
    BRAD PURDY,                        )
7                                      )
                   Defendants.         )
8

9        TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 7A
     BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11  APPEARANCES:

12
    For the Government:    MR. MATTHEW F. MADDEN
13                         MR. SAURISH APPLEBY-BHATTACHARJEE
                           Assistant U.S. Attorneys
14                         219 South Dearborn Street, 5th Floor
                           Chicago, Illinois  60604
15

16                         MR. WILLIAM E. JOHNSTON
                           MR. KYLE C. HANKEY
17                         U.S. Department of Justice
                           Criminal Division, Fraud Section
18                         Washington, D.C.  20530

19

20

21

22                       ELIA E. CARRIÓN
                       Official Court Reporter
23                  United States District Court
                219 South Dearborn Street, Room 1432,
24                     Chicago, Illinois 60604
                          (312) 408-7782
25                 Elia_Carrion@ilnd.uscourts.gov

APPEARANCES (Continued:)

For Defendant
Shah:                    MR. JOHN C. HUESTON
                         Hueston Hennigan LLP
                         620 Newport Center Drive, Suite 1300
                         Newport Beach, California  92660

                         MS. VICKI CHOU
                         MR. MICHAEL H. TODISCO
                         MS. KAREN DING
                         Hueston Hennigan LLP
                         523 West 6th Street, Suite 400
                         Los Angeles, California  90014

For Defendant
Agarwal:                 MS. KOREN L. BELL
                         MR. A. ALEXANDER LOWDER
                         MR. STEPHEN G. LARSON
                         Larson LLP
                         555 South Flower Street, Suite 4400
                         Los Angeles, California  90071

                         MR. PATRICK W. BLEGEN
                         MS. KELSEY H. KILLION
                         Blegen & Garvey
                         53 West Jackson Boulevard, Suite 1437
                         Chicago, Illinois  60604

For Defendant
Purdy:                   MR. THEODORE T. POULOS
                         MR. ERIC PRUITT
                         MR. JOHN PAVLETIC
                         Cotsirilos, Tighe, Streicker, Poulos &
                         Campbell, Ltd.
                         33 North Dearborn Street, Suite 600
                         Chicago, Illinois  60602

1       (Proceedings heard in open court; no jury.)

2              THE COURT:  Let's go on the record.

3              Okay.  We have the government's motion filed

4       yesterday afternoon to admit prior inconsistent -- a prior

5       inconsistent -- prior consistent statement, namely the

6       grand jury testimony of Mr. Ketchum.

7              Had defendants' opposition come in last night.  And

8       then not to be outdone, the government came up with a reply

9       this morning.

10             Have you seen the reply?

11             MS. CHOU:  Yes, Your Honor.

12             THE COURT:  Okay.  All right.  Any additional

13      argument on the issue?

14             First, from the government.

15             MR. MADDEN:  Unless you have questions, we'll stand

16      on our brief, Your Honor.

17             THE COURT:  All right.  Defense.

18             MS. CHOU:  Just to step back a little bit.  Even

19      though --

20             THE COURT:  And could someone shut the door in the

21      back.  The jurors do walk by there when they're coming in.

22             Thank you very much.  Thanks.

23             Go ahead, Ms. Chou.

24             MS. CHOU:  Even though the papers talk about the

25      timing of his motive to lie, this is not a situation that I

1  think is classically contemplated by the rule where the
2  witness has arguably lied on the stand.

3          Instead, his testimony was is that he saw a certain
4  set of emails when he met with the government, and he saw a
5  different set of emails when he testified.  And that accounts
6  for -- to the extent that there is any change in testimony,
7  that's what accounts for it.

8          And then my -- the second thing is just there is a
9  lot in this grand jury testimony that was not covered in his
10 cross-examination.  And so at a minimum, the government should
11 be asked to identify which portions they are trying to
12 introduce to bolster his trial testimony, and the rest should
13 be redacted.

14         THE COURT:  Response?

15         MR. MADDEN:  Your Honor, the entire statement should
16 come in.  I mean, this is -- this is really not a close case.

17         There was a lot of -- I mean, he was impeached about
18 ten different ways, suggested long-standing motive to lie,
19 recent motive to lie.  His -- they raised the fact that just
20 last week, the government filed a petition for immunity for
21 you, correct?

22         I mean, this is classic, recent motive to fabricate.
23 Raising the date of the immunity motion being so close to
24 trial, going over specific dates of meetings with the
25 government, including, you know, January of 2023.  You met

1  with this prosecutor, that prosecutor, that prosecutor.  That

2  is just classic, recent motive to lie.

3         THE COURT:  Well, and not to further your argument,

4  but there were PowerPoint slides put up to illustrate the

5  changing nature of the testimony post-grand jury --

6         MR. MADDEN:  Correct.

7         THE COURT:  -- all the way up to New Year's Eve or

8  two days before New Year's Eve.  And then I believe there

9  might have been a slide afterwards.  But at least up to

10 New Year's Eve, which was emphasized a couple of times.

11        MR. MADDEN:  Right.

12        THE COURT:  But there was a -- at least as to

13 portions of the statement, a -- I thought, a fairly effective

14 cross-examination about the changing nature of his testimony.

15        MR. MADDEN:  Correct, Your Honor.  And so that's --

16 I mean, this is -- I don't think it's -- we don't think it's a

17 close call.  This is just a classic case where the jury should

18 know that four years ago, this is what this witness said.

19        And, you know, what they do with it is up to them.

20 And most -- the defendants' arguments really go to weight.

21 They're going to be able to cross him on it; that's part of

22 the rule.  They can -- he -- it'll be read in.  We have other

23 examples.

24        Mr. Appleby-Bhattacharjee, this came up in a

25 healthcare fraud case with -- in front of Judge Kennelly,

1  *U.S. v. Garcia*, 18 CR 833 --

2  THE COURT:  Slow down.

3  COURT REPORTER:  Slow down, please.

4  MR. MADDEN:  -- 18 CR 833, *U.S. v. Garcia,* healthcare

5  fraud case tried by my trial partner.

6  The witness was impeached on an immunity agreement,

7  among other reasons.  The entire -- we moved into evidence the

8  entire grand jury statement.  The statement was read to the

9  jury, and then the witness was subject to cross.  That's --

10  THE COURT:  Who read it in?

11  MR. APPLEBY-BHATTACHARJEE:  Your Honor, in that

12  case --

13  THE COURT:  By -- to the mic.  You're good.

14  MR. APPLEBY-BHATTACHARJEE:  In that case, on -- on

15  redirect examination, we read the grand jury statement and had

16  the witnesses confirm that that's what he had previously --

17  THE COURT:  Right.  He basically said, "I'm going to

18  read a statement.  Did you give this to the grand jury?"

19  And then that opened up the recross on that statement

20  and the consistency or inconsistency of that with other

21  statements.

22  MR. APPLEBY-BHATTACHARJEE:  That's right, Your Honor.

23  And we went, you know, paragraph by paragraph in some

24  instances or section by section.  But that's -- that's what

25  happened --

1    THE COURT:  All right.

2    MR. APPLEBY-BHATTACHARJEE:  -- in that case.

3    THE COURT:  Well, even -- Ms. Chou, what about the

4  amendment to the rule that talks about to rehabilitate the

5  declarant -- declarant's credibility as a witness when

6  attacked on another ground?

7    They attacked him not just on charges of recent

8  fabrication, but they attacked him on -- they -- you attacked

9  him on a variety of other reasons trying to please the

10  government.  But also, you know, just bad memory or incomplete

11  preparation where he saw some emails and not others.

12    His credibility was attacked, I thought, on a variety

13  of reasons, not just the -- a motive to fabricate something

14  more recently from the -- that occurred more recent than the

15  prior consistent statement.

16    MS. CHOU:  We do view this as different from a

17  situation where a witness says he can't remember or is just

18  sheerly inconsistent, because he didn't say that he couldn't

19  remember.  He said that the difference was that he was shown

20  different emails.

21    And so that does not seem like the situation that is

22  contemplated by the rule, given the advisory comments.  And it

23  is clear from the case law that the -- that the Supreme Court

24  case *Tome* is still supposed to apply to this rule generally.

25    The -- the comments address -- reference the entire

1 rule, not a particular subsection. And what Your Honor's
2 speaking about is subsection --

3             MR. POULOS: Your Honor, may I be heard as well?
4             MS. CHOU: -- little (ii).

5             THE COURT: Yeah, let me just respond. The *Tome*
6 case, one, predates the amendment to the rule. But the
7 advisory notes to the 2014 amendment do mention the *Tome* case,
8 but they don't -- I'm sorry -- the 2000 --

9             MR. MADDEN: '14.

10             THE COURT: -- '14 notes, 2014 amendment notes
11 mention the *Tome* case. But there's -- it doesn't address, at
12 least, the -- it doesn't address explicitly the amendment
13 itself.

14             It just says it retains the requirements set forth in
15 *Tome,* "A prior -- an in -- a consistent statement offered to
16 rebut a charge of recent fabrication or improper influence or
17 motive must have made -- been made before the alleged
18 fabrication or improper influence or motive arose."

19             And, one, I think the government has set forth a
20 number of reasons, and I accept those as reasons why there's
21 been an argument of recent fabrication.

22             It's -- you couldn't listen to that cross-examination
23 and not take from it -- the -- the idea that the government
24 was either squeezing him to change his testimony in a way that
25 they liked or was intentionally keeping documents away from

1  him in order to prevent him giving a fuller explanation of

2  something he believed, at least at the time of the grand jury,

3  was illegal.

4          And so I think there has been an express or implied,

5  certainly an implied charge that the declarant recently

6  fabricated his testimony.  "Recently," meaning in -- since the

7  time he gave his grand jury testimony.  And -- or acted from a

8  recent, improper influence or motive.  And that is satisfied,

9  because the recent improper motive or influence is the request

10 and the giving of the government -- by the government of

11 statutory immunity.

12         Now, I also think this rehabilitates his credibility

13 as a witness when he's attacked on another ground.  They

14 attacked it on -- you attacked him on a variety of grounds

15 that I believe this rule allows the government then to

16 rehabilitate him, because his credibility has been attacked on

17 a ground, in this case, in many -- the chief one is that he

18 was only shown or remembered selective emails.

19         So, anyway, I'm -- I -- but I -- I will hear argument

20 from the other counsel before I make a final ruling, but

21 that's my preliminary ruling.

22         MR. BLEGEN:  Understood, Judge.  And I would like to

23 make a couple of comments.  The first being --

24         COURT REPORTER:  Slow down.

25         MR. BLEGEN:  I would like to make a couple of

1   comments.  The first being, I didn't attack the witness at

2   all.  My entire point of the cross-examination was that his

3   testimony and understanding of things was based on the fact

4   that he had not seen certain documents.

5       That was the point of it.  I never said, "You

6   fabricated anything."  I never said, "You were squeezed."  I

7   said, "You told us you would tell the truth, and if you see

8   something that changes your view on things, that can change

9   your -- your testimony, right?"

10      And he said, "Yes."  And then multiple times said,

11  "Yes, having now seen something that I had not seen before."

12  And you told me I couldn't say the government didn't show you

13  this on direct, so I didn't do that.  Now they want to put in

14  a grand jury testimony where he also had not seen those same

15  documents.

16      So not only is it not inconsistent, I didn't do any

17  of the things that the rule would allow that to come in.  So

18  you should either say that this stuff is not admissible

19  against Ms. Agarwal at all or, I guess, we should ask for a

20  severance, because we --

21      THE COURT:  Are you asking for a severance?

22      MR. BLEGEN:  I'm going to discuss it with cocounsel,

23  and I'll let you know in a moment if that's okay.

24      THE COURT:  Certainly.  You can discuss it.

25      MR. BLEGEN:  Can I finish what I was going to say

1  first --

2          THE COURT:  You may.  Yeah.

3          MR. BLEGEN:  -- because it might resolve the issue?

4          So I don't think I opened the door for any of those

5  things.

6          And I would say in response to Mr. Madden's claim

7  that this is a -- like a typical or a classic example of this.

8  It's not.  What happened with the witness yesterday is not a

9  classic example of what happens when prior grand jury

10  testimony comes in.

11         He didn't flip the government.  He didn't say

12  something is -- "I'm going to just testify differently now."

13  He said, "Having seen things I didn't see, I now have a

14  different view or -- or a different understanding."

15         So -- so that was the point that I made.

16         THE COURT:  Okay.

17         MR. BLEGEN:  Secondly --

18         THE COURT:  Let me respond to that.

19         MR. BLEGEN:  Okay.  Go ahead.

20         THE COURT:  Isn't -- well, this is a rhetorical

21  question.  I'm not asking.  But isn't a lack of memory a

22  classic attack on credibility?  Person doesn't remember.  And

23  this -- these are emails, many of which were shown -- most of

24  which were shown to him, he was on but simply didn't remember.

25         MR. BLEGEN:  It is not an attack on credibility.

1    THE COURT:  I -- I --

2    MR. BLEGEN:  Nobody expects him -- who -- who would

3  expect him to remember all those emails?  I literally said,

4  "There are thousands of emails, mountains of them," you -- I

5  mean, part of the reason I did that is 'cause you told me we

6  would get some sort of curative instruction if I did it a

7  different way.

8    But I also think it's true.  He -- he sat with the

9  government and saw a bunch of emails, right?  He doesn't

10  remember.  Clearly, he doesn't know about the ones he hasn't

11  seen --

12    THE COURT:  Right.

13    MR. BLEGEN:  -- and he doesn't remember.  That's not

14  an attack on his credibility in any way, shape, or form.

15    THE COURT:  Sure it is.  It's on memory.  We're not

16  saying he needs to have a superhuman memory, and that would be

17  unrealistic.  But in a -- in a theoretical sense, anything he

18  wrote that he doesn't remember now, or anything he was copied

19  on that he doesn't remember now is an attack on his memory.

20    Now, in a practical sense, you're absolutely right.

21  But in a strictly theoretical sense for purposes of the -- of

22  this -- this exercise in going through whether this rule is

23  satisfied, an attack on his credibility can be that he doesn't

24  remember something he was copied on or wrote.

25    I believe that's an attack on his memory, and memory

1    is a credibility issue.  It goes to credibility.  And that's

2    why I think that portion of this rule -- outside of the recent

3    fabrication, that portion of the rule is satisfied.

4             MR. BLEGEN:  Well, I think they used the word

5    "attack" for a reason.  It's not -- or "challenge."  It was

6    neither of those things.  It was a reminder of things that had

7    happened.

8             THE COURT:  That's wordsmithing.  There's no way I

9    could sit here and not understand what you were doing was

10   attacking his inability to remember something and reminding

11   him of it then.  And him saying, "Well, now that you remind me

12   of that, I do feel differently on a certain subject."

13            That's -- we're just talking about the same thing;

14   you're using it in a different form of words than I am.  But

15   in looking at the rule, I view that as something that

16   satisfies it.

17            MR. BLEGEN:  Judge, I guess, I disagree.  I mean, you

18   know --

19            THE COURT:  Sure.

20            MR. BLEGEN:  -- words are important in statutes and

21   in rules --

22            THE COURT:  They are.

23            MR. BLEGEN:  -- right?

24            It's not -- they didn't pick those -- let me pull the

25   rule up.  Just -- what is it?  Is it "attack" or "challenge"?

1  Let me look it up real quick.  I didn't do any of those --

2       THE COURT:  Attacked.  Attacked.

3       MR. BLEGEN:  Attacked.  Right.  They didn't pick that

4  word randomly.  If somebody mentions that you haven't seen

5  something before and says, "But I'm not blaming you for that,

6  sir, because I understand you wouldn't have -- you couldn't

7  possibly remember that," how was that an attack on his

8  credibility?

9       THE COURT:  The rule doesn't -- well, go ahead.  I --

10      MR. BLEGEN:  I mean, that's -- they didn't -- I don't

11  think picked that word meaninglessly.

12      THE COURT:  Okay.

13      MR. POULOS:  Your Honor, I --

14      MR. BLEGEN:  I'm not done, Ted; sorry.

15      MR. POULOS:  Pardon me.

16      MR. BLEGEN:  Secondly, how can they be permitted to

17  just read in an entire grand jury testimony that is filled

18  with inadmissible evidence?

19      It has got objectionable statements in there.  There

20  is -- there is lack of foundation for many things.  There are

21  many instances where he says things like, "Ms. Shah and

22  Mr. Agarwal told me things."

23      THE COURT:  Well, that was his direct testimony too.

24      MR. BLEGEN:  No.  I objected when he -- when he did

25  not keep it specific to which defendant he was --

1     THE COURT:  I had --

2     MR. BLEGEN:  -- talking about.

3     THE COURT:  I -- I specifically recall a number of

4 times he lumped in Mr. Shah and Ms. Agarwal without objection.

5 Not that you had to.  But without objection where he said,

6 "They both directed me to do this; they both knew this; they

7 both told me to do that."

8     Now, you did object in some occasions for foundation

9 and for specificity.  But even then he said -- you know, he

10 gave examples, I recall at least on direct, where he said

11 both.

12     MR. BLEGEN:  And there may have been instances where

13 I either forget to object or didn't think it was necessary to

14 object.

15     THE COURT:  Sure.

16     MR. BLEGEN:  But the ones that are in the grand jury

17 are objectionable.  He also testifies to conclusions in there

18 that are not admissible.

19     For example, "When we agreed to do this, Shah and I

20 intended to deceive the client."

21     This is not a backdoor to get in inadmissible

22 testimony.  Just -- and remember, it's a grand jury where

23 there's no one there to object.

24     THE COURT:  That's why you get to cross-examine him

25 after they put it in.

1    MR. BLEGEN:  I know, but cross-examination is not

2  intended to be a cure for inadmissible evidence.  It's --

3    MR. MADDEN:  They all --

4    THE COURT:  Mr. Madden's jumping up while he's

5  standing there.

6    Go ahead.

7    MR. MADDEN:  They specifically asked him, "Did you

8  intend to defraud?"  "Did my client intend to defraud?"

9    And he said answered that negatively.  Of course -- I

10  mean, that's -- that's -- they did exactly that during his

11  cross-examination, Your Honor --

12    MR. BLEGEN:  No, we did not.  I recall --

13    (Indiscernible crosstalk.)

14    THE COURT:  Hang on.  One at time.

15    MR. MADDEN:  Mr. --

16    THE COURT:  You know what?  You finish.

17    MR. BLEGEN:  Okay.  Good.

18    THE COURT:  You still had another point to make.

19    Go ahead.

20    MR. BLEGEN:  I would like to address this point here.

21    THE COURT:  Yeah.

22    MR. BLEGEN:  I think we can look at the transcript,

23  but what I recall Mr. Hueston saying at the end is, "You,

24  Mr. Ketchum" --

25    COURT REPORTER:  Slow down.  Slow down.

1          MR. BLEGEN:  Sorry.

2          What I recall at the end is Mr. Hueston said, "You,

3    Mr. Ketchum, did not intend to defraud."

4          He never said, "Mr. Desai didn't intend to defraud."

5    That would have been, I assume, objected to by the government.

6    I'm pretty confident -- we can check -- that he did not say

7    that.

8          THE COURT:  Right.

9          MR. BLEGEN:  There are -- what I would request,

10   Judge, is that you read -- at a minimum, if you wouldn't mind,

11   take a look at the entire grand jury testimony.

12         THE COURT:  I did.

13         MR. BLEGEN:  Oh.  It is -- it is filled with

14   inadmissible evidence that are -- that are conclusions.  I

15   mean, I can -- I tabbed up some this morning.

16         On page 13, "Shah and Agarwal instructed me not to

17   reveal Outcome -- to Outcome's own salespeople that the

18   list-match results contained projections."

19         That would have been objected to at trial, and you

20   would have required some foundation for it.

21         THE COURT:  Isn't that cured by the

22   cross-examination?

23         MR. BLEGEN:  No, because it's -- it's inadmissible in

24   the first place.  It would have come in, in a different way.

25   That's why it's -- I mean --

1    THE COURT:  What -- give me the examples of
2    inadmissible testimony that was not already, in some ways,
3    covered through consistent statements on his direct
4    examination.
5    MR. BLEGEN:  Page 13.
6    MR. MADDEN:  It's only eight pages, isn't it?
7    THE COURT:  It's only eight pages.  I have the
8    attachment to their reply.  It's an eight-page statement.
9    MR. BLEGEN:  We're not putting in the grand jury
10   statement, I assume.  That was an exhibit to his testimony.
11   MR. MADDEN:  That's his sworn statement --
12   MR. BLEGEN:  No, That's --
13   MR. MADDEN:  He signed -- he signed it and read it to
14   the grand jury.
15   MR. BLEGEN:  Yeah.  And he also said -- excuse me.
16   They can't put in the exhibit, which is the
17   government-prepared statement.  They have to put in his actual
18   grand jury testimony.
19   THE COURT:  That I haven't seen --
20   MR. BLEGEN:  Well, that's what I --
21   (Indiscernible crosstalk.)
22   THE COURT:  I didn't know you wanted the whole thing
23   in.
24   MR. BLEGEN:  I'm sure it's substantially similar,
25   but --

1          MR. MADDEN:  It's the same.

2          MR. BLEGEN:  It's -- it's not the same.  There are

3    questions --

4          THE COURT:  Let's stop.  Let's go off the record for

5    a minute, because this is not helping.

6          (Off-the-record discussion.)

7          THE COURT:  We'll go back on the record.

8          Go ahead and complete your argument.

9          MR. BLEGEN:  Judge, I'm sorry, but I only have it

10   marked up by the actual grand jury testimony.  So I'll just

11   read the examples that I think are objectionable.

12         This one is on page 13 of the grand jury transcript.

13         MR. MADDEN:  Under which subheading, Pat?  Or what

14   topic?

15         MR. BLEGEN:  I didn't mark it up by topic, so that'll

16   take me a minute.  I don't have the statement tabbed up.

17         (Pause in the proceedings.)

18         MR. BLEGEN:  I'll just read it directly and then

19   it'll be in the record as to the part we're objecting to.

20         THE COURT:  Okay.  Do it slowly.

21         MR. BLEGEN:  From page 13 of the grand jury

22   testimony:

23         "For one thing, Shah and Agarwal instructed me not to

24   reveal to Outcome's own salespeople that the list-match

25   results contained projections."

1           THE COURT:  All right.

2           MR. BLEGEN:  This is on page 15 of the transcript:

3           "Based on my interactions with Shah and Agarwal

4    during 2012 and 2013, I believed they approved of the

5    misrepresentations being made to clients.  They wanted clients

6    to believe that Outcome had a higher number of doctors'

7    offices and devices installed as of the date of the list match

8    than Outcome really had."

9           THE COURT:  And I think when -- oh, go ahead.  Let

10   me -- you complete that.

11          MR. BLEGEN:  Page 17 of the transcript:

12          "When we agreed to do this, Shah and I -- Shah and I

13   intended to deceive the client."

14          18:  "Shah and Agarwal would say they never wanted a

15   client to see that there was a doctor or a device shortfall

16   because they did not want to have -- to have to answer."

17          Page 21:  "Shah and Agarwal instructed me on when and

18   how to pull list of offices to send to IMS.  Usually the list

19   pulled for IMS was in a doctor's office where the client's

20   advertisement actually played and did not include offices on

21   the list match sent to the client if those offices did not

22   actually receive advertising."

23          And that's the -- that's the list.

24          THE COURT:  All right.  Any additional argument?

25          MR. POULOS:  Yes, Your Honor.

1           THE COURT:  Well, from Mr. Blegen.

2           MR. BLEGEN:  So my -- the summary of my argument is

3    that, one, inadmissible testimony from the grand jury or from

4    the statement should be -- should not be allowed in as

5    evidence.

6           It's not -- my view is this is not a backdoor to get

7    in inadmissible evidence.  And the government should be

8    required to specify which parts of this statement are prior

9    consistent statements that were attacked based on one of these

10   reasons they're alleging to be attacked.

11          The entirety of the grand jury statement cannot be in

12   a prior consistent statement.  They should have to pick out

13   which parts and tell us which ones they are, and then we can

14   lodge objections to those if need be.

15          But the answer is not simply because a witness

16   testified in the way that they don't like that they,

17   therefore, get to put in the entirety of his grand jury

18   statement or testimony.

19          THE COURT:  Okay.  Thank you.

20          Mr. Poulos, briefly.

21          MR. POULOS:  Your Honor, I echo what Ms. Chou and

22   Mr. Blegen had said.  But I submit, Your Honor, that this is

23   not a situation contemplated by -- by the new -- any

24   modification of Rule 801, that as the Court's noted, his

25   testimony on direct examination was consistent with his

1   grand jury testimony.

2           There was no claim by any defense counsel that since
3   the grand -- that he's changed his grand jury testimony or was
4   impeached with his grand jury testimony.

5           In fact, the situation was, I think, essentially
6   this:  Mr. Hueston pointed out that when he came in the first
7   time and was interviewed without a lawyer present, he said
8   certain things.  Most specifically, he said that Rishi Shah
9   and Shradha Agarwal disclosed the fact of projections to
10  clients.

11          And then he -- that witness said -- and then
12  Mr. Hueston took him through, you got immunity, you got a
13  proffer letter, you got a lawyer, and then you got -- and then
14  you got immunity.  And then in the -- when you get -- by the
15  time you get to the grand jury, you changed what you said from
16  that first interview.

17          And he explained that the reason he changed from the
18  first interview was all the documents that the government had
19  shown him.  Defense counsel, through both Mr. Hueston and
20  Mr. Blegen, showed him other documents that the government had
21  not shown him.  And then it got to the point where the
22  government objected to the defense counsel pointing out that
23  the government had not showed him certain specific documents.

24          And so the entire basis of the cross-examination was
25  simply that he changed his testimony by the time he got to the

1  grand jury.  And -- and that was the issue, not that there had

2  been any change.  So the grand jury is not a prior consistent

3  statement to rebut anything that defense counsel did.

4        I submit, Your Honor, that what the rule contemplates

5  is only the first 302.  If they want to bring in and impeach

6  their own witness by statements that he had made in that first

7  proffer, so be it.

8        But the whole point was that the motive to fabricate

9  was after that, when he got his lawyer, when he -- when he got

10  the protections, even before that.  And then it changed into

11  the grand jury, and his grand jury was entirely consistent

12  with that.

13        Beyond that, Your Honor, I have a more narrow and

14  specific issue to raise.

15        Does -- Your Honor, do you have a copy of the written

16  statement?  Because that's all I'm working off of.

17        THE COURT:  Yes.

18        MR. POULOS:  Judge, if you go to page 7, the first

19  full paragraph, Your Honor, is as follows:

20        "It was also well-known to Shah, Agarwal, Purdy, and

21  me that the company was struggling to keep up with the growth

22  projections pushed by Shah and Agarwal.  The terms 'delta' and

23  'shortfall' were terms used by Shah, Agarwal, Purdy, and

24  others.

25        "Purdy and Shah used the terms frequently.  'Delta'

1  was used by Shah, Agarwal, Purdy, both in a broad

2  sales-related context, and also more specifically to refer to

3  the number of devices needed to make up existing delivery

4  shortfalls to clients."

5        And, Your Honor, I object to the government bringing

6  that paragraph into this redirect.  One, it is well beyond the

7  scope of any cross-examination.

8        MR. MADDEN:  We'll agree to that paragraph coming

9  out, Your Honor, so we can short-circuit that.

10        MR. POULOS:  Okay.

11        THE COURT:  All right.  And is there any -- well, any

12  additional argument, Mr. Poulos?

13        MR. POULOS:  Well, I appreciate that.

14        And then the other point, Your Honor, just for the

15  record, is Mr. Pruitt hasn't completed his cross-examination.

16  But you did see that Mr. Pruitt's cross-examination did not in

17  any way at all challenge his credibility or his prior

18  testimony or -- or any of that.

19        And I would ask that if the government is permitted

20  to go down this road that the jury be instructed that they

21  cannot consider this prior grand jury testimony against

22  Mr. Purdy in any way.

23        THE COURT:  All right.  Well, this goes to the issue

24  that Mr. Blegen raised about a severance.

25        Are you asking for a severance --

1      MR. POULOS:  I'm only asking for that --

2      THE COURT:  -- if I put this in?

3      MR. POULOS:  I'm only asking for the limiting

4   instruction, because I think the limiting instruction can cure

5   what I believe to be the prejudice, Your Honor.

6      THE COURT:  Mr. Blegen, you were going to consult

7   with counsel about whether you wanted a severance?

8      MR. BLEGEN:  We're going to need more than a couple

9   of minutes, Judge.  It's a pretty monumental request,

10  particularly if it's granted.  So can we have five minutes to

11  discuss it?

12     THE COURT:  Well, let's hear from the government in

13  response to the arguments.

14     MR. MADDEN:  First, Your Honor, the -- the defendants

15  are not really dealing with how broad this rule is now.  I

16  mean, the plain language of the statute is that the -- the

17  prior consistent statement comes in if it's offered -- this is

18  No. 2 -- "to rehabilitate the declarant's credibility as a

19  witness when attacked on another ground."

20         Another ground is not limited.  And since 2014, these

21  statements come in all the time, Your Honor.  And that was the

22  whole intent of amending the rule.

23         The first part of -- the first part of it led to

24  confusing discussions about when the motive to fabricate

25  began, inconsistent results, so they -- the rule writers

1   looked at that and broadened the rule because the reality is,

2   the bottom line is prior consistent statements given years

3   before testimony at trial do aid a jury in evaluating the

4   credibility after that person's credibility has been attacked.

5          It's hard to imagine someone who is more thoroughly

6   impeached by defense attorneys than Mr. Ketchum has been for

7   the last couple of days.  The -- Mr. Blegen seemed to think

8   that there needs to be an aggressive attack.  There doesn't

9   need to be an aggressive attack; it just needs to be

10  impeachment.

11         Mr. Blegen was the one who was saying, "That was ten

12  years ago, right?  You don't -- how could you remember that?"

13  He was -- and after -- they all benefitted from the aggressive

14  attack by Shah's attorney, right?  Once he's attacked by the

15  first person who cross-examines him, then the others can

16  benefit from that.  There's a softer attack, but it's an

17  attack nonetheless.

18         So those attacks on memory, "You didn't see these

19  documents; you don't remember those documents; you weren't

20  shown those documents," they all put this into play.  I'm

21  surprised the defense is so surprised by this.

22         It's such a given that we're going to seek to put

23  something like this into evidence after that type of attack on

24  him.  And really, all of their arguments -- and Mr. --

25  Mr. Poulos said the grand jury statement is consistent with

1  his testimony -- testimony on direct. It absolutely is.

2  Of course, it is.

3         And you -- you've -- you read this. You saw his

4  testimony. This is the same things that Ketchum said on the

5  stand as supported by documents. So to -- to cut -- you know,

6  to cut out all of these statements that they want doesn't make

7  sense. That's why you have the cross requirement.

8         They're going to -- I'm sure they're going to cross

9  him on it. They can. The jury should see this to understand

10 that four years ago, he sat in the grand jury under oath and

11 this is what he said.

12        MR. BLEGEN: Judge, can I make a couple of final

13 comments? I'm sorry.

14        THE COURT: Briefly. We're after 9 o'clock, so we're

15 going to start.

16        Go ahead.

17        MR. BLEGEN: Okay. First of all, we're not

18 discussing the actual statement being given to the grand jury

19 as an exhibit, are we? It shouldn't be given more prominence

20 than actual testimony. It should be read in, at most,

21 obviously --

22        THE COURT: Oh, yeah, no. I don't think there's a --

23 this is not a -- it's going to be read in. It's not going to

24 be an exhibit admitted into evidence.

25        MR. MADDEN: We've done that in past cases, but you

1  know --

2  THE COURT:  I -- I -- I don't understand why it

3  should be.  You're simply saying he said the following things.

4  It's -- why would we put -- what, we put the 302 in if that

5  was the prior inconsistent statement --

6  MR. MADDEN:  If --

7  THE COURT:  -- or prior consistent statement?

8  MR. MADDEN:  Well, we would -- I mean, that's not the

9  statement of a witness, so we would -- we're not asking for

10  that.  But, you know, when we move to admit evidence that's

11  not hearsay, whether it's in an email or something else, we

12  move to admit it, and the jury gets to see it.

13  MR. BLEGEN:  Secondly --

14  THE COURT:  Response?

15  MR. BLEGEN:  That -- first of all, then, I guess,

16  we'll ask to put the cross-examination transcript in.  That's,

17  frankly -- I -- I don't know that -- I -- you know, I know

18  Mr. Madden's in the building much more than I am, but this

19  does not happen all the time.

20  And -- and, thirdly, what Mr. Madden seems to be

21  suggesting from the rule is that any cross-examination opens

22  the door.  What -- what -- what could -- what could you

23  possibly do on cross-examination other than saying, "Gee, sir,

24  you're right," and sit back down that Mr. Madden would not say

25  falls under this new subsection.  It has to be an attack on

1  credibility, and I never did that.

2  I -- I tried to enhance his credibility. "Sir, it's

3  not your fault. You didn't see all the emails. You don't

4  remember all of them." That's not -- I --

5  THE COURT: Well, a --

6  MR. BLEGEN: I really think they chose those words

7  intentionally. It's not if you talked to a witness on cross,

8  therefore, his prior grand jury testimony comes in.

9  THE COURT: I'll go back to what I said at the start.

10  You challenged his memory --

11  MR. BLEGEN: Right.

12  THE COURT: -- and if he didn't remember -- attacks

13  on memory are attacks on credibility. And an attack on his

14  memory for not remembering something he wrote, although

15  understandable, is still an attack on his credibility.

16  MR. BLEGEN: I would say I refreshed his -- his

17  memory. I didn't attack it.

18  THE COURT: Well --

19  MR. BLEGEN: I helped him remember.

20  THE COURT: We're --

21  MR. BLEGEN: And that's a -- that's a difference.

22  THE COURT: -- we're fencing on words. I don't find

23  the difference substantive for purposes of this rule. You

24  attacked his credibility by challenging his memory. You can

25  attack credibility for a variety of reasons.

1          One, one that often happens in every case, is memory.

2    And you attacked it for that reason.  Whether you attacked it,

3    whether you challenged it, whether -- whatever words you want

4    to use, there was a -- in my mind, a -- using the words of the

5    rule -- an attack on his credibility as a -- and this is being

6    used to rehabilitate his credibility as a witness when

7    attacked on another ground.  The other ground can be an attack

8    on memory.  So they are rehabilitating him through this.

9          Now, I hadn't -- there's two issues you've raised,

10   which I haven't addressed, which is if there's inadmissible

11   testimony that would be -- if there was a lawyer in the

12   grand jury for the defendant and they objected, saying

13   foundation or some other objection, does that make the

14   statement -- is that something I have to rule on, or is that

15   cured by the ability of defendants to cross-examine the

16   witness on the statement he made in the grand jury?

17         And, two, does it come in as a piece of evidence, the

18   actual statement, or is it simply read?  You both disagree on

19   what is the common practice.  You both say, never; and he says

20   always.  I don't know how to resolve that other than, I

21   suppose, talk to some other judges and see what their practice

22   is.

23         The rule doesn't talk about -- I don't believe --

24   it's -- it's not hearsay.  But, you know, whether you can

25   offer it in -- the statement is not hearsay under this rule.

1 Whether you can offer in the statement as a document or simply
2 read it in, I'm not certain.

3 MR. HUESTON: Your Honor, may I just address that one
4 point?

5 THE COURT: Sure.

6 MR. HUESTON: I do think it's just unfair if he --
7 assuming it's coming in, he reads it. It's testimony like
8 anything else. It just becomes unfair to us then --

9 THE COURT: And I'll stop you right there. I -- I
10 agree.

11 MR. HUESTON: Okay.

12 THE COURT: I really think to put this in as a
13 document highlights a -- in effect, some testimony where
14 they're not getting transcripts of what he said on direct or
15 cross.

16 I think reading it is the fairer way of doing it so
17 it's not magnified as the one statement that they'll likely
18 have in their -- the jury when they deliberate. I don't know
19 they're going to get anything else back there that's in this
20 kind of form.

21 So unless you can point to me some case law that
22 supports it, I -- I agree with Mr. Hueston and what Mr. Blegen
23 raised earlier about the fact this be -- being read rather
24 than actually introduced where they can sit back in the
25 jury room and have the one -- the one thing they'll have back

1  there other than an email is this somewhat government-friendly
2  statement that contains a fair amount of information that were
3  he to read this in court as testimony would have been subject
4  to objection that I likely would've -- possibly could've
5  sustained or allowed -- certainly allowed a -- a reforming of
6  the question to make it permissible.

7  MR. HUESTON:  Your -- your --

8  THE COURT:  Hang on.  Mr. Madden is about to agree
9  with me, I think.

10  MR. MADDEN:  So I -- I think -- I want to talk to my
11  colleagues about it.  But, like, what we'd like to do -- I
12  mean, just as we present -- as we've done with all the other
13  evidence here, and the defense has, is put it up either on the
14  ELMO or on the -- you know, just so everyone can see it and
15  then read along with it.

16  And then I think that's -- I think that's enough.

17  MR. BLEGEN:  Why?  Why?  I don't under --

18  MR. MADDEN:  Why --

19  MR. BLEGEN:  I object to that.

20  MR. MADDEN:  Why?  Yeah, they did it with the
21  depositions.  They have thrown up so many things on the
22  screen, Your Honor, including deposition transcripts.

23  So, I mean, why would we be -- why are they
24  micromanaging how we get to publish our evidence?

25  THE COURT:  Yeah, I think this is within my

1  discretion.  I'm not going to allow the statement to go back

2  to the jury.  I will allow it to be displayed.  It's too long

3  to read in the sense that it's going to have any impact.

4        And they're allowed to put in evidence as I --

5  this -- I'm allowing it in.  And they're allowed to put it in

6  in the manner in which they choose.  Putting it up on an ELMO

7  is no different than deposition testimony that was displayed

8  to the jury.

9        And the jury won't have it back in the jury room.

10  It's not going to be admitted as a -- the statement itself as

11  a document admitted into evidence.  It's simply being read.

12        All right.  Anything else that hasn't been raised

13  already?

14        MR. POULOS:  Very briefly, Your Honor.  The -- I

15  appreciate what the government said about the paragraph and

16  issue I raised.  I'm sure that'll be redacted from what is

17  displayed.

18        My only question is:  Does the government intend to

19  not cover anything else?  Or do they intend to go over the

20  entirety of the rest of the statement?

21        MR. MADDEN:  I don't understand the question.

22        THE COURT:  I don't either.

23        MR. POULOS:  Well, he's agreed not to get into this

24  paragraph.  Is it the government's intent to cover everything

25  else --

1    MR. MADDEN:  Correct.

2    MR. POULOS:  -- or are they going to leave other --

3  certain parts out?

4    MR. MADDEN:  Correct.  We'll read -- other than that

5  paragraph, we'll read in either --

6    MR. POULOS:  That's all I wanted to know.  Thank you.

7    THE COURT:  All right.  And I think -- well, I think

8  that's appropriate.  It puts context into the particular

9  statements that are prior consistent statements.  And the

10  attack on credibility was general, in my mind, because it was

11  a general attack on his memory.

12    So that'll be the ruling.  I don't think we'll get

13  there quite yet anyway.

14    And do we have all our jurors?

15    THE CLERK:  We do.

16    THE COURT:  Okay.  Let's bring in the jury.

17    Let's have the witness retake the stand.

18    (Pause in the proceedings.)

19    COURT SECURITY OFFICER:  All rise.

20    (Jury in at 9:20 a.m.)

21    THE COURT:  All right.  Please be seated, ladies and

22  gentlemen.

23    Good morning.  We have a school group here today.  We

24  often get school groups visiting the courthouse to observe

25  what happens.  And why don't you stand up.  And they're from

1    Daystar Academy.  They're 7th graders.

2            And why don't -- Teacher, identify the school, where

3    you're at, and who the students are, what grade they are.

4            This can be off the record.

5        (Off-the-record discussion.)

6            THE COURT:  With that, you may continue.

7            You're still under oath, sir.  Do you understand?

8            THE WITNESS:  Yes, Your Honor.

9            THE COURT:  All right.

10            THE WITNESS:  Yes, Your Honor.

11            Sorry.

12        JASON KETCHUM, GOVERNMENT WITNESS, PREVIOUSLY SWORN

13                CROSS-EXAMINATION [resumed]

14    BY MR. PRUITT:

15    Q.  And good morning, Mr. Ketchum.

16    A.  Good morning.

17    Q.  I want to just reorient us a little bit to where we left

18    off yesterday.

19            We were talking about your training of Ashik Desai on

20    list match, correct?

21    A.  Yes.

22    Q.  And I believe you testified that part of that education

23    you gave Mr. Desai was showing him the mechanics of how to

24    match the pharmaceutical company's list to various lists and

25    databases that Outcome had -- right? -- to perform that match?

1    A.   Yes.

2    Q.   And one of the things you showed him was how to match the

3    pharma list to the list of live devices that Outcome had

4    operating at the time?

5    A.   Yes.

6    Q.   Another thing you showed him was the mechanics of then how

7    to also incorporate data from the member services database,

8    correct?

9    A.   Yes.

10   Q.   Okay.  And when called upon how to incorporate data from

11   member outreach if that was asked for?

12   A.   Yes.

13   Q.   So those were all things you trained Mr. Desai on?

14   A.   Yes.

15   Q.   Okay.  And so I want to just get into a little bit more

16   detail, because the jury is hearing so much about list match,

17   some of these, kind of, finer points, and so they can

18   understand some of that.

19        So you recall you would get lists from pharma clients

20   often in various different formats, correct?

21   A.   Yes.

22   Q.   And that would present challenges in trying to do the list

23   match, right?

24   A.   Yes.

25   Q.   And so just for some examples.

1    Some could have just like the doctor's name and a

2  ZIP code, correct?

3  A.  Yes.

4  Q.  And that's how they're trying to identify the doctor

5  they're trying to match with?

6  A.  Yes.

7  Q.  Other challenges might be they might have addresses that

8  provide a suite number, or they might not have a suite number,

9  right?

10  A.  Correct.

11  Q.  And they could have street written as "street" or they

12  could just have an abbreviation, right?

13  A.  Correct.

14  Q.  And even the punctuation could be a deviation.

15    You know, like, so if they had a period or a comma

16  misplaced, these are all things that would cause issues in

17  trying to do this match, right?

18  A.  Yes.

19  Q.  So part of what you would have to do or anyone doing the

20  list would do, do a lot of -- you know, to use a phrase,

21  "scrubbing," to try to make that data match up to make sure

22  you're getting a true match, correct?

23  A.  Yes.

24  Q.  And not missing things or misidentifying things between

25  those two lists?

1 A.  Correct.

2 Q.  Because those simple formatting issues could create

3 problems?

4 A.  Yes.

5 Q.  And I could tell from the look on your face, maybe

6 considerable problems?

7 A.  It could, yes.

8 Q.  Okay.  And the example I gave of, like, maybe a suite

9 number, for example, for an office, that might be on the

10 pharmaceutical company's list, but it might not be something

11 that Outcome had noted in its own database?

12 A.  It's possible.

13 Q.  So then you might have to do some homework in figuring

14 that out?

15 A.  Yes.

16 Q.  Okay.  Mr. Ketchum, the pharmaceutical list, the ones you

17 got from the pharmaceutical clients, those would sometimes, or

18 maybe often, contain a piece of information called an NPI

19 number.

20        Do you recall that?

21 A.  Yes.

22 Q.  Can you tell the jury what an NPI number is?

23 A.  Think of it like a social security number for doctors.

24 It's a unique identifier that is assigned to a physician and

25 doesn't change.

1  Q.  And so that's a way of knowing you have exactly the right

2  physician, correct?

3        Because like a social security number, it's unique to

4  that doctor?

5  A.  Correct.

6  Q.  And sometimes the pharma lists would have that, correct?

7  A.  Correct.

8  Q.  And sometimes they wouldn't?

9  A.  Correct.

10  Q.  And Outcome was the same in that regard, right?

11        Sometimes they had those numbers; sometimes they

12  didn't?

13  A.  Correct.

14  Q.  And Outcome tried for some time to try to get all the NPI

15  numbers they could for doctors, right?

16  A.  Yes.

17  Q.  Because that would make the matching process easier and

18  more accurate, right?

19  A.  Yes.

20  Q.  And throughout your tenure at Outcome, Outcome was

21  constantly trying to update and improve its systems and

22  processes, correct?

23  A.  Yes.

24  Q.  And we heard about how hundreds of employees were added

25  over time.

1    That's part of what those hundreds of employees were

2  working on, correct?

3  A.  Yes.

4  Q.  And so -- and part of that subset of what was being worked

5  on and improved over time was the list-match process itself,

6  correct?

7  A.  Yes.

8  Q.  And over time, it got better and more accurate, didn't it?

9  A.  Yes.

10  Q.  Mr. Ketchum, do you understand what I mean when I refer to

11  a "false positive" on a list match?

12  A.  I believe so.

13  Q.  And what do you understand that to mean in that context?

14  A.  If it appears as though the match is -- is -- it appears

15  as though there is a match, but upon further review you find

16  that the match is not actually a match.

17  Q.  And can you just tell the jurors so they understand, what

18  are some of the various ways that that might happen?

19    Some of the things we just talked about today,

20  for example?

21  A.  Yes.

22  Q.  Any other ways that could happen?

23  A.  Not that I really recall.  I think you were pretty

24  inclusive.

25  Q.  Some of those issues of formatting or incompleteness of

1  information, those are all things that would go into creating
2  some false positives occasionally?
3  A.  Yes.
4  Q.  And do you understand what I mean by a "false negative" on
5  a list match?
6  A.  Yes.
7  Q.  And can you tell the jury what that would mean?
8  A.  The exact opposite.  It looks as though there is not a
9  match, but upon closer inspection, there is.  I can give a
10  quick example.
11       You could have a Dr. Joe Johnson at -- two of them,
12  one on each list.  One practicing in Chicago, Illinois 60601,
13  and another practicing, perhaps, in Arlington Heights.  And
14  they -- it could actually be the same doctor practicing at
15  two different locations, because they -- you know, like my
16  kids' pediatrician is at two different locations.  She -- she
17  has two offices, so that -- that's possible.
18  Q.  And so these things you just talked about, false positive
19  and false negative, these are both ways in which a good
20  faith --
21       (Audio interruption.)
22  BY MR. PRUITT:
23  Q.  -- where a list match that Outcome is trying to do could
24  end up being inaccurate, right?
25  A.  It's possible.

1  Q.  And so efforts were made by you to try to make sure that

2  didn't happen?

3  A.  Yes.

4  Q.  And it's fair to say, I think, isn't it, sir, that that

5  was a constant kind of evolution in process to make that

6  process better and more accurate over time?

7  A.  Yes.

8  Q.  And, Mr. Ketchum, would you agree with me also that there

9  are various methods that people could use to try to arrive at

10  the most accurate list match possible, to exclude false

11  matches, false negatives, and false positives?

12  A.  Yes.

13  Q.  Okay.  Different people could approach that different

14  ways, correct?

15  A.  Yes.

16  Q.  Okay.  Mr. Ketchum, I want to move back to a second for a

17  document I asked you about yesterday.

18        MR. PRUITT:  And I'll ask Laura.  Could you put

19  Defense Exhibit 9007 on the screen.

20        This was previously admitted.

21  BY MR. PRUITT:

22  Q.  And, Mr. Ketchum, could we focus in on the second

23  paragraph that begins, "We will be installing."  And just take

24  a second to read that.

25        Okay.  So this email is from August of 2013.

1    And this is you speaking, correct?

2  A.  It is.

3  Q.  So you wrote, "We will be installing our exam room

4  tablets" -- excuse me -- "in two demo offices it looks like by

5  the end of this coming week.  If not, early the following

6  week.  We are very excited about this."

7    Right?

8  A.  Yes.

9  Q.  So just a few questions about that.

10    This was a pilot program that Outcome Health had for

11  these new tablets that were developed for exam rooms, right?

12  A.  Yes.

13  Q.  And these -- this new product was launched in 2014,

14  correct?

15  A.  That sounds right.

16  Q.  And as part of that launch, a lot of tablets were given to

17  clients as a value add.

18    Do you remember that?

19  A.  Yes.

20  Q.  And what that means by a "value add" is a lot of these

21  tablets are given to clients for free?

22  A.  Yes.

23  Q.  I want to make sure everyone understands when I'm using

24  the term "client."

25    What I mean here is what's actually been referred to

1  as members, the doctors' -- right? -- the doctors' offices?

2  A.  Yes.

3  Q.  Okay.  So Outcome gave out a fair number of these to those

4  folks for free?

5  A.  Yes.

6         MR. PRUITT:  Okay.  You can take that exhibit down.

7  Thank you.

8  BY MR. PRUITT:

9  Q.  And, Mr. Ketchum, coming back to a topic we talked about

10  yesterday.

11         We talked about invoices, we talked about affidavits,

12  and we talked about proofs of performance, right?

13  A.  Yes.

14  Q.  With respect to the invoices, based on your experience at

15  Outcome, Brad Purdy was not involved in preparing invoices,

16  was he?

17  A.  Not to my recollection, no.

18  Q.  And with respect to affidavits, Brad Purdy did not show

19  you or train you how to do those affidavits, did he?

20  A.  Not that I recall.

21  Q.  And during your time working on those, Brad Purdy was not

22  involved in the preparation of those affidavits, was he?

23  A.  Not that I recall.

24  Q.  And I think you talked about on direct concerns you may

25  have had about the truthfulness of affidavits or proofs of

1  performance.

2         You did not discuss any of those concerns with

3  Brad Purdy, did you?

4  A.  Not that I recall.

5  Q.  Mr. Ketchum, I just have a few questions for you about

6  another thing that we've heard a lot about which are these IMS

7  studies and those return on investment reports are also called

8  ROIs.

9         You testified on direct about how you were directed

10  to pull lists of doctors to send to IMS, and IMS then used

11  those to generate a slide deck.

12         And we saw some examples of those, right?

13  A.  Yes.

14  Q.  Brad Purdy did not train you on the process related to the

15  creation of IMS reports, did he?

16  A.  No, not that I recall.

17  Q.  And Brad Purdy did not tell you what doctors or

18  information to give to IMS, did he?

19  A.  No, not that I recall.

20  Q.  And Brad Purdy did not give you instructions to remove

21  offices from the list that might negatively impact on the ROI

22  numbers, did he?

23  A.  No, not that I recall.

24  Q.  Mr. Ketchum, Mr. Hankey asked you several questions about

25  an IMS study that was prepared for the Crestor campaign.

1      And we heard a lot about that, right?

2  A.  Yes.

3      MR. PRUITT:  Could we pull up Government Exhibit 167

4  that was previously admitted.

5  BY MR. PRUITT:

6  Q.  And I just have a few questions for you about this.

7      MR. PRUITT:  And can you zoom in on the top of that

8  exhibit, please.

9  BY MR. PRUITT:

10 Q.  So this is an email you sent to Rishi Shah, and you copied

11 Brad Purdy.  And the subject is "Crestor Deck."

12     And that's a reference to that Crestor IMS study that

13 we've talked about, right?

14 A.  Yes.

15 Q.  And can you just read what you wrote there, please?

16 A.  "RS, Brad asked that I forward this deck to you.  Let me

17 know if you have any questions."

18 Q.  So if I understand what you wrote, this is a copy of that

19 IMS study from the Crestor campaign.

20     Brad had given it to you and asked you to forward

21 that on to Rishi, correct?

22 A.  I think --

23     THE WITNESS:  Oh, I'm sorry; I lost my mic.

24 BY THE WITNESS:

25 A.  I believe so.

1  BY MR. PRUITT:

2  Q.  And you recall on direct that the government also showed

3  you Government Exhibits 168 and 169.  And you testified about

4  how it looks like that a certain slide no longer appeared in a

5  later version, right?

6  A.  That's correct.

7        MR. PRUITT:  Could we go to page 9 of this PDF.

8  BY MR. PRUITT:

9  Q.  This is that slide we were talking about, right?

10  A.  Yes.

11  Q.  So in the version of this presentation that Brad gave to

12  you and asked you to forward on, that slide was still in the

13  deck, correct?

14  A.  It was.

15  Q.  And I believe you testified during Mr. Hueston's

16  examination of you that, in fact, that top part of the slide

17  actually contained inaccurate information anyway, didn't it?

18  A.  It appeared to, yes.

19  Q.  Okay.  So you didn't believe that removing that

20  information was actually wrong at all, anyway, did you, upon

21  seeing?

22  A.  Upon seeing further documents, it looked as though there

23  was an error, yes.

24  Q.  So, to your knowledge, Brad Purdy did not change or alter

25  any information in this study in an improper way, correct?

1  A.  At this point, correct.

2  Q.  And you're not aware of him doing anything to this that

3  made it in any way deceptive to the client?

4  A.  No.

5  Q.  Just a few more questions, Mr. Ketchum.

6         During your time at Outcome, you did not observe

7  Brad Purdy executing sales contracts with pharmaceutical

8  clients, right?

9  A.  No.

10  Q.  You testified that certain individuals at Outcome did not

11  want clients to know about under-delivery on contracts, right?

12  A.  Yes.

13  Q.  Brad Purdy never asked you to hide under-delivery on a

14  contract from a client, did he?

15  A.  Not that I recall.

16  Q.  Mr. Ketchum, you did not have any conversations with

17  Brad Purdy where he directed you to lie to a client, correct?

18  A.  Not that I recall.

19  Q.  And, Mr. Ketchum, you did not have any conversations with

20  Brad Purdy where he directed you to do anything dishonest with

21  respect to an Outcome client, lender, or investor, correct?

22  A.  Not that I recall.

23         MR. PRUITT:  One moment, Your Honor.

24      (Pause in the proceedings.)

25         THE COURT:  Just make sure your mic's off over there.

1       MR. PRUITT:  Sorry, Your Honor.

2       THE COURT:  It's all right.  No, unless you want

3    everyone to hear what you were talking about.

4       MR. PRUITT:  I certainly did not.

5       THE COURT:  Yeah, okay.

6       MR. PRUITT:  Although, they're about to.

7       THE COURT:  Okay.

8       MR. PRUITT:  So thank you, Your Honor.

9       Apologies, everyone.

10   BY MR. PRUITT:

11   Q.  I wanted to clarify points.  I may have confused you and

12   everyone else.

13       With respect to those tablets we were talking about

14   that were rolled out, the pharmaceutical companies were not

15   charged anything with respect to those tablets, were they?

16   A.  For the pilot program?

17   Q.  For the pilot program.

18   A.  No.  I believe those were -- were free as well.

19   Q.  And when we -- when we referred to value add, part of that

20   is they're free to the pharmaceutical companies too?

21       They're not being charged for those?

22   A.  During the pilot program, I believe that's correct, yes.

23       MR. PRUITT:  Okay.  All right.  I think that's all I

24   have for you.  Thank you, Mr. Ketchum.

25       THE COURT:  All right.  Redirect examination.

1    MR. HANKEY:  Yes, Your Honor.

2        (Pause in the proceedings.)

3        THE COURT:  And then on the assumption you'll use

4    some exhibits, I'm going to switch this over to prosecution

5    PC.

6        There's no exhibit up right now, correct?

7        MR. HANKEY:  There is not.

8        THE COURT:  Okay.

9        MR. HANKEY:  I'm going to inquire with my counsel one

10   moment about how to display the first set of exhibits,

11   Your Honor.

12       THE COURT:  That's fine.

13       (Pause in the proceedings.)

14       THE COURT:  All right.  I have it off for the jury.

15       Is this an exhibit you want displayed?

16       MR. HANKEY:  It -- it is, Your Honor.

17       THE COURT:  All right.  And I think this was used

18   already so.

19       Is that correct?  Or is this a new exhibit?

20       MR. HANKEY:  It's going to be -- it's using some that

21   have been used, and then as we click through, some slides will

22   be new.

23       THE COURT:  All right.  Have these been shown to the

24   defense?

25       MR. HUESTON:  No.

1    MR. HANKEY:  We can -- we'll send it now.

2    THE COURT:  All right.  Well, we'll take it one at a

3  time.  You can all see this.

4        Any objection to this by the defense?

5        MR. HUESTON:  No, Your Honor.

6        THE COURT:  Anyone else?

7        MR. BLEGEN:  No.

8        THE COURT:  Okay.  Proceed.

9        MR. HANKEY:  Thank you, Your Honor.

10                   REDIRECT EXAMINATION

11  BY MR. HANKEY:

12  Q.  Mr. Ketchum, on cross-examination by counsel for Mr. Shah,

13  you were asked a series of questions about your prior meetings

14  with the FBI and government prosecutors.

15        Do you recall those questions?

16  A.  Yes.

17        MR. HANKEY:  Okay.  So if we could display

18  Slide No. 1, please.

19  BY MR. HANKEY:

20  Q.  Your first meeting with the government attorneys and FBI

21  was on August 9, 2018, correct?

22  A.  Yes.

23  Q.  And counsel for Mr. Shah referenced your first meeting

24  with the FBI a number of times.  He suggested that you told

25  the FBI that Rishi Shah and Shradha Agarwal disclosed both

1   installed numbers and growth to clients.

2           Do you recall those questions?

3   A.  I do.

4   Q.  Do you recall in your first meeting with the government on

5   August 9, 2018, that you told the government that in

6   hindsight, you knew that the list matches were not, quote, "On

7   the up and up" because Outcome Health matched doctors that

8   Outcome Health didn't have in their network?

9   A.  Yes, I do.

10          MR. HANKEY:  Could we go to the next slide, please.

11  BY MR. HANKEY:

12  Q.  That was your first meeting with the government when you

13  said that, right?

14  A.  Yes.

15  Q.  Before you had immunity?

16  A.  It was.

17  Q.  This is over four years ago that you said that list

18  matches at Outcome Health were not on the up and up, correct?

19  A.  Correct.

20  Q.  Do you recall in your first meeting with the government on

21  August 9, 2018, being asked about this email that I'll display

22  next, which is Exhibit 149?

23          MR. HANKEY:  It's in evidence.

24          Can you please click next.

25      (Counsel conferring.)

1  BY MR. HANKEY:

2  Q.  Okay.  Mr. Ketchum, do you see Exhibit 140 on your screen?

3  A.  Yes.

4  Q.  Do you recall in that first meeting with the government on

5  August 9, 2018, being asked about this email in Exhibit 149

6  and saying that, "In this instance, Shah didn't want Mons or

7  the pharma to know Outcome had sold growth"?

8  A.  Yes.

9       MR. HANKEY:  Okay.  Click next.

10  BY MR. HANKEY:

11  Q.  Shah's attorney talked about putting things in context

12  during cross-examination, didn't he?

13  A.  Yes.

14  Q.  But you saw one line out of your first meeting with the

15  FBI and were asked about it repeatedly.  Is that right?

16  A.  Yes, I believe so.

17  Q.  Would it surprise you that the FBI summary of your first

18  meeting with the government was approximately nine pages,

19  single-spaced?

20  A.  It would not.

21       MR. POULOS:  Objection.  No foundation.

22       THE COURT:  Sustained.

23       MR. BLEGEN:  Judge -- Judge, could we have a brief

24  sidebar?

25       THE COURT:  All right.

1           And for the students, what a sidebar is, is we talk

2    privately between the attorneys and me about evidentiary

3    issues to decide whether something ought to be admitted or not

4    in front of the jury.  So we put on headphones, turn on a

5    noise machine so that only we can hear it and the

6    court reporter can hear it.  But you're not going to be able

7    to hear it.

8           Okay.  Hang on.  Go ahead.  All right.

9        (Proceedings heard at sidebar on the record.)

10          MR. BLEGEN:  Judge, first of all, I know that some of

11   this is preliminary stuff, but there's been some leading.

12          But, secondly, these are prior consistent statements

13   that are not under oath and are not admissible for their

14   truth.  So I'd request a limiting instruction since -- I don't

15   know if you've ruled completely yet on the grand jury issue,

16   but that's a distinction.

17          These are not admissible for their truth, and there

18   should be -- we would request a limiting instruction to that

19   effect.

20          THE COURT:  All right.  Any objection from the

21   government on that?

22          MR. HANKEY:  No objection.

23          THE COURT:  All right.  What do you suggest the

24   instruction be?

25          MR. BLEGEN:  The...

1    MR. HANKEY:  Your Honor, we can offer a limiting

2  instruction.

3    THE COURT:  What would you suggest?

4    MR. HANKEY:  That the jury may consider these

5  statements as to whether or not he made them, but not for the

6  truth.

7    THE COURT:  That doesn't make any sense.  I -- let's

8  give one that will be helpful.  These statements go to

9  whether -- go to his credibility, but not as to the

10  truthfulness of the actual assertions made in these prior

11  statements.

12    MR. HANKEY:  Yes, Your Honor.

13    THE COURT:  Because really that's what the -- if it's

14  not for truth, it's -- it's for the effect on his credibility.

15    MR. HANKEY:  Yes.

16    THE COURT:  Defense agree to that?

17    MR. BLEGEN:  I was -- it's okay with me.  I know --

18  it's Mr. Hueston's area right now, so...

19    MR. HUESTON:  Yes.

20    MR. PRUITT:  Yes, Your Honor.

21    THE COURT:  Oh, you have to be at a mic.

22    MR. HUESTON:  Yes, Your Honor.

23    MR. PRUITT:  Yes, Your Honor.

24    THE COURT:  Okay.  Very good.

25     (Sidebar ended.)

1    THE COURT:  Ladies and gentlemen, I think we're going

2 to be getting into a series of statements that the witness

3 made in interviews with the government, either collectively or

4 with an agent or with the attorneys.

5    To the extent these statements are being offered,

6 they're not for the truth of what he said, but for you to

7 consider in terms of the credibility of the witness.  These

8 are not sworn statements he made during these individual

9 meetings and, therefore, they're being offered for the -- for

10 you to consider when you consider the credibility of the

11 witness.

12    But not for the truthfulness of the statements

13 themselves.  That may be for other statements that come up.

14 And if that's the case, I'll instruct you accordingly on that.

15 But this goes to credibility, not necessarily to the

16 truthfulness of the statements he made that are being offered

17 right now as statements he made during these interviews.

18    Proceed.

19    MR. POULOS:  May I have one moment?

20    THE COURT:  Yes.

21   (Counsel conferring.)

22    MR. POULOS:  Thank you, Your Honor.

23    THE COURT:  All right.  You may continue.

24 BY MR. HANKEY:

25 Q.  Mr. Ketchum, sticking with this first meeting, the meeting

1  in which you didn't have immunity, do you also recall that you

2  told the government that the list matches had a growth

3  projection of installed offices if Shah and Agarwal wanted a

4  projection?

5  A.  Yes.

6      MR. HANKEY:  We can click to the next slide, please.

7  BY MR. HANKEY:

8  Q.  Now, your second meeting with the government was in

9  December 2018.  Is that correct?

10 A.  Yes.

11 Q.  And you had no immunity at that time, and as you testified

12 before, you had a proffer letter agreement with the government

13 at the time?

14 A.  Yes.

15 Q.  That's not the same as the immunity that you received?

16 A.  I don't believe so, no.

17 Q.  Do you recall in your meeting with the government on

18 December -- December 13, 2018, that you told the government

19 that Agarwal indicated that she didn't want pharmas to know

20 that the list match contained projections?

21 A.  Yes.

22      MR. BLEGEN:  Judge, I'm going to object under

23 completeness and ask that they read that complete paragraph.

24      THE COURT:  All right.  You should.

25      Since it's all in the same paragraph, there's a

1  colorable argument it all relates to itself, to the statement

2  that was read, so without having seen it myself, unless

3  there's an objection by the government, you should read in

4  that whole paragraph.

5         MR. HANKEY:  Yes, Your Honor.

6         MR. BLEGEN:  Judge, starting with the word

7  "generally" is the -- the paragraph that I'm talking about.

8         THE COURT:  All right.  If you can direct Mr. Hankey

9  to it if you've got it there, unless you found it.

10  BY MR. HANKEY:

11  Q.  Mr. Ketchum, do you recall --

12         MR. BLEGEN:  One moment.  I'm going to direct him to

13  the paragraph, just so --

14      (Counsel conferring.)

15         THE COURT:  All right.  I assume you're -- okay.

16  BY MR. HANKEY:

17  Q.  Mr. Ketchum, I'm going to ask you if you recall saying

18  additional information in the same meeting.

19         I'll start with:  Do you recall saying that generally

20  Agarwal indicated she didn't want pharmas to know the

21  list match contained projections?

22  A.  Yes.

23  Q.  One way she did this was by excluding Outcome Health's

24  sales from emails discussing this?

25         THE COURT:  Hang on.

1          (Pause in the proceedings.)

2     BY MR. HANKEY:

3     Q.  Mr. Ketchum, do you recall saying at the second meeting

4     with the government that one way Ms. Agarwal did this was by

5     excluding Outcome Health's sales from emails discussing

6     projections?

7     A.  Yes.

8     Q.  In another way, throughout Agarwal's back-and-forth emails

9     with Ketchum and others, there was no mention of showing

10    projections to pharmas.

11         Do you recall --

12    A.  Yes.

13    Q.  -- saying that?

14         Do you recall saying, "If pharmas expected an

15    accurate representation from Outcome when they received a

16    list match"?

17    A.  Yes.

18         MR. HANKEY:  Let's click to the next slide, please.

19    BY MR. HANKEY:

20    Q.  Do you recall saying in that same meeting, Mr. Ketchum,

21    that you told the government that Shah and Agarwal said they

22    never wanted the pharma to see there was a doctor or device

23    shortfall because they didn't want questions from pharma?

24    A.  Yes.

25    Q.  And that was in that same meeting years ago, correct?

1  A.  Yes.

2  Q.  Okay.  Now, Mr. Ketchum, in your cross-examination by

3  Mr. Shah's counsel, he showed you some emails --

4          MR. HANKEY:  We can take that down.

5  BY MR. HANKEY:

6  Q.  -- he showed you some emails by your coworkers who were

7  critical of you.

8          Do you remember that?

9  A.  Yes.

10 Q.  Had you seen all of those emails before?

11 A.  No.

12 Q.  Were some of them new to you?

13 A.  Yes.

14 Q.  Was it hard seeing some of those emails?

15 A.  At this point in time, no, not really.

16 Q.  Were Shah and Agarwal aware of some of those criticisms of

17 you?

18 A.  They were on the emails, so yes.

19 Q.  Yet they kept you at the company until 2018?

20 A.  Yes.

21 Q.  When did you start at Outcome?

22 A.  2011.

23 Q.  Did you leave after Mr. Shah, Ms. Agarwal left the

24 company?

25 A.  I believe -- I belive so, yes.

1    Q.  What was your first job at Outcome?

2    A.  Member services executive.

3    Q.  And how many employees were there at the time?

4    A.  If I recall properly, less than 20.

5    Q.  And were you eventually promoted from member services

6    executive to another position?

7    A.  Yes.

8    Q.  Who promoted you?

9    A.  The management team, Rishi and Shradha included.

10   Q.  Can you remind the jury of the jobs that you had at

11   Outcome over time?

12   A.  Yes.  I was a member services executive.  I was member

13   services team lead, member services manager, the head of

14   member experience and operations, general manager of

15   integrated health systems, senior director of strategy.

16          And then I'm not entirely sure my last role.  I had a

17   particular title when I was on people team.

18   Q.  And what was the people team?

19   A.  That's HR, human resources.

20   Q.  Now, I want to talk a little bit about the questions you

21   were asked about emails that you saw and didn't see.

22          Do you remember being asked many times on

23   cross-examination if you were ever shown one email or another?

24   A.  Yes.

25   Q.  During your time at Outcome, you sent and received a lot

1  of emails, correct?

2  A.  Yes.

3  Q.  How many do you think you sent and received every year, if

4  you had to guess?

5  A.  Oh, wow.  I do remember Travis Kemp at one point in time

6  had looked at a number of emails that were sort of processed

7  person by person daily.  And then at one point in time, it was

8  over 400 for me daily.  I don't -- but that was during a

9  shorter period of time.  It was a lot, a lot of emails.

10  Q.  At one point in time, over 400 emails a day?

11  A.  Yeah, yes.

12  Q.  And you reviewed a lot of emails during your interviews

13  with the government?

14  A.  Yes.

15  Q.  The government showed you many emails during those

16  meetings?

17  A.  Yes.

18  Q.  Would you say hundreds?

19  A.  Yes.

20  Q.  Do you remember every document that you were shown by the

21  government in your interviews?

22  A.  No.

23  Q.  And in the meetings leading up to trial?

24  A.  No.

25  Q.  Are you sure you can recall all of the emails and

1  documents that you saw in your meetings with the government?

2  A.  No, not all.

3  Q.  I'm going to shift gears to salespeople and projections

4  and questions you were asked about what salespeople were told.

5       Do you remember being asked on cross about your

6  testimony regarding salespeople being aware of projections or

7  not being aware?

8  A.  Can you rephrase the question?  Sorry.

9  Q.  Yeah.

10      Do you remember during cross being asked questions

11  about whether salespeople were told about projections included

12  in list matches?

13  A.  Yes.

14  Q.  And defense counsel pointed out a number of times that

15  when salespeople were made aware of projections, either in

16  advance or after a sale --

17  A.  They did.

18  Q.  -- right?

19      That was also covered on your direct?

20  A.  It was.

21      MR. HANKEY:  Now, Ms. Paul, could we please put up

22  Government Exhibit 140.

23  BY MR. HANKEY:

24  Q.  Do you recall seeing this email?

25  A.  Yes.

1    MR. HANKEY:  Let's start at the bottom.  Let's walk

2  through it, if we could, Ms. Paul.

3  BY MR. HANKEY:

4  Q.  So it starts with Mr. Mons sending an email to

5  Lyndon Chin, Thomas Coyle, and Pete Regan at RJ Palmer, right?

6  A.  Yes.

7  Q.  And they represented Pradaxa and some other clients?

8  A.  Yes.

9  Q.  And it's sent by Bob Mons, right?

10  A.  Yes.

11  Q.  Mr. Mons writes, "Lyndon, great seeing you guys today.

12  Thanks for making time.  Per Pete's request, attached is an

13  overview for Whit.  We are rock solid in the DPP4 category.

14  70 percent new scripts written NBRx in DPP4s come from our

15  member practices.  For many of the reasons articulated in our

16  conversation over lunch, we are a much better value for pharma

17  sponsors than HealthBridge POC."

18    Did I read that correctly?

19  A.  You did.

20  Q.  Then he has a couple of bullets here, and down below, he

21  says, "Pradaxa, I will have Jason run a new match so you can

22  get the benefit of sites added that are in your sweet spot.

23  Thanks for update on MLR status.  Please continue to keep us

24  posted."

25    Do you see that?

1  A.  Yes.

2        MR. HANKEY:  Okay.  Let's go to the next email.

3  BY MR. HANKEY:

4  Q.  Now, does Rishi Shah respond after that email?

5  A.  Yes.

6  Q.  He writes, "Hey, guys.  For Pradaxa, we already factored

7  in our growth in the initial match, but when Bob learned over

8  lunch last Thursday that Pradaxa is likely going to start in

9  March, he suggested rerunning the match to see if we picked up

10  any more physicians."

11        Did I read that correctly?

12  A.  Yes.

13  Q.  And then he wrote, "This doesn't make sense since we

14  already aggressively factored in for gains in new practices."

15        Is that right?

16  A.  Yes.

17  Q.  Then he says, "SA."

18        That's Shradha Agarwal?

19  A.  Yes.

20  Q.  He asks, "Does Bob know our match was projected?"

21        Is that what he asked?

22  A.  It is.

23  Q.  "Didn't want to copy him on this so he doesn't get

24  confused, but not sure how we should follow up on that point."

25        Did I read that correctly?

1  A.  Yes.

2  Q.  And then he refers to "having asked Jason to rerun below."

3        Do you see that?

4  A.  Yes.

5  Q.  "We could maybe add a few or just say it wasn't too many,

6  and we may be better off rerunning and reporting later in the

7  year."

8        Is that what he asked?

9  A.  Yes.

10        MR. HANKEY:  Okay.  Let's look at the next email.

11  BY MR. HANKEY:

12  Q.  Does Ms. Agarwal reply?

13  A.  She does.

14  Q.  And she writes, "I'm not sure in this particular case,

15  but, generally, the team doesn't know it's a projection

16  because they get confused about how to represent it.  Even

17  though they need not say it any differently.  Agree with you

18  on just adding a few names at some actual matched

19  prescribers/sites that we've since installed that may not have

20  been on our original projection list."

21        Did I read that correctly?

22  A.  Yes.

23  Q.  Now, you were asked earlier about emails showing that

24  Mr. Mons made mistakes from time to time in Word --

25  A.  Yes.

1  Q.  -- right?

2        Do you see this response in Shradha Agarwal's email

3  that says, "They get confused about how to represent it, even

4  though they need not say it any differently."

5        Do you see that?

6  A.  Yes, I do.

7  Q.  Let's see the response.

8        This is Rishi Shah, right?

9  A.  Yes.

10  Q.  He writes, "Sounds good.  Action item.  JK, submit please

11  projection, but add to it any newly signed up offices now

12  installed or in MS pipeline that weren't already installed or

13  projected.  Thanks."

14        Do you see that?

15  A.  Yes.

16        MR. HUESTON:  Your Honor, I'm going to object at this

17  point.  This is a rehash of the document Mr. Hankey went

18  through with virtually the same questions on direct, which I

19  understand is out of bounds here for a redirect.

20        THE COURT:  Well, did this relate to areas of cross?

21        MR. HANKEY:  It does.

22        THE COURT:  It was -- there were other emails putting

23  this email that defense argued put this in context.  Is that

24  correct?

25        MR. HANKEY:  That -- that's what they argued.

1         THE COURT:  Overruled.

2    BY MR. HANKEY:

3    Q.  Okay.  Let's shift gears to Humira.

4         Do you remember being asked a series of questions

5    about the Humira campaign?

6    A.  Yes.

7    Q.  In 2013?

8    A.  Yes.

9         MR. HANKEY:  Let's display Exhibit 137, please.

10   BY MR. HANKEY:

11   Q.  Let's just go through this quickly, starting with the

12   first email in the bottom.

13        This is an email you wrote on February 8, 2013, to

14   Rishi Shah, correct?

15   A.  Yes.

16   Q.  And you wrote, "Jim and I just wanted to double-check with

17   you about the Humira POP.  We are contracted for 480 sites.

18   Currently we have 419."

19        Did I read that right?

20   A.  Yes.

21   Q.  "What do you recommend we send them for addresses to fill

22   in the gap?  We include CM PCP offices, or should we send them

23   offices from outreach?"

24        Did I read that correctly?

25   A.  Yes.

1    MR. HANKEY:  Let's go to the response.

2  BY MR. HANKEY:

3  Q.  Mr. Shah responds and says, "Thanks, Jay.  There isn't a

4  great answer available here."

5    Did I read that right?

6  A.  Yes.

7  Q.  "I know we've added a number of new rheum sites lately so

8  I would encourage us to use the MS pipeline and get any new

9  rheums MO has cleared into the database.  After that, I think

10  using CM group PCP sites is the best option."

11    Is that right?

12  A.  Yes.

13    MR. HANKEY:  Let's display Demonstrative

14  Exhibit 1086, which we've shown before.

15  BY MR. HANKEY:

16  Q.  Mr. Ketchum, do you remember this demonstrative?

17  A.  Yes.

18  Q.  This is the various stages of inventory?

19  A.  Yes.

20  Q.  Member services on the right; member outreach on the left?

21  A.  Yes.

22  Q.  And for a time -- well, you were initially a member

23  services executive, so you worked in member services when you

24  started at the company?

25  A.  Yes.

1    Q.  And then at some point, you were promoted to lead member
2    services, correct?
3    A.  Yes.
4    Q.  Now, what is the member -- what is the MS pipeline and
5    what are the various stages of the pipeline?
6    A.  The member services -- I'm sorry.
7         The member services pipeline is once member outreach
8    gets a sign-up form from the doctor's office, that doctor's
9    office moves to member services.
10        There's a series of stages that are in the process of
11   getting installed, so unconfirmed is one of them.  That's
12   where the member services representative has to reach out to
13   the office and -- and, sort of, say, "Hey, we got your sign-up
14   form.  We just want to make sure the information on the form
15   is accurate.  You do want the system."
16        And then begins the -- the process of project
17   managing the installation.  So then it goes to confirmed on
18   scheduled or confirmed scheduled.  If you're able to schedule
19   with the office to have the system installed, you can move it
20   to confirmed scheduled.
21        If the office confirms but there's some more
22   logistics that needs to be done, more conversation with the
23   member services representative and the doctor's office staff,
24   then it would go to confirmed unscheduled.  And then a series
25   of stages that move through to installed.

1    THE COURT:  All right.  Let's go off the record for a

2  minute.

3       (Off-the-record discussion.)

4       THE COURT:  Back on the record.

5       Please proceed.

6       MR. HANKEY:  Thank you, Your Honor.

7  BY MR. HANKEY:

8  Q.  Mr. Ketchum, the email that we looked at referred to

9  this -- the email in Exhibit 137 referred to the MS database,

10  correct?

11  A.  Yes.

12       MR. HANKEY:  Why don't we put that up -- could we put

13  that up side by side with 1086.

14  BY MR. HANKEY:

15  Q.  Do you see that there at the end of Mr. Shah's email where

16  he says, "He would encourage us to use the MS pipeline and get

17  any new rheums MO has cleared into the MS database"?

18  A.  Yes.

19  Q.  Now, thinking about those stages of member services --

20  right? -- that we just walked through leading up to

21  installation, "New rheums, MO has cleared into the MS

22  database."

23       At what point in the chart that we're looking at on

24  the left at 1086 is that occurring when new rheums are being

25  cleared into the MS database?

1   A.  If the jury sees where the arrow is going over the line,

2   visually think of that line as a wall, from going from member

3   outreach to member services.  So it's the very beginning

4   stages of member services.

5   Q.  So what are the first one or two stages that those rheums

6   would've entered into in member services?

7   A.  Unconfirmed, confirmed unscheduled.  Depending on the

8   situation, it could be pending IT; it could be pending

9   competitor removal; could be confirmed scheduled.  Those --

10   those are the primary ones removed to.

11   Q.  Did any of those stages that you just mentioned, do they

12   involve an actually installed device at that point in time?

13   A.  No, no.

14   Q.  So when MO clears new rheum sites into the MS database,

15   those aren't installed yet, correct?

16   A.  That's correct.

17   Q.  And, of course, member outreach -- if a device -- if an

18   office is in member outreach, how many of -- what's the chance

19   that those offices would have installed devices in them?

20   A.  I'm sorry.  Do you -- I didn't quite catch the last part

21   of the question.

22   Q.  If an office is in member outreach, which is on the left

23   side of the part --

24   A.  That's correct, yes.

25   Q.  -- are -- is -- does it have a device installed in it yet?

1   A.  No.

2   Q.  And if an office doesn't have a device installed, can it

3   actually play an ad?

4   A.  It cannot.

5   Q.  So these offices that would be cleared from MO into the

6   MS database wouldn't be playing ads, correct?

7   A.  Correct.

8   Q.  Wouldn't be able to play any ads until member services

9   actually completed the installation in those offices?

10  A.  Yes.

11  Q.  Now, in your cross-examination, you were asked about

12  Travis Kemp pushing the Humira ad out on February 1, 2013.

13          Do you remember seeing that email?

14  A.  Yes.

15  Q.  So just to level-set ourselves, bring ourselves back to

16  this discussion about Humira and it being originally -- it

17  being scheduled in February of '13, do you recall that the

18  first Humira contract called for 325?

19          Do you remember that?

20  A.  Yes.

21  Q.  So the amount that was being addressed in this -- these

22  questions about Mr. Kemp pushing sites out in February related

23  to an additional amount on top of the 325?

24          Do you remember that?

25  A.  Yes.

1    MR. HANKEY:  And just so we're clear on what we're

2  talking about, let's look at Exhibit 3052, which is the email

3  that we had been discussing.

4  BY MR. HANKEY:

5  Q.  Is this the email that you recall looking at during this

6  part of your cross?

7  A.  Yes.

8  Q.  And then further down, if we look at the bullets, at the

9  fifth bullet down, the Humira addition, 155 sites.

10    Do you see that?

11  A.  Yes.

12  Q.  That's what was focused on during your cross, right?

13  A.  Yes.

14    MR. HANKEY:  Now, let's look at Exhibit 107.

15  BY MR. HANKEY:

16  Q.  And just -- let's start from the bottom of this so that we

17  can look at the whole thing.

18    107 starts with an email from Ms. Agarwal on

19  January 22nd, correct?

20  A.  Yes.

21  Q.  And she writes, "Hey, guys.  Humira wants to expand their

22  program with us.  After looking at -- and after looking at

23  Quickbase numbers, I quoted them an additional 155 screens as

24  they want to make it happen this quarter.

25    "They'd like to see an Excel spreadsheet of the

1  325 sites they've currently purchased and now the additional

2  155 sites they could purchase."

3          Did I read that correctly?

4  A.  Yes.

5  Q.  "They emphasized a couple of times that no PCP, only

6  rheum."

7          Is that right?

8  A.  Yes.

9  Q.  "Jay, can we have both these lists pulled ASAP?  P.S.:

10  Ignore that they have a one-month additional run on some

11  60-ish screens.  You can include these screens in the

12  155 list."

13          Did I read that correctly?

14  A.  Yes.

15          MR. HANKEY:  Okay.  Let's go up to the next email.

16  BY MR. HANKEY:

17  Q.  Did you reply?

18  A.  Yes.

19  Q.  And you wrote, "Shradha Agarwal, lost you on chat there,

20  not sure if you are mobile, so lost the connection.  A few

21  questions I have to make -- I have to make sure we do this

22  right.  Right now Humira is in 325 sites.  Those sites have a

23  total of 363 screens."

24          Do you see that?

25  A.  Yes.

1    Q.  "If Humira wants offices with rheums, then we have a total

2    of 387 sites with a rheum with a total of 440 screens."

3           And you write, "Our total RHN network, including

4    MS pipeline, has 417 with 478 screens.  I just want to make

5    sure what we send out doesn't raise any eyebrows."

6           Did I read that correctly?

7    A.  Yes.

8    Q.  Now, you needed 480 for the contract to start February 1.

9           Do you recall that?

10   A.  I do.

11   Q.  That's the 325, plus the 155 additional sites?

12   A.  Yes.

13   Q.  "And at this time, Outcome only had 387 sites with a rheum

14   with a total of 440 screens."

15          What does that mean, "387 sites with a rheum"?

16   A.  387 doctors' offices that have a rheumatologist practicing

17   at that office.

18   Q.  And that relates to what Ms. Agarwal wrote where the

19   client emphasized they only wanted rheums, not PCPs?

20   A.  Yes.

21   Q.  And then you write, "Our total RHN network, including

22   MS pipeline, has 417 with 478 screens."

23          What was the RHN network?

24   A.  That was the subnetwork or the network for rheumatology

25   health, Rheumatology Health Network.  So doctors' offices that

1  were rheumatologists or doctors' offices that would want

2  rheumatology programming.

3  Q.  Why is there a difference between the number -- let's say,

4  start with the number of sites, 417 for the RHN network and

5  387 for the offices with rheums?

6  A.  The -- so two -- two reasons.  One, the 417 includes the

7  MS pipeline.  And, two, Humira -- it was mentioned by

8  Ms. Agarwal that Humira wanted sites that only had

9  rheumatologists.  And so I included the number of sites that

10  had rheumatologists that were practicing there.

11  Q.  And, again, the target where you were attempting to reach

12  here was 480, correct?

13  A.  Yes.

14  Q.  So short either way.

15       Short on the number of sites?

16  A.  Yes.

17  Q.  And either way, short on the number of screens?

18  A.  Yes.

19       MR. HANKEY:  Now, let's look at Exhibit 112.

20  BY MR. HANKEY:

21  Q.  Do you remember seeing this, Mr. Ketchum?

22  A.  Yes.

23  Q.  Now, this is also sent on January 22nd to Ms. Agarwal and

24  Mr. Shah where you're attaching an Excel file "CM Sites For

25  Humira."

1    Do you see that?

2  A.  Yes.

3  Q.  And you write, "Shradha Agarwal and Rishi Shah, attached

4  is a spreadsheet with two tabs.  Tab 1 includes the 325 sites

5  that Humira is currently live on.  Tab 2 includes

6  155 additional rheum sites that are currently available.

7  Please let me know if you have any questions."

8    Did I read that right?

9  A.  Yes.

10    MR. HANKEY:  Now let's look at the attached list.

11  BY MR. HANKEY:

12  Q.  And do you see that there are two tabs on this list that

13  you included?

14  A.  Yes.

15  Q.  And the first tab is clinics.  Is that right?

16  A.  Yes.

17    MR. HANKEY:  Okay.  Let's scroll down slowly, please,

18  Ms. Paul, so we can review this.

19  BY MR. HANKEY:

20  Q.  And what's the number of lines we see here on this

21  spreadsheet?

22  A.  It goes down to 326.

23  Q.  And how many unique -- or how many addresses appear on

24  here?

25  A.  325.

1        MR. HANKEY:  Now let's go to available inventory.

2            And if you could, Ms. Paul, just scroll to the bottom

3    so we can see where it goes.

4    BY MR. HANKEY:

5    Q.  What are we looking at here, Mr. Ketchum?

6    A.  Sites that are -- a list of sites that are included to

7    appear as available inventory.

8        MR. HANKEY:  Now let's look at -- if we could,

9    Your Honor, just display for the Court and the parties

10   Exhibit 111, which is not in evidence yet.

11           The government's offering this under 801(d)(2)(E).

12           THE COURT:  Any objection?

13           MR. HUESTON:  No objection.

14           MR. BLEGEN:  No objection, Your Honor.

15           MR. PRUITT:  No objection, Your Honor.

16           THE COURT:  Okay.  It's admitted without objection.

17       (Said exhibit admitted in evidence.)

18   BY MR. HANKEY:

19   Q.  Now, Mr. Ketchum, do you see at the bottom of this email

20   the original email that she sent?

21   A.  Yes.

22   Q.  And then if we look at the next email, Mr. Shah says,

23   "Thanks so much, Jason.  Were you able to verify what we

24   discussed within the MO database?"

25           Do you see that?

1   A.  Yes.

2   Q.  And then what do you respond after that?

3   A.  Would you like me to read it?

4   Q.  Do you see that you wrote, "I excluded all offices where

5   different variations of what we discussed were present.  Full

6   name, partial name, nickname, et cetera.  This method

7   eliminated over 1,000 offices.  I spot-checked some of them,

8   and the point of discussion was present.

9        "So that was the right way to do it.  There is a drop

10  box -- down box in outreach that the sales guys use, so the

11  method I used would've caught that as well as catching

12  anything that fell through the cracks of that drop box.  Makes

13  sense?"

14        Did I read that correctly?

15  A.  Yes.

16        MR. HANKEY:  Let's look at what happens next.  So if

17  would could display, Your Honor, for the Court and the

18  parties, Exhibit 1157.

19  BY MR. HANKEY:

20  Q.  And, Mr. Ketchum, again, to be clear, "member outreach"

21  means screens are not installed yet, correct?

22  A.  Correct.

23        MR. BLEGEN:  Judge, I -- is this an admitted exhibit?

24  I, frankly, don't remember.

25        MR. HANKEY:  It is not.

1          THE COURT:  It is not.  The basis of admission?

2          MR. HANKEY:  We're offering it as nonhearsay,

3    Your Honor.  We're focused on the -- we're focused on the

4    portion --

5          MR. BLEGEN:  Could we have a sidebar, Judge?

6          THE COURT:  Yeah, sure.

7          (Proceedings heard at sidebar on the record.)

8          THE COURT:  Okay.

9          MR. HANKEY:  Your Honor, these are being offered as

10   verbal acts.  They're questions and requests.  And then any

11   assertions in here are just strictly for context.

12         THE COURT:  Since I don't have the exhibit in front

13   of me, why don't you explain what -- are you offering the

14   whole exhibit or parts of it?

15         MR. HANKEY:  We're offering the whole exhibit.

16         THE COURT:  All right.  In 30 words or less, what

17   does it say and who's on it?

18         MR. HANKEY:  Yeah.  So Travis Kemp is on it, as is

19   Matt Crandall, the salesperson.  And Rishi and Shradha are

20   also on it.  So it also affects, you know, their knowledge of

21   what's happening.

22         THE COURT:  Well, you can offer it as admissions if

23   they're on it.

24         MR. HANKEY:  They're not making any statements.

25         THE COURT:  I see.  They're just copied.

1          MR. HANKEY:  That's right.

2          THE COURT:  Okay.

3          MR. HANKEY:  And what happens is Mr. Kemp is asking

4   for clarification on how to schedule the 155 offices.  He asks

5   if there's a list match, in which case he'll need it to

6   schedule it to the offices.  Or if it just needs to be pushed

7   out to the entire -- I can't recall the exact phrasing,

8   Your Honor, but rheum -- rheum -- rheum network.

9          THE COURT:  All right.

10         MR. HANKEY:  And then he's told that there's not a

11  list match.

12         THE COURT:  Any objection?

13         MR. BLEGEN:  Judge, I need to see the exhibit.  I

14  take it we're not getting exhibits in advance for redirect?

15         MR. HUESTON:  That's my problem, Your Honor.  I don't

16  understand this.

17        (Indiscernible crosstalk.)

18         THE COURT:  Do you have more exhibits you're going to

19  be using that are not already in evidence on redirect?

20         MR. HANKEY:  Oh, we may have a couple more, and I --

21  I think we did disclose them.

22         MR. HUESTON:  When?

23         MR. HANKEY:  We didn't.  We didn't.  But our intent

24  was to disclose them after cross ended.

25         THE COURT:  All right.

1      MR. HANKEY:  It's a very small number of these total
2  exhibits.
3      THE COURT:  Here's -- here's what we'll do.  We'll
4  take our morning break a little early.  And in the meantime,
5  you can disclose these to the defense.  Email the -- to them.
6  Meet and confer in the next 15 minutes or 20.  We might have a
7  little longer break right now and see if we can get these
8  admitted by agreement or we can state the basis of the
9  objection so that we all can see what these are.
10      MR. HANKEY:  All right.
11      THE COURT:  You think there's about three or four
12  more?
13      MR. HANKEY:  Yes.
14      THE COURT:  Okay.  Then that shouldn't take too long.
15      UNIDENTIFIED SPEAKER:  Your Honor?
16      THE COURT:  And -- yes?  Did someone else want to say
17  something?  All right.  I thought someone did.
18      But all right, we'll take our morning break and make
19  that disclosure now.  The witness is on redirect.  You can
20  certainly turn these over to the defense, if they're not
21  already admitted.  Those you don't have to go through.
22      MR. HANKEY:  Yes, Your Honor.
23      THE COURT:  Okay.
24      MR. HANKEY:  Thank you.
25      (Sidebar ended.)

1    THE COURT:  All right.  We're going to take our break

2  a little earlier today to allow the attorneys to meet and

3  confer on some exhibits so we're not sitting here with you

4  just listening to the noise and us talking.

5    So we'll take our break.  It might be -- it'll be

6  about 15 minutes; it might be 20.  But we'll do our morning

7  break right now.

8    Please don't discuss the case among yourselves or

9  with anyone else and keep an open mind as there is more

10  evidence to hear.

11    COURT SECURITY OFFICER:  All rise.

12    (Jury in at 10:24 a.m.)

13    THE COURT:  All right.  Please be seated.

14    Sir, you're on redirect examination.  You're free to

15  discuss your testimony with the government if you choose to do

16  so or if they want to talk to you, you can do that.

17    What I'd ask the parties to do over this break is the

18  government to disclose to the other side all the exhibits that

19  are not already in evidence that you intend to use on redirect

20  examination.  Meet and confer, and when I come back, you can

21  tell me if there's objection, and we can try and resolve it

22  outside the presence the jury.

23    MR. HANKEY:  Yes, Your Honor.

24    (A recess was had from 10:25 a.m. to 10:46 a.m.)

25

1    THE COURT:  Okay.  We're back on the record.  Did the

2  government disclose the exhibits they're going to use on

3  re-examination to the defense?

4    MR. HANKEY:  We did, Your Honor.

5    THE COURT:  All right.  And is there any disagreement

6  on any of those?

7    MR. HUESTON:  No.

8    MR. PRUITT:  No, Your Honor.

9    MR. BLEGEN:  Judge, they said the only new one they

10  have is the one that had just popped up on the screen.

11    THE COURT:  Okay.

12    MR. BLEGEN:  And we do not object to that one.

13    THE COURT:  Okay.  For any purpose, just admitted

14  substantively?

15    MR. BLEGEN:  Yes.

16    THE COURT:  Okay.  What are the exhibit numbers?

17    We can get the jury while we're doing this.

18    MR. HANKEY:  1157, Your Honor.

19    THE COURT:  And that's the only one that's not

20  already in evidence.

21    MR. HANKEY:  That's correct.

22    THE COURT:  All right.  That will be admitted without

23  objection.

24    We'll bring in the jury.  Thank you.  And there's a

25  couple of papers back there restricting the last couple of

1  rows.  You can take those off, please.  The students were

2  already here, if you don't mind taking them off.  Thanks a

3  lot.

4          Off the record.

5      (Off the record.)

6      (Jury enters.)

7          THE COURT:  All right.  Please be seated.

8          Off the record.

9      (Off the record.)

10          THE COURT:  Back on the record.

11          You may continue your redirect examination.

12          MR. HANKEY:  Thank you, Your Honor.

13          Ms. Paul, let's pull up Exhibit 3052 again, please,

14  just to bring us back to where we were.

15  BY MR. HANKEY:

16  Q.  Mr. Ketchum, we were talking about this e-mail from Travis

17  Kemp, correct?

18  A.  Yes.

19  Q.  Now, I want to show you Exhibit 1157.

20          MR. HANKEY:  And let's go to the bottom of the

21  e-mail, please, Ms. Paul, so we can read it.

22  BY MR. HANKEY:

23  Q.  Mr. Ketchum, do you see at the very bottom of this string

24  there's an e-mail from a credit card company or something of

25  that nature?

1  A.  Yes.

2  Q.  And then following that, there's an e-mail by

3  Troy Colligan who is writing to Matthew -- writing to Jim

4  saying, "Matthew and I seem to be having trouble with our

5  Cirrus support today."

6           That relates to the first e-mail that we just saw,

7  correct?

8  A.  Yes.

9  Q.  Okay.

10          MR. HANKEY:  Let's go to the next one.

11  BY MR. HANKEY:

12  Q.  Now, he had been writing to Jim Demas, correct?

13  A.  Yes.

14  Q.  And, again, this is about the credit card message.  And

15  there's going to be a series of messages after this that are

16  unrelated, so let's go to the next e-mail.

17          So here we have Mr. Crandall now responding to

18  Mr. Demas, right?

19  A.  Yes.

20  Q.  And Mr. Crandall -- excuse me.  He asks, "Did you see the

21  incremental IO for Humira today?"

22          Is that right?

23  A.  Yes.

24  Q.  "They approved 155 more sites going live tomorrow and then

25  committed to the growth locations we proposed recently."

1    Do you see that?

2  A.  Yes.

3  Q.  And this Humira contract, it did -- you recall seeing that

4  the contract had incremental growth specified in it month by

5  month?

6  A.  Yes.

7  Q.  Starting in April?

8  A.  Yes.

9  Q.  Then he writes:  "Please let me know when you expect to

10  sign and return to them.  It calls for going live tomorrow

11  with the extra sites.

12    "Travis, can you please go live tomorrow with the

13  incremental sites."

14    Did I read that correctly?

15  A.  Yes.

16  Q.  Now, let's look at the next e-mail.  The Travis he was

17  talking to is Travis Kemp, correct?

18  A.  Yes.

19  Q.  And Mr. Kemp responds to Mr. Crandall and writes:

20  "Matthew, does this mean it's going to all rheum sites?  If

21  not, I have not been given a list match and would need that as

22  a first step in order to know what to schedule."

23    Did you see that Mr. Kemp wrote that?

24  A.  Yes.

25  Q.  What does Mr. Crandall say in response?  He writes:  "We

1  offered 155 rheum sites above the current 325.  No need for a
2  list match."
3          Do you see that?
4  A.  Yes.
5  Q.  Okay.  Then let's look at the final e-mail in the string.
6  And Mr. Kemp responds:  "Got it.  Will get this done
7  tomorrow."
8          Is that right?
9  A.  Yes.
10 Q.  Who is copied on his e-mail when he responds with that?
11 A.  Shradha, Jim Demas, and Bob Mons.
12 Q.  Okay.
13         MR. HANKEY:  Ms. Paul, could we please display this
14 e-mail side by side with Exhibit 107 which we were just
15 looking at.  And let's blow up the top of 107.  I'm sorry, the
16 full e-mail at the top.  Thank you.
17 BY MR. HANKEY:
18 Q.  So the e-mail we just saw, the e-mail exchange that we
19 just saw involving Mr. Kemp, that was on January 31st, right?
20 A.  Yes.
21 Q.  And the e-mail in Exhibit 107 which we looked at a little
22 while ago, that's sent just a little -- a few days, week or
23 so, before that on January 22nd.
24         Do you see that?
25 A.  Yes.

1  Q.  And, again, that was where you're saying that the RHN

2  network has 417 screens in it; is that right?

3  A.  Yes.

4          MR. BLEGEN:  Objection.  I think he misread that.

5          MR. HANKEY:  Excuse me.  Thank you, Mr. Blegen.

6  BY MR. HANKEY:

7  Q.  It has 417 with 478 screens.

8          Do you see that?

9  A.  Yes.

10 Q.  And how many offices with rheums did Outcome have at the

11 time?

12 A.  387.

13 Q.  How many screens?

14 A.  440.

15         MR. HANKEY:  Now, let's keep up 107 and display 137.

16 BY MR. HANKEY:

17 Q.  You looked at 137 in your direct, and I believe you may

18 have in your cross.  Do you recall that?

19 A.  Yes.

20 Q.  Let's look at the first e-mail in the string at 137.

21 Mr. Ketchum, you wrote:  "Rishi, Jim and I just wanted to

22 double-check with you about the Humira POP.  We are contracted

23 for 480 sites.  Currently we have 419.  What do you recommend

24 we send them for addresses to fill in the gap?"

25         Did I read that correctly?

1    A.  Yes.

2    Q.  "Should we include CM PCP offices or should we send them

3    offices from outreach?"

4          Did I read that correctly?

5    A.  Yes.

6    Q.  So when you write "currently we have 419," what are you

7    referring to there?

8    A.  Sites, 419 sites.

9    Q.  And if we look at Exhibit 107.

10          MR. HANKEY:  If you could pull that down, just drag

11   the popup down, Ms. Paul, so we can see...

12   BY MR. HANKEY:

13   Q.  What would you say was the total in the RHN network on

14   January 22nd on the right-hand side?

15   A.  The total RHN network had 417 sites and 478 screens.

16   Q.  And we're comparing January 22nd on the top and

17   February 8th on the bottom; is that right?

18   A.  Yes.

19          MR. HANKEY:  Now, let's look at Exhibit 107 and

20   compare it side by side with 1157 which we just looked at.

21   And let's pull up the Mr. Kemp e-mail sent at 5:25 p.m.

22   BY MR. HANKEY:

23   Q.  And, again, Mr. Kemp wrote on January 31st:  "Matthew,

24   does this mean it's going to all rheum sites?  If not, I have

25   not been given a list match and would need that as a first

1  step in order to know what to schedule."

2        Did I read that correctly?

3  A.  Yes.

4  Q.  He's asking if the ad is going to all rheum sites?

5        MR. HUESTON:  Your Honor, I'm going to object.  The

6  rule here is there's no interpretation of an e-mail in which

7  he's not included.

8        THE COURT:  Sustained.

9        MR. HANKEY:  Now, let's take a look at Exhibit 3052.

10  And let's blow up Mr. Kemp's fifth bullet.

11  BY MR. HANKEY:

12  Q.  And this is the day after the last e-mail we were just

13  looking at.  1157 was January 31st.  You recall that?

14  A.  Yes.

15  Q.  And this is now February 1st?

16  A.  Yes.

17  Q.  How long had it been since Shah -- that you told Shah that

18  the RHN had 417 sites in it?

19  A.  Roughly ten days.

20  Q.  That's the Rheumatoid Health Network, correct?

21  A.  Yes.

22  Q.  And now Mr. Kemp is saying --

23        MR. HUESTON:  Your Honor, I'm going to object to the

24  framing of that question.

25        I think you framed it as telling Mr. Shah, and the

1  exhibit doesn't have Mr. Shah on it.  I would ask that you --

2          MR. HANKEY:  But that was in another exhibit --

3          MR. HUESTON:  Okay.

4          MR. HANKEY:  -- Your Honor.  That was in -- we could

5  pull that up.

6          THE COURT:  I believe it was referred to an exhibit

7  where he was on; is that correct?

8          MR. HANKEY:  That's correct, Your Honor.

9          THE COURT:  That's what I thought.  Objection

10  overruled.

11  BY MR. HANKEY:

12  Q.  Okay.  So now in 3052, this is where Mr. Kemp is saying,

13  "The Humira addition (155 sites) was pushed out today."

14          Is that right?

15  A.  Yes.

16  Q.  And we had seen earlier that Mr. Kemp had asked if the ad

17  was going to all rheum sites.  Do you remember seeing that?

18  A.  Yes.

19  Q.  Does Mr. Kemp have the ability to play ads at sites where

20  there's not a screen installed?

21  A.  No.

22  Q.  Did Mr. Shah know that?

23  A.  Yes.

24  Q.  Now, let's talk about -- you were asked about screens

25  versus offices and locations --

1  A.  Yes.

2  Q.  -- with respect to the Humira contract?

3  A.  Yes.

4  Q.  Let's talk about that.

5       MR. HANKEY:  So if we could take these down,

6  Ms. Paul.  And let's start by looking at

7  Government Exhibit 109.

8  BY MR. HANKEY:

9  Q.  You remember being asked, Mr. Ketchum, about e-mails

10 reflecting discussions around numbers of screens for Humira

11 and numbers of offices or sites for Humira?

12 A.  Yes.

13 Q.  Let's start at the bottom of this e-mail, Exhibit 109, at

14 the very first e-mail that's sent.  You see that Yesenia

15 Bautista writes:  "Hi, Bob, for Humira RA, we are contracted

16 for 325 offices full year.  Is this the max rheum network?"

17 A.  Yes.

18 Q.  Do you see that?

19 A.  I do.

20 Q.  And Ms. Bautista is referring to the original starting

21 contract for Humira; is that right?

22 A.  Yes.

23 Q.  And she's referring here to 325 offices?

24 A.  Yes.

25      MR. HANKEY:  Let's go to the next e-mail.  Blow that

1  up.

2  BY MR. HANKEY:

3  Q.  Mr. Mons' responds:  "Yesenia, we have additional sites

4  available.  How much are you looking for?  Budget?  Projected

5  start date?  Same creative?"

6        Mr. Mons is referring to sites here, correct?

7  A.  Yes.

8        MR. HANKEY:  Okay.  Let's go to the next one.

9  BY MR. HANKEY:

10 Q.  Ms. Bautista writes, "Hi, Bob, how about you tell me what

11 you have in inventory as of today?  Yes, same creative.  We

12 want to be in all rheum offices (please no PCPs).  We could

13 possibly start very soon.  Appreciate your quick response."

14       Is that right?

15 A.  Yes.

16 Q.  Okay.

17       MR. HANKEY:  Let's go to the next one.

18 BY MR. HANKEY:

19 Q.  And Mr. Mons responds:  "Yesenia, we have 155 additional

20 rheumatology practices available to go live today."

21       Did you see that?

22 A.  Yes.

23 Q.  And he asks:  "Please advise"?

24 A.  Yes.

25       MR. HANKEY:  Let's go to the next one.

1  BY MR. HANKEY:

2  Q.  Then we hear from Ms. Bautista again:  "That's great, Bob.

3  Can you send us the full list of office 325 where we are

4  running and separately the list of 155 locations where we can

5  add in activity?  Via Excel, please."

6          Did I read that correctly?

7  A.  Yes.

8  Q.  Let's go to Mr. Mons' response.  What does he write?

9  A.  Would you like me to read?

10  Q.  Yes, please.

11  A.  "I sure will.  Give me a few minutes...B."

12          MR. HANKEY:  Then let's go to the next e-mail.

13  BY MR. HANKEY:

14  Q.  So then Mr. Mons writes back, and he says, "Yesenia, I

15  know that Jen met with Rishi earlier today.  I just want to

16  confirm/clarify a few things:  Humira is running on 325 RA

17  screens currently?"

18          Here he's referring to screens as opposed to offices,

19  correct?

20  A.  Yes.

21  Q.  And then he writes:  "No. 2, we can add 155 RA screens

22  immediately, bringing Humira's total to 480 screens.

23          "CMH will have a total of 819 RA screens installed

24  and operating for 2013.

25          "Our incremental growth for the first half of 2013

1  has been committed to another RA brand.

2        "We can commit our incremental growth from July

3  through December 2013 to Humira.

4        "Please advise on the following:  What date do you

5  want us to add the 155 screens for Humira?  They are available

6  today.  Will it be 155 or 110?

7        "Does Humira want to commit to our incremental growth

8  from July through December, number of screens TBD?"

9        Then he writes:  "Let me know if anything that

10  requires" -- excuse me.

11        "Let me know if there is anything that requires

12  further clarification."

13        Do you see that?

14 A.  Yes.

15 Q.  He's asking Yesenia for whether she wants further

16  clarification on anything?

17 A.  Yes.

18 Q.  And then he says, "I will forward the Excel in a separate

19  e-mail shortly."

20        Is that correct?

21 A.  Yes.

22 Q.  All right.  Let's look at the next one.

23        Now, we see Jennifer Greufe responding; is that

24  right?

25 A.  Yes.

1   Q.  She's at Target Health?

2   A.  Correct.

3   Q.  Is she and Ms. Bautista both -- are acting on behalf of

4   the Humira client?

5   A.  Yes.

6   Q.  And she responds to Mr. Mons copying Yesenia Bautista and

7   writes:  "Hi, Bob, to clarify, the goal is to add 155

8   incremental offices to our currently contracted order of 325

9   RA offices beginning February 1st."

10          Ms. Greufe is referring to offices, correct?

11  A.  Yes.

12  Q.  And Rishi Shah is copied?

13  A.  Yes.

14  Q.  And then she continues on by saying, "We'd appreciate

15  confirmation as to whether an additional set of newly

16  installed offices would be available for an April start.

17  Ideally, we would commit to 110 additional RA offices for

18  April through December."

19          So, again, she's referring to offices, not screens,

20  correct?

21  A.  Yes.

22  Q.  And then she writes:  "Hope this helps.  We look forward

23  to confirmation regarding the additional installations

24  available for an April start.  Appreciate everyone's time and

25  effort."

1    Is that what she wrote?

2   A.  Yes.

3   Q.  Okay.

4        MR. HANKEY:  Now, let's look at Government's

5   Exhibit 1112.

6   BY MR. HANKEY:

7   Q.  Now, this is dated January 23rd, correct?

8   A.  Yes.

9   Q.  This is a day after the e-mail string we were just

10  reviewing?

11  A.  Yes.

12  Q.  And in this e-mail, you're sending an Excel file to

13  Mr. Mons; is that correct?

14  A.  Yes.

15  Q.  What's the subject of the e-mail?

16  A.  CM sites for Humira, 1/22/2013.

17  Q.  That's the name of the attachment, right?

18  A.  Oh, sorry.  Yes.

19  Q.  And the subject of the e-mail?

20  A.  Humira Excel file.

21  Q.  Okay.

22        MR. HANKEY:  Let's look at the attachment which is

23  1112A.

24  BY MR. HANKEY:

25  Q.  Now, this looks familiar, right?

1  A.  Yes.

2  Q.  We looked at something like this earlier.  And on the

3  left, you see clinics, is that correct, on the tab on the

4  left?

5  A.  Yes.

6  Q.  And then on the right we see available inventory.  Do you

7  see that tab?

8  A.  Yes.

9  Q.  Okay.

10      MR. HANKEY:  Let's click on that.  And, again, let's

11  scroll to the bottom so we see how many sites or items are

12  clear on this list.

13  BY MR. HANKEY:

14  Q.  How many do we see?  How many specific items do we see

15  listed here?

16  A.  156 rows and 155 sites.

17  Q.  So we're looking at a list of sites?

18  A.  Yes.

19  Q.  Are these addresses?

20  A.  Yes.

21  Q.  What was the number that was required for the additional,

22  the add-on that was supposed to go live in February of 2013?

23  A.  155 sites.

24      MR. HANKEY:  Let's look at 1075.  Let's start further

25  down.  Now, we can go up, Ms. Paul.  We've reviewed a couple

1  of these already.  And let's start at the response that breaks

2  between the first page and the second page.

3  BY MR. HANKEY:

4  Q.  So now this is January 23rd, same date that she sent your

5  e-mail to Mr. Mons with the attachment on it, correct?

6  A.  Yes.

7  Q.  And Mr. Mons is writing:  "Hi, Yesenia, per your requests,

8  Excel file with current installed plus availables for

9  February 1.  The attached has three tabs.  The first tab lists

10  the current (325) Humira RA sites.  The second tab is

11  available RA inventory.

12        Do you see that?

13  A.  Yes.

14  Q.  And then he writes:  "155 screens, February through

15  December 31, go-live ready, awaiting your approval."

16        Is that right?

17  A.  Yes.

18  Q.  And then he writes about 161 screens, saying, "161

19  screens, April 1 through December 31.  We are carefully

20  evaluating the possibility of adding 161 screens beginning

21  April 1 as Jen requested.  It will require some finesse as we

22  have another RA vendor that has requested our incremental

23  growth from Jan to June.  There may be a way to satisfy both

24  of you.  We will get back to you later today or tomorrow with

25  something definitive.  Talk to you soon...B."

1    Did I read that correctly?

2  A.  Yes.

3  Q.  Okay.  So Mr. Mons is referring to sites and screens in

4  this e-mail, correct?

5  A.  Yes.

6    MR. HANKEY:  And then if we go to the next e-mail.

7  BY MR. HANKEY:

8  Q.  This is Mr. Mons replying again, correct, same day?

9  A.  Yes.

10    MR. HANKEY:  And can we include that chart?  Thank

11  you.

12  BY MR. HANKEY:

13  Q.  And Mr. Mons writes again:  "The following recaps our

14  current deployment for Humira plus Jen's recent request for

15  additional screens to be added February 1 and April 1.

16    "325 RA screens are currently live, January 1 start.

17    "155 RA screens will be added for a February 1 start,

18  awaiting confirmation.

19    "110 RA screens, weighted average from April through

20  December will be added beginning April 1st, awaiting

21  confirmation ramp schedule is pasted below and attached on the

22  Excel, third tab.

23    "Please let me know if there is anything that

24  requires additional clarity.  Thanks again for the business.

25    "I'll be in touch soon...B."

1    Did I read that correctly?

2    A.  Yes.

3    Q.  And then below we see a chart.  What does the -- at the

4    very first row of the chart read?  Can you read that please?

5    A.  Month -- or the top row?

6    Q.  Yes, please.

7    A.  "Humira, April through December 2013, ramp of 110 sites,

8    weighted average."

9    Q.  Okay.  And there he's referring to sites.  He was

10   referring to screens in the bullets above, correct?

11   A.  Yes.

12   Q.  And then below there's a list of months, and you see that

13   there's specific units deployed in specific months after that?

14   A.  Yes.

15   Q.  Now, this relates to the 110 RA screens bullet that he has

16   above, correct?

17   A.  Yes.

18   Q.  Which is separate and apart from the 155 that we've been

19   talking about?

20   A.  Yes.

21   Q.  Now, again, when you sent your list to Mr. Mons, what were

22   you sending in that list where we saw the 155 listed?

23   A.  Those were projected sites.

24   Q.  And sites meaning addresses?

25   A.  Yes.

1    MR. HUESTON:  Objection.  Leading.

2    THE COURT:  Sustained.

3    MR. HANKEY:  Let's take a look at Exhibit 129.

4  BY MR. HANKEY:

5  Q.  And we looked at this e-mail before.  This is an e-mail

6  where Mr. Demas sends the Humira RA contract to Ms. Agarwal,

7  correct?

8  A.  Yes.

9    THE COURT:  Let's have a sidebar briefly.

10    (Sidebar.)

11    THE COURT:  You know, Mr. Hueston raised an issue

12  earlier about whether we're just redoing direct examination on

13  redirect.  Some of these e-mails are different.  Some you're

14  going through areas you didn't go through the first time.  But

15  I really want you to avoid just rehashing direct.  Otherwise

16  the cross will be the same, and we will be here until June.

17  So make your points if they are to respond to areas raised on

18  cross or if you're raising new issues that were properly

19  brought up in cross that you can properly rebut, but this

20  is -- redirect is not a rehash of direct.

21    MR. HANKEY:  Understood, Your Honor.

22    THE COURT:  All right.

23    (End of sidebar.)

24  BY MR. HANKEY:

25  Q.  Mr. Ketchum, let's take a look at the contract which is in

1    129, and let's go to page 4.

2            MR. HANKEY:  And Ms. Paul, there's a line 10 at the

3    bottom.  Pull it out and just focus on that line 10.

4    BY MR. HANKEY:

5    Q.  Mr. Ketchum, this is the Humira contract and the portion

6    of it that relates to the 155 that we've been talking about,

7    correct?

8    A.  Yes.

9    Q.  Can you read what it says in the middle box here that

10   Ms. Paul is about to highlight?

11   A.  "Digital screens located in 155 rheumatologist waiting

12   rooms (additional 155 offices to current 325 office campaign).

13   60 second spot, two times per hour."

14   Q.  So the contract refers to 155 offices?

15   A.  Yes.

16   Q.  And that's an additional to the current 325 offices,

17   correct?

18   A.  Yes.

19   Q.  Now, let's look at Exhibit 204.  This is the last one I'll

20   show you on this topic.

21           MR. HANKEY:  Let's blow up the bottom e-mail first,

22   Ms. Paul, April 18, 2013.

23   BY MR. HANKEY:

24   Q.  This is an e-mail where Ms. Agarwal is writing regarding

25   Humira, right?

1  A.  Yes.

2  Q.  And she writes:  "Hey, guys, Matthew and Steve had a call

3  with the new agency for AbbVie today.  And as we discussed" --

4  "we had discussed" -- "guessed" -- excuse me -- "there is a

5  lot of confusion and not a very smooth transition in terms of

6  what has been bought.  At this point all they have is monthly

7  dollars spent with each vendor."

8         Let's pause there.  What is Ms. Agarwal writing about

9  here?  What had happened with a Humira client?

10         MR. BLEGEN:  Judge, objection.  This is not redirect.

11         MR. HANKEY:  It's the last --

12         MR. BLEGEN:  I mean, it is redirect.  It's not proper

13  redirect.

14         MR. JOHNSON:  (Inaudible).

15         THE COURT REPORTER:  I can't hear you.

16         THE COURT:  One at a time.  Well, that's Mr. Johnson.

17  Mr. Hankey can respond.

18         Go ahead.

19         MR. HANKEY:  So Mr. Ketchum is on this e-mail chain.

20         THE COURT:  I understand.

21         MR. HANKEY:  The original one.  And this is the last

22  e-mail that we're covering on this topic.  We're tying this in

23  with some of the things we just --

24         THE COURT:  All right.  Objection overruled.  But

25  again, as I said, redirect isn't a rehash of direct.

1    MR. HANKEY:  Yes, Your Honor.

2    THE COURT:  Address subjects brought up in

3  cross-examination.

4    Go ahead.  Finish on this one.

5  BY MR. HANKEY:

6  Q.  Mr. Ketchum, can you explain what's happening at this

7  point in time that Ms. Agarwal is referring to here in her

8  e-mail?

9  A.  Yes.  Target Health was replaced by another agency called

10  Spark related to the Humira campaign in this instance.

11  Q.  Now, she goes on to write:  "This gives us a real

12  opportunity to," and the first bullet says, "Sell waiting

13  rooms/screens versus unique addresses that TH" -- that's

14  Target Health, right?

15  A.  Yes.

16  Q.  That's the original ad agency that represented the Humira

17  client?

18  A.  Yes.

19  Q.  "We let Spark know they have 510 as of today.  Build goal

20  is now an end of year versus weighted average.

21    "We do need to give them history of spend broken out

22  by month and media bought.  MC, could you work with JD to put

23  this together for Spark for Humira?

24    "And Steve, for AndroGel?"

25    Did I read that correctly?

1    A.  Yes.

2    Q.  So Ms. Agarwal is saying this gives us a real opportunity

3    to sell waiting rooms/screens versus the unique addresses that

4    Target Health bought, correct?

5    A.  Yes.

6           MR. BLEGEN:  Judge, I'm objecting to the leading and

7    to the repeating of what was just read.

8           MR. HANKEY:  I'll move on, Your Honor.

9           THE COURT:  All right.  The question and answer is

10   stricken.

11          MR. HANKEY:  One moment, Your Honor.

12      (Counsel conferring.)

13   BY MR. HANKEY:

14   Q.  Mr. Ketchum, who is this e-mail forwarded to?

15   A.  It was sent from Rishi Shah.  Rishi Shah replied to

16   Shradha Agarwal's e-mail.

17   Q.  Now, let's talk about a chart that you saw related to the

18   Humira campaign on cross.  Do you remember seeing a chart

19   where Mr. Shah's counsel had overlaid some green X's on top of

20   one of the Humira delivery charts that you saw in your direct?

21   A.  Yes.

22          MR. HANKEY:  Now, let's look at

23   Government Exhibit 129.  And we'll go down -- again, this is a

24   contract.  We'll go down to the second page of the contract.

25   Can you blow up line 6, please.

1   BY MR. HANKEY:

2   Q.  Does this show the contractual requirement on the Humira

3   campaign for April?

4   A.  Yes.

5   Q.  And what does it require from a delivery standpoint?

6   A.  "Digital screens located in 50 rheumatologist waiting

7   rooms (additional 50 offices to current 480 office campaign).

8   60 second spot, two times per hour.

9   Q.  So 50 offices plus 480 offices, that's 530 offices?

10  A.  Yes.

11  Q.  Let's look at Exhibit 194.  This is one of your MS weekly

12  reports from April of 2013, correct?

13  A.  Yes.

14  Q.  And in these reports, you -- some of these reports, in

15  some of the reports we saw, including this one, you could see

16  at the bottom you provide locations and screens for campaigns.

17  If we go to the next page, you'll see that you provided that

18  for Humira, correct?

19  A.  Yes.

20  Q.  Why were you providing this information?

21  A.  I don't understand the context of the question.

22  Q.  Why were you listing this here in this weekly report?

23  A.  I was instructed to include the numbers in the weekly

24  report.

25  Q.  Do you recall who instructed you to include them?

1  A.  In this particular instance, I don't.

2  Q.  Now, when you include these locations and screens, how do

3  you go ago about pulling this information to provide it?

4  A.  From Quickbase, the database.

5  Q.  And when you pulled information like this out of

6  Quickbase, did you observe that people in the company relied

7  upon it, on the delivery information that you were pulling?

8          MR. HUESTON:  Objection.  I think there's a double

9  question in there; when you pulled, did you observe.

10          THE COURT:  All right.  Rephrase.  It's a compound

11  question.

12  BY MR. HANKEY:

13  Q.  When you pulled this information and you put it into

14  e-mails with your colleagues at work, did you observe that

15  they relied on the information in making decisions?

16          MR. HUESTON:  Objection.  Vague.

17          THE COURT:  Overruled.

18          You can -- if there's an objection -- if he

19  identifies anyone, he's going to have to lay a foundation for

20  it.

21          But in this broad term, broad question, you can

22  answer.

23  BY THE WITNESS:

24  A.  I know they were read and I know they were discussed.  I'm

25  not sure how they were utilized after the fact.

1    MR. HANKEY:  Let's look at the top of this e-mail.
2  BY MR. HANKEY:
3  Q.  This was sent April 7, 2013, correct?
4  A.  Yes.
5  Q.  Now, let's take a look at -- let's compare the numbers,
6  okay.  So 502 -- if we go back down to the bottom, 502
7  screens, right, is less than 530 that the contract -- offices
8  that the contract required, correct?
9  A.  Yes.
10  Q.  And how many locations were there at this time?
11  A.  432.
12  Q.  Again, the contract called for 530, correct?
13  A.  Yes.
14  Q.  Let's look at Exhibit 205.  This is another weekly report
15  from May 2013, correct?
16  A.  Yes.
17  Q.  Now, at the bottom of this one, you're providing similar
18  information but now for RHN; is that right?
19  A.  Yes.
20  Q.  What's the RHN again?
21  A.  The Rheumatoid Health Network.
22  Q.  How many locations do you list for RHN?
23  A.  442 locations.
24  Q.  And how many screens?
25  A.  515 screens.

1          MR. HANKEY:  Let's go back to 129.  Let's go down to

2     page 3 of this exhibit.  And let's zoom in on line number 1.

3     BY MR. HANKEY:

4     Q.  What are we looking at here in line number 1?

5     A.  It's the portion of the contract that is addressing May

6     of 2013.

7     Q.  And what are the -- can you please read the

8     address/description verbiage that we see here in line

9     number 1?

10    A.  Digital screens located in 65 rheumatologist waiting rooms

11    (additional 65 offices to current 480 office campaign).  60

12    second spot, two times per hour.

13    Q.  So what's the number that the contract requires for May?

14    A.  An additional 65 offices.

15    Q.  On top of the 480?

16    A.  Yes.

17    Q.  Which would be --

18    A.  Actually I believe it's on top of the 5 number added from

19    April, unless I'm mistaken.

20    Q.  Well, let's look here.  It says "additional 65 offices to

21    current 480 office campaign"?

22    A.  That's correct.  I was wrong.

23    Q.  Okay.  So what's the total there if you just sum those

24    together?

25    A.  A little less than 550.

1  Q.  545 sound right?

2  A.  Yeah.  Yes.

3       MR. HANKEY:  Let's go back to 205.

4  BY MR. HANKEY:

5  Q.  So the contract requires 545.

6       MR. HANKEY:  Let's go back to the RHN.

7  BY MR. HANKEY:

8  Q.  And in May, there were 442 locations and 515 screens,

9  correct?

10  A.  Yes.

11  Q.  And if you look at the top, does anyone respond to your

12  e-mail, Mr. Ketchum?

13  A.  Yes.

14  Q.  Who does?

15  A.  Rishi Shah.

16  Q.  What does he write?

17  A.  "Thanks, Jay.  I thought both of your last two reports

18  were terrific.  RS."

19  Q.  Now, let's take a look at Government's Exhibit 1134G.

20  This is a chart that you were shown on direct, correct?

21  A.  Yes.

22  Q.  And the blue line shows the delivery requirements in the

23  contract?

24  A.  Yes.

25  Q.  And the red X's come from your various reporting e-mails

1  of delivery of locations and offices?

2  A.  Yes.

3  Q.  And just to remind the jury, there was a period here in

4  April and sometime thereafter where the campaign was paused,

5  right?

6  A.  That's correct.

7  Q.  What was your testimony about what the client's

8  expectations were during that pause?

9  A.  That the client was expecting the locations to be reserved

10  for their advertisements.  They continued paying.

11  Q.  For the number of offices in the contract?

12  A.  Correct.

13  Q.  Okay.  Now, Mr. Ketchum, I'm going to shift topics.

14         MR. HANKEY:  We can take this down, please.

15  BY MR. HANKEY:

16  Q.  Did you testify before the grand jury in connection with

17  the investigation in this case, Mr. Ketchum?

18  A.  Yes.

19         MR. BLEGEN:  Judge, could we be heard at sidebar

20  briefly?

21         THE COURT:  All right.

22     (Sidebar.)

23         THE COURT:  Go ahead.

24         MR. BLEGEN:  So, Judge, it sounds like they're about

25  to read in the grand jury.

1    THE COURT:  They are.  Get a little closer to the
2  mic.  I'm having trouble hearing you.
3    MR. BLEGEN:  It sounds like they're about to read in
4  the jury.  I don't know if you have formalized your decision.
5  It sounded like which way you were heading.  We do have some
6  conclusion on our end about what we would like to ask for, and
7  then I wanted to make -- I'm sorry to have to do this at the
8  last second, but I wanted to make a couple of additional
9  points.
10    THE COURT:  All right.  Is the government intending
11  to read in the grand jury right now?
12    MR. HANKEY:  Yes, Your Honor.
13    THE COURT:  Okay.  Go ahead.
14    MR. BLEGEN:  So first of all, Judge, what I -- so
15  there's not a lot of Seventh Circuit case law on this topic.
16  It has not been discussed in great detail.  I tried to find
17  some case law to support the propositions that I was
18  mentioning this morning about it really has to be an attack on
19  credibility for the -- and by "attack," I mean not just
20  discussing e-mails that he hasn't seen before and maybe didn't
21  remember.  I didn't find any case law on that point in the
22  short amount of time that I was able to look for it.
23    But the other point that I was trying to make and
24  maybe didn't do quite artfully enough is that an attack --
25  even if something is an attack on credibility, the prior grand

1  jury testimony shouldn't be admissible unless it directly

2  relates to that attack on credibility: So, for example, if in

3  a different kind of case someone were to say, sir, you've been

4  convicted of a felony in the past, and that felony conviction

5  came before the grand jury testimony, the government shouldn't

6  be able to get up and say, well, you attacked his credibility

7  for any purpose and so therefore his entire grand jury

8  testimony comes in.

9            THE COURT:  Let me interrupt you for a minute.  What

10  else do you have besides this, Mr. Hankey?

11            MR. HANKEY:  This is my second to last module.

12            THE COURT:  All right.  Then you can -- why don't you

13  use your last module.  I'm going to suggest this if the

14  parties agree.  I don't want to keep the jury waiting on this,

15  but I do want to give you the chance to make your full

16  objection and for me to consider it.

17            One thought is that he finishes this module, you do

18  your recross based on the cross that was done, and then if I

19  allow it, which I'm likely to do as you predicted, that will

20  be a final topic that they do on re-redirect, and you can do

21  your re-recross based on that -- limited to that grand jury

22  statement.  I know it may be a little fuzzy around the edges,

23  but I think this is a way to move it along without having to

24  recess the jury for lunch at 11:30.

25            MR. BLEGEN:  Judge, I'm getting some disagreements

1   from co-counsel about wanting to --

2         THE COURT: Well, let's hear it.

3         MR. BLEGEN: They don't want me to proceed in that

4   manner, so I will rest on our prior objections. I will point

5   out that it's my belief that the prior consistent statement

6   has to be related to the challenge on credibility is the point

7   I was trying to make --

8         THE COURT: Okay.

9         MR. BLEGEN: -- with the prior felony conviction.

10         THE COURT: Okay.

11         MR. BLEGEN: And then lastly, our position is we

12   would like a limiting instruction that this grand jury

13   testimony cannot be used against Ms. Agarwal, and failing

14   that, we would ask for a severance.

15         THE COURT: Well, I'm not going to give you that

16   because this statement relates to Ms. Agarwal. I'm not going

17   to give such an instruction. The direct testimony of this

18   witness was consistent with the grand jury testimony I read.

19   The committee notes on -- 2014 committee notes talk -- state

20   that the intent of the amendment is to extend substantive

21   effect to consistent statements that rebut other attacks on a

22   witness such as the charges of inconsistency or faulty memory.

23   Both occurred here, charges of inconsistency and faulty memory

24   which includes you. Your cross dealt with faulty memory.

25         So to the extent your motion to sever is based on the

1  fact that this shouldn't be admitted to Ms. Agarwal because

2  you didn't challenge, you didn't attack him, his credibility,

3  the notes clearly say faulty memory is one such attack that

4  allows for the admission of a prior consistent statement.  And

5  that's exactly what you did on your cross-examination.

6         So I'm going to have a more fulsome written ruling

7  coming out probably before we have lunch, but I'm going to

8  allow this in.  And I'm not going to give a limiting

9  instruction because it does apply to Ms. Agarwal just as it

10  applies to Mr. Shah, and it comes in as substantive evidence

11  because it's not hearsay.

12         So for all those reasons and others that you'll find

13  in the written order, this will be admitted.  I had suggested

14  a manner in which we do this where we talk about this in

15  greater length at a lunch break.  Apparently there's an

16  objection from the defense from doing that; is that correct?

17         MR. HUESTON:  Yes.

18         THE COURT:  All right.  Then we will do it in the

19  order in which the government intends to produce it or to

20  elicit it.

21         And the other question is do you wish the entire

22  grand jury transcript read in or just the statement?  I have

23  never read the entire grand jury transcript.  If you need it

24  in under the rule of completeness, you can ask the government

25  to read it all in if you want, or I'll allow you to introduce

1    that in your -- in your questioning.

2            MR. HUESTON:  Yeah.  Your Honor, we would just like

3    the statement, and if we need to go beyond that in our

4    questioning, then we would do that.  But just the statement.

5            THE COURT:  Okay.

6            Defense agrees?

7            MR. BLEGEN:  I mean, over objection, but yes.

8            THE COURT:  I mean, assuming it's in, you're not

9    looking for the entire colloquy in the grand jury at this

10   point at least.

11           MR. BLEGEN:  Correct.

12           MR. HUESTON:  Correct.

13           THE COURT:  Okay.

14           MR. BLEGEN:  Are we still on the same page that the

15   written statement itself is not going to come into evidence to

16   be shown to the jury?

17           THE COURT:  It can be put up on the screen, but it's

18   not going to go back to the jury as an admitted exhibit in the

19   jury room.  We can put it up on the screen though, just as you

20   did, or I think Mr. Hueston did showing some prior statements

21   of the witness.

22           Okay.

23           MR. POULOS:  Judge?

24           THE COURT:  Yes, Mr. Poulos.

25           MR. POULOS:  Judge, could we get the limiting

1  instruction as to Mr. Purdy, however, that they cannot

2  consider this grand jury testimony against Mr. Purdy?

3      THE COURT:  Well, is there other parts of the grand

4  jury testimony that contains references to him?

5      MR. MADDEN:  Very few, Your Honor.

6      THE COURT:  And why shouldn't it be admissible as to

7  him if this -- to the extent it deals with conduct before he

8  joined the company, it's not admissible as to him.  Conduct

9  after he joined the company, it's admissible because it's

10  admitted as a piece of evidence that is admitted as to all the

11  defendants.

12      MR. POULOS:  I ask for it because we did not

13  challenge his credibility at all, Your Honor.

14      THE COURT:  I don't think -- I'll consider that

15  instruction when we talk about it at lunch.  It's not going to

16  be given contemporaneously with it coming in.

17      MR. POULOS:  Okay.

18      THE COURT:  Okay.

19      (End of sidebar.)

20      THE COURT:  All right.  You may proceed.

21      MR. HANKEY:  Thank you, Your Honor.

22  BY MR. HANKEY:

23  Q.  So, Mr. Ketchum, earlier in this redirect we talked about

24  a couple of your meetings with the government, correct?

25  A.  Yes.

1   Q.  And those were two meetings before you had immunity, an

2   immunity agreement with the government; is that right?

3   A.  Yes.

4   Q.  And then sometime after those meetings, you were given

5   immunity?

6   A.  Yes.

7   Q.  And subsequent to that, did you testify in the grand jury

8   in connection with the investigation of this case?

9   A.  Yes.

10  Q.  Now, before you testified, you signed a statement of facts

11  that described information that you had given to the

12  government.  Do you recall that?

13  A.  Yes.

14      MR. HANKEY:  Can we display for the jury and the

15  Court the document that has been marked for identification

16  only with 1158.

17  BY MR. HANKEY:

18  Q.  Mr. Ketchum, does this appear to be the statement that you

19  signed?

20  A.  Yes.

21  Q.  Did you initial each page of the statement?

22  A.  Yes.

23  Q.  And you signed it at the end?

24  A.  Yes.

25  Q.  Let's take a look at that, the last page of it.  That was

1    on July 23, 2019, correct?

2    A.  Yes.

3    Q.  That was over three and a half years ago?

4    A.  Yes.

5    Q.  And this statement was referenced on your

6    cross-examination, correct?

7    A.  I believe so.

8    Q.  And I believe you said it was drafted with the government,

9    correct?

10   A.  I don't recall what I said specifically.

11   Q.  Does that sound right though?

12   A.  Yeah, I think so.

13   Q.  Okay.  And you had an opportunity, having that -- the

14   statement to make corrections to it, correct?

15   A.  Yes.

16   Q.  You reviewed it before you signed it?

17   A.  Yes, I did.

18   Q.  And then after you did that, you went before the grand

19   jury, and you read the statement in the grand jury, correct?

20   A.  Yes, I did.

21   Q.  Did you read it under oath?

22   A.  Yes.

23   Q.  Is it similar -- a similar oath that you swore to the one

24   that you swore for your testimony at this trial?

25   A.  Yes.

1  Q.  And you testified during the grand jury appearance under

2  the penalty of perjury, correct?

3  A.  Yes.

4  Q.  And you did that with the benefit of experienced counsel,

5  correct?

6  A.  Yes.

7  Q.  And you had that counsel when you reviewed the statement

8  and signed it; is that right?

9  A.  Yes.

10          MR. HANKEY:  Now, if we could please go to the first

11  page of the statement.

12  BY MR. HANKEY:

13  Q.  Mr. Ketchum, would you please read the statement?

14  A.  Yes.

15          THE COURT:  And, ladies and gentlemen, this is --

16  this is being read in.  It's not an exhibit in the sense it's

17  admitted in something that will go back to the jury room.

18  It's being read in as part of the testimony of this witness.

19          THE WITNESS:  "Jason Ketchum, grand jury statement.

20          "My name is Jason Ketchum.  I am 36 years old, and I

21  live in Chicago, Illinois.

22          I started working at a company called ContextMedia in

23  Chicago, Illinois around November 2011 and stayed there until

24  around February 2018.  By the time I left the company, it had

25  changed its name to Outcome Health, so I will refer to the

1    company as Outcome during my testimony today.

2          "Outcome's business was to place video screens in

3    doctors' offices and then sell advertising space on those

4    devices to pharmaceutical companies.

5          "I held a number of different positions during my

6    tenure at the company.  My first position was as a member

7    services executive working in Outcome's member services

8    department.  The member services department was responsible

9    for getting devices installed in doctors' offices and working

10   with doctors' staff and Outcome technicians to ensure the

11   devices in the doctors' offices continued to function

12   properly.  Eventually I came to manage the member services

13   department.  Between 2014 and 2018, I served in other

14   management and sales roles in the company."

15   BY MR. HANKEY:

16   Q.  Can you continue?

17   A.  Oh, yeah, sorry.  I was just trying to find my spot.

18          "When I first started at Outcome in 2011, it was what

19   people referred to as a start-up company and had about 15 to

20   20 employees.  From 2011 and into 2013, the main leadership of

21   Outcome consisted of Rishi Shah, Shradha Agarwal, and Jim

22   Demas.  Shah and Agarwal were founders of the company, and

23   Demas was the chief financial officer.  Though Shah and

24   Agarwal were the executive officers of Outcome, it was still a

25   small company, and they were involved in pretty much

1   everything there.

2          "The two of them were really hands on.  In the 2011

3   to 2014 time period, Shah and Agarwal would trade off between

4   each other which one of them would take primary responsibility

5   for the revenue side of Outcome's business in New York.  I saw

6   that Shah and Agarwal executed sales contracts, conducted

7   research, and educated doctors and pharmaceutical company

8   clients about the Outcome network.  Shah and Agarwal also met

9   with pharmaceutical clients in person.  In 2011, there was a

10  small number of salespeople at Outcome to sell advertising

11  space to pharma clients.

12         "List match.

13         "Until my role changed in 2014, Shah and Agarwal

14  would ask me to conduct research to support the process of

15  contracting with pharmaceutical clients which we called

16  sponsorship sales.  For example, when negotiating a new

17  contract with Outcome, pharmaceutical clients would give

18  Outcome's salespeople a list of the doctors' offices they

19  wanted their ads to play in.  Part of my job was to take these

20  lists and match them against the offices in Outcome's network.

21  This process was called a list match.  Typically the

22  salespeople gave the list-match results back to the clients as

23  a representative -- as a representation of Outcome's current

24  inventory where the client would play its ads.  Shah was the

25  one who taught me how to do list matches.

1     "Shah and Agarwal instructed me on when and how to do
2  specific list matches.  Shah and Agarwal would typically
3  instruct me to include devices that Outcome did not yet have
4  in its inventory in the list-match results.  These were
5  considered projections of the devices that Outcome hoped to
6  have by the time the clients' advertising campaigns were
7  supposed to go live.  Shah and Agarwal would comment that they
8  wanted to be aggressive on the number of projected devices in
9  order to present as large a number as possible to the client.
10  On occasion, Shah and Agarwal would comment that if a client's
11  budget for ad buying was not captured now, Outcome might not
12  capture it later.

13     "I knew that this list match process was deceptive
14  because we included doctors that Outcome did not have in its
15  network in the list-match results sent to clients.  The
16  methods that Shah and Agarwal directed me to use to project
17  future inventory were unreliable because of how aggressive we
18  often projected and because we could not accurately predict
19  which doctors would end up in the Outcome network by the time
20  the campaign started to run.  Generally when I would express
21  concerns to Shah or Agarwal about the projections we used,
22  they would tell me I was being too pessimistic.

23     "I do not recall ever personally informing the
24  pharmaceutical clients or their ad agencies that I had built
25  projections into the list match process.  Shah and Agarwal

1  told me that they had informed clients about the use of

2  projections in list matches.  However, there were only a very

3  small number of cases where I observed Outcome telling its

4  pharmaceutical clients that it was projecting growth into the

5  numbers given to clients, and in those cases, it was made very

6  clear to the clients that Outcome's numbers included projected

7  growth.

8       "As far as I could see, clients were usually not told

9  that the list-match results contained projections.  In fact,

10 based on other discussions I had with Shah and Agarwal, as

11 well as other things I observed at Outcome, I understood that

12 Shah and Agarwal typically did not want clients to know about

13 the projections in the list-match results given to clients.

14 For one thing, Shah and Agarwal instructed me not to reveal to

15 Outcome's own salespeople that the list-match results

16 contained projections.  I noticed that Agarwal would remove

17 salespeople from e-mail conversations before discussing

18 projections with me, and she explained that salespeople were

19 skittish about projections.

20      "Also, sometimes a pharmaceutical client or their ad

21 agency would request that we send them the exact list of

22 doctors' offices that we matched to rather than just a total

23 number of matched offices.  On at least one of these

24 occasions, Agarwal and I agreed that we needed to avoid

25 including offices that had one of Outcome's competitors'

1  systems installed in our projections.  Agarwal told me that

2  her fear was that the pharmaceutical client might also be

3  talking to another Outcome competitor and that the

4  pharmaceutical client did not want to see two media providers

5  installed in the same office.  This would raise a red flag and

6  potentially reveal that Outcome represented to the

7  pharmaceutical client that it had a certain office when, in

8  fact, the competitor had the office instead.  When I sent the

9  list of offices back to the pharmaceutical client, I did not

10  tell the client that the list included projected offices that

11  Outcome did not yet have in its network.

12          "When sending e-mails like this to clients, I knew

13  that I was misrepresenting Outcome's number of doctors and

14  offices to the client, and it made me feel terrible.

15  Pharmaceutical clients expected accurate representations from

16  Outcome when they received list-match results.  But I did this

17  because this is what I was instructed to do by Agarwal and

18  Shah.

19          "When Ashik Desai began working at Outcome in 2013, I

20  was asked by Shah to review how to perform list matches with

21  Desai.  I recall teaching Desai how to use Excel, which was

22  the program used to perform list matches.  I eventually

23  stopped doing list matches in around 2014.

24          "Based on my interactions with Shah and Agarwal

25  during 2012 and 2013, I believed they approved of the

1  misrepresentations made to the clients.  They wanted clients

2  to believe that Outcome had a higher number of doctors'

3  offices and devices installed as of the date of the list match

4  that Outcome really had.  This was done so that Outcome could

5  get more lucrative contracts with clients.  I saw how Shah and

6  Agarwal seemed to always know what was going on at Outcome

7  especially as it related to sales and other revenue-related

8  matters.

9        "Delivery shortfalls and proof of performance

10  misrepresentations.

11        "Especially during the 2012 and 2013 time period, I

12  also observed that Shah and Agarwal were aware that Outcome

13  was not meeting the projections built into the list-match

14  results and therefore was not delivering advertisements on the

15  number of devices that the clients contracted to receive."

16        THE COURT:  Why don't you stop at that sentence.

17  This is kind of long.  Let's stand up for a minute.

18        I hope you don't mind these occasional stretch

19  breaks, but I think they're helpful sometimes just to get the

20  blood flowing.

21        All right.  Thank you.

22        THE WITNESS:  "Outcome provided some of its clients

23  proof of performance documents representing the number of

24  devices that Outcome was delivering to clients pursuant to

25  their contracts.  I performed this task in 2012 and 2013.  For

1  certain clients, the proof of performance documents I prepared

2  misrepresented the number of devices installed in Outcome's

3  network.  For example, when I was preparing to send proof of

4  performance to one client in 2013, I notified Shah that they

5  were not delivering the contracted number of devices to the

6  client and asked him for direction on how to" -- "on how to

7  prepare the proof of performance.  Shah instructed me to

8  include devices that he knew were not yet installed in the

9  proof of performance document to be sent to the client.  When

10 we agreed to do this, Shah and I intended to deceive the

11 client into believing their ads were playing on more devices

12 than was actually the case.

13         "I had multiple conversations with Shah and Agarwal

14 separately about sending proofs of performance to clients when

15 there was a delivery shortfall.  Shah and Agarwal would say

16 they never wanted to see" -- "a client to see that there was a

17 doctor or device shortfall because they did not want to have

18 to answer the questions that this inevitably would cause the

19 client to ask.

20         "Continued use of projections in sales."

21 BY MR. HANKEY:

22 Q.  Mr. Ketchum, could you slow down just a notch, please, for

23 the court reporter.

24 A.  Yes, of course.

25 Q.  Thank you.

1  A.  "Continued use of projections in sales through 2014, 2015,
2  and 2016.
3       "In 2014, my role at the company changed, and I was
4  no longer responsible for performing list matches.
5  However" --
6       THE COURT:  You can keep your voice up even if you're
7  slowing down.
8       THE WITNESS:  Sorry, Your Honor.
9       "However, throughout 2014, 2015, and 2016, I served
10 in leadership roles at Outcome where I remained involved in
11 discussions where I observed Shah and Agarwal continuing to
12 make highly aggressive projections on how fast Outcome would
13 grow its network of devices.  These growth projections were
14 built and contained in detailed spreadsheets that were
15 sometimes called growth models.  Shah and Brad Purdy were very
16 familiar with these spreadsheets, and Agarwal also tracked the
17 growth models.
18      "Throughout the 2014 through 2016 years, I had also
19 observed that Shah, Agarwal, and Purdy knew that Outcome's ad
20 sales to pharmaceutical clients continued to be made based on
21 projections.  For example, when discussing sales to
22 pharmaceutical clients, I heard Shah talk about selling device
23 counts to clients based upon what clients were willing to buy
24 and not necessarily based upon the number of devices that
25 Outcome had in its network.  Outcome would then attempt to

1 build its network based upon what had been sold to clients.

2 "IMS studies.

3 "It was common for Outcome to guarantee to clients

4 that their ad campaigns on Outcome's network would deliver a

5 certain number of dollars of revenue for every dollar spent on

6 advertising. This was referred to as return on investment, or

7 ROI. A third-party company, IMS, was supposed to

8 independently verify the ROI by conducting a study using its

9 database of prescriber data.

10 "In the earlier years of my working at Outcome,

11 especially in 2012 and 2013, I would assemble information

12 needed in advance of these IMS studies, primarily lists of

13 physician offices that Outcome sent to IMS for ROI study

14 purposes. Shah and Agarwal instructed me on when and how to

15 pull lists of offices to send to IMS. Usually the list pulled

16 for IMS was of doctors' offices where the client's

17 advertisements actually played and did not include offices on

18 the list match sent to the client if those offices did not

19 actually receive advertising.

20 "I believed that including the offices where the ads

21 did not play would have lowered the ROI. I also knew that the

22 purpose of creating the lists" -- pardon me -- "for IMS in

23 this manner was to make the clients believe that they were

24 getting what they paid for.

25 "Shah and Agarwal also instructed me to remove any

1  offices from the list that did not have any full-time doctors

2  in the specialty that would most likely prescribe the client's

3  drug.  Similarly, Shah and Agarwal told me to remove offices

4  from the list when the office had issues with displaying the

5  client's ads, such as where the devices were not working or

6  turned off by the office staff.  Shah typically made the final

7  decision on which offices to put on the list to send to IMS.

8  I also" -- hold on.  I lost my spot.  Oh, okay.

9         "I also observed that Shah made changes to multiple

10 IMS" -- "to multiple studies IMS produced for Outcome before

11 sending the study to the salesperson for transmittal to the

12 client."

13        "Conclusion.

14        "This statement is an accurate summary of the

15 information that I have concerning Outcome Health and other

16 people mentioned in the statement.  There are further details

17 that I have told the government that I not have talked about

18 in the statement.  After thinking about it more, being asked

19 more questions or reviewing additional documents, I may also

20 remember events or details that I do not remember" -- "that

21 I" -- "that I do not remember now."  I apologize.

22 BY MR. HANKEY:

23 Q.  Is that the complete statement --

24 A.  It was.

25 Q.  -- that you signed?

1    A.  Yes, sir.

2    Q.  Now, Mr. Ketchum, this statement was read into the grand

3    jury after those two initial meetings that we talked about,

4    correct?

5    A.  Yes.

6    Q.  The ones in 2018?

7    A.  That's correct.

8    Q.  And after those meetings, the government provided you and

9    your counsel a first draft of this statement; is that right?

10   A.  Yes.

11   Q.  Do you recall that?

12   A.  Yes.

13   Q.  And you had an opportunity to review it?

14   A.  Yes.

15   Q.  And make any changes to it that you wanted to make; is

16   that correct?

17   A.  Yes.

18   Q.  And then after that you initialled it and signed it?

19   A.  That's correct.

20        MR. HANKEY:  We could take that down.

21   BY MR. HANKEY:

22   Q.  Last topic, Mr. Ketchum.

23        So both on direct and cross, you spoke about your

24   commitment to the mission of Outcome, correct?

25   A.  Yes, I believed in the mission of Outcome.

1  Q.  And we saw several e-mails in your cross showing that you

2  had enthusiasm for the company?

3  A.  Yes.

4  Q.  Did you like working at Outcome?

5  A.  Yes.

6  Q.  Can you explain why?

7  A.  Yes.  Similar to what I said over the last several days of

8  testimony, and one part that I mentioned very early on but I

9  didn't really circle back much after that, the mission was

10 providing education to patients and educating doctors, and I

11 saw that on a pretty much daily basis.  And I had a strong

12 personal connection.  You know, my dad suffered with cancer

13 two decades.  My sister had cancer.  My dad passed from cancer

14 a couple of weeks before my daughter was born.  And that's

15 something I thought about every day, was what are things

16 that -- what are the ways that people who are suffering can be

17 made to feel a little bit better.  And that was meaningful for

18 me in a really big way.  Sorry.  I'm just thinking about my

19 dad.  Sorry.

20         And then separately, it was a family which we talked

21 about.  It was a start-up and a family-like environment.  It

22 was very supportive, and I enjoyed that.

23 Q.  And I think you said it was -- had about 15 employees when

24 you started there?

25 A.  15 to 20.

1  Q.  15 to 20?

2  A.  Something like that, yeah.

3  Q.  And that group of employees, that environment felt like a

4  family environment to you?

5  A.  In many ways, yes.

6  Q.  Did it continue to feel that way over the years as you

7  continued to work there?

8  A.  Like everything, like anything that grows, things do

9  change.  There was definitely a lot of strong connections that

10  were still present with a lot of the earlier folks too, and I

11  think a lot of -- not all, but a lot of the folks did believe

12  in the mission.  I think there's some leadership later on who

13  didn't necessarily believe in the mission too strongly.  But

14  yeah, I think largely, at least in -- I'm trying to think of

15  the right way to phrase this.  I think you still felt the

16  family environment in smaller groups, but with 600 or so

17  people, that starts to become a little bit more difficult.

18  Best way I could probably phrase that.

19  Q.  Yeah.  And we talked about this earlier.  You saw some

20  e-mails on cross.  There were some of your colleagues who were

21  critical of you from time to time?

22  A.  Sure.

23  Q.  That's not unusual in a company.  Is that fair to say?

24  A.  No, I sent e-mails that were critical of others too.

25  Q.  Some of those people played important roles in the company

1  though, right?

2  A.  Yes.

3  Q.  Any one of them come to mind?

4  A.  I believe I saw Brad Purdy, Jim Demas, I think Mr. Shah

5  maybe as well.

6  Q.  And we saw that you were also worried about your job

7  security at Outcome a couple of times.

8  A.  Sure.

9  Q.  What kinds of things led to those concerns?

10  A.  There was a lot of -- any time there was kind of talk

11  behind the scenes where I felt like I was kind of getting left

12  out, I was worried, I would be like, oh, what's going on that

13  I don't know about?  And so that sparked that.

14       And the 2017 time frame, I believe that was the day

15  of a layoff, a significant layoff when I messaged Ms. Agarwal

16  that, you know, Rishi Shah had put a one-on-one in my

17  calendar, am I getting let go because there was security at

18  the building that day, at the elevators.  There was a very

19  large layoff that day, if I recall correctly.

20  Q.  Shah never fired you --

21  A.  No.

22  Q.  -- from Outcome?

23       Ms. Agarwal never fired you from Outcome?

24  A.  No.

25  Q.  They were the CEO and the president.

1    A.  Yes.

2    Q.  Eventually Ms. Agarwal was the president.

3            They had the power to fire you?

4    A.  Yes.

5    Q.  Or to lay you off?

6    A.  Yes.

7    Q.  Now, you were -- despite, you know, whatever issues might

8    have been out there with the layoffs, you stayed with the

9    company through 2018, right?

10   A.  Yes.

11   Q.  And throughout that time, is it fair to say that Mr. Shah

12   and Ms. Agarwal, despite the things that popped up from time

13   to time, that they were loyal to you during that time period?

14   A.  I don't know if I'd describe it as loyal, but I felt --

15   Q.  How would you describe it?

16   A.  I guess maybe loyal could be -- yeah, I guess I can't

17   think of a better term.  So yes, I suppose so.

18   Q.  And they relied on you to do your job well?

19   A.  Yes.

20   Q.  In 2012 and 2013, they relied on you to help with

21   sponsorship?

22   A.  Yes.

23   Q.  And can you remind the jury of the types of things that

24   you did to help with sponsorship during that time period?

25   A.  Yes, list matches, analyses that we saw during my

1   testimony and e-mails, assisting with the ROI -- I don't want

2   to say ROI analyses because I didn't really perform the

3   analysis, but assisting with IMS and pulling the lists

4   together for IMS.

5   Q.  And then after that time period, you were eventually given

6   responsibilities over other parts of the company; is that

7   right?

8   A.  Yes.

9   Q.  Can you explain some of the -- the progression -- you

10  don't have to go back through the résumé of being there, but

11  the progression of your kind of responsibility in the company

12  over the years?

13  A.  Sure.

14          MR. BLEGEN:  Judge, objection.  This is --

15          THE COURT:  It does seem repetitive.  Is there a

16  point?  Beyond repeating what was said on direct?

17          MR. HANKEY:  May we have a sidebar, Your Honor?

18          THE COURT:  Go ahead.

19      (Sidebar.)

20          THE COURT:  Where you going?

21          MR. HANKEY:  This is --

22          THE COURT:  I can't hear you.  You need to speak into

23  the mic.  Go ahead.

24          MR. HANKEY:  This is going to move along, but this

25  relates to the -- to the issues that defense raised about his

1    motivations in the company and the like, but --

2         THE COURT:  I'm not seeing it.  Be more explicit.

3    You're just going over his progression of jobs which we talked

4    about on direct, was gone over on cross.  And I don't --

5         MR. HANKEY:  We'll just move on.

6         THE COURT:  All right.

7       (End of sidebar.)

8         THE COURT:  All right.  You may proceed.

9         MR. HANKEY:  Thank you, Your Honor.

10   BY MR. HANKEY:

11   Q.  Now, while you were at the company -- let's start with

12   when you started at the company.  What was your salary?

13   A.  I'm not sure I recall.  I'm not sure I recall what it was.

14   Q.  Okay.  Did you receive raises over the years?

15   A.  Yes.

16   Q.  And do you recall at one time you got a raise up to

17   $150,000?

18   A.  Yes, that sounds right.

19   Q.  Now, this was in roughly 2015.  Do you recall that?

20   A.  Yes.

21   Q.  That was after some of these concerns had been raised?

22   A.  Yes.

23   Q.  You attended executive meetings?

24   A.  Yes.

25   Q.  Those were meetings with Mr. Shah and Ms. Agarwal?

1    A.  Yes.

2    Q.  Over the years?

3    A.  Yes.

4    Q.  You went on executive retreats?

5    A.  Yes.

6    Q.  You testified a little bit about that on direct, but where

7    were those executive retreats?

8              MR. BLEGEN:  Judge, I apologize for keep objecting,

9    but this is not --

10             MR. HUESTON:  Beyond the scope.

11             MR. BLEGEN:  Nobody mentioned the executive retreats

12   on cross as far as I recall.

13             MR. HANKEY:  I'll move on, Your Honor.

14             THE COURT:  Okay.

15   BY MR. HANKEY:

16   Q.  Now, on cross you were shown an e-mail that referenced

17   *The Wall Street Journal* article.  Do you recall that?

18   A.  Yes.

19   Q.  And do you recall, roughly speaking, when that journal

20   article came out?

21   A.  I believe it was 2017.

22   Q.  And was it -- does October 2017 sound about right?

23   A.  It does.

24   Q.  You continued working at Outcome even after *The Wall

25   Street Journal* article came out, correct?

1  A.  I did.

2  Q.  You stayed loyal to Outcome?

3  A.  Yes.

4  Q.  And over the years, you returned Mr. Shah's loyalty to

5  him?

6           MR. BLEGEN:  Judge, objection to leading.

7           THE COURT:  Sustained.

8  BY MR. HANKEY:

9  Q.  Can you explain just from a very high level what *The Wall*

10 *Street Journal* article was about, very high level?

11 A.  Yeah.  *The Wall Street Journal* article --

12          MR. BLEGEN:  Judge, objection.  I believe it's

13 hearsay.

14          THE COURT:  It is.  Sustained.  The fact of the

15 article came in but not the substance of it.  The substance is

16 hearsay.

17          MR. HANKEY:  Okay.

18 BY MR. HANKEY:

19 Q.  Now, after that article came out, you stayed at the

20 company, right?

21 A.  Yes.

22 Q.  And we saw that you were still proud to work at Outcome --

23          MR. BLEGEN:  Judge --

24 BY MR. HANKEY:

25 Q.  -- after the article?

1          MR. BLEGEN:  -- it's leading.

2          MR. HUESTON:  Leading.

3          THE COURT:  Rephrase your question.

4          MR. HANKEY:  We will.

5     BY MR. HANKEY:

6     Q.  When that article came out, you stayed at the company?

7     A.  Yes.

8     Q.  Why did you continue to stay at the company after it came

9     out?

10    A.  I still believed in the mission.  And as I stated on my

11    direct as well, a lot of the concerns that I had earlier on

12    were addressed by Rishi and Shradha when I was made to feel

13    like the things that I had earlier concerns about were okay.

14         MR. HANKEY:  No further questions.

15         THE COURT:  All right.  Cross-exam -- or this is

16    recross-examination.

17         MR. HUESTON:  Yes, Your Honor.

18                    RECROSS-EXAMINATION

19    BY MR. HUESTON:

20    Q.  Good morning, Mr. Ketchum, or good afternoon.

21    A.  Good afternoon.

22    Q.  All right.

23    A.  It's Mr. Hueston, right?

24    Q.  Yes.

25    A.  Good afternoon, Mr. Hueston.

1    Q.  So I want to talk about the grand jury session and the

2    statement you read.  Let's start with that.  And that was I

3    think you're recalling about July 2019, right?

4    A.  Yes.

5    Q.  All right.  And so at that time you're trying to remember

6    things that happened seven, eight years before that, right?

7    A.  Yes.

8    Q.  All right.  And, now, just for perspective, over the last

9    couple of days through my exam and through others, you

10   acknowledge to the jury that you saw many, many e-mails for

11   the first time, right?

12   A.  Yes.

13   Q.  And it helped refresh your recollection and put different

14   context than what you had seen before, right?

15   A.  Yes, in some instances.

16   Q.  And even on topics that you testified to on direct

17   examination, right?

18   A.  Yes.

19   Q.  And these were many e-mails and documents that you had not

20   seen before you went to the grand jury, right?

21   A.  Yes.

22   Q.  Okay.  And so I don't think I heard this so let's --

23   correct me if I'm wrong.  I don't believe Mr. Hankey said,

24   well, Mr. Hueston represented, or you said you saw one, two,

25   three, four, five, six, or 20 e-mails for the first time but

1 | here's the evidence you were shown before, that you were shown
2 | these before, I didn't hear anything like that, right?
3 | A.  I'm sorry.  I'm a little bit confused by your question.
4 | Q.  Okay.  You didn't hear any suggestion that the e-mails
5 | that you identified as "I'm seeing for the first time" that
6 | you had seen them before in early government sessions, right?
7 | A.  Correct.
8 | Q.  All right.  And so based on that more limited set of
9 | e-mails and documents that you had seen up to the time of the
10 | grand jury, the government drafted a statement for you, right?
11 | A.  A statement I agreed with, yes.
12 | Q.  Sure.  At the time from what you had seen, right?
13 | A.  I stand by what I said based on the information.  So I
14 | recall to the best of my knowledge at the time based on what I
15 | had seen and did my best to recollect that.
16 | Q.  Sure.
17 | A.  I stand by that.  I've seen some things, and I'm doing my
18 | best to try to answer those as I see them truthfully.
19 | Q.  That's right.  And that's all we've asked you to do,
20 | right?
21 | A.  Of course.
22 | Q.  And so let's talk a little bit about that.  And you did
23 | the best you could based on the e-mails that you had seen to
24 | tell the truth at that time, right?
25 | A.  Yes, and I stand by what I said at the time.

1    Q.  Okay.  Now, in the grand jury, you were there with one

2    prosecutor, right, Mr. Madden?  You remember that?

3    A.  Yes, I believe so.

4    Q.  Okay.  And there was no defense lawyer there to ask

5    questions, right?

6    A.  No.

7    Q.  And there was no judge in the room to oversee what was

8    happening, right?

9    A.  I actually don't remember.  I don't think so.

10   Q.  Okay.  And but you remember by reading your statement you

11   weren't asked and in the statement you didn't show a single

12   document during that testimony, right?

13   A.  No.

14              THE COURT:  You say no.  You mean correct?

15              THE WITNESS:  Correct.  Sorry, Your Honor.

16              MR. HUESTON:  Thank you, Your Honor.

17   BY MR. HUESTON:

18   Q.  And as we've seen in the last few days and you've

19   acknowledged, the actual details of documents are important,

20   right, sir?

21   A.  Yes.

22   Q.  And as you've said, after seeing additional documents,

23   you've acknowledged context matters, right?

24   A.  Yes.

25   Q.  All right.  So in contrast to what happened here at trial,

1  you were asked in the grand jury to characterize or summarize

2  some of the documents that you had seen up to that time.  Fair

3  statement?

4  A.  Along with my own recollection, yes.

5  Q.  Okay.  So let's turn to some of the examples of what you

6  were citing.  Let's turn to some of the examples of what you

7  were saying in that grand jury statement.

8         So there was a statement that you read that stated,

9  "Typically the salespeople gave the list-match results back to

10  the clients as a representation of Outcome's current

11  inventory."

12         Remember?

13  A.  Yes.

14  Q.  Okay.  Now, yesterday you saw multiple instances where

15  salespeople actually did disclose the list match containing

16  projections, right?

17  A.  I did.

18  Q.  We went over example of example like that?

19  A.  Yes.

20  Q.  And in many instances, you just happened not to be on the

21  e-mail chain when that was transmitted.  You remember that?

22  A.  Yes.

23  Q.  All right.  And it makes sense that you didn't know that

24  the projections had been disclosed because at trial we learned

25  that you didn't even talk to pharma during the 2012/2013

1 period while doing the matches, right?

2 A. Correct.

3 Q. Okay. And we saw yesterday there were multiple instances

4 where Mr. Shah explicitly instructed salespeople to be

5 transparent and honest about what was included in the list

6 match, right?

7 A. Yes.

8 Q. Okay. And so for instance, we showed the example of

9 AstraZeneca, right?

10 A. Yes.

11 Q. All right. And this included Mr. Shah instructing you to

12 disclose to clients that a list match was based on growth,

13 right?

14 A. Could I see the e-mail?

15 Q. Sure.

16     MR. HUESTON: Let's go to -- this was Novo's Victoza,

17 this is another example, but let's go to that, 10105 at 1.

18 BY MR. HUESTON:

19 Q. Okay. Let's see. Mr. Shah down below. And can you tell

20 me -- "Hey, Jay, can you tell me what the match looks like if

21 we use the later stage of outreach? I think the best option

22 may be to give them this limited set of matches and let them

23 know this is a match on the diabetes network for which Novo

24 has contracted a weighted average of 1800 screens?"

25     Do you see that?

1    A.  Yes.

2    Q.  He's explicitly instructing you to disclose to clients

3    that a list match was based on growth, right?

4    A.  Yes.

5    Q.  And he's mentioning weighted average, right?

6    A.  Yes.

7         MR. HUESTON:  And let's just go to another example,

8    the AstraZeneca one, 10158 at 1.

9    BY MR. HUESTON:

10   Q.  Okay.  And Mr. Shah writes below:  "Steve, one of the

11   slides lists a percentage figure for the number of offices

12   that matched.  In order to calculate the number of offices by

13   decile, you should apply the percentage against our 2012

14   weighted average of 1200 offices?"

15        Do you see that?

16   A.  Yes.

17   Q.  "So if we have ten in decile 1, it means 120 offices in

18   decile 1."  And he goes on and says, "All our analysis was

19   calculated by offices."  And he continues:  "If you want to

20   convert to prescribers, then multiple" -- I think it's

21   multiply -- "the number of offices by the average number of

22   prescribers per office."

23        Right?

24   A.  Yes.

25   Q.  And this is to Mr. Svec, a salesman, right?

1  A.  Yes.

2  Q.  And up above, "FYI, copying Jason who quarterbacked the

3  last date match."

4      Right?

5  A.  Yes.

6  Q.  Okay.  So all that being openly talked about and

7  disclosed, right, sir?

8  A.  In this instance, yes.

9  Q.  Okay.  And you testified, sir, after seeing these e-mails

10  and others that there were just a lot of communications that

11  you never saw before and had since forgotten on this topic,

12  right?

13  A.  That's true.

14  Q.  And when I said in my question that these show that there

15  were conversations between Outcome and the client about

16  disclosures of projections, your answer was yes, right?

17  A.  Yes, those were e-mails that I was responding truthfully

18  to as I saw them.

19  Q.  Right.  And yet, while we saw repeated instances of

20  Mr. Shah instructing Outcome employees to disclose projections

21  in list matches, you'll agree we did not see a single instance

22  where Mr. Shah told anyone not to disclose projections, let

23  alone to hide them or lie about them, right, sir?  That's what

24  you testified to?

25  A.  Correct.

1  Q.  In fact, we saw every single salesperson from Outcome back

2  then, didn't we?  We saw Mr. Mons, Mr. Svec, and Mr. Crandall.

3  Those were the three starting salesmen, right?

4  A.  Yes.

5  Q.  And by the way, that wasn't discussed in the grand jury,

6  right?

7  A.  No.

8  Q.  Okay.  Now, here at trial we saw multiple presentations

9  and pitches disclosing projections before the list match

10  process even began, right?

11  A.  Yes.

12  Q.  And so, for instance, we go to CX 10108 at page 4.  This

13  is AstraZeneca, the Onglyza promotion.  And you'll remember we

14  saw this slide, right?

15  A.  Yes.

16  Q.  And this is a deck that we showed went to AstraZeneca,

17  right?

18  A.  Yes.

19  Q.  And option 1, option 2, option 3.  You see those?

20  A.  Yes.

21  Q.  Every one of them says weighted average, right?

22  A.  Yes.

23  Q.  And then we also talked about Amgen and the Enbrel drug,

24  right?

25  A.  Yes.

1  Q.  And with that one, you agree that that disclosure projects

2  into the future, right?

3  A.  Yes.

4  Q.  And we have also -- sir, you've admitted here at trial

5  that we saw multiple instances after the list match during

6  contract negotiations or even during the campaign when Outcome

7  continued to disclose projections to clients, right?

8  A.  Yes.

9        MR. HUESTON:  So, for instance, let's go to CX 8596

10  at 1.

11  BY MR. HUESTON:

12  Q.  And you'll remember this was the -- this was Mr. Mons,

13  right, talking about what he's going to be doing, right, down

14  below, including forecasted match installed, right?

15  A.  Yes.

16  Q.  And as we covered with this e-mail, I asked you, Mr. Mons

17  is literally telling you he's going to give the client color

18  on progress into November and December forecast?  You said

19  yes.  And, again, forecast, not already installed offices, and

20  you admitted yes, that's what it showed, right?

21  A.  Yes.

22        MR. HUESTON:  So we can put that down.

23  BY MR. HUESTON:

24  Q.  And you would agree, Mr. Ketchum, that even if there was

25  an e-mail during the list match stage where a projection was

1   not explicitly disclosed, that doesn't mean that the client

2   didn't know about growth, right?  They could have learned

3   about it some other way, right?

4   A.  I'm sorry.  Can you repeat your question?

5   Q.  Well, sure.  As we saw at trial, projections were being

6   disclosed at multiple points along the way.  That's what I've

7   just been showing, right?

8   A.  Yes.

9   Q.  Okay.  And given Mr. Shah's repeated instructions to

10  explicitly disclose projections, you have no reason to believe

11  that if someone somehow failed to later disclose a projection

12  that it was somehow Mr. Shah's fault, right?

13  A.  It would depend on the situation, but there were several

14  e-mails that you showed where that was the case.

15  Q.  Right.  And sometimes mistakes happen, right?  Somebody

16  doesn't disclose somewhere down the chain, right?

17  A.  Yes, it's possible.

18  Q.  And with the additional context that we were providing

19  here at trial, you now have agreed, you testified that the use

20  of projections as part of the business model was not a secret

21  to Outcome's clients, right?

22  A.  That you showed me e-mails that I was responding

23  truthfully to that indicated in many instances that was the

24  case.

25  Q.  That's right.  It was not a secret that Outcome's health

1 | business model was to sell then build, right?

2 | A. Correct.

3 | Q. That's how --

4 | A. Yes.

5 | Q. Yes. And you answered correct, it was not a secret,

6 | right?

7 | A. Correct.

8 | Q. All right. And then, in fact, you were asked and you

9 | clarified that sell then build necessarily involves

10 | projections, and you answered yes. And that's true, right?

11 | A. Yes.

12 | Q. And we went through several campaigns, Crestor, Humira,

13 | and then showed that those campaigns repeatedly were

14 | disclosing pipelines, right?

15 | A. Yes.

16 | Q. Were disclosing ramps, right?

17 | A. Yes.

18 | Q. Ramps means building up, yes?

19 | A. That's correct.

20 | Q. And forecasts, right?

21 | A. That's correct.

22 | Q. That's looking to the future, right?

23 | A. Correct.

24 | Q. All right. Now, your grand jury statement also contained

25 | some other claims about what you then perceived from what you

1  had looked at as issues with the list match process, right?

2  A.  Yes.

3  Q.  All right.  So, for example, you said, I believe, Mr. Shah

4  and Ms. Agarwal just wanted to be as aggressive as they could

5  to present as large a number as possible to the client, right?

6  A.  Yes.

7  Q.  And but after reviewing documents this week when I asked

8  you about this, you recalled that the forecasts and

9  projections that went into the list match were based on data

10  and analysis that took a lot of time and energy, right, sir?

11  A.  I did, yes.

12  Q.  And, in fact, on multiple instances, we saw examples where

13  Mr. Shah and Ms. Agarwal actually were sending lower numbers

14  than where Outcome's networks were projected to come, right?

15  A.  Yes.  Again, I do stand by my statement that I made at the

16  time.  I have been shown information that, again, I'm just

17  truthfully responding to as I sit here.

18  Q.  Sure.  And I know that.  And so that's why I'm walking

19  through these statements, sir, because this is information

20  that is new to you, and we've gotten testimony on that, right?

21  A.  Correct.

22  Q.  All right.  In fact, you remember in one instance in a

23  campaign, Mr. Shah said he was fine with 850, you know, even

24  though that was far lower than what was the projection.

25  Remember that?

1  A.  Yes.

2  Q.  Okay.  And there was another example with Ms. Agarwal in

3  the Amgen Prolia campaign that we reviewed where 757 as the

4  current match, that was lower than the match that Mr. Mons

5  asserted.  Do you remember that?

6  A.  Yes.

7  Q.  All right.  And so with this new context, Mr. Ketchum, you

8  were refreshed with the knowledge that actually Mr. Shah and

9  Ms. Agarwal didn't just push to present as large a number as

10  possible, right?

11  A.  In the instances I was shown, correct.

12  Q.  Okay.  And your grand jury statement also contained a

13  claim that you knew that the list match process was deceptive

14  when you were doing it.  Remember that claim?

15  A.  Yes.

16  Q.  All right.  But we then reviewed documents that were

17  telling clients that we really want to be clear about the

18  installation pipeline.  You remember that?

19  A.  Yes.

20  Q.  And that there were clear go-live dates, right?  You

21  remember that?

22  A.  Yes.

23  Q.  Where there was no obligation at all to have a device

24  installed before the go-live dates.  Remember that?

25  A.  Correct.

1  Q.  And then we matched up contracts with documents and

2  confirmation that the promise screens did go live on the day

3  they were promised.  Do you remember that?

4  A.  Yes.

5  Q.  And you confirmed yesterday, sir, that you never had an

6  intent to defraud, right?

7  A.  I had an intent to deceive at the time.  I stand by my

8  statement from grand jury.  At the time I felt as though and

9  feel at the time that the intent was to be deceptive.  I did

10  also testify that I didn't necessarily connect that that was

11  fraud.

12  Q.  Okay.  And you were asked, you never had an intent.  Your

13  answer was no, meaning correct, never an intent, and you

14  answered, never an intent.  Do you remember giving that

15  testimony?

16  A.  Yes.

17  Q.  Okay.  Now, we did go over in the last couple of days that

18  mistakes do happen, right?

19  A.  Yes.

20  Q.  All right.  And you know mistakes, that's not deception or

21  fraud, right?

22  A.  Mistakes are mistakes, that's correct.

23  Q.  Right.  Then your grand jury statement also included the

24  claim that there were only a very small number of cases where

25  I observed Outcome telling its pharmaceutical clients that it

1  was projecting growth into the numbers.  Do you remember that?

2  A.  Yes, I stand by my statement at the time.

3  Q.  Okay.  Yeah, at the time.  But then we looked at documents

4  and saw, in fact, disclosure of growth to Outcome's clients,

5  right?

6  A.  Yes, I saw -- you showed me several indicating that, yes.

7  Q.  Well, in fact, let's -- I showed you several.  I showed

8  you a lot, didn't I?

9  A.  Yes.

10  Q.  Okay.  So let's go to DX 10250 to try to save a little bit

11  of time.  And this is a demonstrative.  And this shows the

12  logos of the pharma companies that you and I reviewed.  Do you

13  remember us talking about each of these?

14  A.  I do.

15  Q.  And you recall, sir, we reviewed documents with respect to

16  each one of these clients that showed that they were all

17  informed of projections.  You remember?

18  A.  Yes.

19  Q.  And so you recall we saw explicit disclosure of growth and

20  projections to Amgen, right?

21  A.  Yes.

22  Q.  And a couple of different disclosures of projections to

23  AstraZeneca, right?

24  A.  Yes.

25  Q.  And that was option 1, 2, and 3 we went through, right?

1  A.  Yes.

2  Q.  And a discussion of projections by Johnson & Johnson,

3  right?

4  A.  Yes.

5  Q.  And, of course, J&J has multiple medications and products,

6  correct?

7  A.  Yes.

8  Q.  And we saw also multiple instances of disclosure of

9  projections to Novo, correct?

10  A.  Yes.

11  Q.  And we even saw a template, right, that could be used for

12  multiple clients that included a disclosure of weighted

13  average projection, right?

14  A.  Yes.

15  Q.  It said "insert sponsor logo here," right?

16  A.  Yes.

17  Q.  Clearly the intent it's going to be used with multiple

18  clients, right?

19  A.  Correct.

20  Q.  And to be clear, sir, as you testified yesterday, Outcome

21  didn't really explode in growth until 2013, right?

22  A.  Correct.  Sorry.

23  Q.  And in 2011, 2012, Outcome really had only a relative

24  handful of clients, right?

25  A.  Yes.

1  Q.  And, in fact, sir, when I asked you, you couldn't recall a

2  single Outcome client from 2012 that had not been informed of

3  projected growth, right?

4  A.  I believe that was true, yes.

5  Q.  Yes.  And looking at this group of clients right here,

6  sir, this is either 100 percent or close to 100 percent of

7  Outcome's business from 2012, right, sir?

8  A.  I'm actually not too sure about that.

9       MR. HANKEY:  Objection.

10 BY MR. HUESTON:

11 Q.  Okay.  Can you think of any other clients in 2012?

12 A.  Not off the top of my head.

13 Q.  Okay.  And, again, we went through each one of these and

14 showed disclosure of projections and growth, right?

15 A.  Yes.

16 Q.  So not a once in a while, it was to each one of them,

17 right?

18 A.  Yes.

19 Q.  All right.  Now, there were also a number of documents

20 that you've been copied on but you realize you'd just

21 forgotten about them, right, since it had been about a decade

22 since you had seen the e-mail, right?

23 A.  Yes.

24 Q.  Okay.  And that context that you and I reviewed helped

25 change your view about whether there actually were only a very

1  small number of cases where you observed Outcome telling the

2  pharma clients that it was projecting growth, right, connects

3  right with this review we did here, right, sir?

4  A. Yes, there were several examples.  Yes.

5  Q. Yes.  There were examples with all of these, right?

6  A. Yes.

7  Q. And those were examples that you didn't get a chance to

8  review before you went to the grand jury, right?

9  A. I don't -- I don't believe so.

10  Q. Right.  Or before you testified on direct exam, you were

11  having to answer them with me truthfully, right, for the first

12  time?

13  A. I answered questions truthfully as I saw documents, yes.

14  Q. Right.

15  A. Did my best.

16  Q. And that's all we've asked you to do.

17  A. Yes.

18  Q. And you also read the grand jury script, in this script,

19  that your recollection was that Shah and Agarwal typically did

20  not want clients to know about projections, right?  You said

21  that.

22  A. Yes.

23  Q. And that was also based on what was then the more limited

24  set of documents you've seen at that time, right?

25  A. Yes, I stand by my grand jury statement.

1  Q.  Right.  Based on what you saw at the time, that's what you

2  could observe, right?

3  A.  Yes, and my recollection.

4  Q.  And because you saw that, it turned out, as we just went

5  through, every single Outcome client at the time appears to

6  have been informed of projections.  That's what the evidence

7  we reviewed showed, right, sir?

8          MR. HANKEY:  Objection.  Foundation.  It goes

9  beyond --

10          MR. HUESTON:  Going over what he recalls.

11          THE COURT:  Overruled.

12  BY MR. HUESTON:

13  Q.  You can answer.

14  A.  Yes, you showed me several instances where that was the

15  case, yes.

16          MR. HUESTON:  Your Honor, this is a convenient

17  breaking point.

18          THE COURT:  Okay.  Ladies and gentlemen, we'll take

19  our lunch break, about an hour.  Please don't discuss the case

20  among yourselves or with anyone else, and keep an open mind as

21  there's more evidence to hear.

22          See you in an hour.

23          COURT SECURITY OFFICER:  All rise.

24      (Jury exits.)

25          THE COURT:  Okay.  Sir, please come back in an hour.

1  You're on cross-examination again so please don't discuss your
2  testimony with anyone.
3            THE WITNESS:  Yes, Your Honor.
4            THE COURT:  See you in one hour.
5        (Witness exits the courtroom.)
6            THE COURT:  Okay.  I'm going to have a written order
7  that supplements the oral ruling I made.  That will come out
8  sometime over lunchtime.  If you need further explanation or
9  any further explanation on it once that order comes out, you
10 can ask me for that.  But the reasons I admitted it, I'm
11 comfortable with the ruling.
12            Let's go to sidebar briefly.  We can be off the
13 record -- we'll stay on the record.  We'll go to sidebar
14 though.
15        (Sidebar.)
16            THE COURT:  All right.  Mr.  Lowder mentioned to my
17 law clerk -- was it Mr. Lowder, did you come up or someone --
18            MR. LOWDER:  (Inaudible).
19            THE COURT:  In front of the mic.
20            MR. LOWDER:  Yes, it was me.
21            THE COURT:  And I think you had noticed a juror that
22 may have been dozing off?
23            MR. LOWDER:  I did.
24            THE COURT:  Who was it?
25            MR. LOWDER:  It was the woman who sits in the back by

1  the wall, in the corner.

2         THE COURT:  Okay.

3         MR. LOWDER:  I don't remember the names because they

4  shift too much.

5         THE COURT:  All right.  That's why I asked for the

6  stretch break.  It would seem like a necessary time.  That's

7  the only way to deal with this.  But if you notice a juror --

8  I'm not going to put this -- that's why we're doing this at

9  sidebar.  But if you notice any particular juror or any juror

10 dozing, please do what you did and contact Sydney, or get my

11 attention if need be and just say go to sidebar and we'll do a

12 stretch break.  If it becomes a consistent problem where it's

13 not just someone resting their eyes but becomes a consistent

14 problem, we'll have to address it as we go forward.  But thank

15 you for bringing that to my attention.

16        MR. LOWDER:  Of course.

17        THE COURT:  Okay.  Back off of sidebar.

18     (End of sidebar.)

19        THE COURT:  Anything else the government needs to put

20 on the record at this point?

21        MR. HANKEY:  No, Your Honor.

22        THE COURT:  And how much more do you have,

23 Mr. Hueston?  Seems like you were winding up?

24        MR. HUESTON:  Not winding up.  I'll tell you though,

25 it will be less than an hour.

1          THE COURT:  Okay.

2          MR. HUESTON:  We're moving along.  As long as we --

3  you know, as cross, you never know what's going to happen.

4  But as long as -- you know, should be an hour.

5          THE COURT:  He seems to be agreeing with most of what

6  you say.  No, I'm being serious.  If witnesses fight on cross,

7  it takes longer because you need documents --

8          MR. HUESTON:  Yeah.

9          THE COURT:  -- to prove up the point you're trying to

10  make.

11          MR. HUESTON:  Right.  I mean, I didn't anticipate --

12  and I'm not whining.  The government did choose to go into a

13  number of documents.  So I do need -- there is some field that

14  I have to go into some documents to show a counterweight.  But

15  I'm not going to -- I'm going to keep it moving.

16          THE COURT:  And, Mr. Blegen, how much more do you

17  think you'll have?

18          MR. BLEGEN:  Not as long as Mr. Hueston.  Maybe half

19  as long.

20          Could I ask one clarifying question on a prior

21  ruling?

22          THE COURT:  Yes.

23          MR. BLEGEN:  So you previously indicated that we

24  might get a painful curative instruction if we criticize the

25  government by saying you didn't show somebody a certain

1  document during direct, for example.  Are we free to say --
2  and I think we are because Mr. Hueston already did it sort of
3  and didn't get a curative instruction -- that -- I mean, I
4  think I have to say, you didn't see certain documents before
5  your grand jury testimony.
6          THE COURT:  Oh, that's fine.
7          MR. BLEGEN:  Okay.
8          THE COURT:  Yeah.  That was asked without objection,
9  and that's fine.  I think the objection was the constant, the
10  government -- the government lawyers didn't show you this.
11  Now, it's implied the government is the only people that could
12  show it to him during this period.  But the objection was the
13  one that was made as to a particular phrasing.  I haven't had
14  an objection, nor would I likely sustain it if it's just you
15  didn't see this document, you didn't see that document.
16  That's proper cross.  That's why you're able to get the
17  witness to say in light of other documents I have now seen, I
18  may have a different conclusion.  That's the whole point of
19  the cross-examination, or one of the points.  So you're not
20  going to run afoul of any objection -- of any ruling I've made
21  if you ask what he was shown before he went in the grand jury.
22          MR. BLEGEN:  Right.  Except I'll probably lead it and
23  say you weren't shown.
24          THE COURT:  Yeah, no, of course.  Right.
25          And as to Purdy, there was -- you wanted to -- you

1  raised the issue that you don't believe you attacked his

2  credibility on cross-examination? Was that your objection

3  where you wanted a curative instruction?

4      MR. POULOS: Yes, Your Honor. I'm hoping the

5  government wouldn't even object to a limiting instruction as

6  to Mr. Purdy.

7      THE COURT: Well, talk to them. I don't know if they

8  will, and we'll talk about what -- if they do object, we'll

9  rule on the objection; if they don't object, propose a

10  curative instruction, but I -- well, enough said.

11      Mr. Hankey, my courtroom deputy listens in from her

12  office across the way. She was having trouble hearing you.

13  So I don't know if was you or Mr. Purdy, but one way or the

14  other -- not Mr. Purdy, Mr. Ketchum. It may have been

15  Mr. Ketchum she was talking about. She just said she couldn't

16  hear anyone on the mic, so just keep your voice up.

17      MR. HANKEY: Yes.

18      THE COURT: And Mr. Ketchum tends to -- when we tell

19  him to slow down, he also lowers his voice, and it's -- you

20  can't do both.

21      MR. HANKEY: Yeah.

22      THE COURT: Slow down and keep your voice up is the

23  instruction.

24      MR. HANKEY: Sounds good.

25      THE COURT: Anything else that anyone needs to raise

1  at this time?

2  MS. CHOU:  I do want to raise something with

3  Ms. Bautista who is the next witness, but we can do it after

4  lunch or the next break.  I'm not sure the best time.

5  THE COURT:  What is the issue?

6  MS. CHOU:  Just that I'm not sure if the government

7  is planning to do this in their examination, but in their prep

8  of her, they seemed to have shown her documents regarding the

9  number of sites that were available at some time, and I just

10  don't want that issue to be relitigated through her.  You

11  know, I think she can testify, I wanted to see offices.  I

12  don't think she can say that Outcome under-delivered.

13  THE COURT:  Yeah, thank you for raising that.  I've

14  allowed both sides to use a number of exhibits that are

15  admitted in evidence to make their point with this witness.

16  He is the vessel by which you are publishing these various

17  documents and making points.  But that is just a way to

18  prevent -- or to avoid having many, many more witnesses

19  presumably to come in and testify about the same documents.  I

20  don't think it's going to be appropriate.  I'll deal with it

21  situationally.  I don't think it's appropriate to keep

22  publishing the same documents through another witness when

23  we've already had one witness simply read it.  Was that -- who

24  is putting her on?

25  MR. APPLEBY-BHATTACHARJEE:  I'm putting her on.  Can

1  I respond to that, Your Honor?

2  THE COURT:  Go ahead.

3  MR. APPLEBY-BHATTACHARJEE:  The usual setup for I

4  think what we're talking about here is there will be a proof

5  of performance that says something, an invoice that says

6  something, and that is -- it's already substantively

7  admissible.  It's obviously relevant to the mindset of the

8  client victim regarding what they believe was being delivered.

9  There are internal communications --

10  THE COURT:  And she's a -- is she one of the client

11  victims?

12  MR. APPLEBY-BHATTACHARJEE:  Yes, she is.

13  THE COURT:  All right.

14  MR. APPLEBY-BHATTACHARJEE:  She's a representative of

15  AbbVie.

16  THE COURT:  Okay.  Got it.

17  MR. APPLEBY-BHATTACHARJEE:  There are internal

18  communications that were for obvious reasons not disclosed to

19  the client that are inconsistent with the information that is

20  given to the client.  I'm not asking her to opine on those

21  things.  I'm not asking her to interpret those things.  But it

22  does go to one of the allegations at the core of the

23  indictment which is concealment of information from clients.

24  THE COURT:  So you're going to show her an internal

25  e-mail and say, did you know this?

1          MR. APPLEBY-BHATTACHARJEE:  Correct.

2          MS. CHOU:  But, Your Honor, the issue is, as we've

3    gone through for the last two or three days, there's a

4    tremendous amount of context.  If they're going to do that,

5    then we have to put in all the other e-mails that the internal

6    people were looking at that informed their overall

7    understanding of --

8          THE COURT:  Slow down.

9          MS. CHOU:  We're just kind of relitigating --

10          THE COURT:  Slow down.

11          MS. CHOU:  -- this entire issue.  So that's what I

12    want to avoid, having to re --

13          THE COURT:  All right.  Let me think it over.  It

14    would seem, though, that showing her internal e-mails is

15    something that -- that she's -- she's not even cc'd on

16    obviously for obvious reasons, as you put it.  You could

17    simply ask the question, did you know?  You know, you'd have

18    to avoid the leading question, but I think you can ask her if

19    she knew certain things that you believe existed at that time.

20          MS. CHOU:  Your Honor, even that though I think opens

21    this question of what did exist at the time, what was the

22    actual number that was pushed out, you know, on the --

23          THE COURT:  Well, ask questions, but this deals with

24    whether you're going to throw a series of Outcome Health

25    e-mails in front of an outside witness who had no context,

1 doesn't know anything about those e-mails, necessarily as you

2 said because presumably these facts were hidden from them.

3 MR. APPLEBY-BHATTACHARJEE: The e-mails that we are

4 referring to refer to the brand, Humira, office count and

5 screen count.

6 THE COURT: Yeah, but how do you respond to

7 Ms. Chou's argument that then they get to put in about half a

8 dozen other e-mails that put that e-mail in context?

9 MR. APPLEBY-BHATTACHARJEE: The entire question is

10 about what was represented to the client, not what Outcome

11 believed internally. If Outcome never conveyed that

12 information to the client, then it is concealed from the

13 client.

14 MS. CHOU: I think it's reasonable to ask her what

15 was your understanding, expectation of what was supposed to be

16 delivered. I don't think it's appropriate to ask her, well,

17 does this mean to you that there was under-delivery?

18 MR. LOWDER: And, Your Honor, if I could add, and

19 that's the purpose. They're trying to put this information,

20 the internal communication about -- colloquy about what the

21 status of the network was at any given time which we've seen a

22 lot on to try and prove up through that witness that there was

23 under-delivery when she's not competent to testify to that

24 point. There was or was not under-delivery.

25 THE COURT: Yeah, I'll think about it over lunch.

1  But you can accomplish the same without showing her a

2  document, although it's in evidence, but showing her a

3  document that would need further explanation I think by the

4  defense once you put it in front of her and it's not an AbbVie

5  document.  You can ask her did you know; did you understand;

6  would you have made a different decision if you had known

7  there was fewer screens or fewer doctors?

8  MR. APPLEBY-BHATTACHARJEE:  If that is the ground

9  rule, Your Honor, then on cross-examination, defense should

10  absolutely not be allowed to show internal Outcome e-mails to

11  the witness.

12  THE COURT:  Well, they can ask the same questions,

13  but -- same manner of questions that you do, but you don't get

14  to show her -- if they can't show her the internal documents,

15  you shouldn't either.

16  MS. CHOU:  Your Honor, I agree with that general

17  rule, but this is a little bit nuanced because some of the

18  communications that she is on then get forwarded.  And so it's

19  very difficult to show her -- to ask her questions about what

20  was discussed without then -- without introducing the actual

21  government exhibit that has her on.

22  THE COURT:  That's the rule.  You can cut off e-mails

23  very easily that show what -- where she is on it and not the

24  forwarding to other people.  Either the government gets to put

25  in and have her look at some internal e-mails which I don't

1 think is necessarily a good idea --

2 　　　　MS. CHOU:  Your Honor, I think --

3 　　　　THE COURT:  -- or you will.  You won't be able to
4 either.

5 　　　　MS. CHOU:  If we --

6 　　　　THE COURT:  Why don't you talk about it over lunch.

7 　　　　MS. CHOU:  Okay.

8 　　　　THE COURT:  If that's what you're suggesting.  I
9 didn't mean to cut you off.

10 　　　　MS. CHOU:  I'm just saying we can just show her just
11 the portion that has her on it is --

12 　　　　THE COURT:  Something she is on is fair game for both
13 sides.  It's the unrelated e-mails which I've allowed you to
14 do with this witness in a way to expedite the examinations and
15 the presentation, both sides have done that.  But -- it's more
16 the defense than the government, but both sides have done it.
17 But now we're on to an outsider.  It's a little different
18 issue.

19 　　　　MR. APPLEBY-BHATTACHARJEE:  Your Honor, there's two
20 points that the internal information, if it's not conveyed, if
21 it's being widely distributed within the company and is not
22 conveyed to the client, it goes to concealment.  It goes to
23 materiality.  It goes to the nature of the misrepresentation.
24 It goes to the knowledge of the defendants if they are copied
25 on those internal communications which in many instances refer

1  to the contracted amount and the actual delivery amount.

2  THE COURT:  That's why the e-mails are relevant, but

3  why this witness?

4  MR. APPLEBY-BHATTACHARJEE:  It, again, goes to

5  concealment.

6  THE COURT:  But -- go ahead.

7  MR. APPLEBY-BHATTACHARJEE:  Because she I expect will

8  say if this is what X defendant who was copied on this e-mail

9  knew at the time and this person was communicating with you

10  during the negotiation of the contract and the delivery of the

11  contract, would you have expected them to tell you?

12  MS. CHOU:  Your Honor, this is an issue for the jury

13  to decide.  This is not something for this witness to opine

14  on.

15  THE COURT:  All right.  I stand by what I said.

16  You're going to have to ask questions about that, but I don't

17  see any reason -- for either side to be showing her e-mails

18  internal at Outcome that she's not copied on.  You can ask

19  questions that assume some facts that may be represented in

20  those e-mails, but you can't put up an e-mail saying -- to

21  comment on it when you can get that same thing out with a

22  question.

23  MR. APPLEBY-BHATTACHARJEE:  If I -- am I allowed to

24  ask a question were you aware that as of X date Outcome

25  reported internally that it had X number of offices and

1  screens?

2  THE COURT:  Yeah.

3  MS. CHOU:  Your Honor, that leads to the same issue.

4  Then we'll have to ask, well, were you aware that prior to

5  this date there was an e-mail sent to Ms. Agarwal that

6  communicated there were 155 sites available.

7  THE COURT:  Go ahead.

8  MS. CHOU:  Okay.

9  THE COURT:  You can both do it.  But my ruling is

10  limited just to what you're putting up on a screen in front of

11  a witness where she's not party to that e-mail.

12  MR. APPLEBY-BHATTACHARJEE:  Understood.

13  THE COURT:  But if there are questions that you want

14  to ask to establish materiality, concealment, and others you

15  want to ask on the defense side to point out that that

16  representation about those facts is nuanced or not true or

17  incomplete, you can do that too, but we're not doing it

18  through e-mails.  The witness is not on -- or not even part of

19  the entity that she worked for.  Okay.

20  MS. BELL:  Your Honor, I'm sorry.  Can I just address

21  that last part?

22  THE COURT:  Go ahead.

23  MS. BELL:  Yes.  I think that's, you know, going to

24  be very problematic when there's absolutely no foundation for

25  the witnesses to start talking about -- you know, they can

1  start with a blanket question, are you aware of what was

2  discussed internally at Outcome?  The answer is going to be

3  no.  To then allow the government to go down a long path of,

4  well, were you aware that they were discussing this

5  internally, that internally, this internally, that internally.

6       THE COURT:  Well, slow down.  They can ask that

7  because it's got to be a material misstatement.  They're

8  allowed -- they have to ask if that misstatement to them is

9  something that would have been important to them.  If they say

10  I don't care if it was 401 versus 400 screens, that's an

11  important question for you to ask.  If it's -- if the witness

12  says 480 screens which I thought I was getting and I only got

13  370, that's important for the government to ask about.

14       MS. BELL:  Agreed.  But what would be objectionable

15  is phrasing it in terms of are you aware they were discussing

16  internally that they only had 480 screens.

17       THE COURT:  If --

18       MS. BELL:  Asking her if it made a difference to her

19  or would have, that's fine.

20       THE COURT:  If it's a good faith basis to ask it,

21  which I assume there is because it's right on the e-mail,

22  they're allowed to ask it just as you are.  So there we go.

23  And if there's -- if in practice as this goes through if

24  there's an objection that I think is meritorious, I'll

25  consider it when it comes through.

1        Okay.  I assume people are making interim statements

2  after this witness?

3        MS. CHOU:  Yes.  Is the government exercising their

4  option to go first?

5        THE COURT:  Well, off the record.

6        (Lunch recess had from 12:44 p.m. to 1:29 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

3    UNITED STATES OF AMERICA,          )
                                        )    Docket No. 19 CR 864
4                    Plaintiff,         )
                                        )    Chicago, Illinois
5        v.                             )    February 8, 2023
                                        )    1:29 p.m.
6    RISHI SHAH, SHRADHA AGARWAL,       )
     BRAD PURDY,                        )
7                                       )
                     Defendants.        )
8

9        TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 7B
       BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11   APPEARANCES:

12
     For the Government:    MR. MATTHEW F. MADDEN
13                          MR. SAURISH APPLEBY-BHATTACHARJEE
                            Assistant U.S. Attorneys
14                          219 South Dearborn Street, 5th Floor
                            Chicago, Illinois  60604
15

16                          MR. WILLIAM E. JOHNSTON
                            MR. KYLE C. HANKEY
17                          U.S. Department of Justice
                            Criminal Division, Fraud Section
18                          Washington, D.C.  20530

19

20

21
                         SANDRA M. TENNIS
22                       KATHLEEN M. FENNELL
                        Official Court Reporters
23                   United States District Court
                 219 South Dearborn Street, Room 2260,
24                     Chicago, Illinois 60604
                           (312) 554-8244
25                 Sandra_Tennis@ilnd.uscourts.gov

APPEARANCES (Continued:)

For Defendant
Shah:                    MR. JOHN C. HUESTON
                         Hueston Hennigan LLP
                         620 Newport Center Drive, Suite 1300
                         Newport Beach, California  92660

                         MS. VICKI CHOU
                         MR. MICHAEL H. TODISCO
                         MS. KAREN DING
                         Hueston Hennigan LLP
                         523 West 6th Street, Suite 400
                         Los Angeles, California  90014

For Defendant
Agarwal:                 MS. KOREN L. BELL
                         MR. A. ALEXANDER LOWDER
                         MR. STEPHEN G. LARSON
                         Larson LLP
                         555 South Flower Street, Suite 4400
                         Los Angeles, California  90071

                         MR. PATRICK W. BLEGEN
                         MS. KELSEY H. KILLION
                         Blegen & Garvey
                         53 West Jackson Boulevard, Suite 1437
                         Chicago, Illinois  60604

For Defendant
Purdy:                   MR. THEODORE T. POULOS
                         MR. ERIC PRUITT
                         MR. JOHN PAVLETIC
                         Cotsirilos, Tighe, Streicker, Poulos &
                         Campbell, Ltd.
                         33 North Dearborn Street, Suite 600
                         Chicago, Illinois  60602

1    (Proceedings heard in open court.  Jury out.)

2         THE COURT:  Anything we need to put on the record?

3         MR. HANKEY:  Nothing from the government, your Honor.

4         THE COURT:  Defense?

5         MR. LOWDER:  Not from us, your Honor.

6         THE COURT:  Anything else from the defense?

7    Here's -- well, we can --

8         MR. POULOS:  Judge, we withdraw the request.

9         THE COURT:  You withdraw the request?  Okay.  Very

10   good.

11        Mr. Hueston, anything you need to put on the record

12   before we continue?

13        MR. HUESTON:  No.  Can I just have a couple minutes,

14   your Honor?  I just want to make sure everything's lined up.

15        THE COURT:  Okay.

16        MR. HUESTON:  We're ready.

17        THE COURT:  Okay.  Let's bring in the jury.

18      (Jury in at 1:34 p.m.)

19        THE COURT:  All right.  Please be seated.  Welcome

20   back, ladies and gentlemen.

21        Mr. Hueston, you may continue your

22   recross-examination of the witness.

23        MR. HUESTON:  Thank you, your Honor.

24     JASON KETCHUM, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

25             RECROSS-EXAMINATION (Resumed.)

1 BY MR. HUESTON:

2 Q. Mr. Ketchum, there's another reference back at the time of

3 the grand jury about Mr. Shah and Ms. Agarwal, to your

4 recollection, them not revealing to Outcome's own salespeople

5 that the list-match results contained projections. And so at

6 trial, though, sir, you remember we reviewed dozens of e-mails

7 where you said you've been seeing them for the first time, and

8 Mr. Shah and Ms. Agarwal were openly discussing projections

9 with Outcome salespeople. Do you remember that?

10 A. Yes.

11 Q. Okay. And, in fact, we saw multiple examples of each of

12 the three Outcome salespeople at the time communicating and

13 understanding of projections to Mr. Shah and Ms. Agarwal;

14 right?

15 A. Yes.

16 Q. An example showing that they were communicating that to

17 clients as well; right?

18 A. Yes.

19 Q. And on direct exam, I think you looked at three, or so,

20 examples where a salesperson wasn't copied on one e-mail chain

21 where the calculation of a projection was discussed, and those

22 involved, I think, Linzess and Crestor, for instance; right?

23 A. Yes.

24 Q. But then we saw that on every single one of those

25 campaigns, the salesmen, with additional e-mails that we

1    showed you, was made aware of the projections; right?

2    A.  Yes.

3    Q.  So, for instance, when I went through Pradaxa with Mons, I

4    asked you the question:  "And eventually, does Mr. Mons come

5    to learn there was a projection in this list-match?"

6              And you said:  "I believe so, yes."

7              Do you remember that testimony?

8    A.  Yes.

9    Q.  And then with respect to the Linzess campaign, I asked:

10   "So he knows that this shows an understanding that there's

11   going to be a projection; right?"

12             Answer:  "It does."

13             You acknowledged that; right?

14   A.  Yes.

15   Q.  And then, likewise, with the Crestor campaign, Mr. Mons

16   was shown there, too; right?

17   A.  Yes.

18   Q.  In fact, we went over Mr. Shah's e-mail where he says:

19   "Hi, Bob.  We just had a thorough discussion about where we

20   stand right now on Crestor-matched offices, where we'll be by

21   July 1, and also by December 31st, our growth by

22   December 31st."

23             I asked if you saw that.  You said, "yes."

24             And he writes:  "The conclusion is we'll have 604

25   Crestor-matched offices by July 1.  448 offices of them will

1  be in categories 1 and 2.  Do you see that?"

2          "Yes."

3          "And, in fact, sir, you see below Mr. Mons had

4  himself initiated his discussion with his own ramp schedules."

5          And you acknowledged, "yes."  Right?

6  A.  Yes.

7  Q.  And as you testified, this additional context helped you

8  recall that the sales team wasn't removed from e-mails to

9  prevent them from learning about the fact of the projections;

10 right?

11 A.  In those instances, yes.

12 Q.  Well, those were all the campaigns; right?

13 A.  Yes.

14 Q.  Okay.  And you also acknowledged that just that sometimes

15 there are -- sometimes there are certain complicated and

16 confusing details that you don't need to give salespeople;

17 right?  That comes up at times?

18 A.  Yes.

19 Q.  And, in fact, we saw examples of salespeople getting

20 confused and making mistakes; right?  That was reviewed with

21 you?

22 A.  Yes.

23 Q.  All right.  There was also a reference to proof of

24 performance in the grand jury; right?

25 A.  Yes.

1    Q.  Okay.  And that was a reference to the e-mail where you

2    said to Mr. Shah:  "Hey, we're contracted for 480 devices but

3    since we're at 419, what should I use to fill the gap?"

4            That was the reference point; right?

5    A.  Yes.

6    Q.  But, again, at trial, we brought out additional context

7    and documents; right?

8    A.  Yes.

9    Q.  And we saw, in fact, that all 480 devices were already up

10   and running at that point.  That's what you acknowledged;

11   right?

12   A.  Yes.

13   Q.  And that helped you remember that this wasn't about

14   concealing any devices shortfall or trying to trick the

15   client, it was just about whether to list out the primary care

16   physicians who were already playing the content on the

17   affidavit.  Do you remember that?

18   A.  Yes.

19   Q.  And we also addressed the issue of including devices that

20   were supposedly not yet installed.  Do you remember that?

21   A.  Yes.

22   Q.  And then we went back and looked at documents showing that

23   Mr. Kemp had already informed Mr. Shah that all 155 sites had

24   gone live; right?

25   A.  Yes.

1  Q.  And we even saw an e-mail from you, right, where you said,

2  yeah, this was truthful because you said to Mr. Shah, "155

3  sites are currently available."  That was your understanding

4  at the time; right?

5  A.  Yes, I believe so.

6  Q.  And maybe somebody made a mistake at the time, but that's

7  what you were saying, that's what Mr. Kemp was saying, that's

8  what Mr. Shah was saying; right?

9  A.  Yes.

10  Q.  All right.  And after reviewing these e-mails, you said

11  that Mr. Shah wouldn't have had any reason to believe, based

12  on that, that there was any shortfall at all; right?

13  A.  Correct.

14  Q.  Finally, there was a reference -- almost finally.  There's

15  a reference to claims about the IMS studies or ROI reports;

16  right?

17  A.  Yes.

18  Q.  And there was a specific reference about whether or not

19  there should only be full-time doctors listed.  Remember that?

20  A.  Yes.

21  Q.  And remember, then we showed you other documents you

22  hadn't seen about why you'd have to do certain things to keep

23  it apples-to-apples; right?

24  A.  Yes.

25  Q.  All right.  And, in fact, one e-mail that you admitted

1 you'd never seen before, Mr. Shah is disclosing this practice

2 to Johnson & Johnson and explaining the rationale or why it

3 made results more accurate.  Remember?

4 A.  Yes.

5 Q.  And here at trial, once you saw that, I asked:  "And so

6 Mr. Shah, you understood him to be explaining why it leads to

7 a more accurate result in this instance in filtering out

8 part-time physicians?"

9       And you said, "yes."  Right?

10 A.  Yes.

11 Q.  And you stand by that testimony; right?

12 A.  Yes.

13 Q.  Okay.  And then I refreshed your recollection with an

14 e-mail you were on from ten years ago, where the subject

15 matter experts at Crossix, they had also approved of this

16 practice and even recommended it, right, of taking part-time

17 physicians out; right?

18 A.  Yes.

19 Q.  And you hadn't seen that before; right?

20 A.  Not that I recall.

21 Q.  Right.  And seeing those things, sir, helped you remember,

22 as you testified, that there were legitimate reasons for these

23 filters; right?

24 A.  Yes.  In those instances, yes.

25 Q.  Right.  And then there was a reference to Mr. Shah making

1    changes to some of the IMS reports or data coming out.

2    Remember that?

3    A.  Yes.

4    Q.  Okay.  And remember here at trial we spent some time on

5    that; right?

6    A.  Yes.

7    Q.  And, in fact, we went through about half a dozen examples

8    where Mr. Shah did, in fact, catch actual errors by the IMS

9    and made changes to improve the accuracy.  Remember that?

10   A.  Yes.

11   Q.  And you acknowledged that you recalled that, but you

12   hadn't seen those e-mails before; right?

13   A.  Yes.

14   Q.  And that includes the one example that you walk through

15   when you were on direct exam.  Remember the Crestor PowerPoint

16   with that top bar --

17   A.  Yes.

18   Q.  -- that said that the IMS -- the statement that IMS --

19   that only 126 physicians had participated in the study?

20   A.  Yes.

21   Q.  And Mr. Shah removed that.  And without context, that

22   looks suspicious; right?

23   A.  Correct.

24   Q.  But then I showed you the whole context; right?

25   A.  Yes.

1  Q.  And you admitted when you saw the full story that, in

2  fact, 494 physicians had participated and 126 is what IMS was

3  coming back with, that that was an appropriate correction;

4  right?

5  A.  Yes.  Based on what I was showed, yes, I answered that

6  truthfully.

7  Q.  Right.  And you didn't have that information at the time

8  you were going before the grand jury; right?

9  A.  Not that I recall.

10  Q.  Okay.  So let me just briefly address a couple other

11  things that came up here.  I think there was an exhibit pulled

12  up, so let's do it, GX-107.

13        And this is -- you were shown this on your last exam

14  by Mr. Hankey and -- so this is January 22nd; right?

15  A.  Yes.

16  Q.  Okay.  And January 22nd there were 478 screens in the

17  pipeline; right?

18  A.  Yes.

19  Q.  Okay.  And yesterday you testified those could be

20  scheduled within a half an hour.  Remember that testimony?

21  A.  Um, I don't recall saying within a half an hour.  I'm a

22  little confused by that.

23  Q.  Okay.  Well, let's go to government exhibit 1157.  And

24  this is a January 31st e-mail.  You see that?  So we've gone

25  from GX-107 -- I think I misstated that it was brought before

1  you.  I'm not sure -- I'm getting mixed up what's been out in
2  the last exam, or not.
3         But the last one I showed you showed January 22nd,
4  478 screens; right?
5  A.  Yes.
6  Q.  Okay.  So the goal is 480; right?  Remember?
7  A.  Yes.
8  Q.  Just two more to go; right?
9  A.  Correct.
10 Q.  Okay.  So now it's January 31st, about a week later;
11 right?  Nine days later?
12 A.  Yes.
13 Q.  And adding sites every day, that was your recollection
14 when you were examined on this before; right?
15 A.  Yes.  I recall there was some confusion between screens
16 and the contract saying offices as well, but, yes.
17 Q.  Yeah, there was confusion; right?
18 A.  Yes.
19 Q.  There seemed to be some mix-ups inside; right?
20 A.  Yes.
21 Q.  Wasn't anybody intending to defraud anybody there.  It
22 seems like some people saying tomato, some tomat-toe.  There
23 was nobody trying to pull anything over on one another; right?
24 A.  It's hard for me to say specifically, but there were
25 definitely mistakes.

1 Q. Yeah. And we saw e-mails where -- and we'll go through

2 some of those in a moment with Humira that were done earlier,

3 where sometimes clients said offices, and then other people

4 responded in screens; right?

5 A. Sure. Yes.

6 Q. And you didn't think those people were trying to defraud

7 anybody when they said screens back to the clients. It's

8 confusion; right?

9 A. Yes.

10 Q. Okay. So let's go back to this for a moment. Here, on

11 this e-mail, in nine days, the whole idea was just, push out

12 two more screens; right? That would reach the goal; right?

13 A. If it was based on screens, yes.

14 Q. Yeah. And this information is going to the senior

15 leadership team; right?

16 A. Yes.

17 Q. And all it says here at the top is: We offered 155 rheum

18 sites above the current 325.

19      And if you add that together, I don't have great

20 math, but I think you get to 480; right?

21 A. Yes.

22 Q. So they added a total of two screens in nine days; right?

23 A. Yes.

24 Q. Okay. And that's what the senior leadership is aware of;

25 right?

1  A.  Seems so, yes.

2  Q.  Okay.  So we can put that down.  Sir, you remember that we

3  saw that the primary care physician sites, this is testimony

4  we went over at some length yesterday, they were disclosed to

5  Target Health later in the month.  Remember that?

6  A.  Yes.

7  Q.  Okay.  And that the client, at a very minimum, indicated

8  that those may be relevant sites; right?  They had to go back

9  and check.  So there was a discussion, no need to reduce the

10  contract at that time; right?

11  A.  Correct.

12  Q.  And we never saw an e-mail where the client said, okay,

13  don't count them.  We didn't see that; did we?

14  A.  Not that I've seen, no.

15  Q.  All right.  Last topic I want to briefly hit here.

16          You were asked on redirect about the -- again, we hit

17  it a little bit, screens versus offices for the Humira

18  campaign; right?

19  A.  Yes.

20  Q.  So let's go back.  I think Mr. Hankey showed you an

21  extension contract towards the end.  I want to show you the

22  original contract, which I reviewed with you in our exam and

23  you said you hadn't seen before.

24          So let's go to GX-1076.  And this says:  "Signed

25  Humira contract."  Right?

1  A.  Yes.

2  Q.  Okay.

3  A.  Yes.  I'm sorry.

4  Q.  And then let's go to the next page.  And this is it;

5  right?  Look at the description here.  And you remember us

6  going over this; right?

7  A.  Yes.

8  Q.  "Digital screens located in 325 waiting rooms."  Right?

9  A.  Yes.

10 Q.  And as you acknowledge when we reviewed that, that's the

11 contracts.  Screens in waiting rooms, not 325 offices; right?

12 A.  Yes.

13 Q.  Okay.  And we already discussed, right, that there are

14 often multiple waiting rooms in offices; right?

15 A.  Yes.

16 Q.  Okay.  And then you testified, then, that this contract

17 supported the notion that screens and waiting rooms, that's

18 the right unit, that's what the contract indicates; right?

19 A.  Yes.

20 Q.  All right.  So now let's compare that with what Mr. Hankey

21 showed you.  GX-137.

22         Let's go back for a second.  Let's get a date

23 reference.  So go back to the last document.  Let's go to the

24 front page.  First page.  Yeah.

25         That's November 20, 2012; right?

1    A.  Yes.

2    Q.  Mr. Hankey showed you GX-137.  And let's get that date.

3    And this is dated -- 137, please.

4              UNIDENTIFIED VOICE:  It's 129.

5              MR. HUESTON:  Oh, 129.  I'm sorry.  Okay.

6    BY MR. HUESTON:

7    Q.  Let's go back -- I'm sorry, I pulled up -- let me go back

8    to 1076 and get the front page of that.

9              Okay.  So that's November 20, 2012.  Do you see that?

10   A.  Yes.

11   Q.  Okay.  Then if we go to GX-129.  That's later in time;

12   right?

13   A.  Yes.

14   Q.  Okay.  And this is the new contract, one of the

15   incremental contracts that was coming later; right?

16   A.  Yes.

17   Q.  And then if we go to page 4 of that, we can go down to

18   that tenth entry.  That's what Mr. Hankey showed you; right?

19   A.  Yes.

20   Q.  And even here, the obligation for this incremental

21   contract, it's still described as digital screens located in

22   waiting rooms, and then there's their offices under that;

23   right?

24   A.  Yes.

25   Q.  And so again, this is a late contract which has the word

1  offices in it.  The original one didn't even have the word

2  offices in it; right?

3  A.  Correct.

4  Q.  And all of them have the word screens in it; right?

5  A.  That I've seen, yes.

6  Q.  Okay.  And so this might help explain what we saw in the

7  e-mail chains, that sometimes people got mixed up and used

8  these things interchangeably; right?

9  A.  Seems there has been some confusion there, yes.

10  Q.  But the first contract just said screens; right?

11  A.  Yes.

12  Q.  All right.  So let's go to the invoices, too, to see more

13  about what people understood.  So let's go -- we went through

14  those before, but let's just go to an example.

15          GX-148, page 3 of the exhibit.  And this is being

16  sent to the client; right?

17  A.  Yes.

18  Q.  And it says, "advertising content on 325 health screens."

19  Right?

20  A.  Yes.

21  Q.  Nobody is trying to hide from the client that we think

22  it's for screens; right?

23  A.  It doesn't seem that way.

24  Q.  And, in fact, it's consistent with the contract; right?

25  A.  Yes.

1  Q.  Okay.  And go to page 7.  This is for the incremental

2  contract now that you were shown.  And this says:  "The

3  invoices for Humira rheumatology content on 155 ContextMedia

4  screens during February 2013."  Right?

5  A.  Yes.

6  Q.  And right below it, it says:  "Screens are incremental to

7  325 screens per contract."  Right?

8  A.  Yes.

9  Q.  So written right into the invoice is -- and we think --

10  your recollection is the invoices, that was Jim Demas, the

11  CFO's job; right?

12  A.  That's my recollection, yes.

13  Q.  So it appears it's Mr. Demas, the CFO, he's writing his

14  understanding right into the invoices going right to the

15  client; right?

16          MR. HANKEY:  Objection.  Foundation.

17          MR. HUESTON:  He said he knew.

18  BY THE WITNESS:

19  A.  That's my understanding, yes.

20          THE COURT:  If he has an understanding, you can

21  explore the basis of it on re-redirect.

22  BY MR. HUESTON:

23  Q.  That's your understanding; right, sir?

24  A.  Yes.

25  Q.  Yes.  And here it is, screens are in additional to 325

1   screens placed in a document in black and white and sent to
2   the client; right?
3   A.  Yes.
4   Q.  Okay.  We can put that one down.  Okay.  I don't think I
5   need to go through more examples of that.
6           Sir, I just want to close with, I think you said it
7   already, we had a long -- a long, long set of documents and
8   testimony from you over the last couple days; right?
9   A.  Yes.
10  Q.  And you've done your best to look at those and tell the
11  truth, especially -- and -- and every time you saw something
12  new, you would honestly say, okay, this is something new, it
13  gives me a new perspective.  Right?
14  A.  Yes, I -- I did my best to answer truthfully to the things
15  I was being shown, yes.
16  Q.  And you're not recanting any of that; right, sir?
17  A.  No.
18          MR. HUESTON:  Thank you.  Pass the witness.
19          THE COURT:  Additional cross -- or recross?
20          MR. BLEGEN:  Judge, if I could just have a second to
21  clip the mic on.
22          THE COURT:  All right.
23          MR. BLEGEN:  Good afternoon, Mr. Ketchum.
24          THE WITNESS:  Good afternoon.
25                      RECROSS-EXAMINATION

1  BY MR. BLEGEN:

2  Q.  Mr. Ketchum, I heard you say a couple of times -- more

3  than a couple maybe -- during Mr. Hankey's questions that, "I

4  stand by my grand jury testimony."  Right?

5  A.  Yes.

6  Q.  Okay.  I guess it's pretty obvious by now, but you also

7  stand by what you said on cross-examination to me yesterday;

8  right?

9  A.  Yes.

10  Q.  Okay.  But I -- and you can correct me if I'm wrong.  I

11  detected a little note -- are you concerned about something

12  happening to you if you don't stand by your grand jury

13  testimony?

14  A.  No.

15  Q.  Okay.  What you've been telling us, I think, is that at

16  the time of your grand jury testimony, based on what you saw

17  from the government, right --

18  A.  Yes.

19  Q.  -- or from whoever showed you documents and remembered,

20  your grand jury testimony was true.  Correct?

21  A.  Yes.

22  Q.  And so, of course, that was based on your perceptions and

23  what you remembered at the time; right?

24  A.  Yes.

25  Q.  And you do understand that it is okay to change your

1   conclusions when you see new documents that convince you to
2   change your conclusions; right?
3   A.  Yes.
4   Q.  Okay.  You understand that that's not a problem; right?
5   A.  Yes.
6   Q.  Okay.  And that's what you did over the last couple of
7   days; correct?
8   A.  Yes.  In the instances I was shown, yes.
9   Q.  Right.  If you had seen me in 1985, you would have said:
10  Oh, there's Mr. Blegen with his big, red-head -- you know, a
11  bunch of hair; right?  But now you wouldn't say:  Oh, that
12  Blegen has a wonderful head of hair.  You would describe me
13  differently; correct?
14  A.  Yes.
15  Q.  And that's because your perception is based on what you
16  have seen now; right?
17  A.  Yes.
18  Q.  Okay.  And if something that you've seen now causes you to
19  think differently than what you said in your grand jury,
20  that's what you're telling us; right?  I now have a different
21  belief?
22  A.  I think both can be true.  I think I can still stand by my
23  grand jury statement based on the information that I -- my
24  recollection at the time and what I saw, and also truthfully
25  answer documents as I'm shown them now.

1  Q.  Right.  Well, let's just -- let me just talk to you about

2  one example for now.

3        When you testified on direct, your original testimony

4  a couple days ago now, last week to the government, you said

5  words to the effect of:  I think generally the salespeople did

6  not know that projections were being used.  Remember that?

7  A.  Yes.

8  Q.  And that's consistent with what you said in the grand jury

9  as well; right?

10 A.  Yes.

11 Q.  Okay.  But then you told me after we went through a bunch

12 of e-mails and documents that you hadn't seen, as you sit here

13 now, meaning yesterday, having seen more documents, do you

14 still think that's the case?  And your answer was, no.

15 A.  I saw -- I was answering truthfully to the documents I was

16 being shown.

17 Q.  Yes.  And that's what -- the point I'm trying to ask you

18 about is, you do understand that it is okay to do that; right?

19 A.  Yes.

20 Q.  Okay.  One of the questions that the government asked you

21 on redirect examination was about the Humira contract and what

22 it called for.  Do you remember that?

23 A.  Yes.

24 Q.  All right.  But you now know -- could we put up government

25 exhibit 114, page 2.  You now know, based on things that you

1   have seen in court over the last few days, that there were

2   times that there were agreements that weren't spelled out in

3   the contract.  Remember that?

4   A.  Yes.

5   Q.  Okay.  So the example I'm showing you, government

6   exhibit 114, is the Novo contract from two thousand and --

7   signed -- dated 2012, so it's going into 2013.

8          Do you see that?

9   A.  Yes.

10  Q.  Okay.  And you can take a quick second to look, but it

11  doesn't anywhere in there say that it is a weighted-average

12  contract; right?

13  A.  Can I just have a quick moment to confirm?

14  Q.  Yes.

15  A.  Thank you.

16          That's correct.

17  Q.  Can you put up government exhibit 143.

18          And this is a document that you saw the other day?

19  A.  Yes.

20  Q.  But you know now, because both the client and Mr. Shah

21  from Outcome Health are on there, that there was -- that both

22  parties understood that it was a weighted-average contract;

23  right?

24  A.  Yes.

25  Q.  Even though it wasn't written in the contract; right?

1  A.  Yes.

2  Q.  All right.  But so what happened when you were meeting

3  with -- in the grand jury, or before the grand jury and in

4  your direct, is the government would show you a contract, and

5  it wouldn't say weighted average; correct?

6  A.  Correct.

7  Q.  And you assumed -- no fault of your own -- that that meant

8  weighted average was not part of the contract; right?

9  A.  Yes.

10  Q.  But you now know that there are discussions outside of the

11  contract that you were not part of; right?

12  A.  Yes, there were discussions outside of the contract I was

13  not aware of.

14  Q.  In fact, before I close on that subject, the very last

15  paragraph of your grand jury statement makes clear that you

16  are allowed to change your mind based on new things that you

17  see; right?

18  A.  Yes.

19  Q.  I mean, it literally concludes by saying:  "After thinking

20  about it more, being asked more questions, or reviewing

21  additional documents, I may also remember events or details

22  that I do not remember now."  Right?

23  A.  Yes.

24  Q.  Okay.  And so that's exactly what's happened over the past

25  few days?

1  A.  It has in some instances, yes.

2  Q.  The last paragraph of your grand jury statement has come

3  true; correct?

4  A.  In some instances, yes.

5  Q.  Well, you're saying "in some instances," but there's also

6  some big picture issues here as well; right?

7  A.  Yes, I -- the documents that I was shown seem to indicate

8  that there were times I was incorrect.

9  Q.  Okay.  Like, for example, about Ms. Agarwal taking

10  people -- leaving a salesperson off of a chain as somehow a

11  way to hide from the salesperson that projections were being

12  used; right?

13  A.  Yes, we saw several examples where that was not the case.

14  Q.  Okay.  You also still believe, as you told us yesterday,

15  that everyone in Outcome Health and Outcome Health's clients

16  knew that Outcome's business model was sell, then build;

17  right?

18  A.  I can't speak to everyone, but we were shown several

19  instances where it was not hidden, yes.

20  Q.  Well, you did tell me that yesterday; right?

21  A.  Yes, but when you say "everyone," that comes across as

22  almost just too broad for me to feel comfortable saying.  But,

23  yes.

24  Q.  Clients knew it; right?

25  A.  Yes.

1  Q.  And people in Outcome Health knew it; right?

2  A.  Yes.

3  Q.  People not in the pharma or healthcare industry might have

4  had no reason to care about it; right?

5           THE REPORTER:  Can you say that again?

6           MR. BLEGEN:  Sorry.

7  BY MR. BLEGEN:

8  Q.  People not in the pharma industry would have no reason to

9  care about it; right?

10  A.  That's true.

11  Q.  Mr. Hankey asked you some questions about a statement you

12  had made in one of your meetings with the government on

13  December 13, 2018.  So if I could, I'd like to put it up on

14  the screen for you to look again.  But witness only and

15  parties.  And I'll ask --

16           Put it up, Laura, and then I can tell you which part

17  to highlight, as long as we're not on the --

18           THE COURT:  We're not.

19           MR. HANKEY:  Your Honor could we go to sidebar?

20           THE COURT:  All right.

21     (Proceedings heard at sidebar.)

22           THE COURT:  Go ahead.

23           MR. HANKEY:  This is appropriate if his recollection

24  needs to be refreshed.  But we haven't gotten to that point

25  yet, so he shouldn't be showing him a 302.

1           THE COURT:  What are you about to do?

2           MR. BLEGEN:  So, Judge, the issue is they --

3           THE COURT:  You've got to be in front of a mic.

4    Sorry.

5           MR. BLEGEN:  They discussed -- this is the issue

6    where I asked for completeness, that they read the entire

7    paragraph to him.

8           THE COURT:  Yes.

9           MR. BLEGEN:  I mean, I suppose I could just read it

10   again, but it will be easier for him to follow if I just

11   highlight that paragraph.  Because I want to ask him follow-up

12   questions about it.  He has already answered the question that

13   that is, indeed, what he told them.  I just -- he won't be

14   able to follow what I'm saying if I -- because it's like a

15   list --

16          THE COURT:  All right.

17          MR. BLEGEN:  -- of things.

18          THE COURT:  Go ahead.

19          MR. HANKEY:  No issue with that specifically, your

20   Honor.  But the follow-up shouldn't be with him reading the

21   302 in front of him.

22          THE COURT:  That is not what you intend to do;

23   correct?

24          MR. BLEGEN:  I mean, I was just going to leave that

25   paragraph up there so he could know what I'm talking about,

1    but --

2            THE COURT:  Well, orientate him to what you're going

3    through with refreshing his memory on the 302.  Then ask him

4    additional questions.  Maybe I'm misunderstanding the nature

5    of the cross here.

6            MR. BLEGEN:  They put in what I think they believe is

7    a prior, I guess, consistent statement in this instance.  I

8    want to ask him about that prior consistent statement.  I

9    would like him to be able to see it while I'm doing the

10   questioning so I don't have to keep putting it back up and

11   down.  It's --

12           THE COURT:  That's fine.  Witnesses sometimes have

13   statements up there or documents that they use to refresh

14   their memories, we don't go back and forth.  But this gets him

15   in the topic that you're talking about.  But he shouldn't be

16   reading from it to testify.  His testimony should be firsthand

17   memory or refresh memory.

18           MR. BLEGEN:  That's fine.  I'll do that first.

19           THE COURT:  All right.  Try it that way.  Okay.

20           (End of sidebar proceedings.)

21           MR. BLEGEN:  So, Laura, do not put it up yet, but

22   it's DX-5655, page 3.

23           THE COURT:  All right.  Proceed.

24   BY MR. BLEGEN:

25   Q.  Mr. Ketchum, do you remember on your redirect examination

1  Mr. Hankey was asking you questions about something you said

2  during your December 13, 2018, interview?

3  A.  You'd have to refresh my memory on what he said, sorry.

4  Q.  Well, he read it to you, so I'll just read it to you

5  again.

6              THE COURT:  You can do that.

7  BY MR. BLEGEN:

8  Q.  Do you remember where Mr. Hankey read to you that you had

9  said:  "Generally Agarwal indicated she didn't want pharmas to

10  know the list-match contained projections.  One way she did

11  this was by excluding '08 sales from e-mails discussing this.

12  In another way, throughout Agarwal's back-and-forth e-mails

13  with Ketchum and others, there was no mention of showing

14  projections to the pharmas."  Right?

15  A.  Yes.

16  Q.  Okay.  And so what you told the government then was,

17  Ms. Agarwal indicated she didn't want pharmas to know by the

18  way she handled her e-mails; right?

19  A.  Yes.

20  Q.  Okay.  And one was by excluding people; right?

21  A.  Yes.

22  Q.  But we now know, having seen documents, that that's not

23  the case; right?

24  A.  We saw several, yes.

25  Q.  Okay.  And the other way was by there being no mention of

1    showing projection to pharmas in back-and-forth e-mails;

2    right?

3    A.  Correct.

4    Q.  But we've now seen a bunch of e-mails where the

5    projections are explicitly discussed in the e-mails; right?

6    A.  We did.

7    Q.  Okay.  So what you said -- you have since learned that

8    what you said back in 2018 to the government was incorrect

9    based on information you later learned; right?

10   A.  In the instances we've seen, yes.

11   Q.  Okay.  And they haven't come up here and shown you other

12   instances of that happening; right?

13             MR. HANKEY:  Objection, your Honor.

14             THE COURT:  Sustained.

15   BY MR. BLEGEN:

16   Q.  Well, the government showed you your grand jury testimony;

17   correct?

18   A.  Yes.

19   Q.  All right.  You've been talking about instances a lot;

20   right?  You've been saying "in that instance" or "that

21   instance."  Right?

22   A.  Yes.

23   Q.  On your redirect examination, were you presented with

24   other e-mails that --

25             MR. HANKEY:  Objection.

1    THE COURT:  Yeah, I think the jury can observe what

2  happened on redirect and cross, so it's not necessary to ask

3  the witness what happened.

4    THE REPORTER:  Mr. Hankey, can you keep your

5  microphone closer, please.

6    MR. HANKEY:  Yes, ma'am.

7    THE COURT:  Or don't make objections.

8    (Laughter.)

9    MR. BLEGEN:  That's my preference.

10    THE COURT:  All right.  Go ahead.

11  BY MR. BLEGEN:

12  Q.  Mr. Hankey also showed you, or did show you on redirect,

13  some examples of the install numbers being sent out to other

14  people within Outcome Health; right?  Do you remember that?

15  A.  Yes.

16  Q.  Okay.  That was one of the things that Ms. Agarwal wanted

17  done; right?

18  A.  Yes.

19  Q.  Okay.  And she didn't say, make sure you only send it to

20  people in the black box; did she?

21  A.  I don't know what you mean by black box.

22  Q.  Okay.  She didn't say, hey, don't let anybody else know

23  about this; did she?

24  A.  Correct.

25  Q.  She was interested in open communications about data and

1  everything else within Outcome Health; was she not?

2  A.  In many instances, yes.  Yes.

3  Q.  Your grand jury testimony did not specifically discuss the

4  Multaq issue; did it?

5  A.  I don't recall.

6  Q.  Well, it was read to you sometime ago; right?

7  A.  No, I do, but I don't recall -- Multaq was not named in

8  the grand jury testimony, yes.

9  Q.  All right.  And so the grand jury testimony has nothing to

10  do with the fact that you told me yesterday that there was

11  nothing deceptive about the Multaq issue after you saw

12  additional e-mails; right?

13  A.  From what I was shown, yes.

14  Q.  The Xarelto issue was not specifically discussed in the

15  grand jury; was it?

16  A.  Not that I recall, no.  I don't recall it being named.

17  Q.  And so nothing that was said in the grand jury changes

18  anything about the fact that you told us yesterday that there

19  was nothing deceptive about the Xarelto issue; right?

20  A.  Based on the information that was read to me yesterday,

21  and I answered as truthfully as I could when I saw it, that

22  seems correct, yes.

23  Q.  Okay.  That was the one where there was no, like, double

24  booking; right?

25  A.  Yes.  It was for a future potential contract, yes.

1  Q.  Right.  You had said on direct, well, 3200 was a lie.  But

2  when you realized it was a future contract, you realized it

3  wasn't a lie; right?

4  A.  Correct.

5  Q.  And the grand jury has nothing to do with that because you

6  didn't discuss Xarelto in the grand jury; right?

7  A.  That's correct.

8  Q.  The issue regarding Spark, remember that one?  The new

9  agency?

10  A.  I do.

11  Q.  That also wasn't discussed in the grand jury; was it?

12  A.  No.  Not specifically, no.

13  Q.  So the grand jury testimony has nothing to do with the

14  fact that yesterday you told us there wasn't anything about --

15  deceptive by Ms. Agarwal about the Spark issue; right?

16  A.  Based on the documents I was shown yesterday, it seemed as

17  though it was not deceptive.

18  Q.  So I'm correct; right?

19  A.  Yes.

20  Q.  The issue about whether the Humira screens were actually

21  being played on -- on the screens.  Do you remember that from

22  yesterday?

23  A.  Yes.

24  Q.  Also not specifically discussed in the grand jury; was it?

25  A.  No.

1  Q.  So what you told me yesterday, that that wasn't deceptive,

2  the ads actually were being played, has nothing to do with the

3  grand jury; does it?

4  A.  From what I was shown, that's correct.

5  Q.  And you're affirming that what you said about that

6  yesterday is correct, there wasn't -- the ads were really

7  played; right?

8  A.  From what I was shown, yes.

9  Q.  And the issue of Bob Mons being specifically taken off of

10  that e-mail, remember that first you thought it was deceptive

11  because Ms. Agarwal says based on projection and Mons is not

12  on that one?

13  A.  I recall, yes.

14  Q.  And then we went through it and you were like:  Oh, it

15  turns out Mons already knew it was a projection.  Right?

16  A.  Yes --

17  Q.  That wasn't specifically -- I'm sorry, did I interrupt

18  you?

19  A.  A little bit, but it's okay.

20  Q.  That wasn't specifically discussed in the grand jury

21  either; was it?

22  A.  No.

23  Q.  And so your grand jury testimony has nothing to do with

24  the fact that yesterday you said, that's not deceptive; right?

25  A.  That's correct.  You showed me information where Mr. Mons

 1  was made aware of that instance, yes.

 2  Q.  And lastly, your grand jury testimony had nothing to do

 3  with the e-mail where Ms. Agarwal asks about the guy who

 4  hadn't been hired yet, Mr. Prowker:  "Does he understand that

 5  we sell, then build at Outcome Health."  Right?

 6  A.  That's correct.

 7  Q.  And you told me that that means Ms. Agarwal was -- wanted

 8  it to be announced to a guy who didn't even work there yet

 9  that that was their business plan, sell, then build?

10  A.  Yes.

11  Q.  Which means we sell on projection; right?

12  A.  Yes.

13  Q.  And nothing in your grand jury testimony contradicts that;

14  does it?

15  A.  No.

16          MR. BLEGEN:  If I could just have a moment, Judge?

17          THE COURT:  All right.

18          MR. BLEGEN:  Judge, Ms. Bell has just reminded me, I

19  may not have actually asked to admit 114, but it's GX-114.

20          THE COURT:  Any objection?

21          MR. HANKEY:  No objection, your Honor.

22          THE COURT:  All right.  It's admitted without

23  objection.

24      (Exhibit admitted into evidence.)

25          MR. BLEGEN:  That's all.  Thank you.

1      THE COURT:  All right.  Any additional questions?

2      MR. PRUITT:  No, your Honor.  No questions for Brad

3  Purdy.

4      THE COURT:  All right.  Any additional re-redirect

5  that is limited to the scope of the recross?

6      MR. HANKEY:  No, your Honor.

7      THE COURT:  Okay.

8      Sir, you're excused.  Thank you.

9      THE WITNESS:  Thank you, your Honor.

10    (Witness excused.)

11     THE COURT:  Call your next witness.

12     MR. PRUITT:  Your Honor, I believe we'd like to offer

13  interim statements, at least on behalf of the defendants.

14     THE COURT:  You may.  Whose going first, or are all

15  of you, or some of you?

16     MR. PRUITT:  I am, your Honor.

17     THE COURT:  All right, you may.

18     Ladies and gentlemen, I'm reminding you that I give

19  the parties a limited opportunity always in a lengthy trial to

20  make interim statements.  These are no different than opening

21  statements, closing arguments.  They're not evidence, in and

22  of itself, but it's arguments about what the lawyers believe

23  the evidence has shown or will show going forward.  So you

24  understand, these don't go on for hours.  I give each side a

25  limited amount of time.  The other side keeps track of it.

1  The government gets ten minutes, the defense gets 15 minutes

2  per week.  It doesn't carry over, and it can never be done to

3  interrupt a witness.  It can only take place after there is no

4  witness on the stand.  The government will keep track of the

5  defense time.  Defense keeps track of the government time.

6  And I can assure you, no one is going to go a second over the

7  time they have allotted because someone's going to jump up and

8  say they're done.

9         With that, Mr. Pruitt, you may give your interim

10  statement.

11         MR. PRUITT:  Thank you, your Honor.

12         INTERIM STATEMENT ON BEHALF OF DEFENDANT PURDY

13         MR. PRUITT:  Ladies and gentlemen, Mr. Ketchum is one

14  of the government's key cooperating witnesses that they're

15  trying to use to prove their case to you.  The government led

16  you to believe at the outset of Mr. Ketchum's testimony that

17  you were going to hear testimony and see evidence that Brad

18  Purdy participated in fraudulent activities with Mr. Ketchum,

19  including fraudulent manipulation of those ROI reports and

20  inflating list-matches in some fraudulent way.

21         Ladies and gentlemen, the government did not come

22  close to delivering on that promise.  Ladies and gentlemen,

23  the government did not show you a single document that

24  suggests Brad knowingly participated in a scheme to defraud

25  anyone.  You did not hear or see any evidence that Brad Purdy

1   deceived a client regarding an ROI report.  You did not hear

2   or see any evidence that Brad Purdy did anything to deceive a

3   client regarding a list-match.  And you certainly did not hear

4   or see any evidence that Brad Purdy knowingly participated in

5   hiding under-delivery on a contract from anyone.  And as

6   Mr. Ketchum himself admitted up there, Mr. Purdy never asked

7   him to lie to a client.  Mr. Purdy never asked him to hide

8   anything from a client.

9          What you did hear from Mr. Ketchum on the stand was

10  that Mr. Purdy oversaw software development, acquiring devices

11  that you've heard so much about, the logistics of installing

12  those devices in those offices, acquiring educational content,

13  and later in time, he was involved in traveling to China and

14  setting up supply chains there for getting those devices made.

15  These were all activities on the membership side of the

16  business.

17         What he was not involved in, according to

18  Mr. Ketchum, was selling ads, negotiating contracts with

19  pharmaceutical clients, and he was never in charge of

20  sponsorship sales.  All those folks were interacting with the

21  clients about these contracts.

22         As the government keeps presenting its witnesses and

23  its evidence, we're going to ask you to continue focusing

24  closely on that evidence with respect to each individual

25  defendant, and particularly, folks, on the absence of evidence

1     that Mr. Purdy knowingly participated in deceiving anyone.

2     Thank you.

3              THE COURT:  Thank you.  Anyone else?

4              MS. BELL:  Yes, your Honor.

5              THE COURT:  You may proceed.

6              And, Ms. Bell, you should introduce yourself to the

7     jury.  I don't think you've been up with argument or

8     cross-examination yet.

9              MS. BELL:  I think just for Mr. Kazi, at the very

10    beginning.

11             THE COURT:  Oh, you're right.  I'm sorry.  But it's

12    been a while, so go ahead.

13             MS. BELL:  So long ago now.

14        INTERIM STATEMENT ON BEHALF OF DEFENDANT AGARWAL

15             MS. BELL:  Good morning, everyone.  Nice to see you

16    from this vantage point.

17             So through Mr. Ketchum, we got a snapshot of the time

18    that Ms. Agarwal spent involved with sales.  That was the

19    2012-to-2013 period.

20             THE COURT:  Is your mic working?

21             MS. BELL:  Oh, you know, I think I need to connect

22    myself.  Sorry.  False alarm, I guess.  I guess I need the --

23    all right.

24             MR. HUESTON:  I assume we're on a restart here?

25             THE COURT:  No, we are.

1    (Technical issues.)

2        MS. BELL:  Okay.

3        THE COURT:  Go ahead.

4        MS. BELL:  So, and then -- sorry, this is my first

5    time actually using this.  So we stick this in our pocket

6    or --

7        THE COURT:  Yeah, that's probably the easiest thing.

8    Make sure the green light's on.

9        MS. BELL:  Okay.

10       THE COURT:  Ladies and gentlemen, the court reporters

11   have headphones.  And speaking louder doesn't help for them

12   because they're listening to what comes through on the mic.

13   They get a much clearer audio when they do that.  So lawyers

14   are used to talking without mics, raising their voices.  And

15   it's a little different in this courtroom, and a lot of the

16   new courtrooms, where court reporters use their headphones to

17   get a very accurate recording -- not a recording, but an

18   accurate hearing of what's being said.

19       With that, hopefully we're set.

20       MS. BELL:  We are set.  So I'll -- just to reorient

21   everyone...Through Mr. Ketchum, we got a snapshot of that

22   one-year period that Ms. Agarwal was involved in sales.  And

23   you heard that she was pulled into sales as a byproduct of her

24   many other roles that you heard quite a lot about.  And, in

25   fact, in that e-mail where Mr. Shah announces that to the

1   whole company, he highlights those other roles that she was

2   involved in at the time.  And this was in particular in

3   relation to the expansion of the company from the Chicago home

4   base, where Ms. Agarwal, Mr. Shah, and Mr. Purdy were located,

5   to the New York office, where you will learn is the office

6   from which Mr. Desai actually operated his fraud scheme.

7          And you'll also hear, and you've heard, that she, in

8   summer 2013, transitioned back and refocused on her roles.

9   And that was when Mr. Desai actually came in and was hired in

10  sales.  You will hear more about that.

11         So what about 2012 to 2013?  This was a period when

12  Ms. Agarwal and Mr. Shah could be more hands on, more

13  personally involved in the day-to-day of the company.  Because

14  as you've heard, it was still small.  20 people.  Two

15  networks, diabetes and rheumatology.  One product, those

16  screens in the waiting room, before the tablets and all those

17  other products that came later.  So this was right before that

18  period of rapid growth began in 2013, when they had to start

19  hiring leaders and delegating more.

20         So what did we learn about that 2012-to-2013 period?

21  Well, what you've seen is the very opposite.  The very

22  opposite of an intent to defraud and a scheme to defraud,

23  which is, of course, what the government has to prove to you

24  here in a criminal case.  This is not a breach of contract.

25  It's not about mistakes.  It's not about confusion.

1        So what have we seen over and over again, and what

2  did we hear in the end from Mr. Ketchum?  That the fact of

3  projections was well-known and openly discussed with the three

4  salespeople at the time.  That was Mr. Mons, Mr. Crandall,

5  Mr. Svec, as well as Ms. Agarwal and Mr. Shah, in addition to

6  the clients.

7        We heard about data-based analysis.  All of those

8  crunching numbers.  The forecasts and the ramps.  The

9  percentages.  The hundreds of hours worked per week to get

10  things right.

11        And we heard about efforts to fulfill contractual

12  obligations and to make good when there was a shortfall.

13  Good-faith.  Good-faith is absolutely at odds with an intent

14  to lie and a plan to lie.

15        We also heard a lot about communications and how

16  these communications were not all in writing, and how

17  Mr. Ketchum, in many instances, wasn't privy to these because

18  it was the salespeople back and forth with the agencies and

19  the agencies with the clients.  It was like a big game of

20  telephone.  And we saw an example of that just now on the

21  recross of Mr. Ketchum with the Novo contract, the 2013

22  contract, where no mention of weighted average.  It talks

23  about 1800 screen locations.  But then we see Mr. Shah and the

24  client having a discussion about the weighted average

25  understanding.

1    So what don't we see?  What don't we see in -- in
2  what we've heard and the evidence we've seen?  Any evidence of
3  an intent to lie to pharma clients and any evidence of any
4  scheme to lie to pharma clients.

5    So let's just run through some of -- some of the
6  highlights here.  And there are many examples, but I've pulled
7  out a few.

8    So, first, fraudsters don't advertise the supposed
9  fraud.  And we've talked about this e-mail quite a lot.

10    Fraudsters don't demand accurate data.  You've seen a
11  number of e-mails, discussions, about accuracy.

12    Fraudsters don't bother with data-based analysis.
13  And this is the accurate-versus-made-up e-mail on the left
14  that you've heard so much about.  If you look back at that,
15  when you have that with you in the jury room, you'll see that
16  was Ms. Agarwal discussing misperception.  The second
17  paragraph talks about data-based analysis.  And now you've
18  seen the backup, through Mr. Ketchum.  Data-based analysis.
19  Fraudsters don't bother with that.  They pluck numbers out of
20  the sky.

21    Fraudsters don't admit that a network is growing slow
22  and give live numbers instead of projections.  They just
23  capitalize.  They say:  Oh, yeah, we're growing.  I'll just
24  pick the number that is best for me.

25    Fraudsters don't adjust numbers down.  And you've

1 seen several examples of that. This one was Bob Mons and

2 Ms. Shah -- Ms. Agarwal correcting -- correcting him. And

3 there was another example, Mr. Shah.

4 Fraudsters don't race to meet contract obligations.

5 Doesn't matter. You just lie and say you've done it.

6 Fraudsters don't tell new agency about -- the new

7 agency about under-delivery.

8 Fraudsters don't implement transparency measures,

9 which you've heard lots about.

10 Fraudsters don't bring in top outsider talent.

11 Okay. And what did we hear from Mr. Ketchum,

12 supposed pillar of the fraud scheme, together with Mr. Desai

13 and our clients? No intent to defraud. Did not think he was

14 participating in a fraud. Did not teach Ashik Desai fraud.

15 And that is critical because of the government's theory here

16 that they were operating together as pillars of the fraud

17 scheme together with our client.

18 Shortly you will hear about the real deal: Made-up

19 numbers, intentional lies, a coordinated plan, and the

20 destruction of evidence. Thank you.

21 THE COURT: Any additional interim statements?

22 MR. HUESTON: Yes, your Honor.

23 THE COURT: All right.

24 MR. HUESTON: Can I have a moment to --

25 THE COURT: Sure. Clock is off.

1    Often these interim statements, ladies and gentlemen,
2    are spontaneous.  These are not, as you can see from
3    PowerPoint slides prepared, so.
4        Double check your mic's working, too.
5        MR. HUESTON:  Yes, okay.  May I proceed?
6        THE COURT:  You may.
7        INTERIM STATEMENT ON BEHALF OF DEFENDANT SHAH
8        MR. HUESTON:  Ladies and gentlemen, you witnessed
9    something dramatic here at trial.  You saw a witness come
10   in -- I mean, you might watch TV shows and think things can
11   happen like this.  You saw a witness come in who was supposed
12   to be testifying in one direction, and he got completely
13   turned around by the end of our cross-examinations in another.
14   And it was not by any trick, it was he honestly saw what?
15   Context.  Context matters.  I said it in opening statement,
16   and you saw it here, opening up live before you.  It was an
17   amazing moment that you as jurors got to see, got to live
18   minute-by-minute.  That's called the exposure of truth, and
19   you saw it.
20       I'm just going to briefly go through.  Mr. Ketchum
21   says it in his own words.  You and I, I said to him, have gone
22   through examples and saw that.
23       "In a number of instances, your understanding at that
24   time is that you had, in fact, given testimony without the
25   full context; right, sir?"

1      And he said, "Yes."

2      Here are just a few examples:

3      That Outcome missed its projection deadline on

4   October 1st, and then in cross-examination, shown more

5   documents, said:  You know what, looks like it wasn't due by

6   October 1st.  I was wrong.

7      Remember this document?  Government spent 30 minutes

8   on it.  The removal of that first dark bar.  He's testified,

9   you know what, consistent with Mr. Shah trying to do the right

10  thing, he took that off.  My mistake.

11     And, again, the list that Outcome sent to IMS having

12  only 126 patients.  Mr. Shah was right.  It actually had over

13  500, and that's the amount that came back.  Mr. Shah made a

14  revision consistent with making it more accurate.

15     On direct, you saw nothing from Mr. Shah showing you

16  want to be transparent?  And, you know, Mr. Ketchum said:

17  Gosh, from what I've seen, yeah.  But then on cross, after

18  showing him dozens of new documents, which he honestly

19  described as new, you know what, Mr. Shah is saying to

20  disclose, over and over again.

21     On direct:  "Sir, isn't it true there weren't 155

22  sites?"

23     On cross, it took a while, but remember, go live

24  means it's ready to go, push the button.  He said:  You know

25  what, they were available.

1    Supposed fraud disappears.

2    On direct:  "I think generally salesmen did not know

3    projections were used."

4    You heard it over and over again.  Dozens of times

5    they were shown, projections were used.

6    How about these three demonstratives that I built

7    with him?  The government didn't even try to rehabilitate him

8    on two of the campaigns.  They only brought up Humira.  And

9    they were wrong on that.

10   Humira, they said, you know, here's that last little

11   contract, offices.  Isn't it all about offices?  I showed

12   through the witness it's about screens, or at least there was

13   a misunderstanding maybe in the last portion.  And when you

14   measure by screens, they made it in the campaign.  These are

15   the three they've picked out of hundreds that they don't

16   question.

17   Crestor campaign.  They didn't even try to contest

18   that it was in screens.  When we put the right blue Xs on

19   there, we did the right thing.  We met and exceeded the

20   targets.

21   And the one in the middle, Pradaxa, that was a

22   complicated story.  Mr. Ketchum said both sides had problems,

23   clients and us.  And there was negotiation for doing the right

24   thing, the make-good.

25   Government's theory here, remember?  Years before

1  Ashik ever joined the company, the fraud was already in full

2  swing, they tried to say.

3       Ketchum was there.  He was going to be carrying the

4  microphone to tell you about the pre-Ashik fraud.  Where is

5  it?  It's gone.

6       Then they said most everything Shah Agarwal had

7  Ketchum doing was handed on to Desai.  Do you remember what

8  Mr. Ketchum said?  No way.  That was dramatic on the stand.

9  He said:  I'm not one of the trusted circle of four or five

10  people with dark secrets.  And, no, sir, I did not tutor

11  Mr. Desai on fraud.

12       Ball dropped, ladies and gentlemen.  There's no

13  hand-off.  Never an intent to defraud, he said.  The supposed

14  hand-off is now a brick wall.

15       We will get to the part with Mr. Desai.  And fraud

16  did occur there.  But there is a wall there between that and

17  the testimony you just heard of no fraud at all and good-faith

18  conduct by the defendants.  Thank you.

19       THE COURT:  All right.  Any additional interim

20  statements?

21       MR. JOHNSTON:  Yes, your Honor.

22       THE COURT:  All right.  Do you need this switched

23  over to the prosecution PC?

24       MR. JOHNSTON:  Yeah, I'll need the mic as well.  I'm

25  going to get it from the wooden podium over there.

1    THE COURT:  Okay.  The portable one?  Mr. Hueston has

2  it right here.

3    INTERIM STATEMENT ON BEHALF OF THE GOVERNMENT

4    MR. JOHNSTON:  What you saw in Jason Ketchum was that

5  he was a people-pleaser.  He wasn't like Sameer Kazi.  He

6  didn't push back or ask the hard questions.  You don't need to

7  decide whether Ketchum was good or bad at his job because what

8  you saw in e-mail, after e-mail is that Shah and Agarwal

9  relied on him in 2012 and 2013 to do their dirty work.  And

10  you don't need to rely on Ketchum's testimony to know this

11  because you saw from their own words how Shah and Agarwal were

12  willing to lie.  They wanted to grow their company to overcome

13  the challenge posed by the two-sided market, so they threw

14  smoke bombs.  They didn't need to lie with every client.  But

15  where it was necessary, they did so.

16    They lied to secure contracts.  They lied to cover up

17  shortfalls.

18    How did they lie to secure contracts?  Through

19  list-matches.  You heard that list-match was the process by

20  which a client's desired list of doctors was matched against

21  Outcome's network.  Some clients were okay with growth, but

22  many clients wanted only installed inventory.

23    Here is an e-mail that you saw from an ad agency

24  client representing Crestor.  The client only wanted installed

25  inventory, not future inventory.

1    Clients who wanted installed inventory made a very

2  basic request.  Tell us which offices you have.  Had Shah and

3  Agarwal been telling the truth, this would have been the

4  simplest of exercises.  As the client says here:  You can

5  simply highlight the offices in the target list file that

6  match.  But because they lied, Agarwal and Shah had to do the

7  impossible:  Predict which offices would join the network.

8    You saw multiple e-mail exchanges where they

9  instructed Ketchum to add offices from membership outreach,

10  MO.  Offices that had not even agreed to accept an Outcome

11  screen.  Here, when Ketchum had to provide a false list, he

12  told Agarwal, I just want to make sure what we send out

13  doesn't raise any eyebrows.  What you're providing the clients

14  will only raise eyebrows if you have something to hide.  In

15  this case, that Outcome did not have the offices they were

16  trying to sell to Humira.  They were selling 480 offices, but

17  they only had 417.

18    The defense would have you believe that all clients

19  knew they were buying growth.  But if that were true, then a

20  client's request for a specific list of doctors months in

21  advance makes no sense.  Why request a specific list of

22  doctors if it could look radically different by the time the

23  campaign started?

24    You know Shah and Agarwal didn't want clients to find

25  out that the lists were full of lies because they often

1  excluded their own salespeople when conducting projections.

2  You saw Bob Mons ask for a list-match, then you saw Agarwal

3  remove Mons from the e-mail chain when telling Ketchum to do a

4  projection.  But more importantly, you saw Shah and Agarwal

5  explain why they did this in their own words.

6         For the Pradaxa campaign, Shah asked Agarwal:  "Does

7  Bob know our match was projected?  Didn't want to copy him on

8  this so he doesn't get confused."

9         Agarwal responded:  "Not sure, but generally the

10  sales team doesn't know it's a projection because they get

11  confused about how to represent it."

12         Think about that for a moment.  You eliminate

13  confusion by -- about changing inventory numbers by sharing

14  information, not withholding it.  If all the clients knew

15  exactly what's going on, that the list-matches were just a

16  good-faith estimate of future inventory, then sharing that

17  information with everyone would be how you made sure that the

18  clients and the salespeople were on the same page.

19         These statements make sense only if Shah and Agarwal

20  knew that at times they had to lie to clients.  And it was

21  easier to lie if the salespeople generally didn't know the

22  details about how they projected.

23         Shah acknowledged to Ketchum that the list-matches

24  were lies.  He just tried to rationalize it away.  In this

25  e-mail, Shah admits it's challenging to predict who will be in

1  our network in the future.  "The network will look different,
2  but overall, the list should be the same types of doctors we
3  eventually get."

4       Ladies and gentlemen, a lie is a lie, even if you
5  think you have a good excuse for telling it.  You can't lie
6  about where you are in the present to get someone's money just
7  because you think you'll get where you want to be down the
8  road.  That is still fraud.

9       You see, the clients who wanted current inventory had
10 a good reason for that.  It was risky to contract for
11 something that did not exist.  If the clients had ended up
12 getting what Outcome had sold, if in Shah's words Outcome had
13 executed like a military operation, then we wouldn't be here
14 today.  But, of course, Outcome didn't.  And when it didn't,
15 Shah and Agarwal continued to lie.

16      In this e-mail you saw Ketchum ask for guidance from
17 Shah on a POP.  "We have 419 but need 480.  What do we do?"

18      Shah's response:  "There isn't a great answer
19 available here."

20      There wasn't a great answer because they were faced
21 with two options:  Tell the truth, or lie.  So Shah told
22 Ketchum to double-down on the first lie and tell the client
23 that un-installed screens and screens in offices the client
24 had never purchased were playing the ads.  If the campaign had
25 actually been playing in all 480 sites, as the defense would

1  have you believe, this e-mail would not exist and Shah's
2  response would make no sense.

3          As a result, Outcome invoiced the client the full
4  amount, and Ketchum sent a false affidavit of performance to
5  Abbvie's ad agency, Target Health.  It was lies to get money.

6          You know what an e-mail that the defense never wanted
7  you to see?  It's right here.  You see, this practice of lying
8  and rationalizing those lies had started early.  You saw this
9  evidence back in 2011.  At Shah's urging, Steve Svec, a
10  salesman, was telling clients that Outcome was in waiting
11  rooms of one-third of all endocrinologists in the US.  Agarwal
12  called out that statement as a lie.  Shah acknowledged as
13  much.  But then he rationalized it.  "We hope to be in
14  one-third of endocrinologists offices so why can't we sell
15  campaigns as if we already are."  In other words, why can't we
16  throw a smoke bomb.  Agarwal insisted that it was still a lie
17  and that she had heard Shah repeating the lie a lot.  What was
18  Shah's response?  "Ignore the past and move forward."  A
19  response from Shah you will see again and again throughout
20  this trial.

21          This was the turning point where Shah and Agarwal let
22  their ambition outrun their integrity.  They thought they were
23  building a great company that would change the world one day
24  so why did it matter if they lied and cheated a little along
25  the way?  But once they stopped -- once they started, they

1    would not stop.  They would fake it until they made it.

2          THE COURT:  All right.  Call your next witness.

3          MR. APPLEBY-BHATTACHARJEE:  Yes.  The government

4    calls Yesenia Bautista.

5        (Witness sworn.)

6          THE COURT:  All right.  Have a seat, please.  You can

7    adjust the chair, move the mic up, if you need to.

8          And are you connected correctly?

9          MR. APPLEBY-BHATTACHARJEE:  I am not, your Honor.  I

10   can't see my screen.

11         THE COURT:  Okay.  Well, we never had these problems

12   when I was a lawyer because all I did was use paper copies of

13   everything.  That would be impossible in this case.

14         MR. APPLEBY-BHATTACHARJEE:  There it is.

15         THE COURT:  Okay, great.

16         All right.  You may proceed.

17         MR. APPLEBY-BHATTACHARJEE:  All right.  Thank you,

18   your Honor.  And I don't need the documents yet --

19         THE COURT:  Okay.

20         MR. APPLEBY-BHATTACHARJEE:  -- if you want to have

21   the camera on the witness.

22         THE COURT:  I will switch it over, thank you.

23       YESENIA BAUTISTA, GOVERNMENT'S WITNESS, SWORN,

24                   DIRECT EXAMINATION

25   BY MR. APPLEBY-BHATTACHARJEE:

1  Q.  All right.  Good afternoon, ma'am.

2  A.  Good afternoon.

3  Q.  If you could please state and spell your name for the

4  record.

5  A.  Yesenia Bautista.  Y-e-s-e-n-i-a.  Last name Bautista,

6  B-a-u-t-i-s-t-a.

7  Q.  Ms. Bautista, are you currently employed?

8  A.  Yes.

9  Q.  Where do you work?

10  A.  PHM, Publicis.

11  Q.  In what capacity are you employed there?

12  A.  I'm a vice-president director.

13  Q.  And what kind of company is Publicis?

14  A.  Advertising.

15  Q.  Did you previously work at a company called Target Health?

16  A.  Yes.

17  Q.  What kind of company is that?

18  A.  Also advertising.

19  Q.  Is there a specific industry that Target Health

20  specializes in?

21  A.  It focused on point-of-care media, which is out-of-home

22  media, solely focused on doctors' offices, pharmacies and

23  hospitals.

24  Q.  How long were you employed with Target Health?

25  A.  Approximately eight years.

1  Q.  And do you recall approximately what period?

2  A.  2008 to 2015, 2016.

3  Q.  We'll talk about what you did at Target Health in more

4  detail in a moment.

5       Before we get there, could you briefly walk us

6  through your education history post high school?

7  A.  I attended New Jersey City University and received a

8  bachelor's degree in business with a focus in marketing.

9  Q.  Did you have a few jobs after you graduated before you

10  joined Target Health?

11  A.  Yes.

12  Q.  And then you stayed at Target Health for around eight

13  years?

14  A.  That's right.

15  Q.  At a high level, can you walk us through the positions you

16  held at Target Health when you were working there?

17  A.  I started off as a junior account executive, got promoted

18  to an account executive, and got promoted again to a manager.

19  And that was it, yeah.  Three positions.

20  Q.  So I'm going to focus your attention now on the

21  2012-to-2013 period.  What position did you hold at Target

22  Health at that time?

23  A.  I would have been a manager.

24  Q.  Can you describe your day-to-day job responsibilities as a

25  manager?

1    A.  Sure.  It was planning, executing campaigns for various

2    clients, overseeing junior staff.  Day to day attending

3    conference calls, status calls with clients, creative

4    partners, and other media partners.

5    Q.  Were you involved in the execution of advertising

6    campaigns?

7    A.  Yes.

8    Q.  At all stages?

9    A.  Yes.

10   Q.  So you've mentioned a few terms that I'd like to define

11   further for the jury.  You used the phrase out-of-home

12   advertising.  What is that?

13   A.  That refers to any media found outside that's

14   non-traditional broadcast TV or print.  So media that you see

15   like on a subway station, at the airport and doctors' office,

16   at a pharmacy, in a hospital building.

17   Q.  There is also a term we may use as we go along:

18   Agency-of-record.  Are you familiar with that term?

19   A.  Yes.

20   Q.  In the context of pharmaceutical advertising, what does

21   that mean?

22   A.  That would be a pharmaceutical client that had an

23   exclusive contract partnership with an agency to purchase

24   media on behalf of them, or creative services.

25   Q.  And media here is advertising --

1  A.  Yes.

2  Q.  -- roughly speaking?

3       Are you familiar with the term insertion order?

4  A.  Yes.

5  Q.  Is that another term for advertising contract?

6  A.  Yep.

7  Q.  In your role as a manager at Target Health, were you

8  generally familiar with the terms of advertising contracts

9  that were negotiated on behalf of Target Health's clients?

10  A.  Yes.

11  Q.  Are you familiar with the term proof of performance?

12  A.  Yes.

13  Q.  Can you explain your understanding of what that term means

14  in the context of an advertising campaign?

15  A.  So proof of performance would be collected on a monthly

16  basis and detail out the components of the buy.  For example,

17  there would be an affidavit, a location list, noting where the

18  offices we were purchasing were, and photos.

19  Q.  In your role as manager, were you familiar with Target

20  Health's processes and procedures for evaluating proof of

21  performance on a client's advertising campaign?

22  A.  Yes.

23  Q.  And you've mentioned a series of documents and records

24  that were part of that process.  Were you familiar with the

25  documents that Target Health relied upon in evaluating proof

1 of performance?

2 A. Yes.

3 Q. And did that include, in pertinent part, proof of

4 performance affidavits submitted by vendors?

5 A. Yes.

6 Q. So that term, affidavit, what does that mean?

7 A. It's a document noting the details of the contracted buy

8 that ran monthly. And it would have the reach, which would be

9 number of offices, the month that the media ran, and sign-off

10 by the vendor partner.

11 Q. I'd like to delve a little bit further into what Target

12 Health does, or at least did while you worked there. At a

13 high level, while you worked there, who were Target Health's

14 clients?

15 A. I would say 99 percent all pharmaceutical clients. Do you

16 want me to name them?

17 Q. You could provide some examples.

18 A. Amgen, Abbott, Abbvie, Novartis, GSK, Bayer.

19 Q. And for some portion of time, was Target Health the agency

20 of record for various pharma brands?

21 A. We worked with sister companies under WPP that were the

22 agency-of-record for those companies, and Target Health was an

23 extended buying arm for media in point-of-care, specifically.

24 Q. So you've described out-of-home advertising at a high

25 level. In the context of a pharmaceutical company or brand,

1  what is it that Target Health was doing in the out-of-home
2  advertising space?
3  A.  We mostly planned campaigns to run in doctors' offices.
4  And so we would get a budget and plan based on some planning
5  parameters for the calendar year and look to place media in
6  doctors' offices with creative that would entail like a TV
7  spot, or a print ad.
8  Q.  Earlier in your testimony, you touched on a term
9  point-of-care advertising.  Do you recall that?
10  A.  Yes.
11  Q.  So what does point-of-care advertising mean?
12  A.  Any media found in doctors' offices.  Educational
13  healthcare media in doctors' offices, hospitals, or
14  pharmacies.
15  Q.  You talked about sister companies as well.  Are you
16  familiar with a company called GroupM?
17  A.  Yes.
18  Q.  What, if any, connection does GroupM have to Target
19  Health?
20  A.  So GroupM was the overall larger holding company.  And
21  Kinetic was an agency under GroupM.  And Target Health was a
22  sub-arm under Kinetic.
23  Q.  Was Kinetic the out-of-home agency for GroupM?
24  A.  That's right.
25  Q.  And then was Target the point-of-care specific agency

1  under that?

2  A.  Correct.

3  Q.  For point-of-care advertising campaigns, who would execute

4  the contract with the media vendor, the pharma brand client or

5  Target Health?

6  A.  Target Health.

7  Q.  Who would deliver payment to the media vendor, the pharma

8  brand client or Target Health?

9  A.  Target Health.

10 Q.  And was Target Health doing these things on behalf of the

11 client?

12 A.  Correct.

13 Q.  Are you familiar with a company called Outcome Health,

14 formerly known as ContextMedia?

15 A.  Yes.

16 Q.  Is it okay if I refer to that company as Outcome or

17 Outcome Health as we go along?

18 A.  That's fine.

19 Q.  What kind of services did Outcome provide?

20 A.  They had waiting room TV digital screens in the exam room

21 and mobile wifi.

22 Q.  At various points today throughout your testimony, we'll

23 be referring to the term advertising inventory.  What did you

24 understand inventory means in the context of the services that

25 Outcome provided?

1  A.  That would be referring to offices.

2  Q.  Were screens and offices interchangeable to Target Health

3  and its dealings with Outcome?

4  A.  No.

5  Q.  What metric, screens or offices, did Target Health use

6  when purchasing campaigns from Outcome?

7  A.  Offices.

8  Q.  When do you first recall interacting with Outcome on

9  behalf of Target Health?

10  A.  I would say as early as 2009.

11  Q.  Who, if anyone, do you recall meeting from Target Health

12  -- from Outcome Health at that time?

13  A.  Rishi Shah.

14  Q.  Anyone else?

15  A.  I had a number of reps based on different accounts.

16  Q.  Do you recall the names of some of those reps?

17  A.  Sure.  Bob Mons, Matthew Crandall.  Those two were my

18  primary.

19  Q.  Are you familiar with the name Steve Svec?

20  A.  Yes.

21  Q.  Is that someone else that you interacted at Outcome?

22  A.  Very briefly, yes.

23  Q.  You mentioned Rishi Shah.  What was your understanding, if

24  any, of the role that Rishi Shah had at Outcome?

25  A.  When he -- when I first met him, he was just launching

1  ContextMedia.  And he was founder, CEO, and came to meet

2  myself and the team.

3  Q.  What were your initial impressions of Outcome during those

4  early meetings?

5  A.  Of Outcome as a company?

6  Q.  As a company.

7  A.  They were a new partner in the industry, having new

8  digital offerings, which was refreshing because we only dealt

9  with maybe two, three partners at the time.  So it was nice to

10  have another partner to work with.  And they seemed more

11  innovative, which was also appealing to work with and kind of

12  bring forward that type of media to new clients.

13  Q.  Based on your early interactions with Outcome personnel,

14  did you have an impression of Outcome's rate of growth?

15  A.  They grew pretty quickly.  Not at first.  Maybe, like,

16  four years later, they -- they expanded quite quickly.  And

17  they grew in ways of expanding reps, like hiring more reps to

18  service the accounts and agencies.  And they had expanded

19  their reach in various offices and just really grew as a media

20  partner.

21  Q.  From those early interactions, what were your initial

22  impressions of Mr. Shah?

23  A.  I thought he was a young entrepreneur, very personable.

24  Very nice, very cool.  Very willing to go, like, the extra

25  mile.  Very kind.  Nice.

1  Q.  As part of the early interactions that you've described,

2  did you ever meet with Shradha Agarwal?

3  A.  I met her probably in a larger group setting.  At events,

4  maybe.

5  Q.  What, if anything, do you recall about your initial

6  impressions of Ms. Agarwal?

7  A.  Also very nice.  Smart, entrepreneurial-like.  She seemed

8  like she worked closely with Rishi, like they were a team.

9  And I believe she worked, like, behind the scenes.  She

10  wasn't, like, a day-to-day rep.

11  Q.  Did Target Health ultimately contract with Outcome to

12  conduct advertising campaigns on behalf of certain pharma

13  clients?

14  A.  Yes.

15  Q.  Which clients, if you recall?

16  A.  Abbott, Abbvie and Amgen.

17  Q.  Focusing on Abbvie, which pharmaceutical brands for Abbvie

18  did Target Health run campaigns with Outcome?

19  A.  Humira, AndroGel, Trilipix.  Those would be the top three.

20  Q.  Let's start with Humira.  What kind of drug is that?

21  A.  That is a biologic that treats autoimmune disease.  It

22  could be -- it's mostly indicated for rheumatoid arthritis.

23  Q.  You mentioned AndroGel.  What kind of drug is that?

24  A.  That's for low testosterone.

25  Q.  And Trilipix?

1  A.  That was high cholesterol.

2  Q.  You also mentioned running campaigns on behalf of Amgen

3  brands.  What specifically brands did you run Amgen campaigns

4  with Outcome?

5  A.  Repatha, Prolia, Enbrel, and Neulasta.

6  Q.  Let's start with Repatha.  What kind of drug is that?

7  A.  For high cholesterol.

8  Q.  And Prolia?

9  A.  Osteoporosis.

10  Q.  Enbrel?

11  A.  Rheumatoid arthritis.

12  Q.  Was Enbrel a competitor to Humira?

13  A.  Yes.

14  Q.  And finally Neulasta?

15  A.  That was for chemotherapy.

16  Q.  In or around 2013, did Target Health purchase advertising

17  media from Outcome on behalf of Abbvie's Humira brand?

18  A.  Yes.

19  Q.  So this was for a 2013 campaign?

20  A.  Yes.

21  Q.  Did the negotiations for that advertising contract occur

22  sometime before 2013?

23  A.  Yes.

24  Q.  What, if any, role did you play in the contract

25  negotiation process?

1  A.  I would have built the plan, determined the reach and

2  negotiated the buy, presented it to the client, and gotten

3  sign-off.

4  Q.  And as part of this process, were you regularly

5  interacting with the client?

6  A.  Yes.

7  Q.  Which here would be Abbvie?

8  A.  Right.

9  Q.  Were you also regularly interacting with Outcome?

10 A.  Yes.

11 Q.  Who, if anyone, were your regular contacts at Outcome

12 during the contract negotiation process for the Humira 2013

13 campaign?

14 A.  My reps were Bob Mons and Matthew Crandall.

15 Q.  Did you have any interactions with Rishi Shah during the

16 contract negotiation process?

17 A.  No.

18 Q.  I'm going to draw your attention now to a few documents.

19         If we could have the screen, your Honor?

20         THE COURT:  I think it's time for afternoon break.

21 We'll take that now before we get into the documents.

22         Fifteen minutes, ladies and gentlemen.  Please don't

23 discuss the case among yourselves or with anyone else.

24         COURT SECURITY OFFICER:  All rise.

25     (Jury out at 3:03 p.m.)

1    THE COURT:  All right.  Ma'am, you're excused.

2  15 minutes.  And watch the chair because it rolls and you

3  don't want to go off the edge.

4    All right.  We're off the record.

5    (Recess taken.)

1        MS. CHOU:  We have an issue before the jury comes in.

2        THE COURT:  In the presence of the witness?

3        MS. CHOU:  Oh, sorry.  No, not in the presence of the

4    witness.

5        THE COURT:  Sorry, if you could step out in the

6    hallway, ma'am.  Thank you.

7        All right.  Go ahead.

8      (Witness exits courtroom.)

9        MS. CHOU:  Your Honor, it's our understanding that

10   the government intends to ask Ms. Bautista what her reaction

11   was to the *Wall Street Journal* article, which we do not think

12   is relevant and introduces a host of extraneous

13   hearsay-related issues.

14       THE COURT:  Well, first, do you intend to ask that

15   question?

16       MR. APPLEBY-BHATTACHARJEE:  I do intend to ask that

17   question, and the relevance is in three respects.

18       So given the objection earlier, I'm not going to ask

19   her to get into the specifics of the article or what it says.

20   I'll just keep it at a high level of were there allegations in

21   the *Wall Street Journal* article that were -- you know, that

22   you were made aware of.

23       There is a subsequent course of conduct that is very

24   relevant, which is after this, she, on behalf of Target

25   Health, had to reach back to client companies that had done

1 | business with Outcome.

2 | They had gone back and gone through the process of
3 | clawing back millions of dollars that had been paid for
4 | advertising campaigns, and I think the only other question, it
5 | will make sense in the context of the direct if these
6 | allegations had been known to you earlier, would Target Health
7 | have agreed to do business with Outcome, and I expect she will
8 | say no.

9 | THE COURT:  Are you going to --

10 | MS. CHOU:  Your Honor --

11 | THE COURT:  Let me finish.

12 | Are you going to describe the allegations?

13 | MR. APPLEBY-BHATTACHARJEE:  I'm -- with the Court's
14 | permission, I'll even lead her.

15 | THE COURT:  Well, we have heard, at least through
16 | some of the emails, that there were at least a *Wall Street*
17 | *Journal* reporter attempting to -- investigating writing an
18 | article that was critical of the company, and I think that
19 | came in already in an email --

20 | MR. APPLEBY-BHATTACHARJEE:  It did.

21 | THE COURT:  -- because the last witness talked about
22 | how he didn't believe it and was defending it and, you know,
23 | thought it was unfair, and that was brought out I believe by
24 | both sides in one form or another.

25 | So it's not a surprise there was a *Wall Street*

1  *Journal* article.  It was even referenced in the opening
2  statements as an event.

3  So what's the additional -- as long as we don't get
4  into the detail of the article, which would be hearsay, what
5  is the objection?

6  MS. CHOU:  Well, there are a couple things.

7  First, Ms. Bautista was no longer at Target Health at
8  the time the *Wall Street Journal* article came out.  She had
9  moved on to another agency, and so there's that timing
10  component.

11  But in addition, it is overly prejudicial to -- and
12  not relevant to get into what her reaction was to the
13  allegations, the unsubstantiated allegations, of the *Wall*
14  *Street Journal* article, and allegations that also related to
15  Mr. Desai.

16  And the fact that she had to negotiate things is --
17  gives too much of an implication that there was actually
18  wrongdoing when that doesn't go to whether or not Mr. Shah did
19  anything.

20  And so there's basically going to be a presumption
21  that this is already established, such that these alterations
22  needed to be made to the contractual relationships.

23  THE COURT:  All right.  Last word.

24  MR. APPLEBY-BHATTACHARJEE:  I think I've covered it,
25  Your Honor.  The --

1          THE COURT:  Objection overruled.  Stay out of the

2    detail of it.

3          This is all -- you can explore with her the basis of

4    her knowledge, whether or not she was in a position to do

5    anything at the time she heard of the article, which I assume

6    the government's going to cover anyway --

7          MR. APPLEBY-BHATTACHARJEE:  Yes, Your Honor.

8          THE COURT:  -- otherwise it's not relevant, and --

9    but without getting into the article itself, the objection is

10   overruled.

11         Okay.  Let's bring in the jury and bring in the

12   witness, please.

13         MR. APPLEBY-BHATTACHARJEE:  And if I can have the

14   screen, Your Honor, for documents.

15         THE COURT:  Okay.

16         Are you hooked up?  Should this be on?  It should be.

17         Are you good?

18         MR. APPLEBY-BHATTACHARJEE:  Yes.  Thank you, Your

19   Honor.

20         THE COURT:  All right.  Thank you.

21         You might as well stand up.  We're all going to stand

22   when the jury comes in anyway.

23         COURT SECURITY OFFICER:  All rise.

24       (Jury enters courtroom.)

25         THE COURT:  All right.  Please be seated.

1    Sorry we took a break a little longer than normal,

2  but we were dealing with some evidence issues and trying to

3  reduce the time you hear the white noise.

4    So apologize for the length of time, but it was time

5  well spent in the courtroom while we were trying to get some

6  issues resolved.

7    You may continue.

8    MR. APPLEBY-BHATTACHARJEE:  Thank you, Your Honor.

9  BY MR. APPLEBY-BHATTACHARJEE:

10  Q.  Hello again, Ms. Bautista.

11    Before the break, we had started the process of

12  discussing contract negotiations for the 2013 Humira campaign

13  with Outcome.  Do you recall that?

14  A.  Yes.

15  Q.  I'd like to walk through a few documents with you now.

16  I'm going to place on the screen Government's Exhibit 47.  Do

17  you see that?

18  A.  Yes, I do.

19  Q.  I'd like to focus on the header of the email.  Who is the

20  email from?

21  A.  Bob Mons.

22  Q.  Was that one of the client reps -- or the Outcome reps

23  that you had interacted with?

24  A.  Yes.

25  Q.  Who is it to?

1    A.   Myself.

2    Q.   Is anyone blind copied?

3    A.   Shradha Agarwal.

4    Q.   What's the date of the email?

5    A.   August 27, 2012.

6    Q.   And the subject of the email?

7    A.   2013 Humira proposal from ContextMedia.

8    Q.   I'm going to turn to the content of the email.

9         Why don't you take a moment to just review the

10   content and let me know when you're ready.

11   A.   Ready.

12   Q.   What services was Outcome offering to provide to Humira

13   for the 2013 advertising campaign?

14   A.   It was a three-part proposal for 2013 for Humira to run

15   media with them.

16   Q.   And can you see that on the email there's an attachment?

17   A.   Yes.

18   Q.   I'm going to draw your attention to that attachment now.

19   I'm turning to page 3 of Exhibit 47.  Can you see that on your

20   screen?

21   A.   Yes.

22   Q.   And here, is this the specifications for one of the

23   options that Outcome was proposing to Humira?

24   A.   Yes.

25   Q.   Let me draw your attention to the portion of this document

1  that says 650 RHN locations.  Do you see that?

2  A.  Yes.

3  Q.  What did you understand that meant?

4  A.  650 Rheumatoid Health Network locations.

5  Q.  I'm going to turn your attention to page 4 of Exhibit 47.

6  Is this another option that was being proposed?

7  A.  Yes.

8  Q.  Do you see a reference here to 325 RHN locations?

9  A.  Correct.

10  Q.  What did you understand that meant?

11  A.  Half of the full network, 325 rheumatoid health offices.

12  Q.  What, if any, significance was there to rheumatoid -- or

13  rheumatology offices for Humira?

14  A.  Those were primarily the only offices we were interested

15  in for that brand.

16  Q.  Can you explain why?

17  A.  Due to the indication that the brand is prescribed for,

18  rheumatologists often see these types of patients, so with

19  this medication, you would want to run in rheumatology

20  offices.

21  Q.  I'm going to draw your attention to the portion that says

22  program term, January to December 2013.  Do you see that?

23  A.  Yes.

24  Q.  What did you understand that meant?

25  A.  Full calendar year, 12 months, 2013.

1  Q.  Going to the previous page, based on these documents,

2  what, if any, expectation did Target Health have regarding how

3  many rheumatology offices Outcome had within its entire

4  network?

5  A.  650.

6  Q.  Going back to page 4, do you see a reference here to 3:1

7  minimum ROI guarantee?

8  A.  Yes.

9  Q.  What did you understand that to mean?

10  A.  Based on the commitment, the level of spend, ContextMedia

11  would provide a 3:1 ROI guarantee for the full year contract.

12  Q.  So let's just use some round numbers as an example.

13       If the spend from the client was $100,000 on

14  advertising, what does that mean in terms of the 3:1 minimum

15  ROI guarantee?

16  A.  The return would be 3,000 -- 300,000.

17  Q.  I'm going to draw your attention now to Exhibit 62.  Can

18  you see that on your screen?

19  A.  Yes.

20  Q.  And focusing on the header of this email, who was it from?

21  A.  Bob Mons.

22  Q.  Who was it to?

23  A.  Myself.

24  Q.  Is anyone copied?

25  A.  Jennifer Greufe, Matthew Crandall.

1 Q. Is anyone blind copied?

2 A. Rishi Shah.

3 Q. Jennifer Greufe, who is that?

4 A. She was my boss at the time.

5 Q. What's the date of this email?

6 A. November 8, 2012.

7 Q. And the subject of this email?

8 A. Humira 2013 ContextMedia proposal options.

9 Q. I'm now drawing your attention to the body of the email.

10 Again, take a moment to review it for yourself and let me know

11 when you're ready.

12 A. Okay.

13 Q. What services was Outcome offering to provide to Humira

14 for the 2013 advertising campaign?

15 A. Media placement on their network.

16 Q. And in this instance, what was the size of that network?

17 A. 325 offices.

18 Q. Do you see the subheadings Option 1 and Option 2?

19 A. Yes.

20 Q. And there's different investment prices listed with those?

21 A. Yes.

22 Q. What was the principal difference between Option 1 and

23 Option 2?

24 A. The frequency and right of first refusal, as well as the

25 3:1 ROI guarantee.

1  Q.  So let's start with the first point, frequency.  What does
2  that mean?
3  A.  The number of times that the TV spot would play in the
4  loop.
5  Q.  ROFR, is that right of first refusal?
6  A.  Yes.
7  Q.  What does that mean in this context?
8  A.  Basically, a brand has a deadline to commit to continue
9  with that inventory before it is opened up to another
10 advertiser.
11 Q.  And ROI guarantee has the meaning you've previously
12 described?
13 A.  Yes.
14 Q.  And was ROI guarantee a part of the more expensive package
15 being offered to Humira?
16 A.  Yes.
17 Q.  Did Target Health, in fact, execute a contract with
18 Outcome Health for a 2013 advertising campaign on behalf of
19 Humira?
20 A.  Yes.
21 Q.  Let's take a closer look at that contract.  I'm going to
22 draw your attention to Exhibit 1076.  Can you see that on your
23 screen?
24 A.  Yes.
25 Q.  Focusing on the header, who is this email from?

1   A.  Jim Demas.

2   Q.  Who is it to?

3   A.  Myself.

4   Q.  Anyone copied?

5   A.  Shradha Agarwal and Rishi Shah and Bob Mons.

6   Q.  What's the date?

7   A.  November 20, 2012.

8   Q.  What's the subject?

9   A.  Signed Humira contract.

10  Q.  And does there appear to be an attachment to the email?

11  A.  Yes.

12  Q.  Turning now to page 2 of Exhibit 1076, do you recognize

13  this document?

14  A.  Yes.

15  Q.  What is it?

16  A.  Our contract with ContextMedia.

17  Q.  I'm going to focus on some portions at the top and bottom

18  of the page first.

19      Who was the identified advertiser in this contract?

20  A.  AbbVie.

21  Q.  What is the identified brand?

22  A.  Humira.

23  Q.  Looking at the vendor box, who is listed on the attention

24  line on behalf of ContextMedia?

25  A.  Rishi Shah.

1 Q. And this contract appears to be signed; is that right?

2 A. Yes.

3 Q. And on behalf of Target Health, who's signing?

4 A. Jennifer Greufe.

5 Q. And that's your boss at the time?

6 A. Yes.

7 Q. Focusing on the chart in the middle of the page, what is

8 Outcome contracting to provide here?

9 A. To run the Humira spot two times per hour in 325

10 rheumatology offices for the full year.

11 Q. What's the start date of this contract?

12 A. January 1st, 2013.

13 Q. And what's the end date?

14 A. December 31st, 2013.

15 Q. How much is AbbVie agreeing to pay in this instance

16 through Target Health for this advertising campaign?

17 A. 578,600.

18 Q. And you've touched upon this, but what type of offices

19 were being contracted for here?

20 A. Rheumatology.

21 Q. Would it have been acceptable for Outcome to play ads in

22 any provider's office regardless of specialty?

23 A. No.

24 Q. Why not?

25 A. Because those were not of interest to us or the brand or

1  the client.

2  Q.  We talked about the start date of the contract.

3          How many offices did you expect Outcome to be playing

4  ads in as of January 1, 2013?

5  A.  325.

6  Q.  And how about as of December 31, 2013?

7  A.  325.

8  Q.  Was it your understanding that Outcome could deliver less

9  than 325 offices on day 1 and then make up the shortfall later

10  on in the contract term?

11  A.  No.

12  Q.  So the contract references rheumatology offices, and

13  you've explained a little bit about why rheumatology mattered

14  to AbbVie.

15          How, if at all, did AbbVie identify which

16  rheumatology offices it wanted Outcome to play advertisements

17  in?

18  A.  We would conduct a list match.

19  Q.  Can you expand on that?  Can you explain the list-match

20  process at a high level?

21  A.  Sure.

22          So it's taking the brand list, which is compiled of

23  physician names that are of interest to the brand or writing

24  for the brand, and these offices would generally be called on,

25  Humira's field force to go see those doctors and talk about

1 the benefits of Humira.

2 Q. During the list-match process, were you ever informed that

3 Outcome was using projections of inventory rather than actual

4 installed inventory to conduct the match?

5 A. No.

6 Q. What, if any, impact would Outcome's use of projections

7 have had on your contract negotiations?

8 A. We would have just proceeded with the actual installed

9 offices, not projected numbers.

10 MR. APPLEBY-BHATTACHARJEE: If we could go back to

11 the document.

12 THE COURT: Okay.

13 BY MR. APPLEBY-BHATTACHARJEE:

14 Q. All right. Looking at another portion of the contract, do

15 you see the comments section at the bottom of the page?

16 A. Yes.

17 Q. There's a reference here to added value. Do you see that?

18 A. Yes.

19 Q. Then there's four bullet points under that?

20 A. Correct.

21 Q. Can you walk us through those bullet points and what they

22 mean?

23 A. Starting with the first bullet points, quarterly brochure

24 distribution in all offices for the full year. This would be

25 if Humira, the brand, had any patient literature that they

1   wanted to distribute.  This was included as added value.

2          Sidebar refers to another placement on the screen

3   that Humira could have access to in terms of, like, a media

4   placement for additional viewability to the patients.

5          Category exclusivity refers to having exclusive

6   rights to those offices where a competitor to Humira would not

7   be allowed to advertise in the same offices.

8          And lastly, 3:1 ROI guarantee.

9   Q.  Which is what you've previously described?

10  A.  That's right.

11  Q.  These are all under the sub-heading added value.  What

12  does added value mean?

13  A.  Bonus, value, details that have been negotiated as part of

14  the larger contract.

15  Q.  So focusing on that 3:1 ROI guarantee, assuming Outcome

16  met the 3:1 ROI guarantee, was it your understanding that they

17  would be excused from the remaining performance obligations

18  under this contract?

19  A.  No.

20  Q.  Did you still expect Outcome to deliver all 325 offices

21  specified in this contract?

22  A.  Yes.

23  Q.  Throughout all 12 months of the contract term?

24  A.  Yes.

25  Q.  At some point, did AbbVie, through Target Health, attempt

1  to expand the scope of the 2013 Humira advertising campaign

2  with Outcome?

3  A.  Yes.

4  Q.  So let's turn to some additional emails.  I'm going to

5  draw your attention to Exhibit 113.  Can you see that on your

6  screen?

7  A.  Yes.

8  Q.  Focusing on the header of the email.  Who is it from?

9  A.  Bob Mons.

10  Q.  Who is it to?

11  A.  Myself.

12  Q.  Anyone copied?

13  A.  Matthew Crandall.

14  Q.  Anyone blind copied?

15  A.  Shradha Agarwal.

16  Q.  What's the date?

17  A.  January 22, 2013.

18  Q.  And the subject?

19  A.  Additional RA sites available today for Humira.

20  Q.  So turning first to your email to Mr. Mons dated

21  January 22, 2013 at 12:51 p.m.

22          Would you please read the content of the email into

23  the record?

24  A.  "For Humira RA we are contracted for 325 offices full

25  year.  Is this the max Rheum network?"

1 Q. What are you asking Mr. Mons here?

2 A. If 325 offices is the max we could buy, or if there is any

3 other inventory available to us.

4 Q. And what did inventory mean in this context?

5 A. Offices.

6 Q. Turning to Mr. Mons' response dated January 22, 2013 at

7 approximately 12:57 p.m. Could you read the content of that

8 email into the record?

9 A. "We have additional sites available. How much are you

10 looking for, budget, projected start date? Same creative?"

11 Q. Looking next at your response on January 22, 2013 at

12 12:58 p.m., could you read the content of that email into the

13 record?

14 A. "How about you tell me what you have in inventory as of

15 today? Yes, same creative. We want to be in all Rheum

16 offices. Please no PCPs. We could possibly start very soon.

17 Appreciate your quick response."

18 Q. What are you asking Mr. Mons here?

19 A. To provide the number of offices available in

20 rheumatology.

21 Q. I want to focus your attention on one statement here. "We

22 want to be in all Rheum offices. Please no PCPs." Do you see

23 that?

24 A. Yes.

25 Q. Why was no PCPs important to AbbVie?

1   A.  They were just irrelevant offices that were not of

2   interest to run the Humira RA branding in.

3   Q.  Finally, Mr. Mons' reply at the top of this exhibit, could

4   you please read the content of that email into the record?

5   A.  "Yesenia, we have 155 additional rheumatology practices

6   available to go live today.  Please advise."

7   Q.  What did you understand that to mean?

8   A.  They had an additional 155 rheumatology offices to add to

9   our current footprint.

10  Q.  Did you understand the 155 rheumatology practices to be

11  based on projected rather than actual inventory?

12  A.  No.

13  Q.  Why not?

14  A.  He's not disclosing that they're projected.  They're

15  available to go live today.

16  Q.  Drawing your attention now to Exhibit 109, which is in

17  evidence, and focusing on the header of the email.  Who is

18  this email from?

19  A.  Jennifer Greufe.

20  Q.  Your boss?

21  A.  Yes.

22  Q.  Who is it to?

23  A.  Bob Mons.

24  Q.  And yourself?

25  A.  Myself.

1  Q.  Who's copied?

2  A.  Matthew Crandall and Rishi Shah.

3  Q.  What's the date of this email?

4  A.  January 22nd, 2013.

5  Q.  And the subject?

6  A.  Additional RA sites available today for Humira.

7  Q.  So turning to the content of Ms. Greufe's email, if you

8  could take your time, but please read the content of the email

9  into the record.

10  A.  "To clarify, the goal is to add 155 incremental offices to

11  our currently contracted order of 325 RA offices beginning

12  February 1st.

13      "We'd appreciate confirmation as to whether an

14  additional set of newly installed offices would be available

15  for an April start.  Ideally, we would commit to approximately

16  110 additional RA offices for April through December."

17  Q.  What were Target Health's expectations at the time about

18  how many offices Outcome was already playing Humira ads in?

19  A.  325.

20  Q.  What type of offices?

21  A.  Rheumatology.

22  Q.  As of what date?

23  A.  January 1st.

24  Q.  How many additional offices would Outcome be contracted to

25  play ads in as of February 1st?

1   A.  155.

2   Q.  What type of offices?

3   A.  Rheumatology.

4   Q.  And over what period would Outcome add 110 more offices?

5   A.  April through December.

6   Q.  What type of offices?

7   A.  Rheumatology.

8   Q.  Drawing your attention to Exhibit 1075, can you see that?

9   A.  Yes.

10  Q.  Focusing in on the header of the email, who is this email

11  from?

12  A.  Bob Mons.

13  Q.  Who is it to?

14  A.  Myself.

15  Q.  Anyone copied?

16  A.  Matthew Crandall, Jennifer Greufe, Rishi Shah.

17  Q.  What's the date of the email?

18  A.  January 23rd, 2013.

19  Q.  And the subject?

20  A.  Humira schedule of additional RA screens in 2013.

21  Q.  So turning to the top of Mr. Mons' email, why don't you

22  take a moment to review that and let me know when you're

23  ready.

24  A.  Ready.

25  Q.  What was Outcome representing about how much of its

1  inventory was dedicated to playing Humira ads as of January 1,
2  2013?
3  A.  325.
4  Q.  And what type of offices?
5  A.  Rheumatology.
6  Q.  What was Outcome representing about how many additional
7  offices it would deliver as of February 1st?
8  A.  155.
9  Q.  What --
10        MS. CHOU:  Objection.  Misstates the document.
11        THE COURT:  Do you want to re-ask the question and
12  focus on the particular area that the objection came to?
13  BY MR. APPLEBY-BHATTACHARJEE:
14  Q.  So there's a reference in Mr. Mons' email to screens.  Do
15  you see that?
16  A.  Yes.
17  Q.  What was your understanding of what Target Health had
18  contracted for, offices or screens?
19  A.  Offices.
20  Q.  Did you understand this email from Mr. Mons as informing
21  Target Health that Outcome had anything less than 325
22  rheumatology offices in its network?
23  A.  No.
24  Q.  Did you understand anything about Mr. Mons' email as
25  representing to you that Outcome had anything less than 155

1  additional rheumatology offices ready to go live as of
2  February 1st?
3  A.  No.
4  Q.  And over what period of time was Outcome representing that
5  it would be adding here in Mr. Mons' email 110 RA screens?
6  A.  April through December.
7  Q.  There's a reference here to weighted average under the
8  third bullet point.  Do you see that?
9  A.  Yes.
10 Q.  What's your understanding of the term weighted average?
11 A.  The average of offices through the time period April
12 through December.
13 Q.  So turning to the chart in Mr. Mons' email, can you see
14 that on the screen?
15 A.  Yes.
16 Q.  How does this chart play into Outcome's proposal to
17 deliver additional inventory between April and December on a
18 weighted-average basis?
19 A.  So each month, they are declaring how many offices they
20 would deliver to our program for Humira.
21 Q.  And you said how many offices they would deliver.  There's
22 a reference in this chart to sites.  Do you see that?
23 A.  Yes.
24 Q.  What did you understand sites to mean?
25 A.  Offices.

1  Q.  And how does this chart play into Outcome's proposal to

2  deliver 110 rheumatology offices on a weighted-average basis?

3  A.  I'm sorry, can you --

4  Q.  How does this chart, with the entries for April through

5  December with different numbers, play into Outcome's proposal

6  to deliver 110 offices on a weighted-average basis?

7  A.  These were the additional numbers they were projecting

8  each month to come into the total average of 110.

9  Q.  Were the -- was it your understanding that the 325 offices

10 that were currently live were to be delivered on a

11 weighted-average basis?

12 A.  No.

13 Q.  Was it your understanding that the 155 offices that were

14 to be added as of February 1st were to be delivered on a

15 weighted-average basis?

16 A.  No.

17 Q.  In this proposal, weighted average only applied to 110

18 offices between April and December; is that right?

19 A.  That's right.

20 Q.  And the proposal identifies a specific number of sites or

21 offices to be added each month?

22 A.  Correct.

23 Q.  Now, Ms. Bautista, were you aware that one day before

24 Mr. Mons' email to you, Outcome only had 387 sites available

25 for the Humira campaign in total?

1  A.  No.

2  Q.  Were you aware that one day before Mr. Mons' email to you,

3  Outcome had a total --

4       MS. CHOU:  Objection, Your Honor, this is --

5       THE COURT:  Overruled.

6       What she knew.

7  BY MR. APPLEBY-BHATTACHARJEE:

8  Q.  Were you aware that one day before Mr. Mons' email to you,

9  Outcome had a total of 440 screens available for the Humira

10  campaign?

11  A.  No.

12  Q.  If true, is that information you would have wanted to

13  know?

14  A.  Yes.

15  Q.  Were you ever advised that Outcome did not have a full

16  inventory of 480 rheumatology offices available as of

17  February 1st, 2013?

18  A.  No.

19  Q.  What, if any, impact would that information have on Target

20  Health's planned expansion of the Humira campaign with

21  Outcome?

22  A.  We -- we would have not contracted for those wrong

23  numbers.  We would have revised the contract.

24  Q.  To reflect what?

25  A.  The actual installed numbers.

1  Q.  Did Target Health, in fact, execute a contract with

2  Outcome Health for an expanded 2013 advertising campaign on

3  behalf of Humira?

4  A.  Yes.

5  Q.  Let's now take a closer look at that contract.

6         Let me draw your attention to page 3 of Exhibit 129.

7  Can you see that?

8  A.  Yes.

9  Q.  What is this document?

10 A.  It's an insertion order contract to ContextMedia from

11 Target Health.

12 Q.  And is this the expansion contract we've been referring

13 to?

14 A.  Yes.

15 Q.  I'm going to walk through a series of these boxes you can

16 see in the middle of the page and the next page.

17        First, focusing on Box 10 on page 4 of Exhibit 129.

18 What services was Outcome agreeing to provide from

19 February 1st through December 31st of 2013?

20 A.  Digital screens located in 155 rheumatology offices, in

21 addition to our current footprint of 325.

22 Q.  And if you could --

23        MR. LOWDER:  Objection.

24 BY MR. APPLEBY-BHATTACHARJEE:

25 Q.  If you could just --

1          MR. LOWDER:  Objection.

2          THE COURT:  Okay.

3          MR. LOWDER:  I think the witness maybe skipped over

4   something in the document in terms of language.

5          THE COURT:  Well, if you want to go over it, it will

6   save some time.  There's other language there that you want to

7   highlight --

8          MR. APPLEBY-BHATTACHARJEE:  I do.

9   BY MR. APPLEBY-BHATTACHARJEE:

10  Q.  So, Ms. Bautista, as we walk through this, to the extent

11  possible, can you just read the language that's highlighted

12  verbatim, okay?

13  A.  Sure.

14  Q.  Okay.  So from February 1st, 2013 through December 31st,

15  2013, what was Outcome agreeing to provide?

16  A.  60-second spot 2 times per hour, digital screens located

17  in 155 rheumatologists' waiting rooms, additional 155 offices

18  to current 325-office campaign, 60-second spot, 2 times per

19  hour.

20  Q.  Was it your understanding that that referred to screens or

21  offices?

22  A.  Offices.

23  Q.  So 155 additional screens to the original 325 office

24  campaign; is that right?

25  A.  Correct.

1   Q.  For a total of 480 offices?

2   A.  Yes.

3   Q.  What type of offices?

4   A.  Rheumatology.

5   Q.  From February 1st, 2013 onwards?

6   A.  Yes.

7   Q.  Focusing on Box 6 on page 4 of Exhibit 129.  What was

8   Outcome agreeing to provide as of April 1st, 2013?

9   A.  Digital screens located in 50 rheumatologists' waiting

10  rooms, additional 50 offices to current 480-office campaign,

11  60 --

12  Q.  I'm sorry.  Why don't you finish your answer.

13  A.  60-second spot, 2 times per hour.

14  Q.  So there's a reference now to current 480-office campaign;

15  is that right?

16  A.  Right.

17  Q.  Does that account for the original 325 plus the 155

18  offices to be added in February throughout the rest of the

19  year?

20  A.  Yes.

21  Q.  And so this is 50 rheumatology offices in addition to the

22  previously contracted 480?

23  A.  Yes.

24  Q.  For a total of 530 offices, correct?

25  A.  Correct.

1   Q.  What type of offices?

2   A.  Rheumatology.

3   Q.  Focusing on Box 1 of page 3 of Exhibit 129.  What services

4   was Outcome agreeing to provide as of May 1st, 2013?

5   A.  Digital screens located in 65 rheumatologists' waiting

6   rooms, additional 65 offices to current 480-office campaign,

7   60-second spot, 2 times per hour.

8   Q.  So as of May 2013, a total of 545 offices?

9   A.  Yes.

10  Q.  What type of offices?

11  A.  Rheumatology.

12  Q.  Focusing now on Box 4 on page 3 of Exhibit 129, what

13  services was Outcome agreeing to provide as of June 1, 2013?

14  A.  Digital screens located in 80 rheumatology --

15  rheumatologists' waiting rooms, additional 80 office to

16  current 480-office campaign, 60-second spot, 2 times per hour.

17  Q.  So now a total of 560 offices?

18  A.  Yes.

19  Q.  What type of office?

20  A.  Rheumatology.

21  Q.  Focusing on Box 3 on page 3 of Exhibit 129.  What services

22  was Outcome offering to provide as of July 2013?

23  A.  Digital screens located in 95 rheumatologists' waiting

24  rooms, additional 95 offices to current 480-office campaign.

25  60-second spot, 2 times per hour.

1    Q.   For a total of 575 offices as of July 2013?

2    A.   Yes.

3    Q.   What type of offices?

4    A.   Rheumatology.

5    Q.   Focusing on Box 2 on page 3 of Exhibit 129, what services

6    was Outcome agreeing to provide as of August 2013?

7    A.   Digital screens located in 110 rheumatology waiting rooms,

8    additional 110 offices to current 480-office campaign.

9    60-second spot, 2 times per hour.

10   Q.   For a total of 590 rheumatology offices?

11   A.   Yes.

12   Q.   Focusing on Box 5 on page 4 of Exhibit 129, what services

13   was Outcome agreeing to provide as of September 2013?

14   A.   Digital screens located in 125 rheumatologists' waiting

15   rooms, additional 125 offices to current 480-office campaign.

16   60-second spot, 2 times per hour.

17   Q.   For a total of 605 offices?

18   A.   Yes.

19   Q.   What type of offices?

20   A.   Rheumatology.

21   Q.   Focusing on Box 7 of page 4 of Exhibit 129, what was

22   Outcome agreeing to provide as of October 2013?

23   A.   Digital screens located in 140 rheumatologists' waiting

24   rooms, additional 140 offices to current 480-office campaign.

25   60-second spot, 2 times per hour.

1   Q.  For a total of 620 offices?

2   A.  Yes.

3   Q.  What type of offices?

4   A.  Rheumatology.

5   Q.  Focusing on Box 8 of page 4 of Exhibit 129.  What services

6   was Outcome agreeing to provide as of November?

7   A.  Digital screens located in 150 rheumatology waiting rooms,

8   additional 150 offices to current 480-office campaign.

9   60-second spot, two times per hour.

10  Q.  For a total of 630 rheumatology offices?

11  A.  Yes.

12  Q.  And, lastly, turning to Box 9 on page 4 of Exhibit 129,

13  what services was Outcome agreeing to provide as of December?

14  A.  Digital screens located in 154 rheumatologists' waiting

15  rooms, additional 154 offices to current 480-office campaign.

16  60-second spot, 2 times per hour.

17  Q.  For a total of 634 offices by December?

18  A.  Yes.

19  Q.  What type of offices?

20  A.  Rheumatology.

21  Q.  Would it have been acceptable for Outcome to play ads in

22  any providers' offices regardless of specialty?

23  A.  No.

24  Q.  Why not?

25  A.  Because we were only interested and had only contracted

1  for rheumatology offices.

2  Q.  Was it permissible for Outcome to deliver less than the

3  contracted amount specified for each month?

4  A.  No.

5  Q.  Focusing on page 5 of Exhibit 129.  Do you see this added

6  value section that we saw that's similar to the previous

7  contract?

8  A.  Yes.

9  Q.  And does this expanded contract include the same added

10  value provisions as the original contract?

11  A.  Yes.

12  Q.  Do those have the same meaning as you previously

13  described?

14  A.  Yes.

15  Q.  Now, assuming that Outcome met the 3:1 ROI guarantee, was

16  it your understanding that they would be excused from the

17  remaining performance obligations under the expansion

18  contract?

19  A.  No.

20  Q.  Did you still expect Outcome to deliver the contracted

21  number of offices specified in this contract?

22  A.  Yes.

23  Q.  For each month throughout the contract term?

24  A.  Yes.

25  Q.  Focusing on page 7 of Exhibit 129.  Do you see a reference

1  here to category exclusivity?

2  A.  Yes.

3  Q.  Can you please explain your understanding of what this

4  section provides?

5  A.  This lists out about 10 pharmaceutical brands that are

6  listed as a competitor to Humira that we did not want them

7  running in the same office as Humira.

8  Q.  Were you ever informed by anyone at Outcome that it was

9  under-delivering on its contracted number of rheumatology

10  offices for the AbbVie Humira campaign?

11  A.  No.

12  Q.  What, if any, expectations did you have of Outcome if, in

13  fact, it was under-delivering on the contracted number of

14  rheumatology offices?

15  A.  To let us know, notify us.

16  Q.  Drawing your attention to page 8 of Exhibit 148.  Based on

17  your work with Target Health, are you familiar with proof of

18  performance affidavits like this?

19  A.  Yes.

20  Q.  Do you have an understanding of what purpose these

21  affidavits serve for an ongoing advertising campaign?

22  A.  Yes.

23  Q.  And can you explain your understanding?

24  A.  So this is a document completed by the partner that has

25  been contracted with a media placement through Target Health,

1  and it lists the details of the buy, including the client

2  name, brand name.  It references the contract number, the date

3  of the media placement, the number of offices to be delivered,

4  and sign-off by the media partner.

5  Q.  So is this an affidavit from Outcome Health known at the

6  time as ContextMedia?

7  A.  Yes.

8  Q.  For what month?

9  A.  February 2013.

10  Q.  For what client?

11  A.  AbbVie.

12  Q.  And what brand?

13  A.  Humira.

14  Q.  Do you see a date next to the signature line?

15  A.  Yes.

16  Q.  Now, that's before the end of the month for which this

17  affidavit is being submitted; is that right?

18  A.  That's right.

19  Q.  Is that unusual in your experience?

20  A.  Yes, because they should only have been delivered the

21  month -- the preceding month to complete this document to

22  say -- confirm that the media ran through the whole month.

23  Q.  In your experience, did Target Health presume that the

24  information in this signed affidavit was true?

25  A.  Yes.

1  Q.  I'm going to draw your attention to the number of

2  offices/locations delivered.

3         Now, what did you understand Outcome was representing

4  regarding its delivery on the Humira campaign as of

5  February 2013?

6  A.  480 offices.

7  Q.  If you had learned that that was not true, what, if any,

8  impact would that have on Target Health's payments to Outcome?

9  A.  We would have not paid in full.

10  Q.  Drawing your attention to page 2 of Exhibit 1094, based on

11  your work with Target Health, are you familiar with invoices

12  like this?

13  A.  Yes.

14  Q.  Do you have an understanding of what purpose these

15  invoices serve for an ongoing advertising campaign?

16  A.  Yes.

17  Q.  Can you explain your understanding?

18  A.  Invoices are delivered to accounts payable from the

19  partner, noting the monthly amount based on the contract,

20  and --

21  Q.  In this instance, this is an invoice from Outcome, again

22  known at the time as ContextMedia, to Target Health?

23  A.  Yes.

24  Q.  And for what month?

25  A.  February.

1  Q.  Of 2013?

2  A.  Yes.

3  Q.  What is Outcome billing Target Health for here?

4  A.  Advertising on 325 screens in February.

5  Q.  Now, the contracted amount here, was it your understanding

6  that that was based on offices or screens?

7  A.  Offices.

8  Q.  If Outcome had delivered 325 screens in less than 325

9  offices, is that something you would want to be told?

10  A.  Yes.

11  Q.  If Outcome had delivered 325 screens in less than 325

12  offices, do you expect that Outcome would have -- that Target

13  Health would have paid the full amount of this invoice?

14  A.  Yes.

15  Q.  If they had delivered less offices?

16  A.  Oh, no.

17  Q.  And what is the total amount billed on this invoice?

18  A.  56,550.

19  Q.  Drawing your attention to page 3 of Exhibit 1094, can you

20  see that?

21  A.  Yes.

22  Q.  The document on the screen is another invoice from Outcome

23  to Target Health for February of 2013; is that right?

24  A.  Yes.

25  Q.  Now, what is Outcome billing Target Health for here?

1  A.  155 ContextMedia Health screens in February.

2  Q.  And can you read the additional highlighted portion?

3  A.  "Screens are additional to 325 screens per contract."

4  Q.  So similar to what I had asked you before, as of

5  February 1st, what was your expectation in terms of how many

6  offices Outcome was delivering screens?

7  A.  Total?

8  Q.  Yes.

9  A.  480.

10  Q.  If Outcome had delivered less than 480 offices, would

11  Target Health have paid this invoice?

12  A.  No.

13  Q.  Did you interpret this invoice as a disclosure from

14  Outcome Health that it was delivering less than 480 offices?

15  A.  No.

16  Q.  So between this and the prior invoice, Outcome billed

17  Target Health for 480 locations; is that right?

18  A.  Yes.

19  Q.  On this issue of screens versus offices, I'm going to ask

20  you, Ms. Bautista, please look around the courtroom.  How many

21  screens do you see here?

22  A.  Including computer screens?

23  Q.  Let's go with the big screens, the big TVs.

24  A.  Three, four.

25  Q.  And were there instances where a single rheumatology

1 waiting room had multiple Outcome screens?

2 A. Yes.

3 Q. If this courtroom were a rheumatology waiting room, how

4 many locations does it count for under the contract?

5 A. One.

6 Q. Even though it has multiple screens?

7 A. Yes.

8 THE COURT: If this were the waiting room, this would

9 be a very big practice.

10 (Laughter.)

11 BY MR. APPLEBY-BHATTACHARJEE:

12 Q. Turning back to the February 2013 proof of performance

13 affidavit we were looking at previously, you noted that the

14 date on the signature block is February 11, 2013?

15 A. Yes.

16 Q. Were you aware that three days before this affidavit was

17 signed, Outcome had only 419 sites currently available for the

18 Humira campaign?

19 A. No.

20 Q. If true, is that information you would have wanted to

21 know?

22 A. Absolutely.

23 Q. If you had learned that Outcome was not playing

24 advertisements in 480 rheumatology offices as of

25 February 2013, what, if any, impact would that have had on

1  Target Health's payments to Outcome?

2  A.  We would have not paid in full.

3  Q.  And did Target Health rely on affidavits like the one on

4  the screen as a representation of full delivery?

5  A.  Yes.

6  Q.  Drawing your attention to Exhibit 176, which is in

7  evidence.  If I could turn to your email to Mr. Crandall in

8  this thread, February 26, 2013 at approximately 2:46 p.m.  Do

9  you see that?

10  A.  Yes.

11  Q.  Why don't you take a moment to read over the content of

12  the email.  Let me know when you're ready.

13  A.  Okay.

14  Q.  What are you asking Mr. Crandall for here?

15  A.  To provide a spreadsheet noting all of the locations where

16  Humira RA is running.

17  Q.  And was that part of the proof-of-performance process?

18  A.  Yes.

19  Q.  Turning to Mr. Crandall's response in this thread on

20  February 27, 2013 at 11:19 a.m., does it appear that

21  Mr. Crandall provided you the requested list?

22  A.  Yes.

23  Q.  Moving to your reply in this thread on February 27th, 2013

24  at 2:14 p.m., can you please read the content of this email

25  into the record?

1  A.  "I took a look through the list, and there appears a good

2  amount of locations that are non-rheumatology, such as

3  pediatrics, cardiology, family practice, and oncology.  Maybe

4  these were input by mistake?"

5  Q.  What's the issue you're highlighting here?

6  A.  That based on the contract, we had only wanted to run

7  rheumatology offices.  So the list he was providing included

8  other practices that were not of interest to us.

9  Q.  Was that a problem from Target Health's perspective?

10  A.  Yes.

11  Q.  Based on your interactions with AbbVie, your client, was

12  that a problem from AbbVie's perspective?

13  A.  Yes.

14  Q.  All right.  Drawing your attention to Exhibit 1077 and

15  focusing on the header of the email.  Who is the email from?

16  A.  Matthew Crandall.

17  Q.  Who is it to?

18  A.  Myself.

19  Q.  And who's copied -- who's blind copied?

20  A.  Shradha.

21  Q.  What's the date of this email?

22  A.  February 28, 2013.

23  Q.  And what's the subject of the email?

24  A.  Humira RA location list.

25  Q.  Turning to the content of Mr. Crandall's email, could you

1  please read the content of the email into the record?

2  A.  "Please delete the file I forwarded yesterday with HCPs

3  associated with the Humira campaign.  The list included all

4  HCPs at the targeted rheumatology prescriber waiting rooms,

5  including those not specifically targeted by AbbVie.

6        "More importantly, I am still in my first year at CMH

7  and when put together this request, I forgot that we do not

8  share actual prescriber names with our clients and agencies.

9  Attached is a new file that you can share with your clients.

10  It lists the addresses where your campaign is running.

11        "Sorry for the confusion.  Can you please confirm

12  deletion of the prior list?"

13  Q.  At the time you received this email, did you have any

14  reason to believe that Outcome was trying to hide information

15  from Target Health through its updated list?

16  A.  No.

17  Q.  Can you see in the cover email from Mr. Crandall that

18  there appears to be an attachment, an Excel file?

19  A.  Yes.

20  Q.  So let's look at that attachment.  Publishing Government's

21  Exhibit 1077 A.

22        Is this the list that you received?

23  A.  Yes.

24  Q.  So I'm going to scroll down the list.  Does this list

25  include rheumatology offices or what are represented to be

1  rheumatology offices?

2  A.  Yes.

3  Q.  Does this list also include internal medicine scattered at

4  various points?

5  A.  Yes.

6  Q.  Scrolling down the list, do you see a total of 480

7  locations identified minus the header --

8  A.  Yes.

9  Q.  -- running?

10       Does this list include mostly rheumatology offices?

11  A.  Yes.

12  Q.  When you saw this list, did seeing a few internal medicine

13  offices scattered throughout raise the same concerns as you

14  had flagged with the original list?

15  A.  No.

16  Q.  Why not?

17  A.  It is possible that internal medicine can write for

18  rheumatoid arthritis as well.

19  Q.  And did you have subsequent conversations with Outcome

20  Health about this revised list?

21  A.  Yes.

22  Q.  We'll come to those conversations in a moment.

23       Before we get there, drawing your attention to

24  Government's Exhibit 183, I'm going to turn to your email in

25  this thread on March 4, 2013 at 4:15 p.m.  Do you see that?

1  A.  Yes.

2  Q.  Is this after Mr. Crandall's prior email to you sending

3  the updated list?

4  A.  Yes.

5  Q.  Can you please read the content of your email into the

6  record?

7  A.  "The list includes about 53 internal medicine offices.

8  Can these be scrubbed off?  Our contracted buy is for Rheum

9  offices only.  Let me know."

10  Q.  What did you mean by scrub off?

11  A.  Being removed from the list.

12  Q.  And is that something you expected to be reflected in

13  billing as well?

14  A.  Yes.

15  Q.  Turning to Mr. Crandall's response on March 4, 2013, at

16  7:28 p.m.  Can you read the content of Mr. Crandall's email

17  into the record?

18  A.  "Technically, these offices are marked as IMs, but they

19  have -- but they have opted into our Rheumatoid Health Network

20  as they were -- as they see RA patients and wanted

21  rheumatology programming.  Let me know if this suffices.

22  Otherwise, we can scrub this off your list and move them to

23  the other brand's RA program.  No problem."

24  Q.  Do you see the reference in Mr. Crandall's email to the

25  term scrub off?

1  A.  Yes.

2  Q.  What did you understand Mr. Crandall meant by that?

3  A.  He can remove the 53 IM offices.

4  Q.  Is that something you expected to be reflected in the

5  billing?

6  A.  Yes.

7  Q.  Turning now to your response to Mr. Crandall on March 5th,

8  2013.  Can you read the content of the email into the record?

9  A.  "Can you provide prescription information for these

10 offices?  IM offices.  We'll need to let the AbbVie team know.

11 If AbbVie accepts the offices as relevant, then we can count

12 them.  If not, then the offices will need to be taken out and

13 replaced with Rheum offices per our contract."

14 Q.  What's the issue you were flagging here?

15 A.  The IM offices, whether we needed to disclose and address

16 it with the client and have them decide if they were relevant

17 offices to keep or take them off the buy.

18 Q.  So that was the client's decision?

19 A.  Yes.

20 Q.  In this case AbbVie?

21 A.  Yes.

22 Q.  Do you recall one way or another if AbbVie ever asked for

23 new rheumatology offices to replace the internal medicine

24 offices that Outcome provided in that February 2013 list?

25 A.  I do not recall.

1  Q.  After receiving the February 2013 list, did you ever

2  communicate to Outcome that they could continue adding

3  internal medicine offices instead of rheumatology offices

4  without telling you first?

5  A.  No.

6  Q.  Do you expect you would have ever said something like

7  that?

8  A.  Yes.

9  Q.  That --

10 A.  Oh, to not continue, no.

11 Q.  So let me bring you back to my question.

12       Do you expect you would have ever told Outcome that

13 it was okay for them to just keep adding internal medicine

14 offices without telling you first?

15 A.  No.

16 Q.  And why not?

17 A.  Because that was not of interest to us, nor on the

18 contract.

19 Q.  Was there at least one instance in which Outcome was asked

20 to provide a corrected proof of performance?

21 A.  Yes.

22 Q.  Turning your attention to Exhibit 1074 and looking at an

23 email in this thread from Jennifer Greufe on February 27,

24 2013, can you see that?

25 A.  Yes.

1  Q.  Are you copied on this email?

2  A.  Yes.

3  Q.  Can you please read the content of the email into the

4  record?

5  A.  "We've noticed a discrepancy between the start date of the

6  Humira RA campaign and the affidavit of performance we

7  received from your team.  I've attached the affidavit for

8  reference.  As you'll see, the start date is noted as 1/1/13.

9  This will need to be actualized to reflect the actual start

10  date of 1/11/13.

11        "Moving forward, it is imperative that the affidavits

12  we receive reflect actual start date and end dates as well as

13  number of offices, et cetera.  Appreciate your help in

14  monitoring and actualizing these documents moving forward."

15  Q.  Did Outcome, in fact, submit a corrected proof of

16  performance affidavit for January 2013?

17  A.  Yes.

18  Q.  Turning your attention to page 2 of Exhibit 177.  Is this

19  a proof of performance for the Humira campaign?

20  A.  Yes.

21  Q.  For what month?

22  A.  January 2013.

23  Q.  What's the start date reflected here?

24  A.  January 11th, 2013.

25  Q.  Is that consistent with the correction that Target Health

1  had requested for this affidavit?

2  A.  Yes.

3  Q.  And though this is a January 2013 affidavit, what's the

4  date that it's signed?

5  A.  February 27, 2013.

6  Q.  Now, in your experience, did Target Health presume that

7  the information in this signed affidavit was true?

8  A.  Yes.

9  Q.  Particularly after Target Health requested a correction to

10  the prior affidavit?

11  A.  Yes.

12  Q.  After an error was discovered in the original January 2013

13  affidavit, would Target Health have authorized payments to

14  Outcome if this revised affidavit had not been executed?

15  A.  No.

16  Q.  Drawing your attention to page 54 of Exhibit 1073.  Is

17  this another proof of performance affidavit for the Humira

18  campaign?

19  A.  Yes.

20  Q.  For what month?

21  A.  March 2013.

22  Q.  And what's the date on this affidavit?

23  A.  March 12, 2013.

24  Q.  In your experience, did Target Health presume that the

25  information in this signed affidavit was true?

1  A.  Yes.

2  Q.  How many rheumatology offices did Outcome say it was

3  delivering?

4  A.  480.

5  Q.  If you had learned that was not true, what, if any, impact

6  would that have had on Target Health's payments to Outcome?

7  A.  We would have not paid.

8  Q.  Drawing your attention to page 4 of Exhibit 1094, is this

9  an invoice from Outcome to Target Health for the month of

10 March 2013?

11 A.  Yes.

12 Q.  What is Outcome billing for here?

13 A.  Humira rheumatology advertising content on 325

14 ContextMedia Health screens.

15 Q.  And what is billed to Target Health for that?

16 A.  56,550.

17 Q.  Turning your attention to page 5 of Exhibit 1094, is this

18 another March 2013 invoice from Outcome?

19 A.  Yes.

20 Q.  And what is billed on this invoice?

21 A.  155 ContextMedia Health screens, 26,970.

22 Q.  Between this and the prior invoice, Outcome billed Target

23 Health for a total of 480 screens; is that right?

24 A.  Yes.

25 Q.  And what was your understanding of what Outcome was

1  required to deliver?

2  A.  480 offices.

3  Q.  Were you aware that as of April 7, 2013, Outcome had only

4  432 locations available for the Humira campaign in total?

5  A.  No.

6  Q.  If true, is that information you would have wanted to

7  know?

8  A.  Yes.

9  Q.  If true, is that consistent with the information provided

10  in the February 2013 proof of performance affidavit?

11  A.  No.

12  Q.  Or the March 2013 proof of performance affidavit?

13  A.  No.

14  Q.  Now, from Target Health's perspective, I want to ask you

15  about the affidavit versus the invoice.

16         The affidavit refers to locations, the invoice refers

17  to screens.  Do you recall that?

18  A.  Yes.

19  Q.  If there's a difference in the language between the

20  affidavit and the invoice, from Target Health's perspective,

21  which one are you relying on?

22  A.  Offices.

23  Q.  And that's what's in the affidavit?

24  A.  Yes.

25  Q.  If you had learned that Outcome was not playing

1 advertisements in 480 rheumatology offices as of March 2013,

2 what, if any, impact would that have had on Target Health's

3 payments to Outcome?

4 A.  We would have not paid in full.

5          MR. APPLEBY-BHATTACHARJEE:  Do I have time to cover

6 one more affidavit?

7          THE COURT:  You do.

8 BY MR. APPLEBY-BHATTACHARJEE:

9 Q.  Okay.  Drawing your attention now to 198 and turning to

10 Mr. Crandall's email to you in this thread on April 9, 2013.

11 Do you see that?

12 A.  Yes.

13 Q.  Can you please read the content of the email into the

14 record.

15 A.  "I just want to send a brief note to confirm our

16 conversation.  As of last night, per your request, we have

17 paused the Humira campaign with CMH.  We look forward to

18 receiving new unbranded creative ASAP to restart the campaign.

19 This also confirms that you are not cancelling your exclusive

20 RA presence in the contracted offices, and we will continue to

21 bill as scheduled.

22          "Please keep us posted with updates.  We look forward

23 to restarting with you ASAP."

24 Q.  Was the Humira campaign with Outcome paused in or around

25 April 2013?

1   A.  Yes.

2   Q.  For what reason?

3   A.  We had to take the creative that was live down.

4   Q.  I'm going to draw your attention to Mr. Crandall's

5   statement, "You are not cancelling your exclusive RA presence

6   in the contracted offices, and we will continue to bill as

7   scheduled."

8          Do you see that?

9   A.  Yes.

10  Q.  What's your understanding of that statement?

11  A.  We would, even though our programming was not live, those

12  were still our offices.  They would not be sold to a

13  competitor per the contract.

14  Q.  So while the Humira campaign was paused, Outcome was not

15  playing ads in rheumatology offices.  Is that fair?

16  A.  Correct.

17  Q.  So during that pause period, what does delivery mean?

18  A.  The same number of contracted offices.

19  Q.  Was it your understanding that Outcome would still have to

20  reserve the same number of contracted offices?

21  A.  Yes.

22  Q.  And did Target Health expect that Outcome was, in fact,

23  reserving the contracted number of rheumatology offices for

24  the campaign in April 2013 even when the program was paused?

25  A.  Yes.

1  Q.  And as of April 2013, that would have been 530 offices,

2  correct?

3  A.  Correct.

4  Q.  Were you aware that as of April 5, 2013, Outcome discussed

5  adding PCPs to the proof of performance for the Humira

6  campaign?

7  A.  No.

8  Q.  If true, is that information you would have wanted to

9  know?

10  A.  Yes.

11  Q.  Are internal medicine practitioners the same as PCPs for

12  Target Health?

13  A.  No.

14  Q.  Why not?

15  A.  PCPs are construed mostly like primary care, where you go

16  for your annual, if you have the flu, a cold, sore throat.

17        Internal medicine is more so treating adults that

18  have multiple conditions and have drugs that may interact with

19  one another, so they're -- they may be seeing their internal

20  medicine doctor every quarter, maybe every other month.

21  Q.  Would PCPs have been an acceptable replacement for

22  rheumatology practices to Target Health and AbbVie?

23  A.  No.

24  Q.  At any point, did you communicate to Outcome that they

25  could simply add PCP offices to fill the contracted inventory

1    numbers without first telling Target Health?

2    A.  No.

3    Q.  Were PCP and rheumatology offices interchangeable to

4    AbbVie for the Humira campaign?

5    A.  No.

6    Q.  And why not?

7    A.  PCP offices were just of no interest to Humira.  Only

8    rheumatology offices were.

9    Q.  Now, if Outcome continued to add PCP offices to fill the

10   contracted inventory numbers, what would you have expected

11   them to do?

12   A.  Disclose that to us.

13   Q.  And was that ever disclosed to you to the best of your

14   knowledge?

15   A.  No.

16   Q.  After the February 2013 spreadsheet that we looked at in

17   Government's Exhibit 1077, if Outcome continued to add

18   internal medicine offices to fill the contracted inventory

19   numbers, what would you have expected them to do?

20   A.  To disclose that to us.

21   Q.  All right.  I'm going to draw your attention now to

22   Government's Exhibit 197.  And looking at the cover email, who

23   is it from?

24   A.  Jason Ketchum.

25   Q.  Who was it to?

1 A. Tiffany Yuh.

2 Q. Who is Tiffany Yuh?

3 A. She was our junior account executive on the team, new.

4 Q. Did she report to you at the time?

5 A. Yes.

6 Q. And would Tiffany Yuh share with you items or documents

7 received from vendors as part of the proof of performance

8 process?

9 A. Yes.

10 Q. What's the date of the email from Mr. Ketchum to Ms. Yuh?

11 A. April 9, 2013.

12 Q. What's the subject of the email?

13 A. April docs.

14 Q. Can you please read the content of the email into the

15 record.

16 A. "Tiffany, attached are the docs for AndroGel, Humira and

17 Bayer. Please let me know if you need anything else. Please

18 send the deadlines to me moving forward so I can make sure to

19 get everything to you ahead of the due date."

20 Q. Do you see a series of attachments to this email?

21 A. Yes.

22 Q. Does one of those appear to be a Humira clinic list?

23 A. Yes.

24 Q. And that list is sent as a PDF; is that right?

25 A. Correct.

1  Q.  Is that different from the previous list you and I looked
2  at together?
3  A.  Yes.
4  Q.  There's also what appears to be a Humira April 2013
5  affidavit attached?
6  A.  Correct.
7  Q.  So let's start with the clinic list.  I'm moving to
8  page 126 of Exhibit 197 --
9          THE COURT:  And you've got about three minutes, so if
10  you can get to at least one of these in that three minutes,
11  please do.
12         MR. APPLEBY-BHATTACHARJEE:  Yes.  I think I'll stop
13  it before the affidavit.
14         THE COURT:  Okay.  Very good.
15 BY MR. APPLEBY-BHATTACHARJEE:
16 Q.  Can you walk us through the columns that are on this list?
17 A.  Street, city, state and zip.
18 Q.  Is there a column for specialty?
19 A.  No.
20 Q.  Is that different than the location list we previously
21 looked at in Exhibit 1077 A which was sent to you in February?
22 A.  Yes.
23 Q.  Looking back at the April 2013 list, can you tell which,
24 if any of these, are rheumatology offices?
25 A.  No.

1 Q.  Can you tell which, if any of these, are internal medicine
2 providers?

3 A.  No.

4 Q.  Can you tell which, if any of these, are PCPs?

5 A.  No.

6 Q.  What kind of providers' offices did Outcome contract to
7 provide for the Humira campaign?

8 A.  Rheumatology.

9 Q.  As of April 2013, did you believe Outcome was sending you
10 location lists with internal medicine providers?

11 A.  No.

12 Q.  Is that something you would have wanted to know?

13 A.  Yes.

14          MR. APPLEBY-BHATTACHARJEE:  I think we can stop
15 there.

16          THE COURT:  All right.  Ladies and gentlemen, we're
17 done for today.  Please don't discuss the case among
18 yourselves or with anyone else.

19          Keep an open mind, and we'll see you tomorrow morning
20 at 9:00.  Thank you all.

21          COURT SECURITY OFFICER:  All rise.

22      (Jury exits courtroom.)

23          THE COURT:  All right, ma'am, you're excused.  Please
24 be back by 9:00 tomorrow, and you can talk to the government
25 if they wish to talk to you overnight.

1      Thank you.

2      All right.  Anything we need on the record?

3      We can talk about how we're going to handle some of

4  these exhibits and putting them in evidence off the record,

5  but anything the government needs to put on the record?

6      MR. APPLEBY-BHATTACHARJEE:  From the government, no,

7  Your Honor.

8      THE COURT:  And who are your next witnesses?

9      MR. APPLEBY-BHATTACHARJEE:  We have Lynn Meier who is

10  another agency rep, and after that will be David Ma.

11      THE COURT:  All right.

12      And do you expect disputes on exhibits for Lynn

13  Meier?

14      MR. APPLEBY-BHATTACHARJEE:  So those were already

15  covered by the last list that we have, so I think through

16  David Ma, we should be in a position to pop up exhibits that

17  have been either agreed to for pre-admission or subject to

18  objections that have been overruled.

19      THE COURT:  And on Ma, the same thing?

20      MR. APPLEBY-BHATTACHARJEE:  Yes.

21      MR. JOHNSTON:  Clarification, probably about five or

22  six more exhibits that we'll send over tonight, but the vast

23  majority have already been disclosed and --

24      THE COURT:  For Ma.

25      MR. JOHNSTON:  Yeah, for Ma.

1        THE COURT:  Okay.  Very good.

2        Anything else we need to put on the record from

3    defense?

4        MR. LOWDER:  No, Your Honor.

5        MS. CHOU:  No, Your Honor.

6        THE COURT:  Nothing from defense?  Okay.

7        All right.  We're off the record.

8      (Court adjourned, to reconvene at 8:45 a.m. on 2/9/23.)

9                        CERTIFICATE

10       I certify that the foregoing is a correct transcript from

11   the record of proceedings in the above-entitled matter.

12   */s/ Elia E. Carrión*          *9th day of February, 2023*

13   *Elia E. Carrión*                     *Date*
     *Official Court Reporter*

14

15   */s/ Kelly M. Fitzgerald*      *9th day of February, 2023*

16   *Kelly M. Fitzgerald*                 *Date*
     *Official Court Reporter*

17

18   */s/ Sandra M. Tennis*         *9th day of February, 2023*

19   *Sandra M. Tennis*                    *Date*
     *Official Court Reporter*

20

21   */s/ Kathleen M. Fennel*       *9th day of February, 2023*

22   *Kathleen M. Fennel*                  *Date*
     *Official Court Reporter*

23

24

25