1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3    UNITED STATES OF AMERICA,          )
                                        )   Docket No. 19 CR 864
4                    Plaintiff,         )
                                        )   Chicago, Illinois
5        v.                             )   February 9, 2023
                                        )   8:37 a.m.
6    RISHI SHAH, SHRADHA AGARWAL,       )
     BRAD PURDY,                        )
7                                       )
                     Defendants.        )
8

9         TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 8A
        BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11   APPEARANCES:

12
     For the Government:   MR. MATTHEW F. MADDEN
13                         MR. SAURISH APPLEBY-BHATTACHARJEE
                           Assistant U.S. Attorneys
14                         219 South Dearborn Street, 5th Floor
                           Chicago, Illinois  60604
15

16                         MR. WILLIAM E. JOHNSTON
                           MR. KYLE C. HANKEY
17                         U.S. Department of Justice
                           Criminal Division, Fraud Section
18                         Washington, D.C.  20530

19

20

21

22                    ELIA E. CARRIÓN
                    Official Court Reporter
23               United States District Court
              219 South Dearborn Street, Room 1432,
24                   Chicago, Illinois 60604
                        (312) 408-7782
25               Elia_Carrion@ilnd.uscourts.gov

APPEARANCES (Continued:)

For Defendant
Shah:                    MR. JOHN C. HUESTON
                         Hueston Hennigan LLP
                         620 Newport Center Drive, Suite 1300
                         Newport Beach, California  92660

                         MS. VICKI CHOU
                         MR. MICHAEL H. TODISCO
                         MS. KAREN DING
                         Hueston Hennigan LLP
                         523 West 6th Street, Suite 400
                         Los Angeles, California  90014

For Defendant
Agarwal:                 MS. KOREN L. BELL
                         MR. A. ALEXANDER LOWDER
                         MR. STEPHEN G. LARSON
                         Larson LLP
                         555 South Flower Street, Suite 4400
                         Los Angeles, California  90071

                         MR. PATRICK W. BLEGEN
                         MS. KELSEY H. KILLION
                         Blegen & Garvey
                         53 West Jackson Boulevard, Suite 1437
                         Chicago, Illinois  60604

For Defendant
Purdy:                   MR. THEODORE T. POULOS
                         MR. ERIC PRUITT
                         MR. JOHN PAVLETIC
                         Cotsirilos, Tighe, Streicker, Poulos &
                         Campbell, Ltd.
                         33 North Dearborn Street, Suite 600
                         Chicago, Illinois  60602

1          (Proceedings heard in open court; jury out.)

2          THE COURT:  All right.  We're on the record.  There

3    were a couple issues that came through last night.

4    Apparently, there's two exhibits the government intends to use

5    on direct examination.

6          Can you state them that you noted in your email that

7    you're going to offer.

8          MR. APPLEBY-BHATTACHARJEE:  Yes, Your Honor.  Those

9    will be marked as Government's Exhibit 1162 and Government's

10   Exhibit 1163.  We tendered those to the defense last evening

11   and asked for any objections.  The basis for offering the

12   exhibits are as 803(6) business records.

13          There was no objection from any party.

14          THE COURT:  All right.  They're all admitted without

15   objection.  I saw the same emails, and I'll consider those as

16   agreement to let them come in without objection.  There were

17   three cross exhibits that Ms. Chou intended to use.  There's

18   an objection by the government.

19          I think Ms. Chou said she's going to have to lay a

20   foundation for them to use them.

21          MS. CHOU:  Yes, Your Honor.

22          THE COURT:  Frankly, they look pretty benign to me.

23   And I -- you know, if you lay a foundation, I'll hear a

24   relevance objection if there is one at sidebar.  But if a

25   proper -- if she knows.

1   These may be exhibits she just doesn't --

2   MS. CHOU:  Yeah, okay.

3   THE COURT:  -- is not familiar with.  But if she

4   knows them, I didn't see anything all that problematic about

5   them, but I'll allow the government to, if we get that far,

6   make an objection at sidebar, and you can explain why you

7   think they're unduly prejudicial or completely irrelevant.

8   Okay.  Then there was a motion to -- in limine --

9   filed by Defendant Purdy to ban the shrug.  I read both the

10  motion and the response.  The motion's denied.  This is

11  classic cross-examination.  If -- if the witness ends up -- he

12  laid some foundation, which is unusual in this kind of a case,

13  just through his SEC dep.

14  A foundation may not be, you know, 100 percent

15  perfect in the sense that there could never be a challenge to

16  it.  It's got the typical flaws any witness has in recalling

17  an event interpreting something.

18  But the Rules of Evidence clearly allow a person to

19  testify to what he perceives and how he perceived it.  And if,

20  in fact, this is -- you know, the testimony is somewhat

21  consistent with what he said in the SEC, I'm going to allow

22  it.

23  This is not so prejudicial, the shrug, that even if

24  allowed the prejudicial impact outweighs its probative value.

25  I'm not sure how much probative value it has.  But it's

1  certainly not prejudicial.  And I can anticipate the cross

2  pretty clearly in my mind.

3      And I think that's where it ought to belong through

4  cross-examination, not through elimination for the jury to

5  consider and give it whatever weight it deems appropriate.

6      So that motion in limine is denied.

7  MR. POULOS:  Your Honor, just on that issue a little

8  further.

9  THE COURT:  Sure.

10  MR. POULOS:  It -- the -- so I'm hearing the Court,

11  and I, of course, respect the decision that he will be allowed

12  to testify about the event, here's what I saw happening,

13  here's the limited information of what I heard.

14  THE COURT:  Yeah.

15  MR. POULOS:  But, Judge, then the conclusion and his

16  interpretation of that, we ask that that not be permitted,

17  because -- because it really isn't adequate foundation for

18  that conclusion.  And that conclusion is what's so

19  prejudicial.

20  THE COURT:  It's -- the ruling's the same.  You can

21  cross him on that.  His conclusion, if it's derived from an

22  observation, is a fully admissible observation.  People

23  observe things and interpret them all the time and are allowed

24  to do it in court.

25      The credibility that -- that the conclusion a person

1  draws from an observation is -- or the -- the -- yeah, the

2  credibility of a conclusion from an observation is something

3  routinely testified to.

4        How could -- if he merely testifies, "I saw him

5  shrug," and is not allowed to conclude and complete that

6  circle of why -- what he thought the shrug meant, then it's a

7  meaningless piece of body movement that is untethered to any

8  fact at issue in the case.

9        If he is not, you know, if -- you can cross him on

10  whether -- on how much he heard, how that observation is

11  reasonable.  But under 701, a person, a layperson can make any

12  observation they -- can opine, as long as it's reasonable, as

13  to any observation they make.

14        Now, you don't think it's reasonable.  I'm

15  anticipating your argument.  But --

16        MR. POULOS:  Yeah, and, Judge, just --

17        THE COURT:  Go ahead.

18        MR. POULOS:  -- just -- just for the record.  The

19  701 issue is the point here that it does require reasonable --

20  a sufficient opportunity to -- to observe -- to have observed

21  a situation, to understand it, and then from that, to offer

22  that type of lay opinion.

23        That's the problem with the foundation here, in my

24  view.  And then the ultimate conclusion to be drawn --

25  you know, if he tells the jury, "Here's what I heard

1   Ashik say, here's what I saw Brad do," that's one thing.  And
2   it's for the jury then to draw the -- that conclusion, not for
3   him to fill in this gap.
4           And especially, Judge, when the government's claiming
5   that he's going to testify that, "This is one of the reasons I
6   left the company."
7           Judge, at that point, he had been with the company
8   for maybe four or five months.  He stayed more than a year
9   longer.  So it's -- it's a real stretch in that regard, Judge.
10          THE COURT:  Well, 701 says if a witness is not
11  testifying as an expert, testimony in the form of an opinion
12  is limited to one that is rationally based on the witness's
13  perception and helpful to clearly -- to clearly under --
14  helpful to clearly understanding the witness's testimony or
15  determining a fact in issue.
16          I believe it does.  And I believe that the weight to
17  be given it is certainly something that you can attack, but,
18  as I recall from the deposition transcript from the SEC, he
19  said this event stood out in his mind.  This was not,
20  you know, trying to recall something that occurred ten years
21  where somebody shrugged their shoulders.  He had a specific
22  recollection of the event.
23          So I'm not changing my ruling.  I believe it is
24  something that is -- passes the threshold to allow the witness
25  to testify about it.  And the conclusion he drew from it, what

1    he observed and what he thought it meant, which is, frankly,

2    an unremarkable occurrence for witnesses.

3            And you can cross-examine him.

4            MR. POULOS:  One more -- just one more point on that,

5    Judge.

6            THE COURT:  Sure.

7            MR. POULOS:  I request the opportunity to *voir dire*

8    the witness in connection with this so that the Court can make

9    a -- to take into account what he actually testifies to during

10   the *voir dire* and whether he -- this opinion of his would

11   satisfy 701.

12           THE COURT:  Response from the government.

13           MR. JOHNSTON:  Your Honor, he already did that in his

14   deposition.  You've seen what he would testify to, and that

15   deposition only occurred six months ago.  I think you -- the

16   Court has more than enough assurance that the witness is going

17   to be able to lay the foundation.

18           And a *voir dire* is totally unnecessary in this

19   instance.

20           THE COURT:  Yeah, I believe -- I agree with that

21   because he was deposed.  And, again, it's the unusual

22   circumstance where you have an actual deposition about the

23   event.  And, secondly, this shoulder shrug, in my view of the

24   evidence so far, is not so prejudicial.

25           It's not something where a person made an ethnically-

1  or racially- or gender-biased statement that is so prejudicial
2  that we better be sure it actually happened before it's put
3  before a jury.  This is a shrug.

4         But, frankly, if -- I don't want to get into trial
5  strategy and tactics, but if that's where the government is
6  going on this, I'm -- the closing you have is wide open.

7         I mean, the -- it -- it's a -- the government can put
8  on the case they want, and it's not based on one fact but a
9  variety of facts.  But when they start basing their case on
10  shrugs, in some ways, the defense may get the better of that
11  argument.

12         But that's decidedly in all of your arenas, not mine.
13  But I'm -- I'm just telling you it's not the kind of event
14  where merely hearing it from the jury and then having you
15  cross-examine and then maybe me, at that point, saying, "You
16  should disregard it," can be -- won't be remedied by my having
17  it stricken.

18         This is a shoulder shrug.  And the observation of it,
19  again, is not so damaging that the mere hearing of it by a
20  jury without cross-examination is going to be overly
21  prejudicial compared to its probative impact -- probative
22  value.

23         MR. POULOS:  Thank you, Judge.

24         THE COURT:  You're welcome.

25         Okay.  I have a call very briefly, and then we will

1  take up any other issues we need to discuss.

2       MR. APPLEBY-BHATTACHARJEE:  Your Honor, I just want

3  to flag, there's a logistics issue with respect to the next

4  witness who is the video conference witness.  Perhaps we can

5  address that off the record.

6       THE COURT:  Sure.  I've got an 8:45 call.  It'll take

7  two minutes.  And then we'll go back and off the record talk

8  about your logistical issue.

9       MR. APPLEBY-BHATTACHARJEE:  Thank you.

10     (Pause in the proceedings.)

11     (Jury in at 9:01 a.m.)

12      THE COURT:  All right.  Please be seated.

13      Good morning, ladies and gentlemen.  The student

14 group yesterday, when they were in, I talked to them during

15 the break, and one of them asked if there were ever fights in

16 the courtroom, physical fights.

17      I said, "Not in this trial, but there was one trial

18 in this courthouse where there was, the Chicago Seven Trial."

19      So at some point when we have a break or the parties

20 need to work on some exhibits and -- and you're in the

21 courtroom, I'll tell you about some very interesting stories

22 about the Chicago Seven Trial.

23      But they also asked how you were picked, and I said,

24 "The parties had agreed that this group of jurors could be

25 fair, impartial, listen carefully to the evidence and follow

1  the instructions of the Court."  And they -- and so I told

2  them that's how you were picked.

3          So I appreciate your attentiveness so far and going

4  forward and your timeliness.  We're actually starting at

5  9 o'clock this morning.  So thank you all.

6          Ma'am, you're still under oath.

7          THE WITNESS:  Yes.

8          THE COURT:  All right.  Proceed.

9          MR. APPLEBY-BHATTACHARJEE:  Thank you, Your Honor.

10      YESENIA BAUTISTA, GOVERNMENT WITNESS, PREVIOUSLY SWORN

11                DIRECT EXAMINATION [resumed]

12  BY MR. APPLEBY-BHATTACHARJEE:

13  Q.  Good morning, Ms. Bautista.

14  A.  Good morning.

15  Q.  Yesterday, we were looking at page 126 of Government's

16  Exhibit 197.

17          Do you recall that?

18  A.  Yes.

19  Q.  This is a clinic list that Target Health was sent by

20  Outcome for the Humira campaign in April 2013.  Is that right?

21  A.  Correct.

22  Q.  And you noted yesterday that this clinic list did not have

23  a column for specialty.

24          Do you recall that?

25  A.  Yes.

1    Q.  And we also looked at a clinic list you received from

2    Outcome Health in February 2013 in Government's Exhibit 1077A.

3            Do you recall that?

4    A.  Yes.

5    Q.  And how, if at all, was this list different than the one

6    sent in April?

7    A.  It's missing the specialty column noting rheumatology.

8    Q.  So the February 1st had the specialty column that was

9    missing in the later list?

10   A.  Correct.

11   Q.  So I'm going to move to the affidavit that accompanied the

12   April 2013 list.  This is page 150 of Exhibit 197.

13            And, ma'am, are you familiar with this document?

14   A.  Yes.

15   Q.  Is this a proof of performance affidavit for the Humira

16   campaign?

17   A.  Correct.

18   Q.  For what month?

19   A.  April.

20   Q.  Of 2013?

21   A.  2013.

22   Q.  In your experience, did Target Health presume that the

23   information in this affidavit was true?

24   A.  Yes.

25   Q.  How many rheumatology offices did Outcome say it was

1  delivering?

2  A.  530.

3  Q.  If you learned that was not true, what, if any, impact

4  would that have had on Target Health's payment to Outcome?

5  A.  We would not have paid in full.

6  Q.  Drawing your attention to page 6 of Exhibit 1094.

7          The document on the screen is an invoice from Outcome

8  to Target Health for April 2013.

9          Do you see that?

10 A.  Yes.

11 Q.  What is Outcome billing Target Health for here?

12 A.  Humira rheumatology advertising content on 325 --

13         COURT REPORTER:  Slow down.

14         THE COURT:  Please slow down a little.

15         THE WITNESS:  Oh.

16 BY THE WITNESS:

17 A.  Humira, rheumatology advertising content on

18 325 ContextMedia health screens during April 2013.

19 BY MR. APPLEBY-BHATTACHARJEE:

20 Q.  And what's the total amount billed on this invoice?

21 A.  56,550.

22 Q.  And yesterday, we had talked about screens versus offices.

23         Do you recall that?

24 A.  Yes.

25 Q.  Were those terms interchangeable to Target Health?

1  A.  No.

2  Q.  Drawing your attention to page 7 of Exhibit 1094.

3      Is this another invoice for April 2013?

4  A.  Yes.

5  Q.  Also for the Humira campaign?

6  A.  Correct.

7  Q.  And if you could please note what is being billed here?

8  A.  155 ContextMedia health screens and 50 ContextMedia health

9  screens.

10  Q.  And is this additional to the 325?

11  A.  Correct.

12  Q.  And what's the total amount billed on this invoice?

13  A.  35,670.

14  Q.  Between this and the prior invoice, Outcome billed

15  Target Health for a total of 530 screens?

16  A.  Correct.

17  Q.  Were you aware that as of May 5, 2013, Outcome had only

18  442 locations available in its entire Rheumatology Health

19  Network?

20  A.  No.

21  Q.  Were you aware that as of May 5, 2013, Outcome had only

22  515 screens available?

23      MS. CHOU:  Objection.

24      THE COURT:  Well, that's a contested fact.  So simply

25  ask it as if -- if you were -- if you were aware there were

1    such -- such a number of screens, what effect would it have

2    had.

3          MR. APPLEBY-BHATTACHARJEE:  That was my next

4    question, Your Honor.

5          THE COURT:  Okay.  Phrase it that way.

6    BY MR. APPLEBY-BHATTACHARJEE:

7    Q.  If you were made aware that as of May 5, 2013, Outcome had

8    only 515 screens available in its entire Rheumatology Health

9    Network, would that have concerned you?

10   A.  Yes.

11   Q.  Would that have been consistent with what Outcome

12   represented in its proof of performance affidavit and invoices

13   for April 2013?

14   A.  No.

15   Q.  The contract at that point was for 530 rheumatology

16   offices.  Is that right?

17   A.  Correct.

18   Q.  And Outcome billed Target Health for 530?

19   A.  Correct.

20   Q.  Not 442?

21   A.  No.

22   Q.  Not even 515?

23   A.  No.

24   Q.  Now, if you learned that Outcome was not playing

25   advertisements in 530 rheumatology offices, what, if any,

1  impact would that have had on Target Health's payments to

2  Outcome?

3  A.  We would have not paid in full.

4  Q.  Was there a time that the Humira campaign was paused?

5  A.  Yes.

6  Q.  Was that in or around April 2013?

7  A.  Yes.

8  Q.  What was the reason for the pause?

9  A.  The creative.  The spot had to be taken down.  It --

10  something that happens randomly with a brand's creative.  And

11  then they'll have new creative approved to go live once it's

12  available.

13  Q.  During that pause, did Target Health request that Outcome

14  stop playing ads, Humira ads on its devices in rheumatology

15  offices?

16  A.  Yes.

17  Q.  And was that in or around April of 2013?

18  A.  Yes.

19  Q.  So the invoices we're just looking at are for April 2013.

20  Outcome was not playing ads during that time.  Is that right?

21  A.  That's right.

22  Q.  If Outcome is not playing ads in April 2013, what does

23  "delivery" mean as of April 2013 when the Humira campaign is

24  paused?

25  A.  To reserve the offices we have contracted and not sell

1   them to a competitor.

2   Q.  And as of April 2013, that was 530 offices?

3   A.  Correct.

4   Q.  All right.  I'm going to draw your attention to

5   Government's Exhibit 1138.  And calling out the top portion of

6   this email.

7           Is this an email exchange between you and

8   Matthew Crandall?

9   A.  Yes.

10  Q.  Is anyone blind copied?

11  A.  Shradha Agarwal.

12  Q.  What's the date of the email?

13  A.  May 7, 2013.

14  Q.  And the subject of the email?

15  A.  "AbbVie Unbranded RA Spots Continue Running After May 10."

16  Q.  Was the Humira campaign resumed in or around May 2013?

17  A.  Yes.

18  Q.  Meaning Outcome would resume playing ads on rheumatology

19  offices?

20  A.  Correct.

21  Q.  Did Target Health expect that Outcome was, in fact,

22  running ads in the contracted number of rheumatology offices

23  for the campaign in May 2013?

24  A.  Yes.

25  Q.  Was that 545 offices, by that point?

1 A. Yes.

2 Q. Just drawing your attention to page 8 of Exhibit 1094.

3       Is this another Outcome invoice to Target Health?

4 A. Correct.

5 Q. For what month?

6 A. May.

7 Q. And what is Outcome billing Target Health for here?

8 A. 325 ContextMedia health screens.

9 Q. What's the total amount of this invoice?

10 A. 56,550.

11 Q. Drawing your attention to page 9 of Exhibit 1094.

12       Is this another May 2013 invoice?

13 A. Yes.

14 Q. And what is Outcome billing to Target Health in this

15 invoice?

16 A. 155 ContextMedia health screens and 65 ContextMedia health

17 screens.

18 Q. Additional to the 325?

19 A. Correct.

20 Q. What's the total amount that's billed in this invoice?

21 A. 38,280.

22 Q. Between this and the prior invoice, did Outcome bill

23 Target Health for a total of 545 screens?

24 A. Correct.

25 Q. If you had known that as of May 2013, Outcome had only

1  500 -- 439 locations available in its entire Rheumatology

2  Health Network, would that have been concerning to you?

3            MR. LOWDER:  Objection.  Assumes facts.

4            THE COURT:  Well, again, it's -- it's a contested

5  fact.  The jury can draw from their own memory what the

6  different numbers are.  But why don't you phrase it as "assume

7  there were only X number, would that have changed your

8  position or your -- any actions you would have done."

9            MR. APPLEBY-BHATTACHARJEE:  Okay.

10  BY MR. APPLEBY-BHATTACHARJEE:

11  Q.  Assuming that as of May 2013, Outcome had only

12  439 locations available in its entire Rheumatology Health

13  Network, is that information you would have wanted to know?

14  A.  Yes.

15  Q.  Assuming Outcome had only 510 screens available in its

16  entire Rheumatology Health Network, is that information you

17  would have wanted to know?

18  A.  Yes.

19  Q.  Assuming that were true, would it be consistent with what

20  Outcome billed to Target Health in the May 2013 invoices we

21  just looked at?

22  A.  No.

23  Q.  If you had learned that Outcome was not playing

24  advertisements in 545 rheumatology offices as of May 2013,

25  what, if any, impact would that have had on Target Health's

1  payments?

2  A.  We would not have paid in full.

3  Q.  Assuming that as of July 2013, Outcome had only

4  499 installed screens for the Humira campaign, is that

5  information you would have wanted to know?

6  A.  Absolutely.

7  Q.  Now, by the end of June 2013, the contract was for

8  560 rheumatology offices.  Isn't that right?

9  A.  Yes.

10  Q.  And if you had learned that Outcome was not playing

11  advertisements in 560 rheumatology offices as of June 2013,

12  what, if any, impact would that have had on Target Health's

13  payments to Outcome?

14  A.  We would not have paid in full.

15  Q.  I'm going to draw your attention now to in or around

16  September 2013.

17         Do you recall if Target Health's advertising

18  contracts with Outcome were further revised during this

19  time frame?

20  A.  No.

21  Q.  I'm going to draw your attention to Government's

22  Exhibit 1162.

23         MS. CHOU:  Objection.  Seems like the witness lacks

24  foundation for this.

25         THE COURT:  This was already admitted.

1      Is that correct?

2           MR. APPLEBY-BHATTACHARJEE:  Yes.

3           THE COURT:  Overruled.

4  BY MR. APPLEBY-BHATTACHARJEE:

5  Q.  Can you see the document on the screen?

6  A.  Yes.

7  Q.  Are you familiar with the form of this document?

8  A.  Yes.

9  Q.  As a Target Health Out of Home Media contract order?

10 A.  Yes.

11 Q.  I'm going to focus your attention to the top and bottom of

12 the first page.

13      Do you see the word "revision" at the top?

14 A.  Yes.

15 Q.  Who is the identified advertiser?

16 A.  AbbVie.

17 Q.  What is the identified campaign?

18 A.  Humira RA 2013.

19 Q.  Looking at the vendor box, who is listed on the attention

20 line for ContextMedia or Outcome Health?

21 A.  Rishi Shah.

22 Q.  Who signs this contract for ContextMedia?

23 A.  Jim -- James Demas.

24 Q.  And who signs for Target Health?

25 A.  Jennifer Greufe.

1  Q.  And that was your boss at the time?

2  A.  Yes.

3  Q.  Can you make out the dates of the digital signatures?

4  A.  September 3, 2013.

5  Q.  Focusing now on page 2 of the contract.

6        Can you see that?

7  A.  Yes.

8  Q.  So under this revision, let's start with the

9  "Address/Description."

10       What is Outcome contracting to provide?

11  A.  Digital screens located in 325 rheumatologists' waiting

12  rooms.  60-second spot, two times per hour, January through

13  April.  15-second spot, four times per hour, May through

14  August.

15  Q.  What type of offices are called for by this contract?

16  A.  Rheumatology.

17  Q.  What's the start date of this revision contract?

18  A.  January 1, 2013.

19  Q.  What's the end date?

20  A.  August 31, 2013.

21  Q.  Is that different than the original contract for

22  325 rheumatology offices we saw yesterday?

23  A.  No.

24       MR. APPLEBY-BHATTACHARJEE:  Well, let me put up 1076.

25       MS. CHOU:  Your Honor, objection renewed.

1    THE COURT:  Pardon me?

2    MS. CHOU:  Not -- not as to document being -- just
3 maybe sidebar.

4    THE COURT:  All right.

5    (Proceedings heard at sidebar on the record.)

6    MS. CHOU:  The witness said --

7    THE COURT:  Hang on.  Let the -- okay.  Go ahead.

8    MS. CHOU:  The witness said that she was not aware of
9 the revision, and it seems clear that she doesn't have any
10 knowledge of this, so.

11    THE COURT:  It's a document in evidence.  My guess --
12 well, not my guess.  It sounds like once she saw the document,
13 it refreshed her memory.

14    Is that the purpose of when she says she doesn't know
15 something, you're showing her the document to refresh her
16 memory on a document that's already in evidence?

17    MR. APPLEBY-BHATTACHARJEE:  That's exactly right.

18    THE COURT:  Yeah.  I think that's permissible.  So --
19 and you can cross on -- on certainty about some of these
20 documents, certainly.

21    But objection -- if that's an objection, it's
22 overruled.

23    (Sidebar ended.)

24    THE COURT:  All right.  You may proceed.

25    MR. APPLEBY-BHATTACHARJEE:  Thank you, Your Honor.

1  BY MR. APPLEBY-BHATTACHARJEE:

2  Q.  And I'm going to page 2 of Exhibit 1076.

3         You recall we looked at this yesterday?

4  A.  Yes.

5  Q.  And under "Address/Description," there's also

6  325 rheumatologists' waiting rooms?

7  A.  Correct.

8  Q.  The start date and the original contract was

9  January 1, 2013.

10         Do you see that?

11  A.  Yes.

12  Q.  And the end date was January 31st -- or I'm sorry --

13  December 31, 2013.

14         Do you see that?

15  A.  Yes.

16  Q.  Now, going back to Exhibit 1162, the end date in the

17  revision is now August 2013.

18         Can you see that?

19  A.  Yes.

20  Q.  And is that different from the original contract?

21  A.  Yes, it is.

22  Q.  Now, this contract makes reference to a 60-second spot,

23  two times an hour, as well as a 15-second spot, four times an

24  hour.

25         Do you see that?

1  A.  Correct.

2  Q.  And then in the address/description box, there's a

3  60-second spot two times an hour, Jan through April.

4        Do you see that?

5  A.  Yes.

6  Q.  And 15-second, four times an hour, May through August.

7        Do you see that?

8  A.  Correct.

9  Q.  Now, was the Humira campaign paused in April of 2013?

10  A.  Yes.

11  Q.  And it resumed in May 2013?

12  A.  Yes.

13  Q.  And this changed to a 15-second spot, four times an hour.

14        Is that after the campaign resumed?

15  A.  Yes.

16  Q.  Okay.  Drawing your attention now to Government's

17  Exhibit 1163.

18        Are you familiar with this form of contract again?

19  A.  Yes.

20  Q.  Is this a Target Health Out of Media Home contract order?

21  A.  Yes.

22  Q.  All right.  I'm going to focus your attention on the top

23  of page 1 and the bottom of page 2 -- or I'm sorry -- the

24  bottom of page 3.

25        Now, do you see the words "revision" at the top?

1  A.  Yes.

2  Q.  Who is the identified advertiser?

3  A.  AbbVie.

4  Q.  What's the identified campaign?

5  A.  Humira RA 2013.

6  Q.  Looking at the vendor box, who's identified as the -- on

7  the attention line for ContextMedia?

8  A.  Rishi Shah.

9  Q.  Who signs this contract for ContextMedia?

10  A.  James Demas.

11  Q.  Who signs for Target Health?

12  A.  Jennifer Greufe.

13  Q.  And the dates next to the signatures?

14  A.  September 3, 2013.

15  Q.  Does that appear to be the same date as the prior revised

16  contract we saw?

17  A.  Yes.

18  Q.  Now, I'm going to compare on the screen the revision

19  contract Exhibit 1163 on the left side and the original

20  contract 129 on the right side.

21      Can you see that?

22  A.  Yes.

23  Q.  So drawing your attention first to the provisions

24  regarding February 2013.

25      Do both contracts provide for digital screens located

1  in 155 rheumatologists' waiting rooms, additional 155 offices

2  to current 325 office campaign?

3  A.  Yes.

4  Q.  Now, under the revision, what's the delivery period?

5  A.  February 1, 2013, through August 31, 2013.

6  Q.  And in the original, what's the delivery period?

7  A.  February 1, 2013, through December 31, 2013.

8  Q.  Under the revision, how many offices is Outcome

9  contracting to provide in total?

10  A.  480.

11  Q.  And what type of offices?

12  A.  Rheumatology.

13  Q.  Drawing your attention to the provisions regarding

14  April 2013.

15       Can you see that?

16  A.  Yes.

17  Q.  Do both the original and revision contract provide for

18  digital screens located in 50 rheumatologists' waiting rooms,

19  additional 50 offices to current 480 office campaign?

20  A.  Correct.

21  Q.  Under both offices -- or under both contracts, is Outcome

22  required to deliver a total of 530 offices?

23  A.  Correct.

24  Q.  What type of offices?

25  A.  Rheumatology.

1   Q.  Drawing your attention to the provisions regarding
2   May 2013.
3           Do both contracts provide for digital screens located
4   in 65 rheumatologists' waiting rooms, additional 65 offices to
5   current 480 office campaign?
6   A.  Correct.
7   Q.  Under both contracts, is Outcome required to deliver a
8   total of 545 offices?
9   A.  Yes.
10  Q.  What type of offices?
11  A.  Rheumatology.
12  Q.  Drawing your attention to the provisions regarding
13  June 2013.
14          Can you see that?
15  A.  Yes.
16  Q.  Do both contracts call for digital screens located in
17  80 rheumatologists' waiting rooms, additional 80 offices to
18  current 480 office campaign?
19  A.  Correct.
20  Q.  Under both contracts, is Outcome required to deliver a
21  total of 560 offices?
22  A.  Yes.
23  Q.  What type of offices?
24  A.  Rheumatology.
25  Q.  Drawing your attention to the provisions regarding

1    July 2013.

2           Can you see that?

3    A.  Yes.

4    Q.  Do booth -- do both contracts provide for digital screens

5    located in 95 rheumatologists' waiting rooms, additional

6    95 offices to current 480 office campaign?

7    A.  Correct.

8    Q.  And so under both contracts, is Outcome required to

9    deliver a total of 575 offices?

10   A.  Yes.

11   Q.  What type of offices?

12   A.  Rheumatology.

13   Q.  All right.  Now, I'm drawing your attention to the

14   provisions regarding August 2013.

15          The original contract provided for digital screens

16   located in 110 offices additional to the current 480 office

17   campaign.

18          Do you see that?

19   A.  Yes.

20   Q.  And the revised contract calls for 95 offices to current

21   480 office campaign.

22          Can you see that?

23   A.  Yes.

24   Q.  Does the revised contract have a lower number of offices

25   for August 2013?

1  A.  Yes.

2  Q.  And the revised contract, is that total 575 offices?

3  A.  Yes.

4  Q.  What type of offices?

5  A.  Rheumatology.

6  Q.  And, finally, drawing your attention to the provisions

7  regarding September through December 2013.

8       Can you see that?

9  A.  Yes.

10  Q.  Now, did the delivery obligations for Outcome increase

11  month over month in the original contract?

12  A.  Yes.

13  Q.  And does the revised contract have the same number of

14  rheumatologists' waiting rooms identified for September

15  through December 2013?

16  A.  Yes.

17  Q.  What is that number?

18  A.  575.

19  Q.  All right.  I'm going to draw your attention now to

20  pages 16 and 17 of Exhibit 1094, which is in evidence.

21       The document -- the documents on the screen are

22  invoices from Outcome to Target Health for September and

23  October 2013.  Is that right?

24  A.  Correct.

25  Q.  What is Outcome billing for -- I'm sorry.

1        What is Outcome billing for in each of these months?

2   A.   575 ContextMedia health screens.

3   Q.   The total amount billed on each invoice?

4   A.   123,000 -- $123,337.50.

5   Q.   Drawing your attention now to pages 18 and 19 of

6   Exhibit 1094.

7        Do you see those?

8   A.   Yes.

9   Q.   Are the documents on the screen invoices from Outcome to

10  Target Health for November and December 2013?

11  A.   Yes.

12  Q.   And what is Outcome billing on each invoice?

13  A.   575 ContextMedia health screens.

14  Q.   And what's the total amount billed in each invoice?

15  A.   $123,337.50.

16  Q.   So based on the revised contract that we saw, how many

17  offices was Outcome expected to deliver between September and

18  December 2013?

19  A.   575.

20  Q.   What type of offices?

21  A.   Rheumatology.

22  Q.   Now, assuming that as of September 7, 2013, Outcome had

23  only 507 offices playing Humira ads, is that information you

24  would have wanted to know?

25  A.   Yes.

1  Q.  Assuming that as of October 2013, Outcome started running

2  Xeljanz ads in offices that were originally playing Humira

3  ads, is that something you would have wanted to know?

4  A.  Yes.

5  Q.  Assuming that as of October 2013, Outcome reduced the

6  number of offices in which it was playing Humira ads, is that

7  something you would have wanted to know?

8  A.  Yes.

9  Q.  Assuming that as of October 2013, Outcome reassigned

10  offices that were originally playing Humira ads to fulfill a

11  separate contract with Xeljanz, is that something you would

12  have wanted to know?

13  A.  Yes.

14  Q.  Was Xeljanz a competitor of Humira?

15  A.  Yes.

16  Q.  Now, assuming that the information in the hypotheticals I

17  posed to you were true, what, if any, impact would that have

18  had on Target Health's payments to Outcome?

19  A.  We would not have paid in full.

20  Q.  If it were -- assuming it were a routine business practice

21  at Outcome to conduct list matches with projections rather

22  than with actual inventory of in-network doctors' offices, is

23  that information you would have wanted to know?

24  A.  Yes.

25  Q.  Is that information that would have had an impact on your

1    contract negotiations for the Humira campaigns?

2    A.  Yes.

3    Q.  Assuming that it were a routine business practice at

4    Outcome to track under-deliveries on advertising campaigns

5    based on a lack of sufficient screens or inventory, is that

6    information you would have wanted to know?

7    A.  Yes.

8    Q.  If true, would that information have had an impact on your

9    contract negotiations with Humira?

10   A.  Yes.

11   Q.  And assuming it were a routine business practice at

12   Outcome to submit false proof of performance affidavits for

13   advertising campaigns, is that information you would have

14   wanted to know?

15   A.  Yes.

16          MR. LOWDER:  Objection.  Argumentative.

17          THE COURT:  Overruled.

18   BY MR. APPLEBY-BHATTACHARJEE:

19   Q.  And if true, what, if any, impact would that have had on

20   contract negotiations for the Humira campaign?

21   A.  We would not have paid in full.

22   Q.  All right.  Let's pivot to another type of service that

23   Outcome provided.

24          Did Target Health contract with Outcome on behalf of

25   pharmaceutical campaigns for advertisements to run on exam

1  room tablets?

2  A.  Yes.

3  Q.  What, if any, perceived benefits would such a campaign

4  have for an advertising brand?

5  A.  The tablets were newer technology, something that was more

6  attractive to pharmaceutical clients and another, like, device

7  for patients to interact with and learn more about their

8  health conditions.

9  Q.  Now, earlier, you stated -- yesterday, that one of the

10  pharmaceutical companies that Target Health represented was

11  Amgen.

12        Do you recall that?

13  A.  Yes.

14  Q.  And did Target Health buy any exam room tablet campaigns

15  from Outcome from Amgen brands?

16  A.  Yes.

17  Q.  What brands?

18  A.  Repatha, Prolia, Neulasta, Enbrel.

19  Q.  So focusing on Prolia, what kind of drug was that?

20  A.  For osteoporosis.

21  Q.  Did Outcome provide patient engagement metrics for

22  Prolia's exam room tablet advertisements?

23  A.  Yes.

24  Q.  Was this a unique service in the industry at the time?

25  A.  Yes, it was.

1  Q.  What, if any, use did these tablet metrics have for

2  Target Health with respect to explaining how a campaign was

3  running to a client?

4  A.  It was additional metrics for the branding to understand

5  the patient interaction with the devices.

6  Q.  Did Target Health expect that the tablet metrics it

7  received from Outcome were accurate?

8  A.  Yes.

9  Q.  Now, if Outcome had problems with pulling engagement data

10  for tablets, is that something you would have wanted to be

11  informed?

12  A.  Yes.

13  Q.  Were you ever informed that Outcome was inflating tablet

14  metrics for Prolia?

15  A.  No.

16  Q.  Now, assuming it were true that as of May 2015, Outcome

17  was inflating the number of impressions recorded for Prolia

18  tablets by approximately 7 to 800 percent, is that information

19  you would have wanted to know?

20  A.  Yes.

21  Q.  If that were true, would that have raised any red flags

22  for Target Health?

23  A.  Yes.

24  Q.  How so?

25  A.  It's inaccurate.

1    Q.  Now, we've reviewed multiple examples of proof of

2    performance affidavits and invoices from Outcome Health for

3    the Humira 2013 campaign.

4            Do you recall that?

5    A.  Yes.

6    Q.  Did anyone at Outcome ever tell you that it was submitting

7    false proof of performance affidavits for Humira?

8    A.  No.

9    Q.  Or false invoices for Humira?

10   A.  No.

11   Q.  Drawing your attention to in or around December 2016.

12           Was Target Health running an advertising campaign at

13   the time with Outcome Health for a pharmaceutical brand known

14   as Rexulti?

15   A.  Yes.

16   Q.  Did Target Health discover that Outcome had

17   under-delivered on the Rexulti campaign for several months in

18   2016?

19   A.  Yes.

20   Q.  Did Target Health discover that Outcome was submitting

21   false proof of performance affidavits for the Rexulti

22   campaign?

23   A.  Yes.

24   Q.  Did Target Health discuss this issue with Outcome?

25   A.  Yes.

1    Q.  Were you involved in those discussions?

2    A.  Yes.

3    Q.  Did Outcome offer a make-good?

4    A.  Yes.

5    Q.  So first, what's a make-good?

6    A.  It's an agreed-upon option that can be taken back to the

7    client and proposed to basically make good for what was

8    under-delivered.  And that could be a credit back or to run at

9    no cost or additional offices.

10   Q.  And with respect to the Rexulti campaign in or around

11   December 2016, what did that make-good involve, if you recall?

12   A.  I do not recall.

13   Q.  So we're talking about December 2016.  This is years after

14   the 2013 campaign for Humira was running.  Is that right?

