1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3    UNITED STATES OF AMERICA,          )
                                        )    Docket No. 19 CR 864
4                      Plaintiff,       )
                                        )    Chicago, Illinois
5         v.                            )    February 13, 2023
                                        )    8:48 a.m.
6    RISHI SHAH, SHRADHA AGARWAL,       )
     BRAD PURDY,                        )
7                                       )
                       Defendants.      )
8

9         TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 9A
       BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11   APPEARANCES:

12
     For the Government:    MR. MATTHEW F. MADDEN
13                          MR. SAURISH APPLEBY-BHATTACHARJEE
                            Assistant U.S. Attorneys
14                          219 South Dearborn Street, 5th Floor
                            Chicago, Illinois  60604
15

16                          MR. WILLIAM E. JOHNSTON
                            MR. KYLE C. HANKEY
17                          U.S. Department of Justice
                            Criminal Division, Fraud Section
18                          Washington, D.C.  20530

19

20

21

22                      ELIA E. CARRIÓN
                      Official Court Reporter
23                 United States District Court
              219 South Dearborn Street, Room 1432,
24                   Chicago, Illinois 60604
                        (312) 408-7782
25              Elia_Carrion@ilnd.uscourts.gov

1    APPEARANCES (Continued:)

2
     For Defendant
3    Shah:                     MR. JOHN C. HUESTON
                               Hueston Hennigan LLP
4                              620 Newport Center Drive, Suite 1300
                               Newport Beach, California  92660
5
                               MS. VICKI CHOU
6                              MR. MICHAEL H. TODISCO
                               MS. KAREN DING
7                              Hueston Hennigan LLP
                               523 West 6th Street, Suite 400
8                              Los Angeles, California  90014

9
     For Defendant
10   Agarwal:                  MS. KOREN L. BELL
                               MR. A. ALEXANDER LOWDER
11                             MR. STEPHEN G. LARSON
                               Larson LLP
12                             555 South Flower Street, Suite 4400
                               Los Angeles, California  90071
13
                               MR. PATRICK W. BLEGEN
14                             MS. KELSEY H. KILLION
                               Blegen & Garvey
15                             53 West Jackson Boulevard, Suite 1437
                               Chicago, Illinois  60604
16
17   For Defendant
     Purdy:                    MR. THEODORE T. POULOS
18                             MR. ERIC PRUITT
                               MR. JOHN PAVLETIC
19                             Cotsirilos, Tighe, Streicker, Poulos &
                               Campbell, Ltd.
20                             33 North Dearborn Street, Suite 600
                               Chicago, Illinois  60602
21

22

23

24

25

1    (Proceedings heard in open court; jury out.)

2    THE COURT:  Okay.  We are on the record.  Thank you

3    for the joint submission, Document 376, which I want to look

4    over one more time before I enter it.

5    And is there an issue that the government wanted to

6    put on the record before we start?

7    MR. APPLEBY-BHATTACHARJEE:  So it looks, Your Honor,

8    like we have resolved the issue.  We were all focused on the

9    transcript from January 31st.  It looks like a transcript

10   page 561 from February 1st, 750A, B, and E were moved in

11   without objection.

12   As we were looking at that portion of the transcript,

13   it also looks like 747A and 749A were also moved in without

14   objection.  That's not reflected in the chart we gave you.  So

15   what I can do is submit a revised proposed order --

16   THE COURT:  That's fine.

17   MR. APPLEBY-BHATTACHARJEE:  -- with those correct

18   exhibits.

19   THE COURT:  Okay.  That's fine.

20   And I understand there's a dispute as to attachments

21   to 750?

22   MR. APPLEBY-BHATTACHARJEE:  That's what I'm

23   referencing.

24   THE COURT:  And that's -- this will resolve that?

25   MR. APPLEBY-BHATTACHARJEE:  Yes.

1       THE COURT:  You agree, Ms. Chou?

2       MS. CHOU:  Yes, Your Honor.

3       THE COURT:  All right.  I'll await a revised draft.

4       Okay.  Off the record.

5    (Off-the-record discussion.)

6       THE COURT:  Let's go back on the record.

7       Go ahead.

8       MR. POULOS:  Your Honor, I -- I want to lodge an

9    objection or at least raise a word of caution about what I

10   believe to be -- have been the government's far too liberal

11   use of eliciting testimony from a witness about what he,

12   quote, understands.

13       When that happened, we did lodge relevance

14   objections.  And, Your Honor, it's our position that a

15   witness's understanding may be relevant in limited

16   circumstances to -- for example, to explain why he did

17   something.  Far too often, witnesses testify about an

18   understanding which is not based on personal knowledge but on

19   speculation or hearsay.

20       And I think it's being offered here -- or I'm

21   concerned that the jury's going to understand a witness's,

22   quote, understanding, which may be admissible for limited

23   purposes as proof of the fact that he is telling the jury he

24   understood.

25       So, Judge, we will continue to lodge objections to

1   that.  In my view, the government should be required to ask a

2   witness if he had an understanding, not what that

3   understanding was.  To elicit the basis for that

4   understanding, was it what somebody said to them?  We would

5   potentially lodge an objection to hearsay.

6         Then if they have an exception to that hearsay, it

7   might be appropriate or some basis for personal knowledge.

8   And in those circumstances, perhaps a limiting instruction

9   from the Court to the jury instructing them that they cannot

10   consider this, a witness's understanding, for -- as evidence

11   of the fact which he is representing he understood.

12         THE COURT:  All right.  Response?

13         MR. JOHNSTON:  Yes, Your Honor.

14         Under Rule 701, the witness would be able to testify

15   to understandings of somebody that he interacted with.  And

16   that's within the core of what 701 allows.  You have a

17   conversation with someone; the interlocutor says something;

18   the witness can testify; I understood him to mean X.  And that

19   can be used for what exactly the speaker meant.

20         It's not just purely to the witness's state of mind,

21   though of course it's also relevant to that.  We're not asking

22   the witness to sort of have free-floating judgment about

23   people's states of mind.  It's always key to very specific

24   interactions or specific documents or specific conversations.

25         So we will, of course, lay the foundation for those

1   conversations and those interactions and will not ask
2   free-floating questions about a witness's understanding of
3   someone else's state of mind.  But -- but we believe that it's
4   allowed by Rule 701, to allow a witness to opine what they
5   understood a speaker to mean or -- or the implication of a
6   certain action or gesture.
7             MR. POULOS:  And I -- may I respond, Your Honor?
8             THE COURT:  Yes.
9             MR. POULOS:  I believe that goes far beyond what
10  Rule 701 permits.  If -- if the government wants to elicit his
11  opinion, they should ask that -- for that opinion on whatever
12  subject.  And then we can determine whether that's an
13  appropriate Rule 701 type opinion.  When I look at the notes
14  on it, they went far beyond it.
15            For example, Your Honor, they elicited the testimony
16  it was his, quote, understanding that these documents --
17            THE COURT:  Which Advisory Committee Note are you
18  referring to?  What's your amendment?
19            MR. POULOS:  I'm sorry, Your Honor.  I'm looking at
20  the little Red Book on evidence.
21            THE COURT:  Oh, all right.
22            MR. POULOS:  It discusses examples of opinions
23  allowed under 701, the appearance of things, the identity, the
24  manner of conduct, the competency of a person, degrees of
25  light or darkness, sound, size, height, weight, distance, and

1  an endless number of items that cannot be described factually
2  in words apart from inferences.

3          But, Your Honor, one example that occurred in this
4  trial is he testified that it was his understanding that a
5  delta report that he prepared would be discussed among
6  leadership -- you know, executive leadership or -- or
7  something along those lines.  That -- that is based on
8  hearsay.

9          And the fact that it occurred, may have occurred --
10  they did not elicit testimony for, Your Honor, that at the
11  retreat that he went to, that a delta report had even been
12  prepared.  And in fact, Judge, I'll represent we know that no
13  delta report had been prepared for that initial retreat that
14  he was at.  These delta reports became a new thing at this
15  time, in the spring of 2015.

16          So that's just one example, Your Honor.  Right now, I
17  just wanted to lodge -- express my concern about it, lodge the
18  objection, and -- and ask that the Court limit the ability to
19  do that in the future.

20          THE COURT:  Well, you're probably both right.
21  701 does allow for a lot of this testimony.  And overly
22  conclusive language about an understanding a person has
23  without foundation is also possibly objectionable, where an
24  objection would be cured easily by asking what the basis and
25  the understanding is.

1        We can't drill down too deeply on testimony like

2   this.  Because even what I say right now to you, Mr. Poulos,

3   is still going to be based on your belief of what I said.

4   It's going to be based on your understanding of what I said.

5   And then someone can ask you, what did you understand the

6   Judge to mean when he said it?  That's normal modes of human

7   communication that occur even in this courtroom.

8        So I think your objection or your warning is fine.

9   You may be absolutely correct, depending on the context of the

10  answer to the question.

11       The government has stated they're going to make sure

12  that the witness doesn't go through two or three leaps where

13  he's making an understanding based on something he has no

14  basis to provide, under 701, the basis for that understanding.

15       But every person's testimony in many ways is a form

16  of opinion about something.  It's the -- the perception of the

17  words, perception of the circumstances under which the words

18  are made or are stated to them.  And if we drill down like

19  that, we'd have objections to literally every question and

20  answer, with a witness in the end saying, I know this just

21  because I was there.  That's what I understood; that's what I

22  thought he meant when he said that to me, or she said that to

23  me.

24       So this isn't helping, my legal meanderings right

25  now.  But you've made your warning.  The government has told

1    you how they're likely to respond and how they're going to
2    pattern their questions to hopefully not elicit those
3    objections.  But we'll see how it goes, as it is with
4    everything else.
5         MR. POULOS:  So, Your Honor, to this point, my
6    understanding is that the Court agrees with me on this issue.
7         And thank you, Your Honor.  I just wanted to raise
8    those alarms and I think maybe hash some of this out.
9         THE COURT:  Off the record.
10        (Off-the-record discussion.)
11        THE COURT:  Back on the record.
12        MR. JOHNSTON:  One point I'll just put out there for
13   purposes of this witness.  As the Court has heard so far, this
14   witness worked closely with Ashik Desai, so a lot of his
15   understandings do come from Ashik Desai.  And --
16        THE COURT:  To which you're not getting many
17   objections from that side of the courtroom.
18        MR. JOHNSTON:  Right, exactly.  And I'll note that
19   everything -- almost everything that Ashik Desai tells him
20   would qualify as a coconspirator statement under 801(d)(2)(E).
21        THE COURT:  Yes.
22        MR. JOHNSTON:  Even if we get to the position of, oh,
23   provide the foundation, that foundation is hearsay, we --
24   obviously we should do that and we will, but we'll just point
25   out that the hearsay basis for his understanding will itself

1  be admissible.

2  THE COURT:  I think that's right.  Desai's

3  undoubtedly a coconspirator in this case, or a coventurer, and

4  I think the defendants have -- the defense overall has pointed

5  the finger at Desai and that he engaged in wrongdoing.

6  All right.

7  MS. BELL:  Your Honor, just one more note on that.

8  THE COURT:  Yes.

9  MS. BELL:  If we could ask them that the government

10  elicits the basis for the understanding.  Because I think they

11  were -- we were having to object over and over again,

12  you know, can we get some foundation, what's the basis of the

13  understanding.  And when the government then asked the

14  question, it was Desai.  And so I think that would be a

15  reasonable lead-up to setting the foundation for these

16  broad -- this broad testimony about the understandings.

17  THE COURT:  Yeah.  They seem like effective

18  objections.  Because every time the witness was asked to

19  explain how he knew this, it was often Desai -- but not

20  always.

21  I'm going to -- I'll just have to await objections.

22  The government has stated they will try and be specific in

23  their questioning without being unnecessarily -- unnecessarily

24  detailed.

25  Provide the necessary detail you need to lay a

1  foundation, if necessary, and then move it forward.  We have
2  to move the case along.  I think you all agree with that, for
3  a variety of reasons.
4  　　　　　And so I -- keep with the -- if you can, with the
5  normal course of attorneys.  Don't object unless it's
6  something you really care about.
7  　　　　　Okay.  Do we have a full jury?
8  　　　　　THE CLERK:  Yes.
9  　　　　　THE COURT:  All right.  Let's bring in the jury.
10 　　　　　And you can put your witness on the stand, please.
11 　　　　(Pause in the proceedings.)
12 　　　　　COURT SECURITY OFFICER:  All rise.
13 　　　　(Jury in at 9:06 a.m.)
14 　　　　　THE COURT:  All right.  Good morning.  Please be
15 seated.
16 　　　　　Good morning, ladies and gentlemen.  Thank you for
17 all being timely, and I hope you had a good weekend.  It's
18 good to know we have not suffered from the usual
19 post-Super Bowl absenteeism issue with you or with anybody
20 else in the courtroom.  So thank you for all being here.
21 　　　　　You've asked about a calendar.  There are no early
22 out dates this week or really in the foreseeable future that
23 the attorneys are requesting.  We'll, of course, accommodate a
24 request from jurors if need be, although we want to get as
25 many full days in as we can so that the case can proceed to

1    its completion.

2          Next Monday, though, is President's Day.  It's a

3    federal holiday.  So next week, I'm not going to ask you to

4    come in next Friday to make up the extra day.  I'm sure you've

5    patterned your lives around Fridays being a day to catch up on

6    work or school or family obligations.

7          So we're -- we won't hold court next Friday, so it'll

8    be a three-day week next week.  You'll have a -- basically a

9    four-day break, a Friday, Saturday, Sunday, and Monday from

10   this trial at the end of this week into early next week.  But

11   other than that, we'll be going through 4:30 every day unless

12   there's a request from you to modify that.

13         Again, thank you for your attention so far and your

14   continued attention throughout the trial.

15         With that, we'll continue the direct examination of

16   the witness.

17         Sir, do you understand you're still under oath?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  Okay.  You may proceed.

20         MR. JOHNSTON:  Thank you, Your Honor.

21         DAVID MA, GOVERNMENT WITNESS, PREVIOUSLY SWORN

22              DIRECT EXAMINATION [resumed]

23   BY MR. JOHNSTON:

24   Q.  Mr. Ma, before we broke for the weekend, do you recall

25   testifying about delta reports and growth models?

1  A.  I do.

2  Q.  Can you remind the jurors what a delta report was?

3          MR. BLEGEN:  Judge, pardon the interruption.  I don't

4  think the witness video screens are up.

5          THE COURT:  Yeah.  I thought we were going to do

6  documents right away, but I'll put the video screen up until

7  then.  Hang on one second.

8          All right.  Thanks, Mr. Blegen.

9          It's a little fuzzy.  Let's see how we can resolve

10  that.  I'm not helping.

11          How quickly are you going to get to the document?

12          MR. JOHNSTON:  In about a minute.

13          THE COURT:  All right.  Now it's better.

14          Okay.  Proceed.

15  BY MR. JOHNSTON:

16  Q.  Mr. Ma, can you remind the ladies and gentlemen of the

17  jury what a delta report was?

18  A.  Yep.

19          So a delta report is basically a report that shows

20  where a bunch of advertising campaigns and contracts, how much

21  of a gap there is between what we actually have and what was

22  actually bought.

23  Q.  And can you remind us what a growth model was?

24  A.  A growth model was our way of then taking the delta

25  report, putting it into a future projection, and understanding

1  using hiring and how productive the, you know, people that
2  called on the doctors' offices would be, how fast we could
3  fill up the gap and grow the number of screens and tablets to
4  meet the inventory needs.
5  Q.  And what was the relationship between the delta report and
6  the growth model?
7  A.  A delta report, whatever that spit out, was really put in
8  the growth model.
9  Q.  All right.  When we left off, we were looking at 460A.
10        MR. JOHNSTON:  If we could switch to the government's
11  PC.
12        THE COURT:  Okay.
13  BY MR. JOHNSTON:
14  Q.  Do you recall looking at this document, Mr. Ma?
15  A.  I do.
16  Q.  And what kind of document is it?
17  A.  This is a growth model.
18  Q.  Now, just a couple questions more about delta reports and
19  growth models.
20        You previously testified that you would pull the data
21  that was inputted into these reports and models from the
22  company's various databases?
23  A.  That's correct.
24  Q.  And did you pull the data at the same time that you were
25  making these reports?

1    A.   Right.   Right before making the reports, but yes.

2    Q.   More or less at the same time?

3    A.   Correct.

4    Q.   And was the making of delta reports and growth models done

5    in the ordinary course of your job responsibilities at

6    Outcome Health?

7    A.   Yes.

8    Q.   And were delta reports and growth models used by the

9    company in the ordinary course of the business operations at

10   Outcome Health?

11   A.   Yes.

12            MR. LOWDER:   Objection.   Foundation.

13            THE COURT:   Overruled, in light of his earlier

14   testimony.

15   BY MR. JOHNSTON:

16   Q.   And did -- were the -- was the creation of the reports

17   made by someone, yourself, with knowledge of the relevant

18   information at the time they were made?

19   A.   Yes.

20   Q.   Let's look at Tab 4.   If you recall, that's where we left

21   off on Thursday afternoon.

22            Can you explain the information that is visible to

23   the jurors on the screen in front of us?

24   A.   Yeah.   There's a lot of information here, and so --

25   Q.   All right.   So let's start -- let's start with just the

1    deltas, the fourth table down.  What are we looking at there?

2    A.  Okay.  So in Rows 26 and 27, those are the numbers from

3    the other spreadsheet, the delta report, that we reviewed.

4           And so what this shows is -- the numbers across the

5    top 1 through 12 represent the months and the year -- how

6    large the gap in the number of waiting rooms and number of

7    exam room tablets that are needed to meet the inventory

8    requirements of the contracts.

9    Q.  So do you recall this growth model being created at the

10   end of April 2015?

11   A.  I believe that's the timing on the -- on the document.

12   Q.  And so would April correspond to 4, the Column 4?

13   A.  Yeah.  Roughly Columns F and G, between F and G, 4 and 5,

14   yep.

15   Q.  And so looking at this report, what can you say was the

16   state of the deltas at Outcome Health for the first

17   three months of 2015?

18   A.  So if you look in Columns C through E, the first

19   three months, you can see that we were about 1,700 waiting

20   room screens behind the campaigns through the first

21   three months and over 5,600 tablets behind on the campaigns.

22   Q.  And during those months, were clients still being billed

23   for the full amount of the contracts?

24   A.  As far as I'm aware, that would be the case.

25   Q.  And then what has happened to the delta -- or what's --

1  what happens to the delta as the months go along from April to

2  May to June to July?

3  A.  Yep.  So in the areas that you see highlighted, you can

4  see that the waiting room screen gap grows from 1,700 to

5  2,300 to 3,500 as new campaigns are scheduled to begin.  And

6  then the tablet delta or gap also continues to grow from

7  5,000 to over 9,000 by the middle of the year.

8  Q.  And then assuming there had been no further inventory

9  added, what would be the delta by the end of the year?

10  A.  Assuming no inventory added, by the end of the year and

11  Month 12, the contacts would be short 3,700 waiting room

12  screens and over 12,000 tablets.

13  Q.  Now, where can we look on this screen for information

14  about the projected growth and inventory that happens at the

15  same time?

16  A.  You would want to look in Rows 14 and 15 under the

17  Sea Island plan -- I'm sorry; excuse me -- Rows 6 and 7.  I

18  forgot there were two plans.

19  Q.  So can you explain the difference between the two plans

20  and when they were each devised?

21  A.  Yep.  So the Sea Island plan was done early in the year.

22  I don't -- I don't recall the dates, but it was in reference

23  to a leadership retreat in Sea Island, Georgia.  And there was

24  a plan to grow the number of screens and tablets then.

25          And then later on in the year, in, you know, the

1    March time frame, we had to edit that plan and create a new

2    plan that, you know, changed the Sea Island plan basically.

3    Q.  And why did the old Sea Island plan have to be revised?

4    A.  Because we were behind on the plan.

5    Q.  And is there a column or a -- sorry -- a row that shows

6    what those revisions look like?

7    A.  Yep.  If you look through Rows 20 to 23, it compares the

8    new plan versus Sea Island.  And you can see that in

9    particular in February, in Cell D23, that the company,

10   for example, was almost 700 tablets behind the actual -- the

11   Sea Island plan.  So they did worse than the plan.

12   Q.  And so then what did the revision in the plan do for the

13   rest of the year, if you can explain?

14   A.  So the revision basically took into account what actually

15   happened in the first three months of the year and then tried

16   to still fill the gap, you know, towards the end of the year.

17   Q.  Now, are there any graphs on this particular chart that

18   shows when the delta might be overcome with new inventory

19   growth?

20   A.  There are.

21          MR. JOHNSTON:  Let's scroll further down.

22          Let's stop right here.

23   BY MR. JOHNSTON:

24   Q.  Now, Mr. Ma, why did you put the information that was on

25   those tables into a graph?  What was the purpose of that?

1    A.  To make them easier to understand for people who wouldn't
2    be looking through all the numbers.
3    Q.  And for whom did you intend this to be easier to
4    understand?
5    A.  For the leadership team.
6    Q.  And what does this particular graph show, the one we're
7    looking at that's WR Growth Versus Delta (March Plan)?
8    A.  Yep.  So the heading reads:  Waiting room growth versus
9    delta, March plan.  So this is the new plan.
10          And I write:  Under the new plan, we could reach our
11   waiting room delta by October.  And I caveat that, in a good
12   case scenario.  And so the blue line represents the gap, and
13   the purple line represents when, you know, we would catch up
14   or how we would grow the number of screens to catch up to the
15   gap.
16          And the intersection around Month 10, or October, as
17   I've headlined shows when the -- the gap could be closed.
18   Q.  And until the gap was closed, was it your understanding
19   that clients were continuing to be billed for the full amount
20   of the contracts?
21   A.  That would have been my understanding.
22          MR. TODISCO:  Your Honor, I'd ask for some
23   foundation.
24          THE COURT:  All right.  The basis of his knowledge.
25   BY MR. JOHNSTON:

1    Q.  Mr. Ma, in your role as a sales analyst, did you ever

2    participate in providing false location lists to finance?

3    A.  I did.

4    Q.  And what was the purpose of providing false location lists

5    to finance?

6    A.  To allow for full billing.

7    Q.  And is that the basis of your understanding that clients

8    were always billed the full amount or generally billed the

9    full amount of the contract, regardless of a shortfall?

10   A.  That, and a few other things, yes.

11   Q.  Do you want to elaborate on what those additional things

12   are?

13   A.  Additionally, when we did ROI studies, which I guess we

14   haven't talked about yet, generally we were looking at whether

15   the client's campaign returned the dollars required.  And we

16   usually used the full dollar of the campaign, which is how

17   much we would have billed them in full.

18   Q.  And so if a client wasn't being billed the full amount,

19   you wouldn't have used the full amount of the contract number

20   in the ROI study?

21   A.  Correct.

22   Q.  So let's then go back to the graph in front of us.

23          Does this graph only show the growth of the network

24   from May to December?

25   A.  It does.

1   Q.  What can you say about the size of the delta before May,

2   so for the first four months of the year?

3   A.  Yep.  From the previous numbers that we had reviewed, it

4   would have been, you know, a similar size to where the purple

5   and blue lines are today.

6   Q.  And so assuming all these campaigns were being delivered

7   on a weighted average basis, would the growth in the company's

8   network allow it to meet its obligations under a weighted

9   average basis?

10  A.  It would not.

11  Q.  And why not?

12  A.  Because the large gap between the blue and the purple to

13  the left of the intersection is much larger than the gap to

14  the right of the intersection.

15          MR. JOHNSTON:  Let's scroll further down.  No, I'm

16  sorry.

17  BY MR. JOHNSTON:

18  Q.  Is this just the one we've been looking at for waiting

19  room screens?

20  A.  Correct.

21  Q.  Is there a graph that you've done for exam room tablets?

22  A.  Correct.

23          MR. JOHNSTON:  Can we scroll down, Ms. Paul?

24  BY MR. JOHNSTON:

25  Q.  So same questions.

1       When does this graph show the inventory exceeding the

2   delta?

3   A.  Again, around Month 10, October.

4   Q.  And what can you say about the size of the delta, or at

5   least the gap between the -- the delta and the growth before

6   May of 2015?

7   A.  It would have been a similar gap to the gap between the

8   blue and the purple lines at Month 5.

9   Q.  And assuming the exam room tablets were, in fact, sold on

10  a waiting -- weighted average basis, does this graph indicate

11  one way or the other whether the company would be able to

12  satisfy its obligations under that --

13  A.  Again, assuming the weighted average basis, it would not.

14  It would not.  Excuse me.

15  Q.  And why?

16  A.  Same answer to before.  If you look at the space between

17  the blue and the purple lines to the left, it is larger just

18  than the little area to the right of the intersection.

19       So there's a bigger gap before it reaches the end --

20  before the end of the year when the campaign meets the

21  inventory gap.

22  Q.  And what was your understanding about whether clients

23  would be billed the full amount of their exam room tablet

24  campaigns, even when there was a delta?

25  A.  Same answer as waiting room, billed fully.

1           MR. JOHNSTON:  Let's take a look at the first tab,

2    Q1 review overview.

3    BY MR. JOHNSTON:

4    Q.  What are you providing on the inventory and installed tabs

5    here?

6    A.  So here, I'm just showing in the first three months of the

7    year what actually happened versus what the Sea Island plan,

8    which had been done months before, had projected.

9    Q.  And so how much worse had the exam room tablet

10   installations gone than had been previously predicted?

11   A.  So by the end of March, it -- it looks like they were

12   almost 400 tablets, cumulatively, behind the plan.

13          MR. JOHNSTON:  You can take this down, Ms. Paul.

14          Let's take a look at Exhibit 459.  Let's zoom in at

15   the top, and let's actually include down to Mr. Ma's original

16   email.

17   BY MR. JOHNSTON:

18   Q.  Now, Mr. Ma, is this Mr. Desai's response to your original

19   email attaching the two spreadsheets that we previously looked

20   at?

21   A.  It appears so.

22   Q.  And in your original email, you had attached the growth

23   model and the delta report to the people that are on this

24   email chain?

25   A.  Yep, I believe so.

1  Q.  And you wrote:  Here is the growth model for the weekend?

2  A.  Correct.

3  Q.  And then you also wrote:  AD -- is that Ashik Desai?

4  A.  It is.

5  Q.  Delta model from yesterday is attached for reference as

6  well?

7  A.  Yep.

8  Q.  Okay.  Can you please read what Mr. Desai says in

9  response?

10  A.  He says:  Thanks, D. Ma -- so D. Ma refers to me,

11  David Ma -- and Jason for your hard work on this.  I'm happy

12  we were able to align on outputs and definitions as well.  I

13  walked Rishi through this last night, and we should be --

14  should be good to go at this point.

15  Q.  Mr. Ma, how did Mr. Desai's comments to you affect your

16  understanding about whether your work was being shared with

17  leadership at the company?

18  A.  From -- from my recollection, I already assumed that it

19  was being shared with leadership.  But this email confirms my

20  belief that it was shared with leadership.

21      MR. JOHNSTON:  You can take this down.

22  BY MR. JOHNSTON:

23  Q.  In your time at Outcome Health, did anyone ever

24  rationalize the under-delivery to you?

25  A.  Yes.

1    Q.  Who was that?

2    A.  Both Ashik and Shradha.

3    Q.  Let's talk about what Mr. Desai would tell you.

4    A.  Okay.

5    Q.  Did you ever express your concerns about the

6    under-delivery to Mr. Desai?

7    A.  I did.

8    Q.  What did -- what did he say in response?

9    A.  Ashik was generally pretty empathetic to me.  And so he

10   would start by saying, you know, I -- I get that you're

11   uncomfortable; I understand why you feel that way.  And then

12   he tried a number of different ways to help me feel better

13   about the way that we did business.

14   Q.  What were some of those ways?

15   A.  At one point, he had sort of convinced me that, you know,

16   even if we under-delivered, it would be okay as long as we hit

17   the ROI guarantees on the contracts.

18   Q.  What do you mean by "ROI guarantees on the contracts"?

19   A.  So an ROI guarantee that was written into a lot of the

20   contracts, to my understanding, was -- for example, if a

21   client spent $1 million on a campaign and we would offer,

22   for example, a 3:1 ROI guarantee, that we would then go and

23   verify that they would get the equivalent value in $3 million

24   back.

25   Q.  And so what did the ROI delivery or ROI -- ROI guarantee

1 have to do with hitting the contractual device number?

2 A.   It was just a different provision in the contract.

3 Q.   So when Mr. Desai would tell you that so long as we hit

4 the ROI, it didn't matter whether the contractual device

5 amount was met, was that something that you believed?

6 A.   For a period of time, I did -- yeah, I did believe it

7 because --

8         MR. BLEGEN:   Judge, I'm sorry.   Can I interrupt

9 again?

10         We're not -- we don't have the witness on the

11 screens.   I have a hard time seeing from here.   I imagine the

12 people all the way in the back...

13         THE COURT:   All right.   Yeah.

14         Just let me know if it's going to be a lengthy set of

15 questions without an exhibit up there.

16         MR. JOHNSTON:   Sure.

17         THE COURT:   I'll put the camera on.   I don't want to

18 switch it back and forth every time.

19         Here we go.   Okay.

20 BY MR. JOHNSTON:

21 Q.   So, Mr. Ma, what was your reaction to Mr. Desai's comment

22 that you only had -- that the company only had to meet the ROI

23 delivery?

24 A.   Yeah.   I think it -- it gave me sort of temporary relief

25 that, you know, my boss said that this seemed okay.   And as

1  long as we met the ROI, you know, it's okay if we

2  under-deliver for a bit because the sponsor is still, in

3  theory, getting their, you know, money's worth through the

4  ROI.  So it sort of put me off for a bit on it.

5  Q.  Did you later develop a different understanding about the

6  contractual obligations?

7  A.  I did.

8  Q.  And what understanding did you develop?

9  A.  Well, I think contracts should be contracts.  So as I

10 thought more about it, I felt like, you know, even if,

11 for example, we had hit the ROI, if we had delivered the

12 actual inventories, we could've delivered an even better ROI.

13        And so in my mind, I felt like we were sort of in

14 some ways letting the sponsors and contracts down, basically.

15 Q.  Were there any discussions with Mr. Desai that the

16 shortfalls and deltas were only temporary?

17 A.  There were.

18 Q.  And if you can elaborate on what he told you.

19 A.  Yeah.  I think there was another period of time where he

20 tried to convince me that this was just something that we were

21 doing right now to grow the company and that eventually we

22 would be able to catch up.  And, you know, this was just a --

23 a thing that we were doing so that the business could run

24 better in the future.

25 Q.  Did these rationalizations help you stay at the company

1  longer than you otherwise would have?

2  A.  They did.

3  Q.  How so?

4  A.  You know, I was in a weird state of mind for much of my

5  time at the company.  But, you know, I was oscillating between

6  concern and being sort of assuaged that, you know, maybe this

7  was going to end up being okay.  I was sort of an optimist

8  that, you know, one day the company would, you know, be clean

9  or do things the right way.

10         And so Mr. Desai, or Ashik, was able for a time to

11  convince me that, you know, it's worth staying, that we'll get

12  this right and eventually you won't have to worry about it.

13  Q.  And you mentioned you also had a conversation with

14  Ms. Agarwal?

15  A.  I did.

16  Q.  And we'll revisit that for a second, but did that play any

17  role in your -- did conversations with Ms. Agarwal play any

18  role in your staying at the company?

19  A.  It both did and it didn't.

20  Q.  Okay.  We'll revisit it when we cover that in a bit.

21         Now, at some point did you move away from working on

22  the sponsorship side with Ashik Desai on to the membership

23  side?

24  A.  I had always worked a little bit on the membership side

25  through my role in sponsorship and then later transitioned

1  actually to a product -- to a product team-focused role.

2  Q.  And when did this transition to the product side happen?

3  A.  Early in 2015.  Maybe it was January, I think.

4  Q.  And how long had you been at the company at the time?

5  A.  A little over six months.

6  Q.  Starting in January 2015, who did you report to?

7  A.  I had a double reporting sort of structure into both

8  Shradha, as well as Lee Ebreo, who was the VP of engineering.

9  Q.  What did Lee Ebreo do?

10 A.  He was effectively the head of engineering and the person

11 responsible for developing product and code.

12 Q.  Who replaced you on the sponsorship side?

13 A.  We had hired at that point Kathryn Choi and Oliver Han to

14 replace me.

15 Q.  Despite moving into this product role, did you continue to

16 work on developing and generating the delta reports and growth

17 models?

18 A.  I did.

19 Q.  So in that previous email that we saw from April 2015, is

20 that you still generating the delta report and growth model

21 despite being on the product side?

22 A.  Correct.

23        MR. JOHNSTON:  Let's take a look at Exhibit 483.

24 All right.  Let's first zoom in at the top.

25 BY MR. JOHNSTON:

1    Q.  Who have you forwarded this email to?

2    A.  To Shradha.

3    Q.  And what's the date on this email?

4    A.  August 12, 2015.

5    Q.  What's the subject?

6    A.  Forward Q4 deltas and allocation of resources.

7            MR. JOHNSTON:  All right.  Let's take a look at the

8    bottom of page 2.  Let's zoom in on the chart below.

9    BY MR. JOHNSTON:

10   Q.  What is this particular chart?

11   A.  Can I actually look at the email below, just to --

12   Q.  Yeah, sure.  Let's look at the text first.

13           Would you like to start on the first page?

14   A.  I think the bottom one would be the first email, right?

15   Q.  Okay.  Let's look at this.

16           So can you please read what Mr. Desai wrote you?

17   A.  He says:  Hey, David.  When you get a chance, can you

18   please provide me the following.  I'm trying to share with RS,

19   Rishi Shah, a preliminary idea of in Q4, across each network,

20   where our growth should be allocated.

21   Q.  What is your understanding of what he's asking from you

22   here?

23   A.  He's basically saying can you give me the numbers on how

24   we are doing or, in some cases, how far behind we are in each

25   of the specialty networks?  And, therefore, where we should

1  place our resources to make sure we acquire as many screens or
2  tablets.
3  Q.  And can you read No. 3?
4  A.  Based off -- off of large 2015 deltas and programs that,
5  you know, go across year, such as all of DSI, Astellas, and
6  Takeda business, what networks do you think require the most
7  growth?
8  Q.  What's your understanding of what he is referring to
9  within this question?
10  A.  So he's saying based off of the fact that we ran large or
11  huge gaps for at least the first half of 2015 and, as
12  you know, we're going to renew a bunch of these contracts even
13  for the following year, which networks are the most behind
14  and, therefore, will require the most amount of people to call
15  in to -- to get more screens and tablets.
16  Q.  All right.  Let's take a look at your response.  Let's
17  start with the text.
18          Would you like to start on the first page?
19  A.  Yeah, that would be helpful.
20  Q.  All right.  Let's take a look at what you write,
21  starting -- well, let's first see who you initially sent this
22  information to.
23          Who did you send it to?
24  A.  To Ashik and Matt Garms.
25  Q.  Can you remind us who Matt Garms is?

1  A.  Matt Garms was the person responsible for acquiring new

2  offices and screens and tablets.

3  Q.  All right.  And let's take a look at the actual text.

4         So what -- what have you provided for Mr. Garms and

5  Mr. Desai?

6  A.  I've basically provided a different way of looking at the

7  deltas and the growth models combined into one chart.  And

8  then I've given some context on how it was built and some of

9  the summary below of, you know, where I think we have the

10  biggest gaps.

11  Q.  And which networks did you believe had the biggest gaps?

12  A.   In this email I've written, that I believe cardiology,

13  gastro -- which is gastroenterology -- and neurology have

14  three of -- are three of our most problematic networks.

15  Q.  And can you explain why you found those networks to be so

16  problematic?

17  A.  Yeah.  So for cardiology, I wrote:  Even if we put 25 reps

18  on cardiology and they produce 10 -- so in this case,

19  10 offices per month -- we still won't reach our goal even in

20  12 months.

21         And so my belief was that cardiology was the most

22  oversold or projected to be oversold.  And so even if we

23  staffed a huge number of resources on acquiring cardiology

24  offices, we wouldn't be able to hit our contractual needs.

25  Q.  Within an entire year?

1  A.  Correct.  12 months, yep.

2  Q.  And what's the problem with gastro?

3  A.  I write here:  Limitation is leads, as we're out, as

4  you know.

5       And so what that means is there's only so many gastro

6  doctors in the entire country.  And if I -- even if I wanted

7  to put as many reps onto calling gastro, I couldn't give them

8  enough offices to call upon.

9  Q.  And what do you say is the problem for neuro?

10 A.  Same or similar problem which is, you know, there are just

11 not enough neurologists to get a huge team to call on here.

12 Q.  In this email, have you attached a screenshot that

13 summarizes your conclusions?

14 A.  I have.

15       MR. JOHNSTON:  Let's take a look at page 2, and let's

16 zoom in on the particular chart.

17 BY MR. JOHNSTON:

18 Q.  What's the -- let's just go to -- start from left to right

19 on what we're viewing here.

20 A.  Okay.

21 Q.  What are you -- what's written where it says vertical?

22       MR. JOHNSTON:  And then, you know, maybe because it's

23 pretty small, Ms. Paul, could we do half the -- sort of half

24 the chart at a time?  Or no, I mean the -- sort of

25 verticalwise, yeah.

1       And then with the second chart, please.

2   BY MR. JOHNSTON:

3   Q.  All right.  So what information have you included in the

4   first four columns?

5   A.  Yep.  So starting on the furthest left is the specialty or

6   vertical or category, as we often called it.

7       The next column over, the goal, shows either what

8   contracts have already been sold or what we expected would be

9   very likely sold.

10  Q.  So where -- where would that have -- information come?

11  A.  That would have come from a combination of what was in

12  Salesforce and information that I would have gotten from --

13  from Ashik about where he expected new campaigns to be sold.

14  Q.  And was that because Salesforce contained a list of all of

15  the outstanding contractual obligations that Outcome had to

16  its pharma clients?

17  A.  It would have had the current list, as well as some of the

18  late stage in contracting ones.

19  Q.  And then what's the third column?  What's listed there for

20  current?

21  A.  And so that says the current number of office -- oh, I

22  can't remember if this is offices or screens.  But, you know,

23  basically, the current inventory.

24  Q.  And then what's the fourth column?

25  A.  The delta or, again, the gap between what is needed and

1   what we currently have.

2   Q.  What are the -- sort of the -- I don't know if you can do

3   this quickly, but as a percentage of the goal, which ones just

4   stand out to you as very significant deltas?

5   A.  Well, as -- as we called out on the prior email that I --

6   or the same email that I had just read, cardiology was one of

7   the most problematic ones, needing 3,500 and having only a few

8   hundred and a gap of over 3,200.

9   Q.  And what about dermatology?

10  A.  Yeah.  Dermatology looks like it only has a few hundred,

11  and it's almost 1,000 behind.

12  Q.  What about gastroenterology?

13  A.  Gastro looks like it's only halfway to where it's needed

14  to be.

15  Q.  And then how about neurology?

16  A.  It looks like neurology is only one-third of what we

17  actually need.

18  Q.  And then what is the information that's in the chart at

19  the bottom for -- under general health category?  What

20  information have you provided there?

21  A.  Yep.  So as we, I believe, discussed earlier, there was --

22  so we had specialty networks, which are the ones up top.  And

23  then we talked about general health.

