10253

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )    Docket No. 19 CR 864
                Plaintiff,          )
                                    )    Chicago, Illinois
     v.                             )    April 5, 2023
                                    )    8:33 a.m.
RISHI SHAH, SHRADHA AGARWAL,        )
and BRAD PURDY,                     )
                                    )
                Defendants.         )

          TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 39A
        BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury

APPEARANCES:


For the Government:    MR. MATTHEW F. MADDEN
                       MR. SAURISH APPLEBY-BHATTACHARJEE
                       Assistant U.S. Attorneys
                       219 South Dearborn Street, 5th Floor
                       Chicago, Illinois  60604


                       MR. WILLIAM E. JOHNSTON
                       MR. KYLE C. HANKEY
                       U.S. Department of Justice
                       Criminal Division, Fraud Section
                       1400 New York Avenue NW
                       Washington, D.C.  20530




                       ELIA E. CARRIÓN
                     Official Court Reporter
                  United States District Court
               219 South Dearborn Street, Room 1432
                     Chicago, Illinois 60604
                         (312) 408-7782
                  Elia_Carrion@ilnd.uscourts.gov

10254

1  APPEARANCES (Continued:)

2

3  For Defendant
   Shah:                      MR. JOHN C. HUESTON
                              Hueston Hennigan LLP
4                             620 Newport Center Drive, Suite 1300
                              Newport Beach, California  92660
5
                              MS. VICKI CHOU
6                             MR. MICHAEL H. TODISCO
                              MS. KAREN DING
7                             Hueston Hennigan LLP
                              523 West 6th Street, Suite 400
8                             Los Angeles, California  90014

9
   For Defendant
10 Agarwal:                   MS. KOREN L. BELL
                              MR. A. ALEXANDER LOWDER
11                            MR. STEPHEN G. LARSON
                              Larson LLP
12                            555 South Flower Street, Suite 4400
                              Los Angeles, California  90071
13
                              MR. PATRICK W. BLEGEN
14                            MS. KELSEY H. KILLION
                              Blegen & Garvey
15                            53 West Jackson Boulevard, Suite 1437
                              Chicago, Illinois  60604
16

17 For Defendant
   Purdy:                     MR. THEODORE T. POULOS
18                            MR. ERIC PRUITT
                              MR. JOHN PAVLETIC
19                            Cotsirilos, Tighe, Streicker, Poulos &
                              Campbell, Ltd.
20                            33 North Dearborn Street, Suite 600
                              Chicago, Illinois  60602
21

22

23

24

25

1          (Proceedings heard in open court; jury out.)

2           THE COURT:  Okay.  There was a request by the

3 government last night to add an instruction to the group of

4 instructions already given to the jury.  Adding what is

5 essentially a statute of limitations instruction.

6           The government's request for an instruction is

7 denied.  At the outset, I think -- I don't believe the

8 defendants' arguments were improper.  And my review of the

9 excerpts provided by the government viewed in context were not

10 misleading or confusing about the charges at issue.

11           The government has rebuttal argument to clear up any

12 perceived misstatements by the defense.  The government can

13 argue from the indictment.  It can explain what is charged and

14 what it must prove.

15           In any case, an instruction regarding the statute of

16 limitations I don't think would cure what the government

17 perceives to be misstatements.  And, finally, I'm not at all

18 comfortable changing jury instructions at this point in the

19 case after defense has completed their closings.

20           If the government thought the arguments were

21 improper, they could have made a contemporaneous objection.

22 They could've objected even before Mr. Poulos began his

23 arguments.  But at this stage with all defense arguments over,

24 for that reason, and all the other reasons I just gave, the

25 request for such an instruction will be denied.

1        Mr. Madden, you're free to clear up what you think
2   may have been misstatements about what your scheme alleged and
3   what you need to prove for particular mailings or wirings
4   within that scheme period.

5        Mr. Lowder, you made the point yesterday -- or
6   Ms. Chou, you made -- I think it was Ms. Chou made the point
7   that I told the jury that -- keep an open mind; there's more
8   evidence to hear.  Obviously, there's no more evidence to
9   hear.  But there are arguments to hear.  So I'll correct that
10  for them this morning.

11        All right.  Let's -- while we're waiting for the
12  jury, let's deal with this waiver of the forfeiture.

13        All right.  Mr. Appleby-Bhattacharjee, why don't you
14  explain what the forfeiture allegations are so each defendant
15  knows what it is they're going to be waiving by way of a jury
16  trial.

17        MR. APPLEBY-BHATTACHARJEE:  Certainly.

18        Your Honor, the indictment returned by the grand jury
19  included allegations that certain specified property, which is
20  enumerated in the indictment, is subject to forfeiture on the
21  ground that it is alleged to have been the proceeds of the
22  offenses charged in the indictment against the defendants
23  here.

24        Mail fraud, wire fraud, and bank fraud as to all
25  three.  And then false statements to a bank as to Defendant

1 │ Purdy.  The specific property is alleged in the indictment.

2 │ The defendants have a constitutional right to demand that this

3 │ jury find that the alleged property in the indictment is, in

4 │ the case of a conviction, traceable to the -- as proceeds of

5 │ the various offenses alleged in the indictment.

6 │ And by signing these waivers and making a waiver in

7 │ court, the defendants will be knowingly waiving their right to

8 │ a jury trial on the limited question of forfeiture.  And those

9 │ questions will be resolved by Judge Durkin.

10 │ THE COURT:  All right.  I'll deal with each defendant

11 │ individually.

12 │ First, Defendant Shah.  You've received a copy of the

13 │ indictment.  Are you familiar with the allegations set forth

14 │ in the forfeiture portion of the indictment?

15 │ DEFENDANT SHAH:  Yes, I am, Your Honor.

16 │ THE COURT:  Okay.  I'm going to have some -- ask you

17 │ some questions.  Have you taken any drugs -- and by the way,

18 │ for all three defendants, you're still under oath.  I put you

19 │ under oath before when you waived your right to testify.  That

20 │ oath still applies now.

21 │ Have you taken any drugs, medicine, or pills or drunk

22 │ any alcoholic beverage in the last 24 hours?

23 │ DEFENDANT SHAH:  No, Your Honor.

24 │ THE COURT:  Do you understand you're entitled to a

25 │ trial by jury on the forfeiture allegations in this case?

1           DEFENDANT SHAH:  Yes, Your Honor.

2           THE COURT:  Do you understand that a jury trial means

3    you'd be tried by a jury consisting of the 12 people that will

4    decide the -- the question of guilt or innocence in this case

5    and -- and that all jurors, should they find you guilty, would

6    then be -- you have the right to have that group of jurors

7    decide the issue of forfeiture whether or not the government

8    can seize money that they've alleged were proceeds of illegal

9    conduct?

10           Do you understand that?

11           DEFENDANT SHAH:  Yes, I do, Your Honor.

12           THE COURT:  Okay.  And you also understand that by

13   waiving that right to have that jury decide the issue of

14   forfeiture, the issue will be decided by me?  Do you

15   understand that?

16           DEFENDANT SHAH:  Yes, I do, Your Honor.

17           THE COURT:  The burden of proof will be the same.

18   The Rules of Evidence will be the same.  But I'll be deciding

19   it rather than the jurors that decided this case.

20           Do you understand that?

21           DEFENDANT SHAH:  Yes, I do, Your Honor.

22           THE COURT:  Have you discussed with your attorney

23   your right to a jury trial on the forfeiture allegations?

24           DEFENDANT SHAH:  Yes, I have, Your Honor.

25           THE COURT:  All right.  And do you want to discuss

1  that issue any further with your attorney?

2       DEFENDANT SHAH:  No, I don't need to, Your Honor.

3       THE COURT:  Ms. Chou, have you discussed with the

4  defendant the advantages and disadvantages of a jury trial on

5  the forfeiture case?

6       MS. CHOU:  I have, Your Honor.

7       THE COURT:  Do you have any doubt that the defendant

8  is making a knowing and voluntary waiver of the right to a

9  jury trial?

10      MS. CHOU:  I have no doubts about that, Your Honor.

11      THE COURT:  All right.  And do you believe your

12  client is competent to waive a jury trial in the forfeiture

13  allegations?

14      MS. CHOU:  Yes, Your Honor.

15      THE COURT:  All right.  I have a written waiver of

16  forfeiture determination.  It has a number of the same types

17  of warnings I've just given.

18      Does -- Mr. Shah, do you have any questions of me

19  before I ask you if you're waiving your right to a jury trial?

20      DEFENDANT SHAH:  No, I do not, Your Honor.

21      THE COURT:  And are you, in fact, waiving your right

22  to a jury trial on the forfeiture allegations should they

23  become necessary to be decided?

24      DEFENDANT SHAH:  Yes, I am.

25      THE COURT:  All right.  I find that the defendant has

1  knowingly waived his right to have the forfeiture allegations
2  determined by a jury, and I'll execute the waiver.
3         Okay.  Any additional questions the government wishes
4  me to ask on this subject?
5         MR. APPLEBY-BHATTACHARJEE:  No, Your Honor.
6         THE COURT:  Okay.  All right.  And do you have the
7  other waivers?
8         MR. APPLEBY-BHATTACHARJEE:  I do.
9         THE COURT:  Why don't you bring them over here.
10 Thank you.
11        Okay.  Ms. Agarwal.
12        DEFENDANT AGARWAL:  Good morning, Your Honor.
13        THE COURT:  Good morning.
14        Have you taken any drugs, medicine, or pills or drunk
15 any alcoholic beverages within the last 24 hours?
16        DEFENDANT AGARWAL:  No, Your Honor.
17        THE COURT:  All right.  Do you understand -- and have
18 you read a copy of the indictment and the forfeiture
19 allegations made against you?
20        DEFENDANT AGARWAL:  Yes, Your Honor.
21        THE COURT:  All right.  And do you understand that
22 you're entitled to a trial by jury on those forfeiture
23 allegations?
24        DEFENDANT AGARWAL:  Yes, Your Honor.
25        THE COURT:  And do you understand that the jury would

1   have to agree unanimously before a forfeiture finding could be

2   made against you?

3           DEFENDANT AGARWAL:  Yes, Your Honor.

4           THE COURT:  All right.  And do you understand that if

5   I decide it instead of the jury, I'd be guided by the same

6   rules that a jury would, same Rules of Evidence, same burden

7   of proof?

8           Do you understand that?

9           DEFENDANT AGARWAL:  Yes, Your Honor.

10          THE COURT:  All right.  Have you discussed your right

11  to a trial by jury on the forfeiture allegations with your

12  attorneys?

13          DEFENDANT AGARWAL:  I have, Your Honor.

14          THE COURT:  And I'll ask Ms. Bell:  Have you

15  discussed with the defendant the -- the issue of whether or

16  not a jury should decide this or the Court should decide it?

17          MS. BELL:  Yes, Your Honor.

18          THE COURT:  All right.  And do you have any doubt

19  that the defendant is making a knowing -- knowing and

20  voluntary waiver of the right to a jury trial?

21          MS. BELL:  I do not.

22          THE COURT:  All right.  And has there -- any reason

23  you believe your client is not competent to waive such a

24  trial?

25          MS. BELL:  No, Your Honor.

1    THE COURT:  All right.  Do you have any questions of

2  me, Ms. Agarwal, before I ask you?

3    DEFENDANT AGARWAL:  No.  Thank you, Your Honor.

4    THE COURT:  All right.  Do you wish to waive your

5  right to a jury trial on the forfeiture allegations, should it

6  become necessary?

7    DEFENDANT AGARWAL:  Yes, Your Honor.

8    THE COURT:  All right.  I have a written waiver, and

9  I believe the defendant's waiver of a right to a jury trial in

10  the forfeiture allegations is knowing and voluntary, so I'll

11  execute the waiver.

12    All right.  Mr. Purdy, have you received a copy of

13  the indictment which includes the forfeiture allegations?

14    DEFENDANT PURDY:  Yes, Your Honor.

15    THE COURT:  All right.  And have you taken any drugs,

16  medicine, or pills or drunk any alcoholic beverages within the

17  last 24 hours?

18    DEFENDANT PURDY:  I had two drinks with Mr. Poulos

19  last night.

20    THE COURT:  Okay.  And I take it you're -- you're

21  fully competent at this time to answer my questions and decide

22  whether or not to waive a jury trial in the forfeiture?

23    DEFENDANT PURDY:  Yes, Your Honor.

24    THE COURT:  Is that correct?

25    DEFENDANT PURDY:  Yes, Your Honor.

10263

1          THE COURT:  Okay.  You understand you're entitled to
2    have a jury decide the issue of forfeiture should there be a
3    finding of guilt?
4          Do you understand that?
5          DEFENDANT PURDY:  Yes, Your Honor.
6          THE COURT:  And you understand I could decide that if
7    you waive your right to a jury, and I'd be guided by the same
8    Rules of Evidence and the same burdens of proof that would be
9    attendant to a jury trial on the forfeiture allegations?
10          DEFENDANT PURDY:  Yes, Your Honor.
11          THE COURT:  All right.  Have you discussed with your
12    attorney this issue?
13          DEFENDANT PURDY:  Yes, Your Honor.
14          THE COURT:  All right.  Mr. Poulos, have you
15    discussed with your client the issue of whether or not to
16    waive a jury trial as to forfeiture allegations?
17          MR. POULOS:  Yes.
18          THE COURT:  Do you have any doubt as to your
19    defendant's -- that your defendant is making a knowing and
20    voluntary waiver of his right to a jury trial?
21          MR. POULOS:  I have no doubt about that at all.
22          THE COURT:  All right.  And, Mr. Purdy, I'm ask
23    you -- I'll ask you then:  Do you wish to waive your right to
24    a jury trial on the forfeiture allegations should that become
25    necessary?

1     DEFENDANT PURDY:  Yes, Your Honor.

2           THE COURT:  All right.  I have a written waiver where

3   the same admonitions have been set forth, signed by Mr. Purdy,

4   his attorney, and by the U.S. attorneys, and I will execute

5   and sign that waiver.

6           So all three defendants have waived their right to a

7   jury trial if there is a finding of guilt and we go to a

8   forfeiture proceeding.  That proceeding will not take place

9   immediately.  We'll schedule that -- if necessary, we'll

10   schedule that at a future date and determine how to proceed on

11   it.

12           Okay.  Anything else the government wishes me to

13   inquire about or state on this issue?

14           MR. APPLEBY-BHATTACHARJEE:  No, Your Honor.

15           THE COURT:  Anything else from any of the defendants?

16           MS. CHOU:  No, Your Honor.

17           MR. LOWDER:  No, Your Honor.

18           MR. POULOS:  No, Your Honor.

19           THE COURT:  Okay.  I'll give this back to the

20   government.  I think this probably needs -- if you could

21   either give it -- you can go off the record.

22       (Off-the-record discussion.)

23           THE COURT:  Okay.  We had an off-the-record

24   discussion to confirm the jurors who are on the case.  And

25   those are Jurors 1, 6, 15, 17, 24, 37, 41, 43, 47, 56, 57, and

1    68.  Those are our 12 jurors.

2          The alternates in the order in which they will be

3    called, if they have to take the place of one of the jurors,

4    are Jurors 72, 75, 86, 89, 98, 113, 123, and that's it.

5          Government agree?

6          MR. HANKEY:  Yes, Your Honor.

7          THE COURT:  Defense agree?

8          MS. CHOU:  Yes, Your Honor.

9          MR. LOWDER:  Yes, Your Honor.

10         MR. POULOS:  Yes, Your Honor.

11         THE COURT:  Okay.  Off the record again.

12      (Off-the-record discussion.)

13      (Jury in at 9:02 a.m.)

14         THE COURT:  All right.  Good morning.  I -- welcome

15   back.  Sorry for the late start.  I was stuck on the same

16   Metra train I think one of the jurors was.  So I just got here

17   not long ago myself.  So I appreciate everyone being patient

18   with us that rely on public transportation that was not

19   working great today.

20         When you left yesterday, I said to keep an open mind

21   because there's more evidence to hear.  Of course, there's no

22   more evidence to hear.  What I meant to say is:  Keep an open

23   mind; there's more arguments to hear.

24         What you're going to hear is the rebuttal argument by

25   the government.  As I told you yesterday, they are allowed one

1    extra argument, because they have the burden of proof.  I

2    expect it will take this morning, possibly longer.  But the --

3    that argument will take place now.

4              Mr. Madden, is the computer working correctly?

5              MR. MADDEN:  It is, Your Honor.  Thank you.

6              THE COURT:  Okay.

7              MR. POULOS:  May I have one moment before?

8              THE COURT:  Go ahead.

9          (Counsel conferring.)

10             THE COURT:  Okay.  Mr. Madden, you may proceed.

11             MR. MADDEN:  Thank you, Your Honor.

12             REBUTTAL ARGUMENT ON BEHALF OF THE GOVERNMENT

13             MR. MADDEN:  You just heard 20 hours of running away

14   from titles.  20 hours of running away from responsibilities.

15   20 hours of blaming others.  20 hours of defense closings.

16   Yet, not one minute acknowledging responsibility, not one

17   minute of acknowledging wrongdoing or taking ownership.

18             About those defense closings, I love a great novel.

19   If any of you on the jury appreciate fiction, there was a lot

20   to like in those defense closings.

21             You learned about a place called Fraud Island, which

22   was supposedly first inhabited by a 20-year-old criminal

23   mastermind.  The story line was that the 20-year-old criminal

24   mastermind betrayed his office bosses by telling them a bunch

25   of lies that made his bosses enormously rich.

1        Now, in real life, victims are the people who lose
2    money.  But with fiction, you need to suspend your disbelief.
3    So as the defense yarn goes, the victims here, they got super
4    rich.

5        Another part of the plot is that the chief operating
6    officer knew nothing about the operations of the company.  He
7    was also the chief financial officer.  And predictably, he
8    knew nothing about the finances of the company.  Let's
9    consider whether the defense fiction that these three
10   defendants were babes in the woods who were betrayed and
11   tricked by Ashik Desai for years makes any sense at all.

12       I know things can get muddled after, literally, I
13   think it was 20-plus hours of defense arguments by extremely
14   skilled, talented defense attorneys.  So I want to remind you
15   about some of the key facts for each of these three
16   defendants.

17       First, and this is -- this is the Voxer that is -- I
18   know the people here can see it, but hard for you to see in
19   the back.  This is the Voxer from the CEO, Rishi Shah, to
20   Brad Purdy.  It's a very telling Voxer that Shah sent to Purdy
21   right in the aftermath of that fateful meeting with
22   Sameer Kazi.

23       Kazi had talked about to Shah -- right? -- about the
24   false affidavits, the ROI, and the revenue forecasts being
25   off.  But maybe the most telling part of this is what I've

1    underlined in red on the screen.

2         Shah said, after talking about those three issues,

3    these are -- if you talk to people who were at Google and

4    Facebook from, you know, $100 million to a billion in revenue,

5    they will tell you that these are very normal things.  He goes

6    on to say, "Google data was false and crazy in the early

7    years."

8         Now, I have no idea if that's true about Google or

9    Facebook.  But the key here is what it tells you about Shah's

10   state of mind.  This is a remarkable window into Shah's state

11   of mind, because so often, the defendants and Ashik Desai,

12   they talked around the unethical issues at Outcome.  They

13   cloaked them in corporate doublespeak.  But this is a moment

14   of candor for Shah when you've got the CEO of the company

15   admitting that he thinks it's okay for companies to rely on

16   false data to grow revenue.

17        That is very telling, especially in the aftermath of

18   his conversation with Sameer Kazi, which, of course, was

19   Sameer Kazi's last day at -- at Outcome Health.

20        Shah's attorney -- I know it's been a little bit of

21   time since he was up here, but he kept saying what's important

22   is what's in Rishi Shah's mind.  Look no further than this

23   comment that's right in front of you.

24        It's okay for companies to use fake data to grow

25   revenue.  That really captures Shah's mindset at the time.

1  Notably, this is before they got any of that money from the
2  investors.  January 25th, the money did not start rolling in
3  until March of that year.
4           The CEO also had a thing for attacking and
5  marginalizing whistleblowers.  You've seen this email before.
6  Sahir Raoof, who made the complaint about fraud, willful
7  misrepresentation of -- of inventory.  And this is what he
8  gets from the CEO of the company to Shradha and Ashik.
9           Of course, Shah also lied to Outcome's 500-plus
10 employees at the town hall about his knowledge of this very
11 fraud on the day the *Wall Street Journal* article came out.  He
12 didn't want to publicly admit the truth, which was that Shah
13 actually knew about the manipulation of the IMS reports before
14 Outcome got a single dollar from the investors.
15          Because it's okay for early-stage companies to rely
16 on false data and manipulation of numbers.  They can clean up
17 the messy kitchen later, right?
18          Even though it's clear as day that in this clip right
19 here, Shah lied to the entire company, he -- his -- the Shah
20 team wants you to think that he didn't.  His attorneys said,
21 trying to explain this lie away, this was part of his,
22 quote/unquote, "unprepared remarks."
23          The fact that his response to that question was
24 unprepared makes it even more telling.  It's what's going on
25 in his head.  And what's going on in his head, he's spinning a

1    flat-out lie in real time.

2           Now, that's a stubborn fact.  The CEO of the company

3    lied to 500-plus employees about his knowledge of the fraud.

4    And to think that he and Agarwal told Deloitte that the two of

5    them set a good tone at the top.

6           Shah's team's other explanation is that -- see, I

7    added this language here underlined on the screen -- is that

8    after he lied to this very direct question, he later referred

9    back to the specific charge from BI, Boehringer Ingelheim.

10          So he's asked a direct question about his knowledge

11   of the fraud, and he lies in response.  He then tries to

12   backtrack by acting like the question was something other than

13   what it was.  That shows intent.  He sounds like a politician

14   to me and not the good kind.  The BI excuse is BS.

15          Shah's prepared remarks were no better.  Do you

16   remember -- might remember Shah's counsel played this part

17   for -- this part for you in closing.  "It's critical to me

18   that we win the right way.  I just don't have any tolerance

19   for the kind of behavior that's been described in the

20   article."

21          Shah is acting.  That was pure BS.  Where was that

22   lack of tolerance for unethical behavior when Kazi went to

23   talk to him that day?  Where was it when Bridget O'Donnell

24   went there, turned her computer around to him, and he wouldn't

25   even look at it?

1    Outcome had been winning the wrong way since at least
2  2013.  There's also this crucial Voxer to -- to consider.  The
3  defense attorneys put it up there for you numerous times, so
4  did my colleague.  These are the Christmas Voxers in 2016.

5    Again, before they got a single dollar of that money
6  from the investors, before those fraud inquiry meetings where
7  the defendants so blatantly lied to their auditor.

8    Remember the defense claimed that Ashik Desai was a
9  lone wolf.  He concealed everything from them, right?  Well,
10  here is the lone wolf, one of many examples that shows that
11  that characterization of him is not true, very explicitly
12  telling them about how the monthly affidavits, how the -- how
13  they're sending false monthly affidavit to clients, right?

14    And then he says -- he refers -- and what I've
15  underlined here is if we start changing the affidavit process,
16  that calls into questions, what happens with campaigns that
17  are behind relative to the contracts?  Those are the deltas.
18  And then what does that do if we start telling the truth on
19  the affidavits for revenue risk, number one, and, number two,
20  account risk?

21    I'll start with that second part.  Account risk is
22  he's concerned they're going to lose clients.  If they start
23  telling the truth on the affidavits, the clients are going to
24  see massive under-deliveries -- right? -- and they're going to
25  not want to do business.

1        Think about what happened with Pfizer in 2017.  They

2    disclosed an under-delivery to Pfizer.  That was Courtney --

3    Courtney Cruz was the Pfizer representative.  Pfizer

4    immediately paused all of its campaigns and demanded a refund.

5    They didn't want to do business with crooks.

6        That's what Ashik was talking about.  He knew what

7    would happen with Pfizer, and he's talking about that with --

8    with Rishi and Brad.

9        The second part is the revenue risk perspective.

10   He's saying, if we tell the truth on these affidavits, we're

11   going to lose a ton of revenue.  Again, just like what

12   happened with Pfizer, clients will demand refunds.

13       So Pfizer demanded refunds and got refunds for 2017

14   and then historically, back to 2016.  It affects their prior

15   revenue too.  They hadn't actually earned that, because they

16   were overbilling and accepting too much money from their

17   clients.

18       So this is the lone wolf, as they have characterized

19   him, telling them in great deal, a ten-minute Voxer about all

20   of these issues.

21       He then goes on to talk about rheumatology.  The

22   reason we called Brad's attentions to RA -- so he's obviously

23   talked to Brad about this already -- is because they --

24   they're basically just buying the same footprint that they've

25   had from prior years.

1     Starting to call attention to massive inventory gaps

2   in their contracts would open up a hole in historical legacy

3   of potential issues we'd have to address.  Rheumatology has

4   been a major problem for years, and telling the clients about

5   what's been going on in their campaigns will be disastrous,

6   because it will expose lies if they actually come clean.

7     So these are the issues that he raised in this

8   Christmas Vox.  They've been falsifying affidavits for years.

9   Publishing true affidavits showing shortfalls is going to,

10  number one, impact revenue; two, make them lose clients;

11  number three, going forward with that will try to sell -- this

12  is -- this is them -- and they were starting to take some

13  steps to become an ethical company.

14    They weren't there yet.  It's not something you can

15  do overnight when you've had an unethical company for years.

16  But Ashik is saying we should stop doing this.  And then,

17  four, telling the truth to the RA clients will show massive

18  inventory gaps.

19    It's what Pfizer -- what happened with Pfizer in

20  2017, which caused Pfizer to not do business with them anymore

21  and to demand that refund.  And then, five, the back part of

22  this Vox is when he -- he suggests -- he makes all these

23  unethical suggestions about how they can get around it.

24    Dayparting, which is basically giving the client

25  50 percent of the ads that they're due and a few other ones.

1   So this is a super important Vox, and Ashik sent it to both
2   Rishi, Shah, and Brad Purdy before any of the capital raised
3   money came in.

4           Now we also have a president at the company who is
5   fond of throwing smoke bombs so clients can't see what's going
6   on behind the scenes.  You've -- you -- you heard from
7   David Ma about this.  And this is the poster board for people
8   who were in the jury box, which is off to your right.

9           Let's talk about exactly what David Ma said about
10  this.  I know it's been a little while since he testified, but
11  his testimony was absolutely devastating.  He was asked about
12  the smoke bombs, and he said:  "The comment directly signaled
13  that it had already been rationalized in her mind."

14          He was talking -- they were talking about overselling
15  inventory, Outcome's practice of selling what they didn't
16  have.  This is just the way we were doing business.  It would
17  likely be that way -- it would likely be the way that we would
18  continue.  It was Ma's understanding that the cofounder
19  Agarwal was okay with lying to clients.  The company was never
20  going to be clean.

21          He then said, "The smoke bomb comment was a clear
22  indication that she was okay with this type of misleading or
23  hiding information from clients, a clear indication that was
24  something she knew about and she was okay with it."

25          It's just totally devastating.  He was an

1   extraordinarily credible witness who had issues with the way

2   Outcome ran its business, right?  It caused him to leave the

3   company and ultimately go to the *Wall Street Journal*.

4          He goes to the president of the company thinking --

5   not knowing what's going to happen, and she completely

6   dismissed his concern, and he goes on his way.  She had

7   already rationalized unethical behavior.  She had normalized

8   unethical behavior.  With cofounders like Agarwal and Shah,

9   what you see up here -- in here, you can see why Outcome went

10  down the path that it did.

11         Now, Agarwal's attorney told you in closing this

12  comment here:  "The crux of the case was what's in our

13  client's mind."

14         Well, you've got Agarwal's mindset right here.

15  David Ma was at the company in 2014.  He left the company in

16  October of 2015.  Outcome didn't get any of that money from

17  the lenders until 2016, and then the investor money did not

18  come in, in 20 -- until 2017.

19         So you have Shradha Agarwal's mindset right there in

20  front of you from David Ma.  And here's the mindset:  Lying to

21  clients is okay.  Misleading clients and hiding information

22  from clients is okay.  With the company being founded and run

23  by people like Shradha Agarwal and Rishi Shah, what you get is

24  Outcome Health.

25         Ms. -- Ms. Bell, Agarwal's attorney, gave very short

1   shrift to this David Ma testimony about the smoke bombs in her

2   closing.  And -- and I get it; it is not something that's easy

3   to respond to.  Really, there's no good response for -- for

4   that -- what happened there.

5          And I think Ms. Bell called it, quote/unquote,

6   "government spin on this conversation."  Um, that's not true.

7   This was David Ma's testimony under oath about that

8   conversation.

9          And by the way, Ma testified completely consistent in

10  the grand jury numerous years ago about that smoke bombs

11  conversation with Shradha Agarwal.

12         She also tried to explain away this conversation

13  using some out-of-context snippet from that founders' stories

14  video in 2012, which was three years, approximately, before

15  this conversation.  That argument was really hard to follow

16  and really didn't make sense.

17         Ms. Bell also emphasized that David Ma used

18  euphemisms in this conversation, because he didn't use that

19  five-letter F-word that they really didn't like at Outcome:

20  Fraud.  He didn't use the word "fraud."

21         Ms. Bell asked, "Why would David Ma feel the need to

22  use euphemisms when talking about this with Agarwal?"

23         Well, there's no need to speculate, because David Ma

24  explained that.

25         "QUESTION:  Why did you use euphemisms with Agarwal?

1           "ANSWER:  I would have been very afraid to be

2   confrontational with such direct language with the cofounder

3   of the company.

4           "Afraid of what?

5           "I could be demoted, fired, taken out of the trust

6   circle.  Any number of things."

7           He was afraid of retaliation.  He was afraid of being

8   demoted, fired.  With good reason.  Justifiably so.  That was

9   a well-founded fear.  You've seen how they retaliate against

10  people who raise these types of concerns.

11          You saw, for example, the -- the Sameer Kazi,

12  Sahir Raoof, Adam Prowker, Bryan Morgan.  They were,

13  quote/unquote, "not aligned with Outcome.  Not good culture."

14  They were called "toxic."  They were "troublemaking F-ers."

15  Or they were accused of not understanding the business.  Or

16  all of the above.

17          David Ma was perceptive.  He was smart to use

18  euphemisms with Agarwal.  He wanted to leave the company on

19  his own terms.  He didn't want to be attacked and cycled out

20  like they did with so many other people.  I thought this was

21  one of the more compelling exchanges in the case, and we've

22  got Mr. Poulos to thank for getting this testimony from Ma.

23          He said, "Would you agree with me, Mr. Ma, that you

24  should have been fired?"

25          And Ma said, "You know, it's interesting.  I don't

1  know if I would have been fired from making up numbers.  I may

2  have been fired" -- and then he said -- "I may not have been

3  fired for making up numbers, but for not being with the

4  program."

5          And then he said, "At any other company, I think I

6  should have been fired.  But because of what I understood the

7  founders and executives at Outcome to condone," he wasn't

8  going to be fired.

