### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | No. 19 CR 864 |
| RISHI SHAH AND SHRADHA AGARWAL, et al., | Judge Thomas M. Durkin |
| Defendants. | |

### MEMORANDUM OPINION AND ORDER

Rishi Shah and Shradha Agarwal move to dismiss the indictment or alternatively for a new trial alleging that the pretrial restraint of their untainted assets violated the forfeiture laws and their Fifth and Sixth Amendment rights. R. 488, 490. For the following reasons, the Court denies the motions.

### Background

On November 21, 2019, a federal grand jury returned a superseding indictment charging Shah and Agarwal ("Defendants") with mail, wire, and bank fraud and Shah with money laundering. Shah Ex. 8007 (R. 14) ("Indictment"). That indictment included forfeiture allegations, stating in relevant part that the grand jury found probable cause to believe that "all right, title, and interest in [certain assets] including but not limited to [certain amounts]" were subject to forfeiture. *Id.* at pp. 49–57. The following day, the government sought a protective order with matching language to preserve the availability of the property allegedly subject to forfeiture, which the Court entered. *See* R. 11; Shah Ex. 8005 (R. 27) ("11/22/2019 Protective

Order") (restraining "all right, title, and interest in [certain assets] including but not limited to [certain amounts]").

Shortly after the indictment and the protective order were issued, William Burck and Jonathan Bunge (Quinn Emanuel) entered limited appearances for Shah, and Christina Egan (McGuireWoods) entered a limited appearance for Agarwal. On January 3, 2020, Defendants moved to amend the protective order, asking the Court to unfreeze $10.3 million that Defendants had received in a settlement with their former company (Outcome Health), lenders, and investors so that they could use the funds to pay for their defense. *See* Shah Ex. 8103 (R. 75-1). The Court denied that motion on April 8, 2020, holding that the settlement did not cleanse the funds of their taint, and thus the funds were unavailable to pay counsel regardless of whether Defendants needed them. *See* R. 108 at 7. At the end of May 2020, the Court granted Defendants' request that it allow them until June 30, 2020 to have either current or new counsel appear on their behalf, stating that "[n]o further extensions will likely be granted." Shah Ex. 8108 (R. 111); Shah Ex. 8109 (R. 112).

Defendants engaged new counsel, Hueston Hennigan for Shah and Larson LLP and Blegen & Associates for Agarwal. Shah agreed to pay Hueston Hennigan $4 million up front and the remainder of the $6.5 million flat fee following the future sale of Shah's interests in Alto Pharmacy and Healthfinch. Shah Ex. 8025. Agarwal agreed to pay Larson LLP $2 million up front and agreed to pay Blegen & Associates $250,000 up front and another $100,000 within 90 days or $125,000 thereafter.

Agarwal Ex. 3, 5. Counsel from Quinn Emanuel and McGuireWoods subsequently withdrew, and new counsel appeared for Defendants.

Two and half years later, the case proceeded to trial. The trial lasted nearly three months. The performance of Defendants' counsel during that trial, and their diligent and detailed work leading up to it, was nothing short of extraordinary. As the Court commented at the conclusion of the trial:

> I would like to say, I've been a law clerk for two years, a federal prosecutor for 13 years, a defense lawyer for 20, and a judge for 10. So I've seen a lot of trials. . . . [The] attorneys did an extraordinary job representing the defendants in this case. . . . [I]n 45 years, I haven't seen a performance like this, ever. The amount of evidence you marshalled, presented to the jury in a way that I think they can understand it. Every nuance of every document . . . was examined, sometimes repeatedly by the attorneys. But always done professionally [and with] a lot of work that went into it. So I hope the defendants, their families, and the agents all realize that the work the attorneys did in this case, at least in my judgment with the experience I've had . . . is unparalleled.

R. 623 (4/5/2023 Trial Transcript) at 10454–55.

On April 11, 2023, the jury returned guilty verdicts against Defendants on most of the charges. Following the verdicts, new counsel from Bryan Cave Leighton Paisner LLP appeared for Shah and met with the government about their concern that the protective order's language was overbroad and had restrained property it shouldn't have. Shah Ex. 8851.

Before diving into the language, it is worth discussing how the protective order came to be. Given the complexity of the potential forfeiture, in July 2019, the prosecution team (then comprised of Assistant United States Attorney Matthew Madden and Department of Justice attorneys William Johnston and Kyle Hankey)

and FBI forensic accountant Megan Poelking reached out to the Department of Justice Money Laundering and Asset Recovery Section ("MLARS") for guidance about how "to forfeit the traceable proceeds" from the fraudulently obtained 2016 bank loans and 2017 capital raise. Shah Ex. 8800. In October 2019, MLARS assigned one of its attorneys, Daniel Olinghouse, to work with Poelking, and they engaged the United States Marshals Service ("Marshals") Complex Asset Unit for more assistance.[1] *Id.*; Shah Ex. 8802, 8803. The plan was to "list in the indictment everything our tracing suggests is forfeitable and then seek a post-indictment restraining order of those assets." Shah Ex. 8805.

Poelking was responsible for the tracing analysis. She traced the proceeds of the bank loans and capital raise to Defendants' entities, Gravitas Holdings, LLC ("Gravitas") and Jumpstart Ventures II, LLC ("Jumpstart II"), and then to transfers of funds by those entities into certain private equity entities and private companies.[2] These transfers are called "capital contributions." Olinghouse was responsible for drafting the forfeiture allegations and the protective order. He drafted the language at the center of this litigation: "all right, title and interest in [the private equity entities and private companies] held by [Gravitas and/or Jumpstart II] including but not limited to [certain amounts] in capital contributions." He plugged in the amounts

[1] MLARS is located at Main Justice in Washington D.C. and is not part of the United States Attorney's Office for the Northern District of Illinois, although of course they are all part of the Department of Justice. Johnston and Hankey both worked in the Fraud Section at Main Justice.

[2] In this opinion, "private equity interests" refer to investments in private equity funds, which in turn invest in various portfolio companies, and "private company interests" refer to direct investments in private companies.

that Poelking identified as traceable in the spreadsheets she sent him. And the prosecutors used that language in the final indictment and protective order.

Olinghouse and Poelking's intent and understanding was that the language in the protective order would capture only the traceable amounts "plus any increases in value, in whatever form it was in." Tr. at 1020–21; *see also id.* at 137 ("When I was reading that, I thought it meant that . . . it would be [restraining] the $15,000, plus whatever it turned into. . . . I just read it in English, and that's what I thought it meant.").[3] In practice, the effect of the "all right, title, and interest" was the restraint of Gravitas or Jumpstart II's interests in private equity entities and private companies ("assets") in their entirety. That was not a problem where the asset was acquired with only traceable capital contributions. The entire asset was tainted, so the protective order properly restrained "all right, title, and interest" in it. But where an asset was acquired with both traceable and nontraceable capital contributions, such as when part of the investment was made before the loans and capital raise, only part of the asset was tainted, so the protective order should not have restrained "all right, title, and interest" in it. That was issue that Shah's new counsel raised with the government in June 2023.

That month, the Court granted agreed motions for preliminary orders of forfeiture as to Agarwal and co-defendant Brad Purdy and held a hearing on the contested motion for a preliminary order of forfeiture as to Shah. *See* R. 480

---

[3] The Court cites the transcript from the evidentiary hearing as "Tr." The volumes of the transcript are found at R. 700, 701, 725, 726, 736, 737, 738, 739.

