UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 19 CR 864 |
| | ) | |
| SHRADHA AGARWAL | ) | |
| | ) | Judge Thomas M. Durkin |
| | ) | |

**GOVERNMENT'S POSITION PAPER ON SENTENCING FACTORS AND OBJECTION TO THE PRESENTENCE REPORT REGARDING DEFENDANT AGARWAL**

Shradha Agarwal helped kickstart the fraud at Outcome Health and became its second largest beneficiary. She was an early implementer of the Outcome playbook of inflate, under-deliver and conceal. When later removed from the day to day of overselling advertising campaigns, Agarwal continued to support and condone the scheme that fueled the company's growth. Even as the company began to professionalize and clean up its fraudulent practices, Agarwal was adamant that the past should be ignored, and naysayers silenced. Nothing would stand between her and the fortune and fame she stood to gain.

As Outcome's co-founder, Chief Strategy Officer, and later its President, Agarwal had the unique ability to impact the company's direction—whether it grew through transparency or dishonesty. She joined Rishi Shah, her co-founder and co-defendant, and chose the latter. She oversaw a scheme that defrauded clients, lenders and investors of hundreds of millions of dollars. And

she tried to bury the evidence of her scheme. For these reasons, the jury convicted her of 15 of 17 counts of mail, wire and bank fraud.

These were serious offenses that merit serious punishment. Agarwal was a leading participant in the scheme for many years and was instrumental in causing losses of more than $500 million. The Court should sentence the defendant to 10 years in prison, a sentence well-supported by the 18 U.S.C. § 3553(a) factors.

## I.      Background

The government will assume familiarity with the government's version of the offense in order to reduce the length of this filing. The government's version is hereby incorporated by reference.

### A.      Agarwal joined Outcome Health and the fraud scheme.

Alongside Shah, Agarwal was the original participant in the fraud at Outcome. In 2006, Agarwal joined Outcome Health (then ContextMedia), while still an undergraduate at Northwestern—she was later rebranded as one of the company's co-founders. Agarwal started working full-time after her graduation in 2008. By early 2011, she knew that Shah was willing to lie to accelerate the company's growth. As captured in an email exchange in February 2011, Agarwal called out Shah for lying to potential clients about how many endocrinologist offices Outcome's devices were in. GX2. Shah brushed aside

Agarwal's concerns on the grounds that Outcome would soon be in the number of offices they were claiming they had. *Id.*

The following year Agarwal's unease with making such misstatements had disappeared. She routinely instructed Jason Ketchum to include out-of-network offices in list matches given to clients, in the hopes that the company would acquire the missing offices (albeit a slightly different set of offices) by the time the campaign started. Yet these "projections" were often concealed from clients or salespeople, and instead were represented as current inventory. For example, in the Pradaxa list match in November 2012, Agarwal told Ketchum to include offices in the list match that Outcome had not even started calling yet. GX67. In August 2013, Agarwal admitted in an email about the Pradaxa campaign, "[T]he biggest issue here is that the list they have of 1819 matches isn't the true list (not even 1/3rd of it was installed at the time)." GX265. Yet Lyndon Chin, who worked at the client ad agency, testified that he understood the Pradaxa list-match results to indicate *currently installed* inventory. Tr. 6252.

This deception was accomplished by leaving the salespeople in the dark. In early 2013, Shah asked Agarwal whether Bob Mons, a salesperson, knew that the Pradaxa list match had included a projection. GX140. Her response? "I'm not sure in this particular case, but generally the team doesn't know it's a projection because they get confused about how to represent it." *Id.* Agarwal

later tried to rationalize this concealment, and the resulting shortfall when the campaign started, by telling others within the company that the campaign was being delivered on a weighted average basis. In fact, there was no hope of the company satisfying the campaign on a weighted average basis, and they never did.

