UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 19 CR 864 |
| | ) | |
| BRAD PURDY | ) | |
| | ) | Judge Thomas M. Durkin |
| | ) | |

**GOVERNMENT'S POSITION PAPER ON SENTENCING FACTORS
AND OBJECTIONS TO THE PRESENTENCE REPORT REGARDING
DEFENDANT PURDY**

Brad Purdy was a knowing and willing participant in a billion-dollar fraud. He joined Outcome Health in its early years and quickly learned that the company's growth was fueled by lies. The company sold inventory to its clients that did not exist, sought to acquire the inventory it had just sold, and then concealed any resulting shortfalls from clients. Ever loyal to co-defendants Rishi Shah and Shradha Agarwal, Purdy supported the Outcome model of selling the future, of telling lies in the short run in the hopes that reality would eventually catch up. He was all in: Fake it until you make it.

As the Chief Operating Officer, and later the Chief Financial Officer, Purdy was at the center of the fraud that Rishi Shah and Shradha Agarwal began and that Ashik Desai took to new heights. And Purdy could have stopped it. *Before* Outcome billed its clients for over $45 million in services it did not

1

deliver. *Before* Outcome raised $110 million in loans in April 2016, $375 million in loans in December 2016, and $487.5 million in financing, all based on inflated financial statements. But Purdy pushed ahead, supporting and concealing the massive fraud at Outcome. He acted as if things were normal, despite hearing from one concerned employee after another that Outcome's rotten business practices persisted, despite learning that massive make-goods would have to be given to paper over the company's willful shortfalls. Purdy's incentive to facilitate and conceal the fraud was a powerful one. Even with an equity stake of less than 1%, Purdy stood ready to gain millions of dollars in the scheme. For these reasons, the jury convicted Purdy of 13 of 15 counts charged in the superseding indictment.

These were serious offenses that merit serious punishment. Purdy was a key participant in a pervasive scheme for many years and was instrumental in causing losses of more $500 million. The Court should sentence the defendant to 10 years in prison, a sentence well-supported by the 18 U.S.C. § 3553(a) factors.

## I.      Background

The government will assume familiarity with the government's version of the offense in order to reduce the length of this filing. The government's version is hereby incorporated by reference.[1]

### A.      Purdy Joined Outcome Health and the Fraud Scheme

In the summer of 2012, one year after his graduation from Northwestern University, Purdy joined Outcome. Within a few months of his start, he assumed the role of Chief Operating Officer. GX1920. Given Outcome's small size at the time, Purdy had his hands in both the company's revenue generating side (selling campaigns to advertisers) and its network building side (installing new devices). He advised on list matches, GX98, reviewed ROI studies, GX167 & GX287, tracked campaign delivery, GX195, tracked new device installations, GX221, helped launch tablets, GX260, and strategized on device growth, GX301.

Within that first year, Purdy learned that Outcome's business model was to sell inflated delivery and then conceal any under-deliveries from its clients. Purdy was at Shah and Agarwal's talk in November 2012 where Shah spoke of

---

[1] The Government no longer asserts that the Court should apply the sentencing enhancement for deriving more than $1 million in gross receipts from a financial institution under 2B1.1(b)(17)(A). Purdy did not derive that amount *individually*, even though other co-defendants did. *See* Guidelines § 2B1.1 Application Note 13(A).

using a "smoke bomb" to overcome the dilemma of a "two-sided market" in which Outcome needed enough screens to attract advertisers, but also enough revenue from advertisers to pay for the installation of new screens. GX61, 70, 1054.

Purdy endorsed this "smoke bomb" approach to selling and delivering advertising services, as born out in the 2013 Pradaxa campaign. There, Outcome sold Pradaxa 1819 offices even though Outcome had less than 1/3 installed at the time of the sale and began the campaign with less than half that number. GX101, 195, 196, 265. Even if Purdy believed the campaign was being delivered on a weighted average basis, GX195, he knew that the campaign delivery was woefully short with only a few months left in the year, *e.g.*, GX331.



And despite this knowledge, Purdy agreed with Desai that the under-deliveries would have to be concealed when selling Pradaxa an even larger campaign for the following year. GX313.

