**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19 CR 864 |
| | ) | Judge Thomas M. Durkin |
| RISHI SHAH, *et. al.*, | ) | |
| (SHRADHA AGARWAL) | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT AGARWAL'S SENTENCING MEMORANDUM

Defendant, **SHRADHA AGARWAL**, by and through her attorneys, **BLEGEN & ASSOCIATES, WILLKIE FARR & GALLAGHER, THE LAW OFFICE OF JOHN D. CLINE**, and **LARSON LLP**, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, and 18 U.S.C. § 3553(a), as well as the Sixth Amendment to the Constitution of the United States and the Supreme Court's opinion in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005), respectfully submits the following sentencing memorandum.

**TABLE OF CONTENTS**

I.    INTRODUCTORY COMMENTS ...................................................................... 1

II.   COMMENTS ON SHRADHA'S CONVICTION ................................................. 5

III.  SHRADHA'S HISTORY AND CHARACTERISTICS ARE EXEMPLARY AND
      WARRANT A SIGNIFICANTLY BELOW GUIDELINE SENTENCE ............................. 7

  A.  Shradha's Childhood and Education Set her on a Path of Selflessness .............................. 7

      1.   Core Values: Education ........................................................................... 8

      2.   Core Values: Service .............................................................................. 9

      3.   Core Values: Spirituality ...................................................................... 10

  B.  United World College and Northwestern University ................................................... 11

  C.  Shradha Practices Kindness and Compassion in her Everyday Life ................................ 14

  D.  Shradha's Lifelong Commitment to Serving the Community ........................................ 16

      1.   Dedication to Providing Education Opportunities ........................................ 16

      2.   Uplifting Women and Minorities ........................................................... 18

      3.   Shradha's Commitment to Service Has Continued ....................................... 19

IV.  SHRADHA TRIED TO ENACT HER BELIEFS AT OUTCOME HEALTH ................. 21

  A.  Shradha's Focus was on the Company's Social Mission .............................................. 21

  B.  Shradha Prioritized Outcome's Employees' Growth and Wellbeing ............................... 23

  C.  Instilling the Spirit of Giving at Outcome ............................................................. 27

  D.  Shradha's Work at Outcome was not Motivated by Wealth ......................................... 28

  E.  Shradha was Sidelined as the Company Grew ........................................................ 30

V.   UNWARRANTED ADDITIONAL PUNISHMENTS ALSO SUPPORT A
      SIGNIFICANTLY BELOW GUIDELINE SENTENCE .................................................. 35

  A.  A Lengthy Sentence Will Preclude Shradha and her Husband from Having Children ..... 36

  B.  Deportation from the U.S. is a Significant and Permanent Additional Punishment ......... 38

  C.  Shradha's Non-Citizen Status will Disqualify her from a Minimum-Security Camp and
      Assign her to a Low-Security Prison .................................................................. 42

  D.  Shradha is Ineligible for Reductions Via the First Step Act ........................................ 46

  E.  Shradha Will be Held in an ICE Facility When Her Sentence is Complete ..................... 47

  F.  Shradha's Beloved Ailing Mother's Health is Deteriorating ....................................... 48

VI.  SHRADHA HAS LEARNED HARD LESSONS AND PRESENTS NO RISK OF
      RECIDIVISM .......................................................................................... 50

VII.  THE NEED FOR GENERAL DETERRENCE ................................................. 53

VIII.  CONCLUSION ......................................................................................... 54

i

**U.S. Supreme Court Cases**

*Pepper v. United States*, 113 S.Ct. 1229, 1240 (2011) ................................................................. 7

*Rita v. United States,* 551 U.S. 338, 351, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007) .................... 4

*United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005) ......................................................... 1

**Federal District Court Cases**

*U.S. v. Cohen*, No. 19-cr-741 (S.D.N.Y. 2020), Dkt. 48, at pg. 42 ............................................... 45

*U.S. v. Lewis*, No. 23-cr-370 (S.D.N.Y. 2024), Dkt. 66, 67, 69 ................................................... 45

*U.S. v. Walchli*, No. 20-cr-000497 (S.D.N.Y. 2024), Dkt. 110, 111 ........................................... 45

*United States v. Adelson*, 441 F.Supp.2d 506, 513-514 (S.D.N.Y. 2006, Rakoff, J.) ............... 3, 5

*United States v. Bakeas*, 987 F.Supp. 44, 49 (D. Mass. 1997) ..................................................... 44

*United States v. Connolly,* No. 16-cr-370 (S.D.N.Y. 2019), Dkt. 451, at pg. 91 .................... 45, 49

*United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) .................................. 4

*United States v. Faibish*, 12-cr-265, 2015 WL 4637013, at 2 (E.D.N.Y. Aug. 3, 2015) ............... 4

**Federal Circuit Court Cases**

*United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) .......................................................... 5

*United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) ........................................................... 5

*United States v. Farouil*, 124 F.3d 848, 847 (7th Cir. 1997) ........................................................ 44

*United States v. Guzman*, 236 F.3d 830, 834 (7th Cir. 2001) ....................................................... 44

*United States v. Jackson*, 547 F.3d 786, 792 (7th Cir. 2008) ...................................................... 36

*United States v. Leung*, 40 F.3d 577, 586 (2nd Cir. 1994) ............................................................. 4

*United States v. Moose*, 893 F.3d 951, 959 (7th Cir. 2018) ........................................................... 5

*United States v. Ramirez-Fuentes*, 703 F.3d 1038, 1047 (7th Cir. 2013) ..................................... 39

*United States v. Reed*, 859 F.3d 468, 473 (7th Cir. 2017). ............................................... 36

*United States v. Solomon*, 892 F.3d 273, 278 (7th Cir. 2018) ......................................... 35

*United States v. Stewart*, 590 F.3d 93, 141 (2nd Cir. 2009) ..................................... 35, 53

*United States v. Thavaraja*, 740 F.3d 253, 262-263 (2nd Cir. 2015)............................. 48

*United States v. Wachowiak*, 496 F.3d 744, 748 (7th Cir.2007)................................... 36

*United States v. Warner*, 792 F.3d 847, 857 (7th Cir. 2015) ......................................... 7

*United States v. Warner*, 792 F.3d 847, 860-62 (7th Cir. 2015)................................... 53

**Statutes**

18 U.S.C. § 3553(a)(2)(A) ................................................................................. 35

18 U.S.C. 3632(d)(4)(E)(i) ................................................................................ 47

8 U.S.C. § 1101 (a)(17)..................................................................................... 47

**United States Sentencing Guidelines**

U.S.S.G. § 2B1.1(b)(1) ..................................................................................... 5

## I.    INTRODUCTORY COMMENTS

The conviction of Shradha Agarwal stands out as an aberration for the person described by those who know her — a kind, honest, hardworking, and empathetic woman who has demonstrated a lifelong commitment to helping others. Since an early age and true even today, hers is a life led in service to those around her, whether working at orphanages, a refugee camp, or simply being a good neighbor. Shradha consistently prioritizes friends and family, but also extends the same kindness and empathy towards strangers, whether a homeless man on a cold Chicago day just before trial, or an usher she met at an event in 2015 – to whom Shradha selflessly offered the shoes off her feet.

As the many letters submitted on her behalf attest, Shradha has noticeably dedicated her life to one purpose - uplifting others. She has been thoughtful and generous with her time and efforts towards providing education opportunities to those less fortunate, mentoring young women in particular, and supporting underserved youth. Numerous letters also highlight Shradha's lack of financial motive in life, sharing examples of her modest lifestyle, the absence of luxury possessions, and her quiet demeanor. Those who have known her for a long time particularly emphasize how she remained the same person despite Outcome Health's ("Outcome") success. She has consistently been altruistic, acted with pure intentions, and strived to see the best in others. Counsel knew that Shradha had an impressive background but were frankly taken aback by the depth and breadth of her selflessness, humility, and hard work towards helping others reflected in the many character letters submitted in her support.

It was her passion for helping others that attracted Shradha to the social mission of Outcome Health. Seeing her family members suffer from diabetes complications motivated her work; she did not strive for financial success. She also worked to provide development opportunities for Outcome's employees. Shradha brought the same passion for community and

1

human connection to the company. In hindsight, Shradha's personality and focus might have been better suited for a nonprofit, as some letters note.

As the startup grew larger, Shradha actively became sidelined from growth strategy discussions and core decision-making like fundraising plans, as contemporaneous conversations show. Though she was a beneficiary of it, Shradha was not the one advancing or seeking fundraising. As many letter writers explain, Shradha never discussed money. She did not engage in extravagant spending before or after this case, has done her best to return the money she received, and after trial declined the return of improperly restrained funds so that they can be available for restitution.

The letters that have come to the Court from friends, family, former employees, investors, professors and community members are heartfelt attestations to Shradha's values and motivations written by those who love, support and believe in her. This support has buoyed Shradha at an immensely difficult time in her life, but it is the descriptions of Shradha's character and life-long conduct that is truly remarkable. Soft-spoken, humble, spiritual, respectful, considerate, gracious, are only some of the ways in which people describe Shradha. The letters also describe a young and talented woman intent on making a positive impact on the world around her yet entirely disinterested in wealth or its trappings.

Shradha's life and her actions before and after the trial do not fit the profile of a defendant seeking to enrich herself through fraud, or of a white-collar defendant who points to their charitable donations at the time of sentencing. Shradha did not engage in simple "checkbook charity." She has lived her entire life with a goal of helping others, sometimes in big ways, often in small ones, and typically when no one was watching. How then does the Court account for and sentence such an individual in a financial fraud case?

2

Though she is convicted of serious offenses, Counsel respectfully suggest that the answer here is that Shradha's case represents the rare circumstance where the good outweighs the bad. Shradha is inherently a good person. None of Shradha's many acts of kindness, described in detail in the letters, were done with an eye towards being judged someday. Nevertheless, sentencing is the day when they should be taken into account.

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F.Supp.2d 506, 513-514 (S.D.N.Y. 2006, Rakoff, J.)

Judge Rakoff's words are particularly apropos for Shradha. Her very future does indeed hang in the balance and not only in the usual way of what her sentence will be. Shradha and her husband Jayant share a dream of having children, but with pure motives they intentionally held off until her legal issues were resolved. At thirty-eight years old, the sentence here will likely determine whether Shradha and Jayant's dream will be dashed permanently.

After waiting 15 years to become eligible to apply, Shradha also put her efforts toward becoming an American citizen on hold until her legal issues were resolved. Now, as a result, Shradha will lose the only place she has called home all her adult life (as a lawful permanent resident). She will be deported to India, and her husband will go where she goes. Having not lived in India since they were children, they face the frightening task of building a life thousands of miles away from their home and far away from the relationships they have built over twenty years. This is a considerable punishment in and of itself.

In a final cruel twist based solely on her status as a non-citizen, a custodial sentence for Shradha will be unnecessarily harsh and will punish her more than any other defendant in this case, and more than a similarly situated U.S. citizen. First, she will be unable to serve any portion of a custodial sentence in a prison camp and will in the best-case scenario be designated to a low-security Federal Correctional Institution. The environment in a low-security FCI is considerably more punitive, houses a different profile of inmates, is far more restrictive rules for movement and visitation, and is likely to be located far away from Shradha's family and friends. Second, despite the positive impact that the First Step Act has had on inmates and their families, and on reducing recidivism, Shradha would either receive no benefit from it or only a fraction of its intended prison-time reductions. As a result, the actual time she serves in prison would be significantly longer than a U.S. citizen. Third, even for an uncontested deportation, after her sentence Shradha will be held in an ICE facility for processing, possibly for months, not only lengthening her sentence but subjecting her to another potentially dangerous confinement. [1]

In light of these unwarranted additional punishments, counsel have reminded themselves that a guideline sentence is not to be presumed as a reasonable sentence at this stage. *Rita v. United States,* 551 U.S. 338, 351, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007). As some courts have emphasized, the unreasonableness of the Guidelines is particularly evident when addressing 2B1.1's loss enhancements, which drive the offense level here but are "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004); see also, *United States v. Faibish*, 12-cr-265, 2015 WL 4637013, at 2 (E.D.N.Y. Aug. 3, 2015) ("The loss table is but one example of the seemingly

---

[1] "A defendant's race or nationality may play no adverse role in the administration of justice, including at sentencing." *United States v. Leung*, 40 F.3d 577, 586 (2d Cir. 1994). Nevertheless, immutable BOP policy and the realities of ICE detention will impose an unnecessarily harsh punishment on Shradha for that very reason.

mindless acceleration of penalties for economic crimes incorporated into the current Sentencing Guidelines regime."); *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (describing the "inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss"). Indeed, as one judge from the Second Circuit has concluded, the Guidelines loss table (U.S.S.G. § 2B1.1(b)(1)) is "fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges." *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J. concurring). This Court is, of course, "as free to disagree with the policy behind the loss amount enhancement as [it is] with any other guideline." *United States v. Moose*, 893 F.3d 951, 959 (7th Cir. 2018), *citing, United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010).

