IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
|     *Plaintiff*, ) | |
| ) | |
| v. ) | No. 19 CR 864 |
| ) | Judge Thomas M. Durkin |
| RISHI SHAH, *et. al.*, ) | |
| (SHRADHA AGARWAL) ) | |
| ) | |
|     *Defendants*. ) | |

**DEFENDANT AGARWAL'S OBJECTIONS AND CLARIFICATIONS TO THE PSR**

Defendant, **SHRADHA AGARWAL**, by and through her attorneys, **BLEGEN & ASSOCIATES, WILLKIE FARR & GALLAGHER, THE LAW OFFICE OF JOHN D. CLINE**, and **LARSON LLP**, respectfully submits the following objections and clarifications to the PSR.[1]

---

[1] Although we have some objections to the PSR's conclusions, and some clarifications to the factual information, the defense appreciates the level of attention and detail to this matter provided by the Probation Officer.

# TABLE OF CONTENTS

I. LOSS AND § 2B1.1 CALCULATIONS .................................................................. 1

    A. LOSS TO LENDERS AND INVESTORS .......................................................... 1

    B. LOSS TO CLIENTS ...................................................................................... 7

    C. DIMINISHED INTENT REGARDING LOSS ...................................................... 9

    D. TEN OR MORE VICTIMS ........................................................................... 10

II. THE COURT SHOULD NOT APPLY USSG § 3B1.1 TO SHRADHA ....................11

III. RESULTING GUIDELINE CALCULATIONS UNDER § 2B1.1 .............................. 16

IV. RESTITUTION ................................................................................................ 16

V. CORRECTIONS AND CLARIFICATIONS TO THE PSR ....................................... 16


**Federal Statutes**

18 U.S.C. § 1343 ................................................................................................... 2

**U.S. Supreme Court Cases**

*Burrage v. United States*, 571 U.S. 204 (2014) .................................................... 2

*University of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013) .......................... 3

**Federal Circuit Court Cases**

*United States v. Brennick,* 134 F.3d 10 (1st Cir.1998) ....................................... 10

*United States v. Broderson,* 67 F.3d 452 (2d Cir.1995) ..................................... 10

*United States v. Brown*, 994 F.2d 1377 (7th Cir. 1991) ...................................... 12

*United States v. Cabrera*, 172 F.3d 1287 (11th Cir. 1992) .................................. 2

*United States v. Dade*, 787 F.3d 1165 (7th Cir. 2015) ....................................... 12

*United States v. Domnenko*, 763 F.3d 768, 777 (7th Cir. 2014) .................................................... 2

*United States v. Figueroa*, 682 F.3d 694 (7th Cir. 2012) ............................................................. 12

*United States v. House*, 883 F.3d 720 (7th Cir. 2018) ................................................................. 12

*United States v. Lloyd*, 807 F.3d 1128 (9th Cir. 2015) .................................................................. 3

*United States v. Mendoza*, 576 F.3d 711 (7th Cir.2009) ............................................................. 12

*United States v. Monaco,* 23 F.3d 793 (3d Cir.1994) .................................................................. 10

*United States v. Morris,* 80 F.3d 1151 (7th Cir. 1996) ................................................................ 10

*United States v. Mustread*, 42 F.3d 1097 (7th Cir. 1994) ........................................................... 12

*United States v. Restrepo,* 936 F.2d 661 (2d Cir.1991) ............................................................... 10

*United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017) ................................................................. 3

*United States v. Stuart,* 22 F.3d 76 (3d Cir.1994) ....................................................................... 10

*United States v. Vasquez*, 673 F.3d 680 (7th Cir.2012) .............................................................. 12

*United States v. Vivit*, 214 F.3d 908 (7th Cir. 2000) ..................................................................... 1

*United States v. Weaver*, 716 F.3d 439 (7th Cir. 2013) .............................................................. 12

*United States v. Whiting,* 471 F.3d 792 (7th Cir.2006) ................................................................. 2

**Federal District Court Cases**

*United States v. Costello,* 16 F.Supp.2d 36 (D.Mass. 1998) ....................................................... 10

*United States v. Forchette,* 220 F.Supp.2d 914 (E.D. Wis. 2002) ............................................... 10

*United States v. Jackson,* 798 F.Supp. 556 (D.Minn.1992) ........................................................ 10

