IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 19 CR 864 |
| RISHI SHAH, et al., | Judge Thomas M. Durkin |
| Defendants. | |

**DEFENDANT RISHI SHAH'S**
**OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT**

Defendant Rishi Shah, through his counsel, hereby submits the following Objections to the

Presentence Investigation Report ("PSIR") dated October 27, 2023:

**General Objection.** In order to preserve his appellate rights, Mr. Shah generally objects
to the PSIR's description of the offense conduct, including but not limited to Paragraphs 2,
3, and 19–34, 47–53, and 55.

**Page 3.** DL#: IL S000-7388-6005 (Not Valid/Expired)

**Mr. Shah's Objection:**
Mr. Shah has a current driver's license issued by Puerto Rico. His DL# is 7140334, and it
was issued on November 21, 2019, and is set to expire on January 5, 2025.

**Paragraph 3.** On or about the dates set forth below, the defendant(s), for the purpose of executing
a scheme to defraud, knowingly transmitted, and caused to be transmitted by means of wire
communication, in interstate commerce certain writings, signs, and signals, each wire
communication constituting a separate count; all in violation of 18 U.S.C. § 1343.

| COUNT | DEFENDANT(S) | DATE | WIRE COMMUNICATION |
|---|---|---|---|
| 3 | Brad Purdy | May 4, 2015 | an email to Analyst A and Ashik Desai, which was routed through Google's computer servers located outside the State of Illinois, in response to an email from Analyst A to Brady Purdy and Ashik Desai |

1

| 5 | Rishi Shah | November 14, 2015 | an email to Employee A and Ashik Desai, which was routed through Google's computer servers located outside the State of Illinois |
|---|---|---|---|
| 6 | Ashik Desai | February 26, 2016 | an email message from Ashik Desai to Brad Purdy, which was routed through Google's computer servers located outside the State of Illinois, asking for Purdy's guidance on how to conceal the deltas on advertising campaigns from Auditor A |
| 7 | Brad Purdy | March 17, 2016 | an email from Brad Purdy to a banker at Bank A, which was routed through Google's computer servers located outside the State of Illinois, and which attached a borrower authorization letter that falsely stated that the information Outcome provided to lenders in connection with seeking a $110 million loan did not contain any untrue statement of material fact, or omit to state a material fact necessary to make the statements contained not materially misleading |
| 14 | Rishi Shah Shradha Agarwal | January 23, 2017 | a Voxer audio message from Shradha Agarwal to Rishi Shah, which was routed through Voxer's computer servers outside the State of Illinois |
| 15 | Rishi Shah Shradha Agarwal | January 24, 2017 | an iMessage from Rishi Shah to Shradha Agarwal and Ashik Desai, which was routed through Apple's computer servers located outside the State of Illinois |
| 16 | Rishi Shah Shradha Agarwal | January 24, 2017 | a Voxer audio message from Rishi Shah to Shradha Agarwal, which was routed through Voxer's computer servers outside the State of Illinois |

| 17 | Rishi Shah<br>Shradha Agarwal | January 24, 2017 | a Voxer audio message from Executive C that Shradha Agarwal forwarded to Rishi Shah, which was routed through Voxer's computer servers outside the State of Illinois |
| 18 | Rishi Shah<br>Shradha Agarwal | January 25, 2017 | an iMessage from Rishi Shah to Shradha Agarwal, which was routed through Apple's computer servers located outside the State of Illinois |
| 19 | Rishi Shah | February 1, 2017 | an email from Rishi Shah to Ashik Desai, which was routed through Google's computer servers located outside the State of Illinois, which attached a whistleblower letter from an attorney representing [Marketing Sciences SVP A]. |
| 20 | Rishi Shah<br>Shradha Agarwal | February 10, 2017 | an email from Rishi Shah to Shradha Agarwal and Ashik Desai, which was routed through Google's computer servers located outside the State of Illinois |
| 21 | Rishi Shah<br>Brad Purdy | February 14, 2017 | an email from Brad Purdy to Rishi Shah and Ashik Desai, which was routed through Google's computer servers located outside the State of Illinois, and included a forwarded email from Employee B |
| 22 | Rishi Shah<br>Shradha Agarwal<br>Brad Purdy | March 1, 2017 | an interstate wire transfer of $52,180,000 through the Federal Reserve System from Investor A's account at the Bank of New York to an Outcome Inc. bank account at JPMorgan Chase |
| 24 | Rishi Shah<br>Shradha Agarwal<br>Brad Purdy | March 20, 2017 | an interstate wire transfer of $50,000,000 through the Federal Reserve System from Investor B's account at the Wells Fargo Bank to an Outcome Inc. bank account at JPMorgan Chase |

| 26 | Rishi Shah Shradha Agarwal Brad Purdy | April 28, 2017 | an interstate wire transfer of $15,000,000 through the Federal Reserve System from Investor C's account at the Silicon Valley Bank to an Outcome Inc. bank account at JPMorgan Chase |
|---|---|---|---|

