IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>   v.<br><br>RISHI SHAH, et al.,<br><br>        Defendants. | Case No. 19 CR 864<br>Judge Thomas M. Durkin |

## DEFENDANT RISHI SHAH'S SENTENCING MEMORANDUM

**TABLE OF CONTENTS**

Summary and Introduction ................................................................................................ 1

Background ......................................................................................................................... 4

    A.  Mr. Shah's Childhood .......................................................................................... 5

    B.  Mr. Shah's College Experience ............................................................................ 6

    C.  Outcome Starts Up ............................................................................................... 7

    D.  Outcome Starts Growing Fast—Too Fast ........................................................... 8

    E.  Mr. Desai's Conduct ......................................................................................... 12

    F.  The *Wall Street Journal* and the Investor Settlement .................................... 13

    G.  The Indictment and Its Aftermath ..................................................................... 14

Discussion ........................................................................................................................ 17

    I.    Properly Construed, the Guidelines Recommend a Sentence Much Lower Than Suggested by the Government .................................................................................. 18

       A.  The Government Has Not Adequately Established the Time at Which This Court Should Measure the "Actual Loss" in a Case Such as This under the Guidelines .............. 18

       B.  The Government Cannot Plausibly Carry Its Burden to Establish a Loss Exceeding Half a Billion Dollars ........................................................................................................... 21

          1.    The Government Inaccurately Assesses Nearly $450 Million in Losses to Institutional Investors to the Defendants ......................................................... 23

          2.    The Government Has Failed to Properly Calculate Lender Losses by Failing to Establish Causation, Ignoring the Distinction Between Primary and Secondary Debt Holders, and Not Accounting the Value of the Collateral Received ............... 38

          3.    The Government's Calculation of Customer Losses Ignores Restitution Provided to Customers at Mr. Shah's Direction Through Payments and "Make Goods" .................. 41

          4.    Regardless of the Proper Guidelines Calculation, the Court Should Apply a Downward Departure or, Alternatively, a Downward Variance, with Respect to the Losses in This Case ........................................................................................... 42

       C.  As the PSIR Reflects, Mr. Shah Did Not Employ Sophisticated Means in the Commission of the Offense ......................................................................................... 44

       D.  Although Mr. Shah Was the CEO of Outcome, That Alone Does Not Justify an Aggravating Role Enhancement ................................................................................. 45

       E.  Mr. Shah Should Also Receive a Two-Point Reduction Because of His Status as a Zero-Point Offender ............................................................................................................ 46

       F.  A Proper Guidelines Calculation Dictates a Significantly Lower Guidelines Range Than Proposed by the Government ..................................................................................... 46

II.    The Section 3553(a) Factors Weigh in Favor of a Noncustodial Sentence ...................... 48

A.    Downward Variance Is Necessary to Avoid Unwarranted Sentence Disparities Between Mr. Shah and Other Similarly Situated Defendants............................................................... 49

B.    The Efforts Undertaken by Mr. Shah to Make Customers, Lenders, and Investors Whole Dramatically Distinguishes Mr. Shah from the Typical White Collar Defendant............... 52

C.    The Purposes of Sentencing Reflected in Section 3553(a) Do Not Justify a Significant Sentence of Incarceration........................................................................................................ 53

D.    Ultimately, Mr. Shah's History and Characteristics and the Nature of the Offenses at Issue Justify a Noncustodial Sentence .................................................................................. 55

Conclusion ...................................................................................................................................... 62

## SUMMARY AND INTRODUCTION

Mr. Rishi Shah respectfully requests that this Court exercise its discretion to vary substantially downward from the recommendation of the Sentencing Guidelines in imposing a sentence upon him in this case. Although the Government significantly overstates the Guidelines applicable to Mr. Shah's case, an accurate calculation under the Guidelines still suggests a significant term of incarceration for Mr. Shah. But a rigid application of the Guidelines in Mr. Shah's case would ignore the specific facts, many of which are undisputed, that make Mr. Shah's case unlike that of a typical white collar defendant.

Most importantly, the Government's calculation of loss—which is the primary driver behind the Guidelines' eye-popping recommendation of life imprisonment—ignores the economic reality of the offenses in this case, whereby the vast majority of the corporate victims in this case have been largely or entirely repaid for any losses that resulted from the fraud at Outcome. Most critically, as demonstrated by the analysis of the Defendants' expert Carl Saba,[1] the institutional investors—which account for more than 80% of the Government's loss calculation—did not suffer any pecuniary loss from the fraud in the first instance, and in any event were not only made whole but economically **benefited** from the settlement they reached with Mr. Shah and Ms. Agarwal in early 2018, well before Mr. Shah was even aware of the Government's investigation. *See infra* § I-B-1. And even today, Outcome's business is worth as much or more as when Mr. Shah left it, even after accounting for the effects of the fraud. *See infra* § I-B-1.

Similarly, the institutional lenders that lent to Outcome on the basis of overstated financial statements all received collateral sufficient to cover Outcome's debt, which the Guidelines require

---

[1]    Notably, Mr. Saba's only other engagement as an expert in a criminal case was in the sentencing of Theranos founder Elizabeth Holmes—where he testified on behalf of the Government.

be credited against any lender losses claimed by the Government. *See infra* § I-B-2. And even Outcome's customers, which indisputably suffered a loss in the first instance as a result of overpaying Outcome for services it had not rendered, were fully repaid through cash payments and the provision of "make goods" to be applied against future invoices from Outcome, all at Mr. Shah's direction, and many even before the *Wall Street Journal* first made its allegations. *See infra* § I-B-3. And despite the customers, lenders, and investors having been largely made whole before the Government came on the scene, the Government nonetheless stands to collect more than $50 million from the assets it will forfeit from Mr. Shah, which it can use to pay any remaining restitution to victims.

This case thus stands in stark distinction to a typical federal criminal fraud prosecution, in which the Court might be confronted with millions in uncompensated losses, suffered by individual victims who might have little to no hope of recovering from the harms inflicted on them by the defendant. At bottom, this is a case about underdelivery of services and overstatement of financial data—but it is not a case involving such long-lasting pecuniary harm. And while Mr. Shah contested his criminal culpability by exercising his right to trial, he has long accepted his ethical and moral responsibility, as the CEO of Outcome, to compensate Outcome's customers, lenders, and investors for the consequences of the fraud—and he did everything in his power to meet that responsibility before the Government's criminal investigation was even made known to him.

That is not the behavior of the typical white collar defendant, and Mr. Shah's circumstances therefore do not merit his being treated like a typical white collar defendant, as the Guidelines might otherwise suggest. Instead, this Court should take cognizance of the particular circumstances of Mr. Shah's case, and of Mr. Shah himself—a young man who started Outcome as a 20-year-old

college sophomore with little to no real world experience, who dropped out of college in order to help grow the company to a multi-million dollar enterprise that provided valuable services to customers, doctors, and patients for more than a decade before the events that led to this prosecution—and still does today. Unquestionably, Mr. Shah and his codefendants made significant mistakes along the way, and those mistakes have already cost him many millions of dollars, as well as ownership of the company he founded and loved. That company is today a larger and more profitable enterprise than when he left it, as a result of Outcome's merger with PatientPoint, which resulted in a combined company that is today estimated to be worth more than ████████. Yes, Outcome underdelivered its services and as a result overstated its financials—but Outcome was not a worthless company, like in many white collar cases. As the Government itself acknowledges, nearly 80% of Outcome's revenue was real and not overstated. Outcome was—and is today, as part of PatientPoint—a vibrant, successful, and profitable business, which delivered valued services to customers, doctors, and patients, notwithstanding the misconduct that led to this prosecution.

Mr. Shah and his codefendants are accountable under the Guidelines for the actual and reasonably foreseeable consequences of their conduct, but they are not responsible for all the losses the Government claims. To hold Mr. Shah and his codefendants, as the Government asks, as responsible for more than half a billion in "losses" would be to inflate the total underdelivery, which the Government acknowledges was approximately $65 million at its height, by nearly a factor of ten. And even if the Guidelines could be fairly construed to countenance so high a "loss" calculation, that is but another reason for the Court to vary from the Guidelines to reflect the actual seriousness of the offenses of conviction, not the Government's hyperbolic characterization of the crimes.

For all those reasons, and for the others discussed in detail below, Mr. Shah respectfully requests that the Court acknowledge that consequences he has already suffered, including the loss of his company and the vast majority of his wealth, the impending forfeiture of his assets, the irreparable stain on his reputation, and the psychological toll of this years-long investigation and prosecution, make a lengthy sentence of incarceration "greater than necessary" to serve the purposes of punishment under 18 U.S.C. § 3553(a)—especially considering Mr. Shah's low risk of recidivism and the unusually successful efforts that he has already made and will continue to make amends for the conduct for which he was convicted. Instead, Mr. Shah asks that he be sentenced to a lengthy term of home confinement.

<h3 style="text-align:center">BACKGROUND</h3>

The prosecution in this case has quite naturally been focused on Mr. Shah's tenure as founder and CEO of Outcome, a company he founded from his dorm room at Northwestern University at the age of 20. And while Outcome was a significant part of Mr. Shah's life for many years, Mr. Shah, like all of us, is more than just his work. Rather, as the letters from his family, friends, and colleagues demonstrate, Mr. Shah is someone who, ever since his childhood, has been defined by his love for his family, his energetic and optimistic spirit, and his dedication to helping others through entrepreneurism. Although the misconduct at Outcome was significant, the trial in this case could and did not tell the whole story of who Mr. Shah is and how he came to stand before this Court for sentencing. This Court's judgment will no doubt be the most significant event of Mr. Shah's entire life to date, but Mr. Shah hopes that the Court will consider the broader context of who he is and what let him to this moment, rather than the partial story that has been told by the Government to date.

### A. Mr. Shah's Childhood

Growing up, Mr. Shah idolized his parents—especially his father, an endocrinologist specializing in diabetes. Mr. Shah's father was born and raised in a poor village in India and was determined to build a better life for his own family. After he earned a scholarship to attend medical school in the United States, Mr. Shah's father and mother moved to the suburbs of Chicago, where Mr. Shah and his sister grew up. There, Mr. Shah spent his childhood afternoons and weekends working at his father's medical practice. It was the family business, and Mr. Shah's mother managed the practice for decades before she retired.

Mr. Shah's father was passionate about educating his patients, including about their medical conditions, possible treatment options, and eating and lifestyle choices that could dramatically improve their health outcomes. Mr. Shah grew to appreciate the vital role his father played in his patients' lives, the information those patients desperately needed, and the significant investment of time required by his father to individually educate each patient. That insight gave Mr. Shah an idea that, years later, would grow into Outcome Health: what if there was a way for his father to more efficiently provide such important information to even more patients? Later in Mr. Shah's childhood, when his sister was diagnosed ▮▮▮▮▮▮▮▮▮▮▮, the importance of medical education hit even closer to home. Because Mr. Shah's father was an endocrinologist with access to information on new treatments and devices, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮, which greatly improved her quality of life. Mr. Shah became firmly convinced that everyone should have access to information so they could benefit from new medical treatments, ▮▮▮▮▮▮▮.

Mr. Shah's parents instilled important values in their children, including pride in their cultural background. Throughout his childhood, Mr. Shah volunteered at his temple and local cultural organizations and visited his extended family in India every year. Those yearly trips deeply

affected Mr. Shah. Mr. Shah observed stark poverty during trips to India, which spurred a lifelong commitment to helping individuals who lacked the privilege he had enjoyed in his healthy home and suburban community.

Mr. Shah's parents also encouraged his creativity and interest in entrepreneurial endeavors. Starting at just eleven years old, Mr. Shah helped his father set up online stock market trading accounts and make investments. While doing so, Mr. Shah and his father shared impactful conversations, which Mr. Shah can still recall. Mr. Shah remembers his father's description of building his medical practice from the ground up and his belief that, in the United States, business and entrepreneurship could be used as a force for good. Mr. Shah took these lessons to heart. As a teenager in high school, he founded both a home computer consulting business and started a program that paired freshman between his school and another high school to share career interests, with the idea of facilitating informal networks and resources through those relationships. He also founded a student civic engagement organization that partnered to discuss current events with an inner-city high school. Shortly thereafter, after hearing presidential candidate John Kerry talk about green energy technology initiatives, Mr. Shah—still a teenager—moved to Iowa to work on Kerry's presidential campaign.

**B. Mr. Shah's College Experience**

After graduating high school, Mr. Shah briefly attended other colleges before transferring to Northwestern University in 2005. There, Mr. Shah founded a number of student organizations including a student business organization and a magazine focused on social entrepreneurship (for creating businesses that become successful through making a positive ethical impact), joined student government, and started a student business magazine. He also met two fellow students, Shradha Agarwal and Derek Moeller, who were similarly interested in mission-based entrepreneurship.

While at Northwestern, Mr. Shah came up with a business plan that had its roots in his own father's doctor's office. Years before his attendance at Northwestern, Mr. Shah helped his father record informative videos regarding diabetes and to play them for his patients as they waited to be seen. When Mr. Shah read an article in the 2005 issue of *The Economist* discussing how retailers were creating digital video networks, Mr. Shah decided that he wanted to do the same for diabetes speciality medical practices. Mr. Shah and Mr. Moeller discussed the plan and decided to submit the business plan to a competition in Mr. Moeller's entrepreneurship class. Ms. Agarwal heard the young men discussing their new endeavour and wanted to help. Mr. Shah registered the company as ContextMedia, eventually renamed Outcome Health. Mr. Shah—a 20-year-old college sophomore with no business experience—began serving as its CEO. The following year, Mr. Shah dropped out of school to focus on the company.

### C.    Outcome Starts Up

Inspired by his childhood experiences, Mr. Shah has always believed in the mission underlying Outcome: using technology to provide medical education and ensure better health outcomes. But despite his ideals and optimism, Mr. Shah was just a young college dropout with no real-world experience. In the early years, Outcome struggled to find customers and to pay its employees; at one point, Mr. Shah's and Ms. Agarwal's parents personally put money into Outcome to make ends meet. By 2011 or 2012, Outcome was small but breakeven; it was also led by a team of inexperienced kids in their early to mid-twenties. When Outcome exploded in growth just a few years later, its founders' inexperience reared its ugly head, and the operational problems at Outcome worsened.

Around that time, █████████████████████████████████████████████████.

By 2015, Mr. Shah—who had consumed his first alcoholic drink at the age of 24—████████████

████████. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████.[2]

### D. Outcome Starts Growing Fast—Too Fast

As CEO, Mr. Shah was unrelentingly optimistic about Outcome's ability to fulfill its potential and its promises to clients. He "genuinely believed in the future growth and success of the company," and "really believed the company was going to reach a billion dollars in revenue." Kazi Tr., Dkt. 583 at 356:13–16, 430:19–21. That confidence was coupled with Mr. Shah's staunch belief in Outcome's mission: improving health outcomes for the largest number of people possible. *See* Desai Tr., Dkt. 599 at 4813:23–4814:15 (describing "the mission and vision [that Ms. Agarwal and Mr. Shah] both shared to transform healthcare by delivering health intelligence into every consult room in the world to better health outcomes"); Yesenia Bautista Tr., Dkt. 589 at 2080:24–2081:1 (describing Mr. Shah as "passionate about the company and the mission"); James McHugh Investor Rep. Tr., Dkt. 609 at 7836:24–7837:5 (in his meetings with Mr. Shah, McHugh "sense[d] that [Mr. Shah] was passionate about Outcome's business" and "really seemed to believe in the company's mission"); Laela Sturdy Investor Rep. Tr., Dkt. 612 at 8697:2–7 (when "speaking with [Mr. Shah], [she] felt that Outcome Health was a mission-driven organization"). Simply put, Mr. Shah was an ardent believer in both the good work that Outcome did and its potential to grow as a business and thereby expand access to important medical information for patients.

In 2015, Mr. Shah's optimism finally began to be reflected in the company's financial performance. The company's device sales and deployment experienced tremendous growth in 2015, owed largely to the company expanding into new service lines (such as neurology,

---

[2] ████████████████████████████████████████████████████████████████

████████████████████████████████████████     ████████████████████████

dermatology, and oncology), increasing the number of team members responsible for soliciting new physician practices, adding new products (including 3D anatomical wallboards, interactive exam room tablets, guest Wi-Fi, and clinical trials products), and growing the company's team responsible for advertising sales. All that resulted in the company doubling in revenue (even after discounting by 20% to account for acknowledged overstatements in the company's financials as a result of the fraud). But even as Mr. Shah celebrated his company's success, he recognized that better procedures needed to be put in place to ensure that Outcome was delivering on its promises to its customers.

While Outcome's revenues were booming, it lacked the proper infrastructure to track the full scope of its operational problems or to safeguard against potential improper billing practices. Recognizing that challenge, as early as 2016—and well before the Government's involvement— Mr. Shah spearheaded company-wide efforts to ensure that Outcome had "better operations," "deliver[ed] in the right way for our programs," and had "systems" to track Outcome's deliveries. Desai Tr., Dkt. 595 at 3779:8–13; *see* Dkt. 598 at 4726:13–17 (Mr. Shah instructing Desai to "be really hands-on about fixing the operational issues" and spend "maybe over half your time doing that"). Mr. Shah did not simply bury his head in the sand. To the contrary, Mr. Shah took affirmative steps to understand and address the full scope of any operational problems and to make right by his customers. To start, Mr. Shah ensured that Outcome conducted a full internal audit of its 2016 deliveries to understand the scope of its problems. *Id.*, Dkt. 595 at 3782:1–7. He insisted on hiring Deloitte to examine the company's operations, believing that a Big Four accounting firm would assist the company in meeting the highest standards in its review. Mr. Shah also implemented a widescale plan to provide "make-goods" to clients, whereby clients would receive free advertising in 2017 to compensate them for any underdeliveries on their 2016 contracts. *Id.*,

Dkt. 596 at 4007:2–17. Upon learning about Mr. Desai's inaccurate affidavits, Mr. Shah instructed Mr. Desai to correct any errors, which Mr. Desai assured him was being done and that "make goods" were being issued in any case where there had been a shortfall. Desai Tr., Dkt. 596 at 4082:4–17; 4083:12-17.

There were also changes to stop Outcome's bad practices and implement good practices moving forward. For example, when Mr. Shah learned of Mr. Desai's of sending out false affidavits of performance to clients, Mr. Shah and other executives took steps to halt Mr. Desai's practice and worked together to develop a new—and accurate—affidavit process. Desai Tr., Dkt. 595 at 3694:3–17; Dkt. 596 at 4010:16–4012:7; Dkt. 598 at 4592:19–22. Mr. Shah also hired new employees to improve operations. Those hires included an employee hired to "build out the inventory system" and a new head of growth strategy, who was responsible for conducting accurate ROI studies and creating a better list match process. *Id.*, Dkt. 602 at 5834:8–20. There was also a team of employees tasked with tracking delivery of products to customers, producing accurate numbers to be used in performance affidavits, and ensuring that the 2017 contracts were fulfilled. *Id.* Dkt. 598 at 4621: 11–4623:2; 4626:19–4627:9.

Those efforts bore fruit. By 2017, the affidavit process and delivery reports were accurate or on their way to total accuracy. *Id.*, Dkt. 602 at 5835:16–5836:11. Outcome had also developed a written document discussing the proper list match procedure and was building an automation tool for list matches. *Id.* at 5836:12–20. Most importantly, Outcome's inventory levels were "better" matching its contracts: in 2017, Outcome delivered on nearly all of its contracts. *Id.* at 5837:3–7. And Mr. Desai assured Mr. Shah that all affected 2016 campaigns were also receiving "make goods" to correct for any contractual shortfalls. *Id.*, at 5700:2–4.

Despite Outcome's problems, there was reason for Mr. Shah's continued optimism. Throughout Mr. Shah's time as CEO, Outcome had placed technological devices with beneficial educational content in "doctors' offices across the U.S." Ketchum Tr., Dkt. 584 at 570:10–23. "[A]ll of these devices needed to have educational content because that . . . was the mission of the company." Desai Tr., Dkt. 599 at 4840:13–16; *see* Ketchum Tr., Dkt. 587 at 1631:11–13 ("[T]he purpose of the company was to educate, so, yes, the content was . . . the most important part."). And there is no dispute that, even according to the Government's accounting, Outcome actually delivered the majority of the promised services to its customers. *See* GX1973; *see, e.g.*, Desai Tr., Dkt. 599 at 4997:5–5000:16 ("Outcome had about 100,000 devices by the end of 2016," and acquired approximately 20,000 additional screens in 2017), *id.* at 5000:2–4 (the "inventory . . . w[as] real"); *id.*, Dkt. 598 at 4600:12–4601:9 (Outcome's internal 2016 audit showed over-delivery on some campaigns).

Nor is there any dispute that Outcome's products and services made a genuine impact on patients and doctors. Jason Ketchum, who worked with doctors' offices to install Outcome's devices, testified: "[T]he company was doing really good things for patients. The technology was real. It really was helping patients all over the U.S. and doctors all over the U.S." Ketchum Tr., Dkt. 584 at 652:12–15. Doctors and nurses "would use [Outcome's] devices to assist the care of the patient" or "to chat with the patient." *Id.* at 570:14–23; *see id.*, Dkt. 587 at 1497:17–1499:10 (describing an email about "how doctors' offices were really enthusiastic about Outcome"). Patients significantly benefited from Outcome's work as well. For example, after Mr. Ketchum made a site visit to doctors' offices with Outcome devices, he wrote: "I saw patients who should have been uncomfortable (they probably were) but [Outcome's devices] seemed to not only

11

educate but bring them together and keep the atmosphere relaxed in the waiting room." *Id.* at 1496:13–1497:10.

### E.    Mr. Desai's Conduct

While Mr. Shah undertook efforts to correct the delivery shortfalls he was aware of, it is undisputed that he was not aware of much of his codefendant Mr. Desai's fraudulent conduct until it had already occurred. Quickly after Desai started at Outcome in August 2013, he began originating new fraudulent practices. As Desai's trial testimony established, the origins of the fraud at Outcome arose largely from Mr. Desai's decision to manipulate ROI studies provided to customers. Desai Tr., Dkt. 596 at 4132:15–16. In addition, as mentioned above, one of Mr. Desai's early responsibilities was sending "affidavits" to customers to "prove that the advertising was being delivered to the screens." Desai Tr., Dkt. 597 at 4198:1–5. On his own and without direction from Mr. Shah, Mr. Desai decided to start making "false screenshots," misrepresenting to clients that they were a "live" capture of Outcome's screens. *Id.*, Dkt. 597 at 4201:4–11; 4205:19–4206:3. Mr. Desai also began falsifying and inflating the engagement metrics for the tablets that Outcome placed in doctors' officers—and Mr. Desai and the analysts on his team were "the only individuals" involved in this practice. *Id.*, Dkt. 595 at 3925:14–3927:13. Indeed, Mr. Desai instructed his analyst team to engage in fraud on "many" occasions. *See, id.*, Dkt. 597 at 4236:5–8; 4253:15–19; 4260:12–15; 4267:3–7.

Most egregiously, Mr. Desai began to falsify the return on investment ("ROI") studies, which were prepared by an outside research company and then sent to Outcome's customers, in order to make the customers' advertising campaigns look more successful. Desai Tr., Dkt. 595 at 3872:5–3873:14. No one directed Desai to change the ROI studies—in fact, Mr. Desai "took specific steps to conceal within the company that [he] w[as] changing ROI reports," including lying to Mr. Shah, other Outcome executives, and customers. Dkt. 598 at 4579:5–12; 4551:9–16;

12

Dkt. 595 at 3889:5–3892:13. Nor was that the only time that Mr. Desai lied or obfuscated to Mr. Shah in order cover up his own fraudulent actions. *See, e.g.*, *id.*, Dkt. 597 at 4292:17–18 ("In my response [to Mr. Shah], I didn't directly address the issue"); Dkt. 596, at 4124:1–4125:22 ("I did not tell the truth in certain places of the Vox [to Mr. Shah] . . . . I lied to Rishi because at this point I was really worried about coming clean with everything."). As described above, in most if not all cases, Mr. Shah took steps to correct Mr. Desai's misconduct once he learned about it—but as it turns out, those efforts came too late.

**F.    The *Wall Street Journal* and the Investor Settlement**

Mr. Shah's efforts to improve Outcome's operations were interrupted on October 13, 2017, when the *Wall Street Journal* published an article alleging financial malfeasance at Outcome. When the article was released, Mr. Shah immediately hired former U.S. Attorney Dan Webb at Winston Strawn to internally investigate any and all issues relating to Outcome's shortfalls. Mr. Shah selected Mr. Webb because he understood that Mr. Webb was a man of the utmost integrity who would turn over every stone in making sure that the full extent of Outcome's challenges could be identified and addressed.

Shortly thereafter, Outcome found itself under siege from its institutional investors and lenders, who quickly sued and sought to force Mr. Shah and Ms. Agarwal to hand over control of the company they had started. As a result, Mr. Shah quickly lost his business, his reputation, and the vast majority of his wealth. At the time, Mr. Shah was 31 years old.

Mr. Shah and Ms. Agarwal tried at first to find a path forward that would allow them to continue in their leadership roles in order to be part of the solution to Outcome's problems. But soon enough, it became clear that the institutional investors would not settle for anything less than control of the company. They, like Mr. Shah, knew that, despite the liabilities that Outcome owed

13

to its customers as a result of its underdeliveries, Outcome was an immensely valuable company.[3] And as much as it pained Mr. Shah and Ms. Agarwal to part with the company they had started together, they ultimately settled with the institutional investors by giving them controlling shares of the company and returning many millions of dollars in funds to the investors and the company. Specifically, Mr. Shah and Ms. Agarwal paid $31 million directly to the institutional investors and paid $159 million to the company the investors now controlled. Mr. Shah and Ms. Agarwal received only $31 million for parting with their ownership of company that was worth many hundreds of millions of dollars, even after accounting for the fraud. Mr. Shah did not spend any portion of that $31 million; instead, they remained in Gravitas and were ultimately restrained by the Government after his indictment. As a result, Mr. Shah ultimately did personally benefit from the funds in obtained in the capital raise, either before or after the settlement.

### G.    The Indictment and Its Aftermath

After hiring Mr. Webb to investigate Outcome's internal issues, Mr. Shah retained Jenner & Block to represent him personally in the investigation, at Mr. Webb's recommendation. Later, when Mr. Shah learned of the Government's investigation, he asked Jenner & Block to engage with the Government in the hopes that they might be able to dissuade the Government from pursuing criminal charges, especially in light of the significant benefits conveyed to customers as a result of Mr. Shah's efforts and the significant value conveyed to the institutional investors as a result of the settlement. But those efforts proved unsuccessful, and Mr. Shah was charged with more than two dozen counts of fraud on November 21, 2019. Shortly after, the Government persuaded the Court to freeze the vast majority of Mr. Shah's assets, including the proceeds of the

---

[3]    Indeed, as discussed below, Mr. Saba's analysis demonstrates that, even after adjusting the value of the company for the underdeliveries asserted by the Government, Outcome was worth approximately $730 million on the date of the publication of the *Wall Street Journal* article.

settlement. Mr. Shah also had to scramble to purchase the home he was living in from the Baroda Trust in order to satisfy the Government's insistence that the property be provided as collateral for his bond.

Receiving the indictment and the restraining order were devastating for Mr. Shah, but nothing could have prepared him to receive yet more devastating news: shortly after the indictment, Mr. Shah's father suffered a heart attack and died. To this day, Mr. Shah feels tremendous guilt about the death of his father, believing that the indictment was a contributing factor in his father's death. And while his mother and sister have stayed steadfastly by his side throughout the prosecution, the empty seat in the gallery where his father would have sat has served as a daily reminder for Mr. Shah of how his failings in his management of Outcome have affected those he holds most dear.

The indictment also came at what otherwise should be regarded as a joyful time in a person's life: fatherhood. Shortly before the indictment, Mr. Shah welcomed his first and only son, ██. Although Mr. Shah and ██'s mother are no longer together, Mr. Shah shares joint custody with ██'s mother, which allows Mr. Shah to spend every other week with ██, although in reality Mr. Shah cares for ██ roughly 80% of the time, as his mother is often away for months at a time. When Mr. Shah is with ██, Mr. Shah dedicates as much time as he can to parenting him: Mr. Shah drops off and picks up ██ up from preschool, plays games with him, and reads to him nightly. ██'s favorite books include the *Ninja Life Hacks* books—a social-emotional book series about feelings and life skills—and the classic *Berenstain Bears* books. And just like his father did for him, Mr. Shah encourages ██'s passions, curiosity, and love of learning. For instance, when ██ became interested in the police, Mr. Shah read *Sergeant Murphy's Traffic Book*, and both father and son dressed up as police officers for Halloween. Mr. Shah and ██ also have an ongoing Lego

15

project: whenever ▇ learns something new about the real world, he and Mr. Shah build that into their Lego "world."[4]

Besides being with his family and investing time and energy in the defense of his case, Mr. Shah has spent most of his time the past four-and-a-half years reflecting on what went wrong at Outcome. He has been aided significantly in those reflections by the presence of a new partner in his life, to whom he proposed in December 2022. (Luckily for Mr. Shah, she said "yes.") Through his reflections, Mr. Shah has come to recognize and acknowledge his failures as CEO, particularly with respect to overseeing and managing a quickly growing startup. He knows that, as CEO, he was ultimately responsible for everything that happened at Outcome, including the resulting harms, even if he did not specifically intend them. He has had numerous conversations to this effect with people in the entrepreneur community, especially other founders, who have reached out to him throughout the prosecution of his case. Inspired by those conversations, Mr. Shah began writing a book aimed at other young startup and tech founders so that they learn from—and do not repeat—his mistakes.

Mr. Shah has struggled during the progress of his case to follow the all-too-typical advice of his counsel not to talk about his case with others. Mr. Shah wanted desperately to take the stand at his trial, if for no other reason than to allow him to take responsibility for his failures and explain his thinking behind the decisions that he made (or failed to make). His attorneys forcefully discouraged him from doing so, a decision he regrets to this day. But while he contested his criminal culpability at trial, he has never once denied his moral responsibility for the conduct of the company he founded and his obligation to make right by its customers, lenders, and

---

[4] If Mr. Shah is sentenced to a period of incarceration, he is planning to request placement in a facility near Miami, where ▇ will reside with his mother.

institutional investors, an obligation that he worked to fulfill before he ever knew the Government was investigating him. Mr. Shah sincerely hopes that the Court will recognize his contrition in that regard, as well as the real-world steps he has taken to make amends for his mistakes.

## DISCUSSION

In exercising its discretion under the Sentencing Reform Act, Mr. Shah asks that this Court sentence him to a noncustodial sentence of home confinement. Such a sentence is "sufficient, but not greater than necessary" to accomplish the specified goals of sentencing. 18 U.S.C. § 3553(a)(1)-(2); *see Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Although the Guidelines in this case likely recommend a lengthy custodial sentence, the advisory Guideline range is only the "starting point and the initial benchmark" for this Court's ultimate sentencing determination. *Peugh v. United States*, 569 U.S. 530, 536 (2013) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). As the Court well knows, it may not simply "presume that the Guidelines range is reasonable"; after calculating the range, the Court must then "make an individualized assessment based on the facts presented" and statutory factors under 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49–50 (2007). Critically, in analyzing those factors, the Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(1); *id.* § 3353(a)(6).

As discussed below, the "initial benchmark" set by the Guideline is likely nine to twelve years imprisonment. *See infra* Part I. Although the Government reaches a higher Guidelines recommendation by overstating the loss actually caused by the offenses in this case, the Probation Office—which accepted the Government's overstated calculations—has already recommended a

substantial downward variance to eight years incarceration based on mitigating factors that include Mr. Shah's lack of criminal history, his positive relationship with his parents, his joint custody of his young son, and his supportive fiancée and family.

The § 3553(a) sentencing factors also support substantial leniency for Mr. Shah, particularly given his initially good intentions in founding and working tirelessly to build Outcome aside from any fraudulent conduct, his efforts to make recompense for Outcome's failures, and the lack of need for deterrence for future misconduct by Mr. Shah. *See infra* Part II. In light of those factors, the Government's proposed Guidelines calculation—which, as discussed below, is primarily driven by a significantly overstated loss amount—is plainly unreasonable and should not anchor Mr. Shah's sentence.

## I. Properly Construed, the Guidelines Recommend a Sentence Much Lower Than Suggested by the Government

The Government claims the offense level should be 43 or 45, with a criminal history category of I. But the Government's claim, which is primarily a function of its outsized loss calculation of $522 million, significantly overstates the defendants' criminal culpability, even under the Guidelines' own rubric. But as explained below, the Government has not met its burden to substantiate nearly so large a loss to investors, lenders, or customers.

### A. The Government Has Not Adequately Established the Time at Which This Court Should Measure the "Actual Loss" in a Case Such as This under the Guidelines

One critical question in ascertaining the appropriate calculation of any actual loss in this case is determining the point in time at which the Court is to measure any such loss. Although Mr. Shah had previously anticipated arguing that loss should be measured as of the date of sentencing for each of the offenses in question, the Seventh Circuit appears to have foreclosed such an argument in its recent decision in *United States v. Gulzar*, 92 F.4th 684 (7th Cir. 2024). *Gulzar* recognized a circuit split on whether the Guideline's application notes should be accorded

deference after the Supreme Court's decision in *Kisor v. Wilkie*, 588 U.S. 558 (2019), which instructed Courts not to consider commentary such as Guidelines application notes until they have exhausted all the traditional tools of statutory construction. *See United States v. States*, 72 F.4th 778, 791 n.12 (7th Cir. 2023). But in *Gulzar*, despite recognizing that "Section 2B1.1 does not specify that the time at which a victim's loss should be calculated," the Seventh Circuit nonetheless upheld its prior precedent providing that loss should be determined as of the date of detection of the offense, based on a reading of Application Note 3(E) to that section, which states that a defendant should be provided credit against loss for any money, property, or services returned to a victim. *See Gulzar*, 92 F.4th at 687.

This Court is of course bound by *Gulzar*. As such, the Court is not at liberty to accept Mr. Shah's argument that actual loss should be determined at the time of sentencing.[5] But the Court still must ascertain what in this case qualifies as "detection" of the offense. The Government appears not to have taken an express position on that question, but it seems to suggest that October 13, 2017, the date of the publication of the *Wall Street Journal* article, should be considered the

---

[5] For purposes of preservation, Mr. Shah briefly makes his argument in the margin. First, the Seventh Circuit's prior reliance on the Guidelines commentary of Section 3(E) is, as the Seventh Circuit itself recognized in *States*, 72 F.4th at 791 n.12, likely no longer appropriate in light of *Kisor*, 588 U.S. 558. Moreover, the Supreme Court is presently considering whether to overturn its longstanding ruling in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), which might well undermine the authoritative force of the Sentencing Guidelines commentary even further. *See Loper Bright Enters. v. Raimondo*, 143 S.Ct. 2429 (2023); *Relentless, Inc. v. Dep't of Comm.*, 144 S. Ct. 325 (2023). If instead, as *Kisor* instructs, the language of § 2B1.1 is read plainly, then the term "loss" should be understood to include only the actual loss measured as of the date of sentencing, not losses that the victim has not in fact ultimately suffered. *See United States v. Banks*, 55 F.4th 246, 250 (5th Cir. 2022) (holding that "loss" does not include "intended losses" under the plain meaning of that term, despite language in the commentary suggesting that loss should be determined as the "greater of actual or intended loss."). Likewise, there is no warrant for imposing a "date of detection" limitation on any such interpretation of the word "loss," since that limitation, if any, comes only from the Guidelines' application notes, not the Guidelines themselves.

cut-off for any credit against loss under the Guidelines. 1st Supp. to Gov't Version at 12 ("Similarly, the settlement with investors—as part of which some $31 million was returned— occurred after the publication of the *Wall Street Journal* article alleging fraud. These settlement payments may reduce the amount of restitution owed, but not loss."); 2d Supp. to Gov't Version at 2 ("Nearly the entirety of the principal was still outstanding in October 2017 when the *Wall Street Journal* published its article exposing the fraud at Outcome."); *cf.* § 2B1.1, App. Note 3(e)(i) (suggesting that "[t]he time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency"). However, the Government did not open its investigation until after the publication of that article, *see* PSIR ¶ 15, and the Government investigated for two years before it established enough probable cause to take its case to the Grand Jury. When the Government came to discover all of the elements of the offense—including evidence suggesting the defendants' *mens rea*—is essential for this Court to determine what credit against loss the defendants are entitled to under the Guidelines, a showing the Government has not yet made. *See infra* § I-B (discussing returns of money, property, and services to each category of victims identified by the Government).

But as *Gulzar* itself recognizes, a district court may "[o]f course . . . consider a defendant's efforts to repay his victims, even after detection, under 18 U.S.C. § 3553(a) when fashioning a sentence," because even payments "after the detection of the fraud may indicate acceptance of responsibility." *Gulzar*, 92 F.4th at 687. Thus, even if this Court finds that the offense was "detected" under *Gulzar* prior to some of the victims being made whole, it should nonetheless strongly consider those efforts in distinguishing Mr. Shah and his codefendants from the paradigmatic unrepentant fraudster that the fraud Guidelines target. *See infra* § I-B-1-f.

20

**B.    The Government Cannot Plausibly Carry Its Burden to Establish a Loss Exceeding Half a Billion Dollars**

This is a complex case, and the transactions involved are likewise complex. That complexity may explain the Government's dramatic overstatement of the losses in this case. But at the end of the day, it remains the Government's burden to establish, to a degree of reasonability and by a preponderance of the evidence, the actual losses inflicted as a result of the offense conduct. *United States v. Newton*, 76 F.4th 662, 672 (7th Cir. 2023). Instead, the Government here has presented, at best, a back-of-the-envelope calculation to arrive an "estimated" loss exceeding half a billion dollars. But Mr. Shah and his codefendants have "a due process right to be sentenced based on reliable information," which the Government has not provided here. *United States v. Barker*, 80 F.4th 827, 833 (7th Cir. 2023); *see also Newton*, 76 F.4th at 674 ("A defendant is entitled to have sentencing determinations made based on reliable evidence rather than speculation or unfounded allegations." (quoting *United States v. Nelson,* 774 F.3d 1104, 1107 (7th Cir. 2014))); *United States v. Moore*, 52 F.4th 697, 701 (7th Cir. 2022) (holding that "a defendant whose liberty is at stake is entitled to hold the government to its burden of proof by a preponderance of reliable evidence," not "[a]n unsupported assumption"). Instead, the Government has failed the governing test, which requires the evidence it relies upon to have "sufficient indicia of reliability to support its ***probable*** accuracy." U.S.S.G. § 6A1.3(a) (emphasis added).[6]

It is not enough for the Government to simply extrapolate losses based upon vague statements from institutional investors as to what mark-downs they may have made in their internal evaluations of the value of their post-settlement investment in Outcome. Instead, to establish actual loss, the Government must demonstrate some "reasonably foreseeable ***pecuniary harm*** that

---

[6]    Future references to the Guidelines will omit "U.S.S.G." in the remainder of this memorandum.

resulted from the offense." § 2B1.1 App. Note. 3(A)(i) (emphasis added). Pecuniary harm is actual, concrete harm that is "monetary or that otherwise is readily measurable in money." *Id.* § 2B1.1 App. Note. 3(A)(ii). And to be considered part of the "actual loss," the Government must show that any such pecuniary harm was both actually and proximately caused ***by the offenses of conviction and any relevant conduct***. *See United States v. Burns*, 843 F.3d 679, 688 (7th Cir. 2016) (holding that a determination of "whether loss was reasonably foreseeable" requires "two separation [causation] analyses: but for causation and proximate causation" (internal citations omitted)).

To meet that burden, the Government may not rely on losses due to "superseding causes." *Id.* at 689. Nor may the Government rely on "speculation"—as opposed to reliable evidence—to support its causation arguments. *Newton*, 76 F.4th at 674–75. Where, as here, the Government's calculation of alleged actual loss has a disproportionate impact on the Guidelines calculation, due process requires particular care in determining whether the Government's methodology is reliable and whether the Government's calculation reliably represents losses for which there is both but-for causation and proximate causation. *See Barker*, 80 F.4th at 833 (explaining that, given due process concerns, "where hearsay statements [about drug amount] could dramatically increase a defendant's guidelines range, the best practice for the district court is to order the declarant to appear and testify under oath"); *see also United States v. Reuter*, 463 F.3d 792, 793 (7th Cir. 2006) ("[T]he judge [is allowed] to dip below the guidelines range [under the sentencing factors] if he is justifiably reluctant to impose a sentence most of which rests entirely on a finding of fact supported by a mere preponderance of the evidence.").

Finally, it is especially important in this case to remember what is specifically excluded from its calculation of loss: (1) "the ***money returned***, and the ***fair market value of the property***

*returned and the services rendered*, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected"; and (2) in the case of a secured loan, "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral *at the time of sentencing*." § 2B1.1 App. Note 3(E)(i)–(ii) (emphasis added). In other words, it is not enough, as the Government suggests, for the Court to consider what merely pecuniary value the victims *gave up*—it must also determine the value of what the victims *got* it return. In failing to perform that analysis, the Government has utterly failed to carry its burden to demonstrate reliable evidence from which the Court can make an accurate assessment of the loss in this case. *See United States v. Berger*, 587 F.3d 1038, 1046–47 (9th Cir. 2009) (remanding with instructions for the district court to use a method that "gauge[s] the difference between [the company]'s share price—as inflated through fraudulent representation—and what that price would have been absent the misrepresentation" to determine loss).

### 1. The Government Inaccurately Assesses Nearly $450 Million in Losses to Institutional Investors to the Defendants

The Government's half-a-billion-dollar loss calculation rests principally on one category of losses: losses to institutional investors who participated in the capital raise at Outcome that concluded in March 2017, which the Government assesses at $448.6 million. To justify its headline-grabbing number, the Government extrapolates a few investors' asserted write-downs of their post-settlement investments in Outcome. As Mr. Saba's report explains, that approach is not methodologically sound, and it entirely ignores the change in the structure of the institutional investors' equity that was occasioned by their settlement with Mr. Shah and Ms. Agarwal. *See* **Ex. 1** (Saba Report) ¶ 127. In fact, as Mr. Saba's analysis persuasively shows, the institutional investors did not lose a dime as a result of their investment in Outcome—and in fact, they received

consideration in the settlement that significantly exceeded their initial investment in Outcome, even *after* accounting for the effects of the fraud. *Id.* ¶ 126.

At the end of the day, however, it is not Mr. Shah's burden to establish a reliable method of ascertaining the loss; that burden remains, at all times, the Government's. *See United States v. Moore*, 52 F.4th 697 701 (7th Cir. 2022) ("Because [defendant] provided 'some evidence' . . . and because the government submitted no evidence in response, the district court erred when it accepted the government's unsupported assertions and effectively shifted the burden of persuasion to [defendant]."). The Government's methodology in this case falls well short of meeting that burden. In order to accurately measure such losses to investors, the Government's analysis would need to ascertain what actual pecuniary harm would not have occurred if not for the fraud, as well as establish that any identifiable losses were proximately caused by the fraud, all while excluding the effect of any other confounding factors or intervening causes. *See United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008); *United States v. Holmes*, No. 5:18-cr-00258-EJD-1, 2023 WL 149108, at *4 (N.D. Cal. Jan. 10, 2023). Here, although the Government points to the testimony of investors as to their own assessment of the value of their post-settlement equity in Outcome, the Government has failed to demonstrate an actual pecuniary loss to those investors, or that any asserted diminution in value is tied to any conduct for which the defendants are accountable.

a. **The Government's Methodology of Extrapolating Nearly Half a Billion Dollars in Losses from Isolated Statements of Investors Is Not a Reliable Method of Determining Loss Under the Sentencing Guidelines**

The Government's method of determining investor losses is based on approximately three data points, combined with one giant assumption. The Government estimates that the investors who participated in Outcome 2017 equity raise have today lost over $448.6 million—90% of their $487.5 million investment—and that "the losses to all the investors were reasonably foreseeable" "[b]ecause the jury convicted the defendants." PSIR ¶ 27; Govt. Version Supp. at 9. The

24

Government reaches that curious conclusion despite the fact that $190 million (more than 40% of the funds the institutional investors had provided) were returned to them and to the company they came to control as part of the settlement.

The Government appears to rely upon the jury's verdict for its incomprehensible calculation of loss. But the jury did not endorse the Government's loss calculation or the foreseeability of that loss, nor did the jury find proximate cause or but-for causation for the alleged losses the Government is now claiming justify a 28-point increase in the defendants' offense level under the Guidelines. The Government's proposed 10% deduction from the equity raise is instead cobbled together from the statements or valuations from a small number of the investors in Outcome Health, who described how they internally marked down their investments after the fraud was detected. Gov't Supp. at 9–11. From these few valuations, the Government extrapolated that the investors lost 90% of their original investment. *Id.*

Such a fly-by-night method of determining loss under the Sentencing Guidelines is impermissible—especially in a case where such a determination has the potential to lead to a recommendation of life imprisonment. The Court must instead calculate losses only based on losses for which there is but-for and proximate cause, not losses caused by confounding factors or intervening events. *See, e.g.*, *Burns*, 843 F.3d at 689 (district court erred in failing to consider whether an event was "a superseding cause that br[o]k[e] the causal chain" in determining loss from an investment scheme). Moreover, the Government's loss figure is based on the investors' assessments of value years after the fraud occurred. These subjective investor valuations—in contravention of the applicable caselaw—do not identify which losses were caused by the fraud, as opposed to other factors or events that occurred in the now ***five years*** since the fraud's revelation. *See supra*; *cf.* § 2B1.1 App. Note 3(F)(ix)(I) (finding that the appropriate method for

calculating loss due to fraudulent inflation of securities would be to "calculat[e] the difference between the average price of the security during the fraud" and "during the *90-day period after the fraud was disclosed* to the market" (emphasis added)).

In rejecting the Government's perfunctory calculation of institutional investor losses, this Court should be guided by the Seventh Circuit's recent decision in *Newton*. There, the Government argued that the defendant, who was convicted for her participation in a Medicare overbilling scheme, was responsible for all Medicare reimbursements billed by her company during the conspiracy, less a "10% deduction to account for the possibility" that some of the billings were "legitimate." *Newton*, 76 F.4th at 672. The Seventh Circuit rejected this loss calculation as "speculation." *Id.* at 674. Because the Government had not established that "the entire operation was fraudulent," and its cited evidence "d[id] not establish what proportion" of the total Medicare charges were fraudulent, the Government's 10% discount from all Medicare reimbursements could not reliably establish loss. *Id.* at 673–74.

Here, too, the Government's proposed 10% discount from the entire equity raise is speculative, having been plucked essentially out of thin air. Perhaps the Government's conclusion of a 90% investor loss would be more plausible if Outcome ceased to be an operating company after the fraud was revealed, but there is no dispute that Outcome was, before and after the revelation of the fraud, a legitimate business that provided real services to its customers, as it continues to do today under its current leadership. *See* Gov't Evidentiary Hr. Closing Slides (May 10, 2024), at 35 (acknowledging that "[n]ot all of Outcome Health's advertising campaigns were fraudulent"). Given that reality, the Government cannot simply assume that any post-fraud shifts in the value of the investors' equity value was caused by the defendants' conduct (much less post-settlement shifts). *See, e.g., Newton*, 76 F.4th at 673–74 (rejecting the government's argument that

loss could be based "on an assumption that the entirety of the operation was fraudulent," where "the government presented evidence of significant fraud, but not evidence tainting all Medicare reimbursements"); *United States v. Lonich*, 23 F.4th 881, 917 (9th Cir. 2022) (district court erred in finding defendants responsible under § 2B1.1 for losses associated with bank collapse, where government did not provide evidence that defendants' fraud caused the collapse); *Holmes*, 2023 WL 149108, at *4 (rejecting government's argument that the investors did not receive any value "because the shares ultimately became worthless," as "the government here had not established[ ]by . . . a preponderance . . . that [the company's] ultimate collapse was the result of Defendant's conspiratorial conduct and should therefore be reflected in her loss calculation").[7] The Court should reject the Government's attempt to use unreliable and speculative investor loss calculations to drastically increase Mr. Shah's Guidelines range.

In sum, the Government has performed no analysis and has offered no reliable evidence to support its conclusion that Mr. Shah's conduct was the but-for and proximate cause of investors losing 90% of the value of their March–July 2017 investment. Because the Government has failed to substantiate its calculation of actual losses, this Court need not reach the defendants' other arguments demonstrating the lack of cognizable losses to the institutional investors. But if the Court goes on to consider the actual structure of the investors' equity at the time of the fraud and the shift in their equity as a result of the 2018 settlement (in which there is no allegation of fraud),

---

[7]     The cases cited by the Government to support its causation argument are inapposite; in both cases, the defendants' wrongdoing directly precipitated the losses. Here, in contrast, the Government has not offered any evidence that the fraud at Outcome caused the intervening events, many of which occurred **years** after the fraud's revelation. *See United States v. Lagos*, 25 F.4th 329, 333, 336 (5th Cir. 2022) (defendant could be held responsible for his company's bankruptcy-related costs where it "declared bankruptcy several days" after the revelation of the fraud); *United States v. Reifler*, 446 F.3d 65, 109 (2d Cir. 2006) (shareholder sell-off was the foreseeable result of defendants' stock manipulation due to specific nature of the company).

it will become evidently clear that no losses to the institutional investors can be assessed against the defendants under the Guidelines, as demonstrated by the thorough and convincing analysis of Carl Saba, the defendants' retained expert. *See* **Ex. 1** (Saba Report).

> **b. Even Once the Effects of the Fraud Are Accounted for, Outcome Had Value More Than Sufficient to Cover Payments Required to Be Made to the Institutional Investors**

Mr. Saba's analysis is complex, but his conclusions are straightforward and easy to digest. As Mr. Saba's report explains, when the institutional investors bought into Outcome in early 2017, the company was valued at $970 million. *Id.* ¶ 103. That valuation, however, did not consider the approximately $65 million in liabilities resulting from Outcome's underdelivery of services to its customers, i.e., the fraud alleged in the indictment. In order to account for the fraud, Mr. Saba performed three different analyses—a market approach, a guidelines public company approach, and an income approach—to assess what the true value of Outcome was at the time of the institutional investors' investment. *Id.* ¶ 96. And, at the time, he concludes, Outcome was still worth approximately $780 million, even after taking Outcome's unreported liabilities into account. *Id.* ¶ 109. As Mr. Saba acknowledges, that value of Outcome dropped by an additional $50 million when the *Wall Street Journal* article was published on October 13, 2017, but even at $730 million, the value of Outcome vastly exceeded the institutional investors' investment of $487 million. *Id.* ¶¶ 109, 126.

That difference is important for a significant reason, which the Government's superficial analysis entirely ignores: prior to the settlement, the investors' equity was not structured as traditional preferred or common stock, but was instead in the nature of a fixed, first-priority claim against Outcome's assets and revenues. *Id.* ¶¶ 49–59. Specifically, the 2017 capital raise was structured such that the investors owned neither the upside of the company's growth nor the downside of any losses the company might suffer. Instead, ***no matter what***, the investors were

entitled to a fixed return on their $487 million investment—nothing less, nothing more. In that respect, their investment, which the institutional investors themselves described as "structured equity," was much more like debt than equity. Although the institutional investors nominally held shares in the company, the value of their investment did not fluctuate with the value of the company, as would be the case for a more a traditional stockholder. Thus, so long as the value of Outcome did not dip below $487 million (which, Mr. Saba's analysis shows, it never came close to doing), the investors did not suffer **any** pecuniary harm as a result of the understatement of Outcome's liabilities and the resulting overvaluation of the company at the time of their investment.

To put it a different way, the institutional investors didn't just donate $487 million to Outcome. They bought something with that money. And what they bought was an interest in Outcome that entitled them to the return of that money, plus a premium, over time.[8] But they did not lose the interest they purchased as a result of the fraud. To provide a simpler but similar example: if you pay $10,000 for a used car, and then you learn that the salesman rolled the odometer back, you may have lost $10,000—but you still got a car. Your loss is not $10,000; it's $10,000 minus the actual value of the car based on its true mileage. Similarly, if the bank lends you $100,000 to do improvements on your house and secures the loan by a first priority mortgage on the house, and you represented your house was worth $800,000 on your loan application when it is really only worth $600,000, the bank still owns a $100,000 mortgage on your house that it has the power to collect, and thus the bank has not suffered a loss unless and until the house is sold at

---

[8]     The Government does not seek to include any premium the investors may have been entitled to in its assessment of loss, and the Government is right not to do so: loss "does not include . . . interest of any kind, . . . amounts based on an agreed-upon rate of return or rate of return, or other similar costs." § 2B1.1 App. Note. 3(D)(i).

a value below the face value of the mortgage. *See* § 2B1.1 App. Note. 3I(ii) (recognizing that, in the case of a secured loan, any loss calculation must be reduced by the value of the collateral obtained at the time of sentencing). In each case, there was fraud because there was a material misstatement that resulted in money changing hands, but the resulting ***pecuniary harm***, if any, is the money paid ***minus*** the actual value received.

Applying that same analysis to Outcome, Mr. Saba's analysis shows that the institutional investors had not suffered any loss as of the date of the *Wall Street Journal* article, because they still had the same fixed, first-priority claim against Outcome they had before the fraud was revealed, against a company whose value vastly exceeded the size of that claim. *See* **Ex. 1** (Saba Report) ¶ 126. The Government's analysis entirely ignores that critical aspect of the structure of the institutional investors' equity. But in reality, the Government hasn't even endeavored to assess what the loss to the institutional investors was in the first instance; instead, it has simply extrapolated from isolated statements by representatives of the institutional investors as to what they think their investments are worth ***today***. Yet that analysis suffers from a yet more obvious defect: it ignores the effect of the settlement on the structure of the institutional investors' equity, as well as the actual value returned to the institutional investors as a result of the settlement.

### c. In the Settlement, the Investors Received Value That Exceeded the Amount of Their Initial Investment

If the institutional investors had been forced to settle for pennies on the dollar after the fraud at Outcome was reported, then the defendants acknowledge that those losses could be counted for purposes of the Guidelines. But that is not what happened here. Rather than suffer a diminution in the value of their prior fixed claim against the company, the institutional investors actually ***improved*** the value of their investment as a result of the pre-indictment settlement. As Mr. Saba's report explains, in the settlement agreement, the institutional investors traded their

preexisting fixed claim against the company for traditional equity, whereby they not only maintained a preference that ensured their priority payment status, but they also gained ownership of Outcome's upside. **Ex. 1** (Saba Report) ¶ 112–24. They also obtained operational control of the company, which would ordinarily result in a premium for a purchaser—but as a result of the settlement, the investors did not have to pay any such premium. *Id.* ¶ 25. Instead, they gained control of a very valuable and profitable company simply by abandoning their prior fixed claim against the company and returning approximately $31 million to Mr. Shah and Ms. Agarwal. And Mr. Shah and Ms. Agarwal themselves paid $31 million in cash to the institutional investors and paid $159 million back into the company that the institutional investors now controlled. *Id.* ¶¶ 25–26, 123.

Again, if that gaining control of the company was a losing proposition for the institutional investors (which it obviously wasn't, or else they would have demanded different terms), the defendants agree that any resulting losses could be counted against them. But Mr. Saba's analysis shows the contrary. At the time of the settlement, the same three valuation approaches (market, public company, and income) produce a value for Outcome of $830 million, resulting in the institutional investors' shares being worth $483 million—only $4 million less than their original investment. *Id.* ¶ 123. Adding the $31 million the investors received as a result of the settlement means that the investors actually made at least $26 million relative to their initial investment as a result of the settlement. *Id.* And just in case the Government might claim that Mr. Saba's analysis is too generous (which it is not), Mr. Saba has also calculated precisely what Outcome would have had to be worth in order for the institutional investors to "break even": $762 million. *Id.* Thus, even if Mr. Saba's analysis had overvalued Outcome by $68 million, the settlement would still have been sufficient to make the investors whole.

#### d. Any Losses the Investors May Have Suffered After Being Made Whole in the Settlement Were Not Actually and Proximately Caused by the Fraud

Having failed to perform any analysis of the investors' losses either at the time of their initial investment or the settlement, the Government simply asks the Court to extrapolate from what the investors think their investments in Outcome are worth *today*. As noted above and as elaborated in Mr. Saba's report, internal markdowns by investors are not themselves a reliable method for assessing the value of an investment, much less a solid basis for such a simplistic extrapolation. *See* **Es. 1** (Saba Report) ¶ 127. But even if the Court were to accept the Government's "markdown extrapolation" methodology as reliable (which it is not), the Government cannot show that any of the losses suffered by investors after the settlement were the actual or foreseeable result *of the defendants' conduct*. Since, as established above, Mr. Shah and Ms. Agarwal made the institutional investors whole at least by the time of the settlement in early 2018, any losses that investors may have suffered after they took control of the company cannot be deemed to have been the actual or proximate result of the defendants' actions.

Again, to take a hypothetical: imagine that a fraudster takes $300,000 from a victim, uses it and his own money to buy a $400,000 Ferrari, and, then gives the victim to the keys to the Ferrari and says "I'm sorry; take it; it's yours." At that point, the fraudster, though he may have stolen the victim's money in the first instance, has made his victim whole (and then some). If the victim then takes the Ferrari speeding down the highway and gets in an accident, the costs of repairs the victim may incur are not an actual and proximate result of the fraud. The same is true here. Once Mr. Shah and Ms. Agarwal returned greater value to the investors in the settlement than they contributed during the capital raise, the decision of how to operate Outcome became theirs. And any decisions that particular investors might have made from that point forward are not the actual or proximate result of Mr. Shah's or Ms. Agarwal's conduct.

But the institutional investors did not crash the Ferrari. Instead, Outcome continues to be a thriving and operating company today, having joined forces in an estimated $1 billion merger with PatientPoint to form PatientPoint Health Technologies.[9] And as Mr. Saba's report explains, PatientPoint's own internal valuations reflect that the original equity in Outcome constitutes ███ of the combined enterprise, and an April 2024 valuation of the company estimated a value as of September 2023 that remains well north of █████.[10] *Id.* ¶ 138. Given the continued success of Outcome's business today, there is zno warrant for the Government's claim that the losses claimed by institutional investors are the actual or proximate result of the defendants' criminal conduct.

### e. The Government Cannot Establish What Portion of Any Fluctuations in the Value of Outcome Post-Settlement Were a Result of the Fraud

To the extent that the Government seeks to rely upon changes in the value of any particular investor's equity after the settlement should be considered as part of the loss, it has failed to demonstrate that any such fluctuations were the actual or proximate result of the fraud, as opposed to post-settlement decisions by Outcome's new owners and management. In addition to the defendants' lack of control over Outcome's future performance as a result of the settlement, there

---

[9] "PatientPoint-Outcome Health marriage pushes valuation north of $1bn," PE Hub, https://www.pehub.com/patientpoint-outcome-health-marriage-pushes-valuation-north-of-1bn/.

[10] These numbers are almost certainly conservative estimates of the current value of Outcome's business in light of a recent financing announced by PatientPoint, which likely suggests that the received by the investors in the settlement may now have a value exceeding $1 billion on its own. *See* PR Newsire, "L Catterton Announces Completion of Continuation Fund to Extend its Partnership with PatientPoint Health Technologies, https://www.prnewswire.com/news-releases/l-catterton-announces-completion-of-continuation-fund-to-extend-its-partnership-with-patientpoint-health-technologies-301888257.html. Mr. Shah's counsel has subpoenaed PatientPoint for information regarding this financing and any valuation of Outcome's business connected to that financing. While Mr. Shah understands from PatientPoint's counsel that that information is forthcoming, it is not yet available to Mr. Shah as of the date of this memorandum. Mr. Shah expects to supplement the Court with such information once it is received from PatientPoint.

were also significant intervening events that would have affected the company's value aside from the fraud, as the Government itself acknowledges. *See* Gov't Supp. at 10 (acknowledging that a number of significant intervening events, including multiple "restructuring transactions," that the Government admits have "diminish[ed] the original investments' value"). But instead of pointing to reliable evidence showing that these events were both actual and foreseeable consequence of the fraud, the Government asks this Court to presume that the restructurings and equity diminution were both actually caused by the fraud and foreseeable because it claims Outcome was "premised on defrauding its clients"—despite acknowledging that the underdeliveries established by the Government accounted for only a fraction of Outcome's overall revenue. *Id.* The Court, however, cannot simply assume that all changes in Outcome's value and any individual investor's equity position were a result of the misstatements in Outcome's financials. *See United States v. Stein*, 846 F.3d 1135, 1155–56 (11th Cir. 2017) (district court erred in failing to consider "intervening events that may have affected the stock price"); *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007) (methodology must "[d]etermin[e] the extent to which a defendant's fraud, as distinguished from market or other forces, caused shareholders' losses"); *United States v. Olis*, 429 F.3d 540, 548–49 (5th Cir. 2005) (remanding "[b]ecause the district court's approach to the loss calculation did not take into account the impact of extrinsic factors on [the company]'s stock price decline").[11] Instead, to determine any reliable estimate of loss, the Government would be required to ascertain

---

[11]  While some courts of appeals have looked to the principles governing loss for civil securities fraud, as articulated in *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336 (2005), *see Rutkoske*, 506 F.3d at 179; *Olis*, 429 F.3d at 548–49, others have reached this conclusion simply by relying on the language of the loss Guideline. *See Stein*, 846 F.3d at 1156 n.20; *Berger*, 587 F.3d 1038, 1045–46.

the relative impact of such external factors on the value of Outcome at each relevant point in time—an analysis that the Government has not even undertaken.

First among the confounding factors ignored by the Government is Outcome's acquisition of AccentHealth, which occurred in December 2016, nearly a year before the *Wall Street Journal* article. *See* **Ex. 1** (Saba Report) ¶ 23. Outcome thereafter encountered issues with integrating the two companies, which led to a doubling of costs, without a corresponding increase in revenue. *Id.* ¶¶ 45, 48, 128. The Government does not—and cannot—claim that the AccentHealth acquisition was related to the fraud. That event, wholly unrelated to fraud, significantly affected Outcome's financial outlook. But the Government does nothing to account for that event.

Similarly, the Government ignores the independent decisions made by Outcome's new management in their operation of the company, all of which were outside of the defendants' control after the settlement was signed. In particular, the Government does not consider the impact of new management's independent decision not to honor a cash covenant in one of its lending arrangements that came due over a year after Mr. Shah and Ms. Agarwal settled with investors and left the company. *See id.* ¶ 131. Despite having the cash needed to meet the obligation as a result of Mr. Shah and Ms. Agarwal returning $190 million to the institutional investors and the company as part of the settlement, the institutional investors made the choice not honor that covenant. *Id.* Whatever their reasons may have been, it is that breach of Outcome's contractual obligations and resulting action by Outcome's lenders that was the prime driver behind any diminution in the value of the institutional investors' equity after the 2018 settlement. *Id.* Those events, which were neither caused by the defendants' conduct nor a reasonably foreseeable response to that conduct, must be excluded from any loss calculation under a plain application of the Guidelines.

**f.    Even If the Government's Guidelines Calculation Were Correct, It Vastly Overstates the "Actual Loss" to Institutional Investors Resulting from the Defendants' Conduct**

As explained above, the Government's investor loss calculation fails every test this Court must apply. It does not apply a reasonable methodology to ascertain the actual losses suffered by a single institutional investor. It does not employ a reasonable method to extrapolate those losses to other investors. It fails to credit the defendants for the value received by the investors in exchange for their investment, either at the time of the investment or thereafter. And it does not merely attempt to impose liability on the defendants for intervening events without isolating their effects from those of the fraud: it seeks to hold them responsible for events that occurred *after* Mr. Shah and Ms. Agarwal had made the institutional investors whole through the 2018 settlement. For all those reasons, the Court should reject the Government's unreliable calculation of institutional investor losses and find that there was no actual or foreseeable pecuniary harm to the institutional investors as a result of the defendants' conduct under the Guidelines.

But even if this Court were to entertain the Government's slipshod calculation as potentially proper under the Guidelines, that would only underscore how inappropriate a Guidelines sentence would be for any of the defendants in this case. As erroneously construed by the Government, the Guidelines would not consider any of the critical facts set forth above, such as the value received by the institutional investors at the time of their investment, the value conveyed to them as a result of the settlement, the current value of those holdings today, or the existence of intervening and post-hoc events that call into question whether any losses were actually or proximately caused by the defendants' conduct. If the Government's interpretation were correct, the Guidelines would recommend that this Court treat each defendant in this case no differently from a defendant who stole half a billion dollars and never returned any value whatsoever to his victims. That hypothesis alone shows that the Government's Guidelines

calculation cannot be right—but if it were, then that would counsel strongly in favor of a non-Guidelines sentence in this case.

Indeed, this Court is free to "var[y] from the Guidelines based solely on the judge's view that the Guidelines range 'fails properly to reflect § 3553(a) considerations.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita*, 551 U.S. at 351); *see United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) (noting that "district judges are at liberty to reject *any* Guideline on policy grounds"). In particular, the Seventh Circuit has instructed this Court to "give *less* deference to guidelines that are not the product of the Commission acting in 'its characteristic institutional role,' in which it typically implements guidelines only after taking into account 'empirical data and national experience.'" *United States v. Reyes-Hernandez*, 624 F.3d 405, 418 (7th Cir. 2010) (quoting *Kimbrough*, 552 U.S. at 109). The loss Guideline fits this description exactly. After the loss Guideline was established in 1987, the Sentencing Commission increased the offense points for the highest loss bracket on several occasions, despite lacking any "empirical approach based on data about past sentencing practices." *Corsey*, 723 F.3d at 379–80; *see United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) (noting that the Guidelines range for a typical fraud defendant has increased by more than 500% since 1987). There is therefore widespread consensus that "the loss guideline [is] fundamentally flawed, especially as loss amounts climb." *Corsey*, 723 F.3d at 380 (Underhill, J., concurring); *see, e.g.*, *United States v. Johnson*, 2018 WL 1997975, at *4 (E.D.N.Y. Apr. 27, 2018) (noting the "lengthy list of judges, practitioners, scholars, and other commentators" who have urged the Commission to fix the loss guideline).

Given that reality, courts of appeals have regularly endorsed departing from the Guidelines range in cases where the recommend sentence is driven by the loss amount. *See United States v.*

*Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (remanding for further proceedings, because the "unusualness" of the Commission assigning a "rather low base offense level" to fraud and "then increas[ing] it significantly by a loss enhancement . . . entitles a sentencing judge to consider a non-Guidelines sentence"); *United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016) ("[B]ecause the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances."); *see also United States v. Fry*, 792 F.3d 884, 893 (8th Cir. 2015) (Bright, J., dissenting) ("[T]he Guidelines related to fraud convictions do not present a reasonable starting point for sentencing.").

Courts in this district widely agree: in cases from 2023 where § 2B1.1 was the primary sentencing guideline, courts in this district varied or departed downward in about 77% of sentences; about 64% of these were non-government requested downward variances. *Interactive Data Analyzer*, U.S. Sent'g Comm'n, https://ida.ussc.gov/analytics/saw.dll?Dashboard. This Court should follow suit. Regardless of whether the true economic impact of the fraud on Outcome's institutional investors is considered under the Guidelines or as grounds for a variance from the Guidelines, this Court should not strain to hold the defendants accountable for losses the Government has neither reliably calculated nor demonstrated to be the actual and proximate result of the defendants' conduct.

## 2. The Government Has Failed to Properly Calculate Lender Losses by Failing to Establish Causation, Ignoring the Distinction Between Primary and Secondary Debt Holders, and Not Accounting the Value of the Collateral Received

The Government employs a similar tactic of relying on subjective write downs to estimate the lenders' losses. For similar reasons as those set forth above, that approach does not satisfy its burden to calculate a reasonable estimate of lender loss based on reliable information, much less that those lender losses would not have occurred but for the defendants' conduct and were proximately caused by the defendants' conduct. As with the institutional investors, the

Government's only effort to calculate lender losses was requesting and compiling the lenders' own estimates of their losses—years later. Taking the lenders' responses at face value, the Government estimated that the loss was $25,641,808.14. PSIR ¶ 26. But the say-so of the polled lenders is not sufficient to establish loss for Guidelines purposes, for several reasons.

*First*, the Government's lender loss calculation runs into many of the same causation problems as its investor loss calculation. Specifically, its calculation is based exclusively on unreliable self-reporting from a small number of lenders. The Government asked "all participating lenders" (*i.e.*, those who originally participated in the December 2016 loan and those who purchased Outcome's debt on the secondary market) to "identify and quantify their losses." *Id.* This self-reporting is not reliable evidence of lender loss, as the lenders do not make clear their methodology or whether their purported losses were factually and proximately caused by the defendants' criminal conduct, as distinguished from other factors. *See United States v. Betts*, 99 F.4th 1048, 1063 (7th Cir. 2024) (holding that a spreadsheet containing purported victims' self-reported losses was insufficient for establishing restitution, as "presenting a spreadsheet is not enough to establish causation"). Indeed, the very fact that the Government can apparently only identify losses experienced by lenders in the secondary market totaling roughly $25 million demonstrates that there were no actual impairment to the debt obligation itself. The Government also makes a blanket claim that the primary reason for all lender losses was the May 2019 restructuring, where the lenders' debt was converted "into a nearly worthless lien position in PatientPoint." Gov't 2d Supp. at 2. But as discussed, the Government has not attempted to meet its burden to demonstrate that the 2019 restructuring, or any events after the 2017 fraud revelation and the subsequent 2018 settlement, were actually or proximately caused by the offense conduct. *See Newton*, 76 F.4th at 673–74; *Lonich*, 23 F.4th at 917; *Holmes*, 2023 WL 149108, at *4.

*Second*, the Government makes no distinction between primary and secondary lenders—who invariably relied on different information when acquiring Outcome debt, requiring different causation analysis to track whether their losses would not have otherwise occurred without, and were proximately caused by, the defendants' conduct. Most critically, the Government has offered no evidence that the secondary lenders relied on any material misrepresentation. *See United States v. Wilkozek*, 822 F.3d 364, 369 (7th Cir. 2016) (to be a "victim" for restitution purposes "a person must *actually rely* on the defendant's fraudulent statements to his detriment"); *Stein*, 846 F.3d at 1153 (11th Cir. 2017) ("The government must show that the investors relied on [defendant]'s fraudulent information to satisfy the 'but for' causation requirement under § 2B1.1."). Any secondary lenders who purchased the debt after the revelation of the fraud can certainly not be classified to be "victims" under the Guidelines.

*Finally*, and most critically, the Government entirely ignores the fact that none of Outcome's lenders were merely unsecured creditors; rather, each of the lenders held a security interest against the all of Outcome's assets, including its receivables. *See* **Ex. 1** (Saba Report) ¶ 134–39. And the Guidelines expressly require the Court to reduce any loss calculation by the value of that collateral. *See* § 2B1.1 App. Note 3(E)(ii) (requiring that losses to any victims holding collateral be reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing"); *see also* 1st Supp. Gov't Version at 12 n.7 ("Losses to secured creditors are treated differently than losses to other victims under the Guidelines. Note 3(E) of § 2B1.1 directs that a credit against loss be given for the value of creditors' recovery at the time of sentencing."). Without considering the value of the collateral held by the lenders, the Court cannot arrive at a reliable estimate of any losses they might claim.

In short, the secondary market losses claimed by the Government are not the sort contemplated by the Guidelines or its Application notes. Given these problems, the Court should reject the lenders' self-reporting as unreliable and conclude that the Government has not satisfied its burden to justify applying a sentencing enhancement for lender losses. *See Moore*, 52 F.4th at 701 (holding that, where the defendant offered "some evidence" that the evidence was unreliable and "the government submitted no evidence in response, the district court erred when it accepted the government's unsupported assertions and effectively shifted the burden of persuasion to [defendant]").

### 3. The Government's Calculation of Customer Losses Ignores Restitution Provided to Customers at Mr. Shah's Direction Through Payments and "Make Goods"

The Government asserts that Outcome clients lost $48,447,468 due to ads that were not run. PSIR ¶ 23. But again, in a familiar pattern, the Government fails to give proper credit for the "fair market value of money returned or services rendered" by the defendants. *See* § 2B1.1 App. Note 3(E)(i). The Government's analysis ignores the reimbursements and in-kind services totaling $70 million that Outcome provided to customers, a significant portion of which were provided well before the *Wall Street Journal* article was even published. That is a puzzling oversight, considering that the Government previously took a victory lap by announcing that it had reached an agreement with Outcome requiring $70 million of repayments to customers—despite the fact that $65.5 of the $70 million had already been paid voluntarily by Outcome before it settled with the Government.[12] In reality, "make goods" were regularly made to customers for contractual shortfalls in years prior to 2016, and the process of providing "make goods" on Outcome's 2016

---

[12] Outcome Health Agrees to Pay $70 Million to Resolve Fraud Investigation, U.S. Dep't of Justice (Oct. 30, 2019), https://www.justice.gov/opa/pr/outcome-health-agrees-pay-70-million-resolve-fraud-investigation.

contracts was initiated by Mr. Shah in early 2017, well before the *Wall Street Journal* reported the fraud, a fact the Government entirely ignores. *See* **Ex. 1** (Saba Report) 142–49. At the time of its settlement with Outcome, the Government also announced that Outcome had set aside "an additional $4.5 million to compensate any additional pharmaceutical clients who have not yet been made whole." Thus, ultimately, as in the case of the institutional investors and lenders, Outcome's customers were made whole and therefore did not suffer any loss.

Not only does the Government ignore the more than $65.5 million in restitution efforts, but the Government now claims that there were underpayments in the restitution—despite approving the restitution in 2019.[13] But the Government also claims that there were numerous overpayments, including some that total in the millions. Gov't Supp. Ex. C. According to the Government, there are discrepancies because Outcome's internal restitution efforts "were a product of Outcome's own interactions with its clients rather than evidence of losses provided by the government." Gov't 2d Supp. at 5. Regardless of the details of the under and overpayments, it is clear that Outcome's customers were substantially made whole and the Government's customer loss calculation does not accurately reflect the reality of the offense.

In sum, the Government cannot meet its burden to establish with any degree of confidence that its calculation of losses are reasonable or reliable, that the losses were foreseeable, or that Mr. Shah's conduct was the but-for or proximate cause of those losses.

### 4. Regardless of the Proper Guidelines Calculation, the Court Should Apply a Downward Departure or, Alternatively, a Downward Variance, with Respect to the Losses in This Case

Even if the Court adopts the PSIR or Government's aggressive calculations of losses, the Court should nevertheless apply a downward departure or downward variance. The Guidelines

---

[13] *See id.*

expressly recognize that a "downward departure may be warranted" if the loss Guideline "substantially overstates the seriousness of the offense." § 2B1.1 App. Note 21(C). As the Seventh Circuit has explained, instances where "loss overstates the seriousness of the offense" is "an encouraged basis for departure" from the Guidelines.[14] *United States v. Corry*, 206 F.3d 748, 751 (7th Cir. 2000); *see also United States v. Popovski*, 872 F.3d 552, 554 (7th Cir. 2017) ("If a calculation under [an application note to § 2B1.1] overstates the seriousness of the offense, a district judge *must adjust accordingly*." (emphasis added)).

This case is a prime example of circumstances that justify a downward departure or variance. Although the Government concedes that the defendants have already returned substantial value to investors, lenders, and customers—including over $255 million in actual cash payments—it refuses to credit those efforts in its Guidelines calculation. Gov't Supp. at 12. Similarly, the Government acknowledges that multiple events outside the fraud resulted in fluctuations in the company's value and claimed "diminution" of the investor and lenders' holdings; but the Government nonetheless disregards those supervening events for Guidelines purposes. *Id.* at 10;

---

[14] Courts are not required to *calculate* the Guidelines' advisory downward departures when determining the Guidelines range. *United States v. Pankow*, 884 F.3d 785, 793 (7th Cir. 2018). However, the sentencing judges may "consider a separate reduction based on traditional departures before considering other § 3553(a) factors." *Id.* (internal quotation marks omitted); *see United States v. Loving*, 22 F.4th 630, 636 (7th Cir. 2022) (describing a three-step sentencing process: step one is calculating the Guidelines range; step two is "consider[ing] the advice in the Sentencing Guidelines about potential departures"; and step three is "consider[ing] the sentencing factors listed under 18 U.S.C. § 3553(a)").

Even if this Court does not apply a formal downward departure, a downward variance based on the Guidelines' advice is warranted. The Seventh Circuit has "emphasized that 'district courts can still take guidance from the departure provisions . . . and apply them by way of analogy when assessing the § 3553(a) factors.'" *Id.* (quoting *United States v. Brown*, 732 F.3d 781, 786 (7th Cir. 2013)). "In fact, § 3553(a)(5) contemplates that a district court will consider 'any pertinent policy statements' contained in the Guidelines." *United States v. Bell*, 887 F.3d 795, 798 (7th Cir. 2018).

Gov't 2d Supp. at 2. Given its haphazard methodology, it is no surprise that the Government's proposed loss calculation drastically overstates actual loss and the seriousness of the offense.

Even if the Court does not consider these repayments and supervening events in calculating the Guidelines range, they should be considered under § 3553(a), as explained further in Part II below. *See United States v. Gulzar*, 92 F.4th 684, 687 (7th Cir. 2024) ("[A] district court may consider a defendant's efforts to repay his victims, *even after detection*, under 18 U.S.C. § 3553(a) when fashioning a sentence." (emphasis added)); *United States v. Lane*, 323 F.3d 568, 588 (7th Cir. 2003) ("Once the amount of loss is calculated under the guidelines, the court has the discretion to modify the amount of loss to more accurately reflect the economic realities of the crime."); *United States v. Forchette*, 220 F. Supp. 2d 914, 924–25 (E.D. Wis. 2002) (downward departure may be warranted where loss amount is inflated by other factors or where there has been restitution).

Importantly, Outcome was—and continues to be—a legitimate company. Despite Outcome's problems, Mr. Shah's conduct did not bankrupt Outcome or cause Outcome to collapse. Rather, the company that Mr. Shah built from the ground up continues to be a viable part of PatientPoint and to provide real value. The Government's exaggerated loss amount completely ignores this reality and, as such, should be rejected.

### C.  As the PSIR Reflects, Mr. Shah Did Not Employ Sophisticated Means in the Commission of the Offense

As the PSIR details, Mr. Shah did not employ sophisticated means and no enhancement should apply. § 2B1.1(b)(10)(C). The "sophisticated means" enhancement applies only where the defendant engaged in "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* App. Note 9(B). To determine this, the Seventh Circuit asks whether the offense was more complex than the "garden-variety" version of that

44

crime. *United States v. Higdon*, 531 F.3d 561, 564 (7th Cir. 2008). To that end, the quintessential example of sophisticated means is "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." § 2B1.1 App. Note 9(B); *see, e.g., United States v. Simon*, No. 3:10-CR-00056(01)RM, 2011 WL 924264, at *7, 12 (N.D. Ind. Mar. 14, 2011) (applying sophisticated means enhancement to tax counts, for which defendant used "multiple entities to hide and disguise income," but rejecting enhancement for wire fraud counts, for which defendant simply used false tax forms to obtain financial aid).

No "especially" complex or intricate conduct occurred here. Rather, as the Government has acknowledged, "[t]he scheme [at Outcome] was fairly simple and involved overselling and underdelivering its advertising inventory." DOJ-PROD-S-0000000549–550. The Probation Office agreed, finding that the relevant conduct "is inherent in many fraud cases and the offense did not involve sophisticated means." PSR ¶ 52.

### D. Although Mr. Shah Was the CEO of Outcome, That Alone Does Not Justify an Aggravating Role Enhancement

This Court should also resist the Government's invitation to an aggravating role enhancement under § 3B1.1(a) based simply on Mr. Shah's role as the CEO of Outcome. To qualify for such an enhancement, it is not enough for the defendant to be "an organizer or leader of [his] company"—he must be "an 'organizer or leader' of the ***criminal activity***, *i.e.*, fraud and conspiracy to commit fraud against [the company's] investors" or others. *United States v. Holmes*, No. 5:18-CR-00258-EJD-1, 2023 WL 149108, at *11 (N.D. Cal. Jan. 10, 2023) (emphasis added). Although Mr. Shah was the CEO of Outcome, that title alone is not sufficient for the application of § 3B1.1(a). *See id.* If anything, the evidence at trial demonstrated that Ashik Desai was principally responsible for orchestrating the fraud at Outcome: Desai was solely responsible for large portions of the fraud, concealed his actions from Mr. Shah and other Outcome executives,

and lied to Mr. Shah about his actions. That does not mean that Mr. Shah is not accountable for the fraud under the Guidelines, but it does mean that he cannot be deemed the "organizer" or "leader" of that those activities, given the significantly larger role that Desai played in organizing the fraudulent activities.

### E.    Mr. Shah Should Also Receive a Two-Point Reduction Because of His Status as a Zero-Point Offender

Although it had not yet been enacted at the time the PSIR was originally prepared, under the recent and applicable Guidelines amendments, Mr. Shah should receive a two-level decrease under § 4C1.1, the Zero-Point Offender Amendment. This amendment was enacted due to the Sentencing Commission's recognition that recidivism data shows "offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point."[15] The Zero-Point Offender Amendment provides a two-level decrease where the defendant has no criminal history points and his offense did not involve any of the enumerated aggravating factors. § 4C1.1(a). This decrease applies here, as Mr. Shah has no criminal history and, because he should not receive an adjustment under § 3B.1.1, *see supra*, there are no aggravating factors.

### F.    A Proper Guidelines Calculation Dictates a Significantly Lower Guidelines Range Than Proposed by the Government

As explained above, the Government's analysis of losses falls short of establishing a reasonable estimate of the losses attributable to the defendants in this case. The Government's failure to ascertain through any reliable method what asserted losses were actually and proximately caused by the fraud, as opposed to other confounding or intervening factors, renders its estimates unreliable. With respect to both institutional investor and lender losses, any asserted losses are

---

[15] *Amendment 821*, U.S. Sent'g Comm'n, https://www.ussc.gov/guidelines/amendment/821.

entirely offset by the value received by investors in exchange for their investment and the collateral supporting any of the lenders' loans. And with respect to the losses to customers, by failing to identify the date of the "detection" of the offense or to explain which compensation provided to customers should or should not be credited against loss under the Guidelines, the Government fails to give the Court the tools it would need to determine *any* losses that were not recompensed "before the offense was detected." *See* § 2B1.1 App. Note 3(E)(i).

As a result, the proper Guidelines in this case require a dramatic adjustment from what the Government seeks (changes from the Government's position indicated below in bold):

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| **Loss Amount (§ 2B1.1(b)(1))** | **+0** |
| Number of Victims (§ 2B1.1(b)(2)(A)(i)) | +2 |
| **Sophisticated Means (§ 2B1.1(b)(10)(C))** | **+0** |
| Received >$1M from Banks (§ 2B1.1(b)(17)(A)) | +2 |
| **Role Adjustment (§ 3B1.1(a))** | **+0** |
| **Zero-Point Offender (§ 4C1.1)** | **-2** |
| **Total** | **9** |

Under such a Guidelines calculation, the appropriate Guidelines range for a total offense level of 9 and a criminal history category of I would be four to ten months of imprisonment. Yet even if the Government could establish that customer losses that were not compensated until after the publication of the *Wall Street Journal* article should be counted against the defendants, that would still meaningfully reduce the appropriate Guidelines calculation, since at least $19 million in such payments and perhaps as much as $46 million in "make goods" had been furnished to the victims before that date, against a total liability of $65 million. *See* **Ex. 1** (Saba Report) 142–49. In such an event, the Guidelines would be adjusted as follows:

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| **Loss Amount (§ 2B1.1(b)(1))** | **+20** |
| Number of Victims (§ 2B1.1(b)(2)(A)(i)) | +2 |
| **Sophisticated Means (§ 2B1.1(b)(10)(C))** | **+0** |
| Received >$1M from Banks (§ 2B1.1(b)(17)(A)) | +2 |
| **Role Adjustment (§ 3B1.1(a))** | **+0** |
| **Zero-Point Offender (§ 4C1.1)** | **-2** |
| **Total** | **29** |

Although such a Guidelines calculation would still call for a custodial sentence of 7.25 to 9 years imprisonment, such a sentence still falls significantly below the Government's calculation of life imprisonment, which, for a person of Mr. Shah's young age of 37, could very well amount to more than five times even that inflated recommendation.

## II. The Section 3553(a) Factors Weigh in Favor of a Noncustodial Sentence

As explained above, a proper application of the Guidelines results in a recommended sentence of as little as four months (and no more than 12 years) incarceration. The Government says the Guidelines call for life imprisonment. As with many aspects of this case, the defendants' disagreements with the Government run deep. But there is one thing that both parties can agree on: no defendant in this case deserves a Guidelines sentence. Especially here, where the proposed Guidelines range is driven largely by loss amount, a metric that suffers from acknowledged flaws, *see supra* § I-B-4, the Court should instead give the § 3553(a) factors decisive weight in determining a reasonable and just sentence. *See United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring); *United States v. Adelson,* 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd,* 301 F. App'x 93 (2d Cir. 2008). When imposing a sentence, 18 U.S.C. § 3553(a) instructs this Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentenced imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the applicable category of offense; (5) any pertinent policy statement; (6) the need to avoid

unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

Whatever the proper Guidelines calculation may be, there are numerous factors not adequately considered in the Guidelines that make any sentence they recommend "greater than necessary" to achieve the purposes of criminal punishment. *See* 18 U.S.C. § 3553(a). Indeed, as explained below, this is the unusual case where nearly all of the § 3553(a) facts weigh in favor of the defendants, thereby justifying Mr. Shah's request for a sentence of home confinement.

### A. Downward Variance Is Necessary to Avoid Unwarranted Sentence Disparities Between Mr. Shah and Other Similarly Situated Defendants

Given the circumstances of the instant case, a below-Guidelines sentence is necessary "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). As noted, where § 2B1.1 is the primary Guidelines provision, judges in this district regularly sentence defendants below the Guidelines range. *See supra* § I-B-4. Indeed, even if the losses in this case were as substantial as the Government has claimed, a significantly below-Guidelines sentence would still be warranted.

Indeed, that was the result in an analogous (and arguably more egregious) case recently decided in by the District Court for the Southern District of New York. In *United States v. Milton*, 21-cr-00478 (S.D.N.Y.), the court considered what sentence to impose against a "fake it until you make it" startup founder, Trevor Milton. Milton repeatedly misrepresented that his company had successfully developed zero-emission battery-electric and hydrogen-powered vehicles and was producing hydrogen; in fact, the company was still in the process of developing both. Gov't Mem. (Dec. 12, 2023), Dkt. 315 at 2–7; Def. Mem, (Nov. 14, 2023) Dkt. 299 at 2. After Milton was convicted at trial, the Government urged that the total loss to investors was more than $600 million, resulting in a Guidelines recommendation of 60 years. Gov't Mem. at 10–12. But the court

imposed a 48-month sentence. Sent'g Tr. (Jan 2, 2024), Dkt. 322 at 89. Although the Court found that the Government had "establish[ed] the loss," "the sentence was not driven primarily or even largely by that amount" because the court found that the Guidelines range was "ludicrous" and not a proxy for "moral culpability." *Id.* at 90–91, 98. As the court explained, the defendant—who had "an enthusiasm and an optimism for [his] ideas" that did not always match reality—was not akin to fraudsters (even those with "substantially less" loss) who "looked their victims in the eye as they took the last dollar from their pocket." *Id.* at 93, 97.

*Milton* is not an outlier. For example, in *United States v. Anstett et al.*, 14-cr-102 (N.D. Ill.), the co-defendants engaged in a Ponzi-like scheme, where they fraudulently obtained approximately $196 million in loans for one co-defendant (Mark Anstett)'s company, submitted invoices to lenders falsely reflecting that this company was seeking financing to purchase equipment from the other co-defendant (George Ferguson)'s company, and then used the loans to pay themselves and to pay back older loans. Gov't Anstett Mem. (July 10, 2015), Dkt. 57 at 1–4; *see* Gov't Ferguson Mem. (Jan. 2, 2017), Dkt. 89 at 1–3. The defendants' scheme resulted in $97 million in losses from defendants' unpaid loans. Sent'g Tr. (Sep. 14, 2015), Dkt. 66 at 32. Although the Guidelines range was 121 to 151 months, Judge Leinenweber sentenced Anstett to 60 months and Ferguson to 36 months. *Id.* at 38, 59; Judgment (Feb. 10, 2017), Dkt. 94; Ferguson Mem. (Jan. 25, 2017), Dkt. 90 at 2.

In another case, *United States v. Johnson*, 17-cr-482 (S.D.N.Y), the defendant (the founder and CEO of a company) pleaded guilty to a multi-year fraud of submitting false information about his company's collateral in order to maintain an ongoing loan; eventually, the company went bankrupt, was unable to pay the outstanding loan, and caused lender losses totaling $359 million. Gov't Mem. (July 6, 2018), Dkt. 84. Although the high-end Guidelines recommendation was 19

years, the court imposed a 36-month sentence. Sent'g Tr. (Sept. 7, 2018), Dkt. 87 at 24. While acknowledging that the fraud "became [] huge and brazen" in the end, the court also noted that the defendant "did not intend a loss," even if he "was just blinding [himself] to the reality of the situation." *Id.* at 25. And in *United States v. Balboa*, 12-cr-196 (S.D.N.Y.), the defendant (the manager of a hedge fund) was convicted at trial for falsely inflating the value of various securities, thus misrepresenting the fund's performance, in order to increase his own compensation. Gov't Mem. (June 18, 2014), Dkt. 157 at 7. Based on investor loss of $390 million, the Guidelines recommended life imprisonment. Sent'g Tr. (July 10, 2014), Dkt. 165 at 79. But because the Court found the Guidelines "vastly overstate[d] the seriousness of the offense," the court imposed a 48-month sentence. *Id.* at 79–80.

These and other cases demonstrate that, even in high-dollar-amount cases, courts—including courts within this district—regularly impose substantially below-Guidelines sentences. For example:

- In *United States v. Hild*, 19-cr-602 (S.D.N.Y.), the defendant (the founder and CEO of a loan company) was convicted at trial of a "sophisticated" and "brazen" multi-year scheme to fraudulently inflate the value of bonds to secure loans, causing almost $70 million in losses to lenders. Sent'g Tr. (Mar. 13, 2023), Dkt. 156 at 10. The court described the resulting Guidelines range, with a maximum of over 33 years, as "Draconian" and "irrational," and instead imposed a 44-month sentence. *Id.* at 16, 31–33.

- In *United States v. Petit*, 19-cr-850 (S.D.N.Y), the defendants (the CEO and COO of a publicly traded company) were convicted at trial of inflating their company's revenue, resulting in $34.6 million in loss. Gov't Mem. (Feb. 16, 2021), Dkt. 145 at 2–3, 20; *see* Sent'g Tr. (Mar. 16, 2021), Dkt. 157. Noting that the Guidelines were "inherently irrational," the court sentenced both defendants to one year of imprisonment. Sent'g Tr. at 3, 8, 22.

- In *United States v. Labra*, 18-cr-878 (N.D. Ill.), the defendant operated a "Ponzi scheme" by using "lies and fake documents" to solicit more than $23 million from 43 victims. Gov't Mem. (Feb. 16, 2021), Dkt. 59 at 1, 5–6. Calling defendant's fraud "particularly egregious," the government asked for a sentence at the high end of their 87–108 months Guidelines range. *Id.* at 1. Instead, Judge Feinerman imposed a sentence of 54 months. Am. Judgment (Oct. 12, 2021), Dkt. 65 at 7.

51

- In *United States v. Ahuja*, 19-cr-328 (S.D.N.Y.), the defendant (the founder and CEO of an investment firm) was convicted at trial of defrauding the firm's investors by inflating the value of the firm's fund by over $100 million, resulting in investor losses of almost $52 million. Gov't Mem. (Nov. 18, 2019), Dkt. 298 at 2. Finding that the resulting Guidelines range (262 to 327 months) "overstate[d] the seriousness of the offense," the court imposed a 50-month sentence. Sent'g Tr. (June 17, 2020), Dkt. 364 at 75, 78, 86.

- In *United States v. Gargano*, 18-cr-392 (N.D. Ill.), the three defendants engaged in a multi-year fraudulent scheme by using their companies to obtain money from customers for bulk mailing, keeping the money, and then falsifying postal documents, causing loss of almost $17 million. Gov't Mems. (July 3, 2019), Dkt. 56–58. Judge Ellis sentenced all defendants well below the government's Guidelines calculation of 63 to 78 months, to terms of 48 months, 42 months, and probation (including 24 months home detention). Judgment (July 16, 2019), Dkts. 71, 73, 75.

The Sentencing Commission instructs this Court to keep the desire to avoid unwarranted sentencing disparities in mind when sentencing any defendant, and that includes Mr. Shah. The above examples showcase that courts across the country, including courts in this district, routinely find that a Guideline sentence is excessive and inappropriate in cases similar to Mr. Shah's. To fulfil the purpose of sentencing outlined in 18 U.S.C. § 3553(a)(6), this Court should impose a below-Guidelines sentence.

## B. The Efforts Undertaken by Mr. Shah to Make Customers, Lenders, and Investors Whole Dramatically Distinguishes Mr. Shah from the Typical White Collar Defendant

Section 3553(a)(7) also instructs the Court to consider the "need to provide restitution" to victims of the offense in weighing what sentence to impose against a defendant. And that makes sense: in most cases where loss is a significant driver of a Guidelines sentence, the defendant has taken money from individual victims, most of whom have little to no prospect of recovery. Sadly, it is the rare defendant who takes significant steps (or even has the means) to make his victims whole, even after his crimes are brought to light and a prosecution has been initiated against him.

Mr. Shah is that rare defendant. Long before Mr. Shah had even an inkling that the Government might be viewing the malfeasance at Outcome as a basis to initiate a criminal prosecution, Mr. Shah took steps to correct for his company's mistakes. As explained above, *see* during his tenure as CEO, Mr. Shah initiated and directed a companywide effort to provide "make goods" to customers who had not received the services they were promised, a significant portion of which were provided even before Outcome's troubles became front-page news. With respect to institutional investors and lenders, Mr. Shah and Ms. Agarwal reached a civil settlement with them mere months after the *Wall Street Journal* article, and nearly two years before the Government initiated its prosecution. As explained above, Mr. Shah and Ms. Agarwal gave up control of the company they started together in their early 20s, delivering hundreds of millions of dollars in cash to the investors and the company as a result. In addition to what Mr. Shah and Ms. Agarwal gave up voluntarily, the Government has also restrained and now stands to forfeit many millions of dollars in assets from Mr. Shah and Ms. Agarwal, all of which can be used to provide restitution to any remaining victims who come forward to claim losses.

### C. The Purposes of Sentencing Reflected in Section 3553(a) Do Not Justify a Significant Sentence of Incarceration

Incarceration is not justified by any other legitimate purpose of sentencing, including the need to "promote respect for the law," "afford adequate deterrence," and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(A)–(C). It is highly unlikely Mr. Shah— a first-time, nonviolent offender with close family ties—will recidivate. He has already suffered tremendous consequences from his actions: he lost the business that he built from the ground-up, his reputation in the community, and his once-promising future as an entrepreneur. *Gupta*, 904 F. Supp. 2d at 355 (specific deterrence did not justify further punishment because "having suffered such a blow to his reputation, [defendant] is unlikely to repeat his transgressions"). Those

consequences have been exacerbated by the significant media attention on Mr. Shah's case, both in and outside of Chicago. Given the publicity surrounding his case, it is doubtful that Mr. Shah will ever again be put into a position of trust by investors, lenders, or customers that might even provide him the opportunity to recidivate. Most significantly, Mr. Shah believes that he lost his father due to the stress of this case; Mr. Shah would not do anything to risk further time away from his family, particularly his ███████ son.

Nor does general deterrence justify a custodial sentence. It is now well-accepted that lengthy sentences do not significantly deter would-be criminals; the certainty of being caught does. U.S. Dep't of Justice Office of Justice Programs, *Five Things About Deterrence* (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf. This is particularly true in white collar cases. *See Adelson*, 441 F. Supp. 2d at 514 ("[T]here is . . . considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."). Moreover, Mr. Shah has faced numerous consequences, including losing his livelihood and assets, which have been widely publicized; the Government has already sent a clear message to potential criminals that crimes like those committed in this case do not pay. As such, the Government's thorough and comprehensive forfeiture efforts in this case are themselves a significant deterrent that both serves to reflect the seriousness of the offenses and to promote respect for the law.

In light of those considerations, a custodial sentence against Mr. Shah would not serve the purposes of punishment that Congress has established in Section 3553(a). Mr. Shah's risk of recidivism is extremely low, the massive public and personal cost he has already borne serve as more of a deterrent than prison ever could, and there is neither a public nor personal need that would be served by Mr. Shah being sentenced to imprisonment.

**D.  Ultimately, Mr. Shah's History and Characteristics and the Nature of the Offenses at Issue Justify a Noncustodial Sentence**

The nature of the offenses in this case is serious, but this Court should not lose sight of the many other factors it must consider in determining an appropriate sentence. Principal among those factors is the "history and characteristics of the defendant," 18 U.S.C. § 3553(a). Mr. Shah's history and characteristics strongly support leniency. Although the Court has principally been exposed to the evidence of his failings as the CEO of Outcome, Mr. Shah is not a person who defines himself by the mistakes he has made. Rather, as the letters from his family, friends, and colleagues demonstrate, Mr. Shah is someone who—ever since childhood—had been defined by his love for his family, his energetic and optimistic spirit, and his dedication to helping others through entrepreneurism.

Mr. Shah's strength of character shines through the dozens of letters his friends, family, and business colleagues have written to the Court. **Ex. 2** (letters of support). The sentiments expressed in those letters are perhaps best summarized by Dr. Louis Philipson, Chairwoman of the Hippocratic Cancer Foundation, who describes Mr. Shah as "a visionary, dedicated to employees, dedicated to his family, a devoted son, brother, and father, and committed to philanthropy" and a "thoughtful and caring leader." **Ex. 2** at 36. Similarly, Eleni Bousis, the head of the University of Chicago's Kovler Diabetes Center, describes Rishi as "an exceptional young man with deep ro[o]ted morals and values. One can see the kind soul and heart through his interaction with his Family, friends, and others." **Ex. 2** at 44. Many other letters provided on Mr. Shah's behalf echo that same experience with Mr. Shah, which stands in stark contrast to the portrayal the Government offered during Mr. Shah's trial:

- Jaisen Freeman, Vinjay Tolia, Vishal Shah, Justin Ishbia, Sanjay Tolia, Matthew Santos, Jonny Imerman, Allison Foley, Barry Johnson, Kapil Chaudhary, and Shree Shah all describe Mr. Shah's strong philanthropic devotion. **Ex. 2** at 72; 61; 64; 46; 58; 53; 84; 81; 90; 28; 17.

55

- As Mr. Tolia (the founder and managing partner of Marine Layer Advisors) says, "Rishi's resilience, generosity, and unwavering support for his friends and family exemplify the qualities of a good person and a dedicated community member." **Ex. 2** at 63.

- Mr. Tolia also notes that Mr. Shah has "universal love for people" and also describes Mr. Shah's integrity in a joint entrepreneurial venture: "During our 2 years working side-by-side on this project, I have never seen Rishi take one shortcut or do anything that isn't of the highest moral and ethical standards." **Ex. 2** at 59.

- Mr. Ishbia (the founder and managing member of Shore Capital Partners) describes Mr. Shah as "a principled man who has done a tremendous amount of good for those around him, his community, and his industry," and as "a keen listener, patient, and considerate in his interactions." **Ex. 2** at 46.

- Vishal Shah (who is not related to Rishi Shah), who was himself an Outcome investor in the very Goldman round at issue in this case, tells the Court: "Over the past fourteen years, our friendship has evolved into a multifaceted relationship, encompassing friendship, business partnership, investment collaboration, and mutual support within our community. Rishi has consistently demonstrated unwavering integrity, dedication, and exceptional kindness throughout this time." **Ex. 2** at 64.

- And Mr. Santos (a Grammy-nominated musician and composer) writes: "Through my professional journey, I have met many individuals, but Rishi stands out as a remarkable person whose positive impact on my life and the lives of others is truly noteworthy." **Ex. 2** at 53.

- Mr. Imerman (founder of the nonprofit Imerman Angels) tells the Court: "I have confidence in Rishi and his long-term ability to live a meaningful, productive, righteous life. I believe there is a lot of good in his heart, and he will use his vast talents to do good things in the end. No matter what happens next with his case, I fully expect him to move forward in the spirit of growth, adaptation, and service." **Ex. 2** at 85.

- Mr. Johnson describes Mr. Shah as "an extraordinarily generous and compassionate individual." **Ex. 2** at 92.

- Ms. Chaudhary (founder of RM and previously managing director and cofounder of I2A) explains: "Rishi Shah's loyalty, dedication to education, and charitable contributions highlight his character and positive impact on the community." **Ex. 2** at 30.

- Shree, Mr. Shah's sister, writes that her brother "is a loving, caring soul who would never set out to hurt or deceive anyone intentionally; he has an undying belief in humanity. He is the most selfless and open-hearted person I know." **Ex. 2** at 20.

- Ms. Rajen Shastri (the founder and CEO of Akara Partners) notes: "Many people have and will likely talk about Rishi's tremendous intelligence, business acumen, and business and civic leadership, which are all true. However, from the beginning of our friendship, I noticed more than anything the kindness, compassion, generosity, and empathy that he

56

shared towards everyone he came in contact with. This was very different from other business leaders and entrepreneurs I had been meeting during this time in my life. He was never self-serving and was always there to lend a helping hand to someone in need of advice or support." **Ex. 2** at 55.

- Mark Lawrence (CEO and co-founder of SpotHero) remarks not only on Mr. Shah's generosity but also his "optimism, positivity, and indefatigable support, [which] even in the face of personal adversity, exemplify his inner strength and resilience." Mr. Lawrence also notes that Mr. Shah's willingness and tendency to "put others first, give them the benefit of the doubt and support them above his own personal self interest." **Ex. 2** at 51.

- Krys Hachaj (gym owner and Mr. Shah's personal trainer) explains that "Rishi's contributions to his family, friends, and community, as well as his personal development and resilience, show the attributes of a good and honorable person." **Ex. 2** at 71.

- Dr. William Tan (a family medicine practitioner and childhood friend of Mr. Shah) remarks that "Rishi's personal qualities, including his kindness, generosity, and commitment to his friends and family, have always stood out. He has been an inspiration to those around him. His impact on my life and the lives of many others is profound and enduring." **Ex. 2** at 68.

- Mr. Davin Jin Cho worked with Mr. Shah at Outcome Health. He notes that Mr. Shah has "exceptional character" and that Mr. Shah "pushed [Mr. Cho] and [their] team with ambitious goals while encouraging [the team] to execute [Mr. Shah's] vision honestly and with integrity." **Ex. 2** at 23–24.

Contrary to the Government's portrayal of Mr. Shah as driven fundamentally by greed, it is the passion and dedication that Mr. Shah's supporters describe that drove him to start Outcome as just a sophomore in college, and it was this passion that allowed him to overcome his lack of experience to create a wildly successful company with the purpose of helping people just like his father's patients and his own sister. Mr. Shah's youth and inexperience, along with his uncompromising devotion to furthering Outcome's mission, supply necessary context for the offense. Indeed, Mr. Shah's supporters have described the deep regret that Mr. Shah has felt in the wake of his loss of control over Outcome and his subsequent indictment:

- Mr. Santos talks about how those experiences have changed Mr. Shah: "Since the case was filed against him, I have witnessed a profound transformation in Rishi. He has shown deep remorse for not being the leader that he needed to be. I have talked with him as he has done the hard work to draw out lessons and growth from this experience. The emotional toll this case has taken on him and his family is evident, yet he remains steadfast in his commitment to moving forward positively. I have seen him share lessons he learned from Outcome

Health with other friends and he plans to share his experience and wisdom with entrepreneurs." **Ex. 2** at 53.

- Mr. Shastri writes, "Rishi has shown deep remorse for not being the leader he aspired to be, and he has diligently worked to learn and grow from this experience. His personal growth and resilience are a testament to his ability to learn from mistakes and improve. He is now a more balanced and humble person, sharing his hard-earned lessons honestly." **Ex. 2** at 56.

- Mr. Ishbia notes that "Rishi understands that as a CEO, he bears responsibility for what happens on his watch. He has true remorse that he did not lead better and is humble enough to draw lessons from his past. I have observed Rishi apply lessons he learned from Outcome Health. He practices a more cautious and thoughtful management style and shares his experience and knowledge with other business leaders. He has transformed his experience into an opportunity to evaluate his actions' ethical and legal implications." **Ex. 2** at 47.

- Mr. Johnson, Mr. Shah's close friend, "dedicated two months to being present at court, supporting Rishi" despite his demanding schedule. He notes Mr. Shah's "commitment to understanding and learning from the situation" as well as his commitment to spiritual and personal growth. He further notes that "Rishi has maintained his focus on the one person he could change: himself. He has tried to understand what he could have done differently and learn as much as possible from this experience." **Ex. 2** at 92.

- Mr. Tolia notes that Mr. Shah's actions have positively impacted Mr. Tolia: "Since the verdict in his case, I have seen Rishi with a renewed focus and passion for things that matter to him. He has recently spent more time mentoring and teaching myself and others, driven by his desire to see us achieve our best. Rishi's ultimate joy comes from lifting others up, not just from his own achievements. This selflessness is something I have experienced personally, and it has been truly inspiring." **Ex. 2** at 59.

- Mr. Shah's sister, Shree, writes that Mr. Shah "has talked about what went wrong at his company and expressed remorse about how this case impacted others. Specifically, he has reflected on what he could have done differently in his role as CEO to prevent this painful outcome." **Ex. 2** at 20.

- And Lance Emanuel, Esq. who met Mr. Shah through Mr. Tolia's venture, was impressed with Mr. Shah's ability to face his shortcomings related to Outcome head on and openly. Mr. Emanuel has continued to work with Mr. Shah, noting that "[w]hile building a successful company was incredibly important to Rishi, operating with integrity and implementing the lessons he learned was paramount." **Ex. 2** at 77.

Even as Mr. Shah's life was consumed with business and personal troubles, however, he always saved time and energy for the causes most important to him and his family: education, healthcare, and helping immigrants and those in India. Among other things, Mr. Shah has served

on the board of educational organizations for underserved communities (including Launch U and Community Partnership for Youth), donated to similar educational programs (including OneGoal, Peer Health Exchange, and Cabrini Connections), and served on the board of healthcare-related startups and nonprofits (including Rush University Medical Center's volunteer organization). Mr. Shah has also served on the board of an immigration and criminal justice reform organization (FWD.us) and donated to organizations providing resources to those in need in India (American India Foundation, Apna Ghar, and Akshaya Patra).

Mr. Shah's generous spirit, caring heart, and desire to help those around him did not waiver with Outcome's troubles. Despite all the hardships Mr. Shah has overcome since his indictment, he has remained a central pillar in his family and community, and he intends to continue to do so. Mr. Shah's letters of support uniformly note his unwavering dedication to his family, particularly to his young son, ███. Mr. Shah "has stepped in since the unexpected passing of his father." **Ex. 2** at 37. Mr. Ishbia writes extensively about Rishi's devotion to his family, noting that "Rishi is a devoted family man. He prioritizes his family and consistently invests time and attention in nurturing those relationships. In our forum meetings, I notice Rishi's focus on how his decisions will impact his family and those he loves." **Ex. 2** at 48. Raien Shastri also summarizes Mr. Shah's family devotion stating, "Rishi is a devoted family man." **Ex. 2** at 56. Many of the writers also note Mr. Shah's strong relationship with his fiancé[e], Anita, with Mr. Tolia noting that Mr. Shah and Anita "have forged a loving and supportive partnership characterized by open communication and mutual respect. Observing Rishi and Anita's interactions, even in moments of disagreement, I recognize the qualities I aspire to emulate. Rishi possesses a calm and generous approach to communication, ensuring that others feel heard and respected." **Ex. 2** at 62. Anita herself has written to introduce the Court to the man she has decided to build a life with, despite meeting Mr.

Shah post-indictment. She describes Rishi's selflessness, noting that she's "never known anyone who derives more joy from seeing others happy than Rishi" and remarking on his unwavering faith in other people; his positive outlook and encouraging spirit, even in the face of this very impending sentencing hearing; and his rare dedication and ability to face his faults without flinching and work diligently to overcome them. **Ex. 2** at 1-5.

Mr. Shah's primary and all-consuming passion, however, is raising his son and guiding his son to be a good man, including by emphasizing to his son the values that led him to start Outcome in the first place. Once again, his supporters are effusive in their praise of the role that Mr. Shah has taken in helping to raise his ████████ young son, ██:

- Mr. Freeman describes Mr. Shah's passion for his role as a parent, writing "Rishi often says that despite his many achievements, nothing compares to his joy and fulfillment as a father. His excitement and devotion to spending time with ██ are genuinely heartwarming. . . . Before ██ we talked about how we could make the world a better place or where best to invest our money. Once Rishi had ██, that was all that mattered. I remember him saying that ██ was his greatest accomplishment in life." **Ex. 2** at 72.

- Ms. Bousis writes that Mr. Shah told her: "[M]y focus is on my Family, and to continue my life as a law abiding citizen and one who makes a difference for humanity. I will not let my Father's legacy and my name be dishonored the way I would never want my son to dishonor my name and the law." **Ex. 2** at 45.

- Mr. Vishal Shah writes: "Seeing Rishi as a father and primary caretaker of his son, ██, is truly inspiring. Despite his stresses and challenges, he is incredibly dedicated to ██, constantly trying to spend as much time as possible with him. Rishi's hands-on approach to parenting reflects his deep commitment and love for his family." **Ex. 2** at 65.

- Mr. Shah's sister, Shree, writes: "Rishi is a joy of a human being; today he is raising his ████████ son, ██, with the same unconditional love and openness of heart that he has. He is instilling the importance of integrity, compassion, empathy, and care for others. His son loves him so much and looks forward to seeing his Dada every day." **Ex. 2** at 19.

- And finally, his fiancée, Anita Lewis, describes in loving detail that at "████████ ██, ██'s world revolves around his father. Just the thought of Rishi's absence for a weekend sends ██ into a meltdown. The bond they share is irreplaceable, and Rishi's presence during these formative years is pivotal. Every night, Rishi reads to ██, and together they imagine where they will meet in their dreams because ██ doesn't want to spend even a night away from his dad. I have often observed Rishi acting as the only parent in raising ██, using everyday moments together as small teaching opportunities on things

60

like sharing, kindness, how to introduce himself with confidence or shake someone's hand (which is very cute)." She explains to this Court that Mr. Shah's fight in this case is first and foremost a fight to remain a present and positive influence in ███'s life. **Ex. 2** at 4.

Mr. Justin Ishbia also describes a particular interaction that exemplifies Mr. Shah's devotion to his family and exactly what that says about Mr. Shah's character:

> I had the chance to observe the admirable traits that define Rishi's family-oriented character during a basketball game that I attended with Rishi and his life partner, Anita, several months ago. We were talking about how to teach our kids the importance of "doing hard things" and overcoming adversity in spite of our parental instincts to shelter them. We talked about the importance of guiding our children but not sheltering them, as the process of overcoming hard things in life builds confidence and conviction. In these moments, it became evident that his commitment to family extends beyond mere presence; it encompasses warmth, love, and genuine connection.

**Ex. 2** at 48.

Even as he has endured several years of criminal prosecution and struggled with the prospect of being taken away from his family and his young son by the potential of a term of incarceration, Mr. Shah has maintained a positive outlook, as his supporters have all described. Rather than wallowing in self-pity or self-destructing, Mr. Shah has devoted himself to being present in the lives of those he loves, becoming more spiritual, and becoming a better person and leader. Mr. Freeman says it best: "Whether or not one believes the allegations against him, it is clear that [Mr. Shah] has learned immensely from this experience and has suffered greatly. He is not someone who would be a repeat offender; rather, he is a man who has grown and become more mindful of his actions and their consequences. . . . Given the opportunity, Rishi will continue to drive for good in the community and beyond." **Ex. 2** at 73. As Mr. Tolia writes: "It's inspiring to witness that he has not succumbed to vengeance or self-pity, demonstrating exemplary resilience and a commitment to growth." **Ex. 2** at 62.

As the overwhelming number of letters of support the Court has received illustrate, Mr. Shah is much more than the Government has portrayed him to be in this case. His family, friends,

and colleagues have all expressed their profound respect and admiration for Mr. Shah, despite understanding the significant crimes for which he was convicted. Yet perhaps none understands Mr. Shah better than his fiancée, Ms. Lewis, who concludes her own letter with this:

> I love this country. I have been so blessed to be born here and seeing my future last name against the US government, *US vs. Shah,* has been a profound and painful paradox. Never in my wildest nightmares did I imagine being in this situation, yet I chose this path and continue to choose it because of my extraordinary belief in Rishi's character & growth. I believe so strongly in it that I have been willing to bet the most important decision in my life on it.

**Ex. 2** at 4.

#### CONCLUSION

As this memorandum has hopefully made clear, Mr. Shah is far from the typical criminal defendant. Few people in this world have the drive, intelligence, or perseverance required to start a business that—even today—is worth hundreds of millions of dollars. Of those who do, few are as genuinely motivated by the desire to educate patients and promote positive outcomes for customers, doctors, and patients in the way that Mr. Shah and his codefendants were. And fewer still have had the experience of losing their company, their livelihood, the vast majority of their wealth, and their reputation in the way that Mr. Shah has. Yet despite his failings as the CEO of Outcome, Mr. Shah has maintained a remarkable generosity of spirit and an optimistic view towards the future.

A trial is about what happened. A sentencing is about what happens next. Mr. Shah earnestly assures this Court that, if he is granted the leniency he requests, he will dedicate the rest of his life to correcting the wrongs that led to his departure from Outcome and to finding new ways to make the world a better place. And as explained above, Mr. Shah's history and characteristics, both those prior to his criminal indictment and those that remain and thrive despite his criminal

conviction, along with his low risk of recidivism and uncommon efforts to pay back those who suffered as a result of his actions, warrant a below-Guidelines sentence.

For the foregoing reasons, Mr. Shah respectfully requests that the Court impose a sentence of consisting of a lengthy sentence of home confinement.

Dated: June 14, 2024

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN LLP

*/s/ William A. Burck*
WILLIAM A. BURCK
1300 I Street N.W., Suite 900
Washington, D.C. 20005
Tel: (202) 538-8000
Fax: (202) 538-8100
williamburck@quinnemanuel.com

BRYAN CAVE LEIGHTON PAISNER LLP

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
*richard.finneran@bryancave.com*

*Attorneys for Defendant Rishi Shah*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served upon all counsel of record by operation of the Court's electronic filing system.

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN