IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 19 CR 864 |
| RISHI SHAH, et al., | Judge Thomas M. Durkin |
| Defendants. | |

**DEFENDANT RISHI SHAH'S**
**MEMORANDUM IN SUPPORT OF HIS MOTION FOR BAIL PENDING APPEAL**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

LEGAL STANDARD.......................................................................................................... 3

DISCUSSION .................................................................................................................... 4

I.    Mr. Shah Is Not Likely to Flee and Does Not Pose Any Danger to the Community ............................................................................................................ 4

II.    Mr. Shah's Appeal Will Raise Substantial Questions That, If Decided in His Favor, Would Require Dismissal of the Indictment or, at Minimum, a New Trial ....................... 5

    A.    There Is a Substantial Question Whether the Improper Pretrial Restraint of Millions of Dollars in Untainted Property Violated Mr. Shah's Sixth Amendment Rights ............................................................................ 5

        1.    *The Government Violated Mr. Shah's Sixth Amendment Rights by Improperly Restraining Millions of Dollars in Untainted Property* ................. 6

        2.    *This Court's Grounds for Ruling Against Mr. Shah Will Raise Substantial Questions on Appeal* .................................................... 10

    B.    The Court's Fifth Amendment Analysis Will Raise Substantial Questions on Appeal ............................................................................ 17

    C.    The Admission of Mr. Ketchum's, Mr. Ma's, and Mr. Desai's Grand-Jury Statements Will Raise Substantial Questions on Appeal.................................. 20

        1.    *The Court Improperly Admitted Grand-Jury Statements That Ketchum, Ma, and Desai Made After They Developed a Motivation to Lie* ............................................................................................ 20

        2.    *Rule 801(d)(1)(B) Did Not Permit the Government to Introduce Grand-Jury Statements in Full*........................................................ 26

CONCLUSION.................................................................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Giglio v. United States*,
    405 U.S. 150 (1972)...................................................................2, 18, 19

*Greer v. United States*,
    593 U.S. 503 (2021)........................................................................17

*Kaley v. United States*,
    571 U.S. 320 (2014)...............................................................5, 15, 17

*Kyles v. Whitley*,
    514 U.S. 419 (1995)...................................................................2, 18, 19

*Luis v. United States*,
    578 U.S. 5 (2016) ................................................................. *passim*

*Marks v. United States*,
    430 U.S. 188 (1977)..........................................................................8

*Miller v. Greenleaf Orthopedic Assocs.*,
    827 F.3d 569 (7th Cir. 2016) ..........................................................26

*Nelson v. City of Chicago*,
    810 F.3d 1061 (7th Cir. 2016) ........................................................28

*Puckett v. United States*,
    556 U.S. 129 (2009)........................................................................16

*Shinseki v. Sanders*,
    556 U.S. 396 (2009)........................................................................24

*Tome v. United States*,
    513 U.S. 150 (1995)..................................................................20, 26

*United States v. Burke*,
    425 F.3d 400 (7th Cir. 2005) .....................................................17, 19

*United States v. Collicott*,
    92 F.3d 973 (9th Cir. 1996) ......................................................26, 28

*United States v. Cronic*,
    466 U.S. 648 (1984)........................................................................17

*United States v. Davis,*
896 F.3d 784 (7th Cir. 2018) ................................................23

*United States v. Dennis,*
625 F.2d 782 (8th Cir. 1980) ...............................................26

*United States v. Forrester,*
60 F.3d 52 (2d Cir. 1995)......................................................22

*United States v. Gerke Excavating, Inc.,*
464 F.3d 723 (7th Cir. 2006) ..............................................8, 9

*United States v. Gonzalez-Lopez,*
548 U.S. 140 (2006)........................................................5, 9, 17

*United States v. Harris,*
761 F.2d 394 (7th Cir. 1985) ................................................21

*United States v. Hernandez-Estrada,*
749 F.3d 1154 (9th Cir. 2014) ..............................................10

*United States v. Lewis,*
954 F.2d 1386 (7th Cir. 1992) ..............................................22

*United States v. Maez,*
960 F.3d 949 (7th Cir. 2020) ................................................16

*United States v. Mann,*
140 F. Supp. 3d 513 (E.D.N.C. 2015).................................18

*United States v. Mendoza,*
510 F.3d 749 (7th Cir. 2007) ................................................25

*United States v. Miller,*
753 F.2d 19 (3d Cir. 1985)......................................................4

*United States v. Mitchell,*
358 F. Supp. 2d 707 (E.D. Wis. 2005)..................................4

*United States v. Molt,*
758 F.2d 1198 (7th Cir. 1985) .....................................1, 3, 4, 9

*United States v. Monsanto,*
491 U.S. 600 (1989)...............................................................10

*United States v. Moreno,*
94 F.3d 1453 (10th Cir. 1996) ..................................................22

*United States v. Navarrete,*
88 F.4th 672 (7th Cir. 2023) ...................................................17

*United States v. Nebinger,*
987 F.3d 734 (7th Cir. 2021) ...................................................17

*United States v. Portillo,*
969 F.3d 144 (5th Cir. 2020) ..........................................22, 23, 24

*United States v. Quiroz,*
874 F.3d 562 (7th Cir. 2017) ...................................................17

*United States v. Ramos-Caraballo,*
375 F.3d 797 (8th Cir. 2004) ...................................................26

*United States v. Shoffner,*
791 F.2d 586 (7th Cir. 1986) .................................................3, 4

*United States v. Simonelli,*
237 F.3d 19 (1st Cir. 2001) .....................................................26

*United States v. Stein,*
541 F.3d 130 (2d Cir. 2008) ....................................................10

*United States v. Thompson,*
787 F.2d 1084 (7th Cir. 1986) ...................................................4

*United States v. Trujillo,*
376 F.3d 593 (6th Cir. 2004) ..............................................21, 22

**STATUTES:**

18 U.S.C. § 981(a)(2)(C) ........................................................13

18 U.S.C. § 982 ................................................................14

18 U.S.C. § 3143(b) ...........................................................1, 3

18 U.S.C. § 3143(b)(1)(A) .......................................................4

# TABLE OF AUTHORITIES—Continued

Page(s)

**RULES:**

Fed. R. Evid. 801(d)(1)(B)(i) ................................................................20

Fed. R. Evid. 801(d)(1)(B)(ii) ..............................................................22

Fed. R. Evid. 801 (Note to 2014 Amendment) .......................................23, 27

**INTRODUCTION**

Mr. Shah respectfully requests that this Court grant his motion for bail pending appeal pursuant to 18 U.S.C. § 3143(b).

A defendant is entitled to bail pending appeal when his case raises a "substantial question" on appeal that would lead to reversal or a new trial and does not otherwise pose a flight or safety risk. Mr. Shah easily satisfies this standard. *See* 18 U.S.C. § 3143(b). Mr. Shah's case raises several significant issues for appeal that, if successful, would require the reversal of his conviction, thus warranting bail pending appeal.

First, the Government has *admitted* that it improperly restrained assets that deprived Mr. Shah of access to millions of dollars' worth of untainted property. As Mr. Shah previously argued before this Court, that restraint deprived Mr. Shah of his counsel of choice in violation of the Sixth Amendment. This Court held extensive proceedings in connection with the Government's improper restraint, resulting in several days of hearings, more than a thousand pages of transcripts, and compelled testimony from two government attorneys. Although this Court ultimately denied Mr. Shah's motion to dismiss the indictment, it was—at the very least—a "close" question. *See United States v. Molt*, 758 F.2d 1198, 1200 (7th Cir. 1985). Indeed, the Government has not identified any case where a defendant was improperly deprived of millions of dollars he would have used to retain counsel but was nonetheless denied relief. As the Court itself noted, because, "without question, the restraint was to some degree excessive," Mr. Shah's Sixth Amendment argument "is not a fishing expedition where there's nothing on its face that was improper." Evidentiary Hearing Tr. 526. This Court's ruling denying Mr. Shah relief notwithstanding the admitted impropriety of the Government's restraint in this case will raise numerous difficult and novel Sixth Amendment issues, many of which will be questions of first impression in the Seventh

1

Circuit. These substantial questions entitle Mr. Shah to bail until the Seventh Circuit has an opportunity to review this Court's decision.

Second, the Government's use of the grand jury to procure the excessive and unlawful restraint will raise a significant Fifth Amendment question on appeal. As this Court recognized, the Government's testimony to the grand jury was "not accurate" because "it inevitably suggested to the grand jury that all of the property covered by the forfeiture allegations was derived from criminal proceeds," even though that was false. R. 747 at 32. This Court even recognized that the government officials' interpretation of the relevant language "defies the meaning of the words themselves." *Id.* at 34. And the Court recognized that Mr. Shah has "a valid reason to allege a Fifth Amendment violation." Evidentiary Hearing Tr. 527. The Court nonetheless excused the Government's presentation of false testimony to the grand jury because the Court found that no *individual* government official subjectively realized that the Government's excessive restraint was improper. R. 747 at 39. The Seventh Circuit is likely to reject the Court's individual-intent approach to the Fifth Amendment. Other comparable Fifth Amendment requirements, such as *Brady* and *Jencks*, evaluate the Government's *collective* knowledge as "an entity" rather than asking whether any *individual* Government official had the requisite knowledge. *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *see also Kyles v. Whitley*, 514 U.S. 419, 437–438 (1995); Evidentiary Hearing Tr. 1303–04 (advocating for a collective knowledge standard). There is, at the very least, a substantial question whether the knowing presentation of false testimony to the grand jury should be treated similarly.

Third, the Court admitted over 30 pages of grand-jury testimony from the prosecution's three star witnesses to bolster their testimony on the fundamental questions central to Mr. Shah's innocence. All three witnesses—Jason Ketchum, David Ma, and Ashik Desai—gave this

testimony *after* they developed a motivation to lie to receive plea deals or to evade prosecution altogether, but the Court nonetheless admitted their testimony as prior consistent statements. There are substantial questions whether the Court's admission of this testimony violated Federal Rule of Evidence 801. Even if *portions* of the grand-jury statements were admissible, Mr. Shah believes that the Court committed legal error in admitting the statements essentially wholesale. This grand-jury testimony came from the prosecution's most important witnesses and *was authored by the Government itself* to be maximally damaging to Mr. Shah. Thus, if the Seventh Circuit finds that the admission of such testimony was improper, the Government will be unable to show that introducing that evidence was harmless.

Mr. Shah has great respect for the Court and the careful attention it has given to the rulings he expects to challenge on appeal. Now that the Court has issued a judgment against Mr. Shah, however, Mr. Shah asks that the Court recognize the gravity and significance of the issues subject to appeal in this case, and accordingly grant him bail pending a resolution of those issues by the Seventh Circuit. Mr. Shah should not be required to serve a custodial sentence when there is a substantial question whether his conviction will be vacated.

## LEGAL STANDARD

A district court "shall order" a defendant released pending appeal when it finds that two criteria are met: (1) that the defendant is not a flight risk or a danger to the community; and (2) that the appeal will present a "substantial question" that would lead to reversal or a new trial. 18 U.S.C. § 3143(b); *see United States v. Shoffner*, 791 F.2d 586, 588 (7th Cir. 1986) (per curiam). A question is substantial if it is "close" or "very well could be decided the other way" on appeal. *Molt*, 758 F.2d at 1200 (citation omitted). No "mathematical" formula governs that determination; a district court simply "evaluate[s] the difficulty of the question" decided. *Shoffner*, 791 F.2d at

589–590.  And a court does not need to find that it "should have ruled the other way" or even that its judgment "probably will be reversed" on appeal.  *United States v. Thompson*, 787 F.2d 1084, 1085 (7th Cir. 1986) (per curiam).  Courts accordingly grant bail where a question is novel and lacks controlling precedent.  *Id.*; *see also Molt*, 758 F.2d at 1199; *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985).

## DISCUSSION

### I.     Mr. Shah Is Not Likely to Flee and Does Not Pose Any Danger to the Community

By releasing Mr. Shah on bail, the Court has already determined by clear and convincing evidence that he is not likely to flee or pose any danger to the safety of the community.  *See* 18 U.S.C. § 3143(b)(1)(A).  That determination has proven correct.  Mr. Shah has abided by all of the Court's rulings and the conditions of his pre-trial release, cooperated fully with the United States Probation Department, and returned for sentencing.  He also has close ties to his family and community, as evidenced by the more than 50 letters in support submitted to this Court.  He has an especially close relationship with his four-year-old son, with whom he spends at least every other week.  *Cf. United States v. Mitchell*, 358 F. Supp. 2d 707, 708 (E.D. Wis. 2005) (granting motion for bond pending sentencing based in part on a defendant's ties to community and exemplary compliance with conditions of pre-trial release).

Nor is Mr. Shah a danger to his community.  He has no prior (or subsequent) criminal history.  His conviction is for non-violent offenses.  And as the Court heard at sentencing, Mr. Shah took responsibility for Outcome's problems, taking steps to make customers, lenders, and investors whole and relinquishing control of his company before he was aware of the Government's investigation.  It is also very unlikely that Mr. Shah will be put into a position of trust by customers, lenders, or investors that would give him any opportunity to re-offend.  As the

Court itself noted at sentencing, Mr. Shah was "law-abiding before this" and will "be law-abiding after this is my prediction." Sentencing Tr. 284.

## II. Mr. Shah's Appeal Will Raise Substantial Questions That, If Decided in His Favor, Would Require Dismissal of the Indictment or, at Minimum, a New Trial

Mr. Shah's appeal will raise at least three substantial questions, any one of which would result in either a new trial or dismissal of the indictment. Those substantial questions warrant bail pending the adjudication of his appeal.

### A. There Is a Substantial Question Whether the Improper Pretrial Restraint of Millions of Dollars in Untainted Property Violated Mr. Shah's Sixth Amendment Rights

Mr. Shah respectfully submits that this Court's denial of relief for the violation of his Sixth Amendment rights will present a substantial question on appeal. The "Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (citation omitted). That "particular guarantee" ensures that the accused can "be defended by the counsel *he believes* to be best." *Id.* at 146 (emphasis added). It stands "separate and apart from the guarantee to effective representation" and a fair trial. *Kaley v. United States*, 571 U.S. 320, 336 (2014). An "erroneous deprivation of the right" therefore is a "structural error" that requires a new trial, even if the substitute attorney was not constitutionally ineffective. *Gonzales-Lopez*, 548 U.S. at 150 (citation omitted).

In *Luis v. United States*, Justice Breyer concluded for a plurality of the Supreme Court that "the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." 578 U.S. 5, 10 (2016) (plurality op.). As the plurality explained, the difference between tainted and untainted assets is "an important one"—"[i]t is the difference between what is yours and what is mine." *Id.* at 16. Justice Thomas, who provided the crucial fifth vote, concurred in the judgment. He concluded that the "common law prohibited pretrial

5

freezes of criminal defendants' untainted assets," and that the Sixth Amendment codified that prohibition. *Id.* at 29 (Thomas, J., concurring). Thus, Justice Thomas held that the pretrial restraint of untainted assets violates the Sixth Amendment regardless of whether a defendant needs those assets to hire counsel of choice. It is undisputed that there was a pretrial restraint of untainted assets in this case.

There is a substantial question as to which of these opinions is controlling. But under either Justice Breyer's or Justice Thomas's opinion, the Government's restraint of millions of dollars in property that Mr. Shah could have otherwise used to hire counsel violated his Sixth Amendment rights. At the very least, this issue will raise a substantial question warranting bail pending appeal.

> *1. The Government Violated Mr. Shah's Sixth Amendment Rights by Improperly Restraining Millions of Dollars in Untainted Property*

Before trial, the Government froze "[a]ll right, title, and interest" in millions of dollars of untainted property without having probable cause to do so. R. 747 at 5–6. Indeed, the Government later "explicitly acknowledged" that it illegally restrained millions in untainted assets. *Id.* at 6. Mr. Shah needed those funds to hire counsel of his choice. Because of the improper restraint, the attorney representing Mr. Shah at the time, William Burck, was forced to withdraw from his representation. This Court found that Mr. Burck "required $9-10 million to represent" Mr. Shah at trial, but Mr. Shah only had "approximately $4 million" as a result of the Government's excessive restraint. *Id.* at 21–22. It is undisputed that Mr. Burck declined to represent Mr. Shah solely because Mr. Shah could not raise the necessary funds. *See* R. 75-8, 490-1; *see also* Evidentiary Hearing Tr. 823. After Mr. Burck withdrew, Mr. Shah interviewed several other attorneys who charged lower rates but nevertheless declined to take his case because Mr. Shah did not have "sufficient" funds. *See, e.g.*, Evidentiary Hearing Tr. 951 (explaining that Mr. Shah was interested in hiring Jim Bennett, who declined because Shah did not have enough money to pay

him). Mr. Shah ultimately settled on John Hueston—who had never once before represented a defendant in a criminal trial—because "his firm was . . . willing [to] accept the promise of future payments from the proceeds of potential sales or distribution from illiquid assets" when other firms were not. R. 747 at 22–23; Evidentiary Hearing Tr. 1297–98 (discussing Hueston Hennigan letter providing for additional payments upon liquidation of additional assets). As Mr. Shah will argue on appeal, under either Justice Breyer's or Justice Thomas's opinion, those facts establish a violation of Mr. Shah's Sixth Amendment rights.

Under Justice Breyer's approach, the Government's concededly overbroad restraint deprived him of his ability to hire his counsel of choice. Because Mr. Shah otherwise lacked the funds to hire Mr. Burck, he "needed" the illegally restrained assets to hire his preferred counsel. *See Luis*, 578 U.S. at 18. Mr. Shah did not seek the restrained funds to dissipate his assets to evade his eventual obligation to pay "restitution"—the principal concern of the *Luis* plurality—nor did he fabricate a Sixth Amendment challenge after a guilty verdict to create an issue for appeal. To the contrary, Mr. Shah asserted his need for such funds in a pretrial motion mere weeks after his indictment. *See* R. 75. Mr. Shah needed access to the restrained funds to pay for counsel, and indeed his preferred counsel withdrew from the case for that reason. To the extent the plurality also required a showing that the charged fees are "reasonable," *see* 578 U.S. at 23, Mr. Shah made the requisite showing, as the fees Mr. Burck charged were similar to fees he charged for comparable trials. *See* Evidentiary Hearing Tr. 819–820; *see also* R. 490-1 ¶ 9. Indeed, those fees were comparable to the fees even Mr. Hueston and his firm would have incurred in representing Mr. Shah under their normal billing rates, had they not agreed to a flat fee payment. *See* Evidentiary Hearing Tr. 1292, 1299–1300.

Even setting Mr. Burck aside, Mr. Shah could have—and repeatedly attempted to—hire an attorney who charged lower fees than Mr. Burck but whom Mr. Shah would have nonetheless "preferred" to Mr. Hueston and could have afforded were it not for the improper restraint. *Luis*, 578 U.S. at 12 (plurality op.). The improper restraint prevented Mr. Shah from hiring any of these attorneys, leaving him with only the funds to hire Mr. Hueston, the only attorney who was willing to accept full payment of his flat fee over time, after Mr. Shah received distributions from the sale of two of the few investments the Government did not restrain. As this Court recognized, Mr. Shah paid Mr. Hueston the entire "amount he had available to pay counsel at that time"; he had no "access to additional funds." R. 747 at 22 n.14. If Mr. Shah had access to additional assets, liquid or illiquid, he could have used those assets to hire different counsel. By requiring Mr. Shah to hire his counsel of last resort, the Government's improper restraint violated the Sixth Amendment under the *Luis* plurality.

The Sixth Amendment violation is similarly straightforward under Justice Thomas's approach. In Justice Thomas's view, "a pretrial freeze of untainted assets violates a criminal defendant's Sixth Amendment right to counsel of choice"—full stop. 578 U.S. at 24. The Government therefore conceded that its restraint of Mr. Shah's untainted assets would violate his Sixth Amendment rights under Justice Thomas's approach. *See* R. 512 at 20 (agreeing that "Justice Thomas . . . would not require proof that the defendant needed the assets").

The Government argued that Justice Thomas's concurrence is not controlling, but that is incorrect. When a majority of the Court agrees on the outcome of a case but not the reasoning, lower courts must follow the "position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (quotations omitted). The Seventh Circuit has referred to this as the "least common denominator" approach. *United*

*States v. Gerke Excavating, Inc.*, 464 F.3d 723, 725 (7th Cir. 2006) (per curiam). Justice Thomas's opinion constitutes that least common denominator here. All five Justices "agree[d]" that "a pretrial freeze of untainted assets violates a criminal defendant's Sixth Amendment right to counsel of choice" because the "common law prohibited" the practice. 578 U.S. at 24–25, 29–30 (Thomas, J., concurring) (citing historical sources, including Blackstone); *see also id.* at 19–20 (plurality op.) (drawing from the same historical reservoir). The Justices parted ways only on Justice Breyer's balancing of the government's "contingent" interest in defendants' untainted assets as weighed against a defendant's "fundamental" interest in securing counsel of choice. *Id.* at 18–19. As Justice Thomas explained, this balancing analysis "casts doubt on the constitutionality of incidental burdens on the right to counsel," and could require reversal of practices long thought to be permissible, such as that "defendants must still pay taxes even though these financial levies may deprive them of resources that could be used to hire an attorney." *Id.* at 33–34 (Thomas, J., concurring) (quotation marks and citation omitted). Because Justice Thomas's opinion does not call those incidental burdens into question, his approach is narrower than the majority's. At the very least, no circuit court has conducted a *Marks* analysis of *Luis*, making the issue an "open"— and thus "substantial"—question that warrants bail. *Molt*, 758 F.2d at 1199.

If Mr. Shah prevails under either Justice Breyer or Justice Thomas's opinion, a decision in Mr. Shah's favor will require dismissal, or at minimum a new trial. The "erroneous deprivation of the right to counsel of choice" causes a "structural error" because the "consequences" of the deprivation "are necessarily unquantifiable and indeterminate." *Gonzalez-Lopez*, 548 U.S. at 150 (quotation marks and citation omitted). That makes a new trial an automatic remedy. *See id.* In this case, the Seventh Circuit could well go a step further and dismiss the indictment. "The appropriate remedy for a constitutional violation is one that as much as possible restores the

9

defendant to the circumstances that would have existed had there been no constitutional error." *United States v. Stein*, 541 F.3d 130, 146 (2d Cir. 2008) (quotation marks and citation omitted). Ordering a new trial would not achieve this result, because Mr. Shah will not now have enough money to secure his counsel of choice on the next go-around, after spending millions on the initial trial and appeal. *See id.* at 136 (dismissing indictment where the government "unjustifiably interfered with defendants' relationship with counsel and their ability to mount a defense").

This case demonstrates how error-prone forfeiture allegations can be—even after all the evidence is in—bearing out Justice Kagan's concern with the Supreme Court's decision in *United States v. Monsanto*, 491 U.S. 600, 615 (1989), which holds "that the Government may, prior to trial, freeze assets that a defendant needs to hire an attorney, based on nothing more than probable cause." *Luis*, 578 U.S. at 52 (Kagan, J., dissenting) (quotation marks omitted). If the Seventh Circuit affirms his conviction, Mr. Shah intends to ask the Supreme Court either to overrule or to modify *Monsanto*, a question the Court did not reach in *Luis* only because the parties did not address it. *See id.*; *see also United States v. Hernandez-Estrada*, 749 F.3d 1154, 1160 (9th Cir. 2014) (no need to preserve argument where it would be "futile" to urge a court "to overrule binding . . . precedent"). That again would amount to a substantial issue warranting bail.

### 2. This Court's Grounds for Ruling Against Mr. Shah Will Raise Substantial Questions on Appeal

Mr. Shah recognizes that the Court gave deliberate and considered attention to the issues raised by Mr. Shah's Motion to Dismiss (R. 490). Nonetheless, Mr. Shah respectfully submits that the grounds upon which this Court relied in rejecting his Sixth Amendment argument will raise substantial questions on appeal.

*First*, the Court concluded that even if the Government's restraint "had not been excessive, [Mr. Shah] would not have been able to afford the lawyers [he] wanted." R. 747 at 20. That

conclusion followed from the premise that Mr. Shah was required to prove that he could have afforded to hire *Mr. Burck in particular* absent the restraint. As Mr. Shah will argue on appeal, however, that premise was legally erroneous. The Sixth Amendment does not require Mr. Shah to prove he would have been able to hire Mr. Burck—or any particular attorney—absent the illegal restraint. Instead, it suffices that Mr. Shah was deprived of the "fair opportunity" to hire *any* attorney he would have "preferred" to Mr. Hueston. *Luis*, 578 U.S. at 12 (plurality op.). Mr. Shah made the requisite showing. Mr. Shah consulted with numerous attorneys whom he was unable to hire due to lack of funds, and he settled on Mr. Hueston only because Mr. Hueston was willing to accept the promise of future payment from the limited funds and assets the Government's restraint left available to him. *See, e.g.*, Evidentiary Hearing Tr. 951 (Mr. Bennett expressed concern that Mr. Shah would lack the funds to pay him given "the length of the trial and the amount of discovery").

The Court's conclusion that Mr. Shah was required to prove he would have had funds to hire Mr. Burck was the result of the unusual posture of this case, where Mr. Burck agreed to represent Mr. Shah but then was required to withdraw after the improper restraint left Mr. Shah without the necessary funds. R. 747 at 22 n.14. But most cases, including *Luis*, arise before the defendant can make a decision about which specific counsel they would choose. *See* Evidentiary Hearing Tr. 1367 ("[M]ost defendants will not be in that luxurious position. Most defendants will simply be indicted, they will have an allegation that says all of this property is restrained, and they'll get a public defender, not ever knowing that they had the opportunity to get the counsel they wanted."). The question in that more common posture is whether the improper restraint denied the defendant "a fair opportunity to secure" the counsel he would have chosen. *Luis*, 578 U.S. at 11 (plurality op.) (quotation omitted). Here, there can be little doubt that the improper

restraint of millions of dollars in untainted property denied Mr. Shah a "fair opportunity" to hire different counsel—if not Mr. Burck, then another counsel he would have preferred to Mr. Hueston. The Government has cited no case where a defendant was improperly deprived of millions of dollars he would have used to hire trial counsel but was nonetheless denied relief. Mr. Shah's Sixth Amendment rights are not diminished simply because he happened to select counsel before the improper restraint was put in place.

*Second*, even if Mr. Shah were required to show that he could have hired Mr. Burck absent the restraint, he made that showing. While the Court found otherwise, the Court's opinion incorrectly assumed that Mr. Shah would have had only 11 weeks to liquidate his assets: from April 8, 2020, when the Court ruled that Mr. Shah could not use the proceeds of a settlement with investors to pay counsel, until June 30, 2020, the Court's deadline for Mr. Shah to secure counsel. R. 747 at 21, 27. But there are numerous reasons to conclude that should not have been either the start or the end of the relevant timeframe. For example, the Court itself observed that if Mr. Shah had asked, it likely would have granted an extension from the June 30 deadline. While it faulted Mr. Shah for failing to "ask[] for more time," *id.* at 21, Mr. Shah had no reason to seek additional time to liquidate the assets in question, because *those assets had been restrained*. It defies imagination that Mr. Shah would not have sought an extension had the only obstacle to hiring Mr. Burck been the need for more time to liquidate assets. *See* Evidentiary Hearing Tr. 853 (Burck testifying that he would have sought "additional time from the Court" had he "known that some of the assets restrained by the protective order were not traceable"). And, if the untainted assets had not been restrained, Mr. Shah could have retained other, less expensive counsel, liquidated those assets a few weeks or months *after* the June 30 deadline, and then sought either to substitute

or add Mr. Burck as his counsel.  In short, the Court's imposition of an 11-week clock on Mr. Shah's right to secure his counsel will raise a substantial question in the Seventh Circuit.

The Court's rejection of Mr. Shah's conservative prediction that he could have liquidated the assets at a ten percent discount also raises substantial questions.  For one thing, the Court's analysis rested "critically" on the mistaken timeline described above.  *See* R. 747 at 29.  But a more fundamental error was that the Government never presented evidence of, and the Court never found, an alternative discount rate, and instead simply disputed Mr. Shah's rate as too "speculative."  *Id.* at 29–30.  Without identifying a specific discount rate, however, the Court could not determine the liquidation value of the assets at issue or whether that amount would have sufficed to hire Mr. Burck at any relevant point in time.  Indeed, while Mr. Shah presented expert testimony about the discount rate, the Government did not submit any evidence to establish a competing rate, even though its own improper restraint was to blame for the uncertainty as to what rate might have been obtained.  It will raise a substantial question for the Seventh Circuit whether the Government, rather than Mr. Shah, should have borne the burden of establishing the liquidation value of the erroneously restrained assets where the Government's own improper restraint prevented the sale of those assets at an earlier time.  *Id.* at 30.

The Seventh Circuit is also likely to find that the Court made several legal and factual errors in determining which assets were subject to forfeiture in the first instance.  For example, when determining the forfeitability of property traceable to the proceeds of the April 2016 loan— one of the principal starting points for the Government's tracing analysis—the Court declined to provide any deduction for the repayment of 100% of the loan principal.  *But see* 18 U.S.C. § 981(a)(2)(C) (any calculation of proceeds is subject to a "deduction from the forfeiture to the extent that the loan was repaid, or the debt was satisfied, without any financial loss to the victim").

The Court held that the deduction does not apply to § 982, the charging statute in this case, but the Court itself noted that is an open question the Seventh Circuit will need to resolve. R. 580 at 13.

*Third*, this Court concluded that Mr. Shah should have raised his Sixth Amendment argument earlier, but that conclusion is flawed as well. To begin, the Court noted that "the express provisions of Rule 12(b)(3)" did not require Mr. Shah to raise his challenge to the improper restraint before trial, but, relying on 30-year-old (pre-*Luis*) Ninth Circuit precedent and two other unpublished decisions, faulted Mr. Shah for failing to raise his challenge "at the earliest stages of the case." R. 747 at 11–12. The Court's imposition of that standard not set forth in any procedural rule will raise a novel and substantial question in the Seventh Circuit.

There are particularly compelling reasons not to impose that standard here. At the time of the restraint, Mr. Shah and his counsel had every reason to believe that the Government had evidence to support the forfeiture of all restrained assets. The Government's theory was that Outcome Health "was built on a lie." R. 502 at 1. Accordingly, when the Government sought to restrain "[a]ll right, title, and interest" in Mr. Shah's assets deriving from "the fraud," Mr. Shah and his counsel reasonably understood the Government to be claiming that all assets deriving from the company were subject to forfeiture. R. 14 at 49–57; *see also* Evidentiary Hearing Tr. 815 (Burck stating that, following a telephone call with the prosecution, "it was clear to us . . . that they were asserting that . . . all the funds involved in the case were subject to forfeiture"). As this Court acknowledged, the language of the Government's forfeiture request "inevitably suggested to the grand jury that all of the property covered by the forfeiture allegations was derived from criminal proceeds," which was "not accurate." R. 747 at 32. That same language left the same impression on Mr. Shah and his counsel. *See* Evidentiary Hearing Tr. 811 (Burck testifying that the Government was "alleging that the entire business had been a fraud or based on fraud and run

fraudulently," and that the forfeiture allegations were intended to cover "the entirety of the -- of the funds that had been received"). It was not until the middle of trial, when the Government finally disclosed its tracing spreadsheets, that it was revealed that the Government had failed to establish probable cause that many of the restrained assets were traceable to any criminal activity.

The Court concluded that nothing prevented Mr. Shah's counsel from "performing their own tracing analysis." R. 747 at 13. But conducting such a tracing analysis would have done them no good, because a tracing analysis first requires an understanding of the Government's theory of fraud—it is that *theory of fraud* that distinguishes assets that are traceable to the fraud from assets that are not. And controlling precedent prohibited Mr. Shah from challenging the Government's broad theory of fraud pretrial. *See Kaley*, 571 U.S. at 333 ("A defendant has no right to judicial review of a grand jury's determination of probable cause to think a defendant committed a crime."). The same goes for the Court's observation that it was Mr. Shah's "*own property*" that was "being restrained." R. 747 at 13. Mr. Shah could not have guessed that the Government's theory of fraud was narrower than the indictment suggested simply because the property at issue was his.

The Court maintained that Mr. Shah should have spotted the mistake after reading the Government's grand-jury testimony, because the Government's tracing expert, Megan Poelking, testified that she only "'traced' money going to Defendants from the loans and capital raise." R. 747 at 15. But that finding cannot be reconciled with the Court's conclusion that the Government *itself* did not know "the protective order was overbroad." *Id.* at 33. As the Court recognized, the forfeiture analysis "was incredibly complex"—so much so that Ms. Poelking and the Government officials who actually performed the tracing analysis "did not put the pieces together." *Id.* at 39. If the Government can be excused for not "knowing" of the excessive restraint even though it had

access to all of its tracing analyses, then it cannot fairly be said that Mr. Shah and his counsel "knew" of the restraint based on substantially less information. As Mr. Burck testified, if he had understood that the Government's theory of forfeiture was so narrow, then he would have "[a]bsolutely" raised such a challenge when he challenged the other aspects of the Government's restraint pretrial. *See* Evidentiary Hearing Tr. 837.

The Court stated that "there was nothing preventing [Mr. Shah] from asking for more information" about the Government's tracing or seeking a hearing on the question. R. 747 at 13. But that logic would require every defendant to challenge the Government's forfeiture in every case—even when they lack any good-faith basis to believe the Government's tracing analysis is incorrect. The Seventh Circuit is unlikely to adopt a rule requiring such frivolous motion practice by defense counsel. Requiring defendants to demand a hearing when they have no reason to question the Government's forfeiture allegations would waste the resources of the parties and the Court in the runup to trial on the off chance the Government made an error. The Seventh Circuit will consider it at least a substantial question whether Mr. Shah timely filed his motion.

Regardless, even if the Seventh Circuit agrees with the Court's conclusion that Mr. Shah's motion was not timely and applies a plain-error standard, Mr. Shah's appeal will raise substantial questions because the pretrial restraint of nontraceable property is an error that is "plain," "affects substantial rights," and "affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Maez*, 960 F.3d 949, 956 (7th Cir. 2020) (cleaned up). Structural errors like the denial of the right to counsel of choice "automatically satisfy" the substantial-rights prong. *Id.* at 957 (quoting *Puckett v. United States*, 556 U.S. 129, 140 (2009)). And a finding of structural error will go "a long way toward" showing that the error affected the fairness and integrity of Mr. Shah's trial. *See id*. As Justice Scalia explained, different counsel could have

chosen "different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, [and] presentation of the witnesses." *Gonzalez-Lopez*, 548 U.S. at 150. The right to counsel of choice is "the most precious right a defendant has." *Kaley*, 571 U.S. at 344 (Roberts, C.J., dissenting) (citing *United States v. Cronic*, 466 U.S. 648, 653–654 (1984)). Its violation presents exactly the kind of "exceptional" circumstance that warrant reversal under plain-error review. *United States v. Quiroz*, 874 F.3d 562, 569 (7th Cir. 2017).

Indeed, the Supreme Court and the Seventh Circuit have recently indicated that a structural error may *always* require reversal. *See Greer v. United States*, 593 U.S. 503, 512–513 (2021) (assuming that "'structural'" errors "require automatic vacatur in *every* case without regard to whether a defendant can otherwise satisfy the plain-error test"); *United States v. Navarrete*, 88 F.4th 672, 674 (7th Cir. 2023) (similar); *United States v. Nebinger*, 987 F.3d 734, 739 n.1 (7th Cir. 2021) (similar). And while the Court raised a question as to whether it had the power to consider a forfeited issue under a plain error standard, *see* R. 747 at 19 n.11, there is no question that the Seventh Circuit will apply that standard here. A ruling in Mr. Shah's favor would thus entitle him to a dismissal, or at minimum a new trial, even if plain-error review applies.

### B. The Court's Fifth Amendment Analysis Will Raise Substantial Questions on Appeal

This Court's Fifth Amendment analysis will likewise raise substantial questions on appeal. "The government's knowing use of false testimony, or failure to correct testimony, violates due process." *United States v. Burke*, 425 F.3d 400, 412 (7th Cir. 2005) (citations omitted). This Court recognized that the Government presented testimony to the grand jury that was "not accurate." R. 747 at 32. The Court also acknowledged that the Government's testimony "inevitably suggested to the grand jury that all of the property covered by the forfeiture allegation was derived from criminal proceeds." *Id.* As a direct result of that testimony, the grand jury unwittingly voted to approve the forfeiture of millions of dollars in untainted assets, which the Court then restrained on

17

the basis of that same false belief.  Yet the Court found no Fifth Amendment violation on the ground that Mr. Shah was "unable to show that the government knew that the testimony was inaccurate, or knew the protective order was overbroad."  *Id.* at 33.

There are, at minimum, substantial questions whether that finding rested on an error of law. In other Fifth Amendment contexts imposing disclosure requirements on the Government for information within its knowledge, courts evaluate the Government's *collective* knowledge.  *See Giglio*, 405 U.S. at 154; *see also Kyles*, 514 U.S. at 437–438 (holding that a "prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case"); *United States v. Mann*, 140 F. Supp. 3d 513, 538 (E.D.N.C. 2015) ("Collectively, the government was aware . . . that Mann's three bank accounts did not contain traceable property.").  But the Court did not analyze the Government's collective knowledge.  Instead, the Court adopted a divide-and-conquer approach to assessing each government official's knowledge individually.

The Court first held that Ms. Poelking "was not a lawyer," and so excused her failure to recognize that the indictment's broad language—the accuracy of which she endorsed before the grand jury—did not match her tracing analysis.  R. 747 at 35.  The Court then turned to attorney Daniel Olinghouse, who actually drafted the forfeiture allegations in the indictment, and found that he "did not have any experience with the forfeiture of private equity" and "was not aware of what was ultimately restrained" after "he handed off the drafts."  *Id.*  As for Matthew Madden, the Assistant United States Attorney who led the prosecution, the Court concluded that he "did not recall focusing on or even thinking about" the overbroad forfeiture language in the indictment "or considering the possibility that there was anything problematic about that language until defense counsel raised the issue."  *Id.* at 36–37.  The upshot was that the Court held that no *individual* within the Government subjectively understood that the forfeiture allegation or the protective order

was excessive under the law, even though the government officials' interpretation of the forfeiture language "defies the meaning of the words themselves." *Id.* at 34.

Had the Court considered the Government's collective knowledge, it would have been compelled to conclude that Ms. Poelking, Mr. Olinghouse, and Mr. Madden collectively possessed all the information needed to know that the indictment's forfeiture allegations were false, and that the Government's use of that "false testimony," *Burke*, 425 F.3d at 412, violated Mr. Shah's due process rights. Given that the collective knowledge standard applies in other Fifth Amendment contexts, it is likely that the Seventh Circuit will apply that same standard here. *See Giglio*, 405 U.S. at 154; *Kyles*, 514 U.S. at 437–438.

Yet even if individual knowledge were required, the record reflects that Mr. Olinghouse and Mr. Madden knew all of the facts that made the restraint unlawful, contrary to the Court's conclusions. As the Court found, Mr. Olinghouse's asserted understanding of the forfeiture allegation *he drafted* "defies the meaning of the words themselves. 'All right, title, and interest' means everything, and 'including but not limited to' means 'not only.'" *Id.* at 34. Given the admitted facts that Mr. Olinghouse (1) knew that nontraceable assets were held at numerous of the affected entities, (2) knew that restraint of nontraceable assets was impermissible, and (3) drafted language that nonetheless resulted in the restraint of "[a]ll right, title, and interest" held by those entities, there is at the very least a substantial question whether the Seventh Circuit will find such facts sufficient to establish his personal knowledge. Similarly, Mr. Madden acknowledged both knowing that the language of the protective order covered "[a]ll right, title, and interest" held by the affected entities and being notified that nontraceable assets were held by at least some of those entities. The Seventh Circuit is unlikely to view Mr. Madden's asserted ignorance of the law regarding the impermissibility of restraining nontraceable assets as an excuse—especially after

this Court expressly held that such a restraint was impermissible. *See* R. 108 at 10–11 (noting that "pretrial restraint [was] permitted for 'tainted assets prior to trial, but not the restraint of substitute assets'").

Regardless of whether the Seventh Circuit ultimately applies an individual or a collective knowledge standard to Mr. Shah's claim, the Seventh Circuit could conclude that the Government's grand-jury testimony was false and that it caused the grand jury—and consequently this Court—to restrain millions of Mr. Shah's untainted assets in violation of his Fifth Amendment rights. Such a holding would require dismissal of the indictment or at minimum a new trial, thereby requiring Mr. Shah to be granted bail pending determination of those questions on appeal.

## C.  The Admission of Mr. Ketchum's, Mr. Ma's, and Mr. Desai's Grand-Jury Statements Will Raise Substantial Questions on Appeal

The Court allowed the jury to hear more than 30 pages of narrative statements authored by the Government and read to the grand jury by Mr. Ketchum, Mr. Ma, and Mr. Desai, even though all three witnesses made those statements after they developed a motivation to lie. Rather than tailor the statements to the issues raised on cross-examination, the Court allowed them to be read to the jury essentially wholesale. The Seventh Circuit is likely to seriously question whether the introduction of these statements was an error requiring reversal.

### 1.  *The Court Improperly Admitted Grand-Jury Statements that Ketchum, Ma, and Desai Made After They Developed a Motivation to Lie*

Federal Rule of Evidence 801(d)(1)(B)(i) allows courts to admit prior consistent statements "to rebut an express or implied charge that the declarant recently fabricated" his testimony "or acted from a recent improper influence or motive in so testifying." But of course not every consistent statement can be introduced to rebut a charge of recent fabrication. Rule 801 applies only to statements "made before the alleged fabrication, influence, or motive came into being." *Tome v. United States*, 513 U.S. 150, 156 (1995). As the Seventh Circuit has explained, all trial

evidence must be relevant, and "evidence which merely shows that the declarant said the same thing at trial as he did on a prior occasion is of no probative value to rebut an allegation of recent fabrication when the declarant's motive in making both statements was the same." *United States v. Harris*, 761 F.2d 394, 399 (7th Cir. 1985) (citation omitted).

At trial, the defendants attacked the credibility of Mr. Ketchum, Mr. Ma, and Mr. Desai on the ground that all three witnesses had an improper motive to give favorable testimony to the Government to avoid being prosecuted for their own misconduct or to receive a favorable plea deal. In response, the Government sought on redirect to introduce grand-jury testimony from all three witnesses as prior consistent statements. Mr. Shah objected that all three defendants developed their motivation to lie before they testified to the grand jury, making these statements inadmissible under *Tome*. *See* R. 368 at 2–3; R. 383 at 1; R. 398 at 6–7.

As to Mr. Ketchum and Mr. Ma, both received immunity deals *before* they testified to the grand jury, and those deals required them to testify for the Government or face prosecution. This gave them the very same powerful motivation to lie to the grand jury that they had at trial. Despite Mr. Shah's objection, this Court nonetheless admitted their grand-jury statements, without any mention of *Tome* and without explaining how the grand-jury statements could pre-date their motive to lie. *See* R. 373, 383. The admission of the testimony was particularly improper as to Mr. Ketchum, who, before taking the Government's plea deal, had maintained that any suggestion of fraud at Outcome Health was "actually ridiculous." *See* Trial Tr. 1507–1512. The Sixth Circuit in a similar case held that the Court's failure to "render[] a factual finding as to when [the declarants] formed a motive to lie" was a legal error. *United States v. Trujillo*, 376 F.3d 593, 610–611 (6th Cir. 2004). The Seventh Circuit would likely hold similarly here.

Mr. Desai likewise had a motivation to lie, as he was actively seeking a plea deal from the Government when he testified to the grand jury. This Court concluded that Mr. Desai lacked a motivation to lie to the grand jury because he "made the statement to the grand jury before he received a plea deal" and "did not know what type of deal the government might offer." R. 406 at 4. That holding contravenes precedent from the Seventh Circuit and every other circuit court to address comparable circumstances, all of which hold that "the motive to lie . . . to avoid prosecution" arises before a witness actually reaches a plea deal. *See United States v. Lewis*, 954 F.2d 1386, 1391 (7th Cir. 1992) ("Because he made the statement after he was arrested, Lewis had the motive to lie at that time to avoid prosecution."); *United States v. Portillo*, 969 F.3d 144, 173 (5th Cir. 2020) (holding that "motivation [to lie] existed regardless of the fact that the brothers did not have specific plea agreements until well after" their statements); *United States v. Forrester*, 60 F.3d 52, 64 (2d Cir. 1995) (holding that "motive to fabricate arose as soon as she was arrested"); *United States v. Moreno*, 94 F.3d 1453, 1455 (10th Cir. 1996) (rejecting argument that witness "had no incentive to fabricate a story prior to his plea-bargain agreement"); *Trujillo*, 376 F.3d at 611 ("It is simply not believable to suggest" that witnesses "did not have a motive to lie" after being arrested). That Mr. Desai did not know exactly what particular deal the Government would offer him did not diminish his motivation to tell the story the Government wanted him to tell—if anything, it *increased* his motivation to please the Government. The Court's failure to consider the possibility that a witness actively seeking a plea deal has a strong motivation to give favorable testimony to the Government will raise a substantial question on appeal.

The Court alternatively admitted Mr. Ketchum's and Mr. Ma's testimony—but not Mr. Desai's, *see* R. 406 at 2—under Rule 801(d)(1)(B)(ii), which allows a party "to rehabilitate the declarant's credibility as a witness when attacked on another ground." The Court maintained that

this rule applied because Mr. Shah challenged Mr. Ketchum's and Mr. Ma's credibility "on a variety of fronts, including improper motive, faulty memory, inconsistency, and general bias." R. 383 at 3; *see also* R. 373 at 1–2. But this Rule was added in 2014, and the Seventh Circuit has yet to rule whether *Tome*'s pre-motive requirement "applies to Rule 801(d)(1)(B)(ii) as it unequivocally does to Rule 801(d)(1)(B)(i)." *United States v. Davis*, 896 F.3d 784, 789 (7th Cir. 2018). That unresolved and substantial legal question alone favors granting Mr. Shah bail.

And—although not needed to grant this motion—the Seventh Circuit is likely to rule for Mr. Shah on the merits of this question. The record demonstrates that Mr. Shah challenged Mr. Ketchum's and Mr. Ma's credibility overwhelmingly based on their *motivation to lie*. *See* Trial Tr. 1178–1185; 1189–1218; 2554–2555; 2864–2866; 3015–3016. In such cases, the 2014 "amendment retains the requirement set forth in *Tome*"—that "a consistent statement offered to rebut a charge of recent fabrication . . . must have been made before the alleged fabrication" to be admitted "under Rule 801(d)(1)(B)." Fed. R. Evid. 801 (Note to 2014 Amendment). The Government cannot achieve an "end-run around" that "clear limitation in *Tome*" by claiming that witnesses' credibility was challenged on other grounds as well. *Portillo*, 969 F.3d at 174–176.

It therefore makes no difference whether, in addition to repeatedly challenging Mr. Ketchum's and Mr. Ma's credibility based on their motivation to lie, Mr. Shah and his codefendant asked both witnesses a handful of questions about their recollection of certain conversations and their bias against the defendants. *See, e.g.*, R. 383 at 3 (noting that Agarwal "challenged Ma's recollection of his purported conversation with Agarwal"). As the Fifth Circuit has held, a "litigant may not introduce a prior consistent statement if that statement was made at a time when the litigant allegedly had a motive to fabricate—even if the litigant supplements his attack on the witness's credibility by pointing to other flaws in the declarant's testimony." *Portillo*, 969 F.3d at

175.  Like the Fifth Circuit, the Seventh Circuit is likely to conclude that wholesale admission of grand-jury statements to rebut the suggestion of a motivation to lie cannot be justified on the ground that the witnesses were asked a handful of questions that could be understood to challenge their credibility on other grounds.  *Id.* at 174.

Because Mr. Shah timely objected to the grand-jury statements, the Government will bear the burden of establishing their admission was harmless beyond a reasonable doubt.  *See Shinseki v. Sanders*, 556 U.S. 396, 410 (2009).  The Government cannot meet that burden.  The statements were highly inflammatory, they concerned the central issues at trial, and—highly unusually—they were *drafted by the prosecution itself*.  *See* Trial Tr. 4301–10 (Mr. Desai agreeing that "the government prepared a statement" for him to read to the grand jury).

Begin with Mr. Desai, who, when confronted with documentary evidence, admitted on cross-examination that he committed acts of fraud—like manufacturing fake screenshots of Outcome Health inventory—without Mr. Shah's knowledge.  *See* Trial Tr. 4199–4200; 4518–19.  He also conceded that he repeatedly lied to Mr. Shah to conceal these fraudulent acts and falsely reassured Mr. Shah that under-delivery issues were compensated for with make-goods.  *See* Trial Tr. 4321; Tr. 4637–4638.  These and other statements could well have made the difference between guilt and innocence had the Government not been permitted to read Mr. Desai's grand-jury statement, including:

- "Shah said that he wanted Outcome to grab the pharma clients' entire point-of-care advertising budgets regardless of whether we actually had the inventory. … Shah's sales mentality was to sell now, and try to get the inventory later.  I followed Shah's directives."  R. 397-1 at 2.

Mr. Ketchum, for his part, admitted on cross-examination that he made a mistake in testifying on direct examination that Outcome generally hid from the sales team the fact that sales were based on projections.  *See* Trial Tr. 1590–1596; 1648.  He also testified that Outcome's "sell,

then build" model was not "a secret to the clients." Trial Tr. 1652. In a trial focused so heavily

on witness credibility, Mr. Ketchum's about-face could have very well swayed the jury had the

Government been precluded from reading Ketchum's grand-jury statement, including:

- "Shah and Agarwal would comment that they wanted to be aggressive on the number of projected devices in order to present as large a number as possible to the client." R. 469-1 at 2–3.

- "I understood that Shah . . . typically did not want clients to know about the projections in the list-match results given to clients." *Id.* at 3–4.

- "Shah . . . instructed me not to reveal to Outcome's own sales people that the list-match results contained projections." *Id.* at 4.

- "Shah instructed me to include devices that he knew were not yet installed in the proof-of-performance document to be sent to the client. When we agreed to do this, Shah and I intended to deceive the client." *Id.* at 6.

Similarly, Mr. Ma admitted on cross-examination that he "never" told Mr. Shah he was

"fabricating information" and that Mr. Shah never expressly told him to conceal anything. Trial

Tr. 2873; 2900–2904. That admission could have swayed the jury had Mr. Ma been precluded

from reading the statement the Government had drafted for him, including:

- "My interactions with Shah, Agarwal, and Purdy left me convinced that they were not bothered that [Outcome] was regularly defrauding its clients." R. 381-1 at 7.

- "I told the group that the gap between then existing inventory and needed inventory was in the thousands. Shah did not express surprise that there was a significant gap." *Id.*

Statements like these were more damaging to Mr. Shah's defense than anything Mr.

Ketchum, Mr. Ma, or Mr. Desai said in their own words. Written by the Government, they were

laser focused on Mr. Shah's state of mind—the critical element in dispute. The Government will

therefore not be able to satisfy its burden on appeal of proving that these errors did not have a

"substantial and injurious effect or influence in determining the jury's verdict." *United States v.*

*Mendoza*, 510 F.3d 749, 754 (7th Cir. 2007).

### 2. *Rule 801(d)(1)(B) Did Not Permit the Government to Introduce Grand-Jury Statements in Full*

Even setting aside *Tome*'s pre-motive requirement, the Court likely erred in admitting Mr. Desai's, Mr. Ma's, and Mr. Ketchum's grand-jury statements without tailoring them to issues actually raised on cross-examination. The Seventh Circuit and other courts uniformly require parties to tailor any prior consistent statements to the issues that were raised on cross-examination. In *Miller v. Greenleaf Orthopedic Assocs.*, 827 F.3d 569 (7th Cir. 2016), for example, the Seventh Circuit explained that "[a] prior statement does not fall within Rule 801(d)(1)(B), even if it is consistent with the witness's in-court testimony, unless it has some potential to rebut the alleged link between the in-court testimony and the witness's recent improper motive." *Id.* at 574 (citing *Tome*, 513 U.S. at 157–158); *see also United States v. Collicott*, 92 F.3d 973, 979 (9th Cir. 1996) (holding that a "party may [not] introduce the whole conversation" where cross-examination addressed only a part); *United States v. Dennis*, 625 F.2d 782, 797 (8th Cir. 1980) (prior consistent statements must "relate to the same subject matter as . . . impeachment").

"There is no rule admitting all prior consistent statements simply to bolster the credibility of a witness who has been impeached by particulars." *United States v. Simonelli*, 237 F.3d 19, 28 (1st Cir. 2001) (citing *Tome* to "reject the government's argument that all of its use of prior consistent grand jury testimony is encompassed by the rule of completeness"); *accord United States v. Ramos-Caraballo*, 375 F.3d 797, 803 (8th Cir. 2004). Rule 801 "speaks of a party rebutting an alleged motive, not bolstering the veracity of the story told." *Tome*, 513 U.S. at 158. Yet the Government did not explain—and the Court did not determine—which portions of the grand-jury statements were necessary to rebut the issues raised on cross-examinations under either Rule 801(d)(1)(B)(i) or (ii). The Government simply sought to introduce the statements wholesale.

Admitting the statements in bulk was devastating. They were the longest speeches by far other than the opening and closing arguments. They bolstered Government witnesses whose testimony was central to the Government's case and comprised well more than half of the total trial testimony. And they were authored by the Government to be maximally damaging to Mr. Shah. Consider, for example, Mr. Desai's grand-jury testimony:

> I will provide an example with round numbers to illustrate how we inflated using the top 5% of the results. If, for example, a certain campaign was running ads on 100 tablets and according to our data patients had clicked on those 100 tablets 50 times total during a month, we would not report to the client that there were 50 clicks. Instead, we looked at the data for the top 5 of those 100 tablets, and if the data showed that patients clicked on those 5 tablets a total of 25 times, which was 5 clicks per tablet, and then only clicked on the other 95 tablets a total of 25 times, we would report to the client that there were 500 clicks on their tablets that month (5 clicks per tablet multiplied by 100 tablets). We inflated numbers heavily; sometimes the inflated number we reported to the client was more than 100 times the actual patient engagement numbers we had.

R. 397-1 (Desai Grand-Jury Statement) at 9–10. That statement was *consistent* with Mr. Desai's testimony on cross that he "wildly inflat[ed]" tablet metrics, Trial Tr. 4236, so the Government did not need to "rehabilitate" anything, Fed. R. Evid. 801 (Note to 2014 Amendment). What the Government needed was a way to give the jury the impression that Mr. Shah participated in Mr. Desai's scheme, and it found a way to do that by dressing up its own arguments as witness testimony.

All three witnesses' grand-jury testimonies are rife with statements that were not tailored to the impeachment of these witnesses on cross-examination. *E.g.*, R. 369-1 (Ketchum Grand-Jury Statement) at 3 ("Generally, when I would express concerns to Shah or Agarwal about the projections we used, they would tell me that I was being too pessimistic."); *id.* at 6–7 ("I heard Shah talk about selling device counts to clients based upon what clients were willing to buy, and not necessarily based upon the number of devices that Outcome had in its network."); *id.* at 8 ("Shah typically made the final decision on which offices to put on the list sent to IMS"—the

company that verified clients' return on investment.); R. 381-1 (Ma Grand-Jury Statement) at 7 ("I told two other [employees] that I was leaving [Outcome] due to the false numbers."). Yet the Court did not require the Government to link those statements to any impeachment on cross.

The "cumulative effect" of reading more than 30 pages of testimony to the jury compounded the prejudice to Mr. Shah. *See Nelson v. City of Chicago*, 810 F.3d 1061, 1075 (7th Cir. 2016) (remanding for new trial because of the "cumulative effect" of erroneously admitted evidence). The Government cannot credibly argue that its "windfall of inadmissible evidence" did not influence the jury's verdict, especially because "the Government's overkill went to the heart of this case." *Collicott*, 92 F.3d at 984 (remanding for a new trial because the court improperly admitted "the whole conversation as substantive evidence" under Rule 801(d)(1)(B)).

## CONCLUSION

Mr. Shah sincerely appreciates the considered attention that this Court has given the legal issues that he raised in the course of this prosecution. And Mr. Shah recognizes that the Government's conduct in this case has required the Court to make a number of difficult decisions. But the existence of such close and open questions is precisely what the Seventh Circuit has deemed sufficient for a defendant to be granted bail pending appeal. If Mr. Shah's appeal is unsuccessful, then he will be required to serve the sentence the Court has imposed. The question presented by this motion is not whether that term of imprisonment should commence, but *when*. This Court should not require Mr. Shah to begin his sentence when there is a substantial possibility that the Seventh Circuit will reverse his conviction and grant him either a dismissal or a new trial. For these reasons, the Court should grant Mr. Shah's motion for bail pending appeal.

Date: July 25, 2024                          Respectfully submitted,

                                             BRYAN CAVE LEIGHTON PAISNER LLP

                                             */s/ Richard E. Finneran*
                                             RICHARD E. FINNERAN
                                             211 North Broadway, Suite 3600
                                             St. Louis, MO 63102
                                             Tel: (314) 259-2000
                                             Fax: (314) 259-2020
                                             *richard.finneran@bryancave.com*

                                             *Attorney for Defendant Rishi Shah*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served upon all counsel of record by operation of the Court's electronic filing system.

                                             */s/ Richard E. Finneran*
                                             RICHARD E. FINNERAN