IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br>v.<br>RISHI SHAH, et al.,<br>    Defendants. | Case No. 19 CR 864<br><br>Judge Thomas M. Durkin |

**DEFENDANT RISHI SHAH'S REPLY
MEMORANDUM IN SUPPORT OF HIS MOTION FOR BAIL PENDING APPEAL**

  The parties agree about several critical issues. The Government agrees that Mr. Shah is not a danger to the community or a flight risk. R. 837 ("Opp.") at 4. It also does not dispute that, if the Court finds "substantial questions" about Mr. Shah's entitlement to a new trial or reversal, Congress directed that this Court "shall" grant bail. Opp. 3; 18 U.S.C. § 3143(b). The only disputed issue is whether this case involves at least one such "substantial question."

  Given the complexity of these proceedings, it is no surprise that there is not just one substantial question, but many. The appellate issues Mr. Shah has identified raise open questions of law that the Seventh Circuit "very well could" decide "the other way." Opp. 3 (citation omitted). Rather than acknowledge these open legal issues, the Government instead focuses heavily on factual issues that may prove irrelevant should the Seventh Circuit agree with Mr. Shah on the law. Moreover, there are substantial questions even based on the lengthy factual record developed over the last five years in this Court. Mr. Shah's motion should therefore be granted.

**DISCUSSION**

**I.  The Government's Illegal Restraint Violated the Sixth Amendment**

  Mr. Shah raised at least three different ways that the Seventh Circuit might conclude that

1

the Government's concededly unlawful pretrial restraint violated the Sixth Amendment. Each path involves substantial questions and would independently lead to a new trial, at a minimum.

*First*, there is a substantial question about whether Justice Thomas's opinion in *Luis v. United States*, 578 U.S. 5 (2016), controls. Justice Thomas held that the Sixth Amendment outright prohibits unlawful pretrial freezes based on the "common-law forfeiture tradition." *Id.* at 25, 29. "The common law," he explained, "offers an administrable line: A criminal defendant's untainted assets are protected," and a violation of that protection violates the Sixth Amendment. *Id.* at 32. Although the Government now argues otherwise, the Government previously *conceded* that Mr. Shah's rights were violated under Justice Thomas's opinion. R. 512 at 20; Mot. at 8-9. The Government never reconciles that contradiction, nor does it dispute that *whether* Justice Thomas's opinion controls is an open and substantial question given that no circuit has yet analyzed which *Luis* opinion is controlling under *Marks v. United States*, 430 U.S. 188 (1977). *See* Mot. 9.

*Second*, even under the *Luis* plurality's approach, there is a substantial question whether the Court applied an incorrect legal standard in asking whether Mr. Shah proved he had sufficient funds to hire his counsel of choice. The Government's contrary argument (at 5-6) misreads the *Luis* plurality. Justice Breyer held that the Sixth Amendment protects a defendant's "opportunity to secure counsel of his own choice." *Luis*, 578 U.S. at 11 (citation omitted). When the Government unlawfully restrains assets that the defendant would have used to hire counsel, the Government necessarily constrains the defendant's choice of counsel, denying him that "fair opportunity." *Id.* Mr. Shah thus did not have to show that he had the precise amount needed to hire an attorney he had already identified. *See* R. 737 at 104:2-5 ("[T]he question is simply: Was the amount restrained enough to meaningfully restrict … the range of options that [Mr. Shah] had?").

The *Luis* plurality identified one limitation to its Sixth Amendment holding: In Justice Breyer's view, no Sixth Amendment violation occurs when a defendant does not actually "need[]" the restrained funds for legal representation. *Id.* at 10. That limitation follows from Justice Breyer's effort to balance the defendant's right to counsel of choice against the Government's desire to eventually seek "punishment" and "restitution." *Id.* at 19. Justice Breyer's limitation would apply, for example, where a defendant already has enough *unrestrained* money to hire his chosen attorney and resists the pretrial restraint to frustrate the Government's forfeiture efforts. But, as the Government agrees (at 5), that is not a relevant consideration here. Mr. Shah proved that the Government restrained millions in untainted assets and that this restraint clearly hampered his opportunity to choose his attorney. That is a straightforward violation under the *Luis* plurality.

The Government claims (at 6) that "[t]here is no evidence" that Mr. Shah would have hired someone other than Mr. Burck or Mr. Hueston with more funds. But the Government agrees (at 6) that "[Mr.] Burck … testified that one lawyer, James Bennett, expressed concern about taking [Mr. Shah's] case" because of lack of funds. The Government quibbles about the amount of money that Mr. Bennett believed Mr. Shah to have but does not dispute that Mr. Shah plainly interviewed counsel he would have "preferred," *Luis*, 578 U.S. at 12, before settling on Mr. Hueston.

More importantly, the Government does not dispute that there is a substantial question whether Mr. Shah had to meet such an onerous burden, instead of showing that the illegal restraint denied him a "fair opportunity" to hire counsel. *Id.* at 11. Under the Government's approach, to prove a violation of the Sixth Amendment, a defendant would have to interview attorneys he cannot afford, just to build a record on the off chance that a court may later determine that the Government restrained more than it should have. Nothing in *Luis* requires that, and the Government cites no case that does. *At minimum*, a substantial question exists about the nature of

3

the burden of proof for establishing a Sixth Amendment violation in this context.[1]

*Third*, even if Mr. Shah had to show that he would have had sufficient funds to hire Mr. Burck, Mr. Shah has raised a substantial question about whether he met that burden. There are substantial questions regarding: (1) the relevant time frame for liquidating assets; (2) the appropriate discount rate; and (3) whether the Court overstated the amount of traceable property.

Regarding the timeline, the Government argues that Mr. Shah set the June 30, 2020, end-date in his reply brief. Opp. 7 (citing R. 537 at 18). Not so. Mr. Shah simply argued that the Court should look to whether Mr. Shah had a need for additional funds as of June 30, 2020, when he was searching for Mr. Burck's replacement, rather than by looking at how much money Mr. Shah spent in 2022 (or later). R. 537 at 18. That argument does not mean Mr. Shah would have forgone an extension of the deadline for retaining counsel if he had assets to liquidate. Mot. 12.

The Government argues that if Mr. Shah's timeline for hiring counsel were extended past June 30, 2020, he would have had "substantial amounts of money" to hire any counsel he wished. That is a startling departure from the Government's argument that Mr. Shah did not have *enough* assets to hire Mr. Burck. In any event, Mr. Shah could not have simply replaced trial counsel shortly before trial. *See Chandler v. Fretag*, 348 U.S. 3, 10 (1954) ("a defendant must be given a reasonable opportunity to employ and consult with counsel").

Next, the Government doubles down on its speculation that Mr. Shah could not have sold his assets at a 10% discount. Opp. 8. The Government still provides no evidence to back up that claim. The Government also has no response to Mr. Shah's argument that the Court cannot

---

[1] The Government points out that *Luis* concerned a pre-trial challenge—but that is exactly the point. In the usual case, a defendant needs to show only that the Government improperly restrained his assets and, under the *Luis* plurality, that he plans to use those assets to hire counsel. *Luis* does not address a situation like Mr. Shah's, where the Government's years-long refusal to admit its over-restraint forced an after-the-fact hearing. And it certainly does not hold that Mr. Shah has the burden of proof. The Government is also wrong that the Sixth Amendment is violated only "where the government's restraint completely denie[s] the defendant her right to counsel." Opp. 6 n.1. The Sixth Amendment protects not just the right to counsel but the right to "counsel of choice." *Luis*, 578 U.S. at 18.

determine the liquidation value of the assets without evidence of an alternative discount rate. *See* Mot. 13. Nor does the Government dispute that there is no controlling authority addressing whether the Government should have borne the burden of establishing the liquidation value of the illegally restrained assets, much like the Government bears the burden of establishing the harmlessness of its trial errors. *See id.* In the absence of controlling authority, the Court's decision to place that burden on Mr. Shah raises a substantial question.

Finally, the Government does not dispute that there is an open question in this Circuit as to whether 18 U.S.C. § 981(a)(2)(C) requires a court to deduct repayment of the loan principal when determining the forfeitability of property traceable to a loan. Mot. 13-14. Had the Court allowed the deduction, it would have found that the Government improperly restrained substantially more than the Government acknowledges.

The Government tries to insulate this Court's conclusions by claiming plain error review will apply. But Mr. Shah has raised substantial questions about whether these claims were truly forfeited. The relevant Rule has no deadline or other barrier to raising the issue post-trial—particularly in this case, as Mr. Shah could not have conducted a meaningful tracing analysis until the Government revealed its tracing theory several weeks into trial. Mot. 14-16. Tellingly, the Government does not engage with the substance of these arguments.

Even if plain error applied, there remains a substantial question. The Government disputes the fourth factor of the plain-error test, whether the error seriously affected the fairness and integrity of the trial. The right to counsel of choice, however, is "the most precious right a defendant has." *Kaley v. United States*, 571 U.S. 320, 344 (2014) (Roberts, C.J., dissenting). "Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style

of witness examination and jury argument." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006). If the Government were right that effectiveness is determinative on plain-error review, deprivation of the right to counsel of choice would not be a *structural* error, contradicting decades of Supreme Court precedent. *See id*. at 146.

There is also a substantial question about whether structural errors require automatic reversal even on plain-error review. *See* Mot. 17 (collecting 2021–2023 cases). The Government does not challenge Mr. Shah's reading of recent cases; it simply cites *earlier* cases holding otherwise. But the Supreme Court's statement in *Greer v. United States* that "structural" errors like "denial of counsel of choice" are "subject to automatic reversal on appeal" because they "*necessarily* render a criminal trial fundamentally unfair" raises a substantial question about whether the Government's earlier precedent is inapt. 593 U.S. 503, 512-513 (2021) (cleaned up); *see United States v. Rodriguez-Santos*, 56 F.4th 206, 219 (1st Cir. 2022) (reading *Greer* to "clarify[] that plain error applies to unpreserved, non-structural constitutional errors").

## II. The Court's Fifth Amendment Analysis Raises Substantial Questions on Appeal

The Seventh Circuit will closely examine the substantial questions surrounding the Government's reliance on grand jury testimony that was "not accurate," R. 747 at 32, as well as its failure to correct that testimony during the three years before trial. Most critically, Mr. Shah has explained why precedent from analogous due process contexts shows that the Government's knowledge should be determined collectively rather than individually. The Government claims this "makes no sense," Opp. 10, but cites no case reaching its desired conclusion, and its reasoning is difficult to follow. The Government claims the collective-knowledge standard applies to Fifth Amendment claims under *Brady* and *Giglio* due to the informational advantage the Government has over defendants. Even accepting that questionable rationale, the same is true here. The Government is far better positioned to evaluate whether there are errors in its own representations

to a grand jury—where the defendant is not even permitted to be present—based on investigatory materials in its possession. As the creator of the relevant tracing analyses, author of the forfeiture allegations, and architect of its fraud theory, the Government plainly had an informational advantage over Mr. Shah.

It is also undisputed that the Government conducted tracing analyses for each of the assets before the indictment—another informational advantage—but did not provide the analyses to defense counsel until mid-trial. *See* R. 747 at 13. That means the Government knew by November 2019 that it had failed to trace the entirety of the assets it had restrained to criminal proceeds, but defense counsel did not know that until 2023. Mr. Shah's counsel were affirmatively misled by the Government's grand jury testimony to believe that it had done the necessary tracing to establish probable cause. In short, there are substantial legal questions whether the collective knowledge standard applies—and, tellingly, the Government does not argue it can prevail under that legal standard. *See* Opp. 10-11.

The Government glosses over *United States v. Mann*, 140 F. Supp. 3d 513 (E.D.N.C. 2015), where the court did just what Mr. Shah anticipates the Seventh Circuit will do: applied the collective knowledge standard to inaccurate grand jury testimony concerning the traceability of particular assets. The court observed, "Regardless of whether the agents testified to the best of their personal knowledge, the government has a 'collective knowledge' problem concerning traceability and forfeiture[.]" *Id.* at 538. The Government asserts that *Mann* ultimately held that the agents' false traceability testimony did not prejudice the defendant. *Id.* at 539. But this case could not be more different, given the direct link between the false traceability testimony and the illegal restraint that hindered Mr. Shah's ability to hire his counsel of choice.

The Government next argues that Ms. Poelking's inaccurate testimony did not influence

7

the grand jury's decision to indict Mr. Shah because it related to forfeiture and not the elements of the offenses. The applicable standard, however, is whether "there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Burke*, 425 F.3d 400, 412 (7th Cir. 2005). Ms. Poelking was the Government's tracing expert, and her testimony without question affected the grand jury's approval of the forfeiture allegations.

To be sure, "a mistake is different than misconduct," R. 747 at 40-41, but all that is required for Mr. Shah to establish a due process violation is "[t]he government's knowing use of false testimony, or failure to correct testimony"—not bad faith. *Burke*, 425 F.3d at 412; *see also Brady v. Maryland*, 373 U.S. 83, 87 (1963) (*Brady* violation occurs "irrespective of … good faith or bad faith"). As the Court observed, "[t]he government, *as a unit*, undoubtedly fell short." R. 747 at 40 (emphasis added). The Seventh Circuit may very well conclude that alone warrants a new trial.

### III. The Admission of Mr. Ketchum's, Mr. Ma's, and Mr. Desai's Grand Jury Statements Will Raise Substantial Questions on Appeal

Mr. Shah has likewise raised substantial questions about whether the Government's extensive use of grand jury statements to bolster its key witnesses' credibility warrants a new trial.

*First*, as to whether the statements were inadmissible under *United States v. Tome*, 513 U.S. 150 (1995), recent Seventh Circuit precedent confirms this question to be at least a close one. In *United States v. Echols*, 104 F.4th 1023 (7th Cir. 2024), a district court admitted as a prior consistent statement a witness's assertion to a federal agent that the defendant sent drugs to the witness's house. *Id.* at 1026. The defendant argued that the statement should not have been admitted under *Tome* because the witness provided the statement *after* learning of her boyfriend's involvement. *Id.* at 1027. The Seventh Circuit agreed that the defendant's "theory of a motive to fabricate seems at least plausible" and ruled that the statement "should not have been admitted" under *Tome*. *Id.*; *see* Mot. 22 (collecting similar cases).

8

There is no doubt that Mr. Shah's "theory of a motive to fabricate seems at least plausible" here as well. *Echols*, 104 F.4th at 1027. Mr. Ketchum and Mr. Ma both made statements to the grand jury *after* receiving "immunity grants" that required them to testify for the Government or face prosecution. *United States v. Nelson*, 39 F.3d 705, 709 (7th Cir. 1994). Mr. Desai, meanwhile, had already been charged with fraud and was actively seeking a plea deal when he testified to the grand jury, giving him every incentive to testify favorably to the Government. *See id.*; *United States v. Lewis*, 954 F.2d 1386, 1391 (7th Cir. 1992).

The Government does not address Mr. Ketchum's and Mr. Ma's plain motives to lie to the grand jury,[2] but it maintains that Mr. Desai had no improper motive because he had yet to accept a plea deal when he testified to the grand jury. *See* Opp. 13. This contradicts the Government's own argument in a similar case in this District just days ago. In *United States v. Mitziga*, the Government successfully opposed the admission of a prior statement made by the defendant to the Federal Bureau of Investigation. Resp. to Mot. to Admit Prior Consistent Statements at 6–7, *United States v. Mitziga*, No. 1:23-cr-00242 (N.D. Ill. Aug. 3, 2024), ECF No. 167. The Government argued that, "by the time of the interview," the "defendant knew" that "the FBI was investigating bribery allegations" involving two individuals the defendant had connected. *Id.* at 6. The Government argued that this provided the defendant with a motive to lie about his own involvement, rendering his statements inadmissible under *Tome*. *Id.*; *see also Mitziga*, ECF No. 170 (holding the statements were inadmissible). The Government cannot contend that the opposite is true where Mr. Desai not only had learned of an FBI investigation into the fraud at Outcome (as in *Mitziga*), but also was actively seeking a favorable plea deal when he testified. The

---

[2] The Government points out (Opp. 14) that defense counsel questioned Mr. Ketchum about his receipt of statutory immunity immediately before he testified at trial, but this only confirms that immunity was the key credibility issue and, therefore, that *Tome* precluded admitting the grand-jury statements.

9

Government's shifting positions at least demonstrate this is a substantial question that "could readily go either way." *United States v. Greenberg*, 772 F.2d 340, 341 (7th Cir. 1985).

The Government incorrectly claims that Mr. Ketchum and Mr. Ma were primarily attacked on grounds other than their motives to lie. But the core defense theory of these witnesses' credibility focused on their efforts to secure favorable treatment from the Government, giving them every reason to misrepresent Mr. Shah's role and lie about their own roles. Defense counsel's primary line of questioning bears this out. *See* Trial Tr. 1178-85, 1189-1218, 2554-55, 3015-16. But even if the Court disagrees, the Seventh Circuit has yet to address whether *Tome*'s pre-motive requirement "applies to Rule 801(d)(1)(B)(ii) as it unequivocally does to Rule 801(d)(1)(B)(i)." *United States v. Davis*, 896 F.3d 784, 789 (7th Cir. 2018). Because Mr. Ketchum's and Mr. Ma's statements were admitted under both subsections, this unsettled law underscores the substantial question of whether the statements' admission violated *Tome*. *See United States v. Portillo*, 969 F.3d 144, 175-176 (5th Cir. 2020) (declining to permit an "end-run around the [*Tome*] limitation").

*Second*, the Government cites no precedent supporting the claim that the near-wholesale admission of the grand jury statements was both proper and harmless. *See* Opp. 12-14. Instead, it restates the Court's reasons for admitting the grand jury statements nearly in full, without substantively addressing the caselaw requiring the tailoring of prior consistent statements. *See* Mot. 26 (collecting cases). Moreover, the grand jury statements were drafted by the Government, came from its three key witnesses, and concerned the issues most central to this case, demonstrating the challenge facing the Government in proving harmlessness. *See United States v. Collicott*, 92 F.3d 973, 979, 984 (9th Cir. 1996) (granting a new trial because the Government's introduction of "an entire conversation" amounted to "overkill [that] went to the heart of the case").

## CONCLUSION

For these reasons, the Court should grant Mr. Shah's motion for bail pending appeal.

10

Dated: August 14, 2024    Respectfully submitted,

                                                BRYAN CAVE LEIGHTON PAISNER LLP

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
*richard.finneran@bryancave.com*

*Attorneys for Defendant Rishi Shah*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served upon all counsel of record by operation of the Court's electronic filing system.

*/s/ Richard E. Finneran*

RICHARD E. FINNERAN