UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 19 CR 864-4 |
| v. ) | Judge Thomas M. Durkin |
| ) | |
| ASHIK DESAI ) | |

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

Ashik Desai began working at Outcome Health as an intern at the age of 19. He was recruited there by co-defendant Rishi Shah, Outcome's co-founder and Chief Executive Officer. Desai idolized Shah as a professional and as a person. Thus, when Desai learned of the fraudulent practices that Shah and others implemented at Outcome, he willingly joined in and took part. In fact, he not only took steps to further these fraudulent practices, but also himself came up with new means and methods to conceal the numerous illegal acts taking place at Outcome. In this respect, Desai was an integral part of the massive fraud scheme charged in this case.

Desai's fraudulent actions were significant. Among other things, he:

- fraudulently inflated lists of doctor's offices that Outcome had in its network, so that Outcome's pharmaceutical clients believed that their advertisements would play in a greater number of desired offices, when as Desai knew, Outcome was selling inventory that it did not have;

- concealed Outcome's under-deliveries on its advertising campaigns from Outcome's accounting staff and an outside auditing firm;

- altered, and caused to be altered, return on investment ("ROI") reports created by third-party companies, and caused those altered ROIs to be provided to Outcome's pharmaceutical clients;

- signed false affidavits that were provided to pharmaceutical clients stating that their advertisements ran on the number of screens agreed to in their contracts.

The length and magnitude of the fraud, and the losses that it caused to pharmaceutical companies, lenders, and investors, is staggering. Thus, Desai's extensive involvement in a scheme of this scale certainly weighs in favor of a significant punishment.

However, there is much by way of mitigation as it relates to Desai. First and foremost is his decision to cooperate. Desai began cooperating with the government at an early stage in the investigation. As part of his cooperation, he testified before the Grand Jury, met with the government over a dozen of times, and testified against his co-defendants at the four-month trial in this case. As part of his trial testimony, Desai was cross examined for nearly two weeks, facing repeated and persistent baseless attacks on his credibility and assertions of an utterly nonsensical claim that he was the architect of a fraud scheme that began before he even worked at Outcome. In short, there is no question that Desai's cooperation was extraordinary.

Second, as noted above, Desai was only 19 years old when he began working at Outcome, and quickly fell under the spell of the charismatic Shah. Ultimately, Desai will have to answer for his own actions, but the record is clear that he and others would not be defendants in this case but for Shah's decision to operate Outcome as a criminal venture.

Third, unlike co-defendants Shah and Agrawal, Desai did not receive millions of dollars for his participation in the fraud. Instead, he received his salary, and never any equity in Outcome.

And last, Desai is now only 31 years old. As seen in the presentence investigation, he has taken significant steps during the pendency of this case to move himself past his unfortunate actions at Outcome. Notably, Desai works at an employer aware of the instant offense and supportive of him. He got a second chance at his job because of the hard work and character that he displayed. Significantly, as part of his job, Desai meets with interns to discuss his actions at

2

Outcome and the consequences that have resulted. He has actively questioned how he ended up where he is now, and how others can learn from his mistakes, which certainly makes him a good bet for rehabilitation.

The factors described above are difficult to weigh in a case involving a fraud scheme of the magnitude at issue here. Ultimately, the government believes the appropriate sentence the Court should impose is 60 days of imprisonment. Such a sentence will reflect the serious nature of the offense while also acknowledging the significant mitigation, most notably, Desai's cooperation.

I. **Factual Background**

During the time period relevant to this case, Outcome provided point-of-care advertising services to pharmaceutical companies. Outcome's business model was to place television screens, tablets and wallboards that displayed educational content into doctor's offices and then sell advertising space on those devices to pharmaceutical companies.

Shah founded Outcome in 2006, and co-defendant Shradha Agrawal soon joined him as a co-founder. Desai started as an intern during the summer of 2012, while he was still in college. He later accepted a job offer from Outcome in 2013, eventually becoming Vice President of Business Growth and Analytics. During his employment, Desai reported to Shah.

As Desai admitted in his plea agreement, he was involved in several aspects of the fraud at Outcome, including (1) list matches and deltas; (2) tablets; (3) concealment of the deltas from Outcome's accounting department and its outside auditor; (4) ROI reports, (5) false affidavits, and (6) fraud related to Outcome's capital raise.

**List Matches and Deltas**

One of Desai's responsibilities after he started in 2013 was to conduct list matches to support the process of contracting with Outcome's pharmaceutical clients. Specifically, when negotiating a new contract with Outcome, pharmaceutical clients typically gave Outcome's salespeople a list of doctor's offices in which they wanted their ads to play. Part of Desai's job was to take these lists and match them against the offices in Outcome's network. This process was called a "list match." Purdy, Outcome's Chief Operating Officer and later its Chief Financial Officer, and Individual B, performed list matches before Desai joined Outcome. After Desai joined, he performed list matches until approximately 2014, when Analyst A took over that responsibility under Desai's supervision.

Desai learned Outcome's list match methodology by observing Purdy and Individual B perform list matches and by watching the internal and external communications of Shah, Agarwal, Purdy and others regarding list matches and related issues. Desai then passed on what he learned to Analyst A. The methodology involved inflating the match by representing to clients that Outcome had in its network a higher number of doctor's offices on the clients' lists than Outcome actually had.

The result of the list match process was that Outcome sold inventory it did not have. This created a number of problems, including under-delivering on campaigns while still billing the clients as if Outcome had delivered in full. Outcome under-delivered in several ways: (1) Outcome did not run the ads on the contracted number of screens; and (2) even when Outcome was running ads on the contracted number of screens or even above the contracted number, Outcome oftentimes

was not running the ads in the correct offices, *i.e.*, the offices "matched" during the list match process.

Internally, Outcome referred to the difference between the contracted number of screens and the actual number of screens where Outcome was running the campaigns as the "delta" or the "gap." Despite these deltas or gaps, and despite also running ads in off-target offices, Outcome billed the clients at the contracted number of screens as if it had been delivering in full on the contracts.

**Tablets**

When Desai first started working at Outcome, Outcome was selling advertising space on TVs that it placed in waiting rooms. In approximately late 2013 or early 2014, Outcome introduced another product: tablets. Tablets were interactive iPad-like products that were placed in exam rooms. Outcome had numerous problems with the tablets, including particularly large deltas, but continued to bill clients as if Outcome delivered in full on its contracts.

Desai and others at Outcome, including Analyst A, sent some of the pharmaceutical clients regular reports regarding the patients' engagement with the Outcome tablets, including the number of clicks by patients. Desai and Analyst A inflated these numbers to conceal the deltas. One way that Desai inflated the tablet metrics was, using the data Outcome had for tablet metrics, to take the top 5% of the results, and then extrapolate these numbers for all the Outcome tablets in the campaign. By doing this, Outcome ignored 95% of the results that showed lower patient engagement with tablets. On occasions when Desai and Analyst A inflated the tablet metric numbers but did not use the 5% inflation method, they just made up the numbers as they saw fit.

Desai and Analyst A inflated the numbers heavily; sometimes the inflated number reported to the clients was more than 100 times the actual patient engagement numbers Outcome had.

**Concealment from Accounting and Outside Auditor**

Outcome hired the accounting firm Deloitte to audit its financial statements for the year 2015. As part of the 2015 audit, Deloitte tested whether Outcome delivered on its contracts by requesting data about some of its 2015 campaigns. Desai understood that the data request was a potential problem because Outcome had under-delivered on numerous 2015 campaigns, and Deloitte and the internal Outcome accounting team were not aware of the under-deliveries. Desai understood that if Outcome disclosed the under-deliveries to the internal accounting team and Deloitte, it would bring scrutiny and questions. Desai worried that if Outcome disclosed the under-deliveries to accounting and Deloitte, Outcome's clients would find out, which had the potential to cost Outcome millions of dollars as clients may have stopped working with Outcome.

During his time at Outcome, Desai learned that revenue could only be recognized when there is delivery. Because Outcome had under-delivered on a number of campaigns but billed the clients as if Outcome had delivered on the campaigns in full, disclosure of the deltas to accounting and Deloitte would have impacted the prior year's revenue. Likewise, if Outcome disclosed the deltas to clients, clients would demand refunds or make goods and Outcome would have to lower its prior year's revenue.

Desai asked Purdy for guidance on this issue. Desai and Purdy discussed how large of a delta Outcome could show to the Outcome accountants and Deloitte. Desai and Purdy decided that Outcome could only show deltas of less than 10%, and that for ad campaigns on Deloitte's list that had deltas of greater than 10%, Outcome would create a false list of offices by including offices

6

where the devices had not been installed or were currently uninstalled. The purpose of adding these uninstalled devices/offices to the list was to conceal the deltas from accounting and Deloitte. After these discussions with Purdy, for campaigns that had deltas of more than 10%, Desai told an analyst to add numerous device IDs of tablets or TVs to the lists for the auditors when in fact ads did not run on those devices. For the 2016 audit, which occurred in early 2017, Desai told analysts to do the same thing.

### **ROI Reports**

Outcome agreed to have third-party companies, including IMS Health, measure the performance of Outcome's advertising campaigns, through what are called return on investment, or "ROI" reports. Outcome then provided the information in the ROI reports to some of its clients.

The performance reports reflected some key numbers, including: (1) the number of offices or doctors where the Outcome ads ran; (2) the increase or decrease in prescriptions in those offices as compared to the similar offices where the ads did not run, which was referred to as the "lift" or "prescription lift;" and (3) the incremental revenue gained by the client based on the performance of Outcome's ad campaign, which was used to calculate the ROI.

When IMS completed the reports, an IMS employee typically sent them to Desai and/or another Outcome employee. Because Outcome had so many significant deltas on its ad campaigns, the results in the reports were often poor. Consequently, Desai altered the key numbers in the reports before the information was sent to clients. He did this to continue the concealment of under-deliveries from the clients, and to make it appear that Outcome had delivered in full on its ad campaigns and that the ad campaigns performed well. After getting the reports from IMS, Desai often altered, among other things, the number of offices or doctors from the number reflected in

the report—often lower than the contracted number due to the deltas—to the contracted number of offices/doctors to conceal the deltas and make it appear that Outcome delivered on the contract. Desai also inflated the prescription lift to make it appear that Outcome's ads were successful, and he changed the incremental revenue number to make it appear that the ad campaign drove a significant increase in revenue for the client that met or exceeded any contractual ROI guarantee. After changing the key numbers and shortening the number of slides, Desai sent the altered PowerPoint slides to the client, or sent them to another Outcome employee who he knew would send them to the client. Desai also sometimes presented the PowerPoint slides to clients.

### False Affidavits

Many clients required Outcome to provide some proof—such as affidavits—that Outcome ran their ads on the number of screens as agreed in the contracts. Outcome regularly sent false monthly affidavits to clients. They were false because Outcome had deltas on many ad campaigns, but in the affidavits, Outcome represented that the ads had run on the contracted number of screens, which concealed the deltas from the clients. The affidavits were typically sent to the client together with the monthly invoice for that particular campaign, billing the client for the number of screens set out in the contract. Starting in approximately 2014, Desai began signing many false affidavits. Later, others just affixed Desai's electronic signature to the affidavits. Before Desai first started signing affidavits in 2014, he saw prior affidavits Outcome had sent to clients and noticed that the affidavits reflected the contracted number of screens, even when he knew Outcome had not delivered on the contracted numbers.

**Capital Raise**

Desai played a minor role in the 2017 capital raise. During 2016 and 2017, Shah and Purdy met with numerous investors to raise capital for Outcome. Desai knew about Shah and Purdy's efforts to raise capital because, at the direction of either Shah or Purdy, Desai talked with some of the potential investors about Outcome's business and answered their questions. Desai knew that the potential investors had been provided with Outcome's financial information. Since Desai knew about Outcome's deltas and because he knew that the deltas had been concealed from clients and Deloitte, Desai knew that some of the financial information provided to investors, including revenue, was inflated.

**II.     The Advisory Sentencing Guidelines Range**

The government believes that the correct advisory Guidelines range calculation is set forth in Desai's plea agreement. However, in the PSR, the Probation Department considered and applied the Court's rulings on contested sentencing enhancement issues from the sentencings for the co-defendants in this case. Given the Court's prior rulings, the government has no intention of re-litigating those issues at Desai's sentencing. As such, set forth below is the Probation Department's calculation of Desai's advisory Guidelines:

| | |
|---|---|
| Base offense level (U.S.S.G. § 2B1.1(a)(1)) | 7 |
| Loss of more than $9.5 million but less than $25 million (U.S.S.G. § 2B1.1(b)(1)(K)) | 20 |
| Ten or more victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)) | 2 |
| Zero-point offender reduction (U.S.S.G. § 4C1.1(a)) | -2 |
| Acceptance of responsibility | -3 |

| | |
|---|---|
| **Total** | **24** |

With an adjusted offense level of 24, and no criminal history points, the Probation Department calculates defendant's advisory Sentencing Guidelines range as 51 to 63 months' imprisonment.

**III.     Application of § 3553(a) Factors**

As part of the sentencing process, the Court is to consider the factors set forth in 18 U.S.C. § 3553(a), and impose a sentence that is sufficient, but not more than necessary, to achieve the goals of sentencing. The relevant § 3553(a) factors in this case include: (1) the nature and circumstances of the offense; (2) defendant's history and characteristics; (3) the need to reflect the seriousness of the offense, to promote respect for the law, to afford adequate deterrence, and to provide just punishment for the offense; and (4) the need for restitution. The government submits that these factors weigh in favor of a sentence of 60 days of imprisonment.

**A.     The Nature of Defendant's Crimes Weigh in Favor of the Government's Recommended Sentence**

Desai was an integral part of the elaborate fraud scheme undertaken at Outcome. As detailed in other sentencing memorandums filed in this case, this was not a run-of-the-mill corporate fraud case where a corporate employee took advantage of a singular opportunity to reap extra profit from a small number of transactions, nor was it one of those cases where a small fly-by-night company was operating as the alter-ego of its fraudster owner. Instead, defendant assisted in a fraud scheme that was planned and orchestrated by the founder and chief executive officer of a legitimate and substantial (albeit relatively new) player in the point-of-care advertising industry. The scheme was designed to accelerate the company's growth through fraudulent sales, so that the founders and others could raise capital and cash out.

10

Desai's fraudulent acts undertaken as part of the scheme were significant and integral to the scheme's success. This was not a one-time lapse in judgment on his part, but an overall course of action he engaged in that was designed to deceive. Moreover, though Desai joined the scheme and undertook certain acts at Shah's direction, at times he took steps independent of Shah to make the fraud scheme succeed, which is certainly aggravating.

In mitigation, defendant was not the founder of the scheme, and instead joined the fraudulent conduct after it was already up and running at Outcome. Also, unlike Shah and Agrawal, he did not receive tens of millions of dollars because of the fraud, as he did not own any equity in Outcome.

Overall, the scale of the fraud at Outcome, defendant's role in it, and the resulting losses to victims make this a significant crime worthy of a substantial punishment, though defendant is plainly less culpable than those above him at Outcome, such as Shah.

**B.     Defendant's History and Characteristics Further Weigh in Favor of the Government's Recommended Sentence**

The PSR sets forth in detail defendant's history and characteristics, including aspects of defendant's employment, childhood, and family situation. Nothing in the PSR presents mitigating factors that even begin to explain why defendant chose to engage in the prolonged fraudulent conduct at issue. Defendant grew up in a stable, loving household, which afforded him with opportunities that most defendants who appear before the Court do not have. His family understood the importance of education, and defendant worked hard to obtain a degree from one of the best universities in the country. Given all of that, there were so many things that defendant could have done with his life other than fraud, which is an aggravating factor.

However, as noted, there is much by way of mitigation in defendant's case. First, Desai

11

provided extensive and beneficial cooperation to the government. His testimony at trial, which lasted at least three weeks, was incredibly helpful to the government. In addition, even apart from the cooperation, Desai took responsibility for his actions, showed true remorse, and asked himself hard questions about how he ended up straying so far from his own moral compass. This separates him greatly from his co-defendants, who showed little by way of responsibility, accountability, or remorse.

Furthermore, Desai did not receive anything other than his salary as a result of the offense. Though he was clearly misguided, it appears that Desai's conduct was based, at least in part, on his idolization of Shah, a charismatic individual who falsely portrayed himself as a successful tech entrepreneur. Desai's age likely played a role in this process, as he was 19 years old when he started at Outcome and in his twenties when he joined the fraudulent scheme.

Finally, Desai has taken significant steps to contribute to society after his illegal conduct. He is currently gainfully employed at a job and works with younger employees making himself a test case for what not to do in the corporate world. Between his cooperation, contrition, and steps to inform others about how little things that may seem insignificant can turn someone on a path toward fraud, Desai's history and characteristics weigh favorably for him and deserve significant consideration from the Court.

### C. The Government's Recommended Sentence Will Provide Adequate Deterrence to Others

The need to afford adequate deterrence to others is a critical part of the sentence to be imposed in this case for several reasons. First and foremost, Desai is the exact type of defendant who committed the exact type of crime where general deterrence matters. This case does not involve a crime of need or passion. Crimes of this nature can be deterred with punishment that

includes terms of incarceration. Other would-be defendants who are thinking about committing fraud will think twice if they believe their actions will have serious consequences. These consequences cannot simply be disgorgement of ill-gotten gains or the payment of fines. Instead, the consequences must include serious sentences of incarceration to be effective in deterring others.

In addition, corporate fraud can be difficult to detect and prove, and lucrative to the participants. Thus, it is important that sentences in this and other fraud cases serve to deter individuals from committing the same crime. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) ("endors[ing] the idea that white-collar criminals act rationally, calculating and comparing the risk and the rewards before deciding whether to engage in criminal activity. They are, therefore, prime candidates for general deterrence.") (internal quotation marks and citation omitted).

The government's recommended sentence balances the need for the sentence imposed to provide adequate deterrence through a sentence of incarceration but also takes into account defendant's substantial cooperation.

### D. Restitution

Restitution is mandatory in this case. The Court has currently scheduled a hearing on the restitution amount to be ordered against the defendants in this case. The issues decided at that hearing will affect the restitution amount as to defendant.

**IV.     Conclusion**

For the reasons stated above, the government respectfully asks that the Court sentence defendant to 60 days of imprisonment.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:     /s/ Jason A. Yonan
JASON A. YONAN
Assistant U.S. Attorney
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 353-0708

Dated: September 5, 2024