```
 1                  IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )   Case No. 19 CR 864-4
                                      )
 4            v.                      )
                                      )
 5   ASHIK DESAI,                     )   Chicago, Illinois
                                      )   September 19, 2024
 6                  Defendant.        )   10:02 a.m.

 7            TRANSCRIPT OF PROCEEDINGS - Sentencing
              BEFORE THE HONORABLE THOMAS M. DURKIN
 8
     APPEARANCES:
 9
     For the Government:     MR. MORRIS O. PASQUAL
10                           ACTING UNITED STATES ATTORNEY
                             BY:  MR. JASON YONAN
11                           219 South Dearborn Street, Suite 500
                             Chicago, Illinois 60604
12
                             UNITED STATES ATTORNEY'S OFFICE
13                           BY:  MR. KYLE C. HANKEY
                             Criminal Division, Fraud Section
14                           1400 New York Avenue NW
                             Washington, D.C. 20530
15

16   For the Defendant:      MONICO & SPEVACK
                             BY:  MS. JACQUELINE S. JACOBSON
17                           53 West Jackson Boulevard, Suite 1315
                             Chicago, Illinois 60604
18
     Also present:           MS. KELLY KWONG [U.S. Probation]
19

20   Court Reporter:         ELIA E. CARRIÓN, CSR, RPR, CRR, CRC
                             Official Court Reporter
21                           United States District Court
                             219 South Dearborn Street, Room 1432
22                           Chicago, Illinois 60604
                             312.408.7782
23                           Elia_Carrion@ilnd.uscourts.gov

24                       *   *   *   *   *
                    PROCEEDINGS REPORTED BY STENOTYPE
25         TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

1    (Proceedings heard in open court; defendant present:)

2         THE CLERK:  This is Case No. 19 CR 864, United States

3    v. Ashik Desai.

4         May I please ask the attorneys present on behalf of

5    the United States to state their names.

6         MR. YONAN:  Good morning, Your Honor.  Jason Yonan

7    and Kyle Hankey on behalf of the United States.

8         THE CLERK:  And on behalf of Mr. Desai.

9         MS. JACOBSON:  Good morning, Your Honor.

10   Jacqueline Jacobson on behalf of Mr. Desai.  And sitting with

11   me is Hannah Russell from our office, who is waiting for her

12   bar results.  So she is not formally representing him at this

13   point.

14        THE COURT:  All right.  Thank you.

15        THE CLERK:  And on behalf of the probation office,

16   please.

17        PROBATION OFFICER:  Good morning.  Kelly Kwong on

18   behalf of the probation office.

19        THE COURT:  All right.  We're here for sentencing.

20   Are the parties ready to proceed?

21        MR. YONAN:  The government is prepared to proceed,

22   Your Honor.

23        MS. JACOBSON:  Yes, Your Honor.

24        THE COURT:  Okay.  I have the following documents.  I

25   want to make sure I should have -- I have everything I should

1    have for the sentencing.

2              I have a presentence investigation report, I have a

3    recommendation from the probation office, I have a

4    government's position paper on sentencing factors, and I have

5    a defendant's sentencing submission.

6              The presentence report includes a version of the

7    offense by the defendant and also a mitigation report.  And

8    the defendant's sentencing submission beyond the argument

9    portion of the submission contains a number of letters from

10   friends, coworkers, and family.

11             Finally, I have a -- a document from a

12   Mr. Sean Patton that was filed under seal.

13             Is there anything else I should have?  First, from

14   the government?

15             MR. YONAN:  No, Your Honor.

16             THE COURT:  Defense?

17             MS. JACOBSON:  No, Your Honor.

18             THE COURT:  And probation?

19             PROBATION OFFICER:  Do you have a supplemental report

20   dated August 22, 2024?

21             THE COURT:  Not in front of me.  Is that -- that was

22   filed by the -- by you, Ms. Kwong.  Is that correct?

23             PROBATION OFFICER:  Not me personally.  Someone in my

24   office should've filed that.

25             THE COURT:  Okay.

1          PROBATION OFFICER:  Let me see if I can find a docket

2    number for Your Honor.

3          THE COURT:  Thank you.

4          MS. JACOBSON:  You know what?  I don't think I have

5    that either.

6          THE COURT:  What is contained on it?

7          PROBATION OFFICER:  Letter from Mr. Desai's

8    therapist.

9          THE COURT:  Oh, that is -- I have -- that was filed

10   under seal.

11         PROBATION OFFICER:  Okay.

12         THE COURT:  I have it as Document 874 --

13         PROBATION OFFICER:  Okay.

14         THE COURT:  -- from Mr. Patton -- or Mr. Patton,

15   rather.  Is that the --

16         PROBATION OFFICER:  No.  It was a supplemental report

17   filed by the probation office.

18         THE COURT:  Oh, that I did not see.

19         PROBATION OFFICER:  It is Docket Entry 864.  It's

20   just a mental health section --

21         THE COURT:  Okay.

22         PROBATION OFFICER:  -- paragraph.

23         THE COURT:  Emily, can you print that?

24         PROBATION OFFICER:  860.

25         THE COURT:  Okay.  Yeah, if you can print it, I'll

1    just look at it right now.  It's not lengthy.  Is that

2    correct?

3             PROBATION OFFICER:  I'm sorry?

4             THE COURT:  It's not lengthy?

5             PROBATION OFFICER:  I'm sorry, I --

6             THE COURT:  It's not lengthy?

7             MS. JACOBSON:  It's a paragraph, I think.

8             THE COURT:  It's two pages.

9             PROBATION OFFICER:  Yeah, yeah.  I'm sorry.

10            THE COURT:  Okay.  I'll read it --

11      (Indiscernible crosstalk.)

12            PROBATION OFFICER:  -- no.

13            THE COURT:  I'll read it right now rather than

14   recessing.

15            Oh, okay.

16            Well, in the meantime, while we're getting a copy of

17   that, does either side expect to call any witnesses or victims

18   in this case?  First, the government?

19            MR. YONAN:  No, Your Honor.

20            THE COURT:  Defense?

21            MS. JACOBSON:  No, Your Honor.

22            THE COURT:  All right.  And, Ms. Jacobson, have you

23   and your client read and discussed the presentence

24   investigation report and the recommendation of the probation

25   office and, finally, the supplemental document that the

1    probation officer has described?

2            MS. JACOBSON:  We have not seen the supplemental

3    document, but we have read the presentence report and the

4    sentencing recommendation.

5            THE COURT:  Okay.  Why don't we wait until I see a

6    copy of it.  I'll read it, and I'll hand it to you so you can

7    look it over.  If the government wants to see it, they can

8    also look at it.

9            MS. JACOBSON:  That would be great.  Thank you.

10           THE COURT:  Okay.

11           MS. JACOBSON:  Ms. Kwong showed me that it was

12   emailed to me.  It looks like it was my correct address.  I

13   just don't want to blame the probation office.  But for some

14   reason, I did not see it, so...

15           THE COURT:  Okay.  Well, it was docketed.  I'll get a

16   copy of it and -- did the government see it?

17           MR. YONAN:  We've seen the under seal materials.  I

18   don't know that I've seen this document, Judge.

19           THE COURT:  Okay.  Let me take a look and make sure

20   everyone else sees it and, most importantly, the defendant

21   sees it.

22           Okay.  This is just a -- basically a cover letter or

23   a cover supplemental report referring to the report of

24   Mr. Patton, which I have read.

25           But I'll ask, Emily, if you could share this with the

1    government and defense.

2         And it just refers to the actual report of

3    Mr. Patton, which I -- which I've read in full.  And make sure

4    your client sees it, too.

5         MS. JACOBSON:  Thank you.

6         THE COURT:  All right.  So with that, Mr. Desai, have

7    you read and discussed the presentence report and the

8    recommendation of the probation office with your attorney?

9         THE DEFENDANT:  Yes, Your Honor.

10        THE COURT:  Okay.  Are there any objections to the

11   presentence report?  First, from the government?

12        MR. YONAN:  No, Your Honor.

13        THE COURT:  And defense?

14        MS. JACOBSON:  No, Your Honor.

15        THE COURT:  All right.  Next thing I need to do is

16   calculate the guidelines in this case.  Obviously, the

17   guidelines that are contained in the plea agreement are --

18   have been superseded by findings I made at the sentencings of

19   Mr. Shah and Ms. Agarwal and Mr. Purdy as to loss amount.

20        So the total offense level in -- and I adopt the

21   findings I made at those -- at those hearings for purposes of

22   today because the loss amounts are really no different for

23   Mr. Desai for guideline purposes than they were for the other

24   three defendants.

25        So the total offense level is 24, criminal history

1    category of I, guideline range of 51 to 63 months; supervised

2    release period of 1 to 3 years, a fine of 20,000 to $200,000,

3    and a special assessment of $100.

4            Does the government agree with those guideline

5    calculations?

6            MR. YONAN:  We're not -- we believe the guidelines

7    were appropriately calculated in the plea agreement, but we

8    are not litigating that issue again.  It's already been

9    decided by the Court.

10           THE COURT:  Yeah.  It's more do you agree those

11   are -- in light of my findings from the other sentencings,

12   those are the correct guidelines for this defendant?

13           MR. YONAN:  We do, Your Honor, yes.

14           THE COURT:  All right.  And does defense agree with

15   these guideline calculations?

16           MS. JACOBSON:  Yes, we agree with them, Your Honor.

17           THE COURT:  All right.  Those will be the guideline

18   calculations for this case.

19           Are there any formal departure motions either side is

20   making?  First, the government?

21           MR. YONAN:  Your Honor, the government is making a 5K

22   motion based on substantial assistance that the defendant has

23   provided.

24           THE COURT:  Okay.  And any comment or response to

25   that by the defense?

1          MS. JACOBSON:  No, Your Honor.  We'll discuss

2    Mr. Desai's cooperation when we talk about the 3553(a) factors

3    also.

4          THE COURT:  All right.  Well, a 5K1.1 motion has

5    limited utility post-*Booker*, but it still is -- where there's

6    no mandatory minimum -- but it still is a recognition by the

7    government of a defendant's cooperation.  And to the extent I

8    need to grant such a motion to recognize that substantial

9    assistance, I do grant it.

10         And I believe your -- the plea agreement called for

11   you to make such a motion if you believe the defendant

12   provided truthful cooperation, including testimony at trial.

13         MR. YONAN:  That's correct, Your Honor.

14         THE COURT:  Okay.  So that motion is granted.

15         Okay.  And I'll consider other factors that might be

16   grounds for departure in determining -- that now are really

17   grounds for a variance in determining a reasonable sentence

18   under 18 U.S.C. § 3553(a).

19         So after calculating the guidelines and hearing the

20   departure motion by the government, I must now consider the

21   relevant factors set out by Congress at 18 U.S.C. § 3553(a)

22   and ensure that I impose a sentence sufficient, but not

23   greater than necessary, to comply with the purposes of

24   sentencing.  These purposes include the need for the sentence

25   to reflect the seriousness of the crime, to promote respect

1       for the law, and to provide just punishment for the offense.

2              The sentence should also deter criminal conduct,

3       protect the public from future crime by the defendant, and

4       promote rehabilitation.  In addition to the guidelines and

5       policy statements, I must consider the nature and

6       circumstances of the offense, the history and characteristics

7       of the defendant, the need to avoid unwarranted sentence

8       disparities among similarly situated defendants, and the types

9       of sentences available.

10             Does the government wish to argue about the

11      application of the factors set -- set forth in

12      Section 3553(a) --

13             MR. YONAN:  Yes, Your Honor.

14             THE COURT:  -- request a variance, or otherwise make

15      a sentencing recommendation?

16             MR. YONAN:  Yes, Your Honor.

17             THE COURT:  All right.  Proceed.

18             MR. YONAN:  May I --

19             THE COURT:  Yeah, you can go to the podium.

20             MR. YONAN:  Thank you, Your Honor.

21             I think it's difficult generally applying the 3553(a)

22      factors to a defendant, but I think it's particularly

23      difficult in a case like this one.  I think it's difficult

24      because, on the one hand, there is what I'll call a lot of

25      scheme aggravation.  This was a very large fraud scheme that

1 caused a significant amount of harm.  But at the same time, I

2 agree with a lot of what the defense has presented in terms of

3 mitigation.

4 Mr. Desai made a decision very early on to cooperate

5 in this matter.

6 THE COURT:  Where was he in the -- and I know you

7 weren't involved at the time -- maybe Mr. Hankey knows or the

8 case agent knows, but who cooperated first?

9 MR. YONAN:  He did.

10 THE COURT:  He did.

11 MR. YONAN:  Let me just confirm that.

12 THE COURT:  Yeah.  Because there's other people who

13 cooperated and testified.

14 MR. YONAN:  Without question, he was the first,

15 Your Honor.

16 THE COURT:  Okay.  Thank you.

17 MR. YONAN:  He was the first to cooperate.  And he

18 provided the most substantial cooperation as well.  So he was

19 the first, and I think he provided the most substantial

20 cooperation.

21 I'll talk more about his cooperation, but, you know,

22 there's -- there's more than that in here in terms of

23 mitigation.  He has shown what I think I would characterize as

24 an -- as an unusual amount of remorse for a defendant.  He's

25 very remorseful about his conduct.  And to his credit, he's

1   shown a willingness to ask himself hard questions about how he

2   ended up here and how he can help others by not ending up

3   here.

4          So those are difficult -- it's difficult to weigh the

5   mitigation against the aggravation here.  Ultimately, the

6   government recommendation is that a short time period of

7   incarceration is appropriate.  Our recommendation is 60 days,

8   but we do understand that it's a difficult task based on the

9   aggravation and the mitigation that's -- that's present in

10  this case.

11         THE COURT:  I was surprised by your recommendation.

12  Not surprised by its -- how high it was, but how low it was.

13         One of the things, defense, to give you a preview,

14  you can address is that I find aggravating is he got other

15  people involved.  Choi and Han have felonies on their records

16  now, and they were supervised by Mr. Desai.  Anybody that

17  works at that company -- it's not all the defendant's fault --

18  but anybody that works in that company has Outcome Health on

19  their résumé.  It's like having Enron on their résumé.  It's

20  going to be a stain on their career the rest of their lives, a

21  question that every potential employer is going to ask.

22         Then finally, Mr. Desai did a lot of things himself.

23  He certainly -- and I -- I'm sure I'll hear from defense about

24  this -- that Shah and Agarwal and Purdy were primary movers of

25  this.  But once Mr. Desai got in, he did things to deceive the

pharma companies and, ultimately, deceive borrowers and
lenders.  The trickle-down effect of the deceit to the pharma
companies was deceit to the borrowers and lenders who invested
hundreds of millions of dollars in this company.

Much of what he did was on his own.  He came up with
his own ways to fraudulently report ROI numbers, list matches,
signing affidavits falsely.  And that was, in some cases, not
even known, as far as I know, by the three defendants I've
already sentenced.

So maybe you could address that because I -- I --
candidly, I was surprised your recommendation was so low, even
in light of a substantial assistance.

MR. YONAN:  Sure.  I think you've adequately
explained some of the aggravation here.  This was a massive
fraud scheme in size, scale, and scope.  He willingly joined
the scheme.  That's an aggravating factor that you've
identified.  He tried to make it succeed, and he took acts
that were independent of his coconspirators.

And at least from Mr. Purdy, I think there was
evidence that he hid some of that from Mr. Purdy.  It was not
a one-time lapse in judgment.  And I think you've identified
this, Judge.  I -- I think certainly Mr. Desai is less
culpable than Mr. Shah and Ms. Agarwal, but he is more
culpable than others that have been charged in the case.  And
I do think that's an aggravating factor.

1      From the government's perspective, those are all

2  aggravating.  But we do think that there was -- is a

3  substantial amount of mitigation here, and that really has

4  played a large part in our sentence -- sentencing

5  recommendation.

6      The first is his cooperation, but that's not the only

7  mitigation.  And I'm going to start there.  His cooperation

8  from our perspective was outstanding and extraordinary.  He

9  was the first person to come in.  He met with the government

10  when we asked him to met.  He was truthful with the government

11  from day one.  He testified for an extraordinary long period

12  of time and was subjected to an extraordinary amount of

13  attacks, making it seem like he was the person who was

14  responsible for all of this.

15      I think you even mentioned this, Your Honor, in

16  aggravation at one of the other defendants' sentencings, that

17  the cross-examinations of Mr. Desai was an aggravating factor,

18  the notion that he was the -- the personal attacks on him, the

19  notion that he was the person sort of singly responsible for

20  this fraud that started before he even began there.

21      Obviously, the government found him credible when we

22  met with him over the course of the years when the government

23  was investigating and preparing for trial.  And -- and just as

24  importantly, the jury found him credible.  So I do think his

25  cooperation was extraordinary.  I do think it warrants a -- a

1   large departure variance from the guidelines, and I do think

2   it does have to be -- the government's recommendation has to

3   be also considered against the other sentences that were

4   imposed against other defendants in this case.  And I'll

5   specifically note Mr. Purdy, who got 24 months.

6            We have to -- we're measuring our recommendation

7   against what others are getting.  Mr. Purdy never accepted

8   responsibility for his conduct.  He went to trial.  Mr. Desai

9   did the opposite.  And we do think that there needs to be a

10  substantial difference from someone like Mr. Purdy as opposed

11  to Mr. Desai, who I think did everything you could reasonably

12  expect a defendant to do.  He cooperated; he showed remorse;

13  he's tried to make himself better.

14           So I do think that's part of the reason why we think

15  a 60-day sentence and not something higher is appropriate,

16  because --

17           THE COURT:  And not to -- well, I'm interrupting.

18  But I thought Mr. Purdy got 27 months.

19           MR. YONAN:  I apologize, Your Honor.  Maybe it was

20  27 months.

21           THE COURT:  All right.  And don't use Ms. Agarwal as

22  a barometer.  I clearly -- so it's absolutely clear on the

23  record, I thought it was at the time of her sentencing, I view

24  the gradations of culpability in this case as Mr. Shah, of

25  course, at the top; Ms. Agarwal in the middle; and Mr. Purdy

1    at the bottom of the three that went to trial.

2         The only reason Ms. Agarwal got the sentence she got

3    as opposed to a custodial sentence above Purdy's and below

4    Shah's is because of a ridiculous policy of the Bureau of

5    Prisons that would have resulted in Ms. Agarwal being placed

6    in a Level 1 or a Level 2 penitentiary where she stood a

7    significant risk of being extorted, blackmailed, or harmed.

8    Had she been eligible for a camp like other white-collar

9    criminals, Elizabeth Holmes, for one, I would have sentenced

10   her to a period of incarceration greater than Purdy and less

11   than Shah if I knew she was going to a camp.  Couldn't be

12   because she's a permanent resident, which is a -- well, I

13   spoke about what I thought about that policy at the Bureau of

14   Prisons.  Not your fault, not the government -- not the U.S.

15   attorney's fault, but a policy that I think was inflexible and

16   caused me to give her that sentence.

17        So don't -- she shouldn't be the barometer.  I know

18   you're -- I don't think you were intending to argue that, but

19   she shouldn't be the barometer of where Mr. Desai's sentence

20   should be.

21        MR. YONAN:  Understood, Your Honor.  I do think

22   Mr. Purdy's a better barometer, both in terms of culpability

23   and both in terms of the sentence you imposed.  And I think

24   there's a -- there's a huge divergence between those two.

25   Mr. Purdy went to trial.  If he expressed remorse at his

1      sentencing, I don't think he expressed it in any way, shape,

2      or form similarly to how Mr. Desai has done so.

3              So from -- the government is trying to weigh in its

4      recommendation the idea of all the things that Mr. Desai has

5      done.  And not only that, but also there is going to be

6      another Mr. Desai some day.  There's going to be another

7      Mr. Purdy some day.  And someone's going to ask themselves if

8      the government is up here recommending an 18-month sentence

9      for Mr. Desai and Mr. Purdy's getting 27, it might not be

10     worth it for them to cooperate.  It might not be worth it for

11     them to subject themselves to three weeks of name-calling by

12     defense attorneys who are saying that they're the person who's

13     responsible for this fraud when it was clearly up and running

14     by the time he had joined the company.

15             THE COURT:  Well, to be fair, the plea agreement

16     indicated that you wouldn't recommend more than ten years in

17     jail for Mr. Desai.

18             MR. YONAN:  Correct.

19             THE COURT:  The deal he had, as I under -- well, as I

20     know it was because it's in writing, was that defense could

21     recommend whatever they want.  You wouldn't recommend any more

22     than ten years.  So there was a -- a significant delta, to use

23     the term that's been used in this case by the Outcome people,

24     between the -- what at least he was looking at before he --

25     when he -- when the plea took place as to what he's -- you're

1   recommending now and what the defense is recommending.

2          MR. YONAN:  That -- that's correct.  The -- the plea

3   was open in terms of the government's recommendation.  The

4   only -- the only binding portion of that was that it would not

5   be more than ten years.

6          THE COURT:  Right.

7          MR. YONAN:  So there was a significant delta, that's

8   correct.

9          THE COURT:  Okay.

10         MR. YONAN:  So that's the cooperation, Judge.  And

11  that is, I think, a very significant factor because I think

12  the cooperation was very significant.

13         But I do think there are other things to discuss

14  about -- in mitigation about the defendant.  He was very young

15  at the time of the offense.  He's a very young man now.  I do

16  think that that's mitigating in some respect.

17         THE COURT:  They were all young.

18         MR. YONAN:  Agreed.

19         THE COURT:  From my perspective, they're all young.

20  But I think from any commonsense perspective, I know he was

21  young and significantly younger than -- well, younger than the

22  other three defendants that went to trial.

23         But they were all young in the world of business and

24  life.  And I -- younger, but not -- not an adolescent.  He was

25  an adult.  Go ahead.

1          MR. YONAN:  He did not come up with the scheme.  The

2   scheme was in -- in -- in effect at the time he -- he joined

3   the company.  The scheme was not designed to make him money.

4   It was designed to make other defendants money, Mr. --

5   Mr. Shah and Mr. Purdy.  Mr. Desai did not cash out as part of

6   the scheme.  He did not receive those funds as part of the

7   equity raise.

8          And I do -- I do want to talk about his -- his

9   postcharge conduct, because I do think it's significant.

10          THE COURT:  Before you get there, just on the -- I

11  know he had a salary, a very significant salary but certainly

12  nothing of the scale that Shah and Agarwal were making.

13          MR. YONAN:  No.

14          THE COURT:  But did he have a promise -- Mr. Hankey

15  may have to help remind you on this, or maybe you know it from

16  the record.  Wasn't there a promise of some kind, at least if

17  not explicit, an implicit promise that he would be part of the

18  success of Outcome financially as it grew?

19          MR. HANKEY:  Your Honor, I -- I don't recall there

20  being an explicit promise, but certainly, we would agree there

21  would have been an implicit promise, expectation that he's

22  part of the rise of Outcome, being a senior executive in the

23  company.

24          THE COURT:  All right.  Thank you.

25          Go ahead.

1          MR. YONAN:  With respect to his, I think, postcharge

2     conduct, I think he -- as mentioned, he's shown a very large

3     amount of remorse, as we would describe it, an unusual amount

4     of remorse for a defendant.  He's taken steps to ask himself

5     how he ended up here.

6          And again, he provides a very interesting comparison

7     to Mr. Shah and Mr. Purdy even now.  Mr. Shah, who I would

8     describe as showing very little contrition and very little

9     remorse, provided himself as someone who is advising other

10    people in the entrepreneurial world, even now about the

11    right -- the things that you -- the right things to do and the

12    wrong things to do.  I ask myself how can he do that if he's

13    not really fully accepted responsibility for what he's done

14    here.

15          But compare that to Mr. Desai, who the company that

16    he works at now, he talks to the young people, the interns and

17    the externs or whatever the correct term is for them, and --

18    and presents himself as an example of what you should not do

19    and the consequences of what might happen if you do them.

20          I would submit that that is -- that's a -- that's a

21    very powerful mitigating factor.  And even now, he's

22    presenting himself as very much different from Mr. Shah and

23    Mr. Purdy because that's a real benefit to society when you

24    can -- you can go to young people in the business world and

25    say, this is what I did and look what I have -- look at where

1   I am because of that.  I think that's a very significant

2   factor.

3          I do think deterrence does have a role to play here,

4   a general deterrence.  I do not think that specific deterrence

5   is at play here.  I do not have any reason to think that

6   Mr. Desai is going to end up in any sort of legal trouble

7   again.

8          But I do think you do need to weigh general

9   deterrence.  But in the case of cooperators, general

10  deterrence kind of works in two ways.  First, there does need

11  to be a message that if you engage in this type of conduct,

12  you are going to face a -- potentially face a term of

13  imprisonment.  But the message also does need to be that

14  you're going to receive a benefit for the cooperation that you

15  provide.  So I do think deterrence does have a role to play,

16  but as I said at the beginning, Your Honor, these are

17  difficult factors to weigh in a case like this one.

18         The government's position is that a 60-day sentence

19  appropriately weighs all of these difficult 3553 act- --

20  factors in this case.  And I will just end on the note that

21  you should order restitution, Your Honor, to be determined at

22  a later date as part of the restitution hearing that is

23  ongoing.

24         THE COURT:  What did you -- I know the Han and Choi

25  cases are not in front of me at this moment, but they will be

1     soon.  What do you intend to recommend for those two

2     defendants?

3          MR. YONAN:  So we'll have to go through whatever --

4     we have to get through the approvals of the -- the office

5     approvals for something like that.  My expectation, Judge, and

6     I -- I can't be bound because I haven't gotten the approvals

7     from --

8          THE COURT:  I understand.  I'm not holding you to

9     these.

10          MR. YONAN:  I would -- I would suggest to my office

11     that we would recommend a sentence lower than we have --

12     recommending for Mr. Desai for those two defendants.

13          THE COURT:  All right.  What was your recommendation

14     for Mr. Purdy, if you recall?  Actually, I know it here.  I

15     have it in my notes.  I think you recommended 70 months.

16          So -- okay.  All right.  Thank you.

17          MR. YONAN:  Thank you, Your Honor.

18          THE COURT:  All right.  Does defense wish to argue

19     about the application of the factors set forth in

20     Section 3553(a), request a variance, or otherwise make a

21     sentencing recommendation?

22          MS. JACOBSON:  Thank you, Your Honor.  And I'll just

23     come up to the podium.

24          THE COURT:  All right, Ms. Jacobson.

25          MS. JACOBSON:  I think that we -- I -- I don't

1   disagree a lot with the government.  And they talked about

2   some of the mitigation that we presented.  I'm happy to

3   address some of the issues that you have surrounding the

4   conduct that you -- that you described as Ashik doing on his

5   own.

6           THE COURT:  Yes.

7           MS. JACOBSON:  I do think that we -- we do not

8   disagree with the government.  This was a very serious

9   offense.  Ashik has taken responsibility from very early on.

10  He went in to the government, and I think it could have been

11  very easy for him to say I was directed to do this.  I was

12  directed by Rishi.  I was directed to do this.  And he didn't.

13          And so I think that it -- he is -- his acceptance of

14  responsibility and his cooperation is extraordinary in that

15  regard, too, not just because he explained all these difficult

16  concepts.  And I mean, he was there 15 -- over 15 times,

17  standing up at a board; I was there with him; describing

18  things; going through Voxers.

19          But he also put him -- he made himself very

20  vulnerable very early on.  And he didn't have the support of

21  his family then because he hadn't talked to them about it yet.

22  He knew that he had to make this decision on his own, and he

23  made the right decision.

24          And I do think it is aggravating that Oliver Han and

25  Choi were brought into the fraud, just like I think it's

1   aggravating that Ashik was brought into this fraud as a young

2   person.  And I know that Ashik -- that his cooperation, that

3   he intended to mitigate the circumstances for Han and Choi,

4   that that is part of his cooperation.  Part of his coming in

5   and being very, very honest about everything he did would

6   allow mitigation for individuals with -- that were less

7   culpable in terms of the fraud.

8           THE COURT:  My -- my concern was -- and I understand

9   what you're saying on that.  My concern is that he got -- he

10  was their supervisor when -- on the ground when it was

11  happening.  And, like I said, they're all young.  So were Han

12  and Choi.

13          MS. JACOBSON:  They were all young.

14          THE COURT:  And, you know, they -- he supervised them

15  and their -- but for -- but for Shah, your client wouldn't be

16  here.  But for your client, Han and Choi won't be sentenced --

17  be sentenced and have guilt felony -- felonies on their record

18  and won't be sentenced in the next month or so.  And that's

19  the concern I have.

20          MS. JACOBSON:  And that is something that has lived

21  with Ashik for the last seven years.  That is something that

22  he has apologized for and feels tremendous remorse for.

23          I mean, we can -- I -- I want to go through the

24  factors, but I also understand that there were times -- and we

25  don't disagree, our plea agreement, everything -- where Ashik

1   ran with the ball.  But he was given the playbook before he

2   got -- when he got there.  So in terms of the things that he

3   came up with on his own, it's nuanced.

4          He observed early on how Rishi manipulated important

5   metrics to manipulate the ROI.  And that was where it came

6   from.  The false affidavits, they were signed before he got

7   there.  He started signing them later.

8          And there's no question that his conduct is terrible.

9   It's serious.  So I don't want to quibble with the conduct.

10  We agree with the government.  We've agreed -- he came in very

11  early on and admitted all that.  And he's confronted, as the

12  government mentioned, the worst parts of himself that allowed

13  him to sort of join in and do this.

14         And there is no excuse for his conduct, but we do

15  know that he wasn't motivated by greed.  We do know that he

16  wasn't motivated by a desire to break the law and that there

17  were other factors that contextualize his conduct that are

18  mitigating.  And I think those are important to look at.

19         But I'm going to go -- I'm sort of getting out of

20  order.

21         THE COURT:  All right.

22         MS. JACOBSON:  But so I do -- this has been a very

23  long journey for Ashik.  I don't think it's -- I don't know if

24  it's over.  We don't know what will happen.  But he has fought

25  very hard to get to this place where he is right now.

1    Sometimes it might look easy, but he has worked very hard in

2    therapy, with friends and family, with admitting to his

3    conduct at work.  And all these people that are here to

4    support him are here because of all the work he's done over

5    the last seven years.

6          We -- I believe that Ashik's cooperation was

7    extraordinary.  There's no question.  I think the government

8    agrees with that.  I -- unless you want me to speak to more

9    about his cooperation.

10          THE COURT:  I observed it.

11          MS. JACOBSON:  Yeah.

12          THE COURT:  And I -- I was here for the three weeks

13    he was on the stand and the 12 or whatever number of weeks the

14    trial was.  So I observed his cooperation firsthand.  I viewed

15    it as extraordinary, what -- I believe he fulfilled every

16    aspect of his requirement under the plea agreement.

17          And so I -- you can speak to it if you want, but I

18    have -- I -- I agree with the government's statement that

19    he --

20          MS. JACOBSON:  The only thing --

21          THE COURT:  Oh, go ahead.

22          MS. JACOBSON:  Oh, I'm sorry.  No, you go ahead.

23          THE COURT:  Well, I agree with the government's

24    statement, and perhaps it was yours, too, it was certainly in

25    your memo, that he didn't blame Shah for everything.  It could

1    have been easy to, you know, when there's two people in a

2    room, you know, instead of saying it's a joint idea, you just

3    say it's his idea if something happened.  And there's no

4    disagreeing evidence by way of emails or Voxers or text

5    messages.  You can blame Shah and Agarwal for all of it

6    instead of taking responsibility yourself.

7          Main cooperators do that because they think somehow

8    it's going to impress the sentencing judge to dump on everyone

9    else and take no responsibility.  And your client didn't do

10   that, to his credit.  And I thought he was truthful.  I -- you

11   know, in my own notes of things I want to say, I'm going to

12   say that.  So you can -- you can address his cooperation if

13   you want, but the point of having the same judge who observed

14   the -- the cooperator's testimony sentence that person is for

15   exactly the point you're raising.  I got to see what he did,

16   and I -- I credit it as truthful, complete cooperation.

17         MS. JACOBSON:  Oh, and then I'll move on to his

18   exceptional acceptance of responsibility and postoffense

19   rehabilitation.

20         The government has talked about how this is in sort

21   of a great contrast to the other trial defendants.  Obviously

22   they went to trial, that's their right.  But I do think that

23   his acceptance of responsibility is -- has been very, very

24   exceptional.

25         And I'm not -- not just talking about with the

1    government, but with the people who are here, the 58 letters

2    of many of the people that are here, his -- where he currently

3    works now, the entire executive team and the owner of the

4    company and the CEO are here to support Ashik.  And like I

5    said, I don't believe that would have been possible had he not

6    opened up and volunteered the information and said, I did

7    this, I'm not a victim, this wasn't negligence, this wasn't

8    someone else fault, this is me doing this.

9         And family, we know, will sometimes look at -- maybe

10   you're a kid -- I mean, Ashik was only 24 when I met him --

11   you say, this must have been somebody else's fault.  But Ashik

12   was there saying, no, no.  There are factors that contribute

13   to it, but I did this.  This was my problem, this was my

14   conduct, and it was criminal.

15        And I'll talk a little bit about how that plays --

16   that promotes general deterrence.  But I do think that is an

17   important distinction and something different in this case.

18        We can move into Ashik's history and characteristics,

19   which I think is remarkable.  We have 58 letters from every

20   stage of his life from people that have known him since he was

21   a little boy to people that know him now, people that went to

22   Northwestern, to Wharton, to every school that he's gone to.

23   And everyone has talked about Ashik, has written about Ashik

24   as compassionate, kind, inclusive, charitable.

25        And it goes back to way when he was a kid, when he

1    went to Nicaragua, even before that.  This is the kind of

2    person he is.  So I understand it's in sharp contrast to the

3    conduct that occurred at Outcome Health.

4         THE COURT:  Oddly, the letters I got for Shah,

5    Agarwal, and Purdy were similarly glowing.  You probably

6    couldn't see all of them, maybe you did, but I read them all,

7    just as I read these letters.  And this -- the whole thing is

8    a tragedy because the letters for every one of the defendants

9    in this case, and I expect the letters for Choi and Han, were

10   of people who have never had a brush with the law before, who

11   were well-educated, really in many ways outstanding examples

12   of what people should be in society.  And yet, here we have

13   Outcome Health and a billion-dollar fraud, with losses yet to

14   be determined for restitution, but in the many, many millions.

15        Maybe there's no answer to that.  But I -- I will

16   tell you, I was impressed by the letters.  I'll comment on

17   that when I make my own statements, but they were not unlike

18   many of the letters I received even for Mr. Shah.  And

19   certainly for Ms. Agarwal.

20        So go ahead.

21        MS. JACOBSON:  Except -- and I agree with you in

22   terms of the -- these are very good people.  But I think the

23   letters for Ashik differ.  And maybe, you know, he didn't go

24   to trial.  And I understand that that's their right, but the

25   letters differ in that Ashik admitted that he committed a

1    crime.

2         Ashik -- these -- these were not -- he didn't

3    victimize himself.  He didn't talk about negligence.  He

4    didn't talk about being too trustful.  And when somebody tried

5    to do that, when somebody said, oh, Ashik, you -- you could

6    blame it on this, he said no, I can't.  And he volunteered

7    information about his conduct to people.  And he's willing --

8    and this -- well, I'll save this for when I talk about

9    deterrence.

10        But I will say that -- and the other thing that makes

11   him different is he's confronted his conduct in therapy.  I

12   don't know what anyone else has done privately, but I do know

13   that he feels tremendous shame and tremendous remorse and --

14   and the -- and a desire to really understand what we all want

15   to understand, how did this happen.  You know, you see letters

16   from people that went to Northwestern that were in the medical

17   program with him and here today.  They're doctors.  They're

18   doctors.  And I -- and I -- and this goes into the history and

19   characteristics of the defense, but I truly believe that Ashik

20   would -- would be a surgeon today had he not met Rishi, had he

21   not met Brad Purdy through -- and then Rishi through Brad.

22        So it's -- it's -- to me, you're right, it is a

23   tragedy.  It's a tragedy for all of them.  But I think he

24   would have been a remarkable surgeon, and I think he's going

25   to try and he's -- what he's doing is taking all that good

1   that he wanted to do.  And for the last seven years and for

2   all the time before Outcome, he's been doing that.

3          The nature and circumstances of the offense, I'm -- I

4   don't disagree with the government at all or you about the

5   serious nature of the crime.  His participation in it was

6   integral.  There's no excuse.  But I do think -- and we

7   searched for an answer, how -- how did Ashik get here?

8          And his therapist, who you've read his letter and

9   part of the mitigation report, offers some context to why he's

10  here.  And that context is based on age, which you've said is

11  the same for everybody, but I understand that.  But also, it's

12  based on family dynamic, it's based on complicated factors of

13  wanting to please, a profound need to succeed and to please

14  others.  And whatever it is, it's never going to happen again,

15  number one, because he's confronted this therapy -- this

16  conduct in therapy.  And we know that it wasn't greed.  We

17  know that it wasn't avarice.  We know that it wasn't the sort

18  of typical trappings of white-collar crime.

19          THE COURT:  How about ambition?

20          MS. JACOBSON:  You know, I looked at that very

21  closely.  And I'm sure there is ambition because he's a very

22  smart person.  And when I met him, I was very impressed by who

23  he is, but I'm more impressed by his sense of compassion and

24  kindness.  It wasn't like, oh, this guy is going somewhere to

25  me.  This to me was someone who felt -- yes, I -- I think

1   everyone who goes to business school has -- or goes to college

2   or has -- or grows up in this environment has ambition, but I

3   remember -- I think his ambition was different.  It was sort

4   of -- it was permeated by this family dynamic which his sister

5   wrote about in the letter in the mitigating report about

6   having to succeed at everything and that anything less than an

7   A wasn't good.  And I'm not blaming anybody, but I think

8   ambition intertwines with that, so I don't think it's easy to

9   explain it through ambition.  I just -- I don't see that.

10         But I do think the factors that contributed, that

11   contextualize it are important to consider in mitigation.  And

12   I think the government did, and I thank them for that.

13         Moving on to specific deterrence, that's not an

14   issue -- I'm not going to talk about it unless you want me to.

15         THE COURT:  No, it's not an issue.  It's not an issue

16   for any of the defendants.  They're never going to be back in

17   court again.  Even Mr. Shah, I expect if his conviction's

18   affirmed, then he goes to jail and he gets out, he will never

19   be back in a courtroom again on a criminal matter.  I expect

20   the same for Ms. Agarwal, Mr. Purdy, your client, Choi, Han.

21   And I think that's the last of the people I have to sentence.

22         They never committed crimes before, and I don't

23   expect them to commit crimes in the future either because

24   they've learned their lesson or they'll never be put in a

25   position of trust in light of their convictions where they

1    could abuse it.  But either way, same for your client, I'm

2    never going to see him in a courtroom again other than a

3    motion for early termination of supervised release if he

4    follows the conditions of it.  But that's the -- no need to

5    address it.  I think I have addressed it right there.

6          MS. JACOBSON:  I do -- I will say -- I will add that

7    his extraordinary acceptance of responsibility is different

8    than the others, and I do think that bears on specific

9    deterrence, from what I've seen.  Someone who cooperates and

10   accepts responsibility has confronted their conduct, is no

11   longer sort of this yes-man.  He's become his own person.

12   He's not under -- you know, I think the government talked

13   about this in their closing and their rebuttal, he's no longer

14   under the thumb of Rishi.

15         I think all those things do contribute also to

16   specific deterrence, and I think those are unique to him.  But

17   I agree, I don't -- you know, I don't have any reason to

18   believe the others will be here.

19         Regarding general deterrence, I think there's two

20   aspects of general deterrence -- or, well, respect for the law

21   and general deterrence.

22         I'll start with respect for the law.  And I'm going

23   to -- the probation office, who did a very thorough

24   investigation, recommended one day time considered served and

25   super- -- three years of supervised release.  And that's the

1  sentence we've asked -- we've asked for.

2  I do think that sentence supports general deterrence

3  and respect for the law.  And respect for the law in that it

4  does, as the government has talked about, incentivize

5  individuals to cooperate, even if it's difficult, even if it's

6  cooperating against people you thought you were friends, even

7  if it means spending three weeks on the stand, even if it's

8  seven years of your life.  And if you have to do that, I think

9  it incentivizes people to do that.  Probation recognized this

10  as a reason for recommending that sentence, and I think that's

11  accurate.

12  The other thing, general deterrence, is that the

13  government in their memo says that Ashik is the type of

14  defendant and this is the type of crime that basically can be

15  deterred.  Now, they're -- they're -- in support of their

16  recommended sentence.  I think I agree with them.

17  But jail time, as we know and the Supreme Court has

18  ruled on this, is not the only deterrent.  And here, we have

19  real-life experience of the deterrent effect of Ashik's

20  discussions with other people, his letters where people would

21  try and blame somebody else and he'd say, no, I did this.  And

22  we have his discussions with the young interns at the company

23  that everyone is here supporting him at.  And the hope to

24  formalize this process -- to formalize this process through

25  maybe Indiana University, is my understanding -- to formalize

1   this process where he meets with young people and discusses

2   his conduct.  And not -- you know, not in sort of flowery

3   terms.  I -- I'm a felon.  I committed a crime.  The

4   fake-it-till-you-make-it scenario, it doesn't work.

5        And I think it's interesting -- and I just -- I have

6   a copy of this, but I have sort of handwriting all over it.

7   On Monday, September 16th, the U.S. Attorney's Office in

8   Chicago announced an individual self-disclosure pilot program.

9   It's a six-month program that's geared toward individuals who

10   have participated in and have knowledge of criminal wrongdoing

11   by virtue of their employment.

12        And I couldn't think of anything more relevant than

13   for Ashik to incorporate in any discussions he has with

14   individuals.  This program is offering to individuals who come

15   on, depending on a number of factors, I'm sure, pretrial

16   diversion and -- and other sentences.  But it's obviously not

17   violence, terrorism, sex offense.  I mean, it -- it really is

18   targeting the kind of conduct we're talking about here and the

19   kind of individuals that are similarly situated to Ashik.

20        And those are the people that Ashik is targeting with

21   his discussions.  So I do think that general deterrence is

22   served in this case without a sentence of incarceration, with

23   a sentence of probation's recommended sentence.

24        Well, in -- when you take all these factors together

25   that we've -- I think his cooperation alone was -- was

1  extraordinary.  And in this district, we have seen sentences

2  of nonincarceration for cooperators in very serious cases.  So

3  I don't think it's an outlier.  And I also -- but I will say

4  that in addition to his extraordinary cooperation and his

5  postoffense rehabilitation and his exemplary acceptance of

6  responsibility, that the other 3553 factors support a sentence

7  of one day time served with three years of supervised release,

8  which would include all the conditions recommended by

9  probation in addition to any other conditions that the Court

10 would think of.

11         But I -- my hope is that Ashik is allowed to continue

12 down this path uninterrupted, this path that he's been on for

13 seven years.  And in -- and if he's allowed to do that, if

14 he's given this second chance by the Court, he'll continue to

15 be a productive member of society.  And not only that, he'll

16 continue his charitable work, but -- the kind things that he

17 does for other people, and he will work to make sure that

18 other individuals like him are able to walk away and say, it's

19 not worth it.

20         Thank you.

21         THE COURT:  Thank you.

22         All right.  Mr. Desai, you have a right to make a

23 statement on your own behalf.  I won't penalize you if you

24 don't, but if you wish to make a statement, this is your

25 opportunity to do so.  Do you want to make a statement?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  All right.  You can come up here if you

3     like, or you can stay there, whatever you're more comfortable

4     doing.

5          MS. JACOBSON:  Can I stand -- do you mind if I stand

6     there?

7          THE COURT:  You may.  Sure.

8          MS. JACOBSON:  Thank you.

9          THE DEFENDANT:  I committed a serious -- I committed

10    a serious crime when I was at Outcome Health.  What I did was

11    wrong and illegal.  There is and was no excuse for my conduct.

12    I will feel shame and remorse about my actions for the rest of

13    my life.

14          I apologize to the Court and to the government.  I

15    apologize to the pharmaceutical companies, lenders, and

16    investors for the harm that I caused them.

17          I apologize to the members of my team that assisted

18    me in the fraud.  This case will impact their professional and

19    personal lives forever.  I hope that my truthful explanation

20    about my role in the fraud provides them mitigation before

21    this Court.

22          I will also apologize to all of the other employees

23    impacted by my actions and the corrupt culture at Outcome.  I

24    apologize to my family, friends, and work colleagues for the

25    anxiety, pain, and public shame that I've caused them.  I

1    don't think I could've made it over the last seven years

2    without the love and compassion that a lot of people in this

3    room today have shown me, especially my wife, Neha, my

4    parents, my in-laws, my sister, my sister-in-law, and my

5    brother-in-law, and most especially my boss, Andrea.  They've

6    shown through words and actions that they believe in me and --

7    and that I am worthy of a second chance.  They're all here

8    today, and I'll be grateful to them forever.

9         I'm grateful for the government for allowing me the

10   opportunity to publicly own up to my conduct and cooperate in

11   this case.  I believe that this path and confronting my

12   actions in therapy and publicly have allowed me to make some

13   positive changes over the last seven years.

14        I will continue to make amends for my conduct

15   every day.  I know there's a lot more I can give to my family

16   and to the community.  I hope that my open discussions about

17   my criminal conduct with family, friends, work colleagues, and

18   students will help them do the right thing if they're ever

19   faced with a situation like I was in.  I hope that my

20   discussions give them the strength to walk away or confront

21   unethical or illegal behavior.

22        I ask the Court for a second chance so I can start a

23   family with my wife, Neha, who has stood by me this entire

24   time.  I hope and want to keep working at VMS so I can pay

25   restitution and remain productive and continue to remain

1  committed to volunteering at nonprofits and community

2  organizations and to share the truth about my conduct and this

3  case with anyone who will listen, particularly in the business

4  community and with younger students who are just starting

5  their careers.  I promise I will not disappoint the Court or

6  anyone again.

7          THE COURT:  Thank you.

8          THE DEFENDANT:  Thank you.

9          THE COURT:  All right.  The first thing I do when I

10  impose a sentence is deal with the supervised release portions

11  of the sentence.  In this case, the recommended period of

12  supervised release is three years.  I'm going to impose three

13  years.  I believe it's appropriate.

14          There's going to be a significant amount of

15  restitution owed in this case.  And I'm not going to impose a

16  fine because any monies that are recovered from Mr. Desai that

17  are allowable under whatever my findings are ultimately on

18  restitution should go to restitution and not to a general

19  government fund.

20          But I will impose a period of three years' supervised

21  release so that the administration of the restitution payments

22  takes place under some type of supervision by the probation

23  office and also to make sure that Mr. Desai has the support of

24  the probation office during that period and that he -- they

25  monitor his conduct to make sure that the conditions of

1    supervised release have been met.

2         Are there any conditions of supervised release you're

3    objecting to, Ms. Jacobson?

4         MS. JACOBSON:  No, Your Honor.

5         THE COURT:  All right.  Now, I -- I can either read

6    the conditions or you can waive their reading.

7         MS. JACOBSON:  I'll waive their reading.

8         THE COURT:  All right.  And the defendant's seen the

9    presentence report with the conditions.  So I'm going to

10   impose all those period -- all those conditions of supervised

11   release.

12        MR. YONAN:  Your Honor, may I just raise one

13   condition?  And I'm sorry I'm --

14        THE COURT:  Sure.

15        MR. YONAN:  -- just recognizing this now.

16        THE COURT:  Yes.

17        MR. YONAN:  Condition 14 restricts his -- restricts

18   Mr. Desai to the Northern District of Illinois.  I don't know

19   that he's actually a resident of the -- of this district any

20   longer, so I just wanted to flag that one.

21        MS. JACOBSON:  You know -- thank you.  I flagged that

22   with Ms. Kwong, and she explained to me that that is just sort

23   of typical language.  And once he -- whatever district he

24   gets -- he's supervised in will --

25        Do you want to explain it better?

1          PROBATION OFFICER:  Yeah.  Your Honor --

2          MS. JACOBSON:  You explain it better than me.

3          PROBATION OFFICER:  Thanks.

4          That first sentence reads that "You shall not

5     knowingly leave from the federal judicial district where you

6     are being supervised unless granted permission to leave by --

7     by the Court or probation officer."

8          All the counties listed towards the end of that is

9     for informational purposes within the Northern District of

10    Illinois.  So that condition doesn't actually restrict

11    Mr. Desai's supervision to Illinois.  It is to whatever

12    federal judicial district he will be released to.

13         THE COURT:  Okay.  That's my understanding too.  So

14    with that clarification, is there any objection to that

15    condition?

16         MR. YONAN:  No, Your Honor.  Thank you.

17         THE COURT:  Okay.  Well, and -- and you do waive the

18    reading?

19         MS. JACOBSON:  I do waive the reading, yes,

20    Your Honor.

21         THE COURT:  All right.  Then they'll all be imposed

22    as recommended by the probation office.

23         That leads to the most important part of any

24    sentencing, which is the issue of incarceration.

25         In aggravation, the defendant is well-educated, went

1   to a boarding school for high school, got a degree from

2   Northwestern, a few credits short of an MBA at Wharton.  He

3   has an excellent family background.  His parents loved him and

4   raised him where he wanted -- he wanted for nothing.

5           Why would that be aggravating?  Why would I list that

6   under the aggravating circumstances?  Because most of the

7   cases I have have nobody sitting out there.  It's kids from

8   the West Side and the South Side of Chicago who come in here

9   possessing a firearm when they're a felon or being caught up

10  in gang problems or some type of drug offenses.  And I've said

11  this to them when they come in, it's almost inevitable they

12  end up in front of me.  They don't have two parents -- they

13  don't have two parents, and most of them don't have one parent

14  caring for them.  Most of the parents, if they do have someone

15  around, suffers from some type of mental illness or addiction

16  of some kind.  And the parents that raise them -- you know,

17  many times one of the parents is not even in the picture, but

18  then the parent that is in the picture is caring for a large

19  number of kids in horrific circumstances where they live in

20  poverty, schools that don't perform as well as they should,

21  gangs at every corner, and dysfunction at every level.

22          You had the opposite.  So when -- I see many

23  defendants where they have all those disadvantages that they

24  didn't ask for them, they weren't born -- you know, when they

25  were born, they didn't ask to grow up in a poverty-stricken

1    neighborhood like the West Side or the South Side or grow up

2    where a father or a mother is gone right after they're born or

3    that the one who is remaining has mental illness or

4    addictions.  They didn't ask to be sexually abused, physically

5    abused, emotionally abused.  That's a lot of the defendants I

6    see.

7          And, you know, everyone's born innocent.  And they

8    just got dealt a bad hand.  You got dealt a very good hand.

9    You have loving parents, a loving family, your siblings,

10   friends here, friends that wrote letters that aren't here.  So

11   I view it as an aggravating factor that despite all those

12   advantages, you still engaged in a fraud that took place over

13   many years.

14         So that's why I want to explain a good family

15   background sometimes is an aggravating factor when you compare

16   it to the vast majority of defendants I have where I sentence

17   them in a -- in a courtroom that's empty except for the

18   prosecutor and their own attorney and the probation officer.

19         I noted this earlier and I still view it as an

20   aggravating factor, you got other people involved who, but for

21   you, would not have been facing jail like Choi and Han are and

22   the stigma that other people in that group will face.  The

23   ones that had to come in and testify, Ma, Ketchum -- although

24   the involvement with you and Ketchum is not the same as with

25   Choi and Han -- but everyone who touched this company is now

1 stained.

2 And people you supervised did not have to really

3 engage in this and -- and ended up engaging in this, in part,

4 just like you did because Shah started this and you followed

5 the lead. In many ways, Choi and Han wouldn't be -- wouldn't

6 have felonies on their record right now but for you. I

7 believe that.

8 This happened over a six-year period, not a one-time

9 lapse of judgment. It was almost daily lapses of judgment.

10 Not every waking moment was spent committing fraud, but a lot

11 of waking moments were.

12 And I -- another aggravating factor I've noted

13 already is you didn't just fall in line and act fraudulently

14 because the three defendants that went to trial told you to do

15 it. You embraced it and did a lot more of it on your own.

16 Some of the ways to deceive the pharma companies were entirely

17 your actions. So these are all aggravating factors.

18 In mitigation, there is much to discuss. No prior

19 criminal record, of course. The biggest mitigating factor is

20 your cooperation. Your testimony is a huge part of the

21 government's case, not the only part but a huge part of it.

22 Certainly from the defense point of view, they told the jury

23 if you don't believe Mr. Desai, then the defendants should be

24 found not guilty. The jury believed you, as did I.

25 Your version of the offense that's attached to the

1    presentence report was very impressive.  You recognized your

2    criminality, made no lame excuses that I see so many times

3    from defendants where they rationalize their conduct, trying

4    to excuse it by blaming other people, blame the world, blame

5    society for their own lapses.  You didn't do any of that.

6    You -- you owned up to it, and that's a mitigating factor.

7             You pled guilty knowing -- despite knowing that you

8    were looking at potentially up to ten years in jail, a

9    recommendation of the government.  You didn't know at the time

10   you pled guilty that I'd make loss findings that significantly

11   lowered the guideline range.  You didn't know at the time you

12   pled guilty that your sentence would be on a scale that starts

13   with Shah and went downward.  You pled guilty thinking you

14   could possibly go to jail for ten years, and that's a -- and

15   really probably until you saw Shah's sentence, you didn't know

16   what would happen.  So I think that's a -- a mitigating factor

17   that you did that.

18            The conduct occurred with you over seven years ago.

19   That's a long time.  I -- I know this from representing

20   criminal defendants myself when I was in private practice.

21   The weight of knowing the sword of Damocles is going to hang

22   over you.  Some day was going to be this day.  And waiting for

23   seven years for that day weighs on a person.  It's always in

24   the back of your mind.  It's always -- I think someone

25   referred to it as the third person in a room in one of the

1   letters and one of the descriptions.  And it is.  And that's a

2   very telling and very difficult thing to deal with over a long

3   period of time.

4          You're working now at VMS.  Your impressing everyone

5   you work with shows you can work lawfully.  And you're doing

6   your best to make right the wrongs you did by advising younger

7   people that, don't make the same mistakes I did.  So that's a

8   mitigating factor.

9          You started at this company when you were very young.

10  A mitigating factor.  But you're an adult.  I hear arguments

11  about, you know, undeveloped frontal lobes of the brain and --

12  affecting judgment.  That's not this case, in my mind.

13  Although you were young and impressionable, everybody in this

14  case was young.  And that's a tragedy because why would people

15  invest a billion dollars or close to a billion dollars in a

16  company with such young people running it?  It's because

17  you're all well-educated, you're all impressive, you're all

18  persuasive.  And those are wonderful traits to have as a human

19  being if they're used for good.  If they're used for bad,

20  they're dangerous traits.

21         You -- you talked JPMorgan Chase and Goldman, two of

22  the most sophisticated companies in the world -- not you

23  individually, but you and the -- the -- the defendants that

24  went to trial talked them into parting with hundreds of

25  millions of dollars because the -- because of the impressive

1    nature of the education and persuasiveness all of you had.

2         So certainly it's everyone started at this young, but

3    you had powerful tools of persuasion that were misused.  And I

4    say you in the collective sense, not just you.  You weren't

5    dealing directly with the people that -- the founders who were

6    trying to raise the money, but the pharma companies got

7    fooled.  And we're not talking about, you know, a corner

8    drugstore.  Major large pharma companies:  Pfizer, Abbott,

9    Boehringer, to name a few, and the advertising agencies that

10   they hired all got fooled.  So young is a bit of a defense,

11   but not much in my mind.

12        You were paid a healthy salary.  You weren't getting

13   a piece of the action like Agarwal and Shah were on -- if this

14   company went public, but you were getting a very healthy

15   salary that exceeds the salary of probably 90 or 95 percent of

16   all Americans.  So you were well paid for what you did.  And I

17   don't doubt in my own mind that you thought at some point in

18   the future you would share in the same riches that Shah and

19   Agarwal were attempting to get.

20        The letters from your family and friends were

21   extremely impressive.  I read them all.  They portray a side

22   of you that I -- I don't doubt.  You're -- you're a caring

23   person, an intelligent person, a thoughtful person.  And I

24   thought -- I agree with Ms. Jacobson that unlike many of

25   the -- some of the letters where -- I get where some people

1  say, I don't know how my little Johnny could have possibly

2  done this, the jury got it wrong, those aren't really

3  impressive letters.  Or letters saying I don't know the

4  defendant, but I know his parents from the country club, those

5  aren't really impressive letters.  These are people who wrote

6  who know you, knew you all your life; and every one of them

7  said that you fessed up and admitted to them that you did

8  wrong.  That had to be painful, had to be difficult.  And I

9  find that to be a mitigating factor.

10        Your own statement, the one you made in court, doing

11 it in front of all these people to admit your criminality, all

12 the people you love, all the people who respect you, to do

13 that had to be difficult.  And I thought the statement you

14 made that was attached to the presentence report was

15 comprehensive and impressive in the sense that you summarized

16 pretty clearly what you did and didn't sugarcoat it.

17        You were -- I took part in the fraud with Rishi,

18 Shradha, and Brad.  We sold offices, screens, and devices to

19 pharma clients that the company did not have in its inventory.

20 We lied to clients and overbilled them for inventory that did

21 not exist.  This fraud led to a host of issues throughout the

22 advertising campaigns that could've exposed the fraud.  And to

23 prevent this from happening, we falsified affidavits, inflated

24 metrics, manipulated performance reports, and lied to auditors

25 and investors.  And you knew this within days of joining

1    Outcome as a full-time employee.

2         So you pretty well summarized this case.  It took a

3    couple months to try, but you summarized it there in two or

4    three sentences and admitted that you knew it right away.

5         And then you also noted:  I did not just continue the

6    practices I learned, but I covered up the fraud on my own

7    without explicit direction.  I took it upon myself to

8    manipulate the ROI reports from IMS Health and directed

9    members of my team to engage in this fraud.  I reasoned that

10   if I did not manipulate their ROI reports, the massive

11   under-delivery would be discovered and the company would come

12   crashing down.

13        When other employees raised concerns over business

14   practices involving me, I did not come clean.  Instead, I

15   followed the culture of the company.  That is, I diminished

16   the past and focused on the future, saying that things were

17   being fixed and that we were not committing fraud.  While this

18   was my hope, I knew this was a lie.  The company was a fraud

19   when I got there.

20        So you pretty well summarized this case in a

21   paragraph or two.  And I think your admission to that is -- is

22   a mitigating factor.

23        There was some suggestion that -- I won't go into

24   this too much -- but the -- you know, the culture you grew up

25   in, parents pressuring you to be excellent in all things you

did may have contributed to the bad decisions you made.  I

don't buy that.  Most defendants don't have parents in the

picture, let alone parents that care enough to push them to be

excellent, to be good students, to be good people.  You're

fortunate to have parents like that.  And so I'm -- I'm not --

it's not a factor I -- I -- I view as a reason -- maybe it's a

reason, but it's not an excuse for the conduct.

The letters, as I spoke about, all talk about an

incredibly intelligent, thoughtful, caring, and charitable

person.  That's why it's hard for me to understand, as with

all the other codefendants, how far off everyone fell off the

path and committed the crimes.  All I know is it was so

unnecessary.  You know, whether it was greed -- your lawyer

suggested it wasn't greed in your sight -- in your sense, but

you were paid very well.  The prestige, I think there were a

lot of egos there at that company, including your own.  Being

the hottest start-up in town, being feted by *Crain's* and the

*Tribune*, it's intoxicating for defendants.  And everyone lost

their moral compass because they were intoxicated with the

prestige and notoriety of being one of the hottest companies

in town.

And maybe there were delusions.  Even you noted it

here that you could fake it till you make it.  Well, I've said

this before, fake it till you make it is just a catchy phrase

for let's commit fraud until we make enough money where we can

1    correct the fraud and make up money back to the victims that

2    we defrauded in the first place.  Maybe that phrase is -- has

3    some cache in other parts of the country where, you know,

4    billionaires are idolized because they faked it till they

5    maked it.  It wouldn't be such a catchy phrase if it was let's

6    commit fraud until we get caught or we make enough money where

7    we can correct the fraud we did.

8         As I said during Mr. Shah's sentencing, the victims

9    of fraud don't really care about the making it part.  They

10   care about the faking it part where they have to part with

11   money, thinking this is a legitimate successful company when

12   it, in fact, is not.  So this whole culture of fake it till

13   you make it is just code for let's commit fraud and hope we

14   can repay people later.

15        Specific deterrence, as I told Ms. Jacobson, it's not

16   an issue in this case.  I'm never going to see you again in

17   this courtroom unless it's to shorten any period of supervised

18   release I -- the period I've given you.

19        General deterrence, you can't run a business based

20   on -- on a lie.  And in white-collar cases, I believe general

21   deterrence is a huge factor.  And I have said this for the

22   11 or 12 years I've been a judge, and I believe it:  Jail is

23   the only effective general deterrence for white-collar crime.

24   It is -- everyone who commits a thoughtcrime, a white-collar

25   crime of some kind, weighs the risk of getting caught versus

1   the benefits of committing the crime.  And if it's not all

2   financial benefits, it's prestige or whatever the benefit a

3   person perceives as why they do it.  They weigh the risk.  And

4   if the risk is a slap on the wrist, if the risk is, you know,

5   probation with very strict terms, I don't believe that's a

6   general deterrent -- a general deterrence to that kind of

7   conduct.

8           Certainly there's shame in getting caught.  Certainly

9   there's a loss of sometimes family members and friends because

10  you're caught.  But the real deterrence, the thing that really

11  in my mind -- and I know this from sentencing defendants and I

12  know this from representing defendants -- the most important

13  thing that people view as a deterrent why they don't do

14  something is for fear of going to jail.

15          So I think in white-collar crimes especially -- not

16  the professional criminals that, you know, they're temporarily

17  aren't arrested, they're generally either in jail or

18  committing a crime -- but for white-collar criminals who have

19  no criminal background at all, the only deterrence to keep

20  people from doing it again is, in my mind, a sentence of

21  incarceration.

22          And it's especially true in a case involving this

23  kind of notoriety.  I don't know who's out there listening.

24  People in the courtroom are, but I don't know who else is

25  listening.  But people that run start-ups, people that use

1    their intelligence and their charisma to persuade money --

2    to persuade people to give them money ought to know that when

3    they start lying about things, the result could be jail.  And

4    if -- I believe that stops people from doing things like that.

5    And if I'm wrong -- I assume I will be somewhat wrong, because

6    there will always be white-collar criminals appearing in this

7    building, unfortunately.  There have been for decades, and

8    there will be for decades going forward.  But I think there'll

9    be fewer if people know that if you engage in this kind of

10   conduct, you're going to jail.

11          Maybe the defendant was mesmerized by Shah.  But as I

12   said, Shah was no Svengali.  He was an adult, and the

13   defendant here was an adult.

14          The cooperation is significant.  I value cooperation

15   greatly in a case like this or in a gang, RICO, and murder

16   case.  I value a cooperate -- cooperation greatly.  The three

17   defendants in this case I don't believe would have been

18   convicted without his testimony.  I don't think the government

19   would disagree with me on that.  It was not the only evidence.

20   There was plenty of documentary evidence of the fraud, but it

21   was Mr. Desai's testimony that was critical to the case.

22   Certainly from the defendants' point of view that went to

23   trial; they said you either believe Desai, and if you don't

24   believe Desai, our clients should be found not guilty.  The

25   jury believed him.  I believed him.  He sat right there.  I

1   listened to him for three weeks, and I thought his cooperation

2   was as effective as the government hoped it would be because

3   it was as truthful as it could be.

4          And others should know that cooperation will help you

5   with a sentence.  In my mind, it -- whatever the motivation

6   for cooperating is.  In most cases, the motivation for

7   cooperating is I'll get a lighter sentence, the government

8   will give me a better deal or the judge will give me a better

9   sentence because I cooperated.

10          In other cases, people cooperate certainly for other

11  reasons, too.  One is to get it off their mind, to confess, to

12  basically say I did wrong, how do I make things better.  The

13  no-snitch policy is a stupid one, where people will not

14  cooperate because they want to take it like a man.  That's

15  silly.  It's -- and in my mind, it indicates a person who

16  isn't willing to recognize the criminality of their conduct.

17  I believe you, Mr. Desai, did recognize the criminality of

18  your conduct.  And your cooperation wasn't just to get a

19  better sentence, but also because you wanted to purge yourself

20  of five or six years of criminal activity that you were in --

21  about four or five years of criminal activity you were

22  involved in.  So I -- I view cooperation significantly and

23  value it greatly and credit people for that.

24          And I thought you didn't stretch your testimony.

25  It's easy to inculpate other defendants who went to trial by

1 exaggerating, gilding the lily, having certain comments made

2 that only you could testify to, knowing the defendants are not

3 likely to testify and couldn't get up and deny it. You didn't

4 do that. And the best evidence of that is you admitted to

5 certain things you did on your own, rather than at the

6 specific direction of Shah, Agarwal, or Purdy.

7      I thought your remorse was genuine. A lot of people

8 are sorry they get caught. I think you're sorry you did it.

9 And you've taken steps, significant steps since your

10 conviction, to in some ways really try and undo the harm and

11 educate others about the mistakes you made.

12      It's interesting the defense at the trial, because

13 the fraud was so pervasive, was not that there was no fraud

14 that occurred. That would be indefensible. Even -- even with

15 the skilled attorneys the defendants had, they couldn't get up

16 here and say there was no fraud. They just said it was you

17 that did it, which might have -- must have been very

18 traumatic, given the fact that your relationship with these

19 three defendants, both hard for you to cooperate because I

20 know you were close to them at one time and hard for you to

21 hear their lawyers attacking you as a -- a liar and a person

22 who committed this fraud all by yourself. That was

23 ridiculous. You couldn't have committed it all by yourself.

24 And, of course, you didn't. You did it with the three

25 defendants that went to trial.

1          One thing I didn't see -- this goes back to the

2    comment that I made earlier -- is I didn't see any letters

3    from Han and Choi or Ketchum and Ma and some of the other

4    people saying it's our fault, don't blame Mr. Desai.  I

5    received letters from some of the other defendants, not that

6    I'm looking for more letters.  But some of the other

7    defendants got letters from people who worked at Outcome,

8    mainly as to Agarwal, that talked about what a good person she

9    was and they're all good people, just did a lot of bad things.

10          But this goes back to the whole point of there's a

11   lot of people who got involved in this because of you, just as

12   you got involved in it because of Shah.

13          Many letters ask -- and you ask for a second chance.

14   You've gotten a second chance.  You got a chance to cooperate.

15   You got a chance to purge yourself of the conduct that you

16   did.  The government could've recommended up to ten years, and

17   they're recommending a two-month sentence.  So you've gotten

18   second chances.

19          Second chances are more appropriate when someone

20   makes a momentary lapse of judgment, when someone impulsively

21   robs a bank, when someone impulsively pulls a trigger.

22   Sometimes things can't be undone and second chances are not

23   allowed.  But when someone does an impulsive crime that

24   doesn't take place over years and years, those are the people

25   in my mind that are allowed a second chance.  Because bad

1    judgment over a moment or a day or even a week is impulsive

2    and deserves a second chance in many cases.  It's a little

3    tougher to get a second chance when you've been doing it for

4    many years.

5         All right.  I'm going to take about a ten-minute

6    recess.  I want to think about this some more, so we're going

7    to recess for ten minutes.

8      (Recess at 11:18 a.m., until 11:29 a.m.)

9         THE COURT:  Please be seated.

10        All right.  We're back on the record.

11        Ms. Jacobson, I have gone through a variety of

12   different things I'm considering.  Are there any primary

13   arguments in mitigation I failed to address?

14        MS. JACOBSON:  No, Your Honor.

15        THE COURT:  Okay.  All right.  I, of course, have

16   given thought to all of this.  And I had considered a sentence

17   closer to Mr. Purdy's, quite frankly, in this case, despite

18   the cooperation.

19        But I -- and I rarely go above a government's

20   recommendation.  I've done it in the past.  I did it for

21   Speaker Hastert when he was sentenced by me, and I've done it

22   in a couple other cases.  But I rarely go above probation's

23   recommendation or the government's recommendation, but I do on

24   occasion.  And this will be one of those times.

25        On the other hand, I was very impressed by

1   Mr. Desai's -- by the letters.  And, Mr. Desai, whatever

2   sentence I give you, you ought to thank everyone in this

3   courtroom and the people that wrote you letters because I can

4   assure you the sentence would be higher but for that.

5           One of the things I noted in the letters which

6   distinguishes you from the three defendants that went to trial

7   was that you -- not just what a good person you were and, you

8   know, how charitable you were and thoughtful you were -- but

9   nearly every one of them said you told them what you did, you

10  didn't blame anyone but yourself, and you were going to try

11  and make a better life.  That had to be painful and hard to do

12  to people that respected you, people you respected.  It's hard

13  to admit your failings, but every one of those letters, unlike

14  many of the letters I got from -- for some of the

15  other defendants, said that you -- you didn't sugarcoat it.

16  You told them what you did, you did wrong, and you were just

17  trying to make a better life and move forward from that.  And

18  I admire that.  I think that's something that took some

19  courage.

20          General deterrence, as I said, requires jail.  I just

21  believe that.  But the amount of jail I hope will be

22  recognized through my sentence as a recognition that, even

23  with a -- what the government describes as a billion-dollar

24  fraud, even with that, a cooperation is going to be richly

25  rewarded.

1        And -- and I believe my sentence, which is going to

2  be higher than what the government recommends and higher than

3  what your lawyer recommended and higher than what probation

4  recommended, is still a significant break, given the scope and

5  length of this fraud and the people that got caught up in it

6  through your conduct and that will have to live with that the

7  rest of their lives because you got them involved.

8        So pursuant to the Sentencing Reform Act of 1984,

9  it's the judgment of the Court that the defendant,

10 Ashik Desai, is hereby committed to the custody of the

11 Bureau of Prisons to be imprisoned for a term of seven months

12 on Count 1 of the superseding indictment.

13       Upon release from imprisonment, the defendant shall

14 be placed on supervised release for a term of three years.

15       On Count 6, defendant is ordered to pay restitution

16 in the amount to be determined by the Court, which will take

17 place soon.  It's joint and severally -- he'll be jointly and

18 severally liable with codefendants, but there will be some

19 allocation, I believe.  And I'll hear argument on that at the

20 future date when I have the final hearings on restitution.

21       I find the defendant does not have the ability to pay

22 a fine, therefore, the fine will be waived.  However, a

23 special assessment of $100 will be imposed, due immediately.

24       While on supervised release, the defendant shall

25 comply with the mandatory, discretionary, and special

1   conditions delineated in part D sentencing option section of

2   the presentence investigation report.

3          Sir, you have a right to appeal.  You can appeal your

4   conviction if you believe that your guilty plea was somehow

5   unlawful or involuntary.  But because there was an acceptance

6   of -- there was an acceptance by the government of your

7   testimony in the sense they made a 5K1 motion for a departure,

8   I believe that waives appeal but for the question of

9   involuntariness or ineffective assistance of counsel.

10          Is that correct, Mr. Yonan?

11          MR. YONAN:  I believe that's correct, Your Honor.

12   I'm just checking to see if there's a -- a provision about the

13   sentence.

14          THE COURT:  It's also any defects or errors made in

15   sentencing.  I think it's at paragraph -- page 22 of the

16   plea -- plea agreement.  It says:  If the government makes a

17   motion at sentencing for a downward departure -- which,

18   of course, you did -- defendant knowingly waives the right to

19   appeal his conviction, any pretrial rulings by the Court, any

20   part of the sentence or the manner in which the sentence was

21   determined, including any term of imprisonment and fine within

22   the maximums provided by law and including any order of

23   restitution in exchange for the concessions the government

24   made.

25          So that, I believe, only allows for an appeal if

1    the -- if you believe your guilty plea was involuntary or you

2    received ineffective assistance of counsel.

3          Is that your understanding, Mr. Yonan?

4          MR. YONAN:  It is, Your Honor.  Thank you.

5          THE COURT:  Ms. Jacobson, is that your understanding?

6          MS. JACOBSON:  Yes, Your Honor.

7          THE COURT:  All right.  So to the extent, though, you

8    have a right to appeal, you -- any appeal must be note -- must

9    be filed within 14 days of the entry of judgment or within 14

10    days of the filing of a notice of appeal by the government.

11          If requested, the clerk will prepare and file a

12    notice of appeal on your behalf.  If you can't afford to pay

13    the cost of an appeal or for appellate counsel, you have the

14    right to apply for leave to appeal *in forma pauperis*, which

15    means you can apply to have the court waive the filing fee.

16    On appeal, you may also apply for court-appointed counsel.

17          I'll ask first the government:  Any other matters

18    that need to be addressed?

19          MR. YONAN:  No, Your Honor.

20          THE COURT:  Are there any other counts of the

21    indictment that need to be dismissed?  Or are those the only

22    two he was charged in?  I have a copy of the indictment.

23          MS. JACOBSON:  I thought he was maybe charged in one

24    count.

25          MR. YONAN:  I believe it's just one count,

1     Your Honor, so I don't believe there's anything to dismiss.

2           THE COURT:  Okay.  Well, the -- all right.  So it's

3     just Count 6 of the superseding indictment that the sentence

4     was imposed on?

5           MR. YONAN:  That's correct.

6           THE COURT:  Okay.  Anything else from the government?

7           MR. YONAN:  No, Your Honor.

8           THE COURT:  Anything else from probation?

9           PROBATION OFFICER:  Just a surrender date,

10    Your Honor, when the Court's ready.

11          THE COURT:  Okay.  Ms. Jacobson, first, any other

12    matters to address other than a sentencing date?

13          MS. JACOBSON:  No.  Although I wonder if we could

14    take a little time to come up to talk about the surrender date

15    and perhaps a recommendation to -- with -- closer to where he

16    lives and his family lives.

17          THE COURT:  Sure.  Do you want to talk to him now for

18    that?

19          MS. JACOBSON:  We can talk now.

20          THE COURT:  Yeah.  Take your time and let me know

21    when you're ready.

22          MS. JACOBSON:  All right.  We'll excuse ourselves.

23          THE COURT:  Sure.

24          MS. JACOBSON:  Thank you.

25      (Pause in the proceedings.)

1      THE COURT:  Ms. Jacobson, there's nothing in a

2  sentencing that requires a surrender date be set today.  If

3  you want to discuss this further with your client and also

4  place of incarceration before a recommendation, surrender

5  date's not -- not a recommendation, that is the date.

6      But a place of incarceration is simply a

7  recommendation.  And you want to take more time to discuss it

8  with your client and, you know, research where he's going to

9  be living and what makes the most sense for him to be in

10  proximity to his family, I'll give you more time.

11      MS. JACOBSON:  That would be great.

12      THE COURT:  Why don't you let my -- unless there's an

13  objection from the government, why don't you email my

14  courtroom deputy by Monday of next week and let her know,

15  copying the government of course and Ms. Kwong, but include in

16  it both of those things, a surrender date and recommendation

17  for a place of incarceration.

18      And we won't enter any judgment and commitment order

19  until we've received that from you.

20      MS. JACOBSON:  Okay.  Thank you, Your Honor.

21      THE COURT:  All right.  Let's do it that way.

22      MS. JACOBSON:  Thanks.

23      THE COURT:  All right.  Anything else from defense?

24      MS. JACOBSON:  No, Your Honor.

25      THE COURT:  All right.  Mr. Desai, I was prepared to

1    give you a higher sentence today, quite frankly.  I -- I --

2    the -- but I was impressed by the -- your statement and the

3    letters from your family.  So it may be a higher sentence than

4    you expected, but, frankly, it is a higher -- a lower sentence

5    than I fully expected to give you when I walked out here

6    today.

7            So you asked for a second chance.  You have support

8    of family.  You have support of employers.  You have people

9    out here that love you.  You'll get through this, and I'm

10   confident that you'll be a successful member of society going

11   forward.  Thank you.

12           MS. JACOBSON:  Thank you.

13      (Concluded at 11:40 a.m.)

14

15                        *   *   *   *   *

16       I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18   */s/ Elia E. Carrión*          *7th day of October, 2024*

19   _____     _____
     Elia E. Carrión                      Date
     Official Court Reporter

20

21

22

23

24

25