IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 19 CR 864 |
| RISHI SHAH, et al., | Judge Thomas M. Durkin |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO TERMINATE RESTITUTION PROCEEDINGS**

At the Defendants' sentencings in June 2024, this Court found that the Government had failed to meet its burden to establish any losses suffered by either the institutional investors or lenders, the asserted victims in this case. In light of that finding, the Government requested that the Court forestall making any restitution determination in order to provide the Government time to assemble additional evidence to support its claim for restitution.

The Court granted that request. In the intervening months, the Court has received multiple volumes of testimony and hundreds of pages of briefing relating to the Government's eye-popping claim for more than $400 million in restitution. And yet, more than six months later, the Government has still failed to carry its burden to establish that restitution is still owing to any of the alleged victims in this case. Instead, recent discovery produced by Goldman Sachs has raised more questions than it has answered, revealing that the so-called "valuation" performed in connection with the 2018 settlement (1) considers the value of Goldmans' investment in Outcome under the post-settlement structure, not the structure in existence at the time of the alleged offenses; (2) consists of less than a page and a half of calculations; and (3) appears to have been provided to Goldman's auditors without any additional documentation to support its methodology,

1

assumptions, or analysis. None of the documents produced by Goldman offer any insight into why Goldman and the other investors would have chosen to reinvest nearly $160 million into Outcome (rather than seeking to simply claw back the $220 million they had frozen in litigation) if they did not believe the company was worth that much. Yet rather than provide answer those questions, Goldman has refused to provide any additional supporting documents without a subpoena— including the revised forecasts described by Mr. Gupta in his October 2024 testimony—and it has indicated that it will move to quash the subpoena it has since received.

This Court should not be required to oversee third-party subpoena practice and delve further into complex questions of economic valuation to answer the largely academic question of what residual losses the institutional investors and lenders in this case might claim. Instead, it should make the same ruling it has already made with respect to the Government's claims of losses to Outcome's customers: that "determining complex issues of fact related to the cause or amount of [the] victim[s'] losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to the victim[s] is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). That is especially true here, where (1) the institutional investors and lenders long ago settled with Mr. Shah and Ms. Agarwal, making them whole for any alleged losses, and (2) the Government has the power to compensate any residual losses it may identify through its extrajudicial remission petition process, through which it can distribute upwards of $100 million in forfeited to distribute to victims as it sees fit, with or without a restitution order. *See* 28 C.F.R. § 9.8. Under those circumstances, a restitution order would not serve to enhance the victims' potential recovery, other than a modest potential garnishment of the Defendants' future wages. The difficulty of reaching such a determination far outweighs any potential benefit to the

2

asserted victims, and this Court should not be required to shoulder that burden.

The Court's exercising its discretion under § 3663A(c)(3)(B) is all the more appropriate here in light of the fact that the Government has failed to carry its burden to demonstrate that any uncompensated losses to the institutional investors. The three "valuations" relied upon provided by the Government—Goldman's one-and-a-half page calculation, with no supporting documentation or justification for its assumptions, and Mr. Johnston's two alternative valuations derived from fictional forecasts that we now know were untethered to investor expectations—suffer from obvious defects and shortcomings that have been made clear through these proceedings, making them an unreliable basis for this Court to make a determination of investor losses. But even accepting any of the three Government valuations on their own terms, they are insufficient to carry the Government's burden to demonstrate ***present*** losses, since, among other things, (1) they all consider the value of Outcome after the February 2018 restructuring, not the structure in existence at the time of the offenses; and (2) none of them consider the ***present*** value of any such investments, as would be required to substantiate any claim of restitution asserted by the Government. For all those reasons and those explained further below, the Defendants respectfully request that this Court bring these wearisome restitution proceedings to a close.

## DISCUSSION

### I. This Court Should Find That the Need to Provide Restitution to Institutional Investors and Lenders Is Outweighed by the Burden on the Sentencing Process

This Court has already found that determination of any potential restitution owing to Outcome's customers would unduly complicate and prolong the sentencing process. This Court's efforts to make a similar determination with respect to the institutional investors and lenders has already drained yet greater resources from both the Court and the parties—and continued proceedings, which are likely to require multiple additional hearings, promise to take several more

weeks, especially given Goldman's unwillingness to provide further documents without a court order.

The Government, meanwhile, has had several months since sentencing (and several years since the indictment) to make its case for a restitution order against Defendants. Its failure to carry its burden should no longer be tolerated by this Court. Especially considering that the alleged victims in this case have already been compensated through their settlements with Mr. Shah and Ms. Agarwal and stand to achieve yet greater returns through the Government's remission process, this Court should find that any further prolongation of these restitution proceedings is not necessary to provide the victims compensation for their losses. *See* 18 U.S.C. § 3663A(c)(3)(B).

### A. Further Restitution Proceedings Will Unduly Prolong the Sentencing Process

As the Defendants forecasted in their Joint Restitution Submission (Doc. #870), the process of determining restitution in this case has already placed a considerable strain on the Court's resources. The Court has held multiple days of hearings, at which it has heard additional testimony from Mr. Shah's expert, Carl Saba, as well as testimony from Josh Johnston, the Government's proffered valuation expert, and Ravi Gupta, a corporate representative of Goldman. Those proceedings, however, have produced more questions than they have answered.

Mr. Gupta's testimony revealed the existence of a previously unknown "modeling document" that Goldman used to come to a valuation in December 2017, thought it relied on settlement terms that were not known until late January 2018. Tr. (Doc. #900) at 677–78. As it turns out, that "modeling document" is little more than a back-of-the-envelope calculation with no support for its inputs or assumptions—and it appears that that short "modeling document" was all that Price Waterhouse Coopers ("PWC") was provided in their review of Goldman's audited

4

financial statements.[1] Mr. Gupta's testimony also revealed the existence of revised revenue forecasts, which Goldman has, curiously, refused to produce without a subpoena. *See* Tr. (Doc. #900) at 695–96. Goldman has further indicated that it will resist the Defendants' efforts to subpoena any further documents, declining even to conduct a search to determine the quantity of potentially responsive documents.

Given Goldman's unwillingness to produce any further supporting documentation—including revised forecasts that Mr. Gupta described—this Court is likely to have to entertain litigation on Goldman's forthcoming motion to quash the subpoena, and even then, Mr. Gupta will likely need to be recalled to explain and give context to the documents Goldman has produced. After that process is complete, the Court will be left with, at best, three competing valuations from two Government experts, none of which have successfully refuted the sound methodology of Carl Saba, which he already successfully defended against two Government cross-examinations. And if Goldman ultimately produces documents that explain its methodology and provide support for its assumptions, then Mr. Saba may be required to testify yet a third time to explain what if any impact those assumptions might have on his analysis. Even if the Court is able to reach a restitution number, further proceedings would then commence on questions of allocation. Those proceedings will require considerable time and resources—none of which are necessary, since, as explained below, a restitution order is not necessary in this case to make the victims whole.

### B. There Is No Need to Prolong the Sentencing Process in Order to Provide Restitution to Victims

The substantial burdens placed on this Court's resources by the Government's unsupported

---

[1] As a condition of producing the "modeling document" and other documents to the Defendants, Goldman required that the Defendants' agree not to file any of the produced documents without first giving Goldman the opportunity to seek a protective order. The "modeling document" is therefore not included as an exhibit to this filing.

claims for restitution might be justified if a criminal restitution order were the only means for the victims to obtain compensation—but that is not the case here. The institutional investors on whose behalf the Government seeks restitution settled nearly seven years ago with Ms. Agarwal and Mr. Shah, receiving substantial (if not total) compensation for their asserted losses. But even if those losses had not been fully compensated in the settlement, Mr. Shah and Ms. Agarwal have forfeited upwards of $100 million in additional assets to the Government in this case, which the Government is free to provide to any alleged victims through its remission petition process. *See* 28 C.F.R. § 9.8. As a result, the determination of restitution in this case is largely an academic question, which this Court need not expend any further resources attempting to answer.

## 1. The Institutional Investors Already Received Full Restitution Through Their Settlement with Ms. Agarwal and Mr. Shah

The institutional investors are attempting to do exactly what the MVRA is meant to avoid—recover twice for the same alleged loss. Following the revelation of the fraud at Outcome, investors sued to protect their claim against the amount of their initial investment and succeeded in obtaining an order freezing more than $220 million in cash pending the resolution of the suit. But instead of seeking to claw back that money (and the millions of dollars in cash on Outcome's books), the investors made a conscious, calculated choice to restructure their investment, take over Outcome, and maintain the company as a going concern. In fact, the institutional investors *returned* $31 million to Mr. Shah and Ms. Agarwal to achieve that control. As a result of the settlement, the investors received a controlling interest in Outcome, which was worth much more than what the investors originally paid for their investment. *See* Saba Rpt. (Doc. #764-1) ¶ 126 (calculating post-settlement value of Outcome at $970 million, with pre-restructuring investor equity valued at $483 million); Gupta Aff. (Doc. #778-1) at 55, ¶ 7 (stating that after the 2018 settlement, institutional investors received shares having a face value of $420.9 million).

The Government has yet to provide a credible answer to the critical question: if the investors believed Outcome was all but worthless after the publication of the *Wall Street Journal* article, why did they negotiate to take control of the company, dump $159 million back into it, and keep it operational? Not even Mr. Gupta's testimony supports the claim that the investors felt like they had no choice or "had a gun to their heads," as the Government has hyperbolically claimed. *See* Tr. (Doc. #900) at 647–48 (explaining that the investors believed that Outcome had real value and was worth reinvesting in). Instead, this Court should find that there is no need for this Court to permit the institutional investors to recover their alleged losses again via restitution; they have already been made whole as a result of the settlement.

### 2. Any Remaining Losses Can Be Compensated Through the Remission Process Without the Court's Assistance

Even if the institutional investors had not been fully compensated by their settlement with Mr. Shah and Ms. Agarwal, those investors have a ready source of recovery for their losses: namely, the tens of millions of dollars already forfeited by Mr. Shah and Ms. Agarwal through this Court's forfeiture orders. Indeed, the Government retains the power, even *without* a restitution order, to return upwards of $100 million in forfeited assets to any victims who may assert such claims through the federal remission process. *See* 28 C.F.R. § 9.8 (describing procedures by which a victim can receive the return of forfeited funds, regardless of whether the court imposes a restitution order). The Seventh Circuit has itself recognized that such remission proceedings promote judicial economy, insofar as they permit the Government to make a discretionary determination of whether or not to remit funds to particular victims based upon the relative merits of their claims, subject to only very limited judicial review. *See United States v. Misc. Firearms*, 376 F.3d 709, 713 (7th Cir. 2004) ("[R]emission . . . can obviate the need for judicial proceedings."); *see also Laconia Savings Bank v. United States*, 116 F. Supp. 2d 248, 252–53

7

(D.N.H. 2000) ("Remission of forfeiture is a matter committed to the sound discretion of the seizing agency.") (citation omitted).

The remission process is simple: any victim that believes it has suffered a provable loss as may petition the Government for remission of the forfeitures ordered in this case. *See* 28 C.F.R. § 9.8(a). If multiple victims file such petitions, then the Government may distribute the forfeited funds on an equitable (typically pro rata) basis. *See id.* § 9.8(f). The Government may then either return the forfeited property to the victims in kind[2] or liquidate the assets, at which time it has the discretion to distribute those funds to any qualifying victims. *See id.* § 9.8(b). Notably, the Government can exercise that sovereign prerogative even if this Court does not enter any restitution order whatsoever.

Thus, at the end of the day, all the parties in this case are fighting over is not whether the victims will receive whatever share they might fairly claim of tens of millions of dollars in property that the Government has already forfeited from Defendants (because the Government can remit whatever forfeited assets it wishes with or without this Court's blessing), but whether the Defendants will additionally be saddled with millions of dollars in debt (which they are unlikely ever to be able to repay) in the event that this Court imposes a restitution order that exceeds the value the Government recovers from the forfeited assets. Especially given the fact that the lenders and institutional investors settled with Mr. Shah and Ms. Agarwal years ago—and now stand to receive an additional windfall from the liquidation and distribution of their forfeited assets—this Court should exercise its substantial discretion to find that the Government's desire to place yet an additional financial burden on Defendants is outweighed by the burden that further proceedings

---

[2] Indeed, given the nature of the assets in question, which are largely venture capital investments in early-stage companies, transfer of the assets in kind is likely to ultimately produce a greater return to the Government (or the victims) than their immediate liquidation under a restitution order.

would place on the already lengthy sentencing process in this case.

## II. A § 3663A(c)(3)(B) Find Is Especially Appropriate Here As the Government Has Not Met Its Burden of Demonstrating Any Restitution Is Presently Owed by the Defendants

Ironically, the Government agrees that this Court should not allow for further restitution proceedings. *See* Status Report (Doc. #910) at 5. The Government, however, makes that submission on the false premise that it has carried its burden to demonstrate any restitution that might still be owed to the institutional investors and lenders in this case. But the Government's efforts have fallen short of the mark, and the additional months the Court has given the Government since its failure of proof at sentencing has not improved the Government's case—not to mention the many years of this prosecution that the Government has had to get its act together.

Indeed, the Court would be correct to find no restitution is owing based on the record that is already before it. Carl Saba's testimony has already persuasively established that the value of Outcome did not drop below the face value of the investors' priority fixed claim prior to the February 2018 restructuring. *See infra* § II-B. Although Mr. Johnston produced a competing ***post-restructuring*** valuation, he did not provide any pre-2018 valuation, and the cross-examination of Mr. Johnston and rebuttal provided in Mr. Saba's second examination demonstrated significant shortcomings in Mr. Johnston's valuations' reliability, including most notably his double-counting of risk in his volatility adjustment and his lack of any factual foundation for his alternative forecasts. *See infra* § II-A-1. Nor has Goldman's two-page summary its ***post-restructuring*** valuation of Outcome—evidently, the only supporting documentation provided to PWC to support Goldman's audited financial statements—provide any stronger basis for the Court to ascertain the loss to Goldman (much less any other investor). *See infra* § II-A-2. For those reasons, this Court should find that the Government has not, even these many months after sentencing, carried its burden to demonstrate that any restitution is still owed to institutional investors or lenders.

### A. The Government Has Failed to Meet Its Burden to Demonstrate Any Restitution Presently Owed to Institutional Investors

The Government at all times bears the burden of establishing the amount of restitution owed. *See United States v. Anderson*, 866 F.3d 761, 765 (7th Cir. 2017) ("Because the government bears the burden of establishing 'the amount of the loss sustained by a victim,' it falls on the *government* to prove that the victim will not be made whole by returning . . . property which has been recovered." (emphasis in original)). Doing so here would have required the Government to (1) establish what if any losses the institutional investors suffered as a result of the fraud by determining the difference between the actual value of Outcome on the date of their investment and the price they paid for it; (2) present evidence to connect that difference in value to the fraud; and (3) ascertain whether those losses still exist today.

The Government has taken none of these steps. Instead, it has taken the curious approach of attempting to refute Mr. Saba's conclusion as to the value of the investors' investment in Outcome *after* the 2018 restructuring, without presenting any evidence to suggest that the investors suffered a loss in the first instance, tying any alleged losses to the fraud (as opposed to the settlement and the subsequent conduct of the then-controlling shareholders), or identifying what the value of the investors' unrestructured investment would be today. As such, the only evidence the Court has before it as to whether the fraud at Outcome caused any losses to the investors in the first instance is the unrefuted testimony of Mr. Saba, which established that the fraud did not bring its value below the investors' priority fixed claim under the pre-2018 structure, meaning that the investors did not suffer any cognizable loss as an immediate result of the fraud.

As a result, neither Mr. Johnston's nor Goldman's valuations can bear the weight the Government seeks to put on them. Each of those valuations considers the value of the investors' equity under *after* the February 2018 restructuring, which fundamentally altered the nature of the

10

investors' stake in the company. Even if the flaws in those valuations were ignored (which, as explained below, they should not be), the value of Outcome under the 2018 structure only becomes relevant if the fraud caused the investors to suffer a loss in the first instance—a showing the Government has not even endeavored to make.

### 1. The Flaws in Mr. Johnston's Analysis Render It Fundamentally Unreliable

Between reading his reports and listening to hours of live testimony, this Court is uniquely familiar with the flaws in Mr. Johnston's analysis. Mr. Johnston employed novel methodologies, made aggressively negative assumptions regarding the future of Outcome, and failed to connect any of his projections or forecasts to reality. Perhaps even more confusing, Mr. Johnston consistently used (and defended using) hindsight to inform his analysis, a methodology that Mr. Saba explained is improper. *See* Tr. (Doc. #896) at 356:15–358:10. Ultimately, Mr. Johnston's repeated reliance on unsupported methodologies renders his analysis unreliable.

Mr. Saba's report and testimony explored in detail the numerous errors contained in Mr. Johnston's reports. In reaching his final numbers, Mr. Johnston attempted to account for the effects of the fraud by multiplying a "volatility ratio" by "beta." As Mr. Saba explained, there are two significant problems with this methodology: (1) "beta" already incorporates a volatility ratio, resulting in an unwarranted overcounting of volatility, and (2) that approach is not an accepted approach in the field. Tr. (Doc. #896) at 310:8–314:5. Despite testifying that he could provide academic support for re-multiplying the volatility ratio into "beta," Tr. (Doc. #906) at 565:10–20, no such support has been produced.

Mr. Johnston's analysis also relied on overly negative assumptions that are inconsistent with Outcome's historical performance or the investors' outlook in late 2017. Tr. (Doc. #896) at 283:19–284:23, 456:13–457:13. Instead of adjusting the forecasts relied upon by investors to

11

account for overstated revenue as Mr. Saba did, Mr. Johnston created his own forecasts that were not at all connected to those that management and investors were looking at during the relevant time. *Id.* at 330:5–331:4. Indeed, when asked, even Mr. Gupta indicated that Goldman did not make assumptions as negative as Mr. Johnston's when formulating its revised (but yet undisclosed) forecasts. *See* Tr. (Doc. #900) at 696. At best, Mr. Johnston's analyses reflect how a hypothetical investor who predicted no growth or declining growth might have viewed Outcome's value—but Mr. Gupta, the only non-hypothetical investor before the Court, did not take nearly so pessimistic a view. As a result, the false assumptions of Mr. Johnston's methodology, especially when coupled with his unorthodox and unproven valuation approach, make his conclusions unreliable.

Yet even if this Court were to ignore its flaws and credit Mr. Johnston's analysis, his analysis does not answer the relevant questions. Mr. Johnston's analysis valued Outcome Health as of February 1, 2018, ***after*** the restructuring agreed to by the institutional investors. In other words, Mr. Johnston's analysis only assessed the value of the institutional investors' equity months after the revelation of the fraud, under a structure that did not exist at the time of the offense. As Mr. Saba explained, prior to the settlement, Goldman and the other institutional investors held a priority fixed claim over the equity in Outcome, and the value of Outcome did not drop below the value of that claim prior to the 2018 restructuring. Mr. Johnston's analysis, by his own admission, made no effort to value the company ***before*** the restructuring, which occurred months after the revelations in the *Wall Street Journal*, and which fundamentally changed the nature of the investors' equity. *See* Tr. (Doc. #899) at 587:21–22 (testimony of J. Johnston) ("I haven't quantified what the value [of Outcome] and the losses were prior to February of 2018.").

As a result, Mr. Johnston's analysis fails to establish by any reliable measure what loss occurred to institutional investors in the first instance. But Mr. Johnston's analysis suffers from a

12

final fatal insufficiency: it fails to consider the value of either Outcome or the investors' equity, as of the date of sentencing, as well as to analyze what if any of any subsequent increase or decrease in value resulted from the fraud as opposed to other confounding factors. That failure renders his analysis effectively useless to the Court, since loss for restitution purposes is determined as of the date of sentencing. *See United States v. Heon Seok Lee,* 937 F.3d 797, 818 (7th Cir. 2019) ("The statute sets the restitution amount at the value of the victim's lost property on the date of the loss or the date of sentencing (whichever is greater) minus the value of any property returned." (citing 18 U.S.C. § 3663A(c)(1)(A)(ii)).

### 2. The Documents Produced by Goldman Do Not Adequately Disclose the Basis for Its Valuation

Perhaps recognizing the shortcomings of Mr. Johnston's analysis, the Government has sought to bolster its claims of investor losses by presenting the testimony of Ravi Gupta, who testified that Goldman created both revised revenue forecasts and a "modeling document" to value Outcome in preparing its 2017 financial statements. Tr. (Doc. #900) at 677–78, 695–96. While Goldman has refused to provide the revised forecast without a subpoena (and, now that it has one, evidently plans to move to quash it), it did produce the "modeling document" that was evidently provided to PWC in order to substantiate the reporting for Goldman's 2017 financial statements. The "modeling document," however, does not disclose the basis for a number of its assumptions, including most notably the discount rate, which exceeds even the discount rate recommended by the Government's own expert Mr. Johnston. In contrast to the lengthy analyses produced by both Mr. Saba and Mr. Johnston. The document contains less than two pages of data and calculations to support its valuation. Without production of the revised revenue forecasts and any other information produced by Goldman to PWC (assuming any even exists), the "modeling document" is too thin a reed to support a $400 million restitution order.

Yet even if Goldman produced the documentation behind its back-of-the-envelope calculations, the results would be of limited use to this Court. First, as explained above, Goldman's 2017 valuation incorporated the expected terms of the 2018 settlement, meaning that the "modeling document," much like Mr. Johnston's analysis, does not provide any useful information about what Goldman's investment was worth before the restructuring. *See* Tr. (Doc. #900) at 709–10. Second, as Mr. Gupta himself testified, at the time that document was prepared, Goldman did not have a full sense of the scale of the fraud, unlike both Mr. Johnston and Mr. Saba, whose analyses were based in part on the Government's assessment of overpayments by customers. *See* Tr. (Doc. #900) at 674–75. Finally, at best, Goldman's valuation reflects its own view of its investment in Outcome, which may have differed substantially from that of the other investors—none of whom the Government has presented evidence regarding. *See* Tr. (Doc. #900) at 710.

### B. Mr. Saba's Analysis Shows That No Restitution Is Owed to the Institutional Investors

As explained above, the Defendants had no burden whatsoever to present evidence on the Government's claim for restitution. But in the final analysis, the only reliable analysis the Court has received has come not from the Government, but from the Defendants. Carl Saba's analysis of the changes in Outcome's value as a result of the fraud are, unlike Mr. Johnston's or Goldman's, directly tied to the Government's own analysis of the scale and impact of the fraud, and employed multiple different methodologies to triangulate towards a single, reliable result. In each case, those analyses showed that (1) Outcome's value did not drop below the investors' priority fixed claim as a result of the fraud and (2) the value received by investors as a result of the 2018 settlement exceeded what they paid to obtain that original interest. *See* Saba Rpt. (Doc. #756-1) ¶¶ 7, 9. As a result, Mr. Saba's analysis establishes that the institutional investors did not suffer any loss in the first instance as a result of the fraud at Outcome, and ultimately they were able to obtain value that exceeded even their initial investment.

Mr. Saba's straightforward and thorough analysis, which has been critiqued but not refuted, stands as the only reliable evidence before the Court as to the restitution owed to institutional investors in this case. The Government has simply not presented any other evidence of how the fraud impacted the pre-restructuring value of the investors' fixed priority claim, nor has it established what the value of that claim would be today after accounting for any confounding factors. Even without Mr. Saba's analysis, the Government's failure of proof would preclude this Court's issuance of a restitution order—but with Mr. Saba's analysis, the greater weight the evidence heavily tilts in the Defendants' favor.

## CONCLUSION

This Court has granted the Government several extra months to establish its entitlement to a restitution order. Yet we remain where we began: the Government has failed to produce evidence to establish that the institutional investors in this case are due any restitution whatsoever. Especially considering the burdens further consideration of such issues would place on the Court, along with the Government's power to remit the forfeited property to any alleged victims with or without a restitution order, there is no need to further continue the restitution proceedings in this case. A restitution order against the Defendants will not materially increase the victims' ability to recover from the tens of millions in forfeited assets; it will only slightly increase the financial burden on the Defendants once they have served their terms of incarceration. From any reasonable perspective, that additional potential punishment is not worth the effort it would take the Court and the parties to get there. For all those reasons, the Defendants respectfully request that this Court terminate these restitution proceedings and impose no order of restitution against the Defendants.

Dated: January 1, 2025

Respectfully submitted,

| | |
|---|---|
| BRYAN CAVE LEIGHTON PAISNER LLP | BLEGEN & ASSOCIATES |
| */s/ Richard E. Finneran* <br> RICHARD E. FINNERAN <br> 211 North Broadway, Suite 3600 <br> St. Louis, Missouri 63102 <br> Tel: (314) 259-2080 <br> Fax: (314) 259-2020 <br> *richard.finneran@bryancave.com* | */s/ Patrick W. Blegen* <br> PATRICK W. BLEGEN <br> 53 W. Jackson Boulevard <br> Suite 1424 <br> Chicago, Illinois 60604 <br> (312) 957-0100 <br> *pblegen@blegenlaw.com* |
| *Attorney for Defendant Rishi Shah* | *Attorney for Defendant Shradha Agarwal* |

COTSIRILOS, TIGHE, STREICKER,
POULOS & CAMPBELL, LTD.

*/s/ Theodore T. Poulos*
Theodore T. Poulos
55 E. Monroe St., Ste. 3250
Chicago, IL 60603
(312) 263-0345
*tpoulos@cotsiriloslaw.com*

*Attorney for Defendant Brad Purdy*

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served upon all counsel of record by operation of the Court's electronic filing system.

                */s/ Richard E. Finneran*
                RICHARD E. FINNERAN