**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>RISHI SHAH, SHRADHA AGARWAL, & BRAD PURDY,<br><br>*Defendants*. | No. 19 CR 864<br><br>Judge Thomas M. Durkin |

**DEFENDANT BRAD PURDY'S MEMORANDUM**
**REGARDING ALLOCATION OF RESTITUTION**

## I. Introduction

Brad Purdy remains deeply remorseful for his conduct at Outcome Health and for the harm to its clients, lenders, investors, and employees. He has served his term of imprisonment and continues on supervised release. He has returned to work and is trying to rebuild his life while meeting the responsibilities that follow from this case. He approaches the remaining restitution decision with respect for the Court's judgment and with the hope that his financial obligation will reflect both his responsibility and his circumstances.

18 U.S.C. § 3664(h) provides: "If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." District courts enjoy discretion in deciding whether and how to apportion restitution. *See United States v. Moeser*, 758 F.3d 793, 799 (7th Cir. 2014) (citing *United States v. Sensmeier*, 361 F.3d 982, 990 (7th Cir. 2004)); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (similar). In

exercising this discretion, courts have considered a defendant's actions in furtherance of a scheme, *Moeser*, 758 F.3d at 799; relative culpability, blameworthiness, or guilt, *Sensmeier*, 361 F.3d at 990 & n.6; financial ability to pay, *United States v. Walton*, 217 F.3d 443, 452 (7th Cir. 2000); joinder of a conspiracy and the timing of such joinder, *United States v. Schiro*, 679 F.3d 521, 534 (7th Cir. 2012); and a defendant's convicted offense(s), whether his role was integral to the offense, his presence at certain events, his awareness of certain facts (which affects foreseeability), and any interactions with the victim(s), *United States v. Brazier*, 933 F.3d 796, 805 (7th Cir. 2019). Ultimately, and as stated above, any apportionment of liability among defendants must "reflect the level of contribution to the victim's loss and economic circumstances of each defendant." § 3664(h).

Mr. Purdy's level of contribution to the victims' losses and his economic circumstances warrants an apportionment of his liability for restitution in an amount far below the actual losses incurred by the victims. In this case, an equitable apportionment would require Mr. Purdy to pay restitution in an amount not greater than $1,630,000, which represents the total compensation Mr. Purdy recieved during his tenure at Outcome Health. Such an approach would account for the fact that Mr. Purdy did not devise or hatch the scheme to defraud and did not direct anyone with respect to the implementation or operation of the scheme. Moreover, and quite significantly, unlike Mr. Shah and Ms. Agarwal—who received a total of $225 million of the investor's funds—Mr. Purdy did not receive and never stood to receive a single dollar of those funds or lender funds.

## II. The Differences in Responsibility Support a Smaller Individual Obligation

*First*, in terms of his level of contribution to the victims' losses, Mr. Purdy joined Outcome Health in 2012 (six years after its founding in 2006) and became CFO in 2015. Mr. Purdy was not a Co-Founder of the business and was never the CEO or President. He also never had an ownership interest in the company. He was always merely an employee of the company. Ashik Desai directed

the sponsorship business and reported directly to Mr. Shah throughout his tenure. He never reported to Mr. Purdy. Instead, Mr. Purdy worked primarily on the "membership" side of the business, *i.e.*, the side of the business responsible for obtaining the devices and installing them in doctor's offices. (Trial Tr. 1661–65). He was never involved in, let alone in charge of, sponsorship sales. Thus, he did not interact with pharmaceutical clients, and he did not participate in the invoicing or affidavit process. (*Id.* at 1665, 1742). While the government can point to evidence from which—especially with the benefit of hindsight—Mr. Purdy should have surmised that Outcome was defrauding its clients, the evidence also shows that Mr. Purdy simply did not have detailed knowledge of the operation and extent of the scheme. For example, there is no dispute that Mr. Purdy did not know that Mr. Desai had falsified any of the numerous fraudulent ROI reports that were provided to the lenders and investors, all of which showed that Outcome was successfully achieving the goals of the advertising campaigns.

While he was kept in the dark about the falsified ROI reports, once Mr. Purdy became CFO he was also kept in the dark about the level and extent of under-deliveries in 2015 and 2016. Significantly, after he became CFO and during the time he was interacting with lenders and potential investors, Mr. Purdy was not included on emails in which, and in meetings at which, delivery deltas were discussed. Indeed, other than a February 2015 email that Mr. Purdy sent before he became CFO, which stated that "if we prioritize properly[,] [I] think we can easily hit our inventory needs," (GX 442), others at Outcome neither included him on *any* emails transmitting purported "delta reports" for the rest of 2015 and 2016, nor did they invite him to any meetings at which they purportedly discussed inventory shortfalls. (*See* GX 460, GX 458, DX 3492, GX 1153, DX 3514, GX 483, GX 594).

Consistent with the documentary evidence, David Ma testified that Brad Purdy was not

present at any of the meetings in which Ma discussed deltas and inventory shortfalls with others at Outcome. (Trial Tr. 2762–63). Several prominent examples are worth mentioning. Mr. Purdy was not included on any invites or discussions around "Delta Day," and he was in fact moved to a different car and house for the Lake Geneva retreat in April 2015, shortly after he became CFO (GX453, GX455, GX458, GX459, GX460, DX8635). Mr. Purdy was not included in the June and August 2015 meetings, which as David Ma testified about at trial, centered on the discussion of inventory and deltas. (DX3492, DX3499, DX3500, DX3514). Thus, the June 29 and August 5, 2015 planning invitations included did not include Mr. Purdy. (DX 3492; DX 3514; Trial Tr. 3082:14–23). Similarly, in July 2016, Liane Pierce conducted a detailed audit of Outcome's performance on its 2016 contracts and reported that it was below 90% delivery on 77 of its 137 contracts. (GX 594). She included a color-coded spreadsheet that detailed the under delivery, (GX 594a), but she did not share that information with Mr. Purdy, the CFO and putative COO of the company. Instead, her email copied Mr. Shah, Mr. Desai and others, without including Mr. Purdy. (GX 594 at 1; Trial Tr. 3780:17–3782:13). The executives directing sponsorship thus received detailed assessments of delivery problems but that information was never provided to Mr. Purdy.

All these meetings and materials conspicuously reiterate Mr. Purdy's absence from such discussions throughout his tenure as CFO and during the time he was interacting with lenders and investors. The numerous examples of instances in which critical information was not provided to Mr. Purdy demonstrate that Mr. Purdy's level of contribution to the victims' losses should be viewed as far more limited than others.

The distinction matters to the financing losses themselves. The Court found that investors relied on representations about Outcome's historical revenue, client relationships, and prospects for growth. (Dkt. 1045 at 28). During financing diligence, JPMorgan requested additional ROI

studies for investors, and as the Court is well aware, Mr. Desai acknowledged concealing his falsification of ROI studies from Purdy. (DX 5575 at 1; Trial Tr. 5420:20–5422:3). Thus, Mr. Purdy unwittingly used these critical fraudulent materials in the financing process. That conduct bears directly on the relative contributions to the financing losses, alongside Mr. Purdy's responsibilities in obtaining the financing.

In discussing his offense conduct at the time of his sentencing, Mr. Purdy acknowledged with "intense remorse" his failings that led to his conviction:

> Looking back at what happened within the sponsorship organization I have so many agonizing regrets. I regret that this happened in a business where I was a leader. I regret focusing on many reactive issues instead of the proactive needs of the business. I regret not understanding the business better. I regret not focusing on the details of every email I received. I regret not asking more questions. I regret my lack of suspicion. I regret many of the assumptions I made that I now know to be false. Most of all, I sincerely regret that I disregarded the warning signs—all of which were introduced at trial.

(Dkt. 757, Exhibit 1 to Defendant Brad Purdy's Sentencing Memorandum, at p. 10). Mr. Purdy recognizes that he will have to live with the fact of his failings for the rest of his life, and having looked inward, he is utterly disappointed in himself and full of self-reproach. As he explained to the Probation Officer:

> With the benefit of hindsight and with having seen all individual items of evidence that that the prosecution introduced against me, I certainly wish that I had been far more attentive to what was and was not happening at Outcome Health while I was there, that I had asked more questions, that I had explicitly responded to certain emails, that I had been more suspicious or questioning of others, and that I had recognized something was not right. I have been very angry and disappointed with myself, agonizing over what I could and most certainly should have done differently. I cannot believe I have put myself in this position.

(Defendant's Written Submission, attached to PSR, at 2).

### III. Financial Benefit and Present Resources Further Support Apportionment

The economic circumstances of both the offense conduct and of Mr. Purdy personally also support apportionment along the lines that we urge. First and foremost, the offense conduct produced markedly different financial benefits. Mr. Shah and Ms. Agarwal, the founders and owners of Outcome, received bank-loan distributions measured in tens of millions of dollars, followed by the much larger distributions to Gravitas from the 2017 capital raise. (GX 502, 505, 571, 572, 1082; Trial Tr. 8199:4–19, 8201:5–20, 8223:5–8224:16). Mr. Purdy, on the other hand, had a negligible interest in Context Media and, as such, did not receive a penny of lender or investors funds. Mr. Purdy simply drew a salary. To be sure, following his promotion to CFO, Mr. Purdy's annual salary grew to a $500,000 by 2016. (Trial Tr. 8274:17–8275:12 (citing GX 1947 & GX 1947a)). But the record is clear that, while Mr. Purdy may have hoped for an ownership interest in the company in the future, it never came to fruition. (*Id.* at 7397–99; *see also id.* at 7398:25–7399:5 ("Q. As part of its audit work, I have not seen Deloitte obtaining any actual legal instruments which show an ownership interest corresponding to any of these. Is that right? A. Not that I recall specific to him, no. Q. And we haven't seen any today, have we? A. No."); *id.* at 7399:19–21 ("Q. And sitting here today, do you have any idea at all what actual legal equity interest Mr. Purdy had in the company? A. No.")). Mr. Purdy's lack of ownership interest is manifest in the fact that he did not participate whatsoever in the massive distributions and dividends disbursed to his co-defendants following the various transactions with the victim lenders and investors. (*Id.* at 8198:16–8199:19 (citing GX 572 (referencing distribution in amount of $7,552,321.44)); *id.* at 8200:15–8201:20 (citing GX 571 (referencing distribution in amount of $30,209,285.78)); *id.* at 8223:5–8226:6 (citing GX 1082 & GX 1254 (referencing dividend in amount of $225,000,000)).

In contrast, from 2012 (when he joined Outcome) to February 2018 (when he resigned), Mr. Purdy earned a total of $1,630,044.98 in compensation. The disparity in actual benefit adds weight to the differences in authority and conduct: the employee who helped obtain the financing did not share in the founders' receipt of its proceeds.

Finally, Mr. Purdy's present economic circumstances further support an apportionment and steep reduction of his restitution obligations. He did not work over large swaths of time after he left Outcome in February 2018. Six months later, in August 2018, he landed a position with Carbon Health, a technology-enhanced heath care provider offering primary and urgent care services, but he resigned in October 2019 when he learned of his impending indictment in this case. He remained unemployed until November 2021, when on a contract basis he became the Chief Strategy Officer for Flowcode, a technology and data platform company that specializes in offline-to-online marketing software and consumer analytics. He took a leave of absence in early 2023 to devote himself to trial preparation and resigned in April 2023 after the jury verdicts in this case. Over that time, Mr. Purdy burned through his savings to support himself and pay whatever he could for his defense. Thus, at the time of sentencing, Mr. Purdy had a significant negative net worth. (See, PSR Supplemental Report dated June 21, 2024, at p. 2).

Fortunately, recognizing his many talents and work ethic, Flowcode re-hired Mr. Purdy as a full-time employee in July 2025 when Mr. Purdy completed serving his sentence and was placed on supervised release. Mr. Purdy currently serves as Flowcode's Chief Growth Officer. While he is gainfully employed and is once again optimistic for his future, his financial condition has not appreciably improved since the time of his sentence. (See, Ex. A, Mr. Purdy's Current Financial Statement submitted under seal).

Mr. Purdy's responsibilities were significant but subordinate to the founders' control of the

enterprise and distinct from Mr. Desai's direction of sponsorship. He received employment compensation and none of the loan or investor distributions. His personal resources were then largely depleted in financing his defense and supporting himself during lengthy periods of unemployment. An obligation equal to his full tenure's compensation would extend far beyond the assets now available to him and require a continuing commitment from future earnings. These facts give the compensation reference a basis in both factors Congress identified in § 3664(h), while leaving the ultimate amount to the Court's judgment.

Mr. Purdy understands that an allocation in this amount would represent considerable leniency in relation to the victims' losses. It would nevertheless be a substantial obligation in the life he is now rebuilding. At sentencing, the Court recognized his efforts at rehabilitation and his ability to contribute positively in the future. (Sent. Tr. 49:11–24). He hopes to justify that confidence through his work, his relationships, and the sustained effort to meet his financial responsibilities.

## IV. The Court Should Adopt a "Hybrid Approach" to the Apportionment of Restitution.

For these reasons, we respectfully request that the Court not make Mr. Purdy jointly and severally liable for the full amount of the victims' losses. Notably, courts sometimes apply a "hybrid approach" in fashioning a restitution order. *See generally United States v. Trigg*, 119 F.3d 493, 497 (7th Cir. 1997); *United States v. Yalincak*, 30 F.4th 115 (2d Cir. 2022); *United States v. Sheets*, 814 F.3d 256 (5th Cir. 2016); *see also United States v. Salti*, 59 F.4th 1050 (10th Cir. 2023) (citing *United States v. Harris*, 7 F.3d 1537 (10th Cir. 1993)). The Court has the discretion to employ this "hybrid approach" by which the Court may apportionlater Mr. Purdy's liability while concurrently making all (or some of) the defendants jointly and severally liable for the full amount of restitution due to the victims. *See, e.g.*, *Trigg*, 119 F.3d at 501 (Seventh Circuit upheld restitution

order requiring the primary defendant to pay full loss amount, whereas two co-defendants were liable to pay restitution for some—but not all—of the full amount). Here, the Court should employ the "hybrid approach" in crafting its restitution order by apportioning liability among Mr. Purdy and his co-defendants while simultaneously making his co-defendants jointly and severally liable for restitution.

## V. Conclusion

For the reasons stated above, Mr. Purdy hopes the Court will consider an aggregate restitution limit based on his full compensation of $1,630,044.98, or another individual amount it considers appropriate. He remains sorry for his conduct and the harm that resulted. He is grateful for the Court's consideration of an obligation that recognizes his responsibility while allowing him to continue rebuilding a stable and productive life.

Dated: September 30, 2026

Respectfully submitted,

BRAD PURDY

By: */s/ Theodore T. Poulos*
Theodore T. Poulos
COTSIRILOS, POULOS & CAMPBELL, LTD.
55 E. Monroe St., Ste. 3250
Chicago, IL 60603
(312) 263-0345
tpoulos@cotsiriloslaw.com

*Counsel for Brad Purdy*