**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| -v- | ) | No. 19 CR 864-4 |
| | ) | Hon. Thomas M. Durkin |
| ASHIK DESAI | ) | |
| | ) | |
| Defendant. | ) | |

**ASHIK DESAI'S POSITION PAPER IN SUPPORT OF APPORTIONMENT OF RESTITUTION**

ASHIK DESAI, through his attorney, Jacqueline Jacobson, respectfully requests that the Court exercise its discretion under 18 U.S.C. § 3664(h) and apportion restitution attributable to him in an amount no greater than $1,471,563, the total amount of his earned income during his employment at Outcome Health (Outcome). In support, Mr. Desai submits the following information and argument.

## I. INTRODUCTION

This case involves two overlapping fraud schemes: (1) a scheme to defraud pharmaceutical companies (customers) and, (2) a scheme to defraud investors and lenders. The Court found that restitution is owed to the investor and lender victims, but not to the customer victims. Dkt. 1045 at 35.

While Ashik was integral to the customer fraud, his role in the lender and investor fraud was significantly less than that of his co-defendants. Ashik did not

originate it, did not directly contribute to investor and lender losses, and did not benefit from it. As such, apportionment is justified in this case.

## II. BACKGROUND

Rishi Shah founded Outcome in 2006 and served as CEO. Shradha Agarwal joined Outcome in 2008 and became its President and Co-Founder in 2013. Brad Purdy joined Outcome in 2012 and eventually assumed the role of COO and CFO. Ashik started working full-time at Outcome in 2013. Shah put Ashik in charge of the Sponsorship Sales team, and he reported directly to Shah the entire time.

Within just a few days at Outcome, Ashik observed his co-defendants selling inventory that Outcome did not have and billing customers as if Outcome had delivered in full. The ongoing fraudulent practices were also made obvious to Ashik through his participation in email communications, phone calls, and in-person meetings with his co-defendants. Ashik willingly joined in the customer fraud and came up with new ways to conceal it.

The customer fraud was so pervasive at Outcome that the ever-growing gap between the performance promise and the reality became widely known among Ashik and his co-defendants as the "delta." As the delta grew, numerous issues cropped up that threatened to expose the customer fraud. Ashik worried that if that happened, Outcome would come crashing down. To prevent that, Ashik, with both the direct and tacit approval of his co-defendants, manipulated key numbers in third-party campaign performance reports (ROI) and participated in providing false

campaign performance data to Deloitte & Touche LLP (Deloitte) and Outcome's internal accounting team.

Ashik was aware of Shah and Purdy's efforts to raise capital in 2016 and 2017 for Outcome. Like his co-defendants, Ashik knew about the delta and efforts to conceal it, so he also knew that Outcome's financial statements were inflated and that some of the false ROI reports were part of the investors' data room. Using this false financial information, Outcome secured $485 million in loans from various lenders in 2016. Shah and Agarwal obtained dividends of $30.2 million and $7.5 million respectively from the loans. In 2017, Outcome raised about $487.5 million from investors. As part of the capital raise, Shah and Agarwal received a $225 million distribution. Ashik did not receive any fraud benefits or bonuses during his tenure at Outcome and only received his salary.

When Outcome's massive fraud was revealed in 2017, Ashik was put on administrative leave, and his co-defendants blamed him for the entire fraud. Ashik pleaded guilty and testified against his co-defendants at trial, where they persisted in blaming him for a fraud that began before he started working at Outcome, and from which they benefitted. The jury, this Court, and the Seventh Circuit rejected this defense. *United States v. Shah*, 185 F.4th 769, 793-95 (7th Cir. 2026); *see also* Dkt. 893 at 55 (calling the trial defense that Ashik committed this fraud by himself "ridiculous." "You couldn't have committed it all by yourself. And, of course, you didn't. You did it with the three defendants that went to trial.")

## III. LEGAL STANDARD

18 U.S.C. § 3664(h) permits judges to apportion restitution liability among defendants in a case where multiple defendants contributed to a victim's loss. Section 3664(h) is explicitly discretionary ("may apportion"). The Seventh Circuit has confirmed a district court's authority to apportion restitution among defendants under Section 3664(h). *United States v. Sensmeier*, 361 F.3d 982, 990 (7th Cir. 2004); *United States v. Trigg*, 119 F.3d 493, 501 (7th Cir. 1997). Courts are not required to follow any particular analysis in determining the appropriate restitution. *United States v. Salas-Fernandez*, 620 F.3d 45, 49 (1st Cir. 2010). The Court can consider, among other things, a defendant's relative culpability and financial resources. *Id*. The Court can also consider a defendant's lack of benefit from the fraud in contrast to other defendants' gains from the fraud. *See United States* v. *Executive Recycling*, 953 F.Supp.2d 1138, 1156 (finding apportionment appropriate where "the Defendants did not benefit equally from the fraud" because one defendant "was a salaried employee who did not profit from the fraudulent conduct in any significant way," while his co-defendant "was the president and sole shareholder" of the company).

## IV. ARGUMENT

There is good cause for apportionment in this case given the different contributions the defendants made to the lender and investor losses and because the defendants did not benefit equally. *United States v. Yalincak*, 30 F.4th 115 (2d Cir. 2022) ("joint and several" restitution orders may not be equitable in cases

where "one defendant organizes a criminal scheme and enlists numerous others to play limited roles in a crime."). Ashik played a limited role in the investor and lender loss and did not benefit at all. Consistent with this, Ashik's plea agreement expressly allows him to request apportionment of restitution liability among the defendants. Dkt. 48 at 19.

The government has already described Ashik's role in the 2017 capital raise as minor. Dkt. 878 at 9. It is clear from the indictment that this is how it viewed Ashik's role from the beginning. Ashik was not charged with the three counts of wire fraud related to investor fraud (Counts 22, 24, and 26) or the counts related to lender fraud (Counts 7, 8, 9, and 13). Dkt. at 14. Also telling is that Ashik's name is absent from the paragraphs in Count One describing the inducement of Deloitte to approve Outcome's 2015 and 2016 false financial information (Paragraphs 14, 15, and 16) and the efforts to deceive investors and lenders (Paragraphs 17-30). *Id*.

Instead, as the government succinctly explained, in its sentencing memorandum, Dkt. 878 at 9:

> Desai played a minor role in the 2017 capital raise. During 2016 and 2017, Shah and Purdy met with numerous investors to raise capital for Outcome. Desai knew about Shah and Purdy's efforts to raise capital because, at the direction of either Shah or Purdy, Desai talked with some of the potential investors about Outcome's business and answered their questions. Desai knew that the potential investors had been provided with Outcome's financial information. Since Desai knew about Outcome's deltas and because he knew that the deltas had been concealed from clients and Deloitte, Desai knew that some of the financial information provided to investors, including revenue, was inflated.

The trial evidence confirms this. There is no evidence that Ashik personally lied to investors. Ashik had no authority to raise capital for Outcome, nor was he

asked to do so. Ashik was not included on important emails about the capital raise or privy to the details. Ashik talked with a few investors, but this was at Shah or Purdy's direction and the conversations were limited to discussing or answering questions about Outcome's business. Dkt. 878 at 9. Ashik was not at key investor meetings and Ashik did not develop relationships with the investors to gain their trust and admiration. In contrast, "Shah lied directly to investors to get them to fund the capital raise and his dividend payout" and continued to lie to them even after the Wall Street Journal article to keep his dividend. Dkt. 750 at 19. *See also id*. at 17-18 (discussing trial testimony and documents revealing how "calculated Shah was in convincing investors" to invest).

The government does not even mention Ashik as having a specific role with respect to the lender fraud in its sentencing memorandum, or version of the offense. Nor does the PSR. Here too, Ashik's role rests on Ashik's knowledge of the customer fraud and the efforts to conceal it. Ashik did not provide the lenders with false information. Ashik did not sign, review, or discuss any loan agreements or term sheets internally or with lenders. Ashik did not participate in putting together presentations or information for the lenders. He did not attend any presentations to the lenders, and he did not guarantee the accuracy of any financial information provided.

There is no doubt that Ashik's supervision of other employees in the efforts to mislead Deloitte is an aggravating factor, but it does not change the analysis. Ashik did not act alone in deceiving Deloitte. Ashik sought Purdy's guidance on how large

a delta Outcome could show to Deloitte because Purdy was the CFO and Purdy knew about the large deltas. Tr. 3989: 8-17. Significantly, Ashik did not sign false management representation letters or lie to Deloitte during audit inquiry meetings in pursuit of a clean audit. Dkt. 750 at 15-16; *Shah*, 185 F.4th at 794 (describing Shah as at the "epicenter" of the customer fraud, including making false statements to Deloitte during its audits to secure funding); *Id*. at 795 (concluding that Agarwal knew about the fraud, "took affirmative steps to further or hide it" and around the time of the capital raise "provided information to Deloitte in fraud inquiry meetings and management representation letters without ever apprising the auditors of Outcome's true financial health.")

Moreover, Ashik had no responsibility for Outcome's financial statements, he did not review them, and he did not even have access to them. Finally, unlike Shah, Ashik did not seek a clean audit to raise money for Outcome or enrich himself. While Shah lied directly to Deloitte in pursuit of his goal to "become a billionaire founder," Dkt. 750 at 1, Ashik worried that Deloitte's probe threatened to expose the large delta to customers, which could result in millions of dollars in make-goods, lost business, and revenue implications for those years. Tr. 3992: 11-19.

In short, Ashik, like his co-defendants, knew that Outcome's financial information was inflated, but he did not lead Outcome's capital raise, he did not lie to the investors and lenders to convince them to give money to Outcome, and he did not benefit. Ashik was not a founder of Outcome, he had no equity in the company

or promise of equity, and he only received his salary during his entire tenure at Outcome.

## V. ASHIK'S SALARY IS SUFFICIENT RESTITUTION

Ashik acknowledges that his conduct in the customer fraud had a "trickle-down effect" in the lender and investor fraud and that he should contribute to their restitution. Dkt. 893 at 13. Ashik received $1,471,563 in salary during his employment (2013-2018) at Outcome. Ashik's salary was not a direct benefit of the fraud, and he legitimately earned it. *See* Dkt. 849 at 522-23 ("The majority of sales of your [Shah] company were legitimate. This was not a Ponzi scheme" and "much of this company was legitimate."). Ashik's conduct was not motivated by greed, or a desire to live an extravagant lifestyle. *See* Tr: 10345: 21-23 ("Every lie that Ashik told at Outcome was in service of Rishi Shah and Shradha Agarwal and their business.") Outcome did not pay Ashik's legal fees associated with this case and he spent most of that money over the last nine years paying them. As such, this amount represents a significant economic sacrifice for Ashik and, for the reasons stated above, sufficiently addresses the harm that Ashik contributed to the investor and lender losses.

We leave to the Court's decision whether to order hybrid restitution in this case or strictly an apportioned restitution amount. Hybrid restitution ensures that the most culpable offender is liable for the full amount of loss, while lesser participants can be required to contribute lesser amounts. *Yalincak*, 30 F.4th at 124. Under the hybrid approach, a defendant's restitution obligation only ends

when the defendant has paid his apportioned amount in full or the victim has been paid in full. *Id*.

## VI. CONCLUSION

Nine years have passed since Ashik left Outcome. Ashik has pleaded guilty, cooperated, testified, served his jail sentence, served almost half of his supervised release, maintained steady employment, and became a husband and father. The final step in closing this case and moving forward for Ashik is to pay restitution to the victims. For the reasons stated above, we respectfully ask the Court to order Ashik to pay apportioned restitution in an amount no greater than $1,471,563.

Respectfully submitted,

Ashik Desai,
By: /s/Jacqueline S. Jacobson

Dated: September 30, 2026

Jacqueline S. Jacobson
Law Offices of Jacqueline S. Jacobson
53 West Jackson, Suite 1332
Chicago, Illinois 60603
jackie.jacobson@jjdefense.com
www.jjdefense.com