**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | |
| v. | ) | No. 19 CR 864 |
| | ) | Judge Thomas M. Durkin |
| RISHI SHAH, *et al.*, (SHRADHA AGARWAL) Defendants. | ) | |

**DEFENDANT AGARWAL'S MEMORANDUM ON THE ALLOCATION OF RESTITUTION UNDER 18 U.S.C. § 3664(h)**

Defendant Shradha Agarwal, through counsel, respectfully submits this memorandum concerning allocation[1] of restitution pursuant to the Court's August 19, 2026, Memorandum Opinion and Order (R. 1045).

## INTRODUCTION

The Court has determined the losses for which restitution is due to two sets of victims: lenders (from the December 2016 loan) and investors. The remaining question is how those losses should be apportioned among the defendants under 18 U.S.C. § 3664(h), which permits the Court to consider each defendant's "level of contribution to the victim's loss" and the "economic circumstances of each defendant" to apportion liability.

At sentencing, the government described Ms. Agarwal's role in both "the capital raise in 2017" and "the effort to borrow money from banks prior to that in 2016" as "very minimal." R. 850 (Agarwal Sent. Tr.) at 43:23–44:1. In its sentencing memo the government likewise acknowledged that "there is no dispute that Agarwal played a sideline role in bringing those funds into the company." R. 768 at 5. The Court reached a similar conclusion: "You're not involved as the other defendants in the fund-raising, but you benefited from it." R. 850 (Agarwal Sent. Tr.) at 89:17–18.

[1] The defense uses "apportionment" and "allocation" interchangeably.

Her limited involvement, as well as her financial circumstances, warrant different treatment of Ms. Agarwal's restitution judgment. With respect to the December 2016 loan, she was uninvolved and only marginally aware, as is detailed below. No portion of the December 2016 lender losses should be allocated to Ms. Agarwal. Her role in obtaining the 2017 investor fundraising was peripheral, and an individualized allocation under § 3664(h) should reflect her significantly lower level of contribution.

The $6.2 million the government attributed as gain to Ms. Agarwal from the 2017 raise provides a reasonable and objective measure for fixing a cap on her joint-and-several liability for investor loss. R. 480 (June 16, 2023 Tr.) at 13:21–14:4. This government-calculated amount provides a transaction-specific basis for Ms. Agarwal's apportioned share, consistent with the approach in *United States v. Kerekes*, No. 09 Cr. 137, 2012 WL 3526608, at *4–5 (S.D.N.Y. Aug. 15, 2012), aff'd, 531 F. App'x 182, 184–85 (2d Cir. 2013), and consistent with this Court's conclusion that, "[y]ou're not involved as the other defendants in the fund-raising, but you benefited from it." Agarwal Sent. Tr. at 89:17–18.

Ms. Agarwal agreed to a $13.7 million forfeiture judgment, and substantial assets remained available for forfeiture precisely because she had not dissipated them through personal spending. R. 468; R. 850 (Agarwal Sent. Tr.) at 49–50. The government has consistently stated its intention to seek restoration or remission of forfeited funds to victims, R. 480 (June 16, 2023 Tr.) at 22:6–16, and the Court has recognized that, to the extent forfeited funds are ultimately applied to restitution, they would reduce the outstanding restitution obligation. R. 741 (June 14, 2023 Tr.) 5:25–6:9.

Accordingly, Ms. Agarwal requests a hybrid order under which her apportioned share of the December 2016 lender restitution is zero, her joint-and-several liability for investor restitution is capped at $6.2 million, and amounts actually recovered from her and paid to the restitution victims are credited against that cap. Her present economic circumstances provide additional support for that individualized allocation.

## BACKGROUND

### A. Ms. Agarwal's Sideline Role in Raising Money is Well-Established.

The government's description of Ms. Agarwal's actual role at Outcome Health provides useful contrast to her role in the financings. At sentencing the government explained that, beginning approximately in late 2013 or 2014, Ms. Agarwal's role returned to patient content, education, and other areas of the business in which she had long been focused. The government stated that her involvement in sales after that time period was "essentially nonexistent." R. 850 (Agarwal Sent. Tr.) at 43. It explained:

> [H]er role at the company did again kind of focus on — on the good part of the company, the part that she cared the most about. . . . That's what she wanted to do, and that's what she did. And that's the role that she carved out for herself and she played from 2014 through 2017, probably even starting in late 2013.

*Id*. at 43. The Court made a similar observation noting that Ms. Agarwal "was off on a different aspect of this company." *Id.* at 22. Later, the Court described her focus more broadly: "all of your interests in this company related to patient welfare, patient education, working in a startup business, helping people who worked there." *Id.* at 95.

The government drew the same distinction when addressing the financings: "[n]ow, similar things can be said about the capital raise in 2017 and — and the effort to borrow money from banks prior to that in 2016. She — her role in — in both of those was very minimal." *Id.* at 43:23–44:1.

The government's principal financing-related argument at sentencing was that Ms. Agarwal signed management representation letters ("MRL") and attended management inquiry meetings with Deloitte, and that a clean audit was necessary for the financings. *Id*. at 44:1–8. But the government acknowledged that the Deloitte work paper "doesn't differentiate between the three of them" and that "someone probably took the lead in making those representations. I posit that it probably wasn't Ms. Agarwal." *Id.* at 44:11–21. The Court later made a similar observation: "I don't

know what words you said, and I doubt you said it – but you were there when the words were said." *Id.* at 89:21–23.

The Court declined to apply any aggravating-role enhancement; the defense had argued that Shah "was the impetus behind the fundraising" and that Agarwal "had very, very limited involvement in that." *Id.* 31:2–5, 31:11–24. In addressing the fundraising directly, the Court found: "You're not involved as the other defendants in the fund-raising, but you benefited from it." *Id.* at 89:17–18. At Purdy's sentencing, the Court found that Shah "ran the show," "had the most to gain financially," and "was the person who is responsible for this mess." R. 851 (Purdy Sent. Tr.) 47:13–15.

**B. Ms. Agarwal was Outside of the December 2016 Lender Financing Process**

The lender victims identified in the Court's restitution order arise from the December 2016 credit facility used to acquire AccentHealth and related secondary-market purchases. R. 1045 at 29–32. JP Morgan witness James McHugh was the lead arranger, and he identified other executives, not Ms. Agarwal, as the "primary contact" for the financing, as attending ratings-agency meetings, and attending a lender meeting in New York. Trial Tr. 7821:1–3; 7781:7-18; 7782:12-24. Asked about Ms. Agarwal directly, McHugh agreed that "she had no role in providing financial information," and that, with respect to the December lender presentation, "[s]he was not involved at that presentation." *Id.* at 7844:13–15; 7844:22–7845:2.

The documentary evidence shows a similar lack of involvement. Ms. Agarwal was not among the recipients when JP Morgan circulated the lender presentation. GX 671. She was not copied on the diligence questions or materials, and was not a signatory to the credit agreement. Trial Tr. 7824–30; GX 698. Shah signed the credit agreement. *Id.* 7797:19–21. The proceeds were used to refinance existing debt, purchase AccentHealth, and pay fees; there was no founder distribution from that transaction. *Id.* at 7790:20–25.

**C. The Deloitte Audits Span Two Cycles**

The Deloitte audit history spans two distinct audit cycles, and the timing is relevant to apportionment. The first management representation letter, dated March 23, 2016, related to Deloitte's audit of Outcome's 2015 financial statements. GX 561. That audit preceded the December 2016 lender transaction and was among the information considered by lenders. It also preceded the employee allegations that surfaced to Ms. Agarwal in early 2017. The second audit cycle occurred after the December 2016 loan had already closed.

The timing of the second cycle is important to the 2017 investor raise. Desai testified that negotiations with Goldman Sachs were occurring in late 2016 and early 2017 and that Shah and Purdy had taken the lead for Outcome. Trial Tr. 3817:11-16. Goldman Sachs invested on March 1, 2017, and CapitalG on March 20, 2017. *Id*. at 6695, 8222. Ms. Agarwal signed the second management representation letter, and Deloitte issued its audit of the 2016 financial statements, on March 29, 2017. *Id*. at 7128. Leerink invested later, on April 28, 2017. *Id*. at 8221. The March 2017 management representation letter and audit could not have contributed to the December 2016 lender decision or to the earlier Goldman and CapitalG investment decisions.

**D. Ms. Agarwal was Likewise Outside the Core Fundraising Process**

Consistent with the government and Court's statements at sentencing, the investor testimony likewise distinguishes Ms. Agarwal's role from those who spearheaded the fundraising. Goldman Sachs investment-committee co-chair Kenneth Eberts testified that he did not meet Ms. Agarwal during Goldman's due-diligence period and had no expectation that she would make representations or disclosures to him concerning the operation of the business. Eberts recalled Ms. Agarwal as "someone who was not involved in the day-to-day of the business." Trial Tr. 6859–60. CapitalG's Laela Sturdy identified the principal diligence contacts directly:

> The primary contact for getting the data was Brad from getting it from the data room and process-wise. But I would say Rishi was also a primary contact for questions that we had around diligence.

*Id*. at 8691. She met Ms. Agarwal only during a January 20 visit to Chicago and their discussion was "mostly around product, content, and culture." *Id*. at 8613. Her ongoing communications before and after the visit to Chicago continued to be with others, not Ms. Agarwal. *Id*. at 8593, 8600, 8631.

Leerink's Todd Cozzens gave a similar account. With regard to a meeting in Boston, Cozzens said, "we usually have our entire team meet the team of the company that we're going to invest in." Trial Tr. 7908. The Outcome meeting team did not include Ms. Agarwal. *Id*. at 7910; GX 929. Asked about his interactions with Ms. Agarwal, Cozzens answered: "Not a lot," and described those interactions as concerning the company's founding and mission. *Id.* 7894.

The government's summation of all the financings reflected the same distinction in role. It singled out Shah by saying, "Shah's lies to investors made him and Agarwal $225 million." Id. at 8775. In rebuttal, again, it distinctly excluded Ms. Agarwal when naming others who were "involved in raising the money very intimately." *Id*. at 10424. Those statements are relevant to allocation because the government's own trial theory distinguished Ms. Agarwal's limited involvement from those who had a direct fundraising role.

**E. The Government Has Already Calculated a Transaction-Specific Amount Attributable to Ms. Agarwal From the 2017 Raise**

The 2017 capital raise generated a $225 million dividend to Gravitas Holdings, an entity wholly owned by Outcome Holdings and controlled by Shah. Trial Tr. 8469:18–21; R. 850 (Agarwal Sent. Tr.) at 49:21–25. Those funds remained in Gravitas when the fraud became public. Trial Tr. 6823:21–24. At sentencing, the government acknowledged that Ms. Agarwal had not personally taken or spent those funds. R. 850 (Agarwal Sent. Tr.) at 49–50. In the January 2018 civil settlement, most of the $225 million went back to the investors, the lenders, and the company. The government said, "they retained 31 million" when summarizing what was left in Gravitas Holdings. R. 741 (June 14, 2023 Tr.) at 13:10–12.

When calculating forfeiture, the government applied Ms. Agarwal's ownership percentage to that retained amount to calculate her share:

> And we did the same analysis for Agarwal, and she did not object. And we did the same thing, we just added the two components of Agarwal's dividends, which would have been 20 percent times 31 million for that first part. And then the second component was how much she received from the April 2016 bank loan.

R. 480 (June 16, 2023 Tr.) at 13:21-25. Twenty percent of $31 million is $6.2 million. The remaining portion of her $13.7 million forfeiture judgment derived from a dividend associated with the separate April 2016 loan. R. 468; R. 480 (June 16, 2023 Tr.) at 13:21–14:4. The April 2016 lenders are not among the restitution victims identified in the Court's current order. R. 1045 at 38.

To be clear, Ms. Agarwal did not historically receive past dividends proportionate to her ownership percentage and was sometimes not even aware of payments that were due to her. For example, at sentencing, defense counsel explained that Ms. Agarwal first learned during the Sixth Amendment proceedings of a JumpStart account that had received approximately $12 million in dividends. Despite her economic interest in the entity, she was not notified nor did she receive her corresponding share. R. 850 (Agarwal Sent. Tr.) at 62–63.

**F. Ms. Agarwal's Economic Circumstances**

Ms. Agarwal has not been employed since January 2018, nearly nine years. The pendency and consequences of this case have constrained her ability to return to conventional employment, and her future earning prospects remain uncertain. During that period she has supported herself from non-forfeited savings, which have declined substantially as they have funded ordinary living expenses and continuing legal expenses over the course of these proceedings. She presently has no earned income. At sentencing, the government observed that Ms. Agarwal "appears to have spent very little" of the money she received and that "[s]he lived quite modestly." R. 850 (Agarwal Sent. Tr.) at 50. The Court previously found, after considering her financial circumstances, that she "does not have the ability to pay a fine." *Id.* at 102:5–6.

Ms. Agarwal also has longstanding family obligations. Her mother has been financially dependent on her for more than a decade, and Ms. Agarwal continues to provide financial support while her mother faces ongoing health challenges. R. 753 at 48. Ms. Agarwal's spouse lost employment following the acquisition of his employer in May 2025 and remains unemployed. Ms. Agarwal and her spouse are separated, and she does not presently rely on him for financial support or anticipate doing so in the future. Any future employment Ms. Agarwal pursues is likely to be in the nonprofit sector, consistent with her longstanding history of work and interests in mission-driven and charitable endeavors. Ms. Agarwal owns a residence in Chicago, but it is pledged as security for her bond and cannot presently be sold. She rented out the property earlier this year in an effort to reduce its carrying costs,[2] but the rent does not fully cover the taxes and substantial association fees.

## ARGUMENT

### I. Section 3664(h) Permits an Individualized Allocation, Including a Capped Joint-and-Several Obligation

The MVRA provides courts the option to apportion restitution amongst codefendants. The Seventh Circuit has treated that choice as a meaningful exercise of individualized discretion. In *United States v. Walton*, 217 F.3d 443, 451–52 (7th Cir. 2000), the district court appeared to believe it was required to impose the full amount of restitution. The Seventh Circuit remanded so that the court could exercise the discretion afforded by § 3664(h).

The Seventh Circuit has upheld full liability where a codefendant equally or fully contributed to the loss. *See United States v. Sensmeier*, 361 F.3d 982, 990 (7th Cir. 2004) (affirming where the defendant was "equally culpable"); *United States v. Moeser*, 758 F.3d 793, 799 (7th Cir. 2014) (affirming where the defendant "fully contributed to the loss"). Here, by contrast, the government

[2] Since renting out her residence, Ms. Agarwal has further reduced her living expenses by pet- and house-sitting in exchange for temporary lodging.

told this Court that Ms. Agarwal's role in both "the capital raise in 2017" and "the effort to borrow money from banks prior to that in 2016" was "very minimal." R. 850 (Agarwal Sent. Tr.) at 43:23–44:1. It has conceded that "there is no dispute that Agarwal played a sideline role in bringing those funds into the company." R. 768 at 5. The Court drew the same distinction: "You're not involved as the other defendants in the fund-raising." R. 850 (Agarwal Sent. Tr.) at 89:17–18.

Even an important contribution to a transaction does not necessarily require full liability. In *United States v. Dafna*, No. 19-CR-408 (MKB), 2025 WL 2822475 (E.D.N.Y. Oct. 3, 2025), the government argued that a defendant's participation in a bank-fraud scheme was "crucial to its success" and warranted full joint-and-several liability. The court agreed that the defendant "had a necessary role" and had admitted knowing that false information was being provided to and relied upon by the victim banks. *Id.* at 32–33. It nevertheless found him "less culpable than his co-defendants" and capped his joint-and-several liability "in view of his lower level of culpability." *Id.* at 33.

That reasoning is pertinent here. Even if the Court concludes that Ms. Agarwal's participation in a Deloitte audit and signing MRLs contributed to a particular financing, that conclusion would not negate the allocation inquiry. Section 3664(h) still requires an assessment of her "level of contribution to the victim's loss" in light of the roles played by the defendants who negotiated the financing, supplied the financial diligence, made the presentations, and communicated directly with the lenders and investors. *Dafna* likewise required the government to establish, "on a transaction-by-transaction basis," the role each defendant played before the court determined the appropriate cap. *Id*. at 33–34.

Finally, § 3664(h) permits a hybrid order combining joint-and-several liability with an individualized cap. *See United States v. Yalincak*, 30 F.4th 115, 125–26 (2d Cir. 2022); *United States v. Shvets*, 154 F.4th 74, 88–89 (3d Cir. 2025). As *Yalincak* explains, a court may "combine apportionment of liability to limit the restitution obligation for some participants" while leaving

others liable for the full loss. 30 F.4th at 125–26. That structure preserves the victims' entitlement to full restitution while allowing the Court to reflect each defendant's individual level of contribution.

## II. No Portion of the December 2016 Lender Losses Should Be Apportioned to Ms. Agarwal

The December 2016 lender losses present the clearest opportunity to implement § 3664(h)'s individualized inquiry. Ms. Agarwal received no funds from this loan. Moreover, trial made clear that Ms. Agarwal was outside the process of obtaining the loan. *See supra* at pp. 4-5. The 2016 Deloitte audit, "one of the factors" considered by lenders, was an audit of the 2015 financials. Trial Tr. 7833:9-12. The employee allegations that became central to the government's case, and which the Court noted at sentencing, arose in early 2017, *after* the December 2016 loan had closed. The March 29, 2017 management representation letter and associated inquiry meeting also post-dated the lender transaction.

Contemporaneous documents not used at trial but presented during sentencing further verify that Ms. Agarwal was not part of the loan. In a November 14, 2015 email to Shah, attached to the defense sentencing memo as Exhibit O, Ms. Agarwal wrote that she was being kept in the dark regarding fundraising and that "all our most important conversations – banks, investors, lawyers – are happening without me." R. 753 at Ex. O. The government acknowledged the significance of that email, stating that, "regardless of whether Shah began reading Agarwal into more about Outcome's debt and capital raises… there is no dispute that Agarwal played a sideline role in bringing those funds into the company." R. 768 at 5.

In the past, the government has cited Shah's August 2016 email stating that he wanted to "keep [her] in the loop" as showing that she was aware of the lending. Trial Tr. 8283:3–14; GX 617. Being kept in the loop is, of course, a far cry from being involved in obtaining the loan. And a "keep in the loop" email is only necessary for people like Ms. Agarwal who were not *actually* in the loop.

Section 3664(h) asks about a defendant's "level of contribution to the victim's loss," not simply awareness of the transaction. Ms. Agarwal provided no contribution to the December 2016 loan.

Assigning Ms. Agarwal a share of the December 2016 lender losses would give dispositive weight to her mere awareness of a financing and her limited audit involvement despite the absence of participation in the lender financing process itself. Section 3664(h) permits the Court to make a more individualized judgment. The defense position is that Ms. Agarwal's apportioned share of the December 2016 lender losses should be zero. This is also consistent with the defense position that Ms. Agarwal's gain is a reasonable estimate of her contribution to victims' losses – and she received no gain from this loan.

## III. Ms. Agarwal's Limited Contribution to Investor Losses Warrants a Cap of $6.2 Million

The investor losses call for a different allocation from the lender losses, but the governing principle is the same: § 3664(h) requires an individualized assessment of Ms. Agarwal's level of contribution. As described above, the principal fundraising activity, including the financial diligence and investor communications, was handled by others. *See supra* at pp. 5-6.

Ms. Agarwal's participation in the Deloitte process is relevant, but it represents only part of the § 3664(h) contribution analysis. Timing also matters. The March 29, 2017 management representation letter and associated audit came after Goldman Sachs and CapitalG had already invested; Leerink invested later. *See supra* at p. 5. The investor losses should therefore be allocated based on Ms. Agarwal's own contribution, rather than treating her role as equivalent to that of the defendants who executed the capital raise.

The investor letters submitted for sentencing likewise reflect the distinction in Ms. Agarwal's role. One investor in the 2017 raise wrote that Ms. Agarwal "was not involved in the fundraising process." R. 753 at Ex. D-6. Another wrote: "As an investor I can attest to the fact that Shradha never once spoke to the financials of the company," and explained that he understood her

focus lay elsewhere in the business. *Id.* at Ex. D-8. The Court also noted the unusual fact that investors who had suffered losses nevertheless wrote that they did not hold Ms. Agarwal responsible for those losses, summarizing their position as: "I invested in Outcome; I lost money, but… I don't hold her accountable for it." R. 850 at 93. These accounts are consistent with the trial testimony, contemporaneous documents, and the government's own characterization of Ms. Agarwal's role.

The remaining question is how to translate that lower level of contribution into a principled cap. The government's own forfeiture calculation supplies a transaction-specific measure. In calculating forfeiture, the government attributed 20 percent of the $31 million retained from the 2017 capital raise to Ms. Agarwal, yielding $6.2 million. R. 480 at 13:21–14:4. That figure is useful not because gain determines restitution, but because once the Court determines that Ms. Agarwal's level of contribution was lower than that of the defendants who were principally responsible for the fundraising, the government's calculation provides an individualized basis for fixing her apportioned obligation.

*Kerekes* supports that use of a less culpable defendant's gain as an approximation of their contribution to a victim's loss. There, the district court first determined the victims' actual loss at approximately $53.6 million. It then apportioned $2 million – the amount of a bonus received by a defendant the court found to have played a "relatively modest role," describing it as the "fairest approach." *United States v. Kerekes*, 2012 WL 3526608, at *4–5. The Second Circuit affirmed, explaining that, once the total restitution amount had properly been based on actual victim loss, it was permissible to use the bonus "to approximate the percentage of the overall loss amount for which the defendant should be responsible." *United States v. Kerekes*, 531 F. App'x 182, 184–85 (2d Cir. 2013).

The appropriate allocation for Ms. Agarwal is therefore joint-and-several liability for the investor restitution, subject to an aggregate cap of $6.2 million based on the amount of her gain.

## IV. Economic Circumstances Provide Additional Support for the Requested Allocation

Section 3664(h) separately directs the Court to consider the "economic circumstances of each defendant" when allocating restitution among multiple defendants. Those circumstances do not alter the amount of the victims' loss, which the Court has already determined without regard to ability to pay. See 18 U.S.C. § 3664(f)(1)(A). They do, however, provide an additional individualized consideration in determining Ms. Agarwal's allocation.

As set out above, Ms. Agarwal has had no earned income since January 2018, has been drawing down personal savings to meet living, family, and legal expenses, and faces uncertain future earning prospects after nearly nine years outside the workforce. *See supra* at pp. 7-8.

Her present economic circumstances independently reinforce the need for an individualized allocation under § 3664(h), particularly where a restitution obligation exceeding $270 million would bear little relationship to either her role in producing the losses or any realistic prospect of additional recovery.

## V. Amounts Recovered from Ms. Agarwal and Distributed to Restitution Victims Should Be Credited Against Her Capped Obligation

Ms. Agarwal agreed to a $13.7 million forfeiture judgment. R. 468. That judgment is more than double the $6.2 million restitution cap requested here. At sentencing, the government acknowledged that Ms. Agarwal "didn't try to hide the money" and "appears to have spent very little of it," calling that "a significant – a very significant mitigating factor." R. 850 (Agarwal Sent. Tr.) at 50. The Court likewise observed that there were "no private jets," "no expensive residences," "no huge artwork purchases," and "no going to casinos," and the government added: "She lived quite modestly." *Id.* Those observations have practical significance here. Though she received a dividend, she did not convert that benefit into an extravagant lifestyle or dissipate it. As a result, significant assets remained available to be restrained and forfeited.

Ms. Agarwal also separately declined to seek the return of over-restrained assets[3] attributable to her, choosing instead to leave those funds available for potential victim recovery. As counsel explained at sentencing, her response was immediate: "Give my share to the victims." R. 850 (Agarwal Sent. Tr.) at 63–64. Counsel further advised the Court that the government's plan was to use those funds for restitution. *Id.* at 64.

The requested $6.2 million cap therefore defines Ms. Agarwal's apportioned restitution obligation under § 3664(h), not the amount of her property that may ultimately be available for victim recovery.[4] The defense requests that when property recovered from Ms. Agarwal is actually restored, remitted, or otherwise distributed to the restitution victims for losses covered by the judgment, the payments reduce *her* remaining obligation and count toward *her* cap. That treatment is consistent with the parties' and the Court's understanding when the forfeiture order was entered. Defense counsel explained that the government had stated its intention "to have any forfeited amounts also offset restitution." June 14, 2023 Tr. 5:14–24. The Court responded:

> I certainly wouldn't order double restitution. If I ordered restitution, it would be offset by any forfeited funds that the government applies. That makes a lot of sense to me, but I think it's ultimately a government decision…

*Id.* at 5:25–6:9. Two days later, the government advised the Court that it intended to recommend "that anything that we obtain from – from Ms. Agarwal or really any of the defendants… be applied against restitution," and doing so "would lower the restitution amount." R. 480 (June 16, 2023 Tr.) at 22:6–16.

A clear accounting mechanism is also necessary because Ms. Agarwal cannot independently determine what property is ultimately distributed. As described above, she does not control Gravitas Holdings or JumpStart Ventures, lacks regular visibility into their finances, and does not control the

[3] The amount returned to Shah was approximately $9.6 million in assets net of Ms. Agarwal's share. Tr. October 23, 2023, p. 5. Her share would have been approximately $2.4 million.

[4] To be clear, Ms. Agarwal does not seek the return of any forfeited funds and hopes that the remainder of the $13.7 million forfeited from her is remitted to the victims regardless of apportionment.

government's remission or restoration process. She therefore may not know whether, when, or in what amount property recovered from or specifically attributed to her is ultimately paid to restitution victims. The government should report any such distributions so that the Court, the Clerk, and the parties have an accurate accounting of her remaining obligation.

**RELIEF REQUESTED**

For the foregoing reasons, Ms. Agarwal respectfully requests that the Court enter a restitution judgment for her providing that:

1. Ms. Agarwal is jointly and severally liable with codefendants for investor restitution, subject to an aggregate cap of $6,200,000;
2. Any amount actually received by the restitution victims from property recovered from Ms. Agarwal, or from an interest specifically attributed to her in the government's recovery process, including property distributed through forfeiture, restoration, remission, or the over-restrained assets she left available for restitution, is first credited against her capped obligation;
3. All other forfeited funds that are remitted to victims are credited against any remaining restitution obligations of Ms. Agarwal; and
4. The government reports to the Court, within a reasonable period, the status and amount of any restoration, remission, or other distribution to the restitution victims from property recovered from or specifically attributed to Ms. Agarwal.

Respectfully submitted,

s/Patrick W. Blegen
**PATRICK W. BLEGEN**, Attorney
for Shradha Agarwal

**BLEGEN & ASSOCIATES**
53 W. Jackson Boulevard
Suite 1424
Chicago, Illinois 60604
(312) 957-0100