15   A.  Right.

16   Q.  Now, at the time you were made aware of the issues on the

17   Rexulti campaign, did you have any reason to believe that

18   under-delivery on campaigns was a pervasive issue at Outcome?

19   A.  No.

20   Q.  Did you have reason to believe that submitting false proof

21   of performance affidavits was a pervasive issue at Outcome?

22   A.  No.

23   Q.  So fast-forwarding to in or around October 2017.

24         Do you recall a *Wall Street Journal* article about

25   allegations of conduct at Outcome?

1  A.  Yes.

2  Q.  So, ma'am, without getting into the specific details of

3  what was in the article, were the allegations in the article

4  news to you?

5  A.  Yes.

6  Q.  After the *Wall Street Journal* article was published, what,

7  if anything, did you do with respect to campaigns that your

8  pharmaceutical clients had run with Outcome?

9  A.  We took a close look at all the activity we had run in

10  years prior.  And we worked -- I worked directly with my rep

11  at the time at ContextMedia and questioned him about all of

12  the activity, whether it ran 100 percent throughout all of the

13  years I worked on Amgen.

14        And they came back identifying where there was

15  under-delivery and how that equated to media value.

16  Q.  And this was after the *Wall Street Journal* article?

17  A.  Correct.

18  Q.  And did Amgen get any money back from Outcome after the

19  *Wall Street Journal* article?

20  A.  They opted to run on -- run activity on the network for

21  the various brands.

22  Q.  What were your impressions of Outcome after the

23  *Wall Street Journal* article came to light?

24        MR. LOWDER:  Objection.  Relevance.

25        THE COURT:  Overruled.

1  BY MR. APPLEBY-BHATTACHARJEE:

2  Q.  You can answer.

3  A.  I was very taken back.  I was -- I felt betrayed, because

4  I had been working with ContextMedia for several years and

5  recommended them to my clients.  And my name was attached to

6  these recommendations.  So I felt like my reputation was on

7  the line as well.

8       And I was very angry at all of these findings for

9  myself, my team, as well as the industry.  And we just did not

10  want to work with them anymore.

11  Q.  Did any of the pharma brands you represented at the time

12  suspend doing business with Outcome after the *Wall Street*

13  *Journal* article?

14  A.  Yes.

15  Q.  Are you aware of any changes to Outcome's senior

16  management after the *Wall Street Journal* article?

17  A.  Yes.

18       MS. CHOU:  Objection, Your Honor.

19       THE COURT:  What's the -- you're going to have to

20  explain what the basis of it is, what the foundation is for

21  that.

22       MR. APPLEBY-BHATTACHARJEE:  I can explain that at

23  sidebar.

24       THE COURT:  All right.  Let's do that.

25       (Proceedings heard at sidebar on the record.)

1          THE COURT:  I assume the objection was foundation, or

2   was there a separate -- separate objection?

3          MS. CHOU:  Foundation and prejudice on this.

4          MR. LOWDER:  And -- and hearsay, Your Honor.

5          THE COURT:  Well, that's the -- we'll find that out

6   with foundation.  But why don't you explain both the --

7          MR. APPLEBY-BHATTACHARJEE:  We're --

8          THE COURT:  Hang on.  And turn down your volume a

9   little bit.  It's pretty loud.

10         Okay.  What is the relevance, and what is the

11  foundation for her knowledge of the change in management?

12         MR. APPLEBY-BHATTACHARJEE:  The next question is:

13  Was there a point after the change in management that the

14  pharmaceutical brands you represented resumed doing business

15  with Outcome.

16         THE COURT:  And -- and I'm assuming the change in

17  management was the reason they went in?

18         MR. APPLEBY-BHATTACHARJEE:  Yes.

19         THE COURT:  That's -- I don't understand the

20  relevance of that.

21         So the objection's sustained.

22         MR. APPLEBY-BHATTACHARJEE:  I can move on.

23         THE COURT:  All right.

24      (Sidebar ended.)

25  BY MR. APPLEBY-BHATTACHARJEE:

1 Q. To the best of your knowledge, would Target Health have

2 continued to do business with Outcome if the allegations you

3 had learned in the *Wall Street Journal* had been made known to

4 you earlier?

5 MR. LOWDER: Objection, Your Honor. Can we be heard

6 at sidebar on this one, just --

7 THE COURT: No. Objection's sustained.

8 BY MR. APPLEBY-BHATTACHARJEE:

9 Q. We had talked about the Rexulti campaign, if you had

10 reason to believe that the practices that were discovered in

11 the Rexulti campaign affected multiple campaigns in which you

12 had represented pharmaceutical clients with Outcome, would

13 that have changed how you approached your business with

14 Outcome?

15 A. Yes.

16 Q. How so?

17 A. We probably just would've stopped doing business with

18 them.

19 MR. APPLEBY-BHATTACHARJEE: All right. No further

20 questions.

21 THE COURT: All right. Cross-examination.

22 MS. CHOU: Can you hear me? Can you hear me okay?

23 Now? Yes? It's upside down? This one. Okay. Sorry,

24 everyone. Okay.

25 THE COURT: All right. I'm not sure you've been in

1  front of the jury questioning, so please introduce yourself

2  again to the jury.

3         MS. CHOU:  Hi.  Vicki Chou, one of the attorneys for

4  Rishi Shah.

5                     CROSS-EXAMINATION

6  BY MS. CHOU:

7  Q.  Good morning, Ms. Bautista.

8  A.  Good morning.

9  Q.  So --

10        MS. CHOU:  Sorry.  I have a lot of paper.  Let me

11 just get situated.

12 BY MS. CHOU:

13 Q.  So you agree that two people who are parties, the same

14 conversation can have different takeaways from it, right?

15 A.  Yes.

16 Q.  Even conversations I have with my husband.

17        So let's talk about the screens versus offices

18 discussion.

19        You've testified that you wanted offices, right?

20 A.  Correct.

21 Q.  And let's look at the documents.  The government showed

22 you GX109.

23        MS. CHOU:  And, Laura, if you can bring that up.

24 BY MS. CHOU:

25 Q.  This is a January 22, 2013, email.  And the subject line

1  for this email is "Additional RA Sites Available Today For
2  Humira."
3        And in the middle of the first page, Mr. Mons writes
4  to you.  And we covered some of this.
5        MS. CHOU:  But let's just blow it up, since this was
6  yesterday.
7  BY MS. CHOU:
8  Q.  "Yesenia, I know that Jen met with Rishi earlier today.
9  We just want to confirm, clarify a few things."
10       So that's referring to Jennifer Greufe, right?
11  A.  Yes.
12  Q.  And she had a meeting with Rishi?
13  A.  Correct.
14  Q.  You were not part of that meeting, right?
15  A.  No.
16  Q.  So Mr. Mons is writing to confirm and clarify and make
17  sure everyone is on the same page, right?
18  A.  Correct.
19  Q.  And there he talks about how Humira is running on 325 RA
20  screens currently.  And then there are -- again, he refers to
21  155 screens.  And the end of that sentence is a reference to
22  screens again.  And then in the next line, screens again.  And
23  at the end --
24       MS. CHOU:  If you expand this a little bit more,
25  Laura.

 1   BY MS. CHOU:

 2   Q.  On the next line, there is another reference to screens,

 3   right?

 4   A.  Correct.

 5   Q.  So in this email, he mentions only screens?

 6   A.  Yes.

 7   Q.  And he closes with, "Let me know if there's anything that

 8   requires further clarification," right?

 9   A.  Correct.

10   Q.  Now, the subject line for this email is "Additional RA

11   Sites Available Today For Humira."  And I want to show this

12   document side by side with Government Exhibit 1075, which is

13   another document that we went through yesterday.

14           MS. CHOU:  But I want to highlight some things.

15           So, Laura, if you put up page 4 of GX109 against

16   page 3 of GX1075, and you might need to adjust a little bit.

17   BY MS. CHOU:

18   Q.  But you can see that these are the same -- this starts

19   with the same email, right?

20   A.  Yes.

21   Q.  Bob -- you write, "Hi, Bob.  For Humira RA, we are

22   contracted for 325 offices full year.  Is this the max rheum

23   network," right?

24   A.  Correct.

25   Q.  And if we keep scrolling up, you can see that it's the

1   same email chain for a couple more emails.

2           And then Bob right there says, "We have

3   155 additional rheumatology practices available to go live

4   today."

5           And if you look on the left, GX109, the subject line

6   for that is, "Still Additional RA Sites Available Today For

7   Humira," correct?

8   A.  Yes.

9   Q.  And "sites" is a little ambiguous, right?

10          It could be offices?  It could be waiting rooms?  It

11  could be screens?

12  A.  Yes.

13  Q.  Okay.  But then if we go to GX1075, which is the later

14  email on the right, you see that Mr. Mons has changed the

15  subject heading to "Humira Schedule of Additional RA Screens."

16          MS. CHOU:  And, Laura, if you just go to page 1,

17  we'll see that.

18  BY MS. CHOU:

19  Q.  Right.  So there, he's changed the subject line to "Humira

20  Schedule of Additional RA Screens."

21          And "screens" means screens, right?

22  A.  Yes.

23  Q.  Screens is not the same as offices?

24  A.  No.

25  Q.  In fact, an office might have multiple screens, right?

1    A.   That's right.

2    Q.   And so in a sense, a contract with a price for screens is

3    more precise than offices -- right? -- because you know

4    exactly how many you're getting?

5    A.   Correct.

6    Q.   And -- oh, and sorry.

7         Just before we take this down on 1075 on the right,

8    you also see that there's an attachment, and in the subject

9    line for that attachment is another reference to screens,

10   right?

11   A.   Yes.

12   Q.   And then in case there's any ambiguity, Mr. Mons writes to

13   you, "Yesenia, the following recaps are current deployment for

14   Humira plus Jen's recent request for additional screens to be

15   added."

16   A.   Right.

17   Q.   And there, I think we went -- Mr. Bhattacharjee went

18   through this with you yesterday, 325 RA screens -- right? --

19   plus 155 RA screens, 110 RA screens.

20        And then he writes again, "Please let me know if

21   there is anything that requires additional clarity," right?

22   A.   Correct.

23   Q.   But there's no response to this.

24        You don't recall responding to him, "Are you talking

25   about screens or offices," right?

1    A.  No.

2    Q.  And the government hasn't showed any response to this

3    request for clarification?

4    A.  No.

5    Q.  So the government went through a few invoices with you,

6    and just so that we have everything together, I'm going to

7    hand you --

8              MS. CHOU:  Permission to approach the witness?

9              THE COURT:  Pardon me?

10             MS. CHOU:  Permission to approach the witness.

11             THE COURT:  Oh, go ahead, sure.

12   BY MS. CHOU:

13   Q.  So I have here --

14             MS. CHOU:  And Laura can bring up 1094 so the jurors

15   can follow along.

16   BY MS. CHOU:

17   Q.  But this is the entire stack of invoices for the

18   2013 Humira campaign.

19             And the government went through some of these, but I

20   just -- it would -- if you can just go through and confirm

21   that all of these say "screens," right?

22             MS. CHOU:  And, Laura, can you page through here.

23   It's January -- sorry.  This is for February.  It says

24   "screens."

25   BY MS. CHOU:

1    Q.  Next page is for also February screens.

2    A.  Uh-huh.

3    Q.  March screens.

4          So we don't need to take the jurors through each one,

5    one by one but if, Ms. Bautista, you confirm, every one,

6    January through December, says "screens," right?

7    A.  Yes, screens.

8    Q.  Thank you.

9          And each one of these is sent -- was sent directly to

10   Target Health, right?

11   A.  Correct.

12   Q.  And so the Government Exhibit 148, this was sent to --

13   from Mr. Ketchum and Tiffany Yuh, right?

14          That seemed like the process for a lot of these?

15   A.  Yes.

16   Q.  And so every month Target Health got invoiced for screens,

17   and then every month Target Health -- Health paid, right?

18   A.  Correct.

19   Q.  No one ever asked anyone at ContextMedia to clarify, "Hey,

20   why are you charging us for screens"?

21   A.  No.

22   Q.  And if we go to the second page of this document, you can

23   see at the top, reference to Jim D. at ContextMedia.

24          MS. CHOU:  And just the top left, yeah.

25   BY MS. CHOU:

1  Q.  And there was a reference to Jim D., Jim Demas earlier.

2       Also he's the person who signed the contracts?

3  A.  Yes.

4  Q.  It sound -- it sound -- like, were you even familiar with

5  his name?  Had you heard his name before today?

6  A.  I've heard his name.

7  Q.  But have you ever had a conversation with him?

8  A.  No.

9  Q.  Never called him up about these invoices?

10 A.  No.

11 Q.  So yesterday and today, you answered a lot of

12 hypothetical -- hypothetical questions about what you or

13 Target Health would've done if certain things had perhaps been

14 true, right?

15 A.  Yes.

16 Q.  But if I can sum all of it up, the point is that you only

17 want to pay for what you got, right?

18 A.  Correct.

19 Q.  Right.  That's pretty fair, right?

20 A.  Yeah.

21 Q.  If you pay for offices, you should get offices, right?

22 A.  Right.

23 Q.  And if you pay for screens, you should get screens.

24      That's fair, too, right?

25 A.  Correct.

1 Q. Okay. And, in fact, you actually negotiated a per-screen

2 price for this contract.

3 Do you recall that?

4 A. No. Per office.

5 Q. Well, let me bring up Exhibit 10257 and see if I can

6 refresh your recollection on this.

7 And this is an email from Mr. Crandall to you in

8 January of 2013, right?

9 A. Yes.

10 Q. And so he says, "Good to catch up on a few brands

11 yesterday."

12 So you had a conversation with Mr. Crandall the day

13 before this email?

14 A. Yes.

15 Q. And we don't need to read the rest of the first paragraph.

16 Save the court reporter a little bit of work.

17 But the summary there basically is that you were

18 asking about pricing if you had a longer spot, right?

19 A. Yes.

20 Q. And the 60 versus 75, that refers to the seconds of the

21 ad?

22 A. Correct.

23 Q. Because if your ad is playing for longer, of course, that

24 should cost more money, because you're going to get more eyes,

25 right?

1    A.  Right.

2    Q.  And Mr. Crandall explains, you know, for pricing, it would

3    be a straight line increase to add another 15 seconds to the

4    ad length?

5    A.  Correct.

6    Q.  It says, "Your current rate is $174 per screen per month

7    for the 60 seconds," right?

8    A.  Correct.

9    Q.  So -- and then he closes -- oh.

10              And this is in January of -- in 2013.

11              And he closes with, "I'd be happy to work with you to

12   determine the total incremental cost," right?

13   A.  Correct.

14   Q.  Ms. Bautista, had you seen this document before today?

15              I mean, other than when you first received it, but in

16   the recent few weeks you met with the government, right?

17   A.  No.

18   Q.  And you haven't seen this?

19   A.  No.

20   Q.  And this is a per-screen price that you're discussing with

21   Mr. Crandall, right?

22   A.  He's calling it screens.

23   Q.  Okay.  But let's do some math.  So 325 times 174 --

24              MS. CHOU:  And if, Laura, you can pull up a

25   calculator.

1    BY MS. CHOU:

2    Q.  That's 325, which is the number of screens that you

3    purchased in January of 2013, right?

4            That's the base number of screens that we're talking

5    about before the incremental ads.  Okay.  Times 174.  That's

6    the number that Mr. Crandall was saying was your current rate

7    per screen per month, right?

8    A.  Yes.

9    Q.  Okay.  So that comes out to 56,550.  And if we go back to

10   Exhibit 1047, and that's the one that you have printed out,

11   all the invoices.

12           Oh, sorry.

13           1094.

14           MS. CHOU:  And -- and can you put the calculator up

15   side by side.

16   BY MS. CHOU:

17   Q.  So that's the same number, right?

18   A.  Correct.

19   Q.  It's the 325 times the per-screen, per-month price that

20   Mr. Crandall discussed with you.

21           Sorry.

22           56550 is the number that you get when you take

23   Mr. Crandall's per-screen, per-month price multiplied by the

24   number of screens, right?

25   A.  Correct.

1  Q.  And that's exactly what Target Health was invoiced for,
2  right?
3  A.  Yes.
4  Q.  And the invoiced amount is what Target Health paid for,
5  right?
6  A.  Correct.
7  Q.  Okay.  So let's talk about the affidavits and the
8  contracts.  The government walked you through a few of these.
9       These were Target Health forms, right?
10 A.  Yes.
11 Q.  Yeah, Target Health filled out the contracts, sent it to
12 ContextMedia, somebody at ContextMedia DocuSigned it,
13 basically, right?
14 A.  Correct.
15 Q.  So GX129.  We can see that.
16      MS. CHOU:  And just so the jury has it before them,
17 if we go to the next page.  Or let's go to the page where you
18 can see the contract.  I guess that's page -- next page.  Next
19 page.
20 BY MS. CHOU:
21 Q.  So -- right.  So there's the Target Health logo.  You can
22 see that it's their form.  And if you go to -- I think this
23 one doesn't have Mr. Demas's signature, but we've seen others
24 that have, and we discussed it.
25      It's DocuSigned, right?

1  A.  Yes.

2  Q.  And -- and you've used -- you've used DocuSign?

3  A.  Yes.

4  Q.  And so for anyone who hasn't used DocuSign, it's a

5  program, right?

6          It loads the document.  You get, like, a little

7  arrow?

8  A.  Correct.

9  Q.  And then you hit "sign"?

10  A.  Yes.

11  Q.  Sometimes it's hard to see what the rest of the document

12  says?

13  A.  Yes, fair.

14  Q.  Okay.  So this was just signed.  And then let's go to the

15  affidavits.

16          This also was a Target Health form, right?

17  A.  Yes.

18          MS. CHOU:  And if we pull up 10092.  And on the next

19  page.

20  BY MS. CHOU:

21  Q.  Do you know, did Target Health fill out the information on

22  this, or -- it's hard to tell from the prior email.

23  A.  It would have been the vendor filling it out.

24  Q.  Okay.  But the form, the -- the --

25  A.  Is our form.

1    Q.  It's your form.

2            And so vendor, that's -- that came on your preprinted

3    form, right?

4    A.  Yes.

5    Q.  And if we look at the next form, the next page, you can

6    see, like, all that stuff that's the same.

7            That's part of the form, right?

8    A.  Correct.

9    Q.  Including number of offices/locations delivered.

10           That's part of the form, right?

11   A.  Correct.

12   Q.  That's not something that the vendor is supposed to alter;

13   they're just supposed to write in the number, right?

14   A.  Correct.

15   Q.  And so -- and that says, "offices/locations," right?

16   A.  Correct.

17   Q.  It doesn't say just "offices"?

18   A.  Well, in the case of this affidavit, locations can refer

19   to pharmacies.  Because we would also do media in pharmacies.

20   But -- so most of the media we placed was doctors' offices or

21   pharmacies.  So doctors' offices.

22   Q.  But here there's no -- there's no explanation.

23           It just -- you just -- has a number to fill in,

24   right?

25   A.  Yes.

1  Q.  Right.  Okay.  And so pretty much only the invoices that
2  we've seen were prepared entirely by ContextMedia, right?
3  A.  Correct.
4  Q.  Everything else was a form sent over and someone just
5  filled out the blanks --
6  A.  Correct.
7  Q.  -- or signed it?
8        So just reviewing the contracts.  Again, I think I
9  just want to make sure this is -- we're all on the same page.
10       So January, the contract was for 325 screens, right?
11 A.  Correct.
12 Q.  And then February, you added an incremental 155, right?
13 A.  Yes.
14 Q.  And then you confirmed that April through December was --
15       MS. CHOU:  Oh, sorry.  Laura, you can take this down.
16 BY MS. CHOU:
17 Q.  And you confirmed that April through December was a
18 weighted average contract, right?
19 A.  Correct.
20 Q.  And "weighted average" meant that you knew that you were
21 buying on growth --
22 A.  Yes.
23 Q.  -- right?
24       And the numbers were estimated, right?
25 A.  Yes.

1   Q.  Okay.  So we spent a bit of time yesterday and today

2   talking about this internal medicine specialties thing, right?

3   A.  Yes.

4   Q.  And yesterday to this morning, the government made a big

5   deal out of how the April location list attached to that

6   affidavit did not contain specialties, right?

7   A.  Correct.

8   Q.  But Target Health did not ask ContextMedia to list

9   specialties on that proof of performance location list, did

10  it?

11  A.  We originally did.

12  Q.  Well, if you did and ContextMedia didn't give it to you,

13  it seems like you should have followed up, right?

14  A.  We did.  We would have kicked it back.

15          MS. CHOU:  But -- okay.  Let's -- let's pull up 148.

16  BY MS. CHOU:

17  Q.  So if you go to page 8, that's the affidavit and -- sorry.

18  Sorry.

19          This is February 2013, right?

20  A.  Yes.

21          MS. CHOU:  Okay.  So let's go to page 8 of this

22  exhibit.  And so you see the affidavit, and let's look at the

23  location list.  Sorry.  If you page down, Laura.

24  BY MS. CHOU:

25  Q.  Right.  This doesn't have specialties on it, right?

1  A.  No.

2  Q.  Okay.  And then let's look at 1073.

3        Here's the March affidavit.  And you actually -- the

4  way this government exhibit has been assembled, you can't

5  quite tell what list goes with what.

6        MS. CHOU:  But, Laura, if you page down, you can see.

7  BY MS. CHOU:

8  Q.  Here's another list with no specialty listed, right?

9  A.  Correct.

10  Q.  And then April is the one that the government went through

11  with you.

12        There's no locations, right?

13  A.  Right.

14  Q.  Right.  And so -- and then when you did ask for the

15  specialties, ContextMedia did give it to you, right?

16        That's the reason why we have 1077?

17  A.  Correct.

18        MS. CHOU:  Okay.  And let's just pull up 1077.

19  BY MS. CHOU:

20  Q.  So -- and we haven't seen any emails with someone asking

21  ContextMedia for this information and ContextMedia refusing,

22  right?

23  A.  No.

24  Q.  What we have seen is this email where you ask for

25  information, and it's provided to you by Mr. Crandall, right?

1    A.  Correct.

2    Q.  And we already went through the Excel; that was 1077A.

3            And that's the Excel that showed both rheumatology

4    and internal medicine, right?

5    A.  Correct.

6            MS. CHOU:  And let's go back to 183.

7            And there -- page down.  Sorry.  If you page --

8    middle of page 4.  Right.

9    BY MS. CHOU:

10   Q.  This is what we discussed.  So you noticed that there were

11   53 internal medicine offices.

12           And then there was a discussion about that, right?

13   A.  Yes.

14           MS. CHOU:  If you go up to the next email, Laura.

15   BY MS. CHOU:

16   Q.  Mr. Crandall explains, "Technically, these offices are

17   marked as IMs, but they have opted into our rheumatoid health

18   network as they see RA patients and wanted rheumatology

19   programming," right?

20   A.  Yes.

21   Q.  And he offers to scrub them if it's a problem, right?

22   A.  Correct.

23   Q.  And then you responded, basically, that, "We need to let

24   the AbbVie team know."

25           Because AbbVie is the client, right?

1  A.  Correct.

2  Q.  "And if AbbVie accepts them as relevant, then we can count

3  them," right?

4  A.  Correct.

5  Q.  So Target Health was fine with it as long as AbbVie was

6  fine with it, right?

7  A.  Yes.

8          THE COURT:  Please -- I was going to say --

9          MS. CHOU:  Sorry, sorry, sorry.

10         THE COURT:  -- please slow down.

11         MS. CHOU:  I know.  Mr. Hueston is constantly

12 reminding me to do that.

13         THE COURT:  Well, no, when you're talking now, she

14 has to take it down, too, so be careful.  There's smoke rising

15 from her fingers.  And when I see that, I know you have to

16 slow down.

17         MS. CHOU:  Okay.

18         THE COURT:  So take your time.

19 BY MS. CHOU:

20 Q.  And we've seen no emails today where AbbVie told you that

21 they did not want -- or yesterday or today, where AbbVie said,

22 "No more internal medicine offices," right?

23 A.  No.

24 Q.  And we've also seen no emails where you asked ContextMedia

25 to scrub the offices, the internal medicine office, right?

1  A.  No.

2  Q.  And, in fact, prior to that April email the government

3  showed you, ContextMedia actually followed up with you, again,

4  to make sure that you and the client were okay with these IM

5  offices, right?

6  A.  Yes.

7        MS. CHOU:  And if we put up Exhibit 8710.

8  BY MS. CHOU:

9  Q.  And you see the third email, Mr. Crandall writes,

10  you know, "Also any feedback from Humira client team regarding

11  our office list by specialty?"

12        And if we scroll up to your response, there's no

13  response to that question, right?

14        MS. CHOU:  Oh.  Screens.

15        MR. POULOS:  The screens are blank.

16        THE COURT:  Okay.

17     (Pause in the proceedings.)

18        THE COURT:  Mr. Blegen, this happened with you, and

19  you identified where you --

20     (Indiscernible crosstalk.)

21        MS. CHOU:  What were the tips --

22        THE COURT:  -- bumped it or caused it, so maybe you

23  can help Ms. Chou.

24        We'll stand up and take a break while we're doing

25  this.  If you'd like.

1          (Pause in the proceedings.)

2              THE COURT:  All right.  You may continue.

3    BY MS. CHOU:

4    Q.  So now that we have the document back up.

5              So Mr. Crandall asks you appreciate -- sorry.

6              So this is your response to Mr. Crandall.

7              And there's no reference to the Humira list, right?

8    A.  Correct.

9    Q.  And, in fact, two days ago or, I guess, three days ago

10   now, when you talked to the government, you said it was not a

11   big deal that there were these offices, and you did not think

12   you would have followed up, because there were not many,

13   right?

14   A.  Correct.

15   Q.  And yesterday --

16             MS. CHOU:  Oh, and you can take this down, Laura.

17   BY MS. CHOU:

18   Q.  You said you did not recall if AbbVie ever asked for new

19   rheumatology offices to replace internal medicine offices that

20   Outcome provided in the February 2013 list, right?

21   A.  Correct, correct.

22   Q.  Because it was a long time ago?

23   A.  Yeah.

24   Q.  Yeah.  One was ten years, right?

25   A.  Yeah.

1   Q.  But you've been in the point-of-care industry for a long

2   time, right?

3   A.  Yes.

4   Q.  It's client services, basically?

5   A.  Yes.

6   Q.  And you seem -- you're good at your job?

7   A.  I think so.

8   Q.  You got promoted -- congratulations -- right? -- in

9   October?

10  A.  Yes.

11  Q.  And so you got to where you are, because you're responsive

12  to your clients, right?

13  A.  Yes.

14  Q.  And so if you knew that AbbVie cared about specialties of

15  the doctors' offices, you would have called them to let them

16  know that the ContextMedia reported internal medicine doctors,

17  right?

18  A.  Yes.

19  Q.  And if they had a problem with it, you would have

20  contacted ContextMedia right away, right?

21  A.  Yes.

22  Q.  And followed up, right?

23  A.  Correct.

24  Q.  But you don't recall doing any of that?

25  A.  No.

1  Q.  And we haven't seen any documents reflecting --

2  A.  Correct.

3  Q.  -- that?

4          Now, the government asked you some questions about

5  Exhibit 176.

6          MS. CHOU:  Laura, if you can bring that up.

7  BY MS. CHOU:

8  Q.  And this -- you -- you say, "I took take a look through

9  the list, and there's -- appears to be a good amount of

10  locations that are nonrheumatology," right?

11  A.  Correct.

12  Q.  I think you testified that these practices would have been

13  an issue?

14  A.  Yes.

15  Q.  Right.  But I -- there's a little bit of confusion about

16  what this list actually is.

17          So if we go back to 1077, which is a day after this

18  email, Mr. Crandall says, "Please delete the file I forwarded

19  yesterday with HCPs associated with the Humira campaign,"

20  right?

21  A.  Correct.

22  Q.  And he explains that's because it's the long list,

23  basically, right?

24  A.  Yep.

25  Q.  And so let's see.  Oh.  And he explains, "The list

1   includes all HCPs at the targeted rheumatology prescriber

2   waiting rooms, including those not specifically targeted by

3   AbbVie."

4           COURT REPORTER:  I can't take that down that fast.

5           MS. CHOU:  Sorry.

6   BY MS. CHOU:

7   Q.  The list includes all HCPs at the targeted rheumatology

8   prescriber waiting rooms, including those not specifically

9   targeted by AbbVie, right?

10  A.  [No audible response.]

11  Q.  So basically the wrong list?

12  A.  Yes.

13          MS. CHOU:  Okay.  And if we pull up 10131.

14  BY MS. CHOU:

15  Q.  This is the original list he sent you.

16          MS. CHOU:  And if we pull up 10131A.  And just as a

17  quick reminder, we're looking at February of 2013.

18  BY MS. CHOU:

19  Q.  So that's the 323 base, plus 155.

20          So about 480, right?

21  A.  Yes.

22          MS. CHOU:  10131A, it's a spreadsheet.

23          And if we scroll down and keep on going, keep on

24  going, keep on going.  Just go all the way to the bottom.  You

25  can -- might be faster to just take your mouse.  Right.

1  BY MS. CHOU:

2  Q.  So we're looking at over a thousand entries, right?

3  A.  Yes.

4  Q.  So pretty clear on its face this is not the list of

5  contract screens, right?

6  A.  Correct.

7  Q.  So it really was just a mistake, right?

8  A.  Yes.

9  Q.  Okay.  And 'cause mistakes happen -- right? -- just a

10  lot --

11  A.  Yes.

12  Q.  -- of stuff happened?

13        Okay.  So let's talk about the affidavits.

14        The government talked about --

15        MS. CHOU:  Let's bring up 1074.

16  BY MS. CHOU:

17  Q.  And this is one where the government, I think, went over

18  this first page with you talking about discrepancy and asking

19  for a revision of the affidavit.

20  A.  Yes.

21  Q.  But if we go back.  Let's start on page 10, and then you

22  can see -- so you can see the bottom of page 10 is an email

23  from Jennifer Greufe, right?

24        That was your supervisor?

25  A.  Yes.

1  Q.  And the email says -- oh, and, I guess, we actually need

2  to go deeper into this email.

3          MS. CHOU:  The next one after this, Laura.  Keep on

4  going to page 12.

5  BY MS. CHOU:

6  Q.  And so there you see it starts with someone saying, "I

7  have not received the Humira creative yet," right?

8  A.  Correct.

9  Q.  So there was a delay in the creative, basically?

10  A.  Yes.

11  Q.  So that's why -- that's why there was missed airtime?

12  A.  Yes.

13  Q.  And so even though there was delay from the client side

14  presumably in providing the ad, if we then go back up to the

15  email I had started showing you on page 10, it looks like --

16          MS. CHOU:  Sorry.  Page 11.

17  BY MS. CHOU:

18  Q.  Even though there was a client delay, Ms. Greufe is

19  asking, "Bob, since the brand will have missed a few days of

20  airtime, would it be possible to run extra exposure within the

21  network to catch up on missed impressions?  Once the creative

22  is provided, of course," right?

23  A.  Yes.

24  Q.  So there, she's confirming that the creative still had not

25  yet been provided, right?

1    A.  Correct.

2    Q.  And although that was a delay on the client side, let's

3    look at -- she was asking for the impressions to be made up,

4    right?

5    A.  Correct.

6    Q.  If then if we look at Mr. Mons's email -- finally, we're

7    on the right email.  Sorry about that -- page 10.

8           He says, "No problem," right?

9    A.  Correct.

10   Q.  Okay.  And then bottom of page 9.

11          "Still have not received the spot yet," right?

12   A.  Yes.

13   Q.  And then next email, you explain, "There's been a

14   transition in creative agencies."

15          MS. CHOU:  I think let's page up some more.  I'm

16   trying to scroll ahead.  Page 8.  Right.  Still some more

17   discussion about the missing creative.  Page 7.  And page 6.

18   You explain there's been a transition.  Okay.  And then let's

19   scroll up some more.

20   BY MS. CHOU:

21   Q.  And, finally, on the middle of page 2, Mr. Mons confirms

22   that Humira went live today.

23          And that's January 11th, right?

24   A.  Correct.

25   Q.  And that to make up for the shortfall, they would run on

1    an additional 60 sites for two months, right?

2    A.  Correct.

3    Q.  So the reason why the original affidavit had to be

4    modified was because of this delay in creative, right?

5    A.  Correct.

6    Q.  Nothing nefarious, right?

7    A.  No.

8    Q.  So when the original affidavit said January 1st through

9    January 30th, that was just a mistake, right?

10   A.  Correct.

11   Q.  No one's trying to conceal anything?

12   A.  No.

13   Q.  Right.  Like, everyone knew that it was delayed, right?

14   A.  Correct.

15   Q.  And here, actually, you see that you -- there was supposed

16   to be an additional 60 sites ran.

17          MS. CHOU:  But if we go to Government Exhibit 148,

18   page 8.

19   BY MS. CHOU:

20   Q.  This affidavit for February, when there's supposed to be

21   the additional 60 sites, it still says 480, right?

22   A.  Correct.

23   Q.  'Cause someone's just filling out a form?

24   A.  Correct.

25   Q.  Pretty much based on the contract, right?

1    A.  Correct.

2          MS. CHOU:  And -- and the same thing, I think

3    Affidavit 197, GX197, page 150.

4    BY MS. CHOU:

5    Q.  Here, this is -- the government went through how there was

6    a pause in April?

7    A.  Yes.

8    Q.  Right.  And here it's saying there's a period of activity,

9    right?

10   A.  Yes.

11   Q.  Number of offices locations delivered 530?

12   A.  Correct.

13   Q.  Right.  So it's still saying something about delivery,

14   but, obviously, everyone knew that it was on pause, right?

15   A.  Yes.

16   Q.  So some of these affidavits were just wrong, but -- but --

17   but nothing nefarious behind it.

18         They were just, you know, some problem, some error,

19   right?

20   A.  Can you explain that?

21   Q.  Oh, just, you know, here, he's -- this affidavit says

22   that -- that something has been delivered, but it was on

23   pause, right?

24   A.  Correct.

25   Q.  So that's not accurate, but it's not a problem, right?

1  A.  Correct.

2  Q.  Okay.  And by the way, when we were talking about the

3  January affidavit where you asked them to revise it, they did

4  revise it, right?

5  A.  Yes.

6  Q.  So if Target Health had asked for alterations,

7  ContextMedia would've done it, right?

8  A.  Yes.

9  Q.  Like, including specialties or something?

10  A.  Correct.

11  Q.  Okay.  And Mr. -- Mr. Bhattacharjee asked you about

12  make-goods.

13            They're common in the industry, right?

14  A.  Yes.

15  Q.  Because you're dealing with media, impressions change --

16  A.  Yes.

17  Q.  -- who knows how many people are going to watch the

18  Super Bowl?

19  A.  Right.

20  Q.  Okay.  And the contract itself makes reference to

21  make-goods, right?

22            MS. CHOU:  Let's pull it up so you don't have to

23  guess.

24            THE WITNESS:  Yeah.

25            MS. CHOU:  1076.  And, actually, Laura if you can

1    pull up 1076, the premarked version.

2    BY MS. CHOU:

3    Q.  And this is a form again, right?

4    A.  Yes.

5    Q.  It wasn't drafted specifically for this -- this campaign?

6    A.  It's our terms and conditions.

7    Q.  Yeah.  And here you see "make-goods" appears in three

8    locations, right?

9    A.  Yes.

10   Q.  Okay.  So let's talk about mobile discrepancies.

11          MS. CHOU:  Wait.  Laura, you can take that down.

12   BY MS. CHOU:

13   Q.  So the prosecutor asked you a few questions about tablets

14   and metrics and -- and some more hypotheticals, right?

15   A.  Yes.

16   Q.  But back in -- back -- way back when this was happening in

17   2013, tablets were new, right?

18   A.  Yes.

19   Q.  That's why they were exciting?

20   A.  Yes.

21   Q.  In fact, ContextMedia was doing a pilot program for

22   tablets?

23   A.  Yes.

24   Q.  And in the early days of anything, you're going to have

25   discrepancies, right?

 1  A.  It's possible.

 2  Q.  Tablets are, kind of, notorious for being difficult to

 3  track?

 4  A.  Yes.

 5  Q.  Are you familiar with the IAB?

 6  A.  Yes.

 7  Q.  And what is the IAB?

 8  A.  They audit.

 9  Q.  They're called -- I can't tell if it's the -- I've seen

10  different names.  It's the Interactive --

11          MR. BLEGEN:  Judge, can we have a sidebar just on a

12  technical issue?  I think --

13          THE COURT:  Okay.

14          MR. BLEGEN:  -- our screens are only showing part of

15  the witness.  I don't know if the camera got bumped or

16  something, but...

17          THE WITNESS:  Maybe I'm too short.

18          Better?

19          THE COURT:  It's better if you sit up.  That's great.

20  I think that cures things, so.

21          MS. CHOU:  Okay.  Do you still need the sidebar,

22  Mr. Blegen?

23          MR. BLEGEN:  No.

24          THE COURT:  Thank you.

25          THE WITNESS:  Should I face this way?

1        THE COURT:  Pardon me?

2        THE WITNESS:  Should I face this way?

3        THE COURT:  No.  Just face the questioner.

4        THE WITNESS:  Okay.

5        THE COURT:  That's fine.

6    BY MS. CHOU:

7    Q.  So it's the -- Internet or Interactive Advertising Bureau?

8    A.  Yes.

9    Q.  And, in fact, they put together a standard terms and

10   conditions for contracts between advertising companies and

11   vendors, right?

12   A.  That's right.

13   Q.  Your current company, Publicis, uses their standard terms

14   and conditions?

15   A.  Yes.

16   Q.  And they also put out white papers, right?

17   A.  White papers?

18   Q.  Yeah.

19   A.  Yes.

20        MS. CHOU:  And so, Laura, if you can access the IAB

21   link live, and let's just show it to the witness for now.

22   BY MS. CHOU:

23   Q.  And so do you recognize that website, www.iab.com?

24   A.  Yes.

25        THE COURT:  Hang on.  Okay.  Do you see --

1          THE WITNESS:  No.

2          THE COURT:  It's not on the screen.  Oh, there we

3    are.

4          THE WITNESS:  There it is.

5          THE COURT:  And it's not shown to the jury, which is

6    your -- what you wanted, correct?

7          MS. CHOU:  Yes, yeah.

8          THE COURT:  Okay.  Go ahead.

9    BY MS. CHOU:

10   Q.  And so this is -- this is from this trade association,

11   right?

12   A.  Yes.

13   Q.  And this is marked as exhibit -- and this is a paper that

14   they've published?

15   A.  Yes.

16   Q.  So this is Exhibit 10254.

17         MS. CHOU:  And I move this into evidence at this

18   point.

19         THE COURT:  Any objection?

20         MR. APPLEBY-BHATTACHARJEE:  Yes, Your Honor.

21         THE COURT:  All right.  Let's go to sidebar.

22       (Proceedings heard at sidebar on the record.)

23         THE COURT:  Okay.

24         MR. APPLEBY-BHATTACHARJEE:  Your Honor, the -- yeah,

25   the witness stated she was not familiar with this specific

1  document.  It's only relevant insofar as this document informs

2  her understanding of terms and conditions in either Outcome's

3  contracts or other contracts for campaigns that this witness

4  was responsible for running.

5         She -- her familiarity with the IAB is not sufficient

6  foundation for her familiarity with anything the IAB

7  publishes, let alone things that she has not seen.

8         THE COURT:  Okay.  Response.

9         MS. CHOU:  I think she's laid adequate foundation.

10  She's explained this is a trade bureau.  Her current company

11  relies on that trade bureau for their terms and conditions.

12  She said she recognized that they've published papers.  She

13  recognizes the paper.  We went to the website and pulled it

14  off of the website.  I think that's more than adequate

15  foundation for --

16         THE COURT:  Where are you -- where I'm confused is

17  where you're going on this.

18         What relevance does this have as opposed to the

19  actual terms and conditions of the contract with the -- with

20  the client in this case.

21         MS. CHOU:  Oh, this is -- we were just talking about

22  the difficulties in tracking tablets and --

23         THE COURT:  Which she acknowledged.

24         MS. CHOU:  Right.  And the industry acknowledges,

25  too.  And so that's the point I'm trying to make sure.

1      THE COURT:  Well, what relevance is the industry?  If

2   she knows that there was a -- trouble tracking tablets in

3   this -- in general with clients she had, haven't you made your

4   point?

5      I don't know why you need to reinforce it with a

6   hearsay document that may relate to a variety of other

7   customers and situations.  That's where I'm confused.

8      MS. CHOU:  Well, it is relevant, Your Honor, because

9   the government is making a part of their case that

10  Outcome Health had these difficult and unreliable metrics,

11  inflated metrics.

12      THE COURT:  Well, inflated --

13      MS. CHOU:  Right.

14      THE COURT:  -- I don't think it's unreliable they're

15  arguing.  If it were unreliable, this would be a breach of

16  contract case --

17      MS. CHOU:  Well, it's --

18      THE COURT:  -- and they're arguing these were

19  intentionally inflated.

20      MS. CHOU:  Exactly, Your Honor, which is why we need

21  to prove that they -- there are lots of discrepancies, and

22  inflated metrics aren't necessarily inflated.  They might just

23  be problematic or poorly tracked.

24      THE COURT:  But IAB is what, exactly?

25      MS. CHOU:  It's a trade association that puts

1  together a lot of the governing documents.  That's what she

2  was explaining, and that's what her current employer uses.

3        THE COURT:  I still don't see how this relates to

4  this situation when she's already told you tracking tablets is

5  a -- is a difficult process.

6        I mean, if she denies that it's difficult, commonly

7  difficult to track them, you can impeach her with this.  But

8  she's given you what you asked for.  And that's why I don't

9  understand why you need to bolster it with an out of --

10  you know, another document that we don't know what this is

11  based on.

12        It -- this is based on an industry, this document.

13  Your questions should relate to this case.

14        MS. CHOU:  Well --

15        THE COURT:  So absent more of a foundation or more

16  connection between this and the testimony she's given about

17  her actual contact with Outcome, I'm going to sustain the

18  objection.

19        MS. CHOU:  Okay.  I'll ask her some more questions.

20  Thank you, Your Honor.

21        THE COURT:  All right.  We'll see -- see what

22  develops.  But that -- I hope you understand why I'm troubled

23  by this.

24        And if you can, you know, make some headway on -- on

25  that, I think she's giving you what you wanted.  That's why I

1  don't understand why we need to go into what industry does

2  when she's told you what the circumstances are in this case

3  with this client about the difficulty of tracking tablets.

4        So okay.

5        MS. CHOU:  Okay.

6        MR. APPLEBY-BHATTACHARJEE:  May I finish the record

7  on the government's objection here?

8        THE COURT:  Go ahead.

9        MR. APPLEBY-BHATTACHARJEE:  First of all, as the

10 Court has noted, this is percipient witness; she's not been

11 offered as an industry expert.

12       If the defense wishes to call an industry expert from

13 IAB, they're certainly able to do that.  But this is a way to

14 backdoor a hearsay document that this witness did not draft,

15 that this witness is not familiar with, for its substance.

16       Where, as the Court has noted, she's already

17 testified to the substance that the defense is trying to

18 elicit, which is that tablet metrics are unreliable.

19       She's testified to that.  We should move on.

20       THE COURT:  All right.  You've completed your record.

21 I've already ruled.

22       Proceed.

23     (Sidebar ended.)

24       THE COURT:  All right.  Objection sustained.

25       You may proceed.

1  BY MS. CHOU:

2  Q.  Okay.  Sorry.  Thanks, Ms. Bautista.

3       So we were talking about discrepancies and tablet

4  metrics, right?

5  A.  Yes.

6       THE COURT:  Do you need this exhibit up for the

7  witness?  It's not in front of the jury.

8       But do you still want this up?

9       MS. CHOU:  Yeah, possibly.

10      THE COURT:  All right.  Go ahead.

11      MS. CHOU:  Just leave it there with her for now.

12  BY MS. CHOU:

13  Q.  And so -- and so you recognize that it was a topic of

14  discussion in the industry back in 2013, right?

15  A.  Yes.

16  Q.  So bodies like the IAB wrote papers about it?

17  A.  Yes.

18  Q.  And one of the issues was that they could be --

19  discrepancies could exceed even 50 percent, right?

20      MR. APPLEBY-BHATTACHARJEE:  Same objection,

21  Your Honor.

22      THE COURT:  Well, if she knows what the general

23  industry chatter was about the percentage of discrepancies,

24  see if she even knows it.

25      Did -- were you aware of that?

1       THE WITNESS:  Yes.

2       THE COURT:  Okay.  Proceed.

3  BY MS. CHOU:

4  Q.  And, in fact, discrepancies were so common that the

5  standard IAB terms and conditions considered 10 percent close

6  enough to call, right?

7  A.  Yes.

8  Q.  Okay.  Sorry.

9       And you met Mr. Shah around 2009, right?

10 A.  Correct.

11      THE COURT:  Do you need this up anymore?

12      MS. CHOU:  Oh, no.  Thank you, Your Honor.

13      THE COURT:  Okay.

14      MS. CHOU:  Thanks for the reminder.

15 BY MS. CHOU:

16 Q.  And that was back when Outcome Health was called

17 ContextMedia, right?

18 A.  Yes.

19 Q.  It was much smaller, right?

20 A.  Yes.

21 Q.  And he was in his 20s.

22      He had just founded the company a few years prior?

23 A.  Yes.

24 Q.  And you remember him being passionate about the company

25 and the mission, right?

1   A.  Yes.

2          THE COURT:  You can put the witness back up on the

3   screen if you can do it from your end.

4   BY MS. CHOU:

5   Q.  So way back then in 2009, you had direct interactions with

6   him, right?

7   A.  Correct.

8   Q.  And as the company grew larger, you had fewer and fewer

9   interactions with him, right?

10  A.  That's right.

11  Q.  Then you started interacting more with salespeople, right?

12  A.  Correct.

13  Q.  Mr. Shah might be copied on some emails or looped in

14  later, but, generally, you dealt directly with the

15  salespeople, right?

16  A.  That's right.

17  Q.  And in the emails we've looked at or you've looked over

18  the last couple of days, it's been Bob Mons or

19  Matthew Crandall mostly, right?

20          It's a salesperson?

21  A.  Yes.

22  Q.  You did not directly negotiate the Humira contract or any

23  of the amendments or revisions with Mr. Shah, right?

24  A.  No.

25  Q.  And the government showed you one of the documents, and it

1   said "Attention Mr. Shah" on the top.

2        You have no knowledge about whether or not that

3   contract even went to Mr. Shah, right?

4   A.  Correct.

5   Q.  Right.  It was signed by Mr. Demas?

6   A.  Yes.

7   Q.  And over time, you recognized that Ashik Desai took more

8   and more control over the company, right?

9   A.  I wouldn't say he took control of the company.

10  Q.  Sorry.  You're right.  That is imprecise.

11       He was more involved.  Fair?

12  A.  Yes.

13  Q.  Yeah.  He became the brains behind reporting, I think, is

14  something you said before?

15       MR. APPLEBY-BHATTACHARJEE:  Objection as to form of

16  the question.

17       THE COURT:  Sustained.

18       Rephrase the question.

19  BY MS. CHOU:

20  Q.  Would you say that he became the brains behind reporting?

21       MR. APPLEBY-BHATTACHARJEE:  Objection.

22       THE COURT:  Overruled.

23       If the witness understands the question.

24  BY THE WITNESS:

25  A.  I would say he worked behind the scenes.  I don't know

1    that he did anything to the reports.  They were just sent to
2    me.
3    BY MS. CHOU:
4    Q.  Well, do you recall meeting with the government in 2009?
5    A.  Yes.
6              MR. APPLEBY-BHATTACHARJEE:  2000 -- 2009?
7              MS. CHOU:  2019.  Sorry.
8              THE WITNESS:  '19.
9              MS. CHOU:  2019.
10   BY MS. CHOU:
11   Q.  And do you recall at that time saying that you believed
12   Ashik Desai became the brains behind reporting?
13   A.  Yes.
14   Q.  And are you aware that Mr. Desai has pled guilty to
15   committing fraud in pharmaceutical clients?
16              THE COURT:  Sustained.
17   BY MS. CHOU:
18   Q.  But you are aware that Mr. Desai became more and more
19   involved with the contracts, right?
20   A.  Yes.
21   Q.  And you can't speak to the internal workings of
22   Outcome Health what Mr. Desai was responsible versus what
23   Mr. Shah was responsible for, right?
24   A.  No.
25   Q.  And then, certainly by Rexulti, Mr. -- that was when

1  Mr. Desai was more involved, right?

2  A.  Yes.

3  Q.  Okay.  Now, the government asked you some questions about

4  the *Wall Street Journal* article.

5      And I think you mentioned that even after the

6  *Wall Street Journal* article, you did continue a campaign,

7  right?

8  A.  We would have continued through mostly make-good activity.

9  Q.  Well, do you recall having a conversation with Amgen where

10  you agreed that one of the considerations was you didn't want

11  to give up offices because a competitor might take them, and

12  you'd never get back in?

13  A.  Correct.

14  Q.  So that was one of the concerns, right?

15  A.  Yes.

16  Q.  Because even after everything that happened, the screens

17  still had value, right?

18  A.  Yes.

19  Q.  It's hard to get into those offices?

20  A.  Correct.

21  Q.  Right.  Yeah.

22      And what happened after the *Wall Street Journal*

23  article really sucked, right?

24  A.  Yes.

25  Q.  Yeah.  And fair to say it sucked for the people who worked

1  at Outcome Health also?

2  A.  I'm sure, yeah.

3  Q.  And you knew there were hundreds of employees there,

4  right?

5  A.  Yes.

6  Q.  And you don't think they were all involved in fraud, do

7  you?

8          MR. APPLEBY-BHATTACHARJEE:  Objection.

9  BY MS. CHOU:

10 Q.  You can't say, right?

11         THE COURT:  Hang on.  There's an objection.

12         MS. CHOU:  Sorry.

13         THE COURT:  And then modified your question.

14         MS. CHOU:  I'll -- I'll withdraw the question, and

15 I'll ask a new one.

16 BY MS. CHOU:

17 Q.  You certainly can't speak to what anyone knew or didn't

18 know, right?

19 A.  No.

20 Q.  Or did or didn't do, right?

21 A.  Correct.

22 Q.  Including Mr. Shah, right?

23 A.  Correct.

24         MS. CHOU:  Okay.  Thank you.

25         THE COURT:  All right.  Additional cross-examination?

1 Actually, it's 10:29.  Rather than have you go for one minute,

2 we'll take our break right now.  15-minute break.

3          Ladies and gentlemen, please don't discuss the case

4 among yourselves or with anyone else, and keep an open mind as

5 there's more evidence to hear.

6          COURT SECURITY OFFICER:  All rise.

7      (Jury out at 10:29 a.m.)

8          THE COURT:  Okay, ma'am, 15-minute break.  Since

9 you're on cross-examination, don't discuss your testimony with

10 the government.

11          THE WITNESS:  Okay.

12          THE COURT:  Thank you.

13          Anything we need to address?

14          MS. CHOU:  Not from me.

15          MR. POULOS:  No, Your Honor.

16          MR. APPLEBY-BHATTACHARJEE:  No, Your Honor.  Just --

17          THE COURT:  You want this on the record?

18          MR. APPLEBY-BHATTACHARJEE:  I -- I don't think we

19 need this on the record.

20          THE COURT:  Let's go off the record.

21      (A recess was had from 10:30 a.m. to 10:48 a.m.)

22

23

24

25

1          THE COURT:  Okay.  Let's bring in the witness and

2    let's bring in the jury.

3          (Off the record.)

4          COURT SECURITY OFFICER:  All rise.

5          (Jury enters.)

6          THE COURT:  Okay.  Please be seated.

7          Ladies and gentlemen, we -- I understand you were

8    wishing to get a different view on the witness.  I know many

9    of you in the back have to -- are using the screen to view the

10   witness, and we're going to work on it more over lunchtime,

11   but we've modified it a little bit.  Hopefully it's more

12   consistent with what you're looking for, but we'll work on

13   this more at lunchtime because it involves some switching of

14   the controls.

15         All right.  Mr. Lowder, you may begin

16   cross-examination.

17                        CROSS-EXAMINATION

18   BY MR. LOWDER:

19   Q.  Good morning, Ms. Bautista.  My name is Alex Lowder.  I'm

20   one of the attorneys for Shradha Agarwal.  So I'm going to ask

21   you a few questions, try not to rehash what Ms. Chou did.

22         One of the topics we have discussed today is your

23   main point of contact with Outcome Health, right?

24   A.  Yes.

25   Q.  Okay.  And they were the sales reps were the people that

 1   you interacted with on a day-to-day basis regarding the

 2   campaign with Humira in particular?

 3   A.  Correct.

 4   Q.  And the first salesperson was Bob Mons, correct?

 5   A.  Yes.

 6   Q.  And the next person was Matt Crandall, right?

 7   A.  Correct.

 8   Q.  Okay.  Did you interact directly with a gentleman by the

 9   name of Jason Ketchum in connection with the campaigns?

10   A.  Not directly.

11   Q.  Okay.  Did you have any contract negotiations with

12   Mr. Ketchum?

13   A.  No.

14   Q.  Okay.  Did you ever have meetings with him where you

15   discussed the advertising or things of that nature?

16   A.  No.

17   Q.  Okay.  And then I think you testified on direct that

18   you're aware of who my client is, Ms. Agarwal, correct?

19   A.  Yes.

20   Q.  And she wasn't one of your day-to-day contacts with the

21   company, right?

22   A.  No.

23   Q.  Right.  And so for some of these issues that we've talked

24   about over the last, you know, day and a half, she wasn't your

25   main point for those discussions, right?

1  A.  No.

2  Q.  And so when you were discussion -- discussing, excuse me,

3  the size of the buy, you know, for the number of screens or

4  offices, you didn't have that discussion with Ms. Agarwal,

5  right?

6  A.  No.

7  Q.  And we've seen that the Outcome Health reps, Bob Mons and

8  Matt Crandall, they described that in terms of screens when

9  they were interacting with you, correct?

10  A.  Yes.

11  Q.  Okay.  And, likewise, when you were talking about the

12  terms of the contract, when you were having those discussions,

13  those weren't with Ms. Agarwal, correct?

14  A.  No.

15  Q.  Now, on direct, you were asked some questions, some

16  hypotheticals about would you have liked to have known the

17  size or the inventory of Outcome Health's offering.  Remember

18  those?

19  A.  Yes.

20  Q.  Okay.  Now, it's true that you've never investigated, you

21  know, whether -- what the size of Outcome Health's network was

22  in 2013, correct?

23  A.  Can you ask that again?

24  Q.  Sure.  Let me try and frame this for you.

25          You made reference to meetings with Outcome Health

1    after *The Wall Street Journal* article.  Do you remember that
2    testimony?
3    A.  Yes.
4    Q.  Okay.  And they were talking about an investigation in
5    terms of the value of the -- the advertising, correct?
6    A.  Yes.
7    Q.  And that was for Amgen, right?
8    A.  Yes.
9    Q.  Okay.  And in 2017, you weren't with Target Health
10   anymore, right?
11   A.  No.
12   Q.  You were with a new agency?
13   A.  Yes.
14   Q.  And you didn't have the relationship for the Humira brand,
15   right?
16   A.  No.
17   Q.  Okay.  And so you didn't do an investigation back to 2013
18   to try and confirm any of the representations that you heard
19   at that time, right?
20   A.  No.
21   Q.  So sitting here today, you can't say one way or the other
22   what the actual size of the network was, right?
23   A.  I'm not understanding your question.
24   Q.  Sure.  Let me see if I can frame it this way.
25          Apart from the representations that were made to you

1  at the time, you don't have any information to dispute that?

2  A. No.

3  Q. And that's for 2013 in connection with Humira, right?

4  A. Correct.

5  Q. Now, on direct, there was also a question about list

6  match. You remember that?

7  A. Yes.

8  Q. And you described that generally, correct?

9  A. Yes.

10 Q. Okay. Now, it's true that for the Humira campaign in

11 2013, there was no list match, right?

12 A. Correct.

13 Q. Okay. And I think the government showed you this morning

14 an exhibit, and it's GX 1162.

15       MR. LOWDER: If we could have that.

16       Oh, Your Honor, switch over.

17 BY MR. LOWDER:

18 Q. Okay. If you could look, you know, below the box there,

19 it will say list match, no.

20       Do you see that on this revision order?

21 A. It's not on my screen.

22 Q. Oh.

23       THE COURT: Oh, here. There we go.

24 BY MR. LOWDER:

25 Q. Okay. And you see the box where it has national and

1  medical office display.  Below that, you see list match and

2  location?

3  A.  Yes.

4  Q.  Okay.  And it says "no" there, right?

5  A.  Correct.

6  Q.  And that's consistent with your recollection for that

7  contract --

8  A.  Correct.

9  Q.  -- right?

10       So because there was no list match, Outcome Health

11  didn't have an obligation to deliver specific offices to you

12  for the 2013 campaign, right?

13  A.  Correct.

14  Q.  Right.  AbbVie didn't give them a list of doctors and say

15  we want these doctors, right?

16  A.  Correct.

17  Q.  Right.  You were just buying a portion of the network as

18  it existed, right?

19  A.  Correct.

20  Q.  Now, we talked a little bit about the Humira campaign --

21  well, a lot about the Humira campaign.  Kind of in my mind,

22  I'll say three segments, right?  So there's the 325 screens

23  that you initially contracted for, right?

24  A.  Correct.

25  Q.  And then there was the 155 additional, right?

1    A.  Yes.

2    Q.  And then there was the 110 as well, right?

3    A.  Yes.

4    Q.  And that 110, you were buying Outcome Health's growth,

5    right?

6    A.  Correct.

7    Q.  Okay.  And that wasn't the only occasion where, at least

8    with Target Health, that you had bought growth from

9    Outcome Health, right?

10   A.  Correct.

11   Q.  And the concept of weighted average was familiar to you?

12   A.  Correct, yes.

13   Q.  Okay.  And they also disclosed to you that there was

14   growth even after 2013, right?

15   A.  Yes.

16   Q.  In 2016 as well?

17   A.  Yes.

18   Q.  Okay.  And in all of those occasions, it was okay.  You

19   didn't reject the idea of buying their growth because you

20   wanted the screens, correct?

21   A.  Correct.

22   Q.  And that was valuable to your agency and to the pharmacy,

23   right?

24   A.  Yes.

25          MR. LOWDER:  If you could give me a moment,

1  Your Honor, to confer with my colleagues.  I may be wrapping

2  up.

3          THE COURT:  All right.

4      (Counsel conferring.)

5          MR. LOWDER:  Your Honor, I think we can pass the

6  witness.

7          THE COURT:  All right.  Any additional questions?

8          MR. POULOS:  Yes, Your Honor.

9                     CROSS-EXAMINATION

10  BY MR. POULOS:

11  Q.  Good morning, ma'am.

12  A.  Good morning.

13  Q.  My name is Ted Poulos.  I'm an attorney for Brad Purdy.

14      You never interacted with Brad Purdy, right?

15  A.  Never.

16  Q.  Okay.  You don't even know him, right?

17  A.  No.

18  Q.  Okay.  So, obviously, I'm not going to ask you questions

19  about Brad Purdy, but you have been in this industry for quite

20  some time, right?

21  A.  Yes.

22  Q.  And so I just want to ask a couple of questions about the

23  industry generally.

24      Ms. Chou talked about the -- your reference to --

25  especially when it comes to these new technologies like these

1    tablets were, you mentioned a 10 percent tolerance or

2    variance, right, on issues of delivery relating to tablets and

3    that type of new technology, right?

4    A.  Yes.

5    Q.  Okay.  The new technology that they brought included the

6    tablets but also the digital wallboards, right?

7    A.  Yes.

8    Q.  Same type of thing because they were interactive with the

9    patients?

10   A.  Correct.

11   Q.  When you first started dealing with Outcome, what they had

12   is basically just TV screens up on a wall, right?

13   A.  Yes.

14   Q.  But then they got more and more innovative, correct?

15   A.  Yes.

16   Q.  Okay.  With respect to this 10 percent variance and

17   tolerance, am I right that one of the reasons for that was

18   that these new devices, some of the factors that went into

19   play in developing that 10 percent tolerance or variance was

20   Internet connectivity, right?

21   A.  Yes.

22   Q.  And session times, measuring, how do you measure a session

23   time that somebody is dealing with, that was another reason,

24   right?

25   A.  Correct.

1 Q. And you also know that each of these companies that rolled

2 out these new devices, they had their own proprietary

3 methodology for making these calculations, right?

4 A. Yes.

5 Q. Okay.

6 MR. POULOS: I would like to, if we could, go to

7 Defense Exhibit DX 9028, please.

8 THE COURT: Has this been admitted in evidence?

9 MR. POULOS: It's been admitted. These have been

10 addressed, Your Honor.

11 THE COURT: Okay.

12 MR. POULOS: And, Laura, if we could just blow up the

13 top page very briefly.

14 BY MR. POULOS:

15 Q. Do you see that this is an e-mail. You're on it, right,

16 Ms. Bautista?

17 A. I don't have it on my screen.

18 Q. Oh. We need to do that.

19 MR. POULOS: This is admitted, so I think it can go

20 to all the screens.

21 THE COURT: Yes, there we go.

22 BY MR. POULOS:

23 Q. Is it there now, ma'am?

24 A. Yes.

25 Q. Okay. So this is an e-mail from Ciro Maria. You do

1  remember him, right?

2  A.  I do, yes.

3  Q.  Another sales rep that you interacted with at Outcome?

4  A.  Yes.

5  Q.  And you mentioned Jennifer, is it Greufe, if I'm

6  pronouncing that correct?

7  A.  "GROOF."

8  Q.  Greufe.  She was your --

9  A.  Boss.

10 Q.  -- your boss.

11        Okay.  But you're on it.  And do you understand that

12 Ciro writes there:  "Hi Jennifer, I've attached the

13 presentation we've reviewed yesterday."

14        Right?

15 A.  Yes.

16 Q.  Okay.  Now, I just really want to go to, if we could go to

17 page 5 of the document, Repatha, this is a presentation

18 overview for Repatha.  That's one of the brand names that you

19 dealt with, right?

20 A.  Yes.

21 Q.  Who's the manufacturer of that?

22 A.  Amgen.

23 Q.  That was another Amgen product, okay.

24        MR. POULOS:  And if we could go to page 7 of this

25 document now.

1    BY MR. POULOS:

2    Q.  I just want to go over this, what these tablets look like

3    if you -- did you ever go to one of the offices just to see

4    what the tablets looked like and how they operated?

5    A.  Yes.

6    Q.  Okay.  And what's depicted in the bottom right-hand

7    corner, is that a pretty accurate representation of how they

8    were installed?

9    A.  Yes.

10   Q.  And so it was an exam room product, right?

11   A.  Yes.

12   Q.  Not a waiting room, but now when us patients are sitting

13   there interminably seemingly waiting for the doctor to

14   actually walk in?

15   A.  Yes.

16   Q.  That was the plan, right?

17   A.  Correct.

18   Q.  Patients could sit there and interact and get educational

19   content, right?

20   A.  Correct.

21        MR. POULOS:  And now if we could back out of that.

22   And if we go to the top right-hand section of this.

23   BY MR. POULOS:

24   Q.  These were kind of set up like a YouTube page almost,

25   right?

1    A.  Yes.

2    Q.  And patients could click on various parts of this, right?

3    A.  Correct.

4    Q.  The educational content might be playing, correct?

5    A.  Yes.

6    Q.  And, Ms. Bautista, do you recall that one of the things

7    these devices had on them was the ability to click on it and

8    go to the brand's website?

9    A.  Correct.

10   Q.  And get more information directly from Amgen?

11   A.  Yes.

12   Q.  Okay.  And do you recall, Ms. Bautista, that you were

13   asked a few questions about tablet metrics and the like.  Do

14   you recall, ma'am, that after these tablets were really up and

15   running, that your clients, the pharmaceutical companies like

16   Amgen, they were tracking themselves how often a patient was

17   sent from one of these tablets to their own website, right?

18   A.  Yes.

19   Q.  Okay.

20          MR. POULOS:  If we could back out again.  Okay.  I

21   think we could take that down.

22          Just to set some things with respect to timing.

23   Laura, if we could go to DX 9027, please.  And Laura, only

24   bring up the bottom portion of the e-mail, not the top,

25   please.

1   BY MR. POULOS:

2   Q.  So DX 9027 is an e-mail from Matthew Crandall that's --

3   you mentioned him before -- another Outcome sales rep, right?

4   A.  Yes.

5   Q.  And this is directly to you, right?

6   A.  Correct.

7   Q.  And just to focus on the first paragraph:  "Hi, Yesenia, I

8   hope you had a good weekend.  When we talked last week

9   regarding our free pilot offer for Humira, you asked for some

10  of the details for you to review with Emily and Mia."

11          Correct?

12  A.  Correct.

13  Q.  And the pilot offer there, that was when the tablets were

14  first coming out on kind of a trial or pilot program, right?

15  A.  Yes.

16  Q.  In August of 2013?

17  A.  Correct.

18  Q.  Now, do you recall, Ms. Bautista, that some -- moving into

19  2014, do you recall that Outcome did offer some clients on

20  some brands the tablets as a pure value add?  Do you remember

21  those offers?

22  A.  Yes.

23  Q.  And so for some of the brands and the clients with this

24  brand new product, the tablets, Outcome said, hey, you're

25  buying the wallboards, the TV screens.  We're going to --

1  we'll put tablets in those same locations and run the ads on

2  you for free?

3  A.  Yes.

4  Q.  Okay.  One last thing about the metrics.  Did you ever get

5  a metrics report yourself?

6  A.  Yes.

7  Q.  You did.  Okay.  You don't know who prepared those at the

8  company, do you?

9  A.  No, I don't know.

10 Q.  Okay.

11 A.  I imagine there was a team.

12 Q.  Yeah.  And you don't know what methodology was employed,

13 correct?

14 A.  No.

15 Q.  Okay.  But the metrics, the -- you know, the fact of

16 metric reports, that wasn't a contractual requirement like,

17 for example, the ROI guarantees were, right?

18 A.  No.

19 Q.  They weren't -- they weren't a contractual component,

20 right?

21 A.  No.

22 Q.  Okay.  Now, look, obviously to the extent you got them,

23 you expected the information in them to be accurate, correct?

24 A.  Correct.

25 Q.  Using these various methodologies and variances and

1  allowances that you talked about, correct?

2  A.  Yes.

3       MR. POULOS:  Okay.  We can take that down.

4  BY MR. POULOS:

5  Q.  The ROI component, is it true, ma'am, that these ROI

6  guarantees that Outcome offered really separated them from the

7  rest of the industry, at least initially, right?

8  A.  Yes.

9  Q.  I mean, it was a big selling point, right?

10 A.  Yes.

11 Q.  And is it fair to say that that was kind of the main

12 factor that your clients were interested in, is what do we --

13 what's our -- what's the bang for our buck?  What are we

14 getting out of every dollar we spend with Outcome; fair?

15 A.  I would say that while it was an attractive guarantee, the

16 clients did their own internal research which they relied on

17 more so than any outside party.

18 Q.  Well, thank you for that.  We were going to head there.

19 You knew that with respect to the ROI calculations that were

20 being submitted --

21 A.  Mm-hmm.

22 Q.  -- that Outcome relied primarily on IMS, right?

23 A.  Yes.

24 Q.  And IMS was -- is a big international company, right?

25 A.  Yes.

1  Q.  They actually collect data on every single -- pretty much

2  every single prescription that is written in this country,

3  right?

4  A.  Correct.

5  Q.  And, in fact, the world.  Well, maybe not the entire

6  world.  I'll withdraw that.

7        But that's what they do, right?

8  A.  Yes.

9  Q.  They're a big data company.

10        Crossix, C-r-o-s-s-i-x, that's another company just

11  like IMS, right?

12  A.  Yes.

13  Q.  Okay.  And what you were talking about as the clients,

14  they -- they had access to IMS if they wanted it as well,

15  right?

16  A.  Correct.

17  Q.  And you knew that they were doing their own internal

18  tracking on the IMS results on -- on the campaigns that they

19  were buying, right?

20  A.  Correct.

21  Q.  Okay.  Last subject, I think.

22        MR. POULOS:  I'm worried about touching anything on

23  this side, Judge.  Let me stay away from that.

24        THE COURT:  Are you going to put an exhibit up?

25        MR. POULOS:  In a minute.

1          THE COURT:  All right.

2     BY MR. POULOS:

3     Q.  Ma'am, you were asked some questions about the Rexulti

4     campaign, right?

5     A.  Yes.

6     Q.  Who's the pharma company on Rexulti, do you recall?  It

7     starts with an O?

8     A.  Otsuka.

9     Q.  Otsuka?

10    A.  Yes.

11    Q.  Okay.  If we could go to GX, Government Exhibit, 1584.  I

12    believe this is the contract for Rexulti for 2016.  Do you see

13    that?

14    A.  Yes.

15         MR. POULOS:  Thank you, Laura.

16    BY MR. POULOS:

17    Q.  This specifies under address and description a 90-second

18    spot played two times per loop in 420 offices.

19         Do you see that?

20    A.  Yes.

21         MR. POULOS:  Okay.  We can back out of that, Laura.

22    BY MR. POULOS:

23    Q.  I'm just curious with respect to this contract, do you see

24    that, you know, line items 1 and line items 2 are for the

25    exact same thing, but it's broken out by February 15 of '16 to

1  the end of February, that is, February 29th of '16, and then

2  it picks up again on March 1st through the rest of the year.

3          Do you know why it's broken out that way?  Why

4  doesn't it just say February 15th to December 31st?

5  A.  Only half of February was contracted.  So they started

6  mid-month.

7  Q.  I see.  So when that happens, you want to break out that

8  half separately?

9  A.  Right.

10  Q.  Okay.  And you do see that this contract was signed by

11  Ashik Desai?

12  A.  Correct.

13  Q.  You dealt with sales reps regularly, right?

14  A.  Yes.

15  Q.  But you often were in direct communication with Desai; is

16  that fair?

17  A.  Yes.

18  Q.  Okay.  And did you know, Ms. Bautista, that Ashik Desai

19  was responsible for making sure these ads got played?  Did you

20  know that?  Did you understand it?

21          MR. APPLEBY-BHATTACHARJEE:  Objection.

22          MR. POULOS:  I'll --

23          THE COURT:  Were you about to say you're going to

24  withdraw the question or rephrase the question?

25          MR. POULOS:  Rephrase it.

1          THE COURT:  Go ahead.

2     BY MR. POULOS:

3     Q.  Did you understand from your discussions with Desai and

4     members of the company that it was Desai's responsibility to

5     make sure that these ads got played in 420 offices?

6     A.  No.

7     Q.  Okay.  Now, Ms. Bautista, in late 2016, Outcome disclosed

8     to Target Health that they had under-delivered on Rexulti,

9     right?

10    A.  Yes.

11    Q.  And that was a big deal, wasn't it?

12    A.  Yes, it was.

13    Q.  Kind of a bombshell?

14    A.  Yes.

15    Q.  You said on direct examination early when you were going

16    through the Humira campaign and the like, if the company

17    under-delivered on these contractual obligations, what would

18    you -- what did you and Target Health expect the company to

19    do?  And I think your answer was we expected them to tell us,

20    right?

21    A.  Yes.

22    Q.  And in late 2016, that's exactly what Outcome Health did,

23    correct?

24    A.  Correct.

25          MR. POULOS:  If we could go to Exhibit 42 -- DX 4244.

1      THE COURT:  Be right with you.  I have to --

2      MR. POULOS:  Oh, sorry, Judge.  That's flipping

3  between GX and DX?  I don't know.

4      Laura, if we could please blow up the top half.

5  BY MR. POULOS:

6  Q.  So do you see that DX 4244, ma'am, is an e-mail from Dan

7  Schwartz of Outcome Health dated December 5th of 2016, for the

8  record?

9  A.  Yes.

10  Q.  And it's addressed to you and your colleagues at

11  Target Health, right?

12  A.  Yes.

13  Q.  Melissa, would you pronounce that last name?

14  A.  Dimayuga.

15  Q.  Dimayuga, she is somebody that worked with you, right?

16  A.  Yes.

17  Q.  And do you recall, ma'am, that one of the -- that the

18  folks at Outcome Health reached out to Melissa, set up a

19  meeting, and disclosed that there had been this significant

20  under-performance?

21  A.  Yes.

22  Q.  Okay.  And so for now, just the first sentence, it says,

23  Dan Schwartz, again, another sales rep, right?

24  A.  Yes.

25  Q.  He wrote:  "Hi, Yesenia, please see answers below and know

1  that we're committed to correcting this unprecedented problem

2  to the satisfaction of you and your client and beyond."

3         Do you see that?

4  A.  Yes.

5  Q.  And, again, he's saying please see answers below.

6         MR. POULOS:  Now, if we could go to the bottom

7  portion and just track this through.  That heading, yes.  The

8  bottom of page 1, if you could blow that up, Laura?

9  BY MR. POULOS:

10 Q.  At the bottom of page 1, it reflects that you had sent an

11 e-mail saying:  "Hi, Jordan and Dan."

12         MR. POULOS:  And then now let's go to the top of

13 page 2.  And if you -- yeah, perfect.

14         Thank you, Laura.

15 BY MR. POULOS:

16 Q.  So you wrote to Jordan, and that was Jordan Grafman,

17 someone at Outcome?

18 A.  Yes.

19 Q.  And, again, Dan Schwartz, right?

20 A.  Correct.

21 Q.  Let's review what this document says.

22         You wrote:  "Melissa shared the Rexulti

23 under-delivery with me and I need to understand exactly what

24 occurred since the program was contracted in November of '15

25 for 2016 activity (countersigned contract attached.)"

1       Did I read that correctly?

2   A.  Yes.

3   Q.  And, again, we saw on the exhibit when we looked at the

4   '16 contract that it was, in fact, signed in November of '15,

5   right?

6   A.  Yes.

7   Q.  Okay.  And then you said:  "I want to understand," and

8   then your question, "how this came to light at the very end of

9   the campaign?"

10          And then you understand this is the response to that

11  question.  They typed it into the body --

12  A.  Yes.

13  Q.  -- of your original e-mail.

14          And so what Dan Schwartz wrote is:  "As Jordan

15  mentioned, we became aware of this only after we received the

16  IMS results which showed the program achieving zero lift."

17          Did I read that correctly?

18  A.  Yes.

19  Q.  And so, Ms. Bautista, you understood that to mean that,

20  again, we're near the end of the contract.  We're going to

21  look at the IMS data, see what it shows, and the IMS data

22  showed zero lift, meaning it didn't achieve -- it was -- it

23  was 1 to zero for return, correct?

24  A.  Correct.

25  Q.  And then -- then he goes on to say:  "At that point, our

1  marketing sciences team found some incongruities in the data

2  which caused us to drill down further.  It was at this point

3  that we discovered the issue.  This all happened in the past

4  few weeks."

5          Did I read that correctly?

6  A.  Yes.

7  Q.  Let's look at your second question:  "How did we have nine

8  completed monthly affidavits confirming the activity as proof

9  of performance based on our contract?  There was obviously" --

10 that was the question, right?

11 A.  Yes.

12 Q.  The answer you got back from Dan Schwartz:  "There was

13 obviously a breakdown in the linkage between campaign delivery

14 and performance.  I'll have more on this later today.  We're

15 baffled by this, and in my three-and-a-half years here, I've

16 never encountered anything quite like this."

17         Do you see that?

18 A.  Yes.

19 Q.  Despite the fact that Outcome had sent you month after

20 month one of these form affidavits saying we're delivering 420

21 every month, right?

22 A.  Yeah.

23 Q.  Outcome nonetheless came forward and said those are wrong,

24 we under-delivered, right?

25 A.  Correct.

1    MR. POULOS:  And let's go to the last question.

2    BY MR. POULOS:

3    Q.  "How were the impressions reports provided on a monthly

4    basis if all of the inventory wasn't met?"

5         And then the answer to that was:  "Impressions are

6    based on full campaign delivery which reporting erroneously

7    showed as happening in full."

8         Did I read that correctly?

9    A.  Yes.

10   Q.  Okay.  Now, he did say in connection with this issue of

11   the affidavits that they would -- he would have more on this

12   later today.  Do you see that?

13        In the question of how did we have nine completed

14   monthly affidavits, he did tell you we'll have more

15   information for you later today, right?

16   A.  Yes.

17   Q.  Okay.

18        MR. POULOS:  Now, let's go to -- forgive me.  Let's

19   go to DX 4250, please.  And Laura, if you could blow up

20   perhaps all the way up to, you know, through the three bullet

21   points that are there.  There we go.

22   BY MR. POULOS:

23   Q.  Do you see that this document, DX 4250, is dated the

24   following day, December 6, 2016?

25   A.  Yes.

1  Q.  And, again, it's from Dan Schwartz, correct?

2  A.  Correct.

3  Q.  To you and your colleagues, correct?

4  A.  Correct.

5  Q.  And also including Jordan Grafman, one of the Outcome

6  sales reps, right?

7  A.  Yes.

8  Q.  So let's look at the full large paragraph that begins

9  "With respect to the POP affidavits."

10      I think everyone can see it, so let me just read it

11  into the record.  Does it say, ma'am:  "With respect to the

12  POP affidavits that we have provided in the past, I can

13  confirm that those affidavits were not accurate and

14  incorrectly reported the 420 screens were live (instead of the

15  accurate figures that 60 waiting room TV screens were live

16  from February to June of 2016 and 347 waiting room TV screens

17  were live from July to November)"?

18      Correct?

19  A.  Correct.

20  Q.  Then he explained:  "These inaccuracies were a result of

21  the prior mechanisms that were used to pull information for

22  these affidavits which were pulling from our contract

23  management system."

24      Did I read that correctly?

25  A.  Yes.

1  Q.  "This misalignment has been corrected for 2017 and

2  corresponds with overall updates to our infrastructure."

3         Did I read that correctly?

4  A.  Yes.

5  Q.  And then he goes on to say, "Now information related to

6  POP will be coming directly from the relevant delivery systems

7  used for the devices specified in each contract."

8         Correct?

9  A.  Yes.

10  Q.  "Both our campaign ops team and our finance team will be

11  involved in this process providing additional checks to ensure

12  accuracy."

13         Correct?

14  A.  Correct.

15  Q.  Now, there's that middle sentence that says:  "These

16  inaccuracies were the result of the prior mechanisms that were

17  used to pull information."

18         Ms. Bautista, in terms of dealing with this problem

19  on behalf of your client and interacting with Outcome Health,

20  did you learn that those prior mechanisms for generating these

21  affidavits had been in place for a long, long time, and that

22  this issue is what discovered the fault in that mechanism?

23  A.  No.

24  Q.  That was never explained to you?

25  A.  No.

1   Q.  As best you can -- okay.  All right.

2           This occurred right near the end of your tenure at

3   Target, correct?

4   A.  Yes.

5   Q.  And do you recall, ma'am, that despite the fact that 347

6   waiting room screens were playing those ads from July to

7   November, that Outcome gave a full refund to the client?

8   A.  Yes.

9           MR. POULOS:  I have nothing further, Your Honor.

10           THE COURT:  All right.

11           Redirect examination.

12           MR. APPLEBY-BHATTACHARJEE:  Your Honor, may I have a

13   moment to reset?

14           THE COURT:  Sure.

15           You may proceed.

16           MR. APPLEBY-BHATTACHARJEE:  All right.  Thank you,

17   Your Honor.

18                       REDIRECT EXAMINATION

19   BY MR. APPLEBY-BHATTACHARJEE:

20   Q.  Good morning again, Ms. Bautista.

21           Do you recall being asked questions on

22   cross-examination about how two people can take different

23   things away from a conversation?

24   A.  Yes.

25   Q.  Now, Ms. Bautista, would you agree that one of the ways to

1  resolve different understandings is to put them in a contract?
2  A.  Yes.
3  Q.  A contract signed by both parties?
4  A.  Yes.
5  Q.  I'm going to draw your attention back to an excerpt that
6  we looked at before comparing Outcome's revised expansion
7  contract for the Humira campaign with the original expansion
8  contract.  Do you recall that?
9        THE COURT:  I have to switch over.
10       MR. APPLEBY-BHATTACHARJEE:  There we go.
11       THE COURT:  Okay.
12  BY MR. APPLEBY-BHATTACHARJEE:
13  Q.  You recall seeing this --
14       THE COURT:  Hang on.  I've got to put it up, one more
15  click.
16       MR. APPLEBY-BHATTACHARJEE:  Oh, I'm sorry.
17       THE COURT:  There you go.
18  BY MR. APPLEBY-BHATTACHARJEE:
19  Q.  Do you recall seeing this on your direct examination?
20  A.  Yes.
21  Q.  The document on the left, Government's Exhibit 1163, is
22  the revised contract.  Do you recall that?
23  A.  Yes.
24  Q.  And Exhibit 129 on the right is the original contract?
25  A.  Yes.

1    Q.   What does the original contract say in the portion I've

2    just highlighted?

3    A.   "Digital screens located in 95 rheumatologists waiting

4    rooms (additional 95 offices to current 480-office campaign)

5    60-second spot, 2 times per hour."

6    Q.   And what does the revised contract say in the box that

7    I've highlighted?

8    A.   "Digital screens located in 95 rheumatologists waiting

9    rooms (additional 95 offices to current 480-office campaign)

10   60-second spot, 2 times per hour."

11   Q.   Do both contracts say the same thing?

12   A.   Yes.

13   Q.   And do they refer to offices?

14   A.   Yes.

15   Q.   The revised contract was executed in September 2013.  Do

16   you recall that?

17   A.   Yes.

18   Q.   So that was approximately nine months into the campaign;

19   is that right?

20   A.   Correct.

21   Q.   So was that approximately nine months after the e-mails

22   Ms. Chou showed you between yourself and Mr. Mons?

23   A.   Yes.

24   Q.   Was that nine months after the e-mails Ms. Chou showed you

25   between yourself and Mr. Crandall?

1  A.  Yes.

2  Q.  Nine months into the campaign, the revised contract still

3  says offices?

4  A.  Yes.

5  Q.  You were asked questions about how Outcome's invoices said

6  screens.  Do you recall that?

7  A.  Yes.

8  Q.  Were invoices accompanied by affidavits?

9  A.  Yes.

10  Q.  I'm going to draw your attention to

11  Government's Exhibit 148 at page 8.

12         Is this one of the affidavits that Target Health

13  received from Outcome?

14  A.  Yes.

15  Q.  Does this affidavit say screens?

16  A.  No.

17  Q.  What, if anything, did you understand Outcome was

18  representing to Target Health in this affidavit?

19  A.  Offices.

20  Q.  How many offices?

21  A.  480.

22  Q.  Did Target Health rely on that representation?

23  A.  Yes.

24  Q.  If Outcome was delivering, to take this example, 480

25  screens in less than 480 offices, what, if anything, would you

1  expect them to do?

2  A.  Disclose that.

3  Q.  Do you recall anyone at Outcome asking you, we have 480

4  screens but less than 480 offices; how do we fill out this

5  affidavit?

6  A.  No.

7  Q.  I'm going to put the first page of

8  Government's Exhibit 1094 on the screen.  This is a

9  January 2013 invoice that Outcome sent to Target Health; is

10  that right?

11  A.  Yes.

12  Q.  And what's being billed here is 325 screens.  Do you see

13  that?

14  A.  Yes.

15  Q.  Now, on cross-examination, Ms. Chou walked through some

16  math with you.  Do you recall that?

17  A.  Yes.

18  Q.  How 325 screens multiplied by 175 gets to that total

19  number, $56,550.  Do you recall that?

20  A.  Yes.

21  Q.  Would the same be true for 325 offices multiplied by 175?

22  A.  Yes.

23  Q.  I'm going to draw your attention to

24  Government's Exhibit 1077.  You recall being shown this e-mail

25  on cross?

1   A.  Yes.

2   Q.  Now, Ms. Bautista, is it fair to say that you aren't aware

3   of what, if any, conversations Outcome had internally before

4   Mr. Crandall sent this e-mail to you?

5   A.  No.

6   Q.  You aren't aware one way or another if Mr. Crandall was

7   directed to send this response by his supervisors at Outcome?

8   A.  No.

9   Q.  All you're aware of is what Mr. Crandall told you; isn't

10  that right?

11  A.  Yes.

12  Q.  On cross-examination, you were asked questions about how

13  Target Health asked for a January 2013 affidavit to be

14  corrected.  Do you recall that?

15  A.  Yes.

16  Q.  Now, Target became aware of a problem with the original

17  affidavit, correct?

18  A.  Correct.

19  Q.  And it -- it related to a delay in providing Outcome the

20  media to run the advertising?

21  A.  Yes.

22  Q.  And after Target Health became aware of the error, did

23  Target Health ask Outcome to fix the error?

24  A.  Yes.

25  Q.  By submitting a corrected affidavit?

1   A.  Correct.

2   Q.  Would Target Health know Outcome was under-delivering on

3   the Humira campaign unless Outcome told you that?

4   A.  No.

5   Q.  You were asked questions on cross about tablet metrics.

6   Do you recall that?

7   A.  Yes.

8   Q.  And about discrepancies in tablet metrics.  Do you recall

9   that?

10  A.  Yes.

11  Q.  Now, Ms. Bautista, is it your understanding that

12  discrepancies are the same thing as lies?

13  A.  No.

14  Q.  If there were discrepancies in tablet data that Outcome

15  was getting, would you expect to be told that?

16  A.  Yes.

17  Q.  Now, assuming discrepancies existed, was it your

18  expectation that Outcome would simply make up data?

19  A.  No.

20  Q.  You were asked questions about a 10 percent tolerance

21  threshold.  Do you recall that?

22  A.  Yes.

23  Q.  Now, assuming that Outcome was inflating tablet metrics by

24  7 to 800 percent, is that something you would have wanted to

25  know?

1  A.  Yes.

2  Q.  If that were true, would that have had an impact on your

3  willingness to do business with Outcome?

4  A.  Yes.

5  Q.  And how so?

6  A.  We would not have wanted to deal with false reporting,

7  inaccurate information, all that.

8  Q.  On cross-examination, you were asked about your main

9  contacts at Outcome.  Do you recall that?

10 A.  Yes.

11 Q.  And your main contacts were sales reps?

12 A.  Yes.

13 Q.  Mr. Mons, right?

14 A.  Correct.

15 Q.  And Mr. Crandall?

16 A.  Yes.

17 Q.  And you said on cross-examination that Rishi Shah was not

18 a day-to-day contact for you at Outcome.  Do you recall that?

19 A.  Correct.

20 Q.  Neither was Shradha Agarwal, correct?

21 A.  Correct.

22 Q.  I'm going to draw your attention to Government's

23 Exhibit 1076.

24       Do you recall seeing this e-mail on your direct

25 examination?

1    A.  No.

2    Q.  Let me blow up the whole e-mail.

3            Do you recall seeing this e-mail?

4    A.  Yes.

5    Q.  And its subject line is signed Humira contract.  Do you

6    see that?

7    A.  Yes.

8    Q.  And who is copied on this e-mail from Outcome in addition

9    to Mr. Mons and Mr. Demas?

10   A.  Shradha Agarwal and Rishi Shah.

11   Q.  I'm going to turn to page 2 of Exhibit 1076.  Is this the

12   contract that was attached to that e-mail?

13   A.  Yes.

14   Q.  Does that contract include the same language that we've

15   looked at before?

16   A.  Yes.

17           MR. LOWDER:  Objection.  Misstates the document.

18           THE COURT:  You need to rephrase or --

19   BY MR. APPLEBY-BHATTACHARJEE:

20   Q.  Does the contract refer to 325 rheumatologists waiting

21   rooms?

22   A.  Yes.

23   Q.  Turn your attention to Government's Exhibit 109.  Do you

24   recall being shown this e-mail exchange both on cross and

25   during your direct examination?

1    A.  Yes.

2    Q.  And the top portion of the e-mail is from Jennifer Greufe

3    to folks at Outcome.  Do you see that?

4    A.  Yes.

5    Q.  And who is copied on the e-mail?

6    A.  Rishi Shah.

7    Q.  Does Ms. Greufe use the word "offices" or "screens" when

8    discussing the Outcome campaign -- or the Humira campaign?

9    A.  Offices.

10   Q.  Turning back to page 2 of Exhibit 1076.  You were asked

11   questions about the list-match portion of contracts.  Do you

12   see that?

13   A.  Yes.

14   Q.  And list match says no?

15   A.  Yes.

16   Q.  And was that true for all of the Humira campaign

17   contracts?

18   A.  Yes.

19   Q.  And you testified on cross-examination that Outcome didn't

20   have an obligation to provide specific offices.  Do you recall

21   that?

22   A.  Yes.

23   Q.  Was Outcome obligated to provide a specific type of

24   office?

25   A.  Yes.

1    Q.  What type?

2    A.  Rheumatology.

3    Q.  Did that ever change throughout the Humira campaign?

4    A.  No.

5    Q.  You were asked about a pilot program for tablets in

6    mid-2013.  Do you recall that?

7    A.  Yes.

8    Q.  Did Outcome providing free tablets sometime in the middle

9    of the campaign excuse its obligation to deliver the

10   contracted number of rheumatology offices each month?

11   A.  No.

12   Q.  And you were asked about Rexulti.  Do you recall that?

13   A.  Yes.

14   Q.  In late 2016, you learned that Outcome had under-delivered

15   on the Rexulti 2016 campaign; is that right?

16   A.  Yes.

17   Q.  On cross-examination, you described learning that as a

18   bombshell.  Do you recall that?

19   A.  Yes.

20   Q.  Were you ever informed about under-delivery on any other

21   campaigns?

22   A.  No.

23   Q.  Were you ever informed about under-delivery on the Humira

24   2013 campaign?

25   A.  No.

1    Q.  Now, if that were true, would that also have been a

2    bombshell?

3    A.  Yes.

4         MR. APPLEBY-BHATTACHARJEE:  No further questions.

5         THE COURT:  All right.

6         Any additional cross?

7         MS. CHOU:  Just very briefly.

8         THE COURT:  All right.

9                    RECROSS EXAMINATION

10   BY MS. CHOU:

11   Q.  The government just asked you about -- hi again.

12        The government just asked you about

13   Government Exhibit 109.

14        MS. CHOU:  Laura, could you bring that up?

15   BY MS. CHOU:

16   Q.  That went to Mr. Shah, and that's on January 22, 2013.  If

17   we bring up Government Exhibit 1075, and if you recall 1075 is

18   the one that we went through that came after 109 where

19   Mr. Mons changed subject to Humira schedule of additional

20   screens, right?  You see that?

21   A.  Yes.

22   Q.  It says screens.  And this is also the one where the

23   e-mail also references screens, right?

24   A.  Yes.

25   Q.  And here you can see that this e-mail, which is after 109,

1  goes to Mr. Rishi Shah as well, right?

2  A.  Yes.

3  Q.  Okay.  And then we don't need to walk through the

4  contracts and the affidavits and invoices again, but remember

5  the affidavits said offices/locations, right?

6  A.  Yes.

7  Q.  At a minimum, there's some confusion, right?

8  A.  Yes.

9  Q.  Because the invoices did say screens, right?

10  A.  Yes.

11  Q.  And we also saw e-mail traffic back and forth on the

12  internal medicine stuff, right?

13  A.  Yes.

14  Q.  So at a very minimum, there's at least confusion, right?

15          MR. APPLEBY-BHATTACHARJEE:  Asked and answered,

16  Your Honor.

17          THE COURT:  Well, it's a little bit different.

18          If you can answer the question.

19          THE WITNESS:  Confusion on whose behalf?

20  BY MS. CHOU:

21  Q.  Well, you never asked them to take it off, right?  We went

22  through that?

23  A.  No.

24  Q.  Correct, right?  You never asked them to take it off?

25  A.  No, I didn't.

1  Q.  Right.  Okay.

2        MS. CHOU:  Thank you.

3        THE COURT:  Any additional cross?

4        MR. LOWDER:  Just briefly, Your Honor.

5        Can we switch it over to defense?

6        THE COURT:  It is.

7        MR. LOWDER:  Perfect.  Thank you.

8                    RECROSS EXAMINATION

9  BY MR. LOWDER:

10 Q.  Now, Ms. Bautista, on redirect, Mr. Bhattacharjee showed

11 you a revision contract, and that's 1163.

12       MR. LOWDER:  And can we show that side by side with

13 1162.  And I think if we go to page 2 of 1162, the language

14 there is a little bit easier to read.  If we could blow up

15 that box for the description and then do the same for 1163.

16       Thank you, Laura.

17 By MR. LOWDER:

18 Q.  Now, the point that Mr. Bhattacharjee made was you want to

19 look to the contract to clear up a misunderstanding, right?

20 A.  Mm-hmm.

21 Q.  Okay.

22 A.  Yes.

23 Q.  Thank you.

24       And so both of these revision orders were signed in

25 September of 2013, correct?

1    A.  Correct.

2    Q.  And the description that we see in this contract on 1163,

3    there's a reference to 325-office campaign, right?

4    A.  Yes.

5    Q.  Okay.  But on 1162 in the address description, we don't

6    see a reference to offices, correct?

7    A.  Correct.

8    Q.  Okay.  And so you can't necessarily look to the contract

9    to clear that up, that confusion, because this contract signed

10   at the same time doesn't make any reference to offices,

11   correct?

12   A.  Correct.

13          MR. LOWDER:  Now, if I could zoom out, Laura, to --

14   let's do 1162, please.  And if we could go to page 3.

15   Actually, sorry, try page 1.  Ah, and if we could get the

16   signature box at the bottom, please.

17   BY MR. LOWDER:

18   Q.  So the person who signed this contract on behalf of

19   ContextMedia, that's Jim Demas, right?

20   A.  Yes.

21   Q.  Okay.  And you're familiar with who he is, right?

22   A.  Yes.

23   Q.  It wasn't Mr. Shah?

24   A.  Yes.

25   Q.  It wasn't Ms. Agarwal?

1  A.  Yes.

2  Q.  Right?

3       Okay.  And then if we look who signed on behalf of

4  Target Health, who is that?

5  A.  Jennifer Greufe.

6       MR. LOWDER:  Now, if I could have -- let's see if

7  this is right.  Excuse me one second.

8       (Counsel conferring.)

9       MR. LOWDER:  Bear with me one second, Your Honor.

10      Sorry, Your Honor.

11      Well, I'll look for that one when I'm working through

12  the next thing.

13  BY MR. LOWDER:

14  Q.  All right.  Now, we also -- there was a discussion on

15  redirect about the invoices that Target Health received from

16  Outcome Health that showed screens.  Do you remember that?

17  A.  Yes.

18  Q.  Okay.  And Target Health never objected to those invoices,

19  right?

20  A.  No.

21  Q.  You never contacted your rep to say, hey, you're billing

22  me for screens, but it should say offices, right?

23  A.  Correct.

24  Q.  And now Mr. Bhattacharjee showed you an e-mail where

25  Ms. Agarwal and Mr. Shah were copied on the contract, right?

1    A.  Correct.

2         MR. LOWDER:  Okay.  And I think that was 1076.  If we

3    could have that up.  If we could go to the second page.

4    BY MR. LOWDER:

5    Q.  Okay.  Now, before we get to the description, let's just

6    look at who signed that.  Who signed that on behalf of

7    ContextMedia?

8    A.  Jim Demas.

9    Q.  Okay.  And then who signed it on behalf of Target Health?

10   A.  Jennifer Greufe.

11   Q.  Okay.  Now, let's look at the description in this contract

12   that was forwarded to Mr. Shah and Ms. Agarwal.

13        Do we have a reference to offices there?

14   A.  No.

15   Q.  It says digital screens located in 325 rheumatologist

16   waiting rooms, correct?

17   A.  Correct.

18   Q.  Now, there was also a colloquy about the January proof of

19   performance.  Do you remember that?

20   A.  Yes.

21   Q.  Okay.  And the reason that that had to be corrected was

22   because the creative was received late from the agency, right?

23   A.  Correct.

24   Q.  It wasn't corrected because there was some under-delivery

25   on behalf of Outcome, right?

1    A.  Correct.

2            MR. LOWDER:  I want to pin one thing down,

3    Your Honor, and I'll be done.

4            If I can find it.  I may not be able to.

5            THE COURT:  Sometimes pieces of paper are just like

6    keys.  They get lost.

7            MR. LOWDER:  They do get lost.  I apologize for the

8    delay, Your Honor, but this will be my last question.

9            THE COURT:  It looks like we found it.

10            MR. LOWDER:  No.  There are so many communications.

11            Ah, finally found it.  Okay.  Here we go.

12            So it is -- can we go to DX 8783?  Okay.

13    BY MR. LOWDER:

14    Q.  Now, if we look at the top of that, who is the top message

15    from, Ms. Bautista?

16    A.  Jennifer Greufe.

17    Q.  And Ms. Greufe was your boss at the time, correct?

18    A.  Yes.

19    Q.  Okay.  And she's writing to Bob Mons?

20    A.  Yes.

21    Q.  Okay.  To you?

22    A.  Yes.

23    Q.  CC to Matt Crandall, correct?

24    A.  Correct.

25    Q.  And then also to Mr. Shah, right?

1    A.  Yes.

2    Q.  Okay.  Now, in the second sentence of her first paragraph,

3    she says:  "We would like to add 161 offices from July to

4    December," correct?

5    A.  Correct.

6    Q.  Okay.  But then when you look at the first sentence of the

7    next paragraph, she says:  "We'd really appreciate your

8    thoughts as to the feasibility of recruiting/installing 161

9    incremental screens by July."

10            Do you see that?

11   A.  Yes.

12   Q.  So there was confusion, not just with Outcome Health, but

13   also internally with your team about the unit of measurement

14   for that buy, right?

15   A.  I wouldn't say it was confusion.

16   Q.  She used the terms interchangeably.  She said 161 offices.

17   In the next paragraph, she says 161 screens.  That's what it

18   says, right?

19   A.  Yes.

20   Q.  Okay.  Now, in terms of your points of contact with

21   Outcome Health, you said Bob Mons, Matt Crandall, your two

22   primary, right?

23   A.  Yes.

24   Q.  Okay.  And those are the people you'd have phone calls

25   with, right?

1    A.  Yes.

2    Q.  Regular phone calls about the campaign?

3    A.  Yes.

4    Q.  You would meet in person to talk about the campaign,

5    right?

6    A.  Yes.

7    Q.  Right?  They'd try to take you out to lunch to talk about

8    business with Humira and other brands, right?

9    A.  Yes.

10          MR. APPLEBY-BHATTACHARJEE:  Objection as to scope,

11   Your Honor.

12          THE COURT:  Are you almost done?

13          MR. LOWDER:  Just wrapping up.

14          THE COURT:  All right.

15          MR. LOWDER:  And the punch line's coming.

16   BY MR. LOWDER:

17   Q.  So when you talk about day-to-day, for Ms. Agarwal, that

18   wasn't the nature of your interaction with her, correct?

19   A.  Correct.

20   Q.  You didn't have phone calls on a regular basis, right?

21   A.  No.

22   Q.  You didn't go out to lunch with Ms. Agarwal on a regular

23   basis, right?

24   A.  No.

25   Q.  She didn't invite you to sporting events, right?

1  A.  No.

2           MR. LOWDER:  Okay.

3           No further questions, Your Honor.

4           THE COURT:  Any additional questions?

5           MR. POULOS:  Nothing further, Your Honor.  Thank you.

6           THE COURT:  Any additional questions by the

7  government?

8           MR. APPLEBY-BHATTACHARJEE:  No, Your Honor.

9           THE COURT:  All right, ma'am.  You're excused.  Thank

10  you.

11          THE WITNESS:  Thank you.

12          THE COURT:  All right.  Please call your next

13  witness.

14          MR. JOHNSTON:  Your Honor, at this time, the

15  government would like to make a brief interim statement.

16          THE COURT:  All right.  You may.

17       (Counsel conferring.)

18          MR. JOHNSTON:  Your Honor, if we could please turn to

19  the government's computer.

20          THE COURT:  Is this it?

21          MR. JOHNSTON:  Yes.  It was not visible to the jury

22  yet.

23          THE COURT:  Yeah, I'll do that right now.  I want to

24  make sure we're on the same page.

25          All right.

1       INTERIM STATEMENT ON BEHALF OF THE GOVERNMENT

2            MR. JOHNSTON:  Ladies and gentlemen, you heard there

3   was a lot of confusion about whether there was screens or

4   offices.  You know who wasn't confused at the time the

5   contract was in place?  Shradha Agarwal and Rishi Shah.

6            Here you see Shradha saying:  "This gives us real

7   opportunity to sell waiting room screens versus unique

8   addresses that Target Health bought."  In real time, that is

9   the best evidence of what the contract meant.

10           We're going to give you a preview of our next

11  witness.  You're going to hear from David Ma.  David Ma is

12  going to fill in some key time periods.  What have you seen so

13  far?  Rishi Shah lying in 2011.  You saw Rishi Shah telling

14  the public that the company throws smoke bombs.  You see Ashik

15  Desai started at the company in mid-2013.  And then you've

16  also heard from Sameer Kazi about his confrontation with

17  Rishi Shah.

18           What you'll hear is that Shradha Agarwal repeated the

19  rationalization that the company throws smoke bombs to

20  David Ma when he raised the concerns with her.

21           David Ma is going to give you an insider's look into

22  the fraud when it was in full swing.  What you'll see is that

23  David Ma was doing some of the same things that Shah and

24  Agarwal had Jason Ketchum doing:  False list matches,

25  including offices from member outreach; two, concealing those

1 under-deliveries; and, three, cherry-picking ROI study lists.

2 You'll also see that Brad Purdy was involved in

3 inflating tablet metrics. The defense will try to claim that

4 there was a brick wall between the fraud and David Ma and

5 Ashik Desai. That will not be the case.

6 Thank you.

7 THE COURT: All right. Any additional interim

8 statements?

9 MS. CHOU: Yes, Your Honor.

10 THE COURT: All right. Proceed.

11 MS. CHOU: Sorry. Trying to get my timer up.

12 INTERIM STATEMENT ON BEHALF OF DEFENDANT SHAH

13 MS. CHOU: So you are going to hear about the people

14 who actually committed fraud. But we're going one witness at

15 a time and, once again, the government has ignored the witness

16 that you just heard about.

17 Remember after Jason Ketchum when the government

18 basically told you to forget his testimony and just focus on

19 the documents? It's because these witnesses aren't giving you

20 what the government wants because the government tried to do

21 two things with Ms. Bautista: Convince you that despite the

22 e-mail traffic, Humira bought offices, not screens. We went

23 through document after document that said screens, and she

24 still said offices, and convince you that ContextMedia was

25 doing something wrong by including internal medicine doctors.

1    But what did you learn?  Humira got what they paid

2  for:  Screens.  You saw the communications.  You saw the

3  calculations.  Write down 10257.  That's the e-mail

4  communication where Mr. Crandall said to Ms. Bautista $174 per

5  screen.

6    And you also heard that AbbVie was fine with internal

7  medicine doctors.  They were fully disclosed, and AbbVie never

8  asked to replace them.  AbbVie, the actual client.

9    And you saw previously with Mr. Ketchum that up

10  through April, ContextMedia had enough screens and delivered

11  those screens, and after April it was weighted average based

12  on growth.

13    But even if you believe that Target Health wanted

14  offices or a particular type of offices, it doesn't matter.

15  You heard that at a *minimum*, there's confusion.  And remember

16  what matters is what Mr. Shah, Ms. Agarwal, Ms. Purdy [*sic*]

17  knew or thought.  And it's clear that everyone inside

18  Context -- inside Outcome Health knew and thought it was

19  screens.

20    You're going to get into that e-mail.  But think

21  about what you have already seen and heard.  That's what all

22  the e-mails reflected, that there was no intent to defraud.

23    THE COURT:  All right.  Any additional statements?

24    All right.  Then please call the next witness.

25    MR. POULOS:  One minute?

1   THE COURT:  You're going to use the one minute?  All

2   right.  The witness, I'm sorry, sir.  If you could just stay

3   outside for one more minute, literally.

4   (Laughter.)

5   THE COURT:  All right.  You may proceed, Mr. Poulos,

6   for one minute.

7   INTERIM STATEMENT ON BEHALF OF DEFENDANT PURDY

8   MR. POULOS:  Here's what you're going to see from

9   David Ma, okay, how desperate the government is to give a guy

10  a complete pass with immunity to come in here and give you

11  these little slivers that don't hang together, okay?  He

12  committed this fraud with Ashik Desai.  They wildly inflated

13  these tablet metrics.  Brad was involved on the front end with

14  engineers, where they were struggling through the

15  methodologies that Ms. Bautista talked to you about with this

16  new technology to try to figure it out.  They came up.  They

17  came up with the methodology and came up with a report that

18  even David Ma, when he was talking to engineers, says, oh,

19  that's in the right ballpark, and there's methodology behind

20  it.

21  Watch what happened after that report, the legitimate

22  report, was developed, and what David Ma and Ashik Desai did

23  together in wildly inflating these numbers and lying to Brad

24  Purdy about it.  That's what you're going to see here.

25  Thank you.

1          THE COURT:  All right.  Please call your next

2    witness.

3          MR. JOHNSTON:  Yes, Your Honor.  The government

4    called David Ma to the stand.

5          THE COURT:  All right.

6          THE WITNESS:  Here?

7          THE COURT:  Right up here, sir.

8          Please raise your right hand.

9       (Witness sworn.)

10          THE COURT:  Have a seat.  You can take your mask off.

11          Ladies and gentlemen, the government was going to go

12   put on another witness through a video, a witness who was not

13   going to be in the courtroom, testifying remotely.  Live but

14   remotely.  But that's going to take a little setup.

15          So Mr. Ma is going to testify to the lunch break.

16   They're going to set up the video equipment to allow this next

17   witness to testify.  That next witness will testify, and then

18   Mr. Ma then will retake the stand.  But we didn't want to

19   waste a half an hour doing that, so we're going right into

20   Mr. Ma's testimony.

21          MR. JOHNSTON:  Your Honor, sorry to change the plans.

22          THE COURT:  Okay.

23          MR. JOHNSTON:  But given that the virtual witness has

24   a flexible schedule given her location, we're just going to

25   proceed with Mr. Ma and then put the virtual witness after his

1    testimony.

2         THE COURT:  Feel free to interrupt me when I'm making

3    huge mistakes.

4         (Laughter.)

5         MR. JOHNSTON:  No, you didn't know.  This was a

6    decision we made on the fly.

7         THE COURT:  That's fine.  All right.

8         You may proceed.

9          DAVID MA, GOVERNMENT'S WITNESS, DULY SWORN,

10                   DIRECT EXAMINATION

11   BY MR. JOHNSTON:

12   Q.  Good afternoon.  Or good morning -- afternoon.

13        Could you please state your name and spell it for the

14   record?

15   A.  Yeah.  So my name is David Ma, D-a-v-i-d.  Last name Ma,

16   M-a.

17   Q.  Where do you live, Mr. Ma?

18   A.  I live in San Francisco, California.

19   Q.  How old are you?

20   A.  I'm 31 years old.

21   Q.  What do you do for work?

22   A.  I work as a -- it's called a head of sales operations for

23   a software company that's based out of San Francisco.

24   Q.  How long have you had that current position?

25   A.  Just over one year.

1    Q.  Where did you work before that?

2    A.  Before that, I was in a similar role in sales operations

3    at another software company in San Francisco.

4    Q.  And how long did you have that role?

5    A.  For a little under three years.

6    Q.  And immediately before that, what were you doing?

7    A.  I had tried to start my own company, admittedly

8    unsuccessfully, also based out of San Francisco.

9    Q.  And before your start-up, what were you doing before that?

10   A.  I was attending business school at Stanford, getting my

11   MBA, in California.

12   Q.  Where did you get your undergraduate degree?

13   A.  I got my undergraduate degree from Northwestern

14   University.

15   Q.  What year did you graduate from Northwestern?

16   A.  2012.

17   Q.  Did you used to work at a company called ContextMedia,

18   later Outcome Health?

19   A.  I did.

20   Q.  What was the name of the company when you worked for it?

21   A.  When I worked for the company, it was called ContextMedia.

22   Q.  Do you mind if for purposes of your testimony we refer to

23   it as Outcome Health?

24   A.  Yep, that makes sense.

25   Q.  In what city did you work for Outcome Health?

1    A.  Here in Chicago.

2    Q.  What was the approximate time period you worked there?

3    A.  It was about a year and a half from mid-2014 until late

4    2015.

5    Q.  Does June 2014 sound like the approximate start date?

6    A.  It does.

7    Q.  How about October 2015 for the approximate end date?

8    A.  Yep.

9    Q.  While you worked at Outcome Health, did you participate in

10   unethical business practices?

11   A.  I did.

12   Q.  How would you describe those business practices?

13   A.  I think the headline would be it became understood to me

14   that my job after a while was to basically use my skills in

15   analytics, in numbers and math, basically to deceive, lie,

16   and --

17           MS. CHOU:  The witness has gone blurred on the

18   screen, so --

19           THE COURT:  Pardon me?

20           MS. CHOU:  The witness is blurry.

21           THE COURT:  Oh, you're right.

22           MR. HANKEY:  Also not showing on the big screens.

23           THE COURT:  All right.  That's not good.  We'll try

24   and clear this up.

25           All right.  I think it's better now.  Let's see if we

1  can get it on the screen.

2          THE WITNESS:  I didn't realize I was on the screen.

3          THE COURT:  You are.  Just in the courtroom.

4          All right.  I think it's better now.  Do you want to

5  repeat the question?

6          MR. JOHNSTON:  Yes.

7          THE COURT:  Why don't you do that so -- people may

8  have been distracted by the screen.

9  BY MR. JOHNSTON:

10  Q.  Mr. Ma, can you please describe the unethical business

11  practices that you participated in.

12  A.  Yeah.  It was made clear to me that my job at the company

13  was to use analytics numbers, math basically, to lie, to

14  deceive, to withhold information from clients in order for the

15  company's gain.

16  Q.  Who participated in these practices with you?

17  A.  Other members of the analytics group that I was on at the

18  direction of my boss, Ashik, and it was my understanding that

19  that was our role --

20          MR. LOWDER:  Objection.  Calls for speculation.

21          THE COURT:  Well, he needs to complete his answer

22  before I can rule.

23          Finish your answer.

24  BY MR. JOHNSTON:

25  Q.  What was your understanding, Mr. Ma?

1  A.  My understanding was that me and other groups of analysts

2  were responsible for this type of work that was ultimately

3  used to -- to lie to clients.

4  Q.  Did you voice your concerns with anyone?

5  A.  I did.

6  Q.  Who?

7  A.  Throughout my course of the time, I voiced my concerns

8  with a number of people, including other members of the

9  analytics team.  I've voiced them directly and multiple times

10 to my boss, which was Ashik Desai.  And then in one particular

11 instance to other bosses that I had, which included Shradha as

12 well as Lee Ebreo.

13 Q.  And when you say Shradha, do you mean the defendant

14 Shradha Agarwal?

15 A.  I do.

16 Q.  Were your concerns taken seriously?

17 A.  In my opinion, they were not taken seriously.

18 Q.  Did you leave as a result?

19 A.  I did.

20 Q.  Are you testifying today under an immunity agreement with

21 the government?

22 A.  My understanding is that --

23 Q.  Just yes or no for that one.

24 A.  My understanding is yes.

25 Q.  Okay.  And what is your understanding of what that

1   entails?

2   A.  My understanding is that basically the information that I

3   provide today and all the information that I've provided in

4   the past cannot be used to prosecute me.

5   Q.  Okay.  Have you also submitted a claim under the

6   whistleblower program of the Securities and Exchange

7   Commission?

8   A.  I have.

9   Q.  And what is your understanding of what, if any,

10  protections that program provides?

11  A.  My understanding is that by submitting to the

12  whistleblower program that there are protections against

13  things like retaliation.

14          THE COURT:  Sir, you can back up a little from the

15  mic.

16          THE WITNESS:  Sorry.

17          THE COURT:  Not too far, but otherwise we get a

18  distortion.

19          Go ahead.

20  BY MR. JOHNSTON:

21  Q.  Are there circumstances in which you could receive a

22  financial award as a result of participating in the program?

23  A.  My understanding is yes.

24  Q.  Does your testimony here today have any connection to the

25  possibility of your gaining such an award?

1    A.   My understanding is that this is a separate case.

2    Q.   What is your understanding of the consequences under the

3    whistleblower program if you fail to tell the truth?

4    A.   My understanding is that any protections that I would

5    receive as part of the program would no longer be protected if

6    I do not tell the truth.

7    Q.   Stepping back a little bit, how did you come to work at

8    Outcome Health?

9    A.   Before I was at Outcome Health, I was working at a company

10   here in Chicago that was called the Boston Consulting Group,

11   not based out of Boston.  And I had been contacted by a

12   recruiter who had asked me if I was interested in interviewing

13   at Outcome Health.

14   Q.   What was or is the Boston Consulting Group?

15   A.   The Boston Consulting Group is a global management

16   consulting group that helps large, you can think like

17   Fortune 500 companies with their strategy.

18   Q.   How long had you been working at the Boston Consulting

19   Group when a recruiter contacted you?

20   A.   It was a little under two years, I think maybe a little

21   over a year and a half.

22   Q.   Was that your first job after graduating from

23   Northwestern?

24   A.   You mean BCG, or Boston Consulting Group?

25   Q.   Yes, BCG.

1  A.  Yes, that was my first job out of college.

2  Q.  What was your major in college?

3  A.  I majored -- Northwestern has a special major called

4  mathematical methods in the social sciences, which is like an

5  economics, statistics type of major.  And then I double

6  majored in economics directly.

7  Q.  So approximately how many years out of college were you

8  when you were contacted by a recruiter to join Outcome Health?

9  A.  A little under two years.

10  Q.  Had you previously heard about Outcome Health before you

11  were contacted by a recruiter?

12  A.  I had.

13  Q.  How?

14  A.  From my time at Northwestern where, you know, I was really

15  involved in things like campus entrepreneurship.  Since the

16  founders of ContextMedia were also Northwestern alumni, they

17  were sort of mini campus celebrities who, you know, people who

18  were interested in entrepreneurship looked up to them and the

19  business they had started.  And I had even, I think, attended

20  an event put on by the entrepreneurship group where Rishi came

21  and spoke about ContextMedia.

22  Q.  So who were the founders of the company that you were

23  interviewing at?

24  A.  Rishi Shah and Shradha Agarwal.

25  Q.  And to your knowledge, had they also attended Northwestern

1  University?

2  A.  To my knowledge, they did.

3  Q.  Did your times there overlap at all?

4  A.  They did not.

5  Q.  Did you interview with anyone at Outcome?

6  A.  I interviewed with, yeah, quite a few people at Outcome.

7  Q.  Who did you interview with?

8  A.  I interviewed with Ashik Desai, with Brad Purdy, with

9  Rishi, with Shradha, as well as I think I spoke to a few other

10  people, I think a guy by the name of Ryan Postel and a few

11  other folks during the interview process.

12  Q.  Do you remember anything about your interview with Rishi

13  Shah?

14  A.  I do.

15  Q.  What do you remember?

16  A.  I remember that one thing that he was really adamant about

17  was that the way in which Outcome succeeded was not based off

18  of strategy, it was based off of execution; that, you know,

19  that people like me that come from consulting groups like to

20  think that we're working on strategy, but it's actually

21  execution that makes a company successful.

22  Q.  What's your understanding of the difference between

23  strategy and execution?

24  A.  Strategy is what many people would say is the big-picture

25  thinking, what's the long-term direction, how are we doing

1 things, and, you know, for the gain of the company. And the

2 execution is the actual doing of those things.

3 Q. Do you remember anything about your interview with Shradha

4 Agarwal?

5 A. I do.

6 Q. What do you remember?

7 A. I remember that she had a concern about my background.

8 Again, coming from consulting, there's a preconceived notion

9 that we are people that want to only think big picture and

10 don't actually want to do any of the sort of grunt work

11 required to succeed.

12 And so I believe she didn't think that I would, to

13 use a term, roll up my sleeves to do the work.

14 Q. In your interview, did you think you convinced her

15 otherwise?

16 A. I hope that I did, considering I got the offer.

17 Q. Do you remember anything about your interview with Brad

18 Purdy?

19 A. I just remember that, you know, much of the interview was

20 focused on testing my math and analytical and quantitative

21 skills.

22 Q. Did you think you passed those tests?

23 A. Again, I think my understanding is that because I received

24 the offer that I passed the tests.

25 Q. Did you learn anything about the company that was

1  significant to you before you joined during this interview

2  process?

3  A.  A number of things.

4  Q.  Can you please describe some of them?

5  A.  What attracted me to joining the company in the first

6  place was they were taking off as a Chicago success story.

7  They were sort of one of the darlings of the tech scene here,

8  and, you know, that was something that I thought was

9  significant because there were not that many successful tech

10  companies based out of Chicago at the time.

11  Q.  Did you learn anything about their capital structure at

12  the time?

13  A.  I did.

14  Q.  And can you just describe to the jury what a capital

15  structure means?

16  A.  Capital structure talks about who owns sort of equity or

17  shares in the company, what types of investors have put money

18  into the company.

19  Q.  And what did you learn about the company's capital

20  structure during your interview process?

21  A.  I was told, which I later found out was false, that the

22  company had been --

23           MR. POULOS:  Objection.

24           THE COURT:  All right.  Why don't you rephrase the

25  question.  If you're going to get into conversations, you need

1    to establish who it is, when, where.

2    BY MR. JOHNSTON:

3    Q.  Did you learn about the capital structure in your

4    interview process?

5    A.  I did.

6    Q.  And was this in early 2014?

7    A.  I think mid-2014, yep.

8    Q.  You started in June 2014, correct?

9    A.  Right.

10   Q.  So your interviews had to be before that?

11   A.  Within a few months, that's right.

12   Q.  And did you learn about the capital structure from the

13   founders of the company?

14   A.  I can't remember who specifically I learned about the

15   capital structure from.

16   Q.  But did you learn about it during those interviews?

17   A.  I did.

18   Q.  And were those interviews with Rishi Shah?

19   A.  Yes.

20   Q.  Shradha Agarwal?

21   A.  Yes.

22   Q.  And Brad Purdy?

23   A.  Yes.

24   Q.  Please describe what you learned about the capital

25   structure.

1  A.  I learned that the capital structure, which at the time I

2  heard was bootstrapped, and I later found out that was not the

3  case.  But what bootstrapped means is that it means that they

4  primarily did not receive funding from outside major

5  investors, that they had sort of gotten to the place that they

6  were off of the money they had made from their business

7  versus, you know, a venture capital firm, for example.

8  Q.  Why was that significant to you?

9          MR. POULOS:  Your Honor, may we be heard at sidebar?

10          THE COURT:  All right.

11      (Sidebar.)

12          THE COURT:  Go ahead.

13          MR. POULOS:  Your Honor, I would ask that the Court

14  instruct the government to talk to this witness.  He's lobbing

15  in these conclusions "I later found out to be false."  That's

16  not responsive to the questions.

17          THE COURT:  That ended up not being an answer that

18  stood.  Now he's speaking about capital structure, so I -- but

19  if this is like you're asking me to instruct the government to

20  make sure the witness doesn't reach conclusions or statements

21  that are unfounded, I think they know their obligations.

22          And if a witness does something like that, I'll do

23  the same as I did last time:  Ask for the witness to lay a

24  foundation for whatever conclusion or statement he provides.

25          MR. POULOS:  Your Honor, I just raised it again

1 because he did lob in again that "I later found out it wasn't

2 true."

3     THE COURT:  All right.  Okay.

4     MR. POULOS:  I guess at least we're going to be alert

5 to that type of stuff, Your Honor, because I expect it to

6 continue with this witness based on his performance at the

7 deposition.

8     THE COURT:  Well, I would ask the government to make

9 sure you -- you and the witness, not you, but keep the witness

10 within the bounds of what he can properly testify to.

11     MR. JOHNSTON:  Yes, Your Honor.

12     THE COURT:  All right.  Thank you.

13     (End of sidebar.)

14 BY MR. JOHNSTON:

15 Q.  What was the significance of there having been no outside

16 funding to you?

17 A.  The significance of no outside funding is that it's

18 really, really hard to start a business without outside

19 capital to sort of get it jump started.  And so it's rare for

20 a company to succeed, and that would indicate to me that the

21 company was either profitable or doing well enough that it

22 didn't even need the money, and that attracted me to the

23 company more.

24 Q.  What was the overall impression of the company that you

25 received during the interview process?

1  A.  The overall impression was very positive because it seemed

2  like it was a company that was taking off and on a really,

3  really positive trajectory, and so it was a company that I

4  wanted to work for.

5  Q.  You testified that you received an offer?

6  A.  I did.

7  Q.  Did you accept it?

8  A.  I did.

9  Q.  What was the role that you were offered?

10  A.  The role was called senior sales analyst.

11  Q.  And what was your understanding when you accepted the

12  offer of what that role would entail?

13  A.  My understanding of the role was that it would be my job

14  as an analyst to use, you know, analytical methods to help the

15  company sell advertising contracts to large pharmaceutical

16  clients.

17  Q.  How many people worked at Outcome Health when you joined?

18  A.  From my memory, it was about 50 at the time.

19  Q.  How many offices did the company have?

20  A.  My understanding is there were two.

21  Q.  What was the approximate division of these 50 employees

22  across the two offices?

23  A.  That I don't know exactly, but my estimate would be

24  perhaps 30 or 40 in Chicago and maybe 10, 15 in New York.

25  Q.  What office were you based out of?

1    A.   I was based out of Chicago.

2    Q.   Who did you report to when you first started?

3    A.   I reported in to Ashik Desai.

4    Q.   What was Ashik Desai's role at the time?

5    A.   My memory is that he was an executive vice president of

6    what was called sponsorship in analytics and that sponsorship

7    meant the sales to pharma clients.

8    Q.   How closely did you interact with Desai?

9    A.   Very, very closely.

10   Q.   On a daily basis?

11   A.   Yes.

12   Q.   How did you communicate with him?

13   A.   We communicated in all mediums:  In person, by e-mail, by

14   chat, by text message, by phone call.

15   Q.   What was the division of time that Ashik Desai had between

16   New York and Chicago?

17   A.   That I don't know, but he was certainly in New York much

18   more than I was.

19   Q.   How often would you go to New York?

20   A.   I probably went once every few months or so.

21   Q.   In your role with working under Ashik Desai, did you have

22   an opportunity to observe Desai's relationship with Brad

23   Purdy?

24   A.   I did.

25   Q.   And how often would you observe their interactions and

1  relationship?

2  A.  Whenever they were both in the office.  Their offices were

3  next to each other, and so I would say, you know, on a regular

4  basis, you know, at least a couple of times a week if they

5  were there.

6  Q.  How would you describe their relationship?

7  A.  I would describe it as collegial.  You know, they almost

8  seemed like they were friends.  They were both executives of

9  the company that seemed to have worked closely together at the

10 time and in the past, and so two people who I think trusted

11 each other.

12 Q.  Did you have an opportunity to see Desai's relationship

13 with Rishi Shah?

14 A.  I did.

15 Q.  And how would you describe their relationship?

16 A.  My understanding was that it was much more of like a

17 mentor/mentee relationship.  I believe Ashik viewed Rishi as a

18 mentor, somebody he sought guidance and counsel from in terms

19 of how to become a better executive at the company.

20 Q.  Did you have an opportunity to see Desai's relationship

21 with Shradha Agarwal?

22 A.  I did.

23 Q.  How would you describe their relationship?

24 A.  Similar to how I would describe his relationship with

25 Rishi, which is she was also a cofounder of the company, and

1  so he looked up to her, respected her, and saw her as sort of

2  a mentor.

3  Q.  Let's switch topics a bit and talk about how you assisted

4  the sponsorship sales team.  You testified a moment ago that

5  sponsorship sales sold advertising campaigns to pharma

6  clients, correct?

7  A.  That's correct.

8  Q.  What was the inventory that Outcome was selling?

9  A.  They were selling inventory of effectively their different

10  products.  And so there was a waiting room product and an exam

11  room tablet product that were primarily what they sold.

12  Q.  Who at the company was in charge of increasing the number

13  of doctors' offices that hosted Outcome Health's screens and

14  tablets?

15  A.  There was a team at ContextMedia that we called

16  membership, and basically what that team did was they called

17  on doctors' offices to put in these screens and tablets and

18  made them, you know, members, and that team was run by a

19  gentleman by the name of Matt Garms.

20  Q.  When you first started at Outcome, did you have any role

21  in growing the network alongside the membership team?

22  A.  Within maybe a few weeks to a month or two of starting.

23  Because of my analytics background, I was called on to also

24  support the membership team with helping them grow their

25  network.

1    Q.  So did you have visibility into both sides of the

2    company's business?

3    A.  I did.

4    Q.  So the side that sold to pharma companies?

5    A.  Correct.

6    Q.  And the side that pushed screens into doctors' offices?

7    A.  I did.

8    Q.  Are you familiar with the concept of a two-sided market?

9    A.  I am.

10   Q.  What is a two-sided market?

11   A.  A two-sided market, especially in business terms, is where

12   you need to match up people from one side to the other in

13   order for the business to succeed.

14            And so the example that I always give is Uber, you

15   need to attract drivers on one side and riders on the other

16   side.  And if either of those is out of balance, then the

17   market is out of balance.  So the company does the acquisition

18   of both and tries to match-make them in the middle.

19   Q.  Did Outcome Health operate in a two-sided market?

20   A.  It did.

21   Q.  How did it do so?

22   A.  Using the same analogy, the goal of the business was to

23   acquire inventory on one side, which would be doctors' offices

24   that had screens or tablets, that then they could sell to the

25   other side, to the pharma client, and say, hey, you know, we

1   want you to put advertising on our screens or tablets.

2   Q.  Let's talk about the pharma sales side.  When you first

3   started, did you assist the company in selling advertising

4   campaigns to pharma clients?

5   A.  I did.

6   Q.  While you worked at Outcome, did the company sell more

7   advertising inventory than it really had?

8   A.  It did.

9   Q.  Were you part of the process at the company of selling

10  more inventory than it had?

11  A.  I was.

12  Q.  How were you a part of that process?

13  A.  As part of the selling process, the pharmaceutical clients

14  wanted information about which doctors or which screens or how

15  many doctors or how many screens ContextMedia actually had.

16  And it was my job to do the analytics under Ashik to help

17  present the information about inventory to the pharma clients.

18  Q.  Who taught you how to sell more inventory than the company

19  had?

20  A.  The process of preparing the analytics was taught to me by

21  Ashik and Brad.

22  Q.  What was that process by which more inventory than the

23  company actually had was sold?

24  A.  We used an analytical process that we called a list match

25  that was used to help understand what inventory could be sold.

1  Q.  I want to show you a demonstrative chart, exhibit --

2  Government Exhibit 1084.

3        MR. JOHNSTON:  If we could switch, Your Honor, over

4  to the government screen.

5  BY MR. JOHNSTON:

6  Q.  Can you explain what this chart shows?

7  A.  Yep.  So in the green section, we would work with the

8  pharma client to get a list of physicians that they wanted to

9  advertise in.  So a pharma client might give a list of maybe a

10 hundred thousand doctors they think they want to advertise on.

11 So they might say, you know, Dr. John Smith in California

12 should -- is somebody they want to give us an ad to.

13        And so they would send us an Excel file usually of,

14 you know, doctors that they wanted to advertise to.

15 Q.  So --

16 A.  Our job -- oops.

17 Q.  No, continue please.

18 A.  And that's the green list.

19        Our job in the company was then to say how many of

20 those doctors do we actually have in our network so that you

21 can advertise to those because we obviously didn't have them

22 all, and so we would try to find the area sort of in between

23 in this chart of physicians that they wanted and physicians

24 that we had, and that process was called list match.

25 Q.  So does this chart capture the basic principle behind list

1  match?

2  A.  It does.

3  Q.  Let's talk a little bit about the pharma companies list.

4  Did the list provided by the pharma company --

5        MR. JOHNSTON:  Sorry.  Could we keep that up,

6  Your Honor?

7        THE COURT:  You want the exhibit up still?

8        MR. JOHNSTON:  Yes, please.

9        THE COURT:  Okay.  Sure.

10  BY MR. JOHNSTON:

11  Q.  Did the list provided by the pharma company identify

12  specific doctors, or just general areas or practices?

13  A.  The large majority of the lists provided had the specific

14  doctors that they wanted to capture.

15  Q.  And did the pharma companies generally want just any

16  doctor that Outcome had in its network, or did they want the

17  specific ones that were on their list?

18        MR. POULOS:  Objection, Your Honor.  Calls for the

19  state of mind of a third party.

20        THE COURT:  Overruled.

21  BY MR. JOHNSTON:

22  Q.  You may answer.

23  A.  They, in the large, large majority of cases wanted

24  specific doctors that met a certain criteria.

25  Q.  In other words, did they only want the overlap between the

1  two circles?

2  A.  Right, they wanted the overlap.

3  Q.  Now, did -- was it Outcome Health's practice to provide

4  their prospective clients with a complete list of the doctors

5  that were in the blue circle, so Outcome's network?

6  A.  No.  We generally tried to avoid that as much as possible.

7  Q.  And why did you try to avoid that?

8  A.  It was explained to me that, you know, we didn't want to

9  represent --

10          MR. POULOS:  Objection.  Foundation.

11          THE COURT:  All right.  The basis of his knowledge

12  first.  Then he can give the explanation.

13  BY MR. JOHNSTON:

14  Q.  Who explained to you why the company did not want to share

15  the full list of providers?

16  A.  Ashik did.

17  Q.  And can you please say, describe what he told you.

18  A.  What he told me was to the effect of, you know, we don't

19  want to share with them our whole list because we don't want

20  them to know how large our network is.

21          MR. POULOS:  Your Honor, may we be heard at sidebar?

22          THE COURT:  All right.

23      (Sidebar.)

24          THE COURT:  Go ahead.

25          MR. POULOS:  Your Honor, with respect to --

1    THE COURT:  If you can speak up a little.

2    MR. POULOS:  With respect to objections to

3 foundation, Your Honor, that I ask that they ask at least when

4 did the conversation take place.  We don't know where in the

5 period of time we're talking about and when did he learn this

6 when he's relating conversations.

7    THE COURT:  All right.  Well, I'll assume -- if

8 there's an objection to foundation, you know the foundation to

9 lay it, Mr. Johnston, where, when, who else was present.  I'm

10 not sure where is all that relevant to most of these general

11 conversations that are on facts that I don't think are a

12 matter of contest.

13    But nonetheless -- or maybe they are.  I didn't think

14 this part of it was contested.  But just lay a sufficient

15 foundation.  We're at the lunch break right now, so mark in

16 your outline where you're at.  You can come right back to

17 that.

18    MR. JOHNSTON:  All right.  Thank you, Your Honor.

19    MR. POULOS:  Thank you.

20    (End of sidebar.)

21    THE COURT:  Well, we're at 12:30, ladies and

22 gentlemen, or near it.  So we'll take our lunch break right

23 now.

24    Please don't discuss the case among yourselves or

25 with anyone else, and keep an open mind, as there's more

1  evidence to hear.

2      Thank you.

3      COURT SECURITY OFFICER:  All rise.

4    (Jury exits.)

5      THE COURT:  Okay, sir.  You're excused.  You're on

6  direct examination.  You can still talk to the government if

7  you wish over lunch, over the lunch hour.

8      All right.  Anything we need to put on the record

9  before we break?

10      MR. JOHNSTON:  Not from the government, Your Honor.

11      THE COURT:  Defense?

12      MR. POULOS:  No, Your Honor.

13      MR. LOWDER:  Not from us, Your Honor.

14      MS. CHOU:  No, Your Honor.

15    (Court adjourned at 12:28 p.m., to reconvene at 1:30

16    p.m.)

17

18

19

20

21

22

23

24

25

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3    UNITED STATES OF AMERICA,        )
                                      )   Docket No. 19 CR 864
4              Plaintiff,             )
                                      )   Chicago, Illinois
5         v.                          )   February 9, 2023
                                      )   1:31 p.m.
6    RISHI SHAH, SHRADHA AGARWAL,     )
     BRAD PURDY,                      )
7                                     )
               Defendants.            )
8

9         TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 8B
       BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11   APPEARANCES:

12
     For the Government:   MR. MATTHEW F. MADDEN
13                         MR. SAURISH APPLEBY-BHATTACHARJEE
                           Assistant U.S. Attorneys
14                         219 South Dearborn Street, 5th Floor
                           Chicago, Illinois  60604
15

16                         MR. WILLIAM E. JOHNSTON
                           MR. KYLE C. HANKEY
17                         U.S. Department of Justice
                           Criminal Division, Fraud Section
18                         Washington, D.C.  20530

19

20

21

22              ELIA E. CARRIÓN
              Official Court Reporter
23          United States District Court
         219 South Dearborn Street, Room 1432,
24            Chicago, Illinois 60604
                 (312) 408-7782
25          Elia_Carrion@ilnd.uscourts.gov

1   APPEARANCES (Continued:)

2

3   For Defendant
    Shah:                   MR. JOHN C. HUESTON
                            Hueston Hennigan LLP
4                           620 Newport Center Drive, Suite 1300
                            Newport Beach, California  92660

5
                            MS. VICKI CHOU
6                           MR. MICHAEL H. TODISCO
                            MS. KAREN DING
7                           Hueston Hennigan LLP
                            523 West 6th Street, Suite 400
8                           Los Angeles, California  90014

9
    For Defendant
10  Agarwal:                MS. KOREN L. BELL
                            MR. A. ALEXANDER LOWDER
11                          MR. STEPHEN G. LARSON
                            Larson LLP
12                          555 South Flower Street, Suite 4400
                            Los Angeles, California  90071

13
                            MR. PATRICK W. BLEGEN
14                          MS. KELSEY H. KILLION
                            Blegen & Garvey
15                          53 West Jackson Boulevard, Suite 1437
                            Chicago, Illinois  60604

16

17  For Defendant
    Purdy:                  MR. THEODORE T. POULOS
18                          MR. ERIC PRUITT
                            MR. JOHN PAVLETIC
19                          Cotsirilos, Tighe, Streicker, Poulos &
                            Campbell, Ltd.
20                          33 North Dearborn Street, Suite 600
                            Chicago, Illinois  60602

21

22

23

24

25

1          COURT SECURITY OFFICER:  All rise.

2      (Jury in at 1:30 p.m.)

3          THE COURT:  All right.  Please be seated.

4          All right, ladies and gentlemen, the last half day of

5   the week.  So stretch run for the week.

6          You may continue your direct examination.

7          MR. JOHNSTON:  Thank you, Your Honor.

8       DAVID MA, GOVERNMENT WITNESS, PREVIOUSLY SWORN

9                    DIRECT EXAMINATION

10  BY MR. JOHNSTON:

11  Q.  Mr. Ma, before the lunch break, we were talking about the

12  list-match process at Outcome Health.

13          Do you recall that?

14  A.  I do.

15          MR. JOHNSTON:  Can you -- let's -- can we pull up

16  Exhibit 1084 again.

17  BY MR. JOHNSTON:

18  Q.  And can you walk us through the mix of the list match.

19  A.  Excuse me.  Sorry.

20          The -- the goal of the list match, again, was to find

21  the overlap in doctors between the two lists.  And so, for

22  example, if the pharmaceutical company was interested in

23  advertising to a Dr. John Smith, who practices at, you know,

24  an address, 123 Main Street, our job was in our database to

25  find a Dr. John Smith at that address or Dr. John Smith in

1    general and make sure that those two matched up.

2            And so we used a number of different methodologies to

3    try to guarantee or find out whether the doctor they wanted

4    was the doctor that we had.

5    Q.  So at any given moment, how would you find out what

6    doctors were in Outcome's network?

7    A.  We would download that information from our internal

8    database, which was called Salesforce.

9    Q.  And what was Salesforce used for?

10   A.  Salesforce is effectively what people in the industry call

11   a customer relationship management system.  And it's a place

12   to store all information about doctors, screens, addresses.

13   Basically, it had information about the core operations of the

14   business.

15   Q.  But would it contain information about which physician

16   offices were in Outcome's networks?

17   A.  It did.

18   Q.  So once you pulled the list of physicians and offices,

19   what would you do with it?

20   A.  We would take that list and try to compare it to the list

21   that the pharma company gave us.  So we would put both lists

22   in Excel, and we'd try to get them to see how much of them

23   overlapped or matched up.

24   Q.  After you do the match, what happens with the results?

25   A.  My -- my -- my process was that I would share the match

1  results with my boss, who was Ashik, and then he would decide,

2  you know, how to communicate them to the -- to the sponsorship

3  salesperson or the pharma salesperson and the client.

4  Q.  Would the results be in the form of a specific list of

5  doctors or just a number or sometimes both?

6  A.  Sometimes both.  But we always tried to show less

7  information.  So we wanted to show just, "Hey, we matched up

8  to call it 500 offices and screens."

9        But the clients often requested the specific list of

10  physicians, and sometimes we agreed.

11  Q.  And so when you would return the results in a physician

12  list, what would that -- how would you indicate that a

13  particular physician was in Outcome's network?

14  A.  An example might be, you can imagine, an Excel

15  spreadsheet, and imagine every row was a doctor, and we could

16  just mark the ones that are in the network with, like, an X

17  next to it.

18  Q.  Do you know whether it would end up getting written into a

19  contract whether Outcome Health was providing just a certain

20  number of physicians or a specific targeted list of

21  physicians?

22  A.  I remember seeing some contracts for where, for example,

23  it said, you know, "according to list match," or language like

24  that.

25  Q.  So incorporating the specific list of physicians that you

1 had provided to the client?

2 A.  That's correct.

3      MR. JOHNSTON:  All right.  You may take down this

4 exhibit, Ms. Paul.

5 BY MR. JOHNSTON:

6 Q.  Are you familiar with the word "projection" or "projected

7 inventory"?

8 A.  I am.

9 Q.  How are you familiar with that?

10 A.  In my line of work, which is doing analytics, there's a

11 lot of projections, which are generally, you know, trying to

12 get a sense of what the future may look like.

13 Q.  How did projected inventory factor into the list-match

14 process?

15 A.  It was a core part of the list-match process.

16 Q.  Did such projections result in overselling inventory?

17 A.  It did.

18      MR. JOHNSTON:  Let's take a look at a demonstrative,

19 Exhibit 1085.

20 BY MR. JOHNSTON:

21 Q.  Does this chart help explain how projected list matches

22 worked?

23 A.  It does.

24 Q.  Can you help -- can you explain what the chart

25 demonstrates?

1   A.   Yep.  So the difference between this chart and the last

2   chart is the addition of this orange circle.  So in our

3   database, we not only kept the physicians that we actually had

4   in our network, but we also kept the database of the

5   physicians that we wanted to one day become, you know, members

6   of our network.

7          And so most of the times when conducting a

8   list match, I was instructed to also include physicians and

9   offices that were not yet part of the network, but

10  aspirational ones that we would hope would one day be part of

11  the circle.

12         And that's what the orange circle represents.

13  Q.   So what would ultimately be provided to clients based on

14  what you see in this chart?

15  A.   The result would basically be that we would show them

16  offices and physicians that we claimed matched, even though

17  they weren't actual places that we had screens.

18  Q.   So would the result include the overlap between the blue

19  and the green circle?

20  A.   It would.

21  Q.   Would it also include the overlap between the orange and

22  the green circle?

23  A.   It would.

24  Q.   And when the results were presented, did the spreadsheet

25  distinguish between which physicians were currently in the

1  network and which ones were just aspirational members of the

2  network?

3  A.  Yeah.  So from -- from my memory, there may have been a

4  couple of cases where we did.  But the large, large majority

5  of cases, it was not distinguished.

6  Q.  What was your understanding of what the purpose was of

7  including offices that were not yet in Outcome's network as

8  part of the list-match results?

9  A.  My understanding is that the reason we did this was to

10  show the client a bigger number than was reality in hopes that

11  they would buy a larger and, therefore, more expensive

12  advertising contract.

13  Q.  In your experience, were pharma clients told when they

14  received the results that the results contained projections?

15         MR. LOWDER:  Objection.  Foundation.

16         THE COURT:  Lay some foundation on when he had such

17  conversations, how frequently, and with who.

18  BY MR. JOHNSTON:

19  Q.  Mr. Ma, did you ever have direct interactions with an ad

20  agency client?

21  A.  Sometimes, but not that often.

22  Q.  And when you did, was that by email or in person or phone?

23  A.  It would have largely been by email, but there are a few

24  occasions where I had to present certain analytics to them.

25  Q.  Did you ever receive emails or were you copied on emails

1  when list-match results were presented to clients?

2  A.  I was.

3  Q.  And from observing and reading those emails, do you have

4  an understanding of whether list-match results disclosed that

5  the specific list of doctors contained both projections and

6  current inventory?

7  A.  I'm sorry.  Was the question whether I had exposure?

8  Q.  When you -- when you -- from the emails that you were

9  copied on, did you see whether the results differentiated

10  between doctors that were in the network and ones that were

11  purely aspirational?

12  A.  Yeah, the results were most often presented as, "This is

13  our network now."

14  Q.  How about how the results were presented to the

15  salespeople?

16       Was there any difference between how the results were

17  presented to the salespeople and how then the salespeople

18  presented them to the clients?

19  A.  No.  In general, our -- our, sort of, way of operating was

20  to hide that information from the salespeople as well.

21  Q.  And is it your testimony today that no client was -- that

22  every client was in the dark about projections?

23       MR. LOWDER:  Objection.  Foundation.

24       THE COURT:  Overruled.

25       You can just talk generally, and then you can get the

1  specifics.

2  THE WITNESS:  I'm sorry.  Can you repeat the

3  question.

4  BY MR. JOHNSTON:

5  Q.  Is it your testimony that every client was in the dark

6  about projections?

7  A.  No, not every client.

8  Q.  You're just saying generally?

9  A.  Most clients.

10 Q.  So you testified that generally list-match results were

11 presented as current inventory?

12 A.  Correct.

13 Q.  So let's talk a little bit how you --

14 MR. POULOS:  May we -- Your Honor, may we have a

15 little more foundation as to the who the "we" is there in

16 terms of who presented the results.

17 THE COURT:  Yes.

18 Why don't you have the witness explain that.

19 BY MR. JOHNSTON:

20 Q.  Can you explain, Mr. Ma, who would present results to

21 clients?

22 A.  Generally, it was my job and other people on the analytics

23 job to run the analytics.  We would give options of which

24 results to show, potentially to the client.  First, as a

25 filtering gate to Ashik.  He would decide what we would show

1  to clients.

2          And then it would be our job to pass that information

3  to the salesperson who usually was responsible or Ashik

4  himself for talking to the clients.

5  Q.  So you would pass along the results to salespeople?

6  A.  Oftentimes, yes.

7  Q.  And in the results you passed along, did it distinguish

8  between doctors who were projected and doctors who were

9  current?

10  A.  Generally, no.  We would just say the list-match results

11  are what they are.

12  Q.  Now, let's talk a little bit about how you went about

13  deciding which offices you included in the projection.

14          That is, how did you decide which offices were

15  included in the orange circle that's on this chart?

16  A.  We had information in our database about what stage of,

17  sort of, becoming a member most doctors' offices were in.  So,

18  for example --

19  Q.  Mr. Ma, if I can interrupt you for a second.

20          Is there a chart that would help explain these

21  different stages?

22  A.  Yes.

23          MR. JOHNSTON:  All right.  Let's take a look at

24  Exhibit 1086.  Also, a demonstrative.

25  BY MR. JOHNSTON:

1  Q.  Does this chart accurately capture many of the stages in

2  the inventory process?

3  A.  It does.

4  Q.  Can you help explain what the jury is seeing on this

5  chart?

6  A.  Yep.  So on the far right, to the right of the line where

7  it says "installed," those are actual TV screens or tablets in

8  offices that are members of our ContextMedia network.

9         Then, you know, because these are TVs, you know, they

10  have to be installed.  And so to the left of that line where

11  it says, "pending installation," you know, we had a whole team

12  of contracted people who were responsible for installing the

13  actual technology in these offices.

14         And so when that was happening, they were labeled as

15  pending installation or something like that.

16         And then further left of that line, there's a series

17  of stages where we would say things like, you know, verbal

18  commitment.  So in this case, the office said, "Yeah, I'll

19  take a TV screen, sure."

20         Or ongoing dialogue, which might mean, "Yeah, we're

21  potentially interested in talking about putting a screen in

22  our office."  Or something like pitching in for, which might

23  say, "Yeah, I" -- you know, the doctor's office has received

24  some materials about why it would be good to have a screen in

25  their office.

1    And so various, sort of, stages of progression on how

2  likely it was that eventually the Context technology would be

3  in the office.

4  Q.  Mr. Ma, let's look at the labels at the bottom of the

5  chart.

6    "MO."  What does that stand for here?

7  A.  It stands for membership outreach.

8  Q.  In email communications, did you frequently use just the

9  acronym MO?

10  A.  We did.

11  Q.  Who was in charge of membership outreach while you were at

12  Outcome?

13  A.  It was Matt Garms.

14  Q.  And then further to the right, "MS."

15    What does that stand for?

16  A.  It stands for member services.

17  Q.  Would you also use that acronym in email communications

18  when referring to screens into that classification?

19  A.  We would.

20  Q.  Who was in charge of member services while you worked at

21  Outcome Health?

22  A.  At the beginning, I think it was Jason Ketchum.

23  Q.  And then subsequent to that, who was in charge of member

24  services, if you recall?

25  A.  I think it was always Jason.  But I think, at one point,

1  there was a reorganization where Matt Garms became the head of

2  all membership, so overseeing both MO and MS.  I think Jason

3  was still, sort of, sub-in charge.

4  Q.  So just to be clear, if an office is classified under MS,

5  would it have a live running screen in it?

6  A.  No.  Usually that meant that we were trying to get the

7  screen live.

8  Q.  So no ad could be playing in an office with MS, that's

9  classified as MS?

10  A.  On rare occasions, it's possible that, you know, the stage

11  had forgotten to be flipped, for example.  But in the large

12  majority of cases, it meant what it meant, which was that

13  there was no ad playing and no content playing.

14  Q.  And so then, of course, if it's an MO, could an ad be

15  playing in an MO office?

16  A.  No.

17  Q.  Would there be any Outcome screen in an MO office?

18  A.  No.

19  Q.  Why are the last three stages under membership outreach

20  referred to as "late stage"?

21  A.  If this chart were to be, you know, extended further left,

22  there were other stages that were even earlier, where,

23  you know, perhaps an outreach person just called them and left

24  a voicemail or, you know, they hadn't had a real discussion

25  with them.

1          And so there were other stages of, sort of, pitching

2    a doctor's office to install technology.

3    Q.  So those earlier stages just aren't represented on this

4    chart, correct?

5    A.  Correct.

6    Q.  Typically, what had to happen for an office to be

7    classified or the classification to change from MO to MS?

8    A.  As labeled here, they had to sign some sort of form that

9    says, "Yes, I agree to install technology or a screen in my --

10   in my waiting room, exam room."

11   Q.  And then after the screen was ultimately installed, what

12   would happen to the classification?

13   A.  We would classify it as installed.

14          MR. JOHNSTON:  All right.  Can we pull up side by

15   side 1085 with 1086.

16   BY MR. JOHNSTON:

17   Q.  So now looking at the chart on your left, 1085, which

18   circle would represent everything that would be in MO and MS?

19   A.  The orange circle.

20   Q.  The orange?  Is that what you said?

21   A.  Yeah.  The potential, the orange, correct.

22   Q.  And then which circle would represent everything that's in

23   the installed category?

24   A.  The blue circle.

25          MR. JOHNSTON:  All right.  Let's just leave up 1086,

1   please.

2   BY MR. JOHNSTON:

3   Q.  Now, Mr. Ma, when you were actually performing the

4   list matches and going into Salesforce, how did you know which

5   screens or offices were in which stages?

6   A.  The -- the information was just listed in Salesforce for

7   each office.

8   Q.  Were the statuses of the offices changed regularly by

9   people at the company?

10  A.  They were.

11  Q.  By whom?

12  A.  By the member outreach and member services teams

13  themselves.

14  Q.  And was this -- did this changing function occur as part

15  of their regular business and operations?

16  A.  It was part of their job to keep them up to date.

17  Q.  Did they have any incentive to make sure that the statuses

18  of the offices were up to date?

19  A.  Their managers, you know, would inspect and try to make

20  sure that the data was up to date.

21  Q.  Do you know whether there was any performance metrics tied

22  to changing the classifications of offices to make them

23  accurately reflect offices as they progressed along this line?

24  A.  Yeah, the member outreach team was -- was goal.  They were

25  given commissions and goals on making sure that they could get

1    as many of these sign-up forms signed.

2    Q.  And so then who had the ability to change the status of

3    any given office in Salesforce?

4    A.  The -- the member outreach teams themselves did it, as

5    well as their managers.

6    Q.  And so then was this database kept and maintained in the

7    ordinary course of Outcome's business?

8    A.  It was.

9    Q.  And was it relied upon by employees and managers at

10   Outcome in the ordinary course of its business?

11   A.  It was.

12   Q.  And were the entries made into the database made at the

13   time with -- by people who had the relevant knowledge?

14   A.  They were made, yes, by people who had the knowledge.

15   Q.  And this was all in Salesforce when it came to capturing

16   the inventory that Outcome had?

17   A.  Well, Salesforce was one system that captured inventory.

18   Q.  It was -- was it this -- the system that you relied on to

19   do list matches?

20   A.  It was the system that we relied on for list matches,

21   correct.

22   Q.  Now, let's talk about the orange circle.

23          What was the effect in a list match of including

24   offices in the MS category in the list-match result?

25          MR. JOHNSTON:  You can stay on this, Ms. Paul.

1    THE WITNESS:  Oh.

2    MR. JOHNSTON:  Or just have it side by side, I guess.

3    THE WITNESS:  Yeah.

4  BY THE WITNESS:

5  A.  I think this one is illustrative, because you can

6  basically see that when you include the orange circle, the

7  overlap area gets bigger.  And so the effect of including the

8  orange circle was that you show more doctors or more screens

9  or more offices that would be part of the match.

10  BY MR. JOHNSTON:

11  Q.  Now, was it the case that every office that had agreed to

12  take a sign-up form actually ended -- or sorry -- had returned

13  a sign-up form would end up installing a screen?

14  A.  Not every office did end up installed.

15  Q.  But do -- do you have a sense of what the approximate

16  number was?

17  A.  I think it was probably 70, 80 percent plus, yeah.

18  Q.  If the list-match results included offices that were in

19  the MO stage, what would be the effect of that on the

20  list match?

21  A.  It would make the results look even larger.

22  Q.  And if MO results were included in the list match and

23  presented as current inventory, would that be an accurate

24  representation?

25  A.  It would be an inaccurate representation of current

1  inventory.

2  Q.  And what were the chances of an office that was included

3  from the MO stage of ever becoming an actual installed live

4  screen?

5  A.  It depends on the stage itself.  But, you know, it would

6  probably be less than 70 or 80 percent.  But, for example,

7  pitching in [inaudible] might have been less than 50 percent.

8  Q.  So is the further we go to the left on the inventory

9  chart, the less likely this office would ever become live?

10  A.  That's right.  So if you sent somebody a brochure and

11  said, "Hey, you should try to, you know, install a screen," a

12  lot of those people will still end up saying no later down the

13  line.

14  Q.  And did many offices, even after expressing interest,

15  never follow through?

16  A.  Correct.

17  Q.  When it came to presenting list-match results to clients,

18  was Outcome telling the truth about which offices were

19  installed and which ones were not?

20  A.  They were not.

21  Q.  All right.  Let's talk a little bit about who taught you

22  to include offices that did not have screens installed in the

23  list-match process.

24        Who taught you how to do this?

25  A.  So during my first week, Ashik and Brad taught me about

1    list match.  And then Jason Ketchum helped me figure out how

2    to get the data.

3    Q.  And when you say, "Jason Ketchum taught you how to get the

4    data," what do you mean by that?

5    A.  He taught me how to download the data from Salesforce.

6    Q.  And to find out which offices were in MO and MS?

7    A.  Correct.

8    Q.  What exactly did Brad Purdy teach you?

9    A.  He taught me about different ways to conduct a match,

10   which included using methods like trying to approximate the

11   address of the physicians.

12   Q.  And what type of address-match technique did he teach you?

13   A.  Basically, there was a terminology that we later used that

14   we called a "loose match."  But the idea was to use address

15   data to try and compare the lists to see whether there was

16   overlap.  And he showed me how to do that.

17   Q.  When he taught you the technique, was it called loose

18   match at the time?

19   A.  It was not.

20          MR. JOHNSTON:  Let's take a look at

21   Demonstrative 1087.

22   BY MR. JOHNSTON:

23   Q.  What does this chart demonstrate?

24   A.  Excuse me.

25          So this demonstrates two different types of matches.

1  On the left-hand side, the most precise way to know whether an
2  address from one list matches to another is to include as much
3  information as possible.

4          And so, you know, if you live in an apartment
5  building, your address isn't just the apartment building; it
6  includes which apartment number or what suite number you live
7  in.

8          Whereas, you know, if you mailed something to an
9  apartment building without the suite number, you're not
10  actually sure if it would show up to your actual door.
11  Q.  And so how would that apply to, say, a medical office
12  building?
13  A.  Yeah, I mean, you know, someone who's been to a lot of
14  hospitals or medical complexes, there's often a lot of
15  different doctors' offices, a lot of times, unassociated with
16  each other.

17          And so if you don't include the suite number, you
18  might end up in the wrong medical facility.
19  Q.  So let's, actually, go through the basic examples sketched
20  out on this chart.

21          With a tight address match, what is the address
22  parameter that you're using?
23  A.  Yep.  So if a physician happens to be in practice at
24  12 Street Main -- 123 Main Street, Suite 100, and that's what
25  the pharma list says, and then our database says,

1  123 Main Street, Suite 100, then that's a match.

2  And so because we have the suite information, it

3  helps us understand that we feel pretty confident that this

4  doctor in this office is the one that we think matches.

5  Q.  So that means in this chart, the blue would be doctors

6  actually in network?

7  A.  In network and in that suite.

8  Q.  And in the example on the right with -- called the loose

9  address match, what is the difference in the search parameter?

10  A.  So if you just include just the main address and not, sort

11  of, the -- the line 2 or the suite number, the match result is

12  very likely to return doctors, maybe that are down the hall,

13  upstairs, downstairs, that don't actually have ContextMedia

14  screens installed in their office.

15  Q.  So in this example, would a match that excluded suite

16  number return six doctors that actually did not have a screen

17  but would be captured by the match as having a screen?

18  A.  Correct.  So we would show the six doctors that don't have

19  a screen as having a screen.

20  Q.  So overall, what was the effect on the -- on the match

21  results if you dropped out the suite number?

22  A.  It generally would make the -- the match results much

23  larger, and they could seem like there were more matches than

24  there actually were.

25  Q.  And when you're doing this match, are you trying to find

1  out whether the offices in your -- in -- that is, Outcome's

2  network are the ones the client wants to target?

3  A.  If we're trying to do it for the most precise way and

4  accurate way, we would try to find out whether they're

5  actually in the network.

6  Q.  Now, when you were taught this technique, did you have

7  concerns that it would yield inaccurate results about

8  Outcome's current inventory?

9  A.  I did.

10  Q.  Did you share those concerns with anyone?

11  A.  I did.

12  Q.  Who did you share them with?

13  A.  With both Ashik and Brad.

14  Q.  And let's go with -- did you receive a response from

15  either of them or both of them?

16  A.  It, kind of, just got explained away.  Like, you know,

17  part of it was, like, "Well, you know, we don't always have

18  the data, and so it, you know, helps us sometimes."

19          But, you know, my concern was, you know, aren't you

20  going to end up for sure including a bunch of them that you

21  know you don't have screens in.  And it was, kind of, just

22  told, "Well, that's just kind of the way we do it."

23  Q.  Who told you that?

24  A.  Brad did.

25  Q.  So you told him that you were concerned about what

1  exactly?

2  A.  I was concerned that it would overrepresent the actual

3  inventory.

4  Q.  And what was his response to you?

5  A.  The response was, "Yeah, but I think it's okay," more or

6  less.

7  Q.  What was your understanding of Mr. Purdy's rationale for

8  using this technique in the first place?

9  A.  I think he did try to explain it, "Well, we don't always

10  have the suite number, and so we do want to be a little bit

11  more inclusive sometimes just to catch ones that we might

12  have."

13        But, you know, you know, it's pretty clear that if

14  you use this technique, you know that you'll be

15  overrepresenting.

16  Q.  And were you concerned about being overinclusive in how

17  list-match results were being presented to clients?

18  A.  I was.  'Cause I knew for sure if we used the technique on

19  the right, we would overrepresent.

20  Q.  And did it lead to inaccurate results?

21  A.  It did.

22  Q.  Now, in your experience, did you think there was a

23  legitimate reason to use loose address match to represent

24  inventory to clients?

25  A.  Not if our goal was to show the most accurate inventory.

1  Q.  What types of qualifiers would you need to have accompany

2  the list-match results if this type of technique were to be

3  used?

4  A.  Well, if we were to use this technique, we would have to

5  say something like, "Hey, we're including things at the

6  building level and not the suite level, and so, you know,

7  match results may overstate actual inventory," for example.

8  Q.  Did you ever see such disclosures made?

9  A.  I did not.

10  Q.  Did Brad Purdy ever tell you to make such disclosures

11  as -- after using this technique?

12  A.  He did not.

13          MR. JOHNSTON:  All right.  You can take this down,

14  Ms. Paul.  Let's look at Exhibit 391.  And let's start on the

15  top of page 3, please.  And let's look at the email that

16  starts from Chris Hayes at 12:44 p.m.

17  BY MR. JOHNSTON:

18  Q.  Do you -- what's the date on this email from Chris Hayes,

19  Mr. Ma?

20  A.  August 8, 2014.

21  Q.  About how long after you started at Outcome Health was

22  this email sent?

23  A.  About two months.

24  Q.  Who was Chris Hayes?

25  A.  Chris Hayes was a sponsorship salesperson, which means he

1  was responsible for selling advertising contracts to pharma

2  companies.

3  Q.  Who is he writing this email to?

4  A.  To myself and Ashik.

5  Q.  What is he writing to you?

6          Could you please read.

7  A.  He says, "Ashik, David, please find attached target list

8  for Purdue Butrans for matching purposes.  Can you please give

9  me an ETA on when you think it can be completed so that I can

10  let the client know.  Thanks, Chris."

11          MR. JOHNSTON:  Let's go to the top of page 2 to the

12  email at 10:52.

13  BY MR. JOHNSTON:

14  Q.  What was Mr. Hayes asking you to do?

15  A.  He was just asking for the -- the overlap between the --

16  the two circles, basically.

17  Q.  So he wanted you to do a list match for the Purdue client?

18  A.  Correct.  So Purdue had given us what was -- I forgot the

19  color, but the one on the right -- the client list and asked

20  us to match it up to our network.

21  Q.  Did you end up doing a list match?

22  A.  I did.

23  Q.  And who were you presenting, initially presenting the

24  results to?

25  A.  Yep.  So as I said, my primary way of running these

1  matches was to do the analytics and then show it to Ashik.

2  And so in this case, I'm showing the results to Ashik.

3  Q.  Let's go through the various results.

4       Can you please read the first sentence.

5  A.  So here I write, "Hey, so on an NPI match on installed,

6  plus MS pipe, plus MO late" -- which are terms we just

7  reviewed -- "we have 699 providers at 543 offices."

8       So "providers" in this case means either doctors or

9  nurse practitioners or somebody that can write prescriptions.

10  Q.  What does "NPI" mean?

11  A.  NPI is a shorthand for what's essentially a ten-digit

12  unique code that every person who's allowed to write drugs in

13  America has.  And so every doctor has, like, a unique NPI

14  that's assigned to them.

15  Q.  What was its relevance to doing a list match?

16  A.  It is by far the most accurate to do a list match, because

17  it's a unique code; every physician has one.  And so if the

18  two NP -- two NPIs match up, then you know for sure that this

19  is a doctor that's on both lists.

20  Q.  At this time, August 2014, did Outcome have NPI numbers

21  for the physicians in its database or in its network?

22  A.  I recall we had some, but I can't remember if this by --

23  by this time, we had backfilled or filled in the data for most

24  of the physicians or not.

25  Q.  By what time in your tenure at Outcome do you believe that

1  the Salesforce database contained the NPI numbers for the

2  physicians in Outcome's network?

3  A.  Yeah, so I don't recall.  But I think, you know, probably

4  would have been within the first six months.

5  Q.  Do you have a memory that after some period of time NPI

6  numbers were there?

7  A.  Yeah, like, 90-plus percent completeness.

8  Q.  So in the first set of results that you're presenting to,

9  Mr. Ma, what are you telling him the matches returned?

10 A.  So I'm telling him that it's returned 543 offices that are

11 on the overlap and 699 physicians or providers.

12 Q.  And so by including MS pipe and MO late, are you limiting

13 your match to just installed -- installed physicians?

14 A.  No.  So this 543 already is an overrepresentation of how

15 large the network is.  It's already bigger than the currently

16 installed base.

17 Q.  So this includes the overlap of the orange circle and the

18 green circle?

19 A.  That's right.

20 Q.  Mr. Ma, what was your understanding as to whether the

21 practice of including MO physicians had any history at the

22 company prior to your arriving?

23         MR. LOWDER:  Objection.  Foundation.

24         THE COURT:  Lay a foundation and how he obtained the

25 understanding.

1  BY MR. JOHNSTON:

2  Q.  Did you develop an understanding about whether this had

3  been done prior to your arrival at the company?

4  A.  My understanding was that it was done prior to my arrival

5  at the company.

6  Q.  And how did you develop that understanding?

7  A.  Because I was just instructed to include, sort of, the

8  orange circle in my first couple of matches.

9          MR. LOWDER:  Your Honor, objection.  Just a little

10  bit of foundation there.

11          COURT REPORTER:  I need you to speak into the mic.

12          MR. LOWDER:  Your Honor, just a little bit of

13  foundation on who instructed him.

14          THE COURT:  All right.  Go ahead.

15  BY MR. JOHNSTON:

16  Q.  Who instructed you to include MS pipe and MO late in the

17  list-match results?

18  A.  Ashik.

19  Q.  Did he ever tell you, "This is a new way of conducting

20  list matches at the company"?

21  A.  I did not recall.

22          MR. JOHNSTON:  All right.  Let's look at the fourth

23  paragraph that starts with, "On a loose address match."

24  BY MR. JOHNSTON:

25  Q.  What is that -- what are you returning in results there?

1   A.  Yep.  So in this case when we drop the suite number, it

2   says on a loose address match, it's 1,299 prescribers or

3   845 clinics.  And then I do the math here and say it's almost

4   two times as many physicians and 1.2 times as many offices.

5   Q.  So what is the effect of having done a loose address match

6   versus the NPI match?

7   A.  So the NPI match, which, again, already includes offices

8   that are not in the network, already overstates the result.

9   And then this takes the overstated result and almost doubles

10  it.

11  Q.  And who taught you how to do the loose address match?

12  A.  Again, it was Brad and Ashik.

13  Q.  All right.  Let's take a look at -- well, I guess, before

14  we go.

15          Would either of these results be a true statement of

16  Outcome Health's current inventory?

17  A.  Neither of the results are a true statement.

18          MR. JOHNSTON:  Let's look at Mr. Desai's response at

19  the bottom of the first page.

20  BY MR. JOHNSTON:

21  Q.  Can you read Mr. Desai's response?

22  A.  Yep.  He says, "Hey, let's send out the loose match

23  results and let Chris and the client know that this is the

24  avails" -- or availabilities -- "in the category today."  "I'm

25  comfortable projecting this out a bit now.  Feel we'll be in a

1  good place."

2          MR. JOHNSTON:  All right.  Let's look at your

3  response.  So let's look at David Ma 1150, please, Ms. Paul.

4  BY MR. JOHNSTON:

5  Q.  So first of all, what was -- what did Mr. Desai tell you

6  to do with the two results that you had?

7  A.  He basically looked at the two results.  He liked the

8  larger and less accurate result and told me to present it

9  in -- to the client and the internal salesperson.  He

10  basically told me to give him the false number and present it

11  to the client.

12  Q.  And what do you ask in response?

13  A.  So this is my way of, sort of, questioning whether that's

14  the right thing to do or not.  And so I say, "Jim, I'm just

15  basically, like, clarifying today but not in 2015 or four,

16  five months later, right?"  As in they won't buy that big

17  anyway for Q4, so we can show a larger match.

18  Q.  Did you have concerns about representing the results as

19  current inventory?

20  A.  I did.

21  Q.  And why was that?

22  A.  I was concerned that if somebody bought more than the

23  current inventory, we wouldn't have enough inventory for their

24  actual campaign when it went live.

25          MR. JOHNSTON:  Let's take a look at Mr. Desai's

1  response.

2  BY MR. JOHNSTON:

3  Q.  What is Mr. Desai's response?

4  A.  So he answers my question, and he says, "Exactly.  So we

5  should let them know it exists today as it'll excite them to

6  buy.  They can't afford all avails or availability, as is."

7  Q.  What is his response to you?

8  A.  He's basically saying:  I'm good showing the larger, fake

9  number.  It'll get them pumped to buy, and they don't have

10  enough money anyway to buy all these offices.

11        MR. JOHNSTON:  Okay.  Let's take a look at your

12  response.  Can we please include the second half of the email,

13  Ms. Paul.

14        THE WITNESS:  Sorry.  Can we read the email before

15  it, please.

16        MR. JOHNSTON:  Yep.  That's -- it looks like we

17  missed one from Mr. Desai at the 13th.

18  BY MR. JOHNSTON:

19  Q.  All right.  What does Mr. Desai add?

20  A.  So he then adds another response.  It says, "By the way,

21  this doesn't get communicated to the salespeople."  So he

22  wants to hide it from them.  And he claims that it, "flaws

23  their negotiation and sales execution.  More of a strategic

24  decision we make on our end."

25  Q.  Mr. Ma, what is he asking you to do here?

1    A.  He's asking me to lie to the salesperson.

2    Q.  And he says, "It flaws their negotiation and sales

3    execution."

4            Do you see that?

5    A.  I do.

6    Q.  In your experience, did salespeople get confused with how

7    to present results to clients?

8    A.  Well, they were just generally told that it was the

9    results as is.  And so they shouldn't be confused by that, but

10   if we added all this other information about how these are

11   projections, I think they would have been confused.

12   Q.  So if they knew there was projected inventory, it would be

13   harder to understand?

14   A.  Harder to understand.  And I think it would make them less

15   confident about selling it.

16   Q.  Because it wasn't actually available, correct?

17   A.  Or didn't exist.

18           MR. JOHNSTON:  Let's go further up.

19   BY MR. JOHNSTON:

20   Q.  What does -- what is your response?

21   A.  So I say, "Right on."  And then, in this case, it looks

22   like I'm still sort of uncomfortable, and so I'm asking.  But

23   "All I might tell them is that we like to project out

24   sometimes, depending on the timing of the buy.  That's cool,

25   right?"

1    Q.  What are you looking for clarification on?

2    A.  I'm basically asking if we're going to show this big of a

3    number, can I tell the salesperson that it's a bit of a

4    projection?  "That's okay, right?"

5    Q.  And then what did Mr. Desai respond with?

6    A.  He says, "You can let them know we ask for go-live date

7    just to know whether forecasting or projecting should be used.

8    But when we provide results, let's not reiterate that and

9    definitely not share with a client."

10   Q.  So what was your understanding of the end goal of doing

11   projected list matches?

12   A.  It was to get the client to buy as big of a contract as

13   possible whether we had the inventory or not.

14         MR. JOHNSTON:  All right.  You can take down this

15   exhibit.

16   BY MR. JOHNSTON:

17   Q.  Now, were there other types of loose parameters that

18   Outcome Health used when doing list matches?

19   A.  Sorry.  You may have to clarify.

20   Q.  Yeah.  So, for example, was anything regarding a tablet

21   multiplier used?

22   A.  Ah, yes.

23   Q.  Can you please explain what that was and what was the

24   effect of using it?

25   A.  Yep.  So when I was starting at the company, Outcome had

1  expanded to its second product, so not just a TV in the

2  waiting room of a doctors' office, but a -- sort of like a --

3  you can think of it as an iPad sitting in the exam room of an

4  office.

5  Because it was an early, new product, not all of the

6  offices that had previously been sold had these tablets in

7  them.  But the sponsorship team was already selling new

8  campaigns or contracts for advertising on tablets.

9  And even though we didn't have all the tablets, the

10  general way to show how many tablets we had was just to take

11  the -- the office number and multiply by three.

12  Q.  And so by using that parameter, did you overstate the

13  amount of tablet inventory that Outcome had?

14  A.  Routinely.

15  Q.  Now, you testified earlier that Mr. Desai justified

16  projecting because it would excite the clients to buy.  Is

17  that correct?

18  A.  Correct.

19  Q.  Was that the only effect of including projections in list

20  matches?

21  A.  I'm sorry.  Can you clarify?

22  Q.  Did it ever result in actual contracts for inventory that

23  the company did not have?

24  A.  It did.

25  Q.  If you used offices from membership outreach in the

1  list match, did you think it was possible to accurately

2  predict which of those offices would be available?

3  A.  Not possible.

4  Q.  Did that mean that any specific list match that included a

5  specific MO office would end up being inaccurate?

6  A.  Sorry.  Can you clarify?

7  Q.  Did that mean that any list match that included MO offices

8  would end up being inaccurate?

9  A.  Yeah.  As long as anything from member outreach was

10  included in a list match, that would effectively guarantee

11  that the end result would be inaccurate.

12  Q.  Now, did you ever train others at Outcome Health how to do

13  list matches with projections and loose search parameters?

14  A.  I did, yes.

15  Q.  Who did you train?

16  A.  I trained Kathryn Choi and Oliver Han.

17  Q.  Mr. Ma, how routine was it to sell campaigns based on

18  projections at Outcome Health?

19  A.  It was very routine.

20  Q.  And how routine was it that Outcome did not end up having

21  all the screens that it had sold by the time the campaign

22  started?

23  A.  Many of the campaigns, by the time they started, did not

24  have enough inventory to meet with the contract stipulated.

25  Q.  If there was a gap between what the client had been sold

1   and what was available when the campaign started, was it

2   typically disclosed to -- voluntarily to the client?

3   A.  My understanding and recollection is that it was not

4   disclosed.

5          MR. LOWDER:  Objection.  Foundation.

6          THE COURT:  Yeah, I think you have to -- you have to

7   lay a better foundation.  Before you do that, let's take a

8   moment to stretch.  You have a soothing voice, sir, and

9   sometimes that after lunch can be a little tough.  So not your

10  fault.

11         (Pause in the proceedings.)

12         THE COURT:  With that, we can certainly go on the

13  record and continue the testimony.

14  BY MR. JOHNSTON:

15  Q.  Now, Mr. Ma, before the break, you were testifying about

16  whether there were gaps between the contracted inventory and

17  the actual inventory by the time a campaign was supposed to

18  start.

19         Do you recall that?

20  A.  I do.

21  Q.  What were the primary ways that Outcome dealt with these

22  gaps?

23  A.  Well, one of the ways was just to not run as many screens

24  as the contract says.  Another way was, you know, Context was

25  a growing business, so we were adding new screens, sort of,

1   daily.  And so they would try to add new screens to the

2   campaign over time to get it closer to the number that they

3   had contracted for.

4   Q.  Were the clients ever given screens or offices that were

5   outside of the list that they had targeted?

6   A.  Yes.

7   Q.  Were the clients told that they were getting substitute

8   offices or physicians?

9   A.  Not that I'm aware of.

10  Q.  Are you familiar with the term "weighted average"?

11  A.  It was brought up in a previous -- sort of, my review

12  of -- in preparation, I guess, for -- for my testimony.

13  Q.  While you worked at Outcome, did you hear the term

14  "weighted average" when it came to deliveries on campaigns?

15  A.  I don't recall hearing that term.

16  Q.  So no one told you that under-delivery early in a campaign

17  could be made up with over-delivery later?

18  A.  No.

19  Q.  And while you were at the company, was it anyone's role to

20  ensure that earlier under-delivery was made up for with later

21  over-delivery?

22  A.  Given that I haven't heard the term before, I was not

23  aware of anybody whose job it was to -- to manage a weighted

24  average delivery.

25  Q.  Now, did you play any role in generating the list of

1  offices that the advertisements would actually end up playing

2  on when the campaign was supposed to go live?

3  A.  I did.

4  Q.  And what were these lists called?

5  A.  They were called go-live lists.

6  Q.  How would you generate such a list?

7  A.  We would run another list match.

8  Q.  Based on what?

9  A.  Based off of the actual inventory that was currently

10 available.

11 Q.  So everything that was from the installed bar over?

12 A.  That's correct.

13 Q.  So you testified just a moment ago that sometimes

14 additional screens would get added over time --

15 A.  Yep.

16 Q.  -- to start to make up for a gap?

17 A.  Correct.

18 Q.  Who was in charge of that, adding additional screens as

19 time went on?

20 A.  For some period of time, it was my responsibility to help

21 understand how many new ones were being added every week or

22 every month and then provide that information to a media

23 scheduling team that was responsible for actually pushing the

24 advertisements to the screens.

25 Q.  So you had visibility into how many new screens were

1  getting added every week or every month?

2  A.  I did.

3  Q.  And did you have visibility into the outstanding

4  contractual commitments every given -- every month at Outcome?

5  A.  I did.

6  Q.  How was it decided which offices got which screens --

7  A.  Um --

8  Q.  -- once it had already started?

9  A.  There were rules or criteria that we had tried to follow

10  that would allocate screens to the appropriate advertising

11  campaign.

12  Q.  Were decisions ever made based on who had the largest gap?

13          MR. LOWDER:  Objection.  Foundation.

14          THE COURT:  Well, first, let's get the answer.  Then

15  he can lay a foundation.

16          MR. JOHNSTON:  I believe he already testified he was

17  the one doing this.

18          THE COURT:  Well, okay.  Why don't you remind --.

19  BY MR. JOHNSTON:

20  Q.  Mr. Ma, who was the person deciding which offices would

21  get additional screens?

22  A.  It was my job to put together the analytics and then it

23  was Ashik's job to ultimately decide.

24  Q.  And so what would -- what were the criteria used to decide

25  which screen -- which campaigns got which screens?

1  A.  We would look at information about the physicians.  We

2  would look at how much of a gap there was and figure out how

3  to allocate them appropriately.

4  Q.  Were there ever decisions made based on the priority of

5  the client themselves?

6  A.  Yes.

7  Q.  So were more important clients given higher priority for

8  new screens?

9  A.  Yes.

10  Q.  Did clients ever ask for a list showing where their ads

11  were playing?

12  A.  Yes.

13  Q.  And why would clients ask for such a list?

14  A.  I think they were used for billing purposes or if they

15  wanted to do their own internal research about, you know, how

16  the campaign was doing or if they just wanted to have it for

17  their own records.

18  Q.  What challenges, if any, were posed by such a request when

19  there were campaigns running with a gap?

20  A.  Well, if we knew that the clients had bought, you know, a

21  thousand offices and we were only running -- I'm just making

22  this up -- 500, if we were to go to send them a list of 500,

23  we'd be short.

24        And so we didn't want the client to know that we were

25  short.  So we had to make up a list.

1  Q.  So how would you make up the list to fill in the
2  additional 500?
3  A.  Depending on the campaign, we might look for similar
4  physicians.  We might look for ones that, you know, may have
5  run the ad inappropriately but we were running it anyway.  But
6  a number of different ways to basically fill the list to make
7  it seem like it had full inventory.
8  Q.  Were there any specific challenges to providing such a
9  list if a client had previously be given a specific list of
10  doctors during the list-match process?
11  A.  Yeah.  So if you're already showing somebody an inaccurate
12  list and then later has to -- you have to send them another
13  list, which you know it's inaccurate, then you're, sort of --
14  sort of, like, covering a lie with a lie, I guess.  And so
15  it's hard to go back and cover your steps, I guess.
16  Q.  To your knowledge, were clients told that their list
17  matches were inaccurate after they started running a deficit?
18  A.  Not to my knowledge.
19  Q.  Do you have an understanding whether -- if clients'
20  campaigns were running at a deficit, whether the client was
21  still billed in full for the entirety of the contractual
22  amount?
23  A.  My understanding is that they were billed in full.
24          MR. JOHNSTON:  Let's take a look at Exhibit 448.
25          If we can switch to the government screen.

1     THE COURT:  Okay.

2     MR. JOHNSTON:  All right.  Let's take a look at the

3  chat starting third from the bottom starting with,

4  "Oliver Han.  Okay.  So finance."

5     Can we include the one above it as well, Ms. Paul.

6  BY MR. JOHNSTON:

7  Q.  Who is this chat between, Mr. Ma?

8  A.  It's between myself and Oliver Han.

9  Q.  Who's Oliver Han?

10  A.  Oliver Han was another analyst on Ashik's team.

11  Q.  And what is Oliver Han asking you here?

12  A.  So he says, "Okay.  So finance is looking for a location

13  list for invoicing purposes."

14     And so what that means is he's asking -- he's saying

15  our internal finance team is looking for a list of offices for

16  a campaign so that we can send to the client to bill them,

17  basically, to invoice.

18     "They're expecting 350 office addresses from me to

19  correlate with 1,068 contracted exam rooms.  Have you prepared

20  a location list for Gilenya in the past?"

21     And Gilenya is a pharmaceutical brand.

22  Q.  And what that is the additional information that Oliver

23  Han provides?

24  A.  In the next line, he says, "I used MDM to back check to

25  CMH ID offices, but I'm only getting, like, 260 unique

1   addresses.  Since there are only 840 ERTs tagged with the
2   Gilenya tag MDM."
3         So it's a little bit technical.  But what he's
4   basically saying is:  As far as I'm aware, there's only
5   840 out of the 1,068 contracted tablets.  So that's running at
6   about a 200-tablet deficit that only comprises 260 addresses,
7   even though they had purchased 350.
8   Q.  And what do you say in response?
9   A.  And so at this point, I already knew the Gilenya program
10  was not being delivered correctly, and so I said, "Yeah, we
11  aren't hitting the full Gilenya program."
12        MR. JOHNSTON:  Let's go to the next page.  Let's look
13  at the half of this screen starting from the top.
14  BY MR. JOHNSTON:
15  Q.  So what are you -- say at the top?
16  A.  So I continue.  "So I do not have a full location list."
17  Oliver says, "Okay.  I see."
18        And then I start to give him instruction of how to
19  make up the list.  And so I say, "I would pull all" --
20  Q.  You can just now summarize at this point.
21        What are the instructions you're giving to Oliver
22  Han?
23  A.  I'm basically telling him:  Since you need a list of
24  350 but you can only find a list of actually 260, here's how
25  you might make up a list that looks like it's actually 350.

1    Q.  And what do you tell him to do to make up the difference

2    between the list of 260 and 350?

3    A.  So I tell him to just pull a list of what's actually

4    running.  If you can go down to the next couple of chats.

5              MR. JOHNSTON:  Do you mind, Ms. Paul.

6    BY THE WITNESS:

7    A.  And then you can see No. 2.  It says, "Neuro installed,

8    but no tablets yet."

9              And so in this case what that means is after you have

10   all the things that are actually running, why don't you just

11   give the client a list of neurology physician doctors'

12   offices, even though they don't even have tablets?

13   BY MR. JOHNSTON:

14   Q.  And so when you say, "neuro installed," does that mean

15   that -- which part of the -- that inventory timeline would

16   they be on, MO or MS?

17   A.  Well, so "installed" means that they actually are

18   installed.  But in this case, it would mean that they have

19   installed TVs but they don't have installed tablets.

20   Q.  And so you say, "Ideally ones where we will soon install

21   tablets"?

22   A.  Correct.

23   Q.  So what part of the inventory timeline would you be

24   telling Mr. Han to pull addresses from?

25   A.  The -- this would represent both MO and MS, so left to the

1  line.

2  Q.  And what would be the ones that would be closest to soon

3  installing tablets?

4  A.  Ones that had already been sold tablets but had not had

5  the tablets actually installed in the office.

6  Q.  So would those be the MS?

7  A.  Correct.

8  Q.  So if you're putting MS offices in a list for clients, is

9  that a false list if it's representing inventory playing as of

10  the day the list is sent?

11  A.  Correct.  If we're sending a client list that's supposed

12  to represent the actual list for the purpose of billing and

13  invoicing, including MS would be including things that are not

14  actually running the campaign.

15  Q.  How did you come to learn that you should send finance

16  false lists of locations for purposes of billing?

17  A.  I do not recall.  But if I had to guess, it would have

18  come from instruction from Ashik.

19         MR. JOHNSTON:  You can take this down.

20  BY MR. JOHNSTON:

21  Q.  Was there a word at Outcome for the gap between the number

22  of contracted screens and the number of actual screens?

23  A.  Yes.

24  Q.  What was that word?

25  A.  It was "delta."

1  Q.  Where did that term come from?

2  A.  Well, "delta" is a word that's used in mathematics.  It

3  generally means rate of change, but sometimes it's used for

4  difference.  And I think at the company, I think Brad

5  popularized the word "delta."

6         MR. POULOS:  Objection, Your Honor.  Could we have

7  some foundation for that.

8         THE COURT:  Well, the answer will stand.  But you're

9  going to have to explain what the basis of his knowledge is of

10  that.

11  BY MR. JOHNSTON:

12  Q.  Did you spend a lot of time around Brad Purdy?

13  A.  I don't know what characterizes "a lot," but I worked with

14  him regularly.

15  Q.  Did you see him on a weekly basis?

16  A.  I did.

17  Q.  So would you hear conversations that he had with other

18  people at the company?

19  A.  I did.

20  Q.  Did you participate in executive meetings with Brad Purdy?

21  A.  I was in meetings with Brad Purdy.  I don't know if

22  they're -- they constitute executive meetings.

23  Q.  And in -- from your interactions with Brad Purdy, did you

24  hear him use the word "delta"?

25  A.  I did.

1  Q.  And was that term used to describe the inventory gap or

2  referred to the inventory gap at Outcome Health while you

3  worked there?

4  A.  It was.

5  Q.  Did you play any role in tracking the deltas at

6  Outcome Health?

7  A.  I did.

8  Q.  What, if anything, was being done to track deltas when you

9  first started in June 2014?

10  A.  When I first started, I think you might have on an *ad hoc*

11  basis or just sometimes randomly if where we needed to check,

12  pull the numbers down for a couple of campaigns and just see

13  whether there was a gap.

14          And then later on, it became part of a routine

15  process where we regularly checked on the -- the gaps or the

16  deltas.

17  Q.  But when you first started, nothing was done

18  systematically?

19  A.  Not that I'm aware of.

20          MR. JOHNSTON:  Let's take a look at Exhibit 376.

21  Let's take a look at the bottom email.

22  BY MR. JOHNSTON:

23  Q.  What is this?

24          Can you explain this email exchange between yourself

25  and Mr. Desai?

1    A. Yep. So I think we're trying to schedule media for a

2    number of campaigns, and it looks like from the above email

3    it's about a bunch of rheumatoid arthritis drugs. And so I'm

4    just sending him the files and all of the Excel work it took

5    to figure out where to schedule.

6          MR. JOHNSTON: All right. Let's move up to the top.

7    BY MR. JOHNSTON:

8    Q. And what are you providing to Mr. Desai right now?

9    A. So this is the proposed -- you can think of them as we

10    talked about go-live lists.

11          And so I'm saying for Simponi, I'm proposing that we

12    run with 162 offices, 198 screens, and 79 tablets. And then

13    for each of the drugs, you can see what the proposed office

14    screen and tablet counts are.

15    Q. Mr. Ma, have you looked at the contracts for Humira and

16    Xeljanz?

17    A. I believe I've reviewed them, yes.

18          MR. JOHNSTON: Okay. Let's take a look at

19    Exhibit 343.

20    BY MR. JOHNSTON:

21    Q. And is this the --

22          MR. JOHNSTON: If we zoom in on the top half.

23    BY MR. JOHNSTON:

24    Q. Is this the 2014 contract for Humira?

25    A. It looks like it, yes.

1   Q.  All right.  And what is the contracted number of waiting

2   rooms?

3   A.  609.

4   Q.  And what's the contracted number of tablets?

5   A.  900.

6           MR. JOHNSTON:  And let's look at 349.

7   BY MR. JOHNSTON:

8   Q.  What's the contracted number of waiting rooms --

9           MR. JOHNSTON:  Well, let's first look at the top

10  part.  You can zoom in on the top third, please.

11  BY MR. JOHNSTON:

12  Q.  What campaign is this a contract for?

13  A.  Xeljanz.

14          MR. JOHNSTON:  All right.  Let's look at the

15  contracted amount in the middle.

16  BY MR. JOHNSTON:

17  Q.  What's the number of waiting room screens?

18  A.  206.

19  Q.  And then the number of exam rooms?

20  A.  200.

21          MR. JOHNSTON:  All right.  You can take this down.

22  Let's take a look at Exhibit 1156.

23  BY MR. JOHNSTON:

24  Q.  Does this chart represent the inventory data that, I

25  guess, the go-live numbers that we saw on that email between

1 | you and Mr. Desai?

2 | A. It does.

3 | Q. And how large is the delta for Humira on this day?

4 | A. I don't know what my mental math is, but it looks like

5 | it's well over 300 waiting room screens.

6 | Q. What about for exam room tablets for Humira?

7 | A. Over 800 tablets are missing from the campaign.

8 | Q. What about Xeljanz?

9 | A. It looks like it's just over half of the waiting room

10 | screens that they had contracted for. And then exam room

11 | is -- it looks like it's about 75 percent of what they

12 | actually bought.

13 | MR. JOHNSTON: Let's take a look at Exhibit 396. And

14 | let's start at the email beginning at the bottom of page 1.

15 | BY MR. JOHNSTON:

16 | Q. What is -- what are you writing to Mr. Desai?

17 | A. So I say, "Hey, AD. Where do you keep the contracted

18 | tablets count for each campaign? Revenue doc, perhaps? I

19 | know the waiting room screens is in the waiting room

20 | scheduling doc. I want to do the actual versus contracted

21 | comparison for this."

22 | Q. And why is it that you're looking for this, contractual

23 | device numbers?

24 | A. I think I had been asked or I figured it would be worth

25 | doing to understand if there were major gaps between the

1  tablet campaigns and what had been sold.

2  Q.  And based on what we had previously reviewed for June

3  of 2014, were there significant gaps already?

4  A.  In June, there were significant gaps.

5          MR. JOHNSTON:  Let's take a look at the response from

6  Mr. Desai.

7  BY MR. JOHNSTON:

8  Q.  What does Mr. Desai write?

9  A.  He writes, "Hey, David.  We don't have a document tracking

10  this, but we likely should start one.  Please don't share

11  discrepancies with whole group.  This should only be known to

12  myself and BP."  BP refers to Brad Purdy.

13          "I don't believe the waiting room doc is fully up to

14  date, either.  Here are what the commitments are."

15          And at the end, he says, "This should be all of

16  them."

17  Q.  What was the significance of Mr. Desai's instruction to

18  you to not share the discrepancies with the whole group?

19  A.  To me, that was a plainly-stated way of saying, you know,

20  I know there are discrepancies, but, you know, this is not

21  information that should be broadly communicated.  Just keep it

22  between me, you, and Brad for now.

23  Q.  And who did you mean -- who did you understand him to mean

24  when he's -- he's referring to "the whole group"?

25  A.  I don't know who the whole group is, but I think it's the

1    other people who might be copied on this email.

2    Q.  Now, he says, "This should only be known to myself and

3    BP."

4         What was the significance of that instruction to you?

5    A.  It's significant because it shows that not only does Ashik

6    know about the shortfalls but that Brad also knows about the

7    shortfalls or is allowed to know about the shortfalls.

8         MR. POULOS:  Objection, Your Honor.  Objection.

9    Conclusion.

10        THE COURT:  Overruled.

11        You can cross-examine.

12   BY MR. JOHNSTON:

13   Q.  Now, in this -- in this response, does Mr. Desai give you

14   the contractual commitments for each campaign?

15   A.  He does.

16   Q.  Now, have you subsequently learned that some of the

17   numbers that Mr. Desai showed you or responded to you with

18   don't reflect the actual contracted numbers for a couple

19   campaigns?

20   A.  Yeah.  My understanding is he got a couple of them wrong.

21        MR. JOHNSTON:  All right.  Let's just quickly

22   compare.  Let's do side by side 396 with 349.  And let's zoom

23   in on the exam room number on the Xeljanz contract.

24   BY MR. JOHNSTON:

25   Q.  And so what does the contract say?

1    A.   200 exam rooms.

2    Q.   What did Mr. Desai write in this email?

3    A.   He wrote 600.

4    Q.   So he appeared he overestimated the number on this one,

5    correct?

6    A.   Yeah.   Using the 3X multiplier that we talked about prior.

7    Q.   And why?  What was the common practice at Outcome for how

8    you arrived at the contractual delivery number for exam room

9    tablets?

10   A.   Generally, we tried to sell three times as many tablets as

11   screens.

12         MR. JOHNSTON:  All right.  Let's take a look at

13   another one.  Let's look at Exhibit 1120.  And can I have it

14   side by side with 396.  And let's zoom in at the top,

15   actually, on the -- on the left, Ms. Paul.

16   BY MR. JOHNSTON:

17   Q.   Do you -- do you see that Mr. Desai provided you with the

18   number for Sovaldi?

19   A.   I do.

20         MR. JOHNSTON:  Okay.  And let's -- could we do it

21   side by side, blow up with contractual number for the Sovaldi

22   campaign on the right.

23   BY MR. JOHNSTON:

24   Q.   So in this instance, did he actually underestimate the

25   contractual amount for exam room tablets?

1  A.  Yep, he did.

2         MR. JOHNSTON:  And then let's compare on the right,

3  1119, which is the contract for Invokana and the Invokana

4  number, if we can.

5  BY MR. JOHNSTON:

6  Q.  So is that -- the Invokana number a little bit of an

7  overestimate but in the same ballpark?

8  A.  Correct.

9         MR. JOHNSTON:  You can take this down.

10 BY MR. JOHNSTON:

11 Q.  Now, did you end up responding to Mr. Desai's email with a

12 list of the contracts in the delivery amount?

13 A.  I believe that I did.

14        MR. JOHNSTON:  All right.  Let's look at Exhibit 397.

15 And let's see the top half of the email, please.

16 BY MR. JOHNSTON:

17 Q.  Who is this from?

18 A.  It's from myself.

19 Q.  Who is it to?

20 A.  It's to Ashik.

21 Q.  And who have you copied?

22 A.  Brad Purdy.

23 Q.  And what are you -- what information are you providing in

24 this contract -- sorry -- this email?

25 A.  I actually end up providing him with, sort of, the

1    follow-up to the prior email of how each of the campaigns is

2    doing.  So how much are they contracted for and how much are

3    we actually running.

4    Q.  So you're comparing the actual versus the contracted?

5    A.  I am.

6    Q.  And where would you have obtained the information on where

7    and how many screens were playing for each campaign?

8    A.  You know, I would have either pulled them in Salesforce or

9    MDM.

10   Q.  What was MDM?

11   A.  MDM, I think it stood for Mobile Device Management.  And

12   it was a piece of software that we had used to basically

13   deploy assets or deploy I can think of, like, videos and ads

14   and stuff and other content to the tablets.  And so it was

15   like a -- sort of like a central hub for managing our tablets

16   in the field.

17   Q.  So in this email, have you followed Mr. Desai's

18   instruction to only share the results of your comparison with

19   himself and Mr. Purdy?

20   A.  I have.

21          MR. JOHNSTON:  Let's look at the bottom half of this

22   email.

23   BY MR. JOHNSTON:

24   Q.  And what are you -- what information do you provide here?

25   A.  So in this case, I took all the numbers that he had

1   provided me, and then I overlay that with the number of

2   tablets that are actually running the campaign.  And I provide

3   an assessment on each campaign and whether we are over the

4   contracted amount or under the contracted amount.

5   Q.  And is the accuracy of the -- of this -- now that you know

6   that some the contracted numbers are different, is this

7   actually a perfectly accurate picture of whether something was

8   for every campaign, whether it was over or under the contract?

9   A.  It's not perfectly accurate.

10  Q.  So in the case of Invokana where we saw the contract was

11  900 and here you put 300 live, would that -- would the gap be

12  even greater in reality?

13  A.  I think Invokana was 556.

14  Q.  Sorry.

15  A.  Sorry.

16  Q.  That's -- you're right.  Let's do -- sorry --

17  A.  It's still several hundred short of 556.

18  Q.  Okay.  So it would still be short for Invokana?

19  A.  Correct.

20  Q.  And then we go down to Sovaldi.

21          Is Sovaldi the one that was 900?

22  A.  I don't recall.  I'll have to look at it again, perhaps.

23  Q.  Assume it was 900 --

24  A.  Yeah.

25  Q.  -- would it still be --

1    A.  It would be well short of 900.  It's well short of 900,
2    that's right.
3    Q.  But the one that would actually be fine is Xeljanz,
4    correct?
5    A.  Correct.  I believe that one was 200-some.
6    Q.  Did Mr. Purdy ever reach out to you and express concern
7    that any of these campaigns were short?
8    A.  Not that I recall.
9    Q.  Did he ever reach out to you and say, "Hey, Mr. Ma, I
10   think you are wrong on some of the contracted numbers"?
11   A.  Not that I recall.
12          MR. JOHNSTON:  You can take this down, Ms. Paul.
13   BY MR. JOHNSTON:
14   Q.  Now, were there any specific problems with rheumatology
15   campaigns?
16   A.  There were.
17   Q.  And what were those problems?
18   A.  Rheumatology was a notorious, difficult set of physicians
19   for our membership team to call upon, probably because they
20   had been bombarded with so many ads and calls.  And so it was
21   really hard to convince rheumatology doctors to even install
22   stuff in their offices.
23          And then on the pharma side, because rheumatology
24   offices, for some reason, were extremely valuable, there was a
25   lot of appetite to buy advertising campaigns in rheumatology.

1    And so when the two sides of the market, as we discussed, sort

2    of, don't match up, it creates problems in the actual

3    execution of the advertising campaigns.

4    Q.  Could ads from different pharma -- different rheumatology

5    brands play in the same office?

6    A.  My recollection is that rheumatology, in particular, these

7    brands were very sensitive.  And so if they bought an office

8    for an advertising campaign, they also wanted to guarantee

9    that none of their competitors were running ads in the same

10   offices.

11   Q.  If you remember, what are some of the names of the

12   rheumatology brands that were running on Outcome's --

13   A.  Yeah --

14   Q.  -- network at this time?

15   A.  So the ones we reviewed:  Xeljanz, Humira for RA, and then

16   Simponi Aria are three of the ones that I remember.

17         MR. JOHNSTON:  All right.  Let's look at Exhibit 400.

18   And let's look at the top email.

19   BY MR. JOHNSTON:

20   Q.  Who were you sending this email to, Mr. Ma?

21   A.  To Ashik.

22   Q.  What's the date?

23   A.  September 25, 2014.

24   Q.  What's the subject?

25   A.  "Rheum" -- or rheumatology -- "New Assignments."

1   Q.  And what are you doing in this email?

2   A.  In this case, we are taking the rheumatology advertising

3   campaigns, and we're moving around where the ads should play

4   between different offices, or rebalancing.

5   Q.  And why do you have to rebalance the rheumatology

6   campaigns at this particular point in time?

7   A.  From my recollection, we were just trying to get them

8   based off of their different priority order, to some level

9   of -- I don't know what to call it -- like, respectfulness,

10  but, basically, we were trying to prioritize the campaigns and

11  get ads on to them in a way that we had deemed would be best

12  for the company.

13  Q.  Was there any issue with the Simponi campaign during this

14  time period?

15  A.  Huge issues.

16  Q.  What were those issues?

17  A.  Simponi Aria was a brand that had discovered that we were

18  not running our campaigns in the places that they were

19  actually supposed to be running.

20          And so there was a bunch of fallout and drama where

21  they lost trust in us and made us conduct an audit to

22  understand whether we were actually delivering what we said

23  that we were going to deliver.

24  Q.  And so then what did that mean for who got priority for

25  any new and existing rheumatology screens?

1  A.  Yeah.  So we got direction from -- from Ashik, therefore,

2  we had to prioritize Simponi.  We couldn't screw that one up

3  since we had already, sort of, had our first strike on this

4  one.  And so we had to prioritize giving them the offices that

5  they had actually bought.

6  Q.  All right.  I want to draw your attention to the delivery

7  numbers for Humira and Xeljanz as of this date,

8  September 25, 2014.

9          Do you see that it's 260 -- sorry -- 286 for screens?

10  A.  I do.

11  Q.  285 for tablets?

12  A.  I think it's 205.

13  Q.  Yeah.  Sorry.

14          205 for tablets?

15  A.  Yep.

16  Q.  And then for Xeljanz, 156 for screens?

17  A.  Yep.

18  Q.  And 96 for tablets?

19  A.  Yep.

20          MR. JOHNSTON:  Let's take a look at Exhibit 1155.

21  BY MR. JOHNSTON:

22  Q.  Does this chart accurately compare the difference between

23  the contracted number of devices and the actual number of

24  devices on this particular campaign?

25  A.  Yes.

1    Q.  Those two campaigns?

2    A.  Yep.

3    Q.  And what are the deficits for each of these campaigns?

4    A.  Yep.  So on the Humira waiting room campaign, we are less

5    than half of what they actually bought.

6           In the exam room campaign, we are almost 700 tablets

7    short of what they bought.

8           In the Xeljanz waiting room campaign, we are

9    50 screens short of what they bought.

10          And in the exam room campaign, we are less than half

11    of what Xeljanz had bought.

12    Q.  Now, I just want to draw your attention to the fact that

13    Humira itself had contracted for 609.

14          Do you see that?

15    A.  I do.

16    Q.  For the waiting room screens.

17          MR. JOHNSTON:  And if we go to -- back to

18    Exhibit 400.

19    BY MR. JOHNSTON:

20    Q.  And what's the total number of screens that exist at that

21    time?

22    A.  696.

23    Q.  And what is the difference between CMH ID and screens?

24    A.  CMH ID just represents offices or unique offices.  So in

25    some cases, some physicians' offices have multiple waiting

1    rooms, so we might have had multiple TV screens in some

2    offices.

3    Q.  So if Humira was contracted for 610 offices, would that

4    have been the entirety of the inventory that Outcome had

5    contracted or that -- that was available from Outcome's

6    rheumatology inventory?

7    A.  Screens or offices?  Sorry.

8    Q.  Offices.  Let's assume that.

9    A.  For offices, it would be the entirety.

10   Q.  But there were actually two additional clients for

11   rheumatology at this time?

12   A.  There were two additional clients.

13           MR. JOHNSTON:  Let's look at Exhibit 404.  And let's

14   start at the email from Bob Mons.  We can end where it says,

15   "Thanks."

16   BY MR. JOHNSTON:

17   Q.  What does Bob Mons write here?

18   A.  So Bob Mons, who is another sponsorship salesperson who

19   sells ads to pharma clients, writes to Ashik.  And he writes

20   to Dan Schwartz, who is his boss.

21           "AD, last year Q4, 2013, we ran a test for Xeljanz,

22   added a third spot" -- in this case, commercial -- "in Spanish

23   to the sites in the eight DMAs listed below."

24           So "DMA" in this case just means like a geographical

25   area like Chicago or New York.

1        "They're thinking about doing it again in 2015.  Can

2    you tell me how many of the 300 Xeljanz sites for 2015 are in

3    the eight DMAs listed below?"

4        MR. JOHNSTON:  Let's look up at the response.

5    BY MR. JOHNSTON:

6    Q.  What did Ashik Desai do with that email?

7    A.  He forwarded it to me.

8    Q.  What did he ask you?

9    A.  He said, "Hey, not the 300, but of the Xeljanz sites" --

10   the -- which ones they're actually running in -- "how do we

11   break in these DMAs?"

12   Q.  What is he asking you?

13   A.  He's basically saying what percentage of the actual

14   Xeljanz locations fall into the geographies that Bob is asking

15   for.

16   Q.  And what do you tell Mr. Desai when it comes to the -- for

17   the current number of offices playing Xeljanz?

18   A.  So at the top of the email, I said, "Of a total of

19   147 Xeljanz CMH IDs" -- or office -- "that are live now" -- so

20   running the campaign according to the go-live list --

21   "45 percent" -- or sorry.  Not 45 percent -- "45 offices fall

22   into these eight DMAs or geographical areas or 31 percent."

23        And so we are short over 150 offices to the campaign,

24   and then I'm telling him that --

25   Q.  Well, Mr. Ma, is the 300 the current contracted amount or

1  the amount for 2015?

2  A.  I believe it's the upcoming campaign.

3  Q.  So the one that would start January 1st?

4  A.  That's correct.

5  Q.  And so is that -- is 300 a hundred more offices that had

6  been contracted for the 2014 campaign?

7  A.  I believe that's right, based off the contracts we just

8  reviewed.

9  Q.  Given the shortfall for rheumatology, do you know why

10  Outcome was continuing to sell even larger campaigns in --

11          MR. POULOS:  Your Honor, I'm -- I'm -- Your Honor, I

12  object to the phrase here in terms of outcome.  This was a

13  person who was engaging in this contract --

14          THE COURT:  Well, let's not -- we're going to take

15  our break right now.  We can argue about this outside the

16  presence of the jury.

17          And so we'll take our afternoon break right now.

18  15 minutes, ladies and gentlemen.  Please don't discuss the

19  case among yourselves or with anyone else.

20          COURT SECURITY OFFICER:  All rise.

21      (Jury out at 2:57 p.m.)

22          THE COURT:  All right.  Sir, you're excused.

23  15 minutes.

24          THE WITNESS:  Thank you.

25          THE COURT:  You can talk to the government during

1  your break if you choose to do so.

2          Okay.  Mr. Poulos, your objection.

3          MR. POULOS:  Your Honor --

4          THE COURT:  You need to sit down.

5          You can all sit down.

6          MR. POULOS:  Your Honor, throughout his testimony,

7  he's using phrases "we," without making clear that it's he and

8  Ashik Desai.

9          THE COURT:  Well, I disagree.  I -- other than when

10 he specifically identified Mr. Purdy, it has been him and

11 Desai on every email.  Occasionally, he's brought in Mr. Purdy

12 or Mr. Purdy's use on something.  I have to disagree with you,

13 Mr. Poulos.

14         And I -- I will -- but it's a fair point.

15         Mr. Johnston, whenever he's talking collectively

16 about "Outcome" or "we," ask him who he means.  He's been when

17 able -- you've directed him and asked him that question, he's

18 been perfectly capable of doing it.

19         And so rather than keep getting objections on that

20 score, try and be specific with him.  Have him identify who

21 the "we" is.  Who -- if he's talking about Outcome in general,

22 talk about who at Outcome -- I think the last objection

23 related to when Outcome decided to do X.

24         You know, it's a company.  They act through people.

25 Just ask him who at Outcome he's referring to.

1           MR. JOHNSTON:  Yes, Your Honor.

2           THE COURT:  Okay.  Is that --

3           MR. POULOS:  Yes.

4           THE COURT:  -- objection that you were speaking of?

5           MR. POULOS:  Yes, Your Honor.

6           THE COURT:  Okay.  Let's go off the record, and I'll

7    get the attorneys --

8           MR. BLEGEN:  One more thing on the record.

9           THE COURT:  Oh, yeah, sure, Mr. Blegen.

10          MR. BLEGEN:  Even though this is my witness, it's

11   really just -- one is just a record issue.  And the witness, I

12   think, is just doing it to save time.  But sometimes he's

13   reading from an email, and then he'll say his understanding,

14   what the email means, or add something to it, and the record

15   is -- without being asked -- and the record is going to sound

16   like he's still reading from the email --

17          THE COURT:  Oh.

18          MR. BLEGEN:  -- so it's -- it's a little confusing, I

19   think, for record purposes.

20          THE COURT:  All right.  Mr. Johnston, if you can

21   handle that, too, and --

22          MR. JOHNSTON:  I mean, fortunately, these are

23   exhibits.  So if there's any confusion, you could easily

24   compare the exhibit.

25          THE COURT:  We can go off the record.

1        (A recess was had from 3:00 p.m. to 3:17 p.m.)

1      COURT SECURITY OFFICER:  All rise.

2      (Jury enters courtroom.)

3      THE COURT:  All right.  Please be seated.

4      Ladies and gentlemen, I realize I've probably been

5  rude throughout this trial.  You can stand at any time.  If

6  you feel you need to get some blood flowing or stretch or if

7  your leg is cramping up or anything else, there's good sight

8  lines here.  I think you can stand at any point.

9      You're not interrupting anything.  You're likely not

10  blocking another juror.  If you are, that other juror will tap

11  you on the shoulder and say move over a little.  But feel free

12  to stand up if you -- at any point without me saying anything

13  if you feel it's going to help you concentrate going forward.

14      So with that, you may continue direct examination.

15      MR. JOHNSTON:  Thank you, Your Honor.

16  BY MR. JOHNSTON:

17  Q.  Mr. Ma, before the break, we were talking about the

18  Xeljanz campaign.  Do you recall that?

19  A.  I do.

20  Q.  And my question to you was do you recall that the contract

21  amount for Xeljanz in 2014 was approximately 200?

22  A.  Yep.

23  Q.  And then the contract amount for 2015 was approximately

24  300.  Do you recall that?

25  A.  Yep.

1   Q.  My question to you, why was that -- to the extent you

2   know, why did the campaign amount grow from 2014 to 2015?

3   A.  My understanding is that the company always wanted to sell

4   larger contracts if it could, and so --

5   Q.  And who in particular was the one that you had the most

6   exposure to on contracts?

7   A.  Ashik.

8   Q.  And what was it that Ashik would tell you about growing

9   contracts year to year?

10  A.  That, you know, as our network was growing, we should

11  expect the contracts of the clients to grow as well.

12          MR. JOHNSTON:  Let's take a look at Exhibit 428.  And

13  let's zoom in at the top, please.

14  BY MR. JOHNSTON:

15  Q.  Who is this from?

16  A.  It's from myself.

17  Q.  To whom?

18  A.  To Ashik.

19  Q.  On what day?

20  A.  December 17, 2014.

21  Q.  What's the subject?

22  A.  Rheumatology assign.

23  Q.  And what's the subject matter of this email?

24  A.  Like previous emails, we are again assigning screens and

25  tablets to rheumatology contracts that have been presumably

1  sold at this point.

2  Q.  And given the date, is this the scheduling for January 1st

3  go-lives?

4  A.  It is.

5  Q.  Let's take a look at the chart, table at the bottom of the

6  email.  What is the title that you put on this particular

7  table?

8  A.  I titled it resulting deltas.

9  Q.  And what do you put here for each of the three

10  rheumatology campaigns?

11  A.  Sorry, are you asking what the columns are?

12  Q.  Yeah, what information are you providing?

13  A.  So for each of the campaigns, the first column to the

14  right, where it says WR, is how many waiting-room screens I'm

15  proposing that we allocate to that campaign.

16         The next column over is ERT, which stands for

17  exam-room tablet, which is how many tablets we're proposing

18  allocating to the campaign.

19         The next two columns summarize what -- my

20  understanding of what was purchased for the campaign.

21         And then the next two columns to the right are the

22  difference between what was purchased and what was actually

23  going to be scheduled or, as we've been calling it, the delta.

24         And then the next two columns express the delta not

25  as a number of screens and tablets but as a percentage to the

1    actual campaign.

2    Q.  And so which of the three campaigns is closest to being

3    satisfied according to the contractual number?

4    A.  Simponi Aria appears to be actually above what the

5    campaign or the contract has purchased.

6    Q.  And was that the client that had discovered a shortfall

7    earlier in 2014?

8    A.  Correct.

9    Q.  And what is the shortfall for Humira and Xeljanz?

10   A.  For Humira, it looks like they purchased 612 waiting-room

11   screens, and we were going to give them 374, which means that

12   we were leaving them 238 short and, therefore, a 39 percent

13   gap to their contract.

14           On the tablets, it looks like it's much worse.  It

15   looks like they had bought 1,200 tablets.  We were only able

16   to give them 339, which means that out of the tablets they

17   bought, they would only be given less than 30 percent of the

18   tablets that they actually bought.

19           Want to continue with Xeljanz?

20   Q.  Yes, please do the same with Xeljanz.

21   A.  With Xeljanz, as we discussed earlier, it looks like they

22   had purchased 300 waiting-room screens, and we weren't able to

23   bump up from the 147 earlier much.  We were only able to give

24   them 187 screens.

25           The tablet number looks like they purchased 420.  We

1  were only able to give them 122 of the 420, and so similar to

2  Humira, we were 40 percent short on screens and over

3  70 percent short on tablets.

4  Q.  And this represents the gaps in the campaigns that exist

5  starting January 1, 2015?

6  A.  Yeah, I think starting in January, between, you know,

7  December 17th and January 1st.  It could have gotten a little

8  bit better, but, you know, not enough to cover off a

9  70 percent gap to their campaign.

10  Q.  During your entire time at Outcome Health, did the company

11  ever obtain the inventory needed to satisfy its rheumatology

12  campaigns?

13  A.  As far as I'm aware, they did not.

14  Q.  Did you create a document to help Outcome track its deltas

15  on a more global level?

16  A.  I did.

17  Q.  What was it called?

18  A.  We called it a delta report.

19  Q.  Who asked you to prepare this document?

20  A.  It would have been Ashik.

21  Q.  What was your understanding of who the intended audience

22  for this document was?

23  A.  It was meant to be a summary or a readout for all the

24  executives at the company so they could understand how the

25  campaigns were doing versus their contracted amounts.

1  Q.  And when you say for the executives, who do you mean by
2  that?
3  A.  For Ashik, for Brad, for Rishi and for Shradha and for
4  Matt Garms.
5  Q.  Now, when you were tracking deltas, were you focusing on
6  whether the contract was calling for offices or screens?
7  A.  Sometimes we used them a little bit interchangeably, but,
8  you know, ultimately we were looking, I think, at screens for
9  the most part.
10  Q.  So if a contract was actually based on offices, you might
11  have just been focusing on the screens number of inventory
12  versus contracted?
13  A.  I think that's correct, but usually they were within
14  10 percent of each other, so small difference.
15  Q.  So if you were tracking -- if, in fact, the contracts
16  called for offices, the deltas could potentially even be like
17  10 or so percent higher than what's listed on your documents?
18  A.  Hold on a second, let me think about that one a second.
19        If the -- if we were tracking it on the office basis
20  and they had bought screens, then the office count might be
21  smaller than the screen count, so yes.
22  Q.  Did you also create a document called the growth model?
23  A.  I did.
24  Q.  What was the difference between the delta report and the
25  growth model?

1 A. The delta report was an input into the growth model, which

2 means that I took the results of the delta report and put them

3 into the growth model, and then the growth model was used to

4 project out into the future what deltas might look like, as

5 well as how many screens and TVs we thought we might install

6 over time.

7 Q. And what were you trying to predict in creating the growth

8 model?

9 A. We were trying to predict how much of a gap, or delta, may

10 exist in the future and how long it might take to shrink the

11 gap over time.

12 Q. And what in particular are you measuring are the two

13 things you're measuring to see if the gap, the delta, could be

14 closed?

15 A. I'm not quite sure what the --

16 Q. How do you measure the ability to close the gap?

17 A. We look at how many screens or tablets will be installed

18 over time to see if they will reach against the -- or to see

19 if they will reach the total amount that the contract was

20 purchased for.

21 Q. In creating these documents, the delta report, the growth

22 model, what were the sources of data for the contracted

23 delivery amounts that you relied on?

24 A. We used a number of the systems and tools that I've

25 discussed, including Salesforce, which was the company's CRM.

1    We talked about MDM, which, you know, helped with tablets, and

2    then we also had another database that we called Redshift,

3    which is an Amazon product, which was used to pull data from.

4    Q.  Let's -- we're going to go through a couple of these.

5    When you talked about Salesforce earlier, you talked about how

6    the membership team and the member services team had to make

7    contemporaneous adjustments or entries to move the particular

8    offices along the inventory timeline, correct?

9    A.  Correct.

10   Q.  And did this Salesforce database also contain entries for

11   the contracts themselves?

12          MR. LOWDER:  Your Honor, I think we lost the screens

13   again.

14          THE COURT:  Well, it's the -- did you want to put a

15   document up, or should we go to the camera?

16          MR. JOHNSTON:  It's fine on this end.

17          MR. LOWDER:  Can't see the witness.

18          There we go.

19          THE COURT:  All right.

20          There we go.  Fine.

21   BY MR. JOHNSTON:

22   Q.  Were contemporaneous entries made into Salesforce for the

23   contracts?

24   A.  Do you mean the pharma contracts?

25   Q.  Yeah, the pharma contracts.

1  A.  Yes.  The advertising contracts for pharmaceutical

2  companies were also in Salesforce.

3  Q.  And who made those entries into Salesforce?

4  A.  Early on, I did.

5  Q.  And then after that, whose responsibility was it?

6  A.  I believe it would have been Kathryn and Oliver's

7  responsibility.

8  Q.  And then the delivery amounts, you said you relied on

9  something called MDM?

10  A.  For tablets, we used MDM as a sort of check versus

11  Salesforce to make sure that the two numbers were close to

12  each other.

13  Q.  Were entries made into MDM at the time by people who had

14  knowledge of the delivery information?

15  A.  Of what delivery information?  Sorry.

16  Q.  The delivery information on where the screens were

17  actually playing?

18  A.  Ah, well, the MDM system tracked basically unique devices

19  and tablets, and so it was entered by people who managed the

20  tablet devices for the company.

21  Q.  And were these data entries made by people whose job it

22  was to make regular entries into these databases?

23  A.  It was, yes.

24  Q.  And did the databases reflect the best available sources

25  of data at the time?

1  A.  It did.

2  Q.  Does that mean they were perfect?

3  A.  Not at all.

4  Q.  Were they relied on by employees and executives at Outcome

5  Health for business decisions?

6  A.  They were.

7  Q.  Let's talk a little bit about the growth model.  You said

8  that part of what it calculated was the growth in the

9  company's network; is that correct?

10 A.  That's correct.

11 Q.  Who gave you the numbers and assumptions you needed to

12 model out the rate of growth of the screens?

13 A.  Yeah, I remember I had worked with Matt Garms, Jason

14 Ketchum, and I think some input from Shradha about the

15 assumptions for the growth model.

16 Q.  In your opinion, were the assumptions that went into the

17 growth model realistic?

18 A.  They were not.

19 Q.  And why do you say they weren't realistic?

20 A.  I thought the growth model assumptions were too aggressive

21 in the productivity of the people that we had hired.

22         So, for example, we may have asked our membership

23 team to call a bunch of doctors' offices, and their job was to

24 get, I forget, maybe nine offices a month to sign up.

25         I was perhaps a little bit skeptical that we would

1    reach that level of productivity per person.

2          And then perhaps more importantly, the growth model

3    called for an aggressive hiring plan.  So we were going to

4    hire a ton of these people that were calling doctors' offices,

5    and I didn't think we'd be able to hire that fast.

6    Q.  And did you have experience creating growth models at

7    different points in time while at Outcome?

8    A.  I did.

9    Q.  And so would -- if, say, there was a three-month gap

10   between different growth models, would you be able to see how

11   realistic the earlier assumptions had been?

12   A.  That's right.  We compared the plan and then had to

13   remodel throughout the year.

14   Q.  And in your experience of creating the growth model,

15   over time did the assumptions ever actually -- about network

16   growth ever prove correct?

17   A.  Over time, every growth model from what I recall was

18   behind on the actual assumptions.  So it was not as high as

19   the assumptions had been written in.

20   Q.  And you said that one of the other -- the main purpose of

21   the growth model was to see if the expansion of the network

22   could overcome the gap between contracted inventory and

23   available inventory, correct?

24   A.  That's correct.

25   Q.  And so even if the assumptions of the growth model had

1   proved correct, would there have been deltas for many months
2   before the gap could be closed?
3   A.  That's correct.
4   Q.  And if that had been the case, would the company have been
5   able to meet its obligations under a weighted-average basis?
6   A.  My understanding is that, again, you know, on a
7   weighted-average basis was not something that I talked about,
8   but even if that were the case, the way that the model looked
9   from reviewing it was that the company would not have been
10  able to meet the campaigns on a weighted-average basis.
11           MR. LOWDER:  Your Honor, based on the answer, I'm
12  going to object on foundation.
13           THE COURT:  Well, he said my understanding.  He
14  should state the reason for his understanding.
15           MR. JOHNSTON:  Not only that, the witness testified
16  he created the growth models.
17           THE COURT:  Well, let him testify.  You can re-ask
18  it.
19  BY MR. JOHNSTON:
20  Q.  Did you create the growth models, Mr. Ma?
21  A.  I did.
22  Q.  Are you familiar with the assumptions that went into the
23  growth model?
24  A.  Familiar.
25  Q.  Based on your knowledge of the growth models that you

1  created, would the company have been able to deliver its

2  obligations on a weighted-average basis, given their timing?

3          MR. LOWDER:  Objection, foundation.

4          THE COURT:  Overruled.

5          You can answer.

6  BY MR. JOHNSTON:

7  Q.  Would the company have been able to meet its obligations

8  under a weighted-average basis given the outstanding deltas

9  and the growth model predictions?

10  A.  I do not believe the company would have been able to meet

11  it on a weighted-average basis.

12  Q.  In your tenure at the company, did the deltas ever

13  disappear?

14  A.  They did not.

15  Q.  At every instance when you created the growth model, was

16  the timeline for overcoming the deltas always in the future?

17  A.  It was.

18  Q.  Shifting to a related topic, you testified earlier that

19  one of the ways Outcome managed the deltas was to go out and

20  try to find the inventory that it had already sold.  Do you

21  recall saying that?

22  A.  Yep.

23  Q.  What role, if any, did you play in that process?

24  A.  One of my responsibilities was to understand which

25  physician offices the advertising customer -- or advertising

1  clients ultimately wanted to advertise on, and so my job was

2  to create lists of doctors that our other team could call upon

3  that would meet sponsorship inventory or sponsorship needs

4  basically.

5  Q.  So wherever there were deltas, you would try to find lists

6  of doctors to give to the membership side?

7  A.  Yeah.

8        So, for example, if there was an advertising contract

9  that had a thousand contracted doctors, and let's say that we

10  only had 500, I knew thousands of other doctors that that

11  particular campaign would have liked advertising on.

12        So I could take that list of doctors, hand it to Matt

13  Garms's team and say, hey, Matt, your team should call on

14  these doctors so that we can fill the gap of 500.

15  Q.  Let's take a look at Exhibit 430.

16        And we'll start with the second page, an email from

17  Brad Purdy on December 23rd at 5:53 -- 5:56, that's correct.

18        Mr. Ma, could you please read Mr. Purdy's email to

19  yourself and then just summarize what he's asking or stating

20  here?

21  A.  Yep, so Brad says:  "Automating this with a front end has

22  Walter/Brian/Matt written all over it.  We could probably

23  create something in SF where they dump the list of NPIs in and

24  get a realtime export of who qualifies.

25        "Did you ever catch RS on those 3 docs we discussed

1  yesterday?  I think he would have accepted at least 2, but

2  would be good to check."

3  Q.  Can you pause here for a second.

4       Mr. Ma, what is Mr. Purdy discussing in this email?

5  A.  On the top part we're discussing building a tool.  So SF

6  here means Salesforce.  So we're discussing building a tool in

7  Salesforce where the team of people that calls on doctors can

8  put in a list of doctor names and figure out whether they're

9  valuable for the sponsorship or the pharma sales team.

10      And the people that he's talking about, Walter, Brian

11 and Matt, are technical people who would be able to build such

12 a tool.

13 Q.  And what was the utility of this list that Brad Purdy is

14 referring to?

15 A.  Sorry, which list?

16 Q.  You say that you're creating -- or, sorry, a tool was the

17 utility?

18 A.  The utility would be for us to make sure that we

19 understand, out of the doctors that we're calling upon, which

20 ones are valuable for -- for pharma clients.

21 Q.  And in this context, what constitutes a valuable doctor?

22 A.  Whatever the pharma clients have told us is valuable.

23 Q.  Let's take a look at Mr. Desai's response -- or, actually,

24 no, let's look at your response that begins at 3:50 on

25 December 24th.

1    What do you write here?

2  A.  I say:  "Yes, exactly.  @BP," or Brad Purdy, "I think

3  we're on the same page on this one.  I want to create

4  something in SF" or Salesforce "so that no MOE or MSE," which

5  I can explain, "ever is allowed to enter a prescriber manually

6  again."

7  Q.  Can you stop for a second.

8    What is your response and what does it relate to

9  the -- how does it relate to the original email that Mr. Purdy

10  sent?

11  A.  So I'm agreeing with Brad that I think we should build a

12  tool here and that we should build it in Salesforce so that

13  the team that calls upon doctors doesn't have to enter things

14  in manually into the system.

15  Q.  And let's look at the first page at the top.  We'll just

16  skip over a few emails and look at Mr. Desai's response at the

17  top.

18    I wanted to direct your attention to what Mr. Desai

19  says, starting at No. 1.

20  A.  He says:  "We proactively go after the best leads (i.e.

21  those that qualify for brand programs or 5 plus)."

22  Q.  And then what does he mean by there?

23  A.  So he's basically saying we're going to go after doctors'

24  offices that we want to put screens in that we deem best,

25  a/k/a those that qualify for campaigns that the pharma client

1  wants to buy, or 5 plus.

2  And so 5 plus, this refers to a marker on many of

3  these lists where the pharma client has ranked which

4  physicians they deem as most valuable.  So 5 or more tends to

5  be something that they really value.

6  Q.  Now, let's just go down to the third bullet point.

7  What does Mr. Desai write in the third bullet point?

8  A.  He says:  "Our therapeutic categories with the largest

9  deltas identified in your email have an immediate need, and

10  we're better off filling that volume today with a 2-plus or a

11  3-plus that requires minimal effort to close versus waiting

12  for the 5-plus HCP days later."

13  Q.  So kind of zooming out a little bit and away from all the

14  acronyms, what is Mr. Desai proposing there?

15  A.  Sorry, can you put the email back up?

16  Q.  Yes.

17  A.  He's basically saying in the certain places that we have

18  biggest deltas, or campaign gaps, that are not being -- that

19  are not meeting the advertising campaign, those campaigns need

20  new screens, new tablets right now, and if we can even find a

21  mediocre doctor, 2 or 3, we're fine to just get those into our

22  network versus waiting for the ones that they actually want.

23  Q.  So, Mr. Ma, were you involved in this effort of trying to

24  get new screens to fill in the deltas?

25  A.  I was involved in providing the analytics to the team that

1  was ultimately going to do that, yes.

2  Q.  What role did Brad Purdy play in acquiring doctor offices

3  to fill in the delta?

4  A.  He also was helping with managing the inventory and

5  helping prioritize which, you know, types of physicians or

6  what level of qualification was needed.  So basically helping

7  prioritize which doctors to call upon.

8  Q.  And then which -- what role did Ashik Desai play in this

9  process of getting new doctors' offices to fill in the deltas?

10  A.  He helped us also prioritize which doctors' offices to

11  call upon based off of pharma client needs.

12  Q.  In your interactions with Brad Purdy concerning the

13  acquisition of new doctors' offices, did he ever express

14  concern about significant gaps in inventory?

15  A.  Not that I recall.

16  Q.  Did he ever express surprise about significant gaps in

17  inventory?

18  A.  Not that I recall.

19  Q.  Is this email an example of Outcome trying to find

20  inventory after it's already been sold to clients?

21          MR. POULOS:  Objection, leading.

22          THE COURT:  Sustained.  Rephrase.

23  BY MR. JOHNSTON:

24  Q.  Can you tell me what this email is an example of?

25  A.  I think the email highlights an example where myself,

1 Ashik and Brad are discussing that we know that there are

2 campaign gaps or deltas and that we have to do something to

3 close them, and one of the ways to do that is to get

4 physicians that are less good than the ones that the sponsor

5 actually wants.

6 Q. Did the delta reports that you created inform decisions

7 like the ones we saw in this email?

8 A. It did.

9 MR. JOHNSTON: Let's take a look at Exhibit 442, and

10 let's zoom in at the top, please.

11 You can actually do the whole -- yeah, half the

12 email.

13 BY MR. JOHNSTON:

14 Q. Who is this email from?

15 A. It's from Brad.

16 Q. To whom?

17 A. To myself and Ashik.

18 Q. What's the subject line?

19 A. Monthly campaigns and delta data for lead allocation.

20 Q. Is there attachment to this email?

21 A. Yes.

22 Q. What is it?

23 A. It says campaign deltas - BP edit, and it's an Excel file.

24 Q. And what type of Excel file is it? Is it a type of report

25 that you're familiar with?

1  A.  Oh, it's a -- it's a version of the delta report that Brad
2  has edited.
3  Q.  And how do you know that Brad has edited it?
4  A.  Because he has named the file BP edit.
5  Q.  Can you read what Brad Purdy has written here?
6  A.  He says:  "Here is the updated data based on the new
7  matches from OH and KC."
8  Q.  Let's stop you there for a second.
9       Who is OH?
10  A.  Oliver Han and Kathryn Choi.
11  Q.  Who are they?
12  A.  They are other analysts on the team -- on the sponsorship
13  analytics team.
14  Q.  And so what matches would Brad Purdy be referring to here?
15  A.  I'm not exactly sure actually.
16  Q.  Okay.  Continue reading.
17  A.  "I just ran DMa through the data, and he is going to start
18  running some of the overlap matches as he found an efficient
19  way to start pulling that data out."
20  Q.  What is that a reference to, Mr. Ma?
21  A.  So, many of the doctors that we had at the -- that we had
22  on our network were, like, primary care physicians.  And so
23  they would write prescriptions, for example, for heart disease
24  or diabetes.  And if you know anything about that, people who
25  often have diabetes also have heart disease, they may also

1  have respiratory issues.

2         And so what was great about these types of doctors is

3  that they were valuable, not to just one type of pharma

4  campaign.  They were valuable to heart drugs.  They were

5  valuable to diabetes drugs.  They were valuable to COPD drugs.

6         And so if we acquired one physician, we could

7  effectively kill three or four birds with one stone.

8         And so overlap refers to one doctor that overlaps

9  across multiple category needs.  And so I had found a way to

10  efficiently look at that data to understand which physicians

11  would be most valuable across multiple brands of

12  pharmaceutical categories.

13  Q.  Can you continue reading what Mr. Purdy writes?

14  A.  "After we have the raw overlap data, let's formulate a

15  plan on the reallocation process.  While this is a bit of

16  work, there are two great things coming out of this."

17  Q.  Continue reading, please.

18  A.  "1, it shows how we scale the many growth plans we have

19  and sets up the automation process we will put in place."

20  Q.  Continue reading.

21  A.  "2, we should be able to be far more efficient with our

22  growth.  From what I see, there are some very heavy overlaps,

23  particularly in the GLP-1/COPD/Insulin and A-fib categories.

24  "As such" -- excuse me -- "if we prioritize properly, I think

25  we can easily hit our inventory needs.  Let's get this done."

1   Q.  What is Mr. Purdy referring to in number 2?

2   A.  He's referring to the concept that I just explained, which

3   is if you install screens at doctors' offices that happen to

4   write prescriptions for multiple drugs that pharma company

5   wants, we can more quickly fill in the delta, or the gaps, by

6   growing efficiently.

7   Q.  What does he refer to in number 1?  What's the reference

8   to growth plans?

9   A.  In this case, he's referring to, you know, campaigns that

10  may need to be grown into that may already have gaps, or in

11  some cases perhaps they're plans that have growing inventory

12  over time and says that, you know, this will allow us to set

13  up a way to do it in a more automated way.

14  Q.  So does this -- does this plan that's being mapped out

15  here relate to the growth of the network and how to do that

16  most efficiently?

17  A.  It does.

18  Q.  Let's take a look at the attachment, 442 A.

19          Is this a version of the delta report that you --

20  delta reports that you created?

21  A.  It is a version, yes.

22  Q.  Okay.  Let's -- we're on the first tab for ER.  What does

23  ER stand for?

24  A.  So ER in the bottom left stands for exam room.

25  Q.  And then what is the first table that's visible here?

1 What are we looking at?

2 A. So this is what each drug company or each drug has

3 purchased for their ad campaign.

4 Q. And what do the numbers here represent?

5 A. So a good example here might be to look at Row 4. You can

6 see to the right, there's a series of months. And so you can

7 see in January, it's zero. February, it's zero. In March,

8 it's 900. And then in April it's 1224.

9 And so it means that this campaign is not live or

10 it's not scheduled to be contracted in January and February,

11 but starting in March or April, this sponsor or pharma company

12 expects to have, you know, over 1,200 tablets as part of their

13 advertising campaign.

14 Q. And is there a column here that contains the start date

15 for each campaign?

16 A. There is.

17 Q. And which column is that?

18 A. Column D.

19 Q. And then does it map out the contractual obligations for

20 each campaign for the entirety of the year?

21 A. It does.

22 Q. All right. Let's -- so for a campaign like Gilenya on 14,

23 is the contractual amount the same throughout the year?

24 A. Yes. So this, the way to read it is from the beginning of

25 January, which is its start date, and if you scroll all the

1    way right to the end of the year, the sponsor Gilenya should

2    have 1,060 tablets running its advertisement throughout the

3    year.

4    Q.  And so looking at this table, do you see many clients and

5    campaigns that have bought growth; i.e., increasing number of

6    screens over the year?

7    A.  Not very many.  Most of them are constant through the

8    year.

9    Q.  And where would you have gotten the data on these

10   contractual commitments?

11   A.  From Salesforce, which contained data from the contracts

12   themselves.

13            MR. JOHNSTON:  Let's scroll further down.

14   BY MR. JOHNSTON:

15   Q.  What's the next table?

16   A.  So this one, if you go back to the top real quick and

17   scroll left.

18            MR. JOHNSTON:  Scroll left one more column, please.

19   BY THE WITNESS:

20   A.  You can see that each of these drugs is for a specific

21   what we called category.  And so, for example, if you look at

22   rows 10 through 13, you can see that there are four different

23   drugs that are meant for people with diabetes and it's taken

24   through an oral pill:  Januvia, Invokana, Farxiga, Tradjenta.

25            You can see, for example, that in January, there's

1  750 needed for Januvia and 1,100-ish for Invokana.  Later on

2  in the year, you can see a Tradjenta campaign in May that's

3  supposed to run with 2,000 screens.

4  BY MR. JOHNSTON:

5  Q.  Mr. Ma --

6  A.  The table below -- sorry.

7  Q.  If I can interrupt you for a second.

8       When you're categorizing particular drugs by their

9  purpose --

10  A.  Yep.

11  Q.  -- do those drugs typically have exclusivity provisions

12  among each other?

13  A.  I can't say for certain for all of them, but my

14  understanding is that most of the drugs wanted exclusivity,

15  which meant that their competitors cannot run in the same

16  office.

17  Q.  And so what would that mean in terms of the inventory that

18  would be needed for, say, the diabetes oral campaigns?

19  A.  That you would need inventory to -- you would need enough

20  inventory that adds up to the total number of all of the

21  campaigns in a given month.

22  Q.  So Tradjenta couldn't necessarily play on Invokana, is

23  that what you're saying?

24  A.  Right.  So if there was a Tradjenta ad that was running in

25  the same office as an Invokana ad, generally that would be

1  something that we would not want and would be against many of

2  the contracts that were sold.

3  Q.  Now, in sitting here today, you're not -- you don't have

4  knowledge of all the exclusivity provisions of different

5  drugs.  You're just saying generally?

6  A.  I'm saying generally, correct.

7  Q.  All right.  Let's scroll further down, and you can

8  continue what you're saying about the category inventory needs

9  table.

10  A.  Yep.  So if we again refer to Row 37, we had those four

11  drugs that are diabetes oral, and so this is just if you add

12  up all four contracts, the total number of exam-room tablets

13  that we need by month.

14  Q.  And so what can you say about the inventory needs of the

15  company as the year goes on?

16  A.  They grow over time as more advertising campaigns are

17  scheduled to go live.

18          MR. JOHNSTON:  Let's go down to the next table,

19  please.

20          And if we can put a little bit back to the left to

21  see column C.

22  BY MR. JOHNSTON:

23  Q.  What do we have in this table?

24  A.  So what this table represents is at the time of pulling

25  this report, how many tablets are add -- are actually running

1  the advertisement that -- for that particular drug, so, again,

2  using --

3  Q.  Mr. Ma, I think if you can still speak into the

4  microphone.

5  A.  Oh, sorry.

6  Q.  I know it's hard from looking into the screen.

7  A.  Far away from the screen.  I can move it, I guess.

8          THE COURT:  Yes, you can.

9          THE WITNESS:  Sorry.

10  BY THE WITNESS:

11  A.  So in this case, these are the actual number of tablets

12  running for each of the campaigns, so --

13  BY MR. JOHNSTON:

14  Q.  Is it running or available?

15  A.  That I don't know for sure, but --

16  Q.  I guess my question is given that we have this tracks

17  over time --

18  A.  Yep.

19  Q.  -- if this report was made in February, do you know what's

20  actually running in September?

21  A.  Oh, I see.  Yes, so obviously we cannot predict the future

22  of what's running in this case, and so it represents at this

23  point in time the inventory that would be running the

24  campaigns.

25  Q.  Okay.  And then let's go further down.

1          Actually, before we go further down.  Why is it

2     static?  Why are all the numbers static for available

3     inventory at this time?

4     A.  Again, because I think this was pulled earlier in the

5     year.  We had not yet in this report made any assumptions

6     about how many tablets would be allocated to the campaign

7     later in the year.

8     Q.  So this is just a snapshot of available inventory at the

9     time this -- the data was pulled?

10    A.  Correct.

11    Q.  Okay.  Let's go further down.

12          And so what is represented in the deltas table?

13    A.  Yep.  So this is just the total -- the total contracted

14    inventory minus the -- minus the actual running inventory.

15    Q.  Okay.  So is there -- are these calculations done manually

16    or with a formula?

17    A.  With a formula.

18    Q.  Is there a particular cell you would like to have

19    highlighted so we can see what that formula is?

20    A.  Yeah.  Why don't we look at Row 88, column F perhaps,

21    February for -- I think this was from a February email, right?

22    Q.  Yes.  So what is the -- what is the formula, and what does

23    it --

24    A.  Yeah, there's a little bit sort of Excel that's going on,

25    but the thing to focus on is F 7 minus F 57, where I believe F

1  7 is what they purchased and F 57 is what's actually running.

2  And so we're talking the difference, or as this case we call

3  it the delta, between what's contracted and what is actually

4  running.

5  Q.  So do the numbers in this table show inventory gaps for

6  Outcome Health assuming inventory doesn't grow any more in the

7  year?

8  A.  Correct.

9  Q.  Okay.  Now, is there a table further down that then tries

10  to predict the growth of the network if we go further down?

11  A.  I'd like to look at it.

12      There we go.  Yep.  So it looks like rows 135 and 136

13  represent projected growth.

14  Q.  Okay.  And so before we go and look at how the growth plan

15  interacts with the deltas, let's just take a brief look at the

16  table right below -- sorry, right above.

17      What -- what is the table that we see immediately

18  above the growth plan?

19  A.  Similar to when we were adding up the contract commitments

20  by category, not by drug, we're adding up the inventory, not

21  by drug, but by the category.

22  Q.  All right.  And let's scroll a bit to the right.

23      What does the number in the bottom right that starts

24  with 19,000 represent?  We can hover on the cell?

25  A.  So you can see that's a sum of all the required tablets or

1  contractually obligated tablets in column P.  So by the end of

2  the year what that cell says is we will need 19,341 tablets.

3  Q.  Now is that --

4  A.  Additional tablets.

5  Q.  So additional tablets beyond the ones that Outcome already

6  has?

7  A.  Correct.

8  Q.  And then let's look at the growth plan that's below.  What

9  does this -- what does the growth plan map out?

10  A.  So this says every month how many new tablets will we plan

11  to install at doctors' offices.

12  Q.  And can we scroll just a little bit further to the left,

13  there are two lines -- does this actually include the growth

14  estimates for both screens and tablets?

15  A.  It does.

16  Q.  So what is the one that we should focus on right here?

17  A.  Row 136, the actual tablets.

18       MR. JOHNSTON:  Do you mind highlighting that,

19  Ms. Paul, and then scroll to the right.

20  BY MR. JOHNSTON:

21  Q.  Now, I'm not sure we have the function here, but have you

22  previously looked at this report?

23  A.  I have.

24  Q.  And what does the growth plan show for approximately when

25  the total number of new tablets will meet the number of

1  additional tablets, or delta?

2  A.  Yep.  So if I recall, if Context added as many tablets as

3  they had in the plan, they would meet the 19,000 or so

4  additional tablets required in December, or basically the last

5  month of the year.

6  Q.  And this report is being done in February?

7  A.  Correct.

8  Q.  And so if that were true, would there be any way for the

9  company to meet its obligations on a weighted-average basis?

10  A.  Not a reasonable mathematical way.

11  Q.  What, in general, would have to be true for the company to

12  meet its obligations that are mapped out on this report on a

13  weighted-average basis?

14  A.  Yeah, I mean, if we believed the weighted-average basis

15  were the way to do it, the company would have to have the --

16  the company would have to meet its inventory needs by the

17  middle of the year and then exceed them for the entire back

18  half of the year to make up for the front half of the year's

19  under-delivery.

20  Q.  So meeting it at the end of the year doesn't cut it?

21  A.  It does not.

22  Q.  Now, are there similar calculations for waiting-room

23  screens?

24  A.  There are.

25  Q.  We'll look at this a little quicker, but I'll just briefly

1  look at the waiting room tab, and is the first chart the

2  contracted amounts for waiting-room screens campaign by

3  campaign?

4  A.  It is.

5       MR. JOHNSTON:  All right.  You can go further down.

6  BY MR. JOHNSTON:

7  Q.  And is the second chart the sum of those by category?

8  A.  It is.

9       MR. JOHNSTON:  Okay.  Go down to the third one.

10  BY MR. JOHNSTON:

11  Q.  Is the third one the current inventory for waiting-room

12  screens?

13  A.  It is.

14  Q.  And, again, this would just be data reflecting when this

15  report was created?

16  A.  At the time that it was created, correct.

17       MR. JOHNSTON:  Let's go further down.

18  BY MR. JOHNSTON:

19  Q.  And then is this the difference between the contractual

20  commitments and the available inventory at the time that this

21  report was created?

22  A.  Yep, so this is the gap, or the deltas.

23       MR. JOHNSTON:  Go further down.

24  BY MR. JOHNSTON:

25  Q.  Does this then provide the deltas by category?

1  A.  It does.

2        MR. JOHNSTON:  Let's go to the right.

3  BY MR. JOHNSTON:

4  Q.  So what is the total number of new waiting-room screens

5  that Outcome Health would need to obtain over 2015 just to

6  reach the goal by the end of the year?

7  A.  Yep.  So this is basically saying the same thing, which is

8  as it stands today, they're 7,829 screens short of their

9  contracts.

10 Q.  Okay.  And let's look at the growth plan.  Now are we --

11 is there a different number or different row we should pay

12 attention to here?

13 A.  Yep.  On this one, we should be looking at Row 136.

14 Q.  And I know we don't have the addition function available,

15 but have you looked at this chart before?

16 A.  I have.

17 Q.  And under this growth plan, when is Outcome going to hit

18 its goal of 7,829?

19 A.  Yep.  So if the company were successful in acquiring

20 screens according to the blue numbers and you add them all up,

21 I think it was November or December that they would hit the

22 total number of screens required to fill the delta.

23 Q.  And assuming these were all weighted-average contracts,

24 would this growth plan allow the company to meet its

25 obligations under a weighted-average understanding?

1    A.  It would not allow them to meet their contractual

2    obligations.

3    Q.  Now, did you think that the growth plan assumptions were

4    realistic?

5    A.  I did not.

6    Q.  All right.  Let's go back to the email that this report

7    was attached to, 442.

8            Now, does Mr. Purdy suggest that perhaps the growth

9    plan could do better than is shown on this report as if you

10   guys have an overlap calculation?

11   A.  Correct.

12   Q.  And to be clear, is the overlap calculation reflected in

13   this current report?

14   A.  It's not.

15   Q.  Did you add the overlap calculation to subsequent reports?

16   A.  I did.

17   Q.  And approximately by how much, if you remember, was the

18   delta cut or the -- yeah, was the delta cut by adding these

19   overlap calculations?

20           MR. POULOS:  Your Honor, I object and ask for the

21   document itself.

22           THE COURT:  Well, I think he can't ask questions

23   about the email and the document at the same time.

24           MR. JOHNSTON:  I'm asking him based on a report that

25   he made.

1          THE COURT:  Yeah.  If he recalls the report, he can

2   testify to it.  You can cross-examine about the accuracy of

3   his recollection of the report, but --

4          MR. POULOS:  Can we have some foundation as to this

5   report then, Your Honor?

6          THE COURT:  All right.  Fine.  Go ahead.

7   BY MR. JOHNSTON:

8   Q.  Did you create a subsequent delta report and growth model

9   after this particular one?

10  A.  I did.

11  Q.  And in the subsequent growth model, did you include an

12  overlap calculation like the one that Brad Purdy suggested?

13  A.  I did.

14  Q.  And how did that affect the growth plan for when the

15  company would meet its deltas?

16  A.  It made it easier for the company to meet its delta

17  obligation by reducing the gap.

18  Q.  By approximately how much, if you recall?

19  A.  I don't recall the number, but I think maybe from, like,

20  7,000-some screens to, like, 5,000-some.

21  Q.  And was that reduction large enough to allow the company

22  to meet its obligations by the middle of the year?

23  A.  It was not.

24          MR. POULOS:  Your Honor, I object.  It's speculation

25  at this point.  He said he doesn't recall the exact number.

1  It might have been --

2        THE COURT:  Let's not argue the facts that each side

3  believes is there.

4        The objection is overruled.  This is something you

5  can cross-examine about.  He's --

6        MR. POULOS:  Well --

7        THE COURT:  So objection is overruled.

8  BY MR. JOHNSTON:

9  Q.  So, Mr. Ma, you can answer the question, and I'll repose

10  it.

11        With an overlap calculation, did it show the company

12  hitting its obligations by midyear?

13  A.  From my recollection, reviewing the document, it did not

14  show the company hitting its gap by the middle of the year.

15  Q.  Now, after Brad Purdy sent you this email, did he ever

16  tell you that he didn't really understand what the chart

17  showed?

18  A.  He did not.

19  Q.  How often did you interact with Brad Purdy on quantitative

20  matters?

21  A.  Hard for me to say, but regularly enough.  Maybe once,

22  twice.  In more busy months more -- or a few times a month,

23  but in busier months, multiple times.

24  Q.  And on how many different projects did you -- or

25  quantitative projects did you work with Brad Purdy?

1  A.  That I don't know.  More than ten.

2  Q.  How would you assess his ability to understand numbers?

3  A.  Brad Purdy was somebody who was very quantitatively

4  strong.  As a matter of fact, he was known in the company for

5  being good at math.

6  Q.  In your opinion, did you need much math to know that this

7  chart shows Outcome not hitting its inventory needs until the

8  end of 2015?

9         MR. POULOS:  Your Honor, I'd object.  May I be heard

10  as sidebar, please?

11         THE COURT:  All right.

12     (Proceedings heard at sidebar:)

13         THE COURT:  Okay.  And, Mr. Poulos, earlier when you

14  made your objection, what I didn't want you to do is argue the

15  facts in front of the jury.  Just ask for a sidebar.

16         MR. POULOS:  I should have.

17         THE COURT:  That's fine.  And if you feel like you're

18  asking for too many at some point, remind me to tell the jury

19  that everyone here is just following my directions to ask for

20  these so it doesn't look like you're jumping up and down all

21  the time.  Sometimes attorneys feel uncomfortable about that.

22         So go ahead.  Your request.

23         MR. POULOS:  Well, Judge, the pending question now is

24  Brad Purdy is good at math, does this chart clearly

25  demonstrate that you could meet your inventory needs, and so I

1  object to the question because he's already indicated this

2  chart does not account for the overlaps and that when you do

3  account for the overlaps, it reduces it substantially.  So

4  it's a misleading, prejudicial question and answer that he

5  intends to elicit.

6         THE COURT:  All right.  Response?

7         MR. JOHNSTON:  Yes, Your Honor.  The government has

8  laid the foundation under 701.

9         THE COURT:  Speak into the mic a little closer.

10         MR. JOHNSTON:  The government has laid the foundation

11  for the witness's opinion under 701.  This is rationally based

12  on his observations.

13         The question is not what did Brad Purdy know or

14  understand.  The predicate questions were how do you assess

15  Brad Purdy's ability to understand numbers and models, and

16  then the separate question is do you think that much math,

17  mathematical knowledge, is necessary to understand that this

18  model shows the company not hitting its inventory goals until

19  the end of the year, which he already testified about that the

20  chart shows.

21         So he's being asked, okay, this is your testimony

22  that what the chart shows.  Do you think you need a lot of

23  math to realize that's what the chart shows.

24         THE COURT:  All right.  Last word.

25         MR. POULOS:  Your Honor, my objection isn't really

1  based on 701.  My objection is that the witness has already

2  testified that this chart did not account for the overlaps,

3  and once he did account for the overlaps, so if he wants to

4  ask that question, I wouldn't have an objection to it.

5          But the overlaps are not known and not discussed, and

6  so it's clear that this chart doesn't tell you whether you can

7  meet anything on a weighted average until you account for the

8  overlaps.

9          MR. JOHNSTON:  That's subject for cross, Your Honor.

10          MR. POULOS:  Well --

11          THE COURT:  I think the question should be --

12  apparently the objection is not to the, you know, can someone

13  figure this complex chart out if they have some math

14  background.  You're not objecting to that, correct?

15          MR. JOHNSTON:  No, he is --

16          THE COURT:  Pardon me?

17          MR. JOHNSTON:  I am asking him whether you need a lot

18  of math to understand the conclusion that you have reached

19  from the chart.

20          THE COURT:  All right.  Go ahead.

21          MR. POULOS:  But he's already indicated that -- the

22  question is totally misleading, unfair and prejudicial, Judge,

23  because he's already said you can't reach that conclusion

24  until you account for the overlaps.

25          MR. JOHNSTON:  Your Honor, this is a topic for

1  cross-examination.  The witness can testify what this chart

2  shows.  They can ask him on cross what the chart does not

3  account for.

4        THE COURT:  Yeah, objection overruled.  But re-ask it

5  because it's now kind of a bit confused.  So re-ask it and get

6  your answer and then move on.  We've got about 15 minutes

7  left.

8        (Proceedings heard in open court:)

9        THE COURT:  All right.  Re-ask your question.

10 BY MR. JOHNSTON:

11 Q.  Mr. Ma, you previously testified that the chart Brad Purdy

12 sent to you shows the company not hitting its inventory

13 numbers until the end of the year.  Do you recall testifying

14 to that?

15 A.  I do.

16 Q.  In your opinion, do you need a lot of mathematical

17 background to understand that that's what the chart shows?

18 A.  I think we're just comparing two numbers here, so no, not

19 a lot of mathematical background.

20        MR. JOHNSTON:  You can take this down.

21        Let's take a look at Exhibit 460, and let's zoom in

22 at the top.

23 BY MR. JOHNSTON:

24 Q.  Who is this from?

25 A.  This is from myself to Ashik, to Matt Garms and Jason

1  Ketchum.

2  Q.  What's the subject?

3  A.  It says final growth model.

4  Q.  What's the date?

5  A.  Excuse me.  April 23, 2015.

6  Q.  Are there attachments to this email?

7  A.  There are two.

8  Q.  What are they?

9  A.  There is an updated growth plan for the Q2 retreat and an

10  updated delta report.

11  Q.  Why are you sending this email, Mr. Ma?

12  A.  From my recollection, this is in preparation for a

13  leadership retreat that they would be reviewing this data at.

14  Q.  Who would be reviewing this data?

15  A.  The entire executive team.

16  Q.  And who would that consist of?

17          MR. POULOS:  Objection, foundation.

18          THE COURT:  Well, he knows who the executive team is.

19  What's the foundation for him knowing the executive team is

20  going to review this?

21          Did he go to the executive team meeting, this

22  witness?

23  BY MR. JOHNSTON:

24  Q.  Have you -- did you participate in other executive team

25  meetings?

1 A.  I had participated in one of the retreats at Sea Island.

2 Q.  And who was in attendance at Sea Island?

3 A.  Rishi, Shradha, Brad, Ashik, Matt Garms, Jason Ketchum,

4 and then there were additional people, I believe, as well.

5 MR. LOWDER:  Your Honor, may we be heard at sidebar

6 on this?

7 THE COURT:  Sure.

8 And ladies and gentlemen, we're having a lot of

9 sidebars.  Gives you a chance to stretch.

10 The attorneys are not -- when they make these

11 objections, they're doing as I asked them to make objections.

12 If they feel there's something that they need to discuss,

13 they're not obstructing things or slowing things down.  I've

14 instructed them to ask for these kinds of sidebars.  So please

15 don't hold it against them; hold it against me.

16 Okay.  Go to sidebar.

17 (Proceedings heard at sidebar:)

18 THE COURT:  All right.  Go ahead.

19 MR. LOWDER:  I'll cede to Mr. Poulos, but I think the

20 question that you asked was did he participate in the

21 particular leadership retreat for these particular documents,

22 and the question that was posed or the answer --

23 THE COURT:  Well, I know.  I understand.  Now, this

24 is a different one than the one at Sea Island, but he can at

25 least say he's been to one at Sea Island, who attends it.  The

1    question was who was on the executive team, and he said I

2    understood this would be discussed there.

3           You need to explain why he thinks that would be

4    discussed.

5           MR. JOHNSTON:  Yes, Your Honor.

6           THE COURT:  All right.  So move on.

7       (Proceedings heard in open court:)

8           THE COURT:  All right.  Go ahead.

9    BY MR. JOHNSTON:

10   Q.  Who was the intended audience for the growth model and

11   delta report that you have attached here?

12   A.  The executive team.

13   Q.  Who is on the executive team?

14   A.  In this case, it would be whoever is attending the

15   retreat, the upcoming retreat, who I think would still include

16   from the last one, Rishi, Shradha, Ashik, Brad, Matt Garms,

17   Jason Ketchum, as well as potentially others.

18   Q.  And what's the basis for your understanding that you were

19   preparing this for an executive team retreat?

20   A.  It says in the file Q2 retreat.

21   Q.  What do you write in this email?

22   A.  It says:  "Hey guys, here is the growth model for the

23   weekend.  JK and I spent some time truing up some Q1 stuff

24   including a fair amount of data cleaning.

25           "Let me know if any questions or revisions you guys

1  need to see prior to the retreat.

2         "@AD, the delta model from yesterday is attached for

3  reference as well.  No changes since yesterday."

4  Q.  All right.  Let's start with looking at the delta report,

5  460 B.

6         Let's start at Tab 4.

7         All right.  Let's -- what are we looking at in Tab 4,

8  Mr. Ma?

9  A.  This is a downloaded report from Salesforce of the

10 campaign obligations for a bunch of the drugs that are running

11 campaigns in 2015.

12        MR. JOHNSTON:  Okay.  And if we can scroll a little

13 bit to the right, maybe about two columns.  So we stop at D.

14 This is fine.

15        Ms. Paul, can we highlight rows H, I and J -- or

16 columns H, I and J.

17 BY MR. JOHNSTON:

18 Q.  Mr. Ma, what's represented in columns H, I and J?

19 A.  Yep.  So similar to other reports, it says for a given

20 drug, let's assume it's Row 2, Belsomra, that the target

21 number or the contracted number of waiting rooms is in column

22 I, and the contracted number of exam rooms is in column J.

23 Q.  And does this also include a start date and end date

24 column?

25 A.  It does.

1  Q.  Where did this data come from?

2  A.  This data would have been input directly from the signed

3  contracts or the in-contracting ones, as you can see in status

4  M.

5  Q.  Into Salesforce?

6  A.  Into Salesforce, that's correct.

7  Q.  Let's look at Tab 5.

8      What is listed here?  Do you need to expand any of

9  the columns?

10 A.  Yeah, why don't we expand the columns so that they're all

11 clear.

12     So this report is a downloaded export of data from

13 Amazon Redshift, which is a database tool, that says for each

14 of the therapeutic categories, how many members or in this

15 case offices, how many screens of inventory exist, how many

16 integrated members, and so I'll explain integrated members in

17 a second, and then how many tablets exist for that category.

18 So this represents available current inventory as of April 21,

19 2015.

20     And integrated members just means out of the offices

21 that actually have tablets.  So column B might say that there

22 are 3,468 offices that are primary care physicians.  Of those

23 3468, 1301 of those screens have tablets as well, and then in

24 each of those offices there's probably about an average of

25 somewhere between three and four tablets, which is how you get

1  to column E, 4300 tablets.

2  MR. JOHNSTON:  Let's look at column, or sorry, Tab 3.

3  And then I think we might need to expand some of the

4  columns, Ms. Paul, if you can --

5  THE WITNESS:  I think it's to the left.

6  MR. JOHNSTON:  There we go, see where the plus is.

7  BY MR. JOHNSTON:

8  Q.  All right.  What are we looking at in this tab, Mr. Ma?

9  A.  So this is just a slightly different formatted version of

10  the other Excel that we just looked at, and it has on the top,

11  you can see the months again, and then going on the rows in

12  this case it's not at the drug level but at the category

13  level, and then across the columns you can see what is the

14  contracted number of waiting-room screens.

15  And then if you scroll further right, you will see

16  the contracted number of exam-room screens or exam-room

17  tablets needed.

18  And then if you scroll right again, you can see the

19  actual delta, this time for waiting-room screens.

20  And if you scroll right again, you can see the --

21  sorry, that was the inventory, excuse me.

22  This is the difference, again, the gap, and then to

23  the right would be the same thing for tablets.

24  Q.  These are all -- all show the gaps, assuming there's no

25  growth in inventory?

1  A.  Right.  Similar to the last report, this would be the gaps
2  as of this time in April.

3          MR. JOHNSTON:  Let's look at Tab 1, and then let's
4  start on the left.  If we can -- we're on the right right
5  now, Ms. Paul, if we could just go to the left.
6  BY MR. JOHNSTON:

7  Q.  What does this -- what do these tables show?
8  A.  So this rolls up the categories even further all the way
9  to what we called networks.  And so this is like an even
10 higher level categorization of all the different drugs, and it
11 shows on the top, you can see the deltas across the entire
12 network.

13         And I guess my memory was close enough, which you can
14 see a delta of sort of something in the five thousands by the
15 time that we reach December.

16 Q.  So comparing the delta that we -- well, we'll get to that.

17         But I just want to focus your attention on the date
18 that this report was sent was in end of April 2015, correct?
19 A.  Correct.

20 Q.  And what is the outstanding delta as of the day that this
21 report was created and sent?

22 A.  Yep.  So if you look at column G2 or row or cell G2, that
23 would be the fourth month, April, and we are 2,702 offices
24 short of what we believe we need for the contracted campaigns.

25 Q.  And what does it show, just for the rest of the year, the

1  size of the delta?

2  A.  It shows that if contacts were not able to add new

3  screens, the delta would grow from 2,700 to over 5,500 by the

4  end of the year.

5  Q.  Let's scroll to the right.

6          What do we see for the waiting room calculation?

7  What's the delta for the month that this report was created?

8  A.  It is over 2,000 screens.  It's V2.  And then by the end

9  of the year, 3,700 screens.

10  Q.  Okay.  And then let's go to the right further.

11          What is the delta on the exam-room tablets, the day

12  of the report -- the month the report -- this report was

13  created?

14  A.  So it's over 6,000 tablets short of needed, and by the end

15  of the year, that almost doubles to 12,000 tablets short.

16  Q.  Let's look at the final tab, which is -- we haven't looked

17  at, Tab 2.

18          What are we looking at in Tab 2?

19  A.  So this references the overlap discussion that Brad and I

20  were having by email, where I think the analogy I used is you

21  could kill multiple birds with one stone.

22          And what this means is if you look at row or you look

23  at G20 where it's already highlighted, that 4.75 number means

24  that on average, if we acquired one doctor that happens to be,

25  you know, a highly sought-after doctor on a basal insulin drug

1  list, it might count for four or almost five other drugs.  And

2  so in this case, we're killing 4.75 birds with one stone.

3  Q.  And have you already included or incorporated this overlap

4  calculation into your delta calculation?

5  A.  I have, yes.

6  Q.  Let's go back to the final roll-up inventory tab.

7          Where does that show up on the calculation or on the

8  tabs, tables that we see here?

9  A.  You can see in Row 15 I've said "see overlap calc," and

10  so --

11          MR. JOHNSTON:  Can we highlight, Ms. Paul, all of

12  Row 15?

13  BY THE WITNESS:

14  A.  Yep.

15  BY MR. JOHNSTON:

16  Q.  And so what does this do to the --

17  A.  It makes the delta smaller.

18  Q.  So have you now incorporated into the delta report the

19  overlap calculation that Brad Purdy asked you to do?

20  A.  I have.

21  Q.  And has it reduced the delta a little bit?

22  A.  Yeah, I recall in the last doc it was something like

23  19,000, and so now it's been reduced down to 12,000 by the end

24  of December for tablets, for example.

25  Q.  And what has it been reduced for waiting-room screens?

1   A.  It looks like from screens, it was 7,000-some to

2   3,700-some.

3   Q.  Let's take a look at now -- well, do these numbers feed

4   directly into the growth model?

5   A.  They do.

6   Q.  Which numbers, just so we can pay attention, which numbers

7   end up feeding into the growth model?

8   A.  Yeah, Row 2.  And so I think if you go back all the way to

9   the right, for example, and try to remember the number 12,253.

10          THE COURT:  I don't think we're going to be able to

11  finish this document today. Are you at a --

12          MR. JOHNSTON:  We will.  We have four minutes.

13          THE COURT:  You're going to finish it?

14          MR. JOHNSTON:  Yeah, we're going to switch and be two

15  points.

16          THE COURT:  Fair enough.  Finish it off.

17  BY MR. JOHNSTON:

18  Q.  Let's go to 460 A, please.  And let's start at Tab 4.

19          What do we see here?  Well, first of all, have the

20  deltas been fed into this particular chart?

21  A.  Yes, in Row 27.

22  Q.  And 26?

23  A.  And 26, yep.

24  Q.  And then what are you trying to map out in this chart?

25  A.  In this --

1    Q.  This entire tab, I should say.

2    A.  In this model, we have now projected the number of screens

3    and tablets that we think we will acquire the rest of the year

4    to see if that growth is fast enough to close the deltas in

5    Row 26 and 27 by a certain time period.

6    Q.  Okay.  And have -- is that -- that two growing numbers, I

7    guess, the delta number and the inventory number, have you

8    plotted out those two numbers over time?

9    A.  I have.

10         MR. JOHNSTON:  Let's scroll down.  Further down,

11   please.  There we go.  Let's start with this one.

12   BY MR. JOHNSTON:

13   Q.  What's the chart that we see here?

14   A.  Here you can see what the delta over time looks like, and

15   then how much the screens gain over time looks like in the

16   purple.

17   Q.  And what do you write for the -- to qualify the growth

18   plan that's mapped out here?

19   A.  In Row 81, I write:  "Under the new plan, we could reach

20   our waiting-room delta by October" and I qualify "in a good

21   case scenario."

22   Q.  And so if this were -- if Outcome Health's campaigns were

23   being delivered on a weighted-average basis, would Outcome be

24   able to satisfy those obligations based on the plan and deltas

25   mapped out here?

1    A.   They would not.

2    Q.   Why not?

3    A.   Basically, they would have to exceed the inventory or the

4    deltas earlier in the year because they only exceed them in

5    this case, which is an optimistic case, by November -- or,

6    sorry, October.

7            You can see that the purple line being above the blue

8    line is only a little bit for the last two months, and there's

9    a much, much bigger gap for the five or so months preceding

10   it.

11           And then what's missing from this chart is that that

12   gap also existed for the first four months of the year.  And

13   so the difference between the blue and the purple to the left

14   of the intersection is much bigger than it is to the right.

15   Q.   So let's start, you're saying there was a gap for the

16   first four months; is that correct?

17   A.   Correct.

18   Q.   And so if you colored a big triangle on the left, would

19   that be anywhere near the triangle on the right?

20   A.   It would be much larger.

21   Q.   Let's go further down --

22           THE COURT:  We're not.

23           MR. JOHNSTON:  One more question, Your Honor.

24   BY MR. JOHNSTON:

25   Q.   What can you say about the -- about the exam-room tablets?

1  A.  Same situation holds.  The triangle on the left is much

2  larger than the triangle on the right.

3       THE COURT:  Okay.  We're going to break for the

4  weekend, ladies and gentlemen.

5       I wanted to tell you one thing.  I told you at the

6  start of the case that this is hard work.  It's not easy.

7  It's not a matter of thinking I'll come to court, I'll sit in

8  a chair, and it should be easy.  It's really hard to sit all

9  day and concentrate.

10       So please do your best to get some sleep.  Rest up

11  over the weekend.  Think of anything other than this case.

12  Think of it as a job, as you would your job, you know.  Care

13  for your body, care for your sleep, your diet because it is

14  just hard to sit in any kind of a case for a long period of

15  time because we don't do that normally.

16       That's why classes only last half an hour or

17  45 minutes or an hour in high school and college because

18  people don't sit for hours and hours and listen.

19       But that's what juries have to do.  So I appreciate

20  the attention you've paid to this case, but please, just treat

21  it as you would your job where you're going to work all day

22  and take care of yourselves and enjoy your weekend.  We'll see

23  you Monday morning.  Thank you all.

24       COURT SECURITY OFFICER:  All rise.

25       (Jury exits courtroom.)

1          THE COURT:  Okay.  Sir, be back Monday morning at

2    9:00.  You can talk to the government over the weekend.

3    You're not on cross-examination, so if you wish to talk to

4    them, you're free to do so.

5          Thank you.

6          THE WITNESS:  Thank you.

7          THE COURT:  Okay.  You can all have a seat.

8          Anything the government wants to put on the record?

9          MR. JOHNSTON:  No, Your Honor.

10         THE COURT:  Anything the defense does?

11         MS. BELL:  Yes, Your Honor.  We just wanted to --

12         THE COURT:  You can sit down and be in front of the

13   mic.

14         MS. BELL:  Okay.  It doesn't need to be on the record

15   though.

16         THE COURT:  All right.  Anything else we want on the

17   record?

18         MR. JOHNSTON:  Actually, Your Honor, we would like

19   a -- before Mr. Ma's cross-examination, we'd like a waiver of

20   any conflict of interest by Mr. Shah.

21         THE COURT:  Oh, yeah, I think -- that's fine.  We can

22   do that now, we can do it --

23         MS. CHOU:  He can state it on the record.

24         THE COURT:  All right.  My understanding is that,

25   Mr. Shah, at one point -- why don't you explain the factual

1 circumstances again so I understand them.

2 　　　　　MR. JOHNSTON:  Yes, my understanding is that, in

3 fact, at one point, Mr. Ma and Ms. Ding were close friends.

4 They know each other from working at Boston Consulting Group,

5 they were at Stanford together, they were fairly close friends

6 at one time.

7 　　　　　MS. CHOU:  They were close, but they didn't know each

8 other.

9 　　　　　THE COURT:  All right.

10 　　　　　MR. JOHNSTON:  There are different accounts of it,

11 but at least from Mr. Ma's standpoint, they were fairly close,

12 and she helped him get his lawyer.

13 　　　　　THE COURT:  Oh.  She was never his lawyer.

14 　　　　　MR. JOHNSTON:  No, of course not.

15 　　　　　THE COURT:  All right.  Mr. Shah, you're aware of --

16 obviously aware of these facts, that you knew Ms. Ding from I

17 guess from Boston Consulting and from college, correct?

18 　　　　　DEFENDANT SHAH:  Yes, Your Honor.

19 　　　　　THE COURT:  Okay.  She's now one of your lawyers.

20 　　　　　DEFENDANT SHAH:  Yes.  Yes, Your Honor.

21 　　　　　THE COURT:  Okay.  And she helped him to get a lawyer

22 at some point; is that correct?

23 　　　　　MS. CHOU:  She referred his lawyer.

24 　　　　　THE COURT:  Speak into the mic.

25 　　　　　MS. CHOU:  She referred his lawyer to him, or she

1  gave him the name of his lawyer.

2         THE COURT:  The current lawyers?

3         MR. JOHNSTON:  Yes.

4         THE COURT:  The Hueston firm.

5         MR. JOHNSTON:  No.

6         THE COURT:  That's where I'm confused.

7         MR. JOHNSTON:  Ms. Ding works at Hueston Hennigan.

8         THE COURT:  Right.

9         MR. JOHNSTON:  She recommended that Mr. Ma obtain his

10 current lawyer.

11        THE COURT:  Oh, all right.  Who's his current lawyer?

12        MR. JOHNSTON:  His name is Michael Hirst.

13        THE COURT:  Okay.

14        MR. JOHNSTON:  But the inquiry is more of any

15 possible claim down the road that because of a personal

16 relationship between Ms. Ding and Mr. Ma, that Hueston

17 Hennigan wouldn't be as vociferous in their cross-examination

18 of Mr. Ma.

19        I don't -- I doubt they will be very vociferous.

20 This is just the government wanting to protect the record.

21        THE COURT:  All right.

22        MR. JOHNSTON:  That's it.

23        THE COURT:  Thank you for clearing it up.  I

24 misunderstood the who represented who and what the

25 relationship was.

1  So, Mr. Shah, you understand that the government

2  would be concerned should there be a conviction and you would

3  later say that the Hueston firm did not cross-examine Mr. Ma

4  as aggressively as they would but for the fact that Ms. Ding

5  at one point -- what was her --

6  MR. JOHNSTON:  They were friends though, of course,

7  now they dispute that, but that's our understanding.

8  THE COURT:  All right.  I'm having trouble explaining

9  this conflict because I don't --

10  MS. CHOU:  They may have been close at the time.  I

11  don't think they have an ongoing relationship.

12  THE COURT:  Anyway, Mr. Shah, you understand this I

13  think as well or certainly better than I do.

14  Are you comfortable with the fact of this

15  relationship Ms. Ding had -- or relationship is too strong a

16  word -- but acquaintanceship with someone that is involved and

17  that the Hueston Hennigan firm will aggressively represent you

18  in this case now and going forward, and that nothing about

19  Ms. Ding's participation in that representation will affect

20  their aggressive representation of you?

21  DEFENDANT SHAH:  I am comfortable with that, Your

22  Honor.

23  THE COURT:  All right.  Are there any other questions

24  you want me to ask on this waiver issue?

25  MR. JOHNSTON:  No, Your Honor.

1          THE COURT:  All right.  And Ms. Chou, anything you

2     want me to add to this?

3          MS. CHOU:  No, Your Honor.  Thank you.

4          THE COURT:  Okay.  Thanks.

5          Anything else you want to put on the record?

6          Hearing nothing, Kathy, you're done.

7     (Discussion held off the record.)

8     (Court adjourned, to reconvene at 8:45 a.m. on 2/13/23.)

9                            CERTIFICATE

10         I certify that the foregoing is a correct transcript from

11    the record of proceedings in the above-entitled matter.

12    */s/ Elia E. Carrión*          *10th day of February, 2023*

13    *Elia E. Carrión*                        *Date*
      *Official Court Reporter*

14

15

      */s/ Kelly M. Fitzgerald*      *10th day of February, 2023*
16
      *Kelly M. Fitzgerald*                    *Date*
17    *Official Court Reporter*

18

19    */s/ Kathleen M. Fennel*       *10th day of February, 2023*

20    *Kathleen M. Fennel*                     *Date*
      *Official Court Reporter*
21

22

23

24

25