24          And this was some of the legacy or -- or -- or areas

25  that the company had built up actually fairly well.  And so a

1  lot of these are diseases or states or -- or diseases that
2  basically are comorbidities that people might overlap on.
3       And so we tended to separate our analyses there from
4  specialties versus general health.  And so this is the exact
5  same chart, but for six of our large general health
6  categories.
7  Q.  Are there significant deltas there as well?
8  A.  There are.
9       MR. JOHNSTON:  Let's look at the second half of the
10  chart.
11       THE WITNESS:  I think we might need the whole thing
12  to see the categories.
13       MR. JOHNSTON:  Okay, sure.  I guess we'll have to do
14  the whole thing at this point.
15       THE WITNESS:  To see the categories.
16  BY MR. JOHNSTON:
17  Q.  All right.  Can you -- and it's still probably hard to
18  read for some of the jurors, but if you could just explain --
19       MR. JOHNSTON:  So we'll need the -- the vertical.
20  Okay.
21  BY MR. JOHNSTON:
22  Q.  So let's take a look at what you have indicated on the
23  cardiology line.
24  A.  Yep.  So --
25  Q.  What information are you providing here?

1   A.  So the next few columns, current reps and planned reps,

2   refers to how many what we called membership, you know, or

3   healthcare salespeople.  Again, these are the folks that are

4   calling doctors' offices and trying to convince them to

5   install TVs and tablets, are currently working on calling

6   cardiology offices.  And you can see that we have four.

7           And knowing that this is going to be an area where

8   we're really behind, it seems like at this time we had already

9   started planning for having way more people calling into

10  cardiology.  And so I put 25 planned reps calling into it.

11  So, you know, more than six times the number of people we

12  would need to invest in building cardiology.

13          And then productivity is an assumption that basically

14  says we expect each rep to -- to get ten offices per month.

15  And then the column to the right, the colored one, says how

16  many months would it take us to reach our goal if the

17  assumptions to the left would be true?

18          And so what this basically says is, as I talked about

19  in my summary, the email above, if we 6X'd the number of

20  people calling cardiology and they all produce at the level

21  that we thought they would, it would take 12.9 months just for

22  us to reach the goal of the cardiology campaign -- or the

23  cardiology needs, excuse me.

24  Q.  And how about with gastroenterology?

25  A.  Yeah, same thing.  It would take 12 months to reach.

1    Q.  And then how about for obstetrics and gynecology?

2    A.  Almost 11 months.

3    Q.  And if we look to the general health category, do we see

4    similar timelines for meeting the goal?

5    A.  Yep.  Generally, between 10 and 13 months away.

6    Q.  Now, Mr. Ma, in this particular chart, does the -- the

7    goal indicate exactly what -- like which particular month that

8    the obligation sort of comes online?

9    A.  It does not.

10   Q.  And so in what prior chart had we looked at is that

11   information sort of spelled out in more detail?

12   A.  In the -- the details of the growth model, there's

13   information about the start date and the end date of

14   campaigns.

15           MR. JOHNSTON:  All right.  Let's zoom out, please.

16   Go the first page.

17   BY MR. JOHNSTON:

18   Q.  Why are you forwarding this to Ms. Agarwal?

19   A.  It must have been upon request.  I don't recall exactly.

20   Q.  At this time, was Ms. Agarwal playing any role in

21   overseeing the growth of the network?

22   A.  She was.

23   Q.  And how do you know that?

24   A.  I actually think in this email, it says some context on

25   that.  Further below.

1    MR. JOHNSTON:  Okay.  Can we scroll further down?

2  Further.

3    THE WITNESS:  Yep.  So that middle line, it says:  I

4  then got current reps and projected reps.

5  BY MR. JOHNSTON:

6  Q.  And what do you mean by that?

7  A.  So in the chart where I have the columns current reps and

8  projected reps, it seems like I got that information from

9  Shradha.

10    Because here, the email reads:  I've got current reps

11  and projected reps.  SA, or Shradha Agarwal, said yesterday

12  we'd be at 70 by the end of the year.  And so our hiring plans

13  were something that she had knowledge of.

14  Q.  And, Mr. Ma, the goal number that was listed there, you

15  say that was based partially on existing obligations and also

16  expected obligations.  Is that correct?

17  A.  Correct.

18  Q.  Is it possible that some of those contracts that were

19  expected to be signed never, in fact, signed?

20  A.  Yes.

21  Q.  Is this chart consistent or inconsistent with the prior

22  charts that we looked at in terms of the timeline for meeting

23  any sort of delta?

24  A.  I think very consistent.  It was my experience at the

25  company that we were always, you know, anywhere from 6 to 12

 1   or even more months off from meeting the inventory needs.  It

 2   was a -- kind of like a hamster wheel situation.

 3         MR. JOHNSTON:  You can take this down, Ms. Paul.

 4   BY MR. JOHNSTON:

 5   Q.  Did you ever participate in meetings with Rishi Shah and

 6   Shradha Agarwal about the deltas?

 7   A.  I did.

 8   Q.  Approximately how many meetings if you can remember?

 9   A.  My estimate would be three to six, perhaps.

10         MR. JOHNSTON:  Let's take a look at Defense

11   Exhibit 3492.  If we can zoom in at the top -- just to the

12   details, in fact, of the invite.

13   BY MR. JOHNSTON:

14   Q.  What is this an invite for?

15   A.  The title is "Q2 recap and Q3 plan setting."

16   Q.  What type of event is that?

17   A.  You can think of it as like a quarterly -- a quarterly

18   review.  We were looking at how well did the second quarter go

19   and looking ahead to plan three -- or sorry -- looking ahead

20   to Q3, what were some of the highlights and challenges going

21   forward.

22   Q.  And so is this scheduled for the end of June 2015?

23   A.  It is.

24   Q.  Is that the end of second quarter?

25   A.  April, May, June -- yes, it is the end of the second

1  quarter.

2  Q.  And where is this particular meeting going to take place?

3  A.  In Rishi's office.

4  Q.  And there are a number of participants or invitees.

5     Would all of them have been in attendance?

6  A.  Nope.

7  Q.  Who would not have been in attendance?

8  A.  From my memory, David Cho, and Phil de Guzman did not

9  attend the meetings because they were Rishi and Shradha's

10 admins, or people that helped them schedule.

11 Q.  So who would have been the attendees at this meeting?

12 A.  It would have been Rishi, myself, Ashik, Shradha, and

13 Matt Garms.

14 Q.  At these types of meetings, were you expected to make

15 presentations?

16 A.  I was.

17 Q.  What types of presentations were you expected to make?

18 A.  Very similar content to what we reviewed, either

19 network -- by network or sometimes in highlights in certain

20 contracts, how ahead or behind were we on certain networks,

21 and what was our plan to fill the gaps.

22 Q.  And can you just be a little bit more specific about what

23 information it was your role to provide at these meetings?

24 A.  Yeah.  I think, you know, building delta reports, building

25 growth models, and finding ways to present them in a way that

1  would be easily digested by the executives was one of my

2  roles.

3          MR. JOHNSTON:  Let's take a look at Exhibit 1153.

4  And let's zoom in at the top.  We actually need to zoom in,

5  Ms. Paul, on the top half.

6  BY MR. JOHNSTON:

7  Q.  Do you see this is an email from yourself to Matt Garms?

8  A.  I do.

9  Q.  Was he one of the participants in the Q2 recap meeting

10  that we saw that was scheduled to take place on June 29, 2015?

11  A.  Yes, he was.

12  Q.  And do you see four attachments to this particular email

13  that you sent?

14  A.  I do.

15  Q.  And is this email a forward of an email -- of emails that

16  you had sent yourself?

17  A.  It is.

18  Q.  And the subject line is Q2 review documents?

19  A.  It is.

20  Q.  And do you see that the original email from yourself is at

21  10:13 a.m. on June 29, 2015?

22  A.  I do.

23  Q.  And is that a few hours before the Q2 meeting was supposed

24  to occur in Mr. Shah's office?

25  A.  It is.

1    Q.  Do you believe, based on this context, that these are the

2    materials that you prepared to present in that meeting?

3    A.  I do.

4    Q.  Let's take a look at the spreadsheets, the 1153B.  And

5    let's take a look at some of the tabs.

6         So can you tell us what type of document we're

7    looking at?

8    A.  A delta report.

9    Q.  And how is the delta report classified here?

10   A.  Sorry.  Can you --

11   Q.  Laid out, categorized.

12   A.  By the disease conditions or the categories.

13        MR. JOHNSTON:  Let's go to the next tab, please.  And

14   then let's actually start with -- at Tab 5.

15   BY MR. JOHNSTON:

16   Q.  So again, let's look at the top.

17        What are we looking at here?  Where would this

18   information have been pulled?

19   A.  This is a Salesforce export -- or comes from Salesforce.

20   Q.  And what exactly have you pulled out of Salesforce?

21   A.  Every row here represents a campaign that either had been

22   sold or was going to be -- or we thought was going to be sold.

23   And it contains information about the brand or the drug, which

24   network or, as we talked about earlier, vertical, as well as

25   which specific category it's in, as well as the required

1  inventory for that campaign.

2  Q.  Now, is this a tab that we saw in the April 2015 delta

3  report as well?

4  A.  Yep, a very similar one.

5  Q.  And so this delta report is just approximately two months

6  later?

7  A.  Yep.  Same information, just a few months later.

8         MR. JOHNSTON:  Can we just scroll briefly to the

9  right, Ms. Paul.

10  BY MR. JOHNSTON:

11  Q.  Does it give the indication of start date, end date, and

12  whether the contract was signed?

13  A.  It does.

14  Q.  And --

15  A.  In Columns K through M, to be specific.

16  Q.  And so typically would you only include contracts that

17  were either signed or just about to be signed?

18  A.  Yeah.  My -- my goal was to include things that we would

19  consider high confidence.

20  Q.  And in this particular segment of information,

21  approximately how many have actually been signed?

22  A.  If you scroll down, we can count up the campaigns.

23         So it looks like 80 percent of these contracts are

24  actually signed, and maybe another 20 percent -- I'm just

25  eyeballing here -- are in late stage.  And so it looks like

1  there are 73 we would consider higher confidence advertising
2  campaigns.
3  Q.  All right.  And then have you also included a tab for
4  inventory?
5       MR. JOHNSTON:  If you go to the Tab 5, please,
6  Ms. Paul.
7  A.  I have.
8  BY MR. JOHNSTON:
9  Q.  And is that -- would this -- what date would the --
10 this -- these inventory numbers reflect?
11 A.  So on the tab, it says 150628, the name of the tab.  And
12 so this would be 201506, or June, and the 28th.  And I believe
13 that meeting was on the 29th, and so the day before the
14 meeting.
15 Q.  So this is a current snapshot of Outcome's inventory the
16 day before the meeting with Mr. Shah and Ms. Agarwal?
17 A.  Correct.
18      MR. JOHNSTON:  Let's go then to Tab 4, deltas by
19 month.
20 BY MR. JOHNSTON:
21 Q.  Is this a similar format that we saw to the April delta
22 report?
23 A.  It is.
24 Q.  And is it just a comparison of the contractual obligations
25 and the inventory numbers as of the date that you pulled the

1  inventory?

2  A.  It is.

3  MR. JOHNSTON:  Okay.  And let's look at the Tab 3,

4  Excel.

5  BY MR. JOHNSTON:

6  Q.  What if -- how have you transported the information from

7  Tab 4 into this particular tab?

8  A.  So in Tab 4, it has all the deltas by month.  In this

9  case, you can see that I've put the 12th month up top.  And so

10  I'm just looking at what the gaps would be at the end of the

11  year, assuming that we don't grow inventory.

12  Q.  And have you also included the --

13  MR. JOHNSTON:  If we look at Tab 2.

14  BY MR. JOHNSTON:

15  Q.  -- the overlap calculation that Mr. Purdy had asked you to

16  include back in February of 2015?

17  A.  I have, yep.

18  Q.  And did you -- did this data then plug into a slide deck

19  that was to be presented at that meeting?

20  A.  It did.

21  MR. JOHNSTON:  Let's take a look at 1153A first.

22  BY MR. JOHNSTON:

23  Q.  Now, is this another version of the growth model that we

24  had previously -- that you had previously talked about?

25  A.  It is.

1  Q.  And if we take a look at the information that is on this

2  particular chart, Q2 plan comparison, what can you tell us

3  about how the growth plan has been going?

4        Do you need to see a different part of the chart?

5  A.  I would need to, yes, see more of the --

6        MR. JOHNSTON:  Let's see if we can scroll a little

7  further down, Ms. Paul.

8        Hold on.

9        THE WITNESS:  Yeah, I think the versus plans area is

10  a good place to look.

11        MR. JOHNSTON:  So this next one down, the

12  versus plans?

13        THE WITNESS:  Versus plans, yeah, further -- further

14  down a little bit more.

15        MR. JOHNSTON:  So if you can just scroll down a

16  couple more rows.  There we go.  And then maybe a bit to the

17  right.

18  BY MR. JOHNSTON:

19  Q.  So what can you tell us about how the various plans that

20  have been created over the prior six months have panned out?

21  A.  Yep.  So you can see the -- the Sea Island plan, we were

22  on track for waiting rooms for much of the first half of the

23  year.  But you can see that on the tablets, we were pretty far

24  behind.  In this case, the positive number is going to

25  represent a bigger gap, I believe.

1           MR. JOHNSTON:  Okay.  Can we go further up to the

2      percentages, Ms. Paul?

3      BY MR. JOHNSTON:

4      Q.  So what are the percentages that you have calculated here?

5      A.  It -- it looks like it's percent to plan.

6      Q.  Okay.  Now, has this information been then translated into

7      an executive summary?

8      A.  It has.

9           MR. JOHNSTON:  All right.  Let's take a look at 1153,

10     page 10.  I guess we're going to start at page 2.  Page 3.

11     BY MR. JOHNSTON:

12     Q.  Now, what are we looking at here, Mr. Ma?

13     A.  There's a -- this is the -- the -- either the PowerPoint

14     or the PDF that was attached to that email that we just

15     reviewed.

16     Q.  Do you believe you would have presented this at the

17     meeting?

18     A.  I do.

19     Q.  Do you have a specific memory of presenting it at the

20     meeting?

21     A.  I do not.

22     Q.  But based on your -- on the documents that you see, do you

23     believe that was its intended purpose?

24     A.  I do.  I wouldn't have bothered putting it into a

25     summarized format that was easy to digest if I wasn't planning

1    to present it to executives.

2            MR. JOHNSTON:  All right.  Let's go to the next page.

3    BY MR. JOHNSTON:

4    Q.  What is the summary that you have set forth for the

5    executive team?

6    A.  Yep.  So the first bullet reads:  Growth to date lagging

7    behind Sea Island and Lake Geneva plans.

8    Q.  What do you mean by that?

9    A.  It basically says we set up a plan in Sea Island, and then

10   we later set up a -- and we didn't hit it.  So we set up a

11   revised plan in Lake Geneva, and also we didn't hit.

12           And so it says:  Growth to date lagging behind both

13   plans.  And then I give specifics of how far behind.

14   Q.  And then what's the second bullet point?

15   A.  It says:  Gaps are hiring based, not productivity based.

16   Q.  So what are you saying there?

17   A.  It's basically saying that the reps that are calling the

18   doctors' offices have been roughly as productive as we thought

19   they were in terms of acquiring the number of offices per

20   month, but we haven't hired enough people to hit our goals in

21   the deltas.

22   Q.  And what's the third bullet point?

23   A.  It says:  Growing gaps likely will result in key misses on

24   sold inventory.

25   Q.  What are you highlighting for the executive team in this

1  point?

2  A.  This is just business speak for we have large deltas and

3  we're going to miss our contracts.

4         MR. JOHNSTON:  Let's go down to page 5.  Please

5  scroll to the next page, Ms. Paul.

6  BY MR. JOHNSTON:

7  Q.  Does this -- can you explain what this graph demonstrates?

8  A.  Yep.  So each of the three blue-colored bars represents a

9  different plan.  And so you can see -- I think this is around

10  June, for example.  If you look at the three June bars, I

11  believe this is -- if you look at the top of the chart, it

12  says:  Waiting rooms in thousands.

13         And so what this means is the light blue Sea Island

14  plan said that by June we'd have 6,600 waiting room screens.

15  And then we were falling behind earlier in the year.  And so

16  the Lake Geneva plan revised that down by 200 screens.

17         And then by the time June had actually rolled around,

18  we were even further behind.  So we were about 300-ish

19  screens -- I guess in this case, 241 behind the Sea Island

20  plan that we had set at the beginning of the year.

21         MR. JOHNSTON:  Let's look at page 6.

22  BY MR. JOHNSTON:

23  Q.  Did this lay out the same thing for exam room tablets?

24  A.  It does.

25  Q.  And what can you tell us about the performance of the

1  company in acquiring the inventory compared to how it

2  previously intended to grow?

3  A.  So if you again highlight the June bars, you can see that

4  at the beginning of the year, the optimistic estimate said

5  that we would be at 10,400 tablets.  But by the time that June

6  had rolled around, we were only around 9,400, so almost 1,000

7  tablets behind the original plan.

8  Q.  So, Mr. Ma, what was the implication of -- for the deltas

9  for failing to grow the inventory as much as had been

10  intended?

11  A.  It basically meant that closing the gap would have to

12  happen later in the year.  And so if you recall the two lines

13  overlapping, it means that the intersection would have been

14  even further towards the end of the year.

15          MR. JOHNSTON:  And let's jump to page 10.

16  BY MR. JOHNSTON:

17  Q.  What have you provided in this particular chart?

18  A.  So this is just a chart of the -- one of the tabs in the

19  Excel spreadsheet, the one that I said would be the gaps by

20  December if we didn't grow any additional inventory.

21          And so it's showing -- for example, that if you look

22  at the worst one, allergy, you know, we need 10 -- you know,

23  1067 or 1,067 waiting room screens.  And this case, we have

24  maybe only 100-some.  And so we're 900 behind the allergy

25  campaign.

1    Q.  And, Mr. Ma, I don't know if you recall, but when we

2    looked at the campaign by campaign tab from the delta

3    report --

4    A.  Yep.

5    Q.  -- did those campaigns just begin at the end of the year?

6    Or are most of them already in place and running at the time

7    this report is being generated?

8    A.  Yeah, most campaigns had --

9            MR. LOWDER:  Foundation.

10   A.  -- had started, I think, you know, either by Q2 or the

11   mid-year at the latest.  Many of them by the beginning of the

12   year.

13           MR. LOWDER:  Objection.

14           THE COURT:  Sir, was there an objection?

15           MR. LOWDER:  Yeah.  Foundation, Your Honor.

16           THE COURT:  Ask how he knows.

17   BY MR. JOHNSTON:

18   Q.  Mr. Ma, is this graph a direct import from the delta

19   report that we have just reviewed?

20   A.  It is.

21   Q.  And did that delta report directly incorporate the

22   Salesforce data about the company's outstanding contractual

23   commitments?

24   A.  It did.  It had the start dates and the end dates and

25   whether they were signed or not.

1  Q.  And did most of those campaigns show that the contractual

2  obligation was already in place?

3  A.  It did.

4  Q.  So what does this chart show for the company's

5  then-current ability to satisfy its outstanding campaigns?

6  A.  It basically says for a lot of the orange areas, or the

7  gaps, that there were existing gaps today.

8  Q.  And are some of the gaps substantial?

9  A.  They are.

10  Q.  And this is in the middle of the year, correct, Mr. Ma?

11  A.  Yep, late June.

12  Q.  If any of these -- if all of these campaigns were on a

13  weighted average basis, would Outcome be able to satisfy its

14  obligations on that understanding?

15  A.  Generally -- generally, no.  Maybe some of the ones at the

16  top perhaps.  But the ones on the bottom, very, very, very

17  unlikely.

18  Q.  And why is that?

19  A.  Just doing the math, if that allergy campaign in theory

20  were a weighted average one, basically, immediately, the

21  company would need to not be behind by 904 screens.  It would

22  need to be ahead by over 900.

23          So they'd have to magically find 1,800 screens for

24  allergy for the entire back half of the year, which seems

25  pretty unlikely.

1  Q.  Is there a similar chart that you've created for exam room

2  tablets?

3  A.  Correct.

4          MR. JOHNSTON:  Let's go to page 11.

5  BY MR. JOHNSTON:

6  Q.  Are the deltas even larger for exam room tablets?

7  A.  On average in this case, yes.

8          MR. JOHNSTON:  Your Honor, at this time, the

9  government wants to read -- have Mr. Ma read an exhibit into

10  evidence.  He's not on the email.

11          THE COURT:  All right.  It's already in evidence?

12          MR. JOHNSTON:  It hasn't been objected to.

13          THE COURT:  All right.  What is the exhibit?

14          MR. JOHNSTON:  Exhibit 475.

15          THE COURT:  All right.  Is there any objection?

16          MR. POULOS:  May I have a moment, Your Honor?

17          THE COURT:  All right.

18          Any objection to the admission of the exhibit?

19          MR. POULOS:  No objection, Your Honor.

20          MR. LOWDER:  No objection.

21          MR. TODISCO:  No objection.

22          THE COURT:  All right.  The exhibit is admitted.

23          Are you going to put it on the screen or just have

24  him read it?

25          MR. JOHNSTON:  We're going to put it on the screen.

1           THE COURT:  All right.  Proceed.

2           It's admitted without objection.

3       (Said exhibit admitted in evidence.)

4  BY MR. JOHNSTON:

5  Q.  So let's start with just the bottom email.  I'm not going

6  to have you read all of this, but I'm just -- could you just

7  please read who this is from, who is it to, the subject, and

8  then just the -- what Mr. Purdy writes and then just cover the

9  broad bolded categories.

10 A.  So it's from Brad Purdy to somebody named Jake Goldstein

11 or Goldstein.

12          And Brad writes -- or the subject is:  First quarter

13 wins.  It's from mid-June 2015, so maybe three months after

14 the first quarter.

15 Q.  Yeah.  If you just read the top.

16 A.  Jake, please find the below information on the significant

17 progress CM -- which I presume means ContextMedia -- has made

18 YTD -- which is -- it means year to date in this business

19 context.

20 Q.  Just what are the broad categories listed here?

21 A.  Revenue, brands and campaigns, media efficacy research,

22 sponsorship team, operations, physician practice sales.

23 Q.  Okay.  That's fine.

24          MR. JOHNSTON:  Let's go to the next email, please,

25 Ms. Paul.  Further up.

1  BY MR. JOHNSTON:

2  Q.  Who did Mr. Purdy forward this email to?

3  A.  To Rishi and Shradha.

4  Q.  And what does Mr. Purdy write?

5  A.  He says:  FYI.  Great list here.  Lot of uphill work, but

6  good to see some of the progress in one place.

7  Q.  Okay.  Let's go up to the next email.

8      Can you please write -- or read what Ms. Agarwal has

9  written?

10  A.  She's written:  Brad's done a good job here.  We should

11  have him prepare a similar KPI report for exec each month in

12  absolute numbers (to show the delta, ha) to show us where the

13  gaps are.

14  Q.  Let's go up to Mr. Shah's response.

15  A.  He writes:  Yup, absolutely.  I've had the same thought

16  and have actually created a Google doc of things I want us to

17  measure and look at with different time intervals, too.  Do

18  you think he's the right one to generate the reports?

19      MR. JOHNSTON:  And let's look up.

20  BY MR. JOHNSTON:

21  Q.  What does Ms. Agarwal write?

22  A.  She writes to Rishi:  Curious to see D. Ma -- that's my

23  name -- report today.  We should have wins listed by someone

24  optimistic like Brad, but gaps listed by someone more

25  paranoid.

1    Q.  And what's the date on this particular email?

2    A.  June 29.

3    Q.  Is that the same day as the executive team meeting that we

4    saw the invite for?

5    A.  It is.

6              MR. JOHNSTON:  You can take this down.

7    BY MR. JOHNSTON:

8    Q.  Mr. Ma, is there one particular meeting with the executive

9    team regarding deltas that stands out to you?

10   A.  There is.  There is.  Excuse me.

11   Q.  And when did that meeting take place?

12   A.  I don't know the exact date, but I remember it being sort

13   of mid- to late 2015 in my last few months at the company.

14   Q.  And when did you depart from Outcome Health?

15   A.  October 2015.

16   Q.  So sometime in August or September?

17   A.  I think that sounds right, yep.

18   Q.  Who was at that meeting?

19   A.  The same group of attendees as the one we just reviewed.

20   So Rishi, Shradha, Ashik, and Matt Garms and myself.

21   Q.  What was the purpose of the meeting?

22   A.  Very similar.  We were reviewing some of the numbers, as

23   well as looking forward to the future on different categories

24   and performance of the team.

25   Q.  What specific numbers were you reviewing?

1    A.  Deltas and growth.

2    Q.  What, if anything, do you recall saying at the meeting?

3    A.  My role in a lot of these meetings was just to present the

4    numbers as is, perhaps in a similar form to the documents we

5    just reviewed.  And so I recall reading some of the numbers

6    out to the group.

7    Q.  Do you recall the numbers being good or bad?

8    A.  From my memory, we were always running deltas at the

9    company, and so there may have been some that were good.  But

10   many were bad.

11   Q.  Did you speak to the magnitude of the deltas?

12   A.  I did.

13   Q.  What, if any, reaction did Rishi Shah have to what you

14   were saying?

15   A.  I don't have a lot of specific memories about his reaction

16   to -- to the numbers, but there's one particular memory that I

17   have about a particular interaction.

18   Q.  And that occurred during this meeting?

19   A.  It did.

20   Q.  What did he say?

21   A.  Basically, the -- well, I was reading the numbers for one

22   of the campaigns.  And Rishi posed the question:  Are we the

23   limiter or is the market the limiter?

24           And I don't know if those were the exact words, but I

25   remember the word "limiter."

1    And what that question means is if we wanted to sell

2    more advertising campaigns in this particular network, is the

3    problem that -- sorry, I'm very loud -- is the problem that we

4    don't have enough screens and tablets?  Or is the problem that

5    there's not enough budget and money to buy all the screens and

6    the tablets?

7    Q.  Was this a category on which there was already a delta?

8    A.  There was.

9    Q.  Who, if anyone, responded to Mr. Shah's question?

10   A.  I distinctly remember Ashik Desai responded to the

11   question.

12   Q.  What did he say in response?

13   A.  He said, we are the limiter.

14   Q.  Did Mr. Shah have a response to what Mr. Desai said?

15   A.  And I remember his response.  I don't remember the words,

16   but I certainly remember him sort of gesturing like, then we

17   should take the goal up.

18   Q.  What was the significance of that comment to you?

19   A.  It was one of the few memories that I have of us sort of

20   speaking in pretty plain words about the fact that there's a

21   gap.  And even though there's a gap, we still plan on getting

22   the revenue, not telling the client.

23          And sort of it's just one of the clear examples in my

24   mind of sort of blatant disregard of the fact that there is a

25   gap.  And it's coming from the absolute top that we don't care

1    that there's a gap.

2    Q.  And what was it about his comment that made you believe

3    that he didn't care about the gap.

4    A.  When Ashik says that "we are the limiter," that means we

5    can't get enough screens and tablets to meet what the sponsor

6    or advertiser wants.  And Rishi's signaling just to take up

7    the revenue goal and sell the contract anyway signals that he

8    didn't care that there was a gap.  We just wanted the revenue.

9    Q.  What, if any, reaction or comments do you recall Mr. -- or

10   Ms. Agarwal having in that meeting?

11   A.  Yeah.  I remember she was just really happy to be able to

12   have all the information presented live.  Again, I don't

13   remember the words.  But she was like, oh -- something to the

14   effect of, this is so great that I can just -- you know, we

15   can talk about the networks and get the numbers sort of in the

16   moment.  And I think that level of information was very

17   helpful.

18   Q.  In all of your meetings with the executive team about

19   deltas and the growth models, did --

20          MR. POULOS:  Your Honor, I object to the phrase

21   "executive team."

22          THE COURT:  Overruled.  He's already testified to

23   what he -- he's testified to people at a meeting.  And I

24   suppose if there's anyone he's already testified to as part of

25   the executive team not in a meeting, you should differentiate

1    that.  That, I think, addresses the objection.

2          So go ahead, but be specific.

3    BY MR. JOHNSTON:

4    Q.  Mr. Ma, I'm referring to the meetings that you have

5    previously testified about regarding deltas and growth models.

6    A.  Okay.

7    Q.  And in those, you had previously testified that Rishi Shah

8    was in attendance?

9    A.  Yep.  Yes.

10   Q.  Shradha Agarwal was in attendance?

11   A.  Yes.

12   Q.  Matt Garms was in attendance?

13   A.  Yes.

14   Q.  And Ashik Desai was in attendance?

15   A.  Yes.

16   Q.  And then, of course, you?

17   A.  Yes.

18   Q.  In any of those meetings, did either Rishi Shah or

19   Shradha Agarwal express concern that there were such large

20   gaps between contracted inventory and actual inventory?

21   A.  I do not recall any concern.

22   Q.  Did they ever express surprise that there were such large

23   gaps between contracted inventory and actual inventory?

24   A.  There may have been some surprises around how large, but I

25   don't recall any surprise that there was gaps.

1  Q.  Moving topics along.  Let's talk a little bit about tablet

2  metrics.

3  A.  Okay.

4  Q.  When you started at Outcome Health, how new were exam room

5  tablets as a product?

6  A.  My recollection is that they were a product we were just

7  rolling out that year.

8  Q.  What was the supposed value of the tablets to advertising

9  clients?

10  A.  So if you think of the waiting room screens, you think

11  about going to the doctor's office, you show up, you sign in,

12  and you sit there.  And there's something to keep you

13  entertained maybe 10 or 15 minutes before you walk in to your

14  doctor.

15        And so the advertisers would like this because they

16  could place an ad there maybe ten minutes before you see your

17  doctor that says, you know, have you asked your doctor about

18  Humira?

19        So advertisers love this because -- I think the

20  phrase that we often used was it was sort of like a last mile

21  or 1-yard line to getting people to consider a specific drug.

22        The exam room tablets were even more -- you can think

23  of them as like the 1-inch line.  Because if you go to the

24  doctor's office, usually you sign in, you watch some TV, you

25  read a book.  Then a nurse takes your blood pressure.  Then

1  you sit down in the exam room.

2          And that's truly not just ten minutes, but minutes

3  before the doctor actually walks in the office.  And so if you

4  are looking at an iPad and receiving an ad about a drug for a

5  condition that you have, the chances of you asking your doctor

6  about that drug are even higher a couple minutes before you

7  see your doctor.

8          And so the advertisers love the idea of basically

9  inserting an ad just a couple minutes before you might see the

10  doctor.

11  Q.  Were patients expected to interact with the tablets that

12  were in the exam rooms?

13  A.  They were.

14  Q.  Did the clients expect to receive metrics about those

15  interactions?

16  A.  They did.

17  Q.  During your time at Outcome Health, did you play any role

18  in providing those metrics to clients?

19  A.  I did.

20  Q.  What were the tablet metrics supplied to clients supposed

21  to measure?

22  A.  They were meant to measure interactions.  So --

23  excuse me -- that might include how many videos did the

24  patient watch; how many times did they touch the screen; how

25  many ad -- advertisements did they see; how many times did

1  they click on the advertisements.  These types of metrics.

2  Q.  Were there any challenges to providing those metrics to

3  clients?

4  A.  There were.

5  Q.  What were those challenges?

6  A.  Because the tablet was a new product, we had internal

7  challenges with even, you know, measuring some of the metrics

8  themselves.

9  Q.  When you first started, what was the reliability of

10  Outcome's tablet network?

11  A.  I would consider it not that reliable.

12  Q.  Were tablets often not even connected or operating?

13  A.  Yeah.  So the problem with a lot of the tablets is

14  sometimes they were loud.  Sometimes because of, you know,

15  maybe bad programming, they couldn't connect to the Wi-Fi.

16  You know, sometimes the instructions weren't clear and, I

17  think, you know, the nurses would just unplug them after the

18  end of the day because they thought it might be sucking

19  batteries --

20          MR. POULOS:  Objection, Your Honor.  Speculation.

21  Move to strike.

22          THE COURT:  Just ask for the basis of his knowledge.

23          Objection overruled.  Lay a foundation.

24  BY MR. JOHNSTON:

25  Q.  Mr. Ma, what is the basis for your knowledge about how

1  tablet metrics were interacted with at the offices that you --

2  that were in Outcome's network?

3  A.  I was responsible for looking at many of the reports and

4  discussing with our network health team some of the causes of

5  low metrics.

6  Q.  Were you tasked with finding a solution to the tablet

7  metric problem when you first started at Outcome Health?

8  A.  I was shown some of the reports and asked how I could

9  help, yes.

10  Q.  Was someone already working on a solution when you

11  started?

12  A.  They were.

13  Q.  Who was working on it?

14  A.  So from -- from my recollection in reviewing some of the

15  documents, Brad Purdy, Chirag Patel, Cindy Sui were working on

16  the problem.

17  Q.  Who is Chirag Patel?

18  A.  Chirag Patel was a -- was an engineer and someone who --

19  who helped develop the tablets.

20  Q.  Who was Cindy Sui?

21  A.  She was an intern.

22  Q.  And what was Brad Purdy's role with respect to those two

23  individuals?

24  A.  He was more senior.

25  Q.  When you started working on the tablet metric problem, did

1  you have interactions with Brad Purdy?

2  A.  I did.

3  Q.  When you started, had Mr. Purdy already come up with a

4  model for how to report tablet metrics?

5  A.  He had.

6          MR. JOHNSTON:  Your Honor, I'm about to go into a

7  document.  This may be a good time to --

8          THE COURT:  Is it a lengthy document or --

9          MR. JOHNSTON:  It is kind of a lengthier document.

10          THE COURT:  All right.  That's fine.

11          We'll take our morning break, ladies and gentlemen.

12  Please don't discuss the case among yourselves or with anyone

13  else.  Keep an open mind as there is more evidence to hear.

14          We'll see you in 15 minutes.

15          COURT SECURITY OFFICER:  All rise.

16      (Jury out at 10:24 a.m.)

17          THE COURT:  All right.  Sir, 15 minutes.  You can

18  still talk to the government if they wish to talk to you over

19  the break.

20          THE WITNESS:  Okay.

21          THE COURT:  Anything we need to put in the record?

22          MR. JOHNSTON:  Not from the government, Your Honor.

23          THE COURT:  Defense?

24          MR. POULOS:  No, Your Honor.

25          MR. TODISCO:  No, Your Honor.

1        MR. LOWDER:  No, Your Honor.

2        THE COURT:  Okay.  See you in 15.

3    (A recess was had from 10:25 a.m. to 10:46 a.m.)

4        COURT SECURITY OFFICER:  All rise.

5    (Jury in at 10:46 a.m.)

6        THE COURT:  All right.  Please be seated.

7        Sir, you may continue your direct examination.

8        MR. JOHNSTON:  Thank you, Your Honor.

9  BY MR. JOHNSTON:

10 Q.  Mr. Ma, before the break, we were talking about tablet

11 metrics.

12       Do you recall that?

13 A.  I do.

14 Q.  And you testified that when you arrived, Brad Purdy had

15 already come up with a model to assist in calculating tablet

16 metrics.

17       Do you recall that?

18 A.  I do.

19       MR. JOHNSTON:  All right.  Let's look at

20 Exhibit 1144.

21 BY MR. JOHNSTON:

22 Q.  And let's start with the top -- well, who is this email

23 chain between?

24 A.  It's from Brad to me, with Ashik CC'd.

25 Q.  What's the date?

1    A.   June 23, 2014.

2    Q.   Approximately how long after you began at Outcome Health

3    was this email sent?

4    A.   Less than one month.

5    Q.   And what's the subject line?

6    A.   It says regarding tablet reweighting.

7    Q.   And what's the attachment?

8    A.   Victoza report, all months, BP edit.

9    Q.   What's your understanding of what BP refers to?

10   A.   BP refers to Brad Purdy.  It means that he edited the

11   file.

12   Q.   Let's take a look at the original email from yourself.

13            On sort of a high level, if you can just read it to

14   yourself and then summarize what you're asking Mr. Purdy.

15   A.   Okay.  Can I have a minute to read through it, please?

16   Q.   Yes.

17   A.   Okay.

18   Q.   What are you asking Mr. Purdy about?

19   A.   We're getting into some pretty, like, sort of complex sort

20   of guts of the spreadsheet here.  And I'm basically saying I'm

21   checking on his methodology and asking him a couple of

22   questions.

23   Q.   Just what's the broad topic of this email?

24   A.   We are looking at a bunch of tablets and basically trying

25   to use a weighting formula to determine what the

1   top-performing tablets are.

2   Q.  What's the purpose of looking at the top-performing

3   tablets in this context?

4   A.  Yep.  So from my recollection, we were trying to publish a

5   report to Victoza, which was the name of the sponsor in the

6   subject, and give them tablet, sort of, engagement metrics.

7   And my recollection is we thought the metrics would end up

8   being very bad, and so we wanted to pick some of the best

9   tablets to show the best metrics.

10  Q.  And was the plan to tell the client, here are your best

11  100?

12  A.  No.

13  Q.  What was the plan?

14  A.  The plan would have been to show the metrics, saying, here

15  are the metrics for your campaign.  And that's it.

16  Q.  And so would the -- well, how would the best 100 be used

17  to calculate what was going to be shown to clients?

18  A.  So we would have generalized the best 100 tablets as if

19  the entire campaign were running like the best tablets.

20  Q.  Is that an honest assumption to make?

21  A.  It's not.

22  Q.  Why not?

23  A.  It's basically -- it's like -- it's like cherry-picking.

24  It's like if you take, I don't know, a dozen eggs and,

25  you know, you say, here are the two that are definitely not

1  spoiled.  And then you sell someone the other dozen and say,

2  they're all definitely not spoiled.  It's kind of like that.

3         MR. JOHNSTON:  Let's take a look at exhibit --

4  Demonstrative Exhibit 1164.  Try 1148.  There it is.

5  BY MR. JOHNSTON:

6  Q.  Can you please talk about what is being demonstrated in

7  this particular chart?

8  A.  Yep.  So on the left, all the boxes would represent,

9  you know, all the tablets.  And the little blue ones would be

10  the ones that we were trying to figure out if they were the

11  best ones.  And then the red ones would be all the ones that

12  are not performing very well.

13         We would take the metrics from the little blue ones,

14  which is the one in the middle, and then pretend as if all the

15  tablets performed as well as the little blue ones.

16         MR. JOHNSTON:  All right.  You can take this down.

17         Let's go back to 1144.

18  BY MR. JOHNSTON:

19  Q.  Now, you testified that there's a spreadsheet attached to

20  this?

21  A.  Yep.

22  Q.  All right.  And what is Mr. Purdy's response to your

23  original email where you're asking questions about

24  the spreadsheet?

25         MR. JOHNSTON:  We can zoom in, Ms. Paul.

1  BY THE WITNESS:

2  A.  So my first question to him was:  I think you made a

3  formula error.  Did you mean to do that?

4          And he says, right.  I only meant to lock the row,

5  not the column.  So I did make an error.  It does change the

6  top 100 tablets that we're trying to cherry-pick.  See the

7  updated list here.

8          And then my second question to him was --

9          MR. POULOS:  Your Honor, I object to the

10  editorializing when he's asked to read a document.

11          THE COURT:  Well, two steps.  Ask him to read it.

12  Then ask him what he understands to have been meant in the

13  communication to him.

14  BY MR. JOHNSTON:

15  Q.  So we'll just do it in that format now, Mr. Ma.

16  A.  Okay.  Apologies.

17  Q.  Just describe what he is saying, and then I can ask a

18  follow-up.

19  A.  He says:  Right.  No. 1, right.  I only meant to lock row,

20  not column.  It does change the top 100 and 400.  Please find

21  the update list attached.

22  Q.  And is there -- does he say there's any difference in the

23  top 100?

24  A.  He does.

25  Q.  And just on a broad level, what are the two of you

1  discussing with these formulas for the top 100?

2  A.  We're trying to figure out which are the top 100 tablets,

3  and we're trying a number of different ways to determine which

4  ones are the top 100.  And so editing the formula could

5  potentially change which 100 we deem as the top 100.

6          MR. JOHNSTON:  Okay.  Let's take a look at the

7  spreadsheet itself, 1144A.

8          And if we can just see that full name of the tab that

9  we're on, Ms. Paul.  If tab --

10  BY MR. JOHNSTON:

11  Q.  So what's the name of the tab that we're on right now?

12  A.  It says:  Weighted Victoza List of BP.

13  Q.  What's your understanding of what is meant by the title of

14  that tab?

15  A.  That this is metrics that we are gathering for Victoza.

16  It uses a weighted sort of formula to determine which are the

17  top ones.  And BP means that this is Brad's tab, and he's made

18  edits here.

19  Q.  Okay.  And so on Column A, what is listed with the -- all

20  the alphanumeric strings?

21  A.  Yeah.  So these are just codes where every row represents

22  one tablet.

23  Q.  Okay.  And then, are there a bunch of numbers for -- or

24  bunch of rows for the different metrics you're trying to

25  calculate?

1   A.  Do you mean columns?

2   Q.  That's what I -- yes, there are a bunch of columns.

3   Thank you.

4   A.  Yes, there are a bunch of columns for different metrics.

5   Q.  Can you read --

6          MR. JOHNSTON:  Let's just highlight Row 1.

7   BY MR. JOHNSTON:

8   Q.  And then, Mr. Ma, can you read what some of those metrics

9   are?

10  A.  Total videos, passive and active.  Total ad impressions.

11  Nonunique ad taps.  Passive ad videos.  Active ad videos.

12  Nonunique active ad impressions.

13         Do you want me to keep going?

14  Q.  Okay.  Let's just talk a little bit about what is meant by

15  nonunique ad taps.

16  A.  This would just mean the total number of times -- or

17  sorry.

18         My interpretation is this would mean the total number

19  of times the ad was clicked on.

20  Q.  And what's the -- the number or at least the average of

21  all the screens listed here?

22  A.  It looks like in Row 4, it's 1.66 times per tablet.

23  Q.  Okay.  And then are there a bunch of other metrics listed

24  here?

25  A.  Yes.

1          MR. JOHNSTON:  And then let's scroll further to the

2   right; further to the right.

3   BY MR. JOHNSTON:

4   Q.  What are all the numbers just in a broad -- broad strokes?

5   What's happening here?

6   A.  We're basically applying a weighting algorithm.  And so

7   the best way that I can explain that is -- for example, let's

8   say that, you know, we're trying to rank our tablets by how

9   many times the ad was tapped.  We might say that we're going

10  to weight that way, way, way more and place more of the score

11  of a tablet on, you know, that particular metric.

12         And so the calculations here are doing the weighting,

13  which is to say which of these metrics do we care more about,

14  basically.

15         MR. JOHNSTON:  All right.  And let's go further to

16  the right.

17  Q.  Does it -- does the score, like, master score

18  ultimately -- is one ultimately assigned to each metric?

19  A.  I can't remember if that's the exact one, but something

20  like a master score that gives a score to each tablet to allow

21  it to be ranked is what's happening here.

22         MR. JOHNSTON:  All right.  Let's go further to the

23  right.  Further to the right.  There we go.

24  BY MR. JOHNSTON:

25  Q.  So what -- in this final -- these final two columns, BB

1  and BC, what information is being provided here?

2  A.  So in BB, that is the master score after we've done all

3  the weighting, all the calculations, and the sort of advanced

4  methodology.

5       And then BC, marked by the X, are the top 100

6  tablets.

7       MR. JOHNSTON:  Okay.  And let's just scroll down till

8  we get to Row 105, thereabouts.

9       All right.  You can stop.

10  BY MR. JOHNSTON:

11  Q.  So what does -- what does the X demonstrate here?

12  A.  It means it's one of the top 100 tablets.

13  Q.  And what are these 100 tablets going to be used for?

14  A.  Generating a report for a sponsor.

15  Q.  Was this a representative sample of all the tablets that

16  were running in the Victoza campaign?

17  A.  It's not.

18  Q.  Was the client going to be told that these were just the

19  top 100?

20  A.  As far as I'm aware, they would not be told.

21       MR. LOWDER:  Objection.  Foundation.

22       THE COURT:  All right.  How would he know?  Ask him.

23  BY MR. JOHNSTON:

24  Q.  Did you play any role in generating the reports that went

25  to clients?

1  A.  I did.

2  Q.  And in any of the reports that you generated, did it ever

3  disclose that the calculations were based off of purely the

4  top 100 playing the campaign?

5  A.  Nope.

6      MR. LOWDER:  Your Honor, could we be heard at sidebar

7  on this?

8      THE COURT:  All right.  Make sure your mic's in front

9  of you.

10     (Proceedings heard at sidebar on the record.)

11     MR. POULOS:  Your Honor, may I have a moment to

12  confer?

13     THE COURT:  Go ahead.

14     (Pause in the proceedings.)

15     MR. LOWDER:  Your Honor, I think the question was his

16  understanding about it going to clients.

17     THE COURT:  Yes.

18     MR. LOWDER:  And those responses didn't address why

19  he thinks the clients would know.  He just talked about what

20  he prepared.

21     THE COURT:  Overruled.  He's in a position to explain

22  why these were prepared, who they went to, and what the

23  purpose of the preparation was.  That's been very clear.

24     Overruled.

25     (Sidebar ended.)

1          THE COURT:  All right.  Objection overruled.

2          Proceed.

3    BY MR. JOHNSTON:

4    Q.  In this particular chart, who has picked the top 100

5    tablets to show to clients as representative of their

6    campaign?

7    A.  It seems like Brad Purdy has picked them.

8          MR. JOHNSTON:  All right.  Let's take a look at

9    Exhibit 1146.

10   BY MR. JOHNSTON:

11   Q.  And let's start with your email on the 27th.

12         All right.  Can you read to yourself what you've

13   written here, and then we'll walk through it.

14   A.  Okay.

15         Okay.

16   Q.  Okay.  First, I want to draw your attention to who you're

17   referring to when you say:  Cindy has brought to my attention.

18   A.  Okay.

19   Q.  Who is Cindy?

20   A.  Cindy Sui was the intern that we talked about earlier.

21   Q.  And then I want to draw your attention to what you say

22   when you say in the end of the first paragraph:  We keep

23   pushing back the Victoza report.

24         What is that a reference to?

25   A.  That means that, from my memory, we were still struggling

1  to figure out how best to report this out to Victoza, the

2  sponsor.  And so this was just another delay in -- in being

3  able to do so.

4  Q.  Okay.  And what are the concerns you raise in the bullet

5  points?

6  A.  I raise a concern about the overall data set that we're

7  looking at, the schedule that the campaign is running on the

8  tablets, and then a possible question about how the weighting

9  algorithm is computed.

10  Q.  Now, why are you concerned about which 100 tablets to

11  pick?

12  A.  I'm saying it's possible that not all the top 100 are

13  actually running the -- the Victoza advertisement.

14  Q.  And why would that affect what you report?

15  A.  It might make the numbers look lower.

16  Q.  And so what is the overall goal here in laying out these

17  concerns?

18  A.  We're just trying to figure out how best to come up with a

19  methodology to report to the -- to the -- to the sponsor.

20  Q.  When you use the word "methodology," what do you mean by

21  that?

22  A.  To basically find a series of calculations that we can use

23  repeatedly so that every time we have to generate another

24  similar report, we can reuse the same sort of set of

25  calculations and process.

1  Q.  Does using a methodology mean that the process is or is

2  not an honest methodology?

3  A.  Methodology doesn't mean that at all.  You could 2X

4  everything and that would be a -- that would be considered a

5  methodology, for example.

6  Q.  So in this instance, what are you trying to find a

7  methodology to be able to do?

8  A.  To show higher numbers to the sponsor.

9  Q.  And when you say "show higher numbers," do you mean higher

10  than reality or higher just for what they expect to see?

11          What do you mean by that?

12  A.  Based off of what they -- we understood the -- the

13  sponsors wanted to see, basically.

14  Q.  So in your opinion, was the goal ever to reflect the

15  reality of how Outcome's tablets were actually performing?

16  A.  Maybe in the long, long run, but not in this exercise.

17  Q.  And so what was the goal in this particular exercise?

18  A.  To show numbers that were sufficiently high enough that

19  they wouldn't generate suspicious questions from the -- from

20  the client.

21  Q.  And how does the methodology that you referred to

22  contribute to that effort?

23  A.  By picking the top 100 tablets out of many more than 100,

24  we were hoping to find the ones that were, for example, least

25  offline, most interacted with in hopes that those would

1  provide a boost to the metrics that we could show the sponsor.

2  Q.  All right.  Let's look at Mr. Purdy's response.

3         What is Mr. Purdy's response?

4  A.  He said:  David, let's connect for a quick chat on Monday

5  morning here.  I will be in New York City.  When is a good

6  time on your end?  JY -- who is Julianne Yun in the email --

7  can schedule a time for us.  AD -- who is Ashik Desai -- do

8  you want to be on this as well?

9  Q.  What was the date that this email was sent?

10  A.  June 27, 2014.

11         MR. JOHNSTON:  All right.  Let's take a look at

12  Exhibit 1149.  And let's look at the calendar invite.

13  BY MR. JOHNSTON:

14  Q.  What is this calendar invite for?

15  A.  This is a calendar invite for the email we just reviewed.

16  Q.  So this is the phone call that was to take place on Monday

17  between yourself, Mr. Desai, and Mr. Purdy?

18  A.  It looks like it, yep.

19  Q.  Now, do you have a memory of this specific phone call?

20  A.  I do not.

21  Q.  But based on the prior email that we reviewed, what would

22  have been the topics that you discussed?

23         MR. POULOS:  Objection, Your Honor.  Speculation.  He

24  doesn't remember it.

25         THE COURT:  Sustained.

1    BY MR. JOHNSTON:

2    Q.  As needed, did you have conversations with Brad Purdy

3    about how to select the tablets to report metrics to clients?

4    A.  We did.

5    Q.  Did some of those conversations happen on the phone?

6    A.  It appears so.

7    Q.  Did some happen in person?

8    A.  I do recall some in person.

9    Q.  And then were many on email?

10   A.  Yes.

11   Q.  Through your discussions with Mr. Purdy, did the plan to

12   cherry-pick the sample and present it to the client as

13   representative continue?

14   A.  We tried to -- to make that work.

15   Q.  Did Brad Purdy continue to support that approach --

16             MR. POULOS:  Object.

17   BY MR. JOHNSTON:

18   Q.  -- of cherry-picking?

19   A.  He did.

20             MR. JOHNSTON:  Let's take a look at Defense

21   Exhibit 3112.  Let's start at page 2.

22   BY MR. JOHNSTON:

23   Q.  The email beginning on July 11 at 5:09 p.m.

24             All right.  Can you please take a moment to read this

25   to yourself, and then I'll start asking you some questions.

1    A.  Okay.

2    Q.  I'm going to direct your attention to where you say:

3    We're still seeing issues with the results that I think

4    prevent us from sharing these with the clients.

5            What do you mean by that?

6    A.  That's just me using business speak to say the numbers are

7    too low and we can't share them with clients.

8    Q.  Why can't you share low numbers with clients if they

9    reflect the truth?

10   A.  We're afraid that the client will think that the tablets

11   perform poorly and that they won't want to continue buying

12   them in the future.

13   Q.  Now, are you making the decision on your own to delay

14   reporting to clients?

15   A.  I'm not.

16   Q.  Who would you have been talking with about the decision to

17   delay reporting?

18   A.  With Ashik.

19   Q.  Let's look at some of the bullet points that you raise

20   below.

21           MR. JOHNSTON:  Can we include the bottom part as

22   well, Ms. Paul.

23   BY MR. JOHNSTON:

24   Q.  All right.  Can you please summarize what you've

25   identified in the bullet points?

1   A.  Can I have a moment to read it, please?

2   Q.  Yes.

3   A.  Okay.

4   Q.  Now, actually, I want to just direct your attention first

5   to the second bullet point under No. 1.

6           What did you say?  What have you written there?

7   A.  I said:  We've controlled for the top 100 tablets in each

8   month using the same thing.  Have run the same scripts, but

9   May still has a huge drop-off.

10  Q.  And so what do you -- what do you mean when you're

11  referring to the top 100 tablets?

12  A.  We would have used a similar methodology to the one that

13  we reviewed in the spreadsheet to pick the best performing

14  tablets in April and May.

15  Q.  All right.  I want to direct your attention to bullet

16  point 4 where you say:  I'm a bit worried that we'll not be

17  able to arrive at good numbers to share with Victoza.

18          Where did you get your understanding that only good

19  numbers could be shared with clients?

20  A.  It was already my general understanding at the time.  And

21  I would have gotten it from Ashik Desai.

22  Q.  Let's look at Mr. -- Mr. Purdy's response.

23          MR. POULOS:  Your Honor, I -- I do object that -- and

24  ask that under the rule of completeness that all the bullet

25  points under Item 1 be presented at this time.

1           THE COURT:  Well, the exhibit's in evidence.  The

2    government can present what they choose to present.  I'm not

3    sure that --

4           MR. POULOS:  I'll withdraw the objection, Judge.

5           THE COURT:  All right.  You're free to go through all

6    those during your examination.

7           MR. POULOS:  Thank you.

8           THE COURT:  Go ahead.

9    BY MR. JOHNSTON:

10   Q.  Does Mr. Purdy say anything about the plan to use the top

11   100?

12   A.  Not in this email.

13   Q.  What is his -- how would you characterize his response or

14   interpret his response?

15   A.  He's -- he has a hypothesis that this banner video

16   rotation issue or decision could have been one of the reasons

17   why the numbers between April and May are inconsistent.

18          And so he's asking Chirag Patel, CP, to -- to share

19   the order of the rotation to see if that's a reason why the

20   metrics may be affected.

21   Q.  All right.  And let's just go back to the first page to

22   just review who is on this email chain.

23          MR. JOHNSTON:  We can zoom in at the top.

24   BY MR. JOHNSTON:

25   Q.  Who is on this email chain?

1   A.  Myself, Chirag Patel, Brad Purdy, Ashik Desai, and

2   Cindy Sui.

3   Q.  Did Brad Purdy ever tell you that you could just produce

4   the true numbers to the clients?

5           MR. POULOS:  Objection.  Argumentative.

6           THE COURT:  Overruled.

7   BY THE WITNESS:

8   A.  Not that I recall.

9           MR. JOHNSTON:  Let's take a look at Exhibit 1145.

10  BY MR. JOHNSTON:

11  Q.  All right.  Is this approximately -- let's look at the

12  date.

13          Is this approximately a week after that earlier

14  exchange with Mr. Purdy?

15  A.  That seems maybe closer to two weeks, but close enough.

16  Q.  Okay.  You're right.

17          Let's take a look at what you write --

18          MR. JOHNSTON:  If we can start at the -- I think we

19  just blow up the text, that should be enough on the screen.

20          That looks good.  Thanks, Ms. Paul.

21  BY MR. JOHNSTON:

22  Q.  So what have you attached to this particular email?

23  A.  I attached a sample dashboard that contains a high-level

24  summary of some of the metrics we are trying to show the

25  sponsor.

1  Q.  Can you read the first paragraph, please?

2  A.  I said:  Hey, here are just three slides that I would say

3  comprise a, quote/unquote, dashboard.  This is for Victoza in

4  April (the month where we honestly have the highest metrics.)

5  Q.  What do you mean when you say "the month where we honestly

6  have the highest metrics"?

7  A.  That's just saying if we were to look at April and May, we

8  actually think that April performed better than May.

9  Q.  Does that mean that the April metrics you're going to

10  produce to clients are, in fact, honest?

11  A.  Not at all.

12  Q.  All right.  Please continue where you say "the story I'm

13  trying to tell."

14  A.  The story I'm trying to tell here is:  One, tablets are

15  getting great engagement.  Here's who's seeing -- here's who

16  is seeing the tablets, e.g. -- or, for example -- for Victoza,

17  you're getting lots of diabetes patients.  For Myrbetriq,

18  you're getting lots of women.  And three, they're engaging

19  with not just the tablet, but with your brand.

20  Q.  At the time, Mr. Ma, did you think you were telling a

21  truthful story?

22  A.  No.

23  Q.  And why not?

24  A.  From my memory, we never once told a completely truthful

25  story about tablet metrics.

1  Q.  Let's look at No. 2 where you ask Mr. Desai, I think:

2  Questions for you to review are.

3          Could you read what you wrote for No. 2?

4  A.  I wrote:  Do any of these numbers surprise you based on

5  what we've seen in the past?  I don't have great insight into

6  what standards are and what we've seen in the past.  Some of

7  these are pretty different from the mixed panel slide I've

8  seen, so want to get your reaction on these.  If they're

9  surprising, we should decide whether to exclude or find a

10  method for pumping up (I've already been a bit liberal here).

11  Q.  What are you referring to when you write:  "If they're

12  surprising, we should decide whether to exclude or find a

13  method for pumping up.  I've already been a bit liberal here."

14  A.  I'm sorry.  What was the question?

15  Q.  What are you referring to?  What do you mean by that?

16  A.  It's basically saying if the metrics are surprising in a

17  bad way, in a way that you don't like, Ashik, we should decide

18  whether just to exclude the ones we don't like or find another

19  method to make the numbers higher.

20          And I note I've already basically trying to -- tried

21  to find a way to make them higher by saying "being a bit

22  liberal."

23  Q.  And when you say "method," are you referring to the

24  methodology that you previously testified about?

25  A.  Some methodology.

1    Q.  Is this approach consistent or inconsistent with what you

2    had been discussing on the email chain with Mr. Purdy two

3    weeks earlier?

4    A.  They're just different ways to report better numbers than

5    are actual.

6    Q.  Is this an honest or dishonest approach to calculating

7    metrics?

8    A.  Dishonest.

9    Q.  Why?

10   A.  Because we're just finding a way to make the numbers what

11   we want them to be.  It's wishful thinking, at best.

12            MR. JOHNSTON:  Let's take a look at Exhibit 392.

13   BY MR. JOHNSTON:

14   Q.  Is this a text message string between yourself and

15   Mr. Desai?

16   A.  It is.

17   Q.  Can you read what you wrote on August 13, 2014?

18   A.  Said:  Hey, Myrbetriq metrics on clicks are a bit lower

19   than Victoza, e.g., 10 minutes to 9 minutes, and 7.2 clicks to

20   5.8 clicks.  I think this is okay because they have more

21   patients per day than Victoza (so naturally their engagement

22   per patient is a bit lower).  Let me know if you agree.  I can

23   inflate Victoza a bit more so that they are closer, too.

24   Q.  Let me stop you there for a second, Mr. Ma.

25            What are you referring to in the first text?

1  A.  I'm comparing two different tablet metric reports that

2  I've generated in saying that, you know, Myrbetriq has lower

3  clicks and then providing a reason or rationale for why I

4  think that's an acceptable set of metrics.

5  Q.  And is there any basis for reporting metrics like these as

6  the truth?

7  A.  Sorry.  Can you clarify that?

8  Q.  Is there a basis for reporting these metrics as the truth?

9  A.  I guess the question -- well, I think the answer is

10  they're -- they're not the truth.

11  Q.  So if they were represented as the truth, would that be

12  false?

13  A.  That would be false, correct.

14  Q.  And is there -- at this point, are you even using a

15  methodology to come up with the tablet metrics?

16  A.  From my recollection, we are not using a methodology.

17  Q.  And was this effort consistent or inconsistent with the

18  original effort of calculating tablet metrics two months

19  earlier based on cherry-picking the top 100?

20  A.  This would just be a faster way to show false numbers.

21  Q.  Now --

22        MR. JOHNSTON:  You can take this down, Ms. Paul.

23  BY MR. JOHNSTON:

24  Q.  -- at some point, did you get more reliable data about the

25  true metrics?

1  A.  We did.

2  Q.  And how inaccurate -- well, were the true metrics

3  different than the ones that had been reported?

4  A.  They were.

5  Q.  And how inaccurate were the inflated numbers compared to

6  the true numbers?

7  A.  A number of -- in order of magnitude.

8  Q.  What do you mean by that?

9  A.  Could be 5, 10, 15, 20, or many times worse.

10  Q.  Was there a decision to go back to the client with the

11  true numbers?

12  A.  No.

13  Q.  What was decided?

14  A.  Ashik and I had hatched a plan to basically try to lower

15  the metrics over time in hoping that the product would get

16  better so that, over time, maybe one day the actual metrics

17  might reach the metrics that we had brought down over time.

18  So we were trying to make them meet in the middle, basically.

19  Q.  Were there problems with this plan?

20  A.  Yes.

21  Q.  What were they?

22  A.  The sponsors didn't like to see their metrics go down, and

23  I don't honestly believe that we would have ever reached

24  the -- the -- even the lowered metrics.

25  Q.  Did the tablet metric numbers ever come down to reality

1    while you were there at the company?

2    A.   The ones that we presented to clients?

3    Q.   Yes.

4    A.   They did not.  I mean, there may have been examples of

5    individual small metrics that we reported as reality.  But the

6    vast majority, they did not.

7    Q.   Now, during the time period when you and Ashik Desai were

8    fabricating numbers, did you have day-to-day discussions with

9    Brad Purdy about that fact?

10   A.   I wouldn't call them day to day.

11   Q.   Did you ever hide the fact that the tablet numbers were

12   fabricated from Brad Purdy?

13   A.   I did not.

14   Q.   Did you ever explicitly tell Brad Purdy that the tablet

15   numbers were, in fact, fabricated?

16   A.   I did.

17            MR. JOHNSTON:  All right.  Let's take a look at

18   Exhibit 3456, Defense Exhibit 3456.

19   BY MR. JOHNSTON:

20   Q.   Let's start by looking at the date at the top.

21            Who is this chat between?

22   A.   Myself and Brad.

23   Q.   What's the date?

24   A.   May 5 -- or May 4, 2015.

25   Q.   So how long had you been at the company at the time?

1  A.  At this point, a little under one year.

2  Q.  And how many months into the practice of fabricating and

3  reporting those numbers are we?

4  A.  Probably tenish months.

5  Q.  All right.  I'm going to have you read the chat starting

6  at the top.

7  A.  Okay.

8  Q.  And please just read it, and then I'll pause you if I need

9  to ask you a follow-up.

10  A.  Okay.

11       MR. JOHNSTON:  Can we zoom in to that top half,

12  please?

13  BY THE WITNESS:

14  A.  So Brad says:  Hey, DM.  That's me.  I say:  Hey, what's

15  up?  Brad says:  Hey.  Do you have any of the SS materials re:

16  tablet engagement stats?

17  BY MR. JOHNSTON:

18  Q.  Pause for a second.

19       What's your understanding of what Mr. Purdy means

20  when he says SS materials regarding tablet engagement stats?

21  A.  So SS means sponsorship sales or pharma sales materials.

22  Q.  And was sponsorship -- sponsorship sales the department

23  that was actually reporting the fabricated metrics to pharma

24  clients?

25  A.  Yeah.  So it was the analytics team that I was on under

1  sponsorship under Ashik.

2  Q.  Okay.  What is your response?

3  A.  I say:  I have them all, but they're not real.

4  Q.  All right.  Let's go further down.

5        What do you mean, Mr. Ma, when you're saying they're

6  not real?

7  A.  They're made up.

8  Q.  Okay.  What does Mr. Purdy say?

9  A.  He says:  Okay.  Can you send what you have?  I need to

10  pull something together for one of these system calls.

11  Q.  Let me pause you for a second.

12        What is your understanding of Mr. Purdy when he says,

13  "I need to pull something together for one of these systems

14  calls"?

15  A.  So Outcome had built its business calling on doctors'

16  offices.  A lot of those offices were little mom and pop

17  physicians' offices, but we were trying to get into selling

18  into major health systems.  So you could imagine like a -- I

19  don't know, a University of -- or a Northwestern University,

20  massive hospital, for example.  We were trying to sell these

21  big systems.

22        And so there were presentations needed for those sort

23  of calls, and so they wanted some sponsorship stuff for that

24  as well.

25  Q.  So what is your response to Mr. Purdy's --

1  A.  So I say:  I have literally a report for every sponsor for

2  every month.  I don't think you want that kind of granularity.

3  And are you sure you're comfortable sharing nonreal stats?

4  Q.  Again, what do you mean by "nonreal stats"?

5  A.  Made-up metrics.

6  Q.  And just so we're clear, do you see that the -- what

7  should be an apostrophe is being represented in this printout

8  as an ampersand pound 39 semicolon?

9  A.  Yep.

10  Q.  And would you have actually used those characters instead

11  of an apostrophe when actually typing the chat?

12  A.  No.  This is just how they're exported.

13  Q.  All right.  What is -- what is Mr. Purdy's response?

14  A.  He says:  Well, I'm comfortable reusing existing SS data

15  for these purposes.

16  Q.  And, again, what does SS data mean?

17  A.  Sponsorship sales.

18  Q.  And those are the false metrics that had been reported to

19  clients for the last ten months?

20  A.  Correct.

21  Q.  Let's go further down.

22        What does Mr. Purdy ask you?

23  A.  Do you have any of those that are in decks?

24  Q.  What's your response?

25  A.  Let me dig one up.  I haven't made a deck for this in a

1  while.  I know Oliver did one.

2  Q.  What's your understanding of who Oliver is -- or yeah, who

3  is Oliver?  You used that word.

4  A.  Oliver is an analyst on the team.

5  Q.  What's his last name?

6  A.  Han, H-A-N.

7  Q.  What role, if any, did he play in reporting false tablet

8  metrics?

9  A.  He -- he helped with them and I think eventually took over

10 doing some of them.

11 Q.  Okay.  What does Brad Purdy write?

12 A.  TYVM, which is thank you very much.

13 Q.  Okay, further down.

14        Let's see what Mr. Purdy writes, starting with what's

15 visible on the screen.

16 A.  He says:  Yeah, I have seen a couple, but don't have the

17 latest.

18        And I say:  I sent through a pretty thorough one.

19 Easy thing to do.  May just -- or maybe just to blind a few

20 slides.

21 Q.  What do you mean by that, Mr. Ma?

22 A.  Blinds in this case just means taking out the sponsor name

23 so that the system doesn't know which brand it is.

24 Q.  What's Mr. Purdy's response?

25 A.  Yep, this is great.  I'm just gonna grab one to two slides

1  and dump in a larger deck.

2  Q.  What does Mr. Ma -- or sorry.

3       What do you write, further down?

4  A.  Cool.

5       MR. JOHNSTON:  Okay.  Can we scroll further down,

6  Ms. Paul.  Can we scroll a little bit more of the screen on.

7  BY MR. JOHNSTON:

8  Q.  Okay.  What does Mr. Purdy write?

9  A.  I think -- basically, I think Megan just needs a

10  glossy-looking three- to four-slide deck to use in later stage

11  system calls.  I think it's kind of a check-the-box type

12  thing, but should be quite helpful.

13  Q.  What's your response?

14  A.  Yeah, I hope that's the case.

15  Q.  So what do you understand Mr. Purdy to be saying when he

16  says "we need a glossy-looking three- to four-slide deck"?

17  A.  He just wants to take some of the reports that we've

18  generated for sponsors, put them in some slides, and use them

19  to help sell these large systems screens.

20  Q.  Including the false numbers?

21  A.  Correct.

22  Q.  Let's continue.  If you can read the rest of your

23  responses.

24  A.  I said:  Yeah, I hope that's the case.  We don't really

25  have the bandwidth right now to go much further than that.

1    Thanks for taking care of this.  I know she'll

2   appreciate just having something to speak to.  Anyway, I'm

3   out.  LMK -- which means let me know -- if anything else is

4   needed.

5   Q.  Now, Mr. Ma, why did you tell Brad Purdy that the tablet

6   metric reports he was requesting contained fake data?

7   A.  He was someone that I know Ashik trusted to know this

8   information, and I just didn't want him to share anything

9   inaccurate without knowing that he was sharing something

10  inaccurate.  So I was just being transparent in disclosing

11  that they're not real.

12  Q.  Did you send a follow-up email to this chat?

13  A.  I believe we have reviewed a document for that, yes.

14          MR. JOHNSTON:  Let's look at Exhibit 465.  And if we

15  can just actually compare sort of side by side 465 with 3456.

16          And, Ms. Paul, with 3456, if we could go to the

17  time stamp on the last chat.

18  BY MR. JOHNSTON:

19  Q.  So what's the date and time for the last chat?

20  A.  This is May 4th, around 8:17 or -- it should be 8 -- yeah,

21  8:17.

22  Q.  So just we're looking at it in military time, correct?

23  A.  Correct.

24          MR. JOHNSTON:  All right.  And let's keep that right

25  there, Ms. Paul, and let's blow up the header of the --

1  BY MR. JOHNSTON:

2  Q.  Actually, well, let's look at your -- well, your email

3  which starts a little earlier.

4         MR. JOHNSTON:  Where it says 9:53, Ms. Paul.

5  BY MR. JOHNSTON:

6  Q.  So approximately how long after the chat with Mr. Purdy do

7  you send an email?

8  A.  It seems like a little under two hours.

9  Q.  Okay.  And what do you write to Mr. Purdy?

10 A.  Hey, Brad.  Here are a couple sample reports of some

11 numbers we've used in SS.

12 Q.  What does SS mean?

13 A.  Sponsorship sales.

14 Q.  And then you say:  @AD.

15        Who is that referring to?

16 A.  AD refers to Ashik Desai.

17 Q.  Is he on this email chain?

18 A.  He is.

19 Q.  And what do you write to AD?

20 A.  I wrote: @AD, I've mentioned to BP -- or Brad Purdy --

21 that these are inflated.  Want to make sure you're comfortable

22 with using numbers at these magnitudes for potential use in

23 presentations with systems.  Assuming no concerns, but wanted

24 to confirm.

25 Q.  So, Mr. Ma, why did you also want Mr. Desai to know that

1   Mr. Purdy was going to be using inflated tablet metrics?

2   A.  Similar reasons.  I -- you know, I know that these numbers

3   are not real.  I'm potentially a little uncomfortable with

4   showing these to other people.  And so I've already checked

5   the box with Brad, and now I'm checking the box with Ashik,

6   who owns, ultimately, the reports to make sure that he's also

7   okay with me sharing false metrics out more broadly.

8           MR. JOHNSTON:  Okay.  Let's just look at 465.

9   BY MR. JOHNSTON:

10  Q.  What is Mr. Purdy's response?

11          MR. JOHNSTON:  If we can zoom in at 9:57.

12  A.  He says:  Hey.  Do either of you have this in deck format?

13  BY MR. JOHNSTON:

14  Q.  What's your understanding of what he's asking you for?

15  A.  Deck format just means do you have any of the numbers that

16  you just shared, but actually in slides.

17  Q.  So Microsoft PowerPoint?

18  A.  Something like that, yep.

19  Q.  Okay.  Let's take a look at the final email.

20          What did you attach to this chain as your final

21  response?

22  A.  A file that's called "CMH-GSK Tablet Dashboard V7."  It's

23  a PowerPoint.

24  Q.  And what do you write?

25  A.  I said:  Attached deck Oliver made for a GSK presentation.

1  Q.  What does GSK stands for?

2  A.  GSK stands for GlaxoSmithKline, which is a pharmaceutical

3  company.

4  Q.  And what did you attach to the email?

5  A.  A tablet metric report for GSK.

6  Q.  Are the numbers in the report fake?

7  A.  They are.

8          MR. JOHNSTON:  All right.  Let's take a look at

9  page 2, please.

10  BY MR. JOHNSTON:

11  Q.  What's the first page of the slide deck that you sent

12  over?

13  A.  It's just a cover page with the logo and GSK's logo, with

14  the dates of the campaign and some key takeaways.

15          MR. JOHNSTON:  All right.  Let's take a look at

16  page 4.

17  BY MR. JOHNSTON:

18  Q.  In this particular presentation, what is the tablet

19  metrics being used for?

20  A.  From my reading, we are at the end of the year and we are

21  trying to convince them to basically renew and do another

22  contract for the following year.  So using the metrics to sell

23  additional campaigns.

24          MR. JOHNSTON:  Let's look at page 5.

25  BY MR. JOHNSTON:

1  Q.  Now, I want to look at the data first on the top, the ones

2  that are above the icons.

3         How many tablets are indicated -- are running the --

4  the campaign?

5  A.  750.

6  Q.  Now, Mr. Ma, when these reports were sent out, did they

7  ever disclose the true amount of delivery if there was a delta

8  between the contracted amount and the actual amount?

9  A.  We would have not disclosed the delta.

10  Q.  And let's look at the particular numbers starting on the

11  right.  So 7.3 active patients -- no -- let's look at the

12  engagement ones.

13         Where it says 8.8 average engagement time per

14  session, what is that supposed to represent?

15  A.  It's supposed to represent if you sit down, you know, at

16  the tablet, it would say that you spent on average almost nine

17  minutes playing with the tablet.

18  Q.  And what about 6.7, what's that supposed to represent?

19  A.  Interactive touches would be how many times did you click

20  on something.

21  Q.  And what about the 5.6 number?

22  A.  So how many videos did you start watching.

23  Q.  So specifically looking at the engagement time per session

24  and interactive touches per session, were those accurate

25  measurements of how patients were actually interacting with

1  Outcome's tablets?

2  A.  They were not.

3  Q.  How do you know this?

4  A.  Because we made them up.

5          MR. JOHNSTON:  Let's look at page 6.

6          MR. POULOS:  Your Honor, I object and ask for a

7  foundation as to that last bit of testimony.

8          THE COURT:  Overruled.  You can cross-examine --

9  well, overruled.

10  BY MR. JOHNSTON:

11  Q.  Let's take a look at website engagement.

12          What is being represented here?

13  A.  So CTR means click through rate, which is the number of

14  clicks divided by the number of total, sort of, views,

15  basically.

16          And then the number below it is the number of clicks.

17  And then to the right is how many minutes the average patient

18  spent on the brand website once they clicked.

19  Q.  Were these numbers real or fake?

20  A.  They were fake.

21          MR. JOHNSTON:  Okay.  You can take this down.

22          Let's just get back to the email, please, 465.

23  BY MR. JOHNSTON:

24  Q.  Mr. Ma, after you sent this slide deck to Mr. Purdy, did

25  he ever express surprise to you that fake numbers were being

1  sent to clients?

2  A.  Not that I recall.

3  Q.  Did he ever try to stop the practice?

4  A.  Not that I recall.

5  Q.  Did he ever say to you, let's go back to the client and

6  tell them the truth?

7  A.  Not that I recall.

8  Q.  What was Brad Purdy's position at the time that you sent

9  him this email?

10  A.  I believe it was chief operating officer.

11  Q.  Now, did tablet metrics continue to pose a problem for the

12  company?

13  A.  They did.

14  Q.  Did Ashik Desai ever tell you that he was going to discuss

15  the issue with any other members of the executive team?

16  A.  He did.

17  Q.  Who did he tell you he was going to discuss the issue

18  with?

19  A.  With Shradha.

20  Q.  What in particular did Ashik tell you he was going to

21  bring to Shradha's attention?

22  A.  I don't recall the specifics, but I remember -- I remember

23  at the time that he wanted to sort of basically bring her up

24  to speed and let her know more details about what was

25  happening on the tablet metric reporting.

1  Q.  And specifically, what was your understanding about what
2  she needed to be brought into the loop about?

3          MR. LOWDER:  Objection.  Speculation.  Hearsay.  And
4  leading.

5          THE COURT:  Three objections.  You're going to have
6  to clean it up for three objections.

7          All right.  Reask the question, and I'll -- we'll see
8  if there's a further objection.

9          The objection on hearsay is overruled.
10  BY MR. JOHNSTON:
11  Q.  Mr. Ma, you testified that Ashik Desai told you he was
12  going to inform Shradha Agarwal about what was going on with
13  the tablets, correct?
14  A.  Correct.
15  Q.  Can you provide more detail as to what your understanding
16  was of what Ashik Desai was going to tell Shradha Agarwal?
17  A.  My understanding is that he was going to give her more
18  detail about how the campaigns were performing, some of the
19  issues we were seeing in the metrics, and basically just let
20  her know that -- sort of the current state of things and how
21  they were working, and then use that as sort of a reason to
22  ask her for help in terms of figuring out how to improve the
23  situation.
24  Q.  And what was wrong with the situation at that time?
25  A.  The situation was that the actual performance of the

1  tablets was nowhere near what we were actually reporting to
2  clients.
3  Q.  Now, do you know one way or the other whether he actually
4  raised that issue with Shradha Agarwal?
5  A.  I don't.
6  Q.  All right.  At this time, I want to have you look at
7  Exhibit 452.
8         Now, this is a strange format, but have you reviewed
9  this -- this particular chat before?
10 A.  I have.
11 Q.  And is this from a software platform known as Slack?
12 A.  It is.
13 Q.  What is Slack?
14 A.  Slack is like a messaging platform that you would use.
15 It's like a work chat, basically.
16 Q.  Did Outcome use chat -- or use Slack at the time you were
17 there?
18 A.  We did.
19 Q.  Is this conversation between you and Lee Ebreo?
20 A.  It is.
21 Q.  And have you reviewed records that place this at
22 approximately April 2015?
23 A.  I can't recall the exact time, but I believe that's right.
24 Q.  When were you reporting to Lee Ebreo?
25 A.  From January 2015 and onwards.

1   Q.  And can you remind the jurors who Lee Ebreo was?

2   A.  He was the VP of engineering.  So he was sort of head of

3   building out the tablets and the products in engineering.

4   Q.  Did you ever share any of your concerns with the way the

5   company operated with Lee Ebreo?

6   A.  I did.

7   Q.  All right.  Let's take a look at -- we're going to

8   actually read this.  It's a bit of a longer conversation, but

9   we'll try to do it as fast as possible.

10          MR. JOHNSTON:  So if we could zoom in, Ms. Paul.  And

11  then if we can find a way to scroll -- maybe have three or

12  four chats as -- visible at any one time.

13  BY MR. JOHNSTON:

14  Q.  Now, do you see the user info on the left -- or sorry --

15  the second row for each chat?

16  A.  Yep.

17  Q.  And based on your prior review of this chat, who is

18  Mr. Ebreo and who is -- who is you in this chat conversation?

19  A.  So I'm -- I'm the second one, V2W, and he is FBU.

20  Q.  So that means any time a chat is -- follows FBU, that's

21  Mr. Ebreo typing; anytime a chat follows V2W, that's yourself

22  typing?

23  A.  Correct.

24  Q.  Okay.  Let's start with what Mr. Ebreo says.

25  A.  He says:  What is the definition of a growth campaign?

1    Q.  What is your response?

2    A.  A campaign that we will add new sales to.  So an MO closes

3    an account in order to -- yeah -- an MO closes an account.

4            And he responds:  In order to meet target inventory?

5            MR. JOHNSTON:  Okay.  Let's move down.  Is there any

6    way we can scroll, Ms. Paul, while blowing it -- while in it?

7    BY MR. JOHNSTON:

8    Q.  Okay.  And then what do -- what do you write in response?

9    A.  I said:  If that campaign qualifies for a given set of,

10   quote/unquote, growth campaigns, we will add that campaign to

11   the site.  Correct.  But a key caveat.

12           MR. JOHNSTON:  Now, let's continue further down.

13           All right.  So we missed that.  Yes, starting at the

14   bottom of page 1.

15   BY MR. JOHNSTON:

16   Q.  What do you write, Mr. Ma?

17   A.  I wrote -- I think if you go up one more, it's a complete

18   sentence:  A key caveat is that we have some programs that may

19   be behind.

20   Q.  Further down?

21   A.  That are not growth campaigns.

22   Q.  So I want to pause for a second.

23           Mr. Ma, what do you mean when you distinguish between

24   growth campaigns and nongrowth campaigns?

25   A.  We used the word a little bit loosely when we were at the

1  company.  A growth campaign in its most strict sense would

2  mean that the sponsor has agreed that we would buy some

3  inventory now and that that inventory amount contracted goes

4  up over time.  So maybe they buy 100 to start, and then it

5  gets to 150 and then 200 on certain dates.

6  Q.  And at the time that you were creating the delta reports

7  and you reviewed contract information, were the majority of

8  contracts growth -- actual growth campaigns or had static

9  delivery for the entirety of the contract?

10  A.  My recollection is that most were not growth campaigns.

11  Q.  Okay.  So what do you write when you say:  An example

12  would be in rheumatology.

13          Could you continue reading there?

14  A.  So -- sure.

15          An example would be in rheumatology, where both

16  Humira and Xeljanz are both behind on target.

17          And I continue:  But we're giving all growth

18  rheumatology to Humira.

19  Q.  So I want to pause you for a second.

20          What's your -- what do you mean when you say were

21  giving all growth rheumatology to Humira?

22  A.  So it means that Humira is behind on their actual

23  contracted amount.  But every time we install a new tablet,

24  we're just giving it to Humira to basically reduce the gap.

25  Q.  And did you previously testify on Thursday that one of the

1  ways Outcome managed the delta was to backfill campaigns with

2  new inventory as they came online?

3  A.  I did.

4  Q.  Is that what you're referring to here?

5  A.  It is.

6  Q.  So when you say growth, do you -- are you -- do you

7  actually mean that Humira was sold a growth campaign?

8  A.  Not that I recall.  I don't recall them having a growth

9  campaign in this case.

10 Q.  So when you're saying growth, are you referring to filling

11 in the delta?

12 A.  Correct.

13 Q.  All right.  What is the next question that Mr. Ebreo asks

14 you?

15 A.  Saying:  What is the relationship between ScriptLift and

16 competing brands scheduling?

17 Q.  What's your response?

18 A.  What do you mean by that?

19 Q.  Further down?

20 A.  And I clarify:  We are contractually obligated not to

21 place competitors in the same office.

22 Q.  What did you mean by that?

23 A.  This is the idea that we've talked about, about

24 exclusivity, where -- you know, for example, if Humira is

25 playing an ad in a particular doctor's office, we've written

1  in the contract that their competitor Xeljanz cannot also play

2  an ad in that office.

3  Q.  Let's continue, please.

4       Why is -- sorry.  Please read what Mr. Ebreo writes.

5  A.  He asks:  Why do we give all rheum to Humira?

6  Q.  What's your response?

7  A.  Humira is paying us a lot more, I think.

8  Q.  What else do you write?

9  A.  I think sees the AbbVie relationship as being more

10 valuable to invest in.

11 Q.  What does Mr. Ebreo write?

12 A.  The Humira question and my previous question are related

13 in that I'm to understand how we decide which brands get

14 priority scheduling.

15      MR. JOHNSTON:  Go further down.  Further up.

16 BY MR. JOHNSTON:

17 Q.  What's your response?

18 A.  Well, Lee says:  Ah, so based on deal value.  I thought it

19 would be based on promised performance lift.

20 Q.  And what is your response?

21 A.  Almost all brands --

22      MR. JOHNSTON:  Scroll down.

23 BY THE WITNESS:

24 A.  -- have a 3:1 guaranteed ROI, or at least 2:1.  So there

25 isn't a huge difference in promised performance lift.  The

1 reason we use deal size is that the denominator in ROI is

2 obviously spend. So a bigger spender will be tougher to reach

3 ROI.

4 Q. Let's pause for a second.

5       What do you mean by that?

6 A. If a sponsor is paying us $1 million and they require 3:1,

7 that means that we had to deliver $3 million in value. If a

8 sponsor is only paying us 100K to deliver 3:1, we only need to

9 deliver 300K in value.

10       So the more you spend, the more value we have to

11 deliver by a large order of magnitude.

12 Q. And so how does that impact who gets priority for

13 backfilling campaigns?

14 A. Well, in my chats here, I'm saying that sponsors that pay

15 us more would get more priority.

16 Q. All right. What do you write starting with the other key

17 math variable?

18 A. The other key math variable here is the LTV or the

19 long-term value.

20 Q. What do you mean by that?

21 A. Long-term value is a business word that basically

22 denotes -- or it talks about how value -- or how much money a

23 sponsor would make from selling a drug.

24       And so, for example, if somebody has a diabetes

25 prescription, they're not just fulfilling it once. They're

1  usually fulfilling it for months and months and months on end.
2  And so you add up all of the prescriptions over time, you
3  basically get the long-term value of how much that patient is
4  worth to the brand.
5  Q.  And how does the long-term value factor into the ROI
6  calculation?
7  A.  It's the numerator, so the top part of the fraction.
8  Q.  Okay.  Can you continue reading?
9  A.  In which I say -- which is in the numerator.
10  Q.  And then what does Mr. Ebreo write?
11  A.  He says:  But the deal is predicated on target inventory
12  that leads to absolute performance lift of at least 2:1
13  factor, correct?
14  Q.  Further down.
15  A.  And I say:  Target inventory is the contracted number.
16  And Lee says:  Ah, disregard my comment.
17         And I say:  But say we sell someone 300 sites.  We
18  may be able to get 3:1 ROI lift with only 150 sites, depending
19  on their spend and the LTV of the product.
20  Q.  Continue reading.
21  A.  So an example is hepatitis C.  Its LTV is $80,000 per
22  patient.  So if we sold $1 million campaign, we need to get
23  3 million.  So we only need to get 38 new prescriptions versus
24  a control to hit ROI.  LOL, L-O-L.
25  Q.  So what are you referring to there?

1  A.  I'm basically saying for some drugs, even if we're running

2  a delta, because that drug is so expensive, we could

3  potentially hit the 3:1 ROI without giving the client the

4  actual contracted number of screens or tablets.

5  Q.  Then what you write, continuing with "which is"?

6  A.  Then I write:  Which is partially why we are so behind in

7  GI.

8  Q.  And what does Mr. Ebreo write?

9  A.  Do we have to meet contracted inventory or just meet ROI?

10  Q.  Go further down.

11       What do you write?

12  A.  Technically, both.

13  Q.  And is that consistent with your prior testimony that you

14  understood the contracts as requiring that Outcome to meet

15  both the ROI number and the contractual number of devices?

16  A.  Correct.  It's the -- that a contract is a contract.

17  Q.  Okay.  And then what do you write, starting with "but

18  we're so behind on inventory"?

19  A.  So I say:  But we're so behind on inventory that we don't

20  reach contracted inventory on many programs.  So we use ROI as

21  a catchall for performance.

22  Q.  Is that referring to the rationalization that you had

23  previously talked about, you spoke with Ashik Desai about?

24  A.  Correct.  That Ashik had told me that even though if we

25  don't meet the inventory, as long as we hit ROI, that's okay.

1  Q.  All right.  What is -- what do you write starting with

2  "part of Oliver and Kathryn's job"?

3  A.  So I write:  Part of Oliver and Kathryn's job is when a

4  brand goes, quote/unquote, send us all of the addresses and

5  doctors where our program campaign is running --

6               MR. JOHNSTON:  Further down.

7  BY THE WITNESS:

8  A.  -- is that -- is that they will send, say, the 150 sites

9  they are actually running in and find an additional 150 that

10  they are not running in.

11  Q.  Who are Kathryn and Oliver?

12  A.  They are other analysts that were brought in to replace

13  me.

14  Q.  So Kathryn Choi and Oliver Han?

15  A.  Correct.

16  Q.  Okay.  What do you write, starting "and send it to them

17  anyway"?

18  A.  So -- and find an additional 150 that they aren't running

19  in and send it to them anyway.

20  Q.  Let's -- what does Mr. Ebreo write?

21  A.  He says:  I can see why a sponsor wants both goals.  Why

22  do we want both goals?  We have a better deal if the singular

23  goal of ROI.

24  Q.  What do you understand Mr. Ebreo to be saying?

25  A.  He's just trying to understand why a sponsor might even

1  care about the number of screens and tablets and why not just

2  care more about ROI.

3  Q.  So is he talking about what would be nice -- a scenario

4  that would be nice to have?  Or is he talking about reality?

5  A.  He's talking about a hypothetical scenario.

6  Q.  So what do you write?  Continue.

7  A.  I said:  When we sell, we price out the TVs and tablets as

8  units or as offices in a package.

9  Q.  Okay.  Oh, sorry.  We missed that.

10  A.  So we need a per unit price to determine spend.  At least

11  that's how we do it now.

12  Q.  Further down.

13  A.  I could see us eventually just moving to -- and he

14  interrupts.  Ugh.  We'll deliver a, quote/unquote, 3:1 ROI and

15  we choose.

16  Q.  So what are you referring to there?

17  A.  I'm saying, you know, in a world that's different today,

18  maybe we could eventually just move to a world where we don't

19  say the number of screens and tablets and just promise that

20  3:1 ROI.

21        MR. JOHNSTON:  Let's go further down.

22  BY MR. JOHNSTON:

23  Q.  What do you write starting with "the other thing"?

24  A.  The other thing is that brands obviously target very

25  specific doctors.  Hence, all this work on this targeting

1    project.

2    Q.  Okay.  And what does Mr. Ebreo write?

3    A.  He writes:  The problem with that is we could better

4    utilize our networks without the inventory constraint.

5    Q.  Further down.

6    A.  So I say:  So we actually promised them X number of sites

7    that are, quote/unquote, matched doctors to their target list.

8    Q.  So what are you referring to when you're talking about

9    matched doctors?

10   A.  This is the list match that we discussed.

11   Q.  And how does that factor into your understanding of the

12   delivery obligation that Outcome has taken upon itself?

13   A.  Is that many of the contracts specify not just a number of

14   sites, but that they want the specific physicians that were

15   matched.

16   Q.  So if you're filling in a delta with unmatched doctors,

17   would that be meeting the obligation of the contract?

18   A.  If the contract says matched results, then it would not

19   meet the obligation of the contract.

20   Q.  All right.  What does Mr. -- sorry.

21          What do you write starting at "yes, we totally

22   could"?

23   A.  I said:  Yes, we totally could.  I live in constant fear

24   of an audit.

25   Q.  Why do you write that?

1   A.  At this point, I had already helped in an audit that was

2   in some ways the bane of my existence.  And so I'm in fear of

3   having to do another one.

4   Q.  And what you do you mean by audit?  From whom?

5   A.  There was a campaign that we under-delivered on or had a

6   mistake on, and the sponsor found out.  And they asked us to

7   go site by site and figure out whether we were correctly

8   delivering the inventory, which was a ton of work, very, very

9   stressful.  And it caused a lot of, you know, issues at the

10  company.  It was one of the worst projects I ever worked on.

11          And so knowing that a lot of other campaigns had

12  similar issues, I was afraid that another sponsor would find

13  out that there were issues with the campaign and that I would

14  have to be responsible for helping do another audit.

15  Q.  All right.  Continue reading, please.

16  A.  I said:  I live in fear of a -- or I live in constant fear

17  of an audit where we send them a list of offices that they,

18  quote/unquote, have and then their sales reps go and see a

19  competitor or something and then be like WTF.  And then we set

20  off an audit.  That happened last year.

21  Q.  Does that refer to the Simponi campaign?

22  A.  Simponi Aria campaign, correct.

23  Q.  All right.

24          MR. JOHNSTON:  Let's continue scrolling down.

25  BY THE WITNESS:

1  A.  And then I write:  I got the expletive stick in managing

2  the entire audit.  And Lee says:  It's good for the sponsor

3  because the inventory target means that they can get a larger

4  ROI at a discount.

5  BY MR. JOHNSTON:

6  Q.  Further down.

7  A.  I say:  Yeah.  Theoretically we could deliver a 7:1 if we

8  hit inventory.  For example -- and then he interrupts.  And

9  we've consumed network that we could allocate elsewhere.

10        So I write:  Yeah.  So the reason AD -- or

11  Ashik Desai -- wants a live look at ROI eventually is so that

12  if we know we've hit or are on target to hit ROI, we can shift

13  our network allocation to programs that are behind.

14  Q.  What's your understanding of what that means?

15  A.  It means that we wanted to basically move around screens

16  and tablets if we knew that we'd already hit the brand ROI

17  and, basically, sneakily try to use deltas to only hit ROI and

18  not actually hit inventory.

19  Q.  All right.  Let's continue.

20  A.  I say:  Or can boost programs that we want to make a good

21  impression on.

22        And Lee writes:  Right, except future deals should be

23  structured to ignore the inventory constraint.

24  Q.  Further down.

25  A.  And I say:  That'd be nice.  Ha ha.

1  Q.  What's your understanding of what Mr. Ebreo means when he

2  says:  Future deals should be structured to ignore the

3  inventory constraint?

4  A.  He's talking about a wishful world where the sponsors

5  don't care about the number of screens and tablets and only

6  care about the ROI.

7  Q.  All right.  Let's continue where you're writing "that

8  would be nice."

9  A.  I say:  That would be nice.  Ha ha.  I don't know enough

10  about the pharma marketing space to know whether that would

11  work or not.  As you can see, we do a lot of, quote/unquote,

12  legacy things.

13        Lee asks:  Don't the agencies and sponsors understand

14  that the whole point of advertising is the ROI and not the

15  stupid screen count?

16  Q.  Further down.

17  A.  And I write:  That's because -- or because that's how the

18  market thinks.  Sometimes.  Some don't.  For example, a lot of

19  brands just target high-performing docs.  It's really stupid

20  because it's not a good way to spend your money.

21  Q.  So, Mr. Ma, are you expressing disagreement or agreement

22  with some of the clients' decisions to spend money?

23  A.  I am.

24  Q.  In this particular instance, what are you saying?

25  A.  So let's suppose that you have a doctor that is known and

1   writes a ton of prescriptions of your drug already.  I'm

2   saying why would an advertiser advertise more to that doctor

3   when they already write a lot of your drugs?  You're not going

4   to get a lot -- you're not going to get them to write way

5   more.

6          And so I think it's stupid to spend money on a

7   campaign for someone that already uses your product,

8   for example.

9   Q.  Mr. Ma, notwithstanding your view, did you think it was

10  your job to substitute your judgment for the client's

11  expectations of what they wanted in the contract?

12  A.  Not at all.

13  Q.  Okay.  Let's continue.  Can you continue reading?

14  A.  Because it's not a good way to spend your money on doctors

15  already writing a lot of your doc.

16  Q.  Further down.

17  A.  You aren't going to change their behavior.  Your best

18  targeting fence sitters and medium decile doctors, but they

19  don't always get it.  Some get it, others don't.  A joke that

20  Brad told me once was that, quote/unquote, you think it'd be

21  easier to hand out free money to pharma companies.

22  Q.  What does Mr. Ebreo say?

23  A.  He said:  Ugh.  Do we brand ourselves as more a network

24  operator but also as a media analytics operator?

25  Q.  What's your response?

1  A.  Probably, given how much analytics we promise brands as
2  part of their program.
3        MR. JOHNSTON:  Scroll further down, Ms. Paul.
4  BY MR. JOHNSTON:
5  Q.  All right.
6  A.  Lee says:  I don't want to talk about this anymore.  The
7  sponsors and agency ignorance is making me angry.
8  Q.  What do you write, Mr. Ma?
9  A.  My response:  Oh, F.  That reminds me, I gotta go do
10  tablet metrics for April.  Like ASAP.
11  Q.  Further down.
12  A.  Yeah, man.  I don't envy AD -- or Ashik's -- job at all.
13  It's not an easy one.
14  Q.  So what --
15        MR. JOHNSTON:  Further up.
16  BY MR. JOHNSTON:
17  Q.  What do you mean when you say, I don't envy AD's job at
18  all; it's not an easy one?
19  A.  I don't recall exactly what I was thinking at that time.
20  But as I reflect on that, it was very clear to me that Ashik's
21  job was to continuously lie to clients and sell them things
22  that didn't exist.  And so I would never want that job.
23  Q.  All right.  What does -- what do you write?  I'm sorry.
24        What does Mr. Ebreo write?
25  A.  And so in referring to tablet metrics, he's saying:  Who

1  should be doing that?  Kathryn or Oliver?

2  Q.  What do you write?

3  A.  And I said:  You should discuss that with him.  Referring

4  to Ashik.  And I say:  Me, we decided that when I moved, I

5  would retain that -- referring to tablet metrics -- because

6  it's so far from the truth and it requires SQL.

7  Q.  What do you mean when you say "it's so far from the

8  truth"?

9  A.  I'm again referring to the fact that the tablet metrics

10 that we're reporting are nowhere near what's actually

11 happening.

12 Q.  And what do you write?

13 A.  I say:  Right now, it's just me and AD.

14 Q.  You and AD doing what?

15 A.  The tablet metrics.

16 Q.  And then what does Mr. Ebreo respond?

17 A.  He goes:  Ah, yeah, it makes sense.

18 Q.  Further down.

19 A.  And then I wrote -- if you read the previous sentence

20 before that where he interrupts me, I said -- sorry.  Go up a

21 little bit more.  I'm just trying to read the whole sentence.

22      Right now, it's just me and AD that do tablet

23 metrics.  I'm actually pushing more to him --

24      THE WITNESS:  If you scroll down.

25 BY THE WITNESS:

1  A.  -- this time around because I don't want to be responsible

2  for reporting nontruth.

3  Q.  What does Mr. Ebreo say?

4  A.  KK.

5  Q.  And then what do you write at the bottom?

6  A.  This was part of my discussion with SA --

7  Shradha Agarwal -- last week.

8         MR. JOHNSTON:  Further down.  I guess that's the end.

9  BY MR. JOHNSTON:

10  Q.  Mr. Ma, now, do you have a memory sitting here today of a

11  specific conversation with Shradha Agarwal regarding tablet

12  metrics?

13  A.  I do not.

14  Q.  But based on this text exchange back in April 2015, do you

15  have an understanding of what you would have been bringing to

16  her attention at the time?

17  A.  It would have been related to what --

18         MR. LOWDER:  Your Honor --

19         THE COURT:  Hang on.  What?

20         MR. LOWDER:  He said he didn't recall that meeting.

21         THE COURT:  Well, he -- that's not quite exactly what

22  he said.  He can testify to what he believed he would have

23  said based on the last exhibit.  It goes to weight, not

24  admissibility.  You can cross-examine on the details.

25         Go ahead.

1  BY MR. JOHNSTON:

2  Q.  So based on your review of this chat message and your

3  memory of what was happening at the time, what was your

4  understanding of what you would have brought up to Ms. Agarwal

5  at this time?

6  A.  So as I mentioned, I knew that Ashik was scheduled at some

7  point or had told me that he was going to talk to Shradha

8  about the tablet metrics.  And I was very keen on that

9  conversation happening because I thought that it would be a

10  way for me to get this work making up the tablet metrics off

11  of my plate so it wasn't something that I had to do.  And so I

12  wanted that conversation to happen.

13          And so I would not have very directly asked Shradha

14  about the ins and outs of the metrics, but I would have

15  checked in on whether that conversation with Ashik had

16  happened or not.

17  Q.  That conversation between Ms. Agarwal and Mr. Desai?

18  A.  Correct.

19  Q.  And that was one that Mr. Desai had told you he was going

20  to have?

21  A.  Correct.

22          MR. JOHNSTON:  All right.  You can take this down.

23  BY MR. JOHNSTON:

24  Q.  Mr. Ma, did you ever work on ROI studies while you were at

25  Outcome Health?

1  A.  I did.

2  Q.  What was the purpose of ROI studies?

3  A.  As we mentioned before, if a pharma company had spent

4  $1 million, we wanted to independently prove that we delivered

5  2 or 3X ROI or maybe 2 or $3 million of value to the client.

6  And so the studies helped us validate that with metrics.

7  Q.  How was the study conducted?

8  A.  Generally, we contracted out to a third party because we

9  wanted to be unbiased and neutral between Context and the

10  client.  And what we would do is we would send them a list of

11  physicians that supposedly ran the campaign, and then the --

12  the third-party research company would study those physicians

13  to see if they wrote more prescriptions as a result of the

14  campaigns.

15  Q.  Who were the third-party research companies that performed

16  ROI studies?

17  A.  Two that I remember are called IMS and Crossix.

18  Q.  Now, in your mind at the time you were assisting with ROI

19  studies, did you think there was a right way to select a study

20  sample?

21  A.  At the time, I remember thinking about it and sometimes

22  being a little confused.  But as I sit here today, I know that

23  the right way is whatever ran the advertising is who gets

24  studied.

25  Q.  And why was that?

1   A.  Whatever they ran the advertising is what the client

2   ultimately bought, so it's the denominator.

3   Q.  And how was Outcome selecting sample studies -- sample

4   sizes when you were there?

5   A.  We tried a number of ways to mess with the sample for the

6   research study.

7   Q.  Can you describe some of those ways?

8   A.  One of the ways was -- was excluding MIAs.

9   Q.  What does MIA stand for?

10  A.  Missing in action.

11          And what that means is if we had a number of waiting

12  room screens that were running the campaign but, say, found

13  out that they were unplugged or had issues with their Wi-Fi

14  connectivity or, you know, had issues technologically, we

15  would exclude those screens from the study because we believe

16  that those screens would not have been effective advertising

17  and affected doctor behavior.

18          MR. POULOS:  Your Honor, may we get foundation as to

19  the "we" in that testimony?

20          THE COURT:  All right.

21  BY MR. JOHNSTON:

22  Q.  Who did you work with in selecting sample sizes?

23  A.  With Ashik Desai and Jason Ketchum.

24  Q.  And in your understanding, what was wrong with only

25  sending a sample that excluded the MIAs?

1  A.  Similar to the tablet metrics, it basically represents

2  cherry-picking.  And it would not fully capture the results of

3  the entire set of screens that actually ran the advertisement.

4        MR. JOHNSTON:  Let's take a look at Demonstrative

5  Chart 1164, Exhibit 1164.

6  BY MR. JOHNSTON:

7  Q.  So what is represented on this particular chart, Mr. Ma?

8  A.  Yep.  So on the left-hand side, the blue and the red

9  combined would represent all of the doctors that should have

10 been exposed to advertising.

11       And then the red ones would include the ones that we

12 tried to exclude from the research study.

13       And then in the middle, you see just the ones that we

14 believe had good health or network health or their screens

15 were on and fully running the study -- or fully running the

16 campaign.  Excuse me.

17       And then we would try to present all of the -- we

18 would try to present the results of that cherry-picked study

19 as if -- as if it were the entire campaign.

20 Q.  So, Mr. Ma, is there inherently anything wrong with

21 excluding MIAs?

22 A.  It depends on what the purpose of excluding is for and

23 what we're trying to get an understanding of.

24 Q.  So if the purpose of the ROI study is to study the

25 effectiveness of an ad, would it be appropriate to exclude

1  MIAs?

2  A.  That might be appropriate, yes.

3  Q.  But if the purpose of an ROI study is to measure the

4  monetary return that a client has gained as a result of a

5  certain spend, is it wrong to exclude the MIAs?

6  A.  As long as the denominator is the entire dollar amount

7  that they spent, you shouldn't exclude anything.

8  Q.  And when the results were presented to clients, did you

9  see any disclosure that the sample that was selected was not

10  representative of the overall campaign?

11  A.  Not that I recall.

12  Q.  And without that disclosure, how does that overstate the

13  ROI?

14  A.  Well, it -- it potentially just overstates it.

15  Q.  Now, were there also instances, Mr. Ma, when campaigns

16  that never ran the ad at all were actually, in fact, included

17  in the study?

18  A.  There were.

19        MR. JOHNSTON:  You can take this down, Ms. Paul.

20  BY MR. JOHNSTON:

21  Q.  Why would that ever happen if you just testified that the

22  whole point was to remove the MIAs?

23  A.  You know, generally when we were reading out ROI results

24  to clients, they expected to see a certain number of doctors

25  because they knew roughly how many they bought -- or they knew

1  exactly how many they bought in some cases.

2        And so if we are running a huge delta or an inventory

3  gap, we would have been afraid to show the client that we had

4  a gap.  And so if we were only studying, say, 300 physicians

5  out of thousands that they bought, we wouldn't want to tell

6  them that.  And so sometimes, we would gamble the ROI to make

7  it seem like we actually ran the campaign on a number of -- on

8  a larger sample of doctors.

9  Q.  So in the specific instances where you included screens

10 where it never ran --

11 A.  Yeah.

12 Q.  -- what would be the impact on -- the expected impact on

13 ROI?

14 A.  It potentially could lower the ROI.

15 Q.  But how was that -- how did you weigh that effect against

16 the effect of disclosing the delta?

17 A.  It's sort of like a lesser of two evils.  Potentially, you

18 would try to figure out which -- which one of those would be

19 more acceptable to the client, lower ROI or lying to them

20 about the inventory count.

21       MR. JOHNSTON:  All right.  Let's take a look at

22 Exhibit 1154.  And we can just start with the email at the

23 bottom.

24 BY MR. JOHNSTON:

25 Q.  Is this an email exchange between you and Mr. Desai?

1  A.  It is.

2  Q.  What's the basic topic in this email exchange?

3  A.  I'm basically telling Ashik that there's a lot of screens

4  that are MIAs and that worries me.

5  Q.  And why are you making this calculation?

6  A.  At this point, we are trying to prepare a list of

7  physicians to research.  And I'm trying to understand how many

8  physicians we can include in the study.

9  Q.  And how are you making that decision?

10 A.  We are looking at how many of the screens were offline and

11 then figuring out which ones have issues.  And then I'm asking

12 Ashik for his opinion.

13         MR. JOHNSTON:  Okay.  Let's go further up.

14 BY MR. JOHNSTON:

15 Q.  What does Mr. Desai write to you?

16         Just if you can summarize it at a high level?

17 A.  So we're basically playing with the line of -- of what is

18 considered MIA.

19         And so, for example, if you look at the third

20 paragraph, it says:  Lastly, I do think it's worthwhile

21 extending to 20 days and bumping all rules to that number.  So

22 2 MIA cases is 40, et cetera.

23         We're basically debating, like, is 20 days offline

24 too many?  Is 40 days offline too many?  Like, how many days

25 of offline screens can we accept before we exclude them from

1   the study.

2   Q.  And what's the decision here for what's the minimum number

3   of days that's acceptable?  Or is that not clear?

4   A.  It's -- I'd have to read through in more detail to -- to

5   remember.

6   Q.  The take-home point being when are screens being excluded

7   from the study list?

8   A.  The -- the takeaway is that there's some number of days

9   where if the screen is offline, we are afraid that it will

10  screw up the results.  And so we're trying to exclude it.

11  Q.  And at any point, would the client be informed that those

12  offline screens didn't play their ad?

13  A.  Not that I recall.

14          MR. JOHNSTON:  You can take this down, Ms. Paul.

15  BY MR. JOHNSTON:

16  Q.  Now, Mr. Ma, did you have a number of jarring moments

17  working at Outcome Health?

18  A.  I did.

19  Q.  And what was the defining feature of these jarring

20  moments?

21  A.  For most of my time at the company, even in the first few

22  months, it became clear to me that what we were doing was

23  misleading.  But we didn't talk a lot about it.  We didn't use

24  language.  And I didn't have sort of confirmation that all

25  the execs knew about it.

1    The moments that are jarring, to use that language,

2  that stick out to me are the moments where it kind of felt

3  like it came out from like the darkness into the light, where

4  we were just very plainly and openly speaking about this.  Or

5  that, you know, it was a clear acknowledgment from one of the

6  execs that, you know, misleading inventory, short of inventory

7  is something that just -- we just do as a business; this is

8  the way that it runs.

9  Q.  Did you have one of these moments with Brad Purdy?

10 A.  I did.

11 Q.  Did you have one of these moments with Rishi Shah?

12 A.  I did.

13 Q.  Did you have one of these moments with Shradha Agarwal?

14 A.  I did.

15 Q.  Let's go first to your moment with Shradha Agarwal.

16      At some point, did you rise your concerns about the

17 business practice of overselling inventory directly with

18 Shradha Agarwal?

19 A.  I did.

20 Q.  When did this occur?

21 A.  In early 2015.

22 Q.  How long had you been at the company?

23 A.  Six, seven, eight months.

24 Q.  Who were you reporting to at the time?

25 A.  Shradha and Lee, as I testified.

1    Q.  How long had you been participating in deceptive and

2    unethical business practices at the time you spoke to

3    Ms. Agarwal about your concerns?

4    A.  Pretty much my entire tenure.

5    Q.  And why did you wait until February to speak with

6    Ms. Agarwal about these concerns?

7    A.  And, again, I don't remember if it was February.  But it

8    was -- it was only then, you know, within the first couple of

9    months of my reporting relationship in to Shradha that I felt

10   comfortable.  Because at that point, she had become my direct

11   boss.

12   Q.  Was it your practice to share your concerns with your

13   direct supervisor?

14   A.  It was.

15   Q.  Did you share your concerns with Ashik Desai?

16   A.  I did.

17   Q.  Did you share your concerns with Lee Ebreo?

18   A.  I did.

19   Q.  Was that email -- that chat conversation with Lee Ebreo

20   one of the examples that you'd share in your concerns with

21   your direct supervisor?

22   A.  It is a direct example, correct.

23   Q.  What was the context for the meeting with Shradha Agarwal?

24   A.  It was a recurring one-on-one meeting.

25   Q.  How often did this meeting occur?

1    A.   My memory is that it was bi-week -- every two weeks.

2    Q.   Where did this particular meeting that stands out to you

3    occur?

4    A.   In her office.

5    Q.   Was anyone else there?

6    A.   No.

7    Q.   How did you express your concerns to her?

8    A.   I spoke about it in euphemisms because I wasn't sure how

9    delicately to dance around the topic.  And so I don't remember

10   the words that I used, but --

11   Q.   Let me stop you for a second.

12               Why did you feel like you had to use euphemisms to

13   talk about the issue of overselling inventory?

14   A.   I viewed it as sort of this somewhat secretive topic that

15   was maybe a little taboo and only a few people at the company

16   knew about.  And I didn't want to so directly imply that

17   something very unethical was going on.

18   Q.   And why didn't you want to directly imply that?

19   A.   I didn't want to be seen as someone who wasn't a team

20   player, that wasn't with the program, or -- you know, I -- I

21   had fear that if I more directly or used plain language to

22   state it, it could have negative consequences for me.

23   Q.   So did you use the word "fraud"?

24   A.   I would not have used that word.

25   Q.   Did you indirectly imply that the practice that was going

1   on was something you were uncomfortable with?

2   A.   I did.

3   Q.   How did you imply that?

4   A.   Again, I don't know what words I would have used, but I --

5   I recall phrasing it as a question and asking for her opinion

6   on sort of the general matter.

7   Q.   And what was the general matter that you were presenting

8   to her and asking for her opinion on?

9   A.   Misleading and overselling.

10  Q.   Did she make a comment in response to your question?

11  A.   She did.

12  Q.   What did she say?

13  A.   The -- the parts that I remember most clearly are she used

14  the words "we throw smoke bombs to" -- and then I remember

15  hearing, "to clean up our operations."

16  Q.   What did those comments mean to you?

17  A.   I think it -- it -- it conveyed to me that she understood

18  my question, knew what I was talking about, and had an answer

19  or a rationalization for why we did the things that we did.

20  Q.   Did she elaborate at all on what she meant by cleaning up

21  operations?

22  A.   From my memory, it's more sort of the general idea that --

23  you know, the idea of the smoke bomb is that you have the

24  smoke that people can't see behind the smoke screen.

25  Q.   And who are the people who can't see behind?

1  A.  Our -- our customers and our sponsors, clients, pharma

2  clients.

3  Q.  Continue, please.

4  A.  And that a point is that the smoke creates a -- you know,

5  a distraction or a, you know, a time lag or a gap so that in

6  the background, we can scramble and try to figure out how to

7  handle the situation or, you know, do things perhaps in a

8  better way.

9  Q.  What was your understanding of her approval of this

10  practice of overselling inventory?

11  A.  To me, the comment directly signals that it had already

12  been rationalized in her mind.  This is just the way that we

13  were doing business, and it had been the way that we had been

14  able to get the growth in the company that we had already had,

15  and that this would likely be the way that we would continue.

16  Q.  How did this conversation impact your thinking about what

17  you were doing at the company?

18  A.  At the time, I think part of me felt a little bit better

19  about it.  Because it was, here was the cofounder telling me

20  that this is just kind of the way it is.  And so, you know,

21  it's from a position of authority.

22       But over time, it sat less and less well with me

23  because it was my understanding that the cofounder of the

24  company was okay with us lying to clients.  And it was one of

25  the reasons that I realized that, you know, I don't think the

1   company was ever going to be clean.

2   Q.  Did you have any jarring moments with Brad Purdy?

3   A.  I did.

4   Q.  When did -- is there a particular moment that stands out

5   in your mind with Brad Purdy?

6   A.  There is.

7   Q.  And when did that occur?

8   A.  It was late 2014.

9   Q.  Where did it occur?

10  A.  Outside of Brad and Ashik's office.

11  Q.  Was that in the office in Chicago?

12  A.  It is -- or it was.

13  Q.  And what was the context of that interaction?

14  A.  I remember that I was due to have a meeting with Ashik,

15  and so I was waiting outside of his office.  And when Ashik

16  came out to get me, I think Brad was also coming out of his

17  office.

18          And I think the two of them had an exchange that I

19  witnessed about some sort of campaign.  I don't remember which

20  one it was, and I don't remember exactly what Ashik said.  But

21  he said something to the effect of, I think, we're really

22  coming from behind on this one.

23  Q.  And what was your understanding of what meant?

24  A.  It just meant that there was a large gap or a large delta,

25  and we were really behind the inventory on this campaign.

1    Q.  What, if any, response did Brad Purdy have?

2    A.  Yeah.  I remember it was a very sort of characteristic

3    shrug, if you will.

4    Q.  What do you mean by that?

5    A.  I just mean he sort of shrugged.  And sort of, to me, that

6    means that, yeah, that's just the way it is, you know; sorry

7    to hear that.

8    Q.  Do you have a memory of what the shrug looked like?

9    A.  I mean, it's -- I could -- I could try.

10   Q.  Well, maybe for the jurors in the back who can't see,

11   could you stand?

12   A.  Okay.

13          THE COURT:  Well, that's not going to help.  Because

14   when he stands, his shoulders are outside the picture.

15          MR. JOHNSTON:  That's true.  That's true.

16   BY MR. JOHNSTON:

17   Q.  I guess we'll just -- you can just demonstrate it in the

18   video.

19          MR. JOHNSTON:  Let the record reflect that the

20   witness has shrugged.

21          THE COURT:  It will.

22   BY MR. JOHNSTON:

23   Q.  Why was that a memorable experience for you?

24   A.  It was another moment where, you know, I realized that

25   there was kind of indifference to this; that, you know, we

1  were numb to it; that, you know, oh, here's a huge campaign

2  that's behind that would otherwise be very alarming.  And his

3  response was, yeah, par for the course; seems like that just

4  happens.

5  Q.  How did Brad Purdy's reaction impact your view of your own

6  conduct?

7  A.  Similar answer.  It just said, you know, hey, the execs of

8  this company seem to condone this.  Maybe they know something

9  I don't.  And that -- you know, maybe this was okay.  But

10 similarly over time, it made me realize that this is not

11 something that I wanted to be a part of.

12 Q.  Did this interaction with Brad Purdy happen many months

13 before the inflated metrics that you told him about by an

14 email and chat?

15 A.  It did.

16 Q.  Now, did you have any jarring moments with Rishi Shah?

17 A.  I did.

18 Q.  And have we already discussed one of them?

19 A.  We have.

20 Q.  And which -- what was that?

21 A.  It was the comment about whether we are the limiter or the

22 market is the limiter and the meeting about deltas and growth.

23 Q.  And was there an indirect interaction that you had with

24 Rishi Shah that impacted your thinking?

25 A.  Not my direction, but -- or not my interaction.

1    Excuse me.

2    Q.  So it was your interaction with whom?

3    A.  With Ashik.

4    Q.  Okay.  And what was the interaction with Ashik that

5    impacted your thinking?

6    A.  Yep.  So I remember I was having a one-on-one discussion

7    with Ashik about a campaign that I think we were, again, very,

8    very behind on.  And I think we were due to do an ROI study

9    for that campaign.

10            And I remember asking Ashik something to the effect

11   of, what are we going to do about this?  And Ashik is a person

12   who is extremely confident and really smart.  And so most of

13   the times when I asked him a question, he had an answer for

14   me.

15            And it was jarring in two ways.  One was this was one

16   of the first times I ever remember him not having a clear

17   answer about what to do.  And then his response to me was

18   something like I'm going to have to chat with Rishi about this

19   one.

20            And so it was one of the first times that he didn't

21   have a direct answer for me and he felt like he needed to go

22   to his boss to understand what to do next.

23   Q.  And how did that interaction impact your view of your

24   conduct?

25   A.  It -- it was -- you know, at the time, I had always

1    assumed and understood that the execs, you know, knew about

2    this and were fine with it.  But it was one of the first times

3    that I remember thinking, oh, like, you know, when it comes

4    down to the tough decisions, Rishi has to make the call.

5            And as I testified before with the previous ones,

6    you know, it meant that part of me thought, well, at least

7    we're in good hands here.  Somebody here is figuring out what

8    to handle in these situations.  But, you know, it also made me

9    feel like, you know, again, that the -- the founders and the

10   leaders of the company were okay with this thing that I felt

11   uneasy about.

12           MR. JOHNSTON:  All right.  Let's take a look at

13   Exhibit 1147, a chart, a demonstrative chart.

14           MR. POULOS:  Your Honor, I object.  Could we have a

15   sidebar?

16           THE COURT:  All right.  Hang on.

17           MR. POULOS:  Move that, please.

18           THE COURT:  It is off the jury's view.

19       (Proceedings heard at sidebar on the record.)

20           MR. POULOS:  Judge, I --

21           THE COURT:  All right.  Go ahead.

22           MR. POULOS:  Judge, I object to the chart.  This is a

23   summary now of his testimony.  It's entirely argumentative.

24   They shouldn't be allowed to recap, basically, his testimony.

25   If they want to use it in an interim statement, fine.  But

1  it's argumentative.

2       THE COURT:  I've seen charts identical to this used

3  in the cross-examination by all the defendants, certainly by

4  Defendant Shah.  I'm not sure you used it, Mr. Poulos, but

5  it's been used in the same manner by defendants in

6  cross-examination.

7       If you have an objection to it being inaccurate,

8  that's an objection I'll entertain.

9       Mr. Hueston, I think, is going to tell me where I'm

10 wrong.

11      MR. HUESTON:  Well, Your Honor, what I did is I built

12 my chart as testimony was coming in.  And I was not allowed --

13 at the end of my exam, Mr. Hankey objected over recap;

14 objection sustained.

15      There was no recap.  This does appear to be something

16 that is now going to be -- you said before, it's a recap as

17 opposed to a build during the live testimony.

18      THE COURT:  All right.

19      MR. JOHNSTON:  Your Honor, if I may respond?

20      THE COURT:  Go ahead.

21      MR. JOHNSTON:  We have just laid the foundation for

22 each one of these, and we're not going to recap.  This just

23 allows him to identify and situate what -- his testimony on a

24 timeline.  Nothing more and nothing less.

25      We've laid the foundation for the descriptive

1   accuracy and timeline for each of the five or six bubbles that

2   are on this.

3           THE COURT: How much more do you have on direct?

4           MR. JOHNSTON: 15 minutes.

5           THE COURT: All right. We're going to take our lunch

6   break now. Then I can put this chart up, because I can't see

7   it with the sidebar on. And then we'll discuss it outside the

8   presence of the jury.

9           MR. JOHNSTON: Thank you.

10      (Sidebar ended.)

11           THE COURT: Ladies and gentlemen, as you might have

12   guessed, we'll take our lunch break now. Please don't discuss

13   the case among yourselves or with anyone else and keep an open

14   mind. There's more evidence to hear. Thank you.

15           COURT SECURITY OFFICER: All rise.

16      (Jury out at 12:27 p.m.)

17           THE COURT: All right. Mr. Ma, we have a one-hour

18   break. You can discuss your testimony with the government if

19   you choose to do so over lunchtime; you're still on direct

20   examination. You're excused from the stand, though.

21           All right. Let's put that exhibit up, please.

22           All right. And the objection again, Mr. Poulos?

23           MR. POULOS: Well, Your Honor, I -- many of the other

24   demonstratives summarized -- basically laid out data and

25   charts, and that made sense. That was a demonstrative exhibit

1 tracking something.

2 THE COURT: Well, let me interrupt you there. The
3 demonstrative I recall used in Defendant Shah was about
4 changing testimony from an FBI interview walking in the door
5 to grand jury testimony to an SEC deposition. I'm -- I'm
6 summarizing, but it was the -- it was a timeline of changing
7 testimony --

8 MR. POULOS: Your Honor --

9 THE COURT: -- contrasted with the courtroom
10 testimony.

11 MR. POULOS: Yeah.

12 But, Your Honor, even there, it tracked a particular
13 issue. This is just a summary of his testimony.

14 And by the way, I'll point out as to the reference to
15 Brad Purdy, he shrugged off news that a campaign was falling
16 short. That witness testified that Ashik Desai said that they
17 were coming from behind. That's not a campaign falling short.
18 So that's a characterization and an argument that the
19 government is making there.

20 Coming to --

21 THE COURT: Well, let me interrupt you. I get to
22 interrupt; sorry.

23 I recall the witness -- actually, I recall the
24 witness at least on one of his answers saying it was coming up
25 short. I -- I'd have to review the real time transcript; I'm

1  going to check my notes.

2      MR. POULOS:  His -- his -- I recognize the quote,

3  Your Honor, because it was consistent with deposition

4  testimony where he said Desai said that we were really coming

5  from behind on a particular campaign.

6      THE COURT:  Okay.  All right.

7      MR. JOHNSTON:  He also used the word "short."

8      THE COURT:  I thought he put it both ways.  Now,

9  that's an area of cross, especially if you -- since you had

10  the advantage -- or not advantage, but you had the opportunity

11  to depose him during the SEC deposition.

12      But he was deposed, correct?

13      MR. POULOS:  Yes.

14      THE COURT:  All right.  Go ahead.

15      MR. POULOS:  So that's a characterization,

16  Your Honor, and it's argumentative.

17      THE COURT:  Well, it matches at least one answer he

18  gave on his direct examination.

19      What I'm concerned about -- I'll hear from the

20  defendants in a minute -- is Mr. Hueston saying I cut him off

21  from doing something that I think the government's about to

22  do.

23      Why don't you respond --

24      (Indiscernible crosstalk.)

25      MR. HUESTON:  I didn't put it -- I didn't put it

1 quite that harshly. But, you know, there was an objection

2 sustained when I attempted to do --

3         THE COURT: Well, that's -- that's another way of

4 saying cut off, but --

5         MR. JOHNSTON: Your Honor, I'm not going to recap his

6 testimony. I'm purely going to ask --

7         THE COURT: What are your questions on this?

8         MR. JOHNSTON: "Mr. Ma, does this timeline accurately

9 capture the -- the certain memorable moments at Outcome Health

10 and when they occurred?" And look at it. "Yes." Okay.

11 We'll take it down.

12         THE COURT: Oh, all right. And I assume you'll use

13 it at some point --

14         MR. JOHNSTON: Yes.

15         THE COURT: -- in the future.

16         All right. That is acceptable. You're not recapping

17 what has already been gone through over the last day and a

18 half or two days of testimony.

19         MR. JOHNSTON: No.

20         THE COURT: Okay. That objection I'll overrule,

21 then.

22         But now you know what -- it's a very limited

23 questioning on that. Then I don't think that one comment

24 about the shrug is necessarily inaccurate, given what may be

25 changing testimony, or at least a different characterization

1  of it by the witness.  But I recall hearing the campaign was

2  falling short answer.

3          Okay.  Mr. Poulos, you made an objection earlier and

4  I don't think I acknowledged it.  And I apologize, but you

5  need to -- both you and Mr. Lowder need to speak up.  You

6  don't need to shout, but speak up if you have an objection.

7          Because often when I hear an objection and nobody --

8  and the witness keeps rolling through it -- I didn't hear it.

9  I only noticed it because of the reference on the real time

10  transcript.  Many times that's because the witness gives an

11  answer where you decide it's not worth following up on.

12          MR. POULOS:  I don't think it was me, Your Honor.

13  I --

14          THE COURT:  Well, you did.  I saw it on the -- it was

15  you.  I saw a reference to objection on the real time

16  transcript, and I -- I didn't hear it.  I just saw it on the

17  transcript.  And I'm assuming --

18          COURT REPORTER:  I think it was Lowder, but I

19  couldn't hear you because you weren't speaking into the mic.

20          THE COURT:  Oh, then maybe it was Mr. Lowder.  Okay.

21          But, if -- then I apologize.  But if it's something

22  you are -- let's go off the record.  This doesn't need to be

23  on.

24          (Off-the-record discussion.)

25          THE COURT:  Back on the record.

1          Mr. Poulos.

2          MR. POULOS:  So, Your Honor, the other issue with

3   this timeline is that the witness said this shrug occurred in

4   late 2014.  And the government, for whatever reason, tries to

5   cabin that during the month of September and October.

6          And my hunch here, Judge, is that the government down

7   the road here is going to highlight some event happening in

8   September or October.  And so that -- that -- the testimony

9   does not support that -- that reference to cabining that

10  occurrence in September or October.

11         THE COURT:  Yeah, my notes say late 2014.  I hope you

12  have a good map maker or a chart maker.  You can make a --

13         MR. JOHNSTON:  We can expand the bracket.

14         THE COURT:  That's fine.  Late 2014, put it --

15         MR. JOHNSTON:  If Mr. Poulos would like us to do

16  that, we can do that.

17         THE COURT:  Yeah.  Talk it over.  If there's a way to

18  modify that that meets his objection.  And if there's not, you

19  can bracket it from --

20         MR. JOHNSTON:  I mean, September to just like late --

21         THE COURT:  September to December.

22         MR. JOHNSTON:  September to December would be late

23  2014.

24         THE COURT:  It would.  That certainly would

25  adequately represent what the witness testified to.  But speak

1  to Mr. Poulos.  Maybe there's a shorter time period that meets
2  his objection.
3          Anything else?
4          MR. JOHNSTON:  Yeah, one other issue, Your Honor.
5          There were -- or there are four text message exhibits
6  that we would like to use Mr. Ma as a reader on at the very
7  end of his testimony.  Just easier for the jury to understand.
8          He's never even seen them before.  This would -- he'd
9  be literally reading them live for the first time today.  So
10  we just -- rather than just call a separate witness --
11          THE COURT:  Are the exhibits --
12          MR. JOHNSTON:  These are just between the defendants.
13          THE COURT:  Are the exhibits in evidence?
14          MR. JOHNSTON:  I've noted -- I've noted them to the
15  defendants, that this is -- these are exhibits that we intend
16  to admit.  But, you know, I don't think that they were
17  necessarily listed in that order of preadmitted exhibits.
18          THE COURT:  All right.  Do you know what exhibits
19  he's talking about?
20          MR. POULOS:  I don't.
21          MR. TODISCO:  I don't.
22          MR. JOHNSTON:  You can look at their 955 --
23          THE COURT:  Well, we don't have to do it now.  At the
24  lunch break, which we'll start in a minute, give them the
25  numbers and let them look it over.

1           If there's an objection substantively to their
2   admission, I'll hear it when we come back.  If there's not,
3   I'll admit them outside the presence of the jury.  And then
4   you're allowed to read them, but not characterize or interpret
5   through that witness.
6           Okay.  Anything else?
7           See you in an hour, or less; probably about
8   45 minutes.
9       (A recess was had from 12:37 p.m. to 1:30 p.m.)

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3    UNITED STATES OF AMERICA,        )
                                      )      Docket No. 19 CR 864
4                    Plaintiff,       )
                                      )      Chicago, Illinois
5         v.                          )      February 13, 2023
                                      )      1:30 p.m.
6    RISHI SHAH, SHRADHA AGARWAL,     )
     BRAD PURDY,                      )
7                                     )
                     Defendants.      )
8
             TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 9B
9          BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury

10
     APPEARANCES:
11
     For the Government:    MR. MATTHEW F. MADDEN
12                          MR. SAURISH APPLEBY-BHATTACHARJEE
                            Assistant U.S. Attorneys
13                          219 South Dearborn Street, 5th Floor
                            Chicago, Illinois  60604
14

15                          MR. WILLIAM E. JOHNSTON
                            MR. KYLE C. HANKEY
16                          U.S. Department of Justice
                            Criminal Division, Fraud Section
17                          Washington, D.C.  20530

18

19

20

21
                           SANDRA M. TENNIS
22                         KATHLEEN M. FENNELL
                          Official Court Reporters
23                       United States District Court
                    219 South Dearborn Street, Room 2260,
24                         Chicago, Illinois 60604
                              (312) 554-8244
25                     Sandra_Tennis@ilnd.uscourts.gov

APPEARANCES (Continued:)

For Defendant
Shah:                   MR. JOHN C. HUESTON
                        Hueston Hennigan LLP
                        620 Newport Center Drive, Suite 1300
                        Newport Beach, California  92660

                        MS. VICKI CHOU
                        MR. MICHAEL H. TODISCO
                        MS. KAREN DING
                        Hueston Hennigan LLP
                        523 West 6th Street, Suite 400
                        Los Angeles, California  90014

For Defendant
Agarwal:                MS. KOREN L. BELL
                        MR. A. ALEXANDER LOWDER
                        MR. STEPHEN G. LARSON
                        Larson LLP
                        555 South Flower Street, Suite 4400
                        Los Angeles, California  90071

                        MR. PATRICK W. BLEGEN
                        MS. KELSEY H. KILLION
                        Blegen & Garvey
                        53 West Jackson Boulevard, Suite 1437
                        Chicago, Illinois  60604

For Defendant
Purdy:                  MR. THEODORE T. POULOS
                        MR. ERIC PRUITT
                        MR. JOHN PAVLETIC
                        Cotsirilos, Tighe, Streicker, Poulos &
                        Campbell, Ltd.
                        33 North Dearborn Street, Suite 600
                        Chicago, Illinois  60602

1      (Proceedings heard in open court.  Jury out.)

2          THE COURT:  All right.  Let's go on the record.

3          Go ahead.  Is there any objection to the exhibits?

4          MR. TODISCO:  Yes, your Honor.  We have several

5    objections.  The first is that all these messages post-date

6    Mr. Ma leaving the company by sometime, at least two years in

7    some instances, and do not relate to issues that he has

8    testified about.  So they're related to the capital raise in

9    2017, and about defendants' knowledge and their understanding

10   at that time, and that, as you can imagine, and as you've seen

11   with other witnesses, is going to be an important area of

12   cross-examination, what is his understanding of what

13   defendants knew and when.  And we think that, you know, there

14   is a witness exclusion order for a reason, and we don't want

15   to both potentially confuse Mr. Ma and pollute his

16   understanding of these issues by having him read them right

17   before we're able to cross-examine him.

18         THE COURT:  All right.  Why are you putting them in

19   through this witness?

20         MR. JOHNSTON:  The timing makes sense.

21         THE COURT:  I thought they post-date his leaving the

22   company.

23         MR. JOHNSTON:  Well, he went to the Wall Street

24   Journal the day that the capital raise was announced.  And so

25   these are texts messages between the defendants at

1    approximately the same day and the day before.

2           THE COURT:  Are you going to get into his going to

3    the Wall Street Journal?

4           MR. JOHNSTON:  Yes, absolutely.

5           THE COURT:  By the time he went to the Wall Street

6    Journal, he was gone from the company?

7           MR. JOHNSTON:  He was.

8           THE COURT:  Do you have another witness you can put

9    these through?

10          MR. JOHNSTON:  Well, they're just between the

11   defendants.  There's no other witness to read them in.  We'd

12   have to put up an agent.

13          THE COURT:  Yeah, you'd have to put up an agent.

14   But, nonetheless, I don't see the relationship if it's -- if

15   it's --

16          MR. JOHNSTON:  He is not going to be asked any

17   questions about it.

18          THE COURT:  No, no, but -- I understand.  But the --

19   the -- it's not even on the subject matter he testified about;

20   is that correct?

21          MR. JOHNSTON:  Well, you'll see that he -- he will be

22   testifying about why he went to the Wall Street Journal to

23   publicize what he knew about the company.

24          THE COURT:  Sure.  And that's what he has talked

25   about for the last two days.

1          MR. JOHNSTON:  Right.

2          THE COURT:  Or last two days of testimony.

3          MR. JOHNSTON:  And this -- in particular, it was the

4    announcement of, here's all this money that's being raised.

5    He is sort of shocked by it.  He's like, how could they raise

6    all this money when there's all this fraud going on.  Somebody

7    needs to know about this.  And the text that he --

8          THE COURT:  Well, is the raising of the money the

9    reason he went to the Wall Street Journal?

10          MR. JOHNSTON:  It's one of the primary reasons, yes.

11          THE COURT:  He'll testify to that?

12          MR. JOHNSTON:  Yes.

13          THE COURT:  All right.  Next argument.

14          MR. TODISCO:  Well, I think whether or not that is

15    one of the reasons that Mr. Ma went to the Wall Street

16    Journal, that doesn't solve the problem that this is going to

17    change his perception of what defendants knew and when, and

18    that him reading these texts prior to our opportunity to cross

19    him would still be very problematic.

20          Separately, the subject matter of these texts, there

21    are certain things in them that are either, I understand,

22    precluded by motion in limine or very prejudicial and are

23    going to certainly impact the way that Mr. Ma -- you know, the

24    last thing that Mr. Ma knows about the defendants.

25          I'll give you one example.  In Exhibit 958,

1  Ms. Agarwal texts Mr. Shah and says:  "How does it feel to
2  wake up as a billionaire wizard?"
3          And Mr. Shah responds:  "LOL, drug wizard."
4          Especially in this climate about big pharma --
5          THE COURT:  Did you say drug wizard?
6          MR. TODISCO:  Drug wizard.  So having that be the
7  last thing that Mr. Ma is asked about right before we cross
8  him --
9          MR. JOHNSTON:  I'm not asking him anything.
10          THE COURT:  No, but he's reading it.  Put it in --
11  one way to do this is to have him -- if this is necessary as
12  the vehicle to put them in, put it in after cross.  You can
13  put it in -- read them into redirect.  Otherwise, call an
14  agent.  This is not the same as some of the other ones that
15  have been read that are in the bandwidth of what the witness
16  testified about.  The time period, I'm not as concerned about.
17  But this is a completely unrelated topic, and I think the
18  defense -- it's a -- it's a, I think, unduly prejudicial way
19  to finish his testimony where he's talking about numbers, ROI
20  reports, and a variety of list-match issues, and then throwing
21  in the financing, which is something that was not covered in
22  his deposition -- or in his direct testimony at all.  So
23  perhaps we'll let it in after the main cross has been over,
24  you can put it in redirect, or just call an agent.
25          MR. JOHNSTON:  Okay.  We'll plan on just having him

1  do it on redirect, then.

2         THE COURT:  Well, I'm suggesting that as a

3  possibility.  I haven't seen these yet.  And so --

4         MR. JOHNSTON:  Would you like to see them?

5         THE COURT:  I would.  But it's not going to change

6  what we're doing right now.  So I'll get them at a break.

7         All right.

8         MR. BLEGEN:  Judge, can I just flag that 957 has the

9  personal relationship issue in it that you ruled on a motion

10 in limine.  I'm sure the government just missed it, but I just

11 want to flag it so it doesn't get lost.

12        THE COURT:  Fair enough.  These are all reasons why I

13 need to look it over.  And it's going to take more time than

14 we're going to spend right now on it because I want you to

15 finish your direct and I want the cross to start.

16        MR. JOHNSTON:  Yes, your Honor.

17        THE COURT:  You can hand it up --

18        Lenny, why don't you grab that.  You can hand it up

19 to my extern.  I'll take a look at it while we're doing that.

20        Okay.  Thank you.

21     (Jury in at 1:36 p.m.)

22        THE COURT:  Please be seated, ladies and gentlemen.

23        Mr. Johnston, you may continue your direct

24 examination.

25        MR. JOHNSTON:  Thank you, your Honor.

1    DAVID MA, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

2    DIRECT EXAMINATION (Resumed)

3  BY MR. JOHNSTON:

4  Q.  Mr. Ma, before the break, you were testifying about some

5  jarring moments that you had with various members of the

6  executive team.  Do you recall that?

7  A.  I do.

8  Q.  How soon into your tenure at Outcome Health did you

9  realize that the company's business model had the potential to

10  cheat its clients?

11  A.  Um, within the first, you know, month or two --

12           MS. CHOU:  I think the screen's on.

13           THE COURT:  Pardon me?

14           MS. CHOU:  The screen's --

15           MR. JOHNSTON:  Well, it's just the government's

16  computer.

17           THE COURT:  Are you going to be using more exhibits?

18           MR. JOHNSTON:  Yes, your Honor.

19           THE COURT:  Soon?  Or should I put it on the camera?

20           MR. JOHNSTON:  You can revert to the camera.

21           THE COURT:  All right.

22  BY MR. JOHNSTON:

23  Q.  Did it bother you that you were participating in conduct

24  that you knew to be wrong?

25  A.  Very much did.

1    Q.  If it bothered you, why did you stay?

2    A.  It's a complicated answer.  I think a combination of fear,

3    optimism, you know, maybe belief that things might get better.

4    You know, steady paycheck.  But at some point I wanted to

5    leave, and then I got promoted.  You know, I was afraid that

6    if I spoke out that there weren't enough tech companies in

7    Chicago for me to find another job, especially given how

8    powerful and connected the execs were.

9           You know, just -- you know, I was 23 at the time, and

10   so I didn't know what implications that would have on my

11   career to be at a job for less than a year, if that would look

12   bad on my resume, would it be difficult for me to get another

13   job in the City in Chicago.

14          And so just, you know, I wish that I had quit

15   earlier, but, you know, it's hard for me now to know the exact

16   reason why I was convinced to stay so long.

17   Q.  How did you end up deciding to leave?

18   A.  Ultimately, I actually decided it over a vacation.  You

19   know, I was working probably 55, 60 hours a week, and on the

20   weekends, and never had time to clear my mind.  And it was on

21   vacation when I was in Europe that I had a chance to really

22   reflect and think about it.  This was summer of 2015, so a

23   year and maybe a few months in.  It was at that time that I

24   decided that, you know, I couldn't be associated with this any

25   longer, and I sort of created a plan for myself to exit the

1  company.

2  Q.  Can you explain why you ultimately left?

3  A.  I mean, the real reason why I left is I didn't want to do

4  any of this stuff anymore.  You know, I think -- I had done it

5  for long enough and knew that I had done enough things that I

6  figured to myself were wrong.  And I didn't want to keep doing

7  it.  But I ultimately gave a more, sort of, politically

8  correct answer to the company.

9  Q.  Did anything about your interactions with Purdy, Agarwal

10  or Shah affect your decision to leave?

11  A.  Yeah.  If you add up all those things together, you know,

12  I think I said earlier, there was a sense of optimism that I

13  thought, you know, maybe one day this company would figure out

14  how to do things in a clean, ethical way.  But all of those

15  interactions, to me, signaled that there wasn't really an

16  intention to ever do it the right way.  That, you know, if we

17  ever caught up, we would just sell ahead again.  And so I lost

18  any sense of optimism.  And those interactions were -- are

19  examples of in my mind where, you know, it became clear to me

20  that the business was never going to operate in an ethical

21  way.

22  Q.  All right.  I want to show you a timeline that's

23  demonstrative Exhibit 1164.  Sorry, 1147.  1147.

24        Mr. Ma, does this chart sort of accurately capture

25  the approximate timelines for the events that are captured on

1  this chart?

2  A.  It does.

3  Q.  And you can mark on your screen.  Can you mark whereabouts

4  you -- when you would have decided to leave the company?

5  A.  Somewhere in this timeframe.

6  Q.  You can take this down.

7        Mr. Ma, was it stressful working at a company that

8  had so many dishonest business practices?

9  A.  Very stressful.

10  Q.  How did that affect you?

11  A.  It had a really negative effect on me, I think.  You know,

12  I don't think --

13        MR. LOWDER:  Objection, your Honor.  Relevance.

14        MR. JOHNSTON:  We can go to sidebar, your Honor.

15        THE COURT:  All right.  Let's go to sidebar.

16     (Proceedings heard at sidebar.)

17        THE COURT:  Go ahead.

18        MR. JOHNSTON:  Your Honor?

19        THE COURT:  Well, let me hear the objection first.

20        MR. JOHNSTON:  Sure.

21        MR. LOWDER:  Just, I don't know his -- the stress and

22  the prejudicial basis or impact of him talking about his

23  internal feelings about what he was doing, what doesn't really

24  relate to, you know, what the government has to prove here.

25  It's just gratuitous at this point.

1          THE COURT:  All right.  Response?

2          MR. JOHNSTON:  Yes, your Honor.  So the defense has

3    already attacked Mr. Ma's credibility in opening, in interim

4    statements.  And so the government is entitled to explore his

5    inner motivations for staying at the company, for later

6    reporting the misconduct because the jury needs to be able to

7    hear, at least from the government's perspective, that he

8    ultimately disclosed this fraud to the Wall Street Journal out

9    of disinterested motives, not what Mr. Lowder alleged in his

10   opening statement was just an attempt to get ahead of the law.

11   And so this is directly relevant to what he ended up doing.

12   And we are entitled to bring it out.

13         THE COURT:  Well, the question was, I assume, leading

14   up to some physical manifestations of anxiety.  Is he going to

15   talk about something where he was physically sleepless, or

16   anxious, or took medication, or anything?

17         MR. JOHNSTON:  He's going to talk about that he was

18   anxious and it was a -- like a bad experience.  And then he's

19   going to talk about how this impacted him after he left and

20   what he ended up doing.

21         THE COURT:  All right.  Objection overruled.  This

22   isn't -- this is marginally relevant to his motivation and the

23   genuineness of his motivation to disclose the conduct -- the

24   alleged conduct to the Wall Street Journal.  Overruled.

25         (End of sidebar proceedings.)

1    THE COURT:  All right.  You can ask your question

2 again.

3 BY MR. JOHNSTON:

4 Q.  How did the stress of working in a company with so many

5 dishonest business practices affect you?

6 A.  I would say, to summarize, it affected me in a

7 professional manner, and a mental health manner, and a

8 personal manner.

9    You know, professionally, it made me realize that,

10 for as long as this company was on my resume, you know, I

11 would be -- I would have this, sort of, in some way, sort of a

12 dark mark on my employment history.

13    Mental-health-wise, I was working really, really

14 hard, and it caused me to sort of be in a bit of a dark place

15 for periods of time when I was at the company.

16    And personally, you know, I don't know that it -- I

17 can't say for sure, but I think it sort of messed with some of

18 my personal relationships, including, you know, a relationship

19 with someone.

20    So, I mean, in many ways it was a real dark period of

21 my life.

22 Q.  Mr. Ma, when you decided to leave, did you tell anyone at

23 the time that the dishonest business practices were the reason

24 you were leaving?

25 A.  I did.

1 Q. Who did you tell that to?

2 A. I told a number of people at the company that I trusted,

3 including a number of the analysts on the analytics group,

4 which includes Kathryn Choi, Oliver Han, Joyce Chen, Hailey

5 Lefkofsky, Lisa Wolkoff. I told a friend of mine at the

6 company named Frank Peters. There may have been additional

7 people. But, you know, there were a number of people at the

8 company that I sort of entrusted and let them know the real

9 reason.

10 Q. What did you tell other people at the company for why you

11 were leaving?

12 A. It was my plan to get out of the company in a way that

13 wouldn't burn any bridges. I had already, at that point,

14 gotten accepted into business school and accepted into a

15 coding or software development boot camp. And so I told the

16 company that I was going to go learn how to code and

17 eventually attend business school.

18 Q. So why didn't you tell everyone else that the company's

19 business practices were the real reason you were leaving?

20 A. Fear. You know, when I was at the company, Rishi and

21 Shradha had invited Mayor Rahm Emanuel in the office. They

22 were, you know, known to be associated with the Pritzkers.

23 They had brought in a Kennedy -- congressman, I think -- into

24 the office for a tour. And so I knew them as powerful people

25 in the Chicago scene. And there is not that big of a tech

1    sector here in Chicago.  And as somebody who wanted to be

2    employed, I was afraid that if I spoke out and it was clear

3    that I spoke out, I'd be, sort of, black-marked or, you know,

4    blacklisted from future tech employment here in Chicago.

5    Q.  Mr. Ma, after you left Outcome Health, were you still

6    bothered by what you had been a part of?

7    A.  Very much so.

8    Q.  What, if anything, did you try to do?

9    A.  I -- overall I just wanted to -- to make known what I

10   already knew.  I saw the company as sort of operating in a way

11   that was unethical, and I wanted it to get out there, and I

12   didn't know how.  And so I tried to talk to lawyers.  I tried

13   to talk to the press.  I tried to convince a group of other

14   people at the company who had left to speak out together as a

15   group, sort of strength in numbers.  But, overall, I just had

16   this sort of feeling inside of me that the information needed

17   to come out.

18   Q.  Were you able to convince anyone else to come forward with

19   you at the beginning?

20   A.  Ultimately I was not able to.

21   Q.  Did you come forward at some point to -- and speak with a

22   journalist?

23   A.  I did.

24   Q.  And when was that?

25   A.  This was spring of 2017.

1  Q.  And had there been anything in the news that led you to

2  reach out to a specific journalist?

3  A.  Yes.

4  Q.  And what was it that was in the news?

5  A.  Outcome Health at this point had changed its name, had

6  just raised a very large round of funding.

7  Q.  Do you recall how much money they had raised?

8  A.  It was in the hundreds of millions of dollars.

9  Q.  And what, if anything, about the capital raise impacted

10 your decision to reach out?

11 A.  I had seen an article about it from a journalist that I

12 thought had reported on it in a very balanced way.  And so I

13 reached out to that journalist.

14 Q.  Who was that journalist?

15 A.  His name is Rolfe Winkler.

16 Q.  What publication did he work for?

17 A.  At the Wall Street journal.

18 Q.  Let's look at Exhibit 960, and let's look at the first

19 e-mail exchange at page 3.  No, I guess it's page 2.  Let's

20 zoom in on the very first e-mail.

21      Is this you writing out -- or writing the initial

22 e-mail, Mr. Ma?

23 A.  It is.

24 Q.  And who are you writing to here?

25 A.  To Rolfe Winkler, the journalist at the Wall Street

1  Journal.

2  Q. Can you please read what you wrote?

3  A. "Hi, Rolfe. Congratulations on breaking the news on the

4  Outcome Health round of funding. In particular, I think you

5  did a really balanced job of describing some of the

6  less-than-normal parts of the funding arrangement.

7       "If you are interested, I have some additional

8  information on Outcome Health that I'd be willing to share

9  (the less than rosy stuff) if you're open to hearing it.

10      "I was a former employee mid 2014 to late 2015 and

11  think there are some things that might be worth knowing, given

12  the recent news.

13      "Of course, all up to your judgment, but if you're

14  curious.

15      "Feel free to write back here or text --" my

16  number "-- and we can set up a time. I'm in the bay area so

17  could be easier to meet up as well."

18  Q. Mr. Ma, bringing your attention to your first line about

19  breaking the news on Outcome Health round of funding, what are

20  you referring to right there?

21  A. The large fundraising round that -- the article that he

22  wrote about the large fundraising round.

23  Q. And was Rolfe Winkler the person who had broken that news

24  article?

25  A. I don't recall if he was the one -- the first to break it,

1  but he was one of several journalists who had covered it.

2  Q.  Was he the one that you noticed in particular?

3  A.  He was -- yes.

4  Q.  And what do you mean when you write:  "If you are

5  interested, I have some additional information on Outcome

6  Health that I'm willing to share (the less than rosy stuff)"?

7  A.  Basically all the details that we've covered in my

8  testimony so far.

9  Q.  And why did you want to tell a reporter at the Wall Street

10  Journal about the unethical business practices you had

11  participated in?

12  A.  It's my opinion, personal opinion, that they didn't

13  deserve the funding that they had received because it was all

14  built on a lie.

15  Q.  Let's go to the next article -- the next e-mail.

16         Did Mr. Winkler respond?

17  A.  He did.

18  Q.  Did you speak with him?

19  A.  I did.

20  Q.  On the phone?

21  A.  On the phone.

22  Q.  Did you also meet with him in person?

23  A.  I did.

24  Q.  How soon after your initial outreach did you meet in

25  person with Mr. Winkler?

1    A.  I think it was within a few days.

2    Q.  What type of information did you share with Mr. Winkler?

3    A.  I spent a lot of time with him.  I shared many of the

4    details about the scheme, how it worked, my involvement, other

5    people who were involved.  And ultimately I shared a number of

6    screen shots of text messages between myself and Ashik Desai.

7    Q.  An example of which we saw during your testimony?

8    A.  Correct.

9    Q.  At the time you reached out to the Wall Street Journal,

10   had you obtained any legal protection for yourself?

11   A.  No.

12   Q.  At the time you spoke to the Wall Street Journal, were you

13   aware that your reaching out could result in negative

14   publicity surrounding your own employment there?

15   A.  Yeah, I was definitely afraid of that.

16   Q.  So why did you reach out, regardless?

17   A.  Um, I just -- it felt like it was the right thing to do.

18   You know, I feel like I had information that other people

19   didn't have.  I felt like it was information that people

20   needed to know.  In some ways, it was sort of bursting to get

21   out of me.  And so perhaps, foolishly, I reached out and just

22   tried to get the information out there in any way I could.

23   Q.  Did Mr. Winkler publish a later article in October 2017,

24   containing many of the details that you told him?

25   A.  He did.

1   Q.  At that point, had you obtained a lawyer or any legal
2   protections for yourself?
3   A.  Not when it was initially published, no.
4   Q.  Sometime after that second article's publication in
5   October 2017, did you obtain counsel?
6   A.  I did.
7   Q.  And was it after you obtained counsel that you filed a
8   whistleblower complaint with the SEC?
9   A.  Correct.
10          MR. JOHNSTON:  If we could have a moment, your Honor?
11          THE COURT:  All right.
12          MR. JOHNSTON:  Your Honor, at this time the
13  government passes the witness.
14          THE COURT:  All right.  Cross-examination.  Ready to
15  go?
16          MR. POULOS:  Yes, your Honor.
17          THE COURT:  You may proceed.
18                      CROSS-EXAMINATION
19  BY MR. POULOS:
20  Q.  Mr. Ma, about a week after that Wall Street Journal
21  article was filed, you and your lawyer filed this
22  whistleblower complaint at the SEC; right?
23          MR. JOHNSTON:  Objection.  Vague as to time.
24          THE COURT:  Overruled.
25  BY MR. POULOS:

1    Q.  Within a week or two?

2    A.  I don't think it was within a week or two.

3    Q.  How long was it, sir?

4    A.  From my recollection, it was somewhere between one and

5    two months.

6    Q.  Maybe four weeks, is that what you're saying?

7    A.  From my recollection, the filing to the SEC was done in

8    December, and the article was published in October.

9    Q.  Mr. Ma, the lawyer you hired is a plaintiff's lawyer;

10   correct?

11   A.  Sorry, can you rephrase the question?

12   Q.  The lawyer that you hired is a plaintiff's lawyer;

13   correct?

14   A.  I don't -- I don't know exactly what that means.

15            MR. JOHNSTON:  Your Honor, if we could have a

16   sidebar?

17            MR. POULOS:  That's okay, your Honor.  I'll move on

18   here.

19            THE COURT:  All right.

20   BY MR. POULOS:

21   Q.  Sir, when you and your lawyer filed the action at the SEC,

22   you were looking to cash in; weren't you?

23   A.  No, I don't think that's true.

24   Q.  Didn't your lawyer specifically assert on your behalf that

25   you should be entitled to a certain percentage under what --

1   based on whatever recovery the SEC might obtain?

2   A.  My understanding is that as part of the filing there is

3   the possibility of a financial reward.

4   Q.  My question to you, sir -- listen to my question.

5           Did you know at the time, were you aware that your

6   lawyer specifically asserted that you are entitled to a

7   portion of any recovery?

8   A.  I don't know if there's a specific filing or a document

9   that asserts that.

10  Q.  Okay.  We'll get to that later.

11          Mr. Ma, it's true, right, that you knowingly

12  participated in a scheme to defraud; correct?

13  A.  Um, I think the answer to that is I don't know.  I think

14  I've been very transparent that I --

15  Q.  Sir, let me make this -- let me state it in plainer

16  English for you.

17          MR. JOHNSTON:  Objection, your Honor.

18          MR. POULOS:  He's not answering the question, Judge.

19          MR. JOHNSTON:  He wasn't given the chance.

20          THE COURT:  You've got to let him complete his

21  answer, and then you can move to strike it.

22          Were you done with your answer?

23          THE WITNESS:  No.

24          THE COURT:  Finish your answer.

25          If you don't think it's responsive, you can move to

1  strike.

2  BY THE WITNESS:

3  A.  I think I was saying I know I've been, I think, very

4  transparent and honest that during my time at the company, I

5  did things that at the time I thought were wrong, now I know

6  are very wrong.  But I don't know -- you know, we helped lie,

7  we helped deceive.  You know, these were things that my boss

8  asked me to do.  But I don't know that -- you know, I don't

9  know what the legal definition of, you know, to defraud, or

10  what that means.  And so, you know, my job here is just to

11  tell you what I know.

12  BY MR. POULOS:

13  Q.  Let me state it this way:  Did you knowingly deceive

14  clients of Outcome Health?

15  A.  Yes.

16  Q.  Did you intentionally deceive clients of Outcome Health?

17  A.  At the direction of my boss I did, yes.

18  Q.  But my question is:  Did you do that?

19  A.  I did, yes.

20  Q.  I'm going to ask you to quit volunteering information.

21  Okay, sir?  We're going to be here a long time.

22        MR. JOHNSTON:  And, your Honor --

23  BY MR. POULOS:

24  Q.  I'm going to ask you specific questions --

25        MR. JOHNSTON:  Objection.

Ma - cross by Poulos

1  BY MR. POULOS:

2  Q.  -- I would appreciate it if you would confine your answer

3  to the question I've asked.

4          THE COURT:  All right.  Hang on everybody.

5          Mr. Ma, just try your best to answer the question as

6  it's asked.  If you can't, you should say so.  But try and

7  restrict your answer to the question that is being asked.

8          THE WITNESS:  Okay.

9          THE COURT:  Let's proceed.

10 BY MR. POULOS:

11 Q.  Mr. Ma, I assure you, we are going to get into what your

12 boss directed you to do.

13         THE COURT:  Just ask questions.

14 BY THE WITNESS:

15 A.  Okay.

16 BY MR. POULOS:

17 Q.  My question to you is:  You intentionally deceived the

18 clients of Outcome Health; correct?

19 A.  Correct.

20 Q.  You did that repeatedly; did you not?

21 A.  I did.

22 Q.  And Ashik Desai gave you specific instructions to

23 repeatedly lie to clients; right?

24 A.  Correct.

25 Q.  Because that is how you deceive them.  You put in writing

1  on numerous occasion false statements to the pharmaceutical
2  companies; correct?
3  A.  Um, may I give a slightly contextual answer on this?
4  Q.  Are you saying your answer to my question is -- is not
5  correct?  Let me restate the question, see if you can
6  understand it.
7  A.  Okay.  Sure.
8  Q.  Did you repeatedly send false information in writing to
9  the clients of Outcome Health?
10 A.  I usually sent it to the salespeople who then sent it to
11 the clients, but, yes.
12 Q.  So you repeatedly generated false documents that you gave
13 to the sales reps, knowing and intending that it would be
14 given to the pharma companies; right?
15 A.  That is correct, yes.
16 Q.  Okay.  And you just -- besides affirmative, outright lies
17 to the pharmaceutical company, you also concealed material
18 information from them; correct?
19 A.  From the clients, sir?
20 Q.  Yes.
21 A.  Yes.
22 Q.  You did that repeatedly; right?
23 A.  Um, yes.
24 Q.  Did you -- did you lie that -- the entire time that you
25 were at Outcome Health, sir, did you lie to a pharmaceutical

1  company or cause a false statement to be made to a

2  pharmaceutical company pretty much every single day?

3  A.  Hard for me to say exactly every single day, but very

4  often, yes.

5  Q.  Every single week?

6  A.  Yes.

7  Q.  Multiple times a week?

8  A.  Yes.

9  Q.  Ashik Desai was your mentor; right?

10  A.  I wouldn't use the word "mentor."  I would use boss.

11  Q.  Well, he taught you how to do a lot of these things that

12  turned out to be false and fraudulent; correct?

13  A.  He did.

14  Q.  He did mentor you in that type of conduct; correct?

15  A.  Perhaps you and I have a different definition of mentor.

16  But he taught me how to do them, yes.

17  Q.  And you've interacted with him, I think you told us on

18  direct, on a daily basis; right?

19  A.  Correct.

20  Q.  He gave you instructions on what specific lies to tell;

21  right?

22  A.  Correct.

23  Q.  And he gave you instructions on what specific facts to

24  conceal; right?

25  A.  He did.

1   Q.  Did he do that on a weekly basis?

2   A.  Yes.

3   Q.  Sometimes multiple times a week; correct?

4   A.  Correct.

5   Q.  Besides all the lies and the concealment of information

6   from pharmaceutical clients, sir, you also lied to a number of

7   people within the company; correct?

8   A.  Can you be more specific?

9   Q.  Can you think of any person that you lied to, sir?  Do I

10  need to be more specific?

11  A.  Um, I can try to think of specific people, but I guess the

12  answer to your question is yes.

13  Q.  Okay.  Tell us, who did you lie to within the company?

14  A.  Well, generally this whole scheme was meant to be kept

15  away from large majorities of the --

16  Q.  My question, sir, is --

17              MR. JOHNSTON:  Objection.

18              THE COURT:  Hang on, Mr. Poulos.  You cannot

19  interrupt the witness' answer.  If you want to move to strike

20  it because you think it's non-responsive, that's a ruling I

21  can make.  But you cannot interrupt him.

22              Finish your answer.

23  BY THE WITNESS:

24  A.  We, on the sponsorship side, tried to conceal much of this

25  information from other parts of the company, including the

1 large majority of the membership side. And so, if asked about

2 it from any of those people, I would have tried to conceal it.

3 BY MR. POULOS:

4 Q. The people on the membership side?

5 A. Correct.

6 Q. Who -- give me some specific names of who you concealed it

7 from.

8 A. Well, I would have told it directly to Matt Garms and

9 Jason Ketchum, but any of their -- many of their direct

10 reports I would have concealed it from.

11 Q. Okay. Anybody else that comes to mind in terms of false

12 -- lies and false information provided?

13 A. Potentially to the finance team, as we've discussed?

14 Q. That's where I was going, sir. Thank you.

15 A. Okay.

16 Q. You made a lot of lists at Outcome Health; right?

17 A. I did.

18 Q. Let's try to take them in order. You would get a target

19 list from pharmaceutical companies; correct?

20 A. Correct.

21 Q. And then it was your job, with Ashik Desai, to try to come

22 up with a list-match of what you're going to tell to the

23 pharmaceutical company in terms of how many sites, locations,

24 devices you match up to; right?

25 A. That's correct.

1   Q.  And then you would generate various lists while you were

2   going through that process; right?

3   A.  Correct.

4   Q.  It wasn't just one list, usually; right?

5   A.  Um, it depends on which part of the process you're

6   speaking about.

7   Q.  You told us on direct examination about this thing

8   called -- that you coined -- you ended up coining it a loose

9   match; right?

10  A.  Correct.

11  Q.  And that was when you had 123 Main Street, Suite 1000;

12  correct?  That's one example?

13  A.  The loose match dropped the suite, to be clear.

14  Q.  Right.  I'm giving you -- you would have 123 Main Street,

15  suite number 1000, for an example.  You follow me so far?

16  A.  Yes, sir.

17  Q.  And then -- and then for a loose match, you would just

18  take those first eight digits, correct, 123 M-i -- M-a-i-n,

19  et cetera; correct?

20  A.  Correct.

21  Q.  That was basically just taking the first eight, is what

22  you ended up calling it, right --

23  A.  Correct.

24  Q.  -- the first eight?

25          Now, when you were instructed to use the first eight

1    digits in an address, did somebody have to teach you how to do

2    that, sir?

3    A.  Yes.

4    Q.  Somebody had to tell you, these are the first eight?

5    A.  Well, I could deduce the first eight myself.

6    Q.  Okay.  When Ashik Desai told you, use the first eight

7    digits in this address, did he have to teach you anything more

8    beyond that -- that direction?  Did he have to tell you how to

9    take the first eight digits?

10   A.  No, I think I was capable of doing that myself.

11   Q.  Of course you were.  You're bright; right?

12   A.  Sure.

13   Q.  Okay.  In other words, the simple instruction of, take the

14   first eight, you were able to take the first eight and then

15   run that against the list that you had; right?

16   A.  Correct.

17   Q.  So you get the target list from the pharma, maybe you're

18   instructed to use the first eight; correct?

19           You have to say yes.

20   A.  Yes, sorry.

21   Q.  Something that was pretty simple to do; correct?

22   A.  Yes.

23   Q.  And then after that, you could do tighter -- tighter

24   matches; right?

25   A.  Correct.

1  Q.  In fact, you did tighter matches after you did the first

2  eight many times; correct?

3  A.  That is correct.

4  Q.  You would enter the suite number sometimes; correct?

5  A.  We would -- we would use the suite number, correct.

6  Q.  Right.  You could use an NPI number in addition to that;

7  right?

8  A.  That is correct.

9  Q.  You could use a telephone number; correct?

10  A.  We could, but I don't think we often used telephone

11  numbers.

12  Q.  But you did sometimes; didn't you?

13  A.  I don't recall.  It wasn't one of the things that we used

14  a lot.

15  Q.  Okay.  You could use the practice's name; correct?

16  A.  We could, but we generally did not either.

17  Q.  Okay.  And you could use the doctor's name; correct?

18  A.  Correct.

19  Q.  Okay.  Now, when you do the first eight, that's going to

20  get you the largest cut; correct?

21  A.  Potentially one of the largest cuts, correct.

22  Q.  And then you could funnel it and whittle it down, correct,

23  trying to get -- trying to get as tight a match as you wanted

24  to get; correct?

25  A.  Correct, you could get a tighter match from the address.

1    Q.  And you gave Ashik Desai all these different options;

2    right?  You often took the first eight and you said, I've also

3    cut it this way and cut it that way.  What do you want to do:

4    Right?

5    A.  Yes, it was customary to present multiple options to Ashik

6    Desai.

7    Q.  Okay.  And then Ashik Desai and Ashik Desai alone

8    instructed you on what lists to give to the pharmaceutical

9    company; correct?

10    A.  In the large majority of cases, correct.

11    Q.  Sometimes you came up with that on your own; didn't you?

12    A.  I helped guide him to answers, correct.

13    Q.  And in putting together the lists, sometimes they would

14    include projections; right?

15    A.  That's fair, I think, yes.

16    Q.  Okay.  The projections were derived from these various

17    stages of installation and recruitment of members; correct?

18    A.  That's one of the ways.  Correct.  Yes.

19    Q.  Okay.  And sometimes, when you didn't have enough doing it

20    that way, you would just add any old device that you might

21    have had on your -- on your master MO list; correct?

22    A.  I don't know that I would agree with any old device, but

23    we might extend it further left on that chart that we

24    reviewed.

25    Q.  Okay.  But you would just add in additional stuff if the

1  MO and the M -- and the MS list wasn't enough; right?

2  A.  I can't recall specific instances then.  If we did, it

3  would have been rare.

4  Q.  Okay.  So I just -- I do want to be clear about this, sir,

5  that -- is it true that in the vast majority of the cases, the

6  lists that you added out, even though you didn't have the

7  office trying to match up to the target list, included devices

8  that Outcome was either scheduled to install; correct?

9  A.  It included devices that were scheduled to install;

10  correct.

11  Q.  Where the doctors had agreed to an installation; correct?

12  A.  In most cases, correct.

13  Q.  And there's outstanding continuous dialogue; right?

14  A.  Yeah, I think the term was ongoing dialogue.  Correct.

15  Q.  Okay.  So there was some methodology to that process;

16  right?

17  A.  Of course.

18  Q.  And when you first started there, did you see that process

19  as a good-faith process of projecting out to where we think

20  we'll be by the time this contract kicks in?

21  A.  My time -- or my recollection of that time was I had a

22  mixed opinion about that.  And I can expand more, if helpful.

23  Q.  Well, let me ask you this:  When you first started, is

24  what I've asked --

25  A.  Sure.

1  Q.  -- did you see that as a good-faith approach to trying to
2  determine what devices we, in fact, will be able to run this
3  on by the time the contract kicks in?
4           MR. JOHNSTON:  Objection.  Asked and answered.
5           THE COURT:  Overruled.
6  BY THE WITNESS:
7  A.  When I first started, I didn't know how they would be
8  communicated, so I thought it might have been valid.
9  BY MR. POULOS:
10 Q.  Okay.  In fact, with respect to the communication of
11 projections, Ashik Desai instructed you not to let sales reps
12 know that there were projections built in; is that right?
13 A.  Correct.  We reviewed that document, right.
14 Q.  Right?
15 A.  Yes.
16 Q.  And I think you told us -- you told us repeatedly on
17 direct examination that you know -- for example, you knew that
18 the pharma clients, boy, they love the tablets.
19           Do you remember that testimony?
20 A.  I said that they loved the idea of what the tablets could
21 deliver.
22 Q.  Right.
23 A.  Yes.
24 Q.  Did you know that because you interacted and communicated
25 directly with the pharma clients?

1   A.  I knew it because they purchased a lot of them.

2   Q.  Oh, so from the simple fact of the purchase is what based

3   your testimony to this jury that you knew they loved what

4   these metrics can do?

5   A.  Well, it was from the purchase, as well as what was

6   explained to me by Ashik.

7   Q.  Okay.  So here's my question:  Did you interact directly

8   with the pharmaceutical clients?

9   A.  In some cases, yes.

10  Q.  How often?

11  A.  Not that often.

12  Q.  Can you give me a --

13  A.  Once a month.  Once every two months.

14  Q.  And tell me what those interactions were about, sir.

15  A.  I recall one specific instance where I was asked to

16  actually present and explain the false tablet metrics to a

17  client.

18  Q.  We're going to get into that, too.

19  A.  Okay.

20  Q.  You never, in your interactions with the clients, told

21  them that these lists that Ashik had directed you to put

22  together and send him included projections.  Is that your

23  testimony?

24  A.  I don't know about never, but I don't recall any instance

25  where we told them that they were projections.

1    Q.   Okay.  So I just want to be clear.  You said, can't say

2    never, but you have no recollection of ever telling them;

3    correct?

4    A.   I don't have a recollection.  That is correct.

5    Q.   Okay.  So based on the list-match that you and Ashik Desai

6    put together, pharmaceutical companies, some of them would

7    sign the contract; correct?

8    A.   Correct.

9    Q.   And then -- by the way, it was implicit I think in what we

10   were saying earlier, but I do want to be clear about this.

11          You're often negotiating a contract that's going to

12   kick in in January of, say, 2015, you were negotiating that

13   contract in the summer of 2014; correct?

14   A.   Well, I personally was not, but the company was.

15   Q.   But the company was.

16   A.   Correct.

17   Q.   And you were part of that process, doing the list-match

18   and interacting with people at the company about this upcoming

19   contract; right?

20   A.   I was responsible for the list-match, correct.

21   Q.   Okay.  So, now, a contract gets signed, month later, you

22   have to implement the contract and deliver; correct?

23   A.   Correct.

24   Q.   Okay.  During the time you were there, was it Travis Kemp,

25   Travis Kemp and his people, who basically took the ads and got

1  them out to the devices?

2  A.  He was -- he was one of the people who was asked to help

3  do that, correct.

4  Q.  Ryan Postel, was he another one of those folks?

5  A.  Correct.

6  Q.  Okay.  So there was a division or group within the company

7  who would basically deliver the ads out to the devices to make

8  sure they got run?

9  A.  Correct.  They would push the button, or whatever, assign

10  the ad.

11  Q.  Correct.  Those guys had to know what devices to send the

12  ads to; right?

13  A.  Correct.

14  Q.  By the way, when we say "send the ads," this was all done

15  digitally, electronically; right?  I mean, no one went out to

16  a particular doctor's office and installed an ad.  This was

17  all tech -- techno-driven; correct?

18  A.  I think there were rare instances of old places that had

19  DVDs, but the large case was pushed out remotely and

20  wirelessly, correct.

21  Q.  Certainly all the tablets were like that; right?

22  A.  Correct.

23  Q.  So, now, when it came time for Travis Kemp and Ryan Postel

24  and the others to actually deliver the ads, you, sir, had to

25  come up with another list; right?

1    A.  Correct.

2    Q.  And that was called the go-live list?

3    A.  Correct.

4    Q.  And, now, you've got to give them a list of sites that the

5    ad can actually run on; correct?

6    A.  That is correct.

7    Q.  And so you had to kind of reinvent the wheel there, to

8    some extent; didn't you?

9    A.  Sorry, can you be more specific by what you mean by

10   "reinvent the wheel"?

11   Q.  You had to make an entirely brand new list; right?

12   A.  I had to perform another list-match.

13   Q.  Put it this way, right, you couldn't use the client's

14   target list; correct?  You couldn't just -- what I mean by

15   that, sir -- I should be more specific.

16          You couldn't just give Travis Kemp, here's the target

17   list, run the ads there; right?

18   A.  Of course not.

19   Q.  And you couldn't give him the list-match that you sent to

20   the pharmaceutical company either; right?

21   A.  I could have, but I would not have.

22   Q.  And you wouldn't have because it wasn't where the ads were

23   going to run.  At least on a lot of the ones on the

24   list-match, they weren't going to run there; correct?

25   A.  Well, some would have, but some would have not, correct.

1   Q.  So as I understand it, what you had to do, then, was you

2   would take the list-match and then actually figure out which

3   of these devices on the list-match can we run it on; correct?

4   A.  That is correct.

5   Q.  Was it limited to the items that were on the list-match?

6   Let me try to be clear.

7   A.  Yeah.

8   Q.  When you put together a list, you started with the devices

9   on the list match; right?

10  A.  Are you talking about for go-live --

11  Q.  Yes.

12  A.  -- to be clear?

13          Yes, we would start with sites that we actually

14  believed we had in our network and knew that we could run the

15  ads on.

16  Q.  How did you make that determination?

17  A.  We tried to do a -- much more of a tight match in this

18  case to understand which physicians from their list we

19  actually had as members and actually had screens and devices.

20  Q.  Okay.  Because -- so if I understand what you're saying,

21  you did want to make sure that to the extent you have devices

22  in the pharma's target list, you wanted to make sure that you

23  were going to run the ads on those devices; correct?

24  A.  Correct.

25  Q.  Then what other -- how did you go about deciding where

1  else it might play?

2  A.  There were a number of methodologies, depending on the

3  campaign.

4  Q.  And are these methodologies that you developed as an

5  analyst?

6  A.  They're ones that I worked on and developed with Ashik;

7  correct.

8  Q.  So that's the go-live list; right?

9  A.  Correct.

10  Q.  The next list is a location list; right?

11  A.  Okay.

12  Q.  Correct?  In the process, in the chain of events, then you

13  would need a location list; right?

14  A.  Do you mean for billing?

15  Q.  Yes.

16  A.  Not -- not all campaigns asked me to provide a location

17  list.  But, yes, that was one of the lists that I had to help

18  generate.

19  Q.  We've seen some text messages and -- I mean, look, while

20  you were there, you got requests from the finance department

21  for a location list because -- correct?

22  A.  Correct.

23  Q.  And you understood that the finance department was asking

24  you for this location list in connection with billing the

25  pharmaceutical company; correct?

1  A.  Correct.

2  Q.  And, sir, when you put together the location list in

3  connection with the billing, is it true that you generated

4  location lists representing 100 percent delivery on the

5  contract?

6  A.  From -- from my recollection, that would be the case, yes.

7  Q.  What devices did you put on the location list that you

8  sent to the finance department for billing?

9  A.  We would have sent locations that were running the

10  campaign, as well as -- as well as locations that were not

11  running the campaign.

12  Q.  That were on the target list.

13  A.  Most -- not all of them had a target list, but if they

14  did, we would have tried to use ones from the target list,

15  correct.

16  Q.  And then in addition to -- so finance asked for the

17  location list.  When they asked for it, you give them location

18  lists representing 100 percent delivery on the contract;

19  right?

20  A.  In most cases I think that was true, yes.

21  Q.  Sir, when you got one of these requests from the finance

22  department, did you ever tell somebody -- did you ever -- let

23  me back it up.

24        Did you ever tell Jim Demas or Christie Peters that

25  you weren't delivering 100 percent on the contracts?

1    A.  I do not recall having -- I do not recall having told
2    either of them.
3    Q.  And you knew that they handled the billing; correct?
4    A.  I did.
5    Q.  Do you remember a fellow by the name of Nate Parkins
6    joining the accounting department shortly after Mr. Demas and
7    Ms. Peters left the company?
8    A.  I do not.
9    Q.  That name doesn't ring a bell?
10   A.  It doesn't.
11   Q.  You continued to send location lists really up until --
12   well, let me withdraw that.
13          When did you stop personally participating in the
14   creation of location lists?
15   A.  I don't recall, but I can give you an approximation, if
16   helpful.
17   Q.  I'll take it.
18   A.  Once I was transferred off the sponsorship team to the
19   product team in January 2015.  I think that would have
20   relinquished my responsibility there.
21   Q.  Okay.  So you would acknowledge, however, that the
22   location list you sent to the finance department for the
23   billing of pharmaceutical clients were false; right?
24   A.  Correct.
25   Q.  The final list that I'd like to discuss with you for now

1    are ROI lists that you talked about this morning.

2  A.  Okay.

3  Q.  Do you recall that?

4  A.  Yep.

5  Q.  Ashik Desai -- you worked with Ashik Desai to generate

6    lists to give to IMS or Crossix saying, study these offices

7    and their prescription levels on this particular campaign.

8    Correct?

9  A.  That's correct.

10  Q.  And then IMS or Crossix, whichever the case might be, but

11    it was primarily IMS; correct?

12  A.  That I don't know.

13  Q.  Okay.  IMS would then study whatever offices you and Desai

14    identified for IMS and then generate a report back; correct?

15  A.  To be precise, they would study the physicians I think

16    more so than the offices, but correct.

17  Q.  Okay.  But they would send a report back?

18  A.  Correct.

19  Q.  Did you ever look at one of those reports?

20  A.  I did.

21  Q.  Did you analyze them?

22  A.  I did.

23  Q.  Did you know, sir, that Ashik Desai falsified some of the

24    ROI reports that he provided to his pharma clients?  Did you

25    know that at the time you worked there?

1  A.  I have a vague recollection that he tried to influence

2  them.  But I don't know that I would remember he specifically

3  changed numbers or falsified any.

4  Q.  Do you now know that he did?

5          MR. JOHNSTON:  Objection, relevance.

6          THE COURT:  First question is yes or no, does he know

7  that he did.

8  BY THE WITNESS:

9  A.  I don't have a specific memory of him doing it, so I don't

10  know.

11  BY MR. POULOS:

12  Q.  Did he ever ask you to alter and falsify the data in an

13  IMS report?

14  A.  It's possible he may have, yes.

15  Q.  You just don't recall it?

16  A.  I don't have a specific memory, but if there are documents

17  describing it, it may help me remember more details about it.

18  Q.  I do want to explore -- I think you said you have a vague

19  recollection of maybe knowing -- I don't want to

20  mischaracterize what you said.

21          But I ask you again:  Did you know that Desai had

22  falsified these ROI reports?  And you said something about a

23  vague -- could you elaborate, please?

24  A.  Sure.

25          MR. JOHNSTON:  Objection, asked and answered.

1          THE COURT:  Well, he's going to elaborate on an

2    answer that --

3          MR. JOHNSTON:  Objection, foundation, speculation.

4          THE COURT:  Well, it has got to be knowledge based on

5    something you learned while you were at the company, not after

6    you left.

7          THE WITNESS:  It was knowledge at the company --

8    while I was at the company.

9          THE COURT:  While you were -- all right.  You can

10   answer.

11   BY THE WITNESS:

12   A.  I have a particular memory of trying to influence a

13   Crossix report to show a result that we wanted.

14   BY MR. POULOS:

15   Q.  And what do you recall about that?  What did you do?

16   A.  I don't recall the specifics, but I remember interacting

17   with somebody on the Crossix team, questioning and challenge

18   their methodology and trying to influence them to show a

19   better result.

20   Q.  Okay.  It's different than I'm -- than what I was

21   interested, at least.  So let me just make clear.

22   A.  Correct.

23   Q.  To your knowledge, while you were at the company, did you

24   ever know that Ashik Desai simply took numbers and data out of

25   the IMS report and altered them to show a higher ROI than the

1  data actually revealed?

2  A.  I don't have a specific memory of that.

3  Q.  Okay.  He didn't discuss that with you?

4  A.  I don't recall specific discussions about it.

5  Q.  You have no recollection of him enlisting you in aid of

6  that type of fraudulent conduct; do you?

7          MR. JOHNSTON:  Objection, asked and answered.

8          THE COURT:  Last question on it.  Go ahead.

9  BY THE WITNESS:

10  A.  I don't have a memory, or I guess an independent memory,

11  of being asked to fake the numbers on an ROI study.

12  BY MR. POULOS:

13  Q.  Okay.  I'd like to switch our focus to this issue of

14  tablets and tablet metrics.  Okay?

15  A.  Okay.

16  Q.  The tablets in 2014 were a new product; correct?

17  A.  Correct.

18  Q.  They were really just starting to roll out at the time you

19  started at the company; correct?

20  A.  Correct.

21  Q.  And did you know, sir, at the time that many of the

22  tablet -- many of the tablet contracts were free?

23  A.  I don't know that I knew that many, but I knew that some

24  were free.  Correct.

25  Q.  And how would you have known whether they were free, or

1  not?

2  A.  In some select cases, I would have seen a contract at one

3  point.  But in most cases, I would have been told by Ashik.

4  Q.  Based on what he told you?

5  A.  Correct.

6  Q.  So on what occasions would you see a contract?

7  A.  I don't have a specific reason for why or why not I would

8  have seen a contract, but I just know that some have been

9  forwarded to me, either for recordkeeping, to put into our

10  sales force system, or to help, perhaps, prepare a go-live

11  list so that I could have the full context.

12  Q.  So you did understand early on in your tenure there that

13  the tablets were a new technology; correct?

14  A.  Correct.

15  Q.  And did you come to understand that it was complex

16  technology involved in -- in playing ads, in getting data

17  back?  Did you understand there was complexity to that?

18  A.  Yeah, I would consider it complex.

19  Q.  And you learned early on that the data that was coming

20  back from these brand new tablets was faulty at times;

21  correct?

22  A.  Yep, I believe we covered that.

23  Q.  Right?

24  A.  Yep.

25  Q.  I think you worked with Cindy Sui in connection with

1  trying to figure out what the metric data was; correct?

2  A.  That is correct.

3  Q.  And you worked with Chirag Patel, correct --

4  A.  Correct.

5  Q.  -- to try to figure out what those tablet metrics were;

6  correct?

7  A.  Correct.

8  Q.  And you guys knew -- you knew, didn't you, as you were

9  first getting involved in the question to tablet metrics, that

10  the data didn't make sense oftentimes; correct?

11  A.  I think "makes sense" is vague, but I think we knew that

12  oftentimes they were wrong, they were -- potentially there

13  were bugs.  And so I think, you know, we knew that there were

14  issues with the tablet metrics.

15          MR. POULOS:  Okay.  Your Honor, I'd like to introduce

16  DX-3109.

17          THE COURT:  Any objection by the government?  Hang on

18  before you put it up in front of the jury.

19          MR. JOHNSTON:  No objection, if admitted for effect

20  on the listener.

21          MR. POULOS:  Your Honor, I -- may we be heard at

22  sidebar, your Honor?

23          THE COURT:  All right.

24      (Proceedings heard at sidebar.)

25          THE COURT:  All right.  I have no idea what the

1   document is.

2        MR. POULOS:  Judge, it's a weekly report that was

3   generated by Chirag Patel about the activities of the

4   engineering team that went to various leaders within the

5   company.  I have a number of these because they were generated

6   on a weekly basis, and I think on their face they would be a

7   business record.

8        THE COURT:  All right.  What's the response?

9        MR. JOHNSTON:  Your Honor, that whether a specific

10  e-mail is a business record is an e-mail-by-e-mail

11  determination.  I don't believe this witness or any other

12  witness has laid the foundation for this specific report or

13  these specific reports about products for them to qualify as a

14  business record.

15       If this witness can lay the foundation, and I'm not

16  sure he can because I don't believe he would have received

17  this e-mail, then we would withdraw our objection.  But to

18  date, there is no foundation for this document, or document

19  like it, as business records.  So that's why we --

20       MR. POULOS:  Your Honor, I could cut this off.

21  I'll -- I'm -- the government has no objection admitting it

22  for effect on the listener, that is, Mr. Purdy's state of

23  mind.  So we'll proceed and we'll -- I would just ask the

24  Court to reserve ruling as to whether it could also be

25  admitted as a business record under 803(6).

1           THE COURT:  So I'll tell the jury it's not admitted

2     for the truth of the information on it, but just for the

3     effect on the listener, meaning the witness.

4           MR. JOHNSTON:  Well, actually --

5           THE COURT:  I don't even know whose on this document.

6     Is it on -- is Mr. Purdy on it?

7           MR. POULOS:  Mr. Purdy, and I think Mr. Shah and --

8           THE COURT:  All right.  So it's being admitted not

9     for the truth of the information, but the effect of the people

10    who are listed on the exhibit itself.

11          MR. JOHNSTON:  Yeah.  In particular a list-serve that

12    at least Mr. Purdy would have been on.  I don't know about the

13    other defendants.

14          THE COURT:  All right.

15          MR. JOHNSTON:  But one thing I would flag while we're

16    at sidebar, Mr. Ma did not receive this.  So I'll be objecting

17    if he asks Mr. Ma to interpret parts of this as opposed to

18    just reading.

19          THE COURT:  All right.  Well, first see if he's on

20    it.  I assume he's not.  Or do you acknowledge he's not on it?

21          MR. POULOS:  Yes, if he's not on it, I won't ask him

22    to interpret the words.

23          THE COURT:  All right, then, fair enough.

24         (End of sidebar proceedings.)

25          THE COURT:  All right.  Defense Exhibit 3109 is

1   admitted for simply the purpose of showing the effect on the

2   state of mind of the people who received it.  It's not offered

3   for the truth of the information in it, but it's something

4   people who are on the list of people who got it, and if it's a

5   defendant, it goes to their state of mind.

6         (Exhibit admitted into evidence.)

7             THE COURT:  Proceed.

8   BY MR. POULOS:

9   Q.  Okay.  Do you see that the document is an e-mail from

10  Chirag Patel?

11  A.  I do.

12  Q.  And it's addressed to Ryan Postel, Travis Kemp; correct?

13  A.  It is.

14  Q.  And then the product team at ContextMedia; correct?

15  A.  Correct.

16            MR. POULOS:  Your Honor, I think we have a

17  stipulation that Brad Purdy was a recipient on this product

18  e-mail chain.

19            MR. JOHNSTON:  So stipulated.

20            THE COURT:  All right.  Proceed.

21  BY MR. POULOS:

22  Q.  And it says the subject of this is "The product dev weekly

23  report re June 20th of 2014."  Correct?

24  A.  Correct.

25  Q.  Mr. Ma, do you recall that your first day at Outcome

1  Health was June 3rd of 2014?

2  A.  I can't recall the exact date, but that sounds correct.

3  Q.  It was early June; correct?

4  A.  It was early June.

5  Q.  Okay.  Laura, if we could -- if we could blow up the first

6  section, "product delivery, top three goals."

7          And do you see there, sir, under "top three goals

8  this week sent to team leads also," the second bullet point

9  says:  "Root causes and fixes to analytics issue, mainly

10 sponsorship impressions, accurate Victoza report, session

11 duration."

12         Did I read that correctly?

13 A.  Correct.

14 Q.  And the third bullet point says:  "Tablet wifi, low power

15 mode investigation and fix."

16         Then it goes on to say:  "Demon tablet fix (constant

17 APK restart) seen twice lately.  Test offline metrics to

18 prevent flash size bloat."

19         Do you see that?

20 A.  I do, yes.

21 Q.  Now, you didn't receive this e-mail; correct?

22 A.  I do not think so.

23 Q.  But you do see the reference to the phrase accurate

24 Victoza report.  Do you see that?

25 A.  I do see the reference.

1    Q.   Now, the tablet metrics document that Mr. Johnston

2    reviewed with you related to Victoza; correct?

3    A.   Correct.

4    Q.   And you already told us that you worked and had

5    discussions with Chirag Patel and Cindy Sui and others about

6    the issues underlying the problems in getting the tablet

7    metrics; correct?

8    A.   Correct.

9    Q.   And Mr. Ma, you knew at this time that because of

10   technological problems, the numbers that were being reported

11   were not accurate; correct?

12   A.   I think that's correct, yes.

13   Q.   The real numbers, Mr. Ma, that were coming back were not

14   accurate, and that's why these engineers and you and others

15   were trying to figure out a methodology to figure out what the

16   right number should be; correct?

17   A.   I don't know that I would agree with the characterization

18   that we were trying to figure out what the right numbers

19   should be.

20   Q.   Okay.  What do you think Chirag Patel was working on?

21   A.   I think he was just helping us figure out basically how to

22   report on the metrics in a way that was more reliable.

23   Q.   More reliable.  Trying to come up with more reliable

24   numbers as opposed to the real numbers that the faulty data

25   was reporting; correct?

1  A.  Again, I might draw a distinction between getting reliable
2  numbers and then the selection of top tablets.
3  Q.  I'm not there yet.  I'm just saying, the real numbers that
4  were coming back was known to be inaccurate; correct?
5            MR. JOHNSTON:  Objection, asked and answered.
6            THE COURT:  Overruled.
7  BY THE WITNESS:
8  A.  Yes, fair.
9  BY MR. POULOS:
10  Q.  Let's go to page 2 of this document.  If you could blow up
11  the second bullet point section, Linda, please.  Thank you
12  very much.
13            Do you see the first bullet point under here under
14  "goals fully met from last week," says -- there is a reference
15  to Multunus, M-u-l-t-u-n-u-s; correct?
16  A.  Yep.
17  Q.  What is Multunus, do you know?
18  A.  I don't exactly recall, but I have a hunch.
19  Q.  I'll take your hunch, at least.
20            MR. JOHNSTON:  Objection.  We don't have testimony on
21  hunches.
22            THE COURT:  Agreed.  If he has got firsthand
23  knowledge or knowledge based on reasonable observations, he
24  can testify to it.  Hunches, no.
25  BY MR. POULOS:

1  Q.  Well, you say "hunch," are you saying that you think you

2  might know but you're just not 100 percent certain?

3  A.  That's right, I'm not 100 percent certain.  But I do

4  recall working the third-party group to help us better

5  understand the metrics.  And that may have been the one, but I

6  don't know specifically.

7  Q.  Okay.  Anyway, it goes on to say, after the reference to

8  Multunus:  "Resolved the Myrbetriq issue with AirWatch and

9  re-pushed for newly online tablets, and early signs show

10  98 percent success rate."

11          Did I read that correctly?

12  A.  Yep.

13  Q.  And then it says:  "Impressions for Myrbetriq, TBD."  To

14  be determined; right?

15  A.  Yep.

16  Q.  Did I read that correctly?

17  A.  Correct.

18  Q.  Mr. Ma, with respect to tablets, you recall that AirWatch

19  was a system that pushed the ads out to the tablets; correct?

20  A.  I have a sort of vague recollection of that, but, yes.

21  Q.  Do you recall that in the summer of 2014, there were all

22  sorts of issues of, hey, we pushed them out to these things,

23  but they didn't get to the tablets.

24          Do you remember that happening?

25  A.  I do have a recollection of that, yes.

1  Q.  And do you remember that it was -- that on a number of

2  occasions the directions were re-pushed on AirWatch to get it

3  out there?

4  A.  I, again, have a sort of vague recollection that that was

5  something that had happened, yes.

6  Q.  And do you recall that Brad Purdy, sir, was one of the

7  people at the company who was really in charge of rolling out

8  the tablet product; correct?

9  A.  I don't know about in charge, but highly involved.  I

10  would agree with that, yes.

11  Q.  And do you recall Brad Purdy giving directions along those

12  lines of:  Let's find out what's playing and get things

13  re-pushed when necessary.  Do you remember that, generally?

14  A.  I don't know about specific instructions, but I think that

15  sounds accurate to me.

16  Q.  Let's go down to the part under that says, "new goals

17  introduced mid week that prevented goals from last week."

18         Do you see that Chirag Patel reported to Brad Purdy

19  and other members of the company that he redid sponsorship

20  impressions metrics to verify the assets are adding up?

21         Did I read that correctly?

22  A.  Correct.

23  Q.  It goes on to say:  "Notice a gap and investigating."

24         Correct?

25  A.  Correct.

1    Q.  Again, you didn't receive this, but I'm just asking, you

2    were -- what we talked about earlier is consistent with what's

3    described here at least; right?  Your own conduct and

4    recollection that verification of asset metrics wouldn't add

5    up at times; correct?

6              MR. JOHNSTON:  Objection, vague.

7              THE COURT:  He didn't get the document.  You can ask

8    him to read it, but beyond that he can talk about his own

9    conduct.

10   BY MR. POULOS:

11   Q.  And then if we go down one line.  The next bullet point

12   under "goals for next week," referencing Multunus, it says:

13   Fix discrepancy with sponsorship impression metrics.

14             Did I read that correctly?

15   A.  Correct.

16   Q.  If we could go to the next page, please.  Just one more

17   line on this document.  If you could blow up the part of --

18   near the top, "goals by end of week, next week and dates."  If

19   you could blow up that whole section.

20             Do you see, sir, that the third bullet point from the

21   bottom, again referencing Multunus says:  "Verify expected

22   number of sponsorship impressions for all sponsors, including

23   Victoza."

24             Do you see that?

25   A.  I do.

1 Q.  So that document, again for the record, was dated
2 June 21st of 2014.

3         Now let's go to government exhibit 1144.  You were
4 shown this document on direct examination.  Do you recall it?
5 A.  I do.
6 Q.  This is dated June 23rd; correct?
7 A.  Correct.
8 Q.  One week after the report from Chirag Patel that went to
9 Brad Purdy; correct?
10 A.  Wasn't that from the 21st?
11 Q.  I'm sorry, the 21st.  What did I say?  I misspoke.  Just
12 for the record, clear that up.

13         This exhibit, government exhibit 1144, is dated June
14 23rd, two days after the prior exhibit; correct?
15 A.  Correct.
16 Q.  Now, this document is, in the bottom portion of the
17 e-mail, if we can go to what you wrote.

18         In the first line up there, you say:  "Hey, Brad."
19         You say:  "A quick check on your methodology and a
20 few Qs for you on tablet reweighting?"

21         Did I read that correctly?
22 A.  Yep.
23 Q.  There was a process going on of trying to find out what --
24 trying to identify the top 100 tablets, as you said; correct?
25 A.  Correct.

1   Q.  Now, Mr. Ma, that process did not involve simply saying,

2   give me the top five -- give me the ones that show the 100

3   most impressions; correct?

4   A.  I don't recall the exact weighting or methodology.

5   Q.  Cindy Sui and Chirag Patel and other people were involved

6   in that analysis; weren't they?

7   A.  Correct.

8   Q.  And isn't it true that that effort -- that that was an

9   effort to just try to determine at this early stage what's the

10  most reliable data that we have?

11  A.  I don't know that I would agree with that

12  characterization.

13  Q.  Well, when you're talking about re-weighting, you're not

14  just saying, let's report the top 100 numbers -- average out

15  the top 100 numbers on X metric; right?

16  A.  Right.  The re-weighting refers to a bunch of different

17  metrics in trying to figure out which ones are most important.

18  Q.  As a way to figuring out which of the data is the most

19  meaningful; correct?

20  A.  I don't know about "most meaningful."  It would just say,

21  out of the different metrics, which ones do we deem to be the

22  most relevant or best for ranking the top 100 tablets.

23  Q.  Let's go to exhibit DX-9008.

24          THE COURT:  Again, are you offering this just for the

25  effect on the listener -- effect on the person it's addressed

1    to?

2        MR. POULOS:  For Brad Purdy's state of mind.  Yes,

3    your Honor.

4        THE COURT:  All right.  For the state of mind of the

5    defendant.  This is offered for that purpose, not for the

6    truth of the information contained in the report itself.

7        (Exhibit received into evidence.)

8        MR. POULOS:  Thank you.

9    BY MR. POULOS:

10   Q.  Exhibit 9008 is another weekly report from Chirag Patel.

11   Brad Purdy would have been one of the recipients.  It's dated

12   June 28th; correct?

13   A.  Correct.

14   Q.  And he is reporting on issues week ending June 27th,

15   according to the document; correct?

16   A.  Yep.

17   Q.  Okay.  If we could go to the first -- yes.

18        Under -- just want to direct you to the last bullet

19   point that says:  "Chirag reports work with Cindy, Sandeep,

20   David, Brad on Victoza report validations and consequently KPI

21   validation."

22        Did I read that correctly?

23   A.  Correct.

24   Q.  And then it says, parentheses:  (Add active/passive videos

25   to the list).

1 A. Yes.

2 Q. Okay. Independent of this document, sir, do you recall

3 working with these engineers on key performance indicator

4 validations for the tablet metrics?

5 MR. JOHNSTON: Objection, your Honor. Can we have

6 the document down when he's being asked questions that aren't

7 related to the document?

8 THE COURT: No, that's unnecessary. But, again, this

9 is a document this witness hasn't seen before. Is that

10 correct?

11 MR. POULOS: That's correct, Judge. I'm just asking

12 now about the events, whether he recalls.

13 THE COURT: Yeah, that doesn't need to be taken down

14 for that purpose. It's an admitted exhibit for a specific

15 purpose of the state of mind of the defendant, so it can

16 remain up.

17 Go ahead.

18 MR. POULOS: Okay.

19 BY MR. POULOS:

20 Q. Let's go to page 2. If you could blow up the second large

21 bullet point, halfway down the page, "on track analytics --"

22 no, halfway. There you go. And can you blow up a few lines

23 beyond that.

24 The next reference here on, "goals fully met from

25 last week" says: "Validate, Cindy and Sandeep validate

1  session duration."

2          Did I read that correctly?

3  A.  Yes.

4  Q.  "Five people profiles, TTL bug validation."  Correct?

5  A.  Yes.

6  Q.  "Validate the difference between 2.5 minute versus 5

7  minute between MixPanel and Mongo."  Did I read that

8  correctly?

9  A.  Correct.

10  Q.  Then it said:  Cindy/Sandeep top 100 tablet fixes for

11  Victoza report.  Filtered sponsorship tablets, found fix for

12  selection of tablets to use Victoza only tablets."

13          Did I read that correctly?

14  A.  Correct.

15  Q.  Then the next bullet point says:  "Cindy, initial draft of

16  margin of errors for all metrics and Victoza report and

17  updated KPI report."

18          Did I read that correctly?

19  A.  Correct.

20  Q.  And then finally the last bullet point on this section,

21  says:  "Fixed discrepancy with sponsorship impression

22  metrics."

23          Did I read that correctly?

24  A.  Correct.

25  Q.  Now if we could go down to the bottom quarter of this page

1    under the heading of "goals by end of week, next week."

2             And it goes on to say:  "Presentation on change in

3    Victoza metrics from April to May once top 100 tablet

4    parameters have been hashed out (Cindy/Sandeep) work with

5    David Ma on fine-tuning the Victoza monthly report."

6             Did I read that correctly?

7    A.  Correct.

8    Q.  Then, finally, if we could go just to the first line on

9    the next page, last item here.

10            Do you see that Chirog Patel reported:  "Verify

11   expected number of sponsorship impressions for all sponsors,

12   including Victoza."

13            Did I read that correctly?

14   A.  Yes.

15   Q.  If we could go to Exhibit 1149.

16            I'm just going to try to go through a timeline here.

17   The last exhibit, the weekly report, was June 28th.  This

18   exhibit, 1148, you were shown on direct exam, is an invite for

19   a telephone conference with you, Ashik, and Brad Purdy;

20   correct?

21   A.  Correct.

22   Q.  And I believe you told us on direct examination you have

23   no recollection of what was discussed during that session?

24   A.  That is correct.

25   Q.  Okay.  Now, if we could go to exhibit 9001.  I'm sorry,

1    9009.  Forgive me, Linda.

2         Mr. Ma, do you see that this is an e-mail that you

3    wrote to yourself on July 2nd --

4    A.  I do.

5    Q.  -- of 2014.  Subject line:  "7-2-14, tasks."  Correct?

6    A.  Correct.

7    Q.  So you send an e-mail to yourself just kind of outlining

8    the various tasks upcoming; right?

9    A.  Correct.

10   Q.  If we could go to item 7 on the list.

11        Under item 7, you reference the Victoza campaign;

12   correct?

13   A.  I do.

14   Q.  And you say:  "Victoza/Myrbetriq tablets, Cindy running

15   point."  Correct?

16   A.  Correct.

17   Q.  And that's Cindy Sui?

18   A.  Correct.

19   Q.  By the way, for the record, her name was spelled S-u-i;

20   correct?

21   A.  Correct.

22   Q.  Do you recall that Cindy Sui was running point in

23   connection with the preparation of the metric reports?

24   A.  I recall that she was doing a lot of the heavy lifting in

25   terms of working with engineering and others to help generate

1  the metrics.

2  Q.  Let's go to Exhibit 9023, please.

3         Your Honor, this is another Chirag Patel weekly

4  report that we offer for -- as evidence of Brad Purdy's state

5  of mind.

6         THE COURT:  All right.  It's admitted for the same

7  purpose:  State of the mind of the defendant, not for the

8  truth of the information contained in the report itself.

9      (Exhibit admitted into evidence.)

10  BY MR. POULOS:

11  Q.  So this is the following week.  "Week ending July 3rd,

12  2014."  Do you see that?

13  A.  I do.

14  Q.  By the way, you do see here that this is going to Jim

15  Demas and Ms. Agarwal and Rishi Shah and Brad Purdy; correct?

16  A.  I do.

17  Q.  Let's just go to the last bullet point on the page, page

18  1.

19         Do you see that Mr. Patel wrote:  "Work with

20  Cindy/Sandeep/David on finalizing KPI validation with TTL bug

21  analysis done and finish Myrbetriq reports."

22         Did I read that correctly?

23  A.  Yes.

24  Q.  If we go to page 2.  And if you could just blow up the

25  section on Cindy near the top quarter of the page.

1          Under Cindy, Chirag Patel wrote:  "She has been a big

2    help validating metrics (Multunus is better at writing queries

3    and implementing.)  Correct?

4    A.  Correct.

5    Q.  And then he wrote to these people:  "I asked Ashik if he's

6    comfortable with Cindy handling coordination/hand-off of

7    Myrbetriq/Victoza reports, and he said yes."  Correct?

8    A.  Correct.

9    Q.  And now if we could go to page 4 of this document, down at

10   the bottom under "top 100 tablets."

11          On page 4 of this exhibit, there is a reference to

12   "goals fully met from last week."  Do you see that?

13   A.  I do.

14   Q.  And a reference to the "top 100 tablets."  Do you see

15   that?

16   A.  I do.

17   Q.  Rather than me reading -- take a -- let's take a moment,

18   Mr. Ma, you take a moment, and read what was written there to

19   yourself.

20   A.  Okay.  I'm sorry, was this to me?

21   Q.  I was addressing it to you.

22   A.  Oh, sorry.  I was clarifying --

23   Q.  Forgive me, I'm --

24          THE COURT:  One at a time, please.

25          THE WITNESS:  Sorry.

1      THE COURT:  You start, Mr. Poulos.

2    BY MR. POULOS:

3    Q.  Mr. Ma, I'm going to ask you just to read to yourself what

4    is there, the two bullet points under top 100 tablets.

5    A.  Apologies.  I was just clarifying whether it was sent to

6    me.

7          THE COURT:  Do you need to see the rest of the

8    document to -- do you want to tell them what the --

9          THE WITNESS:  No, I think it's clear that it's not

10   sent to me.  Sorry.

11         THE COURT:  Okay.  Proceed.

12         THE WITNESS:  I was just clarifying.

13   BY THE WITNESS:

14   A.  Okay.  I've read it.

15   BY MR. POULOS:

16   Q.  Okay.  And let's go to the top of the next page.  Just a

17   couple more bullet points, then we're done, here.

18         Do you see that he wrote:  "Imported master score

19   weighting and ranking process into Google Spreadsheets to

20   empower more automation going forward, two hours."  Correct?

21   A.  Correct.

22   Q.  And then it says:  Tablet KPIs in general, separated

23   margins of error for each metric into significant and

24   negligible margins of error."  Correct?

25   A.  Correct.

1    Q.  Okay.  We can take that down.

2         Do you recall, sir, that Cindy Sui and Chirag Patel

3    and Sandeep were working with you on finalizing the KPI

4    validations for the Myrbetriq and Victoza report?

5    A.  On calculating the metrics for those, yes.

6    Q.  Let's go to Exhibit 3112.  I believe Mr. Johnston showed

7    you this document.

8    A.  Yes.

9    Q.  And so this is an e-mail -- if we could just blow up the

10   to-from.  This is an e-mail that you wrote now on July 17th.

11   I'm sorry, I -- forgive me, I made a mistake.  We'll come back

12   to this.

13        THE COURT:  Well, it's a good time at 3:00 o'clock to

14   make a mistake because we're going to take our break.

15        MR. POULOS:  Okay.

16        THE COURT:  Fifteen minutes, ladies and gentlemen.

17   Please don't discuss the case among yourselves or with anyone

18   else.

19        COURT SECURITY OFFICER:  All rise.

20        (Jury out at 3:00 p.m.)

21        THE COURT:  All right, sir.  15-minute break.  Please

22   don't discuss your testimony with the government, you're on

23   cross-examination.

24        All right.  Anything we need to discuss?  Government?

25        MR. JOHNSTON:  Not from the government.

1          THE COURT:  Defense?  Okay.  All right.
2     (Recess taken at 3:00 p.m.)

1    COURT SECURITY OFFICER:  All rise.

2       (Jury enters courtroom.)

3       THE COURT:  All right.  Please be seated.

4       Mr. Poulos, you may continue your cross-examination

5  examination.

6       MR. POULOS:  Thank you, Your Honor.

7       Thank you, Your Honor.

8  BY MR. POULOS:

9  Q.  Mr. Ma, we're going down the timeline leading up to the

10  Victoza metric report, okay?

11  A.  Okay.  Understood.

12  Q.  Let me ask you about the tablets.  You did understand

13  that -- come to learn that some of the tablets would continue

14  to play the content even when not connected to the Internet,

15  correct?

16  A.  I think that was one of the features, is that they were

17  supposed to play the tablet even when not connected to the

18  Internet.

19  Q.  Okay.  And if -- but if the tablet is running content but

20  not being connected to the Internet, those metrics aren't

21  coming back, correct?

22  A.  I actually don't think that's fully correct because the

23  tablet would try to store some of them and when it came back

24  online try to send the metrics back once it came back online.

25       MR. POULOS:  Okay.  Let's go to -- I did have the

1  right exhibit number, Judge, first time around -- Defense

2  Exhibit 3112.  Mr. Johnston showed you part of this document.

3         Let's go to page -- well, starting at the top.

4  BY MR. POULOS:

5  Q.  Let's see who's on this chain.

6  A.  Okay.

7  Q.  It's you, Chirag Patel, Brad Purdy, Ashik Desai and Cindy

8  Sui, correct?

9  A.  Yes.

10 Q.  It's subject of Victoza and Myrbetriq metrics, correct?

11 A.  Correct.

12        MR. POULOS:  If we could go to page 2, please, Laura.

13 BY MR. POULOS:

14 Q.  So we do see on page 2 an email from you to the group at

15 5:09 p.m., correct?

16 A.  Correct.

17        MR. POULOS:  If we could blow -- well, if you could

18 just capture from "just sat down" all the way down through the

19 rest of Item 1.

20        Right there, perfect.  Thank you.

21 BY MR. POULOS:

22 Q.  Now, Mr. Ma, this is now on July 11, 2014.  You've been

23 there a little over a month, correct?

24 A.  Correct.

25 Q.  And you write:  "Just sat down with Cindy to take a look

1  at Victoza metrics and first past Myrbetriq metrics."

2  Correct?

3  A.  Correct.

4  Q.  And you wrote that she shared the high-level report with

5  each of you via Google Drive, correct?

6  A.  Correct.

7  Q.  So you're referring to a report prepared by Cindy Sui,

8  correct?

9  A.  I believe so, correct, yes.

10  Q.  And then you report:  "We're still seeing issues with the

11  results which I think prevent us from sharing with the

12  clients."  Right?

13  A.  Correct.

14  Q.  And Mr. Ma, that's because you knew that the numbers

15  coming back, the issues you're still seeing, resulted in

16  unreliable data, right?

17  A.  I both knew that they were unreliable but also that the

18  metrics would have been too low or not good enough to share

19  with clients, as I believe I testified before.

20  Q.  But my question is you knew the numbers were unreliable,

21  correct?

22          MR. JOHNSTON:  Objection.  Asked and answered.

23          THE COURT:  Overruled.

24  BY THE WITNESS:

25  A.  Correct.

1    BY MR. POULOS:

2    Q.  You go on to say:  "A few high level issues with each

3    report, I think we should talk Monday morning through these

4    via phone or live if you're all here."

5         Did I read that correctly?

6    A.  Correct.

7    Q.  Now, Mr. Ma, you don't have any recollection of a call or

8    a conference to discuss these issues, do you?

9    A.  I do not.

10   Q.  Now, let's focus on Victoza in particular.  Item 1, it

11   says:  "With Victoza, we are still seeing large dropoffs

12   between April and May for active video sessions and flash

13   impressions despite seeing more patients in May."  Correct?

14   A.  Correct.

15   Q.  And then you go on to say:  "We've been" -- under that

16   point you say:  "We've been brainstorming why this is the

17   case, but I can't think of a reason why."  Correct?

18   A.  Correct.

19   Q.  Earlier before we started really getting into this thing,

20   you're saying here that the data that you're seeing doesn't

21   make sense, correct?

22   A.  I'm saying that I don't understand why the -- yeah, fair

23   enough.

24   Q.  The data is reporting to you that the numbers from April

25   to May -- the May numbers came way down even though the data

1   was telling you that more patients were interacting with the

2   tablets, correct?

3   A.  Correct.

4   Q.  Skipping to the fourth bullet point, you say:  "I'm a bit

5   worried that we will not be able to arrive at good numbers to

6   share with Victoza on this even if we do nail down a better

7   compensation method just because the bugs and network health

8   issues we've been seeing across months."  Correct?

9   A.  Correct.

10  Q.  Now, Mr. Ma, when you're saying "I'm a bit worried we're

11  going to be able to arrive at good numbers to report," you're

12  conveying, are you not, that we're not going to have reliable

13  numbers to report, correct?

14  A.  No.  I believe I testified earlier that good numbers in

15  this case also refers to high enough numbers that we believe

16  the client would expect or want to see.

17  Q.  You didn't say that in this email, though, did you?

18  A.  I did not.

19  Q.  You're talking about numbers not making sense, and then

20  saying we're not going to be able to arrive at good numbers.

21  That's all you said in this email, correct, on that issue?

22  A.  On this email, I specifically, yes, said that there are

23  issues and then I said the numbers are not good enough to

24  share.  That is what's in the email, correct.

25          MR. POULOS:  Let's go to -- back to page 1 to --

1   let's go to where Brad Purdy says, at 7:52 down near the

2   bottom of the page.

3   Q.  Brad Purdy writes to you and the others:  "The fixed

4   banner/video and ad slot structure for after TTL that are

5   currently in place.  What we spoke about on the white board.

6   Think that is the driver?"

7          Did I read that correctly?

8   A.  Correct.

9   Q.  "What is the banner/video ad rotation for April and May on

10  those tablets?  Have a feeling that may explain this."

11         Did I read that correctly?

12  A.  Correct.

13  Q.  What's Brad Purdy saying there?

14  A.  He's proposing a hypothesis for what might explain some of

15  the issues in the metrics that we are seeing below.

16  Q.  Brad's asking legitimate questions there, right?

17  A.  Yep.

18  Q.  Mr. Ma, Brad Purdy ultimately did instruct you to employ

19  the methodologies that were being developed in conjunction

20  with the engineers, correct?

21  A.  I don't know if there's a specific instruction that you're

22  speaking of.

23  Q.  Well, he authorized you to do that, did he not?

24  A.  We worked on the methodology together, which I guess

25  implies that, yes.

1  Q.  Okay.  And you arrived at the methodology, correct?  You

2  worked through the methodology, correct?

3  A.  I don't remember if we landed on a final methodology, but

4  I remember working through a long series of things to arrive

5  at some methodology, yes.

6  Q.  And the questions that Brad Purdy is asking here are

7  legitimate questions to arrive -- to figure out what the

8  issues are and to arrive at a proper methodology, correct?

9  A.  It depends on what you mean proper, but we are trying to

10  fix something here to arrive at a methodology, correct.

11  Q.  Yeah.

12          Now, Mr. Ma, I do understand that it is your position

13  that Outcome Health reported false numbers because they didn't

14  report the real data that these tablets were bringing back.

15  Instead, they deployed methodologies and compensations and

16  arrived at a formula to report those numbers, correct?

17          MR. JOHNSTON:  Objection.  Compound question.

18          THE COURT:  Sustained.

19  BY MR. POULOS:

20  Q.  Mr. Ma, you and Ashik Desai wildly inflated the metrics

21  numbers, correct?

22  A.  We inflated the tablet metrics, correct.

23  Q.  Substantially, correct?

24  A.  By a very large order of magnitude, correct.

25  Q.  Brad Purdy didn't tell you to do that, correct?

1  A.  Not using the methodology ultimately that Ashik and I
2  used, correct.

3  Q.  Right.

4      Well, I think you told us that the methodology that
5  you and Ashik used was just making up the numbers because it
6  was quicker.  Didn't you tell us that this morning?

7  A.  Yes, I said that we made up the numbers, correct.

8  Q.  Okay.  Let's go to the top of this email.  You end up
9  responding a couple of chains later.  You report:  "Cindy,
10  when you get a chance tomorrow morning, can you follow up and
11  attach the results you've been working on here with new
12  compensation methods."

13      That's what you said, right?

14  A.  That's correct.

15  Q.  The phrase compensation method there is -- the
16  compensation methods were basically taking some assumptions
17  based on the data that you were seeing and trying to arrive at
18  a methodology, correct?

19  A.  Correct.

20  Q.  You were in a position where you had to rely on
21  assumptions, correct?

22  A.  We relied on them, but I don't know that we should have.

23  Q.  Okay.  Let me just take a step back.  There were
24  assumptions then that got built into a compensation method to
25  employ a methodology, correct?

1  A.  Correct.

2  Q.  And then you wrote to Brad Purdy, "@BP, Cindy applied a

3  first pass new compensation we discussed earlier about using

4  the total video plays as a proxy for tablet uptime, but

5  numbers still look pretty low for June.  There may be

6  something else going on, but want you to see metrics first to

7  hypothesize."  Correct?

8  A.  Correct.

9  Q.  And then you go on to say separately, "Ashik AD, the

10 sheet" -- probably meant to say that Cindy will share here,

11 "the sheet Cindy will share here, I will use to try and put

12 together the first-pass version of the slides for Myrbetriq.

13 Let's then troubleshoot which numbers we think are too low."

14 Correct?

15 A.  Correct.

16 Q.  Let's go to Exhibit 9024.  This is another weekly report

17 by Chirag Patel.

18        Do you see that it's sent to Mr. Shah, Ms. Agarwal,

19 Mr. Demas, and Brad Purdy, correct?

20 A.  I do.

21        THE COURT:  All right.  It's admitted, again, just to

22 show the state of mind of the defendants who received it, not

23 for the truth of the information contained in the exhibit

24 itself.

25        MR. POULOS:  Thank you, Judge.

1    Let's go about halfway down the first page, Laura.

2  It's probably the sixth or seventh bullet point that starts

3  "David and Cindy."

4  BY MR. POULOS:

5  Q.  What Chirag Patel reports here is, "David and Cindy"

6  that's you and -- you worked with Cindy Sui, correct?

7  A.  Correct.

8  Q.  "David and Cindy have been seemingly making good progress

9  on validating Victoza/Myrbetriq analytics.  With restricted

10  time, I'm chiming in when I need to but not overseeing

11  100 percent.  My main goal is validate methodology and help

12  with scripts.  I got to write -- I got to write a Touch to

13  Listen script this week."  Correct?

14  A.  Yep.

15  Q.  So do you recall, Mr. Ma, that by late July, you, working

16  with the engineers, like Chirag Patel and Cindy Sui, had

17  arrived at a methodology?

18  A.  I don't recall the exact timeline, but I recall that we

19  were working on a methodology, yes.

20  Q.  Right, that worked on -- you took the data you had, you

21  tried to make sense of it, you incorporated various

22  assumptions and arrived at a methodology, correct?

23        MR. JOHNSTON:  Objection, compound question.

24        THE COURT:  Sustained.

25        MR. POULOS:  I'll break that down.

1   BY MR. POULOS:

2   Q.  You -- you working together, you took the data, correct?

3   A.  Correct.

4   Q.  And then you made various assumptions, correct?

5   A.  Correct.

6   Q.  You tried to incorporate those assumptions in making sense

7   of the data, correct?

8   A.  Again, I don't know that I would characterize that the

9   goal was to purely make sense of the data.

10  Q.  You were trying to make sense of the data, correct?

11  A.  That was one of the goals.

12  Q.  Okay.  That's -- and then you ended up arriving at a

13  methodology.

14  A.  Again, I can't recall if we arrived at a final

15  methodology, but we worked on a methodology, correct.

16  Q.  Let's go to Exhibit 3117.

17           3117 is one of these G chats, correct?  Do you see

18  that?

19  A.  I do.

20  Q.  And this is July 24th, correct?

21  A.  It is, yep.

22  Q.  And this is just between you and Ashik Desai, correct?

23  A.  Correct.

24  Q.  Okay.  Mr. Ma, it is a fact, right, that you and Ashik

25  Desai kept a lot of information just amongst yourselves,

1  correct?

2  A.  Of course, we did.

3  Q.  And if we go to -- well, why don't you -- let's take the

4  first three comments that you make there.

5        And why don't you read those to us, Mr. Ma, please?

6  A.  Sure.

7        I said:  "Hey, we should talk through metrics

8  dashboard at some point.  I'm having a bit of trouble deciding

9  on what to share/how to share, and then once we have that, how

10 to compensate for not-so-great metrics."

11       MR. POULOS:  Okay.  We can take that down.

12 BY MR. POULOS:

13 Q.  Do you recall having a conversation with Desai to figure

14 out what you guys were going to do?

15 A.  I don't have a specific recollection of that conversation.

16       MR. POULOS:  Okay.  Let's go to Exhibit 1145.  This

17 has been introduced during your direct exam.

18       THE COURT:  These other exhibits, I assume, unless

19 there's a limited purpose, are being offered without

20 objection; is that correct?

21       MR. POULOS:  Yes.

22       MR. JOHNSTON:  Yes, Your Honor, and many of these are

23 already in evidence.

24       THE COURT:  Right.  The other ones that aren't

25 though, other than the ones I've noted are just for the state

1    of mind of the defendant, are being offered as substantive

2    exhibits without objection?

3              MR. JOHNSTON:  Yes, the ones that Mr. Ma is on.

4              THE COURT:  Right.

5              MR. JOHNSTON:  Yeah.

6              THE COURT:  Very good.  Thank you.

7              Proceed.

8              MR. POULOS:  Thank you, Judge.

9    BY MR. POULOS:

10   Q.  So this is, again, this is just you and Desai, right?

11   A.  Correct.

12   Q.  You didn't include Chirag Patel or Cindy Sui on this,

13   correct?

14   A.  Not on this email, no.

15   Q.  You didn't include Brad Purdy on it, correct?

16   A.  I did not.

17             MR. POULOS:  Let's go to the top half of what Mr. Ma

18   wrote.

19   BY MR. POULOS:

20   Q.  You write:  "Hey, here are just 3 slides that I would say

21   comprise a dashboard.  This is for Victoza in April (the month

22   where we honestly have the highest metrics.)"  Correct?

23   A.  Correct.

24   Q.  When you wrote April is the month where we honestly have

25   the highest metrics, were you lying to Ashik Desai?

1    A.  No.

2    Q.  And then you go on to say:  "The story I'm trying to tell

3    here is tablets are getting great engagement," correct?

4    A.  Correct.

5    Q.  And at the bottom you say you could put more graphs and

6    the like, correct?

7    A.  That's correct.

8            MR. POULOS:  Let's go to the bottom half of what

9    Mr. Ma wrote.

10   BY MR. POULOS:

11   Q.  Mr. Ma, just to be clear, this is the very first tablet

12   metrics report that you're working -- that you've worked on,

13   correct?

14   A.  I'm not sure if it is.

15   Q.  You write in bullet point 2:  "Do any of these numbers

16   surprise you based on what we've seen in the past?"

17           And then you go on to say:  "I don't have great

18   insight into what standards are and what we've seen in the

19   past."  Correct?

20   A.  Correct.

21   Q.  You, in fact, didn't know what had been done in the past,

22   correct?

23   A.  I think I'm saying here I don't know if anything has been

24   shared in the past and what the benchmarks should be.

25   Q.  Well, you also say you don't have great insight into what

1  we've seen in the past, correct?

2  A.  Correct.

3  Q.  Okay.  So you're asking -- you're seeking Ashik Desai's --

4  you're not asking Chirag Patel and Cindy Sui's advice on what

5  to do, you're asking Ashik Desai, correct?

6  A.  That's correct.

7          MR. POULOS:  Let's go to Exhibit 9021.

8          That last exhibit, for the record, 1145, was

9  July 24th, and now we go to Defense Exhibit 9021.

10          MR. PRUITT:  What's the numbers?

11          MR. POULOS:  Forgive me.  9021.

12  BY MR. POULOS:

13  Q.  9021 is one of these calendar invites for July 25th,

14  correct?

15  A.  Correct.

16  Q.  Again, just you and Ashik Desai, right?

17  A.  That's correct.

18  Q.  Not Brad Purdy?

19  A.  Not Brad Purdy.

20  Q.  Not the engineers?

21  A.  Not the engineers.

22  Q.  And you specifically say the purpose of it is the Victoza

23  tablet metrics deck, correct?

24  A.  Correct.

25          MR. POULOS:  Let's go to Exhibit 1151.  And if you

1  could blow up the -- you know, everything from the "from" to

2  below the word "David," Laura.

3  BY MR. POULOS:

4  Q.  You had -- that meeting on the invite was for the morning.

5  Do you recall that?

6  A.  That looks right, yep.

7  Q.  And now we are -- here we are on the evening of July 25th,

8  right?

9  A.  Correct.

10  Q.  And now you do include Cindy Sui on this email, do you

11  not?

12  A.  Correct.

13  Q.  Tablet metrics for client is the subject, right?

14  A.  Correct.

15  Q.  Would you read the first paragraph.

16  A.  "Hey Ashik, here are the metrics dashboards for Victoza

17  and Myrbetriq.  Take a look through and let me know what you

18  think.  Let's not send until Monday though."

19  Q.  Next paragraph, please.

20  A.  "I want to take the time to review these with fresh eyes

21  again over the weekend.  Just wanted to send so you can see

22  the output and react to the numbers on the page again.

23  @Cindy, please take a look through as well and let me know

24  what you think."

25  Q.  You did want Cindy Sui to take a look at this draft of the

1  deck that you had prepared, correct?

2  A.  That looks correct, yes.

3  Q.  Now, read the next paragraph, please.

4  A.  "To be honest, I've been fairly liberal in choosing where

5  and how to compensate here in order to arrive at metrics that

6  I think won't elicit gut reactions of 'jeez, that doesn't seem

7  right.'  The numbers feel like they are in the right ballpark

8  range and all have a methodology behind them.  My guess is

9  that the client won't really focus on these anyways and that

10  we're sharing them as a first look into their brand new shiny

11  tablet investment."

12  Q.  When you told Cindy Sui and Ashik Desai in this email that

13  the deck that you prepared feel like they are in the right

14  ballpark range, you meant to say, did you not, that they

15  seemed at least somewhat reliable?

16  A.  I, again, would disagree with that characterization.

17  Q.  What ballpark range are you referring to, sir?

18  A.  A ballpark range of what I think the clients would not

19  have a gut reaction to "jeez, that doesn't seem right."

20  Q.  The numbers that you did come up here employed the

21  methodology that you had been working on with Cindy, correct?

22  A.  I don't know specifically, but I do say that they all have

23  a methodology behind them.

24  Q.  There was a methodology, correct?

25  A.  In this case, it appears so.

1    Q.  Right.  You didn't just make up the numbers.  You employed
2    an actual methodology, correct?
3    A.  In this case, it appears so, yes.
4    Q.  Let's see what you put together on this first draft.
5            MR. POULOS:  If we could go to page 4 of the
6    exhibit -- well, let's go to page -- I'm sorry, Laura.  Let's
7    go to page 2.
8    BY MR. POULOS:
9    Q.  You put together a deck for just the month of June,
10   correct, on Victoza, right?
11   A.  That's what it looks like, yes.
12           MR. POULOS:  And let's go to page 3 now, the next
13   page.
14   BY MR. POULOS:
15   Q.  You put together this chart of active Victoza flash
16   impressions on the right, correct?
17   A.  Yes.
18   Q.  Active Victoza video impressions, correct?
19   A.  Correct.
20   Q.  Tablets running campaign, correct?
21   A.  Correct.
22   Q.  The numbers that appear on this chart, this graph, sir,
23   were they generated using the methodology?
24   A.  Based off of my email, I don't have a recollection, but it
25   appears based off my email that they were generated using a

1  methodology, yes.

2          MR. POULOS:  Okay.  Let's go to the next page.

3  BY MR. POULOS:

4  Q.  You wrote -- you put on here the number of tablets running

5  the Victoza campaign, do you see that?

6  A.  I do.

7  Q.  Did you intentionally overstate what the number of the

8  contract was?

9  A.  I don't recall.

10  Q.  It was 400.  Do you recall that now?  Do you know that

11  now?

12  A.  Not without seeing further documentation.

13  Q.  The reach.  Under -- in the middle column, that says

14  patients reached in the campaign, correct?

15  A.  It does.

16  Q.  And you report 70.2 thousand, correct?

17  A.  Correct.

18  Q.  And then you report active patients reached per day per

19  tablet, correct?

20  A.  Correct.

21  Q.  3.3, right?

22  A.  Correct.

23          MR. POULOS:  I'd like to go to page 6.

24          Your Honor, just for the record, we have a

25  demonstrative prepared because we're going to go through a

1 couple iterations of this deck, but I just want to highlight.
2 BY MR. POULOS:
3 Q.  For flash ads, you put down 144,000, right?
4 A.  Correct.
5     MR. POULOS:  Okay.  Let's go to Exhibit 9011.
6 BY MR. POULOS:
7 Q.  So that first draft we looked at was from July 25th.
8 9011, we're three days later.  It's July 28th.  Do you see
9 that?
10 A.  I do.
11     MR. POULOS:  Oh, just a second.
12     MR. JOHNSTON:  Objection, Your Honor.  This exhibit
13 is not in evidence.
14     MR. POULOS:  We can take that down.  I realized,
15 Judge, that I skipped over one of the graphs, so I'm going to
16 go back to another exhibit in any event.
17     THE COURT:  All right.  Go ahead.
18     MR. POULOS:  Let's go to Government Exhibit 1145.  If
19 we could go to page 2.
20 BY MR. POULOS:
21 Q.  So 1145 was July 24th.  You put together a deck on Victoza
22 for April, correct?  Do you see that?
23 A.  I do.
24 Q.  And you reported various numbers, correct?
25 A.  I did.

1  Q.  Do you want to take a look at page 3 of the exhibit?

2  A.  Okay.

3  Q.  This is the very first draft.  You reported 650 tablets

4  were playing, correct?

5  A.  Correct.

6  Q.  And you reported that it had reached 33.8 thousand,

7  correct?

8  A.  Correct.

9  Q.  And then you reported 2.4 patients per tablet per day,

10  right?

11  A.  Correct.

12  Q.  Now, then on the 28th, you put together a different report

13  for the month of June, not April, correct?

14  A.  I can't remember the dates.

15  Q.  That was Exhibit 9011.

16  A.  That sounds right, yep.

17  Q.  Okay.

18          MR. POULOS:  If we could go to Defense Exhibit 9040.

19          Your Honor, we offer these as a verbal act by Ashik

20  Desai giving instructions --

21          THE COURT:  Take it off the screen while we're

22  determining that.  It's off the jury's screen.  You can put it

23  up so I can see it.

24          MR. JOHNSTON:  And, Your Honor, if the government may

25  be heard at sidebar.

1          THE COURT:  All right.

2              (Proceedings heard at sidebar:)

3          THE COURT:  Go ahead.

4          MR. JOHNSTON:  Yeah, Your Honor, the government

5   objects to this exhibit.  There's no relevant verbal act here.

6   Ashik Desai is describing what he did to salespeople.  There's

7   no indication that this was ultimately passed along to the

8   clients, so I'm not sure what the relevance is for this

9   witness.

10          This witness didn't receive it, none of the

11  defendants received it, and the only information contained

12  there is hearsay.

13          THE COURT:  Response?

14          MR. POULOS:  It's not offered for the truth.

15          THE COURT:  That is a -- I don't know how it can be

16  offered for anything else at this point.

17          Use it with Desai.  I don't understand the use with

18  this witness, so objection sustained.

19          You're not going to finish tonight anyway, right?

20          MR. POULOS:  No.

21          THE COURT:  We can -- put it back on --

22          MR. POULOS:  No.

23          THE COURT:  I don't mean to be short on this.  I

24  think you can put it up for me at 4:30, where I can actually

25  see it.  It was just flashed in front of me.  I'll hear

1    further argument then, but it's not going to affect the rest
2    of your examination today, correct?
3            MR. POULOS:  No.
4            THE COURT:  Go ahead.  And talk to your client, if
5    you want.
6            MR. POULOS:  Judge, I'm good to go.
7            THE COURT:  All right.
8            Okay.  Take your headphones off.  You want to talk to
9    your client for a second, go ahead.
10           If you need to talk to your client, go ahead.
11          (Counsel and defendant conferring.)
12          (Proceedings heard in open court:)
13           THE COURT:  All right.  Ready to proceed?
14           MR. POULOS:  Yes, Your Honor.
15           THE COURT:  Go ahead.
16           All right.  You can pull it off the screen though.
17           MR. LOWDER:  Take it down.
18   BY MR. POULOS:
19   Q.  Mr. Ma, you do recall these two drafts that you put
20   together, one for April, one for June.  We've taken a look at
21   those.
22           Do you recall that Ashik Desai took those drafts that
23   used the methodology and wildly inflated the numbers?
24   A.  So, I don't have a memory of Ashik himself doing it.  I
25   actually -- I think I've been on the record in the past saying

1  I remember there were a set of metrics that had a methodology

2  and later there were a set that didn't, and the sequence of

3  events in the middle are unclear to me as to what exactly

4  happened.  But I think I've also been on the record saying

5  that I suspected that it was Ashik that did it.

6         MR. POULOS:  Let's go to Exhibit 9018.

7  BY MR. POULOS:

8  Q.  These are -- this is a series of text messages between you

9  and Ashik Desai on November 3rd of 2013, correct?

10 A.  Correct.

11 Q.  And would you read for us -- would you read for us what

12 you wrote in the text, the dark shaded areas on November 3rd,

13 2014?

14 A.  "Don't think so.  I need to pull the Humira and Simponi UC

15 metrics and then will get back to neuro.  These click metrics

16 make me really nervous.  The highest clicks we are getting for

17 any brand is 574 for Sovaldi for the entire month.  Simponi UC

18 clicks are closer to 120 for the entire month.  What we are

19 showing Simponi UC is 22,000 clicks ... 185 times the real

20 number."

21        MR. POULOS:  Let's go to page 3 of this exhibit.

22 BY MR. POULOS:

23 Q.  Read the second item there, "I really don't have."

24 A.  "I really don't have a good one.  We set ourselves down a

25 bad path of showing metrics like this in the first place when

1  we inflated Victoza metrics."

2  Q.  That's a reference to these Victoza metrics, correct?

3  A.  I believe so, yes.

4  Q.  Do you remember these numbers where it was in the

5  thousands, do you remember learning that Ashik Desai had

6  inflated the numbers that were in the thousands to

7  7.7 million.  Do you remember that?

8  A.  Again, I think I've commented I don't remember

9  specifically whether Ashik did or what the specific numbers

10  are from the methodology one to the made-up ones.

11        MR. POULOS:  Let's go to Exhibit 9025.

12  BY MR. POULOS:

13  Q.  Do you see that the date of this, at least the top chain,

14  is August 12th?

15  A.  Correct, yes.

16        MR. POULOS:  Let's go to start at the bottom of

17  page 2.

18        So just the from on the bottom there, if you could --

19  I'm sorry, and the rest of that bottom part.  The bottom --

20  yes.

21  BY MR. POULOS:

22  Q.  So you were on the chain, you eventually get on this

23  chain.  Did you recall seeing that, sir?

24  A.  I think I saw it on the top, but it looks like I'm not on

25  this email.

1  Q.  And we'll get there.

2  A.  Okay.

3  Q.  Steve Svec, he was the sales rep on Victoza, right?

4  A.  That seems -- I can't recall exactly, but that seems

5  right, yep.

6  Q.  And he wrote an email to Nancy Gottlieb.  Do you see that?

7  A.  I do.

8  Q.  He copied Ashik Desai on it, right?

9  A.  Correct.

10  Q.  And the subject line was Victoza ER tablet early read

11  metrics.  Do you see that?

12  A.  I do.

13  Q.  And why don't you read us what he wrote to Nancy.

14  A.  He wrote:  "Nancy, very sorry for the delay, we really

15  wanted to be able to walk you through this, but obviously

16  you're pressed for time so I thought I'd go ahead and send it.

17  In lieu of a discussion here, are some notes/highlights on

18  this initial February through June early read."

19          MR. POULOS:  Let's go to the next page.

20  BY MR. POULOS:

21  Q.  And then under targeted patient reach and overall

22  engagement, this email reports the specific metrics being

23  provided to the client on Victoza, correct?

24  A.  It appears that it does.

25  Q.  Do you see it says:  "8 patients per day"?

1   A.  I do.

2   Q.  And it says:  "7.2 touches per day"?

3   A.  I do.

4        MR. POULOS:  And let's go down to the next category

5   under sponsor banner/video impressions.

6   BY MR. POULOS:

7   Q.  Do you see, sir, that this email reports 7.7 million

8   banner impressions for diabetes patients.  Do you see that?

9   A.  I do.

10       MR. POULOS:  If we could leave -- we'll come back to

11  it.  If we could go to Exhibit 1151.

12  BY MR. POULOS:

13  Q.  Again, this is the one that you wrote, put together, sir,

14  where you said in the right ballpark methodology, correct?

15  A.  Correct.

16       MR. POULOS:  If we could go to the second page.

17  Again, this is June.

18       Third page, please.

19       Okay.  Next page.

20       And one more.

21       And finally the next page.

22  BY MR. POULOS:

23  Q.  Sir, what you put together being in the right ballpark

24  with methodology was 144,000 total active flash impressions,

25  correct?

1    A.  Correct.

2    Q.  And the 7.7 million is referring to the same item, the

3    banner impressions, correct?

4    A.  I think I would caveat that it's a little bit apples to

5    oranges.

6    Q.  But the bottom line is that 7.7 million number was

7    inflated by orders of magnitude, correct?

8    A.  Well, so that 7.7 number seemed to reflect I think

9    six months of data.  This is one month of data.

10   Q.  Yeah, you don't -- do you recall that he didn't even have

11   six months of data?  You didn't have data for February and

12   March.

13   A.  Correct, yes, yes.

14   Q.  Right.  And your text message, sir, where you say, after

15   these numbers were reported, sir, you and Desai were stuck

16   with them, right?

17   A.  That is correct, yes.

18   Q.  That's what you meant when you wrote in that text message

19   we led ourselves down a bad path when we inflated the Victoza

20   metrics, correct?

21   A.  That is correct, yes.

22   Q.  And you said we inflated the Victoza metrics, correct?

23   A.  Correct.

24   Q.  And now you're stuck with them, and you and Desai, for a

25   period of nearly a year, continued to report wildly inflated

1  metrics, correct?

2  A.  Correct.  We reported inflated metrics, correct.

3  Q.  You saw the one of 185 times the real metrics that were

4  being reported, correct?

5  A.  That is correct.

6  Q.  With no methodology at all.

7  A.  Correct.

8  Q.  Far, far beyond the numbers that were reported in these

9  two drafts that we looked at, correct?

10  A.  Again, I think it's a little bit apples to oranges what

11  you're saying, but your point stands, I think, that the

12  numbers were inflated further, yes.

13  Q.  By a lot.

14  A.  I'm just trying to be precise, I'm sorry.

15  Q.  By a lot, correct?

16  A.  Without knowing the exact active versus passive and the

17  months and the timeline, it's hard for me to quantify a lot;

18  but, yes, I can see that 7.7 million is a lot more than

19  144,000.

20  Q.  Yes.  You don't have to be good at math to do that one,

21  right?

22  A.  Again, I think --

23          MR. POULOS:  I'll withdraw that, Judge.  Sorry.

24  BY THE WITNESS:

25  A.  I think it's a little bit misleading, but --

1          MR. POULOS:  Let's go to Exhibit 392.
2    BY MR. POULOS:
3    Q.  Mr. Svec sent those numbers in the prior exhibit on
4    August 12th, correct?
5    A.  I don't remember the exact date.  I'll take your word for
6    it.
7    Q.  I'll state for the record -- I'm sorry, it was July 31st
8    that he sent that, okay?
9    A.  Okay.
10         MR. POULOS:  And then let's go to 392.
11   BY MR. POULOS:
12   Q.  And now this is August 13th, about two weeks later, right?
13   A.  That looks right, yep.
14   Q.  And you're talking about inflating more metrics, correct?
15   A.  That's correct.
16   Q.  With no methodology you told us, right?
17   A.  Correct.
18   Q.  The methodology went out the window right after those
19   crazy inflated Victoza metrics were sent out, correct?
20   A.  That seems correct, yes.
21   Q.  And who came up with the numbers?  When you and Desai were
22   just making up the numbers, who came up with them?
23   A.  Again, at the beginning, the transition from methodology
24   to no methodology, I think I've stated I don't know how those
25   were generated because I don't think I was on the emails or

1 communications.

2       Later on, I think I've been forthcoming that it

3 became my responsibility to create the first draft of made-up

4 numbers for Ashik to review.

5 Q. And they were made-up numbers, right?

6 A. Correct.

7 Q. No methodology?

8 A. Correct.

9       MR. POULOS: Let's go to Exhibit 9012.

10 BY MR. POULOS:

11 Q. Moving forward in time, this is September 16 of 2014 now.

12 A. Okay.

13 Q. Okay. And a G chat, again, just you and Desai, right?

14 A. It appears so, yes.

15 Q. And let's -- why don't you read --

16 A. From the top?

17 Q. Yeah. Desai said I came out -- comes out and says: I

18 spoke to Chris. All set on Orencia." Do you see that?

19 A. I do.

20 Q. You say: "Okay, cool. What did we promise?" Right?

21 A. I do see that, yep.

22 Q. And then you go in a different direction. You say: "Our

23 tablet metrics inflation makes me nervous." Correct?

24 A. Correct.

25 Q. Let's go to the next several lines.

1                    And he responds to "no promises on engagements,"

2    right, on Orencia.  He's telling you no promises on engagement

3    metrics, isn't that what he's saying?

4    A.  Sorry, are you asking for what that means or just what

5    he's saying?

6    Q.  Yes.

7    A.  He's saying no promises on engagement, correct.

8    Q.  And that's what he means, right?  I'm not making any

9    promises about engagement metric tablets, right?

10   A.  Correct.  There's nothing -- he's basically saying that on

11   the campaigns, I'm not saying that we're guaranteeing any

12   engagement, correct.

13   Q.  And by now in September because of the wildly inflated

14   metrics report, you say:  "Those numbers are out in the abyss

15   forever."  Correct?

16   A.  I do.

17   Q.  That made you nervous that you were involved with Desai in

18   sending out wildly inflated metric -- tablet metrics numbers,

19   correct?

20   A.  It did.

21   Q.  And so he says:  "No promises on engagement."  But then he

22   says:  "That's not our business, just a 2:1 guarantee on

23   script lift."  Correct?

24   A.  Correct.

25   Q.  Let me pause right there.

1          You told us earlier that one of the ways Desai tried

2     to calm your nerves was to say, hey, it's all about the ROI,

3     right?

4     A.  I did say that, yes.

5     Q.  He told you repeatedly, right, that what we sell --

6     sorry -- what we really sell is an ROI guarantee, right?

7     A.  Correct.

8     Q.  He's telling you this in connection with metrics.  Listen,

9     no promises on tablet metrics, and he says our business are

10    the ROI guarantees, right?

11    A.  That's what he says, yes.

12    Q.  He also told you repeatedly, right, that in terms of

13    under-delivery on contracts, our business is ROI, right?

14    A.  Correct.  He used that as a rationalization for me, yes.

15    Q.  He specifically told you that in his view, so long as we

16    deliver on the ROI, it really doesn't matter if we

17    under-deliver on the contracts, right?

18    A.  I don't know if that was his true view, if he was just

19    trying to make me feel better about my concerns, but that was

20    what was told to me, yes.

21    Q.  That's what I want to make clear.  My question was that's

22    what he told you, correct?

23    A.  Yes.

24    Q.  And you don't know one way -- I mean, did you believe that

25    he was -- at the time he was telling you this, did you believe

1  that that is, in fact, what he truly felt?

2  A.  I don't know.

3  Q.  You heard him say that to people all throughout the

4  company, did you not?

5  A.  I --

6  Q.  Wasn't that a mantra of his, we sell ROI?

7  A.  I heard him say it to other analysts, but I don't know

8  that I would characterize it across the company.

9  Q.  Okay.

10        Okay.  So you're nervous.  He says try to stay calm,

11  we sell ROI, correct?

12  A.  That's a good paraphrase, yes.

13        MR. POULOS:  Let's go to 3149.

14  BY MR. POULOS:

15  Q.  Now we're at September 17th.  This is, again, just you and

16  Desai, correct?

17  A.  Correct.

18  Q.  And this email is about Tecfidera tablet engagement

19  metrics, correct?

20  A.  Correct.

21  Q.  And why don't you read us what you wrote to Desai?

22  A.  "Hey, I will actually ask Cindy to pull these report and

23  see what it looks like in reality.  We will still need to

24  inflate, but this one makes me a bit more nervous.

25        "This one is a bit trickier for a few reasons:

1  Matthew has seen the Victoza numbers and these are going to be
2  different by a decent gap (given our Simponi UC calibration).
3        "Tecfidera is the sponsor that is tracking clicks in
4  the unique URL.  Given that we are short on execution, they
5  will be able to either calculate a terrible click rate, or we
6  will have to show them poor engagement numbers.
7        "3.  I think Tecfidera started a bit late (not the
8  full month of August)."
9  Q.  Okay.  Regarding bullet point 1, you're referring to Matt
10  Crandall there, right?
11  A.  Correct.
12  Q.  You're telling him gets kind of tricky here because Matt
13  Crandall has seen the wildly inflated Victoza numbers,
14  correct?
15  A.  Correct.  Matt has seen prior -- prior reports with higher
16  numbers, yes.
17  Q.  Yeah, like 7.7 million.  That's the report you're talking
18  about, right?
19  A.  Again, I don't know if that's the specific one, but he's
20  seen higher numbers is what I'm saying, yes.
21  Q.  And when you look at the real numbers that Cindy has put
22  together for you, you see there's going to be a decent gap,
23  right?
24  A.  Correct.
25  Q.  You reference "given our Simponi UC calibration."  What

1  does that refer to?

2  A.  I can't remember.

3  Q.  Okay.  And then as to Item 2, after you and Desai just

4  started making up the numbers, you guys later learn, like,

5  hey, the clients themselves are tracking clicks, right?

6  A.  For some campaigns, yes.

7  Q.  You came to learn that on the tablet metrics, a patient

8  could click on the tablet and it takes them to the pharmacy

9  company's website, right?

10  A.  Well, that was the case for all campaigns, yes.

11  Q.  Okay.  And you then learn that some of the pharmaceutical

12  companies, they then started tracking how many -- how many

13  people got directed to our website based on clicking on the

14  tablet, correct?

15  A.  That is correct, yes.

16  Q.  They had that metric to compare it to the metric that you

17  reported.

18  A.  Correct.

19  Q.  That made you real nervous, right?

20  A.  It did.

21  Q.  And you and Desai schemed on how you're going to try to

22  deal with that problem, right?

23          MR. JOHNSTON:  Objection.  Argumentative.

24          THE COURT:  Overruled.

25          He can answer or characterize it the way he wants.

1  BY THE WITNESS:

2  A.  Yeah, I mean, we can choose the word scheme, but Ashik and

3  I thought that that was an issue because we were afraid of the

4  sponsors seeing a very low number, and so we tried to find a

5  way to either explain it away or report metrics that made it

6  seem not inconsistent.

7  BY MR. POULOS:

8  Q.  And that was a challenge, right?

9  A.  That was a challenge.

10  Q.  Because if you're going to -- you can't go from

11  7.7 million to 144,000 overnight, right?

12  A.  Again, I think that's misleading a little bit in the

13  timeline and the active versus passive, but I think your point

14  stands that there's a gap between reality and what we're

15  showing and that this presents a problem.

16  Q.  Well, the -- so what you guys come up with a plan to

17  you're going to continue to just make up the numbers but start

18  making them up in increments and adjusting downward, correct?

19  A.  That is correct.

20  Q.  And did you do that?

21  A.  Adjust the numbers downwards over time?

22  Q.  Yes.

23  A.  We did, yes.

24  Q.  That last exhibit, again, the reference to Matt Crandall,

25  you're saying it's getting tricky because Matt Crandall saw

1  the numbers, right?

2  A.  Correct.

3  Q.  Okay.  Now, the final wildly inflated numbers that went to

4  Victoza, that campaign, is it true, Mr. Ma, that when you

5  learned of those numbers, that Ashik Desai blamed Matt

6  Crandall for wildly inflating those numbers?

7  A.  I think you're referring to a statement that I made in one

8  of my --

9  Q.  Listen, I'm just asking you is it true or not?

10  A.  Yeah.  What I'm saying is I don't recall exactly, but from

11  my memory, I believe he blamed Matt, and so I think it's true,

12  but I can't say for certain.

13  Q.  Well, when he blamed Matt Crandall for wildly inflating

14  the numbers, you -- you guys started inflating all sorts of

15  numbers on all the campaigns, right?

16  A.  Correct.  We inflated numbers on most of the campaigns.

17  Q.  So Matt Crandall --

18          THE COURT:  Let finish your answer, please.

19          MR. POULOS:  I apologize.

20          THE COURT:  All right.  Finish your answer, please.

21  BY THE WITNESS:

22  A.  I think I was -- yes, we inflated the numbers on many

23  campaigns, correct.

24  BY MR. POULOS:

25  Q.  Matt Crandall had nothing to do with that, right?

1    A.  On the other campaigns?

2    Q.  Yeah.

3    A.  Correct.

4    Q.  Mr. Ma, when Ashik Desai, if -- well, I'll tell you what,

5    let me -- let's go to Exhibit 3344.

6           MR. POULOS:  I'm sorry, Laura, 3344, 3-3-4-4.

7    BY MR. POULOS:

8    Q.  This is, again, an email just between you and Desai,

9    right?

10   A.  Correct.

11   Q.  Now we're at February 19, 2015, correct?

12   A.  Correct.

13   Q.  I think you told us by this point, you had kind of moved

14   on into programs, right?

15   A.  On a product --

16   Q.  Product, I'm sorry, right?

17   A.  Correct.

18   Q.  You were no longer doing the list match and all that type

19   of stuff.

20   A.  Rarely, yes.

21   Q.  Right.  Because Kathryn Choi and Oliver Han had been hired

22   in late 2014 to begin doing that work.

23   A.  That's correct.

24   Q.  And by the way, you taught them how to do that work,

25   right?

1  A.  I believe I testified that I did, yes.

2  Q.  How to lie to clients?

3  A.  Sure.  I taught them how to do the report, which then was

4  communicated to salespeople, which then was lying to clients,

5  yes.

6  Q.  Right.  You recognize that you were teaching them how to

7  get false information to clients, right?

8  A.  I do recognize that, yes.

9  Q.  And you also taught those folks how to get false

10  information to the pharmaceutical -- I'm sorry -- to the

11  finance department, correct?

12  A.  That's correct.

13  Q.  Okay.  February 19, 2015, even though you were able to

14  shed those responsibilities, it was Ashik Desai who insisted,

15  because of what you guys had done with these inflated metrics,

16  he insisted that you remain involved in that, correct?

17  A.  In the tablet metrics?

18  Q.  Yes.

19  A.  That's correct.

20       MR. POULOS:  Now, let's go to the -- okay.  Laura, if

21  we could go to the first email in this chain halfway down the

22  page, February 18th at 10:50 p.m. and blow up the whole --

23  BY MR. POULOS:

24  Q.  Mr. Ma, could you please read for us what you wrote to

25  Ashik Desai.

1  A.  "Hey, AD.  I think you said you're in the office tomorrow.
2  We should talk through Novo metrics.

3       "I need your help/creative juices on this one.  Not a
4  great situation with metrics.

5       "Essentially, I'm trying to put together the monthly
6  Victoza metrics for KC" -- Kathryn Choi -- "so she can put
7  together that summary deck with MC" -- Matthew Crandall.

8       "Long story short, we've shared a few times with them
9  already, and it's not really possible to make them foot.  See
10  the attached model if interested.

11      "1, Feb through June metrics, way too high.

12      "2.  September metrics, in-line.

13      "3.  Campaign total spreadsheet for their data
14  feed/marketing mix model, low to in-line.

15      "The problem is either:

16      "1, someone (I think Matt Crandall you said?) made
17  Feb through June metrics way too high.  IMO" -- in my
18  opinion -- "this is the problem.  19-plus ad impressions per
19  session.

20      "2.  Campaign totals spreadsheet numbers too low.
21  Comes out to 14.8 per session, so not as bad.  I didn't think
22  we would have to share monthly totals, so I didn't do as much
23  diligence to make sure that it was a perfect fit with the data
24  that we'd shared previously."

25  Q.  When you reference -- you were trying to put together

 1   monthly Victoza metrics for KC, you were talking about Kathryn

 2   Choi there, right?

 3   A.  Correct.

 4   Q.  To get her involved in that process, correct?

 5   A.  I don't know if it's to get her involved in the process as

 6   much as to give her a report.

 7   Q.  Okay.  The main thing I want to focus on is Item 1 there.

 8   You're talking about Victoza here, correct?

 9   A.  Correct.

10   Q.  And you wrote to Desai, "Someone (I think MC you said?)

11   made the February and June metrics way too high," correct?

12   A.  Correct.

13   Q.  Does that refresh your recollection that Desai told you

14   that Crandall was responsible for that?

15   A.  It does.

16   Q.  And you knew that was a lie, right?

17   A.  Again, I wasn't on the email, so I don't know for sure,

18   but I suspected it was a lie, yes.

19   Q.  Let's go to Desai's response at 4:56 p.m.

20   A.  Would you like me to read it?

21   Q.  I'll take this turn.

22   A.  Okay.

23   Q.  "Hey DMa, I think we report tablet metrics for each month

24   but change those that we -- but change those that we should

25   for Feb-June.  Also, the insulins didn't go live till later,

1  right?"

2  So then he goes on:  "So it's mainly Victoza?  I

3  would just bring the metrics down, and we can let MC know that

4  our data software was calculating the first two frames of the

5  banner versus just a new refresh."

6  Did I read that correctly?

7  A.  Correct.

8  Q.  Ashik Desai in this email to you is proposing a lie that

9  you guys could tell to Matt Crandall for the lowered numbers,

10  correct?

11  A.  That's correct.

12  Q.  The fact that Desai is proposing a lie for you guys to

13  provide to Matt Crandall means Matt Crandall wasn't

14  responsible for the initial big lie, correct?

15  A.  That's what it appears, yes.

16  Q.  And he just comes out and says it to you.  Do you think

17  you knew that Desai had lied to you from way back?

18  A.  Again, I had assumed that he did, just -- just was

19  suspicious that he did, yes.

20  Q.  Mr. Ma, you would agree with me, right, that there will be

21  dozens of written communications between you and Desai

22  discussing how to falsify and inflate the metrics, correct?

23  A.  Dozens, maybe more.

24  Q.  And those are all going to be just you and Desai because

25  it was only you and Desai until Choi got involved, right?

1    A.  It was primarily Ashik and I in the early days, yes.

2    Q.  Okay.  Choi and Oliver Han, did they interview with you

3    before they were hired?

4    A.  I believe that they did, but I don't have a specific

5    memory of it.

6    Q.  Okay.  They were really young -- well, not that you were

7    old.  They, too, were freshly out of college, correct?

8    A.  I don't recall if they were freshly out of college, but

9    they were similar in age to me.

10   Q.  They were bright, correct?

11   A.  I think that's fair.

12   Q.  Eager?

13   A.  Fair.

14   Q.  Energetic?

15   A.  Fair.

16   Q.  At the time that they interviewed with you in late 2014,

17   you knew that Desai was having you engaged in deceptive,

18   dishonest conduct, correct?

19   A.  I did.

20   Q.  And when they -- when they interviewed with you, you told

21   them what a great company it was, right?

22   A.  I probably did.

23   Q.  You didn't give them any hint to stay away from working

24   with Ashik Desai, right?

25   A.  I would not have.

1  Q.  And then in the spring of 2015, another analyst was hired

2  by the name of Joyce Chen, am I right?

3  A.  Correct.

4  Q.  You knew Joyce Chen, correct?

5  A.  I did.

6  Q.  You're the one who caused her to join Outcome Health,

7  right?

8  A.  I did, and I regret it every day.

9  Q.  You caused her to join, correct?

10 A.  I did.

11 Q.  You told her what a great company this is, correct?

12 A.  I did.

13 Q.  And then you leave the company, and Joyce Chen and Oliver

14 Han and Kathryn Choi are still there, correct?

15 A.  Correct.

16 Q.  You get a free pass on getting prosecuted for your

17 criminal conduct, correct?

18 A.  Again, I think as I've answered, I don't know if what I

19 did technically constitutes it, and I think I've testified

20 that I am here speaking under immunity.

21 Q.  Wait, wait, let me see if I -- are you telling me that you

22 are uncertain whether what you did with Ashik Desai at Outcome

23 Health constitutes a crime?

24 A.  Yeah, that's what I'm saying.

25 Q.  Okay.

1    A.  I'm not a lawyer.

2    Q.  But your lawyer did a nice job in getting you immunity

3    from these prosecutors, right?

4    A.  Again, yes, I have immunity.

5    Q.  Right.

6          When these folks promised you that nothing you say

7    will be used against you, you understood that meant against

8    you in a federal criminal prosecution, right?

9    A.  From a potential federal criminal prosecution.

10   Q.  Right.

11   A.  Yes.

12   Q.  And you got a free pass on a potential federal criminal

13   prosecution, correct?

14   A.  On a potential one, correct.

15   Q.  And you bring in Kathryn Choi and Oliver Han, and they end

16   up getting charged, correct?

17   A.  I didn't bring in --

18          MR. JOHNSTON:  Objection, relevance.

19          MR. POULOS:  Well --

20          THE COURT:  Sustained.

21          MR. POULOS:  Judge, I have nothing --

22          THE COURT:  Rephrase.  Rephrase if you want, or you

23   can say you're about to call it a day and move on to another

24   subject tomorrow.

25          MR. POULOS:  We'll call it a day, Judge.

1          THE COURT:  All right.

2          With that, ladies and gentlemen, we're recessed for

3   today.  Please don't discuss the case among yourselves or with

4   anyone else.  Keep an open mind.  There's more evidence to

5   hear.  Thank you very much.

6          COURT SECURITY OFFICER:  All rise.

7      (Jury exits courtroom.)

8          THE COURT:  Okay, you're excused until 9:00, you're

9   on cross-examination, so please don't discuss your testimony

10  with the government.

11         All right.  Anything anybody wants to put on the

12  record?  First the -- you can all have a seat -- government?

13         MR. JOHNSTON:  One thing, Your Honor.  Our scheduler

14  is likely going to have to reach out to Mr. Ma and push back

15  his travel further.

16         THE COURT:  Oh, that's fine.  It's substantive

17  testimony that shouldn't be discussed.

18         MR. JOHNSTON:  Just wanted to clarify.

19         THE COURT:  You can always talk to any witness on

20  cross about the mechanics of coming in, coming out, the

21  schedule, things like that.  It's the substance of testimony

22  that's the bar.

23         MR. JOHNSTON:  Thank you, Your Honor.

24         THE COURT:  Anything else from the defense?

25         MR. POULOS:  Judge, the -- this is an exhibit --

1           THE COURT:  Is this the one we were talking about?

2           MR. POULOS:  Yeah.

3           THE COURT:  Let me look.

4           MR. JOHNSTON:  This wasn't the exact one.

5           MR. POULOS:  Well, this is another one.

6           MR. JOHNSTON:  Another version of it.

7           MR. POULOS:  Do you have an objection to this one?

8           MR. JOHNSTON:  I have an objection to both, yes.

9           THE COURT:  Okay.  Let's put on the record what are

10 the two exhibits you're offering?

11           MR. POULOS:  Judge, I don't need to offer the other

12 one.

13         As to 9041, this is Desai saying we pulled that --

14 Judge, the bottom line is this is Desai giving Steve Svec and

15 Matt Crandall the deck for Victoza.  It says Victoza tablet

16 metrics.

17         And then, Laura, if we could go to the attachment.

18 It's February through June.  And I'll represent, Your Honor,

19 that every number that is in the email that Svec ends up

20 sending to Nancy Gottlieb that's reflected in that document is

21 reflected in here.

22         So this establishes that Ashik Desai provided those

23 numbers to Steve Svec, which he ended up reporting to the

24 client.  This witness is saying I'm not aware of that.  This

25 establishes that that happened.

1    And to that extent, I do believe it's a verbal act.

2    It just shows he's the one who -- who directed it to happen.

3         THE COURT:  All right.  Response?

4         MR. JOHNSTON:  And Mr. Desai will be testifying, and

5    Mr. Poulos can make the point then.

6         The point here is that they're offering the document

7    to suggest an inference that it was Mr. Crandall who got this,

8    this deck, this exact information, and then passed along, and

9    they'll have Mr. Desai who can testify to that one way or the

10   other because he was on both emails.

11        I just don't think it's appropriate to raise in front

12   of this witness.  It's not -- it doesn't go to his state of

13   mind, the defendants didn't receive it.  It just seems

14   irrelevant and something that will be able to be covered with

15   a later witness.

16        MR. POULOS:  Judge, if this was like an issue that's

17   out of left field from the context of his testimony, I would

18   understand that point.  But he's testified about Ashik Desai

19   blaming Matt Crandall.  We saw that in the material.  He's on

20   the email where they get the number.  He said I do believe

21   that Desai was lying.  I don't know how it got there.

22        I don't need to do a lot with respect to putting this

23   on just to establish that fact, and it's an appropriate

24   purpose for that document on that verbal act.

25        MR. JOHNSTON:  Well --

1          THE COURT:  Tell me the Federal Rule of Evidence
2    relating to the verbal act.  Always helps to go to the Federal
3    Rules of Evidence.
4          MR. POULOS:  Judge, I think the verbal act point
5    comes from the idea that somebody giving a direction, that the
6    fact that they said something and did something itself has
7    significance independent of the words that happened.
8          And so this document merely shows, and this is why I
9    don't believe it is offered for the truth of the matter
10   asserted, it's a document that merely shows Desai sending
11   something to Steve Svec.  And then, Judge, I have a chart
12   where I will tie in that document to the other exhibit.  It's
13   just the attached document that ties into the Svec email.
14         THE COURT:  What do you mean you have a chart?
15         MR. POULOS:  Well, I have a demonstrative, Judge.
16         THE COURT:  I see.  I was wondering why you were
17   fighting so hard about this.
18         MR. POULOS:  Judge, the problem is, you know, and the
19   reason I want to do it now, Judge, is that to sit there and
20   tell the jury, okay, that one was at 4.0, the next one was
21   3.9, then 6.7, 144,000, then 3.5 million, then 7.3, just to
22   put each document on the screen isn't -- it's too confusing to
23   this jury.
24         And so, you know, I'd like to introduce this, Your
25   Honor, just point out that he sees it's Desai sending it to

1  Svec.  We've already covered the email with Svec sending it to
2  him, and then we'll do the demonstrative.

3          THE COURT:  I understand the part about Desai sending
4  it to Svec.  It's the attachment that is the problem.  I mean,
5  the verbal act is the transmission of a report, not the
6  content of the report.

7          MR. POULOS:  Well, but we're not -- Judge, we're not
8  offering this -- we're definitely not offering the content of
9  the report to prove that, in fact, that they had 7.7 million.
10 That is the lie.  I mean, it's definitely not offered for the
11 truth.

12         THE COURT:  Right.  All right.  Last word.

13         MR. JOHNSTON:  Again, I think we need Mr. Desai to
14 establish the foundation that this was the document that he
15 intended to give to the salespeople for purposes of the
16 salespeople to share it with the client.  We don't know that
17 yet.

18         MR. POULOS:  Judge --

19         THE COURT:  One at a time.

20         MR. JOHNSTON:  I'm still talking.

21         We have no foundation that this was the intention of
22 this report.  This was what Mr. Desai intended when he
23 forwarded this to Svec and Crandall.  He'll be testifying
24 soon, and then Mr. Poulos can establish that, that necessary
25 link to this document's relevance, and then it will come in.

1        MR. POULOS:  I -- there's no evidentiary rule that

2   should prohibit me from offering this right now, Judge.  It's

3   not for the truth.  It shows the direction given by Desai.  It

4   ties into this.

5        For whatever reason, the government is desperate --

6   if it's coming in, why are they so desperate from presenting

7   it from the first witness who testifies at length about tablet

8   metrics especially about my client?

9        And I will say, too, Judge, this foundation objection

10  is on its face not well-founded, and if the government is

11  going to take -- we haven't lodged that kind of an objection

12  to a single document in this case on foundation.  And if the

13  government's going to take that approach, then this trial is

14  going to grind to a halt because we're going to do the same,

15  Judge.

16       I'm shocked that they would say you have to call

17  Desai to lay a foundation as to this document.

18       MR. JOHNSTON:  It's just not apparent on the face of

19  the email what it's for.

20       MR. POULOS:  Yes, it is.

21       MR. JOHNSTON:  It's not.

22       THE COURT:  Put up the front email again, please.

23       All right.  You can admit this through this -- it can

24  come in through this exhibit -- or through this witness,

25  rather.

1    We've been doing this more than I've seen in any

2  trial, but I've allowed it because the government wanted to

3  put on an exhibit at the start to have it read by a witness

4  who was not on the email.  Defense has done the same.

5    It's a -- under 611 or 6 -- I'll find the rule

6  again -- 611, I'm allowed to supervise the orderly admission

7  of documents in a way that is understandable to the jury and

8  promotes efficiency.

9    If we -- I do agree with Mr. Poulos if we wait and

10  put foundational strictures on documents that obviously are

11  admissible one way or the other, putting them in through a

12  particular witness is an appropriate way to do it.  You're not

13  going to do it again.  You're not going to spend much time

14  with Desai on this if you want to put it in now.

15    MR. POULOS:  Right.

16    THE COURT:  Keep that in mind.

17    MR. POULOS:  Right.

18    THE COURT:  And if the government objects on that

19  ground, that we're going over the same thing you went over

20  with Mr. Ma on this exhibit, I'll sustain the objection.

21    MR. POULOS:  Yeah.

22    THE COURT:  So you can't do it twice or three times,

23  but in order to promote the orderly and efficient and

24  effective presentation of evidence for this jury to understand

25  in a way that does not cloud their understanding because of

1 | the hundreds of documents being thrown at them at a rapid
2 | speed, I'll allow it in.

3 | All right. Anything else from the government on --
4 | that you want put on the record?

5 | MR. APPLEBY-BHATTACHARJEE: Well, Your Honor.

6 | THE COURT: Now we're double teaming, but go ahead.
7 | Go ahead.

8 | MR. APPLEBY-BHATTACHARJEE: With that first victim
9 | witness, we were not allowed to show documents that are
10 | already in evidence to prove a concealment. We were required
11 | to pose questions in terms of hypotheticals assuming facts
12 | that are set forth in documents.

13 | If this procedure is allowed on cross-examination,
14 | there's no reason, if a document is already admitted in
15 | evidence, that we shouldn't be allowed to just publish it with
16 | a victim witness.

17 | MS. CHOU: Your Honor, may I be heard on that issue?
18 | THE COURT: Sure.

19 | MS. CHOU: That was a different situation because
20 | what they were trying to show the victim witness were
21 | documents that were disputed -- or that went to a disputed
22 | issue, which is what did the company actually have in
23 | inventory, what did they actually deliver.

24 | So with respect to Ms. Bautista, one of the animating
25 | concerns for the Court's ruling was that there not be a trial

1 within a trial for this witness in terms of what actually

2 existed at the time at the company for the inventory.

3 I think it has to be a case-by-case decision, and it

4 made sense on that witness on the documents that we were

5 talking about.

6 MR. LOWDER: Your Honor, can I just add one other

7 piece that animated that discussion for Bautista, and I'll

8 make it brief.

9 Also they were trying to show her internal

10 communications of Outcome Health, and I think the rule that we

11 talked about was if they were communications from within her

12 organization, that would be one thing. But trying to show her

13 internal calls from Outcome Health where she never was

14 employed to try to make a point, was one of the other dividing

15 lines that we reached.

16 THE COURT: It did seem like the -- you were allowed

17 to ask the hypothetical, which I thought was effective to tell

18 her if you knew this, what would your reaction be; assume

19 this, what would your reaction be.

20 Showing her a document from Outcome Health which she

21 never had access to before and not an employee of Outcome

22 Health I thought was a clear dividing line, unlike this

23 document, which is an Outcome Health document with people that

24 this witness worked with.

25 So I think that's the distinguishing feature. Now,

1 you're not going to find that in, you know, any Federal Rules

2 of Evidence treatise, nor would I expect you to find it.

3 We're dealing with an unusual case, and that seems like an

4 orderly way to proceed.

5 Now, I'm -- if there's other suggestions on how to do

6 this, I'm happy to hear it, but this seems certainly within

7 the spirit of the earlier ruling, and it doesn't prevent, I

8 don't think, the government and it didn't prevent the

9 government from asking Ms. Bautista questions that related to

10 the materiality of the misrepresentations.

11 Similarly here, showing that this document, which the

12 jury is going to see one way or the other, either now or

13 through Desai, showing that these false numbers actually found

14 their way out to a customer when this witness said probably

15 but I don't know, that's not inappropriate to show him this

16 document with the person he worked side by side with putting

17 it into a deck that was going to go to a customer.

18 I don't see the reason to exclude it at this time.

19 It's certainly admissible.  It's just a question of when it's

20 going to be shown.

21 MR. APPLEBY-BHATTACHARJEE:  And that's the question

22 of when it's going to be shown is really what we're getting to

23 the heart of here because the point that is trying to be made

24 on cross is really to connect two data points that in the

25 orderly course would happen through two different witnesses

1  and then perhaps an interim statement, and the defense is able

2  to do that on cross-exam using documents that involve two

3  different witnesses, whereas we are required to essentially

4  save the point for an interim statement when the document is

5  already in evidence.

6          THE COURT:  I'm not following.  If you're unhappy

7  about the use of this document on cross, you can ask similar

8  questions about it on redirect if you'd like.

9          It sounds like you'd prefer to defer this until

10 Desai.  That seems to be the objection of Mr. Johnston.

11         MR. APPLEBY-BHATTACHARJEE:  That was the original

12 scope of the objection is just this document and publishing it

13 and asking questions about it is something -- we agree, it's

14 going to happen, but it should happen through Desai.  He's the

15 one who sent it, and he's the one who can speak to it

16 beyond -- and we could put the document back up.  I did not

17 see a verbal act in Desai's email.

18         THE COURT:  Well, let's put it up.

19         Do you remember the number?

20         MR. APPLEBY-BHATTACHARJEE:  Do you have the number of

21 the document?

22         THE COURT:  Yeah, we're asking to put it back up.

23         All right.  Here we go.

24         Is this the only page other than the PowerPoint?

25         All right.  That's actually a fair point.  What is

1  the verbal act?  I thought the verbal act was we're

2  transmitting it.  The document's being transmitted to a

3  customer.

4          MR. POULOS:  Judge, we --

5          THE COURT:  Where is the -- go ahead.

6          MR. HUESTON:  Sorry.  It says:  "See the attached."

7  That's the verbal instruction.

8          MR. POULOS:  Well --

9          THE COURT:  Well, that's --

10         MR. JOHNSTON:  That would be relevant.

11         MR. POULOS:  Judge, if we go to 9001, it will

12 explain.

13         DEFENDANT PURDY:  9011.

14         MR. POULOS:  9011.

15         THE COURT:  All right.

16         MR. POULOS:  This is the same day, Judge.

17         THE COURT:  Blow it up, please.

18         MR. POULOS:  Can you blow up the top half, Laura?

19         THE COURT:  All right.  Who is Nancy and who is Jeff

20 Fayer?

21         MR. POULOS:  Nancy is Nancy Gottlieb, the client,

22 Your Honor, and the other exhibit where Steve Svec transmits

23 the data via email is the client.  So Nancy here is -- so

24 Steve Svec does exactly what Desai says here, shared the data

25 with Nancy, and that's what he's directing happen here to his

1  underling, Steve Svec and Matt Crandall.  That's exactly what
2  Steve Svec does.  That's what ties here.

3      Your Honor, what he ended up doing was saying wait a
4  second, so -- we do intend -- we would like -- Judge, it is
5  our hope to introduce both of these exhibits.  Here's Desai
6  saying, hey, here's a new deck.  That number, Judge, is 3.35
7  million on the big number.  And then he says -- and what
8  happens, Judge, is -- so 9011 is send this.  9041 you'll see,
9  he says:  "We pulled that one.  Additional stat is requested,
10  changed color schemes, removed a few items and made a layout
11  change and gender cleaner."

12      Now, Judge, what happened is in that transmission at
13  10:51 he attached the original deck that Ma said was in the
14  right ballpark, and so a couple minutes later or a minute
15  later really later, he realized, oh, sorry, wrong deck, please
16  see this attached.

17      THE COURT:  All right.

18      MR. POULOS:  So the bottom line is Desai, in 9011
19  says send this, and then in 9041 says nope, we made changes,
20  send this one.

21      THE COURT:  All right.  It's clearer with both emails
22  put side by side.  The first one wasn't going to be offered
23  but apparently is now.

24      It is direction of nonverbal of -- I'm going back to
25  the definitions of hearsay and it's -- first, it's not being

1  offered for the truth because these numbers are all false, so

2  it's not being offered for that purpose, and I believe it is a

3  form of direction to some form of verbal act, which is not

4  under the -- under 801 is not hearsay by itself.

5  Now, it contains all kinds of detail which could be

6  considered hearsay, but it's not being offered for its truth,

7  that is clear, and I'll allow it in through this witness.

8  MR. POULOS:  Thank you.

9  THE COURT:  But it is -- I think the government's

10  point is a good one that we're not -- actually, both sides

11  made this point -- we're not going to allow documents to be

12  shown to a witness from an organization they don't belong to,

13  as I prohibited with Ms. Bautista, and if you're getting it in

14  through this witness and ask questions about this, your

15  questions on Desai will be limited, extremely limited, because

16  we're not going to do things twice.

17  MR. POULOS:  Yeah, that's -- of course, Your Honor,

18  assuming the government isn't going to go back over it with

19  Desai, but obviously if he does that --

20  THE COURT:  They're free to do that, but you're the

21  one offering it in cross-examination.  You don't cross the two

22  witnesses on the same document again unless there's an

23  independent point you're making.

24  MR. POULOS:  Yeah, absolutely, Judge.

25  THE COURT:  All right.  Anything else from the

1 government?

2 MR. JOHNSTON: Yes, Your Honor. I don't know if

3 you've had time to look at 955 to 958.

4 THE COURT: Those are the business records?

5 MR. JOHNSTON: No, those are the texts that I passed

6 up to you at lunch.

7 THE COURT: Oh, yeah. I think the main objection on

8 these was that they were, in effect, infecting the witness's

9 knowledge of the case with information he didn't know.

10 If you want to publish them through him once you

11 redact the part about the personal relationship between the

12 defendants, you can put it in in redirect.

13 MR. JOHNSTON: So that --

14 THE COURT: They're undoubtedly admissible. They're

15 admissions of defendants, and you can put them in through and

16 read them in on redirect examination, redacting the part about

17 the personal relation.

18 MR. JOHNSTON: And there was one, I guess, one part

19 where they -- I mean, it's a pretty vague allusion. They

20 don't even say -- they don't even talk about dating or

21 romance, they just -- it's sort of a vague allusion to it, but

22 if that is what the Court believes is appropriate, we will

23 redact that one part.

24 THE COURT: Let me see it again on the -- by the way,

25 who is Derek.

1    MR. JOHNSTON:  The actual other co-founder of the
2   company.
3            THE COURT:  What's his name?
4            MR. JOHNSTON:  Derek Moeller, and he was -- it's
5   apparent in that email exchange Rolfe Winkler, in writing his
6   article about the capital raise, reached out to Derek Moeller
7   and --
8            THE COURT:  All right.  Where was the one about the
9   relationship, which number?
10           MR. JOHNSTON:  It's Exhibit 957, page 3, and
11  Ms. Agarwal writes:  "I think Derek told him about a personal
12  relationship," and then Mr. Shah said, "Yeah, I figured."  If
13  that's a line that you believe should be redacted, we can
14  redact that.
15           THE COURT:  Yeah, I granted the motion in limine.
16  This starts us down a path of more discussion about that, I
17  suppose.  It's pretty vague, but you should redact it.
18           MR. HUESTON:  Your Honor, I have an objection to 958.
19  This is the one that began coming up earlier.  "How does it
20  feel to wake up as a billionaire wizard?"  "Laugh out loud.
21  Drug wizard."
22           THE COURT:  Yeah.
23           MR. HUESTON:  Your Honor, there's nothing relevant
24  here at all, and it's all sorts of prejudicial.  I mean,
25  what's that, a Scarface or opioid king reference?

1      THE COURT:  It's their words.

2      MR. HUESTON:  It can be their words.  It doesn't mean

3  that that should come into this trial as something where the

4  401-403 balance test still applies even to their own words.

5      THE COURT:  Sure, it does, but -- well, go ahead from

6  the government, respond.

7      I cut you off.  Let me let you finish your argument.

8      MR. HUESTON:  Well, first I'd like to hear what is

9  the relevance of this?  Then maybe I can further respond as to

10  why is it that drug wizard would come in?

11      I can't imagine, given that -- this vague, two-word

12  answer which is freighted, especially now years here in 2023

13  with the opioid crisis and everything else, with all sorts of

14  awful negative implications.  This is clearly horribly

15  prejudicial with -- I can't imagine what this is asserting.

16  It's not in contest that there was a path to 2 billion and

17  Mr. Shah the testimony has come out, it's undisputed, was

18  trying to make this into a multi-billion-dollar company.

19      I wouldn't even object to the -- if it's the, gee,

20  they are talking intimately to the first part and the laugh

21  out loud.  But to put in that extra thing, drug wizard, is

22  something that is not right and not fair and wholly

23  prejudicial at this trial.

24      THE COURT:  Response?

25      MR. JOHNSTON:  Your Honor, we can respond.

1  Obviously, this is contemporaneous evidence out of the

2  defendant's own mouth of his motive and intent.  He can call

3  it a flip statement if he wants.  That is fine.  But that is

4  different, that doesn't affect the 401 and 403 analysis.

5          THE COURT:  Where is the relevance of it though?

6          MR. JOHNSTON:  So the relevance is this is literally

7  the morning that the capital raise is being announced, saying

8  this company is worth $5.6 billion, and Mr. Shah is an

9  80 percent owner valued now at $3.6 billion himself.

10          THE COURT:  Fair enough.

11          MR. JOHNSTON:  And so --

12          THE COURT:  Let me finish.  Fair enough.

13          And that certainly is the -- Ms. Agarwal's statement,

14  "How does it feel to wake up as a billionaire wizard," "LOL"

15  is the response.  But how is the actual response by Mr. Shah,

16  drug wizard, how does that further the point that you're

17  making, which is a legitimate one?

18          MR. JOHNSTON:  Their business is selling

19  pharmaceutical drugs.

20          THE COURT:  I know --

21          MR. JOHNSTON:  That is the reference.

22          THE COURT:  Hang on, let's be clear.  If he said

23  pharmaceutical wizards, we wouldn't be having this discussion.

24          Drug wizard in the context -- I don't see how this

25  gets any worse for the defendants -- well, break.  I don't see

1  the relevance gets any better for you than everything up to
2  the word drug wizard, and you can even say redacted wizard,
3  but the word drug wizard --

4          MR. HUESTON:  That's it.

5          THE COURT:  -- carries with it connotations in
6  today's society that are -- that connote illegal drugs.
7  That's how I'd read it if I were a juror, and I'm reading it
8  as a judge.  I know better, of course, and I think had he
9  thought about it, he wouldn't have done this text in the first
10 place, but what he meant is pharmaceutical wizard,
11 pharmaceutical drug wizard.  If the word "pharmaceutical" was
12 put in front of it, that would be fine.

13         MR. HUESTON:  That's right.

14         THE COURT:  But we're not -- hang on.

15         We're not going to add words to this.  I'm not going
16 to add the word pharmaceutical drug wizard in front of it.  So
17 you can take out and put redacted wizard or just put out the
18 line itself.

19         MR. JOHNSTON:  We will just redact the word "drug" if
20 that is what the defendants would prefer, and it will be
21 redacted wizard.

22         THE COURT:  Well, that's the ruling, too.  But the
23 rest of it comes in, you can do it on redirect, and removing
24 the personal relationship line in 957.

25         Okay.  Anything else from the government?

1          MR. JOHNSTON:  No, Your Honor.

2          MR. APPLEBY-BHATTACHARJEE:  Not on the record, Your

3   Honor.  There is a scheduling issue.

4          THE COURT:  We'll get to that in a minute.

5          MS. BELL:  Sorry, Your Honor.

6          THE COURT:  I think we have a few more on the record,

7   and Kathy's past her time here, so --

8          MR. HUESTON:  Not for us, Your Honor.

9          THE COURT:  None?

10         All right.  Go ahead.

11         MS. BELL:  Your Honor, I think we have some

12  additional relevance objections, for example, to the prior

13  evidence, so perhaps the government could walk through and

14  explain the relevance --

15         THE COURT:  All right.  Let me stop.  We're not

16  getting to redirect on this fellow, Ma, I expect until at the

17  earliest lunch, and that may be optimistic.  Am I correct?

18         MR. LOWDER:  I'm assuming that's probably right.

19         THE COURT:  All right.  Because he had something to

20  Shah and Agarwal, not just Purdy.  We'll take it up tomorrow

21  morning at 8:45.

22         Anything else beyond this that we need to put on the

23  record?

24         MS. BELL:  No, Your Honor.

25         THE COURT:  This being the last set of exhibits the

1    government wants to read in?

2            And from Defendant Purdy?

3            MR. POULOS:  No, Your Honor.

4            THE COURT:  Okay.  Off the record.

5        (Discussion held off the record.)

6        (Court adjourned, to reconvene at 8:45 a.m. on 2/14/23.)

7                         CERTIFICATE

8        I certify that the foregoing is a correct transcript from

9    the record of proceedings in the above-entitled matter.

10   */s/ Elia E. Carrión*              *14th day of February, 2023*

11   *Elia E. Carrión*                        *Date*
     *Official Court Reporter*

12

13   */s/ Sandra M. Tennis*             *14th day of February, 2023*

14   *Sandra M. Tennis*                        *Date*
     *Official Court Reporter*

15

16   */s/ Kathleen M. Fennell*          *14th day of February, 2023*

17   *Kathleen M. Fennell*                     *Date*
     *Official Court Reporter*

18

19

20

21

22

23

24

25