9          So he understood what kind of company Outcome was.

10  The type of place where you wouldn't get fired for making

11  numbers up; it was the kind of place that was just the

12  opposite.  You would get fired at Outcome if you wouldn't play

13  ball, if you wouldn't make up numbers, or if you would raise a

14  stink about it if people were making up numbers.

15          He understood the culture at Outcome where doing

16  wrong was right, raising questions about the wrongfulness of

17  what they were doing raised the specter of retaliation.  That

18  could have gotten him fired, because it was very much a "with

19  us or against us" culture.

20          And David Ma understood where it came from.  It came

21  from the founders and the executives, these three defendants,

22  Ashik Desai.  Ma understood that it was dangerous at Outcome

23  to speak truth to power.

24          It would have been dangerous for him to use the word

25  "fraud" in a conversation with Agarwal and Shah.  They turned

1   on people on a dime.  There are so many examples of it.  And
2   it was wrong, it was unethical, and they retaliated against
3   people to keep them quiet, to keep the messy kitchen in the
4   kitchen.  The last thing they wanted was for that messy
5   kitchen to spill out into the dining room or God forbid out
6   into the public, especially before they got the money from the
7   investors.

8           Some human emotions are very difficult to fake.
9   Regret is one of them; remorse is another.  I'm thinking about
10  David Ma here still.  All of these years later, he is full of
11  remorse and regret.  He regrets his involvement in the fraud
12  scheme at Outcome.  He regrets the lies.  He regrets the
13  deceit.  He regret -- regrets working for Shah and Agarwal.

14          He regrets rooting -- recruiting people to Outcome.
15  You can see from his text between him and Desai, even when he
16  was there, he was uncomfortable with it.  He went along with
17  it, but he was uncomfortable with it.

18          He was a measured and thoughtful witness on the
19  stand, even in the face of attacks on his character from the
20  defense attorneys.  Very credible witness.  And his testimony
21  sank the defendants, especially Agarwal.

22          This Voxer is another example that shows how Agarwal
23  and Shah had normalized and rationalized unethical conduct.
24  She believed that employees who called out the fraud for what
25  it was, well, they should be fired.  As you'll recall, Liane

1   and Adam had talked to Kazi about the fraud, and her reaction
2   is, let's fire Adam and Liane.  That is such a telling
3   exchange there, and it is so wrong.  There is something wrong
4   with this picture.
5           The world was upside down at Outcome.  Doing wrong
6   was right.  Employees who raised concerns about unethical
7   business practices were attacked and pushed out.  On the other
8   hand, if you played ball by participating in the fraud, if you
9   ignored the past and focused on the future, you were rewarded.
10  Like Ashik Desai.
11          Finally, you've got the COO/CFO who uses and approves
12  of the use of fake, inflated, nonreal numbers to impress
13  potential clients and clients.  And, yes, you've seen these
14  numerous times, and these emails are as ugly as it gets.  And
15  his attorney was up here for hours talking about Brad Purdy's
16  good faith.
17          You also heard Mr. Poulos say in closing, You've seen
18  clear-cut and egregious emails between David Ma and
19  Ashik Desai.  Um, that's true, but talk about the kettle
20  calling the pot black.
21          Purdy is on the same kinds of emails, open, explicit,
22  egregious emails as Desai and Ma.  And isn't it curious?  Take
23  a look who's on these emails with -- with Brad Purdy.  It's
24  Ashik Desai and David Ma.  Everyone in this courtroom agrees
25  that Ashik Desai and David Ma are insiders on this scheme,

1    right?

2            Well, those two guys, they clearly trusted Brad Purdy

3    when it came to talk about inflating numbers that were going

4    out to clients.  Zero chance that these guys would include

5    Brad Purdy on emails like this if he wasn't part of the

6    scheme.

7            There's this one too, which is maybe one of the most

8    explicit exchanges of -- about fraud in this entire case.  You

9    could put this in a textbook for Fraud 101.  Egregious,

10   egregious fraud.

11           As -- as Ma says here, "I've got those numbers you

12   want, but they're not real."  Then he says a second time in

13   that same exchange, "Are you sure you're comfortable using

14   nonreal stats?"

15           And Purdy says, "Well, I'm comfortable reusing

16   existing sales data for these purposes."

17           So the word "reusing," that means he knows that

18   they're currently using them with the pharma clients, right?

19   Fake data with existing clients.  And Mr. Poulos again was

20   talking about yesterday, he wants objective, contemporaneous

21   documentation, right?

22           That is a good point.  It's important to rely on

23   objective, contemporaneous documentation.  Please do.  You

24   don't need to look any further than these emails that I've

25   just shown you for objective, contemporaneous documentation of

Case: 1:19-cr-00864 Document #: 620 Filed: 11/30/23 Page 30 of 204 PageID #:22850

rebuttal - government

10282

1  Brad Purdy's mindset.  And it is ugly and explicit.

2        His intent, his state of mind, his involvement in

3  this scheme.  Total lack of good faith.  The opposite of good

4  faith.  Lies.

5        Mr. Poulos didn't mention this email until

6  approximately four hours into his closing.  We were wondering

7  if -- if and when he was going to mention it.  And here's the

8  lame excuse that he offered.  Brad didn't really know what Ma

9  and Desai were doing.  I mean, what?  Ma could not have been

10  more explicit.  He repeated himself.  What is -- what about

11  nonreal stats is unclear?

12        At another point in his closing, he said --

13  Mr. Poulos said:  "Brad did the right thing at every step."

14  Here's a news flash:  Using fake, nonreal, made-up numbers

15  with potential clients, that's not doing the right thing.

16  That's the opposite.  It's fraud.

17        Then he called that exchange "cryptic."  In fact,

18  that exchange is the complete opposite of cryptic.  Ma said, I

19  have the stats you need, but they're not real.  Are you

20  comfortable using nonreal stats?

21        Ma's exchange could have not been more plain or more

22  explicit.  Calling it "cryptic" was hilarious.  Why did

23  Mr. Poulos offer such an inaccurate, lame description of this

24  exchange?  Because there's no good excuse for this ugly truth.

25  When the lies are coming out of the defendants' own mouths,

1    they've got no one else to blame.

2            Purdy, of course, then used those fake, inflated,

3    nonreal numbers to try and get some business.  I mean, why

4    not?  It's Outcome Health.  Nothing superficial about what's

5    going on there, right?  Just black-and-white lie.

6            And Mr. Poulos is accusing the government of only

7    proving negligence against Mr. Purdy, right?  That could not

8    be further from the truth.  This is intentional.  It's

9    unethical.  It's wrong.  It's blatant.  This is fraud.

10           Emails like this are part of the reason why it was

11   hard to understand all that anger that was exhibited towards

12   Ashik Desai during the early part of -- with Mr. Poulos's

13   cross-examination.  I mean, I understand where it comes from.

14   Because this is truly offensive to lie to clients and

15   potential clients like that.

16           But why is it offensive when Ashik Desai is the one

17   telling lies but not when Brad Purdy does it and not when

18   Rishi Shah or Shradha Agarwal does it?  Mr. Poulos asked, What

19   do you want from this kid?  Well, much, much more than this.

20           By the way, Mr. Poulos made a very careful comment

21   nearing -- near the beginning of his closing.  I'm not sure if

22   you noticed.  He said that Poulos had never -- excuse me --

23   excuse me -- that Purdy had never lied directly to pharma

24   clients, with an emphasis on "pharma."  Because he knew about

25   this email exchange, which is obvious evidence of Purdy lying

rebuttal - government

1   to the other side of the business, potential clients' hospital

2   systems -- right? -- because they had the two-sided business.

3          You've heard a lot about it.  Pharma clients, those

4   were the paying clients on the one side.  The opposite side

5   was hospital systems, doctors' offices.  They didn't pay, but

6   they were still clients.  It was a two-sided business.

7          So Purdy and the other defendants caused countless

8   lies to go to the pharma clients.  But in this particular

9   example, Purdy was lying to the other sides of the business,

10  potential clients on the -- in hospital systems.

11         You may also recall that my colleague,

12  Mr. Appleby-Bhattacharjee, got up during his

13  apples-and-oranges interim statement a couple weeks ago, and

14  he referred to this statement.  He said, Brad Purdy also lied

15  when he sent a deck containing what he had been told --

16  repeatedly told were fake, inflated tablet metrics by -- to a

17  potential client.

18         When -- and Mr. Poulos got up in response to that, he

19  opted for misdirection, a very brief comment he made

20  afterwards.  He said:  I'm going to say -- the last thing I'm

21  going to say is it is distressing for federal prosecutors --

22  referring to my colleague -- to stand up here and say that the

23  tablet things went to a client.  It didn't go to a client.  It

24  was going to a systems.  It didn't go to a pharma client.  I

25  hope they're going to get up here and correct that.

rebuttal - government

1          He -- what Mr. Appleby-Bhattacharjee said was

2     100 percent accurate.  He said it went to a potential client.

3     He didn't say "pharma clients."  And Poulos did not have an

4     answer to the substance, which is that Purdy had lied here.

5     And so he opted for misdirection.  He opted for an attack, a

6     baseless attack, inaccurate attack on my colleague.

7          And it -- and also, it's not like it's okay to lie --

8     it's okay to lie to hospital systems on the one side of the

9     business, but then it's not okay to lie to pharma.  A lie is a

10    lie is a lie is a lie.

11         So there was absolutely nothing to this.  And then

12    Mr. Poulos doubled down and made the same argument yesterday

13    in closing, suggesting that my client did something

14    inappropriate.  Could not be further from the truth.

15         It was a totally baseless accusation, and there was a

16    purpose to it.  The purpose was to distract you, to try and

17    take your eye off the ball from the fact that Mr. Purdy had so

18    blatantly lied to potential clients' hospital systems.  Pure

19    misdirection.

20         What the moral of the story here is when lies are

21    coming out of the defendants' own mouths, there's no one else

22    to blame, so they opt for things like misdirection.

23         So ask yourselves:  Why did they do that?  It's all

24    to distract you.  The truth is in -- from the truth, which

25    doesn't help Mr. Purdy.  The truth is in the documents.  The

1  truth is that he was deeply involved in this scheme.  The

2  truth is Mr. Purdy is guilty.

3          By the way, does it surprise you all that the Outcome

4  executives' attorneys were attacking the prosecutors during

5  this trial and questioning our motives?  That was about as

6  surprising to us as the cold weather in Chicago in February.

7  Totally, totally predictable.

8          When anyone made an allegation of fraud at Outcome

9  back in the day in 2016, 2017, what did they do?  Attack the

10  sender, right?  Not what happens to be DOJ employees who are

11  leveling accusations of fraud, but they've got the same MO,

12  the same response to us.

13          And the response is:  Attack, marginalize, try to

14  change the narrative.  That was the defendants' MO back in the

15  day in 2016, 2017.  It remains their MO here at trial.  I

16  guess the big difference is they can't cycle us out.

17          Mr. Poulos also noted in closing, there are so many

18  emails in that 15 -- group of 1,500 or so emails, exhibits,

19  that Brad Purdy is not on.  He said there's so much that Brad

20  didn't know.  Well, we've been looking at some emails that

21  Brad is on, and they are very incriminating.

22          But let's take a look at a few more emails that Purdy

23  is on to show what he did know.  Here's Araba's exit

24  interview.  I mean, these exit interviews are just

25  extraordinary.  The fact that they did nothing in the wake of

1    this, that Brad Purdy, the COO and CFO, got these and did
2    nothing is nuts.

3            Araba was an analyst.  And when she left, she said,
4    "What qualities and skills should we seek in your
5    replacement?"

6            "Someone for whom integrity is not a number one
7    concern.  At Outcome, you need to be able -- you need to
8    operate in shades of ethical gray."

9            Isn't that nuts?  Purdy gets that from
10    Collin Williams.  Another one the next month, very similar.
11    Isaiah Samuel leaves.  And why did he start looking for a new
12    job?  "Inconsistencies in what was promised and what was
13    delivered."

14            He's talking about the massive deltas.  It's totally
15    unethical conduct.  "Lack of sincerity and integrity from
16    supervisors and leadership.  Being put in situations that felt
17    morally compromising."

18            Well, that sounds like Outcome, does it -- doesn't
19    it?  Next month, there's another one, of course.  Anjolie
20    Kulkarni.  She got this one.  She hit the nail right on the
21    head.  What caused her to start looking for a new job?

22            "Ethical issues with how sponsorship, number one,
23    reports ROI."  That's Ashik manipulating the numbers.  And
24    these defendants are claiming they didn't know about it.

25            "Number two:  Fulfills contracts."  That's the

1    deltas.  They're ripping off clients.

2          "Number three:  They used the analytics team to do

3    the cover-up."

4          So there's that word that keeps coming up at Outcome.

5    Ethical issues, ethical issues, integrity, et cetera.

6          And Mr. Poulos is claiming that it's the prosecutors

7    are the ones who have blinders on.  Brad Purdy is the one

8    who's receiving all of these, the COO of the company.

9          What -- and what does -- what does Purdy do after he

10   receives these?  Nothing.  Absolutely nothing.  I'm sorry; let

11   me correct that.  I said he did nothing.  I thought of one

12   thing that he did do.  He told Deloitte after this that he

13   wasn't aware of any actual, suspected, or alleged fraud at

14   Outcome.  So he did do that.  He did lie to Deloitte after

15   that, which, of course, was a true whopper.

16         For Outcome's only in-house attorney,

17   Collin Williams, unsurprisingly, these were a -- he called

18   them a "WTF moment."  Understandably, he's looking for a new

19   job.  What kind of lawyer would want to stay at a place like

20   Outcome?

21         Brad Purdy on the other hand, his response was

22   characteristic.  He shrugged, right?  He did nothing.  You

23   see, Purdy was a busy man.  He was about to play a key role in

24   raising 375 million from the lenders.  That was for the

25   acquisition of their competitor, AccentHealth at the end of --

1  at late December 2016.  And in raising nearly 500 million from

2  the investors.  A grand total of $862 million.

3         So he didn't have time for this stuff, right?  He was

4  super busy.  And Purdy, of course, played a key role in lying

5  to the auditors to conceal the fraud for them.  I'll come back

6  to this, because Mr. Poulos talked about this constantly.

7  I'll cover it in more detail.  But remember this:  It is --

8  it's another key episode that tells you about Purdy's intent.

9         One more email string I want to remind you of is the

10 "spoke with Nancy G" email string, because it's -- it's a

11 really crucial one that I -- I'd -- I'd recommend that you all

12 take a look at.

13        The one that I have here in front of you is -- so

14 this is -- this is Novo.  This is going back a ways.  Desai

15 testified about this.  Novo was their biggest client in 2013.

16 Approximately 50 percent of their revenue was Novo that year.

17 They had lied to Novo about the size of their network.

18        And this email exchange -- and I put in on the -- on

19 the left-hand side.  This is 324.  But they were, like,

20 rapid-fire responding, and so there's a number of related

21 email strings.  And I put the numbers on the left-hand side.

22        By the way, one of them is extremely small font when

23 you print it out, so it's better to look at it on the

24 computer.  And my understanding is that you will have both.

25 You'll have a laptop to look at documents.  Obviously,

1    spreadsheets and other documents are easier to look at on a

2    spreadsheet.  You'll have hard copy exhibits and -- and then

3    other documents on a computer.

4         And the other thing I'll tell you is my understanding

5    is you won't get copies of trial transcript.  Like,

6    for example, the David Ma transcript over there.  You won't

7    get a copy of trial transcript, but you will get all the --

8    the exhibits that we introduced into evidence, just as an FYI.

9         So on this Novo exchange, which is, as you might

10   recall, two months into Ashik starting at the company, this is

11   those three guys talking about deceiving their biggest client.

12   Three really smart guys, basically talking about how they can

13   make sure the client doesn't catch them in the lie.

14        The significance of this exchange is that, number

15   one, they're deceive -- they're talking about -- they're

16   openly talking about deceiving their biggest client.  Number

17   two, Ashik has been there for about two months.  He's still on

18   training wheels, he's still learning the ropes, and he's

19   learning the ropes from Shah and Purdy.

20        Number three, Shah and Purdy are actively involved in

21   this deceit.  It totally disproves the claim that Ashik was a

22   lone wolf who came -- not only was he a lone wolf, they claim

23   that he came up with all this stuff, which is just nuts that

24   this 20-year-old walked into the company and made all this

25   stuff up.

1        And then, number four, you might remember Ashik's

2    testimony that he and Desai -- excuse me -- that he and Shah

3    met with Novo about a week after this.  I think it was, like,

4    October 8th or 9th in person.  And they lied to Novo.  It

5    makes total sense that they lied to Novo if you look at this

6    email string.  This email string is all about deceiving Novo.

7    Then they go in and tell lies straight to their face.

8        Last point on this email string is this, along with

9    Pradaxa in 2013, are paradigms for what was to come.  Desai,

10   Ma, and Choi and others got involved.  They're doing the same

11   stuff in the later years that you see in Novo and that you see

12   in Pradaxa in 2013.  These were practices that were put into

13   place in early days, and then it just continued and grew.

14   Ashik truly learned from the best.

15       There is something that we agree about with

16   Mr. Poulos.  He said Brad Purdy didn't know much about

17   anything.  He certainly didn't know how to tell the truth to

18   Deloitte or the lenders or investors.

19       Or in 2017, when -- when Pfizer demanded that refund

20   that I mentioned, he didn't even know how to tell Pfizer the

21   company lie that you've heard so much about at trial, that

22   Outcome delivered on weighted average.  That massive

23   under-delivery comes up in 2017, and the client's asking for a

24   refund.  You heard Courtney Cruz's testimony.  They never

25   mentioned weighted average.  They would have been laughed out

1  of the room if they did.

2         It wasn't weighted average.  They knew that.  If they

3  thought it was weighted average, they would have discussed it

4  with Pfizer and try to justify the under-delivery.  And they

5  were massive, massive, massive under-deliveries.  There's no

6  way they could've met that.  There's no way.  It was a lack of

7  inventory, and given the -- given the magnitude of those

8  under-deliveries, there's no way they would have had the

9  inventory to satisfy that later.

10        They would have been thrown out of the room if they

11  suggested weighted average.  So despite all this evidence that

12  I just went over and much, much more, the defense group spent

13  about 20 hours telling you about their clients being totally

14  clueless about the business that they created and ran.

15        They were either totally clueless, or they are

16  mistaken about what was going on at Outcome.  Let's think

17  about that a little bit, starting with -- back to the first

18  witness, Sameer Kazi.  Kazi started at Outcome on January 9,

19  2017.  It took him a grand total of two weeks to realize there

20  was a massive fraud going on at Outcome.  Let me repeat that:

21  It took Kazi two weeks to realize there was a massive fraud

22  going on at Outcome.

23        Next, we've got Bridget O'Donnell, the one who came

24  off the witness stand and sat over here and showed us how she

25  opened up her laptop to show Rishi about the blatant fraud

1  going on at his company, that he already knew about,

2  of course, and showed zero interest in.

3      She's a recent college grad, got a job at Outcome,

4  entry-level position.  Within approximately four to six weeks,

5  she sees obvious evidence that Outcome is manipulating key

6  numbers that are going to clients.  She had the courage to

7  talk to Shah about it after that town hall and -- about the

8  fact that they were lying, and he showed zero interest.

9  Literally would not look at her screen.

10      Now, let's compare that to the defendants using early

11  2017 before the money came in from the investors as our

12  time frame.  By that time, Shah had been there.  They started

13  the company in 2006.  So Shah had been there for about

14  11 years, which is roughly 550 weeks.  He was totally

15  clueless, apparently.

16      Agarwal had been there about nine years, 450 weeks.

17  Purdy had been there about five, or to 250.  Agarwal,

18  apparently, was just as cluely -- clueless as Shah was.  And

19  Purdy, of course, he was a know-nothing CO -- COO and CFO.

20      Now, let's talk about reality instead of the defense

21  fiction.  The defendants were the CEO, the president, and the

22  COO/CFO.  The top three executives at the company.  They ran

23  that business day in and day out for years, yet their lawyers

24  have portrayed them as if they were totally clueless about the

25  business that they created and ran and didn't even understand

1    the core of their own business.

2           Here's the truth:  The defendants are all extremely

3    smart people.  They're trying to portray Desai as though he

4    has this incredibly high IQ, and he was so incredibly smart,

5    he was able to pull the wool over their eyes.

6           Now, obviously, you saw Ashik.  He is super smart.

7    No one is denying that.  But so are the defendants.  When it

8    comes to intelligence and talent, the three defendants, Ashik,

9    David Ma, they're all up here somewhere in the top 1, 2,

10   3 percent.  Extraordinary intelligence, extraordinary talent.

11          In some ways, that's what makes this case so

12   fascinating and also so disappointing and depressing.  You

13   think about the core four at Outcome, three defendants and

14   Ashik.  You put together these four people and the level of

15   talent and intelligence that they have, the -- and their work

16   ethic, their passion, and the massive Outcome Health fraud is

17   what we got out of it.

18          If only they had acted with an equal measure of

19   integrity or even just a baseline, an average level of

20   integrity.  Like, don't lie to your clients.  Be forthright

21   with your clients.  Don't lie to investors.  Don't lie to

22   lenders.  Don't silo information from people at your company.

23          I mean, think of how shortsighted it is to lie to

24   your clients and your partners.  I mean, it's outrageous what

25   they were doing.  But they did all of those things.  And you

1    add it up, and they obtained from those people approximately a

2    billion dollars by fraud.

3          Back to their claims about how smart Ashik was.  As

4    if they couldn't keep up with Ashik's intelligence.  It is

5    laughable for them to suggest that Ashik outsmarted them.

6    They all went to Northwestern, world-class university,

7    of course.  You've read their texts.  You've read their

8    emails.  You've listened to witnesses talk about them.

9          It's obvious how smart they were, how invested they

10   were in the business, how much they knew about the business.

11   They were in on the details.  They played different roles

12   throughout the time, but they knew the business inside and

13   out.  And they ate, slept, and drank Outcome.  They knew that

14   company.

15         And the business wasn't really that complicated.  I

16   mean, Kazi and O'Donnell, they're both smart people.  It's not

17   like they're omniscient, God-like beings, though.  It's not

18   like Sameer Kazi and O'Donnell are outliers, either --

19   right? -- and be able to recognize the fraud right away.

20         Desai's testimony was similar.  He was asked:  How

21   soon after you started at Outcome was it apparent to you that

22   Outcome was lying to clients?

23         I was observing -- in my first few weeks at the

24   company, he observed it.  And then he came to know it was

25   common within the first few months.

1       How long was it apparent that Outcome was concealing

2   information about list matches and under-deliveries?  Within

3   his first few months there.  David Ma had a similar

4   experience.

5       Remember David Ma's job description?  This was --

6   this was something.  My colleague asked him to describe his --

7   his -- what his job responsibility is.  He said, "It was clear

8   to me that my job at the company was to use analytics numbers,

9   math, basically, to lie, to deceive, to withhold information

10  from clients in order for the company's gain."

11      Not really something you'd put on a LinkedIn profile.

12  But that was the reality of what his job was.  Isn't that

13  stark?  I mean, David Ma, you saw him.  He's someone who

14  actually calls things for what they -- what they are, which

15  really, that was not a company value at Outcome.  That made

16  him a bad -- that made him stand out at Outcome, and it meant

17  that he was never really going to be a long-term employee.

18      One more thing to note about Ma.  He didn't know that

19  Ashik was changing the ROI reports.  He wasn't involved in

20  that.  Because remember, all the defendants have -- have

21  explained is true:  Ashik kept that to himself.

22      So -- so what Ma's talking about when he says Outcome

23  was built on a lie and the smoke bombs conversation over

24  there, and we were unethical and lying to clients, he's not

25  talking about the ROI, right?  He's talking about the actual

1    core of the fraud.

2            The core of the fraud started at the beginning when

3    they were selling inventory they didn't have.  Those inflated

4    list matches, not delivering, billing clients, overbilling

5    clients on campaigns where they under-delivered, and they did

6    that all the time.  That's what Ma's talking about.

7            And then the -- those practices just continued after

8    you -- after you -- after -- after the list match, they had to

9    cover up everything.  One lie becomes another, and you need to

10   conceal one inflated list match when you're doing the

11   list match on the next campaign for that drug.

12           His testimony and his experience at Outcome puts the

13   lie to the defense claim that the core of this fraud was

14   changing the ROI reports.  They changed the RO -- Ashik

15   changed those reports because of the fraud that preceded it,

16   because of the list match fraud, because of the lies and

17   under-deliveries.

18           So the upshot is that the whistleblower, David Ma,

19   who broke this whole story to the *Wall Street Journal*, he

20   understood that the central lie of Outcome was selling

21   inventory they didn't have in the first place.  And then

22   everything else followed.

23           It's exactly what Ma was talking about in that smoke

24   bombs conversation that's up there on the poster board in

25   front of you.  It was all built on a lie.

1    Let's now think about the whistleblowers.  And not
2  even, like, talking about the alarming substance of what these
3  people, whistleblowers or others who raised concerns about the
4  fraud.  Not talking about the alarming substance of what they
5  said.  Just the sheer number of them.

6    If a company's success was measured by the number
7  of -- number of people who raised concerns about unethical
8  business practices, Outcome would have been a smashing
9  success.  I mean, look at this.  We just had -- if you're a
10  baseball fan, you know we just had opening day.  They could
11  have fielded a baseball team with all of these whistleblowers.
12  David Ma batting leadoff.  Then Adam Prowker.  You've got
13  Sameer Kazi batting third.  Then just fill -- fill in the rest
14  of the lineup with that parade of analysts who left in 2016.

15    I mean, it is nuts to have that many whistleblowers
16  at a company.  I was going to say basketball team, but you can
17  only put five people on the court at one time.  I'd be worried
18  about getting all the whistleblowers playing time.

19    Guess who was not aware of Outcome's all-star team of
20  whistleblowers?  Deloitte.  Their auditor, right?  Because
21  they needed -- they needed Deloitte to sign off on their
22  financials to raise all that money.  Who else?  Goldman.  They
23  got 100 million from them.  Why would they need to know all
24  these whistleblowers?

25    CapitalG.  They only got 50 million from them.  Why

1    would they tell CapitalG about this?

2           Leerink.  They got 15 million from them.

3           Other investors, their clients, these people had the

4    good sense to get out of dodge, to -- to leave Outcome, to get

5    away from the defendants and their business.  They didn't want

6    to be associated with the business.  Now, in some cases, they

7    were pushed out.  They didn't have much of a choice.  But most

8    of them left.

9           And the defense spent 20 hours arguing in closings --

10   right? -- but they danced around the elephant in the room.

11   Who had the most to gain from this massive fraud?  And who, in

12   fact, gained the most?

13          Behind every fortune, there is a crime.  Have you

14   heard that before?  I don't know if it's true, but it was

15   absolutely true in the case of Outcome Health.  The true story

16   that you've heard over the past 2 1/2 months is that there was

17   a fraud of epic proportions at Outcome and a fortune to match.

18          The Outcome fortune, of course, was Rishi Shah and

19   Shradha Agarwal's fortune, and there was a massive fraud

20   behind the fortune.

21          The defense has talked a lot about the differences

22   between the different time periods at Outcome.  But you know

23   what one of the biggest differences is between those

24   time periods?  In the early days, Shah and Agarwal were

25   dreaming about millions.  But by 2016, it had started to

1    become a reality.

2          By 2016, April, Shah and Agarwal both got their first

3    huge multimillion dollar dividends.  They had gone from

4    dreaming about money to sleeping in beds of money.  With that

5    2016 dividend, Shah had the kind of money where he could pay

6    $75,000 in rent.  The kind of money that allowed him to just

7    take off for a weekend and spend $65,000 on a private jet.  In

8    those two transactions, Shah spent more than Ashik Desai made

9    in a year.

10          But Shah and Agarwal were just getting started.  You

11   see, in late 2016 and early 2017, Shah, Agarwal, and Purdy

12   were courting investors.  Big investors.  The kind of

13   investors who could put Outcome into a different stratosphere.

14   The kind of investors who could send wires for 15 million,

15   50 million, 100 million.  The kind of money that would put

16   Outcome into the big leagues.  A unicorn.  Billion-dollar plus

17   valuation.  And nearly half of that money was going to the

18   founders.

19          The 2016 dividend was peanuts compared to the cool

20   225 million that these two pulled down from the 2017 capital

21   raise.  But while the defendants were courting investors,

22   Outcome was literally desperate, desperate for cash.  Talking

23   about losing the company due to an anticipated Q1 revenue

24   miss.  Talking about laying off a large part of the company

25   due to Q1 revenue.  Talking about existential fires, being

1    behind the eight ball on debt, and bad news on revenue.

2    Talking about false affidavits and fraud.  Talking about more

3    than 50 percent of their revenue being recalled.  Not that

4    they breathed a word of this to the investors like Goldman

5    Sachs and CapitalG before receiving their money.

6            Think about the difference between those internal

7    communications that I've just shown you and that you've seen

8    throughout the trial and what was being said to the -- to the

9    investors that they were courting.  There's a huge difference

10   between what they were saying to Laela Sturdy of CapitalG and

11   Ken Eberts of Goldman and Todd Cozzens of Leerink and what

12   they were talking about internally.

13           Let's do a thought experiment.  Imagine if someone

14   like Laela Sturdy from CapitalG, if she got access to the

15   Outcome Health executives' texts and Voxers before CapitalG

16   sent Outcome that 50 million, she would have seen the -- we

17   basically lose that whole -- we basically lose the whole

18   company Vox from Shah.  She would have seen the talk about

19   laying off half of the company, the existential fires Vox from

20   Brad Purdy.  Agarwal and Madan's Voxers about Kazi.  Alleging

21   fraud; talking about 50 percent of their revenue being

22   recalled.

23           If the investors had seen what you all have seen,

24   there never would have been a capital raise.  Laela Sturdy

25   would have been on the phone with Ken Eberts like that.  They

1  would have -- it would have been bye-bye to the capital raise,

2  bye-bye to that multibillion -- multibillion dollar valuation.

3  But alas, the investors could not read the minds of the

4  defendants, and they didn't have access to their Voxers,

5  texts, and emails.  The investors bought into the defendants'

6  charisma, their vision, and their lies.

7      With the company on the precipice and so desperate

8  for cash, talk of laying off half the company, you might think

9  that the cofounders would take something less than

10  225 million, right?  Maybe just like 50 or 75 million and pour

11  the rest of that into the company?  Not a chance.

12      Shah and Agarwal's vision was clouded by the dollar

13  signs in their eyes.  The dividend was going to be really

14  amazing security for them.  Shah and Agarwal had their eyes on

15  Forbes billionaire profiles and then an IPO in the future,

16  which is when they get super rich.  They had hogged all the

17  equity in the company, never gave a single share to

18  Ashik Desai.  They did give a small but valuable amount of

19  shares to Purdy.

20      Let's now talk about the defendants' favorite

21  witness, Jason Ketchum.  First things first.  No one,

22  absolutely no one in this courtroom knows Jason Ketchum better

23  than Rishi Shah and Shradha Agarwal.  And let's give credit

24  where credit's due.  They understood Ketchum's insecurities.

25  They understood his personality.

1        And so Shah's attorney went after him aggressively

2   during the first part of cross.  Make -- you know, basically

3   suggesting that Ketchum wasn't a good employee, people at

4   Outcome didn't really like him.  And, basically, they made

5   Ketchum feel about that small with that line of cross.

6        Shah and Agarwal understood that if they did that --

7   and they were right.  It was in some ways impressive -- they

8   understood if they did that, he'd turn into a puddle and push

9   back about as much as a turnstile.

10       I mean, Ketchum was starting to nod before the

11  defense attorneys even got their -- even -- even got their

12  questions out.  It was a total free-for-all.  I mean, the

13  defendants' group realized he will say yes to anything, that

14  he will say yes to anything, we can ask him any question, and

15  then we can pass that off in closing to the jury as if it's

16  the truth, and that's what happened.

17       In closing, Shah's attorney referred to that as

18  courage.  I wanted to say to the judge, we'll stipulate that

19  Ketchum will say yes to the next 75 questions that the defense

20  will ask him regardless of what they ask him.  It didn't even

21  look like Ketchum was listening to the questions on cross.

22  And that's who the defense wants you all to rely on.

23       In case you don't remember, I'll just give you a very

24  high-level summary of Ketchum's testimony on cross.  Yes.

25  Yes.  Yes.  Yes.  Total yes-man, just like he was back in

1  2012 when Shah and Agarwal needed someone to do their dirty
2  work.

3         When they needed an inflated list match to be sent to
4  a client, right?  When they needed, like, Pradaxa, for the
5  2013 campaign, he was involved in that.  When they needed a
6  fake address list to be sent to a client as proof of
7  performance.  Yes, yes, yes, yes, yes.

8         And it's pretty easy to see someone like
9  Jason Ketchum doing Shah and Agarwal's bidding back in the
10  day.  And it is useful to have minions like him to do the
11  dirty work when you're involved in a fraud scheme.  Another
12  thing we can all agree about, I think, with Jason Ketchum, he
13  fit in very well there.  He was a long-term employee.

14         Ashik Desai fit in well, too, another long-term
15  employee at Outcome.  Brad Purdy, another long-term employee
16  at Outcome.  The defendants, they were there from the start.

17         Now, think about who didn't fit in so well at
18  Outcome.  Sameer Kazi, he was there 2 1/2 weeks.
19  Bridget O'Donnell, she didn't fit in very well.  David Ma, he
20  had some scruples.  Adam Prowker, Bryan Morgan, Sahir Raoof,
21  the analysts who -- who left after all their concerns about
22  the unethical behavior.

23         People with a conscience did not fit in well there.
24  They weren't good cultural fits.  They were called names.
25  They were undermined or they were ignored.

1    You notice that Shah's counsel was pointing out all

2  these little things about the whistleblowers to supposedly

3  justify them getting criticized and/or fired.  You knew who

4  made a lot of mistakes but was never fired?  The yes-man,

5  Jason Ketchum.  Ketchum stayed loyal, even in February 2017

6  when Outcome had a job applicant ask if the stories about

7  Outcome being a fraud were true.

8    I mean, think about that.  This is how I'm imagining

9  that interview went.  At the end of the interview where the --

10  where the people doing the interview say:  "Hey, do you have

11  any other questions for us?  There's no such thing as a bad

12  question."  An applicant said, "Is it true that Outcome is a

13  fraud?"  They had a job applicant asking if Outcome was a

14  fraud in February 2017, and the three top executives at the

15  company want you to believe that they thought everything was

16  on the up-and-up at the company.

17    By the way, in so many ways, the defense in this case

18  wants to have things both ways.  Let me just give you one

19  example.

20    Ashik Desai is a fraudster because he deleted all his

21  texts.  You've heard that countless times, right?  In closing,

22  Shah's attorney said the -- the members of Fraud Island, they

23  deleted their communications because they thought it was

24  shameful conduct.  That's what fraudsters do.

25    Well, at another point in Shah's closing, he

1    mentioned accurately that Jason Ketchum deleted his Voxer.

2    And Jason Ketchum, according to Shah's attorney, is three

3    things:  One, the most important witness in the case; two, a

4    star defense witness, and; three, supposedly, he was on the

5    clean side of that wall with Rishi Shah, right?

6            Well, Shah's attorney did say that if you --

7    fraudsters are the ones who delete communications, and that's

8    what earns you a spot on Fraud Island.  So applying the Shah

9    team standard, Ashik has some company on Fraud Island.

10           Two more quick examples to show how the defense group

11   wants to have everything -- things both ways.  All that talk

12   about all of the emails, you know, the defendants got.

13   Mr. Poulos showed you that chart about the volume of emails

14   that Brad Purdy got.  The point of that, of course, is to

15   suggest they didn't read their emails or they didn't read all

16   of their emails, you know.

17           And the reason they do that is because there's a lot

18   of emails that really significantly incriminate them, and so

19   they want to suggest that -- or make you think that they

20   didn't actually read their emails, and they don't have the

21   response to the substance of the emails, even though many

22   times they actually responded to those emails.

23           Here's how they want to have it both ways.  If they

24   found an email -- when they found an email or a Voxer that

25   they thought was useful in some way to their defense, you

1    didn't hear a peep about the volume of emails that they got,
2    right?  Or whether or not they read it or whether or not they
3    listened to it.

4           If they found -- if they found a helpful email, it
5    was -- they read it.  They relied on it.  They read it again.
6    They -- it explained their inaction or their action with
7    Deloitte or with investors, right?  They want to have it both
8    ways in this -- in this trial.

9           One more example.  Think of all the names that they
10   called Ashik.  Ashik was an inveterate liar, natural born con
11   man, the most dangerous kind of liar.  They were basically
12   trying to come up with the most creative ways to insult
13   Ashik and call him a liar.  And some of it was mean, honestly.
14   Even though he was a liar and he deserved to be crossed, they
15   really went too far in some ways with all -- with all those
16   names.  Ashik was a malignancy.  That was another one which
17   was, at the very least, unkind.

18          How many times -- and how many -- and by the way, so
19   here's the part about them having it both ways.  Sometimes in
20   the same breath when they would call out Ashik for his lies,
21   they would be relying on his testimony for something else that
22   they saw as favorable to them.

23          I mean, how many times during the defense closings
24   did you see transcripts of something that Desai said and the
25   defense attorney would say, I got him to admit this, or he was

1   forced to admit this.  Ashik wasn't forced to admit anything.

2   He was here to answer questions.  He was asked questions on

3   direct.  He was asked questions on cross.  He responded to

4   those questions.

5          But there are literally dozens of statements that

6   they put up during their closings that they are relying on for

7   the truth of what Ashik said.  So, basically, they want you to

8   believe everything Ashik said, which is huge -- a high

9   percentage of what he said as true if it favors their clients,

10  but if it's something that incriminates their clients, then

11  Ashik's an inveterate liar.  It's a very strategic and

12  convenient approach to Desai.

13         Back to Jason Ketchum.  As I mentioned, Shah's

14  attorney spent an extraordinary amount of time talking about

15  Ketchum, called him the most important witness in the case.

16  But one of the reasons Shah's team wants to build up the

17  import of Ketchum and wants you all to focus on Ketchum is

18  because they don't want you to focus on the other witnesses.

19         Shah definitely doesn't want you to think about

20  Sameer Kazi -- right? -- for -- for obvious reasons.  Doesn't

21  want you to think at all about Bridget O'Donnell, right?  She

22  lost trust in leadership, including Shah.  Shah does not want

23  you to think about Bridget O'Donnell one bit.  She was very

24  insightful.  She understood correctly that Shah was

25  retaliatory and that if she took it any further, she would be

1    the next one on the RIF, or reduction in force list or she'd
2    be called toxic.

3              Shah definitely doesn't want you thinking about
4    David Ma.  He understood all too well that the defendants and
5    Desai did not operate with integrity.  Ma understood that
6    Outcome was built on a lie.  He understood that Outcome got
7    that big -- big pile of money from investors based on lies.

8              Shah certainly does not want you thinking about
9    Laela Sturdy's testimony, either.  Because Shah and Purdy
10   blatantly lied to Sturdy.  Shah told Sturdy here in this -- in
11   this transcript.

12             The question was:  "When the team was asked whether
13   they had ever missed an ROI across any customer" -- I'm sorry.
14   That's the answer -- "they told us no."  And then the question
15   was:  Who do you recall telling you that they never missed an
16   ROI?

17             ANSWER:  Rishi.  And I think Brad was in the room.
18             Did Mr. Shah qualify his statement in any way?
19             The answer is no.

20             That was a total lie.  And by the way, that's
21   Count 24.  Count 24 is a very, very strong count.  That's
22   the -- that's the capital -- the $50 million wire from
23   CapitalG.

24             For the -- and -- and one thing I'll note is for the
25   investor and lender fraud counts, there's -- there are

1    affirmative lies like this one that underlie the count, but

2    there are a boatload of material omissions.  You're going

3    to -- I'll go over a jury instruction with you on that.

4          There were -- and that, kind of, goes back to what I

5    said about the things that they said internally:  We're going

6    to lose the company, lay off half the company.

7          And then their conversations with -- with people like

8    Laela Sturdy and -- and Todd Cozzens where they lied to them,

9    and they also omitted this incredibly material information

10   about what was going on at the company.  I'll go over some of

11   those with you towards the end when we go over the counts.

12         But this is on the left.  On the right is -- is the

13   lie, is them saying they never missed an ROI.  On the left is

14   evidence that Shah, Agarwal, and there's also evidence that

15   Purdy knew it was a lie.  This is a text in the aftermath of

16   Sameer Kazi where Shah says to Agarwal, "One critical fact is

17   that many ROI guarantees weren't met in 2016."

18         So they missed all these ROIs on 2016 programs.  That

19   hurt their -- that's why the Q1 revenue went down so much.

20   And yet they're out telling -- they're out telling their

21   investors that they never missed an ROI.  It was blatantly,

22   blatantly false.

23         In addition, if you take a look at -- I know the

24   people up here can see it better.  This is the -- this is

25   the -- this is Government Exhibit 785.  This proves that

1  Brad Purdy knew about -- both Brad Purdy and Rishi knew that
2  this was false.

3          Because if you see here, this is after the
4  conversation with Sameer.  At line 6 here, he -- he refers to
5  the affidavits, the ROI, and the bottom-up forecast.  You see
6  the ROI is the second one.  He's talking about the ROI misses.

7          And then Rishi says going on:  We have been knee-deep
8  in some of them, and they've cost a bunch of money on the
9  first.

10          And then referring to the ROI:  When we've had to go
11  to clients on the second, you know, that's why we're down a
12  lot in revenue, because we've got all of those make-goods.
13  He's referring to the ROI misses.  ROI misses on 2016 programs
14  affecting their 2017 revenue.

15          So internal communication right here, a second
16  internal communication on the left of the screen saying we've
17  got all those ROI misses, which was true.  They missed a bunch
18  of ROIs in 2016.  Investors, not only did they not know that,
19  they affirmatively lied to the investors about that.

20          Same thing with Todd Cozzens, who is definitely
21  someone who Shah -- Shah's attorney would not want you all to
22  focus on.  They prefer that you -- you think about
23  Jason Ketchum.  He was Leerink.  You saw the invest --
24  Government Exhibit 932 that was the investment committee memo
25  that said that Outcome never missed an ROI.  The same lie that

1   they told to Google.

2          And here's the testimony about that.  Where did

3   Leerink get the info about Outcome never missing an ROI

4   guarantee?  And he said:  Outcome executives repeatedly stated

5   that Outcome never missed an ROI.  And the question was:

6   Well, which Outcome executives?  And he said:  We were mostly

7   speaking with these matters with Brad Purdy and Rishi Shah,

8   mostly those two.

9          This is Count 26.  Another extremely, extremely,

10  extremely strong count.  All of the counts are strong.  Some

11  of these investor ones are -- are really layups they're so

12  strong.

13         As with CapitalG, when it came to Leerink, not only

14  did they affirmatively lie to Leerink, they also were -- there

15  were a whole bunch of material omissions with Leerink.  All

16  that internal chatter about really significant issues, they

17  didn't share any of that with Leerink.

18         Now, Leerink, there's actually another flat-out lie.

19  This is on the right here, you might remember.  Now, they did

20  tell Leerink that they had the Q1 revenue miss.  You may

21  remember the Leerink money came in later.  It came in, in

22  April.

23         So they really had no choice, because the Q1 ended

24  at -- at the end of March.  So they have the Q1 miss, which

25  is, you know, concerning to Leerink.  But they lied to Leerink

1    about the cause of the revenue miss.

2         This is the internal Leerink memo here that says,

3    number one, what -- what was explained to them was they had a

4    change in sales strategy.  They went from selling to the

5    agencies.  The agencies are in between the -- you know, the

6    go-between with the client to going directly to pharma.

7         And so that's what they told Leerink when the reality

8    is what -- what's up here and what we just looked at in the

9    last slide is the reason they actually had the revenue miss

10   was because of the ROI misses and the make-goods.  That's the

11   reality, but they lied to Leerink about it.  So they told two

12   big lies to Leerink.

13        And then the Voxer on the left, which is 715B, Ashik

14   sent Rishi a Voxer about this.  And it's the same -- the same

15   thing.  He's explaining that about all the make-goods because

16   of 2016 misses, and he -- Entresto was a big one that they

17   missed on significantly, and that's why he had to move down

18   the revenue for -- forecast for Q1 2017.  Not something they

19   shared about -- they didn't share that -- the real reason for

20   the revenue miss.

21        And so basically, they had already lied -- Leerink

22   came later in time.  They had already lied to Laela Sturdy

23   saying they never had an ROI miss.  They -- the lie worked,

24   of course.  They repeat the same lie to Leerink.

25        And given that they'd already told Leerink that

1  they'd never had an ROI miss, well, when the Q1 revenue --

2  when they missed Q1 revenue, they couldn't really say the

3  reality, which is that they missed the R -- they missed it

4  because of the ROI miss -- right? -- because they already said

5  we've never missed an ROI.

6      So they attributed it to a sales strategy change,

7  which is, you know, if you're an investor, that's not as

8  concerning, right?  If they'd gone to Todd Cozzens and said:

9  We -- we had all these make-goods because we had all these

10 misses in 2016, that one would have been a much bigger red

11 flag.  But they didn't tell him that.  They lied to him about

12 that.  There's really overwhelming evidence on the Leerink

13 count, which is Count 24.

14      Here's the Cozzens testimony.  He said -- this is --

15 this was the questions about that document on the right that

16 we're just looking at.  He said we talked to -- I'm sorry.

17 This is the question.

18      I said -- question is:  "When you say we talked to

19 the company about why, who did you talk to at Outcome?

20      He said mostly Brad Purdy.

21      What was the explanation that they had for the

22 significant Q1 miss?

23      He said -- answer was they had talked to us when they

24 came to our office about steering away contracts through

25 agencies and going direct to manufacturers, the pharmaceutical

1    company.  So they -- the explanation was what was reflected in
2    the Leerink investment committee memo, that change in sales
3    strategy.  Totally false.
4           And all of these lies to Leerink, CapitalG,
5    investors, lenders, and you've got Mr. Poulos up here
6    yesterday putting the definition of the word "superficial" up
7    on the screen as if anything about this two-and-a-half month
8    case was superficial.  He could not be more wrong.
9           Probably the first time in history that a nearly
10   three-month trial has been called superficial, as if we were
11   going to keep you here until July.
12          While we're talking about all the lies in this case,
13   I want to mention something.  In closing, the defense
14   attorneys tried to make it seem like we have to prove so many
15   things that we don't actually have to prove.  It's like they
16   were actually -- almost like they were coming up with their
17   own definition of "fraud" and suggesting that we have to prove
18   way more than what's actually required under the law.
19          What we actually have to prove is what's set forth in
20   the jury instructions, and that's what Judge Durkin is going
21   to give you.  He's the expert in the law here.  He's going to
22   give you the written jury instructions about what we have to
23   prove, and I'm going to go over some of those key instructions
24   with you towards the end of my time today.
25          And -- but I want to show you right now a key jury

1   instruction that the defense predictably chose not to show you
2   during their 20 hours of closings.

3          And here it is on the scheme to defraud.  In
4   considering whether the government has proven a scheme to
5   defraud, the government must prove beyond a reasonable doubt
6   one or more of the false or fraudulent pretenses,
7   representations, or promises charged in the indictment.

8          And you'll see Count 1 describes the entire scheme.
9   It's a lengthier count with a bunch of paragraphs.  It's
10  just -- it's one scheme, and that scheme is incorporated into
11  all the other counts.  The other counts are really just what
12  we call the executions.  The mailings -- the difference is the
13  executions.  The mailings, the wirings, which are the emails,
14  the Voxers, et cetera.  It's the same scheme.  And so you
15  might have gotten the impression that we have to prove some
16  crazy number of lies or misrepresentations from the defense
17  closings.  We have to prove at least one.  And there were
18  countless lies in this case.  Countless lies have been proved
19  in this case.  I just wanted to make sure you knew that.

20         So in considering all of these witnesses, you can see
21  why Shah's attorney would rather have you focus on
22  Jason Ketchum, right?  It's -- Shah's attorney said what I
23  have at the top, that witnesses matter.

24         And, of course, witnesses do matter.  They matter a
25  great deal.  You know who matters the most?  The credible

1  witnesses.  Like these five witnesses here, all extremely

2  credible witnesses.  And these witnesses absolutely sank Shah.

3          Sameer Kazi, fraud was happening.  CEO didn't see as

4  a red flag.  Bridget O'Donnell lost trust in Shah.  David Ma,

5  Shah didn't operate with integrity.  And then the lies to

6  Sturdy and Todd Cozzens.

7          These witnesses demolished Rishi Shah.  And now you

8  see why they want you to focus on Jason Ketchum.  Because if

9  you focus on these witnesses, Rishi Shah's in big, big

10  trouble.

11          By the way, Shah's counsel put such a focus on

12  Ashik's -- you know, that comment in that Voxer about -- where

13  Ashik said Outcome is acting with the utmost integrity.  The

14  idea that Rishi Shah believed in -- at that time in 2017 that

15  Outcome was acting with utmost integrity is ridiculous.

16          And think about these witnesses when you consider the

17  Shah team's claims about the import of that utmost integrity

18  Voxer.  Ashik was in full Mini Rishi mode in that Voxer when

19  he claimed they were acting with the utmost integrity, just

20  spitting out BS talking points.  He learned that from the

21  absolute best.

22          At a certain point in his closing, Mr. Poulos

23  talked -- talked about concern about you all -- you know, what

24  you might -- considering the totality of the evidence in this

25  case, which I can understand, ladies and gentlemen.  Because

1    considering the cumulative force of the evidence against

2    the -- against Shah and all the defendants, it is

3    overwhelming.

4            And the defense spent the last three days trying --

5    or however many days that was trying to knock down individual

6    pieces of evidence, and they also ignored a fair amount of

7    really incriminating evidence.  But when you consider the

8    totality of evidence that's been presented in the last

9    three months and that's the way you should consider it, there

10   was a very strong case here that establishes that there was a

11   scheme to defraud, and all three of these defendants were in

12   it.  Inflate, under-deliver, conceal.  And then countless lies

13   to the investors and lenders.

14           Now, note that I haven't even mentioned Ashik Desai

15   in this slide.  Nor have I listed all of the incriminating

16   emails, texts, and the Voxers that also sank Shah.  If you

17   credit just a couple of these witness, Shah's a participate --

18   participant in this fraud scheme.

19           And all of these witnesses were credible.  I mean,

20   look at this list:  Kazi, O'Donnell, Ma, Sturdy, Cozzens.  All

21   of them were very, very credible witnesses.  There's zero

22   reason to doubt the credibility of any of those witnesses.

23           The reality is, is not only was Shah a participant in

24   this scheme, he was the leader.  So we've got another resident

25   on this tropical island.  The Shah team likes this document

rebuttal - government

10319

1   for some reason, so does Purdy's team.  I think Mr. Poulos put
2   this up as well.
3          You remember Shah showed this to David Ma when he was
4   on the stand.  It's got, like, the matrix -- not, like,
5   letters or numbers coming down.  And they suggested that -- I
6   think they used this.  This is where the Fraud Island concept
7   may have come from.  They used this to suggest that isle --
8   Ashik's team was on an island committing fraud.
9          Ma circled Desai and then put himself and Kathryn --
10  I've circled them in red there -- put himself and Kathryn Choi
11  and Oliver Han as participants of the fraud.  However, Ma was
12  then asked to circle additional people on the chart starting
13  with people who he knew lied to clients.
14         And he said I don't know if the salespeople lied to
15  clients, but given what we know -- if they knowingly lied to
16  clients, but they did lie to clients.  That's the whole point
17  of the siloing practice, that salespeople oftentimes didn't
18  know what was going on behind the scenes.
19         They siloed, and so then -- it's -- they're out there
20  tell -- making misrepresentations to -- to clients, even
21  though they might not know it, which means that's the siloing.
22  So then he circled the salespeople -- right? -- because they
23  were out telling lies, even if they were unintentional lies to
24  clients.
25         Then he was asked who condoned lies to clients and

1  unethical behavior at Outcome?  The core four, of course.

2  Ashik, Brad, Shradha, and Rishi -- Rishi.  So he circled them

3  on this as well.

4       So who's the more credible witness about who

5  participated in this fraud at Outcome?  The extremely talented

6  group of defense attorneys who have been up here arguing for

7  the last 20 hours make -- trying to make you think their

8  clients weren't in on this?  Or David Ma, who actually worked

9  at Outcome and was a reluctant but active participant in the

10 fraud?  David Ma was someone who was inside Shah and Agarwal's

11 dirty kitchen, and he knew how the sausage was made.

12       By the way, in some ways, it was super -- it was

13 appropriate for Mr. Poulos to focus on the word "superficial"

14 in this case, but not for the reasons he suggested.  Outcome's

15 success appeared to be real from the outside until it was

16 examined more closely.

17       Think of it -- think of it from David Ma's

18 perspective.  Talented young man who gets a job at an exciting

19 start-up company in Chicago, fellow Northwestern grads running

20 the business.  Very, very appealing on the surface.  Then he's

21 there for a while, and he wakes up to the reality of working

22 for people like Shah, Agarwal, Desai, and Purdy.

23       Unethical behavior day after day, week after week,

24 campaign after campaign, client after client, misleading

25 clients, concealing from clients, lying to clients, having to

1   cover up one lie with another.  He went to Agarwal with his
2   concerns.  She dismisses his concerns with that smoke bomb
3   comment.

4          It still bothered him when he left the company,
5   of course.  So when he sees that article about the capital
6   raise, he goes to the *Wall Street Journal*.  The rest is
7   history.  David Ma was an extremely credible witness, and he
8   sinks all three of the defendants.

9          You saw from some of these org charts they did have a
10  barista at Outcome.  This is how I'm imagining the orientation
11  at Outcome went.  Welcome to Outcome Health.  We've got coffee
12  in the back, but please check your integrity at the door.
13  Unless it's adaptable integrity, then you'll fit in just fine.

14         So let's move on now to Mini Rishi, Shah's protege,
15  also known as Ashik Desai.

16         First thing to remember is that the Outcome story
17  does not start with Desai.  The business was launched and its
18  fraudulent practices launched long before Ashik joined the
19  company.

20         2016.  Ashik turned 13 that year.  That's when Shah
21  started the company -- I'm sorry -- 2006.  2007, Shah's still
22  running the company.  I think 2008 is when Agarwal joins him.
23  They become cofounders.  2009, they're running the company.
24  2010, another year at the helm.  2011, same thing.

25         Then there's some telling email exchanges around this

1     time.  You might remember this email exchange, Government
2     Exhibit 2, right at the front of the binder, probably, that
3     you get back there.  This is a really, really telling
4     exchange.
5            A year and a half before Ashik joins the company.
6     Steve Svec was one of their salespeople at the time.  He -- he
7     made this representation.  In fact, we're currently in waiting
8     rooms of one-third of all endos in the United States.  That
9     was false.
10           Rishi Shah forwarded to Agarwal, and she immediately
11    realized that it was a lie.  She knew that they were only in
12    25 percent, and -- and they were now telling clients it was
13    33 percent.  So his initial response right here is the lie
14    that the defense has been trying to pass off to you for the
15    past three months:  weighted average this year equals 1,000.
16           I mean, I -- that was February of 2011.  We
17    celebrated the anniversary of -- of this email exchange
18    together.  In February of 2013 -- however many years ago,
19    12 years ago, Rishi Shah was using weighted average as a lie
20    as an internal justification to justify lies told to clients
21    about the size of their network.  And that's what they're --
22    and now we're here 12 years later, the defense is trying to
23    get you to accept the same thing.
24           Let's see how Agarwal responded to that.  She doesn't
25    even -- this is her response at the top.  Isn't it inaccurate

1    to say we're already in?

2           In other words, she completely ignores his weighted

3    average comment, because she knows it's complete BS.  The

4    weighted average from Shah was not even worthy of a response

5    from Agarwal, because she knows it's not accurate.

6           So just like Agarwal ignored his weighted average

7    justification in 2011, you all should do the same here.

8    That's -- it's all it is.  It's internal justification.  Not

9    saying they were never weighted averages, but they were rare.

10   You heard that from Ashik and others.  It's also reflected in

11   all the contracts.

12          And I'll go over the victim testimony from the pharma

13   and agency witnesses, was totally consistent about that.  Some

14   of them barely even seemed to know what weighted average was,

15   and they're people who've been in the industry for years.

16          So Shah concedes it's a lie.  He says, as a

17   stand-alone term it's inaccurate.  But he rationalized it away

18   by saying they were selling the future.

19          Let's take a step back, though, and think about

20   something else that's notable in this exchange.  Shah was

21   lying about the size of the network in February 2011 to try

22   and get some new business.  And lo and behold, 2 1/2 years

23   later, Ashik Desai starts at the company in August of 2013.

24          If you believe the defense group, Ashik came up with

25   the exact same idea, right?  Lie about the size of Outcome's

1  network in order to sell Outcome's ad campaigns.  What an
2  extraordinary coincidence.  Rishi Shah was doing the same
3  thing in February 2011 and approving their salesperson making
4  those false representations.

5          And Ashik, if you believe the defense, he came up
6  with that same idea.  I guess the universe is aligned, right?
7  Total nonsense that Ashik came up with that idea on his own.

8          One more observation while we're thinking about this
9  lie from Shah in February 2011.  Unethical business decisions
10 are made one at a time.  Maybe the first time -- right? --
11 this lie doesn't seem that significant.  They're saying
12 one-third versus, you know, a quarter, and it's a potential
13 client.  So maybe it won't have significant consequences.
14 Maybe they -- they won't get that client or the client won't
15 buy the whole network.  So it might not have significant
16 consequences.  Maybe it has no consequences.

17         But it doesn't change the underlying fact that it's a
18 lie.  And then the next lie might come with a little less
19 thought.  And then one or two lies become 5, 10, 20.  And then
20 those lies need to be covered up.

21         An inflated list match leads to a client request for
22 an address list.  And then the address list is a lie.  Then
23 for the next campaign, they have to think about the prior
24 list match when they lied to the client and gave them a false
25 address list.  And then it goes on and on and on, and lies

rebuttal - government

10325

1    become a part of the culture.

2           Your Honor, if you wanted to break at 10:30, we could

3    stop here.

4           THE COURT:  All right.  We'll take our morning break,

5    ladies and gentlemen.  15 minutes.  Please don't discuss the

6    case among yourselves or with anyone else, and keep an open

7    mind as there's more arguments to hear.

8           COURT SECURITY OFFICER:  All rise.

9        (Jury out at 10:29 a.m.)

10          THE COURT:  All right.  Anything we need on the

11   record?

12          First, the government.

13          MR. MADDEN:  No, Your Honor.

14          THE COURT:  Defense?

15          MS. CHOU:  No, Your Honor.

16          MS. BELL:  No, Your Honor.

17          MR. PRUITT:  No, Your Honor.

18          MR. POULOS:  No, Your Honor.

19          THE COURT:  All right.  Very good.

20          Thanks, Elia.

21       (A recess was had from 10:30 a.m. to 10:46 a.m.)

22

23

24

25

1    (Proceedings heard in open court; jury in.)

2    MR. POULOS:  Your Honor?  I'm sorry.  I do have an

3    issue I'd like to raise.  On the record.

4    THE COURT:  On the record?  Go ahead.

5    MR. POULOS:  Your Honor, the instruction does say --

6    the elements instruction on the mail, wire fraud counts does

7    say that:  In considering whether the government has proven a

8    scheme to defraud, the government must prove beyond a

9    reasonable doubt one or more of the false or fraudulent

10   pretenses, representations or promises charged in the portion

11   of the indictment describing the scheme.

12   So, Judge, there's no allegation in the indictment of

13   any false representations along the lines of, we never missed

14   an ROI.  That whole conduct that -- these allegations or this

15   evidence and testimony about we never missed an ROI and -- and

16   the make-goods, that -- that -- all of that results from not

17   falsified ROIs but truthful ROIs that then resulted in a

18   make-good.  So it's not part of the false and fraudulent ROIs

19   that are described here.  And there's no allegation in the

20   indictment anywhere of false statement alleging that they

21   lied -- that they lied about that particular point, which,

22   again, isn't part of the ROI fraud.

23   And -- and Mr. Madden stood up, and with respect to

24   Count 24, I believe, but also referenced it with other counts,

25   that that false statement, that alleged false statement to the

1    investors that we never missed an ROI is sufficient to support

2    a conviction on those counts, even though that false and

3    fraudulent pretense, promise and representation is not alleged

4    in the indictment.  And as the instruction says, they have to

5    find at least one of the ones alleged in the indictment.

6            And so I just wanted to raise that issue, Judge.  I

7    think the government should be precluded from making that

8    argument.

9            THE COURT:  Response?  Briefly.

10           MR. MADDEN:  There are numerous broad allegations in

11   the indictment.  Of course, we don't have to write a, you

12   know, 500-page indictment and list every single lie or

13   concealment that's done on the scheme.  I'll just cite to

14   paragraphs 30 and 31, which are very broad allegations about

15   the defendants causing -- concealing and causing to be

16   concealed from investors Outcome's business practices and that

17   there's additional acts that are not listed that just say that

18   Outcome did various acts of concealment, including -- such as

19   the following.  It was not -- it was not an exclusive list, of

20   course.  We don't charge cases that way, otherwise our

21   indictment would be hundreds of pages.

22           THE COURT:  Yeah, to the extent that's an objection,

23   it's overruled.  It's proper argument.  And the jury has the

24   indictment.  The jury has instructions telling them what they

25   have to find to find the defendant guilty.  And there's

1  nothing about the argument that Mr. Madden made that's

2  inconsistent with what the instructions are.  So objection

3  overruled.

4          All right.  Let's bring in the jury.

5       (Jury in at 10:48 a.m.)

6          THE COURT:  All right.  Please be seated.

7          Mr. Madden, you may continue.

8          MR. MADDEN:  Thank you, your Honor.

9          REBUTTAL ARGUMENT ON BEHALF OF THE GOVERNMENT

10         MR. MADDEN:  We just broke talking about Desai in

11 2011, now moving on to 2012.  I was just talking about Outcome

12 in 2011.

13         On to 2012, this is that inflated list-match for

14 Pradaxa, one of the most egregious campaigns that we've seen

15 in the early days.  And this type of stuff just continues

16 later.  This is Agarwal and Shah are all over this inflated

17 list-match.  This is the one where Agarwal later says:

18         Only one-third of the offices were installed at the

19 time.

20         They were inflating this list-match by over

21 60 percent.  The same kind of thing that Ashik and David Ma

22 and others were doing later.  Predictably, this massively

23 inflated list-match led to a disastrous campaign with massive

24 under-delivery.

25         The timing of that is really incredible.  It's

1   November 12th, 2012, you see.  The founders story video is the

2   day later, and that -- this is a different quote than one of

3   the other ones that we focused on, but this was played at

4   trial.  There's -- this was Shah giving advice to -- literally

5   the day after this massively inflated list-match on Pradaxa,

6   which led to massive under-delivery, Shah and Agarwal being

7   interviewed for their apparent success in the founder series

8   story.  And here's one piece of advice Shah gives to other

9   entrepreneurs.

10          There's one more tip I'll throw in there.  Something

11  I wish I knew.  Deliver.  Deliver on what you say you're going

12  to do.  Whether you're talking to investors or customers, the

13  biggest thing you can do is -- and really matters -- is

14  deliver.

15          That -- as you all know -- that obviously -- even

16  though the audience didn't know it, that advice fell into the:

17  Do-what-I-say-not-what-I-do category.

18          So, again, contrast what Outcome is telling the

19  public what we have on the left, the founders series story, to

20  what the company actually did, which is the Pradaxa campaign

21  on the left.  So on the public, they're saying:  Deliver,

22  deliver, deliver.  And, of course, that suggests to the

23  public, this is how we do things at Outcome Health.  And on

24  the right we've got Pradaxa, which is:  Under-deliver,

25  under-deliver, under-deliver.

1       That contrast makes me think of what they were doing

2    with the investors in 2017.  All that -- those internal

3    communications about what a disaster -- the disastrous things

4    that were going on at the company at that time.  And they're

5    talking to the investors as if it's this incredible time

6    period and the company's incredible story.

7       As of the time -- another thing to consider is, as of

8    the time of this November 2012 interview, Shah and Agarwal

9    understood how important it was for startup businesses to

10   deliver.  And Outcome, of course, was an epic fail when it

11   came to delivery.  Not that their clients knew that, of

12   course.  The under-delivery was concealed from the clients.

13      It's not like it got better over time.  This is

14   that -- on the right is Government Exhibit 594.  That's the

15   July 2016 delta report that --

16      MS. BELL:  Objection.  Misstates the evidence, your

17   Honor.

18      THE COURT:  Well, once again, you're going to hear

19   this again from me today.  The evidence is as you recall it.

20   And if you think the argument misstates evidence, what counts

21   is what you recall from the trial itself.  Attorneys on both

22   sides are entitled to argue what they believe the evidence

23   shows.  So the objection is overruled.

24      And recall that it's the evidence that counts.  And

25   attorney arguments are just meant to point you to different

1    pieces of evidence and give you their interpretation of what
2    they think the evidence shows.
3            Proceed.
4            MR. MADDEN:  So this is -- the top part is just the
5    header of the e-mail that went to Agarwal, Desai and Shah.
6    That the bottom part is the -- one of the spreadsheets that
7    was attached.
8            And, I mean, just take a look at these delivery
9    numbers.  I mean, it's pretty outrageous.  You've got Xeljanz,
10   long-time clients at Pfizer, line 48 from -- client since
11   2013.  And the 2013 campaign was a disaster.  It was a
12   disaster every year that followed.  They're literally
13   delivering at 6.7 percent.  The campaign started in January.
14   The middle of the year, their -- their delivery is less than
15   seven percent.
16           Then you've got, you know, Jardiance.  That's a BI
17   drug.  That's 53.  Remember, Pradaxa also makes BI.  They're
18   delivering ads, I think it's 20 -- 27 percent.  You just go
19   down the list.  I mean, it's three percent, six percent,
20   11 percent, 27 percent, 33 percent.  Just a disaster when it
21   comes to delivery.
22           So let's do another thought experiment while we're
23   here.  Because the defense has essentially suggested that, you
24   know, these under-delivery numbers and delta reports are not
25   that big of a deal because, you know, their clients -- they

1     got so many of them, and so they're trying to explain them

2     away.

3           Let's imagine that someone on this e-mail string, one

4     of the defendants or someone else who got it, decided in

5     July 2016 to send this -- just to forward this to the biggest

6     clients that are listed on there.  Right?  Let's just say they

7     sent it to Pfizer, BI, GlaxoSmithKline, Merck, AstraZeneca, to

8     those clients there.  And Pfizer saw:  Oh, we're paying

9     1.4 million for this campaign, same amount on a monthly basis.

10    They're delivering at six percent on the -- I think it's six

11    percent on the wallboards.  They're delivering at 11 percent

12    on the tablets.

13          BI, who has been -- you know, BI makes Pradaxa, that

14    campaign, 2013.  They've been a client since then.  These are

15    some of their biggest clients.  They're delivering at

16    27 percent on a $4 million campaign.  Think about that.

17          GSK is -- I think GSK is -- Breo is the drug on there

18    on line 55.  35 percent delivery.  $3.3 million.

19          Keytruda on line 58.  That's Merck.  45 percent

20    delivery.

21          Bydureon, which I think is AstraZeneca.  That's line

22    57.  45 percent.

23          So just imagine this being sent to clients.  It would

24    have been like a grenade going off if this was sent to

25    clients.

rebuttal - government

10333

1    Remember what happened to Pfizer in 2017, when Pfizer
2    learned about that massive under-delivery?  They paused all
3    campaigns, demanded a refund and didn't want to do business
4    with Outcome anymore.  This -- if someone forwarded this to
5    these clients, they would have been Pradaxa -- excuse me,
6    would have been like Pfizer 2017 times 10.  You'd be talking
7    about lawsuits, demands for refunds, possible bankruptcy.
8    Zero chance they're acquiring AccentHealth, getting the money
9    from lenders.  Zero chance at a capital raise.  It would have
10   been a disaster for the company.  And the defense group for
11   the last two-and-a-half months is trying to get you to think
12   that these delta reports were no big deal.
13        David Ma --
14        MS. BELL:  Objection.  Misstates the evidence, your
15   Honor, as to delta report.
16        THE COURT:  Overruled.
17        MR. POULOS:  Your Honor, I do object as well to -- as
18   to these materials and the delta reports --
19        THE COURT:  No arguments.  The facts are what the
20   jury heard.  If this is an objection to the -- go to sidebar.
21        (Proceedings heard at sidebar.)
22        THE COURT:  I'm not going to hear a defense closing
23   argument in the middle of the government's rebuttal where you
24   give your interpretation of what certain pieces of evidence
25   are.  That's why we're going to sidebar.

1              Go ahead, Mr. Poulos.  State your objection.

2              MR. POULOS:  Judge, I'm not objecting to --

3              THE COURT:  Speak up.

4              MR. POULOS:  Judge, what I am objecting to is what we

5    objected to from the very outset of this case.  When he says

6    "the defense group."  When --

7              THE COURT:  Oh, go ahead.

8              MR. POULOS:  That the point I made here, Judge, Brad

9    Purdy's not on these delta reports.  He's certainly not on

10   this one.  And it is totally misleading to suggest to this

11   jury that he was.  And to say "the defense group" because I

12   did not make any argument regarding a -- a meaningless delta

13   reports.  I didn't do that.

14             THE COURT:  And the jury will interpret whose on

15   these reports and who isn't.

16             Mr. Madden, if -- you've heard the objection.  If you

17   need to be more specific, go ahead.

18             MR. MADDEN:  Sure.

19             THE COURT:  I assume that was just a loose phrase.

20             MR. MADDEN:  I didn't suggest that Brad Purdy was on

21   the e-mail.  I noted exactly who was on it.  I'm just making a

22   general argument about what would happen if a delta report

23   like this was sent to clients.

24             MR. POULOS:  But my objection is when he says "the

25   defense group," which is totally inaccurate, Judge.  And that

1    is misleading.  And I think it's inappropriate.  He ought to
2    individualize what he is talking about.
3              MR. MADDEN:  I will be going over the Purdy and --
4    deltas.  I would be happy to go over that in great detail, if
5    Mr. Poulos wants me to.
6              THE COURT:  Okay.
7              MS. BELL:  And, your Honor, may I just please --
8              THE COURT:  Go ahead.  Briefly.
9              MS. BELL:  -- complete the record?
10             So the government's own witnesses testified that
11   Ms. Agarwal never received a delta report, and there was no
12   evidence, no testimony that this is a delta report.  And I
13   think it does misstate the evidence on a critical point.  Even
14   the subject of this does not say delta report, it says audit.
15             And so I do think, again, the prosecution has certain
16   obligations.  And one of those obligations is not to
17   mischaracterize what its own witnesses said and didn't say
18   because, of course, they didn't bring in these witnesses.  So
19   that's it.  That's the nature of my objection on this.  It is
20   a key document for us.  They try and connect it to Count 11,
21   and they're -- the terminology is critically important.
22             MR. MADDEN:  It's semantics, your Honor.  It
23   obviously reflects under-delivery.  And I'll be discussing
24   deltas in greater detail.  Happy to go over great detail
25   what --

1          THE COURT:  All right.

2          MR. MADDEN:  -- their clients' receipt of other

3    documents related to this -- under-deliveries.

4          THE COURT:  And you can explain whether it's called a

5    delta report, a deficiency report, an under-delivery report.

6    And I'm not going to suggest arguments, but you can

7    characterize it as you wish.

8          And, by the way, it's not just prosecution.  All

9    attorneys have an argument to make -- have an obligation to

10   make arguments consistent with the evidence.

11         And so the objections -- your objections are noted,

12   they're overruled.

13         And, Mr. Madden, try and conform your arguments to

14   meet these objections, even though I'm overruling them.

15         MR. MADDEN:  Thank you.

16         MS. BELL:  Thank you, your Honor.

17      (End of sidebar proceedings.)

18         MR. MADDEN:  May I proceed, your Honor?

19         THE COURT:  You may.

20         MR. MADDEN:  The short of it is, it would have been

21   disastrous if a report like this or any other report that

22   reflected these massive under-deliveries had gone to clients.

23   And I'm going to go over what they call delta reports and all

24   these under-delivery reports, like the one you're seeing here,

25   in greater detail.  But it would have -- it could have put the

1    business under.  And so for them to suggest that the receipt

2    of these was no big deal is -- is ridiculous.

3         A few more points on delta reports, then I'll get

4    back to Ashik.  First, Shah's attorney in his closing kept

5    saying the delta reports they received were on a

6    category-by-category basis, like rheumatology or dermatology.

7    Well, look at this.  This is broken down on a

8    campaign-by-campaign basis.  Shah and Agarwal both got this

9    one, so they're getting a report of massive under-deliveries.

10   And these campaigns were -- most of them were starting in

11   January.  So they see we are under-delivering at a massive,

12   massive level midyear, July, on these -- lots of their biggest

13   clients.  And the reality is is those delta reports on

14   category-by-category basis, they were just as alarming.

15   Certain categories like rheumatology, they were -- there were

16   massive deltas in every single delta report.  If you take a

17   look at them, the spreadsheets, when you're in the -- when

18   you're deliberating, you'll see thousands and thousands of

19   screens of under-delivery in these delta reports consistently.

20   That's what David Ma testified to.  It's what Ashik testified

21   to, when they're going over these delta reports.  Every one of

22   these delta reports is alarming.

23        Another point.  Agarwal's attorney argued that

24   ordering this audit is the opposite of committing fraud.  She

25   forgot a key qualification on that.  They order the audit, but

1    they didn't share the results with the client.

2          The point that I just made is, if they did that

3    second part and sent these to the client or shared these with

4    the client, which is what an ethical business would have

5    done -- I mean, you heard from all the victims.  If there's

6    under-delivery, okay.  But tell us.  They expect to be told

7    right away.  This is July.  Multimillion-dollar campaigns.

8    And the delivery numbers are outrageous.  They really are.

9    Long-term clients.  And they brag to investors about how their

10   business is sticky.  They keep their clients.  Well, they kept

11   their clients by under-delivering and then not concealing it

12   from them.  The clients thought they were delivered.  The

13   clients didn't know anything about these under-deliveries.

14         Another issue that Agarwal's attorney suggested was

15   that this report only reflected operational issues.  And

16   that's -- that's not true.  It does reflect operational

17   issues.  That's Column M.  Devices are inactive.  But it also

18   reflects these massive under-deliveries in Column N, to the

19   far right.

20         What I have here on the top corner is, if you run

21   these numbers -- just want to explain how it works -- like

22   Xeljanz, line 49.  If you see 921, that's the -- that's the

23   column I, that is the contracted number of tablets that

24   they're supposed to be delivering on since January.  The

25   actual number of devices that they have is 143.  Of those 143,

1   34 are inactive.

2          So you subtract -- the way this works is you would

3   subtract 34 from 143, and that gives you 109.  And you put --

4   and that might be ops issues.  It might be ops issues.  That

5   might be why those in the column are inactive.  But you

6   subtract that, and you do the division that I have on the

7   screen, it gets you to 11.83 percent.

8          Any way you look at it, it's terrible for the client.

9   And it's concealed from the client.  And they're getting all

10  this money on a monthly basis, just like they did with Pradaxa

11  in 2013.  Bill it -- you know, deliver at 20 percent, deliver

12  at six percent, bill at 100 percent, regardless of -- of what

13  they're delivering.

14         The defense tried to make a big deal of that Delta

15  Day e-mail to try to suggest that the government doesn't have

16  its facts right.  The government's not showing you the right

17  facts.  There was a Delta Day e-mail that you might remember.

18  They were going to do a -- they were going to Soho House.

19  Agarwal and Desai and others were on it.  They were going to

20  go to Soho House, discuss deltas, then court side seats for

21  the Bulls.

22         Ashik testified about that.  His recollection is that

23  they did it.  On cross, they showed him a document, it was a

24  calendar invite that was canceled, and they suggested that it

25  was canceled.  Ashik's testimony was he recalled that they did

1    the Delta Day, but he -- and he said about -- he said

2    something along the lines of just the fact that the calendar

3    invite was canceled, doesn't mean we didn't go.

4         But the reality is, regardless of whether or not that

5    particular Delta Day happened is really beside the point

6    because they were talking about deltas all the time.  So much

7    so that Shah actually complained in 2016 about not wanting to

8    have every meeting to be about deltas.

9         And so that's why these defense claims about how many

10   times my client received a delta report or how many times my

11   client heard about the deltas are really silly.

12        Let me show you that e-mail.  This is Government

13   Exhibit 557.  March 2016.  Shah and Agarwal are on it.

14   Surakanti was Shah's chief of staff at that time.  And

15   there's -- this is about an exec team meeting.  And Surakanti

16   is sending out -- he initially sent out the agenda.  And one

17   of the things -- this is his initial e-mail, number 4 on the

18   agenda was growth model.  And he says:  We're going to discuss

19   what gaps exist -- that's the deltas -- and then how they're

20   going to be -- how we're going to address the alignment

21   between distribution and sponsorship.  He puts "bulk of

22   meeting."  So the bulk of meeting is going to be to talk about

23   the deltas.

24        But the key part is Shah's response to this.  By the

25   way, growth model, the defense claim that the growth model was

1   not related to the delta report is not accurate.  It's

2   inconsistent with David Ma's testimony and Desai's testimony,

3   who explained that the delta report was an input, a part of

4   the growth model.

5           So here's Shah's response to Jayanth Surakanti's

6   e-mail.  He's responding to number -- to four, which was the

7   discussion of the gaps.

8           And he said:  I don't want Matt to recommend new

9   ideas not cleared by me because it will turn into an

10  inquisition rather than an update to the group on how we'll

11  address the gap.  This isn't a meeting for brainstorming on

12  how to fill the gap, as many people don't work in those areas.

13  We don't want to spend every meeting on that topic.

14          He's talking about deltas.  He does not want every --

15  so in March of 2016, Shah is saying -- the CEO is saying:  I

16  don't want every one of our meetings to be about deltas.  Not

17  only that, he's looking to control the conversation.  Right?

18  I mean, he's the CEO.  That's his prerogative.  But they're

19  talking about transparency.  And he's saying, those ideas

20  should be discussed and pre-cleared ahead of time.  He wants

21  to dictate what is said about this and who can say what and --

22  and you've got the defense up here showing these silly photos

23  and being, like:  Wow, they told everyone.  Anyone could talk

24  about deltas.

25          Look at this e-mail.  Shah is dictating.  He's the

1    CEO dictating what can be said, how much they're going to talk

2    about deltas.

3              And the other takeaway is they're talking about

4    deltas so much Shah is complaining it's like every meeting.

5              I also wanted to mention that Mr. Poulos's claim that

6    Purdy didn't hear about deltas because, between the time that

7    Purdy e-mailed a delta report, which I think was

8    February 2015, and then this Rexulti issue that occurred in

9    2016, I think that was -- Mr. Purdy said -- Mr. Poulos, excuse

10   me, said that Poulos -- that Purdy did not know about deltas

11   in the interim.  That's not accurate.  Here you've got this

12   e-mail here, Shah, the CEO, is saying:  We're spending every

13   meeting on deltas.  Purdy is part of the executive team.  He

14   goes to these meetings.  Every day at Outcome was a Delta Day.

15   The idea that they weren't discussing deltas is totally

16   inconsistent with the evidence.

17             And then, of course, consider like the -- you know,

18   Mr. -- the data pull from the auditor's e-mail, which Desai

19   forwarded to Brad Purdy.  And Choi said, a bunch of these

20   campaigns are at 50 percent.  What can we show Deloitte?

21   She's talking about 50 percent under-delivery, forwarded to

22   Brad Purdy.  Just more evidence that it was openly discussed

23   with Brad Purdy, the deltas were.  The defendants knew all

24   about deltas.

25             I want to give you an analogy, or two, to help you

1    think through why the deltas and under-deliveries were a big

2    deal.  Let's say school is starting, and I go to a store to

3    buy four pairs of shoes for my kids.  Pay for those four pairs

4    of shoes, walk out, and I get home, and I realize there's only

5    one box of shoes in my bag.  And that's 75 percent

6    under-delivery.  That's how the -- that's how the rheumatology

7    clients would feel if they knew about Outcome's

8    under-deliveries.

9            Then I open up the box that I do have, it's not the

10   size that I bought for one of my kids.  It's basically useless

11   for me, or probably useless.  You know, that's what we would

12   call off-target delivery in this business.  It's not what I

13   paid for.

14           So how do you think a customer like that would react,

15   or a client of Outcome?  Would they think it's no big deal if

16   you pay for four pairs of shoes and got one and the one that

17   you got wasn't even what you thought -- what you bought?

18           I mean, God forbid the Core 4 ever started a sandwich

19   shop.  Right?  Let's play that out a little bit.  If it was

20   the Shah-Agarwal-Purdy-Desai Deli, let's say I go to -- I go

21   there, and I buy six sandwiches for the government team.  To

22   make it simple, let's say they're all turkey sandwiches.  I

23   pay for the sandwiches.  I get back to the Dirksen building,

24   I'm downstairs, and I'm starting to think, the bag's a little

25   light.  But they wouldn't rip me off like that.  I paid for

1    six sandwiches.

2             I get back to the office, everybody's hungry, I empty

3    the bag, and I see there's only three sandwiches.  50 percent

4    under-delivery.  Then I open them up, and we're, like, maybe

5    we can share.  And it turns out, well, only one is turkey and

6    two are tuna.  That's off-target delivery.

7             What would our reaction be to that?  Concern.

8    Surprise.  Maybe anger.  How are we going to react?  I'd go

9    back -- we'd go back to the store immediately, demand a

10   refund, call them, ask what happened.

11            Now, the difference is, we actually knew -- in those

12   examples, the customer or client would know about the

13   under-delivery immediately.  In Outcome's business, it wasn't

14   that easy.  They were in hundreds and hundreds of offices.  It

15   wasn't like the clients could check that easily.

16            It was a trust business.  You've heard that.  They

17   took advantage of the trust that their clients put in them.

18            These deltas were a big deal.  It's blatant.  It is

19   blatant to take people's money and give them half, 20 percent,

20   30 percent, 70 percent of what they've paid for.  And

21   oftentimes what they were delivering wasn't even the right

22   thing.

23            Back to discussion of Ashik after that interlude

24   about deltas.

25            We finally get to August of 2013, when Desai starts.

1 He had that fork in the road, which he talked about during the

2 early part of his testimony, where he had to make that

3 decision:  Do I stay on this path to become a doctor, that

4 seven-year program at Northwestern, or do I go work for Shah

5 and Agarwal.  And unfortunately for him, he chose the latter.

6      His first time -- his first job out of college.  If

7 you believe the defense, he's the 20-year-old criminal

8 mastermind who immediately puts into place all those

9 fraudulent business practices.  As if the two defendants, who

10 had been running the business for seven years or six years,

11 approximately, at that point, as if they're going to take

12 direction from a 20-year-old, new-hire with no experience.

13      Think about Shah's personality when you think about

14 that defense position.  And if you have any questions about

15 Shah's personality, listen to the recording of Shah and

16 Prowker and others in January 2017.  Or listen to clips of

17 that founders stories video.  Or the e-mail that we just

18 looked at about the inquisition on deltas.  Shah dictates.  He

19 is a leader.  He leads.  You could see him as the CEO.  That

20 is his personality.  He's a very forceful person.

21      I mean, think of the way that Adam Prowker meeting

22 went.  It was hard to -- and then the founder series video.

23 He was doing all the talking.  He is not the -- the next time

24 Rishi Shah takes a backseat to anyone will be the first time.

25 And the idea that he took a backseat to Ashik Desai is

1    laughable.  That's not what happened.

2         And defense understands it makes no sense for a

3    20-year-old to arrive at his first job out of college where

4    the, you know, the co-founder has been running the business

5    for a while and immediately put into place all these

6    fraudulent practices.

7         So Shah's attorney -- excuse me, Agarwal's attorney

8    showed you all these e-mails in closing.  Look.  Ashik, he

9    volunteered for a few tasks.  He took some initiative.  He was

10   smart.  Ergo, he was the fraud mastermind who took things over

11   at the business.  That was one of the weaker arguments.

12   There's some competition for that.  But that was one of the

13   weaker arguments that you've heard from the defense.  Makes no

14   sense and so far from reality.

15        Let's think about motive.  Throughout their

16   arguments, the defendants have tried so hard to explain the

17   "why."  Why, if what they claim is true, would Ashik Desai

18   commit this fraud all by himself?  Puff pieces in the news?

19   Facebook posts?  All silly reasons to throw your integrity

20   away.  So think -- the one thing the defense has focused on

21   was Desai's salary.  He was making about 500 grand towards the

22   end of his time there.  Remember the defense showed you a

23   slide similar to this?  However, as you saw Desai's salary,

24   and defendants' salaries were very similar.

25        Then there's this.

1               And this.

2               The co-founders' dividends in 2016.  Bank loan.

3               So who's got the financial motive to represent to the

4       lenders for the April 2016 loan that everything's on the

5       up-and-up at Outcome?

6               And then, of course, the massive dividend from the

7       capital raise that dwarfs everything else.  That kind of

8       equity interest in a company is some kind of incentive.

9               But don't take my word for it.  Shah's attorney said

10      it himself in closing.  He said:  Equity is the ultimate and

11      greatest incentive.

12              And you saw who had equity or ownership interest in

13      the company year after year:  Rishi Shah, Shradha Agarwal,

14      Brad Purdy.  Never Ashik Desai.

15              Let's consider what Desai did not say.  Sometimes

16      that's just as important as what a witness did say.  Desai

17      explained to you that he manipulated the ROI reports on his

18      own.  He didn't talk to Shah about it.  Didn't seek permission

19      from Shah.  Didn't discuss it with any defendants, except when

20      he lied to Brad.

21              Desai never put that on them.  He owned it from the

22      start.  And he has been straight with the government from the

23      start.

24              This is the consistency here.  His grand jury

25      statement, September of 2019, nearly four years ago, before he

1  had a deal with the government.  Shah -- excuse me.  Desai

2  testified under oath:  I did not tell Shah or others that I

3  was changing the numbers in ROI reports.  In fact, on one

4  occasion when Purdy asked me about it, I lied to him.

5       100 percent consistent with his testimony in court.

6  He has been consistent from the start.  Owning this.

7       This is what the truth looks like.  This is what

8  taking responsibility for your actions looks like.

9       One last -- on that last line here about lying to

10  Purdy there in the grand jury, you might remember that

11  Ashik -- that related to Ashik changed the numbers.  That was

12  related to Tradjenta.  And Ashik lied to Purdy in a one-on-one

13  conversation around that time.  No documents memorializing

14  that conversation.  You didn't see any documents on that.  No

15  Voxer, anything like that.  So how do we know that, A, there

16  was such a conversation, and B, that Ashik lied to Brad?

17       Because Ashik told us about it.  He owned up to it.

18  Remember this testimony?  He looked back at the summary report

19  from the FBI about when he first told the government this.  It

20  was in 2018, more than five years ago.  First talking -- when

21  he first started to talk to the government.  The government --

22  so the one-on-one conversation, that all came from Ashik.

23  That Ashik lied about -- lied to Brad in that conversation and

24  told the government about it.

25       And Purdy's attorney is calling Desai an inveterate

1    liar.  Shah's counsel called him rotten from day one.  A

2    corrupter and a natural-born liar.

3            They're making it seem like Desai was just lying

4    about anything he could think of to please the people at this

5    table.  Yet, he takes responsibility for one of the most

6    egregious parts of this scheme.  Not only that, he

7    acknowledges that from day one, that he didn't tell anyone

8    else about it.  And number 2, that he affirmatively lied to

9    Purdy about it.  That does not square with the way the defense

10   is portraying Ashik Desai.

11           Think about that when you consider Mr. Poulos's

12   argument about that phone call while Purdy -- excuse me, while

13   Purdy was in Mexico.  Poulos is claiming that Desai just made

14   that up and the phone call never happened.  The question is:

15   Why?  Why would Desai make that up?  Why would Desai admit

16   that he never told anyone about the ROI reports?  That he lied

17   to Brad about the ROI reports, but then make up this -- this

18   -- this -- the fact that he had this phone call about Deloitte

19   with Brad.  That makes no sense.

20           Ashik was telling the truth about that phone call.

21   Purdy's attorney is calling Ashik an inveterate liar because

22   he understands that Purdy is toast if you credit Ashik's

23   testimony.  And there's so much other evidence that shows that

24   Purdy is guilty, of course.  But, yeah, that phone call is

25   incriminating.  I can see the concern.  But you should

1    absolutely credit Ashik.

2            While we're talking about the fact that Ashik did not

3    loop the defendants in on his alteration of the ROI reports

4    and the lie to Tradjenta, let me address one point the defense

5    attorneys argued about this.  They made a few similar points,

6    but the takeaway was that co-schemers supposedly never lie to

7    each other.  Mr. Poulos said:  It's absurd for the government

8    to say that fraudsters lie to each other.

9            If those defense attorneys are right, it means that

10   fraudsters apparently have a previously unknown moral code

11   that, even though they lie to lots of people, they make --

12   like, they lie to clients, they lie to potential clients, they

13   lie to lenders, they lie to investors, but they always tell

14   the truth to each other.  That's a new one.

15           You learn something new every day.  The reality is,

16   there's no honor among thieves.  And the fact that Desai kept

17   one aspect of the fraud scheme a secret and lied to Purdy

18   about it on one occasion does not undermine all the other

19   evidence in this case and doesn't undermine Desai's testimony.

20           The truth is that fraudsters lie, even to each other

21   sometimes.  But fraudsters also protect each other, even when

22   the scheme -- when the scheme is about to get outed.  When

23   whistleblowers started flooding Outcome, pointing the finger

24   at Desai, Shah and Agarwal circled the wagons.  They gave him

25   advanced warning, and they pushed out the whistleblowers.

1    Not only that, after those complaints to Shah about
2    ROI reports being manipulated and other aspects of Outcome's
3    fraudulent scheme, Shah placed Desai back in charge of
4    operations, which included responsibility for list-match,
5    delivery, and ROI.  The ROI reports.
6    What else did Desai not say?  He never said that he
7    told Shah about inflating the tablet metrics.  Among the
8    defendants, he only implicated Purdy and Agarwal in that.  His
9    testimony was that Purdy was involved with the tablet metric
10   aspect of the fraud.  And that's obviously consistent with the
11   documents you've seen.  And Desai testified that Agarwal knew
12   about it because he told her about it.  Both Agarwal and Purdy
13   were very involved in tablets with product.  So it makes total
14   sense that he would discuss it with them.  But he didn't
15   tell -- he never said he told Shah about it.  He's telling the
16   truth.
17   Agarwal's attorney said that Desai lied when he told
18   Agarwal that they were inflating tablet metrics.  Again, ask
19   the question why.  If Desai is lying about that, why does he
20   implicate Agarwal but not Shah?  He's telling the truth.
21   Agarwal had responsibility over product.  She was part of the
22   scheme.  Ashik looped her in.
23   During closing, Mr. Poulos noted that Desai, in his
24   quote-unquote "preppy" sweater was so calm and collected on
25   the stand.  And that's true.  Desai was calm and collected on

1    the stand.  I think Mr. Poulos attributed that to:  Lying
2    being in Mr. Desai's essence.

3         Let me offer you another explanation:  Desai has made
4    peace with his history of lies and fraud by coming clean and
5    accepting responsibility.

6         Compare that to the defense group's panic at the
7    prospect that you would believe Ashik.

8         You know what Desai's biggest problem was while he
9    was at Outcome?  He was under the sway of Rishi Shah and
10   Shradha Agarwal.  People who have the mindset that you see on
11   these poster boards.

12        And we've switched the poster boards so you all over
13   there can see the other one.

14        He worshiped them from the start.  He did their
15   bidding.  Desai understood exactly what Shah wanted:  Growth
16   at any cost, go get revenue at any cost, and anything goes.
17   Operate in shades of gray, green, red, blue, whatever it
18   takes.  That was the Outcome business model.

19        And now Ashik is all grown up.  He's no longer under
20   their spell.  He's no longer Mini-Rishi.  And there's nothing
21   they can do about it, other than:  Attack, attack, attack, and
22   call him names.

23        Desai's testimony is consistent with other evidence.
24   Let's consider some of that.  David Ma's testimony.  There are
25   numerous consistencies between David Ma and Ashik Desai.  The

1    client victim testimony.  Ashik's grand jury testimony.  Prior
2    consistent statements.  There are e-mails, Voxers, texts.
3         Let me give you a few examples of Ashik's
4    corroboration.  First, a central point, of course:  Both Ashik
5    and David Ma implicate Purdy, Shah and Agarwal in the scheme.
6    David Ma said that they condone the unethical behavior.  And
7    there was other testimony as well.  Both Ashik Desai and Ma
8    implicate Purdy in the inflation of tablet metric scheme.
9         Ma also corroborated Desai's testimony that he told
10   Shradha about the inflated tablet metrics.  This is Desai on
11   the left.  And David Ma testified that Ashik told him that he
12   was going to discuss the issue with Shradha.
13        Then you've got Ashik's grand jury -- this is --
14   let's see, this is -- let me give you -- let me give you
15   another example of how Desai's testimony is corroborated by
16   both documents and another witness.
17        You'll recall that Desai testified that after he
18   started, he was generally speaking the practice of silo
19   information from sales, including the list-match info.  The
20   result was that the salespeople didn't know that they were
21   giving false information, generally speaking, and thus the
22   clients didn't know.
23        That, of course, is consistent with David Ma's
24   testimony.  Remember Ma circled the salespeople on that
25   matrix-like org chart saying salespeople didn't know that they

1    were lying, necessarily, but they were providing false

2    information.

3            Let me walk through how the testimony from both Desai

4    and Ma is corroborated by records, starting with a comment in

5    Shah's closing.  According to Shah's counsel, Shah always --

6    Outcome was -- always thought Outcome was transparent and

7    disclosed that it was selling growth to clients.  And then

8    they suggested that the government may have just searched for

9    the word "made-up" to make this case.

10           This was a summary chart that they put together about

11   weighted average.

12           And then Shah's counsel noted in numerous times in

13   closing that timelines are important.

14           We noticed something curious, looking at the

15   documents.  Shah's team is relying on these documents here,

16   listed in this chart.  The documents are all dated 2011 and

17   2012.  Before this e-mail exchange, for example, about siloing

18   in February 2013 where Shah writes:  Does Bob know our match

19   was projected?  Don't want to copy him on this so he doesn't

20   get confused.

21           Agarwal responds:  I'm not sure in this particular

22   case, but generally the team doesn't know its projection

23   because they get confused.

24           Hiding details about projections from salespeople is

25   how you deceive the clients.  Salespeople aren't sure what

1    they're selling.  Clients won't know what they're buying.

2           Here's that on this chart.  Another one, before the

3    defense -- the defense exhibits were before this e-mail from

4    Agarwal to Desai and Shah about siloing.  Again, two quick

5    points on this e-mail because Agarwal's -- spent a lot of time

6    on this.

7           First, it was Agarwal who used the language:  Any

8    time we're having a back-and-forth here, let's take the

9    salesperson off the chain.  I've noticed their confidence

10   level in our data change when presenting to clients if they

11   believe it's accurate versus made up.

12          Those are Shradha Agarwal's words, and she's trying

13   to minimize them now.

14          Second -- the next paragraph is key because she

15   refers to list-matches.

16          I don't always share back-end thinking in how we

17   arrive at the number.

18          And then the parens is important.

19          (Same with list-matches when we project)  But we do

20   have a pattern of how I do it.

21          Look no further than here for where Desai took his

22   cues on hiding projections from salespeople his first week on

23   the job.

24          So there's that one.  From 2013 forward, they weren't

25   disclosing growth.  Generally speaking, they were siloing

1    information, consistent with Desai's testimony, consistent
2    with Ma, consistent with these e-mails.
3            Here's another one before that same time that Target
4    Health bought specific monthly goals, not a weighted average.
5            Here's another one.  October 2013.  We don't want to
6    incorporate weighted average into discussion.  It will affect
7    pricing.
8            Also, after the defense exhibits.  October '13, this
9    is from Brad Purdy.  I don't think -- I don't think Mr. Poulos
10   commented on this one.  This is Purdy saying that we should
11   have some sort of barrier between sales and ops regarding
12   tablets and cumulative counts.  So keep them focused on
13   selling the future.  Also after all those defense exhibits.
14           Then this is Count Five.  Another very, very strong
15   count because siloing was such a central part of the business.
16   Rishi Shah sends another e-mail about siloing.
17           So you can see the point here.  These e-mails about
18   siloing are -- all come later.  It became a business practice.
19   And it was really the defendants.  The Core 4 were all very
20   involved in that.
21           What else puts the lie to weighted average?  I've
22   talked about it a few other times, but, number one, it's the
23   way they talk about it in these e-mails.  It's clearly a
24   fallback, internal excuse.
25           Number 2.  The magnitude of the deltas.  They were

1    reflected in the delta reports and the data pull for the

2    auditors.  You would need a huge increase to even come close

3    to achieving weighted average.  The magnitude of the deltas

4    made that generally impossible.

5          Three.  Petron's testimony.  Mr. Petron, the expert,

6    he testified that he actually ran the numbers on the weighted

7    average and made very little difference.  It just changed it a

8    few percent.  It was still very material.

9          Four.  You know, the defendants -- well, four is the

10   Christmas Voxers that I showed you earlier.

11         The false affidavits -- talking about the false

12   affidavits and concealing under-delivery.

13         And Desai says:  They haven't been telling clients

14   that they've purchased weighted average, and reporting true

15   affidavits will cause confusion and alarm.

16         If that's -- if they knew about weighted average, the

17   affidavits would not cause confusion and alarm if they showed

18   under-delivery.

19         Let me give you an example of how Desai's testimony

20   is corroborated by victim witness testimony by clients, either

21   pharma or ad agency.

22         You'll recall that Desai testified that, generally

23   speaking, clients wanted to buy installed inventory, not

24   weighted average or growth.  Shah's counsel suggests that the

25   only thing that matters is what's in Shah's head, not what

 1    those ten, or so, pharma/ad agency witnesses said.

 2           But in considering whether these supposed beliefs

 3    were in fact genuinely held, you can compare them to what

 4    these witnesses said and their understandings.  And isn't it

 5    convenient that the defendants at this trial and their

 6    supposed understanding of the contracts is the exact opposite

 7    of every single client victim that you heard from.  What can

 8    explain the sheer number of misunderstandings.  Certainly not

 9    Ashik Desai.  He wasn't there in the early days when some of

10    these campaigns happened.  This is what the victims had to

11    say:

12           Was Pfizer interested in weighted average?

13           No.

14           Why not?

15           Um, we made determinations on how to spend our

16    budget.  We might have chosen to spend them differently.

17           If weighted-average delivery was acceptable, should

18    that be in the contract?

19           Yes.

20           Courtesy Cruz again.  You've had a chance to look at

21    all these contracts.  Are any of them -- do any of them

22    reflect anything about weighted average?

23           No.

24           Courtney Cruz.  Do any of your communications -- this

25    is the 2017 issue.  Did Brad Purdy or anyone else suggest that

1   Outcome had delivered on weighted average to explain the

2   under-deliveries?

3           No.

4           Same thing from the agency.  Not interested.

5           Lyndon Chin, BI.  How often was weighted average

6   used?

7           It was mentioned, but not really implemented.

8           How often would you actually request for that type of

9   information?

10          Maybe once or twice during my time.

11          Lyndon Chin again.  It should be on the contract.

12          Tameka Teal.  Same thing.  These are just -- these

13  are all consistent.

14          Matthew Ubriaco.  They were interested in installed

15  devices.  Would not contract on the possibility of offices.

16  They wanted installed devices.

17          Very consistent.  And one of the points is this

18  victim witness testimony, it's consistent with Desai's

19  testimony.  Desai said clients generally weren't interested in

20  weighted average or growth.

21          And it's all inconsistent with the defense -- what

22  the defense group has been trying to sell you.  The defendants

23  themselves were experts in point-of-care advertising.  They

24  created and ran one of the largest point-of-care vendors in

25  the country.  The idea that they didn't know that their

1    long-term clients were generally not interested in weighted
2    average is absurd.

3            The defendants were executives who were paid to run
4    their business well.  If they didn't understand this reality,
5    that their clients wanted and expected installed inventory,
6    they were either incompetent or not very smart.  And we know
7    that these three defendants were none of those things.

8            Another point on evidence corroborating Desai is the
9    data pull for the auditors e-mail.  You know the details, so
10   I'm not going to go over it in great detail.  But Choi sends
11   this e-mail here.  The word "backfill" means conceal.  That is
12   how it's being used here.  Talking about deltas at 50 percent.
13   And then what she's suggesting is what they can and cannot
14   show Deloitte.  She's openly discussing massive deltas and
15   whether they should conceal them for -- to Deloitte.

16           What's the first thing Desai does?  He forwards it to
17   Brad Purdy, asks for guidance.  The testimony about -- Desai's
18   testimony about the phone call is totally consistent with this
19   e-mail.  He immediately forwards it to Brad Purdy and asks for
20   guidance.  Not acting like a lone wolf, is he?  Not hiding
21   anything from Brad Purdy.

22           Purdy has been an insider from the start, and Desai
23   is not the only one that trusts Purdy.  This is in February of
24   2016.  Consider what we know about Brad Purdy at that time.
25   These e-mails all precede the data pull for the auditor

rebuttal - government

10361

1    string.

2           Not only does Purdy know that Outcome has deltas,

3    he's literally editing a delta report here.  This precedes

4    that string as well.

5           Then there is this e-mail at the top, which is

6    Desai's response to Purdy.  Desai tells Purdy:  We're going to

7    show Deloitte device IDs for devices under repair and

8    un-installed.

9           There is nothing legitimate about including IDs for

10   devices that are under repair or un-installed when you're

11   sending information about delivery to Deloitte.  That conceals

12   what's going on.  This e-mail exchange really tells you

13   everything you need to know about the episode.

14          Purdy's attorney is focused on the phone call because

15   the phone records don't show a communication between the two

16   phones.  Despite the fact that what they cooked up on the call

17   is exactly what's reflected in the records that we just

18   reviewed, the reality is is the phone records are

19   inconclusive.  That's the bottom line.

20          We do know Purdy had a call with Tracy Harrison from

21   Deloitte while he was in Mexico.  The call was on Purdy's

22   calendar.  And Harrison testified that she, in fact, had a

23   call with Purdy.

24          So her phone call, though, does not show up in

25   Purdy's records.  Just like Desai's call with Purdy doesn't

1    show up either.  The phone records did show a call between
2    Purdy and Desai shortly after Purdy returned.  Another time
3    when they talked.  But overall, the phone records thing is a
4    red herring, and Mr. Poulos attributes way too much weight to
5    it.

6         Focus on the evidence that you do have.  Ashik
7    immediately looped in Purdy, forwards him an incriminating
8    e-mail from Choi, and asked him for guidance.  Then kept him
9    in the loop later with the e-mail at the top.

10        Anyway, if Desai is sending Purdy multiple e-mails
11   about the exact topic, doesn't it stand to reason that they
12   might have had a phone call about it too?

13        Purdy was definitely part of the decisionmaking
14   process on concealing the deltas from Deloitte.

15        Ashik Desai has been consistent on this as well.
16   This is his grand jury testimony in 2019.  He said:  Purdy and
17   I had telephone conversations about this issue.  During one of
18   the calls, Purdy and I discussed how large of a delta we could
19   show to the Outcome accountants and Deloitte.

20        And then they came up with that 10 percent threshold.
21        Ad campaigns -- after that, for ad campaigns on
22   deltas list of deltas greater than that, we would create a
23   false list of offices by including where the devices had not
24   been installed or were currently un-installed.

25        Consistent with his trial testimony.

1            And think about this.  Desai's testimony, again to

2    use one of Mr. Poulos's phrases, is corroborated by objective

3    contemporaneous evidence.  The e-mail.  His decision to

4    immediately forward the e-mail to Brad and then keep him in

5    the loop is consistent with his testimony.

6            You did hear a new defense that I wasn't familiar

7    with before, the Cabo defense, yesterday.  Or we could call it

8    the margarita or piña colada defense.  You heard it here

9    first.  Apparently you can't hold a CFO responsible for his

10   participation in a fraud scheme involving the fabrication of

11   data to deceive an auditor if he's south of the border,

12   holding a drink in one hand and his phone in the other.

13   Because the left hand doesn't know what the right hand is

14   doing.

15           Now, that -- that is consistent with a theme at

16   Outcome, where the left hand doesn't know what the right hand

17   is doing.

18           But it's -- the Cabo defense, of course, is

19   entertaining, but it was meaningless.  Ashik included him on

20   that e-mail in the first place where he and -- were talking

21   about concealing massive under-deliveries from the auditor.

22           And the suggestion that Brad was just busy partying

23   down in Cabo?  You saw his calendar.  He was taking calls with

24   Tracy Harrison from Deloitte.  There was another call with JP

25   Morgan when he was down there.  He was clearly working and

1  taking work calls when he was down there.

2          One final point about other evidence corroborating

3  Desai.  The e-mails corroborate him, including the Novo

4  e-mails like the call from Nancy G.  The Pradaxa 2013 e-mails

5  also very strongly corroborate Desai.

6          I'm not going to go over these in great detail, but I

7  just put up some of the key ones here.  This is the initial

8  list-match, Exhibit 67.  This is a really key one where --

9  this is the key one where Agarwal says:  The biggest issue

10  here is the list they have of 18, 19 matches isn't the true

11  list.  Not even one-third of it is -- was installed at the

12  time.

13          The mean of Agarwal's response could not be clearer.

14  They had inflated the list-match by 66 percent and did not

15  disclose to the client.  And Outcome never caught up.  Outcome

16  was actually playing in about 1,000 screens at that time, so

17  they were about 800 short at the time.

18          If Shah or Agarwal thought this was weighted average,

19  they would have just sent the client -- because what happened

20  here is the client was going to do an internal ROI.  So they

21  needed the offices.  If they thought it was weighted average,

22  they would have just sent the client the thousand offices to

23  study.  But they didn't want to disclose the under-delivery,

24  so they -- that's why this e-mail exists.

25          I can't say it better than my colleague said it.

1  This e-mail would not exist if they believed this was weighted
2  average.

3          Here, I don't think Shah covered this one, but Shah's
4  giving Ashik his first direction to lie, down there in the
5  bottom.  The third paragraph.  He tells Desai to lie to the
6  client and say that IMS was contracted automatically for all
7  campaigns.  It was not true.  Ashik testified about this at
8  trial and in the grand jury.  The testimony was the same.
9  They weren't automatically contracted.  That was being done to
10 try and get BI to allow them to do the report where they --
11 allow them to have IMS do it so they could control it.

12         Then, of course, there's the open-to-being-honest
13 e-mail.  In the end, we're open to being honest if we're
14 caught.  Given the lack of communication between research and
15 brand teams, I think this will be unlikely.

16         Desai, early days, learning the ropes from Shah and
17 Agarwal.  He is a quick study.

18         Shah and Agarwal's team's interpretation of this 2013
19 campaign are like something out of an alternate universe.  The
20 reality is is that campaign was a disaster, and the client had
21 no idea, which was par for the course at Outcome.

22         To try to confuse you about campaigns like that, the
23 defense was plucking out snippets and very quickly showing you
24 snippets up on the screen from unrelated e-mails and then
25 highlighting irrelevant portions of incriminating e-mails.

1    Let me give you an example.

2            They showed you this e-mail about Pradaxa.  This is a

3    slide from Agarwal's closing that we recreated here.  This

4    is -- the e-mail exchange is between the Core 4 related to

5    Pradaxa, dated October 1, 2013.  They're talking about selling

6    Pradaxa on a 2014 campaign.  And on the right side, we've

7    recreated the callouts that Agarwal's team has pulled out.

8    This is Exhibit A of what context looks like for the defense

9    group.

10            The point of the callouts is to make it seem like

11   Agarwal's "ditto" is agreeing with what Brad Purdy said in the

12   first e-mail:  I'm not sure we really want to stretch growth.

13            Which is a snippet from the second paragraph of his

14   e-mail at the bottom.

15            And then this is the -- this is the argument about

16   it.  "Ditto" means, I agree.  We should consider whether or

17   not we want to stretch growth.  And then, of course, they say:

18   We put this in context for you.

19            Here's the actual e-mail that -- where Ashik says:  I

20   think there are certain match numbers we'll have to hit as

21   they're adding back old physicians we claimed to have had.

22            This e-mail is about the 2014 Pradaxa list-match.

23   When he says "we claimed" he's referring back to that

24   massively inflated 2013 Pradaxa list-match before -- done by

25   Shah and Agarwal before Desai joined the company.  The upshot

1    is they have to stay consistent with the prior lie.

2              After this, Agarwal chimes in and says:  "Ditto."

3              E-mails like this could not be clearer.  They have to

4    inflate the list-match again to cover up the prior year's

5    inflated list-match.  So here's the full e-mail that we just

6    looked at.  I've highlighted it in yellow, the key exchanges

7    there.

8              And now you see what was presented to you by

9    Agarwal's team.  These are their callouts on the right.

10   What's in red is what they left out from their callouts.

11   What's in yellow is what they called out of the e-mail.  So

12   they called out:  I'm not sure we really wanted to stretch the

13   growth, from Brad.

14             Ashik's:  I completely agree with you.  In yellow.

15             And then ditto, to suggest that the ditto was

16   responding to that.  When, in fact, the e-mail's extremely

17   incriminating.  But from the callouts, they made it seem like

18   it wasn't.

19             That's context for the defense.  They're hoping that

20   you'll rely on distortions like that.

21             Then in January, Desai learns that there was an ops

22   error.  The campaign did not play at all for the last four

23   months of the year.  He talked it over with Shah, but of

24   course neither the client or Bob Mons were going to be

25   informed.  No refund or make-good.

1        Shah tried to make a big deal out of the fact that
2    Ashik initially thought that he talked to Shah about this in
3    late 2013.  It turned out that their conversation was shortly
4    before this in January.  So what?  Shah is trying to suggest
5    that in January '14, Ashik just made this it up and never
6    talked to Shah about it and threw Rishi's name in this e-mail.
7    Ashik had just started the company a few months before this.
8    They didn't have enough inventory for Pradaxa at any time
9    during 2013, which had nothing to do with Ashik.  And then an
10   ops error happened, which was not Ashik's fault.  Ask yourself
11   this:  Why would Ashik lie about this?  Why would he lie about
12   it to you all?  Why would he lie in this e-mail back in 2014?
13   He's openly discussing with Dan Schwartz, so why would he talk
14   to Dan Schwartz about this and not talk to Shah about it?  It
15   doesn't make any sense.
16        Again, we've talked about Ashik has owned the
17   manipulation of the IMS reports.  He owned his lie to Brad.
18   Why would he make this up when he's owning all these other
19   things and not putting them on the others?
20        The reality is, there's no way a new employee like
21   Ashik would have kept this to himself.  Pradaxa, this
22   campaign, like Novo, was how he learned the ropes.  It was a
23   paradigm for campaigns going forward.  Inflate.
24   Under-deliver.  And conceal.
25        This is the result.  The client gets screwed in the

1    end.  I mean, look at the profit margin there.  Pretty

2    respectable profit margin for Outcome; right?  Bill at

3    100 percent.  Delivery is -- is awful.

4          You know, Shah told Sturdy and Google that they were

5    bootstrapped, which means that they got little outside

6    capital, which Sturdy thought was impressive because it's

7    unusual for an early stage company.  But bootstrapping

8    Outcome-Health-style was a different kind of bootstrapping

9    because it involved ripping off clients.  Clients like BI

10   didn't know it, but they were effectively funding Outcome as

11   if they were lenders.  That's just -- there was no

12   negotiation; right?  There was no negotiation of the amount.

13   No interest rate.  No repayment of principal.  They were just

14   stealing from their clients.  Outcome's -- this was Outcome's

15   twisted way of bootstrapping, was funding operations from

16   their clients.

17         You can call it bootstrapping or you can call it what

18   it is:  Fraud.

19         Let me talk about Ashik's assurances, since that was

20   discussed extensively.

21         This is the Voxer that I think they had up on one of

22   the poster boards.  It is a very thin read upon which to base

23   a defense, but you got to go with what you got.

24         As I mentioned here, Ashik was in full Mini-Rishi

25   mode when he said:  We operate with the utmost integrity.  And

1    offer that meaningless talking point.  The two of them offer

2    that type of nonsense to each other numerous times when people

3    were raising ethical concerns about Outcome.  The idea that

4    Ashik -- the idea that Shah actually believed that in 2017 is

5    ridiculous.  But it made me think of a couple things.

6              Simponi Aria in 2014.  Remember?  This was when

7    Outcome got caught by the client under-delivering.  And the

8    client was understandably very, very upset.

9              In response, the two of them sent an e-mail -- they

10   did an audit.  The two of them sent an e-mail where they

11   completely lied about how Outcome did list-matches.  In the

12   same response, they also represented to Simponi that they were

13   committed to doing everything possible to retain the

14   operational integrity that has always been at the core of our

15   work.

16             The core of Outcome work, in fact, involved a total

17   lack of operational integrity.  So many times Desai just

18   parroted things back to Shah.  He knew what Rishi would say,

19   and he knew what Rishi wanted to hear.  He was called

20   Mini-Rishi for a reason.

21             Listen to the Voxers.  Desai imitates Shah to such a

22   degree, it's difficult for the first 10 or 15 seconds to tell

23   if it's Rishi Shah talking or Ashik imitating his voice.  He

24   imitated him in so many ways.

25             Desai's comment about "utmost integrity" made me

1   think of Shah's comments at the town hall.  Just totally empty
2   talking points, oftentimes used by Shah and Desai when
3   addressing concerns about their fraudulent business practices.
4   This is consistent with the type of situation where Ashik
5   would say the same thing.

6       Not only that, but in the same Voxer, right before
7   Ashik says "utmost integrity," he acknowledges the deltas.  He
8   acknowledges the false affidavits.  He acknowledges the ROI
9   misses.  So after he acknowledges the core of the Outcome
10  fraud, he goes right back to the tried-and-true Outcome
11  talking point:  We operate with operational integrity.
12  100 percent empty Outcome Health talking point.  The notion
13  that Shah was actually reassured by that is silly.

14      Remember the claim that Desai was supposedly trying
15  to hide the fact that he was taking -- faking the screenshots?
16  That's not true either.  This is an e-mail from Ashik to Ryan
17  Postel, October 2013.

18      He said -- Ashik says at the bottom here:  We have to
19  confirm that the Humira spot we're playing has the images that
20  Matt Crandall pulled from the website.  Could you pull a few
21  screen grabs.  I'll add a timestamp to the bottom right to the
22  document with tomorrow's date, time and clinic ID to make it
23  look like it's live.

24      Again, Ashik is not acting like a lone wolf here.
25      Let's talk about the fraud inquiry meetings with

1  Deloitte.  This is Tracy Harrison's testimony, who's talking
2  about misunderstandings are not fraud.  Operational problems
3  are not fraud.  And then she said:
4          Question:  Assuming it were true that Outcome was
5  routinely tracking under-deliveries on campaigns, billing
6  clients in full, concealing under-deliveries from clients,
7  would you view that as a mistake?
8          No.
9          Or simply an operational problem?
10         No.
11         Then there's this:  Shah, Agarwal and Purdy met with
12  the auditors face-to-face for their audits.  You heard about
13  the meetings where they were asked:  Are you aware of any
14  actual, suspected or alleged fraud at the company?
15         No.
16         Each of them, in lockstep, flat out lie.  Each of
17  them, then, double down on that in writing, not just once but
18  twice in the management rep letters with -- to Deloitte.
19         Shah said in closing:  Of course timeline's
20  important.  We need to put things in context.
21         Well, remember they relied on the sub-certs and said:
22  Oh, we relied on John Bosshart.  We relied on him, him and
23  him.  What they left out was the timing.  These were the dates
24  of the -- the highlighted dates are the dates of the fraud
25  inquiry meetings.  March 15, 2017, when they were asked about

1    knowledge of actual, suspected or alleged fraud.

2         Look at the date of the sub-certs.  It was two days

3    later.  They were not relying on the sub-certs when they had

4    those in-person meetings with Deloitte and lied to Deloitte.

5    You heard it from Tracy Harrison.  They did not disclose any

6    of this stuff.  The sub-certs came later.  That's context,

7    ladies and gentlemen.

8         And Tracy Harrison was asked:  Are you familiar with

9    Sameer Kazi?

10        I am not.

11        Do you recall that Sameer Kazi ever being mentioned

12   as part of the fraud inquiry?

13        Nope.

14        Were you aware that Kazi was hired?

15        Nope.

16        Then she was asked:  Is it fair to say that at least

17   one instance of a departing employee was disclosed?

18        Yes.

19        And that was Collin Williams.

20        Then, of course, there's this Voxer where Kazi is

21   reporting fraud at the company.  More than 50 percent of

22   revenue can be recalled.  The whole Kazi episode was concealed

23   from Deloitte.  Adam Prowker as well.

24        And then Tracy Harrison testified because they're

25   trying to say -- a lot of what they were -- the defense was

1   presenting was, well, we didn't believe these campaigns --
2   these -- the complaints because Ashik was undermining these
3   people.
4          They were supposed to -- it was any alleged fraud.
5   It wasn't as if the fraud had to be proved.  Any allegation of
6   fraud was supposed to be disclosed.  Tracy Harrison testified
7   if the defendants believed the claims were frivolous, they
8   still were supposed to disclose it.  They concealed it.  They
9   lied to Deloitte, one-on-one meetings.
10          Adam Prowker again.  Prowker, Bryan Morgan.  This
11   was -- everything was concealed from them.
12          Sahir Raoof.  I mean, look at this.  Sahir Raoof used
13   the word fraud.  Defendants were complaining like:  We don't
14   know what the word fraud means.  Well, you could use Rishi
15   Shah's definition from the founder stories in 2012.  Or just
16   rely on the fact that employees actually used the word fraud.
17   Sameer Kazi used the word fraud.  So did Sahir Raoof.  That
18   was not disclosed.  And they lied about it.
19          More context.  They suggested Desai put -- it was
20   Desai's decision to put Sahir Raoof on the RIF list.
21          Let's look at the timing of that now.  This is this
22   e-mail.  Sahir Raoof makes that complaint about fraud, he gets
23   put on the RIF list on this e-mail.  Look at the date, though,
24   of Rishi's Voxer here, February 6th.  It preceded that.  Rishi
25   says:  I do think there are some people that are pretty toxic.

1    He mentions Sahir.  So Rishi's Voxer, February 6th, precedes

2    Ashik putting him on the RIF list.  Ashik puts him on the RIF

3    list after Rishi says that he's toxic.  That is context.  The

4    timing is important.

5           Same thing.  You remember this one.  This was another

6    big fib that they told Deloitte.

7           If an individual acted unethically, that individual

8    would be terminated immediately.

9           They got so many reports of flawed, unethical conduct

10   by Ashik and others that they did not report.  That was

11   another lie to Deloitte.

12          I want to now go through some fallacies in defense

13   arguments.  I know I've already hit some.  Here's a few more.

14          Desai had a stranglehold on data.  That was from

15   Agarwal's attorney.

16          Shah's attorney said:  You couldn't even get to his

17   computer where he had the data.

18          Um, that was false.

19          MS. BELL:  Objection.  Misstates argument.

20          MR. MADDEN:  For example --

21          THE COURT:  Objection overruled.  The jury will rely

22   on its own memory as to what the evidence was and what

23   arguments were by attorneys.

24          MR. MADDEN:  Bridget O'Donnell's testimony.

25   Remember?  23-year-old, new-hire.  And they're claiming that

1  the leaders of the company didn't have access.  She compared

2  the decks, you know, the IMS deck and the client deck.

3         Did you have difficulty at all getting access?

4         No.

5         To the IMS deck.

6         Did you have difficulty getting access to client

7  decks?

8         No.

9         23-year-old, new-hire has no problem getting access.

10 Ryan O'Donnell worked with her on this.  Adam Prowker, Liane

11 Pierce.  They sent all this information to Kazi.  They have no

12 problem getting access to the data.  And you're hearing that

13 Ashik Desai had a stranglehold on data and no one else could

14 get access to it.  It's absurd to suggest that Ashik had a

15 stranglehold on data and the leaders of the company couldn't

16 access it.  They could have fired Ashik anytime if they wanted

17 to.  They could have gotten access to any of this data.  They

18 had zero interest.

19         Everything fixed in 2017.  This is truly a doozy.  I

20 used green because they used green for the green period.

21 Everything's fixed.  Look at all the things that were going on

22 in 2016 into 2017, when the defense is claiming everything was

23 fixed.  It was basically like the world was on fire at Outcome

24 in late 2016, early 2017.  And the defense is saying:  There's

25 nothing to see here.  It was -- things were nuts at Outcome

1  during that time.  Look at what's going on at that time.  And

2  they're claiming everything is fixed.

3          You know, Kazi makes his report of fraud.  All the

4  revenue can be recalled.

5          Here's more.  Sahir Raoof's claim of, you know,

6  fraud.  Willful misrepresentation of inventory.

7          Prowker.  Adam Morgan.  All of this going on during

8  this supposedly green -- green is good; right?  The green

9  period, 2017.

10          And then, of course, the big one.  They obtained

11  nearly $500 million by fraud.  That's why they're claiming

12  everything's fixed in 2017 because they're worried about all

13  these things going on and what it shows about their client's

14  intent.

15          2016 into 2017 was a disaster at Outcome.

16          Shah was the CEO who dug in.  Think about -- think

17  about his interactions with Bridget O'Donnell and Sameer Kazi.

18  Saying that Shah dug in with people who raised ethical

19  concerns about Outcome's business practices could not be

20  further from the truth.

21          Look at all these -- what happened as a result of all

22  these meetings.  The typical reaction at Outcome was not

23  digging in, it was retaliation or ignoring the concerns.

24          We should have called more witnesses, if you asked,

25  you know, the defense attorneys.  We should have kept you here

1    much longer than two-and-a-half months.

2            The government didn't call Bob Mons.  We didn't call

3    salespeople.  We didn't call Adam Prowker.  You know, at a

4    certain point, ladies and gentlemen, enough is enough to let

5    you all see the evidence that you need to see to understand

6    that Outcome was built on a lie and that these defendants were

7    not only the biggest beneficiaries of it, they were

8    participants in it.

9            Second point on this.  The defendants never have the

10   burden of proof.  We respect it.  You should respect it.  They

11   didn't have to put on any evidence.  The burden is with us at

12   all times, so I'm not commenting on that.

13           But, they have subpoena power, just like we do.  They

14   have the power to bring witnesses in here, just like we do.

15   If they wanted to bring these witnesses in here, they had the

16   right to do it.  They chose not to, which is their right.  But

17   for them to suggest that we should have done it, they had the

18   ability to do it if they wanted to.

19           Next.  They criticized all of our hypothetical

20   questions; right?  And I think the basic point is to suggest

21   that basically our evidence was these questions were

22   untethered to reality.  And the reality is is, actually, our

23   questions were rooted in -- were rooted in evidence that you

24   heard and saw.

25           Let's take the Humira campaign, for example, which

1    is -- this is a January 2014 invoice.  First one sent for

2    Humira in 2014 when Spark took over.  609 waiting rooms.  900

3    tablets.

4         Ms. Meier, who signed the contract was asked:

5    Assuming that as of January 2014, the same month as that

6    invoice, Outcome had less than 609 waiting room screens, would

7    you want to know?

8         She said:  Yes.

9         That came directly from this e-mail, January 17, from

10   Ashik Desai to Rishi, noting that the contract numbers for

11   rheumatology campaigns, what the actual number of inventory

12   was.  609 waiting rooms for Humira.  And, yet, the entire

13   rheum network was at just under 600.  Contracted number,

14   including the two -- the two listed there was over 800.  And

15   the total inventory to network was 600.

16        Another question to Ms. Meier was:  Assuming Outcome

17   had 120 tablets available for its entire rheum network as of

18   January 2014, would you have wanted to know?

19        Again, where do these numbers come from.  An e-mail

20   right around that timeframe that corroborates it.

21        So the hypothetical questions were rooted in the

22   evidence.  That's the point here.

23        Another one from Lynn Meier that I'll go through so

24   that you got the point.

25        Operational problems.  You know where -- you heard a

1  lot about that from the defense.  You know where Outcome never

2  had operational problems?  Billing.  When it came to billing,

3  the operational problems went "poof" up in the air.  There

4  were no dark periods when it came to billing; right?  What a

5  miracle.  Despite all the growth of the company, all the

6  new-hires, they were good at billing.  They figured it out.

7  They got it done.  They operated with military precision.

8          But when it came to playing ads, not so much.  But

9  the defendants talk about operational problems at that time,

10  and now, was just talk.  Talk that tried to justify their

11  unethical business practices.  They never had operational

12  problems that would justify what they were doing.  Even though

13  they had some operational problems, those problems don't

14  justify lies to clients and billing for ads that didn't run.

15          You have to disclose to the client what's going on,

16  whether it's an operational problem for a dark period or just

17  a lack of inventory.  Let them know that you didn't deliver

18  and don't bill them for it.

19          The defense has found some campaigns where the

20  clients were not actually defrauded.  But they're not the

21  campaigns that are at issue in the case.  The campaigns at

22  issue in the case are the rheumatology campaigns:  Pradaxa,

23  Novo, Jardiance.  The dozens of campaigns on the delta

24  reports.  The campaigns that Mr. Petron examined in his expert

25  analysis.  It's a large number of campaigns.  But it's not all

1    of the campaigns that they had.  They didn't defraud everyone.
2    But the defense argument is not persuasive.  We never
3    suggested that everyone was defrauded.  Let me give you an
4    example.
5          A bank robber robs five Bank of Americas, and he gets
6    charged with those five.  He goes to trial and says:  Well, I
7    didn't -- I didn't rob those five Wells Fargo banks.  Well,
8    it's not really relevant.  That's not what he was charged
9    with.  He's charged with robbing the five Bank of Americas.
10   If he still robbed them, he's a bank robber.  It's no
11   different here.
12         The fact that someone doesn't commit a crime every
13   time they could possibly do it doesn't mean that they're
14   innocent of the crime that they're actually charged with.
15         Purdy's attorney said the government never showed
16   this one exhibit to a witness.  Very quickly, that was not
17   true.  We actually did show this to Ashik.  He said that we --
18   you know, we just picked this because it had the word inflate
19   in it.  And this is Ashik's testimony.  We did go over it with
20   him.  And, in fact --
21         What was your understanding of what Purdy was going
22   to use that information for?
23         He was looking to share that information with
24   potential investment firms.
25         So, in fact, we did go over it with a witness.  And

1    it's just another example of Purdy's willingness to use

2    inflated numbers to impress third parties to try and get money

3    for Outcome.

4            MR. POULOS:  Just a noted objection.  It misstates

5    the argument.

6            THE COURT:  All right.  Once again, ladies and

7    gentlemen, you can recall the arguments.  And the arguments

8    themselves are not evidence.  So, proceed.

9            MR. MADDEN:  The defense wants to provide you with

10   context.  Here's another example of something the defense

11   showed you.  What's missing?  This is the data pull from the

12   auditor's e-mail exchange.  Every time this went up that I

13   recall during cross-examination, this is what it looked like.

14   What's missing?  The bottom.  The incriminating part where

15   Kathryn Choi is talking about 50 percent of programs being at

16   deltas and then backfilling those programs.

17           The defense group kept telling you they want to

18   provide context, but oftentimes they would omit the key part

19   or incriminating parts of e-mails that they showed you.

20           Deferred revenue in 2015.  Poulos pointed out that

21   there was a 1.4 million in revenue that was deferred from '15

22   to '16, and used this document to suggest that the revenue

23   was -- from make-goods was showing up in the financials.

24           He also misleadingly read from this document

25   highlighting this set of questions to suggest that Deloitte

1    was aware of under-delivery.  He didn't focus on this column,

2    right here, that's in red.  Please go back and look at this

3    document.  You'll see that many of these items that Mr. Poulos

4    flagged were identified as client-caused delays, not

5    Outcome-caused delays.  Under-delivery.

6        Despite what Mr. Poulos wanted you to believe, Purdy

7    wouldn't have seen this as disclosure of Outcome's massive

8    under-deliveries to Deloitte.  The client-caused delays are

9    completely different.  Please pay attention to that.

10        Another fallacy is Agarwal and the deltas.  Basically

11   the idea was that Agarwal wasn't aware of or wasn't in the

12   loop as much on the deltas.  We've already -- I think you've

13   already seen that she was.  They talked about deltas all the

14   time.  This is just another example of them -- her being on

15   the list for a Q2 recap, Q3 plan setting.  And the date is for

16   June 29, 2015.  Here's the meeting.

17        And she says:  Curious to see DMa's report today.

18        And she's referring to a delta report here.  Growth

19   plan and goal setting.

20        Growing gaps likely results in key misses on sold

21   inventory.

22        MS. BELL:  Objection.  Misstates the evidence.

23        THE COURT:  Overruled.

24        MR. MADDEN:  And then here's another document that --

25   this is the delta report that was contained.  Again, just

1  another delta report that David Ma sends to Shradha Agarwal,

2  Government Exhibit 483.

3          So she really was in the loop.  I'm not saying that

4  she had the same role as what Rishi Shah and Brad Purdy had in

5  these days, but she was still leader of the company, president

6  of the company, and she was kept in the loop about these key

7  deltas.

8          ROI filtering.  Another topic.  Mr. Shah's attorney

9  said in closing that filtering is not fraud.  Here is

10  something that -- and he said:  Here is something that even

11  Mr. Desai had to admit at the end of cross-examination was not

12  fraud.

13          Actually, it was the opposite.  This is what the

14  actual testimony was at the end of cross.  They're talking

15  about the ROI filtering.

16          Question:  This is right to the client; right, sir?

17          It's stating that it's projecting, but it's

18  misleading.

19          That's what Desai said at the end.  "It's

20  misleading."

21          Then Mr. Hueston said:  Okay.  No more questions on

22  that.  That be a convenient time to break.

23          And topic stopped.

24          So at the end of his cross, he actually said, "It's

25  misleading."  He didn't say it wasn't fraud.

1    But the other thing is he didn't ask the obvious

2    follow-up question.  If someone says "it's misleading," the

3    question is:  Well, why is it misleading?  Mr. Hueston had no

4    interest in you all hearing that, so I followed up about a

5    week later and asked that question.  And then Desai explained

6    that projecting the results across all of that is misleading.

7    And the reality is is both Desai and David Ma

8    testified that the ROI filtering was like cherry-picking.  And

9    Rishi Shah was the one who came up with that method.  I mean,

10   it's like saying:  I'm an incredible free-throw shooter.  I

11   shoot 100 free-throws.  And if I shot 100 free-throws in the

12   backyard last night, but just ignore the 95 misses, just count

13   the five that I made.  I mean, why would you count air balls

14   and bricks?  It got kind of windy.  I was thinking about work.

15   I was distracted.  So just don't count those.  Count the five

16   that I made.  I'm 100 percent free-throw shooter.

17   That's what they were doing with tablet metrics.

18   They were ignoring -- they were only taking the top five

19   percent, ignoring the bottom 95 percent.

20   ROI filtering was similar.  They're just ignoring the

21   offices that weren't going to perform well.  It's definitely

22   misleading.

23   Next is Purdy and Rexulti.  You heard about this from

24   yesterday.  He spent a lot of time on this.  And he tried to

25   make it seem like the Rexulti fiasco was something that it

1    wasn't.  Think about what Purdy had supposedly discovered for
2    the first time with Rexulti:
3           That the company had been sending false affidavits
4    for years because they always reported contracted number of
5    screens.  The clients understandably interpreted these
6    affidavits as representations of actual delivery.  This
7    discovery would have told Purdy one thing:  Weighted average
8    was a fiction.  Because a client who agreed to weighted
9    average would not have expected to receive a monthly affidavit
10   that always reported the contracted number.  They would have
11   expected to receive a number that varied from month to month.
12          And what Purdy had learned is that never happened.
13   It was always the contracted number.
14          And who did Purdy decide not to tell about all this
15   new information he supposedly learned for the first time
16   during Rexulti?  Deloitte.
17          Who didn't know that Outcome provided a refund to
18   Rexulti because of the under-delivery and contractual misses?
19   Deloitte.
20          Who didn't know anything about the false affidavits
21   being submitted to Rexulti for eight months?  Deloitte.
22          Because Purdy concealed that information from
23   Deloitte, just like so much other information about the fraud
24   or suspected fraud at Outcome was kept under wraps during the
25   audits by these three defendants.

1      The defense has also tried to suggest that because

2   this statement in the deck was literally true, that Outcome

3   never had to pay out of pocket for a missed ROI guarantee, it

4   can't be a basis for the investor fraud counts.

5      But there's something curious about this argument.

6   When it comes to pharma contracts, the defense wants you to

7   believe that there can be oral misunderstandings, like

8   weighted average, that supplement the contract.  But when it

9   comes to the investor materials, they want you to believe that

10  all that matters is what's written down.

11      Let's consider that for a moment.

12      Even if the only statement is the one highlighted in

13  this document, it would still be a lie.  It is a half truth.

14  A lie by omission.  It was designed to create the false

15  impression that the company never missed an ROI guarantee.

16  How would you know it's designed to create this misimpression?

17  Because all the investors came away with exactly that

18  understanding.

19      The idea showed up in the Leerink deck, and Todd

20  Cozzens testified about it.

21      Laela Sturdy came away with the same understanding.

22  That's how it came -- that's how it ended up in the CapitalG

23  investment deck.

24      Mr. Poulos tried to suggest that JP Morgan, not

25  Purdy, was responsible for the content of the deck.  He --

1  specifically the change from the language:  Company has never

2  missed out an ROI guarantee.  To adding the out-of-pocket

3  language, which is nonsense.  These investor decks were

4  product of information provided by Purdy.  The language

5  appeared in the version of the March 2016 deck given to

6  lenders.

7          Purdy reviewed its accuracy, even gave Shah and

8  Agarwal a chance to review.  McHugh told you that none of the

9  material, including the deck, would be released to lenders

10  before its accuracy had been attested by an executive of the

11  company.  In this case, Purdy.

12          And this is the letter, Count 7, another strong

13  count, that Purdy signed attesting the accuracy of information

14  that went to lenders.

15          When a November deck was released, the new language

16  was in there.  Who do you think had to approve that change?

17  Brad Purdy.  Because he's the one who actually gave the

18  presentation to the lenders.

19          Jim McHugh told you that the information given by

20  lenders had to be personally approved by an executive at the

21  borrowing company.  So when Purdy and Shah recycled the same

22  decks for investors in early 2017, they knew they were

23  creating a misleading picture about the company's performance.

24          Shah and Agarwal discussed make-goods due to ROI

25  misses extensively, as we talked about.

1           So does Shah and Purdy, which is this document here.

2           If you're unsure about what Sturdy and Cozzens'

3    memory about them was, you know the defendants intended to

4    create a false and misleading picture about the company.  And

5    that's enough.

6           Let's talk about the hiring of lawyers and auditors.

7    You heard a lot about that.

8           The defendants have insisted that they relied on

9    others.  Brad Purdy relied on Collin Williams.  All the

10   defendants supposedly relied on Deloitte, who found no

11   evidence of fraud.  Yet, that argument runs into a brick wall,

12   the defendants' own concealment of important material facts

13   from these third parties.

14          Collin Williams wasn't aware of the details of the

15   capital raise.  Think about that.  Their in-house lawyer, left

16   totally in the dark about the massive capital raise that would

17   change the company's financial prospects and valuation

18   overnight.  Brad Purdy can't hide behind Collin Williams when

19   he failed to disclose material facts to Williams.

20          The defendants' supposed reliance on Deloitte fares

21   no better.  The defendants, each of them, knew that Outcome

22   was routinely tracking the deltas.  Between -- and this --

23   their after-the-fact fire drills to meet the minimum

24   requirements -- their after-the-fact fire drills to meet the

25   minimum requirements of their contracts.  But who didn't know

1    about the delta reports?  Deloitte.  Each of them also knew
2    about the numerous whistleblowers who raised the allegations
3    of fraud.  Who didn't know about that?  Deloitte.  They -- in
4    fact, they affirmatively lied about that.

5           You don't get to rely on the opinions of someone that
6    you misled.  It's plain and simple.  It's also truly rich to
7    hear these defendants claim that they brought in lawyers
8    because they wanted to do the right thing.

9           Here's the reality.

10          The major problem at Outcome was the total lack of
11   real ethical leadership and a total lack of real legal
12   oversight for years.  Outcome only wanted yes-men.  Think
13   about the comments about fraud in the exit interviews.  The
14   comments about the whistleblower complaints.  The shelf life
15   of the analysts who were out the door so quickly.  They hired
16   Collin Williams, but they left him in the dark about so many
17   things.

18          Why did they bring in Deloitte?  One reason was
19   money.  That's the big reason.  They wanted money from
20   lenders.  They wanted money from investors for the company.
21   The money would serve two key purposes:  One, it allowed Shah
22   and Agarwal to cash out in the major way.  Two, it would
23   provide money for the company to get lenders and investors.
24   Plus, the end, of course, was for everyone to get crazy rich
25   in an IPO, and they knew they needed a Big Four accounting

1    firm to sign off on their financials. But they were never

2    going to tell Deloitte about the misconduct. I mean, think

3    about it. They didn't give the delta reports to Deloitte.

4    Number two, they -- all three defendants lied to them

5    affirmatively and concealed in those one-on-one -- in those

6    fraud inquiry meetings. And they concealed material

7    information from Deloitte. And add in the management rep

8    letters. So the topic of Deloitte truly incriminates the

9    defendants. There's nothing about Deloitte that exonerates

10    the defendants.

11         THE COURT: Mr. Madden, can we go to sidebar real

12    briefly.

13         MR. MADDEN: Sure.

14       (Proceedings heard at sidebar.)

15         THE COURT: We've been going about an hour and a

16    half. If you think you can finish by 12:30, then we will keep

17    going. If you think it's going to go past 12:30, I'd rather

18    we just take a break now.

19         MR. MADDEN: We should probably just take a break. I

20    think I've -- I'll take a look at -- I've got about an hour,

21    or so, left, I think.

22         THE COURT: Oh, all right. Then we'll just take a

23    break for lunch right now.

24         MR. MADDEN: Okay. Thanks.

25         THE COURT: Okay. Do you have a few more comments

rebuttal - government

10392

1    you need to make?

2         MR. MADDEN:  No.  No, I'm good.

3         THE COURT:  Okay.  All right.

4      (End of sidebar proceedings.)

5         THE COURT:  Ladies and gentlemen, we're going to take

6    our lunch break right now.  One hour.  Please don't discuss

7    the case among yourselves or with anyone else.  See you in an

8    hour.

9         COURT SECURITY OFFICER:  All rise.

10      (Jury out at 12:17 p.m.)

11        THE COURT:  All right.  Anything anyone needs to put

12   on the record?  First, the government?

13        MR. MADDEN:  No, your Honor.

14        THE COURT:  Defense?

15        MR. POULOS:  Yes, your Honor.

16        THE COURT:  All right.  Let's go in order first.

17        Ms. Chou?

18        MS. CHOU:  Not from us, your Honor.

19        THE COURT:  Ms. Bell?

20        MS. BELL:  Nothing, your Honor.

21        THE COURT:  All right.  Mr. Poulos?

22        MR. POULOS:  Your Honor, Mr. Madden -- the evidence

23   is that after February of 2015, Mr. Purdy was not in any of

24   these meetings about the Q1 review.  He didn't receive any of

25   the delta reports that came out.  And in attempting to rebut

1    that argument, Mr. Madden referenced Exhibit 557.

2              And, you know, Judge, I've noticed that with just

3    about all the e-mails that have been flashed, the government

4    did put the to-from date and the rest.  But when they

5    displayed 557, they didn't put it up there.  And Mr. -- this

6    is the one where Mr. Shah is talking about avoiding an

7    inquisition on deltas.  And Mr. Madden expressly told the jury

8    that Brad Purdy is on that e-mail.  And that's just not true,

9    Judge.

10             And I do request that Mr. Madden correct that

11   statement for this jury.  It's one thing to argue inferences,

12   and the like, but it -- it misstates the document itself.

13             MR. MADDEN:  I don't think I said -- I'll look at the

14   transcript.  I do not think I said Brad Purdy was on the

15   e-mail.  I said that Brad Purdy -- it was about an exec team

16   meeting, and Brad Purdy would go to the exec team meetings.

17   In fact, in terms of the date, I actually think I had the date

18   up in the top -- the caption on the slide.  I think it was

19   3/19 2016.  So I had the date there.

20             I think I noted it was Jayanth Surakanti, Rishi Shah,

21   Shradha Agarwal on the e-mail.  That's my recollection.  I

22   think the argument was that Brad Purdy went to exec team

23   meetings and they were -- and what Shah was saying is they

24   were talking about deltas so often that he didn't want every

25   team -- every meeting to be about deltas.  That's my

1    recollection.

2              THE COURT:  All right.  Well, look over -- you've got

3    a realtime transcript, look it ever and see what you said.  If

4    it's inaccurate, you should correct it.  But if it's simply

5    you accurately reported who was on the e-mail and then you

6    reported that people such as Mr. Purdy attended exec team

7    meetings, that's fair argument.  But look over the realtime

8    transcript.  You can discuss it with Mr. Poulos.  Maybe

9    there's a -- either you reach agreement or you don't.  But

10   there may be a way to correct it without interrupting your

11   argument.

12             MR. MADDEN:  Sounds good.

13             THE COURT:  All right.  We'll see you in -- it's

14   12:20, so see you at 1:20.

15        (Recess from 12:20 p.m. to 1:19 p.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3     UNITED STATES OF AMERICA,          )
                                          )   Docket No. 19 CR 864
 4                     Plaintiff,         )
                                          )   Chicago, Illinois
 5          v.                            )   April 5, 2023
                                          )   1:19 p.m.
 6     RISHI SHAH, SHRADHA AGARWAL,       )
       and BRAD PURDY,                    )
 7                                        )
                       Defendants.        )
 8

 9            TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 39B
            BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11     APPEARANCES:

12
       For the Government:    MR. MATTHEW F. MADDEN
13                            MR. SAURISH APPLEBY-BHATTACHARJEE
                              Assistant U.S. Attorneys
14                            219 South Dearborn Street, 5th Floor
                              Chicago, Illinois  60604
15

16                            MR. WILLIAM E. JOHNSTON
                              MR. KYLE C. HANKEY
17                            U.S. Department of Justice
                              Criminal Division, Fraud Section
18                            1400 New York Avenue NW
                              Washington, D.C.  20530
19

20

21

22                        SANDRA M. TENNIS
                         Official Court Reporter
23                    United States District Court
                 219 South Dearborn Street, Room 1432,
24                    Chicago, Illinois 60604
                         (312) 408-7782
25                 Elia_Carrion@ilnd.uscourts.gov
```

rebuttal - government

10396

1    APPEARANCES (Continued:)

2

3    For Defendant
     Shah:                    MR. JOHN C. HUESTON
                              Hueston Hennigan LLP
4                             620 Newport Center Drive, Suite 1300
                              Newport Beach, California  92660
5
                              MS. VICKI CHOU
6                             MR. MICHAEL H. TODISCO
                              MS. KAREN DING
7                             Hueston Hennigan LLP
                              523 West 6th Street, Suite 400
8                             Los Angeles, California  90014

9
     For Defendant
10   Agarwal:                 MS. KOREN L. BELL
                              MR. A. ALEXANDER LOWDER
11                            MR. STEPHEN G. LARSON
                              Larson LLP
12                            555 South Flower Street, Suite 4400
                              Los Angeles, California  90071
13
                              MR. PATRICK W. BLEGEN
14                            MS. KELSEY H. KILLION
                              Blegen & Garvey
15                            53 West Jackson Boulevard, Suite 1437
                              Chicago, Illinois  60604
16

17   For Defendant
     Purdy:                   MR. THEODORE T. POULOS
18                            MR. ERIC PRUITT
                              MR. JOHN PAVLETIC
19                            Cotsirilos, Tighe, Streicker, Poulos &
                              Campbell, Ltd.
20                            33 North Dearborn Street, Suite 600
                              Chicago, Illinois  60602
21

22

23

24

25

1       (Proceedings heard in open court; jury in.)

2           THE COURT:  All right.  Please be seated, ladies and

3   gentlemen.

4           Mr. Madden, you may continue.

5           MR. MADDEN:  Thank you, your Honor.

6       REBUTTAL ARGUMENT ON BEHALF OF THE GOVERNMENT (resumed)

7           MR. MADDEN:  The defense attorneys have claimed that

8   if they were part of a fraud, they wouldn't have brought in

9   outsiders.  Talented executives like Sameer Kazi or Madan

10  Nagaldinne.

11          Remember though, it's fake it till you make it.

12  There's two parts to that.  The first part, the faking it,

13  that's why this trial took so long.  Two-and-a-half months

14  trial about all of the fraud at this company.  But there is a

15  second part, and that's important part.  They, of course,

16  wanted to make it.  No one wants their business to rely on

17  lies the way that Outcome's business did for so long.  They

18  wanted to become legitimate at some point.  That massive

19  industrial vat of smoke bombs was going to run out.  Right?

20  It's not a way to run the business.  The fraud couldn't go on

21  forever.

22          THE COURT:  Mr. Madden, is your mic on?  Just tap it,

23  make sure it's on.  It is.

24          All right.  Maybe you need to move it a little.  I

25  don't think it's picking up your voice.  Move it down a

1    little, possibly.  Or, Sandy, what do you recommend?  Off the

2    record.

3            (Discussion had off the record.)

4            MR. MADDEN:  Think about, though, what they did when

5    they brought in someone like Sameer Kazi who was not content

6    to ignore what Outcome had done for years, and years, and

7    years.  He had a very short tenure there.  They got rid of

8    him, essentially.  And they thought they could keep things

9    under control when they hired people like Kazi.  Didn't work

10   out with Kazi.  With others, they stayed around.

11           Another reason to hire the outsiders, though, were,

12   they were out there for investors.  By hiring people like

13   Madan Nagaldinne, Blake Chandlee, people like that, they were

14   people they could show off for the investors.  You saw those

15   in the deck.  They're saying to Goldman Sachs and the Googles

16   of the world:  We are legitimate.  You should invest in us.

17   You saw them in the investor decks.  But, of course, if they

18   didn't fall in line, they were dropped like a bad cold, like

19   Sameer Kazi.

20           I'd now like to -- I am getting towards the end of

21   this.  We have some more time -- things to cover.  But I'm now

22   going to cover -- get more into the jury instructions.  One is

23   the venue slides because some -- some of the defense attorneys

24   have raised venue.  And the second part is, I want to walk

25   through the counts of the indictment with you and the evidence

1    that supports them and the jury instructions that are

2    relevant.

3            I'll start with venue.  Venue is, as the defense

4    attorneys have mentioned, and I think Judge Durkin mentioned,

5    this is the instruction:  Unlike every other element in this

6    case, which we have to prove beyond a reasonable doubt, venue

7    requires proof by only a preponderance of the evidence.  Put

8    another way:  The government must prove facts supporting venue

9    are more probably true than not.

10           So, lower legal standard than we have to prove in

11   terms of the crimes alleged here.  More probably true than

12   not.  Venue is actually very easy to prove, and the

13   defendants -- defense attorneys said very little about it, but

14   it was mentioned.  So I do want to walk through it with you.

15           You might note that the defense attorneys didn't

16   actually say -- didn't challenge a certain count saying that

17   there was no -- as I recall.  I don't recall a specific

18   challenge to a certain count, they just said the government

19   has to prove venue.  So I want to walk through it with you.

20           This is the -- this is the jury instruction I expect

21   Judge Durkin to give you on venue as it relates to mail and

22   wire fraud.  Most of the counts are mail and wire fraud.

23           As to each of the mail or wire fraud counts, you can

24   find venue if the government proves by a preponderance that

25   the mailings or wire transmissions were -- this is the key

1  part -- sent from, passed through or received in this

2  district, the Northern District of Illinois.  Which, of

3  course, includes the City of Chicago.

4          So let's walk through the counts.  Here's some of the

5  facts that you can consider.  Outcome, as you know, their

6  office was downtown, not very far from here.  330 North

7  Wabash, downtown Chicago, just north of the river.  And you

8  saw many of their invoices, including the invoices related to

9  the charged counts.  Of course, they're asking clients to send

10 checks to their -- to their Chicago -- to the Chicago address,

11 which is generally what happened in these charged counts.

12         On the right-hand side, you see you've got a -- copy

13 of a hard-copy check with all the details on there.  The check

14 matches up with the invoice.  We compare the details with the

15 witness.  You can take a look at it when you're back here.

16 But the short of it is -- and you heard testimony that the

17 business practice in a lot of these cases was to mail these

18 checks, and obviously looking at what you have, a hard-copy

19 check, and the invoice.  This was mailed here.  And so venue

20 is established for Count One.

21         Same for Count Two.  We present very similar evidence

22 on these counts.  You've got the invoice going out the door.

23 And we married up the invoices to the checks that were sent to

24 the -- to the ContextMedia address in Chicago.  This was a

25 Humira account.  Venue is easily established.  It just means

1    more probably than not that this went through Chicago.  In
2    fact, this arrived in Chicago.

3              Then you've got Count Four here.  Again, the same
4    kind of evidence.  You'll have the invoices.  These are the
5    exhibit numbers, if you want to take them down.  This is Count
6    Four, the mailing of that check from Biogen Tecfidera.  Huge
7    delta on that campaign, as there were for these other charged
8    counts.

9              Jardiance, BI.  It wasn't just Pradaxa that was a
10   disaster of a campaign, Jardiance had a massive
11   under-delivery.  Same thing here.  You've got a copy of the
12   check, the invoice that's married up with it, and you see both
13   on the check, which is pay to the order of Context at their
14   Chicago address on North Wabash, and then the invoice.

15             Count 23.  Merck was another client, Belsomra.  Same
16   thing.  Here we even have the envelope with the postage stamp
17   on it.  But a hard-copy check that is married up to the
18   information on the invoice.

19             So venue is established for each of these because
20   this shows that the mailings were -- came to -- were -- the
21   invoices went out and the mailings were sent here.

22             Then Count 25 is another rheumatology campaign,
23   Xeljanz.  Same thing you have.  You've got the invoice, 836.
24   And then you've got the physical check, including -- including
25   the envelope, which is Government Exhibit 930.

rebuttal - government

10402

1    So every charged mailing arrived in Chicago because
2    that's where every check was addressed to.  And that's where
3    the invoices send them -- send them to.  So Outcome's office
4    in Chicago.  It just means that we have to prove that mailing.
5    And so that's why we -- you might have wondered, that's why we
6    present it as evidence to you.

7    This is now just back to the wire fraud.  Wire fraud
8    is very similar to mail fraud, just, instead of using the
9    mails, we have to prove a wire.  E-mails, Voxers, et cetera.
10   Those are the wires.  Those are interstate wires.

11   The stipulations -- you'll get a hard copy of the
12   stipulations.  Remember, we read at various points the parties
13   have stipulated to certain things.  Take a look at the
14   stipulations, please.  You'll get a hard copy of that, I
15   expect, when you're back there.  They're relevant to a bunch
16   of things but includes the mailings and wires.  They explain
17   how Outcome's e-mail system worked, for example.  I think that
18   might be Stipulation 4 and 5.  One is I think how Voxer works.
19   There's -- Voxer has -- it's an interstate wire that goes I
20   think to wherever their server is.  I think it might be
21   Nevada.  Then there's another one that relates to how
22   Outcome's e-mail system worked.  And like a lot of businesses,
23   what the stipulation says is that e-mail, Google hosted
24   Outcome's server.  So even though it didn't say Google on it,
25   it was Google-hosted.  And basically what the stipulation says

1    is there were interstate -- it resulted in interstate wire.

2           And so for wire fraud for venue, what we have to

3    prove is that it was went from, through or received in this

4    district.  Of course, you can consider the fact that Outcome

5    was based in Chicago.

6           This is Count Three.  E-mail exchange between Purdy

7    and Ma about the inflated tablet metrics.  Very, very strong

8    count, given the blatant fraud on this one.

9           You can consider the fact that Outcome's -- again,

10   that it's office is here, just like you do for the mailings.

11   You saw, of course, that not on -- Shah's not on this one, but

12   of course you saw Shah's house is in Chicago.  That was his

13   residence.  CEO, unsurprisingly, lived here, where Outcome's

14   office was.

15          David Ma also testified that he worked out of the

16   Chicago office.  So for this, for example, it's more likely

17   than not that this was sent or received, passed through our

18   district, Chicago.

19          Same thing here.  Shah, a resident of Chicago,

20   working out of Outcome.  Sent this e-mail to Dave DiCosala.

21   You see DiCosala's signature block at the bottom which shows

22   where he works out of Chicago.  And you know where Shah worked

23   and live.  So, again, low standard of proof.  It just needs to

24   be more likely than not that this went through Chicago.  And,

25   again, please take a look at the stipulations.

1           This is Count Seven, which is the e-mail from Purdy

2    to -- related to the loan.  Purdy's responding to a woman

3    named Colleen Kennedy from JP Morgan.  What we've called out

4    on the left-hand side, bottom, is that her -- Ms. Kennedy

5    works out of JP Morgan's Chicago office.  Unsurprisingly she's

6    working with Outcome here.  So given that Kennedy was based

7    out of Chicago, and given that Purdy, of course, was -- worked

8    at Outcome, more likely than not that this also passed through

9    Chicago.

10          These are the Voxers, the various executions, which

11   are all -- they're all wires related to Sameer Kazi episode.

12   Just -- if you just note the dates.  They're all between

13   January 23rd, and at the bottom, January 24th at about

14   6:00 p.m.  And we've got evidence that shows that Shah and --

15   and Ashik were both in Chicago.

16          This is Government Exhibit 1976.  It shows here that

17   Shah and Desai were scheduled to take what appears to be a

18   private jet out of Midway at 10:00 PM on January 24th.  Which

19   would have been after -- you know, that 6:09 communication was

20   the last one on the wiring.  So Shah and -- it makes it more

21   likely than not that Shah and/or Ashik were in Chicago at the

22   time because they left Chicago at 10:00 PM on the 24th and

23   would arrive in New York -- you might recall, Shah arrived in

24   New York that night.  He met with Sameer Kazi the next day.

25   The meeting with Sameer Kazi took place on January 25th, the

1    morning of January 25th at Shah's apartment in New York.  That

2    was the bull-in-a-china-shop conversation.  A venue's

3    established there.

4          This is the whistleblower letter to Desai related to

5    Prowker.  Shah sent Desai, forwarded it to Desai.

6          And here's an invite that we found, a one-on-one

7    meeting where Shah and Agarwal scheduled for -- Shah and

8    Agarwal in one of their offices in Chicago.  So venue's

9    established for that one as well.  More likely than not that

10   they're here.

11         This is the trouble-making F'ers e-mail, another

12   wire.  This is from Shah to Agarwal and Desai.  Again, they

13   all work for Outcome, which is based out of Chicago.  Although

14   Desai was in the New York office most of the time.  But,

15   again, we've got another one-on-one meeting at the -- in their

16   Chicago office.

17         So Count 21.  This is Bryan Morgan, February 14,

18   2017.  Government Exhibit 862.  Shah to Brad Purdy and Ashik

19   Desai.  Same day.  Brad Purdy had some one-on-one meetings

20   scheduled in Chicago, according to 1967.  Again, venue is a

21   low standard.  It's established more likely than not that this

22   passed through Chicago.

23         The wires are very straightforward.  Counts 22, 24,

24   and 26 are the wire transfers from the investor victims.  Of

25   course the money was coming to Outcome, it's bank account in

1    Chicago.  These are Chase bank records where Outcome was

2    banking that were wired to Chicago.  52 million at top.

3    That's the Count 22 from Goldman.

4              Very similar for CapitalG.  Same records, just either

5    same page or different page.  But, again, wired to a bank

6    account in Chicago, so venue's established there.

7              Count 26 is Leerink.  Again, the funds from Leerink

8    were wired to Chicago.  So venue was established on Count 26

9    as well.

10             Let's go over bank fraud.  There's a couple bank

11   fraud counts.  This is the jury instruction I expect Judge

12   Durkin to give you on this.

13             As to each bank fraud count, you may find that venue

14   exists if the government proves, again, by that preponderance

15   standard, that the alleged scheme to defraud is at least

16   partially committed in this district, which includes Chicago.

17             You heard the testimony from Jim McHugh.  He was

18   the -- he was the executive from JP Morgan who testified.

19   McHugh -- he was testifying here that Outcome, of course, was

20   based out of Chicago and the defendants, as you know, all

21   worked there.  And, of course, when you've got a massive fraud

22   out of Chicago, it makes sense to charge the case here for

23   venue.  Venue is the legal reason.

24             Then you've got the testimony of McHugh who's talking

25   about a meeting that he went to with Brad, Rishi and Shradha.

1   The meetings occurred in Chicago.

2           You've got Count Nine, which is another one of the

3   bank -- which is related to the loan agreement.  It also shows

4   Chicago's connection, if you look through the super lengthy

5   loan agreement.  It says notices for -- related to -- it

6   should be sent to Brad Purdy at the ContextMedia office in

7   Chicago.

8           Same thing for the next one, which is Count 13, which

9   is December 23, 2016.  Again, all the -- the executives all

10  worked at Outcome who were involved in this.  They also listed

11  Chicago as the address for Outcome in the -- in Government

12  Exhibit 698.  So venue is established for all of the bank

13  fraud counts, in addition to wire fraud and mail fraud.

14          So the defendants spent a lot of time -- defense

15  attorneys spent a lot of time moving the goal post.  Here's

16  what I mean by that.  They made numerous arguments suggesting

17  that we need to show more than the law actually requires.  But

18  it's Judge Durkin who's the expert in the law.  He's the one

19  who is going to give you the jury instructions that you'll get

20  when you go back to deliberate.  And the jury instructions is

21  what sets out -- what we actually have to prove, the elements

22  for each count.  Let me give you an example.

23          There was a slide in an argument made by Shah's

24  attorney that the government has to prove -- I think it was

25  five steps for deltas to be a crime, which that was -- you

1    know, that -- they made that out of thin air.  You'll see

2    nothing in the jury instructions about that the government has

3    to prove X, Y, Z for deltas.

4           The government has to prove the elements of wire

5    fraud, mail fraud, bank fraud, or whatever the count is.

6    That's what we're required to prove, what Judge Durkin has set

7    forth in the jury instructions.  We don't need to prove X, Y,

8    Z about the deltas.  The deltas are just part of the evidence

9    of the scheme and show that the defendants knew what was going

10   on.  We don't need to prove -- check certain boxes about the

11   deltas for them to be relevant.  They are relevant because

12   they show that Outcome was massively under-delivering on their

13   campaigns for years.  But it's not like there's like a series

14   of things we need to check out for each delta report.

15          And to the extent that you got -- I don't know if you

16   got that impression, but to the extent you got that

17   impression, that's not right.

18          The defense group made what I would call some

19   creative definitions -- suggested some creative definitions

20   for what fraud really is.  And, of course, they generally

21   centered on Ashik Desai.  That's what fraud really is, what

22   Ashik did.  Then they listed all these things Ashik did.

23   Well, the defendants were involved in a bunch of those things

24   themselves.  But it's not like there is one way to commit

25   fraud.  What we actually have to prove is what's, again, those

1    elements.  And I'm about to go over them.  The elements of

2    fraud are what we have to prove.  Not that -- not that every

3    defendant did exactly what Ashik did.  That's just not the

4    standard.  Again, if you got that impression, that's -- that's

5    not accurate.

6         So let's refocus on what the government actually has

7    to prove in this case.  There's four elements.  Mail fraud and

8    wire fraud are very similar.  My colleague, Mr. Johnston, went

9    through these with you.  But, again, just remember, this is

10   the single and only source of information about what the

11   government has to prove.  These are the elements of mail and

12   wire fraud.  You'll have a copy of this, so I'm not going to

13   go over them in great detail here.

14        And then the bank fraud elements are similar.  We've

15   gone over this before.  But, again, these are key jury

16   instructions.  You'll have hard copies when you go back.

17        So here -- these are the common elements to mail,

18   wire and bank fraud.  And if one thing is clear from this very

19   lengthy trial and 20 hours of arguments that the defendants

20   and the government all agree on is that there was absolutely a

21   scheme to defraud at Outcome clients, lenders, and investors,

22   through materially false and fraudulent promises,

23   representations or omissions.

24        And that's basically conceded.  Everyone agrees that

25   there was a fraud at Outcome, and it's obvious.  There's so

1    much evidence of it.  So, really, what this trial is really,

2    really about was these two top elements.  And that's what we

3    spent the last two-and-a-half months putting on all this

4    evidence for.  That's what I've been talking about for the

5    last three hours.  It's what Mr. Johnston argued about for

6    seven hours, and what the defense attorneys argued about for

7    20.

8            Those are what it's all about.  And let me try and --

9    I'm not going to go over everything because I've been up here

10   for a long time.  But that's what I've been talking about for

11   the last three hours.  I'm going to try to focus you in on the

12   big picture.

13           This is the definition of knowledge, which is another

14   key jury instruction.  It has been shown to you, so I'm not

15   going to read it right now.

16           Intent to defraud is another key jury instruction

17   that I draw your attention to.  But the scheme, as we

18   discussed, has three critical components:  Inflate.

19   Under-deliver.  Conceal.  And the defendants' fingerprints are

20   all over every part of this scheme, starting with inflate.

21           You've heard from the defense.  If the client knows

22   it's a projection, then there's nothing wrong with projecting.

23   But look at e-mails like this between Shah and Agarwal:

24           Generally the team doesn't know its projection

25   because they get confused on how to represent it.

1           There's no confusion here.  This is about making
2   clients believe that Outcome had, in its network, more offices
3   and devices than it really had.

4           Here's another example.  Shah, Agarwal, Purdy and
5   Desai, the Core 4, openly discussing projections that were
6   concealed from the client.  Physicians we claimed to have had.
7   I showed you this this morning.  Then there's consistent with
8   David Ma who said, this is all about the siloing.  Clients --
9   excuse me, salespeople were providing false information to
10  clients, whether they knew it or not.  That's the first --
11  this is the first step of the process.

12          And remember the jury instruction.  We only need to
13  prove one lie or misrepresentation.  We've proved so many and
14  we've proved many material omissions, but we only need to
15  prove one.

16          Another example from Desai to Rishi Shah, telling
17  Shah that rheumatology clients -- what rheum clients were
18  contracted for 2014.  Over 1,200 waiting rooms.  And what
19  Outcome currently had in its inventory, just under 600.  Not
20  enough to satisfy the Humira contract, let alone Xeljanz and
21  Simponi, which were also scheduled to go live.

22          They then discussed their best-case scenario, but by
23  late 2014, which would be getting to about 1150 waiting rooms.
24  Still below the minimum contracted numbers.  So there was --
25  rheumatology campaigns were a disaster from the start.

1    There's several counts that are related to the rheumatology

2    campaigns.

3            Next part of the process, of course, is the

4    under-delivering.  There's three defendants that you've heard

5    from, 20 plus hours of defense arguments.  Not a single

6    response to this e-mail.  Brad Purdy leading the charge with

7    Shah -- with the other three, Shah, Agarwal and Desai on it.

8    The Core 4, all in the huddle together.  They're there at the

9    beginning.  And the three, of course, are here at trial.

10   Ashik opted out by taking responsibility.  They're talking

11   about reassigning inventory from Humira to Xeljanz, making it

12   certain that Outcome would be under-delivering on not one but

13   both campaigns.  Violating exclusivity.  Just totally offenses

14   for them to take -- shift one office through a competitor's

15   office.  You heard that from, you know, from the victim

16   testimony here.

17           Under-delivery is just an issue that never went away.

18   You take a look at any of these delta or under-delivery

19   reports.  The point of them is if -- what is the point, if not

20   to address the continuing, un-fixable and ever-growing

21   problems of under-delivery.  Problems that existed every year

22   and persisted throughout time.  Year, over year, over year.

23           Defendants may not have been copied on every delta

24   report, every growth model.  But that's not the point.  The

25   point is that each of them year, after year knew Outcome was

1    under-delivering on its campaigns.  According to Shah, it got

2    to the point, as I said, that every meeting was about deltas.

3    They were constantly talking about deltas.  It was a huge

4    issue.  And if you look at the magnitude of these

5    under-deliveries, you can understand why.  And despite that,

6    it was concealed from clients.  Selling inventory that they

7    didn't have.

8            Now the last step is, as you know it is -- you know

9    how it worked.  It was:  Concealment.  Smoke bombs.  More

10   smoke bombs.  More smoke bombs.  And more smoke bombs.  All to

11   what end?  More money for Outcome.  Bring in the revenue.

12   They wanted to grab all that revenue consistent with Shah's

13   very aggressive mentality of:  Grab all the revenue you can,

14   get the entire advertising budget, worry about the inventory

15   for later.  And, of course, more money for the defendants,

16   their motive, who held equity in the company.  And a giant pot

17   of gold at the end of the rainbow for Shah and Agarwal.

18           This is another instruction that I don't know if

19   you've seen.  I can't remember if my colleagues showed it to

20   you or not.  But this is the good-faith instruction.  I think

21   the defendants have probably shown you the first two

22   paragraphs.  I don't know that they've shown you that third

23   paragraph here that we've pulled out.  And it's a super

24   important one in this case.

25           A defendant's honest and genuine belief that he or

1    she will be able to perform what was promised is not a defense

2    to fraud if the defendant also knowingly made false and

3    fraudulent representations.

4           So even if you think:  Oh, we're going to meet these

5    projections.  If you lie on the front end about the

6    list-match, that is still fraud.  You can't -- you can't lie

7    and just tell people -- and just think -- even if you think, I

8    think it's going to work out because a lie is a lie.  And so

9    much of that is -- like that paragraph encapsulates a lot of

10   what this case is about.  They were lying on the front end.

11   And you can't justify that -- even though there were so many

12   internal justifications that you saw here, you can't justify

13   the lie by just thinking:  I think it's all going to work out.

14   And even if they did think it's going to work out, it's not

15   good faith if you're lying to clients.  And they lied to

16   clients so many times.  And -- and given their -- where they

17   were at the company, they were causing many lies to go out to

18   clients, especially through the salespeople.

19          Scheme to defraud.  I've already shown you this one.

20   We only need to prove one, not -- not some super long laundry

21   list of lies.

22          On this point I wanted to point out that -- so the

23   definition -- another definition that follows this is the

24   definition of a false, fraudulent or fraudulent -- false,

25   fraudulent or fraudulent pretense, representation or promise

1   may be accomplished by an omission and the concealment of

2   material information.

3           There was an -- there weren't just affirmative lies,

4   there were many affirmative lies in this case that we've

5   talked about.  There was so much that was omitted and

6   concealed.  So much material information that was omitted and

7   concealed.  So many of those questions that we were asking.

8   Assuming this, assuming that, which were based on the evidence

9   and -- and you heard the testimony from all of these victims:

10  Yes, I would have wanted to know X, Y, Z.

11          And so I'll just go over a few of these with you.

12          This is Laela Sturdy, for example.  She was asked:

13          Question:  If Outcome had obtained contract renewals

14  from clients by concealing ongoing under-delivery, is that

15  something you would have wanted to know?

16          Yes.

17          Was that ever told to you?

18          No.

19          Would that information have been important to you, or

20  why?

21          Because it would have indicated that things were not

22  working at the company.

23          Different than what was represented to her.  That was

24  material.  That was important.  It was an omission.

25          Another material omission, more concealment here,

1   related to Deloitte.

2           If the audit opinion from Deloitte had been obtained

3   by concealing information about under-delivery, would that

4   have impacted CapitalG's decision to invest?

5           Yes.

6           Why?

7           It would have meant that these were incorrect

8   financial statements.

9           Crucial information that they were concealing.  More

10  omissions.

11          I'm not going to go through all -- I'll go through a

12  few more here.

13          This is related to:  At any point during your visit

14  to Chicago did Shah or Purdy tell you they had serious

15  concerns about their ability to fulfill 2017 contracts?

16          No.

17          Would you have wanted to know that?

18          Yes, of course.

19          She wants to know underlying concerns about the

20  business model.

21          Another one from Sturdy.  Were you told by those guys

22  that they had serious doubts about their ability to meet their

23  revenue goals from the first quarter of 2017?

24          You probably recognize that because you've seen the

25  internal communication where that was actually what was going

1    on.  We asked her if that was important to her.

2           She said:  Yes.  Or she wasn't told that, and then

3    she would have wanted to know.

4           More concealment and omissions.  So it wasn't just --

5    there were a lot of misrepresentations, but there were also

6    lots of concealment.

7           And this one is related to Sameer Kazi.  You know,

8    she would have wanted to know about that.  She wasn't told.

9           If Purdy had known the company was going to miss Q1

10   revenue, would that have come as a surprise to you?

11          Yes.

12          Why?

13          Because he didn't tell me.

14          Another material omission.  And we went through

15   these.  I'm not going to go through every investor.  But as

16   you know, we went through a laundry list of questions with the

17   investors related to material omissions.  And there were many

18   with every investor.

19          I'm going to give you a few examples because there

20   were omissions on the pharma client side as well.

21          This is Yesenia Bautista, one of our early witnesses

22   from February.

23          Question:  Assuming that Outcome starting running

24   Xeljanz ads and offices that were originally playing Humira,

25   is that something you would have wanted to know?

1          This is that transfer of offices that we just looked

2    at.

3          Yes.

4          Assuming they reduce the number of offices, is that

5    something you would have wanted to know?

6          Yes.

7          And then assuming it went to a competitor, Xeljanz,

8    she would have wanted to know that.  And then she's asked:

9    What impact would have that had?

10          We would not have paid in full.

11          Material omission.

12          And then this is about conducting list-matches with

13    projections.  She would have wanted to know that, and it would

14    have had an impact on contract negotiations for Humira.

15          Tameka Teal, similar testimony related to Tecfidera.

16    It would have impacted -- they would have paused their

17    payments to do further investigation if they knew there was

18    under-delivery.  It's kind of obvious, but we had to ask those

19    questions.

20          Courtney Cruz.  If it were true -- this is Pfizer --

21    routine business practice to track under-deliveries, i.e.,

22    delta reports, including Pfizer campaigns?

23          Of course she would have wanted to know that.  They

24    didn't learn that until 2017.  And even then, it was only a

25    partial disclosure.  They never disclosed the under-deliveries

1   in '13, '14, and '15.  They should have because massively they

2   under-delivered in those years.

3          It was a routine business practice for Outcome to

4   conduct list-matches on projections.  Would you have wanted to

5   know that?

6          Yes, of course.  We would have definitely

7   reconsidered our investment with Outcome if we had known any

8   of those things.

9          Another material concealment to Pfizer.

10         Another -- questions of Courtney Cruz:  To your

11  knowledge, did anyone from Outcome disclose under-deliveries

12  in 2014?

13         No.  Not during those 2017 discussions.

14         Finally, for 2013, did anyone disclose, to your

15  knowledge, the under-deliveries in 2013?

16         No.  They concealed the fact they under-delivered in

17  '13, '14, '15 and only addressed '16 and '17.

18         Lyndon Chin.  He was the agency rep for Pradaxa.  If

19  Outcome included those offices -- if they included offices in

20  the proposal they hadn't even contacted yet about installing

21  the screen, would that have been important to you?

22         Yes.

23         Remember, they inflated that list-match by

24  two-thirds.  Material omission.

25         Would it have impacted your decision or your

1    negotiations?

2            Yes.

3            Another thing I thought was telling was Courtney Cruz

4    and -- Courtney Cruz had been at Pfizer for 12 years.  She had

5    never seen under-delivery of this magnitude in her career.

6    She had never seen off-target delivery of that magnitude in

7    her career of what she learned about in 2017.  Again, the

8    defense is suggesting the deltas were no big deal.  They were

9    a huge deal.

10            David Dobbins, BI as well.  This was massive

11    under-delivery in 2016.  Of course he would have wanted to

12    know, and he would have expected to know that information

13    immediately.  That was not the Outcome way.

14            Lynn Meier, very similar about selling more inventory

15    than they have.  Of course she would have wanted to know that.

16            One more.  While we're talking about the victims, I

17    want to show you this other instruction I expect Judge Durkin

18    to give you.

19            It's not a defense to fraud to blame the victim of

20    the fraud for being duped or being negligent.  It's not a

21    defense to fraud that if the victim had only been more

22    diligent it might have discovered and prevented the fraud.

23            So -- and then there's, of course, the burden of

24    proof that we've embraced the entire trial.

25            The focus of a fraud trial is not on what the victims

1    did or did not do.  The focus is on the defendants and whether

2    they lied, concealed, et cetera, during this fraud scheme.  So

3    to the extent that questions weren't posed of the victims

4    suggesting, oh, you should have done more to basically find

5    out that -- what we were doing, that's not the focus.  It's

6    not right.  Because it's not a defense to fraud to blame the

7    victims for not doing more.  It's not the way the law works.

8    So I expect Judge Durkin to give you this instruction.

9           So we have met all of these elements.  The really key

10   elements in the case I think are these common elements,

11   number one -- that I had as one and two here.

12          The final one is straightforward.  It's the mailing

13   and wirings.  We've talked about this a little bit when I

14   discussed venue.

15          But the defendants tried to confuse you about what

16   the government doesn't -- really about things the government

17   really doesn't have to prove.  You know, such that, like, we

18   don't have prove that a particular defendant received a

19   specific delta report.  Look at -- well, let's just look at

20   this instruction:

21          For the purpose of carrying out the scheme, the

22   defendant you are considering used or caused the use of the

23   mails or interstate wire communications to take place in the

24   manner charged in the particular count.  And then there's a

25   specific -- another jury instruction that explains what that

1    means.  And it's -- it's -- we have to prove that a defendant

2    need not actually intend that the use of the mails or wire --

3    that the use of the mails took place.

4            You must find that the defendant knew -- either knew

5    the use would actually occur; or, that the defendant knew it

6    would occur in the ordinary course of business; or, the

7    defendant knew from facts -- facts from which the use could

8    reasonably have been foreseen.

9            The government does not have to prove the defendant

10   knew that the wire communication was of an interstate nature.

11           And so that concept of reasonably -- of reasonable

12   foreseeability is -- that's the way the law works.  I don't

13   know if you heard about this from -- during the defense

14   closings.  But it's -- if -- it's not like senior executives

15   are the ones who are working the mail room.  They're not the

16   ones who are accepting mailings or sending out mailings.  But

17   the reality is is, the entire point of the business, of

18   course, was for the defendants to get money from pharma.  They

19   knew that the invoices were being sent out.  They knew that

20   pharma was paying on the contracts.  That's the gist of this.

21   Yet, it's the whole point of the business.  It's the point of

22   the fraud, was to get the advertising budget and get as much

23   money as they could from clients.  And, of course, they

24   understood that the money would either be mailed or wired to

25   them because that's reasonably foreseeable.  That's how it

1    worked when you're sending out invoices to clients to be paid

2    on a monthly basis.  So it's not like -- of course, if it were

3    different, it's not like -- a CEO could never be charged;

4    right?  Because 500 people of the company, of course the CEO

5    is not the one who's sending out invoices or, you know,

6    signing every contract or accepting the mailings.  I mean,

7    they get the benefit of it, but as long as it's -- if they

8    have no facts which is reasonably foreseeable, which is

9    absolutely true, given their knowledge of the company, we've

10   proven what we need to prove here.

11          Another instruction I wanted to mention, too.  And

12   this kind of goes to the point I was just making.  A scheme to

13   defraud may be committed by more than one person.  Guilt may

14   be established without proof that a defendant personally

15   performed every act constituting the scheme to defraud.

16          People have different roles in fraud schemes, just

17   like have different roles in companies.  So it's not as though

18   one defendant has to do every single thing related to a fraud

19   scheme.  Right?  I mean, they had -- Ashik was the one on the

20   front lines.  David Ma was on the front lines.  The analysts

21   were often on the front lines.  The defendants were the ones

22   on the front lines more in the early days.  Their roles

23   changed a little bit over time, but they still participated in

24   the fraud over time by overseeing things, protecting Ashik,

25   attacking the whistleblowers.  And, of course, accepting the

1    benefits.  And then, of course, they were also involved in

2    raising the money very intimately, especially Purdy and Shah.

3             There was testimony about -- I'll just show you a

4    couple of examples.  In terms of the mailings themselves, we

5    had -- there's copies of checks that you'll see on some of

6    them.  On others, you'll have like a hard -- a copy of -- an

7    image of a hard copy of a check and the invoice, which also is

8    sufficient proof to show that there was a mailing there.

9             We also had some witnesses testify about their -- the

10   ordinary course of business was to send -- was to send their

11   checks in the mail.  Tameka Teal testified about that.  So did

12   Lynn Meier testify that -- about that as well.  It's, again,

13   to prove up the actual mailings.  We listed that testimony.

14            So I now want to talk about the actual categories of

15   counts.  This is on the, you know, the mailings and wires.

16            The first category I want to talk about is the

17   communications in furtherance of the scheme.  These are the

18   Voxers and e-mails.  Just the way we charged it.

19            The second one is defrauding the pharma clients.

20   That would be the money, the checks that we just discussed.

21            Then there's the lender fraud, investor fraud.

22            So here's Count Three, which is the e-mail exchange

23   between Ma and Purdy about inflated tablet metrics.  I mean,

24   this e-mail speaks for itself.  You've seen it many times.

25   I'm not going to go over it.  It's really blatant, talking

1  about these heavily inflated tablet metrics.  The "not real"

2  metrics.  This is a very strong count.  And clearly, you know,

3  Brad Purdy is -- is all over it.

4        And then, of course, he uses -- he sends the false

5  numbers to clients later -- to a potential client, I should

6  say.

7        MR. POULOS:  Just note an objection to clients, your

8  Honor.

9        MR. MADDEN:  Client.

10        MR. POULOS:  Or even client.

11        THE COURT:  All right.

12        MR. MADDEN:  Potential client.

13        THE COURT:  That should address the objection.

14        Go ahead.

15        MR. MADDEN:  Count Three.  These are the numbers.

16  They're hugely inflated numbers.

17        Count Five.  This is -- these are -- siloing of

18  information was so key at Outcome.  That's what led to them,

19  you know, them over-selling inventory.  All the defendants are

20  on siloing e-mails.  Shah's on this one.  It was charged as

21  Count Five.  It's a really crucial e-mail.  Conceal the truth

22  from sponsorship sales, conceal the truth from clients.

23  That's how that works.

24        The Kazi -- the Kazi counts are extraordinarily

25  strong.  I don't know if you noticed.  It seemed like the

1   defense had a hard time responding to those in closing.
2   They're -- their arguments were convoluted and difficult to
3   follow.
4          Understandable.  There's just -- the whole Kazi
5   episode is such a bad, bad, bad look for Shah and Agarwal.
6   The way he treated was wrong, and it's super telling about
7   their intent.  And there's a number of counts that related to
8   it.  You've seen them all.  I'm not going to go over them in
9   great detail.  This is the Voxer from Agarwal to Shah about
10  what Madan said.  Ashik exchanging numbers.  Not the first
11  time we heard about it.  Keeping people in the loop about
12  what's -- keeping co-schemers in the loop is very important.
13  So that's what this is about.  That's how that furthered the
14  fraud.
15         Another one is, you know, then, of course, the
16  retaliatory action here.  Reaction.  Let's cycle out Sameer
17  and Adam and Liane and bring in other people.  Liane and Adam
18  tell them about the fraud.  Let's get rid of all three of
19  them.  That was the Outcome way.
20         Then you've got this Voxer from -- this one's from
21  Shah to Agarwal.  And he wants to know -- it seems striking
22  that he would say things like "once this goes public."  And
23  that would have been the true nightmare on January 23rd, 2017.
24  They didn't -- they were deep in negotiations with Goldman.
25  So keeping people like Sameer -- someone like Sameer Kazi,

1   who's a confident man, if he goes out telling people what's

2   going on at Outcome, it would have been a disaster.  They got

3   him out of the company.  Got him a separation agreement.  Kept

4   him quiet.  He's gone.

5        Count 17.  This is Nagaldinne's -- the forward of

6   Nagaldinne's Voxer about Kazi.  Another super-strong count.

7   This is when, you know, he's talking about how 50 percent of

8   revenue could be recalled.  Kazi is saying:  This is fraud.

9   Again, so this is Shradha Agarwal wanting to keep -- was very

10  important for her to keep Rishi Shah in the loop.  There was

11  such a huge flurry of communications about Kazi.  Fascinating

12  how it all happened, but this is another one of the counts.

13       We also charged this one -- their concern about who

14  Sameer is talking to about the affidavits issue.  They wanted

15  to shut him up.  This was them communicating about that.

16       Count 19.  This is the Prowker.  Another

17  Whistleblower.  Another weak.  Another Whistleblower.  This is

18  Rishi keeping Ashik in the loop about the Prowker e-mail --

19  excuse me, about the Prowker's lawyer's whistleblower letter.

20  Talking about the manipulation of the IMS reports and the

21  under-deliveries.  He forwards that to Shah -- excuse me, to

22  Desai, keeping him in the loop.  You've seen this numerous

23  times.  Attacking whistleblowers was a big part of this.

24       This refers to Sahir Raoof.  And, I mean, this is

25  just blatant -- blatantly retaliatory.  Raoof's formal

1   complaint about fraud was I think either January 30th or 31st.

2   And then the CEO of the company is calling him a

3   trouble-making F'er.  It definite is -- it's part of the

4   scheme.

5        Then Count 21 is -- this is, you know, another weak,

6   another whistleblower.  Bryan Morgan sends this e-mail raising

7   the manipulation of the IMS reports.  Shah then forwards it

8   to -- I'm sorry, yep.  And then it goes -- Purdy forwards it.

9   And then it -- and then Shah responds to it.  So I think the

10  charged transaction is -- the charged e-mail is the Purdy's

11  forward to Shah and Desai.  So those are all established.

12       Let's move on to the defrauding of the pharma

13  clients.  I've already talked about this a lot, so I'll go

14  through it relatively quickly.

15       We charged three counts that are related to

16  rheumatology brands because of the disaster that was the

17  rheumatology category.  Count One, Two, and 25.  One and 25

18  are Xeljanz.  And you heard from both Courtney Cruz and Joe

19  DiFoglio, the agency rep about Xeljanz.

20       Ashik also testified extensively about rheumatology

21  being a disaster.  If you look at the delta reports, you'll

22  see it.  From 2013 forward, their under-deliveries were

23  massive.  They never had enough inventory in rheumatology.

24  And it just went on until 2017.  The Christmas Voxer is a key

25  Voxer to look at, at least for the Count 25, which is later in

1  time because that comes afterwards.  Ashik -- and in that

2  Christmas Voxer, Ashik refers to the massive inventory gaps in

3  rheumatology when he's talking to Rishi and Shah and Purdy.

4         But you've seen the invoices.  It's all married up

5  here with the -- there was -- the point of us showing you the

6  e-mails from Ma and Desai to show that, in fact, there was

7  under-delivery on this.

8         Remember that the defendants are the ones who

9  approved reassigned inventory from Humira to Xeljanz to

10  address under-deliveries on both campaigns.  The Core 4 on

11  this are on this e-mail in October of 2013.  Robbing Peter to

12  pay Paul.  A tactic that was understood and approved by each

13  of Rishi Shah, Shradha Agarwal, Brad Purdy.  And for waiting

14  room screens, exam room tablets, it was 1928.  This was -- the

15  last one was waiting room screens.  This one is exam room

16  tablets.  1929.  Again, they're shifting inventory from one

17  competitor to another in rheumatology which was something that

18  they did, given the huge gaps that they had on those programs.

19         So this is, again, this is Xeljanz, Humira.

20         Count Four is Biogen, Tecfidera.  Check mailed by

21  Biogen's agency.  You saw the invoice from Outcome billing

22  Tecfidera for full delivery of 900 tablets.  The delivery on

23  that was pathetic.  They actually had four devices out of 900

24  and billed the client in full.  A shocking delta of 99 percent

25  under-delivery on that one.

1           And as part of their quarterly meetings, Shah and

2    Agarwal were informed of the grave continuing deltas on MS.

3           As of June 2015 -- as of June 2015, one month after

4    Purdy was copied on the exchange demanding payment for

5    Tecfidera, for the February 2015 invoice, the entire MS

6    category was short.  Over 1,000 exam room tablets.  The

7    defendants did nothing to stop the process of billing in full,

8    despite pervasive under-deliveries.

9           Within days of the e-mail demand, Biogen paid this

10   amount in full of the invoice.  Government Exhibit 466.  Check

11   from Biogen's media agency.  Again, it marries up to the

12   invoice.

13          Count 11.  This is BI, Jardiance, July 22, 2016.

14   We've got both the invoice -- the invoices right here.

15   Billing Tecfidera for the full amount of delivery, despite the

16   delta.

17          I think it was this count, if I recall correctly,

18   that the -- yeah.  Yes.  Okay.  So here, you can take a look

19   at this, the massive under-delivery here on Jardiance.

20   They're only delivering at 27 percent.  This is Liane Pierce's

21   audit here that we've already looked at numerous times today.

22   Pierce reported correctly that under -- that there was a delta

23   of almost 75 percent.  It was so glaring that it was one of

24   the ones that Pierce highlighted in red.

25          Same story with waiting room screens.  Outcome was

1  contracted to deliver about 3,000, only delivering 2,000 and
2  some change, about 900 short.  No one raised any alarm bells,
3  despite the serious pervasive under-deliveries.  And Shah and
4  Agarwal were both copied on -- on this -- on this audit
5  report.
6          Inevitably, BI paid in full, just like the other
7  victims of the scheme.  And here's the check for the media
8  agency, which matches the invoice.
9          Count 23 is a check mailed by Merck's media agency
10 for Belsomra.  You saw the invoice, billing Belsomra for the
11 full delivery.  You saw the affidavit of performance attesting
12 the full delivery, reflecting that they delivered at
13 100 percent, when it wasn't true.
14         Here is -- here's what shows the under-delivery.  The
15 contractual requirements for Belsomra were 3,600 and some
16 change.  Waiting room screens and false affidavit performance,
17 which you know was not true.
18         Here's the check from Merck's media agency for this
19 campaign.  It matches -- that matches -- and the envelope as
20 well.
21         Finally, Count 25, which I already talked about.  You
22 heard significant testimony about this.  Pfizer paused their
23 -- paused their campaigns when they heard about the
24 under-deliveries.  You may remember they also canceled -- they
25 said, we're not paying the current invoices we have when they

1  realized they'd been ripped off.  It was too late for them to

2  cancel this.  This had already gone out.  So despite -- and

3  they ended up having to pay almost $5 million.

4          So they did pay this back.  But that does not -- the

5  fact that you pay back someone you've defrauded does not -- is

6  not a defense to fraud.  So this is still -- this was still

7  obtained by fraud.  We've still proved the elements on this

8  count.  Huge under-deliveries, and of course, not shockingly,

9  it's not like Outcome denied the under-deliveries when

10 Pfizer -- during those conversations from Pfizer in 2017.

11 There's no way they could.

12         And then here's the -- here's the document that just

13 shows the under-delivery.  This is Government Exhibit 835.

14 And then you, of course, got the check and the invoice.

15         The last two -- one thing before I move on to that.

16 I want to mention that on not all of these -- on some of the

17 delta reports and under-delivery reports, they're obviously

18 not the same exact day and sometimes not the same month as --

19 as the count that's charged.  For example, you might see a

20 delta report or under-delivery report in July, and we're

21 charging for, like, an invoice that was sent out in June.

22         Well, you heard from Mr. Petron.  You've seen other

23 evidence.  The way it usually worked is that typically the

24 delivery increased over time.  So if you have a delta report

25 from July, generally speaking, the delta was even greater in

1   previous times in that -- in that month.  So, for example, if

2   you've got a delta report in July, typically there was an even

3   greater delta in June.  And so it's fair for you to rely on

4   the various delta reports that you've seen and the ones we've

5   presented to you to know that they were under-delivering on

6   these campaigns.  And we've picked -- for the counts, we've

7   picked campaigns where there were absolutely massive

8   under-deliveries, not just modest under-deliveries.  I know

9   the defense pointed out, oh, on this one it was only 10

10  percent or five percent.  Well, the charged counts are ones

11  where -- like rheumatology, oftentimes -- they were like

12  75 percent, you know, regularly throughout the years.  And if

13  you look at the other charged counts, the deltas were just

14  massive.  It wasn't like something that could have, you know,

15  easily been made up.  Just wanted to mention that.

16          Lender fraud and investor fraud.  We've gone through

17  this.  This is that first -- this is related to that first

18  loan where Shah and Agarwal got their -- their initial

19  dividend and -- although Brad -- Brad Purdy is on the e-mail

20  here.

21          The second one is the -- I'm sorry, this is

22  Count Nine, which is related to the loan itself.

23          Count 13, my colleague went over as well.  This

24  relates to the AccentHealth acquisition.  There were, you

25  know, tons of issues going on with Outcome at this period, as

1   we've talked about that.  That late 2016, early 2017 period.

2   Massive deltas.  Note that this was -- this was after that

3   audit that Liane Pierce did.  For example, July 2016, that

4   showed those massive under-deliveries.  So there were -- there

5   were lies and concealment to these lenders to get this huge

6   loan.

7           Finally, you've got the investor fraud, which I've

8   talked about extensively.  I'm not going to go over too much

9   now.  But these are -- the three counts were Goldman, CapitalG

10  and Leerink.  Those were really significant fraud.

11          Built on a lie.  Those were the words of David Ma.

12  Lies and deceit were at the center of Outcome's business.

13  Selling inventory they didn't have.  Under-delivering on

14  campaigns.  Over-billing clients as if they delivered at

15  100 percent.

16          Ladies and gentlemen of the jury, we are sincerely so

17  grateful for your service.  We are well aware that you've made

18  significant sacrifices to be here four days a week for

19  two-and-a-half, going on three months.  Lots of people get

20  called for jury service.  Most people don't get the

21  three-month trial.  So I know everyone, the defense group, the

22  judge, the government, we all really, really, really

23  appreciate and recognize your diligence and respect the

24  service that you're doing here.  We can't thank you enough.

25          When you go back to that jury room, think about the

1    witnesses.  Think about David Ma.  He knew that Outcome was

2    built on a lie.  He started the process of holding these

3    defendants accountable when he went to the Wall Street Journal

4    with what he knew about Outcome.  David Ma was not wrong about

5    Outcome.  Outcome was built on a lie.  And no one knew it

6    better than these three defendants.  And no one benefited more

7    from it.

8        Think about Sameer Kazi when you're deliberating.  He

9    said fraud was going on at the company and the CEO didn't see

10   it as a red flag.  Sameer Kazi was not wrong.

11       Think about Bridget O'Donnell.  She lost faith in the

12   leadership of Outcome Health, including the CEO.  Bridget

13   O'Donnell was not wrong about them.

14       Think about the victim witnesses that the defendants

15   and their -- others at Outcome lied to.  Think about Laela

16   Sturdy.  Todd Cozzens.  Ken Eberts.  Think about all the

17   pharma victims.  The victims' testimony corroborate each

18   other.  The testimony was consistent.

19       And don't be distracted by all the smoke bombs the

20   defendants have been throwing throughout the trial.

21       And, of course, think about Ashik Desai.  Every lie

22   that Ashik told at Outcome was in service of Rishi Shah and

23   Shradha Agarwal and their business.

24       This trial has been a nightmare for the defendants

25   because Ashik is no longer under their thumb.  He is no longer

1   willing to lie for them.

2          Ladies and gentlemen, hold them accountable.  Don't

3   let them get away with it, like they did for so many years at

4   Outcome.  Convict them on every count because they're guilty.

5   Thank you.

6          THE COURT:  All right.  Thank you.  Ladies and

7   gentlemen --

8          And if you could take this board down here, the board

9   that's over here, Mr. Johnston?  If you can just take it down,

10  please.  Thank you.

11         If you have your jury instructions with you, you can

12  pull them out.  If you don't, I'm going to read them to you.

13  You have them back in the jury room anyway.  But I'm going to

14  read the last instruction, starting with instruction number

15  41.

16         Once are you all in the jury room, the first thing

17  you should do is choose a foreperson.  The foreperson should

18  see to it that your discussions are carried on in an organized

19  way, that everyone has a fair chance to be heard.

20         You may discuss the case only when all jurors are

21  present.  Once you start deliberating, do not communicate

22  about the case or your deliberations with anyone except other

23  members of your jury.  You may not communicate with others

24  about the case or your deliberations by any means.  This means

25  oral or written communications, as well as any electronic

1    method of communication, such as telephone, cellphone, smart

2    phone, iPhone, Android, computer, text messaging, instant

3    messaging, the internet, chat rooms, blogs, websites, or

4    services like Facebook, LinkedIn, YouTube, Instagram,

5    Snapchat, Twitter, Tik Tok, or any other method of

6    communication.

7            If you need to communicate with me while you're

8    deliberating, send a note through the court security officer.

9    The note should be signed by the foreperson or by one or more

10   members of the jury.  To have a complete record of this trial,

11   it is important that you do not communicate with me except by

12   a written note.  I may have to talk to the lawyers about your

13   message, so it might take me some time to get back to you.

14   You may continue your deliberations while you wait for my

15   answer.

16           Please be advised that transcripts of trial testimony

17   are not available to you.  You must rely on your collective

18   memory of this testimony -- or of the testimony.

19           If you send me a message, do not include the

20   breakdown of any votes you may have conducted.  In other

21   words, don't tell me that you're split 6-to-6 or 8-to-4, or

22   whatever your vote happens to be.

23           A verdict form has been prepared for you.  You will

24   take this form with you into the jury room.  When you have

25   reached unanimous agreement, your foreperson will fill in,

1    date and sign the verdict form.  Each of you will sign it.

2         Advise the court security officer once you've reached

3    a verdict.  When you come back to the courtroom, I'll read the

4    verdict aloud.

5         I'd like to show you the verdict form right now.  And

6    I'm going to ask Sydney to put it up on the ELMO.  Thank you.

7         Okay.  It has the title of the case and then page --

8    the first page, it says:

9         We, the jury, as to the following charges of the

10   indictment, find as follows regarding Defendant Rishi Shah.

11   With various counts, and a check -- a box for you to check,

12   either not guilty or guilty.

13        You can turn to the next page.  Those counts continue

14   on the second page.

15        And then it reads:  We, the jury, as to the following

16   charges of the indictment, find as follows regarding Defendant

17   Shradha Agarwal.

18        And, again, it lists out the counts with boxes for

19   not guilty or guilty.

20        Then, finally, it says:  We, the jury, as to the

21   following charges of the indictment, finds as follows

22   regarding Defendant Brad Purdy.

23        And it lists out the various counts, and it reads not

24   guilty and guilty.

25        Then finally, after those counts are all listed out,

1    there's lines for you all to sign it and date it when you've

2    reached your verdict.  First with the foreperson, and then the

3    other 11 members of the jury.  And date your verdict form when

4    you've reached the unanimous verdict.

5            The final instruction I'll give you is this:

6            The verdict must represent the considered judgment of

7    each juror.  Your verdict, whether it is guilty or not guilty,

8    must be unanimous.

9            You should make every reasonable effort to reach a

10   verdict.  In doing so, you should consult with each other,

11   express your own views, and listen to your fellow jurors'

12   opinions.  Discuss your differences with an open mind.  Do not

13   hesitate to re-examine your own view and change your opinion

14   if you come to believe it is wrong.  But you should not

15   surrender your honest beliefs about the weight or effect of

16   evidence just because of the opinions of your fellow jurors or

17   just so that there can be a unanimous verdict.

18           You should give fair and equal consideration to all

19   the evidence.  You should deliberate with the goal of reaching

20   an agreement that is consistent with the individual judgment

21   of each juror.

22           You are the impartial judges of the facts.  Your sole

23   interest is to determine whether the government has proved its

24   case beyond a reasonable doubt.

25           So, Emily, I'd ask you to please swear in the court

1  security officer.

2       (Court security officer sworn.)

3       THE COURT:  All right.  You undoubtedly have noticed

4  there's 19 of you and 12 will be on the jury.  I'm going to

5  ask certain people to remain in the courtroom.  They will be

6  the alternate jurors.  Once I've talked to them, they're going

7  to come back to the people that have also left the courtroom

8  that will be on the jury.  They'll be able to collect their

9  materials, if you wish to talk to them and exchange phone

10  numbers, or, you know, I'm sure many of you have become

11  friends over this time.  So if there's things you want to say,

12  other than anything about the case, you're free to do so.  And

13  then I'm going to have the 12 of you back in the courtroom for

14  a moment, just to talk about schedule.  And then you'll go

15  back to start your deliberations.

16       You'll have, in the jury room, copies of all the

17  exhibits, hard copies of the exhibits, along with electronic

18  copies.  You'll also have six copies of the stipulations and

19  six copies of the indictment.  We didn't need to make 12

20  copies, but six should be sufficient.

21       So with that, I'm going to ask the following jurors

22  to remain in the courtroom.  Kathleen Cox.  Cristobal Rosales.

23  John Armstrong.  Garry Gillette.  Jeanelle Bassett.  Alex Pup.

24  And Joseph Ciresi.

25       If your name was not called, please go back to the

1 jury room, not to begin deliberations, but just to await me
2 calling you back into the courtroom in a few minutes.  Thank
3 you.

4           COURT SECURITY OFFICER:  All rise.

5      (Jury exited the courtroom.)

6           THE COURT:  And if your name was one of those I just
7 called, you can all have a seat.  If your name was not called,
8 then please go back to the jury room.

9           There should be -- all right.  I think we may have --
10 let's just make sure we have everyone here.  Kathleen Cox?
11 Okay.  Cristobal Rosales.  John Armstrong.  Garry Gillette.
12 Jeanelle Bassett.  Alex Pup.  And Joseph Ciresi.  Okay.  Thank
13 you.  All have a seat, please.

14           Ladies and gentlemen, you are the alternate jurors.
15 That may be a relief to you or may be a disappointment to you.
16 You've been extraordinary, paying attention to this case
17 throughout the entirety of it, coming in every day throughout
18 this very lengthy, lengthy trial.

19           We have to have alternate jurors because, as you
20 know, of course, we need 12 jurors for a verdict.  If we had
21 just picked 12 and somebody got sick, we'd have to try this
22 all over again.  I've been on many cases where we have two or
23 three alternates and every one of them ends up serving on the
24 jury because people get sick or there's other events that
25 prevent regular jurors from actually participating in the

1   deliberations.  Quite frankly, when we started with 19 here, I
2   expected we would lose many jurors throughout this process and
3   the alternate jurors would become part of the regular jury.
4   No one knew who the regular jurors were or who the alternate
5   jurors were.  And that's the practice of the courts because
6   it's unpredictable whether you'll become part of the 12 that
7   will be deliberating.

8           In this case, it's not an insignificant chance that
9   if someone on the jury can't continue to serve, if they get
10  sick or for some reason can't continue to serve, we would call
11  you, in order, but call you to come in and serve on the jury.
12  And the jury would be required to start their deliberations
13  all over again.  And that's the practice.  And that's happened
14  in cases I've had, where we lost a juror during the jury
15  deliberations because of illness or some type of personal
16  conflict of some kind where they can't come in.  And
17  deliberations have to continue, and you'll be called by Emily
18  to come in.  And the deliberations will start from day one as
19  if you had been there from the start, and they'll just start
20  all over again.

21          But, again, I -- I wish -- there was no way to
22  predict how many people of the group of 12 that I called off
23  would remain and not -- we wouldn't lose them throughout the
24  trial.  As I said, especially with COVID, we've had instances
25  where we've lost jurors because of illness and alternates have

1  come in and served.  And when we didn't have enough jurors, we
2  had to declare a mistrial and start all over.  It couldn't
3  happen in this case.  Couldn't allow it to happen.

4         So with that, I wanted to at least give you some
5  explanation of what's going on.  And thank you, on behalf of
6  the Court and all the parties, for your service.  You may yet
7  be called to serve.  That is certainly a possibility.  And
8  because of that, Emily has your contact information.  And
9  because of that, I'm going to ask you not to talk about the
10  case with your family, with the other jurors when you go back
11  briefly to collect any materials you have.

12         I'm going to ask you to give your notes and your copy
13  of the instructions to Emily.  Write your name on top of your
14  notepads.  We'll keep those notepads until this trial is over
15  because if you're called back to serve as a juror, you may
16  want those notepads to refresh your memory about evidence
17  you've heard.

18         If -- when the trial is over and you haven't been
19  called to deliberate and you want to get your notes, call
20  Emily and she will provide them to you.  But I would ask that
21  you put your instructions, slip them into your notepads, put
22  your name on the notepads and provide them to the court
23  security officer or Emily.  Go back -- don't talk to the other
24  jurors about the case, but if -- I'm sure you've made friends
25  with some of them and you want to exchange phone numbers, or

1    greetings, or anything else, you're free to do so.

2         I'm going to call them back in in a few minutes when

3    you're all relieved of your duties and are allowed to go home

4    to talk about schedule with them.

5         So, again, with the Court's thanks, you are

6    discharged.  But don't discuss the case until the case is over

7    for fear you may be called back to serve as a juror.  And if

8    you have any questions about the status of things, contact

9    Emily, and she will let you know if a verdict has been

10   reached.

11        With that, you are -- ma'am, did you have a question?

12   Okay.  Thank you.  So, once again, I thank you all.  Thank

13   you.

14        COURT SECURITY OFFICER:  All rise.

15      (Alternate jurors exited the courtroom.)

16        THE COURT:  All right.  Please be seated.  Anything

17   anyone wants to put on the record?

18        MR. MADDEN:  No, your Honor.

19        MS. CHOU:  No, your Honor.

20        MS. BELL:  No, your Honor.

21        MR. POULOS:  I do, your Honor.

22        THE COURT:  All right.

23        MR. POULOS:  Your Honor, I move for a directed

24   verdict of not guilty on Count Three of the indictment.

25   That's the one that relates to the e-mail from David Ma on

1    May 4th of 2015.  The government just argued, twice this

2    morning in connection with that e-mail, that Brad Purdy took

3    that data and transmitted it to a client.  And when this issue

4    first arose, I noted that "client," the way it has always been

5    used in this trial time and time again, were the pharma

6    clients.  And that did not go to a pharma company, it went to

7    a system.  And as the Court knows, as we all know, it's a

8    two-sided business.  The membership side, the systems, the

9    doctors, the offices where these are installed, are not

10   alleged to be victims of the scheme or targets of the scheme.

11   This case is specifically, expressly, there's no doubt about

12   it, the charge was frauding pharma clients.  And Mr. Madden

13   just argued this, that you can convict him because he sent it

14   to a "client."  But it was a system client.  And so,

15   therefore, they have failed in their proof.  And this jury

16   should not be permitted to consider that argument, that claim,

17   that theory of criminality and liability on that count, given

18   the charges in this case where the victims are pharma clients,

19   not members.

20              THE COURT:  All right.  Response?

21              MR. MADDEN:   I made it very clear what type of

22   clients were.  Specifically talked about that e-mail, talked

23   about the two-sided market.  Talked about the fact that it's

24   not okay to lie to a client on one side and not the -- and

25   it's not okay to lie to clients on either side.

1    We -- the indictment is broadly drafted.  We do not

2 need to list every single lie in it.  The jury has all the

3 information.  There is nothing -- no inappropriate argument

4 made.

5    THE COURT:  All right.  Well, as I did with the

6 directed finding, verdicts, or the motions for directed

7 findings, I'm going to reserve ruling on it.  Should it become

8 necessary to consider this, you can include it in your, what

9 will inevitably be a motion for judgment of acquittal or

10 motion for new trial.

11    MR. POULOS:  Thank you.

12    THE COURT:  But I'm going to reserve ruling on your

13 oral motion right now.

14    MR. POULOS:  Thank you, Judge.

15    THE COURT:  All right.  Then what I'm going to do is

16 when the other jurors have left, the alternates, I'm going to

17 bring the jury back in the courtroom.  I'm going to tell them

18 that -- we're going to talk about what their schedule is.  And

19 let them -- I want to give them their options.  I'm going to

20 tell them that I would like them in at 8:30, if possible, to

21 start no later than 9:00 every day.  I'd like them to stay

22 until 4:30 every day.  I'd like them to stay until 5:00, if

23 they can.  But no earlier than 4:30.  They'll be given lunch,

24 so they won't be out buying their own lunch.  We'll provide it

25 to them.  The court security officer will take them to the

 1  cafeteria, likely around 11:30.  So if you're there, make sure
 2  you avoid them.  And that's about it on schedule.
 3       I'm going to ask -- I think there's a -- the court
 4  security officer told me one of the jurors, I don't know
 5  whether it was an alternate or one of the regular jurors, had
 6  a matter relating to a death in the family where they had to
 7  leave at 4:15 tomorrow.  I'm not sure that applies to this
 8  group of 12.  If it does, they'll leave at 4:15.
 9       I'm also going to ask them if they can come in on
10  Fridays.  I'm going to encourage them to.  I'd like them to.
11  But I'm not going to force them to because of the -- for the
12  same reasons we've talked about throughout the trial.  I don't
13  know if the conflicts on Friday were with the alternates or
14  were with the 12 jurors.
15       So that's how we'll work.  You'll have to -- I think
16  you all have contact information you've given to Emily, but
17  double check that after we let the jurors go.
18       I would like to be in communication with you if we
19  get questions so that we can communicate by e-mail and then
20  get on a conference call.  If need be, we'll come back to
21  court.
22       Is there any -- do the defendants object to answering
23  jury questions by convening on a phone call or through
24  agreement on e-mail?
25       MS. CHOU:  No objection to that.  In fact, we would

 1  prefer that.

 2          THE COURT:  Okay.

 3          MR. LOWDER:  No objection, your Honor.

 4          MR. POULOS:  No objection generally, Judge.  But

 5  depending on what the question might be, it might be more

 6  advisable that we gather.  But as a general rule, no objection

 7  to proceed in that fashion.

 8          THE COURT:  Okay.  How about the government?

 9          MR. MADDEN:  No objection.

10          THE COURT:  All right.  Very good.  Anything else

11  anyone wants to put on the record?

12          MS. BELL:  Nothing on the record, your Honor.  Just

13  one matter I wanted to bring up at sidebar.

14          THE COURT:  Okay.  Anything else on the record?  I

15  want to give Sandy a rest here.

16          All right.  Sandy, we're off the record.  But the

17  jurors are going to come in, and I would like that on the

18  record.

19          Okay.  Let's go to sidebar.  Off the record.

20      (Proceedings heard at sidebar off the record.)

21          THE COURT:  Are the binders and redacted indictments,

22  copies of it -- and it looks like we just got the thumb drive.

23  Is that for all defendants or just defense exhibits?  Defense

24  exhibits?  Do we have it for the government?

25          MR. APPLEBY-BHATTACHARJEE:  We do have the government

1   exhibits.  Let me just confirm with Ms. Paul.

2           THE COURT:  Okay.  We can wait a second.  I think the

3   jury is coming back.

4           MR. APPLEBY-BHATTACHARJEE:  We do have them.

5           THE COURT:  Okay.  Very good.

6           (Jury in at 2:34 p.m.)

7           THE COURT:  You can sit wherever you'd like.  We're

8   just going to be in the courtroom for a minute, so no assigned

9   seating.  Make sure we have 12.  Please be seated.

10          All right, ladies and gentlemen, as you've

11  undoubtedly perceived, you are the jury that is going to

12  deliberate on this case.  I've discharged the alternates.

13  They will not communicate with you about your deliberations

14  because if one of you is no longer able to deliberate for

15  illness or any other reason, one of the alternates will come

16  in and take his or her place, and you'll begin deliberations

17  anew.  That's the process that's followed to substitute

18  alternate jurors for regular jurors, if someone can't serve.

19          But they should not communicate with you certainly

20  about the case.  When it's over, you can all talk about it as

21  much as you'd like.  But while you're deliberating, you

22  shouldn't talk to them about the case, or with family members

23  or friends, of course.

24          Lunch is going to be provided for you every day.

25  You'll go down to the cafeteria, and you can order what you

1   want, and it will be paid for by the Court.  Emily or the

2   court security officer will take you down there.  We want you

3   to keep deliberating while you eat lunch.  Or take the break

4   you want, but we want to keep you together, is the whole point

5   of it.

6         You can begin every morning at 8:30, if you'd like.

7   You can come in at 9:00, if you want.  I'd prefer you spend

8   longer days, but it's your choice.  I wouldn't want you to

9   start any later than 9:00.  But it'll be up to you

10  collectively on what time you want to start.

11        I'd like you to work until 4:30, really to

12  5:00 o'clock, if you can.  But if 4:30 is what you decide to

13  break every day, that's your choice.  If you want to change

14  the times because some days someone can make it earlier, some

15  days can't make it earlier.  Some days someone can stay later

16  and someone can't stay later, you can alternate the times as

17  you wish.  It is your collective decision.  Let the court

18  security officer know because, while you're deliberating, we

19  want to be available to answer, hopefully no questions, but if

20  you do have questions, we want to be available to answer them.

21        The -- whether you deliberate -- I know someone told

22  the court security officer there was a need to leave at 4:15

23  tomorrow.  I don't know if that was one of you or one of the

24  alternates.  If it's one of you, you can leave at 4:15.

25        (Juror raised hand.)

1    THE COURT:  Okay, yeah.  I think there was a personal

2  issue, and we'll respect that.  So if you have to leave at

3  4:15 tomorrow, then we will stop early tomorrow.

4    I don't know if the objection to going on Fridays was

5  unanimous, whether it was the alternates, or included some of

6  the people on this jury.  If you can't serve on a Friday, then

7  you're not going to come in on Fridays.  But I think, as you

8  can tell, at this point with the trial going as long as it is,

9  the more time you can spend together to work on deliberating

10  in this case, the better.  And whatever you decide, we'll

11  abide by.

12    Electronic copies of the exhibits are going to be

13  provided to you, along with hard copies of them.  And then

14  copies of the indictment and copies of the stipulations.

15    Emily is going to go back and make sure the

16  electronic version of the exhibits is loaded properly so you

17  can access them.

18    And with that, you're -- I'm going to discharge you.

19  You can go back to the jury room and begin deliberations.

20  Just let the court security officer know what you decided

21  about schedule on any particular day so we know when you're

22  here and when you're leaving you.  Thank you all.

23    COURT SECURITY OFFICER:  All rise.

24    (Jury out to deliberate at 2:38 p.m.)

25    THE COURT:  Okay.  All right.  I'd like each side to

1    exchange the exhibits, or at least put on the record that

2    you've reviewed what each side is sending back to the jury and

3    have no objection to what's being sent back to them.

4          So, first, the government.  Have you reviewed the

5    defense exhibits, and is there any objection to what is on the

6    thumb drive that's going back?

7          MR. APPLEBY-BHATTACHARJEE:  We have reviewed the

8    defense exhibits.  There is no objection to what is on the

9    thumb drive.

10         I will note that we have the native Excel files on

11   the government laptop, which is available for the defense to

12   inspect before it goes back.  But as for what's being loaded

13   into JERS and what is being sent back as hard copy exhibits,

14   we have no objection.

15         THE COURT:  Okay.  And from the defense, have you

16   reviewed what the government is sending back by way of their

17   exhibits?  Have you reviewed the Excel sheets on the laptop,

18   and is there any objection to what's going back?

19         MS. CHOU:  We've reviewed what's being loaded to the

20   JERS system.  I think we still have to review the Excels on

21   the laptop.  But we have no objection to what's been loaded or

22   the paper copies.  So the only thing to be done is to look at

23   the laptop.

24         THE COURT:  All right.  For Defendant Agarwal?

25         MR. LOWDER:  Your Honor, we've reviewed the hard

1   copies and also reviewed the JERS files, and no objection to

2   those.  And I assume there will be no objection once we review

3   the Excel spreadsheets on the laptop.

4              THE COURT:  All right.  Defendant Purdy?

5              MR. PAVLETIC:  And same here, your Honor.

6              THE COURT:  Okay.  Then, Emily, we can take back the

7   hard copies.  Are they in a cart or are they in a box, or

8   where are they?

9              MR. APPLEBY-BHATTACHARJEE:  We have our binders in a

10  cart, and we can reorganize so we can put these boxes onto the

11  cart as well.

12             THE COURT:  All right.  Let's do that.  And then

13  someone from the defense team each -- each one of the

14  defendants should review the laptop before it goes back with

15  the Excel sheets.

16             Then on the exhibits, Emily has a question, if you

17  could help her out here.

18             We're off the record.

19         (Discussion had off the record.)

20             THE COURT:  Let's go on the record.

21             All right.  Have the -- have all other exhibits, the

22  laptop that has the Excel sheets and any other exhibits going

23  back to the jury been examined?  First, by the government?

24             MR. APPLEBY-BHATTACHARJEE:  Yes, your Honor.

25             THE COURT:  And is everything there by -- is

1    everything -- they're admitted.  Is everything they're getting
2    something you reviewed and have no objection to the jury
3    receiving?
4              MR. APPLEBY-BHATTACHARJEE:  Yes, your Honor.
5              THE COURT:  All right.  Defendant Shah?
6              MS. CHOU:  No objections.  We've reviewed everything
7    that have gone back to the jury -- that is going back to the
8    jury.
9              THE COURT:  Okay.  Defendant Agarwal?
10             MR. LOWDER:  We've reviewed everything that's going
11   back to the jury, your Honor.  We have no objection.
12             THE COURT:  All right.  Defendant Purdy?
13             MR. PAVLETIC:  Same here, your Honor.  No objection.
14             THE COURT:  All right.  We will have all this sent
15   back to the jury.  Make sure you give contact information to
16   Emily, if she doesn't have it already.  And then we'll proceed
17   from there.
18             I would like to say, I've been a law clerk for two
19   years, a federal prosecutor for 13 years, a defense lawyer for
20   20, and a judge for 10.  So I've seen a lot of trials.  This
21   was as well-tried a case.  You know, I know there's family
22   members of defendants here.  Your attorneys did an
23   extraordinary job representing the defendants in this case.
24   And the government, the agents are here, the prosecutors did
25   an extraordinary job putting on the case that you

10455

1  investigated.

2         It's easier to say now than after a verdict because,

3  with verdicts, there are a lot of emotions that come in,

4  whatever the verdict is.  But I thought I'd tell you all that

5  now.  You've really all been -- in 45 years, I haven't seen a

6  performance like this, ever.  The amount of evidence you

7  marshalled, presented to the jury in a way that I think they

8  can understand it.  Every nuance of every document possibly

9  was examined, sometimes repeatedly by the attorneys.  But

10 always done professionally.  Always done with obviously a lot

11 of work that went into it.

12        So I hope the defendants, their families, and the

13 agents all realize that the work the attorneys did in this

14 case, at least in my judgment with the experience I've had,

15 this is unparalleled.  So thank you all.

16        MR. MADDEN:  Thank you, Judge.  We appreciate it.

17        ATTORNEYS:  Thank you your Honor.

18        THE COURT:  All right.  We'll be in touch.

19     (Trial adjourned at 2:52 p.m.)

20

21

22

23

24

25

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Elia E. Carrión                    6th day of April, 2023
_____     _____
Elia E. Carrión                              Date
Official Court Reporter


/s/ Sandra M. Tennis                   6th day of April, 2023
_____     _____
Sandra M. Tennis                             Date
Official Court Reporter