("Forfeiture Hr'g Tr.").[4] At the hearing, the government implicitly acknowledged that certain restrained assets were not traceable to criminal proceeds. *Id.* at 16, 229. After that hearing, Shah moved to amend the protective order to release those assets, and the government, in parallel, moved for a prejudgment writ of garnishment for the same assets. *See* R. 472, 474. In the course of that briefing, the government explicitly acknowledged the excessive restraint. *E.g.*, R. 482 at 12; R. 482-11. Then, on July 14, 2023, Defendants moved to dismiss the indictment, or for a new trial, based on alleged violations of the Fifth and Sixth Amendments and the forfeiture laws in connection with the pretrial restraint of the untainted assets. R. 490 ("motion to dismiss").[5]

On August 8, 2023, the Court granted Shah's motion to amend the protective order to release certain restrained assets and denied the government's motion for a prejudgment writ of garnishment. *See* Shah Ex. 8852 (R. 500). The Court thereby ordered released the assets that the government conceded were not traceable to criminal proceeds. *Id.*; R. 506. Shah moved for the release of additional restrained assets in September 2023, which the Court granted in part and denied in part. R. 524, 551; *see also* R. 550, 555. The returned assets included approximately $9.6 million in

---

[4] The Court subsequently granted in part and denied in part the government's motion for a preliminary order of forfeiture as to Shah. *See* R. 580. The preliminary order of forfeiture used different language than the forfeiture allegations and protective order. *Compare* R. 622 ("All right, title and interest in Leerink Transformation Partners, LTP BHE LP, held in the name of [Gravitas] that was acquired by or exchanged for $319,489 in capital contributions submitted on or about June 28, 2019, plus any appreciation on that right, title and interest[]") *with* Indictment ("All right, title, and interest in [Leerink Transformation Partners LTP BHE LP], held by [Gravitas], including, but not limited to, $319,489 in capital contributions submitted on or about June 28, 2019").

[5] Agarwal joined Shah's motion. *See* R. 488.

liquid funds from one of the private equity entities, Guild Capital. While litigating these motions and others,[6] the parties completed their briefing on the motion to dismiss.

The Court heard argument on the motion to dismiss on October 27, 2023, and then granted Defendants' request for an evidentiary hearing on the Fifth and Sixth Amendment claims and the timeliness of the motion. R. 624, 626, 629. The Court also allowed discovery on these issues, including the issuance of subpoenas to third parties. R. 629.

The evidentiary hearing began on January 3, 2024. During its opening statement, the government asserted that of the $9.6 million it had returned to Shah pursuant to the Court's orders in August and September 2023, $8.4 million was in fact traceable to criminal proceeds. Tr. at 57–60. Because that claim raised potential conflicts as some of the returned funds were used to finance the defense, the Court recessed the hearing. *Id.* at 250–52. In the months that followed, defense counsel worked through the potential conflict issues and the parties reached an agreement regarding a clawback of certain funds. R. 679. Defendants nonetheless contested the traceability of the $8.4 million and filed a motion to preclude the government from shifting its position on the traceability of those funds and exclude related evidence.

---

[6] During this time, Defendants and Purdy completed the briefing on their motions for judgment of acquittal and for a new trial. On March 21, 2024, the Court denied the motions. R. 678.

R. 688. The Court heard argument on that motion during the reconvened hearing on April 8, 2024. *See* Tr. at 457–80.[7]

Throughout the spring of 2024, the Court heard argument on the government's objection to the production of certain evidence as protected by the attorney-client privilege, work product doctrine, and the deliberative process privilege, specifically the testimony of and declarations submitted by government attorneys and certain internal email communications between government attorneys and agents. The Court ultimately held that only the work product doctrine applied to protect the documents, but—for most of the documents, including the government attorneys' declarations—Defendants showed a substantial need sufficient to overcome the protection. R. 695, 707, 724, 727. Defendants requested and the Court ordered the testimony of Madden and Olinghouse. *Id.* All of these rulings were made over the objections of the government.[8]

The evidentiary hearing continued on April 8th and on May 7th, 8th, and 21st, during which the following evidence was presented:

- Testimony from Poelking, Madden, Olinghouse, Burck, Patrick Blegen (Agarwal's counsel), Koren Bell (Agarwal's counsel), Kevin Lane (trustee of the Baroda Trust), and Kenneth Mathieu (Defendants' expert);

- Declarations from government attorneys Madden, Olinghouse, Johnston, Hankey, Saurish Appleby-Bhattacharjee and government agents Poelking, Mark Stakem, Cory Johnsrud, and Christopher Santangelo;

---

[7] The Court decided to allow the evidence at the hearing and instead consider the motion to exclude as a motion to strike.

[8] Shah's motion to compel disclosure, R. 711, is denied as moot in light of the government's agreement to produce certain documents and the Court's other rulings. *See* R. 714, 724, 727.

- Financial records including Defendants' bank and investment accounts and expenditures and declarations and related documentation from third-party entities subject to the protective order;

- Internal communications between government attorneys and agents before and after the indictment;

- Communications between government attorneys and agents and third-party entities subject to the protective order;

- Engagement documents, invoices, and email communications involving Hueston Hennigan, Larson LLP, Blegen & Associates, Quinn Emanuel, and McGuireWoods; and

- Mathieu's reports and select materials cited in the reports.

The Court also considered the declarations of Defendants, Burck, Mathieu, and Lane from the 2020 motion to amend litigation and additional declarations of Agarwal and Burck from the briefing on the instant motion. *See* Gov. Ex. 2004, 2005, 2019, 2047, 2015; Shah Ex. 8100; R. 103-4, 488-1, 490-1, 528-1. Neither Shah nor Agarwal testified at the hearing. The evidentiary hearing concluded with closing arguments on May 22, 2024.

## Discussion

Defendants raise three grounds for their motion to dismiss. First, they argue that the government's pretrial restraint of untainted assets violated their Sixth Amendment right to hire their counsel of choice, Quinn Emanuel and McGuireWoods, based on the Supreme Court's decision in *Luis v. United States*, 578 U.S. 5 (2016). Second, Defendants argue that the government knowingly presented false testimony to the grand jury that "all right, title, and interest" in the property described in the indictment was subject to forfeiture and failed to correct that testimony (or the

9

excessive restraint) in violation of the Fifth Amendment. Third, Defendants argue that the pretrial restraint of nontraceable assets violates the forfeiture laws. The government contests each of these arguments and also challenges the timeliness of the motion. The Court addresses timeliness first.

## I. Timeliness

At the start, the Court must decide whether Defendants can properly bring the motion to dismiss at this late stage. "A criminal defendant forfeits an argument if negligently fails to assert a right in a timely fashion." *United States v. McMillian*, 786 F.3d 630, 635–36 (7th Cir. 2015) (citations omitted). Federal Rule of Criminal Procedure 12(b)(3) requires a motion "alleging a defect in instituting the prosecution" or "a defect in the indictment" to be raised before trial "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." An error in the grand jury proceeding is one of the defects in instituting the prosecution contemplated by Rule 12(b)(3). Fed. R. Crim. P. 12(b)(3)(A)(v). However, a court may consider an untimely motion "if the party shows good cause." Fed. R. Crim. P. 12(c)(3).

Defendants raise several arguments in support of dismissal: the pretrial restraint of untainted property in violation of the Sixth Amendment and the forfeiture laws, and the presentation of false testimony to the grand jury and the failure to correct that testimony in violation of the Fifth Amendment. Certainly, the argument that the government presented false testimony to the grand jury that "all right, title, and interest" in the property described in the indictment was subject to

forfeiture can fairly be characterized as "an error in the grand-jury proceeding." Fed. R. Crim. P. 12(b)(3)(A)(v). While Defendants argue that the types of indictment defects contemplated by Rule 12(b)(3)(B) relate to the form of the allegations, not their veracity, Defendants do not argue that such a limitation applies to Rule 12(b)(3)(A). Nor would such an argument change the outcome, where Rule 12(b)(3)(A) expressly refers to errors in grand jury proceedings. *Id.*; *see also United States v. Whitfield*, 590 F.3d 325, 358–59 (5th Cir. 2009) (affirming denial of motion to dismiss that was filed after trial began in which defendant claimed government presented false testimony to grand jury and presented a factually incorrect indictment). And for the reasons that follow, Defendants' arguments that this ground for dismissal was not "reasonably available" to them before trial and there is "good cause" for the delay fall flat. However, unlike the presentation of false testimony to the grand jury, the other two bases for Defendants' motion—that the government failed to correct grand jury testimony and that untainted assets were unlawfully restrained—focus on conduct arising after the indictment, and thus neither allege "a defect in instituting the prosecution" or "a defect in the indictment." Those bases are not rendered untimely by the express provisions of Rule 12(b)(3).

That does not mean, however, that a motion on these grounds can be brought at any time. Several courts have held that defendants forfeit Sixth Amendment counsel of choice challenges by failing to object to the restraint of untainted funds before trial. *See United States v. Lindell*, 766 F. App'x 525, 528 (9th Cir. 2019) (defendant forfeited the Sixth Amendment challenge by failing to object to the

pretrial restraint of untainted funds until after trial) (citing *Puckett v. United States*, 556 U.S. 129, 134 (2009); *United States v. Ripinsky*, 20 F.3d 359, 365 (9th Cir. 1994)); *United States v. Balotin*, 2023 WL 2264181, at *21 (M.D. Fla. Feb. 28, 2023) (denying motion for new trial where defendant "fail[ed] to show any cause for his decision to wait to raise this Sixth Amendment challenge only after he was convicted at trial"). Notably, *Luis*, the primary case on which Defendants rely, involved a *pretrial* challenge to a restraining order. 578 U.S. at 9 (plurality opinion).

Indeed, criminal defendants have an avenue to lodge such a challenge at the earliest stages of a case. Under longstanding Seventh Circuit case law, defendants are entitled to an "immediate, postrestraint, adversary hearing at which the government is required to prove the likelihood that the restrained assets are subject to forfeiture." *United States v. Moya-Gomez*, 860 F.2d 706, 731 (7th Cir. 1988); *see also United States v. Jones*, 844 F.3d 636, 640–41 (7th Cir. 2016). That procedure aligns with the practice of courts across the country. *See Kaley v. United States*, 571 U.S. 320, 324 (2014) ("Since *Monsanto*, the lower courts have generally provided a hearing to any indicted defendant seeking to lift an asset restraint to pay for a lawyer. In that hearing, they have uniformly allowed the defendant to litigate . . . whether probable cause exists to believe that the assets in dispute are traceable or otherwise sufficiently related to the crime charged in the indictment."). And a post-indictment restraining order and a district court's order refusing to vacate it are immediately appealable. *See United States v. Kirschenbaum*, 156 F.3d 784, 788 (7th Cir. 1998).

Defendants never sought a *Moya-Gomez* hearing as to the assets at issue in this motion. Instead, they waited more than three and a half years after indictment, seven months after the start of trial, and three months after conviction to raise the issue of an excessive restraint with the Court. Defendants say they could not have discovered the restraint was overbroad until March 2023, when the government first produced Poelking's tracing spreadsheets and email correspondence with the government pursuant to the Jencks Act (18 U.S.C. § 3500) shortly before her trial testimony. But within three months of the entry of the protective order, Defendants and their counsel had all of the information they needed to discover the excessive restraint, or at least challenge the traceability or seek greater clarity from the government. By February 2020, they had received copies of the indictment, protective order, grand jury testimony and exhibits, bank records, and records from the private equity entities and private companies. Gov. Ex. 2115. Though those materials did not include Poelking's tracing spreadsheets, there was nothing preventing Defendants from asking for more information about the government's tracing analysis or performing their own tracing analysis.

After all, it was their *own property* being restrained. Defendants were the ones who made the investments in the first place, orchestrated the relevant transactions, and set up and maintained the numerous corporate entities and bank accounts at issue. Indeed, Defendants would have received periodic account statements in real time. By that token, in the unlikely event that Defendants did not know which of

13

their assets were funded by what sources, including the loans and capital raise, they certainly had the ability to figure it out.

Defendants say they were under the "impression" that the government had traced "all right, title, and interest" in the restrained assets to not only the loans and capital raise but to the pharmaceutical company fraud too.[9] Tr. at 825. Burck attributed that impression to the fact that the forfeiture allegation in the indictment cites the wire and mail fraud counts associated with the pharmaceutical company fraud, *see* Indictment at p. 49, and a phone call with the government in December 2019. Tr. at 815, 825, 892–93, 970–71. According to Burck, on the call, defense counsel explained their understanding that "the allegation was the entire business was a fraud," and the government "confirmed that." *Id.* at 815. He understood the government to assert that anything that had come from Outcome Health could be forfeited as criminal proceeds, including Defendants' salaries. *Id.* at 815, 970–72. He further recalled that one of the government attorneys (either Madden or Johnston) said that the "indictment spoke for itself" and confirmed that the amounts listed in the protective order were not meant to be limiting or exclusive. *Id.* at 892–93, 901, 970–71.

There are no notes from this conversation with the government. *Id.* at 894–95. Madden testified that he did not recall a conversation with Burck or any member of

---

[9] In addition to alleging that Defendants defrauded lenders and investors, the indictment alleged that Defendants defrauded Outcome's pharmaceutical company clients through over-selling Outcome Health's inventory and concealing pervasive under-deliveries.

the defense group about the scope of the protective order outside of the issues related to the settlement money. *Id.* at 1256–57. He did not recall a conversation where he or Johnston stated that the "indictment speaks for itself." *Id.* at 1257. And he did not recall a conversation where he or Johnston characterized the entirety of Outcome Health as a fraud and further stated that he wouldn't have characterized it as such because it was not their theory and would not have been consistent with the evidence. *Id.* at 1247–49. Additionally, some of the Defendants' affidavits from the motion to amend litigation around this time suggest their contemporaneous belief that the forfeiture was focused on the "Company's fundraising," as opposed to the pharmaceutical fraud. Gov. Ex. 2004, 2005.

But even if the Court resolves these inconsistent recollections by taking Burck at his word that the defense team had the impression—based on the indictment and the phone call with the government—that the government was seeking to forfeit proceeds of the pharmaceutical fraud along with the investor and lender fraud, the grand jury materials that Defendants received in January 2020 say otherwise. Gov. Ex. 2115 Those materials make explicit that the government was seeking to forfeit proceeds of the 2016 loans and the 2017 capital raise. At the grand jury, Poelking testified that as part of her investigation, she "identified a few transactions that resulted in large payments" to Defendants, specifically the 2016 loans and the 2017 capital raise. Gov. Ex. 2114 ("Grand Jury Tr.") at 5:18–6:20. She testified that she "traced" money going to Defendants from the loans and capital raise. *Id.* She then reviewed several charts she prepared that illustrated the flow of funds from these

sources. *Id.* at 6:21–12:25. She followed with testimony about three other charts titled, "Assets Subject to Forfeiture Attributable to the Loans Obtained in 2016," "Assets Subject to Forfeiture Attributable to the Capital Raise in 2017," and "Assets Subject to Forfeiture Attributable to the Loans Obtained in 2016 and the Capital Raise in 2017," respectively. *Id.* at 14:13–17:25; Gov. Ex. 2113. Those charts included columns for the source of the funds; the entities where the funds were transferred to; the asset identified (e.g., "all right, title and interest in investments made with [the entities]"); and the "amount traceable to criminal proceeds." Gov. Ex. 2113. Poelking then testified that the assets on the chart were the same as those listed in the indictment. Grand Jury Tr. at 18:1–13.

Burck received these materials after the conversation he recalls with the government. He chose not to review them. Tr. at 922–23. Had he read them, it is hard to imagine he would be left with the impression that the government had traced restrained assets to proceeds from the fraud against Outcome Health's pharmaceutical clients. Indeed, there is no mention of the pharmaceutical company fraud or of Defendants' salaries in Poelking's grand jury testimony or the accompanying charts. Defendants make much of a reference to "the fraud" in testimony that followed Poelking's testimony about her charts:

> Q: Have you reviewed the [forfeiture] allegations in Pages 47 -- 49 to 57 [in the indictment]?
> A: I have.
> Q: And do they truly and accurately, to the best of your knowledge, list items for which there is probable cause that they came from the proceeds of *the fraud*?
> A: Yes.

Grand Jury Tr. at 18:15–22 (emphasis added). But viewing the testimony and charts in their entirety belies an interpretation of "the fraud" as referring to something other than the loans and the capital raise. Indeed, the testimony that immediately followed the above expressly clarified that the "fraud" referred to the investor and lender fraud:

> Q: And just so we're clear, the -- the April 2016 loan would be proceeds of – proceeds of bank fraud?
> A: Yes.
> Q: And the – and the capital raise being proceeds of wire or mail fraud?
> A: That's correct.

*Id.* at 18:23–19:4. Separately, when a grand juror asked her what "criminal proceeds" were, Poelking answered, "In this indictment, we're alleging that the capital raise [and] the loans that they received will be criminal proceeds[.]" *Id.* at 13:19–25. Ultimately, Defendants had every opportunity to question and explore the appropriateness of the pretrial restraint based on this testimony years before they finally did.

That Defendants waited until after the verdict to explore this issue is made even more surprising by the fact that they moved to amend the protective order in early 2020, approximately five weeks after the protective order was entered, and argued in that motion that they needed certain funds to pay counsel. *See* Shah Ex. 8011, 8101, 8105; R. 86, 103. At no point in that motion did Defendants raise the argument that they raise now: that the protective order unlawfully restrained "all right, title, and interest" in assets that contained, in certain instances, portions that were not traceable to criminal proceeds. Instead, they solely argued for the release of

the $10.3 million they claimed was cleansed of its taint by the settlement agreement with the company, lenders, and investors. *See* R. 108 at 3, 7–8. Defendants, who were represented at the time by their preferred counsel and arguing about funds needed to retain counsel, could have raised this additional line of attack on the protective order at that time. Defendants also could have raised it after they obtained new counsel, at any point in the nearly three years before trial commenced, or in the middle of trial, when they claim they received the information they needed to discover the issue.

Had either party brought the excessive restraint to this Court's attention, this Court could have taken any number of actions short of dismissing the indictment. As stated, the Court could have held a *Moya-Gomez* hearing. The Court also could have amended the protective order on the motion of either party. It bears noting that when Shah moved twice to amend the protective order after his conviction, the Court reviewed those motions on an expedited basis and ordered the release of the assets the government acknowledged were untainted. Before trial, the Court could have granted a continuance for the parties to investigate the issue, resolve any disputes, and consider any other request Defendants would have made. Indeed, the Court granted a lengthy, over eleven-month continuance of the trial over the government's objection when a health matter prevented one of Shah's attorneys from participating at the previously scheduled date.[10] *See* R. 201. And had the parties raised the issue

---

[10] Shah argued in that motion that denying a continuance would impinge upon his Sixth Amendment right to his counsel of choice. R. 193.

during trial, the Court could have declared a mistrial to allow an investigation of the relevant issues and fair consideration of any related requests. In short, the situation in which the parties now find themselves was entirely avoidable. Which of these remedies would have been best would have been for the Court to decide, not Defendants. But the issue was never brought to the Court until this very late stage.

In sum, Defendants have forfeited their Sixth and Fifth Amendment and statutory challenges. Because Defendants had all of the information they needed to realize and challenge the restraint of their untainted assets well before their trial and conviction, but never did, they cannot now claim that the restraint warrants a dismissal of the indictment or a new trial. But even if the Court were to consider Defendants' challenges to have been made in a timely manner, they are without merit for the reasons that follow.[11]

## II.     Sixth Amendment

The Sixth Amendment guarantees a criminal defendant the right to assistance of counsel, including "a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53 (1932); U.S. Const. Amend. VI. That "fair opportunity" has limits. *Wheat v. United States*, 486 U.S. 153, 159 (1988). Relevant here, "the Sixth Amendment guarantees a defendant the right to be represented by an otherwise

---

[11] Defendants argue that a finding that they forfeited these arguments does not foreclose review altogether, but instead subjects their claims to plain error review. Plain error review is an appellate standard of review. Defendants do not cite any cases where a district court applied plain error review to its own proceedings. But because the Court considers the merits of Defendants' claims in the alternative, it need not reach this issue.

19

qualified attorney *whom that defendant can afford to hire.*" *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624–25 (1989) (emphasis added).

Defendants argue that the pretrial restraint of untainted assets violated their Sixth Amendment right to counsel of choice. Specifically, they claim that the restraint precluded them from using those assets to retain the lawyers they wanted (Quinn Emanuel for Shah and McGuireWoods for Agarwal) and forced them to retain different counsel.

In *Luis*, four members of the Supreme Court held, in an opinion written by Justice Breyer, that "the pretrial restraint of legitimate, untainted assets *needed* to retain counsel of choice violates the Sixth Amendment." 578 U.S. at 10 (emphasis added). Justice Thomas concurred in the judgment but omitted the "need" requirement. *Id.* at 24 ("I agree with the plurality that a pretrial freeze of untainted assets violates a criminal defendant's Sixth Amendment right to counsel of choice."). The parties disagree about whether the Court should consider Justice Breyer's opinion or Justice Thomas's opinion to be the controlling one.[12] But explicit in both of those opinions is the limiting principle that a defendant only has a Sixth Amendment right to be represented by an attorney that he or she can afford to hire. *See Luis*, 578 U.S. at 12 (Breyer, J.); *id.* at 34 (Thomas, J.). And here, even if the restraint had not been excessive, Defendants would not have been able to afford the lawyers they wanted.

---

[12] The Seventh Circuit appears to view Justice Breyer's as the controlling opinion. *See United States v. Balsiger*, 910 F.3d 942, 949 (7th Cir. 2018); *Jones*, 844 F.3d at 639.

The keystone of this analysis is June 30, 2020, the date Defendants themselves requested as an extended deadline to secure counsel. Defendants acknowledged that this was the relevant date in their briefing. R. 537 at 18. There was some suggestion by counsel during the hearings that this deadline—over seven months after indictment and proposed by Defendants—was not reasonable. That proposition runs headlong into the well-settled principle that "[a] court retains wide latitude to balance the right to choice of counsel against the needs of fairness to the litigants and against the demands of its calendar." *United States v. Sellers,* 645 F.3d 830, 834 (7th Cir. 2011) (citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006); *United States v. Smith*, 618 F.3d 657, 666 (7th Cir. 2010); *United States v. Carrera*, 259 F.3d 818, 824–25 (7th Cir. 2001)). What's more, Defendants never asked for more time. *Cf. Carrera*, 259 F.3d at 825 ("Only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay" violates the Sixth Amendment.). Defendants point out that the Court said in its order that further extensions were "not likely" to be granted. But "not likely" was not an outright ban and left plenty of room for argument by counsel about why more time was needed. Indeed, Burck acknowledged that his team "certainly understood that the Court was not saying that was a hard-and-fast deadline." Tr. at 852.[13]

The first question then is how much Defendants needed in order to hire the lawyers they wanted by June 30, 2020. Quinn Emanuel required $9-10 million to

---

[13] Burck further testified that at the time, he thought one additional month would "give [Shah] enough time" to find substitute counsel and acknowledged that "the Court had already shown a great deal of patience." Tr. at 852.

represent Shah. *Id.* at 817–18; *see also* Shah Ex. 8100 (estimating $14-15 million for representation of both Defendants by the two firms). Shah had approximately $4 million in liquid assets to pay for counsel at that time; that was the amount he wired to Hueston Hennigan on July 1, 2020.[14] Tr. at 585–86. Accordingly, Shah needed an additional $5-6M to hire his preferred counsel.

McGuireWoods required $5.8 million to continue its representation of Agarwal. Agarwal had $2.25 million; that was the amount Agarwal paid by July 1, 2020 to retain both Larson LLP and Blegen & Associates.[15] *Id.* at 160, 719; Gov. Ex. 2001, 2007. Thus, Agarwal needed another $3.5 million to hire her preferred counsel. *Id.* at 104–05. Together, Defendants needed another $8.5-9.5 million, though Burck testified to his belief in hindsight that $7.8 million in additional funds would have been sufficient. *Id.* at 861–62.

The availability of *liquid* funds was absolutely essential. Burck testified that, unlike Hueston Hennigan, his firm was not willing accept the promise of future payments from the proceeds of potential sales or distributions from illiquid assets,

---

[14] The Court credits Shah's argument that what he paid to Hueston Hennigan was the amount he had available to pay counsel at that time. The government claimed that Shah had access to additional funds through the Baroda Trust. But Shah was not a beneficiary of the trust. He could only obtain assets by substituting other assets of equal value. And Lane, the trustee of the Baroda Trust, testified that it was unlikely he would have permitted Shah further substitutions. Additionally, the evidence related to Shah's expenditures before the indictment do not show he had more money to spend on counsel as of June 30, 2020.

[15] The Court similarly credits Agarwal's argument that what she paid to Larson LLP and Blegen & Associates was the amount she had available to pay counsel at that time. While the government argued that Agarwal had other liquid assets, she was advised by her tax preparer that she should expect a 2019 tax liability of over $2 million, which exceeded the liquid funds she had in early 2020. Gov. Ex. 2005.

which were "too risky and too uncertain." Tr. at 838–40, 849–50, 856–57. In fact, Shah asked Quinn Emanuel if they would consider such an arrangement. *Id.* at 839. Burck testified that his firm does not accept fees in that form for a variety of reasons, including tax-related issues and, at the time, the volatility of the markets with the onset of the COVID crisis. *Id.* While there was no parallel testimony from Egan, there is no suggestion in the record that McGuireWoods would have been open to the promise of future proceeds from these illiquid assets.

The next question is how much Defendants would have had but for the overbroad restraint. This is a more complicated question. The restraint at issue dealt with investments in private equity funds and private companies held by Gravitas and Jumpstart II. R. 27. Defendants' expert, Kenneth Mathieu, analyzed the total distributions from nontraceable portions of the interests that were withheld from Gravitas and Jumpstart II. Mathieu determined that absent the overbroad restraint, Gravitas and Jumpstart II would have received $1.739 million in distributions by June 30, 2020.

There are a few caveats to Mathieu's conclusion. The first relates to the approximately $563,030 in nontraceable distributions from 7Wire Ventures Fund L.P. ("7Wire") during this period. Before the indictment, on October 30, 2019, Jumpstart II failed to fully fund a capital call (paying only $16,200 of the $334,000 due) and became a defaulting partner. Gov. Ex. 2118. Due to the default, as 7Wire made distributions in 2020, Jumpstart II did not receive them. *Id.* 7Wire's representative stated that had Jumpstart II attempted to fully fund the capital call

23

before the Court issued the protective order, 7Wire likely would have allowed it to do so and avoid the default. Shah Ex. 8870. The problem is that Jumpstart II did not attempt to pay, and the evidence suggests that Shah could have paid during the relevant period but chose not to. During that time, Shah spent more than the approximately $317,800 owed toward the capital call on beach resort fees, artwork, cleaning and personal assistant services, and travel through a company called First Business Flights. Gov. Ex. 2063, 2110. In other words, Defendants did not receive the $563,030 of the $1.739 million in nontraceable distributions because of their own choices, not the protective order.

Additionally, Mathieu's analysis began in 2017, such that Defendants received some portion of the calculated nontraceable distributions before the protective order was even in place. Tr. at 732. For example, of the $75,918 distributed by GreatPoint Ventures Innovation Fund, L.P. ("GreatPoint") before June 30, 2020, $32,487 was distributed in 2017. Gov. Ex. 2143. Likewise, of the $13,381 distributed by HealthX Ventures Fund I, LP before June 30, 2020, $6,456 was distributed in late 2018. Gov. Ex. 2122. It cannot be said that Defendants did not have access to these distributions because of the protective order.

Further, it is not clear how the improperly restrained distributions would have been split between Shah and Agarwal. The record reflects that Shah and Agarwal had 80% and 20% interests, respectively, in Gravitas and its investments, and 85% and 15% interests, respectively, in Jumpstart II and its investments. *See* Gov. Ex. 2005 ¶ 2. Agarwal's attorney separately argued at the evidentiary hearing that she

would have received 50% of the improperly restrained assets, consistent with Shah giving her approximately half of the money held by Quinn Emanuel to use for her own counsel. As far as the Court can tell, that decision was entirely discretionary on Shah's part.

In any case, $1.739 million is well short of the $7.8 million that Burck said would be sufficient for the representation of both Defendants. Put differently, even if Defendants had received the distributions they should have, they would not have had sufficient liquid funds to hire their preferred counsel, by a long shot.

Defendants try to get around this math problem in two ways. First, they argue that the government should be held to its original position that the returned Guild Capital distributions were untainted. As previously discussed, in its opening statement at the evidentiary hearing, the government claimed that $8.4 million of the $9.6 million it released to Shah were in fact traceable to criminal proceeds. But $9.6 million covered the period from when protective order was entered in November 2019 through the amendment in late 2023. Under the government's original position, there were only $365,022 in nontraceable distributions before June 30, 2020.[16] That is less than the amount calculated by Mathieu under the government's new approach ($427,939). So, holding the government to its original position about Guild Capital's

---

[16] This value was calculated by adding the nontraceable distributions by Guild Capital listed in Exhibit 1 to Mathieu's report dated January 2, 2024, the day before the government's opening statement. *See also* Tr. at 619–21.

distributions brings Defendants no closer to the amount they needed to hire their preferred counsel.[17]

Defendants also argue that the Court should consider not just the liquid distributions that they would have received absent the excessive restraint, but also the hypothetical proceeds from the sale of nontraceable portions of the restrained assets. Mathieu characterized these private equity interests as meaningfully more liquid than interests in private companies because of a robust secondary market for the former. *E.g.*, Tr. at 750–51. Mathieu estimated $6.29 million in proceeds from the sale of these interests by applying a 10% discount to the capital account balances at that time. But that analysis turns on a number of assumptions.

First, Mathieu assumes that Defendants would have been able to sell these interests at all. He acknowledged that each of the assets at issue had transfer restrictions. Tr. at 697. In particular, the interests could not be sold or transferred without the consent of the general partner, who could withhold consent in their sole discretion. *E.g.*, *id.* at 564, 700–03. Defendants offered some evidence that entities such as Institutional Venture Partners ("IVP") XV and XVI permitted several transfers per year of limited partner interests. Shah Ex. 8032. But ultimately,

---

[17] Shah's motion to strike this evidence and preclude the government from shifting its position is denied. R. 688. The question of whether the funds Shah claims he could have used to hire different counsel are tainted is plainly relevant. There is no prejudice to Shah from considering this updated analysis. For one, Shah reached an agreement with the government on the clawback of funds. Further, the Court permitted Defendants to gather new evidence, update their expert's analysis, and make new arguments over the four months following the government's revelation. The Court considered the new analysis alongside Mathieu's original analysis and the extensive cross-examination of Poelking.

whether the entities would have given consent to the sale of each of Defendants' interests and how quickly they would have given it are open questions.

Second, assuming that Defendants would have been able to get the consent they needed within the relevant time period, there is also the question of whether there would have been willing buyers. Mathieu acknowledged that such restrictions would have diminished the marketability of these private equity interests, just as they would for private company interests. Tr. at 701, 703. In his view, however, private equity interests are more liquid than the private company interests because there is a secondary market for them, with an annual overall market volume of over $100 billion. *Id.* at 703, 751. But the existence of a secondary market does not necessarily mean there were willing buyers of the assets at issue. As Mathieu acknowledged, his testimony was about the overall market for private equity interests. He did not assess the market for each of the specific interests at issue. *Id.* at 704–05, 745–76.

Third, even if there had been permission to sell and willing buyers, Mathieu assumes that Defendants would have been able to complete the sale of their interests in the 11 weeks between April 8, 2020, when the Court ruled that Defendants could not use the settlement money to pay counsel, and June 30, 2020. That seems unlikely. Shah's affidavit from March 5, 2020 offers a helpful comparison. He relayed how, about six weeks before the indictment, Defendants sold Gravitas' interest in IVP XVI. Gov. Ex. 2124. Shah stated that was the "only time [he had] ever been able to sell a fund interest or private security." Gov. Ex. 2047. That sale was "unique," because IVP

27

was an "established fund that is consistently oversubscribed, meaning that there are more investors looking to invest in the fund than the fund will permit," his interest was "relatively large," and the fund itself was large. *Id.* Even under those "ideal" circumstances, it took over six months to arrange the sale and have it approved by the fund. *Id.*; Tr. at 772–73. There is no evidence in the record that suggests the sale of the private equity interests at issue would have moved any quicker. Instead, the fact that the markets were in turmoil with the onset of the COVID pandemic at that time suggests the sales might have taken even longer.

Fourth, Mathieu assumes that the proceeds Defendants would have received from the sale of these interests was 90% of their capital account balances. Mathieu chose a 10% discount as a value slightly more conservative than the average discount of 7.46% he observed across studies of transactions in the secondary market. Tr. at 561–62. Some of those studies are from the early 2020 time period; others are not. Additionally, there was no representation on the part of the private equity entities, for example, that the discounted capital account balances are what the interests would have sold for. *Id.* at 745. Nor is it clear that the 10% discount accounts for any broker fees, separate from the management fees. *See id.* at 557.

Two specific examples in the record suggest a more significant discount. Defendants sold the previously discussed IVP XVI interest at a loss. *See* Tr. at 437; Gov. Ex. 2047, 2060. Additionally in February 2022, GreatPoint sought to sell Defendants' interest at cost basis less the fund's expenses for the interest. Gov. Ex. 2143; Tr. at 711–13. That would be an estimated discount of nearly 35% of the last

reported capital account balance. Tr. at 731. Shah disputed the valuation and wanted to sell the interest at fair market value, which the buyers declined. Gov. Ex. 2143; Tr. at 711–13. While Mathieu did not believe this offer to have any probative value as to what the terms of the hypothetical sales might have been, Tr. at 770, the Court disagrees. More critically, the limited time period that Defendants had to liquidate, which coincided with a time of tremendous market volatility, would have almost certainly negatively affected the offers buyers would be willing to make and Defendants would be willing to accept. Indeed, Mathieu recognized in his 2020 affidavit that "a forced immediate liquidation gives an advantage to the buyer in the transaction due to the seller's lack of control regarding the timing of the sale." R. 103-1.

In the end, Mathieu acknowledged that his analysis was necessarily speculative. It required him to speculate whether there might be an interested buyer for each of the assets, and what the sale price would be. Tr. at 559–60. Some speculation is unavoidable for the purpose of this motion. Defendants were not able to attempt a sale of these assets during the relevant period because the assets were restrained. But in examining whether the protective order infringed on Defendants' Sixth Amendment right to counsel of choice in the way they claim—that is, by depriving them of representation by Quinn Emanuel and McGuireWoods—there must be some assurance that Defendants could have made up the significant difference between what they had and what they "needed" by liquidating the interests before June 30, 2020.

In sum, Defendants needed liquid assets to secure representation by their preferred counsel. But the improperly restrained assets did not include nearly enough liquid funds in distributions to retain them. And Defendants have not shown by a preponderance that their illiquid assets were sufficiently great or that they could have been liquidated fast enough to close the gap. Further, the fact that Quinn Emanuel and McGuireWoods would not represent Defendants based on a combination of liquid and illiquid assets does not violate the Sixth Amendment. It simply means that Defendants could not have afforded to hire those attorneys on terms adequate to them. *See United States v. Mann*, 140 F. Supp. 3d 513, 536 (E.D.N.C. 2015) (the fact that counsel of choice would not represent defendant based on a promissory note or transfer of real property did not violate Sixth Amendment).

Such a finding does not run afoul of *Luis* for several reasons. For one, *Luis* involved a challenge to a protective order before trial. As previously discussed, notwithstanding numerous opportunities to do so, Defendants did not challenge the protective order until after they were convicted. Had Defendants raised this issue before trial, the remedy would have been to modify the protective order, just as the Court did when Defendants raised the issue after trial. Additionally, the protective order in *Luis* effectively restrained all the defendant's assets. By preventing the defendant from dissipating any assets up to the equivalent value of $45 million, she was left with no funds to pay for a lawyer. *Id.* at 9. In other words, "the restraint itself suffice[d] to *completely* deny [her] constitutional right." *Id.* at 20 (citing *Gonzalez-Lopez*, 548 U.S. at 148) (emphasis added). That is not what happened here.

30

Defendants had and spent millions of dollars on private counsel. And as explained in the preceding analysis, the Court cannot conclude that Defendants were "erroneously prevented from being represented by the lawyer [they] want[ed]" because of the excessive restraint. *Gonzalez-Lopez*, 548 U.S. at 148. Quite simply, even without the overbroad restraint, they could not have afforded to hire Quinn Emanuel and McGuireWoods. Therefore, the Court finds that the excessive pretrial restraint did not violate Defendants' Sixth Amendment right to counsel of choice.

### III.    Fifth Amendment

"The government's knowing use of false testimony, or failure to correct testimony, violates due process." *United States v. Burke*, 425 F.3d 400, 412 (7th Cir. 2005) (citations omitted). Defendants argue that Poelking's testimony before the grand jury was false. Specifically, they focus on the following exchange:

> Q: Have you reviewed the [forfeiture] allegations in Pages 47 – – 49 to 57 [in the indictment]?
> A: I have.
> Q: And do they truly and accurately, to the best of your knowledge, list items for which there is probable cause that they came from the proceeds of the fraud?
> A: Yes.

Grand Jury Tr. at 18:15–22. According to Defendants, in that testimony, Poelking vouched for the accuracy of the inaccurate forfeiture allegation, which had the "all right, title, and interest . . . including, but not limited to" language. Defendants further argue that the government failed to correct that testimony. In reality, Defendants contend that the government failed to correct *the consequence* of that testimony: the restraint. In other words, Defendants say the government knowingly

31

restrained their untainted assets without probable cause in violation of the Fifth Amendment. The asserted harm is the same as the alleged Sixth Amendment violation: that because of the excessive restraint, Defendants could not hire their counsel of choice.

Poelking did not lie. She answered "yes" to the question of whether the indictment's forfeiture allegations "truly and accurately, to the best of your knowledge, list items for which there is probable cause that they came from proceeds of the fraud." *Id.* To the best of her knowledge, the indictment only sought the forfeiture of the assets she had traced. She reiterated that mistaken belief on at least three separate occasions under oath. *E.g.*, Forfeiture Hr'g Tr. at 88:3–9 ("Q. So my question was: Are you aware that the indictment in this case suggested that there – that all right, title, and interest in each of the assets the government sought to forfeit was traceable to criminal proceeds? A. Right. And again, I'll just say I was under the impression that it meant all right, title, and interest of those funds that were sent on that date to the fund."); Tr. at 83, 141, 231–32; R. 640 ¶ 3 (affidavit). And the allegations did include "items" for which there was probable cause to believe they came from criminal proceeds. But the allegations included other, nontraceable items too. And while Poelking's testimony was certainly not perjurious, it inevitably suggested to the grand jury that all of the property covered by the forfeiture allegations was derived from criminal proceeds. That was not accurate. *See Cheeks v. Gaetz*, 571 F.3d 680, 685 (7th Cir. 2009) (a witness's testimony need not be knowingly false (and hence perjury) to succeed on a due process claim).

32

Even so, Defendants are unable to show that the government knew that the testimony was inaccurate, or knew the protective order was overbroad. The record on the government's knowledge is extremely well-developed. The Court permitted extensive discovery on the issue. The Court compelled, over objection, the disclosure of over one hundred internal government communications related to the forfeiture allegations and the protective order. Those communications spanned from May 16, 2019, months before the indictment, to July 10, 2023, shortly after Shah first requested an amendment to the protective order. The communications were undoubtedly work product, but the Court found Defendants had a substantial need for them in order to explore the Fifth Amendment issue.[18] The Court also ordered disclosure of sworn affidavits from members of the prosecution team and other DOJ and FBI personnel involved in the drafting of the initial forfeiture allegations and the application for a protective order restraining those assets. The Court permitted Defendants to call former Chief of the Criminal Division and trial attorney Madden and Assistant United States Attorney Olinghouse as witnesses over the government's

---

[18] The Court initially reviewed those communications and others in camera. The government agreed to turn over all of Poelking's communications that it had previously withheld. The Court subsequently ordered the government to produce all of the emails that Madden and Olinghouse sent or received. Shortly thereafter, the Court ordered the disclosure of the remaining emails on the privilege log and the portion of the final prosecution memo relating to forfeiture. R. 727. The Court denied Defendants' request for communications that Madden and others had with Poelking after July 10, 2023, when the litigation on the asset restraint began. *Id.* Such communications would have dealt with the instant litigation itself, and besides being irrelevant, were work product for which Defendants did not demonstrate a substantial need.

objections. And the Court permitted Defendants to examine Poelking on the stand four separate times on these issues.

After thoroughly examining those materials and closely reviewing the testimony, the Court finds that the government intended to forfeit and restrain only traceable proceeds and did not know Poelking's grand jury testimony was inaccurate or that the protective order was restraining nontraceable property. Moreover, there is no evidence of any knowing non-disclosure of the fact that nontraceable portions of assets were being restrained. The government did not act in bad faith.

The language originated with Olinghouse. He understood that the government could only restrain traceable property before trial. And both he and Poelking knew that some of the assets were paid for with both traceable and nontraceable funds. But they believed that the protective order, as written, restrained only the traceable portions and any change in the value or form of those traceable portions. *E.g.*, Forfeiture Hr'g Tr. at 89; Tr. at 136, 231–33, 1019–21, 1144. They did not believe the protective order's language would have the effect of restraining nontraceable property. *E.g.*, Tr. at 1019–22, 1097, 1134, 1144.

To be sure, their read of this language defies the meaning of the words themselves. "All right, title, and interest" means everything, and "including but not limited to" means "not only." But the Court found their testimony to be credible for several reasons. From the start, the forfeiture was incredibly complex. Shah Ex. 8800; Tr. at 1024–25, 1040 (noting "these are tricky investments"). That is why the prosecutors reached out to MLARS to work alongside Poelking to draft the forfeiture

34

allegations and the protective order. Yet, when Olinghouse was assigned to work on the case, he "didn't really have that much expertise in forfeiture." Tr. at 1025. He did not have any experience with the forfeiture of private equity or private company interests. *Id.* at 1027–28. And he had not received any specific training on the drafting of forfeiture allegations or protective orders in criminal cases. *Id.* at 1009–10. In fact, he asked the Marshals' Complex Asset Unit for samples of protective orders. *Id.* at 1040; Shah Ex. 8803.[19] What's more, Olinghouse's involvement in the case ended when he handed off the drafts. He was not aware of what was ultimately restrained. Tr. at 1023.

Poelking, for her part, was not a lawyer. She did not recall having any concern about the forfeiture allegations or the protective order language when she read it. *Id.* at 1127. After the indictment and protective order were issued, she fielded questions from Madden related the protective order at least twice. Shah Ex. 8825, 8833. But in those communications, she consistently conveyed her view that the protective order restrained only what was traceable. Forfeiture Hr'g Tr. at 89–91; Tr. at 1131–34. Moreover, both Olinghouse and Poelking were vigorously examined by defense counsel on their understanding of this language, for Poelking on several different occasions over more than ten months. The Court, as the factfinder, observed their

---

[19] The sample protective order provided by the Marshals' Complex Asset Unit had the "all right, title, and interest . . . including, but not limited to" language. Shah Ex. 8803. Olinghouse did not testify that this was his model for the language at issue in this litigation, but the Court makes the observation nonetheless.

manner of testifying and found them to be honestly conveying their sincere belief at the time.

As to Johnston, Hankey, and Appleby-Bhattacharjee, none of them knew that any part of the assets listed in the forfeiture allegations or the protective order had been acquired using nontraceable funds or that any nontraceable property was being restrained. *See* R. 642, 648, 710-2, 712-2, 712-3, 721-1, 721-2. Indeed, Johnston's "clear" and "explicit" instruction to Olinghouse and Poelking was that the government was "going after what was traceable to the fraud." Tr. at 1049–50, 1062. As such, in questioning Poelking before the grand jury, Johnston did not know that her "yes" response was inaccurate.

Madden, for his part, had very little involvement in drafting the forfeiture allegations and protective order. *Id.* at 1055–56. However, his name was listed in the protective order as a point of contact for the affected private equity entities and private companies. *Id.* at 1191. Madden followed the letter of the protective order in his communications with those entities. On several occasions, Madden instructed those entities to place proceeds payable to Defendants into the Marshals' escrow, consistent with the restraint of "all right, title, and interest." *E.g.*, Shah Ex. 8830, 8832. And by the same token, Madden instructed Guild Capital to *release* certain funds to the Baroda Trust, because they were not covered by the protective order. Shah Ex. 8834 at 13; Tr. at 1250–51.

Madden testified that he did not know that the protective order was overbroad. He did not recall focusing on or even thinking about the "all right, title, and interest"

36

language or considering the possibility that there was anything problematic about that language until defense counsel raised the issue for the first time in June 2023. Tr. at 1173, 1185, 1235–38. Even at that point, recognizing his own lack of expertise in forfeiture law, he felt "confident" that MLARS had "done it right" in light of their expertise. *Id.* at 1155–56, 1187.

Defendants primarily focus on two email exchanges in 2020 that they say show Madden knew the restraint was excessive.[20] The first was an email exchange between Madden and Poelking on February 18, 2020. The context was Defendants' effort to use the settlement money to pay for counsel, which included the issue of their bona fide need for those funds. Madden referenced Defendants' mention of "remaining assets" in their affidavits, and asked Poelking, "Do you know what assets Jumpstart and Gravitas has that are not subject to the restraining order?" Shah Ex. 8825. Poelking responded with a copy of the spreadsheet she used the year prior "to help with the list of assets for the protective order." *Id.* She added, "One item is in yellow – 7 Wire – as we only were able to trace $280k to the fraud, the remainder is not protected." *Id.*

Nothing in this email suggested that the protective order was restraining nontraceable assets. In fact, the opposite is true. Poelking was saying (and she so testified) that for 7Wire, the amount she was able to trace was restrained, and the remainder was not restrained by the protective order (i.e., "not protected"). Tr. at 97,

---

[20] These emails were produced in advance of Poelking's trial testimony pursuant to the Jencks Act.

1131–32. And that was how Madden understood her email, as he testified. *Id.* at 1184, 1243. This email may show Madden's awareness that one of the entities subject to the protective order had received both traceable proceeds and nontraceable funds. But this email does not show that Madden knew that the protective order was restraining that nontraceable property. Defendants emphasize that the Court's order a few months later stated that the law does not permit the pretrial restraint of substitute assets. But the subject of the Court's order was different; it was about the settlement money. And Madden did not recall that legal principle standing out to him, nor did he recall having any concern, based on the Court's order, that there was a problem with the way the government went about forfeiture in this case. *Id.* at 1228–30.

The second email highlighted by Defendants is an exchange between Poelking to Madden in August 2020. The context of this email was that Impact Engine Ventures II, LP ("Impact II") reached out to Madden seeking guidance because Defendants had stopped fulfilling the capital commitments. Shah Ex. 8833. Madden asked why the protective order covered Impact Engine Ventures IV, LP, but not Impact II. *Id.* Specifically, he wanted to know "if the money that went into Impact II was traceable and we did not realize it, or if we knew about it but concluded it was not traceable." *Id.* Poelking replied that Defendants funded their capital contributions to Impact II with funds they had received from Guild Capital and another entity (I2A). *Id.* Poelking went on, "Our subjects & their companies made investments in Guild & I2A with traceable funds, but there were also investments in

these entities that dated back to 2015 and 2013, respectively." *Id.* She added, "I probably did not include the Impact II investments in the [protective order] due to the fact that they were not directly traceable to the fraud, but perhaps indirectly they were." *Id.*

Madden acknowledged that this email indicates that Defendants made investments in Guild Capital with nontraceable funds. Tr. at 1209. But again, this email does not flag that the protective order is restraining nontraceable property. *Id.* at 1208. To the contrary, Poelking is again stating that she did not include nontraceable investments in the protective order. This email did not cause Madden any concern that the protective order was overbroad. *Id.* at 1230, 1250. Additionally, Madden's question about the traceability of the funds that went into Impact II supports his understanding at the time that they were only restraining what was traceable.

Defendants highlight Madden's email to Guild Capital about two weeks later on September 1, 2020. In that email, Madden sent a copy of the protective order and instructed Guild Capital to put certain distributions in escrow. *See* Shah Ex. 8834 at 21–24. In Defendants' view, Madden gave those instructions while knowing that there were nontraceable assets at Guild Capital restrained by the protective order. But the evidence does not show Madden had the awareness that Defendants attribute to him. Tr. at 1207–10.

Ultimately, Madden did not put the pieces together. As discussed, Poelking told him that Defendants transferred both traceable and nontraceable funds to

certain private equity entities affected by the protective order. At the same time, he applied the "all right, title, and interest . . . including but not limited" language of the protective order. But he did not put two and two together. *E.g.*, *id.* at 1185. He did not come to the realization—or even consider the possibility—that there was any problem with the protective order or that for certain assets, the protective order was restraining nontraceable property until Shah's counsel pointed it out in June 2023. *Id.* at 1173, 1235–38.

As with Poelking and Olinghouse, the Court found Madden's testimony that he was not aware of the excessive nature of the restraint to be credible for a number of reasons. For one, he acknowledged that he was not a forfeiture expert and had never done a pretrial restraint like the one in this case. *Id.* at 1151–52. That is why the prosecution team consulted MLARS, the forfeiture experts, to draft the forfeiture allegations and the protective order. *Id.* Madden trusted, with good reason, that MLARS had "done it right." *Id.* at 1156, 1235–36. True, Madden did not double check. But there was never any suggestion of a problem. No one—not Olinghouse, Poelking, any members of the prosecution team, or any defense counsel—ever raised a concern that the protective order was overbroad or that nontraceable property was being restrained until June 2023. Furthermore, the Court observed Madden's testimony firsthand, and found his manner of testifying to be entirely consistent with a truthful recollection of the events of the past four and a half years.

The government, as a unit, undoubtedly fell short. The protective order restrained more of Defendants' assets than it should have. But a mistake is different

than misconduct. There is no evidence even tending to suggest that the government realized the problem with the protective order and ignored it or concealed it from Defendants. And Defendants were equally if not better positioned to realize that error and bring it to the attention of the Court well before they were tried and convicted.

In all, Defendants' Fifth Amendment challenge is without merit because even if Poelking's grand jury testimony was inaccurate, the evidence did not show that the government knew that was the case or that the protective order was overbroad and failed to correct it.

## IV.    Statutory Violation

That leaves the statutory violation. The Court does not understand the government to be contesting that such a violation of the forfeiture laws occurred. *See Jones*, 844 F.3d at 641 (21 U.S.C. § 853 permits the restraint of "tainted assets prior to trial, but not the restraint of substitute assets"). What the government challenges is Defendants' request for dismissal of the indictment or a new trial. Even if Defendants raised this violation in a timely way, neither proposed remedy is appropriate.

In advocating for dismissal of the indictment based on the statutory violation, Defendants rely exclusively on the Court's inherent supervisory power under Article III, citing *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008). In that case, the Second Circuit upheld the dismissal of an indictment after the government pressured KPMG not to provide indemnification for several executives who were separately prosecuted, thereby preventing those defendants from retaining their counsel of choice. *Id.* at 141.

Of course, that case is not binding on this Court. And the district court in *Stein* dismissed the indictment *before* those defendants had been tried and convicted. Dismissing an indictment with prejudice before trial is a serious matter. *See United States v. Stein*, 495 F. Supp. 2d 390, 415 (S.D.N.Y. 2007) ("The Court has reached this conclusion only after pursuing every alternative short of dismissal and only with the greatest reluctance."). Dismissing an indictment with prejudice after Defendants have been tried and convicted is, in effect, setting aside the verdict and issuing a judgment of acquittal.

But most critically, the prosecutorial misconduct that occurred in *Stein* is a far cry from what happened here. There is no evidence that the government deliberately intervened with the goal of depriving Defendants of their counsel of choice. Indeed, it is hard to see why the government would care whether Defendants were represented by formidable counsel at Quinn Emanuel and McGuireWoods as opposed to the equally formidable private counsel who ultimately represented them. Instead, the government inadvertently used overbroad language in a protective order and did not catch it. Neither did Defendants until after the verdict, even though they had all the information to discover and raise it with the Court well before that time. This is not the type of outrageous government misconduct or manifest injustice that calls out for tossing a verdict.

Defendants offer little support for the proposition that a violation of the forfeiture laws, standing alone, requires a new trial. Indeed, they acknowledge a lack of precedent and instead cite cases where the Seventh Circuit granted a new trial

upon finding a violation of a criminal defendant's Sixth Amendment right to counsel of choice. *See Sellers*, 645 F.3d at 840 (granting new trial upon finding that district court's denial of a continuance to substitute new counsel violated defendant's Sixth Amendment right to counsel of choice); *United States v. Turner*, 594 F.3d 946, 955 (7th Cir. 2010) (granting new trial upon finding that district court's erroneous disqualification of counsel violated defendant's Sixth Amendment right to counsel of choice). That remedy makes sense because with the deprivation of counsel of choice, "it is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings." *Gonzalez-Lopez*, 548 U.S. at 150. But here, as discussed, even without the improper restraint, Defendants would not have been able to hire their preferred lawyers. A new trial is not appropriate in these circumstances.

*     *     *     *

While the effectiveness of counsel is not at issue in this litigation, it nevertheless bears reiterating what the Court said at the conclusion of the trial in this case. From the start of this case through the trial years later, Defendants received what is indisputably the highest quality representation a criminal defendant can receive. Their legal teams collectively consisted of more than 12 attorneys who entered appearances, and undoubtedly numerous other associates who did not, along with considerable support staff. Those attorneys were from reputable firms, with decades of experience and expertise in white collar criminal defense and trial practice. Those attorneys were thorough and diligent in combing through millions of

documents and other materials in this case. And their talent in written and oral advocacy was on full display in the motion practice and over the course of the three-month-long trial. Having observed the performance of counsel firsthand, there is no doubt that Defendants received far beyond the adequate representation the Constitution requires.

## Conclusion

For these reasons, the Court denies Defendants' motions to dismiss the indictment or alternatively for a new trial.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: June 12, 2024