### Pradaxa 2013– Contracted vs. Actual Delivery

| Date | Contracted Delivery | Actual Delivery | Amount Invoiced |
|------|--------------------|-----------------|-----------------|
| Apr. 2013 | 1,819 | 708 | $219,371.40 |
| May 2013 | 1,819 | 775 | $219,371.40 |
| June 2013 | 1,819 | 832 | $219,371.40 |
| July 2013 | 1,819 | 1019 | $219,371.40 |
| Aug. 2013 | 1,819 | 1019 | $219,371.40 |
| Sept. 2013 | 1,819 | 0 | $219,371.40 |
| Oct. 2013 | 1,819 | 0 | $219,371.40 |
| Nov. 2013 | 1,819 | 0 | $219,371.40 |
| Dec. 2013 | 1,819 | 0 | $219,371.40 |

In other list matches, Agarwal would have Ketchum falsely indicate in spreadsheets for clients that certain offices were within Outcome's network when in fact many of them were not. GX107, 210, 213, 213, 1112, 1112a. These lies appeared not only in list matches but also in proofs of performance and location lists for campaigns like Humira and Crestor, where Outcome had to tell the client exactly where the campaign was live. GX68, 1077, 1077a. Agarwal ensured that Outcome concealed its delivery shortfalls from these clients.



When it came to selling the 2014 Pradaxa campaign, Agarwal agreed with Desai that they would have to lie once again in the list match. Desai wrote, "I think there are certain match numbers we will have to hit as they are adding back old physicians we claimed to have had, but think we can limit the additional growth." GX308.  Agarwal's response?  "Ditto."  *Id.*  To conceal their earlier inflation and under-delivery, Agarwal and her co-defendants sold an even larger program to the ad agency representing Pradaxa. GX346, 1167.  In other words, by the end of 2013, Agarwal had abandoned her initial hesitancy and was fully committed to the scheme of inflate, under-deliver and conceal.

> **B.    Agarwal continued to support the scheme as Outcome's President.**

Even when Agarwal stepped back from the day-to-day of selling campaigns, she continued to support the same essential scheme she had helped

implement. Desai took over the sales side of the business, and Agarwal oversaw the membership side of the business, the part that went out to acquire new offices. In that role, and as the company's President, Agarwal had high-level visibility into the ongoing scheme that was fueling Outcome's growth. She participated in meetings with Shah and Desai—some of which included David Ma—about the company's inventory needs and the "delta" between its obligations and its inventory. Tr. 2331-32, 3655-56; GX360, 475, 1027, 1153; DX3492. She received and reviewed the delta reports herself, GX475, 483, 594, which detailed, in real time, substantial under-deliveries. All the while the clients were billed in full.

Her support for this extensive, ongoing fraud was best captured in her "smoke bomb" comment to David Ma. In early 2015, Ma reported directly to Agarwal and had a biweekly meeting with her. Tr. at 2423-24. During one of these meetings, Ma expressed his concerns with Outcome's practice of overselling inventory. *Id.* at 2424-25. Agarwal's response was telling: "We throw smoke bombs." *Id.* at 2425. As Ma testified, the purpose of these "smoke bombs" was to distract so the company could then "clean up our operations." *Id.* Ma believed that Agarwal had "rationalized in her mind" that dishonest growth was just the way the company did business. *Id.* at 2426.

Her continued rationalization of the fraud was borne out in how Agarwal handled delivery shortfalls and operational errors. When Desai alerted

6

Agarwal to a massive operations error in June 2016, she did not insist on immediate disclosure, credits, or refunds to clients. GX588; DX11031. When Liane Pierce conducted a campaign audit a few weeks later, showing material shortfalls in more than 50% of all campaigns, Agarwal did nothing. GX594, 594a. It was the Outcome way to conceal such shortfalls from clients. Tr. 3788. Indeed, the following month, Agarwal joined Shah at a public forum where they boasted they had solved the chicken-and-egg problem of simultaneously obtaining doctors offices and pharma clients to advertise in those offices, when in fact they had sold offices that did not exist and then concealed the inevitable shortfalls. GX606.

### C.    Agarwal diminished the past and silenced dissent.

As Outcome grew to become the leading point-of-care advertising provider in the country, the defendants knew they had to professionalize—but not at the cost of exposing their prior misdeeds. When Sameer Kazi joined and threatened to do just that, Agarwal and Shah were determined to keep him silent.

Kazi was recruited in late 2016 to take over the sales side of the business. But within weeks of his joining in January 2017 he learned about Outcome intentionally overselling inventory, sending false affidavits to clients, and manipulating ROI reports. Tr. at 277-82. Word quickly got back to Agarwal and Shah that Kazi was digging into the companies' fraudulent business

practices. GX747, 752. In a Voxer on January 23, 2017 to Shah, Agarwal worried that Kazi "may even share this [information] with others." GX747. She then stated her desire to get rid of Liane Pierce and Adam Prowker, who had alerted Kazi to the misconduct. *Id.* (The jury convicted Agarwal of Count 14 for sending that Voxer.) Agarwal then warned Desai about Kazi's discovery and helped prepare him on how to respond to Kazi's inquiries. GX754. Agarwal supported Shah in his desire to push Kazi, Prowker and Pierce out of the company. GX778.

### D.     Agarwal lied to the auditor, lenders and investors.

Driven by their ambitions of growing Outcome exponentially, by early 2016, Shah, Agarwal and Purdy "started to look for outside investors in the company to raise money." Tr. 3978. Before Outcome could raise outside capital, however, it would need to have its financial statements audited by a "Big Four" accounting firm. Tr. 3977–78, 6886–87, 7767. Defendants hired Deloitte & Touche LLP ("Deloitte") for that purpose in 2016. *Id.* By that time, fraud had been deeply engrained in Outcome for years. And concealment of the fraud was critical not only to keeping its client-victims in the dark; it was essential to securing an unqualified audit opinion letter from Deloitte.

Despite participating in fraud for years and ignoring or marginalizing the ever-growing chorus of employees lobbing well-founded allegations of fraud, Shah, Agarwal and Purdy signed management representation letters in

March of 2016 and March of 2017 that represented that they "ha[d] no knowledge of any fraud or suspected fraud affecting the company involving management" and that they "ha[d] no knowledge of any allegations of fraud or suspected fraud affecting the company's financial statements" and submitted those letters to Deloitte. GX562, 910; Tr. 7008–10, 7123–25. Shah, Agarwal and Purdy similarly lied in annual "fraud-inquiry meetings" with Deloitte, denying knowledge of any actual, suspected or alleged fraud at Outcome. Tr. 6978; GX1932-33.

The defendants' deceit was successful. They obtained the audit opinion letter from Deloitte and used that letter and Outcome's inflated revenue figures to raise approximately $1 billion for the company. First, mere days after receiving the opinion letter for 2015, the defendants used it to secure a $110 million loan from JPMorgan Chase Bank and other lenders. GX573; Tr. 7774. Shah and Agarwal obtained a dividend of $30.2 million and $7.5 million, respectively, from the proceeds of that loan. GX571, 572, 1033, 1078.

Later in 2016, the defendants set their eyes on a new goal: acquiring AccentHealth, one of Outcome's biggest competitors, to further their ambition of growing Outcome into a billion-dollar company. GX657; Tr. 266–67, 430, 3805, 5748, 7775. To do so, however, Outcome needed to raise substantial funding. GX617; Tr. 3805. Again, the company turned to JPMorgan Chase, which—along with a consortium of banks—lent Outcome $375 million in

9

December 2016. GX698; Tr. 7775. To obtain that loan, Shah and Purdy presented the lenders with the inflated revenue figures from Outcome's 2015 audited financial statements, which all three defendants obtained by lying to and deceiving Deloitte.

After defrauding lenders to the tune of nearly half a billion dollars in 2016, Shah, Agarwal and Purdy used the same playbook to defraud investors out of $487 million in 2017. With this influx of cash, the investors and Outcome laid the groundwork for an initial public offering in the future, aiming to generate lucrative returns for all parties involved. Tr. 6634, 7911, 8602. Shah and Agarwal, however, would not need to wait for an IPO: as part of the capital raise, they received a $225 million distribution. GX1071, Tr. 6673–74. That payout was front-of-mind for Shah and Agarwal from the outset. As Shah texted Agarwal on December 23, 2016 (the day that Outcome completed its acquisition of AccentHealth): "I'm cautiously very excited about the [Goldman Sachs] round[, t]he dividend out of which [would] be really big for both of us[.] It will provide a security that will be really amazing[.]" GX702.

## II. The Probation Officer's and the Government's Sentencing Guidelines Calculations

The Probation Officer concluded that the defendant's offense level was 43 and that her criminal history category was I. This flows from a base offense level of 7; an increase of 28 levels for the amount of loss; an increase of 2 levels

for ten or more victims; an increase of 2 levels for more than $1 million in gross receipts from one or more financial institutions; and an increase of 4 levels for her leadership role in the scheme. The Probation Officer determined that that 2-level sophisticated means enhancement did not apply.

Apart from the Probation Officer's decision not to apply the sophisticated means enhancement, the government agrees with the Probation Officer's application of the Guidelines.

## A.     Sophisticated Means Enhancement

The government objects to the Probation Officer's decision to forego the sophisticated means enhancement because the scheme did involve the use of sophisticated means that Agarwal intentionally engaged in and caused. For the sophisticated means enhancement to apply, the conduct must be "notably more intricate than that of the garden-variety offense." *United States v. Sheneman*, 682 F.3d 623, 632 (7th Cir. 2012) (*quoting United States v. Knox*, 624 F.3d 865, 871 (7th Cir. 2010)); *see also United States v. Harris*, 791 F.3d 772, 781 (7th Cir. 2015) ("[T]he level of planning or concealment in relation to a typical fraud of its kind is determinative."). Here, Agarwal and her co-schemers went to extensive and intricate lengths to plan and conceal the fraud.

For example, in November 2012 Agarwal gave specific directions to Ketchum for how he should go about creating a list match from various categories of offices not yet installed in the Outcome network. GX67. And in

11

May 2013, Agarwal coordinated with Ketchum on a list match where they included uninstalled offices on list match results, but ensured that competitors' offices did not appear on the list to avoid being discovered. GX212. And, like Shah, Agarwal led her co-schemers to keep certain information about projections and shortfalls from the sales team to facilitate the execution of the scheme.  *See* GX140.

For these reasons and others, there is more than enough evidence to support a sophisticated means enhancement.

## B.      The Government's Guidelines Calculation

After including the sophisticated means enhancement, the total offense level is 45.  The government's Guidelines calculations are set forth below:

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| Loss more than $250 million (§ 2B1.1(b)(1)(O))[1] | +28 |
| More than 10 victims (§ 2B1.1(b)(2)(A)(i)) | +2 |
| Sophisticated means (§ 2B1.1(b)(10)(C)) | +2 |
| More than $1 million from financial institutions (§ 2B1.1(b)(17)) | +2 |
| Leader/organizer (§ 3B1.1(a)) | +4 |
| | |
| **TOTAL** | **45** |

Under Application Note 2 to the Sentencing Table in Chapter 5, an offense level of more than 43 is to be treated as an offense level of 43.  Thus, the final offense level here is 43.  The statutory maximum sentence for

---

[1] The Government incorporates by reference the loss arguments made in the Government's sentencing memorandum for defendant Shah.

Agarwal's offenses is 320 years' imprisonment. Because that is technically less than the life sentence determined by applying the Guidelines sentencing table to an offense level of 43, the Guidelines provide for a sentence of 320 years.

## III. The Factors Set Forth in 18 U.S.C. § 3553(a)

### A. Seriousness of the Offense and Nature and Circumstances of the Offense

As the government described in the sentencing memorandum for Agarwal's co-defendant, Rishi Shah, this is not the run-of-the mill corporate fraud case where a corporate employee took advantage of a singular opportunity to reap extra profit from a small number of transactions. Nor is this a scheme involving a small fly-by-night company operating as the alter-ego of its fraudster owner.

The scheme that Agarwal initiated with Shah is extraordinary for its involvement of senior corporate executives, as well as for its duration, pervasiveness and scope of harm. Agarwal eagerly joined Shah's efforts to accelerate the growth of their company with fraudulent sales, with the ultimate goal of raising capital and cashing out. And Agarwal personally secured millions from the scheme. For the reasons described in Shah's memorandum, few corporate fraud offenses can compare to the level of seriousness displayed in this case.

**B.     History and Characteristics of the Defendant**

Agarwal's role in the scheme was different from that of Shah's—with Agarwal ultimately less culpable than Shah. The scheme was Shah's idea and he drove its beginnings. Yet Agarwal knew exactly what Shah set out to do and she fervently supported it—starting as early as 2012 and 2013 when she was in charge of sales and worked directly with Ketchum to defraud and deceive Outcome's clients. While she initially pushed back and questioned the ethics of Shah's lies in 2011, GX2, she had insufficient moral backbone to push Shah onto the right path or leave the company. Given Agarwal's role in the company and as Shah's friend and confidant, one can reasonably question whether Shah would have moved forward with the scheme without her support and active participation.

Agarwal became less directly involved in the scheme after 2013. Her role was largely limited to lying to auditors when it was necessary to pass an audit needed to raise capital, and to encouraging her co-conspirators to circle the wagons and expel ethical employees concerned about the fraud at Outcome.

Still, Agarwal's readiness to lie to her company's auditors demonstrates how far she was willing to go to reap the ultimate reward of their fraud scheme.

And it was Agarwal's willingness to silence concerned employees and help Shah and Desai circle the wagons that speaks volumes about her character. Her condemnation of ethical, concerned employees disturbed by the

14

fraud scheme illustrates how her desire for financial gain and her pursuit of professional success corrupted her moral compass.

When Adam Prowker and Liane Pierce revealed the fraud to Sameer Kazi, it was Agarwal who was in Shah's ear saying that they "may just have to clean up in a lot of different areas of that org." GX747b, 2:37 to 2:55; *see also* GX673, 752, 753, 754, 780a, 878. When Ma went to Agarwal to seek direction on the concerns he had with what he was being asked to do, Agarwal guided Ma back onto the wrong path by rationalizing and diminishing the fraud, describing it as throwing "smoke bombs." Tr. 2425-26.

Finally, Agarwal, like Shah, has not acknowledged any wrongdoing, or shown any acceptance of responsibility or remorse whatsoever.

## C. The Need for Deterrence

The need to afford adequate deterrence to others is a critical part of the sentence to be imposed in this case. Corporate fraud is often committed by educated and affluent defendants. Neither Agarwal or any of her co-defendants acted out of need or passion. As explained more fully in the government's Shah memorandum, crimes of this nature can be deterred with punishment that includes meaningful terms of incarceration. A sentence of 10 years' incarceration for Agarwal would deter other executives from engaging in similar conduct, and it would also promote respect for the law for the reasons described in Shah's memorandum. A lower sentence raises a significant risk of

undermining respect for the rule of law by signaling a lack of serious interest in holding corporate executives accountable for their crimes.

## IV.  Restitution

Restitution is mandatory in this case pursuant to 18 U.S.C.§ 3663A, at a total amount of $455,258,505.64. Restitution should be ordered in the amounts and to the entities set forth in the Second Supplement to the Government's Version of the Offense and its accompanying exhibits.

## CONCLUSION

Agarwal committed serious crimes for which she deserves to be punished through a meaningful and appropriate term of imprisonment. In this case, a variance below the Guidelines sentence is appropriate, and 10 years of imprisonment would balance the mitigating factors in Agarwal's favor with the seriousness of her conduct, her personal characteristics and circumstances that led to that conduct and the need for adequate general deterrence and support for the rule of law.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:    *s/ Jason Yonan*
      Jason Yonan
      William Hogan
      Corey B. Rubenstein
      Assistant United States Attorneys
      219 S. Dearborn Street
      Chicago, Illinois 60604
      (312) 886-2050

      GLENN S. LEON
      Chief, Fraud Section
      Criminal Division
      U.S. Department of Justice

By:    *s/ Kyle C. Hankey*
      Kyle C. Hankey
      Assistant Chief
      1400 New York Ave NW
      Washington, D.C. 20530
      (202) 616-2639