Purdy took similar action in the rheumatology campaigns. By late 2013, Outcome had oversold its rheumatology network to Humira and Xeljanz, who were competitors. Rather than ensuring clients were told of the oversold network and under-delivery, Purdy assisted Desai in shifting inventory between the two campaigns, GX330, 337, 1928, while still billing both campaigns in full, GX 312.

Purdy also endorsed a similar approach when presenting a 2014 proposal to Novo Nordisk. On October 2, 2013, Purdy, Shah, and Desai engaged in a lengthy email exchange in which they discussed the challenges of presenting the client with an inflated list of Outcome's network. GX 320-322, 324, 326-329. The entire exchange would not have occurred if they were, in fact, being honest with Novo Nordisk.

### B. Purdy Ensured the Scheme's Continued Success

Even after Ashik Desai joined the company, Purdy knew the company's business model of faking it until making it persisted. Indeed, he continued to perpetuate it. Purdy's conduct with the tablets is most revealing. When Outcome rolled out the tablet to clients in 2013, it was an unreliable and

5

glitchy product that did not yield good data about patient interactions. Rather than come clean to clients about the system's deficiencies, Purdy proposed selecting the top 5 or 10% of tablets and presenting those results to clients as if this cherry-picked sample was representative of the entire campaign. Tr. 2358-2360; GX 1144, 1144a. Desai learned from this approach. In drafting the first tablet report in November 2013 to be delivered to Pfizer, Desai told Purdy, "Few things I heavily inflated - % engaging with tablet and impressions #. . . . Let me know whether we should stay away from that." GX345. Purdy never told Desai to stop inflating tablet numbers. Tr. at 3933. Indeed, the practice only grew from there.

David Ma and Desai routinely fabricated tablet metrics through 2015. An exchange between Ma and Purdy on May 4, 2015 demonstrated Purdy's ongoing approval of such fabrications. Purdy asked Ma, via chat, whether he had tablet engagement data that had been shared with pharma clients. DX3456. Ma responded that he did, but "they're not real." *Id.* When Purdy seemed unruffled by this fact and stated his intention to share the false data with prospective hospital clients, Ma asked, "[A]re you sure you're comfortable sharing non-real stats?" *Id.* Purdy responded that he was. *Id.* In a follow-up email to Purdy and Desai a few hours later to which Ma attached a slide deck with inflated tablet metrics, Ma wrote, "I've mentioned to BP that these are

6

inflated. Wanted to make sure you're comfortable with using numbers at these magnitudes for potential use in presentations with systems." GX465.

Purdy also supported the practice of siloing information from salespeople to sell larger campaigns. In an October 8, 2013 email, Purdy wrote, "[W]e should probably make some sort of barrier between the [Sponsorship Sales] team and ops with regards to tablets and/or take off the cumulative counts. With all the projecting I want [Sponsorship Sales] to stay focused on selling the future . . . .". GX332. In other words, the sales team cannot know the truth about the true inventory numbers because they might not be willing to sell clients nonexistent inventory.

In early 2015, Purdy was informed about the ongoing gap between contractual obligations and deliveries, the "delta." GX441, 441a. Rather than ensure that clients were informed of these deltas, Purdy continued the practice first implemented by Shah—growing into campaigns without disclosing the initial shortfalls while billing clients at 100%. Even if Purdy somehow believed that weighted average delivery was permissible, many shortfalls could never be overcome under any delivery scenario.

### C. Purdy Approved Lies to Deloitte and Oversaw Raising Hundreds of Millions of Dollars

Purdy played a crucial role in approving the lies that induced Deloitte to sign off on Outcome's financial statements. When Deloitte started its audit in February 2016, it asked to see delivery data on various advertising campaigns. GX530. Kathryn Choi, who was pulling the data, approached Desai with a problem: "[I] think you mentioned that we'd shared with the auditors that we may grow into programs over time, but how much of a delta would we be able to show? Know some programs may have been at 50% so we'd probably need to backfill those?" *Id.* In other words, they needed to falsify data or else the auditors would discover they were under-delivering on their contracts.

Purdy was not copied on Choi's email, so Desai forwarded this suggestion to "backfill" to Purdy to ask for his guidance. *Id.* One week later, Purdy emailed Desai about whether they should "jump on the phone here today?" *Id.* Desai responded they would be "okay" by "showing" devices assets that were "uninstalled/repair" as having run the advertising campaign in question. While there was some dispute at trial about whether and when a phone call occurred between those two emails, the mere fact that Desai approached Purdy with the shocking suggestion to "backfill" demonstrated that Purdy was an integral part of scheme to inflate, under-deliver and conceal.

The stubborn fact remains: Purdy was told about a plan to fabricate delivery data for Deloitte, and he nevertheless told Deloitte a few weeks later that he had no knowledge of fraud at Outcome and that its financial statements were accurate. GX533, 561.

Concurrent with Purdy's lies to Deloitte were more lies to Outcome's lenders at JPMorgan and other investment banks—all part of an effort to raise $110 million in April 2016. Purdy quarterbacked the fraudulent loan. *See* GX526, 527, 534, 535. He signed a representation letter stating that all the materials provided to the banks, to include the inflated financial statements, were true and accurate, GX551, a transmission charged as Count Seven of the indictment. He sent the fraudulently obtained audit opinion and financial statements to JPMorgan, GX560, which was charged as Count Eight of the Indictment. And he executed the lending agreement itself, GX573 at 120, the funding of which was charged as Count Nine.

### D. Purdy Ignored Whistleblowers and Advice of In-House Counsel

Even as Outcome started to professionalize and bring in outside executives, multiple analysts reminded Purdy that fraud and dishonesty were still at the heart of the company's business model. Starting in March 2016, the analysts began to leave, and, during their exit interviews, aired their concerns

about the company's dishonest business practices with the company's in-house counsel, Collin Williams. These concerns, memorialized in questionnaire responses, alarmed Williams, who forwarded them to Purdy. Tr. 6367-80.

In one questionnaire, the analyst wrote that her replacement should be "[s]omeone for whom integrity is not a #1 concern; they should be willing to operate in ethical shades of gray." GX580. The analyst also recommended the creation of a "corporate compliance team" and "an internal audit team." *Id.* Another analyst in his questionnaire complained of finding himself in "situations that lacked ethics." GX586. He explained further, "I also determined that I cannot continue to put confidence behind work that isn't transparent and that makes me feel ethically compromised." *Id.* Still another analyst explained that her reason for leaving was due to "[e]thical issues with how sponsorship 1) reports ROI 2) fulfills contracts 3) uses the analytics team to cover up these issues." GX592. Williams raised the analysts' complaints with Purdy, who dismissed the analysts as immature and lacking understanding of Outcome's "business model." Tr. at 3680. Suspecting that improprieties were afoot, Williams started looking for a new job. *Id.*

At the same time, Williams recommended that Outcome hire outside counsel to conduct an internal investigation into the company's sales practices and implement a compliance program. GX668; Tr. at 6390. Indeed, in

10

November 2016, Williams told Purdy that Outcome needed a "compliance/risk management professional whose sole focus is to maintain the integrity of the business on all levels so we can be 100% buttoned up on all issues well in advance of a liquidity event." GX668. But Purdy did no such thing and moved ahead with raising over $800 million. The jury appropriately convicted Purdy of Count 13, related to the $375 million loan; and Counts 22, 24, and 26, all related to the $487.5 million capital raise.

### E. Purdy Concealed Make Goods and Delivery Shortfalls and Presented Inflated Financials When Raising Capital from Investors

Purdy not only ignored and concealed evidence of Desai's misdeeds, he affirmatively lied to investors about Outcome's track record with clients.

Shortly before the company started raising money from investors, Purdy was once again reminded how the company had always delivered its proofs of performance: by inserting the *contractual* number of devices rather than the number of devices that were actually live and active. In November 2016, a client found out that affidavits for the Rexulti campaign had been false, and Outcome had to deliver a make good. DX4258. And then, in the "Christmas Vox," sent on December 26, 2016, Desai reminded Purdy and Shah of this practice and the problem with correcting it, thereby "call[ing] attention to massive inventory gaps in their contracts [that] would then open up a whole

11

and historical legacy of potential issues that we'd have to address." GX704. At the same time, Outcome was giving massive make goods due to ROI misses, and, in Shah's contemporaneous account, Purdy had "grave concerns . . . about . . . our lack of ability to fulfill the current standing of 2017 contracts." GX701.

When presenting to investors over the following months, however, Purdy mentioned nothing about make goods or historical or current inventory shortfalls. Instead, Purdy and his co-defendants presented an image of unbounded growth, unbreakable client relationships, and never-missed ROI guarantees. GX729; Tr. 8618-24; 8635-36. And they continued to bill clients in full and present false affidavits. These were all lies.

### F.  Purdy Continued to Conceal Even as Clients Learned of More Shortfalls

Purdy's instincts to lie and conceal were on full display even after clients began learning of the magnitude of the campaign shortfalls. Purdy personally negotiated and approved the cash refund to Pfizer in the summer of 2017, while playing off the shortfalls as an unfortunate mistake rather than a longstanding practice of cheating their clients, GX 988, Tr. 6077-88. Yet Desai had reminded Purdy of the persistent rheumatology shortfalls a few months earlier, GX704, and Purdy had been personally involved in overselling and under-delivering rheumatology campaigns as far back as 2013, GX330, 337, 1928.

Even at the end, Purdy did not relent in his long-standing support for and participation in the fraudulent scheme that had fueled Outcome's growth. Purdy believed that if they could bury the past for a little longer, then his equity stake in a multi-billion-dollar company would make him wildly rich. GX 1946, 1946a.

## II.     The Probation Officer's Sentencing Guidelines Calculation

The Probation Officer concluded that the defendant's offense level was 35 and that his criminal history category was I.  This is based on a base offense level of 7, an increase of 28 levels for the amount of loss, and an increase in 2 levels for 10 or more victims.

The government agrees with the Probation Officer's calculations, except that the government believes that the sophisticated means enhancement should apply.

### A.     Sophisticated Means Enhancement

The government objects to the probation officer's decision to forego the sophisticated means enhancement. The defendants' scheme did involve the use of sophisticated means that Purdy intentionally engaged in and caused.

"The purpose of the enhancement is to deter 'elaborate efforts to avoid detection.'" *Sykes*, 774 F.3d at 1153 (*citing United States v. Landwer*, 640 F.3d 769, 772 (7th Cir. 2011)). Offense conduct is sophisticated if it displays "a

13

greater level of planning or concealment than a typical fraud of its kind." *United States v. Wayland*, 549 F.3d 526, 528 (7th Cir. 2009). For the enhancement to apply, the conduct must be "notably more intricate than that of the garden-variety offense." *United States v. Sheneman*, 682 F.3d 623, 632 (7th Cir. 2012) (*quoting United States v. Knox*, 624 F.3d 865, 871 (7th Cir. 2010)); *see also*, *United States v. Harris*, 791 F.3d 772, 781 (7th Cir. 2015) ("[T]he level of planning or concealment in relation to a typical fraud of its kind is determinative.").

The scheme itself involved sophisticated means for the reasons described in the sentencing memoranda for Shah and Agarwal. The record is clear that Purdy himself engaged in and caused some of those sophisticated means. For example, as described above on page 5, Purdy was involved in an extensive amount of discussion with Desai and Shah about how to lie to and conceal the fraud from Novo Nordisk in October 2013. In another example, Purdy was involved in fashioning a process for cherry-picking tablet metrics as described above on page 5. For these reasons and others, Purdy was engaged in and caused at least some of the sophisticated means used to perpetrate the fraud scheme for which he was found guilty.

### B.     The Government's Guidelines Calculation

The government's Guidelines calculations are set forth below.

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | +7 |
| Loss more than $250 million (§ 2B1.1(b)(1)(O)) | +28 |
| More than 10 victims (§ 2B1.1(b)(2)(A)(i)) | +2 |
| Sophisticated means (§ 2B1.1(b)(10)(C)) | +2 |
| | |
| Zero Point Offender | -2 |
| | |
| **TOTAL** | **37** |

With an offense level of 37 and a criminal history category of I, the Guidelines range is 210 to 262 months' imprisonment.

## III.    The Factors Set Forth in 18 U.S.C. § 3553(a)

### A.     Seriousness of the Offense and Nature and Circumstances of the Offense

As described in the memorandums for Shah's and Agarwal's sentencings, this corporate fraud scheme—in which Purdy was a core participant throughout—is extraordinary for its duration, pervasiveness and scope of harm. Purdy knowingly and intentionally carried out Shah's plan to accelerate the growth of Outcome with fraudulent sales, and then cash out on the back of Outcome's astonishing growth.

Purdy stood to gain much less than Shah and Agarwal—and ultimately did gain much, much less—but the potential financial and professional upside

for Purdy was still immense. And Purdy's support was instrumental—and necessary—for the completion of the phase of the scheme that caused the greatest pecuniary harm: the fraud on Outcome's lenders and investors.

Purdy was intently loyal both to Rishi Shah and to his fraud scheme. It is worth recognizing that Purdy was a close friend to Shah, Tr. 3407:11-24, undoubtedly a motivating factor for Purdy's misconduct. Not only did Purdy have a small slice of ownership in Outcome, GX1941, 1064, as a member of Shah's inner-circle—and Outcome's COO and CFO—there was huge upside for Purdy if the scheme succeeded and Shah realized his ultimate dream of taking Outcome public in an IPO.

### B.    History and Characteristics

Like most of the young people drawn into Shah's scheme, Purdy was a well-educated, smart and very capable young professional. He stayed at Outcome and committed fraud by choice, loyal to Shah's dream of riding Outcome's rocket ship growth into the stratosphere of wealth and prestige. And he gamely abandoned his integrity away to make it there. Purdy was no passive member of Shah's massive fraud scheme. He willingly lied again and again to pull it off.

Purdy repeatedly lied to Deloitte. The auditors conducted a management inquiry of Purdy in March 2016. GX533. Purdy assured Deloitte that he was

16

not aware of any fraud at the company and that anyone acting unethically would be fired immediately. And Purdy signed his name to a management representation letter signing off on the company's financials and making multiple false denials of fraud.

Worse still, Purdy did the same in October 2016 (management inquiry meeting—GX652) and March 2017 (management representation letter—GX910), during and after a deluge of allegations from concerned employees, e.g., GX580, 592, 667, 1911, 857, 862, and brainstorming by Desai and Shah in late December 2016 about how to cover up Outcome's history of issuing false affidavits and its "massive inventory gaps." GX701, 704, GX707.

Then, in late 2016 and early 2017, just as he was voicing major concerns to Shah about the revenue fallout from Outcome's massive inventory gaps, GX736, Purdy was leading the effort to raise hundreds of millions of dollars from private investors. Tr. 8628:7-8629:10; 8630:4-8631:12. Purdy crafted investor slides that concealed Outcome's failures to meet ROI guarantees to customers (compare GX535, p.16 to 729, p.24), and he was in meetings where he or Shah or both convinced investor Leerink that Outcome had never missed an ROI guarantee. Tr. 7916-17.

Purdy sent tablet metrics that Ma specifically told Purdy were "not real" and "inflated" to an industry contact to tout the attractiveness of Outcome tablets to hospital systems. DX3456; GX465 & 1908.

- **Brad Purdy**, `2015-05-04 19:41:58`

  hey - do you have any of the SS materials re tablet engagement stats?
- **David Ma**, `2015-05-04 19:42:10`

  I have them all
- **David Ma**, `2015-05-04 19:42:12`

  but...
- **David Ma**, `2015-05-04 19:42:18`

  they&#39;re not real...
- **Brad Purdy**, `2015-05-04 19:42:47`

  ok - can you send what you have?
- **Brad Purdy**, `2015-05-04 19:42:56`

  i need to pull something together for one of these system calls

Purdy had zero qualms with presenting fabricated tablet metrics to hospital systems. The success of the scheme required it. Otherwise, the messaging would be inconsistent with what Outcome had told its clients about the tablets.



And the evidence was clear as to what Purdy did. Comparing the slides that Ma sent to Purdy shows that the slides Purdy sent to his contact outside the company used nearly identical tablet engagement metrics.

### C.    The Need for Deterrence

The government will not repeat all of the points advanced in its sentencing submissions for Shah and Agarwal, but the circumstances here are the same. Corporate fraud is often committed by educated and affluent defendants. None of the participants in this scheme acted out of need or

passion, so the conduct can be deterred with punishment that includes meaningful terms of incarceration.

A sentence of 10 years' incarceration for Purdy is an appropriate measure of punishment for Purdy's serious crimes. It would deter other executives from engaging in similar conduct, and it would protect the rule of law. C-suite executives of substantial companies like Outcome are entrusted with power that has the capacity to positively or negatively impact society. The public depends on the criminal justice system to hold those executives accountable for criminal corporate fraud. For Purdy, a sentence of less than 10 years raises a significant risk of undermining respect for the rule of law by signaling a lack of serious interest in holding corporate executives accountable for their crimes.

### D.  Purdy's Conduct Relative to the Conduct of Agarwal

The government also considered the need to avoid unwarranted sentencing disparities. In doing so, the government considered the relative culpability of Purdy and Agarwal, and whether they deserved different sentences. In doing so, the government determined that Purdy and Agarwal were equally culpable for their actions, but in different ways.

Agarwal was extensively involved in the pharma customer fraud during 2012 and 2013, and so was an early initiator of the scheme. She also stood to

benefit much more than any other co-schemer besides Shah, and she ultimately did benefit by receiving millions of dollars in fraudulent proceeds.

Purdy was also involved in the pharma customer fraud, but less so than Agarwal. He occasionally assisted Desai and Shah in deceiving customers, and he supported the use of fraudulent tablet metrics in presentations to customers. Nonetheless, Purdy was less involved in day-to-day sales decisions like Agarwal was in 2012 and 2013. Moreover, Purdy benefited much less than Agarwal from the fraud.

Despite his small equity stake in Outcome, Purdy engaged full force in the effort to defraud Outcome's lenders and investors. He helped defraud Deloitte and he lied to and misled Outcome's investors. While young and early in his career, Purdy was highly intelligent and understood the ramifications of lying to banks and investment firms to trick them into supplying capital. Yet he did so anyway. In this way, Purdy was front-and-center in causing the vast majority of the loss and harm associated with the fraud scheme. Because of this direct connection to causing the huge amount loss to investors and lenders, and because Purdy knew about and encouraged the pharma fraud, he is equally culpable when compared to Agarwal. And, for that reason, the government did not see a justification for recommending different sentences for Agarwal and Purdy.

21

## IV.    Restitution

Restitution is mandatory in this case pursuant to 18 U.S.C. § 3663A, at a total amount of $455,258,505.64. Restitution should be ordered in the amounts and to the entities set forth in the Second Supplement to the Government's Version of the Offense and its accompanying exhibits.

## <u>CONCLUSION</u>

Purdy teamed up with Shah, Agarwal and Desai to commit serious crimes for which he deserves to be punished through a meaningful and appropriate term of imprisonment. As is the case with Shah and Agarwal, Purdy's sentence should vary below the Guidelines sentence, but it should be sufficient to account for the seriousness of Purdy's misconduct—especially as it relates to raising money for Outcome—as well as Purdy's personal circumstances leading to his misconduct and the need for adequate general deterrence and support for the rule of law. Here, 10 years' imprisonment is sufficient but not greater than necessary to satisfy the factors under 18 U.S.C. § 3553(a).

Respectfully submitted,


MORRIS PASQUAL
Acting United States Attorney

By:    _s/ Jason Yonan_
         Jason Yonan
         William Hogan
         Corey B. Rubenstein
         Assistant United States Attorneys
         219 S. Dearborn Street
         Chicago, Illinois 60604
         (312) 886-2050

         GLENN S. LEON
         Chief, Fraud Section
         Criminal Division
         U.S. Department of Justice


By:    _s/ Kyle C. Hankey_
         Kyle C. Hankey
         Assistant Chief
         1400 New York Ave NW
         Washington, D.C. 20530
         (202) 616-2639