The guidelines are therefore not the presumptive sentence against which the ultimate sentence is to be measured, and the issue is not whether a sentence far below the guidelines is "too low," "too far of a drop," or "too much to ask." The question is whether Shradha's case under all of the 3553(a) factors "warrants a different sentence regardless" of the sentencing guidelines. *Rita,* 551 U.S. at 351. Shradha has no criminal history and poses little to no risk of reoffending. Due to circumstances entirely unrelated to the offense, and entirely disconnected from the purposes of sentencing, a custodial sentence will punish Shradha far more severely than is warranted.

## II. COMMENTS ON SHRADHA'S CONVICTION

Shradha has, throughout this entire case, remained remarkably respectful toward the justice system. There was no mumbling under her breath about witness testimony; no indignant responses to prosecution arguments; and, while she was disappointed in the verdict, she has never expressed anger or resentment about it or towards any witness or lawyer or the jury's decision. Instead, as she did throughout the entire process, Shradha has looked inward to lessons she has and continues to learn, including about business matters, attention to detail, and the requirement of being

5

scrupulously careful, particularly when people's money is at stake. She realizes that her limited involvement in the fundraising process is not an excuse. Among her biggest regrets is that she did not consider the management representation letters more carefully. She was among the people required to sign the MRLs, and the obligation to make sure her verifications were accurate fell solely to her.

Shradha is immensely remorseful and intends to express her remorse directly to the Court at sentencing. She is sorry for any losses suffered by the victims: the customers of Outcome and the lenders and investors. Many of the individual investors were Shradha's friends and some have written letters indicating that they support Shradha and believe in her inherent goodness despite the conviction. Shradha is thankful for their support and is committed to taking steps to make funds available for restitution. This is no hollow promise: she did not oppose forfeiture (the value of which far exceeds the dividends she personally received), and Shradha's response to the issue of whether she wanted her share of the improperly restrained funds demonstrates her sincerity – without hesitation she agreed that the government should keep (for restitution) whatever funds would otherwise have been returned to her.

Shradha is also terribly sorry for any damage caused to the reputation of Outcome's former employees. She considered them her family and tried as best she could to create a close-knit and encouraging work environment where employees grew and prospered. She is distressed by the thought that employment at Outcome may be considered as a "black mark" on anyone's career. Since the trial's completion, she has been able to reconnect with many of her former co-workers and express her deep regret. She is grateful for continuity of employment that the merger of Outcome with PatientPoint has provided to many former employees. She is heartened to hear from employees, some of whom have written letters for her, who still view their time at the company in

a positive light, and she takes solace in the friendships those employees have maintained. As David Epstein, employee at Outcome for seven years, writes: "While challenging, my time at Outcome Health was the best career decision I have made to date. I was able to network with peers well above my pay grade at the time, a few remain my closest mentors and the others lifelong friends. The people made the experience at Outcome Health, and our people experience would not have been possible without Shradha." (Exhibit D-1).

### III. SHRADHA'S HISTORY AND CHARACTERISTICS ARE EXEMPLARY AND WARRANT A SIGNIFICANTLY BELOW GUIDELINE SENTENCE

As is reflected in the many letters received on Shradha's behalf, as well as the PSR and a mitigation report prepared by former probation officer Kelly Rice, Shradha has lived a truly exceptional life geared toward helping and uplifting others.[2] Shradha's character is by all accounts extraordinary; and, as the Supreme Court has instructed, "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 113 S.Ct. 1229, 1240 (2011). The Seventh Circuit has also made clear that a defendant's good works can justify a below guideline sentence. *United States v. Warner*, 792 F.3d 847, 857 (7th Cir. 2015).

### A. Shradha's Childhood and Education Set her on a Path of Selflessness

Shradha was born in India in 1985. Her father worked as an accountant and a part-time clinical professor at his alma mater. Her mother had a degree in education but served as a homemaker. The Agarwal family struggled financially at first, but as her father advanced in his career as an accountant, became more comfortable. (Exhibit G). Shradha, surrounded by the poverty of a still-developing India, displayed a kind nature at a very young age. Her aunts, Garima

---

[2] The letters submitted on behalf of Shradha are attached hereto as grouped exhibits A – F with a separate number for each writer's letter. For example, the first letter is A-1. Ms. Rice's report is attached as Exhibit G. Several of the letters along with Ms. Rice's report were part of the defense Version of the Offense and are part of the PSR packet. We have included them here as well for the Court's convenience.

Gupta and Manisha Arora, recall how she "lost" her shoes during a trip by train to visit her grandfather (Exhibit A-5):

> We remember once when as a 5 or 6-year-old child she was travelling with us on a train to our father's home in Punjab. We suddenly noticed that Shradha had no shoes on. When we asked her where her shoes went, she replied that she had noticed a little girl with no shoes on, sitting on the railway platform, and that she had given her shoes to that girl because she still had socks to protect her own feet. Our eyes welled up with tears and we knew then that we have a sensitive child who would go on to do good in the world. And she did!

### 1. Core Values: Education

Shradha dedicated her efforts in school and later in college to being the kind of person to make a difference. An avid reader, she started taking her books to school for her classmates to borrow to broaden their own learning (which she eventually donated to a school for underprivileged youth). She had been taught by her family that education is a privilege and an opportunity to build a life of purpose and meaning. Having been displaced from their homes and losing everything in the partition of 1947, her grandparents rebuilt their lives in India relying on education. Her grandparents encouraged their four daughters, including Shradha's mother, to pursue higher education and become self-reliant. It was not socially common for girls to do so in India in the '70s – or to pursue a career. Shradha's mother got a Master's degree in the hopes of becoming a teacher. After marriage, her in-laws did not permit her to work, but she dedicated herself to raising her two children, Shradha and her younger brother Kabir, with a different dream for their future. (Exhibit A-2).

One such dream was the quintessential "American Dream" – Shradha's parents wanted to send their daughter to a culture where hard work determined success rather than socioeconomic background, gender identity, or a family's last name. Shradha's parents saved for years to send their children to the United States. As Kabir described in his interview with mitigation expert Kelly Rice and also in his letter (Exhibit A-8):

My sister and I grew up in a modest, simple and sheltered environment in Calcutta, India. Our parents worked extremely hard to provide for us. They taught us the importance of it too. I remember our parents opting to buy used furniture from an estate sale to furnish our apartment, so that they could save up to bring us to visit the USA, at a young impressionable age. It was apparent that they wanted to familiarize us with the land of opportunity where they believed that hard work and perseverance makes a difference.

## 2. Core Values: Service

As a middle and junior-high student at an all-girls school in Calcutta, India, Shradha was a Girl Scout, a member of Interact (the youth chapter of Rotary International), and on Saturday mornings volunteered at a free community clinic in Calcutta's poorer neighborhoods. On Thursday afternoons, she volunteered at the Little Sisters of The Poor Old Age Home, where she read to and helped provide care for elderly residents. (Exhibit A-10). Shradha organized camps to ensure that homeless individuals would receive clean drinking water during hot summer months and helping priests visit religious shrines, who could not otherwise afford to go. (Exhibit A-5). Her mother made it a point to teach her these values of giving back to those less fortunate: "when God gives you more, you up your giving, not your living." (Exhibit A-2).

Every year on each of her children's birthdays, Shradha's mother would take her kids to an orphanage, Mother Theresa's Shishu Bhavan, to distribute food and clothes and to provide love and care to the children who lived there. Shradha continues to practice this annual birthday tradition whether it be in the form of donating blood, donating her hair to make wigs for children with cancer, or helping underprivileged kids through various organizations. One year, Dr. Deepa Arla, a friend, accompanied Shradha to an orphanage in Chicago (Exhibit B-6):

I know her phone was probably full of missed calls and messages, but she was fully present every minute of our time at the orphanage. The most important thing to her at that time, was to make these children feel like someone does care about them and to put smiles on their face with treats and kindness. I remember thinking how she

9



*PHOTO: Shradha at Chicago orphanage*

really doesn't do it for her happiness, but for the happiness of these children. That was her gift and the only gift she needed that day and every year on her birthday.

### 3.      Core Values: Spirituality

Service above self had been ingrained in Shradha since she was a young girl. Having spent many of her childhood summers with her grandparents in Delhi, Shradha learned from them the true purpose of life or "dharma." As a long-standing friend, Dr. Nimarta Singh, refers to it in her letter – "dharma" means to give back and show kindness, generosity, humility and selflessness. (Exhibit B-2). In Indian culture, it is also believed that "karma" "is the fundamental causal law by which good or bad acts decide the future modes of an individual life. It applies to all deeds and their consequences and is used to advance the soul and cause enlightenment. (Exhibit G). Kabir explained to Kelly Rice in an interview how "karma" impacted Shradha in her everyday life:

> Shradha's brother explained that they grew up with spiritual teachings including the meaning of Karma and sin. Mr. Agarwal related they were taught that if someone is doing something wrong you give them the benefit of the doubt, that maybe there is a reason, and you should offer assistance not condemnation. He believes this spiritual belief led his sister to be gullible and allowed people to take advantage of her. He explained a person that believes as she does could never intentionally harm anyone – financially, emotionally or physically.

*Id*.

As Kabir wrote in his letter, "[m]y sister has always lent a helping hand to anyone who comes her way, not just friends and family, but her peers and strangers too… Her motive in life has been to push people upwards." (Exhibit A-8). Shradha's upbringing, education, and her belief in the principles of karma and dharma have guided her and have imbued in her a strong purpose

10

for her life – to help others. She was raised to be God-fearing and God-loving, which is reflected in her day-to-day life. (Exhibit A-4).

## B. United World College and Northwestern University

At the age of sixteen, as Shradha's mother describes in her letter, Shradha was presented with an opportunity to be an Indian Ambassador at a pre-university residential program in Singapore, the United World College ("UWC"), a movement then co-helmed by Nelson Mandela. (Exhibit A-2). Shradha was given a merit scholarship after a rigorous three-day offsite interview and then joined other Ambassadors representing 96 different countries. Designed on the principles of the United Nations that seeks to "use education as a powerful force to unite people, nations and cultures for peace and a sustainable future," this experience further solidified Shradha's commitment to non-judgement, tolerance, communication, and service. Shradha took her education and responsibilities away from home seriously. As her high school friend Poorti Chopra-Patel relates (Exhibit B-5), Shradha served as the "responsible one" among her friends.

> We shared all our high school highs and lows together through which Shradha was always the voice of reason. She was the only one amongst us away from home in boarding school and she was considered the responsible one so much so that our conservative Indian parents only allowed us on our solo girls' trip to Sarawak, Malaysia for service and learning because they knew Shradha would be able to manage the trip itinerary and all other responsibilities in great manner.
>
> In the entire time I have known Shradha, even in High School, the years that every teen wants to break some rules, or boundaries, Shradha has not once done anything outside the set limits of her parent's upbringing or her moral principles. She was even particular about getting back before her Boarding house curfew. She consistently displayed remarkable discipline.

Ms. Chopra-Patel also shares that Shradha maintained her commitment to helping others even during her intense studies at the UWC, relaying that Shradha "was heavily involved in social service activities… that supported the welfare of underprivileged human beings be it kids or women." *Id*. Shradha's report card from UWC (Exhibit H) highlights her "extremely positive"

nature, participation as a "very positive member of Bombay Street Kids Global Concerns group," performing "social service activity at the Woodbridge Teenage Unit," where she prepared and hosted activities on a weekly basis for mentally-ill and specially-abled children. In addition, she read books on tape for visually-impaired students at another local school. Shradha was an "attentive, cooperative and conscientiousness" student. *Id*.

After two years at the UWC in Singapore, Shradha arrived in the United States in 2004, seeking to earn a degree in Journalism at Northwestern University, and fulfilling her parents' lifelong aspiration. Shradha chose to study journalism at the encouragement of her high school English teacher who recognized a pattern and interest Shradha had in bringing information to people (Shradha had started a high school newspaper). Shradha did not live the life of a care-free college student away from home. As several friends describe in their letters, Shradha worked hard and participated in many social service projects while in college. Shradha's friend from Northwestern, Shreya Jani (Exhibit B-1), writes about Shradha's aspirations:

> Shradha has always had a vision that was larger than her own life. When we were 18, I distinctly remember one evening when we were discussing our life goals. I was shocked and amazed to find out that her dream even at that young age was not to become rich or famous, but it was to open a free school for underprivileged kids in rural areas. Shradha is guided by her sense of service to others which is probably why I have never seen her take shortcuts. She was majoring in Journalism and International Studies, and while most of her friends were busy partying or wasting time, she was driving to downtown Chicago at 4 AM every weekday to work for the early morning news at NBC before attending her classes! She was always finding ways to use the media as a platform for educating the masses. She reported for the Northwestern News Network on campus and was the Editor of a new magazine that focused on corporate social responsibility.

Shradha's volunteer work continued in college where she worked with Global Girls, a non-profit on the South Side of Chicago, which provides dancing and acting skills to young girls of color to help them develop self-confidence and a voice in their communities. Shradha spent time with its Executive Director developing programming for the girls, building a website, creating

community awareness to grow sign-ups and launching a supporter newsletter. Shradha not only spent her own time volunteering, she often encouraged her friends to join as well. Lai Xu, another close college friend, recalls this experience: "One of my fondest memories was when Shradha and I spent time volunteering at Global Girls". Ms. Xu observes that most friends would have an anecdote[3] of "an act of kindness from Shradha which then grew into lasting friendship." (Exhibit B-3). She shares her own sophomore year account of how she first met Shradha: while standing on the street with her hands full of conference materials, when Shradha noticed her, introduced herself, and offered help. *Id*.



*PHOTO: Don Baker with the team*

Shradha also volunteered at Youth & Opportunity United (Y.O.U.), an Evanston-based non-profit that seeks to close the opportunity gap by helping to prepare under-privileged children for post-secondary and life success. Donald Baker, the now retired founder and executive director of Y.O.U. said of Shradha (Exhibit E-4):

> From the beginning, Shradha impressed me as the strongest member of a very strong team. She did her homework, completed her assignments, and prepared helpful reports. She was both an articulate communicator and an attentive listener. She proved to be an effective leader when she needed to be, and she was a willing and helpful follower when other members of her team took the lead.
>
> I appreciated her sensitivity and kindness… That all is to say that I hope Shradha Agarwal's sentence allows her many good years to show that she is capable of being the kind, effective, and admirable leader we need more of in every sector of our society.

---

[3] Shradha has maintained close relationships with her friends from school and college years, treating them as family and thoughtfully supporting them in life's ups and downs throughout the years, examples of which are shared in dozens of letters.

### C. Shradha Practices Kindness and Compassion in her Everyday Life

In addition to her deep involvement in organized charitable work, what further stands out about Shradha is what letter writers describe as her "everyday kindness" – the compassion and generosity she exhibits when no one is looking. Jasmine Alkhatib describes Shradha as "full of beautiful ideas about how to make the world a better place and support the goodness inherent in human beings… Shradha's deeply-rooted moral principles and especially her commitment to supporting and bringing happiness to those around her have been clearly apparent to me." (Exhibit B-4). Sheila Premkumar, Shradha's mother-in-law, writes, "This is one of her most endearing qualities – that she always puts others before herself." (Exhibit A-4). Shradha's husband Jayant marvels (Exhibit A-1) at his wife's seeming endless well of kindness toward others, leading him to also open his heart.

> The giving doesn't stop with organized activities. I call it the "everyday giving" mindset. For example, she would stop and help a store clerk stretch because he mentioned he'd been standing on his feet all day. She will pick up cans on hiking trails. She will drop off flowers on the first day of school for our neighbor, who is a second-grade public school teacher. Winter 2021 in Texas brought unprecedented snow and power cuts. Our neighborhood was affected as well. Some of our neighbors suffered devastating floods from burst pipes and broken equipment. We too lost heat and power. But Shradha checked in on all of our neighbors, prepared food for one neighbor who hadn't stocked up, took blankets to another and used Google translator to check in on a Spanish speaking neighbor. She is kind and generous even when no one is watching, or even when nobody will praise her actions.

> She measures herself by how many lives she can touch. Just a few days before the trial began, she was walking out from a meeting with her lawyers. It was a cold January day and she made eye contact with a homeless person on the street. He thanked her for acknowledging him and shared that he had been hungry all day. Late on a Sunday night, not much is open in the Loop area so she walked several blocks with him to find an open food option. Finally, she brought him to a Walgreens to buy him a bag full of snacks and drinks. I share this to show you that even in the moments when she is scared and under a lot of stress, she does not fail to find ways to serve others and ease their pain.

Shradha extends compassion and care to anyone she meets, even without them asking for help. From taking the initiative to "pass around chilled drinks to [the homeless] on a hot Texas day," (Exhibit A-4), distributing bananas and water to construction workers in her neighborhood, to giving up her pre-ordered gluten-free meal on a flight to another elderly passenger with the same allergies who didn't order one (Exhibit C-13). Shradha has always been attuned to the needs of others. Similar accounts are shared in the stack of letters. Dr. Alap Jani, who lives in Austin, describes all the ways in which "Shradha took care of her neighbors" and emphasizes that "[t]hese were not things that would earn her effusive praise or garner attention, but they mattered to the people she has helped." (Exhibit B-8).

Harkening back to her childhood train trip during which she gave away her shoes, Shradha has carried her acute empathy for others into adulthood. At the end of a presentation for Chicago Ideas Week in 2015, an usher at the event, Ms. Dorothy Odom, complimented Shradha's boots as she walked off the stage. Without hesitation, Shradha offered her the pair of boots and removed one for Ms. Odom to try on. The size was a mismatch and while Ms. Odom thanked her and thought that was the end of the story, Shradha asked for the correct shoe size and an address to mail Ms. Odom a new pair of the same boots. Ms. Odom was pleasantly surprised (Exhibit F-1):

> She kept her word and I received the "boots" the very next day… now how's that for "integrity". She didn't have to do anything for me as I was a total stranger to her. To this very day I've learned a powerful lesson to never overlook the kindness of strangers and to be "grateful" in life for all things.

Dorothy's thank you card reads: "Dear Shradha, 'Thank you' for the lovely gift (shoes) these shoes will allow me to walk in 'your shoes' until I can stand up on my own two feet." *Id*. Shradha continued to correspond and provide written encouragement, and a month later, inspired by Shradha's Ideas Week presentation on the importance of education, Ms. Odom sent a follow-up letter:

Dear Shradha,

 just wanted to say "Hello" to you and Grace. Since I've been walking in your beautiful "Shoes" … my life has taken a turn for the better. Last week I strolled right up to Truman College and enrolled myself in school. In fact, some would say that I "sashayed" all the way to Room 2424. (the front desk) I'm going back to school to get my "<u>G.E.D.</u>" I dropped-out of school years ago. However, going back to school has always been a "dream" of mine. So, I'm determined to become what I was meant to be. That's right !! It's never too late to follow your dreams . . . . who knows where your beautiful "shoes" will lead me next? Maybe India, Spain or New York.

       Love, Dorothy

*Id*.

       Ms. Odom – now in her 70s – has since completed her diploma, traveled to Africa on a service trip, and supported her own daughters and granddaughters to pursue higher education, with one of them currently enrolled in a PhD program. Shradha's generosity and kindness is amplified in a pay-it-forward cycle by recipients like Ms. Odom, who in turn became vehicles of generosity and kindness. As Ms. Odom puts it, "Today I am helping others and inspire them to get an education (stay in school) with the encouragement from Shradha Agarwal." In these small but unseen acts of kindness, Shradha's true character is revealed.[4]

### D.  Shradha's Lifelong Commitment to Serving the Community

#### 1.  Dedication to Providing Education Opportunities

      Shradha's passion for supporting educational opportunities for others is extraordinary. Shradha visited classrooms, spent time with high school students, hosted teachers and principals for appreciation events, learned of the challenges in the education arena, and wholeheartedly donated her time, skills and space. Jessica Yagan (whose husband Sam Yagan invested money in the Outcome fundraising) met Shradha in 2014 "through our joint interest in social

---

[4] As one might expect, Shradha's kindness begins with family. Letters from her in-laws, aunts, cousin and others describe Shradha's compassion and warmth towards them.

entrepreneurship and venture philanthropy" and is a fellow board member at OneGoal. (Exhibit E-9). Through her 5-year tenure at OneGoal, Shradha devoted her time to provide 8,000 Chicago-based high school students with the opportunity to attend a 4-year university. (Exhibit E-2). She provided similar support to MoneyThink, Urban Alliance, Academy for Global Citizenship, Chicago Children's Choir (now Uniting Voices) and the Chicago Public Education Fund[5].

Chaula Gupta, a nonprofit leader, notes that in her experience, business leaders generally wait to buildup resources and then donate them. "But Shradha showed a keen interest in engaging in Chicago's social sector relatively early, both in terms of age and career." (Exhibit E-6). She adds Shradha was on-the-ground in understanding systemic challenges faced by educators and working with organizations on creating solutions. Several friends have written how Shradha persisted in her efforts to also positively influence them "to give back to our city" (Exhibit D-8). She would often "have deep conversations about the meaning of life and how our fundamental purpose as human beings is to serve others." (Exhibit E-1). Ms. Ellen-Blair Chube was introduced to Uniting Voices Chicago – a music education nonprofit – by Shradha and now serves as their Board Chair, writing, "it is now one of the most meaningful parts of my life. For that I am forever grateful for the example she set." (Exhibit C-8).

Shradha volunteered at Karma Kitchen, a community initiative to provide free meals, where she cooked, served, or cleaned. She was also involved in the World Economic Forum, where she sought to improve Chicago neighborhoods through collaboration with groups such as My Block, My Hood, My City. (Exhibit C-9). Shradha has always had a strong commitment to Chicago, which has been her home since she was a teenager. Evan Kirkpatrick recalls when

---

[5] Ms. Jagriti Ruparel, and several others, highlight that Shradha did not accept wedding gifts; instead, she requested "just blessings" (Exhibit F-2) and donations to these nonprofits from her friends and family – A Better Chicago, OneGoal, the Malala Fund and Nanhi Kali. Shradha and her husband raised $25,850 for A Better Chicago, which disperses grants to nonprofits serving at-risk youth.

Shradha walked him around Chicago's "various neighborhoods and buildings." He observes: "She genuinely seemed to care deeply about the city, people, and history and was never materialistic or interested in climbing social ladders or wealthy circles." (Exhibit C-6).

## 2. Uplifting Women and Minorities

Shradha also spent time with other impact-based organizations such as Founder Institute, StartUp Institute, BluePrint Health, Impact Engine, ARA, Women in Bio, MsTech, Chicago Innovation's Women Mentoring Co-Op, and coached students presenting innovation projects at the Chicago Student Invention Convention. Shradha recognized entrepreneurship empowerment as a path for historically-marginalized communities to create a better future for themselves. Sherman Wright observes Shradha "was unapologetic about championing diversity, equity, and inclusion in Chicago's business community." (Exhibit E-3). Jimmy Odom, an entrepreneur with limited access to capital or network, met Shradha at a startup competition where she offered her support for his entrepreneurial journey "without expecting anything in return." (Exhibit C-10). Rishi Roongta, a friend, former investor with the Pritzker group, and someone who also invested personally in Outcome, writes (Exhibit D-7):

> She is also so committed to advancing the health space that she invested her hard-earned capital into other promising entrepreneurs, not knowing whether they would succeed, but giving them a fighting chance to build their companies and have social impact. This is atypical to re-invest for the next generation of entrepreneurs, instead of changing her own lifestyle and personally benefitting. There are many founders that owe some of their success to Shradha for giving them capital, time and her wisdom.

Additionally, Shradha served as a mentor to many young women and made it a point to seek out speaking engagements targeted at empowering women, as described by Nancy Tyrell of Women in Bio (Exhibit D-12) and Jason Jacobsohn of the Founder Institute (Exhibit E-10). Ms. Xu writes that Shradha was doing so "Even after a long day's work, instead of heading home or to

18

a restaurant to unwind" and recalls attending events where she saw people inspired by not just Shradha's "words of encouragement, but also by the authenticity and the genuine passion." (Exhibit B-3).

Shradha's commitment to volunteering her time, efforts, and expertise is nothing short of inspiring. Daniela Bolzmann, a female immigrant entrepreneur from Peru, also benefited from Shradha's mentorship and relays how "Shradha never pressured us to grow at all costs, she encouraged us to trust ourselves and follow the strategy that we felt was right. She only offered her opinion and advice when we were seeking it." (Exhibit C-11). She often mentored young entrepreneurs, putting them on the right path and advising them of obstacles they could potentially face. Ms. Bolzmann adds: "She wanted to see more women and diversity in the community and she made it her mission to create the change she wanted to see," and further notes:

> At her core, Shradha is a person who cares about making the world around her better. She represents the spirit of giving by investing her time, money and wisdom to benefit thousands of people of the Chicago Tech community. I feel so honored to have witnessed first hand the immediate and direct impact one person can make. She changed my life…
>
> Shradha's unique qualities set her apart from other leaders; her decisions are dictated by a moral compass that prioritizes compassion, empathy, and impact over self-interest.

*Id.*

### 3. Shradha's Commitment to Service Has Continued

Despite her legal troubles, Shradha's commitment to service has continued and has never been limited by what is convenient or easy. Her work at a refugee camp in Greece aptly demonstrates this. In the summer of 2019, Shradha traveled to Athens, Greece, to volunteer at the Skaramangas Refugee Camp at the height of the refugee crisis to teach English, organize crafts for children, and distribute clothes to refugees and asylum seekers from over 25 countries.

As Naif AlObaid, a co-volunteer, writes that Shradha's students "found solace in her comforting presence… they saw acceptance and non-judgement in Shadha's eyes and a feeling of being equals in her demeanour towards them." (Exhibit E-7). She even brought six large bags of clothes that she had collected from friends in Chicago. Despite soaring summer temperatures, she commuted by local public transportation, and worked in the un-airconditioned shipping containers the camp used as buildings and "did all of these with enthusiasm, initiative and did not avoid any of these duties." He adds:

> Working with Shradha, I had no idea of her background or that she had attained any sort of professional or financial success in her life. We do not usually expect people with means (who typically donate in terms of financial aid by writing a cheque), to spend their summer actually spending time serving the needs of refugees for weeks with donating their time and skills. At most, they arrive for a day to learn about the work that they are financially supporting. She did not talk about herself much and was really humble and down-to-earth. Greece is a country that people visit to relax on vacation to the islands. However, she visited purposefully, spending weeks of her summer in service of others, taking public transportation early each morning to spend the day building hope for refugees in camps, who had little left, showing the oft forgotten that someone cared, thinking of new craft activities for children and teaching English so that someday they would get a visa and be able to find a job for a better future.



*PHOTO: Shradha volunteering with children*

To this day, Shradha remains committed to volunteer work. Shradha teaches English as a Second Language to a young girl in Ukraine. (Exhibits A-1 and A-4). Every Tuesday morning, she volunteers at a food bank 'Hungry Souls' at the Bannockburn Church in Austin, where she helps impoverished students by packing lunch kits for struggling families. (Exhibit A-4). "Over the past year, she has accumulated nearly 100 hours of volunteer service, a testament to her commitment and compassion," writes the Executive Director. (Exhibit E-5). "Shradha has shown a profound ability to empathize with and uplift those around her… and inspires everyone involved to give a little more." *Id*.

Shradha continues to find other ways to contribute – such as 'Operation Turkey,' where she aided in the preparation of Thanksgiving meals and its distribution to the homeless. She also volunteers with her spiritual organization, Art of Living, and helps out with coordination of religious events at her local temple, Shree Sanatan Mandir of Austin, including washing dishes and tidying supplies. Her mother-in-law states (Exhibit A-4), "I can see how affected Shradha is by others' suffering even though she is going through a trying period in her own life."

## IV. SHRADHA TRIED TO ENACT HER BELIEFS AT OUTCOME HEALTH

### A. Shradha's Focus was on the Company's Social Mission

The social mission and opportunity to have a positive impact on patients was very dear to Shradha. Jeff Coney, a Northwestern professor and another board member of Outcome, relates, "it quickly became clear that she was more than passionate about the company's mission." (Exhibit D-12). She had seen close family members suffer from diabetes complications and understood the importance of bringing helpful lifestyle tips to improve the quality of their life. Shradha's aunts explain (Exhibit A-5):

> Shradha was close to her grandmother and experienced her health struggles. She saw her grandmother losing her eyesight to diabetes and would read the newspaper to her after school. We knew that what our mother eats had an effect on her diabetes,

but we didn't have the chance to learn which foods - and our mother would simply say that the doctor didn't forbid her from enjoying the items we told her not to eat much of. It was no surprise to us when we learned more about the start-up Shradha joined that she was trying to help other families like ours take better care of their loved ones by teaching them about diabetes and the effect food can have on their health.

Shradha's core focus at the company was to develop an extensive library of educational videos for health conditions such as diabetes for patients to watch during their visit to their doctor's office. Shradha directly oversaw a large team responsible for shooting original content with patient experiences, physician recommendations, healthy cooking recipes, and exercise videos including yoga and meditation. She utilized her broadcast journalism training to create user-friendly content to help patients. Both patients and physicians appreciated and benefited as Dr. Alap Jani, a cardiologist in Texas, relates (Exhibit B-8):

> Throughout the years since that time, as an interventional cardiologist, I have seen patients who have asked me questions about things they have seen on the interactive screens in waiting rooms and commented on the helpfulness of the content on these screens. As a physician, the difference between someone waiting with nothing but their own phone versus someone who has been more engaged and thinking about their health while waiting has been dramatic.

For patients diagnosed with a chronic condition, learning valuable information on how to manage their symptoms can be life-changing. In one email, an employee recapped his meeting with a patient who was struggling to control his blood sugar until he saw Outcome programming in his new doctor's office, eventually losing 15 pounds through changing his diet and exercising. (Exhibit I). Another describes how a grandmother in Arizona was at a loss for how to support her newly-diagnosed granddaughter. When she saw the Outcome videos on healthy cooking, she tried out the recipes and changed the lifestyle for the entire family: "the episodes very inspirational and wonderful guides on how to live healthier." (Exhibit J).

22



*PHOTO: Helpful educational content on Outcome Health products, earning industry recognition*

Outcome Health continues to provide these products and educational videos today, after merging with a competitor called PatientPoint. Shradha even spotted the products installed at the cardiology office in Austin when accompanying her mother for a check-up. PatientPoint, which is based in Cincinnati, maintained the Chicago office after the merger and many Outcome employees remained employed there, including some from the content, product and physician services teams. Robert Fealy, who served on the Outcome board from 2018 to 2019, writes Outcome Health "continues to operate successfully under new ownership." (Exhibit D-10).

### B. Shradha Prioritized Outcome's Employees' Growth and Wellbeing

Consistent with her lifelong beliefs, Shradha sought to promote them at Outcome, seeking to create a work environment that promoted the public good and to encourage and assist Outcome's employees in their career goals. Shradha is keenly aware that Outcome employees suffered greatly in the wake of the company's downfall. She is incredibly sorry for those who lost their jobs and for any negative impact on their careers. But Shradha certainly did not intend to hurt Outcome's employees, nor did she intentionally ignore their wellbeing.

ContextMedia/Outcome Health was launched in Professor William White's entrepreneurship class at Northwestern by Derek Moeller and Rishi Shah in 2006, and Professor

White served on Outcome's Board until 2014. Shradha joined as Director of Marketing and Media in 2008,[6] "[h]er early company contribution earned her continued promotions" and "[l]ater she was named one of the founders." (Exhibit D-11). "Her passion for the business was driven by the diagnosis of diabetes in her immediate family." *Id*.

Because of his Chairman position, Prof. White (*Id*.) has significant insight into Shradha's role at the company and her attitude toward employees. His grandson also joined the company:

> I was able to observe Shradha in her interactions with employees and with the board for a number of years. Her personal leadership style always focused on the recruitment and training of new employees. During that time, I was proud to learn that my grandson Benjamin White had joined the company.

> During that time I was impressed by her maturity, her emphasis on encouraging the growth of the employees. She was frequently exploring contemporary professional training programs, always trying to improve the skill sets of the team. For someone very young in a major position she exhibited maturity and an openness to think long term. This is rarely seen in young graduates.

> From my experience observing and working with Shradha over those years, it is my judgement that she is fundamentally a very good person who really cares about the people around her, particularly her teammates.

Ernesto Rodriguez, an employee of Outcome in the software department, describes how Shradha mentored him through tough times at his job when a superior wanted him fired. Shradha did not simply overrule the superior. Instead, Mr. Rodriguez relates (Exhibit D-2) that "through her positive and friendly guidance and coaching, I exceeded expectations and was later praised by the same middle management that wanted to let me go." He credits Shradha with helping him become "one of the best product managers in the city," with a job and final interviews at high-profile technology companies. He concludes,

---

[6] Shradha joined as a salaried employee reporting to Mr. Shah, with no equity or a board seat. (Exhibit K) She was granted ownership in 2015 structured as a "waterfall agreement," such that the higher the company's valuation grew the smaller Shradha's percentage of ownership would become. (Exhibit L)

[w]ithout Shradha believing in me when nobody else did (including myself), I would not have improved my life and career the way I have over the last decade. I am forever grateful to her for being part of turning my life around.

That Shradha encouraged and aided employees in their professional growth and prioritized their personal wellbeing is echoed by other Outcome employees. Travis Kemp, the seventh employee hired by Outcome, who worked there from 2011 through 2017, writes: "I have had many 'managers' but in this case, can honestly say that NONE of my other managers were as empathetic or caring as Shradha." (Exhibit D-3).



*PHOTO: Shradha and Travis travelled to China for hardware manufacturing*

Mr. Kemp remained with the company through several years of rapid growth, and came to manage a large team. Mr. Kemp describes Shradha as "incredibly empathetic" and recalls "working directly with Shradha on career and personal development plans for each of my 15+ employees, something we focus on several times per year." He adds: "She coached me, taught me and made me into the professional I am today based on values, morals and ethics." *Id.*

Mr. Kemp recruited his brother, Jason Kemp, to join the human capital team in 2015. Shradha's recruiting philosophy and leadership style had a positive impact not only on him but on the lives of many other employees. The environment created with Shradha's leadership allowed him to "stay close to many former colleagues, and the number of lifelong friendships that were formed in this environment is exceedingly rare." "I considered her one of my greatest mentors and the impact she has on me was profound."

David Epstein, another long-time employee in the operations department, writes, Shradha "was always generous with her time and resources, spending countless nights whiteboarding workflows with various teams… discussions with topics ranging from enabling our mission to improve patient education at the point of care, creating mentorship opportunities for our teams and broader Chicago tech scene, book club, my personal career development, and more." (Exhibit D-1) He adds that Shradha focused on empowering teams: "Thanks to the standards she set, our teams thrived, dynamic and agile, and able to come together quickly to solve the challenge of the day." *Id*.

Steven Collens was a 2017 investor in Outcome who lost a significant amount of money. He has written a letter supporting Shradha: "She was not involved in the fundraising process and had enough other work on her plate to keep anyone busy around the clock." (Exhibit D-6). He describes other observations from a time when he worked on his own healthcare incubator out of Outcome's office, saying he had a "front-row view of the way Shradha operated". *Id*. Others have described Shradha's management style as "the definition of a servant leader. She is humble, nurturing and giving." (Exhibit C-4). In fact, Shradha's office was not located in the row of other executive offices, but rather next to the employee café. (Exhibit A-3). Mr. Kirkpatrick recalls visiting the Outcome office in Chicago (Exhibit C-6): "her focus was always on the people, changing health care for the better, culture, hiring, and creating a shared mission among team members. She pointed out the company mission on the walls and how the space was arranged to promote interaction amongst team members." Shradha also planned various activities and learning opportunities for employees to build and deepen relationships at work and outside of work through initiatives such as 'Giving Team', 'Learning Team' and 'Wellness Team.'

Adam Goodman, a Northwestern professor, recommended Outcome to his daughter, Alex, who joined the talent team that Shradha led: "Alex believed in the mission and found a network that has enriched her career through roles at several subsequent companies… Say what you will about Outcome Health's failures, the culture that Shradha built and the people who she hired in that part of the business were first-rate. I am grateful that my daughter found her profession and passion there." (Exhibit D-12).

### C. Instilling the Spirit of Giving at Outcome

A young manager only in her 20s, she still prioritized instilling a spirit of community service in her employees, and as one writes, "Shradha was instrumental in my development in terms of volunteer work, and extra curriculars." (Exhibit D-3). She created and led the "Giving Team" at Outcome, which introduced specific initiatives as well as supported those already close to an employee's heart[7]. Employees volunteered for health-related causes through walks/runs and at local hospitals. They supported underserved youth by hosting students for job shadowing and career mentorship, and through paid summer internships. Outcome also donated air-time to nonprofits, such as Imerman Angels, and its founder says, "she did this for no cost - only to help the mission of the organizations." (Exhibit E-11). Jonny Imerman, co-founder of this nonprofit focusing on helping patients fight cancer, states:

> Her passion and focus, as I could always see, was the education for patients - she always asked how to improve the positive impact and thought of new ways to use technology to connect patients/mentors and to build awareness of the support available to them in their journey. She also hosted 'Charitable Chats' at Outcome Health and invited the Executive Director of different nonprofits to speak to her employees and get them involved.

*Id.*

---

[7] Exhibit M summarizes a few health-focused and education-oriented initiatives of the Giving Team.

### D. Shradha's Work at Outcome was not Motivated by Wealth

While most teenagers spend their first paychecks on frivolous items, a 19-year-old Shradha sent the entirety of her first paycheck to Tsunami [hurricane] relief efforts in Sri Lanka in 2004. (Exhibit A-2). Shradha remained that same person even after she met with some success in her professional life. Dr. Andrew Tannenbaum, the husband of one of Shradha's college friends, writes, "[w]hen I first met Shradha, she was at the height of her professional success, yet the woman I met could not have been more kind and down to earth." (Exhibit B-7). His wife, Dr. Singh, shares, "Spirituality has played a large role in and basis of our friendship" and adds: "Despite her great success and means, she remained (and remains) the same woman I befriended almost twenty years ago. Some people are changed by wealth and power. She was not." (Exhibit B-2). What several letters have highlighted is Shradha's lack of financial ambition. Dr. Tannenbaum's letter captures Shradha's disinterest in the trappings of wealth succinctly:

> What I personally struggle with is quite simple – I've never seen a clear motive. Her lifestyle has never been that of a stereotypical tech entrepreneur. Her only indulgence was a modest high-rise condo. When I asked her why one day, she told me it was because she "always wanted a view of the water. That was my gift to myself." Even with that, her home was furnished quite modestly. She drove an older car. She never carried designer bags or wore designer clothes. She was never a conspicuous consumer of a luxury life. For all of her means, she lived a relatively modest life before and after her indictment and subsequent conviction. Her life has never seemed to be based on greed or a desire for more.

(Exhibit B-7).

Coupled with her spiritual teachings and intrinsic motivation to help as many people as she could, Shradha has never aspired to material possessions or other societal metrics/signs of success. Sheena Lindahl has known Shradha for more than a decade and writes that Shradha "never even subtly flaunted her success. The company's financial success and growing media profile seemed irrelevant to her." (Exhibit C-2). Mr. Fealy is a veteran of the startup industry since the '80s and

has known Shradha for 15 years. They have served together at several non-profits; he stepped in to serve as her nominee on the Outcome board in 2018. He communicates his unwavering support for Shradha in his letter, hoping that she "not be painted with the same broad brush applied to others…" (Exhibit D-10). He knows Shradha to be of "kind and thoughtful demeanor, somewhat uncharacteristic among many entrepreneurs." Most importantly though, consistent with dozens of other letters, he conveys: "I don't associate Shradha with seeking or needing position, advantage, or fortune in her life." *Id*. Ashwin Ram, who met Shradha through a professional organization and later became a federal prosecutor, writes,

> I believe her heart to be better suited for the nonprofit world than the business world. She has remained the kind, thoughtful, and generous person I met in 2011/2012, as her company grew, and also through these circumstances.
>
> *****
>
> And when I was in Austin last year, she drove to the airport to pick me up – in her Honda Accord, to have dinner and take me to my hotel. I had asked her to pick somewhere "nice" for dinner and when we got there, it was a simple place. She said she took "nice" to mean good food, not "fancy." I also observed she knew little about the other "fancy" things in life – such as the wine list.

(Exhibit C-7).

Numerous letters share examples of Shradha's lifestyle choices, even as the company and her means grew; from continuing to drive her car from her college days and opting to "fly Economy and use UberX" (Exhibit A-4) to selecting far "more reasonably priced hotels" and furnishing her home with items she "had picked up on sale at a box store" i.e. HomeGoods (Exhibit B-2) (in fact, Shradha has a store credit card for TJMaxx and Macy's). When Shradha and her husband relocated to Austin to start a family, they purchased a comparable residence (2871 sqft) to their Chicago accommodation (2550 sqft) purchased in 2013 (before receiving any dividends). Susan Miner, a friend and real estate professional, witnessed first-hand that "Shradha never lived a glamorous

lifestyle." (Exhibit C-12). There are no trusts, LLCs, vacation homes, artwork, luxury vehicles, or collectibles. (PSR., par. 119) Ms. Miner says "[m]ost of my executive clients live in 7-8 figure homes. By contrast, Shradha spent years looking for a reasonably priced home to buy. In fact, even though she could have afforded whatever homes I showed her, Shradha never even put in an offer and instead decided to continue living her modest lifestyle with Jayant." *Id*.

Mr. Collens, a friend and an investor in Outcome, notes "she lived a relatively modest lifestyle, even at the heyday of the company's success" with "nothing extravagant" and he "never once heard her talk about money." (Exhibit D-6). Mr. Kirkpatrick was entrusted by Shradha to manage her finances; Shradha was "hands-off" regarding any investment strategies with her focus remaining on serving others even as her resources grew over time. She specifically discussed wanting "to create a scholarship for refugees at her high school" and "she was getting ready to do that prior to the legal proceedings." (Exhibit C-6).

Numerous other letters attest to this reality about Shradha. She has never been motivated by the pursuit of wealth. Michael Simmons writes that "we need more entrepreneurs in the world like Shradha" because rather than those "who achieve wealth and give it back," the world needs more people like Shradha "who are humble, who treat all people with dignity and respect, and who sincerely want to help every person they come into contact with, not just for headlines and stats, but because it's the right thing to do." (Exhibit C-3).

### E. Shradha was Sidelined as the Company Grew

Although Shradha sought to create a positive work environment for Outcome's employees, her own relationship with Mr. Shah deteriorated over time, and led to her being excluded from important aspects of the company. As the Court is aware, when Shradha began working at Outcome in 2008, she was in a romantic relationship with Mr. Shah. This was her first relationship as dating was not a common practice in India. Dating, in Indian culture, is considered a precursor

to marriage. Though they broke up in 2010, Mr. Shah rekindled the prospects by discussing the possibility of marriage with Shradha's parents during a trip he made to India in 2012. Shradha's parents were not ready to bless the relationship.  The closure to this chapter came in an unexpected manner a year later, when Mr. Shah met another romantic prospect but did not inform Shradha of this development. This severely strained communications and the working dynamic between the two.

As Kelly Rice noted in her report (Exhibit G):

Although her romantic relationship with Codefendant Shah ended in 2010, Ms. Agarwal explained that once he became involved with someone else Shradha related their personal relationship became more difficult with minimal communication by 2014. Her longtime friend Dr. Singh confirmed that once Rishi started a relationship with another woman the communication between him and Shradha was "not great," and Shradha would talk about being left out of major decision making.

After having conducted multiple interviews and having reviewed character letters, Ms. Rice concluded that Shradha's fractured relationship with Mr. Shah significantly impacts her culpability:

It is clear that Ms. Agarwal's involvement in the company was colored by her personal relationship with Mr. Shah, both by her trust in him and later the fraying of that relationship contributing to limited communication. Her lack of business experience, her distraction by family difficulties, philosophy of trust in others and general leadership style of trust and delegation, led to her failure to appreciate or fully understand the seriousness of the fraudulent activities. Although because she has an ownership stake, although only a small percentage, she benefited from a portion of the ill-gotten gains, she was not the driver behind the amount of fraudulent funds obtained. The resulting guideline sentence, driven in large part by the fraud amount, substantially overstates her role in and responsibility for the fraud and results in a lengthier sentence than is necessary. [Id.]

Then-Chairman of Outcome's Board Mr. White recalls that around this time, Shradha sought his advice about leaving the company and pursuing a graduate program. He now regretfully recalls the advice he gave her "to stay with this dynamic company where in her important role she

would learn more performing her daily job." (Exhibit D-11). Mr. Coney, another board member, recalls similar guidance he gave Shradha. (Exhibit D-12). Mr. Ram writes of Shradha's decision to stay as "notable" given that "she had put her responsibility towards the startup's needs above her own personal situation." (Exhibit C-7). He continues:

> I also got to meet Rishi briefly and saw that he had a real business mind. Rishi and Shradha are very different people and have subsequently come to learn that startup partners typically bring very different skill sets and personalities to the table. Shradha led from her heart and focused on the mission, company culture, employee and patient impact and was less engaged in areas such as sales or commercialization of products.

*Id*.

The disconnect between Shradha and Mr. Shah was particularly evident when it came to the company's rapid growth and fundraising. Robby Hill, an entrepreneur and member of a peer mentorship group called Empact, recalls (Exhibit C-5): "I was a witness to many disagreements about how to run the company and how to structure the evolving roles in the company and the struggles she faced as a result."

These recollections of Shradha's friends and Ms. Rice's conclusions are confirmed by contemporaneous emails that show Shradha was indeed sidelined. Attached as Exhibit N is an email that Shradha wrote to Mr. Shah on July 14, 2015. In it Shradha relates her struggles with the company's growth strategy:

> I have to communicate this to you at some point because I find myself living in constant fear of you recently and I can't keep going this way. I don't want to have this conversation in the office with all glass walls so sending it here for you to read. And this has been a theme now for at least the past 4-6 months so I have to let you know at some point without you dismissing what I'm saying.
>
> *****
>
> I have no desire to get in the trenches every 30m with the teams - not even being able to use the ladies room all day going back to back on interviews. I'll stop doing any of them. Use your scoring system. And IQ tests. When your managers come to me and say they can't participate in recruiting anymore and they can't see more people getting fired, you handle it. On one hand, you keep telling me I'm wasting

my time on nonsense. On the other hand, you tell me you know how CEOs run their company and I'm in your way.

*****

I feel like you keep giving it to me on both ends - saying I'm doing it all wrong, and holding my equity and my contribution as a gun to my head. I can't deal with this toxicity and am happy to quit today for nothing in return. Happy being a multi billionaire to you, and maybe some day you'll see that's not all there is to life.

(Exhibit N)

Shradha's exclusion was even more pronounced on the topic of the company's finances.

As her November 14, 2015, email attached as Exhibit O makes clear, Shradha was often left in the

dark and told that fundraising was none of her business:

> This leads me to the second theme - non-transparency around conversations and external partnerships. I know we're all moving really fast right now - trust me I know the non-communication is unintentional, I've spent the past two weeks fighting this and course-correcting between Sponsorships & Product. But all our most important conversations - banks, investors, lawyers - are happening without me and when I ask for quick updates just to be aware, I'm told it's not worth my time. I think if we truly are partners in this business, I should be at least aware, just aware, of what is being considered, what routes we're choosing, where our financing is coming from, how much debt we're loading on, I don't think it's fair to tell me it's none of my business. It IS my business. I'm not saying decisions need to be made democratically or we need to slow down any of our processes, but being kept in the dark makes me wary. We're both only 30 and this isn't the first big thing we're going to build. Next time, we may actually want to raise money. I trust you when you told me to pull myself out of these conversations - I actively dodge invitations from banks and investors at this point. In return for this trust, I can't be left off the story or the path.
>
> *****
>
> I offered to you earlier this year, that if you're trying to systematically belittle me, hire people around me who make decisions on important things I own, take over talent and product, then just say it – let's create a transition plan.
>
> (Exhibit O).

Feeling disconnected from decision-making and unhappy with the company's direction,

Shradha again contemplated leaving in 2016. She had joined a fledgling startup and enjoyed

working in a family environment. But as the company became larger and more 'corporate', she

missed the personal connections and intimate setting of a smaller team. A close friend, Arti Sharma, remembers conversations with Shradha during this phase:

> Throughout her 20's, she was utterly dedicated to her career - not looking for any shortcuts to success but simply working all hours day and night for over a decade.

> Shradha and I always have long philosophical discussions about life and God and how to be better people. During one such conversation in 2016, she shared that she wanted to quit work because the company was getting too big and she missed the personal connection she shared with colleagues in a smaller environment. Her happiest years were when ContextMedia had a family feel and she felt like she was making a difference by educating patients at hospitals.

(Exhibit B-12).

As seen in Exhibit O, Shradha had limited involvement in the company's decisions regarding raising capital and acquiring a competitor. This limited involvement with fundraising is consistent with the investors' experiences. For example, Kenneth Eberts, the co-chair of Goldman Sachs' investment committee did not meet with Shradha during Goldman's due diligence process (Tr. 6859). As detailed in the accompanying Objections and Clarifications to the PSR, other investors echoed this limited involvement of Shradha. Friends of Shradha noted her disconnect with fundraising as well. Benji Rabhan recalls Shradha was surprised to learn that the company was in the process of finalizing terms with investors in December 2016:

> I recall a time after her wedding where I was asking Shradha how things were going. She was sharing that she found out that her company was finalizing fundraising. I could tell she was surprised by this and it appeared that she had been left out of the loop. But again, that was not her primary concern, instead I recall her talking about the education programs she was focused on, and how excited she was to have found new passion through her better defined education leadership role in the company to build a 'university' of sorts.

(Exhibit C-1).

Fundraising was a critical aspect of the charged scheme, and it is the biggest driver of the government's proposed Guideline level. Shradha's lack of involvement, and the deliberate exclusion of her from fundraising information and details, are significant

mitigating factors that warrant a below Guideline sentence. Other factors, personal to Shradha, warrant a below Guideline sentence as well and are discussed next.

## V. UNWARRANTED ADDITIONAL PUNISHMENTS ALSO SUPPORT A SIGNIFICANTLY BELOW GUIDELINE SENTENCE

As a 38-year-old non-citizen of the United States, who dreams of having children, and is the primary caretaker for her ailing mother in India, Shradha faces severe collateral consequences from her sentence that are unwarranted and which will undoubtedly make the punishment she faces harsher, more dangerous, and more devastating to her family than the terms this Court will impose on other defendants. The sentencing guidelines are not a "straitjacket," and the Court is free to account for these unwarranted differences when selecting the appropriate sentence for Shradha. *United States v. Solomon*, 892 F.3d 273, 278 (7th Cir. 2018). The Court is also free, as other courts have,[8] to fashion a sentence based on the realities of what Shradha's sentence will mean in terms of the actual length of the sentence, the conditions she would face in prison, and how the sentence will impact Shradha, her husband, and her family in the years that follow her sentence. The 3553 factors, "which are still mandatory after Booker (unlike the Sentencing Guidelines themselves), 'are broad, vague, and open-ended,' leaving the sentencing judge with 'considerable discretion to individualize the sentence to the offense and offender as long as the judge's reasoning is consistent with § 3553(a).'" *United States v. Jackson*, 547 F.3d 786, 792 (7th Cir. 2008) (*quoting United States v. Wachowiak*, 496 F.3d 744, 748 (7th Cir.2007)).

---

[8] *See, e.g., United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("The district court is specifically required by section 3553(a) to consider the 'just punishment for the offense.' 18 U.S.C. § 3553(a)(2)(A). It is difficult to see how a court can properly calibrate a 'just punishment if it does not consider the collateral effects of a particular sentence.")

### A. A Lengthy Sentence Will Preclude Shradha and her Husband from Having Children

Perhaps the most significant, non-traditional punishment Shradha and her husband will suffer from a lengthy sentence is the lost opportunity for Shradha to become pregnant and give birth to a child.[9] When Shradha met Jayant in 2014, they discussed their dream of having children together and adjusting their careers around their growing family. (Exhibit A-1). In 2017, only a few months after Shradha and Jayant got married, issues with Outcome arose. By 2018, Shradha was 32 years old, and the civil lawsuit against Outcome had been settled. At this point, she felt that the worst was behind her, so she and Jayant hoped to start a family and later relocated to Austin. In 2019 Shradha learned that she was a target of this criminal investigation. Believing it would be irresponsible to start their family during such turbulent times and expose their child to uncertainty, Shradha and Jayant decided to delay their plan.

Physicians define a woman of advanced maternal age (or geriatric pregnancy) as a woman who is 35 years of age or older at the time of delivery.[10] As a woman gets older, she will experience a decrease in her fertility, regardless of environment, and encounter further risks and complications, such as diabetes, hypertension, and obesity. *Id*. Additionally, pregnancy loss is more common in individuals aged 35 and older. The American Congress of Obstetricians and Gynecologists ("ACOG") has found that the rate of pregnancy loss in women aged 35 is 20%, which increases to 40% for women 40 years of age, and 80% to women 45 years of age.[11] There is also risk to the fetus. Children born to women of advanced age could experience chromosomal

---

[9] Exceptional Family circumstances are, of course, a factor that courts can consider under § 3553(a). *See*, *e.g.*, *United States v. Reed*, 859 F.3d 468, 473 (7th Cir. 2017).
[10] See, Pregnancy at Age 35 Years or Older, (August 2022) (available at: https://www.acog.org/clinical/clinical-guidance/obstetric-care-consensus/articles/2022/08/pregnancy-at-age-35-years-or-older).
[11] See, Early Pregnancy Loss (November 2018) (available at: https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2018/11/early-pregnancy-loss)

abnormalities or congenital malformations. After 40, there is heightened risk of growth abnormalities in the fetus.[12] There is also greater risk of stillbirth in women experiencing a geriatric pregnancy.

Shradha is 38 years old. A lengthy sentence could not only pose substantial risks to her with regards to pregnancy but could preclude her and Jayant from having children altogether. Shradha's inherent maternal instinct, affectionate nature and love of children is apparent from the letters submitted by those who know her. Her tenderness towards children is described by many of her friends and family. On multiple occasions, Shradha has interrupted her personal life to forge relationships with her friends' children, whether that be cutting short her time at a conference to deliver a stuffed dinosaur to a friend's unborn child (Exhibit B-8), taking time during trial preparations to bring cupcakes on her friend's 2-year-old's birthday (Exhibit B-2), or even rerouting an international flight to spend time with her 'nephew.' (Exhibit B-11). One friend stated that while his oldest child never wants to go anywhere, he will "gladly go to Shradha's house." (Exhibit B-8).



PHOTO: Shradha is a doting aunt

---

[12] See, Pregnancy at Age 35 Years or Older, (August 2022) (available at: https://www.acog.org/clinical/clinical-guidance/obstetric-care-consensus/articles/2022/08/pregnancy-at-age-35-years-or-older).

Recognizing Shradha's love for children and desire of her and Jayant to have a family of their own, Shradha's loved ones are deeply saddened at the thought that she and Jayant may not be able to share their love. Her close friend, Dr. Tannenbaum, writes, "[w]hen I see [Shradha] with my children, I am constantly reminded how wonderful she would be with her own children, and now I am quite sad knowing that may never come to fruition." (Exhibit B-7). Mr. Rabhan rues that the most devastating consequence of this case might be the fact that such a nurturing, caring, and supportive individual may never have the chance to experience motherhood herself. (Exhibit C-1). Ms. Xu shares how her daughter, Ella, considers Shradha as "the world's best aunt" and adds:

> I can't help but feel a sense of sadness and loss for Shradha, because I know how much Shradha would've loved to be a mother. In recent years, Shradha and I have often talked about the painful decision she and Jayant had made to put their dream of becoming parents on hold. To Shradha and Jayant, having children is not just about bringing life to this world, but about being fully present parents that can be there for their children every step of the way.

(Exhibit B-3)

While incarceration obviously affects Shradha, it also affects her husband Jayant. In his letter, Jayant poignantly describes the pain he feels, saying "[w]e're already on the risky end of childbirth and I fear that much more time lost would permanently take away our chance to start a family." (Exhibit A-1). Her own agony aside, Shradha suffers guilt and grief knowing that her husband's dream of having children may never be realized.

## B. Deportation from the U.S. is a Significant and Permanent Additional Punishment

Shradha came to the United States on a student visa in 2004 in pursuit of her and her family's lifelong dream that she pursue an education in the United States and build a life here. She graduated from Northwestern University in 2008, obtained a work visa in 2009, and has lived in the United States as a legal permanent resident since 2014 (PSR at 21). In late 2019, after fifteen years of living in the U.S., Shradha would have become eligible to apply for full citizenship.

Unfortunately, by that time Shradha had been notified that she was a target in this investigation, and she quite responsibly put her pursuit of citizenship on hold as the case proceeded.

Shradha is now unable to apply for citizenship and upon finishing her sentence, she will be deported to India, a country that she has not resided in for over twenty years. Not only will she be forcibly removed from the United States, but she will also be permanently barred from reentering, leaving behind her support network as she attempts to reintegrate into a society with which she is unfamiliar.[13]

As he stands in unwavering support of his wife, Shradha's husband Jayant also faces this punishment. Like Shradha, Jayant came to the United States to attend college. His mother, Mrs. Premkumar, says (Exhibit A-4) that "it will be a travesty for Shradha and my son Jayant to have to leave the United States involuntarily. Shradha and Jayant each moved to the U.S. at the age of 18 to follow the American dream of hard work and innovation." Jayant would ultimately return to India upon the completion of Shradha's sentence, a country he has also not resided in for over twenty years and has no foundation or business relationships in and with limited job prospects.

One of the things Shradha and Jayant admire about the United States is the widespread belief in finding a place for yourself in society regardless of world view, and current or past circumstances – this country is forgiving of failures and provides people with second chances. This is not a belief that is commonplace in India, particularly where there is a criminal conviction. Instead, Indian society and culture promotes a protracted shaming, avoidance, and denouncement of those convicted of crimes, even after their sentence has been completed and even extending to innocent family members. Attached as Exhibit P is a legal opinion prepared by S.P. Singh, an

---

[13] Ramifications from deportation are a relevant 3553(a) factor. *See*, *e.g.*, *United States v. Ramirez-Fuentes*, 703 F.3d 1038, 1047 (7th Cir. 2013).

attorney of 38 years based out of New Delhi, India, describing the effects of conviction and incarceration in Indian society. As Attorney Sing explains:

> [The] attitude of societal prejudice and alienation extends to the spouse, parents, siblings, and children of the person convicted as in India, society views one's family as one unit and sharing of similar values. This stigma can lead to family members' exclusion from society, discrimination for employment and housing, and a general isolation affecting mental, emotional, and financial health.

(Exhibit P, p. 5)

Attorney Singh's legal opinion attributes the stigma, in part, to a low conviction rate in India, explaining in essence that because criminal convictions are so infrequent, especially for women, those convicted are viewed as the worst of the worst:

> The National Crime Records bureau (NCRB) data of the year 2022 shows that out of 1,56,371 people who were arrested in the year 2022, 1,51,883 were men, 4466 were women, and 22 were transgenders. Furthermore, those who are convicted[,] the stigma associated often hampers the reintegration of individuals into society, especially women because a conviction is much rarer for them. This social stigma can affect employment opportunities, housing prospects, and relationships, making it challenging for convicted individuals to rebuild their lives.

(Exhibit P, p. 3)

Attorney Singh sheds further light on the social alienation that Shradha will face upon her deportation, which is more exacerbated in Indian society because, "[i]n India, there is little scope in societal perception for second chances for people with a criminal record[,] as society judges a person's actions as defining of their entire identity." This is heightened for a woman, as he writes: [w]omen may face additional prejudice tied to societal expectations of morality and virtue and are perceived as someone with lack of moral character." (Exhibit P, p. 4-5)

Were she in the United States, Shradha's friends from college and associates in the professional community would help her reintegrate into society and assist her with employment. All of them are in the United States. Mr. Wright expresses in his letter, "I know Shradha has

unconditional support from a dynamic group of loving family and friends" and that he would "continue to assist Shradha as she rebuilds her life knowing that her reputable character is authentic and aligned with the values I got to know over the years." (Exhibit E-3). But once deported, Shradha will lose her entire support network of friends and community relationships. Another friend says, "I would also personally commit to assisting Shradha with her efforts to reintegrate." (Exhibit C-5). This type of support will be difficult to replicate in a country that she has not lived in for two decades.

Shradha will also not be able to return to the U.S., even to visit her loved ones to continue her relationships with their children – whom she lovingly treats as her "nieces" and "nephews." This is a devastating thought for Shradha and equally heartbreaking for her friends as well. (Exhibit B-1). Mr. Singh commented that it is uncertain whether Shradha could renew her Indian passport, potentially precluding her from traveling altogether.

Employment for women in India is not commonplace, as it is the cultural standard for women to serve as a wife and homemaker instead of working outside of the home.[14] With regard to employment, women are far behind, oftentimes not taken seriously in working environments.[15] Her skills in hiring practices and building a company culture revolving around teamwork and collaboration is generally not a priority for companies in India, which instead prioritize a hierarchical structure and authority.[16] On top of all of her other fears about the future, Shradha

---

[14] Evans, Jonathan, et. al., How Indians View Gender Roles in Families and Society, Pew Research Center's Religion & Public Life Project (March 2, 2022)  (available at: https://www.pewresearch.org/religion/2022/03/02/how-indians-view-gender-roles-in-families-and-society/)

[15] Kumari, Varsha, Problems and Challenges Faced by Urban Working Women in India (2014) (Dissertation, National Institute of Technology Rourkela).

[16] Thakuria, Pansy, Dealing with Indian Work Culture vs. American Culture, Vantage Lens (March 12, 2024)(available at: https://www.vantagelens.com/blog/indian-work-culture-vs-american/)

worries about the challenges in obtaining employment in India based on her conviction. Attorney Singh elaborates:

> People with a criminal record encounter difficulty securing employment, facing exclusion from most professions despite their qualifications and capabilities. Getting access to a job [e]specially in the field of their own choice becomes very difficult as the stigma impacts the outlook of the employer as well as other employees.

(Exhibit P, pp. 6-7)

Shradha is, of course, not the only one who faces the effects of her deportation. Her husband Jayant would face hardship as he does not speak the local language and would encounter employment challenges upon arriving in India, having "little to no awareness of working norms or professional practices." (Exhibit A-1). He is in a difficult position, employment-wise, as he is too old to work an entry-level position, and the skills he developed in the United States would not translate to the working world in India. He would also be leaving behind his family in the U.S. including his brother, sister-in-law, aunts, uncles and cousins.

We urge the Court to consider the ramifications of deportation on both Shradha and Jayant, along with their families, a severe punishment which no other defendant in this case will face.

### C. Shradha's Non-Citizen Status will Disqualify her from a Minimum-Security Camp and Assign her to a Low-Security Prison

Pursuant to BOP regulations, a sentence of incarceration will cause Shradha to be designated to a BOP facility that is not appropriate for her offense, her security risk, or her personal characteristics. Although she was at all times lawfully within the United States, solely because she is not a citizen, Shradha would be precluded from serving any portion of her sentence in a minimum-security prison camp (an FPC), and would instead be assigned to a low security Federal Correctional Institution (an FCI). *See* BOP Program Statement 5100.08 at 50 ("A male or female

inmate who is not a citizen of the United States . . . shall be housed in at least a Low security level institution")

Attached hereto as Exhibits Q, R, and S, are declarations from Joel Sickler (a 40 year prisoner advocate and consultant), Janet Perdue (a prison consultant who previously served as a 34 year employee of the BOP), and Maureen Baird (a prison consultant who served as a 26 year employee of the BOP, including as the Warden of a women's FCI). As all three make clear, Shradha will not be permitted to serve a custodial sentence in a camp. Instead, she will be designated to a low-security FCI.

While called "low-security" the differences between an FCI and an FPC are stark. Because of those differences, Shradha will face a significantly harsher punishment than any of her codefendants or a similarly situated U.S. citizen. Some, but not all of the additional and unwarranted punishments Shradha would face in an FCI include: (1) increased risk of victimization by fellow inmates (Exhibit Q, ¶ 19 and Exhibit R, ¶ 18); (2) housing in a more restrictive setting including controlled movements, fences, concertina wire, and roving patrols (Exhibit Q, ¶ 13 and Exhibit R, ¶ 17); (3) mass body checks with strip searches *Id.*) ; (4) placement in a facility far from family and friends as a result of limited women's facilities ( Exhibit Q, ¶ 16 and Exhibit R, ¶¶ 9, 15); (5) more restrictive visitation (Exhibit Q, ¶ 20 and Exhibit R, ¶¶ 16, 17); and, (6) overcrowding resulting in sleep disturbances and limited access to food and hygiene.

The Court can and should account for this unwarranted additional punishment on Shradha under § 3553(a).[17] Even before the guidelines became advisory, courts were permitted to grant a

---

[17] The increased severity in punishment based on being a non-citizen is relevant to considering: the "history and characteristics of the defendant" under 3553(a)(1), the need to "provide *just* punishment for the offense" under 3553(a)(2)(A) (emphasis added), "to afford adequate deterrence" under 3553(a)(2)(B), to provide "correctional treatment in the most effective manner" under 3553(a)(2)(D), "the kinds of sentences available" under 3553(a)(3), "to avoid unwarranted sentencing disparities," under 3553(a)(6),

downward departure based on the increased severity in punishment resulting from non-citizenship. *United States v. Guzman*, 236 F.3d 830, 834 (7th Cir. 2001); *United States v. Farouil*, 124 F.3d 848, 847 (7th Cir. 1997) ("The district court is thus free to consider whether Farouil's status as a deportable alien has resulted in unusual or exceptional hardship in his conditions of confinement."). *See, also, United States v. Bakeas*, 987 F.Supp. 44, 49 (D. Mass. 1997) (granting downward departure because "Prison camp and a medium security prison are as different in kind as are home detention and community confinement, and they have as great an impact on whether [the defendant's] sentence is 'greater than necessary.' It would be inconsistent for the guidelines to instruct me to consider the latter difference and forbid me to consider the former.")

Since the Guidelines have become advisory, courts have increasingly recognized and acted to mitigate the increased punishment imposed on non-citizens, particularly where the defendant was otherwise lawfully in the United States. For example, in *United States v. Connolly*, a fraud case in the Southern District of New York, Judge McMahon observed:

> If I could sentence Mr. Black to a term of incarceration -- a brief term of incarceration -- knowing that he would go to a facility appropriate to his criminal conduct, I would do it. But I know that I can't. I know that simply because he is a noncitizen -- and I use that term advisedly. He is not an illegal alien. But because he is a non-citizen, he will not be eligible to serve his sentence in the same way that any American citizen who stood convicted of this crime would serve. And that's not right.

*United States v. Connolly,* No. 16-cr-370 (S.D.N.Y. 2019), Dkt. 451, at pg. 91.

Facing a Guideline range of 57-71 months, Mr. Black was sentenced to time served and nine months home confinement in the U.K., his native country. *Id*, at Dkt. 451, pg. 95. Other courts have similarly accounted for non-citizens facing incarceration in an unnecessarily harsh prison environment based on their citizenship status. *See, e.g.*, *U.S. v. Walchli*, No. 20-cr-000497

---

and to the overall consideration that courts impose a sentence "sufficient, but not greater than necessary," to fulfill purposes of sentencing set forth in 3553(a)(2).

(S.D.N.Y. 2024), Dkt. 110, 111 (defendant faced a Guideline range of 18-24 months, sentenced to time served); *U.S. v. Lewis*, No. 23-cr-370 (S.D.N.Y. 2024), Dkt. 66, 67, 69 (defendant facing a Guideline range of 18-24 months was sentenced to three years' probation in home country); *U.S. v. Cohen*, No. 19-cr-741 (S.D.N.Y. 2020), Dkt. 48, at pg. 42 (defendant facing Guideline range of 30-37 months, sentenced to time served plus one year of supervised release with the condition of home detention. Defendant ordered to return to his home country upon completion of sentence.)

It cannot go unmentioned as well, that BOP facilities housing women have struggled with issues related to sexual assault. As is detailed in the declarations of Ms. Perdue and Ms. Baird, "[t]here are very real dangers that currently exist in federal women's prisons throughout the BOP that are occurring in real time." (Exhibit R, ¶ 20 and Exhibit S, ¶ 10). While the Department of Justice has taken laudable steps to investigate and prosecute offenders, the problem undoubtedly persists. (Exhibit Q, ¶¶ 29, 30, 33, 34 and Exhibit S, ¶ 10).



*PHOTO: Minimum Security Camps - FPC Montgomery, FPC Morgantown*



*PHOTO: Low Security Institutions - FCI Lompoc, FCI Waseca*

### D.    Shradha is Ineligible for Reductions Via the First Step Act

In his opening statements to the Senate Judiciary Committee on the five-year anniversary of the First Step Act ("FSA"), Senate Majority Whip Dick Durbin praised the success of this landmark legislation in not only improving the fairness of this country's criminal justice system but in reducing recidivism:[18]

> The First Step Act has been quite a success.  Of almost 30,000 people released under its reforms through January 2023, only 12.4 percent have been arrested for new crimes.  Compare that to the Bureau of Prisons' overall recidivism rate more than three times that number—43 percent.  Even with this legislation's achievements in reducing recidivism, we must remember that this is indeed a first step in a long journey toward rethinking rehabilitation and reversing failed approaches in our criminal justice system.

> In order to make our system fairer, we must continue to learn from and [build upon] the proven successes of 'smart on crime' policies like the First Step Act.  We must provide more opportunities for those who are incarcerated to reenter society successfully, reunite with their families, and contribute to their communities.

> Five years ago, we wrote the blueprint for reimagining rehabilitation and protecting public safety, and now we know by the numbers that it works.  Today, I am looking forward to reflecting on what we can achieve.

Despite the resounding success of this legislation, because she is not a citizen, Shradha can, at best, benefit only from a portion of it. "A prisoner is ineligible to apply time credits under subparagraph (C) if the prisoner is the subject of a final order of removal under any provision of the immigration laws (as such term is defined in section 101(a)(17) of the Immigration and Nationality Act (8 U.S.C. § 1101 (a)(17))." 18 U.S.C. § 3632(d)(4)(E)(i).

Consistent with this statute, and as Mr. Sickler's declaration explains, and Ms. Perdue and Ms. Baird's declarations affirm, once a final order of removal is entered, a non-citizen cannot earn

---

[18] www.judiciary.senate.gov/press/releases/durbin-delivers-opening-statement-during-senate-judiciary-committee-hearing-on-the-fifth-anniversary-of-the-landmark-first-step-act

any FSA reductions. (Exhibit Q, ¶ 23). Provided a final order of removal has not been entered, a non-citizen *could* earn up to 365 days of Reduction in Sentence ("RIS") credit during the prisoners first 26 months of incarceration. *Id.* at pars. 23-25. Earning these credits, of course, depends on matters unrelated to the prisoner's good conduct or the amount of programming she performs. It is essentially left to the whims of the timing of the immigration court process; that is, when a final order is entered.

It is at this point that any uncertainty ends. Whether a non-citizen earns the one year of RIS credit that is *potentially* available, a non-citizen *cannot* benefit from any FSA credit toward early release to a halfway house and/or home confinement. *Id.* at par. 26. In one scenario run by Mr. Sickler, this inequity means that a U.S. citizen would serve less than half (47%) of their sentence in prison while a non-citizen would serve substantially more.

A citizen can also reduce their sentence by an additional one year for successfully completing the Residential Drug Abuse Program ("RDAP"), which is unavailable to non-citizens. (Exhibit R, ¶ 13). Non-citizens are also not eligible for furloughs to address family medical issues or deaths, and they cannot be released to home confinement pursuant to the CARES Act, for example in the event of a medical situation similar to the COVID-19 pandemic. (Exhibit R, ¶ 12).

### E.  Shradha Will be Held in an ICE Facility When Her Sentence is Complete

In a final inequity, rather than being transferred to a half-way house or home-confinement when her custodial sentence nears its end, or simply allowed to self-deport as she undoubtedly would, a non-citizen like Shradha will serve out their full custodial sentence and then be taken in shackles to ICE custody for an undetermined period, possibly for months, until deportation is effectuated. (Exhibit Q, ¶ 22).

Judge McMahon of the Southern District of New York expressed a similar dismay at this policy as she did at the BOP's exclusion of lawfully admitted non-citizens from FPCs:

> [F]or reasons I cannot comprehend, at the end of that term he could not walk out the door and be picked up by Mr. Levine and taken to the airport. He would be treated like an illegal alien, and he would be released into the custody of ICE, and at some point long after my intended sentence had expired he would be deported. And that's not right.

*United States v. Connolly,* No. 16-cr-370 (S.D.N.Y. 2019), Dkt. 451, at pg. 91.[19]

Moreover, as Mr. Sickler's declaration relates, ICE facilities have been under scrutiny and the subject of alarming news reports and investigations into mismanagement, lack of medical care, staffing shortage, and abuse of inmates. (Exhibit Q, ¶¶ 32-37). This is a significant period of additional incarceration that Shradha would face under extremely harsh and potentially dangerous conditions.

### F. Shradha's Beloved Ailing Mother's Health is Deteriorating

Shradha has been the primary caregiver for her mother – who resides in India - for years. Dr. Seema Sethi, Mrs. Agarwal's physician in India, documents Mrs. Agarwal's health issues over the years, including Type-2 diabetes, resulting in weakened eyesight, negative impacts on her nervous system, irritable bowel syndrome, and high blood pressure. (Exhibit F-4). She also struggles with early onset arthritis, which causes periods of limited mobility during flare-ups *Id*.

---

[19] *See, also, United States v. Thavaraja*, 740 F.3d 253, 262-263 (2nd Cir. 2015) ("In determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice . . . a district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family."

In 2019, Shradha's role as her mother's caregiver intensified after she suffered a cardiac event, during which Mrs. Agarwal was hospitalized in Austin and diagnosed with congestive heart failure. After her diagnosis, her mother's physician recommended that she undergo triple bypass surgery. This is a high-risk surgery for Mrs. Agarwal and, given her medical history, she will require months-long care for recovery. It remains uncertain whether Mrs. Agarwal will be able to undergo the surgery without Shradha being available to take care of her.

Mrs. Agarwal relies on Shradha to manage and coordinate her medical care. Even while she was in India and Shradha was in the United States, Shradha coordinated her mother's health care through telephone calls, emails, and other communications with her mother and doctors. Shradha has been a pillar of mental strength and source of emotional support for her mother, as several friends and family have observed. Putting her own legal troubles aside, Shradha singlehandedly nursed her mother back to health, even changing her own lifestyle to support her mother through her recovery. Among the lifestyle changes Shradha implemented for herself and her mother included waking up at 4:30 am daily to practice yoga together, cooking heart healthy foods, helping her mother take daily walks, and furthering her knowledge of meditation techniques to connect with her mother not only on a spiritual level, but to aid her mother in developing mental and emotional strength during this trying time. (Exhibit A-1). In his letter to the Court, Dr. Jani says:

> Shradha was able to act as her mother's physical therapist, nurse, counselor, and aide in order to care for her mother. She was able to do more during that time for her mother than most patients get from a team of providers at a hospital or rehab. Shradha's mother went from being able to barely make it across a room to being able to walk down the street… Shradha was able to give her mother her life back, which is rare for me to see even as a physician who cares for these kinds of patients routinely.

(Exhibit B-8).

Mrs. Agarwal's physician notes that Shradha's care to this day is indispensable in "providing necessary care and assistance…for [Mrs. Agarwal's] physical and emotional stability." (Exhibit F-4). A sentence where Shradha would not be able to take care of her mother for a prolonged time runs the risk that Mrs. Agarwal's health will deteriorate further. Shradha is also distressed, petrified, and guilt-ridden that her mother might not survive her sentence.

## VI.  SHRADHA HAS LEARNED HARD LESSONS AND PRESENTS NO RISK OF RECIDIVISM

Pursuant to § 3553(a)(2)(C), the Court must impose a sentence that is sufficient, but not greater than necessary, to protect the public from further crimes of the defendant. Shradha has lived an exemplary life, has no criminal history; and, leaving this case aside, there is no hint of unethical or improper conduct in her past. She faces deportation and the rebuilding of her entire life in another country. She poses no real risk of reoffending.

The "likelihood that [a defendant] will engage in future criminal conduct" is "a central factor that district courts must assess when imposing sentence." *Pepper*, 562 U.S. 476 at 492. Mr. Ram, a former federal prosecutor, helped Shradha find replacement counsel:

> I have had multiple discussions with Shradha in the past 4 years and Your Honor, she has reflected on her own mistakes and lessons learned. She has not been defensive or trying to pass the buck.

(Exhibit C-7).

"She has faced the consequences, thought and rethought her mistakes. The soul searching is well underway," writes Ms. Lindahl. (Exhibit C-2). Raised on a spiritual foundation of learning and growth, Shradha's family and friends point to her natural capacity for reflection and ownership. Her spiritual guide shares, "She did not blame anyone, speak ill of others, or make excuses." (Exhibit B-11). Her lifelong friends emphasize: "For the kind of person she is, this time

has been very punishing for her and I know that while she is reflecting, she is also being very hard on herself." (Exhibit B-9).

Entrepreneurs and business community leaders have also highlighted that Shradha has not blamed anyone else throughout this process, "has learned from this situation and the pain it has caused" (Exhibit C-4) has acknowledged her own mistakes and "profound lessons she has learned" (Exhibit D-12), and "will continue to actively focus on learning and being better as that is her nature." (Exhibit C-1). Dr. Singh writes, "One of the most amazing parts of Shradha has been her own personal reflection as part of this process and her inward journey." (Exhibit B-2).

In reality, punishment will not begin for Shradha only on the day of sentencing. Shradha has put her life on hold since the indictment in 2019. These events have been devastating and rather than move on to start a new business or go on living life as she had, Shradha recognized the importance of pausing, reflecting and learning. Mr. Hill says, "The charges and impending trial have shaped her life for years with her future being unknown and life being on hold." (Exhibit C-5). She lost the ability to continue her life's work with her heart and soul poured into it, lost communication with the team she built, and lost the ability to make a living and continue serving the causes to which she dedicated her life. Shradha stepped down from the nonprofits and civic organizations she had been a long-standing contributor of to preserve their reputation. (Exhibit C-8).

This has been a lengthy and highly-publicized prosecution. In these past five years, there has been devastation to Shradha and her family to the point that everyone and everything she values has been affected. Shradha could not travel to India to pay her last respects to her mother's sister and brother-in-law, who had served essentially as Shradha's Godparents. She has not yet met her niece (brother's younger daughter) born during this period. In addition to the effects on

Shradha's mother's health, Shradha's own health has suffered tremendously. Living with this uncertainty and anxiety has taken a toll on Shradha. Having had no prior history of serious medical conditions, since 2021, Shradha has been experiencing regular and severe stress migraines which often lead to nausea and vomiting for a couple of days each time. [20]

Mr. Kirkpatrick notes (Exhibit C-6), "Shradha has been devastated by this process and I have personally witnessed her sadness as a result of losing the opportunity to continue her mission and yet none at losing her financial stability." As Shradha's actions from the time of indictment, through trial, and especially post-conviction show, these legal proceedings have led to life-changing lessons and ramifications for Shradha. Mr. Rabhan lives in Austin and has been closely observing Shradha:

> After a difficult event like being indicted, some entrepreneurs just try to move on and have success in other businesses. For better or worse Shradha does not fall into that category. After she was indicted and it was clear this was really happening, I watched Shradha cocoon herself in a self-imposed prison, reflecting and trying to comprehend the situation. Her life just paused… for years.
>
> The sight of her enduring six years of mostly self-inflicted torment was painful for me. She was determined to keep herself from doing anything until she had made sense of the situation and ultimately had made sense of the world.

(Exhibit C-1)

Courts are permitted to account for shame, humiliation and other aspects of a prosecution and conviction when determining an appropriate sentence. *See, e.g.*, *United States v. Warner*, 792 F.3d 847, 860-62 (7th Cir. 2015) (considering collateral consequences of conviction such as shame, humiliation, and professional damage when considering deterrence); *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (the "need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the

---

[20] The defense is submitting a recent letter from Shradha's physician to the Probation Department and ask that it be appended to the PSR.

defendant.") Here, Shradha has been significantly shamed and humbled, and has taken palpable steps to look inward and reflect on her conduct. A length sentence is not necessary to deter her further.

## VII.    THE NEED FOR GENERAL DETERRENCE

Likewise, Shradha's sentence does not need to be lengthy to deter the public from committing crimes or for others to recognize the severity of this offense. Many entrepreneurs attended the trial and countless others have read the local and national media coverage about it. As reflected in letters to the Court, some in the startup community have internalized lessons from this case, have taken action, and present a thoughtful perspective of growth at all costs. A few examples are set forth below:

- As a direct result of Shradha's trial, I have made the decision to grow my business more slowly and organically for the long-term rather than pursuing growth at all cost… or make promises our company can't deliver. As a convener of hundreds of other successful young entrepreneurs, I can say that my response is nearly universal. – Michael Simmons, education company in New Jersey (Exhibit C-3)

- We used to look at legal as somewhat of a nuisance that slowed things down... Now we value those services... – Evan Kirkpatrick, financial services in Iowa (Exhibit C-6)

- This case and all the publicity it received shows the business community that these corporate officer signed assertions are to be taken seriously. I have personally retold this story to fellow entrepreneurs. – Robby Hill, Health IT company in South Carolina (Exhibit C-5)

- I think about how our marketing is representing the facts, and if there are any ways we can improve it… making adjustments when we see opportunities for additional transparency or information… we would be way bigger by now if Shradha had not gone through this... I have actually seen many benefits to this that were unplanned. For example, my father who is more risk averse than I am is very proud of me, and more vocal about it than ever. – Benji Rabhan, healthcare services in Texas (Exhibit C-1)

The message that "fake it until you make it" is a fraudulent business practice has been adequately sent and received. Moreover, Shradha was not the impetus behind the ever-increasing revenue goals of Outcome and massive fundraising – the apparent goal of "faking it" in this instance. A lengthy sentence for *her* is not necessary to further deliver this message to the public.

## VIII.   CONCLUSION

Before deciding punishment for Union Army deserters in mid-1864, Abraham Lincoln is said to have discussed the matter with close friend and fellow Illinois politician Joseph Gillespie. Lincoln decided he would delay his judgment until the following morning. As Gillespie recalled, "Before retiring, I told Mr. Lincoln I could not sleep unless I had some inkling as to how he was going to decide in regard to these poor fellows." Lincoln's response: "I can't tell you; but I will say this, that I have always found that mercy bears richer fruits than strict justice."[21]

The defense humbly requests mercy for Shradha. The law, facts, and record set forth above fully support a substantially below Guideline sentence in this instance, and the extraordinary life she has lived to date amply demonstrates that mercy granted here will bear fruit. Given the chance, Shradha will continue the life she has always lived – one that is focused not on herself or personal enrichment, but dedicated to service and uplifting others.

Respectfully submitted,

s/Patrick W. Blegen
**PATRICK W. BLEGEN**, one of the
Attorneys for Shradha Agarwal

**BLEGEN & ASSOCIATES**
53 W. Jackson Boulevard
Suite 1424
Chicago, Illinois 60604
(312) 957-0100

---

[21] https://www.mrlincolnandfriends.org/the-politicians/joseph-gillespie/ (*citing* Francis Fisher Browne, *The Every-day Life of Abraham Lincoln*, p. 168)