*United States v. Nachamie,* 121 F.Supp.2d 285 (S.D.N.Y.2000), *affd*, 5 Fed.Appx. 95 (2d Cir.2001) ...................................................................................................................................... 10

**United States Sentencing Guidelines**

U.S.S.G. § 1B1.3 ............................................................................................................................. 3

U.S.S.G. § 2B1.1 .................................................................................................................. 1, 6, 7, 10

U.S.S.G. § 3B1.1 .................................................................................................................... 11, 15

U.S.S.G. § 4C1.1 ........................................................................................................................... 16

## I.     LOSS AND § 2B1.1 CALCULATIONS

The defense submits the following objections to the loss calculations set forth in the PSR at paragraphs 47-50. Probation's calculations agree with those set forth in the government's Version of the Offense and Supplements. Because she had a different role at Outcome, and limited involvement in fundraising, the defense raises loss challenges for Shradha that are different than those raised by her codefendants. Nevertheless, we agree with global loss arguments related to loss raised by counsel for Mr. Shah. In the event the Court rejects the individualized loss arguments below, we hereby adopt the loss analysis set forth in Mr. Shah's sentencing memorandum.

### A.     LOSS TO LENDERS AND INVESTORS

Because the government has not sufficiently established that Shradha caused the loss to lenders and investors, she should not be accountable for those losses, calculated by the government and Probation as totaling $474,274,657.65 which is the sum of $448,632,849.50 from investors and $25,641,808.14 from lenders.

The primary failure of the government's effort to attribute investor and lender loss to Shradha is that it fails to establish that Shradha was a "but for" cause of the loss to investors and lenders. The Government bears the burden to establish the loss amount by a preponderance of the evidence. *See, e.g.*, *United States v. Vivit*, 214 F.3d 908, 916 (7th Cir. 2000). Here, the government has sought to establish actual loss. Actual loss is defined by the commentary to § 2B1.1 as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1(b)(1) n.3(A)(i). While courts need only make a "reasonable estimate" of the financial loss, the loss calculation must be based on the court's assessment of the evidence. U.S.S.G. § 2B1.1 n.3(C). The government must support its loss calculation with reliable and specific evidence. *United States v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1992).

1

The government's analysis, set forth in two supplements to its Version of the Offense,[2] briefly addresses "reasonable foreseeability," but its analysis is meager and does not focus on Shradha specifically at all, stating only that, for example, "[b]ecause the jury convicted the defendants of all the counts related to the investor fraud, the losses to all the investors were reasonably foreseeable to all three defendants." (Govt Supplement 1, p. 9). Simply pointing to the counts of conviction is plainly not enough, and similar efforts to base reasonable foreseeability on the fact of conviction and have been rebuffed. "If the government was correct, practically every defendant convicted in every fraud case could be held responsible for every resulting loss, foreseeable or not, since everyone convicted under 18 U.S.C. § 1343 must have had an intent to defraud. *United States v. Domnenko*, 763 F.3d 768 (7th Cir. 2014). "The loss must be 'reasonably foreseeable,' which requires some causation analysis, and that was not done here." *Id*. (*citing United States v. Whiting,* 471 F.3d 792, 802 (7th Cir. 2006) (requiring "but for" and legal causation).

Courts are required to perform a causation analysis and must conclude the defendant was both the proximate cause *and* the "but for" cause of the loss. *Id*. (causation analysis is required to determine reasonable foreseeability); *Whiting*, 471 F.3d at 802 (but for and proximate causation inquiries are required.) "But for" causation means "'that the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct." *Burrage v. United States*, 571 U.S. 204, 210 (2014) *quoting University of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. 338, 346-47 (2013). In an investment context, the government must show, through direct or circumstantial evidence, that investors relied on the fraudulent information provided by the defendant to meet the

---

[2] The government submitted a September 1, 2023 "Supplement to Government's Version of the Offense Regarding Amount of Loss" which addressed investor loss and an October 19, 2020, "Second Supplement to the Government's Version of the Offense Regarding Amount of Loss and Restitution," which addressed lender loss.

2

"but for" causation requirement.[3] *United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017).

It is also not sufficient to simply say that there was jointly undertaken criminal activity, so all loss is attributable to each participant. (Govt Supplement, pp. 1-2) Attributing loss to a defendant requires an analysis of reasonable foreseeability and whether the loss was within the scope of the criminal activity that the defendant agreed to jointly undertake. *See*, *e.g., United States v. Lloyd*, 807 F.3d 1128, 1142 (9th Cir. 2015). The Guidelines make clear that an individual analysis of the particular defendant is required:

> Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant (the "jointly undertaken criminal activity") is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement). The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision. The conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision.

U.S.S.G. § 1B1.3, commentary, n. 3(B)

From the beginning, and as illustrated by the charging language in the Superseding Indictment ("Indictment"), Shradha was deemed to have a different role and different level of culpability and involvement as related to the scheme to defraud investors and lenders. Count One describes Outcome's efforts to obtain a $110 million loan in the spring of 2016, a $375 million loan in the winter of 2016, and the $487.5 million capital raise in 2017. (Dkt 14, pp. 13, 15, 17). With relation to all of these efforts at raising funds, the Indictment alleges that two of Shradha's

---

[3] A defendant would, of course, not escape liability because she caused another to provide false information to an investor. As discussed below, however, the Superseding Indictment in this matter did not even allege that Shradha caused others to provide false information.

3

codefendants "provided and caused to be provided to [the lenders or investors] materially false and misleading information regarding Outcome, including [various materially false documents and revenue numbers]." *Id*.

The allegations against Shradha are markedly different. Shradha is not alleged to have provided false and misleading documents to lenders and investors, nor is she even alleged to have caused someone else to do so. Instead, in each instance of fundraising, the Indictment alleges that the documents were provided with Shradha's "knowledge and approval." *Id*. "Knowledge and approval" is, of course, a far cry from actively providing false financial information to lenders and investors upon which they rely. It also does not amount to "but for" causation.

The essence of the lender and investor fraud is that they were provided materially false information that caused them to lend money to Outcome Health or invest in Outcome Health. It simply cannot be said that the investor and lender loss would not have occurred without Shradha's "knowledge and approval." Others, who were not being controlled by Shradha, had direct ongoing involvement with the investors and lenders, instigated and arranged for the loans and investments, and provided the purportedly false financial documents and information.

The evidence bore out Shradha's virtually non-existent role with lenders and investors and also revealed an absence of knowledge on her part as to what was even being provided to them. With regard to lenders, J.P. Morgan and several other banks provided a $90 million loan and $20 million line of credit in April 2016. James McHugh, the J.P. Morgan trial witness, could not recall whether he had met Shradha once or twice "at initial meetings" or in a "dog and pony show." Tr. 7744-45; 7481. He testified that she had no role in providing financial information in connection with the loan and did not sign the loan documents. (Tr. 7843-44; 7774; GX 573). Shradha attended a presentation to lenders, but she was not a presenter. (Tr. 7845, 8277; GX 534 at 4). No evidence

4

was offered that she knew information others presented to J.P. Morgan was false.

Shradha's connection to the December 2016 $325 million loan and $50 million line of credit from J.P. Morgan and other banks was even more attenuated. As Mr. McHugh acknowledged regarding this loan, Shradha did not attend either the presentation to the ratings agency or the presentation to the institutional lenders for that loan. (Tr. 7781-82, 7844-45; GX 671 at 3, 5). When a JP Morgan representative emailed the Outcome presentation to attendees at the lender presentation, Shradha was not among the recipients. (GX 671). She was not copied on any of the diligence questions or documents and was not a signatory on the loan. (Tr. 7824-30; 7796). There was no evidence she provided JP Morgan with financial information in connection with the December 2016 loan, made any misrepresentations, caused others to make misrepresentations, or knew that misrepresentations were being made.

The evidence regarding Shradha's involvement, contact and communications with investors is similarly threadbare. Goldman Sachs made an investment on March 1, 2017. The Goldman trial witness, Ken Eberts, testified that he did not meet with Shradha personally during the due diligence period and had no expectation that she would make representations or disclosures to him about the operation of the business. (Tr. 6859-60).

CapitalG, the investment arm of Google, invested on March 20, 2017. Laela Sturdy, the CapitalG trial witness, testified that she met with Shradha on January 20, 2017. Ms. Sturdy described her conversations with Shradha as "mostly around product, content, and culture." Tr. 8612-13. As with the other investor counts, there was no evidence that Shradha provided financial information or historical revenue figures, nor was she a point of contact for other data or due diligence information. (Tr. 8623; 8691-94). There was no evidence that she made any misrepresentations, causes others to make misrepresentations, or knew that misrepresentations

were being made.

Leerink invested on April 28, 2017. Todd Cozzens, the Leerink trial witness, was asked to describe his interactions with Shradha. His answer: "Not a lot. You know, talked about, you know, founding of the company, the mission, et cetera. Less--less with her." (Tr.7894). The government presented no evidence linking Shradha to any misrepresentations made to Leerink or otherwise establishing her involvement in a scheme to defraud Leerink.

In sum, the government did not even allege that Shradha caused false financial information to be provided to lenders and investors. Instead, they alleged it was done with her "knowledge and approval." The actual evidence demonstrated even less than that, revealing her involvement with the representatives of the lenders and investors was brief and related not to financial matters but to her actual role in the company – content and culture. The evidence also demonstrated that Shradha was unaware of any false financial information being provided to investors and lenders. Shradha is not a "but for" cause of the loss to lenders and investors, and those losses should not be attributed to her under § 2B1.1.

Such losses were also not within the scope of any activity she agreed to jointly undertake. The Court has also now seen contemporaneous emails (Exhibits N and O to Shradha's Sentencing Memorandum) detailing how she was sidelined from matters related to the company's growth strategy and fundraising—including as her personal relationship with Shah, previously her romantic partner, deteriorated with minimal communication by 2014. As Exhibit O reflects, there was not a jointly undertaken decision to pursue massive fundraising, and Shradha was left in the dark on many details. As Shradha wrote in November of 2015:

> "But all our most important conversations - banks, investors, lawyers - are happening without me and when I ask for quick updates just to be aware, I'm told it's not worth my time. I think if we truly are partners in this business, I should be at least aware, just aware, of what is being considered, what routes we're choosing,

6

> where our financing is coming from, how much debt we're loading on, I don't think it's fair to tell me it's none of my business. It IS my business. I'm not saying decisions need to be made democratically or we need to slow down any of our processes, but being kept in the dark makes me wary. We're both only 30 and this isn't the first big thing we're going to build. Next time, we may actually want to raise money. I trust you when you told me to pull myself out of these conversations - I actively dodge invitations from banks and investors at this point. In return for this trust, I can't be left off the story or the path.

(Exhibit O).

The trial evidence, along with contemporaneous emails, demonstrates the government's failure to establish that Shradha caused the loss to lenders and investors for purposes of USSG § 2B1.1.

### B. LOSS TO CLIENTS

The same analysis regarding how loss must be calculated and attributed, including "but for" causation, applies to the entire amount of client loss ($48,447,468) that the government and Probation have attributed to Shradha. Shradha's role at Outcome Health, and her primary areas of focus during the entirety of her time there, related to content (the creation of educational videos), product (software and hardware), as well as hiring and culture (a human resources role aimed at hiring talent and creating a positive working environment). Jason Ketchum explained that, "content was … the most important part" of the company, given its mission to educate patients, and Shradha was heavily involved in the content because she "had a passion for education." (Tr. 1631). Ashik Desai testified that he only overlapped with Shradha for a period of weeks in sales, and thereafter, the nature of their communications were largely related to recruiting, marketing, office builds and moves, and eventually product. (Tr. 4840; 4189; 4900). Sameer Kazi likewise confirmed Shradha's role in marketing, products, and engineering, as well as the large amount of work this focus entailed. (Tr. 502-03).

Shradha was not, for the vast majority of her time at Outcome, involved in sales. There was a period from July 2012 to July of 2013, that she was pulled into sales before returning to

7

focus on her traditional roles. (Tr. 1638) But that limited time in sales does not make Shradha accountable for the entire amount of loss to clients.

The government's argument that Shradha should be accountable under § 2B1.1 for all of the client losses, including the years 2015-2016 when Shradha was undeniably not involved in sales, boils down to "delta reports"; that is reports indicating that Outcome had shortfalls in its delivery versus contracted amounts of screens. (Govt Supplement, p. 5). The problem with delta reports is that Shradha did not receive them and thus was not made aware of ongoing fraud. At trial there was some confusion between "growth models" and delta reports. Shradha and many others received growth models, which were goal planning documents for the entire company. (E.g., CX 11160, CX 11164). Shradha received none of the actual delta reports that tracked contracts. (E.g. Tr. 3114-15, 8394-8406, 8458-59, 8827-28). Perhaps having now realized the impact of the absence of delta reports on Shradha's culpability for losses in later years, the government's supplement pivots to a single email from Mr. Shah, indicating that he did not want people bringing up various ideas regarding how to deal with "deltas" during management meetings without first clearing it with him. (Govt Supplement, p. 5). That email (GX 557), does not carry the significance the government seeks to give it. The word "delta" does not appear in the email chain at all. And the "gap" that one of the employees was going to discuss was a gap in the *growth model* – a business model designed to predict how much the company would grow in coming months. This email does not demonstrate that "everyday was 'delta day'" or that Shradha was aware that Outcome was routinely and massively falling short of its contracted number of screens. (Govt Supplement 1, p. 5).

Moreover, in light of her short involvement in sales and her focus on other matters, primarily content, product, and culture, it cannot be said that Shradha is a "but for" cause of client

8

losses in later years. The government's supplement concedes as much, asserting that the practice of billing in full despite the existence of deltas, "stemmed directly from Shah, who—despite being informed of significant deltas—"continually push[ed]" for ever-increasing sales "goals that [Outcome] could not reach" without defrauding its pharma clients. (Govt. Supplement, p.5, *quoting* (Tr. 2348–49, 3028–29)).

In light of the above, it is the defense position that Shradha should be held accountable for the client losses occurring in the early years at Outcome, during part of which time Shradha was involved in sales. That loss amount would be no more than $3,539,517.68, the amount of losses to clients identified by the government as occurring between 2012 and 2014. (Govt Supplement 1, pp. 6-7).

### C. Diminished Intent Regarding Loss

In the event the Court overrules the defense Guideline objections related to loss, Shradha's diminished intent regarding the loss and her limited role should result in a substantially below guideline sentence under § 3553.

Even before the Guidelines became advisory, courts could grant a downward departure where the calculated loss amount overstates the seriousness of the Offense. Pursuant to Application Note 10 to 2Fl.1 (the previous fraud guideline), a downward departure could be appropriate in a case where the "loss determined under subsection (b)(l) [overstates] the seriousness of the offense." 2Fl.1, comment. (n.10) (1995). The current fraud guideline, § 2Bl.1, has similar language although not limited only to loss calculations. "There may be cases in which the offense level determined under the guideline substantially overstates the seriousness of the offense. In such cases a downward departure may be warranted." § 2Bl.1, comment (n. 21(C))

One district court has explained that departures were granted on these bases in light of a

9

defendant's "unusual conduct or role." *United States v. Forchette,* 220 F.Supp.2d 914 (E.D. Wis. 2002). The court described such a departure as follows:

> [T]he unusual nature of the fraudulent conduct or of the defendant's role in it may provide a basis for a departure. For example, the defendant may have had a limited or inferior role in the fraud that bore little relationship to the amount of the loss; he may have had little or no knowledge of the amount being taken, such that it would be unfair to attribute the entire amount of loss to him; his intent in involving himself in the scheme may have been significantly different than of the usual fraud defendant, *e.g.* he may have entered the scheme with honest intentions or with the intent to make good on his obligations; his fraudulent representation may have been of limited materiality, as where he could have obtained a loan by truthful means but at a higher interest rate; or the defendant's fraud may have been of little or no gain, especially in comparison to the size of the loss.

*Id.* at 925 (*citing United States v. Brennick,* 134 F.3d 10, 13 (1st Cir.1998); *United States v. Morris,* 80 F.3d 1151, 1172-74 (7th Cir. 1996); *United States v. Broderson,* 67 F.3d 452, 459 (2d Cir.1995); *United States v. Monaco,* 23 F.3d 793, 799 (3d Cir.1994); *United States v. Stuart,* 22 F.3d 76, 82 (3d Cir.1994); *United States v. Nachamie,* 121 F.Supp.2d 285, 295-97 (S.D.N.Y.2000), *affd*, 5 Fed.Appx. 95 (2d Cir.2001); *United States v. Costello,* 16 F.Supp.2d 36, 39-40 (D.Mass. 1998); *United States v. Jackson,* 798 F.Supp. 556, 557 (D.Minn.1992); *United States v. Restrepo,* 936 F.2d 661, 667 (2d Cir.1991)).

For the reasons explained above, Shradha's conduct and intent, particularly as it relates to fundraising, was limited. She was not directly involved in soliciting or obtaining the fundraising, and as her contemporaneous email demonstrates, she was left out of the decision-making process. Fundraising makes up the vast majority of the government's proposed loss and is a substantial driver of the Guideline range. The Court should account for Shradha's different and more limited role when selecting an appropriate sentence.

### D. TEN OR MORE VICTIMS

The government and Probation have applied a 2 level enhancement for Ms. Agarwal based

10

on ten or more victims under 2Bl.l(b)(2)(A)(i). Because Ms. Agarwal should be held accountable only for losses related to the ear1y days at Outcome Health, when she was temporarily involved in sales, this enhancement should not apply. According to Attachment A to the government's loss supplement, the number of clients suffering a loss during that time period is less than ten.

## II. THE COURT SHOULD NOT APPLY USSG § 3B1.1 TO SHRADHA

Despite having told the jury in closing arguments that, "Shah was the fraud's leader; Agarwal, its enthusiastic supporter; Purdy, its loyal captain; and Desai, its talented workhorse," the government now seeks the same four level enhancement as an organizer or leader under U.S.S.G. § 3B1.1 for Shradha as it does for Mr. Shah.[4] (Tr. 9170; Govt Version pp. 12-29) Shradha was undoubtedly a leader of Outcome – she eventually received the title of co-founder and was the company's President. But Outcome was not a fraudulent company. Outcome provided real services, entered and performed on many of its contracts, and still operates today as part of a successor company, Patient-Point. The enhancement is only appropriate if Shradha was an organizer or leader of the *criminal activity*, not merely a leader of the company. *See* U.S.S.G. § 3B1.1(a) (stating adjustment may apply to "organizer or leader of a criminal activity"). When examining the criminal activity, and separating out her role in Outcome's legitimate business, it is apparent that Shradha is not a leader or organizer.

"The central concern of § 3B1.1 is the defendant's relative responsibility for the commission of the offense." *United States v. Vasquez*, 673 F.3d 680, 685 (7th Cir.2012) (*quoting United States v. Mendoza*, 576 F.3d 711, 717 (7th Cir.2009). The "primary goal in applying § 3B1.1 should be to make a 'commonsense judgment about the defendant's relative culpability

---

[4] The PSR adopted the government's position. PSR, par. 56.

11

given [the defendant's] status in the criminal hierarchy.'" *United States v. House*, 883 F.3d 720, 724 (7th Cir. 2018) (*quoting United States v. Dade*, 787 F.3d 1165, 1167 (7th Cir. 2015).

As the Seventh Circuit has explained, the key inquiry of a sentencing court's analysis should be "whether the defendant exercised some control over at least one other participant," *United States v. Mustread*, 42 F.3d 1097, 1104 (7th Cir. 1994) (*citing United States v. Brown*, 994 F.2d 1377, 1381 (7th Cir. 1991). For the purposes of § 3B1.1, "a defendant exercises control and authority over another when [the defendant] 'tells people what to do and determines whether they've done it.'" *United States v. Weaver*, 716 F.3d 439, 443 (7th Cir. 2013) (*quoting United States v. Figueroa*, 682 F.3d 694, 697 (7th Cir. 2012)). The Seventh Circuit has also explained that the enhancement can apply if the defendant "was responsible for organizing others." *House*, 883 F.3d at 725 (*citing Dade*, 787 F.3d 1166). But, of course, that organizing of others must have been, "for the purpose of carrying out the crime." *Id*. The enhancement also "requires ongoing supervision, not a one-off request from one equal to another during the course of the criminal activity." *Weaver,* 716 F.3d at 444 (*citing Figueroa*, 682 F.3d at 697–98).

Here, the government has failed to establish that Shradha directed any of the other participants in the commission of the offense or was responsible for organizing others for the purposes of carrying out the crime. The portion of the government's Version of the Offense seeking to establish that Shradha should receive the same four level enhancement as Mr. Shah is eighteen pages long, but it provides little in the way of analysis of Shradha as an individual. It begins by noting that Shradha was "the President and co-founder of Outcome." (Govt Version, p. 12) But this, of course, is insufficient. The Version then generally lumps Shradha together with Mr. Shah, arguing for the leadership role of "Shah and Agarwal," or "Agarwal and Shah" or referring to them collectively as "they" more than a dozen times. *Id*. at 12-29.

12

With regard to analysis directed specifically at Shradha, the government's Version is sparse and does not meet the burden of establishing the enhancement. As to whether Shradha directed a participant in the offense, and after a ten-week trial, the government's Version of the Offense points to *two* emails alleging that she provided such direction.

The first email is GX 274 (also GX 271).[5] This email - much debated at trial – uses the phrase "made-up" and the government claims it amounts to Shradha, "directing [Desai] to silo information from sales." (Govt Version, p. 14.) As the trial evidence made clear, the government has misunderstood this email from the beginning.[6] This email concerns removing salespeople from conversations related to complicated calculations, which could and actually did confuse salespeople. (Tr. 1567-1590). This email is also not a direction to keep salespeople in the dark about lies or false calculations – the information was truthful and the calculations were not "made-up." (Tr. 1541) To the extent this email can be read as a "direction," it is a business-related effort to prevent sales people from getting confused by complex calculations; it was not a direction related to the offense. Other emails and testimony prove this point. Shradha also told Mr. Desai that she did not want to "overpromise and under-deliver" on a campaign. (DX 8931). She told salespeople, with Mr. Desai copied, that she was using "conservative" numbers – "adjusting numbers down" to 400 rather than 600. (Tr. 4887-89; DX 8818). Shradha also sent out company-wide emails indicating what actual install numbers were, and sought to make that information available to salespeople on Google drive, indicating that she did not intend to "silo" sales people. (Tr. 1627-29; DX 8752) Salespeople also generally were aware that projections were being used

---

[5] GX 271 contains Mr. Shah and M. Desai's responses. Notably, Mr. Desai does not respond until Mr. Shah has weighed in.
[6] Shradha was, of course, convicted. But the jury did not necessarily accept each and every one of the government's arguments.

13

in list matches, and Shradha openly discussed growth projections with them. (Tr. 1648; 4887-89; 4896-99; DX 11099).

The second email the government relies on as a "direction" is GX 67, an email from Shradha to Jason Ketchum. In this email Mr. Ketchum and Shradha are discussing a projection for a list match for Pradaxa, and Mr. Ketchum asks, "do we want ms and outreach to project, ms only, or ms and an overly [sic] combo to project?" Shradha responds, "Full MS + MO pipeline + project from overlay combo of the list we'll soon start to call that is more diabetes-focused." (GX 67). The government asserts that this email "directed Ketchum to massively inflate the list match for Pradaxa." (Govt Version, p. 15) Again, the government provides little analysis as to why this was a direction connected with the commission of the offense. The Pradaxa campaign was understood by Shradha and others at Outcome including Jim Demas to be a weighted average campaign from the start for which the use of projection would not be inappropriate. Tr. 1357-58; GX 88; GX 195; DX 7624.

The remainder of the government's arguments regarding the enhancement for Shradha focus on emails and voxers indicating that she was aware of certain issues, for example employees who were leaving Outcome, whistleblowers, and complaints about the company's practices. (Govt Version, pp. 19-23) None of those communications involve Shradha directing, ordering, or even organizing anything. And, most of those communication are with Mr. Shah, who no one has or could suggest Shradha was superior to or was "leading" for purposes of § 3B1.1 At most, these communications amount to communications *to a superior*.

With regard to the more holistic 3B1.1 analysis suggested by the Seventh Circuit (a "commonsense judgment about the defendant's relative culpability given [the defendant's] status in the criminal hierarchy") it is hard to imagine that common sense would lead to Shradha being

14

considered a leader or organizer on par with Mr. Shah. The government's closing argument, referenced above, calling Shradha an "enthusiastic supporter" but not a "leader" is a good starting point. The evidence made clear as well that Shradha's role was considerably less for other reasons as well. She was directly involved in sales, and therefore list matches and projections, for only a little over a year – from 2012 to 2013. (Tr. 1638). She did not work directly with Mr. Desai on sales strategy. (Tr. 3829). She was not involved in Mr. Desai's discussions about revenue. (Tr. 3831).

She did not work with Mr. Desai on ROI studies. (Tr. 3871). She was not involved in make-good discussions. (Tr. 4007). She was not involved in Mr. Desai's discussions related to proof of play affidavits. (Tr. 4010-4011). She did not provide direction to Mr. Desai regarding firing "toxic" employees. (Tr. 4115). In short, her relative culpability is far below that of a leader/organizer in the context of the offense.

The above analysis relates to the scheme to defraud clients of Outcome (the pharma companies) alleged in the Indictment. Although briefly mentioned in the government's Version (Govt Version, p. 29), Shradha was so disconnected from the fundraising that a leadership role related to that scheme should be a non-starter. The Indictment makes that clear. In each instance where the Indictment alleges active conduct by other defendants to obtain a loan or fundraising, the Indictment alleges that such conduct was performed not by Shradha, but with her "knowledge and approval." (Dkt 14, pars. 17, 22, 29)[7]. This lack of involvement was borne out by the evidence as well. For example, Shradha did not take the lead in fundraising negotiations and was not involved in them. (Tr. 3805; 3817). Shradha did not attend various meetings and presentations

---

[7] The same "knowledge and approval" allegation is used in connection with the false tablet metrics charges as well. (Dkt. 14, par. 12)

15

with JP Morgan. (Tr. 7781; 7782; 7844-45). Shradha was not a primary contact for Google relate to its investment diligence. (Tr. 8612-13; 8630-33; 8691; 8693-94).

The Court should decline to add four levels to Shradha's offense level as a leader/organizer.[8]

### III. RESULTING GUIDELINE CALCULATIONS UNDER § 2B1.1

| | |
|---|---|
| 2B1.1(a)(1) Base Offense Level | 7 |
| 2B1.1(b)(1)(J) Loss Amount $3,539,517.68 | +18 |
| 2B1.1(b)(2)((A)Ten or more victims | +0 |
| 2B1.1(b)(10)(C)Sophisticated Means | +0 |
| 2B1.1(b)(17(A) More than $1 million | +2 |
| 3B1.1(a) Aggravating Role | +0 |
| 4C1.1 Zero Point Offender | -2 |
| Total | 25 |

### IV. RESTITUTION

The analysis and arguments set forth in Section I above apply equally to restitution. For example, "but for" causation applies to the Mandatory Victim Restitution Act ("MVRA"). *See, e.g.*, *United States v. Betts*, 99 F.4th 1048, 1061 (7th Cir. 2024). As such, the defense submits that the appropriate amount of restitution for Shradha is $3,539,517.68.

### V. CORRECTIONS AND CLARIFICATIONS TO THE PSR

Shradha provided detailed financial information to the Probation Department during the PSR process in August of 2023; her financial information has changed somewhat since that time. In addition, however, there are some inaccuracies in the PSR's recitation of Shradha's finances that substantially impact her net worth.

---

[8] The absence of a leader/organizer enhancement also means that Shradha qualifies for the zero point offender reduction pursuant to U.S.S.G. § 4C1.1.

16

- A Personal Certificate of Deposit Account is listed as having $750,001. (PSR pg. 27; par. 119) As documents provided to the probation department reflect, this CD's value was actually $75,001.

- PSR lists the full value of a condominium on East Chicago Avenue (this condo is posted as bond) as an asset of Shradha's. [9] (PSR pg. 28, par. 119) As reflected in the Pretrial Services report in this matter, and bond documents, the property is owned jointly by Shradha and her husband. In the same way the PSR treats other joint property, half of the value should therefore be listed as an asset of Shradha.

- Due to the above, the total assets calculated in the PSR (PSR pg. 28, par. 119) should be reduced by $1,209,000.00.

Respectfully submitted,

s/Patrick W. Blegen
**PATRICK W. BLEGEN**, one of the
Attorneys for Shradha Agarwal

**BLEGEN & ASSOCIATES**
53 W. Jackson Boulevard
Suite 1424
Chicago, Illinois 60604
(312) 957-0100

---

[9] The property was mistakenly listed by the defense as an individual asset (I) as opposed to a joint asset (J) in documents provided to the probation department.

17