**Mr. Shah's Objection:** Mr. Shah asks that the PSIR be revised to strike Counts 3, 6, and 8, because Mr. Shah was not charged in those counts.

**Paragraph 4.** Count 8 charges that on or about March 23, 2016, Brad Purdy, along with others known and unknown to the Grand Jury, knowingly made a false statement to Bank A, the deposits of which were then insured by the Federal Deposit Insurance Corporation, by sending a copy of an Outcome financial statement reflecting inflated revenue numbers to a Bank employee, for the purpose of influencing Bank A and other participating banks to offer a loan to Outcome; in violation of 18 U.S.C. §1014.

**Mr. Shah's Objection:** Mr. Shah asks that the PSIR be revised to strike this paragraph because it relates to Count 8, for which Mr. Shah was not charged.

**Paragraph 23.** The government's version indicates that in 2015 and 2016, the defendants defrauded more than 25 customer victims on more than 100 advertisement campaigns, which was corroborated by Special Agent Stakem. The government's version notes that the defendants obtained more than $100 million from customers over the course of many years and many advertisement campaigns. The supplement to the government's version specifies that, based on conservative estimates, between 2012 and 2016, Outcome's clients suffered approximately $48.4 million in losses, which is based on the amount Outcome billed its clients for ads it did not run. The second supplement to the government's version indicates the clients incurred a loss of $48,447,468.

**Mr. Shah's Objection:** Although described as the government's version, Mr. Shah nevertheless objects to the statements contained in this paragraph of the PSIR. Mr. Shah's sentencing memorandum and accompanying expert analysis show that the Government cannot meet its burden to show that its calculation of over $48 million of Outcome customer losses is a reasonable estimate of loss based on reliable evidence. *See, e.g.*, *United States v. Newton*, 76 F.4th 662, 672 (7th Cir. 2023). At Mr. Shah's direction, Outcome's customers received millions of dollars of reimbursements and credits for ads that were not run, including before the *Wall Street Journal* article alleged that Outcome was engaging in fraud. The Government cannot show that Outcome's customers suffered $48 million in losses with any degree of reliability under the circumstances.

**Paragraph 24.** The government asserts that no credit for refunds made to Outcome's clients starting in 2017 should be applied to the $48.4 million loss because Outcome provided refunds to their clients in 2017 after the clients questioned the failure of the ROI guarantees, which revealed Outcome had routine under-deliveries. The government states that the inquiries were made by the victims and not affirmative disclosures made at the initiative of the defendants.

**Mr. Shah's Objection:** Although characterized as the government's assertion, Mr. Shah objects. Mr. Shah should receive credit against the loss amount for providing refunds to customers—efforts undertaken to mitigate the harm. Further, it is the Government's burden to provide reliable evidence establishing that Outcome's customers lost $48.4 million. *See, e.g.*, *Newton*, 76 F.4th at 672. There is credible evidence that, at Mr. Shah's direction, Outcome began issuing credits and refunds to Outcome customers before any Government investigation or public allegation of fraud, and before those customers contacted Outcome to request any relief. The Government has made a bald assertion that Outcome's "victims" prompted the refunds and that Outcome did not make affirmative disclosures, but the Government has not performed any analysis or made any showing sufficient to support its assertion—much less met its burden to show the losses with any degree of certainty or reliability. To Mr. Shah's knowledge, the Government lacks evidence to trace the timing and circumstances of the make goods Outcome provided at his direction, and Mr. Shah lost access to that information when he left the company.

**Paragraph 26.** During 2016, Shah and Purdy met with lenders to obtain loans for Outcome. In March and April of 2016, Outcome obtained $110 million from lenders, resulting in the distribution of $30.2 million to Shah and $7.5 million to Agarwal. Special Agent Stakem indicated that it is common for founders of companies to take cash out for their work. The government's version states that in November and December of 2016, Outcome obtained $375 million from lenders. In order to obtain the loans, Shah and Purdy provided the lenders with false information about Outcome's revenue, which information was material to the lenders. The government did not specify in its version of the offense the number of lenders who funded the two loans; however, the government stated, and Special Agent Stakem corroborated, that the victim financial institutions included JPMorgan Chase Bank, Goldman Sachs, and Wells Fargo. According to the second supplement to the government's version, the December 2016 loan obtained by Outcome consisted of (1) a $325 million Term B from debt investors that was used to acquire a competitor, Accent Health, and to refinance an old debt; and (2) a $50 million line of credit for a group of large commercial banks. The government stated that there were over 20 different lenders who participated in the Term B loan. The government sought information from the lenders to ascertain their losses. Seven lenders responded to the government's request, indicating they suffered losses totaling $25,641,808.14.

**Mr. Shah's Objection:** Mr. Shah objects to the assertion that the lenders lost $25,641,808.14. As discussed in Mr. Shah's Sentencing Memorandum and above, the Government bears the burden to establish the loss amount through reliable evidence. *See, e.g.*, *Newton*, 76 F.4th at 672. However, the Government has failed to perform any analysis to substantiate its conclusion that the lenders experienced $25,641,808.14 in foreseeable losses that are attributable to Mr. Shah's conduct. Of particular importance is that the Government has not shown and cannot show that the alleged lender losses were not caused by other intervening events. For example, Outcome undertook a merger that greatly increased its costs and negatively impacted Outcome's performance. That failed merger was neither the product of nor caused by Mr. Shah's conduct, and it represents an independent cause of losses experienced by lenders. The Government also fails to account for the settlement which restructured Outcome and provided significant value to the

lenders. As part of this settlement, Mr. Shah relinquished control of Outcome. Finally, the Government does not account for the 2019 restructuring. Mr. Shah left Outcome in January 2018. In addition, as the Government acknowledges, the losses to lenders it asserts were incurred on the sale of their debt on the secondary market, not actual impairments of the value of the lenders' collateral. The Guidelines do not recognize such losses; instead, as their application notes reflect, any asserted losses to lenders must be offset by the fair market value of any collateral they obtained. The Government acknowledges this principle, but appears not to apply it.

**Paragraph 27.** In 2016 and 2017, Shah and Purdy met with numerous investors to raise money for Outcome. Special Agent Stakem advised that most investors were comprised of large corporations, such as Google and Goldman Sachs; however, some of the investors included smaller limited liability companies. According to the government, Shah and Purdy provided potential investors with false and misleading financial information regarding Outcome, such as its revenue, which was materially inflated. Shah and Purdy also falsely informed investors that Outcome had never missed an ROI guarantee on an advertising campaign. Between approximately March and July of 2017, Outcome raised approximately $487 million from more than 20 investors, which resulted in a distribution of $225 million to Shah and Agarwal. The supplement to the government's version cites that a conservative estimate of the investors' loss is $438.75 million, which is 90 percent of the original amount invested. This figure was arrived via valuation of illiquid equity stakes as none of the investors contacted by the government indicated that their current stake was worth more than ten percent of the amount originally invested into Outcome. The government asserts in its supplement to the government's version that a $31 million settlement with investors occurred after the publication of a Wall Street Journal article alleging fraud by Outcome, and that the funds returned should not be credited against loss in this case because the return of the money occurred after the publication of that article. However, the returned monies should reduce the amount of restitution owed. The second supplement to the government's version specifies the loss to the investors totals $448,632,840.50.

> **Mr. Shah's Objection:** Mr. Shah objects the loss amount being $448,632,840.50. As discussed in Mr. Shah's Sentencing Memorandum and above, the Government bears the burden to establish the loss amount through reliable evidence. *See, e.g.*, *Newton*, 76 F.4th at 672. However, the Government has failed to perform any analysis to substantiate its conclusion that the institutional investors suffered over $448 million in losses. Rather, the Government relies on the a select number of investors who responded with what they wrote down their investments. This approach does not account for numerous, non-fraud related intervening causes that occurred with Outcome. Nor does it account for the nature of the investment at issue, in which the institutional investors received a special form of structured equity, analogous to debt, whereby their investment remained secure so long as the Outcome's value exceeded the size of their investment. Similarly, the Government does not account for the merger with AccentHealth which financially impaired the company but was not connected to the fraud. Additionally, on January 26, 2018, Mr. Shah, Outcome, and others reached a settlement with investors and lenders, which included a substantial cash infusion into Outcome and a $31 million cash payment directly to investors, resolving and satisfying their claims for any losses. Moreover, the Government has not shown that any investor losses are attributable to Mr. Shah's conduct, as opposed to other intervening

events after Mr. Shah's departure. For example, after Mr. Shah's departure, Outcome was restructured in 2019. But the Government fails to account for this event.

**Paragraph 41.** The 2021 Guidelines Manual, incorporating all guideline amendments, was used to determine the defendant's offense level. USSG §1B1.11.

> **Mr. Shah's Objection:** Mr. Shah objects to the use of the 2021 Guidelines Manual. The 2023 Guidelines Manual should be used. U.S.S.G. §1B1.11(a) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.").

**Paragraph 45.** The highest offense level of the counts in the Group is Count Group 1, which comprises the fraud offenses, as detailed below. The offense level for Count Group 2 (money laundering offenses), in accordance with Chapter Two and Parts A, B, and C of Chapter Three, is 40 (base offense level of seven; 28-level increase based on the loss amount; a two-level increase for the number of victims; a two-level enhancement for deriving more than $1,000,000 in gross receipts from a financial institution; and a one-level increase because the defendant was convicted under 18 U.S.C. §1957).

> **Mr. Shah's Objection:** Mr. Shah objects to the Guidelines calculation. As discussed in Part I of his Sentencing Memorandum, the correct offense level should be no more than 29, and possibly as low as 9.

**Paragraph 48.** Application Note 3I of §2B1.1 states loss shall be reduced by the money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The government asserts that no credit for refunds or settlement payments made to Outcome's clients or investors starting in 2017 should be applied to the $48.4 million of client loss or the $438.75 million in investor loss because the refunds and settlement payments occurred after the clients questioned the failure of the ROI guarantees and after the publication of a Wall Street Journal article alleging fraud by Outcome. The government argues that the inquiries were made by the victims and not affirmative disclosures made at the direction of the defendants.

> **Mr. Shah's Objection:** Mr. Shah objects to the PSIR's assertion that Mr. Shah should not receive credit for the refunds given to customers and the settlement with investors, as discussed in Mr. Shah's Sentencing Memorandum and above. "Inquiries" alone do not qualify as the "detection" of a criminal offense.

**Paragraph 49.** Based on the factors above, this officer concurs with the government's assertion that the loss to the clients, investors, and lenders totals $522,722,125.64. Therefore, the offense level is increased by 28 levels because the loss was more than $250,000,000, but less than $550,000,000. USSG §2B1.1(b)(1)(O).

> **Mr. Shah's Objection:** Mr. Shah objects to the Probation Office's loss calculation of $522,722,125.64, which adopts the government's calculation of loss. As discussed in Mr. Shah's Sentencing Memorandum and in Mr. Shah's objections to Paragraphs 23–24, 26–27, 41, 45, and 48 of the PSIR, the Government has failed to meet its burden to provide a

reasonable estimate of loss and to demonstrate causation between any asserted losses and the offense conduct and any relevant conduct. Thus, Mr. Shah objects to the 28-level increase pursuant to USSG § 2B1.1(b)(1).

**Paragraph 51.** Specific Offense Characteristics: The government's version indicates that the offense involved sophisticated means and the defendant intentionally engaged in and caused the conduct constituting sophisticated means. To support its position, the government asserts that the defendants engaged in "extraordinary efforts to conceal their lies and avoid detection." Specifically, the defendants directed employees to silo information from sales so that the salespersons did not know they were providing false information to clients during sales meetings. Also, the defendants concealed under-delivery and overbilling by adding false offices to the list of offices when clients requested proof of performance. The defendants also strongly suggested that clients allow them to use IMS Health to conduct third-party studies of ad performance, which allowed Outcome to control the studies and conceal under-delivery. Shah, Agarwal, and Purdy lied to Outcome's auditor, Deloitte, about their knowledge of fraud at Outcome during annual fraud inquiry meetings. Purdy and Desai had analysts provide a large amount of false information to the auditors to conceal under-deliveries on numerous Outcome ad campaigns.

> **Mr. Shah's Objection:** Mr. Shah objects to the application of the sophisticated means enhancement, as discussed in his Sentencing Memorandum. As the Probation Office itself acknowledges in Paragraph 52, the conduct in this case "is inherent in many fraud cases and the offense did not involve sophisticated means." Specifically, the fraud at Outcome consisted of overselling and underdelivering to customers. This is "garden-variety overbilling fraud" that does not merit the sophisticated means enhancement. *United States v. Higdon*, 531 F.3d 561, 564 (7th Cir. 2008). Nor is there any of the quintessential examples of sophisticated means, such as using fictitious entities to hide the crime. USSG § 2B1.1 App. Note 9(B); *see, e.g.*, *United States v. Simon*, No. 3:10-CR-00056(01)RM, 2011 WL 924264, at *7, 12 (N.D. Ind. Mar. 14, 2011).

**Paragraph 55.** Adjustment for Role in the Offense: The defendant was one of four individuals charged in the instant case. Co-conspirators Kathryn Choi and Oliver Han are charged in a related case (United States District Court for the Northern District of Illinois, Docket No. 19 CR 865). The defendant was the majority owner of Outcome, and its Chief Executive Officer. Special Agent Stakem indicated that the defendant owned a larger share of Outcome and had more control over the company, particularly in its day-to-day operations. Special Agent Stakem noted that the defendant had more involvement, including in person meetings, with investors than Agarwal. As mentioned in the government's version, the defendant met with lenders to obtain loans and with investors to raise money for Outcome. The defendant directed others to silo information from Outcome's salespeople. The defendant directed Desai and others to dissuade clients from using their companies to conduct independent studies of the performance of their ad campaigns. The defendant instructed his employees to fraudulently portray the results of ROI studies. Based on the above factors, the undersigned concurs with the government's position that the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive; therefore, four levels are added. USSG §3B1.1(a).

**Mr. Shah's Objection:** Mr. Shah objects to the application of the leader/organizer enhancement pursuant to U.S.S.G. § 3B1.1(a), as discussed in Part I.C of his Sentencing Memorandum. While Mr. Shah was the CEO of Outcome Health, this is insufficient to establish the leader/organizer enhancement, as Mr. Shah was not the leader or organizer of the ***fraud*** at Outcome Health. *See United States v. Holmes*, No. 5:18-CR-00258-EJD-1, 2023 WL 149108, at *11 (N.D. Cal. Jan. 10, 2023).

**Paragraph 60.** Total Offense Level: 43

**Mr. Shah's Objection:** Mr. Shah objects to the Probation Office's calculation of his offense level. The correct Guidelines calculation results in an offense level of no more than 29 and potentially as little as 9, as discussed in his Sentencing Memorandum.

**Paragraph 67.**

| Date of Arrest | Conviction/Court | Date Sentence Imposed/Disposition | Guideline | Pts |
|---|---|---|---|---|
| 09/09/2003 (Age 17) | Ct. 2: No Valid Driver's License/ Circuit Court of Cook County, 1st District, Chicago, IL; Docket No.: 32346958 | 12/03/2003: Guilty, 4 months supervision; 04/05/2004: Terminated satisfied | 4A1.2(c)(1) | 0 |

**Mr. Shah's Objection:** Mr. Shah objects to the inclusion of this juvenile offense because it is not relevant for computation of Mr. Shah's criminal history category, *see* U.S.S.G. § 4A1.1, and it occurred more than ten years ago, *see id.* § 4A1.2(e).

**Paragraph 79.** The defendant has one sibling, Shree Shah, age 34. Ms. Shah lives in Chicago, Illinois, and she is employed in the field of healthcare administration. Ms. Lewis advised that Shree worked at Anthem Health, a telehealth company; however, Shree was laid off and is currently searching for employment. The defendant reported he has close relationships with his sister, and he maintains frequent contact with her. The defendant advised there is no history of criminal convictions within his family. The defendant mentioned his family members attended the trial in the instant case, and they have remained supportive of him during his prosecution and conviction in this matter.

**Mr. Shah's Objection:** Shree Shah is 35 years old.

**Paragraph 82.** The defendant has no marital history. The defendant has been in a relationship with his fiancée, Anita Lewis, age 30, since 2020/2021. The defendant stated his fiancée is employed as the lead human resources employee of a technology company. Ms. Lewis indicated she works at a technology company that assists employees of other businesses with their training needs, so that those employees are better able to service their customers/clientele. The defendant reported he and Ms. Lewis get along well with one another, and there have been no instances of domestic violence during their relationship. The defendant and Ms. Lewis do not have any children

together. The defendant stated his fiancée has been supportive of him during the pendency of this case. The defendant also noted that Ms. Lewis does not have any mental health or substance abuse problems, and she does not have a history of criminal convictions. Ms. Lewis corroborated the aforementioned information.

 **Mr. Shah's Objection:** Anita Lewis is 31 years old.

**Paragraph 84.** The defendant lived in the Northern District of Illinois from birth to approximately 2015 when he relocated to New York (city not specified), where he remained until approximately 2017. The defendant returned to the Northern District of Illinois, where he stayed until he relocated to Puerto Rico in May 2019. The defendant currently resides at 7000 Bahia Beach Boulevard in Rio Grande, Puerto Rico, with his fiancée and son. The defendant has lived at this address since May 2019. The defendant noted that he also occasionally spends time at his place of residence at 924 North Clark Street in Chicago, Illinois. According to Ms. Lewis, she and the defendant spent a lot of time in Chicago during the trial. The defendant's fiancée indicated that she and the defendant traveled back and forth between Chicago and their legal residences in Florida and Puerto Rico during the pendency of this case. The defendant advised he plans to relocate to Miami, Florida, to be near his son, or reside in the Northern District of Illinois to be near other family members after completion of the sentence in this case.

 **Mr. Shah's Objection:** Mr. Shah did not move to New York. Rather, Mr. Shah traveled to New York frequently.

**Paragraph 94.** Regarding the effect of his prosecution in this case on his mental health, the defendant indicated he feels "okay," and that exercising, meditation, and yoga have been beneficial for his emotional well-being. The defendant's fiancée advised the pendency of this case has been stressful for the defendant and although the defendant "puts on a brave face," she believes he is "depressed."

 **Mr. Shah's Objection:** Mr. Shah would supplement this paragraph to add that this case has seriously impacted his mental health. While Mr. Shah's mental health has largely recovered, Mr. Shah did frequently struggle to get out of bed.

**Paragraph 95.** The defendant recalled he consumed an alcoholic beverage for the first time when he was 24 years old. The defendant admitted he has had an "off and on drinking problem" since 2015. The defendant stated he consumed one to two glasses of scotch to aid in sleeping whenever he worked long hours; however, there were occasions when he drank more than that amount. The defendant indicated he no longer consumes as much alcohol, but he admitted he becomes irritable when he ceases drinking alcohol. Ms. Lewis believes the defendant consumes alcohol to "self-medicate," and even though she does not know the frequency or amount of the defendant's alcohol consumption, she believes the defendant's use of alcohol can be "problematic."

 **Mr. Shah's Objection:** Mr. Shah requests that the PSIR reflect his request to be placed in an RDAP program. During the conduct at issue in this case, Mr. Shah frequently consumed excessive alcohol, in fact leading to hospitalization on one occasion.

**Paragraph 114.** Guideline Provisions: Based upon a total offense level of 43 and a criminal history category of I, the guideline imprisonment range is life. However, the statutorily authorized maximum sentences are less than the minimum of the applicable guideline range; therefore, the guideline term of imprisonment is 4,560 months (or 380 years, the sum of the statutorily authorized maximum sentence for each count of conviction). USSG §5G1.2(b).

> **Mr. Shah's Objection:** Mr. Shah objects to this calculation of his Guidelines range. When the Guidelines are accurately calculated, Mr. Shah has a criminal history category of I and a a total offense level of no more than 29, which would result in a Guidelines range of 87–108 months imprisonment, and as little as 9, which would result in a Guidelines range of four to ten months imprisonment, as discussed in his Sentencing Memorandum.

**Paragraph 130.** Statutory Provisions: Pursuant to 18 U.S.C. §3663A, restitution in an amount to be determined shall be ordered in this case. According to Exhibit A of the second supplement to the government's version, restitution in the total amount of $455,258,505.64 is due and owing to various lenders, investors, and clients.

> **Mr. Shah's Objection:** Mr. Shah objects to the Government's calculation of restitution as $455,258,505.64. As detailed in Part I.B of Mr. Shah's Sentencing Memorandum, the Government has failed to meet its burden of proof as to the losses experienced by investors, lenders, and customers.

Dated: June 14, 2024

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN LLP

*/s/ William A. Burck*
WILLIAM A. BURCK
1300 I Street N.W., Suite 900
Washington, D.C. 20005
Tel: (202) 538-8000
Fax: (202) 538-8100
williamburck@quinnemanuel.com

BRYAN CAVE LEIGHTON PAISNER LLP

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020

*richard.finneran@bryancave.com*

*Attorneys for Defendant Rishi Shah*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served upon all counsel of record by operation of the Court's electronic filing system.

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN